# EXHIBIT O


EXHIBIT

# In The Matter Of:

## Tammy Kitzmiller, et al.   v.
## Dover Area School District, et al.

### Heather Geesey
### March 10, 2005

**Filius & McLucas Reporting Service, Inc.**

1427 East Market Street, York, PA

4309 Linglestown Road, Harrisburg, PA

(717) 845-6418   or   (717) 236-0623

Original File HG031005.TXT, 122 Pages
Min-U-Script® File ID: 3817974781

**Word Index included with this Min-U-Script®**

Tammy Kitzmiller, et al.  v.
Dover Area School District, et al.
Case 4:04-cv-02688-JEJ   Document 86-17   Filed 06/15/05   Page 3 of 5
Heather Geesey
March 10, 2005

Page 32

[1] Q: Is it your testimony today that you didn't really
[2] understand what he was talking about?
[3] A: I knew what he was talking about, but I don't — I
[4] couldn't go into theory and tell you what theory — what
[5] all the scientific theories are. I knew he wanted a
[6] balanced curriculum.
[7] Q: Just to be sure I understand it, you didn't understand
[8] at the time what he meant by a balanced presentation of
[9] evolution?
[10] A: That's incorrect. No. I do understand that he wanted
[11] more than one theory.
[12] Q: What did you — this is what I am trying to get at. I
[13] am not trying to argue with you. I just want to
[14] understand what you thought he meant by more than one
[15] theory.
[16] A: Just another scientific theory like the one presented.
[17] Just another one.
[18] Q: Did he explain what other one he was considering or
[19] seeking to consider?
[20] A: No.
[21] Q: Did you have any questions about that?
[22] A: No.
[23] Q: Did you have any understanding about what he was
[24] referring to when he said another theory?
[25] A: No.

Page 33

[1] Q: Did anyone ask him any questions that you remember?
[2] A: No. Not that I remember.
[3] Q: Was there any discussion of his comments?
[4] A: Not that I remember.
[5] Q: There's an allegation in this Complaint which says that
[6] Mr. Buckingham told the Board he was looking for a book
[7] that offered balance between the Biblical view of
[8] creation and Darwin's theory of evolution.
[9] Is that allegation consistent with your memory of
[10] what was said at the meeting by Mr. Buckingham?
[11] A: No.
[12] Q: What is it about that allegation that you don't recall
[13] being said?
[14] A: I do not remember him ever saying — I don't remember
[15] him ever saying what the other — what he wanted to
[16] balance it with.
[17] Q: Do you remember Mr. Buckingham saying that this country
[18] was founded on Christianity, and our students should be
[19] taught as such?
[20] A: No.
[21] Q: Do you have a memory that he didn't make such a
[22] statement?
[23] A: No.
[24] Q: You just don't remember?
[25] A: I just don't remember.

Page 34

[1] Q: When the June 7 meeting was over, did you view this as
[2] an important issue for the Board's consideration?
[3] A: It was something I knew they still had to work on, but
[4] it wasn't my committee. So I didn't really have to
[5] think about it.
[6] Q: Were there any other textbook purchase decisions that
[7] were before the Board at that time?
[8] A: No.
[9] Q: Did you become aware of news reports of that meeting
[10] after the meeting was over?
[11] A: No.
[12] Q: Was there any discussion among Board members after the
[13] June 7 meeting about the news reports of what had
[14] transpired at that meeting?
[15] A: I don't know if it was the June 7th or the other one,
[16] but I remember there was fallacies. It was incorrect.
[17] Q: The other one meaning the June 14th meeting?
[18] A: Right. I don't know — I can't tell the meetings apart.
[19] They run together so I'm not sure. But I remember
[20] people saying what was reported was incorrect.
[21] Q: Tell me which people you are referring to.
[22] A: The Board saying that they were quoted, and it wasn't
[23] true.
[24] Q: Which members of the Board do you remember?
[25] A: Bill, but I don't remember anybody else.

Page 35

[1] Q: Do you recall what Mr. Buckingham said was untrue in
[2] news reports of the June 14 or June 7 meeting?
[3] A: No.
[4] Q: Did you ever look at the articles that described those
[5] meetings to learn more about what Mr. Buckingham said
[6] had been reported inaccurately?
[7] A: No.
[8] Q: Was there any discussion with any other Board members
[9] about the accuracy or inaccuracy of the news reports of
[10] the June meetings?
[11] A: No. It is an ongoing thing, so no.
[12] Q: What is an ongoing thing?
[13] A: The inaccuracies of the newspaper.
[14] Q: How do you know if you don't read the paper that they
[15] are inaccurate?
[16] A: Because everyone says.
[17] Q: Let me put that question in a slightly different way to
[18] be fair about it.
[19] Have you ever looked at any of the news reports
[20] about Dover School District Board meetings that took
[21] place in 2004, printed ones?
[22] A: Yes.
[23] Q: Which reports have you looked at?
[24] A: In October, and I was misquoted.
[25] Q: You are referring to the reports of the October Board

Tammy Kitzmiller, et al. v.
Dover Area School District, et al.

