IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

————————————————————

TAMMY KITZMILLER; BRYAN and
CHRISTY REHM; DEBORAH
FENIMORE and JOEL LIEB; STEVEN
STOUGH; BETH EVELAND; CYNTHIA
SNEATH; JULIE SMITH; and ARALENE
("BARRIE") D. and FREDERICK B.
CALLAHAN,

                       Plaintiffs,

         v.

DOVER AREA SCHOOL DISTRICT and
DOVER AREA SCHOOL DISTRICT
BOARD OF DIRECTORS,

                     Defendants.

————————————————————

CIVIL ACTION

No. 4:04-cv-2688

(JUDGE JONES)

(Filed Electronically)

OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

QUESTIONS PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.   History Of Religiously Motivated Attacks On Evolution . . . . . . . . . 5

    B.   History of Dover Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

I.    STRONG EVIDENCE SHOWS THAT THE POLICY'S PRIMARY
    PURPOSE IS RELIGIOUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    A.   The Policy's Language, Legislative History, and Historical
       Context All Evidence The District's Religious Purpose . . . . . . . . 26

    B.   The District's Asserted Purposes Are Shams . . . . . . . . . . . . . . . . . 37

II.   STRONG EVIDENCE SHOWS THAT THE POLICY'S PRIMARY
    EFFECT IS TO ADVANCE RELIGION . . . . . . . . . . . . . . . . . . . . . . . . 46

    A.   The Policy Communicates To Students A Strong Endorsement
       Of Religion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

    B.   The Policy Sends The Dover Community A Strong Message Of
       Religious Endorsement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

CERTIFICATE OF SERVICE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

## TABLE OF AUTHORITIES

**Page(s)**

## CASES

*ACLU v. Black Horse Pike Reg'l Bd. of Educ.*,
   84 F.3d 1471 (3d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Bd. of Educ. v. Mergens*, 496 U.S. 226 (1990) . . . . . . . . . . . . . . . . . . . . . 29, 30, 49

*Bob Jones Univ. v. United States*, 461 U.S. 574 (1983) . . . . . . . . . . . . . . . . . . . 22

*Bown v. Gwinnett County School District*, 112 F.3d 1464
   (11th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

*Capital Square Review & Advisory Bd. v. Pinette*,
   515 U.S. 753 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*County of Allegheny v. ACLU*, 492 U.S. 573 (1989) . . . . . . . . . . . . . 47, 49, 59, 62

*Daniel v. Waters*, 515 F.2d 485 (6th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Doe v. Santa Fe Indep. Sch. Dist.*, 168 F.3d 806 (5th Cir.1999),
   *aff'd*, 530 U.S. 290 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Edwards v. Aguillard*, 482 U.S. 578 (1987) . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Epperson v. Arkansas*, 393 U.S. 97 (1968) . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Freethought Soc'y v. Chester County*, 334 F.3d 247 (3d Cir. 2003) . . . . . . . 48, 58

*Freiler v. Tangipahoa Parish Bd. of Educ.*,
   185 F.3d 337 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Freiler v. Tangipahoa Parish Bd. of Educ.*, 975 F. Supp. 819
    (E.D. La. 1997), *aff'd*, 185 F.3d 337 (5th Cir. 1999) . . . . . . . . . . . . . . 45, 58

*Int'l Union, United Auto., Aero., & Agric. Implement Workers*
    *of Am. v. Skinner Engine Co.*, 188 F.3d 130 (3d Cir. 1999) . . . . . . . . . . . 25

*Lee v. Weisman*, 505 U.S. 577 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Lemon v. Kurtzman*, 403 U.S. 602 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . 24, 54

*Lynch v. Donnelly*, 465 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . 46, 47, 55, 63

*Malnak v. Yogi*, 440 F. Supp. 1284 (D.N.J. 1977) . . . . . . . . . . . . . . . . . . . . 36, 45

*McCreary County, Kentucky v. ACLU*, 125 S. Ct. 2722 (2005) . . . . . . . . . . *passim*

*McLean v. Arkansas Bd. of Educ.*,
    529 F. Supp. 1255 (E.D. Ark. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Modrovich v. Allegheny County, Pennsylvania*,
    385 F.3d 397 (3d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Mozert v. Hawkins County Bd. of Educ.*,
    827 F.2d 1058 (6th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Peloza v. Capistrano Unified Sch. Dist.*, 37 F.3d 517 (9th Cir. 1994) . . . . . . 45, 58

*Saldana v. Kmart Corp.*, 260 F.3d 228 (3d Cir. 2001) . . . . . . . . . . . . . . . . . . 3, 25

*Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290 (2000) . . . . . . . . . . . . . . . *passim*

*Sch. Dist. v. Ball*, 473 U.S. 373 (1985), *overruled in part on
    other grounds*, *Agostini v. Felton*, 521 U.S. 203 (1997) . . . . . . . . . . . . . . 48

*Scopes v. Tennessee*, 289 S.W. 363 (1927) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Selman v. Cobb County Sch. Dist.*, No. Civ.A.1:02-CV-2325-C,
　　2005 WL 83829, at \*19-\*20 (N.D. Ga. Jan. 13, 2005) . . . . . . . . . . . *passim*

*Stone v. Graham*, 449 U.S. 39 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 38

*Texas Monthly, Inc. v. Bullock*, 489 U.S. 1 (1989) . . . . . . . . . . . . . . . . . . . . . . . 47

*Van Orden v. Perry*, 125 S. Ct. 2854 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*Verbena United Methodist Church v. Chilton County Bd. of Educ.*,
　　765 F. Supp. 704 (M.D. Ala. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Wallace v. Jaffree*, 472 U.S. 38 (1985) . . . . . . . . . . . . . . . . . . . . 36, 37, 38, 44, 47

## CONSTITUTION, STATUTES, AND REGULATIONS

U.S. Const. amend. I, cl. 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

22 Pa. Code § 235.10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

## MISCELLANEOUS

Bob Jones University Creed, *at* http://www.bju.edu/about/creed/ . . . . . . . . . . . 22

Heidi Bernhard-Bubb, *Dover schools could face lawsuit*,
　　York Dispatch, June 9, 2004, at 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

H.R. Rep. No. 107-334 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 46

National Academy of Sciences, Science and Creationism
　　(2d ed. 1999), *available at* http://www.nap.edu/openbook/
　　0309064066/html/25.html . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

Percival Davis & Dean H. Kenyon, Of Pandas and People: The
　　Central Question of Biological Origins (2d ed. 1993) . . . . . . . *passim*

Joseph Maldonado, *Book is focus of more debate; The teaching of creationism or evolution was the topic again at the Dover Area School Board meeting*, YORK DAILY RECORD, June 15, 2004, at 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Joseph Maldondo, *Dover schools still debating biology text; A board member said a book was rejected because it didn't offer creationism*, YORK DAILY RECORD, June 9, 2004, at 4 . . . . . . . . 18, 19

Chris Mooney, *Intelligent Denials*, AM. PROSPECT ONLINE, Feb. 22, 2005, *at* http://www.prospect.org/web/ page.ww?section=root& name=ViewWeb&articleId=9216 . . . . . . . . . . . 32

KENNETH R. MILLER & JOSEPH LEVINE, BIOLOGY (2002) . . . . . . . . . . . . . . . . . . 18

Linda Shaw, *Does Seattle group 'teach controversy' or contribute to it?*, SEATTLE TIMES, Mar. 31, 2005, at A1 . . . . . . . . . . . . . . . . . . . . . . . 32

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1986) . . . . . . . . . . . . . . . 54

# INTRODUCTION

> Families entrust public schools with the education of their children, but condition their trust on the understanding that the classroom will not purposely be used to advance views that may conflict with the private beliefs of the student and his or her family.[1]

The Dover Area School District violated that trust; plaintiffs will prove it at trial. But the school district and its board of directors seek to deny plaintiffs the opportunity: They ask the Court to decide the case without a trial, relying on the board's word that it has legitimate secular purposes for disparaging the scientific theory of evolution and introducing intelligent-design creationism into the Dover science curriculum, and trusting the district's assurances that its policy will not promote religion. But defendants never confront the voluminous evidence to the contrary.

Indeed, to read the district's brief, one would think that there is no factual record at all — no testimony from fact witnesses, no expert testimony, no legislative history for the district's policy, and no historical context for that policy's genesis. Certainly, one would never guess that the record establishes that:

- School-board members described the district's objectives at public board meetings using overtly religious terms.

- In developing its policy, the board did not consult any scientific resources — not one professional scientist, not one scientific organization, not one scientific treatise, and not even the district's own science teachers — and instead sought only *legal* advice, from a religious think-tank and a faith-based law firm.

---

[1]    *Edwards v. Aguillard*, 482 U.S. 578, 584 (1987).

- The book to which the policy directs students was originally written as a creationist text, and was revised to use the term 'intelligent design' only after the Supreme Court declared teaching creationism in public schools unconstitutional.

- Intelligent design does not fit any accepted definition of science because it assumes a supernatural 'designer' not subject to empirical observation or scientific testing.

- The Dover community understands the policy to be religiously inspired and to further religious objectives.

But those facts, and a host of others, are what plaintiffs have already marshaled to support their claims. And when the evidence is considered under the applicable legal standards, the motion for summary judgment has no merit.[2]

## QUESTIONS PRESENTED

The Establishment Clause forbids governmental conduct having the primary purpose or effect of promoting religion. The Supreme Court has thus prohibited tailoring teaching and learning in public schools to religious doctrines, and it has held that views entailing belief in a supernatural creator have no place in public-school science curricula.

---

[2]    Five appendices accompany this Opposition. Appendix I contains fact-witness depositions; Appendix II contains the district's experts' reports and depositions; Appendix III contains plaintiffs' experts' reports and depositions; Appendix IV contains miscellaneous exhibits and articles cited in this Opposition; Appendix V contains Dr. Barbara Forrest's Supplemental Expert Report, which has been filed under seal (*see infra* note 11). Miscellaneous materials in Appendix IV are cited by tab number, in the form App. IV-__.

Dover-school-board members publicly advocated adding creationism to the ninth-grade-biology curriculum because they feared that instruction in the scientific theory of evolution would undermine Christianity.  The board ultimately adopted a policy that both (a) disparages evolution using what courts and plaintiffs' experts have identified as standard creationist tactics, and (b) advances 'intelligent design' — a view that, according to the district's own experts, assumes a supernatural creator.

The questions presented are:

1.    Is there more than a scintilla of evidence that the board's primary purpose for implementing its policy was religious?

2.    Is there more than a scintillia of evidence that the policy's primary effect is to promote religion?

**FACTS**[3]

In October 2004, the Dover school board voted to change its ninth-grade-biology curriculum to include an introduction to the classroom unit on the scientific theory of evolution.[4]  The introduction consists of a disclaimer denigrating the

---

[3]    Most of plaintiffs' evidence is unrefuted — and indeed is corroborated by the testimony of the school-board members and the district's own experts.  But in all events, the Court "'must view the facts in the light most favorable to the [plaintiffs] and draw all inferences in [their] favor.'" *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001) (citation omitted).

[4]    App. IV-A.

3

scientific theory of evolution and presenting 'intelligent design' as an alternative to that scientific theory.[5]    The disclaimer instructs students that evolution "is a theory, * * * not a fact"; that there are "Gaps in the Theory * * * for which there is no evidence"; and that "Intelligent Design" is an "explanation of the origin of life that differs from" evolution.  It then invites students to consult the book *Of Pandas and People*[6] to "gain[] an understanding of what Intelligent Design actually involves." Finally, it encourages students to "keep an open mind," while "leav[ing] the discussion of Origins of Life to individual students and their families."  To explain the curriculum change, the school district sent district residents a newsletter stating that "intelligent design is a scientific theory," and that, "on a molecular level, scientists have discovered a purposeful arrangement of parts which cannot be explained by Darwin's theory."[7]

The district's change to its ninth-grade-biology curriculum did not spring abruptly from the school board's collective mind.  Rather, the policy represents the confluence of two historical trends:  It embodies the board's ongoing efforts to advocate a particular set of religious beliefs.  And it constitutes the current chapter in

---

[5]    App. IV-B (original disclaimer); App. IV-C (as amended, June 2005).

