## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

TAMMY KITZMILLER, et al.,    )
          )
    Plaintiffs,    )    Case No. 04-CV-2688
          )    (Hon. Judge Jones)
    v.    )
          )
DOVER AREA SCHOOL DISTRICT and  )    **DEFENDANTS' REPLY**
DOVER AREA SCHOOL DISTRICT    )    **BRIEF IN SUPPORT OF**
BOARD OF DIRECTORS,    )    **MOTION FOR SUMMARY**
          )    **JUDGMENT**
    Defendants.    )
_____)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................iii

INTRODUCTION ..........................................................................................2

ARGUMENT ................................................................................................7

    I.    "Gaps And Problems" With Plaintiffs' Theory Of The Case ..............7

        A.    The <u>Actual</u> Policy At Issue .......................................................7

        B.    The Deafening Sound Of Silence .............................................11

        C.    Throw It Up And See If It Sticks..............................................13

        D.    Science vs. Science................................................................17

        E.    Evolution:  Fact or Theory?.....................................................24

        F.    Where's The Link? .................................................................27

              1.    Fundamentalists And The Book Of Genesis .................28

              2.    *Epperson v. Arkansas* ....................................................29

              3.    Balanced Treatment ......................................................31

        G.    Disclaiming The Truth?...........................................................33

              1.    *Freiler v. Tangiapahoa Parish Bd. Of Educ.* .................34

              2.    *Cobb County* .................................................................38

    II.    THE PURPOSE AND EFFECT OF DASD'S MODEST CURRICULUM CHANGE DO NOT ESTABLISH RELIGION ...........................................41

        A.    DASD'S Policy Has A Valid Secular Purpose ...................................41

1.      Valid Secular Purposes ...........................................................46

(a)     Raising students' awareness about multiple ways of knowing ...................................................................46

(b)     Promoting critical thinking.......................................................46

(c)     Encouraging students to assume more responsibility in their learning and to play an active part in constructing their own knowledge......................................................................48

(d)     Promoting a fuller understanding of the theory of evolution, including its limitations ...........................................................48

(e)     Aligning its curriculum with the Pennsylvania Academic Standards, which require students to "Critically evaluate the status of existing theories," including the "theory of evolution"..............................................................................49

(f)     Helping students understand the views inherent in controversial issues, such as biological evolution, which is consistent with the Santorum Amendment .......................................................49

2.      Purpose Not Motives ................................................................50

B.      The Primary Effect Neither Advances Nor Inhibits Religion.............52

CONCLUSION.................................................................................................57

CERTIFICATE OF COMPLIANCE................................................................59

CERTIFICATE OF SERVICE ..........................................................................60

# TABLE OF AUTHORITIES

<u>Case</u>                                                                                                      <u>Page</u>

*Alder v. Duval County Sch. Bd.,*
206 F.3d 1070 (11th Cir. 2000) (en banc) ................................................................. 3

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1969) ........................................................................................ 1

*Board of Education v. Mergens,*
496 U.S. 226 (1990) ................................................................................*passim*

*Board of Educ. v. Pico,*
457 U.S. 853 (1982) ................................................................................*passim*

*Bown v. Gwinnett County Sch. Dist.,*
112 F.3d 1464 (11th Cir. 1997) ......................................................................... 51

*Capitol Square Review & Advisory Bd., v. Pinette,*
515 U.S. 753 (1995) ................................................................................. 15, 53

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ........................................................................................ 2

*County of Allegheny v. ACLU,*
492 U.S. 573 (1989) ...................................................................................... 53

*Daniel v. Waters,*
515 F.2d 485 (6th Cir 1975) ............................................................................. 31

*Edwards v. Aguillard,*
482 U.S. 578 (1987) ................................................................................*passim*

*Epperson v. Arkansas,*
393 U.S. 97 (1968) .................................................................................*passim*

*Freedom from Religion Found. v. City of Marshfield,*
203 F.3d 487 (7th Cir. 2000) ........................................................................... 15

*Freethought Soc'y v. Chester County,*
334 F.3d 247 (3rd Cir. 2003) ..................................................................53

*Freiler v. Tangiapohoa Parish Bd. Of Educ.,*
185 F.3d 337 (5th Cir. 1999) ...........................................................*passim*

*Grove v. Mead Sch. Dist.,*
753 F.2d 1528 (9th Cir. 1985) .................................................................16

*Lambs' Chapel v. Central Moriches Union Free School Dist,*
508 U.S. 384 (1993)...................................................................................36

*Lemon v. Kurtzman,*
403 U.S. 602 (1971)...........................................................................*passim*

*Lynch v. Donnelly,*
465 U.S. 668 (1984)..................................................................36, 52, 53

*McCreary County v. ACLU,*
125 S.Ct. 2722 (2005)........................................................................*passim*

*McLean v. Arkansas Bd. Of Educ.,*
529 F. Supp. 1255 (E.D. Ark 1982)..................................................28, 31

*Modrovich v. Allegheny County,*
385 F.3d 397 (3rd Cir. 2004) .............................................................52, 53

*Monell v. New York City Dep't Of Soc. Serv.,*
436 U.S. 648 (1978)..................................................................................3, 30

*Mueller v. Allen,*
463 U.S. 388 (1983)....................................................................................42

*School Dist. Of Abington Township v. Schempp,*
374 U.S. 203 (1963)......................................................................................5

*Selman v. Cobb County Sch. Dist.,*
No. Civ. A. 1:02-CV-2325-C, 2005 WL 83829 ...............................*passim*

*Tangiapahoa Parish Bd. Of Educ. v. Freiler,*
530 U.S. 1251 (2000) ............................................................................ 37

