### 1.    Fundamentalists And The Book Of Genesis.

Part of the "social and historical facts" that Plaintiffs urge this Court to consider is the allegation that because fundamentalists saw "evolution as inconsistent with Genesis's account of abrupt creation in six days, they viewed the scientific theory of evolution as a substantial threat." (Pls.' Br. at 6).

However, intelligent design, as Plaintiffs acknowledge, does not require adherence to a literal reading of the Book of Genesis.   Therefore, it does not require adherence to fundamentalist religious beliefs.   Moreover, if DASD considered teaching evolution such a "threat," they would have banned it from their classrooms—like the Arkansas statute at issue in *Epperson v. Arkansas*, 393 U.S. 97 (1968).   Instead, as the undisputed facts of this case show, DASD is a standards-driven district and is responsible for complying with the Pennsylvania Academic Standards.   In compliance with these standards, the students at DASD learn about the theory of evolution and take a standardized test in which evolution is part.   (*See* SMF at ¶¶2, 3; Pls.' Resp. to SMF at ¶¶2, 3 (admitting facts)). Moreover, DASD purchased the book *Biology*, which is co-authored by Plaintiffs' expert, for use as the primary and <u>only</u> text for the class.[24]   This text provides

---

[24] Plaintiffs allege the following: "Between the 1920's and early 1960's, anti-evolutionary sentiment had a subtle but pervasive influence on the teaching of biology in public schools," with one consequence being that, "[g]enerally, <u>textbooks avoided the topic of evolution</u>." (Pls.' Br. at 7 (quoting *McLean v. Arkansas Bd. of Educ.*, 529 F.Supp. 1255, 1259 (E.D. Ark. 1982) (emphasis

comprehensive coverage of the theory of evolution.  (*See* SMF at ¶¶5, 7; Pls.'

Resp. to SMF at ¶¶5, 7 (admitting facts)).

Thus, there is no dispute that DASD is teaching the theory of evolution

pursuant to state academic standards and consistent with the scientific status of that

theory.  Therefore, there is no evidence of fundamentalist religious beliefs being

forced upon the students in DASD's biology class.

### 2.    *Epperson v. Arkansas.*

According to Plaintiffs, "[t]he legal landscape changed radically in 1968

when, in *Epperson v. Arkansas*, the Supreme Court struck down Arkansas's

statutory prohibition against teaching evolution."  (Pls.' Br. at 7).  Plaintiffs claim

that "[a]lthough, unlike the Scopes law, the Arkansas statute did not include direct

references to the Book of Genesis or the fundamentalist view that religion should

be protected from science, the Supreme Court readily concluded that 'the

motivation for the [Arkansas] law was the same: to suppress the teaching of a

theory which it thought, 'denied' the divine creation of man.'  The Supreme Court

explained that the 'overriding fact is that Arkansas' law selects from the body of

knowledge a particular segment which it proscribes for the sole reason that it is

deemed to conflict with a particular religious doctrine; that is, with a particular

---

added)).  This alleged "historical" fact clearly has no relevance here and is, in fact,
contradicted by the evidence.  As noted above, the textbook used at Dover High
School includes comprehensive coverage of the theory of evolution.

interpretation of the Book of Genesis by a particular religious group.'" (Pls.' Br. at 8 (emphasis added)). Plaintiffs point out that the Court struck down the statute, holding that "the First Amendment does not permit the State to require that teaching and learning must be tailored to the principles or prohibitions of any religious sect or dogma." (Pls.' Br. at 8 (quoting *Epperson v. Arkansas*, 393 U.S. 97, 106 (1968)).

Plaintiffs' recitation of the facts and holding of *Epperson* would be meaningful were the facts of <u>this</u> case similar. However, in the present case, DASD is <u>not</u> banning the teaching of evolution—it is advancing it, to include having recently purchased <u>new</u> copies of the latest edition of *Biology* for use in the ninth-grade biology class. Moreover, DASD does not "require that teaching and learning . . . be tailored to the principles or prohibitions of any religious sect or dogma." As the facts show, the only teaching and learning required in the ninth-grade biology class that is relevant here is the teaching and learning of the Darwinian theory of evolution. And unless the Dover High School teachers intend to present philosophical or religious views, such as Dr. Miller's, regarding this theory, then *Epperson* is not implicated. However, if a teacher were to do so, he or she would be violating DASD policy and such a violation would not be a basis for holding DASD liable. *See Monell,* 436 U.S. at 658 (holding that under § 1983 a government entity may not be held liable under a theory of respondeat superior).

### 3.    Balanced Treatment.

Plaintiffs cite three cases for the basic proposition that the government may not enact "statutes requiring public-school teachers who taught evolution to devote equal time to teaching the biblical view of creation." (*See* Pls.' Br. at 8-14 (citing *Daniel v. Waters*, 515 F.2d 485 (6th Cir. 1975), *McLean v. Arkansas Bd. of Educ.*, 529 F.Supp. 1255 (E.D. Ark. 1982), and *Edwards v. Aguillard*, 482 U.S. 578 (1987)). The only controlling case, of course, being *Edwards v. Aguillard*.

As noted previously, DASD is not devoting "equal time" to teaching the Biblical version of creation.  DASD is dedicating <u>full time</u> to teaching the Darwinian theory of evolution.  In fact, DASD policy expressly prohibits the teaching of creationism in the science classroom.  Additionally, it would be rather disingenuous to claim that <u>mentioning</u> intelligent design in a biology class in which the theory of evolution is given center stage constitutes "equal time" or "balanced treatment."

