# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

TAMMY KITZMILLER; et al.              )
                                      )
                                      )
            Plaintiffs,               )      Civil Action No.  04-CV-2688
                                      )      (M.D. Pa.)
                                      )
            v.                        )       Hon. John E. Jones III
                                      )
                                      )
DOVER AREA SCHOOL                     )      **Defendants'**
DISTRICT; et al.,                     )      **Pretrial Memorandum**
                                      )
                                      )
            Defendants.               )
                                      )
                                      )
_____ )

## DEFENDANTS' PRETRIAL MEMORANDUM

The parties held a preliminary pretrial conference as required by this Court's local rule on August 12, 2005.

**A.      Statement Of Jurisdiction.**

Defendants concur in the Plaintiffs' statement concerning jurisdiction and venue.

**B.      Summary Statement Of Facts And Contentions As To Liability.**

DASD respectfully submits that–when all is said and done–this honorable Court will find that the Plaintiffs have failed to prove that the predominate purpose or primary effect of the curriculum change adopted by the board of Dover Area School District ("DASD") on October 18, 2004 is to advance religion.  Quite the contrary, this Court will find that DASD's curriculum change represents a legitimate exercise of DASD's lawful authority to determine curriculum that has the primary purpose and primary effect of advancing science education.  This Court will so find because the facts of the matter do not support the Plaintiffs' notion that a cabal of religious zealots changed the biology curriculum to achieve a religious purpose–at least if one credits the commonsense axiom that actions speak louder than words.

First of all, the actions and votes of the board members responsible for the

2

approval of biology texts and the curriculum change belie the Plaintiffs' claim. Neither Sheila Harkins nor Jane Clever fit the bill as religiously motivated co-conspirators.  As the Plaintiffs have learned, Harkins has no objection to evolutionary theory ("ET") based upon her religious beliefs.  She was <u>for</u> "making students aware" of other theories, including <u>but</u> <u>not</u> <u>limited</u> <u>to</u> Intelligent Design Theory ("IDT"), because she believed this would encourage critical thinking; she was <u>against</u> "teaching" IDT because she deferred to the science teachers, who were against it.[1]

Jane Clever's views are similar.  She was <u>for</u> the curriculum change because she believes ET is a scientific theory (not a fact), and it was a good idea to make students aware of other scientific theories (including but not limited to IDT).  She did not believe IDT should be taught because the teachers objected.  She believes that Creationism should never be taught.

Heather Geesey cannot be cast as a religious co-conspirator either.  She went to Christian schools as a child and was taught Creationism but she knew IDT was not Creationism, which is based on the Bible, and thought it was good education to make students aware other scientific theories including but not

---

[1]Defendants' maintain that the religious beliefs of individual board members have no proper place in this proceeding, but address the issue here to rebut the improper innuendo Plaintiffs have sought to create in this case. Defendants will file a motion *in limine* to exclude this improper evidence.

limited to IDT.  She voted to delay the text purchase because she thought the Board could reach consensus on the text issue.  But she took it for granted, quite rightly, that DASD would purchase the basal biology text recommended by the science faculty.  After all, the vote in August was to link <u>approval</u> of that basal text (*Biology* by Miller & Levine), with <u>approval</u> of a supplemental text (*Of Pandas*); it was <u>not</u> a vote to approve *Of Pandas* as the basal text (this was never an issue).  And the whole purpose of her letter to the editor was to make it clear that DASD cooperated with families in the district by leaving religious or philosophical issues to the family.[2]

Alan Bonsell, a board member since December of 2001, has never called for any change relating to the biology text, curriculum, or instruction.  He believes he may have asked whether Creationism was addressed in biology classes upon coming to the board, and he did meet with the science faculty in the Fall of 2003 to learn how they approached ET.  At that meeting he learned that faculty taught ET and mentioned Creationism; he also learned that faculty did not teach Creationism because they believed it would be illegal; and that was the end of the matter.  When Bill Buckingham tried to hold up the purchase of the biology text

---

[2]Defendants maintain that statements by individual board members are not admissible evidence but make this point simply to address the Plaintiffs' effort to use these statements to advance their claim.  Defendants will file a motion *in limine* to exclude this evidence.

recommended by the science teachers in August, 2004, Bonsell voted <u>against</u> Buckingham's motion because he believed students should have the text recommended by the science faculty regardless of whether *Of Pandas* was approved.  And on the night the Board approved the curriculum change at issue here, Bonsell moved to add the "note" which ensured that IDT was <u>not</u> taught in biology classes at DASD.  <u>Bonsell's</u> <u>motion</u> was seconded by Jeff Brown, who opposed the curriculum change and also did not want IDT taught in the classroom; and it was <u>approved</u> <u>unanimously</u> by the Board, including those members opposed to the curriculum change, because it was understood to have that effect.

Even Bill Buckingham cannot bear the weight needed for the Plaintiffs to prove their case.  Based upon his personal reading, he believed the biology text made claims for ET far in advance of what had been demonstrated by science.  He wanted students to be aware of IDT, a scientific theory he believed to be supported by numerous scientist.  And he wanted approval of the <u>basal</u> text recommended by teachers (*Biology*) to be linked to approval of the <u>supplemental</u> text (*Of Pandas*) because he thought that this would make for good science education.  Consistent with this belief, Buckingham wanted the supplemental text used in the classroom, and he wanted the two theories taught side-by-side, to spur debate and critical thinking.  But he relinquished those goals in light of teacher objections, settling

for the goal that the Board reached by consensus.

