# EXHIBIT H

EXHIBIT

tabbies®

H

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 83829
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

c

Not Reported in F.Supp.2d, 2005 WL
83829
Briefs and Other Related Documents
Only the Westlaw citation is currently
available.

United States District Court,N.D. Georgia,
Atlanta Division.
Jeffrey Michael SELMAN, Kathleen
Chapman, Jeff Silver, Paul Mason, and
Terry Jackson, Plaintiffs,
v.
COBB COUNTY SCHOOL DISTRICT
and Cobb County Board of Education,
Defendants
**No. Civ.A.1:02-CV-2325-C.**

Jan. 13, 2005.

Gerald R. Weber , Margaret Fletcher
Garrett , American Civil Liberties Union
Foundation of Georgia, Inc. , Atlanta, GA,
Michael Eric Manely , The Manely Firm,
Marietta, GA, for Plaintiffs.
Ernest Linwood Gunn, IV , Brock Clay
Calhoun Wilson & Rogers, Marietta, GA,
for Defendants.
Lynn Gitlin Fant , Office of Lynn G. Fant,
Marietta, GA, for Amicus.
George M. Weaver , Hollberg & Weaver,
Atlanta, GA, for Amicus and Intervenor.
Kevin Thomas McMurry , Hollberg &
Weaver , Atlanta, GA, Kevin Hayden
Theriot, Alliance Defense Fund, Olathe,
KS, for Intervenor.

*ORDER*

COOPER, J.

INTRODUCTION

*1 Plaintiffs Jeffrey Michael Selman, Kathleen Chapman, Jeff Silver, Paul Mason, and Terry Jackson (collectively referred to herein as "Plaintiffs") bring this action under 42 U.S.C. § 1983 against Defendants Cobb County School District and Cobb County Board of Education (collectively referred to herein as " Defendants") to challenge the constitutionality of a sticker commenting on evolution, which the Cobb County Board of Education (referred to herein as the "School Board") adopted in March of 2002 and placed in certain science textbooks later that year. Plaintiffs contend that the sticker violates the Establishment Clause of the First Amendment, as incorporated by the Fourteenth Amendment, and the Constitution of the State of Georgia. Plaintiffs are all parents of students attending Cobb County schools, FN1 and Plaintiffs are residents and taxpayers of Cobb County, Georgia. Plaintiffs seek declaratory and injunctive relief, nominal damages, costs, and attorneys' fees.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 83829
**(Cite as: Not Reported in F.Supp.2d)**

> FN1. Plaintiff Jeffrey Selman's child attends Tiber Ridge Elementary School. Plaintiff Kathleen Chapman's daughter attends McEachern High School. Plaintiff Jeff Silver's daughter attends Cobb County High School. Plaintiffs Paul Mason and Terry Jackson also have children who attend Cobb County schools.

This matter involves one of those instances where science and religion both offer an explanation to resolve a controversial issue-namely, the origin of the human species. This issue historically has generated intense controversy and debate precisely because of its religious implications and the belief of some that science and religion cannot coexist. Since at least the 1920s, courts throughout the Nation have been struggling to determine the constitutional limitations that should be placed on public school curriculum concerning the origin of the human species and to delineate clearly the line that separates church and state.

Due to the various challenges that arise in this area, the Court believes it prudent to state from the outset what the instant case is *not* about First, the Court is not resolving in this case whether science and religion are mutually exclusive, and the Court takes no position on the origin of the human species. Second, the issue before the Court is not whether it is constitutionally permissible for public school teachers to teach intelligent design, the theory that only an intelligent or supernatural cause could be responsible for life, living things, and the complexity of the universe. Third, this case does not resolve the ongoing debate regarding whether evolution is a fact or theory or whether evolution should be taught as fact or theory.

To be clear, this opinion resolves only a legal dispute. Specifically, the narrow issue raised by this facial challenge is whether the sticker placed in certain Cobb County School District science textbooks violates the Establishment Clause of the First Amendment of the United States Constitution and/or Article I, Section II, Paragraph VII of the Constitution of the State of Georgia.

The findings of fact and conclusions of law adduced below are based on the Court's review of the evidence presented at trial, the testimony of the witnesses at trial, the parties' trial briefs, the parties' proposed findings of fact and conclusions of law, the other documents and evidence in the record, and the applicable law FN2.

> FN2. The Court has received numerous letters, e-mails, and other forms of correspondence pertaining to this case. The only documents submitted by third parties the Court has considered, however, are those that are an official part of the record Consistent with the foregoing, the Court has taken

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                              Page 3

Not Reported in F.Supp.2d, 2005 WL 83829
**(Cite as: Not Reported in F.Supp.2d)**

under consideration the following (1) the Amicus Brief of Parents for Truth in Education, (2) the Amicus Curiae Brief of Biologists and Georgia Scientists, In Support of Defendants, (3) the Amicus Curiae Brief of the Colorado Citizens for Science, Kansas Citizens for Science, Michigan Citizens for Science, Nebraska Religious Coalition for Science Education, New Mexico Academy of Science, New Mexicans for Science and Reason, New Mexico Coalition for Excellence in Science and Math Education, and Texas Citizens for Science, in Support of Plaintiffs, and (4) the Amicus Curiae Brief of J Foy Gum, Jr, a district court judge from another district who is supporting the Defendants in his capacity as a citizen.

### FINDINGS OF FACT

**\*2** Evolution is the dominant scientific theory regarding the origin of the diversity of life and is accepted by the majority of the scientific community FN3 (Miller Trial Test; Moreno Trial Test, McCoy Trial Test, Stickel Trial Test) FN4. The inclusion of this theory in the curriculum of Cobb County Schools has been a source of controversy for quite some time. In 1995, the Cobb County School District maintained a policy, which was adopted in 1979 and revised on several occasions thereafter, stating the following.

FN3. The Court notes that many in the scientific community maintain that evolution is not a theory of the origin of life but is a theory concerning the origin of the diversity of life See Amicus Curiae Brief of the Colorado Citizens for Science, et al, in Support of Plaintiffs at 4. The significance of this distinction is not entirely clear to the Court, particularly as it relates to the origin of the human species, which is one of the more sensitive issues in the ongoing debate between proponents and opponents of evolution

FN4. "Miller" refers to Dr Kenneth Miller, the co-author of one of the biology textbooks used in the Cobb County School District "Moreno" refers to Dr Carlos S Moreno, an assistant professor at Emory University, who has a Ph D in genetics and molecular biology from Emory "McCoy" refers to Dr Roger W McCoy, the science department chair at North Cobb High School, who teaches genetics, biology, and astronomy "Stickel" refers to George Stickel, the high school science supervisor for Cobb County schools.
The Court notes that in an Order [Doc No 72] entered on November 4, 2004, ruling on a Motion to Exclude Witness Testimony filed by Defendants, the Court ordered that Dr Miller would be permitted

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                          Page 4

Not Reported in F.Supp.2d, 2005 WL 83829
**(Cite as: Not Reported in F.Supp.2d)**

to testify at trial so long as he testified only as a fact witness. Order at 7. The Court also expressed in that Order its understanding that Plaintiffs no longer intended to call Dr Moreno as an expert witness at trial. Id at 2 n. 1 Accordingly, the Court declared moot that portion of Defendants' Motion to Exclude Witness Testimony that sought to exclude Dr Moreno as a witness Id. Notwithstanding the foregoing, counsel for both Plaintiffs and Defendants asked Dr Miller questions at trial that sought testimony more in the nature of testimony that an expert witness would provide. Additionally, Dr Moreno testified at trial on behalf of the Plaintiffs with no objection by Defendants In the absence of an objection at trial by Defendants to the testimony of either Dr Miller or Dr Moreno, the Court has decided to consider the testimony offered by both witnesses and to rely on the testimony where deemed appropriate

The Cobb County School District acknowledges that some scientific accounts of the origin of human species as taught in public schools are inconsistent with the family teachings of a significant number of Cobb County citizens. Therefore, the instructional program and curriculum of the school system shall be planned and organized with respect for these family teachings The Constitutional principle of separation of church and state shall be preserved and maintained as established by the United States Supreme Court and defined by judicial decisions.Defs' Ex 1

A more specific statement regarding the practicality of teaching theories of origin in Cobb County public school classrooms, the Cobb County School District's regulation concerning theories of origin read as follows in 1995.

In respect for the family teachings of a significant number of Cobb County citizens, the following regulations are established for the teaching of theories of the origin of human species in the Cobb County School District:

(1) The curriculum of the Cobb County School District shall be organized so as to avoid the compelling of any student to study the subject of the origin of human species.

(2) The origin of human species shall be excluded as a topic of curriculum for the elementary and middle schools of the Cobb County School District.

(3) No course of study dealing with theories of the origin of human species shall be required of students for high school graduation.

(4) Elective opportunities for students to investigate theories of the origin of human species shall be available both through classroom studies and library collections which shall include, but not be limited to, the creation theory.

(5) All high school courses offered on an

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 83829
(Cite as: Not Reported in F.Supp.2d)

Page 5

elective basis which include studies of the origin of human species theories shall be noted in curriculum catalogs and listings which are provided for students and parents for the purpose of course selection.
Defs' Ex. 2.

Neither the former policy nor regulation explicitly references evolution, but both imply that a significant number of Cobb County citizens maintain beliefs that are deemed to conflict with evolution. Not all Cobb County teachers interpreted the former policy and regulation to require teaching on evolution, although the state curriculum apparently mandated such teaching. (McCoy Trial Test, Searcy Trial Test) FN5. In fact, it was common practice in some science classes for textbook pages containing material on evolution to be removed from the students' textbooks (Tippins Dep, p 86, ll. 11-15; Searcy Trial Test). With respect to human evolution specifically, teachers were asked not to discuss that topic in required courses for graduation but to restrict the topic to those courses that were considered electives (McCoy Trial Test).

FN5. "Searcy" refers to Laura Searcy, one of the members of the School Board at the time the textbook adoption process was taking place. The other members of the School Board at that time included Gordon O'Neill, Betty Gray, Johnny Johnson, Lindsey

Tippins, Curt Johnston, and Teresa Plenge (Redden Aff ¶ 7). Joseph Redden is the Superintendent of the Cobb County School District and was in that position at the time of the textbook adoption (Redden Aff ¶ 2)

*3 In the Fall of 2001, the Cobb County School District began the process of adopting new science textbooks (Redden Aff. ¶ 3.) The textbook adoption process started with the formation of a textbook adoption committee, which read and studied various books and then recommended certain books for adoption (Redden Dep, p 5, ll. 18-20, p 6, ll 5-8, McCoy Trial Test). In October of 2001, the textbook adoption committee raised concerns regarding curriculum and instruction on theories of the origin of life (Redden Aff ¶ 3.). One concern of the committee was that a textbook adoption might conflict with the existing policy and regulation on theories of origin (Redden Trial Test.) After a legal review of the issues raised by the textbook adoption committee, the school administration determined that revisions to the policy and regulation would be recommended (Redden Aff. ¶¶ 5-6, Redden Trial Test.) These revisions would strengthen evolution instruction and bring Cobb County into compliance with statewide curriculum requirements (Redden Aff ¶ 6, Redden Trial Test).

