# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TAMMY KITZMILLER, et al., | ) | |
| Plaintiffs, | ) | Case No. 04-CV-2688 |
| | ) | (Hon. Judge Jones) |
| v. | ) | |
| | ) | (Filed Electronically) |
| DOVER AREA SCHOOL DISTRICT and | ) | |
| DOVER AREA SCHOOL DISTRICT | ) | |
| BOARD OF DIRECTORS, | ) | |
| Defendants. | ) | |

## DEFENDANTS' BRIEF IN SUPPORT OF MOTION *IN LIMINE* TO EXCLUDE THE TESTIMONY OF BARBARA FORREST, PH.D.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................ ii

INTRODUCTION ............................................................................. 1

PROCEDURAL HISTORY ............................................................... 1

QUESTION INVOLVED .................................................................. 1

FACTS ............................................................................................. 2

ARGUMENT .................................................................................... 5

    I.    RULE 702 ............................................................................. 5

        A. "Qualification" ............................................................. 8

        B. "Reliability" ................................................................. 13

            1. Factors to Determine "Reliability" ......................... 13

            2. Standard for Determining "Reliability" ................. 13

            3. Applications of Factors ........................................... 14

        C. Fit ................................................................................. 16

    II.    RULE 703 ........................................................................... 19

    III.    RULES 401 & 403 CONSIDERATIONS ........................... 20

CONCLUSION ................................................................................. 21

CERTIFICATE OF COMPLIANCE ................................................. 23

i

# TABLE OF AUTHORITIES

## Cases

*Aloe Coal Co. v. Clark Equip. Co.,*
816 F.2d 110 (3rd Cir. 1987) ................................................................. 8

*Burger v. Mays,*
179 F.R.D. 153 (E.D. Pa. 1997) ........................................................... 10

*Burkhart v. Washington Metro. Area Transit Auth.,*
112 F.3d 1207 (D.C. Cir. 1997) ........................................................ 9-10

*Daubert v. Merrel Dow Pharmaceuticals,*
509 U.S. 579 (1993) ................................................................... *passim*

*Elcock v. Kmart Corporation,*
233 F.3d 734 (3rd Cir. 2000) ............................................................. 7, 9

*General Electric Co. v. Joiner,*
522 U.S. 136 (1997) ....................................................................... 6-7

*Haberen v. Kaupp Vascular Surgeons, Ltd.,*
812 F. Supp. 1376 (E.D. Pa. 1992) ...................................................... 10

*Hamilton v. Emerson Elec. Co.,*
133 F. Supp.2d 360 (M.D. Pa. 2001) ................................................... 17

*Hygh v. Jacobs,*
961 F.2d 359 (2nd Cir. 1992) .............................................................. 10

*In re Crash Disaster at New Orleans, La.,*
795 F.2d 1230 (5th Cir. 1986) ............................................................. 12

*In re Paoli R. R. Yard PCB Litigation,*
35 F.3d 717 (3rd Cir. 1994) .......................................................... *passim*

*Kannankeril v. Terminix Int'l, Inc.,*
128 F.2d 802 (3rd Cir. 1997) ................................................................ 6

*Kumho Tire Co., Ltd. v. Carmichael,*
526 U.S. 137 (1999) ................................................................................ 7

*Lantec, Inc. v. Novell, Inc.,*
306 F.3d 1003 (10th Cir. 2002) ............................................................. 11

*Lemon v. Kurtzman,*
403 U.S. 602 (1971) ........................................................................ 17-18

*Lynch v. Donnelly,*
465 U.S. 668 (1984) ................................................................................ 9

*Salas v. Carpenter,*
980 F.2d 299 (5th Cir. 1992) ................................................................. 12

*Schneider v. Fried,*
320 F.3d 396 (3rd Cir. 2003) ........................................................ 7, 8, 13

*United States v. Downing,*
753 F.2d 1224 (3rd Cir. 1985) ......................................................... 13, 16

*United States v. Sebaggala,*
256 F.3d 59 (1st Cir. 2001) ................................................................... 11

