## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TAMMY KITZMILLER, et al., ) | |
| ) | |
| Plaintiffs, ) | Civil No. 04-CV-2688 |
| ) | |
| v. ) | Filed Electronically |
| ) | |
| DOVER AREA SCHOOL ) | Hon. John E. Jones, III |
| DISTRICT, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

### DECLARATION OF DOUGLAS P. JACOBS

I, Douglas P. Jacobs, declare under penalty of perjury, as follows:

1.  I am Executive Vice President and General Counsel of Courtroom Television Network LLC ("Court TV").

2.  Since its creation in 1991, Court TV has televised over 900 trials and judicial proceedings. It has televised trials in state and federal courtrooms across the United States, as well as proceedings in countries around the world, including the former Soviet Union, El Salvador, Serbia, and at the International Court of Justice at The Hague.

3.  Court TV strives to enable viewers to observe judicial proceedings as though they themselves were in the courtroom. In this case, Court TV seeks to televise the entirety of the trial, from preliminary proceedings to

opening statements to the rendering of the Court's judgment, should it be announced in open court.

4. Prior to and throughout each proceeding it covers, Court TV works with the presiding judge and/or court personnel to ensure that all requirements concerning equipment placement and camera coverage are satisfied.

5. In covering proceedings, Court TV employs one or two stationary cameras, which produce no noise, require no lighting other than existing courtroom lighting, and are placed away from the proceedings. Wiring is unobtrusive. Microphones are small and are not operated in such a way as to record conversations between attorneys and clients or conversations at the bench between the attorneys and the Court. Microphones are turned off during all parts of the proceedings that are not part of the public record.

6. Annexed hereto as Exhibit 1 is a true and correct copy of Court TV's *Network News And Editorial Guidelines*, updated on December 31, 1999. Pursuant to 18 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 1st day of September 2005.

_____
Douglas P. Jacobs

# COURTROOM TELEVISION NETWORK NEWS AND EDITORIAL GUIDELINES

I. EDITORIAL PRINCIPLES

Court TV's daytime and evening news coverage must adhere to the highest standards of traditional journalism. With respect to Court TV's ongoing coverage of trials, it is our goal to share what really happens in the courtroom with our viewers; to give them a seat in the gallery, to see what any citizen might see if they exercised their right to witness the trial in person.

On the other hand, until the Supreme Court recognizes the right to put cameras in courtrooms alongside other news media, Court TV's right to be in the courtroom is entirely dependent on various state laws and, ultimately, on the discretion of the court. Therefore, all Court TV reporters and producers must be cognizant of the ultimate authority of the court. Accordingly these guidelines reflect a grave respect for that authority and for the complex issues facing judges whenever they consider camera access.

II. CONDUCT IN THE COURTROOM

   A. Employees should make every effort to be familiar with all specific orders or wishes of the presiding judge.

   B. Employees attending a trial should never contact or attempt to contact a juror while a trial is in progress. (This does not mean we should not try to interview jurors after a trial.)

   C. Employees attending a trial should take special care to be courteous, respectful and thoroughly professional to all court personnel, from bailiff to judge.

   D. Employees attending a trial should uphold the dignity of the courtroom by refraining from reading, talking, making distracting noises or interfering in any way with the proceedings.

   E. Employees, including production personnel, are expected to dress in appropriate professional business attire while attending a trial.

   F. Employees attending a trial should never alter the furniture in a courtroom without specific permission from the court or court personnel and should not set up any equipment without specific permission from the court

III. COVERAGE AND BROADCAST GUIDELINES

   A. Never shoot anything on an attorney's table or a judge's bench so that any written material can come even close to being read.

   B. Never change the position of the microphones or camera while court is in session.

   C. Most state camera laws forbid showing jurors. In those states where it is permitted to show jurors, the field production staff should consult with the Vice President, Daytime

---

Editorial Guidelines              1              Updated 12/31/99

Programming (VPP) or the Executive Producer (EP) about whether we wish to show jurors in a particular case.

