USA TODAY, August 26, 2005

1 of 507 DOCUMENTS

Copyright 2005 Gannett Company, Inc.
USA TODAY

August 26, 2005, Friday through Sunday, CHASE EDITION

**SECTION:** NEWS; Pg. 6A

**LENGTH:** 1643 words

**HEADLINE:** New school year, new battle over evolution;
Federal lawsuit targets Pa. district's requirement that biology teachers mention theory of 'intelligent design'

**BYLINE:** Jill Lawrence

**DATELINE:** DOVER, Pa.

**BODY:**
DOVER, Pa. -- The high school here looks like American high schools everywhere: flat, featureless and brick, with the requisite athletic field and a billboard advertising "meet-the-teams night."

But the school term that starts here Tuesday promises to be anything but ordinary. A nationally watched court case and a polarizing local school board election have made this small southern Pennsylvania town a flash point for those who support and oppose intelligent design -- the concept that parts of the universe and human life are so complex, they are best explained by an intelligent cause or designer. "Chance and necessity do not explain the origins of life," says Stephen Meyer, director of the Center for Science and Culture, an intelligent design think tank in Seattle.

Is intelligent design science or religion? That's the question a U.S. district court judge in Harrisburg will consider starting Sept. 26, and Dover voters will weigh Nov. 4.

The two tests arise from a long struggle to discredit evolution, the theory that life forms evolved over billions of years through a natural process. Though broadly accepted by scientists, evolution has long been challenged by creationists who say God created the universe.

Courts repeatedly have found that teaching creationism in public schools amounts to promoting a religious viewpoint, in violation of the Constitution. Now come intelligent-design advocates. Hoping to avoid church-state conflicts, they don't discuss the identity of the designer, and they deny any link to creationism. But Eric Rothschild, the attorney leading the challenge against Dover schools, says intelligent design is "a new form of creationism" that still violates the separation of church and state.

The Dover school district requires that biology classes, in addition to teaching evolution, include a one-minute statement that explicitly mentions intelligent design and a book on the subject published by a Christian foundation. That policy -- believed by activists on both sides to be the only one of its kind in a U.S. school district -- goes on trial Sept. 26 in a federal lawsuit filed by 11 parents against the Dover Area School Board. Seven school board members who support the policy are on the ballot less than six weeks later, up against challengers who say intelligent design is a religious idea that doesn't belong in science class.

Still a mystery

Intelligent design has a network of passionate scholars and supporters who have helped four states write science education standards critical of evolution. Intelligent design is a prominent topic in newspapers and magazines. President Bush recently heartened advocates when he said it should be taught along with evolution.

Yet despite all the attention they've drawn, critics of evolution are losing in court and making little headway so far in most state legislatures and school boards. And intelligent design remains mysterious to many; more than half in the latest USA TODAY/CNN/Gallup Poll say they are not familiar with it.

USA TODAY, August 26, 2005

"A lot of us thought that school board elections all over the country would be dominated by it -- particularly in conservative areas," says Terry Madonna, director of the Center for Politics & Public Affairs at Franklin & Marshall College near here. "But other than a couple of places, it just has not taken off."

Even sympathizers say intelligent design probably isn't destined to become a galvanizing national political movement such as abortion or gay marriage. Republicans and conservatives are divided on its merits and skeptical about its relative importance to voters. Even its most passionate proponents are moving ahead gingerly, for fear they'll provoke court challenges like the one here -- and set back their own cause.

The Center for Science and Culture (CSC) and its parent, the Discovery Institute, are leading promoters of intelligent design. Their goal: "to see design theory permeate our religious, cultural, moral and political life" by 2018.

Discovery is trying to avoid a constitutional showdown that could result in a ban on teaching intelligent design. The current approach: urging schools to "teach the controversy" over evolution that it has fueled.

To that end, Discovery tried to head off the Dover confrontation. John West, CSC's associate director, says freedom of speech is at stake. Banning intelligent design is wrong, he says, but so is "trying to impose it in classrooms," as Dover does.

Attorney Seth Cooper advised the Dover school board not to adopt its policy and even offered guidelines for change. "We do believe a lawsuit is certain in your situation," Cooper told Alan Bonsell, the school board curriculum chairman, in a Dec. 10, 2004, e-mail. "We strongly recommend some corrective action be taken."

Discovery is constantly on alert for such brushfires. In June, when Utah state Rep. Chris Buttars proposed a bill to teach "divine design," West accused Buttars of wrongly conflating creationism and intelligent design. So far, Buttars has not introduced his bill.

Pennsylvania State Rep. Thomas Creighton introduced a bill authorizing school districts to teach intelligent design. He says it is opposed by people who have a more "atheistic" worldview. It's also opposed by Discovery, which said so in a letter to the Legislature.

No GOP consensus

Republicans and conservatives are divided over intelligent design. Seven state Republican parties -- Alaska, Iowa, Minnesota, Missouri, Oklahoma, Oregon and Texas -- have "anti-evolutionist" platform planks that support teaching creationism and/or intelligent design, according to the pro-evolution National Center for Science Education.

But the national GOP platform does not mention it. In Pennsylvania, says party spokesman Josh Wilson, "there are Republicans on both sides" and it has never come up at a state committee meeting.

A few conservatives in Congress have aligned themselves with intelligent design. Sen. Rick Santorum, R-Pa., said in 2001 that students should debate "such alternative theories as intelligent design." But Santorum, who is running for re-election next year, told National Public Radio on Aug. 4 that "as far as intelligent design is concerned, I really don't believe it has risen to the level of a scientific theory ... that we would want to teach it alongside of evolution."

Some Republicans are reluctant to wade in. Ex-House speaker Newt Gingrich, who often discusses his faith in God and in science, is refusing to do interviews on intelligent design. When the conservative Heritage Foundation invited CSC director Meyer to lecture last April, it received protest e-mails. Some fellows said the opposing view should also be presented. "We don't do any research in this area at all," says Stuart Butler, the group's domestic policy director. "There are a large number of people at Heritage who disagree with it."

Two other conservative think tanks, the American Enterprise Institute and the Cato Institute, list no intelligent design experts on their websites. Most Christian advocacy groups focus on judges, abortion and gay issues. Focus on the Family has worked with intelligent design advocates and featured proponents on founder James Dobson's radio show several times. But even so, "it's not on our radar screen as high as the other issues," says Tom Minnery, the group's vice president of public policy.

Will intelligent design ever turn into a broad movement? It may not because of its tendency to divide conservatives, and other reasons:

USA TODAY, August 26, 2005

*It's not that important to most voters. Even in Dover, intelligent design is secondary to school financing. "The big issue really is responsible management of the school system and the taxpayers' money," says school board member Jim Cashman, an intelligent design supporter up for re-election.

*It's a local concern that doesn't lend itself to federal action. "It doesn't seem that it's an issue that would mobilize social conservatives nationally," Minnery says.

*It's too muddled to generate what Butler calls "political adrenaline." You can't be for and against abortion, he says, but you can believe in God and evolution: "It's like thinking of the world poetically and ... of the world scientifically."

*It doesn't carry the emotional punch of abortion or gay marriage. William Martin, a Rice University fellow in religion and public policy, says the intelligent design battle cry is that evolution is unproved, "and here's an alternative we believe is more appropriate."

"They're not saying human beings are being killed, or the family is being destroyed," he says, citing conservative attacks on abortion and gay marriage. Martin, author of With God on Our Side: The Rise of the Religious Right in America, says intelligent design "is not likely to die off right away. But I don't think it will get much further."

One indicator of its future will be the outcome of the trial here. But that's expected to last several weeks and go to the Supreme Court, no matter which side wins. A more immediate measure will be the Nov. 4 school board elections.

The candidates on the Democratic ticket include four moderate Republicans. One of them, Patricia Dapp, voted for Bush last year but now says he's "overstepped his bounds" on personal, religious issues such as intelligent design.

Bonsell, the curriculum chairman, is running for re-election on the GOP ticket. He says he can't believe the fuss over Dover's policy.

His daughter will take ninth-grade biology this year along with the daughter of a Democratic opponent, physics teacher Bryan Rehm. "I don't believe in evolution, but I don't mind my daughter hearing about it. Why can't there be a discussion?" Bonsell asks.

Rehm replies: "Teach intelligent design. But not in science class."

**LOAD-DATE:** August 26, 2005

Source: News & Business > News > **News, Most Recent 90 Days (English, Full Text)** ⓘ
Terms: **ostling**  (Edit Search | Suggest Terms for My Search)

↩Select for FOCUS™ or Delivery
☐

*The Macon Telegraph August 20, 2005 Saturday HO EDITION*

Copyright 2005 The Macon Telegraph
All Rights Reserved



Found on Macon ● com

The Macon Telegraph

August 20, 2005 Saturday HO EDITION

**SECTION:** D; Pg. 1

**LENGTH:** 907 words

**HEADLINE:** Are the arguments over evolution inescapably religious?;
By Richard N. **Ostling** ASSOCIATED PRESS

**BODY:**
As students head back to biology classrooms, debate over whether they should be taught "intelligent design" concepts alongside evolution is getting hotter, with the president, other politicians and a high-profile Roman Catholic cardinal all weighing in.

Quizzed on the topic, President Bush told reporters recently: "You're asking me whether or not people ought to be exposed to different ideas and the answer is 'Yes.' "

The president's remark prompted sharp criticism from intelligent design opponents. Democratic Party Chairman Howard Dean said Sunday on the CBS program "Face the Nation" that Bush is "anti-science" and "there's no factual evidence for intelligent design."

They aren't the only ones entering the fray.

Last month, Austria's Cardinal Christoph Schoenborn wrote in a New York Times op-ed piece that "the human intellect can readily and clearly discern purpose and design in the natural world." He said Catholicism cannot accept evolution if this means "an unguided, unplanned process."

Schoenborn's statements caused consternation among scientists and educators - including some Catholics - who have resisted intelligent design (or ID) for a decade.

Meanwhile, the National Center for Science Education tallies evolution disputes in 18 states this year. Last week, the Kansas Board of Education gave preliminary approval to science standards that allow ID-style alternatives to be discussed alongside Darwinism. In Pennsylvania, a forthcoming federal trial will test the legality of disputed ID instruction in Dover's schools. And earlier this year, a federal judge ordered Cobb County school officials to remove disclaimer stickers from science textbooks that said evolution is "a theory, not a fact."

The ID movement says Darwin's mechanism of natural selection acting upon gradual biological changes cannot address how life originated. ID also argues that Darwinism fails to

fully explain how extremely varied and complex life forms emerged during the past 600 million years.

Therefore, it concludes, guidance and information from some external intelligence must be involved. That intelligence is usually left unidentified, but it sounds like God - and critics say ID is religion masquerading as science.

Michael Ruse, a Florida State University philosophy professor and ardent ally of Darwinism, outlines the conflict in a new book, "The Evolution-Creation Struggle" (Harvard University Press).

Ruse says the fight over ID and evolution is important because it's "a struggle for the hearts and souls of people, with deep implications for the ways in which we live our lives and regulate our conduct. It is a religious or metaphysical battle, not simply a dispute about scientific theory."

While scientists accuse religious advocates of stepping outside their field by pronouncing on what is and isn't biologically possible, religious thinkers accuse scientists of reaching beyond science into the realm of theology with some of their pronouncements.

For example, a National Association of Biology Teachers statement once defined evolution as "an unsupervised, impersonal, unpredictable and natural process."

Two distinguished religion scholars, philosopher Alvin Plantinga and Huston Smith, a historian of world religions, convinced the association to drop the first two adjectives in 1997 because these were theological assertions, not scientific ones.

"How could an empirical inquiry show that God was not guiding and directing evolution?" the two scholars asked the association.

The answer is that such statements go beyond what science alone can discover and enter the realm of philosophy and religion, says Plantinga, a Protestant teaching at the University of Notre Dame. " 'Unguided evolution' is not part of science," Plantinga says. "It's a theological add-on" that some scientists use to try and undercut religion.

In his view, schools should teach four things about evolution: there's lots of debate; most biologists see Darwinism as the best explanation; some think the process is wholly unguided; and there are "respectable people" who disagree.

Warren Nord, an educational philosopher at the University of North Carolina at Chapel Hill, thinks the pros and cons should be fairly presented to students, whether or not ID is inherently religious. His reasons: There's wide discussion of the issue and it "ties into perennial philosophical questions about design in nature that go all the way back to the Greeks, as well as the Bible."

John F. Haught, a lay Catholic theologian at Georgetown University, agrees that scientists sometimes turn evolution into an anti-religious worldview that exceeds the proper limits of science. However, he opposes ID as both bad science and bad theology.

To Haught, educators fail to admit that "there are different layers of explanation" for phenomena. For example, water boiling on a stove can be validly explained as molecules responding to heat, as effects caused by turning on the burner, or as evidence that someone wanted a cup of tea.

Similarly, he thinks, evolution can be seen as both the result of natural selection and part of God's overarching purpose.

Where is this debate headed? The new challenge posed by ID seems destined to eventually reach the U.S. Supreme Court, which in 1987 barred a different critique of Darwinism, Bible-based "creationism," from the nation's schoolrooms because it is advanced a "religious viewpoint."

