# REPORT

# OF THE COMMITTEE ON

# AUDIO-VISUAL COVERAGE

# OF COURT PROCEEDINGS

## May 1994

Hon. Burton B. Roberts, Chair

### Members

| | |
|---|---|
| Floyd Abrams | Philip M. Damashek |
| Eleanor S. Applewhaite | Edward W. Hayes |
| Richard Aurelio | Jack T. Litman |
| Hon. Richard A. Brown | Sam Roberts |
| S. Paul Conti, Jr. | Harry M. Rosenfeld |

Richard N. Winfield

Lawrence K. Marks
Counsel

## DEDICATION

The Committee dedicates this report to the memory of Saul Weprin, late speaker of the Assembly of the State of New York and champion of the First Amendment.

Permanently establishing cameras in the courts would be a fitting memorial to Saul Weprin's long-standing commitment to this issue and form an abiding legacy for the people of the State of New York.

**Page**

New York City ................................. 36

Albany ....................................... 53

Letters and Other Submissions ................ 68

VII.   AUDIO-VISUAL COVERAGE IN OTHER JURISDICTIONS ....... 74

VIII.  REVIEW OF PRIOR STUDIES ........................... 75

Prior Studies ................................ 75

Public Opinion Polls ......................... 83

IX.    ANALYSIS .......................................... 85

Education of the Public ...................... 85

The Public Trial ............................. 90

Additional Benefits .......................... 91

Nonparty Witness's Right to Have Image
     Visually Obscured ....................... 99

Requiring Parties' Consent to Coverage
     of Arraignments and Suppression Hearings.... 100

The Seven-Day Application Rule ............... 102

Requiring Parties' Consent to Coverage
     If Trial Has Commenced .................. 103

X.     CONCLUSIONS AND RECOMMENDATIONS ................... 104

**Appendices**

A.   Letter of Paul J. Cambria, Jr.

B.   Letter of Hon. Kevin M. Dillon

# TABLE OF CONTENTS

Page

Executive Summary ........................................ iii

I.      INTRODUCTION ...................................... 1

II.     BACKGROUND ....................................... 1

        1987 Authorizing Legislation ..................... 3

        Administrative Rules ............................. 6

        1989 Report of the Chief Administrator .......... 9

        1989 Statutory Amendments ....................... 11

        1991 Report of the Chief Administrator .......... 13

        1991 Sunset of Authorizing Legislation .......... 14

        1992 Authorizing Legislation .................... 15

III.    THE REVIEW COMMITTEE ............................. 18

        Mandate and Composition ......................... 18

        Approach ........................................ 20

        Timing of Submission of Report .................. 22

IV.     APPLICATIONS AND ORDERS ......................... 24

        Applications and Orders Overall ................. 24

        Visual Obscuring of Nonparty Witness ............ 26

        Applications and Orders by Judicial District
            and Type of Court ........................... 26

        Type of Audio-Visual Coverage ................... 29

        Audio-Visual Coverage by Nature of Proceeding ... 30

        Reasons for Denial of Coverage .................. 31

V.      COMMENTS OF TRIAL JUDGES......................... 33

VI.     PUBLIC HEARINGS ................................. 36

- i -

coverage would endanger that person's safety.  In deciding whether to allow coverage, the judge was to consider a number of factors, such as the type of case involved and whether it involved "lewd or scandalous" matters, any harm to the participants that might result, and the effect on the fair administration of justice, the rights of the parties and law enforcement activity.  A written application for coverage and a written order were required, and the judge could impose any necessary condition on the coverage and could end coverage at any time.  Only two videotape cameras, with two operators, and two still cameras, with one operator, were permitted, and the types of equipment approved for use were strictly limited.

Following submission in 1989 of a report by former Chief Administrative Judge Albert M. Rosenblatt, recommending permanent enactment of the statute, the Legislature instead extended the experiment for an additional two years, until May 31, 1991.  In extending the program, the Legislature provided some new restrictions: consent of counsel for the parties was required for camera coverage of arraignments, suppression hearings and when the application for coverage was made after a jury trial had commenced; counsel for each party was required to advise each witness of the witness's right to request an exemption from coverage;  and applications for coverage had to be made not less than seven days before commencement of the proceeding, unless the court exercised its discretion to shorten the period.

- iv -

<u>Executive Summary</u>

This executive summary sets forth the conclusions and recommendations of the Committee on Audio-Visual Coverage of Court Proceedings based upon its review of the current cameras in the courts experiment in New York State.

The Committee has concluded that audio-visual coverage of court proceedings has been a success. Camera coverage is of significant benefit to the public with minimal, if any, adverse effect on participants in court proceedings. The Committee thus recommends that New York's lengthy experiment with cameras in the courts should be concluded and permanent legislation permitting camera coverage be enacted. All but one member of this 12-member Committee have approved this report and concur with its conclusions and recommendations.

<u>Background</u>

In 1987, the Legislature approved New York's first experiment with audio-visual coverage of trial court proceedings. The experiment began on December 1, 1987, and was to run until May 31, 1989. The legislation gave the presiding trial judge the authority to decide whether audio-visual coverage should be permitted. Certain types of coverage, however, were prohibited, including coverage of sex offense victims, undercover police officers, certain conferences between attorneys, clients and judges, and of any person if the judge determined that camera

- iii -

studies conducted in other jurisdictions; (3) the Committee's own survey of New York trial judges who have presided over proceedings in which cameras were present; (4) the comments of individuals who testified at the public hearings held by the Committee and the written submissions of others who were unable to testify at the hearings; (5) the Committee's review of data relating to applications for audio-visual coverage; and (6) the personal experiences of Committee members with cameras in the courts.

Based on this analysis, the Committee concluded that the benefits of New York's cameras in the courts program are substantial.   Most important, audio-visual coverage of court proceedings serves an important educational function.   The wider exposure to the courts that camera coverage provides engenders a deeper understanding of legal principles and processes, which in turn leads to increased public respect for the justice system. Camera coverage also promotes the values underlying the principle of the public trial and the First Amendment, thereby fostering public scrutiny of court proceedings and serving as a deterrent against injustice. Additional benefits include the salutary effect that the presence of cameras has on the behavior of judges and attorneys, an increase in the accuracy of reporting by broadcast and newspaper reporters and the educational tool that videotapes of court proceedings provide to judges, attorneys and students.

Following the submission in 1991 of a report by former Chief Administrator of the Courts Matthew T. Crosson, also recommending permanent enactment of the statute, the Legislature failed during the 1991 legislative session to continue the experiment. This was primarily because of a dispute over whether coverage of the testimony of a nonparty witness in a criminal case should be permitted only on the witness's consent. Thus, on June 1, 1991, audio-visual coverage of trial court proceedings ceased in New York.

In June 1992, the Legislature reinstituted the experiment for an additional two and one-half years (until January 31, 1995). The major statutory change affecting the current experiment is that a nonparty witness in a criminal proceeding, except an expert, professional or government witness, may now require that his or her image be "visually obscured" in the coverage of the witness's testimony. The statute also created this Committee to "evaluate, analyze, and monitor" the current experiment, and to make recommendations to the Legislature, the Governor and the Chief Judge "as to the efficacy of the program and whether it should be continued."

Analysis and Recommendations

The Committee's analysis of whether the experiment should be continued was based on: (1) its review of the prior surveys and studies conducted in this State; (2) its review of the surveys and

- v -

the burden of conducting one more study that inevitably will reach the same conclusion as all the prior studies -- that cameras in the courts have minimal, if any, adverse effect on participants in court proceedings.

2.   The Committee believes that, as cameras eventually are accepted as an unobjectionable part of court proceedings, certain of the current statutory restrictions and safeguards relating to their usage will become superfluous.   Nevertheless, because of the need to focus on the paramount goal of permanently enacting the statute, the Committee does not now recommend that any of the current restrictions and safeguards be amended or repealed.

3.   The Committee is highly critical of judges who have decided applications for audio-visual coverage solely on their own predetermined attitudes.    Some   judges   have   told   media representatives that they will never allow cameras into their courtrooms.  The Committee urges these judges to reevaluate their positions, and recommends that Administrative Judges be more aggressive in exercising their authority to reverse a trial judge's determination that is not based on a reasonable exercise of discretion.

4.   Judges   should   be   mindful   that   the   statutory requirement   that   the   parties   consent   before   coverage   of arraignments and suppression hearings is allowed applies only to

- viii -

These benefits heavily outweigh the minimal, if any, negative effects of the program.  Unlike the rudimentary technology of yesteryear, cameras now function in the courtroom without disruption or distraction.   Improvements in technology have rendered cameras no more, and possibly less, conspicuous than the newspaper reporter with pencil and notebook and the courtroom artist with crayon and sketch pad.  Further, the numerous studies and surveys conducted in New York and throughout the nation uniformly have established that audio-visual coverage has no adverse impact on the vast majority of participants in court proceedings, including witnesses and jurors.  Notably, no criminal conviction in New York has ever been reversed on the ground that the presence of cameras in the courtroom interfered with the defendant's right to a fair trial.  And virtually no violations of the statute during the current experiment have been reported to the Committee, even though ample opportunity was provided to do so.

The Committee's analysis, which is set forth in Section IX of this Report, led it to the following conclusions and recommendations:

1.  New York's lengthy experiment with cameras in the courts has been a success, and the statute should now be permanently enacted.  Permanent enactment of the statute will end the long-standing uncertainty surrounding the policy of this State concerning cameras in the courts; and it will relieve the State of

- vii -

## I.   INTRODUCTION

The Committee on Audio-Visual Coverage of Court Proceedings submits this report to the Legislature, the Governor, and the Chief Judge of the State of New York, as required by Chapter 187 of the Laws of 1992.   Chapter 187 resumed an experimental program, originally authorized by Chapter 113 of the Laws of 1987 and extended by Chapter 115 of the Laws of 1989, for audio-visual coverage of trial court proceedings.  As required by Chapter 187, this report evaluates, analyzes and monitors audio-visual coverage of trial court judicial proceedings in New York State.

## II.   BACKGROUND

The nature of audio-visual coverage of trial court proceedings has undergone dramatic changes in recent years.  As the Legislature has observed, "[I]t was the experience of an earlier generation that bright lights, large cameras and other noisy equipment intruded upon the dignity and decorum of the courtroom and tended to create an atmosphere unsuited to calm deliberation and impartial decision making."   L.1987, Ch.113, section 1. Indeed, the rudimentary technology of that earlier period led the American Bar Association, following the excesses of the coverage of the 1937 Lindbergh kidnapping trial, to promulgate Canon 35, which banned camera operators from the courtroom.  The ABA expanded its ban on camera operators in 1952 to include television cameras.

arraignments and suppression hearings [as that term is defined in Jud. Law 218(2)(g)], and not to any other pretrial proceeding.

5.  The media should make greater efforts to adhere more scrupulously to the statute's seven-day application rule; and judges, upon receiving applications for coverage, should notify the parties so that they will have time to prepare their arguments and be heard on the application.

6.  As recommended by several media representatives who testified at the public hearings, the list of acceptable audio-visual equipment models authorized by the Chief Administrator of the Courts pursuant to section 218(6)(b)(i) of the Judiciary Law [see 22 NYCRR 131.13] should be updated to reflect recent technological advances in such equipment.

7.  The Committee commends those news media organizations that, in conjunction with their coverage of court proceedings, have made  concerted efforts to include discussions and presentations on relevant principles of law and judicial processes.  These efforts have enhanced the public's understanding of the justice system. The Committee encourages other news organizations, as well as judges and lawyers, to further this worthy goal.

promulgated a set of rules authorizing audio-visual coverage of court proceedings.   The rules expressly authorized electronic photographic recording of proceedings in the State's appellate courts, subject to detailed requirements for the deployment of equipment and technicians.   The rules also authorized an experimental program for audio-visual coverage of civil trials, to become effective if the Legislature subsequently removed the bar of section 52 of the Civil Rights Law.   (<u>See</u> 22 NYCRR 29.2, 29.3, repealed December 1, 1987).

### 1987 Authorizing Legislation

In 1987, the Legislature removed the bar of section 52 of the Civil Rights Law by authorizing an 18-month experiment of audio-visual coverage of criminal and civil trial court proceedings.  L.1987, Ch.113.  The experiment began on December 1, 1987, with a sunset date of May 31, 1989.   The Legislature permitted this experiment based upon its findings that "various improvements in the technology of photography and of the audio and video broadcast media, in addition to the development of procedural safeguards as provided for in various state programs, make it feasible to permit in this state, on an experimental basis, audio-visual coverage of court proceedings without disruptive effect." <u>Id</u>., section 1.

The law authorized the Chief Administrator of the Courts to designate counties in which the experiment was to be conducted.

