officials, such as prosecutors and the police, perform their roles effectively.  Because it is not possible for all but a few members of the public to be physically present in the courtroom, cameras in the courts provide the most effective opportunity for public scrutiny of court proceedings.

### Additional Benefits

Cameras in the courts produce additional benefits.  Many have observed, with considerable satisfaction, that the presence of cameras has a salutary effect on the behavior of judges and attorneys: judges tend to suppress their more irascible tendencies, and attorneys are often better prepared.  Others have noted that reporting on court proceedings, both by newspaper and broadcast reporters, frequently is more accurate and comprehensive when cameras are present. Apparently, this is because videotapes of the proceedings are available to be studied by the reporters, and because reporters may be more inclined to adhere to the facts when they know that a video record of the proceedings exists.  Finally, in addition to the educational value that cameras provide for the general public, videotapes of court proceedings are a superb educational tool for judges, attorneys and students, who can enhance their knowledge and courtroom skills by studying these tapes.

\*        \*        \*

Opponents of cameras in the courts no longer maintain that cameras are a disruptive or distracting presence in the courtroom.   They still argue, however, that camera coverage produces certain negative effects, which outweigh the beneficial aspects of the coverage.   Most of the negative effects that opponents cite are said to prejudice a criminal defendant's right to a fair trial.   Although the Committee has taken note that no criminal conviction in New York has been reversed or set aside on the ground that audio-visual coverage interfered with the defendant's right to a fair trial, the Committee has closely scrutinized the arguments made by opponents.

A major criticism is that camera coverage adversely affects participants in court proceedings, including judges, attorneys, witnesses and jurors.   First, it is suggested that judges, particularly elected judges, will be less inclined to act impartially toward an unpopular criminal defendant if cameras are present.   Opponents have offered no concrete evidence that this occurs, other than citing a few examples in which judges appear to have acted unusually harshly toward defendants in cases in which cameras were present.   Innumerable examples exist, however, of cases in which judges acted this way when cameras were not present. In any event, a judge whose interest is not in seeing that justice is done but in pleasing the majority will be inclined to do so even if only the print media are covering the proceedings.   Camera coverage, in fact, could more effectively expose dishonorable

92

judges who demonstrate a pattern of lack of impartiality.   If camera coverage does have any real effect on judges, it probably encourages them to act with greater respect and restraint towards participants in the proceedings, particularly the attorneys.

Nor does coverage apparently affect adversely the performance of attorneys.   On the contrary, many judges have reported that attorneys frequently come to court better prepared when cameras are present.   Judges have rarely complained that attorneys have engaged in "grandstanding" or otherwise played to the cameras.

Opponents also claim that cameras make witnesses more nervous or even discourage them from testifying or coming forward. As discussed in Section VIII, _supra_, the many surveys of witnesses that have been conducted, in New York and elsewhere, reveal that the vast majority of witnesses report that camera coverage had minimal impact on them.   And now that nonparty witnesses in New York can require that their images be visually obscured, witnesses have even less reason to feel apprehension about cameras.   Notably, the Committee has learned of no prosecutor or defense attorney who has lost a witness because of camera coverage.   It is significant that the State's District Attorneys, who certainly would have strong reservations about camera coverage if their witnesses were unduly intimidated by camera coverage, all are supportive of cameras in the courts.

93

An additional concern about the impact of camera coverage on witnesses is that such coverage creates the potential to undermine a judge's order that witnesses who have yet to testify remain out of the courtroom until they present their testimony. Although the Committee has received no evidence that this a widespread problem, the existence of television broadcasts of the proceedings certainly creates the potential for such an order to be undermined. The Committee trusts that judges who learn of witnesses who violate their orders in this manner will wisely exercise their discretion to preclude testimony or, in appropriate cases, exercise their contempt powers to deter this undesirable conduct.

The suggestion that camera coverage adversely affects jurors is also erroneous. Again, as discussed in Section VIII, _supra_, all the surveys of jurors reveal that camera coverage does not influence their role in the proceedings. Aside from the question of whether it is, in fact, prejudicial if jurors believe they are presiding over an unusually important case, jurors are as likely to draw this conclusion if newspaper reporters and sketch artists are present during the proceedings as they are if cameras are present. Moreover, if cameras are not permitted into a particularly newsworthy trial, jurors are likely to encounter them outside the courtroom anyway. Camera coverage does create the possibility that a juror, in violation of the court's instructions, may watch tape-delayed television broadcasts of the day's

94

proceedings or speak with friends and relatives who have watched broadcasts. However, because television broadcasts will reveal, for the most part, only what the juror had already observed earlier that day, viewing broadcasts or speaking with someone who has viewed them probably will be less prejudicial than exposure to newspaper coverage, which often provides a more subjective account of the proceedings.

