# AN OPEN COURTROOM
# CAMERAS IN NEW YORK COURTS
## 1995-97

**NEW YORK STATE**
**COMMITTEE TO REVIEW AUDIO VISUAL COVERAGE**
**OF COURT PROCEEDINGS**

*April 4, 1997*

## COMMITTEE TO REVIEW AUDIO VISUAL COVERAGE
## OF COURT PROCEEDINGS

The New York State Committee to Review Audio-Visual Coverage of Court Proceedings consists of the following members:

Hon. Fritz W. Alexander, II, counsel, Epstein, Becker & Green and former Associate Judge, New York Court of Appeals

Richard Alteri, President, Cable Television and Telecommunications Association of New York

Professor Jay C. Carlisle, II, Pace University School of Law

Veronica Gabrielli Dumas, Assistant District Attorney, Office of the Albany County District Attorney

John D. Feerick, Dean, Fordham University School of Law (Chair)

Diane Kennedy, President, New York Newspaper Publishers Association

Henry G. Miller, Senior Partner, Clark, Gagliardi & Miller and former president, New York State Bar Association

Leonard Noisette, Director, Neighborhood Defender Service of Harlem

Michelle Rea, Executive Director, New York Press Association

Professor James M. Tien, Chair of the Department of Decision Sciences and Engineering Systems, Rensselaer Polytechnic Institute

Monte I. Trammer, President and Publisher of the Saratogian & Community News

Alissa Pollitz Worden, Associate Dean, School of Criminal Justice, University of Albany, State University of New York

# TABLE OF CONTENTS

Page

Acknowledgments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

EXECUTIVE SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II. OVERVIEW OF THE COMMITTEE'S WORK . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

III. SUMMARY OF CURRENT LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    A. Section 218 of the Judiciary Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
        1. Judicial Discretion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
        2. Safeguards for Defendants in Criminal Proceedings and
           Parties in Civil Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
        3. Safeguards for Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
        4. Safeguards for Children . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
        5. Safeguards for Jurors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
        6. Other Safeguards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
        7. Pretrial Conference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
        8. Equipment and Personnel Restrictions . . . . . . . . . . . . . . . . . . . . . . . 16
        9. Appeals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    B. Rules of the Chief Administrative Judge . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

IV. OVERVIEW OF CAMERA COVERAGE LAWS IN OTHER STATES AND IN
    FEDERAL COURTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    A. State Courts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
        1. 50-State Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
        2. California . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    B. Federal Courts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

V. SUMMARY OF THE COMMITTEE'S RECORD . . . . . . . . . . . . . . . . . . . . . . . . . . 27

    A. Public Benefits. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
        1. Public Education about the Courts . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
        2. Judicial Accountability and Public Scrutiny of the Judicial System . . . . . . 30
        3. Cathartic and Deterrent Effects . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

4. Other Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
5. Opponents' Views . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
A. Nature of Televised Coverage . . . . . . . . . . . . . . . . . . . . . . . . 36
B. Effect on Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
C. Fair Trial Implications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
D. Privacy Concerns . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
B. Compliance by Trial Judges and the Media . . . . . . . . . . . . . . . . . . . . 42
1. Compliance by Trial Judges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
A. Testimony and Public Comment . . . . . . . . . . . . . . . . . . . . . . 42
B. Results of the Committee's Judicial Survey . . . . . . . . . . . . . 44
C. Office of Court Administration Data . . . . . . . . . . . . . . . . . . . 47
2. Compliance by the Media . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
C. Effect of Audio-Visual Coverage on the Conduct
of Participants in Court Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . 51
1. Effect on Jurors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
2. Effect on Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
3. Effect on Lawyers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60
4. Effect on Judges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62
A. Inside the Courtroom . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62
B. Outside the Courtroom . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

VI. COMMITTEE'S ASSESSMENT AND CONCLUSIONS . . . . . . . . . . . . . . . . . . . . . . . 66

A. Public Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66
B. Compliance by Trial Judges and the News Media
With the Safeguards of Section 218 of the Judiciary Law . . . . . . . . . . . . . . . 68
1. Judges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68
2. News Media . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70
C. Effect of Audio-Visual Coverage on the Conduct
of Participants in Court Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . 70
1. Jurors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71
2. Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72
3. Lawyers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73
4. Judges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74
D. Defendant's Consent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

VII. RECOMMENDATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

1. Cameras Should Be Permitted in New York State Courts
on a Permanent Basis With All of the Safeguards of Current Law For
Parties, Prospective Witnesses, Jurors, Crime Victims and Other Trial
Participants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

ii

2.   Defendant Consent Should Be a Prerequisite for Camera Coverage
of Bail Hearings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78
3.   There Should Be No Separate Rules for Death Penalty Cases . . . . . . . . . . . . 78
4.   Judges Should Be Vigilant in Addressing the Safety and Privacy Concerns of
Witnesses in Both Criminal and Civil Proceedings . . . . . . . . . . . . . . . . . . . . . 78
5.   The Office of Court Administration Should Actively Monitor
Camera-Covered Proceedings, Make Periodic Reports, and,
If Necessary, Recommend Changes in Section 218 of the Judiciary Law
and the Implementing Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79
6.   The Office of Court Administration Should Develop a Judicial
Training Program to Familiarize All Judges with the Applicable
Statutory and Administrative Provisions and Safeguards . . . . . . . . . . . . . . . 81

APPENDICES

A. Judicial Survey

B. Marist Institute for Public Opinion Poll

C. Judiciary Law, Section 218

D. Rules of the Chief Administrative Judge

E. California Rule of Court 980

F. 50-State Overview

G. Jury Consultant Interviews

H. Office of Court Administration Data on News Media Applications for
Audio-Visual Coverage of Court Proceedings

I. Sample Monitoring Instrument for Camera-Experienced Lawyers

J. Judicial Training Program Outline

K. Selected Bibliography

## ACKNOWLEDGMENTS

The work of this Committee would never have been completed without the dedication of those who selflessly devoted thousands of hours to this project. The Committee is deeply indebted to all of them.

We owe our greatest debt to Alexandra D. Lowe, Esq., a lawyer with experience in both state and local government. She served with singular distinction as the Committee's counsel. We thank her most especially for the commitment and excellence she brought to all of her work for the Committee, making possible the exhaustive nature of the Committee's review of the subject.

Special thanks are due to Taryn V. Shelton, Esq. and Joseph Guglielmelli, Esq., experienced lawyers who volunteered their time to help organize the Committee's public hearings and assist the Committee's information gathering process. Their participation was truly invaluable. Ms. Shelton also provided enormous help in the final stages of the drafting of the Committee's report.

The Committee wishes to express its special gratitude to Professor Edmund Mantell of Pace University's Lubin School of Business, who designed the data base for the Committee's judicial survey and performed the statistical analysis of the data from that survey on a *pro bono* basis. We are greatly indebted to him for his time, his insights, and his commitment to this project.

We are also especially grateful to Dr. Lee M. Miringoff and Dr. Barbara L. Carvalho of the Marist Institute for Public Opinion who undertook a public opinion poll for the Committee to determine the views of New Yorkers on cameras in the courts. They refined the Committee's poll topics, surveyed the public, and compiled the results at no cost to the Committee. The interpretation of the survey findings is the Committee's.

The Committee received unfailing cooperation from the staff of the Office of Court Administration. Special thanks are due to Chief Administrative Judge Jonathan Lippman, Deputy Counsel for Criminal Justice Lawrence Marks and the staff of the Jury and Data Services Unit (especially Chester ("Chip") H. Mount, Jr., Gail Miller, David Greenberg, Harvey Cigman, and Gloria Jean Williams) for their help in compiling information from the news media's applications for camera coverage. OCA also printed over one thousand mailing labels for the Committee's judicial survey, arranged for court reporters to record and transcribe the Committee's five public hearings, and handled the burdensome task of copying those transcripts for the Committee.

iv

Eight Fordham Law School students -- Anthony Bolzan, Dickson Chin, Terris Ko, John McCarthy, Mark Sherman, Elisa Shevlin Rizzo, Joan Soares and Daniel Winterfeldt -- logged hundreds of hours in the law library and reached out to dozens of organizations across the country to put together a national perspective on the issue of cameras in the courts. Their continued involvement and insight at every stage of the Committee's proceedings was an invaluable asset. We would also like to thank Scott Welkis, a new lawyer who found time to help assemble and analyze the public comment the Committee received.

Without the logistical support of Marilyn Force, Sarina McGough and Michelle Sampson of Fordham Law School, the work of the Committee would have ground to a halt. Together, they kept open the channels of communications, scheduling and rescheduling countless meetings, conference calls, interviews and appointments. They photocopied thousands of pages of materials, faxed and re-faxed documents, assembled hundreds of overnight mail packages and made sure that the Committee's meetings and public hearings occurred without a hitch.

The Committee's judicial survey was desk top-published by Fordham Law School's Assistant Dean of Admissions, Kevin Downey, over the course of many nights and weekends. His help was enormous. Equal dedication was demonstrated by John Feerick, Jr., who volunteered to enter all of the data from the judicial surveys into the Committee's data base and helped display the final results. Paul Woomer and the other computer specialists at the Fordham University Law School's "Help Desk" made sure that our computers were able to store and retrieve all of the information and data we collected.

Professor Beth Schwartz of Fordham Law School volunteered to interview jury consultants about their experience with cameras in the courtroom. Michele Falkow and Janice Greer, Fordham Law School reference librarians, fielded dozens of last-minute requests for information and research. Christopher Carter of Fordham University's Office of Public Affairs drafted numerous press releases and helped ensure that notice of the Committee's public hearings and meetings was widely disseminated throughout the state.

Still others assisted the Committee in innumerable ways. Ruth Hochberger, chief editor of the *New York Law Journal*, graciously agreed to help the Committee solicit public comments on cameras in the court by running more than half a dozen public service announcements for the Committee. Helen Herman and Scott Lilly oversaw all of the logistical details of the Committee's two public hearings which took place at Fordham Law School. Donna Welensky, Fordham's Law Clinic Administrator, handled the logistics of videotaping the Committee's first two public hearings, ably assisted by camera operators James G. Andary and Esteban Y. Mondoza.

William Carroll and his dedicated staff at the New York State Bar Association (including Robert Millman, Dorothea Salvador and Terry Scheid) hosted the Committee's November 14, 1996 public hearing in Albany, contributing space, videotaping services and providing refreshments to the Committee. We are grateful to Presiding Justice Dolores Denman of the New York State Supreme Court, Appellate Division, Fourth Department, who offered the Committee the use of the Fourth Department courtroom for the Committee's December 17, 1996 meetings in Rochester, and to Carl Darnall, Clerk of the Appellate Division, Fourth Department, who helped the Committee with the logistics of using that courtroom for a public hearing.

Finally, the Committee would like to express its gratitude to all of the judges who took the time from their crowded court calendars to complete the Committee's judicial survey, and to all those who testified at the Committee's hearings, responded to the Committee's public opinion survey, wrote to the Committee, or contributed their knowledge and expertise to the Committee in telephone interviews and meetings.

# EXECUTIVE SUMMARY

Our Committee conducted its work against the background of camera coverage in New York State of civil and criminal proceedings since December 1, 1987. In allowing for an experimental period, the New York State Legislature noted in its 1987 findings that:

> court proceedings are complex, often involving human factors that are difficult to measure. There may be inherent problems in any court proceeding which could possibly be complicated by audio-visual coverage.

> [T]he Legislature, remaining sensitive to these concerns, hereby determines that, in order to enhance public familiarity with the workings of the judicial system, while not interfering with the dignity and decorum of the courtroom, the prohibition of audio-visual coverage of court proceedings should be modified for an experimental period.

Our review of the experiment, the fourth of its kind in New York since 1987, did not find that the presence of cameras in New York interferes with the fair administration of justice. Rather, testimony from over 50 witnesses who spoke at our five public hearings, over 350 responses to our judicial survey, and over 50 letters of public comment from lawyers, bar associations, and interested citizens strongly suggest that the judges of this state have done an excellent job in administering the present law. The many safeguards contained in the law and in the accompanying rules issued by the Chief Administrative Judge have worked well to provide judges with the necessary discretion to deal with potential abuses and to protect the legitimate concerns of parties, prospective witnesses, jurors, crime victims and other participants in trial proceedings.

The Committee's record includes strong evidence of compliance with the requirements and safeguards of Section 218 of the Judiciary Law by representatives of the electronic news media. Overall, the media appeared to understand and respect the solemnity and dignity of the courtrooms they covered.

In light of the long period of examination of this subject by prior committees and this Committee, we recommend that Section 218 of the Judiciary Law be amended to permit audio-visual coverage on a permanent basis, with all of the safeguards of the current legislation for defendants in criminal proceedings, parties in civil proceedings, witnesses, jurors, crime victims, children and others.[1] We believe that the public nature of a trial and the public's right of access to a trial support the adoption of a law permitting television coverage of court proceedings under the careful control and supervision of trial judges, who must retain their unfettered discretion to

---

[1] One Committee member, Leonard Noisette, Esq. does not join in this recommendation and submits a minority report.

I.

determine whether or not to admit cameras to their courtroom, taking into consideration the concerns of trial participants.

In striking this balance, we find instructive judicial decisions on the public nature of a trial and the values served by the principle of openness of the judicial process. These values include promoting confidence in the judicial process, assuring that proceedings are conducted fairly, providing the public with information about the workings of the judiciary, and satisfying the appearance of justice. Although televised coverage could, at times, show the judicial system in an unfavorable light, we do not view that as a detriment. Rather, to the extent that such coverage offers an opportunity for improving the judicial system, we view it as a strength of our democratic system.

It is a fact of life that television has radically changed what is available to the public. Millions now watch inaugurations and other public events previously limited to a few. The courts, like other public institutions, belong to the people, and a principal way for most New Yorkers to view their legal system in action is through television. Certainly, some act differently when they know a camera is upon them. But for every person who shows off, usually to his or her detriment, there are others who will be on their best behavior. For those who are concerned that the public's thirst for stronger punishment might infect the process if criminal trials are televised, there is the compensating safeguard of a courtroom monitored by many members of the community.

While there is no constitutional requirement mandating the presence of cameras in the courtroom, we agree with the findings contained in the initial 1987 legislative authorization for cameras in New York:

> An enhanced understanding of the judicial system is important in maintaining a high level of public confidence in the judiciary. Public awareness and understanding of judicial proceedings, however, is often limited to the role played as a juror or witness, or as a party in a small claims proceeding. The average law-abiding citizen is not afforded numerous opportunities to participate in civil and criminal court proceedings, or able to attend and observe firsthand the functioning of our legal system. The vast majority of citizens, therefore, rely on reports in the news media for information about the judicial system and accounts of judicial proceedings.

The Committee believes that one of the greatest benefits derived from the presence of cameras in the courtroom is enhanced public scrutiny of the judicial system. The majority of judges who responded to the Committee's survey and a wide array of witnesses who testified at the Committee's hearings agreed that the presence of television cameras in the courtroom enhances public scrutiny of judicial proceedings. It seems clear that television coverage of court proceedings enables the public to learn more about the workings of the justice system, to see directly the conduct of particular cases, and to become more familiar with legal concepts and developments.

In implementing a permanent law in New York on cameras in the courts, we consider it essential that the Chief Administrative Judge actively monitor compliance with the law and its implementing rules, establish a formal mechanism to receive and review complaints about the operation of the law, make periodic reports to the Legislature and, if necessary, recommend changes in Section 218 of the Judiciary Law and the implementing rules.

We strongly recommend that the Chief Administrative Judge develop an enhanced training program for all judges, including town and village judges, to ensure that every judge in the state is familiar with the safeguards of the current law and the implementing rules, and is equipped with the tools necessary to exercise wisely the discretion conferred by the law.  In making this recommendation, we note that some judges reflected a misunderstanding that the current statute provides a presumption in favor of cameras in the courtroom.

We also recommend that in order to minimize inadvertent violations of the statute, the Office of Court Administration should develop a new application form which would identify, in plain English, each of the restrictions on camera coverage which are enumerated in the applicable law and administrative rules.  Representatives of the news media should be required to sign the form to indicate that they have read and understood the applicable safeguards.

We further recommend that the Legislature extend to bail hearings the same safeguard of defendant's consent which is currently required as a prerequisite to camera coverage of arraignments and suppression hearings. Because widespread pre-trial dissemination of hearsay statements made at bail hearings may have a prejudicial effect on prospective jurors comparable to that of the dissemination of evidence ruled inadmissible at a suppression hearing, the Committee believes that it would be consistent with existing safeguards to add bail hearings to the list of pre-trial proceedings which require a defendant's consent.

The Committee considered whether there should be a special camera coverage rule for death penalty cases insofar as New York State's death penalty statute is new and we have no experience with camera coverage in such cases.  The Committee notes that a majority of New York State judges who responded to our survey were not of the view that different rules were needed to govern camera access in capital proceedings, although a sizeable minority favored banning cameras altogether in such proceedings.  We find no basis in our consideration of the subject to distinguish such cases from other criminal proceedings.  However, we believe that it is important for the trial judge to take account of all relevant factors in deciding whether or not to permit camera coverage in death penalty cases.

The Committee also considered whether a witness' right to insist that his or her image be visually obscured -- which is available under current law to non-party witnesses in criminal proceedings -- should be extended to non-party witnesses in civil cases.  The Committee concluded that it is appropriate to distinguish between these two categories of proceedings, given the heightened safety concerns that may exist in a criminal trial, where threats to witnesses' physical

safety could be of serious concern. We also recognize that the privacy concerns of rape and other sexual assault victims are important in criminal proceedings.

We believe that the safety and privacy concerns of witnesses in civil cases deserve the trial judge's careful attention. Some witnesses in civil proceedings may reasonably fear injury to their personal or professional reputation if certain aspects of their past are thrust before a television audience. In accordance with the rules of the Chief Administrative Judge, we believe that trial judges should remain "especially sensitive and responsive to the needs and concerns of all . . . . witnesses" and should exercise, if necessary, their statutory discretion to protect the witness in a civil proceeding who raises a valid privacy or safety concern.

Finally, no report about cameras in the courtroom in 1997 would be complete without at least some mention of the O.J. Simpson case. Televised coverage of the Simpson criminal trial has cast a long shadow over the "cameras in the court" debate nationwide. Camera proponents assert that televised coverage of that proceeding made an important contribution to the public's understanding of the judicial process and fundamental legal principles, such as the presumption of innocence, proof beyond a reasonable doubt, and the suppression of illegally seized evidence. Camera opponents have argued that the Simpson case personifies the evils of cameras in the courts: television programming that sensationalized the judicial process and turned a murder trial into a mass-marketed commercial product which, in the eyes of some observers, brought the American legal system into disrepute.

From its inception, this Committee stayed in close contact with the California judicial taskforce charged with re-evaluating California's camera coverage law in the wake of the O.J. Simpson trial. We had several lengthy telephone conferences with the taskforce's senior staff, who shared with us the voluminous set of materials compiled by the California taskforce. Justice Richard Huffman of the California Court of Appeal, who chaired the California study effort, flew to New York to testify at the Committee's hearings. We also heard testimony from one of the criminal defense lawyers who played a pivotal role in the Simpson case. We carefully reviewed the new California court rule on cameras in the court, which gives broad discretion to the trial judge and which provides that there should be no presumption for or against camera access.

In the end, this Committee reaches the same conclusion as California: televised coverage of trials should be left to the sound discretion of the trial judge[2], unfettered by any presumptions. As required by the current implementing rules, judges in New York should carefully consider "the objections of any of the parties, prospective witnesses, victims or other participants" before deciding whether or not to admit cameras to the courtroom and must remain, throughout the trial,

---

[2] We note that New York provides greater safeguards in pre-trial proceedings than California. We fully support the existing pre-trial safeguards in our law.

> especially sensitive and responsive to the needs and concerns of all
> parties, victims, witnesses and participants in [court] proceedings,
> particularly where the proceedings unnecessarily threaten the
> privacy or sensibilities of crime victims, or where they involve
> children or sex offenses.

With these safeguards in place, the Committee is confident that cameras in the courts of New York State can and will strengthen the public's access to the vital work of the judicial system. We in New York can show the world the benefits of an open system.

In sum, the Committee makes the following recommendations:

1. **Cameras should be permitted in New York State courts on a permanent basis with all of the safeguards of current law for parties, prospective witnesses, jurors, crime victims and other trial participants.**

2. **Defendant consent should be a prerequisite for camera coverage of bail hearings.**

3. **There should be no separate rules for death penalty cases.**

4. **Judges should be vigilant in addressing the safety and privacy concerns of witnesses in both criminal and civil proceedings.**

5. **The Office of Court Administration should actively monitor camera-covered proceedings, make periodic reports, and, if necessary, recommend changes in Section 218 of the Judiciary Law and the implementing rules.**

6. **The Office of Court Administration should develop an enhanced judicial training program to familiarize all judges with the applicable statutory and administrative provisions and safeguards.**

In the final analysis, we observe that New York opted in 1987 to open its courts to cameras in both civil and criminal proceedings. Almost 10 years of experience argue in favor of allowing cameras in the courts on a permanent basis so long as a law allowing camera coverage is grounded on judicial discretion, contains all of the safeguards in place during the experimental period and recommended by this Committee, and directs the Office of Court Administration to monitor camera-covered proceedings, make periodic reports, and, if necessary, recommend changes in Section 218 of the Judiciary Law and the implementing rules. It is this Committee's judgment that such an approach, in the context of New York's experiment, respects the public value of openness, the public nature of a trial, and the constitutional principle of a fair trial.

## I. INTRODUCTION

In January 1995, the New York State Legislature approved the fourth phase of New York's "experiment" with cameras in the courtroom.[3] This experiment, which began on December 1, 1987, gives trial judges discretion to allow televised and still camera coverage of civil and criminal trial court proceedings.[4]

As before, the Legislature created a mechanism for evaluating the latest phase of the experiment, which is scheduled to last until June 30, 1997.   The Legislature called for the appointment of a 12-member committee "to review audiovisual coverage of court proceedings."[5] The Legislature directed this Committee to evaluate the efficacy of the experimental program and to assess whether:

1.   Any public benefits accrue from the experimental program;
2.   Any abuses occurred during the program;
3.   The extent to which and the way in which the conduct of participants in court proceedings changes when audio-visual coverage is present;
4.   The degree of compliance by trial judges and the media with the requirements of Section 218 of the Judiciary Law;

---

[3] The term "experiment" refers to a loosening, on a temporary basis, of the strictures of § 52 of the Civil Rights Law, which prohibits televising proceedings "in which the testimony of witnesses by subpoena or other compulsory process is or may be taken." *See* Judiciary Law § 218(1).

[4] Although this report most often uses the term "cameras in the court" to refer to televised coverage of court proceedings, still camera coverage is also part of the experiment.

[5] Judiciary Law § 218(9)(a).  Richard Alteri, president of the Cable Television and Telecommunications Association of New York, Professor Jay C. Carlisle, II of Pace University School of Law, and Henry G. Miller, Senior Partner, Clark, Gagliardi & Miller, were appointed to the Committee by the Governor. Committee Chair John D. Feerick, Dean of Fordham University School of Law, Hon. Fritz. W. Alexander II, counsel, Epstein, Becker & Green, and Veronica Gabrielli Dumas, Assistant District Attorney, Albany County, were appointed by the Chief Judge of New York State.  Monte Trammer, president and publisher of The Saratogian & Community News, and Professor James M. Tien, Chair of the Decision Sciences and Engineering Systems Department at Rensselaer Polytechnic Institute, were appointed by the Majority Leader of the Senate.  Leonard Noisette, director of Neighborhood Defender Service of Harlem, and Alissa Pollitz Warden, Associate Dean of the School of Criminal Justice of the University of Albany, were appointed by the Speaker of the Assembly.  Diane Kennedy, president of the New York Newspaper Publishers Association, was appointed by the Minority Leader of the Senate.  Michelle Rea, executive director of the New York Press Association, was appointed by the Minority Leader of the Assembly.

