# Electronic Media Coverage of Federal Civil Proceedings

## An Evaluation of the Pilot Program in Six District Courts and Two Courts of Appeals

## Federal Judicial Center

1994

Federal Judicial Center
Thurgood Marshall Federal Judiciary Building
One Columbus Circle, N.E.
Washington, DC  20002-8003

# Electronic Media Coverage of Federal Civil Proceedings

**An Evaluation of the Pilot Program in Six District Courts and Two Courts of Appeals**

Molly Treadway Johnson

Carol Krafka

**Federal Judicial Center**

1994

This Federal Judicial Center publication was undertaken in furtherance of the Center's statutory mission to conduct and stimulate research and development for the improvement of judicial administration. The views expressed are those of the authors. On matters of policy, the Center speaks only through its Board.

## The Federal Judicial Center

**Board**

The Chief Justice of the United States, *Chair*

Judge Edward R. Becker, U.S. Court of Appeals for the Third Circuit

Judge J. Harvie Wilkinson III, U.S. Court of Appeals for the Fourth Circuit

Judge Martin L. C. Feldman, U.S. District Court for the Eastern District of Louisiana

Chief Judge Michael A. Telesca, U.S. District Court for the Western District of New York

Judge Marvin E. Aspen, U.S. District Court for the Northern District at Illinois

Judge Elizabeth L. Perris, U.S. Bankruptcy Court for the District of Oregon

L. Ralph Mecham, Director of the Administrative Office of the U.S. Courts

**Director**
Judge William W Schwarzer

**Deputy Director**
Russell R. Wheeler

**Division Directors**
Gordon Bermant, Planning & Technology Division
William B. Eldridge, Research Division
Denis J. Hauptly, Judicial Education Division
Sylvan A. Sobel, Publications & Media Division
Steven A. Wolvek, Court Education Division

Federal Judicial Center
Thurgood Marshall Federal Judiciary Building
One Columbus Circle, N E.
Washington, D.C. 20002-8003

# Contents

Acknowledgments   v

Introduction   1

History and Description of the Pilot Program   3
   Pilot Program Guidelines   5

The Federal Judicial Center Evaluation   7
   Summary of Findings   7
   Limits of the Evaluation   8
   Research Approaches and Results   8
      Information About Media Activity   8
      Judge Questionnaires   11
      Attorney Questionnaires   18
      Telephonic Interviews   22
      Content Analysis of Evening News Broadcasts   31
      Collection of Information About Extended Coverage of
         Civil Proceedings   37
      Review of State Studies of Electronic Media Effects on Jurors
         and Witnesses   38

Recommendations   41
   On Access Generally   41
   On Guidelines   41
   On Facilities   44
   The Issue of Judge Opt-Out   45

Appendix: Guidelines for the Pilot Program on Photographing, Recording,
   and Broadcasting in the Courtroom   47

# Acknowledgments

Over the course of this evaluation we received assistance from a number of Research Division staff members at the Federal Judicial Center, including George Cort, Jim Eaglin, Scott Gilbert, Adam Hodges, Laural Hooper, Carolyn Hunter, Aletha Janifer, Patricia Lombard, Judith McKenna, Kim McLaurin, Melissa Pecherski, Marisa Reddy, John Shapard, Donna Stienstra, Charles Sutelan, and Carol Witcher.

In addition, we are very grateful to the pilot court judges, court staff, attorneys, and media representatives who responded to our research inquiries.

# Introduction

In September 1990, the Judicial Conference of the United States adopted the report of its Ad Hoc Committee on Cameras in the Courtroom, which recommended a pilot program permitting electronic media coverage[1] of civil proceedings in six federal district courts and two federal courts of appeals. Under the pilot program, media representatives interested in using electronic media to cover all or part of a civil proceeding in one of the eight pilot courts submitted an application to the court, and the judge presiding over the proceeding determined whether to permit coverage. Guidelines promulgated by the Judicial Conference set forth the conditions under which coverage could take place (see Appendix).

In adopting the committee's recommendation, the Judicial Conference approved the Federal Judicial Center's proposal to evaluate the pilot program, and this report presents the results of the Center's evaluation. The evaluation covers the period from July 1, 1991, to June 30, 1993.

The research project staff used the following resources to evaluate the program: (1) information about application and coverage activity in each court; (2) questionnaire responses from participating and nonparticipating judges in the pilot courts; (3) questionnaire responses from attorneys who participated in proceedings in which there was electronic media coverage; (4) telephone interviews with (a) judges who had the most experience with electronic media coverage, (b) media representatives whose organizations participated in the program, and (c) court personnel responsible for day-to-day administration of the program in each pilot court; (5) a content analysis of evening news broadcasts incorporating courtroom footage obtained under the program; (6) information about coverage provided by extended-coverage networks; and (7) reviews of studies exploring effects of electronic media coverage on witnesses and jurors in state court proceedings.

1. In this report the phrase "electronic media coverage" refers to the broadcasting, televising, electronic recording, or photographing of courtroom proceedings by the media.

# History and Description of the Pilot Program

Electronic media coverage of criminal proceedings has been expressly prohibited under Federal Rule of Criminal Procedure 53 since the Criminal Rules were adopted in 1946.[1] In 1972, the Judicial Conference of the United States adopted a prohibition against "broadcasting, televising, recording, or taking photographs in the courtroom and areas immediately adjacent thereto . . . ." (Canon 3A(7) of the Code of Conduct for United States Judges). The broad prohibition applied to both civil and criminal cases. At that time the American Bar Association's Model Code of Judicial Conduct contained a similar provision, and cameras were prohibited in most state courts.

In the mid-1970s, state courts began authorizing broadcast coverage of judicial proceedings, on either an experimental or permanent basis. In 1981, the Supreme Court ruled in *Chandler v. Florida*, 449 U.S. 560 (1981), that the presence of television cameras at a criminal trial was not a denial of due process. In 1983, a group of interested media and other organizations petitioned the Judicial Conference to adopt rules permitting electronic media coverage of federal judicial proceedings, and the Conference appointed an ad hoc committee to consider the issue. In its September 1984 report, that ad hoc committee recommended denial of the requested changes, on September 20, 1984, the Conference adopted the committee's report.

Shortly after the *Chandler* decision, the American Bar Association revised Canon 3A(7) of its Model Code of Conduct to permit judges to authorize broadcasting, televising, recording, or photographing civil and criminal proceedings subject to appropriate guidelines. The canon was ultimately removed from the ABA's Code of Conduct based on a determination that the subject of electronic media coverage in courtrooms was not directly related to judicial ethics and was more appropriately addressed by administrative rules adopted within each jurisdiction.[2]

2. In June 1994, the Judicial Conference's Standing Committee on Rules of Practice and Procedure voted to publish for comment a revision of Rule 53 that would remove from that rule the prohibition on electronic media coverage.

3. *See* ABA Standing Committee on Ethics and Professional Responsibility, Final Draft of Recommended Revisions to ABA Code of Judicial Conduct (December 1989).

Throughout the 1980s, several cases challenged the federal courts' prohibition on electronic media coverage. In 1988, the Judicial Conference appointed a second Ad Hoc Committee on Cameras in the Courtroom "to review recommendations from other Conference committees on the introduction of cameras in the courtroom, and to take into account the American Bar Association's ongoing review of Canon 3A(7) of its Code of Judicial Conduct, dealing with the subject."[4] In September 1990, after receiving input from news organizations and a letter from U.S. Representative Robert Kastenmeier, then Chair of the House Judiciary Committee's Subcommittee on Courts, Intellectual Property, and Administration of Justice, the ad hoc committee recommended that the Judicial Conference (1) strike Canon 3A(7) from the Code of Conduct for United States Judges, and include policy on cameras in the courtroom in the *Guide to Judiciary Policies and Procedures*; (2) adopt a policy statement expanding permissible uses of cameras in the courtroom; and (3) authorize a three-year experiment permitting camera coverage of certain proceedings in selected federal courts.[5]

In September 1990, the Judicial Conference adopted these recommendations and authorized the three-year pilot program allowing electronic media coverage of civil proceedings in selected federal trial and appellate courts, subject to guidelines approved by the Judicial Conference. The Federal Judicial Center (FJC) agreed to monitor and evaluate the pilot program. In its final report to the Conference in March 1991, the ad hoc committee recommended pilot courts for the experiment: the U.S. District Courts for the Southern District of Indiana, District of Massachusetts, Eastern District of Michigan, Southern District of New York, Eastern District of Pennsylvania, and Western District of Washington; and the U.S. Courts of Appeals for the Second and Ninth Circuits. The pilot courts were selected from courts that had volunteered to participate in the experiment. Selection criteria included size, civil caseload, proximity to major metropolitan markets, and regional and circuit representation. The use of size, civil caseload, and location in metropolitan areas as criteria reflected a concern

---

4  For a summary of these mostly constitutionally based challenges, see Radio-Television News Directors Association, *News Media Coverage of Judicial Proceedings with Cameras and Microphones: A Survey of the States* (1991).

5  See Report of the Judicial Conference Ad Hoc Committee on Cameras in the Courtroom (September 1990).

6  See Report of the Proceedings of the Judicial Conference of the United States (September 1990).

7  *Id.*

---

that smaller and less metropolitan courts would not have enough cases with high media interest to support evaluation of the program.

After the ad hoc committee selected the pilot courts and approved the FJC's proposed evaluation methods, the Conference discharged the ad hoc committee and assigned oversight of the pilot program to the Judicial Conference Committee on Court Administration and Case Management.

## Pilot Program Guidelines

The pilot program began on July 1, 1991, and runs through December 31, 1994.[8] The program authorizes coverage only of civil proceedings and only in the courts selected for participation in the pilot program. The guidelines adopted by the Judicial Conference require reasonable advance notice of a request to cover a proceeding; prohibit photographing of jurors in the courtroom, in the jury deliberation room, or during recesses; allow only one television camera and one still camera in trial courts (except for the Southern District of New York, which was permitted to allow two cameras in the courtroom for coverage of civil proceedings) and two television cameras and one still camera in appellate courts; and require the media to establish "pooling" arrangements when more than one media organization wants to cover a proceeding.[9] In addition, discretion rests with the presiding judicial officer to refuse, terminate, or limit media coverage.

---

8  The program was originally scheduled to terminate on June 10, 1994. In March 1994, the Judicial Conference adopted a recommendation of the Committee on Court Administration and Case Management to continue the program in the pilot courts through the end of 1994 to avoid a lapse in the program while a final Judicial Conference decision is pending.

