TAB 6

### ADMINISTRATIVE OFFICE OF THE COURTS
Report Summary

**Task Force on Photographing, Recording and Broadcasting in the Courtroom**          February 16, 1996

SUBJECT:   Review the Task Force Report and Approve its Circulation for
           Comment  (Action Required)

On October 27, 1995, Chief Justice Lucas announced the appointment of a special
task force to review California Rules of Court, rule 980 concerning photographing,
recording, and broadcasting in the courtroom.  Since the end of November 1995,
the 13-member task force has met four times in person and many times by
conference call; conducted a statewide survey of judges, public defenders, and
prosecutors; solicited the views of many bar groups; attended an educational forum
and hosted a public hearing on the topic of cameras in the courtroom; and received
and reviewed scores of letters, telephone calls, reports, newspaper and journal
articles, previously conducted studies, and other information.

The Rules and Forms Committee considered the proposed amended rule on
February 15, 1996, and will report to the Judicial Council on February 23, 1996.

Recommendation

The Task Force on Photographing, Recording, and Broadcasting in the Courtroom
recommends that the Judicial Council (1) approve the attached report, including
the proposed amended rule 980, for circulation and (2) request the task force to
report back to the Judicial Council at the business meeting set for May 17, 1996.

The text of the proposed amended rule is at page 19.

**JUDICIAL COUNCIL OR CALIFORNIA**
**ADMINISTRATIVE OFFICE OF THE COURTS**
303 Second Street, South Tower
San Francisco, California  94107
Phone 415/396-9100•FAX 415/396-9388


TO:             Members of the Judicial Council

FROM:           Task Force on Photographing, Recording and Broadcasting in
                the Courtroom
                Hon. Richard Huffman, Chair
                Ms. Dale Anne Sipes, Staff Coordinator

DATE:           February 16, 1996

SUBJECT:        Review Task Force Report and Approve its Circulation for
                Comment (Action Required)


## Contents

|  | Page |
|---|---|
| I. Background...................................................................... | 2 |
|    A.  History of Rule 980.................................................... | 2 |
|    B.  Cameras in the Courtroom in Other Jurisdictions.................... | 3 |
| II.  Task Force Review and Analysis....................................... | 4 |
|    A.  Present Task Force Charge........................................ | 4 |
|    B.  Task Force Methodology.......................................... | 4 |
|    C.  Commentary Received by Task Force............................ | 5 |
|    D.  Task Force Analysis on Issue of Whether to Ban Cameras..... | 9 |
|    E.  Task Force Analysis on Other Major Issues....................... | 11 |
| III.  Recommendation to Judicial Council............................... | 17 |
| Appendices................................................................. | 18 |
|    A--Text of Proposed Amended Rule 980....................... | 19 |
|    B--Snapshot Survey Results.................................... | 24 |
|    C--List of Persons Offering Oral and Written Testimony.............. | 30 |

## I. Background

### A. History of Rule 980

Film and electronic media coverage of criminal and civil courtroom proceedings at the trial and appellate levels in the California state courts has been allowed on a permanent basis since July 1, 1984, when new rule 980 of the California Rules of Court took effect.

The permanent rule governing film and electronic coverage was the culmination of a five-and-a-half-year process during which the question of such coverage was considered by a special committee of the Judicial Council of California. An experimental rule was adopted, and the effect of film and electronic media coverage was reviewed. California was the first state to conduct a statewide evaluation of such an experiment.

The Judicial Council embarked on the evaluation process in December 1978, when it approved a one-year experimental program to permit broadcasting and photographing of court proceedings in selected courts with the judge's and parties' consent and without cost to the council or the courts. It also recommended the appointment of an advisory committee to develop a program for coverage, draft necessary rules, and suggest evaluation procedures.

In January 1979, the Chief Justice appointed the 28-member Special Committee on the Courts and the Media. The experimental program began on July 1, 1980. Subsequently, the council extended the expiration date of the rules to December 31, 1981, to permit review of a report by an outside consultant who monitored and evaluated the experiment, before considering adopting the rules as permanent. In consideration of the consultant's final report and recommendations, the council on January 1, 1982, repealed one of the rules, substituted some new language, and extended the expiration date of the experimental rules to December 31, 1982. The council once again extended the expiration date of the experiment to December 31, 1983. This allowed further evaluation of comments received regarding the effects of coverage on witnesses and jurors.

