

# alaska judicial council

1031 W. Fourth Avenue, Suite 301, Anchorage, Alaska 99501 (907) 279-2526

EXECUTIVE DIRECTOR
Harold M. Brown

NON-ATTORNEY MEMBERS
Leona Okakok
Hilbert J. Henrickson, M.D.
Renee Murray

ATTORNEY MEMBERS
William T. Council
James D. Gilmore
Barbara L. Schuhmann

CHAIRMAN, EX OFFICIO
Warren W. Matthews
Chief Justice
Supreme Court

### NEWS CAMERAS IN THE ALASKA COURTS:
### ASSESSING THE IMPACT

### JANUARY 1988

### PROJECT STAFF

Marla N. Greenstein, Project Director
Teresa W. Carns, Research Associate
Mary Scotese, Secretary
Josefa M. Zywna, Administrative Assistant

## I.  The Study

The attached study responds to a request by the Alaska Supreme Court that the Alaska Judicial Council assess the impact of Canon 3(A)(7) of the Code of Judicial Conduct on the media and the courts.  At the time that the request was made, the supreme court adopted an amendment to its rule governing cameras in the courtroom that significantly altered the rule's use and impact.  Prior to July 1, 1985, a defendant's consent was required before news cameras would be allowed into criminal court.  Defendants rarely gave their consent.  The rule change adopted by the court in July 1985 eliminated this consent requirement.

Originally adopted for one year, the experimental court rule was ultimately extended to January 15, 1988 to allow a thorough study to be completed.  This extension enabled two major murder trials occurring in 1987 to be incorporated into the study.  Prior to the Mackay-related trials the Anchorage Media Courtroom had not been used nor had any significant legal issues emerged under the media rule.

Paragraph 3 of the supreme court order leading to this study reads:  "...The Alaska Judicial Council shall monitor the impact of the amended canon and media coverage plan upon media coverage of judicial proceedings and upon the courts."  As a result, our study attempts to examine the impact of the Media Plan on two entities, the courts and the media, by assessing differences before and after the July 1985 rule change.

The Cameras study is divided into seven parts.  The first three sections set the context for an understanding of the analysis that follows.  First, a brief history outlines the developing role of media in the courtroom and establishes the issues that have evolved over time.  The second section takes a general overview of the current status of cameras in the courtrooms of all fifty states.  Part three is a quick look at how these issues have developed in Alaska up to the recent rule change in July 1985.  Part four begins the critical analysis of the impact of the rule by looking at how the rule has affected the Alaska courts in each of the four judicial districts and at the appellate level.  This section uses data obtained from the "Requests for Media Coverage" that have been filed with the courts as well as incorporating interviews with judges, court personnel, attorneys, and media representatives across the state.  Part five examines and interprets data on how the Media Plan has affected the media's coverage of the courts.  With the aid of a

clipping service, the Judicial Council was able to monitor Anchorage television news programs on the courts from June 1984 to April of 1987 and to analyze news clippings statewide for selected cases both before and after the rule change.    Part six outlines the issues, both legal and administrative, that arose under the Media Plan, and recommends specific changes that address these issues.    The study ends with a brief conclusion assessing the merits of the Media Plan.

II.  **Findings**

A.    The Media Plan and the Courts

Generally, outside of Anchorage, requests by the media to cover cases are handled informally.    Exceptions occur in particular newsworthy cases such as the Peel trial in Ketchikan and the Mackay-related trials in Fairbanks and Anchorage. Regardless of the formality of the request, judges tend to place similar restrictions on the placement of cameras in the courtroom.    In addition, judges at times, though rarely, restrict the subject matter of the photos or video tapes.

The Anchorage trial courts have had the most requests for media coverage with a total of 259 requests; 189 were granted without written restrictions and only 15 were completely denied.    Cameras have rarely been in use in the appellate courts.

Overall, the courts throughout the state report a good working relationship with the media.    Many problems that arose during the first days of increased access to the courts have been addressed by both formal and informal arrangements between the courts and the local media.

B.    The Media Plan and the Media

For purposes of this study, the media was divided into electronic media (mostly television) and print media (largely daily newspapers).    Television coverage of the courts was analyzed for the period of June 1984 through March 1987.    As expected, the number of newsclips on the nightly news in Anchorage increased substantially since the rule change in July 1985.    While increased quantity of coverage does not necessarily reflect increased quality of coverage, many television news directors and reporters feel that the increased access has brought with it an increased understanding of court process.    In addition, the television stations

- II -

preferred the types of video they could get in court to the out-of-court "ambush" shots they got prior to courtroom access.

Several minor technical problems remain for both television cameras and still cameras in the courtroom. These concerns are noted in detail in Part V of the attached study.

Selected cases were studied to assess the impact the plan has had on newspaper coverage of the courts. The most interesting finding parallels those relating to television coverage of the courts. The number of in-court photos uniformly increased since July 1985. Also, when newspapers had in-court photos, their stories were longer.

## III.  Recommendations

These recommendations address both the legal issues and the technical problems that arose during the course of the study.

1.  The Plan should incorporate procedures that give the media the ability to challenge a denial of camera access.

2.  Witness objections to camera coverage should be considered on a case by case basis.

3.  Proceedings that indirectly include family matters may require consent of the parties for camera coverage but only for the time that those matters are discussed in the proceeding.

4.  Camera coverage of sexual offenses should be treated as coverage of a criminal matter except that the victim should not be photographed without the victim's consent.

5.  Sketch artists should be subject to standards established under the Media Plan.

6.  Judges should have the discretion to ensure the fair administration of justice.  This discretion includes the ability to consider possible

pretrial publicity generated by news cameras in severed criminal proceedings.

7.   Prior to suspension of media privileges, the individuals or organizations to be disciplined should be entitled to present evidence on their behalf at a hearing before a judge.

8.   Camera access to the courts in all cases except family matters should be presumed, subject to reasonable restrictions by the judge under the Media Plan.  "Request for Coverage" forms should be changed to "Notice of Coverage."

9.   An effort should be made to correct the technical problems that render the media courtroom in Anchorage unusable.

10.   Judges and media organizations should be made aware of the Media Plan's policies and provisions.

IV.   <u>Conclusions</u>

The July 1985 change in the Media Plan is viewed by a great majority of judges and virtually every member of the press as a great step forward.   As mentioned above, our quantitative analysis shows a substantial increase in the coverage of the courts by both the broadcast and print media.   And while it is difficult to evaluate the quality of the increased coverage, increased public awareness of the courts and their functions can only be positive.

The few problems that were identified in our study are easily corrected. Most stem from ambiguities in the Plans's provisions.   Technical difficulties encountered by the Media were equally minor and could often be overcome with a combination of patience and creativity.

## V.   THE MEDIA PLAN AND THE MEDIA

### News Cameras in the Alaska Courts:
### Assessing the Impact

V.    The Media Plan and the Media

Generally, the media falls into two distinguishable forms: print and electronic broadcast. Most of the requests for coverage have come from the broadcast media, and, more specifically, television news media. Of the 259 requests filed in the Third Judicial District from July 1, 1985 to April 1, 1987, 159 were submitted by the broadcast media while 100 were filed by the print media (see Table V, p. 33). In other words, for every still camera request there were 1.6 requests for video cameras.

To quantify the amount of television coverage that actually took place we monitored television coverage of court cases by the three Anchorage television news stations both before and after the July 1, 1985 rule change. In addition, we studied print coverage of selected cases statewide both before and after the rule changes.

A.    The Electronic Media and Court Coverage

Anchorage stations filed 157 requests for coverage of the courts during the 21 months of our study (see Table V, p. 33). Seventy-seven or 49% of those requests were filed by KTUU-Channel 2 news. KTVA television with KBYR radio filed 45 requests or 29% of the broadcast requests and KIMO television followed with 35 requests or 22% of the total broadcast requests.

