**EXHIBIT A**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| TAMMY KITZMILLER, et al., ) | |
| ) | |
| Plaintiffs, ) | **Civil No. 04-CV-2688** |
| ) | |
| v. ) | **Filed Electronically** |
| ) | |
| DOVER AREA SCHOOL ) | **Hon. John E. Jones, III** |
| DISTRICT, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

## MEMORANDUM OF COURTROOM TELEVISION NETWORK LLC IN SUPPORT OF ITS UNOPPOSED MOTION FOR LEAVE TO RECORD AND TELECAST TRIAL PROCEEDINGS

Dated: September 2, 2005

Lee Levine*
Gayle C. Sproul
Michael Berry
Levine Sullivan Koch & Schulz, L.L.P.
2112 Walnut Street, Third Floor
Philadelphia, Pennsylvania 19103
(215) 988-9778 (phone)
(215) 988-9750 (facsimile)
lee.levine@lskslaw.com
gayle.sproul@lskslaw.com
michael.berry@lskslaw.com
*Attorneys for Intervenor*
*Courtroom Television Network LLC*

\*       Petition for special admission filed on September 2, 2005.

It is difficult to conceive of a trial that is better suited to televising than the one in this case. On the one hand, three powerful interests collide in this constitutional challenge: the regulation of the public education of children by local government, the appropriate role of religion in public education, and conflicting beliefs about the origins of life. On the other hand, none of the generally asserted countervailing concerns that often cause courts to hesitate to permit televised coverage exist here: privacy interests of parties and witnesses, prurient interest in salacious material, constitutional rights of criminal defendants, or the protection of a jury. It is not an exaggeration to say that, if ever a case existed that should be the subject to the type of unobtrusive and comprehensive television coverage provided by Courtroom Television Network LLC ("Court TV"), this one is it.

Indeed, this case is a defining example of the kind of judicial proceeding in which the gravity of the public implications of its outcome matches the public's fervent interest in it. By the same token, unless televised coverage of the trial is permitted, only a fortunate few will be able to watch the proceedings in this case unfold. The rest of the local community, the Commonwealth, and the country will have to await second-hand accounts and third-hand analysis, often "spun" by those with an interest in the outcome.

In light of the importance of the issues presented by this case and the passionate and legitimate public interest in them, Court TV seeks leave to televise

the trial from beginning to end – from the attorneys' opening statements to the court's rendition of its judgment. Broadcasting the trial live will afford millions of Americans the opportunity to see the trial first-hand, to evaluate each side's arguments and evidence, and to observe our system of justice at work. The televising of courtroom proceedings in this case – to which none of the parties objects – would provide an open civics lesson for the country and would serve to inform a great national discussion of some of the most vital issues of the day.

## STATEMENT OF FACTS

### I.    The Procedural History Of This Case

On December 14, 2004, plaintiffs, a group of taxpayer parents of school age children, filed a complaint against defendants, the Dover Area School District and its Board of Directors, based on alleged violations of plaintiffs' rights under the Establishment Clause of the First Amendment and Article I, Section 3 of the Pennsylvania Constitution. Specifically, the Board is alleged to have resolved to suggest to students that they may wish to study the theory of intelligent design, which some believe conflicts with the theory of evolution. In addition, the Board has accepted the donation of textbooks titled *Of Pandas and People: The Central Question of Biological Origins*, and mandates that teachers mention this book to students as a resource on the topic of intelligent design at the outset of the study of evolution in biology class. According to plaintiffs, intelligent design is creationism

in sheep's clothing and its promotion by the Board in public school constitutes a

violation of the Establishment Clause.  The complaint seeks injunctive relief,

nominal damages, and fees and costs.

Defendants filed a motion for summary judgment on July 13, 2005.  That

motion is currently pending.  Trial in this matter is scheduled to commence on

September 26, 2005.

