**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

TAMMY KITZMILLER; BRYAN AND
CHRISTY REHM; DEBORAH
FENIMORE AND JOEL LIEB; STEVEN
STOUGH; BETH EVELAND; CYNTHIA
SNEATH; JULIE SMITH; AND ARALENE
("BARRIE") D. AND FREDERICK B.
CALLAHAN,

    Plaintiffs,

     v.

DOVER AREA SCHOOL DISTRICT;
DOVER AREA SCHOOL DISTRICT
BOARD OF DIRECTORS,

    Defendants.

Civil Action No. 04-CV-2688

Honorable John E. Jones III

**PLAINTIFFS' BRIEF IN OPPOSITION TO
DEFENDANTS' MOTIONS IN LIMINE**

# TABLE OF AUTHORITIES

## CASES

ACLU of New Jersey v. Black Horse Pike Reg. Bd. of Educ., 84 F.3d 1471 (3d Cir. 1996) ......................................................................................... 10

ACLU v. City of Las Vegas, 13 F. Supp. 2d 1064 (D. Nev. 1998) ............ 24, 27,28

Bell v. EPA, 232 F.3d 546 (7th Cir. 2000)......................................................... 31, 32

Board of Education v. Mergens, 496 U.S. 226 (1990)................................. 11, 12, 13

Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc., 247 F.3d 79 (3d Cir. 2001)........................................................................................... 25, 29

Bown v. Gwinnett County School District, 112 F.3d 1464 (11th Cir. 1997) ... 13, 14

Cayuga Indian National v. Pataki, 165 F. Supp. 2d 266 (N.D.N.Y. 2001)............. 36

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993)................... 35

EEOC v. Sears, Roebuck & Co., 628 F. Supp. 1264 (N.D. Ill. 1986)..................... 36

Edwards v. Aguillard, 482 U.S. 578 (1987)......................................................... 5, 6

Epperson v. Arkansas, 393 U.S. 97 (1968) ...................................................... 19, 20

Freethought Society v. Chester County, 334 F.3d 247 (3d Cir. 2003) ................... 10

Harjo v. Pro-Football, Inc., 50 U.S.P.Q. 2d (BNA) 1705 (1999) ........................... 36

Kumho Tire Co., Ltd. v. Charmichael, 526 U.S. 137 (1999)................................... 39

Larez v. City of Los Angeles, 946, F.2d 630 (9th Cir. 1991) .......................... 23, 28

Mariani v. United States, 80 F. Supp. 2d 352 (M.D. Pa. 1999)............................. 17

Marks v. United States, 430 U.S. 188 (1977) ........................................................ 13

Page

McCollum v. Board of Education, 333 U.S. 203 (1948) ........................................ 14

McCreary County, Kentucky v. American Civil Liberties Union, 125 S. Ct. 2722 (2005) ................................................................. 8, 9, 11, 41

McLean v. Arkansas Board of Education, 529 F. Supp. 1255 (E.D. Ark. 1982) ................................................................. 5, 6, 7, 36, 41

Mera v. Lohman, No. 3-CV-00-1507, 2002 U.S. Dist. LEXIS 6279 (M.D. Pa. Apr. 4, 2002) ........................................................ 23, 24

Modrovich v. Allegheny County, 385 F.3d 397 (3d Cir. 2004) ................. 9, 10, 18, 19

NAACP v. City of Niagara Falls, 65 F.3d 1002 (2d Cir. 1995) ...................... 36

In re Paoli Railroad Litigation, 35 F.3d 717 (3d Cir. 1994) ........................ 35, 39

Planned Parenthood v. Casey, 869 F. Supp. 1190 (E.D. Pa. 1994) ................. 17

Romano v. Oklahoma, 512 U.S. 1 (1994) ........................................ 13

Sackie v. Ashcroft, 270 F. Supp. 2d 596 (E.D. Pa. 2003) .......................... 17

Santa Fe Independent School District v. Doe, 530 U.S. 290 (2000) ............. 7, 8, 41

United States v. Virginia, 852 F. Supp. 471 (W.D. Va. 1994) ..................... 36

Waterhouse v. R.J. Reynolds Tobacco Co., 368 F. Supp. 2d 432 (D. Md. 2005) ................................................................. 36

## STATUTES

Fed. R. Evid. 702 ................................................................. 34

Fed. R. Evid. 801(c) ............................................................. 17, 23

Fed. R. Evid. 801(d)(2)(A) ....................................................... 23

Page

Fed. R. Evid. 803 (3) ................................................................29, 31, 32

Fed. R. Evid. 807 ................................................................25, 29

# TABLE OF CONTENTS

Page

B.   Counterstatement of Questions Presented ........................................ 3

A.   The Challenged Evidence Is Relevant. ............................................ 4

B.   The Challenged Evidence Is Not Hearsay ....................................... 16

   1.   News Materials Are Admissible For The Purpose Of Showing
What The Community Was Hearing With Respect To This
Controversy. ............................................................................. 17

   2.   The News Materials Are Admissible To Show The State Of Mind
Of The Community. ................................................................... 19

   3.   The News Materials May Be Admitted As Evidence Of Religious
Purpose In The Curriculum Change. .......................................... 20

   4.   The Materials Disclosing the Purposes of the Originators and
Proponents of Intelligent Design Are Admissible. ...................... 29

C.   Barbara Forrest's Proffered Expert Testimony Is Admissible. ........... 33

   1.   Dr. Forrest Is Qualified To Testify as an Expert Witness. ........... 34

   2.   Dr. Forrest's Methodology Is Reliable. ...................................... 35

   3.   Dr. Forrest's Testimony "Fits" the Issues in This Case ............... 40

COUNTERSTATEMENT OF FACTS AND PROCEDURAL HISTORY

Plaintiffs have submitted a final pretrial memorandum in which they have designated the witnesses and documentary evidence they intend to use at the trial of this action.  That evidence is expected to show, *inter alia*:

- that various members of the Dover Area School Board made statements tending to show that they had a religious purpose in proposing or supporting the Board's change to the biology curriculum;

- that the primary actors in developing intelligent-design creationism, and writing and publishing the intelligent-design textbook, reference to which was mandated by the Board in this case, had a religious purpose in pursuing their intelligent-design efforts; and

- that the community understands intelligent design to be a religious precept.

Defendants have moved, *in limine*, to exclude all such evidence:

1.     They seek to preclude evidence of statements made by various members of the Board during or after meetings of the Board, on the ground that only the official Board resolutions are relevant to the First Amendment inquiry.

2.     They seek to preclude evidence of statements or writings by persons who, or entities that, played leading roles in the development of the

concept of intelligent design, or the writing and publication of the text *Pandas*, on the ground that the Board was ignorant of all such statements, therefore such evidence sheds no light on the Board's purpose in adopting the intelligent-design edict, and therefore such evidence is not relevant to the First Amendment inquiry.

   3. They seek to preclude evidence of the news reports or letters to the editor identified in plaintiffs' pretrial memorandum, or any other similar evidence, on the grounds that such matter is hearsay, and not probative as to either the full Board's purpose, or the effect of the Board's action on Dover Area High School students, and therefore not relevant to the First Amendment inquiry.

   4. They seek to preclude any testimony from plaintiffs' designated expert, Barbara Forrest, on a variety of grounds, including her qualifications, the reliability of her methodology, and the relevance of her testimony to any issue in the case.

   Each of defendants' attempts to circumscribe the information this Court may consider, as it reflects on its findings of fact and conclusions of law, must be rejected.

