# Exhibit A

# Dover Area School District  News

**February 1995**    *Biology Curriculum Update*

---

This newsletter has been produced to help explain the changes in the biology curriculum . Unfortunately a great deal of misinformation has been spread regarding this policy. We hope this publication will help those who need better understanding of the policy, while eliminating the misconceptions some may have about the curriculum change. We sincerely appreciate your understanding on this matter.

## Frequently Asked Questions

**What is all the fuss about?**

A small minority of parents have objected to the recent curriculum change by arguing that the Board has acted to impose it's own religious beliefs on students. This is not true. The approved statement read to students was adopted to present a balanced science curriculum and forbids any presentation of religious belief.

**Students are told of the theory of Intelligent Design (ID). Isn't ID simply religion in disguise?**

No. The theory of intelligent design involves science vs. science, where scientists looking at the same data come to different conclusions. The theory does not mention or discuss God, Christianity or the Bible in any way.

**What is the theory of evolution?**

The word evolution has several meanings, and those supporting Darwin's theory of evolution use that confusion in definition to their advantage. Evolution can mean something as simple as change over time, which is not controversial, and is supported by most people.

## Sen. Santorum Applauds Dover District

*By Sen. Rick Santorum*

The following editorial appeared in the 12/23/04 edition of the Pittsburgh Post-Gazette

A recent [Pittsburgh] Post-Gazette editorial was completely inaccurate in describing the York County district's decision regarding the teaching of evolution and indulges in rhetoric instead of engaging in a reasoned debate on the issues. The fact is that the Dover Area School District will continue to teach evolution and prohibit the teaching of intelligent design, creationism or the presentation of any religious beliefs. The school board simply has presented a balanced curriculum that makes students aware of the controversies surrounding evolution.

Let me be clear: I firmly believe that creationism should not be taught in public schools. Proponents of intelligent design theory believe that our public schools should teach our children more about evolution, including a candid assessment of the theory's unresolved difficulties. Evolution should be taught as a

> *"The school board simply has presented a balanced curriculum that makes students aware of the controversies surrounding evolution"*

scientific theory that is open to scrutiny, not as sacred dogma that cannot be questioned.

But is there a real scientific dispute? Absolutely. Recently, over 300 scientists, including scholars from Yale, Princeton, MIT and the Smithsonian, signed a public statement declaring that they were "skeptical of claims for the ability of random mutation and natural selection to account for the complexity of life" and encouraging "careful examination of the evidence for Darwinian theory."

Because there is a real scientific dispute, federal education policy calls on schools to "teach the controversy." In 2001, I offered report language ultimately attached to the No Child Left Behind Act that states, "Where topics are taught that may generate controversy (such as biological evolution), the curriculum should help students to understand the full range of scientific views that exist, why such topics may generate controversy and how scientific discoveries can profoundly affect society."

Constitutional law also allows the teaching of

alternative scientific theories in the classroom. In 1987, the U.S. Supreme Court made clear in Edwards v. Aguillard that "we do not imply that a legislature could never require that scientific critiques of prevailing scientific theories be taught."

A 2001 Zogby poll shows that 71 percent of Americans believe that "biology teachers should teach Darwin's theory of evolution, but also the scientific evidence against it." Even more overwhelming is a 2004 Steinberg Poll showing 73 percent of California voters believe that biology teachers in public schools should teach the scientific evidence for and against Darwin's theory of evolution.

Ultimately, academic freedom is at stake. Students should learn both the strengths of Darwinian evolution, as well as the theory's scientific weaknesses. It is beneficial for our students to discuss the existing unanswered questions surrounding evolution. If we want our students to become educated citizens, we should all support an open, engaging and broad discussion of evolution theory in our public schools. I commend the Dover Area School District for taking a stand and refusing to ignore the controversy.

## Text of Statement Read to Students

"The Pennsylvania Academic Standards require students to learn about Darwin's Theory of Evolution and eventually to take a standardized test of which evolution is a part.

Because Darwin's Theory is a theory, it continues to be tested as new evidence is discovered. The Theory is not a fact. Gaps in the Theory exist for which there is no evidence. A theory is defined as a well-tested ex-

planation that unifies a broad range of observations.

Intelligent Design is an explanation of the origin of life that differs from Darwin's view. The reference book, Of Pandas and People, is available for students who might be interested in gaining an understanding of what Intelligent Design actually involves.

With respect to any theory, students are encouraged to keep an open mind. The school leaves the discussion of the Origins of Life to individual students and their families. As a Standards-driven district, class instruction focuses upon preparing students to achieve proficiency on Standards-based assessments."

Continued on page 2

# Frequently Asked Questions *Continued*

However, evolution in its biological sense means a process whereby life arose from non-living matter and subsequently developed by natural means, namely, natural selection, acting on random variations.

## What is the theory of Intelligent Design?

The theory of intelligent design (ID) is a scientific theory that differs from Darwin's view, and is endorsed by a growing number of credible scientists.  ID attempts to explain the complexity of the world by interpreting the scientific data now available to modern biologists.  Its principle argument is that certain features of the universe are best explained by an intelligent cause, rather than undirected causes such as Darwin's theory of natural selection.

In simple terms, on a molecular level, scientists have discovered a purposeful arrangement of parts, which cannot be explained by Darwin's theory.  In fact, since the 1950's, advances in molecular biology and chemistry have shown us that living cells, the fundamental units of life processes, cannot be explained by chance.

Even Bill Gates, computer software genius and founder of Microsoft, has said, "DNA is like a computer program but far, far, more advanced than any software we have ever created."

## Are Dover students taught the theory of intelligent design?

No.  Perhaps the most widely misreported fact is that Dover school district requires the "teaching" of intelligent design.

Students are only made aware of the theory of ID during the one minute statement read prior to the ninth grade biology course (see front page).  Students interested in learning more are able to do so by viewing books and materials available in the library.

## Are there religious implications to the theory of ID?

Not any more so than the religious implications of Darwinism.  Some have said that before Darwin, "we thought a benevolent God had created us.  Biology took away our status as made in the image of God"... or "Man is the result of a purposeless process that did not have him in mind.  He was not planned."... or "Darwinism made it possible to be an intellectually fulfilled atheist."

## Is the DASD policy constitutional?

The last Supreme Court case dealing with the theory of evolution was the 1987 case of *Edwards v. Aguillard*.

Although that case held unconstitutional the teaching of creationism alongside Darwin's theory of evolution, it specifically held that schools can teach alternatives to Darwin's approach to origins.  The court stated that teaching a variety of scientific theories regarding the origins of life might be validly done with the clear secular intent of enhancing the effectiveness of science education which is the goal of the Dover Area School District.

## What about the lawsuit filed by the ACLU?

In December the district was served with a federal lawsuit filed by the American Civil Liberties Union on behalf of several parents of Dover students.

The Thomas More Law Center, a non-profit law firm based in Ann Arbor, MI has agreed to defend the district without charge.

Knowing there were complicated legal questions involved in the curriculum change, the statement was adopted to comply with the requirements of the law, while also providing students with the best possible science education.  As the elected representatives of the citizens of Dover, the board was determined to act in the best interest of students, despite threats from the ACLU.  The lawsuit is being fought vigorously.

## Administration: No Problems With Curriculum Implementation

On January 18 & 19, the curriculum change adopted by the Dover Area School Board on October 18 went into effect.  Ninth grade students enrolled in biology were read a four paragraph, one minute statement approved by the Board.  A copy of the statement read to students appears on the front of this publication.

Contrary to rumor and misleading news reports, after the statement was read, students were instructed on the theory of evolution no differently than in years past.  No teacher was instructed to teach the theory of intelligent design or present his or her religious beliefs.

As previously explained, the purpose of the curriculum change was to provide students with a fair and balanced science curriculum.  On that basis, the school board voted to make students aware of the scientific controversy surrounding the theory of evolution in a manner which they believed to be objective and neutral.

Parents of students with concerns about the one-minute statement were permitted to excuse their children from that portion of the class.  Of the 175 students who are enrolled in the course, parents of 15 students requested their students be opted out of hearing the statement.

We are pleased that the curriculum change accelerated without incident, and appreciate the cooperation and tremendous support of both parents and students.

## Quotables

"The Dover Area School District has taken a step in the right direction by attempting to teach the controversy of evolution."
- Sen. Rick Santorum

"[DNA] has shown, by the almost unbelievable complexity of the arrangements which are needed to produce (life), that intelligence must have been involved....My whole life has been guided by the principle of Plato's Socrates: Follow the evidence, wherever it leads."
-Anthony Flew (world famous atheist who now admits the universe appears to have an intelligent design)

"Where topics are taught that may generate controversy (such as biological evolution), the curriculum should help students to understand the full range of scientific views that exist." (Conference Report from the No Child Left Behind Act of 2001)

*For more information on this topic, please visit our libraries and/or our website at www.dover.k12.pa.us*

## 2001 National Zogby Poll



14% - Neither/Not sure

71% - Teach Darwin's theory, but also teach scientific evidence against it

15% - Teach only Darwin's theory

Source: *Zogby International, 1750 Genesee Street, Utica, NY 13502.* Nationwide poll of 1202 American adults was taken in August 2001. Margin of error is +/- 3% points.

# Exhibit B

# In The Matter Of:

*Tammy Kitzmiller, et al.   v.*
*Dover Area School District, et al.*

---

*Steven Stough*
*April 6, 2005*

---

*Filius & McLucas Reporting Service, Inc.*
*1427 East Market Street, York, PA*
*4309 Linglestown Road, Harrisburg, PA*

*(717) 845-6418   or   (717) 236-0623*

*Original File SS040605.TXT, 75 Pages*
*Min-U-Script® File ID: 1133090786*

# Word Index included with this Min-U-Script®

Tammy Kitzmiller, et al. v.
Dover Area School District, et al.

Case 4:04-cv-02688-JEJ   Document 189-2   Filed 09/16/05   Page 6 of 65

Steven Stough
April 6, 2005

---

Page 9

[1] A: None beyond a high school advanced biology course that
[2] would have covered it and also a class at Penn State
[3] where — I guess it was actually two classes where part
[4] of the time was working with natural selection and
[5] Evolution.
[6] Q: When did you take those classes at Penn State?
[7] A: 1975.
[8] Q: Wow! That is a pretty good recollection. You put your
[9] finger on that pretty quick.
[10] I see that you are represented by counsel. I just
[11] want to get an idea for when you came to be and how you
[12] came to be represented by counsel in connection with
[13] this litigation.
[14] Now as we ask these questions, as time will tell
[15] you, anything that you — communications between you and
[16] your lawyer about legal advice, about this litigation
[17] are privileged. When I ask you questions today, I don't
[18] want you to tell me any of those communications between
[19] counsel and you.
[20] Likewise, I don't want you to tell me about
[21] communications with other plaintiffs where you were
[22] discussing the legal advice provided by your counsel.
[23] So these questions are just directed towards when the
[24] relationship was formed and how it came to be formed.
[25] A: I don't know the specific date, but the Monday before

---

Page 10

[1] Thanksgiving Thursday of 2004, I had finally had my fill
[2] of everything that I had been seeing happening, and I
[3] contacted the ACLU over the phone on their hotline to
[4] Philadelphia.
[5] The following day, I was contacted by e-mail. And
[6] then later in the day I talked to on the phone with
[7] Paula Knudsen of the ACLU. She took my information and
[8] forwarded that then to Pepper Hamilton. And I received
[9] a phone call from Steve Harvey on Friday.
[10] Q: I believe you said this was around Thanksgiving?
[11] A: It was the Friday after Thanksgiving.
[12] Q: You indicated that you reached out and called them?
[13] A: That's correct.
[14] Q: What was the purpose of your call?
[15] A: I felt that my rights and my daughter's rights were
[16] being violated. And to be quite honest, I can tell you
[17] the phone call was I don't know what to do; I am just
[18] reaching out.
[19] Q: You said you had finally had your fill. And that's why
[20] I have you in here, to find out what you know about the
[21] dispute.
[22] At this point, just give me an idea, what was it
[23] you saw that gave you concern and led you to call
[24] counsel?
[25] A: I would have to say throughout the summer, I did read

---

Page 11

[1] the newspaper articles. I did not attend any of the
[2] Board meetings. But slowly, I became aware of what was
[3] happening in Dover regarding the Pandas book, the
[4] curriculum change, the dispute over finding a new
[5] biology textbook.
[6] I don't know how to describe it. But at that
[7] point, it just grew and grew until the October 18th
[8] meeting when they adopted the curriculum, and the books
[9] showed up I guess in September, that I thought things
[10] were going the wrong way. And I thought about it for
[11] quite a bit and decided at Thanksgiving time that I had
[12] had enough I guess.
[13] Q: When you say you had had enough, had enough of what?
[14] A: It became very real. There was curriculum that was
[15] going to address Intelligent Design. The Pandas books
[16] were there. My daughter in a year would be subjected to
[17] this.
[18] I didn't know if I could stop it or what could
[19] happen, but I felt that as an individual, my rights were
[20] being violated and those of my daughter.
[21] Q: And you referenced the October 18th, 2004 meeting of the
[22] Dover Area School District School Board?
[23] A: Correct.
[24] Q: And the curriculum change. What was it, Steve, as we
[25] start out, give me a general idea, what was it about

---

Page 12

[1] that curriculum change that concerned you?
[2] A: Number one would have obviously been the inclusion of
[3] Intelligent Design because again, I feel that is
[4] basically Creationism.
[5] Additionally, the attempt to discredit Evolution
[6] with the gaps and problems language. And I don't know
[7] that there is anything that could ever be done about
[8] this, but the failure of the School District to actually
[9] address origins.
[10] Q: Thanks. That gives me an idea of your general concerns.
[11] I will explore those allegations more. Let me ask you
[12] in preparation for today's deposition, did you speak
[13] with anyone other than your attorney?
[14] A: Yes.
[15] Q: Tell me who.
[16] A: On Monday evening at the Board meeting, I spoke with
[17] Beth Eveland. This is in preparation for the
[18] deposition?
[19] Q: Yes.
[20] A: That would be it.
[21] Q: That would be it?
[22] A: Yes.
[23] Q: So what did you and Beth talk about?
[24] A: What kind of questions you had asked her.
[25] Q: That is fair enough. I would probably do the same. Do

---

Exhibit C

# In The Matter Of:

*Tammy Kitzmiller, et al.   v.*
*Dover Area School District, et al.*

---

*Aralene Callahan*
*March 30, 2005*

---

*Filius & McLucas Reporting Service, Inc.*
*1427 East Market Street, York, PA*
*4309 Linglestown Road, Harrisburg, PA*

*(717) 845-6418   or   (717) 236-0623*

*Original File AC033005.TXT, 123 Pages*
*Min-U-Script® File ID: 2023279861*

**Word Index included with this Min-U-Script®**

Tammy Kitzmiller, et al.    v.
Dover Area School District, et al.

