# EXHIBIT F

Tammy Kitzmiller,
Dover Area School Di~

eila Harkins
~nuary 3, 2005

Page 20

MR. HARVEY: So you're instructing the witness not to answer the question on the grounds of relevance?

MR. THOMPSON: On the grounds of relevance, on the grounds of the state statute of Pennsylvania, and the federal rules.

MR. HARVEY: Do you realize that's highly improper and under the federal rules in particular in this district as under Judge Gawthrop's opinion in Hall versus Clifton Precision to instruct a witness not to answer a question on any other grounds other than privilege or to protect—

MR. THOMPSON: That's what I said, it's on privilege. It is a privilege. We're not going to turn this into an inquisition about what someone's religious beliefs are.

MR. HARVEY: Well, we may have to consult the court on that, but I'll go on right now.

MR. THOMPSON: Absolutely.

BY MR. HARVEY:

[21] Q: Are you familiar with the theory of evolution?
[22] A: Yes.
[23] Q: What is the theory of evolution?
[24] A: The theory of evolution that all things evolve

Page 21

[1] is my simple explanation.
[2] Q: Are you referring now to the biological theory
[3] of evolution?
[4] A: I am not a scientist. I cannot give definitions
[5] of terms.
[6] Q: Can you tell me what your understanding of what
[7] the biological theory of evolution is?
[8] A: Would be that all things evolve, all living
[9] things.
[10] Q: Evolve from a common ancestor?
[11] A: Evolve.
[12] Q: Do you have an understanding about whether the
[13] biological theory of evolution holds as a
[14] proposition that all living life forms are
[15] derived from a common ancestor?
[16] MR. THOMPSON: That's been asked and
[17] answered. She's not a scientist. She's
[18] indicated that her own theory is things evolve
[19] and she hasn't gotten any further than that.
[20] She's indicated she doesn't know what the
[21] biological theory of evolution is.
[22] MR. HARVEY: Counsel, you are out of line
[23] here. We are conducting a deposition in
[24] accordance with the federal rules of civil
[25] procedure, and the rules are very clear that all

[1] objections are to be concise in a
[2] nonargumentative manner and that speaking
[3] objections are entirely improper. You're
[4] disrupting the deposition. We only have a
[5] certain amount of time today. I request that
[6] you please do not make speaking objections.
[7] Your objections should be objection to the form
[8] of the question. If I want to know the basis
[9] for your objection, I will ask you.
[10] MR. THOMPSON: First of all, I'm not going
[11] to take a lecture from you, okay. She answered
[12] the question twice, and you keep on asking her
[13] what is her understanding of the theory of
[14] biological evolution. She says she doesn't
[15] know. She says she's not a scientist.
[16] MR. HARVEY: I am not talking about the
[17] witness's answer right now. I'm talking about
[18] your conduct at this deposition. You are not to
[19] interrupt the deposition with your
[20] argumentative, speaking objections. Objection
[21] should be as to the form of the question, and if
[22] you feel that you need to instruct the witness
[23] not to answer, you may do so. And we can bring
[24] those issues up with the court. But it's not
[25] proper to interject with speaking objections

Page 23

[1] throughout the day and objection— I'd like to
[2] proceed on that basis.
[3] MR. HARVEY: Can you read back the last
[4] question and answer.
[5] (The court reporter read the previous
[6] question.)
[7] BY MR. HARVEY:
[8] Q: Can you please answer that question?
[9] A: I don't know.
[10] Q: Does the theory of evolution in your mind
[11] conflict with your religious views?
[12] A: No, it does not.
[13] Q: Have you ever had any conversations with anybody
[14] on the school board about whether the theory of
[15] evolution conflicts with your personal religious
[16] views?
[17] A: No, I have not.
[18] Q: The school board members on October 18th were in
[19] addition to you Mr. Buckingham, Ms. Geesey,
[20] Mr. Wenrich, Mr. Bonsell, both Mr. and
[21] Mrs. Brown, Ms. Yingling, and Ms. Cleaver. Am I
[22] correct?
[23] A: I don't know. I believe you.
[24] Q: I believe that's the case. You don't understand
[25] me to be wrong about that?

Page 24

[1] A: I don't understand you to be wrong. I don't
[2] know that, but I believe you.
[3] Q: Have you ever had any conversations with any of
[4] those people about whether the theory of
[5] evolution conflicts with their personal
[6] religious views?
[7] A: No, I have not.
[8] Q: Have any of those people ever shared with you
[9] their personal views on their religious views as
[10] it relates to the theory of evolution?
[11] A: No.
[12] (Plaintiff's Deposition Exhibit #4 marked
[13] for identification)
[14] BY MR. HARVEY:
[15] Q: Ms. Harkin, I've just handed you what's been
[16] marked as Plaintiff's Exhibit 4. There's no
[17] need for you to look at it right now. It's a
[18] long exhibit.
[19] A: Do you want me to read this?
[20] Q: No, not just for a second — just a second.
[21] I'm not asking you to read this right now. I
[22] may ask you to refer to portions of this
[23] throughout my questioning. And I'll tell you
[24] right now it's a compendium of articles from the
[25] York Daily Record and the York Dispatch over the

