# EXHIBIT H

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Richard Nilsen
January 3, 2005

Page 25

[1] A: Three and a half years.
[2] Q: When you were Assistant Superintendent, did you have
[3] responsibilities for curriculum as Mr. Baksa does now?
[4] A: Yes.
[5] Q: And prior to becoming Assistant Superintendent, what did
[6] you do?
[7] A: Director of Curriculum Instruction.
[8] Q: For Dover area?
[9] A: No. Big Springs School District.
[10] Q: How long did you hold that position?
[11] A: Five years. Five or six.
[12] Q: And prior to that?
[13] A: High School Principal, Big Springs School District.
[14] Q: How long did you hold that position?
[15] A: Total five years.
[16] Q: You used the word total. Was it broken up?
[17] A: Yes.
[18] Q: Why was that?
[19] A: I was acting one year, then returned to the Assistant
[20] Principal's position. I then went to another District
[21] for three years, then returned for four.
[22] Q: When you were in the other District, were you also
[23] Principal?
[24] A: Yes.
[25] Q: Prior to taking positions as a Principal or Assistant

Page 26

[1] Principal, were you ever a schoolteacher?
[2] A: Yes.
[3] Q: What subjects did you teach?
[4] A: Social studies.
[5] Q: How long did you do that?
[6] A: Five and a half years.
[7] Q: Where did you get your degree?
[8] A: Which one?
[9] Q: What degrees do you have?
[10] A: I have an undergraduate BA in social studies from Gordon
[11] College. I have a Master's in Administration from
[12] Shippensburg University, and I have a doctorate from
[13] Temple University. So I am actually Dr. Nilsen.
[14] Q: During any of your college and post graduate education,
[15] did you take any science courses?
[16] A: No. Wait a minute. You said undergraduate?
[17] MR. GILLEN: He did I believe.
[18] A: Yes.
[19] BY MR. ROTHSCHILD:
[20] Q: Did you take any biology courses?
[21] A: No. I took a theory of science I believe.
[22] Q: While you were an undergraduate?
[23] A: Yes.
[24] Q: That is the only science subject you can remember taking
[25] as an undergraduate?

Page 27

[1] A: No. I am sorry. That is over 30 years ago. That is
[2] all I remember.
[3] Q: Have you attended any courses or lectures or seminars
[4] relating to the subjects of evolution, Intelligent
[5] Design, creation or Creationism?
[6] A: No.
[7] Q: How often does the Dover Area School Board meet?
[8] A: Usually twice a month.
[9] Q: Do you attend all those meetings?
[10] A: Yes.
[11] Q: Who keeps the minutes of those meetings?
[12] A: The secretary.
[13] Q: How is the secretary position selected?
[14] A: To clarify, the Board approves a secretary. Our current
[15] secretary of the Board is battling cancer and has not
[16] been in the District for over a year and a half. We
[17] have had an Acting Secretary who the Board formally
[18] approved as Assistant Secretary.
[19] On one occasion, October 18th, we had an
[20] additional individual sit in as the Board secretary.
[21] Q: In place of the Acting Secretary?
[22] A: Yes.
[23] Q: Is it the practice of the Board to record the meeting?
[24] A: Yes.
[25] Q: What is done with those recordings after the meeting is

Page 28

[1] completed?
[2] A: They are kept until the Board officially approves the
[3] minutes. After the approval of the minutes, the tapes
[4] are destroyed.
[5] Q: Who developed the policy of destroying the tapes after
[6] the minutes are approved?
[7] A: Don't know. It happened prior to me.
[8] Q: Are there any circumstances where the full Board meets
[9] that is not open to the public?
[10] A: Yes.
[11] Q: Is there a name for those kinds of meetings?
[12] A: Executive session.
[13] Q: Do you attend those sessions?
[14] A: Some.
[15] Q: What are the — let me back up. Is it your
[16] responsibility to attend all the full public Board
[17] meetings?
[18] A: Yes.
[19] Q: What are the circumstances where you will attend an
[20] executive session meeting?
[21] A: If requested by the Board to attend.
[22] Q: Does anyone record what is said in the executive session
[23] meetings?
[24] A: No.
[25] Q: Who developed the policy of not recording executive

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Richard Nilsen
January 3, 2005

Page 49

[1] is — that was added to the biology curriculum through
[2] the October 18th resolution?
[3] A: Yes.
[4] Q: Total discretion?
[5] A: Total.
[6] Q: Am I correct in understanding your testimony that
[7] teachers are not required to bring the Pandas book into
[8] their classroom when they teach this unit?
[9] A: That's correct.
[10] Q: Is anybody else besides teachers allowed to take those
[11] textbooks, the Pandas textbooks out of the library?
[12] A: Students.
[13] Q: Mr. Nilsen, when I asked you about your prior
[14] experience, you talked about serving as Assistant
[15] Principal, Principal, Assistant Superintendent and
[16] Superintendent in various school districts.
[17] In any school districts that you have been an
[18] administrator in, has the subject of Intelligent Design
[19] be part of the curriculum?
[20] A: No.
[21] Q: What about the subject of Creationism?
[22] A: Not that I'm aware of.
[23] Q: If I extend that question to any school district in
[24] which you have taught, would your answer be the same?
[25] A: Yes.

Page 50

[1] Q: What newspapers do you read as a regular matter?
[2] A: The Patriot News and the two York County papers.
[3] Q: Do you read the two York County papers everyday?
[4] A: I read the — I have a secretary pull all related
[5] educational articles.
[6] Q: Do those clippings include the articles that have been
[7] written about the biology curriculum issue during 2004?
[8] A: Yes.
[9] Q: Have you ever asked any newspapers to correct anything
[10] that has been reported about the biology curriculum?
[11] MR. GILLEN: Objection, relevance. Answer,
[12] please. I'm sorry.
[13] A: I have asked them to read the press release on the
[14] District web page.
[15] BY MR. ROTHSCHILD:
[16] Q: Other than that, have you ever asked the newspapers to
[17] correct anything reported about the biology curriculum?
[18] MR. GILLEN: Same objection.
[19] A: I don't remember.
[20] BY MR. ROTHSCHILD:
[21] Q: Have you ever asked them to retract any item reported
[22] about the biology curriculum?
[23] MR. GILLEN: Objection, relevance.
[24] A: No.
[25]

Page 51

[1] BY MR. ROTHSCHILD:
[2] Q: Have you ever communicated to any newspaper that you
[3] have been misquoted regarding the subject of the biology
[4] curriculum?
[5] MR. GILLEN: Objection, relevance.
[6] A: No.
[7] BY MR. ROTHSCHILD:
[8] Q: Have you ever communicated to any newspaper that any
[9] other individual has been misquoted regarding the
[10] biology curriculum?
[11] MR. GILLEN: Objection, relevance.
[12] A: Sorry. Could you ask that question again?
[13] BY MR. ROTHSCHILD:
[14] Q: Have you ever communicated to any newspaper that any
[15] individual besides yourself was misquoted or
[16] misrepresented in the reporting about the biology
[17] curriculum?
[18] MR. GILLEN: Same objection.
[19] A: Housed within the press release is a sentence that says
[20] many statements have been personal statements and
[21] opinions from the media, community members and Board
[22] members which are completely inaccurate or false. That
[23] has been communicated publicly.
[24] BY MR. ROTHSCHILD:
[25] Q: Is that the only way that that has been communicated?

Page 52

[1] A: Yes.
[2] Q: Are you aware of anybody else involved with the biology
[3] curriculum, School District employes or School Board
[4] members communicating to any newspaper that they have
[5] been misquoted or their statements misrepresented?
[6] MR. GILLEN: Objection, relevance.
[7] A: I am sorry. Ask that question again.
[8] BY MR. ROTHSCHILD:
[9] Q: Are you aware of anybody else involved with this biology
[10] curriculum issue, School Board members or employes of
[11] the School District communicating to the newspapers that
[12] they misreported something or misquoted them?
[13] A: Yes.
[14] Q: Who has done that?
[15] A: Mr. Bonsell and Mr. Buckingham.
[16] Q: What statements reported in the newspaper articles —
[17] A: I can't speak to that.
[18] MR. GILLEN: Objection, relevance.
[19] BY MR. ROTHSCHILD:
[20] Q: How do you know that they communicated that to the
[21] newspapers?
[22] A: They individually told me that they had talked to
[23] reporters about their misstatements and
[24] misrepresentations.
[25] MR. GILLEN: Whose misstatement and

Tammy Kitzmiller, et al.  v.
Dover Area School District, et al.

Richard Nilsen
January 3, 2005

Page 57

[1]   A: Not that I can remember.
[2]   Q: Do you remember any other School Board member bringing
[3] up the subject of Creationism at any School Board
[4] meeting?
[5]   A: Not that I can remember.
[6]   Q: If you can turn to the next page.
[7]   A: (Witness complies.)
[8]   Q: Do you see there is a paragraph which begins with the
[9] words Assistant Superintendent Michael Baksa?
[10]   A: Yes.
[11]   Q: And two paragraphs down from that, the article reports
[12] that Mr. Baksa said that teachers may make reference to
[13] Creationism in class. Do you see that?
[14]   A: Yes.
[15]   Q: Were you aware that —
[16]   MR. GILLEN: Objection, hearsay.
[17]   BY MR. ROTHSCHILD:
[18]   Q: Were you aware that the newspaper reported that
[19] statement by Mr. Baksa?
[20]   A: I don't remember that, no.
[21]   Q: Do you know whether Mr. Baksa made that statement?
[22]   A: I don't remember that.
[23]   Q: Do you remember Mr. Baksa ever making any statements
[24] about teachers making reference to Creationism in class?
[25]   A: No, I do not.

Page 58

[1]   Q: Would you turn to the next article which is a June 9th,
[2] 2004 article from the York Daily Record?
[3]   A: (Witness complies.)
[4]   Q: Do you see at the bottom of the paragraph — it reports
[5] Board President Alan Bonsell disagreed saying there were
[6] only two theories (Creationism and evolution) that could
[7] possibly be taught. Are you aware —
[8]   MR. GILLEN: Objection, hearsay.
[9]   BY MR. ROTHSCHILD:
[10]   Q: Are you aware of the newspaper reporting that statement
[11] by Mr. Bonsell?
[12]   A: I do not remember that, no.
[13]   Q: Do you remember Mr. Bonsell making that statement?
[14]   A: No, I do not.
[15]   Q: Do you remember Mr. Bonsell making any reference to
[16] Creationism at any time in a Board meeting?
[17]   A: At a Board meeting, I do not remember that, no.
[18]   MR. ROTHSCHILD: Pat, as we go through these
[19] articles, you can have a standing objection to hearsay.
[20] I don't agree with it, but you won't have waived it by
[21] not making it each time.
[22]   MR. GILLEN: Okay.
[23]   BY MR. ROTHSCHILD:
[24]   Q: Could you turn to the next article which is a June 10th,
[25] 2004 article from the York Daily Record?

Page 59

[1]   A: (Witness complies.)
[2]   Q: In the third paragraph, it says during this past Monday
[3] night's Board meeting, Board members Alan Bonsell, Noel
[4] Wenrich, and Buckingham spoke aggressively in fair of
[5] have a biology book that includes creation as part of
[6] the text.
[7]   Were you aware that the newspaper reported that?
[8]   A: No.
[9]   Q: Do you recall any of those individuals speaking in favor
[10] of a biology book that includes theories of Creationism
[11] as part of the text?
[12]   A: No.
[13]   Q: Could you turn to the article, the June 14th, 2004 York
[14] Daily Record article?
[15]   A: Are these in order?
[16]   Q: They are in the chronological order, yes.
[17]   A: Okay.
[18]   Q: In the second paragraph, it is reported that at Monday's
[19] School Board meeting, William Buckingham said as part of
[20] a search for a new biology book, he and others are
[21] looking for one that offers balance between Christian
[22] views of creation and Darwin's Theory of Evolution.
[23]   Were you aware —
[24]   A: That is not June 14th.
[25]   MR. GILLEN: He is looking at the second piece.