Case 4:04-cv-02688-JEJ   Document 86-17   Filed 06/15/05   Page 4 of 5

Heather Geesey
March 10, 2005

Page 96

[1] gaps and problems were?
[2]  A: The curriculum committee.
[3]  Q: When you say the curriculum committee, do you mean
[4] anybody other than Bonsell and Buckingham?
[5]  A: There should be a third member, but I don't know. I was
[6] relying on Bill and Alan, yes.
[7]  Q: I have about four more questions on this whole subject,
[8] and then we will move to something else.
[9]  A: Okay.
[10]  Q: To this date, to today which is March 10th, have you
[11] ever looked at the contents of the book Of Pandas and
[12] People?
[13]  A: No.
[14]  Q: Have you ever looked at the contents of the biology
[15] textbook by Miller and Levine that was approved in
[16] August?
[17]  A: No.
[18]  Q: Do you have any opinion yourself about whether your
[19] biology textbook by Miller and Levine provides a
[20] balanced approach to the teaching of evolution?
[21]  A: No.
[22]  Q: Again on that subject, you are relying entirely on
[23] Bonsell and Buckingham?
[24]  A: Yes.
[25]  Q: Do you know Noel Wenrich?

Page 97

[1]  A: Yes.
[2]  Q: How do you know him?
[3]  A: He was on the Board.
[4]  Q: When did he leave the Board?
[5]  A: November.
[6]  Q: Of 2004; is that right?
[7]  A: I assume so.
[8]  Q: He was on the Board during the time of the October 18th
[9] meeting we have been discussing; wasn't he?
[10]  A: Yes.
[11]  Q: Did he vote in favor of the change to the curriculum or
[12] against it; do you recall?
[13]  A: I think he was in favor.
[14]  Q: Do you recall any discussion that Mr. Wenrich
[15] participated in to remove any reference to intelligent
[16] design from the curriculum?
[17]  A: I don't remember.
[18]  Q: Do you remember Carol Brown resigning at the end of the
[19] October meeting?
[20]  A: She resigned. I don't know when.
[21]  Q: Do you know why?
[22]  A: No.
[23]  Q: Do you remember her making any statement explaining?
[24]  A: She read a long letter.
[25]  Q: At the October meeting?

Page 98

[1]  A: I don't know when.
[2]  Q: Do you remember what the letter said?
[3]  A: No.
[4]  Q: Do you remember if it had anything to do with the
[5] adoption of the intelligent design curriculum?
[6]  A: I would assume so, but I don't know.
[7]  Q: Have you ever seen the text of the letter?
[8]  A: No.
[9]  Q: Did she give copies to Board members?
[10]  A: No.
[11]  Q: Do you remember a discussion at the October meeting
[12] about the possibility that the Board and the School
[13] District might be sued if they adopted the proposed
[14] change to the curriculum?
[15]  A: No.
[16]  Q: Do you remember if anyone discussed whether the Board's
[17] and the District's regular solicitor would represent the
[18] district in the event of any lawsuit?
[19]  A: Repeat that again.
[20]  Q: Sure. Do you remember any discussion about whether the
[21] District's solicitor would represent it in the event of
[22] any lawsuit over the change in the curriculum?
[23]  A: No.
[24]  Q: Do you remember any discussion about whether the
[25] teachers could be represented by the District's

Page 99

[1] solicitor?
[2]  A: No.
[3]  Q: Do you remember making a statement that if the faculty
[4] insisted on separate legal representation, they should
[5] be fired?
[6]  A: No.
[7]  Q: Do you remember any newspaper article quoting you as
[8] having made such a statement?
[9]  A: Yes.
[10]  Q: How did you learn about that newspaper article?
[11]  A: I read it.
[12]  Q: How did you come to read it?
[13]  A: I'm not sure.
[14]  Q: Did somebody bring it to your attention?
[15]  A: I don't know.
[16]  Q: You don't get the paper at your home?
[17]  A: Correct.
[18]  Q: And the School District doesn't send you clippings at
[19] least not ordinarily; is that right?
[20]  A: Correct.
[21]  Q: But you don't remember how you came across this article?
[22]  A: No.
[23]  Q: Did you do anything about it?
[24]  A: Yes.
[25]  Q: What?