[6]    PERCIVAL DAVIS & DEAN H. KENYON, OF PANDAS AND PEOPLE: THE CENTRAL QUESTION OF BIOLOGICAL ORIGINS (2d ed. 1993).

[7]    App. IV-D.

the long-standing struggle by fundamentalist religious groups to use public schools both to proselytize, and to attack the scientific theory that they regard as a key threat to their religious beliefs.

**A.    History Of Religiously Motivated Attacks On Evolution.**

This dispute is only the latest in a series of cases involving religious opposition to teaching the scientific theory of evolution.[8]  These cases are not only pertinent legal precedent but also the social facts and historical context that this Court should consider in determining what a reasonable observer would perceive to be the policy's purpose and effect.[9]

The cases explain that opposition to teaching evolution grew out of a religious tradition — Christian fundamentalism — that "began in nineteenth century America as part of evangelical Protestantism's response to," among other things, Charles Darwin's exposition of the theory of evolution as a scientific explanation for the

---

[8]    Forrest Rep. at 1, 13-18.

[9]    *McCreary County, Kentucky v. ACLU*, 125 S. Ct. 2722, 2725, 2737 (2005); *Selman v. Cobb County Sch. Dist.*, No. Civ.A.1:02-CV-2325-C, 2005 WL 83829, at *19-*20 (N.D. Ga. Jan. 13, 2005) (attached as App. IV-H); *see also Edwards*, 482 U.S. at 590 & n.9 ("There is a historic and contemporaneous link between the teachings of certain religious denominations and the teaching of evolution.").

diversity of species.[10]  Believing that if the creation story in Genesis 1-11 is not literally true in every sense, then the New Testament's treatment of sin and redemption would be called into doubt, fundamentalists regarded anything conflicting with Genesis as not only false but inimical to Christian beliefs, and therefore to Christian morality.[11]  And seeing evolution as inconsistent with Genesis's account of abrupt creation in six days, they viewed the scientific theory of evolution as a substantial threat.[12]

In an "upsurge of 'fundamentalist' religious fervor of the twenties," religiously motivated groups pushed state legislatures to adopt laws prohibiting public schools

---

[10]    *McLean v. Arkansas Bd. of Educ.*, 529 F. Supp. 1255, 1258 (E.D. Ark. 1982); *see also, e.g.*, *Edwards*, 482 U.S. at 590-92; *Epperson v. Arkansas*, 393 U.S. 97, 98, 107-08 (1968).

[11]    Forrest Suppl. Rep. at 11-13.  Plaintiffs have filed Dr. Forrest's Supplemental Expert Report under seal.  The Report analyzes documents that the Foundation for Thought and Ethics produced under the terms of a Protective Order permitting it, in good faith, to designate documents as confidential, and requiring the parties to file such documents under seal at the pleading stage.  FTE has agreed that when the parties submit such documents in open court (as during the hearing on FTE's Petition to Intervene), the Protective Order does not apply.  At this juncture, plaintiffs take no position on whether the documents that Dr. Forrest describes meet the standards for confidentiality, and leaves to the Court's discretion the decision whether the documents should remain under seal until trial.

[12]    *Id.*

from teaching evolution,[13] leading to the *Scopes* 'monkey trial' of 1925.[14]  But the battle against evolution was cultural as much as legal:  "Between the 1920's and early 1960's, anti-evolutionary sentiment had a subtle but pervasive influence on the teaching of biology in public schools," with one consequence being that, "[g]enerally, textbooks avoided the topic of evolution."[15]  In other words, formal legal sanctions reinforced a religiously based social movement to expel the scientific theory of evolution from the classroom.

The legal landscape changed radically in 1968 when, in *Epperson v. Arkansas*,[16] the Supreme Court struck down Arkansas's statutory prohibition against teaching evolution.  Although, unlike the *Scopes* law, the Arkansas statute did not include direct references to the Book of Genesis or the fundamentalist view that religion should be protected from science, the Supreme Court readily concluded that "the motivation for the [Arkansas] law was the same: to suppress the teaching of a theory

---

[13]     *Epperson*, 393 U.S. at 98; *accord McLean*, 529 F. Supp. at 1259.

[14]     *McLean*, 529 F. Supp. at 1259; *see Scopes v. Tennessee*, 289 S.W. 363 (1927) (criminal prosecution of public-school teacher for teaching about evolution).

[15]     *McLean*, 529 F. Supp. at 1259.

[16]     393 U.S. 97.

which, it was thought, 'denied' the divine creation of man."[17]  The Supreme Court explained that the "overriding fact is that Arkansas' law selects from the body of knowledge a particular segment which it proscribes for the sole reason that it is deemed to conflict with a particular religious doctrine; that is, with a particular interpretation of the Book of Genesis by a particular religious group."[18]  Reviewing legislators' and community members' declarations that teaching evolution subverted Christianity,[19] the Court struck down the statute, holding unequivocally that "the First Amendment does not permit the State to require that teaching and learning must be tailored to the principles or prohibitions of any religious sect or dogma."[20]

Following *Epperson*, evolution's religious opponents replaced the outright prohibitions that the Supreme Court had invalidated with "balanced treatment" statutes requiring public-school teachers who taught evolution to devote equal time to teaching the biblical view of creation.  But in *Daniel v. Waters*,[21] the Sixth Circuit rejected this new ploy as just another attempt to "establish[] the Biblical version of the

---

[17]    *Edwards*, 482 U.S. at 590 (quoting *Epperson*, 393 U.S. at 109) (alterations in original).

[18]    *Epperson*, 393 U.S. at 103.

[19]    *Id.* at 108 n.16.

[20]    *Id.* at 106.

[21]    515 F.2d 485, 487 (6th Cir. 1975).

creation of man."[22]  The court held that, by assigning a "preferential position for the Biblical version of creation" over "any account of the development of man based on scientific research and reasoning," the challenged statute officially promoted religion, violating the Establishment Clause.[23]

Now that fundamentalist opponents of evolution could neither ban it nor counter it with religious instruction in the public schools, they adopted a new tactic — dressing up their religious beliefs in scientific-sounding language and then mandating the teaching the resulting 'creation science' (or 'scientific creationism') as an alternative to evolution.  Thus, in the wake of *Daniel*, "[f]undamentalist organizations were formed to promote the idea that the Book of Genesis was supported by scientific data."[24]  The creation-science movement then pressed for state and local school boards to impose new balanced-treatment requirements affording equal instruction time to creation science whenever the scientific theory of evolution was taught.[25]

---

[22]    *Id.* at 496.

[23]    *Id.* at 489, 491.

[24]    *McLean*, 529 F. Supp. at 1259.

[25]    *See Edwards*, 482 U.S. at 590-93; *McLean*, 529 F. Supp. at 1256, 1259.

But this gambit was no more successful than the prior ones:  In 1982, the district court in *McLean v. Arkansas Board of Education*[26] saw creation science for what it was — biblical creationism in a new guise — and struck down one of the new laws.  And five years later, the Supreme Court did exactly the same thing in *Edwards v. Aguillard*.[27]

In reviewing Arkansas' balanced-treatment law, the *McLean* court evaluated creation science in light of *Scopes*, *Epperson*, and the long history of fundamentalism's assault on the scientific theory of evolution.[28]  Reviewing the statute's legislative history and historical context,[29] the court found that creation-science organizations were fundamentalist religious entities that "consider[ed] the introduction of creation science into the public schools part of their ministry."[30]  The court also found that even the statute's sponsor and chief proponents "d[id] not believe creation science is a science" but instead aimed to "'kill[] evolution'" by teaching their religious beliefs as though they were a scientific alternative to

---

[26]    529 F. Supp. 1255.

[27]    482 U.S. 578.

[28]    *McLean*, 529 F. Supp. at 1258-64.

[29]    *Id.*

[30]    *Id.* at 1260.

evolutionary biology.[31]  The court then explained that creation science rested on a "contrived dualism" that (a) recognized two and only two possible explanations for life — the scientific theory of evolution and biblical creationism; (b) treated the two as mutually exclusive such that "one must either accept the literal interpretation of Genesis or else believe in the godless system of evolution"; and accordingly (c) viewed any critiques of evolution — whether in the form of science, pseudo-science, or unadorned religion — as evidence that necessarily supported biblical creationism.[32]

---

[31]      *Id.* at 1261, 1262.

[32]      *Id.* at 1266; *see also id.* at 1260 ("Creationists have adopted the view of Fundamentalists generally that there are only two positions with respect to the origins of the earth and life: belief in the inerrancy of the Genesis story of creation and of a worldwide flood as fact, or belief in what they call evolution.").

As the court explained, however, creation science and evolutionary biology do not address the same issues:

> The emphasis on origins as an aspect of the theory of evolution is peculiar to creationist literature.  Although the subject of origins of life is within the provice of biology, the scientific community does not consider origins of life a part of evolutionary theory.  The theory of evolution assumes the existence of life and is directed to an explanation of how life evolved.  Evolution does not presuppose the absence of a creator or God * * *.

*Id.* at 1266.  Hence, juxtaposing creation science with evolution could not yield "balanced treatment" even if creation science had in fact been a scientific theory rather than a religious view.

11

The court went on to demonstrate that approach's logical deficiencies, concluding not only that there is no valid basis to assume only two possible explanations for life (and hence, evidence against one is not affirmative evidence for the other), but also that belief in a supernatural cause — divine creation — stands outside the realm of science, "requir[ing] a leap of faith."[33] Elaborating further on the difference between matters of faith and matters subject to scientific inquiry, the court explained that, because creation science "depends upon a supernatural intervention," it cannot be explained by natural causes or proven through empirical investigation, and therefore is neither testable nor falsifiable.[34] So it "is simply not science."[35] For that reason, Arkansas' balanced-treatment statute could have no valid secular purpose or effect, and could serve only to advance religion, violating the First Amendment.[36]

Five years later, the Supreme Court in *Edwards* struck down Louisiana's balanced-treatment law for similar reasons. Beginning with *Epperson* and *McLean*'s history of fundamentalist attacks against evolution, the Court painstakingly reviewed legislative history, focusing both on statements by the statute's sponsor and most

---

[33]    *Id.* at 1269.

[34]    *Id.* at 1267.

[35]    *Id.*

[36]    *Id.* at 1264, 1272.

vocal legislative proponents, and on the character of the organizations advocating for creation science.[37]   In light of those factors, the Court specifically rejected as disingenuous the state's proffered legislative purposes of encouraging academic freedom and making the science curriculum more comprehensive by "teaching all of the evidence" respecting 'origins of life.'[38] Among other reasons, the Court concluded that the challenged statute did not actually serve the legislature's professed purposes because (a) state law already allowed schools to teach any scientific theory (so academic freedom already received full protection);[39] and (b) if the legislature really had intended to make science education more comprehensive, "it would have encouraged the teaching of all scientific theories about the origins of humankind" rather than permitting schools to forgo teaching evolution but mandating that schools that do teach it must also teach creation science — an inherently religious view.[40] The Court also considered it especially revealing that, "[o]ut of the many possible science subjects taught in the public schools, the legislature chose to affect the teaching of the

---

[37]    482 U.S. at 586-87, 591-92 & nn. 12-14; *see also id.* at 599-604 (Powell, J., concurring).

[38]    *Id.* at 578.

[39]    *Id.* at 588 (disbelieving professed purpose because state had not "'identified any secular purpose that was not fully served by existing state law'" (alteration and citation omitted)).

[40]    *Id.* at 588-89.

one scientific theory that historically has been opposed by certain religious sects."[41] And although presented with experts affidavits (including *Pandas*-coauthor Dean Kenyon's) declaring that creation science is scientific,[42] the Court gave short shrift to the claim that the state was trying to teach competing scientific theories. The Court held instead that the state had violated the Establishment Clause by "restructur[ing] the science curriculum to conform with a particular religious viewpoint."[43]

Intelligent design followed the Supreme Court's rejection of creation science as night follows day: At the time that *Edwards* was decided, the Foundation for Thought and Ethics (a publisher of Christian texts) had been developing *Of Pandas and People* as a creationist work to advance the FTE's religious and cultural mission.[44] After the Supreme Court rejected the proffered expert opinions in *Edwards* claiming that creation science is 'science,' Kenyon and FTE took their draft textbook (which advocated for creationism) and, with all the elegance of a word processor's algorithm, replaced references to 'creationism' with the new label 'intelligent

---

[41]    *Id.* at 593.