*United States v. Allen,*
760 F.2d 447 (2nd Cir. 1985) ............................................................... 16

*Van Orden v. Perry,*
125 S.Ct. 2854 (2005) ........................................................................... 34

*Wallace v. Jaffree,*
472 U.S. 38 (1985) ........................................................................... *passim*

## Books

*Biology* ............................................................................................ *passim*

*Finding Darwin's God* ..................................................................... 19, 21

*Of Pandas and People:  The Central Question of Biological Origins* ............. *passim*

*The Origin of Species* ....................................................................... 18, 21

## Other

*American Constitutional Law* 828 (1978) ............................................... 17

## SUMMARY JUDGMENT

This case is ripe for summary judgment in Defendants' favor.  In a feckless effort to resist this proper result, Plaintiffs have created a straw man, which ignores the actual policy at issue.  This tactic is not sufficient to survive Defendants' motion.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1969) (stating, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact").[1]

Plaintiffs make several heartfelt pleas for a trial, seeking, at times, this Court's compassion for their cause, almost begging for it.  (*See* Pls.' Br. at 64 ("Ms. Brown's plea for religious inclusion should not be a cry into the wind.")).  At other times they are demanding, boldly stating that they "have earned their day in court."  (Pls.' Br. at 64).  Despite Plaintiffs' passion for their cause, the evidence does not support their wildly exaggerated claims, as demonstrated further below.

Contrary to Plaintiffs' assertions, the summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral

---

[1] In this reply, Defendants cite to their previously filed Statement of Material Facts Pursuant to LR 56.1 ("SMF") with attached Exhibits 1 through 8, Exhibit 9 (exhibits from the deposition of Dr. Kenneth Miller), Exhibit 10 (deposition excerpts of John Buell), Exhibit 11 (deposition excerpts of Charles Thaxton), and Exhibit 12 (deposition excerpts of Robert Linker), which are filed along with this reply, and deposition testimony filed by Plaintiffs, which is cited by reference to its appendix and tab location.

part of the Federal Rules as a whole, which are designed to "secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Indeed, Defendants are entitled to a judgment as a matter of law and have earned the right to put this lawsuit behind them and to get on with the business of educating the students in the Dover Area School District ("DASD").

## INTRODUCTION

> Families entrust public schools with the education of their children, but condition their trust on the understanding that the classroom will not purposely be used to advance views that may conflict with the private beliefs of the student and his or her family.

*Edwards v. Aguillard*, 482 U.S. 578, 584 (1987).

Plaintiffs cite this oft-quoted passage from *Edwards* and then proceed to ignore it.

DASD parents and students trust and expect that their public schools will be places to learn, to inquire, and to explore and challenge ideas. Defendants' curriculum change is a modest step in that direction, and the policy at issue expressly ensures that the science "classroom will not purposely be used to advance views that may conflict with the private beliefs of the students and his or her family."[2]   Plaintiffs, on the other hand, take a rather illiberal view toward

---

[2] The challenged policy at issue unequivocally states that no teacher will teach intelligent design, creationism, or present his or her, or any DASD Board member's religious beliefs. (SMF ¶¶4, 30, Ex. E at Ex. 1). There is no evidence that any faculty member or administrator at Dover High School violated this

education and seek to use the power of the courts to force Defendants to censor ideas that Plaintiffs dislike. This is contrary to the trust and expectations of the students and parents. Indeed, Plaintiffs want this Court to cast a pall of orthodoxy over the science education at Dover High School. This Court should decline this improper invitation.

Plaintiffs' lengthy brief and the tactics their attorneys have employed in this case[3] are quite telling. This case is not about the concerns of Plaintiffs, or more accurately, the concerns of the ACLU and Americans United for Separation of Church and State ("AUS"), for the science education of the students at Dover High

---

policy. And if they had, this would not be the basis for holding DASD liable. *See Monell v. New York City Dep't of Soc. Serv.*, 436 U.S. 658 (1978) (holding that under § 1983 a government entity may not be held liable under a theory of respondeat superior and that to obtain a judgment against the municipality a plaintiff must show that the municipality itself supported the violation of the alleged rights).

[3] For example, during deposition, Plaintiffs' attorneys have asked DASD board members such questions as "Do you attend a church?," "Do you have a copy of the Bible at home?," "Do you know what version of the Bible it is?" (Harkins Dep. at 16-17 at App.I, Tab-L); "What church do you attend?," "That pin you're wearing, the cross, the crucifix, with the flag on it, is that a representation of your personal beliefs?," "Is the theory of evolution offensive to your personal religious beliefs?," and "Do you believe in a literal reading of the book of Genesis?" (Buckingham Dep. at 8, 10, 11, 12 at App.I, Tab-G). In their brief, Plaintiffs criticize DASD for selecting the Thomas More Law Center to represent it in this case because of the Law Center's religious character. This criticism is improper. *See Adler v. Duval County Sch. Bd.*, 206 F.3d 1070, 1086 (11th Cir. 2000) (en banc), *vac. on other grounds*, 531 U.S. 801, *opinion and judgment reinstated*, 250 F.3d 1330 (11th Cir. 2001) ("There is nothing inappropriate about a school system attempting to understand its constitutional obligations."). Such *ad hominem* attacks are irrelevant and inappropriate.