This case is <u>not</u> at all like *Edwards*, where the teaching of creationism was <u>required</u> if the school was teaching the theory of evolution.  The Court in *Edwards* rejected the government's claimed secular purpose of providing a more comprehensive curriculum because, "Such a ban on teaching does not promote— indeed, it undermines—the provision of a comprehensive scientific education." *Id.* at 587.  Thus, the Court rejected the stated legislative purpose for the state statute

because the statute did not actually advance it.   Because of <u>this</u>, the Court proceeded to inquire into the legislature's "actual" purpose, relying on the legislative history to reveal it. *See Edwards*, 482 U.S. at 587.

In the present case, as Defendants demonstrated in their initial brief, DASD has many valid, secular purposes that <u>are advanced</u> by this modest curriculum change.   Plaintiffs provide no logical or reasonable refutation of these valid purposes.

It would be inappropriate for this Court to ignore the fact that DASD's policy advances many valid secular purposes and favor, instead, Plaintiffs' view that DASD should be held responsible for the <u>entire</u> history of the *Biblical Creation v. Evolution* controversy, which has little to do with DASD's policy. This is a red herring that should not divert this Court's attention from the actual policy at issue.

Finally, Plaintiffs make the claim that "Intelligent design followed the Supreme Court's rejection of creation science as night follows day . . . ." (Pls.' Br. at 14).   However, the challenged policy at issue was passed in 2004—17 years after the *Edwards* decision.   Nevertheless, as demonstrated previously, intelligent design is not "creation science" nor does it require any adherence to the Biblical account of creation as set forth in the Book of Genesis (which is what

32

fundamentalist believe).  Plaintiffs simply want this Court to ignore the policy at issue in favor of keeping alive the secular legend of the Scopes trial.

### G.   Disclaiming The Truth?

The theory of evolution is <u>not</u> a fact.  To claim otherwise would be dishonest and truly misrepresent science.   Plaintiffs admit, as they must, the following material facts:

1.   The origin of life is still an unsolved scientific problem;

2.   Because the Darwinian theory of evolution is a theory, it continues to be tested as new evidence is discovered;

3.   The Darwinian theory of evolution is not a fact; and

4.   There are weaknesses in the theory of evolution, including uncertainty as to how life began, how new species arise, and why species become extinct.[25]

(*See* SMF at ¶¶8, 10, 12, 13; Pls.' Resp. to Defs.' SMF at ¶¶8, 10, 12, 13 (admitting facts)).

Thus, DASD's statement <u>accurately</u> portrays the status of the theory of evolution in the scientific community.   However, according to Plaintiffs' far-fetched view of the Establishment Clause, to do so establishes religion.

---

[25] These admissions demonstrate the "gaps and problems" of the theory of evolution that DASD's policy alludes to.

Plaintiffs insist that "religion-based opposition to the scientific theory of evolution began taking another form: disclaimers that cast doubt on evolution's validity so that students would credit religious alternatives." (Pls.' Br. at 15).

In support of this claim, Plaintiffs cite two cases. The first is *Freiler v. Tangiapahoa Parish Bd. of Educ.*, 185 F.3d 337 (5th Cir. 1999). The second is an unpublished district court decision out of Georgia, *Selman v. Cobb County Sch. Dist.*, No. Civ. A. 1:02-CV-2325-C, 2005 WL 83829 (N.D. Ga. Jan. 13, 2005). Plaintiffs rely heavily on the holdings in these two cases. However, a close inspection of these cases further supports a finding of constitutionality in this case.[26]

### 1.     *Freiler v. Tangiapahoa Parish Bd. of Educ.*

The petition for writ of certiorari in this case was denied. However, Justice Scalia, joined by Chief Justice Rehnquist and Justice Thomas, took the extraordinary step of issuing an opinion in dissent of this denial. Justice Scalia's

---

[26] In fact, both cases held that the practices under review did not violate the purpose prong of the *Lemon* test. (*See* discussion of "purpose" *infra*, Section II-A, of this reply). Plaintiffs claim, however, that these courts were mistaken, but should be forgiven because they did not have the benefit of the *McCreary* decision. (*See* Pls.' Br. at 38, n.137). Plaintiffs are incorrect. *McCreary* did not make such dramatic and sweeping changes in the law. (*See* discussion of "purpose" *infra*, Section II-A, of this reply); *cf. Van Orden v. Perry*, 125 S.Ct. 2854 (2005) (upholding the display of the Ten Commandments in an Establishment Clause case decided the same day as *McCreary* and noting that the *Lemon* test was "not useful" to its analysis).

opinion, while not controlling, persuasively counters the arguments advanced by

Plaintiffs in this case.  A lengthy citation to Justice Scalia's opinion is in order:

> Even assuming, however, that the Fifth Circuit correctly chose to
> apply the *Lemon* test, I believe the manner of its application is so
> erroneous as independently to merit the granting certiorari, if not
> summary reversal.  Under the second prong of *Lemon*, the "principal
> or primary effect [of a state action] must be one that neither advances
> nor inhibits religion." [citing *Lemon v. Kurtzman*, 403 U.S. 602, 612
> (1971).]  Far from advancing religion, the "principal or primary
> effect" of the disclaimer at issue here is surely to advance freedom of
> thought.  At the outset, it is worth noting that the theory of evolution
> is the only theory actually *taught* at Tangipahoa Parish schools.  As
> the introductory paragraph of the resolution suggests, the disclaimer
> operates merely as a (perhaps not too believable) "disclaimer from
> endorsement" of that single theory, and not as an affirmative
> endorsement of any particular religious theory as to the origin of life,
> or even of religious theories as to the origin of life generally.  The
> only allusion to religion in the entire disclaimer is a reference to the
> "Biblical version of Creation."   Mentioned as an illustrative
> *example*—surely the most obvious example—of a "concept" that the
> teaching of evolution was "not intended to influence or dissuade."
> The disclaimer does not refer again to the "Biblical version of
> Creation," much less provide any elaboration as to what the theory
> entails; instead, it merely reaffirms that "it is the basic right and
> privilege of each student to form his/her own opinion or maintain
> beliefs taught by parents on this very important matter of the origin of
> life and matter," and neutrally encourages students "closely [to]
> examine *each* alternative" before forming an opinion.
>
> As even this cursory discussion of the disclaimer amply
> demonstrates, the Fifth Circuit's conclusion that "[t]he disclaimer . . .
> encourages students to read and mediate upon religion in general and
> the Biblical version of Creation in particular," [citing *Freiler*, 185
> F.3d at 346] lacks any support in the text of the invalidated document.
> In view of the fact that the disclaimer merely reminds students of
> their right to form their own beliefs on the subject, or to maintain
> beliefs taught by their parents—not to mention the fact that the theory
> of evolution is the only theory actually taught in the lesson that

follows the disclaimer—there is "<u>no realistic danger that the [School Board] was endorsing religion or any particular creed, and any benefit to religion or to the Church would have been no more than incidental.</u>" [citing *Lamb's Chapel v. Central Moriches Union Free School Dist.*, 508 U.S., 384, 395 (1993)]. At bottom, the disclaimer constitutes nothing more than "simply a tolerable acknowledgement of beliefs widely held among the people of this country," [citing *Marsh v. Chambers*, 463 U.S. 783, 792 (1983)]. [*See also Lynch v. Donnelly*, 465 U.S. 668, 673 (1984)] ("Nor does the Constitution require complete separation of church and state; it affirmatively mandates accommodation, not merely tolerance, of all religions and forbids hostility toward any.").

In denying the petition for rehearing, the Fifth Circuit panel took another tack: "In denying rehearing, we emphasize that we do not decide that a state-mandated statement violates the Constitution simply because it disclaims any intent to communicate to students that the theory of evolution is the only accepted explanation of the origin of life, informs students of their right to follow their religions principles, and encourages students to evaluate all explanations of life's origins, including those taught outside the classroom. We decide only that under the facts and circumstances of this case, the statement of the Tangipahoa Parish School board is not sufficiently neutral to prevent it from violating the Establishment Clause." [citing *Freiler*, 201 F.3d at 603]. <u>Inasmuch as what the disclaimer contains is nothing more than what this statement purports to allow, the explanation is incoherent.</u> Reference to unnamed "facts and circumstances of this case" is not a substitute for judicial reasoning. The only aspect of the disclaimer that could conceivably be regarded as going beyond what the rehearing statement purports to approve is the explicit mention—as an example—of "the Biblical version of Creation." To think that this reference to (and plainly not endorsement of) a reality of religious literature—and this use of an example that is not a contrived one, but to the contrary the example most likely to come into play—somehow converts the otherwise innocuous disclaimer into an establishment of religion is quite simply <u>absurd</u>.

*Tangiapahoa Parish Bd. of Educ. v. Freiler,* 530 U.S. 1251, 120 S.Ct. 2706, 2708-09 (2000) (emphasis added).

Leaving aside for the moment the significant factual differences between the statement at issue in this case and the "disclaimer" at issue in *Freiler*, which are discussed further below, as Justice Scalia points out, to think that a <u>reference</u> to intelligent design somehow converts an otherwise innocuous statement into an establishment of religion is absurd.  Similarly, it is absurd to claim that it is an establishment of religion to state undisputed, scientific facts (i.e., that the theory of evolution is not a fact and that gaps in the theory exist for which there is no evidence).

The resolution at issue in *Freiler* expressly stated that it was "a <u>disclaimer</u> from endorsement" of the theory of evolution and expressly encouraged students to "closely examine" the "Biblical version of Creation."  *Freiler*, 185 F.3d at 346. The primary concern of the Fifth Circuit in holding this policy unconstitutional was that "[t]he disclaimer . . . encourages students to read and meditate upon religion in general and the 'Biblical version of Creation' in particular."  *Id.* at 346. This concern is nonexistent in this case.  There is no mention of the "Biblical version of Creation" in DASD's statement.  Moreover, DASD's statement is not a "disclaimer" of evolution, as in the *Freiler* case.  This mislabel is yet another effort by Plaintiffs to mischaracterize the curriculum at issue.

Indeed, DASD's statement encourages students to read and think about the theory of evolution—reminding students that classroom discussion will focus on this theory and that the students will be tested on it.[27]

### 2.   *Cobb County.*

At issue in *Cobb County* was whether the school district violated the Establishment Clause by placing a sticker on its biology textbooks.  The sticker contained the following warning:

> This textbook contains material on evolution.  Evolution is a theory, not a fact, regarding the origin of living things.  This material should be approached with an open mind, studied carefully, and critically considered.

*Cobb County Sch. Dist.*, 2005 WL 83829 at *4.