Finally, the whole notion that the text selection process or curriculum change were rigged to secure a religious goal is wholly undermined by the role of Angie Yingling, a former board member.  In August, 2004, Yingling agreed to support Buckingham's effort to link approval of the basal text recommended by the science faculty (*Biology*) with approval of the supplemental text (*Of Pandas*). Although Yingling initially voted for Buckingham's motion, she reversed her vote a few minutes later voting (with Bonsell) to <u>approve</u> purchase of the basal text and <u>defer</u> consideration of the supplemental text.  She changed her vote <u>not</u> because she had some sudden revelation that IDT was a religious teaching, but because the reaction from the gallery made her think the students should have the basal text right away.  Nevertheless, she voted <u>for</u> the curriculum change approved by the Board on October 18, 2004, <u>not</u> because she wanted a religious theory taught in biology class, but because she felt she should support Buckingham given her reversal in August.

In a similar way, the actual deliberative process employed by the Defendants belies the Plaintiffs' claim that a religiously motivated cabal ram-rodded the curriculum change heedless of the science faculty or community. While the Plaintiffs have alleged that neither the science faculty nor Community

Advisory Committee were consulted with respect to the curriculum change, the evidence will show that this allegation is simply untrue.  The starting point here is the recognition that Buckingham sought to secure balance by tying approval of the basal text (*Biology*) to approval of the supplemental text (*Of Pandas*), <u>he</u> <u>lost</u> <u>that</u> <u>vote</u>, and the text recommended by the faculty was purchased.

Teachers were also consulted with respect to Buckingham's effort to secure the teaching of IDT.  Members of DASD's Board Curriculum Committee and the science faculty met throughout the Summer of 2004; science teachers reviewed materials regarding IDT provided by Discovery Institute and agreed that ET, like any theory, had gaps and problems.  Teachers agreed to make students aware of gaps and problems (the basal text mentions some gaps and problems precisely because this is good science education), and that consensus became part of the curriculum changes.  But the opposite is true with respect to Buckingham's effort to ensure that the supplemental text *Of Pandas* was given to students in the classroom and that ET and IDT were taught side–by–side.  The teachers opposed these goals, and <u>he</u> <u>lost</u> <u>on</u> <u>these</u> <u>issues</u>.  Here again, the board deferred to the teachers and settled for the more modest goal of making students aware of IDT and informing them that *Of Pandas* was in the library for their reference (if interested).  Currently, the Board informs students that there are other texts

addressing ET and IDT in the library, including six texts addressing IDT, three of those are authored by Plaintiffs' experts in this case and are <u>critical</u> of the IDT.

It is true that the Board did not agree with all the assertions and recommendations of the science faculty–or the administration for that matter.  Of course, it is the Board's right and duty to exercise its judgment when adopting measures designed to serve the citizens of DASD.  After all, consultation designed to help Board members exercise their authority does not require capitulation to science faculty at the High School or members of the Curriculum Advisory Committee (which was also consulted with respect to the curriculum change). Quite the contrary, the Board's decision is entitled to the great deference precisely because the Board is elected by citizens who entrust board members to serve the community to the best of their ability.

The Board also consulted teachers with respect to the implementation of the curriculum change.  In response to teacher concerns about potential liability and the manner in which students should be made aware of IDT, the Defendants drafted an informational statement.  Teachers were consulted with respect to the text of the statement, and the definition of theory was added at the suggestion of the science faculty.  Similarly, in response to claims by teachers that this might give rise to problems and potential liability, DASD also decided that teachers

would not be required to answer questions about IDT.  In sum, teachers were also consulted extensively in connection with the curriculum changes and the final result reflects, in large measure, their input. These efforts to consult and reach a consensus belie any claim that a faction of the board was bent on achieving a religious end heedless of the concerns expressed by others.

The notion that a faction of the board was on a religious crusade to alter the biology curriculum is also belied by the actual result of the deliberative process. The primary effect of the curriculum change on science education in the district is an informational statement which reads:

> The Pennsylvania Academic Standards require students to learn about Darwin's Theory of Evolution and eventually take a standardized test of which evolution is a part.

> Because Darwin's Theory is a theory, it continues to be tested as new evidence is discovered.  The Theory is not a fact.  Gaps in the Theory exist for which there is no evidence.  A theory is defined as a well-tested explanation that unifies a broad range of observations.

> Intelligent Design is an explanation of the origin of life that differs from Darwin's view.  The reference book, Of Pandas and People is available in the library along with other resources for students who might be interested in gaining an understanding of what Intelligent Design actually involves.

> With respect to any theory, students are encouraged to keep an open mind.  The school leaves the discussion of Origins of Life to individual families.  As a Standards-driven district, class instruction focuses upon preparing students to achieve proficiency on Standards-

9

based assessment.

It speaks volumes that the actual result of the deliberative process is so far removed from Buckingham's objectives as chair of the Board Curriculum Committee.  And this, in turn, shows that the Plaintiffs' effort to portray the Board as a cabal of zealots bent on a religious mission cannot withstand close scrutiny.