Prior to the presentation of the new policy and regulation and based on

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 6

Not Reported in F.Supp.2d, 2005 WL 83829
**(Cite as: Not Reported in F.Supp.2d)**

recommendations received from the textbook adoption committee, the administration recommended science textbooks for adoption by the School Board (Redden Aff. ¶ 7, Redden Trial Test). The committee believed that the textbook written by Kenneth Miller and Joseph Levine, which was one of the books ultimately adopted by the School Board and the textbook that has taken the forefront in this litigation, was the best they had seen for high school students (McCoy Trial Test) George Stickel, Supervisor of High School Science Curriculum, agreed and saw the textbook as offering a comprehensive perspective of current scientific thinking regarding theory of origins. (Stickel Aff ¶¶ 7-8, Ex A, B; Stickel Trial Test.)

Once parents of Cobb County students learned that instruction on evolution was being strengthened and that the School Board was in the process of adopting new science textbooks containing material on evolution, certain parents began to express their concerns to School Board members about this issue. (Johnston Dep, p 7, ll 14-18, Johnston Trial Test). In accordance with School Board regulation, parents were permitted to review and comment upon the recommended textbooks (Redden Dep, p 5, ll 21-25, Gray Trial Test). Only three parents reviewed the books containing material on evolution at the formal review session conducted on February 26, 2002 (Doc No. 77, Ex 42). Of these three parents, one parent submitted a comment form stating that he was *very* happy w/

the inclusion of evolution, even if not by that term we must teach this." (*Id* ) (emphasis in original). The second parent, Marjorie Rogers, submitted several comment forms that criticized the presentation of evolution in various textbooks and condemned the books for not mentioning any alternate theories, such as one involving a creator (*Id* ). The third parent made no comment regarding the presentation of evolution (*Id* ).

*4 Although the evidence shows only three parents submitted official comment forms regarding the textbooks, the School Board heard complaints from several parents that the textbooks did not present the theories of origin in a fair manner. (Johnston Dep, p 9, ll 3-8; Johnston Trial Test, Searcy Trial Test.; Redden Trial Test) Similar to Ms Rogers' complaint, most of the complaints were that the textbooks presented only the theory of evolution and did not offer any information regarding alternate theories or criticisms of evolution. (Johnston Dep, p 7, ll 21-24, Johnston Trial Test; Redden Dep, p 12, ll. 24-25, p 13, ll 1-4, p 24, ll 19-25.) For some of the parents, such as Ms Rogers, the alternate theories would have included the theories of creationism and intelligent design. (Redden Dep, p 18, ll 24-25, p. 19, ll 1-4; Rogers Trial Test)

Ms Rogers, who identifies herself as a six-day biblical creationist, was the most vocal of the parents who complained to the School Board Opposed to the presentation of evolution as a fact rather than as a theory, Ms Rogers organized and presented

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 7

Not Reported in F.Supp.2d, 2005 WL 83829
**(Cite as: Not Reported in F.Supp.2d)**

a petition to the School Board that contained the signatures of about 2,300 Cobb County residents (Redden Dep, p. 27, ll 17-23, p. 28, ll. 3-5, Rogers Trial Test, Redden Trial Test). The petition requested that the School Board "clearly identify presumptions and theories and distinguish them from fact" (Rogers Trial Test). The petition also requested, among other things, that the Board ensure the presentation of all theories regarding the origin of life and place a statement prominently at the beginning of the text that warned students that the material on evolution was not factual but rather was a theory (*Id* ).

Mr Tippins, who is the current chairman of the School Board, initially brought to the School Board's attention the concerns of those parents who had problems with the proposed textbooks (Redden Dep, p 24, ll 19-25., Tippins Trial Test). In response to the outcry from these parents, certain unidentified members of the School Board consulted legal counsel to determine if there was any language that would help to address parent concerns within the confines of the law (Johnston Dep, p. 7, l 25, p 8, ll. 1-12; Johnston Trial Test, Searcy Trial Test). The Cobb County School District's legal counsel recommended language that they thought would be constitutional. (Johnston Dep, p 7, l 21, p 8, ll. 15-18, Tippins Dep, p 77, ll. 8-11) The language, which now appears on the sticker (referred to herein as the "Sticker"), reads as follows:

This textbook contains material on evolution Evolution is a theory, not a fact, regarding the origin of living things This material should be approached with an open mind, studied carefully, and critically considered.

Pls' Ex 1. Evolution is the only theory mentioned in the Sticker, and there is no sticker placed in textbooks related to any other theory, topic, or subject covered in the Cobb County School District's curriculum (Plenge Dep., p. 12, ll 14-21; Tippins Dep, p. 81, ll 14-17, Johnston Dep., p 18, ll 8-14; Plenge Trial Test). However, there are other scientific topics taught that have religious implications, such as the theories of gravity, relativity, and Galilean heliocentrism (Miller Trial Test.; McCoy Trial Test, Stickel Trial Test.)

**\*5** On March 28, 2002, the School Board unanimously adopted the textbooks recommended by the administration with the condition that the Sticker would be placed in certain of the science textbooks FN6 (Compl ¶ 13; Pls' Ex. 1; Plenge Dep, p 16, ll 6-12, Tippins Trial Test, Plenge Trial Test). With respect to this issue, the School Board minutes from a meeting held on March 27, 2002, reflect only that citizen concerns prompted the School Board to consider the idea of putting a statement at the beginning of the textbooks. (Doc No 77, Ex 43) There are no School Board minutes detailing any of the discussions had by the School Board members about the Sticker. The School Board's collective purpose in adopting the Sticker is not stated on the Sticker, and the School Board

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 83829
**(Cite as: Not Reported in F.Supp.2d)**

did not issue any statement regarding the purpose of the Sticker contemporaneous with its adoption.

> FN6. Most individuals who were present at the Board meeting recalled that the adoption of the textbooks was conditioned upon the placement of the Sticker in the textbooks (Redden Dep, p 25, ll 5-12, Tippins Dep, p 77, ll 2-7, Searcy Trial Test, Gray Trial Test). Others either did not recall the specifics of the vote or did not understand the adoption of the textbooks to be conditioned upon placing the Sticker in the textbooks (Plenge Dep, p 15, ll 9-21, Johnston Dep, 12, ll 3-21)

A majority of the School Board members attest that they did not intend to promote or benefit religion in voting for the Sticker (Searcy Aff. ¶ 5, O'Neill Aff ¶ 4; Gray Aff ¶ 5, and Johnson Aff ¶ 5). A majority of the School Board members also attest that they were either aware of the fact that the policy and regulation were being revised to strengthen evolution instruction at the time they voted on the Sticker, or that the policy and regulation are consistent with their purpose in voting on the Sticker. (Plenge Dep., p. 14, ll. 23-25, p. 15, ll 1-8, Johnston Dep, p 24, ll 14-25, Ex 1,2; Johnson Aff ¶ 4, Gray Aff. ¶ 4; Searcy Aff ¶ 4). Additionally, Mr. Johnston, who was then chairman of the School Board, issued a public statement in September of 2002 that the Sticker "was not intended to interject religion into science instruction but simply to make students aware that a scientific dispute exists" (Johnston Dep., p. 12, l 22, p 14, l. 20.; Pls' Ex 17).

The School Board members individually had several different concerns and motivations when they unanimously decided to adopt the Sticker. Mr Johnston possessed the personal opinion that a scientific dispute regarding the origin of life existed among proponents of evolution, creation science, intelligent design, and the theory that life on Earth came from outer space by means of an asteroid or meteorite (Johnston Dep., p 13, l 15, p. 14, l 20, Johnston Trial Test.) In voting for the Sticker to be placed in the textbooks, Mr Johnston wanted students to consider critically information regarding evolution to try to determine its validity. (Johnston Dep., p 19, ll. 4-12).

School Board member Lindsey Tippins was concerned that the science textbooks did not address "controversy in the field of science about macroevolution from an evidentiary standpoint" (Tippins Dep., p. 14, ll 23-25, p 15, ll 1-4). Mr. Tippins, like the other School Board members, had received communications from members of the public and members of the scientific community, who both supported and opposed the idea that there might be scientific controversy regarding evolution ( *Id* at p. 22, ll. 2-19, p 24, ll 1-9). Mr. Tippins also had inquired about the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 83829
**(Cite as: Not Reported in F.Supp.2d)**

permissibility of teaching intelligent design or scientific creationism but was advised that teaching such theories of origin was not legally permissible (*Id* at p. 51, ll 22-25, p 52, ll 1-11, p. 56, ll. 9-11, 19-21, Tippins Trial Test). After receiving this advice, Mr Tippins did not further consider the teaching of these theories (Tippins Dep, p 56, l. 25, p. 57, ll 1-3, 14-17.) Thus, he understood the Sticker's purpose was " to pursue and facilitate open discussion in the classroom about controversial issues of a scientific nature," not to enable intelligent design or creationism to be taught in science classrooms. (*Id.* at p. 61, ll 12-16.)

*\*6* School Board member Teresa Plenge remembered that the School Board's deliberation on evolution instruction began with proposed revisions to the policy on theories of origin (Plenge Dep, p 14, l. 15, p 15, l 8.) She mentioned that some parents wanted the curriculum to include principles such as intelligent design and creationism, and others simply wanted a broad-based approach to the subject (*Id,* p. 19, l. 14). As Ms Plenge recalled, these were the concerns that led to the Sticker in dispute, which she adamantly stated was not a disclaimer. (*Id,* p. 19, l 14, p 20, l. 12, Plenge Trial Test) FN7 In her mind, the School Board sought to come up with a constitutional way to guide the discussion in science classrooms and still encourage students to think critically. (Plenge Trial Test) She did not intend for the Sticker to " invoke" discussion about different theories of origin, but she did state that "teachers

could be tolerant" of a student's expression regarding a different theory of origin (*Id.*). She clarified, however, that "the teacher's responsibility is to get back on task teaching the QCCs that do not include other theories of origin other than evolution " (*Id.*). Thus, Ms. Plenge wanted to promote critical thinking among students and provide clarification for teachers who had previously had problems with the policy regarding teaching theories of origin. (Plenge Dep., p 17, ll 13-23; Plenge Trial Test)

> FN7. George Stickel and other teachers were cautious and concerned about the handling of the subject of evolution in classrooms prior to the issuance of the Sticker and revised policy and regulation (Stickel Aff ¶¶ 44-46)

School Board member Laura Searcy felt that placing the Sticker in the front of the science textbooks would serve the purpose of notifying parents and students that the book contained material on evolution so that they could handle any potential offense or conflicts the scientific information might cause. (Searcy Aff. ¶ 3, Searcy Trial Test). Both School Board members Searcy and Betty Gray thought that the Sticker served the additional purpose of clarifying the new policy that evolution would be taught (Searcy Aff ¶ 4; Gray Aff. ¶ 4) Ms. Searcy was rigidly opposed to alternative theories of origin being taught in the classroom, and she

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                   Page 10

Not Reported in F.Supp.2d, 2005 WL 83829
**(Cite as: Not Reported in F.Supp.2d)**

clarified that her intent in adopting the Sticker was not to communicate to students to critically consider only evolution (Searcy Trial Test). Rather, in her mind, the School Board singled out evolution as the subject discussed on the Sticker because that was the only subject creating the controversy (*Id.*).