*Waldorf v. Shuta,*
142 F.3d 601 (3rd Cir. 1998) .................................................................. 8

## **Rules**

Fed. R. Evid. 403 ............................................................................ 12, 21

Fed. R. Evid. 702 ................................................................................... 5

Fed. R. Evid 703 ................................................................................... 19

## INTRODUCTION

Dr. Barbara Forrest ("Forrest") has <u>no</u> scientific, technical, or other specialized knowledge that will assist the trier of fact.  A close inspection of her "expertise" and proffered testimony reveals that she is little more than a conspiracy theorist and a web-surfing, "cyber-stalker" of the Discovery Institute ("DI") and its supporters and allies—none of whom are affiliated with DASD.  Through her testimony, Plaintiffs seek to introduce immaterial and impertinent matter masquerading as expert opinion.  It is Plaintiffs' attempt at achieving "guilt by association" without the association.  This Court should exclude such matters.

## PROCEDURAL HISTORY

Plaintiffs filed this action in December 2004, challenging portions of DASD's ninth-grade biology curriculum.  DASD answered in January 2005. Discovery is now closed, and DASD filed a motion for summary judgment, which is pending.  Trial is scheduled to begin on September 26, 2005.

During discovery, the parties disclosed various witnesses who will provide expert opinions.  Plaintiffs have identified Forrest as an expert.  DASD seeks to exclude her testimony.

## QUESTION INVOLVED

I.    Whether Forrest should be excluded from testifying in this case.

## FACTS

This case involves an Establishment Clause challenge to DASD's modest change to its ninth-grade biology curriculum. Pursuant to this policy, a brief statement will be read to the students in which the words "intelligent design" will be stated twice and the book *Of Pandas and People* will be referenced and placed in the school's library. None of the concepts of intelligent design will be taught or discussed in the classroom. Students are not required to read any portion of *Pandas*. Students will not be tested on intelligent design. And students will not be presented with any teacher's or DASD Board member's religious beliefs, let alone the religious beliefs and motivations of so-called "Wedge" leaders. (*See* Ex.1).

DASD is not affiliated with DI or the Foundation for Thought and Ethics ("FTE"). Prior to the filing of the complaint, DASD did not know of the so-called "Wedge Document," or "Wedge Strategy," which is allegedly being advanced by DI and others. DASD had never seen nor was aware of the existence of any drafts of *Pandas* or the alleged religious motives and purposes of those who helped develop this book. DI and FTE do not speak for DASD. (*See* Exs. 2-8; *see also* Exs.9-10).

Plaintiffs intend to have Forrest testify as an expert. Forrest has provided a primary and supplemental expert report, and she has been deposed. (Exs.11,12).[1]

---

[1] Forrest's supplemental report was previously filed under seal.

Admittedly, Forrest is <u>not</u> an expert in science, religion, the philosophy of science, or the philosophy of education. (Forrest Dep. at 48,49,50,56,76,178 at Ex.12). As such, she is not qualified to offer expert opinion in these fields.

According to Forrest, her "area of expertise is the nature and strategy of the intelligent design (ID) creationist movement." (Rep. at 1 at Ex.11). In particular, she claims to be an expert on the "Wedge Strategy" (Forrest Dep. at 48 at Ex.12), which is allegedly reflected in a document that was purportedly stolen from the offices of DI (*see* Rep. at 2 at Ex.11) and in the "[s]tatements by the ID movement's leaders," which she claims is "the best evidence of the nature of ID." (Rep. at 11 at Ex.11). Her primary data also consists of alleged "statements by [the Wedge leaders'] allies and supporters." (Rep. at 11 at Ex.11). She claims that "[a]mong the most important sources of primary data are those which show the ID movement's religious alliances and associations," including DI's "major funding sources." (Rep. at 12 at Ex.11). Her "secondary sources of information" are essentially "publications and statements" from "ID movement's religious associates and allies such as Focus on the Family." (Rep. at 12 at Ex.11).