D. Most state camera laws forbid showing victims of sex crimes or alleged victims of sex crimes, or identifying them by name. In those states where it is permitted to show such victims' faces or use their names, a Court TV reporter or producer must get the consent of such person, before their names or faces are put on the air. The VPP or EP must be consulted before a victim or alleged victim of a sex crime is shown or identified.

E. Court TV is very sensitive about exposing minors to undue or harmful publicity. Moreover, many state camera laws also forbid showing minors faces or using minors names, whether such minors are alleged perpetrators, victims, or witnesses. However, where it is legal to do so, it is Court TV's policy to show all participants in a trial, including minors, subject to the court's rules and Court TV's guidelines. Therefore, any decision to identify or show a minor must be based on a balance between the potential harm and the potential benefit of the coverage. The VPP or EP must be consulted before a minor is shown or identified. (Where a minor or minor's guardian objects to such coverage, in those states where it is permissible to show minors' faces or use their names, the General Counsel should also be consulted.)

F. Use discretion when showing victims, or victims' families, while emotional or graphic testimony or evidence is being heard in court.

G. Make sure that microphones cannot pick up lawyers' conferences with their clients, and that microphones are not on during off-the-record bench conferences, or during parts of a trial that are not on the record.

H. If a mistake in coverage is made, the error should be reported to supervisors and corrected immediately. If a mistake is made in violation of court order, it should be reported immediately to the court, the VPP or EP.

I. In criminal cases, stress the presumption of innocence and the burden of proof as often as possible. In civil cases, explain the applicable burden of proof.

J. Whenever possible, warn viewers in advance about testimony and trial exhibits that sensitive viewers might find offensive such as those that are sexually explicit, depict violence (e.g., graphic autopsy or crime scene photos) or contain obscene language.

## IV. INTERVIEWS AND OTHER PACKAGED MATERIALS

A. Interview subjects should never be told what questions will be asked in advance. It is not inappropriate to discuss before the interview the subject matter which will be discussed, but interviews which are not spontaneous and unrehearsed are prohibited.

B. A reporter should never say, while the camera is off, "Don't you really want to say...." On the other hand, there is nothing wrong with reminding someone that on the phone he said X and is now saying Y and asking about the contradiction.

C. When editing interviews, the subject's answer must be to the question asked. The objective of the editing process is to produce a clear and succinct statement which reflects fairly, honestly and without distortion what was seen and heard by our reporters, cameras and microphones. The achievement of this objective requires careful news judgments geared to the individual facts of each situation. These basic standards, should assist you in making those judgments:

   i. If the answer to an interview question, as that answer appears in the broadcast, is derived, in part or in whole, from the answers to other questions, the broadcast will so indicate, either in lead-in narration, bridging narration lines during the interview, or appropriate audio lines.

   ii. If more than one excerpt from a speech or statement is included in a documentary broadcast, and the order of their inclusion in the broadcast is not the same as the order of their inclusion in the speech or statement, the change in the order of presentation must not change the meaning or context of the language used in the speech or statement.

   iii. The standards covering the use of reaction and reverse shots are described below in IV E. These standards apply with the same force in the editing room as they do in the field when the interview is conducted.

D. An interview should never be edited out of context to include simply the most sensational comment, if that comment was not truly emblematic of what the person really said and meant. The standard is "fairness"-- if the entire interview is played back, the selected bite should be viewed as a fair representation.

E. Never do phony reaction shots. Reactions shots and reverse shots, made out of natural time sequence, may be used except that:

   i. they may not be used when the entire broadcast, or a complete segment of a magazine broadcast, consists of a single interview in which the interviewer plays a significant part; the use of multiple cameras in such situations will obviate the need for reaction shots and reverse shots made out of natural time sequence; but if, because of space, time or other operational exigencies, the use of multiple cameras is precluded, the VPP or EP may approve an exception to this standard;

   ii. reaction shots and reverse shots made out of natural time sequence in connection with an interview must either be made in the presence of the interviewee (or his or her representative) or, if neither wishes to wait for this to be done, only after what is about to be done is explained to, and approved by, the interviewee;

      iii. reverse questions must conform to the original questions in tone, character and content;

      iv. reaction shots made out of natural time sequence may not, in any way, distort or alter what actually occurred during the natural time sequence, e.g., if an audience reaction during the natural time sequence is laughter, a reaction shot of the audience made out of natural time sequence must also include laughter.