**LOAD-DATE:** August 20, 2005

Source: News & Business > News > **News, Most Recent 90 Days (English, Full Text)** ⓘ
Terms: **ostling**  (Edit Search | Suggest Terms for My Search)
View: Full
Date/Time: Monday, August 29, 2005 - 10:21 AM EDT

About LexisNexis | Terms and Conditions

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

The New York Times January 16, 2005 Sunday

9 of 11 DOCUMENTS

Copyright 2005 The New York Times Company
The New York Times

January 16, 2005 Sunday
Late Edition - Final

**SECTION:** Section 1; Column 1; National Desk; Pg. 18

**LENGTH:** 1671 words

**HEADLINE:** An Alternative to Evolution Splits a Pennsylvania Town

**BYLINE:** By NEELA BANERJEE

**DATELINE:** DOVER, Pa.

**BODY:**

Ever since the school board here voted to make this town in Pennsylvania Dutch country the first in the nation to discuss an alternative to evolution in high school biology classes, students have been as sharply divided as the rest of this normally close-knit community.

"I think we should have a choice: They should teach you both," said Meagan Hass, 14, while eating pizza after school at KT's restaurant with her friend Abbi Hake. "Evolution to me is like we come from monkeys."

At a nearby table, Jessika Moury, 14, said her mother supported the school board but she did not. "There are so many aspects of religion, so you have to teach what each of them says," Jessika said. "There's Bible Club in school for this, and that's where it should be taught."

With the new instruction on the origin of life set to begin, Dover has become a critical testing ground in a widening national debate about teaching evolution.

In early January, Dover High School's science teachers refused to read to ninth-graders a short statement written by the school board that criticizes evolution and cites a controversial approach called Intelligent Design as an alternative.

The teachers contend that such a change to the curriculum amounts to teaching Intelligent Design and that the approach is inherently religious, not scientific.

"Kids are smart enough to understand what Intelligent Design means," said Robert Eshbach, a science teacher who refused to read the statement. "The first question they will ask is, 'Well, who's the designer? Do you mean God?'"

Jen Miller, who teaches ninth-grade biology, said she saw no conflict between evolution and religion.

"I've never had a problem in my classroom in the way I approach evolution," Ms. Miller said. "Just because I teach evolution doesn't mean that God's not there or that I'm going against the religious beliefs of my students." With the teachers balking, an administrator will read the statement instead, as early as next week. Students may opt out of the reading with their parents' permission.

Several states have issued disclaimers to students questioning the validity of evolution, claiming it is riddled with gaps. But the Dover school board went further on Oct. 18 when it voted to specifically identify an alternative to evolution and encourage students to learn more about it.

Proponents of Intelligent Design, which asserts that life is so intricately complex that an architect must be behind it, say it is a valid scientific theory. Critics argue that Intelligent Design has no basis in science and is another iteration of creationism. And while people are still polite to one another in Dover, those same arguments have split school board members, clergy, residents and students alike.

The New York Times January 16, 2005 Sunday

"It's been very polarizing," said the Rev. David F. Sproull, pastor of the Dover Assembly of God Church and a supporter of the board's decision. "I see very few people sitting in the middle of it. It evokes very strong feelings."

Some have already moved to stop the school board. In mid-December, 11 local parents represented by the American Civil Liberties Union and Americans United for Separation of Church and State sued the school board, contending that discussing Intelligent Design is a way to foist religion on their children.

"The dispute here isn't between Christians versus non-Christians or non-believers," said Jeff Brown, a former school board member who voted against criticizing evolution. "It's between Christians who are comfortable with the Constitution and those who want special treatment."

Conservative Christians across the country say the re-election of President Bush has given them the momentum to achieve important local goals, including challenging the teaching of evolution, and they are watching developments in Dover closely.

In a November 2004 CBS News Poll, nearly two-thirds of Americans said they favored teaching creationism alongside evolution in schools.

In Grantsburg, Wis., the school board recently voted to teach a critical approach to evolution, without identifying alternatives. In South Carolina, legislation will be introduced to examine the state's curriculum on teaching the origin of species. In Kansas, conservatives who favor challenging the teaching of evolution recently won a majority on the state school board, and they are generally expected to change the state science curriculum as early as the spring.

[A federal judge in Georgia ruled on Thursday that schools in Cobb County must remove from science textbooks stickers that criticize evolution, dealing a blow to local creationists.]

Located 25 miles southwest of Harrisburg, Dover, population 25,000, is a cluster of modest churches, clapboard homes and weathered family restaurants hemmed by rolling farmland. It is in York County, which supported President Bush by a nearly 2-to-1 margin in the November election. The area was largely settled by the small Protestant denominations that grew among the Pennsylvania Dutch, and people learned to be tolerant of those with differing beliefs because of the patchwork of faiths that made up their town, Mr. Brown said.

But a growing number of conservative Christians in Dover, like many elsewhere, bridle at what they see as the marginalization of their faith in a country they believe was founded on biblical values. "I think we're coming to place where we're certainly not browbeating people with religion, but that it has just become a normal part of life now," Mr. Sproull, the pastor, said of introducing Intelligent Design to the local high school. "Everyone in the country seems to have freedom of speech but those who talk about religion and God."

To many in Dover, teaching students that the Earth is millions of years old or that man evolved in ways that contradict biblical accounts is akin to promulgating atheism.

"If they can teach there is no God, then they can teach there is a God," said Jean Eisenhart, 72, as she left the Dover Diner after breakfast on a recent brisk morning.

The six people on the nine-member board who voted for the challenge to evolution have declined to talk to the news media because of the pending lawsuit. But the high school's science teachers said they were first approached by a board member about evolution in fall 2003.

By last summer, some members tried to stop the purchase of a biology textbook recommended by teachers because it mentioned Charles Darwin.

The York Dispatch quoted one board member, William Buckingham, as saying in that debate: "Nearly 2,000 years ago, someone died on the cross for us. Shouldn't we have the courage to stand up for him?" Richard Thompson, president of the Thomas More Law Center, a Christian legal defense group representing the six board members, said Mr. Buckingham made that statement in another context, a dispute about the Pledge of Allegiance in 2003.

The textbooks were ultimately ordered, but the board voted to have teachers read the statement criticizing evolution. Mr. Brown and his wife, Carol, longtime board members, resigned in protest. Many people have supported them; others stopped talking to them.

"I got no joy out of it," Mrs. Brown said. "But people have to be aware: This is dividing the country. Who pays attention to school board meetings anyway?"

The New York Times January 16, 2005 Sunday

The Rev. Warren Eshbach, an adjunct professor at Lutheran Theological Seminary in nearby Gettysburg and the father of Robert Eshbach, the science teacher, warned at board meetings about how divisive the issue might prove. Like many fellow Dover residents, he said the biblical account of the origins of humanity should be taught in a comparative religion class, not a biology class.

"Science is figuring out what God has already done," Mr. Eshbach said. "But I don't think Genesis 1 to 11 was ever meant to be a science textbook for the 21st century."

Noel Wenrich, an evangelical Christian board member who voted with the Browns against the measure, said he wanted approaches other than evolution explained in school. But given a 1987 Supreme Court decision against teaching creationism, he worried that the mention of Intelligent Design would embroil the district in losing lawsuits and drain it of badly needed funds.

"I think that 80 percent of the community might support the measure, but not if taxes go up," Mr. Wenrich said. "Then it's 30 percent."

Ninth graders at Dover High have been following the ruckus, and some say they wish that it would stop, and that Dover might be known for something else, something more run-of-the-mill, like its academics.

Amy Mummerd, a ninth grader, put some of her classmates' frustrations directly. "I think it should be kept out of school," she said of Intelligent Design. "Because it goes against the separation of school and church, or whatever."

A Statement on the 'Intelligent Design' of Life

Following is a statement on evolution and an alternative that a school administrator in Dover, Pa., is expected to read to high school biology students this week:

The Pennsylvania Academic Standards require students to learn about Darwin's theory of evolution and eventually take a standardized test of which evolution is a part.

Because Darwin's theory is a theory, it continues to be tested as new evidence is discovered. The theory is not a fact. Gaps in the theory exist for which there is no evidence.

A theory is defined as a well-tested explanation that unifies a broad range of observations.

Intelligent Design is an explanation of the origin of life that differs from Darwin's view. The reference book "Of Pandas and People" is available for students who might be interested in gaining an understanding of what Intelligent Design actually involves.

With respect to any theory, students are encouraged to keep an open mind. The school leaves the discussion of the origin of life to individual students and their families.

As a standards-driven district, class instruction focuses upon preparing students to achieve proficiency on standards-based assessments.


URL: http://www.nytimes.com

GRAPHIC: Photos: Jessika Moury, left, and Megan Boyer, students at Dover High, at a restaurant after school. "There's Bible Club in school for this," Jessika said.
"It's been very polarizing," said the Rev. David F. Sproull, who supports the school board. (Photographs by Ryan Donnell for The New York Times)Map of Pennsylvania highlighting Dover: Dover, Pa., is a critical testing ground in a widening national debate about teaching evolution.

LOAD-DATE: January 16, 2005

106V3S

********** Print Completed **********

Time of Request:     August 26, 2005  10:12 AM EDT

Print Number:        1821:58410947
Number of Lines:     124
Number of Pages:

Send To:  POTTER, AMY
          LEVINE SULLIVAN KOCH & SCHULZ LLP
          1050 17TH ST NW STE 800
          WASHINGTON, DC 20036-5514

PRINTER'S NO. **1153**

## THE GENERAL ASSEMBLY OF PENNSYLVANIA

# HOUSE BILL

## No. **1007** Session of 2005

INTRODUCED BY CREIGHTON, ARMSTRONG, BASTIAN, BENNINGHOFF, BOYD, CLYMER, ELLIS, HERSHEY, LEH, PETRARCA, ROHRER AND STERN, MARCH 16, 2005

REFERRED TO COMMITTEE ON EDUCATION, MARCH 16, 2005

AN ACT

1  Amending the act of March 10, 1949 (P.L.30, No.14), entitled "An
2      act relating to the public school system, including certain
3      provisions applicable as well to private and parochial
4      schools; amending, revising, consolidating and changing the
5      laws relating thereto," providing for the teaching of
6      theories on the origin of man and earth.

7      The General Assembly of the Commonwealth of Pennsylvania

8  hereby enacts as follows:

9      Section 1.  The act of act of March 10, 1949 (P.L.30, No.14),

10  known as the Public School Code of 1949, is amended by adding a

11  section to read:

12      Section 1516.2.  Teaching Theories on the Origin of Man and

13  Earth.--(a)  In any public school instruction concerning the

14  theories of the origin of man and the earth which includes the

15  theory commonly known as evolution, a board of school directors

16  may include, as a portion of such instruction, the theory of

17  intelligent design. Upon approval of the board of school

18  directors, any teacher may use supporting evidence deemed

19  necessary for instruction on the theory of intelligent design.

1    (b)   When providing supporting evidence on the theory of

2    intelligent design, no teacher in a public school may stress any

3    particular denominational, sectarian or religious belief.

4    (c)   This section shall not be construed as being adverse to

5    any decision which has been rendered by an appellate court.

6    Section 2.   This act shall be retroactive to July 1, 2005.

7    Section 3.   This act shall take effect July 1, 2005, or

8    immediately, whichever is later.

PRINTER'S NO. **694**

THE GENERAL ASSEMBLY OF PENNSYLVANIA

# SENATE RESOLUTION

## No. 70    Session of 2005

INTRODUCED BY C. WILLIAMS, MUSTO, FERLO, LAVALLE, COSTA,
    RAFFERTY, TOMLINSON, STACK AND BOSCOLA, APRIL 13, 2005

REFERRED TO EDUCATION, APRIL 13, 2005

A RESOLUTION

1   Reaffirming Pennsylvania's commitment to the teaching of the
2       theory of evolution in public schools, urging every school
3       district to take appropriate action to ensure that the theory
4       of evolution is being taught and urging the Department of
5       Education to take appropriate action to ensure that the
6       theory of evolution is being taught in Pennsylvania.

7       WHEREAS, In 2002 the Commonwealth of Pennsylvania, through

8   the State Board of Education, adopted Academic Standards for

9   Science and Technology; and

10      WHEREAS, Pursuant to those standards, Pennsylvania's public

11  schools are required to teach, challenge and support every

12  student so that he or she will acquire, by the end of tenth

13  grade, the knowledge and skills needed to be able to explain the

14  mechanisms of the theory of evolution; and

15      WHEREAS, Pursuant to those standards, Pennsylvania's public

16  schools are required to teach, challenge and support every

17  student so he or she will acquire, by the end of 12th grade, the

18  knowledge and skills needed to be able to analyze the theory of

19  evolution; and

1    WHEREAS, Scientists, science teachers and science professors
2    strongly believe that teaching the theory of evolution is a
3    critical component of a comprehensive knowledge of science that
4    will enable students to understand the world around them; and
5    WHEREAS, Scientists, science teachers and science professors
6    strongly believe that students must be taught the theory of
7    evolution in public schools if those students are to effectively
8    compete for admission to our best colleges and universities and
9    to enjoy successful professional careers; and
10   WHEREAS, The theory of evolution is the fundamental basis of
11   biotechnology and life sciences, fields which hold the promise
12   of medical discoveries and which have the potential for exciting
13   new economic development projects; and
14   WHEREAS, There are troubling studies which show that high
15   school students in the United States are performing below the
16   international average in scientific achievement; therefore be it
17   RESOLVED, That the Senate reaffirm Pennsylvania's commitment
18   to the teaching of the theory of evolution in public schools as
19   part of the science curriculum; and be it further
20   RESOLVED, That the Senate urge every school district to take
21   appropriate action to ensure that the theory of evolution is
22   being taught and that students are acquiring the knowledge and
23   skills to be able to explain the mechanisms of the theory of
24   evolution and to analyze the theory of evolution; and be it
25   further
26   RESOLVED, That the Senate urge the Department of Education to
27   take appropriate action to ensure that the theory of evolution
28   is being taught in Pennsylvania in accordance with the Academic
29   Standards for Science and Technology adopted in January 2002.