3

New York followed suit that same year, enacting section 52 of the Civil Rights Law.   That statute prohibited the televising, broadcasting or taking of motion pictures in public proceedings, including court proceedings, "in which the testimony of witnesses by subpoena or other compulsory process is or may be taken."   And in 1965, disruptive and obtrusive technology contributed to the decision of the United States Supreme Court that television coverage of a criminal trial denied the defendant due process of law.  See Estes v. Texas, 381 U.S. 532 (1965).

In the years following the enactment of section 52, significant technological advances rendered cameras and related equipment far less obtrusive.  As a result, audio-visual coverage of trials began to be permitted, in some degree, in many other jurisdictions.  In 1981, when the Supreme Court revisited the issue of cameras in the courts, the Court held that consistent with constitutional  guarantees  a  state  may  provide  for  radio, television, and still photographic coverage of a criminal trial for public broadcast, notwithstanding the objection of the defendant. Although the Court noted that there is no constitutional right to have live witness testimony recorded and broadcast, it held that such coverage, in itself, is not a denial of due process.   See Chandler v. Florida, 435 U.S. 589 (1978).

In 1982, the Chief Judge of New York State, with the approval  of  the  Associate  Judges  of  the  Court  of  Appeals,

2

the deliberation room; no audio-visual coverage of undercover officers who appear as witnesses (consent required); no audio-visual coverage of victims of sex offenses; and no audio-visual coverage of anyone if there is a finding that the coverage would endanger the safety of that person.  Jud. Law 218(7).

The statute also imposed specific restrictions on equipment.  No more than two electronic cameras (with two operators), two still cameras (with one operator) and one audio system was permitted.  Jud. Law 218(6)(a)(i), (ii), (iii).  The news media were required to enter into voluntary pooling arrangements, and the courts were not to be called upon to resolve any disputes in these pooling arrangements.  Section 218(6)(a)(v).  Equipment was to produce no distracting sound or light, and the Chief Administrator was required to promulgate a list of acceptable equipment models.  Section 218(6)(b)(i).  The law prohibited motorized drives, moving lights, flash attachments or signals visible or audible to trial participants.  Section 218(6)(b)(ii), (iii).  Positioning of equipment was solely within the discretion of the trial judge, section 218(c), and could not be moved during the course of the trial.  Section 218(6)(d).  The judge was granted the authority to increase or decrease the amount of equipment consistent with the dignity of the court and the judicial process.  Section 218(6)(a)(iv).

5

Jud. Law 218(3)(a).   News media seeking to provide audio-visual coverage of specific court proceedings in those counties were authorized to make formal written application to the presiding trial judge, and coverage was made subject to the discretion of that judge, subject to review by the appropriate administrative judge.  Section 218(3)(b), (c).   In considering the application, the presiding trial judge was obligated to consider the type of case involved, any harm to the participants, the effect on the fair administration of justice or on the rights of the parties, the effect on any law enforcement activity, and whether the trial involved "lewd or scandalous matters."  Section 218(3)(d).  Consent of the participants was not required.  Section 218(5).  In making his or her determination, the judge was authorized to permit coverage with specific limitations, such as restricting coverage of parts of the trial for the protection of a participant or to preserve the welfare of a minor.  Section 218(4)(a).  The statute also contemplated a mandatory pretrial conference to set the ground rules for coverage and to consider any limitations.   Section 218(4)(b).

The law imposed certain express restrictions on audio-visual coverage:   no audio coverage of conferences between attorneys, attorneys and their clients, or attorneys and the trial judge (consent required); no audio-visual coverage of conferences in chambers; no audio-visual coverage of jurors, either during the selection process or during the trial, including going to and from

4

required to notify the parties of the application, and conduct an appropriate review of the application, including consultation with counsel for all parties, who were to be responsible for identifying the concerns of the parties and potential witnesses.   Section 131.4(a).

The determination of the application by the judge was to be based on the statutory factors (type of case, possible harm to participant, fair trial, interference with law enforcement) as well as any objections by the participants, and the physical requirements of covering the proceeding in the courtroom.   Section 131.4(c).   The rules mandated that great weight be given to the fact that any party, prospective witness or other participant is a child, with judicial discretion afforded throughout the proceeding to limit or modify coverage at any time.   The rules directed that the court be especially sensitive to circumstances involving children, sex offenses or lewd or scandalous matters.   Section 131.9(b).

The statute also provided authority for the administrative judge to review coverage orders by the presiding trial judge.   The rules provided a standard for this review -- whether the order reflects an abuse of discretion by the presiding trial judge -- and required that no judicial proceeding be delayed to allow for the review of an order denying coverage.   Section 131.5(b), (c).

Finally, the law mandated that the trial judge and all counsel of record file with the Chief Administrator a report evaluating the effect of such coverage on the proceedings. Section 218(9). Reports of the other participants, such as witnesses and news media representatives, were permitted as well.

### Administrative Rules

The statute required the Chief Administrator to promulgate rules to implement the new law. After consultation with members of the media, judges, court administrators, the bar and public interest groups, Part 131 of the Chief Administrator's rules was promulgated (22 NYCRR).[1]

The rules provided for a phased-in implementation of the experiment -- beginning on December 1, 1987 in New York City and in Monroe, Onondaga, Erie and Chemung Counties, and then moving into additional groups of counties on February 1, April 1, and June 1, 1988, by which time all counties in the State were included. 22 NYCRR 131.1(b). A formal media application process was created, requiring a written application to be made at least seven days before the proceeding unless shortened by the presiding trial judge due to exigent circumstances. Section 131.3(b)(1). The judge was

---

[1]     Part 131 subsequently was amended in several respects to comply with the statutory changes effected by Chapter 115 of the Laws of 1989 (see section II(D), infra) and chapter 187 of the Laws of 1992 (see section II(G), infra).

6

## 1989 Report of the Chief Administrator

Chief Administrative Judge Albert M. Rosenblatt's report, recommending that the experiment be made permanent, was submitted in March, 1989.  The report and recommendation were based on an analysis of over 1000 written evaluations submitted by judges, lawyers and news media representatives who had participated in court proceedings where audio-visual coverage had been permitted.

An analysis of the evaluation reports revealed that 84% of the judges were favorable to coverage.  Although about one-third of the judges noted that the coverage created some additional administrative burdens on the court, two-thirds felt that coverage had no effect on the progress of the trial.  The judges, after consultation with the foreperson of the jury, agreed that the coverage had very little effect on jurors.  No judge felt that coverage made it difficult for jurors to ascertain the truthfulness of testimony.

Attorneys were less favorable than judges:  about one-third were negative towards the experiment. Most of their concerns related to insufficient time to ascertain the views of clients and witnesses in deciding whether to object.  Attorneys involved in proceedings in New York City were more favorable towards media coverage than those involved in proceedings elsewhere.  Attorneys in proceedings outside of New York City were more likely to

9

Under the rules, the scope of the statutorily required pretrial conference was delineated.  A meeting was required with counsel for the parties and representatives of the media to consider any objections that may have been raised, the breadth and limitations of the coverage, and the nature and extent of the technical equipment and personnel to be deployed.  Section 131.6(a).  Requirements for media pooling arrangements were set forth, directing that the media designate the pool operators and agree upon procedures for cost-sharing and dissemination of audio-visual material.  Section 131.6(b).

The rules reiterated the statute's detailed requirements regarding use and deployment of equipment and personnel.  A separate appendix to the rules listed the types and models of acceptable video and still cameras, with the permission of the trial judge required to use any other audio or video equipment.

The rules also tracked the statutory requirements for gathering information for the Chief Administrator's report on the effect of this experiment.  The presiding trial judge and counsel were to prepare and file reports assessing the effects of coverage.  Others, including witnesses and the news media, were invited to file similar reports [section 131.10(a)], and the media also was required to transmit to the Office of Court Administration any audio-visual material aired or published.  Section 131.10(c).

8

### The 1989 Statutory Amendments

Following the submission of Judge Rosenblatt's report, the Legislature amended section 218 of the Judiciary Law, continuing the experiment for two more years (until May 31, 1991) but with some significant changes.  L.1989, Ch.115.

The major change in the amended statute was to require the consent of counsel for coverage of arraignments, suppression hearings and instances in which an application was made after the beginning of a jury trial (except for coverage of the verdict and sentencing).  Section 218(3)(d), (5)(b).  In addition, while preserving the court's discretion to permit coverage over the objection of witnesses, the statute was amended to require that counsel to each party advise their witnesses of the right to request an exemption from coverage.  Section 218(5)(c).

The amended statute codified the procedure in the implementing rules requiring that applications for coverage be made at least seven days before the commencement of the proceeding, with the judge having discretion to shorten that time period when circumstances so require.  Section 218(3)(a).  The statute also specifically provided that no judicial proceeding could be scheduled or delayed at the request of or for the convenience of the media, section 218(7)(i), and it required that court rules include provisions to insure that coverage not interfere with the

11

complain that coverage and personnel created undesirable noise and distractions and detracted from the dignity of the proceeding.

The media representatives were overwhelmingly satisfied with the process and the physical arrangements. The vast majority stated that the limitations imposed by the court were reasonable and did not interfere with the accurate depiction of the trial.

For the small sample of witness respondents, twice as many were favorable to media coverage as were unfavorable. While about one-fourth of witness respondents reported feeling anxious and nervous because of the presence of equipment, three-fourths were of the opinion that the coverage did not create undesirable noise and distractions. A very small percentage of witnesses felt that the presence of coverage made them reluctant to testify.[2]

The written comments on the surveys provided additional confirmation of the trends noted above, with a small proportion expressing skepticism as to educational value and concerns about time constrictions, especially at arraignments. No one, however, commented that the presence of coverage influenced the ultimate outcome of a trial.

---

[2]   The evaluations conducted in connection with the 1989 report are discussed in further detail in Section VIII, _infra_.

## 1991 Report of the Chief Administrator

Chief Administrator Matthew T. Crosson's report was submitted in March, 1991. The report revealed that from the first experiment to the second experiment, the number of applications for camera coverage declined from 731 to 284. The report explained that this substantial decline was the result of the new statutory requirement of consent for coverage of arraignments.

The responses of the approximately 750 participants, however, as compiled from the evaluation forms prepared by the five-member Advisory Committee, were consistent with the first experiment. In the first experiment, 84% of judges were favorable or neutral to camera coverage; in the second experiment, 91% of judges were favorable or neutral to camera coverage and 94% of judges said camera coverage did not affect the fairness of the proceedings. In the first experiment, 68% of attorneys were favorable or neutral camera coverage; in the second experiment, 71% reported those conclusions. Eighty-four percent of witnesses during the second experiment, and 75% during the first experiment, were favorable or neutral to camera coverage. And 98% of jurors in the second experiment (jurors did not complete forms in the first experiment) said that they felt neither pressured to convict nor acquit a defendant in a criminal trial; 85% of jurors reported being neither more reluctant nor more eager to participate because

13

decorum and dignity of the court.  Section 218(11).

The statute resolved a legal issue left open under the prior law with respect to judicial review.  Two appellate courts had split over whether the administrative judge's review of the trial judge's decision regarding coverage was reviewable by appellate courts.  The amended statute preserved review by the administrative judge but made that review final; no further judicial review was permitted.  Section 218(3)(b).

Finally, the amended statute again required a report to the Legislature by the Chief Administrator on the effect of the experiment.  As part of this study, however, the Chief Administrator was required to create a five-member temporary advisory committee, consisting of professional specialists, to advise and assist the Chief Administrator in developing an appropriate methodological design for the report and also for the evaluation forms to be completed by the presiding trial judge, counsel for the parties and other participants in the proceedings.  Section 218(9), (10).  The report was to use the methodological design developed by the advisory committee and the Chief Administrator.  L.1989, Ch.115, section 9.

12

ted only on the witness's consent.  Thus, on June 1, 1991,
visual coverage of trial court proceedings ceased in New


## 1992 Authorizing Legislation


Audio-visual coverage resumed in June 1992, when the
ture reinstituted the experiment for two and one-half more
until January 31, 1995), with some additional changes.
Ch.274.  The major change reflected the Legislature's
.on of the dispute over whether coverage of a nonparty
should be permitted only on the witness's consent.  The law
ides that any witness in a criminal case who is not a party
proceeding, except an expert, professional or government
(including a police or peace officer witness who was not
n an undercover capacity), may have his or her image
' obscured" in the coverage of the witness's testimony.
218(2)(h), (i), 5(c).  "Visually obscured" means that the
face "shall either not be shown or shall be rendered
unrecognizable to the viewer of such proceeding by means
l editing by the news media." Section 218(2)(i).  Counsel
rty is required to advise each nonparty witness of this
ction 218(5)(c).