In addition to contending that cameras in the courts adversely affect participants in the proceedings, opponents claim that camera coverage has negative effects that prejudice the criminal defendant outside of the courtroom. Opponents argue that the pictures that cameras create are more powerful than words that newspaper reporters write, and that camera angle, lighting, context and juxtaposition can be used to undermine the presumption of innocence by making the defendant appear guilty. An example of this is a camera shot of an assault victim lying in a hospital bed immediately followed by a shot of the defendant sitting in the courtroom.

This argument is based on a premise that this Committee does not accept -- that the public suspends analytical judgment when it watches television. In any event, the argument ignores the fact that the broadcast (or print) media can use pictures in a prejudicial manner whether cameras are permitted in the courtroom or not. Indeed, when cameras are not permitted in the courtroom,

the media frequently use far more prejudicial pictures of the
defendant taken outside of the courtroom.  Instead of a dignified
shot of the defendant sitting at the defense table in jacket and
tie, the television station barred from the courtroom often will be
inclined to show the defendant, with head bowed, being led from the
police station in handcuffs.

Opponents further argue that camera coverage unfairly
imposes on the defense the additional burden of defending the
accused in the media, and that this diverts attention and resources
from defending the accused in the courtroom.  They also argue that,
in those cases that receive particularly wide television coverage,
the defendants often become icons of wrongdoing -- for example,
during his widely televised trial Joel Steinberg became a national
symbol of a domestic violence perpetrator.

The answer to this argument is that, absent camera
coverage, these cases would still receive extensive media
attention.  Whether television coverage of a highly newsworthy
court proceeding is permitted or not, print and broadcast media
will still cover the case extensively; thus, defense counsel who
feel obligated to present their versions of the evidence to the
media will still have to do so, and defendants who are unlucky
enough to be the focus of such proceedings will still be subject to
intense public scrutiny.  With or without cameras in the courtroom,
celebrated trials will occur and ostracized defendants will emerge.

96

Finally, opponents of cameras in the courts argue that the provisions of section 218 of the Judiciary Law are repeatedly violated, to the detriment of criminal defendants.  Sensitive to this concern, the Committee specifically asked the Criminal Justice Section of the New York State Bar Association and the New York State District Attorneys Association to inquire of their members whether any violations of the statute have occurred during the current experiment (see Appendices A and B).  The Committee received no reports of violations from these groups.

In addition, the Committee inquired of witnesses at its public hearings and of judges who presided over proceedings in which audio-visual coverage occurred whether they knew of any violations of the statute during the current experiment.  The witnesses cited only five instances of alleged violations. Four of those instances, however, were complaints that defense counsel received no notice of the application for audio-visual coverage until they appeared in the courtroom to find cameras present.  In all cases, defense counsel were permitted to argue that cameras should not be permitted; in none of these cases had a trial already commenced.  Because section 218 affords the trial court discretion to shorten the seven-day application period, see Jud. Law 218(3)(a), the Committee concludes that the statute was not violated in these cases.  In the fifth instance, the defense counsel heard that some of the jurors, during deliberations, watched television coverage of the trial proceedings.  Assuming

97

that this report was true, the Committee agrees that the jurors violated the trial judge's putative admonition to them not to view news accounts of the trial.  One judge reported a violation of the statute, in which a still photograph taken of a victim's family in the courtroom was printed in a newspaper.

Given the size of this State and the hundreds of applications for audio-visual coverage made during the current experiment, the Committee is favorably impressed with the paucity of violations of section 218 that were reported to it.  By contrast, 68 violations were alleged during the second experiment, although Chief Administrator Crosson's investigation of those allegations revealed that only seven involved actual violations. One explanation for the limited number of violations during the current experiment is that judges, attorneys and the news media are now fully familiar with the statute and its restrictions. Whatever the reason, it is apparent that concern over statutory violations is not a valid reason to oppose cameras in the courts.