    5.    The effect of audio-visual coverage on the conduct of trial judges both inside and outside the courtroom.[6]

As the Committee began its work, it quickly became apparent that it would not be writing on a blank slate. Except for one year during which the experiment was allowed to lapse, cameras have been present in the trial courts of New York State since 1987. Three prior reports had recommended that the state's "cameras in the courts" law be made permanent. A majority of states permit cameras in their trial courts in both civil and criminal proceedings. The U.S. Judicial Conference ended its experiment with cameras in federal civil cases in 1994 and federal law continues to prohibit cameras in federal criminal cases.

Many of the arguments presented to this Committee were presented to prior Committees. Camera proponents, for instance, assert that cameras educate the public about the courts, enhance public scrutiny of the judicial branch of government, improve the quality of justice by discouraging perjury and encouraging knowledgeable witnesses to step forward, increase the accuracy of news reporting about the courts, and help some crime victims or their survivors come to terms with their tragedy.

On the other hand, camera opponents assert that the educational benefits of camera coverage are slight, given the focus of camera coverage, for the most part, on cases involving violent crime, which are frequently depicted in brief segments on the evening news. They further argue that fear of publicity discourages rape and other sexual assault victims from reporting these serious crimes, and that televised coverage of trials affects the fairness of the trial itself, by deterring witnesses from coming forward, by affecting the demeanor and credibility of witnesses who may be intimidated by the presence of cameras, and by creating a danger that hearsay from television news reports and commentary will creep into the public consciousness and prejudice potential or actual members of the jury.

Over the course of a 10-month period, the Committee sought to collect information from a wide variety of sources that might shed light on these arguments and concerns. The Committee reached out to every part of the legal community. The Committee's methodology, a summary of the statute and the rules which govern cameras in New York State courts, a short survey of comparable laws across the country, and a detailed overview of the record the Committee has compiled are set forth in sections II through V of this report. The Committee's assessment of the record and its recommendations are set forth in sections VI and VII.

---

[6] Judiciary Law § 218(9)(c).

## II. OVERVIEW OF THE COMMITTEE'S WORK

The Committee met for the first time on June 25, 1996[7]. The Committee held seven meetings and its members conferred frequently throughout the course of its work. Faced with the challenge created by the absence of any significant funding to discharge its responsibilities, the Committee developed a work plan which sought to take maximum advantage of the *pro bono* resources available to it.

The Committee designed and conducted a written survey to assess the experience of New York judges with cameras in the courtroom.[8]  It contacted the Marist Institute for Public Opinion, which agreed to survey public opinion in New York on the issue of cameras in the courtroom.[9]  In fulfillment of its statutory mandate to "request participation and assistance from the New York State Bar Association and other bar associations", the Committee wrote to the presidents and executive directors of 150 bar associations in New York asking for information about the experience of their members with respect to each of the issues the Legislature had directed the Committee to study.  In a further effort to reach lawyers with experience trying cases in which cameras were present, the Committee contacted the New York Law Journal, which agreed, as a public service, to run a prominent notice of the Committee's interest in receiving public comment.[10]

Between October 29, 1996 and December 17, 1996, the Committee held four day-long public hearings -- two in New York City, one in Albany and one in Rochester -- and a shorter public hearing in New York City on February 27, 1997.[11]   Each public hearing was announced by

---

[7] As of that date, only seven of the 12 members of the Committee had been appointed: Committee Chair John D. Feerick and Hon. Fritz W. Alexander by the Chief Judge, Monte Trammer and Professor James Tien by the Majority Leader of the Senate, Diane Kennedy by the Minority Leader of the Senate, and Leonard Noisette and Alissa Pollitz Worden by the Speaker of the Assembly.  As the Committee approached its full complement of members, it decided to open its meetings to the public.  Each public meeting was announced in a press release issued by Fordham University's Office of Public Affairs.

[8] The results of the judicial survey are included in Appendix A.  The data base for the judicial survey was designed on a *pro bono* basis for the Committee by Professor Edmund Mantell of Pace University's Lubin School of Business, who also performed the statistical analysis of the 351 responses to the survey.

[9] The results of the Marist poll are included in Appendix B.

[10] The notice ran on more than half a dozen occasions, beginning in mid-December 1996 and ending in late January 1997.

[11] Transcripts of the Committee's public hearings are on file at Fordham University School of Law and will be available for review in the New York Public Library, the library of the Association of the Bar of the City of New York and the New York State Library in Albany.  Throughout this report, these transcripts are referred to as follows: the public hearing in New York City on October 29, 1996 is cited as "NYC-I".  The public hearing in New York City on November 12, 1996 is cited as "NYC-II".  The public hearing in

a press release, which reiterated the Committee's interest in receiving public comment and which was sent to the Associated Press Daybook, Reuters News Service, UPI, the New York Law Journal, CNN and New York's daily newspapers.[12] Over fifty witnesses, including representatives of the print and electronic media, civil and criminal trial lawyers who had participated in televised trials, judges, crime victim advocates, law enforcement officials, media scholars and jurors, testified at the Committee's hearings. In addition, the Committee received numerous communications and letters commenting on the "cameras in the courts" law,[13] a number of which appeared to have been inspired by newspaper coverage of the Committee's hearings.

To understand more fully what kinds of proceedings television cameras covered and what information about the judicial process was conveyed to the public, the Committee sought data from the New York State Office of Court Administration describing the number and kinds of proceedings for which permission to televise was sought and detailing the frequency with which media applications were granted or denied.[14] The Committee also invited television stations around the state to provide samples of their televised courtroom footage to the Committee.[15]

To give the Committee a national perspective on this issue, a team of Fordham law students gathered information on "cameras in the court" laws in the 50 states (including California, which recently undertook a comprehensive review of its own "cameras" law),[16] and collected information about the federal "cameras in the courtroom" pilot project. They also reviewed both

---

Albany on November 14 and the public hearing in Rochester on December 17, 1996 are cited, respectively, as "Albany" and "Rochester". The public hearing in New York on February 27, 1997 is cited as "NYC-III".

[12] In addition, the press advisory for the Committee's first public hearing in New York City on October 29, 1996 was also sent through Business Wire, which distributed the advisory to media outlets and daily newspapers throughout New York State. Releases for subsequent public hearings and for the Committee's public meetings were also distributed to broadcast and major print outlets in specific media markets (New York City, Albany, Rochester) where meetings were held. Altogether, Fordham University's Office of Public Affairs prepared and distributed eight (8) media advisories to publicize the Committee's meetings and public hearings.

[13] Copies of the written public comments sent to the Committee are on file at Fordham Law School.

[14] Data from the Office of Court Administration on news media applications for camera coverage is summarized in Appendix H.

[15] COURT-TV, WRGB-TV in Albany, and R-NEWS and WOKR-TV in Rochester responded to the Committee's request.

[16] A table prepared for the Defense Research Institute, which summarizes the camera coverage laws of the 50 states based on information compiled by the Radio And Television News Directors Association, is included in Appendix F. *See also* Christo Lassiter, *An Annotated Descriptive Summary of State Statutes. Judicial Codes, Canons, and Court Rules Relating to Admissibility and Governance of Cameras in the Courtroom,* 86 Journal of Criminal Law & Criminology 1019 (1996).

the principal decisions of the U.S. Supreme Court on this issue and the legal and psycho-social literature in this field.[17]

The Committee wrote to the deans of all of the law schools in New York State to determine to what extent televised footage from New York cases is used in the classroom and in continuing legal education programs for practicing attorneys. The Committee also wrote to eleven jury consultants to seek information about their experience with the impact of cameras in the courtroom on jurors and other trial participants.[18]

Finally, the Committee conferred informally with media scholars, trial and appellate state court judges from New York and around the country, federal judges who had experience with the federal pilot "cameras in the court" program (including two judges from the U.S. District Court for the Southern District of New York and the former chair of the U.S. Judicial Conference's Executive Committee), camera-experienced trial lawyers in New York State and elsewhere, and a wide variety of organizations, ranging from the Courtroom Television Network to the Radio and Television News Directors Association, and from the New York State Bar Association and New York State Defenders Association to the New York State Coalition Against Sexual Assault.

---

[17] A short bibliography of the legal and psycho-social literature on cameras in the courtroom, together with a short list of the principal organizations which supplied background information to the Committee on camera coverage laws in other states, is included in Appendix K.

[18] A memorandum summarizing the jury consultants' responses is included in Appendix G.

## III. SUMMARY OF CURRENT LAW

### A. Section 218 of the Judiciary Law

Cameras in the courts of New York are governed by the provisions of Section 218 of the Judiciary Law.[19]  Compared to the governing law in most states, New York's camera coverage law is quite detailed.[20]

#### 1. Judicial Discretion

Section 218 gives trial judges discretion to permit audio-visual coverage of civil and criminal court proceedings upon application by the news media.[21]  A judge's decision to grant or deny the news media's request for camera coverage must be in writing and must contain both a list of any restrictions imposed by the judge on camera coverage and a warning to all parties that any violation of the order is punishable by contempt.[22]  The judge must also review his or her restrictions and warnings with counsel and with the news media in a pre-trial conference.[23]

The statute identifies five factors which trial judges must take into account when ruling on an application for camera coverage:

1.  The type of case involved;
2.  Whether the coverage would cause harm to any participant in the case or otherwise interfere with the fair administration of justice, the advancement of a fair trial or the rights of the parties;
3.  Whether any order directing the exclusion of witnesses from the courtroom prior to their testimony could be rendered substantially ineffective by allowing audio-visual coverage

---

[19] A copy of § 218 of the Judiciary Law is included in Appendix C.

[20] New York's law is also unusual in that cameras in the courts in most states are governed not by statute but by rules of court or codes of judicial conduct.

[21] Judiciary Law § 218(3)(a) & (b).  Under § 218(3)(a), requests for audio-visual coverage must be made in writing "not less than seven days before the commencement of the judicial proceeding."  The statute, however, allows some leeway in applying the 7-day notice provision.  According to 218(3)(a), "where circumstances are such that an applicant cannot reasonably apply seven or more days before the commencement of the proceeding, the presiding trial judge may shorten the time period for requests."

[22] *Id.*, § 218(3)(b).

[23] *Id.*, § 218(4)(b).

11

> that could be viewed by such witnesses to the detriment of
> any party;
>
> 4.  Whether such coverage would interfere with any law
>     enforcement activity;
>
> 5.  Whether such coverage would involve lewd or scandalous
>     matters.[24]

Absent from the list of factors which the judge is specifically directed to consider are any objections raised to the prospect of camera coverage by the parties, their lawyers, their witnesses or members of the jury. Instead, Section 218(5) provides that "audio-visual coverage of judicial proceedings, except for arraignments and suppression hearings, shall not be limited by the objection of counsel, parties, or jurors, except for a finding of good or legal cause." However, as described in the following section of this report, the implementing regulations promulgated by the Chief Administrative Judge, make it clear that, before deciding whether or not to admit cameras, judges must consider the "objections of any of the parties, prospective witnesses, victims or other participants in the proceeding of which coverage is sought."[25]

The exercise of judicial discretion is not limited to the initial decision to permit camera coverage. The statute is clear that "throughout the proceeding", the trial judge has discretion to revoke his or her approval or limit coverage and "may, where appropriate, exercise such discretion to limit. restrict or prohibit audio or video broadcast or photography of any part of the proceeding in the courtroom. or of the name or features of any participant" in the proceeding.[26] In other words. a judge may decide, in the midst of a trial, to remove cameras from the courtroom or bar coverage of any witness or exhibit, even if he or she had previously granted permission for coverage.

## 2. Safeguards for Defendants in Criminal Proceedings and Parties in Civil Proceedings

The statute contains a number of safeguards aimed at protecting the fair trial rights of criminal defendants. Cameras are currently not permitted at arraignments and suppression

---

[24] *Id.*, § 218(3)(c).

[25] New York Court Rules, § 131.4(c)(7).

[26] Judiciary Law § 218(7). *See also id.*, § 218(4)(c)("there shall be no limitation on the exercise of discretion under this subdivision except as provided by law. The presiding trial judge may at any time modify or reverse any prior order or determination").

hearings[27] without the consent of all parties to the proceeding.  Defendants who are unrepresented by counsel at the time of the arraignment or suppression hearing cannot consent to camera coverage unless they have been advised of their right to counsel and have affirmatively elected to proceed without counsel at the arraignment or suppression hearing.[28]

Section 218 also contains a number of provisions that limit camera coverage of certain aspects of both criminal and civil trials which take place outside the purview of the jury.  For instance, Section 218 prohibits audio pickup and broadcast of discussions between attorneys and their clients and between attorneys and the judge at sidebar.  It also prohibits audiovisual coverage of conferences which take place in the judge's chambers.[29]

A judge may not permit camera coverage of either civil or criminal trials if the request is made after the trial has begun, unless counsel for all parties consent to the coverage.[30] An exception has been carved out for requests to cover verdicts and sentencings, which may be granted without the parties' consent.[31]

Finally, the statute expressly provides that "no judicial proceeding shall be scheduled, delayed, reenacted or continued at the request of, or for the convenience of, the news media."[32]

### 3.  Safeguards for Witnesses

Section 218 contains a number of safeguards designed to protect the privacy of witnesses and to encourage witnesses to come forward who might otherwise be reluctant to appear on camera. In criminal (but not in civil) cases, non-party witnesses[33] are entitled to request that their image be

---

[27] "Suppression hearings" are broadly defined to include a hearing on a motion made pursuant to § 710.20 of the Criminal Procedure Law, as well as "a hearing on a motion to determine the admissibility of any prior criminal, vicious or immoral acts of a defendant and *any other hearing held to determine the admissibility of evidence*." Judiciary Law § 218(2)(g) (emphasis added).

[28] *Id.*, § 218(5)(b) & (7)(h).

[29] *Id.*, § 218(7)(a) & (b).

[30] *Id.*, § 218(3)(d).

[31] *Id.*

[32] *Id.*, § 218(7)(I).

[33] A "nonparty witness" is defined by § 218(2)(h) as "any witness in a criminal trial proceeding who is not a party to the proceeding; except an expert or professional witness, a peace or police officer who acted in the course of his or her duties and was not acting in a covert or undercover capacity in connection with the instant court proceeding, or any government official acting in an official capacity shall not be deemed to

13

"visually obscured"[34] during their testimony--such as with the use of a so-called blue dot.[35] If a witness makes such a request, the statute directs the judge to order the news media "to visually obscure the visual image of the witness in any and all audio-visual coverage of the judicial proceeding."[36] In both civil and criminal proceedings, the judge is further empowered to bar audio-visual coverage if he or she finds that "such coverage is liable to endanger the safety of any person."[37]

New York does not exclude sexual assault cases from camera coverage.  It provides a safeguard for the privacy of the complaining witness in a rape case by excluding audio-visual coverage of the victim (unless the victim requests such coverage) and by giving the judge discretion, throughout the proceeding, "to limit any coverage that would identify the victim" in a prosecution for rape, sodomy, sexual abuse or other sex offense .   .   ."[38] Alternately, the victim may request that his or her testimony be filmed but that his or her image be visually obscured by the news media.[39]

New York's statute also contains safeguards aimed at protecting those involved in covert or undercover police operations.  Audio-visual coverage is not permitted of covert or undercover witnesses without their prior written consent.[40]

-------------------------

be a 'nonparty witness'."

[34] "Visually obscured" is defined by the statute to mean that "the face of a participant in a criminal trial proceeding shall either not be shown or shall be rendered visually unrecognizable to the viewer of such proceeding by means of special editing by the news media." Judiciary Law § 218(2)(I).

[35] Judiciary Law § 218(5)(c).  Counsel to each party in a criminal case is charged with the duty to advise each non-party witness of their right to request that their image be visually obscured. *Id.*  Counsel are also charged with conveying to the judge at the mandatory pre-trial conference any prospective witnesses' concerns about camera coverage. *Id.,* § 218(4)(b).

[36] *Id.*

[37] *Id.,* § 218(7)(j).

[38] Judiciary Law § 218(7)(g).

[39] *Id.*

[40] *Id.,* § 218(7)(e) & (f).  The importance of these safeguards was underscored by New York City Police Commissioner Howard Safir in his letter to the Committee dated January 24, 1997 ("any audio-visual coverage of [] undercover officers during court proceedings would potentially threaten their safety and have a chilling effect on their continued ability to investigate criminal activity").

14

### 4. Safeguards for Children

Unlike states which specifically exempt divorce and child custody proceedings from camera coverage, New York does not automatically bar camera coverage of domestic relations matters or other cases involving children. However, Section 218 directs the trial judge in any case involving "lewd or scandalous matters" to prohibit audio-visual coverage where necessary "to preserve the welfare of a minor."[41] Section 218 further prohibits camera coverage of any proceedings which by law are closed to the public or which have been closed to the public.[42] This covers many matters which are heard in Family Court, where judges have broad discretion to exclude the public from the courtroom.[43]

### 5. Safeguards for Jurors

Section 218 prohibits coverage of the selection of the jury.[44] It further prohibits coverage of the jury or of any juror or alternate juror while in the jury box, in the courtroom, in the jury deliberation room during recess, or while going to or from the deliberation room.[45] However, with the consent of the jury's foreperson, the presiding judge may, in his or her discretion, permit audio coverage of the delivery of the verdict.[46]

### 6. Other Safeguards

Section 218 contains a variety of other safeguards. For instance, in a criminal case, it specifically bars coverage of any family members of a victim or of a party, except when the family member is testifying. Camera personnel are required to make "reasonable efforts" to identify family members so that coverage can be avoided.[47]

---

[41] *Id.*, § 218(4)(a).

[42] *Id.*, § 218(7)(k).

[43] *See, e.g.*, 22 NYCRR § 205.4 (authorizing family court judge to exclude any person or the general public from a proceeding in Family Court); *see also* Family Court Act, § 433 (authorizing court to exclude the public from the courtroom).

[44] Judiciary Law § 218(7)(c).

[45] *Id.*, § 218(7)(d).

[46] *Id.*

[47] *Id.*, § 218(7)(l).

Where court proceedings involve "lewd or scandalous matters", Section 218 permits the judge to prohibit audio-visual coverage of any trial participant, a minor, or an exhibit if such a prohibition is needed to "protect[ ] any participant or to preserve the welfare of a minor."[48]

### 7. Pretrial conference

The statute requires the presiding trial judge to hold a pretrial conference in each case in which camera coverage of the proceeding has been approved.[49]  At that conference, the judge must review with the lawyers in the case and the members of the news media the restrictions on camera coverage which she or he intends to impose.  Lawyers for the parties are required to convey to the judge any concerns that a prospective witness may have about the prospect of camera coverage of his or her testimony.

### 8. Equipment and personnel restrictions

The statute contains detailed restrictions on the number of cameras and camera-operating personnel who may be present in the courtroom.[50]  For instance, no more than two electronic or motion picture cameras and no more than one audio system is permitted, although the statute also gives judges the power to modify these restrictions in "special circumstances".[51]  Various broadcasters must enter into "pooling arrangements" and establish procedures for "cost sharing and dissemination of audio-visual material".[52]

The statute also contains detailed restrictions on the type of lighting and sound equipment which may be used in the courtroom.  Motorized drives, for instance, are not permitted and only electronic cameras, still cameras and audio equipment that do not produce distracting sounds or light may be used in court.[53]  The judge is required to designate where the cameras, equipment and

---

[48] Id., § 218(4)(a).

[49] Id., § 218(4)(b).

[50] Id., § 218(6)(a).

[51] Id., § 218(6)(a)(I), (iii) & (iv).

[52] Id., § 218(6)(a)(v).  In making these pooling arrangements, "consideration shall be given to educational users' needs for full coverage of entire proceedings." Id.

[53] Id., § 218(6)(b).

personnel are to be positioned.[54]  Camera personnel are directed not to move about the courtroom or change camera film and lenses except during recesses in the proceeding.[55]

### 9. Appeals

Section 218(3)(b) of the Judiciary Law provides that an order "for initial access" may be reviewed only by the administrative judge.[56]  No further judicial review is available during the pendency of the proceeding.[57]

## B. Rules of the Chief Administrative Judge

Pursuant to Section 218(10) of the Judiciary Law, the Chief Administrative Judge has promulgated rules implementing the state's "cameras in the courts" statute.[58]  As the rules make clear, they have two purposes: to comport first "with the legislative finding that an enhanced understanding of the judicial system is important in maintaining a high level of public confidence in the judiciary" and second "with the legislative concern that cameras in the court be compatible with the fair administration of justice."[59]

The rules specifically state that "nothing in these rules is intended to restrict the power and the discretion of the presiding trial judge to control the conduct of judicial proceedings."[60]  Judges are reminded that in addition to their specific responsibilities under the rules, they must take "whatever steps are necessary to insure that audio-visual coverage is conducted without disruption of court activities, without detracting from or interfering with the dignity or decorum of the court,

---

[54] *Id.,* § 218(6)(c).

[55] *Id.,* § 218(6)(d).

[56] *Id.,* § 218(3)(b).  *See also New York Times v. Bell,* 135 A.D.2d 182, 523 N.Y.S.2d 807 (1st Dep't 1988) (trial judge's denial of application for camera coverage reviewable by administrative judge, not under CPLR Article 78). *But see P.B. v. C.C.,* 223 A.D.2d 294, 647 N.Y.S.2d 732 (1st Dep't 1996) and *In re Reuben R.,* 219 A.D.2d 117, 641 N.Y.S.2d 621 (1996) (reversing Family Court order denying motion to exclude press and public from courtroom).

[57] *Id.,* § 218(3)(b).

[58] N.Y. Court Rules, Part 131.  A copy of the implementing rules is included in Appendix D.

[59] N.Y. Court Rules, § 131.1(a).

[60] *Id.,* § 131.1(d).

17

courtrooms and court facilities, without compromise of the safety of persons having business before the court, and without adversely affecting the administration of justice."[61]

For the most part, the implementing rules track the language of Section 218 itself. However, in certain specific instances, the rules provide additional guidance to judges. For instance, the rules make it clear that if a crime victim, a prospective witness, a party or a child objects to camera coverage, the judge may hold a conference and "conduct any direct inquiry as may be fitting"[62] before ruling on the application for camera coverage.

With respect to the factors to be considered by the presiding judge in deciding whether or not to grant an application for camera coverage, the rules elaborate upon the statutory factors by identifying three additional factors judges must take into account, along with "all relevant factors":

> 1. The objections of any of the parties, prospective witnesses, victims or other participants in the proceeding of which coverage is sought;
>
> 2. The physical structure of the courtroom and the likelihood that any equipment required to conduct coverage of proceedings can be installed and operated without disturbance to those proceedings or any other proceedings in the courthouse;
>
> 3. The extent to which the coverage would be barred by law in the judicial proceeding of which coverage is sought.[63]

In addition, the judge is specifically directed by the rules to "consider and give great weight to the fact that any party, prospective witness, victim or other participant in the proceeding is a child."[64]

The rules also contain a provision directing judges to consider alternatives to denying an application for coverage. Before denying an application, the judge shall consider "whether such coverage properly could be approved with the imposition of special limitations," including but not limited to:

---

[61] *Id.*, § 131.1(f).