9  Pooling involves running an electronic feed from a television camera inside the courtroom to a monitor located outside the courtroom, from which other interested media organizations can obtain footage. This procedure enables a number of media organizations to cover proceedings while limiting the number of cameras in the courtroom.

# The Federal Judicial Center Evaluation

So that we could report research results to the Conference prior to the termination of the pilot program, our evaluation covered the period from July 1, 1991, through June 30, 1993.

## Summary of Findings

Our overall findings were the following:

- During the two-year period from July 1, 1991, through June 30, 1991, the media filed applications for coverage in 257 cases; 82% of the applications were approved.

- The most common type of coverage was television coverage of trials.

- Overall, attitudes of judges toward electronic media coverage of civil proceedings were initially neutral and became more favorable after experience under the pilot program.

- Judges and attorneys who had experience with electronic media coverage under the program generally reported observing small or no effects of camera presence on participants in the proceedings, courtroom decorum, or the administration of justice.

- Judges, media representatives, and court staff found the guidelines governing the program to be generally workable.

- Overall, judges and court staff report that members of the media were very cooperative and complied with the program guidelines and any other restrictions imposed.

- Most television evening news footage submitted for content analysis (1) employed courtroom footage to illustrate a reporter's narration rather than to tell the story through the words and actions of participants; (2) provided basic verbal information to the viewer about the nature and facts of the cases covered; and (3) provided little verbal information to viewers about the legal process.

- Results from state court evaluations of the effects of electronic media on jurors and witnesses indicate that most participants believe electronic media presence has minimal or no detrimental effects on jurors or witnesses.

7

## Limits of the Evaluation

Several potentially relevant issues were not examined in the evaluation and therefore cannot be addressed in this report. First, the evaluation design as approved by the Ad Hoc Committee on Cameras in the Courtroom did not include a measure of the *actual* (as opposed to *perceived*) effects of electronic media on jurors, witnesses, counsel, and judges. The only way to measure objectively the actual effects of electronic media on jurors and witnesses would be to compare the behavior and perceptions of jurors and witnesses in two different groups of cases: those covered by electronic media and those not covered. The Federal Judicial Center suggested—and the Ad Hoc Committee on Cameras in the Courtroom concurred—that this approach was not feasible because, among other reasons, there would be too few cases in the pilot courts with high media interest to support such an evaluation.

Second, we did not directly measure the attitudes of jurors, witnesses, and parties because most have had little courtroom experience and could not, we believed, make judgments (as judges and attorneys could) about the effects of electronic media on themselves. (A witness who has never been in a courtroom might be nervous for many reasons but might attribute that state—inappropriately—to the presence of cameras.) We did obtain some information on these issues through other methods, such as judge and attorney questionnaires. Also, we reviewed results from state court studies exploring these questions.

Finally, because the pilot program limited coverage to civil proceedings, the impact of electronic media coverage on federal criminal proceedings was not addressable in this evaluation. Opinions on the issue of criminal coverage were obtained through questionnaires and interviews.

Another consideration relevant to interpreting the findings in this report is that the pilot covers cases chosen from among courts that had volunteered to participate, and most of the analyses in our study focused on judges who actually had experience with electronic media coverage. Thus, it could be expected that judges whose responses we report would on average be more favorable toward electronic media coverage than would a randomly-selected sample of judges throughout the country.

## Research Approaches and Results

### Information About Media Activity

From July 1, 1991, through June 30, 1993, media organizations applied to cover a total of 257 cases across all of the pilot courts. Of these, 186 applications were approved, 41 were disapproved, and 19 were not acted on (usually because the case was settled or otherwise terminated, or the application was withdrawn before the judge ruled on the application). Table 1 shows the breakdown, by court, of the outcomes of applications for electronic media coverage.

### Table 1. Outcome of Applications, by Court

| | Number of applications | Number approved | Number disapproved | No ruling | % approved in cases with a ruling |
|---|---|---|---|---|---|
| Second Circuit | 16 | 12 | 4 | 0 | 75 |
| Ninth Circuit | 18 | 13 | 4 | 1 | 76 |
| S.D. Indiana | 23 | 16 | 1 | 6 | 94 |
| D. Massachusetts | 19 | 17 | 2 | 0 | 89 |
| E.D. Michigan | 14 | 21 | 8 | 5 | 72 |
| S.D. New York | 40 | 26 | 7 | 7 | 79 |
| E.D. Pennsylvania | 78 | 54 | 15 | 9 | 78 |
| W.D. Washington | 29 | 27 | 1 | 1 | 96 |
| TOTAL | 257 | 186 | 42 | 29 | 82 |

As can be seen from this table, most application activity was in the district courts, but there was also variation among the district courts with respect to activity. These variations in application activity are generally—but not perfectly—related to the size of the court. In telephone interviews, other factors were suggested that may have influenced the extent of application activity: the number of non participating judges in a court,[10] differences in local television and radio station resources across cities of various sizes; and, most importantly, the involvement of a media coordinator, an agent of media organizations in a particular market.[11] There was a very active media coordinator in the Eastern District of Pennsylvania, which had the greatest volume of application and coverage activity (it was the second-largest district court in the pilot).

10. Some judges in the pilot courts declined to participate in the pilot program.

11. Media coordinators kept media organizations in a market apprised of interesting cases, coordinated pooling arrangements, and in some instances served as a media liaison to the court.

Use of cases as the unit of analysis in reporting activity, as in the numbers reported above, provides a very conservative measure of the extent of coverage activity. For example, many cases were covered by more than one media organization; our data do not reflect the number of media organizations interested in covering each proceeding. In addition, several cases involved coverage of more than one proceeding (e.g., a pretrial hearing and the trial) or multiple days of coverage for one proceeding (e.g., a trial). The data we collected reflect a total of 124 coverage days over the two-year data collection period, for an average of 2.2 coverage days for each proceeding covered. The longest coverage of a proceeding was 15 days, for a jury trial in which the plaintiff alleged sexual harassment and discrimination by an employer.

### Reasons for Disapproval of Applications

The guidelines do not require judges in the pilot courts to explain their reasons for denying coverage of a case; however, a number of them did indicate reasons in their written orders denying coverage. In the forty-two denials, thirteen did not state a reason and seven because a judge was not participating in the pilot program.[12] Five of the stated reasons were general statements that coverage would not be in the interests of justice or would prejudice the parties, without explaining in detail why this was so. Specific reasons given for the remaining seventeen denials included the sensitive nature of a case, witness or party objection to coverage, and untimely media applications.

### Non-Coverage of Approved Cases

Of the 186 cases approved for coverage, 147 were actually recorded or photographed. Nineteen of the 39 approved cases that were not covered had settled or otherwise terminated. Nine applications were withdrawn, and in 11 instances the media failed to appear to cover an approved case.[13]

### Proceedings Covered

Not surprisingly, trials were the type of proceeding most frequently covered by electronic media; fifty-six trials were covered over the two-year period. Other proceedings covered included pretrial proceedings (twenty-

seven), bankruptcy proceedings (four), appellate proceedings (twenty-four), and other proceedings (forty-three), including hearings for injunctive relief, show cause hearings, motions for stay, conferences, and proceedings not related to a particular case, such as a judge's swearing-in ceremony or court activities filmed or photographed for a special television program or news article.

### Type of Coverage

Television was by far the most common type of coverage under the pilot program, with 124 proceedings covered. The majority of television coverage was done by local stations for use in evening news broadcasts, although 12 proceedings were filmed and broadcast by networks such as Court TV and C-SPAN, which provide more extensive coverage of proceedings. Still photographers covered 56 proceedings, while radio covered 27. Approximately one-third of the covered proceedings were covered by more than one type of electronic media (e.g., television and still photographers).

### Types of Cases for Which Coverage Requests Were Made

The types of civil cases in which coverage applications were most frequently made were civil rights cases and personal injury tort cases.[14]

## Judge Questionnaires

### Method

Prior to the start of the pilot program, we sent a questionnaire to all judges (including district, appellate, senior, magistrate, and bankruptcy judges) in the pilot courts asking about their expectations and opinions of electronic media coverage of court proceedings. Judges were asked to rate the likelihood of certain potential effects of electronic media coverage as compared to conventional coverage. These effects included potential positive and negative effects of electronic media on witnesses (e.g., "motivates witnesses to be truthful," "makes witnesses more nervous than they otherwise would be"); jurors (e.g., "increases juror attentiveness," "signals to jurors that a witness or argument is particularly important"); attorneys (e.g.,

[14] Applications were made to cover 107 civil rights cases and 27 personal injury tort cases. Other types of cases in which applications were frequently filed include the following: contracts (15), intellectual property (including patent, trademark, and copyright) (14); labor litigation (9); bankruptcy and bankruptcy appeals (9); environmental matters (8), habeas corpus (8), ERISA (4), and constitutionality of state statutes (4).

---

[12] Three of these cases involved appellate panels on which retired Supreme Court Justice Thurgood Marshall was sitting.

[13] According to telephone interviews, media "no shows" usually happened when an event occurred to which a station chose to devote resources that were originally scheduled to cover the court proceeding.

10   Electronic Media Coverage of Federal Civil Proceedings

The Federal Judicial Center Evaluation   11

"causes attorneys to be more theatrical in their presentation," "prompts attorneys to be more courteous"), judges (e.g., "increases judge attentiveness," "causes judges to avoid unpopular decisions or positions"), and overall effects of electronic media presence (e.g., "disrupts courtroom proceedings," "educates the public about courtroom proceedings"). The response categories ranged from 1 (effect expected "to little or no extent") to 5 (effect expected "to a very great extent"). As a baseline, judges were asked to rate their views of the same effects for conventional media coverage as compared to the absence of coverage. Finally, judges who had experience with electronic media coverage (e.g., as a litigator or state court judge), and their expectations as to whether they would participate in the pilot program.

After the program had been in operation for one year, we sent follow-up questionnaires asking pilot court judges about the following: their beliefs about the same specific potential effects of electronic media coverage as had appeared in the initial questionnaire; the same specific effects of conventional coverage; whether they had experienced electronic media coverage under the pilot program, and their overall attitudes toward electronic media coverage of civil and criminal proceedings. Judges who did not respond to the one-year follow-up received the same follow-up questionnaire after the program had been in operation for two years.[17] Overall, 114 out of 163 district judges (70%) and 14 out of 51 appellate judges (67%) responded to both the initial and follow-up questionnaires.