At its November 19, 1983, meeting the council authorized the circulation for comment the text of a draft permanent rule permitting film and electronic media coverage of courtroom proceedings. The expiration date of the experimental rules was extended to June 30, 1984, to allow time for comment on the draft permanent rule. The permanent rule took effect July 1, 1984.

In evaluating the experiment begun in 1980, two major questions were considered:

(1) Will the presence and operation of broadcast, recording, or photographic equipment in a courtroom be a significant distraction for trial participants, disrupt proceedings, or impair judicial dignity and decorum?

(2) Will trial participants or prospective trial participants, knowing that their words or pictures will be or are being recorded for possible use on television and radio or in newspapers and magazines, change their behavior in a way that interferes with the fair and efficient administration of justice?

According to the consultant's report on the experiment, during the 15-month testing period, there was little awareness of, or distraction caused by, media presence. Among the findings:

- Three-quarters of those surveyed were either unaware or "a little aware" of the coverage.

- Four-fifths of the participants surveyed either were not distracted by the extended media coverage or were distracted only at first.

- Ninety percent of the judges and attorneys surveyed said the presence of cameras interfered only slightly or not at all with courtroom dignity and decorum.

- Twenty-five percent of the jurors said there was a negative impact on the courtroom environment.

- Most judges, attorneys, and jurors said the media coverage did not affect the behavior of the various participants.

## B. Cameras in the Courtroom in Other Jurisdictions

Most states have some laws—whether permanent, experimental, or a mix— concerning cameras in the courtroom. Some allow such coverage only at the appellate level; others allow coverage of only certain types of cases. Three states do not permit cameras in court: Indiana, Mississippi, and South Dakota.

The use of cameras in the federal courts has been allowed on an experimental basis. A pilot project, approved by the policymaking Judicial Conference of the United States in September 1990 and begun in July 1991, permitted the photographing, recording, and broadcasting of civil proceedings in circuit courts in

San Francisco and New York, as well as district courts in Indiana, Massachusetts, Michigan, New York, Pennsylvania, and Washington. In 1994, the Judicial Conference voted to end the three-year experiment. The ban on such coverage, dating back to 1937, was restored. In 1996, the conference intends to review the cameras in the courtroom issue, including a proposal that would let each of the 13 federal appeals courts decide for themselves whether to allow television and radio coverage of appellate hearings.

## II. Task Force Review and Recommendations

### A. Present Task Force Charge

The Task Force on Photographing, Recording, and Broadcasting in the Courtroom was appointed in October 1995 and charged with:

1. Evaluating whether rule 980 should be amended or remain as it currently appears in the California Rules of Court;

2. Evaluating if criteria to be applied by the court in determining whether to allow film and electronic equipment in courtrooms should be revised;

3. Evaluating whether film and electronic media coverage should be prohibited in all state court proceedings, in certain types of proceedings, or in certain portions of proceedings;

4. Evaluating whether there should be an expansion of the circumstances under which film and electronic media coverage of state court proceedings is now permitted;

5. Evaluating the criteria for the operation of cameras and other electronic recording equipment, including pool cameras, in courtrooms.

### B. Task Force Methodology

Since the end of November 1995, the 13-member task force has met four times in person and many times by conference call; conducted a statewide survey of judges, public defenders, and prosecutors; solicited the views of many bar groups; attended an educational forum and hosted a public hearing on the topic of cameras in the courtroom; and received and reviewed scores of letters, telephone calls, reports, newspaper and journal articles, previously conducted studies, and other information.

The task force determined early in the examination of the issues to divide deliberations into two substantive categories:

(1) whether film and electronic media should be barred from using their equipment in all California courtrooms; and

(2) whether and to what extent existing California Rules of Court, rule 980 should be amended to alter the manner in which the trial courts deal with requests for film and electronic media coverage.