The requests that were denied initially appear somewhat disproportionate to the totals. KTUU was denied only three requests, while KTVA with a little over half the total requests of KTUU had almost twice the denials (see Table VII, p. 34). However, when examined more closely, all of the KTUU denials and four of the KTVA denials were for the Mackay-related trials that were closed to cameras.

We analyzed Anchorage television coverage of the courts for the period of June 1984 through March 1987.[75] The numbers prior to July 1, 1985 therefore represent thirteen months of coverage as compared to twenty-one months of coverage after July 1, 1985. The column labeled "per month average" gives comparable numbers for the periods before and after the July 1985 rule change in Table VIII (p. 35). News "clips" were those portions of a news broadcast with accompanying video footage relating to a court story. Looking at these numbers, several interesting trends appear.

- 32 -

TABLE V
(<u>News Cameras in the Alaska Courts: Assessing the Impact</u>)

<u>COVERAGE GRANTED (NO RESTRICTIONS) AND TOTAL</u>

THIRD JUDICIAL DISTRICT
(JULY 1, 1985 – APRIL 1, 1987)

| MEDIA ORGANIZATION | NO. REQUESTS GRANTED WITH NO RESTRICTIONS | TOTAL NO. REQUESTS |
|---|---|---|
| KTUU TV | 56 | 77 ( 29.7%) |
| KIMO TV | 30 | 35 ( 13.5%) |
| KTVA TV/KBYR Radio | 26* | 45 ( 17.4%) |
| <u>Anchorage Times</u> | 36 | 48 ( 18.5%) |
| <u>Anchorage Daily News</u> | 25 | 36 ( 13.9%) |
| <u>Frontiersman</u> | 6 | 10 ( 3.9%) |
| <u>Homer News</u> | 2 | 2 ( .8%) |
| <u>Clarion</u> | 2 | 2 ( .8%) |
| KENI Radio | 2 | 2 ( .8%) |
| <u>Kodiak Daily Mirror</u> | 1 | 2 ( .8%) |
| **TOTAL** | **186 (71.8%)** | **259 (100.1%)**** |

\*   Of the 26 requests, 23 were filed for KTVA-TV and 3 for KBYR
     Radio.   However, the radio often used audio from the KTVA
     video tape.

\*\*  The total is greater than 100% due to rounding to the nearest
     tenth of a percent.

TABLE VI
(<u>News Cameras in the Alaska Courts: Assessing the Impact</u>)

<u>COVERAGE GRANTED WITH RESTRICTIONS</u>

THIRD JUDICIAL DISTRICT
(JULY 1, 1985 – APRIL 1, 1987)

| <u>MEDIA ORGANIZATION</u> | <u>NO. REQUESTS</u> | |
|---|---|---|
| KTUU TV | 18 | ( 31.0%) |
| KIMO TV | 3 | (  5.2%) |
| KTVA TV/KBYR Radio | 14 | ( 24.1%) |
| <u>Anchorage Times</u> | 9 | ( 15.5%) |
| <u>Anchorage Daily News</u> | 9 | ( 15.5%) |
| <u>Frontiersman</u> | 4 | (  6.9%) |
| <u>Kodiak Daily Mirror</u> | 1 | (  1.8%) |
| **TOTAL** | 58 | (100.0%) |

TABLE VII
(<u>News Cameras in the Alaska Courts: Assessing the Impact</u>)

<u>COVERAGE DENIED</u>

THIRD JUDICIAL DISTRICT
(JULY 1, 1985 – APRIL 1, 1987)

| <u>MEDIA ORGANIZATION</u> | <u>NO. REQUESTS</u> |
|---|---|
| KTUU TV | 3 |
| KIMO TV | 2 |
| KTVA TV/KBYR Radio | 5 |
| <u>Anchorage Times</u> | 3 |
| <u>Anchorage Daily News</u> | 2 |
| **TOTAL** | 15 |

TABLE VIII
(News Cameras in the Alaska Courts: Assessing the Impact)

TV FOOTAGE
(June 1, 1984 - April 1, 1987)

| | Total No. of Clips | Out of Court | | In Court - Alaska | | | In Court - Out of State | | | Total Court Clips | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Per Month Average | Total Time (Minutes) | No. of Clips | Per Month Average | Time (Minutes) | No. of Clips | Per Month Average | Time (Minutes) | No. of Clips | Per Month Average |
| **Channel 2 (KTUU)** | | | | | | | | | | | |
| Before 7/1/85 | 100 | 7.7 | 140 | 15 | 1.2 | 22 | 5 | .4 | 13 | 120 | 9.2 |
| After 7/1/85 | 248 | 11.8 | 259 | 174 | 8.3 | 217 | 27 | 1.3 | 24 | 449 | 21.4 |
| % Change | +148% | +53.2% | | | +591.7% | | | | | +274.2% | +132.6% |
| **Channel 11 (KTVA)** | | | | | | | | | | | |
| Before 7/1/85 | 56 | 4.3 | 70 | 27 | 2.1 | 59 | -- | | -- | 83 | 6.4 |
| After 7/1/85 | 86 | 4.1 | 95 | 128 | 6.1 | 141 | 13 | .6 | 20 | 227 | 10.8 |
| % Change | +53.6% | -4.7% | | | +190.5% | | | | | +173.5% | +68.8% |
| **Channel 13 (KIMO)** | | | | | | | | | | | |
| Before 7/1/85 | 193 | 14.8 | 289 | 31 | 2.4 | 52 | -- | | -- | 224 | 17.2 |
| After 7/1/85 | 163 | 7.8 | 177 | 174 | 8.3 | 222 | 29 | 1.4 | 22 | 366 | 17.4 |
| % Change | -15.5% | -47.3% | | | +245.8% | | | | | +63.4% | +1.2% |

For two of the Anchorage stations, Channel 11 (KTVA) and Channel 13 (KIMO), use of out-of-court video footage has declined while use of in-court footage has roughly tripled. Although use of out-of-court footage by Channel 2 (KTUU) has increased by 53%, their use of in-court footage has increased by over 590%. The last column on the right shows that overall, court coverage by the three Anchorage stations has increased dramatically. All three stations increased their number of stories substantially after July 1, 1985. Channel 13 (which had about twice as many court stories during the year prior to the media plan as the other stations) increased its coverage by 63%. Channel 11 increased court stories by 173% and Channel 2 increased court coverage by 274%. The average number of court stories per month has increased for each of the three Anchorage stations ranging from a minimal increase of .2 clips for Channel 13 to a substantial increase of 12.2 clips per month for Channel 2. Channel 11 showed a moderate increase of 4.4 clips per month.

Although this increased attention to the courts could be due in part to an increased awareness of the courts and widespread increased attention in crime, our research indicates that the increased coverage is related to the more open camera access to the courts. Rather than merely sending a reporter over to the courts to flip through log notes and calendars, many television stations and newspapers now routinely show up in court with cameras. Where there has been a request to cover a case, reporters are more likely to sit through the proceedings if their cameras have gained access. In short, the press has become more comfortable being in a courtroom and more familiar with court procedures as well.

This increased coverage of the courts is especially true for television. The nature of television requires visual presentation of a story. It is only reasonable that a visual medium, such as TV news, would take more time and interest in a subject when it has accompanying video. Not only has there been an increased use of court story clips but the stories themselves continue to be slightly longer if the video is in-court footage (see Table IX, p. 37).

Table IX shows the average time devoted to court stories for each of the three Anchorage stations both before and after the July rule change. While the number of clips devoted to court stories has increased dramatically since July 1985, the amount of air time devoted per clip has dropped uniformly. This holds true for both in-court and out-of-court footage and therefore seems to reflect an overall trend in the television industry towards shorter news stories.