## II.   **The Debate**

As noted, this case presents issues of profound national importance.  When

these questions were presented in the *Scopes* trial in Tennessee, it was called the

"trial of the century," and that courtroom drama has been permanently etched in

the nation's history.  *See, e.g.*, *Scopes v. Tennessee*, 289 S.W. 363 (Tenn. 1926);

Jerome Lawrence & Robert E. Lee, *Inherit the Wind* (1951).  Eighty years later,

the country is still discussing, studying, and debating the same weighty issues

presented in the *Scopes* trial,[1] and its attention has now turned to the federal

---

[1]   In just the past few months, these issues have become the subject of two
bills pending in Pennsylvania's General Assembly, have been debated by public
officials in Kansas, and have even evoked a statement from the President of the
United States.  *See* H.B. 1007, 2005 Pa. Sess. (seeking to amend the Public School
Code of 1949 to add new section entitled "Teaching Theories on the Origin of Man
and Earth," which reads as follows:  "[i]n any public school instruction concerning
the theories of the origin of man and the earth which includes the theory commonly
known as evolution, a board of school directors may include, as a portion of such
instruction, the theory of intelligent design") (Declaration of Gayle C. Sproul
("Sproul Decl."), Ex. 14); S. Res. 70, 2005 Pa. Sess. ("Reaffirming Pennsylvania's
commitment to the teaching of the theory of evolution in public schools") (Sproul

courthouse in Harrisburg where this Court will soon preside over the trial in this

matter. *See, e.g.*, Jill Lawrence, *New School Year, New Battle Over Evolution*,

USA TODAY, Aug. 26, 2005, at A6 (Sproul Decl., Ex. 10); Richard N. Ostling, *Are*

*the Arguments Over Evolution Inescapably Religious?*, MACON TELEGRAPH, Aug.

20, 2005, at D1 (Sproul Decl., Ex. 11); Jerry Adler, *Doubting Darwin*, NEWSWEEK,

Feb. 7, 2005, at 44 (Sproul Decl., Ex. 12); Neela Banerjee, *An Alternative to*

*Evolution Splits a Pennsylvania Town*, N.Y. TIMES, Jan. 16, 2005, at A18 (Sproul

Decl., Ex. 13). Indeed, the witness lists of the parties to this action read like a

"Who's Who" of the experts and commentators on this very controversial topic.

*See* Pls.' Pretrial Memo. at 13-19 (listing expert witnesses, such as Drs. Brian

Alters, Barbara Forrest, and Robert Pennock).

## III.   The Experience, Policies, And Practices Of Court TV

Court TV is a national cable news network dedicated to reporting on the

legal and judicial systems of the United States, the fifty states, and the District of

Columbia.[2]  Since its creation in 1991, Court TV's cornerstone has been televising

---

Decl., Ex. 15); Diane Carroll, *Evolution Issue Again Gets Look Form Board*,
KANSAS CITY STAR, Aug. 9, 2005, at B1 (Sproul Decl., Ex. 16); Peter Baker &
Peter Slevin, *Bush Remarks On "Intelligent Design" Theory Fuel Debate*, WASH.
POST, Aug. 3, 2005, at A1 (Sproul Decl., Ex. 17).

[2]      The facts recited herein concerning Court TV are a matter of public record,
both in the press and in judicial opinions, *see, e.g., Katzman v. Victoria's Secret
Catalogue*, 923 F. Supp. 580, 582 (S.D.N.Y. 1996), and Court TV respectfully
requests that the Court take judicial notice thereof. Additionally, for the Court's

civil and criminal trials in their entirety. *See Sigmon v. Parker Chapin Flattau & Klimpl*, 937 F. Supp. 335, 336 (S.D.N.Y. 1996) ("Court TV has specialized in complete, extended coverage of trials, both civil and criminal, as well as coverage of oral arguments on motions and in appellate proceedings."). It has televised trials in state and federal courtrooms across the United States, as well as proceedings in countries around the world, including the former Soviet Union, El Salvador, Serbia, and at the International Court of Justice at The Hague. *See* Jacobs Decl., ¶ 2.

The underlying premise for Court TV's telecast of each of these proceedings is the same – to capture the public workings of the justice system as accurately as possible. Court TV strives to enable viewers to observe the proceedings as though they themselves were in the courtroom. *See* Jacobs Decl. ¶ 3. It pursues this mission to inform and educate the public in the most accurate fashion possible, differentiating its coverage from the piecemeal sound-bites and "spin" that frequently attend out-of-court coverage of judicial proceedings. Court TV permits citizens to watch for themselves the moment-to-moment work of the judicial process as it unfolds.

_____

consideration, Court TV submits the Declarations of Douglas P. Jacobs ("Jacobs Decl.") and Gayle C. Sproul, which are attached hereto as Exhibits A and B respectively, and which include as exhibits copies of Court TV's *Network News And Editorial Guidelines*, as well as an array of studies and reports concerning cameras in state and federal courtrooms.