  **B.** **<u>Counterstatement of Questions Presented</u>**

   1. Would the questioned evidence be relevant to any of the inquiries mandated by the Supreme Court of the United States or the Court of

Appeals for the Third Circuit when deciding the constitutionality of state action

challenged as violating the First Amendment?

      2.     Is any of the questioned evidence barred as impermissible

hearsay?

      3.     Are the qualifications of Barbara Forrest, the methodologies she

employs, or the facts and data on which she relies, so lacking as to render her

proffered expert testimony too unreliable to be helpful to the trial court, as the trier

of fact?

## **ARGUMENT**

### A.   **The Challenged Evidence Is Relevant.**

      According to defendants' *in limine* arguments, the only relevant

evidence in this case apparently is the text of the Board's resolution itself, to show

the "purpose" of the Board's change to the biology curriculum, and evidence

showing the effect of that policy on ninth-grade biology students. According to

defendants, none of the challenged evidence speaks directly to either of those fact

issues, and therefore none of the challenged evidence is admissible.

      Defendants are entirely too crabbed in their understanding of the

issues this Court may, indeed <u>must</u>, consider. The Supreme Court has made clear

that courts hearing First Amendment challenges should look behind the bare words

of a legislative act, to the underlying purposes of the act's sponsors and

proponents.  In *Edwards v. Aguillard*, 482 U.S. 578 (1987), for example, the Court

observed:  "While the Court is normally deferential to a State's articulation of a

secular purpose, it is required that the statement of such purpose be sincere and not

a sham."  The Court explained:

> A court's finding of improper purpose behind a statute is
> appropriately determined by the statute on its face, [or]
> its legislative history. . . .  The plain meaning of the
> statute's words, enlightened by their context and the
> contemporaneous legislative history, can control the
> determination of legislative purpose.  Moreover, in
> determining the legislative purpose of a statute, the Court
> has also considered the historical context of the statute,
> and the specific sequence of events leading to passage of
> the statute.

*Edwards*, 482 U.S. at 594.  In applying this approach, the Court then considered

comments made by the legislative sponsors of the statute during legislative

hearings, including comments "which revealed their religious motives for

supporting the bill," as well as comments made during the hearings by the

sponsoring legislators' leading expert on the topic of creation science.  *Id*. at 587,

591, 592 nn.12-13.

    The Supreme Court in *Edwards* also relied on the findings of a

District Court case, *McLean v. Arkansas Board of Education*, 529 F.Supp. 1255

(E.D. Ark. 1982), in which extensive expert testimony had been taken by the trial

judge to assess the "historical and contemporary antagonisms between the theory

of evolution and religious movements." *Edwards*, 482 U.S. at 590, n.9. The Court

concluded:

> [W]e need not be blind in this case to the legislature's
> preeminent religious purpose in enacting this statute.
> There is a historic and contemporaneous link between the
> teachings of certain religious denominations and the
> teaching of evolution.

*Edwards*, 482 U.S. at 590.

In point of fact, the court in *McLean* discussed and relied on evidence

remarkably parallel to the kinds of evidence challenged here.  The court

summarized expert testimony connecting the resurgence of Fundamentalists'

concerns regarding the teaching of evolution with the renewed dedication to

science education occurring throughout the United States in the wake of the Soviet

Union's successful launch of the "Sputnik" satellite.  *Id.* at 1259.  The court traced

"creation science" back to the writings of certain Fundamentalist "think tanks," the

Institute for Creation Research, the Creation Science Research Center, the Bible

Science Association, and the American Scientific Affiliation.  The court's

descriptions of and quotations from these organizations reveal them to be entirely

analogous to the Discovery Institute and its Center for the Renewal of Science and

Culture, where Philip Johnson, Stephen Meyer, and William Dembski write their

intelligent-design pieces, including the Wedge Strategy, and the Foundation for

Thought and Ethics, where Jonathan Buell brought together Charles Thaxton,

-6-

Nancy Pearcey, Percival Davis, and Dean Kenyon to write *Biology and Origins*, which subsequently became *Of Pandas and People*. The court in *McLean* quoted from the "Mission Statement" of the organizations discussed there, just as plaintiffs' expert and exhibits here present and quote from the mission statements of the Center and the Foundation, and their other organizational documents and fundraising missives. And the court in *McLean* quoted from the apologetics writings of the proponents of "creation science," just as plaintiffs' exhibits and plaintiffs' expert present and quote from similar writings by intelligent design's proponents, including specifically, in both cases, writings describing the sponsoring organizations' efforts to get "creation science" and "intelligent design" into the public schools' curricula. The parallels between the evidence regarded as relevant by the district court in *McLean*, and by the Supreme Court through its reliance on *McLean* in *Edwards*, and the evidence plaintiffs proffer here, could not be more apparent.

Similarly, in *Santa Fe Independent School District v. Doe*, 530 U.S. 290 (2000), the Court held that "[i]n cases involving state participation in a religious activity, one of the relevant questions is whether an objective observer, acquainted with the text, legislative history, and implementation of the statute, would perceive it as a state endorsement." *Id.* at 308. It was adamant that "[w]e refuse to turn a blind eye to the context in which this policy arose." *Id.* at 315.

And it reiterated, harking back to *Edwards*, that it is "the duty of courts to distinguish a sham purpose from a sincere one." *Id*. at 308.

Most recently, in *McCreary County, Kentucky v. American Civil Liberties Union*, 125 S.Ct. 2722 (2005), Justice Souter, writing for the Court, flatly rejected an attempt, like defendants' here, to preclude examination into a government act's underlying purposes. The Court wrote:

> [T]he Counties ask us … to truncate any enquiry into purpose here. Their first argument is that the very consideration of purpose is deceptive; according to them, true "purpose" is unknowable, and its search merely an excuse for courts to act selectively and unpredictably in picking out evidence of subjective intent. The assertions are as seismic as they are unconvincing.

*Id*. at 2734.

The Court continued, explaining that "scrutinizing purpose does make practical sense, as in *Establishment Clause* analysis, where an understanding of official objective emerges from readily discoverable fact, without any judicial psychoanalysis of a drafter's heart of hearts." *McCreary*, 125 S.Ct. at 2734. Citing *Edwards*, the Court quoted from it to emphasize that the purpose enquiry looks to the "plain meaning of the statute's words, enlightened by their context and the contemporaneous legislative history [and] the historical context of the statute, … and the specific sequence of events leading to [its] passage." *McCreary*, 125

S.Ct. at 2734.  The Court then rejected an alternative rationale for limiting the

purpose inquiry:

> After declining the invitation to abandon concern with
> purpose wholesale, we also have to avoid the Counties'
> alternative tack of trivializing the enquiry into it.  The
> Counties would read the cases as if the purpose enquiry
> were so naïve that any transparent claim to secularity
> would satisfy it, and they would cut context out of the
> enquiry, to the point of ignoring history, no matter what
> bearing it had on the significance of current
> circumstances.  There is no precedent for the Counties'
> arguments, or reason supporting them.

*Id.* at 2735.