Aralene Callahan
March 30, 2005

Case 4:04-cv-02688-JEJ   Document 189-2   Filed 09/16/05   Page 9 of 65

Page 49

[1] You called some parents. Do you recall who you
[2] called?
[3] A: I remember calling one parent in particular. I remember
[4] the one parent I talked to was Mrs. Mummert.
[5] Q: Why did you call her?
[6] A: Because clearly her husband had demonstrated to me a
[7] concern for quality education.
[8] Q: And how had Mr. Mummert demonstrated that interest to
[9] you?
[10] A: He had been to many — he had certainly attended School
[11] Board meetings. Any time he spoke, he spoke with what
[12] is good for kids in mind or just education. So I
[13] thought — and he is a minister. So I thought this
[14] could be a really important person to have involved.
[15] Mrs. Mummert said to me, well clearly, I mean we
[16] happen to believe in Creationism, which is fine, but we
[17] clearly don't think it should be part of the science
[18] classroom. And maybe Reverend Mummert would write a
[19] letter. She said I am not sure whether he will be able
[20] to attend. It might have been a conflict in schedule.
[21] Q: Apart from Mr. Mummert, did you contact — you said you
[22] contacted other parents. Do you recall any others?
[23] A: I don't recall them specifically. The reason I think I
[24] remember the Mummerts is because I don't think I have
[25] ever called them before. Other parents, I would call

Page 50

[1] regularly to say you might want to be aware of this, or
[2] you might want to be aware of that. So because it was
[3] unique for me to call Reverend Mummert, that is the only
[4] one I know I called.
[5] Q: Can you give me a sense for the parents that you called
[6] regularly? My purpose is simply to find out people who
[7] would be apprised of these events through you.
[8] I take it from your comments that you are aware of
[9] other parents who have a shared interest with you in the
[10] education that takes place at Dover schools?
[11] A: Yes, the Reibers, Bergdoll, Taylor, Miller, probably
[12] Lonnie Langione and Larry Snook.
[13] I am not sure if I actually contacted all these
[14] people. These are people who over the years I have
[15] touched base with because they are credible —
[16] Q: Right.
[17] A: — in their concern for education.
[18] Q: Exactly. I mean that is all I am trying to do, get a
[19] sense for the likely people that you spoke with when you
[20] got out of the June meeting and you had a concern and
[21] sort of who you would contact.
[22] For the Reibers, give me one of the names?
[23] A: Vicki.
[24] Q: Bergdoll?
[25] A: Linda.

Page 51

[1] Q: Taylor, first name?
[2] A: Randy, Michelle.
[3] Q: And Miller?
[4] A: Diane.
[5] Q: Lonnie Langione, that name sounds familiar to me. I am
[6] not sure why. Was he a Board member at some time?
[7] A: Yes.
[8] Q: And Larry Snook, same thing?
[9] A: Yes.
[10] Q: Now you have indicated that by reason of your daughter's
[11] engagement, you missed the next meeting in June. That
[12] would be the second School Board meeting in June?
[13] A: Yes.
[14] Q: How about July, did you go to the School Board meetings?
[15] A: No.
[16] Q: August?
[17] A: No, unless there was one at the very end of August.
[18] Q: And did you have vacation plans or something?
[19] A: Yes. Not necessarily vacation, but I was not in
[20] Pennsylvania.
[21] Q: That is all. I just wanted to make sure. You recall
[22] that specifically so I thought there might be —
[23] A: Yes.
[24] Q: When is the next Board meeting you recall going to?
[25] A: I don't remember. I would think it was shortly after I

Page 52

[1] came back. Because when I came back, I did ask to
[2] borrow the book Of Pandas and People. And that is when
[3] a new level of concern happened.
[4] Q: Well let's look at that because obviously, you got back.
[5] You had this concern on your mind. Did you contact
[6] people to sort of get up to date on what had happened?
[7] A: My husband had brought the newspaper articles to me.
[8] Q: So were you following the disputes through the
[9] newspapers?
[10] A: Yes.
[11] Q: When you say newspapers, which specific newspapers are
[12] you referring to?
[13] A: The York Dispatch and the Daily Record.
[14] Q: Apart from information that you gained from reviewing
[15] those papers, did you have any other basis for
[16] information concerning the activities of the Dover Area
[17] School Board between the first meeting in June of 2004
[18] and the next meeting you attended which would be at
[19] either the end of August or in September?
[20] A: Ask that again. I am sorry.
[21] Q: Sure. You filled yourself in or you were keeping
[22] yourself abreast of the developments. We know that you
[23] did it through the papers.
[24] Was your husband here in Dover?
[25] A: Yes.

Exhibit D

NewsLibrary: Document Display

# NewsBank InfoWeb

# NewsLibrary

Estimated printed pages: 4

Docs remaining: 12
Subscription until: 01/30/2005 1:15 PM

York Daily Record (PA)

June 15, 2004
Section: LOCAL
Page: 01, 05

**Book is focus of more debate The teaching of creationism or evolution was the topic again at the Dover Area School Board meeting.**
Author: *JOSEPH MALDONADO; For the Daily Record/Sunday News*

Article Text:

At Monday evening's Dover Area School Board meeting, **William Buckingham** apologized to anyone he may have offended with the comments he made at last week's board meeting during discussions over a new biology book for the high school.

But then the school board member reiterated one of his statements to the roughly 90 in attendance that the separation of church and state is a myth.

"Nowhere in the Constitution does it call for a separation of church and state," he said.

But, in part of the First Amendment to the Constitution, it states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . ."

**Buckingham** said while growing up, his generation prayed and read from the Bible during school. Then he said liberals in "black robes" were taking away the rights of Christians.

"Two thousand years ago, someone died on a cross," he said. "Can't someone take a stand for him?"

Last week, **Buckingham** said that the science department's choice for a new biology book is "laced" with Darwinism. This week, he said a Seattle-based think-tank gave the book, "Biology," by Miller and Levine, an "F" grade. He didn't name the think-tank at the meeting and he didn't say why the book received an "F."

But in reference to its teaching of Darwinism, he said, "I challenge you (the audience) to trace your roots to the monkey you came from."

Board member Carol Brown said she reviewed the book and had it with her at the meeting. She said the book makes no mention of anyone evolving from monkeys.

12/31/2004

P 01327

During public comments, Bertha Spahr, chair of the high school science department, said the 1,000-plus-page text only contains seven pages that refer to Darwinism.

In addition to meeting state standards, she said the book was chosen by her department because it takes into account the many different beliefs Dover residents may have.

"It was the least offensive book we could find," she said.

Also during public comments, **Buckingham**'s wife, Charlotte **Buckingham**, argued that evolution teaches nothing but lies. After quoting several verses from the book of Genesis in the Bible, she asked, "How can we allow anything else to be taught in our schools?"

During her time, she repeated gospel verses telling people how to become born-again Christians and said evolution was in direct violation of the teachings of the Bible.

But the Rev. Warren Eshbach, retired, said the book of Genesis was not written as a science book, but rather as a statement of faith. "It's the place of the church to teach on matters of faith," he said. "Not public schools."

He also said the creationism vs. evolution issue was polarizing the community.

During the meeting, **Buckingham** told those in attendance that he had been asked to tone down his Christian remarks.

"But I must be who I am, and not politically correct," he said.

After the discussion, Dover Area High School graduate Brad Erney said creationism would only be acceptable in the classroom if it could be taught without a religious context.

"But that's impossible," he said. "This whole thing opens the board up to lawsuits that could end up costing already overburdened taxpayers a lot of money."

As resident Susan Napierskie was leaving the meeting with her three young daughters, she said she had mixed feelings.

"I'm raising my girls with Christian values," she said. "But I can't be a hypocrite and say that in a public school, teachers can only teach from a Christian perspective. One of the reasons people settled in this country was to escape religious persecution."

Napierskie shook her head and said the teaching of evolution does have the potential to undermine the values she is trying to instill in her daughters.

(c) 2004 York Daily Record. All rights reserved. Reproduced with the permission of Media NewsGroup, Inc. by NewsBank, Inc.
Record Number: MERLIN_561008

**P 01328**

12/31/2004

Exhibit E

# NewsBank InfoWeb

# NewsLibrary

Estimated printed pages: 3

Docs remaining: 11
Subscription until: 01/30/2005 1:15 PM

York Dispatch, The (PA)

June 15, 2004
Section: TOP STORIES

**Church, state issue divides**
**Creationism draws 100 to Dover meeting**
Author: *HEIDI BERNHARD-BUBB For The York Dispatch*

Article Text:

Nearly 100 Dover residents and teachers attended last night's school board meeting to continue debating whether creationism should be taught alongside evolution in the high school's biology curriculum.

At the center of the controversy is a ninth-grade biology textbook, the 2002 edition of Prentice Hall Biology, which is up for adoption for the upcoming school year and which offended several board members because it teaches evolution without reference to creationism.

Last night's debate determined one thing -- there are strong feelings on both sides of the issue. The audience responded to each speaker with smatterings of applause.

Board member and curriculum committee member Casey Brown said it is her duty as a board member to uphold her oath to support the Constitution and the school code, which she said is clear about the separation of church and state.

In 1987, the U.S. Supreme Court rejected the teaching of creationism in public school as a violation of the separation of church and state. In addition, the Pennsylvania Department of Education high school science standards require the teaching of evolution.

The 'least offensive option': High school Principal Trudy Peterman and Bertha Spahr, head of the science department, said the faculty considered that Dover was a religious community when they selected the book, which they believed was the least offensive option.

The book includes one chapter on evolution, which includes a description of Charles Darwin's theory of natural selection and how he developed his theories.

Brown quoted from the teacher's edition that the purpose of the section on evolution was to "help students understand the evolutionary worldview and promote understanding without compelling belief."

The book, which has been reviewed for more than a year, was selected by the high school science

12/31/2004

P 01324

department and district administration to replace the current textbook, which is six years old and out of date in some areas.

Spahr said the teachers do not address the origins of life, suggesting to the students that other theories are in existence and should be taught by students' families or at their churches.

She added that the curriculum is aligned with state standards, which she said do not include creationism.

Opponents' position: **William Buckingham**, a board member and head of the curriculum committee, who brought up the issue last week, stood by his opposition to the book and the separation of church and state.

"Nearly 2,000 years ago someone died on a cross for us; shouldn't we have the courage to stand up for him?" he asked.

Board members Alan Bonsell and Noel Wenrich agreed with **Buckingham**, saying creationism should be taught to balance evolution.

**Buckingham** apologized for offending any teachers or residents of the community with his remarks but was unapologetic about his belief that the country was founded on Christianity and not other religions and that a "liberal agenda was chipping away at the rights of Christians in this country."

His remarks were echoed by his wife, Charlotte **Buckingham**, who said that teaching evolution was in direct opposition to God's teachings and that the people of Dover could not in good conscience allow the district to teach anything but creationism.

A minister's view: Dover resident Warren Eshbach, a minister of the Church of the Brethren, said he was concerned that the issue was polarizing the district.

He said that he believes people might believe in both God and evolution, adding that while public schools should have values, religious beliefs should be taught at home and church. Eschbach also said he was concerned that compelling the staff to teach creationism might expose the district to legal ramifications that could impact the taxpayers.

Robert Boston, spokesman for Americans United for Separation of Church and State, has said the district will be inviting a lawsuit if it chooses a textbook that teaches creationism. **Buckingham** said he did not believe the members of the AU know what it means to be American.

The school board approved six new textbooks for the high school last night, but the biology book was not among them.

Assistant Superintendent Michael Baksa said the curriculum committee, made up of Brown, **Buckingham** and Sheila Harkins, is scheduled to meet tomorrow to look for a book that will make everyone happy.

Although the committee is expected to make a recommendation on a textbook, Baksa said the entire board will ultimately determine which book is selected.Subscribe Now!

(c) 2004 The York Dispatch. All rights reserved. Reproduced with the permission of Media NewsGroup, Inc. by NewsBank, Inc.

12/31/2004

P 01325

Record Number: 2214249

P 01326

12/31/2004

Exhibit F



LOCAL

**Dover schools still debating biology text; A board member said a book was rejected because it didn't offer creationism.**

JOSEPH **MALDONADO**

York Daily Record

326 words

9 June 2004

York Daily Record

4

English

Copyright (c) 2004 Bell & Howell Information and Learning Company. All rights reserved.

Former Dover school board member Barrie Callahan repeated her request for new biology books for the high school at Monday night's board meeting.

For the past few months, she has appeared several times before the board to request a status update.

Board member William Buckingham, who sits on the curriculum committee, said a book had been under consideration ("Biology," by Miller and Levine) but was declined because of its one-sided references to evolution.

"It's inexcusable to teach from a book that says man descended from apes and monkeys," he said. "We want a book that gives balance to education."

Buckingham and other board members are looking for a book that teaches creationism and evolution.

But a former student, Max Pell, told the board Monday night that he was concerned that that type of book would trample on the separation of church and state.

Board President Alan Bonsell disagreed, saying there were only two theories (creationism and evolution) that could possibly be taught. He said as long as both were taught as theories, there would be no problems for the district.

"Have you ever heard of brainwashing?" Buckingham asked Pell. "If students are taught only evolution, it stops becoming theory and becomes fact."

After the meeting, Buckingham said all he wants is a book that offers balance between what he said are Christian views of creationism and evolution.