Page 25

[1] past year. I don't know whether you're aware of
[2] them, but I am aware that this is a — this is —
[3] York's had a — a certain number of them —
[4] You're aware that the board deliberations
[5] over the past year about the biology curriculum
[6] have generated a certain amount of press?
[7] A: Yes.
[8] Q: Do you read a newspaper on a daily basis?
[9] A: Yes.
[10] Q: Which one do you read?
[11] A: York Daily Record.
[12] Q: Do you ever read the York Dispatch?
[13] A: Rarely.
[14] Q: Why do you read the York Daily Record as opposed
[15] to the York Dispatch?
[16] A: That one that comes to my door.
[17] Q: Is the Daily Record the morning paper?
[18] A: Yes.
[19] Q: Are you aware that the York Daily Record has
[20] followed the board's actions over the past year
[21] on the subject of the biology curriculum and had
[22] quite a number of articles on that?
[23] A: Followed you made it up?
[24] Q: There's been reporting on it.
[25] A: Yes.
[26]

Page 26

[1] Q: Have you ever contacted anyone at the paper to
[2] tell them that the reporting is incorrect?
[3] A: I have yelled at Joe Maldonaldo occasionally.
[4] Q: Tell me on how many occasions have you done
[5] that?
[6] A: I couldn't count.
[7] Q: More than five?
[8] A: Probably.
[9] Q: Do you remember the things that you yelled at
[10] him about?
[11] A: I couldn't even— Many different topics.
[12] Q: Why did you yell at him?
[13] A: Because he's a lousy reporter.
[14] Q: Why is he a lousy reporter?
[15] A: He never reports what's said, rarely I should
[16] say.
[17] Q: Did you yell at him for the press coverage that
[18] relates to the subject of the board's
[19] deliberations about the biology curriculum?
[20] A: Yes. But by that point I was getting tired of
[21] him, and so I was telling him just stay away
[22] from me.
[23] Q: Are you aware of anything in particular that was
[24] reported over the past year by the York Daily
[25] Record that you believe was incorrect?

Page 27

[1] A: I can't even think of all things.
[2] Q: Can you think of any of the things?
[3] A: Well, when we were discussing deliberating the
[4] under God in the Pledge, his reporting was
[5] askew.
[6] Q: Anything else that you can remember that you
[7] read in the York Daily Record that you believe
[8] was incorrect?
[9] A: There were some things about Angie Yingling that
[10] were incorrect.
[11] Q: What things about Angie Yingling?
[12] A: I don't remember the specifics, but I remember
[13] they were about Angie and they were totally
[14] false that he reported.
[15] Q: Anything else other than what you've just told
[16] me about under God in the Pledge and things that
[17] were reported by Angie Yingling that you believe
[18] were reported incorrectly?
[19] A: Not topics, no.
[20] Q: Now, I'd like to go and ask you a question
[21] starting about some events that began in June of
[22] this past year. Do you remember there was a
[23] board meeting on June the 7th?
[24] A: I believe you. Do I remember the board
[25] specifically, no.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

**Page 9**

[1] Intelligent Design?

[2]   A: I looked at several websites involving Intelligent

[3] Design.

[4]   Q: I believe in your prior testimony you had said that you

[5] don't recall at this time any of the articles that you

[6] had read; is that still the case?

[7]   A: That is pretty much. That's correct.

[8]   Q: Did you conduct any research with respect to Evolution?

[9]   A: I looked at websites, yes, that covered both areas.

[10]   Q: In what ways did you search the Internet? Do you recall

[11] search terms that you used when going to the Internet

[12] for your research?

[13]   A: I used Google. I used Intelligent Design. I think I

[14] used Evolution. I used macro and micro Evolution.

[15]   Q: In what way did you judge whether or not the contents or

[16] the information that you received on these websites

[17] was —

[18]   A: I am sorry.

[19]   Q: When looking at the websites, in what way did you

[20] determine whether or not the information that you

[21] received from these websites was accurate?

[22]   MR. GILLEN: Objection to the form.

[23]   MR. LOWE: Could you clarify?

[24]   MR. GILLEN: Sure. You are assuming that she was

[25] evaluating it — first of all, that she did conduct that

**Page 10**

[1] kind of evaluation, and second that she had some

[2] criteria to do so. Go ahead, Sheila.

[3]   A: I did not assume it was accurate. I was just looking

[4] for information. In no way was I determining the

[5] accuracy of it.

[6]

**BY MR. LOWE:**

[7]   Q: To address Pat's objection, did you base your decision

[8] as to whether or not to vote for this policy on the

[9] information that you received from these websites?

[10]   A: Very minimally.

[11]   Q: When you say minimally, what did you use from those

[12] websites to help you in determining whether or not to

[13] vote for this resolution?

[14]   A: Only to become somewhat more informed.

[15]   Q: To the extent that you used the information from these

[16] websites, I realize it was only minimally to help you

[17] make an informed decision, the information that you

[18] used, did you do anything to verify that that

[19] information was accurate?

[20]   A: I am sorry. I am not following your path of thought.

[21]   Q: I am sure that you understand that on the Internet,

[22] anyone can pose anything?