Page 60

[1] Turn the page.
[2]   BY MR. ROTHSCHILD:
[3]   Q: Sorry about that.
[4]   A: There's two 14's.
[5]   Q: Do you see the second paragraph?
[6]   A: Yes.
[7]   Q: Were you aware that the newspaper reported those
[8] statements by Mr. Buckingham?
[9]   A: No.
[10]   Q: Do you remember Mr. Buckingham making those statements?
[11]   A: No.
[12]   Q: Do you have a personal understanding of what is meant by
[13] the term Creationism?
[14]   A: Yes.
[15]   Q: What is your understanding?
[16]   A: My understanding is creation refers to the Biblical
[17] account of the origins of life.
[18]   Q: Anything else?
[19]   A: No.
[20]   Q: Do you know that to be a scientific proposition?
[21]   A: I do or do not. I have no comment on that.
[22]   Q: You don't have an understanding?
[23]   A: No.
[24]   Q: In the same article two paragraphs down, the paper
[25] reports that Mr. Buckingham said this country wasn't

Richard Nilsen
January 3, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

Page 69

[1] prepared that statement?

[2]   A: Mr. Baksa in conjunction with Board members and

[3] teachers.

[4]   Q: Other than providing the teachers that statement which

[5] they are required to read, have the teachers been given

[6] any other guidance about how to present this unit?

[7]   A: Yes.

[8]   Q: What other guidance?

[9]   A: If any student brings up the question of either any

[10] other Creationism or any other origins of life, they

[11] have been directed not to speak to that, but to give

[12] that information and that question directly to either

[13] their parents and/or their own research.

[14]   Q: Let me make sure I got that right. If any student

[15] brings up either Creationism or origins of life, they

[16] are directed not to answer, but to instruct the students

[17] to ask their parents or do their own research?

[18]   A: Yes.

[19]   Q: Have the teachers been given any other guidance besides

[20] that directive?

[21]   A: No.

[22]   Q: Who gave the teachers that directive?

[23]   A: Me.

[24]   Q: How was that communicated?

[25]   A: November 24th, 1:05, this office, this room.

Page 70

[1]   Q: Sitting around a table?

[2]   A: Yes.

[3]   Q: Who was present for that meeting?

[4]   A: Mr. Baksa, myself, the Union President, Bill Miller,

[5] Past President, and the Science Department.

[6]   Q: Did you instruct them how they — how they were required

[7] to answer any other kinds of questions by students

[8] relating to this unit?

[9]   A: They were instructed not to answer any questions dealing

[10] with the origins of life. Any other questions in

[11] Darwinian Theory or anything else that is discussed is

[12] within their own domain.

[13]   Q: Did you give them any instructions about how to answer

[14] questions about the subject of Intelligent Design?

[15]   A: Yes.

[16]   Q: What instructions were those?

[17]   A: Not to discuss it. Report — any student requesting

[18] that is to immediately go back to either their parents

[19] or their own research, not a topic of discussion.

[20]   Q: Why?

[21]   A: Why was Mr. Miller the past President?

[22]   A: No. Well done.

[23]   A: I figured at 11:30, you needed it.

[24]   Q: Why did you give the teachers the directive not to

[25] answer any questions about Intelligent Design?

Page 71

[1]   A: I didn't want to be sitting in a meeting with you across

[2] the table in a legal suit.

[3]   Q: Is that the only reason?

[4]   A: I believe it is a topic of discussion that should be

[5] discussed with parents, not the School District.

[6]   Q: What is it about Intelligent Design which is part of the

[7] school's biology curriculum which makes it —

[8]   MR. GILLEN: Objection, foundation,

[9] characterization.

[10]                  BY MR. ROTHSCHILD:

[11]   Q: What is it about Intelligent Design that makes it a

[12] subject appropriate for discussion with parents, but not

[13] in the school?

[14]   A: The school has decided that the curriculum should focus

[15] on the Darwinian theory and not focus on other options

[16] due to time constraints.

[17]   Q: Is that the only reason — is time constraints the only

[18] reason that the school has decided it should focus on

[19] Darwin and not other options?

[20]   A: We are specifically, as the press release says, a

[21] standards driven curriculum and only address the

[22] standards.

[23]   Q: What is the purpose of addressing this section of the

[24] curriculum if it is not going to be discussed, not part

[25] of the standards?



Page 72

[1]   A: The purpose is there are individual students that have

[2] other opinions beyond the Darwinian. We did not want to

[3] be discrimination. We firmly believe that any

[4] individual has a right to their own beliefs. We do not

[5] want to be discriminatory.

[6]      We are required to teach Darwin. We are also

[7] required not to be discriminatory.

[8]   Q: How do you know that there are individual students that

[9] have other opinions besides Darwin's?

[10]   A: I have talked to other students.

[11]   Q: Is it your understanding that the individual opinion

[12] that these students hold different from Darwin's theory

[13] is Intelligent Design?

[14]   MR. GILLEN: Objection, foundation.

[15]   A: Could you ask that question, again?

[16]                  BY MR. ROTHSCHILD:

[17]   Q: Is it your understanding that the individual beliefs

[18] that these individuals hold different from Darwin's

[19] theory include Intelligent Design?

[20]   A: Some, yes.

[21]   Q: When did you become aware that students believed in

[22] Intelligent Design?

[23]   A: Since I have been in education.

[24]   Q: Mr. Nilsen, didn't you testify that the first time you

[25] became aware of Intelligent Design was July, 2004?

---

Min-U-Script®   Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Richard Nilsen
January 3, 2005

**Page 25**

[1] A: Three and a half years.
[2] Q: When you were Assistant Superintendent, did you have
[3] responsibilities for curriculum as Mr. Baksa does now?
[4] A: Yes.
[5] Q: And prior to becoming Assistant Superintendent, what did
[6] you do?
[7] A: Director of Curriculum Instruction.
[8] Q: For Dover area?
[9] A: No. Big Springs School District.
[10] Q: How long did you hold that position?
[11] A: Five years. Five or six.
[12] Q: And prior to that?
[13] A: High School Principal, Big Springs School District.
[14] Q: How long did you hold that position?
[15] A: Total five years.
[16] Q: You used the word total. Was it broken up?
[17] A: Yes.
[18] Q: Why was that?
[19] A: I was acting one year, then returned to the Assistant
[20] Principal's position. I then went to another District
[21] for three years, then returned for four.
[22] Q: When you were in the other District, were you also
[23] Principal?
[24] A: Yes.
[25] Q: Prior to taking positions as a Principal or Assistant

**Page 26**

[1] Principal, were you ever a schoolteacher?
[2] A: Yes.
[3] Q: What subjects did you teach?
[4] A: Social studies.
[5] Q: How long did you do that?
[6] A: Five and a half years.
[7] Q: Where did you get your degree?
[8] A: Which one?
[9] Q: What degrees do you have?
[10] A: I have an undergraduate BA in social studies from Gordon
[11] College. I have a Master's in Administration from
[12] Shippensburg University, and I have a doctorate from
[13] Temple University. So I am actually Dr. Nilsen.
[14] Q: During any of your college and post graduate education,
[15] did you take any science courses?
[16] A: No. Wait a minute. You said undergraduate?
[17] MR. GILLEN: He did I believe.
[18] A: Yes.
[19] BY MR. ROTHSCHILD:
[20] Q: Did you take any biology courses?
[21] A: No. I took a theory of science I believe.
[22] Q: While you were an undergraduate?
[23] A: Yes.
[24] Q: That is the only science subject you can remember taking
[25] as an undergraduate?

**Page 27**

[1] A: No. I am sorry. That is over 30 years ago. That is
[2] all I remember.
[3] Q: Have you attended any courses or lectures or seminars
[4] relating to the subjects of evolution, Intelligent
[5] Design, creation or Creationism?
[6] A: No.
[7] Q: How often does the Dover Area School Board meet?
[8] A: Usually twice a month.
[9] Q: Do you attend all those meetings?
[10] A: Yes.
[11] Q: Who keeps the minutes of those meetings?
[12] A: The secretary.
[13] Q: How is the secretary position selected?
[14] A: To clarify, the Board approves a secretary. Our current
[15] secretary of the Board is battling cancer and has not
[16] been in the District for over a year and a half. We
[17] have had an Acting Secretary who the Board formally
[18] approved as Assistant Secretary.
[19] On one occasion, October 18th, we had an
[20] additional individual sit in as the Board secretary.
[21] Q: In place of the Acting Secretary?
[22] A: Yes.
[23] Q: Is it the practice of the Board to record the meeting?
[24] A: Yes.
[25] Q: What is done with those recordings after the meeting is

**Page 28**

[1] completed?
[2] A: They are kept until the Board officially approves the
[3] minutes. After the approval of the minutes, the tapes
[4] are destroyed.
[5] Q: Who developed the policy of destroying the tapes after
[6] the minutes are approved?
[7] A: Don't know. It happened prior to me.
[8] Q: Are there any circumstances where the full Board meets
[9] that is not open to the public?
[10] A: Yes.
[11] Q: Is there a name for those kinds of meetings?
[12] A: Executive session.
[13] Q: Do you attend those sessions?
[14] A: Some.
[15] Q: What are the — let me back up. Is it your
[16] responsibility to attend all the full public Board
[17] meetings?
[18] A: Yes.
[19] Q: What are the circumstances where you will attend an
[20] executive session meeting?
[21] A: If requested by the Board to attend.
[22] Q: Does anyone record what is said in the executive session
[23] meetings?
[24] A: No.
[25] Q: Who developed the policy of not recording executive

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Richard Nilsen
January 3, 2005

Page 49

[1] is — that was added to the biology curriculum through
[2] the October 18th resolution?
[3]   A: Yes.
[4]   Q: Total discretion?
[5]   A: Total.
[6]   Q: Am I correct in understanding your testimony that
[7] teachers are not required to bring the Pandas book into
[8] their classroom when they teach this unit?
[9]   A: That's correct.
[10]   Q: Is anybody else besides teachers allowed to take those
[11] textbooks, the Pandas textbooks out of the library?
[12]   A: Students.
[13]   Q: Mr. Nilsen, when I asked you about your prior
[14] experience, you talked about serving as Assistant
[15] Principal, Principal, Assistant Superintendent and
[16] Superintendent in various school districts.
[17]     In any school districts that you have been an
[18] administrator in, has the subject of Intelligent Design
[19] be part of the curriculum?
[20]   A: No.
[21]   Q: What about the subject of Creationism?
[22]   A: Not that I'm aware of.
[23]   Q: If I extend that question to any school district in
[24] which you have taught, would your answer be the same?
[25]   A: Yes.