Heather Geesey
March 10, 2005

Case 4:04-cv-02688-JEJ   Document 86-17   Filed 05/16/05   Page 5 of 5

Tammy Kitzmiller, et al. v.
Dover Area School District, et al.

Page 100

[1] A: I spoke to the reporter.
[2] Q: Who was the reporter?
[3] A: Joe Maldonado.
[4] Q: What was the substance of that discussion?
[5] A: I told him I did not say that. I said you know I did
[6] not say that. And he said so, I am putting my kids
[7] through college.
[8] Q: When did you have that discussion?
[9] A: Shortly after that was in the paper.
[10] Q: I am going to have this marked as Exhibit 29.
[11] (Deposition Exhibit 29 was marked.)
[12]                BY MR. SCHMIDT:
[13] Q: Have you seen this document before?
[14] A: Yes.
[15] Q: When?
[16] A: When I typed it.
[17] Q: Have you seen this document with the handwriting on it
[18] before?
[19] A: No.
[20] Q: Let me say that what we are marking as P-29 has been
[21] Bates stamped 346. It is part of the defendants'
[22] production.
[23] It is a copy of an e-mail dated Wednesday, October
[24] 20th, 2004 at 9:11 a.m..
[25] Did you send this e-mail?

Page 101

[1] A: Yes.
[2] Q: Is HADLEY96 at aol.com your home e-mail address?
[3] A: Yes.
[4] Q: Just checking. When you were asked to produce documents
[5] by counsel for the defendants, did you produce copies of
[6] any things that were on your e-mail?
[7] A: I don't have anything.
[8] Q: How do you know?
[9] A: I don't save anything.
[10] Q: Were there any items that you either sent or received by
[11] e-mail that had anything to do with your service as a
[12] member of the Dover Area School District Board of
[13] Directors?
[14] A: No.
[15] Q: This is the only one?
[16] A: Yes.
[17] Q: How can you be so sure?
[18] A: That is my home e-mail address. I don't use that.
[19] There's nothing there.
[20] Q: Do you use any other e-mail address?
[21] A: There is a school one, and there is nothing on there
[22] either.
[23] Q: When you say there is a school one, do you receive
[24] school e-mails at your home?
[25] A: Yes.

Page 102

[1] Q: At a different address, but on your home computer?
[2] A: You can access through, yes.
[3] Q: I don't want to be confusing, and I'm easily confused on
[4] this subject.
[5] You have a computer at your home; right?
[6] A: Yes.
[7] Q: And you have a school based address because you are a
[8] member of the School Board; is that right?
[9] A: I access their website because there's an e-mail there.
[10] Q: So you can use the School District's website to exchange
[11] e-mails with people?
[12] A: Yes.
[13] Q: Do you do that? Have you ever done it?
[14] A: I have.
[15] Q: Have you done it daily, weekly, monthly?
[16] A: No. I remember doing it for the boys' teachers at the
[17] beginning of the year.
[18] Q: Can you think of any occasion other than the example
[19] that we are looking at right now, P-29, when you have
[20] used the School District's e-mail facility to send or
[21] receive an e-mail?
[22] A: Yes.
[23] Q: On what subjects?
[24] A: Anything that has to do with the school. That is how
[25] they reach me. I am a public servant.

Page 103

[1] Q: Do you ever print e-mails at your home?
[2] A: No.
[3] Q: Did you ever make any attempt to recover e-mails from
[4] your computer?
[5] A: Dr. Nilsen did that for us.
[6] Q: For you?
[7] A: And supplied them. For all of the e-mail addresses for
[8] the school, and he supplied them.
[9] Q: Through your counsel?
[10] MR. SCHMIDT: Counsel is indicating yes.
[11] MR. GILLEN: Yes.
[12] MR. SCHMIDT: Got you.
[13]                BY MR. SCHMIDT:
[14] Q: Why did you send this e-mail?
[15] A: I was upset that the rest of the teachers in the
[16] District that weren't at this meeting would read this,
[17] especially my children's teachers, and I wanted them to
[18] know that it was not true.
[19] Q: And what was not true was the statement that you thought
[20] the faculty should be fired if they wanted a separate
[21] representation in the event of a lawsuit?
[22] A: Repeat that.
[23] Q: Okay. Let's make it easy. Here is the statement in the
[24] news report. And this is from a news article by Joseph
[25] Maldonado published in the Daily Record on Tuesday,