[42]    *See id.* at 612 (Scalia, J., dissenting) (citing experts' statements that creation science is collection of scientific data); App. IV-E, at ¶ 6.

[43]    *Id.* at 593.

[44]    Buell 07/14/2005 Testimony at 87; *see also* Forrest Suppl. Rep. at 10-13.

design.'[45]  When they issued *Pandas*'s first edition just two years later, they presented intelligent design as if it were a new intellectual endeavor rather than merely a rechristening of creationism.  But *Pandas* defines 'intelligent design' exactly as an earlier draft had defined 'creationism.'[46]

At the same time, religion-based opposition to the scientific theory of evolution began taking another form: disclaimers casting doubt on evolution's validity so that students would credit religious alternatives.  But the Fifth Circuit rejected this new ploy in *Freiler v. Tangipahoa Parish Board of Education*,[47] as did the district court in *Selman v. Cobb County School District*.[48]

In *Freiler*, the challenged disclaimer informed students that evolution was "presented to inform students of the scientific concept and not intended to influence or dissuade the Biblical version of Creation or any other concept"; and it urged them to examine alternatives to evolution.[49]  The Fifth Circuit invalidated the policy, concluding that "[a] teacher's reading of a disclaimer that not only disavows

---

[45]     Buell 07/14/2005 Testimony at 98-99; App. IV-G; Forrest Suppl. Rep. at 4-8.

[46]     Buell 07/14/2004 Testimony at 98-99; Forrest Suppl. Rep. at 5.

[47]     185 F.3d 337 (5th Cir. 1999).

[48]     2005 WL 83829.

[49]     185 F.3d at 341.

15

endorsement of educational materials but also juxtaposes that disavowal with an urging to contemplate alternative religious concepts implies School Board approval of religious principles."[50]

The challenged disclaimer in *Selman*, meanwhile, took the form of a textbook sticker announcing that evolution is "a theory, not a fact," and directing students to approach the topic with an "open mind" and consider it "critically."[51]  The court there found that "whether evolution is referenced as a theory or a fact is * * * a loaded issue with religious undertones" such that, in choosing to describe evolution as a theory, the school board "appear[ed] to have sided with the proponents of religious theories of origin in violation of the Establishment Clause."[52]

The cultural and religious agenda that motivated FTE to produce a creationist book and then re-label it 'intelligent design,' and impelled the school boards in *Freiler* and *Selman* to disclaim evolution, drives the entire intelligent-design movement and its most prominent participants, the Discovery Institute, its Center for the Renewal of Science and Culture (now less provocatively renamed the 'Center for Science and Culture'), and the Center's fellows.  Notable in this regard, the Center's *Wedge*

---

[50]    *Id.* at 348.

[51]    2005 WL 83829, at *4.

[52]    *Id.* at *21.

16

*Strategy*[53] explicitly decries the cultural consequences of "Darwinism" and vows to replace it with "a science consonant with Christian and theistic convictions."[54]  This drive to create theistic 'science' also defines the work of the Discovery Institute's fellows.[55]

**B.    History of Dover Policy.**

The Dover school board's actions are just another step in creationism's long march.  The record shows that the board set out to incorporate religion into the Dover science curriculum and undermine instruction in the scientific theory of evolution, and that the board's actions had just the desired effect.  Yet in its brief, the district never mentions a word about how its curriculum change came into being, as though facts don't exist — and genuine issues of material fact don't arise — if one does not acknowledge them.

The board first began considering the roles that creationism and evolution would play in the Dover-high-school biology curriculum when, in late 2002 or early 2003, the district's science teachers requested a new biology textbook for their

---

[53]    App. IV-I, at 4.

[54]    *Id.*

[55]    *See generally* Forrest Rep.; Haught Rep.

classes.[56]   During the textbook-selection process, Assistant Superintendent Mike Baksa told Bertha Spahr, the high-school-science-department chair, that a board member (most likely Alan Bonsell) wanted half the evolution unit devoted instead to creationism[57] — notwithstanding the clear constitutional prohibition against doing so.[58]

By June 2004, Bill Buckingham, the board's curriculum-committee chairperson, was publicly criticizing the textbook that the science teachers had selected — Miller and Levine's *Biology*[59] — attacking it at public board meetings as being "laced with Darwinism."[60]   If students were taught only evolution, Buckingham warned, they would be "brainwash[ed]" into thinking that it was a fact rather than a theory.[61] Responding to the public's concern that it might not be proper to favor Christianity

---

[56]     Eshbach Dep. at 25:8-20; Peterman Dep. at 22:9-23:4.

[57]     Spahr Dep. at 35:18-37:1 & Exh. 9.

[58]     *E.g.*, *Edwards*, 482 U.S. at 596-97.

[59]     KENNETH R. MILLER & JOSEPH LEVINE, BIOLOGY (2002).

[60]     Joseph Maldonado, *Dover schools still debating biology text; A board member said a book was rejected because it didn't offer creationism*, YORK DAILY RECORD, June 9, 2004, at 4 (App. IV-K); Heidi Bernhard-Bubb, *Dover schools could face lawsuit*, YORK DISPATCH, June 9, 2004, at 1 (App. IV-L); W. Buckingham Dep. II, at 5:19-7:9, 29:7-30:8.

[61]     Maldonado, *Dover schools still debating*, *supra*, at 4 (App. IV-K); W. Buckingham Dep. I, at 36:14-37:25.

18

over other religions, he declared that "[t]his country wasn't founded on Muslim beliefs or evolution" but instead "was founded on Christianity, and our students should be taught as such."[62] Thus, Buckingham announced that the curriculum committee would look for a textbook presenting creationism as well as evolution.[63]

At the next board meeting, Buckingham stepped up the attack: He denied that the Constitution calls for separation of church and state; he lamented that public-school students no longer prayed and read the *Bible* in class as they had in his day; and he criticized "liberals in 'black robes' [for] taking away the rights of Christians."[64] Buckingham beseeched others to support his position by stating: "'Two thousand years ago, someone died on a cross. Can't someone take a stand for him?'"[65]

Other board members made their views equally clear: Responding to the concern that the board could not endorse Christianity over other religions, Heather Geesey indignantly proclaimed that other religions would not be allowed in the Dover

---

[62]   Maldonado, *Dover schools still debating*, *supra*, at 4 (App. IV-K); W. Buckingham Dep. II, at 7:10-10:3.

[63]   Maldonado *Dover schools still debating*, *supra*, at 4 (App. IV-K).

[64]   Joseph Maldonado, *Book is focus of more debate; The teaching of creationism or evolution was the topic again at the Dover Area School Board meeting*, YORK DAILY RECORD, June 15, 2004, at 1 (App. IV-M).

[65]   *Id.*; J. Brown Dep. at 109:25-111:24.

public schools.[66]  Alan Bonsell agreed, rejecting the suggestion that there was any problem with teaching only a Christian view of creation.[67]  And when Jeff and Casey Brown resigned their board seats over the curriculum change, Bonsell attacked them as "atheists."[68]

Instead of consulting with scientists or science teachers, or taking any other action to determine how the scientific community regards evolutionary biology or creationism,[69] Buckingham sought legal advice about the science curriculum from the Discovery Institute[70] (an organization with the stated goal of casting doubt on science and the scientific method in order to promote "a broadly theistic understanding of nature"[71]) and the Thomas More Law Center[72] (a law firm with no scientific affiliation or credentials that describes itself as "the sword and shield for people of faith, * * * defend[ing] and protect[ing] Christians and their religious beliefs in the public

---

[66]    J. Brown Dep. at 12:1-10.

[67]    *Id.* at 138:17-25.

[68]    *Id.* at 31:7-17.

[69]    W. Buckingham Dep. II, at 20:21-21:12.

[70]    W. Buckingham Dep. I, at 98:24-99:20.

[71]    App. IV-I.

[72]    W. Buckingham Dep. I, at 80:21-83:1, 68:24-69:12.

20

square").[73]  Buckingham then met with the high-school science teachers at an in-service-training session, where he showed them a Discovery Institute video purporting to demonstrate holes in the theory of evolution.[74]

In late June, Geesey wrote a letter to the *York Daily Record* to defend the board's position, underscoring both that the board did in fact intend to teach "creationism" and that it shared Buckingham's scorn for religious views other than Christian fundamentalism:

> Our country was founded on Christian beliefs and principles.  We are not looking for a book that is teaching students that this is a wrong thing or a right thing.  It is just a fact.
>
> *  *  *
>
> You can teach creationism without its being Christianity.  It can be presented as a higher power.  That is where [a] part of Dover's mission statement comes into play.  That part would be in partnership with family and community.  You as a parent can teach your child your family's ideology.[75]

Shortly thereafter, Assistant Superintendent Baksa followed up on the curriculum committee's pledge to find a biology textbook teaching creationism:  He surveyed ***parochial schools*** (but not other public schools) in the region to determine

---

[73]    App. IV-N.

[74]    Eshbach Dep. at 59:20-60:13.

[75]    App. IV-O.

which biology texts they used.[76]  And he gathered information from the Bob Jones

University publication *Biology for Christians*.[77]

In late July 2004, Buckingham proposed that the board purchase the creationist

book *Pandas* as a supplement to the Miller-Levine text.[78]  While the board did not end

up buying the books, Buckingham solicited contributions through his church, and

Alan Bonsell's father also gave money, to purchase 60 copies of *Pandas* for

'anonymous' donation to the district.[79]  The district accepted that donation in the fall,

and the books arrived at the high school in November.[80]

Meanwhile, the board adopted the curriculum change on October 18.  Its

resolution provided that students would be "made aware of gaps/problems" with

---

[76]    Nilsen Dep. I, at 105:21-108:14; Baksa Dep. at 54:3-11; App. IV-P.

[77]    Baksa Dep. at 52:21-57:6; 93:23-95:16.  Bob Jones University is "dedicated to the teaching and propagation of * * * fundamentalist Christian religious beliefs." *Bob Jones Univ. v. United States*, 461 U.S. 574, 580 (1983).  Its official "Creed" proclaims belief in "the creation of man by the direct act of God" (*at* http://www.bju.edu/about/creed/), a belief that the University describes as "irreconcilable" with evolution (http://www.bju.edu/about/creed/creat.html).

[78]    App. IV-Q, at Bates No. 42.

[79]    W. Buckingham Dep. II, at 50:3-56:9; A. Bonsell Dep. I, at 12:24-13:25; D. Bonsell Dep. at 32:9-38:19.

[80]    App. IV-Q, at Bates Nos. 127-136.

respect to the theory of evolution and would be informed about intelligent design.[81]

Board members have testified, however, that they received no materials explaining

what intelligent design is.[82]  And indeed, most still do not understand what it entails.[83]

The board passed the resolution over the Dover science teachers' objections.[84]

Implementing the board's resolution, the district developed a disclaimer that

disparages evolution as a theory rather than a fact (like the disclaimers did in *Freiler*

and *Selman*) and advances intelligent design as an alternative (like the balanced-

treatment statutes did for creation science in *Edwards* and *McLean*).  The board then

ordered Dover's biology teachers to read the disclaimer to their classes as an

introduction to the evolution unit.[85]

---

[81]      App. IV-S.

[82]      Geesey Dep. at 91:10-15; Harkins Dep. II, at 28:2-29:4; Cleaver Dep. at 64:25-65:15; Yingling Dep. at 23:16-23.

[83]      *See, e.g.*, Cleaver Dep. at 64:12-24, 65:12-15; Geesey Dep. at 78:2-9, 83:15-84:6.

[84]      Geesey Dep. at 91:16-94:6; Eshbach Dep. at 118:8-119:16; J. Miller Dep. at 125:11-126:5.