School.  If that *were* the case, Plaintiffs and the organizations representing them would encourage the introduction of new ideas and different ways of thinking and learning.  Moreover, if Darwin's theory of evolution were a rock-solid fact—as Plaintiffs' brief implies—one would expect Plaintiffs to invite and encourage criticism and to use this as an opportunity to learn more about the strengths of the theory.  However, the dirty little secret is that the Darwinian theory of evolution is <u>not</u> a fact.  This is not a religious idea; it is a scientific one—just ask Plaintiffs' lead expert, Dr. Kenneth Miller, under oath.[4]  And this <u>fact</u> is a material fact that is undisputed in this case.[5]  Moreover, scientists acknowledge weaknesses (i.e., gaps and problems) in the Darwinian theory of evolution.[6]  One would assume the contrary by reading Plaintiffs' brief.

In the final analysis, this lawsuit amounts to little more than a thinly-veiled effort to advance the broader agenda and objectives of the ACLU and AUS to perpetuate the myths of the Scopes trial.[7]  To do so, Plaintiffs must ignore the

---

[4] *See* SMF at ¶12 (citing Miller Dep. at 319:19-24-320:1-4 at Ex. 2).  *See also Epperson*, 393 U.S. at 114 ("[P]erhaps no scientist would be willing to take an oath and swear that everything announced in the Darwinian theory is unquestionably true.") (Black, J., concurring).

[5] *See* Pls.' Resp. to SMF at ¶¶12-13 (admitting facts).

[6] *See* SMF at ¶¶8-11; Pls.' Resp. to SMF at ¶¶8-11 (admitting facts).

[7] The highly publicized Scopes trial was less about proving the innocence of Scopes and more about seeking to humiliate fundamentalists.  This case is not "just

salient and simple facts of this case and, indeed, obscure them by resorting to hyperbole and histrionics and raising matters that have absolutely no relevance nor connection to this case.

This is not the case that Plaintiffs claim it to be, nor, quite frankly, the case that they probably wanted to bring. No matter how hard they try to make this into the Scopes Trial II, the undisputed, material facts simply do not support their exaggerated claims.

As this Court considers Defendants' motion, it should be mindful of what Justices Goldberg and Harlan concluded in *School Dist. of Abington Township v. Schempp*: "The First Amendment does not prohibit practices which <u>by any realistic measure</u> create none of the dangers which it is designed to prevent and which <u>do not so directly or substantially</u> involve the state in religious exercises or in the favoring of religion as to have <u>meaningful and practical impact</u>." *School Dist. of Abington Township v. Schempp*, 374 U.S. 203, 308 (1963) (concurring opinion) (emphasis added).

This lawsuit and the attention it has attracted in the local and national press cannot stand as the basis for Plaintiffs' constitutional claims. Indeed, but for the hype created by the media and the making of this modest curriculum change into a

---

another step in creationism's long march," as Plaintiffs allege. (Pls.' Br. at 17). Rather, it is simply another effort to push the much beloved secular legend of the Monkey Trial one step further.

federal case, students would have come and gone as usual, some partaking of the offer to look at *Of Pandas and People*, most not—preferring to focus on the many other distractions associated with being a teenager in a public high school.

Here, this Court must "distinguish between real threat and mere shadow." *Id.* Indeed, Plaintiffs' challenge to DASD's modest change to its ninth-grade biology curriculum elevates the trivial to the proverbial "federal case."

As a consequence of the rather simple and straightforward result that the facts of this case command—a result not favorable for Plaintiffs—Plaintiffs are compelled to ignore the undisputed material facts of <u>this</u> case in favor of complicating and obfuscating the matter beyond that which is recognizable or logically feasible. Plaintiffs are desperately trying to make this case the one they wanted. As a result, Plaintiffs ask this Court to ignore the modest curriculum change at issue in favor of extrapolating from it some far-reaching, fundamentalist conspiracy that would make Oliver Stone envious.[8] This Court should not be so easily persuaded.

_____

[8] As an interesting, and important, side note, DASD's lead science expert, Dr. Michael Behe, like Plaintiffs' lead science expert, is a practicing Catholic who has no religious objections to the Darwinian theory of evolution. (Behe Dep. at 87:24-25-88:1-9 at App.II, Tab-B; Miller Dep. at 139-141 at App.III, Tab-I). Also of note, Board member Sheila Harkins, who voted for the curriculum change, is a Quaker. She, like Dr. Behe, has no religious objections to the Darwinian theory of evolution. (*See* Harkins Dep. at 23:10-12 at App.I, Tab-L). Nevertheless, Plaintiffs insist on making this a "fundamentalist" issue—like the Scopes trial—which it is not.

## ARGUMENT

## I.     "Gaps And Problems" With Plaintiffs' Theory Of The Case.

Plaintiffs claim to have "marshaled" "voluminous evidence" to support their Establishment Clause claim.   (Pls.' Br. at 1-2).   Yet, once this Court closely examines this "evidence" in light of the underline actual policy at issue and the relevant case law, it is clear that no constitutional violation has occurred.[9]   In fact, Plaintiffs' approach appears to be "throw it all against the wall and see what sticks."

### A.     The **Actual** Policy At Issue.

Curiously absent from Plaintiffs' brief is a full recitation of the modest curriculum change and the brief statement that *are* at issue in this case.   Plaintiffs also fail to mention the official position of DASD regarding how this curriculum change will be implemented—the only true "disclaimer" at issue.   Taken together, these constitute the "policy" that Plaintiffs have challenged in the complaint.   *See* Compl. at ¶ 44 ("The defendant Dover School Board has authority to set official policy for the Dover Area School District.   Accordingly, the October 18, 2004, Board resolution and the November 19, 2004, press release at issue here represent

---

[9] Much of the "evidence" advanced by Plaintiffs is irrelevant to this case and/or objectionable on evidentiary grounds.   DASD intends to file motions *in limine* to exclude such matters should this case go to trial.   However, for purposes of this motion, DASD is confident of this Court's ability to wade through the morass of irrelevant "evidence" and illogical claims and assertions advanced by Plaintiffs and base its decision on the actual policy at issue.   The history of the Scopes trial and the alleged goals and objectives of Discovery Institute and FTE are not relevant to the inquiry at hand.

official policy of the Dover Area School District."). However, one would hardly know that from reading Plaintiffs' brief.