---

[27] As noted previously, the *Freiler* court held that the "disclaimer" at issue had a valid secular purpose.  The court began its analysis by stating the proper standard under *Lemon*'s first prong.  *Freiler*, 185 F.3d at 334 ("*Lemon*'s first prong does not require that the challenged state action have been enacted in furtherance of exclusively, or even predominantly, secular objectives. . . . .  In order for state activity to pass muster under *Lemon*'s first criterion a sincere secular purpose for the contested state action must exist; even if that secular purpose is but one in a sea of religious purposes.").  Upon application of this standard, the court concluded that "the dual objectives of disclaiming orthodoxy of belief and reducing student/parent offense are permissible secular objectives that the School Board could rightly address." *Id.* at 345.  The court stated, "In so doing, we acknowledge that local school boards need not turn a blind eye to the concerns of students and parents troubled by the teaching of evolution in public classrooms." *Id.* at 345-46.

The district court held that this Sticker violated the Establishment Clause, stating that "[t]he critical language in the Sticker that supports the conclusion that the Sticker runs afoul of the Establishment Clause is the statement that '[e]volution is a theory, not a fact, concerning the origin of living things.'" *Id.* at *21. To that end, the court found it particularly important that "the Sticker does not reference 'evolution' as a 'scientific theory' or a 'prevailing scientific theory.' To the contrary, the Sticker appears to purposely leave to question whether evolution is an accepted or established theory in the scientific community, even if evolution is subject to scientific critique." *Id.* at *23. The court also noted that the use of "theory" in the sticker played "on the colloquial or popular understanding of the term and suggests to the informed, reasonable observer that evolution is a highly questionable 'opinion' or a 'hunch.'" *Id.* at *23.

In comparison, DASD's statement expressly and accurately defines "theory," thereby negating any "colloquial or popular understanding of the term" that might suggest that evolution is an "opinion" or "hunch."

Moreover, DASD's statement does not target only "evolution" to be approached with "an open mind," as does the Cobb County warning label. Rather, DASD's statement expressly states, "With respect to <u>any</u> theory, students are encouraged to keep an open mind." (SMF at ¶22). And this statement comes in the paragraph immediately following the statement regarding intelligent design.

Finally, the beginning and ending of DASD's statement unequivocally express that students will be taught the theory of evolution in the classroom and that it is this material that they will be responsible for learning.   Therefore, DASD's statement encourages students to read, study, and learn the theory of evolution, particularly if they have any interest in passing the course—this is hardly "undermining" the validity of Darwin's theory, as Plaintiffs contend. Indeed, DASD included the well-accepted definition of "theory" in its statement, stating that "A theory is defined as a well-tested explanation that unifies a broad range of observations."   (SMF at ¶22).   Therefore, students come away with the idea that the theory of evolution is "well-tested" and that it "unifies a broad range of observations."

Despite its ultimate holding, the district court in *Cobb County* found that the Sticker did not violate the purpose prong of the *Lemon* test, finding, in relevant part, that "the Sticker fosters critical thinking by encouraging students to learn about evolution and to make their own assessment regarding its merit."   *Id.* at *19.[28]   The court reached this conclusion after applying the following standard: "The Sticker runs afoul of the Establishment Clause only if it is entirely motivated by a purpose to advance religion.   Thus, it logically follows that a state-sponsored

---

[28] The court also held that the Sticker had a valid secular purpose for the following additional reason: "[B]y presenting evolution in a manner that is not unnecessarily hostile, the Sticker reduces offense to students and parents whose beliefs may conflict with the teaching of evolution." *Id.* at *19.

message may satisfy this first prong even if it is motivated in part by a religious purpose.  However, the religious purpose must not be preeminent."  *Id.* at *13 (internal quotations and citations omitted).  As noted previously and discussed further in Section II-A *infra*, this is the proper standard that is applicable to this case as well.

In the final analysis, *Cobb County* is an unpublished, district court decision that should hold little weight in this case.  Despite the district court's appearance of having conducted a thorough legal analysis, its holding of unconstitutionality comes down to the following absurdity: because fundamentalists have historically opposed the teaching of evolution in the public schools, any criticism of this theory, *ipso facto*, establishes religion.  *See id.* at *21.  This explains Plaintiffs' reliance on matters that have no relevance to the case at bar.  However, this Court should not be so persuaded.

## II.    THE   PURPOSE   AND   EFFECT   OF   DASD'S   MODEST CURRICULUM CHANGE DO NOT ESTABLISH RELIGION.

### A.    DASD'S Policy Has A Valid Secular Purpose.

Under the first prong of the *Lemon* test, there is <u>no</u> Establishment Clause violation if the challenged law or practice has "a secular purpose."  *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971).  Thus, the central issue in the purpose inquiry is whether or not the challenged practice has a valid secular purpose.  This is determined first and foremost by the actual language of the legislation or policy

41

at issue. *See Edwards*, 482 U.S. at 594 ("The plain meaning of the statute's words, enlightened by their context and the contemporaneous legislative history, can control the determination of legislative purpose."). Plaintiffs seek to avoid the actual language at issue in favor of "rigging" the inquiry so that any time evidence is presented that is critical to the theory of evolution a finding of an invalid purpose will result. However, such is not the law. *See McCreary County v. ACLU*, 125 S.Ct. 2722, (2005) (noting that there is no "indication that the enquiry is rigged in practice to finding a religious purpose dominant every time a case is filed").

Plaintiffs acknowledge, somewhat reluctantly, that the courts are "normally deferential to a State's articulation of a secular purpose." *Edwards*, 482 U.S. at 586; *Mueller v. Allen*, 463 U.S. 388, 394-95 (1983) (ascribing the Court's disinclination to invalidate government practices under *Lemon*'s purpose prong to its "reluctance to attribute unconstitutional motives to the States, particularly when a plausible secular purpose for the State's program may be discerned from the face of the statute"). Yet, Plaintiffs seek to have this Court give no deference to DASD and completely ignore the actual policy and the valid secular purposes it advances. This would be an error.