Furthermore, the evidence will show that the Defendants are fully justified in their belief that the curriculum change enhances science education.  Although Plaintiffs allege that IDT is a non-scientific argument that is inherently religious, the evidence will show that IDT is a scientific argument, advanced by scientist relying on evidence and technical knowledge proper to their specialties. Although the Plaintiffs claim that IDT is Creationism, the evidence will show that <u>IDT</u> is <u>not</u> <u>Creationism</u>.  Although the Plaintiffs object to the Defendants' observation that ET has gaps and problems, the evidence will show that ET does have gaps and problems.  The evidence will also show that the theory of evolution <u>is</u> a theory (not a fact) and that components of the theory, including the centerpiece mechanism of natural selection, are contested on scientific grounds.  And while some tout ET as the crowning achievement of biology, the evidence will show that there is little reason to believe that ET, for all its billing, has a significant impact on the actual research of scientist working in the field.

The evidence will also show that IDT's openness to the possibility of causation which some might classify as "supernatural" (at least in light of current knowledge) does not place IDT beyond the bounds of "science." Quite the contrary, IDT's refusal to rule out this possibility represents the essence of scientific inquiry precisely because the hypothesis is advanced by means of reasoned argument based upon empirical evidence and existing knowledge. In truth, it is merely a philosophical commitment to so-called methodological naturalism, adopted as a convention by the bulk of the scientific community, which bars reference to the possibility of supernatural causation (at least so far as current knowledge regards phenomena as "super" natural). But the evidence will show that this philosophical (nonscientific) commitment is in no way an essential feature of scientific inquiry. One should be reluctant (truly loathe) to impose–as a matter of federal law–a current convention of the scientific community when the consequence would be to rule out of science Newton's efforts to explicate the laws of gravity; but that would be the practical effect of accepting the artificially narrow view of science espoused by Plaintiffs' experts. This Procrustean effort to confine science within bounds set by nothing greater than present-day convention displays a deplorable lack of historical perspective and philosophical sophistication. Such a view of science is <u>not</u> <u>science;</u> <u>but</u> it is <u>bad</u> <u>philosophy</u> <u>of</u>

11

science.  This Court must eschew the Plaintiffs' invitation to declare the laws of

science–if only because history demonstrates that all such efforts are doomed to

failure.

It is these plain facts of the matter which explain why the Plaintiffs have

been forced so far afield in order to advance their claims, offering evidence that

has no meaningful connection to this case.  Although the Plaintiffs focus a great

deal of attention on Discovery Institute's "Wedge Strategy," the evidence will

show that the Defendants have never seen the so-called "Wedge Document" or

discussed the "Wedge Strategy" with anyone at any time.  Although the Plaintiffs

focus on statements of Phillip Johnson, the evidence will show that the Defendants

do not know the man.  Although the Plaintiffs focus on the Foundation for

Thought and Ethics ("FTE") and statements made by Jon Buell, the Defendants

never spoke with Buell, and knew nothing about the origins, purpose, or mission

of FTE. Although the Plaintiffs are focused on prior drafts of the text *Of Pandas*,

and the motives or statements of its authors or editors, the Defendants had no

knowledge of, or interest in, these statements, or for that matter the motives,

purpose, or metaphysical commitments of these strangers.[3]

_____

[3]Defendants maintain that evidence relating to the motives, statements, and activities of such third-parties
has no proper place in these proceedings and will file a motion *in limine* to exclude this evidence.

In sum, the actual facts of the matter belie the Plaintiffs' farfetched notion that a conspiracy of religiously motivated board members implemented a curriculum change heedless of all criticism and bent on defiance of the law.  And that is why the main support for the Plaintiffs' claim is a mountain of press clippings built on a molehill of statements allegedly made by one board member who, wrestling with addiction to Oxycontin, occasionally allowed political opponents or reporters to put words in his mouth.[4]

**C.      Comprehensive Statement Of Undisputed Facts As Agreed To By Counsel Pursuant to Local Rule 16.3.**

The parties have agreed to stipulations of fact, which will be filed as per the Court's Preliminary Pretrial Order dated August 26, 2005.

**D.      Brief Description Of Damages.**

Defendants maintain that the Plaintiffs have suffered no wrong such that an award of damages is not authorized by law.

**E.      Names And Addresses Of Witnesses, along with specialities and qualifications of experts to be called.**

Defendants' witness list is attached hereto as Exhibit A.  All Defendants and

---

[4]Defendants maintain that the newspaper articles the Plaintiffs would use to prove their case are rank hearsay, and will file a motion *in limine* to exclude such evidence.  Defendants also maintain the evidence relating to the individual motives or goals of individual board members are not admissible and will file a motion *in limine* to exclude such evidence.

Defendants' experts can be contacted through counsel for the Defendants. The specialties and qualifications of experts are summarized in Section F.