School Board member Betty Gray, who has been in education in various capacities for over fifty years, was aware when she voted for the Sticker that there were groups of people in Cobb County who had very strong religious views concerning theories of origin. (Gray Trial Test) She was aware that these parents did not want the teaching of evolution to infringe on their kids' personal feelings and beliefs about the origin of life. (*Id* ) After thinking for a long time about the prospect of including a sticker in the science textbooks, she decided that including the Sticker would serve the purpose of clarifying for teachers and reassuring the public that Cobb County science classrooms would be tolerant of the diverse range of views that students might have regarding theories of origin (*Id* ) However, Ms Gray credibly testified that religion had nothing to do with her support for the sticker (*Id.*) Ms Gray simply wanted to "safeguard" the feelings of the kids, and she hoped that the science classroom would be "safe enough for a youngster to express themselves, whatever their views are." (*Id* )

**\*7** Neither School Board member Johnny Johnson nor Gordon O'Neill testified at trial. However, Mr. Johnson and Mr O'Neill, along with School Board members Gray and Searcy, previously testified by way of affidavit that they voted for the Sticker, in part, "to promote tolerance and acceptance of diversity of opinion" (Johnson Aff ¶ 3, Gray Aff ¶ 3; O'Neill Aff. ¶ 3, Searcy Aff ¶ 3). These School Board members also stated that they wanted to promote critical thinking (Johnson Aff ¶ 3, Gray Aff ¶ 3; O'Neill Aff. ¶ 3; Searcy Aff ¶ 3).

The School Board did not solicit expert opinion on scientific theories of origin or do research outside of the School Board sessions before voting on the Sticker, but they did hear from scientists via materials sent to them via e-mail and through the mail (Redden Dep, p 30, ll 23-25, p. 31, ll 1-6; Johnston Trial Test, Searcy Trial Test.) Among other things, the School Board received material from the Discovery Institute, which included a pro-intelligent design book called *Icons of Evolution* (Searcy Trial Test; Johnston Test.) Mr Johnston also received correspondence from Dr West of the Discovery Institute in which Dr. West offered to assist the Board in, among other things, drafting a sticker presumably to go into textbooks (Johnston Test.) Mr Johnston did not take Dr. West up on his offer, but Mr Johnston did refer Dr West to the Cobb County School District's legal counsel (*Id* ). There is no evidence that Dr. West ever conferred with the Cobb County School District's legal counsel.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                          Page 11

Not Reported in F.Supp.2d, 2005 WL 83829
**(Cite as: Not Reported in F.Supp.2d)**

After the School Board adopted the Sticker, numerous citizens, organizations, churches, and academics from around the country contacted the School Board and individual School Board members to praise them for their decision to open the classroom to the teaching and discussion of creationism and intelligent design. On the other hand, the School Board also received letters in which individuals and groups expressed dismay at the inclusion of the Sticker in the textbooks. Ms. Rogers, although she had requested that a disclaimer be placed in the textbooks, testified that she was not happy with the Sticker because it did not go far enough in stating that there were criticisms of evolution and it did not distinguish macroevolution from microevolution Ms Rogers requested in writing that the School Board revise the Sticker, but the School Board did not grant Ms. Rogers' request.

Dr. Wes McCoy, one of the high school science teachers who had served on the textbook adoption committee, opposed the placement of any sticker in the textbooks (McCoy Trial Test) Notwithstanding that sentiment, he proposed two alternative versions of the Sticker to the School Board and to the administration, which he believed would address the status of evolution in the science community in a more accurate manner. (McCoy Trial Test.) The administration favored one of the alternative versions, which stated the following.

This textbook contains material on evolution, a scientific theory, or explanation, for the nature and diversity of living things Evolution is accepted by the majority of scientists, but questioned by some All scientific theories should be approached with an open mind, studied carefully and critically considered.
**\*8** Pls' Ex 2

The School Board gave minimal consideration to the alternative language proposed by Dr. McCoy, in large part because the School Board had already voted on language that their counsel suggested and thought was constitutional At trial, two School Board members did not immediately recall alternative language even being proposed (Searcy Trial Test, Plenge Trial Test). Once Ms Searcy's recollection was refreshed, she remembered having an objection to the second sentence of the alternative sticker because she believed it was irrelevant whether some scientists did not like the theory of evolution (Searcy Trial Test.) Ms Searcy did not recall the School Board spending much time considering the alternative language (*Id* ). Similarly, Ms. Plenge testified that the alternative language obviously must have been rejected, but she did not recall the details of the School Board's rejection (Plenge Test). Ms Gray actually had the impression that the language on the Sticker was the administration's final recommendation (Gray Trial Test). In trying to explain at trial why the alternative language was not adopted, however, she stated that it must not have met the needs of the School Board (*Id* ). Mr Johnston recalled the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                      Page 12

Not Reported in F.Supp.2d, 2005 WL 83829
**(Cite as: Not Reported in F.Supp.2d)**

alternative language being proposed after the adoption of the original language, but he stated that the School Board decided to stay with the original language. (Johnston Trial Test) Mr. Tippins also remembered the alternative language, but he thought the language was weak. (Tippins Dep, p 78, ll 17-19; Tippins Trial Test.) He also held the opinion that the administration had acted in a highhanded manner by proposing alternative language after the School Board had already adopted language for the Sticker. (Tippins Trial Test) Thus, even though no stickers had been placed in any textbooks at the time, the School Board rejected the alternative language for the Sticker in June of 2002 (Redden Trial Test, Johnston Trial Test).

Between the Summer and Fall of 2002, the School Board had the Stickers produced with monies from the general fund (Plenge Dep, p 30, ll 20-23, Searcy Trial Test). The Stickers were then sent to the schools, and personnel at the schools physically affixed the Stickers into all of the science textbooks that contained material regarding the origin of life (Redden Dep, p. 29, ll. 13-19, p. 30, ll. 1-5, Stickel Trial Test.)

Following the adoption of the new science textbooks and the Sticker, the Board adopted its revised policy on theories of origin in September of 2002. (Johnston Dep, p 24, ll 14-17, Ex. 1.) The pertinent part of the policy states the following:
[I]t is the educational philosophy of the Cobb County School District to provide a broad based curriculum; therefore, the

Cobb County School District believes that discussion of disputed views of academic subjects is a necessary element of providing a balanced education, including the study of the origin of the species. This subject remains an area of intense interest, research, and discussion among scholars. As a result, the study of this subject shall be handled in accordance with this policy and with objectivity and good judgment on the part of teachers, taking into account the age and maturity level of their students.
**\*9** The purpose of this policy is to foster critical thinking among students, to allow academic freedom consistent with legal requirements, to promote tolerance and acceptance of diversity of opinion, and to ensure a posture of neutrality toward religion. It is the intent of the Cobb County Board of Education that this policy not be interpreted to restrict the teaching of evolution, to promote or require the teaching of creationism, or to discriminate for or against a particular set of religious beliefs, religion in general, or non-religion.
Defs.' Ex. 5.

The revised regulation regarding theories of origin, which was adopted in January of 2003, states:
1. Theories of origin shall be taught as defined within the Quality Core Curriculum (QCC). Teachers should seek to help students demonstrate proficiency in understanding those aspects of the theory of origins [sic] defined in the QCC and the impact of scientific theories

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 13

Not Reported in F.Supp.2d, 2005 WL 83829
**(Cite as: Not Reported in F.Supp.2d)**

on the disciplines studied.$SU11 2. Teachers are expected to set limits on discussion of theories of origin in order to respectfully focus discussion on scientific subject matter; at the same time, it is recognized that scientific instruction may create conflict or questions for some students with regard to belief systems. Discussion should be moderated to promote a sense of scientific inquiry and understanding of scientific methods, and to distinguish between scientific and philosophical or religious issues It may be appropriate to acknowledge that science itself has limits, and is not intended to explain everything, and that scientific theories of origin and religious belief are not necessarily mutually exclusive.

3. Under no circumstances should teachers use instruction in an effort to coerce students to adopt a particular religious belief or set of beliefs or to disavow a particular religious belief or set of beliefs. Instruction should be respectful of personal religious beliefs, and encourage such respect among students. Teachers should not interject their personal faith-based beliefs, or lack thereof, into such instruction, and should maintain a posture of neutrality toward religion.

4. It is recognized that instruction regarding theories of origin is difficult because it is socially controversial and potentially divisive. The administration expects, and will support, every teacher's effort to provide objective and professional instruction.

Defs' Ex 6

In over two years since the adoption of the science textbooks and the placement of the Sticker in the textbooks, neither the Superintendent of the Cobb County School District, the Supervisor of High School Science Curriculum, nor the Board members who testified at trial have received complaints about the teaching of religion or religious theories of origin in science classes (Redden Trial Test.; Stickel Trial Test, Johnston Trial Test, Tippins Trial Test.; Searcy Trial Test, Plenge Test.) Moreover, students have brought up the topic of religion as it relates to the theory of evolution no more frequently than they did before the Sticker was placed in textbooks (McCoy Trial Test.)