In her deposition, Forrest testified as follows:

Q.   Do you believe that the people who prepared the policy were acting under the guidance of the intelligent design movement?

A.   **<u>I have no way to know.</u>**

3

(Forrest Dep. at 172:18-21 at Ex.12).

She further testified:

Q.      Now, do you have **any** evidence at all that the members of the Dover Area School Board had **any** knowledge of the so-called **Wedge Document**?

A.      I do not know.

Q.      Do you have any evidence?

A.      I can't speak to that at all.  I have no way to know.

Q.      **You don't have any evidence?**

A.      **No.**

(Forrest Dep. at 251:15-24 at Ex.12).

In response to the many misrepresentations made regarding the so-called "Wedge Document" and strategy, DI released an article entitled, *The "Wedge Document": "So What?"*.  In this article, DI stated, *inter alia*, the following: "We fail to see any scandal in [articulating a strategy for influencing science and culture with ideas through research, reasoned argument and open debate].  Nor have we been able to see how any fair-minded person who actually read the 'Wedge Document,' or who had any acquaintance with our actual work, could attribute to us the nefarious views and motives that Professor Forrest and others have assigned us. . . .  Barbara Forrest and others have invented and then hyped a supposed secrecy surrounding the wedge strategy, characterizing the 'wedge of intelligent

design' as a 'Trojan horse.'   At one point Forrest claimed that the 'Wedge Document''s 'authenticity . . . has been neither affirmed or denied by [DI].'  Yet if Professor Forrest wanted to know whether the document was authentic, all she had to do was ask.  <u>But she didn't.</u>"  (Ex.13) (emphasis added).

Forrest is a member of the ACLU, a member of the National Advisory Council of Americans United for the Separation of Church and State, and a member of the New Orleans Secular Humanist Association, which is affiliated with the Council of Secular Humanists.[2]  (Forrest Dep. at 16,197,201 at Ex.12).

## ARGUMENT

### I.  RULE 702.

Pursuant to Rule 702, this Court is charged with the responsibility of acting as a gatekeeper to exclude unreliable expert testimony.  The Rule provides,

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, <u>may</u> testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702 (emphasis added).

---

[2] *See* mission and goals at Ex.14.  This, more than any particular "expertise," most likely accounts for Forrest's participation in this case.  For people like Forrest, this case is not about preserving science—it's about preserving her worldview and censoring any ideas that might challenge it.

Rule 702 has three major requirements: (1) the proffered witness must be an expert; (2) the expert must testify about matters requiring scientific, technical, or specialized knowledge; and (3) the expert's testimony must assist the trier of fact. *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3rd Cir. 1997).

The Supreme Court interpreted Rule 702 in the well known case of *Daubert v. Merrel Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). In *Daubert*, the Court focused upon the admissibility of scientific expert testimony, pointing out that such testimony is admissible only so long as it is both relevant and reliable. *See id.* at 597. It held that the Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597. The Court discussed certain factors which might prove helpful in determining the reliability of a particular scientific "theory or technique." *See id.* at 593-94. The Court emphasized that Rules 702 and 703 grant expert witnesses testimonial latitude unavailable to other witnesses on the "assumption that the expert's opinion will have a <u>reliable</u> basis in the knowledge and experience of his <u>discipline</u>." *Id.* at 592. (emphasis added).

Although *Daubert* focused on principles and methodology and not on conclusions, in *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997), the Court stated:

> [C]onclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data.

6

But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data <u>only by the *ipse dixit* of the expert</u>.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

(emphasis added).

In *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999), the Court was asked to decide how *Daubert* applied to experts who are <u>not</u> scientists.  The Court concluded that "*Daubert*'s general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge."  The Court also concluded "that a trial court *may* consider one or more of the more specific factors that *Daubert* mentioned when doing so will help determine that testimony's reliability." *Id*.  As the Court noted, the reliability test is "'flexible,' and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Id; see also Elcock v. Kmart Corporation*, 233 F.3d 734, 744 (3rd Cir. 2000) (noting that *Daubert*'s "rigorous gatekeeping function" applies "to cases involving non-scientific testimony").