      v. In situations in which a reporter or producer with a crew is accompanying police or other law enforcement personnel during their normal duties (e.g. police ride-alongs), a Court TV crew may not enter private property without the express permission of the property owner or resident. Having the permission of law enforcement to bring a crew with them into a private building or residence is NOT sufficient.

The editor and/or producer of each broadcast must carefully examine <u>all</u> reaction shots and composite editing and compare <u>all</u> reverse questions with the original questions to insure that their use does not distort or alter the content, tone or meaning of the original questions, answers or reactions. Reverse questions and composite editing may not be used to clean up a poorly phased or poorly stated original question.

F. We do not use recreations in news coverage. Point-of-view shots are sometimes permissible, but before going on the air they must be approved by the VPP or EP. Such tape will only be approved if it helps clarify events for the viewers, and if it is made clear to the viewers that what they're watching is not reality.

For documentaries, we may use limited recreations when we have no video to support the story, under the following guidelines:

    – Re-enactments cannot alter facts.

    – Re-enactments should be minimal, with emphasis on details; they should be evocative, not literal.

    – We prefer illustrating documentaries with point-of-view camera, and by layering the video.

    – Limited re-enactments should be identified for the viewer, i.e. that they are not real, but illustrative. They can be labeled "re-enactment", or treated in post-production so they look significantly different from actual events.

    – Finally, all re-enactments must be approved by the Vice President/Documentaries and Specials.

G. If file footage is used, it must be indicated and, if possible, the date given.

H. Never stage an event or fake even the most seemingly insignificant thing. For example, if you are doing a story about someone jumping into the East River, do not use a shot of the Hudson River because it is more convenient.

## V. ANCHOR AND GUEST COMMENTARY

A. Anchors and reporters should not opine on someone's guilt or innocence, and should instruct guest commentators not to express views about guilt or innocence as well. The anchors and guests are there to explain what is going on and to comment on the dynamics of the trial or proceeding.

B. Try not to use legal jargon unless it is either absolutely necessary or it is used to explain how someone in court has used it.

C. Guest commentators must not have conflicts of interest; if it is discovered that a guest commentator does have a conflict, that conflict must be immediately disclosed.

## VI. CORRECTIONS

Court TV's correction policy must be candid and aggressive.

A. Always correct a mistake as soon as one is discovered and it becomes appropriate to cut back to the studio.

B. Repeat the correction as much as necessary.

C. Explain how the mistake occurred, if this is appropriate, but never try to disavow responsibility for it.

D. Reporters and everyone else on staff should tell those in charge about mistakes, theirs or anyone else's, as soon as possible so that the mistake can be corrected. Anyone with knowledge of a mistake who fails to come forward will be subject to more stringent discipline than would be administered to anyone for making a mistake. It is worse to know about a mistake and fail to correct it than to have honestly made it.

## VII. SOURCING

Whether in news reports, trial packages or at the anchor desk, all reporters and production staff must be careful about the sources of their information.

A. Know the ground rules.

i. All reporters and producers are obligated to be thoroughly familiar with the vocabulary of reporting ground rules. To avoid confusion, and because usage varies, the basics are as follows:

ii "Off the record" means your source never told you the information and you cannot use it in your story. (Of course, a good reporter can usually get the story from other sources once he or she knows it is there to get. But you should have at least two other sources; and one of your sources cannot be the off the record source.)

iii. "On background" means that you can use the information without attributing it to your source personally or to sources at his organization. You can use the information, you just cannot attribute it.