Source: News & Business > News > News, Most Recent 90 Days (English, Full Text) ⓘ
Terms: **"kansas board of education" and "intelligent design"**  (Edit Search | Suggest Terms for My Search)

☛Select for FOCUS™ or Delivery
☐

*The Kansas City Star August 9, 2005, Tuesday*

Copyright 2005 Knight Ridder/Tribune Business News
Copyright 2005 The Kansas City Star
The Kansas City Star

August 9, 2005, Tuesday

**KR-ACC-NO:** KC-SCHOOL-EVOLUTION-20050809

**LENGTH:** 572 words

**HEADLINE:** Evolution issue again gets look from board

**BYLINE:** By Diane Carroll

**BODY:**
 The **Kansas Board of Education** is expected to move closer today to adopting science standards that would encourage students to challenge some aspects of the theory of evolution.

Chairman Steve Abrams said he expected the board to tentatively approve the standards and send them to an education laboratory in Denver for review. A final vote is likely in October.

A majority of the 26-member committee that drafted the standards objected last week to changes made this summer by conservatives on the board. The changes use "**intelligent design**-inspired language," and **intelligent design** has no scientific basis, the committee wrote in a reply to the board.

The changes fall in line with those proposed in a minority report submitted late last year by eight members of the standards committee. Besides calling for a more critical look at evolution, they would also change the definition of science. The new definition would no longer limit explanations of the world to "natural" phenomena.

Scientists boycotted hearings the state board held in May on the minority report. But supporters of **intelligent design** spent three days testifying in support. They included representatives from the Seattle-based Discovery Institute, which promotes **intelligent design** -- the theory that some aspects of the universe are too complex to be explained by natural causes alone.

Board member Kathy Martin of Clay Center, who supports the standards, said in an interview last week that she hoped the changes would help teachers realize that they are "free and encouraged to let their students and themselves be open-minded to look at all the scientific research and data and evidence and whether it supports or refutes evolution because evolution is not a sacred cow. The world is not going to end if it is questioned."

In particular, she said, she thinks more questions should be asked about macroevolution, which results in relatively large and complex changes in species. Witnesses at the May hearings provided evidence that macroevolution is statistically improbable, she said.

Board member Janet Waugh of Kansas City, Kan., who opposes the standards, said she

thought they would have a negative effect.

Although most teachers probably would continue teaching science as they believe it should be taught, she said, a minority might feel uncomfortable enough that they would avoid teaching evolution. Others probably would feel obligated to present alternatives, she said, even though they would have received no training to do so.

The board earlier solicited agencies interested in reviewing the science standards, said Alexa Posny, deputy education commissioner.

The only one that replied was the Mid-Continent Regional Education Laboratory of Denver, which is funded by the U.S. Department of Education.

The board is expected to hire that agency today to determine whether the standards meet guidelines endorsed by national science associations.

The board is not required to accept any suggestions Mid-Continent offers, Posny said.

-----

To see more of The Kansas City Star, or to subscribe to the newspaper, go to
http://www.kansascity.com.

Copyright (c) 2005, The Kansas City Star, Mo.

Distributed by Knight Ridder/Tribune Business News.

For information on republishing this content, contact us at (800) 661-2511 (U.S.), (213) 237-4914 (worldwide), fax (213) 237-6515, or e-mail reprints@krtinfo.com.

**JOURNAL-CODE:** KC

**LOAD-DATE:** August 10, 2005

Source:  News & Business > News > News, Most Recent 90 Days (English, Full Text) [i]
Terms:  "kansas board of education" and "intelligent design"  (Edit Search | Suggest Terms for My Search)
View:  Full
Date/Time:  Monday, August 29, 2005 - 4:35 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

Search - 2 Results - "Peter Baker"

Source: <u>News & Business</u> > <u>News</u> > <u>By Individual Publication</u> > <u>W</u> > **The Washington Post** ⓘ
Terms: **"peter baker" and date(geq (08/03/2005) and leq (08/03/2005))** (<u>Edit Search</u> | <u>Suggest Terms for My Search</u>)

☞Select for FOCUS™ or Delivery
☐

*The Washington Post August 3, 2005 Wednesday*

Copyright 2005 The Washington Post

# The Washington Post

## washingtonpost.com

The Washington Post

**August** 3, 2005 Wednesday
Final Edition

**SECTION:** A Section; A01

**LENGTH:** 985 words

**HEADLINE:** Bush Remarks On 'Intelligent Design' Theory Fuel Debate

**BYLINE: Peter Baker** and Peter Slevin, Washington Post Staff Writers

**BODY:**

President Bush invigorated proponents of teaching alternatives to evolution in public schools with remarks saying that schoolchildren should be taught about "intelligent design," a view of creation that challenges established scientific thinking and promotes the idea that an unseen force is behind the development of humanity.

Although he said that curriculum decisions should be made by school districts rather than the federal government, Bush told Texas newspaper reporters in a group interview at the White House on Monday that he believes that intelligent design should be taught alongside evolution as competing theories.

"Both sides ought to be properly taught . . . so people can understand what the debate is about," he said, according to an official transcript of the session. Bush added: "Part of education is to expose people to different schools of thought. . . . You're asking me whether or not people ought to be exposed to different ideas, and the answer is yes."

These comments drew sharp criticism yesterday from opponents of the theory, who said there is no scientific evidence to support it and no educational basis for teaching it.

Much of the scientific establishment says that intelligent design is not a tested scientific theory but a cleverly marketed effort to introduce religious -- especially Christian -- thinking to students. Opponents say that church groups and other interest groups are pursuing political channels instead of first building support through traditional scientific review.

The White House said yesterday that Bush's comments were in keeping with positions dating to his Texas governorship, but aides say they could not recall him addressing the issue before as president. His remarks heartened conservatives who have been asking school

boards and legislatures to teach students that there are gaps in evolutionary theory and explain that life's complexity is evidence of a guiding hand.

"With the president endorsing it, at the very least it makes Americans who have that position more respectable, for lack of a better phrase," said Gary L. Bauer, a Christian conservative leader who ran for president against Bush in the 2000 Republican primaries. "It's not some backwater view. It's a view held by the majority of Americans."

John G. West, an executive with the Discovery Institute, a Seattle-based think tank supporting intelligent design, issued a written statement welcoming Bush's remarks. "President Bush is to be commended for defending free speech on evolution, and supporting the right of students to hear about different scientific views about evolution," he said.

Opponents of intelligent design, which a Kansas professor once called "creationism in a cheap tuxedo," say there is no legitimate debate. They see the case increasingly as a political battle that threatens to weaken science teaching in a nation whose students already are lagging.

"It is, of course, further indication that a fundamentalist right has really taken over much of the Republican Party," said Rep. Barney Frank (D-Mass.), a leading liberal lawmaker. Noting Bush's Ivy League education, Frank said, "People might cite George Bush as proof that you can be totally impervious to the effects of Harvard and Yale education."

Bush's comments were "irresponsible," said Barry W. Lynn, executive director of Americans United for Separation of Church and State. He said the president, by suggesting that students hear two viewpoints, "doesn't understand that one is a religious viewpoint and one is a scientific viewpoint." Lynn said Bush showed a "low level of understanding of science," adding that he worries that Bush's comments could be followed by a directive to the Justice Department to support legal efforts to change curricula.

Bush gave no sign that he intended to wade that far into the debate. The issue came up only when a reporter from the Knight Ridder news service asked him about it; participants said the president did not seem especially eager to be asked. "Very interesting question," he told the reporter playfully.

At a morning briefing yesterday, White House press secretary Scott McClellan said Bush was simply restating long-standing views. "He has said that going back to his days as governor," McClellan said. "I think he also said in those remarks that local school districts should make the decisions about their curriculum. But it's long been his belief that students ought to be exposed to different ideas, and so that's what he was reiterating yesterday."

In comments published last year in Science magazine, Bush said that the federal government should not tell states or school boards what to teach but that "scientific critiques of any theory should be a normal part of the science curriculum."

The president's latest remarks came less than two months after Cardinal Christoph Schonborn, archbishop of Vienna and an influential Roman Catholic theologian, said evolution as "an unguided, unplanned process of random variation and natural selection" is not true.

"Any system of thought that denies or seeks to explain away the overwhelming evidence for design in biology is ideology, not science," Schonborn wrote in the New York Times. He said he wanted to correct the idea that neo-Darwinism is compatible with Christian faith.

Bruce Alberts, president of the National Academy of Sciences, warned this year in a "Dear Colleagues" letter of "increasingly strident attempts to limit the teaching of evolution."

The most prominent debate is underway in Kansas, where the conservative state board of

education is expected to require the teaching of doubts about evolution to public high school students. A challenge to the teaching of intelligent design is scheduled for trial in Dover, Pa., while a federal court in Georgia said textbook stickers questioning evolution were unconstitutional.

Slevin reported from Chicago.

**LOAD-DATE:** August 3, 2005

Source:  News & Business > News > By Individual Publication > W > **The Washington Post** ⓘ
Terms:  **"peter baker" and date(geq (08/03/2005) and leq (08/03/2005))**  (Edit Search | Suggest Terms for My Search)
View:  Full
Date/Time:  Monday, August 29, 2005 - 4:37 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

## UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

### ORDER

Pursuant to the resolution of the Judicial Conference of the United States on March 12, 1996 authorizing each court of appeals to decide for itself whether to permit the taking of photographs and radio and television coverage of appellate arguments, subject to any restrictions in statutes, national and local rules, and such guidelines as the Conference may adopt, and pursuant to the vote of the Court of Appeals of the Third Circuit at an administrative meeting on February 26, 1997, following full discussion of the issue, it is hereby ORDERED that:

Photographing, recording, broadcasting and televising of proceedings in any courtroom of or used by this Court and in areas adjacent to any courtroom is prohibited, except that audio and visual devices may be used:

(1) by the Court or at its direction for the perpetuation of the record of the proceedings;

(2) for insuring Court security;

(3) where authorized by the judge presiding over an investiture or other ceremonial proceeding;

(4) where authorized by the Court in non-judicial proceedings, such as moot court programs or continuing legal education programs.

1

(5) where authorized by the Court to create a
recording of an oral argument at the expense of an
educational institution for its later use for
educational purposes.

By the Court,

Chief Judge

Dated:  April 30, 1997

o:\administ\cameras

2



# FREEDOM OF INFORMATION

**Supreme Court Will Promptly Release Tapes and Transcripts of Bush v. Palm Beach County**

<u>Click here for background on this important decision for journalists.</u>

**November 29, 2000-** The U.S. Supreme Court has decided to release the audiotape of the Bush v. Palm Beach County Canvassing Board oral argument immediately after the conclusion of the argument December 1 and make it available for broadcast. This is a major victory for RTNDA, which had asked the court to reconsider its earlier decision to bar television and radio coverage. A copy of Chief Justice William H. Rehnquist's letter to RTNDA President Barbara Cochran follows.

---

November 28, 2000

Ms. Barbara S. Cochran, President
Radio-Television News Directors Association
Suite 615
1000 Connecticut Avenue, N.W.
Washington, D.C. 20036-5302

Dear Ms. Cochran:

I have received your letter of November 27, urging that the Court allow television and audio coverage of the proceedings in Bush v. Palm Beach County Canvassing Board, No. 00-836. Yesterday the Court took up the question of televising these proceedings and a majority of the Court remains of the view that we should adhere to our present practice of allowing public attendance and print media coverage of argument sessions, but not allow camera or audio coverage.

For some time, the Court's proceedings have been recorded and a transcript of the proceedings is available shortly after they occur. In light of the public interest in the Bush case, a transcript will be made available on an expedited basis on the day of the argument. Additionally, the Court today has decided to release a copy of the audiotape of the argument promptly after the conclusion of the argument.

Sincerely,

William H. Rehnquist
Chief Justice
Supreme Court of the United States

Source: News & Business > News > By Individual Publication > N > Newsweek ⓘ
Terms: adler (Edit Search | Suggest Terms for My Search)

✔Select for FOCUS™ or Delivery
☐

*Newsweek February 7, 2005 U.S. Edition*

Copyright 2005 Newsweek
Newsweek

For original reprints (with graphics) available
http://www.rsicopyright.com/ics/prc_main/prs_request.html/

February 7, 2005 U.S. Edition

**SECTION:** IDEAS; Pg. 44

**LENGTH:** 2178 words

**HEADLINE:** Doubting Darwin

**BYLINE:** By Jerry **Adler**; With T. Trent Gegax in Dover, Pa., Joan Raymond in Ohio, Jill Sieder in Atlanta, Jamie Reno in Santee, Calif., and Catharine Skipp in Miami

**HIGHLIGHT:**
How did life, in its infinite complexity, come to be? A controversial new theory called 'intelligent design' asserts a supernatural agent was at work.