The new law adopts two of the recommendations of the 1991
irst, when a criminal defendant is not yet represented by

15

cameras were present; and 85% said cameras either had no effect on, or actually improved, the fairness of their trials.[3]

Based upon these results, Chief Administrator Crosson recommended that the statute permitting audio-visual coverage of court proceedings be permanently enacted, with some changes:  (1) that one of the factors for a court to consider in deciding an application for coverage be "whether audio-visual coverage has been shown to be qualitatively different from other types of coverage in the case before the court"; (2) that the requirement of a written application be eliminated in courts of record; (3) that audio coverage of a jury foreperson be permitted with the consent of the judge and the foreperson; and (4) that the language in the statute requiring consent of the defendant's counsel for coverage of an arraignment or suppression hearing be changed to require consent of the party, not the counsel.

### 1991 Sunset of Authorizing Legislation

Following the submission of Chief Administrator Crosson's report, the Legislature failed during the 1991 legislative session to continue the experiment.  The primary reason for this was a dispute within the Legislature over whether coverage of the testimony of a nonparty witness in a criminal case should be

---

[3]     The evaluations conducted in connection with the 1991 report are discussed in further detail in Section VIII, _infra_.

14

## III.  THE REVIEW COMMITTEE

## Mandate and Composition

Chapter 187 of the Laws of 1992 provides that a 12-member committee shall be created to review audio-visual coverage of court proceedings. Jud. Law 218(9). The committee is accorded the "power, duty and responsibility to evaluate, analyze, and monitor" the experiment. Section 218(9)(c). The Office of Court Administration, bar associations and all participants in proceedings in which audio-visual coverage is permitted must cooperate with and assist the committee in its task. The statute further provides that the committee shall make recommendations to the Legislature, the Governor and the Chief Judge "as to the efficacy of the program and whether it should be continued." Id. These recommendations must be presented in a report to the Legislature, the Governor and the Chief Judge no later than November 30, 1994. Id.

Under the statute, three members of the Committee were to be appointed by the Governor, three by the Chief Administrator of the Courts, two by the Senate Majority Leader, two by the Assembly Speaker and one each by the Senate Minority Leader and the Assembly Minority Leader. The committee's chair was to be appointed by the Chief Administrator.

18

In contrast to the prior experiments, the new statute eliminated the requirement that participants in proceedings in which audio-visual coverage has been permitted complete and file evaluation forms assessing the effect of the coverage of the proceedings.

Finally, the statute created this Committee.  Section 218(9).  The Committee's mandate, composition and approach are discussed in Section III.[4]

---

[4]     The current statute was amended in 1993 to provide that no order allowing for audio-visual coverage of court proceedings shall be sealed (see Jud. Law 218(3)(b)).  L.1993, Ch.348.

## Approach

In carrying out its mandate to "evaluate, analyze and monitor" the current experiment, the Committee adopted the following methods:

1.   The Committee solicited and compiled comments and observations of trial judges throughout the State who, since the current statute become effective, have presided over proceedings in which audio-visual coverage was permitted (see Section V, infra).

2.   The Committee solicited complaints, statutory violations and other concerns relating to audio-visual coverage of court proceedings from members of the Criminal Justice Section of the New York State Bar Association and from the New York State District Attorneys Association (see Appendices A and B).

3.   The Committee collected all applications for audio-visual coverage made during the course of the experiment, and analyzed and compiled data from such applications (see Section IV, infra).

4.   The Committee reviewed and analyzed prior studies and surveys relating to audio-visual coverage, including studies and surveys conducted in other jurisdictions (see Section VIII, infra).

20

In May 1993, the appointment of the Committee's members was completed.  The Hon. Burton B. Roberts, Administrative Judge of the Twelfth Judicial District, was appointed Committee Chair.  The Chief Administrator's additional appointments were:  Hon. Richard A. Brown, the District Attorney of Queens County; and Sam Roberts, a New York Times reporter.  The Governor's appointees were: Eleanor S. Applewhaite, Esq., General Counsel of the Educational Broadcasting Corporation; S. Paul Conti, Jr., Assistant News Director of WNYT-TV in Albany; and Edward W. Hayes, Esq., a private attorney in Manhattan.

The Senate Majority Leader's appointees were:  Philip M. Damashek, Esq., a member of the law firm of Damashek Godosky & Gentile; and Richard N. Winfield, Esq., a member of the law firm of Rogers & Wells.  The Assembly Speaker's appointees were:  Floyd Abrams, Esq., a member of the law firm of Cahill Gordon & Reindel; and Harry M. Rosenfeld, Editor of the Albany Times Union.  The Senate Minority Leader's appointee was Jack T. Litman, Esq., a member of the law firm of Litman, Asche, Lupkin & Gioiella.  The Assembly Minority Leader's appointee was Richard Aurelio, President of Time Warner-NYC Cable Group.

Assisting the Committee were Lawrence K. Marks, Esq. and Philip Ferrara, Ph.D. of the Office of Court Administration.

19

Nor did the Committee (with one member dissenting) decide to commission an academic research study of the experiment. In light of the uniformly positive results of the prior studies and surveys, the Committee had considerable doubts about the value or necessity of an academic study. More importantly, the proposals that were brought to the Committee's attention all required a substantial expenditure of money -- indeed, the research study recommended by the New York State Defenders Association, which was outlined in a 1991 proposal by a researcher from Northeastern University, would cost as much as $800,000. Given that the Legislature appropriated no funds for the Committee to conduct its review, the Committee could not give serious consideration to commissioning such a study.

### Timing of Submission of Report

Pursuant to a request from the Governor's Office, the members of this Committee (with one dissent) decided to submit this report now, rather than delay until the November 30, 1994 deadline that the statute sets for submission. Jud. Law 218(9)(c). In the Committee's view, submission of the report on or about that late date could significantly increase the possibility that audio-visual coverage of trial court proceedings again might be discontinued on January 31, 1995, the sunset date in the current statute. Rather than submit this report in November, when the Legislature generally is not in session, and require the Legislature to confront these

22

5.   The Committee reviewed and analyzed information regarding audio-visual coverage statutes and rules from other jurisdictions (see Section VII, infra).

6.   The Committee conducted two public hearings, at which over 40 witnesses testified, and it reviewed written submissions prepared by other individuals and organizations who were unable to testify (see Section VI, infra).

7.   The Committee met as a group on a number of occasions to discuss and debate the many issues relating to audio-visual coverage of court proceedings.

The Committee unanimously decided not to develop and distribute evaluation forms to be completed by participants in proceedings in which audio-visual coverage was permitted. The current statute, in contrast to the prior statutes, does not require that participants complete evaluation forms. This apparently was in response to a recommendation in the 1991 report that the use of evaluation forms be discontinued. Based on its review of the consistently favorable results of the numerous prior studies in New York and in other jurisdictions (see Section VIII, infra), the Committee concluded that one more survey would add little, if anything, to its assessment of the current experiment.

21

IV.   APPLICATIONS and ORDERS

As part of its review of the cameras in the courts program, the Committee collected copies of all applications for audio-visual coverage made by the news media since the program was reinstituted in June 1992, and copies of all orders granting or denying coverage since that time.  Upon receiving these documents, the Committee analyzed the applications and orders relating to the period from June 23, 1992 to August 1, 1993. The Committee focused on this 13.3 month period because it was comparable in duration to the data collection periods analyzed in the prior two experiments in New York.

### Applications and Orders Overall

Table 1 compares application and order data relating to the current study with data relating to the two prior experiments. The courts received a total of 385 applications requesting audio-visual coverage from June 1992 to August 1993. Of the 385 applications made, 315 or 81.8% resulted in orders granting coverage.  A total of 64 orders or 16.6% denied coverage and 6 orders or 1.6% were still pending.  The finding that approximately four out of five applications resulted in orders granting coverage is virtually identical to the finding in the second experiment, in which 79.6% of all applications resulted in approved orders.

24

issues in the space of a single month when it reconvened in January, the Committee agreed with the suggestion of the Governor's Office that it is of vital importance that the Legislature and the Governor receive the report this spring.

## Visual Obscuring of Nonparty Witness Image

The Committee also collected information concerning non-party witnesses who requested that their image be visually obscured. Table 1 reports a total of 12 judicial proceedings, representing only 3.8% of all the proceedings with orders granting coverage, in which at least one nonparty witness requested that his or her image be visually obscured.

## Applications and Orders by Judicial District and Type of Court

Table 2 shows the applications and orders for the current and the second experiments by judicial district. The judicial districts in New York City are aggregated, and Nassau and Suffolk counties, both in the Tenth Judicial Districts, are listed separately.  For the current experiment, the percentage of orders granting coverage ranged from 59.1% in Suffolk County to 95.5% in the Fifth Judicial District. Compared to the second experiment, the current study reveals significant increases in the total applications for such areas as Nassau County (6 applications v 70 applications), the Third Judicial District (6 applications v 20 applications), and the Eighth Judicial District (32 applications v 63 applications).

26

Table 1

### Applications and Orders for Audio-Visual Coverage of Judicial Proceedings Across Three Experiments

|  | First Experiment | Second Experiment | Current Study |
|---|---|---|---|
| Study Period | 12/1/87 - 2/15/89 | 12/15/89 - 2/8/91 | 6/23/92 - 8/1/93 |
| Duration (Months) | 14.5 Months | 13.8 Months | 13.3 Months |
| Applications Received | 805 | 357 | 385 |
| Orders Granting Coverage | 731 (90.8%) | 284 (79.6%) | 315 (81.8%) |
| Orders Denying Coverage | 74 ( 9.2%) | 73 (20.4%) | 64 (16.6%) |
| Pending Cases | — | — | 6 ( 1.6%) |
| Proceedings With a Witness Image Obscured | — | — | 12 (3.8%)[5] |

The current experiment and the second experiment had less than half the number of applications as compared to the first experiment. Also, the percentage of orders granting coverage was the highest during the first experiment, with 90.8% of all the applications approved. The significant decrease in applications and approval rate since the first experiment resulted from the statutory amendment enacted after the first experiment requiring the defendant's consent for coverage of arraignments.

---

[5]Percentage is based upon the number of orders granting coverage.

Table 3 provides data on the number of applications made in each type of court during the current experiment. There were few applications in the Family Court (1.8%), District Court (.8%) and Town and Village Courts (.5%). The largest number of applications, 244 proceedings or 63.4% of all applications, were filed with County Court. Nearly 80% of all applications were made in proceedings outside of New York City.

**Table 3**

**Applications for Audio-Visual Coverage
of Judicial Proceedings by Type of Court**

| Type of Court | Current Study (6/23/92 - 8/1/93) | |
|---|---|---|
| | Number | Relative % |
| Supreme | 83 | 21.6% |
| County | 244 | 63.4% |
| Family | 7 | 1.8% |
| District | 3 | .8% |
| NYC Criminal | 23 | 6.0% |
| City | 23 | 6.0% |
| Town/Village | 2 | .5% |
| Total Applications | 385 | |

28

## Table 2

### Applications and Orders for Audio-Visual Coverage of Judicial Proceedings by Judicial District

| Judicial District | Second Experiment (1989-91) | | | Current Study (1992-93) | | | |
|---|---|---|---|---|---|---|---|
| | Total Applications | Orders Granting Coverage | % Approved | Total Applications | Orders Granting Coverage | % Approved | Pending Cases |
| New York City J.D. (1,2,11,12) | 97 | 81 | 83.5% | 68 | 54 | 79.4% | 2 |
| Long Island | | | | | | | |
| 10th J.D. (Nassau) | 6 | 3 | 50.0% | 70 | 55 | 78.6% | 2 |
| 10th J.D. (Suffolk) | 26 | 18 | 69.2% | 22 | 13 | 59.1% | 0 |
| Upstate | | | | | | | |
| 3rd J.D. | 6 | 6 | 100.0% | 20 | 15 | 75.0% | 0 |
| 4th J.D. | 20 | 18 | 90.0% | 48 | 45 | 93.8% | 2 |
| 5th J.D. | 54 | 45 | 83.3% | 22 | 21 | 95.5% | 0 |
| 6th J.D. | 40 | 38 | 95.0% | 35 | 31 | 88.6% | 0 |
| 7th J.D. | 47 | 34 | 72.3% | 25 | 22 | 88.0% | 0 |
| 8th J.D. | 32 | 17 | 53.1% | 63 | 48 | 76.2% | 0 |
| 9th J.D. | 29 | 24 | 82.8% | 12 | 11 | 91.7% | 0 |

27

<u>Audio-Visual Coverage by Nature of Proceeding</u>

The applications also were analyzed by the type of case or nature of the proceeding. Proceedings were sorted into the following five categories: (1) criminal-violent crime (excluding sex related offenses) (<u>e.g.</u>,murder, robbery, assault);(2) criminal-non violent crime (<u>e.g.</u>, grand larceny and drug possession/sale); (3) criminal-sex-related offenses (<u>e.g.</u>, rape and sodomy); (4) civil court cases; and (5) family court cases. Table 5 shows the number of applications by the type of case including data on the proportion of orders granting coverage for each of these categories.  The category with the largest number of applications was criminal cases involving violent crime; 230 applications out of 367, or 62.7%, fell into this category.  Cases involving criminal-nonviolent crimes comprised 19.6% of the total applications, followed by cases involving criminal charges for sex-related offenses, which comprised 10.4.%.  Excluding the few family court cases, the relative percentage of applications granted was relatively similar across different types of cases.