*          *          *

The Committee has concluded, therefore, that New York's cameras in the courts program is a success.  Audio-visual coverage of court proceedings serves an important educational function, and promotes public scrutiny of the judicial system.  The program has had minimal, if any, adverse effects, particularly during the

98

current experiment.  No criminal conviction in New York has ever been reversed or set aside on the ground that audio-visual coverage interfered with the defendant's right to a fair trial; indeed, the issue is rarely even raised on appeal.

The Committee recognizes, however, that the continued success of the program requires that the authorizing statute contain appropriate restrictions and safeguards.  The Committee's analysis of the more controversial restrictions and safeguards in the current statute follows.

### Nonparty Witness's Right to Have Image Visually Obscured

The statute provides that any witness in a criminal case who is not a party to the proceeding, except an expert, professional or government witness, may have his or her image "visually obscured" in the coverage of the witness's testimony. Jud. Law 218(2)(h), (i), 5(c).  News media representatives have criticized this provision, claiming that, when it is invoked by a witness, coverage of the proceedings inevitably is rendered unbalanced.  Many trial judges also oppose the provision, emphasizing that, as was true under the prior experiments, they should decide this question based on whether a legitimate reason exists to order visual obscuring.  Those who favor the provision, including most prosecutors, argue that it is difficult for many witnesses to articulate the reasons for their apprehension about

99

testifying before cameras, and that this protection better guarantees that witnesses will not be reluctant to come forward.

The Committee is sympathetic to the arguments for providing the court with the authority to make this decision. On the other hand, the predictions of some that the provision would be widely invoked by witnesses have not held true; the provision has been invoked in only 3.8% of the cases in which applications have been granted, see Section IV, supra, and in some parts of the State it never has been invoked. Although a significant number of Committee members are supportive of returning this decision to the court, the Committee recognizes that the paramount goal must be the permanent enactment of the statute. Accordingly, the Committee does not recommend that the provision be changed, but that the Legislature, at some future time, reconsider this issue.

### Requiring Parties' Consent to Coverage of Arraignments and Suppression Hearings

The statute requires that audio-visual coverage of arraignments and suppression hearings may be permitted only with the consent of all parties to the proceeding. Jud. Law 218(5)(b). Suppression hearings involve the question of whether certain evidence, such as confessions or identifications, will be admissible at the trial. Thus, extensive media coverage of these hearings, which often are held just before trial, can expose to potential jurors evidence that ultimately may be ruled

100

inadmissible.  Because of this danger, apparently no one has objected to requiring the parties' consent for audio-visual coverage of suppression hearings, and the Committee agrees that the consent requirement should be continued.

The consent requirement for arraignment coverage is more troublesome.  Opponents of this requirement argue that coverage of the defendant in a dignified courtroom setting is preferable to the alternative that the media often resort to when consent for arraignment coverage is not given -- _i.e._, coverage of the handcuffed defendant with bowed head outside the courtroom. Opponents also cite what they claim are the irrational results of the application of this provision in some cases -- _e.g._, coverage of a felony arraignment in the local criminal court is prohibited, coverage is then permitted of subsequent proceedings in the case in the local criminal court, but then, following indictment and transfer of the case to the superior court, coverage is again prohibited of the arraignment in the superior court.

Those who favor the consent requirement for arraignment coverage claim that such coverage may prejudice defendants, who frequently appear at arraignments not only in handcuffs but looking sleepy and haggard after having spent the previous night in a local detention facility.  In addition, arraignment coverage may prejudice defendants in cases in which identification is a key issue.  Moreover, arraignment coverage may taint prospective trial

jurors because arraignments, in both local criminal courts and superior courts, involve bail rulings, which frequently require an oral discussion and evaluation of the weight of the evidence against the defendant.  <u>See</u> Crim. Proc. Law 510.30(2)(a)(vii).

Although a close question, because of the legitimate concerns that camera coverage of arraignments in some cases may prejudice the defendant's right to a fair trial, the Committee does not recommend elimination of this provision of the statute.  The Committee emphasizes, however, that the statute should not be read so broadly, as some judges apparently have done, to require the parties' consent for coverage of any pretrial proceeding.  The statute requires consent only for arraignments and suppression hearings, as that term is defined in the statute.  <u>See</u> Jud. Law 218(2)(g).