[62] *Id.*, § 131.4(a).

[63] *Id.*, § 131.4(c)(7), (8) & (9).

[64] *Id.*, § 131.4(c).

1.   Delayed broadcasting of the proceedings, which is available "only for the purpose of assisting the news media to comply with the restrictions on coverage provided by law or by the presiding trial judge;"[65]

2.   "Modification or prohibition of audio-visual coverage of individual parties, witnesses, or other trial participants, or portions of the proceedings;"

3.   "Modification or prohibition of video coverage of individual parties, witnesses or other trial participants, or portions of the proceedings."[66]

The rules contain several other salient features. First, the rules spell out what is to occur at the mandatory pretrial conference. The rules make it clear that the purpose of the pretrial conference is to review with the parties' lawyers and with media representatives "any objections to coverage that have been raised, the scope of the coverage to be permitted, the nature and extent of the technical equipment to be deployed, and the restrictions on coverage to be observed."[67] The rules remind judges that they may include in the conference any person they deem appropriate, including "prospective witnesses and their representatives".[68]

Second, the rules emphasize the judge's continuing duty to supervise audio-visual coverage throughout the course of the proceedings. No camera coverage, for instance, is permitted in the courtroom "when the trial judge is not present and presiding."[69] The rules reiterate that the presiding trial judge "shall have discretion throughout [the] proceedings to revoke [his or her] approval or limit the coverage authorized in any way."[70] In this regard, the rules instruct trial judges to be:

especially sensitive and responsive to the needs and concerns of all parties, victims, witnesses and participants in such proceedings, particularly where the proceedings unnecessarily threaten the

---

[65] *Id.*, § 131.4(e)(1).

[66] *Id.*, § 131.4(e).

[67] *Id.*, § 131.6(a).

[68] *Id.*, § 131.6(a).

[69] *Id.*, § 131.9(a).

[70] *Id.*, § 131.9(b).

privacy or sensibilities of victims, or where they involve children or
sex offenses or other matters that may be lewd or scandalous.[71]

The rules place the judge under "a continuing obligation to order the discontinuation or
modification of coverage where necessary to shield the identity or otherwise insure the protection
of any such person, party, witness or victim, or in order to preserve the welfare of a child."[72]

Third, the rules emphasize the lawyers' obligation to find out whether any of the witnesses
they intend to call have any "concerns or objections" about camera coverage.  If a witness objects,
the lawyer is required to notify the presiding trial judge.[73]

Fourth, the rules make it clear that either the news media applicant or a party, victim, or
prospective witness who has objected to camera coverage may seek review by the administrative
judge of "any order determining an application for permission to provide [camera] coverage."[74]
The administrative judge is directed to uphold the order unless it "reflects an abuse of discretion
by the presiding trial judge."[75]  The rules further clarify that only the presiding trial judge's initial
order is subject to review by the administrative judge.  Other orders or decisions of the trial judge
relating to camera coverage are not reviewable at this stage in the proceeding.[76]

Finally, the rules identify the types of audio-visual equipment which may be used in a
courtroom and prescribe a standard application form for camera coverage and a standard order for
ruling on those applications.[77]

---

[71] *Id.*, § 131.9(b).

[72] *Id.*, § 131.9(b).

[73] *Id.*, § 131.9(c)

[74] *Id.*, § 131.5(a).

[75] *Id.*, § 131.5(b).

[76] *Id.*, § 131.5(d).

[77] N.Y. Ct. Rules, Part 131 Forms and §§ 131.12 & 131.13.

20

## IV. OVERVIEW OF CAMERA COVERAGE LAWS IN OTHER STATES AND IN FEDERAL COURTS

Before considering in detail the record developed by this Committee regarding the operation of Section 218, we turn next to a brief overview of the "cameras in the courts" laws in New York's sister states and in the federal court system.

### A. State Courts

#### 1. 50-State Overview

Across the country, cameras in the courtroom are governed by a patchwork of statutes, court rules and codes of judicial conduct. According to information collected by the Radio-Television News Directors Association, 47 states permit some form of television coverage of court proceedings.[78] In some states, coverage is severely limited. Illinois, Delaware and Louisiana, for instance, permit coverage of appellate courts only, while Maryland and Pennsylvania limit trial coverage to civil cases.[79]

Thirty-seven (37) states permit camera coverage of criminal trials without the consent of the defendant.[80] Thirty-nine (39) states permit camera coverage of civil trials without the parties' consent.[81] A number of these states exclude certain types of proceedings from their camera coverage laws. Televised coverage of sex crimes, for instance, is excluded in whole or in part in

---

[78] *See* Radio-Television News Directors Association, *News Media Coverage of Judicial Proceedings With Cameras and Microphones: A Survey of the States* (January 1997) (hereinafter "RTNDA Survey") at B-1. The District of Columbia, Indiana, Mississippi and South Dakota do not permit camera coverage. *Id.* at B-2.

[79] RTNDA Survey at B-1, B-2. The Supreme Court of Louisiana recently declined to proceed with a proposal for camera coverage of trial court proceedings which was narrowly approved by its Taskforce to Study Cameras in the Trial Courts of Louisiana. *See* Order, Supreme Court of Louisiana (Dec. 12, 1996).

[80] RTNDA Survey at B-2, B-10. Alabama, Arkansas, Minnesota and Oklahoma require defendant's consent to televise a criminal trial. *Id.* On December 30, 1996, Tennessee removed its defendant consent requirement and committed the question of cameras in the courtroom to the discretion of the trial judge. *See* Tennessee Supreme Court Rule 30, reprinted in Administrative Office of the Courts, *Report on Cameras in the Courtroom Surveys* (Nov. 4, 1996) (Nashville, Tennessee).

[81] RTNDA Survey at B-13.

fourteen states.[82]  Fifteen states exclude child custody proceedings.[83]  Fourteen states exclude divorce proceedings.[84]

### 2. California

In the wake of the verdict in the O.J. Simpson criminal trial, California undertook a thorough re-examination of its cameras in the courts law.  The Honorable Richard Huffman, Associate Justice of the California Court of Appeal, chaired the California Judicial Council's taskforce charged with re-assessing Rule 980 of California's Rules of Court concerning photographing, recording and broadcasting in the courtroom.  Justice Huffman testified at the Committee's November 12, 1996 hearing about California's experience.

Like this Committee, the California taskforce conducted a statewide survey of judges, solicited the views of many bar groups, hosted a public hearing and received extensive public comment.  It also surveyed public defenders and prosecutors and hosted an educational forum on cameras in the courts.[85]

Although a majority of California judges proposed that cameras be barred from courtrooms,[86] judges with television camera experience tended to have more favorable views of cameras.  Forty-three percent (43%) of camera-experienced judges believed that video cameras affect witness behavior, primarily by promoting guarded testimony or self-conscious, nervous behavior.[87]  A large majority of prosecutors and public defenders advocated barring cameras

---

[82] *Id.* at B-23.  New Jersey, for instance, prohibits camera coverage of proceedings involving "sexual penetration or attempted sexual penetration." Id. at A-57.  *See also* New Jersey Supreme Court Guidelines for Still and Television Camera and Audio Coverage of Proceedings in the Courts of New Jersey, New Jersey Court Rules, Guideline 10(b)(1996). Camera coverage of sexual offenses is also prohibited in Connecticut and Virginia. *Id.* at A-17, A-82. *See also* Va. Code Ann. § 19.2.266 (1992).

[83] RTNDA Survey at B-20.

[84] *Id.* at B-21.

[85] The details of the taskforce's work are laid out in two memoranda from the Taskforce on Photographing, Recording and Broadcasting in the Courtroom to the members of the California Judicial Council: one dated February 16, 1996 and a second dated May 10, 1996.  These are referred to below as the "February 16, 1996 California Memorandum" and the "May 10, 1996 California Memorandum" respectively. *See* May 10, 1996 California Memorandum at 6.

[86] Testimony of Justice Richard Huffman, NYC-II at 137-38.

[87] February 16, 1996 California Memorandum at 24-25.

altogether in Los Angeles County criminal cases, as did the representative of the Los Angeles County judiciary on the taskforce.[88]

The taskforce concluded that a total ban on cameras in the courtroom was inconsistent with the California Judicial Council's long-range goal of increasing public access to the courts.[89] According to the taskforce's preliminary report, "today's citizen relies too heavily on the electronic media for information; yet actual physical attendance at court proceedings is too difficult for the courts to countenance a total removal of the public's principal news source."[90]

Instead, the taskforce recommended a ban on coverage of pre-trial proceedings in criminal cases, including arraignments, bail hearings, preliminary hearings, jury selection and pre-trial actions. It further recommended that in both criminal and civil trials, only those matters which were heard by the trier of fact be televised. These proposals were designed to limit camera access "where the potential for prejudice to the rights of the parties and the ability to influence potential jurors is the greatest."[91]

In the end, the California Judicial Council adopted a rule which left television camera access to both pre-trial and trial proceedings to the "unfettered discretion" of the trial judge.[92] The new Rule 980 provides that "this rule does not create a presumption for or against granting permission to photograph, record or broadcast court proceedings."[93]

In weighing an application for camera coverage, the new California rule directs judges to consider a list of 18 specific factors, as well as any other factor the judge deems relevant.[94] These factors include, among others, the importance of promoting public access to and maintaining public trust and confidence in the judicial system, the parties' support of or opposition to the request for camera coverage, the privacy rights of all participants in the proceeding (including witnesses, jurors and victims), the effect on any unresolved identification issues and on the parties' ability to select

---

[88] NYC-II at 137-40.

[89] NYC-II at 140.

[90] February 16, 1996 California Memorandum at 10.

[91] *Id.* at 10-11; *see also* May 10, 1996 California Memorandum at 12-16 and testimony of Justice Richard Huffman (NYC-II at 146).

[92] NYC-II at 143.

[93] California Rule of Court 980 (a) (effective January 1, 1997). The full text of the new California rule is set forth in Appendix E.

[94] Rule 980(e)(3).

a fair and unbiased jury, the effect of coverage on the willingness of witnesses to cooperate, the difficulty of jury selection if a mistrial is declared, and the nature of the case.[95]

The new rule, which requires 5-day advance notice unless good cause is shown to shorten the time period,[96] includes bans on television coverage of jury selection, jurors, spectators, conferences between an attorney, client, witness or aide, among attorneys, or between counsel and the judge at the bench.[97]   The rule also defines "court" expansively to include not only the courtroom where the televised trial takes place but the courthouse and its entrances and exits, giving judges leeway to regulate cameras in the hallways.[98]

## B.  Federal Courts

In contrast with the law in the majority of state courts, federal law prohibits camera coverage of federal criminal proceedings.[99]   A narrow exception to this rule was created in 1996 with the passage of the Anti-Terrorism and Effective Death Penalty Act.  In order to permit crime victims to watch federal criminal trial proceedings in proceedings, such as the Oklahoma bombing, where the trial has been moved more than 350 miles out of state, the new federal law requires a trial judge to order closed circuit televising of the proceedings.[100]

On the civil side, the U.S. Judicial Conference ended a three-year pilot project with cameras in the courtroom in September 1994.  By a 2-1 majority, the Judicial Conference concluded that

---

[95] *Id.*

[96] Rule 980(e)(1).  This same provision requires the clerk to "promptly notify the parties that a request has been filed."

[97] Rule 980(e)(6).

[98] Rule 980(b)(3).

[99] Federal Rule of Criminal Procedure 53 provides that "[t]he taking of photographs in the court room during the progress of judicial proceedings or radio broadcasting of judicial proceedings from the court room shall not be permitted by the court."  As the RTNDA Survey notes, "by its terms, Rule 53 does not explicitly proscribe television broadcasting, but courts have interpreted it as banning television coverage. *See, e.g., United States v. Hastings,* 695 F.2d 1278, 1279, n.5 (11th Cir. 1983)". RTNDA Survey at 4, n.3.

[100] *See* Public Law 104-132, approved September 30, 1996 and codified at 42 U.S.C.A. § 10608 (West 1996).  The statute makes clear that "no public broadcast or dissemination shall be made of the signal transmitted", which may be viewed only by "persons specifically designated by the court", including "such persons the court determines have a compelling interest in doing so and are otherwise unable to do so by reason of the inconvenience and expense caused by the change of venue."  42 U.S.C.A. § 10608(a)(2), (b)(1) & (c)(2).

"the intimidating effect of cameras on some witnesses and jurors was cause for serious concern."[101]
Some members further concluded that "any negative impact on witnesses or jurors could be a
threat to the fair administration of justice."[102]

The question of cameras in civil cases in federal courts did not end, however, with the
Judicial Conference decision.  In March 1996, U.S. District Court Judge Robert J. Ward of the
Southern District of New York granted a motion by Court TV to televise a March 4, 1996 oral
argument on plaintiff's motion for class certification and defendants' partial motion to dismiss in
*Marisol v. Giuliani*, a class action lawsuit brought on behalf of foster children against New York
City's child welfare agency.[103]  Judge Ward noted that the public interest would be served by
granting the application and held that the policy of the Judicial Conference does not supplant the
local rules of the Southern District of New York, which give judges discretion to allow cameras
in the court.[104]

In April 1996, U.S. District Court Judge Robert W. Sweet granted a similar motion by
Court TV to televise a May 1, 1996 oral pre-trial argument in *Katzman v. Victoria's Secret
Catalogue*.[105]  Like Judge Ward, Judge Sweet found authority in the local district court rules to
allow cameras in the court.[106]

Following Judge Ward's decision in the *Marisol* case, the Judicial Conference strongly
urged each federal circuit court's judicial council to adopt orders reflecting the September 1994
decision not to permit electronic media coverage of district court proceedings.[107]  The Judicial
Conference further urged each circuit to abrogate any local rules of court that conflicted with the

---

[101] *See* Memorandum from L. Ralph Mecham, Director of the Administrative Office of the United States
Courts to All Judges, United States Courts (Sept. 22, 1994).

[102] *Id.* (emphasis in original). *See also* Molly Treadway Johnson & Carol Krafka, *Electronic Media
Coverage of Federal Civil Proceedings: An Evaluation of the Pilot Program in Six District Courts and Two
Courts of Appeal* at 14 (Federal Judicial Center 1994).  The FJC study, whose recommendations in favor
of cameras in civil proceedings were rejected by the U.S. Judicial Conference, was based, in part, on the
responses of 41 federal judges who experienced camera coverage under the pilot program.

[103] 929 F. Supp. 660 (S.D.N.Y. 1996).

[104] *Id.* at 661.

[105] 923 F. Supp. 580 (S.D.N.Y. 1996).

[106] *Id.* at 583-85.

[107] *See* Press Release from the Administrative Office of the U.S. Courts (March 12, 1996).

prohibition on cameras in the trial courts. [108]  At the same time, the Judicial Conference approved a resolution allowing each circuit court to decide whether or not to allow cameras in appellate proceedings.[109]

At its June 1996 meeting, the Second Circuit Council took no action to change local rules regarding cameras in the court.[110]  Since then, at least two other federal district court judges in New York -- Judge Peter K. Leisure in the Southern District of New York and Judge Jack B. Weinstein in the Eastern District of New York -- have granted permission to televise civil proceedings.[111]

Judge Gilbert Merritt of the U.S. Court of Appeals for the Sixth Circuit chaired the Executive Committee of the U.S. Judicial Conference during the federal pilot program.  He informed the Chair of this Committee that although he has serious reservations about televising criminal cases, he personally would like to see the federal courts open to cameras in civil cases, provided that guidelines could be developed that would inhibit so-called "soundbite" coverage, which he views as counterproductive in educational terms.

---

[108] *Id.*

[109] *Id.*  The Judicial Conference took no vote on whether the resolution to permit the broadcast of appellate proceedings applied to criminal appeals. *See* Summary of the Report of the Judicial Conference Committee on Court Administration and Case Management, Agenda F-7 at 5 (September 1996).  While some judges thought that Federal Rule of Criminal Procedure 53 prohibited the broadcasting of criminal appeals, others thought that the Judicial Conference left the decision to each circuit. *Id.* To date, the Second and the Ninth Circuit Courts have authorized cameras in appellate courts. *See* Press Release from the Second Judicial Circuit of the United States (March 27, 1996)(allowing camera coverage for all proceedings in open court, except for criminal matters); Press Release from the Ninth Judicial Circuit of the United States (March 22, 1996)(allowing camera coverage of appellate arguments in all cases except direct criminal appeals and extradition proceedings; coverage also permitted in habeas corpus and death penalty appeals).

[110] Deborah Pines, Circuit Court Leaves Camera Rule Intact, N.Y. L. J., June 14, 1996 at 1.

[111] *See Sigmon v. Parker Chapin Flattau & Klimpl,* 937 F. Supp. 335 (S.D.N.Y. 1996), and *Hamilton v. Accu-Tek,* 942 F. Supp. 136 (E.D.N.Y. 1996).

26

# V. SUMMARY OF THE COMMITTEE'S RECORD

As set forth in the Introduction, the Committee was directed to issue a report to the Legislature, the Governor and the Chief Judge evaluating five specific aspects of "cameras in the courtroom" in New York State. The Committee was asked to review the efficacy of the program and assess whether:

1.   Any public benefits accrue from the experimental program;
2.   Any abuses occurred during the program;
3.   The extent to which and the way in which the conduct of participants in court proceedings changes when audio-visual coverage is present;
4.   The degree of compliance by trial judges and the media with the requirements of Section 218 of the Judiciary Law;
5.   The effect of audio-visual coverage on the conduct of trial judges both inside and outside the courtroom.

This section of the report summarizes the information gathered by the Committee on these subjects.

## A. PUBLIC BENEFITS

As set forth below, the Committee heard from a wide array of witnesses about a broad range of public benefits that flow from cameras in the courtroom. Proponents of cameras in the courtroom informed the Committee that cameras help educate the public about the courts, allow for enhanced public scrutiny of the judicial system, foster judicial accountability, raise the level of judicial conduct, enhance the quality of justice by discouraging perjury and encouraging knowledgeable witnesses to come forward, increase the accuracy of news reporting about the courts and help some crime victims and their families come to terms with the tragedy they have experienced. This section provides a detailed summary of this facet of the Committee's record.

### 1. Public education about the courts

Heading the list of public benefits articulated by proponents of cameras in the courtroom is the view that cameras in the courtroom demystify the judicial system and allow the public to become better informed about courtroom procedures.[112]   Martin O'Boyle, Chief of the New York City Police Department's Organized Crime Control Bureau, testified that cameras give the public

---

[112] *See* John Corporon, former news director, WPIX-TV (NYC-I at 151). *See also* letter from Doris Aiken, founder, RID ("Remove Intoxicated Drivers")(with the emergence of home cable channels devoted solely to live broadcasts of current cases, the general public now takes an interest in "everything from the initial voir dire to the final summation")(Nov. 20, 1996); testimony of Janet Dubin (television coverage of trials allows people to see what a juror's responsibility entails)(NYC-III at 53-54).

a better understanding of the criminal justice system.[113]  Thomas Moore, a plaintiff's malpractice attorney in New York City, stated that cameras in the courtroom "give an appreciation of the [American] judicial system."[114]  Madeleine Schachter, who chairs the New York State Bar Association's Media Law Committee, emphasized in her testimony that cameras help funnel information about trials to large numbers of people, including cases which attract so much attention that there is not enough seating in the courtroom for all who might wish to attend.[115]  Along the same lines, Anthony Lewis of *The New York Times* wrote to the Committee on November 11, 1996 to say that, "cameras faithfully recording what is seen by jurors are far less likely to prejudice the legal process than much other journalism, and far more likely to educate citizens."

A similar view was articulated by the New York State Committee on Open Government which, in its recent annual report, concluded that, "with appropriate safeguards, the law authorizing the use of cameras in the courtroom should be made permanent" because "television, as a means of educating the public and promoting understanding of the judicial process, has significant potential value."[116]

_____

[113] NYC-II at 47. *See also* Bud Carey, general manager, WCBS-TV (NYC-II at 229)(camera coverage educates the public not just about a particular case, but about the justice system itself); Christopher Bruner, executive assistant news director, WNYT-TV (camera coverage dispels the Perry Mason image of trials; educates viewers about important emerging legal developments, such as the use of DNA evidence in a serial rape case)(Albany at 9-10); Hon. Howard Relin, Monroe County District Attorney (more people learn how real trials are conducted when cases are on television)(Rochester at 10); Hon. Patricia Marks, Supervising Judge, Criminal Courts, Seventh Judicial District (camera coverage familiarizes first-time jurors with court proceedings)(Rochester at 37-38); Judith Condo, director, Albany County Rape Crisis Center (camera coverage with current restrictions counteracts astounding lack of public information about the criminal courts)(Albany at 128); letter dated November 13, 1996 from Scott Karson, Esq. to John L. Juliano, president, Suffolk County Bar Association ("the policy behind the First Amendment, *i.e.*, a well-informed public, is best served by permitting televised coverage of court proceedings).

[114] NYC-I at 169.

[115] NYC-II at 63-64. *See also* letter dated October 23, 1996 from Irwin S. Davison, executive director, New York County Lawyers Association (according to a report adopted by the Association's Board of Directors on February 14, 1994, "when compared with the way the public learns of cases in the print media, it seems certain that the public gets a more complete view of the judicial process when there is audio-visual coverage of trials, as opposed to mere articles in newspapers or reports by television news correspondents on the courthouse steps").

[116] New York State Committee on Open Government, Annual Report, p.10 (December 1996). *See also,* Committee for Modern Courts, "Citizens' Bill of Rights for the Court System", p.2 (1997). The Chair of this Committee, John D. Feerick, also chairs the Committee for Modern Courts. He did not participate in the development of Modern Courts' policy statement, which predated his tenure. He also has recused himself from participating in Modern Courts' implementation of its policy.

Not only do cameras educate the public about the courts in general, say camera proponents, but they shed light on major societal problems. Judge Harold Rothwax, who presided over the Joel Steinberg trial, testified that cameras opened a "window into the whole area of child abuse."[117] Jeanne Mullgrav, director of court programs at the Victims Services Agency, testified that cameras in the courtroom educate the public about domestic violence and other problems formerly "swept under the rug"[118] and that the resulting exposure has helped speed the passage of legislation in the area of sexual assault and domestic violence.[119]

Surviving family members of homicide and drunk-driving victims were particularly outspoken on the issue of educational benefits. Patricia M. Gioia, chapter leader of the Capital District Chapter of Parents of Murdered Children & Other Survivors of Homicide Victims, informed the Committee that camera coverage "has created a heightened interest in the presentation by victims (or in cases where the victim is deceased, a family member) of an oral victim impact statement at the time of sentencing a convicted defendant." She noted that "when victims have seen -- even if only through a small segment on the nightly television news -- another family having the courage to give their impact [statement] before the [j]udge and jury, it is a morale builder and inspiration for them to do the same."[120]

Finally, the Committee surveyed the deans of New York State law schools to determine to what extent law schools use videotaped court proceedings for educational purposes. Ten law schools responded to the Committee's inquiry. Among the five schools which regularly used videotapes of court proceedings, tapes of New York State Court of Appeals arguments appear to have received the widest use. Several schools mentioned using Court TV videos of trial court proceedings, although it was not clear from the responses whether those materials involved New York state trials or trials which took place in other states. Those schools which made widespread

---

[117] NYC-I at 11.  See also Joseph Reilly, President, New York State Broadcasters Association (televising the Steinberg case helped expose "the horrors of domestic violence")(Albany at 143).