## Results

### District judges

Our analysis of responses about the effects of electronic media coverage focused on responses of judges who had experienced electronic media coverage under the program. In general, district judges who had experience with electronic media coverage under the pilot program believed electronic coverage had only minor effects on the participants or proceedings, in the follow-up question-

15. Judges were also given the option of indicating they had no opinion.

16. Though criminal case coverage was not allowed in the pilot program, media representatives are arguing the federal courts to allow criminal coverage, and therefore we thought opinions of pilot court judges on this issue might be of interest to policy makers.

17. Copies of the initial and follow-up questionnaires are on file with the Research Division of the Federal Judicial Center.

naire, their median ratings indicated that all but one potential effect occurred "to little or no extent" or "to some extent."[18] Table 2 shows these judges' responses to the follow-up survey about specific effects of coverage.

When we compared the results in Table 2 to results from the initial questionnaire (not displayed here), our analysis showed that district judges who had experience with electronic media coverage rated nine of seventeen potential effects significantly lower (i.e., as occurring to a lesser extent) on the follow-up questionnaire than on the initial questionnaire.[19] These effects included the following items relating to electronic media coverage: "violates witnesses' privacy", "distracts witnesses", "makes witnesses more nervous than they otherwise would be", "signals to jurors that a witness or argument is particularly important", "causes attorneys to be more theatrical in their presentation", "disrupts courtroom proceedings", "motivates attorneys to come to court better-prepared", "increases judge attentiveness", and "prompts judges to be more courteous." Thus, judges apparently experienced these potential effects to a lesser extent than they had expected.

In contrast, when we compared ratings of conventional coverage effects between the initial and follow-up surveys we found no significant differences. This suggests that the differences in ratings of effects of electronic media coverage between the initial and follow-up questionnaires were attributable to experience with electronic media coverage and not to some more general shift in judges' attitudes toward the media.

18. The median represents the midpoint of all responses. The median rating on the item "educates the public about courtroom procedures" indicated this effect occurred "to a great extent."

19. Ratings of each potential effect by judges who completed both questionnaires were compared using a Wilcoxon Signed Rank test. This analysis examined the number of judges who changed their response in each direction and enabled a determination of whether the direction and magnitude of changes in ratings between the initial and follow-up questionnaires were statistically significant.

## Table 2. Ratings of Effects by District Judges Who Experienced Electronic Media Coverage Under the Program, by Percentage*

| Effect | To little or no extent | To some extent | To a moderate extent | To a great extent | To a very great extent | No opinion |
|---|---|---|---|---|---|---|
| Motivates witnesses to be truthful | 61 | 7 | 7 | 2 | 0 | 22 |
| Violates witnesses' privacy | 37 | 34 | 10 | 7 | 5 | 7 |
| Makes witnesses less willing to appear in court | 32 | 27 | 15 | 2 | 2 | 22 |
| Distracts witnesses | 51 | 22 | 15 | 2 | 2 | 7 |
| Makes witnesses more nervous than they otherwise would be | 24 | 37 | 22 | 5 | 0 | 12 |
| Increases juror attentiveness | 46 | 22 | 7 | 7 | 2 | 15 |
| Signals to jurors that a witness or argument is particularly important | 51 | 15 | 10 | 5 | 7 | 12 |
| Increases jurors' sense of responsibility for their verdict | 49 | 15 | 15 | 10 | 0 | 12 |
| Prompts people who see the coverage to try to influence juror-friends | 54 | 10 | 7 | 0 | 0 | 27 |

*(continued)*

## Table 2 (continued)

| Effect | To little or no extent | To some extent | To a moderate extent | To a great extent | To a very great extent | No opinion |
|---|---|---|---|---|---|---|
| Motivates attorneys to come to court better prepared | 32 | 32 | 15 | 10 | 7 | 5 |
| Causes attorneys to be more theatrical in their presentation | 29 | 37 | 20 | 2 | 5 | 7 |
| Prompts attorneys to be more courteous | 44 | 20 | 15 | 17 | 2 | 2 |
| Increases judge attentiveness | 63 | 10 | 15 | 10 | 2 | 0 |
| Causes judges to avoid unpopular decisions or positions | 88 | 2 | 5 | 2 | 0 | 2 |
| Prompts judges to be more courteous | 56 | 22 | 15 | 7 | 0 | 0 |
| Disrupts courtroom proceedings | 83 | 15 | 0 | 2 | 0 | 0 |
| Educates the public about courtroom procedure | 12 | 20 | 12 | 24 | 30 | 2 |

*Note: The figure in each cell represents the percentage of responding judges ($N = 41$) who selected that answer

With respect to overall attitudes toward electronic media coverage of civil and criminal proceedings, district judges (including those who personally experienced coverage and those who did not experience coverage but presumably observed the effects of coverage on their colleagues and on the court as a whole) exhibited significantly more favorable attitudes toward electronic media coverage of civil proceedings in the follow-up questionnaire than they had in the initial questionnaire. The median response to this question in the initial questionnaire was a 3, indicating "I have no opinion on coverage," while the median response in the follow-up questionnaire was a 2, representing "I somewhat favor coverage." After the program had been in place, thirty-six judges had more favorable attitudes toward electronic coverage of civil proceedings than they had reported in the initial questionnaire, fifteen had less favorable attitudes, and sixty-one reported the same attitude that they had in the initial questionnaire.

District judges also indicated less opposition to coverage of criminal proceedings in the follow-up questionnaire, moving from a median of 4 in the initial questionnaire (indicating "I somewhat oppose coverage") to a median of 4 (indicating "I have no opinion on coverage"). In the follow-up questionnaire, thirty-five judges reported more favorable attitudes toward criminal coverage than they had in the initial questionnaire, seventeen reported less favorable attitudes, and sixty-one reported the same attitude they had initially.

### Appellate Judges

Experience with electronic media coverage appears not to have changed the appellate judges' ratings of the effects of cameras. In both the initial and follow-up questionnaires, appellate judges' median ratings of effects were generally 1 (indicating the effect occurs "to little or no extent") or 2 (indicating the effect occurs "to some extent"). The following table shows responses of appellate judges with electronic media experience to the question in the follow-up survey about the effects of coverage.

## Table 3. Ratings of Effects by Appellate Judges with Experience in the Program, by Percentage*

| Effect | To little or no extent | To some extent | To a moderate extent | To a great extent | To a very great extent | No opinion |
|---|---|---|---|---|---|---|
| Prompts attorneys to come to oral argument better prepared | 52 | 26 | 0 | 17 | 0 | 4 |
| Causes attorneys to be more distracted in their presentation | 48 | 30 | 9 | 4 | 4 | 4 |
| Causes attorneys to change their emphasis or content of their oral argument | 39 | 43 | 0 | 4 | 4 | 4 |
| Increases judges' attentiveness at oral argument | 70 | 26 | 4 | 0 | 0 | 0 |
| Prompts judges to be more courteous in questioning attorneys | 57 | 35 | 9 | 0 | 0 | 0 |
| Causes judges to change the emphasis or content of their questions or oral argument | 65 | 30 | 4 | 0 | 0 | 0 |
| Disrupts courtroom proceedings | 74 | 22 | 0 | 4 | 0 | 0 |
| Educates the public about the work of the court of appeals | 1 | 30 | 30 | 9 | 6 | 4 |

*Note: The figure in each cell represents the percentage of responding judges (N = 23) who selected that answer

The responses shown in Table 3 do not differ significantly from responses to the same questions in the initial questionnaire. Similarly, appellate judges' overall attitudes toward coverage, both before and after their experience with the pilot program, were favorable. In both the initial and follow-up questionnaire their median response to a question about overall attitudes toward civil appellate coverage corresponded with "I somewhat favor coverage." Altogether, of the appellate judges responding to this question on both questionnaires, nine were more favorable to civil appellate coverage after the program, four were less favorable, and sixteen held the same attitude toward civil coverage as they had prior to the program.

With respect to coverage of criminal proceedings, appellate judges' median rating on the initial questionnaire was "I have no opinion on coverage," while their median rating for the follow-up questionnaire was "I somewhat favor coverage." In particular, eleven appellate judges were more favorable to coverage of criminal cases after the program, four were less favorable, and fourteen held the same attitudes as previously.

The overall questionnaire results (district and appellate) suggest judges' attitudes toward electronic media coverage of civil and criminal proceedings generally stayed the same or became more favorable after experience with the program. In addition, judges who deal with electronic media coverage experienced potential effects to either the same or a lesser extent than they had expected. In overall before–after comparisons for judges in each type of court, there were no potential negative effects that were rated significantly higher (i.e., as occurring to a greater extent) after experience with cameras than before.

It should be noted that not all judges held favorable attitudes toward electronic media coverage, and some had strong objections. The written questionnaire comments of judges, some of which express negative views, are on file with the Federal Judicial Center.

## Attorney Questionnaires

### Method

After the pilot program had been in operation for over two years, questionnaires were sent to lead plaintiff and defense attorneys from 100 cases covered by electronic media during the first two years of the program. All 31 cases reported to have been covered by extended-coverage networks were included in the sample, and the remaining 68 cases were selected randomly from among other cases covered under the program. Questionnaires were

returned from 110 out of 191[11] attorneys surveyed (58%), with respondents divided fairly equally between plaintiff and defense (or appellee and appellant) attorneys.

We asked attorneys about the following issues: (1) if the court adequately considered their views and those of their clients in deciding whether to approve coverage requests; (2) whether potential witnesses refused to testify because of the prospect of camera coverage; (3) what effects of electronic media coverage they observed; (4) whether electronic media coverage affected the fairness of the proceedings; (5) whether, overall, they favor electronic media coverage of civil proceedings; and (6) whether their views toward electronic media coverage have changed as a result of participation in the program.

### Results

Overall, 71 out of 109 attorneys responding (66%) indicated they somewhat or greatly favor electronic media coverage of civil proceedings. Fourteen (13%) said they had no opinion on coverage, while the remaining 23 (21%) were somewhat or greatly opposed to electronic media coverage. In response to a separate question about whether experience with coverage had changed their views, twenty nine out of 104[12] attorneys responding (28%) reported they were more favorable toward electronic coverage now than they had been prior to having experience with it, 4 (4%) said they were less favorable after experience, and 71 (68%) said their opinions had not changed.