Pursuant to such determination, the task force was divided into subcommittees to investigate both issues and to make recommendations. The report which follows is thus separated into these two broad areas, the question of closing the courts to cameras and the proposed amendments to rule 980.

First, however, is an outline of the general nature of the material presented to the task force to assist it in arriving at its recommendations.

### C. Commentary Received by the Task Force

The task force received a substantial amount of written material from participants on both sides of the controversy. In addition, the members attended a forum at McGeorge School of Law in Sacramento and held a public hearing in San Francisco in order to gain as much knowledge as possible of the views of judges, journalists, victims' rights organizations, representatives of various segments of the bar, and members of the public.

### 1. Proponents of a Ban on Cameras in the Courtroom

Following the Simpson trial in Los Angeles, a number of persons have called for an outright ban on cameras in the courtroom for all California trial courts. Many of the proponents of such a ban have argued this particular form of coverage detracts from the dignity and solemnity of court proceedings and intrudes on privacy interests of witnesses, jurors, victims, and defendants. In particular, proponents of a ban point to the undisputed media excesses in the coverage of the Simpson case and the perceived impact of the expanded coverage on the trial participants. They conclude the benefit of increased public access to trials is offset by the "circus-like" atmosphere that can easily be created in a high-profile case.

In support of a ban, we received a letter from State Senator Quentin Kopp opposing the use of cameras in all California trial courts, civil and criminal. We

also heard from the Governor's Legal Affairs Secretary, Mr. Daniel Kolkey, who conveyed the Governor's concern about cameras in criminal trial courtrooms because of the potential for impairing the dignity of court proceedings and the erosion of public confidence that can occur from a trial where the participants are substantially affected by the publicity. Also of concern was the potential adverse impact of such coverage on witnesses and jurors. The Governor, through Mr. Kolkey, thus urged that cameras be banned from all criminal trials.

The task force also considered the materials prepared by the Rule 980 Committee of the Superior Court of Los Angeles, whose findings were endorsed by the presiding judge and the supervising criminal judge of that court. Further, the Superior Court of Los Angeles designated Judge Mary Ann Murphy to speak to the task force at its public hearing.

From the materials and testimony presented, we may conclude that the Los Angeles experience with high-profile cases is unique in the state. While most counties have experienced some film or electronic media courtroom coverage, few have any experience close to that of Los Angeles, where at any time there may be six or seven truly high-profile cases in progress, all with requests for extended media coverage. The institutional factors of court staff and resources, as well as physical access to court facilities, are all severely impacted by this form of news coverage in that county.

Moreover, Los Angeles judges have sometimes directly experienced adverse impacts on their courts from media conduct in the hallways or from reported intrusions on the privacy of jurors and witnesses. They have been forced to deal with violations of court orders which have adversely affected the conduct of trials or the privacy of witnesses. Trial judges have experienced the phenomenon of media "experts" commenting, nightly in some cases, as to which side won and lost which points in trial, much like coverage of professional football games. For all these reasons, representatives of the Superior Court of Los Angeles have urged an outright ban on cameras in the courtroom.

### 2. Snapshot Survey of Judges, Prosecutors, and Public Defenders

In order to gain as much pertinent advice as possible from all California judges, we distributed survey questionnaires to each member of the judiciary at the trial and appellate levels. We received over 600 responses, which is fairly large response, particularly considering that the forms were sent out during the winter holiday season.

6

Appendix B to this report includes a complete review of important survey findings, including the following:

### All Judge-respondents

- 55 percent prefer that video cameras be banned from courtrooms

- 63 percent indicate that the courtroom presence of video cameras impairs judicial dignity and courtroom decorum

- 70 percent indicate video broadcast media in the court have a negative effect on parties' right to a fair trial

- 69 percent would prefer to have discretion to allow video broadcast media in the courtroom

- 59 percent note that the O.J. Simpson trial changed their opinion of the value of broadcast media in the courtroom; of these, 59 percent now believe televised court proceedings are less valuable than they believed before the O.J. Simpson trial