TABLE IX

(News Cameras in the Alaska Courts: Assessing the Impact)

TV FOOTAGE
(June 1, 1984 - April 1, 1987)

(Time in Minutes)

| | Out of Court Average | In Court - Alaska Average | Total No. of Clips | Total Time (Minutes) | Per Month Average (Minutes) |
|---|---|---|---|---|---|
| **Channel 2 (KTUU)** | | | | | |
| Before 7/1/85 | 1.4 | 1.47 | 120 | 175 | 13.5 |
| After 7/1/85 | 1.0 | 1.23 | 449 | 500 | 23.8 |
| % Change | -28.6% | -16.3% | | | +76.3% |
| **Channel 11 (KTVA)** | | | | | |
| Before 7/1/85 | 1.25 | 2.18 | 83 | 129 | 9.9 |
| After 7/1/85 | 1.10 | 1.10 | 227 | 256 | 12.2 |
| % Change | -12.0% | -49.5% | | | +23.2% |
| **Channel 13 (KIMO)** | | | | | |
| Before 7/1/85 | 1.50 | 1.68 | 224 | 341 | 26.2 |
| After 7/1/85 | 1.08 | 1.28 | 366 | 421 | 20.0 |
| % Change | -28.0% | -23.8% | | | -23.7% |

Prior to the rule change, on the rare occasions that the television stations had in-court footage, they uniformly devoted more time to in-court footage (see Table IX). While Channel 2 (KTUU) devoted only .07 minutes more to in-court coverage, Channel 11 (KTVA) devoted .93 minutes more, and Channel 13 (KIMO) devoted .18 minutes more to in-court footage. After the rule change, not only were more in-court clips used, but those clips, overall, were longer than any out-of-court clips that were used to cover the courts. Looking once again to Table IX, Channel 2 (KTUU) now devotes .23 more minutes to its court stories when it has in-court footage than when the footage is out of court. The time per out-of-court story declined by 29% after July 1, 1985 but the number of stories per month increased by 53% (Table VIII). For in-court stories, the time per story dropped by a lesser percentage (16.3%), but the number of stories increased by over 590% (Table VIII, from 1.2 stories per month to 8.3 stories per month, or about 2 stories per week). The net effect was an average 21.4 court stories per month on Channel 2, or about 5 per week after the media plan, largely due to the greatly increased number of in-court stories.

Since the rule change, Channel 11 devotes the same amount of time to a court story regardless of whether the footage is in or out of court and Channel 13 (KIMO) devotes .20 minutes more to a court story if it has in-court footage. Channel 13 showed a 28% drop in the time devoted to out-of-court stories and a 47% drop in the number of out-of-court stories after July 1, 1985. The time per in-court story also dropped, by 24%, but the number of in-court stories increased by 246% (Table VIII). The net effect for Channel 13 was that the number of court-related stories per month remained virtually unchanged by the media plan (Table VIII, 17.2 stories/month before; 17.4 stories/month after), and the amount of time per month actually dropped by 24% (Table IX). For two of the three Anchorage stations, Channel 2 and Channel 11, the combined increased number of in-court clips and longer air time for in-court footage has meant more total air time devoted to court stories.

A comparison of the three television stations shows that while all of the stations responded to the media plan by making very substantial increases in the amount of in-court coverage, the net effect on court coverage was not quite as straight forward. All of the stations cut the time per story, apparently in response to a trend towards shorter news stories. Channel 11 kept its out-of-court number of stories about the same, but increased its in-court coverage substantially. Channel 13 cut out-of-court stories in half, but more than tripled

- 38 -

the number of in-court stories. However, the net effect was virtually no change in the number of court stories per month and an actual decline in the amount of time per month spent on these stories. Channel 2 showed the largest net increases in both stories per month and time per month devoted to court coverage. Channel 2 was also the only station to increase out-of-court coverage as well as in-court coverage. As a result, Channel 2 became the leader in court coverage after the media plan. The per month average time devoted to court stories increased by 10.3 minutes for Channel 2 (KTUU) and by 2.3 minutes for KTVA (Table IX). While the time Channel 13 (KIMO) devotes per month to court stories has dropped since July 1985, that station still devotes a substantial amount of time to court stories at about 20 minutes per month.

While increased quantity of coverage does not necessarily reflect increased quality of coverage, as mentioned above, many of the television news directors and reporters feel that the increased access to the courts has brought with it an increased understanding of court process. In addition, overall, the television stations preferred the types of video they could get in court to the out-of-court "ambush" shots they got prior to courtroom access. The overwhelming amount of court news is criminal.[76] Prior to access to the courtroom, television news cameras were getting their footage by taping criminal defendants being led into the courthouse. Those clips showed the defendant in handcuffs and led by a police officer. Today, in-court clips of the defendant show a well-dressed individual accompanied by an attorney facing a judge and his accusers. The television press feels that this portrayal is a more accurate and human view of the criminal justice system.

Television stations in Alaska are uniformly satisfied with the administration of the Media Plan since July 1985. The only improvement they would suggest is that request forms become unnecessary as the court and the press become better acquainted with the provisions of the Plan. Ultimately, the broadcast media would prefer filing "notices of intent" to cover proceedings rather than the current judge-approved request forms.

The overwhelming technical problem for the television stations statewide was the ability to deal with pooling arrangements. Under the provisions of the Media Plan, a judge may restrict the media to not more than two television cameras in a courtroom.[77] Only one television camera was allowed in the Mackay trial in

- 39 -

Fairbanks, creating an almost constant need for a pooling arrangement. The most difficult factor in arranging a television pool seems to center around the quality of the agreed-upon video. Television video equipment quality varies greatly from one station to another. While this has not been a big concern in Anchorage, it has been a very real concern in Fairbanks and in Ketchikan during the Peel trial. One Fairbanks station uses 1/2 inch videotape rather than the industry standard of 3/4 inch, making sharing of video tape very difficult. The Media Plan places the burden of pooling on the media and out of the courts' hands. While many of the television stations are dissatisfied with the absence of standards or guidance for establishing pooling arrangements, they agree that this should not be dealt with by the court.

A second concern related to pooling arrangements is the availability of the pooled tape to the non-pooling stations. Although delay in sharing tape is sometimes attributable to technical duplicating problems, often delay is due to a misunderstanding between the stations as to their mutual responsibilities and expectations. Once again, the stations do not expect the court to become directly involved but it is an area where responsibilities need to be defined.

Other technical problems concern the differing courtroom layouts. Often, the only electrical outlets in a courtroom are located in the back, behind the judge's bench. When television cameras are required to stand at the far end of the courtroom, cables must be run the length of the courtroom, often interfering with the trial process. Other courtrooms may be long and narrow, difficult for cameras to get workable camera angles. Problems can also occur when cameras are placed between the jury and the judge, in constant view by the jury (see fig. 1 and 2, p. 41). Whenever possible, existing courtrooms should be designed to accommodate the media's needs. Judges should be aware of these needs when hearing newsworthy cases.

Little use of the Media Plan has been made by radio. Radio stations with television affiliates have made the most use of the increased access by using the audio off the television video tape. Radio stations that have attempted to use their own audio have encountered two problems. First, if they feed their audio off the existing court audio system, they get so much background noise that the tape is virtually worthless (television stations attempting to use the court sound system have experienced the identical problem). Second, if a judge allows the broadcast media to place their own microphones in the courtroom, it is rare that more than one

- 40 -

figure 1



JUDGE
WITNESS
JURY
CAMERA
DEFENSE
PROSECUTION
BAR

PUBLIC SEATING

## PREFERRED CAMERA PLACEMENT

figure 2

## INAPPROPRIATE PLACEMENT



JUDGE
WITNESS
CAMERA   JURY

set of microphones will be allowed.   Preference is most often given to the television microphones.   Apparently, all the existing microphones in the courtroom are always on during the proceeding, allowing sounds from all areas of the room to be picked up simultaneously.   Judges have recognized the problem and have allowed the media to place a reasonable number of their own microphones in the court.   The only restriction is that the media organization cannot leave its station "flag", identifying the station, on the microphone.

Television cameras in the courtroom have had virtually no effect on courtroom behavior of participants.   Judges have noted that there is no grandstanding by attorneys, and, if anything, the realization that they may appear on the evening news has improved attorneys' behavior.   Most often participants forget that the cameras are there after the first few moments and instead concentrate on the reason that they are all in the courtroom.