In fact, Court TV has now televised more than 900 trials and other judicial proceedings. *See* Jacobs Decl. ¶ 2. Its presence in the courtroom is non-disruptive. Prior to and throughout each proceeding it covers, Court TV works with the presiding judge and/or court personnel to ensure that all requirements concerning equipment placement and camera coverage are satisfied. *See id.* ¶ 4. It employs one or two stationary cameras, which produce no noise, require no lighting other than existing courtroom lighting, and are placed away from the proceedings. *See id.* ¶ 5. Wiring is unobtrusive. *See id.* Microphones are small and are never operated in such a way as to record conversations between attorneys and clients or conversations at the bench between the attorneys and the Court; they are turned off during all parts of the proceedings that are not part of the public record. *See id.* Court TV will observe all technical and equipment criteria concerning camera placement.

Court TV seeks to televise the entirety of the trial in this case, from preliminary proceedings to opening statements to the rendering of the Court's judgment, should it be announced in open court. *See* Jacobs Decl. ¶ 3.

## STATEMENT OF QUESTION INVOLVED

Whether the Court should exercise its discretion under Local Rule 83.1.1 to permit Court TV to record and telecast the complete trial proceedings in this "specific case."

## **ARGUMENT**

### I.    **The Local Rules Afford This Court Discretion To Permit Televised Trial Coverage in "Specific Case[s]."**

In civil matters proceeding in the Middle District, Local Rule 83.1.1 governs the use of cameras and recording equipment in the courtroom. That rule states in full:

> The taking of photographs in the courtroom or its environs, or radio or television broadcasting from the courtroom or its environs, or taping or recording in the courtroom or its environs during the progress of and in connection with judicial proceedings, including proceedings before a United States Magistrate Judge, whether or not court is actually in session, is prohibited. Environs of the courtroom shall include the entire floor on which is located any courtroom, grand jury room, marshal's office, clerk's office, or office of the United States Attorney, or any lock-up, and the corridor or lobby on the main floor or street floor constituting an entrance area to the building in which is located any elevator door for elevators leading from such entrance areas of the building to any such floor. *The court may make such orders as may be necessary in connection with any specific case to protect the rights of all parties and the public.*

M.D. PA. R. 83.1.1 (emphasis added). Thus, although the rule generally prohibits "television broadcasting from the courtroom," it specifically provides that an individual court "may" enter an order in a "specific case" as is "necessary . . . to protect the rights of all parties and the public." Other than this local rule, there is "no binding authority" concerning the recording and telecast of trial proceedings in

- 7 -

the Middle District.[3] *Katzman*, 923 F. Supp. at 584 (noting that only the local rules for the Southern District of New York govern cameras in the courtroom in that federal judicial district); *see also Chandler v. Florida*, 449 U.S. 560, 582-83 (1981) (holding that a state court's policy of permitting television cameras in criminal trials is not unconstitutional).[4]

The plain meaning of Local Rule 83.1.1 is that, in particular cases, the Court "may" enter orders that depart from the general rule. *See United States v. Rodgers*, 461 U.S. 677, 706 (1983) ("The word 'may,' when used in a statute, usually implies some degree of discretion."); *Flynn v. United States*, 786 F.2d 586, 591 (3d Cir. 1986) (when statute states that court "may" issue an injunction, the matter "lies within the discretion of the court"); *Anchorage Assocs. v. Virgin Islands Bd. of Tax Rev.*, 922 F.2d 168, 174 (3d Cir. 1990) (holding that local rule of district

---

[3]    In contrast, the Federal Rules of Criminal Procedure bar television cameras from courtrooms in all criminal cases and do not provide the court with any discretion to proceed otherwise. *See* FED. R. CRIM. P. 53 ("Except as otherwise provided by a statute or these rules, the court must not permit ... the broadcasting of judicial proceedings from the courtroom."). No analogous prohibition is contained in the Federal Rules of Civil Procedure.