In the Third Circuit, the court has been equally cognizant of the

context in which a First Amendment issue arises.  In *Modrovich v. Allegheny*

*County*, 385 F.3d 397 (3d Cir. 2004), for example, a Ten Commandments plaque

case, the court explained that the context in which a religious display appears can

change the reasonable observer's perception of it, and that is why the court must

consider the history of how the plaque came to be, including the identity of the

donor of the plaque, the purpose of that organization in offering the donation, and

what the judge who accepted it said during his acceptance speech.  In doing so, the

court made clear that "the reasonable observer is an informed citizen who is more

knowledgeable than the average passerby." *Id.* at 407.  The court then cited to a

newspaper article from the local paper in showing what was said at the judge's

acceptance speech, *id.* at 407, and relied upon a press release to shed light on other

relevant events that occurred, *id.* at 411.  Context, in other words, mattered in determining whether a "reasonable observer" would conclude that the challenged state action represented governmental endorsement of religion.

Context was also important in another recent Third Circuit case, *Freethought Society v. Chester County*, 334 F.3d 247, 258-60 (3d Cir. 2003). *Freethought* was another Ten Commandments plaque case, and just as in *Modrovich*, the court examined both history and context to determine how a reasonable observer might perceive the presence of the plaque on a government building.  *See also ACLU of New Jersey v. Black Horse Pike Reg. Bd. of Educ.*, 84 F.3d 1471, 1486 (3d Cir. 1996) ("We must determine whether, under the totality of the circumstances, the challenged practice conveys a message favoring or disfavoring religion.").

These cases make plain that evidence shedding light on the religious purposes of individual Board members (such as their statements during Board meetings or in the broader course of the debate over the biology curriculum) is relevant in assessing the purpose of the policy, and that evidence shedding light on the history of the development of intelligent-design creationism is relevant in assessing what a reasonable observer would understand about the scientific *bona fides, vel non,* of that theory, and accordingly of the purpose and effect of the edict.

Defendants seek to persuade the Court that the Board's purpose cannot be illumined either by its members' own statements in adopting the edict, or by consideration of the historic context in which and from which intelligent-design creationism emerged. But as observed in *McCreary*, there is neither precedent nor reason supporting that position.

Defendants premise their motion in limine to exclude the legislative history of the policy — and indeed their entire defense to plaintiffs' purpose claim — on *Board of Education v. Mergens*, 496 U.S. 226 (1990). Defendants purport to draw two legal principles from that case: First, they contend that *Mergens* requires a staged inquiry into purpose, with the Court initially looking only at the plain text of the challenged policy and considering other indicia of purpose, if at all, only if the policy's purpose is ambiguous. Second, they argue that *Mergens* makes statements by individual legislators irrelevant as a matter of law to the purpose inquiry, thus requiring their exclusion. Defendants are wrong in both respects.

At the outset, the staged inquiry in *Mergens* is ***not*** an inquiry into purpose under the Establishment Clause; it is simply an application of the traditional canon of statutory interpretation that in ascertaining the meaning of a statutory term — in that case, "noncurriculum related student group" — courts should initially look to the statute itself, and should look beyond the language to

legislative history to give content to a term only if the term is ambiguous.  And that legal principle — which has nothing whatsoever to do with the Establishment Clause's required purpose inquiry — weighs against defendants' motion: because the term 'intelligent design' is not defined in the District's policy, it must be given content by, among other things, legislative history, and the writings of those who have developed and promoted intelligent design.  So while plaintiffs will show that the defendants' policy on its face manifests improper religious purpose, neither *Mergens* nor any other case prevents this Court from also looking at legislative history as part of the constitutionally mandated purpose inquiry.

Defendants' other argument — that *Mergens* holds legislators' statements irrelevant (and therefore should make them inadmissible) — is wrong as a matter of law for several reasons.

First of all, the portion of *Mergens* on which defendants rely is Justice O'Connor's discussion for a plurality of what she viewed as the difference between Congress's legislative purpose for passing the Equal Access Act, on the one hand, and the "'possibly religious *motives*'" of some of the Act's individual supporters, on the other.  *See* Defs.' Brf. Supp. Mot. in Limine to Preclude Pls. From Using or Introducing at Trial Statements Made by Individual Board Members, Doc. # 151, at 5 (quoting *Mergens*, 496 U.S. at 249 (plurality op.)).  Because that portion of Justice O'Connor's opinion did not garner a majority, it lacks precedential value.

-12-

*See, e.g., Romano v. Oklahoma*, 512 U.S. 1, 9 (1994); *Marks v. United States*, 430 U.S. 188, 193-94 (1977).

Second, the District's reading of the *Mergens* plurality and *Bown v. Gwinnett County School District*, 112 F.3d 1464 (11th Cir. 1997), fails to take account of the actual legislative history in those cases, and the effect of that history on the courts' analysis. Although the *Bown* court viewed the *Mergens* plurality opinion as "provid[ing] helpful guidance for a case . . . in which the legislative history is ***conflicting***" (*id.* at 1471 (emphasis added)), the statements by school-board members here are unequivocal and unrefuted by any other legislative history. And even if that were not the case, there still would be no basis to exclude those statements: Conflicts among board members would go to the weight of plaintiffs' purpose evidence and not to its admissibility.

Third, the Supreme Court has consistently held, both before and after *Mergens*, that legislative history can, and indeed must, be considered in ascertaining legislative purpose under *Lemon*, and that looking to statements by a measure's sponsors and chief proponents is a commonplace and entirely appropriate part of that inquiry. Less than three months ago, for example, the Supreme Court reaffirmed that the "[e]xamination of purpose is a staple of statutory interpretation that makes up the daily fare of every appellate court in the country," and the Court went on to explain that the purpose inquiry under *Lemon*

looks to "the 'text, legislative history, and implementation of' an "official act."

*McCreary*, 125 S. Ct. at 2734 (quoting *Santa Fe*, 530 U.S. at 308). In describing

the requisite inquiry, the Court specifically pointed to *Edwards*, 482 U.S. at 586-

88, which the defendants acknowledge to be controlling precedent here (*see* Defs.'

Pretrial Mem. at 24), explaining that the Court in *Edwards* "relied on a statute's

text *and the detailed public comments of its sponsors*, when we sought the

purpose of a state law requiring creationism to be taught alongside evolution."

*McCreary*, 125 S. Ct. at 2734 (emphasis added).  Likewise, in *Wallace v. Jaffree*,

472 U.S. 38 (1985), the Supreme Court treated as both relevant and highly

probative the statements of purpose made by the challenged moment-of-silence

statute's sponsor both during legislative debate over the bill and during testimony

in the district court.  *Id.* at 43, 56-58.

      In addition, defendants assert, without citation to any authority, that

the sole constituency that should be considered in assessing effect is the ninth

graders who must hear a recitation of the edict.  Defs.' Brf. Supp. Mot. in Limine

to Exclude Testimony of Barbara Forrest, Ph.D., Doc. #159-1, at 22.  The Supreme

Court has repeatedly explained, however, that cases touching upon public

education implicate a far broader range of considerations.  As Justice Frankfurter

wrote in *McCollum v. Board of Education*, 333 U.S. 203, 216-17 (1948):

> Designed to serve as perhaps the most powerful agency
> for promoting cohesion among a heterogeneous

> democratic people, the public school must keep
> scrupulously free from entanglement in the strife of sects.
> **The preservation of the community from divisive**
> **conflicts,** of Government from irreconcilable pressures
> by religious groups, of religion from censorship and
> coercion however subtly exercised, requires strict
> confinement of the State to instruction other than
> religious, leaving to the individual's church and home,
> indoctrination in the faith of his choice.

(Emphasis added.)