He said there needn't be consideration of the beliefs of Hindus, Buddhists, Muslims or other faiths and views. "This country wasn't founded on Muslim beliefs or evolution," he said. "This country was founded on Christianity, and our students should be taught as such."

On Tuesday, Assistant Superintendent Michael Baksa said teachers, administrators and curriculum committee members will work together to find a book that is agreeable to all.

Document YKDR000020040610e0690001q

     © 2005  Dow Jones Reuters Business Interactive LLC (trading as Factiva). All rights reserved.

# Exhibit G

NewsBank InfoWeb

# NewsLibrary

Estimated printed pages: 3


Docs remaining: 5
Subscription until: 01/30/2005 1:15 PM

York Dispatch, The (PA)

June 9, 2004
Section: LOCAL NEWS

**Group: Dover schools could face lawsuit**
**Says it's a textbook case of church, state separation**
Author: *HEIDI BERNHARD-BUBB For The York Dispatch*

Article Text:

The quest of several Dover Area School Board members to find a high school biology textbook that teaches both evolution and creationism could put the district at odds with the U.S. Supreme Court and at risk of a lawsuit.

**William Buckingham,** a board member and head of the curriculum committee, said this week he was disturbed by a proposed high school biology textbook, the 2002 edition of Prentice Hall Biology, because it was laced with Darwinism.

Board member Noel Wenrich agreed.

The book was initially selected by the high school science department and district administration to replace the current textbook, which is six years old and out of date in some areas.

A recommendation on the book will come from the curriculum committee, which also includes board members Sheila Harkins and Casey Brown. **Buckingham** said the committee would look for a book that presented both creationism and evolution.

However, teaching creationism may get the district in trouble.

Robert Boston, spokesman for Americans United for Separation of Church and State, said the district will be inviting a lawsuit if it chooses a textbook that teaches creationism.

"Creationism isn't a science, it's religion, and any attempts to introduce creationism into public school science classes would most likely spark a lawsuit," Boston said. "The district would almost certainly lose a lawsuit like that. It's not even worth wasting the time and energy to consider."

The Washington, D.C.-based group is leading the charge in Hanover to remove a monument to the Ten Commandments from the borough-owned Wirt Park.

12/31/2004                                                                                       P 01311

Americans United sent a letter to the borough council in November, saying the monument violates the First Amendment and asking that it be removed from public land, where it has been since the 1950s.

The letter sparked strong public response, as residents signed petitions and held a vigil asking the borough not to move the monument.

At the suggestion of State Rep. Steve Nickol, the council petitioned the York County Common Pleas Court for permission to sell the monument and the land on which it sits to a nonprofit organization, so that it will no longer be on public property. Judge Gregory Snyder will hear Hanover's arguments at 9 a.m. Monday.

Previous cases: In 1987, the U.S. Supreme Court rejected the teaching of creationism in public school as a violation of the separation of church and state.

But **Buckingham** said he is unconcerned about violating the separation of church and state.

Although he swore to uphold the Constitution when he became a school board member, **Buckingham** said he didn't come to uphold the separation of church and state, which he sees as a myth and the Supreme Court's interpretation.

Also, the Pennsylvania Department of Education high school science standards require the teaching of evolution.

Assistant Superintendent Michael Baksa said the current textbook, called The Living Science, and the school's science curriculum teach evolution.

"We do not address the origins of life," he said. "The origin of life is left to the personal beliefs of each family."

However, he said teachers may make reference to creationism in class and the district would not prevent students from pursuing other theories.

The district has not rejected the proposed new textbook, Baksa said, but it will continue to look for a book that will make everyone happy.

However, he acknowledged that at the end of the day, the book has to match state standards, which would mean a book that teaches evolution.

The other curriculum committee members stayed away from the creationism issue.

Brown declined to comment, saying she will be making a public statement on the issue at the next board meeting, at 7 p.m. Monday at North Salem Elementary.

Harkins said she didn't think the high school needed a new science textbook, saying the current one has hardly been used. She would not comment on creationism .

The school board will have the final say on which textbook to use, said Superintendent Richard Nilsen.Subscribe Now!

(c) 2004 The York Dispatch. All rights reserved. Reproduced with the permission of Media NewsGroup,

12/31/2004

P 01312

Inc. by NewsBank, Inc.
Record Number: 2202398

P 01313

12/31/2004

# Exhibit H

# NewsBank InfoWeb

# NewsLibrary

Estimated printed pages: 5

Docs remaining: 7
Subscription until: 01/30/2005 1:15 PM

York Daily Record (PA)

June 10, 2004
Section: LOCAL
Page: 01/03

**Residents join creation debate A school board member's objection to evolution raises worries about curriculum.**
Author: *JOSEPH MALDONADO; For the Daily Record/Sunday News*

Article Text:

Robert Bowman of Dover is a Christian man. But after reading about the Dover Area School Board's desire to have theories of creation taught alongside of evolution in his daughter's biology class, he still saw a potential for problems in the classroom.

"It seems like Bill (school board member **William Buckingham**) wants more of a church thing to be going on in school," Bowman said. "But there are a lot of different beliefs even among those that call themselves Christian. Which school board member is going to declare whose version is right?"

During this past Monday night's board meeting, board members Alan Bonsell, Noel Wenrich and **Buckingham** spoke aggressively in favor of having a biology book that includes theories of creation as part of the text.

"All I'm asking for is balance," **Buckingham** said.

Asked if he thought this might violate the separation of church and state, **Buckingham** called the law, "a myth."

Resident Richard Cherry suggested parents who want religion taught as part of a science curriculum enroll their children in Christian or Catholic schools funded by private tuition, not tax dollars.

"Muslims pay taxes, too," said Bowman. "To shoot down their faith and beliefs by saying it's not as important as Christianity isn't fair."

But fellow resident Tom Jackson, who said he was a Christian, said he saw no problem with offending others with different beliefs.

"There really are no other religions," he said. "There's atheism and Christianity. That's it."

12/31/2004

P 01316

Jackson also said he felt there was a way to teach creation without necessarily talking about God or a creator, thereby avoiding problems with the law.

Bethany Yenner, a spokeswoman for the Pennsylvania Department of Education, said creation can be taught in the science classroom under the state's current Academic Standards for Science and Technology.

"But it (creation) has to be taught without attitudes and values," Yenner said. "It's up to each district to decide how they want to apply the standard.

In 2000, Pennsylvania was one of four states to get an "A" from a national organization of scientists grading how well evolution is included in state education standards. Lawrence S. Lerner, who compiled the report for the Thomas B. Fordham Foundation, called creationism "a pseudoscientific rival to evolution that the courts have repeatedly held to be thinly veiled religion."

Overall, creationism has not fared well in the courts.

In 1981, Louisiana passed the Balanced Treatment for Creation-Science and Evolution-Science Act, which was designed to ensure evolution and creationism were taught together in the sciences.

The act was ultimately struck down in 1987 by the U.S. Supreme Court in the case of Edwards vs. Aguillard. "The Act violates the Establishment Clause of the First Amendment because it seeks to employ the symbolic and financial support of government to achieve a religious purpose," Justice **William** Brennan wrote in the majority opinion in that case.

In 1994, the Ninth U.S. Circuit Court of Appeals struck down an attempt to introduce creationism into the classroom by claiming evolution was itself a religion (Peloza vs. The Capistrano School District).

And in 1997, the United States District Court for the Eastern District of Louisiana rejected the idea that teacher-read disclaimers would make teaching creationism acceptable in public schools (Freiler vs. The Capistrano School District).

Regardless of its potential legal ramifications, any move to implement a book that mandates the study of creationism worries Bowman.

"Once these types of religious themes are introduced into a classroom, it puts a lot of pressure on kids," he said. "I worry that students will feel intimidated to talk with teachers or their fellow classmates if their belief system is different from the version of creation that is being taught."

On Wednesday afternoon, Noel Wenrich, a member of the Dover Area School Board, said students needn't worry about that because the board's goal is not to say that students must believe in creationism or the existence of a creator. But he also said that creationism does imply the existence of an intelligent life force ultimately responsible for all life.

Then he stressed again that no one will be required to believe in creationism or a creator any more than they are currently required to believe in evolution.

"What I am saying is that when you teach only one theory (evolution), that theory becomes a fact," Wenrich said. "I'm not saying that students must believe in creation, but I do believe they must consider the possibility."

**P 01317**

12/31/2004

(c) 2004 York Daily Record. All rights reserved. Reproduced with the permission of Media NewsGroup, Inc. by NewsBank, Inc.
Record Number: MERLIN_555517

P 01318

# Exhibit I

**NewsBank InfoWeb**

**NewsLibrary**



Estimated printed pages: 3

Docs remaining: 4
Subscription until: 01/30/2005 1:15 PM

York Dispatch, The (PA)

June 8, 2004
Section: TOP STORIES

**Dover debates evolution in biology text**
**Book on hold because it doesn't address creationism**
Author: *HEIDI BERNHARD-BUBB For The York Dispatch Did human beings descend from apes? Some members of the Dover Area School Board don't think so and want to make sure the high school biology curriculum teaches more than evolution. William Buck*

Article Text:

In 1987, the U.S. Supreme Court rejected the teaching of creationism in public schools as a violation of the separation of church and state.

And according to the Web site of the state chapter of the American Civil Liberties Union, Pennsylvania's new standards "do not include language that could have been interpreted as opening the door to the teaching of creationism." The standards, in fact, call for the teaching of evolution.

But Dover Area Superintendent Richard Nilsen said he is bound by state law to abide by the board's decision. He said the board votes on all textbooks and has the final say.

"The teachers cannot teach from a book that is not board-adopted," he said.

He said the district "will always look for textbooks that have a balanced approach to all topics."

When asked what that means for the evolution versus creationism debate, Nilsen said Dover will "present all options and theories."

ACLU staff attorney Paula Knudsen said the courts have "pretty well settled" the issue, so someone objecting to a textbook presenting creationism would have an "immediate ability to challenge (the) textbook" in federal court.

Districts can "use religion in the school setting to teach about literature, history, whatever, but when you're in the science forum, the case law is so clear it's probably a good idea for school districts not to use creationism at all, even if it's just a portion of a science textbook," Knudsen said.

Nilsen said he is not concerned about exposing the district to a possible lawsuit.

12/31/2004

P 01309

Still looking: Board President Alan Bonsell said the board would look for a book that teachers and board members could approve, one that presents a fair and balanced approach.

A recommendation on the book will come from the curriculum committee, which also includes board members Sheila Harkins and Casey Brown.

Since last year when she was still a member of the board, Barrie Callahan has been questioning the board as to why the new book was not approved.

**Buckingham** said although the book had been available for review since May 2003, he had just recently reviewed the book himself and was disturbed the book was laced with Darwinism.

Resident Max Pell questioned whether the board should be teaching religion in school: "Creationism is a religious theory," he said. "Why does it have to be taught in biology class?"

Pell graduated from Dover High School in 2003 and just completed his freshman year as a biology major at Penn State University's main campus.

Opposes separation of church and state: **Buckingham** said he believes the separation of church and state is mythical and not something he supports.

Board member Jeff Brown said the entire board would make the final decision and the book has not been completely rejected.

Pell said he had no problem with **Buckingham**'s views if they weren't presented in the school curriculum.

Also at issue is whether a book will be approved before the upcoming school year. Callahan said she was concerned that students would have an outdated textbook for another year.

Assistant Superintendent Michael Baksa said the district was planning to adopt a textbook before the start of the new school year.

He said that he would present options to the curriculum committee and give the committee more information about how the district teaches evolution and creationism.Subscribe Now!

(c) 2004 The York Dispatch. All rights reserved. Reproduced with the permission of Media NewsGroup, Inc. by NewsBank, Inc.
Record Number: 2200130

12/31/2004

P 01310

# Exhibit J

LEXSEE 2002 US DIST LEXIS 6279

**ED MERA, Plaintiff, vs. FRANCES LOHMAN, et al., Defendants.**

**NO. 3:CV-00-1507 (JUDGE CAPUTO)**

**UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF
PENNSYLVANIA**

*2002 U.S. Dist. LEXIS 6279*

**April 4, 2002, Decided**

**DISPOSITION:** [*1] Parties' motions for summary judgment denied.

**LexisNexis(R) Headnotes**

**COUNSEL:** For EDWARD MERA, plaintiff: Bruce J. Phillips, McHugh, Wetzel, Caverly & Phillips, Wilkes Barre, PA.

For FLORENCE K. LOHMAN, BRIAN C. MCDERMOTT, JOHN J. SIPPER, RICHARD C. SWOBODA, defendants: Sean P. McDonough, Dougherty, Leventhal & Price, L.L.P., Moosic, PA.

For HANOVER TOWNSHIP, defendant: Sean P. McDonough, Dougherty, Leventhal & Price, L.L.P., Moosic, PA. William Henry Amesbury, William H Amesbury & Assoc, Kingston, PA.

**JUDGES:** A. Richard Caputo.

**OPINIONBY:** A. Richard Caputo.

**OPINION:**

### MEMORANDUM

Presently before the Court are Plaintiff's motion for summary judgment (Doc. 17) and Defendants' motion for summary judgment. (Doc. 22.)

Plaintiff Ed Mera is the former Township Manager of Hanover Township, Pennsylvania. n1 Plaintiff filed the present civil rights action on August 23, 2000, alleging that Defendants Florence K. Lohman, Brian C. McDermott, John J. Sipper, Richard C. Swoboda, members of the Board of Commissioners of Hanover Township, and Hanover Township violated his First and Fourteenth Amendment rights when the Board of Commissioners voted to terminate him from his position as Township Manager in June 2000. (Compl., Doc. [*2] 1.) Plaintiff moved for summary judgment on September 25, 2001. (Doc. 17.) Defendants moved for summary judgment on September 28, 2001. (Doc. 22.) Both motions for summary judgment have been fully briefed and are ripe for disposition.

n1 Plaintiff was appointed to the position of Township Manager on a temporary basis on February 24, 1999. (Doc. 23, Ex. A.) However, Plaintiff was permanently appointed to the position of Township Manager by vote of the Hanover Township Board of Commissioners on November 22, 1999. (Doc. 23, Ex. D.)