[23]   A: That is very true.

[24]   Q: You can find things on the website that look extremely

[25] official, that look as if they are nothing but the

**Page 11**

[1] truth, and yet if you dig a little bit deeper, you can

[2] find that the person that published these articles or

[3] published the website either did so sarcastically or in

[4] farce or has absolutely no information about what it was

[5] that he or she posted.

[6]   Was there any way going back to the information

[7] that you used, that you based your — that you used to

[8] help you make your informed decision, did you in any way

[9] check to see that that information was accurate or

[10] truthful or scientific?

[11]   A: No. I think that's why I said I was not considering it

[12] accurate. I was only trying to gather information.

[13]   Q: Okay.

[14]   A: I think we are all well aware of the information on the

[15] Internet is just out there.

[16]   Q: If at any time during the course of this deposition you

[17] feel the need to take a break, if I ask you any

[18] questions that make you feel uncomfortable with

[19] consideration to my duty to my own clients —

[20]   A: Sure. I would just ask you to slow down. My brain does

[21] not process fast.

[22]   Q: I will continue to use my slow voice. Of the materials

[23] that you reviewed on the Internet, did you provide any

[24] of these materials to other Board members?

[25]   A: No, I never downloaded to print anything out ever.

**Page 12**

[1]   Q: When did you first hear about Intelligent Design?

[2]   A: Could you expand on that?

[3]   Q: Sure. Did you hear about Intelligent Design prior to

[4] the passing of the resolution?

[5]   A: Oh, yes.

[6]   Q: Did you hear about Intelligent Design prior to let's say

[7] the previous June Board meetings?

[8]   A: Yes. I heard of Intelligent Design in several years

[9] past, but only in passing.

[10]   Q: Do you recall in what way you were acquainted with

[11] Intelligent Design, how it was that you had heard of

[12] Intelligent Design?

[13]   A: No, I don't. And I don't think I was informed really of

[14] what it really — what different people's perception was

[15] it involved.

[16]   Q: At what time did you start to research Intelligent

[17] Design?

[18]   A: After it was brought up with the Board.

[19]   Q: With your best recollection, was it brought up in the

[20] Board prior to the June meetings?

[21]   A: Oh, yes.

[22]   Q: Do you remember —

[23]   A: I was at meetings with the teachers in the spring.

[24]   Q: Do you remember at what point it was brought up with the

[25] Board first?

:ila Harkins
·il 12, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

**Page 29**

Q: Were you presented with any materials from members of the administration?

A: I may have been, but I don't recall any. And if I would have been, they would have given it to you.

Q: Sure.

A: I think they gave you copies of what was included in our Board packets, but I don't keep this stuff so I don't know that.

Q: I understand that. One reason we go down this avenue of questions is because we realize that both with the defendants, as well as with the plaintiffs, sometimes these questions can just spark memories the way we ask or, just something that has occurred can help you recall something that you didn't remember before. That is why I am going through this.

I am confident we have received everything you guys have turned over. I am also confident at the time you turned it over, you turned over everything you remembered that was relevant to this case. I just might be exploring a few avenues just to make sure that since that time, you don't recall anything.

A: Okay.

MR. LOWE: Pat, we don't have that much more.

MR. GILLEN: That's fine. Off the record.

(An off-the-record discussion was had.)

---

**Page 30**

(A recess was taken.)

AFTER RECESS

BY MR. LOWE:

Q: Did you ever participate in discussions with members of the School Board in which you described your understanding of Intelligent Design?

A: No.

Q: And did you ever participate in discussions with members of the School Board in which they shared with you their understanding of Intelligent Design?

A: No.

Q: To your knowledge, did any of the members of the Board, yourself included, make any phone calls to any scientific organizations with respect to Intelligent Design?

A: Could you read the question again?

Q: Sure. Maybe I will be more specific. To the best of your knowledge, did either you or any of the members of the School Board make any phone calls or discuss Intelligent Design with any scientific organizations?

And I will give you a couple of different scientific organizations such as the American Association for the Advancement of Science or the American Federation of Biology Teachers.

A: Not that I'm aware of.

---

**Page 31**

[1]  Q: Are you aware of any member of the administration
[2] reaching out to any of these scientific organizations
[3] for information on Intelligent Design?
[4]  A: Not that I'm aware of.
[5]  Q: Is it your understanding that Intelligent Design is in
[6] fact sound science or good science?
[7]  A: Yes.
[8]  Q: Is it your understanding that Intelligent Design is a
[9] scientific theory?
[10]  A: Yes.
[11]  Q: How did you come to this understanding that Intelligent
[12] Design was sound science?
[13]  A: I read different things, saw different things, and it
[14] sounded like sound science to me.
[15]  Q: When you are referring to things that you read and saw,
[16] you are referring specifically to what you had seen on
[17] websites?
[18]  A: Yes.
[19]  Q: At this time, do you recall anything else?
[20]  A: No, they were written by — some of them by credible
[21] biologists, people that sounded like they were credible
[22] biologists.
[23]  Q: You have touched on my next question. How is it that
[24] you determined that these people were, first of all,
[25] biologists?