Page 50

[1]   Q: What newspapers do you read as a regular matter?
[2]   A: The Patriot News and the two York County papers.
[3]   Q: Do you read the two York County papers everyday?
[4]   A: I read the — I have a secretary pull all related
[5] educational articles.
[6]   Q: Do those clippings include the articles that have been
[7] written about the biology curriculum issue during 2004?
[8]   A: Yes.
[9]   Q: Have you ever asked any newspapers to correct anything
[10] that has been reported about the biology curriculum?
[11]   MR. GILLEN: Objection, relevance. Answer,
[12] please. I'm sorry.
[13]   A: I have asked them to read the press release on the
[14] District web page.
[15]       BY MR. ROTHSCHILD:
[16]   Q: Other than that, have you ever asked the newspapers to
[17] correct anything reported about the biology curriculum?
[18]   MR. GILLEN: Same objection.
[19]   A: I don't remember.
[20]       BY MR. ROTHSCHILD:
[21]   Q: Have you ever asked them to retract any item reported
[22] about the biology curriculum?
[23]   MR. GILLEN: Objection, relevance.
[24]   A: No.
[25]

Page 51

[1]       BY MR. ROTHSCHILD:
[2]   Q: Have you ever communicated to any newspaper that you
[3] have been misquoted regarding the subject of the biology
[4] curriculum?
[5]   MR. GILLEN: Objection, relevance.
[6]   A: No.
[7]       BY MR. ROTHSCHILD:
[8]   Q: Have you ever communicated to any newspaper that any
[9] other individual has been misquoted regarding the
[10] biology curriculum?
[11]   MR. GILLEN: Objection, relevance.
[12]   A: Sorry. Could you ask that question again?
[13]       BY MR. ROTHSCHILD:
[14]   Q: Have you ever communicated to any newspaper that any
[15] individual besides yourself was misquoted or
[16] misrepresented in the reporting about the biology
[17] curriculum?
[18]   MR. GILLEN: Same objection.
[19]   A: Housed within the press release is a sentence that says
[20] many statements have been personal statements and
[21] opinions from the media, community members and Board
[22] members which are completely inaccurate or false. That
[23] has been communicated publicly.
[24]       BY MR. ROTHSCHILD:
[25]   Q: Is that the only way that that has been communicated?

Page 52

[1]   A: Yes.
[2]   Q: Are you aware of anybody else involved with the biology
[3] curriculum, School District employees or School Board
[4] members communicating to any newspaper that they have
[5] been misquoted or their statements misrepresented?
[6]   MR. GILLEN: Objection, relevance.
[7]   A: I am sorry. Ask that question again.
[8]       BY MR. ROTHSCHILD:
[9]   Q: Are you aware of anybody else involved with this biology
[10] curriculum issue, School Board members or employees of
[11] the School District communicating to the newspapers that
[12] they misreported something or misquoted them?
[13]   A: Yes.
[14]   Q: Who has done that?
[15]   A: Mr. Bonsell and Mr. Buckingham.
[16]   Q: What statements reported in the newspaper articles —
[17]   A: I can't speak to that.
[18]   MR. GILLEN: Objection, relevance.
[19]       BY MR. ROTHSCHILD:
[20]   Q: How do you know that they communicated that to the
[21] newspapers?
[22]   A: They individually told me that they had talked to
[23] reporters about their misstatements and
[24] misrepresentations.
[25]   MR. GILLEN: Whose misstatement and

**Tammy Kitzmiller, et al.  v.**
**Dover Area School District, et al.**

Richard Nilsen
January 3, 2005

---

Page 57

[1]   A: Not that I can remember.

[2]   Q: Do you remember any other School Board member bringing

[3] up the subject of Creationism at any School Board

[4] meeting?

[5]   A: Not that I can remember.

[6]   Q: If you can turn to the next page.

[7]   A: (Witness complies.)

[8]   Q: Do you see there is a paragraph which begins with the

[9] words Assistant Superintendent Michael Baksa?

[10]   A: Yes.

[11]   Q: And two paragraphs down from that, the article reports

[12] that Mr. Baksa said that teachers may make reference to

[13] Creationism in class. Do you see that?

[14]   A: Yes.

[15]   Q: Were you aware that —

[16]   MR. GILLEN: Objection, hearsay.

[17]         BY MR. ROTHSCHILD:

[18]   Q: Were you aware that the newspaper reported that

[19] statement by Mr. Baksa?

[20]   A: I don't remember that, no.

[21]   Q: Do you know whether Mr. Baksa made that statement?

[22]   A: I don't remember that.

[23]   Q: Do you remember Mr. Baksa ever making any statements

[24] about teachers making reference to Creationism in class?

[25]   A: No, I do not.

---

Page 58

[1]   Q: Would you turn to the next article which is a June 9th,

[2] 2004 article from the York Daily Record?

[3]   A: (Witness complies.)

[4]   Q: Do you see at the bottom of the paragraph — it reports

[5] Board President Alan Bonsell disagreed saying there were

[6] only two theories (Creationism and evolution) that could

[7] possibly be taught. Are you aware —

[8]   MR. GILLEN: Objection, hearsay.

[9]         BY MR. ROTHSCHILD:

[10]   Q: Are you aware of the newspaper reporting that statement

[11] by Mr. Bonsell?

[12]   A: I do not remember that, no.

[13]   Q: Do you remember Mr. Bonsell making that statement?

[14]   A: No, I do not.

[15]   Q: Do you remember Mr. Bonsell making any reference to

[16] Creationism at any time in a Board meeting?

[17]   A: At a Board meeting, I do not remember that, no.

[18]   MR. ROTHSCHILD: Pat, as we go through these

[19] articles, you can have a standing objection to hearsay.

[20] I don't agree with it, but you won't have waived it by

[21] not making it each time.

[22]   MR. GILLEN: Okay.

[23]         BY MR. ROTHSCHILD:

[24]   Q: Could you turn to the next article which is a June 10th,

[25] 2004 article from the York Daily Record?

---

Page 59

[1]   A: (Witness complies.)

[2]   Q: In the third paragraph, it says during this past Monday

[3] night's Board meeting, Board members Alan Bonsell, Noel

[4] Wenrich, and Buckingham spoke aggressively in favor of

[5] have a biology book that includes creation as part of

[6] the text.

[7]   Were you aware that the newspaper reported that?

[8]   A: No.

[9]   Q: Do you recall any of those individuals speaking in favor

[10] of a biology book that includes theories of Creationism

[11] as part of the text?

[12]   A: No.

[13]   Q: Could you turn to the article, the June 14th, 2004 York

[14] Daily Record article?

[15]   A: Are these in order?

[16]   Q: They are in the chronological order, yes.

[17]   A: Okay.

[18]   Q: In the second paragraph, it is reported that at Monday's

[19] School Board meeting, William Buckingham said as part of

[20] a search for a new biology book, he and others are

[21] looking for one that offers balance between Christian

[22] views of creation and Darwin's Theory of Evolution.

[23]   Were you aware —

[24]   A: That is not June 14th.

[25]   MR. GILLEN: He is looking at the second piece.

---

Page 60

[1] Turn the page.

[2]         BY MR. ROTHSCHILD:

[3]   Q: Sorry about that.

[4]   A: There's two 14's.

[5]   Q: Do you see the second paragraph?

[6]   A: Yes.

[7]   Q: Were you aware that the newspaper reported those

[8] statements by Mr. Buckingham?

[9]   A: No.

[10]   Q: Do you remember Mr. Buckingham making those statements?

[11]   A: No.

[12]   Q: Do you have a personal understanding of what is meant by

[13] the term Creationism?

[14]   A: Yes.

[15]   Q: What is your understanding?

[16]   A: My understanding is creation refers to the Biblical

[17] account of the origins of life.

[18]   Q: Anything else?

[19]   A: No.

[20]   Q: Do you know that to be a scientific proposition?

[21]   A: I do or do not. I have no comment on that.

[22]   Q: You don't have an understanding?

[23]   A: No.

[24]   Q: In the same article two paragraphs down, the paper

[25] reports that Mr. Buckingham said this country wasn't

---

Richard Nilsen
January 3, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

**Page 69**

[1] prepared that statement?

[2] A: Mr. Baksa in conjunction with Board members and
[3] teachers.

[4] Q: Other than providing the teachers that statement which
[5] they are required to read, have the teachers been given
[6] any other guidance about how to present this unit?

[7] A: Yes.

[8] Q: What other guidance?

[9] A: If any student brings up the question of either any
[10] other Creationism or any other origins of life, they
[11] have been directed not to speak to that, but to give
[12] that information and that question directly to either
[13] their parents and/or their own research.

[14] Q: Let me make sure I got that right. If any student
[15] brings up either Creationism or origins of life, they
[16] are directed not to answer, but to instruct the students
[17] to ask their parents or do their own research?

[18] A: Yes.

[19] Q: Have the teachers been given any other guidance besides
[20] that directive?

[21] A: No.

[22] Q: Who gave the teachers that directive?

[23] A: Me.

[24] Q: How was that communicated?

[25] A: November 24th, 1:05, this office, this room.

**Page 70**

[1] Q: Sitting around a table?

[2] A: Yes.

[3] Q: Who was present for that meeting?

[4] A: Mr. Baksa, myself, the Union President, Bill Miller,
[5] Past President, and the Science Department.

[6] Q: Did you instruct them how they — how they were required
[7] to answer any other kinds of questions by students
[8] relating to this unit?

[9] A: They were instructed not to answer any questions dealing
[10] with the origins of life. Any other questions in
[11] Darwinian Theory or anything else that is discussed is
[12] within their own domain.

[13] Q: Did you give them any instructions about how to answer
[14] questions about the subject of Intelligent Design?

[15] A: Yes.

[16] Q: What instructions were those?

[17] A: Not to discuss it. Report — any student requesting
[18] that is to immediately go back to either their parents
[19] or their own research, not a topic of discussion.

[20] Q: Why?

[21] A: Why was Mr. Miller the past President?

[22] A: No. Well done.

[23] A: I figured at 11:30, you needed it.

[24] Q: Why did you give the teachers the directive not to
[25] answer any questions about Intelligent Design?

**Page 71**

[1] A: I didn't want to be sitting in a meeting with you across
[2] the table in a legal suit.

[3] Q: Is that the only reason?

[4] A: I believe it is a topic of discussion that should be
[5] discussed with parents, not the School District.

[6] Q: What is it about Intelligent Design which is part of the
[7] school's biology curriculum which makes it —

[8] MR. GILLEN: Objection, foundation,
[9] characterization.

[10] BY MR. ROTHSCHILD:

[11] Q: What is it about Intelligent Design that makes it a
[12] subject appropriate for discussion with parents, but not
[13] in the school?

[14] A: The school has decided that the curriculum should focus
[15] on the Darwinian theory and not focus on other options
[16] due to time constraints.

[17] Q: Is that the only reason — is time constraints the only
[18] reason that the school has decided it should focus on
[19] Darwin and not other options?

[20] A: We are specifically, as the press release says, a
[21] standards driven curriculum and only address the
[22] standards.

[23] Q: What is the purpose of addressing this section of the
[24] curriculum if it is not going to be discussed, not part
[25] of the standards?

**Page 72**

[1] A: The purpose is there are individual students that have
[2] other opinions beyond the Darwinian. We did not want to
[3] be discrimination. We firmly believe that any
[4] individual has a right to their own beliefs. We do not
[5] want to be discriminatory.

[6] We are required to teach Darwin. We are also
[7] required not to be discriminatory.

[8] Q: How do you know that there are individual students that
[9] have other opinions besides Darwin's?

[10] A: I have talked to other students.

[11] Q: Is it your understanding that the individual opinion
[12] that these students hold different from Darwin's theory
[13] is Intelligent Design?

[14] MR. GILLEN: Objection, foundation.

[15] A: Could you ask that question, again?