[85]      In January 2005, the science teachers informed the district that they would not present the disclaimer.  The teachers explained that intelligent design is not science and *Pandas* is not a scientific resource, so introducing them as such would require the teachers to breach their ethical obligations — as specified in Pennsylvania's Code of Professional Practice and Conduct for Educators — to develop sound educational policy, teach the truth, and not misrepresent aspects of the curriculum.  *See* App. IV-U (citing, among other code sections, 22 Pa. Code § 235.10

In June, the district updated the disclaimer to reflect the fact that it was not keeping *Pandas* in the science classrooms as the board had originally intended. As amended, the disclaimer informs students that "[t]he reference book, *Of Pandas and People*, is available in the library along with other resources for students who might be interested in gaining an understanding of what Intelligent Design actually involves."[86]

## ARGUMENT

Under the Supreme Court's *Lemon* test, the challenged policy is unconstitutional if (a) the district's primary purpose was to advance religion; or (b) the policy has the primary effect of promoting or endorsing religion; or (c) the policy excessively entangles the district with religion.[87] Because the *Lemon* test is disjunctive, **either** an improper purpose **or** an improper effect renders the policy invalid.[88] (Plaintiffs do not claim that the policy creates entanglement problems.) So

_____

(prohibiting teachers from "knowingly and intentionally misrepresenting subject matter or curriculum")). So the district administrators delivered the in-class disclaimers themselves when the teachers taught the evolution unit in January and May 2005. Baksa Dep. at 73:7-10, 98:10-99:2.

[86]    App. IV-C.

[87]    *See Edwards*, 482 U.S. at 582-83. *See generally Lemon v. Kurtzman*, 403 U.S. 602, 612-613 (1971). The district acknowledges that *Lemon* provides the governing legal standards. Br. at 8; *see McCreary*, 125 S. Ct. at 2732-33.

[88]    *Edwards*, 482 U.S. at 583; *Frieler*, 185 F.3d at 343.

24

in opposing the district's motion for summary judgment, all that plaintiffs must show is that more than a scintilla of evidence supports either their purpose claim or their effect claim.[89]  And before plaintiffs have to make even that limited showing, the **district** bears the burden to present a *prima facie* case that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law.[90]

Viewing the record as a whole — including the curriculum change and disclaimer, the expert testimony, the fact witnesses' testimony, the documentary evidence, and the broader historical context of the religiously motivated opposition to evolution — plaintiffs have more than met their minimal burden at the summary-judgment stage.

## I.    STRONG EVIDENCE SHOWS THAT THE POLICY'S PRIMARY PURPOSE IS RELIGIOUS.

The central issue in the purpose inquiry is whether the district has shown favoritism toward religion or a particular set of religious beliefs:

> The touchstone for our analysis is the principle that the "First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion."  When the government acts with the ostensible and predominant purpose of advancing religion, it violates that central Establishment Clause value of official religious

---

[89]    *Int'l Union, United Auto., Aero., & Agric. Implement Workers of Am. v. Skinner Engine Co.*, 188 F.3d 130, 137 (3d Cir. 1999).

[90]    *Id.*; *accord Saldana*, 260 F.3d at 232.

neutrality, there being no neutrality when the government's objective is
to take sides.[91]

The purpose inquiry involves considering the policy language, "enlightened by its
context and contemporaneous legislative history" — including the broader context of
historical and ongoing attempts to advance creationism and denigrate the scientific
theory of evolution.[92]  The evidence strongly supports the inference that the district
acted principally to advance religion.

>    **A.   The Policy's Language, Legislative History, and Historical Context
>         All Evidence The District's Religious Purpose.**

The policy's language and legislative history, informed by the historical
context, support the conclusion that the district acted for religious purposes.

---

[91]    *McCreary*, 125 S. Ct. at 2733 (quoting *Epperson*, 393 U.S. at 104).

[92]    *Selman*, 2005 WL 83829, at *13.   As the Supreme Court held in
*Edwards*:

> A court's finding of improper purpose behind a statute is appropriately
> determined by the statute on its face, its legislative history, or its
> interpretation by a responsible administrative agency.   The plain
> meaning of the statute's words, enlightened by their context and the
> contemporaneous legislative history, can control the determination of
> legislative purpose.  Moreover, in determining the legislative purpose of
> a statute, the Court has also considered the historical context of the
> statute, and the specific sequence of events leading to passage of the
> statute.

482 U.S. at 594.

26

1.    First, the board chose to describe evolution as a "theory, * * * not a fact," employing misleading language[93] that is "one of the latest strategies to dilute evolution instruction employed by anti-evolutionists with religious motivations."[94]  Plaintiffs will show at trial that the theory-not-fact language made its way into the Dover board's vocabulary in June 2004 — after curriculum-committee-chair Bill Buckingham had consulted with the Discovery Institute and the Thomas More Law Center, and had shown Dover's science teachers a Discovery Institute video — when Buckingham publicly advocated for a curriculum change to ensure that students were not "brainwash[ed]" into viewing the scientific theory of evolution as fact because otherwise they might come to doubt whether the biblical view of creation is true.[95]

2.    Second, the legislative history makes plain that the policy grew directly out of the board's attempts to incorporate creationism into the curriculum.  To recap only the highlights:  (1) Bonsell advocated giving equal time to instruction in

---

[93]    Fuller Dep. at 110:3-111:11 (district expert acknowledging that policy is misleading).

[94]    *Selman*, 2005 WL 83829, at *21 (listing cases showing that "whether evolution is referenced as a theory or a fact is * * * a loaded issue with religious undertones," and citing law-review articles explaining cultural significance of declaring that evolution is theory and not fact).

[95]    *See supra* page 18 & n.61.

27

creationism and evolution.[96]   (2) Buckingham, the curriculum committee's chairperson, declined to consult any scientist or science teacher or to seek any other scientific advice in preparing the curriculum change, and instead sought legal advice from two faith-based organizations — the Discovery Institute and the Thomas More Law Center.[97]   (3) Bonsell, Geesey, and Buckingham used explicitly religious arguments in advocating at public board meetings for the curriculum change, and Buckingham pledged to find a textbook that incorporated creationism.[98]  (4) Geesey defended teaching "creationism" in a letter to the editor of a local newspaper.[99]  (5)

---

[96]      *See supra* page 18.

[97]      *See supra* pages 20-21; *cf. McLean*, 529 F. Supp. at 1262-63 (noting that balanced-treatment act's sponsor did not consult any scientists or science educators, and that no scientist testified at legislative hearing).

The district here defends its board members as "ordinary people" — "small town" folks who are not "experts in science."  Br. at 8 n.6.  But that is all the more reason for them to have consulted with scientists or science educators if they truly wanted to improve science education.  In all events, they did not advocate for the curriculum change by making unsophisticated **scientific** arguments; they advocated for it on **religious** grounds.  So even if intelligent design were in fact science or if there were any independent scientific merit to declaring that evolution has "gaps/problems," the board's choice to incorporate those elements into the biology curriculum would still violate the Establishment Clause's prohibition against tailoring "teaching and learning * * * to the principles or prohibitions of any religious sect or dogma." *Epperson*, 393 U.S. at 106.

[98]      *See supra* pages 18-21.

[99]      *See supra* page 21.

Assistant Superintendent Baksa surveyed parochial schools to determine for the curriculum committee which biology textbooks those institutions used; and he consulted Bob Jones University's *Biology for Christians* as part of his investigation.[100] (6) The board considered purchasing *Pandas* — a creationist text — to supplement the Miller-Levine book, and accepted 60 copies as an 'anonymous' donation from Bonsell's father, Buckingham, and Buckingham's fellow parishioners.[101]  (7) And only after district officials had taken all those measures to incorporate creationism into the biology curriculum and had learned to employ the theory-not-fact language, the "[g]aps * * * for which there is no evidence" language, and the label 'intelligent design,' did the board produce its curriculum-change resolution and disclaimer.[102]

The district brushes aside this entire history as "a few statements by one board member"[103] — a transparently false claim.  And citing *Board of Education v. Mergens*[104] and *Bown v. Gwinnett County School District*,[105] it suggests that this Court

---

[100]    *See supra* pages 21-22.

[101]    *See supra* page 22.

[102]    *See supra* pages 22-23.

[103]    Br. at 19.

[104]    496 U.S. 226 (1990).

[105]    112 F.3d 1464 (11th Cir. 1990).

must disregard all the public debate, and every declaration of legislative purpose by the board or its members, on the theory that officials' motives have no bearing on the legislative purpose for the policies they institute.[106]  But all that *Mergens* and *Bown* say is that individual legislators' religious motives will be insufficient to invalidate a statute when the statute's ***preeminent purpose*** is a valid secular one.[107]  They do not hold that public statements by a policy's sponsors and chief proponents are irrelevant to the purpose inquiry.  Nor has the Supreme Court ever hesitated to consider such evidence.

Quite the contrary.  In both *Epperson* and *Edwards*, the Court viewed the sponsors' and chief proponents' public statements as compelling evidence that the legislatures in those cases enacted the challenged statutes for improper purposes.[108] And in *McCreary County, Kentucky v. ACLU*,[109] the Court underscored that "[e]xamination of purpose is a staple of statutory interpretation that makes up the daily

---

[106]     Br. at 12.

[107]     *See Mergens*, 496 U.S. at 235, 239, 249 (disregarding individual legislators' motives "[b]ecause the Act on its face grants equal access to both secular and religious speech," a purpose that the Supreme Court had already ruled constitutional); *Bown*, 112 F.3d at 1471-72 (analyzing primary legislative sponsor's actions as well as statute's language in determining that statute had clearly secular purpose).

[108]     *Edwards*, 482 U.S. at 586-88; *Epperson*, 393 U.S. at 108 n.16.

[109]     125 S. Ct. 2722.

fare of every appellate court in the country," thus reaffirming that courts should consider "traditional external signs" of purpose — including sponsors' comments.[110]

In short, the Supreme Court has refused to "ma[k]e the purpose test a pushover for any secular claim," and has explicitly held that courts may not "'turn a blind eye to the context in which [a governmental] policy arose.'"[111]

3.    Third, although the district in its brief speaks of intelligent design as though it were a scientific theory and builds its entire argument on that assumption, the record tells a different story:  Plaintiffs' experts (including a biologist, a paleontologist, and a philosopher of science) vigorously contest any attempt to portray intelligent design as science.[112]  And the evidence is not all from plaintiffs' experts: Not only do major science organizations deny that intelligent design is science,[113] but

---

[110]    *Id.* at 2735.  In the process, the Court effectively answered the district's *Mergens-Bown* argument by explaining that a public official's motives are treated as irrelevant to the purpose inquiry only when the official "hides religious motive so well that the 'objective observer, acquainted with the legislative history, and implementation of the statute,' cannot see it," because in that case, and "without something more[,] the government does not make a devisive announcement that in itself amounts to taking religious sides."  *Id.* (quoting *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 308 (2000)).

[111]    *Id.* at 2736 (quoting *Santa Fe*, 530 U.S. at 315).

[112]    *See infra* pages 32-37 and accompanying notes.

[113]    *See, e.g.*, Alters Rep. at 5-6 (citing statements by American Association for the Advancement of Science, National Academy of Sciences, National Association of Biology Teachers, and National Science Teachers Association).  Indeed, the White

the Discovery Institute — intelligent design's leading think-tank — has **opposed** the Dover policy, acknowledging that intelligent design is not sufficiently developed scientifically to warrant including it in high-school curricula.[114] And even defendants' lead expert, Michael Behe, acknowledged that intelligent design is not a 'scientific theory' as the National Academy of Sciences defines that term;[115] in order to encompass intelligent design, he invented his own more liberal definition — under which even **astrology** would qualify as a 'scientific theory.'[116]

Intelligent design is not science because science is "the systematic search for natural explanations of natural phenomena."[117]  Science thus is neither antagonistic

---

House's chief science adviser, John Marburger, has unequivocally stated, "Intelligent Design is not a scientific theory. * * * I don't regard Intelligent Design as a scientific topic."  Chris Mooney, *Intelligent Denials*, AM. PROSPECT ONLINE, Feb. 22, 2005, *at* h t t p : / / w w w . p r o s p e c t . o r g / w e b / p a g e . w w ? s e c t i o n = r o o t & name=ViewWeb&articleId=9216.