This is more than a simple oversight on Plaintiffs' part. Plaintiffs have obviously backed away from the actual curriculum and policy at issue and fail to address them in their entirety because they do not fit their theory of the case. Instead, Plaintiffs prefer to create a straw man that is more favorable to their position.

The _actual_ ninth-grade biology curriculum at issue (i.e., the October 18, 2004 resolution) simply states:

> Students will be made aware of gaps/problems in Darwin's Theory and of other theories of evolution including, but not limited to, Intelligent Design. The Origins of Life is not taught.

(SMF at ¶¶20, 28; Compl. at ¶33).

This is a rather insignificant addition to a curriculum that requires the comprehensive coverage of the Darwinian theory of evolution. (_See_ SMF at ¶¶2, 3, 5, 7, 28, Ex. B at Ex. 1; Pls.' Resp. to SMF at ¶¶2, 3, 5, 7, 28 (admitting facts)).

The brief statement is as follows:

> The Pennsylvania Academic Standards require students to learn about Darwin's Theory of Evolution and eventually to take a standardized test of which evolution is a part.

> Because Darwin's Theory is a theory, it continues to be tested as new evidence is discovered. The Theory is not a fact. Gaps in the Theory exist for which there is no evidence. A theory is defined as a well-tested explanation that unifies a broad range of observations.

8

Intelligent Design is an explanation of the origin of life that differs from Darwin's view.  The reference book, *Of Pandas and People*, is available for students who might be interested in gaining an understanding of what Intelligent Design actually involves.

With respect to any theory, students are encouraged to keep an open mind.  The school leaves the discussion of the Origins of Life to individual students and their families.  As a Standards-driven district, class instruction focuses upon preparing students to achieve proficiency on Standards-based assessments.

(SMF at ¶21).

This statement was modified to include the following revised sentence: "The reference book, *Of Pandas and People*, is available <u>in the library along with other resources</u> for students who might be interested in gaining an understanding of what Intelligent Design actually involves."   (SMF at ¶22) (emphasis added).   This revision reflects the fact that there are multiple resources regarding the topic of evolution, including intelligent design, available in the library.  (SMF at ¶22).

Because of the mischaracterizations surrounding the selection of the ninth-grade biology text and adoption of this modest curriculum change—mischaracterizations that Plaintiffs seek to perpetuate—DASD issued an <u>official</u> statement on November 19, 2004 and again on December 14, 2004, which stated, in relevant part, the following:

Over the past several months, the District's Board of Directors has been updating its Science and Biology curriculum and adopting and approving support materials, including textbooks.  The School Board has undertaken considerable effort to develop and adopt a fair and balanced science curriculum.  During the course of discussions about

9

> curriculum updates, numerous individuals and the media have made confusing, conflicting, and inaccurate statements. Many of these statements have been personal opinions or misinterpretations of District activities and curriculum directives. Some statements and opinions from the media, community members, and Board members, which are completely inaccurate or false, have been assumed to be official District policy or curriculum procedure.

(SMF at ¶30; Pls.' Resp. to SMF ¶30 (admitting fact)).

This official policy statement concludes as follows: "The foregoing statements were developed to provide a balanced view, and not to teach or present religious beliefs. The Superintendent, Dr. Richard Nilsen, has directed that no teacher will teach Intelligent Design, Creationism, or present his or her, or the Board's, religious beliefs. . . . School districts are forums for inquiry and critical discussions. The above statement and the District's revised Biology curriculum together provide an opportunity for open critical discussion—the real heart of scientific practice." (SMF at ¶30; Pls.' Resp. to SMF ¶30 (admitting fact)).

Thus, the personal opinions and misrepresentations that Plaintiffs advance in this case are not the official policy of DASD and not part of the actual policy that Plaintiffs have challenged in this case.

In the final analysis, the modest curriculum change at issue is a mere footnote. It is implausible to claim that its predominant purpose or primary effect is to advance religion. The predominant purpose and primary effect of DASD's policy in the context of the ninth-grade biology class is to teach the Darwinian

theory of evolution pursuant to state academic standards, as required.  Through a brief statement, students are simply made aware of an alternative explanation that is being advanced by a minority of scientists and of the existence of reference books on evolution, including intelligent design, in the school library.  The news stories, personal opinions, and character assassinations are not part of the curriculum—as much as Plaintiffs are trying to make that the case.  Indeed, this curriculum change is a mere shadow and not a real threat that "directly and sharply implicate[s] basic constitutional values."  *See Epperson v. Arkansas*, 393 U.S. 97, 104 (1968).

### B.    The Deafening Sound Of Silence.

After laboring through Plaintiffs' ponderous brief and the volumes of exhibits and deposition transcripts, the <u>absence</u> of what one would certainly consider crucial evidence is striking—in fact, Plaintiffs' case has many missing links.