Moreover, contrary to Plaintiffs' assertion (*see* Pls.' Br. at 38, n.137), the court in *Freiler v. Tangiapahoa Parish Bd. of Educ.*, 185 F.3d 337 (5th Cir. 1999)

applied the proper standard in finding that the evolution "disclaimer" at issue had a valid secular purpose. The court began its analysis by stating the standard as follows: "*Lemon*'s first prong does <u>not</u> require that challenged state action have been enacted in furtherance of exclusively, <u>or even predominantly</u>, secular objectives. . . . . In order for state activity to pass muster under *Lemon*'s first criterion a sincere secular purpose for the contested state action must exist; even if that secular purpose is but one in a sea of religious purposes." *Id.* at 344 (emphasis added). This standard is <u>consistent</u> with the standard applied in *McCreary County.*[29] *See McCreary County v. ACLU*, 125 S.Ct. 2722, 2733-2735 (2005) (stating "[w]hen the government acts with the ostensible and <u>predominant purpose of advancing religion</u>, it violates the central Establishment Clause value of official religious neutrality," "[t]he cases with findings of a <u>predominantly religious purpose</u> point to the straightforward nature of the test," and "[i]n the past, the test has not been fatal very often, presumably because government does not generally act unconstitutionally, with the <u>predominant purpose of advancing religion</u>") (emphasis added). And this standard is similar to the standard that was applied in *Cobb County. See Cobb County*, 2005 WL 83829 at *13 (holding that the challenged practice "runs afoul of the Establishment Clause only if it is entirely

---

[29] This Court should be reminded that *McCreary* was a case involving the public display on government property of a Ten Commandments monument that explicitly stated, "You shalt have no other gods before me." *See McCreary*, 125 S.Ct. at 2728.

motivated by a purpose to advance religion.  Thus, it logically follows that a state-sponsored message may satisfy this first prong even if it is motivated in part by a religious purpose.  However, the religious purpose must not be preeminent") (internal quotations and citations omitted).

Plaintiffs seek to turn the test on its head, claiming "that governmental conduct is lawful <u>only</u> if the '<u>preeminent</u>' or '<u>primary</u>' purpose <u>is a legitimate secular one</u>." (Pls.' Br. at 38) (emphasis added).  However, as noted previously, according to *McCreary County*, the government acts impermissibly only when it "acts with the ostensible and <u>predominant purpose of advancing religion</u>," as Defendants pointed out in their opening brief.  Therefore, in order for the curriculum at issue to be invalid, its "predominant" purpose must be to advance religion.  Thus, even if DASD has but one sincere, secular purpose "in a sea of religious purposes," this Court is bound to give it deference and uphold the challenged practice. *See also Wallace v. Jaffree*, 472 U.S. 38, 57, 75-76 (stating that the inquiry into the purpose "should be deferential and limited.  Even if the text and official history of a statute express no secular purpose, the statute should be held to have an improper purpose only if it is beyond purview that endorsement of religion or a religious belief was and is the reason for the law's existence") (O'Connor, J., concurring) (internal quotations and citation omitted).

As noted in DASD's opening brief, there are multiple, valid secular purposes for the modest curriculum change at issue, and these valid purposes can be discerned on its face. *See Board of Education v. Mergens*, 496 U.S. 226, 249 (1990) (upholding statute against Establishment Clause challenge and stating that "[b]ecause the Act on its face grants equal access to both secular and religious speech, we think it clear that the Act's purpose was not to endorse or disapprove of religion") (quotations and citation omitted).

As this Court conducts its inquiry, it should keep in mind that the policy at issue is a very <u>small</u> part of the ninth-grade biology curriculum. Thus, the secular educational goals advanced by it will be similarly modest. Nevertheless, they are valid and they are secular. Moreover, these purposes are not merely "*post hoc rationalizations*," as Plaintiffs claim. (*See* Pls.' Br. at 41). In fact, they are legitimate educational goals that are plainly discerned from the face of the policy. *See, e.g., Mergens*, 496 U.S. at 249 (holding that the challenged statute on its face had a valid secular purpose); *Mueller,* 463 U.S. at 394-95 (noting the Court's reluctance to invalidate government practices under *Lemon*'s purpose prong, particularly when a plausible secular purpose for the practice may be discerned from the face of the statute).

**1.      Valid Secular Purposes.**

The following demonstrates the many valid, secular purposes advanced by DASD's policy:

**(a)      Raising students' awareness about multiple ways of knowing.**

In the search for knowledge, scientists examine and interpret evidence from divergent perspectives.   As a result, researchers may examine the same phenomenon but describe it in different ways or reach different conclusions. DASD's policy introduces students to the idea of multiple ways of knowing about the development of the natural world.   As the expert reports and testimony presented in this case demonstrate quite nicely, scientists draw different conclusions about this development.   The policy at issue simply introduces students to this fact.

**(b)      Promoting critical thinking.**

Fostering critical thinking is clearly a secular purpose.   *See, e.g., Cobb County Sch. Dist.*, 2005 WL 83829 at *15-16 (holding that Sticker had a valid secular purpose by fostering critical thinking); *compare Freiler*, at 345 (holding that the disclaimer did not promote critical thinking because it communicated to students that evolution "need not affect what they already know" and "critical thinking requires that students approach new concepts with an open mind and a willingness to alter and shift existing viewpoints").   In the present case, DASD's

statement expressly states, "With respect to <u>any</u> theory, students are encouraged to keep an <u>open mind</u>." Thus, it encourages students to examine science critically and to gather further information.