**F.     Summary of Testimony Of Each Expert Witness**.

    **1.     *Michael J. Behe, Ph.D.***

Michael J. Behe, Ph.D., is a Professor of Biological Sciences at Lehigh University in Bethlehem, Pennsylvania. He received his Ph.D. in Biochemistry in 1978 from the University of Pennsylvania and has taught in his field at the college/university level for over twenty years. Dr. Behe has published numerous articles in leading scientific journals. He is the author of the widely acclaimed and popular book, *Darwin's Black Box: The Biochemical Challenge to Evolution*, in which he presented the scientific argument that Darwinian processes are unlikely explanations for the biochemical complexity that modern science has found in the cell. As such, he presented the counter argument of intelligent design, discussing the scientific concept of "irreducible complexity," a cornerstone of this theory. Dr. Behe will testify that intelligent design is a scientific theory based entirely on empirical, observable facts about biology plus logical inferences. He will testify that the science supporting intelligent design is debated and discussed amongst scientists. And he will testify as to the utility of intelligent design as a scientific theory.

Dr. Behe has expertise on the theory of evolution, including the gaps and problems of this theory, and he will testify as such.   Dr. Behe has expertise regarding the typical arguments advanced by opponents of intelligent design, including the arguments advanced by most of Plaintiffs' experts, and how they rely on false premises or misrepresentations in an effort to "disqualify" intelligent design as science.   In particular, Dr. Behe will refute the claim that intelligent design is a form of creationism.   Dr. Behe also has expertise regarding the various claims of proponents of Darwinian evolution and how they misrepresent this theory and its capabilities to advance non-scientific claims.   He will testify about this.   Dr. Behe will testify that it is appropriate to make students aware of the fact that the theory of evolution has gaps and problems and that some scientists are advancing an alternative explanation for the complexity of life that modern science has found, as Dover has done in this case.   Finally, Dr. Behe will provide rebuttal testimony to the claims advanced by Plaintiffs' experts, Dr. Kenneth Miller and Dr. Kevin Padian.

## 2.    *Scott Minnich, Ph.D.*

Scott Minnich, Ph.D., is an Associate Professor of Microbiology at the University of Idaho in Moscow, Idaho.   Dr. Minnich received his Ph.D. in Microbiology from Iowa State University in 1981 and has taught in his field at the

college/university level since 1987. From 1981 to 1983, Dr. Minnich was a Postdoctoral Fellow at Purdue University, and from 1984 to 1987, Dr. Minnich was a Postdoctoral Fellow at Princeton University.

Dr. Minnich's background and experience include extensive training in the molecular genetics of microorganisms. Over the past ten years, his research interests have focused on the regulation of bacterial flagellum biosynthesis and type III protein secretory systems in bacterial pathogens. Between October 2003 and May of 2005, Dr. Minnich served as a WMD subject matter expert with the Iraq Survey Group operating out of Baghdad and Mosul. He has taught extensively in undergraduate, graduate and medical school programs and currently teaches a General Microbiology Course for undergraduates and coordinates and lectures in an Infectious Disease course for first year medical students.

Dr. Minnich will testify that intelligent design theory is a scientific theory based entirely on empirical, observable facts about biology plus logical inferences. He will testify that intelligent design theory is an inference to the best explanation as to the origin of design that is found even in the simplest cells, which is an explanation in contrast to the generally accepted mechanism of Darwinism that holds that mutations and natural selection are sufficient to account for the diversity and "apparent" design recognized as an inherent property of all organisms.

16

Dr. Minnich, as a working scientist, will explain that evolution is such a broad discipline that it has, in reality, played only a minor role in experimental science, and that, as a discipline, it has had little impact over the revolutionary progress made in biology over the past 50 years, as admitted by prominent evolutionists. Dr. Minnich will testify that evolution is often the filter by which experiments are explained after their completion and not the driving force behind the experimental design. He will testify that, as a working scientist, it is design principles that drive his laboratory research and not elements derived from the theory of evolution.

Dr. Minnich will testify that the science supporting intelligent design is debated and discussed amongst scientists. Dr. Minnich has expertise on the theory of evolution, including the gaps and problems of this theory, and he will testify as such. Dr. Minnich will testify that he has read and is familiar with *Of Pandas and People* and that it is a good text that critically analyzes various aspects of Darwin's theory—it asks critical questions in terms of the evidence and mechanism required to drive evolution. Dr. Minnich will testify that such questions are essential for the advancement of science and that making students aware of the controversy in the science community is good for students and it is good for science, whereas repressing such evidence and ideas, as Plaintiffs seek to

do, has the opposite result.

### 3.   *Dick M. Carpenter II, Ph.D.*

Dick M. Carpenter II, Ph.D., is an Assistant Professor of Educational Leadership at the University of Colorado, Colorado Springs.  He received his Ph.D. in Educational Leadership and Innovation from the University of Colorado, Denver, in 2001.  Dr. Carpenter is an expert on education policy, practice, and pedagogy.  Dr. Carpenter will testify that the policy in question advances many valid, secular educational goals, including the following: (1) raising students awareness about multiple ways of knowing; (2) promoting critical thinking; (3) encouraging students to assume more responsibility in their learning and to play an active part in constructing their own knowledge; (4) promoting a fuller understanding of the theory of evolution, including its limitations; (5) aligning its curriculum with the Pennsylvania Academic Standards, which require students to "Critically evaluate the status of existing theories," including the "theory of evolution"; and (6) helping students understand the views inherent in controversial issues, such as biological evolution, which is consistent with the Santorum Amendment.  Dr. Carpenter will also provide testimony in rebuttal to claims advanced by Plaintiffs' experts, Dr. Brian J. Alters and Dr. Kevin Padian.