**\*10** Notwithstanding the foregoing, it appears that the Sticker is impacting science instruction on evolution Some students have pointed to the language on the Sticker to support arguments that evolution does not exist (McCoy Trial Test). In addition, Dr. McCoy testified that the Board's misuse of the word "theory" in the Sticker causes "confusion" in his science class and consequently requires him to spend significantly more time trying to distinguish "fact" and "theory" for his students (*Id* ). Dr. McCoy stated that some of his students translate the Sticker to state that evolution is "just" a theory, which he believes has the effect of diminishing the status of evolution among all other theories (*Id* ).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 14

Not Reported in F.Supp.2d, 2005 WL 83829
**(Cite as: Not Reported in F.Supp.2d)**

Some parents who saw the Sticker were alarmed by its contents Plaintiff Kathy Chapman's "alarm bells went off" when she saw the Sticker in her child's textbook, and she immediately felt that the Sticker " came from a religious source" because, in her opinion, religious people are the only people who ever challenge evolution. (Chapman Trial Test) She viewed the Sticker as promoting the religious view of origin and questioning the science in the textbooks (*Id* ). Plaintiff Jeff Silver perceived the effect of the Sticker to "open [ ] the door to introducing schools of thought based in faith and religion into science classes." (Silver Trial Test). He also believed that the Sticker disparaged evolution and implicitly asked students to think about alternative theories (*Id* ). Not surprisingly, the Sticker also raised a red flag for Plaintiff Jeffrey Selman because the Sticker singled out evolution and was, in his opinion, obviously religious (Selman Trial Test). Thus, the Sticker is now before this Court for consideration of its constitutionality.

## CONCLUSIONS OF LAW

### I. Establishment Clause Challenge

The Establishment Clause of the First Amendment of the United States Constitution states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof". U.S. Const. Amend. I "The

prohibition against the establishment of religion applies to the states through the Fourteenth Amendment." *King v. Richmond County,* 331 F.3d 1271, 1275 (11th Cir.2003) (citing *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940)), *see also Wallace v. Jaffree,* 472 U.S. 38, 49-50, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985).

The Supreme Court has recognized that " [s]tates and local school boards are generally afforded considerable discretion in operating public schools". *Edwards v. Aguillard,* 482 U.S. 578, 583, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987); *see also Epperson v. Arkansas,* 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968) ; *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). The Supreme Court has also stated that "[j]udicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint". *Epperson,* 393 U S at 104 Thus, courts usually should refrain from prematurely interfering with the educational policy decisions of school boards and administrators. *San Antoio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 42, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973)

**\*11** When decisions of states or local school boards do not comport with the guarantees secured by the First Amendment, however, federal courts do intervene. *Board of Education v. Pico,* 457 U.S. 853, 864, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1982) , *Epperson,* 393 U S at 104.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 15

Not Reported in F.Supp.2d, 2005 WL 83829
(Cite as: Not Reported in F.Supp.2d)

Indeed, the Supreme Court has found numerous violations of the Establishment Clause in public school settings. *See, e g, Santa Fe Indep. Sch. Dist. v. Doe,* 530 U.S. 290, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000) (declaring unconstitutional a policy permitting student-led, student-initiated prayer at football games), *Lee v. Weisman,* 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) (holding that a "nonsectarian" prayer delivered by a clergyman at a public middle school graduation exercise violated the Establishment Clause), *Wallace v. Jaffree,* 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) (holding that state statute providing for a moment of silence for mediation or voluntary prayer violated the Establishment Clause), *Stone v. Graham,* 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980) (striking down state statute that required the posting of privately financed copies of the Ten Commandments in public school classrooms), *Abington School Dist. v. Schempp,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (holding requirement of daily Bible reading in public schools to be unconstitutional under the Establishment Clause).

With respect to the teaching of theories of origin in public schools, both the Supreme Court and lower federal courts have struck down anti-evolution statutes, policies, and disclaimers as well as balanced treatment legislation. *See Edwards v. Aguillard,* 482 U.S. 578, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987) (striking down state statute that forbid the teaching of evolution in public

schools unless "creation science" was also taught); *Epperson v. Arkansas,* 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (striking down state statute that made it unlawful for teachers to instruct on the Darwinian theory of evolution in public schools); *Freiler v. Tangipahoa Parish Bd. of Educ.,* 185 F.3d 337 (5th Cir.1999) (invalidating disclaimer required to be read to students prior to teaching of evolution because the disclaimer had the primary effect of endorsing a particular religious viewpoint). *Daniel v. Waters,* 515 F.2d 485 (6th Cir.1975) (declaring unconstitutional a statute that required a disclaimer to accompany all theories of origin except the Biblical theory of creation and that precluded the teaching of occult or satanical beliefs of human origin), *McLean v. Arkansas Bd. of Educ.,* 529 F.Supp. 1255 (E.D.Ark.1982) (striking down statute that required balanced treatment of creation science and evolution in public schools).

To determine whether the Sticker at issue violates the Establishment Clause, Supreme Court and Eleventh Circuit precedent direct the Court to apply the three-prong test articulated in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) *See Santa Fe,* 530 U S at 314 (applying the *Lemon* test in analyzing an Establishment Clause challenge), *Glassroth v. Moore,* 335 F.3d 1282, 1295-96 (11th Cir.2003) (same) Under the *Lemon* test, a government-sponsored message violates the Establishment Clause of the First

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                   Page 16

Not Reported in F.Supp.2d, 2005 WL 83829
**(Cite as: Not Reported in F.Supp.2d)**

Amendment if. (1) it does not have a secular purpose, (2) its principal or primary effect advances or inhibits religion, or (3) it creates an excessive entanglement of the government with religion. *Lemon,* 403 U S at 612-13 If the government-sponsored action or message fails to meet either of these three prongs, then the challenge under the Establishment Clause succeeds *Glassroth,* 335 F.2d at 1295. As the Eleventh Circuit unequivocally recognizes, however, "there is no bright-line rule for evaluating Establishment Clause challenges " and "each challenge calls for line-drawing based on a fact-specific, case-by-case analysis" *King,* 331 F.3d at 1275-76 (citing *Lynch v. Donnelly,* 465 U.S. 668, 679, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984)).

**\*12** Both the Supreme Court and the Eleventh Circuit have acknowledged that the second and third prongs of the *Lemon* test are interrelated insofar as courts often consider similar factors in analyzing them. *See Agostini v. Felton,* 521 U.S. 203, 232-33, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) ; *Holloman v. Harland,* 370 F.3d 1252, 1284-85 (11th Cir.2004). In fact, the Eleventh Circuit, like several other circuit courts, has combined the second and third prongs of the *Lemon* analysis into a single " effect" inquiry *See Harland,* 370 F.3d at 1285, *accord Child Evangelism Fellowship of New Jersey, Inc. v. Stafford Township Sch. Dist.,* 386 F.3d 514, 534(3d Cir.2004) , *Commack Self-Service Kosher Meats, Inc. v. Weiss,* 294 F.3d 415, 424 (2d Cir.2002) , *Columbia Union College v. Clarke,* 159

F.3d 151, 157 (4th Cir.1998). The Court will do the same in the instant Order.

Defendants assert that the Court should also apply to this case the standard set forth in *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d *697 (1987),* in which the Supreme Court announced that a plaintiff mounting a facial challenge to a legislative act "must establish that no set of circumstances exists under which the Act would be valid," *See also Adler v. Duval County Sch. Bd.,* 206 F.3d 1070, 1083 (11th Cir.2000) (en banc), *vac. on other grounds,* 531 U.S. 801, 121 S.Ct. 31, 148 L.Ed.2d 3, *opinion and judgment reinstated,* 250 F.3d 1330 (11th Cir.2001) (observing the *Salerno* standard in a facial challenge to a school district's policy regarding student-led prayer at football games and commencement exercises but deciding the appeal in favor of the school district on a different basis). However, the Supreme Court did not apply the *Salerno* standard in *Santa Fe,* the Court's most recent case in which there was a facial challenge to a policy under the Establishment Clause *See* 530 U.S. at 313-14, *see also Adler,* 250 F.3d at 1342 (Carnes, J, dissenting) (stating that the Supreme Court's *Santa Fe* decision "unequivocally held" that the *Salerno* standard is inapplicable in the Establishment Clause area). Thus, the applicability of the *Salerno* standard in Establishment Clause cases is questionable.

Based on the nature of this case, the Court is not inclined to apply the rigid *Salerno*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 17

Not Reported in F.Supp.2d, 2005 WL 83829
**(Cite as: Not Reported in F.Supp.2d)**

standard. First, as mentioned above, the Supreme Court has at least suggested that the *Salerno* standard does not apply to Establishment Clause challenges. Even if the standard does apply, however, the Establishment Clause challenge mounted by the Plaintiffs in this matter does not fit squarely within the line of cases dealing with challenges to legislative acts, statutes, or policies. In those cases, the acts, statutes, and policies are subject to application. The challenge in this case is to a government-sponsored message, which is not being "applied" in the traditional sense Indeed, as both parties have acknowledged, to the extent that the sticker has an " application," the application is governed by the Cobb County School District's policy and regulation regarding theories of origin Albeit relevant to the instant case, the policy and regulation are not the subject of Plaintiffs' challenge. *See* Selman Dep, p. 49, ll 6-25, p 52, l. 23, p 53, ll 12-13, p. 54, ll 17-22, Selman Trial Test.) The sticker in dispute may have practical effects and create perceptions in the minds of its observers, but the Sticker does not " operate" or have an "application" as contemplated by *Salerno*. For these reasons, the Court concludes that the *Salerno* standard should not apply in this case, and the Court will focus its analysis using the standard set forth in *Lemon*.

### A *Purpose*

***13** "The purpose prong of the *Lemon* test asks whether government's actual purpose

is to endorse or disapprove of religion" *Lynch*, 465 U S. at 690 (O'Connor, J., concurring). To survive this Establishment Clause challenge, the Sticker in dispute must have a "clearly secular purpose" *Wallace*, 472 U S at 56, *Bown v. Gwinnett County Sch. Dist.*, 112 F.3d 1464, 1469 (11th Cir.1997) However, the purpose of the Sticker "need not be exclusively secular." *Bown*, 112 F.3d at 1469 (citing *Lynch*, 465 U S at 681 n. 6) The Sticker runs afoul of the Establishment Clause only if it is "entirely motivated by a purpose to advance religion." *Wallace*, 472 U S at 56, *King*, 221 F.3d at 1278, *Bown*, 112 F.3d at 1469. Thus, it logically follows that a state-sponsored message may satisfy this first prong "even if it is 'motivated in part by a religious purpose." ' *Adler*, 206 F.3d at 1084 (quoting *Wallace*, 472 U S. at 56)). However, the religious purpose must not be preeminent. *Stone*, 449 U.S. at 41

The court should defer to a state's articulation of a secular purpose, so long as the statement is sincere and not a sham. *Edwards*, 482 U S. at 586-87. A determination of the statement's purpose should involve a look at the language of the statement itself, enlightened by its context and contemporaneous legislative history *Edwards*, 482 U S at 594. As Justice O'Connor advised in *Wallace*, the inquiry into the purpose "should be deferential and limited. Even if the text and official history of a [statement] express no secular purpose, the [statement] should be held to have an improper purpose only if it

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 18

Not Reported in F.Supp.2d, 2005 WL 83829
**(Cite as: Not Reported in F.Supp.2d)**

is beyond purview that endorsement of religion or a religious belief 'was and is the ... reason for [the statement's] existence " ' 472 U.S. at 75-6 (O'Connor, J, concurring).