The Third Circuit has "explained that Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit." *Schneider v. Fried*, 320 F.3d 396, 404 (3rd Cir. 2003).

As stated by the Court,

> Qualification refers to the requirement that the witness possess specialized expertise. . . . Secondly, the testimony must be reliable; it must be based on the methods and procedures of science <u>rather than on subjective belief or unsupported speculation</u>. . . . Finally, Rule 702 requires that the expert testimony must fit the issues in the case. In other words, the expert's testimony <u>must be relevant for the purposes of the case and must assist the trier of fact</u>.

*Id.* at 404 (internal quotations and citations omitted) (emphasis added).

The application of this "trilogy" compels one conclusion: this Court should exclude Forrest's testimony. Forrest is not qualified to provide any relevant expert testimony in this case, her testimony is unreliable, and it does not properly "fit" the issues.

### A.     "Qualification."

The Third Circuit has "interpreted [the qualification] requirement liberally," holding "that a broad range of knowledge, skills, and training qualify an expert as such." *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 741 (3rd Cir. 1994) ("*Paoli II*"). Nevertheless, this does not excuse this Court from exercising its role as a gatekeeper. *See, e.g., Aloe Coal Co. v. Clark Equip. Co.*, 816 F.2d 110, 114 (3rd Cir. 1987) (holding that the district court abused its discretion by allowing a tractor sales representative to testify as an expert regarding the cause of a tractor fire); *Waldorf v. Shuta*, 142 F.3d 601, 625 (3rd Cir. 1998) ("Even though we apply Rule 702 liberally, we have not pursued a policy of qualifying *any* proffered

witness as an expert."). Moreover, although a proffered expert's suspect credentials may be sufficient to clear the "qualification" hurdle, the marginal nature of the qualifications does enter into the *Daubert* calculus and "may affect the reliability of the expert's opinion." *Paoli II*, 35 F.3d at 741; *see also Elcock*, 233 F.3d at 744 (same).

Here, Forrest admits that she is not an expert in science, the philosophy of science, the philosophy of education, or religion. As such, she is not qualified to give an expert opinion on science, including whether intelligent design is science or has any scientific validity. She is not qualified to given an opinion regarding the methodology of science, including the merits of methodological naturalism. She is not qualified to give an opinion on whether intelligent design is religion. And she is not qualified to give an opinion on whether the modest curriculum at issue advances any educational goals. Moreover, despite her claim that "teaching ID poses a distinct threat to the constitutionally mandated separation of church and state" (Rep. at 7 at Ex.9), she is not a lawyer (and certainly not a good one at that—*see, e.g., Lynch v. Donnelly*, 465 U.S. 668, 672 (1984) ("Nor does the Constitution require complete separation of church and state; it affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility toward any.")) and the courtroom has but one legal expert, and that is the judge. *See Burkhart v. Washington Metro. Area Transit Auth.*, 112 F.3d 1207,

9

1213 (D.C. Cir. 1997) ("Each courtroom comes equipped with a 'legal expert,' called a judge . . . ."). Thus, her legal opinions and conclusions must be excluded.[3] *Hygh v. Jacobs*, 961 F.2d 359 (2nd Cir. 1992) ("This circuit is in accord with other circuits in requiring the exclusion of expert testimony that expresses a legal conclusion."); *Burger v. Mays*, 176 F.R.D. 153 (E.D. Pa. 1997) ("[E]xpert testimony which merely tells the jury what result to reach is improper. Furthermore, expert testimony that expresses a legal conclusion should be excluded.") (quotations, punctuation, and brackets omitted); *Haberern v. Kaupp Vascular Surgeons, Ltd.*, 812 F.Supp. 1376, 1378 (E.D. Pa. 1992) ("An expert may not opine legal conclusions drawn by applying the law to the facts.").