>    iv. "Not for attribution" means that the source can be identified in a general way. Be careful here: you want to give the viewer as much information as possible about your source's credibility (or lack of credibility). But you do not want to give away so much that a careful viewer can identify the source. "A partner at Smith, James who worked on the case" is better than "a Smith, Jones lawyer" - but if only one partner is working on the matter, you have improperly identified your source.
>
>    Always push people to be on the record. Remind them that viewers put more stock in an attributed quote. If you must, allow them to speak "not for attribution;" then, if that fails, "on background;" and, if all else fails, "off the record." But remember that "off the record" means you cannot use the statement or information in your story at all unless confirmed independently by at least two on the record sources.
>
> B. Be explicit.
>
>    i. All reporters should try to use the most explicit sourcing possible. Avoid using the words "sources say." The words "sources say" or "a source said" mean little to a viewer.
>
>    ii. Always state how many sources, precisely. And, to the extent possible, what kinds of sources: Your doorman? Or a top lawyer working on the case?
>
>    iii. "Sources say" is not a figure of speech, meaning one source told you something. Court TV views this statement as more than one unless you say "a (or one) source said". If more than one, give the number. Similarly, do not use "more than" if you can be more specific. Precision adds more to a reporter's credibility than a vague allusion to larger numbers.
>
>    iv. If a source insists that he/she not be described in any way at all, then you really cannot cite the source. You cannot say "a source said" or anything equivalent to that.
>
> C. Tell about a source's weakness.
>
>    If your anonymous (or named) source clearly has an ax to grind, tell your viewers. An example: "says a lawyer involved in the Texaco/Pennzoil case" is not as good as "says a lawyer on the Texaco side."
>
>    Another example: "says someone who knows Smith well" is not as good as "says someone who claims to know Smith well, but who left his employ after a falling out." The goal is to tell viewers what we know along with any information necessary to judge the quality of the information, not to sell our viewers something there is doubt about or about which we are wary.

## VIII. GIVING CREDIT

All news organizations, including Court TV, are offended when another news organization, particularly a competitor, uses their information without credit. (Questions of copyright are

## IX. LAWSUITS

Lawsuits often come with good reporting. We will defend them vigorously when we think we are right. But, to be effective, we need to know immediately when someone has threatened to sue. Tell the Executive Producer, Executive Editor and General Counsel when someone has threatened a lawsuit. Similarly, whenever a lawyer or a judge in a trial that you are covering even hints at wanting to get you involved, e.g., by subpoenaing our out-takes, let us know. And in any suddenly developing legal situation, always be courteous but always ask to call the General Counsel (and the local lawyer who may have been working with you on access issues, if any).

Other than for acts of dishonesty and intentional plagiarism or acts otherwise outside of an employee's scope of duties, Court TV will indemnify all employees for all costs and damages in any lawsuit arising from their activities on behalf of Court TV.

## X. OUT-TAKES

Court TV will handle requests for copies of material as follows:

   A. If it is for a copy of something that has been aired, it can be sold at prevailing rates.
   
   B. If it is a request for a copy of trial footage that was shot and did not air, it can also be sold at rates that have been established to help cover the costs of shooting trials and to cover the cost of finding and copying such material. This is public record material not entitled to any special privilege. (Accordingly, it may be made available at a discounted rate to lawyers involved in a case as a courtesy.) However, if any request is made for audience shots taken during the trial, it will be considered on a case by case basis. And if any request is made for out-takes of lawyer-client conferences or other non-public record material shot inadvertently, such material will never be provided.
   
   C. If it is material that Court TV is responsible for producing—an interview, etc.—but did not air, then it will **not** be made available to anyone under any circumstances unless required by court order after appropriate opportunity to be heard. In other words, this is the material that Court TV will treat like all other news organizations' reporters' or editors' notes.

## XI. HONESTY IN REPORTING

   A. Always identify yourself as a reporter.
   
   B. Never buy information from sources or make deals with sources regarding the manner in which a story will be reported.
   
   C. Never tape telephone conversations without the other person's explicit permission (In many states this is not only dishonest, it is also unlawful; federal laws may also be violated by electronic eavesdropping. The complexity of the laws governing hidden cameras and other surreptitious electronic newsgathering demands that Court TV personnel never engage in such activity.)
   