**BODY:**
When Joshua Rowand, an 11th grader in Dover, pa., looks out from his high school, he can see the United Church of Christ across the street and the hills beyond it, reminding him of what he's been taught from childhood: that God's perfect creation culminated on the sixth day with the making of man in his image. Inside the school, he is taught that Homo sapiens evolved over millions of years from a series of predecessor species in an unbroken line of descent stretching back to the origins of life. The apparent contradiction between that message and the one he hopes someday to spread as a Christian missionary doesn't trouble him. The entire subject of evolution by natural selection is covered in two lessons in high-school biology. What kind of Christian would he be if his faith couldn't survive 90 minutes of exposure to Darwin?

But many Americans would rather not put their children to that test, including a majority on the Dover School Board, which last month voted to inform students of the existence of alternatives to Darwin's theory. Eighty years after the Scopes trial, in which a Tennessee high-school teacher was convicted of violating a state law against teaching evolution, Americans are still fighting the slur that they share an ancestry with apes. This time, though, the battle is being waged under a new banner--not the Book of Genesis, but "intelligent design," a critique of evolution couched in the language of science. And in this debate, both sides claim to be upholding the principle of free inquiry. Proponents of I.D., clustered around a Seattle think tank called the Discovery Institute, regard it as an overdue challenge to Darwinism's monopoly over scientific discourse. "To say, as Darwinians do, that everything has to be reduced to a chemical reaction is more ideology than science," asserts Discovery's John West. Opponents, led by the Oakland, Calif.-based National Center for Science Education, regard I.D. as an assault on a basic principle of the Enlightenment, that science must explain nature through natural causes. "Intelligent design is predicated on a supernatural creator," says Vic Walczak, a lawyer with the American Civil Liberties Union, which is challenging Dover's introduction of the concept into biology classes. "That's not

science, it's religion."

Walczak calls the Dover case, which has not yet come to trial, "Scopes Redux 25"-- the latest episode in the never-ending struggle to reconcile the Bible, Charles Darwin's "Origin of Species" and the First Amendment. The last round was touched off when the school board in suburban Cobb County, Ga., added stickers to its new biology textbooks warning students that "evolution is a theory, not a fact... [and] should be approached with an open mind, studied carefully and critically considered." "If you see that out of any context, you'd think it sounds reasonable," observes law professor Edward Larson, the leading historian of the Scopes trial and its aftermath. But the wording, he says, encourages confusion over the everyday meaning of "theory"--akin to "hunch"--with the scientific meaning, a systematic framework to explain observations. Evolution, which deals with events that no one was around to witness, will always be a "theory."

The other salient point about the sticker, Larson says, is that it singles out evolution for critical analysis, among all the potentially controversial views to which students might be exposed. Marjorie Rogers, the parent who led the campaign for the sticker, says her motives were purely to "expand the teaching of science in this area, and to correct bias and inaccuracy in the textbooks." But five other parents who didn't see it that way sued the board to remove the stickers. On Jan. 13, after a three-day trial, federal district court Judge Clarence Cooper ruled for the parents and ordered the stickers removed. Noting that Rogers "identifies herself as a six-day Biblical creationist," Cooper concluded that any "informed, reasonable observer" would know why the sticker was there, and "interpret [it] to convey a message of endorsement of religion." The board plans to appeal.

Ironically, this battle was touched off when Cobb County bought new textbooks --that actually covered evolution, after years in which the subject was largely ignored. The same kinds of struggles are cropping up in towns in Wisconsin, Arkansas and elsewhere, as school boards try to implement state curriculum standards mandated by Congress. All sides are keeping a close eye on Ohio, which last year adopted standards including an incendiary phrase about "critically analyz[ing] aspects of evolutionary theory." Kansas, which in the November election handed the anti-evolution forces a 6-4 majority on the state school board, is due to review its standards in February; five years ago, the state was widely ridiculed for eliminating evolution from the required curriculum entirely. The only thing lacking for a full-scale culture war is involvement by the national conservative movement, which has treated it as a local issue. That could change, though. Republican Sen. Rick Santorum of Pennsylvania, who wrote an op-ed article supporting the Dover School Board, says he regards evolution as one of the "big social issues of our time," along with abortion and gay marriage.

The Cobb County decision was a blow to the new tactic of attacking evolution with objective, scientific language. The Discovery Institute, which sent materials and offers of help to Cobb County but was not involved in drafting the sticker, takes pains to distinguish its critique of Darwinism from the Biblical fundamentalism espoused at the Institute for Creation Research, near San Diego. The view that the Earth was created by God within the past 12,000 years is thriving at the institute's museum, where school groups study murals of men cavorting with dinosaurs, before the beasts were wiped out by Noah's flood. The institute's vice president, Duane Gish, a biochemist, has managed to fit every observation from paleontology, astronomy and nuclear physics into a theory derived entirely from the Book of Genesis. The problem for Gish is that, although polls consistently show that nearly half of all Americans believe in the Biblical account, it has been a loser in the courts since 1987, when the Supreme Court (with Justice Antonin Scalia and Chief Justice William Rehnquist dissenting) struck down a Louisiana law calling for equal treatment of evolution and "creation science."

Soon thereafter, I.D. burst into public awareness with the publication of "Darwin on Trial" by Phillip Johnson, a Berkeley law professor who underwent a midlife conversion to evangelical Christianity. As a scientific theory, I.D. is making only slow progress in overcoming

evolution's 150-year head start. Johnson and his followers seek to overturn two of the central precepts of evolution. The first is universal common descent, the idea that every living creature can trace an unbroken lineage back to the same primitive life forms, which arose billions of years ago from nonliving matter. Biologists, armed with the powerful tool of molecular genetics, overwhelmingly accept this view. Nevertheless, I.D. proponents are seeking to undermine it, mostly through popular books like "Icons of Evolution" by Jonathan Wells. Wells dissects some of the most famous textbook examples of evolution, such as the way peppered moths adapted a new color pattern for better camouflage after pollution killed the lichens on tree trunks. "There is a lot of ambiguity and dissent about the lines of evidence," insists Stephen Meyer, director of the Discovery Institute's Center for Science and Culture. "It's in the scientific literature, and we think students should know about it."

The second concept is natural selection, which holds that the entire complexity and ingenuity of life has evolved by the accumulation of small random mutations. Changes that help the organism survive in its environment, like the different shapes of the beaks Darwin observed on the birds of the Galapagos, are more likely to be passed on. Repeated over many generations, the process produces not just finches but naturalists to watch them. Many people have struggled with the philosophical implications of this theory, and entire disciplines of science are dedicated to working out its details. I.D. proposes an intuitively appealing alternative, that the living world reflects the design of a conscious, rational intelligence.

The classic illustration is the eye, which seems to depend on all its manifold parts working in concert. How, then, could it have arisen by a series of discrete steps? Evolutionary biologists respond that even a primitive light-sensitive spot has survival value, and have tried to show how a series of small improvements could eventually build the complete organ. With the publication of "Darwin's Black Box" in 1996, biochemist Michael Behe moved the argument to the cellular level, using examples such as the immune-system response. They exhibit what he calls "irreducible complexity," meaning that all their parts are necessary for them to function at all. This, he says, is the hallmark of intelligent design.

But I.D. has nothing to say on the identity of the designer or how he gets inside the cell to do his work. Does he create new species directly, or meddle with the DNA of living creatures? Behe envisions as one possibility something akin to a computer virus inserted in the genome of the first organism, emerging full-blown millions of generations later. Meyer's view is simply that "we don't know." He declines even to offer an opinion on whether people are descended from apes, on the ground that it's not his specialty. The diversity of life, in his view, is a "mystery" we may never solve.

For Eugenie Scott, executive director of the National Center for Science Education, there's no mystery about what I.D. proponents believe: "It's another way of saying God did it. It isn't a model of change; it isn't a theory that makes testable claims." A 2002 resolution by the American Association for the Advancement of Science called I.D. "an interesting philosophical or theological concept," but not one that should be taught in science classes. In fact, the Discovery Institute doesn't call for teaching I.D. in school either, only the "controversy" over Darwinism. But most scientists don't believe there is one. The institute's "Scientific Dissent From Darwinism," whose operative sentence reads "We are skeptical of claims for the ability of random mutation and natural selection to account for the complexity of life," has been signed by about 350 scientists. (AAAS has 120,000 members.) Scott's organization has circulated a countermanifesto asserting that "there is no serious scientific doubt that evolution occurred or that natural selection is [the] major mechanism... " As a tongue-in-cheek tribute to the late paleontologist Stephen Jay Gould, they signed up only scientists named Steve. At last count they had 528.

The real stakes, though, go beyond what high-school students are taught about Galapagos finches. To accept I.D. is to admit a supernatural process into the realm of science. In fact, *that's just* what I.D. proponents want to see happen, a revolution--or counterrevolution--

against what Johnson calls "methodological naturalism." "Is it the obligation of the scientist to come up with a materialist explanation of phenomena, choosing among an artificially limited set of options," Meyer asks rhetorically, "or just the best explanation?"

Behe points out that while most Christians accept a God who set the universe in motion according to natural laws, evolution raises more difficult existential questions. People want to feel that God cares for them personally. British biologist Richard Dawkins has written that Darwin's theory "made it possible to be an intellectually fulfilled atheist." But that's not what most Americans want for their children. Margaret Evans, a psychologist at the University of Michigan, has studied religious beliefs in children and seen the appeal of creationism. "We are biased toward seeing the world as stable and purposeful," she says. "I don't know what to believe," one parent told her. "I just want my child to go to heaven."

Well, so does the pope, but the Vatican has said it finds no conflict between Christian faith and evolution. Neither does Francis Collins, the director of the Human Genome Institute at the National Institutes of Health and an outspoken evangelical. He wrote recently of his view that God, "who created the universe, chose the remarkable mechanism of evolution to create plants and animals of all sorts." It may require some metaphysical juggling, but if more people could take that view, there would be fewer conflicts like the one in Dover. In the debate over I.D., both sides acknowledge that most scientists accept evolution, but they agree that scientific disputes are not settled by majority vote. School-board elections, however, are.

**GRAPHIC:** PHOTO: A Cro-Magnon skull from the Czech Republic, a Neanderthal fossil from France; PHOTO: Darwinism on display at the natural history museum, South Kensington, London; PHOTO: Different shades of peppered moths are a disputed example of evolution; GRAPHIC(text): Mandates and Monkey Trials: Eighty years in the battle over creationism: (graphic omitted)

**LOAD-DATE:** February 10, 2005

Source:  News & Business > News > By Individual Publication > N > Newsweek ⓘ
Terms:  **adler**  (Edit Search | Suggest Terms for My Search)
View:  Full
Date/Time:  Monday, August 29, 2005 - 4:33 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2005 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 05-2376

———

JOHN SHINGARA

v.

KATHY A. SKILES, WESLEY R. WAUGH, JAIME KEATING,
RALPH PERIANDI, ROBERT SANNER

Philadelphia Newspapers, Inc.,

Appellant

———

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil Action No. 04-CV-00621)
District Judge: Honorable Sylvia H. Rambo, District Judge

———

Argued July 12, 2005

Before: ALITO, BECKER, and GREENBERG, Circuit Judges.

(Filed: August 24, 2005)

———

Donald A. Bailey (argued)
Bailey & Ostrowski
4311 N. 6th Street
Harrisburg, PA 17110

    Attorneys for John Shingara

Amy B. Ginensky
Michael E. Baughman (argued)
Nory Miller
Alessandro Martuscelli

Dechert LLP
4000 Bell Atlantic Tower
1717 Arch Street
Philadelphia, PA 19103

Attorneys for Appellant
Philadelphia Newspapers, Inc.

Thomas W. Corbett, Jr.
Attorney General
J. Bart DeLone (argued)
Senior Deputy Attorney General
Calvin R. Koons
Senior Deputy Attorney General
John G. Knorr, III
Chief Deputy Attorney General
Chief, Appellate Litigation Section
Office of the Attorney General
Appellate Litigation Section
15th Floor, Strawberry Square
Harrisburg, PA 17120

Attorneys for Appellees Kathy A. Skiles,
Wesley R. Waugh, Ralph Periandi

————

OPINION OF THE COURT

————

GREENBERG, Circuit Judge.

## I. INTRODUCTION

This matter comes on before this court on an appeal by Philadelphia Newspapers, Inc. ("PNI") from an order of the district court denying its motion to vacate a protective order. Though PNI originally was not a party in this case, it sought to intervene and asked the court to vacate the protective order which had designated as confidential "all information" produced during the course of the action. App. at 14.[1] The district court granted PNI's motion to intervene but denied its motion to vacate the protective order.

————————————

[1]"App." refers to the appendix appellant's attorneys filed.

2

Because the district court erred in denying PNI's motion to vacate the protective order, we will reverse the district court's order to the extent that it denied that prong of PNI's motion.