30

<u>Type of Audio-Visual Coverage</u>

Table 4 presents data on the type of media coverage requested in applications made during the current experiment. Based on a total of 381 applications, 244 or 64.0% included requests for multiple audio-visual coverage (videotape, audiotape, and still photography). Approximately 25% of the remaining applications involved videotape only, 9.4% still photography only, and less than 1% involved audiotape only. Applications requesting multiple audio-visual coverage had the highest proportion of orders granting coverage (84.8%). When only still photography was requested, 75.0% of the applications resulted in orders granting coverage.

**Table 4**

**Type of Audio-Visual Coverage**
**Requested by the Media and Percent Granted Coverage**

| | Applications | Relative % of Total | Percent Granted Coverage (Orders) |
|---|---|---|---|
| Multiple Audio-Visual Coverage (Videotape, Audiotape, and Still Photography) | 244 | 64.0% | 84.8% (207) |
| Videotape <u>Only</u> | 98 | 25.7% | 80.6% (79) |
| Still Photography <u>Only</u> | 36 | 9.4% | 75.0% (27) |
| Audiotape <u>Only</u> | 3 | .8% | 66.7% (2) |
| Total Applications | 381[6] | | |

---

[6]Type of media coverage requested was not available for four proceedings.

29

**Table 6**

**Reasons for Denial of Audio-Visual Coverage
of Judicial Proceedings**

| | First Experiment (1987-89) | | Second Experiment (1989-91) | | Current Study (1992-93) | |
|---|---|---|---|---|---|---|
| | Number of Cases | Relative % | Number of Cases | Relative % | Number Of Cases | Relative % |
| Defense Objected (No Consent) | N/A | --- | 44 | 60.3% | 20 | 31.3% |
| Untimely Application | 18 | 24.3% | 6 | 8.2% | 15 | 23.4% |
| Interfere with Defendant's Right to Fair Trial | 17 | 23.0% | 2 | 2.7% | 3 | 4.7% |
| No Defense Counsel to Consult | N/A | --- | 3 | 4.1% | 0 | 0.0% |
| Mental/Emotional Harm or Disruptive Due to Nature of Proceeding | 14 | 14.9% | 2 | 2.7% | 5 | 7.8% |
| Age/Youthful Offender | 7 | 9.5% | 0 | 0.0% | 4 | 6.3% |
| Reason Not Given | 18 | 24.3% | 16 | 21.9% | 17 | 26.6% |
| Total Applications Denied | 74 | | 73 | | 64 | |

The relative percentage of applications denied because of a lack of timeliness in making the application increased from 8.2% during the second experiment to 23.4% during the current study. In addition, during the second experiment, only 26.4% of the judges surveyed in proceedings with coverage indicated that the media adhered to the seven day-application rule. Finally, very few applications (4.7% or 3 cases) were denied on the ground that the coverage would interfere with a defendant's right to a fair trial.

32

Table 5

### Requests for Audio-Visual Coverage of Judicial Proceedings by the Type of Case

| Type of Case | Applications | Relative % of Total | Orders Granting Coverage | Percent Granting Coverage |
|---|---|---|---|---|
| Criminal - Violent Crime (excludes sex-related offenses) | 230 | 62.7% | 188 | 81.7% |
| Criminal - Non Violent Crime | 72 | 19.6% | 64 | 88.9% |
| Criminal - Sex Related Offenses | 38 | 10.4% | 31 | 81.6% |
| Civil Cases | 23 | 6.3% | 20 | 87.0% |
| Family Court Cases | 4 | 1.1% | 3 | 75.0% |
| Overall | 367[7] | | | |

### Reasons for Denial of Coverage

In the current experiment, the most common reason for denial of coverage (31.3%, or 20 cases) was that the defense objected. This reason was also the most frequently cited in the second experiment, with 60% of the orders denying coverage falling into this category. As previously noted, this is a result of the statutory change following the first experiment requiring that coverage of arraignments and suppression hearings be permitted only if the defendant consents. A statistical summary of the reasons for the denial in the current experiment and the prior two experiments is provided in Table 6.

---

[7]Excludes six cases still pending and 12 cases where the nature of the proceeding was not available.

31

unobtrusive, had no effect upon the fairness of the proceedings and did not disturb the dignity and decorum of the courtroom.   Some trial judges reported that attorneys seemed better prepared, and that, for the most part, participants forgot that cameras were present in the courtroom.   Several Administrative Judges commented that the cameras in the courts program has been implemented in their districts without incident and has been an overall success.

A few judges offered negative comments about the program. One judge complained that he had to spend time advising the media on their own pooling arrangements.   He also noted that the broadcast and print media were attempting to "scoop" one another. Another judge reported that in one case still photographs of a victim's family were taken in the courtroom and published, contrary to the judge's direction.   A trial judge in another proceeding commented that the prosecutor engaged in "grandstanding" during the video coverage.   One judge generally commented that audio-visual coverage of arraignments is not desirable because it will "increase media coverage and perhaps inflame public sentiment covering the case and/or the defendant."

Several judges who reported no problems with audio-visual coverage in cases in which they presided did express some general negative views about the cameras in the court program.   Some complained that audio-visual coverage causes delays of other matters before the court; the delays result from untimely

34

## V.   COMMENTS OF TRIAL JUDGES

The Committee, through the Administrative Judges of the Unified Court System, solicited and compiled comments and observations of trial judges throughout the State who, since the current statute became effective, have presided over proceedings in which audio-visual coverage was permitted.  The trial judges were asked whether they experienced any problems as a result of the audio-visual coverage, whether any complaints had been made to them by participants in the proceedings and their general views as to the effectiveness of the cameras in the courts program.

Eighty trial judges responded to the Committee's request for information.  Some of these judges had experience during the current experiment with only one or two proceedings in which audio-visual coverage was permitted, and others presided over several cases in which coverage was permitted during this time period. Comments were received from trial judges who presided over the vast majority of proceedings during the current experiment in which audio-visual coverage was permitted.

A total of 76, or 95%, of the trial judges reported no problems with audio-visual coverage, and no complaints by participants or others with respect to such coverage.  The majority of the comments were extremely positive, stating that the media were highly cooperative and that the audio-visual coverage was

33

## VI.   PUBLIC HEARINGS

The Committee held two public hearings:  in New York City on March 1, 1994, and in Albany on March 8, 1994.  The purpose of the hearings was to permit all interested persons and organizations to submit their views on the effect of audio-visual coverage of judicial proceedings and on the procedures governing the experiment.  The hearings were publicized in a press release and in public notices that were circulated to bar associations and organizations and posted in courthouses throughout the State.

Forty-six people, including judges, attorneys and media representatives, testified at the hearings.   Following are summaries of the testimony:

### New York City, March 1, 1994

#### Michael Miller, Esq.:

Mr. Miller, the co-chair of the Special Committee on Cameras in the Courts of the New York County Lawyers Association, provided the Committee with copies of the Associations's recently released report calling for permanent enactment of section 218 of the Judiciary Law.  He stated that, of the three branches of government, the judiciary is the least understood by the public. Aggravating this problem is the urbanization of modern society, which has diminished personal attendance at court proceedings and has decreased many informational sources for citizens.   The Association believes that audio-visual coverage has promoted the

36

applications, the need to interview witnesses regarding coverage and the occasional lengthy hearing on the application.    Other judges commented that the program did not promote public understanding of the judicial process because the media tend to provide brief, sound bite coverage of high profile cases with violent or prurient appeal.

Mr. Brill cited a recent Times Mirror survey which revealed that 43% of Americans had watched a trial on television in the past two years, 66% of whom reported a better understanding of and 49% of whom reported increased respect for the judicial process. His organization has surveyed judges in the cases it has covered. The surveys reveal that not one judge reported that camera coverage impeded the proceedings, and 75% believed that such coverage enhanced the public's understanding of the process.

Mr. Brill observed that even though Court TV provides extensive, often gavel-to-gavel, coverage of court proceedings, even "sound bite" coverage is preferable to a reporter summarizing the proceedings or lawyers placing their "spin" on the actual testimony. Moreover, he believes that Court TV keeps the sound bites honest because it provides a record of the entire proceedings. He also contended that many criminal defense attorneys have become more favorable to camera coverage because juries in covered cases, in which the public actually can see and hear the evidence, have been less reluctant to deliver unpopular verdicts. He also noted that no appeal in which Court TV covered the trial has even raised the issue of camera coverage.

Mr. Brill strongly disputed the suggestion that camera coverage of the first Rodney King trial in Los Angeles led to the post-verdict rioting in that city. It was the repeated showing of the amateur videotape of the beating, not the daily coverage of the

38

concept of the public trial, providing the public with a fuller view of the judicial process.

In addition, cameras in the courts have great educational value, in that students, attorneys and judges can study videotapes and learn from them.  In the Association's view, section 218 is a carefully drafted, effective statute; as a result, the Association has learned of no case in which a criminal defendant's due process rights have been violated because of audio-visual coverage.

Steven Brill, Esq.:

Mr. Brill is the President and Editor-in-Chief of the Courtroom Television Network.  Since its inception, Court TV has covered approximately 280 court proceedings in the United States and around the world, including 23 cases in New York State since June 1992.  In his view, Court TV's coverage has been far superior to print media coverage of these and other proceedings.  He gave examples of three recently covered New York cases that raised important public issues: (1) the Daly murder trial in Brooklyn, in which the primary question was who of several teenagers involved in a gun battle actually shot a public school principal who was walking in the vicinity; (2) the Lemrick Nelson/Crown Heights trial, of which a two-hour summary videotape was provided to public schools throughout New York City; (3) and a complicated medical malpractice case tried in Orange County Supreme Court.

37

Mr. Lefcourt cited as an example of prejudicial camera coverage the televising of the arraignment of a state legislator he represented.  Although the legislator ultimately was acquitted of the charges, he contended that her political career never recovered.[8]  He asserted that the television coverage of the Rodney King and Reginald Denny trials in Los Angeles was "skewed," and resulted in public ridicule of the court system.  He also charged that television stations that invite viewers to call in and vote on the guilt or innocence of defendants whose trials are being televised trivialize the justice system.

George Freeman, Esq.:

Mr. Freeman is Assistant General Counsel for the New York Times and Chair of the New York State Bar Association Media Law Committee.  He stated that televised trials afford the public a better understanding of the judicial process and the opportunity to confront major issues in our society.  Critics of cameras in the courts have focused on the impact of cameras outside the courtroom because it is now indisputable that cameras have caused no disruption inside the courtroom.

---

[8]   Upon investigation of Mr. Lefcourt's claim that, because of the camera coverage of this case, the state legislator's political career never recovered, the Committee learned the following:  that the person is still a member of the Legislature, and that since the acquittal the person twice has been re-elected by an overwhelming majority and has been named the chair of an important legislative standing committee.

trial, that led to the violent response to the verdict.   In his view, most viewers of the television coverage of the trial were not surprised at the verdict.

Mr. Brill supports having the trial judge decide whether a nonparty witness's image should be visually obscured.  He noted that when a witness invokes this right under the current statute, Court TV generally will not cover the trial at all because it does not want to provide unbalanced coverage of the proceedings.   He also complained that it is the policy of the Manhattan District Attorney's Office to encourage its witnesses to invoke the right.

Gerald Lefcourt, Esq:

Mr. Lefcourt, a criminal defense lawyer, testified on behalf of the New York State Association of Criminal Defense Lawyers, the New York State Criminal Bar Association and the Criminal Justice Section of the New York State Bar Association.  An opponent of cameras in the courts, Mr. Lefcourt complained that adequate research has not been conducted to ascertain the effect of televised trials on the public or to determine whether society as a whole has benefitted from camera coverage.  He also complained that the broadcast media tend to cover only those cases involving salacious matters.  He expressed concern that television provides powerful images and that inculpatory evidence against defendants often is exacerbated by television "snippets."

Professor Leonard Jeffries's civil suit against the City University of New York.  In his view, the televised coverage of this trial was an "immense step" forward in the education of Americans in the court system and the Constitution.  Prior to the Jeffries trial, he presided over a trial involving similar issues.  Because that trial was not televised (it took place before the federal court experimental program commenced), it generated relatively little public interest as compared to the Jeffries trial.

Mr. Conboy stated that the television coverage of the Jeffries trial was highly professional and impressively impartial.  In addition, the newspaper coverage of the trial was probably of higher quality because the print reporters watched summaries of the trial each night on Court TV.  He received over 1000 letters following the trial, and he considered the level of understanding of issues as reflected in the letters to be extraordinary.