## The Seven-Day Application Rule

The statute requires that an application for audio-visual coverage be made at least seven days before the commencement of the judicial proceeding, although the court may, in appropriate situations, shorten that period.  Jud. Law 218(3)(a).  Although news media representatives have complained that this rule sets an arbitrary time period for application, judges apparently have been quite flexible in shortening the period to accommodate the media. Indeed, some defense attorneys have complained that judges have been too accommodating to the media, and that they have had

inadequate time to prepare their arguments in opposition to coverage.

The Committee favors retaining the seven-day rule, and recommends that the media make greater efforts to comply with the rule than they have heretofore.   In addition, the Committee encourages judges, upon receiving applications for coverage, to notify the parties so they will have time to prepare their arguments and be heard on the application.

## Requiring Parties' Consent to Coverage if Trial Has Commenced

The statute provides that an application for coverage of a jury trial that is made after the trial commences may not be granted unless the parties consent (unless the application is for coverage of the verdict or the sentencing).   Jud. Law 218(3)(d). The media oppose this restriction, arguing that occasionally they do not learn about a case until after the trial begins, and that it may not become apparent that a case is "newsworthy" until after the trial begins.  Those who favor this provision claim that entry of the broadcast media after trial commences may signal to the jury that a particular witness's testimony is especially important, may lead to unbalanced coverage of the proceedings and precludes questioning of prospective jurors about whether camera coverage would affect them.   The Committee supports retaining this restriction.

## X. CONCLUSIONS AND RECOMMENDATIONS

This Committee, in executing its obligation to evaluate, analyze and monitor New York's cameras in the courts program, has concluded that the benefits of the program are substantial, with little or no adverse effect on anyone. Cameras in the courts serve a valuable educational function and promote public scrutiny of the judicial system. This in turn provides a deterrent against injustice and fosters a sense of confidence and respect for the judicial process. It is no surprise that almost every other jurisdiction in the nation permits, to some degree, audio-visual coverage of its court proceedings, and that the great majority of the jurisdictions have enacted permanent statutes or rules permitting coverage of criminal trial proceedings. It would be lamentable if New York, the media center of the nation, decided to buck this irreversible trend.

The Committee's recommendations are summarized as follows:

1. New York's lengthy experiment with cameras in the courts has been a success, and the statute should now be permanently enacted. Permanent enactment of the statute will end the long-standing uncertainty surrounding the policy of this State concerning cameras in the courts; and it will relieve the State of the burden of conducting one more study that inevitably will reach

104

the same conclusion as all the prior studies -- that cameras in the courts have minimal, if any, adverse effect on participants in court proceedings.

2.   The Committee believes that, as cameras eventually are accepted as an unobjectionable part of court proceedings, certain of the current statutory restrictions and safeguards relating to their usage will become superfluous.   Nevertheless, because of the need to focus on the paramount goal of permanently enacting the statute, the Committee does not now recommend that any of the current restrictions and safeguards be amended or repealed.

3.   The Committee is highly critical of judges who have decided applications for audio-visual coverage solely on their own predetermined attitudes.   Some judges have told media representatives that they will never allow cameras into their courtrooms.  The Committee urges these judges to reevaluate their positions, and recommends that Administrative Judges be more aggressive in exercising their authority to reverse a trial judge's determination that is not based on a reasonable exercise of discretion.

4.   Judges should be mindful that the statutory requirement that the parties consent before coverage of arraignments and suppression hearings is allowed applies only to arraignments and suppression hearings [as that term is defined in

105

Jud. Law 218 (2)(g)], and not to any other pretrial proceedings.

5.  The media should make greater efforts to adhere more scrupulously to the statute's seven-day application rule; and judges, upon receiving applications for coverage, should notify the parties so they will have time to prepare their arguments and be heard on the application.

6.  As recommended by several media representatives who testified at the public hearings, the list of acceptable audio-visual equipment models authorized by the Chief Administrator of the Courts pursuant to section 218(6)(b)(i) of the Judiciary Law [see 22 NYCRR 131.13] should be updated to reflect recent technological advances in such equipment.

7.  The Committee commends those news media organizations that, in conjunction with their coverage of court proceedings, have made concerted efforts to include discussions and presentations on relevant principles of law and judicial processes.  These efforts have enhanced the public's understanding of the judicial system. The Committee encourages other news organizations, as well as judges and lawyers, to further this worthy goal.