[118] NYC-I at 248.

[119] Id. at 254-55.

[120] See letter dated December 8, 1996 from Patricia M. Gioia. See also letter dated January 2, 1997 from Linda Campion ("cameras in the courtroom serve as a crucial educational tool to bring awareness of the criminal justice system proceedings and shed light on the rights of crime victims" including "the right of the victim to speak at sentencing"); Christopher Bruner, executive assistant news director, WNYT-TV (cameras record victim impact statements in drunk driving proceedings, which are no longer "dismissed with a wink")(Albany at 10); Carole Mulhern, Director of Victim and Witness Services, Monroe County District Attorney's Office (televised coverage of sentencings and victim impact statements lets crime victims know that they are entitled to have a say in the judicial process)(Rochester at 19); letter dated December 23, 1996 from Renee Barchitta, coordinator, Delaware County STOP-DWI Program (among other things, cameras in the courtroom address a "lack of knowledge of victims rights").

use of videotaped court proceedings were enthusiastic about this material, noting that "tapes are wonderful teaching tools" and "serve an important educational value."[121]

Among the law schools not currently using videotapes of court proceedings, several mentioned that they would be interested in making greater use of videotaped court proceedings if the materials were made as user-friendly as possible and tailored to the needs of the classroom instructor.[122]

## 2. Judicial accountability and public scrutiny of the judicial system

At the Committee's hearings and in their written comments, many shared the belief of Harry Rosenfeld, editor-at-large of the *Albany Times Union*, in the "overriding importance" of the principle of "opening government agencies to the fullest public scrutiny."[123] He added that "[o]f all the governmental agencies, it is our courts that require the most openness, because they directly touch the lives of all our people."[124]

Several criminal defense counsel testified that "justice is better served by opening the courtroom wide."[125] Terence Kindlon, a criminal defense lawyer in Albany, testified that when he served as an assistant public defender, he was "crushed like a bug" by judges "who pushed us around, limited our trial rights, and made it almost impossible to defend" unpopular clients.[126] He noted that that "really is something that doesn't happen when a camera is in the room." With a television audience looking over their shoulder, Kindlon testified, "everybody behaves. The defense lawyers behave better, the prosecutors behave better, the judges behave better and even the defendants behave better and the witnesses behave better."[127]

---

[121] *See* , *e.g.*, letter dated October 30, 1996 from Daan Braveman, Dean, Syracuse University College of Law. *But see* letter dated February 19, 1997 from Richard L. Ottinger, Dean, Pace University School of Law (experienced trial practice teacher believes that videotapes of court proceedings "have very little educational value").

[122] *See*, *e.g.*, memorandum dated October 23, 1996 from Larry Grossberg to Harry Wellington, Dean, New York Law School.

[123] NYC-I at 198.

[124] *Id.* at 201.

[125] *See* testimony of Terence Kindlon, Esq. (Albany at 56).

[126] Albany at 45-46.

[127] *Id.* at 47, 66.

Along the same lines, criminal defense attorney Ira London, past president of the New York State Association of Criminal Defense Lawyers, noted that, in his view, "a courtroom devoid of spectators or observers is a courtroom where there is less attention to justice."[128] A similar view was expressed by criminal defense lawyer John Condon of Buffalo in a telephone conference with the Chair of this Committee.

Several homicide victims' relatives also argued that public scrutiny of the judicial system is served by cameras in the courtroom. Patricia M. Gioia, chapter leader of the Capital District Chapter of Parents of Murdered Children & Other Survivors of Homicide Victims, wrote to the Committee:

> In former years when no coverage was available inside the courtroom, there was a greater tendency for pushing through plea bargains by district attorneys and defense attorneys, with absolutely no victim participation. Having a television camera available at the proceeding will better ensure that victims and their families are present not only at the trial but at any plea bargain that has been worked out.[129]

Similar views were stated by a number of journalists. "Widening the window of public scrutiny of judicial procedure is in and of itself an important ingredient of our democracy," said John Corporon, WPIX-TV's former news director.[130] His views were echoed by Professor Jay Wright of the S.I. Newhouse Communications Center at Syracuse University, who testified that cameras belong in the courtroom because "what happens in a trial is a public matter."[131]

Steven Brill, President, Courtroom Television Network, took issue with the criticisms of cameras in the courtroom based on the O. J. Simpson criminal trial. If "lots of lawyers and lots

---

[128] NYC-II at 279. Mr. London was careful to point out that the professional association which he formerly headed opposes cameras in the courtroom without the consent of the defendant. *Id.* at 284.

[129] Letter dated December 8, 1996. *See also*, letter dated January 2, 1997 from Linda Campion ("cameras are needed in our courtrooms in DWI homicide cases as defense attorneys in some counties throughout the state are accustomed to making back door deals with little accountability and no visibility for their clients") and testimony of Linda Campion (Albany 135-40).

[130] NYC-I at 154.

[131] NYC-I at 79. *See also* testimony of New York State Supreme Court Justice Donald J. Wisner, Monroe County (he approves most applications for camera coverage "in keeping with the fact that the courts are open and we are about the public business")(Rochester at 139). For a different perspective *see* Don Hewitt, executive producer, *60 Minutes*, "Pencils, Yes; Cameras, No", *The New York Times*, June 20, 1996, Section A at 15; Nina Totenberg, legal affairs correspondent, *National Public Radio*, *Chicago Law Bulletin*, p.1 (Oct. 10, 1996).

31

more judges feel that the verdict [in that case] made the system look bad," said Brill, "the system deserved to look bad. . . . It is ridiculous to criticize journalism because journalism covers a public function and makes it look bad. If the system looked bad in that case, that is a benefit of cameras."[132] In a letter dated January 30, 1997, Laura R. Handman, Chair of the Committee on Communications and Media Law of the Association of the Bar of the City of New York, stated that:

> Blaming courtroom cameras for the systemic problems that the Simpson trial may have highlighted confuses the messenger with the message. Audio-visual coverage that raises questions about the effectiveness of the process -- in the Simpson trial or elsewhere -- is part of the solution, not the problem.

Finally, a plea for open courtrooms was made by Michael Posner, executive director of the Lawyers' Committee for Human Rights. Posner testified that if New York opens its courtrooms to cameras, it would provide an additional precedent which his organization and others could invoke in their efforts to open the courts of repressive regimes around the world to cameras and to official accountability.[133]

A sixty-three percent (63%) majority of the approximately 350 New York State judges who responded to the Committee's judicial survey agreed that television coverage fosters public scrutiny of judicial proceedings.[134] Twenty-five percent (25%) of responding judges agreed that television coverage had a positive effect on the state's criminal justice system.[135] Twenty percent (20%) of the 616 New York State registered voters surveyed by the Marist Institute for Public Opinion agreed that cameras in the courtroom had a positive effect on New York's justice system.[136]

### 3. Cathartic and deterrent effects

Based on testimony presented to the Committee, it appears that sentencings in criminal cases have become an important feature of television coverage of court proceedings. Hon. Patricia Marks, Supervising Judge of the Criminal Courts in the Seventh Judicial District, testified that most

---

[132] NYC-II at 14. *See also* Committee for Modern Courts, "Citizens' Bill of Rights for the Court System," p.2 (1997).

[133] NYC-II at 119.

[134] Judicial Survey, Question 4(e).

[135] *Id.* at Question 4(k).

[136] Marist poll, Question 5. 35% of black respondents, 36% of regular TV-trial watchers, 23% of men and 17% of women agreed that television cameras have a positive effect on New York's justice system.

of the applications she has received from the media recently "have been for sentencing."[137] As part of her testimony, Judy Sanders, WRGB-TV's Albany news chief, aired a videotape of WRGB coverage of the sentencing of four local criminal cases. As she described the segments:

> In the first two, Albany County Court Judge Thomas Breslin uses the bench to teach two young men a message that their conduct is unacceptable to society. In the second two, families used the court system as a civilized forum in which to express their rage and confronted defendants who have committed crimes against their loved ones. These cases deal with important social issues that had strong impacts on their communities, and television was a compelling way in which to convey that.[138]

According to some Committee witnesses, coverage of sentencing lets the public know that the personal tragedies caused by the defendant are taken into account.[139] Aside from the cathartic effect of camera coverage, Joseph Kelner, past president of the New York State Trial Lawyers Association and the Association of Trial Lawyers of America, suggested that "televised trials have the potential power to deter viewers from criminal or wrongful acts" because "televised trials are living educational demonstrations relating to criminal and civil liability derived from illegal activities."[140] According to Thomas Neidl, an assistant public defender in Albany County, if "a parent or a young person see[s] a person as young as he standing before a court getting ten years, or two years for something, they might focus in and say, 'I could really go to jail if I do something.'"[141]

### 4. Other benefits

Witnesses and others described a number of further benefits. Hon. Howard Relin, Monroe County District Attorney, testified that camera coverage has prompted witnesses to come forward

---

[137] Rochester at 47. Although the Office of Court Administration does not require media applicants to specifically identify the type of proceeding for which coverage is sought, OCA's analysis of copies of the media applications which were forwarded to it during the period January 31, 1995 through September 1, 1996 suggests that requests to cover sentencings accounted for the second largest identifiable category of specific proceedings covered, following arraignments. *See* Appendix H, Table 7.

[138] Albany at 174.

[139] Testimony of Bud Carey, general manager, WCBS-TV (NYC-II at 228).

[140] Letter from Joseph Kelner, Esq. to the Committee (Dec. 20, 1996).

[141] Albany at 188-89. *See also* Steven Brill, president, Courtroom Television Network ("one of the bedrock purposes of the criminal justice system . . . . is . . . . the embarrassment of the guilty. That is part of what deterrence is all about.")(NYC-II at 42).

who did not realize the potential significance of their testimony until they saw a case on television.[142] It was also suggested to the Committee that witnesses are "more likely to overcome the temptation to perjure themselves in public proceedings" at which cameras are present.[143]

Others asserted that by allowing the public to see and hear for themselves the actual testimony of the witnesses and other trial participants, cameras allow news to be reported "with greater accuracy and insight."[144] Along these same lines, it was suggested that camera coverage helps the public understand and accept the outcome of controversial cases, including cases where defendants are acquitted or are given what might otherwise appear to be "light" sentences.[145]

The judges who responded to the Committee's survey were evenly divided on the question of whether cameras in the courtroom increase the accuracy of press coverage of judicial proceedings. Forty-seven percent (47%) of judges agreed that television coverage increases the accuracy of news accounts of judicial proceedings. Forty-seven percent (47%) of judges disagreed.[146] It is worth noting that, although only 23% of judges agreed that *televised nightly news* coverage of court proceedings accurately represents what actually takes place in New York courtrooms, 63% agreed that *televised gavel-to-gavel* coverage of court proceedings accurately represents what takes place in court.[147]

---

[142] Rochester at 15.  *See also* testimony of Paul Conti, news director, WNYT-TV (publicly reported testimony is capable of bringing forth witnesses to dispute or add to what has been presented)(Albany at 15).  The U.S. Supreme Court has recognized that this is an important reason to keep courts open to the press generally. *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980).

[143] Testimony of Paul Conti, news director, WNYT-TV (Albany at 15).

[144] Testimony of Bud Carey, General Manager, WCBS-TV (NYC-II at 225-26). *See also* George Freeman, Assistant General Counsel, *The New York Times* ("the more the viewer can see actual testimony, the fewer questions there can be about the reporter's accuracy")(NYC-II at 79); John Miller, reporter, WNBC-TV (presence of TV cameras enhances accuracy of reporting because, otherwise, reporters have to rely on their notes for quotes from witnesses)(NYC-II at 217-18); Erin Moriarty, CBS correspondent (fairer to the defendant on the stand to report his actual words rather than to try to paraphrase them)(NYC-II at 331); Ed Miller, reporter, Fox News (cameras increase accuracy; viewer no longer dependent on someone else's version of what was said)(NYC-II at 334, 339-40); Christopher Bruner, executive assistant news director, WNYT-TV (Albany 10-11); Hon. Patricia Marks (Rochester at 38-39).

[145] Testimony of Bud Carey, general manager, WCBS-TV (camera coverage helped public understand why a "light" sentence was handed down in the shooting of a black plain-clothed police officer by a white police officer in the subway)(NYC-II at 229).

[146] Judicial Survey, Question 4(a).

[147] *Id.*, Questions 5(j) & 5(k).

34

Twenty-eight percent (28%) of those surveyed by the Marist Institute agreed that cameras in the courtroom increase the accuracy of news coverage.[148]

## 5. Opponents' Views

Contrasting with the testimony and public comments the Committee received about the public benefits of cameras in the courtroom were the strong reservations voiced by some judges and members of the public about the educational benefits of cameras in the courtroom. Although 45% of the 350 New York State judges who responded to the Committee's judicial survey agreed that television coverage has enhanced public understanding of New York's judicial system, 52% of the responding judges disagreed with that statement.[149]   Sixty-one percent (61%) of the overall public surveyed in the Marist Institute poll indicated that they thought that cameras in the courtroom are a "bad idea," though a majority of black respondents (54%) thought cameras are a "good idea." Women surveyed had a less favorable view than men: 65% of women compared to 56% of men disfavored cameras.[150]

It was also suggested to the Committee that the educational benefits of camera coverage are slight, given the focus of camera coverage on cases involving violent crime, which are often depicted in brief segments on the evening news. In addition, a number of individuals and organizations raised questions as to whether the televised coverage of trials affects the fairness of the trial itself, by deterring witnesses from coming forward, by affecting the demeanor and credibility of witnesses who may be intimidated by the presence of cameras, and by creating a danger that hearsay and inadmissible evidence will "creep into the public consciousness"[151] and prejudice prospective or actual members of the jury. Some of these concerns are outlined in Section V(C) below, along with our assessment. This Section provides an overview of those concerns which are not addressed in that section.

---

[148] Marist Poll, Question 2. As in other respects, the answer to this question varied by race, gender and frequency of TV trials watched. Among black respondents, 49% felt that television cameras increase the accuracy of news coverage of trials; 24% of women, 32% of men and 52% of regular TV-trial watchers agreed. *Id.*

[149] Judicial Survey, Question 4(b). *See also* Judicial Survey, Question 4(c)(80% of judges agreed that television coverage of court proceedings is more likely to serve as a source of entertainment than education for the viewing public); Marist Poll, Question 3 (61% of respondents thought that television cameras in the courtroom were more a source of entertainment than a vehicle for increasing the public's understanding of the judicial system).

[150] Marist Institute poll, Question 1. *See also* Question 3 (32% of all respondents, 50% of black respondents, 51% of regular TV-trial watchers, 35% of men and 30% of women thought that television cameras in the courtroom increase the public's understanding of the justice system).

[151] Testimony of Hon. Norman E. Joslin, past president, New York State Association of Supreme Court Justices (Rochester at 127).

### a. Nature of televised coverage

With the exception of COURT-TV, which appears to have covered a fairly even mix of New York civil and criminal cases over the past several years,[152] the information submitted to the Committee suggests that the vast preponderance of cases which received audio-visual coverage were criminal, often involving a homicide or other crime "at the high end of the sentencing structure."[153]  This testimony is consistent with data compiled by the Office of Court Administration, at the request of this Committee, from copies of media applications forwarded to it during the period January 31, 1995 to September 1, 1996: 94% of the proceedings in which camera coverage was sought were criminal cases.[154]

The Committee heard from a number of individuals and organizations to the effect that only "sensational" cases attract televised coverage, which, they stated, convey "a very false impression of what justice is all about and what courtroom procedures and trials are all about."[155]  It was suggested to the Committee that the reduction of lengthy, complex trials to brief segments on the

---

[152] According to information supplied by Court TV, 45% of the 49 New York trials and hearings aired on Court TV through November 1996 were civil cases. *See* Courtroom Television Network, "New York Trials and Hearings Aired To Date (as of November 11, 1996)."

[153] Testimony of Terence Kindlon, Esq. (Albany at 70). *See also* testimony of Hon. Joseph Harris, who supports cameras in the courts, Supreme Court Justice, Albany County ("I have had over two dozen cameras in the courtroom and every single case was a criminal case")(Albany at 151).

[154] OCA was able to further analyze 183 of the 540 media applications to determine what kind of criminal proceedings attracted media attention.  OCA found that 59% involved violent crime (exclusive of sex-related offenses), 7% involved sex-related offenses and 34% involved non-violent crime. *See* Appendix H, Table 5B.

[155] Letter dated November 1, 1996 from Philip Learned, Chemung Bar Association. We received a similar expression of this point of view from several other bar associations, as well. *See* letter dated October 28, 1996 from Verner M. Ingram, Jr. , President, St. Lawrence County Bar Association, summarizing the comments of Hon. Eugene L. Nicandri; letter dated January 9, 1997 from Deborah A. Elsasser, Westchester Women's Bar Association, forwarding comments of ten members of the Association; letter dated November 14, 1996 from Edward R. Marinstein, President, Rensselaer County Bar Association; letter dated January 23, 1997 from Frank A. Gulotta, Jr., President, Bar Association of Nassau County. *See also* letter dated December 19, 1996 from Acting Supreme Court Justice Martin H. Rettinger (suggesting that there should be audio-visual coverage of "less than 'newspaper cases'" since "the great bulk of trials deal with lower degree felonies" and "most proceedings deal with matters that have no spectacular content - they do not deal with public figures in high and glamorous positions").

36

evening news is more misleading than helpful in conveying information about the justice system[156] and that much of the commentary that accompanied televised news coverage of trials was subjective.[157]

Opponents of cameras raised a further objection, taking issue with the assertion that a camera faithfully records in an accurate and neutral fashion what takes place in a courtroom. George Gerbner, former Dean of the Annenberg School of Communications at the University of Pennsylvania, suggested that television creates the deceptive "illusion of actually seeing [a trial] when, in fact, what you are seeing are camera angles, camera selections, editing etc."[158]   Richard Sexton, Esq., wrote to the Committee to point out that "the images which appear on the TV set are those selected by the cameraman, director, producer and advertising sponsor. . . . [Viewers] think that they know enough about the imaged persons to make a judgment of them."  As a result, he argued, "images and emotional responses supplant the ordered presentation of facts as limited by the rules of evidence."[159]

A concern that the television-viewing audience will usurp the role of the jury was raised by Max Frankel, former executive editor of *The New York Times*.  Speaking for himself only, Frankel testified that cameras in the courtroom give viewers "the illusion" that they are "entitled to reach

---

[156] *See* testimony of Professor Barry Scheck, Cardozo Law School (NYC-I at 144-45).  However, a number of reporters and several judges took issue with the "soundbite" critique.  They argued that even a soundbite can have a "very positive impact" on the public and that over the course of a one-week or two-week trial, the short segments add up to a "fairly long and extensive body of reporting." *See* testimony of Hon. Patricia Marks (Rochester at 37) and testimony of Christopher Bruner, executive assistant news director, WNYT-TV (Albany at 30). *See also* testimony of Paul Conti, news director, WNYT-TV ("Is a person going to become educated about the court process because they view a one-minute story about the court process? No. But over 365 days, if they see 80 of them, they might be.")(Albany at 32).  For a different perspective, *see* memorandum dated September 22, 1994 from L. Ralph Mecham, Director, Administrative Office of the United States Courts to All Judges, United States Courts. *See also* Federal Judicial Center, *Electronic Media Coverage of Federal Civil Proceedings: An Evaluation of the Pilot Program in Six District Courts and Two Courts of Appeals* at p.36 (1994).

[157] Testimony of Professor Barry Scheck, Cardozo Law School (NYC-I at 121-23). *See also* testimony of Frank Bensel, Esq. (NYC-III at 8-9).

[158] NYC-I at 55.  Dean Gerbner's testimony received confirmation from Henry Simon, a former television news reporter and producer who serves as a court analyst in the chambers of the Hon. Joseph Mattina, Erie County Surrogate, and is a strong supporter of cameras in the courtroom.  Mr. Simon testified that "it's very easy to say the camera doesn't lie but it's lying constantly", depending on what camera angle is used and whether or not a defendant, witness or judge has incurred the dislike of the camera person, who could make that person "look like hell."  Rochester at 109-10.

[159] Letter from Richard Sexton, Esq. , pp. 3-5 (Jan. 9, 1997).

a judgment."[160]  Similarly, one comment received by the Committee expressed a concern that cameras in the courtroom allow viewers who have not watched the entire trial to "make [a] judgment" without seeing all of the evidence, as the jury does.[161]

### b. Effect on witnesses

The Committee heard from several spokespersons for crime victims who expressed the opinion that there is a "significant risk" that cameras will have a chilling effect on a victim or a witness' willingness to report a crime or testify in court.[162]  Jeanne Mullgrav, Director of Court Programs for the Victims Services Agency, said that the impact of publicity was particularly acute in the case of victims of sex offenses, domestic violence, child abuse and family members of victims.[163]  Even with the current safeguards, she told the Committee, "the details and sensitive nature of the case are still televised and can subject the family and the victim to public scrutiny and public attention."[164]

Her views were shared by Professor Elizabeth Schneider of Brooklyn Law School, who voiced her concern that "audio-visual coverage could become an additional impediment to and disincentive for women pursuing legal remedies for sexual assault and/or battering."[165]  Along the same lines, Tonia St. Germain, director of public policy for the New York State Coalition Against Sexual Assault, said that "high profile rape cases negatively impact on the survivor's willingness to report."  She told the Committee that "the consent of the rape victim-witness must be the overriding factor governing judicial discretion in allowing live television coverage" of a trial.[166]

---

[160] NYC-I at 191. He also noted that the defendant has a constitutional right not to testify at trial and yet he can be required to sit there and "let every bullet of sweat be examined by the entire country."

[161] Letter from Brenda Fair Stevens (Dec. 18, 1996).

[162] Testimony of Jeanne Mullgrav, Director of Court Programs, Victim Services Agency (NYC-I at 250).

[163] Id.

[164] Id.

[165] Letter dated December 9, 1996 from Brooklyn Law School Professor Elizabeth Schneider. *See also* testimony of Professor Elizabeth Schneider (NYC-II at 292, 303-06)(possibility of televised coverage may impact on the initial decision of a rape victim or a victim of domestic violence on whether to go forward and press charges). *But see* testimony of Judith Condo, director, Albany County Rape Crisis Center (although there is a "gross underreporting of sexual assault and domestic violence," she was not certain that cameras in the courtroom are a major contributor to victims' failure to report)(Albany at 129, 134).

[166] Letter from Tonia St. Germain (September 25, 1996), who said that, " the traditional considerations that apply to any witness, such as the likelihood that the witness would be intimidated or distracted by the cameras while testifying are magnified for the sexual assault survivor because of the explicit nature of her testimony.  In addition, the victim's right to privacy, the probability that she would be subjected to

Concern about the deterrent effect of cameras on prospective witnesses went beyond the area of sexual assault. Hon. Howard Relin, Monroe County District Attorney, although strongly supportive of cameras in the courtroom, testified that he had observed in court proceedings generally "a very disturbing trend" of witness intimidation, in the form of threats of witnesses' physical safety, over the past several years.[167] As a result, he pointed out, some witnesses are reluctant to have their face and voice disseminated on television.[168]

### c. Fair trial implications

The Marist Institute poll commissioned by the Committee reveals concern among the public about the fair trial implications of cameras in the courtroom. Sixty-two percent (62%) of respondents think that television cameras in the courtroom get in the way of a fair trial, while 29% think that television coverage decreases the possibility that courts will be unjust.[169] Among black respondents, 47% were of the view that cameras get in the way of a fair trial; and 44% thought cameras decrease injustice. Among regular TV-trial watchers, 39% thought that they get in the way of a fair trial, while 46% thought that television cameras in the courtroom decrease injustice. Sixty-five percent (65%) of women thought that cameras get in the way of a fair trial, as did 58% of men.