Sixty-three percent of attorneys responding to the survey reported that they had been given adequate time to notify their clients after learning of the prospect of camera coverage, and most (76%) indicated they had been given an opportunity to object to coverage, although few (8%) had actually registered an objection. The majority of both district and appellate court attorneys responding thought the court had given adequate consideration to the views of counsel and of the parties in deciding whether to allow

10. No information was available for nine attorneys in the sampled cases.

11. In particular, of those attorneys responding to this item on the district court questionnaire, forty-six identified themselves as representing a plaintiff in the case, thirty-six identified themselves as representing a defendant, and two identified themselves as "other" (e.g., representing a respondent to a subpoena). Of the attorneys responding to the appellate questionnaire, eleven identified themselves as representing the appellant, eleven as representing the appellee, and one as "other."

12. Not all attorneys answered every question.

*Note:* The figure in each cell represents the percentage of responding attorneys selecting that answer. Items marked with an asterisk were presented only to attorneys in district court cases; other items were presented to attorneys in both district and appellate court cases.

## Table 4 (continued)

| Effect | To little or no extent | To some extent | To a moderate extent | To a great extent | To a very great extent | No opinion |
| --- | --- | --- | --- | --- | --- | --- |
| Distract attorneys (N = 103) | 7 | 20 | 9 | 0 | 1 | 1 |
| Prompt attorneys to be more courteous (N = 103) | 3 | 13 | 3 | 1 | 0 | 2 |
| Increase judge attentiveness (N = 101) | 4 | 12 | 10 | 9 | 1 | 12 |
| Prompt judges to be more courteous (N = 101) | 5 | 12 | 8 | 4 | 3 | 11 |
| Disrupt the courtroom proceedings (N = 103) | -- | 10 | 8 | 3 | 0 | 3 |

## Table 4. Attorney Ratings of Electronic Media Effects in Proceedings in Which They Were Involved, by Percentage*

| Effect | To little or no extent | To some extent | To a moderate extent | To a great extent | To a very great extent | No opinion |
| --- | --- | --- | --- | --- | --- | --- |
| Motivate witnesses to be more truthful than they otherwise would be (N = 70)* | 58 | 3 | 2 | 0 | 0 | 38 |
| Distract witnesses (N = 66)* | 52 | 18 | 9 | 5 | 0 | 17 |
| Make witnesses more nervous than they otherwise would be (N = 66)* | 46 | 21 | 12 | 5 | 2 | 15 |
| Increase juror attentiveness (N = 53) | 26 | 6 | 8 | 6 | 0 | 53 |
| Distract jurors (N = 54)* | 30 | 9 | 6 | 4 | 0 | 52 |
| Motivate attorneys to come to court better-prepared (N = 97) | 72 | 11 | 7 | 4 | 1 | 6 |
| Cause attorneys to be more theatrical in their presentations (N = 103) | 78 | 7 | 6 | 2 | 3 | 2 |

(continued)

electronic media coverage. Fifty eight percent of attorneys in the district courts and 84% of attorneys in the appellate courts did not believe their clients would have chosen to refuse coverage if given an absolute right to do so. Only one attorney reported having a witness or witnesses who declined to testify because of the prospect of camera coverage.

When asked whether the presence of cameras affected the overall fairness of the proceeding on which they had been involved, ninety-seven said camera presence had no effect on fairness, three said camera presence increased the fairness of the proceeding, and four said it decreased the fairness of the proceeding.

Table 4 shows the number of attorneys selecting each answer in response to questions about effects of electronic media coverage in the case in which they participated.

The table shows that attorneys with experience under the program who expressed an opinion generally indicated that various effects occurred "to little or no extent." These results are consistent with questionnaire results of judges who experienced electronic media coverage under the program.

## Telephone Interviews

### Method

In September and October 1993, we conducted telephone interviews with three groups of participants in the pilot program: (1) judges with the greatest amount of experience with electronic media coverage under the pilot program, (2) representatives of media organizations that covered cases under the pilot program, and (3) court staff responsible for the day-to-day administration of the program in each of the pilot courts. Members of each of these groups were asked specific questions about their experiences with electronic media coverage under the pilot program.[23]

The overall results from the interviews suggest that judges, media representatives, and court staff thought the Judicial Conference guidelines were very workable and that the pooling arrangements worked particularly smoothly. A number of interviewees said that the issue of whether habeas proceedings were eligible for coverage had been raised in their court. This issue—which was not addressed in the program guidelines—was resolved by the Committee on Court Administration and Case Management, which determined that post-conviction habeas corpus hearings (including death

23. Questions used in each set of interviews are on file in the Research Division of the Federal Judicial Center.

penalty habeas hearings) were eligible for coverage but preconviction habeas hearings were not.[24]

### Judges with Greatest Experience Under the Pilot Program

Twenty judges with the greatest experience with electronic media under the pilot program (as measured by the number of cases covered in which they presided on an appellate panel or were the presiding district court judge) were interviewed. This group comprised judges from each of the pilot courts and included four appellate judges, fifteen district judges, and one bankruptcy judge. Our database showed that these twenty judges were involved in sixty-seven proceedings covered under the program. The greatest number of covered cases in which any one judge was involved was five for district judges and five for appellate judges.

Experienced judges were asked a number of questions about their practices in allowing electronic media coverage under the pilot program; their perceptions regarding the effects of electronic media on attorneys, jurors, witnesses, themselves, and on courtroom decorum and the administration of justice; and their overall attitudes toward electronic media coverage.

### Representatives of Media Organizations That Covered Cases Under the Program

We interviewed representatives of media organizations that most frequently covered cases under the program. This included representatives from nine local news stations in the pilot court markets, two extended to coverage networks, two legal newspapers, and one national organization for radio and television news directors. Media representatives were asked how they learned about cases to court and made decisions about what to cover; how electronic media access to the courtroom had affected the quantity of their coverage; about their experiences with and views of the program, including the guidelines, and how they used courtroom footage to enhance coverage.

### Court Administrative Liaisons

Each pilot court designated an administrative liaison—generally a member of the clerk's office staff—to monitor activity under the pilot program, provide information to the FJC, and oversee the day-to-day administration of the program. Issues addressed in interviews with these individuals included the amount of time spent administering and overseeing the program,

24. The committee also determined that extradition hearings were ineligible for coverage.

what functions they performed in administering the program, whether any problems were encountered, and whether the guidelines were workable.

## Results

### Judge with Greatest Experience Under the Pilot Program

*1. Benefits and disadvantages of electronic media coverage.* Judges were asked what they saw as potential benefits and potential disadvantages of electronic media coverage of court proceedings, and whether they thought these effects were realized under the pilot program. Nearly all judges thought that educating the public about how the federal courts work was the greatest potential benefit of coverage, and most thought this benefit could be more fully realized with electronic media rather than traditional media. However, most judges said the educational benefit had been realized only to a moderate extent or not at all under the program. Several judges expressed the view that the education function was best served through extended coverage of proceedings rather than brief "snippets" of coverage. The potential disadvantage of electronic media coverage most frequently mentioned by judges was the possibility of distorting or misrepresenting what goes on in court, although generally they did not feel this problem had occurred under the program.

*2. Partners in ruling on applications.* Most of the judges interviewed had never denied coverage; those who had did so because the nature of the proceeding was particularly sensitive or the proceeding was being held in chambers. In reaching decisions on applications, about half of the judges either solicited the views of counsel and/or parties, or at least notified counsel of the prospect of camera coverage. Most judges also reported giving attorneys an opportunity to object to coverage, with several mentioning they have overruled objections on this issue on one or more occasions. Judges who heard attorney objections on the issue generally reported that this took only a small amount of their time. When asked, most judges expressed the view that coverage would be reduced considerably if parties or witnesses had an absolute right to refuse coverage in a case.

*3. Witness privacy issues.* District judges were asked whether they thought witness privacy concerns presented a problem for electronic media coverage in civil cases. Most said this was not a big problem in civil cases and that the presiding judge in a particular case would be able to address the problem if it arose. One judge thought that even though witness privacy could be an issue in some instances, "the public's right to know outweighs the privacy issue."

*4. Effects of electronic media on trial participants.* When asked about the effects of electronic media coverage on various trial participants, most judges

who had experienced electronic media in their courts reported no major or detrimental effects. Nearly all such district judges said they saw no significant effect of electronic media presence on jurors, with two indicating that jurors noticed the cameras for the first few moments of the trial but then ignored their presence. One district judge said that he had closely observed the result of a jury trial over which he presided and had spoken with jurors after the trial to determine whether the presence of a camera had had an effect; his conclusion was that the jurors were not concerned about the camera "nor was the result out of line." Most district judges explained the presence of cameras to jurors at the beginning of a trial, informing them that they would not be photographed, that the presence of cameras for a particular portion of a trial should not be considered significant, and that jurors should not watch coverage of the trial on television. All district judges indicated they were not aware of any instances in which jurors had viewed televised coverage of trials in which they were sitting as jurors.

Most district judges also did not observe an effect of cameras on witnesses, with one judge pointing out that because of the increasing use of video depositions, many witnesses are already "used to having cameras poked in their faces." Two judges said they thought witnesses were more affected than other trial participants, but they did not think the effect was strong.

Most district and appellate judges found electronic media to have no effect or a positive effect on the performance and behavior of counsel. As one judge said, "[counsel] shouldn't do anything for cameras they wouldn't do for me or the jury." Similarly, most judges thought they themselves were not affected by the presence of cameras, or that they were affected in a positive way (e.g. by being more vigilant regarding proper courtroom procedures).

*5. Courtroom decorum and the administration of justice.* District and appellate judges were also asked whether the presence of electronic media negatively affected courtroom decorum, and whether it interfered with the administration of justice in any cases in which they had been involved. All but one judge who responded to the decorum question said that the presence of electronic media did not negatively affect courtroom decorum; the judge who did report a negative effect described a case involving "a lot of politicians" in which counsel "played to the TV" and their "arguments were overly zealous and exaggerated." Two judges said that courtroom decorum could be even better preserved if cameras could be installed permanently in courtrooms in concealed locations.

With respect to effects on administration of justice, all but one judge thought the presence of electronic media had no effect. One judge was concerned that the click of a still camera at certain points in a proceeding "puts an exclamation point on certain testimony," but thought this was usually not a problem in civil cases.