- 51 percent believe Rule 980 needs modification

### Judge-respondents Who Reported Experience with Cameras in Their Court

- 96 percent reported that the presence of a video camera did not affect the outcome of the hearing or trial in any way

- 77 percent reported no affect on their ability to maintain courtroom order and control of proceedings

- 68 percent reported at least a small increase in their administrative/supervisory burden

- 81 percent believed the video camera did not intrude into the attorney-client privilege

- 86 percent reported no decrease in persons willingness to serve as jurors as a result of video broadcast media in the courtroom

• 75-80 percent noted there were not more attempts made to offer unnecessary motions, evidence, or witnesses in cases where the judge allowed a video camera in the courtroom

Coming directly on the heels on the O.J. Simpson experience, it is not surprising that judges have more negative ideas about cameras in the courtroom than they did in the early 1980s. Although the majority of our judge-respondents favored a ban, those judges who actually had experience with cameras in their courts tended to be less likely to support a total ban. The clear majority (69%) favored strengthening the discretionary authority of judges to deal with film and electronic media. Many respondents had specific suggestions about how to improve rule 980 (detailed in Appendix B, Attachments 4 and 5) in order to avoid the negative or potential negative impact of video broadcast media in court.

The task force also sent surveys to the elected district attorneys and the heads of various public defender's offices, but we did not receive a statistically significant sampling of those persons' views. Those who did respond supported a ban on cameras or, at a minimum, conditioned the presence of cameras on the consent of the parties. A representative of the California District Attorneys Association appeared at the public hearing to urge removal of cameras from criminal trials.

### 3. Supporters of Cameras in the Courtroom

Arrayed against those opposing cameras in the courtrooms were representatives of various media organizations, the American Judicature Society, attorneys' associations, and several groups representing victims rights' organizations. The victims' groups were somewhat divided on the issue as they are concerned with limiting unnecessary intrusions into the privacy of witnesses and victims; yet they also believe that increased public awareness of the justice system fostered by media coverage augurs well for the rights of victims. The victims' groups urged a variety of measures to aid judges in maintaining the dignity of the proceedings and in protecting the interests of those who must participate in the system.

The proponents of the present rule or of expanding media coverage pointed most often to the experience of the approximately 14-year period in which California has had a rule permitting film and electronic media coverage of the courts. They argue that on balance, the rule has been a success, and that problems which occur can ordinarily be solved by the sound exercise of judicial discretion.

The point was made during the various presentations that the public today gains the bulk of its news from television. Currently, few people in society have the time to come to the courthouse to observe trials, and there is seldom enough space

in today's courtrooms for more than a tiny fraction of the public to attend proceedings at those cases that have caught the public's attention. Programs such as *Court TV* have provided access to judicial proceedings for millions of people who would otherwise have little opportunity to observe the courts in action.

Moreover, the proponents of such coverage have argued the principle that the American judicial system was designed to be as open as possible. Examples were given of trials in the past where a large percentage of citizens were able to and did attend trials in their communities. The task force was reminded of the recommendations of the *Justice in the Balance/2020* report presented to the Judicial Council, which envisioned a future with far greater electronic access to the courts than is true today, even taking into account the existing rule permitting some electronic coverage of the courts. We were reminded that the Long-Range Strategic Plan of the Judicial Council includes efforts to increase public access to the courts.

In short, those who sought to maintain access for film and electronic media to the courts suggested that a rule such as existing rule 980, which places these decisions in the sound discretion of the trial courts, will continue to strike the appropriate balance between (1) protecting courtroom dignity, (2) protecting the parties' right to fairness, and (3) increasing public access to the courts.

## D.  Task Force Analysis on Issue of Whether to Ban Cameras

As outlined above, the members of the task force reviewed voluminous written materials, evaluated the presentations at the public hearing, and spent considerable time discussing the question of whether to ban cameras from California courtrooms. At the end of the process, on a vote of 12-0 (1 absent), the task force voted NOT to ban electronic photographing, broadcasting, and recording from California courtrooms. Similarly, on a vote of 11-1 (1 absent), the task force voted NOT to ban live, contemporaneous electronic photographing, broadcasting, and recording from California courtrooms.