B.   **Media Plan and Newspaper Coverage**

The initial ban on cameras in court was a ban on the newspaper still cameras of another era.   Images of flashes going off in all directions while photographers climb over spectators in the court for a better view still haunt many of the nation's courts.   However, those cameras were clearly from another era.   Today high speed film and fast lenses make even a dimly-lit courtroom photographable without a flash.   Telephoto lenses are used routinely to allow the close-ups of a defendant's face to be taken from across the courtroom and many cameras have quiet shutters that are barely audible.

To compensate for the lack of camera access to the courts, newspapers employed sketch artists to get pictures of court proceedings.   Today, sketch artists are often unnecessary but are used on those rare occasions when cameras are denied access to the courtroom.

Assessing the impact of the July 1985 rule change on the print media required selecting roughly comparable cases that attracted newspaper coverage.   Since newspapers contain numerous court stories daily, often reprinting stories from other papers or wire services, several choices had to be made.   For each case selected:

1.   only bylined original stories were included unless a photo was involved;

2.    only original bylined wire service stories are included; and

3.    non-bylined wire service stories were included if accompanied by a photo.

Where measurements are involved, stories are measured to the nearest half inch.

Two of the cases chosen, "Cantwell" and "Yi," took place entirely before the July 1985 rule change. Two additional cases, "Lowry" and "Faccio," spanned before and after the rule change. Three cases were post-rule-change cases: "Burris," "Open Meetings," and "Mackay." In addition, the Peel case was studied as a post-rule-change case that operated under the consent requirement that existed before the rule change.

The murder of a 63 year-old women in Cantwell by three teenagers occurred in August 1982. All three were tried as adults in early 1983. Since consent of the defendants was required for in-court pictures, none were taken. There were only three out-of-court pictures all taken outside the courthouse, showing the defendant accompanied by a state trooper. The <u>Anchorage Times</u> ran over 50% more articles on the case than the <u>Daily News</u> but the articles that the <u>Daily News</u> ran were longer than those run by the <u>Times</u>. Story lengths in the <u>Daily News</u> exceeded those run by the <u>Times</u> both without pictures and when accompanied by pictures (see last column, Table X, p. 44). Both papers ran longer stories if there were accompanying pictures.

Table XI (p. 45) analyzes another pre-rule-change case. As with the Cantwell case, the Yi case shows that the <u>Times</u> runs more articles on a court story than the <u>Daily News</u> (87 as compared to 73) but the <u>Daily News</u> ran longer stories than the <u>Times</u>. Both papers, once again, ran longer stories if they had accompanying pictures. The in-court pictures in this murder-for-hire case included photos of the prosecutor, defense attorney, defendant, and the judge. Two other defendants apparently did not consent to camera coverage and were photographed entering the courthouse with state troopers. The Yi stories ran from February of 1983 through January of 1984.

### TABLE X
(News Cameras in the Alaska Courts: Assessing the Impact)

NEWSPAPER COVERAGE
(All before 7/1/85)

#### CANTWELL CASE

| Newspaper | Articles Without Pictures | Articles With Pictures In Court | Articles With Pictures Out of Court | Total Column Length of Articles (In.) Without Pictures | With Pictures | Average Column Length Without Pictures | With Pictures |
|---|---|---|---|---|---|---|---|
| Anchorage Daily News | 16 | — | 1 | 222 | 18 | 13.9 | 18.0 |
| Anchorage Times | 25 | —|— | 2 | 264 | 24 | 10.6 | 12.0 |
| TOTAL | 41 | 0 | 3 | 486 | 42 | 11.8 | 14.0 |

### TABLE XI
(News Cameras in the Alaska Courts: Assessing the Impact)

NEWSPAPER COVERAGE
(All before 7/1/85)

YT CASE

| Newspaper | Articles Without Pictures | Articles With Pictures in Court (Sq. In.) | Articles With Pictures Out of Court | Total Column Length of Articles (In.) Without Pictures | With Pictures | Average Column Length Without Pictures | With Pictures |
|---|---|---|---|---|---|---|---|
| Anchorage Daily News | 66 | 2 (223) | 5 | 881 | 133 | 13.3 | 19.0 |
| Anchorage Times | 78 | 3 ( 37) | 6 | 867 | 168 | 11.1 | 18.7 |
| TOTAL | 144 | 5 (260) | 11 | 1748 | 301 | 12.1 | 18.8 |

Tables XII and XIII (pp. 48-49) look at two cases that were affected by the rule change while in progress. The Lowry murder case illustrates the effect of eliminating the need for defendant's consent for cameras. Prior to July 1, 1985, there were no in-court pictures in either of the Anchorage papers but out-of-court pictures appeared in each. After the rule change, both papers published in-court pictures and out-of-court pictures became unnecessary. The Daily News continued to run fewer but longer articles than the Times. However, the trend that articles are longer with pictures than without did not hold true for the Daily News in this case. Once again, out-of-court pictures showed the defendant outside the courthouse, accompanied by state troopers.

Similar to the Cantwell murder, the Faccio case in Table XIII (p. 49), was a murder by teenagers ultimately tried as adults. In-court pictures did appear for the trial of the one defendant who did not plead guilty and for the sentencing of both defendants. The Anchorage Daily News did not publish any pictures prior to the rule change, while the Times published two out-of-court pictures. The Times and Daily News published a comparable number of articles but the Daily News articles continued to be longer. Overall, articles accompanying photos continue to be longer than those without pictures. Out-of-court pictures in this case included photos of the victims' family. Once again, no in-court pictures were taken prior to the July 1, 1985 rule change.

A series of three very different cases was studied as exemplary cases that took place entirely after the rule change allowing cameras in court without the defendant's consent. Table XIV (p. 50) looks at the Burris trial, another youth tried as an adult for the murder of a cab driver. Neither Anchorage paper devoted extensive coverage to this case; both devoting an equivalent number of articles. The Daily News devoted more space to its stories than did the Times, but the Times was the only paper to use any pictures and both of those photos were in court.

The second post-rule-change case was a civil suit challenging legislative decisions made behind closed doors. Of statewide interest, this Juneau case attracted both television and print media interest. The Anchorage Daily News and Juneau Empire clearly ran the most articles on this story (see Table XV, first column, p. 51), and were the only papers to run photos with their stories. The Daily News included out-of-court as well as in-court photos. Once again, the

<u>Daily News'</u> articles were longer than either the <u>Times</u> or the <u>Juneau Empire</u> and the <u>Daily News</u> continues to print longer stories if accompanied by a photo.

TABLE XII
(News Cameras in the Alaska Courts: Assessing the Impact)

NEWSPAPER COVERAGE

LOMRY CASE

| Newspaper | Articles Without Pictures | Articles With Pictures in Court | Articles With Pictures Out of Court | Total Column Length of Articles (In.) | | Average Column Length | |
|---|---|---|---|---|---|---|---|
| | | | | Without Pictures | With Pictures | Without Pictures | With Pictures |
| Anchorage Daily News | | | | | | | |
| Before 7/1/85 | 13 | -- | 2 | 225 | 34 | 17.3 | 17.0 |
| After 7/1/85 | 4 | 1 | -- | 82 | 15 | 20.5 | 15.0 |
| Total | 17 | 1 | 2 | 307 | 49 | 18.0 | 16.3 |
| Anchorage Times | | | | | | | |
| Before 7/1/85 | 14 | -- | 2 | 148 | 22 | 10.6 | 11.0 |
| After 7/1/85 | 9 | 2 | -- | 85 | 20 | 9.4 | 10.0 |
| Total | 23 | 2 | 2 | 233 | 42 | 10.1 | 10.5 |