[4]    Although the Federal Judicial Conference has expressed its opposition to allowing television cameras in federal courtrooms, that position is not binding on any court. *See Katzman*, 923 F. Supp. at 584. No rule, order, or statute prohibits their use in civil cases. Indeed, while the Federal Judicial Conference has invited each Circuit to issue a rule barring cameras in its districts, *see id.*, the relevant Third Circuit rule only prohibits cameras in proceedings before the Court of Appeals, *see* 3d Cir. Order of Apr. 30, 1997 (Sproul Decl., Ex. 18).

court providing that a court "may" treat a motion as conceded "authorizes" the court to grant motion on basis advocated by moving party). Thus, the rule permits the Court to decide for itself on a case-by-case basis whether to allow civil proceedings in its courtroom to be televised.[5]

This discretion is consistent with that afforded to courts in other federal districts. For example, courts in the Southern and Eastern Districts of New York have held that their local rules provide courts with the discretion to authorize telecasts of civil proceedings in their courtrooms. *See Katzman*, 923 F. Supp. at 583-84 (holding that local rule "grants a judge of this Court discretion to authorize television proceedings in his or her courtroom"); *Hamilton v. Accu-Tek*, 942 F. Supp. 136, 137 (E.D.N.Y. 1996) (courts have discretion to permit cameras in the courtroom); *Sigmon*, 937 F. Supp. at 336 (recognizing that court has "full discretion" under local rules to permit television camera in its courtroom); *Marisol A. v. Giuliani*, 929 F. Supp. 660, 661 (S.D.N.Y. 1996) (same).

---

[5]     This is also consistent with Middle District Standing Order No. 05-3 regarding the possession and use of electronic devices in the courthouse, which was promulgated earlier this year. That Standing Order provides that "*unless otherwise permitted by court order*, use of any device to take photographs anywhere inside the Courthouse and Federal Building is expressly forbidden." Standing Order No. 05-3, at ¶ 2 (emphasis added). Like the Local Rules, this Standing Order contemplates that an individual court may permit cameras inside its courtroom.

There can be no doubt that the public will benefit from the televising of this "specific case." Certainly, comprehensive coverage of the trial would bring into full relief the public's fundamental right of access to civil trial proceedings. The Court can ensure fulfillment of the promise of that right by exercising its discretion to permit Court TV to televise this trial, as discussed more fully below.[6]

## II. The Court Should Exercise its Discretion to Permit Court TV to Telecast the Trial Proceedings in This Case Because It Involves Issues of Great Public Importance and Televising the Trial Would Cause No Harm to Any Protectible Interest.

This unique and "specific case" presents the Court with compelling reasons to permit live camera coverage:

- *Television coverage provides the best method to ensure meaningful public access to this trial.*

As the Supreme Court noted in *Richmond Newspapers, Inc. v. Virginia*, space constraints and changing times preclude the vast majority of Americans from physically attending trials and, therefore, from observing them. *See* 448 U.S. 555, 572-73, 577 & n.12 (1980) ("Instead of acquiring information about trials by

---

[6]     The public has a constitutional right of access to trial proceedings. *See, e.g.*, *Publicker Indus. v. Cohen*, 733 F.2d 1059, 1061, 1066-71 (3d Cir. 1984) (discussing precedent articulating constitutional right to access to civil trials). Court TV does not here argue that this right compels the Court to permit it to telecast the proceedings in this matter. Rather, it requests that the Court exercise its discretion to permit the broadcast in this particular case in accordance with the Local Rules. It cannot be doubted, however, that televising this trial would permit the public at large to exercise its fundamental right of access to the trial itself. Hence, following the language of Rule 83.1.1, by permitting the telecast, the Court will "protect" the public's fundamental right of access to judicial proceedings.

- 10 -

firsthand observation or by word of mouth from those who attended, people now acquire it chiefly through the print and electronic media. In a sense, this validates the media claim of functioning as surrogates for the public."). The fundamental right of access to public trials "can be fully vindicated only if the opportunity for personal observation is extended to persons other than those few who can manage to attend the trial in person." *United States v. Criden*, 648 F.2d 814, 822 (3d Cir. 1981). For, as the Third Circuit has asked, "what exists of the right of access if it extends only to those who can squeeze through the door?" *United States v. Antar*, 38 F.3d 1348, 1360 (3d Cir. 1994). *Cf. Craig v. Harney*, 331 U.S. 367, 374 (1947) ("what transpires in the court room is public property"). Today, given the unobtrusiveness of the relevant technology, equipment concerns do not provide a reason to limit access to the courtroom to the few members of the press and public who are able to squeeze inside, nor to filter its observation of the trial through the recollections and second-hand musings of often interested observers.

Live television not only provides an immediate opportunity to attend and observe, but particularly where, as Court TV proposes here, coverage is comprehensive, it provides the best and most effective opportunity to do so.[7]

---

[7] Based on television's unique advantages, 43 states permit television coverage of civil proceedings. *See* Radio-Television News Directors Association, *Cameras in the Courtroom: A State-By-State Guide*, http://www.rtnda.org/foi/scc.html (last visited Aug. 29, 2005) (Sproul Decl., Ex.