  The implication of these cases is that the constituency on whom the

Board's policy's effect should be considered consists of not just of the students

required to hear it, but also the parents entrusting their children to the public

schools, and even the citizens whose taxes are supporting those schools. This

implication is amply reinforced by the fact that here, the Board sent a newsletter to

every household in the district promoting and expanding on its change to the

biology curriculum.  *See* District Newsletter at Exhibit A.

  The defendants seek, by their *in limine* motions, to impose blinders on

this Court as it considers what a reasonable observer might understand the motives

of intelligent design's proponents to have been, what the motives of the Board

members supporting the change to the biology curriculum were, and what an

alerted and informed citizenry might reasonably believe the purpose and intended

effect of that policy therefore might be.  The challenged evidence, however, sheds

light on precisely the issues that the Supreme Court and the Third Circuit have

consistently examined and found controlling.  That evidence, then, is plainly

relevant.

**B.     <u>The Challenged Evidence Is Not Hearsay.</u>**

From early June, 2004, the Dover community was blanketed with

newspaper articles, magazine articles and television news clips (collectively

referred to as "news materials"), reporting the activities of the Dover Area School

Board.  Through these news materials residents of the community, like plaintiffs

Steven Stough and Barrie Callahan, learned about the controversy surrounding the

Dover Area School District.  And, as a direct result of reading these articles, the

community began to gain an understanding – and formulate an opinion – of the

board's actions.

Plaintiffs intend to introduce these news materials at trial.  The news

materials, which in many instances contain admissions of the defendants, will

serve three purposes.  First, the news materials will show the court exactly what it

was that the community was hearing with respect to the controversial decision of

the school board and thereby give content to what the reasonable observer will be

charged with knowing.  Second, they will show how the community perceived the

controversy.  And third, the news materials will show that school-board members

made statements tending to show that they had a religious purpose in proposing or

supporting the Board's curriculum change.

1.   <u>News Materials Are Admissible For The Purpose Of Showing
     What The Community Was Hearing With Respect To This
     Controversy.</u>

Hearsay is defined as an out-of-court statement offered to prove the

truth of the matter asserted and is inadmissible because it is considered unreliable.

*See* Fed. R. Evid. 801(c); 5-801 Weinstein's Federal Evidence § 801.02 (2005).

Although news materials may in some circumstances be excluded as hearsay,

courts may admit news materials where they are not considered hearsay or when

they fall within a hearsay exception.  "Newspaper articles are only hearsay if

offered in evidence to prove the truth of the matter asserted." *Planned Parenthood*

*v. Casey*, 869 F. Supp. 1190, 1196 (E.D. Pa. 1994), *citing* Fed. R. Evid. 801(c).

*See also Mariani v. United States,* 80 F. Supp. 2d 352, 362 (M.D. Pa. 1999),

*quoting Democratic Party of U.S. v. National Conservative Political Action*

*Comm.*, 578 F. Supp. 797, 829 (E.D. Pa. 1983), *aff'd in part and rev'd in part*, 470

U.S. 480 (1985) ("The hearsay evidence rule does not bar, however, the

admissibility of these and other authenticated news reports when used to show

public perceptions of corruption, rather than corruption in fact."); *Sackie v.*

*Ashcroft*, 270 F. Supp. 2d 596, 602 (E.D. Pa. 2003) (admitting newspaper and

internet articles for an even broader purpose, and using them as evidence to show

that the foreign government was guilty of numerous human-rights violations as

tending to prove plaintiff's claim that he was tortured in past and likely to be tortured in the future if returned to his native country).

News materials are not hearsay when used as evidence of what knowledge the community has with respect to a controversy. In *Modrovich*, where the Third Circuit determined that a plaque containing the Ten Commandments posted on the county courthouse did not violate the Establishment Clause, the court said that the reasonable observer would know the history and context of the community and forum in which the religious display appeared. In making a determination of what a reasonable observer might know, the court cited a newspaper article from the local paper showing what was said in a speech that related to the controversy. 385 F.3d at 407. In addition to the newspaper article, the court also considered a press release and testimony of the party witnesses. *Id.* at 411.

Like the news items in *Modrovich*, here the news materials are being offered for the purpose of showing the Court what the community was hearing with respect to the controversial decision of the Board, and thus to give definition to the information that a reasonable observer will be charged with knowing. There can be no doubt that the perceptions of the Dover community were shaped by the news materials, because it was through these materials that many people in the community learned of the controversy. For example, plaintiff Steven Stough

testified that his involvement in this controversy was prompted by the mounting

frustration he felt from having read the local news accounts of the controversy.

*See* Stough Dep. at 10:19 – 11:12 (attached as Exhibit B).  Likewise, plaintiff

Barrie Callahan stated that while she was out of state in July and August of 2004,

she was kept abreast of the controversy through the news materials that her

husband brought to her.  *See* B. Callahan Dep. at 51:14 – 52:25 (attached as

Exhibit C).

Not only are the articles the basis for much of the community's

knowledge, but they also contain the information that the reasonable observer –

like the reasonable observer in *Modrovich* – will be charged with knowing.  As

such, the news materials should be admitted for the non-hearsay purposes of

showing what the community could have understood, and what the reasonable

observer could understand, with respect to this controversy.

2.    The News Materials Are Admissible To Show The State Of
        Mind Of The Community.

The news materials, particularly the editorials and the letters to the

editor, should also be admitted for the non-hearsay purpose of showing the state of

mind of the community.  The Supreme Court admitted letters to the editor and

advertisements placed throughout a community as evidence of how a community

perceived certain events.  In *Epperson v. Arkansas*, 393 U.S. 97 (1968), the Court

considered letters to the editor, along with advertisements placed throughout the

community, as conclusive evidence that some members of the community believed that the theory of evolution was inconsistent with their religious beliefs, and that their fundamentalist sectarian conviction was the purpose behind the challenged law, which prevented teachers from teaching the theory of evolution. *Id.* at 107-108, n.16 (1968).

In this case, plaintiffs have identified approximately 80 editorials and over 200 letters to the editors from the three local papers – the *York Daily Record*, *The York Dispatch*, and *The Patriot News* – to show the Court how the community perceived the controversial events.  These editorials and letters to the editor, beyond informing the Court about what the community was exposed to with respect to this controversy, are evidence of the community's state of mind with respect to this controversy, and they should be admitted for this non-hearsay purpose.

3.  The News Materials May Be Admitted As Evidence Of Religious Purpose In The Curriculum Change.

In addition to admitting the news materials for the non-hearsay purposes of showing what the community knows about and how it perceives the controversy, several of the articles may also be admitted as evidence that the school-board members made statements tending to show that they had a religious purpose in proposing or supporting the Board's curriculum change.  Courts have allowed newspaper articles into evidence for this and similar purposes when (1)

they contain statements that are not hearsay or that fall within a hearsay exception, and (2) the article itself falls within an exception to the hearsay rule.

a.   Statements of the School-Board Members in the Articles Are Not Hearsay.

Some of the news materials that defendants want to exclude include quotes from former school-board member Bill Buckingham.  Articles in the *York Daily Record* and *The York Dispatch* attributed various statements to Buckingham that were made while he was a member of the school board and while he was at public school board meetings.  In some cases, both papers included the same, or similar quotes.  In these cases, there was little variance between the quotations within either paper, and the substance of the quotations was substantially corroborated by both newspapers.  Examples include:

1.   "Two thousand years ago, someone died on a cross.  Can't someone take a stand for him."  Joseph Maldonado, *Book Is Focus Of More Debate,* York Daily Record June 15, 2004 (attached as Exhibit D); *see also* Heidi Bernhard-Bubb, *Church, State Issue Divides*, The York Dispatch, June 15, 2004 ("Nearly 2,000 years ago someone died on a cross for us; shouldn't we have the courage to stand up for him?") (attached as Exhibit E).