### LEGAL STANDARD

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56 (c)*. A fact is material if proof of its existence or non-existence might affect the outcome of the suit under the applicable substantive law. *See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. [*3]

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one. *See id. at 248*. An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party." *See id.*

Where there is a material fact in dispute, the moving party has the initial burden of proving that 1) there is no genuine issue of material fact and 2) she is entitled to

judgment as a matter of law. *See* CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2727 (2d Ed. 1983). The moving party may present its own evidence or, where the nonmoving party has the burden of proof, simply point out to the court that "the nonmoving party has failed to make a sufficient showing of an essential element of her case." *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).* All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire [*4] record must be examined in the light most favorable to the nonmoving party. *See White v. Westinghouse Elec. Co., 862 F.2d 56, 59 (3d Cir. 1988).* Once the moving party has satisfied its initial burden, the burden shifts to the nonmoving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law. *See Anderson, 477 U.S. at 256-257.* The court need not accept mere conclusory allegations or denials taken from the pleadings. *See Schoch v. First Fidelity Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990).* In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson, 477 U.S. at 249.*

## DISCUSSION

### 1. Procedural Due Process

The Fourteenth Amendment Due Process Clause forbids the states from "depriving any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV. In order to show a violation of his procedural [*5] due process rights with respect to the termination of a specific employment position, a plaintiff must first establish a property interest in his employment. *See Latessa v. New Jersey Racing Comm'n, 113 F.3d 1313, 1318 (3d Cir. 1997)* (quoting *Board of Regents v. Roth, 408 U.S. 564, 577, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972)).* A property interest in employment can be created expressly by state statute or regulation, arise from government policy, or arise from an implied agreement between an employer and an employee. *See Perry v. Sindermann, 408 U.S. 593, 601, 92 S. Ct. 2694, 33 L. Ed. 2d 570 (1972).* Pennsylvania law provides that, unless there is specific legislative language to the contrary, at-will public employees do not have a property interest in continued employment. *See Williams v. Philadelphia Housing Auth., 834 F. Supp. 794, 797 (E.D. Pa. 1993), aff'd, 27 F.3d 560 (1994).*

In the present case, Pennsylvania law requires that the office of Township Manager be created by local ordinance, and provides that, among other things, the term of the office shall be regulated by ordinance. *See* 53 PA. CON. STAT. ANN. § 5604. [*6] Local ordinance number 007-99 provided that "the Township Manager shall be removed from office only for just cause by a majority vote of all the members of the Board of Commissioners." (Doc. 20 at 1a.) Thus, Plaintiff had a property interest in his job under local ordinance 007-99. However, in the spring of 2000, Defendants amended the ordinance to provide that "the Township Manager shall be subject to removal from office at any time by a majority vote of all the members of the Board of Commissioners." (Doc. 20 at 4a.) In June 2000, the Board of Commissioners voted to replace Plaintiff with Ron Wydo, Esquire. Plaintiff became an at-will employee when the ordinance was amended in the spring of 2000, and, at the time that he was fired in June 2000, Plaintiff did not have a property interest in his job under the Fourteenth Amendment. Thus, the question becomes whether Defendants violated Plaintiff's procedural due process rights when they amended the ordinance in the spring of 2000.

Procedural due process protection does not extend to legislative action. *See Rogin v. Bensalem Twp., 616 F.2d 680, 693 (3d Cir. 1980)* (citing *Bi-Metallic Investment Co. v. State Bd. of Equalization of Colorado, 239 U.S. 441, 36 S. Ct. 141, 60 L. Ed. 372 (1915)).* [*7]

> Where a rule of conduct applies to more than a few people, it is impracticable that everyone should have a direct voice in its adoption. The Constitution does not require all public acts to be done in town meeting or an assembly of a whole. General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule.

*Bi-Metallic, 239 U.S. at 445.* Where a rule of conduct applies to more than a few people, it is legislative action and the due process clause does not apply absent an indication that the legislative process treats an entire class of people inequitably. *See Rogin, 616 F.2d at 693* (citing *Bi-Metallic,* 239 at 445). Procedural due process protection is triggered where a rule of conduct applies only to a small number of people who are exceptionally affected on individual grounds. *See Bi-Metallic, 239 U.S. at 446* (citing *Londoner v. Denver, 210 U.S. 373, 385, 28 S. Ct. 708, 52 L. Ed. 1103 (1908)).* [*8]

2002 U.S. Dist. LEXIS 6279, *

In the present case, Defendants' adoption of an ordinance making Plaintiff an at-will employee was not a legislative action, and the procedural due process clause applies. As the town manager, Plaintiff was the only person affected by the ordinance at the time it was passed. Indeed, there is evidence that Defendant Lohman stated that "her team plans to look at options for getting rid of . . . Mera." n2 As a state employee who could only be fired for-cause under the original ordinance, Plaintiff had a property interest in his employment. Thus, under the procedural due process clause, Plaintiff was, at minimum, entitled to notice and an opportunity to be heard. *See Cleveland Bd. of Ed. v. Loudermill, 470 U.S. 532, 546, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985).*

n2 The November 24, 1999 newspaper article that Lohman's quote appeared in is hearsay, as it is an out-of-court statement offered to prove the truth of the matter asserted. *See FED. R. EVID. 801(a).* However, Lohman's statement is admissible as an admission by a party-opponent. *See FED. R. EVID. 801(d)(2).* Hearsay statements can be considered on a motion for summary judgment if they would be admissible at trial. *See Shelton v. University of Medicine & Dentistry of New Jersey, 223 F.3d 220, 223 n.2 (3d Cir. 2000).*

[*9]

In the present case, it is unclear whether Plaintiff received notice and an opportunity to be heard when the ordinance was amended to make him an at-will employee. Both parties' motions for summary judgment regarding Plaintiff's procedural due process claim will be denied.

## 2. First Amendment

### A. Appropriate Job Requirement

Defendants move for summary judgment on the grounds that political affiliation is an appropriate job requirement for the position of Township Manager.

"Promotions, transfers and recalls after layoffs based on political affiliation or support are an impermissible infringement on the First Amendment rights of public employees." *Rutan v. Republican Party of Ill., 497 U.S. 62, 75, 110 S. Ct. 2729, 2737, 111 L. Ed. 2d 52 (1990)* (extending holding of *Elrod v. Burns, 427 U.S. 347, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976)* and *Branti v. Finkel, 445 U.S. 507, 100 S. Ct. 1287, 63 L. Ed. 2d 574 (1980)).* However, there is an exemption to the general prohibition against politically motivated discharge where the employee holds a confidential or policy-making position.

*See Wetzel v. Tucker, 139 F.3d 380, 383 (3d Cir. 1998)* [*10] (citing *Elrod v. Burns, 427 U.S. at 367-68).* In determining whether this exception applies, the inquiry is whether the hiring authority can show that party affiliation is an appropriate requirement for effective performance of the office, and not whether the label "policymaker" or "confidential" fits a particular position. *See Wetzel, 139 F.3d at 383* (citing *Branti v. Finkel, 445 U.S. 507, 518, 100 S. Ct. 1287, 63 L. Ed. 2d 574 (1980)).* The court's inquiry should focus on the public office in question, and not on the actual past duties of the particular employee involved. *See 139 F.3d at 384.* However, evidence regarding actual past duties may be informative. *See id.* The defendant bears the burden of proving that party affiliation is an appropriate requirement for the effective service of the public office involved. *Laskaris v. Thornburgh, 733 F.2d 260, 265 n.4 (3d Cir.), cert. denied, 469 U.S. 886, 105 S. Ct. 260, 83 L. Ed. 2d 196 (1984).*

There is a genuine issue of material fact as to whether party affiliation is an appropriate requirement for the position of Township Manager. The Town Manager [*11] is responsible for day-to-day administration of the Township's affairs, and at times may be called upon to pick up supplies, post notices and pick up mail. (Doc. 23, Ex. F at 32; Doc. 26 at 1a-6a.) This does not end the Court's inquiry, however, as an employee who oversees day-to-day operations may still fall within the exception if his office is also involved in policy work. *See Assaf v. Fields, 178 F.3d 170, 178 (3d Cir. 1999)* (citing *Waskovich v. Morgano, 2 F.3d 1292, 1300, 1302 (3d Cir. 1993)).* While there is uncontradicted evidence that the Town Manager does not have the authority to make final policy decisions, there is also uncontradicted evidence that advising the Board of Commissioners on policy decisions is a key part of the Town Manager's role. (Doc. 20, 1a-2a, 4a-6a; Doc. 26, 1a, 4a.) The Town Manager's responsibilities include: attending and participating in all Board Meetings; attending particular committee meetings, upon the Board's request, to provide input on specific issues; keeping the Board informed regarding the conduct of Township affairs and making recommendations to the Board of Commissioners, based on his reports, regarding [*12] "the welfare of the Township;" preparing and submitting a proposed fiscal budget to the Board, and administering the budget after it has been approved by the Board; and negotiating collective bargaining agreements on the Township's behalf, subject to the Board's approval. (Doc. 20 at 2a, 5a-6a.) This evidence suggests that the political affiliation is an appropriate job requirement for the office of Township Manager. However, at least one Defendant has stated that political affiliation is **not** an appropriate job requirement for the position of Township Manager. (Doc. 26, 7a.) Statements by a member of a hiring authority to

the effect that political affiliation is not a proper requirement for a particular government position are "significant," and cannot be lightly dismissed. *Boyle v. County of Allegheny, Pennsylvania, 139 F.3d 386, 389 (3d Cir. 1998).* In light of this contradictory evidence, I find that there is a genuine issue of material fact as to whether political affiliation is a proper requirement for a particular government position. Defendants' motion for summary judgment on this issue will be denied.

### B. Establishing a First Amendment Violation

[*13]

Plaintiff moves for summary judgment on the issue of whether Defendants violated his First Amendment rights.

In order to demonstrate a constitutional violation of a plaintiff's First Amendment rights, a plaintiff must show: "(1) that he is a public employee, (2) that he was engaged in protected conduct such as maintaining an affiliation with a particular political party, and (3) that his political affiliation was a substantial or motivating factor in the state actor's personnel decision." *Albrechta v. Borough of White Haven, 810 F. Supp. 139, 145 (M.D. Pa. 1992)* (Kosik, J.) (citing *Laskaris, 733 F.2d at 265).* Once the plaintiff has established an inference of unconstitutional conduct, the burden shifts to the defendant to show that it would have reached the same decision regarding the plaintiff's employment status even in the absence of the protected conduct. *See Albrechta, 810 F. Supp. at 145.*

In the present case, it is undisputed that Plaintiff was a public employee at the time in question. While Plaintiff was a registered Republican, like Defendants, he supported the Democratic ticket during the fall 1999 Hanover Township elections [*14] by distributing materials endorsing the Democratic slate of candidates for the Board of Commissioners. (Doc. 20 at 33a; Doc. 23, Ex. G at 49-51.) Thus, I find that the first two prongs have been met. The issue, then, is whether Plaintiff's political affiliation during the fall 1999 elections was a substantial factor in Defendants' decision to terminate him. This is a matter for the jury to decide. *See Baldrassare v. New Jersey, 250 F.3d 188, 195 (3d Cir. 2001)* (citing *Zamboni v. Stamler, 847 F.2d 73, 79 n.6, 80 (3d Cir. 1988), cert. denied, 488 U.S. 899, 109 S. Ct. 245, 102 L. Ed. 2d 233 (1988)).* Plaintiff's motion for summary judgment will be denied.

### 3. Qualified Immunity

Defendants move for summary judgment on the grounds that they have qualified immunity.

Government officials performing discretionary functions are entitled to qualified immunity in two circum-

stances. First, qualified immunity shields officials from liability when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Wilson v. Layne, 526 U.S. 603, 614, 119 S. Ct. 1692, 143 L. Ed. 2d 818 (1999)* [*15] (quoting *Harlow v. Fitzgerald, 457 U.S. 800, 102 S. Ct. 2727 (1982)).* Second, even when a violation of a constitutional right has been clearly established, an official may be entitled to qualified immunity where "a reasonable officer could have believed that his or her conduct was lawful, in light of the clearly established law and the information in the officer's possession" at the time of the conduct in question. *Sharrar v. Felsing, 128 F.3d 810, 826 (3d Cir. 1997)* (citing *Hunter v. Bryant, 502 U.S. 224, 227, 112 S. Ct. 116, 116 L. Ed. 2d 589 (1991)* (per curium)).

In the present case, I have found that there are genuine issues of material fact as to whether Plaintiff's First and Fourteenth Amendment rights have been violated. If Plaintiff is able to establish a violation of his constitutional rights, Defendants will not have qualified immunity. The First and Fourteenth Amendment rights at issue here were well established at the time of Defendants' alleged conduct in 2000. *See Rutan v. Republican Party of Ill., 497 U.S. 62, 75, 110 S. Ct. 2729, 2737, 111 L. Ed. 2d 52 (1990)* (First Amendment); *Rogin v. Bensalem Twp., 616 F.2d 680, 693 (3d Cir. 1980)* [*16] (Fourteenth Amendment). *See also Air Line Pilots Assoc., Int'l v. Quesada, 276 F.2d 892, 896 (2d Cir. 1960), cert. denied, 366 U.S. 962, 6 L. Ed. 2d 1254, 81 S. Ct. 1923 (1961)* (applying the legislative/adjudicative analysis to determine whether commercial pilots' claimed property rights in their pilot licenses and their collective bargaining agreements violated the due process clause.) Thus, "the contours of current law [at the time of the alleged conduct would have] put a reasonable defendant on notice that his conduct would infringe on the plaintiff's asserted right." *Gruenke v. Seip, 225 F.3d 290, 302 (3d Cir. 2000). See also McLaughlin v. Watson, 271 F.3d 566, 572 (3d Cir. 2001).* Defendants' motion for summary judgment on the issue of qualified immunity will be denied.

### 4. Benefits

Plaintiff moves for "summary judgment for benefits accrued as of the date of his termination." (Doc. 18 at 16.) However, Plaintiff has not identified any legal grounds justifying his recovery, and thus has not met his burden of establishing that he is entitled to judgment as a matter of law. *See FED. R. CIV. P. 56.* [*17] Plaintiff's motion for summary judgment will be denied.