---

**Page 32**

[1]  A: Because the website said they were biologists. Whether
[2] they were or not, I don't know that. It is just what
[3] they claimed to be, and they had background information
[4] on themselves.
[5]  Q: Did you go beyond the website to research whether any of
[6] these individuals were biologists?
[7]  A: Ie?
[8]  Q: You are on a website put together by Mr. Gillen, and he
[9] explains his background. Did you go beyond that website
[10] to see whether or not what he said about himself was in
[11] fact accurate or true?
[12]  A: I had on — I don't remember the names, but one or two I
[13] just put in their names.
[14]  Q: When you say put in their names, you mean —
[15]  A: Google.
[16]  Q: Do you recall what you got back when you Googled their
[17] names?
[18]  A: No, I don't exactly. No.
[19]  Q: Google is wonderful; isn't it? Did you go further than
[20] just Googling their names?
[21]  A: I might have hit one or two of them. In Google, you
[22] read what it says, and I may have hit one or two.
[23]  Q: Do you recall any of these names?
[24]  A: I'm sorry.
[25]  Q: That's okay. Do you recall what any of these second

---

Case 4:04-cv-02688-JEJ   Document 198-7   Filed 09/21/05   Page 6 of 11

ila Harkins                                          Tammy Kitzmiller, et al.   v.
il 12, 2005                                     Dover Area School District, et al.

**Page 37**

believe that something outside of what we can perceive
needs to take an action according to Intelligent Design?

A: Something?

Q: Something, someone.

A: Excuse me?

MR. GILLEN: Objection to the form. Can we go off
the record?

MR. LOWE: Sure.

(An off-the-record discussion was had.)

BY MR. LOWE:

Q: Is it your understanding that Intelligent Design
requires an acceptance of the fact that there is some
intelligent designer?

A: I would say an acceptance that there is — that it is
designed by intelligence.

Q: Do you have any understanding of what this intelligence
is?

A: No, I don't.

Q: Do you think one needs an understanding of what this
intelligence is in your opinion?

A: Does one need? It is up to whether one does need.

Q: To understand Intelligent Design, would one need an
understanding of what this designer is?

A: Only if one desired to know.

Q: Would it be okay in your opinion for what the

**Page 38**

intelligent designer was to be explored in the public
school setting?

A: Would it be okay?

Q: Yes, in your opinion.

A: I never crossed — I never thought of that.

Q: In your opinion, would it be okay to discuss in the
public school setting what this intelligent designer
was?

A: That was never considered.

MR. GILLEN: Object to the form.

MR. LOWE: Could you explain?

MR. GILLEN: Sure. I mean you are assuming she
had an opinion.

A: I don't have an opinion.

BY MR. LOWE:

Q: So you have no opinion as to whether or not the teaching
of what an intelligent designer is would be appropriate
in the public schools?

A: There was never any thought given or consideration.

Q: That is okay. I am asking if you were to give
consideration to it at this moment. And it is fine to
say what you have already said.

A: I don't have one.

Q: I am going to take a couple of minutes, and I am going
to actually step back from that topic this time, and I

**Page 39**

[1] am going to spend just a couple of seconds to talk about
[2] the donation of books in your School District.
[3]    A: Okay. Do you want me to look at this anymore?
[4]    Q: Not at this time. I doubt we will get back to this.
[5] And by this, she is referring to her own deposition, her
[6] previous deposition testimony.
[7]    Who is it that made the decision to accept the
[8] donation Of Pandas and People?
[9]    A: I believe the administration.
[10]    Q: Did the School Board or any committee of the School
[11] Board review the books before they were accepted?
[12]    A: There had been discussion of the book Of Pandas prior.
[13]    Q: Do you recall who was involved with these discussions?
[14]    A: It was at the Board meeting.
[15]    Q: Did you personally review these books before the
[16] donation was accepted?
[17]    A: Yes.
[18]    Q: Do you recall if any other members of the Board reviewed
[19] the books prior them being accepted?
[20]    A: I don't know that.
[21]    Q: Is it my understanding that recently, you accepted the
[22] donations of a number of other textbooks that were
[23] donated by a group called Debunk Creation?
[24]    A: A lot of those weren't textbooks.
[25]    Q: Let me rephrase my question. Are you aware of some

**Page 40**

[1] books being donated by a group called Debunk Creation?
[2]    A: Yes.
[3]    Q: Was that donation handled in a different manner than the
[4] donation of the book Of Pandas and People?
[5]    A: Oh, yes.
[6]    Q: In what ways was it handled differently?
[7]    A: They just showed up at the door.
[8]    Q: When you say they just showed up at the door, could you
[9] elaborate?
[10]    A: I think Dr. Nilsen got an e-mail from Debunk Creation
[11] saying they had a UPS slip that we got the books, if we
[12] accepted them or something like that. And he didn't
[13] even know where the books were. That is incorrect
[14] English. It hurt my ears when I said it.
[15]    Q: It's okay. Do you know who received those books?
[16]    A: They had a slip saying with some secretary's name. Then
[17] they were hunted down. Is that what you are asking?
[18]    Q: Yes. I just wanted to know if you had personal
[19] knowledge whether they were sent to the School Board. I
[20] am trying to pursue who it was sent to.
[21]    A: I don't know who they were addressed to, but I just know
[22] one of the secretaries in the building signed the UPS
[23] slip.
[24]    Q: That's good enough. Other than the fact that they
[25] showed up unannounced, was there any other way in which

Case 4:04-cv-02688-JEJ   Document 198-7   Filed 09/21/05   Page 7 of 11

eila Harkins                                         Tammy Kitzmiller, et al.   v.
ril 12, 2005                                         Dover Area School District, et al.