[16] BY MR. ROTHSCHILD:

[17] Q: Is it your understanding that the individual beliefs
[18] that these individuals hold different from Darwin's
[19] theory include Intelligent Design?

[20] A: Some, yes.

[21] Q: When did you become aware that students believed in
[22] Intelligent Design?

[23] A: Since I have been in education.

[24] Q: Mr. Nilsen, didn't you testify that the first time you
[25] became aware of Intelligent Design was July, 2004?

00009
1   correct, three of the districts -- or I am sorry --
2   three of the schools and which biology books they were
3   using.
4   Q.   What was your role in 2004 in the work of the curriculum
5   committee's to select or recommend, rather, new
6   textbooks in the School District?
7   A.   My role as Superintendent were to place the book that
8   Mr. Baksa as Director of Curriculum Instruction -- to
9   place his recommendation on the Board agenda.
10  Q.   It sounds like your role is passive.  You simply take
11  whatever Baksa gives you and put it on the agenda
12  without making any judgments about whether it is an
13  appropriate recommendation; am I right about that?
14  A.   Passive to the extent of where Mr. Baksa in his capacity
15  makes the recommendation.  In this case and in most
16  cases, his recommendation has been put on where I have
17  not questioned his recommendation beyond the fact that
18  did he follow procedure.  And when he communicated to me
19  he did, it was placed on the agenda.
20  Q.   Mr. Baksa described some of the work that he did with
21  the curriculum committees in the summer of 2004.  I
22  believe from his testimony that this inquiry to the
23  parochial schools followed a June meeting of the School
24  District Board when the biology textbook issue was
25  discussed

Richard Nilsen 4/14/05 (Day 2)          Page 9

00010
1   Were you at that School Board meeting?
2   A.   Yes.
3   Q.   Do you recall the discussion about biology textbooks in
4   the high school?
5   A.   I remember the discussion, the specifics.  I am not sure
6   I remember all of them.
7   Q.   What do you remember of the discussion?
8   A.   I remember that Mr. Buckingham had some concerns about
9   the textbook and was interested in looking at other
10  options.
11  Q.   What do you recall he said about his concerns about the
12  textbook?
13  A.   I believe he communicated his dissatisfaction with how
14  the Darwinian Theory of Evolution was presented in the
15  book.
16  Q.   Was his dissatisfaction with how the Darwinian Theory
17  was presented, or was his dissatisfaction with the
18  absence of any other theory being presented?
19  A.   My only recollection is how the Darwinian Theory was
20  presented.
21  Q.   What did he say about his dissatisfaction?
22  A.   He documented -- and again the documentation I believe
23  you have -- of areas of concern about how evolution was
24  being presented in the book.  Beyond that, I don't
25  recollect what was specifically stated and/or written

Richard Nilsen 4/14/05 (Day 2)          Page 10

00011
1   Q.   Did you make any notes yourself of the discussion of the
2   biology textbook at that June Board meeting?
3   A.   No.
4   Q.   Do you have a practice of making notes during Board
5   meetings?
6   A.   Yes.
7   Q.   What do you do with those notes?
8   A.   All the notes I take are actions the Board has requested
9   me to do and/or any changes in future agenda items.
10  Once those items have been completed, those notes are
11  thrown out.
12  Q.   Did you make notes of the discussion of the biology
13  textbook at the June meeting?
14  A.   No.
15  Q.   Did you have any conversation with Mr. Baksa after that
16  meeting about the actions that should follow in
17  connection with Mr. Buckingham's concerns or any other
18  discussion that happened at that June meeting?
19  A.   Yes.
20  Q.   What was that discussion with Baksa?
21  A.   My discussion with Mr. Baksa was he had to decide what
22  direction he was going to go with as it related to the
23  textbook and when the textbook decision was to be made
24  Q.   At that time, I mean at the time of your discussion with
25  Mr. Baksa, what did you think the directions were that

Richard Nilsen 4/14/05 (Day 2)          Page 11

00012
1   he needed to consider?
2   A.   I think he needed to consider answering whatever
3   concerns Mr. Buckingham and/or any other Board member
4   had with the present recommended book Miller and Levin
5   Biology.
6   Q.   I understand that.  But what did you think his options
7   were?  You referred -- and I am using the word options.
8   You referred to he needed to decide what direction he
9   was going to go in.  That suggests to me that there
10  were -- there was more than one direction available to
11  Baksa.
12  What did you have in mind when you had that
13  conversation with him?
14  A.   I don't recommend -- my apologies.  I don't recollect
15  the full conversation, but obviously, there would be
16  two.  One would be to continue the conversation on the
17  current book.  Or two, look for other options that
18  possibly anybody and everybody would be satisfied with.
19  Q.   Did you give him any suggestions for how to find out
20  more about other options than simply persisting with the
21  Miller and Levin book?
22  A.   Again, I don't remember any specific.  It would not be
23  out of character for me to tell him to call and make
24  sure he has contacted every other district and everyone
25  he knows of to see if there would have been another

Richard Nilsen 4/14/05 (Day 2)          Page 12

00017
1  A.   I will clarify your question.  The family consumer
2     science book was content issue based on the fact that
3     they thought the content was already in our curriculum
4     and didn't see the reason to purchase another book that
5     had the same content.
6  Q.   Okay.
7  A.   Not specifically along the same lines, but along the
8     same general conversation.  The District gets a donation
9     from the county on a book pamphlet that we give to our
10    students that has a number of agencies listed in it, and
11    a Board member and a parent had a considerable concern
12    on the information that was in the book, specifically
13    dealing with comments dealing with sexual education and
14    issues concerning specific agencies that was in there
15       To the point of where we ended up sending home
16    information prior to the students receiving the books,
17    as well as a discussion of whether to even continue
18    handing out the individual books
19       And through my experience, not only in this
20    district, but other districts, any time we have adopted
21    a health curriculum, there has always been conversations
22    zeroing in on what is and what is not taught as it
23    relates to the curriculum.
24       Mr. Bonsell and I had conversations and I believe
25    a third party, but nonetheless I believe Mr. Bonsell has

Richard Nilsen 4/14/05 (Day 2)          Page 17

00018
1     also talked to Mr. Baksa about the health curriculum in
2     our education dealing with abstinence.
3        I know Mr. Baksa is meeting next week, if not the
4     following week, with another Board member dealing with
5     our drug and alcohol curriculum, specifically where
6     inhalants are being taught.
7        If your question is does the Board hold
8     discussions on multiple issues with content beyond this
9     individual issue, my experience is yes.
10 Q.   On those issues where the Board has either demonstrated
11    or expressed a keen interest in a decision like the
12    distribution of a pamphlet, or the selection of a
13    textbook, is it your practice as Mr. Baksa's supervisor
14    and as the Superintendent of Schools to basically say we
15    have got to pay attention to this, get it right, be sure
16    that we do what we need to do to be giving all the
17    information to the Board and do the best job we can?
18       You don't treat it as a routine matter, do you?
19       MR. GILLEN:  I object to the form.
20 A.   I think it is a routine matter.  I think the routine
21    matter of the Board's reviewing curriculum and making
22    comments about curriculum is routine.  Board members
23    historically have had conversations about what is in the
24    curriculum, and their recommendations on what should be
25    in the curriculum, and what type of curriculum should be

Richard Nilsen 4/14/05 (Day 2)          Page 18

00019
1     placed in our planned courses.  That is a routine
2     matter.
3  BY MR. SCHMIDT:
4  Q.   At the time of the June meeting in 2004, had you ever
5     heard of the notion of Intelligent Design?
6  A.   Not that I can remember, no.
7  Q.   Do you remember your first contact with the Discovery
8     Institute?  And by you in this case, I am referring to
9     you personally.
10 A.   Me personally, yes.
11 Q.   When did that contact take place?
12 A.   The fall of 2004.
13 Q.   Where did the contact take place?
14 A.   Over the phone.
15 Q.   Who else was involved in the telephone contact?
16 A.   No one else.
17 Q.   That wasn't meant to be a trick question.  You were on
18    the phone.  Who else was on the phone; somebody from the
19    Discovery Institute?
20 A.   Yes.
21 Q.   Do you remember who it was?
22 A.   No, I don't.
23 Q.   Do you know someone named Seth Cooper?
24 A.   Yes.
25 Q.   There is a deposition exhibit that has previously been

Richard Nilsen 4/14/05 (Day 2)          Page 19

00020
1     marked as Plaintiff 38 which I would ask you to take a
2     look at?
3  A.   (Witness complies.)
4        MR. GILLEN:  Tom, I mentioned to Eric yesterday
5     that 40, I have a problem with in that I am not sure if
6     it wasn't inadvertently provided.  I need to go back to
7     the office and check on that.
8        MR. SCHMIDT:  Okay.
9        MR. GILLEN:  Thank you.
10 BY MR. SCHMIDT:
11 Q.   Dr. Nilsen, have you seen this document before today?
12 A.   I have reviewed over 2,000 documents.  Does this jump
13    out at me?  No.  Would I have reviewed it before?  I
14    believe so.
15 Q.   Do you recall seeing this e-mail at about the time it
16    was sent in June of 2004?
17 A.   Not to my recollection, no.
18 Q.   Were you aware in June of 2004 that Seth Cooper or
19    anyone from the Discovery Institute was reaching out and
20    trying to contact Mr. Bonsell?
21 A.   Not to my recollection, no.
22 Q.   If you would, look at the e-mail address at the top of
23    Plaintiffs 38.  Is the e-mail address for Mr. Bonsell
24    one that is provided by the School District?
25 A.   Yes.

Richard Nilsen 4/14/05 (Day 2)          Page 20

00049

1   that teachers were not to teach Intelligent Design?

2   A.   I am sorry.  I don't understand that.

3   Q.   Okay.  Why weren't the teachers to teach Intelligent

4        Design?

5   A.   Based on the fact that it is not one of the standards.

6        My reading of the curriculum documents tells me that the

7        amount of time devoted to Evolution is 19 days?

8   A.   No.

9   Q.   How much time is devoted to Evolution?

10  A.   One to two days.

11  Q.   What is the origin of life debate that is referred to in

12       the next sentence of Exhibit P-37.

13  A.   The origin of life debate is the origin of the creation

14       or beginning, the genesis, if you will, not using

15       Biblical references, but the beginning part of man

16  Q.   Of man?

17  A.   Yes.

18  Q.   What is Darwin's opinion about the origin of life as you

19       understand it?  I am now looking at the next sentence.

20  A.   I don't know.

21  Q.   What did you mean when you put that sentence in the

22       release?

23  A.   The Board believes that there are other options and

24       discussions on Darwin's opinion on the origins of life,

25       and I have communicated that.

00050

1   Q.   The sentence reads the School Board has noted that there

2        are opinions other than Darwin's on the origin of

3        life -- end of quote.

4            Do you know what Darwin's opinions on the origin

5        of life are?

6   A.   No.

7   Q.   Did you make any inquiry about what the Board had in

8        mind when it said there are other opinions?

9   A.   No.  But my context was some Board members differed with

10       Darwin's concept of origins of life and communicated

11       such publicly.

12  Q.   Why did you capitalize origin of life in these

13       sentences?

14  A.   I have no idea.

15  Q.   Are you aware of any opinions other than Darwin's

16       opinion on the origin of life, whatever that may be?

17  A.   Yes.

18  Q.   What are the other opinions that you are aware of?

19  A.   There is the opinion -- and I have no idea how to spell

20       it -- Plantaria, whatever it is, where there are aliens

21       that have come in some capacity.  The whole conversation

22       dealing with the pyramids and the structure that the

23       earth was created by an outside force, whatever that --

24       either alien as defined as an entity beyond homo sapiens

25       on earth.