[114]     App. IV-W; Linda Shaw, *Does Seattle group 'teach controversy' or contribute to it?*, SEATTLE TIMES, Mar. 31, 2005, at A1 (App. IV-X); App. IV-Y.

[115]     According to the National Academy of Sciences, a scientific theory is "a well-substantiated explanation of some aspect of the natural world that can incorporate facts, laws, inferences and tested hypotheses."  NATIONAL ACADEMY OF SCIENCES, SCIENCE AND CREATIONISM 2 (2d ed. 1999), *available at* http://www.nap. edu/openbook/0309064066/html/2.html (App. IV-Z).

[116]     Behe Dep. at 123:16-126:20, 132:17-24, 133:18-135:12.

[117]     K. Miller Dep. at 33:17-19, 193:17-23, 194:24-195:8; *accord* Alters Dep. at 217:1-8 (stating that one of "ground rules of science * * * is methodological naturalism, and methodological naturalism is basically that we do research * * * by

32

toward nor accommodating of faith or belief, but instead is an entirely different paradigm.[118] For while science deals only with observable, testable phenomena in the natural world, matters of faith deal with the supernatural, the unobservable, the unquantifiable.[119] Intelligent design posits a supernatural 'designer' as its central premise, which places it outside any accepted definition of science and squarely within the realm of faith.[120] Thus, the National Academy of Sciences has explained that "[c]reationism, intelligent design, and other claims of supernatural intervention in the origin of life or of species are not science because they are not testable by the methods of science."[121] The American Association for the Advancement of Science has issued a Board Resolution stating that "'the lack of scientific warrant for so-called 'intelligent design theory' makes it improper to include as part of science education.'"[122] And the National Association of Biology Teachers has officially stated

---

trying to find natural causes for natural phenomena"); Pennock Dep. at 100:6-106:10.

[118]     Pennock Dep. at 105:1-21; K. Miller Dep. at 16:25-17:16.

[119]     Alters Dep. at 217:1-8.

[120]     Pennock Rep. at 10-13; K. Miller Dep. at 227:1-3, 227:15-18; Alters Dep. at 219:9-220:1, 323:8-324:16.

[121]     NATIONAL ACADEMY OF SCIENCES, SCIENCE AND CREATIONISM, *supra*, at 25, *available at* http://www.nap.edu/openbook/0309064066/html/25.html.

[122]     Alters Rep. at 5 (quoting AAAS Board Resolution).

that "'[e]xplanations or ways of knowing that invoke non-naturalistic or supernatural events or beings, whether called 'creation science,' 'scientific creationism,' 'intelligent design theory,' 'young earth theory,' or similar designations, are outside the realm of science and not part of a valid science curriculum.'"[123]

Indeed, as plaintiffs' expert Dr. Pennock explains, the intelligent-design movement acknowledges that the very definition of science — not to mention the entire character of scientific inquiry — would have to change radically to encompass unobservable supernatural phenomena before intelligent design could wear the label 'science.'[124]  For example, William Dembski — one of intelligent designs's leading lights and formerly an expert for the district in this case — explicitly stated that, because science excludes the supernatural, the "ground rules of science by which the natural sciences are conducted" would have to be redefined to make room for intelligent design, for otherwise intelligent design "is by definition excluded from science."[125]  And the district's remaining experts share essentially the same view.[126]

---

[123]   *Id.* at 6 (quoting NABT's position statement on teaching evolution).

[124]   Pennock Rep. at 10-13; *accord* Minnich Dep. at 91:21-93:22.  Simply put, the intelligent-design movement by its own admission wants to change science to allow supernatural 'explanations.'  *See* Pennock Rep. at 3; App. IV-AA, at 20.

[125]   *See* Pennock Rep. at 13; App. IV-AA, at 20.

[126]   Behe Dep. at 152:3-5 (agreeing that, from a practical standpoint, methodological naturalism is severe constraint on intelligent design); Minnich Dep.

In simplest terms, the evidence respecting *Pandas*'s development (as set forth in Dr. Forrest's Expert Reports), and the acknowledgment by intelligent design's proponents that that view depends upon supernatural action, demonstrates that what defendants' policy teaches is creationism — the very thing that the Supreme Court in *Edwards* held could not be taught.  To be sure, some define 'creationism' narrowly as a literal reading of Genesis 1:11.[127]  But the 'creation science' that the Supreme Court rejected in *Edwards* did not include "catastrophism, a world wide flood, a recent inception of the earth or life, from nothingness (ex nihilo), the concept of kinds, or any concepts from Genesis or other religious texts."[128]  Rather, 'creation science' as considered in *Edwards* and *McLean* was essentially indistinguishable from intelligent design:  Both have supernatural action as their core characteristic.[129]

---

at 93:21-95:4 (agreeing that, in order for intelligent design to be considered a "valid science," definition of 'science' would have to include supernatural).

[127]   Indeed, one of plaintiffs' experts, John Haught, employs that narrow definition, although still concluding that ID is religious.  As Haught explains, intelligent design's religious roots run far deeper than the twentieth century's creationism debates.  Haught Rep. at 4; Haught Dep. at 78:1-14, 79:21-85:6, 132:1-21.

[128]   App. IV-E, at ¶ 9; *see also McLean*, 529 F. Supp. at 1271.

[129]   *See Edwards*, 482 U.S. at 595 (creation science defined as "origin through abrupt appearance in complex form"); *id.* at 592 n.12 ("creation * * * requires the direct involvement of a supernatural intelligence"); *McLean*, 529 F. Supp. at 1271 ("By creation we mean the bringing into being by a supernatural creator of the basic kinds of plants and animals by the process of sudden, or fiat, creation.").

There can, of course, be no valid secular purpose for presenting unscientific beliefs — beliefs not accepted by the scientific community, not subject to scientific inquiry, and not, therefore, within the bounds of science — in a high-school science classroom.  And where arguably religious governmental conduct serves no secular purpose, the Supreme Court has held that an unconstitutional religious purpose will be inferred.[130]

Such an inference here is singularly appropriate.  The federal courts have routinely recognized that "'concepts concerning . . . a supreme being of some sort are manifestly religious . . . .  These concepts do not shed that religiosity merely because they are presented as philosophy or as science.'"[131]  Neither do they shed that religiosity by calling their supreme being an 'intelligent designer.'[132]  Intelligent

---

[130]   *See Edwards*, 482 U.S. at 587-88; *Wallace v. Jaffree*, 472 U.S. 38, 59-60 (1985).

[131]   *Edwards*, 482 U.S. at 599 (Powell, J., concurring) (alteration omitted) (quoting *Malnak v. Yogi*, 440 F. Supp. 1284, 1322 (D.N.J. 1977)); *see, e.g.*, *id.* at 591 n.11 (belief that "supernatural being created humankind" is a "religious viewpoint"); *see also* Alters Dep. at 219:9-12 ("intelligent design is a theological and philosophical idea attempting to masquerade as science in schools").

[132]   Although creationists, having suffered defeat after defeat in the courts, have become quite circumspect about their language, using the term 'intelligent design' without specifying who the 'designer' is (*cf. Epperson*, 393 U.S. at 109 (speculating that "the sensational publicity attendant upon the *Scopes* trial induced Arkansas to adopt less explicit language" than *Scopes* law had in referring to "'the Divine creation of man'"); *cf. also Edwards*, 482 U.S. at 603 (Powell, J., concurring)), that legerdemain fools no one:  Plaintiffs' experts here have explained that there is no

design, in short, is not just unscientific but inherently religious, "and no legislative recitation of a supposed secular purpose can blind us to that fact."[133]

**B.     The District's Asserted Purposes Are Shams.**

Undoubtedly aware that the challenged policy's language, legislative history, and historical context all point to improper religious purpose, the district employs two tactics to avoid confronting the evidence against it.   First, it waters down the Establishment Clause's secular-purpose requirement beyond recognition so that plaintiffs' purpose evidence will appear irrelevant. And second, it suggests a variety of supposed secular goals to which it claims this Court must defer, without pointing to any evidence that those asserted purposes are sincere.  Both gambits fail.

1.     Relying on a snippet from *Wallace v. Jaffree*,[134] the district contends that the Establishment Clause forbids only governmental conduct that is "'entirely motivated by a purpose to advance religion,'" and hence that, as long as the district

---

serious dispute that the 'designer' is God (*see also* Behe Dep. at 87:1-8) — and the Christian God of the Old and New Testaments at that (*see, e.g.*, K. Miller Dep. at 146:14-147:12.).  And the district's experts themselves admitted under oath that they believe that the designer is the Christian God (*see* Behe Dep. at 87:1-23; Minnich Dep. at 146:14-147:12) — and that other explanations are implausible (Behe Dep. at 86:16-20, 152:6-17).

[133]     *Stone v. Graham*, 449 U.S. 39, 41 (1980).

[134]     472 U.S. 38.

can show any secular purpose at all that would be served by its policy, its actions survive *Lemon*'s purpose inquiry.[135]

That view is wrong as a matter of law.

Although the phrase from *Wallace* on which the district relies might "suggest[], in isolation, a fairly complaisant attitude" toward the secular-purpose requirement, the Supreme Court in *McCreary* reaffirmed the clear holding in a long line of cases — and the practical import of *Wallace* itself, the one infelicitous phrase notwithstanding — that governmental conduct is lawful only if the "'preeminent' or 'primary'" purpose is a legitimate secular one, and that it is therefore not enough for the government to demonstrate some secular purpose that is "merely secondary to a religious objective."[136]    In so doing, the Court thoroughly repudiated the "tack of trivializing the [purpose] inquiry" that the district takes here.[137]

_____

[135]    Br. at 11 (quoting *Wallace*, 472 U.S. at 57).

[136]    *See McCreary*, 125 S. Ct. at 2735-36 (citing *Santa Fe*, 530 U.S. at 308; *Edwards*, 482 U.S. at 590; *Stone*, 449 U.S. at 41).

[137]    *Id*. at 2735.  To be fair, the district is not alone in having misunderstood *Wallace*:  Before the Supreme Court decided *McCreary*, the *Frieler* and *Selman* courts made the same mistake, thus erroneously diluting their purpose inquiries as the district does.  *See Freiler*, 185 F.3d at 344-45; *Selman*, 2005 WL 83829, at *13.  But the district quotes in its brief some of the pertinent language from *McCreary* (*see* Br. at 11-12 (quoting *McCreary*'s description of predominant-purpose standard)), making difficult to explain its failure to divine the correct standard.

38

2.    The district also advances no less than six secular purposes that its policy supposedly advances:

> (1) raising students [sic] awareness about multiple ways of knowing; (2) promoting critical thinking; (3) encouraging students to assume more responsibility in their learning and to play an active part in constructing their own knowledge; (4) promoting a fuller understanding of the theory of evolution, including its limitations; (5) aligning its curriculum with the Pennsylvania Academic Standards, which require students to "Critically evaluate the status of existing theories," including the "theory of evolution"; and (6) helping students understand the views inherent in controversial issues, such as biological evolution * * *.[138]

But the district does not point to any evidence that it was actually pursuing those goals.  Nor does it explain how its policy might further any of them.

3.    Instead, the district cites *Edwards* and *McCreary* for the proposition that this Court must "take the government at its word" and blindly defer to any asserted secular purpose that the district chooses to offer.[139]  But neither the Supreme Court nor any other court has ever held that assertions of secular purpose get blind deference. To be sure, governmental professions of secular purpose are entitled to "**some** deference"[140] — but "some" is a very long way from the near absolute deference that

---

[138]    Br. at 18.

[139]    Br. at 11 ("The Supreme Court has consistently held that when a court undertakes the difficult task of reviewing a government's asserted purpose, it must take the government at its word absent compelling evidence to the contrary.").