Plaintiffs have presented <u>no</u> evidence that intelligent design or any of its concepts was actually taught in the ninth-grade biology class at Dover High School.[10]  There is <u>no</u> evidence that any Board member's religion was taught in the

---

[10] According to Plaintiffs, merely stating the words "intelligent design" constitutes "teaching" the subject. (Pls.' Br. at 54).  However, it doesn't take expert testimony to demonstrate the absurdity of that claim.  According to Plaintiffs' logic, if a teacher said "astrophysics," then the students have in fact been taught "astrophysics."  Moreover, there is a distinction between the substantive

ninth-grade biology class or even discussed for that matter.  There is <u>no</u> evidence that the Darwinian theory of evolution was not dutifully taught by the Dover High School biology teachers pursuant to state standards and <u>consistent</u> with its status in the scientific community.  There is <u>no</u> evidence that any student was tested on intelligent design, creationism, or religion in the ninth-grade biology class, let alone asked any questions about these subjects.  There is <u>no</u> evidence that any Board member was even aware of the existence of this so-called "Wedge Strategy" allegedly being advanced by Discovery Institute.  And there is <u>no</u> evidence of any collusion between the Foundation for Thought and Ethics ("FTE") and DASD.  As the testimony of John Buell and Charles Thaxton demonstrate, DASD has had <u>no</u> contact, let alone a relationship, with FTE.  (*See* Buell Dep. at 130-134 at Ex. 10; Thaxton Dep. at 97-103 at Ex. 11).  Moreover, as Plaintiffs' evidence shows, DASD kept the Discovery Institute at arms-length.[11]

Plaintiffs' suggestion that DASD is somehow part of a vast religious conspiracy that is being led by Discovery Institute and FTE is simply <u>not</u> true and just more of the fiction that Plaintiffs want to present as fact.

---

curriculum taught in the classroom and providing students with an opportunity to engage in voluntary inquiry in the library.  *See, e.g., Board of Educ. v. Pico*, 457 U.S. 853, 869 (1982).  Plaintiffs seek to blur any distinction.

[11] *See* Pls.' Br. at 31-32.

### C.   Throw It Up And See If It Sticks.

Consider these additional "evidentiary" claims:

1.   Plaintiffs claim that "[d]uring the textbook-selection process, Assistant Superintendent Mike Baksa told Bertha Spahr, the high-school-science-department chair, that a board member (most likely Alan Bonsell) wanted half the evolution unit devoted instead to creationism—notwithstanding the clear constitutional prohibition against doing so." (Pls.' Br. at 18).

After making this bold claim, one would expect to find "half the evolution unit devoted instead to creationism." However, that is not the case. In fact, that would be <u>contrary</u> to the actual policy that <u>was</u> adopted and implemented by DASD—the policy at issue. Plaintiffs seek to have this case be about something that it is not.

2.   Plaintiffs recite several comments allegedly made by Bill Buckingham in June 2004 in the context of the Board's debate and deliberations over purchasing a new science textbook. Plaintiffs allege that Mr. Buckingham was critical of the recommended text, Miller and Levine's *Biology*, and that "Buckingham announced that the curriculum committee would look for a textbook presenting creationism as well as evolution." (Pls.' Br. at 18-19). Plaintiffs claim that Mr. Buckingham "stepped up the attack" during the next board meeting. (Pls.' Br. at 18-19).

13

While the statements and motives of Mr. Buckingham may sell newspapers, they are not relevant here and are being presented to divert this Court's attention from the task at hand; namely, to determine whether the challenged policy has a secular purpose,[12] which it plainly does.   Most importantly, however, is the undisputed fact that the Miller and Levine *Biology* book **was** selected as the primary text for the ninth-grade biology class and purchased for that purpose. Thus, whatever concerns Mr. Buckingham allegedly had regarding this book and any personal statements he may have made to express those concerns are irrelevant to the issue at hand.[13]

Indeed, DASD issued an official statement that expressly disclaimed any opinions and statements made by individual board members regarding their personal religious beliefs. (*See* SMF at ¶30).  This "disclaimer," which was issued prior to this litigation and which Plaintiffs ignore for obvious reasons, is significant in the Establishment Clause calculus.  It vitiates the taint that Plaintiffs seek to apply to DASD.  *See, e.g., Wallace v. Jaffree*, 472 U.S. 38 (1985) ("If a legislature expresses a plausible secular purpose for a moment of silence statute in either the

---

[12] *See Lemon v. Kurtzman*, 403 U.S. 602, 612 (1971) (holding that there is no Establishment Clause violation if the challenged law or practice has "a secular purpose").

[13] Similarly, it is irrelevant whether Assistant Superintendent Michael Baksa sought to find a textbook that taught creationism.  (*See* Pls.' Br. at 21).  No such book was selected or purchased for use in the ninth-grade biology class.

text or the legislative history, or <u>if the statute disclaims an intent to encourage</u> <u>prayer</u> over alternatives during a moment of silence, then courts should generally defer to that stated intent.") (O'Connor, J., concurring) (emphasis added); *cf. Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 776 (1995) ("In context, a disclaimer helps remove doubt about state approval of respondents' religious message.") (O'Connor, J., concurring); *Freedom from Religion Found. v. City of Marshfield*, 203 F.3d 487, 497 n.3 (7th Cir. 2000) (stating "that a disclaimer . . . would be helpful to make clear the City's disavowal of any endorsement of religion").

3.    Plaintiffs complain that DASD did not commission a team of science experts to examine the modest curriculum proposal at issue.  (*See* Pls.' Br. at 20). *But see Selman v. Cobb County Sch. Dist.*, No. Civ. A. 1:02-CV-2325-C, 2005 WL 83829 at *18 (N.D. Ga. Jan. 13, 2005) (<u>rejecting</u> plaintiffs' claim that the school board's failure to seek out expert opinion from scientists before adopting its Sticker proves that the school board sought to advance religion).  Undoubtedly, had DASD solicited the expert opinions of Dr. Michael Behe and Dr. Scott Minnich, Plaintiffs would have similarly complained.  Plaintiffs want this Court to ignore the reality of life as a small town school board.  Plaintiffs also want this Court to ignore the reality that the Board is ultimately responsible for the educational policy of the school district and that they believed that intelligent

design was a scientific theory advanced by at least some credentialed scientists—and they were correct.  Moreover, *Pandas*, as this Court can readily judge for itself, is a book about science.  It does not contain citations to Sacred Scripture nor does it discuss the Biblical account of creation as found in the Book of Genesis.  A ninth-grade biology student at Dover High School would hardly come away from his voluntary reading of this book believing that he or she now needs to become a fundamentalist Christian.