Contemporary pedagogy across many disciplines establishes critical thinking as a legitimate goal for students. According to Plaintiffs' expert, Dr. Miller, "Not only is critical thinking a legitimate pedagogical goal, I think it's an important component of teaching science." (Miller Dep. at 27:1-3 at App.III, Tab-I). As DASD's official statement makes clear, "School districts are forums for inquiry and critical discussion." (SMF at ¶30; Ex. A at Ex. 1). Thus, DASD's policy plainly advances this secular purpose.[30]

---

[30] The fact that DASD is not spending class time to discuss intelligent design does not undermine this stated goal, as Plaintiffs contend. (*See* Pls.' Br. at 42). Rather, this simply reflects the fact that DASD is not teaching intelligent design or its concepts as part of its curriculum. As the challenged statement expressly states, "As a standards-driven district, class instruction focuses upon preparing students to achieve proficiency on Standards-based assessments." As such, students are required to learn about the Darwinian theory of evolution and take a standardized test on which evolution is a part. (SMF at ¶22). Therefore, class time is devoted to achieve this objective. Moreover, students are not assigned any materials about this subject and *Pandas* is not required reading for any of the students. As a result, there would be no real context in which to meaningfully answer questions about it. Finally, it is rather disingenuous for Plaintiffs to complain about "teaching" intelligent design in the classroom, and then complain that the teachers aren't teaching it enough. They can't have it both ways.

Plaintiffs also complain about the fact that the school leaves the discussion of the origins of life to individual students and their families. The fact of the matter is that this was included in the statement and curriculum to placate the teachers' concerns that they might have to dedicate classroom time to actually teach

**(c)      Encouraging students to assume more responsibility in their learning and to play an active part in constructing their own knowledge.**

As a practical matter, DASD's policy provides students with an opportunity to engage in independent learning.  It encourages students to make use of the school library "to inquire, to study and to evaluate, to gain new maturity and understanding." *See Board of Educ. v. Pico*, 457 U.S. 853, 868-69 (1982) (internal quotations and citations omitted).  As the Supreme Court explained, "The school library is the principal locus of such freedom. . . .  [I]n the school library, a student can literally explore the unknown, and discover areas of interest and thought not covered by the prescribed curriculum. . .  Th[e] student learns that a library is a place to test or expand upon ideas presented to him, in or out of the classroom." *Id.* (internal quotations and citations omitted).  This secular purpose is clearly advanced by the policy at issue.

**(d)      Promoting a fuller understanding of the theory of evolution, including its limitations.**

DASD's curriculum requires students to learn about and be tested on the Darwinian theory of evolution.  DASD's policy challenges students to more fully understand this theory, including its weaknesses.  DASD's statement reminds

---

intelligent design pursuant to *Pandas*. (*See, e.g.* Linker Dep. at 60:17-25-61:1-7 at Ex. 12).  The full title of *Pandas* is *Of Pandas and People: The Central Question of Biological Origins* and the statement describes intelligent design as "an explanation of the origin of life." (emphasis added).

students that this theory is a "well-tested explanation that unifies a broad range of observations"; yet, it continues to be tested as new evidence is discovered. It invites students to more fully explore this subject.[31]

**(e)** **Aligning its curriculum with the Pennsylvania Academic Standards, which require students to "Critically evaluate the status of existing theories," including the "theory of evolution."**

As the evidence shows, Pennsylvania's Academic Standards require students to learn about the Darwinian theory of evolution. They also require students to "critically evaluate the status" of this theory. DASD's modest curriculum change is consistent with and advances this standard—a legitimate secular goal.

**(f)** **Helping students understand the views inherent in controversial issues, such as biological evolution, which is consistent with the Santorum Amendment.**

As the Santorum Amendment recommends, "Where topics are taught that may generate controversy (such as biological evolution), the curriculum should help students to understand the full range of scientific views that exist." (*See* Pls.' Br. at 45 (quoting from amendment)). DASD's policy takes a modest step in this

---

[31] Plaintiffs' claim that this purpose is "fully served by [other measures]"; therefore, it is invalid. (Pls.' Br. at 44). That is simply inaccurate. While the statement is consistent with the *Biology* text, it is also complementary to it. Moreover, *Biology* does not make students aware of intelligent design or the fact that *Pandas* and other resources on evolution are available to the students in the school's library, all of which will assist a student in gaining a better understanding of and appreciation for the theory of evolution. Finally, applying Plaintiffs' reasoning to its logical conclusion, there would be no need for a teacher to open his or her mouth in a science classroom—just hand the students the textbook and let them learn.

direction. Indeed, DASD's science curriculum focuses on the science at issue, not the "religious or philosophical claims" that Plaintiffs suggest (*see* Pls.' Br. at 45), whether those claims are advanced by intelligent design advocates or evolutionary biologists. Thus, DASD is seeking to maintain a religiously-neutral science curriculum consistent with the Constitution.

Having satisfied numerous valid secular purposes on its face and given the fact that this Court is required to show deference to DASD's stated purposes, it is unnecessary, and indeed, improper, for this Court to go digging through press clippings or to make illogical inferences about single events occurring years before the adoption of the curriculum at issue to find, what Plaintiffs hope, is a predominant purpose to advance religion. This Court can, and should, decide this issue in Defendants' favor on the record before it, as demonstrated above.