### 4.    Dr. Steven Fuller Ph.D.

Steve Fuller, Ph.D. is Professor of Sociology at the University of Warwick, England. He received a BA *summa cum laude* in History and Sociology from Columbia University, where he was awarded a Kellett Fellowship to study at Cambridge University, where he received an M.Phil. in History & Philosophy of Science. His Ph.D. is in History & Philosophy of Science from the University of Pittsburgh. He is a pioneer in the interdisciplinary study of the social foundations of knowledge, or "social epistemology," the name of a quarterly peer-reviewed journal he founded in 1987 as well as the first of his eleven books. His recent book, *Kuhn vs Popper: The Struggle for Soul of Science,* was named "book of the month" in February 2005 by *Popular Science* magazine. Dr. Fuller is also the author of nearly 200 peer-reviewed articles and book chapters in a variety of disciplines. His works have been translated into fifteen languages. He has been a visiting professor in the US, Sweden, Denmark, Netherlands, Israel, and Japan. Dr. Fuller was the first postdoctoral fellow in History & Philosophy of Science at the US National Science Foundation, and the first research fellow in Public Understanding of Science at the UK Economic and Social Research Council. He designed the course, "Are Science and Religion Compatible?" for the M.Sc. in Science Communication degree at the UK's Open University, the world's largest

19

distance-learning institution of higher education.

Dr. Fuller will testify that IDT is science not religion. He will explain that the convention of methodological naturalism currently in prevalent in the scientific community is by no means a necessary feature of scientific inquiry and that scientific inquiry and progress have taken place without any commitment to methodological naturalism. He will also demonstrate that attempts to exclude IDT from science based upon reference to causation, testability, or other so-called "demarcation criteria" are inherently flawed.

Fuller will also explain that IDT is not Creationism and that the openness to the possibility of supernatural causation does not make IDT inherently religious. As he will explain, the "context of discovery" for scientific inquiry, which may entail a belief that the subject of scrutiny results from a supernatural phenomena (at least phenomena regarded as "supernatural" in light of the state of current knowledge), does not disqualify a given theory from science. As he will explain, the history of science is full of supernatural hypotheses. For example, both Newton's gravity and the wave-particle duality of quantum mechanics were originally thought to have supernatural qualities for that reason.

He will further testify that IDT exhibits the characteristics of scientific inquiry because, among other things, of the "context for justification" for IDT,

which allows the claims of IDT theorists to be addressed without regard to any shared metaphysical premises.  Fuller will also explain that IDT is not a threat to modern science and that a religious or supernaturalistic context for discovery has actually fostered scientific progress.

Fuller will also explain that ET is a theory, that there is good reason to believe that ET plays a most marginal role in actual work in the field, and that any number of hypothesis advanced under the broad rubric of ET are deemed debatable by relevant scientific specialists.

### 5.     Dr. Warren A. Nord, Ph.D.

Warren A. Nord received a Ph.D. in philosophy from the University of North Carolina Chapel Hill, where he teaches philosophy of religion and philosophy of education.  He is the author of two dozen book chapters and articles in professional and scholarly journals dealing with religion and education and two books on the subject.  He testifies as a philosopher with an interest in education and religion.

Dr. Nord will testify that IDT cannot be deemed religion merely by reason of IDT's openness to the possibility of supernatural causation.  Moreover, he will explain that efforts to exclude IDT from science result from a philosophical (not merely methodological) naturalism.  Further Nord will testify that claims advanced

21

by IDT theorists working in biology gain force when seen in a larger context because the hypothesis advanced by IDT theorists working in biology demonstrate convergence with hypothesis advanced a cosmological level and in other areas, such as work dealing with the phenomena of mind.

In addition, Nord will explain that making students aware of other ways of approaching given topics, including ET and IDT, as well as helping students appreciate the cultural and intellectual commitments touching on science is sound pedagogy.  Dr. Nord will also testify that it is sound educational practice, consistent with the philosophy of liberal education, to introduce students to IDT and the controversy surrounding ET and IDT and that such an approach is in fact consistent with National Science Education Standards.  Dr. Nord will testify that DASD's curriculum change and resulting informational statement foster legitimate secular pedagogical goals.

**G.     Special Comments About Pleadings And Discovery, Including Depositions.**

The Pretrial Discovery authorized by this Court's Pretrial Order has closed. Defendants motion for summary judgment is pending and a hearing will be held on that matter pursuant to the Court's order.  Currently, Defendants await this Court's decision on the motion for reconsideration relating to depositions of

newspaper reporters Joe Moldanado and Heidi Bernhard Bubb and intend to conduct discovery to the full extent permitted by this Court's order.  In addition, Plaintiff Barrie Callaghan has recently produced supplemental documents bearing on her prior testimony and the Plaintiffs' claims.  Defendants anticipate that they will take a supplemental deposition of Callaghan in light of this newly produced evidence.  On September 1, 2005, Defendants were informed that Plaintiffs intend to seek an additional deposition of former board member Bill Buckingham, Defendants are currently considering their position with respect to Plaintiffs effort and will inform the Plaintiffs and the Court of their position on this matter in short order.