Based on the evidence before this Court at the summary judgment stage, the Court ruled that the School Board did not act with the purpose of promoting or advancing religion in placing the Sticker in the science textbooks. To the contrary, the Court found that the School Board sought to advance two secular purposes. First, the School Board sought to encourage students to engage in critical thinking as it relates to theories of origin. Second, given the movement in Cobb County to strengthen teaching on evolution and to make it a mandatory part of the curriculum, the School Board adopted the Sticker to reduce offense to those students and parents whose personal beliefs might conflict with teaching on evolution. The Court was satisfied on summary judgment that these two purposes were secular and not a sham However, both parties made arguments in their trial briefs and presented evidence at trial relevant to the purpose inquiry. Therefore, having considered all of the arguments and evidence presented by the parties and upon closer review of the applicable law, the Court will revisit the purpose prong of the *Lemon* test to provide a more thorough analysis.

**\*14** In most Establishment Clause cases involving challenges to statutes or school board policies, there is a stated purpose for the statute or policy. *See, e.g., Edwards,* 482 U.S. at 586 (stated purpose of statute requiring equal treatment of evolution and creation science in science classroom was to protect academic freedom), *Adler,* 206 F.3d at 1085 (stated purpose of policy allowing student-initiated messages at commencement exercises was to give " graduating students an opportunity to direct their own graduation ceremony by selecting a student speaker to express a message"), *Bown,* 112 F.3d at 1469 (stated purpose of statute requiring moment for quiet reflection in public schools was to give students the opportunity to reflect quietly on the events to come during the day). The Sticker in this case does not include a statement regarding its purpose. Likewise, there is no contemporaneous legislative history, such as detailed meeting minutes, which would aid the Court in determining the School Board's purpose for voting for the Sticker. The dearth of such evidence makes the Court's factual inquiry regarding the purpose somewhat difficult, but it does not mean that Defendants fail the purpose prong *King,* 331 F.3d at 1277 (government does not fail purpose prong simply because " there is no available evidence of the original intent").

In this case, Defendants state that the Cobb County School District's revised policy concerning theories of origin is consistent with the School Board's purposes for adopting the Sticker Notably, the School Board did not adopt the revised policy until almost six (6) months after adopting the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 19

Not Reported in F.Supp.2d, 2005 WL 83829
**(Cite as: Not Reported in F.Supp.2d)**

Sticker, and the revised policy does not reference the Sticker. However, the majority of the School Board members either knew the policy was being revised to reflect the strengthening of the evolution curriculum in Cobb County or they testified during the litigation that the policy was consistent with their purpose in voting for the Sticker.

Courts generally frown upon evidence of purpose that is not contemporaneous with the challenged action *See Edwards,* 482 U S. at 595 (concluding that post-enactment testimony from outside experts would be of little benefit in determining legislature's purpose for enacting balanced treatment statute); *Adler,* 206 F.3d at 1088 (post-enactment comments by individual board members did not outweigh other evidence of a secular purpose); *Adland v. Russ,* 307 F.3d 471, 483 n. 3 (6th Cir.2002) (refusing to rely on post-enactment comments of legislator in evaluating asserted secular purpose of statute challenged under Establishment Clause), *Friedman v. Board of County Comm'rs of Bernalillo County,* 781 F.2d 777, 781 n. 3 (10th Cir.1985) ("all courts must be wary of accepting after-the-fact justifications by government officials in lieu of genuinely considered and recorded reasons for actions challenged on Establishment Clause grounds"). However, in these cases, the evidence offered consisted of either testimony from individuals who were not a part of the decision-making process or comments made by individual legislators or decision-makers regarding their particular motivations. In contrast, the post-adoption evidence in this case is an official policy of the Cobb County School District, which was revised and adopted by the School Board as a collective unit. Thus, while the Court examines the secular purposes asserted following the adoption of the Sticker with caution, the Court will not refuse to consider them altogether.

**\*15** The revised policy states, in pertinent part, that its purpose "is to foster critical thinking among students, to allow academic freedom consistent with legal requirements, to promote tolerance and acceptance of diversity of opinion, and to ensure a posture of neutrality toward religion". Defs' Ex 5. To evaluate the sincerity of these articulated purposes in relation to the Sticker, the Court relies on the text of the Sticker and the circumstances giving rise to the Sticker's adoption. The Court also considers the testimony of the School Board members whom the Court found to be highly credible.

Fostering critical thinking is a clearly secular purpose for the Sticker, which the Court finds is not a sham. First, it is important to note that prior to the adoption of the new textbooks and Sticker and the revision of the related policy and regulation, many students in Cobb County were not being taught evolution or the origin of the human species in school. Further, the School Board was aware that a large population of Cobb County citizens maintained beliefs that would potentially

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 20

Not Reported in F.Supp.2d, 2005 WL 83829
**(Cite as: Not Reported in F.Supp.2d)**

conflict with the teaching of evolution Against this backdrop, the Sticker appears to have the purpose of furthering critical thinking because it tells students to approach the material on evolution with an open mind, to study it carefully, and to give it critical consideration. The other language on the Sticker, which states that evolution is a theory and not a fact, somewhat undermines the goal of critical thinking by predetermining that students should think of evolution as a theory when many in the scientific community would argue that evolution is factual in some respects. However, the testimony of the School Board members persuades the Court that the School Board did not seek to disclaim evolution by encouraging students to consider it critically. Rather, the School Board sought to encourage students to analyze the material on evolution themselves and make their own decision regarding its merit.

In *Freiler v Tangipahoa Parish Bd. of Educ.,* a case involving a similar challenge to an oral disclaimer regarding evolution, the Fifth Circuit rejected a school board's avowed purpose of critical thinking. 185 F.3d 337 (5th Cir.1999) The disclaimer in that case instructed students "to exercise critical thinking and gather all information possible and closely examine each alternative toward forming an opinion," but the disclaimer also stated that the teaching of evolution was "not intended to influence or dissuade the Biblical version of Creation or any other concept." *Id.* at 341. The court concluded that the

disclaimer did not further the purpose of critical thinking but encouraged "the protection and maintenance of a particular religious viewpoint" by communicating to students that the teaching of evolution " need not affect what they already know" *Id* at 344-45. The Fifth Circuit went on to state that "critical thinking requires that students approach new concepts with an open mind and a willingness to alter and shift existing viewpoints. *Id* at 345

**\*16** Unlike the disclaimer in the *Freiler* case, the Sticker in this case does not contain a reference to religion in general, any particular religion, or any religious theory This weighs heavily in favor of upholding the Sticker as constitutional. *See Adler,* 206 F.3d at 1083 ("For the most part, statutes which the Supreme Court has invalidated for lack of secular purpose have openly favored religion or demonstrated a religious purpose on their face."). Moreover, the Sticker here does not explicitly mention any alternative theories of origin. The Sticker specifically tells students to keep an open mind and to study evolution carefully. Plaintiffs urge that encouraging students to critically consider only evolution suggests that the School Board's asserted purpose of promoting critical thinking is a sham However, evolution is the only theory of origin being taught in Cobb County classrooms. Thus, it makes sense that the School Board is not suggesting that students critically consider other theories of origin. Moreover, as School Board member Laura Searcy pointed out at trial,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                              Page 21

Not Reported in F.Supp.2d, 2005 WL 83829
**(Cite as: Not Reported in F.Supp.2d)**

evolution was the only topic in the curriculum, scientific or otherwise, that was creating controversy at the time of the adoption of the textbooks and Sticker. The School Board's singling out of evolution is understandable in this context, and the undisputed fact that there are other scientific theories with religious implications that are not mentioned in this Sticker or in others supports the Court's conclusion that the Board was not seeking to endorse or advance religion. Therefore, the Court continues to believe that the School Board sincerely sought to promote critical thinking in adopting the Sticker to go in the textbooks.

Having found a secular purpose for the Sticker that is not a sham, the Court is not required to proceed further in analyzing this prong *See Lynch,* 465 U.S at 681 n. 6 (stating that *Lemon* requires only one secular purpose to exist). However, the Court does not believe that the promotion of critical thinking is the Sticker's main purpose Rather, the chief purpose of the Sticker is to accommodate or reduce offense to those persons who hold beliefs that might be deemed inconsistent with the scientific theory of evolution. The School Board did not articulate this purpose as such in the revised policy it adopted, but the arguments of the Defendants and the evidence in this case overwhelmingly show that this is the primary purpose of the Sticker. Because this purpose is intertwined with religion, the Court discusses this purpose in detail below.

Evidence in the record suggests that the idea of placing a sticker in the textbooks originated with parents who opposed the presentation of only evolution in science classrooms and sought to have other theories, including creation theories, included in the curriculum. Namely, Marjorie Rogers wrote a letter to the School Board over two weeks before the adoption of the Sticker recommending, among other things, that the School Board place a disclaimer in each book. Moreover, Ms Rogers and over 2,300 other Cobb County citizens submitted a petition to the School Board also asking the School Board to place a statement at the beginning of the texts that warned that the material on evolution was not factual. There is no dispute that a large number of Cobb County citizens opposed the teaching of evolution in a rigid fashion, and it is clear to the Court that many of these citizens were motivated by their religious beliefs.

**\*17** However, the Court does not rely on communications from these individuals, who apparently sought to advance religion, to determine whether the School Board itself sought to endorse or advance religion when it voted to place the Sticker in science textbooks. *See Adler* 206 F.3d at 1086 (stating that courts should not discern legislative purpose from letters written by community members to school officials). Rather, the highly credible testimony of the School Board members, although not contemporaneous with the sticker adoption, made it clear that the School Board adopted the Sticker to placate their

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                          Page 22

Not Reported in F.Supp.2d, 2005 WL 83829
**(Cite as: Not Reported in F.Supp.2d)**

constituents and to communicate to them that students' personal beliefs would be respected and tolerated in the classroom.