Exactly what is her "field" of expertise? According to Forrest, it is the "nature and strategy of the intelligent design (ID) creationist movement." To say that this "field" is novel would be a gross understatement. As a "field" of one, her apparent expertise is the collecting of statements and documents from so-called "Wedge leaders" and their religious supporters and affiliates, none of whom are affiliated with DASD or the policy in question, and then drawing subjective conclusions to serve her personal agenda. From her collection of select, unrelated,

---

[3] Forrest makes repeated references to court cases and their alleged impact. (*See* Rep. at 13,16,17,19,23,24,25,29 at Ex.11; *see also* Supp. Rep. at 1,10 and n.5, *infra.*). Indeed, she inaccurately claims that "*Edwards v. Aguillard* outlawed creationism in public school science classes" (Rep. at 16 at Ex.11), and then proceeds to claim that intelligent design is creationism.

hearsay statements and anecdotal information, she attempts to explain what the speakers and authors of these statements really meant. However, her subjective conclusions are often contrary to what the speaker actually meant—as the speakers themselves have noted.[4] In fact, her testimony is simply biased journalism—and bad journalism at that—since she doesn't bother to conduct personal interviews of the subjects that she is impugning with ill motives. This is hardly the sort of "expert" testimony or "expertise" that is helpful to this Court. *See, e.g., United States v. Sebaggala*, 256 F.3d 59, 65-66 (1st Cir. 2001) (excluding expert testimony, concluding that it "was grounded primarily in 'anecdotal experiences,' and was 'speculative at best'"); *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1025-26 (10th Cir. 2002) (excluding as unreliable economic expert's testimony about relevant market because he "attempted to spin anecdotes from a handful of personal conversations with firms in a limited geographic area into evidence of a worldwide product market"). Additionally, in her supplemental report, she purportedly read *Pandas* and prior drafts of this book and then compared them—a task that a layperson could certainly do, and this is particularly true since Forrest admits to having no expertise in science.[5] Indeed, her entire supplemental report is

---

[4] *See, e.g., The "Wedge Document": "So What?"* at 3-4 Ex.13.

[5] Her supplemental report again seeks to make legal claims, arguing that the changes in the drafts of *Pandas* were made "in light of *Edwards v. Aguillard* (1987)." She further claims, "In order to get *Pandas* accepted in public school

an exercise in futility since no one associated with the DASD policy at issue has ever seen or heard of these alleged drafts of *Pandas*, nor are these drafts provided to DASD students.  Indeed, her focus on FTE's "Religious and Moral Mission" is revealing.   It shows that Forrest is not an objective "expert" concerned with science or education—rather, she is a biased critic on a crusade to promote a personal agenda, shaped by her secular humanist worldview.

In the final analysis, Forrest brings no scientific, technical, or other specialized knowledge to this case.  Instead, Plaintiffs are using her as a "Trojan Horse" to bring into the courtroom impertinent matters to prejudice DASD.[6]  *See* Fed. R. Evid. 403.  (*See* discussion at Sec. III, *infra*).  This Court should exercise its gatekeeper function and exclude such testimony and evidence.  *See also In re Crash Disaster*, 795 F.2d 1230, 1233 (5th Cir. 1986) ("[T]he trial judge ought to insist that a proffered expert bring to the jury more than the lawyers can offer in argument."); *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992) (same).

---

science classes after *Edwards*, 'creationism' and its cognates had to be removed." (Forrest Supp. Rep. at 1,10).

[6] In fact, Plaintiffs intend to use Forrest to admit over <u>200</u> irrelevant, hearsay documents (Exhibits P-350 to P-558).  It is little wonder that Plaintiffs believe that the trial will take 15 to 20 days.

**B.   "Reliability."**

**1.   Factors To Determine "Reliability."**

Consistent with *Daubert* and its progeny, the Third Circuit has suggested

some factors that a district court should consider when determining whether

proposed expert testimony is reliable.  These factors include:

> (1) whether a method consists of a testable hypothesis; (2) whether
> the method has been subject to peer review; (3) the known or
> potential rate of error; (4) the existence and maintenance of standards
> controlling the technique's operation; (5) whether the method is
> generally accepted; (6) the relationship of the technique to methods
> which have been established to be reliable; (7) the qualifications of
> the expert witness testifying based on the methodology; and (8) the
> non-judicial uses to which the method has been put.