   D. Never tape (audio or video) anyone without someone's explicit permission if it is in a place where they have a right to expect privacy.

C. Never buy video, photos or documents, without previously getting authorization from the VPP, EP, VP/Documentaries or Sr. VP/Programming.

D. Never make deals with sources regarding the manner in which a story will be reported.

E. Never tape telephone conversations without the other person's explicit permission (In many states this is not only dishonest, it is also unlawful; federal laws may also be violated by electronic eavesdropping. The complexity of the laws governing hidden cameras and other surreptitious electronic newsgathering demands that Court TV personnel never engage in such activity.)

F. Never tape (audio or video) anyone without someone's explicit permission if it is in a place where they have a right to expect privacy.

G. Never agree to show tape of any interview or event to a subject before it airs.

## XII. COURTESY

The First Amendment does not give a reporter or anyone else the right to be rude, nor does it provide a reporter with the right to be angry at a person who will not cooperate. It is their right not to cooperate. So, push people for information or to help, but do not be rude or threatening.

The most predictable camera shot/interview is not always good journalism and often constitutes inexcusable personal conduct. For example, flashing a camera in front of someone who five seconds before or five minutes before has suffered a personal tragedy, and asking "How do you feel?" is not acceptable journalism at Court TV.

## XIII. CONFLICTS OF INTEREST

You must not have any interest in any story or case that you are working on other than your professional interest in getting it right; and if you do, you must tell the Executive Producer and not accept the assignment, or, if you did not know you had a conflict, you must tell the EP about it as soon as the conflict is discovered so that someone else can be assigned and you can be assigned to something else.

What is a conflict? A friendship or family or business relationship with someone involved in the story or some personal or financial stake in the outcome. When in doubt, report the potential conflict. Failure to reveal a conflict may result in disciplinary action up to and including termination.

With this in mind, Court TV wants to underscore again the ban on outside employment—freelance or otherwise—without prior specific approval.

Finally, any trials or stories Court TV is doing that involve a conflict with Court TV's partners, e.g., a lawsuit about a Warner Brothers movie, should be disclosed (often) to viewers.

XIV. A QUESTION OF COPYRIGHT -- THE FAIR USE DOCTRINE

All artistic works, writings, paintings, movies, photographs, sculptures, in whatever medium such works exist, are protected by the laws of copyright, which vary around the world in extent but not in substance -- the "taking," or "infringing," of someone else's creation is illegal and can subject the infringer to significant monetary damages. There are, however, certain situations wherein such a taking, without obtaining a license, is legally defensible, a concept known as "fair use."

There are four factors courts consider in determining if the use of a copyrighted work is "fair" and not actionable despite the absence of a license. They are:

1. The purpose and character of the use;
2. The nature of the copyrighted work;
3. The amount and substantiality of the portion used in relation to the entire work; and
4. The effect of the use upon the potential market for the work.

These four factors are elastic and it is often difficult to predict whether a contemplated use is proper. Moreover, each of these factors is given different weight in different contexts.

For example, the use of a photograph (factor 2) is almost always more likely to be problematic than the use of a clip from a movie, because no matter how you use the photo you use the entire work (factor 3), which weighs heavily in favor of the copyright proprietor, i.e., the "owner." Moreover, use without payment certainly effects the potential market (factor 4). Nonetheless, there are still possible situations where the availability of a photograph for use in a news broadcast (factor 1) may be significant and, perhaps, outweigh all the other factors -- but such a case must be scrutinized closely.

As for clips from movies or other entertainment works, the analysis is more complex and cannot be easily summarized. Suffice it to say, there is no rule of thumb that use of a movie clip, or someone else's news clip, is always fair merely because you use less than 15 or 10 seconds or any other guideline as to time. While the length of the clip used in relation to the entire work is important (factor 3), each such use must be weighed in light of all four factors; perhaps most important is whether the clip is used as an integral part of the story rather than merely enhancing production values (factor 1). (The issues surrounding the use of music are even more complicated, requiring a thorough analysis of every potential music use.)