The facts germane to this appeal are not complex. John Shingara, an employee of the Pennsylvania State Police, filed this action under 42 U.S.C. § 1983 against several other employees of the Pennsylvania State Police (the "defendants"). Shingara alleges that the defendants retaliated against him for speaking out about allegedly faulty radar speed detection devices that the State Police used. Through discovery, Shingara obtained documents related to those devices. Shingara's counsel gave some of those documents to PNI and PNI relied on them in publishing newspaper articles regarding the allegedly faulty radar devices. After PNI published those articles, the defendants, at a time when PNI was not yet a party in this case, without notice to PNI, through an oral motion sought a protective order from the district court seeking to prevent further disclosure of discovery documents to the media. On December 14, 2004, the district court granted the motion and entered the following order:

> 1) Defendants' motion for a protective order is GRANTED.
>
> 2) All information, including documents, deposition testimony, and other responses to discovery, produced or otherwise disclosed by either of the parties, including any witness for either of the parties, during the course of this action shall be held in confidence and shall be used only for purposes of this action and shall not be disclosed or made available to any persons other than the parties, their attorneys, including in-house counsel, persons employed in such attorneys' offices or by such attorneys who are assisting counsel in this action, or any independent consultant or expert retained or employed for purposes of this action by either of the parties or their attorneys.
>
> 3) Should either of the parties find it necessary in the preparation or trial of this action to disclose information obtained in discovery to any person other than a person identified in paragraph 2 above, a notice shall be served on the other party fully identifying the person to whom disclosure is to be made, together with

3

a designation of the specific information or documents
to be disclosed to such person.  Any objection to the
proposed disclosure, and the reasons for the objection,
shall be stated in writing within ten days of the receipt
of the notice.  If that objection is not resolved by
agreement, then the matter shall be submitted to this
court by the party seeking disclosure, and the
disclosure shall not be made pending this court's ruling
as to whether the objection should be sustained.

4) This order shall not apply to public
documents.

5) Both parties shall comply with Local Rule
83.2.7 and Pa. Rules of Prof'l Conduct R. 3.6.App. at
14-15.

As we have indicated, PNI filed a motion to intervene in
Shingara's action and asked the district court to vacate the protective
order.  In response, on April 11, 2005, the district court granted PNI's
motion to intervene but denied its motion to vacate the protective
order.  PNI timely filed a notice of appeal to this court on April 29,
2005, from the April 11, 2005 order to the extent that the court denied
PNI's motion to vacate the protective order.[2]

## II. JURISDICTION

While we recognize that orders relating to discovery generally
are not final for purposes of appellate jurisdiction, we have
jurisdiction here under 28 U.S.C. § 1291 pursuant to the collateral
order doctrine because: (1) the district court's order "conclusively
determines the disputed question;" (2) the district court's order
"resolves an important issue that is completely separate from the
merits of the dispute;" and (3) the district court's order will be
"effectively unreviewable on appeal from a final judgment."  In re
Ford Motor Co., 110 F.3d 954, 958 (3d Cir. 1997) (discussing Cohen
v. Beneficial Indus. Loan Corp., 337 U.S. 541, 69 S.Ct. 1221 (1949));
see also In re San Juan Star Co., 662 F.3d 108, 112-13 (1st Cir. 1981).

---

[2]No party challenges the April 11, 2005 order insofar as it
granted PNI's motion to intervene.

4

In this regard it is obvious that the order denying the motion to vacate the protective order satisfies the first two criteria for finality under the collateral order doctrine. The possibility that the district court on motion of a party may reconsider the order with respect to a particular document is too narrow to reject the conclusion that the court has determined not to disturb the protective order. In fact, the court set forth the possibility of focused reconsideration of its protective order only in the order itself and not in the April 11, 2005 order denying its vacatur. Furthermore, the designation as confidential of information produced in the action addresses a matter completely distinct from the substantive issues in the case.

The more substantial question relating to the applicability of the collateral order doctrine is whether the district court's April 11, 2005 order effectively will be unreviewable on appeal after the entry of a final judgment. In this regard we note that the district court recognized in its opinion denying the motion to vacate the protective order that after the case is resolved the confidentiality restrictions may be relaxed. In that event an appeal at that time from the April 11, 2005 order might be moot and thus be ineffective. We are convinced, however, that even if an appeal of the April 11, 2005 order would not be moot after final judgment, the protective order never will be effectively appealable unless we entertain PNI's appeal now. We have reached this conclusion because in this case a newspaper is being constrained in its attempt to obtain information so that it can report the news, and in such a situation time is of the essence.[3] See In re San Juan Star Co., 662 F.2d at 113. After all, nobody wants to read yesterday's news.[4] Thus, we are satisfied that if we permit PNI to appeal only after a final judgment, its appeal will be futile either because the controversy will be moot or PNI, if successful, will obtain only stale relief.

_____

[3]We hasten to add that we do not suggest that only a newspaper could be entitled to appeal on the basis of the collateral order doctrine in a situation similar to that here. We limit our discussion to newspapers because only a newspaper seeks relief from the protective order in this case. If another party sought the same relief the court would have to address that party's claim on the basis of the facts surrounding it.

[4]We recognize that we should be cautious in finding that the collateral order doctrine justifies the exercise of jurisdiction under 28 U.S.C. § 1291, see Bacher v. Allstate Ins. Co., 211 F.3d 52, 55 (3d Cir. 2000), but we regard our result here as consistent with that approach.

5

## III. THE MERITS

On this appeal, our standard of review is clear.  Though we review the grant of a protective order, and thus the denial of a motion to vacate the protective order, for abuse of discretion, "we exercise plenary review over the district court's interpretation and application of the legal standard for granting or modifying a confidentiality order."  Pansy v. Borough of Stroudsburg, 23 F.3d 772, 783-84 (3d Cir. 1994).

Under Federal Rule of Civil Procedure 26(c), a court "for good cause shown" may, in certain circumstances, enter a protective order in the context of discovery.  We are satisfied that after the court enters such an order there must be good cause to maintain the order in the face of a motion to vacate it, particularly when, as here, the moving party did not have an opportunity to oppose the entry of the protective order in the first instance.  In Pansy, we explained that "it is well-established" that good cause must exist to obtain a protective order over discovery materials.  23 F.3d at 786.  While the facts in Pansy involved a confidentiality order issued to protect a settlement agreement from public knowledge, we indicated there that the good cause analysis of Rule 26(c) applied "whether an order of confidentiality is granted at the discovery stage or any other stage of litigation."  Id.

In Pansy we explained that there is good cause when a party shows that disclosure will result in a clearly defined, specific and serious injury but that broad allegations of harm are not sufficient to establish good cause.  Id.  We also stated that the party seeking protection has the burden of showing that there is good cause for it.  Id. at 786-87.  We directed the district court to determine whether there is good cause by balancing the interests of the public and the parties and further indicated that the court should explain the reasoning behind its balancing conclusion.  Id. at 789.

We discussed several balancing factors in Pansy, though we stated that those factors are not exhaustive.  Id.  In particular, in Pansy and in a later decision, Glenmede Trust Co. v. Thompson, 56 F.3d 476 (3d Cir. 1995), we listed seven factors that a court should consider in determining whether to grant a protective order.  Those factors are:

1) whether disclosure will

6

violate any privacy interests;

2) whether the information is being
sought for a legitimate purpose or for an
improper purpose;

3) whether disclosure of the information
will cause a party embarrassment;

4) whether confidentiality is being
sought over information important to
public health and safety;

5) whether the sharing of information
among litigants will promote fairness
and efficiency;

6) whether a party benefitting from the
order of confidentiality is a public entity
or official; and

7) whether the case involves issues
important to the public.

Id. at 483 (citing Pansy, 23 F.3d 787-91).

Though the district court in this case recognized our direction
in Pansy by stating that it must "balance the privacy interests of the
parties against the public interest in access to the discovery
information," app. at 5, and it recognized certain factors from Pansy
that we have listed above, the court ultimately agreed with the
defendants that "the analysis should not turn on the fact that the
[Pennsylvania State Police] is a public entity and the fact that this case
involves issues of public concern." Id. at 6-7.

The district court distinguished this case from Pansy because
this case involves a protective order over discovery materials whereas
Pansy was not concerned with the effect of disclosure on ongoing
litigation but rather concerned the confidentiality of a settlement
agreement. The district court believed that this distinction is relevant
for two reasons. First, the district court stated that "[h]ere, the
disclosure of discovery materials to the media could unduly prejudice
the public, from which jurors for this litigation may be selected," a

7

concern the district court determined we did not address in <u>Pansy</u>. <u>Id</u>. at 7. Second, the district court reasoned that "[t]he issues of public concern in this case may still reach the public in the future." <u>Id</u>. As a result of these distinctions from <u>Pansy</u>, the district court concluded that "although <u>Pansy</u> requires the court to balance the competing interests in the case, the facts of this case require the court to conduct an analysis that differs slightly from the test employed in <u>Pansy</u> itself." <u>Id</u>. at 7-8.

We are convinced that even though there are significant factual differences between this case and <u>Pansy</u>, and that in some cases the distinction between protection of materials before and after completion of the trial court proceedings could be critical, the district court's reasoning here is not consistent with <u>Pansy</u> and the factual differences cannot justify a different result here. To start with, the concern that the disclosure of discovery materials to the media <u>could</u> unduly prejudice the public is exactly the type of broad, unsubstantiated allegation of harm that does not support a showing of good cause. <u>See</u> <u>Glenmede Trust Co.</u>, 56 F.3d at 483. We ordinarily are confident that a district court will be able to select a fair and impartial jury in cases even where there has been pre-trial media attention to the case and we see no reason to believe that this case would present an exception to the usual case. <u>See</u> <u>United States v. Gilsenan</u>, 949 F.2d 90, 96 (3d Cir. 1991). Therefore, we fail to see how jury selection will be a serious concern, let alone good cause for a broad and sweeping protective order, in this case. After all, the defendants did not present any evidence to support their argument, drawn from the information already published, that there will be difficulty selecting a jury in this case or evidence that if additional information is published there would be such difficulty.

We also believe that by focusing on the issue of media attention, the district court unacceptably downplayed the fact that this case involves public officials and issues important to the public, two factors that we emphasized in <u>Pansy</u>. In fact, the district court never explained how it reasoned that its concern about media attention trumped those two factors. While the <u>Pansy</u> factors are not exhaustive, that does not mean that a district court may ignore the concerns <u>Pansy</u> specifically addressed. Similarly, because the district court did not point to any real threat of prejudice to the defendants, we disagree with its reasoning that the likelihood of the discovery documents becoming public in the future is a determinative factor.

8

In fact, most of the Pansy factors weigh against the protective order in this case. First, neither party has pointed to any legitimate privacy concerns regarding the requested documents, and we can think of none. As we observed in Pansy, "privacy interests are diminished when the party seeking protection is a public person subject to legitimate public scrutiny." 23 F.3d at 787. Additionally, there is no evidence in the record that PNI seeks access to the information "for an improper purpose."

With regard to the third factor–embarrassment–in Pansy we noted that "an applicant for a protective order whose chief concern is embarrassment must demonstrate that the embarrassment will be particularly serious." Id. (quoting Cipollone v. Liggett Group, Inc., 785 F.2d 1108, 1121 (3d Cir. 1986)). Defendants have not shown any risk that "particularly serious" embarrassment will result from the release of the documents. The fourth and fifth factors–"whether confidentiality is being sought over information important to public health and safety" and "whether the sharing of information among litigants will promote fairness and efficiency"–are either neutral or weigh against the protective order.

Finally, the last two factors clearly weigh against the protective order. The parties benefitting from the protective order are public officials, and the case certainly involves "issues important to the public." Defendants argue that "Pansy made clear that the weight of public interest was only relevant with respect to that information to which the public already was entitled access," appellant's br. at 21 n.7, but we see no support for this claim. Rather, Pansy emphasized that a court always must consider the public interest when deciding whether to impose a protective order. See, e.g., 23 F.3d at 785 ("Disturbingly, some courts routinely sign orders which contain confidentiality clauses without considering the propriety of such orders, or the countervailing public interests which are sacrificed by the orders.").

We also take issue with the nature of the district court's protective order in that it grants broad, umbrella protection to the defendants. On this issue the district court understandably relied on our opinion in Cipollone in which we stated that we "commend the umbrella approach for consideration of the district courts in this circuit in complex cases." Cipollone, 785 F.2d at 1123. Nevertheless in Cipollone we cautioned that "[t]here may be cases in which the document-by-document approach . . . will be preferable." Id. Given

9

that this action is neither complex nor involves large-scale discovery and given that the district court should have realized that the good cause it found for entry of the protective order was weak at best (in actuality, nonexistent), the district court erred in adopting the sweeping umbrella approach in this case.[5]

## IV. CONCLUSION

In view of the conclusions we reached in the foregoing discussion, we will reverse the district court order of April 11, 2005, to the extent that it denied the motion to vacate the protective order and we will remand the matter to the district court for it to enter an order vacating the protective order. We emphasize that our opinion in no way relieves the parties or their counsel from their ethical obligations and does not preclude any party from seeking protection over specific documents. Such protection is available only where good cause exists, however, and a district court may determine that good cause exists only based on reasoning that is true to the direction, language and spirit of Pansy. Finally, we point out that we are predicating our opinion on the situation as it now exists and as we anticipate it will develop. Thus, even though we doubt that the district court in the future in this case will need to enter a protective order similar to the order of December 14, 2004, we do not shut the door to that action if a change in circumstances requires it.

---

[5]In his brief Shingara raises an issue regarding the constitutionality of Middle District Local Rule 83.2.7. The district court referenced this local rule in its December 14, 2004 order. We, however, do not address this point because Shingara is not an appellant and PNI did not advance the issue.