Ira London, Esq.:

Mr. London is a criminal defense lawyer and the President-Elect of the New York State Association of Criminal Defense Lawyers.  He represented the defendant in People v. Joel Steinberg.  He stated that the presence of cameras in that case in no way distracted him or prejudiced his client.  He believes that the camera coverage raises the performance level of all participants and diminishes prosecutorial misconduct.  Based on his experience, cameras create no more anxiety in witnesses than do

42

Mr. Freeman noted that even snippets have value, in that they enhance the public's perception that the judicial process is serious and fair.  He predicted that although coverage of newsworthy trials will become more extensive over time, restriction or limitation of coverage because it is not deemed sufficiently newsworthy would not be constitutional.

## Madeleine Schacter, Esq:

Ms. Schacter is a litigation attorney with CBS and Chair of the Cameras in the Courts Subcommittee of the New York State Bar Association Media Law Committee.  Because no proceeding has been disrupted or impaired because of audio-visual coverage and the experiment has been successful, her committee recommends that the statute be made permanent, with some amendments.  First, the statute should provide for a presumption of access, with access permitted unless a qualitative difference between audio-visual coverage and print coverage is demonstrated.  Second, except for the victim of a sex offense, a judge should decide whether the image of a nonparty witness should be visually obscured; and a judge should require this only if the witness has presented a reasonable ground to do so.

## Kenneth Conboy, Esq.:

Mr. Conboy, a member of the law firm of Mudge, Rose, Guthrie, Alexander & Ferdon, was until recently a federal district judge in Manhattan.  Before leaving the bench, he presided over

41

the cases the verdicts have been guilty, in others the verdicts have been not guilty.

Several years ago, he presided over a televised case that presented the complex issue of the admissibility of DNA evidence. Following that case, he received numerous letters from the public that demonstrated tremendous respect for the judicial system. Judge Sheindlin believes that the judge should decide whether a witness's image should be visually obscured. He sees no rationale for prohibiting camera coverage of arraignments in Supreme Court.

Elizabeth Hubbard:

Ms. Hubbard is the Executive Director of the Committee for Modern Courts. She supports permanent enactment of the statute. Volunteers of her organization who monitor court proceedings have observed numerous cases in which cameras were present, and they have seldom, if ever, reported that cameras interfered with the fairness of the proceedings. Camera coverage provides the public with the opportunity to see and hear justice in action. The ability of an active media to reach beyond the confines of the courthouse is extremely valuable.

Rosanna Scotto:

Ms. Scotto is a news anchor and reporter for Fox TV. She has covered numerous court proceedings, some of which were televised. In her experience, camera coverage has never disrupted

44

spectators.   Whenever cameras are present in the courtroom, the level of fairness tends to rise.

Steven Paulus:

Mr. Paulus is Vice-President of New York 1 News, a 24-hour cable news station serving 1.2 million New York City subscribers that has presented extensive coverage of court proceedings.  He stated that camera coverage of actual testimony, even sound bite coverage, is always preferable to the statements of witnesses and attorneys outside the courtroom.  He urges permanent enactment of the statute, but recommends some reforms.  The statute should provide for a presumption for camera coverage; cameras should be seen as a standard fixture and a necessary component of the judicial process.   In addition, the decision whether a witness's image should be visually obscured should be made by the trial judge, not the witness.

Hon. Gerald Sheindlin:

Judge Sheindlin, who sits in Bronx Supreme Court, has presided over many televised court proceedings.  He has observed no adverse effect resulting from such coverage.  Witnesses have not been more nervous, jurors have not been distracted and attorneys have tended to be more prepared.  Soon after the cameras begin to function, no one even notices them.  In his experience, camera coverage has had no effect whatsoever on jury verdicts; in some of

43

presence of cameras.  He has observed that judges and attorneys have become more receptive to cameras as they become more familiar with them.

Mr. Bookstaver disputed the contention that the media cover only sensational trials.  Although he has been involved in the coverage of numerous civil trials, it is the sensational trials that people tend to remember.  He recommends that the judge decide whether a witness's image should be visually obscured.  Under the prior experiments, when this was a judicial decision, he saw no instance in which a witness who had a legitimate reason not to be filmed was forced to testify before the cameras.  He cited a case tried during a prior experiment in which a major witness testified before the cameras calmly and seemingly unaffected by their presence; yet, when the case was retried during the current experiment, the witness inexplicably invoked the right to have his image visually obscured.

Mr. Bookstaver opposes requiring the defendant's consent to cover an arraignment, so long as the defendant is represented at the arraignment by counsel.  He cited a recent case in which cameras were barred from a defendant's arraignment in the lower court, were permitted to cover subsequent proceedings in the lower court, but then were barred again from covering the arraignment in the superior court because the defendant would not consent.  In addition, because some judges have told him that they will never

46

the proceedings.   She believes that camera coverage renders reporting more accurate; without it, reporters must paraphrase testimony and rely on the attorneys' versions.  She recommends that the judge decide whether a witness's image should be visually obscured, citing cases in which witnesses have invoked this privilege and then, after testifying, given televised interviews outside the courtroom.

Hon. Joseph K. West:

Judge West is Supervising Judge of the Criminal Courts in the Ninth Judicial District.  He was originally opposed to cameras in the courts, but experience has demonstrated that they have no effect on court proceedings.  None of the judges in the Ninth District have had any problems with camera coverage.  Witnesses have not been more nervous when cameras are present, and most participants soon forget about the cameras.  In his district, witnesses have rarely invoked the right to have their image visually obscured.

David Bookstaver:

As administrator of the New York Broadcasters Pool for the past five years, Mr. Bookstaver serves as the media liaison for audio-visual access to the courts in the New York City metropolitan area.  In that capacity, he has been directly involved in over 700 proceedings in which cameras were present in the courtroom.  He is unaware of a single proceeding that has been disrupted by the

45

is useful because new or complicated information is more readily understood and retained when provided in small doses.

David Diaz:

A correspondent with WCBS-TV in New York City, Mr. Diaz has covered hundreds of court proceedings, a number of which have been televised. He supports permanent enactment of the statute and a presumption of audio-visual access. The judiciary is the least understood branch of government; the average citizen knows little about the rights of criminal defendants, the rules of evidence and other legal principles. When cameras are present at court proceedings, the print media are generally more accurate in their reporting. He has observed no disruption in proceedings resulting from the presence of cameras. In his view, participants display an initial curiosity but then forget the cameras are present.

Hon. Harold Rothwax:

Judge Rothwax sits in Manhattan Supreme Court, where he presided over the trial of People v. Joel Steinberg. Initially, he was opposed to the cameras in the courts program because he thought cameras would be disruptive and distracting. However, he discovered that this was not true; the cameras were invisible and the attorneys ignored them and focused on the issues in the case. In his view, cameras provide a calming, anti-sensational influence on the proceedings. They serve to restrain bad behavior on the part of the attorneys, and they exert a positive influence on

48

allow cameras into their courtrooms, he favors a statutory presumption in favor of camera access.  He also views as arbitrary the requirement that an application for coverage be submitted seven days in advance of the proceedings.

Ivar Goldart, Esq.:

Mr. Goldart testified on behalf of the Legal Aid Society of New York City.  Although the Legal Aid Society has previously opposed cameras in the courts, it now supports continuation of the program, but on an experimental basis with all the existing safeguards remaining.  In the relatively few Legal Aid Society cases that have received audio-visual coverage, the Society's original fears have not materialized -- that is, no "grandstanding" has occurred, witnesses have not been frightened and the reporting has been relatively balanced.

Douglas O'Brien, Esq.:

Mr. O'Brien is the News Director for WQCD Radio in New York City and the Chair of the Public Relations Committee of the New York State Bar Association.  He recommended that the statute be made permanent, although he believes that the rules governing cameras in the courts should be prescribed by the courts, not by the Legislature.  The public now relies heavily on radio and television for information.  Although gavel-to-gavel coverage is particularly informative, in his view even minimal audio-coverage

47

being influenced by social pressures brought to bear on a particular case. In addition, editing can prejudice criminal defendants; reaction shots, juxtaposition, camera angles and lighting can be used to make the defendant appear guilty.

Professor Thaler raised concerns about the impact of camera coverage on participants in the proceedings. His case study of the Joel Steinberg trial revealed that an expert witness at the trial was concerned that her testimony might be watched by her two young daughters who might get caught up in the lurid details of the case. And his interview of Hedda Nussbaum, the key prosecution witness in the case, revealed that she saw herself as a symbol of the battered women's movement. Other witnesses at the trial told him that they were more nervous and had to focus more intently because of the presence of cameras.

Professor Thaler further complained that most viewers of televised court proceedings do not watch Court TV, but watch commercial television, which exploits trial images and revels in the sensational and lurid.

<u>Murray Richman, Esq.</u>:

Mr. Richman, a criminal defense lawyer, has represented defendants in two criminal trials in which cameras were present. The cameras did not affect him, the prosecutor or the witnesses in those cases, both of which resulted in acquittal. He also spoke to

judges.   He supports permanent enactment of the statute, but
opposes a presumption of access.  He also believes that the judge
should  decide  whether  a  witness's  image  should  be  visually
obscured.

Marvin Scott:

        Mr. Scott is a news anchor and correspondent with WPIX-TV
in  New York City,  and  he is  President of  the Television-Radio
Working Press Association.  He believes that the experiment, which
has been an overwhelming success and has better informed the
public,  should  be  ended  and  that  the  statute  should  be  made
permanent.   With the aid of cameras in the courts, reporters no
longer have to paraphrase testimony and thus can more accurately
cover the proceedings.   Because a number of judges have stated
they will never allow ~~cameras into their courtrooms~~, he favors a
presumption of access.

Paul Thaler:

        Professor Thaler is the Director of Journalism and Media
at  Mercy  College  and  the  author  of  a  recently  published  book
entitled "The Watchful Eye: American Justice in the Age of the
Television Trial".   An opponent of cameras in the courts, he
believes  that  television  creates  an  entirely  new  courtroom
environment that can undermine the presumption of innocence and
transform criminal defendants into public figures.   The courtroom
must be a place where the process of law is carried out without

49

whether a witness's image should be visually obscured; the current provision allowing the witness to decide has discouraged gavel-to-gavel coverage in a number of cases.   The Association also recommends that the current list of authorized camera equipment be updated.

Richard Heffner:

Professor Heffner teaches communications and public policy at Rutgers University, is the producer and moderator of "The Open Mind" and is the Chair of the Rating Board of the Motion Picture Industry.  He also was the Chair of the Office of Court Administration's first Cameras in the Courts Committee and a member of OCA's second Cameras in the Courts Committee.  He noted that the primary intent of the statute is to enhance public understanding of the judicial system.  With the exception of Court TV, he has been unimpressed with the educational value of much of the televised coverage of court proceedings.  He also is greatly concerned that televised court proceedings are demeaned by commercial advertisements.

Nevertheless, he supports permanent enactment of the statute, with all the current safeguards.  He is opposed to creating a presumption of access, and favors a thorough, methodical and independent study of the cameras in the courts program.

52

the jurors after the trials, and not one said that the cameras in
any way affected the deliberations.  In his view, judges are on
better behavior when cameras are present.

### Steven Fishner, Esq:

Mr. Fishner, the Administrative Assistant District
Attorney in the Manhattan District Attorney's Office, testified on
behalf of District Attorney Robert M. Morgenthau  The experiment
has been a success in New York County, and District Attorney
Morgenthau supports permanent enactment of the statute, with all
the current restrictions.  Mr. Fishner disputed that it is the
policy of his office to encourage nonparty witnesses to invoke the
right to have their image visually obscured.  The policy of his
office, as the statute requires, is merely to notify witnesses of
this right.  He referred to a recent televised trial involving
charges of illegal abortion, in which one victim invoked the
privilege and another victim did not.

### Devereux Chatillon, Esq.:

Ms. Chatillon, a member of the Committee on
Communications and Media Law of the Association of the Bar of the
City of New York, testified on behalf of the entire Association.
The Association supports permanent enactment of the statute, having
concluded that the experiments in New York and throughout the
nation have been a success.  The Association also favors a
presumption of access.  And it supports having the judge decide

camera coverage and would not recognize his office's objection because the office had not yet been assigned to the case.   Mr. Nowak acknowledged that the new provision in the current statute, which requires the defendant's consent for arraignment coverage when the defendant is not yet represented by counsel and requires an advisement of the right to counsel and an affirmative waiver of that right, is designed to address this problem.

The second case cited was <u>People</u> v. <u>Nicole Eddy</u> (a 1993 case), in which the defendant was charged with shaking her baby to death.  Following a televised arraignment, the charge against the defendant was increased from second degree manslaughter to second degree murder.  Mr. Nowak suggested that the increase in the charge was a direct result of the publicity generated by audio-visual coverage of the arraignment.   In a subsequent proceeding in the same case, the defense attorney did not receive notice of the application for coverage until arriving in the courtroom, although the court did, at that time, hear argument on whether coverage should be permitted.  Similarly, in <u>People</u> v. <u>Jackson</u> (also a 1993 case), the defense attorney did not receive notice until arriving in the courtroom, although again the court permitted argument at that time.