106

**APPENDIX A**

# ΝΕW YORK STATE BAR ASSOCIATION

**CRIMINAL JUSTICE SECTION**

**1993-1995 OFFICERS**

PAUL J. CAMBRIA, JR.
  Chair
  42 Delaware Avenue, Suite 300
  Buffalo, NY 14202
  716/849-1333
  FAX 716/855-1580
ROBERT W. VINAL
  Vice-Chair
  52 Howton Avenue
  Staten Island, NY 10308
  212/225-0478
  FAX 212/825-2477
SUSAN B. LINDENAUER
  Secretary
  Legal Aid Society
  15 Park Row
  New York, NY 10038
  212/577-3549
  FAX 212/577-3431

June 17, 1993

Dear Member of the Criminal Justice Section:

Jack Litman, a member of our Committee to Review Audio–Visual Coverage of Court Proceedings, has asked me to inquire as to whether any of you have encountered problems with audio–visual coverage of any court proceedings. Jack would like information from any attorney who has complained to a trial judge, an administrative judge, the Office of Court Administration, or elsewhere with regard to that issue. He is interested in the name and docket or indictment number of the case, the court in which it was tried and the name of the presiding judge, the names, addresses and phone numbers of the lawyers on both sides, and the details concerning the complaint about the audio–visual coverage. These complaints may include claimed violations of §218 of the Judicial Law, difficulties encountered in *voir dire*, concerns regarding the manner in which the audio–visual coverage was aired on television, and any other complaints.

If you have been involved in an audio–visual coverage issue, please contact Jack Litman at your earliest convenience to provide him with the requested information. Jack's address is:

> Jack T. Litman, Esq.
> Litman, Asche, Lupkin & Gioiella
> 45 Broadway Atrium
> New York, New York 10006
> Telephone: 212–809–4500
> Telecopier: 212–509–8403

The Committee to Review Audio–Visual Coverage will be meeting in September and Jack would appreciate your comments prior to that time.

Thank you for your attention to this very important matter.

Very truly yours,

Paul J. Cambria, Jr.

PJC/slb

**DO THE PUBLIC GOOD**

**APPENDIX B**

# DISTRICT ATTORNEYS ASSOCIATION
## STATE OF NEW YORK



**PRESIDEN /ELECT**
KEVIN M. DILLON
Erie County

**IST VICE PRESIDENT**
JAMES M. CATTERSON, Jr.
Suffolk County

**2ND VICE PRESIDENT**
CHARLES J. HYNES
Kings County

**3RD VICE PRESIDENT**
FRANCIS D. PHILLIPS
Orange County

**SECRETARY**
KAREN F. McGEE
Richmond County

**TREASURER**
EUGENE A. MURTHA
Nassau County

**PRESIDENT**
**KEVIN M. DILLON**
Erie County
25 Delaware Avenue
Buffalo, New York 14202

**EXECUTIVE COMMITTEE**

| | |
|---|---|
| SOL GREENBERG | Albany County |
| GERALD F. MOLLEN | Broome County |
| JOHN T. WARD | Chautauqua County |
| JAMES T. HAYDEN | Chemung County |
| JOHN McDONALD | Essex County |
| HOWARD R. RELIN | Monroe County |
| DENIS E. DILLON | Nassau County |
| ROBERT MORGENTHAU | New York County |
| MATTHEW J. MURPHY | Niagara County |
| WILLIAM J. FITZPATRICK | Onondaga County |
| RICHARD A. BROWN | Queens County |
| WILLIAM L. MURPHY | Richmond County |
| KENNETH GRIBETZ | Rockland County |
| DAVID WAIT | Saratoga County |
| ROBERT M. CARNEY | Schenectady County |
| JOHN TUNNEY | Steuben County |
| STEVEN LUNGEN | Sullivan County |
| MICHAEL KAVANAUGH | Ulster County |
| RICHARD M. HEALY | Wayne County |
| CARL VERGARI | Westchester County |

August 19, 1993

Hon. Burton B. Roberts, Chair
Cameras in the Courts Review Committee
851 Grand Concourse
Bronx, New York 10451

Dear Justice Roberts:

The New York State District Attorneys Association supported the original enactment of legislation authorizing audio-visual coverage of judicial proceedings and has supported the various amendments made to that legislation to date.

We are not aware of any complaints made by any District Attorney in the state as to the manner in which the legislation has been implemented within the court system. We continue to support the legislation.

If there is any further information you require, please contact me.

Sincerely,

KEVIN M. DILLON
PRESIDENT

KMD/sue