---

excessive public attention, and the fact that this attention encourages victim-blaming, presents a safety and well-being issue for the survivor, her family and her children." *But see* testimony of Paul DerOhannesian, assistant district attorney, Albany County District Attorney's Office (he has been "surprised" in sexual assault cases at how willing complainants have been to allow coverage of their trial or of their testimony as long as they are not identified, because they feel that the exposure is helpful)(Albany at 92).

[167] Rochester at 31-32. *See also* testimony of Jeanne Mullgrav, director of court programs, Victims Services Agency (in criminal cases generally, victim and witness intimidation is a problem of "enormous magnitude," making additional reference to the commission of crimes in the Bronx. (NYC-I at 248-49).

[168] Rochester at 31. *See also* letter dated October 28, 1996 from Verner Ingram, President, St. Lawrence County Bar Association (summarizing views of Hon. Eugene L. Nicandri of St. Lawrence County, who has not detected any change of conduct of participants in "covered proceedings" with the possible exception of heightened nervousness, but speculated that "cameras might be a further impediment to certain victims' willingness to come forward in the first place"); testimony of Ira London, Esq. ("The blue dot is not going to calm the fears of a nervous witness .   .   .   . A witness who's going to be intimidated in his or her testimony is going to be intimidated by the presence of a camera focusing even if there is a blue dot there")(NYC-II at 283); testimony of Erin Moriarty, CBS correspondent (blue dot can be "disconcerting"; works with witnesses to make them feel more comfortable,  *i.e.*, by agreeing to film their hands instead)(NYC-II at 342).

[169] Marist poll, Question 4. Question 4 asked respondents: "Which statement comes closer to your opinion: one, television cameras in the courtroom decrease the possibility that the courts will be unjust, or two, television cameras in the courtroom get in the way of a fair trial?"

According to the Marist poll, seventy percent (70%) of respondents would not want their trial televised if they were a party to a civil lawsuit.[170]  Sixty-eight percent (68%) would not want the trial televised if they were the victim of a crime;[171] and sixty-nine percent (69%) would not want their trial televised if they were a criminal defendant.[172]

Concerns about the fair trial implications of cameras in the courtroom lay at the heart of much of the opposition to cameras voiced by a number of judges and criminal defense attorneys at our hearings.  Presiding Justice Francis T. Murphy of the New York State Supreme Court, Appellate Division, First Department, pointed to the absence of proof that the defendant will not be prejudiced by cameras in the courtroom and testified that the burden of proof should be on camera proponents to show by a fair preponderance of the evidence that the defendant will get a fair trial if cameras are present.[173]  Hon. Norman E. Joslin, past president of the New York State Association of Supreme Court Justices, has suggested that "selective editing and repetitive broadcasting of video clips . . .  influences the proof and distorts the process."[174]

According to Jack Litman, Esq., prejudice to the defendant is real, even if it is difficult to prove:

> How is the defendant to prove that the prosecutor acted differently than he ordinarily would have, that defense counsel was more concerned with impressing prospective clients than with the interests of the defendant, that a juror was [so] concerned with [how he appeared on] television [that his] mind [continually] wondered from the proceedings, or that an important defense witness made a bad impression on the jury because he was playing to a television

---

[170] Marist poll, Question 7. 59% of black respondents would not want their civil lawsuit televised.  Neither would 73% of women and 52% of regular TV-trial watchers. *Id.*

[171] Marist poll, Question 12. Among black respondents, the comparable figure was 59%. 76% of women and 48% of regular TV-trial watchers would not want the trial televised if they were a victim of a crime.

[172] Marist poll, Question 11. 31% of black respondents would not want their criminal trial televised, nor would 75% of women and 43% of regular TV-trial watchers.

[173] NYC-I at 88, 101.

[174] *See* Norman E. Joslin, "Justice Loses to TV in O.J. Trial", *Buffalo News* (Sept. 7, 1995).

audience, or that the judge was more lenient or more strict than he might usually be because he's subject to re-election.[175]

To address this perceived prejudice to the defendant, Litman and other witnesses proposed that Section 218 of the Judiciary Law be amended to require the consent of the defendant as a prerequisite to televising a criminal trial.[176]

Finally, it was suggested that televising bail hearings raises the likelihood that prejudicial information will taint the prospective pool of jurors. California's Associate Justice Richard Huffman testified that prosecutors have a legitimate purpose in pointing out, at a bail hearing, "all the evil [things]" the defendant has done.[177] He said that if statements which may be inadmissible as evidence at trial are broadly disseminated on television, any incremental benefit in terms of information about the system "is vastly outweighed by the prejudice to the fair trial interests of both sides."[178]

### d. Privacy concerns

Another concern voiced at the Committee's hearings was that cameras invade a zone of privacy which trial participants may have even in court. Eleanor Alter, Esq., a matrimonial lawyer, testified that in New York, which still has a fault-based divorce law, the presence of cameras "publicize[s] aspects of people's lives that most every other state has recognized should not be publicized . . . in a courtroom."[179] According to Alter, television coverage is especially hard on young children, who may watch (or whose friends may watch) their parents "testifying about the terrible things [they] did or did not do."[180] Alter testified that television is more graphic because

---

[175] NYC-I at 46, citing *Estes v. Texas*, 381 U.S. 532, 579 (1965)(Warren, C.J., concurring). It was also suggested that one potential drawback of gavel-to-gavel coverage is the ability of witnesses to watch the trial testimony of other witnesses. *See* testimony of Paul DerOhannesian, Albany County assistant district attorney (Albany at 87). But DerOhannesian, like Terence Kindlon, Esq., said that that issue can be addressed on cross-examination. (Albany at 87-88).

[176] NYC-I at 29. *See also*, e.g., testimony of Jonathan Gradess, executive director, New York State Defenders Association (NYC-I at 222); testimony of Norman Effman, Wyoming County Public Defender (Rochester at 213).

[177] NYC-II at 157, 170. *See also* testimony of Isaiah Gant, board member, Tennessee Association of Criminal Defense Lawyers (pre-trial footage of defendant gets played over and over again and is viewed by members of the potential jury pool)(NYC-I at 233-34).

[178] *Id.* at 170-71.

[179] NYC-II at 180.

[180] *Id.* at 207-08.

41

it provides the exact words and demeanor of witnesses and other trial participants and has a negative impact on their families.[181]

Frank Bensel, defense counsel in the Libby Zion case, raised a different privacy concern. He questioned the wisdom of forcing private litigants in a civil case to air their dispute on commercial television, where coverage of the three-month long trial competed with the afternoon soap operas.[182] His co-counsel, Luke Pittoni, who favors cameras in the court, after having initially opposed them, voiced concern for the potential harm to the professional reputation of litigants in a televised medical malpractice suit even if they ultimately prevail at trial.[183]

Finally, it has been suggested that the ability of a camera to zoom in from a distance to provide an extreme close-up image of the witness' face is an invasion of the witness' privacy.[184]

## B. COMPLIANCE BY TRIAL JUDGES AND THE MEDIA

We next turn to whether "any abuses occurred during the program" as well as "the degree of compliance by trial judges and the media" with the provisions of Section 218 of the Judiciary Law. Because these two facets of the Committee's mandate are related, they are considered together below.

### 1. Compliance by Trial Judges

#### a. Testimony and public comment

The Committee received only two specific complaints about the way in which trial judges administered the provisions of Section 218 of the Judiciary Law, only one of which appeared to fall

---

[181] Id. at 208. Alter also noted that cameras hinder judge-made settlements and the resulting publicity makes it harder for people to get on with their lives. (NYC-II at 180-81). They also have, she said, a "chilling effect" on witnesses in child custody cases if the witness lacks "proper immigration status." Id. at 182-83. It is our understanding that Family Court proceedings are rarely open to the public.

[182] NYC-III at 7-9. Bensel suggested that "there should be some requirement of consent by the litigants" before a civil trial could be televised. Id. at 8.

[183] NYC-III at 10-11.

[184] M. David Lepofsky, Cameras in the Courtroom: Not Without My Consent, 6 National J. of Constitutional Law 161, 171 (1996), who stated that, "To obtain such a view in the courtroom, the spectator would have to walk up to the witness stand and place him or herself inches from the witness' nose -- something that no presiding judge would permit. Hence, the camera can electronically invade and violate the court participant's personal space in a fashion that no spectator can."

within the period of our legislative mandate.[185]  Christopher Bruner, executive assistant news director of WNYT-TV in Albany, testified that he was aware of instances when town justices allowed cameras to cover the arraignments of unrepresented defendants, an apparent violation of Section 218(5)(b) of the Judiciary Law.[186]  He testified that "several times, I personally had to quietly inform town justices and my fellow members of the media that we had to refuse the invitation" of town justices to let the cameras in under those circumstances.[187]  Bruner further testified that he has advised reporters to destroy tapes and not to air material where town justices have permitted camera access they should not have.[188]

The Committee received a substantial amount of testimony from reporters and attorneys which suggested that judges have discharged their obligations under Section 218 quite responsibly. Christopher Bruner testified that in his experience, "the judge, if a witness, a non-material witness, expressed any misgivings whatsoever about having the camera in the courtroom, the judge would immediately tell us that he was inclined not to allow us to take pictures."[189]  His views were shared by Carol De Mare, a reporter with 25 years' experience at the *Albany Times Union,* who  testified

---

[185] The two complaints received by the Committee include:

1. An allegation that a judge refused to enforce his order that the media not photograph a rape victim on court property, including entering and leaving the building and in the parking area. *See* letter from Tonia St. Germain, Director of Public Policy for the New York State Coalition Against Sexual Assault (Dec. 13, 1996). It appears from subsequent staff discussions with the rape victim's attorney that this incident, which occurred in 1996, involved, at least in part, an issue of whether the rape victim had standing to seek contempt sanctions for the news media's alleged violations of the court's order.

2. An allegation that a judge permitted camera coverage of an adjournment at which the defendant was scheduled to appear to consent to AIDS testing, with no notice to defense counsel. Testimony of Michelle Maxian, Director of Special Litigation, Legal Aid Society, Criminal Defense Division (NYC-II at 249-50).  This incident, according to Ms. Maxian, took place more than three years ago.  In the end, the media agreed not to film the defendant's face. *Id.* at 269-70.

[186] Albany at 11. Section 218(5)(b) provides that an unrepresented defendant cannot consent to coverage of an arraignment unless he or she "has been advised of his or her right to the aid of counsel" and "has affirmatively elected to proceed without counsel".

[187] Albany at 11-12.

[188] *Id.* at 34-35.

[189] Albany at 26. *See also* testimony of John Miller, reporter, WNBC-TV (he has seen trial judges instruct cameras to be pointed at something else if a witness does not want to be televised  and has seen judges shut off the cameras when undercover agents testify)(NYC-II at 221).

that in her experience, judges "have all been extremely familiar with the guidelines and safeguards governing cameras [and] . . . have exhibited the utmost control of the situation."[190]

Paul DerOhannesian, assistant district attorney in Albany County, testified that judicial compliance in the child homicide and sexual assault cases that he handles has been "excellent".[191] DerOhannesian testified that "when there are abuses, I have found the judges that I have practiced before . . . are very willing to exercise [ ] control."[192] Thomas Neidl, an assistant public defender in Albany County, also testified that he had "complete satisfaction" with the way trial judges have complied with the law's safeguards.[193]

Reporters were appreciative of the "latitude" judges have given them on the 7-day notice provision, which according to John Miller, a reporter for WNBC-TV, "is completely applicable" for trials but not for hearings and other proceedings "that come up suddenly."[194] In this regard, Miller testified, "judges have been flexible."[195]

### b. Results of the Committee's Judicial Survey

This willingness of judges to be flexible with respect to the 7-day notice provision is borne out by the Committee's judicial survey. Seventy-one percent (71%) of the 205 judges who responded to the relevant portion of the Committee's survey reported that they had "shortened or waived the statutory seven-day notice period in granting an application for camera coverage."[196] Asked to explain their willingness to waive the 7-day notice period, some judges noted the

---

[190] Albany at 111. She noted further that "judges at least in this county have bent over backward to accommodate us." *Id.* at 113.

[191] Albany at 71.

[192] *Id.* at 80.

[193] *Id.* at 194. *See also* letter dated January 23, 1997 from Frank A. Gulotta, President, Bar Association of Nassau County (although the majority of the Association's Executive Committee and Board of Directors voted to recommend that cameras in the courtroom be discontinued in both civil and criminal cases, they felt that "judges have done their jobs well both in complying with the safeguards included in the State's camera coverage law and in their conduct both inside and outside the courtroom").

[194] NYC-II at 234-35.

[195] *Id. See also* testimony of Judy Sanders, Albany news chief, WRGB-TV News ("by and large, the judges do give us some latitude" on the 7-day notice provision)(Albany at 185).

[196] Judicial Survey, Question 14(a). Section 218(3)(a) of the Judiciary Law gives judges discretion to shorten the notice period "where circumstances are such that an applicant cannot reasonably apply seven or more days before the commencement of the proceeding."

impracticability of complying with the 7-day notice period in cases involving "breaking news".[197] Others commented that "every single application I have ever gotten has been filed the day of the proceedings"[198] and that the "media usually and habitually disregard the requirement."[199] Others noted the absence of objections as a reason for waiving the 7-day notice period.[200]

    The Committee's Judicial Survey sheds further light on how trial judges handle applications for camera coverage. Part II of the survey, which sought information only from judges who had, at any time, received an application to permit television coverage in their courtroom, was completed by 226 judges. Nearly 90% of responding judges stated that they hold oral argument to determine whether camera coverage should be permitted,[201] 7% hold an evidentiary hearing and 21% allow counsel to brief the issue.[202]

    Two hundred and five (205) judges -- 91% of Part II respondents -- had granted at least one application for televised coverage in their courtroom. The most common reason given for granting an application for television coverage was the "absence of objections", followed in close succession by "the importance of maintaining public trust and confidence in the judicial system" and "the importance of promoting public access to the judicial system."[203] Others mentioned that they felt constrained to grant the application because they interpret Section 218 to contain a "presumption" in favor of access,[204] requiring that "we must provide audio-visual access unless there are compelling reasons not to do so."[205]

---

[197] See Judicial Survey, Question 14(b), written comments of Judge #311. See also comments of Judges #159 ("impossible to have 7 days notice to cover preliminary hearings which happen within 6 days"); #164 ("immediate request made, just after arrest"); #271 ("not enough time between arrest and court appearance to give 7-day notice").

[198] Judicial Survey, Question 14(b), written comments of Judge #45.

[199] Judicial Survey, Question 14(b), written comments of nine judges.

[200] Judicial Survey, Question 14(b), written comments of Judges # 187, 195, 216, 244. On the other hand, 62 judges identified "application untimely" as a factor which had led them to deny an application for camera coverage. See Judicial Survey, Question 12(b)(iv).

[201] Judicial Survey, Question 15(a)(ii).

[202] Id., Question 15(a)(I) and 15(a)(iii).

[203] Id. Question 11.

[204] Id., Question 13(c)(vii), written comments of Judges #28, 304. See also Question 13(d), written comments of Judge #106 (under the current law, "the presumption favors the presence of audio-visual coverage and provides little, if any, discretion to the court").

[205] Judicial Survey, Questions 11(b)(viii), 13(c)(vii) and 13(d), written comments received from five judges.

Forty-eight percent (48%) of 186 responding judges stated that they had permitted camera coverage over the objections of the defense in criminal cases (other than arraignments and suppression hearings, where defendant consent to camera coverage is required).[206] Explaining their decision to override defense objections, judges pointed most often to the "importance of promoting public access to the judicial system" and of "maintaining public trust and confidence" in that system. Judges also mentioned that they were more willing to override a defendant's objections to camera coverage if they believed that the objection was "pro forma".[207]

Fifty-eight percent (58%) of the judges stated that they had denied at least one application for camera coverage.[208] In criminal cases, the most common reasons for denying an application were the objections of the defense (a factor mentioned by 80% of 121 judges who had denied an application), objections of the prosecution (mentioned by 61% of judges), objections of witnesses and the effect on witnesses' willingness to cooperate, including the risk that coverage will engender threats to the health or safety of any witness (mentioned by 55% of judges), possible interference with the defendant's right to a fair trial (55%), the type of case involved (52%), and the untimeliness of the news media's application (51%). The possibility that coverage might unfairly influence or distract the jury was mentioned by 39% of judges. At the other end of the scale, only 8% of judges cited administrative or financial burdens as grounds for denying an application and only 12% mentioned the difficulty of jury selection if a mistrial were declared.[209]

Approximately one-fourth of the responding judges (23%) have exercised their discretion to impose restrictions on camera coverage in criminal cases in addition to those expressly required by Section 218 of the Judiciary Law and the implementing rules promulgated by the Chief Administrative Judge.[210] For instance, several judges mentioned that they do not allow the media to televise the defendant's face; others imposed limits on televising in the corridors or parking lot of the courthouse[211] or have ruled that television "could film all the witnesses or none of them but

---

[206] Judicial Survey, Question 13(a).

[207] Judicial Survey, Question 13(c)(vii), written comments of Judge # 336.

[208] Judicial Survey, Question 12(a).

[209] Judicial Survey, Question 12(b).

[210] Judicial Survey, Question 16(a). The Chief Administrative Judge's rules are codified at 22 NYCRR Part 131.

[211] Judicial Survey, Question 16(b).

could not film some and not others."[212]  Several judges mentioned that they "maintain control over where the camera is positioned"[213] and do not allow shots of spectators.[214]

### c.  Office of Court Administration Data

Data compiled by the Office of Court Administration suggests that judges grant a majority of the applications they receive for camera coverage.  Of the 540 applications which were forwarded to OCA by the twelve judicial districts around the state during the period from January 31, 1995 to September 1, 1996, 83.5% were approved.[215]  Like the Committee's judicial survey, the OCA data suggest that the most common reason given by judges for denying an application for camera coverage was the objection of the defense.[216]

The OCA data further suggests that the most common restrictions on camera coverage imposed by the court are restrictions on the news media's equipment.  The second most common restriction was a prohibition on photographing or filming the defendant's face, followed by restrictions on revealing the defendant's name, the victim's name and/or face, and a prohibition on filming spectators.[217]

### 2. Compliance by the Media

The Committee's record includes strong evidence of compliance by many television reporters and camerapersons with the requirements and safeguards of Section 218 of the Judiciary Law.

Several witnesses testified that they were unaware of any abuses by the media.  Professor Jay Wright of the S.I. Newhouse Communications Center at Syracuse University, who chairs New York State's Fair Trial/Free Press Conference, reported to the Committee that no abuses had been brought to his attention over the period of this Committee's mandate.[218]  His experience paralleled

---

[212] Judicial Survey, Question 16(b), written comments of Judge #18

[213] Id., Judge #56.  See also, id., Judges # 62, 190, 209, 249, 316, 336, 345.

[214] See, e.g., id, Judges # 28, 61

[215] Appendix H, Table 1.

[216] Appendix H, Table 6.

[217] Appendix H, Table 8.

[218] NYC-I at 80-81.

that of Madeleine Schachter, chair of the New York State Bar Association's Media Law Committee and Francis D. Phillips II, president of the New York State District Attorneys Association.[219]

Their testimony was bolstered by further evidence of compliance by the media with court rules.[220] The Committee received several letters of public comment from both lawyers and judges which stated that the media had been cooperative with respect to excluding certain witnesses from coverage[221] and "generally compl[ied] with the safeguards" of Section 218.[222]

The Committee's judicial survey asked judges whether they were aware of any violations of Section 218 of the Judiciary Law by the media or any improper or inappropriate use of television footage filmed in a courtroom. Only nine percent (9%) of 172 judges answered "yes" to that question.[223] Several responded that the news media had violated a judge's order not to film certain trial participants (*i.e.*, the defendant's family members, a victim's family, a witness, or the jury) or had filmed an attorney's legal pad.[224] A few others complained that the media had done an end-run

---

[219] *See* testimony of Madeleine Schachter (NYC-II at 62); letter dated October 25, 1996 from Francis D. Phillips, president, New York State District Attorneys Association ("to the best of my knowledge, the media has complied with the safeguards included in the law").

[220] *See* testimony of Paul DerOhannesian, assistant district attorney, Albany County (compliance by media has been "exemplary") (Albany at 72); *See also* testimony of Hon. Patricia Marks (Rochester at 41-42)(media "very cooperative"); letter dated October 29, 1996 from Hon. Guy James Mangano, Presiding Justice, Appellate Division, Second Department (press and television personnel have "comported themselves properly" in covering appellate proceedings in his court).

[221] *See* letter from Verner M. Ingram, president, St. Lawrence County Bar Association (October 28, 1996).

[222] *See* letter dated January 9, 1997 from Deborah A. Elsasser, Westchester Women's Bar Association, enclosing members' responses to the Committee's request for comments. *See also* letter dated December 19, 1996 from Acting Supreme Court Justice Martin H. Rettinger (all rules were followed by camera crew who covered one of his trials).

[223] Judicial Survey, Question 25(a). Question 25 on the judicial survey was not expressly limited to the recent two-year period of the Committee's mandate so that the Committee could not ascertain specifically where and when the alleged instances occurred. Furthermore, the Committee has not independently investigated these allegations and makes no judgment about the specifics of each individual complaint. Indeed, most of the complaints were not particularized so as to permit such an undertaking even if resources had been available.

[224] Judicial Survey, judges' written comments to Question 25. *See also* additional comments of Judges #47 ("when told not to film a 14-year old rape victim, [the news media] simply stalk her into the parking lot and her sobbing countenance is that night's "lead""); #68 ("the explosion of independent producers in the news magazine TV format create[s] potential for harm. They are not or don't seem to be constrained in any way. Unlike regular TV reporters, they don't worry about pushing or testing the rules because they are not going to be coming back looking for permission to A/V a case").

48

around the ban on filming arraignments without the defendant's consent, either by filming in the hallway outside the courtroom without the permission of the presiding judge or the administrative judge, or by filming an unrepresented defendant with a bag over his head.[225] A few cited alleged "abuses" ranging from "inadvertent violations" to a complaint that "footage was taken in the courtroom of a party [to the proceedings] while the news media representative was applying for permission."[226]

By far the most common complaint voiced by lawyers was "that we never get seven days notice."[227] Although Section 218(3)(a) of the Judiciary Law requires the media to file a written request for camera coverage "not less than seven days before the commencement of the judicial proceeding," failure to provide seven days notice is not necessarily a violation of Section 218, since 218(3)(a) also allows a judge to shorten the notice period "where circumstances are such that an applicant cannot reasonably apply seven or more days before." This might be the case, for example, in circumstances when an unforseen proceeding is scheduled on an expedited basis, and the media does not receive sufficient advance notice of the proceeding. However, criminal defense lawyers testified that they found it burdensome and distracting to "have to argue against the press, about coverage" at the last minute, especially when a trial date has been set well in advance.[228]

---

[225] *Id.* According to Paul DerOhannesian, assistant district attorney for Albany County, if an arraignment is closed, the defendant is photographed in handcuffs going to and from the courtroom. Albany at 79, 99-104.

[226] Judicial Survey, Question 25(b), written comments of judges #13 and #152.