6. *Effects on settlement.* District judges were asked whether, to the best of their knowledge, the prospect of camera coverage affected settlement in any cases before them. Although the majority of judges said they had not seen this, four said that this had happened in one or more of their own cases, one reported having seen it happen in other judges' cases, and one said that in settlement discussions with the parties in a case "there might have been a time or two when a party was being outlandish . . . and I might have suggested [that] would look interesting on TV."

7. *Experiences with the media.* Judges were also asked about their working relationship with representatives from the electronic media. All judges who had experience with cases in which camera coverage was pooled were satisfied with this arrangement, and most said that issues concerning pooling were not brought to the attention of the court. Two judges pointed out that the camera pooling resulted in fewer media representatives being present in the courtroom, because members of the press who would normally be in the courtroom would choose to watch the proceedings from a room down the hall where the electronic feed from the pool camera was sent and where they could continue other activities without disturbing the court (e.g., chat, make phone calls). Judges in courts for which a media coordinator had been hired were also pleased with how that system worked. All experienced judges also said—often very enthusiastically—that members of the media generally complied with the Judicial Conference guidelines and with any additional restrictions imposed by presiding judges, although one appellate judge related a concern about the "noisy shutters" of still cameras in a quiet courtroom, and another appellate judge mentioned an episode where a still photographer used a "bright flash" that he found distracting.[15]

8. *Administrative requirements.* Judges reported that involvement in the pilot program had very little effect on their administrative responsibilities except for the necessity of dealing with some additional paperwork and additional people in the cases covered by electronic media. Two judges who had served as media liaison judges for their courts reported a slightly greater time involvement than those who were not liaison judges, particularly when

the program was first starting. In general, however, judges said that court staff absorbed most of the administrative burdens of the program.

9. *Use of footage.* Judges were asked whether they thought the audio and video material obtained as a result of the program enhanced news coverage of the cases; they were also asked how electronic coverage compares to conventional coverage in terms of informing the public about the court's work. The majority thought that audio and video access enhanced news coverage and that electronic coverage was somewhat more beneficial and realistic than conventional coverage. Several judges pointed out that many people obtain their information these days through television rather than through the print press.

10. *Media knowledge.* Judges were asked whether they thought members of the media were generally well informed about cases that might be considered for coverage. About half thought the media were not well informed, with one judge lamenting that "they're poorly informed and I don't know how to get them informed without denigrating our impartiality." Others thought the media were reasonably well informed, particularly in courts where the media received information about upcoming cases from the court or a media coordinator. Several judges added that they thought some electronic media representatives were not well informed about court procedures. For example, one judge cited an instance in which a news story indicated that the judge had decided a case when in fact it had been decided by a jury; it appears, however, that misinformation such as this was an anomaly.

11. *Potential direct costs associated with electronic media coverage.* Judges were asked to comment on potential costs of electronic media coverage identified by the Judicial Conference in 1984, including the need for increased sequestration of jurors, increased difficulty empaneling an impartial jury in the event a retrial was necessary, and the need for larger jury panels. All judges responding to this question said they had not seen any evidence of these potential costs, although five mentioned they thought the potential costs would be of greater concern in criminal cases.

12. *Changes in the guidelines.* Though we asked, most judges did not suggest changes in the guidelines governing the program. There said in would be helpful for the guidelines to suggest how to handle and weigh litigant or witness objections to coverage. Another interviewee suggested that the guidelines cover where cameras can be placed in a courtroom. One appellate judge mentioned a preference for presumptive coverage (i.e., not requiring judge consent), at least for appellate proceedings. Finally, one judge suggested the media should be required to notify judges when their plans for coverage change.

15. Use of a flash attachment is prohibited by the guidelines.

13. *Overall attitudes toward coverage in real cases.* Consistent with the judge questionnaire results, when asked whether their attitudes toward electronic media coverage had changed after experience in the program, ten district judges indicated their attitudes had remained relatively stable, four said they are now more favorable toward electronic coverage, and one reported being less favorable. The judge who reported being less favorable explained that, "Originally [I] thought cameras would be a good thing; now, [I'm] not so sure. TV destroys the dignity of the courtroom . . . it does not give a true picture and more often than not distorts reality." In contrast, two judges who reported being more favorable now indicated that concerns they had about electronic media coverage were alleviated after experience. The three appellate judges who answered this question indicated that their attitudes had remained stable.

14. *Extension of electronic media coverage to criminal proceedings.* Finally, judges were asked whether, based on their experiences, they would recommend extending camera coverage to criminal proceedings. Seven district judges answered yes to this question, two said no, and three said they would favor expansion with some hesitancy (e.g., proceeding on a pilot basis, giving parties the option of not being photographed). Of the remaining two judges,[16] one said he had not thought about the issue and did not know what his view would be, and the other said he would not favor extending coverage if it could affect a defendant's decision regarding whether to testify. Of three appellate judges who answered this question, all said they would favor expanding coverage to criminal appellate proceedings, with two specifying they would not recommend allowing electronic media access to trial-level criminal proceedings.

### Media Representatives

1. *Overall experience with the program.* Overall, the media representatives interviewed were pleased with their experiences in the pilot program, and thought that federal court personnel and judges were very cooperative with the media. The pooling procedures worked smoothly, as most media organizations were already familiar with pooling arrangements from state court coverage or other contexts. Last-minute changes in court schedules generally did not pose a problem for media organizations, as they normally found out about these changes before sending a crew to the courthouse.

16. Some judges did not complete the full interview, either because of time constraints or because they did not think they had enough experience to answer specific questions.

2. *Information about proceedings to consider for coverage.* Most media representatives learned about proceedings that might be considered for coverage through a media coordinator (if there was one for the court they covered) or by their own tracking of a case once they had learned about it at the time of filing (i.e., prior to when schedules were set for case events). Representatives from legal newspapers said they have reporters who are constantly tracking cases in the local federal courts. Most media representatives also said that the media coordinators played an important function in keeping the media abreast of interesting cases—indeed, several suggested that media coverage would undoubtedly be increased through the presence of this type of coordinator for each court. In addition, media representatives said court staff or judges occasionally alerted them to upcoming cases that might be considered for coverage. Most media representatives thought they had generally been informed about cases with enough time to make coverage decisions, with some saying they would like the courts to provide more information to the media.

3. *Judgments about which cases to cover.* Media representatives reported they used the following criteria in deciding whether to cover cases with electronic media (in descending order of frequency of mention): whether the subject matter of the case had universal relevance or broad applicability; whether it was "newsworthy"; whether the story was relevant to local interests; and whether the case involved "high profile" litigants.

4. *Extent of coverage.* Most representatives from local news stations said their organizations did not generally cover cases electronically from start to finish, because of limitations on station resources. Aspects of proceedings most frequently mentioned as being covered included opening arguments, key testimony, closing arguments, and the verdict, all of which suggest an emphasis on trial proceedings. This is in contrast to extended coverage networks, representatives of which reported they cover proceedings from beginning to end ("gavel-to-gavel").

5. *Amount of coverage.* The majority of media interviewees from television stations said their organizations report on more cases now in the federal courts than they did before camera and audio access was allowed. Descriptions of this increase in coverage ranged from "maybe a tad bit more now" to "much more frequent [now]." Most local media representatives said that since the pilot program started they had reported on some cases in the pilot courts without including camera footage. When this occurred, it was most frequently because camera access was denied or the station or newspaper did not have a photographer available to cover the proceeding.

6. *Denial of access.* About half of the media representatives interviewed said their organization had been denied access to one or more proceedings. In addition, one extended-coverage network representative reported that the network declined coverage of one approved case because additional conditions were imposed that made coverage impractical. In particular, the presiding judge indicated that witnesses could not be covered if they objected to coverage, but this would not be known until each witness appeared to testify. This condition made it impossible for the network to plan coverage.

7. *Adequacy of lighting and sound systems.* Media representatives generally thought the lighting and sound systems in the federal courtrooms were technically adequate, although there were problems in some situations. One media representative said his organization did not rely on the court's sound system.

8. *Use of courtroom footage.* Local news media representatives were asked in what way audio and video material obtained through the pilot program enhanced news coverage of cases. The two most common responses to this question were that the use of courtroom footage produced a more realistic depiction of the proceedings and that it allowed viewers to see the expressions and emotions of the courtroom participants. As one respondent described, "Video tells a much better story than a sketch artist's rendition—one can see when a judge gets angry and the facial and body expressions of the parties."

9. *Experience with the program guidelines.* The majority of media interviewees said the program guidelines were applied consistently. When asked whether they would recommend changes in the program guidelines, they most frequently suggested extension of the program to criminal proceedings and shortening of the deadlines for media applications for coverage, or at least allowing for extenuating circumstances. Three interviewees, including representatives from two extended-coverage networks, suggested permitting two cameras in trial courtrooms. When respondents were explicitly asked how often their organizations would take advantage of the opportunity to use two cameras in trial courtrooms, the majority of local news station representatives said they would see this opportunity in half or fewer of the cases they covered, while extended-coverage network representatives indicated they would make use of two cameras in nearly every case. As one representative of an extended-coverage network pointed out, if only one camera is permitted and an attorney steps in front of that camera for half an hour, this causes serious problems for a network trying to broadcast an entire proceeding.

10. *Prediction about coverage of criminal cases.* Media representatives were asked if they could give a guess as to the level of coverage their organizations

would provide if it were possible to restrict criminal cases in the federal courts. Most predicted a substantial increase in the amount of coverage, although some – including representatives from two legal newspapers and one extended-coverage network – said their coverage would not increase much over what is being done for civil proceedings. Overall, the responses to this question ranged from a prediction of no increase in coverage to a prediction that coverage would increase "by a factor of ten."

## Court Administrative Functions

1. *Amount of time spent administering program.* Court personnel responsible for the day-to-day administration of the electronic media program in the pilot courts were asked what percentage of their time was spent administering and overseeing the program. These estimates ranged from 1% to 25% of their time, with most interviewees indicating that the time they spent on the program was greatest when it was first starting up and that the amount of time demanded of them fluctuated.

2. *Functions performed.* Court personnel performed the following functions in administering the program: received applications from the media and forwarded them to presiding judges; notified media of judges' decisions on coverage applications; generally served as liaison between the court and the media (e.g., informed media of problems that arose); notified security personnel when representatives of electronic media were coming to the courthouse; dealt with the media on days when they came for coverage, escorted them to courtrooms, and showed them where to set up; generally ensured that media representatives complied with the guidelines; and kept records to document application and coverage activity.