The question of whether the courts should exclude a form of media coverage is not one which can be resolved by resorting to absolute principles or to indisputable facts. It is a question resolved in part by perceptions of impact regarding this particular form of media coverage on the judicial process. Hence, it is not a surprise that a substantial majority of judges perceives that such coverage adversely impacts fairness. Yet those who have had to deal with cameras in courtrooms were generally willing to continue with their use.

We deduce that these perceptions as to fairness pertained to the general subject, in the abstract. In practice, however, those judges with experience in the area tended to believe they had successfully addressed the problems by use of the discretionary power given to them. The problem in selecting the proper course for the judiciary lies in the difficulty of assessing the potential for adverse consequences in light of the reality that trial judges, given adequate guidance and discretion, ordinarily produce solutions to the conflicts caused by the particular type of media coverage.

The task force believes balancing the competing policy interests compels a conclusion that a total ban on cameras in the courtroom would be inappropriate. The task force also believes that society's interest in an informed public, recognized in the planning and mission of the Judicial Council, is an important objective for the judiciary, which would be severely restricted by a total ban. Today's citizen relies too heavily on the electronic media for information; yet actual physical attendance at court proceedings is too difficult for the courts to countenance a total removal of the public's principal news source.

On the other hand, the task force was impressed by those who responded with thoughtful concerns about the impact electronic media coverage can, and sometimes does, have on the dignity and perceived fairness of the court system. Those persons critical of the current rule have raised serious concerns that need to be addressed if the courts are to strike an appropriate balance between the sometimes competing interests of calm, reliable decision-making and full public access.

The task force believes the better approach to resolving the conflict of values presented by the issue of film and electronic media coverage is to modify rule 980 to restrict such media access to those proceedings where the potential for prejudice to the rights of parties and the ability to influence potential jurors is the greatest. Additionally, the task force has learned through the process of the survey and the public hearing that the trial courts have been uncertain as to the (1) scope of their discretionary authority, (2) the nature of the hearings, if any, required in order to act on a media request, and (3) to what extent the trial courts can control conduct of media personnel in or around the court facility.

Related to the issue of whether to recommend a complete ban on media coverage, the task force also unanimously voted not to ban live, contemporaneous electronic photographing, broadcasting, and recording from California courtrooms. It was suggested to the task force that delaying broadcast would work to reduce the commercialization and frenzy surrounding live media coverage. Task force members, however, also believed that a rule to delay broadcast would eliminate from the courtroom those media agencies offering the more responsible,

educational, gavel-to-gavel coverage, leaving the public only with "snippets" and "sound bites" on the evening news.

### E. Task Force Analysis on Other Major Issues

The material that follows will outline new proposed restrictions on media access, including (1) removal of such access from all pretrial proceedings in criminal cases and (2) limitations on trial coverage in civil and criminal cases to only those matters presented to the trier of fact.

The report will also highlight a series of proposed amendments to rule 980 to provide guidance to trial judges on their duties with regard to media requests, and the factors to be considered in granting or denying such requests. The amendments attempt to make clear that trial courts have the power to regulate activity in court facilities, other than the courtroom, to the extent necessary to protect the privacy rights of witnesses and jurors and to ensure the courts are a place for the reasoned and calm resolution of disputes.

The task force believes such changes will, to the greatest extent possible, preserve public access to the system of justice consistent with the duty of the courts to ensure the rights of the participants to fair and dignified trials.

### 1. Proposed Limitations on Coverage

(a) **Summary.** The proposed revision of rule 980 includes a number of new limitations on electronic media coverage of the trial courts. Specifically, on a unanimous vote, the task force recommends in criminal cases that such coverage be prohibited in all pre-trial proceedings including arraignments, bail hearings, preliminary hearings, jury selection and pre-trial motions. As to both civil and criminal trials, the task force recommends coverage be limited to those matters presented to the trier of fact, with the exception that post-verdict proceedings could be the subject of film and electronic media coverage. (See proposed amended rule 980 (e)(6).)