## TABLE XIII
### (News Cameras in the Alaska Courts: Assessing the Impact)

### NEWSPAPER COVERAGE

### FACCIO CASE

| Newspaper | Articles Without Pictures | Articles With Pictures in Court | Articles With Pictures Out of Court | Total Column Length of Articles (In.) | | Average Column Length | |
|---|---|---|---|---|---|---|---|
| | | | | Without Pictures | With Pictures | Without Pictures | With Pictures |
| **Anchorage Daily News** | | | | | | | |
| Before 7/1/85 | 4 | -- | -- | 72 | -- | 18.0 | -- |
| After 7/1/85 | 12 | 3 | 3 | 176 | 156 | 14.7 | 26.0 |
| Subtotal | 16 | 3 | 3 | 248 | 156 | 15.5 | 26.0 |
| **Anchorage Times** | | | | | | | |
| Before 7/1/85 | 3 | -- | 2 | 54 | 25 | 18.0 | 12.5 |
| After 7/1/85 | 17 | 1 | -- | 218 | 20 | 12.8 | 20.0 |
| Subtotal | 20 | 1 | 2 | 272 | 45 | 13.6 | 15.0 |
| **TOTAL** | 36 | 4 | 5 | 520 | 201 | 14.4 | 22.3 |

TABLE XIV
(News Cameras in the Alaska Courts: Assessing the Impact)

NEWSPAPER COVERAGE
(All after 7/1/85)

HARRIS CASE

| Newspaper | Articles Without Pictures | Articles With Pictures in Court | Articles With Pictures Out of Court | Total Column Length of Articles (In.) | | Average Column Length | |
|---|---|---|---|---|---|---|---|
| | | | | Without Pictures | With Pictures | Without Pictures | With Pictures |
| Anchorage Daily News | 6 | --- | --- | 92 | --- | 15.3 | --- |
| Anchorage Times | 3 | 2 | --- | 40 | 28 | 13.3 | 14.0 |
| TOTAL | 9 | 2 | | 132 | 28 | 14.7 | 14.0 |

TABLE XV

News Cameras in the Alaska Courts: Assessing the Impact

NEWSPAPER COVERAGE
(All after 7/1/85)

OPEN MEETINGS CASE

| Newspaper | Articles Without Pictures | Articles With Pictures in Court | Articles With Pictures Out of Court | Total Column Length of Articles (In.) Without Pictures | Total Column Length of Articles (In.) With Pictures | Average Column Length Without Pictures | Average Column Length With Pictures |
|---|---|---|---|---|---|---|---|
| All-Alaska Weekly | 1 | --- | --- | 10 | --- | 10.0 | --- |
| Anchorage Daily News | 14 | 3 | 2 | 238 | 108 | 17.0 | 21.6 |
| Anchorage Times | 9 | --- | --- | 141 | --- | 15.7 | --- |
| Fairbanks Daily News-Miner | 3 | --- | --- | 38 | --- | 12.7 | --- |
| Frontiersman | 1 | --- | --- | 7 | --- | 7.0 | --- |
| Homer News | 1 | --- | --- | 12 | --- | 12.0 | --- |
| Juneau Empire | 12 | 1 | --- | 172 | 10 | 14.4 | 10.0 |
| Ketchikan Daily News | 3 | --- | --- | 58 | --- | 19.3 | --- |
| Peninsula Clarion | 1 | --- | --- | 19 | --- | 19.0 | --- |
| Sitka Sentinel | 1 | --- | --- | 12 | --- | 12.0 | --- |
| Southwest Journal | 1 | --- | --- | 10 | --- | 10.0 | --- |
| Valdez Vanguard | 2 | --- | --- | 28 | --- | 14.0 | --- |
| Valley Sun | 1 | --- | --- | 12 | --- | 12.0 | --- |
| Wrangell Sentinel | 4 | --- | --- | 53 | --- | 13.2 | --- |
| TOTAL | 54 | 4 | 2 | 810 | 118 | 15.0 | 19.7 |

The final set of post-rule-change cases were the Mackay murder-for-hire cases. Half of these proceedings took place in Anchorage before a change of venue to Fairbanks for the remaining defendants, including Neil Mackay. Neil Mackay's arrest took place in Hawaii and many of the out-of-state pictures listed in Table XVI, p. 53, were pictures taken in the Hawaii courtroom in connection with extradition proceedings. Four newspapers ran stories with in-court pictures: the Anchorage Daily News, Anchorage Times, Fairbanks Daily News-Miner, and Juneau Empire. Each of these papers ran longer stories with pictures than without pictures. The Anchorage Daily News and Anchorage Times ran a comparable number of articles on these cases but, once again, the Anchorage Daily News's stories exceeded the length of the Times's stories.

We conducted the same type of analysis for the Peel case (see Table XVII, p. 54) but have treated it separately since it is a pre-rule-change case requiring the defendant's consent where that consent was conditionally given. Three papers extensively covered the Peel trial: the Anchorage Daily News, Anchorage Times, and Ketchikan Daily News. The Ketchikan Daily News covered the proceedings almost daily, running a total of 260 articles. Almost all the papers devoted more column space to articles with pictures than those without. The one notable exception is the Juneau Empire. While the Empire devoted over eighteen column inches on average to its four articles without pictures, it devoted an average of under ten column inches to the ten articles that were accompanied by pictures. Overall, the Ketchikan Daily News devoted the most space to the Peel trial.

Our final comparison looks at the overall coverage by the two Anchorage papers both pre and post-rule change. Table XVIII, p. 55, illustrates the aggregate data for the cases discussed above. The top portion of the table is a comparison of the data for all eight cases that were examined. The second part of the table shows the data for the two pre-rule-change cases plus the pre-change data for the two cases that spanned over the rule change. The bottom portion shows the post-change data for the two cases that spanned the change plus the three post-rule-change cases but does not include the Peel case. The Peel case has been included in the top portion of the table, showing the aggregate numbers for all cases, but has not been categorized as either a pre- or post-rule-change case because of the unique circumstances that required Peel's consent to coverage.

### TABLE XVI
### (News Cameras in the Alaska Courts: Assessing the Impact)

NEWSPAPER COVERAGE THROUGH MAY 1987
(ALL AFTER 7/1/85)

MACKAY RELATED CASES

| Newspaper | Articles Without Pictures | Articles With Pictures In Court | | Articles With Pictures Out of Court | Total Column Length of Articles (In.) | | Average Column Length | |
|---|---|---|---|---|---|---|---|---|
| | | Alaska | Out of State | | Without Pictures | With Pictures | Without Pictures | With Pictures |
| All-Alaska Weekly | 3 | — | — | — | 71 | — | 23.6 | — |
| Anchorage Daily News | 104 | 27 | 4 | 18 | 1627 | 1272 | 15.6 | 26.0 |
| Anchorage Times | 105 | 11 | 2 | 14 | 1528 | 613 | 14.6 | 22.7 |
| Fairbanks Daily News-Miner | 24 | 14 | 1 | 1 | 306 | 256 | 12.8 | 16.0 |
| Juneau Empire | 1 | 1 | — | — | 12 | 18 | 12.0 | 18.0 |
| Ketchikan Daily News | 2 | — | — | — | 43 | — | 21.5 | — |
| Nome Nugget | 1 | — | — | — | 3 | — | 3.0 | — |
| TOTAL | 240 | 53 | 7 | 33 | 3590 | 2159 | 15.0 | 23.2 |

## TABLE XVII

(News Cameras in the Alaska Courts: Assessing the Impact)