Obviously, space in the Harrisburg courtroom will be limited, and only a
fortunate few members of the press and public will comprise the gallery. Absent
television coverage, the rest of the public will be relegated to learning about the
trial from second-hand accounts and images broadcast from the courthouse steps.
The vast majority of Americans will not be able to observe what really matters
where it really matters – the actual arguments and testimony presented inside the
courtroom. These filtered accounts are a poor substitute for actually seeing the
inside of the courtroom, hearing the arguments, and considering the actual
evidence and testimony in its entirety.

The technology of television is uniquely positioned to maximize the right of
access and to permit the greatest number of people to observe the trial in this case.
*See Katzman*, 923 F. Supp. at 586 ("[A] silent, unobtrusive in-court camera can
increase public access to the courtroom without interfering with the fair
administration of justice."). It would allow the American public to observe the
demeanor of witnesses, to listen to the tone of their voices, and to evaluate their
credibility and veracity. Likewise, it would provide the public with the
opportunity to consider and weigh each side's unfiltered, unedited arguments.
Simply stated, a telecast would allow the public at large to observe the trial as if it
were in the courtroom. *See United States v. Stewart*, 360 F.3d 90, 99 (2d. Cir.

1); National Center for State Courts, *Cameras in the Courts: Summary of State
Court Rules* (2001) (Sproul Decl., Ex. 2).

2004) ("The ability to see and to hear a proceeding as it unfolds is a vital component of the First Amendment right of access . . . .").

Such coverage facilitates "'informed discussion of governmental affairs by providing the public with the more complete understanding of the judicial system.'" *United States v. Simone*, 14 F.3d 833, 839 (3d Cir. 1994) (quoting *United States v. Smith*, 787 F.2d 111, 114 (3d Cir. 1986)). Judge Weinstein of the Eastern District of New York echoed this sentiment when permitting Court TV to broadcast a civil proceeding in his courtroom:

> In our democracy, the informed tend to be more robustly engaged in public issues. Information received by direct observation is often more useful than that strained through the media. Actually seeing and hearing court proceedings, combined with commentary of informed members of the press and academia, provides a powerful device for monitoring the courts.

*Hamilton*, 942 F. Supp. at 138.

Here, with such weighty issues at the core of the litigation, it is of the highest importance for people to have the opportunity to learn for themselves about the parties' respective positions. When President Bush recently commented on intelligent design, he stated his belief that "[b]oth sides ought to be properly taught . . . so people can understand what the debate is about. Part of education is to expose people to different schools of thought." Baker & Slevin, *supra*, at A1. The same can be said for televising this trial.

- 13 -

The legal, scientific, and spiritual questions presented in Your Honor's courtroom will continue to be discussed by Americans for many years. Seeing the trial as it unfolds will allow all Americans to understand "what the debate is about" and to expose them "to different schools of thought." Only by having the first-hand opportunity to learn about both sides' views and to evaluate both sides' evidence will Americans be able to engage in a fully informed discourse, which stands as the bedrock of our democracy. *See Publicker Indus.*, 733 F.2d at 1070 (recognizing that the right to observe judicial proceedings ensures that the "constitutionally protected 'discussion of governmental affairs' is an informed one").[8]

•    ***Televising the trial is consistent with our recent tradition of providing contemporaneous broadcasts of court proceedings addressing significant matters of public concern.***

In recent years, courts have increasingly opened their proceedings to public telecasts when they consider significant public issues. For example, when the

---

[8]    Even a verbatim transcript of the proceedings will not be nearly as effective in achieving these worthy objectives. *See Stewart*, 360 F.3d at 99 ("[O]ne cannot transcribe an anguished look or a nervous tic."); *Antar*, 38 F.3d at 1360 n.13 (3d Cir. 1994) ("some information, concerning demeanor, non-verbal responses, and the like, is necessarily lost in the translation of a live proceeding to a cold transcript"); *Simone*, 14 F.3d at 842 ("[A] transcript is not the equivalent of presence at a proceeding; it does not reflect the numerous verbal and non-verbal cues that aid in the interpretation of meaning."); *Publicker Indus.*, 733 F.2d at 1072 ("The availability of a trial transcript is no substitute for a public presence at the trial itself. As any experienced appellate judge can attest, the 'cold' record is a very imperfect reproduction of events that transpire in the courtroom.").