2.   "This country wasn't founded on Muslim beliefs or evolution.  This country was founded on Christianity, and our students should be taught as such."  Joseph Maldonado, *Dover School Still Debating Biology Text*, York Daily

Record, June 9, 2004 (attached as Exhibit F); *see also* Heidi Bernhard-Bubb, *Church, State Issue Divides*, The York Dispatch, June 15, 2004 ("Buckingham apologized for offending any teachers or residents of the community with his remarks but was unapologetic about his belief that the country was founded on Christianity and not other religions and that a 'liberal agenda was chipping away at the rights of Christians in this country.'") (attached as Exhibit E).

3.     "…[the book] was laced with Darwinism." Heidi Bernhard-Bubb, *Dover Schools Could Face Lawsuit*, The York Dispatch, June 9, 2004 (attached as Exhibit G); *see also* Joseph Maldonado *Book Is Focus Of More Debate*, York Daily Record /Sunday News, June 15, 2004 ("Last week, Buckingham said that the science department's choice for a new biology book is 'laced' with Darwinism.") (attached as Exhibit D).

4.     "Buckingham said the committee would look for a book that presented both creationism and evolution." Heidi Bernhard-Bubb, *Dover Schools Could Face Lawsuit*, The York Dispatch, June 9, 2004 (attached as Exhibit G); *see also* Joseph Maldonado *Dover Schools Still Debating Biology Text*, York Daily Record, June 9, 2004 ("Buckingham and other board members are looking for a book that teaches creationism and evolution.") (attached as Exhibit F).

5.     "Asked if he thought this might violate the separation of church and state, Buckingham called the law, 'a myth.'" Joseph Maldonado, *Residents*

*Join Creation Debate,* York Daily Record, June 10, 2004, (attached as Exhibit H);
*see also* Heidi Bernhard-Bubb, *Dover Debates Evolution In Biology Text,* The
York Dispatch, June 8, 2004, ("Buckingham said he believes the separation of
church and state is mythical and not something he supports.") (attached as
Exhibit I).

      A school board member's actual out-of-court statements pose no
admissibility problem. The statements clearly are relevant. They are probative of
a central issue in the case, the school board's purpose in changing the biology
curriculum. In addition, they are admissible non-hearsay, either as admissions of a
party opponent, *see* Fed. R. Evid. 801(d)(2)(A), or because they are not offered for
the truth of the matter asserted (*e.g.,* not offered to prove that this country was
founded on Christianity), but rather to show a school board member's state of
mind. *See* Fed. R. Evid. 801(c); *Larez v. City of Los Angeles,* 946 F.2d 630, 642
(9th Cir. 1991).

      Statements made by school-board members during school-board
meetings are admissions by party-opponents, and are admissible against the school
board and the school district. For example, in *Mera v. Lohman,* No. 3-CV-00-
1507, 2002 U.S. Dist. Lexis 6279 (M.D. Pa. Apr. 4, 2002) (attached as Exhibit J),
the court admitted language from a newspaper article after concluding that the
statement itself was an admission of a party-opponent. In *Mera,* the plaintiff sued

several members of the township's board of commissioners for voting to terminate

his position. *Id.* at *1. In deciding the parties' motions for summary judgment, the

court considered as evidence language quoted from a newspaper article. In doing

so, the court noted that the statement in question, made by one of the defendant's

employees, indicated that the defendant had been looking for options to remove the

plaintiff from his position. *Mera*, 2002 U.S. Dist. LEXIS 6279, at *8. The court

found that the statement was admissible as an admission of a party-opponent. *Id.*

at *8 n.2, *citing* Fed. R. Evid. 801(d)(2).

      In *ACLU v. City of Las Vegas*, 13 F. Supp. 2d 1064 (D. Nev. 1998)

(discussed in greater detail below), a case cited by defendants to support exclusion

of news articles, the court actually stated that the quotations in the news articles

attributed to the defendants were not hearsay because "they are admissions of party

opponents in their official capacities." *Id.* at 1069.

      Here, the quoted language in the articles are statements by a school

board member made while he was at a school board meeting. These statements are

clearly admissions of a party in this case and are therefore admissible evidence.

      b.    <u>The Articles Themselves Are Admissible Under the
Residual Exception to the Hearsay Rule.</u>

      The articles themselves are also admissible as evidence that board

members made the statements attributed to them because they fall under the

residual exception to the hearsay rule.

-24-

To be admissible under the residual exception to the hearsay rule, the evidence must fulfill five requirements: trustworthiness, materiality, probative importance, interest of justice, and notice.  The residual exception to the hearsay rule states that among those statements not excluded by the hearsay rule is:

> [a] statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interest of justice will best be served by admission of the statement into evidence.

Fed. R. Evid. 807.  *See generally Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 112 (3d Cir. 2001) (holding that the lower court did not err when it held that an affidavit of a former president of the plaintiff corporation was admissible under Fed. R. Evid. 807).

As for the first requirement, it is clear that the news materials are trustworthy because: (1) the declarants were known and named; (2) the articles were corroborated by several other witnesses at the meetings; (3) in some instances, the articles corroborate each other as they contain nearly identical quotes; (4) the statements in the articles were based on personal observation; (5) the declarants' position and background qualified them to make the assertions; (6) the articles are supported by signed affidavits of the authors, Maldonado and

Bernhard-Bubb; and (7) the authors will testify at trial as to the authenticity and accuracy of the articles.

With respect to the second requirement, it is also clear that the articles are being offered as evidence of a material fact – that school board members made statements tending to show that they had a religious purpose in proposing or supporting the Board's curriculum change.

The third requirement is also met – the articles are more probative on the point for which they are offered than any other evidence that plaintiffs could procure through reasonable efforts:  the articles were written near in time to the described events, and they were written by people who saw and heard the events they reported.  Plaintiffs have not found anyone else who attended the meetings who has a written record of each of the statements attributed to the Board member at the meetings, and although the Board regularly tapes its meetings, the Board's tapes of the meetings in question no longer exist.[1]

---

[1] In response to plaintiffs' request for audio tapes of all relevant school board meetings, defendants produced tapes of only the following meetings: December 1, 2004, December 6, 2004, December, 14, 2004, December 20, 2004, January 10, 2005, January 30, 2005, February 7, 2005, March 7, 2005, March 14, 2005, April 4, 2005, April 11, 2005.  Apparently, tapes of the June 7, 2004 and the June 14, 2004 meetings were destroyed prior to our request.  *See* Nilsen Dep. at 27:23 - 28:7 (attached as Exhibit K).

As to the fourth requirement, the general purpose of the rules and the administration of justice, those purposes would be served by admitting the articles, because they would assist the court in determining the truth.

Finally, the fifth requirement has also been met because the plaintiffs not only cited to many of the news materials in their Complaint, but they also listed each of the news materials in their pretrial memorandum with attached witness list and exhibit list.  (Doc. 133).