### CONCLUSION

2002 U.S. Dist. LEXIS 6279, *

Both parties' motions for summary judgment will be denied. An appropriate order will follow.

Date April 4, 2002

A. Richard Caputo

United States District Court

**ORDER**

NOW, this 4 of April, 2002, IT IS HEREBY ORDERED that:

(1) Plaintiff's motion for summary judgment (Doc. 17) is **DENIED.**

(2) Defendants' motion for summary judgment (Doc. 22) is **DENIED.**

A. Richard Caputo

United States District Court

Filed April 4, 2002

Exhibit K

# In The Matter Of:

*Tammy Kitzmiller, et al.   v.*
*Dover Area School District, et al.*

---

*Richard Nilsen*
*January 3, 2005*

---

*Filius & McLucas Reporting Service, Inc.*
*1427 East Market Street, York, PA*
*4309 Linglestown Road, Harrisburg, PA*

*(717) 845-6418   or   (717) 236-0623*

*Original File RN010305.TXT, 114 Pages*
*Min-U-Script® File ID: 3385283062*

# Word Index included with this Min-U-Script®

Tammy Kitzmiller, et al.    v.
Dover Area School District, et al.    Case 4:04-cv-02688-JEJ    Document 189-2    Filed 09/16/05    Page 39 of 65

Richard Nilsen
January 3, 2005

Page 25

[1]  A: Three and a half years.

[2]  Q: When you were Assistant Superintendent, did you have

[3] responsibilities for curriculum as Mr. Baksa does now?

[4]  A: Yes.

[5]  Q: And prior to becoming Assistant Superintendent, what did

[6] you do?

[7]  A: Director of Curriculum Instruction.

[8]  Q: For Dover area?

[9]  A: No. Big Springs School District.

[10]  Q: How long did you hold that position?

[11]  A: Five years. Five or six.

[12]  Q: And prior to that?

[13]  A: High School Principal, Big Springs School District.

[14]  Q: How long did you hold that position?

[15]  A: Total five years.

[16]  Q: You used the word total. Was it broken up?

[17]  A: Yes.

[18]  Q: Why was that?

[19]  A: I was acting one year, then returned to the Assistant

[20] Principal's position. I then went to another District

[21] for three years, then returned for four.

[22]  Q: When you were in the other District, were you also

[23] Principal?

[24]  A: Yes.

[25]  Q: Prior to taking positions as a Principal or Assistant

Page 26

[1] Principal, were you ever a schoolteacher?

[2]  A: Yes.

[3]  Q: What subjects did you teach?

[4]  A: Social studies.

[5]  Q: How long did you do that?

[6]  A: Five and a half years.

[7]  Q: Where did you get your degree?

[8]  Q: Which one?

[9]  Q: What degrees do you have?

[10]  A: I have an undergraduate BA in social studies from Gordon

[11] College. I have a Master's in Administration from

[12] Shippensburg University, and I have a doctorate from

[13] Temple University. So I am actually Dr. Nilsen.

[14]  Q: During any of your college and post graduate education,

[15] did you take any science courses?

[16]  A: No. Wait a minute. You said undergraduate?

[17]  MR. GILLEN: He did I believe.

[18]  A: Yes.

[19]  BY MR. ROTHSCHILD:

[20]  Q: Did you take any biology courses?

[21]  A: No. I took a theory of science I believe.

[22]  Q: While you were an undergraduate?

[23]  A: Yes.

[24]  Q: That is the only science subject you can remember taking

[25] as an undergraduate?

Page 27

[1]  A: No. I am sorry. That is over 30 years ago. That is

[2] all I remember.

[3]  Q: Have you attended any courses or lectures or seminars

[4] relating to the subjects of evolution, Intelligent

[5] Design, creation or Creationism?

[6]  A: No.

[7]  Q: How often does the Dover Area School Board meet?

[8]  A: Usually twice a month.

[9]  Q: Do you attend all those meetings?

[10]  A: Yes.

[11]  Q: Who keeps the minutes of those meetings?

[12]  A: The secretary.

[13]  Q: How is the secretary position selected?

[14]  A: To clarify, the Board approves a secretary. Our current

[15] secretary of the Board is battling cancer and has not

[16] been in the District for over a year and a half. We

[17] have had an Acting Secretary who the Board formally

[18] approved as Assistant Secretary.

[19]  On one occasion, October 18th, we had an

[20] additional individual sit in as the Board secretary.

[21]  Q: In place of the Acting Secretary?

[22]  A: Yes.

[23]  Q: Is it the practice of the Board to record the meeting?

[24]  A: Yes.

[25]  Q: What is done with those recordings after the meeting is

Page 28

[1] completed?

[2]  A: They are kept until the Board officially approves the

[3] minutes. After the approval of the minutes, the tapes

[4] are destroyed.

[5]  Q: Who developed the policy of destroying the tapes after

[6] the minutes are approved?

[7]  A: Don't know. It happened prior to me.

[8]  Q: Are there any circumstances where the full Board meets

[9] that is not open to the public?

[10]  A: Yes.

[11]  Q: Is there a name for those kinds of meetings?

[12]  A: Executive session.

[13]  Q: Do you attend those sessions?

[14]  A: Some.

[15]  Q: What are the — let me back up. Is it your

[16] responsibility to attend all the full public Board

[17] meetings?

[18]  A: Yes.

[19]  Q: What are the circumstances where you will attend an

[20] executive session meeting?

[21]  A: If requested by the Board to attend.

[22]  Q: Does anyone record what is said in the executive session

[23] meetings?

[24]  A: No.

[25]  Q: Who developed the policy of not recording executive

Exhibit L

# In The Matter Of:

*Tammy Kitzmiller, et al.   v.*
*Dover Area School District, et al.*

---

*Frederick B. Callahan*
*March 30, 2005*

---

*Filius & McLucas Reporting Service, Inc.*
*1427 East Market Street, York, PA*
*4309 Linglestown Road, Harrisburg, PA*

*(717) 845-6418   or   (717) 236-0623*

Original File FC033005.TXT, 54 Pages
Min-U-Script® File ID: 1933525437

# Word Index included with this Min-U-Script®

Frederick B. Callahan
March 30, 2005

Case 4:04-cv-02688-JEJ   Document 189-2   Filed 09/16/05   Page 42 of 65

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 21

[1] addressing the biology text issue?

[2]  A: Yes.

[3]  Q: Tell me what was your sense of her purpose in speaking.

[4]  A: Well, it was clear to me that she was in favor of the

[5] direction the Board was taking — and almost to a degree

[6] that she didn't think it was far enough.

[7]  Q: The sense you had of her sense of the direction the

[8] Board was taking, what would that be?

[9]  A: That it was perfectly acceptable that she would endorse

[10] it and be very much in favor of their direction.

[11]  Q: What is their direction?

[12]  A: I think her interpretation of the direction was that

[13] they were going to be bringing some degree of religion

[14] into the discussion.

[15]  Q: Let's look at what Bill said with this statement. What

[16] did he offer by way of explanation for the statements

[17] attributed to him at the last meeting of the School

[18] Board?

[19]  A: I think — I remember his comment about someone died on

[20] the cross for us 2,000 years ago, and can't we stand up

[21] for him now. And as I recall, there was his comment

[22] about the — I don't know if it was at this meeting

[23] quite honestly because I think he probably said it more

[24] than once.

[25]  I know it is a strong mantra of his that there is

Page 22

[1] nothing in the Constitution about the separation of

[2] church and state. And I think he brought that into the

[3] discussion.

[4]  But other than that, the only other sense that I

[5] recall that I got from that was that he was essentially

[6] unapologetic for what he had said at the previous

[7] meeting. He was perhaps a little bit — was making an

[8] effort to be more diplomatic, but was not retracting

[9] much of what he had said either.

[10]  Q: Just trying to get a sense for that, did he specifically

[11] address the biology text issue?

[12]  A: Well, I'm sure he did. I just can't remember. I can

[13] remember I guess Bert Spahr at some point addressed the

[14] Board and talked about the search that they had gone

[15] through. And she had said that the book that they had

[16] settled on was the most widely — I can remember her

[17] saying was the most widely used biology textbook in the

[18] country.

[19]  And that and — you know — it was the Biology

[20] Department's feeling that it was a very appropriate book

[21] and the best one suited for the School District.

[22]  And I can recall that — and Buckingham, being the

[23] leading voice, being opposed to or having some

[24] reservations about that book for the way it handled the

[25] subject of Darwin's Theory.

Page 23

[1]  Q: Exactly. Let me ask you about that. That has plainly

[2] come up. I am just trying to get a sense of it.

[3]  Do you recall anything that Buckingham said about

[4] the text or the basis for his reservations?

[5]  A: Just that generally, he was specifically focused on the

[6] way it treated Darwinist Theory, and that he was holding

[7] up approval I guess of the book for that reason.

[8]  Q: Do you recall him talking about the balance, balanced

[9] presentation?

[10]  A: That may have been used. I can't say specifically.

[11]  Q: Do you recall him using the phrase Intelligent Design at

[12] that meeting?

[13]  A: I would have to say that that probably — I would — I

[14] didn't realize where this was going at the time so I

[15] wasn't making an effort to commit it all to memory.

[16]  I know I went to very few School Board meetings,

[17] and that was the first time that I was introduced to the

[18] phrase Intelligent Design. So I would have to say there

[19] was a good chance that it was at that meeting since I

[20] don't think I went to more than two or three meetings

[21] last year.

[22]  Q: How about Creationism? Did Buckingham speak to the

[23] teaching of Creationism or the legality of teaching

[24] Creationism?

[25]  A: I can't say that he did at that meeting.

Page 24

[1]  Q: Do you recall any reference to Of Pandas at that

[2] meeting?

[3]  A: I can't say when that came up, whether that was when

[4] that book — I don't think. It would be my recollection

[5] that that book hadn't been donated and wasn't on the

[6] horizon at that point, but I could be wrong about that.

[7]  Q: I am just trying to get a sense of your recollection.

[8] This is why, Fred, you mentioned he was holding up the

[9] book. And what I am trying to get a sense for is was

[10] there a discussion of what Buckingham's goal was with

[11] respect to the text? Did he say, for example, I am

[12] holding up approval of this text until you approve Of

[13] Pandas?

[14]  A: I don't think it was ever — I don't recall ever hearing

[15] or feeling that it was necessarily a quid pro quo. Some

[16] of this I got from my wife and her reporting to me

[17] because she went to far more meetings.

[18]  But there was a point where it became assumed on

[19] my part — she had gone to several meetings and asked

[20] about the status of the biology textbook, why they

[21] hadn't been approved.

[22]  Q: Let me stop you there. Prior to —

[23]  A: Prior to.

[24]  Q: Very good.

[25]  A: And she became suspicious that this was the issue she

Exhibit M

# In The Matter Of:

*Tammy Kitzmiller, et al. v.*
*Dover Area School District, et al.*

---

*Bryan Rehm*
*April 8, 2005*

---

*Filius & McLucas Reporting Service, Inc.*
*1427 East Market Street, York, PA*
*4309 Linglestown Road, Harrisburg, PA*

*(717) 845-6418  or  (717) 236-0623*

*Original File BR040805.TXT, 183 Pages*
*Min-U-Script® File ID: 0843907291*

# Word Index included with this Min-U-Script®

Tammy Kitzmiller, et al. v.
Dover Area School District, et al.

Case 4:04-cv-02688-JEJ    Document 189-2    Filed 09/16/05    Page 45 of 65

Bryan Rehm
April 8, 2005

Page 81

[1] who has been privy to these developments, she is finally
[2] making her sort of case in a public forum as it
[3] addresses these issues that we have been talking about,
[4] the biology text and biology curriculum; is that
[5] accurate?
[6]    A: That would be accurate.
[7]    Q: Now if we stop right there, and we know Bert got up and
[8] given her brief, do you recall a response from the Board
[9] to her comments?
[10]    A: Bill Buckingham's comment came along the lines of and
[11] where did you get your degree? I am sorry. Where did
[12] you get your law degree? Indicating that she can't read
[13] and comprehend what she is reading of her own accord.
[14]    Q: Anything else from Bill to Bert?
[15]    A: There was so much my jaw was dropping. And what I can
[16] say here is that I read the papers the next day and what
[17] was in the paper was not inconsistent with what I heard
[18] the prior night.
[19]    I don't remember the sequence. Bill Buckingham
[20] was saying things. He was making his comments about
[21] Christianity. This is a Christian nation. We need to
[22] teach the students that.
[23]    Bill Buckingham was spouting about somebody died
[24] on a cross 2,000 years ago, and we need to stand up for
[25] him. I am sorry. Somebody needs to take a stand for

Page 82

[1] him.
[2]    Bill Buckingham's wife, I don't remember if it was
[3] the June meeting, first or second, or the October
[4] meeting, she was there. I couldn't believe the things
[5] she was saying in the public forum, quoting Genesis left
[6] and right, about you will pay, and you must obey this
[7] law, and you must obey that law. To me I couldn't
[8] believe because they are discussing science curriculum,
[9] and this doesn't belong in science.
[10]    It all comes into play with why I am running for
[11] School Board. And the questions of are you Born Again,
[12] or are you a Christian? What does that have to do with
[13] my science education? Why are you asking somebody at a
[14] Board meeting are you a Christian? Defend yourself.
[15]    What does that have to do with running a School
[16] District? My religion belongs either in my home or in
[17] my church. It doesn't belong in the School Board.
[18]    So the subsequence in which that erupted, I
[19] couldn't tell you. It was shocking.
[20]    Q: I understand. And I respect your concerns. I mean I
[21] understand where you are coming from. Really my goal is
[22] just to try and watch the story unfold. We are in June.
[23]    Obviously, you have indicated you were at the
[24] meeting, recalled some statements that Bill Buckingham
[25] made. And it is your recollection that the statements