Page 53

Q: So it was more of a grammatical or stylistic change than it was a substantive change?

A: Yes.

Q: Do you recall anyone else making changes to the newsletter prior to its publication?

A: I don't know that.

Q: Okay. We are on to my last section. It is my understanding of the Intelligent Design or rather of the curriculum policy or the curriculum update that when Intelligent Design is presented in class, students are not allowed to ask questions about Intelligent Design; is that correct?

MR. GILLEN: Objection to the form.

MR. LOWE: Could you explain?

MR. GILLEN: Yeah. Did you say students aren't allowed to ask or teachers aren't allowed to answer?

MR. LOWE: I started students aren't allowed to ask. I am trying to get an understanding.

A: That is really not something the Board deals with.

BY MR. LOWE:

Q: Is it your understanding that students — let me go to the teacher's end of it. That might be easier for you.

It is my understanding that teachers aren't allowed to respond to any questions concerning Intelligent Design that may be brought up?

Page 54

A: That is my understanding.

Q: Are you aware of any other subject that is covered in the Dover area curriculum in which students or rather in which teachers aren't allowed to answer questions?

A: No, I'm not.

Q: Can you explain why it is that Intelligent Design is treated differently than any other subject that is introduced in school?

MR. GILLEN: Objection to the characterization of the evidence.

MR. LOWE: Can you explain?

MR. GILLEN: Just she said she doesn't — she is not aware of anything else. I am not sure there are any other subject matters that teachers can't address, and therefore —

MR. LOWE: Fair enough.

BY MR. LOWE:

Q: Could you explain why it is — according to your understanding, there's no other subjects in which the teachers aren't allowed to address questions.

With this in mind, could you explain why Intelligent Design is treated differently?

A: I think it was an administrative decision, possibly because of the lawsuit. I don't know. I only would be guessing then.

Page 55

[1] Q: I don't want you to guess. Is it your belief, your
[2] opinion that Intelligent Design should be allowed to be
[3] more fully explored in the science classroom?
[4]      MR. GILLEN: Objection to the form.
[5]      MR. LOWE: Could you explain?
[6]      MR. GILLEN: You are assuming she has a belief or
[7] opinion on that issue.
[8]      BY MR. LOWE:
[9] Q: Do you have an opinion as to whether Intelligent Design
[10] should be allowed to be fully explored in the science
[11] classroom?
[12] A: We never got that far because the teachers made us aware
[13] they weren't educated in the area and preferred not to
[14] teach it. So that's where it stopped.
[15] Q: Would you personally have a problem if Intelligent
[16] Design were fully explored in the science classroom —
[17] more fully explored?
[18] A: I never gave it consideration.
[19] Q: If I were to ask you to give it consideration now, would
[20] you have an opinion either way?
[21]      MR. GILLEN: Objection. Calls for speculation.
[22]      MR. LOWE:
[23] Q: I am asking for your opinion.
[24] A: We are a standards driven district. It would have to be
[25] explored more fully how it would relate to the standards

Page 56

[1] before I could form an opinion I think.
[2] Q: That's fine. In your opinion, is not allowing questions
[3] with respect to a topic that is brought up or introduced
[4] in schools, is that consistent with your general
[5] understanding of good educational practice?
[6]      MR. GILLEN: Objection to the form.
[7]      MR. LOWE: Could you explain?
[8]      MR. GILLEN: Sure. I think you are assuming she
[9] has got an understanding of good educational practice
[10] and how certain questions and certain subject matters
[11] should be dealt with according to standard educational
[12] practice.
[13]      MR. LOWE: Fair enough. Are you instructing her
[14] not to answer?
[15]      MR. GILLEN: No. I am saying — read back the
[16] question, please. May I ask you to read back the
[17] question?
[18]      (The question, "In your opinion, is not allowing
[19] questions with respect to a topic that is brought up or
[20] introduced in schools, is that consistent with your
[21] general understanding of good educational practice," was
[22] read by the reporter.)
[23]      BY MR. LOWE:
[24] Q: Again, I believe I was clear in both instances that's
[25] your opinion in each instance.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Sheila Harkins
April 12, 2005

[1] Intelligent Design?

[2]    A: I looked at several websites involving Intelligent

[3] Design.

[4]    Q: I believe in your prior testimony you had said that you

[5] don't recall at this time any of the articles that you

[6] had read; is that still the case?

[7]    A: That is pretty much. That's correct.

[8]    Q: Did you conduct any research with respect to Evolution?

[9]    A: I looked at websites, yes, that covered both areas.

[10]    Q: In what ways did you search the Internet? Do you recall

[11] search terms that you used when going to the Internet

[12] for your research?