00051

1         There is the Big Bang Theory of where the

2    beginning of time was created out of an explosion in

3    some capacity.  And there is also the conversation that

4    there is a Godlike entity that created earth and

5    everything on it.

6         MR. SCHMIDT:  Off the record, please.

7         (An off-the-record discussion was had.)

8         (Plaintiffs Exhibit 43 was marked.)

9   BY MR. SCHMIDT:

10  Q.   Dr. Nilsen, have you had an opportunity to review

11       Plaintiffs Exhibit 43?

12  A.   Yes, I have.

13  Q.   Identify the document, please.

14  A.   The document is Administrator's Biology Statement in

15       Biology Class.

16  Q.   Bates numbered 10991100.  Do you know who prepared this

17       document?

18  A.   Yes.

19  Q.   Who?

20  A.   I did.

21  Q.   What use was made of the document?

22  A.   The document was read in total by either myself or Mr.

23       Baksa.

24  Q.   Verbatim?

25  A.   99.9 percent.

00052

1   Q.   Was it the plan to stick --

2   A.   As close as possible.

3   Q.   Paragraph five on page two of the document includes a

4        statement that there will be no other discussion of the

5        issue and your teachers will not answer any questions on

6        this issue.

7            What is this issue that is referred to in that

8        paragraph?

9   A.   The issue of Intelligent Design.

10  Q.   When you prepared what has been marked as P-43, what was

11       your understanding of the difference between the

12       Intelligent Design explanation of the origin of life and

13       Darwin's explanation of the origin of life?

14  A.   When I prepared the document?

15  Q.   Right.

16  A.   At that time, I don't think I had an understanding.

17  Q.   Do you recall when you prepared the document?

18  A.   Yes.

19  Q.   When?

20  A.   It would have been in mid January.

21  Q.   Do you have an understanding now?

22  A.   I have somewhat of an understanding.  I don't think I

23       have a total understanding.

24  Q.   I can't ask for perfection, but what is your present

25       understanding?

00053
1  A   Intelligent Design refers to an order   Darwin refers to
2      randomness
3  Q   And how do those two notions that you have just stated
4      have to do with the origin of life?
5  A   As it relates to Darwin, there could be a randomness   I
6      think his theory is survival of the fittest   And
7      Intelligent Design has a specific design to it, not a
8      randomness
9  Q   I think I took that from the order versus random   But
10     what do those two notions have to do with what you have
11     used the phrase and it is used in this document the
12     origin of life, do you have any understanding of the
13     relationship between the two concepts you have referred
14     to and the origin of life?
15 A   Not beyond what I have said, no
16 Q   You have been an educator for going on 20 years?
17 A   Twenty-nine
18 Q   Twenty-nine years.  Can you recall any instance in your
19     career as an educator when students have been directed
20     that they are not to discuss topics, and students are
21     not permitted to comment on topics with students?
22        MR. GILLEN   Object to the form
23 A   Yes
24 BY MR. SCHMIDT
25 Q   Can you give me another circumstance besides this one?

00054
1  A   Political affiliation, sexual education, issues within
2      the community that are highly politically charged
3  Q   And religion?
4  A   And religion
5  Q   Did any parents or students ever contact you after the
6      statement was read?
7  A   Not that I remember, no
8  Q   I am going to show you a document that has been marked
9      previously as Plaintiffs 9.  Have you had an opportunity
10     to look at Exhibit P-9?
11 A   Look at it.  Read it in total, no
12 Q   Let me ask you some questions.  If you need to review it
13     in any detail, just let me know.  This is a document
14     that contains Bates numbered pages 944 through 951   Let
15     me ask you to turn first to page 946
16 A   (Witness complies.)
17 Q   Do you recognize this document?
18 A   Yes
19 Q   Is this the Biology One Curriculum that was in place
20     before October 18th, 2004?
21 A   To the best of my ability, yes
22 Q   I need your help to understand it.  As I read this
23     document, it suggested to me that there were 19 days out
24     of the biology curriculum devoted to natural selection,
25     the mechanism of Evolution and the origins of bio

00055
1      diversity   Have I read the top line correctly?
2  A   That's correct
3  Q   And it appears, for instance, that the references to
4      Darwin, Darwin's Theory of the origin of species and
5      issues involving Evolution are spread throughout this 19
6      day period?
7  A   That is what is written here, correct
8  Q   As I understood your testimony a few moments ago, it was
9      the Theory of Evolution was limited to two days in the
10     biology curriculum.   Did I mishear your testimony?
11 A   You did not
12 Q   Can you explain why you say two days and this appears to
13     say 19?
14 A   The ugliness that every Superintendent and Assistant
15     Superintendent has is the fact that teachers teach not
16     solely the outline of the planned instruction.   This
17     obviously is the case
18        Because when asking the specific teachers how many
19     days they spend on the theory, they said two   So I am
20     following what they have told us is the reality versus
21     what is in the planned course   Meaning this document is
22     obviously the instructional guide, but not what is in
23     practice
24 Q   As Superintendent are you concerned that the guide's
25     call for 19 days of instruction and your teachers are

00056
1      telling you they are only devoting two?
2  A   I think you noted my introductory comment of the
3      ugliness of it, and the answer is yes.  Whether the
4      planned course is misdone or the instruction is misdone.
5      I can't speak to that.  But obviously, both should be
6      similar.
7  Q   Back to page 944, have you seen this memorandum before
8      today, the memorandum from Trudy Peterman to Mr. Baksa,
9      Mr. Redding and Mrs. Spahr dated April 1, 2003?
10 A   Yes
11 Q   I am assuming you saw it in the course of preparing
12     documents for discovery in this case, but did you see it
13     about the time it was issued?
14 A   I have no recollection of that except to say that it is
15     carbon copied to me, and I would expect within my
16     responsibilities that I would have come across it.
17 Q   Would you have read it?
18 A   Yes.
19 Q   Do you recall doing anything in response to or following
20     receipt of this memorandum?
21 A   No
22 Q   You don't recall any discussions with Mr. Baksa or Mrs.
23     Spahr about it?
24 A   No.  Let me rephrase that.  About this specific memo
25     with Mr. Baksa?

00061

```
1  A.  No.
2  Q.  Why not?
3  A.  Two reasons.  One is the Superintendent doesn't have
4      direct supervision in the evaluation of teachers.  Those
5      are the individual responsibilities of the building
6      principal.
7          And secondly, this conversational capacity would
8      end up being between the conversation of Mr. Baksa, Dr.
9      Peterman and her eventual responsibilities of
10     evaluation.
11 Q.  I misunderstood that answer.
12 A.  Meaning if Mrs. Spahr is misquoting Mr. Baksa, it would
13     be Mr. Baksa's responsibility to communicate to Dr.
14     Peterman of the misquotation.
15 Q.  Do you know whether he did that or not?
16 A.  No.  I do not know that.
17 Q.  As I understand what happened in response to the two
18     sentences that appear at the beginning of -- I am sorry
19     -- three sentences that appear at the beginning of this
20     exhibit, Dr. Peterman is disciplined for having made a
21     statement that she heard from Mrs. Spahr, but Mrs. Spahr
22     is not disciplined for having made the original
23     statement which you and Mr. Baksa think is untrue?
24         MR. GILLEN:  Object to the form.
25 A.  I can speak to the first which is yes.  I can't speak to
```

00062

```
1      the other point based on the fact that I have not an
2      understanding of what Dr. Peterman did and what Mr.
3      Baksa did with the individual teacher.
4  Q.  Did you ask Dr. Peterman what she did in her supervision
5      of Mrs. Spahr about this subject?
6  A.  No, not this subject, no.
7  Q.  Is it your position as the Superintendent that when
8      somebody that you are evaluating repeats the statement
9      of another person, if that statement turns out to be
10     untrue, that the person you supervise bears the
11     responsibility for that untruth?
12         Let me withdraw the question.  It's too big.  I
13     have already got your answer on it.  I understand what
14     you did.
15         MR. GILLEN:  Thank you.  Tom.
16 BY MR. SCHMIDT:
17 Q.  Did you have any further discussion with Mr. Baksa about
18     the subject of his reported conversation with Mrs. Spahr
19     on the topics that are addressed in this memorandum?
20 A.  Yes.
21 Q.  When did you have that conversation with him?
22 A.  Over the past year.
23 Q.  Did you have a conversation with him around the time
24     that this memorandum was issued in April of '03?
25 A.  In a general sense, yes.  As it relates to specifics,
```

00063

```
1      no.
2  Q.  How did you reach the determination to give Dr. Peterman
3      a bad evaluation because of what appears in this first
4      paragraph without doing an investigation --
5          MR. GILLEN:  Object to the form.
6  BY MR. SCHMIDT:
7  Q.  -- with Mr. Baksa?
8          MR. GILLEN:  I am sorry.
9          MR. SCHMIDT:  That is all right.  I paused.
10 A.  The evaluation was not solely based on this individual
11     action.  It was significantly broader obviously than
12     this.  And the behavior reflected not solely the
13     information, but the process of the information.
14 BY MR. SCHMIDT:
15 Q.  Did you ever instruct Dr. Peterman about how she was to
16     behave or interact with the Board at Board meetings?
17 A.  Yes.
18 Q.  What instructions did you give her?
19 A.  The Board directed me to direct to her that when she
20     came to Board meetings, that she like every other
21     individual was to be recognized prior to coming to the
22     podium, was to direct her comments to the Board and not
23     the constituents.
24         She was also not to raise her voice.  She was also
25     not to pound the podium.  And she was to be on point,
```

00064

```
1      not wander off a point.
2  Q.  Did you give her those directions in writing?
3  A.  Yes.
4  Q.  Is that the current state of her instructions with
5      respect to Board meetings?
6  A.  She is no longer employed.
7  Q.  Was she fired?
8  A.  No.  She has since gone to another district where she is
9      in litigation with the Superintendent because the
10     Superintendent put her on leave, as the prior district
11     also put her on leave.  So out of three districts, two
12     out of the three, she was put on leave for behavior
13     unbecoming to an administrator.
14 Q.  I would like to show you a document that has previously
15     been marked as Plaintiffs 28.  I just have a quick
16     question or two about this.
17         Dr. Nilsen, at least initially, you can probably
18     answer my question by looking at the first page.  If
19     someone else has already asked this, I apologize to you.
20         But is this your handwriting on this document?
21 A.  No.
22 Q.  Do you know whose it is?
23 A.  Without certainty.  But it does look like Mr. Baksa's.
24     It is neater than mine.
25         MR. GILLEN:  Off the record.
```

00093
1 activistic stand against what the Supreme Court had
2 already done. There was a conversation we had about
3 what was currently being discussed in the national
4 paper, as well as what impact the Board -- I am sorry --
5 what impact the Supreme Court had directly on schools.
6 Q. Okay. Let me just go back to explain one line of
7 testimony you gave earlier this morning. I had asked
8 you a couple of questions about the origin of life
9 debate and what your understanding is of origin of life.
10 As I reflect back on your testimony, I am not sure
11 I understand what you mean when you refer in the
12 documents you have written and what you are
13 understanding is about the policy of the Board when it
14 refers to origin of life.
15 If you will bear with me for a minute, could you
16 explain it again?
17 A. My apologies, but I think you asked three different
18 questions
19 Q. I am sure I did. That is the topic -- if you would, tell
20 me again what your understanding is, Dr. Nilsen's
21 understanding is of the terms origin of life?
22 A. The beginning of mankind.
23 Q. Is it your understanding that that is what the Board
24 means when it included that term in its revised biology
25 curriculum?