[140]    *Santa Fe*, 530 U.S. at 308 (emphasis added).

the district arrogates to itself. And the Supreme Court has consistently held that any asserted "secular purpose has to be genuine, not a sham, and not merely secondary to a religious objective."[141] Thus, the Supreme Court routinely conducts painstaking inquiries to smoke out unconstitutional purposes, considering, among other things, whether the legislative history reveals a primary purpose different from the asserted secular ones, whether the historical or cultural context for the governmental conduct suggests an improper purpose, and whether a mismatch between the asserted secular purpose and the policy's practical effect suggests that the purpose is not what the government claims.[142]

4.    Even if record evidence here could support an inference that the district's asserted secular purposes were valid and sincere, summary judgment would be improper because, at a minimum, the challenged policy's language, legislative history, and context raise a genuine issue of material fact whether the district's **primary** purpose was permissible or impermissible. But the district has pointed to nothing in

---

[141]    *McCreary*, 125 S. Ct. at 2735; *accord, e.g.*, *Santa Fe*, 530 U.S. at 308 ("it is * * * the duty of the courts to 'distinguish[] a sham secular purpose from a sincere one'" (citation omitted)); *Edwards*, 482 U.S. at 586-87 ("While the Court is normally deferential to a State's articulation of a secular purpose, it is required that the statement of such purpose be sincere and not a sham.").

[142]    *See, e.g.*, *McCreary*, 125 S. Ct. at 2734-2737; *Edwards*, 482 U.S. at 586-96.

the record to show that any of its asserted purposes had any effect on the board's or the district administrators' actions. The district's *post hoc* rationalizations are "presented only as a litigating position," and are not entitled to deference.[143] For "[n]o reasonable observer could swallow the claim that the [district] had cast off the objective so unmistakable" throughout the entire time that it was evaluating textbooks and altering its curriculum.[144]

    5.    Worse yet, the asserted secular purposes are irreconcilable with the curriculum change and disclaimer as written — providing strong evidence that the district's supposed purposes are shams.[145]

    First of all, the district offers three secular purposes that amount to the same thing: teaching students "multiple ways of knowing"; promoting critical thinking; and "'[c]ritically evaluat[ing] the status of existing theories.'"[146] But as the Fifth Circuit held in *Freiler*, the disclaimer here "furthers a contrary purpose, namely the protection

---

    [143]    *McCreary*, 125 S. Ct. at 2740; *see, e.g.*, *Freiler*, 185 F.3d at 342.

    [144]    *McCreary*, 125 S. Ct. at 2740 & n.19.

    [145]    *See, e.g.*, *Edwards*, 482 U.S. at 587-89 (concluding that asserted purposes of encouraging academic freedom and improving science instruction were shams because balanced-treatment statute would have been written far more broadly if intended to serve those objectives); *Freiler*, 185 F.3d at 344-45 (rejecting as sham asserted purpose of promoting critical thinking because disclaimer inhibited critical thinking).

    [146]    Br. at 18.

and maintenance of a particular religious viewpoint."[147]  In that regard, the disclaimer describes evolution as a theory and states that, "with respect to any theory, students are encouraged to keep an open mind."  By contrast, it advances intelligent design without providing any qualifications, warnings, or directives to approach that view critically.  If the district's goal had been to promote critical thinking, its disclaimer would have encouraged students to look critically not just at evolution but also at intelligent design — and everything else in the science curriculum.  Instead, Superintendent Nilsen gave the science teachers here strict orders not to go beyond the disclaimer by answering questions or otherwise discussing intelligent design in class[148] — a directive that cannot be squared with the district's stated goal of encouraging critical thinking.  What is more, the policy "leaves the discussion of Origins of Life to individual students and their families," thus excluding that topic from the realm of critical thought in the classroom.[149]  The district thus sends students the clear message not only that evolution alone deserves their suspicious scrutiny, but also that "evolution as taught in the classroom need not affect what they already

---

[147]   185 F.3d at 344-45.

[148]   Nilsen Dep. I, at 69:4-21.

[149]   *Freiler*, 185 F.3d at 345.

42

know."[150]  As the *Freiler* court explained, "[s]uch a message is contrary to an intent to encourage critical thinking, which requires that students approach new concepts with an open mind and a willingness to alter and shift existing viewpoints."[151]

For similar reasons, the disclaimer belies the district's asserted purpose of "encouraging students to assume more responsibility in their learning and to play an active part in constructing their own knowledge":  If the district had truly meant to encourage students to engage in active learning, it would have issued a broad statement inviting them to do outside investigation on all topics that they study.  What is more, the district would not have created a special exemption for 'origins of life,' but would have encouraged students to engage their parents in critical discussions about all topics in the curriculum.

As for "promoting a fuller understanding of the theory of evolution, including its limitations," the district acknowledges that the official biology text — the Miller-Levine book — fully accomplishes that aim.[152]  And two of plaintiffs' experts — Dr.

---

[150]    *Id.*

[151]    *Id.*  The disclaimer's instruction to "keep an open mind" about theories does not on its face apply to intelligent design, which the disclaimer describes as an "explanation" rather than a theory.  But even if it did, the directive must be considered in light of the district's cordoning off the subject of 'origins of life' from critical thought and directing students to talk to their families to learn what they should believe.

[152]    Br. at 5, 14-15 n.8; Defs.' SMF ¶¶ 7-9.

Miller himself and Dr. Alters — agree:  The disclaimer adds nothing to the textbook's explication of the scientific theory's limitations and weaknesses.[153]  But while the district apparently believes that it should get a free pass on judicial scrutiny for asserting a secular purpose reflected in the textbook, the law is entirely to the contrary: In both *Wallace* and *Edwards*, the Supreme Court made clear that where an avowed secular purpose was "'fully served by [other measures] before the enactment of the [challenged policy],'" the policy provides no added value in achieving that purpose; and hence, the professed purpose should be "rejected * * * as insufficient."[154]

The district's final avowed purpose fares no better:  The district asserts that the policy will  "help[] students understand the views inherent in controversial issues, such as biological evolution"; and it claims that this goal is "consistent with" a statement that Senator Santorum included in the Conference Report accompanying the No Child Left Behind Act of 2001.[155]  But quite apart from the fact that the Santorum statement has no legal force of any kind, the district's assertion that its policy complies with that statement elides the statement's express objective:

---

[153]    K. Miller Dep. at 287:1-288:7, 326:3-329:16; Alters Dep. at 242:2-250:22.

[154]    *Edwards*, 482 U.S. at 587-88 (quoting *Wallace*, 472 U.S. at 59).

[155]    Br. at 18.

The Conferees recognize that a quality science education should prepare students to distinguish the data and testable theories of science from religious or philosophical claims that are made in the name of science. Where topics are taught that may generate controversy (such as biological evolution), the curriculum should help students to understand the full range of scientific views that exist * * *.[156]

As noted above,[157] intelligent design does not meet any accepted definition of science because it posits a supernatural 'designer.' The federal courts have consistently recognized, however, that belief in a supernatural creator is a religious viewpoint, not a scientific one.[158] Incorporating intelligent design into the biology curriculum cannot, therefore, help students understand "the full range of *scientific* views that exist."[159] Rather than advancing science, it "has the distinctly different purpose of discrediting evolution by counterbalancing its teaching at every turn with the teaching of creationism."[160] Indeed, if the district were truly attempting to implement a policy consistent with the Santorum statement, it would explain to students that because

---

[156]   H.R. REP. NO. 107-334, at 703 (2001) (App. IV-BB).

[157]   *See supra* pages 32-34.

[158]   *See, e.g.*, *Edwards*, 482 U.S. at 591-92; *id.* at 598-601 (Powell, J., concurring); *Peloza v. Capistrano Unified Sch. Dist.*, 37 F.3d 517 (9th Cir. 1994); *Freiler v. Tangipahoa Parish Bd. of Educ.*, 975 F. Supp. 819, 827 (E.D. La. 1997), *aff'd*, 185 F.3d 337 (5th Cir. 1999); *McLean*, 529 F. Supp. at 1266-67; *Malnak*, 440 F. Supp. at 1322.

[159]   H.R. REP. NO. 107-334, at 703 (emphasis added) (App. IV-BB).

[160]   *Edwards*, 482 U.S. at 589 (internal quotation marks and citation omitted).

45

intelligent design involves a claim about the supernatural, it is not a "testable theor[y] of science" but rather a "religious or philosophical claim[] * * * made in the name of science."[161]

## II. STRONG EVIDENCE SHOWS THAT THE POLICY'S PRIMARY EFFECT IS TO ADVANCE RELIGION.

Plaintiffs' experts have testified that intelligent design is not science.[162]  And if it "is not science, the conclusion is inescapable that the only real effect of [the challenged policy] is the advancement of religion."[163]  That commonsense conclusion alone should be enough to dispose of the district's motion for summary judgment. But the record is replete with evidence that the policy fails *Lemon*'s effect test for myriad other reasons as well.

"The effect prong asks whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval."[164]  It seeks to ascertain whether some action "places the [government's] prestige, coercive authority, or resources behind a single religious faith or behind

---

[161]    H.R. REP. NO. 107-334, at 703 (App. IV-BB).

[162]    *See supra* pages 31-37.

[163]    *McLean*, 529 F. Supp. at 1272.

[164]    *Lynch v. Donnelly*, 465 U.S. 668, 690 (1984) (O'Connor, J., concurring).

religious belief in general."[165] "The Establishment Clause, at the very least, prohibits government from appearing to take a position on questions of religious belief or from 'making adherence to a religion relevant in any way to a person's standing in the political community.'"[166] Thus, official action violates the Establishment Clause if it "'convey[s] * * * a message that religion or a particular religious belief is *favored or preferred*.'"[167] Among other things, therefore, government may not "adopt a preference for the dissemination of religious ideas."[168]

Here, the effect inquiry requires this Court to determine what message the district's policy conveys to a reasonable, objective observer who knows the policy's language, origins, and legislative history, as well as the history of the Dover community and the broader social and historical context in which the policy arose.[169]

---

[165]   *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 9 (1989) (plurality op.).

[166]   *County of Allegheny v. ACLU*, 492 U.S. 573, 594 (1989) (quoting *Lynch*, 465 U.S. at 687 (O'Connor, J., concurring)).

[167]   *Id.* at 593 (quoting *Wallace*, 472 U.S. at 70 (O'Connor, J., concurring in judgment)).

[168]   *Texas Monthly*, 489 U.S. at 907 (Blackman, J., concurring) (cited in *Allegheny*, 492 U.S. at 593).

[169]   *McCreary*, 125 S. Ct. at 2736-37 (objective observer "presumed to be familiar with the history of the government's actions and competent to learn what history has to show"); *Santa Fe*, 530 U.S. at 308 (objective observer familiar with "'implementation of'" governmental action (citation omitted)); *Selman*, 2005 WL 83829, at *19 (objective observer "familiar with the origins and context of the

"[T]he reasonable observer is an informed citizen who is more knowledgeable than the average passerby":  In addition to knowing the challenged conduct's history, the observer is deemed able to "glean other relevant facts" from the face of the policy in light of its context.[170]  So irrespective of the district's purposes, the policy here is unconstitutional if an objective observer would conclude that it endorses or favors religion generally or one set of religious beliefs in particular.[171]

Because students in public schools "are impressionable and their attendance is involuntary,"[172] this case requires "particular[] vigilan[ce] in monitoring compliance with the Establishment Clause."[173]  Thus, "the operative inquiry is whether an

_____

government-sponsored message at issue and the history of the community where the message is displayed").

[170]    *Modrovich v. Allegheny County, Pennsylvania*, 385 F.3d 397, 407 (3d Cir. 2004); *see also Freethought Soc'y v. Chester County*, 334 F.3d 247, 258-60 (3d Cir. 2003).

[171]    *See, e.g.*, *Freiler*, 185 F.3d at 346 ("*Lemon*'s second prong asks whether, irrespective of the School Board's actual purpose, 'the practice under review in fact conveys a message of endorsement or disapproval.'" (quoting *Doe v. Santa Fe Indep. Sch. Dist.*, 168 F.3d 806, 817 (5th Cir.1999), *aff'd*, 530 U.S. 290 (2000))).

[172]    *Edwards*, 482 U.S. at 584.