Plaintiffs' experts may have reason to complain about some of the scientific data that is presented in this 1993 textbook based on their particular expertise.  However, no reasonable person, particularly a layperson such as the DASD board members or a ninth-grade student, reviewing this book would conclude that it is a religious text—it certainly is unlike the Ten Commandments ("Thou shalt have no other gods before me") or the Bible.  It is simply unreasonable to strap local school boards with the requirement to commission a board of experts every time they seek to make a curriculum change—particularly such a modest one, as in this case, and it is similarly unreasonable to conclude that *Pandas* is a religious text akin to the Ten Commandments or the Bible.  *See Grove v. Mead Sch. Dist.*, 753 F.2d 1528, 1537 (9th Cir. 1985) (noting that while an expansive definition of religion "best serves free exercise values, the same expansiveness in interpreting the establishment clause is simply untenable"); *United States v. Allen*, 760 F.2d 447,

450-51 (2ⁿᵈ Cir. 1985) (recognizing that "all that is 'arguably religious' should be considered religious in a free exercise analysis," while "anything 'arguably non-religious' should not be considered religious in applying the establishment clause") (quoting L. Tribe, *American Constitutional Law* 828 (1978)).  At the end of the day, the science associated with intelligent design is "arguably non-religious" and should, therefore, not be considered religious in applying the Establishment Clause in this case.

4.      Finally, Plaintiffs allege, "In late July, Buckingham proposed that the board purchase the creationist book *Pandas* as a supplement to the Miller-Levine text."  (Pls.' Br. at 22).  As Plaintiffs admit, DASD did not purchase these books.  In fact, no school money was used for the purchase of *Pandas*.  Also, this book is not being used as "a supplement to the Miller-Levine text."  Rather, it was placed in the Dover High School library, along with other books on evolution, for the students to access, if <u>they</u> so desire.

**D.      Science vs. Science.**

This Court need not act as the final arbiter for what is or is not properly considered "science" or even "education" (indeed, the latter is without doubt the proper province of the local school board—hence the reluctance to which courts intervene in such matters).  *See, e.g., Board of Educ. v. Pico*, 457 U.S. 853, 863 (1982); *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968).  And it need not resolve

for the science community whether the scientific claims of intelligent design are valid.[14]

It is without dispute that the question of the scientific status of intelligent design is a question that is being debated by well-credentialed scientists based on scientific evidence. This Court can take judicial notice of that fact based on the evidence before it.[15] However, whether Dr. Kenneth Miller's refutation of Dr. Michael Behe's concept of irreducible complexity and Dr. William Dembski's concept of complex specified information should prevail based on the evidence is not a decision that this Court should or need make.[16] At the end of the day,

---

[14] See DASD's discussion of "purpose" and "principal and primary effect" *infra*, Section II of this reply.

[15] See the expert reports of Dr. Kenneth Miller (App.III at Tab-H), Dr. Michael Behe (SMF at ¶14, Exs. A, B, C at Ex. 3) and Dr. Scott Minnich (SMF at ¶14, Ex. A at Ex. 4).

[16] Dr. Kenneth Miller testified as follows: "If irreducible complexity could be proven, which an irreducibly complex structure is a part, which as Dr. Behe said, in which the removal of a single part renders the system completely nonfunctional with nothing that can be favored by natural selection, would that present an argument for design or more properly put, an argument against evolution? I think the answer to that is yes, it would." (Miller Dep. at 125:1-11 at App.III, Tab-I); (*see also* Miller Dep. at 124:4-8 at App.III, Tab-I ("And that is that it is entirely true that we do not know enough about all of the structures in the cell to either describe how they all work or to describe how evolution could have produced each of them by step-by-step Darwinian mechanisms.")).

In *Finding Darwin's God*, Dr. Miller quotes the following passage from *The Origin of Species* in which Darwin acknowledged the following: "If it could be demonstrated that any complex organ existed, which could not possibly have been

intelligent design involves scientists debating science—a proper subject for a biology class.

Plaintiffs, however, do not want the issue to be one about science, <u>as the policy at issue requires</u>.  Rather, Plaintiffs want the issue to be about philosophy— but they insist that the argument be only one-sided.  Indeed, to this end, it is convenient, and an error, for Plaintiffs to paint intelligent design with the "Biblical creationism" brush.

As Plaintiffs' expert, Dr. Miller, a staunch supporter of the Darwinian theory of evolution, testified, a "creationist" is simply "any person who believes in an act of creation."  (Miller Dep. at 93:23-24-94:1 at App.III, Tab-I).  Dr. Miller then proceeds to make a striking admission, "I believe that the universe was created by God, and in a sense that would make me a creationist since I like I think any Christian for that matter any person who follows any of the Abrahamic religions, Islam, Judaism and Christianity is a creationist in that they believe that there's a single God who brought the universe into existence."  (Miller Dep. at 94:2-8 at App.III, Tab-I).  Remarkably, Dr. Miller claims to be a scientist and Plaintiffs hold him out as one—how can that be?  The answer is simple, having a philosophical or theological view does not disqualify <u>anyone</u> as a scientist.

---

formed by numerous, successive, slight modifications, my theory would absolutely break down."  (Miller Dep. at Ex. 17 (excerpts from *Finding Darwin's God*) at 140 at Ex. 9).