### 2. Purpose Not Motives.

Plaintiffs' reliance on the alleged religious motivations of certain school board members—indeed, most, if not all, of their case rests on this—is completely misplaced. *See Mergens*, 496 U.S. at 249 (upholding the Equal Access Act against an Establishment Clause challenge and stating that "even if some legislators were motivated by a conviction that religious speech in particular was valuable and worthy of protection, that alone would not invalidate the Act, because what is relevant is the legislative *purpose* of the statute, not the possibly religious *motives*

of the legislators who enacted the law"); *Bown v. Gwinnett County Sch. Dist.*, 112 F.3d 1464, 1471-72 (11th Cir. 1997) (holding that the religious motives of individual legislators could not alone invalidate the statute and stating, "we readily conclude at the very least that the legislative history cannot be construed to override the express statutory language articulating a clear secular purpose and also disclaiming a religious purpose"). Plaintiffs make the claim that the *McCreary* Court effectively answered DASD's *Mergens-Bown* argument by explaining that a public official's motives are treated as irrelevant for the purpose inquiry <u>only</u> when the official effectively "hides" them. (*See* Pls.' Br. at 31, n.110). This is not accurate.

Mergens, for example, does not hold that the legislative motives for enacting the statute were irrelevant for the purpose inquiry because they were somehow "hidden." Rather, the Court stated that they were irrelevant because what truly mattered was the *purpose* of the statue, which the Court determined on its face. *Mergens*, 496 U.S. at 249. Moreover, in *Bown*, the Court expressly noted that "some Georgia legislators expressed religious motives for voting for the Act." *Bown*, 112 F.3d at 1472. Yet, the court held that those <u>expressed</u> motives were irrelevant. *See id.* Indeed, even the court in *Cobb County* held that "the religious motivations of individual School Board members cannot invalidate the Sticker." *Cobb County Sch. Dist.*, 2005 WL 83829 at *18.

Thus, much of Plaintiffs' case is irrelevant to the inquiry at hand and a close inspection of the material facts in light of the relevant case law plainly reveals that DASD's policy easily satisfies the first prong of the *Lemon* test.

**B.     The Primary Effect Neither Advances Nor Inhibits Religion.**

Under the second prong of the *Lemon* test, there is <u>no</u> Establishment Clause violation if the "principal or primary effect" of the challenged law or practice "neither advances nor inhibits religion." *Lemon*, 403 U.S. at 612-13.

As an initial matter, this Court should not apply the "endorsement" test that Plaintiffs suggest.  In neither *Edwards v. Aguillard* nor *Epperson v. Arkansas*, the only controlling cases to have addressed a similar issue, did the Court apply an endorsement test.  The "endorsement" test is a modification of the *Lemon* test that is principally used in cases involving religious displays on government property. *See, e.g., Modrovich v. Allegheny County*, 385 F.3d 397, 401 (3rd Cir. 2004) ("[T]he 'endorsement' test modifies *Lemon* in cases involving religious displays on government property.   The endorsement test dispenses with *Lemon*'s 'entanglement' prong, and, combining an objective version of *Lemon*'s 'purpose' prong with its 'effect' prong, asks whether a reasonable observer familiar with the history and context of the display would perceive the display as a government endorsement of religion.").  This test was announced by Justice O'Connor in her concurring opinion in *Lynch v. Donnelly*, 465 U.S. 668 (1984), a religious display

case, and used again in *County of Allegheny v. ACLU*, 492 U.S. 573 (1989) and *Capital Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753 (1995), both religious display cases.[32]

Moreover, the difficulty in applying this test in this case is readily apparent. For example, the "reasonable observer" in this case would be a ninth-grade student attending the biology class at Dover High School.[33]   As such, pursuant to the challenged policy, this "observer" will <u>hear</u> an approximately one-minute-long statement in which the words "intelligent design" will be stated twice.   The challenged policy is not a visual display of a religious symbol, such as the Ten Commandments or a Nativity scene.   There is no "physical setting" for this observer to consider.   *See Lynch*, 465 U.S. at 672 (noting the importance of the physical setting of the display at issue).   Indeed, the "reasonable observer" is

---

[32] The Third Circuit cases cited by Plaintiffs in support of their "endorsement" argument are *Freethought Soc'y v. Chester County*, 334 F.3d 247, 257 (3rd Cir. 2003), a Ten Commandments display case in which the court noted that this test "has been adopted by the majority in other religious display cases," and *Modrovich v. Allegheny County*, 385 F.3d 397 (3rd Cir. 2004), also a case involving a challenge to a Ten Commandments display.

[33] Not satisfied that the "reasonable observer" should be limited to the ninth-grade students who are actually taking the class in which the challenged policy will apply, Plaintiffs ask this Court to "consider as well the message that the district's conduct communicates to the community as a whole." (Pls.' Br. at 49). But why stop there? Perhaps we should take a poll or maybe have an extended trial where the parties can examine a majority of the community under oath to determine what message they received. (They should probably sit through the biology class ahead of time, however.) Maybe this Court should also consider the message conveyed to the nation as whole, since this case has received national press.

actually a "reasonable listener."  Moreover, how much or little knowledge should this Court attribute to this ninth-grade student?  In their continuing efforts to make this case the Scopes Trial II, Plaintiffs suggest that this ninth-grade student should be credited with knowing the policy's "language, origins, and legislative history, as well as the history of the Dover community and the broader social and historical context in which the policy arose."  (Pls. Br. at 47).  However, the only thing that we can be certain that this ninth-grade student will truly know is what he will hear in this brief statement.

With that being said, DASD agrees with Plaintiffs on this point: "This case comes down to the students: They are the policy's intended audience . . . ."  (Pls.' Br. at 50).  Thus, the issue is whether, from the perspective of a ninth-grade biology student, the principal or primary effect of DASD's policy advances or inhibits religion.