## H.   Summary Of Legal Issues Involved And Legal Authorities Relied Upon.

The legal issue in this case is whether a four paragraph statement drafted prior to this litigation, which references IDT twice, informs students that IDT differs from ET, makes students aware of a supplemental text in the library addressing IDT (and, more recently, other texts addressing ET and IDT), and prohibits the teaching of IDT, Creationism, or religion, violates the Establishment Clause of the First Amendment to the Constitution of the United States.  As this Court considers the evidence presented, it must be mindful that "The First Amendment does not prohibit practices which <u>by any realistic measure</u> create none

of the dangers which it is designed to prevent and which <u>do not so directly or</u>
<u>substantially</u> involve the state in religious exercises or in the favoring of religion
as to have <u>meaningful and practical impact</u>." *School Dist. of Abington Township*
*v. Schempp*, 374 U.S. 203, 308 (1963) (concurring opinion) (emphasis added).  Put
simply, this Court must "distinguish between real threat and mere shadow." *Id.*

The Plaintiffs allege that DASD's curriculum violates the Establishment
Clause because it has the primary purpose and effect of advancing a religious
doctrine, *see Edwards v. Aguillard*, 482 U.S. 578 (1987), not because it prohibits
the teaching of ET. *See Epperson v. Arkansas*, 393 U.S. 97 (1968).  Under these
circumstances *Edwards* provides the controlling law and requires this Court to
determine if DASD's policy has the primary purpose or primary effect of
advancing religion.  *Edwards*, 482 U.S. at 582-83 (applying *Lemon* test); *see also*
*Agostini v. Felton*, 521 U.S. 203, 237 (1997) ("[I]f a precedent of this Court has
direct application in a case . . . the Court of Appeals should follow the case which
directly controls, leaving to this Court the prerogative of overruling its own
decisions.").[5]  *Edwards*, *supra*, actually supports the Defendants position precisely
because the Supreme Court took pains to point out that "teaching a variety of

---

[5]In their Pretrial Memorandum Plaintiffs state that they advance only a claim under the First Amendment
and do not base their claim on an alleged entanglement of church and state.  See Plaintiffs' Pretrial Memorandum at
n. 1 & n. 4.

scientific theories about the origins of humankind to school children, might be validly done with the clear secular intent of enhancing the effectiveness of science instruction." *Edwards*, 482 U.S. at 594.  Defendants' policy is a modest step in that direction, making students aware of IDT as a theory which differs from ET while focusing teaching effort on ET as recommended by science faculty, and from this it follows that the Plaintiffs' claim must be rejected.

The Plaintiffs cannot prove that the primary purpose of DASD's curriculum change was to advance religion.  As sketched above, the Defendants believed that IDT was a scientific theory, not Creationism, when they enacted a curriculum change designed to enhance science education.  A review of the text shows the *bona fide* basis for the judgment that IDT was a scientific theory, and DASD expressly prohibited the teaching of Creationism or religion in order to ensure absolute compliance with the law.  Thus even if the Plaintiffs could show that IDT were religion (which they cannot as explained below), this would <u>not</u> support their claim that Defendants' primary purpose was to advance religion because the Board's actual purpose, based upon the actual conclusion it derived from its deliberations, was to enhance science education.

The Plaintiffs cannot show that the Defendants had a religious purpose based on statements said to demonstrate an illicit motive or goal on the part of

individual board members.  The purpose of actions taken by public bodies must be

determined with reference to the collective resolutions and actions of the body,

determined first and foremost by the actual language of the legislation or policy at

issue—the only true reflection of the actions of a public body.  *See Edwards*, 482

U.S. at 594 "The plain meaning of the statute's words, enlightened by their context

and the contemporaneous legislative history, can control the determination of

legislative purpose.").  *Mueller v. Allen*, 463 U.S. 388, 394-95 (1983) (ascribing

the Court's disinclination to invalidate government practices under Lemon's

purpose prong to its "reluctance to attribute unconstitutional motives to the States,

particularly when a plausible secular purpose for the State's program may be

discerned from the face of the statute"); *Board of Education v. Mergens*, 496 U.S.

226, 249 (1990) (upholding statute against Establishment Clause challenge and

stating that "[b]ecause the Act on its face grants equal access to both secular and

religious speech, we think it clear that the Act's purpose was not to endorse or

disapprove of religion") (quotations and citation omitted).  And this Court's

inquiry into the Defendants' purpose should be limited and deferential.  *Edwards*,

482 U.S. at 586; *Wallace v. Jaffree*, 472 U.S. 38, 57, 75-76 (stating that the

inquiry into the purpose "should be deferential and limited.  Even if the text and

official history of a statute express no secular purpose, the statute should be held

to have an improper purpose only if it is beyond purview that endorsement of religion or a religious belief was and is the reason for the law's existence") (O'Connor, J., concurring) (internal quotations and citation omitted).