The Court notes that well-established law holds that the government may not " undertake religious instruction nor blend secular and sectarian education nor use secular institutions to force one or some religion on any person" *Id.* Additionally, " the First Amendment does not permit the State to require that teaching and learning must be tailored to the principles or prohibitions of any religious sect or dogma" *Epperson,* 393 U.S. at 106. Still, the Constitution does not require the government to "show a callous indifference to religious groups" *Zorach v. Clauson,* 343 U.S. 306, 314, 72 S.Ct. 679, 96 L.Ed. 954 (1952). As the Fifth Circuit stated in *Freiler,* "local school boards need not turn a blind eye to the concerns of students and parents troubled by the teaching of evolution in public classrooms. " 185 F.3d at 346

Here, the School Board did not implement other recommendations, such as making theories of origin that posit the existence of a creator or supreme being a part of the curriculum or obtaining specially-printed textbooks from publishers that omit materials that some would consider " objectionable." Instead, the School Board adopted a sticker that is not openly religious but served to put students, parents, and teachers on notice that evolution would be taught in a manner that is inclusive rather than exclusive. The

School Board sought to show consideration for their constituents' personal beliefs regarding the origin of life while still maintaining a posture of neutrality towards religion. The School Board's decision to adopt the Sticker was undisputably influenced by sectarian interests, but the Constitution forbids only a purpose to endorse or advance religion. *Wallace,* 472 U S. at 56, *King,* 331 F.3d at 1278, *Bown,* 112 F.3d at 1469. Here, even Plaintiffs concede that "[t]he intention of the Board was to accommodate parents who held a belief contrary to evolution," Plaintiffs' Amended Findings of Fact and Conclusions of Law ¶ 36, and the law clearly holds that mere accommodation of religion is insufficient to render the Sticker unconstitutional. *See Hobbie v. Unemployment Appeals Comm'n,* 480 U.S. 136, 144, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987) (stating that the Supreme Court " has long recognized that the government may accommodate religious practices and that it may do so without violating the Establishment Clause), *Lynch,* 465 U S. at 673 (stating that the Constitution " affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility toward any"); *cf Smith v. Board of Sch. Comm'rs,* 827 F.2d 684, 691 (11th Cir.1987) (stating that mere accommodation of religion is not sufficient to violate the primary effect prong of the *Lemon* analysis).

**\*18** Notwithstanding Plaintiffs' concession that the School Board's purpose was to accommodate the religious views held by

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                     Page 23

Not Reported in F.Supp.2d, 2005 WL 83829
**(Cite as: Not Reported in F.Supp.2d)**

parents, Plaintiffs argue that inquiries by School Board members concerning whether creationism and intelligent design could be taught in public classrooms are evidence of the School Board's desire to advance religion. It is undisputed that School Board member Lindsey Tippins posed questions regarding the teaching of creationism and intelligent design. However, it is also the case that this became a moot issue once the School Board received the legal opinion of the Cobb County School District's counsel that such theories could not be taught. While one still might assume from these inquiries that at least one School Board member may have seen the Sticker as the first step in getting religion into the classrooms, the Eleventh Circuit has advised that "[t]here is nothing inappropriate about a school system attempting to understand its constitutional obligations" *Adler,* 206 F.3d at 1086. Moreover, the religious motivations of individual School Board members cannot invalidate the Sticker *See Bown,* 112 F.3d at 1471-72 (holding that motivations of individual legislators could not alone invalidate statute requiring period for silent reflection).

Relying heavily upon *McLean v. Arkansas Bd. of Educ.,* 529 F.Supp. 1255 (E.D.Ark.1982) , a case in which a balanced treatment statute was held unconstitutional, Plaintiffs also assert that the Court should infer a purpose to advance religion by the School Board's failure to seek out expert opinion from scientists before adopting the Sticker

*McLean,* however, is distinguishable from the instant case because *McLean* involved a statute requiring the teaching of creation-science, which was a substantial change to the curriculum. In this case on the other hand, the Sticker only speaks generally about evolution and does not change the curriculum. While the School Board may have acted more prudently by consulting educators and scientists to determine whether evolution should properly be referenced as a theory, fact, or combination thereof, and to get expert opinion regarding what impact, if any, the Sticker might have on the teaching of evolution, the School Board's failure to do so does not prove that the School Board sought to advance religion.

Plaintiffs further contend that the School Board's refusal to adopt the alternative language drafted by Dr McCoy and proposed by the administration is indicative of the School Board's desire to advance religion. The evidence in the case and the testimony from the School Board members refute this proposition. First, the alternative language proposed, which was more comprehensive and probably more accurate as a scientific matter, was not before the School Board at the time that the Cobb County School District's attorneys presented the language that they believed would be constitutional. The record indicates that the alternative language was not presented until almost three months later. Although the School Board had the alternative language prior to the printing of the Sticker, and therefore it

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 24

Not Reported in F.Supp.2d, 2005 WL 83829
**(Cite as: Not Reported in F.Supp.2d)**

was not too late to change the language, the testimony of the School Board members indicates that the School Board simply considered the language of the Sticker to be a closed issue because they had relied on the attorneys to draft language that would pass constitutional muster.While one School Board member, Lindsey Tippins, testified that he thought the alternative language was weak, his individual opinion does not represent the collective belief of the School Board. School Board member Betty Gray testified that the alternative language must not have met the needs of the School Board, but Ms.Gray's testimony was no more than her guess as to why the School Board did not adopt the other language Defendants concede that the language of the Sticker perhaps could have been better, but their refusal to adopt the alternative language three months later does not render the Sticker unconstitutional.

**\*19** Therefore, after considering the additional arguments and evidence presented by the parties and evaluating the evidence in light of the applicable law, the Court remains convinced that the Sticker at issue serves at least two secular purposes. First, the Sticker fosters critical thinking by encouraging students to learn about evolution and to make their own assessment regarding its merit Second, by presenting evolution in a manner that is not unnecessarily hostile, the Sticker reduces offense to students and parents whose beliefs may conflict with the teaching of evolution. For the foregoing reasons, the

Court concludes that the Sticker satisfies the first prong of the *Lemon* analysis.

## B *Effect*

Regardless of the School Board's actual subjective purpose in voting for the Sticker, the effects prong asks whether the statement at issue in fact conveys a message of endorsement or disapproval of religion to an informed, reasonable observer *Wallace,* 472 U S at 56 n. 42, *Glassroth,* 335 F.3d at 1297; *Bown,* 112 F.3d at 1472 "Endorsement sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community." *Lynch,* 465 U S at 688. Borrowing from the analysis typically applied in religious display cases, to which this case bears great similarities, the Court is mindful that the informed, reasonable observer is someone who personifies the "community ideal of reasonable behavior" and is familiar with the origins and context of the government-sponsored message at issue and the history of the community where the message is displayed. *See Capitol Square Review & Advisory Bd. v. Pinette,* 515 U.S. 753, 779-81, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995) (O'Connor, J., concurring), *Turner v. Habersham County,* 290 F. Supp. 2d 1362, 1372 (N.D.Ga.2003). Whether the Sticker communicates a message of endorsement of religion is not really based on the Court's factual findings

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 25

Not Reported in F.Supp.2d, 2005 WL 83829
**(Cite as: Not Reported in F.Supp.2d)**

but is "in large part a legal question to be answered on the basis of judicial interpretation of social facts" *Lynch,* 465 U S at 693-94 (O'Connor, J, concurring). Thus, the Court's focus here is not on the particular views or reactions held by the Plaintiffs or the numerous citizens and organizations who wrote to the School Board. The Court's focus is on ascertaining the view of a disinterested, reasonable observer.

In this case, the Court believes that an informed, reasonable observer would interpret the Sticker to convey a message of endorsement of religion. That is, the Sticker sends a message to those who oppose evolution for religious reasons that they are favored members of the political community, while the Sticker sends a message to those who believe in evolution that they are political outsiders. This is particularly so in a case such as this one involving impressionable public school students who are likely to view the message on the Sticker as a union of church and state Given that courts should be "particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools," *Edwards,* 482 U S. at 583-84, the Court is of the opinion that the Sticker must be declared unconstitutional *See also Smith,* 827 F.2d at 690 (stating that courts must use " 'particular care" 'when " 'many of the citizens perceiving the governmental message are children in their formative years" ') (citation omitted)

**\*20** Members of certain religious denominations historically have opposed the teaching of evolution in public schools *See McLean,* 529 F.Supp. at 1259-60 (setting forth the history of the movement by Christian fundamentalists and creationists in opposition to evolution). As early as the 1920s and continuing into the late 1960s, the judicial system was resolving challenges to anti-evolution statutes, which made it criminal to teach evolution in school. *See Epperson,* 393 U S at 97, *Scopes v. State,* 154 Tenn. 105, 126, 289 S.W. 363, 369 (1927), *see also McLean,* 529 F.Supp. at 1259. In *Epperson,* the Supreme Court declared such statutes unconstitutional. In the 1970s and 1980s, there was a movement by anti-evolutionists to have creationism taught alongside evolution. *See Edwards,* 482 U S at 578, *McLean,* 529 F.Supp. at 1255, 1259. However, the Supreme Court held in *Edwards* that the teaching of creation science in public schools would constitute an establishment of religion in violation of the First Amendment. Most recently, the judicial system has witnessed efforts by anti-evolutionists motivated by religion to discredit or disclaim the theory of evolution *See Freiler,* 185 F.3d at 337.

Just as citizens around the country have been aware of the historical debate between evolution and religion, an informed, reasonable observer in this case would be keenly aware of the sequence of events that preceded the adoption of the Sticker. *See Capitol Square,* 515 U S at 780 (O'Connor, J, concurring) (noting that the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 83829
**(Cite as: Not Reported in F.Supp.2d)**

reasonable observer is "presumed to possess a certain level of information that all citizens might not share"). Based on Justice O'Connor's description of what the reasonable observer would be deemed to know, the Court believes these events are key to ascertaining the primary effect of the Sticker. Specifically, the informed, reasonable observer would know that a significant number of Cobb County citizens had voiced opposition to the teaching of evolution for religious reasons. The informed, reasonable observer would also know that despite this opposition, the Cobb County School District was in the process of revising its policy and regulation regarding theories of origin to reflect that evolution would be taught in Cobb County schools. Further, the informed, reasonable observer would be aware that citizens and parents largely motivated by religion put pressure on the School Board to implement certain measures that would nevertheless dilute the teaching of evolution, including placing a disclaimer in the front of certain textbooks that distinguished evolution as a theory, not a fact. Finally, the informed, reasonable observer would be aware that the language of the Sticker essentially mirrors the viewpoint of these religiously-motivated citizens.

While the School Board may have considered the request of its constituents and adopted the Sticker for sincere, secular purposes, an informed, reasonable observer would understand the School Board to be endorsing the viewpoint of Christian fundamentalists and creationists that evolution is a problematic theory lacking an adequate foundation. Of course, the *amicus* brief filed by certain biologists and Georgia scientists indicates that there are some scientists who have questions regarding certain aspects of evolutionary theory, and the informed, reasonable observer would be aware of this also. On the whole, however, the Sticker would appear to advance the religious viewpoint of the Christian fundamentalists and creationists who were vocal during the textbook adoption process regarding their belief that evolution is a theory, not a fact, which students should critically consider.