*Paoli II*, 35 F.3d at 742 n.8 (citing *Daubert*, 509 U.S. at 593-94; *United States v.*

*Downing*, 753 F.2d 1224, 1238-41 (3rd Cir. 1985)); *see also Schneider,* 320 F.3d at

405.

Upon application of these factors, as discussed in Section I-B-3 below,

Forrest's testimony proves unreliable.

**2.   Standard For Determining "Reliability."**

As the Third Circuit notes,

> *Daubert* holds that admissibility under Rule 702 is governed by Rule
> 104(a), which requires the judge to conduct preliminary factfinding,
> to make "a preliminary assessment of whether the reasoning or
> methodology underlying the testimony is scientifically valid," and
> thus enables the judge to exclude evidence presented in plaintiffs'
> prima facie case.  Similarly, we held in *Downing* that "it is plain that
> the proponent must make more than a prima facie showing . . . that a

technique is reliable." We added that, in contrast to the view that the admission of scientific testimony is a matter of conditional relevancy governed by Rule 104(b), "novel scientific evidence carries with it concerns over trustworthiness and reliability akin to those raised by offers of hearsay evidence. When there is a serious question of reliability of evidence, it is appropriate for the court to exercise to some degree an evidentiary screening function."

*Paoli II*, 35 F.3d at 743 (internal quotations and citations omitted).

As such, Plaintiffs must demonstrate by a preponderance of the evidence that Forrest's testimony is reliable. *See id.* at 744. With regard to reliability, "[t]he ultimate touchstone is helpfulness to the trier of fact," and "helpfulness turns on whether the expert's technique or principle is sufficiently reliable so that it will aid the jury in reaching accurate results." *Id.* at 744 (internal quotations, brackets, and citations omitted). "The same standard of reliability extends to the step in the expert's analysis that 'fits' his or her conclusion to the case at hand." *Id.* at 745. This "standard is <u>higher</u> than bare relevance." *Id.* (emphasis added).

### 3. Application of Factors.

Because of the non-scientific nature of Forrest's testimony, this Court can only roughly analogize to the relevant *Daubert* factors. Nevertheless, upon doing so, it is evident that her testimony is unreliable and should be excluded.

Forrest's "method" of relying on selectively chosen hearsay statements of so-called "Wedge leaders" does not create a testable hypothesis. Rather, it is merely a subjective evaluation and judgment based on subjectively chosen data—it

can neither be duplicated nor tested for validity. As such, it is difficult to imagine how such an idiosyncratic method and judgment could be subjected to any meaningful peer review and generate any measurable rate of error. There are no standards controlling her method—except those that she seeks to employ to reach her subjective judgment. For example, what is the method by which she employed to exclude DI's reasonable explanation for the "Wedge Document"? The answer, or course, is that DI's explanation completely undermines Forrest's conclusions. Indeed, this "data"—DI's explanation—is of the type that she claims to have relied upon. She also excludes the scientific claims of intelligent design—such as irreducible complexity—even though Dr. Michael Behe, a professor of biochemistry at Lehigh University, wrote an entire book, *Darwin's Black Box*, about this subject relying on scientific evidence. Thus, there is no reliability to her methods or the subjective conclusions that she reaches. Forrest's personal agenda, as demonstrated by her background, accounts more for her biased and subjective conclusions than any particular "qualification," further undermining the reliability of her testimony. Finally, the only "non-judicial" use of her work is its apparent utility for producing conspiracy novels such as *Creationism's Trojan Horse*.

In the final analysis, Forrest's testimony is unreliable.