It is also necessary to differentiate among the several types of uses when re-using material. A "fair use" in the context of topical/daily news presentation does not allow for automatic permissible re-use on an ongoing basis, e.g., a later produced documentary may possibly require a license for material previously used without permission, and a license may also be necessary for the sale of tapes for home viewing, although none was otherwise required (or the license obtained may have been limited in scope).

Finally, all producers should be extremely wary of taking material from the Internet; merely because a copyrighted work is already on the Web does not make it automatically available for copying, i.e., material on the Web may itself be in copyright violation or may be subject to other limitations.

Rather than attempt to set out specific rules in advance, before any copyrighted work is used, all producers should consult with the VPP or the EP and the General Counsel or Associate General Counsel should be asked for a legal opinion.

## XV. COURT TV MICROPHONE POLICY

Court TV has a strict policy of keeping microphones off during all courtroom conversations other than those conducted on the public record in open court.

Conversations that are not public and will not be broadcast or recorded in any fashion are those between lawyers and their clients, conferences between attorneys at the defense, plaintiff or prosecution tables that are not intended for public consumption, and all bench conferences with the court.

All audio transmissions must comply with the letter and spirit of orders from the judge in the case even if they are more stringent than Court TV's own policies

In cases where Court TV is not in charge of pool coverage of a trial, the network urges judges to order the same procedures for alternate crews.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TAMMY KITZMILLER, et al., | ) |
| Plaintiffs, | ) Civil No. 04-CV-2688 |
| v. | ) Filed Electronically |
| DOVER AREA SCHOOL DISTRICT, et al., | ) Hon. John E. Jones, III |
| Defendants. | ) |

## DECLARATION OF GAYLE C. SPROUL

I, Gayle C. Sproul, declare under penalty of perjury, as follows:

1. I am a partner in the law firm Levine Sullivan Koch & Schulz, L.L.P., which represents Courtroom Television Network LLC ("Court TV") in this matter.

2. I have attached to this declaration the following resource materials for the Court's review and consideration. Most, but not all, of these materials are cited in the foregoing memorandum in support of Court TV's motion to record and telecast the trial proceedings in this matter.

3. Annexed hereto as Exhibit 1 is a true and correct copy of Radio-Television News Directors Association, *Cameras in the Courtroom: A*

*State-By-State Guide*, http://www.rtnda.org/foi/scc.html (last visited Aug. 29, 2005).

    4.    Annexed hereto as Exhibit 2 is a true and correct copy of National Center for State Courts, *Cameras in the Courts: Summary of State Court Rules* (2001).

    5.    Annexed hereto as Exhibit 3 is a true and correct copy of REPORT OF THE COMMITTEE ON AUDIO-VISUAL COVERAGE OF COURT PROCEEDINGS (May 1994).

    6.    Annexed hereto as Exhibit 4 is a true and correct copy of NEW YORK STATE COMMITTEE TO REVIEW AUDIO VISUAL COVERAGE OF COURT PROCEEDINGS, AN OPEN COURTROOM: CAMERAS IN NEW YORK COURTS 1995-97 (Apr. 4, 1997).

    7.    Annexed hereto as Exhibit 5 is a true and correct copy of FEDERAL JUDICIAL CENTER, ELECTRONIC MEDIA COVERAGE OF FEDERAL CIVIL PROCEEDINGS: AN EVALUATION OF THE PILOT PROGRAM IN SIX DISTRICT COURTS AND TWO COURTS OF APPEALS (1994).

    8.    Annexed hereto as Exhibit 6 is a true and correct copy of REPORT FROM THE CALIFORNIA TASK FORCE ON PHOTOGRAPH, RECORDING, AND BROADCASTING IN THE COURTROOM (Feb. 16, 1996).