10

2 of 2 DOCUMENTS

**GWENDOLYN DASHNER and JOHN HIRKO, SR., as Co-Administrators of the
Estate of John Hirko, Jr., Deceased, KRISTIN FODI, and TUAN HOANG, Plaintiffs
vs. JOSEPH EDWARD RIEDY, Individually, and in his Official Capacity as a
Member of the Bethlehem Police Department, et al., Defendants and THE
MORNING CALL, INC., Intervenor**

Civil Action No. 99-CV-02124

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
PENNSYLVANIA

*2004 U.S. Dist. LEXIS 19980*

September 30, 2004, Decided

**SUBSEQUENT HISTORY:** Later proceeding at *Dashner v. Riedy, 2004 U.S. Dist. LEXIS 22600 (E.D. Pa., Nov. 2, 2004)*

**PRIOR HISTORY:** *Dashner v. Riedy, 2004 U.S. Dist. LEXIS 4379 (E.D. Pa., Feb. 12, 2004)*

**DISPOSITION:** Motion of **Morning Call** for access to court proceedings was granted in part.

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1] JOHN P. KAROLY, JR., ESQUIRE On behalf of Plaintiffs.

STEPHEN LEDVA, JR., ESQUIRE SUSAN R. ENGEL, ESQUIRE On behalf of Defendants.

GAYLE C. SPROUL, ESQUIRE On behalf of Intervenor.

**JUDGES:** James Knoll Gardner, United States District Judge.

**OPINIONBY:** James Knoll Gardner

**OPINION:**

This matter is before the court on the Motion of The **Morning Call** to Intervene and for Access to Court Proceedings, filed November 19, 2003. On November 26, 2003 the undersigned entered an Order granting the motion of the petitioner newspaper to for access to certain court records and proceedings.

The specific court proceedings which the newspaper is seeking to access is the sealed transcript of an in camera hearing held before the undersigned on October 8, 2003 during the jury trial of the within civil rights action.

For the reasons expressed below, we grant the newspaper's request in part. Accordingly, we will unseal, and make available to the public, a redacted portion of the October 8, 2003 in camera hearing.

Procedural Background

In this civil rights action, plaintiffs are seeking damages for, among other things, the use of excessive police force in conducting a search of a private residence for evidence [*2] of suspected drug trafficking. n1 The jury trial was bifurcated on the issues of liability and damages. After a nearly six-month liability trial the jury reached a liability verdict on March 4, 2004. In their mixed verdict, the jury found in favor of each plaintiff on some issues, including use of excessive force, failure to supervise, and unlawful search and seizure of property; and in favor of each defendant on some issues, including use of excessive force, failure to train, and civil conspiracy.

n1 Plaintiffs Gwendolyn Dashner and John Hirko, Sr. are the parents and Co-Administrators of the Estate of their deceased son, John Hirko, Jr. Plaintiff Kristin Fodi is John Hirko, Jr.'s former girlfriend, with whom he resided at the time of his death. Plaintiff Tuan Hoang was their landlord.

In the evening of April 23, 1997 members of the Emergency Response Team of the Bethlehem

Police Department attempted to execute a search warrant at the residence of John Hirko, Jr. and Kristin Fodi, in Bethlehem, Pennsylvania. The search warrant authorized the police to search the residence for the presence of drugs, drug paraphernalia and weapons.

Two officers on the front porch broke the front window and threw a "flash/bang" distraction device into the living room in order to distract the occupants, while a group of officers at the rear of the house broke down the rear door with a battering ram and entered the premises through the kitchen.

Defendants contend that John Hirko, Jr. fired a handgun at the officers on the porch and pointed the gun at the officers in the kitchen. They contend that defendant Officer Joseph Edward Riedy on the front porch returned a burst of fire from his semi-automatic assault rifle, and that defendant Officer Todd William Repsher fired a single shot from his handgun from the kitchen. Plaintiffs contend that Mr. Hirko neither had a gun in his hand, nor pointed or fired it.

Eleven bullets, including ten from Officer Riedy's semi-automatic rifle and one possibly from Officer Repsher's handgun, entered Mr. Hirko's body, killing him. The flash/bang device started a living room sofa on fire, which in turn started the house on fire.

Kristin Fodi escaped from the fire by climbing out a second-story window and lowering herself to the ground with the aid of a group of police officers, who placed her in custody and transported her to police headquarters.

[*3]

Prior to commencement of the damages portion of the bifurcated trial, the case settled.

Motion to Intervene and for Access to Court Proceedings

As noted above, the Motion of The **Morning Call** to Intervene and for Access to Court Proceedings was filed November 19, 2003.

On December 8, 2003 Defendants' Response to Motion of The **Morning Call**, Inc. for Access to Court Proceedings was filed. Defendants opposed the request of the newspaper for access to the transcript.

The matter was briefed by intervenor and defendants. Plaintiffs did not file a response or brief. At the December 9, 2003 hearing on the newspaper's motion, the parties stipulated to the accuracy of a transcript of two sidebar conferences held in open court on October 8, 2003. At those sidebars, counsel and the court discussed a defense objection on the grounds of privilege to a question propounded during the trial by plaintiffs' counsel to defendant police officer Edward James Repyneck, Jr. n2

> n2 The transcript of the October 8, 2003 sidebar conferences was attached as Exhibit A to The **Morning Call's** motion. That was the only evidence offered at the hearing.

[*4]

Counsel for intervenor and counsel for defendants each argued orally at the December 9 hearing. Counsel for plaintiffs did not argue. However, he stated that he did not object to the newspaper's request. n3 After oral argument the undersigned took the matter under advisement. Hence this Order and Opinion.

> n3 Plaintiff's counsel requested, and was granted, permission to leave the hearing during oral argument.

Psychotherapist-Patient Privilege

On August 18, 2003 a Motion by Police Defendants in Limine to Preclude Evidence of Post-Incident Psychological Counselling Involving Police Defendants was filed. n4 On August 28, 2003 a General Response to All Defendants' Motions in Limine, including this one, was filed. n5 On September 3, 2003 an answer specific to this motion was filed, titled Plaintiffs' Answer to Police Defendants' Motion in Limine to Preclude Evidence of Post-Incident Psychological Counseling Involving Police Defendants. n6

> n4 Docket Entry 183.

[*5]

> n5 Docket Entry 216.

> n6 Docket Entry 242.

In their motion, defendants requested an Order precluding plaintiffs from introducing any evidence concerning psychological counseling by defendants in this case. Plaintiffs intended to introduce evidence of a meeting of police officers held in Room 504 of Bethlehem City Hall a few days after the April 23, 1997 drug raid, which is the subject of this suit. Plaintiffs argued that this

was an inappropriate meeting of the police officers who conducted the raid, held to concoct a favorable version of what occurred and to get their stories straight in connection with a criminal investigation of the incident being conducted by the Pennsylvania State Police.

Defendant police officers and defendant City of Bethlehem contended, on the contrary, that the meeting was a group psychological counseling session set up by defendant Bethlehem Police Commissioner Eugene Learn to help the officers deal psychologically and emotionally with what happened. Defendants contend that the counseling session was facilitated by Chief Timothy Stephens of the Fountain Hill, [*6] Pennsylvania Police Department, and that "stress officers" from other departments were brought in to serve as counselors.

Defendants contend that at this meeting the officers talked about how they felt regarding this incident. They were instructed as to what they could be expected to feel, and they were given instructions that if they needed it, they should get additional counseling. n7

n7 See Notes of Testimony Excerpt from the October 8, 2003 trial session at pages 3-5. This excerpt is attached as Exhibit A to The **Morning Call's** motion for access to court's proceedings.

Oral argument on defendants' motion in limine was held before the undersigned in open court on September 22, 2003. At the conclusion of oral argument, on the record, in open court, the undersigned entered the following Order:

NOW, this 22nd day of September, 2003, upon consideration of Police Defendants' Motion In Limine to Preclude Evidence of Post-Incident Psychological Counseling Involving Police Defendants filed August 18, 2003; upon [*7] consideration of plaintiffs' answer to the motion filed September 3, 2003; upon consideration of the briefs of the parties; for the reasons articulated simultaneously on the record; and pursuant to *Jaffee v. Redmond, 518 U.S. 1, 116 S. Ct. 1923, 135 L. Ed. 2d 337 (1996),*

IT IS ORDERED that defendants' motion in limine is granted.

IT IS FURTHER ORDERED that plaintiffs are precluded from offering any evidence at trial that defendant officers were offered post-incident psychological counseling.

IT IS FURTHER ORDERED that plaintiffs are precluded from introducing any evidence at trial regarding conversations had, and/or statements made, by defendant police officers during any psychological, psychiatric or psychotherapeutic counseling sessions.

IT IS FURTHER ORDERED that plaintiffs are precluded from questioning any witness at trial concerning whether the witness received any psychotherapy.
BY THE COURT:

Subsequent to the argument, the above Order was typed, proofread, corrected and filed on October 10, 2003. n8

n8 Docket Entry 316.

[*8]

Immediately after dictating the Order, the undersigned articulated on the record, in open court, our reasons for granting defendants' motion in limine. We incorporate those reasons here. n9

n9 See Notes of Testimony ("N.T.") titled Excerpts of Hearing Before The Honorable James Knoll Gardner, United States District Court Judge", hearing held September 22, 2003, at pages 12-17.

As noted in our articulation on the record, *Federal Rule of Evidence 501* concerns privileges. That rule is couched in general language which authorizes the courts to determine what privileges exist under principals of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. The federal evidentiary rule does not provide specific categories of privilege, but rather leaves it up to the court to determine under common law what those privileges are.

In *Jaffee v. Redmond, 518 U.S. 1, 116 S. Ct. 1923, 135 L. Ed 2d 337 (1996)*, the [*9] Supreme Court of the United States recognized an unqualified psychotherapist-patient privilege. The Supreme Court recognized the privilege to exist under *F.R.E. 501*. The Supreme Court found that the psychotherapist-patient privilege is rooted in the imperative need for confidence and trust between patient and therapist.

The Court reasoned that because of the sensitive nature of the problems for which individuals consult psy-

chotherapists, disclosure of confidential communications made during counseling sessions may cause embarrassment or disgrace. For this reason, the mere possibility of disclosure may impede development of the confidential relationship necessary for successful treatment.

The Court recognized that the psychotherapist-patient privilege serves a public interest by facilitating the provision of appropriate treatment for individuals suffering the effects of a mental or emotional problem. The Supreme Court stated that the mental health of the citizenry, and no less than its physical health, is a public good of transcendent importance.

More specifically, the Court recognized the importance of a psychotherapist-patient privilege for police [*10] officers. In footnote ten of Jaffe the Supreme Court stated, "Police officers engaged in the dangerous and difficult tasks associated with protecting the safety of our communities, not only confront the risk of physical harm, but also face stressful circumstances that may give rise to anxiety, depression, fear, or anger. The entire community may suffer if police officers are not able to receive effective counseling and treatment after traumatic incidents, either because trained officers leave their profession prematurely or because those in need of treatment remain on the job." n10

n10 Jaffee v. Redmond, 518 U.S. at 11 n.10, 116 S. Ct. at 1929 n.10, 135 L. Ed. 2d at 346 n.10.

The Supreme Court at footnote 16 of its opinion defined "psychotherapists" as psychologists and medical doctors who provide mental health services. But the Court went on to point out that in today's climate, social workers need to be included in that definition as well.

We determined that whether or not a police officer [*11] defendant in this case obtained, or requested, psychotherapy, or other similar counseling, has no relevance to any issue in this case. More importantly, we concluded that the privilege as defined and described by the Supreme Court is an absolute one. We found that the importance which the Supreme Court gave to this absolute privilege is such that it would jeopardize the privilege to permit a question concerning whether or not the witness had sought the services of a psychotherapist. In other words, we concluded that not only are the conversations between the psychotherapist and the patient privileged, but the mere seeking of the professional help by the patient is privileged as well.

We find this to be consistent with the policy behind the creation of the privilege. That policy includes, in part, the necessity for the patient to have confidence that all aspects of the treatment and the therapist-patient relationship will be confidential in order to encourage people who might need such services to seek those services, and to encourage them to be frank with the therapist.

The effect of our ruling was to preclude plaintiffs from eliciting evidence at trial that any defendant sought [*12] or received counseling, or eliciting any details of such counseling. Any disputes concerning whether a meeting of officers was a counseling session, and thus privileged; or a police cover-up, and thus not privileged, was reserved until the time of trial.

In Camera Hearing

At the trial session of October 8, 2003, in open court, in the presence of the jury, in plaintiffs' case-in-chief, plaintiffs' counsel John P. Karoly, Jr., Esquire, called defendant Office Edward James Repyneck, Jr. as a plaintiffs' witness as of cross-examination. n11 During Attorney Karoly's questioning of Officer Repyneck, the following occurred:

BY MR. KAROLY:

Q. Now, sir, did you participate in subsequent meetings, debriefings, re-enactments concerning this [incident]?

A. I did not. ...There was only one meeting that was held that I was present for.

Q. Okay, I'm going to ask you which one that is, but I take it that you weren't present for the re-enactment?

A. No, sir.

Q. Did you meet with ERT members and others including a Chief Timothy Stephens of [the] Fountain Hill [, Pennsylvania Police Department]?

A. Yes.

Q. And did you discuss the events at 629 Christian [*13] Street?

MR. LEDVA [Defense Counsel]: Objection, your Honor.