Finally, Mr. Nowak cited the case of <u>People</u> v. <u>Terrell Green</u>, a class A-1 felony drug sale case, in which the parties agreed to a dismissal of the charges in the interest of justice.

54

Albany, March 8, 1994

Hon. G. Oliver Koppell:

Mr. Koppell is the Attorney General of the State of New York and a former Chair of the Assembly Judiciary Committee. He originally was an opponent of cameras in the courts, but upon learning more about the program he became a vigorous proponent who favors permanent enactment of the statute. The program serves a valuable educational function, reduces public skepticism and cynicism and sends the message that the court system is an open one in which all litigants are treated equally.

He has surveyed the over 400 attorneys in his office concerning their experience with camera coverage. Although there has not been extensive coverage of the office's cases, the reports he has received from his attorneys are all positive. He knows of no case in which anyone was harmed by the presence of cameras. Mr. Koppell commented that he supports having the judge decide whether a witness's image should be visually obscured.

Edward J. Nowak, Esq.:

Mr. Nowak is the Monroe County Public Defender and the President of the New York State Defenders Association. He cited four cases in Monroe County that he claimed highlight his concerns about the cameras in the courts program. In the first case, People v. Arthur Shawcross (a 1990 case), the arraigning judge permitted

53

notices an initial reaction by participants to the cameras, but then the cameras are forgotten. She has spoken with a number of citizens groups who feel that cameras in the courts have made a tremendous contribution and that audio-visual coverage is far more educational than newspaper coverage. Judge Marks favors retaining all the restrictions in the current statute.

Diane Kennedy:

Ms. Kennedy is the President of the New York State Newspaper Publishers Association. In her opinion, the camera fulfills the same function as a pencil and notebook; it is a "surrogate eye" for the newspaper reader. She supports permanent enactment of the statute, but with some significant changes. The judge should decide whether a witness's image should be visually obscured, and the defendant's consent should not be required to cover arraignments. In addition, the seven-day notice rule is arbitrary and burdensome; because there is nothing so unwieldy about audio-visual coverage, a 48-hour notice rule would be more appropriate. And coverage should be permitted, in the judge's discretion, after a trial begins; news does not always break predictably, and mid-trial coverage should not be contingent on the parties' consent.

Hon. Kevin Mulroy:

Judge Mulroy, an Onondaga County Judge, testified on behalf of the judges of the Fifth Judicial District. When cameras

Although the defense attorney had consented to camera coverage at the proceeding in which the case was to be dismissed, the broadcast media never appeared at the proceeding because, in Mr. Nowak's opinion, the defendant had been granted permission not to appear.

Terrence Connors, Esq.:

Mr. Connors is a trial attorney in Buffalo who has represented a number of clients whose cases have been televised. Although he considers Court TV to be excellent, in his view most other television coverage has been of minimal educational value. In addition, camera coverage tends to scare away ordinary, lay witnesses.  And jurors in cases in which cameras are present receive the message, which can be detrimental to criminal defendants, that the case is an important one.  He recommends that the judge instruct the jurors in such cases that the cameras must have no effect on their deliberations.

Mr. Connors also cited a Buffalo case in which a man who had been suspected of committing a series of highly publicized rapes was arrested on drug charges.  Several days after his arraignment on the drug charges was televised, the man killed himself in the county jail.

Hon. Patricia D. Marks:

Judge Marks, a Monroe County Judge, has presided over about 15 cases in which cameras were present.  She generally

55

Joseph Rohm:

Mr. Rohm is Managing Editor of WKBW-TV in Buffalo. He stated that cameras are an unobtrusive presence in the courtroom, and participants soon forget that they are there. The more knowledge that members of the public have of the courtroom in a realistic setting, the more respect they will have for the courts and the law. In his view, camera coverage of court proceedings tends to reduce prejudice to criminal defendants, because the broadcast media in those cases will not film defendants in prejudicial postures outside the courtroom. He has received no complaints regarding his station's coverage of court proceedings.

Robert Elmore:

Mr. Elmore, the News Director of WHEC-TV in Rochester, testified on behalf of broadcast journalists who cover the courts in the Rochester area. He supports permanent enactment of the statute. Since the program began, his station has included more court-related stories in its newscasts, with the result that the public has gained a better understanding of the legal system. A recent study showed that television news stories relating to the courts have been twice as long as they were before the cameras experiment began.

Mr. Elmore opposes the consent requirement for arraignments and pretrial hearings, except for suppression hearings. He also opposes the ban on coverage of jurors, because

are present, judges tend to be more attentive and decorous.   He
emphasized that it is important to educate judges on the procedures
set forth in the statute, and that administrative judges must play
an active role in reconciling differences between the parties and
the media.   He also stated that the seven-day notice rule is too
long because the media are frequently ill-prepared to know what is
on the court's docket.   He favors a 48-hour rule instead.

Linda Campion:

        Ms. Campion is a victim rights advocate whose daughter
was killed by a drunk driver.   She favors permanent enactment of
the statute.   In the case involving her daughter's death, when the
media learned of a scheduled court conference, at which the
defendant ultimately pleaded guilty and was sentenced, it was too
late to comply with the seven-day notice rule.   Had cameras been
present at that proceeding, they would have prevented the defense
attorney from later grossly mischaracterizing "as a pack of
jackals" supporters of the victim who were present.

Mary Bissaillon:

        Ms. Bissaillon also is a victim rights advocate whose
child was killed by a drunk driver.   She is a proponent of cameras
in the courts who believes that, had cameras been present at the
sentencing of the drunk driver, they would more widely have exposed
the overly generous sentence that he received.

has observed that participants in court proceedings are generally so captivated by what they are doing that they forget that cameras are present.  He discussed camera coverage procedures in some of the other states, and remarked that New York's program is one of the most restrictive in the nation.  In particular, he observed that New York is one of only a few states that allows a nonparty witness, rather than the judge, to decide whether the witness's image should be visually obscured.  When that right is invoked, it inevitably results in unbalanced coverage of the proceedings.

Ms. Randolph generally discussed the educational value of Court TV.  She described the network's efforts to make available to schools tapes of trials that it covers.

Hon. Michael D'Amico:

Judge D'Amico, an Erie County Judge, has presided over approximately 20 trials in which cameras were present.  He has received no complaints regarding audio-visual coverage, and has observed less opposition from defense attorneys as they have had more experience with cameras.  He favors shortening the seven-day notice rule, which is usually complied with in high-profile cases but is often a problem for the media in lower-profile cases.  He also believes that coverage should be permitted in the court's discretion after a trial commences, because in some cases the media do not learn of the trial until then.  He is opposed to requiring the defendant's consent for arraignment coverage, unless

60

he believes it makes the process appear too secretive.  He favors a presumption of access with the burden to prevent coverage on the opponents, but with notice by the media (preferable 48 hours). Nonparty witnesses in his area rarely, if ever, have exercised the right to have their image visually obscured.

### Hon. William Fitzpatrick:

Mr. Fitzpatrick, the Onondaga County District Attorney, has had experience with cameras in the courts both as a prosecutor and as a defense attorney.  He supports the program, and has never heard another district attorney express opposition to audio-visual coverage.   In his view, cameras educate the public, discourage prosecutorial misconduct, and serve as a teaching tool for professionals.   He has never seen the dignity of the courtroom undermined, or a witness act differently, because of the presence of cameras.   The program has had no effect on witnesses coming forward to testify.  He has never heard of a case in his area in which a nonparty witness exercised the right to have his or her image visually obscured.

### Fred Graham and Carol Randolph:

Mr. Graham and Ms. Randolph, co-anchors for the Courtroom Television Network, noted that 1.5 million households in New York now have access to Court TV.  They favor permanent enactment of the statute and a presumption of access.  Mr. Graham testified that he has yet to see a witness adversely affected by camera coverage; he

59

case in Rochester involving the attempted murder of a police officer, the court granted a tardy application for coverage, made on the eve of trial, over the defendant's objection. And in <u>People v. Tankleff</u>, several jurors watched television coverage of their testimony at a post-conviction hearing involving unrelated juror misconduct. Mr. Gradess acknowledged that the camera coverage of the post-conviction hearing had no bearing on whether the defendant received a fair trial.

<u>Norman Effman, Esq.</u>:

Mr. Effman is the Public Defender of Wyoming County. Wyoming County has a population of 42,000 people, 3500 of whom are inmates in two State prisons. Not including the inmates, the population of the county is over 99% white. Mr. Effman has represented a number of minority inmates charged with committing felonies within the prisons, often against correction officers. In the last five cases he has tried, every member of the jury pool was white, with the exception of one Asian.

In these cases, Mr. Effman favors audio-visual coverage because he wants as many people as possible to view the proceedings as a protection against juror bias. He believes that the jurors will be more inclined to act fairly if they know that people from less homogeneous parts of the State are watching. Although, ideally, he favors a rule that requires the defendant's consent before camera coverage is allowed, he has never had a case in which

identification is an issue in the case.  And he believes that the judge should decide whether a witness's image should be visually obscured; this question is no different than numerous other difficult questions that judges must resolve.

Jonathan Gradess, Esq.:

Mr. Gradess is the Executive Director of the New York State Defenders Association.  He criticized proponents of the program who he contended have sought to shift the focus from education to freedom of the press.  In addition, he believes that the burden should not be on opponents to show that camera coverage is unfair; rather, the proponents must demonstrate that coverage is not unfair.  In that regard, he urged the Committee to study the psychological effects of camera coverage on witnesses and jurors, and he recommended a "controlled" study of the type that was proposed by Northeastern University in 1991.

Mr. Gradess noted that the issue of camera coverage was raised in the appeals of two criminal convictions:  People v. Steinberg and People v. Shattell.  In addition, he stated that 39 states permit audio-visual coverage of criminal trials, but maintained that five of those states (Alabama, Arkansas, Minnesota, Tennessee and Utah) require the defendant's consent.

He cited two cases in which he claimed the defendant's rights were violated by camera coverage.  That very morning, in a

<u>Mark Carros</u>:

     Mr. Carros is the News Director of WSTM-TV in Syracuse and Vice President of the New York State Associated Press Broadcasters Association. He favors permanent enactment of the statute. After seven years, there has been no evidence that cameras have had a deleterious impact on the administration of justice. A recent Times Mirror survey reveals that camera coverage leads to a more favorable public impression of the judicial system.

     Mr. Carros recommends eliminating the requirement that the defendant consent to arraignment coverage. The alternative of filming the defendant outside the courtroom hiding his or her face tends to undermine the presumption of innocence. The seven-day notice rule is unwieldy, because the media often do not learn which judge has been assigned to the case until late in the proceedings. He knows of no case in which a nonparty witness has requested that his or her image be visually obscured.

<u>William Sullivan, Esq.</u>:

     Mr. Sullivan is a criminal defense attorney in Ithaca. He testified about four Tompkins County criminal cases he has handled in the past several years in which he claimed that cameras in the courts prejudiced his clients. In <u>People</u> v. <u>Bush</u>, a 1993 rape trial, he did not receive notice of the application for coverage until he arrived in the courtroom. The judge then overruled his objection to coverage; he did not appeal to the

64

he believed it was not in his client's best interests to have cameras present.

Stephen Baboulis:

Mr. Baboulis is the News Director of WNYT-TV in the Capital District area.  The cameras program has produced a better informed public, and has portrayed defendants in a straightforward, objective manner.  When cameras are present, all participants are "kept on their toes."  He favors reducing the seven-day notice rule to 48 hours, and having the judge decide whether a witness's image should be visually obscured.  He has never received any complaints concerning his station's coverage of court proceedings.

Tim Atseff:

Mr. Atseff is the Managing Editor of the Syracuse Herald-Journal and the President of the New York State Associated Press Association.  He supports permanent enactment of the statute. Audio-visual coverage promotes the purpose of the public trial requirement -- to ensure that the defendant is treated fairly and that justice will be done for all to see.  The studies have demonstrated that cameras are not disruptive and do not have an adverse impact on the proceedings.  And the danger of witness or juror taint is no greater with cameras than with other media.

judge initially denied the witness's request to have her image visually obscured, he ultimately granted the request.

Martin Cirincione, Esq.:

Mr. Cirincione is the Executive Director of the Schenectady County Public Defender's Office. His office has never represented a defendant whose trial was televised, but has represented a number of defendants whose arraignments and sentencings were televised. In all those cases, his clients were extremely distraught about having to appear in front of cameras. He strongly favors requiring the defendant's consent for coverage of arraignments. He described one case, which arose under the original experiment when consent was not required, involving a young woman with a substance abuse problem who was charged with choking her baby to death. The woman refused to enter the courtroom with the cameras present, and was only persuaded to do so when a large police officer agreed to stand in front of her to shield her image from the cameras.