[227] Testimony of Michele Maxian, Director of Special Litigation, New York Legal Aid Society, Criminal Defense Division (NYC-II at 260). *Cf.* testimony of Justice Joseph Harris, New York State Supreme Court, Albany County ("I've never had one make an application on time according to the rules, but they always show up with their camera right at the last minute and ask for permission and you [have] to hold a hearing")(Albany at 152); testimony of Madeleine Schachter, chair of the New York State Bar Association's Media Law Committee ("occasionally there has been some issue about getting the application in within the 7-day statutory period and there may occasionally be some rushing of that time period")(NYC-II at 94).

[228] *See* testimony of Michelle Maxian, Director of Special Litigation, New York Legal Aid Society, Criminal Defense Division (NYC-II at 261); *See also* testimony of Diane Russell, an assistant public defender in the Monroe County Public Defenders Office (Rochester at 58-61).

Other complaints raised, but not investigated by the Committee, drew our attention to the quality of some of the sound equipment,[229] occasional distracting noises,[230] the behavior of a camera crew,[231] audio-visual coverage of defense counsel's table,[232] and equipment which exceeds the statutory guidelines.[233]

---

[229] *See* testimony of Terence Kindlon, Esq. (because of the poor quality of some of the sound equipment, after a judge finishes saying "a lot of really bad things about my client at a sentencing", the TV equipment does not pick up the response of the defendant or his counsel) (Albany at 51).

[230] Schuyler County Judge John P. Callanan wrote to the Committee on December 17, 1996 to report that the camera-covered trials over which he has presided have gone "without interruption with one serious exception. During the sentencing of a 17-year old girl who got 25 years to life in the state prison for murder in the second degree, one of the television cameramen made a series of loud, interrupting noises with his equipment that was very distracting to everyone in the courtroom. The reporter apologized to the Court in chambers after the conclusion of the sentencing."

[231] *See* letter dated October 23, 1996 from Remy Perot, founder of the Southern Tier Criminal Defense Attorneys Association (describing a televised second-degree murder trial at which, it is alleged, "the crew in the monitoring room . . . had left the feed lead on during breaks and were listening to the conversations of the family of the victim . . .").

[232] Testimony of Diane Russell, assistant public defender, Monroe County Public Defender's Office (use of microphones on counsel table) (Rochester at 61-62). *See also* the testimony of Henry J. Simon, a member of the staff of Erie County Surrogate Joseph S. Mattina, regarding a local cameraman employed by Court TV shooting a video of still pictures of minors left on counsel table. Rochester at 93-95. The Committee has examined this matter and is satisfied that the cameraman's mistake was corrected and that the footage in question was never aired. We also received a copy of a November 27, 1995 letter of Justice Mattina's to Steven Brill, stating that "[a]pparently there were several occasions that led to some disagreement as to the suitability of videotaping certain material provided by some of the parties. Your producers were, after discussion and explanation, understanding of the wishes and intentions of the court. They are to be commended for outstanding work in logistically difficult circumstances and for demonstrating high ethical standards." The letter accompanied a memorandum to the Chair of this Committee from Jeffrey H. Ballabon, Vice President of Government Relations for Court TV, dated March 28, 1997.

[233] *See* testimony of Jonathan Gradess, executive director, New York State Defenders Association (asserting that 10 video cameras were present for a proceeding in New York's first death penalty case)(NYC-1 at 211). Although § 218(6)(a)(i) through (iii) limit the number of still and video cameras which may be permitted, § 218(6)(a)(iv) allows judges to vary these limits in "special circumstances, so long as [doing so] will not impair the dignity of the court or of the judicial process."

50

## C. EFFECT OF AUDIO-VISUAL COVERAGE ON THE CONDUCT OF PARTICIPANTS IN COURT PROCEEDINGS

At the core of the debate over the wisdom of allowing cameras in the courtroom is the question of whether cameras have an impact on trial participants -- the jurors, the witnesses, the lawyers or the judge -- and, ultimately, on the outcome of the case. In an earlier era, the concern included a fear that the camera itself -- unwieldy, noisy, and accompanied by glaring lights -- might distract the trial participants from the tasks at hand. However, with the advances in technology, those fears have been laid to rest.[234]

What remain very much alive are the concerns about the psychological impact of the camera: how will the realization that their every word and gesture is being transmitted to a vast, unseen audience affect the behavior of trial participants?[235]  We turn to the record developed by this Committee on this question.

### 1. Effect on jurors

The Committee heard testimony from two jurors: the foreperson and another juror who served on the jury in the Libby Zion malpractice action against New York Hospital and several physicians.  Neither juror felt that the presence of television cameras on a daily basis in that three-month long trial affected the outcome of the case.[236] One juror stated that the presence of cameras

---

[234] *See,* however, testimony of Peter Moschetti, Esq. (sometimes the cameras are "right by the jury box . . . there's a lot of hardware . . . I know the jurors look at the cameras when they come in, I know they watch the cameras move at times")(Albany at 249); testimony of Luke Pittoni (the snapping and rewind sounds of still cameras were "extremely distracting" in the Libby Zion trial)(NYC-III at 18-19); testimony of Diane Russell, Monroe County assistant public defender (Rochester at 62).

[235] Perhaps the most comprehensive summary of the concerns about the psychological impact of cameras on trial participants is set forth in the several plurality opinions in *Estes v. Texas,* 381 U.S. 532 (1965). *See, e.g.,* the concurring opinion of Chief Justice Earl Warren, 381 U.S. at 567-70 ("awareness that trial is being televised to a vast, unseen audience is bound to increase nervousness and tension, cause an increased concern about appearances, and bring to the surface latent opportunism that the traditional dignity of the courtroom would discourage"). *See also* concurring opinion of Justice John Harlan, 381 U.S. at 591 ("In the context of a trial of intense public interest, there is certainly a strong possibility that the timid or reluctant witness, for whom a court appearance even at its traditional best is a harrowing affair, will become more timid or reluctant when he finds that he will also be appearing before a 'hidden audience' of unknown but large dimensions"). *See also* M. David Lepofsky, "Cameras in the Courtroom: Not Without My Consent", 6 National Journal of Constitutional Law 161 (1996). *But see Chandler v. Florida,* 449 U.S. 560, 579-80 (1981)("at present, no one has been able to present empirical data sufficient to establish that the mere presence of broadcast media inherently has an adverse effect on the [judicial] process").

[236] Testimony of Janet Dubin (NYC-III at 56-57); testimony of Edgar Greene (NYC-III at 57-59).

just for one witness or one aspect of a proceeding could send a signal to the jurors "about the importance of one aspect over another aspect of the proceedings."[237]

Janet Dubin, the foreperson in the Zion case, felt that there were benefits and drawbacks to cameras in the courtroom. On the one hand, she testified that television allows people to become "more familiar with what is going on in the courtroom" and that it is important for the public to see what jurors' responsibilities entail.[238]  On the other hand, after the trial was over, she watched televised videotapes of the trial, which she felt was "so different" from being at the trial.[239] She also felt that the commentary that accompanied the televised trial footage "does not give the public the experience of what it looks like to be a juror and to just go with what's given in the trial."[240]

Edgar Green, her fellow juror, expressed his view that cameras in the courtroom "are generally not helpful."[241] He noted a concern of his about the rights of parties, especially defendants in civil cases, whom he felt should be able to say "I don't want to be displayed before a multinational audience of millions of people."[242] According to Green, jurors in the Zion case, in which he participated, noticed the camera.[243] However, he also felt that cameras had no impact on the jurors in that case as they worked their way through the lengthy set of questions the trial judge asked them to answer.[244]  He also expressed a general concern that jurors might inadvertently see televised coverage of a case,[245] although he said there was no indication that any juror did so in the 3-month long Zion trial.

Diane De Bellis, a third juror in the Libby Zion case, wrote to the Committee to convey her "strong feelings in favor of and against the videotaping and airing of trials." She believes that televised trials provide some educational benefits, may encourage witnesses to be truthful if they know that "their testimony will be shared with, potentially, millions of television viewers" and may provide an incentive for lawyers to work "more competently . . . knowing their work will be

---

[237] *Id.* at 66-67.

[238] *Id.* at 53-54.

[239] NYC-III at 62.

[240] *Id.* at 53.

[241] *Id.* at 54-55.

[242] *Id.* at 54-55.

[243] *Id.* at 58.

[244] *Id.* at 59.

[245] *Id.* at 64.

scrutinized by colleagues and potential clients alike."[246]  She stated the view that the presence of cameras during a trial is "invasive and disruptive", especially for those who "experience a sense of discomfort when in front of a camera."  She said that televised witnesses might withhold information out of fear of "criminal or professional retribution."  She also believes that "many attorneys and witnesses play to the camera and add unwarranted drama" which may be a "major obstacle in the pursuit of the truth."[247]

      With respect to jurors, two concerns were voiced at the Committee's hearings: first, that jurors will watch televised coverage of the case (or will speak to family members, friends and colleagues who have watched the televised coverage) and will be influenced either by commentary about the case or by evidence which was ruled inadmissible and thus not presented to the jury, and second, that jurors will be influenced in their deliberations by their realization that the eyes of the general public are upon them and will be reluctant to reach a verdict which is "unpopular" with the community to which they will return after the trial.

      Only 17% of judges who had received an application for camera coverage agreed that jurors in televised trials were more likely to have communications with people who have seen coverage of the case.[248]  Thirty percent (30%) of camera-experienced judges agreed that "jurors were more likely to be aware of the implications of their verdict in cases in which TV cameras were present."[249]  Twenty-one (21%) of the 167 judges who answered this question disagreed and 48% had no opinion.

      The idea that television coverage heightens jurors' perception of the implications of their verdict was expressed by Professor Barry Scheck of Cardozo Law School, one of the defense lawyers in the Simpson criminal case.  Scheck testified that in televised trials, jurors will have to explain their verdicts in ways that are different from the past.[250]  Scheck also expressed concern about the "second-guessing" of jury verdicts by TV viewers who believe, based on seeing a short segment of a witness' testimony on television, that they are as capable as the actual jurors of

---

[246] Letter from Diane De Bellis (March 5, 1997).

[247] *Id.*

[248] *See* Judicial Survey, Question 22(b).  24% of the 165 judges who answered this question disagreed and 59% had no opinion.

[249] *Id.*, Question 22(c).

[250] NYC-I at 116.

making a judgment about a witness' credibility.[251]  His views were consistent with those of George Gerbner, Dean Emeritus of the Annenberg School of Communications at the University of Pennsylvania, who testified that putting a trial on television transports it "into a global tribunal" and "mobilize[s] emotionally an entire community to which judges and jurors must return at the end of the trial.[252]  In that environment, he testified, "there is no way that your own future will not weigh as heavily in what you are saying [as] the specific facts of the case."[253]

Professor Beth Schwartz interviewed on behalf of the Committee three jury consultants about their impressions of the impact of cameras on jurors and other trial participants.[254]  One was of the opinion that the presence of cameras would exaggerate the importance of the case for jurors and that, in most cases, camera coverage would be harmful to criminal defendants, in part because some defense witnesses may be less forthcoming if cameras are present.  A second jury consultant felt that there was very little impact so long as there was only one camera focused on the witness box.  During some of the televised trials at which she had been present, she said the jurors appeared to pay little or no attention to the cameras.  She felt it was possible that some jurors might be concerned that if there is televised coverage of a trial, they may be asked to account for their verdict.  A third jury consultant was concerned about televised coverage that might mislead members of the public who constitute the pool of prospective jurors.[255]

At its hearings, the Committee heard testimony from several witnesses to the effect that some jurors may be affected by the presence of cameras.  Thomas Moore, Esq., a plaintiff's malpractice lawyer who favors cameras in the courtroom, testified that, in his opinion, jury verdicts

---

[251] *Id.* at 118-19.  *See also* testimony of Max Frankel, former executive editor, *The New York Times* (in the Simpson criminal case, cameras allowed "two-thirds or more of the American people to feel and to believe that they know better than the 12 people who were painstakingly empaneled and who sat through every moment of that trial")(NYC-1 at 188-89).

[252] NYC-I at 59-60, 64.

[253] *Id.* at 59.  *See also* testimony of Peter Moschetti, Esq. (jurors in one of his cases were very concerned that they might have been filmed; "if their verdict was an unpopular verdict, then their neighbors and people they see around would know that they sat on that jury")(Albany at 247).

[254] *See* Appendix G.

[255] In her written comments to the Committee, Elissa Krauss, president of the National Jury Project, asserted that "audio-visual courtroom coverage injects bias into a trial that is difficult to detect or remedy."  She voiced a concern that "the presence of cameras in courtrooms increases the widespread predisposition to presume that a person who is accused of a serious crime is probably guilty."  She further noted her concern that "the presence of cameras in courtrooms exacerbates privacy and safety concerns."  Memorandum from Elissa Krauss, to the Committee (Jan. 23, 1997).

are more "conservative" when cameras are present than when they are not.[256] "In a plaintiff's case," he explained, that means that there is "more likely to be a verdict against the plaintiff and for the defendant, that means that there is "more likely to be a verdict against the plaintiff and for the defendant. In a criminal case, [that means] a verdict for the prosecution and [a] finding of guilty against the defendant."[257]

Christopher Bruner, executive assistant news director at WNYT-TV in Albany, took issue with the view that jurors are influenced by camera coverage. He testified that he has interviewed jurors after trials and "ha[s] yet to encounter a juror who said afterward that they found the camera either distracting or the media coverage an impediment to rendering a fair verdict."[258] Mr. Bruner described a high-profile trial in which a town councilman was exonerated of the most severe charge of murder and where he was convicted of the lesser charge of manslaughter. Although the trial received extensive television coverage, Bruner testified that none of the jurors felt that the camera had any effect.[259] Hon. Patricia Marks reported getting feedback from a juror who said to her "you told us not to pay attention to the cameras so we didn't".[260]

Norman Effman, the Wyoming County Public Defender, testified that cameras "have an impact" on trial participants, which "has to be recognized and factored in as a strategy question for lawyers" before they decide whether or not to object to an application for camera coverage. In his upstate trials where he typically finds himself defending black and Hispanic prison inmates before all-white juries, he favors camera coverage because he thinks "it's important to open the doors to the courtroom to a much broader community than the community in which the trial is taking place". He wants jurors to feel that "it's not a closed club situation when they go back to the deliberation room and determine what to do in a case involving someone who truly isn't from their community."[261]

The Committee also heard opinions on the question of whether jurors are likely to disregard the judge's instructions not to watch televised coverage of the trial or discuss the cases with family members and friends who have, as well as on the question of what effect, if any, such a disregard

---

[256] NYC-I at 170-71, 175-76.

[257] Id. at 170-71.

[258] Albany at 12.

[259] Id. at 25.

[260] Rochester at 41.

[261] Rochester at 203, 205-06.

might have on the outcome of the case.[262] Thomas Neild, an assistant public defender in Albany County, testified that "clearly, jurors will go home and watch the news whether they're told to or not on occasion." However, Neild testified that he does not believe that it affects their ability to decide the case.[265]

### 2. Effect on Witnesses

The Committee heard from several witnesses concerning whether the presence of cameras in the courtroom deters potential witnesses from coming forward.

According to Jacqui Williams, a member of the board of the New York State Coalition Against Sexual Assault, the impact of cameras in the courtroom on sexual assault survivors is "immense" and "create[s] a barrier to any survivor pursuing prosecutorial action."[264] According to Ms. Williams, a study by the National Victim Center suggests that "high profile cases negatively impact on survivors' willingness to report."[265]

New York State Supreme Court Justice Harold Rothwax took issue with the contention that the presence of cameras deters witnesses from coming forward to testify. In his experience, it is not more difficult to get witnesses if cameras are present.[266] His experience is consistent with the views of 42% of the respondents to the Marist public opinion poll, who stated that the presence of a television camera in a criminal case would make no difference in their willingness to testify.[267]

---

[262] Carol De Mare, a reporter of the Albany Times Union, stated that she could see potential prejudice to a criminal defendant if a juror speaks to a spouse who has seen the defendant on television and the defendant has made a poor impression. (Albany at 121-122.) Ms. De Mare further testified that the "same thing could happen" with any witness. She noted that newspaper reporters try to put into context as much as possible of a witness' testimony. "That can't happen on television. The very best line spoken by that witness is what the people see," she told the Committee. "And sometimes the re-cross doesn't get in or a defense lawyer will eventually get up and rehabilitate that witness after that witness has been shot down and that doesn't get on television and it will get into a newspaper." (Id. at 123.) See also testimony of Thomas Moore. (NYC-1 at 174.)

[263] Id. at 203-205.

[264] Albany at 219-20.

[265] Id. at 220.

[266] NYC-1 at 22. See also testimony of Thomas Neild, assistant public defender, Albany County ("I have not seen the cameras having any effect on any of my witnesses or my clients' either as a public defender or during his 15 years as a prosecutor)(Albany at 193).

[267] Marist Poll, Question 13. 55% of black respondents and 33% of women said that the presence of cameras would make no difference in their willingness to testify. Id.

56

However, 54% of all respondents, 45% of black respondents, 41% of regular TV-trial watchers and 64% of women said they would be less willing to testify as a witness to a crime if cameras were present.[268] In contrast, only 20% of all respondents, 16% of black respondents, 20% of regular TV-trial watchers and 23% of women said they would not be willing to testify if only newspaper reporters were present.[269]

Some lawyers for criminal defendants drew the Committee's attention to the effect of cameras in the courtroom on the willingness of some defense witnesses to come forward in criminal cases. In his testimony, Jonathan Gradess, executive director of the New York State Defenders' Association, related the experience of David Bruck, defense counsel in the Susan Smith murder case in South Carolina, who moved to exclude cameras from that case on the grounds that it would be harder for the defendant's witnesses' "untrammeled, full, nuanced testimony to come across."[270]

On the other hand, Professor Barry Scheck stated that television coverage of the Simpson case led a key defense witness to come forward who might otherwise not have realized the relevance of her testimony.[271]

Peter Moschetti told the Committee that subpoenaing a witness who is reluctant to testify because of cameras is an option that may "alienate" a witness whom counsel would prefer to put as much at ease as possible.[272] Isaiah Gant, a board member of the Tennessee Association of Criminal Defense Lawyers, gave testimony about adverse effects of cameras on witnesses in the penalty phase of a death penalty case.[273]

---

[268] *Id.*

[269] *Id.*, Question 15. According to the Marist poll, the presence of television cameras in a *civil* case would make no difference in the willingness to testify of 52% of respondents. But 45% of all respondents, 51% of black respondents, 36% of regular TV-trial watchers and 49% of women said they would be less willing to testify as a witness in a non-criminal case if there were cameras in the courtroom. *See* Marist Poll, Question 8. In contrast, only 17% of all respondents, 27% of black respondents, 7% of regular TV-trial watchers and 18% of women said they would not be willing to testify in a non-criminal trial if there were only newspaper reporters in the courtroom (Question 10).

[270] NYC-I at 215.

[271] *Id.* at 130-31.

[272] Albany at 257. Diane Russell, a Monroe County assistant public defender, testified that a subpoenaed witness did not appear in one of her cases when he became aware that the trial was being filmed on national television. (Rochester at 63.)

[273] NYC-I at 228. *See also* testimony of Jack Litman (speaking up for a defendant at the penalty phase of a death case is particularly difficult)(NYC-I at 41).

Section 218(5)(c) of the Judiciary Law permits non-party witnesses in criminal cases to request that their image be visually obscured[274] and is aimed at reassuring witnesses who are intimidated by the presence of cameras.  In this regard, criminal defense attorney Jack Litman testified that even with the blue dot, some witnesses simply will not appear.[275]  Other witnesses do not come forward, said Litman, "because they don't know there is a blue dot."[276]  According to Litman, the deterrent and intimidating effects of cameras fall disproportionately on defense witnesses, who are typically friends and neighbors of the defendant and are less used to the criminal justice system, he said, than forensic experts or police officers who routinely appear in courtrooms on the prosecution's behalf.[277]

The Committee also received views that witnesses who do appear at trial may be intimidated by the presence of cameras.[278]  Although he favors cameras in the courtroom, Pittoni was of the opinion that the presence of cameras has an effect on witnesses and makes them more

---

[274] Under Section 218(5)(c) of the Judiciary Law, the duty to inform a non-party witness of his or her "right to request that his or her image be visually obscured" during the witness' testimony is imposed on counsel in criminal proceedings.  Section 218(4)(b) imposes on counsel the duty to convey to the court during the pretrial conference "any concerns of prospective witnesses with respect to audio-visual coverage."  The witness' right to insist that his or her image be visually obscured is limited to non-party witnesses in criminal cases.  There is no corresponding right in civil cases.

[275] NYC-I at 28.  The Committee heard testimony that the blue dot is not always "fail safe."  *See also* testimony of Jacqui Williams, a member of the board of the New York State Coalition Against Sexual Assault, regarding the William Kennedy Smith rape trial in Florida, where the victim's name was inadvertently broadcast. (Albany at 222.)  The Committee was not made aware of any such mishaps taking place in New York, where the rape victim is entitled, under Section 218(7)(g) of the Judiciary Law, to request that his or her testimony not be televised.

[276] NYC-I at 37.

[277] *Id.* at 41. *See also* testimony of Michelle Maxian, Director of Special Litigation, New York Legal Aid Society, Criminal Defense Division (she said that because government witnesses such as police officers have more experience testifying than defense witnesses, the impact of camera-induced nervousness falls more heavily on the defendant)(NYC-II at 256); letter dated November 6, 1996 from Peter R. Kehoe, counsel and executive director, New York State Sheriffs' Association Institute (although "none of the responding sheriffs reported the occurrence of any problems during the experimental period, [m]ost expressed a concern that the presence of cameras intimidates some witnesses"); New York State Defenders Association, *The Intrusion of Cameras in New York's Criminal Courts* at 6 (May 12, 1989).

[278] Testimony of Edwin Nowak, Monroe County Public Defender and president of the New York State Defenders' Association  (Rochester at 276).

58

nervous.[279] Michelle Maxian of the Legal Aid Society's Criminal Defense Division said that even if witnesses eventually get used to the camera, the defendant in a criminal trial is not entitled to an instant replay. The jury's impression of a witness is formed right from the beginning, Maxian stated. If a nervous witness "hems and haws" or does not answer a question, she opined that influences the jury's view of the witness's credibility and can influence the jury's fact-finding function.[280]

According to Part II of the Committee's judicial survey (which was completed only by judges who had actually received an application for television coverage in their courtrooms), 40% of the judges agreed that "witnesses were more nervous in the presence of cameras"[281] although 40% also agreed that "witnesses' testimony was unchanged in the presence of cameras."[282] Thirty-two percent (32%) thought witnesses were distracted by the presence of TV cameras. Twenty-two percent (22%) thought witnesses' testimony was more guarded in the presence of cameras.[283] Three percent (3%) thought witnesses were more truthful in the presence of cameras.[284] Thirty-two percent (32%) thought witnesses' privacy was violated by the presence of cameras.[285]

---

[279] NYC-III at 21. Pittoni suggested that where necessary to protect a witness' livelihood and reputation, witnesses in civil cases be allowed to give their name and address outside of the presence of the jury and to have their visual image obscured. *Id.* at 20-21 . Further, although he believed that cameras in the courtroom made some witnesses nervous, he was not convinced that the camera had an adverse effect on the "end product." *Id.* at 48.

[280] NYC-II at 256.