3. *Experience with the media and pooling arrangements.* Court administrators were very satisfied with the operation of pooling arrangements. Two interviewees said that at their courts the first media organization to file an application was automatically designated as the pool camera (i.e., the one located inside the courtroom). In all courts, it was up to the media to work out pooling arrangements, as required by the guidelines. The court administrators said that the media were very cooperative, although one mentioned that compliance with the dress code was occasionally a problem.

4. *Providing rate information to the media.* Court administrators were asked whether they ever provided information to media organizations about cases that might be considered for coverage. Three interviewees said they did not do this, three said they provided general information about cases pending in the court (e.g., a listing of scheduled cases or a copy of the court's calendar,

and there said that in some instances they approved the media of specific pending cases that might be interesting to cover.

5. *Time periods for applications.* Most of the administrators said that the advance notification periods set by their courts for coverage applications, which ranged from one hour to seven days, were not strictly enforced. Most also thought the time periods could be shortened without a great deal of additional burden, although they generally said that deadlines were good to have so that not all requests would be made at the last minute. As one administrator said, "If [there is a] late-breaking news story, we can't argue against a last-minute request—but this shouldn't become a habit."

6. *Media "no shows."* Administrators were asked whether they found it problematic when media representatives did not show up to cover an approved proceeding. Most did not think this was a problem, with four reporting it had never happened in their court.

7. *Problems in the administration of the program.* Administrators were asked whether they had encountered any problems in the overall administration of the program or in particular cases. Most reported no problems, with two reporting minor disruptions in particular proceedings.

8. *Issues not covered by the guidelines.* Court administrators were asked whether any situations had arisen in their courts that were not covered by the guidelines. Four responded that the issue of whether habeas proceedings could be covered under the program had been raised in their court.

9. *Changes in program guidelines.* Administrators were asked if they would recommend any changes in the program guidelines. Three said they did not have specific suggestions, four recommended expanding coverage to criminal proceedings, one suggested that courtrooms have cameras installed permanently (at media expense), and one suggested that interviews be allowed inside the courtroom after proceedings have adjourned.

## Content Analysis of Evening News Broadcasts

### Method

Part of the Center's evaluation, as approved by the Judicial Conference, involved an analysis of how courtroom footage obtained under the pilot program was used and what information about the recorded proceedings was made available to the public. Our main approach to this issue depended on a content analysis[12] of evening news broadcasts using footage obtained during the pilot program; this analysis was conducted by the Center for Media and Public Affairs under a contract with the FJC.[27]

Initially, the Ad Hoc Committee on Cameras in the Courtroom, at the request of the Center, required media organizations to provide any footage and photographs that were used on the air or published. At the request of media representatives who pointed out many practical problems, the requirement was modified to require only television footage to be submitted. The requirement was also changed from mandatory to voluntary after a test period that determined that an adequate number of tapes would be submitted voluntarily. The relaxation of the mandatory submission requirement means that the cases analyzed in the content analysis do not represent all stories produced under the program, or even a random sample of the stories produced; thus, conclusions based on this analysis must be viewed with caution.[29]

At three points (November/December 1991, April 1992, and May 1993) the Center requested footage obtained under the program. Stations responded to our requests for footage 58% of the time, either by provision of a tape or an explanation of why it could not be provided.[30] A total of ninety news stories were obtained for use in the content analysis. These stories, which covered thirty-six different cases, were broadcast on twenty television stations located in nine media markets.

The content analysis technique was used to examine how courtroom footage was used in the news stories, the type and quality of information provided to viewers about the particular cases covered, and the quality of information that news stories conveyed about the legal process.

12. Content analysis is the objective and systematic description of communicative material. The content analysis performed for this study proceeded in two phases. First, a qualitative analyst was used to identify the symbols, stylistic devices, and narrative techniques shaping the form and substance of the news stories; this allowed the researchers to develop analytic categories based on the actual content of the stories rather than imposing a priori categories. Second, the analytic categories that were developed and the were tested formed the basis of a quantitative analysis, which involved the systematic coding of story content into discrete categories.

28. The contractor's report and code book are on file with the Research Division of the FJC.

29. For example, it is conceivable—though we have no reason to believe this—that stations refrained from sending broadcast tapes containing uses of courtroom footage that they thought would be considered lacking in educational value.

10. Some requested footage could not be provided because the tapes were no longer available.

The Federal Judicial Center Evaluation   13

## Results

### Use of Courtroom Footage in News Reports

The content analysis revealed that in news stories on covered proceedings, footage from the courtroom occupied 59% of the total air time. The ninety stories analyzed presented a total of one hour and twenty-five minutes of courtroom footage, with an average of fifty-six seconds of courtroom footage per story. Across stations, the total amount of courtroom footage used ranged from a low of 20% of a story to a high of 97%. Stories that aired on the first day of the pilot program and that were generally aimed at explaining the media access available under the program used the least amount of courtroom footage, averaging 47% of air time. Stories covering cases over several days did not use a significantly higher proportion of courtroom footage than did stories covered on a single day.

The analysis also examined the extent to which courtroom footage was voiced over by a reporter's narration. On average, reporters narrated 61% of all courtroom footage.[11] The percentage of the story narrated by a reporter varied widely across stations and across cases covered, but did not appear to be related to either the length of the story or the nature of the case.

Overall, participants in the federal proceedings (witnesses, parties, attorneys) spoke on camera during or outside the proceedings for just under forty-seven minutes, or 31% of the total air time. Most stations used a mixture of participant statements from inside and outside the courtroom. Overall, plaintiffs were given 42% of the total air time that was devoted to participant statements, while defendants spoke for 17%.[12] Other participants who spoke in broadcast coverage included judges, outside experts or analysts, witnesses, and court personnel.

In addition to verbal coverage, visual patterns of courtroom coverage were also examined. For this analysis, each camera shot that appeared on screen was separated out. The results were similar to the analysis of speaking time, with plaintiffs (and their attorneys) shown in 30% of the shots that were devoted to participants, and defendants (and their attorneys) shown in 20% of these shots.

### Information Provided in Stories About the Cases Covered

A second aspect of the content analysis examined how well the stories conveyed the facts or details of the cases presented. Four variables were developed to assess the information provided in the stories: (1) identification of

11. With "first day" stories removed from the analysis, this drops to 63%.
12. These figures include the parties and their attorneys.

the participants; (2) descriptions of the nature of the matter before the court; (3) statements of the facts of the case; and (4) mentions of what the plaintiff sought in the case.

Overall, 91% of the stories identified the plaintiff and 86% identified the defendant; with first day stories removed from the analysis, all but one story identified the plaintiff and all but two identified the defendant. In addition, 100% of the non-first day stories mentioned the nature of the case (e.g., that it was a civil rights suit) before the court. In half of these stories, information on the nature of the case was provided by reporters or anchors without relying on the participants, while in 44% of the stories this information was provided by a combination of reporters and participants in the courtroom. The remaining 6% of stories conveyed information about the nature of the case through a combination of reporters and participants outside the courtroom.

The stories were also analyzed for information about the facts of the case, including who was involved in the proceedings, what happened to start the dispute between the parties, and when and where the events in question occurred. Ninety-nine percent of the non-first day stories provided at least two of these four elements. Most stories identified the parties involved and mentioned the reason the case was in court; the location and time of the events at issue were less frequently mentioned.

Finally, the stories were examined for a mention or explanation of what the plaintiff in the case was seeking or what would happen if the plaintiff prevailed. Sixty-two percent of the non-first day stories mentioned the plaintiff's goals, and 14% of the stories explained in more detail what the plaintiff sought. Virtually all (94%) statements of plaintiffs' goals were made by reporters.

An overall analysis of these measures reveals that most stories contained an explanation of the basic details of the case. Multiple day coverage of a case slightly improved the depth of coverage. Interestingly, there was no correlation between the percentage of courtroom footage used in the story and the performance in the above measures. The contractors conclude that "it would appear from viewing the tapes that the educational comments fre quently added color or emotion rather than substance to the discussion."

### Information Provided in Stories About the Legal Process

To determine the extent to which the stories provided basic educational information about the legal system, the content analysis of news stories also examined the information available to viewers about the legal process. The analysis examined whether five pieces of information were conveyed to the viewer: (1) identification of the case as a civil matter; (2) identification of the

type of proceeding (e.g., hearing, trial), (4) statements about whether a jury was present, (5) descriptions of the proceedings on a given day, and (6) discussion of the next step in the legal process.

The vast majority of stories (95% on first-day stories) did not identify the proceeding covered as a civil matter. In addition, 77% of the stories failed to identify the type of proceeding involved. Almost three-quarters (74%) of all stories did not provide information about whether a jury was present, including half of the stories that identified the covered proceeding as a trial.

Most stories (74%) did explain what transpired in court on a particular day, such as who testified or what evidence was presented. In multiple-day cases, 90% of the stories explained the daily proceedings, compared to 63% in single-day stories. Seventy-six percent of the daily proceedings in a story were explained by a combination of reporter narration and participant discussion. Only 29% of stories mentioned the next step in the litigation process in the case.

Thus, the stories did not provide a high level of detail about the legal process in the cases covered. In addition, the analysis revealed that increasing the proportion of courtroom footage used in a story did not significantly increase the information given about the legal process.

Overall, the content analysis revealed considerable variation—across both stations and cases—of the following: amount of courtroom footage used and its integration with other elements of the story; the information conveyed about the facts of the case and the legal processes involved; and the degree to which both sides of the case were presented. There were, however, certain patterns identified in the analysis.

First, most footage was accompanied by a reporter's narration rather than the story being told through the words and actions of the participants; thus, the visual information was typically used to reinforce a verbal presentation, rather than to add new and different material to the report. Second, plaintiffs and their attorneys received more air time than defendants and their attorneys. Third, the stories did a fairly good job of providing information to the viewer about the specific cases covered, however, the amount of courtroom footage was not related to the amount of information communicated. Fourth, the coverage did a poor job of providing information to viewers about the legal process.

## Collection of Information About Extended Coverage of Civil Proceedings

Because the content analysis was limited to televised evening news broadcasts, we also obtained information about most extended coverage provided by Court-TV and C-SPAN, which were the two national networks most active in the program. Each of these networks provided information to the Center—in the form of printed material and interview responses by network representatives—about the cases they had covered under the program and the content of their coverage.