Currently, rule 980 prohibits coverage of any proceedings closed to the public, conferences between counsel and client, and close-up photography of jurors, as well as minors who are parties or witnesses. The rule currently prohibits sound recording of bench conferences. The proposed revisions would further limit coverage by prohibiting all photography of jurors and minors who are parties or witnesses, and would add spectators in the courtroom to such prohibition. The changes would also ban film and all electronic coverage of bench conferences.

11

To restate an obvious limitation of the scope of the task force's work, the proposed new limitations deal only with the ability of the media to engage in film or electronic coverage. The changes will have no effect on the right of media representatives to attend and report in a traditional manner on those events occurring in the public sessions of the courts.

   **(b) Basis for the Proposed Limitations on Coverage.** The material presented to the task force raised a number of legitimate concerns regarding the potential of extended media coverage to create adverse impacts on the fairness of the judicial process, particularly in criminal cases. Specifically, there were concerns as to whether witnesses and jurors may be adversely influenced by such coverage. Concerns were also expressed regarding the real potential that participants in criminal cases, including attorneys and witnesses, will be influenced to act in a particular manner for the benefit of the media. It is believed by many that, at least in some cases, attorneys have brought motions, made arguments, or raised issues mainly in an attempt to influence public opinion through the media.

The task force recognizes these concerns are not new; however, they have been raised and emphasized, at the present time, when the courts have gained more experience with the litigation of publicized cases. The proposed changes represent an effort by the task force to find an acceptable balance between the goal of increased public access to the courts and the duty of the courts to provide fair and reliable adjudication of disputes.

   **(c) Examples: Adverse Impact of Pre-trial Coverage.** It is difficult to quantify the impact on witnesses and jurors that is created by the additional coverage provided by the film and electronic media. It seems clear, however, that extensive coverage of pre-trial proceedings in criminal cases may result in serious adverse impacts on the fairness of the adjudicative process. For example, when potential witnesses and/or jurors have access to certain material as presented by the media, it may affect a witness's version of events or may affect the ability of a juror to be impartial.

Expanded coverage of arraignments of criminal defendants presents an example of concerns expressed to the task force. Witnesses may observe the coverage of the arraignment and thus be influenced in their identifications or perceptions. Pre-trial coverage of the defendant, for example, who may be in custody with obvious security measures in place, may subsequently reduce the effectiveness of the efforts by the trial judge to eliminate the prejudice of custody by allowing the defendant to appear at trial in ordinary clothing, as opposed to jail clothing, and

without obvious restraints.  Similar concerns exist with any expanded coverage of preliminary hearings, bail review hearings and other pre-trial matters.

   **(d)  Task Force Conclusion Regarding Criminal Pre-trial Coverage.** Any assessment of the proper manner of dealing with what seems to be a clear potential for prejudice to the parties' rights to a fair trial also requires consideration of the public's right to access.  As previously noted, the proposed changes do not eliminate the right of the public and the media to attend the courts; the changes focus only on electronic and film coverage.  Accordingly, the problem is where to place the balance of the competing interests.

   Pre-trial matters in criminal cases are by definition preliminary.  These matters address custody, timing, admissibility of evidence, and the procedures to be followed by the court.  Guilt and innocence remain to be determined by the trier of fact based upon the admissible evidence at trial.  While the media are free to report that which occurs in public hearings, contemporaneous broadcast of all or significant parts of such preliminary matters adds little to the public's knowledge of the case.  Contemporaneous broadcast also offers a real potential for adverse impacts on the fairness of trial proceedings.

   As the survey results have indicated, trial courts have exercised their discretion and have done a good job of attempting to eliminate prejudice.  It is the sense of the task force, however, that such efforts are, after all, attempts, and their effectiveness is very difficult to measure.  Thus, after reviewing the serious concerns raised by many of the opponents of electronic and film coverage of criminal cases, the task force concluded the balance should be struck by taking proposed steps toward insuring fairness and reliability in the criminal trial process. Any incremental benefit of film and electronic coverage of preliminary matters is outweighed by its potential for harm.  Similarly, by recommending the limitation of electronic media coverage to only those events seen by the trier of fact, the risk that a juror will hear information that might improperly influence the outcome of the case will be negligible.  Also, the concern of some, that lawyers are trying to "play" to the public at large, will be addressed.