### NEWSPAPER COVERAGE THROUGH MAY 1987

### PEEL CASE

| Newspaper | Articles Without Pictures | Articles with Pictures in court | Articles with Pictures out of Court | Total Column Length of Articles (In.) Without Pictures | Total Column Length of Articles (In.) With Pictures | Average Column Length Without Pictures | Average Column Length With Pictures |
|---|---|---|---|---|---|---|---|
| All-Alaska Weekly | 3 | -- | -- | 29 | -- | 9.7 | -- |
| Anchorage Daily News | 38 | 11 | 1 | 569 | 274 | 15.0 | 22.8 |
| Anchorage Times | 26 | 6 | 6 | 426 | 203 | 16.4 | 16.9 |
| Fairbanks Daily News Miner | -- | 7 | 1 | -- | 66 | -- | 8.3 |
| Island News | 5 | -- | 1 | 70 | 12 | 14.0 | 12.0 |
| Juneau Empire | 4 | 9 | 1 | 73 | 97 | 18.2 | 9.7 |
| Ketchikan Daily News | 209 | 42 | 9 | 4152 | 1164 | 19.9 | 22.8 |
| Southeastern Log | -- | 1 | -- | -- | 20 | -- | 20.0 |
| TOTAL | 285 | 76 | 19 | 5319 | 1836 | 18.7 | 19.3 |

## TABLE XVIII
### (News Cameras in the Alaska Courts: Assessing the Impact)

### NEWSPAPER COVERAGE

### ALL CASES (8)*

| Newspaper | Articles Without Pictures | Articles With Pictures in Court | Articles With Pictures Out of Court | Total Column Length of Articles (In.) | | Average Column Length | |
|---|---|---|---|---|---|---|---|
| | | | | Without Pictures | With Pictures | Without Pictures | With Pictures |
| Anchorage Daily News | 277 | 51 | 32 | 4184 | 2010 | 15.1 | 24.2 |
| Anchorage Times | 289 | 27 | 32 | 3771 | 1123 | 13.0 | 19.0 |
| **COVERAGE BEFORE 7/1/85 (4 CASES)** | | | | | | | |
| Anchorage Daily News | 99 | 2 | 8 | 1400 | 185 | 14.1 | 18.5 |
| Anchorage Times | 120 | 3 | 12 | 1333 | 239 | 11.1 | 15.9 |
| **COVERAGE AFTER 7/1/85 (5 CASES)** ** | | | | | | | |
| Anchorage Daily News | 140 | 38 | 23 | 2215 | 1551 | 15.8 | 25.4 |
| Anchorage Times | 143 | 18 | 14 | 2012 | 681 | 14.1 | 21.3 |

\* Two of the eight cases started before 7/1/85 and continued after 7/1/85

\*\* Excludes Peel case.

Many of the characteristics that were examined on a case-by-case basis above are more clearly evident in Table XVIII. For example, the top portion of the table shows that the Anchorage Times runs more articles without pictures than the Daily News, the Daily News uses more in-court pictures, and both papers run longer stories with pictures. Overall, the Daily News runs longer stories than the Times. Prior to July 1, 1985, the Times ran more articles than the Daily News, but shorter articles. When pictures were available, articles that accompanied them were significantly longer. Since the opportunities to obtain in-court pictures were rare, neither paper ran very many (see Table XIII, p. 55, second column).

After July 1985, the Daily News began to run more court stories than the Times, using more pictures both in and out of court while continuing to run longer stories. It appears that the rule change allowing greater use of cameras in the courtrooms, led to increased use of pictures and increased attention to the courts by the press. Story lengths for both newspapers increased significantly after the rule change. The length of a story without a picture increased from 14 inches to almost 16 inches for the Daily News and from 11 inches to 14 inches for the Times. With pictures, the Daily News articles increased by seven inches a story (from 18.5 to 25.4) and the Times increased their articles from 15.9 inches before the rule change to 21.3 inches after.

While changes in editorial policy and the nature of the papers studied could account for some of this change, it appears that increased access of cameras to the court had a large impact on the papers' increased coverage of court cases. The cases chosen before, during, and after the rule change were all chosen for their notoriety and comparability. Clearly, the Mackay cases and the Peel trial were media events; however, the Yi and Cantwell cases provided many of the same elements. The numbers tell us that increased camera access has not detracted from the written story that appears in the paper. If there was a fear that newspapers would become photo tabloids, that fear has not been realized. There are neither fewer articles on the courts nor are court articles shorter with the use of photos. Use of photos may have also affected the placement of the story. While many of the editors interviewed were not willing to say that photos make stories "front page" stories, many agree that an interesting story would likely get front page placement with a good photo.

Newspaper photographers have had few administrative difficulties with courtroom access. Those that were requested to stop using their cameras, were using

single lens reflex cameras with relatively loud shutters.  These were often quiet proceedings or exceptionally tense moments in proceedings where the same camera was allowed later in the hearing.  Photographers with quiet shutters have had fewer problems taking photos during court proceedings.[78]  Often, photographers are asked to restrict their movement in the courtroom and to avoid changing lenses and film prior to a court recess.  Photographers restricted in this way may bring several cameras with them into the courtroom.

Sketch artists have been used by the newspapers on some occasions when their cameras have not been allowed into the courtroom.  Judges agreed that sketch artists create the largest distraction in the courtroom.  While television cameras are quiet and unobtrusive and still cameras may project minor clicking sounds, sketch artists fumble loudly through cases of pens and pencils, flipping large pages of sketch pads while attracting a crowd looking over their shoulders.  Many judges believe that sketch artists should be subject to the same standards as still photographers in their courtroom.

Overall, newspaper reporters and photographers are appreciative of their new camera access to the courtroom.  They are concerned with accurately portraying court behavior while not interfering with the operation of the court.

C.    The Anchorage Media Courtroom

In anticipation of the increased use of news cameras in the courts, the Anchorage court set aside a courtroom especially designed to accommodate the media. The courtroom was designed with three built-in video cameras and a glass-enclosed media booth, complete with audio controls, telephone, and video monitors, built in the back of the room.  Unfortunately, due to several design defects, the media finds this courtroom virtually unusable.

The video cameras built into the walls are set back into the walls in a stationary position with a fixed lens, allowing for no variation in the picture angle.  Of the three video cameras, none faces the defense table, making pictures of the defendant using the court cameras virtually impossible.  In addition, the quality of the video may not be considered "air quality" by many of the news stations' standards.

Apparently, no consideration was given to the use of still cameras in the media courtroom.  All photographers reported that the worst lighting conditions in a courtroom were in the media courtroom.  The only place that still cameras can set up unobtrusively is in the glass booth which is fronted by smoked glass, reducing the available light even further.

Judges do not seem to use the courtroom for their own reasons.  Often they are unaware ahead of time that a proceeding might draw considerable media attention.  Judges are also more comfortable in their own courtroom and confusion can result from a last-minute change in courtrooms.  Judges in Anchorage on a temporary basis tend to be the ones to use the courtroom.

All participants agree that the media courtroom could easily and fairly inexpensively be improved.  Additional lighting is needed with an additional camera facing the defense table and a separate area for still cameras to set up.  By removing the three existing video cameras from behind the wall and by allowing them to rotate and adjust lens angles, they would become usable tools as well.

VI. ISSUES AND RECOMMENDATIONS

<u>News Cameras in the Alaska Courts:</u>
<u>Assessing the Impact</u>

VI.   <u>Issues and Recommendations</u>

A variety of legal issues arose during the course of this study. While the Media Plan attempted to outline procedures and address concerns of both the court and the media, several ambiguities remain. Our recommendations focus on clarifying the remaining ambiguities and defining the Media Plan's underlying policy considerations.