- 14 -

Ninth Circuit heard oral argument in the Napster file-sharing case, it allowed C-SPAN to cover the argument with cameras in the courtroom. *See A&M Records, Inc. v. Napster, Inc.*, No. 00-16401 (9th Cir. Sept. 25, 2000) (order granting applications to audio or video record) (Sproul Decl., Ex. 22). Likewise, the D.C. Circuit permitted the press to disseminate live audio coverage of the oral arguments in *United States v. Microsoft Corporation. See Appeals Hearing to Be Live on Radio, Internet*, SEATTLE TIMES, Feb. 13, 2001, at C1 (Sproul Decl., Ex. 23).

And, of course, in 2000, the eyes and ears of the nation were keenly focused on the litigation that would determine the outcome of that year's presidential election. As the litigation wound its way through the judiciary, Americans were able to watch and listen live as the Florida courts – including the Florida Supreme Court – considered the candidate's arguments. *See, e.g.*, David Bianculli, *Air Fair to Fla. & U.S.: State is Right to Allow TV*, DAILY NEWS (N.Y.), Dec. 8, 2000, at 146 (Sproul Decl., Ex. 24). Then, breaking with tradition, the United States Supreme Court released to the public the audiotape of the oral argument in its chambers promptly following the conclusion of the argument. *See* Letter from Chief Justice Rehnquist to Barbara Cochran, Radio-Television News Directors Association (Nov. 28, 2000) ("[T]he Court recognizes the intense public interest in the case and for that reason today has decided to release a copy of the audiotape of

- 15 -

the argument promptly after the conclusion of the oral argument.") (Sproul Decl.,

Ex. 19). The Supreme Court argument was immediately broadcast in its entirety

on radio and television stations throughout the United States.

Each of these cases provided Americans with the opportunity to observe

directly its judicial system as it wrestled with some of the most significant legal

issues of our time. By opening up their courtrooms, these courts gave citizens the

means to participate in the judicial process and the satisfaction of observing justice

in action. *See Simone*, 14 F.3d at 839 (explaining that the right to observe court

proceedings provides "a significant community therapeutic value as an outlet for

community concern, hostility and emotion" (internal quotation omitted));

*Publicker Indus.*, 733 F.2d at 1070 (recognizing that the right of access "permits

the public to participate in and serve as a check upon the judicial process – an

essential component in our structure of self-government" (internal quotation

omitted)). In each instance, the country was treated to a civics lesson – it learned

not only about the particular issues presented to the court, but also about the

judicial process itself. *See Globe Newspaper Co. v. Superior Court*, 457 U.S. 596,

606 (1982) (emphasizing that access to court proceedings heightens "public respect

for the judicial process"); *Katzman*, 923 F. Supp. at 586 (explaining that televising

court proceedings "exposes greater numbers of citizens to our justice system" and

"engenders a deeper understanding of legal principles and processes" (internal
quotations omitted)).

        By allowing Court TV to televise the trial in this case in its entirety,
the Court would achieve these same vital objectives. At a time when the country is
grappling with the proper place of religion in the public square[9] and passionately
debating the origins of life and how it should be taught in our public schools, *see*
*supra* note 1, Court TV respectfully requests that this Court permit nationwide
television access to trial proceedings in its courtroom, thereby providing all
Americans with the opportunity to participate in, and learn from, this unique and
important case.

       •   ***No interest exists that weighs against permitting this trial to be***
***televised.***

Those courts that have prohibited televising trials have typically focused on
one or more of the following potentially negative aspects of televised coverage:
the concern that (1) jurors and witnesses will be intimidated; (2) private or
salacious matters will be the subject of testimony and exhibits; (3) a defendant's
constitutional rights to a fair criminal trial will be impeded; (4) coverage will pose

---

[9]     Just this year, for example, the Supreme Court issued two decisions
concerning the constitutionality of displaying the Ten Commandments on public
property, which reached opposite conclusions. *Compare Van Orden v. Perry*, 125
S. Ct. 2854 (2005) (Ten Commandments at state capitol constitutional), *with*
*McCreary County v. ACLU*, 125 S. Ct. 2722 (2005) (Ten Commandments in
county courthouses unconstitutional).

distractions to witnesses, jurors and court personnel; and (5) one or both sides to

the litigation opposed the telecast. *See, e.g., Estes v. Texas*, 381 U.S. 532 (1965)

(plurality opinion).[10]  In this unique case, none of these factors is present:

> **(1)     This is a bench trial.**  There is no need to be concerned with

the potential impact on jurors.