In cases cited by defendants in which articles containing admissions by party opponents were excluded from evidence as inadmissible hearsay, the court's decision to exclude the articles was because the articles themselves (not the statement within the article) failed to meet the best evidence requirement of the residual exception to the hearsay rule, or because they lacked the circumstantial guarantees of trustworthiness necessary to fit within the hearsay exception.  For example, in *ACLU v. City of Las Vegas,* plaintiffs submitted newspaper articles in support of their motion for a preliminary injunction to prove the truth of the statements made by the defendants in the articles.  13 F. Supp. at 1069.  In excluding these articles from evidence, the court observed that the statements made by the defendants were not hearsay because "they are admissions of party opponents in their official capacities."  *Id.*  The court's decision to exclude the

articles was based on the fact that, unlike the present case, the plaintiffs failed both to obtain affidavits of and present testimony from the newspaper reporters. *Id.*

Likewise, in *Larez,* the plaintiffs submitted three newspaper articles quoting statements the defendant allegedly made after he testified at trial. Although the court determined that the lower court erred in admitting the articles, it did so because the plaintiffs did not have the reporters testify, even though the reporters were prepared and willing to do so. *Id.* at 644. Despite its decision not to admit the articles, the court noted that the articles had the circumstantial guarantees of trustworthiness required by the rules. Recognizing that three articles contained nearly identical statements, the court noted that "[t]he perception, memory, narration, and sincerity of the several declarants is especially reliable because the declarants corroborated one another." *Id.* at 633. In the present case, plaintiffs not only have affidavits from each of the reporters affirming the authenticity and accuracy of the articles, but plaintiffs also intend to call the reporters to testify to the accuracy of the statements. In addition, like the articles in *Larez,* there are multiple articles containing identical quotations and plaintiffs have designated several witnesses who will be testifying to quotes contained in the articles. *See, e.g.s.,* F. Callahan Dep. at 21:15 – 22:9 (attached as Exhibit L); B. Rehm Dep. at 81:14 – 83:3 (attached as Exhibit M).

The news articles should be admitted under Fed. R. Evid. 807.

4.    The Materials Disclosing the Purposes of the Originators and Proponents of Intelligent Design Are Admissible.

By mandating the inclusion of intelligent design in the biology curriculum, defendants have made intelligent design a part of this case. And to determine whether intelligent design is in fact religious, one must understand what "intelligent design" is. Among the evidence of this are the writings and statements of the people who originated and developed it: the Discovery Institute and its founder Phillip Johnson; the Foundation for Thought and Ethics and its Founder, Jon Buell; and the authors of the "supplemental text" that is the subject of the Board's edict, Charles Thaxton, Percival Davis, and Dean Kenyon (collectively referred to as "ID materials"). These ID materials are admissible under Fed. R. Evid. 807, the Residual Exception to the Hearsay Rule or, in the alternative, Fed. R. Evid. 803 (3), the Then Existing Mental, Emotional, or Physical Condition exception to the hearsay rule ("state of mind" exception).

As noted above, to be admissible under the residual exception the evidence must fulfill five requirements: trustworthiness, materiality, probative importance, interest of justice, and notice. *See Bohler-Uddeholm,* 247 F.3d at 112–113.

As for the first requirement, trustworthiness, it is clear that the ID materials are trustworthy because: (1) the declarants were known and named; (2) the ID materials have been corroborated by the testimony of several of the parties

responsible for their creation; (3) one of the ID materials – the *Wedge Document* – has been authenticated as being authored by the ID think tank – the Discovery Institute – by another publication of the Discovery Institute – *The "Wedge Document": "So What?"* (attached at Exhibit N);[2] (4) the statements in the articles were based on the personal beliefs of the declarants; and (5) the declarants' positions and backgrounds are consistent with the statements.

With respect to the second requirement, materiality, it is also clear that the articles are being offered as evidence of a material fact:  that intelligent design has a religious history and was designed as a tool to get theistically friendly, supposed science into schools.

The third requirement, probative importance, is also met:  the ID materials are more probative on the point for which they are offered than any other evidence that the plaintiffs could procure through reasonable efforts; the materials were written by the people who and institutions that created intelligent design.

---

[2] In fact, defendants have conceded the authenticity of the *Wedge Document* as a writing of the Discovery Institute through their use of *The "Wedge Document": "So What?"* as evidence in their brief in support of their motion in limine to exclude the testimony of Barbara Forrest, Ph.D.  (See Doc. # 159-1, at 4-5)

As to the fourth requirement, the general purpose of the rules and the interests of justice, those purposes would be served by admitting the ID materials because those materials will assist the Court in determining the truth.

Finally, the fifth requirement, notice, has also been met because the plaintiffs listed each of the intelligent-design materials in their pretrial memorandum with attached witness list and exhibit list. (Doc. 133).

Moreover, many of the ID materials are also admissible under Fed. R. Evid. 803(3) – the existing state-of-mind exception – which provides that a statement is not hearsay if it is:

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as ***intent, plan, motive, design***, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

Fed. R. Evid. 803(3) (emphasis added).

Federal courts have used this exception to allow written materials in as evidence of the declarant's then existing state of mind. In *Bell v. EPA*, 232 F.3d 546 (7th Cir. 2000), an employment discrimination case, the court held that the trial court improperly excluded from evidence a memorandum the plaintiffs submitted to show that the defendants were not sincere in their assertion that they had simply selected the candidates whom they believed to be best suited for a job

for which the plaintiffs had applied. *Id.* at 551-552.  The memorandum stated:

"The issue of selection causes me a great concern. . . . This is the first time in my

career that I cannot support an issue which is so clear in my mind and where I

think others are totally out of reality. We want to select the best. . . . I cannot see

that [selectees] Kathy [Kieth] and Denny [Dart] are superior to [plaintiff] Farro

[Assadi].  I cannot support them because I believe they are not the best. . . . I

consider Farro [Assadi] better by far than all of them and [plaintiff] Karen [Bell]

better than . . . [selectee] Linda [Hamsing]." *Id.*  In admitting this memorandum,

the circuit court rejected the district court's finding that the evidence did not fall

within the Fed. R. Evid. 803(3) hearsay exception, allowing a statement of the

declarant's then existing state of mind. *Id.* at 552.  In making its determination that

the memorandum was improperly excluded from evidence, the court reasoned that

plaintiffs were attempting to use the memo for the permissible purpose of

countering the defendant's assertion that it honestly believed it was promoting the

four best candidates. *Id.*

       Like the memorandum in *Bell*, the ID materials are admissible under

Fed. R. Evid. 803(3) because they are being offered as evidence of the then

existing state of mind of the declarants.  Statements in the various ID materials

provide evidence of the religious motivations behind the creation of intelligent

design.  "We are building to this momentum, broadening the wedge with a positive

scientific alternative to materialistic scientific theory, which has come to be called the theory of intelligent design (ID).  Design theory promises to reverse the stifling dominance of the materialistic worldview, and to replace it with science consonant with Christian and theistic convictions."  Discovery Institute, *The Wedge*, at 4.

Because the ID materials fall within both the residual exception and the existing state-of-mind exception to the hearsay rule, they should be admitted into evidence.  That motive is probatively important, since it shows that intelligent design was conceived not as better science, but as a tool to restore a theistic world view in the culture war being waged by a coterie of conservative Christians against what they saw as a dehumanizing secular science that denied any role for a divine Creator in the origins of life and the species inhabiting the created world.

C.      **Barbara Forrest's Proffered Expert Testimony Is Admissible.**

Defendants' motion *in limine* seeking to exclude Barbara Forrest's proffered expert testimony is misguided.  Her testimony goes directly to the issue of the origins of intelligent-design creationism, and she shows how, although a few words have been changed, the concepts presented and purposes of those presenting them are identical to or direct descendants of the so-called "Creation-Science" ruled unconstitutional in *Edwards*.  One would think that nothing could be more important to the trier of fact in this case.