Page 83

[1] that were reported fairly represented your memory; is
[2] that true?
[3]    A: Yes.
[4]    Q: Anyone else? I mean Bill is making these statements as
[5] you recall. Did anyone else on the Board speak up? For
[6] example, Alan Bonsell, he had had a discussion with the
[7] faculty. There had been no movement from that meeting
[8] through now.
[9]    Did he speak to the issues that Bert raised?
[10]    A: In my recollection, yes. I couldn't tell you what. At
[11] the time, at this point, Bill Buckingham was already
[12] into his antagonistic state of mind being very
[13] confrontational.
[14]    And by comparison, Alan Bonsell was cool,
[15] collected and speaking in a civil tone. And he pretty
[16] much reiterated the same thing he had been saying all
[17] along. We need to take care of this so that we are
[18] working as parents and teachers together, and that we
[19] don't have to tell the kids that what they're learning
[20] in school is lies. He just kept approaching it from
[21] that angle.
[22]    Sheila Harkins was speaking. I couldn't tell you
[23] what she was saying either. Buckingham is the one that
[24] — like I said, my jaw dropped.
[25]    Q: Do you recall Alan Bonsell referencing Intelligent

Page 84

[1] Design during this Board meeting?
[2]    A: I cannot say definitely one way or the other. My
[3] recollection is just not there on that word.
[4]    Q: Do you have any recollection of Bill Buckingham using
[5] that term?
[6]    A: I don't recall him using Intelligent Design. Everything
[7] he was talking about was Christian this, Christian that,
[8] Christ this, Christ that, creation.
[9]    Q: Do you recall him using the term Creationism?
[10]    A: Yes.
[11]    Q: How did that come up? What do you recall him saying?
[12]    A: I am not going state which meeting it was because I
[13] don't recall the sequence, if it was the first June
[14] meeting or the second June meeting.
[15]    Somewhere in the neighborhood of when Bert Spahr
[16] was making her statements I believe is when Barrie
[17] Callahan stood up, and the question came of what is with
[18] the biology books and had something to do with
[19] Evolution. And it came up then again, we need to
[20] balance Evolution with Creationism.
[21]    And so I can't tell you if it was the first or
[22] second June meeting. But at the Board meeting, I
[23] remember specifically hearing Evolution had to be
[24] balanced. And the question was balanced with what, and
[25] Creationism was the answer given. That came from

Exhibit N



**D**ISCOVERY **I**NSTITUTE   1511 Third Avenue, Suite 808, Seattle, WA 98101
(206) 292-0401 ◆ fax (206) 682-5320
www.discovery.org ◆ members@discovery.org

# The "Wedge Document": "So What?"

## INTRODUCTION

In 1999 an early fundraising proposal for Discovery Institute's Center for the Renewal of Science and Culture (CSC) was posted on the Internet by people claiming to have revealed a secret strategy. Dubbed the "Wedge Document," this fundraising proposal soon took on a life of its own, popping up in all sorts of places and eventually spawning a kind of intellectual urban legend.

Darwinian activists and self-identified "secular humanists" claimed that the "Wedge Document" provided evidence of a great conspiracy by fundamentalists to establish theocracy in America and to impose religious orthodoxy upon the practice of science. One group claimed that the document supplied evidence of a frightening twenty-year master plan "to have religion control not only science, but also everyday life, laws, and education." Barbara Forrest, a Louisiana professor active with a group called the New Orleans Secular Humanist Association, similarly championed the document as proof positive of a sinister conspiracy to abolish civil liberties and unify church and state. Others have characterized it as an attack on science and an attempt "to replace the scientific method with belief in God."

These claims were so confused that for a long time we simply ignored them, content to enjoy the notoriety that our somewhat hysterical opponents had conferred upon us. Not since the 1960's, when the Council on Foreign Relations was called a communist front by the John Birch Society, has a think tank inspired such obsessive interest in its unreasonable foes.

Recently, however, the paranoia on certain websites has reached a fevered pitch and has begun to spread to mainstream media reports. And Professor Forrest has now published a whole book with biologist Paul Gross exploring the nefarious aspects of our supposed conspiracy. So we have decided to set the record straight.

## 1. BACKGROUND: AIMS OF THE CENTER FOR SCIENCE AND CULTURE

Discovery Institute is a public policy think tank founded in 1990 "to make a positive vision of the future practical" through transforming long-range research in such fields as transportation, regionalism, economics, and the environment (see http://www.discovery.org/). Since its founding, Discovery has had a special interest in

BF 001139

science and technology and the way in which developments in these domains affect public policy, economics and culture.

In 1996 Discovery Institute established the Center for the Renewal of Science and Culture (since named the Center for Science and Culture—CSC). Its main purposes were (1) to support research by scientists and other scholars who were critical of neo-Darwinism and other materialistic theories of origins, and to support those who were developing the emerging scientific theory of intelligent design; (2) to explore the larger philosophical or world-view implications of the scientific debate about design as well other philosophically-charged issues in modern science, and (3) to explore the cultural implications of competing philosophies of science and worldviews. With respect to (2) and (3), it has been a particular interest of the Center to counter the idea that science supports the unscientific *philosophy* of materialism.

From the beginning the Center has focused its attention on scientific discoveries and theories that raise larger philosophical, world-view or cultural issues.[1] For this reason, Center Fellows examined theories of biological and cosmological origins as well as theories in the social and cognitive sciences that raise questions about human nature. More recently, the Center has begun to address bioethical issues arising from developments in bio-medical technology.

It is in the context of our concern about the world-view implications of certain scientific theories that our wedge strategy must be understood. Far from attacking science (as has been claimed), we are instead challenging *scientific materialism*—the simplistic philosophy or world-view that claims that all of reality can be reduced to, or derived from, matter and energy alone. We believe that this is a defense of sound science.

With this in mind, we have supported research that challenges specific theories (such as neo-Darwinism, chemical evolutionary theory and various "many worlds" cosmologies) that provide support for the materialistic vision of a self-existent and self-organizing universe.

We also have supported research that challenges theories (such as behaviorism, strong AI (artificial intelligence) and other physicalist conceptions of mind) that have portrayed humans as completely determined animals or machines.

Naturally, many of our scholars and scientists are also working to develop competing hypotheses and theories, including theories of intelligent design and theories that defend the reality and irreducibility of human agency, responsibility and consciousness.

As it happens, many of these fellows think that new discoveries in science either support, or are consonant with, a "broadly theistic" world-view. The "Wedge Document" makes the philosophical significance of our work—its challenge to scientific materialism and its favorable implications for theism—known to potential

2

BF 001140

supporters. Even so, the case that our scientists have made against neo-Darwinism or for design is based on scientific evidence. Scientists of various (and no) religious persuasions have formulated such arguments (see below). Their work stands on its own.

In any case, the "Wedge Document" articulates a strategy for influencing science and culture *with our ideas* through research, reasoned argument and open debate. As our not-so-secret secret document put it, "without solid scholarship, research and argument, the project would be just another attempt to indoctrinate instead of persuade."

We fail to see any scandal in this. Nor have we been able see how any fair-minded person who had actually read the "Wedge Document," or who had any acquaintance with our actual work, could attribute to us the nefarious views and motives that Professor Forrest and others have assigned us. The "Wedge Document" articulates a plan for reasoned persuasion, not political control.


## 2. INITIAL CONSIDERATIONS

So let us set the record straight.

Discovery Institute's Center for Science and Culture does not support theocracy. We should not have to say this, but apparently we do.

Discovery Institute's Center for Science and Culture rejects all attempts to impose orthodoxies on the practice of science as contrary to the spirit of the scientific enterprise. Indeed, our fellows have consistently contended for the right of scientists to follow scientific evidence wherever it leads and they have opposed *a priori* methodological restrictions on the interpretive freedom of scientists.

The Center for Science and Culture is not attacking science or the scientific method. It is challenging the philosophy of scientific materialism and the false scientific theories that support it(more on this below).

The Center for Science and Culture does not have a secret plan to influence science and culture. It has a highly and intentionally *public* program for "challenging scientific materialism and its destructive cultural legacies"—the preceding quotation, by the way, is from our very first statement of purpose that was prominently and publicly featured on our website.

Those who doubt these declarations might consider the following facts:

- Far from promoting a union between church and state, Discovery Institute actively supports pluralistic democracy. For several years during the 1990s, Center associate director Dr. John West sponsored a seminar for college

3

BF 001141

students, The George Washington Fellows Program, that advocated religious liberty and the *separation* of church and state.

- At the time the "Wedge Document" was being used by Darwinists to stoke fears about theocracy, the Chairman of Discovery Institute's Board was Jewish. The present Chairman says he is "not religious," and our various officers and fellows represent an eclectic range of religious views ranging from Roman Catholic to Presbyterian to agnostic—hardly a fundamentalist cabal!

- Discovery's Center for Science and Culture advocates a science education policy that encourages open discussion of controversial issues in science and *rejects* attempts to insert the Biblical creation story into the public school science classroom. Center director Stephen Meyer and Center fellow John Angus Campbell (University of Memphis) have just edited a peer-reviewed volume with Michigan State University Press defending this "teach the controversy" approach as most consistent with American traditions of liberal tolerance and intellectual and religious pluralism.[2] Their philosophy of public education, which is classically liberal and self-evidently inconsistent with theocracy, is a direct expression of the policy of the Center itself.

- Most of the fellows of the Center for Science and Culture are professional Ph.D.-trained scientists or historians and philosophers of science. All have a high view of science and want to see it strengthened, not "attacked."

- Our initial strategy for influencing science and culture (which was first articulated in the "Wedge Document") has been repeatedly discussed at numerous conferences, in book and articles, on our website and in our brochure. Indeed, much of the offending text from the document had already appeared on our website and in our Center brochure. (So much for a secret conspiracy.) Further, Professor Phillip E. Johnson of the University of California at Berkeley published an entire book articulating his version of the wedge strategy in the year 2000.[3] Yet Barbara Forrest and others have invented and then hyped a supposed secrecy surrounding the wedge strategy, characterizing the "wedge of intelligent design" as a "Trojan horse." At one point Forrest claimed that the "Wedge Document"'s "authenticity…has been neither affirmed nor denied by the Discovery Institute." Yet if Professor Forrest had wanted to know whether the document was authentic, all she had to do was ask. But she didn't.

These facts alone suggest that our critics have badly misrepresented us.

4

## 3. SUMMARY AND COMMENT ON KEY PASSAGES

The best way to dispel the hysteria surrounding the wedge strategy is to actually look at the document in question. The "Wedge Document" simply doesn't advocate the views that our detractors attribute to it.

In what follows we cite and discuss the document's major points and offending passages, none of which support the claims that our opponents have made about us, and all of which we continue to affirm. (Text from the "Wedge Document" is highlighted in bold and the full text is provided below).

*"The proposition that human beings are created in the image of God is one of the bedrock principles on which Western civilization is built. Its influence can be detected in most, if not all, of the West's greatest achievements, including representative democracy, human rights, free enterprise, and progress in the arts and sciences."*

**Comment:** It may be disagreeable to Barbara Forrest, but as an historical matter, the above statement happens to be true. The idea that humans are created in the image of God *has* had powerful and positive cultural consequences, not least, on our conception of human rights as enshrined in the American Declaration of Independence. ("We hold these truths to be self-evident that all men are *endowed by their Creator with certain unalienable rights*. . .) Only a member of a group like the "New Orleans Secular Humanist Association" could find anything objectionable here.

(By the way, isn't it strange that a think tank supposedly promoting "theocracy" would praise "representative democracy" and "human rights" as we do in the "Wedge Document"?)

Of course, what has aroused the suspicion of our detractors about this passage is its implication that we ourselves might believe that humans are created in the image of God. This, they say, establishes our hidden religious agenda. Entire websites have now been erected to publicize various evidences of our theistic beliefs[4]—as if such belief itself now constituted a scandal in our contemporary intellectual culture. We don't think that it does, but we would like to spare our loyal opposition any more exhausting detective work. Here is the truth, whole and nothing but: Many—though not all—of our fellows believe in God. Most of them think that this belief has played a positive influence on the development of Western culture.

So what?

For all their sleuthing, our critics have failed to grasp some important but obvious distinctions.

One can believe in God and not want to impose theocracy on our culture.

5

BF 001143

One can reject theocracy and still think that religious believers, like all other citizens, have a right to contend for their views in the public square—whether in science, the humanities or politics.

A scientist can do excellent scientific research regardless of whether he or she believes in God. Indeed, some of the greatest scientists in history pursued their scientific inquiry because they believed in God.

A scientist can make arguments for the intelligent design of life or the universe without making God a premise in the argument—that is, a scientist can argue for intelligent design based upon scientific evidence (as some of our scientists are doing) without basing that argument on a prior belief in God.

So, again, we ask: where is the scandal?

> *"Yet a little over a century ago, this cardinal idea [that humans were created in the image of God] came under wholesale attack by intellectuals drawing on the discoveries of modern science. Debunking the traditional conceptions of both God and man, thinkers such as Charles Darwin, Karl Marx, and Sigmund Freud portrayed humans not as moral and spiritual beings, but as animals or machines who inhabited a universe ruled by purely impersonal forces and whose behavior and very thoughts were dictated by the unbending forces of biology, chemistry, and environment."*

**Comment:** This statement highlights one of the animating concerns of Discovery Institute's Center for Science and Culture: the worldview of scientific materialism. We think this worldview is false; we think that the theories that gave rise to it (such Darwinism, Marxism and Freudian psychology) are demonstrably false; and we think that these theories have had deleterious cultural consequences. (Consider, for example, the eugenics crusade pushed by Darwinist biologists early in the twentieth century or the present denial of personal responsibility endemic in our legal system and therapeutic culture).

> *"Discovery Institute's Center... seeks nothing less than the overthrow of materialism and its cultural legacies."*

**Comment:** We admit it. We think the materialistic world-view that has dominated Western intellectual life since the late 19th century *is false* and we want to refute it. We further want to reverse the influence of such materialistic thinking on our culture.

We certainly are not concealing these views. We are proud of the case that our scholars are marshalling against scientific materialism. Materialism is a dehumanizing philosophy that has been used to justify genocide, infanticide and eugenics, among other evils. We want to see it discredited.

6

BF 001144

Still, we have been misinterpreted.