[13]    A: I used Google. I used Intelligent Design. I think I

[14] used Evolution. I used macro and micro Evolution.

[15]    Q: In what way did you judge whether or not the contents or

[16] the information that you received on these websites

[17] was —

[18]    A: I am sorry.

[19]    Q: When looking at the websites, in what way did you

[20] determine whether or not the information that you

[21] received from these websites was accurate?

[22]    MR. GILLEN: Objection to the form.

[23]    MR. LOWE: Could you clarify?

[24]    MR. GILLEN: Sure. You are assuming that she was

[25] evaluating it — first of all, that she did conduct that

[1] kind of evaluation, and second that she had some

[2] criteria to do so. Go ahead, Sheila.

[3]    A: I did not assume it was accurate. I was just looking

[4] for information. In no way was I determining the

[5] accuracy of it.

[6]    BY MR. LOWE:

[7]    Q: To address Pat's objection, did you base your decision

[8] as to whether or not to vote for this policy on the

[9] information that you received from these websites?

[10]    A: Very minimally.

[11]    Q: When you say minimally, what did you use from those

[12] websites to help you in determining whether or not to

[13] vote for this resolution?

[14]    A: Only to become somewhat more informed.

[15]    Q: To the extent that you used the information from these

[16] websites, I realize it was only minimally to help you

[17] make an informed decision, the information that you

[18] used, did you do anything to verify that that

[19] information was accurate?

[20]    A: I am sorry. I am not following your path of thought.

[21]    Q: I am sure that you understand that on the Internet,

[22] anyone can pose anything?

[23]    A: That is very true.

[24]    Q: You can find things on the website that look extremely

[25] official, that look as if they are nothing but the

[1] truth, and yet if you dig a little bit deeper, you can

[2] find that the person that published these articles or

[3] published the website either did so sarcastically or in

[4] farce or has absolutely no information about what it was

[5] that he or she posted.

[6]    Was there any way going back to the information

[7] that you used, that you based your — that you used to

[8] help you make your informed decision, did you in any way

[9] check to see that that information was accurate or

[10] truthful or scientific?

[11]    A: No. I think that's why I said I was not considering it

[12] accurate. I was only trying to gather information.

[13]    Q: Okay.

[14]    A: I think we are all well aware of the information on the

[15] Internet is just out there.

[16]    Q: If at any time during the course of this deposition you

[17] feel the need to take a break, if I ask you any

[18] questions that make you feel uncomfortable with

[19] consideration to my duty to my own clients —

[20]    A: Sure. I would just ask you to slow down. My brain does

[21] not process fast.

[22]    Q: I will continue to use my slow voice. Of the materials

[23] that you reviewed on the Internet, did you provide any

[24] of these materials to other Board members?

[25]    A: No, I never downloaded to print anything out ever.

[1]    Q: When did you first hear about Intelligent Design?

[2]    A: Could you expand on that?

[3]    Q: Sure. Did you hear about Intelligent Design prior to

[4] the passing of the resolution?

[5]    A: Oh, yes.

[6]    Q: Did you hear about Intelligent Design prior to let's say

[7] the previous June Board meetings?

[8]    A: Yes. I heard of Intelligent Design in several years

[9] past, but only in passing.

[10]    Q: Do you recall in what way you were acquainted with

[11] Intelligent Design, how it was that you had heard of

[12] Intelligent Design?

[13]    A: No, I don't. And I don't think I was informed really of

[14] what it really — what different people's perception was

[15] it involved.

[16]    Q: At what time did you start to research Intelligent

[17] Design?

[18]    A: After it was brought up with the Board.

[19]    Q: With your best recollection, was it brought up in the

[20] Board prior to the June meetings?

[21]    A: Oh, yes.

[22]    Q: Do you remember —

[23]    A: I was at meetings with the teachers in the spring.

[24]    Q: Do you remember at what point it was brought up with the

[25] Board first?



eila Harkins
ril 12, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

**Page 29**

Q: Were you presented with any materials from members of the administration?

A: I may have been, but I don't recall any. And if I would have been, they would have given it to you.

Q: Sure.

A: I think they gave you copies of what was included in our Board packets, but I don't keep this stuff so I don't know that.

Q: I understand that. One reason we go down this avenue of questions is because we realize that both with the defendants, as well as with the plaintiffs, sometimes these questions can just spark memories the way we ask or, just something that has occurred can help you recall something that you didn't remember before. That is why I am going through this.

I am confident we have received everything you guys have turned over. I am also confident at the time you turned it over, you turned over everything you remembered that was relevant to this case. I just might be exploring a few avenues just to make sure that since that time, you don't recall anything.

A: Okay.

MR. LOWE: Pat, we don't have that much more.

MR. GILLEN: That's fine. Off the record.

(An off-the-record discussion was had.)

---

**Page 30**

(A recess was taken.)

**AFTER RECESS**

**BY MR. LOWE:**

Q: Did you ever participate in discussions with members of the School Board in which you described your understanding of Intelligent Design?

A: No.

Q: And did you ever participate in discussions with members of the School Board in which they shared with you their understanding of Intelligent Design?

A: No.