Richard Nilsen 4/14/05 (Day 2)          Page 93

00094
1 A. I can't speak for the Board except to say that comment
2 is a reflection of what the teachers said they were
3 doing.
4 Q. Okay. This might be part of where I am getting lost.
5 What comment is a reflection of what the teachers said
6 they are doing?
7 A. Origins of life is not taught.
8 Q. Teachers say we're not teaching origins of life; is that
9 what you are saying?
10 A. Yes.
11 Q. And when the teachers say we are not teaching origins of
12 life, what do you understand them to be saying?
13 A. They are not teaching macro evolution.
14 Q. What do you mean by macro evolution?
15 A. The Big Bang Theory, the jumping from species to species
16 piece of Darwinian Theory.
17 Q. And is it your understanding as the Superintendent of
18 the Dover Area School District that when the Board
19 adopted its amended or revised curriculum, it was
20 reflecting that understanding of what the teachers were
21 doing?
22 A. Yes.
23 MR. SCHMIDT: All right. That is all I have.
24 Thank you. I appreciate your staying through lunch to
25 get this completed.

Richard Nilsen 4/14/05 (Day 2)          Page 94

00095
1 MR. GILLEN: I just have a few questions. Tom.
2 BY MR. GILLEN:
3 Q. Mr. Schmidt asked you a few questions. One set of them
4 related to Plaintiffs Deposition Exhibit 9 which is that
5 memo from Dr. Peterman. Tom asked you did you take
6 action in light of that, and you said no.
7 Just to be clear on this point, at the time that
8 you received this memo, did Dr. Peterman have a lot of
9 credibility with you?
10 A. Zero.
11 Q. Was it in large measure because this memo came from Dr.
12 Peterman which explained your inaction?
13 A. Two things. One, first of all, I knew no one was
14 discussing either from the administrative standpoint, or
15 the Board standpoint, or Mr. Baksa's standpoint, or my
16 standpoint any discussion of Creationism. So a memo
17 that generated and stated that there was a discussion of
18 Creationism had absolutely a non starter.
19 Secondly, as it related to Dr. Peterman, I didn't
20 believe anything she put in writing anyway. In fact,
21 one of the prior evaluations I had with her was to stop
22 putting things in writing because she would put things
23 in writing prior to knowing what actually was the
24 reality. And I had to spend time with her going back
25 and correcting what was on the record.

Richard Nilsen 4/14/05 (Day 2)          Page 95

00096
1 She had a long history of putting things in
2 writing that were inaccurate that we had to go back and
3 correct.
4 She had dictated to the faculty that she no longer
5 would talk to any faculty members, and that the only way
6 she would communicate with faculty members is through
7 Department Chairs. And the only way that Department
8 Chairs could talk to her is if they requested a meeting.
9 And then in the middle of that year '03-'04, she
10 communicated the Department Chair, she would no longer
11 talk to them. So she generated information that was
12 totally inaccurate in memo format.
13 So her credibility with me in any written format
14 was absolutely nonexistent. And eventually, it was
15 reflected in the end of the year evaluations.
16 Q. Tom also directed your attention to Plaintiff Exhibit
17 48. When I looked at it here today, I noticed that it
18 said any future communication pertaining to
19 Creationism/Intelligent Design intended for the Science
20 Department shall be in written form.
21 Is it accurate that the teachers when they
22 discussed Intelligent Design equated it with Creationism
23 in the way they have here in this memo?
24 A. Yes. There was never any communication ever on
25 Creationism. And they had a behavior of equating both,

Richard Nilsen 4/14/05 (Day 2)          Page 96

---

00009
1 correct, three of the districts -- or I am sorry --
2 three of the schools and which biology books they were
3 using.
4 Q. What was your role in 2004 in the work of the curriculum
5 committee's to select or recommend, rather, new
6 textbooks in the School District?
7 A. My role as Superintendent were to place the book that
8 Mr. Baksa as Director of Curriculum Instruction -- to
9 place his recommendation on the Board agenda.
10 Q. It sounds like your role is passive. You simply take
11 whatever Baksa gives you and put it on the agenda
12 without making any judgments about whether it is an
13 appropriate recommendation; am I right about that?
14 A. Passive to the extent of where Mr. Baksa in his capacity
15 makes the recommendation. In this case and in most
16 cases, his recommendation has been put on where I have
17 not questioned his recommendation beyond the fact that
18 did he follow procedure. And when he communicated to me
19 he did, it was placed on the agenda.
20 Q. Mr. Baksa described some of the work that he did with
21 the curriculum committees in the summer of 2004. I
22 believe from his testimony that this inquiry to the
23 parochial schools followed a June meeting of the School
24 District Board when the biology textbook issue was
25 discussed.

Richard Nilsen 4/14/05 (Day 2)        Page 9

00010
1 Were you at that School Board meeting?
2 A. Yes.
3 Q. Do you recall the discussion about biology textbooks in
4 the high school?
5 A. I remember the discussion, the specifics. I am not sure
6 I remember all of them.
7 Q. What do you remember of the discussion?
8 A. I remember that Mr. Buckingham had some concerns about
9 the textbook and was interested in looking at other
10 options.
11 Q. What do you recall he said about his concerns about the
12 textbook?
13 A. I believe he communicated his dissatisfaction with how
14 the Darwinian Theory of Evolution was presented in the
15 book.
16 Q. Was his dissatisfaction with how the Darwinian Theory
17 was presented, or was his dissatisfaction with the
18 amount of any other theory being presented?
19 A. My only recollection is how the Darwinian Theory was
20 presented.
21 Q. Did he say about his dissatisfaction?
22 A. His dissatisfaction -- and again that documentation I believe
23 you have -- of some of concerns about how evolution was
24 presented in the book. Beyond that, I don't
25 recollect what was specifically stated and/or written.

Richard Nilsen 4/14/05 (Day 2)        Page 10

00011
1 Q. Did you make any notes yourself of the discussion of the
2 biology textbook at that June Board meeting?
3 A. No.
4 Q. Do you have a practice of making notes during Board
5 meetings?
6 A. Yes.
7 Q. What do you do with those notes?
8 A. All the notes I take are actions the Board has requested
9 me to do and/or any changes in future agenda items.
10 Once those items have been completed, those notes are
11 thrown out.
12 Q. Did you make notes of the discussion of the biology
13 textbook at the June meeting?
14 A. No.
15 Q. Did you have any conversation with Mr. Baksa after that
16 meeting about the actions that should follow in
17 connection with Mr. Buckingham's concerns or any other
18 discussion that happened at that June meeting?
19 A. Yes.
20 Q. What was that discussion with Baksa?
21 A. My discussion with Mr. Baksa was he had to decide what
22 direction he was going to go with as it related to the
23 textbook and when the textbook decision was to be made.
24 Q. At that time, I mean at the time of your discussion with
25 Mr. Baksa, what did you think the directions were that

Richard Nilsen 4/14/05 (Day 2)        Page 11

00012
1 he needed to consider?
2 A. I think he needed to consider answering whatever
3 concerns Mr. Buckingham and/or any other Board member
4 had with the present recommended book Miller and Levin
5 Biology.
6 Q. I understand that. But what did you think his options
7 were? You referred -- and I am using the word options.
8 You referred to he needed to decide what direction he
9 was going to go in. That suggests to me that there
10 were -- there was more than one direction available to
11 Baksa.
12 What did you have in mind when you had that
13 conversation with him?
14 A. I don't recommend -- my apologies. I don't recollect
15 the full conversation, but obviously, there would be
16 two. One would be to continue the conversation on the
17 current book. Or two, look for other options that
18 possibly anybody and everybody would be satisfied with.
19 Q. Did you give him any suggestions for how to find out
20 more about other options than simply persisting with the
21 Miller and Levin book?
22 A. Again, I don't remember any specific. It would not be
23 out of character for me to tell him to call and make
24 sure he has contacted every other district and everyone
25 he knows of to see if there would have been another

Richard Nilsen 4/14/05 (Day 2)        Page 12

00013
1  textbook.
2      Now do I remember that specific conversation? No.
3  Would it be out of my character? Again, no.
4  Q. Is it possible that in that conversation you suggested
5     that he not only contact other public school districts
6     but that he contact parochial schools in the area?
7  A. It is possible I told him to contact everybody and
8     anybody that he hadn't contacted before.
9  Q. When you first saw the memorandum reporting on his
10    contacts with parochial schools, what did you do with
11    that information?
12 A. Read it.
13 Q. Did you talk to him about it?
14 A. Yes, but I don't remember the conversation.
15 Q. Were you surprised when you got the memorandum to see
16    that it only reported on contacts with parochial schools
17    and didn't provide any information about contacts with
18    other area schools?
19 A. No.
20 Q. I ask why not?
21 A. Because I would have assumed he would have contacted the
22    other parochial schools beforehand.
23 Q. Did you mean most of the other public schools?
24 A. Yes, my apologies.
25 Q. Did you know that he actually did make those contacts?

Richard Nilsen 4/14/05 (Day 2)            Page 13

00014
1  A. No, I don't know that as a fact.
2  Q. Did you suggest at any time to Mr. Baksa that he speak
3     with any of the families that are providing home
4     schooling in your district --
5  A. No.
6  Q. -- to see what textbooks they used?
7  A. No.
8  Q. Did you make any inquiries on your own about alternative
9     biology textbooks?  That is alternatives to Miller and
10    Levin.
11 A. No.
12 Q. What was done, if you know, with the information that
13    Mr. Baksa collected about the books being used in
14    parochial schools?
15 A. I do not know.
16 Q. Did you share the memorandum or that information with
17    any Board member?
18 A. I have no recollection of that.
19 Q. Did you ask Mr. Baksa to share that information with any
20    Board member?
21 A. I have no recollection of that either.
22 Q. I am trying to understand what happened when he
23    developed the information.  You received the
24    information, and the sense I have is that it landed on a
25    piece of paper, and the piece of paper landed in a

Richard Nilsen 4/14/05 (Day 2)            Page 14

00015
1  drawer or in a file, and that no use was made of it.
2  A. Well --
3  Q. I'm trying to figure out what use was made of that
4     information since somebody went to the trouble to
5     collect it.
6  A. Well, I think that is a question that needs to be
7     directed to Mr. Baksa being he generated information and
8     it was his responsibility to research and make the
9     recommendation on the textbook.
10 Q. Did you see at this time, which is after the June Board
11    meeting, that the selection of a biology textbook had
12    not just the selection of another textbook but had
13    become a matter of primary interest to the Board, at
14    least in terms of its curriculum responsibilities?
15 A. I am sorry. I don't understand the question.
16 Q. It was a cumbersome question.  Can you remember any
17    other debate and discussion involving the teachers, the
18    administration and the Board on a textbook selection
19    that has the same characteristics as what you and the
20    District have been through since last June on the
21    selection of a biology textbook?
22 A. Yes.
23 Q. Which textbook was that?
24 A. The chemistry book the prior year and the family
25    consumer science books the prior year.