[173]    *Id.*; *see also Lee v. Weisman*, 505 U.S. 577, 592 (1992) (students are impressionable and must be protected from government's coercive power); *Sch. Dist. v. Ball*, 473 U.S. 373, 390 (1985) ("The inquiry into this kind of effect must be conducted with particular care when many of the citizens perceiving the governmental message are children in their formative years."), *overruled in part on other grounds*, *Agostini v. Felton*, 521 U.S. 203 (1997); *Selman*, 2005 WL 83829, at *19.

'objective observer' in the position of a student of the relevant age would 'perceive official school support' for the religious activity in question."[174]  In other words, this Court should in the first instance consider "the message conveyed by the disclaimer to the students who are its intended audience,"[175] from the perspective of "an objective [Dover Area] High School student."[176]  But this Court should bear in mind, too, that the public, political dispute here has affected Dover more broadly, and therefore the Court should consider as well the message that the district's conduct communicates to the community as a whole.

Viewed through either lens, there is strong evidence that the challenged policy's effect is to "protect and maintain a particular religious viewpoint"[177] by disparaging the scientific theory historically thought to rival that viewpoint, and by encouraging students to study and reflect on inherently religious beliefs.

---

[174]    *Verbena United Methodist Church v. Chilton County Bd. of Educ.*, 765 F. Supp. 704, 711 (M.D. Ala. 1991) (quoting *Mergens*, 496 U.S. at 249).

[175]    *Freiler*, 185 F.3d at 346 (citing *Allegheny*, 492 U.S. at 620).

[176]    *Santa Fe*, 530 U.S. at 308.

[177]    *Freiler*, 185 F.3d at 346.

49

## A.    The Policy Communicates To Students A Strong Endorsement Of Religion.

This case comes down to the students:  They are the policy's intended audience, so there can be no more critical issue than determining what message it conveys to them.[178]  And there is highly persuasive evidence that the disclaimer directs them to accept religious teachings and reject science — an unequivocal endorsement of religion.

1.    In *Freiler*, the Fifth Circuit struck down an evolution disclaimer for unconstitutional effect, citing "the interplay of three factors":

> (1) the juxtaposition of the disavowal of endorsement of evolution with an urging that students contemplate alternative theories of the origin of life; (2) the reminder that students have the right to maintain beliefs taught by their parents regarding the origin of life; and (3) "the Biblical version of Creation" as the only alternative theory explicitly referenced in the disclaimer.[179]

Dover's policy has all three features, and hence there is ample reason to conclude that it communicates to students the same unconstitutional message that the *Freiler* disclaimer did.

---

[178]    *Id.*

[179]    *Id.*

50

2.      Most obviously, the policy here "leaves the discussion of the Origins of Life to individual students and their families," thus mimicking the *Freiler* disclaimer's reminder that students can maintain the beliefs that their parents hold.[180]

3.      As in *Freiler*, the Dover policy also encourages students to "keep an open mind" and explore alternatives to evolution; yet it offers only one alternative, and an inherently religious one at that.  In this regard, even a relatively unsophisticated ninth-grader could figure out that the phrase 'intelligent design' necessarily contemplates an 'intelligent designer.'  Whether that student then accepts the board's invitation to explore *Pandas* "and other resources" on intelligent design, or instead follows the

---

[180]      The district advances the view that excluding "Origins of Life" from its science curriculum is at least a permissible accommodation to students or parents who have religious objections to scientific theories of 'origins'; and it suggests that not altering its curriculum in that way might even constitute unconstitutional hostility toward religion.  Br. at 18.  Both views are wrong as a matter of law.  While the district could lawfully decide not to teach about 'origins' for purely secular reasons (such as, for example, lack of time in the semester or a determination that scientific theories of origin are too complicated for ninth-graders to comprehend) as long as the decision did not have the primary effect of advancing religion, the Supreme Court foreclosed the district's accommodation argument in *Epperson* when it declared that "the First Amendment does not permit the State to require that teaching and learning must be tailored to the principles or prohibitions of any religious sect or dogma."  482 U.S. at 106.  And if the Establishment Clause ***prohibits*** school districts from omitting instruction on 'origins' because the topic might offend some students' or parents' religious views, the Clause cannot simultaneously ***require*** them to banish the topic from their curriculum for the very same reason.

51

board's suggestion to discuss 'origins of life' with family members, it requires no great leap to infer that the district's proffered alternative to evolution is religious.

4.    And although Dover's policy perhaps disclaims evolution less straightforwardly than the policy in *Freiler* did,[181] it makes up in thoroughness what it lacks in elegance:  It singles out evolution from among all the scientific concepts that students learn, and uniquely identifies evolution as a theory, "not a fact."  It then defines 'theory' as "a well-tested explanation that unifies a broad range of observations."  And it tells students that evolution is a theory with gaps "for which there is no evidence" — sending them the clear message that evolution must not be "a well-tested explanation that unifies a broad range of observations" but must instead be nothing more than a set of wild hunches.

The court in *Selman* confronted the same theory-not-fact language and credited Dr. Miller's testimony explaining that "the use of 'theory' in the Sticker plays on the colloquial or popular understanding of the term and suggests to the informed, reasonable observer that evolution is only a highly questionable 'opinion' or

---

[181]    *Cf.* 185 F.3d at 341 (informing students that lesson on evolution "should be presented to inform students of the scientific concept and not intended to influence or dissuade the Biblical version of Creation or any other concept").  One cannot help but wonder whether Dover's more guarded language might reflect the district's or its counsel's awareness of the need to distance itself from the creationists' failures in *Edwards* and *Freiler*.  *Cf. Edwards*, 482 U.S. at 603 (Powell, J., concurring); *Epperson*, 393 U.S. at 109.

'hunch.'"[182] Drs. Miller and Alters testified similarly here.[183] What is more, an expert for the district, Fuller, agrees the policy is misleading for that reason.[184] Surely the district's misleading language — which invites students to devalue the scientific theory of evolution for invalid reasons — at least raises a fact question whether the policy has the unconstitutional effect of promoting a religious alternative to evolution. For "[a] teacher's reading of a disclaimer that not only disavows endorsement of educational materials but also juxtaposes that disavowal with an urging to contemplate alternative religious concepts implies School Board approval of religious principles."[185] And that message only gets magnified where, as here, the policy treats the scientific theory of evolution and the proffered alternative in an unbalanced fashion by criticizing evolution as lacking sufficient empirical support, when the alternative that the school district advances is a view of the supernatural that is not subject to empirical proof.

5.      Finally, the Dover policy bears another stamp of official school-district approval that the *Freiler* and *Selman* disclaimers lacked.  Unlike in those cases, a

---

[182]     *Selman*, 2005 WL 83829, at *23.

[183]     K. Miller Dep. at 321:15-322:1; Alters Dep. at 286:16-288:5, 307:24-308:6.

[184]     Fuller Dep. at 110:3-111:11.

[185]     *Freiler*, 185 F.3d at 348.

school administrator makes a special appearance in the students' science class and displaces the regular classroom teacher to deliver the disclaimer — surely a rare and portentous event, and one whose significance would not be lost on students.[186]

If the Fifth Circuit in *Freiler* and the district court in *Selman* could conclude that the disclaimers in those cases unconstitutionally endorsed religion, then surely this Court should reach the same conclusion here, where the message of endorsement is even stronger.

## B. The Policy Sends The Dover Community A Strong Message Of Religious Endorsement.

Although the challenged policy's intended audience consists primarily of Dover-high-school students, the school board — a body of elected officials — developed and instituted the policy in a series of public meetings and defended it in

_____

[186]    *See* Alters Dep. at 243:12-244:24, 248:22-249:14.  The district repeatedly argues that its policy cannot have either the purpose or the effect of advancing religion because the high school does not "teach[]" intelligent design but instead merely "mak[es] students aware of" that set of beliefs.  *See, e.g.*, Br. at 2, 13, 16, 21-22.  The district's semantic distinction is not only false (*see, e.g.*, Alters Dep. at 134:17-137:3 (explaining that reading statement to science class constitutes teaching; WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2346 (1986) (defining "teach" to include "present[ing] in a classroom lecture or discussion")), but also irrelevant as a matter of law:   The Establishment Clause forbids not just 'teaching' religion, but ***any*** governmental action that has the primary purpose or effect of advancing religion.  *See generally Lemon*, 403 U.S. at 612-13.  Thus, for example, the constitutional violation in *Epperson* consisted of ***forbidding*** the teaching of evolution (393 U.S. at 103), and the violation in *Selman* took the form of placing passive stickers on students' textbooks (2005 WL 83829, at *25).

the media and through a direct-mail campaign.  Thus, the school board drew the entire community into the fray, and the Court should therefore also consider, from the standpoint of a reasonable, objective observer in the community, the message that the challenged policy communicates.

The reasonable, objective observer, knowing legislative history for the challenged policy, the community's history, and the broader social and historical context in which the policy arose, considers the publicly available evidence relevant to the purpose inquiry.[187]  But the observer looks at that evidence to ascertain whether the policy "in fact conveys a message of endorsement or disapproval" of religion, irrespective of what the district might have intended by it.[188]  Put differently, the effect inquiry focuses on "the 'objective' meaning of the [board's policy] in the community," whereas the purpose inquiry looks at the "intention of the speaker."[189] The upshot is that, even if this Court were to find at trial that the district's primary

---

[187]    *See, e.g.*, *Selman*, 2005 WL 83829, at *19.

[188]    *Lynch*, 465 U.S. at 690 (O'Connor, J., concurring) ("The central issue in this case is whether [government] has endorsed Christianity by its [actions]. To answer that question, we must examine both what [the government] intended to communicate * * * and what message [its conduct] actually conveyed.  The purpose and effect prongs of the Lemon test represent these two aspects of the meaning of the [government's] action."); *Freiler*, 185 F.3d at 346; *Selman*, 2005 WL 83829, at *19-*20.

[189]    *Lynch*, 465 U.S. at 690 (O'Connor, J., concurring).

purpose was secular — an inference that the record does not support — the policy still violates the Establishment Clause if the community would regard it as having the primary effect of favoring religion or giving preferential treatment to particular religious beliefs.[190]

On the record here, this Court could surely come to that conclusion, thus precluding summary judgment.

1.     Without belaboring the point, a reasonable observer considering all the explicitly religious statements that the board members made in advocating for the curriculum change could readily conclude that the policy is nothing short of creationism — an inherently religious view.  Bonsell, Buckingham, and Geesey all made clear that their goal was to work creationism into the curriculum:  They said so to the high-school administration,[191] in public board meetings,[192] and to the press.[193] As curriculum-committee chairperson, Buckingham pledged to find a textbook that

---

[190]     *See, e.g.*, *Freiler*, 185 F.3d at 346; *Selman*, 2005 WL 83829, at * 19-*20.

[191]     *See supra* page 18.

[192]     *See supra* pages 18-20.

[193]     *See supra* page 21.

56

would present creationism,[194] and *Pandas* offered just what he sought.[195]  Beyond that, a reasonable observer would know (or have the capacity to discover) that the board received *Pandas* as an 'anonymous' donation funded by Bonsell's father and by contributions that Buckingham solicited from the parishioners at his church.[196]  Such an observer would surely conclude, on that evidence, that the board probably achieved with its policy what it had set out to accomplish.[197]

2.    Beyond that, a reasonable observer, looking at the disclaimer in light of the history of religious opposition to evolution and the courts' response thereto, would know that the board employed commonplace religious tactics for disparaging evolution and advancing creationism.

First, the disclaimer declares that evolution "is a theory * * * not a fact."  That language has a pedigree:  A long line of anti-evolution cases reveals that "whether evolution is referenced as a theory or a fact is * * * a loaded issue with religious undertones," reflecting "a lengthy debate between advocates of evolution and

---

[194]    *See supra* page 19.

[195]    *See supra* pages 14-15, 22.

[196]    *See supra* page 22.