Nevertheless, as the evidence plainly reveals, intelligent design is not "creation science" and it does not require one to adhere to the literal interpretation of the Book of Genesis.[17]  Plaintiffs plainly mislabel Defendants as "creationist" to suit their purposes.

In fact, in the *Cobb County* case cited so liberally by Plaintiffs, Plaintiffs' expert, Dr. Kenneth Miller, testified as follows:

> Now, it's very important to define what one means by creationism. I'm a Roman Catholic, for example, so I believe that the universe was created.  So you could always say, ah-hah, that means you're a creationist.
>
> But in modern usage of that language in the United States, the word "creationist" means something quite different other than a person who simply believes in a supreme being and thinks that there is meaning and order and purpose to the universe.
>
> In the current usage in the United States, creationist is taken to mean someone who thinks that [1] the Earth is only six to 10,000 years old, [2] that all living organisms were simultaneously created during a very brief period of time, perhaps six days [i.e., the story of the Book of Genesis], and [3] that the entire geological record is an illusion, a column of flood deposition from a single 40-day flood that has been misinterpreted for 250 years by the geological sciences as a series, a system of geological ages.
>
> For what it's worth, creationists also think that the universe is no older than six to 10,000 years, so therefore they reject the basic scientific underpinnings of cosmology, astronomy, geology, and biology.  And because they reject so much of science, I think it's very clear that that version of creationism is not a scientific theory or a scientific idea and therefore we didn't cover it in our book.

---

[17] *See* SMF at ¶14, Ex. A (Behe report) at 15-17 at Ex. 3; *see generally* Haught Dep. at 37:14-18 at App.III, Tab-G.

(Miller Dep. at Ex. 11(Testimony in *Cobb County*) at 138:8-25-139:1-6 at Ex. 9).

Intelligent design requires no religious dogma that one must profess to be an advocate of it. And it does <u>not require</u> the action of a "supernatural creator," as Plaintiffs claim.[18] In fact, this mischaracterization[19] and singular reliance on the

---

[18]  Indeed, applying Plaintiffs' standard, Darwin also required the actions of a "supernatural creator." In *Finding Darwin's God*, Dr. Miller quotes the following passage from Darwin's *The Origin of Species*,

> There is grandeur in this view of life; with its several powers having been originally breathed by the Creator into a few forms or into one; and that, whilst this planet has gone cycling on according to the fixed law of gravity, from so simple a beginning endless forms most wonderful and most beautiful have been, and are being evolved.

(Miller Dep. at Ex. 16 (excerpts from *Finding Darwin's God*) at 292 at Ex. 9).

Dr. Miller himself believes that God (a "supernatural creator") is the author of the laws of nature that make natural selection operate. (*See* Miller Dep. at 142-143 at at App.III, Tab-I).

[19]  Plaintiffs cite deposition testimony of Dr. Behe and Dr. Minnich for the proposition that excluding the "supernatural" necessarily excludes intelligent design from science. (Pls.' Br. at 34, n.126). However, upon review of the deposition pages cited by Plaintiffs, it is clear that Plaintiffs' representations are misleading. Dr. Behe, when asked if he agreed with a statement that was purportedly made by Dr. William Dembski regarding "methodological naturalism," testified as follows:

> Again, it depends on what you mean by methodological naturalism. If you think that the designer had to have been by definition an entity contained within the universe, <u>that is logically possible</u>, but that hobbles Intelligent Design because it restricts the possibility of designers.

"supernatural" is merely a convenient way for Plaintiffs to discredit intelligent design without confronting the scientific evidence. The inference to "real" design as opposed to "apparent" design in nature is a logical inference from empirical evidence that need go no further in a science class.[20] Plaintiffs are the only ones who insist on taking it further in order to create the straw man that they have been building from the onset.

---

> And so to that extent, to the extent that it artificially restricts the possibilities open to Intelligent Design, it would restrict the number of people who think it is a good theory. (Behe Dep. at 151:18-25-152:1-2 at App.II, Tab-B) (emphasis added).

This is far from saying that the "designer" <u>must be</u> a "supernatural creator," as Plaintiffs erroneously contend. In fact, Dr. Behe confirms in his testimony that it is a logical possibility that the designer is found in nature, and then proceeds to makes the <u>obvious</u> statement that if you limit it as such, then you limit who the designer might be. The same statement could be made regarding the "Big Ban Theory," for example; yet, that doesn't change the scientific aspect of that theory.

Furthermore, a close inspection of the deposition testimony of Dr. Minnich reveals that the "supernatural" he was referring to was not the "supernatural" (i.e. God) that Plaintiffs are referring to. (*See* Minnich Dep. at 92:18-95:15 at App.II, Tab-I). If that were the case, then Plaintiffs would have to rule out from science NASA's SETI (search for extraterrestrial intelligence) program and Nobel laureate Francis Crick's theory of panspermia, in which he posited that life was scattered here either intentionally or unintentionally from other planets, which, of course, Plaintiffs are unwilling to do.

[20] *See, e.g.,* SMF at ¶14, Ex. A (Behe report) at 11-14 at Ex. 3; Miller Dep. at 147:18-22 at App.III, Tab-I.

22

As the actual policy at issue makes plain, the science classroom will focus on science and <u>not</u> philosophy—whether it is the philosophical implications of the Darwinian theory of evolution or similar implications of intelligent design.