Therefore, this Court need not entertain the "fundamentalist" conspiracy claims or the history of the Scopes trial or even the vast majority of the information contained in the voluminous expert reports and deposition transcripts presented by Plaintiffs.  Instead, this Court should conduct a straightforward and simple analysis and decide this case in DASD's favor on this motion, as demonstrated below.

It is undisputed that the ninth-grade biology student—the intended audience—will hear the following statement:

The Pennsylvania Academic Standards require students to learn about Darwin's Theory of Evolution and eventually to take a standardized test of which evolution is a part.

Because Darwin's Theory is a theory, it continues to be tested as new evidence is discovered. The Theory is not a fact. Gaps in the Theory exist for which there is no evidence. A theory is defined as a well-tested explanation that unifies a broad range of observations.

Intelligent Design is an explanation of the origin of life that differs from Darwin's view. The reference book, *Of Pandas and People*, is available in the library along with other resources for students who might be interested in gaining an understanding of what Intelligent Design actually involves.

With respect to any theory, students are encouraged to keep an open mind. The school leaves the discussion of the Origins of Life to individual students and their families. As a Standards-driven district, class instruction focuses upon preparing students to achieve proficiency on Standards-based assessment.

(SMF at ¶22; Pls.' Resp. to SMF at ¶22 (admitting fact)).

Upon hearing this, the student will understand the following:[34]

1.      According to state standards, the student will be required to learn about the theory of evolution and be responsible for knowing it because the student will be tested on it.

2.      The theory of evolution is a theory and not a fact and that there are weaknesses in this theory. Yet, because it is a "theory," (i.e., not a "hunch" or

---

[34] One may quibble over the exact terms or words used in the statement. In hindsight, DASD may have been more artful in their drafting. It is certainly easy to be a Monday morning quarterback. Nevertheless, the legal standard applicable here is whether the "principal" or "primary effect" either "advances" or "inhibits religion," not whether Plaintiffs or this Court could have drafted a better statement.

"opinion") it is "a well-tested explanation that unifies a broad range of observations."

3.      There is an explanation called "intelligent design" that differs with the theory of evolution and that a book, *Of Pandas and People*, is available in the school library, along with other resources, if the student is interested in learning something about this subject.

4.      "With respect to any theory," the student is "encouraged to keep an open mind."  Thus, with regard to any scientific claim or idea, the student should approach it critically and with a willingness to accept or reject it—including intelligent design.

5.      There will be <u>no</u> classroom discussion devoted to the "Origins of Life"[35] and class time will focus on preparing the student for achieving proficiency on the topics that will be tested and for which the student will be accountable for knowing (i.e., the theory of evolution).

6.      That *Biology* by Miller and Levine, which contains comprehensive coverage of the theory of evolution and no discussion of creationism or intelligent design, was selected and purchased by DASD as the required text for this class because the student will have received a copy of it.

---

[35] This also makes it clear that there will be no classroom discussion on intelligent design, which explains why DASD described intelligent design as "an explanation of the <u>origin of life</u>."

Thus, this statement, taken as a whole, encourages students to critically study and learn the theory of evolution because they will be held accountable for understanding it, and it invites the students to go to the library if they have an interest in learning about intelligent design—because there will be no classroom discussion on this topic.

In the final analysis, to conclude that this innocuous statement either advances or inhibits religion in violation of the Establishment Clause is quite simply <u>absurd</u>.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court grant judgment in their favor as to all claims.

Respectfully submitted this 19th day of August, 2005.


By:

Robert J. Muise (MI P62849)*
Richard Thompson (MI P21410)*
Patrick T. Gillen (MI P47456)*
Edward L. White III (MI P62485)*
THOMAS MORE LAW CENTER
24 Frank Lloyd Wright Drive
P.O. Box 393
Ann Arbor, Michigan 48106
(734) 827-2001
Fax: (734) 930-7160

* Admitted *pro hac vice*

57

Ron Turo
TURO LAW OFFICES
29 South Pitt Street
Carlisle, Pennsylvania 177013
(717) 245-9688

*Attorneys for Defendants*

## CERTIFICATE OF COMPLIANCE

I certify that pursuant to the LR 7.8 and this Court's Order dated August 11, 2005 the foregoing *Defendants' Reply Brief In Support Of Motion For Summary Judgment* has a typeface of 14 points Times New Roman and contains 14,670 words.

Dated:      August 19, 2005

Robert J. Muise, Esq.

## CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2005, a copy of the foregoing

*Defendants' Reply Brief in Support of Motion for Summary Judgment* and exhibits

were served on the following counsel through the electronic case filing system:

Eric Rothschild                                     (Counsel for Plaintiffs)
Stephen G. Harvey
Joseph M. Farber
Benjamin M. Mather
Pepper Hamilton LLP
3000 Two Logan Square
18th & Arch Streets
Philadelphia, PA 19103

Thomas B. Schmidt, III
Pepper Hamilton LLP
200 One Keystone Plaza
North Front and Market Streets
PO Box 1181
Harrisburg, PA 17108

Witold J. Walczak
ACLU of Pennsylvania
313 Atwood Street
Pittsburgh, PA 15213

Paula K. Knudsen
ACLU of Pennsylvania
105 N. Front Street
Suite 225
Harrisburg, PA 17101

Richard B. Katskee
Ayesha Khan
Alex J. Luchenitser
Americans United for Separation
  of Church and State
518 C Street, NE
Washington, DC 20002

Mary Catherine Roper
ACLU of Pennsylvania
P.O. Box 1161
Philadelphia, PA  19105


Robert J. Muise*
Admitted *pro hac vice*