The purpose of the public body <u>cannot</u> be proven with evidence about the motives or goals of <u>individuals</u> with no legal authority, as <u>individuals</u>, to bind or speak for the <u>public body</u>. *See Board of Education v. Mergens*, 496 U.S. 226, 249 (1990) (upholding the Equal Access Act against an Establishment Clause challenge and stating that "even if some legislators were motivated by a conviction that religious speech in particular was valuable and worthy of protection, that alone would not invalidate the Act, because what is relevant is the legislative purpose of the statute, not the possibly religious motives of the legislators who enacted the law"); *see also U.S. v. O'Brien*, 391 U.S. 367, 383-84 (1968)(refusing to invalidate legislation based upon comments of individual legislator); *Modrovich v. Allegheny County, PA*, 385 F.3d 397 (3rd Cir. 2004)(refusing to invalidate Ten Commandments display on grounds some legislators allegedly had religious purpose supporting display). The purpose of a public body <u>cannot</u> be proven with evidence of the motives or purpose of third parties, whether scientists, academics, editors, authors, publishers, because–again–the purpose of <u>public bodies</u> must be determined with reference to the collective purpose of the <u>public body</u>. And, of

course, Plaintiffs cannot prove that the Defendants had an improper purpose based on rank speculation by political opponents of the Board (even if Plaintiffs in this case), newspaper reporters, or other third parties.

The Plaintiffs cannot prove that the primary effect of the Defendants' policy is to advance religion. As sketched above, the evidence will show that the primary effect of the curriculum is to advance science education. The informational statement implementing the curriculum change simply informs students that IDT is an explanation for the origins of life which differs from ET, that *Of Pandas* is a book about IDT available in the library, and that there are other books about ET and IDT in the library. The statement does not describe the substance of claims advanced by IDT theorists. Also, DASD prohibits the teaching of IDT or religion. These are <u>not</u> religious effects.

The Plaintiffs' effort to prove that Defendants advance "religion" by informing students about *Of Pandas* and other texts in the library fails as a matter of law. DASD cannot be charged with individual decisions to examine texts in the library for the same reasons that government cannot be charged with establishing religion because individuals exercising private choices use public vouchers to attend religious schools. *Cf. Zelman v. Simmons-Harris*, 536 U.S. 639, (2002)(voucher program did not violate Establishment Clause even though

majority of students enrolled in religiously affiliated schools where public funds

flowed as a result of private choices); *see also Rosenberger v. University of*

*Virginia*, 515 U.S. 819, 842-44 (1995)(government does not advance religion by

making facilities or funds available to students which engage in religious activity).

Indeed, even if DASD could be charged with individual decisions to

conduct free inquiry, it is pure speculation to guess whether the effect of DASD's

reference to books in the library will advance–or retard–IDT.  DASD points

students to *Of Pandas* and other resources in the library addressing ET and IDT, at

least three of which are authored by Plaintiffs' experts and critical of IDT.  This is

particularly true because DASD requires use of a basal text addressing ET and

provides classroom instruction in ET, but merely alerts students to a supplemental

text addressing IDT in the library and allows no teaching of IDT in the classroom

as recommended by the science faculty.

Moreover, even if the policy could be said to "advance" IDT in any

meaningful sense the evidence will show that IDT is–in fact–a scientific theory,

not Creationism.  The Plaintiffs' effort to classify IDT as religion rests upon a

mischaracterization of the hypotheses actually advanced by IDT, which is not a

religious assertion and which, as a matter of science, leaves open various

possibilities concerning the source of design thought to be evidenced by nature

(which some might classify as natural, others supernatural).  This evidence will show that IDT is not <u>religion</u> as a matter of law.  *See Grove v. Mead Sch. Dist.*, 753 F.2d 1528, 1537 (9th Cir. 1985) (noting that while an expansive definition of religion "best serves free exercise values, the same expansiveness in interpreting the establishment clause is simply untenable"); *United States v. Allen*, 760 F.2d 447, 450-51 (2nd Cir. 1985) (recognizing that "all that is 'arguably religious' should be considered religious in a free exercise analysis," while "anything 'arguably non-religious' should not be considered religious in applying the establishment clause") (quoting L. Tribe, *American Constitutional Law* 828 (1978)).  Indeed, even if IDT were considered "junk science" (which it is not), such proof would not suffice to show that DASD's curriculum change had the purpose of advancing religion because this would not prove that IDT is religion.

The Plaintiffs' experts seek to disqualify IDT as "science" simply because <u>some</u> (not all) of the possible hypothesis left open by IDT theorist may coincide with some (not all) religious or philosophical beliefs.  But it is fundamental that mere coincidence, in this case between scientific hypothesis and certain religious or philosophical beliefs, provides no grounds to void a policy on the theory it is an establishment of religion.  *Cf. Harris v. McRae*, 448 U.S. 297, 319-320, 100 S.Ct. 2671, 2689-2690 (reasoning that Hyde Amendment prohibiting funding for

abortion did not violate Establishment Clause simply because the values it

reflected happened to coincide with religious beliefs of some religious groups.);

*McGowan v. Maryland*, 366 U.S. 420, 442-43, 81 S.Ct. 1101, 1113-14 (reasoning

that Establishment Clause  does not ban laws simply because rationale for law

"happens to coincide or harmonize with the tenets of some or all religions.").