**\*21** The critical language in the Sticker that supports the conclusion that the Sticker runs afoul of the Establishment Clause is the statement that "[e]volution is a theory, not a fact, concerning the origin of living things". This statement is not problematic because of its truth or falsity, although testimony from various witnesses at trial and the *amicus* brief submitted by the Colorado Citizens for Science, et al, suggest that the statement is not entirely accurate. Rather, the first problem with this language is that there has been a lengthy debate between advocates of evolution and proponents of religious theories of origin specifically concerning whether evolution should be taught as a fact or as a theory, and the School Board appears to have sided with the proponents of religious theories of origin in violation of the Establishment Clause. As the Supreme Court stated in *County of Allegheny v.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 27

Not Reported in F.Supp.2d, 2005 WL 83829
**(Cite as: Not Reported in F.Supp.2d)**

*American Civil Liberties Union,* 492 U.S. 573, 593-94, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989), "[t]he Establishment Clause, at the very least, prohibits government from appearing to take a position on questions of religious belief," and this is exactly what the School Board appears to have done.

This Court's review of anti-evolution cases indicates that whether evolution is referenced as a theory or a fact is certainly a loaded issue with religious undertones. *See, e.g., Edwards,* 482 U.S. at 624 (Scalia, J, dissenting) (noting that senator who sponsored balanced treatment legislation opposed evolution being taught as a fact because it would communicate to students that "science has proved their religious beliefs false"), *Peloza v. Capistrano Unified Sch. Dist.,* 37 F.3d 517, 520 (9th Cir.1994) (high school biology teacher who was a practicing Christian brought § 1983 action to oppose the teaching of "evolutionism" because, among other things, the school district allegedly required him to teach "evolutionism" as a fact rather than a theory); *Mozert v. Hawkins County Bd. of Educ.,* 827 F.2d 1058, 1062 (6th Cir.1987) (witness in Free Exercise case brought by born again Christians complained that teachers presented evolution in a factual manner, although there were disclaimers in textbooks stating that "evolution is a theory, not a proven scientific fact"), *Freiler v. Tangipahoa Parish Bd. of Educ.,* 975 F.Supp. 819, 924 (E.D.La.1997) (noting concern of school board members

with teaching of evolution as fact because many students in school district believed in Biblical version of creation).

Because the Court is examining social facts to aid in its analysis of the effect of the Sticker, the Court may also consider secondary sources that shed light on relevant facts. *See County of Allegheny,* 492 U.S. at 614 n. 60; *Lynch,* 465 U.S at 709-12, 721-24 (Brennan, J, dissenting). The Court's review of pertinent law review articles affirms that encouraging the teaching of evolution as a theory rather than as a fact is one of the latest strategies to dilute evolution instruction employed by anti-evolutionists with religious motivations. *See* Kent Greenawalt, *Establishing Religious Ideas: Evolution, Creationism, and Intelligent Design,* 17 Notre Dame J.L. Ethics & Pub Pol'y 321, 329 (2003), Wendy F. Hanakahi, Comment, *Evolution-Creationism Debate: Evaluating the Constitutionality of Teaching Intelligent Design in Public Classrooms,* 25 U Haw L Rev 9, 28, 50-51 (2002); Deborah A Reule, *The New Face of Creationism The Establishment Clause and the Latest Efforts to Suppress Evolution in Public Schools,* 54 Vand L Rev 2555, 2558 (2001); *cf.* Jay D Wexler, *Darwin, Design, and Disestablishment Teaching the Evolution Controversy in Public Schools,* 56 Vand L Rev. 751, 752 (2003) (referring to "critics of evolution" generally without specifying whether they have a religious intent).

**\*22** There is no evidence in this case that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 28

Not Reported in F.Supp.2d, 2005 WL 83829
**(Cite as: Not Reported in F.Supp.2d)**

the School Board included the statement in the Sticker that "evolution is a theory, not a fact" to promote or advance religion. Indeed, the testimony of the School Board members and the documents in the record all indicate that the School Board relied on counsel to draft language for the sticker that would pass constitutional muster. Thus, the presence of this language does not change the Court's opinion that the Sticker survives the purpose prong of the *Lemon* analysis.

Still, the informed, reasonable would perceive the School Board to be aligning itself with proponents of religious theories of origin. The case law is clear that a governmental action or message that coincides with the beliefs of certain religions does not, without more, invalidate the action or message *Harris v. McRae,* 448 U.S. 297, 318-20, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980) ; *McGowan v. Maryland,* 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961) ; *Smith,* 827 F.2d at 691. However, in light of the sequence of events that led to the Sticker's adoption, the Sticker communicates to those who endorse evolution that they are political outsiders, while the Sticker communicates to the Christian fundamentalists and creationists who pushed for a disclaimer that they are political insiders.

The Sticker also has the effect of implicitly bolstering alternative religious theories of origin by suggesting that evolution is a problematic theory even in the field of science In this regard, the Sticker states, in part, that "[e]volution is a theory, not a fact, concerning the origin of living things" that should be "approached with an open mind, studied carefully, and critically considered." Pls' Ex 1 This characterization of evolution might be appropriate in other contexts, such as in an elective course on theories of origin or a religious text However, the evidence in the record and the testimony from witnesses with science backgrounds, including the co-author of one of the textbooks into which the Sticker was placed and Defendants' own witness, Dr Stickel, reflect that evolution is more than *a theory* of origin in the context of science To the contrary, evolution is the dominant *scientific* theory of origin accepted by the majority of scientists. While evolution is subject to criticism, particularly with respect to the mechanism by which it occurred, this Sticker misleads students regarding the significance and value of evolution in the scientific community for the benefit of the religious alternatives. By denigrating evolution, the School Board appears to be endorsing the well-known prevailing alternative theory, creationism or variations thereof, even though the Sticker does not specifically reference any alternative theories.

In addition to the foregoing, the Sticker targets only evolution to be approached with an open mind, carefully studied, and critically considered without explaining why it is the only theory being isolated as such The School Board members convincingly testified at trial that they

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2005 WL 83829
**(Cite as: Not Reported in F.Supp.2d)**

believed all scientific theories should be critically considered, and they also stated that they singled out evolution because it was the topic causing the controversy at the time. The Court finds the School Board's explanation to be rational and does not declare the Sticker to violate the purpose prong of *Lemon.* However, because the administration suggested alternative language that did not place the emphasis so heavily on evolution, albeit after the Board adopted the Sticker, the message communicated to the informed, reasonable observer is that the School Board believes there is some problem peculiar to evolution. In light of the historical opposition to evolution by Christian fundamentalists and creationists in Cobb County and throughout the Nation, the informed, reasonable observer would infer the School Board's problem with evolution to be that evolution does not acknowledge a creator.

**\*23** In *Epperson,* the Supreme Court declared an anti-evolution statute unconstitutional because it "select[ed] from the body of knowledge a particular segment which it proscribe[d] for the sole reason that it is deemed to conflict with a particular religious doctrine" 393 U S. at 103. Similarly, in *Edwards,* the Supreme Court declared that a balanced treatment statute was unconstitutional because "[o]ut of many possible science subjects taught in the public schools, the legislature chose to affect the teaching of the one scientific theory that historically has been opposed by certain religious sects." 482 U S at 522

n. 7. This case is distinguishable from *Epperson* and *Edwards* inasmuch as those statutes clearly impacted the teaching of evolution and the theories of origin curriculum, whereas the Sticker in this case does not preclude evolution from being taught and has not resulted in any complaints that religion is being taught in science classrooms. This case is further distinguishable because the Supreme Court found that the government actors in those cases did act with a purpose to advance religion. However, just as evolution was isolated in the statutes in *Epperson* and *Edwards,* evolution is isolated in the Sticker in this case. In the absence of an explicit explanation on the Sticker for evolution's isolation, the Court believes the Sticker sends an impermissible message of endorsement.

Due to the manner in which the Sticker refers to evolution as a theory, the Sticker also has the effect of undermining evolution education to the benefit of those Cobb County citizens who would prefer that students maintain their religious beliefs regarding the origin of life. As Plaintiffs argue and Dr Miller, the co-author of the science textbook, testified, the use of "theory" in the Sticker plays on the colloquial or popular understanding of the term and suggests to the informed, reasonable observer that evolution is only a highly questionable "opinion" or a "hunch" . The Sticker thus has a great potential to prompt confusion among the students. FN8 While there may be an educational benefit to students spending time learning the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                              Page 30

Not Reported in F.Supp.2d, 2005 WL 83829
**(Cite as: Not Reported in F.Supp.2d)**

general difference between a theory and a fact as a scientific matter, teachers have less time to teach the substance of evolution. Thus, although evolution is required to be taught in Cobb County classrooms as a technical matter, distracting tangential issues effectively dilute evolution instruction to the benefit of the anti-evolutionists who are motivated to advance their religious beliefs FN9

> FN8. While the instant Establishment Clause challenge is only a facial challenge and the Court consequently has intentionally geared its focus away from what actually happens in the classroom, Dr. McCoy testified that one of the Sticker's effects is that he has to spend significant classroom time explaining to students the difference between a theory and a fact in a scientific context. The Court believes it may properly consider this testimony just as the Court has considered the testimony of the School Board members and the Cobb County School District officials that there have been no complaints of religion being taught in the science classrooms See *Brown v. Gilmore,* 258 F 265, 275 (4th Cir2001) (" [E]ven though we must not speculate about a statute's application in considering the second and third prongs of the *Lemon* test, we can examine the

available data to determine the statute's 'inevitable' effects"), *cf Adler,* 206 F.3d at 1083 (considering how statute had been applied, while noting that argument regarding application of statute " would be far better suited to an as-applied challenge, where the record has been properly developed, rather than to a facial challenge")

> FN9. Plaintiffs have argued emphatically throughout this litigation that the Sticker at issue also invites discussion of alternative theories of origin, including religious theories. The Court is of the opinion that the regulation regarding theories of origin, more so than the Sticker, permits and perhaps invites discussion of alternative theories of origin However, as mentioned *supra* at p. 20, the regulation is not the subject of Plaintiffs' challenge. While the Court believes that the " discussion" of religious theories is fraught with danger that the constitutionally impermissible " teaching" of religious theories could result, the Court declares the Sticker unconstitutional independent of whether alternative theories are discussed or taught in the classroom

Parents for Truth in Education, participating as *amici curiae,* argue that the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 31

Not Reported in F.Supp.2d, 2005 WL 83829
**(Cite as: Not Reported in F.Supp.2d)**

Sticker properly references evolution as a theory because prior case law, the dictionary, and other sources do the same *See* Brief of Parents for Truth in Education 7-9 In this regard, *amici* note that the Supreme Court referred to evolution as a " theory" in both the *Edwards* and *Epperson* decisions and that Justice Brennan, concurring in the *Edwards* decision, cited a dictionary that defined "evolution" as a " theory." *Id.* at 7 *Amici* also argue that the *Edwards* Court implicitly acknowledged that evolution is not a fact by making the statement that "[w]e do not imply that a legislature could never require that scientific critiques of prevailing scientific theories be taught." *Id.* at 8 (citing *Edwards,* 482 U.S. at 593). While the foregoing may be true, the basis for this Court's conclusion that the Sticker violates the effects prong is not that the School Board should not have called evolution a theory or that the School Board should have called evolution a fact Rather, the distinction of evolution as a theory rather than a fact is the distinction that religiously-motivated individuals have specifically asked school boards to make in the most recent anti-evolution movement, and that was exactly what parents in Cobb County did in this case By adopting this specific language, even if at the direction of counsel, the Cobb County School Board appears to have sided with these religiously-motivated individuals. Additionally, unlike the *Edwards* and *Epperson* Courts, the Sticker does not reference "evolution" as a "scientific theory " or a "prevailing scientific theory." To the contrary, the Sticker appears to purposely leave to question whether evolution is an accepted or established theory in the scientific community, even if evolution is subject to scientific critique.