### C.    "Fit."

In addition to assessing the proffered expert's qualifications and the reliability of her opinion, this Court must determine whether the expert's testimony "fits" the issues of the case.   As the Third Circuit put it in *United States v. Downing*, 753 F.2d 1224, 1237 (3rd Cir. 1985), admissibility depends in part on "the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case."   Moreover, Rule 702 demands more than what is required by the relevance rules.   Before the expert evidence can be said to "assist" under Rule 702, it must be connected to the questions at issue, and this "fit" standard is "higher than bare relevance." *Paoli II*, 35 F.3d at 745 n.13.[7]

A couple of examples are instructive.   In *Paoli II*, the Third Circuit offered the following: "[I]n order for animal studies to be admissible to prove causation in humans, there must be good grounds to extrapolate from animals to humans, just as the methodology of the studies must constitute good grounds to reach conclusions about the animals themselves." *Id.* at 743.

In *Daubert*, the Court provided an additional example of "fit":

---

[7] "*Daubert*'s statement that fit 'goes primarily to relevance' is not to the contrary. This statement elucidates what the fit requirement is about—that the scientific knowledge must be connected to the question at issue—rather than the standard for evaluating that connection." *Paoli II*, 35 F.3d at 745 n.13.

The study of the phases of the moon, for example, may provide valid scientific "knowledge" about whether a certain night was dark, and if darkness is a fact in issue, the knowledge will assist the trier of fact. However (absent creditable grounds supporting such a link), evidence that the moon was full on a certain night will not assist the trier of fact in determining whether an individual was unusually likely to have behaved irrationally on that night.   Rule 702's "helpfulness" standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.

*Daubert*, 509 U.S. at 591-92.

Therefore, in order for the expert testimony to "fit" the case, there must be a valid, scientific connection between it and the issues in the case.   "Thus, the requirement of reliability, or 'good grounds,' extends to each step in an expert's analysis all the way through the step that connects the work of the expert to the particular case." *Paoli II*, 35 F.3d at 743.   Moreover, "nothing in either *Daubert* or the Federal Rules of Evidence require a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert.   A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Hamilton v. Emerson Elec. Co.*, 133 F.Supp.2d 360, 369-70 (M.D. Pa. 2001).

The issues in this case are whether DASD's modest curriculum change has "a secular purpose" and whether the "principal or primary effect" of this curriculum change either "advances or inhibits religion." *Lemon v. Kurtzman*, 403

U.S. 602, 612-13 (1971). The "effect" of the challenged policy is determined from the perspective of a ninth-grade biology student—the policy's intended audience.

Forrest's testimony does not "fit" the issues of this case.   Her entire testimony is premised on the alleged and amorphous "nature and strategy of the intelligent design (ID) creationist movement" that she has concocted through her own subjective beliefs.[8]  Indeed, by her own testimony, Forrest admits that she can make no valid connection between her claimed expertise and the policy at issue in this case.   When asked directly whether she "believe[d] that the people who prepared [DASD's] policy were acting under the guidance of the intelligent design movement," she answered, **"I have no way to know."**  (Forrest Dep. at 172:18-21 at Ex.10).   When asked if she had "**any**" evidence at all that the members of the Dover Area School Board had **any** knowledge of the so-called **Wedge Document**," she answered, **"No."**   (Forrest Dep. at 251:15-24 at Ex.10).   The record in its entirety overwhelmingly supports these facts without contradiction.

In summary, the motives of certain scientists and so-called "Wedge leaders," who are absolute strangers in this case, has no connection to the policy adopted by DASD.  This Court should exclude this testimony.

---

[8] Indeed, the evidence shows that the "Wedge Document," which Forrest described as "the signature summary of the movement's nature and strategy" (Rep. at 1 at Ex.11) and which provides the foundation for her testimony, is not what she claims it to be, further undermining her testimony's reliability.  *See The "Wedge Document": "So What?"* (Ex.13).

## II.   RULE 703.

"While Rule 702 focuses on an expert's methodology, Rule 703 focuses on the data underlying the expert's opinion." *Paoli II*, 35 F.3d at 747.