9.  Annexed hereto as Exhibit 7 is a true and correct copy of REPORT FROM THE CALIFORNIA TASK FORCE ON PHOTOGRAPH, RECORDING, AND BROADCASTING IN THE COURTROOM (May 10, 1996).

10. Annexed hereto as Exhibit 8 are true and correct excerpts from ALASKA JUDICIAL COUNCIL, NEWS CAMERAS IN THE ALASKA COURTS: ASSESSING THE IMPACT (Jan. 1988).

11. Annexed hereto as Exhibit 9 are true and correct excerpts from BOB BAKER, CAMERAS AND RECORDERS IN ARIZONA'S TRIAL COURTS: AN EVALUATION OF THE EXPERIMENT (1983).

12. Annexed hereto as Exhibit 10 is a true and correct copy of Jill Lawrence, *New School Year, New Battle Over Evolution*, USA TODAY, Aug. 26, 2005, at A6.

13. Annexed hereto as Exhibit 11 is a true and correct copy of Richard N. Ostling, *Are the Arguments Over Evolution Inescapably Religious?*, MACON TELEGRAPH, Aug. 20, 2005, at D1.

14. Annexed hereto as Exhibit 12 is a true and correct copy of Jerry Adler, *Doubting Darwin*, NEWSWEEK, Feb. 7, 2005, at 44.

15. Annexed hereto as Exhibit 13 is a true and correct copy of Neela Banerjee, *An Alternative to Evolution Splits a Pennsylvania Town*, N.Y. TIMES, Jan. 16, 2005, at A18.

16. Annexed hereto as Exhibit 14 is a true and correct copy of H.B. 1007, 2005 Pa. Sess.

17. Annexed hereto as Exhibit 15 is a true and correct copy of S. Res. 70, 2005 Pa. Sess.

18. Annexed hereto as Exhibit 16 is a true and correct copy of Diane Carroll, *Evolution Issue Again Gets Look From Board*, KANSAS CITY STAR, Aug. 9, 2005, at B1.

19. Annexed hereto as Exhibit 17 is a true and correct copy of Peter Baker & Peter Slevin, *Bush Remarks On "Intelligent Design" Theory Fuel Debate*, WASH. POST, Aug. 3, 2005, at A1.

20. Annexed hereto as Exhibit 18 is a true and correct copy of the Order of the United States Court of Appeals for the Third Circuit dated April 30, 1997.

21. Annexed hereto as Exhibit 19 is a true and correct copy of Letter from Chief Justice Rehnquist to Barbara Cochran, Radio-Television News Directors Association (Nov. 28, 2000), *available at* http://www.rtnda.org/foi/taperelease.html (last viewed on Aug. 29, 2005).

22. Annexed hereto as Exhibit 20 is a true and correct copy of the opinion in *Shingara v. Skiles*, No. 05-2376, slip op. (3d Cir. Aug. 24, 2005).

23. Annexed hereto as Exhibit 21 is a true and correct copy of the opinion in *Dashner v. Riedy*, 2004 U.S. Dist. LEXIS 19980 (E.D. Pa. Sept. 30, 2004).

24. Annexed hereto as Exhibit 22 is a true and correct copy of material excerpts from the court docket in *A&M Records, Inc. v. Napster, Inc.*, No. 00-16401 (9th Cir.) (last visited on Aug. 29, 2005).

25. Annexed hereto as Exhibit 23 is a true and correct copy of *Appeals Hearing to Be Live on Radio, Internet*, SEATTLE TIMES, Feb. 13, 2001, at C1.

26. Annexed hereto as Exhibit 24 is a true and correct copy of David Bianculli, *Air Fair to Fla. & U.S.: State is Right to Allow TV*, DAILY NEWS (N.Y.), Dec. 8, 2000, at 146.

Pursuant to 18 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 2nd day of September 2005.