THE COURT: All right. Approach sidebar, please. n12

n11 The trial transcript excerpt incorrectly refers to the witness as James Edward Repyneck, Jr. at N.T., October 8, 2003, page 2, line 3. See Exhibit A to intervenor's motion.

n12 N.T., October 8, 2003, page 2, line 9 to page 3, line 2. See Exhibit A to intervenor's motion.

At sidebar, out of the hearing of the jury sitting in the jury box, the undersigned heard argument on the objection. Defense counsel contended that the meeting about which plaintiffs' counsel inquired was a counseling session which the undersigned on September 22, 2003 found to be privileged and confidential. Plaintiffs' counsel contended that it was a meeting of police officers with no counselors present and that, accordingly, it was neither privileged, nor confidential. n13

n13 N.T., October 8, 2003, page 3, line 3 to page 5, line 15.

[*14]

While still at sidebar, the undersigned then stated to counsel:

THE COURT: All right, we're going to have an in camera hearing and elicit from this officer by nature of an offer of proof what he would testify concerning that meeting if permitted to do so. All right. (End of sidebar discussion.) n14

n14 N.T., October 8, 2003, page 5, lines 16-20.

The court then excused the jury from the courtroom, intending to conduct the in camera hearing out of the presence of the jury, in open court, in the presence of the public, not at sidebar, and on the record.

After the jury departed, the court invited plaintiffs' counsel to interrogate Officer Repyneck to elicit what his answers might be if the plaintiffs were permitted to question him in the presence of the jury concerning the meeting with Chief Stephen from Fountain Hill. n15 At that point, plaintiffs' counsel asked to approach. At sidebar the following occurred:

MR. KAROLY: I'm concerned, Judge, if that depends on what he says and how this [*15] turns out as to how it will affect my ability to question other officers. Can we make this truly in camera in which it's the witness, the Judge and the attorneys?

THE COURT: No, I'm not going to exclude the public from this portion of the proceedings. ... n16

n15 N.T., October 8, 2003, page 6, lines 4-13.

n16 N.T., October 8, 2003, page 6, lines 18-24.

At this point four defendant police officers who had not yet testified were still in the courtroom. Because they were potential witnesses in plaintiffs' case-in-chief, as of cross-examination, and/or in defendants' case-in-chief, a discussion was held concerning whether those witnesses should be directed to leave the courtroom while Officer Repyneck was being questioned in camera. Defense counsel then requested that the in camera hearing be closed to the public because the undersigned had already ruled that the subject matter was privileged and confidential. Plaintiffs' counsel then requested that a closed in camera hearing be held in another [*16] courtroom. n17

n17 N.T., October 8, 2003, page 6, line 24 to page 8, line 25.

The undersigned then declared a ten-minute recess. The attorneys, the witness (Officer Repyneck), the undersigned, the court reporter, and a court security officer then proceeded to another courtroom on the same floor of the courthouse to conduct a closed, in camera interrogation of Officer Repyneck by plaintiffs' counsel, and legal argument by counsel, on defendants' privilege objection to plaintiffs' question.

The hearing was held on the record, out of the presence of the jury. The doors to the courtroom were locked and the public was excluded. This was done so as not to violate the witnesses' psychotherapist-patient privilege (by asking him whether he conferred with a counselor and the contents of that communication) in the process of determining whether or not he was entitled to the privilege at that meeting of officers.

Discussion

The **Morning Call** has standing to intervene in this action pursuant to *Rule 24(b) of the Federal Rules of Civil Procedure.* [*17] *Pansy v. Borough of Stroudsburg, 23 F.3d 772, 778 (3d Cir. 1994).* Accordingly, as noted above, we entered an Order on November 26, 2003 permitting the newspaper to intervene.

The *First Amendment* extends to the press and public a qualified right of access to judicial proceedings. *Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 100 S. Ct. 2814, 65 L. Ed. 2d 973 (1980); United States v. Raffoul, 826 F.2d 218, 222 (3d Cir. 1987).* The public right of access to trial proceedings extends to criminal and civil cases. *Publicker Industries, Inc. v. Cohen, 733 F.2d 1059, 1071 (3d Cir. 1984).*

The right to access criminal and civil trials extends to transcripts of sidebar and in camera proceedings that, by definition, occur out of public earshot during civil and criminal trials. See *Goldstein v. Forbes (In re Cendant Corp.), 260 F.3d 183, 192 (3d Cir. 2001); United States v. Smith, 787 F.2d 111, 114-115 (3d Cir. 1986).*

The Third Circuit has set out specific procedures for notice to the public of closure motions during hearings and trials. Motions for closure that are made outside the public's hearing [*18] should be renewed in open court before being acted upon. Those actually present and objecting to removal should be heard before a closure order is entered. Before closing the courtroom, the court must consider alternatives to closure and state on the record its reasons for rejecting them. *Raffoul, 826 F.2d at 226.*

In the context of a motion to unseal the transcript of trial proceedings that have already been closed, the parties seeking the continued sealing of the transcript of the closed hearing must "demonstrate a compelling interest in keeping the transcript sealed, the absence or unworkablity of less restrictive alternatives such as redacting the transcripts, and the effectiveness of keeping the transcript sealed in furthering the compelling interest." *Raffoul, 826 F.2d at 227.*

In other words, four factors must be considered by the court. They are as follows:

1. Compelling Interest. A party seeking to seal court records must first demonstrate that public access is likely to harm a compelling government interest. *Publicker Industries, Inc., 733 F.2d at 1071.*

2. No Alternative. A party seeking to seal records [*19] must further demonstrate that no alternative to secrecy can adequately protect the threatened interest. *Publicker Industries, 733 F.2d at 1072.*

3. Narrow. If no adequate alternative exists, any sealing imposed must be no broader than necessary to protect the threatened interest. *Richmond Newspapers, Inc., 448 U.S. at 581*; and

4. Effective. A substantial probability must exist that defendant's rights would be prejudiced by publicity that closure would prevent. *Press-Enterprise Company v. Superior Court, 478 U.S. 1, 14, 92 L. Ed. 2d 1, 106 S. Ct. 2735 (1986)* (Press-Enterprise II).

Our evaluation of these factors is as follows. Public access to defendant Repyneck's testimony concerning his psychological counseling would harm the compelling public interest contained in the psychotherapist-patient privilege for the reasons articulated above in our discussion of *Federal Rule of Evidence 501* and *Jaffee v. Redmond, supra.* This court stated those compelling interests on the record, in open court, at the September 22, 2003 hearing and ruling on defendants' motion in limine. n18

n18 N.T., September 22, 2003, pages 12-17.

[*20]

No alternative to secrecy can adequately protect the threatened interest. Once the patient is forced to testify publicly that he sought psychological counseling or to state publicly the details of that counseling, he has lost his psychotherapist-patient privilege and cannot get it back. This court concluded on the record, in open court, at the September 22, 2003 hearing that no alternative to secrecy can adequately protect the threatened interest for those reasons.

Because no adequate alternative exists, the sealing of the transcript imposed must be no broader than necessary to protect the threatened interest. If certain portions of the sealed transcript deal with the seeking of counseling with a psychologist or social worker, the obtaining of such professional assistance, and/or the details of such counseling, but other parts of the sealed transcript deal with matters unrelated to the privilege, or matters relating to the privilege which are not themselves privileged, then the privileged portions of the sealed transcript must be redacted, but the remaining portions must be made available to the public. If any non-privileged materials remain sealed, the sealing would be broader [*21] than necessary to protect the threatened interest.

Accordingly, the undersigned has carefully reviewed the sealed transcript of the October 8, 2003 in camera

2004 U.S. Dist. LEXIS 19980, *

hearing. Because a number of matters unrelated to the privilege were discussed at the closed hearing, as well as some matters relating to the privilege which were not themselves privileged, the undersigned has prepared a redacted version of the sealed transcript. This redaction eliminates those privileged matters, but makes available to the public and the press all portions of the transcript which are not privileged. This will limit the impact of the closure on the public's right to access.

Concerning the fourth and final factor, for all the reasons discussed concerning the first two factors (Compelling Interest and No Alternative), we conclude that a substantial probability exists that Mr. Repyneck's psychotherapist-patient privilege would be destroyed and prejudiced by publicity concerning those privileged matters which closing of the hearing prevented.

While the Court had sound reasons for closing the hearing and sealing (at least part of) the transcript, as indicated above, the undersigned did not advise the public in [*22] open court (as opposed to advising counsel at sidebar) that the proceedings would be closed, nor did the undersigned provide those in the courtroom at the time with an opportunity to object and be heard before the closure Order was entered, as required by *Raffoul, supra.* Despite the extreme difficulty of conducting such a procedure publicly without violating the witnesses' *privilege,* the effort must be made to do so pursuant to *Raffoul.* This oversight has been cured by entertaining the newspaper's motion for access to the court proceedings, conducting a hearing, entertaining oral argument, rendering a decision granting the motion in part, and making the redacted transcript available to intervenor, albeit after the fact.

*Raffoul* also requires the court to consider alternatives to closure before closing the courtroom and to state on the record its reasons for rejecting them. While the undersigned considered and rejected alternatives to closure (including a public in camera hearing out of the presence of the jury, and a public in camera hearing from which four potential witnesses would be sequestered), and while the court has stated its reasons on the record

and in this [*23] Opinion for rejecting those alternatives to closure, Raffoul requires the statement of these reasons to be made before, not after, closing the courtroom. However, we believe that stating our reasons for rejecting those alternatives to closure at this time and providing a redacted transcript will, nevertheless, serve the public interest.

Conclusion

For all the foregoing reasons we grant in part the motion of intervenor for access to the sealed transcript of the October 8, 2003 in camera hearing, and we are providing the press and public with access to a redacted transcript of those proceedings by filing the redacted transcript, without impoundment, simultaneously with the filing of the within Order and Opinion.

ORDER

NOW, this 30th day of September, 2004, upon consideration of the Motion of The **Morning Call** to Intervene and for Access to Court Proceedings, filed November 19, 2003; it appearing that a motion to intervene was granted on November 26, 2003; upon consideration of Defendants' Response to Motion of The **Morning Call,** Inc. for Access to Court Proceedings, filed December 8, 2003; after hearing held December 9, 2003; after oral argument; and for the reasons contained [*24] in the accompanying Opinion,

IT IS ORDERED that the motion of The **Morning Call** for access to court proceedings is granted in part.

IT IS FURTHER ORDERED that, pursuant to the within Opinion, a redacted version of the in camera proceedings on October 8, 2003 concerning the testimony of defendant Edward James Repyneck, Jr. shall be filed simultaneously with the within Order and Opinion.

BY THE COURT:

James Knoll Gardner

United States District Judge

Search for Case                                                          Help

Print Page

# General Docket
## US Court of Appeals for the Ninth Circuit

Court of Appeals Docket #: 00-16401                          Filed: 7/27/00
Nsuit: 3820  Copyright (Fed)
A&M Records, Inc., et al v. Napster, Inc.
Appeal from: Northern District of California (San Francisco)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
Case type information:
     1) civil
     2) private
     3) (null)
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
Lower court information:

     District: 0971-3 : CV-99-05183-MHP
     presiding judge: Marilyn H. Patel, District Judge
     Date Filed: 12/6/99
     Date order/judgment: 7/26/00
     Date NOA filed: 7/27/00
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
Fee status: paid

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
Prior cases:
     None
Current cases:

|          | Lead      | Member    | Start    | End |
|----------|-----------|-----------|----------|-----|
| companion: |         |           |          |     |
|          | 01-16011  | 01-16556  | 8/9/01   |     |
|          | 01-15998  | 01-16308  | 7/12/01  |     |
|          | 01-16003  | 02-15149  | 1/28/02  |     |
| consolidated: |      |           |          |     |
|          | 00-16401  | 00-16403  | 7/28/00  |     |
|          | 01-16011  | 01-16308  | 7/27/01  |     |
|          | 01-15998  | 01-16003  | 5/23/01  |     |
|          | 01-16543  | 01-16556  | 8/9/01   |     |
| cross appeal: |      |           |          |     |
|          | 01-15998  | 01-16011  | 5/24/01  |     |
| related: |          |           |          |     |
|          | 00-16403  | 01-16011  | 5/24/01  |     |
|          | 01-16011  | 01-16543  | 8/8/01   |     |

Docket as of October 24, 2002 11:15 pm                    Page 1

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

00-16401 A&M Records, Inc., et al v. Napster, Inc.