Mr. Cirincione also complained that the media generally are interested only in covering sensational cases. He referred to a pending case, in which a 55 year-old man is charged with having sex with a 16 year-old girl and then sucking her blood and drinking her urine. In another pending case, two teenage boys are charged with murdering their foster father. The defense in the case is that the deceased sexually abused the boys. On the day after a

66

Administrative Judge because he had no time to do so.  He noted that, although the media were granted permission to cover the trial, the only portions that were broadcast were shots of the defendant being escorted into the courtroom in shackles.

In People v. Chamberlain, a televised 1990 homicide trial, a witness came forward in the middle of the trial and gave testimony that was critical to proving the prosecution's case.  Mr. Sullivan believes the witness came forward only to attract publicity.  In People v. Augustine, a televised 1992 homicide trial, he learned that during the deliberations a number of the jurors held a party at the hotel where they were sequestered and watched a news broadcast of the trial.

In People v. Kinge, a televised murder trial in 1991 that arose out of the killing of four family members, a state police investigator who had yet to testify for the prosecution watched the trial proceedings on a television monitor situated in a hallway outside the courtroom.  When Mr. Sullivan learned of this and objected, the judge ruled that he could raise the matter on cross-examination.  Subsequently, he received reports that other state police witnesses who had yet to testify were watching the trial at their barracks.  Mr. Sullivan also commented that a defense witness was afraid to testify before the cameras (the case was tried before enactment of the current statute, which afford's a nonparty witness the right to have his or her image visually obscured); although the

65

## Letters and Other Submissions

In addition to testimony received at the public hearings, the Committee received a number of letters and other written submissions from interested parties. The following is a summary of those submissions:

### Richard F. Altieri:

Mr. Altieri, the President of the Cable Television Association of New York, recommends permanent enactment of the statute, but with a presumption of access and elimination of the right of a nonparty witness to have his or her image visually obscured. Camera coverage enhances scrutiny of the judicial process and educates the public. The experiment has led to no disruption or distortion of court proceedings.

### Ken Chamberlain:

Mr. Chamberlain is Vice-President of the Cable News Network. He wrote that camera coverage is unobtrusive and promotes public confidence in the legal system. Camera coverage has not been shown to be any different than press coverage of court proceedings, and the content of news reports essentially will be the same whether cameras are present in the courtroom or not.

newspaper article described the testimony involving the sexual abuse, the broadcast media applied to cover the rest of the trial. He noted that the application was denied based on lack of consent.

Mr. Cirincione is opposed to shortening the seven-day notice period. A shorter period, such as 48 hours, would place an undue burden on understaffed public defender offices.

Laura Murray:

Ms. Murray is the Legislative Representative of the New York Civil Liberties Union. Although the NYCLU previously has given qualified support for the cameras in the courts program, last year its board voted for the first time to oppose the program unless the defendant is accorded the right to consent to any coverage. The change in position was based on the concerns of some that cameras interfere with a defendant's right to a fair trial and concerns by others that no reliable evaluation data is available. Ms. Murray strongly recommended that a sound, comprehensive study of the program be conducted.

Ms. Murray was unaware of any case in which the NYCLU or the American Civil Liberties Union has submitted a brief arguing that audio-visual coverage denied a defendant the right to a fair trial. She also was unable to cite a specific case in which such coverage violated a defendant's right to a fair trial, although she maintained that it is extremely difficult to show that.

Dr. Roberta Entner:

Dr. Entner, an Instructor of Communications at Rutgers University, based her doctoral dissertation on cameras in the courts. She studied videotapes of over 50 cases in New York that were covered in 1989 and 1990. She believes that pictures are "creative reflectors," not reportorial mirrors of reality. Camera angle, lighting, juxtaposition and context all affect how pictures are perceived. And when people view pictures, they suspend analytical judgment by responding affectively rather than cognitively. Remarking that the intent of the program was to educate the public, she noted that trial coverage often is reduced to just a few seconds, with complex ideas ignored or treated simplistically. Dr. Entner also complained that the broadcast media's need to create exciting, impressive visuals can prejudice criminal defendants, citing as an example a shot of weeping spectators immediately followed by a shot of the defendant.

Senator Joseph L. Galiber:

Senator Galiber, a New York State Senator, opposes the cameras in the courts program. He believes that camera coverage destroys the deliberative atmosphere of courtroom proceedings that is necessary for evenhanded justice. The presence of cameras makes it more difficult for participants to do their job, and intimidates both defense and prosecution witnesses, particularly the elderly and women. In addition, camera coverage has not promoted education, and has been used to boost ratings and profits. Senator

70

Hugh C. Conroy:

Mr. Conroy is a Principal Court Clerk in the Suffolk County Court. He believes that camera coverage has an adverse effect on court proceedings. In installing their equipment, the media have damaged walls, ceilings and rugs and have obstructed "movement" in the courtroom and delayed proceedings. In addition, the media have focused their coverage on sensational cases. He also is concerned about whether television coverage may exert pressures on jury deliberations.

Hon. Kevin M. Dillon:

Mr. Dillon, the Erie County District Attorney, wrote on behalf of the New York State District Attorneys Association, of which he is President. The District Attorneys Association recommends permanent enactment of the statute, and encourages the broadcast media to expand its coverage of court proceedings. The current carefully drafted statute has effectively protected against disruption of proceedings and has served an educational purpose, although more so in some cases than in others. Witnesses have not been reluctant to testify, and the identity of sex offense victims has not been revealed. Camera coverage has diminished the necessity that the public rely on the attorneys' "spin" on the proceedings.

in the proceedings.  He has seen no evidence that camera coverage has harmed anyone.

Hon. Robert T. Johnson:

Mr. Johnson is the Bronx County District Attorney. Because there have been few, if any, problems with camera coverage, he favors permanent enactment of the statute, with all the current safeguards and with continued monitoring of the program.  Audio-visual coverage permits the public to have an unfiltered look at the proceedings.  In light of today's high crime rates and the overburdened condition of our courts, it is more important than ever that the public be educated about our criminal justice system.

Nancy Lee:

Ms. Lee is the Photography Editor of the New York Times. She emphasized the benefits of still photography coverage of court proceedings.  Photographs add depth, power and understanding to a printed news story; they provide a "visual sidebar" to the newspaper article.  Photographic coverage of court proceedings is superior to such coverage of press conferences, which do not depict the reality of the courtroom.

Thomas F. Liotti, Esq.:

Mr. Liotti is the President of the New York State Association of Criminal Defense Lawyers.  His organization's Board recently voted nearly unanimously to oppose the cameras in the

Galiber also complained that an objective study of the program has not been conducted.

James C. Goodale, Esq.:

Mr. Goodale, an attorney, wrote on behalf of his client, News 12 Long Island. News 12 is a 24-hour cable television news station delivered to over 650,000 households on Long Island. The experiments in New York and around the country have been a success and have resulted in no prejudice to participants in court proceedings. Because television, video cameras and other video technology have become a regular, everyday part of our experience, participants in court proceedings accept them easily. When News 12 covers court proceedings, there is generally an increased interest in the proceedings on the part of the Long Island public. The statute should be made permanent, and because many judges still do not permit coverage, it should include a presumption of access. In addition, the right of a nonparty witness to demand that his or her image be visually obscured should be eliminated.

Hon. Charles J. Hynes:

Mr. Hynes, the Brooklyn District Attorney, supports the cameras in the courts program. Camera coverage of court proceedings is consistent with coverage of the other branches of government. Coverage performs an educational function, and the public exposure that results promotes fairness for all participants

71

## VII.   AUDIO-VISUAL COVERAGE IN OTHER JURISDICTIONS

As part of its review, the Committee collected information about the extent of audio-visual coverage of court proceedings in other jurisdictions throughout the nation. According to data provided to the Committee by the National Center for State Courts, as of August 1993, 47 states and the federal courts permit some form of audio-visual coverage of court proceedings. Only Indiana, Mississippi and South Dakota permit no audio-visual coverage of court proceedings.

Of the 47 states that permit some coverage, five states permit coverage only of appellate proceedings. The remaining 42 states, and the federal courts, permit coverage of trial court proceedings. However, three of those states, and the federal courts, permit coverage only of civil trial court proceedings.

Although the information the Committee has received is not entirely clear on this point, it appears that only three states -- Alabama, Minnesota and Oklahoma -- require a criminal defendant's consent before coverage of proceedings is permitted. In addition, only four states -- Maine, Minnesota, Missouri and New York -- and the federal courts have experimental programs with specific dates of expiration; the remaining states have permanent statutes or rules permitting audio-visual coverage or have extended their experimental programs indefinitely.

74

courts program, on the ground that camera coverage potentially endangers the cause of justice.

proceedings.  Sixty-four percent of the judges reported that no objections were made to coverage, and of the objections made, 80% were by defense counsel in criminal proceedings.  Although 74% of the judges reported that the seven-day application rule was not adhered to, 87% reported that coverage did not delay the commencement of the proceeding.  Only 14% of the judges reported that the administrative burdens associated with coverage were unreasonable.  However, 43% noted that coverage of suppression hearings could adversely affect fairness.

Based on 246 evaluation forms received from attorneys (with roughly equal numbers from prosecutors and defense attorneys), 72% raised no objections to audio-visual coverage. Sixty-two percent of the attorneys noted that witness testimony was not affected by coverage, and only 5% reported that a witness would not testify because of the presence of cameras.  Seventy-six percent of the attorneys reported that the coverage did not affect the fairness of the proceedings.  Thirteen percent reported that the audio-visual equipment and cameras were disruptive, and 37% reported that the presence of cameras made the atmosphere in the courtroom tense.  Overall, 38% of attorneys were favorable to cameras in the courts, 33% were neutral and 28% were opposed.

A total of 183 jurors completed evaluation forms. Approximately 85% reported being neither more reluctant nor more eager to participate because of the presence of cameras.  Eighty-

76

## VIII.   REVIEW OF PRIOR STUDIES

As part of its analysis of New York's cameras in the courts program, the Committee reviewed the results of prior studies and surveys relating to audio-visual coverage of court proceedings. The Committee examined the prior studies conducted in New York and in other jurisdictions, as well as public opinion polls seeking to measure the educational benefits of camera coverage.

### Prior Studies

In addition to New York, a number of other jurisdictions, including the federal courts, have studied the effect of camera coverage on participants in court proceedings.  The following is a summary of the findings of the studies:

<u>1991 New York Study</u>:

A total of 922 evaluation forms, developed by an advisory committee consisting of two social scientists with extensive experience in research methodology, two communications experts and one legal expert, were completed by participants.  Over 90% of the 245 judges who completed evaluation forms reported that the impact of audio-visual equipment and operators was either neutral (23%) or nondistracting (68%).  Eighty-seven percent of the judges reported that witness testimony was not affected by the presence of cameras, and 94% reported that cameras had no effect on the fairness of the

75

created some additional administrative burden, 66% reported that coverage had no effect on the progress of the proceedings. Not a single judge believed that coverage made it difficult for jurors to ascertain the truthfulness of testimony.

Attorneys were less favorable than judges, but only 32% were negative toward the program. Attorneys involved in proceedings in New York City were more favorable than attorneys involved in proceedings elsewhere. Media representatives who completed evaluation forms were satisfied with the process and the physical arrangements. Of the small number of witnesses who completed evaluation forms, twice as many were favorable as unfavorable. Although 27% of witnesses reported feeling anxious and nervous because of the presence of cameras, 78% were of the opinion that the coverage did not create undesirable noise and distractions.

1979 Florida Study:

Evaluation forms were completed by 654 witnesses and 437 jurors. Nearly 67% of the witnesses were either favorable or very favorable toward the presence of cameras, and 61% reported that cameras did not distract them. Fifty-three percent of witnesses reported that they were "not at all" nervous because of the presence of cameras, and 26% were only "slightly" nervous. Approximately 70% of witnesses reported no concern that camera coverage might result in harm to them. Nearly 85% of jurors

78

one percent reported that the cameras had no effect on their level of attentiveness, and only 5% reported feeling more tense or distracted.  Although the presence of cameras made 28% of the jurors believe that the proceeding was more important  98% reported that they felt no pressure to convict or acquit because of cameras. Ninety-two percent reported that the proceedings were not disrupted because of coverage, and 81% believed that coverage either did not affect the fairness of the proceedings or affected the fairness of the proceedings in a positive way.  Ninety percent of the jurors reported that they would be willing to participate as jurors again in a proceeding in which cameras were present.

A total of 64 witnesses completed evaluation forms, with only 4% commenting that the presence of cameras was prejudicial. Although 39% felt tense, 44% felt more self-conscious and 30% felt somewhat uneasy, only 10% were reluctant to participate because of cameras, and 83% were either neutral or reported that coverage did not make testifying at all difficult.  Nearly 60% of the witnesses favored camera coverage, and 90% reported that they would be willing to participate again as witnesses in a case in which cameras were present.