[281] *See* Judicial Survey, Question 22(f). 28% of the 173 judges who responded to this question had "no opinion"; 32% disagreed that witnesses were more nervous in the presence of television cameras.

[282] Judicial Survey, Question 22(I). 39% of the 170 judges who responded to this question had "no opinion'; 20% disagreed. *See also* Eugene Borgida, Kenneth G. DeBono, & Lee A. Buckman, *Cameras in the Courtroom: The Effects of Media Coverage on Witness Testimony and Juror Perceptions*, 14 Law & Human Behavior 489 (1990)(although witnesses and jurors in mock camera-covered trials reported greater witness nervousness, distraction and awareness than those in mock print media-covered trials, the camera coverage experience did not impair witnesses' ability to accurately recall the details of the crime or the witnesses' ability to communicate effectively).

[283] *Id.* Questions 22(e) & 22(h).

[284] *Id.* Question 22(g). 49% of the 174 judges who responded to this question had no opinion; 47% disagreed. In a separate interview, Thomas Moore said that, in his experience, expert witnesses were more truthful in the presence of cameras, avoiding "outlandish and outrageous" claims and statements.

[285] *Id.* Question 22(d). 21% of the 172 judges who responded to this question had no opinion; 47% disagreed.

Some camera proponents said that cameras probably do change participants' behavior, but suggested to the Committee that the effect is no greater than that of a court reporter taking down the witness' every word.[286]  While it may be "regrettable" that putting witnesses on television makes them nervous, argued John Corporon, former news director and vice-president, WPIX-TV, "it's part of . . .  an open, free system."[287]

One final issue regarding witnesses should be mentioned.  It was suggested to the Committee that the presence of cameras invades the privacy of witnesses in ways that are different from print media coverage.  According to Professor Barry Scheck of Cardozo Law School, one of the defense lawyers for O.J. Simpson, television coverage conveys a level of intimate personal detail that is usually missing from newspaper coverage.  He told the Committee that one of the expert witnesses on DNA contamination in the Simpson criminal case received death threats at his laboratory.  Scheck suggested that it would have been unusual for a newspaper to have disclosed, as the television station apparently did, the address of the witness' laboratory.[288]  We received no information of an incident of this kind in New York, however.

### 3. Effect on Lawyers

The experience of lawyers who had tried camera-covered cases ran the gamut from one lawyer who wrote to the Committee to say that the presence of cameras made everyone "extremely self-conscious",[289] to another who testified that it never even occurred to him that the camera was there during a highly sensational murder trial.[290]  In between was one lawyer who testified that some lawyers are more conscious of the cameras than he would like them to be[291] and another who expressed his view that "there are a number of my colleagues who believe that television in the

---

[286] Testimony of John Corporon, former news director, WPIX-TV (NYC-I at 155-56).  *See also* testimony of Carol De Mare, *Albany Times Union* reporter ("undoubtedly, some witnesses have been inhibited by cameras.  I have observed this.  It's usually a passing reaction . . . .  I think they soon forget that that camera is trained on them.")(Albany at 110).

[287] NYC-I at 162.

[288] NYC-I at 127-30.

[289] *See* members' comments forwarded to the Committee by Deborah A. Elsasser of the Westchester Women's Bar Association (Jan. 9, 1997).

[290] Testimony of Thomas Neidl, assistant public defender, Albany County (Albany at 192).  On the other hand, he stated that "there [are] a lot of lawyers who play to the cameras somewhat," although he "did not think that has been really damaging." *Id.* at 196-97.

[291] Testimony of Thomas Moore, Esq. (NYC-I at 186).

courtroom represents essentially free advertising and I think that many times that affects the way they present the case."[292]

Thirty-five percent (35%) of the judges who responded to Part II of the Committee's survey agreed that lawyers came to court better prepared in cases in which TV cameras were present.[293] Most judges also felt that compared to similar cases covered only by the print media, about the same number of motions, witnesses and objections were made in camera-covered cases and about the same amount of evidence and argument was presented in both kinds of cases. Thirty-three percent (33%) of 147 responding judges were of the view that more arguments were made in camera-covered cases and 26% of 141 responding judges were of the view that more objections were made in camera-covered cases.[294]

A different concern was voiced by several defense counsel. One criminal defense lawyer suggested that "on occasion, decisions are made as to whether there should be a trial or a plea based on sometimes the need or the desire for publicity that's generated as a result of the case that's going to have cameras in the courtroom, and I think that many times that works to the detriment of the defendant."[295] Another defense lawyer specializing in civil cases expressed the view that there was a greater probability that a products liability defendant might settle a case if it were to be

---

[292] Testimony of Peter Moschetti (Albany at 243-44).  *See also* letter dated January 28, 1997 from Stephan J. Siegel, Esq. (in the presence of television cameras in the courtroom, "defense lawyers tend to posture and say more about their case than is good for their client.  I have even seen lawyers reveal what I thought to be confidences of clients.  Prosecutors posture and tend to pronounce grandiloquent platitudes to the detriment of the judicial proceedings"); letter dated January 23, 1997 from Frank A. Gulotta, Jr., President, Bar Association of Nassau County, N.Y., Inc. (members of his Association felt that "attorneys knowing a case is being televised try[ ] to impress the television audience with their flamboyance and antagonistic approach in hopes of attracting future clients").  *But see* testimony of Pete Dobrovitz, News Director R-News.  ("I think the attorneys by nature are performing in a courtroom, and it's still a performance for the jury.  And the fact that there are a couple cameras there I don't think affects them differently.") (Rochester at 188)

[293]  Judicial Survey, Question 22(k).  *See also* testimony of John Miller, reporter, WNBC-TV (when cameras are present, defense lawyers are "better prepared because they know that they are not just defending their clients, but, in a sense, they are selling themselves and their work as highly competent")(NYC-II at 220); testimony of Terence Kindlon, Esq. (when cameras are present, "the defense lawyers behave better, the prosecutors behave better, the judges behave better and even the defendants behave better and the witnesses behave better.  Everybody acts the way that they're really supposed to act.")(Albany at 47); letter dated January 22, 1997 from Paul A. Callan, Esq. ("attorneys are generally on their best behavior and are better informed and more forceful advocates when cameras are monitoring the proceedings").

[294] Judicial Survey, Question 23.

[295] Albany at 255.

61

televised.[296]   Finally, several criminal defense lawyers noted that arguing over whether or not cameras should be permitted constituted a last-minute distraction from the job of preparing to try their case.[297]

### 4. Effect on Judges

#### a. Inside the courtroom

With near unanimity, witnesses and interested citizens agreed that the presence of cameras had some effect on judges.[298]   There was disagreement over whether the effect was beneficial or harmful.

There was ample testimony and public comment that cameras raised the level of performance of judges. One lawyer who wrote to the Committee suggested that cameras serve as "court watchers" and have an ameliorating effect on judicial conduct.[299] This sentiment was echoed by Terence Kindlon, who testified that when cameras come into court, "the judges behave better"[300] and by Jerry Garguilo and Madeleine Fitzgibbon, co-chairs of the Suffolk County Bar Association's

---

[296] NYC-III at 77-79.  *See also* testimony of Edgar Green (because a video camera reaches "so deeply in the courtroom, it might influence the way that litigation is brought about")(NYC-III at 55).

[297] *See, e.g.,* testimony of Peter Moschetti, Esq. (when the press makes their application, "you're trying a murder case, you're worried about the rights of the accused, the prosecution is worried about presenting a case in the manner that's going to result in a just decision, and not whether cameras should be in the courtroom and whether there should be a filming")(Albany at 245-46).

[298] *See, e.g.,* testimony of Justice Harold Rothwax (after his wife pointed out that he appeared angry on videotapes of the Steinberg trial, he became more mindful of the way he appeared) (NYC-I at 15); testimony of John Miller, reporter, WNBC-TV (in the presence of cameras, judges may be "more alert")(NYC-II at 220).  *See* Testimony of Hon. Patricia Marks (after the first couple of minutes, "you forget [the camera] is there")(Rochester at 50).

[299] Anonymous letter from a former prosecutor who has done "substantial criminal defense work as well" (Dec. 31, 1996) (cameras "act as incentives for judges whose courtroom demeanor and treatment of the participants is normally horrid to behave more properly").  *See also* testimony of Luke Pittoni (NYC-III at 38-39)(a camera in the courtroom may make the judge "spend more time thinking about his or her ruling").

[300] Albany at 47.  *See also* testimony of Thomas Moore, Esq. (with cameras present, "some judges rise to the occasion and are even better judges")(NYC-I at 186); letter from Francis D. Phillips II, President, New York State District Attorneys Association (October 25, 1996)(when cameras are present, "I have personally witnessed the conduct of judges rise to a higher level"); testimony of Norman Effman, Wyoming County Public Defender (cameras counteract the dangers of a closed society and expose improper judicial practices)(Rochester at 212-13). The Chair's telephone conference with John Condon, Esq. was to the same effect.

District Court Committee, who concluded that "the effect of camera coverage on the conduct of trial judges both inside and outside the courtroom is indeed positive" since cameras in the courtroom tend to "enhance the behavior of both professional and civil participants in court proceedings."[301]

Joseph Kelner, past president of the New York State Trial Lawyers Association, agreed. In his written comments, he pointed out to the Committee that:

> some judges have pro-plaintiff or pro-prosecutor leanings in civil or criminal cases while others occasionally activate their pro-defendant proclivities.  Under the glare of television, such excesses are likely to be remedied.[302]

Along similar lines, Luke Pittoni testified that cameras have a "watchdog" impact on judges and ensure that they carefully consider motions and rulings which they might otherwise treat in a more *pro forma* fashion.[303]

Several witnesses reminded the Committee that judges are elected officials who stand to benefit from the publicity a televised trial generates.  Justice Norman E. Joslin, past president of the New York State Association of Supreme Court Justices, testified that some elected judges welcome the exposure that cameras offer, noting that some judges "will volunteer for . . . . a criminal term the year before they're up for re-election.  You get a lot more exposure than you will get in the civil term."[304]   Justice Joslin testified further that while most judges are very conscientious, "there are a few [who] will showboat" and that "showboating" can affect the fairness of the trial.[305]

Several criminal defense lawyers suggested that the desire for publicity may adversely affect a judge's rulings or his or her conduct at sentencing.  Peter Moschetti noted that judges are elected officials and that "to maintain a spot on the bench, it's my belief that you must come across as a law-and-order judge."  Moschetti testified that:

---

[301] Letter dated October 30, 1996 from Jerry Garguilo and Madeleine A. Fitzgibbon to John Juliano, president, Suffolk County Bar Association.

[302] Letter from Joseph Kelner, Esq. (December 20, 1996).

[303] NYC-III at 39.

[304] Rochester at 126.

[305] Rochester at 126-28.

> When there's a camera in the courtroom  .   .   .   We see more
> name-calling, words like "predator" and calling them "sick
> individuals" and "less than human."  I have had judges say on the
> bench, "if the death penalty were available, that person should get
> it."  .   .   .  [T]hose are comments you just didn't hear before the
> cameras were placed in the courtroom.[306]

His views were echoed by Michelle Maxian, Director of Special Litigation, New York Legal Aid Society, Criminal Defense Division, who testified that judges "want to appear more popular when they are televised" and "right now, what's popular is being tough." According to Ms. Maxian, it takes "a very courageous woman or man who can stand up there and give a ruling that they know will be  .   .   .  vilified in the press"[307]

The Committee's judicial survey sought to elicit judges' views on this issue.  Fifty-two percent (52%) of 350 judges disagreed with the proposition that cameras in the courts "tend[] to cause judges to issue rulings they might otherwise not issue", although 37% agreed with that statement.[308]

### b. Outside the courtroom

The Committee also sought to obtain information about the effect of cameras on the conduct of judges outside the courtroom, including how frequently judges appeared on television or radio to comment on televised cases.

Fourteen percent (14%) of the 344 judges who answered the relevant portion of the Committee's judicial survey stated that they had been interviewed on television or radio about a televised court proceeding.[309]  The subject matter of the interviews included, among others, a discussion of child abuse and the role of child protective services agencies, the nuts and bolts of

---

[306] Albany at 244-45. Mr. Moschetti stated further that the language which the judge places on the record at the time of sentencing may subsequently influence decisions about parole. Albany at 251-53. *See also* letter from Stephan J. Siegel, Esq. (Jan. 28, 1997)(when cameras are present, "judges tend to react by being much tougher than they regularly are in an effort to show that they are tough on crime").

[307] NYC-II at 255. *See also* testimony of Thomas Neidl, assistant public defender, Albany County ("I think there [have] been judges who want to move from one bench to another and have used the camera for that purpose. But I think that's a rare example  .   .   .  [T]he judge may be speaking a little longer than he has to, showing himself to be firmer than he has to, because I believe that it's popular for judges running for office to show themselves as tough judges in today's world")(Albany at 189-90).

[308] Judicial Survey, Question 4(g).

[309] Judicial Survey, Question 9. Several of the respondents noted that the interviews occurred before they became judges.

64

housing court proceedings, and the fairness of drunk driving plea bargains, as well as such celebrated cases as the Bernard Goetz, Tawana Brawley, Joseph Buttafuoco, Colin Ferguson, Baby Jessica and O.J. Simpson cases.[310]  Despite the huge amount of publicity surrounding the latter, only two judges stated that they were interviewed about the Simpson case.

---

[310] Although criminal cases constitute the overwhelming majority of cases for which applications for audio-visual coverage were forwarded to the Office of Court Administration, civil cases represented approximately one-third of the cases in which judges identified the subject matter of their television or radio interview in response to the Committee's judicial survey.

65

# VI. COMMITTEE'S ASSESSMENT AND CONCLUSIONS

In assessing each aspect of its legislative mandate, the Committee is mindful that its record contains a great deal of information based on opinions and surveys. The information was received in the form of public testimony, interviews, responses to the Committee's judicial survey, a public opinion poll sponsored by the Marist Institute for Public Opinion, and communications from bar associations, judges, lawyers, law school deans, and interested citizens. The Committee did not undertake extensive controlled studies to measure the difference, if any, in outcomes between trials in which cameras are present and comparable cases in which cameras are not present. Even if funds had been appropriated by the Legislature for such studies, the Committee seriously doubts that any such analysis could or will resolve the fundamental clash of interests and values which underlie the issue of cameras in the court.

The Committee is satisfied that it has heard a broad spectrum of points of view from a wide range of persons with experience and expertise in this field and organizations with a vital interest in this issue. Based on the record it has developed over the course of its work, the Committee reaches the following conclusions about the operation of Section 218 of the Judiciary Law since January 31, 1995.

## A. Public Benefits

The Committee believes that one of the greatest benefits derived from the presence of cameras in the courtroom is enhanced public scrutiny of the judicial system. The majority of judges who responded to the Committee's survey and a wide array of witnesses who testified at the Committee's hearings agreed that the presence of television cameras in the courtroom enhances public scrutiny of judicial proceedings.

The record developed by the Committee also suggests that there have been educational benefits to the public in general from the state's experiment with cameras in the courts. It seems clear that television coverage of court proceedings, especially where it is gavel-to-gavel or extended, enables the public to learn more about the workings of the justice system, to see directly the conduct of particular cases, and to become more familiar with legal concepts and developments. The fact that many view television coverage as a form of entertainment does not deprive it of educational content, since education and entertainment are not mutually exclusive.

The record before the Committee does not establish to what extent the presence of cameras in New York State courts has actually enhanced the public's understanding of New York's judicial system. The judges of the State, according to our survey, were split on the question. The record suggests that civil cases are often not covered by the major media and that in criminal proceedings, coverage is focused largely on violent crimes. With rare exceptions, coverage on the evening news takes the form of a brief segment, which is by itself hardly sufficient to promote a detailed understanding of the judicial system. At the same time, there is little doubt that television coverage

has drawn the public's attention to major societal problems, such as domestic violence and child abuse, and has served a cathartic purpose for the families of some homicide victims.

The record also contains opinions that the presence of cameras may operate as a disincentive for some victims of sex crimes, domestic violence or child abuse either to report such crimes or to participate as witnesses in judicial proceedings involving those crimes. According to the Marist poll commissioned by the Committee, a majority of the public would not want their trial televised if they were a party to a proceeding or the victim of a crime. As for the claim that camera coverage may encourage witnesses to come forward, the  specific evidence in support of that contention during the experimental period is slight.

Weighing the question of public benefits is not a simple matter. After having carefully reviewed the record, the Committee believes that the benefits that flow from televised coverage of the judicial process are so important that they ought not to be sacrificed by barring cameras from the courtroom across-the-board. The Committee agrees with the view expressed by one witness that "what happens in a trial is a public matter"[311] and should be accessible to as many interested New Yorkers as possible. Video and photographs have become important tools in presenting news to the public, many of whom now rely on television as their principal source of information about public affairs.

Openness of public institutions, including the judiciary, is a key ingredient in our democracy. Among the many values served by openness are promoting public confidence in government, providing the public with information about the workings of the judiciary, assuring the fairness of court proceedings, and satisfying the appearance of justice.

As the New York State Legislature stated in its findings in 1987:

> The average law-abiding citizen is not afforded numerous opportunities to participate in civil and criminal court proceedings, or able to attend and observe firsthand the functioning of our legal system. The vast majority of citizens, therefore, rely on reports in the news media for information about the judicial system and accounts of judicial proceedings.[312]

The Committee considers it of the utmost importance that judges have unfettered discretion to decide in each case whether or not to allow cameras, taking into account the benefits of coverage

---

[311] Testimony of Syracuse University Professor Jay Wright, executive director, New York State Fair Trial/Free Press Conference (NYC-1 at 79).

[312] Chapter 113, Laws of New York, 1987 Regular Session, approved June 15, 1987, codified as § 218 of the Judiciary Law.

as well as all of the objections to such coverage, whether those objections are raised by parties, their counsel, prospective witnesses, crime victims or other trial participants.

## B. Compliance by Trial Judges and the News Media with the Safeguards of Section 218 of the Judiciary Law

### 1. Judges

The record strongly suggests that New York State trial judges have discharged with care their responsibilities under Section 218 of the Judiciary Law and have acted appropriately both inside and outside the courtroom. The Committee received few complaints about the way in which trial judges have administered Section 218. Nor has the Committee's research revealed any published appellate decisions overturning a judgment, verdict, or conviction based on the presence of cameras at trial.[313] The evidence, rather, reflects a high degree of compliance by judges with the requirements of Section 218.

We find instructive the evidence from the Committee's judicial survey that many judges have applied the safeguards of Section 218 to deny camera coverage and that some, while granting coverage, have exercised their statutory judicial discretion to impose restrictions in addition to those expressly mandated by Section 218. We note that judges who granted applications for coverage cited "the absence of objections" as the most common reason for doing so and that those who denied coverage frequently did so because of objections by the defense, the prosecution, or witnesses.

According to the Committee's judicial survey, some judges who granted coverage indicated that they felt obligated to do so because they understood Section 218 to contain a presumption in favor of camera coverage. We would note that Section 218 of the Judiciary Law does not contain a presumption of access. Although the statute provides that "audio-visual coverage . . . shall not be limited by the objection of counsel, parties, or jurors, except for a finding by the presiding trial judge of good or legal cause," it expressly states that "presiding trial judges, in their discretion, may permit audio-visual coverage of civil and criminal court proceedings."[314]

The wide discretion of the trial judge in deciding whether or not to permit camera coverage lies at the core of Section 218 and its implementing rules. The statute instructs the judge to evaluate:

       1.    The type of case involved;

---

[313] See, e.g., New York v. Shattell, 179 A.D.2d 896, 578 N.Y.S.2d 694 (3d Dep't 1992)(rejecting defendant's claim that he was denied a fair trial as a result of alleged mismanagement of television cameras at his trial).

[314] Judiciary Law § 218(3)(b) & 218(1).

2.     Whether the coverage would cause harm to any participant in the case or otherwise interfere with the fair administration of justice, the advancement of a fair trial or the rights of the parties;

3.     Whether any order directing the exclusion of witnesses from the courtroom prior to their testimony could be rendered substantially ineffective by allowing audio-visual coverage that could be viewed by such witnesses to the detriment of any party;

4.     Whether such coverage would interfere with any law enforcement activity;

5.     Whether such coverage would involve lewd or scandalous matters.[315]

In addition, under the rules promulgated by the Chief Administrative Judge, judges must take into account "the objections of any of the parties, prospective witnesses, victims or other participants in the proceedings of which coverage is sought" and must give "great weight" to the fact that a child may be involved.[316]

Judges are further directed to protect all participants and to preserve the welfare of minors, where necessary, by prohibiting coverage of testimony or exhibits, particularly in cases involving "lewd or scandalous matters." The law imposes no limits on this authority and further enables judges to modify or reverse any earlier order or determination. In other words, a judge can decide mid-trial to remove cameras from the courtroom or bar coverage of any witness or exhibit, even if he or she previously indicated coverage would be allowed.

If a judge elects to grant permission to cover a trial, he or she must make a written order granting permission for coverage and include this order in the record of the proceedings. The order must contain the judge's restrictions and a warning to all parties that a violation of the restrictions is punishable by contempt. The judge must also go over his or her restrictions and warnings with counsel and the media in a pre-trial conference.

We conclude, in the absence of any hard evidence of judicial abuses in any of the cases televised during the experimental period, that there is no basis in the record to bar outright all televised coverage of court proceedings based on the potential for such abuse. However, the discretion of the trial judge is of critical importance in handling requests for camera coverage and in striking the appropriate balance in each case between the principles of public access and a fair trial. We stress again that judges must have wide discretion to weigh the benefits and objections

---

[315] Judiciary Law § 218(3)(c).

[316] N.Y. Court Rules § 131.4(c)(7).

to camera coverage in each individual case. By a wide margin, our judicial survey shows that judges favor broad discretion in this area.[317] It should remain unfettered.

### 2. News Media

The Committee's record includes strong evidence of compliance with the requirements and safeguards of Section 218 by representatives of the electronic news media.  Reporters and photographers who testified before the Committee appeared to understand and respect the solemnity and dignity of the courtrooms they covered.  The most common complaint heard by the Committee was the absence of 7-days notice of the media's intent to film or photograph a court proceeding.  It appears that in some cases the 7-days notice was not given.  In some instances, judges have exercised their statutory discretion to shorten the notice period (*i.e.*, where 7-day notice was not possible because the court proceeding was scheduled at the last minute) or have denied coverage altogether because of the absence of adequate notice.

The Committee's record revealed several individual complaints about the media, ranging from filming of arraignments without the consent of the defendant to filming material on counsel table without permission of the court or counsel.  It appears that some of the *alleged* violations may have been inadvertent, although not all of the complaints can be excused on this ground.  Other complaints regarding the use of televised footage fell outside the scope of Section 218 and took issue with editorial decisions regarding such footage.

We believe that in order to minimize inadvertent violations of the statute,  it would be important for the Office of Court Administration to develop a new application form which would identify, in plain English, each of the restrictions on camera coverage which are enumerated in the applicable law and administrative rules.  Representatives of the news media should be required to sign the form to indicate that they have read and understood the applicable safeguards.

### C. Effect of Audio-Visual Coverage on the Conduct of Participants in Court Proceedings

Central to the debate over cameras in the courtroom are concerns about the psychological impact of the camera. Will critical witnesses be deterred from coming forward by the fear of publicity?  Will witnesses be so nervous or guarded in the presence of television cameras that the jury will mistake that nervousness for a lack of credibility? Will jurors avoid reaching unpopular verdicts for fear of public reaction?  Will lawyers "showboat", wasting the court's time with frivolous arguments, unnecessary motions, cumulative witnesses?  Will judges, with an eye on the upcoming elections, tailor their rulings and their sentencings to suit the views of the television audience scrutinizing their performance?