Thirty-two cases in the pilot program received extended coverage between July 1, 1991, and June 30, 1993. FJC records indicate that most of these cases were in district or appellate courtrooms where two cameras operated. Network representatives said that working with a single camera causes problems for "gavel-to-gavel" coverage, because participants will occasionally block the camera for extended periods of time. As a result, they said that if two-camera access were allowed, they would take advantage of this opportunity in nearly every case covered.

Court-TV Network, which covered and broadcast twenty-eight cases under the program during the evaluation period, covers cases in their entirety when they are broadcast live. When taped proceedings are broadcast they are sometimes edited to take out moments of inactivity, such as sidebar conferences. Recaps of events that have occurred in the proceeding are provided at regular intervals, and experts in relevant areas of law provide commentary and analysis of the legal proceedings covered.

Similarly, C-SPAN, which covered and broadcast seven cases between July 1, 1991, and June 30, 1991, covers gavel-to-gavel and provides supplementary information to viewers about each case, including interviews with counsel, parties, and relevant interest groups concerning the proceeding being covered. In addition, C-SPAN representatives say they have conducted and broadcast interviews with judges in the cases being covered. In the interviews, judges were asked to talk about how the federal courts function and what being a federal judge involves, not about the specific case at hand.

Thus, according to network representatives, these networks provide extended coverage of proceedings as well as educational information about individual cases, substantive law, and court processes.

## Review of State Studies of Electronic Media Effects on Jurors and Witnesses

In response to an inquiry from the Committee on Court Administration and Case Management, we reviewed the results of studies others have done on the effects of electronic media on jurors and witnesses. The studies report that the majority of jurors and witnesses who experience electronic media coverage do not report negative consequences or concerns. These findings are consistent with what judges and lawyers in the pilot courts observed about jurors and witnesses in those courts.

Below we summarize results from studies conducted in state courts (Arizona, California, Florida, Hawaii, Kansas, Maine, Massachusetts, Nevada, New Jersey, New York, Ohio, and Virginia) of the potential effects of electronic media on witnesses and jurors.[10] For witnesses, researchers have looked at such effects as distraction, nervousness, distortion or modification of testimony, fear of harm, and reluctance or unwillingness to testify with electronic media present. For jurors, researchers examined such effects as distraction, effect on deliberations or case outcome, making a cause or witness seem "more important," and reluctance to serve with electronic media present. Most state evaluations have studied jurors and witnesses through surveys, although California researchers also observed the behaviors of jurors and witnesses in proceedings covered and not covered by electronic media.

We should note that in all of the state courts whose evaluations are discussed here, electronic media coverage was allowed in criminal as well as civil cases, and the majority of coverage was in fact in criminal cases. As pointed out by several judges interviewed in our study, certain effects could be expected to occur to a greater extent in criminal cases than in civil cases (e.g., a witness' fear of harm from being seen on television). Thus, it might

be expected that the findings of these studies would be more negative than findings from studies based solely on experiences in civil cases.

### Effects on Witnesses

- *Distraction* One concern is that witnesses in cases covered by electronic media will be distracted and unable to focus on their testimony. A number of state evaluations addressed this issue in surveys and found that, although a small number of witnesses reported being distracted, the vast majority of witnesses reported no distraction at all or only initial distraction.

- *Nervousness* Another concern is that witnesses will be made nervous by the presence of electronic media, that this nervousness will make them uncomfortable, and thus that jurors will find it difficult to judge the veracity of their testimony. In state studies that asked witnesses about nervousness, the great majority said they were not at all or were only slightly nervous due to the presence of electronic media during their testimony. In addition, jurors in a 1991 New York survey were asked whether the credibility of witnesses was affected by their relative insecurity or tenseness caused by audio or visual coverage. The majority of jurors indicated that "not at all" affect the credibility of witnesses, and most indicated that the presence of audio and visual media did not in fact tend to make witnesses appear tense or insecure. Similarly, over 90% of responding jurors in Florida and New Jersey surveys said the presence of electronic media had "no effect" on their ability to judge the truthfulness of witnesses.

Finally, in addition to surveying witnesses, the consultants who conducted the California study systematically observed proceedings in which electronic media were and were not present. They concluded that witnesses were equally effective at communicating in both sets of circumstances.[14]

---

10. Studies of the effects of electronic media in state courts have generally been conducted by state court administrators, special advisory committees appointed by the court, bar associations, or outside consultants. A handful of state studies other than those mentioned here address juror and witness issues; we did not include all of them, however, because some reports do not provide enough detail about methods to them, however, because some reports do not provide enough detail about methods to determine what questions were asked and how, and others used methods we did not consider sufficiently rigorous to rely on for this evaluation (e.g., a judge polling one jury after a trial about whether cameras affected them). But even the less rigorous studies tend to report results that are similar to our findings and other state court findings. A more detailed description of the studies summarized in this report is on file with the Research Division of the FJC.

14. In an experimental study comparing the effects of conventional and electronic media coverage on mock witnesses and jurors, researchers at the University of Minnesota found that witnesses who were covered by electronic media reported being more distracted and more nervous about media presence than witnesses who were covered by conventional media. There was no difference between the two conditions, however, in mock juror perceptions of the quality of witness testimony, including ratings of the extent to which the testimony was believable. See Eugene

---

28   Electronic Media Coverage of Federal Civil Proceedings

The Federal Judicial Center Evaluation   19

- *Distraction.* If the presence of cameras were distracting to jurors, this could decrease their ability to concentrate on testimony, potentially affecting the outcome of the proceedings. The state court results, however, suggest that this is not a problem for the majority of jurors. In California, results of the observational portion of the study indicated that jurors in proceedings covered by electronic media were slightly more attentive to testimony than jurors in proceedings not covered by electronic media. In addition, when asked about their level of distraction from the electronic media presence, most jurors responding to surveys in state court evaluations indicated they were not distracted or were distracted only at first.

- *Effect on deliberations or outcome.* Some commentators on electronic media in the courtroom fear that coverage will influence jurors' decisions—for example, by creating more public pressure to decide the case in a particular way. At least four state studies have surveyed jurors about this issue; all found that the vast majority said there was no influence of electronic media coverage on their deliberations or that they did not feel pressured by the media to decide the case in a particular way. In addition, the California researchers found that jurors who had experience with electronic media coverage were less likely to think it would affect the outcome of trials than did jurors who did not have experience with electronic media coverage.

- *Highlighting importance of a case or witness.* Another concern about cameras in the courtroom is their potential to distort the importance of a case or, if present only for a portion of the proceedings, that they will make jurors think certain witnesses or testimony are more important than others. The state court results on this issue indicate that the majority of jurors do not think the presence of electronic media signals that a case or witness is more important, although a minority do think it lends importance to the case (very few think it makes a witness more important).

- *Reluctance to serve as a juror.* There is some concern that allowing camera access to proceedings will make it more difficult to impanel juries because some prospective jurors will try to avoid jury duty in a particular case if they think it will be covered by electronic media. Again, the state court results suggest that this is not

- *Distortion or modification of testimony.* One of the more serious concerns is that witnesses who testify will distort or modify their testimony because of the presence of electronic media. In state court evaluations in which this issue was addressed, most witnesses reported that the presence of electronic media had no effect on their testimony and did not make it more difficult for them to testify. A small number of witnesses indicated an inhibitory effect.

- *Fear of harm.* Several surveys in state studies asked witnesses—most of whom had testified in criminal trials—whether the presence of electronic media caused them to fear they would be harmed. Most witnesses surveyed said they had no fear of harm stemming from electronic media coverage of a proceeding in which they testified, although a minority said they did fear harm to some extent.

- *Reluctance to testify with electronic media.* Surveys in several states asked witnesses if they were reluctant to testify at all because of electronic media or if they would be reluctant to testify again in a proceeding covered by electronic media. In general, about 80% to 90% of witnesses said the presence of electronic media did not affect their desire to participate or would not affect their willingness to serve as a witness in a future proceeding, a finding closely parallel to the attorney survey responses on this issue in our study.[15]

## Effects on Jurors

As in the federal pilot program, most state programs discussed here did not allow electronic media coverage of jurors. In some programs, the jury could be shown in the background of a shot, but no individual juror could be shown in an identifiable way. Other kinds of problems have, however, been posited.

Borgida et al., *Cameras in the Courtroom: The Effects of Media Coverage on Witness Testimony and Juror Perceptions,* 14 Law & Hum. Behav. 489 (1990).

15. In our attorney survey, we asked attorneys who participated in proceedings covered by electronic media whether they had any witnesses who declined to testify because of the prospect of electronic media coverage. Out of sixty-eight district court attorneys responding to this question, sixty-three (93%) reported they had no witnesses who declined to testify, one reported they had, and four reported they couldn't say.

likely to be a problem, with the vast majority of jurors reporting that the presence of electronic media would not affect their willingness to serve in a future proceeding.

The results summarized above are consistent with our findings from the judge and attorney surveys; that is, for each of several potential negative effects of electronic media on jurors and witnesses, the majority of respondents indicated the effect does not occur or occurs only to a slight extent, while a minority indicated the effects occur to more than a slight extent. The state court findings, to the extent they are credible, lend support to our findings and the recommendations made in our initial report.

Although indications from even a small number of participants that cameras have negative effects can be cause for concern, perhaps these concerns are addressed adequately by the federal court guidelines. These guidelines give the judge trying the case discretion to limit or prohibit, if necessary, coverage of any proceeding or of a particular witness or witnesses. In addition, coverage of jurors is proscribed (see Appendix).

# Recommendations

Note that these are recommendations of the research project staff, not of the Federal Judicial Center or its board.

## On Access Generally

Recommendation 1: The research project staff recommends that the Judicial Conference authorize federal courts of appeals and district courts nationwide to provide camera access to civil proceedings in their courtrooms, subject to guidelines (as discussed below). This recommendation is based on information obtained in response to questions presented by the Judicial Conference and addressed in this report and does not imply any position on legal or constitutional issues.

Explanation: The converging results from each of our inquiries suggest that members of the electronic media generally complied with program guidelines and that their presence did not disrupt court proceedings, affect participants in the proceedings, or interfere with the administration of justice. To the extent decisions about expanding access would rest on these considerations, our results support expansion.