   **(e)  Proposed Limitations on Trial Coverage.**  Existing rule 980 places a number of limitations on film and electronic coverage of trials.  The proposed revisions would add further limitations.

   First, the changes would limit coverage to those matters heard by the trier of fact.  Necessarily, such limitations would exclude coverage of in limine motions, sidebar conferences, and matters heard outside the presence of the jury. Such additional restrictions are premised on the belief that the principal purpose of

13

the trial is to determine the truth in a dignified and reliable manner. Trials are not primarily intended to be educational or to be a source of entertainment. Even though extended broadcast of trials provides some additional access to the public (as compared to a nontelevised public trial), the task force concluded, however, that broadcast of matters not considered by the trier of fact poses a great risk of adverse effects on the trial process, which outweighs the added value of public access.

Much of the concern expressed in the general criticism of extended broadcast coverage included the potential for jury contamination from the broadcast of material not heard by the jurors in court, and the potential influence of such matters on the testimony of witnesses. As previously suggested, the material presented to the task force also raised the real possibility that attorneys may raise issues, bring motions, or make arguments primarily in an effort to influence public opinion. The task force found these concerns to be legitimate and concluded that the proposed limitations struck the better balance of the competing interests.

   (f) Proposed Limitation on Spectator Coverage. Some comment is warranted regarding the proposed limitation on the ability of the media to film spectators. Often media coverage of trials includes coverage of the spectators and their reactions to the events at trial. Certainly trials, particularly criminal trials, can have dramatic and emotional moments: A victim's family members may become distraught as a result of testimony regarding the crime; a defendant's relative may react emotionally to a verdict, ruling, or sentence.

While the task force recognizes the dramatic value of such events and the desire of the media to be able to display such events, it was determined that such coverage has the potential of significant intrusion into the privacy interests of such spectators. It was also determined that this kind of coverage of spectator reaction to trial events does not advance the public's knowledge of the workings of the courts or the basis of the verdict in a given case. It was felt such coverage was more in the nature of entertainment or drama, and that persons attending trials, particularly family members of those involved in the case, should not be subjected to such intrusions as the price of their attendance. Persons who wish to speak to the media or to be subject to broadcast interviews can do so outside of the courtroom, thus affording the media a source of coverage without subjecting spectators in the court to unwanted intrusions into their privacy.

   2. Proposed Changes in Application Process

The above-described limitations placed on pretrial electronic media coverage makes it possible to recommend improvements to the process by which media

agencies seek permission to cover a court proceeding. The existing process for requesting an order for media coverage refers to filing a request for an order "a reasonable time before the portion of the proceeding to be covered." This provision was criticized by many as vague and unhelpful. Requests are often made at the last minute, which makes it difficult to provide meaningful notice to the parties or to provide them an opportunity to inform the court, in its exercise of discretion, on parties' views of the question of coverage.

Under the proposed new rule, media agencies will typically know ahead of time when a trial or other proceeding where coverage is permissible is scheduled to occur. Therefore, the new recommended procedure changes "a reasonable time" to a period of five court days. The added time for notice seems reasonable in light of the proposed changes in the type of proceedings which may be the subject of extended coverage. If the case is of sufficient interest that the media wish to film or broadcast the trial, the date of the trial or post-trial proceeding will be known in advance. The task force could perceive no good reason why requests could not be made five days in advance of the event. The burden thereby placed on the media, to be timely in its requests, does not seem onerous or unreasonable. (See proposed amended rule 980(e)(1) through 980(e)(5).)

### 3. Proposed Factors to be Considered by the Judge

On a vote of 12-0 (1 absent), the task force voted to approve a list of factors the judge shall consider in ruling on the request for coverage. (See proposed amended rule 980(e)(3).) The task force proposes 13 factors that appear to be pertinent to the decision-making process. Some of the factors promote general public interests, some safeguard the rights of the various parties to the litigation, and some ensure that other proceedings and business in the courthouse are not disrupted by the presence of electronic media.