A.   <u>Legal Issues</u>

The most significant legal dispute arose during the Mackay-related proceedings before Judge Greene. Various defense attorneys filed motions objecting to the presence of news cameras during their clients' proceedings. In their motion, the attorneys for Neil Mackay argued that a prohibition on electronic media and still photography was "necessary to ensure decorum and prevent distractions of the participants and jurors...to ensure the fair administration of justice, and to prevent interference with the achievement of fair and impartial hearings and trial...."[79] Among their allegations was that coverage would "unduly invade the privacy of the jurors and distract them in their considerations of the evidence."[80] The motion asserted that extended coverage would create "a substantial likelihood that the testimony and demeanor of witnesses will be unduly influenced, thereby prejudicing the jury's assessment of the veracity and credibility of the witness."[81] Finally, they argued that the prosecution's evidence would relate to matters of child custody to such an extent that media coverage would not be permitted under the current court rule. The memorandum in support of the motion argued that the existing pretrial publicity was severe enough to "sensationalize the controversy and shock the reader" through the additional publicity that cameras would add.[82]

On the day that the motion was filed, John McKay, an attorney for the <u>Anchorage Daily News</u> and several other local media organizations, delivered a letter to the court requesting "reasonable notice and opportunity to be heard before any restrictions are imposed on coverage by print or electronic media in this case."[83] The State's response to the defense motion to prohibit cameras agreed that electronic media equipment should be prohibited from the courtroom prior to the trial and that the question of electronic media at trial could be addressed closer to the trial date after venue of the trial had been established. It appears that

while the defense was concerned about interference with defendant Mackay's fair trial rights, the prosecution was equally concerned with preserving Anchorage as the venue for the trial.   Many of these same concerns were voiced by prosecutors and defense attorneys in the course of this study.

Codefendant Robert Betts filed a response and joinder to the motion to prohibit electronic and photographic media several days later.[84]   The Betts motion added that since "an offer of witness protection, immunity, and a new identity had been offered the defendant Robert Betts," and remained an issue to be determined, photographs revealing Mr. Betts's face to the general public would defeat the agreement.[85]

On January 31, 1986, ten days after the defense motion to ban cameras was filed, the various media organizations filed a motion to intervene.   On that same day, a lengthy memorandum in opposition to the motion to prohibit electronic media and still photography coverage was filed by the intervenors.   The press argued that the extensive coverage given to the case up until that date severely lessened any additional impact of media coverage in the subsequent cases.   Noting that the TV stations already had file footage of the trial participants, the media argued that "Defendant Mackay cannot show a substantial effect resulting from audio and camera coverage of the trial that is substantially and prejudicially [sic] different and separable."[86]   After reviewing the history and development of rules restricting camera use in the courts and outlining improvements in electronic technology during that period, the media asserted their procedural rights in the proceedings.[87]

Arguing that the affected media are entitled to procedural due process, the memorandum notes:

> ...Notice of a hearing must be adequate to allow for a meaningful response and preparation.   If some restrictions are being considered, the news media should have substantive notice of what they are, and an opportunity for an evidentiary hearing to determine what less restrictive means are available, if any restrictions may be justified....Copies of affidavits or documentary evidence upon which Defendant intends to rely should be provided in advance to allow meaningful cross-examination.
>
> At any hearing to restrict media access, the moving party carries the burden of proving that any restrictions at all

are justified, and that no less restrictive means are available.[88]

The current Media Plan does not outline a procedure for the press to participate in the decision-making process.  The media's memorandum illustrates an attempt to apply existing procedures to situations arising under the Media Plan.   While an appropriate mechanism, developing procedures as the situations present themselves may ultimately be unfair to the media.   The media in this case were fortunate to have had an attorney.  Often media organizations cannot afford an attorney or the case in dispute is not worth the financial investment of hiring an attorney to defend their access rights.

With the aid of counsel during the Mackay pretrial proceedings, the media's interests were brought before the court.  However, even with counsel, the media's efforts to maintain involvement in the Mackay proceedings were often frustrating. Attorney for the media, John McKay, was compelled to file a motion "to require due process for news media concerning attempts to restrict access to or coverage of trial,"[89] after failing to receive copies of filed pleadings.  Keeping the media informed was clearly a low priority for the parties.

Unfortunately, many of these issues were not decided by written opinion. Ultimately Judge Greene prohibited cameras from all proceedings except the final trials held in Anchorage and Fairbanks respectively, on grounds that photo coverage of the codefendants' trials would have a prejudicial effect on the subsequent related trial.   Whether all serial trials of codefendants in related cases will be denied camera coverage remains unanswered.   The Media Plan as it is currently written, does not carve out an exception for coverage in related trials but does allow the judge to prohibit coverage to "ensure the fair administration of justice in the pending cause" (emphasis added).[90]  A denial of camera coverage to ensure fair trials in future proceedings may be an implied judicial power but it is not explicitly granted by the current court rule.

The Mackay cases raised several additional issues such as:

(1)   If a witness is anticipating protection in the Federal Witness Protection program, should the media be denied coverage?

(2)   Where child custody issues may be brought into the context of a criminal trial is consent of the parties required?

(3)   Do child witnesses deserve special protection from cameras in the courtroom?

(4)   Should a sketch artist be treated as a note pad reporter or as a photographer under the Media Plan?

None of these issues is currently addressed by the Media Plan.

Although there is no express provision in the Media Plan protecting witnesses from camera coverage in criminal proceedings, with the exception of those involving sexual offenses, judges have requested the press not to photograph witnesses on the few occasions when they have been reluctant to testify with cameras present.  Rather than ban cameras from the entire proceeding, judges have requested the media to not photograph the objecting witness and the press has complied with those requests.[91]

In the early Mackay related trials cameras were not allowed, in part, because witnesses were in the Federal Witness Protection program.  Witnesses in the federal program are often relocated out-of-state with new identities.  There is some concern that photographing protected witnesses might make the federal program less effective.  However, attorneys did not object to cameras when one of the protected witnesses testified in the trial of Neil Mackay and photos of Gilbert Paoule appeared in several newspapers.  Apparently, there is no existing federal regulation that addresses this particular issue.

The prosecution in the Mackay trial brought in evidence relating to a child custody battle that Neil Mackay and his wife had been involved in.   Mackay's attorneys initially asserted that the parties' consent was necessary under the Media Plan's provision addressing matters involving child custody.   Read in its entirety, Canon 3(A)(7)(c) appears to restrict coverage in child custody proceedings:

> (c)   Extended media coverage provisions set forth in (7)(a) shall not apply to matters involving juveniles, divorce, dissolution of marriage, domestic violence, child support, child custody and visitation, adoption, paternity and other family matters.   Media coverage for these proceedings is prohibited, except that it may be allowed on a case-by-case

> basis only upon approval of the judge or master presiding and
> the consent of all parties, including any guardians ad
> litem...[92]

The issue briefly arose again at the time Neil Mackay's son was to testify in court. Concern was orally expressed as to whether a juvenile witness could be photographed in court. A written order by Judge Greene deferred decision on these specific items until they came up in the course of the trial noting that "depending on the nature of the information presented, the court may preclude electronic media coverage of the matters involving child custody and visitation to the extent that such issues are introduced...."[93] Ultimately, photos of the child testifying appeared on the front pages of several newspapers.

Finally, the last major issue arising in the course of the Mackay trial involved the court's ability to restrict a sketch artist. The original request forms used by the courts since July 1985 contained a space for sketch artists to request access. Sketch artists, however, are not covered by the provisions of the Plan. After confusion over the need for sketch artists to request permission to cover a trial resulted in formal court action against a sketch artist, the court realized its error and issued a memorandum correcting the request forms (i.e. deleting the words "sketch artist"). The more substantive issue is whether sketch artists should be covered by the provisions of the Media Plan, including the requirements of filing formal requests. Most judges agree that sketch artists are the most distracting members of the media in the courtroom and feel that if identification of certain individuals is an issue, sketches of those people could be just as damaging as photos or video footage. Since sketch artists are most often used in jurisdictions that do not allow courtroom cameras, no other state has attempted to regulate sketch artists within the framework of a media rule.

Although formal disciplinary action has not been necessary during the time that the Media Plan has been in effect, its disciplinary provisions deserve a closer look. Paragraph 11 of the Media Plan outlines the following procedures for Suspension of Media Coverage Privileges.

> If the judge presiding at a proceeding determines that an
> individual or organization has violated any provision of the
> media plan, the judge may recommend to the administrative
> director that the individual's or organization's media
> coverage privileges be suspended for a period of up to one
> year. The judge shall notify the individual or organization
> by certified mail of the recommendation and the reasons which
> support it. The individual or organization shall have five

working days from receipt of the notice to respond in writing to the administrative director.   The director shall send notice to the judge and the individual or organization of the director's decision within five working days.[94]

While it is clear that the court needs authority over the media in the courtroom to ensure the fair administration of justice, a provision that allows the administrative director to suspend media privileges for up to one year is a severe penalty.   Suspension of media privileges is suspension of a First Amendment right that requires due process of law.[95]   Under the existing suspension provision, the media organization does not have a hearing of any kind before the right to cover the courts can be revoked.