> **(2)     Most of the witnesses are public figures and people who**

**have taken public positions on controversial issues.**  The parties' witness lists

reveal that the people who will testify are public officials, experts in various fields,

and others who have spoken publicly about the issue of presenting intelligent

---

[10]     In 1965, the Supreme Court held in *Estes* that the media's presence during
the pretrial and trial proceedings in the case of a Texas criminal defendant violated
the defendant's right to a fair trial.  In that case, more than a dozen cameramen
were present, wires crossed the entire courtroom, and large microphones were
fixed on the judge, jury, and attorneys.  *See id.* at 536.  Sixteen years later, the
Court held that the Constitution did not ban cameras in the courtroom, noting that
television is "an evolving technology, which in terms of modes of mass
communication, was in its relative infancy in 1964 [the year of the trial at issue in
*Estes*], and is even now, in a state of continuing change."  *Chandler*, 449 U.S. at
573-74.  In the following twenty-four years, technology has rendered these
concerns entirely moot.  As one report on broadcasting court proceedings noted,
"[i]mprovements in technology have rendered cameras no more, and possibly less,
conspicuous than the newspaper reporter with pencil and notebook and the
courtroom artist with crayon and sketch pad."  REPORT OF THE COMMITTEE ON
AUDIO-VISUAL COVERAGE OF COURT PROCEEDINGS (May 1994) (Sproul Decl., Ex.
5); *accord Katzman*, 923 F. Supp. at 589 ("[T]wenty-two years after the *Estes*
holding, the advances in technology . . . have demonstrated that the stated
objections [to televising trials] can readily be addressed and should no longer stand
as a bar to a presumptive First Amendment right of the press to televise as well as
publish court proceedings, and of the public to view those proceedings on
television.").

design in public schools. Indeed, the only private parties here are the plaintiff-parents, who themselves have raised this issue in a public courtroom and who have already spoken out publicly against the school board's resolution. The defendant school board is, of course, a purely public entity with no privacy rights or interests, and its directors are sued in their official public capacities. In any event, numerous studies have shown that the presence of cameras in the courtroom does not adversely affect witnesses or their testimony. *See, e.g.*, *Katzman*, 923 F. Supp. at 586; Sproul Decl., Exs. 3-5.

**(3)** **No personal or private information will be revealed at trial.** This case contains no salacious facts, involves no prurient interests, and raises no privacy concerns. The issues before the Court are purely public in nature.

**(4)** **The trial will receive significant media attention regardless of whether or not it is televised.** Given the significance of the questions presented by this case and the press attention already devoted to it, there is no question the trial will garner extensive media coverage, with or without a camera in the courtroom. *See In re Petition of Post-Newsweek Stations, Inc.*, 370 So. 2d 764, 776 (Fla. 1979) ("[N]ewsworthy trials are newsworthy trials, and . . . they will be extensively covered by the media both within and without the courtroom" whether cameras are permitted or not.). *Without* cameras in the courtroom, however, the only information about what happens inside its doors will come from

- 19 -

those few members of the media and public able to fit inside the courtroom or from

individuals surmising – or guessing – what has occurred. With a camera in the

courtroom, the trial will be presented just as it unfolds – in a dignified manner and,

as always, under the Court's complete control. *See Stewart*, 360 F.3d at 101, 106

(noting that it would be unfair and inappropriate if trials of greatest interest should

be the ones most likely to be restricted).

      **(5)    Technological advances allow Court TV to telecast the trial**

**unobtrusively with no disruptions.** As explained in the Statement of Facts *supra*,

Court TV uses two stationary cameras that require only the existing lighting in the

courtroom. *See supra* at 4-6. Its wiring and microphones are inconspicuous.

Moreover, Court TV is both prepared and able to work with the Court and

courtroom personnel to take any and all steps required to minimize the impact of

its presence. As Judge Sweet of the Southern District of New York stressed nearly

a decade ago, "televised coverage of trial court proceedings does not impede the

fair administration of justice, does not compromise the dignity of the court, and

does not impair the orderly conduct of proceedings." *Katzman*, 923 F. Supp. at

585.[11]

---

[11]    Court TV is not aware of a single appellate decision overturning a civil
judgment based on the presence of cameras at trial. *Cf.* NEW YORK STATE
COMMITTEE TO REVIEW AUDIO VISUAL COVERAGE OF COURT PROCEEDINGS, AN
OPEN COURTROOM: CAMERAS IN NEW YORK COURTS 1995-97, at 68 (Apr. 4, 1997)
(Sproul, Decl., Ex. 4).