In attacking Forrest's testimony, defendants challenge her qualifications on the grounds that she has no "specialized knowledge" useful here, that the methodology she uses is not sufficiently reliable, and that her subject matter does not "fit" any disputed factual issues in the case. Each of these challenges should be rejected.

    1.    <u>Dr. Forrest Is Qualified To Testify as an Expert Witness.</u>

As Dr. Forrest's report makes clear, she has "specialized knowledge" (*see* Fed. R. Evid. 702) about the historic context in which intelligent-design creationism emerged, and the motives and intentions of its originators and subsequent proponents. That specialized knowledge was acquired in the course of years of work researching and writing her major book, *Creationism's Trojan Horse: The Wedge of Intelligent Design*, published in 2004 by one of the most prestigious academic presses in the world, Oxford University Press. Her previous book chapter, "The Wedge at Work: How Intelligent Design Creationism Is Wedging Its Way into the Cultural and Academic Mainstream," appears in the book *Intelligent Design Creationism and Its Critics: Philosophical, Theological, and Scientific Perspectives*, published by another highly regarded academic publisher, MIT Press.

In point of fact, one need only consider the exceptionally well-annotated and documented Report that Dr. Forrest submitted here to conclude that

-34-

she plainly possesses a huge amount of "specialized knowledge" on the subject of

the people who devoted themselves to the development of intelligent-design

creationism, and the ideas and motives propelling them.  That her Ph.D. thesis at

Tulane University was in the study of naturalism and its place in public education

further equips her to understand the philosophical underpinnings of the debate and

materials involved here.  Forrest Report at 6.  The question in this case cannot be

whether she possesses such specialized knowledge.  Rather, the only questions can

be whether her methods in developing her testimony here are reliable in the

relevant field of expertise, and whether that testimony is relevant.

     2.    <u>Dr. Forrest's Methodology Is Reliable.</u>

     Defendants compare Dr. Forrest's methodology with the screening

mechanisms articulated by the Supreme Court in *Daubert v. Merrell Dow*

*Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), and the Third Circuit in *In re Paoli*

*Railroad Litigation*, 35 F.3d 717 (3d Cir. 1994) ("*Paoli II*"), for assessing the

admissibility of proffered scientific testimony, and find her methods wanting.  But

Dr. Forrest is not testifying to any scientific subject.  She is not testifying, for

example, either that evolution is scientifically accurate or not.  Therefore the

*Daubert/Paoli* reliability criteria are largely inapplicable.

     Dr. Forrest's field of expertise is entirely different.  She is a

philosopher, specializing in pragmatic naturalism, in the school of such

predecessors as John Dewey and Sydney Hook.  Pragmatic naturalism investigates

issues of social, cultural, or political concern, stressing the use of empirical data,

rather that the application of pure reason, to understand an issue or concern.

Therefore, Dr. Forrest's careful search for and analysis of empirical data – the

primary and secondary materials revealing the history of the intelligent-design

movement described and discussed in her report – are entirely consistent with the

methodology required by her academic training and subsequent academic

experience.[3]

---

[3] Testimony by experts on historical subjects has been accepted in a
multitude of cases, including significantly the *McLean* case (discussed in Section
A).  *See, e.g., Cayuga Indian National v. Pataki*, 165 F. Supp. 2d 266, 300
(N.D.N.Y. 2001) (providing testimony on historical context of disputed purchase
of Cayuga land by State of New York at turn of nineteenth century); *NAACP v.
City of Niagara Falls*, 65 F.3d 1002, 1020 (2d Cir. 1995) (noting historical
testimony on discriminatory intent of laws and practices that allegedly infringed
right to vote); *Harjo v. Pro-Football, Inc.*, 50 U.S.P.Q. 2d (BNA) 1705, 1717-18
(1999) (noting testimony on historical connotations of word "redskin" in dispute
over validity of trademarks held by Washington Redskins; *United States v.
Virginia*, 852 F. Supp. 471, 486-87 (W.D. Va. 1994) (noting testimony by historian
on such topics as history of higher education for American women); *EEOC v.
Sears, Roebuck & Co.*, 628 F. Supp. 1264, 1314-15 (N.D. Ill. 1986) (noting
competing testimony on history of American women's alleged lack of interest in
nontraditional jobs such as commission sales); *see also, e.g. Waterhouse v. R.J.
Reynolds Tobacco Co.*, 368 F. Supp. 2d 432, (D. Md., 2005) (expert "has analyzed
the question by applying reliable professional methods used in conducting
historical research in general.  He examined a wide array of historical scholarship
and primary sources of public knowledge about the effects of tobacco use,
including. . . . popular magazines, government documents, manuscript collections,
scholarly histories, state and federal laws regarding tobacco and cigarette smoking,
curriculum guides and school text books approved for use in various states

(continued...)

Dr. Forrest has employed here precisely the type of methodology she regularly employs in her academic research and writing. The vast bulk of her initial report is based on the publications and speeches by intelligent-design creationism's proponents (what she refers to accurately as "primary source data," *see* Report at 10), such as Phillip Johnson, Stephen Meyer, and William Dembski. Similarly, the "Wedge Document" was authored by the intelligent-design think tank Discovery Institute, as conclusively established by the *"So What"* document appended to defendants' motion.[4] Her supplemental report is based almost entirely on the writings, including draft documents, of the Foundation for Thought and Ethics, primary source evidence as valuable as an empiricist searching the historical record could ever hope for.[5]

---

(continued...)

(including Maryland), religious publications, polling and survey data, movies, television programs, and other forms of popular culture.").

[4] Defendants' reliance on the Discovery Institute's *"So What"* document, a post-hoc rationalization for the Wedge Document, is argument about the substantive importance of the Wedge Document, not its admissibility. It underscores that the proper procedure for contesting Dr. Forrest's opinions is opposing evidence and vigorous cross examination, not exclusion.

[5] There is no hearsay issue for the FTE materials relied upon by Dr. Forrest, because they have been authenticated in sworn testimony that will be part of the trial-court record through the designation of the deposition of FTE president Jon Buell.

It is also perfectly proper for a witness relying on what is essentially historical evidence to rely on "secondary" sources of historic information. *See* Report at 12. As an initial matter, many of the articles characterizing the actions of members of the intelligent-design movement were in fact written by members of the movement; they argue in essence, the movement's serial autobiography. For example, Paul Nelson, a fellow of the Discovery Institute and a major figure in the intelligent-design movement,[6] has written an article titled *Life in the Big Tent: Traditional Creationism and the Intelligent Design Community* (Plaintiffs' trial exhibit 429, cited at n.59, 61-65 of Forrest report), in which he describes Phillip Johnson's development of intelligent design in the wake of *Edwards*, including the revelation that "definitions of science . . . could be contrived to exclude any conclusion we dislike or include any we favor." This document may be a secondary source as to the work and thoughts of Phillip Johnson, but it is a primary source on the intelligent-design movement, written by one of its leading avatars.

In addition, secondary sources such as news articles quoting or discussing the positions of leaders of the intelligent-design movement, even if not written by members of that movement, are proper material for an empiricist's historical analysis, particularly when they are consistent with the primary sources.

―――――――――――――――――――

[6] *See* Forrest Report at 40-41.