Some, for example, have claimed falsely that this passage shows that Discovery Institute is orchestrating an attack *on science.*

But the document doesn't say, or even imply, that. Instead, we are doing two things.

First, we are challenging the truth of particular scientific theories (such as neo-Darwinism and the theory of chemical evolution) using appropriate scientific methods, canons of reasoning and evaluation and, most importantly, scientific evidence. To say that challenging a particular scientific theory constitutes an attack on science itself is to misunderstand science profoundly. Science advances precisely by such challenges.[5] Reasoned argument about how best to interpret scientific evidence is, and always has been, essential to the practice of science—indeed, in a real sense it *is* science.

Second, as noted, we are challenging the *philosophy* of scientific materialism, not science itself. Our detractors fail to make this critical, but obvious, distinction. We don't know why. But we suspect that some scientists have so equated science with their own materialistic worldview that they regard any challenge to that worldview, or any challenge to the theories that give it plausibility, as tantamount to an attack on science itself.

Others suggest that our discussion of an "overthrow of materialism" shows that Discovery Institute is pursuing an illegitimate political agenda. But materialism is not a political party or government. It is a system of thought. We are not planning to "overthrow" a political regime by force or otherwise. We are not asking anyone to impose our perspective on anyone else, or to make our perspective a condition of employment. In contrast, many of our scholars and scientists have been pressured to affirm neo-Darwinism and other materialistic ideas as a condition of *their* employment in certain public universities and research centers.

Instead, the "Wedge Document" makes clear that we are advancing an *intellectual* challenge to a philosophical perspective and to a set of theories that previously have made that perspective seem credible. The kind of "overthrow" we are seeking is an intellectual one, a shift in perspective that can only be achieved by research, writing and reasoned argument — as the "Wedge Document" itself makes clear. Our intellectual interlocutors may disagree with our perspective (and we respect their right to do so), but we do not see how they can reasonably object to our methods or to the facts that we have a plan to persuade and influence science and culture *with our ideas.*

And, who doesn't try to persuade others with their ideas? Certainly, any group that contends for a point of view in the public square—whether the Darwin-only lobby at the National Center for Science Education, the American Civil Liberties Union, the American Association for the Advancement of Science or the New Orleans Secular Humanist Association—wants to see its ideas influence others. And most such groups

7

have plans about how they want to achieve such influence. So again: Where is the scandal?

> *"Without solid scholarship, research and argument, the project would be just another attempt to indoctrinate instead of persuade."*

**Comment:** Precisely because we affirm the importance of open debate and reasoned argument—and because we reject attempts to manipulate or indoctrinate—the "Wedge Document" identified the "essential" component of our program as support of scholarly "research, writing and publication." The document makes clear that the primary goal of Discovery Institute's program in this area is to support scholars working in scientific and philosophical fields so they can engage in research and publication. Accordingly, the largest program in the Center's budget has been the awarding of research fellowships to scholars in such fields as biology, biochemistry, physics, mathematics, and philosophy and history of science. These fellowships have been granted to enable our scholars to engage in research and writing.

This passage underscores our commitment to influencing science and culture by reasoned persuasion, not indoctrination or intimidation. We don't quite know how we could be misunderstood on this point. But we wonder. Could it be that many intellectuals in the universities are themselves so accustomed to imposing their own ideological perspective on their colleagues—through tenure committees, the peer-review process and the granting system—that they reflexively assume that anyone challenging their intellectual dominance must intend to use the same tactics as they themselves have used?

> *"The best and truest research can languish unread and unused unless it is properly publicized."*

**Comment:** It's shocking but true—Discovery Institute actually promised to publicize the work of its scholars in the broader culture. What's more, we expressed our desire to engage our Darwinist colleagues in academic debates at colleges and universities! We are happy to say that we still believe in vigorous and open discussion of our ideas, and we still do whatever we can to publicize the work of those we support. We are especially happy about the public debates and university conferences and symposia in which our fellows have participated, though our detractors often avoid such debates.

> *"Discovery Institute's Center. . . wants to reverse the stifling dominance of the materialist worldview, and to replace it with a science consonant with Christian and theistic convictions."*

**Comment:** For many the scandal of the "Wedge Document" is nothing more and nothing less than its mention of "Christian and theistic convictions" and our stated intention to support scientific research that is "consonant" with such convictions.

But why should this be upsetting?

8

BF 001146

Please note first, that "consonant with" means "in harmony with" or "consistent with." It does *not* mean the "same as." Recent developments in physics, cosmology, biochemistry, and related sciences may lead to a new harmony between science and religion. Many of us happen to think that they will, and we are not alone in that. But that doesn't mean we think religion and science are the same thing. We don't. Nor do we want to impose a religious agenda on the practice of science.

This passage instead was referring to our conviction that science, rather than supporting a materialistic philosophy, is at least consistent with theistic belief, including Christian belief. In fact, some of our fellows actually go further than this. They think that new developments in science may actually *support* a theistic world-view or have "theistic implications," even though they do not think that science can "prove" the existence of God or specific religious doctrines.

Two of our fellows, William A. Dembski and Stephen C. Meyer, have developed these distinctions in some carefully argued philosophical essays.[6] We commend the essays to those who want to develop a responsible understanding about the relationship between science and religious belief. Dembski and Meyer have argued that certain evidences from the natural world provide what they call "epistemic support" for theism even though (we have to repeat) such evidences can't "prove" the existence of God or a specific religion.

These are important philosophical distinctions and we can understand how some of our critics might have misunderstood us and our intellectual agenda, especially if their first encounter with our ideas was reading the "Wedge Document" out of context on a hostile atheistic website. Nevertheless, that some of our fellows think some aspects of science may support theistic belief, or that science is consonant with theism, does not constitute a threat to the practice of science. Nor is it a kind of a modern thought crime. In fact many of the founders of modern science —such as Boyle, Kepler and Newton—held precisely this same view.

In any case, the "Wedge Document" does not propose replacing "science" or the "scientific method" with "God" or "religion," as one reporter claimed. Still less does it advocate imposing a particular conclusion on scientists as a condition of their practicing science—something that would be absurd. Instead, it advocates open debate and argument (see below). Proponents of intelligent design have long insisted[7] that all scientists must be free to follow evidence wherever they think its leads. It happens that many (though not all) of our fellows think that a considerable body of evidence now points to the intelligent design of life and the universe. Most of these scientists and scholars think that this evidence supports, or is at least consonant with, a theistic view of the world. The "Wedge Document" does nothing more sinister than announce our intention to support the research of such scientists—among others.

Even so, our critics insist that the "Wedge Document" shows that the *case* for intelligent design is *unscientific* because it is *based on* religious belief. But here again

9

BF 001147

they fail to grasp an obvious distinction—the distinction between the *implications* of a theory and the *basis* for a theory.

Contemporary theories of intelligent design are not *based upon* theistic beliefs. They are based upon scientific evidence and analyses. In his groundbreaking book, *Darwin's Black Box*, Lehigh University biochemist Michael Behe *bases* his case for design on the presence of the "irreducibly complex" miniature motors and circuits now found in cells.[8] Center fellows Stephen Meyer (philosopher of science)[9], Charles Thaxton (chemist)[10] and Dean Kenyon (biophysicist)[11] have made a case for intelligent design *based upon* the presence of encoded information in DNA. Other Center scientists and philosophers are now making arguments for intelligent design *based upon* evidence of the "fine tuning" of the laws of physics and/or the parameters that make Earth friendly to life and scientific discovery.[12]

These arguments have evidential, not theological premises. As CSC director Stephen Meyer has said, intelligent design is "an inference from biological data, not a deduction from religious authority."[13] Or, as geneticist Michael Denton has observed, the contemporary argument for design "may have religious implications, but it does not depend on religious presuppositions."[14]

Thus, someone cannot refute design arguments simply by asserting that such arguments are "religiously-motivated." In fact, many contemporary design arguments have been advanced by scientists (such as Paul Davies, Michael Denton and John Leslie) who are not personally religious. But even if this were not the case, science-based design arguments would still need to be assessed independently of any consideration of motives or personal beliefs. Motives don't matter in science. Evidence does.

Consider a parallel example. Noted Darwinist Richard Dawkins has praised Darwin's theory because it allows one "to be an intellectually fulfilled atheist."[15] In Dawkins's view Darwinism explains "the appearance of design" without having to invoke a designer—something as an atheist he wants to avoid. Does Dawkins's anti-religious motive disqualify his scientific argument against design? Does it disqualify Darwinian evolution from consideration as a scientific theory? Clearly not. But then the same rule should apply when considering the case for design. It's not what motivates a scientist's argument that determines its validity; it's the quality of the evidence and analysis that the scientist uses to support the argument.

## 4. WHERE WE STAND

And this is where we want to leave the matter. In the end, the "Wedge Document," like the motives of an individual scientist, is irrelevant to assessing the questions that we are raising and the arguments that we are making. It is now long past time that our intellectual opponents addressed the evidential case that we are making and the challenges that now face neo-Darwinism and other similarly simplistic materialistic theories. The nearly obsessive focus in some quarters on our sources of funding, our

10

BF 001148

motivations, and our allegedly sinister plans betrays a deep intellectual insecurity in the Darwinist community. Those who have scientific arguments make them. Those who do not, change the subject and speculate about motives, conspiracies and personal associations. We talk about evidence and ideas; our opponents want to talk about us. Indeed, our Darwinist colleagues and some sympathizers in the media have developed a penchant for avoiding discussion about real scientific and philosophical issues. Instead, they have come to rely upon *ad hominem* attacks, motive-mongering, conspiracy theories, guilt by association and other tactics of intimidation—thus distracting attention from a failing system of thought.

Neo-Darwinism is a theory in deep crisis. It envisions, among other implausible scenarios, the transformation of complex functionally integrated living systems into other complex and different functionally-integrated systems with no intervening functional loss—something for which we have no analogue in our own high-tech world and something that, from an engineering point of view, lacks plausibility on its face. Neo-Darwinism similarly relies on an undirected mechanism that can only operate after the fact of an advantageous biological change. Natural selection "selects" for functional advantage. But with the advent of modern biochemistry, embryology, physiology and molecular biology, scientists now realize that the structures that confer functional advantage on organisms are exquisitely complex and finely-tuned both spatially and temporally. Living things depend upon hugely improbable arrangements of matter: information-rich genes, complex three-dimensionally specified proteins, functionally-integrated molecular machines and hierarchically-organized physiological systems and body plans. Yet, according to the logic of orthodox neo-Darwinian theory, these entities and systems must arise *before* natural selection can act to preserve them. But if this is so, how do these complex biological systems, subsystems and components originate in the first place?

The neo-Darwinian answer to this question—random mutations—now lacks all credibility in the face of the astronomical improbabilities associated with the structures that such mutations must build. Chemical evolutionary theories of the origin of life have likewise failed to explain how the complexity and information necessary to the very first life might have arisen from non-living chemicals. Advocates of Strong AI (artificial intelligence) have for their part failed to give a satisfactory account of the origin and nature of human cognition; we are not "computers made of meat" as strong AI advocate Marvin Minsky has asserted. AI advocates have utterly failed to reduce the functioning of the human mind to a "computational algorithm," nor do they show promise of doing so anytime soon. We could go on. But suffice to say that the theories that have supported scientific materialism are increasingly and demonstrably bankrupt.

Against this intellectual backdrop, fellows of the Center for Science and Culture are researching and developing new theories of origins and deeper and richer understandings of human nature and consciousness. We think that our ideas will stand the test of experience. And we invite careful and rigorous scrutiny of our work on that basis. We reject—although we find strangely amusing—attempts to dismiss our work on the basis of factors that are irrelevant to assessing the theories and arguments that

11

BF 001149

we are developing. We regard the recent paranoia and near-panic over a now nearly five year-old fund-raising document as precisely one such irrelevancy.

## 5. WHAT THE DOCUMENT ACTUALLY SAYS (FULL TEXT)

NOTE: The five-year plan described in the following document is now out of date. Many of its goals were reached or exceeded, but some were not.

CENTER FOR THE RENEWAL OF SCIENCE AND CULTURE
DISCOVERY INSTITUTE (1999)

INTRODUCTION

The proposition that human beings are created in the image of God is one of the bedrock principles on which Western civilization was built. Its influence can be detected in most, if not all, of the West's greatest achievements, including representative democracy, human rights, free enterprise, and progress in the arts and sciences.

Yet a little over a century ago, this cardinal idea came under wholesale attack by intellectuals drawing on the discoveries of modern science. Debunking the traditional conceptions of both God and man, thinkers such as Charles Darwin, Karl Marx, and Sigmund Freud portrayed humans not as moral and spiritual beings, but as animals or machines who inhabited a universe ruled by purely impersonal forces and whose behavior and very thoughts were dictated by the unbending forces of biology, chemistry, and environment. This materialistic conception of reality eventually infected virtually every area of our culture, from politics and economics to literature and art.

The cultural consequences of this triumph of materialism were devastating. Materialists denied the existence of objective moral standards, claiming that environment dictates our behavior and beliefs. Such moral relativism was uncritically adopted by much of the social sciences, and it still under girds much of modern economics, political science, psychology and sociology.

Materialists also undermined personal responsibility by asserting that human thoughts and behaviors are dictated by our biology and environment. The results can be seen in modern approaches to criminal justice, product liability, and welfare. In the materialist scheme of things, everyone is a victim and no one can be held accountable for his or her actions.

Finally, materialism spawned a virulent strain of utopianism. Thinking they could engineer the perfect society through the application of scientific knowledge, materialist reformers advocated coercive government programs that falsely promised to create heaven on earth.

12

BF 001150

Discovery Institute's Center for the Renewal of Science and Culture [now named the Center for Science and Culture] seeks nothing less than the overthrow of materialism and its cultural legacies. Bringing together leading scholars from the natural sciences and those from the humanities and social sciences, the Center explores how new developments in biology, physics and cognitive science raise serious doubts about scientific materialism and have re-opened the case for a broadly theistic understanding of nature. The Center awards fellowships for original research, holds conferences, and briefs policymakers about the opportunities for life after materialism.