Q: To your knowledge, did any of the members of the Board, yourself included, make any phone calls to any scientific organizations with respect to Intelligent Design?

A: Could you read the question again?

Q: Sure. Maybe I will be more specific. To the best of your knowledge, did either you or any of the members of the School Board make any phone calls or discuss Intelligent Design with any scientific organizations? And I will give you a couple of different scientific organizations such as the American Association for the Advancement of Science or the American Federation of Biology Teachers.

A: Not that I'm aware of.

---

**Page 31**

[1]  Q: Are you aware of any member of the administration
[2]  reaching out to any of these scientific organizations
[3]  for information on Intelligent Design?
[4]  A: Not that I'm aware of.
[5]  Q: Is it your understanding that Intelligent Design is in
[6]  fact sound science or good science?
[7]  A: Yes.
[8]  Q: Is it your understanding that Intelligent Design is a
[9]  scientific theory?
[10]  A: Yes.
[11]  Q: How did you come to this understanding that Intelligent
[12]  Design was sound science?
[13]  A: I read different things, saw different things, and it
[14]  sounded like sound science to me.
[15]  Q: When you are referring to things that you read and saw,
[16]  you are referring specifically to what you had seen on
[17]  websites?
[18]  A: Yes.
[19]  Q: At this time, do you recall anything else?
[20]  A: No, they were written by — some of them by credible
[21]  biologists, people that sounded like they were credible
[22]  biologists.
[23]  Q: You have touched on my next question. How is it that
[24]  you determined that these people were, first of all,
[25]  biologists?

---

**Page 32**

[1]  A: Because the website said they were biologists. Whether
[2]  they were or not, I don't know that. It is just what
[3]  they claimed to be, and they had background information
[4]  on themselves.
[5]  Q: Did you go beyond the website to research whether any of
[6]  these individuals were biologists?
[7]  A: Ie?
[8]  Q: You are on a website put together by Mr. Gillen, and he
[9]  explains his background. Did you go beyond that website
[10]  to see whether or not what he said about himself was in
[11]  fact accurate or true?
[12]  A: I had on — I don't remember the names, but one or two I
[13]  just put in their names.
[14]  Q: When you say put in their names, you mean —
[15]  A: Google.
[16]  Q: Do you recall what you got back when you Googled their
[17]  names?
[18]  A: No, I don't exactly. No.
[19]  Q: Google is wonderful; isn't it? Did you go further than
[20]  just Googling their names?
[21]  A: I might have hit one or two of them. In Google, you
[22]  read what it says, and I may have hit one or two.
[23]  Q: Do you recall any of these names?
[24]  A: I'm sorry.
[25]  Q: That's okay. Do you recall what any of these second

---

eila Harkins
ril 12, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 37

believe that something outside of what we can perceive needs to take an action according to Intelligent Design?

A: Something?

Q: Something, someone.

A: Excuse me?

MR. GILLEN: Objection to the form. Can we go off the record?

MR. LOWE: Sure.

(An off-the-record discussion was had.)

BY MR. LOWE:

Q: Is it your understanding that Intelligent Design requires an acceptance of the fact that there is some intelligent designer?

A: I would say an acceptance that there is — that it is designed by intelligence.

Q: Do you have any understanding of what this intelligence is?

A: No, I don't.

Q: Do you think one needs an understanding of what this intelligence is in your opinion?

A: Does one need? It is up to whether one does need.

Q: To understand Intelligent Design, would one need an understanding of what this designer is?

A: Only if one desired to know.

Q: Would it be okay in your opinion for what the

Page 38

intelligent designer was to be explored in the public school setting?

A: Would it be okay?

Q: Yes, in your opinion.

A: I never crossed — I never thought of that.

Q: In your opinion, would it be okay to discuss in the public school setting what this intelligent designer was?

A: That was never considered.

MR. GILLEN: Object to the form.

MR. LOWE: Could you explain?

MR. GILLEN: Sure. I mean you are assuming she had an opinion.

A: I don't have an opinion.

BY MR. LOWE:

Q: So you have no opinion as to whether or not the teaching of what an intelligent designer is would be appropriate in the public schools?

A: There was never any thought given or consideration.

Q: That is okay. I am asking if you were to give consideration to it at this moment. And it is fine to say what you have already said.

A: I don't have one.

Q: I am going to take a couple of minutes, and I am going to actually step back from that topic this time, and I

Page 39

[1] am going to spend just a couple of seconds to talk about

[2] the donation of books in your School District.

[3] A: Okay. Do you want me to look at this anymore?

[4] Q: Not at this time. I doubt we will get back to this.

[5] And by this, she is referring to her own deposition, her

[6] previous deposition testimony.

[7] Who is it that made the decision to accept the

[8] donation Of Pandas and People?

[9] A: I believe the administration.

[10] Q: Did the School Board or any committee of the School

[11] Board review the books before they were accepted?

[12] A: There had been discussion of the book Of Pandas prior.

[13] Q: Do you recall who was involved with these discussions?

[14] A: It was at the Board meeting.

[15] Q: Did you personally review these books before the

[16] donation was accepted?

[17] A: Yes.