Richard Nilsen 4/14/05 (Day 2)            Page 15

00016
1  Q. What was the controversy involving the chemistry book?
2  A. The financial issue, as well as the issue of whether the
3     teachers needed the book or not.
4  Q. By financial, you mean the cost of the book?
5  A. The ability for the District to pay for a new book.
6  Q. I assume whether the teachers needed it or not was an
7     aspect of that financial decision?
8  A. Yes.
9  Q. And the other book was family consumer science?
10 A. That is correct.
11 Q. What was the controversy surrounding that?
12 A. The controversy surrounded whether it was an identical
13    replacement of the book that the faculty already had,
14    and the issue of whether the Board could once again
15    finance a textbook that the teachers already had in
16    their possession.
17 Q. It strikes me that both of those controversies -- and I
18    will use that word in quotes -- involved basically
19    financial considerations, cost considerations.  It
20    appears to me that the discussions about the biology
21    book involve its contents.
22     Can you think of any other situation when a book
23    is being considered by the Board for inclusion in the
24    curriculum when there has been this kind of attention
25    and controversy devoted to that subject?

Richard Nilsen 4/14/05 (Day 2)            Page 16

00017
1  A.  I will clarify your question.  The family consumer
2      science book was content issue based on the fact that
3      they thought the content was already in our curriculum
4      and didn't see the reason to purchase another book that
5      had the same content.
6  Q.  Okay.
7  A.  Not specifically along the same lines, but along the
8      same general conversation.  The District gets a donation
9      from the county on a book pamphlet that we give to our
10     students that has a number of agencies listed in it, and
11     a Board member and a parent had a considerable concern
12     on the information that was in the book, specifically
13     dealing with content dealing with sexual education and
14     issues concerning specific agencies that was in there.
15         To the point of where we ended up sending home
16     information prior to the students receiving the books,
17     as well as a discussion of whether to even continue
18     handing out the individual books.
19         And through my experience, not only in this
20     district, but other districts, any time we have adopted
21     a health curriculum, there has always been conversations
22     zeroing in on what is and what is not taught as it
23     relates to the curriculum.
24         Mr. Bonsell and I had conversations and I believe
25     a third party, but nonetheless I believe Mr. Bonsell has

             Richard Nilsen 4/14/05 (Day 2)          Page 17

00018
1      also talked to Mr. Baksa about the health curriculum in
2      our education dealing with abstinence.
3          I know Mr. Baksa is meeting next week, if not the
4      following week, with another Board member dealing with
5      our drug and alcohol curriculum, specifically where
6      inhalants are being taught.
7          If your question is does the Board hold
8      discussions on multiple issues with content beyond this
9      individual issue, my experience is yes.
10 Q.  On those issues where the Board has either demonstrated
11     or expressed a keen interest in a decision like the
12     distribution of a pamphlet, or the selection of a
13     textbook, is it your practice as Mr. Baksa's supervisor
14     and as the Superintendent of Schools to basically say we
15     have got to pay attention to this, get it right, be sure
16     that we do what we need to do to be giving all the
17     information to the Board and do the best job we can?
18         You don't treat it as a routine matter; do you?
19         MR. GILLEN:  I object to the form.
20 A.  I think it is a routine matter.  I think that routine
21     matter of the Board's reviewing curriculum and making
22     decisions about curriculum is routine.  Board members
23     historically have had conversations about what is in the
24     curriculum, and their recommendations on what should be
25     in the curriculum, and what type of curriculum should be

             Richard Nilsen 4/14/05 (Day 2)          Page 18

00019
1      placed in our planned courses.  That is a routine
2      matter.
3  BY MR. SCHMIDT:
4  Q.  At the time of the June meeting in 2004, had you ever
5      heard of the notion of Intelligent Design?
6  A.  Not that I can remember, no.
7  Q.  Do you remember your first contact with the Discovery
8      Institute?  And by you in this case, I am referring to
9      you personally.
10 A.  Me personally, yes.
11 Q.  When did that contact take place?
12 A.  The fall of 2004.
13 Q.  Where did the contact take place?
14 A.  Over the phone.
15 Q.  Who else was involved in the telephone contact?
16 A.  No one else.
17 Q.  That wasn't meant to be a trick question.  You were on
18     the phone.  Who else was on the phone; somebody from the
19     Discovery Institute?
20 A.  Yes.
21 Q.  Do you remember who it was?
22 A.  No, I don't.
23 Q.  Do you know someone named Seth Cooper?
24 A.  Yes.
25 Q.  There is a deposition exhibit that has previously been

             Richard Nilsen 4/14/05 (Day 2)          Page 19

00020
1      marked as Plaintiff 38 which I would ask you to take a
2      look at?
3  A.  (Witness complies.)
4          MR. GILLEN:  Tom, I mentioned to Eric yesterday
5      that 40, I have a problem with in that I am not sure if
6      it wasn't inadvertently provided.  I need to go back to
7      the office and check on that.
8          MR. SCHMIDT:  Okay.
9          MR. GILLEN:  Thank you.
10 BY MR. SCHMIDT:
11 Q.  Dr. Nilsen, have you seen this document before today?
12 A.  I have reviewed over 2,000 documents.  Does this jump
13     out at me?  No.  Would I have reviewed it before?  I
14     believe so.
15 Q.  Do you recall seeing this e-mail at about the time it
16     was sent in June of 2004?
17 A.  Not to my recollection, no.
18 Q.  Were you aware in June of 2004 that Seth Cooper or
19     anyone from the Discovery Institute was reaching out and
20     trying to contact Mr. Bonsell?
21 A.  Not to my recollection, no.
22 Q.  If you would, look at the e-mail address at the top of
23     Plaintiffs 38.  Is the e-mail address for Mr. Bonsell
24     one that is provided by the School District?
25 A.  Yes.

             Richard Nilsen 4/14/05 (Day 2)          Page 20

00049
1    that teachers were not to teach Intelligent Design?

2  A.  I am sorry. I don't understand that.

3  Q.  Okay. Why weren't the teachers to teach Intelligent

4       Design?

5  A.  Based on the fact that it is not one of the standards.

6  Q.  My reading of the curriculum documents tells me that the

7       amount of time devoted to Evolution is 19 days?

8  A.  No.

9  Q.  How much time is devoted to Evolution?

10 A.  One to two days.

11 Q.  What is the origin of life debate that is referred to in

12      the next sentence of Exhibit P-37.

13 A.  The origin of life debate is the origin of the creation

14      or beginning, the genesis, if you would, not using

15      Biblical references, but the beginning part of man.

16 Q.  Of man?

17 A.  Yes.

18 Q.  What is Darwin's opinion about the origin of life as you

19      understand it? I am now looking at the next sentence.

20 A.  I don't know.

21 Q.  What did you mean when you put that sentence in the

22      release?

23 A.  The Board believes that there are other options and

24      discussions on Darwin's opinion on the origins of life,

25      and I have communicated that.

Richard Nilsen 4/14/05 (Day 2)                    Page 49

00050
1  Q.  The sentence reads the School Board has noted that there

2       are opinions other than Darwin's on the origin of

3       life -- end of quote.

4           Do you know what Darwin's opinions on the origin

5       of life are?

6  A.  No.

7  Q.  Did you make any inquiry about what the Board had in

8       mind when it said there are other opinions?

9  A.  No. But my context was some Board members differed with

10      Darwin's concept of origins of life and communicated

11      such publicly.

12 Q.  Why did you capitalize origin of life in these

13      sentences?

14 A.  I have no idea.

15 Q.  Are you aware of any opinions other than Darwin's

16      opinion on the origin of life, whatever that may be?

17 A.  Yes.

18 Q.  What are the other opinions that you are aware of?

19 A.  There is the opinion -- and I have no idea how to spell

20      it -- Pinstaria, whatever it is, where there are aliens

21      that have come in some capacity. The whole conversation

22      dealing with the pyramids and the structure that the

23      earth was created by an outside force, whatever that --

24      either alien as defined as an entity beyond homo sapiens

25      on earth.

Richard Nilsen 4/14/05 (Day 2)                    Page 50

00051
1           There is the Big Bang Theory of where the

2       beginning of time was created out of an explosion in

3       some capacity. And there is also the conversation that

4       there is a Godlike entity that created earth and

5       everything on it.

6           MR. SCHMIDT:  Off the record, please.

7           (An off-the-record discussion was had.)

8           (Plaintiff's Exhibit 43 was marked.)

9  BY MR. SCHMIDT:

10 Q.  Dr. Nilsen, have you had an opportunity to review

11      Plaintiff's Exhibit 43?

12 A.  Yes, I have.

13 Q.  Identify the document, please.

14 A.  The document is Administrator's Biology Statement in

15      Biology Class.

16 Q.  Bates numbered 10991100. Do you know who prepared this

17      document?

18 A.  Yes.

19 Q.  Who?

20 A.  I did.

21 Q.  What use was made of the document?

22 A.  The document was read in total by either myself or Mr.

23      Baksa.

24 Q.  Verbatim?

25 A.  99.9 percent.

Richard Nilsen 4/14/05 (Day 2)                    Page 51

00052
1  Q.  Was it the plan to stick --

2  A.  As close as possible.

3  Q.  Paragraph five on page two of the document includes a

4       statement that there will be no other discussion of the

5       issue and your teachers will not answer any questions on

6       this issue.

7           What is this issue that is referred to in that

8       paragraph?

9  A.  The issue of Intelligent Design.

10 Q.  When you prepared what has been marked as P-43, what was

11      your understanding of the difference between the

12      Intelligent Design explanation of the origin of life and

13      Darwin's explanation of the origin of life?

14 A.  When I prepared the document?

15 Q.  Right.

16 A.  At that time, I don't think I had an understanding.

17 Q.  Do you recall when you prepared the document?

18 A.  Yes.

19 Q.  When?

20 A.  It would have been in mid January.

21 Q.  Do you have an understanding now?

22 A.  I have somewhat of an understanding. I don't think I

23      have a total understanding.

24 Q.  I can't ask for perfection, but what is your present

25      understanding?

Richard Nilsen 4/14/05 (Day 2)                    Page 52

00053
1  A.  Intelligent Design refers to an order.  Darwin refers to
2      randomness.
3  Q.  And how do those two notions that you have just stated
4      have to do with the origin of life?
5  A.  As it relates to Darwin, there could be a randomness.  I
6      think his theory is survival of the fittest.  And
7      Intelligent Design has a specific design to it, not a
8      randomness.
9  Q.  I think I took that from the order versus random.  But
10     what do those two notions have to do with what you have
11     used the phrase and it is used in this document the
12     origin of life, do you have any understanding of the
13     relationship between the two concepts you have referred
14     to and the origin of life?
15  A. Not beyond what I have said, no.
16  Q.  You have been an educator for going on 20 years?
17  A.  Twenty-nine.
18  Q.  Twenty-nine years.  Can you recall any instance in your
19      career as an educator when students have been directed
20      that they are not to discuss topics, and teachers are
21      not permitted to comment on topics with students?
22          MR. GILLEN:  Object to the form.
23  A.  Yes.
24  BY MR. SCHMIDT:
25  Q.  Can you give me another circumstance besides this one?