[197]    *See Santa Fe*, 530 U.S. at 308.

proponents of religious theories of origin."[198]  Telling students that evolution is a

theory rather than a fact is "one of the latest strategies to dilute evolution instruction

employed by anti-evolutionsists with religious motivations."[199]  The Third Circuit has

held that "'the history and ubiquity' of a practice is relevant [to the effect inquiry]

because it provides part of the context in which a reasonable observer evaluates

whether a challenged governmental practice conveys a message of endorsement of

religion."[200]  A reasonable observer would thus know the social meaning of the theory-

not-fact circumlocution and would "perceive the School Board to be aligning itself

with proponents of religious theories of origin," thus "communicating to those who

endorse evolution that they are political outsiders, while * * * communicat[ing] to the

---

[198]     *Selman*, 2005 WL 83829, at *21 (citing *Edwards*, 482 U.S. at 624 (Scalia, J., dissenting) (noting that balanced-treatment-act's sponsor opposed evolution being taught as fact because it would communicate to students that "science has proved their religious beliefs false"); *Peloza*, 37 F.3d at 520 (rejecting Christian teacher's claim that "evolutionism" is a religion and that school district therefore violated Establishment Clause by requiring him to teach evolution as fact rather than theory); *Mozert v. Hawkins County Bd. of Educ.*, 827 F.2d 1058, 1062 (6th Cir. 1987) (witness in Free Exercise case brought by born-again Christians complained that teachers presented evolution as fact); *Freiler*, 975 F. Supp. at 824 (noting school-board-members' concern with teaching evolution as fact because many students in district believed in biblical view of creation)).

[199]     *Selman*, 2005 WL 83829, at *21 (citing law-review articles explaining that fact).

[200]     *Freethought*, 334 F.3d at 259 (quoting *ACLU v. Black Horse Pike Reg'l Bd. of Educ.*, 84 F.3d 1471, 1486 (3d Cir. 1996)).

58

Christian fundamentalists and creationists who pushed for a disclaimer that they are political insiders."[201]  But, of course, "'[t]he Establishment Clause, at the very least, prohibits government from appearing to take a position on questions of religious belief,' and this is exactly what the School Board appears to have done."[202]

Second, the disclaimer here singles out the scientific theory of evolution, targeting it and nothing else in the curriculum as a "theory" with "[g]aps" and inadequate empirical support.[203]  The *Selman* court and plaintiffs' expert Dr. Miller both explain that "there are other science topics taught that have religious implications, such as the theories of gravity, relativity, and Galilean heliocentrism."[204] Yet the district targets only evolution — "the one scientific theory that historically has been opposed by certain religious sects."[205]  The *Selman* court found that this singling-

---

[201]    *Selman*, 2005 WL 83829, at *22.  That message would only be bolstered by the reasonable observer's knowledge that Buckingham first used the language when publicly advocating for creationism.  *See supra* pages 18-19.

[202]    *Id.* at *21 (quoting *Allegheny*, 492 U.S. at 593-94) (alteration in original).

[203]    The district makes the truly bizarre argument that "it is of no constitutional significance that the Darwinian theory of evolution is the only theory of evolution in which 'gaps/problems' will be presented because it is the *only* such theory that will be taught."  Br. at 14.  The point, of course, is that the district singles out ***evolution***, not that it singles out one person's exposition of evolution.

[204]    2005 WL 83829, at *4; *see* K. Miller Dep. at 172:17-173:9.

[205]    *Edwards*, 482 U.S. at 522 n.7.

out technique sends the message that "the School Board believes there is some problem peculiar to evolution";[206] and "[i]n light of the historical opposition to evolution by Christian fundamentalists and creationists[,] * * * the informed, reasonable observer would infer the School Board's problem with evolution to be that evolution does not acknowledge a creator."[207]  Plaintiffs' experts will testify that the policy here communicates just such a message; and this Court could so find.

Third, although evolution is, at the very least, "the dominant *scientific* theory of origin accepted by the majority of scientists,"[208] — a fact that the district concedes[209] — the policy "does not reference 'evolution' as a 'scientific theory' or a 'prevailing scientific theory,'" thus "appear[ing] to purposely leave to question whether evolution is an accepted or established theory in the scientific community."[210]  Plaintiffs' expert Dr. Alters confirms[211] that, "[b]y denigrating evolution, the School

---

[206]     *Selman*, 2005 WL 83829, at *22; *see also* K. Miller Dep. at 320:2-322:9.

[207]     *Selman*, 2005 WL 83829, at *22.

[208]     *Id.*

[209]     Br. at 14.

[210]     *Selman*, 2005 WL 83829, at *22-*23.

[211]     *See* Alters Dep. at 254:2-255:22, 257:16-258:3.

Board appears to be endorsing the well-known prevailing alternative theory, creationism or variations thereof * * *."[212]

3.    The record is also replete with evidence that the entire Dover community understands the biology-textbook and curriculum debate to be a religious controversy, and that the community recognizes intelligent design and the challenged policy to be fundamentally religious in nature.   The board members' express religious and creationist objectives have received, for example, extensive coverage in local newspapers; and numerous letters to the editor demonstrate that citizens on every side of the issue perceive the disputes to involve religion.[213]   In *Epperson*, the Supreme Court looked to such indicators to ascertain how the community viewed the challenged anti-evolution statute;[214] and this Court may do so here.

---

[212]    *Selman*, 2005 WL 83829, at *22.

[213]    *See* App. IV-CC, DD.

[214]    393 U.S. at 108 n.16.  The Court considered community members' letters to the editor in determining the challenged statute's purpose.  But plainly, measures of how the public perceives a governmental action are at least as relevant to effect as to purpose.  *See, e.g.*, *Santa Fe*, 530 U.S. at 308 (unconstitutional endorsement of prayer can be established by considering how "listening public" would view message in context in which prayer is delivered).  Although the endorsement test does not focus on the actual perceptions of individual observers (*Capital Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 799-800 (1995) (O'Connor, J., concurring)), the fact that so many articles and letters to the editor have described the dispute in religious terms provides strong evidence of the community's "collective social judgment" (*id.* at 780 (O'Connor, J., concurring) (brackets omitted)).

61

The widespread attention that the policy has received in Dover is no surprise, for the district brought the dispute to every doorstep, sending each household a newsletter defending the policy by declaring that, "on a molecular level, scientists have discovered a purposeful arrangement of parts which cannot be explained by Darwin's theory."[215]

4.     But the news reports and letters to the editor do more than just clarify how the public views the district's actions here:  They reveal that Dover is sharply divided over the board's conduct — divided precisely because everyone knows that the controversy here is neither an academic dispute about competing scientific theories nor a pedagogic debate about modes of thinking, but rather a religiously based culture clash in which the district has impermissibly and unadvisedly taken sides.[216]  "[O]ne of the major concerns that prompted adoption of the Religion Clauses" was that "[t]he Framers and the citizens of their time intended * * * to guard against the civil divisiveness that follows when the Government weighs in on one side of a religious debate."[217]

---

[215]     App. IV-D.

[216]     *See Allegheny*, 492 U.S. at 593-94.

[217]     *McCreary*, 125 S. Ct. at 2742; *see also, e.g.*, *Van Orden v. Perry*, 125 S. Ct. 2854, 2868 (2005) (Breyer, J., concurring in judgment) (Religion Clauses "seek to avoid that divisiveness based upon religion that promotes social conflict, sapping the strength of government and religion alike"); *Santa Fe*, 530 U.S. at 310 ("One of

5.      Divisiveness is no small matter here:  Not only has the board's policy placed neighbors on opposite sides of a religious dispute, while affording one group the school district's stamp of approval,[218] but it drove three school-board members — Casey Brown, Jeff Brown, and Angie Yingling — to resign their posts in the face of attacks from the remaining members, who branded them atheists.[219]  The Supreme Court warned in *Santa Fe* that "[s]chool sponsorship of a religious message is impermissible because it sends the ancillary message to members of the audience who are nonadherents 'that they are outsiders, not full members of the political community * * *.'"[220]  Casey Brown's resignation speech chillingly echoes that warning:

> In the past year, regretfully, there * * * has been a slow, but steady, marginalization of some board members.  Our opinions are no longer valued or listened to.  Our contributions have been minimized or not acknowledged at all.
>
> A measure of that is the fact that I myself have been twice asked within the past year if I was ["]born again.["]  No one has — or should

---

the purposes served by the Establishment Clause is to remove debate over [religious] issue[s] from governmental supervision or control.").

[218]     *See Santa Fe*, 530 U.S. at 308.

[219]     J. Brown Dep. at 31:7-17, 145:6-11, 170:4-21, 172:9-15; C. Brown Dep. at 204:4-221:5; Yingling Dep. at 37:15-41:25.

[220]     *Santa Fe*, 530 U.S. at 309-10 (quoting *Lynch*, 465 U.S. at 688 (O'Connor, J., concurring)); *accord McCreary*, 125 S. Ct. at 2733.

have — the right to ask that of a fellow board member.  An individual's religious beliefs should have no impact on his or her ability to serve as a School Board Director.  Nor should a person's beliefs be used as a yardstick to measure the value of that service.

However, it has become increasingly evident that, in the direction this board has now chosen to go, holding a certain religious belief is of paramount importance.

Because of this, it is quite clear that I can no longer effectively function as a member of this board — that I can no longer properly represent the members of this community.[221]

Ms. Brown's plea for religious inclusion should not be a cry into the wind; plaintiffs should have the opportunity to vindicate the fundamental constitutional values it represents by making the district explain its actions at trial.

## CONCLUSION

Plaintiffs have earned their day in court:  The expert and fact-witness testimony and documentary evidence strongly supports their claims that the challenged policy's primary purpose and effect are religious, and hence that the policy violates the Establishment Clause.  The motion for summary judgment should be denied.

---

[221]    App. IV-EE.

Respectfully submitted,


 /s/ *Richard B. Katskee*
Ayesha N. Khan (adm. *phv*)
Richard B. Katskee (adm. *phv*)
AMERICANS UNITED FOR SEPARATION
    OF CHURCH AND STATE
518 C St., NE
Washington, DC  20812
(202) 466-3234
*akhan@au.org*
*katskee@au.org*

Eric Rothschild (PA 71746)
Stephen G. Harvey (PA 58233)
Alfred H. Wilcox (PA 12661)
Christopher J. Lowe (PA 90190)
PEPPER HAMILTON LLP
3000 Two Logan Square
18th & Arch Streets
Philadelphia, PA  19103
(215) 981-4000
*rothschilde@pepperlaw.com*
*harveys@pepperlaw.com*
*wilcoxa@pepperlaw.com*
*lowec@pepperlaw.com*

Thomas B. Schmidt, III (PA 19196)
PEPPER HAMILTON LLP
200 One Keystone Plaza
North Front and Market Streets
P.O. Box 1181
Harrisburg, PA  17108
(717) 255-1155
*schmidtt@pepperlaw.com*

65

Witold J. Walczak (PA 62976)
ACLU OF PENNSYLVANIA
313 Atwood St.
Pittsburgh, PA  15213
(412) 681-7864
*vwalczak@aclupgh.org*

Paula K. Knudsen (PA 87607)
ACLU OF PENNSYLVANIA
105 N. Front St., Suite 225
Harrisburg, PA  17101
(717) 236-6827
*pknudsen@aclupa.org*

*Counsel for Plaintiffs*

Date:  August 8, 2005

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing *Opposition to Defendants' Motion for Summary Judgment* complies with Local Rules 5.1 and 7.8 and with this Court's Order dated August 4, 2005.  The brief contains 14,971 words and is printed in 14-point Times New Roman typeface.


/s/ Richard B. Katskee
Richard B. Katskee

Date:  August 8, 2005

## CERTIFICATE OF SERVICE

I hereby certify that, on August 8, 2005, I caused a copy of the foregoing *Opposition to Defendants' Motion for Summary Judgment* and the accompanying *Response to Defendants' Statement of Material Facts Pursuant to LR 56.1* to be served by the Middle District's ECF system, and a copy of the *Opposition*'s five supporting appendices to be served by overnight carrier, postage prepaid, on the following counsel:

Richard Thompson                    Ron Turo
Robert J. Muise                     Turo Law Offices
Patrick T. Gillen                   28 South Pitt St.
THOMAS MORE LAW CENTER              Carlisle, PA  17013
24 Frank Lloyd Wright Dr.
P.O. Box 393
Ann Arbor, MI  49106

*Counsel for Defendants*


 /s/ Richard B. Katskee
Richard B. Katskee

68