So whether the science that underlines intelligent design is good or bad is an interesting question—indeed, it is one that the students at Dover High School would probably find interesting and quite provocative. However, it is not one that raises an Establishment Clause violation. *See, e.g., Edwards*, 482 U.S. at 594 ("We do not imply that a legislature could never require that scientific critiques of prevailing scientific theories be taught . . . . [T]eaching a variety of scientific theories about the origins of humankind to schoolchildren might be validly done with the clear secular intent of enhancing the effectiveness of science instruction.").

Indeed, Plaintiffs seek to refute the scientific evidence for intelligent design using scientific arguments and then immediately leap to the philosophical arguments in an effort to keep the science out. Plaintiffs can't have it both ways. What the policy at issue simply does is inform the students that the scientific debate exists (which it does, as Plaintiffs' evidence demonstrates) and nothing more.

In the final analysis, regardless of the ultimate conclusion as to the scientific validity of intelligent design, DASD's modest curriculum change advances many

23

secular educational goals that are properly included in a science class.   (*See* Section II-A, *infra*).

### E.      Evolution: Fact or Theory?

Plaintiffs rely on a common misunderstanding by implying that intelligent design is "anti-evolution."  This is an example of the fallacy of equivocation.

On one hand there is evolution (change over time), and on the other there is the Darwinian theory of evolution.  Supporters of Darwin's theory often slide back and forth, without explanation or warning, between the two when it suits their needs.

The concept of evolution (change over time) is without dispute.  Advocates of intelligent design acknowledge what the scientific community at large acknowledges—life on earth today is not similar to the life on earth that appeared many millions of years ago.  Thus to describe advocates of intelligent design as "anti-evolution" is inaccurate and misleading.[21]

The Darwinian theory of evolution, as Dr. Michael Behe demonstrates in his expert report, consists of several separate claims.  Dr. Behe points out the five claims of this theory that were identified by recently-deceased Harvard biologist Ernst Mayr.  The five consist of the following:

---

[21] DASD's statement got it right by expressly referring to "Darwin's Theory" and stating that this "Theory is not a fact."  (SMF at ¶22; *see also* Miller Dep. at 321:6-12 at App.III, Tab-I).

1.      Evolution as such.  This is the claim that the world is not constant nor recently created nor perpetually cycling but rather is steadily changing and that organisms are transformed in time;

2.      Common descent.  This is the claim that every group of organisms descended from a common ancestor and that all groups of organisms, including animals, plants, and microorganisms, ultimately go back to a single origin of life on earth;

3.      Multiplication of Species.  This is the claim that explains the origin of the enormous organic diversity.   It postulates that species multiply, either by splitting into daughter species or by "budding," that is, by the establishment of geographically isolated founder populations that evolve into new species;

4.      Gradualism.  According to this claim, evolutionary change takes place through gradual change of populations and not by the sudden production of new individuals that represent a new type; and

5.      Natural selection.   According to this claim, evolutionary change comes about through the abundant production of genetic variation in every generation.  The relatively few individuals who survive, owing to a particularly well-adapted combination of inheritable characters, give rise to the next generation.

(SMF at ¶14; Ex. A (Behe Report) at 9-10 at Ex. 3).

In his expert report, Dr. Kenneth Miller reduces these five claims into three core propositions, which include:

1.    Life has changed over time;

2.    Living things share common ancestries; and

3.    Biological change over time is driven by forces such as natural selection. Evolutionary biologists have also discovered that other processes are important in evolutionary change, including genetic drift, the so-called founder effect, genetic recombination, transposition, and horizontal gene transfer between species.

(Miller Expert Report at 2-3 at App.III, Tab-H).

Thus, the concept of evolution—"change over time"—is simply one proposition of the Darwinian theory of evolution—a proposition, by the way, that intelligent design advocates, such as Dr. Behe, accept. (*See* SMF at ¶14, Ex. A (Behe Report) at 10-11; Ex. B (Behe Rebuttal Report of Miller) at 2 at Ex. 3).

Thus, contrary to popular understanding and myth, the Darwinian theory of evolution is not simply the observable fact that life on this planet has changed over time. Rather, the theory has several core propositions, as outlined above, that logically separable. This is an important point that Plaintiffs and the courts have largely ignored. As Dr. Behe explains, intelligent design focuses on the proposed

mechanism of how complex biological structures arose—Mayr's fifth claim. (*See* SMF at ¶14, Ex. A (Behe Report) at 11 at Ex. 3).[22]

Unfortunately, it is a common tactic, which is being used in this case, to borrow legitimacy from the well-supported claim of "change over time" to support the far more controversial claim of "natural selection."[23] This is yet another step in the construction of Plaintiffs' straw man.

**F.    Where's The Link?**

Plaintiffs spend a great deal of time explaining the history of fundamentalists' challenges to evolution and outlining the various cases in which such challenges have been held unconstitutional.   However, a comparison of Plaintiffs' claims with the actual policy at issue here compels one conclusion: DASD's modest curriculum change is constitutional.

---

[22] *See also* Miller Dep. at 124:4-8 at App.III, Tab-I ("And that is that it is entirely true that we do not know enough about all of the structures in the cell to either describe how they all work or to describe how evolution could have produced each of them by step-by-step Darwinian mechanisms.").

[23] As Dr. Behe points out in his primary expert report and in his rebuttal expert report of Dr. Kenneth Miller, intelligent design advocates are not the only scientists who doubt that natural selection provides a complete answer for the complexity of life.   Complexity theorists, such as Stuart Kauffman, for example, believe that natural selection alone is inadequate. (*See* SMF at ¶14; Ex. A (Behe Report) at 9; Ex. B (Behe Rebuttal Report of Miller) at 2 at Ex. 3). *See also* Miller Dep. at 112:9-20 at App.III, Tab-I ("So, yes, there are lots of people who would dispute that that is the sole mechanism.").