The Plaintiffs' assertion that DASD's policy does not advance DASD's

goals is wholly beside the point.  DASD's goal was modest, to make students

aware of IDT and the controversy concerning ET and IDT in the scientific and

academic community.  But the Establishment Clause does not empower the

Plaintiffs to second-guess the Defendants' lawful exercise of authority to

determine curriculum based on nothing more than differing views concerning the

wisdom of the chosen pedagogical goal or efficacy of means by which that goal is

advanced.   Quite the contrary, it is fundamental that the Board's exercise of

authority is entitled to this Court's deference.

Finally, the Plaintiffs cannot prove that the primary effect of DASD's

curriculum policy is to advance religion by pointing to an "endorsement" of

religion which they–or others–would attribute to DASD's curriculum policy.  The

Plaintiffs' recourse to the endorsement test is improper because no Court is free to

set aside Supreme Court precedent on the theory that intervening case law has

somehow changed the law where, as here, the controlling case is clear.  *See Agostini*, 521 U.S. at 237 ("if a precedent of this Court has direct application in a case . . . the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."); *Otto v. Pennsylvania State Education Association-NEA*, 330 F.3d 125, 132-33 (2003)(following Supreme Court precedent despite questions because "[a]bsent a counter directive by the Supreme Court, we likewise make no exception.").  As the Third Circuit has recognized, the "endorsement" test has been developed for, and applied with respect to, cases involving religious displays. *See, e.g., Modrovich v. Allegheny County*, 385 F.3d 397, 401 (3rd Cir. 2004) ("[T]he 'endorsement' test modifies *Lemon* in cases involving religious displays on government property."). But the Supreme Court has never applied the endorsement test to claims that curriculum violates the Establishment Clause and therefore, "[a]bsent a counter directive by the Supreme Court," *see Otto*, 330 F.3d at 132-33, this Court must "likewise make no exception," *id*, to the straightforward application of the *Lemon* test the Supreme Court has employed with respect to claims that the purpose and effect of a curriculum change was to advance religion.

This adherence to controlling case law required by law is particularly appropriate where, as here, the purported change in the law lacks appeal to

commonsense.  One need look no further than the Plaintiffs' arguments to see the absurd results that would follow from an effort to apply the endorsement test to this case.  For by some strange alchemy, the Plaintiffs seek to conjure an endorsement of religion from newspaper stories asserting that DASD's policy is religious and DASD's effort to address that misinformation in a press release and a newsletter.  By this sleight-of-hand a change to the ninth grade curriculum which results in a statement read to students, has a primary effect that advances religion not just in Dover but the world.  The Court must reject this effort to equate primary effect with "butterfly effect" precisely because it finds no support in the law.

Finally, it is likewise clear that Plaintiffs' use of newspaper clippings and the like as evidence of public controversy concerning the legitimacy of the Board's curriculum policy cannot stand-in for an actual constitutional violation. The reason is obvious: on this theory mere controversy becomes the ersatz substitute for a genuine constitutional violation.  The Supreme Court has already rejected this argument in another context precisely because it makes accusation (no matter how baseless) tantamount to conviction.  *See Lynch v. Donnelly*, 465 U.S. 668, 683-84 (1984)(rejecting claim that political divisiveness provides basis for Establishment Clause violation).  For these reasons, the Defendants are

confident that this Court will deny the Plaintiffs' request for relief and, instead, will declare that DASD's curriculum is constitutional and enter judgment dismissing, with prejudice, the Plaintiffs' claim.

**I.      Estimated Number of Trial Dates.**

Defendants concur in the Plaintiffs' estimate.

**J.      Other Pertinent Matters.**

Defendants concur in the Plaintiffs' statement regarding other pertinent matters and will comply with this Court's order.

**K.      Prenumbered Schedule of Exhibits.**

A schedule of exhibits is attached hereto as Exhibit B.  Defendants concur in and adopt by reference the Plaintiffs' view with respect to exhibits and likewise reserve the right to supplement the list if needed to include exhibits inadvertently omitted or needed to respond to new issues arising as this litigation proceeds, including, but not limited to, exhibits needed in connection with pretrial motions or trial exigencies such as cross examination or rebuttal.

**L.      Special Verdict.**

Not applicable.

**M.** **Statement of Settlement Authority And Notification Pursuant To Local Rule 16.2**

The undersigned certifies that counsel for the Defendants has settlement authority and has notified the Defendants about the requirements of, and possibility of sanctions under, Local Rule 16.2.

**N.** **Certificate under Local Rule 30.10.**

Defendants concur in Plaintiffs' representations to the Court and will designate deposition testimony as required by the Court's Preliminary Pretrial Order dated August 26, 2005.

**O.** **Proposed Findings Of Fact And Law.**

Defendants will submit proposed findings of fact and law as required by the Court's Preliminary Pretrial Order dated August 26, 2005.

Respectfully submitted,

September 2, 2005

Patrick T. Gillen (P47456)*
Richard Thompson (P21410)*
Robert J. Muise  (P62849)*
THOMAS MORE
LAW CENTER
24 Frank Lloyd Wright Drive
PO Box 393
Ann Arbor, Michigan 48106
(734) 827-2001
*Attorneys for Defendants*
        **admitted pro hac vice*

35

By:_____

    Ron Turo
    Turo Law Offices
    29 South Pitt Street
    Carlisle, PA 177013