**\*24** Defendants and their *amici* also argue that the context in which the Sticker is displayed supports the conclusion that the Sticker does not have a primary effect to advance religion. In *Smith v. Board of School Commissioners,* 827 F.2d 684 (11th Cir.1987), a case in which the Eleventh Circuit considered an Establishment Clause challenge to the use of certain textbooks that allegedly advanced secular humanism, the court emphasized that " [f]ocus exclusively on the religious component of any activity would inevitably lead to its invalidation under the Establishment Clause" '. *Smith,* 827 F.2d at 692 (citing *Lynch,* 465 U S at 679-80). In this case, the Court has considered the Sticker in context and still concludes the Sticker is unconstitutional. The Sticker is a statement composed of only three sentences, and the Sticker makes up only a very small part of a text that contains hundreds of pages on evolution Nevertheless, the Sticker is prominently featured at the front of the textbooks, and the Sticker focuses exclusively on evolution. The Sticker is the only one of its kind in the science textbooks, and there are no other stickers placed in any other textbooks used in the Cobb County School District regarding any other subjects. Therefore, although the message on the Sticker might be small in size when

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 32

Not Reported in F.Supp.2d, 2005 WL 83829
**(Cite as: Not Reported in F.Supp.2d)**

compared to the numerous pages of material on evolution in the textbook, the message has an overwhelming presence. The School Board has explicitly endorsed its approval of this message, and students are bound to see the message when they open their textbooks. These facts support Plaintiffs' argument that the Sticker, considered in context, conveys a message of endorsement. This is particularly so given the Sticker's intended audience, impressionable school students. *See Lee v. Weisman,* 505 U.S. 577, 592, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) (emphasizing that students in elementary and secondary schools are impressionable and must be protected from the coercive power of the government); *Edwards,* 482 U S at 584 (same)

Defendants further urge that the instant case is distinguishable from the *Freiler* case, in which the Fifth Circuit held that an oral disclaimer regarding evolution had a secular purpose but nevertheless violated the Establishment Clause because of its impermissible primary effect. *See Freiler,* 185 F.3d at 346 In *Freiler,* the Fifth Circuit relied on the presence of three factors in concluding that the disclaimer violated the primary effect prong.

(1) the juxtaposition of the disavowal of endorsement of evolution with an urging that students contemplate alternative theories of the origin of life; (2) the reminder that students have the right to maintain beliefs taught by their parents regarding the origin of life; and (3) the " Biblical version of Creation" as the only

alternative theory explicitly referenced in the disclaimer.

*Id* Defendants persuasively argue that the Sticker in this case does not explicitly reference any alternative theory of origin, religious or otherwise. Nor does the Sticker explicitly urge students to consider alternative theories of origin or remind them that they have the right to maintain their home teachings regarding the origin of life. Nevertheless, the Sticker here disavows the endorsement of evolution, a scientific theory, and contains an implicit religious message advanced by Christian fundamentalists and creationists, which is discernible after one considers the historical context of the statement that evolution is a theory and not a fact. The informed, reasonable observer is deemed aware of this historical context *Capitol Square,* 515 U S at 780 (O'Connor, J., concurring). Further, it is clear from the testimony of the School Board members and the other evidence in the record, including the revised regulation, that the School Board sought to communicate to students that even though evolution would be taught, they should feel comfortable maintaining and expressing their personal religious beliefs. As stated previously, the School Board's purpose in this regard was not impermissible Nor does this fact alone render the primary effect of the Sticker religious. However, considering all facts and circumstances related to the Sticker and its adoption, the Court is convinced that the Sticker's primary effect surpasses accommodation and endorses religion. Thus, even though the Sticker may not

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                   Page 33

Not Reported in F.Supp.2d, 2005 WL 83829
**(Cite as: Not Reported in F.Supp.2d)**

explicitly advance a particular religious viewpoint and explicitly encourage maintenance of that viewpoint as did the disclaimer in *Freiler,* the Constitution requires that the government "pursue a course of complete neutrality toward religion." *Wallace,* 472 U S at 60 The Sticker in this case, considered in context, communicates to the reasonable observer that the School Board has violated this mandate.

**\*25** In sum, the Sticker in dispute violates the effects prong of the *Lemon* test and Justice O'Connor's endorsement test, which the Court has incorporated into its *Lemon* analysis. Adopted by the school board, funded by the money of taxpayers, and inserted by school personnel, the Sticker conveys an impermissible message of endorsement and tells some citizens that they are political outsiders while telling others that they are political insiders. Regardless of whether teachers comply with the Cobb County School District's regulation on theories of origin and regardless of the discussions that actually take place in the Cobb County science classrooms, the Sticker has already sent a message that the School Board agrees with the beliefs of Christian fundamentalists and creationists. The School Board has effectively improperly entangled itself with religion by appearing to take a position Therefore, the Sticker must be removed from all of the textbooks into which it has been placed.

**II. Challenge Under Georgia Constitution**

In addition to the Establishment Clause challenge, Plaintiffs assert that the Sticker violates Article I, Section II, Paragraph VII of the Constitution of the State of Georgia. This provision states the following "No money shall ever be taken from the public treasury, directly or indirectly, in aid of any church, sect, cult, or religious denomination or of any sectarian institution." As an initial matter, the Court notes that case law interpreting this provision is sparse. However, in *Bennett v. City of LaGrange,* 153 Ga. 428, 112 S.E. 482, 484 (1922), the Supreme Court of Georgia declared unconstitutional a resolution passed by the city council of LaGrange that authorized the city to pay the Salvation Army, a sectarian institution, to perform the city's charitable work. The court specified in *Bennett* that the provision at issue FN10 seeks to safeguard citizens from having their tax dollars " taken or appropriated" in aid of religious institutions or denominations of religionists *See also Savannah v. Richter,* 160 Ga. 177, 127 S.E. 148 (1925) (declaring unconstitutional the city of Savannah's assumption of paving assessments against churches and sectarian institutions). In addition, while not finding a violation of this provision, this Court previously noted an opinion of the Georgia Attorney General interpreting this provision to afford greater protection or " have a stronger application than the first amendment to the United States Constitution." *See Birdine v. Moreland,*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 34

Not Reported in F.Supp.2d, 2005 WL 83829
**(Cite as: Not Reported in F.Supp.2d)**

579 F.Supp. 412, 417 (N.D.Ga.1983)
(citing 1960-61 Op Att'y Gen p. 349)

FN10.. A version of the provision
being challenged by Plaintiffs
previously appeared in paragraph
14 of section 1 of article 1 of the
Constitution of Georgia , and it is
the prior provision that *Bennett*
interpreted. The prior provision
read "No money shall ever be taken
from the public treasury, directly or
indirectly, in aid of any church,
sect, or denomination of
religionists, or of any sectarian
institution" *Bennett*, 112 S.E. at 484
. As is clear, the language of the
prior provision is almost identical
to the language of the current
provision

In the instant case, it is undisputed that the
Cobb County School Board used the
money of taxpayers to produce and place
the Sticker in dispute in certain of the
Cobb County School District science
textbooks. This Sticker aids the beliefs of
Christian fundamentalists and creationists.
In light of the prior interpretation of the
Georgia Constitution provision challenged
by the Plaintiffs and given the Court's
conclusion above that the Sticker violates
the Establishment Clause of the First
Amendment, the Court likewise concludes
that the Sticker runs afoul of the Georgia
Constitution.

CONCLUSION

**\*26** For the above-stated reasons, the
Court hereby FINDS and CONCLUDES
that the Sticker adopted by the Cobb
County Board of Education violates the
Establishment Clause of the First
Amendment and Article I, Section II,
Paragraph VII of the Constitution of the
State of Georgia In light of this conclusion,
the Court hereby ORDERS as follows:
  1. Defendants shall immediately remove
  the Sticker from all science textbooks
  into which the Sticker has been placed.
  2 Defendants are permanently enjoined
  from disseminating the Sticker in any
  form.
  3 Because Plaintiffs seek nominal
  damages, Plaintiffs shall file with the
  Court and serve upon Defendants their
  claim for damages and a verified
  statement of any fees and/or costs to
  which they claim entitlement.
  Defendants shall have the right to object
  to any such fees and costs as provided in
  the applicable statutes and court rules.

The parties having resolved the following
motions between themselves without Court
involvement, the Court DENIES as moot
Defendants' Motion to Quash Subpoenas
[Doc No 74], Defendants' Amended
Motion to Quash [Doc No 75], and
Plaintiffs' Motion Seeking Leave to
Amend the Pretrial Order [Doc No 78].

The Court GRANTS the Application to
File Brief Amicus Curiae of Amicus
Curiae of Colorado Citizens for Science,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 35

Not Reported in F.Supp.2d, 2005 WL 83829
**(Cite as: Not Reported in F.Supp.2d)**


Kansas Citizens for Science, Michigan Citizens for Science, Nebraska Religious Coalition for Science Education, New Mexico Academy of Science, New Mexicans for Science and Reason, New Mexico Coalition for Excellence in Science and Math Education, and Texas Citizens for Science [Doc. No 87]
   SO ORDERED.

N.D.Ga.,2005.
Selman v. Cobb County School Dist.
Not Reported in F.Supp.2d, 2005 WL 83829

Briefs and Other Related Documents (Back to top)

• 1:02cv02325 (Docket) (Aug. 21, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Date of Printing: SEP 06,2005

## KEYCITE

**Selman v. Cobb County School Dist., 2005 WL 83829 (N.D.Ga., Jan 13, 2005) (NO. CIV.A.1:02-CV-2325-C)**

© Copyright 2005 West, Carswell, Sweet & Maxwell Asia and Thomson Legal & Regulatory Limited, A 058 914 668, or their Licensors. All rights reserved.