Rule 703 permits expert opinion to be based on three possible sources: firsthand knowledge, admitted evidence, and facts or data not admitted into evidence if "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Fed. R. Evid. 703.  Thus, it is implicit in this Rule that expert testimony that is not properly based on one of these three sources should be excluded.  *See Daubert*, 509 U.S. at 595 ("Rule 703 provides that expert opinion based on otherwise in-admissible hearsay are to be admitted <u>only</u> if the facts or data are 'of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.'") (emphasis added).

The Third Circuit has opted for an active gatekeeper approach in which the trial court exercises independent judgment as to reliability.  This means the court may exclude expert opinion on the grounds that its basis is not "reasonably relied upon" under the specific facts of the case even if experts in the field typically rely on the same type of data.  In *Paoli II*, the Court stated, "[I]t is the judge who makes the determination of reasonable reliance, and . . . for the judge to make the factual determination under Rule 104(a) that an expert is basing his or her opinion on a

type of data reasonably relied upon by experts, the judge must conduct an independent evaluation into reasonableness." *Paoli II*, 35 F.3d at 748. When making this determination, the judge should "assess whether there are good grounds to rely on this data to draw the conclusion reached by the expert." *Id.* at 749.

A simple review of DI's explanation of the so-called "Wedge Document"—an explanation that Forrest avoids for obvious reasons, demonstrates why hearsay evidence, such as that relied upon by Forrest, is inherently unreliable—particularly when you make selective use of it, as Forrest has done. *See The "Wedge Document": "So What?"* (Ex.13). Thus, Forrest's reliance on this "data" is reason for this Court to exclude her testimony.

## III.   RULES 401 & 403 CONSIDERATIONS.

In *Daubert*, the Court noted that expert evidence can be "both powerful and quite misleading," so trial judges should exercise more control over experts than over other witnesses when applying Fed. R. Evid. 403. *Daubert*, 509 U.S. at 595. *Cf. Paoli II*, 35 F.3d at 747, n.16 ("The fact that *Daubert* held that Rule 702 is the primary locus of a court's gatekeeping role indicates that exclusion under Rule 403 should be rare despite the Court's later statement that Rule 403 gives judges greater power over experts than over ordinary witnesses. *Daubert*'s view of the judge's substantive power under Rule 403 is thus similar to our view of the judge's

substantive power under the overwhelming/confusion prong of Rule 702—both give the judge slightly more power than is ordinarily the case under Rule 403 to find that evidence is more prejudicial than probative."). Thus, despite the apparent conflation of Rules 403 and 702, it is evident that there is some room for Rule 403 to operate independently. *See Paoli II*, 35 F.3d at 746-47.

Upon application of the balancing test of Rule 403, it is evident, based upon the above discussion, that any probative value of Forrest's testimony and the exhibits she intends to use is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the trier of fact, and by considerations of undue delay and waste of time. *See* Fed. R. Evid. 403.

## CONCLUSION

This Court should exclude the testimony of Dr. Barbara Forrest.

Respectfully submitted this 6th day of September, 2005.

By:  *[signature]*

Robert J. Muise (MI P62849)*
Richard Thompson (MI P21410)*
Patrick T. Gillen (MI P47456)*
Edward L. White III (MI P62485)*
THOMAS MORE LAW CENTER
24 Frank Lloyd Wright Drive
P.O. Box 393
Ann Arbor, Michigan 48106
(734) 827-2001
Fax: (734) 930-7160

* Admitted *pro hac vice*

Ron Turo
TURO LAW OFFICES
29 South Pitt Street
Carlisle, Pennsylvania 177013
(717) 245-9688

*Attorneys for Defendants*

## CERTIFICATE OF COMPLIANCE

I certify that pursuant to LR 7.8(b) the foregoing Defendants' Brief In Support of Motion *in Limine* to Exclude the Testimony of Barbara Forrest, Ph.D. has a typeface of 14 points Times New Roman and contains 4,987 words.

Dated:          September 6, 2005.

Robert J. Muise, Esq.