_____
Gayle C. Sproul

# EXHIBITS TO
# DECLARATION OF GAYLE C. SPROUL

| NUMBER | EXHIBIT |
|---|---|
| 1 | Radio-Television News Directors Association, *Cameras in the Courtroom: A State-By-State Guide* |
| 2 | National Center for State Courts, *Cameras in the Courts: Summary of State Court Rules* (2001) |
| 3 | REPORT OF THE COMMITTEE ON AUDIO-VISUAL COVERAGE OF COURT PROCEEDINGS (May 1994) |
| 4 | NEW YORK STATE COMMITTEE TO REVIEW AUDIO VISUAL COVERAGE OF COURT PROCEEDINGS, AN OPEN COURTROOM: CAMERAS IN NEW YORK COURTS 1995-97 (Apr. 4, 1997) |
| 5 | FEDERAL JUDICIAL CENTER, ELECTRONIC MEDIA COVERAGE OF FEDERAL CIVIL PROCEEDINGS: AN EVALUATION OF THE PILOT PROGRAM IN SIX DISTRICT COURTS AND TWO COURTS OF APPEALS (1994) |
| 6 | REPORT FROM THE CALIFORNIA TASK FORCE ON PHOTOGRAPH, RECORDING, AND BROADCASTING IN THE COURTROOM (Feb. 16, 1996) |
| 7 | REPORT FROM THE CALIFORNIA TASK FORCE ON PHOTOGRAPH, RECORDING, AND BROADCASTING IN THE COURTROOM (May 10, 1996) |
| 8 | ALASKA JUDICIAL COUNCIL, NEWS CAMERAS IN THE ALASKA COURTS: ASSESSING THE IMPACT (Jan. 1988) |
| 9 | BOB BAKER, CAMERAS AND RECORDERS IN ARIZONA'S TRIAL COURTS: AN EVALUATION OF THE EXPERIMENT (1983) |

| | |
|---|---|
| 10 | Jill Lawrence, *New School Year, New Battle Over Evolution*, USA TODAY, Aug. 26, 2005, at A6 |
| 11 | Richard N. Ostling, *Are the Arguments Over Evolution Inescapably Religious?*, MACON TELEGRAPH, Aug. 20, 2005, at D1 |
| 12 | Jerry Adler, *Doubting Darwin*, NEWSWEEK, Feb. 7, 2005, at 44 |
| 13 | Neela Banerjee, *An Alternative to Evolution Splits a Pennsylvania Town*, N.Y. TIMES, Jan. 16, 2005, at A18 |
| 14 | H.B. 1007, 2005 Pa. Sess. |
| 15 | S. Res. 70, 2005 Pa. Sess. |
| 16 | Diane Carroll, *Evolution Issue Again Gets Look From Board*, KANSAS CITY STAR, Aug. 9, 2005, at B1 |
| 17 | Peter Baker & Peter Slevin, *Bush Remarks On "Intelligent Design" Theory Fuel Debate*, WASH. POST, Aug. 3, 2005, at A1 |
| 18 | Order of the United States Court of Appeals for the Third Circuit dated April 30, 1997 |
| 19 | Letter from Chief Justice Rehnquist to Barbara Cochran, Radio-Television News Directors Association (Nov. 28, 2000), *available at* http://www.rtnda.org/foi/taperelease.html |
| 20 | *Shingara v. Skiles*, No. 05-2376, slip op. (3d Cir. Aug. 24, 2005) |
| 21 | *Dashner v. Riedy*, 2004 U.S. Dist. LEXIS 19980 (E.D. Pa. Sept. 30, 2004) |

| | |
|---|---|
| 22 | Material excerpts from the court docket in *A&M Records, Inc. v. Napster, Inc.*, No. 00-16401 (9th Cir.) (last visited on Aug. 29, 2005) |
| 23 | *Appeals Hearing to Be Live on Radio, Internet*, SEATTLE TIMES, Feb. 13, 2001, at C1 |
| 24 | David Bianculli, *Air Fair to Fla. & U.S.: State is Right to Allow TV*, DAILY NEWS (N.Y.), Dec. 8, 2000, at 146 |