A&M RECORDS, INC., a                Russell J. Frackman, Esq.
corporation ;                       310/312-3119

```
          Plaintiff - Appellee        [COR LD NTC ret]
                                      MITCHELL SILBERBERG & KNUPP LLP
                                      11377 West Olympic Blvd.
                                      Los Angeles, CA 90064

                                      Hank Goldsmith
                                      212/969-3000
                                      [COR LD NTC ret]
                                      PROSKAUER ROSE, LLP
                                      1585 Broadway
                                      New York, NY 10036


GEFFEN RECORDS, INC., a               Russell J. Frackman, Esq.
corporation; INTERSCOPE               (See above)
RECORDS; SONY MUSIC                   [COR LD NTC ret]
ENTERTAINMENT, INC.; MCA
RECORDS, INC.; ATLANTIC
RECORDING CORPORATION; ISLAND
RECORDS, INC.; MOTOWN RECORD
CO.; CAPITOL RECORDS INC.
     Plaintiff - Appellee

   v.


NAPSTER, INC.                         Terry W. Bird, Esq.
     Defendant - Appellant            310-201-2100
                                      23rd Floor
                                      [COR LD NTC ret]
                                      Thomas R. Freeman, Esq.
                                      FAX 310-201-2110
                                      310-201-2100
                                      23rd Floor
                                      [COR LD NTC ret]
                                      Jennifer S. Berman, Esq.
                                      FAX 310/201-2110
                                      310/201-2100
                                      23rd Floor
                                      [COR NTC ret]
                                      BIRD, MARELLA, BOXER & WOLPERT
                                      A Professional Corporation
                                      1875 Century Park East
                                      Los Angeles, CA 90067-2561

                                      Daniel Johnson, Jr., Esq.
                                      650/494-0600
                                      [COR LD NTC ret]
                                      FENWICK & WEST
                                      2 Palo Alto Square
                                      Palo Alto, CA 94306

                                      David Boies, Esq.

Docket as of October 24, 2002 11:15 pm              Page 2
```

00-16401 A&M Records, Inc., et al v. Napster, Inc.

```
                              914/273-9800
                              [COR LD NTC ret]
                              BOIES, SCHILLER & FLEXNER, LLP
                              80 Business Park Drive
                              Armonk, NY 10504

                              Laurence F. Pulgram, Esq.
                              FAX 415/281-1350
                              415/875-2300
                              Ste. 1500
                              [COR LD NTC ret]
                              David L. Hayes
                              415/875-2300
                              Ste. 1500
                              [COR LD ret]
                              FENWICK & WEST
                              275 Battery Street
                              San Francisco, CA 94111

                              Jonathan Schiller
                              202/237-2727
                              Ste. 570
                              [COR LD ret]
                              Michael Brille
                              202/237-2727
                              Ste. 570
                              [COR LD NTC ret]
                              BOIES, SCHILLER & FLEXNER
                              5301 Wisconsin St. NW
                              Washington, DC 20015

--------------------------

CASANOVA RECORDS              Hannah Bentley
      Amicus                  415/474-7692
                              # 3C
                              [COR LD NTC ret]
                              1000 Chestnut Street
                              San Francisco, CA 94109

NICOLA BATTISTA               Hannah Bentley
      Amicus                  (See above)
                              [COR LD NTC ret]

KUTMUSIC                      Hannah Bentley
      Amicus                  (See above)
                              [COR LD NTC ret]

ECL3CTIC                      Hannah Bentley
      Amicus                  (See above)
                              [COR LD NTC ret]

DIGITAL MEDIA ASSOCIATION     Andrew P. Bridges, Esq.

Docket as of October 24, 2002 11:15 pm           Page 3
```

00-16401 A&M Records, Inc., et al v. Napster, Inc.

      Amicus                        493-9300
                                         [COR LD NTC ret]
                                         WILSON SONSINI GOODRICH &
                                       ROSATI
                                       650 Page Mill Road
                                       Palo Alto, CA 94304-1050

AD HOC COPYRIGHT COALITION,          Thomas W. Kirby
Commercial Internet Exchange;        [COR LD NTC ret]
Computer & Communications            Scott E. Bain
Industry Association;                202-719-7000
Information Technology               [COR LD NTC ret]
Association of America;              WILEY, REIN & FIELDING
Netcoalition.com; United             1776 K Street, N.W.
States Internet Industry             Washington, DC 20006
Association; United States           (202)429-7000
Telecommunications Association
      Amicus                        Bruce G. Joseph
                                       202-719-7000
                                       [COR LD NTC ret]
                                       WILEY, REIN & FIELDING
                                       1776 K Street N.W.
                                       Washington, DC 20006

Docket as of October 24, 2002 11:15 pm              Page 4

----------------------------------------------------------------------

00-16401 A&M Records, Inc., et al v. Napster, Inc.

A&M RECORDS, INC., a corporation ;; GEFFEN RECORDS, INC., a
corporation; INTERSCOPE RECORDS; SONY MUSIC ENTERTAINMENT,
INC.; MCA RECORDS, INC.; ATLANTIC RECORDING CORPORATION;
ISLAND RECORDS, INC.; MOTOWN RECORD CO.; CAPITOL RECORDS
INC.

              Plaintiffs - Appellees

   v.

NAPSTER, INC.

              Defendant - Appellant

      -------------------------

CASANOVA RECORDS; NICOLA BATTISTA; KUTMUSIC; ECL3CTIC;
DIGITAL MEDIA ASSOCIATION; AD HOC COPYRIGHT COALITION,
Commercial Internet Exchange; Computer & Communications
Industry Association; Information Technology Association of
America; Netcoalition.com; United States Internet Industry
Association; United States Telecommunications Association

              Amici Curiae

Docket as of October 24, 2002 11:15 pm              Page 5

|         | (PANEL). [00-16401, 00-16401] (jr) [00-16401 00-16403] |
|---------|--------------------------------------------------------|
| 9/21/00 | Rec'd ntc of chg of address of Hannah Bentley for Amicus Ecl3ctic, Kutmusic, Nicola Battista, Casanova Records dated 9/18/00 to 1000 Chestnut Street #3C, SF, CA 94109. [00-16401, 00-16403] (jr) [00-16401 00-16403] |

Docket as of October 24, 2002 11:15 pm                Page 11

_____

00-16401 A&M Records, Inc., et al v. Napster, Inc.

| 9/21/00 | Rec'd Amicus Ecl3ctic, Casanova Records, Nicola Battista Kutmusic rpy regarding request to speak at hearing; served on 9/21/00 (FED EXED TO PANEL). [00-16401, 00-16403] (jr) [00-16401 00-16403] |
|---------|--------------------------------------------------------|
| 9/22/00 | Rec'd Amicus' (Independent Music) satisfaction of (minor) brf deficiency (rec'd phone call from csl; certificate of compliance is correct for amicus brfs). [00-16401, 00-16403] (jr) [00-16401 00-16403] |
| 9/25/00 | Filed Amicus' (Casanova Records, Nicola Battista, Kutmusic, Ecl3ctic) emergency motion to intervene as parties [00-16401, 00-16403]; served on 9/25/00 (FED EXED TO PANEL 9/25/00). [3998689] (jr) [00-16401 00-16403] |
| 9/25/00 | Filed aplt's rpy to opposition to motion to strike portions of aples' suppl excerpts of record [3989704-1] in 00-16401, 00-16403; served on 9/25/00 (FED EXED TO PANEL). [00-16401, 00-16403] (jr) [00-16401 00-16403] |
| 9/25/00 | Filed order MOATT (MD)............the panel has voted to deny the requests for use of still cameras and to grant the applications to audio or video record live or for later broadcast. KTVU Channel 2, KGO Channel 7, KRON-TV, CNN, C-SPAN, McGeorge School of Law, Nat'l Narrowcast Network adn KCBS Radio are directed to arrange a pooling system pursuant to Section 4 of this court's Guidlines, and to notify Jim Hochstadt at 415/556-98122 (phone) or 415/556-9721 (FAX) regarding the details of those arrangements by noon, Wednesday, 9/27/00. [00-16401, 00-16403] (jr) [00-16401 00-16403] |
| 9/26/00 | Filed order (Deputy Clerk: gb) the motionss of Ralph Oman and Copyright Law Professors to file brfs as amicus curiae are GRANTED. [3982105-1] in 00-16401, 00-16403 [00-16401, 00-16403] (jr) [00-16401 00-16403] |
| 9/26/00 | Filed original and 15 copies Amicus (Copyright Law Professors) brf of 15 pages; served on 8/25/00. [00-16401, 00-16403] (jr) [00-16401 00-16403] |
| 9/26/00 | Filed original and 15 copies Amicus' (Ralph Oman) brf of 8 pages; served on 8/24/00. [00-16401, 00-16403] (jr) [00-16401 00-16403] |

FOCUS - 27 of 74 DOCUMENTS

Copyright 2001 The Seattle Times Company
The Seattle Times

February 13, 2001, Tuesday Fourth Edition

**SECTION:** ROP ZONE; Business; Pg. C1

**LENGTH:** 291 words

**HEADLINE:** Appeals hearing to be live on radio, Internet
Microsoft antitrust case

**BYLINE:** Bloomberg News

**DATELINE:** Washington

**BODY:**

WASHINGTON--The legal arguments on Microsoft's appeal of a judge's order to split the software giant in two will be broadcast live via an audio feed to radio and TV networks, the appeals court said yesterday.

Bowing to the importance of the landmark antitrust case against Microsoft, the U.S. Court of Appeals for the District of Columbia Circuit said the broadcast would be distributed through the television network pool and over the Internet on Feb. 26 and 27.

Seven appeals judges are to hear seven hours of arguments over the two days on Microsoft's challenge to a lower court's ruling that it illegally protected its Windows monopoly for personal-computer-operating software and should be divided into two companies.

The live broadcast will be allowed "due to the widespread public interest in this case and the limited seating" in the courtroom, the court said. It will be the first live broadcast of D.C. Circuit proceedings.

Other federal appeals courts, notably the 9th Circuit in San Francisco, have allowed live broadcasts of arguments, though such media access is rare.

Federal trial courts do not permit the broadcast or recording of proceedings, even though the practice is commonplace in many state courts.

The U.S. Supreme Court allowed a delayed broadcast of the audio feed of two arguments the justices heard late last year over the contested presidential election count in Florida.

The court's decision cleared the way for George W. Bush's victory.

Besides the broadcast network audio feed, the Microsoft arguments will be available on the World Wide Web at *www.ABCNEWS.com* and *www.c-span.org.*

Other Web sites will be able to link to the streaming audio page via ABC News, the court said.

**LOAD-DATE:** July 17, 2003

6 of 72 DOCUMENTS

Copyright 2000 Daily News, L.P.
Daily News (New York)

December 8, 2000, Friday SPORTS FINAL EDITION

**SECTION:** TELEVISION; Pg. 146

**LENGTH:** 578 words

**HEADLINE:** AIR FAIR TO FLA., & U.S. State is right to allow TV

**BYLINE:** BY DAVID BIANCULLI

**BODY:**
There was no dramatic music played during the key moments of yesterday's nationally televised coverage of the Florida Supreme Court.

There were no telling closeups, as there are every week on ABC's "The Practice," to signal when a lawyer or judge had made an especially significant point.

There were no "Perry Mason" courtroom epiphanies, no outrageous "L.A. Law" tactics, no "Ally McBeal" halluci-nations. Neither David Boies, arguing for Al Gore, nor Barry Richard, arguing for George W. Bush, even remotely re-sembled Dylan McDermott.

Instead, what the country saw on TV yesterday, as when the same court was visited earlier in this stint of post-election legal battles, was an intense barrage of specific, intelligent questions and answers about state and federal law.

That Florida Supreme Court morning session, with its 68 minutes of questions from the seven justices, was broad-cast in its entirety by ABC, CBS, NBC and all the cable news networks. In the afternoon, the cable operations also broadcast other live court cases from Florida, including closing arguments in the Seminole County and Leon County ballot trials.

Just as the voters of Florida appear to be the key factor in the presidential election of 2000, they also are responsible for our ability, as a nation, to watch these hugely important court cases unfold on live TV. In this respect, too, Florida cannot be ignored.

The United States Supreme Court, a week ago, relented enough to allow taped broadcasts of the audio portion of its proceedings in this election battle - but refused, as always, to allow TV cameras or live coverage.

Like the House of Representatives before it allowed C-SPAN to provide gavel-to-gavel coverage in 1979, and the Senate before it gave access to the same invaluable cable network seven years later, the highest and most powerful judi-cial minds in the land are wary of live TV coverage.

They shouldn't be.

Even before C-SPAN was launched 21 years ago, Florida legislators believed in the power of television and the rights of the people to have access, electronic as well as physical, to its court system. On April 1, 1978, the state passed its so-called Sunshine Law, calling for TV cameras to be permanently installed in every courtroom, including the State Supreme Court. The microphones and four cameras relaying us yesterday's proceedings weren't installed for the occa-sion; they've been there for decades.

(I was a TV critic in Florida - in Broward County, at the Fort Lauderdale News - when the Sunshine Law was passed, and covered telecasts of several important state cases; one, based on an absurd premise, tried to defend an ac-cused young murder defendant on the grounds that television made him do it.)

Daily News (New York) December 8, 2000, Friday

In these courtrooms, the equipment is unobtrusive, and the stakes so high that no one is grandstanding. In the Supreme Court, at any level, attorneys are playing to the justices, not the cameras; the men and women in robes, for their part, have matters of law on their mind, not vain concerns about how they're coming off on TV.

The U.S. Supreme Court is wrong about denying TV access to its chambers. The Florida Supreme Court telecasts, both of them, have been historic but not histrionic. They show, to anyone driven enough to tune in, our system at its best. Thank the Sunshine Law for making it possible, the cable networks for recognizing its import, and the medium of television for bringing it to us live, raw and unfiltered.

**GRAPHIC:** CAMERA-READY Networks aired Florida Supreme Court proceedings live yesterday.

**LOAD-DATE:** December 8, 2000

106V3S

```
********** Print Completed **********

Time of Request:    August 29, 2005  05:04 PM EDT

Print Number:       2822:58714557
Number of Lines:    56
Number of Pages:
```

```
Send To:  BERRY, MICHAEL
          LEVINE SULLIVAN KOCH & SCHULZ LLP
          1050 17TH ST NW STE 800
          WASHINGTON, DC 20036-5514
```