1989 New York Study:

A total of 1,100 evaluation forms were completed by participants.  Eighty-four percent of the judges were favorable to camera coverage.  Although 37% of the judges reported that coverage

present reported no reluctance to participate again in a proceeding with camera coverage, and 60% who served in cases in which cameras were not present reported no reluctance to participate in a proceeding with camera coverage.

Ninety percent of judges and attorneys interviewed reported that the presence of cameras interfered either not at all or only slightly with courtroom dignity and decorum.

1981 Nevada Study:

Only 3% of judges surveyed were opposed to camera coverage, although 24% of attorneys and 35% of witnesses either were slightly or completely opposed. Of the 31 witnesses surveyed, 71% were "not at all" nervous and 13% were only "slightly" nervous because of the presence of cameras, and 68% either were not at all or only slightly aware of the cameras during the proceedings. Twenty-eight percent of the judges commented that the presence of cameras slightly increased the dignity of the proceedings, and 77% of the witnesses and 76% of the attorneys reported that cameras had no effect on the dignity of the proceedings.

1983 Arizona Study:

Ninety-three percent of the jurors and witnesses surveyed reported that the presence of cameras did not distract them, and 96% reported that the cameras did not make them nervous. Ninety-two percent of the jurors and witnesses commented that they would

80

reported that the presence of cameras did not affect their ability to concentrate on the testimony.  Seventy-four percent of jurors did not believe that the presence of cameras meant that a particular witness's testimony was more important.

## 1980 Iowa Study:

A limited survey of jurors revealed that 96% believed that the presence of cameras did not affect judges, 88% believed that cameras did not affect witnesses and 84% believed that coverage did not jeopardize a fair trial.

## 1981 California Study:

Of 56 witnesses surveyed, 80% reported that they were not distracted or were distracted only slightly by the presence of cameras.  Ninety-eight percent of witnesses did not believe that any harm would result to them because of camera coverage of their testimony.  About 85% of witnesses reported no reluctance to participate as witnesses again in a proceeding with camera coverage.

Among one group of 56 jurors interviewed, 48% were not at all distracted by the presence of cameras and another 21% were distracted only at first.  Eighty-seven percent of these jurors reported no reluctance to participate as jurors again in a proceeding with camera coverage.  Among a larger group of jurors who were interviewed, 77% who served in cases in which cameras were

## 1990 Ohio Study:

A limited survey of witnesses and jurors revealed that 43% of the witnesses reported that the presence of cameras made them nervous, 30% of witnesses reported that the cameras distracted them, 19% of witnesses reported some fear of harm because of the camera coverage of their testimony and almost half of the jurors commented that they thought the proceedings were more important because cameras were present.

## 1991 New Jersey Study:

Of the relatively small number of witnesses surveyed, none reported being distracted by the presence of cameras, although one was distracted by the print media.  Only about 15% of the witnesses responded that the presence of cameras affected their desire to participate in the trial.  Of the 57 jurors surveyed, 92% reported that the presence of cameras did not affect their ability to concentrate on the testimony, 88% did not believe that a witness's testimony was more important because it was covered by cameras and 77% were not at all distracted during the proceedings.

## 1993 Maine Report:

Of the 84 witnesses surveyed, 94% reported that the presence of cameras did not divert their attention.  Although 28% reported that cameras made them more uncomfortable, nearly 90% stated that their willingness to participate in the proceedings was not affected by the presence of cameras any more than the presence

be willing to serve again with cameras present.  About 90% of the judges surveyed, and 82% of the jurors and witnesses surveyed, reported that the presence of cameras did not affect the dignity of the proceedings.

### 1984 and 1985 Kansas Studies:

Seventy-six percent of witnesses (only expert witnesses) surveyed in the 1984 study and 92% of witnesses (lay and expert witnesses) surveyed in the 1985 study reported that the presence of cameras did not affect their concentration.  Similarly, 95% of the jurors in the 1984 study and 96% of the jurors in the 1985 study reported that cameras did not affect their concentration.  Eighty-three percent of the witnesses in the 1985 study reported no concern that they might be harmed as a result of camera coverage of their testimony.

### 1990 Virginia Report:

Of the 57 witnesses surveyed, 94% reported that the presence of cameras did not affect their testimony or make them fearful of harm.  Only 6% reported that cameras distracted them, and 14% reported that cameras made them nervous.  Of the 54 jurors surveyed, about 5% reported that the presence of cameras was distracting or made them nervous, and 89% commented that they did not think that the testimony of witnesses was more important because cameras were present.

of newspaper reporters.  Of the 49 jurors surveyed, 98% reported that the presence of cameras did not divert their attention or influence their deliberations.

1993 Federal Courts Study:

This study, conducted by the Judicial Conference of the United States, analyzed the current pilot program permitting audio-visual coverage of federal civil proceedings.  The study revealed that, overall, the attitudes of judges toward camera coverage initially was neutral but became more favorable after experience with coverage.  The judges and attorneys interviewed reported observing little or no effect of camera presence on participants, courtroom decorum or the administration of justice.

## Public Opinion Polls

Two public opinion polls have sought to measure whether audio-visual coverage of court proceedings has educated the public and enhanced the public's confidence in the justice system.  In a study reported by William Petkanas in "Cameras on Trial: An Assessment of the Educational Effects of News Cameras in Trial Courts," (Ph.D. diss., New York University, 1990), a random telephone survey was conducted of 400 New York State residents. The survey was conducted one year before the first cameras in the courts experiment went into effect and then one year later to assess any changes.  The results revealed no changes over the one-

year period in the level of public understanding of, or public confidence in, the justice system. In addition, most surveyed could not recall whether or not televised news reports on court proceedings included pictures from the courtroom.

A recent nationwide survey of 1,207 adults was conducted for the Times Mirror Center for the People and the Press by Princeton Survey Research Associates ("TV Trials Captivate Public," February 4, 1994). Approximately 20% of those surveyed reported that they had cable access that included the Courtroom Television Network. Of those with access to Court TV, 44% reported that they watched Court TV either regularly or sometimes. Of those viewers, 66% said that, as a result of watching Court TV, they had a better understanding of the court system, and 49% said they had a better impression of the fairness of the court system (which was a significantly higher percentage than those who do not watch Court TV).

*                    *                    *

The Committee's review of these studies, particularly the surveys of participants in court proceedings involving audio-visual coverage, led it to two conclusions. First, audio-visual coverage has no adverse impact on the vast majority of participants, including, most importantly, witnesses and jurors. Second, given the uniformly positive results of these numerous studies, a third round of evaluations of participants here in New York was unnecessary.

84

## IX.   <u>ANALYSIS</u>

This Committee's essential task under Chapter 187 is to recommend to the Legislature, the Governor and the Chief Judge whether New York's cameras in the courts program should be continued.  The Committee's analysis of this question was based on the following:  (1) its review of the prior surveys and studies conducted in this State; (2) its review of the surveys and studies conducted in other jurisdictions; (3) the Committee's own survey of New York trial judges who have presided over proceedings in which cameras were present; (4) the comments of individuals who testified at the public hearings held by the Committee and the written submissions of others who were unable to testify at the hearings; (5) the Committee's review of data relating to applications for audio-visual coverage; and (6) the personal experiences of Committee members with cameras in the courts.  This analysis has led the Committee to the firm conclusion that the virtues of the program are compelling.

### <u>Education of the Public</u>

First and foremost, cameras in the courts provide an important educational function.  It is generally acknowledged that the judiciary has been the least understood branch of government. Given the pervasive impact that courtroom decisions have on individuals throughout our society, this is a disturbing

85

phenomenon.  An enlightened society should strive to educate all its citizens about the fundamental legal precepts upon which its legitimacy is premised.  Cameras in the courts can promote such education.

Relatively few people ever attend court proceedings, and even fewer attend them on a regular basis.  To be sure, citizens can learn about our system of justice in schools and from books, newspapers and other written materials.  Although our nation's educational institutions can do more to educate the young in this regard, and written materials can be highly informative, cameras in the courts can be a critical component in this educational process.  Whether good or bad, vast numbers of citizens rely on television as their primary source of information about our society.  This is an irreversible trend that, given recent technological advances, is likely to expand.  Television coverage of court proceedings, therefore, exposes greater numbers of citizens to our justice system.

This exposure is not of an abstract nature; it affords the public the opportunity to learn about the justice system in the context of actual legal proceedings involving real people with real factual scenarios.  Cameras in the courts enable citizens to see and hear the legal system in action.  Through television coverage of court proceedings, the public can learn about fundamental principles of law and the procedures by which cases and

86

controversies are adjudicated, and can more fully grasp these concepts because they are introduced in their genuine setting. The hearsay rule, the privilege against self-incrimination, cross-examination and the jury charge are not presented as abstract legal concepts and procedures but are revealed as they arise in the context of actual cases.

In addition to facilitating greater understanding of legal principles and process, cameras in the courts afford the public the opportunity to confront the major substantive issues that court proceedings often present.   Domestic violence, date rape, freedom of speech -- these are but a few of the substantive issues presented in widely televised trials that have generated extensive, even national, debate.   Television coverage has helped to energize public debate over these and other important issues because citizens have examined the issues as they have arisen in the lives of real people whom they have seen and heard.

The wider exposure to court proceedings and the deeper understanding of legal principles and processes that camera coverage engenders inevitably lead to increased public respect for the justice system.   Indeed, judges have reported that, following televised trials over which they presided, they have observed an enhanced respect for the court system in letters they have received from the public and at meetings they have had with citizen groups. As the New York Court of Appeals has stated, "[W]hen justice has

been done, public awareness 'serve[s] to instill a sense of public trust in our judicial process.'"  <u>Matter of Westchester Rockland Newspapers</u> v. <u>Leggett</u>, 48 N.Y.2d 430, 437(1979) (citation omitted).

Opponents of cameras in the courts generally have not disputed the program's potential educational value.  In fact, several have praised the extensive and analytical coverage of court proceedings provided by Court TV.  Opponents maintain, however, that the more typical coverage is not the gavel-to-gavel broadcast with expert commentary but the brief "sound bite" coverage provided in the nightly news program.  Obviously, more extensive coverage of court proceedings tends to be of greater educational value than limited coverage,[9] and it is the Committee's expectation that in the future additional television networks, cable or otherwise, will broadcast more extensive coverage of court proceedings similar to the coverage that Court TV now provides.  Nevertheless, even minimal coverage, which permits viewers to see and hear portions of actual court proceedings, is preferable to a reporter's description of, or an attorney's "spin" on, what actually transpired in the courtroom.  Reality is more informative than descriptions or distortions of it.

---

[9]  As discussed in Section VIII, <u>supra</u>, a recent Times Mirror survey revealed that 66% of Court TV viewers polled reported a greater understanding of the judicial system as a result of watching Court TV.

Opponents further maintain that the educational potential of cameras in the courts has not been realized because the broadcast media cover only "sensational" proceedings, often involving famous people, and ignore proceedings raising serious issues that do not appeal to prurient and voyeuristic interests. A review of applications for audio-visual coverage made during the current experiment, however, reveals that it simply is not true that the media have sought to cover only "sensational" proceedings. Only a few of these proceedings have involved well-known people; for that reason, it is those cases that many tend to remember when they think of proceedings that have received camera coverage. Other proceedings, to be sure, have received significant publicity, even apart from the publicity generated by audio-visual coverage. Yet, a case is not a sensational case merely because it has received substantial publicity. And certainly a high percentage of the proceedings have been criminal cases involving violent crime. Violent crime, however, is a major public issue in our society, possibly the major concern of New Yorkers today. A court proceeding involving a charge of violent crime is not, in itself, a sensational proceeding.

Although the broadcast media do not choose to cover only "sensational" cases, even camera coverage of those cases, however they may be defined, serves to educate the public. Coverage of those cases reveals the reality of the courtroom as distinctly as does the coverage of other cases. And legal issues and processes

are as much a part of sensational cases as they are of other cases. In general, the viewing of so-called sensational cases will be as educational for the public as the viewing of nonsensational cases.

## The Public Trial

In addition to its educational value, cameras in the courts foster the goal of the "public trial." As reflected in the Sixth Amendment, this principle promotes the criminal defendant's right to a fair trial by protecting ~~against~~ secret and improper inquisitions. In that regard, the Committee was strongly impressed by the public hearing testimony of Norman Effman, the Public Defender of Wyoming County. Wyoming County, with an almost exclusively white population, has two State prisons that house a significant number of minority inmates. Mr. Effman has represented a number of those inmates on charges that they committed felony offenses while inside the prisons, often against white correction officers. When those cases are tried before inevitably all-white juries, Mr. Effman welcomes the presence of cameras because the jurors then will know that others beyond the confines of this homogeneous county will be watching to see that justice is handed out fairly and impartially.

The principle of the public trial also promotes the public's interest that other participants in court proceedings, such as crime victims, are treated fairly, and that public

90