---

[317] Judicial Survey, Questions 5(a) & 5(f).

Undoubtedly, it is human nature to act differently when our conduct is under public scrutiny. But the question for this Committee is how differently do we act in the presence of cameras, and is that difference (whatever it might be) significant enough to justify ending the use of cameras in the courtrooms of New York State?

Prior Committees, reviewing earlier surveys of judges, lawyers and other trial participants, concluded that evidence of impact on trial participants was too slight to outweigh the benefits of cameras. The majority of states which permit camera coverage of court proceedings have reached similar conclusions.[318] The U.S. Judicial Conference brought its "cameras in the court" pilot project to a halt because "the intimidating effect of cameras on some witnesses and jurors was cause for concern."[319]

The record developed by this Committee does not show that the fears regarding the impact of cameras on trial participants have been realized in New York during the experimental period. In our judgment, if subject to judicial discretion and accompanied by appropriate safeguards for trial participants, audio-visual coverage does not impair the search for justice. The many safeguards contained in Section 218 of the Judiciary Law and the implementing rules issued by the Chief Administrative Judge, along with the recommendations in this report, if properly applied, address the fair trial concerns that have been raised. We therefore conclude that any impact cameras may have on trial participants does not justify an across-the-board ban of cameras in courtrooms.

### 1. Jurors

Although under the current statute no audio-visual coverage of jurors is permitted,[320] two major concerns were voiced at the Committee's hearings with respect to jurors: first, that jurors will watch televised coverage of the case (or will speak to family members, friends and colleagues who have watched the televised coverage) and will be influenced either by commentary about the case or by evidence which was ruled inadmissible and thus not presented to the jury; and second, that

---

[318] See Molly Treadway Johnson, "Supplemental Report to the Federal Judicial Center, Electronic Media Coverage of Courtroom Proceedings: Effects on Witnesses and Jurors" at 4 (January 18, 1994)(overview of 12 state studies of the impact of cameras on witnesses and jurors suggests that the majority of jurors and witnesses who experience media coverage do not report negative consequences or concerns).

[319] See memorandum dated September 22, 1995 from L. Ralph Mecham, Director, Administrative Office of the United States Courts to All Judges, United States Courts. Some members of the Judicial Conference of the United States, who voted by a 2-1 margin to disapprove the request to permit cameras in the federal courts in civil proceedings, "believed that any negative impact on witnesses or jurors could be a threat to the fair administration of justice." Id.

[320] Judiciary Law § 218(7)(d) prohibits audio-visual coverage of jurors while in the jury box, in the courtroom, in the jury deliberation room during recess, or while going to or from the deliberation room, except that "upon the consent of the foreperson of a jury, the presiding trial judge may, in his or her discretion, permit audio coverage of such foreperson delivering a verdict."

jurors will be influenced in their deliberations by their realization that the eyes of the general public are upon them and will be reluctant to reach a verdict which is "unpopular" with the community to which they will return after the trial.

The Committee has not received any hard data to support these claims. No one has drawn the Committee's attention to a specific case in New York in which jurors had improper communications regarding a televised case or in which jurors disregarded a judge's instructions not to watch televised coverage of the proceedings. Nor has it been suggested to us that the outcome of a particular case in New York was altered by the presence of cameras. Judges, of course, are equipped with a variety of tools which they can use to minimize the impact of trial publicity. They can instruct the jury not to watch televised coverage of the case and can give those instructions repeatedly throughout the trial. In extraordinary cases, they can sequester the jury.

We recognize that fears that jurors will be influenced by televised coverage of a case or will shy away from reaching unpopular verdicts are not wholly imaginary. But we believe that judges, exercising their discretion under the statute, are capable of taking these factors into account when they consider whether to grant or deny an application for camera coverage in a particular case. In this regard, we note that a number of New York State judges reported that in denying an application for television coverage, they typically take into account whether the coverage might unfairly influence or distract the jury.

### 2. Witnesses

It is the possible effect of the presence of cameras on witnesses that lies at the heart of some of the opposition to cameras in the courtroom. Concerns were voiced by some at the Committee's hearings that if cameras are present, witnesses will be deterred from coming forward to testify. For example, a prospective witness may be concerned that certain aspects of his or her past will be made public before a television audience. It was said that the victim of a rape and sexual assault may fear the invasion of privacy that follows in the wake of a highly publicized trial and may refrain from prosecuting a case because of the attendant publicity. It was also said that a witness may fear retribution and physical retaliation. It was suggested that witnesses who do come forward will be intimidated by the   presence of cameras, and that their initial nervousness may be misinterpreted by the jury as a lack of credibility. Where the witness' testimony is highly personal in nature, concerns were voiced that the presence of cameras will make it more difficult for witnesses to tell their story fully and honestly.

It is difficult for this Committee to segregate the effect on witnesses of the presence of television cameras from the effect of being called to testify in any public trial (especially a highly publicized trial) which is covered by the print media alone, or, for that matter, in any public trial before a judge and jury. The Marist poll suggests that members of the public have a greater aversion to testifying in the presence of cameras than in the presence of conventional media, although there is an aversion to the latter as well. The Committee's judicial survey suggests that many judges believe that witnesses' testimony is unchanged in the presence of cameras.

72

The Committee concludes from its review of the evidence that witness intimidation is neither borne out by the record in New York nor sufficiently strong to warrant barring cameras from the courtroom across-the-board. Such witness concerns are adequately addressed, in our view, by all of the current safeguards in Section 218 and in the implementing rules. In deciding whether to permit cameras, judges need to be mindful, as they have been during the experimental period, of the potential effects of coverage on witnesses. Where camera coverage is permitted in criminal proceedings, judges should ensure that counsel have advised witnesses of their right under Section 218 to request that their image be visually obscured and, if necessary, reiterate that admonition themselves. In addition, Section 218 accords judges the power in both civil and criminal proceedings to insist that the face -- and the voice, if necessary -- of a witness not be transmitted beyond the courtroom.[321]

In the final analysis, we observe that New York opted in 1987 to open its courts to cameras in both civil and criminal proceedings. Almost 10 years of experience argue against an across-the-board ban on cameras so long as a law allowing camera coverage is grounded on judicial discretion, contains all of the safeguards in place during the experimental period, and directs the Office of Court Administration to monitor camera-covered proceedings, make periodic reports, and, if necessary, recommend changes in Section 218 of the Judiciary Law and the implementing rules. It is this Committee's judgment that such an approach, in the context of New York's experiment, respects the public value of openness, the public nature of a trial, and the constitutional principle of a fair trial.

### 3. Lawyers

The experience of lawyers who have tried camera-covered cases ran the gamut from those who were self-conscious to whose who told the Committee that they were unaware of the camera. For the most part, it appears that lawyers who are initially self-conscious, often become so absorbed in the task of trying their case that the camera fades into the background. There is some indication that lawyers may come to court better prepared in camera-covered cases.[322]

Concern was voiced that prosecutors, knowing that a case is being televised, will make decisions (*i.e.,* whether or not to offer a plea bargain, for instance) with an eye to the favorable publicity that might attend a televised trial. Others expressed concern that attorneys in a televised case will seek to impress the television audience in hopes of attracting future clients.

According to the Committee's judicial survey, most judges felt that compared to similar cases covered only by the print media, lawyers made about the same number of motions,

---

[321] Judiciary Law § 218(2)(I), 218(5)(c), 218(7).

[322] Judicial Survey, Question 22(k)

objections and arguments in camera-covered cases and presented about the same amount of evidence and witnesses.[323]

One objection voiced by lawyers about the impact of cameras on their own performance was that arguing over whether or not cameras should be permitted constituted a last-minute distraction from the job of preparing to try their case. For this reason, the Committee believes that it remains important that lawyers receive adequate notice of the media's application for permission to televise a trial, especially one that has been scheduled in advance.

As for the claim of lawyers seeking to "showboat" or call attention to themselves in televised cases, we cannot discount these possibilities. On the other hand, we do not believe that it is fair to the public to construct a policy against cameras based on a presumption that lawyers will not handle their roles professionally. We recognize that some may not, with or without cameras, but we have no basis from our review to conclude that lawyers in camera-covered cases in New York State have failed to serve their clients and the public responsibly. The evidence from the record before this Committee is that they have met their professional obligations.

### 4. Judges

The Committee's record establishes that the presence of cameras has an effect on some judges. There was ample testimony and public comment that cameras raised some judges' performance and had a positive impact on judicial demeanor. Some suggested to the Committee that cameras serve as "court watchers" and deter judicial abuses. A few witnesses suggested, however, that cameras encourage "showboating" and can adversely affect a judge's rulings, particularly at the time of sentencing. Thirty-seven (37%) percent of the 350 judges who responded to the Committee's judicial survey agreed that the presence of television cameras in the courtroom tends to cause judges to issue rulings they otherwise might not issue, with 52% disagreeing with that statement.

The Committee has wrestled with the meaning of the response to this survey question. While it is possible that some judges may issue substantively different rulings when cameras are present, we think that it is at least equally plausible that the presence of cameras may simply cause some judges to proceed with greater caution and to issue written rulings instead of ruling from the bench on a variety of objections and evidentiary issues. Without further information, it is difficult to draw any firm conclusion from this survey response.

As for the argument that the presence of cameras causes judges to make harsher comments at the time of sentencing or even to impose harsher sentences, we find it difficult, if not impossible, to segregate the impact of cameras from the overall pressure of the times for judges to be "tough on crime" regardless of whether or not cameras are present.

---

[323] *Id.*, Question 23.

In the end, we are left with a record heavily weighted with opinions which suggest that judicial conduct may improve rather than worsen in the presence of cameras. There is no basis in this record to conclude that judges will not faithfully discharge their responsibilities if courtrooms are open to cameras. The evidence before this Committee is that they have met their obligations with a high degree of competence.

## D. Defendant's Consent

A number of criminal defense lawyers who testified before the Committee urged us to recommend that Section 218 of the Judiciary Law be amended to require the consent of the defendant in a criminal trial before television cameras are admitted to the courtroom. They argue that it is the defendant's Sixth Amendment right to a fair trial which is at stake in a criminal proceeding and that the defendant ought therefore to have a say in whether or not the trial is televised. They further argue that if witnesses are deterred by the presence of cameras from coming forward, if witnesses are intimidated by the presence of cameras, or if jurors will be influenced by televised coverage of the trial, the defendant -- whose liberty and whose life is at stake -- should have a voice in determining whether or not cameras will be present.

We note that New York, by imposing a defendant consent requirement for two major categories of pre-trial proceedings, has already gone further in the direction of protecting the rights of criminal defendants than most states. Under Section 218 of the Judiciary Law, neither arraignments nor suppression hearings may be covered by cameras unless the defendant consents to the coverage. Of the 37 states which permit camera coverage in criminal proceedings without the consent of the defendant at trial, it appears that New York is the only one to explicitly limit coverage of arraignments.[324] New York also is one of only a handful of states to explicitly limit coverage of motions *in limine* and hearings on the admissibility of evidence.[325]

Precluding camera coverage of an arraignment without the defendant's consent minimizes the likelihood that witnesses in subsequent "line ups" and other identification procedures will be influenced in their identifications and perceptions by images broadcast from an arraignment. Similarly, exclusion of cameras from suppression hearings minimizes the possibility that prospective jurors will be exposed to information and evidence which a judge has ruled to be inadmissible at trial.

In order to more fully protect the defendant's fair trial rights, we believe that it would be consistent with the existing statutory safeguards to add bail hearings to the list of pre-trial proceedings which require defendant consent. Wide dissemination of hearsay statements made

---

[324] Radio and Television News Directors Association, *News Media Coverage of Judicial Proceedings with Cameras and Microphones: A Survey of the States* at B-26 (January 1997).

[325] *Id.* at B-25, B-26.

by prosecutors at bail hearings may have a prejudicial effect on prospective jurors comparable to that of broad dissemination of inadmissible evidence.

With these pretrial safeguards in place, together with all of the other statutory and administrative safeguards and the wide discretion granted to the trial judge, we do not believe that a defendant consent requirement is needed at trial, or appropriate.  In our view, one of the gravest dangers to a defendant's fair trial rights is created by pretrial publicity and, particularly, by publicity regarding inadmissible evidence.  At the trial stage, we believe that openness and the public access to information about trials afforded by television works as a safeguard, not a threat, to the defendant's rights.  As the U.S. Supreme Court ruled in *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980), an open trial:

> giv[es] assurance that the proceedings were conducted fairly to all
> concerned and discourage[s] perjury, the misconduct of participants,
> or decisions based on secret bias or partiality.[326]

As for death penalty cases, the Committee discussed whether there should be a special rule to take account of the fact that the state's death penalty law is new and that we have had no experience with camera coverage in such cases.  The Committee noted that a majority of the 323 New York State judges who responded to the relevant portion of its survey were not of the view that different rules were needed to govern television camera access in capital cases, although a sizeable minority favored banning cameras in death penalty cases.[327]  We find no basis from our consideration of the subject to distinguish such cases.  We believe it important to emphasize again, however, that the trial judge must take account of all relevant factors in the particular case.

---

[326] 448 U.S. at 569.  The case did not involve camera coverage of a trial.

[327] Judicial Survey, Question 8(b).

## VII. RECOMMENDATIONS

1. **Cameras Should Be Permitted in New York State Courts on a Permanent Basis With All of the Safeguards of Current Law for Parties, Prospective Witnesses, Jurors, Crime Victims and Other Trial Participants**

Our Committee conducted its work against the background of camera coverage in New York State of civil and criminal proceedings since December 1, 1987. In allowing for an experimental period, the New York State Legislature noted in its 1987 findings that:

> court proceedings are complex, often involving human factors that are difficult to measure. There may be inherent problems in any court proceeding which could possibly be complicated by audio-visual coverage.

> [T]he Legislature, remaining sensitive to these concerns, hereby determines that, in order to enhance public familiarity with the workings of the judicial system, while not interfering with the dignity and decorum of the courtroom, the prohibition of audio-visual coverage of court proceedings should be modified for an experimental period.

Our review of the experiment, the fourth of its kind in New York since 1987, did not find any evidence that the presence of cameras in New York cases has actually interfered in a particular case with the fair administration of justice. Rather, testimony from over 50 witnesses who spoke at our five public hearings, over 350 responses to our judicial survey, and over 50 letters of public comment from lawyers, bar associations, and interested citizens strongly suggests that the judges of this state have done an excellent job in administering the present law. The many safeguards contained in the law and in the accompanying rules issued by the Chief Administrative Judge have worked well to provide judges with the necessary discretion to deal with possible abuses and to protect the legitimate concerns of parties, prospective witnesses, jurors, crime victims and other participants in trial proceedings.

In light of the long period of examination of this subject by prior committees and our committee, we recommend that Section 218 of the Judiciary Law be amended to permit audio-visual coverage on a permanent basis, with all of the safeguards of the current legislation for defendants in criminal proceedings, parties in civil proceedings, witnesses, jurors, crime victims, children and others. We believe that the public nature of a trial and the public's right of access to a trial support the adoption of a law permitting television coverage of court proceedings under the careful control and supervision of trial judges, who must retain their unfettered discretion to determine whether or not to admit cameras to their courtroom, taking into consideration the concerns of trial participants.

In striking this balance, we find instructive judicial decisions on the public nature of a trial and the values served by the principle of openness of the judicial process. These values include

77

promoting confidence in the judicial process, assuring that proceedings are conducted fairly, providing the public with information about the workings of the judiciary, and satisfying the appearance of justice. Although televised coverage may, at times, show the legal system in an unfavorable light, we do not view that as a detriment. Rather, to the extent that such coverage offers an opportunity for improving the judicial system, we view it as a strength of our democratic system.

**2.      Defendant Consent Should Be a Prerequisite for Camera Coverage of Bail Hearings**

We further recommend that the Legislature extend to bail hearings the same safeguard of defendant's consent which is currently required as a prerequisite to camera coverage of arraignments and suppression hearings. Because widespread pre-trial dissemination of hearsay statements made at bail hearings may have a prejudicial effect on prospective jurors comparable to that of the dissemination of evidence ruled inadmissible at a suppression hearing, the Committee believes that it would be consistent with existing safeguards to add bail hearings to the list of pre-trial proceedings which required defendant's consent.

**3.      There Should Be No Separate Rule for Death Penalty Cases**

The Committee considered whether there should be a special camera coverage rule for death penalty cases in light of the fact that New York State's death penalty statute is new and that we have no experience with camera coverage in such cases. We find no basis in our consideration of the subject to distinguish such cases. However, we believe that it is important for the trial judge to take account of all relevant factors -- including even slight evidence of a prospective witness' intimidation and nervousness -- in deciding whether or not to permit camera coverage in death penalty cases.

**4.      Judges Should Be Vigilant in Addressing the Safety and Privacy Concerns of Witnesses In Both Criminal and Civil Proceedings**

The Committee considered whether a witness' right to insist that his or her image be visually obscured -- which is available under current law to non-party witnesses in criminal cases -- should be extended to non-party witnesses in civil cases. The Committee concluded that it is appropriate to distinguish between these two categories of proceedings, given the heightened safety concerns that could exist in a criminal trial, where threats to witnesses' physical safety may be of serious concern. We also recognize that the privacy concerns of rape and other sexual assault victims are important in criminal proceedings.

We believe that the safety and privacy concerns of witnesses in civil cases deserve the trial judge's careful attention. Some witnesses in civil proceedings may reasonably fear injury to their personal or professional reputation if certain aspects of their past are suddenly thrust before a television audience. In accordance with the rules of the Chief Administrative Judge, we believe that trial judges should remain "especially sensitive and responsive to the needs and concerns of

all . . . witnesses" and should exercise, where and if necessary, their statutory discretion to protect the witness in a civil proceeding who raises a valid privacy or safety concern.

5.  **The Office of Court Administration Should Actively Monitor Camera-Covered Proceedings, Make Periodic Reports, and, If Necessary, Recommend Changes in Section 218 of the Judiciary Law and the Implementing Rules**

Although we uncovered no pattern of non-compliance by the media with the safeguards of the law, we heard complaints about inadequate notice of the news media's interest in televising a court proceeding as well as scattered other complaints, ranging from filming material on counsel table without the consent of the court or counsel to violations of judges' orders not to film certain trial participants. (As previously noted, the Committee did not investigate and determine the merit or validity of each complaint.)  We also received information of an anecdotal nature that some witnesses might be deterred from coming forward by the presence of cameras in the courtroom, that some of those who did come forward might be intimidated by the presence of cameras, and that their attendant nervousness could be misinterpreted by the jury as a lack of credibility.

We also note that the development of new technology and new media for the coverage of trials (e.g., the Internet, additional cable networks and programs) make it impossible to say with absolute certainty how these expanded types of coverage will affect trials in the future. The recent enactment of the New York death penalty statute introduces a further element of uncertainty into the "cameras in the court" arena, since no death penalty case has yet been tried with cameras in the courtroom. Therefore, in implementing a permanent law in New York on cameras in the courts, we consider it essential that the Office of Court Administration actively monitor compliance with the law and its implementing rules, establish a formal mechanism to receive and review complaints about the operation of the law, make periodic reports to the Legislature and, if necessary, recommend changes in Section 218 and the implementing rules.

We recommend a three-part monitoring approach.  First, OCA should develop a formal procedure for receiving and investigating complaints from trial participants, members of the public, and the press. Those who believe that Section 218, or the implementing rules, have been violated need to have somewhere to go with their complaints.  A formal mechanism for filing those complaints should be established, together with a procedure for investigating those complaints and publicly reporting the results of those investigations.

Second, the Office of Court Administration should periodically survey lawyers who have participated in camera-covered cases about their experience.  A sample survey has been prepared by the Committee and is included in Appendix I to this report. Such a survey would assist OCA in assessing the impact of cameras on witnesses and other trial participants and could serve as the basis for future judicial training programs.

Third, the Office of Court Administration should collect certain basic data on each case in which an application for camera coverage is made and should provide periodic reports to the Chief

Judge, the Legislature and the Governor summarizing its findings. The types of data which should be considered for collection include:

1. the applicant (with pertinent identifying information);
2. the court to which the application was made and the name of the presiding judge;
3. type of case (including whether the case is a civil or criminal proceeding, what the principal crime or cause of action is, and whether the case is one in which the death penalty has been sought);
4. type of coverage sought (gavel-to-gavel or for a particular witness or portion of the proceeding; live television coverage; videotape for later broadcast; still photography; radio broadcast);
5. type of proceeding for which coverage is sought (arraignment, suppression hearing, bail hearing, pre-trial motion, trial, verdict, penalty phase of capital case, sentencing, appeal, etc.);
6. whether objections were made and, if so, by whom and on what grounds;
7. grounds for granting or denying the application;
8. any limitations imposed on coverage;
9. whether approval was subsequently revoked in whole or in part;
10. how many witnesses, if any, requested that their image be visually obscured and, if known, why;
11. names, addresses and telephone numbers for the presiding judge, parties' attorneys, and representatives of the media who applied for permission for camera coverage;
12. whether the decision to grant or deny coverage was subsequently challenged;
13. in criminal proceedings where permission for televised coverage is sought, what level of bail was set, whether the defendant was acquitted or convicted and, if convicted, what sentence was imposed;
14. whether any complaints were filed with the Office of Court Administration and, if so, the results of OCA's investigation of the complaint.

Finally, the Committee recommends that in order to minimize inadvertent violations of the statute, it would be important for the Office of Court Administration to develop a new application form which would identify, in plain English, each of the restrictions on camera coverage which are enumerated in the applicable law and administrative rules. Representatives of the news media should be required to sign the form to indicate that they have read and understood the applicable safeguards.

**6.**     **The Office of Court Administration Should Develop an Enhanced Judicial Training Program to Familiarize All Judges with the Applicable Statutory and Administrative Provisions and Safeguards**

It is essential that all judges be familiar with the safeguards contained in Section 218 of the Judiciary Law and in the implementing rules promulgated by the Chief Administrative Judge. We recommend that OCA develop a judicial training program for all judges, including town and village judges, to ensure that the entire judiciary of the state is familiar with the safeguards contained in the statute and the rules which are designed to provide judges with wide discretion and to protect parties, witnesses, jurors, crime victims and other trial participants.

A syllabus for a continuing judicial education program on cameras in the courts is included in Appendix J to this report. Using selected readings, lectures, simulations and roundtable discussions with camera-experienced judges, lawyers, witnesses, jurors, journalists and media scholars, a judicial training program should acquaint all judges with the requirements and safeguards of Section 218 and the implementing rules, and should provide a guide to judges for the informed exercise of their statutory discretion.

81

Respectfully submitted,[328]


Fritz W. Alexander, II
Richard Alteri
Jay C. Carlisle, II
Veronica Gabrielli Dumas
John D. Feerick, Chair
Diane Kennedy
Henry G. Miller
Leonard Noisette[329]
Michelle Rea
James M. Tien
Monte I. Trammer

April 4, 1997

---

[328] Alissa Pollitz Worden was unable to participate in the work of the Committee and therefore did not express a view.

[329] Leonard Noisette, Esq. submits a minority report.

82

*NEW YORK STATE*
*COMMITTEE TO REVIEW AUDIO VISUAL COVERAGE*
*OF COURT PROCEEDINGS*

Copies of this report are available by writing to
Fordham Law School
Office of the Dean
140 West 62nd Street
New York NY 10023