## On Guidelines

Recommendation 2: The research project staff recommends that if the committee and Conference decide to continue or expand the program, the guidelines in effect for the pilot program remain in effect, subject to the modifications recommended in the Center's initial report (and set forth as Recommendations 3, 4, and 5 below).

Explanation: As we reported, judges, court staff, and media representatives all indicated that the guidelines are very workable and provide judges with the discretion needed to deny or limit electronic media coverage based on the circumstances of a particular case.

Recommendation 3: The research project staff recommends that the guidelines be modified to call for a standard practice of informing counsel or a party appearing pro se that an application for media coverage has been re-

43

cerved. We do not recommend that there be guidelines for ruling on these applications.

**Explanation:** Some attorneys responding to our survey complained that they were not informed about electronic media coverage prior to appearing for a hearing or trial. Because most judges are willing to entertain attorney and party objections, a notice requirement seems reasonable. However, experience in the pilot program suggests that conditions that might warrant denial of an application are so specific that guidelines would have to be so general as to provide little help. The inevitably general guidelines would then be likely to produce unnecessary motion activity. The basic questions arising from the assertion of personal right to privacy and the public right to know should be left for decision in the normal course of litigation.

**Recommendation 4:** The research project staff recommends that the guidelines be modified to reflect the committee's determinations regarding the eligibility of extradition and habeas proceedings for electronic media coverage.

**Explanation:** We learned in telephone interviews that the issue of whether habeas proceedings could be covered was raised in several of the pilot courts. If the program is continued or expanded, we recommend the committee's determinations on these issues be incorporated into the guidelines so they will not be raised anew by media representatives unaware of the committee's determinations.

## On Facilities

**Recommendation 5:** The research project staff recommends that the guidelines be revised to permit two television cameras in trial courtrooms and appellate courtrooms.

**Explanation:** The absence of problems reported from the Southern District of New York suggests that permitting two cameras in trial courtrooms does not cause additional disruptions. In addition, permitting two television cameras in the trial courtroom encourages coverage by extended-coverage networks, which provide the type of coverage that most judges favor. The majority of cases covered under the program by extended coverage networks were in courts (both trial and appellate) that allow two television cameras, and represen-

tatives from extended coverage networks indicated in interviews that the ability to use two cameras is important when providing "gavel to gavel" coverage of proceedings. In comparing the type of coverage provided by extended-coverage networks to the type of coverage analyzed in the content analysis, it would appear that extended coverage likely serves a greater educational function, which is a function judge interviewees identified as the greatest potential benefit of allowing electronic media access to the courts. Judges would retain discretion under the guidelines to limit the number of cameras in a particular case.

**Recommendation 6:** The research project staff recommends that media organizations be invited to submit to the Committee on Court Administration and Case Management proposals for constructing and regulating use of permanent camera facilities in federal courthouses.[16]

**Explanation:** Several interview and questionnaire respondents (including judges, court administrators, attorneys, and media representatives) expressed the view that electronic media coverage of proceedings would be least intrusive if cameras were installed permanently in federal courtrooms. Most who raised the issue suggested this be done at media expense.

## The Issue of Judge Opt-Out

In our initial report, we brought the following issue to the attention of the Committee on Court Administration and Case Management without making a recommendation.

Another policy issue the committee and Conference may want to consider is the extent to which individual judges in a court should be able to opt out completely from allowing electronic media coverage in their courtrooms. Media representatives argue that the question of coverage should not depend on the fortuity of the judge to whom a case is assigned, and several judges in the pilot program expressed disappointment at the less-than-full participation of their court. On the other hand, judges who chose not to

16. Subject to numerous assumptions set forth in more detail in our Supplemental Report to the Committee on Court Administration and Case Management (January 18, 1994), we estimate the cost of permanently equipping one federal courtroom for electronic media coverage of cases would be $70,000–$125,000. The Supplemental Report is on file with the Research Division of the FJC.

participate in the program have strong objections to coverage, as indicated by their questionnaire responses and comments.

**Explanation:** This issue is entirely one of policy and is not addressed by the research project. Research staff has no empirical basis on which to make a recommendation on the relative values of uniform practice and individual judge control.

# Appendix

## Guidelines for the Pilot Program on Photographing, Recording, and Broadcasting in the Courtroom

(Approved by the Judicial Conference of the United States, September 1990. Revised June 1991.)

### 1.  General Provisions.

(a)  Media coverage of federal court proceedings under the pilot program on cameras in the courtroom is permissible only in accordance with these guidelines.

(b)  Reasonable advance notice is required from the media of a request to be present to broadcast, televise, record electronically, or take photographs at a particular session. In the absence of such notice, the presiding judicial officer may refuse to permit media coverage.

(c)  A presiding judicial officer may refuse, limit, or terminate media coverage of an entire case, portions thereof, or testimony of particular witnesses, in the interests of justice to protect the rights of the parties, witnesses, and the dignity of the court; to assure the orderly conduct of the proceedings; or for any other reason considered necessary or appropriate by the presiding judicial officer.

(d)  No direct public expense is to be incurred for equipment, wiring, or personnel needed to provide media coverage.

(e)  Nothing in these guidelines shall prevent a court from placing additional restrictions, or prohibiting altogether, photographing, recording, or broadcasting in designated areas of the courthouse.

(f)  These guidelines take effect July 1, 1991, and expire June 30, 1994.

### 2.  Limitations.

(a)  Coverage of criminal proceedings, both at the trial and appellate levels, is prohibited.

(b)  There shall be no audio pickup or broadcast of conferences which occur in a court facility between attorneys and their clients, between co-counsel of a client, or between counsel and the presiding judicial officer, whether held in the courtroom or in chambers.

47

(c) No coverage of the jury, or of any juror or alternate juror, while in the jury box, in the courtroom, in the jury deliberation room, or during recess, or while going to or from the deliberation room at any time, shall be permitted. Coverage of the prospective jury during voir dire is also prohibited.

3. **Equipment and Personnel.**

(a) Not more than one television camera, operated by not more than one camera person and one stationary sound operator, shall be permitted in any trial court proceeding. Not more than two television cameras, operated by not more than one camera person each and one stationary sound person, shall be permitted in any appellate court proceeding.

(b) Not more than one still photographer, utilizing not more than one camera and related equipment, shall be permitted in any proceeding in a trial or appellate court.

(c) If two or more media representatives apply to cover a proceeding, no such coverage may begin until all such representatives have agreed upon a pooling arrangement for their respective news media. Such pooling arrangements shall include the designation of pool operators, procedures for cost sharing, access to and dissemination of material, and selection of a pool representative if appropriate. The presiding judicial officer may not be called upon to mediate or resolve any dispute as to such arrangements.

(d) Equipment or clothing shall not bear the insignia or marking of a media agency. Camera operators shall wear appropriate business attire.

4. **Sound and Light Criteria.**

(a) Equipment shall not produce distracting sound or light. Signal lights or devices to show when equipment is operating shall not be visible. Moving lights, flash attachments, or sudden light changes shall not be used.

(b) Except as otherwise approved by the presiding judicial officer, existing courtroom sound and light systems shall be used without modification. Audio pickup for all media purposes shall be accomplished from existing audio systems present in the court facility, or from a television camera's built-in microphone. If no technically suitable audio system exists in the court facility, microphones and related wiring essential for media purposes shall be unobtrusive and shall be located in places designated in advance of any proceeding by the presiding judicial officer.

5. **Location of Equipment and Personnel.**

(a) The presiding judicial officer shall designate the location in the courtroom for the camera equipment and operators.

48   Electronic Media Coverage of Federal Civil Proceedings

(b) During the proceedings, operating personnel shall not move about nor shall there be placement, movement, or removal of equipment, or the changing of film, film magazines, or lenses. All such activities shall take place each day before the proceeding begins, after it ends, or during a recess.

6. **Compliance.**

Any media representative who fails to comply with these guidelines shall be subject to appropriate sanction, as determined by the presiding judicial officer.

7. **Review.**

It is not intended that a grant or denial of media coverage be subject to appellate review insofar as it pertains to and arises under these guidelines, except as otherwise provided by law.

**Guidelines Addendum:**

The Judicial Conference Committee on Court Administration and Case Management made a number of recommendations in a June 1991 report to the Judicial Conference Executive Committee. The recommendations, subsequently approved, include:

(1) That the Executive Committee endorse the [CACM] Committee's interpretation that the ban on the changing of film included in guideline 5(b), does not include the changing of video cassettes.

(2) That the Executive Committee approve an expansion of the experiment to permit the Southern District of New York to allow the use of two cameras during court proceedings.

(3) That the Executive Committee direct the Committee on Court Administration and Case Management to notify courts that strict adherence to the guidelines approved by the Conference is a condition for participation as a pilot.

Appendix: Guidelines for the Pilot Program   49

# About the Federal Judicial Center

The Federal Judicial Center is the research, education, and planning agency of the federal judicial system. It was established by Congress in 1967 (28 U.S.C. §§ 620–629), on the recommendation of the Judicial Conference of the United States.

By statute, the Chief Justice of the United States chairs the Center's Board, which also includes the director of the Administrative Office of the U.S. Courts and six judges elected by the Judicial Conference.

The Court Education Division develops and administers education and training programs and services for nonjudicial court personnel, such as those in clerks' offices and probation and pretrial services offices, and management training programs for court teams of judges and managers.

The Judicial Education Division develops and administers education programs and services for judges, career court attorneys, and federal defender office personnel. These include orientation seminars and special continuing education workshops.

The Planning & Technology Division supports the Center's education and research activities by developing, maintaining, and testing technology for information processing, education, and communications. The division also supports long-range planning activities in the Judicial Conference and the courts with research, including analyses of emerging technologies, and other services, as requested.

The Publications & Media Division develops and produces educational audio and video programs, multimedia, and coordinates the production of all Center publications, including research reports and studies, educational and training publications, reference manuals, and periodicals. The Center's Information Services Office, which maintains a specialized collection of materials on judicial administration, is located within the division.

The Research Division undertakes empirical and exploratory research on federal judicial processes, court management, and sentencing, and its consequences, often at the request of the Judicial Conference and its committees, the courts themselves, or other groups in the federal court system.

The Center's Federal Judicial History Office develops programs relating to the history of the judicial branch and assists courts with their own judicial history programs.

The International Affairs Office serves as a clearinghouse for the Center's work with state and federal judicial councils and coordinates programs for foreign judiciaries, including the Foreign Judicial Fellows Program.