During the public hearing, media agencies expressed frustration that coverage decisions are now made summarily, without offering guidance that would allow the media to make better or more appropriate requests. Although the proposed amended rule does not require a hearing on the request, by specifying a list of factors, media agencies wishing to cover court proceedings are put on notice as to the kind of information the judge will take into consideration in making the coverage decision.

### 4. Proposed Provision Regarding Presumption

On a vote of 10-2 (1 absent), the task force voted not to draft a rule in which there is a presumption against allowing electronic photographing, broadcasting, and

recording in California courtrooms.  (See proposed amended rule 980 (a).)
Discussion surrounding this decision centered on the unanimous opinion that a
coverage decision should be completely within the judge's discretion in each
instance.  Also, the importance of not creating an additional workload for the
courts was stressed.  While wanting to promote appropriate public access to the
court system, it was felt that a presumption either for or against allowing electronic
media access leads to a burden which must be overcome, possibly through a
hearing where evidence and witnesses are offered and findings are made.

The task force strongly opposes any rule or implication that the coverage decision
requires a court hearing.  It was felt that by offering judges more clearly defined
procedures and factors to consider, a presumption becomes unnecessary.

### 5. Proposed Additional Changes

In addition to the above issues of whether to completely ban electronic major
coverage, proposed limitations on coverage, and changes in the application process,
the following are also notable changes in the proposed amended rule:

(a)  By changing the title to reflect the "court," rather than "courtroom" and
more broadly defining "court" to include the courtroom at issue, the courthouse, and
the area immediately surrounding the court facility, the rule will be available, for
example, to address logistical issues that may be interfering with activities outside of
the courtroom at issue.  This broad definition is important to the factors noted at
(e)(3)(ix)and(x).  The task force believes this broader definition will help to prevent
the kind of difficulties faced by the Los Angeles Superior Court system during the
O.J. Simpson trial.  (See proposed amended rule 980(b)(3).)

(b)  The order permitting media coverage specifically notes there is no
requirement for the judge to make findings or a statement of decision.  (See
proposed amended rule 980(e)(4).)

(c)  The order permitting media coverage may incorporate any local rule or
order of the presiding judge regulating media activity outside of the courtroom, in
order to accommodate situations such as multiple notorious trials occurring in the
same courthouse.  (See proposed amended rule 980(e)(4).)

(d)  The order permitting coverage may be conditioned on the media
agency's agreement to pay for increased court-incurred costs.  (See proposed
amended rule 980(e)(4).)

(e) Each media agency is specifically made responsible for ensuring that all its personnel know and follow the order permitting coverage, and avoid situations where substitute staff operate outside the scope of the order. (See proposed amended rule 980(e)(4).)

(f) Violation of the rule or an order made under the rule may be the basis for an order terminating coverage, a citation for contempt of court, or an order imposing monetary or other sanctions as provided by law. (It appears that modification of the sanctions statute will be necessary.) (See proposed amended rule 980(f).)

## III. Recommendation to the Judicial Council

The existing California Rules of Court, rule 980, has been in effect for over 11 years following a 6-year period of experimentation and study by the Judicial Council. While it is generally agreed that the existing rule has been applied successfully, recent developments, including high-profile trials and today's citizenry's increasing dependence on the electronic media for information, has resulted in the judiciary's reevaluation of rule 980.

The Task Force on Photographing, Recording, and Broadcasting in the Courtroom sought and considered the views of all interested parties, including judges, media representatives, victims' rights groups, and representatives of various segments of the bar, an educational forum, surveys, and reports. The task force's proposed amendments to rule 980 are reflective of broad and, in many cases, disparate views, and strike a balance between the sometimes competing interests of ensuring participants' rights to fair and dignified trials and preserving public access to our system of justice.

Recommendation

The Task Force on Photographing, Recording, and Broadcasting in the Courtroom recommends that the Judicial Council (1) approve the attached report, including the proposed amended rule 980, for circulation and (2) request the task force to report back to the Judicial Council at the business meeting set for May 17, 1996.

Attachments