B.   Administrative Issues

Administrative procedures under the Media Plan are fairly simple and routine.   A media organization wanting camera access to a courtroom first fills out a "Request for Coverage", gets the judge's signature, picks up a press badge and enters the courtroom with a camera.   The overall simplicity of the process is what makes it so workable.

Media suggestions for improving the administration of the Plan reflect a sensitivity to the subtle restrictions placed by the Plan's provisions.   Ideally, media representatives would prefer to file a "Notice of Coverage" in place of the existing "Request."   In addition, some concern has been expressed by notepad reporters who have been required to wear press badges since the July 1985 Media Plan was adopted.   The requirement that grew out of the court's concern that witnesses and jurors know who the media are, is viewed by some media representatives as an infringement on their ability to freely enter the court.   The head of security for the Anchorage courts believes that much of the formal paperwork required two years ago, is no longer necessary and, in fact, is burdensome.   The media and the court personnel have developed a working relationship that no longer requires daily monitoring.[96]

Technical problems in the courtroom concern the media as well.   Television crews do not like cables leading across the length of the courtroom any more than the judges do.   Both television and radio must get permission to place their own microphones in the courtroom to obtain "air quality" audio, and extension cords need to be made available where the only outlet is behind the judge's bench.

- 64 -

Each of the technical problems is acknowledged to be minor.  What is of major concern to the judges and the media alike is the general lack of knowledge of the Media Plan's provisions.  Administration of the Plan can only be effective if those charged with implementing the Plan are intimately aware of its provisions.   Both judges and members of the media need to be made aware of the most recent provisions of the Plan.

C.   Recommendations

1.   THE PLAN SHOULD INCORPORATE PROCEDURES THAT GIVE THE MEDIA THE ABILITY TO CHALLENGE A DENIAL OF CAMERA ACCESS.

Currently, the media organizations must hire a lawyer to challenge a ruling that bars them from the courtroom.  Denials of access are rare, but when they do occur, if erroneous, may have the effect of barring meaningful coverage of a court proceeding.  The ability to challenge the denial should also be speedy.  Often once the proceeding has taken place, there is no comparable opportunity to obtain pictures.  Once media access to the courtroom has come into question, the media should receive adequate notice and a meaningful opportunity to address the possible closing of the proceedings to cameras.  The court system should consider defining the extent and content of the notice to the media (see p. 61).

2.   WITNESS OBJECTIONS TO CAMERA COVERAGE SHOULD BE CONSIDERED ON A CASE BY CASE BASIS.

The sensitive nature of some cases may require that a judge exercise discretion when a witness expresses reservations about the presence of news cameras in the courtroom.  This recommendation merely states that the existing practice should be expressly articulated in the Media Plan (see pp. 27 & 62).

3.   PROCEEDINGS THAT INDIRECTLY INCLUDE FAMILY MATTERS MAY REQUIRE CONSENT OF THE PARTIES FOR CAMERA COVERAGE BUT ONLY FOR THE TIME THAT THOSE MATTERS ARE DISCUSSED IN THE PROCEEDING.

This recommendation reflects a desire that where parts of a proceeding should be excluded from camera coverage, cameras should not be banned from the entire proceeding (see pp. 62-63).

4. CAMERA COVERAGE OF SEXUAL OFFENSES SHOULD BE TREATED AS COVERAGE OF A CRIMINAL MATTER EXCEPT THAT THE VICTIM SHOULD NOT BE PHOTOGRAPHED WITHOUT THE VICTIM'S CONSENT.

A complete ban on cameras in sexual offense cases seems unwarranted if the central goal is to protect the victim. The victim could be protected from publicity while the defendant would come into the public view through newspaper photographs and television coverage (see p. 15).

5. SKETCH ARTISTS SHOULD BE SUBJECT TO STANDARDS ESTABLISHED UNDER THE MEDIA PLAN.

Chiefly because of the distractions that they cause in the courtroom, sketch artists should be required to fill out a form in the same manner as a photographer and be subject to standards of noise level and movement. In addition, sketch artists could be subject to the same treatment as cameras in proceedings (see pp. 57 & 63).

6. JUDGES SHOULD HAVE THE DISCRETION TO ENSURE THE FAIR ADMINISTRATION OF JUSTICE. THIS DISCRETION INCLUDES THE ABILITY TO CONSIDER POSSIBLE PRETRIAL PUBLICITY GENERATED BY NEWS CAMERAS IN SEVERED CRIMINAL PROCEEDINGS.

The language in Canon 3(A)(7) and the Media Plan that limits a judge's discretion to the fair administration of justice in the "pending cause" should be reworded. By removing the phrase "pending cause", judges will, for example, have the discretion to determine whether camera presence will enhance the effect that a news report will have on the public's view of subsequent defendants' guilt or innocence in severed criminal proceedings (see pp. 28 & 61). Other provisions relating to the judge's discretion should contain parallel language, consistent with this recommendation.

7.   PRIOR TO SUSPENSION OF MEDIA PRIVILEGES, THE INDIVIDUALS OR
ORGANIZATIONS TO BE DISCIPLINED SHOULD BE ENTITLED TO PRESENT EVIDENCE
ON THEIR BEHALF AT A HEARING BEFORE A JUDGE.

Suspension of media privileges is a serious and significant measure
that affects the basic rights and livelihood of the media members
involved.  A hearing before a judge should ensure that the disciplined
media organization or individual receives its due process rights under
the constitutions of the United States and the State of Alaska (see p.
64).

8.   CAMERA ACCESS TO THE COURTS IN ALL CASES EXCEPT FAMILY MATTERS SHOULD
BE PRESUMED, SUBJECT TO REASONABLE RESTRICTIONS BY THE JUDGE UNDER THE
MEDIA PLAN.  "REQUEST FOR COVERAGE" FORMS SHOULD BE CHANGED TO "NOTICE
OF COVERAGE".

Request forms have, in practice, become notices to the judge that
cameras will be present in court.  A formal acknowledgment of the
presumption of camera access to most proceedings should encourage a
uniform approach by judges to the presence of news cameras.  Many of
the differences among judges' treatment of cameras are attributable to
differing philosophies as to camera access.  An express statement that
access is presumed should give judges needed guidance.  The presumption
of camera access remains rebuttable under the other provisions of the
Media Plan (see pp. 39 & 64).

9.   AN EFFORT SHOULD BE MADE TO CORRECT THE TECHNICAL PROBLEMS THAT RENDER
THE MEDIA COURTROOM IN ANCHORAGE UNUSABLE.

Simple adjustments to the existing video cameras and the addition of
one camera could transform the unusable media equipment into a workable
media courtroom.  Any anticipated changes that are planned to alter the
Media Courtroom would benefit from participation by members of the
media.  Future courtrooms that are built in the state should also
anticipate use by the media and provide the necessary technical support
(see pp. 57-58).

10.   JUDGES AND MEDIA ORGANIZATIONS SHOULD BE MADE AWARE OF THE MEDIA PLAN'S POLICIES AND PROVISIONS.

The Alaska Court System may want to consider printing a short explanatory brochure outlining the Media Plan's provisions for use by the media.   One of the major reasons for the lack of knowledge of the Media Plan and the media's obligations is the constant turnover of media personnel.   This turnover seems especially marked in the television industry.   A simple publication could go a long way in helping to bridge the knowledge gap for new reporters.   Judges should also be educated as to the provisions of the Plan and encouraged to become comfortable with cameras in their courtrooms.   The Alaska Court System could also annotate this publication with judicial decisions relating to the Media Plan providing a useful commentary interpreting the various provisions.