**(6)     The parties do not oppose televising the trial.**  Unlike other cases, in which one or all parties oppose televising a trial, in this case none of the parties objects to Court TV's request.

Put simply, there is every reason to broadcast this trial, and no reason to prohibit it.

## **CONCLUSION**

For the foregoing reasons, Court TV respectfully requests that the

Court exercise its discretion under Local Rule 83.1.1, grant this Motion, and permit

Court TV leave to record and telecast the full trial proceedings in this action.

Dated:  September 2, 2005

                    Respectfully submitted,

                    LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.


          By: _____
                       Lee Levine*
                       Gayle C. Sproul
                       Michael Berry
                       2112 Walnut Street, Third Floor
                       Philadelphia, Pennsylvania 19103
                       (215) 988-9778 (phone)
                       (215) 988-9750 (facsimile)
                       lee.levine@lskslaw.com
                       gayle.sproul@lskslaw.com
                       michael.berry@lskslaw.com

                    *Attorneys for Intervenor*
                    *Courtroom Television Network LLC*


*          Petition for special admission filed on September 2, 2005.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **TAMMY KITZMILLER, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | **Civil No. 04-CV-2688** |
| ) | |
| **v.** ) | **Filed Electronically** |
| ) | |
| **DOVER AREA SCHOOL** ) | **Hon. John E. Jones, III** |
| **DISTRICT, et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## ORDER

AND NOW, this __ day of _____, 2005, after

consideration of the Unopposed Motion of Courtroom Television Network LLC

for Leave to Record and Telecast Trial Proceedings, and any response thereto, IT

IS HEREBY ORDERED that the Motion is GRANTED, and Courtroom

Television Network LLC is granted leave to record and telecast the trial

proceedings in this action.

BY THE COURT:

_____
John E. Jones, III
United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TAMMY KITZMILLER, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **Civil No. 04-CV-2688** |
| | ) | |
| **v.** | ) | **Filed Electronically** |
| | ) | |
| **DOVER AREA SCHOOL** | ) | **Hon. John E. Jones, III** |
| **DISTRICT, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**REQUEST OF COURTROOM TELEVISION
NETWORK LLC FOR ORAL ARGUMENT**

Pursuant to Local Rule 7.9 of the Local Rules of the United States

District Court for the Middle District of Pennsylvania, Courtroom Television

Network LLC ("Court TV"), through its undersigned counsel, respectfully requests

the Court grant oral argument on its Unopposed Motion to Intervene and its

Unopposed Motion for Leave to Record and Telecast Trial Proceedings.

This case raises legal, scientific, and spiritual issues at the forefront of national debate and therefore has captured the attention of citizens throughout the country. Although the public has a fundamental right of access to court proceedings, only a fortunate few will in fact be able to enter the Harrisburg courtroom where the trial in this matter will take place. Court TV seeks to vindicate the public's right to observe the court proceedings – and provide millions of Americans with the opportunity to exercise this right – by broadcasting the trial in its entirety.

In light of the significant public focus on this case and its right of access to court proceedings, Court TV respectfully submits that oral argument is needed to articulate fully the strong public interest in televising this trial. Moreover, oral argument would provide Court TV an opportunity to explain the unobtrusive technology used to record trials and to address any concerns the Court or parties may have about telecasting the proceedings in Your Honor's courtroom.

WHEREFORE, Court TV respectfully requests that the Court grant oral argument on Court TV's Unopposed Motion to Intervene and Unopposed Motion for Leave to Record and Telecast Trial Proceedings.

Dated: September 2, 2005

Respectfully submitted,

LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.

By: _____

Lee Levine*
Gayle C. Sproul
Michael Berry
2112 Walnut Street, Third Floor
Philadelphia, Pennsylvania 19103
(215) 988-9778 (phone)
(215) 988-9750 (facsimile)
lee.levine@lskslaw.com
gayle.sproul@lskslaw.com
michael.berry@lskslaw.com

*Attorneys for Movant-Intervenor*
*Courtroom Television Network LLC*

\*     Petition for special admission filed on September 2, 2005.