Any issues about Dr. Forrest's reliance on these materials goes to weight, not admissibility.

That Dr. Forrest's methodology is true to her area of expertise is evidenced by the very fact that her Report largely tracks the methodology of her book, *Creationism's Trojan Horse: The Wedge of Intelligent Design*. This book was published by a highly regarded, peer-reviewing academic press. In *Paoli II* terms, her work outside the courtroom is the same as her work in the courtroom: it meets the factor, "the non-judicial uses to which the method has been put." *Paoli II*, 35 F.3d at 742 n.8.[7] And in the broader inquiry into the reliability of expert testimony outside the narrow confines of scientific or technical expertise, that is regarded as the touchstone:

> The objective of [the gatekeeping] requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.

*Kumho Tire Co., Ltd. v. Charmichael,* 526 U.S. 137, 152 (1999).

---

[7] Because the materials relied upon by Dr. Forrest are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject," her testimony and opinions about them are admissible even if the Court concludes the materials themselves are not.  FRE 703.

In the end, defendants' objection to Dr. Forrest's methodology is summarized by their pejorative characterization of her work as collecting "select, unrelated, hearsay statements and anecdotal information." Motion at 10-11. But that completely mischaracterizes her methodology, which is in fact to read the work of intelligent-design proponents and report representative statements that demonstrate the religious, cultural, non-scientific nature of the movement. There is no way that expert testimony, an expert report, or even her much longer book could report verbatim the entire body of work by the intelligent-design movement. Nor should they: No historian or historical expert does that. However, plaintiffs will, if requested by the Court, happily submit both of Dr. Forrest's reports, all her books and book chapters, all her articles, and all the materials on which she has relied for the Court's consideration. And, of course, defendants can cross examine her about any inaccuracies in her characterization of intelligent-design writings. It is revealing that defendants are shying away from that, hoping instead to completely deprive the Court of the compelling evidence Dr. Forrest will present.

3.    Dr. Forrest's Testimony "Fits" the Issues in This Case.

Defendants attack the relevancy of Dr. Forrest's proposed testimony by quoting from her deposition testimony that she does not claim any knowledge as to what was known by the members of the Dover Area School Board. *See* Doc. # 159-1, at 22. Of course she does not. Plaintiffs intend her testimony to

-40-

illuminate the inquiry, required by the decisions in *McCreary* and *Santa Fe*, as to what a reasonable, objective, *informed* observer would know of the broad social and historical context in which the Board's edict arose. As noted in Section A above, the Supreme Court in *Edwards* endorsed the opinion in *McLean* for its review of the "historic and contemporaneous link between the teachings of certain religious denominations and the teaching of evolution." *Edwards*, 482 U.S. at 590.[8] That review was built on the expert testimony presented in *McLean*, 529 F. Supp. at 1259, and on a review of documents virtually identical in kind to that presented, helpfully, by Dr. Forrest here. *McLean*, 529 F.Supp. at 1259-63. (It must be noted, also, that the review by the district court in *McLean* relied importantly on the kinds of evidence – the intelligent-design material discussed in Section A above – that defendants also seek to bar).

Dr. Forrest's testimony about the creationist origins of *Pandas*, reported in both her first and supplemental reports, equally fits the facts of this case. Defendants have nakedly asserted that "<u>IDT</u> [intelligent design theory] <u>is</u> <u>not</u>

---

[8] Dr. Forrest does not link her historic review to specific religious "denominations" per se; rather, she links the "intelligent design" community to its creationist predecessors, based in Christian Fundamentalism generally. But that in no way detracts from her helpfulness to the court in assessing the religious roots of intelligent-design creationism. In point of fact, the district court's historic review in *McLean* focused more on the roots of "Creation Science" in Christian Fundamentalism generally, rather than on any specific religious denomination.

<u>Creationism</u>." Defendants' Pre-trial memorandum, Doc. # 146, at 10. Dr.
Forrest's testimony will demonstrate that *Of Pandas and People*, which more than
anything else defines intelligent design for Dover High School and the Dover
community, was a creationist book developed and written by creationists.

The "fit" between Dr. Forrest's proffered testimony and the analysis
this Court must conduct under the controlling cases could not be closer. Her
testimony should be admitted.

## CONCLUSION

For all the foregoing reasons, defendants' several motions *in limine*
should be denied.

/s/ *Thomas B. Schmidt, III*
Eric Rothschild (PA 71746)
Alfred H. Wilcox (PA 12661)
Stephen G. Harvey (PA 58233)
Pepper Hamilton LLP
3000 Two Logan Square
18th & Arch Streets
Philadelphia, PA 19103
(215) 981-4000
(215) 981-4750 (fax)
*rothschilde@pepperlaw.com*
*wilcoxa@pepperlaw.com*
*harveys@pepperlaw.com*

Thomas B. Schmidt, III (PA 19196)
Pepper Hamilton LLP
200 One Keystone Plaza
North Front and Market Streets
O. Box 1181
Harrisburg, PA  17108
(717) 255-1155
(717) 238-0575 (fax)
*schmidtt@pepperlaw.com*

Witold J. Walczak (PA 62976)
ACLU of Pennsylvania
313 Atwood Street
Pittsburgh, PA 15213
412-681-7864
412-681-8707 (fax)
*vwalczak@aclupgh.org*

-43-

Paula K. Knudsen (PA 87607)
ACLU of Pennsylvania
105 N. Front St., Suite 225
Harrisburg, PA 17101
(717) 236-6827
(717) 236-6895 (fax)
*pknudsen@aclupa.org*

Ayesha Khan (adm. *phv*)
Richard B. Katskee (adm. *phv*)
Alex J. Luchenitser (adm. *phv*)
Americans United for Separation
    of Church and State
518 C St., NE
Washington, DC 20002
(202) 466-3234
(202) 466-2587 (fax)
*akhan@au.org; katskee@au.org;
luchenitser@au.org*

Attorneys for Plaintiffs,
TAMMY KITZMILLER; BRYAN AND
CHRISTY REHM; DEBORAH
FENIMORE AND JOEL LIEB; STEVEN
STOUGH; BETH EVELAND; CYNTHIA
SNEATH; JULIE SMITH, AND
ARALENE ("BARRIE") D. AND
FREDERICK B. CALLAHAN

Dated:  September 16, 2005

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that Plaintiffs' Brief in Opposition to Defendants' Motions in Limine complies with this Court's Order dated September 14, 2005 authorizing Plaintiffs to submit their brief in excess of 15 pages, but not to exceed 60 pages or 20,000 words.  The word count of the Brief is 9,110 words (excluding the tables of authority and contents).

<u>/s/ Thomas B. Schmidt III</u>
Thomas B. Schmidt, III (19196)

## CERTIFICATE OF SERVICE

I hereby certify that on September 16, 2005, a copy of the foregoing

Plaintiffs' Brief in Opposition to Defendants' Motions in Limine should be served

on the following counsel through the electronic case filing system:

  Richard Thompson, Esquire    (Counsel for Defendants)
  Robert J. Muise, Esquire
  Patrick T. Gillen, Esquire
  Thomas More Law Center
  24 Frank Lloyd Wright Drive
  P.O. Box 393
  Ann Arbor, MI  48106

  Ron Turo, Esquire      (Local Counsel for Defendants)
  Toro Law Offices
  28 South Pitt Street
  Carlisle, PA 17013

        /s/ Thomas B. Schmidt III
        Thomas B. Schmidt, III (19196)