The Center is directed by Discovery Senior Fellow Dr. Stephen Meyer. An Associate Professor of Philosophy at Whitworth College, Dr. Meyer holds a Ph.D. in the History and Philosophy of Science from Cambridge University. He formerly worked as a geophysicist for the Atlantic Richfield Company.

## THE WEDGE PROJECTS

*Phase I. Scientific Research, Writing & Publication*
Individual Research Fellowship Program
Paleontology Research program (Dr. Paul Chien et al.)
Molecular Biology Research Program (Dr. Douglas Axe et al.)

*Phase II. Publicity & Opinion-making*
Book Publicity
Opinion-Maker Conferences
Apologetics Seminars
Teacher Training Program
Op-ed Fellow
PBS (or other TV) Co-production
Publicity Materials / Publications

*Phase III. Cultural Confrontation & Renewal*
Academic and Scientific Challenge Conferences
Potential Legal Action for Teacher Training
Research Fellowship Program: shift to social sciences and humanities

## FIVE YEAR STRATEGIC PLAN SUMMARY

The social consequences of materialism have been devastating. As symptoms, those consequences are certainly worth treating. However, we are convinced that in order to defeat materialism, we must cut it off at its source. That source is scientific materialism. This is precisely our strategy. If we view the predominant materialistic science as a giant tree, our strategy is intended to function as a "wedge" that, while relatively small, can split the trunk when applied at its weakest points. The very beginning of this strategy, the "thin edge of the wedge," was Phillip Johnson's critique of Darwinism begun in 1991 in

13

BF 001151

Darwinism on Trial, and continued in Reason in the Balance and Defeating Darwinism by Opening Minds. Michael Behe's highly successful Darwin's Black Box followed Johnson's work. We are building on this momentum, broadening the wedge with a positive scientific alternative to materialistic scientific theories, which has come to be called the theory of intelligent design (ID). Design theory promises to reverse the stifling dominance of the materialist worldview, and to replace it with a science consonant with Christian and theistic convictions.

The Wedge strategy can be divided into three distinct but interdependent phases, which are roughly but not strictly chronological. We believe that, with adequate support, we can accomplish many of the objectives of Phases I and II in the next five years (1999-2003), and begin Phase III (See "Goals/ Five Year Objectives/Activities").

Phase I: Research, Writing and Publication

Phase II: Publicity and Opinion-making

Phase III: Cultural Confrontation and Renewal

Phase I is the essential component of everything that comes afterward. Without solid scholarship, research and argument, the project would be just another attempt to indoctrinate instead of persuade. A lesson we have learned from the history of science is that it is unnecessary to outnumber the opposing establishment. Scientific revolutions are usually staged by an initially small and relatively young group of scientists who are not blinded by the prevailing prejudices and who are able to do creative work at the pressure points, that is, on those critical issues upon which whole systems of thought hinge. So, in Phase I we are supporting vital writing and research at the sites most likely to crack the materialist edifice.

Phase II. The primary purpose of Phase II is to prepare the popular reception of our ideas. The best and truest research can languish unread and unused unless it is properly publicized. For this reason we seek to cultivate and convince influential individuals in print and broadcast media, as well as think tank leaders, scientists and academics, congressional staff, talk show hosts, college and seminary presidents and faculty, future talent and potential academic allies. Because of his long tenure in politics, journalism and public policy, Discovery President Bruce Chapman brings to the project rare knowledge and acquaintance of key op-ed writers, journalists, and political leaders. This combination of scientific and scholarly expertise and media and political connections makes the Wedge unique, and also prevents it from being "merely academic." Other activities include production of a PBS documentary on intelligent design and its implications, and popular op-ed publishing. Alongside a focus on influential opinion-makers, we also seek to build up a popular base of support among our natural constituency, namely, Christians. We will do this primarily through apologetics seminars. We intend these to encourage and equip believers with new scientific evidences that support the faith, as well as to "popularize" our ideas in the broader culture.

14

BF 001152

Phase III. Once our research and writing have had time to mature, and the public prepared for the reception of design theory, we will move toward direct confrontation with the advocates of materialist science through challenge conferences in significant academic settings. We will also pursue possible legal assistance in response to resistance to the integration of design theory into public school science curricula. The attention, publicity, and influence of design theory should draw scientific materialists into open debate with design theorists, and we will be ready. With an added emphasis to the social sciences and humanities, we will begin to address the specific social consequences of materialism and the Darwinist theory that supports it in the sciences.

## GOALS

*Governing Goals*
- To defeat scientific materialism and its destructive moral, cultural and political legacies.
- To replace materialistic explanations with the theistic understanding that nature and human beings are created by God.

*Five Year Goals*
- To see intelligent design theory as an accepted alternative in the sciences and scientific research being done from the perspective of design theory.
- To see the beginning of the influence of design theory in spheres other than natural science.
- To see major new debates in education, life issues, legal and personal responsibility pushed to the front of the national agenda.

*Twenty Year Goals*
- To see intelligent design theory as the dominant perspective in science.
- To see design theory application in specific fields, including molecular biology, biochemistry, paleontology, physics and cosmology in the natural sciences, psychology, ethics, politics, theology and philosophy in the humanities; to see its influence in the fine arts.
- To see design theory permeate our religious, cultural, moral and political life.

## FIVE YEAR OBJECTIVES

1. A major public debate between design theorists and Darwinists (by 2003)

2. Thirty published books on design and its cultural implications (sex, gender issues, medicine, law, and religion)

3. One hundred scientific, academic and technical articles by our fellows

4. Significant coverage in national media:

15

BF 001153

Cover story on major news magazine such as Time or Newsweek
PBS show such as Nova treating design theory fairly
Regular press coverage on developments in design theory
Favorable op-ed pieces and columns on the design movement by 3rd party media

5. Spiritual & cultural renewal:
- Mainline renewal movements begin to appropriate insights from design theory, and to repudiate theologies influenced by materialism.
- Major Christian denomination(s) defend(s) traditional doctrine of creation & repudiate(s) Darwinism.
- Seminaries increasingly recognize & repudiate naturalistic presuppositions
- Positive uptake in public opinion polls on issues such as sexuality, abortion and belief in God.

6. Ten states begin to rectify ideological imbalance in their science curricula & include design theory.

7. Scientific achievements:
- An active design movement in Israel, the UK and other influential countries outside the US
- Ten CRSC Fellows teaching at major universities
- Two universities where design theory has become the dominant view
- Design becomes a key concept in the social sciences Legal reform movements base legislative proposals on design theory

## ACTVITIES

(1) Research Fellowship Program (for writing and publishing)

(2) Front line research funding at the "pressure points" (e.g., Paul Chien's Chengjiang Cambrian Fossil Find in paleontology, and Doug Axe's research laboratory in molecular biology)

(3) Teacher training

(4) Academic Conferences

(5) Opinion-maker Events & Conferences

(6) Alliance-building, recruitment of future scientists and leaders, and strategic partnerships with think tanks, social advocacy groups, educational organizations and institutions, churches, religious groups, foundations and media outlets

(7) Apologetics seminars and public speaking

16

BF 001154

(8) Op-ed and popular writing

(9) Documentaries and other media productions

(10) Academic debates

(11) Fund Raising and Development

(12) General Administrative support

## THE WEDGE STRATEGY PROGRESS SUMMARY

*Books*

William Dembski and Paul Nelson, two CRSC Fellows, will very soon have books published by major secular university publishers, Cambridge University Press and The University of Chicago Press, respectively. (One critiques Darwinian materialism; the other offers a powerful alternative.)

Nelson's book, On Common Descent, is the seventeenth book in the prestigious University of Chicago "Evolutionary Monographs" series and the first to critique neo-Darwinism. Dembski's book, The Design Inference, was back-ordered in June, two months prior to its release date.

These books follow hard on the heals of Michael Behe's Darwin's Black Box (The Free Press) which is now in paperback after nine print runs in hard cover. So far it has been translated into six foreign languages. The success of his book has led to other secular publishers such as McGraw Hill requesting future titles from us. This is a breakthrough.

InterVarsity will publish our large anthology, Mere Creation (based upon the Mere Creation conference) this fall, and Zondervan is publishing Maker of Heaven and Earth: Three Views of the Creation-Evolution Controversy, edited by fellows John Mark Reynolds and J.P. Moreland.

McGraw Hill solicited an expedited proposal from Meyer, Dembski and Nelson on their book Uncommon Descent. Finally, Discovery Fellow Ed Larson has won the Pulitzer Prize for Summer for the Gods, his retelling of the Scopes Trial, and InterVarsity has just published his co-authored attack on assisted suicide, A Different Death.

*Academic Articles*

Our fellows recently have been featured or published articles in major scientific and academic journals in The Proceedings to the National Academy of Sciences, Nature, The Scientist, The American Biology Teacher, Biochemical and Biophysical Research Communications, Biochemistry, Philosophy and Biology, Faith & Philosophy, American

17

BF 001155

Philosophical Quarterly, Rhetoric & Public Affairs, Analysis, Book & Culture, Ethics & Medicine, Zygon, Perspectives on Science and the Christian Faith, Religious Studies, Christian Scholars' Review, The Southern Journal of Philosophy, and the Journal of Psychology and Theology. Many more such articles are now in press or awaiting review at major secular journals as a result of our first round of research fellowships. Our own journal, Origins & Design, continues to feature scholarly contributions from CRSC Fellows and other scientists.

*Television and Radio Appearances*

During 1997 our fellows appeared on numerous radio programs (both Christian and secular) and five nationally televised programs, TechnoPolitics, Hardball with Chris Matthews, Inside the Law, Freedom Speaks, and Firing Line. The special edition of TechnoPolitics that we produced with PBS in November elicited such an unprecedented audience response that the producer Neil Freeman decided to air a second episode from the "out takes." His enthusiasm for our intellectual agenda helped stimulate a special edition of William F. Buckley's Firing Line, featuring Phillip Johnson and two of our fellows, Michael Behe and David Berlinski. At Ed Atsinger's invitation, Phil Johnson and Steve Meyer addressed Salem Communications' Talk Show Host conference in Dallas last November. As a result, Phil and Steve have been interviewed several times on Salem talk shows across the country. For example, in July Steve Meyer and Mike Behe were interviewed for two hours on the nationally broadcast radio show Janet Parshall's America. Canadian Public Radio (CBC) recently featured Steve Meyer on their Tapestry program. The episode, "God & the Scientists," has aired all across Canada. And in April, William Craig debated Oxford atheist Peter Atkins in Atlanta before a large audience (moderated by William F. Buckley), which was broadcast live via satellite link, local radio, and internet "webcast."

*Newspaper and Magazine Articles*

The Firing Line debate generated positive press coverage for our movement in, of all places, The New York Times, as well as a column by Bill Buckley. In addition, our fellows have published recent articles & op-eds in both the secular and Christian press, including, for example, The Wall Street Journal, The New York Times, The Washington Times, National Review, Commentary, Touchstone, The Detroit News, The Boston Review, The Seattle Post-Intelligencer, Christianity Toady, Cosmic Pursuits and World. An op-ed piece by Jonathan Wells and Steve Meyer is awaiting publication in the Washington Post. Their article criticizes the National Academy of Science book Teaching about Evolution for its selective and ideological presentation of scientific evidence. Similar articles are in the works.

---

[1] By the way, we do not think that all scientific research raises such worldview questions. Much experimental or "bench" science concerns more narrowly-focused and philosophically-neutral questions about the composition, structure and behavior of physical or biological systems.

18

BF 001156

[2] John Angus Campbell and Stephen C. Meyer, editors, *Darwinism, Design and Public Education* (East Lansing, Michigan: Michigan State University Press, 2003).

[3] Phillip E. Johnson, *The Wedge of Truth: Splitting the Foundations of Naturalism* (Downers Grove, Illinois: InterVarsity Press, 2000).

[4] One website for example made much of the fact that a film company that made a film about the theory of intelligent design featuring many Discovery fellows had also previously made religious films about the Bible. This is a version of the tactic of guilt by association—if, that is, making films about the Bible now makes one culpable in our society.

[5] Marcello Pera, *The Discourses of Science* (Chicago: University of Chicago Press, 1994).

[6] William A. Dembski and Stephen C. Meyer, "Fruitful Interchange or Polite Chit-Chat?: The Dialogue between Science and Theology?," in *Science and Evidence for Design in the Universe*, Proceedings of the Wethersfield Institute (San Francisco: Ignatius Press, 2000), pp. 213-234; William A. Dembski and Stephen C. Meyer, "Fruitful Interchange or Polite Chit-Chat?: The Dialogue between Science and Theology?," *Zygon*. September 1998, Vol. 33, No. 3, pp. 415-30.

[7] Stephen C. Meyer, "The Scientific Status of Intelligent Design: The Methodological Equivalence of Naturalistic and Non-Naturalistic Origins Theories," in *Science and Evidence for Design in the Universe*, Proceedings of the Wethersfield Institute (San Francisco: Ignatius Press, 2000), pp. 151-211.

[8] Michael Behe, *Darwin's Black Box: The Biochemical Challenge to Evolution* (New York: The Free Press, 1996).

[9] Stephen C. Meyer, "DNA and the Origin of Life: Information, Specification and Explanation," in Campbell and Meyer, editors, *Darwinism, Design and Public Education*, pp. 223-285.

[10] Charles Thaxton, Walter Bradley and Roger Olsen, *The Mystery of Life's Origin* (Dallas: Lewis & Stanley, 1992).

[11] Gordon Mills and Dean Kenyon, "The RNA World: A Critique," *Origins & Design* 17:9-16.

[12] Guillermo Gonzalez and Jay Richards, *The Privileged Planet: Why Our Place in the Cosmos is Designed for Discovery* (Washington, D.C.: Regnery, 2004).

[13] Stephen C. Meyer, "Let Schools Provide Fuller Disclosure," *The Spokane Spokesman Review*, Opinion Section, March 29, 1998.

[14] Michael Denton, *Evolution, A Theory in Crisis* (London: Burnett Books, 1985), p. 341

[15] Richard Dawkins, *The Blind Watchmaker* (London: Penguin Books, 1988), p. 6.

19

BF 001157