[18] Q: Do you recall if any other members of the Board reviewed

[19] the books prior them being accepted?

[20] A: I don't know that.

[21] Q: Is it my understanding that recently, you accepted the

[22] donations of a number of other textbooks that were

[23] donated by a group called Debunk Creation?

[24] A: A lot of those weren't textbooks.

[25] Q: Let me rephrase my question. Are you aware of some

Page 40

[1] books being donated by a group called Debunk Creation?

[2] A: Yes.

[3] Q: Was that donation handled in a different manner than the

[4] donation of the book Of Pandas and People?

[5] A: Oh, yes.

[6] Q: In what ways was it handled differently?

[7] A: They just showed up at the door.

[8] Q: When you say they just showed up at the door, could you

[9] elaborate?

[10] A: I think Dr. Nilsen got an e-mail from Debunk Creation

[11] saying they had a UPS slip that we got the books, if we

[12] accepted them or something like that. And he didn't

[13] even know where the books were. That is incorrect

[14] English. It hurt my ears when I said it.

[15] Q: It's okay. Do you know who received those books?

[16] A: They had a slip saying with some secretary's name. Then

[17] they were hunted down. Is that what you are asking?

[18] Q: Yes. I just wanted to know if you had personal

[19] knowledge whether they were sent to the School Board. I

[20] am trying to pursue who it was sent to.

[21] A: I don't know who they were addressed to, but I just know

[22] one of the secretaries in the building signed the UPS

[23] slip.

[24] Q: That's good enough. Other than the fact that they

[25] showed up unannounced, was there any other way in which

**Page 53**

Q: So it was more of a grammatical or stylistic change than it was a substantive change?

A: Yes.

Q: Do you recall anyone else making changes to the newsletter prior to its publication?

A: I don't know that.

Q: Okay. We are on to my last section. It is my understanding of the Intelligent Design or rather of the curriculum policy or the curriculum update that when Intelligent Design is presented in class, students are not allowed to ask questions about Intelligent Design; is that correct?

MR. GILLEN: Objection to the form.

MR. LOWE: Could you explain?

MR. GILLEN: Yeah. Did you say students aren't allowed to ask or teachers aren't allowed to answer?

MR. LOWE: I started students aren't allowed to ask. I am trying to get an understanding.

A: That is really not something the Board deals with.

BY MR. LOWE:

Q: Is it your understanding that students — let me go to the teacher's end of it. That might be easier for you.

It is my understanding that teachers aren't allowed to respond to any questions concerning Intelligent Design that may be brought up?

**Page 54**

A: That is my understanding.

Q: Are you aware of any other subject that is covered in the Dover area curriculum in which students or rather in which teachers aren't allowed to answer questions?

A: No, I'm not.

Q: Can you explain why it is that Intelligent Design is treated differently than any other subject that is introduced in school?

MR. GILLEN: Objection to the characterization of the evidence.

MR. LOWE: Can you explain?

MR. GILLEN: Just she said she doesn't — she is not aware of anything else. I am not sure there are any other subject matters that teachers can't address, and therefore —

MR. LOWE: Fair enough.

BY MR. LOWE:

Q: Could you explain why it is — according to your understanding, there's no other subjects in which the teachers aren't allowed to address questions.

With this in mind, could you explain why Intelligent Design is treated differently?

A: I think it was an administrative decision, possibly because of the lawsuit. I don't know. I only would be guessing then.

**Page 55**

Q: I don't want you to guess. Is it your belief, your opinion that Intelligent Design should be allowed to be more fully explored in the science classroom?

MR. GILLEN: Objection to the form.

MR. LOWE: Could you explain?

MR. GILLEN: You are assuming she has a belief or opinion on that issue.

BY MR. LOWE:

Q: Do you have an opinion as to whether Intelligent Design should be allowed to be fully explored in the science classroom?

A: We never got that far because the teachers made us aware they weren't educated in the area and preferred not to teach it. So that's where it stopped.

Q: Would you personally have a problem if Intelligent Design were fully explored in the science classroom — more fully explored?

A: I never gave it consideration.

Q: If I were to ask you to give it consideration now, would you have an opinion either way?

MR. GILLEN: Objection. Calls for speculation.

BY MR. LOWE:

Q: I am asking for your opinion.

A: We are a standards driven district. It would have to be explored more fully how it would relate to the standards

**Page 56**

before I could form an opinion I think.

Q: That's fine. In your opinion, is not allowing questions with respect to a topic that is brought up or introduced in schools, is that consistent with your general understanding of good educational practice?

MR. GILLEN: Objection to the form.

MR. LOWE: Could you explain?

MR. GILLEN: Sure. I think you are assuming she has got an understanding of good educational practice and how certain questions and certain subject matters should be dealt with according to standard educational practice.

MR. LOWE: Fair enough. Are you instructing her not to answer?

MR. GILLEN: No. I am saying — read back the question, please. May I ask you to read back the question?

(The question, "In your opinion, is not allowing questions with respect to a topic that is brought up or introduced in schools, is that consistent with your general understanding of good educational practice," was read by the reporter.)

BY MR. LOWE:

Q: Again, I believe I was clear in both instances that's your opinion in each instance.