00054
1  A.  Political affiliation, sexual education, issues within
2      the community that are highly politically charged.
3  Q.  And religion?
4  A.  And religion.
5  Q.  Did any parent or students ever contact you after the
6      statement was read?
7  A.  Not that I remember, no.
8  Q.  I am going to show you a document that has been marked
9      previously as Plaintiff's 9.  Have you had an opportunity
10     to look at Exhibit P-97.
11  A. Look at it.  Read it in total, no.
12  Q.  Let me ask you some questions.  If you need to review it
13      in any detail, just let me know.  This is a document
14      that contains Bates numbered pages 944 through 951.  Let
15      me ask you to turn first to page 946.
16  A.  (Witness complies.)
17  Q.  Do you recognize this document?
18  A.  Yes.
19  Q.  Is this the Biology One Curriculum that was in place
20      before October 18th, 2004?
21  A.  To the best of my ability, yes.
22  Q.  I need your help to understand it.  As I read this
23      it suggested to me that there were 19 days out
24      of the biology curriculum devoted to natural selection,
25      the mechanism of Evolution and the origins of bio

00055
1  diversity.  Have I read the top line correctly?
2  A.  That's correct.
3  Q.  And it appears, for instance, that the references to
4      Darwin, Darwin's Theory of the origin of species and
5      issues involving Evolution are spread throughout this 19
6      day period?
7  A.  That is what is written here, correct.
8  Q.  As I understood your testimony a few moments ago, it was
9      that Theory of Evolution was limited to two days in the
10     biology curriculum.  Did I misheard your testimony?
11  A.  You did not.
12  Q.  Can you explain why you say two days and this appears to
13      say 19?
14  A.  The realness that every Superintendent and Assistant
15      Superintendent has is the fact that teachers teach not
16      solely the outline of the planned instruction.  This
17      obviously is the case.
18      Because when asking the specific teachers how many
19      days they spend on the theory, they said two.  So I am
20      following what they have told us in the reality versus
21      what is in the planned course.  Meaning this document is
22      obviously the instructional guide, but not what is in
23      practice.
24  Q.  As Superintendent, are you concerned that the guide's
25      call for 19 days of instruction and your teachers are

00056
1  telling you they are only devoting two?
2  A.  I think you noted my introductory comment of the
3      realness of it, and the answer is yes.  Whether the
4      planned course is misdone or the instruction is misdone,
5      I can't speak to that.  But obviously, both should be
6      
7  Q.  Turn to page 944, have you seen this memorandum before
8      today, the memorandum from Trudy Peterman to Mr. Baksa,
9      Mr. Redding and Mrs. Spahr dated April 1, 2003?
10  A.  Yes.
11  Q.  I am assuming you saw it in the course of preparing
12      documents for discovery in this case, but did you see it
13      about the time it was issued?
14  A.  I have no recollection of that except to say that it is
15      certain copied to me, and I would expect within my
16      
17      Would you have read it?
18  A.  Yes.
19  Q.  Do you recall doing anything in response to or following
20      receipt of this memorandum?
21  A.  No.
22  Q.  You don't recall any discussions with Mr. Baksa or Mrs.
23      Spahr about it?
24  A.  No.  Let me rephrase that.  About this specific memo
25      with Mr. Baksa?

00061
1  A.  No.
2  Q.  Why not?
3  A.  Two reasons. One is that Superintendent doesn't have
4      direct supervision in the evaluation of teachers.  Those
5      are the individual responsibilities of the building
6      principal.
7          And secondly, this conversational capacity would
8      end by being between the conversation of Mr. Balza, Dr.
9      Peterman, and the external responsibilities of
10     evaluation.
11 Q.  I understand that answer.
12 A.  Meaning if Dr. Peterman is misquoting Mr. Balza, it would
13     be his, Balza's responsibility to communicate to Dr.
14     Peterman of his interpretation.
15 Q.  Do you know whether he did that or not?
16 A.  No, I do not know that.
17 Q.  As I understand what happened in response to the two
18     sentences that appear at the beginning of -- I am sorry
19     -- three sentences that appear at the beginning of this
20     exhibit, Dr. Peterman is disciplined for having made a
21     statement that she heard from Mrs. Spahr, but Mrs. Spahr
22     is not disciplined for having made the original
23     statement which you and Mr. Balza think is untrue?
24         MR. GILLEN:  Object to the form.
25 A.  I can speak to the first which is yes.  I can't speak to

00062
1      the other point based on the fact that I have not an
2      understanding of what Dr. Peterman did and what Mr.
3      Balza did with the individual teacher.
4  Q.  Did you ask Dr. Peterman what she did in her supervision
5      of Mrs. Spahr about this subject?
6  A.  No, not this subject, no.
7  Q.  Is it your position as the Superintendent that when
8      somebody that you are evaluating repeats the statement
9      of another person, if that statement turns out to be
10     untrue, that the person you supervise bears the
11     responsibility for that untruth?
12         Let me withdraw the question.  It's too big.  I
13     have already got your answer on it.  I understand what
14     you did.
15         MR. GILLEN:  Thank you, Tom.
16 BY MR. SCHMIDT:
17 Q.  Did you have any further discussion with Mr. Balza about
18     the subject of his reported conversation with Mrs. Spahr
19     on the topics that are addressed in this memorandum?
20 A.  Yes.
21 Q.  When did you have that conversation with him?
22 A.  Over the past year.
23 Q.  Did you have a conversation with him around the time
24     that this memorandum was issued in April of '03?
25 A.  In a general sense, yes.  As it relates to specifics,

00063
1      no.
2  Q.  How did you reach the determination to give Dr. Peterman
3      a bad evaluation because of what appears in this first
4      paragraph without doing an investigation --
5          MR. GILLEN:  Object to the form.
6  BY MR. SCHMIDT:
7  Q.  -- with Mr. Balza?
8          MR. GILLEN:  I am sorry.
9          MR. SCHMIDT:  That is all right.  I paused.
10 A.  The evaluation was not solely based on this individual
11     action.  It was significantly broader obviously than
12     this.  And the behavior reflected not solely the
13     information, but the process of the evaluation.
14 BY MR. SCHMIDT:
15 Q.  Did you ever instruct Dr. Peterman about how she was to
16     behave or interact with the Board at Board meetings?
17 A.  Yes.
18 Q.  What instructions did you give her?
19 A.  The Board directed me to direct to her that when she
20     came to Board meetings, that she like every other
21     individual was to be recognized prior to coming to the
22     podium, was to direct her comments to the Board and not
23     the constituents.
24         She was also not to raise her voice.  She was also
25     not to pound the podium.  And she was to be on point,

00064
1      not wander off a point.
2  Q.  Did you give her those directions in writing?
3  A.  Yes.
4  Q.  Is that the current state of her instructions with
5      respect to Board meetings?
6  A.  She is no longer employed.
7  Q.  Was she fired?
8  A.  No.  She has since gone to another district where she is
9      in litigation with the Superintendent because the
10     Superintendent put her on leave, as the prior district
11     also put her on leave.  So out of three districts, two
12     out of the three, she was put on leave for behavior
13     unbecoming to an administrator.
14 Q.  I would like to show you a document that has previously
15     been marked as Plaintiffs 28.  I just have a quick
16     question or two about this.
17         Dr. Nilsen, at least initially, you can probably
18     answer my question by looking at the first page.  If
19     someone else has already asked this, I apologize to you.
20         But is that your handwriting on this document?
21 A.  No.
22 Q.  Do you know whose it is?
23 A.  Without certainty.  But it does look like Mr. Balza's.
24     It is neater than mine.
25         MR. GILLEN:  Off the record.

00093
1   activistic stand against what the Supreme Court had
2   already done.  There was a conversation we had about
3   what was currently being discussed in the national
4   paper, as well as what impact the Board -- I am sorry --
5   what impact the Supreme Court had directly on schools.
6 Q.  Okay.  Let me just go back to explain one line of
7   testimony you gave earlier this morning.  I had asked
8   you a couple of questions about the origin of life
9   debate and what your understanding is of origin of life.
10      As I reflect back on your testimony, I am not sure
11   I understand what you mean when you refer in the
12   documents you have written and what you are
13   understanding is about the policy of the Board when it
14   refers to origin of life.
15      If you will bear with me for a minute, could you
16   explain it again?
17 A.  My apologies, but I think you asked three different
18   questions.
19 Q.  I am sure I did.  That is the topic.  If you would, tell
20   me again what your understanding is, Dr. Nilsen ▓▓▓▓▓▓
21   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
22 A.  The beginning of mankind --
23 Q.  Is it your understanding that that is what the Board
24   means when it included that term in its revised biology
25   curriculum?

Richard Nilsen 4/14/05 (Day 2)          Page 93

00094
1 A.  I can't speak for the Board except to say that comment
2   is a reflection of what the teachers said they were
3   doing.
4 Q.  Okay.  That might be part of where I am getting lost.
5   What comment is a reflection of what the teachers said
6   they were doing?
7 A.  Origin of life is not taught.
8 Q.  Teachers are not teaching origin of life; is that
9   what you are saying?
10 A.  Yes.
11 Q.  And when the teachers say you are not teaching origins of
12   life, who are you understanding them to be saying?
13 A.  They are not teaching evolution.
14 Q.  What do you mean by teaching evolution?
15 A.  The evolution, like the jumping from species to species
16   period of Darwinian Theory.
17 Q.  And is it your understanding that the Superintendent of
18   the Dover Area School District and when the Board
19   adopted its amended or revised curriculum, it was
20   reflecting that understanding of what the teachers were
21   doing?
22 A.  Yes.
23      MR. SCHMIDT:  All right.  That is all I have.
24   Thank you.  I appreciate your staying through lunch to
25   get this completed.

Richard Nilsen 4/14/05 (Day 2)          Page 94

00095
1      MR. GILLEN:  I just have a few questions, Tom.
2 BY MR. GILLEN:
3 Q   Mr. Schmidt asked you a few questions.  One set of them
4   related to Plaintiffs Deposition Exhibit 9 which is that
5   memo from Dr. Peterman.  Tom asked you did you take
6   action in light of that, and you said no.
7      Just to be clear on this point, at the time that
8   you received this memo, did Dr. Peterman have a lot of
9   credibility with you?
10 A.  Zero.
11 Q.  Was it in large measure because this memo came from Dr.
12   Peterman which explained your inaction?
13 A.  Two things.  One, first of all, I knew no one was
14   discussing either from the administrative standpoint, or
15   the Board standpoint, or Mr. Baksa's standpoint, or my
16   standpoint any discussion of Creationism.  So a memo
17   that generated and stated that there was a discussion of
18   Creationism had absolutely a non starter.
19      Secondly, as it related to Dr. Peterman, I didn't
20   believe anything she put in writing anyway.  In fact,
21   one of the prior evaluations I had with her was to stop
22   putting things in writing because she would put things
23   in writing prior to knowing what actually was the
24   reality.  And I had to spend time with her going back
25   and correcting what was on the record.

Richard Nilsen 4/14/05 (Day 2)          Page 95

00096
1      She had a long history of putting things in
2   writing that were inaccurate that we had to go back and
3   correct.
4      She had dictated to the faculty that she no longer
5   would talk to any faculty members, and that the only way
6   she would communicate with faculty members is through
7   Department Chairs.  And the only way that Department
8   Chairs could talk to her is if they requested a meeting.
9      And then in the middle of that year '03-'04, she
10   communicated the Department Chair, she would no longer
11   talk to them.  So she generated information that was
12   totally inaccurate in memo format.
13      So her credibility with me in any written format
14   was absolutely nonexistent.  And eventually, it was
15   reflected in the end of the year evaluations.
16 Q.  Tom also directed your attention to Plaintiff Exhibit
17   48.  When I looked at it here today, I noticed that it
18   said any future communication pertaining to
19   Creationism/Intelligent Design intended for the Science
20   Department shall be in written form.
21      Is it accurate that the teachers when they
22   discussed Intelligent Design equated it with Creationism
23   in the way they have here in this memo?
24 A.  Yes.  There was never any communication ever on
25   Creationism.  And they had a behavior of equating both,

Richard Nilsen 4/14/05 (Day 2)          Page 96