# APPENDIX I

# TAB A

# In The Matter Of:

*Tammy Kitzmiller, et al.   v.*
*Dover Area School District, et al.*

---

*Michael Baksa*
*March 9, 2005*

---

*Filius & McLucas Reporting Service, Inc.*
*1427 East Market Street, York, PA*
*4309 Linglestown Road, Harrisburg, PA*

*(717) 845-6418   or   (717) 236-0623*

*Original File MB030905.PRN, 199 Pages*
*Min-U-Script® File ID: 1831012083*

## Word Index included with this Min-U-Script®

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Michael Baksa
March 9, 2005

---

**Page 1**

[1]       IN THE COURT OF COMMON PLEAS OF
                DAUPHIN COUNTY, PENNSYLVANIA
[2]
[3] TAMMY KITZMILLER,      .
      et al.,
[4]      Plaintiffs  .
              . Civil Action No. 04-CV-2688
[5]      vs.
[6] DOVER AREA SCHOOL      . (JUDGE JONES)
      DISTRICT, et al.,
[7]      Defendant  .
[8]
[9]
[10]   Deposition of:  MICHAEL BAKSA
[11]   Taken by            : Plaintiffs
[12]   Date               : March 9, 2005; 9:30 a.m.
[13]   Place              : 200 One Keystone Plaza
                Harrisburg, Pennsylvania
[14]
      Before             : Susan D. Kashmere, RPR
[15]      Reporter - Notary Public
[16]
[17] APPEARANCES:
[18]   PEPPER HAMILTON, LLP
      By:  ERIC ROTHSCHILD, ESQ.
[19]
      For - Plaintiffs
[20]
      THOMAS MORE LAW CENTER
[21]   By: PATRICK GILLEN, ESQ.
[22]      For - Defendants
[23] ALSO PRESENT:
[24]   BARRIE CALLAHAN
[25]

---

**Page 2**

[1]              INDEX
                 WITNESS
[2]
      MICHAEL BAKSA        Examination
[3]
      By Mr. Rothschild         4, 196
[4]
      By Mr. Gillen             195
[5]
                 EXHIBITS
[6]
      P. Deposition
[7] Exhibit Numbers          Page
[8] 9   8-page document, Bates Numbers     38
      000944 through 000951
[9]
      10   Document entitled "Beyond the    49
[10]   'Evolution vs. Creation' Debate"
[11] 11 Document Bates Number 000208, titled   51
      "Product Profile"
[12]
      12 Document Bates Number 001084, titled   52
[13]   "Product Profile"
[14] 13   Dover Area School District, Survey  57
      of Biology Books Used in Area Schools
[15]
      14 4-page document, handwritten notes on    60
[16]   "from the desk of Michael R. Baksa,
      Assistant Superintendent", Bates
[17]   Numbers 000952 through 000955
[18] 15 Document entitled "The Wedge Strategy"   105
[19] 16 Handwritten notes entitled "Biology    114
      Meeting - 6/24/04", Bates Numbers
[20]   000056 through 000060
[21] 17 Dover Area School District, Survey of   118
      Biology Books Used in Area Schools,
[22]   Bates Number 000055
[23] 18 47-page document, Bates Numbers 000897   129
      through 000943
[24]
      19   Dover Area School District News,  151
[25]   Biology Curriculum Update, February
      2005

---

Michael Baksa
March 9, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 3

[1]
        INDEX(Cont'd.)
[2]          EXHIBITS
[3] P Deposition
    Exhibit Numbers              Page
[4]
    20 Dover Area School District Memorandum   153
[5]      dated September 20, 2004
[6] 21 Dover Area School District Memorandum   153
        dated September 21, 2004
[7]
    22  Board Curriculum Council Meeting,  159
[8]      October 7, 2004, Proposed Curriculum
        Changes, Bates Number 000035
[9]
    23  Board Curriculum Council Meeting,  159
[10]     October 7, 2004, Proposed Curriculum
        Changes, Bates Number 000036
[11]
    24 Dover Area School District Memorandum   166
[12]     dated October 13, 2004, Bates
        Numbers 000019 through 000027
[13]
    25 E-mail dated 10/19/04, Michael Baksa   180
[14]     to Brad Neal
[15] 26 Handwritten notes, Bates Number 000963   189
[16] 27  2-page document, handwritten notes 192
        and typewritten memo, Bates Numbers
[17]     000975 and 000976
[18] Previously Marked Exhibits      Page
[19] P-4  NewsBank InfoWeb NewsLibrary     66
[20] P-8  Dover Area School District Biology I   32
        Planned Course/Curriculum Guide
[21]
[22]
[23]
[24]
[25]

Page 4

STIPULATION

[1]

[2] It is hereby stipulated by and between

[3] counsel for the respective parties that

[4] sealing, filing, and certification are hereby

[5] waived; and that all objections, except as to

[6] the form of the question, are reserved to the

[7] time of trial.

[8]    MICHAEL BAKSA, called as a witness, being

[9] duly sworn, testified as follows:

[10]        EXAMINATION

[11]  BY MR. ROTHSCHILD:

[12]    Q: Good morning, Mr. Baksa. I've introduced

[13] myself off the record, but let me introduce

[14] myself on the record. My name is Eric

[15] Rothschild. I'm from the law firm of Pepper

[16] Hamilton, LLP and we represent the plaintiffs

[17] in the lawsuit that has been captioned

[18] Kitzmiller, et al versus Dover Area School

[19] District, et al, and your deposition is being

[20] taken in this matter. Do you understand that?

[21]    A: Yes.

[22]    Q: One of the other things you told me off the

[23] record is that your wife is a court reporter.

[24] So you probably have more understanding of the

[25] process than many witnesses who are being

Page 5

[1] deposed, but let me ask you, have you ever

[2] personally been deposed?

[3]    A: No.

[4]    Q: I'm just going to go over some of the general

[5] instructions that we give witnesses when

[6] they're first taking part in this process.

[7]    I'm going to be asking you questions and

[8] you'll be giving answers and Sue, the court

[9] reporter here, will be taking down those

[10] questions and answers and creating a

[11] transcript.

[12]    In order for that process to work, one

[13] thing I need you to do is answer in words as

[14] opposed to with gestures or nonverbal

[15] utterances. Do you understand that?

[16]    A: Yes.

[17]    Q: I sometimes tend to talk a little quickly. I'm

[18] going to try and slow that down. We will be

[19] more successful in creating a clear transcript

[20] if both of us speak at a pace that is not too

[21] fast.

[22]    The other thing we can do to help the

[23] court reporter and make the transcript clear is

[24] for you to wait until my questions are done

[25] before you answer. Often we can anticipate

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Michael Baksa
March 9, 2005

Page 6

[1] what each other is asking or saying, but we
[2] need to make sure that each of us allow the
[3] other to finish what they're saying. So if you
[4] could let me finish my questions and I will do
[5] my best to let you finish your answers. Can we
[6] agree on that?
[7]   A: Yes.
[8]   Q: If you don't understand any of my questions,
[9] please let me know. This is not an endurance
[10] test. If you need a break during the process
[11] to use the rest room, to get a drink, to talk
[12] to your lawyer, that's fine, just please let me
[13] know and I'm happy to take a break and I may
[14] initiate breaks myself. Okay?
[15]   A: Fine.
[16]   Q: Did you do anything to prepare for this
[17] deposition?
[18]   A: I did review documents that were requested in
[19] the first and second production from the court.
[20] So I did review those documents.
[21]   Q: When did you do that?
[22]   A: Over the past two weeks or so.
[23]   Q: Did any of those documents refresh your
[24] recollection about events relating to the
[25] biology curriculum or purchase of the biology

Page 7

[1] book?
[2]   A: I'd say yes.
[3]   Q: Did you do anything else to prepare?
[4]   A: No.
[5]   Q: Did you meet with counsel at any time?
[6]   A: Yes.
[7]   Q: And when did you do that?
[8]   A: We met yesterday and we spoke over the phone.
[9]   Q: How long did you meet yesterday?
[10]   A: Approximately from 10:30 until 5:30 with a
[11] break for lunch.
[12]   Q: Is Mr. Gillen the attorney you met with?
[13]   A: Yes.
[14]   Q: Was anybody else present when you met?
[15]   A: No.
[16]   Q: Was anybody else participating by phone?
[17]   A: No.
[18]   Q: You said you also spoke to him on the phone.
[19] When was that?
[20]   A: Probably maybe a week or so ago.
[21]   Q: And was that to prepare for the deposition?
[22]   A: Yes. And to prepare answers to the
[23] interrogatories.
[24]   Q: Interrogatories?
[25]   A: Yes.

Page 8

[1]   Q: How long did you speak with counsel then?
[2]   A: Well, a total — probably around 13 hours.
[3]   Q: That's a lot of time. Had you also met with
[4] counsel for the school district in advance of
[5] the depositions of Mr. Nilsen, Mr. Buckingham,
[6] Mr. Bonsell and Ms. Harkins?
[7]   A: No.
[8]   Q: And when I speak about counsel for defendants
[9] I'm not referring just to Mr. Gillen, but any
[10] lawyers representing the Dover School District.
[11]   A: I didn't meet with them.
[12]   Q: Mr. Baksa, have you ever heard any member of
[13] the Dover School Board of Directors express a
[14] desire to have creationism taught in Dover High
[15] School?
[16]   A: No.
[17]   Q: And you're sure of that?
[18]   A: Um-hum.
[19]   Q: That's a yes?
[20]   A: Yes.
[21]   Q: Where do you live?
[22]   A: 36 Oak View Drive, Strasburg, Pennsylvania.
[23]   Q: And how long have you lived there?
[24]   A: Since '89.
[25]   Q: Are there any newspapers that you regularly

Page 9

[1] read?
[2]   A: The Lancaster New Era.
[3]   Q: I'm sorry, the Lancaster?
[4]   A: New Era.
[5]   Q: Anything else?
[6]   A: No.
[7]   Q: What was the last grade of education you
[8] completed?
[9]   A: At this point I've completed all of my
[10] doctorate course work for my doctorate and the
[11] next step would be for me to take comprehensive
[12] exams and do my dissertation.
[13]   Q: And where did you take your doctorate classes?
[14]   A: Currently I'm finishing up at Widener.
[15]   Q: What's the last level of education you
[16] completed or the last degree you received?
[17]   A: That would be my graduate, master's.
[18]   Q: And what is that degree in?
[19]   A: Education administration.
[20]   Q: Where did you get that degree?
[21]   A: Lehigh University.
[22]   Q: What year? You can estimate if you don't know
[23] exactly.
[24]   A: I believe it's around — it was right when we
[25] moved. So it was around '89.

Michael Baksa
March 9, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

Page 10

[1]   Q: And where did you receive your undergraduate
[2] degree?
[3]   A: Moravian College.
[4]   Q: What year was that?
[5]   A: That would be '83, 1983.
[6]   Q: And what was your degree in?
[7]   A: English and communications, education, teaching
[8] certificate.
[9]   Q: Have you had any science education after high
[10] school?
[11]   A: I would have at Indiana University of
[12] Pennsylvania.
[13]   Q: Is that a university you attended before
[14] completing your degree at Moravian?
[15]   A: Yes.
[16]   Q: How many years did you go to school there?
[17]   A: I believe three.
[18]   Q: And do you remember what science courses you
[19] took at Indiana University?
[20]   A: I took a science course in my freshman year. I
[21] really don't remember whether it was chemistry
[22] or general science.
[23]   Q: But that course would have been the last
[24] science course you took at any time?
[25]   A: Right.

Page 11

[1]   Q: Are you currently the assistant superintendent
[2] of Dover Area School District?
[3]   A: Yes.
[4]   Q: How long have you held that position?
[5]   A: This is my third year.
[6]   Q: What are your duties and responsibilities as
[7] assistant superintendent?
[8]   A: Primarily I'm responsible for curriculum, the
[9] strategic plan, professional development and
[10] federal programs titled to Title 5.
[11]   Q: What do you mean by strategic plan?
[12]   A: Strategic plan is a plan every six years that
[13] has to be submitted to the state that includes
[14] specific goals that the district sets for
[15] itself and its special education plan and its
[16] professional development plan and its
[17] technology plan.
[18]   Q: Prior to becoming assistant superintendent at
[19] Dover can you describe your work history after
[20] college, just, you know, where did you work and
[21] what did you do?
[22]   A: I taught for six years at Penn Ridge High
[23] School in Perkasie, Pennsylvania.
[24]   Q: What did you teach?
[25]   A: I taught English.

Page 12

[1]   Q: After that?
[2]   A: After that I was an assistant principal at
[3] Octorara Middle School, grades five through
[4] eight and I was there for four years. After
[5] that I was an assistant principal at Governor
[6] Mifflin High School.
[7]   Q: How long was that?
[8]   A: That also was four years. And then after that
[9] I was five years principal at Conestoga Valley
[10] High School in Lancaster.
[11]   Q: And then you came to Dover?
[12]   A: Yes.
[13]   Q: Have you attended any courses or lectures or
[14] seminars relating to the subjects of evolution,
[15] intelligent design or creationism?
[16]   A: I attended a Messiah evening presentation on
[17] the teaching of evolution in the high school
[18] classroom.
[19]   Q: When was that?
[20]   A: I think that was my first year there,
[21] 2002/2003.
[22]   Q: First year at Dover?
[23]   A: Yes.
[24]   Q: And what is Messiah?
[25]   A: Messiah is a college.

Page 13

[1]   Q: Where is that?
[2]   A: I think it's — I attended it in Harrisburg,
[3] but I'm not sure where Messiah is.
[4]   Q: Is Messiah a sectarian or demoninational
[5] school? I mean, is it affiliated with a
[6] religion or have a religious mission?
[7]   A: I believe it is.
[8]   Q: And do you know what that mission is?
[9]   A: No.
[10]   Q: You understand it to be a Christian college?
[11]   A: I wouldn't know that.
[12]   Q: Why did you go to that seminar?
[13]   A: Dr. Nilsen brought the presentation to my
[14] attention and recommended that I attend.
[15]   Q: And how long was that presentation?
[16]   A: Maybe an hour.
[17]   Q: Was there any discussion of intelligent design?
[18]   A: No. Primarily the lecture was the history of
[19] the controversy on teaching evolution.
[20]   Q: And what did you learn at that lecture?
[21]   A: Well, I did take notes on it, but, you know, I
[22] learned the historical interactions, the
[23] controversy and how it was dealt with publicly
[24] and in the private school and some of the
[25] players and some of the books that were written

---

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Michael Baksa
March 9, 2005

---

Page 14

[1] or used in expounding different views.

[2]     And then there was a little bit of a Q and

[3] A after that about what implications there

[4] might be for the teaching in the public high

[5] schools.

[6]     Q: Did anybody state a position about what the

[7] implications were?

[8]     A: I believe the presenter put forth the view that

[9] he thought it would be okay to present the

[10] controversy on evolution, you know, to students

[11] at public schools.

[12]     Q: And when he used the term controversy on

[13] evolution, what did you understand him to mean?

[14]     A: Just that there are other theories out there

[15] that would have different time lines, account

[16] for different origins other than Darwin.

[17]     Q: Did you have an understanding of what those

[18] other theories were?

[19]     A: They didn't go into that.

[20]     Q: And when you talk about other time lines, what

[21] do you mean by that or what did you understand

[22] him to mean?

[23]     A: He talked about creationism and talked about

[24] the different definitions of that with younger

[25] theories and different takes on those time

---

Page 15

[1] lines, specifically creation, how it might have

[2] occurred.

[3]     Q: Did Mr. Nilsen say why he thought it might be a

[4] good idea for you to go?

[5]     A: No.

[6]     Q: Did you ask him?

[7]     A: No.

[8]     Q: Prior to attending this session did you

[9] understand there to be any controversy about

[10] evolution?

[11]     A: Where?

[12]     Q: Anywhere. I mean, you used the term

[13] controversy on evolution. Did you have any

[14] understanding that there was a controversy

[15] about evolution prior to attending that

[16] session?

[17]     A: At Dover or in general?

[18]     Q: Anywhere.

[19]     A: I think in general I had a sense that evolution

[20] was a sensitive topic in the public schools.

[21]     Q: Did you have an understanding that there was a

[22] controversy in the scientific community about

[23] the scientific merits of the theory of

[24] evolution?

[25]     A: No.

---

Page 16

[1]     Q: Do you have an understanding now that there's a

[2] controversy about the scientific merits of the

[3] theory of evolution?

[4]     A: Yes.

[5]     Q: You talked about this concept of a time line,

[6] that there might be a — is it fair to say that

[7] they were expressing the concept that there

[8] might be a younger earth than might be

[9] otherwise understood?

[10]     A: Yes.

[11]     Q: Was it your understanding that this presenter

[12] was recommending that that concept could be

[13] taught in the public schools?

[14]     A: Yes.

[15]     Q: Did you understand what the source of this

[16] concept that there is a — or let me backtrack.

[17] When he was referring to a younger earth did

[18] you have an understanding of what he meant by

[19] that?

[20]     A: No.

[21]     Q: Did you understand him to be associating that

[22] with the length of time suggested by the Bible?

[23]     A: I don't remember him mentioning that.

[24]     Q: Did he describe what the source of this

[25] understanding of a younger earth was?

---

Page 17

[1]     A: I think he cited an author and a work, a book.

[2]     Q: Do you remember who that was?

[3]     A: No.

[4]     Q: Is it your practice to attend the public

[5] meetings of the Dover Area School Board?

[6]     A: Yes.

[7]     Q: And do you also attend any — is it your

[8] practice to attend executive sessions of the

[9] board?

[10]     A: Yes.

[11]     Q: Do you attend all of the executive sessions of

[12] the board?

[13]     A: If I'm there, yes.

[14]     Q: What would determine whether you're there?

[15]     A: If I'm available I would be there, yes.

[16]     Q: And you also attend committee meetings of the

[17] board?

[18]     A: Some.

[19]     Q: Curriculum committee?

[20]     A: Yes.

[21]     Q: Am I also correct in understanding that there

[22] is separate from the board curriculum

[23] committee, there's another committee devoted to

[24] the curriculum that includes board members,

[25] teachers and members of the community?

---

Michael Baksa
March 9, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 18

[1] A: Yes.

[2] Q: And what do you call that committee?

[3] A: Curriculum advisory committee.

[4] Q: Do you also attend those meetings?

[5] A: Yes.

[6] Q: During all of these meetings that we've just
[7] listed do you have a practice of taking notes
[8] during the meeting?

[9] A: Yes.

[10] Q: And what is that practice?

[11] A: For the curriculum advisory committee I take
[12] notes and publish minutes. For the board
[13] curriculum meetings I would simply take notes,
[14] but there are no minutes published.

[15] Q: And what about for the executive sessions, do
[16] you take notes there?

[17] A: No.

[18] Q: And — go ahead.

[19] A: On occasion. Generally, no, but sometimes I
[20] have, yes.

[21] Q: And at public board meetings do you take notes?

[22] A: I might take a few notes on the board agenda.

[23] Q: What happens with the minutes that you publish
[24] for the curriculum advisory committee?

[25] A: Those are approved at the next curriculum

Page 19

[1] advisory committee meeting and my secretary
[2] keeps them.

[3] Q: You can correct me if you think I'm wrong about
[4] this, but it does not appear to me that there
[5] were any curriculum advisory committee minutes
[6] produced by defendants in this litigation. You
[7] actually reviewed what was being produced by
[8] the school district, correct?

[9] A: Document 1.

[10] Q: What?

[11] A: Document 1 is the minutes from the curriculum
[12] advisory committee, Document 1.

[13] MR. GILLEN: If you look at the document
[14] Bates stamped 1.

[15] A: Those are the minutes.

[16] BY MR. ROTHSCHILD:

[17] Q: I'm going to show you the document that was
[18] marked 1 in the defendant's production. Is
[19] that what you're referring to?

[20] A: No.

[21] Q: Can you describe for me what these minutes
[22] would look like?

[23] A: They're titled Curriculum Advisory Committee
[24] Minutes. I believe the date is April 10th.
[25] And then you'll see numbered —

Page 20

[1] Q: Let me show you another document, because I do
[2] see one document that might fit that
[3] description. I'm going to show you a document
[4] that was marked 5 in the production. Is that
[5] what you are referring to as curriculum
[6] advisory council minutes?

[7] A: Yes.

[8] Q: Again, my memory is not perfect, but I think
[9] that is the only example of a document of this
[10] type that was in the production. Is that
[11] consistent with what you recollect?

[12] A: I think so.

[13] Q: Is that because there were — did you review
[14] all the curriculum advisory council minutes to
[15] determine whether there was discussion about
[16] the biology curriculum issue in them?

[17] A: Yes.

[18] Q: And this was the only one that you located?

[19] A: Yes.

[20] Q: How often does the curriculum advisory council
[21] meet?

[22] A: Once a year, sometimes more.

[23] Q: What are the circumstances that cause a meeting
[24] to be scheduled of this committee?

[25] A: Typically, the curriculum advisory committee

Page 21

[1] meets during April and at that time any
[2] curriculum and textbooks that are being — or
[3] any curriculum initiatives that are being
[4] presented for implementation for the following
[5] year, those would be reviewed by the committee.
[6] And those people responsible for those
[7] curriculum pieces would present and explain
[8] whatever program or textbooks that they're
[9] looking at.

[10] Q: Was a meeting of the curriculum advisory
[11] council held at any time in the fall of 2004
[12] when the modification to the biology curriculum
[13] was being considered?

[14] A: No.

[15] Q: Is there a reason with a change in curriculum
[16] being presented that this committee was not
[17] convened?

[18] A: Typically, the committee only meets in April.
[19] There's been instances in the past where a
[20] curriculum might not be prepared in time for
[21] April, it might be finished in June and then it
[22] would be presented to the board without the
[23] curriculum advisory committee reviewing it.

[24] Q: So they're cut out of the process then?

[25] A: Typically they meet in April to review. So if

**Tammy Kitzmiller, et al.   v.**
**Dover Area School District, et al.**

**Michael Baksa**
**March 9, 2005**

---

Page 22

[1] something came later to that something might go
[2] to the board without having gone before the
[3] curriculum advisory committee.
[4]     Q: And that was the case with the biology
[5] curriculum, the change in the biology
[6] curriculum?
[7]     A: The curriculum committee did not meet to review
[8] the language and the changes in the biology
[9] curriculum. However, the committee did receive
[10] the proposed changes by e-mail and by mail and
[11] was asked to respond with any comments to those
[12] changes and I would present those to the board.
[13]     Q: You described your practice of taking notes,
[14] for example, at the board curriculum committee
[15] and occasionally in executive meetings and the
[16] public board meetings. What do you with those
[17] notes?
[18]     A: File them.
[19]     Q: Do you ever discard them?
[20]     A: From which meetings?
[21]     Q: All of them. Let's start with the board
[22] curriculum committee.
[23]     A: The board curriculum committee notes, I would
[24] keep those. Any notes I would take at a board
[25] meeting, typically those are just to-do notes

Page 23

[1] that I'd have to follow up on the next day.
[2] Generally those are discarded. Depending on
[3] what the document is in executive session, I
[4] may discard it or keep it.
[5]     Q: For your notes of the board curriculum
[6] committee, did you go back and look at those
[7] notes in order to produce responsive documents
[8] in this litigation?
[9]     A: From the board curriculum?
[10]     Q: Your notes of the board curriculum committee
[11] meetings.
[12]     A: I looked at those.
[13]     Q: And produced what you thought related to the
[14] biology curriculum? Did you produce those to
[15] counsel?
[16]     A: Oh, yes.
[17]     Q: How often does the board curriculum committee
[18] meet?
[19]     A: This is my third year. My understanding is
[20] that typically what would happen is as a
[21] curriculum is proposed both the curriculum
[22] that's going to be implemented and the
[23] textbooks would be made available to the board
[24] curriculum committee.
[25]     Typically they might pick those documents

Page 24

[1] up and review them and there would be no
[2] meeting. If there were any questions, then
[3] either I or the teachers who created the
[4] documents would answer those questions for the
[5] board. So there's no regularly scheduled
[6] meeting of the board curriculum committee as a
[7] part of the curriculum review process.
[8]     Q: Let me just see if I can summarize what you've
[9] said and you tell me if this is correct. As a
[10] general matter when a curriculum is being
[11] developed is it developed by the administration
[12] and the teachers?
[13]     A: Primarily the teachers.
[14]     Q: Okay. And as a general practice, the teachers
[15] submit those materials through you to the board
[16] curriculum committee?
[17]     A: Correct.
[18]     Q: And the board curriculum committee — does the
[19] board curriculum committee have to indicate
[20] their approval?
[21]     A: They review the documents and if there's any
[22] questions that they would have, then we try to
[23] get that board curriculum committee answers so
[24] that they're prepared to make a recommendation
[25] to the full board for approval or not.

Page 25

[1]     Q: But ultimately the product of their review is a
[2] recommendation to the board?
[3]     A: Yes.
[4]     Q: And generally there's not a meeting for this to
[5] occur, the board curriculum committee simply
[6] looks at the documents and makes their
[7] recommendation?
[8]     A: Correct.
[9]     Q: Do they convene in order to discuss among
[10] themselves what their recommendation is?
[11]     A: I wouldn't know that.
[12]     Q: How do they communicate their recommendation to
[13] the full board?
[14]     A: If there are no questions or concerns and the
[15] chair of the board curriculum committee is okay
[16] with the textbooks or the curriculums that are
[17] being recommended, then that would be
[18] communicated through me to the superintendent
[19] for that item to be placed on the board agenda
[20] for approval. And then at the board meeting
[21] the board curriculum chairperson would make a
[22] motion to approve.
[23]     Q: Other than the biology curriculum, the specific
[24] change to the biology curriculum, which is the
[25] subject of this litigation, can you think of a

---

**Tammy Kitzmiller, et al.   v.**
**Dover Area School District, et al.**

**Michael Baksa**
**March 9, 2005**

Page 30

[1] recall.

[2]  **Q: The principal was invited?**

[3]  **A:** I believe it was principal and staff for family

[4] consumer science. I'm not sure that we met

[5] about the Fundamentals of Success curriculum.

[6]  **Q:** Were faculty members invited to board

[7] curriculum committee meetings for any

[8] discussion of the purchase of a biology book or

[9] the change to the biology curriculum that is

[10] the subject of this litigation?

[11]  **A:** Yes.

[12]  **Q:** And do you know on how many occasions?

[13]  **A:** I think there were at least three meetings.

[14]  **Q:** When were those?

[15]  **A:** I believe — or four meetings, actually. There

[16] would have been a meeting in September of 2003;

[17] June, 2004; July, 2004 and August, 2004.

[18]  **Q:** We'll go back to those meetings, but let me ask

[19] some other questions first.

[20]    Other than the biology textbook that was

[21] purchased in 2004 have you been involved in the

[22] purchase of other textbooks for Dover School

[23] District?

[24]  **A:** The first year I came the curriculum cycle was

[25] science, family consumer science and gifted.

Page 31

[1] The second year was to be language arts and

[2] that was put off a year and so language arts is

[3] this year.

[4]  **Q:** And what is the process for the selection and

[5] purchase of books at Dover School District?

[6]  **A:** Typically either myself or Dr. Butterfield, the

[7] language arts supervisor, would work with

[8] teachers to select the books from different

[9] publishers and those books then may be piloted

[10] in the year before purchase.

[11]    And typically by February the teachers

[12] would have made a recommendation for a

[13] particular textbook for purchase for the

[14] following year.

[15]  **Q:** Other than the biology textbook, has there ever

[16] been, in your tenure, an instance where the

[17] school board rejected the recommendation of a

[18] textbook? And I'm not suggesting that happened

[19] with the biology textbook, but just putting

[20] that issue aside.

[21]  **A:** The books that were not purchased in the

[22] curriculum cycle would have included science

[23] books, chemistry and biology and I believe

[24] there's about four textbooks in family consumer

[25] science. Those items not purchased.

Page 32

[1]  **Q:** They were recommended by the faculty, but not

[2] purchased?

[3]  **A:** Correct.

[4]  **Q:** Other than the biology textbook, what was the

[5] reason that those books were not purchased?

[6]  **A:** Economic reasons.

[7]  **Q:** And that's the only reason?

[8]  **A:** Yes.

[9]    (P Deposition Exhibit Number 8 PREVIOUSLY

[10] marked for identification.)

[11]           BY MR. ROTHSCHILD:

[12]  **Q:** I'm going to hand you something that we

[13] previously marked as P-8 in this case and it is

[14] the Biology Curriculum Guide. And I've turned

[15] you to the page where the intelligent design

[16] item is found.

[17]    Does the language at the bottom of that

[18] page stating, Students will be made aware of

[19] gaps/problems in Darwin's Theory and of other

[20] theories of evolution including, but not

[21] limited to intelligent design and Note: The

[22] Origins of Life is not taught, is that the

[23] language that was added to the biology

[24] curriculum through the resolution that the

[25] board passed on October 18th, 2004?

Page 33

[1]  **A:** Yes.

[2]  **Q:** The language that the curriculum item refers to

[3] intelligent design, what do you understand

[4] intelligent design to mean as used in this

[5] curriculum item?

[6]  **A:** Well, from what I've read, and I'm not a

[7] scientist or a science teacher, but I believe

[8] intelligent design is a theory that holds that

[9] examining life and finding the complexities and

[10] the mechanisms that work in it, that that

[11] complexity is hard to account for by chance.

[12]  **Q:** Anything else?

[13]  **A:** No.

[14]  **Q:** How did you gain that understanding? You said

[15] things you've read. What are you referring to?

[16]  **A:** I would get literature, either e-mail or

[17] through the mail, that might speak to

[18] intelligent design and, also, read the book Of

[19] Pandas and People.

[20]  **Q:** When you talk about literature you received and

[21] communications through the mail, is there a

[22] time period in which you received those

[23] materials?

[24]  **A:** Primarily I'd say I was receiving them through

[25] the 2004/2005 school year.

Michael Baksa
March 9, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 34

[1]   Q: After the resolution was passed or before?
[2]   A: Before.
[3]   Q: Why were these materials sent to you or how
[4] were they sent to you?
[5]   A: I don't know.
[6]   Q: People just randomly sent them to you?
[7]   A: Yes.
[8]   Q: You didn't solicit them?
[9]   A: Correct.
[10]   Q: You weren't given them by members of the school
[11] board?
[12]   A: They might have given me some documents.
[13]   Q: Are there particular members of the school
[14] board who gave you documents?
[15]   A: Mr. Buckingham gave me the book Of Pandas and
[16] People and he also gave me some videos.
[17]   Q: Did Mr. Buckingham give you anything else?
[18]   A: Not that I remember.
[19]   Q: When I asked you your understanding of
[20] intelligent design you said I'm not a scientist
[21] or a science teacher. Why did you feel that
[22] was an important point to make?
[23]   A: I don't understand.
[24]   Q: Why did you say that? Why does it matter that
[25] you're not — I asked you what your

Page 35

[1] understanding was of intelligent design and you
[2] said — you gave me an understanding and you
[3] said it was based on things you had read and
[4] you qualified it by saying I'm not a scientist
[5] or a science teacher. Why did you say that?
[6]   A: I was thinking at Lehigh University there's a
[7] professor, Dr. Behe, who has written a work, I
[8] think it's Darwin's Black Box, something like
[9] that, and I think he would be more qualified to
[10] explain the scientific portion of intelligent
[11] design than I would.
[12]   Q: Okay. Do you think a science teacher would be
[13] able to understand it better?
[14]   A: Only if they — our teachers, in conversations
[15] with them, they would say — or have said to me
[16] that their training for teaching would be the
[17] theory of evolution according to Darwin. I
[18] don't know if they would have any other course
[19] work that would allow them to teach other
[20] theories.
[21]   Q: Do you feel qualified to assess whether
[22] intelligent design is a sound scientific
[23] concept?
[24]   A: I would really defer to teachers on that.
[25]   Q: Is there a particular type of training or

Page 36

[1] education that you think you would need to be
[2] qualified to assess whether intelligent design
[3] is sound science?
[4]   A: Certainly I would like to do — I would think I
[5] would need to hear authorities in the field and
[6] read works on it.
[7]   Q: Do you feel, though, you would need a
[8] particular educational background or training
[9] in order to make an assessment of the
[10] scientific merits of intelligent design?
[11]   A: Well, my background is language arts and my
[12] responsibility is for Curriculum K to 12 and
[13] other than Dr. Butterfield handling language
[14] arts K to 12, I am responsible for making some
[15] judgment, even with the background I have, in
[16] all the curriculum areas.
[17]   Q: And do you feel qualified to make a judgment
[18] about whether a particular concept is
[19] scientifically sound before you put it in the
[20] curriculum to teach students?
[21]   A: I didn't put it in the curriculum.
[22]   Q: Do you feel that you need to have some kind of
[23] education or training to assess the soundness
[24] of a particular concept, the scientific
[25] soundness of a concept?

Page 37

[1]   A: Generally teachers write curriculum. The
[2] content pretty much is dictated by the state
[3] standards and we stick to that. So in
[4] consultation with the teachers we would make
[5] that decision together.
[6]   Q: So would you say that you defer to the
[7] expertise of the teachers in whatever subject
[8] matter of a curriculum is being discussed?
[9]   A: I would.
[10]   Q: You said you read Pandas. When did you do
[11] that?
[12]   A: Sometime after July, 2004.
[13]   Q: And that was after it was provided to you by
[14] Mr. Buckingham?
[15]   A: Yes.
[16]   Q: Did you feel that you understood Pandas?
[17]   A: I didn't understand the science of it and some
[18] of the references they made to the science.
[19]   Q: Did you ever discuss the content of Pandas with
[20] any school board member?
[21]   A: No.
[22]   Q: When was the first time you heard of
[23] intelligent design?
[24]   A: Probably sometime after — or around June, 2003
[25] — or 2004.

**Tammy Kitzmiller, et al.   v.**
**Dover Area School District, et al.**

**Michael Baksa**
**March 9, 2005**

---

Page 38

[1]    Q: After June or it could have been in June?

[2]    A: It could have been in June, yeah.

[3]    Q: Do you remember the circumstances in which you

[4] heard about intelligent design? Was it, for

[5] example, a public school board meeting, a

[6] discussion with a school board member or

[7] otherwise?

[8]    A: I don't.

[9]    Q: Do you remember anything about the substance of

[10] what you heard the first time you heard about

[11] it?

[12]    A: No.

[13]    Q: The first time you heard about it, was it in

[14] the context of the Dover Area High School

[15] biology curriculum?

[16]    A: I don't remember that.

[17]    Q: When was the first time you heard of the book

[18] Of Pandas and People?

[19]    A: When Bill gave it to me, Mr. Buckingham.

[20]    MR. ROTHSCHILD: Let me mark this document

[21] as P-9.

[22]    (P Deposition Exhibit Number 9 marked for

[23] identification.)

[24]        BY MR. ROTHSCHILD:

[25]    Q: Do you recognize the document we've marked as

Page 39

[1] P-9?

[2]    A: Yes.

[3]    Q: Is this a memorandum that you received on or

[4] around April 1st, 2003 from the principal,

[5] Trudy Peterman?

[6]    A: Yes.

[7]    Q: Could you review this document and let me know

[8] whether there's anything in it that you —

[9] well, review the document and let me know

[10] whether there's anything in it you think is

[11] incorrect.

[12]    A: Okay. There are a number — just the first two

[13] pages or do you want me to do the rest?

[14]    Q: I think we can probably just look at the first

[15] two pages for purposes of my question.

[16]    A: There are a number of errors and inaccuracies.

[17]    Q: Could you describe them?

[18]    A: First, Trudy — Dr. Peterman was not at the

[19] meeting — was not at the — or was not present

[20] when I had a conversation with Mrs. Spahr that

[21] generated this memo.

[22]    I never told Mrs. Spahr that the board

[23] wanted creationism taught. Dr. Peterman in

[24] many instances overreacts to instances and

[25] jumps the gun and I think this is a good

Page 40

[1] example of that.

[2]    My conversation with Bert Spahr was simply

[3] a heads up that there was still, you know, some

[4] talk about some board members of presenting

[5] some alternative theory. I did not say that

[6] there was creationism, nor did any board member

[7] ever say to me that they wanted creationism

[8] taught in the classroom.

[9]    Additionally, she talks about creationism

[10] should still be — Dr. Peterman says I advise

[11] and continue to mention that creationism is

[12] another alternate theory of evolution. That's

[13] Dr. Peterman acting on her own.

[14]    The only information I have is that I did

[15] know that some of our teachers before teaching

[16] the evolution unit would mention other

[17] theories. They might mention creationism, but

[18] there was no — at this point there was no

[19] directive from the board or administration for

[20] them to do so.

[21]    So the way I reacted to this is I ignored

[22] this because the board was not putting forth

[23] any definite plans or content or curriculum to

[24] be implemented.

[25]    Mr. Bonsell at a board retreat, where

Page 41

[1] there's administrators all around, had, just in

[2] talking about something, mentioned this 50/50.

[3] He did not talk to me personally about that,

[4] nor direct that to happen. And I simply took

[5] that back to Bert Spahr just to give her a

[6] heads up that there are board members that are

[7] still looking at alternatives that are being

[8] presented.

[9]    Q: You've got a lot packaged in here. First of

[10] all, you said ignored this. Can I take from

[11] that that you did not respond to Ms. Peterman?

[12]    A: Correct.

[13]    Q: Verbally or in writing?

[14]    A: Correct.

[15]    Q: Did you have any follow-up conversation with

[16] Ms. Spahr in reaction to this memo?

[17]    A: That I don't remember, but I would be talking

[18] to Mrs. Spahr continually anyway as long as

[19] there was some interest in presenting

[20] alternative theories and since we were working

[21] on the science curriculum.

[22]    Q: This is a memo from April 1st, 2003 and you

[23] said — the way you started your answer was

[24] that there was still some talk about presenting

[25] an alternative theory. What do you mean still

---

**Michael Baksa**
**March 9, 2005**

**Tammy Kitzmiller, et al.   v.**
**Dover Area School District, et al.**

Page 42

[1] some talk? Had there been talk prior to April
[2] 1st, 2003 about teaching something different in
[3] the biology curriculum?
[4]     A: During the first year of the science curriculum
[5] cycle Mr. Bonsell was the chair of the board
[6] curriculum committee and Mr. Bonsell had
[7] expressed concerns about the presentation of
[8] Darwin's theory in the book and the lack of
[9] alternative theories.
[10]     Q: And do you remember, you know, using this April
[11] 1st, 2003 as a marker, when he was raising this
[12] issue?
[13]     A: I remember it being in the fall, early in the
[14] 2002 school year.
[15]     Q: Now, you said that at a board retreat he raised
[16] the concept of 50/50. Is this a retreat that
[17] you were at?
[18]     A: Yes.
[19]     Q: And when he used the word 50/50, what was he
[20] referring to?
[21]     A: I believe Mr. Bonsell was referring that if we
[22] spent a day teaching Darwin's theory we should
[23] spend a day teaching another theory.
[24]     Q: When he said that, what was he talking about?
[25]     MR. GILLEN: Objection to the extent it

Page 43

[1] calls for speculation.
[2]                 BY MR. ROTHSCHILD:
[3]     Q: What was your understanding of what he was
[4] talking about?
[5]     MR. GILLEN: Objection, foundation.
[6]                 BY MR. ROTHSCHILD:
[7]     Q: You can answer.
[8]     A: I don't know.
[9]     Q: So he says 50/50 one theory and something else
[10] and you have no idea what he's talking about?
[11]     A: That's correct.
[12]     Q: And he's not using the words intelligent design
[13] here?
[14]     A: No.
[15]     Q: But in your memory, he also did not use the
[16] word creation?
[17]     A: That's correct.
[18]     Q: You're sitting here listening to this and you
[19] have responsibility for a curriculum. Did you
[20] ask Mr. Bonsell what other possible theories
[21] are you talking about?
[22]     A: I did have a conversation with him after that.
[23] Initially I think his concern was just that our
[24] teachers don't present Darwin's theory as the
[25] sole theory, make students aware that there are

Page 44

[1] other theories out there.
[2]     When I heard this 50/50, that was
[3] something new, I hadn't heard that before. I
[4] do remember having a conversation with him
[5] afterwards trying to clarify that a little bit.
[6] However, in that conversation Mr. Bonsell
[7] indicated to me just some of his concerns with
[8] the presentation of Darwin in the book and some
[9] of the premises that students might be led to.
[10] No alternative theory was presented to me by
[11] Mr. Bonsell.
[12]     I had raised the question that if we're
[13] presenting an alternative theory and if that
[14] theory is about the origins of life it becomes
[15] problematic because whose theory would we
[16] present and whose story of the origins of life
[17] would we present. And I never got anything
[18] directly back from him that this is what we
[19] should be presenting.
[20]     Q: And when he was using the word other theories,
[21] did he say other scientific theories?
[22]     A: I don't remember.
[23]     Q: Did you understand him to be referring to other
[24] scientific theories?
[25]     A: Well, he was speaking about other theories of

Page 45

[1] evolution, Darwin's scientific evolution. So
[2]
[3]     Q: But what else is there and did you ask him that
[4] question?
[5]     A: No.
[6]     Q: You said that he expressed his concerns about
[7] some of the premises that students could draw
[8] from what they were being taught about Darwin's
[9] theory of evolution. What do you mean by that?
[10]     A: Mr. Bonsell expressed concerns that Darwin's
[11] theory was presented in the book as a fact and
[12] as the only theory.
[13]     Q: And why did he have a problem with that?
[14]     MR. GILLEN: Objection, speculation.
[15]                 BY MR. ROTHSCHILD:
[16]     Q: Did he say why he had a problem with that?
[17]     A: No.
[18]     Q: You did communicate — I take it this memo is
[19] correct in referring to the fact that you
[20] communicated to Ms. Spahr issues being raised
[21] by a board member. Is that fair?
[22]     A: Yes.
[23]     Q: And was that board member Mr. Bonsell?
[24]     A: Yes.
[25]     Q: And what did you tell Mrs. Spahr?

**Min-U-Script®**   **Filius & McLucas Reporting Service, Inc.**

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Michael Baksa
March 9, 2005

---

Page 46

[1] A: I really don't recall. I don't think it was a
[2] long conversation. I really don't remember it
[3] clearly.
[4] I believe I simply gave her a heads up
[5] that now I had heard that there might — that
[6] Mr. Bonsell might be asking for a 50/50 split.
[7] Really my intent was just to keep her informed,
[8] to keep her in the loop and let her know that
[9] at some point, whenever the board would give us
[10] clear direction about what they might want
[11] done, we may need to look at that and may need
[12] to do something.
[13] Q: How did Mrs. Spahr respond to that?
[14] A: Mrs. Spahr was throughout this, from the very
[15] first instance where she would have heard of
[16] board concerns with the presentation of
[17] Darwin's theory is the only theory, I think
[18] from the very beginning Mrs. Spahr was very
[19] concerned that creationism would be required to
[20] be taught in classrooms.
[21] Q: And did she express that to you in this
[22] discussion in which you reported Mr. Bonsell's
[23] comments?
[24] A: I don't remember in particular, but Mrs. Spahr
[25] expressed that concern to me on a number of

---

Page 47

[1] occasions.
[2] Q: When you heard Mr. Bonsell say that he wanted
[3] some 50/50 split did you have a concern that
[4] what he wanted taught alongside Darwin's theory
[5] was creationism or some religious account of
[6] the origins of life?
[7] A: I don't know. I mean, I didn't know what his
[8] intentions were.
[9] Q: And just to make sure I understand your answer.
[10] After you received this memo, you didn't
[11] respond to Ms. Peterman, correct?
[12] A: Yes.
[13] Q: Do you have any recollection of speaking to Ms.
[14] Spahr, who also received this memo, about what
[15] Mrs. Peterman had written about her
[16] understanding of what you and Ms. Spahr talked
[17] about?
[18] A: I don't remember doing that.
[19] MR. ROTHSCHILD: Let's take a break.
[20] (Recess taken)
[21] BY MR. ROTHSCHILD:
[22] Q: Mr. Baksa, I asked you the question earlier in
[23] the deposition about whether any board member
[24] had expressed his desire that creationism be
[25] taught at Dover schools and you said no.

---

Page 48

[1] Did any board member or the board
[2] collectively ever ask you or express an
[3] interest in purchasing a biology book that
[4] included creationism?
[5] A: No board member ever said that to me directly.
[6] Q: You used the word directly. Why did you say
[7] that?
[8] A: I believe at the June, 2004 school board
[9] meeting in talking about our status of the
[10] selection of the biology book, for the first
[11] time I believe in — I don't remember the exact
[12] wording, but I remember Mr. Buckingham
[13] mentioned creationism and that was the first
[14] time I heard that. But afterwards I was never
[15] directed from the board curriculum committee or
[16] from Mr. Buckingham specifically to look for a
[17] text with creationism in it.
[18] Q: Without, you know, expecting you to precisely
[19] quote Mr. Buckingham, what do you remember him
[20] saying about creationism?
[21] A: I just remember that he said creationism.
[22] Q: Did he say anything about wanting a biology
[23] text that included creationism?
[24] A: I don't remember that.
[25] Q: You recognize Ms. Callahan, who's in the room?

---

Page 49

[1] A: Yes.
[2] Q: And you understand she's one of the plaintiffs
[3] in this lawsuit?
[4] A: Yes.
[5] Q: Do you remember ever saying to her that the
[6] board members — the board wanted a biology
[7] text that included creationism?
[8] A: No.
[9] Q: I'm going to mark another exhibit as P-10.
[10] (P Deposition Exhibit Number 10 marked for
[11] identification.)
[12] BY MR. ROTHSCHILD:
[13] Q: You see that on P-10 —
[14] A: Which one?
[15] Q: There's two pages of P-10 and on each page
[16] there are some handwritten notes that appear to
[17] say "Given to me by Baksa spring 2004". Do you
[18] recognize —
[19] MR. GILLEN: Objection, hearsay. Go
[20] ahead.
[21] BY MR. ROTHSCHILD:
[22] Q: Do you recognize the handwriting on these two
[23] pages?
[24] A: No.
[25] Q: Do you recognize the documents?

---

Michael Baksa
March 9, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

Page 50

[1] **A:** No.

[2] **Q:** Do you believe you've ever seen them before?

[3] **A:** I don't remember them.

[4] **Q:** Is it possible that the handwriting is Jennifer
[5] Miller's, the biology teacher?

[6] **A:** I have no idea.

[7] **Q:** Have you seen these documents in the last two
[8] weeks?

[9] **A:** I saw this one.

[10] **Q:** Okay. And just to be clear about what you're
[11] referring to, the document you saw in the last
[12] two weeks is the one numbered 212?

[13] **A:** Yes.

[14] **Q:** And the page you do not believe you saw in the
[15] last two weeks is 213?

[16] **A:** Yes.

[17] **Q:** And other than seeing 212 over the last two
[18] weeks, you don't recognize them at all?

[19] **A:** That's correct.

[20] **MR. GILLEN:** Eric, if I may, it appears
[21] that we have — I've received two pages like
[22] this.

[23] **MR. ROTHSCHILD:** I'll be glad to give you
[24] a copy of that. (Handing). Pat, this is one
[25] of these circumstances where a representation

---

Page 51

[1] about where this document came from, whose
[2] files — or who provided it to counsel would be
[3] extremely helpful.

[4] **MR. GILLEN:** Yes. And I would be glad to
[5] say for the record that as we sit here today
[6] and look at it, the two pages that Mr.
[7] Rothschild has produced here and marked as
[8] Plaintiff's Exhibit 10, I myself recognize the
[9] document Bates stamped 212 and see that the
[10] next page is Bates stamped 213.

[11] I can tell Mr. Rothschild that I believe
[12] these documents were produced by the teachers
[13] to Dover Area School District and we, in turn,
[14] produced them to the plaintiffs.

[15] **MR. ROTHSCHILD:** Thank you. I'm going to
[16] mark this document as P-11.

[17] (P Deposition Exhibit Number 11 marked for
[18] identification.)

[19] **MR. GILLEN:** And before you begin, I'd
[20] like to say that it also appears to me that
[21] document Bates stamped 208 was produced to us
[22] by the teachers and produced to plaintiffs.

[23] **MR. ROTHSCHILD:** And just so that the
[24] record is clear, I'm just going to show counsel
[25] another version of that document without

---

Page 52

[1] handwriting, which has the Number 1084 on it
[2] and if you could make a representation about
[3] whose files that came from that would be
[4] helpful.

[5] **MR. GILLEN:** With respect to the document
[6] Bates stamped Number 1084, I'm not certain, but
[7] I tend to believe it was also part of the
[8] teachers' production.

[9] **MR. ROTHSCHILD:** And I'm actually going to
[10] go ahead and mark that version, which does not
[11] have handwriting, as P-12.

[12] (P Deposition Exhibit Number 12 marked for
[13] identification.)

[14] **BY MR. ROTHSCHILD:**

[15] **Q:** And if you could keep both in front of you, Mr.
[16] Baksa. Do you recognize the document in either
[17] the version marked as P-11 or P-12?

[18] **A:** Yes.

[19] **Q:** What are the circumstances in which you saw
[20] this document?

[21] **A:** I believe in the search for textbooks that
[22] teachers were reviewing we were also looking at
[23] other than mainstream publishers what other
[24] textbooks there might be out there. And I
[25] believe I remember our home schooling

---

Page 53

[1] population finding their own textbooks and I
[2] thought I remembered some of those home
[3] schoolers using Bob Jones University.

[4] And I think what I did then is asked my
[5] secretary if she would go on the website and
[6] see if she could find what biology textbooks
[7] Bob Jones University might be using.

[8] **Q:** You said we were searching for alternative
[9] textbooks. Is that — maybe you can read it
[10] back. If you could read back that last answer.

[11] (Previous answer read by the court
[12] reporter)

[13] **BY MR. ROTHSCHILD:**

[14] **Q:** When you said we were also looking at other
[15] than mainstream publishers, who's the "we" you
[16] were referring to?

[17] **A:** The teachers and I and the board curriculum
[18] committee.

[19] **Q:** Why were you looking for books from other than
[20] mainstream publishers?

[21] **MR. GILLEN:** Objection to the
[22] characterization of his answer.

[23] **BY MR. ROTHSCHILD:**

[24] **Q:** You can answer.

[25] **A:** Can you rephrase that?

---

Min-U-Script®   Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Michael Baksa
March 9, 2005

---

Page 54

[1]   Q: Why was the group you just referred to looking
[2] at books from other than mainstream publishers?
[3]   A: Dr. Nilsen had asked me to look at some of the
[4] books that some of our local parochial schools
[5] might be using and then he might have even
[6] mentioned home schoolers, but I would have
[7] known about Bob Jones from our home schoolers.
[8]   So I had Marsha Hake, one of our
[9] secretaries, contact those schools and we
[10] provided the list of that to the teachers and
[11] the board curriculum committee.
[12]   Q: Do you know why Mr. Nilsen was asking you to
[13] look at books from parochial schools?
[14]   A: No.
[15]   Q: Other than what Mr. Nilsen said to you, did you
[16] have any conversations with any board member
[17] about searching for books from parochial
[18] schools?
[19]   A: No.
[20]   Q: Did you have an understanding of why you were
[21] being asked to look for books being used by
[22] parochial schools?
[23]   A: No.
[24]   Q: Describe the — let me back up. When did this
[25] instruction from Mr. Nilsen occur?

Page 55

[1]   A: Probably sometime after June, 2004.
[2]   Q: Tell me what he said to you.
[3]   A: To see what books the parochial schools were
[4] using.
[5]   Q: And what did you say in response?
[6]   A: I don't remember. I just did it.
[7]   Q: So you had no understanding of why you would be
[8] looking to parochial schools for books to be
[9] taught to the public Dover Area High School?
[10]   A: No one gave me a specific reason.
[11]   Q: Did you have any discussion with Mr. Nilsen,
[12] teachers or board members about that project?
[13]   A: No.
[14]   Q: In terms of finding out what Bob Jones
[15] University was publishing, was that an
[16] investigation that you thought of yourself?
[17]   A: That came from to look and see what our home
[18] schoolers were using. And I don't remember if
[19] Dr. Nilsen asked me to see what our home
[20] schoolers or if that was just something I knew
[21] of and did on my own.
[22]   Q: Is there a reason you looked for what home
[23] schoolers were using as part of an assignment
[24] to find out what parochial schools were using?
[25]   A: It was just another organization.

Page 56

[1]   Q: And in your mind did you associate home
[2] schooling education with objectives similar to
[3] what parochial schools' objectives are?
[4]   A: I don't know that I made that connection. It
[5] was just another source.
[6]   Q: On the version that we've marked as P-11 there
[7] is handwriting on the document. Do you
[8] recognize that handwriting?
[9]   A: No.
[10]   Q: Do you remember whether you gave this
[11] description of the Bob Jones University book to
[12] the teachers?
[13]   A: I might have, but I don't remember doing it or
[14] when I would have done it.
[15]   Q: Do you remember whether you gave this
[16] description of the Bob Jones University book to
[17] Mr. Nilsen?
[18]   A: No.
[19]   Q: Do you remember whether you gave it to the
[20] board?
[21]   A: No.
[22]   Q: Did you review the description of the text
[23] being published by Bob Jones University?
[24]   A: Did I read this?
[25]   Q: Yes.

Page 57

[1]   A: I read this.
[2]   Q: And upon reading it what did you do with the
[3] information you learned?
[4]   A: Nothing.
[5]   Q: Did you make any recommendations about it?
[6]   A: No.
[7]   Q: Other than contacting the parochial schools and
[8] investigating what the home schoolers were
[9] using did you make any other investigations
[10] about what biology texts other schools were
[11] using?
[12]   A: The teachers secured other texts from other
[13] publishers. I attend Curriculum Council, which
[14] is an organization that has representatives
[15] from all of the schools. I believe I remember
[16] asking a couple people just what text they use,
[17] but I didn't do any type of formal survey.
[18]   MR. ROTHSCHILD: Let me mark this as P-13.
[19]   (P Deposition Exhibit Number 13 marked for
[20] identification.)
[21]   BY MR. ROTHSCHILD:
[22]   Q: Mr. Baksa, do you recognize the document marked
[23] as P-13?
[24]   A: Yes.
[25]   Q: And what is that?

---

Michael Baksa
March 9, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 58

[1]   A: Well, I don't know what the handwriting is on
[2] it or whose it is.
[3]   MR. GILLEN: For the record, I object to
[4] the handwritten notations as hearsay, but go
[5] ahead.
[6]   BY MR. ROTHSCHILD:
[7]   Q: And when you're referring to the handwritten
[8] notations, there's handwritten notations up in
[9] the corner and then there's handwriting under
[10] the headings. Are you referring to one or the
[11] other?
[12]   A: My secretary produced all of the typewritten
[13] text and I have no understanding of the
[14] handwriting.
[15]   Q: So in terms of the typewritten text, is that
[16] the product of your survey of parochial
[17] schools?
[18]   A: Yes.
[19]   Q: And what did you do with the information about
[20] what the parochial schools were teaching?
[21]   A: I believe this was presented. I believe it was
[22] the July, 2004 board curriculum committee with
[23] the teachers.
[24]   Q: And did you make any presentation about what
[25] you had found?

Page 59

[1]   A: I handed this document out to those present at
[2] the meeting and then the teachers had all of
[3] the texts — I believe the teachers had the
[4] texts from all the textbook publishers there
[5] and then made a presentation to the board
[6] curriculum committee on the pluses and minuses
[7] of each of the texts and made a recommendation
[8] to the board curriculum committee.
[9]   Q: And what was that recommendation?
[10]   A: For Miller and Levine.
[11]   Q: Was there any discussion of the other books
[12] being used by the parochial schools?
[13]   A: I don't remember any.
[14]   Q: Did it strike you as odd, Mr. Baksa, that you
[15] were being asked as an assistant superintendent
[16] in a public school system to survey what
[17] parochial schools were teaching their students
[18] in biology?
[19]   A: No. They're other schools.
[20]   Q: I'm sorry?
[21]   A: No, it did not.
[22]   Q: It didn't strike you as strange that you were
[23] — your instruction was about parochial schools
[24] as opposed to other public schools?
[25]   A: Correct.

Page 60

[1]   Q: You didn't take from that that Mr. Nilsen or
[2] the school board was interested in finding
[3] material that was more religious in nature?
[4]   A: No one ever said that to me.
[5]   MR. ROTHSCHILD: Mark this as P-14.
[6]   (P Deposition Exhibit Number 14 marked for
[7] identification.)
[8]   BY MR. ROTHSCHILD:
[9]   Q: Mr. Baksa, the group of documents that we've
[10] marked as P-14, which are a Bates range of 952
[11] to 955, they were presented to us in that
[12] numerical order. I'm not making any
[13] representation of whether they were actually a
[14] collective document in their original form.
[15] Do you recognize these documents?
[16]   A: Yes.
[17]   Q: And on the first page, which is handwritten
[18] text on a memo pad "from the desk of Michael R.
[19] Baksa," is that your handwriting?
[20]   A: Yes.
[21]   Q: And looking at this, can you tell us when you
[22] made these handwritten notations on the memo?
[23]   A: During the period that we were developing a
[24] statement that was to be read in class and that
[25] statement was reviewed by the teachers and

Page 61

[1] board members. What 952 is is my notes from a
[2] telephone conversation with Mr. Buckingham and
[3] these are — this is language that he would
[4] have liked to see included in the statement
[5] that would be read to students.
[6]   Q: And then turning to 953, whose handwriting is
[7] that?
[8]   A: I can't say for sure, but it's probably Marsha
[9] Hake's, the secretary who did the survey at the
[10] schools.
[11]   Q: Turning to 954, whose handwriting is that?
[12]   A: From Melanie Window down to Randy Reeve is my
[13] handwriting. 12.0 or higher reading level, I
[14] don't know whose handwriting that is.
[15]   Q: Who is Melanie Window?
[16]   A: I think Melanie Window is involved as an
[17] administrator in the Tomball School District in
[18] Texas.
[19]   Q: And is she someone you called?
[20]   A: Yes.
[21]   Q: And why did you call her?
[22]   A: They had used the book Of Pandas and People in
[23] their biology classes.
[24]   Q: And did you have a conversation with her?
[25]   A: Yes.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Michael Baksa
March 9, 2005

Page 62

[1]  Q: And what did you talk about?
[2]  A: I asked her whether they are still using the
[3]  book in the classes. She informed me that the
[4]  teacher who taught the book — used the book in
[5]  his classes, that that teacher no longer is
[6]  there and she wasn't sure whether the book was
[7]  being used or even if they still had it.
[8]  Q: Did she otherwise discuss whether it was a good
[9]  text to use?
[10]  A: No, I didn't ask her that.
[11]  Q: Did you ask her anything besides are you still
[12]  using it?
[13]  A: No.
[14]  Q: And who is Randy Reeve?
[15]  A: I don't know.
[16]  Q: Did you make any inquiries to anybody about
[17]  whether Pandas was appropriate from a
[18]  readability standpoint for ninth grade
[19]  students?
[20]  A: I'm thinking about your last question. Randy
[21]  Reeve may be the principal. I'm not sure.
[22]  Q: At the Tomball?
[23]  A: Yeah. I'm sorry, could you ask your question?
[24]  Q: Did you at any time do any investigation about
[25]  the appropriateness from a readability

Page 63

[1]  standpoint of Pandas and People for ninth grade
[2]  students?
[3]  A: Yes.
[4]  Q: When did you do that?
[5]  A: I gave the book to Dr. Butterfield to do a
[6]  readability study.
[7]  Q: And did you get a response?
[8]  A: Yes.
[9]  Q: And what did Dr. Butterfield say?
[10]  A: That it was 12th grade or higher.
[11]  Q: And what did you do with that information?
[12]  A: I spoke to teachers about it and I might have
[13]  spoken to board members about it, but I'm not
[14]  sure.
[15]  Q: Turning to 955, do you recognize that
[16]  handwriting?
[17]  A: Yes.
[18]  Q: Whose handwriting is that?
[19]  A: My secretary's, Amy.
[20]  Q: Mr. Baksa, are you aware that there's been a
[21]  lot of reporting about the purchase of the
[22]  biology textbook and the change of the biology
[23]  curriculum in the two York papers?
[24]  A: Yes.
[25]  Q: Have you made it a practice to read newspaper

Page 64

[1]  articles about the issue at Dover?
[2]  A: Yes.
[3]  Q: And when did you start that practice?
[4]  A: Our receptionist in our administration
[5]  building, it's her responsibility to pull
[6]  articles about Dover and other educational
[7]  articles on other schools and then to make
[8]  copies to distribute to the office. So the
[9]  practice was already in place for anything to
[10]  come through about us to be read by everyone.
[11]  Q: Earlier in your testimony you indicated you
[12]  remembered Mr. Buckingham using the word
[13]  creationism during meetings in June, 2004,
[14]  correct?
[15]  A: Yes.
[16]  Q: And are you aware that there were quite a few
[17]  articles in the two York papers about the
[18]  meetings in June?
[19]  A: Yes.
[20]  Q: And are those articles you read around the time
[21]  that they were published?
[22]  A: Could you ask that again?
[23]  Q: Yes. These articles written in June about the
[24]  June meetings, did you read those articles
[25]  during June?

Page 65

[1]  A: Yes.
[2]  Q: Have you ever asked any reporter to correct
[3]  anything that they reported in the newspaper
[4]  about things that you said?
[5]  MR. GILLEN: Objection, relevance. You
[6]  can answer, Mike.
[7]  A: No.
[8]  BY MR. ROTHSCHILD:
[9]  Q: Never verbally or in writing?
[10]  A: No.
[11]  Q: Have you ever asked any newspaper reporter or
[12]  newspaper to correct anything they reported
[13]  about anything that any school board member
[14]  said?
[15]  MR. GILLEN: Objection, relevance. Go
[16]  ahead.
[17]  A: No.
[18]  BY MR. ROTHSCHILD:
[19]  Q: What about things that were reported about what
[20]  Mr. Nilsen said?
[21]  MR. GILLEN: Same objection.
[22]  A: No.
[23]  BY MR. ROTHSCHILD:
[24]  Q: Have you ever asked a newspaper reporter to
[25]  correct anything they have reported that

**Michael Baksa**
**March 9, 2005**

**Tammy Kitzmiller, et al.   v.**
**Dover Area School District, et al.**

---

Page 66

[1] relates to the purchase of the biology textbook
[2] or the biology curriculum?
[3]    MR. GILLEN: Same objection.
[4]    A: No.
[5]    (P Deposition Exhibit Number 4 PREVIOUSLY
[6] marked for identification.)
[7]              BY MR. ROTHSCHILD:
[8]    Q: Mr. Baksa, we've compiled a collection of news
[9] articles relating to the issues in dispute in
[10] this litigation that was previously marked as
[11] P-4. And let me represent to you that I — or
[12] I am not representing to you that this is every
[13] article written on the subject, but a
[14] compilation of many articles written on the
[15] subject.
[16]    If you could look at the first article in
[17] this collection. It's a June 8th, 2004 article
[18] in the York Dispatch.
[19]    A: Do you want me to read it?
[20]    Q: I'm going to ask you specific questions about
[21] the contents of the article and when I ask the
[22] question if you feel you need to go back and
[23] read the entire article, you should certainly
[24] do that.
[25]    MR. GILLEN: Eric, for the convenience of

Page 67

[1] your question, would it be okay with you if I
[2] had a standing objection to the newspaper
[3] articles and statements therein as hearsay?
[4]    MR. ROTHSCHILD: Yes. I don't agree with
[5] the objection, but you can have the standing
[6] objection.
[7]              BY MR. ROTHSCHILD:
[8]    Q: If you turn to the second page of this article,
[9] four paragraphs down it is reported that Mr.
[10] Buckingham was said that he was disturbed that
[11] the book was laced with Darwinism. Do you
[12] remember him making that statement in public
[13] school board meetings in June of 2004?
[14]    A: I remember Mr. Buckingham saying laced with
[15] Darwinism. I'm not sure when.
[16]    Q: Then the next paragraph refers to a statement
[17] by a person named Max Pell in which he says,
[18] creationism is a religious theory; why does it
[19] have to be taught in biology class.
[20]    Do you remember Mr. Pell getting up and
[21] speaking at a school board meeting on the issue
[22] of the biology textbook or biology curriculum?
[23]    A: No.
[24]    Q: Do you remember whether any members of the
[25] community who spoke at meetings in June asked

Page 68

[1] questions or raised concerns about the teaching
[2] of creationism?
[3]    A: I don't remember — no, I don't remember
[4] creationism being a topic of discussion.
[5]    Q: And when you say you don't remember, do you
[6] believe it did not happen or you just have no
[7] recollection?
[8]    A: I just don't remember.
[9]    Q: A couple paragraphs down it says, Buckingham
[10] said he believes the separation of church and
[11] state is mythical and not something he
[12] supports. Do you remember him saying anything
[13] to that effect at any time?
[14]    A: I don't remember that.
[15]    Q: Could you turn to the next article? This is a
[16] June 9, 2004 article from the York Dispatch
[17] reporting about a school board meeting. And it
[18] says, Buckingham said the committee would look
[19] for a book that presented both creationism and
[20] evolution. Do you remember Mr. Buckingham
[21] making a statement to that effect?
[22]    A: I remember him saying creationism, but I don't
[23] remember the rest, the context.
[24]    Q: When he referred to creationism, was he
[25] speaking in support of it or in support of the

Page 69

[1] teaching of it?
[2]    A: I don't remember.
[3]    Q: He wasn't saying let's make sure we keep
[4] creationism out of the school, was he?
[5]    A: I remember him saying creationism.
[6]    Q: Did he use those words in one meeting or more
[7] than one meeting?
[8]    A: I just remember — I don't know if it was used
[9] — are you asking me if Mr. Buckingham used the
[10] word at other meetings?
[11]    Q: Yes.
[12]    A: I don't remember. I don't remember whether it
[13] was — whether he used the word creationism in
[14] other meetings, that I don't remember.
[15]    Q: Do you remember whether there was any dialogue
[16] between Mr. Buckingham and people attending the
[17] school board meeting on the issue of
[18] creationism?
[19]    A: I remember I believe after the June meeting,
[20] and I do remember people coming to the board
[21] meetings to express their views on creationism.
[22]    Q: And do you remember who any of those
[23] individuals were?
[24]    A: No. Well, I remember Eric Riddle.
[25]    Q: Do you remember, did Eric Riddle — during what

---

**Min-U-Script®**   **Filius & McLucas Reporting Service, Inc.**

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Michael Baksa
March 9, 2005

---

Page 70

[1] time period did Eric Riddle speak about
[2] creationism?
[3]   MR. GILLEN: Objection to the
[4] characterization of his answer.
[5]   MR. ROTHSCHILD: In what respect?
[6]   MR. GILLEN: That he said Riddle talked
[7] about creationism.
[8]   MR. ROTHSCHILD: Could you read back his
[9] answer about Eric Riddle, please?
[10]      (Questions and answers, Page 68, Lines 24
[11] and 25, Pages 69, Lines 1 and 2 read by the
[12] court reporter)
[13]   MR. ROTHSCHILD: I'll withdraw my prior
[14] question.
[15]               BY MR. ROTHSCHILD:
[16]   Q: Did Mr. Riddle talk on the subject of
[17] creationism?
[18]   A: I don't remember whether it was creationism or
[19] intelligent design. I just remember Mr. Riddle
[20] speaking to the board in support of the board.
[21]   Q: And do you remember what time period that was?
[22]   A: Sometime after June.
[23]   Q: Other than that, you don't remember any citizen
[24] bringing up the topic of creationism at the
[25] school board meetings?

---

Page 71

[1]   A: Not specifically, no.
[2]   Q: Is it possible that that occurred? I mean, do
[3] you have a firm recollection that no such
[4] discussion did occur or do you just not
[5] remember?
[6]   A: I don't remember.
[7]   Q: In this article there's some — starting about
[8] seven paragraphs down there's reference to
[9] yourself, Assistant Superintendent Michael
[10] Baksa, and it continues for about five
[11] paragraphs.
[12]   A: What page are we on?
[13]   Q: We're in the York Dispatch June 9th article on
[14] the second page and you'll see about seven
[15] paragraphs down, eight paragraphs down the
[16] reference to Assistant Superintendent Michael
[17] Baksa.
[18]   A: Okay.
[19]   Q: Looking through the paragraphs that refer to
[20] things you said, do you think it's reported
[21] accurately?
[22]   A: It's accurate that Assistant Superintendent
[23] Michael Baksa said the current textbook called
[24] Biology: The Living Science, and the school's
[25] science curriculum teach evolution, that's

---

Page 72

[1] accurate.
[2]   Q: What about the next paragraph?
[3]   A: That's accurate.
[4]   Q: And the paragraph I just asked you to look to
[5] states, We do not address the origins of life.
[6] The origin of life is left to the personal
[7] beliefs of each family.
[8]      What did you mean by the term origin of
[9] life when you said that?
[10]   A: In conversations with the teachers and early on
[11] when we met in September of 2003 with Mr.
[12] Bonsell, the teachers explained to Mr. Bonsell
[13] that they did not teach the origins of life,
[14] that they teach evolution as change over time
[15] within the species.
[16]   Q: So at the time you made the statement it was
[17] your understanding that origins of life are not
[18] taught in Dover High School biology class. Is
[19] that right?
[20]   A: Yes.
[21]   Q: And, in fact, that practice was memorialized in
[22] the resolution that was passed on October 18th,
[23] correct, the resolution included adding the
[24] text to the curriculum origins of life is not
[25] taught?

---

Page 73

[1]   A: Correct.
[2]   Q: Is it your understanding that intelligent
[3] design is a theory on the origins of life?
[4]   MR. GILLEN: Objection, foundation.
[5]   A: That I wouldn't know.
[6]               BY MR. ROTHSCHILD:
[7]   Q: You read a statement to the biology class on
[8] January 18th in implementing the change to the
[9] biology curriculum, correct?
[10]   A: Yes.
[11]   Q: And in that statement one of the things you
[12] said to the students is intelligent design is
[13] an explanation of the origin of life that
[14] differs from Darwin's view. Is that right?
[15]   A: Yes.
[16]   Q: If origins of life is not being taught at Dover
[17] High School why is the fact that intelligent
[18] design is a theory, an explanation of the
[19] origin of life being taught to the students?
[20]   MR. GILLEN: Objection, calls for
[21] speculation.
[22]               BY MR. ROTHSCHILD:
[23]   Q: You can answer.
[24]   A: We're not teaching intelligent design.
[25]   Q: What do you understand you are doing when you

---

**Michael Baksa**
**March 9, 2005**

**Tammy Kitzmiller, et al.   v.**
**Dover Area School District, et al.**

Page 74

[1] made that statement?

[2]    A: We're reading that statement making students

[3] aware of intelligent design and that there's a

[4] book in the library, if they wanted to research

[5] that they could.

[6]    Q: When the statement is read to the students and

[7] they are being made aware of intelligent

[8] design, is it your testimony that that is not

[9] teaching the students?

[10]    A: Yes.

[11]    Q: What do you call that doing?

[12]    A: Making them aware.

[13]    Q: Do you understand the students to be learning

[14] when that statement is made?

[15]    A: They're learning that they're aware of a book

[16] in the library.

[17]    Q: So they're learning, but not being taught?

[18]    A: Correct.

[19]    Q: In the news article I was asking you to look at

[20] a couple of paragraphs down it says, The

[21] district has not rejected the proposed new

[22] textbook, Baksa said, but it will continue to

[23] look for a book that will make everyone happy.

[24]    Was that an accurate characterization of

[25] what you said?

Page 75

[1]    A: Yes.

[2]    Q: And when you were referring to the proposed new

[3] textbook, were you referring to the Miller

[4] Levine book recommended by the teachers?

[5]    A: Yes.

[6]    Q: And when you said that the district is

[7] continuing to look for a book that will make

[8] everyone happy, what did you mean by that?

[9]    A: A book that would be acceptable to the board

[10] curriculum committee and the teachers.

[11]    Q: What was your understanding of what it would

[12] take in a book to make everyone happy?

[13]    A: I think the board curriculum committee was

[14] concerned with the presentation of Darwin and

[15] so they were examining the chapters that dealt

[16] with Darwin.

[17]    Q: And what was your understanding of what they

[18] were concerned about?

[19]    A: That Darwin was taught as a fact and that it

[20] was overstated as a given with no mention of

[21] any shortcomings or gaps or problems.

[22]    Q: And did you personally ever review the biology

[23] textbook to reach your own conclusion about

[24] whether the book, in fact, did identify gaps or

[25] shortcomings in the theory?

Page 76

[1]    A: Yes.

[2]    Q: And what conclusion did you come to?

[3]    A: The 2004 edition of the Miller Levine does

[4] mention gaps.

[5]    Q: Is that different from earlier versions being

[6] used by — that were being used by the school

[7] district?

[8]    A: The 2004 edition of the Miller Levine made a

[9] number of changes that softened the

[10] presentation of Darwin.

[11]    Q: So, in fact, the textbook that the teachers

[12] were recommending did, in fact, address what

[13] the school board was worried about, whether the

[14] gaps and shortcomings were being identified?

[15]    MR. GILLEN: Objection to the question.

[16] It's misleading, characterizes the board's

[17] position without adequate foundation.

[18]    BY MR. ROTHSCHILD:

[19]    Q: You can answer.

[20]    A: The teachers recommended the 2004 Miller Levine

[21] and the board approved that text.

[22]    Q: And that text does identify gaps, correct?

[23]    A: Yes.

[24]    Q: And shortcomings?

[25]    A: I don't remember the word shortcomings being

Page 77

[1] used, but gaps is used.

[2]    Q: Okay. So given that the book identifies gaps,

[3] is there any reason why the students needed to

[4] be told separately Darwin's theory has gaps —

[5]    MR. GILLEN: Objection, calls for

[6] speculation.

[7]    BY MR. ROTHSCHILD:

[8]    Q: — in the statement that you read to the

[9] students on January 18th?

[10]    A: Could you ask that again?

[11]    Q: Yes. If the book identifies gaps in Darwin's

[12] theory of evolution, why is the district making

[13] a point to tell the students in a statement

[14] read before the subject of evolution is covered

[15] Darwin's theory has gaps?

[16]    MR. GILLEN: Objection, calls for

[17] speculation.

[18]    A: I was directed to work with the board and the

[19] teachers to develop a statement that the

[20] teachers would read to address the concerns

[21] that other alternative theories of evolution

[22] were presented and that students being made

[23] aware of the book Of Pandas and People and that

[24] resulted in that statement being — having

**Tammy Kitzmiller, et al.   v.**
**Dover Area School District, et al.**

**Michael Baksa**
**March 9, 2005**

---

Page 78

[1] input from the teachers and the board that
[2] statement being created and read.
[3]          BY MR. ROTHSCHILD:
[4]     Q: And so that statement tells students that there
[5] are gaps in the theory, correct?
[6]     A: I don't have the statement in front of me, but
[7]
[8]     Q: But what?
[9]     A: Yeah, I don't remember if gaps is in the
[10] statement.
[11]    Q: All right. We'll return to that. Could you
[12] turn to the next article, which is a June 9th,
[13] 2004. In this June 9, 2004 article from the
[14] York Daily Record, four paragraphs down it
[15] quotes Mr. Buckingham as saying, It's
[16] inexcusable to teach from a book that says man
[17] descended from apes and monkeys. We want a
[18] book that gives balance to education. Do you
[19] remember him saying that?
[20]    A: No.
[21]    Q: And then it follows by saying, Buckingham and
[22] other board members are looking for a book that
[23] teaches creationism and evolution. Do you
[24] remember him communicating that?
[25]    A: No.

Page 79

[1]    Q: Two more paragraphs down it says that Board
[2] President Alan Bonsell said there were only two
[3] theories, creationism and evolution, that could
[4] be taught. Do you remember him saying that?
[5]    A: I think I remember Noah Wenrich saying
[6] something like that, not Mr. Bonsell.
[7]    Q: At the end of the article it attributes — I'm
[8] sorry, the second to last paragraph, again, it
[9] says, Buckingham said he wants a book that
[10] offers balance between what he said are
[11] Christian views of creationism and evolution.
[12] Do you remember him saying that?
[13]    A: No.
[14]    Q: And then the next paragraph he's quoted as
[15] saying, This country wasn't founded on Muslim
[16] beliefs of evolution, this country was founded
[17] on Christianity and our students should be
[18] taught as such. Do you remember him saying
[19] that?
[20]    A: Yes.
[21]    Q: What were the circumstances in which he said
[22] that?
[23]    A: I don't remember when he said that or the
[24] circumstances. I just remember him saying that
[25] and hearing that.

Page 80

[1]    Q: You actually heard it yourself?
[2]    A: Yes.
[3]    Q: As a professional in education, Mr. Baksa, do
[4] you have an understanding of whether it's legal
[5] for a public school to teach religious concepts
[6] of creation to students?
[7]    A: I have an understanding of the legal opinion on
[8] teaching creationism in the classroom and my
[9] understanding is that that would not be legal.
[10]    Q: And you heard Mr. Buckingham say this country
[11] was founded on Christianity and our students
[12] should be taught as such.
[13]        Do you understand what Mr. Buckingham said
[14] in that statement to be consistent with what a
[15] public school can legally do?
[16]    A: I really don't know — curriculum is about
[17] content and without specific content being put
[18] in front of me I can't make a judgment on
[19] whether it's legal or not.
[20]    Q: We're reviewing articles in which it's fairly
[21] regularly repeated that Mr. Buckingham and
[22] perhaps other school board members were
[23] expressing their desire that creationism be
[24] taught alongside evolution and you read
[25] articles of that nature during this June

Page 81

[1] period?
[2]    A: I'm sorry?
[3]    Q: We have a lot of articles here. You're welcome
[4] to flip through more of them, but there are
[5] articles through the June period about meetings
[6] of the Dover board in which it is reported that
[7] Mr. Buckingham specifically expressed — and
[8] other board members expressed a desire that
[9] creationism be taught alongside evolution, a
[10] number of articles like that.
[11]        Do you remember reading a lot of articles
[12] like that during this June period?
[13]    A: That creationism be taught?
[14]    Q: Reading the articles. I'm not asking you what
[15] was said. I'm asking you do you remember
[16] reading the articles?
[17]    MR. GILLEN: Objection. The question is
[18] vague.
[19]    A: Yeah. Can you restate the question?
[20]        BY MR. ROTHSCHILD:
[21]    Q: You said that you read the articles pulled from
[22] the local papers about things going on in the
[23] school district, correct?
[24]    A: Yes.
[25]    Q: And I've just shown you a few examples and

---

Michael Baksa
March 9, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 82

[1] we'll go through a few more where the reporters
[2] are reporting that the school board or
[3] individual members of the school board are
[4] looking for a biology textbook that presents
[5] creationism or want creationism taught in the
[6] public schools. Do you remember reading
[7] articles like that, including the ones I've
[8] shown you?
[9]    A: I don't remember any articles talking about
[10] teaching creationism in schools. I do remember
[11] Joe Maldonado talking to me within June and I
[12] do remember Joe making the assumption that we
[13] were reading — I remember reading articles by
[14] him that made the assumption that we were
[15] looking for a book on creationism, that
[16] included creationism.
[17]    And I remember talking to Joe later when
[18] finally we chose Miller and Levine and him
[19] asking me if there is creationism in that book.
[20] However, neither the teachers, I, nor the board
[21] curriculum committee never directed, other than
[22] hearing the words said at the public board
[23] meeting, the board curriculum committee never
[24] directed me or the teachers specifically to
[25] look for a book that had creationism in it.

Page 83

[1]    Our understanding was that we were looking
[2] for a book that presented a better balanced
[3] presentation of Darwin's theory of evolution.
[4]    Q: And by better balanced you mean what?
[5]    A: Again, that it's not simply presented as a
[6] fact, that it's not — the evidence isn't
[7] overstated, that it's not misleading to
[8] students.
[9]    Q: In any of the textbooks you looked at,
[10] including Miller and Levine, did you read the
[11] statement evolution is a fact?
[12]    A: I don't remember.
[13]    Q: I mean, was that — you know, where was that
[14] concern arising from?
[15]    A: It was a concern of — the individual board
[16] members had expressed that concern to me.
[17]    Q: And which individual board members was that?
[18]    A: Mr. Bonsell and Mr. Buckingham.
[19]    Q: Did they ever point to you anything in any
[20] textbook in order to demonstrate to you what
[21] they meant by the statement evolution is being
[22] presented as a fact?
[23]    A: Yes.
[24]    Q: And what did they point you to?
[25]    A: I don't remember specifically, but I do

Page 84

[1] remember Mr. Bonsell reviewing the book and
[2] returning the book to me with certain pages
[3] marked that he had concerns with.
[4]    I remember Mr. Buckingham creating a list
[5] of pages in the biology book that he had
[6] concerns with. So that was what they were
[7] presenting that they were finding that they had
[8] concerns with.
[9]    Q: And to your knowledge, do Mr. Bonsell or Mr.
[10] Buckingham or any other school board member
[11] have the expertise in science to make a
[12] judgment about whether the textbooks are
[13] properly presenting scientific knowledge on the
[14] subject of evolution?
[15]    A: I wouldn't know.
[16]    Q: Did you ever make any inquiries or
[17] investigations into what — let me withdraw
[18] that. Do you understand that there are
[19] associations and universities that make
[20] recommendations on the teaching of scientific
[21] subject matter, National Academy of Science?
[22]    A: I'm aware of national science organizations.
[23] Their specific activities I'm not aware of.
[24]    Q: In trying to make this assessment about whether
[25] these textbooks were fairly presenting the

Page 85

[1] theory of evolution did you ever avail yourself
[2] of any resources from organizations like that?
[3]    A: No.
[4]    Q: So you just went to parochial schools to find
[5] out what they're teaching?
[6]    MR. GILLEN: Objection to the
[7] characterization of his answer as to who he
[8] went to to look for advice on the text.
[9]    A: Could you ask your question again?
[10]    BY MR. ROTHSCHILD:
[11]    Q: You didn't go to nationally recognized
[12] scientific organizations, you just went to
[13] parochial schools to investigate what should be
[14] taught?
[15]    MR. GILLEN: Same objection to the steps
[16] he took to investigate the texts.
[17]    BY MR. ROTHSCHILD:
[18]    Q: You can answer the question.
[19]    A: In selecting a text the teachers contacted
[20] publishers and got their current editions of
[21] those texts and they reviewed those texts.
[22]    In addition to that, we were looking at
[23] what other texts other parochial schools might
[24] be using and Dr. Nilsen asked me to get that
[25] list and I provided that list to the teachers.

**Tammy Kitzmiller, et al.   v.**
**Dover Area School District, et al.**

**Michael Baksa**
**March 9, 2005**

---

Page 86

[1] Q: Mr. Baksa, could you turn to the — it's a few
[2] articles in, to the June 15th, 2004 York
[3] Dispatch article? Have you found that article?
[4] A: I think so. 12/31 on the bottom?
[5] Q: That's right. Do you remember reading this
[6] article? This is an article by Heidi
[7] Bernhard-Bubb of the York Dispatch.
[8] A: Can I read it?
[9] Q: Sure.
[10] A: Okay.
[11] Q: Do you remember reading that article?
[12] A: Yes.
[13] Q: And if you could turn to the next article
[14] behind it, which is a June 15th, 2004 article
[15] by Joseph Maldonado in the York Daily Record.
[16] Could you tell me whether you remember reading
[17] that article?
[18] A: Can I read it?
[19] Q: Sure. It's the only way you'll know.
[20] A: Okay.
[21] Q: Do you recognize that second article by Mr.
[22] Maldonado?
[23] A: Yes.
[24] Q: It's something you read on or around June 15th,
[25] 2004?

Page 87

[1] A: Yes.
[2] Q: In both of these articles a statement is
[3] attributed to Mr. Buckingham, 2000 years ago
[4] someone died on a cross, can't someone take a
[5] stand for him. Do you remember Mr. Buckingham
[6] saying that?
[7] A: Yes.
[8] Q: And do you remember him saying that in one of
[9] these June meetings?
[10] A: That I don't remember.
[11] Q: Describe for me what you remember about the
[12] context of Mr. Buckingham saying that.
[13] A: I just remember hearing that.
[14] Q: And —
[15] A: I don't remember the context.
[16] Q: And can you put any time frame on when that
[17] occurred?
[18] A: No, not really.
[19] Q: Do you remember whether it was said in
[20] conjunction with a meeting in which the biology
[21] curriculum or purchase of biology textbook was
[22] being discussed?
[23] A: I don't remember.
[24] Q: Mr. Baksa, this is a pretty notable statement
[25] and you're telling me you have no memory of

Page 88

[1] when it occurred or what it was about?
[2] A: I remember hearing the statement, but I don't
[3] remember when it was.
[4] Q: What was your reaction when you heard this?
[5] It's a pretty odd thing to be said in the
[6] middle of a discussion about public school
[7] activities, isn't it?
[8] A: I just remember hearing the statement.
[9] Q: And what? Any reaction to it?
[10] A: Well, without remembering the context in which
[11] the statement was made, I don't remember if it
[12] would have any implications for the district at
[13] all or for the curriculum at all.
[14] One of the things, as creationism is being
[15] talked about Mrs. Spahr and I already have in
[16] our hands documents about the legal precedence
[17] of teaching creationism. I also have our
[18] solicitor's opinion on teaching creationism.
[19] So there was no formal movement by the
[20] board to actually do that. They were talking
[21] about it, it was being brought up by the public
[22] and being answered, but I was not being asked
[23] to do anything with that. And the legal
[24] opinion I had certainly would support the cases
[25] that had already been heard on that.

Page 89

[1] Q: Okay. But you do remember that the board was
[2] talking about creationism and the public was
[3] talking about creationism?
[4] MR. GILLEN: Objection to the
[5] characterization of his answer, but go ahead.
[6] A: I remember Bill saying creationism.
[7] BY MR. ROTHSCHILD:
[8] Q: And you remember the public talking about it?
[9] A: Yeah — well, I remember from — if I don't
[10] have the newspaper articles in front of me
[11] nothing comes into my head specifically about
[12] someone other than I do remember Mrs.
[13] Buckingham getting up there and talking about
[14] creation as according to the Bible, but other
[15] than her no one comes to mind as far as
[16] speaking about creationism.
[17] Q: And Mrs. Buckingham getting up and speaking
[18] about it is reported in these newspaper
[19] articles, correct?
[20] A: Yes.
[21] Q: And they're reporting about what she said at a
[22] meeting in June, correct? That's when these
[23] were written?
[24] A: Yeah, I think it was in June when she spoke.
[25] Q: And did you have an understanding of why she

---

Michael Baksa
March 9, 2005

Tammy Kitzmiller, et al.  v.
Dover Area School District, et al.

Page 90

[1] was getting up and speaking about teaching
[2] creationism?
[3]   A: No.
[4]   Q: Did you understand her to be speaking in
[5] support of her husband or other members of the
[6] board who were interested in teaching
[7] creationism?
[8]   A: I don't know why she was talking.
[9]   Q: Do you have any reason to doubt what is
[10] reported in these stories that the
[11] 2000-years-ago statement was made during a
[12] meeting in June in which the biology curriculum
[13] was being discussed?
[14]   A: All I could say is I don't remember — I
[15] remember hearing it, but I don't remember when.
[16]   Q: Do you remember ever having discussions with
[17] members of the board in which anybody said have
[18] you seen what they're reporting in these
[19] newspapers, they're getting it all wrong? Do
[20] you ever remember anybody saying that? Let me
[21] narrow the question.
[22]   Do you remember in terms of these articles
[23] that are coming out in June anybody reacting to
[24] this and saying, oh, my God, look what they're
[25] writing here, they've got it all wrong?

Page 91

[1]   MR. GILLEN: Objection, relevance.
[2]   A: Not specifically. In general I remember
[3] comments occasionally about how the reporters
[4] might have characterized an interview with a
[5] board member or a meeting in which they're
[6] reporting on, but I couldn't tell you
[7] specifically.
[8]   BY MR. ROTHSCHILD:
[9]   Q: So you don't know what, if anything, was being
[10] discussed as being wrong in the reporting?
[11]   A: Right.
[12]   Q: In these June meetings — you do recall that in
[13] these June meetings there was discussion about
[14] the biology textbook?
[15]   A: Yes.
[16]   Q: And during these discussions was there ever
[17] mention of intelligent design?
[18]   A: Alan Bonsell might have mentioned it. I'm not
[19] sure, though.
[20]   Q: And do you remember anything he said about it?
[21]   A: No.
[22]   Q: After these meetings in June did you ever speak
[23] to any members of the Dover community who
[24] expressed concern over the fact that the school
[25] board was interested in teaching creationism?

Page 92

[1]   A: I had a parent phone call. I don't think it
[2] was for creationism, though. No, I had no
[3] phone calls on creationism, no.
[4]   Q: Against or in support?
[5]   A: Correct.
[6]   Q: Another thing reported in both of these
[7] articles, and they phrase it slightly
[8] differently, but the idea that liberals in
[9] black robes and the liberal agenda was taking
[10] away the rights of Christians in this country,
[11] statements attributed to Mr. Buckingham. Do
[12] you remember him making statements to that
[13] effect?
[14]   A: Not that specifically, but I remember some
[15] comments along those lines, with that idea, but
[16] I don't remember those exact words.
[17]   Q: And were those comments made at the June
[18] meeting?
[19]   A: That I don't remember.
[20]   MR. ROTHSCHILD: This is a good time to
[21] break.
[22]   (Luncheon recess taken)
[23]   BY MR. ROTHSCHILD:
[24]   Q: Mr. Baksa, when you went to that lecture by
[25] Messiah College did the speaker express any

Page 93

[1] views on the scientific theory of evolution
[2] that's generally taught in public schools?
[3]   A: About it?
[4]   Q: Yes, whether there were problems with it or he
[5] supported the teaching of it.
[6]   A: No.
[7]   Q: Did he indicate in any way that the scientific
[8] theory of evolution was in conflict in any way
[9] with any religious principles?
[10]   A: No.
[11]   Q: During this morning's testimony you testified
[12] about Mr. Nilsen's instruction to you to survey
[13] parochial schools for what textbooks they were
[14] using. And I just want to confirm that you're
[15] confident in that memory that it was Mr. Nilsen
[16] who instructed you to do that.
[17]   A: Yeah, I believe so.
[18]   Q: And not any board member?
[19]   A: Right.
[20]   Q: And that he did not otherwise tell you why he
[21] wanted you to do that?
[22]   A: Correct.
[23]   Q: On the subject of the Bob Jones University
[24] textbook, which we looked at a description of
[25] this morning, do you remember the subject of

Min-U-Script®    Filius & McLucas Reporting Service, Inc.

**Tammy Kitzmiller, et al.   v.**
**Dover Area School District, et al.**

**Michael Baksa**
**March 9, 2005**

---

Page 94

[1] that textbook coming up in a recent discussion
[2] you had with members of the Dover High School
[3] science staff?
[4] **A:** No.
[5] **Q:** Do you remember Mr. Eshbach asking you about
[6] that book?
[7] **A:** At a meeting I think I went to the science
[8] department and met with them to confirm the use
[9] of the old books. And at that meeting in
[10] talking about the process I think somebody
[11] brought up about the Bob Jones and my comment
[12] was I had forgotten about that book.
[13] **Q:** Did you also say in response to that topic that
[14] you thought that Alan Bonsell had given you the
[15] information on that book?
[16] **A:** That's correct, initially that's what I was
[17] thinking.
[18] **Q:** And is that still your recollection?
[19] **A:** Now I'm thinking that it wasn't Alan, but it
[20] was my research through the home schoolers.
[21] **Q:** And what caused you to change your
[22] recollection?
[23] **A:** In reviewing the production documents on my
[24] initial with counsel that was my initial
[25] understanding of how that document came to be,

Page 95

[1] but then when we talked further about that and
[2] I thought further about that and I also talked
[3] to my secretary, I thought I did then remember
[4] having asked my secretary to go to a website
[5] and look for that.
[6] **Q:** Okay. And was that search suggested to you by
[7] anybody or was that initiated by yourself?
[8] **A:** Bob Jones?
[9] **Q:** Yes.
[10] **A:** I'm not clear whether Dr. Nilsen directed me to
[11] research what the home schoolers were using or
[12] whether as we were doing this research of
[13] parochial schools that I also thought the home
[14] schoolers would be another organization to look
[15] at what text they're using. That I'm not clear
[16] about.
[17] **Q:** But sitting here today testifying under oath to
[18] the best of your recollection, you don't
[19] associate that search with Mr. Bonsell anymore?
[20] **A:** Yes.
[21] **Q:** That's correct?
[22] **A:** I don't associate it with him, right, yes.
[23] **Q:** I'm not sure I asked that question perfectly
[24] clearly, but I think you understand it.
[25] **MR. ROTHSCHILD:** Pat, one thing I should

Page 96

[1] have said earlier, you've made a number of
[2] objections as to relevance and hearsay. And if
[3] I recall from our previous depositions, we
[4] agreed that all objections except as to form
[5] would be reserved. Is that your understanding
[6] as well?
[7] **MR. GILLEN:** I'm not sure what you mean by
[8] reserved.
[9] **MR. ROTHSCHILD:** In other words, your
[10] relevance objections are preserved and so you
[11] don't need to be making substantive objections,
[12] those are preserved. And I'm not changing my
[13] questions because I think we had previously
[14] operated under the understanding if you object
[15] to form it's my responsibility to correct it if
[16] I think that's necessary. Other than that, all
[17] objections are preserved.
[18] **MR. GILLEN:** In other words, you're saying
[19] I don't need to object now to preserve it for
[20] future use?
[21] **MR. ROTHSCHILD:** To preserve relevance.
[22] You know, if you do it I'm not going to say
[23] anything, but I think we're operating under
[24] that understanding. Those are for trial.
[25] **MR. GILLEN:** Okay, that's fine for this

Page 97

[1] dep. And I guess we can work out an agreement.
[2] **BY MR. ROTHSCHILD:**
[3] **Q:** Mr. Baksa, did you have a conversation with
[4] Jennifer Miller, a teacher at Dover High
[5] School, in early February about the position
[6] that the school teachers were taking as regards
[7] the biology curriculum?
[8] **A:** Yes.
[9] **Q:** And what did you tell her when you had that
[10] discussion?
[11] **A:** Do you have a specific question?
[12] **Q:** Well, did you tell her to be careful about
[13] standing up to the board?
[14] **A:** I warned Jen that any position that they might
[15] take which could be judged to be insubordinate
[16] by our council, that they should be careful
[17] about taking a stand like that, that it's not
[18] necessary that they put themselves in a risky
[19] position like that.
[20] **Q:** Why did you tell her that?
[21] **A:** Because I felt that just personally I work very
[22] closely with all the science teachers and I saw
[23] them in some instances putting themselves at
[24] risk and just as a matter of courtesy I just
[25] wanted to communicate to them to be cautious

---

**Michael Baksa**
**March 9, 2005**

**Tammy Kitzmiller, et al.   v.**
**Dover Area School District, et al.**

---

Page 98

[1] and to refer them that it's not necessary that
[2] they do that.
[3]    Q: Did your concern that they might be putting
[4] themselves at risk derive from anything that
[5] had been said to you?
[6]    A: No.
[7]    Q: So nothing from a member of the board or Mr.
[8] Nilsen?
[9]    A: No.
[10]    Q: Is one of the things they have done that you
[11] thought might put them at risk, does that
[12] include the position they took that they did
[13] not want to read the statement?
[14]    A: Yes.
[15]    Q: And why did you feel that that put them at
[16] risk?
[17]    A: Because I felt that they did not have — it
[18] wasn't the statement so much as we had come to
[19] an agreement about the procedures for
[20] implementing the reading of the statement. At
[21] a meeting with the teachers we reviewed how we
[22] were going to do that and they were in
[23] agreement with that.
[24]    After that they submitted a request not to
[25] have to do that and the superintendent

Page 99

[1] responded that he would make that accommodation
[2] in this particular instance.
[3]    What they failed to do is on a Friday they
[4] were to distribute the forms for students to be
[5] excused from classes without informing anybody
[6] of that. I felt that that action was risky in
[7] that there was an administrative understanding
[8] for them to do so and they didn't do so and if
[9] examined by council that could be determined to
[10] be an act of insubordination which would put
[11] them at risk.
[12]    Q: And what about the action of opting out or
[13] requesting to be excused from reading the
[14] statement, did you consider that an act of
[15] insubordination?
[16]    A: No, because they made the request and we
[17] granted it.
[18]    Q: Did they explain to you why they had made that
[19] request?
[20]    A: I read a document they submitted in making that
[21] request and in that they did put some
[22] rationale.
[23]    Q: You described to me earlier today materials
[24] that Mr. Buckingham had given you. And let me
[25] just make sure that I have exhausted the list.

Page 100

[1] There's the book Of Pandas and People?
[2]    A: Yes.
[3]    Q: There was a video?
[4]    A: There were three videotapes — three CDs.
[5]    Q: And do you know what those CDs were?
[6]    A: One I recall the title was I think it's Icons
[7] of Evolution. The other two titles I don't
[8] recall.
[9]    Q: Was one of them called Unlocking the Mystery of
[10] Life, a Scientific Case for Intelligent Design?
[11]    A: I don't remember.
[12]    MR. ROTHSCHILD: Pat, you tell me if you
[13] think I'm wrong, but those are the only two
[14] videos that have been represented to us I
[15] believe.
[16]    MR. GILLEN: I believe that you're
[17] correct, Eric, that there were two DVDs and
[18] then a book by the title Icons of Evolution and
[19] Of Pandas and People. I believe that that is
[20] the sum total of materials.
[21]    A: That may be, that there were only two.
[22]    BY MR. ROTHSCHILD:
[23]    Q: And I have the book Icons of Evolution here.
[24] Is that something that was provided to you?
[25]    A: Yes.

Page 101

[1]    Q: This group of materials, and, you know, I
[2] realize there may be some uncertainty about
[3] whether there were two or three videos, were
[4] they provided to you all at once?
[5]    A: I think so.
[6]    Q: And when did that occur?
[7]    A: I think it occurred sometime after — around
[8] June, 2004 or sometime after that.
[9]    Q: Did you yourself review any of those materials?
[10]    A: No.
[11]    Q: Did you provide those materials to anybody
[12] else?
[13]    A: I gave one of the CDs to the science department
[14] to review.
[15]    Q: I assume you mean DVD?
[16]    A: Yes, DVD.
[17]    Q: Do you remember which one that was?
[18]    A: I think it was Icons of Evolution.
[19]    Q: Why among the materials that you received from
[20] Mr. Buckingham did you choose that one to give
[21] to the science teachers?
[22]    A: That might have been — I think I remember that
[23] first going to Dr. Nilsen and then he gave me
[24] that one. I think I do remember talking a
[25] little bit to Mr. Buckingham about the tape, it

---

**Min-U-Script®**    **Filius & McLucas Reporting Service, Inc.**

**Tammy Kitzmiller, et al.   v.**
**Dover Area School District, et al.**

**Michael Baksa**
**March 9, 2005**

---

[1] would be something good to review — or the
[2] DVD. So I think that was the only one I had at
[3] the time to give to the teachers and then I
[4] might have received another one at a later
[5] time.
[6]     **Q:** I just want to make sure the record is clear
[7] because I thought you said you got them all at
[8] once.
[9]     **A:** Yeah. And now I'm thinking that I would have
[10] only had that one, because if I had had two I
[11] would have given both to the teachers.
[12]     **Q:** Then what about the rest of the materials, were
[13] those received all at once?
[14]     **A:** I really can't recall, you know, if it was one
[15] at a time or all at once.
[16]     **Q:** Is it your understanding that all these
[17] materials were given to the administration by
[18] Mr. Buckingham?
[19]     **A:** Yes.
[20]     **Q:** Did he communicate where he had gotten those
[21] materials from?
[22]     **A:** Not positive, but I think he might have said
[23] the Discovery Institute.
[24]     **Q:** Are you aware that he has, in fact, been in
[25] touch with the Discovery Institute?

[1]     **A:** Yes, I was aware of that.
[2]     **Q:** Is the way you became aware of it because he
[3] gave you materials that had been provided by
[4] the Discovery Institute?
[5]     **A:** I don't exactly remember, but I would assume
[6] so.
[7]     **Q:** Other than the materials you've described,
[8] which are either two or three DVDs, a book —
[9] two books, did Mr. Buckingham give you any
[10] other materials related to the subject of the
[11] biology curriculum or intelligent design?
[12]     **A:** I don't think so.
[13]     **Q:** When these materials were given to you did he
[14] give you any instructions or recommendations
[15] about what you should do with them?
[16]     **A:** No.
[17]     **Q:** Do you know whether those materials were -- did
[18] you or Mr. Nilsen provide those materials to
[19] other members of the board?
[20]     **A:** The book Of Pandas and People we did order
[21] copies for the board curriculum committee and
[22] the teachers. I don't think we ordered copies
[23] for the entire board.
[24]     **Q:** Other than that were any of these materials
[25] shared with the board?

[1]     **A:** I don't remember providing the DVDs to
[2] individual board members.
[3]     **Q:** And what about the Icons book?
[4]     **A:** I don't remember providing that to individual
[5] board members.
[6]     **Q:** You've now described everything that Mr.
[7] Buckingham gave you?
[8]     **A:** As far as I remember.
[9]     **Q:** Did any other board member give you or Mr.
[10] Nilsen any materials relating to intelligent
[11] design or any materials that related to the
[12] subject of evolution?
[13]     **A:** I know Mrs. Harkins might have given us one or
[14] two articles. I might have gotten something
[15] from Mr. Bonsell, I'm not sure.
[16]     **Q:** Where would those materials be maintained if
[17] you had received them?
[18]     **A:** They would have been sent in the production.
[19]     **Q:** Prior to finding out about Mr. Buckingham's
[20] communications with them had you ever heard of
[21] the Discovery Institute?
[22]     **A:** No.
[23]     **Q:** Did Mr. Buckingham tell you anything about his
[24] communications with the Discovery Institute
[25] other than sharing the materials he received

[1] from them?
[2]     **A:** No.
[3]     **Q:** Have you spoken to anybody at the Discovery
[4] Institute?
[5]     **A:** No.
[6]     **Q:** At any time?
[7]     **A:** No.
[8]     (P Deposition Exhibit Number 15 marked for
[9] identification.)
[10]          **BY MR. ROTHSCHILD:**
[11]     **Q:** I'm showing you a document marked as P-15
[12] titled The Wedge Strategy. Have you ever seen
[13] that document?
[14]     **A:** I don't remember it.
[15]     **Q:** You don't remember it?
[16]     **A:** Hum-um.
[17]     **Q:** Have you ever heard of it?
[18]     **A:** I've heard of The Wedge Strategy only in — I
[19] remember it being in part of the suit.
[20]     **Q:** The complaint?
[21]     **A:** Yeah.
[22]     **Q:** So you said Mr. Bonsell may have given you
[23] articles, Ms. Harkins may have given you
[24] articles. Any other board members?
[25]     **A:** No.

---

Michael Baksa
March 9, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 106

[1]   **Q:** Other than the Pandas book, are you aware that
[2] any materials relating to evolution or
[3] intelligent design were provided to the board
[4] curriculum committee for their consideration?
[5]   **A:** By me?
[6]   **Q:** By you or did you witness anyone else providing
[7] materials?
[8]   **MR. GILLEN:** Objection, vagueness.
[9]   **A:** Bert Spahr might have had handouts.
[10]   (Interruption)
[11]   **A:** Could you ask it again?
[12]               **BY MR. ROTHSCHILD:**
[13]   **Q:** Sure. Putting aside Pandas and putting aside
[14] any sort of standard biology textbook, such as
[15] the Miller Levine book, was the board
[16] curriculum committee during 2004 presented with
[17] any materials relating to intelligent design or
[18] the subject of evolution?
[19]   **A:** Bert Spahr — I know Bert gave me — Mrs. Spahr
[20] gave me some articles. I don't recall
[21] specifically what they were. I do know that I
[22] would have shared those with Dr. Nilsen. I
[23] think I recall at least one of those being
[24] shared with the board.
[25]   Mrs. Spahr at our meetings might also have

Page 107

[1] distributed articles to the board, but other
[2] than that I don't remember seeing them get
[3] anything.
[4]   **Q:** And you didn't present any materials to the
[5] board?
[6]   **A:** Correct.
[7]   **Q:** And Mr. Nilsen didn't?
[8]   **A:** Well, I don't know what —
[9]   **Q:** That you're aware of?
[10]   **A:** Yeah, yeah.
[11]   **Q:** And you're at all the curriculum committee
[12] meetings?
[13]   **A:** Yes.
[14]   **Q:** And what about individual members of the board?
[15] I mean, did Mr. Buckingham hand out anything,
[16] such as an explanation of intelligent design or
[17] anything of that kind to the curriculum
[18] committee?
[19]   **A:** I don't remember him doing that.
[20]   **Q:** And did any other board member do that?
[21]   **A:** I don't remember any of them doing that.
[22]   **MR. ROTHSCHILD:** Why don't we take a
[23] break.
[24]   (Recess taken)
[25]               **BY MR. ROTHSCHILD:**

Page 108

[1]   **Q:** Mr. Baksa, did anybody make any presentation to
[2] the curriculum committee about intelligent
[3] design? Did anybody get up and speak about it
[4] and explain it?
[5]   **A:** No.
[6]   **Q:** I'm going to ask you similar questions for the
[7] full board. Was the full board ever provided
[8] any materials relating to intelligent design or
[9] evolution other than the Pandas textbook —
[10] actually, let me withdraw that. Was the Pandas
[11] textbook provided to all members of the board?
[12]   **A:** I think I remember the Pandas book was
[13] purchased for the teachers and the board
[14] curriculum committee and that copies were made
[15] available for the rest of the board to review.
[16]   **Q:** Putting aside Pandas and putting aside the sort
[17] of what I'll call standard textbooks like the
[18] Miller and Levine book, were any other
[19] materials provided to the board prior to their
[20] voting on the resolution on October 18th?
[21]   **A:** Not by me.
[22]   **Q:** Are you aware of any materials being presented?
[23]   **A:** I'm not aware of any.
[24]   **Q:** Do you know whether anybody made any kind of
[25] verbal presentation to any members of the board

Page 109

[1] relating to the subject of intelligent design?
[2]   **A:** I'm not aware of any.
[3]   **Q:** So, for example, when Heather Geesy voted on
[4] October 18th on the issue of whether to modify
[5] the biology curriculum to mention intelligent
[6] design, anything she would know about
[7] intelligent design she would have had to have
[8] learned on her own, correct?
[9]   **MR. GILLEN:** Objection, calls for
[10] speculation.
[11]   **A:** Yeah, I wouldn't know.
[12]               **BY MR. ROTHSCHILD:**
[13]   **Q:** But you don't know of anything that she
[14] received from any source?
[15]   **A:** Again, I wouldn't know that.
[16]   **Q:** You were involved in the preparation of the
[17] resolution and its transmittal to members of
[18] the board, correct?
[19]   **A:** Resolution —
[20]   **Q:** The resolution that was voted on on October
[21] 18th to change the curriculum.
[22]   **A:** Okay. Could you ask that again?
[23]   **Q:** Yes. There was a resolution voted on October
[24] 18th to add some language to the biology
[25] curriculum, correct?

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Michael Baksa
March 9, 2005

---

Page 110

[1] A: Yes.
[2] Q: It's what we looked at at the very beginning of
[3] the deposition.
[4] A: Correct.
[5] Q: And you were involved with the development of
[6] that resolution, correct?
[7] A: That's correct.
[8] Q: And you were responsible for transmitting that
[9] to all members of the board so they could see
[10] it before they voted on it, correct?
[11] A: Correct.
[12] Q: And as a general matter, when issues arising
[13] out of the curriculum committee need to be
[14] communicated to the whole board, are you the
[15] vehicle for doing that? Are you the person who
[16] does that?
[17] A: If there are issues from the board curriculum
[18] committee?
[19] Q: Anything that the board curriculum committee is
[20] doing that needs to be considered by the whole
[21] board and needs to be communicated to them,
[22] including a recommendation for approval of a
[23] particular curriculum, are you the person who
[24] communicates that to the rest of the board?
[25] A: I have at times. Sometimes it's just brought

Page 111

[1] to the board by the board curriculum committee
[2] chairperson. And as the board meets as a
[3] whole, if they have any questions the
[4] chairperson would be the first person to answer
[5] and if there's some additional information he
[6] may throw it to me to provide additional
[7] information.
[8] Q: And when you say it might be communicated to
[9] the board by the committee chairman, how would
[10] he do that, you know, in a written submission
[11] or just bring it up in the public meeting?
[12] A: Usually it's just brought up at the public
[13] meeting.
[14] Q: Did Mr. Buckingham ever report to either the
[15] curriculum committee or the entire board his
[16] communications with the Discovery Institute?
[17] A: Yeah, he might have talked about the Discovery
[18] Institute and materials he received from them.
[19] Q: Other than describing the materials, did he
[20] tell the board or a committee of the board
[21] anything else about the Discovery Institute?
[22] A: I don't remember anything else.
[23] Q: Did he ever say why he had contacted the
[24] Discovery Institute?
[25] A: I don't ever remember hearing a reason why he

Page 112

[1] contacted them.
[2] Q: Are you aware that Mr. Buckingham contacted the
[3] Thomas More Law Center prior to the time they
[4] became involved as counsel to the school
[5] district and the school board?
[6] MR. GILLEN: Objection to the preposition
[7] of when we became involved as counsel.
[8] BY MR. ROTHSCHILD:
[9] Q: Do you know when Thomas More was retained by
[10] the school district to represent them in this
[11] lawsuit?
[12] A: December, 2004.
[13] Q: I'm not asking for any knowledge about that
[14] period going forward. What I'm asking about is
[15] prior to that time had you become aware that
[16] Mr. Buckingham had contacted the Thomas More
[17] Law Center?
[18] A: I remember Mr. Buckingham, and I don't know
[19] where, but I remember learning from him that
[20] there was the Thomas More Law Center and that
[21] they would be willing to defend us without
[22] cost.
[23] Q: And can you estimate what time period that was
[24] communicated?
[25] A: It could be anywhere from July, 2004 to

Page 113

[1] October, 2004.
[2] Q: Did he say why he had contacted the Thomas More
[3] Law Center?
[4] A: No.
[5] Q: Did he describe what issue the Thomas More Law
[6] Center would need to represent the school
[7] district about?
[8] A: Again.
[9] Q: I mean, he's talking about getting
[10] representation from a law firm in the summer of
[11] 2004. Did he say why he was even exploring the
[12] question of getting representation? Nobody had
[13] been sued, right?
[14] A: Right. He didn't explain.
[15] Q: Other than saying that this Thomas More Law
[16] Center might represent the district, did he say
[17] anything else about what they had communicated
[18] to him?
[19] A: Not that I remember.
[20] Q: I'm going to mark as P-16 documents that bear
[21] the numbers 56 through 60 from the defendants'
[22] production. They are handwritten notes, I
[23] think they're your handwritten notes, but I'll
[24] ask you to confirm that. They don't appear to
[25] be in chronological order, but that's how they

---

Michael Baksa
March 9, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

Page 114

[1] were numbered for us.

[2]    (P Deposition Exhibit Number 16 marked for
[3] identification.)

[4]        BY MR. ROTHSCHILD:

[5]    Q: Can you just flip through the document and tell
[6] me whether you recognize each of the pages as
[7] bearing your handwriting?

[8]    A: Yes.

[9]    Q: The first page, the one that's marked Number
[10] 56, is headed Biology Meeting, 6/24/04. Do you
[11] know what that's referring to?

[12]    A: Could I read through it?

[13]    Q: Sure.

[14]    A: This was a meeting of the board curriculum
[15] committee and the science teachers and myself.
[16] I think — at this meeting I think Dr. Peterman
[17] might have also been there.

[18]    Q: I'm going to come back to that, but turning to
[19] the next page there's a document headed
[20] Curriculum Committee and the date on there is
[21] January 4th of 2004. Are these your notes
[22] about events at a curriculum committee meeting
[23] on that date?

[24]    A: I believe these are my notes from a meeting
[25] with Mr. Buckingham. It was just Mr.

---

Page 115

[1] Buckingham and me.

[2]    Q: Is there a reason it's headed curriculum
[3] committee if it was just you and Mr.
[4] Buckingham?

[5]    A: I don't know.

[6]    Q: But you're confident it was just the two of
[7] you?

[8]    A: Yes, I met with him and reviewed these pages.

[9]    Q: And there's notes — numbered notes here, some
[10] of them referring to page numbers. These are
[11] your notes, but are they taken down — things
[12] Mr. Buckingham told you?

[13]    A: Yes.

[14]    Q: And is this Mr. Buckingham giving you his
[15] characterization of items in the biology
[16] textbook that concern him?

[17]    A: Yes.

[18]    Q: Did he give you any instructions or suggestions
[19] — after communicating to you all these issues
[20] he had with items in the textbook did he tell
[21] you he wanted anything done or give you any
[22] suggestions?

[23]    A: No.

[24]    Q: So what was the purpose of this exposition by
[25] Mr. Buckingham?

---

Page 116

[1]    A: Mr. Buckingham originally gave me a typed sheet
[2] with page numbers on and a few words referring
[3] to a section of the text and from that sheet I
[4] couldn't determine what his specific concerns
[5] were with those pages or those sections.

[6]        So I asked to meet with him so that I
[7] could learn of his concerns so that I could
[8] share those with the teachers so we might be
[9] able to prepare an answer to answer those
[10] concerns.

[11]    Q: After getting his typewritten page and then
[12] listening to him did you believe his concerns
[13] were in any way legitimate?

[14]    A: I wasn't making judgment on his concerns. I
[15] was simply getting them down so that I could
[16] communicate them to the staff so that they
[17] could answer them.

[18]    Q: And did you have the staff respond to his
[19] concerns?

[20]    A: I did share these with the staff so that they
[21] could see that and then we set the meeting up
[22] at the end of June in which those concerns
[23] could be addressed or any others from Mr.
[24] Buckingham.

[25]    Q: And is the handwritten notes with the Bates

---

Page 117

[1] stamp 56 on it the notes of that meeting?

[2]    A: Yes.

[3]    Q: And in that meeting did the science faculty
[4] address the issues raised by Mr. Buckingham?

[5]    A: We did address his concerns, but we didn't go
[6] page by page. We did it more generally.

[7]    Q: And how — I mean, what was communicated to Mr.
[8] Buckingham?

[9]    A: Can you be more specific?

[10]    Q: Well, I'm asking you to be specific really.
[11] He's raised a bunch of concerns. Staff gets up
[12] and responds to them. What did they say?

[13]    A: Again, the staff stressed that they don't teach
[14] the origins of life, that they teach evolution
[15] as change over a period of time within a
[16] species and Mr. Buckingham was okay with that.

[17]        At this meeting we were also looking at
[18] the textbook for adoption. Mrs. Spahr
[19] addressed some of Mr. Buckingham's concerns. I
[20] believe Mr. Eshbach also would have answered
[21] him.

[22]        Mr. Buckingham was concerned that we were
[23] teaching the origins of life. So they
[24] addressed that. We talked about the —
[25] actually, I think there's another page of my

---

**Min-U-Script®**     Filius  &  McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Michael Baksa
March 9, 2005

Page 118

[1] notes with this.

[2] **Q:** And if you'd flip through the pages. And this

[3] is consecutively numbered, so —

[4] **A:** It would be on the sheet that lists the

[5] parochial schools and the textbooks.

[6] **Q:** Okay, I think I know what you're talking about.

[7] Let me see if I have a copy of that.

[8]    I'm going to show you — let me actually

[9] go ahead and make copies of it.

[10]    (P Deposition Exhibit Number 17 marked for

[11] identification.)

[12]       BY MR. ROTHSCHILD:

[13] **Q:** First of all, thank you for clarifying that,

[14] because this is the consecutively numbered page

[15] right before, so it makes sense. And the page

[16] we marked as Exhibit 17, which is Bates stamped

[17] 55, starts with the information on the survey

[18] of biology books.

[19]    Is it your recollection that that

[20] information was presented to the curriculum

[21] committee at this June 24th meeting?

[22] **A:** Yes.

[23] **Q:** And then you have some notes here and maybe you

[24] can explain to me what's being communicated on

[25] this first page of notes here.

Page 119

[1] **A:** The first line, evolution as change over time,

[2] are my notes from the teachers' explanation of

[3] what they teach, not teaching the origins of

[4] life. I think the next note, four or five days

[5] to cover material, is their outside estimate of

[6] how much time they use. Icons of Evolution -

[7] Coldwater Media, that is the DVD that was

[8] provided. And I think either at this meeting

[9] or later, but I think it was at this meeting

[10] that the teachers said they would review that

[11] DVD.

[12]    My next note, Bill is making a point that

[13] he wants us to point out flaws in Darwin's

[14] theory.

[15] **Q:** And did he say why he wanted that done?

[16] **A:** No.

[17] **Q:** And in your experience as an assistant

[18] superintendent and a participant in the

[19] curriculum committee, did the curriculum

[20] committee or the board or any individual member

[21] of the board ever examine any other scientific

[22] content being taught in the schools to

[23] determine whether it was being properly

[24] represented to students?

[25] **A:** In any other —

Page 120

[1] **Q:** Any other scientific content besides the other

[2] topic, besides evolution.

[3] **A:** In biology?

[4] **Q:** Or any other science.

[5] **A:** When the textbooks would come to the board

[6] curriculum committee they would review the

[7] entire textbook that would cover all the

[8] topics.

[9] **Q:** And was it ever your experience that members of

[10] the school board would criticize those

[11] textbooks or ask that flaws in any particular

[12] scientific concept or theory be underscored for

[13] the students?

[14] **A:** I don't remember.

[15] **Q:** All right. Why don't we keep going on.

[16] **A:** The next line, I don't know what that is, Topic

[17] 1, but it looks like we will review tape and

[18] offer flaws if found around our content. I

[19] think that refers to the teachers saying they'd

[20] review it, if it fit our content and was

[21] suitable that we would be able to use that.

[22]    The next line says intelligent design

[23] instead of creationism. I don't recall that

[24] conversation other than now we're talking about

[25] intelligent design.

Page 121

[1]    The next line, no mural ever again. Mr.

[2] Buckingham had communicated that he was upset

[3] that there was a mural that was once in the

[4] science classroom that depicted the evolution

[5] of apes to man.

[6] **Q:** Did he say why he was upset about that?

[7] **A:** No. Again, then here's Mr. Buckingham saying

[8] that we wouldn't talk about the origin of life.

[9] The teachers are saying it. And curriculum

[10] okay I think is just — I think that's just my

[11] note to myself that what the teachers were

[12] doing in the classroom, what they said how they

[13] were presenting evolution, that Mr. Buckingham

[14] was okay with that.

[15]    On the notes then over to the left, at

[16] this meeting —

[17] **Q:** And on the left you're talking about Document

[18] Page 56?

[19] **A:** 55. On the line that says intelligent design

[20] instead of creationism, the next section that's

[21] kind of separate —

[22] **Q:** Yes.

[23] **A:** — Mrs. Brown at this meeting said that as the

[24] chair of the policy committee that she would

[25] look at revising the gift policy and the

Michael Baksa
March 9, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 122

[1] curriculum policy to reflect that any gift that
[2] would be donated or presented into the
[3] classroomm would fit our standards and that our
[4] curriculum would fit our standards. So that's
[5] what this page is about.
[6]    Q: Was there a discussion at this meeting that
[7] there would be a modification or addition to
[8] the biology curriculum?
[9]    A: On 56 at the bottom it was my understanding at
[10] the end of this meeting that Mr. Buckingham
[11] would be okay with the approval of Miller and
[12] Levine knowing that the teachers have
[13] reaffirmed that they're teaching evolution over
[14] time within the species, that they're not
[15] teaching the origins of life, that we make
[16] appropriate revisions to the gift policy and
[17] curriculum policy. And at the very bottom here
[18] we talked about putting something in the
[19] curriculum and it was —
[20]    Q: Finish your sentence out. I apologize.
[21]    A: And it was my understanding when we left this
[22] curriculum that I talked about writing
[23] something up, it was my understanding that we
[24] had agreed that we would mention other theories
[25] of evolution, including, but not limited to

Page 123

[1] intelligent design.
[2]    Q: Let me do this in a couple steps. When you
[3] talk about addressing the gift policy and
[4] curriculum policy, I don't understand what was
[5] expected or anticipated there.
[6]    A: I'm not sure about the curriculum policy. Mrs.
[7] Brown said she would look at that. There was
[8] changes to both policies. If I recall, the
[9] curriculum just says to reflect some diversity
[10] in the gift, that it matches — fits our
[11] curriculum for our standards, the content
[12] that's being taught in the class.
[13]    The idea there was that we were looking at
[14] language that would prevent murals that might
[15] — artifacts in the classroom that might be a
[16] gift that might conflict with our curriculum.
[17] And this was an agreement from this meeting
[18] that if these things were in place Mr.
[19] Buckingham would feel assured that with those
[20] things in place, plus the teachers'
[21] reassurances, that the use of the textbook
[22] would be okay.
[23]    Q: And so when you're talking about what Ms. Brown
[24] was looking at, it was not to change the
[25] biology curriculum, this was related to policy

Page 124

[1] about gifts and how they — whether they were
[2] consistent with the curriculum?
[3]    A: Yes.
[4]    Q: All right, got that issue. Then the separate
[5] issue I think you're talking about is, and on
[6] Page 56 it appears to have the notations "can
[7] we" and then it says mention intelligent design
[8] as an alternative in curriculum guide, mentions
[9] other theories of evolution, including, but not
[10] limited to intelligent design, and then it says
[11] mention the existence of...
[12]    Explain what these notes mean. Is this
[13] somebody's suggestion? Is this just your
[14] inquiry? What do these notes mean?
[15]    A: During this meeting we talked about putting
[16] something in the curriculum guide, what type of
[17] language. So I thought verbally I had run this
[18] by the members present. That mention other
[19] theories of evolution, including, but not
[20] limited to intelligent design, that that would
[21] be another piece of the puzzle so the policies,
[22] the piece in the curriculum and the adoptions
[23] of the textbook would all work together at the
[24] same time.
[25]    The "can we" I believe refers to I did run

Page 125

[1] this language by our solicitor and got a report
[2] back from him. So I think that's my note to
[3] myself to make sure I check with the solicitor.
[4]    Q: This suggested potential curriculum language,
[5] was that — I mean, is that your suggestion or
[6] is that coming from somebody else?
[7]    A: I don't remember who — I remember us talking
[8] about intelligent design, but who initiated it,
[9] I'm not clear who first initiated it.
[10]    Q: And further up the page under a "To Do" item it
[11] says, Opinion on intelligent design. Is that a
[12] reference to seeking an opinion from your
[13] solicitor?
[14]    A: Yes.
[15]    Q: And then below it it says Bill would like both
[16] taught so that we can — is that assure?
[17]    A: Yes.
[18]    Q: — assure that both and then it looks like
[19] period, intelligent design. What's being
[20] recorded there?
[21]    A: That's just a note to myself of what I'm
[22] hearing. So I'm referencing for my
[23] understanding that Bill would like to see both
[24] intelligent design taught alongside evolution.
[25]    Q: And then it says so that we can assure that

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Michael Baksa
March 9, 2005

---

Page 126

[1] both. That both what?
[2]    A: I think that both are presented or something.
[3] I didn't finish the sentence.
[4]    Q: So in this meeting you have the topic of
[5] intelligent design arising. And to your
[6] recollection, is this the first time you're
[7] hearing intelligent design brought up as an
[8] issue for the biology curriculum?
[9]    A: I don't really recall. It might have been
[10] brought up earlier.
[11]    Q: Do the teachers respond in any way to this
[12] subject of intelligent design? Well, actually,
[13] let me withdraw that for a moment and ask you,
[14] is anybody in this meeting explaining what
[15] intelligent design is?
[16]    A: No.
[17]    Q: So when the suggestion is being put out there
[18] that you mention intelligent design in the
[19] curriculum, in science class, nobody even knows
[20] what it is. Is that right?
[21]    A: I don't know what people's understanding of it
[22] is.
[23]    Q: It doesn't really matter, does it?
[24]    A: I don't know what their understanding is.
[25]    Q: What are the teachers saying about intelligent

Page 127

[1] design?
[2]    A: It was my understanding after this meeting that
[3] we were going to write language into the
[4] curriculum that talked about other theories,
[5] including intelligent design.
[6]    And it was my understanding that — and
[7] with that understanding there was no — that
[8] meeting ended with us moving forward to do
[9] these things, Casey to look at the policies, me
[10] to look at the curriculum piece here.
[11] Can I go back to something?
[12]    Q: Yes, sure.
[13]    A: My notes about Bill would like both taught so
[14] that we can assure that both are presented,
[15] intelligent design, that was never seriously
[16] talked about. In other words, we didn't have a
[17] discussion with the teachers here about
[18] teaching intelligent design. If Bill mentioned
[19] that, it was something he mentioned, but nobody
[20] picked on and nobody pursued.
[21]    Q: And, again, you're drawing a distinction
[22] between teaching and making aware?
[23]    A: Yes.
[24]    Q: In this meeting did any of the teachers speak
[25] up in any way to give their opinions or

Page 128

[1] understanding about intelligent design?
[2]    A: I don't remember them doing that.
[3]    Q: From your perception did they even know what
[4] intelligent design was when it was brought up
[5] at that meeting?
[6]    A: In 2003 when Alan — Mr. Bonsell was head of
[7] the board curriculum committee and first had
[8] concerns about some of the texts and teaching
[9] some alternative theories I know Mrs. Spahr
[10] produced a lot of documents, both on
[11] creationism and those documents also dealt with
[12] intelligent design and I believe she shared
[13] those with the other science teachers. Other
[14] than that I don't know what materials they
[15] would have looked at.
[16]    Q: I thought in your earlier testimony you said
[17] you hadn't heard of intelligent design until
[18] sometime in 2004 and now you're saying you were
[19] made aware of it in 2003?
[20]    A: Intelligent design is mentioned in the
[21] documents that Mrs. Spahr gave to both Mr.
[22] Bonsell and I in 2003. However, the documents
[23] are, you know, about an inch thick. I did not
[24] read through all of those documents, but I
[25] remember Mrs. Spahr later referring to those

Page 129

[1] documents and referring to intelligent design
[2] in those documents and then I remember going
[3] back and looking through those documents
[4] further to see what she was referencing.
[5]    So it's hard for me to put a time on.
[6] Even though I might have had the documents in
[7] my hand, the piece of intelligence item might
[8] not have come to my attention until later.
[9]    Q: Are the documents you're referring to that Ms.
[10] Spahr provided, were they given to counsel and
[11] made part of production?
[12]    A: Yes.
[13]    MR. GILLEN: I can assure you that to the
[14] extent we got them you have them.
[15]    MR. ROTHSCHILD: You know, this is, again,
[16] the difficulty of not knowing — I mean, you
[17] know, you've given us a lot of stuff and I
[18] don't know whose files it came from. I'm going
[19] to go get the entire file and we'll see if we
[20] can sort it out.
[21]    (P Deposition Exhibit Number 18 marked for
[22] identification.)
[23]    BY MR. ROTHSCHILD:
[24]    Q: You had referred to materials that Ms. Spahr
[25] provided to you and Mr. Bonsell in 2003,

---

Michael Baksa
March 9, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 130

[1] correct?

[2]   A: Yes.

[3]   Q: And the compilation of documents I gave you are

[4] what you're referring to?

[5]   A: I believe so.

[6]   Q: And when Ms. Spahr gave you those documents did

[7] she say why she was giving them to you?

[8]   A: Mrs. Spahr was providing documents to me and

[9] Mr. Bonsell to show that creationism can't be

[10] taught in schools because she was under the

[11] understanding that that might be what some

[12] board members were looking to do.

[13]   Q: And why did she have that understanding, Mr.

[14] Baksa?

[15]   A: I don't know.

[16]   Q: So we have this April, 2003 memo from Ms.

[17] Peterman in which she reports Bertha Spahr's

[18] understanding that Mr. Bonsell wants to teach

[19] creationism and we have Ms. Spahr compiling

[20] materials about the legality of teaching

[21] creationism, but you have no idea where these

[22] concerns about teaching creationism come from?

[23]   A: Correct.

[24]   Q: But it's not just Ms. Peterman having that

[25] perception, it's Ms. Spahr, too, isn't it?

Page 131

[1]   A: Yes.

[2]   Q: Yet you'll understand if it strikes me as odd

[3] that you can't explain why either of these

[4] people have this understanding of — this

[5] concern that the board wants creationism

[6] taught?

[7]   A: I think Mrs. Spahr made the — hearing the

[8] board members were concerned about only one

[9] theory of evolution and that they wanted an

[10] alternative theory, I think Mrs. Spahr made the

[11] assumption that that would be creationism, but

[12] I don't know why.

[13]   Q: Same assumption that Ms. Peterman made, right?

[14]   A: Um-hum.

[15]   Q: Yes?

[16]   A: Has Dr. Peterman assumed they wanted to teach

[17] creationism?

[18]   Q: That's the question.

[19]   A: Yes.

[20]   Q: So Ms. Peterman made that assumption, Mrs.

[21] Spahr made that assumption and the reporters at

[22] the York Dispatch and the York Daily Record

[23] made that assumption, right?

[24]   A: Well, they're two very different time periods.

[25] After Mr. Bonsell had made — addressed —

Page 132

[1] expressed concerns about the biology text and

[2] only teaching one theory of evolution Mr.

[3] Bonsell at this meeting when we received these

[4] documents met with the science teachers.

[5]       When the teachers explained what they were

[6] saying and doing in the classroom Mr. Bonsell

[7] was satisfied and no longer brought any

[8] concerns to me addressing the issue. So at

[9] that point we weren't looking on doing anything

[10] different in the classroom.

[11]   Q: So after receiving these materials from Ms.

[12] Spahr there was a meeting that included you,

[13] Mr. Bonsell and science teachers?

[14]   A: In September.

[15]   Q: And those materials were among the subject

[16] matter of that meeting?

[17]   A: No. Mrs. Spahr handed these materials to Mr.

[18] Bonsell and myself and the materials were not

[19] looked at or discussed at the meeting. The

[20] subject of the meeting was what are we teaching

[21] in our classrooms and to answer Mr. Bonsell's

[22] questions if he had any concerns with what we

[23] were teaching.

[24]   Q: Who initiated that meeting?

[25]   A: I did.

Page 133

[1]   Q: And why did you initiate that meeting?

[2]   A: Because Mr. Bonsell had concerns about the text

[3] and how we might be presenting material. And

[4] we both were under the assumption that origins

[5] of life was being taught when, in fact, it

[6] wasn't being taught.

[7]   Q: Did the subject of creationism come up in that

[8] meeting?

[9]   A: I don't think so. I remember talking to Mr.

[10] Bonsell afterwards and he was quite — he was

[11] surprised about this. He just wanted to talk

[12] to the teachers. He wasn't looking at doing

[13] anything. So he was kind of taken aback how

[14] well armed they were to make a case against

[15] creationism. And I don't believe we did talk

[16] about anything other than what the teachers

[17] were doing in class.

[18]   Q: Returning to the notes of the June 24 meeting.

[19] We have at the bottom of the page these notes

[20] about adding this curriculum item about

[21] intelligent design and other theories.

[22]       At that meeting or immediately after that

[23] meeting was a plan of action put in place to

[24] supplement the biology curriculum?

[25]   A: At the end of this meeting I thought I had

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Michael Baksa
March 9, 2005

Page 134

[1] tentative language for the curriculum that
[2] everyone agreed on. I did have my secretary
[3] enter that language into the draft curriculum
[4] guide and then it was put on hold, because what
[5] happened, in the meantime the agreement here
[6] was that Mr. Buckingham would be okay with the
[7] books if those two policies were looked at by
[8] Mrs. Brown and this curriculum language came
[9] in.
[10]      Shortly after this meeting Mr. Buckingham
[11] withdrew his approval of the books. So in my
[12] mind everything was off the table, we were back
[13] to square one on, okay, how do we proceed to
[14] answer additional concerns. So I did nothing
[15] with this.
[16]      Q: And then what happened after that as regards
[17] the purchase of the biology book and the
[18] biology curriculum? So walk me through
[19] chronologically.
[20]      A: After that — well, there's another meeting in
[21] July.
[22]      Q: I have notes here at Page 58. Are those notes
[23] from that meeting?
[24]      A: No, that's an August, 2004 meeting, 58.
[25]      Q: Do you know if there are notes from a July

Page 135

[1] meeting?
[2]      A: Yeah. Oh, no, there isn't a meeting in July,
[3] is there? The first meeting in June presented
[4] the textbooks. I don't think there was a
[5] meeting in July.
[6]      Q: Okay. Of the curriculum committee?
[7]      A: Right.
[8]      Q: And just —
[9]      A: But if there was a meeting there would be
[10] notes.
[11]      Q: Okay. And just to try and put, you know, some
[12] time frames on this. August 2nd is the meeting
[13] — the full school board meeting at which the
[14] Miller Levine book is voted in, there's some
[15] back and forth votes, because I think there's
[16] only eight people there, not nine and it's four
[17] to four and then eventually the votes change
[18] and the Miller Levine book is voted in. Do you
[19] remember that?
[20]      A: Yes.
[21]      Q: So from this June 24th meeting till August 2nd
[22] are there any meetings of the board curriculum
[23] committee?
[24]      A: No, I don't think so.
[25]      Q: In this time period is there any action on the

Page 136

[1] issue of changing the biology curriculum?
[2]      A: No. Then the next thing, without a July
[3] meeting, the next thing that would have
[4] happened is there was a meeting at the end of
[5] August with the teachers when they came back to
[6] discuss the use of the Panda book.
[7]      And at that meeting Dr. Nilsen — I was
[8] away from the end of July till like the middle
[9] of August. So this meeting — the meeting for
[10] the end of August was set up by Dr. Nilsen.
[11]      And at that meeting Dr. Nilsen presented
[12] the draft of the curriculum language from the
[13] meeting on 6/24. And at that meeting Mrs.
[14] Spahr expressed surprise that intelligent
[15] design was in there.
[16]      Q: And you were at this meeting, the August
[17] meeting?
[18]      A: Yes, yes.
[19]      Q: Are the notes that we have here on Page 58, are
[20] those notes from that meeting?
[21]      A: Yes. So what was decided then, Mrs. Spahr was
[22] saying, no, we didn't agree to this, this isn't
[23] language that we would recommend. So out of
[24] this meeting the board curriculum committee
[25] then directed me to work with the teachers to

Page 137

[1] draft new language.
[2]      Q: Were you surprised that Ms. Spahr took the
[3] position she did about the intelligent design
[4] language?
[5]      A: Yes.
[6]      Q: You had understood from the June meeting that
[7] she had signed on to that language?
[8]      A: Yes.
[9]      Q: Did she explain why she was opposed to that
[10] language?
[11]      A: I remember her just making a point that we were
[12] never — teachers were never consulted about
[13] this and I was surprised at that because that
[14] was the topic of the June meeting.
[15]      Q: Did she discuss the topic of intelligent design
[16] substantively in terms of, you know, what she
[17] thought about it?
[18]      A: I don't believe so.
[19]      Q: Did anybody at that meeting in August make the
[20] case for why intelligent design should be part
[21] of the curriculum?
[22]      A: No.
[23]      Q: And am I correct in understanding that from a
[24] substantive level in terms of sort of
[25] explaining why intelligent design belongs in

Michael Baksa
March 9, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 138

[1] the curriculum, nobody has ever done that in
[2] any meetings of the board or the board
[3] curriculum committee?
[4]    A: Nobody has —
[5]    Q: Said here's why we should present intelligent
[6] design to the students.
[7]    A: Intelligent design was suggested just to be as
[8] an example of one of the other theories,
[9] alternative theories other than Darwin's.
[10]   Q: Mr. Baksa, I could suggest that another theory
[11] of the development of species is they were all
[12] made out of playdough, right, I mean I could
[13] say that, right, and you would agree with me
[14] that that's a scientifically unsound
[15] proposition? Is that fair?
[16]   A: Are we talking about playdough now?
[17]   Q: I'm not talking about the philosopher. I'm
[18] talking about the stuff that's like clay.
[19]   A: In the discussions about language that we would
[20] use, intelligent design was brought up as when
[21] we're making students generally aware of other
[22] theories, intelligent design was brought up as
[23] an example. And I don't remember presenting it
[24] in that way that being challenged. I think
[25] that was generally accepted.

Page 139

[1]    Q: Okay. But I assume that when you're trying to
[2] develop science curriculum you're actually —
[3] and you're making students aware of other
[4] theories you're trying to make them aware of
[5] scientific theories, correct?
[6]    A: Yes. And it was my understanding at the June
[7] meeting that the teachers were okay with
[8] language that included intelligent design. So
[9] I would have — again, my goal was to try to
[10] come to some agreement between the concerns of
[11] the board and the language teachers could live
[12] with. So I thought we — that was acceptable
[13] to them.
[14]   Q: Okay. But at that June meeting nobody
[15] explained what intelligent design was or what
[16] its status was in the scientific community at
[17] large or anything like that?
[18]   A: I don't remember any of them doing that.
[19]   Q: And that never happened after that either,
[20] correct, as far as you know?
[21]   A: Yes.
[22]   Q: I'm correct?
[23]   A: You're correct.
[24]   Q: And originally it was your understanding that
[25] the science teachers were okay with this

Page 140

[1] language, but in August it turned out that
[2] regardless of what they had said before,
[3] they're not okay with it?
[4]    A: Correct.
[5]    Q: And other than Ms. Spahr indicating that the
[6] teachers hadn't been consulted and didn't agree
[7] with this, did she explain what's wrong with
[8] intelligent design?
[9]    A: Mrs. Spahr from the very beginning, from
[10] documents 897, which include reference to
[11] intelligent design, in my conversations with
[12] Mrs. Spahr she made no distinction between
[13] intelligent design and creationism. For her
[14] they were synonymous.
[15]   Q: And did she explain why she held that view?
[16]   A: From her research that she had done she felt
[17] that legally we would not be able to teach
[18] intelligent design because it's just
[19] creationism.
[20]   Q: And did she express that view at either this
[21] June board meeting or — the June curriculum
[22] committee meeting or the August curriculum
[23] committee meeting?
[24]   A: I know she did to me. I'm not sure if she did
[25] at either of those other meetings.

Page 141

[1]    Q: In these notes from this August meeting on Page
[2] 58 it says, Call Russell - did they say what
[3] schools are using it.
[4]       Did you make an inquiry to the solicitor
[5] about whether other schools were using this
[6] textbook?
[7]    A: We did ask our solicitor to see if there were
[8] any other schools using the book, to give us an
[9] opinion on its use as a classroom set or to
[10] distribute it to each individual student, if
[11] there were any cases involving the teaching of
[12] intelligent design and also asked for a
[13] specific law firm's history.
[14]   Q: And was that the Thomas More Law Center?
[15]   A: I think so, yes.
[16]   Q: In terms of finding out whether other schools
[17] used it, did you get an answer to that
[18] question?
[19]   A: The only school that I found — that came to my
[20] attention that used it was Tomball.
[21]   Q: Did you also make a call to anybody at Liberty
[22] University relating to intelligent design or
[23] Pandas, a Dr. Gillen maybe?
[24]   A: Yes. Dr. Gillen taught at Tomball.
[25]   Q: In the answers to interrogatories it says that

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Michael Baksa
March 9, 2005

Page 142

[1] you consulted with Dr. Gillen, believed to be
[2] currently at Liberty University, regarding use
[3] of Pandas and People in connection with
[4] instruction in high school biology.
[5]   A: Right.
[6]   Q: What was the reason you called Mr. Gillen?
[7]   A: To find out how he used the Pandas and People
[8] book in the classroom.
[9]   Q: And was the reason you called him because he
[10] had previously been involved at Tomball?
[11]   A: Yes.
[12]   Q: So it's not because he's at Liberty?
[13]   A: Right.
[14]   Q: It's just because he's involved with Tomball?
[15]   A: That's correct.
[16]   Q: Then about three-quarters of the way down the
[17] page there's a line that starts with Alan.
[18] Could you tell me what — I assume that's a
[19] reference to something Alan Bonsell said?
[20]   A: Yeah, those are my notes. Here I think Alan is
[21] asking that something be put into the
[22] curriculum, that teachers teach holes in
[23] Darwin's theory and that it's not only not
[24] flawless, but also that the teachers show the
[25] flaws.

Page 143

[1]   Q: And then what does it say after that?
[2]   A: The next line?
[3]   Q: Yes.
[4]   A: That's Sheila buying Rich lunch anyway, which
[5] has nothing to do with anything.
[6]   Q: Who's Rich?
[7]   A: Dr. Nilsen.
[8]   Q: And what was the upshot of this meeting in
[9] terms of developing curriculum?
[10]   A: After this meeting I was to work with the
[11] teachers and develop a draft and then send that
[12] to the board for their review.
[13]   Q: And was the understanding that you would
[14] develop a draft along the lines of what Alan
[15] Bonsell had suggested?
[16]   A: Yes.
[17]   Q: Was there any understanding of whether
[18] intelligent design was going to be mentioned in
[19] that curriculum — in the curriculum?
[20]   A: Well, my first step was to produce a draft with
[21] the teachers. So I would take their draft and
[22] show it to the board and then the board would
[23] work on a draft of their own that included the
[24] language. So what was going to be put in there
[25] at this point wasn't determined.

Page 144

[1]   Q: And there was no instruction or recommendation
[2] to the board about whether intelligent design
[3] would or would not be included?
[4]   A: Not at this meeting.
[5]   Q: Evolution is only one of the scientific
[6] concepts that's taught to Dover High School
[7] students, correct?
[8]   A: Yes.
[9]   Q: And there's many other concepts in biology and
[10] there's many other concepts in other science
[11] classes, right?
[12]   A: Yes.
[13]   Q: And evolution is generally considered a
[14] scientific theory, correct?
[15]   A: Yes.
[16]   Q: And there are other scientific theories that
[17] are also taught to students, correct?
[18]   A: Yes.
[19]   Q: So far as you know, does evolution — is
[20] evolution any more — have any less status in
[21] the scientific community or is it known to have
[22] more problems than other scientific theories
[23] which are taught to students in Dover?
[24]   A: I think evolution in public schools is
[25] generally known to be controversial and

Page 145

[1] sensitive.
[2]   Q: And why is that? Is it because of scientific
[3] deficiencies or because — well, what's your
[4] understanding of why it's sensitive and
[5] controversial?
[6]   A: I don't know.
[7]   Q: Do you know whether its sensitivity and
[8] controversy arises out of the fact that it is
[9] perceived to be inconsistent with some people's
[10] religious beliefs?
[11]   A: Could you ask that again? I mean, I'm aware of
[12] generally evolution being a theory in public
[13] schools that typically is questioned by parents
[14] and students, feeling that the theory is not a
[15] fact and may not be the way things occur.
[16]   What I'm not aware of, what specifically
[17] might motivate any individual to make that.
[18] I'm just generally aware that people are
[19] sensitive to the theory of evolution and what
[20] it proposes.
[21]   Q: Do you have an understanding of what the word
[22] theory means in science?
[23]   A: Roughly.
[24]   Q: And what's that understanding?
[25]   A: And that would be from my work in drafting the

Michael Baksa
March 9, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 146

[1] statement that was read to students in the
[2] biology classes, that a theory in science is a
[3] general conclusion or assumption drawn after
[4] observation.
[5]     Q: And, you know, the students are being taught
[6] it's a theory, not a fact. And that language
[7] is not being used for any other theory that's
[8] being taught to Dover students, correct? The
[9] curriculum hasn't changed so that students are
[10] told that germ theory is a theory, not a fact,
[11] or the theory of gravity is a theory, not a
[12] fact, or atomic theory is a theory not a fact.
[13] Right?
[14]     A: That's correct.
[15]     Q: Only evolution is being singled out. Is that
[16] fair?
[17]     A: That's correct.
[18]     Q: Has anybody in the board ever communicated why
[19] of all the scientific concepts being taught to
[20] Dover students evolution is being singled out
[21] for the qualification that it's a theory, not a
[22] fact?
[23]     A: Not to me.
[24]     Q: And in your understanding of the scientific
[25] terms of theory and fact, could a scientific

Page 147

[1] theory ever graduate to a fact?
[2]     A: I have no idea in the scientific world what
[3] qualifies something to move from one stage to
[4] another or even what the definition of either
[5] of them might be in the scientific world.
[6]     Q: Did any school board member ever explain why
[7] they wanted language that it was a theory, not
[8] a fact?
[9]     A: Nothing other than they felt that that was an
[10] erroneous presentation in the textbook, to
[11] present it as such.
[12]     Q: What was erroneous?
[13]     A: That it was being presented as a fact when, in
[14] fact, it's a theory that still hasn't been
[15] ultimately proven to be a fact.
[16]     Q: In all the page sites that school board members
[17] called to your attention did they ever show you
[18] text in the textbook that was adopted in which
[19] evolution was called a fact, not a theory?
[20]     MR. GILLEN: Objection to the
[21] characterization of his testimony to the extent
[22] it implies more than one board member did that.
[23] Answer, Mike.
[24]     A: Could you —
[25]     BY MR. ROTHSCHILD:

Page 148

[1]     Q: Did any school board member ever pick up this
[2] textbook and say, look, in here it says that
[3] evolution is a fact, not a theory or it's a
[4] fact and a theory? Is there any text that they
[5] pointed you to that made that assertion?
[6]     A: I don't remember specific pages, but I do think
[7] I remember both Mr. Bonsell — I know for sure
[8] Mr. Bonsell felt that there was language in
[9] there — I remember him saying that there was
[10] talk about evolution without saying it's a
[11] theory, that they were omitting the word
[12] theory. So he felt that strengthened the case
[13] to present it as a fact. And Mr. Bonsell would
[14] have been looking at the edition before the
[15] 2002.
[16]     Q: But that wouldn't really matter for the
[17] curriculum item you developed because the
[18] edition you were using was the 2004 edition,
[19] correct?
[20]     A: In August, yes.
[21]     Q: And Mr. Baksa, I'm looking at the teacher's
[22] version of the biology textbook, but I am
[23] fairly confident that in this respect it is
[24] similar to the student's version, that, in
[25] fact, the heading, as you start your study of

Page 149

[1] evolution, is Darwin's Theory of Evolution.
[2]     A: Um-hum.
[3]     Q: So in that respect it's not misleading the
[4] students at all, it's in marquee and klieg
[5] lights presented as a theory, correct?
[6]     A: I have no idea.
[7]     Q: Do you understand intelligent design to be a
[8] scientific theory?
[9]     A: I understand professors like Michael Behe at
[10] Lehigh University are either proponents or
[11] researchers for intelligent design. My
[12] knowledge of intelligent design and the
[13] scientific community is fairly limited. I
[14] haven't been exploring it for a long period of
[15] time. So I don't know that I could fully
[16] answer that other than knowing a few
[17] individuals who are involved in intelligent
[18] design.
[19]     Q: Do you understand that there's a distinction
[20] between something that scientists say and
[21] something being a scientific theory? Not
[22] everything scientists say is a scientific
[23] theory. You would agree with that, right?
[24]     A: Okay.
[25]     Q: Do you agree with that or do you just not know

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Michael Baksa
March 9, 2005

Page 150

[1] one way or the other?

[2]    A: I mean, I'm not in a position to judge what the

[3] scientific community, how they — the standards

[4] they set and the judgments they make about

[5] their colleagues and their research and the

[6] status it has. I just have no knowledge of

[7] that.

[8]    Q: And how would you — what would it take for you

[9] to feel qualified to answer the question

[10] whether intelligent design is a scientific

[11] theory? What expertise would you feel you

[12] would have to have or what resource would you

[13] feel you would need to look to to make a

[14] determination for yourself whether intelligent

[15] design is a scientific theory?

[16]    A: I don't know.

[17]    MR. GILLEN: Objection. It calls for

[18] speculation. If you can answer, do.

[19]    A: Yeah, I don't know.

[20]           BY MR. ROTHSCHILD:

[21]    Q: Do you feel that you could make a judgment

[22] about whether intelligent design is, in fact, a

[23] scientific theory by listening to the opinions

[24] of the members of the Dover Area School Board?

[25]    A: I wasn't making — I wasn't asked to make a

Page 151

[1] judgment. What I was asked to do was to work

[2] with the board curriculum committee and the

[3] whole board and the teachers to develop

[4] language that was agreeable in the curriculum,

[5] to find a textbook that was agreeable to both

[6] and to develop a statement that would be read

[7] to the students that would be agreeable to them

[8] and that was my role.

[9]    MR. ROTHSCHILD: Can we mark this as an

[10] exhibit, please?

[11]    (P Deposition Exhibit Number 19 marked for

[12] identification.)

[13]           BY MR. ROTHSCHILD:

[14]    Q: Do you recognize the document we've marked as

[15] P-19?

[16]    A: Yes.

[17]    Q: And what is it?

[18]    A: This is a news release that the district sent

[19] to all of our residents.

[20]    Q: And who prepared this document?

[21]    A: Dr. Nilsen.

[22]    Q: Did you have any involvement with it?

[23]    A: No.

[24]    Q: Do you know if anybody else had any involvement

[25] with it?

Page 152

[1]    A: I believe my secretary Amy Aumen formatted it.

[2]    Q: Do you know whether Mr. Nilsen created this on

[3] his own or with the aid of others?

[4]    A: I believe he created this in conjunction with

[5] Thomas More.

[6]    Q: If you turn to the second page there is a

[7] frequently asked question, What is the theory

[8] of Intelligent Design. And it says, The theory

[9] of intelligent design is a scientific theory

[10] that differs from Darwin's view and is endorsed

[11] by a growing number of credible scientists.

[12]    Do you know what the Dover Area School

[13] District based its assertion that intelligent

[14] design is a scientific theory on?

[15]    A: No.

[16]    Q: Going back to the development of curriculum.

[17] Out of this August meeting you had taken on the

[18] task to develop an edition to the curriculum

[19] with the teachers, correct?

[20]    A: Yes.

[21]    Q: And did that, in fact, occur?

[22]    A: Yes.

[23]    Q: And in terms of who actually created the text

[24] for it, who did that, you, the teachers or

[25] both?

Page 153

[1]    A: I wrote a first draft and I gave it to the

[2] teachers.

[3]    (P Deposition Exhibit Numbers 20 and 21

[4] marked for identification.)

[5]           BY MR. ROTHSCHILD:

[6]    Q: Do you recognize the two exhibits we've marked

[7] as 20 and 21?

[8]    A: 20 and 21? I don't have those.

[9]    Q: Exhibits 20 and 21.

[10]    MR. GILLEN: Yes, you do.

[11]    A: Oh, oh.

[12]           BY MR. ROTHSCHILD:

[13]    Q: And are these the product of your work with the

[14] science department on developing a modification

[15] to the biology curriculum?

[16]    A: Yes, but not entirely.

[17]    Q: And what's missing?

[18]    A: There's another teacher draft.

[19]    Q: And chronologically here where does that

[20] teacher draft fall, before September 20th,

[21] before September 21st?

[22]    A: It would be a draft created on October 18th.

[23]    Q: October 18th, okay. So up till — sorry, I'll

[24] back up. Am I correct that the documents we're

[25] looking at as 20 and 21 are identical except

Michael Baksa
March 9, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 154

[1] for one is sent to the board curriculum
[2] committee and one is sent to the full board?
[3]    A: Yes.
[4]    Q: And up to this point, September 20th and 21st,
[5] was what we have marked as Exhibits 20 and 21
[6] the completed product of your work with the
[7] science teachers?
[8]    A: Yes.
[9]    Q: And the language that I think is relevant here
[10] is at the bottom of Pages 29 and 32, students
[11] will be made aware of gaps in Darwin's theory
[12] and of other theories of evolution. Who
[13] crafted that text?
[14]    A: I wrote that originally as a draft to get going
[15] on this and then the teachers reviewed that and
[16] then sent that back as a recommendation, that
[17] they had no further changes to that.
[18]    Q: How did you come up with that language?
[19]    A: From our June 24th meeting.
[20]    Q: Am I correct in understanding that in the
[21] course of these discussions the board members
[22] expressed a view that the presentation of
[23] evolution before these changes were made was
[24] not balanced?
[25]    A: Mr. Bonsell initially believed we were teaching

Page 155

[1] the origins of life and only teaching what
[2] might be attributed to the theory of evolution
[3] according to Darwin. And in that sense there
[4] was nothing else being presented. However,
[5] when he learned that we weren't doing that he
[6] was fine with what was being presented in
[7] class.
[8]    The balance came — it came in that there
[9] was no balance in the — they had concerns
[10] about the balance that they might have found
[11] lacking in the textbook and so the curriculum
[12] language was just to solidify what teachers had
[13] already reported to us that they did normally
[14] and prior to any concerns by the board.
[15]    Q: So that was the intent of this language here,
[16] to memorialize in the curriculum what the
[17] teachers were representing they were already
[18] doing?
[19]    A: Yes.
[20]    Q: Did you personally feel that there was anything
[21] wrong or unbalanced about the way teachers were
[22] presenting evolution prior to having to develop
[23] this curriculum item?
[24]    A: Again, my role was to, you know, work between
[25] the board and the teachers to develop both the

Page 156

[1] curriculum language, the adoption of the
[2] textbook and the student statement. I wasn't
[3] making — I was trying to answer the board's
[4] concerns and trying to answer the teachers'
[5] concerns. I wasn't making judgment about
[6] instruction.
[7]    Q: And had Mr. Nilsen ever expressed any view that
[8] there was anything wrong with the way teachers
[9] were presenting evolution prior to this whole
[10] issue arising?
[11]    A: No, I don't remember him saying that.
[12]    Q: And is it fair to say the teachers had no
[13] problems themselves with their own presentation
[14] of evolution?
[15]    A: That's correct.
[16]    Q: So to the extent there were issues, it was
[17] coming solely from the board?
[18]    A: That's correct.
[19]    Q: You drafted this language here and it includes
[20] the language of other theories of evolution.
[21] What did you understand that to mean?
[22]    A: I took that from my conversations with the
[23] teachers initially. I asked them — when Mr.
[24] Bonsell had questions I asked them do we
[25] present other theories, do we tell students

Page 157

[1] about gaps and they said, yeah, we do.
[2]    I didn't ask them to explain to me what
[3] other theories they were offering, but the fact
[4] that they said they were doing that, then that
[5] became part of the language.
[6]    Q: So you have no idea what they meant by other
[7] theories of evolution?
[8]    A: That's correct, other than there are
[9] contemporaries of Darwin's that are mentioned
[10] in the book as other theories of evolution.
[11]    Q: Was it your understanding that that was what
[12] the teachers meant by presenting other theories
[13] of evolution?
[14]    A: No, I don't know. That's just me making a —
[15] that's just from my reading I know that. That
[16] wasn't a conversation I had.
[17]    Q: Lamarck, for example, is a contemporary who had
[18] a different theory of evolution than Darwin,
[19] correct?
[20]    A: I'll take your word for it it was Lamarck. I
[21] do know that there are other contemporaries
[22] mentioned in the textbook.
[23]    Q: Did the teachers ever affirmatively say this is
[24] what we mean when we say we're presenting other
[25] theories of evolution?

Page 154 - Page 157   (42)

Min-U-Script®   Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Michael Baksa
March 9, 2005

Page 158

[1]   A: I don't recall the teachers giving a list of
[2] specific others or mentioning. I do know at
[3] the September meeting with Mr. Bonsell and the
[4] science department and teachers that the
[5] teachers did mention that there are other
[6] theories or beliefs out there.
[7]   I know Mr. Lenker for one talked about
[8] prefacing his teaching of evolution by
[9] mentioning creationism. In what form he did, I
[10] don't really remember.
[11]   Just in general I remember the teachers
[12] felt that they were — if the board was
[13] concerned that they weren't mentioning other
[14] theories of evolution that they felt, indeed,
[15] they were doing that.
[16]   (Recess taken)
[17]           BY MR. ROTHSCHILD:
[18]   Q: Mr. Baksa, was the next thing that happened
[19] after the recommendation for the change to the
[20] curriculum from the teachers and yourself a
[21] meeting of the board curriculum committee?
[22]   A: When I sent the draft to — the teachers' draft
[23] to the board curriculum committee and the full
[24] board I received different recommendations for
[25] changes from Mr. Buckingham, Mr. Bonsell and

Page 159

[1] Mrs. Brown.
[2]   (P Deposition Exhibit Numbers 22 and 23
[3] marked for identification.)
[4]           BY MR. ROTHSCHILD:
[5]   Q: I'm going to mark as Exhibits 22 and 23 two
[6] documents titled Board Curriculum Council
[7] Meeting, October 7th, 2004, Proposed Curriculum
[8] Changes, one of which differs from the other
[9] because it has some handwritten marks on it.
[10]   Do you recognize these two documents, Mr.
[11] Baksa?
[12]   A: Yes.
[13]   Q: And describe the one that's got the Bates stamp
[14] 35 and describe what it is.
[15]   A: This is my preparation of the recommendations
[16] from the staff and the board curriculum
[17] committee members. And I called this meeting
[18] so that the board curriculum committee could
[19] look at the staff's recommendations and the
[20] recommendations of other board curriculum
[21] committee members and decide on what would be
[22] the final language that they would like to see
[23] included.
[24]   Q: And these were recommendations that you had
[25] received from Mr. Bonsell, Ms. Brown and Mr.

Page 160

[1] Buckingham in advance of this meeting?
[2]   A: Yes.
[3]   Q: And is this document something you — was there
[4] actually a meeting on October 7th?
[5]   A: Yes.
[6]   Q: And was this document handed out?
[7]   A: Yes.
[8]   Q: And who attended this meeting?
[9]   A: Mr. Bonsell, Mr. Buckingham and Mrs. Harkins.
[10]   Q: And was Mrs. Harkins a member of the curriculum
[11] committee at that time?
[12]   A: Mrs. Harkins was board president. And
[13] typically a board president would join
[14] meetings.
[15]   Q: I believe I'm correct in saying that Mrs.
[16] Harkins was not board president at that time.
[17] In fact, I was at the meeting in which she was
[18] voted board president, which was quite a bit
[19] after. Is that —
[20]   A: Oh, Alan — is that right?
[21]   MR. GILLEN: I believe Mr. Rothschild is
[22] right also in that Alan Bonsell was president
[23] of the board at this time.
[24]   A: Then it would be — the board curriculum
[25] committee members would be Mrs. Brown, Mr.

Page 161

[1] Buckingham and Mrs. Harkins and Alan would be
[2] there as board president.
[3]           BY MR. ROTHSCHILD:
[4]   Q: You do believe Mrs. Harkins was on the board
[5] curriculum committee?
[6]   A: Yes, correct.
[7]   Q: You listed Bonsell, Buckingham and Harkins.
[8] Was Mrs. Brown not at this meeting?
[9]   A: Correct.
[10]   Q: And was anybody else at this meeting besides
[11] the three individuals you named and yourself?
[12]   A: No.
[13]   Q: No faculty?
[14]   A: No.
[15]   Q: Is there a reason why faculty was not included
[16] in this meeting?
[17]   A: The purpose of the meeting was for the board to
[18] come to some consensus on their variations of
[19] their curriculum piece. The board already had
[20] in hand the recommendation of the staff.
[21]   Q: From the document that is Bates stamped 35,
[22] which is Exhibit Number 22, it looks like Mr.
[23] Bonsell changed the administration's
[24] recommendation only to add the word problems.
[25] Is that fair?

Michael Baksa
March 9, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 162

[1]    A: Yes.
[2]    Q: And Mr. Buckingham added the terminology
[3] intelligent design, correct?
[4]    A: Yes.
[5]    Q: And then am I correct in understanding from —
[6]    A: Let me back up.
[7]    Q: Sure, go ahead.
[8]    A: Mr. Buckingham would have seen the draft
[9] language that included intelligent design at
[10] the August meeting and it may be — and that
[11] was the language that I drafted from the June
[12] 24th meeting.
[13]    So it may be that Mr. Buckingham was just
[14] looking at that draft and saying let's just
[15] keep that, but you're right, that's the version
[16] that he's supportive of.
[17]    Q: But when you say that, you don't know that
[18] because he told you that, you're just
[19] speculating?
[20]    A: Yes.
[21]    Q: So you have these versions here. Then on
[22] Exhibit Number 23, which is Bates stamped 36,
[23] there's handwriting added to Mr. Bonsell's
[24] entry, Including, but not limited to
[25] intelligent design. Is that your handwriting?

Page 163

[1]    A: Yes.
[2]    Q: And why did you write that there?
[3]    A: This was the board's final recommendation of
[4] the language that they would like to see.
[5]    Q: The language that you handwrote on to Mr.
[6] Bonsell's entry?
[7]    A: Yes.
[8]    Q: And so that was ultimately what the board
[9] curriculum committee recommended, the language
[10] that is under Mr. Bonsell's name in Exhibit 23?
[11]    A: Yes.
[12]    Q: Describe the discussion at this meeting that
[13] resulted in that language being selected.
[14]    A: It was very short. I passed out these proposed
[15] changes. They looked at the entries. And
[16] within a matter of minutes I think there was a
[17] decision — I think Mr. Buckingham wanted to
[18] make sure intelligent design was in there. So
[19] I think there was an agreement.
[20]    Mrs. Harkins did not have a separate
[21] language — draft of language that she was
[22] proposing. So what ended up happening is the
[23] language from Mr. Buckingham and Mr. Bonsell
[24] were married and Sheila was fine with that. So
[25] within a matter of minutes the board had

Page 164

[1] finalized language that they would like to see.
[2]    Q: And did you express any views about that
[3] language?
[4]    A: No.
[5]    Q: Did you communicate the faculty's views on that
[6] language or what you thought the faculty's
[7] views would be on that language?
[8]    A: Well, if you look at the recommendations, the
[9] recommendation from the administration and the
[10] staff is A.
[11]    Q: Right.
[12]    A: So the board was — at this was looking at that
[13] recommendation and deciding that they wanted to
[14] go with their language.
[15]    Q: Right. And did you say to them, hey, look, you
[16] know, what you're putting in here is different
[17] than what our science faculty, the science
[18] professionals in this community are
[19] recommending, did you say anything like that to
[20] them?
[21]    A: Not at this meeting.
[22]    Q: Did you say anything like that to them at any
[23] time?
[24]    A: At the board — before the October 18th board
[25] meeting where this language would be voted on

Page 165

[1] Dr. Nilsen and I recommended that we accept the
[2] teachers' language that did not include
[3] intelligent design because we felt it was
[4] important that the teachers support language
[5] that they would be subject to in their
[6] curriculum.
[7]    Q: When did this discussion occur?
[8]    A: Prior to the board meeting.
[9]    Q: That day?
[10]    A: No, within a half hour, hour of the board
[11] meeting.
[12]    Q: Prior to the board meeting?
[13]    A: Yes.
[14]    Q: On October 18th?
[15]    A: Yes.
[16]    Q: Okay. That's what I meant by that day. That
[17] same day as the board meeting?
[18]    A: That same day, yeah.
[19]    Q: And tell me what was said to the board and how
[20] they responded.
[21]    A: Well, again, what I had said before, Dr. Nilsen
[22] and I said that we recommend that the — at
[23] that meeting the board had Enclosure 11A and
[24] 11B. And at that meeting prior to the board
[25] meeting Enclosure 11C was distributed.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Michael Baksa
March 9, 2005

[1]   Q: Okay.

[2]   A: Enclosure 11C was developed in the afternoon of
[3] October 18th. So it was a second
[4] recommendation by the teachers to see if the
[5] board would be agreeable to — if the board
[6] would not be — the teachers were already aware
[7] of the language the board was proposing.
[8]     They were aware that the board was doing
[9] more with their language than they had
[10] originally proposed and that without something
[11] in between it would be the language as proposed
[12] out of this curriculum committee, with the
[13] board curriculum committee. So the teachers
[14] agreed to additional language that resulted in
[15] Enclosure 11C.
[16]   Q: And why don't we just make sure the record is
[17] clear. I'm going to pass out and mark as
[18] Exhibit 24 an October 13th, 2004 memorandum
[19] from you to the board which I think has the
[20] enclosures that you are describing.
[21]     (P Deposition Exhibit Number 24 marked for
[22] identification.)
[23]          BY MR. ROTHSCHILD:
[24]   Q: When you're referring to Enclosures 11A, B and
[25] C, are you referring to the documents that you

[1] find as part of this memorandum?
[2]   A: Can I look at the documents?
[3]   Q: Sure, take your time.
[4]   Q: Go ahead, you can answer the question.
[5]   A: What was the question?
[6]   Q: The question was are these the enclosures you
[7] were referring to, 11A, B and C?
[8]   A: Yes.
[9]   Q: And before I go back to my question about what
[10] you said to this board before they voted, why
[11] don't you tell me what communications you had
[12] with the teachers, if any, about the language
[13] that was being recommended by the board
[14] curriculum committee.
[15]   A: On the afternoon of the 18th I took the board
[16] curriculum committee language to the teachers
[17] and I'm not sure if I had —
[18]   Q: On the 18th, the day of the vote?
[19]   A: Yes. And I'm not sure if I had the note
[20] origins of life will not be taught. That was a
[21] suggestion from Mr. Bonsell. I know I talked
[22] to them about that. I'm not sure if I took a
[23] draft with that language over to them or not.
[24]     But the question I had before them was
[25] would they be — that the current language

[1] before — the current language that the board
[2] curriculum committee is recommending will
[3] probably be approved and theirs would probably
[4] not be approved and is there something else
[5] that they might be able to compromise with that
[6] they would still be okay short of Enclosure A.
[7]     The result of that question to them
[8] resulted in Enclosure C, which then the
[9] administration then was saying if the board did
[10] not like Enclosure B, then our next
[11] recommendation would be the administration and
[12] the teachers are recommending Enclosure C.
[13]     And it's that what I communicated and Dr.
[14] Nilsen communicated prior to the October 18th
[15] board meeting.
[16]   Q: Okay. So until October 18th the teachers had
[17] no idea that curriculum language that included
[18] intelligent design was going to be put to a
[19] vote?
[20]   A: No, I'm pretty sure I met with the board
[21] curriculum committee on October 7th and I'm
[22] pretty sure the next day I took that new
[23] language over to them.
[24]   Q: So what you were communicating to them on
[25] October 18th was your understanding that the

[1] board curriculum committee meetings — board
[2] curriculum committee's language was going to be
[3] voted in?
[4]   A: Yes.
[5]   Q: But they already knew about the language prior
[6] to that?
[7]   A: Yes.
[8]   Q: What was their reaction when they first heard
[9] about the language being advocated by the board
[10] curriculum committee?
[11]   A: Again, they objected to intelligent design
[12] being included in the curriculum because, as I
[13] later learned as they presented to the board
[14] and spoke, their fear is that the language
[15] making students aware of, they interpreted that
[16] as — and this is Jen Miller's remarks at a
[17] school board meeting, that that language might
[18] be telling her that she has to teach that and
[19] they didn't feel, again, equating intelligent
[20] design with creationism, that they would be
[21] able to do that legally.
[22]   Q: And then did the teachers communicate anything
[23] else in reaction to finding out about the board
[24] curriculum committee's language?
[25]   A: No. I mean, other than Mrs. Spahr repeatedly

Michael Baksa
March 9, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 170

[1] would say doesn't the board know they can't do
[2] that. You know, she told me that many times,
[3] feeling that her position was that intelligent
[4] design wasn't tenable in the curriculum.
[5]    Q: Do you have an understanding about whether
[6] intelligent design is the same as creationism?
[7]    A: I don't believe it's the same from the little I
[8] read.
[9]    Q: And when you're talking about the little you
[10] read, what are you referring to?
[11]    A: Of the documents that might have come across my
[12] desk in this two-year period.
[13]    Q: Do you have an understanding of whether the
[14] concept of intelligent design is religious in
[15] nature?
[16]    A: From reading the book of Peoples and Pandas I
[17] would say it's not religious.
[18]    Q: And you've read all the way through it?
[19]    A: Yes.
[20]    Q: Do you have an understanding of who the
[21] intelligent designer is?
[22]    A: That's why I think it's not religious, because
[23] intelligent design, from what I've read,
[24] doesn't point to anyone in particular or thing
[25] in particular.

Page 171

[1]    Q: Do you have a familiarity with the term
[2] creationism or do you have an understanding
[3] what that term means?
[4]    A: If you want to define it for me —
[5]    Q: No, I really want to know what your
[6] understanding of the term is.
[7]    A: My understanding of creationism is that it is
[8] the — creationism is the belief that the world
[9] came into existence according to the literal
[10] reading of the Bible Genesis.
[11]    Q: And that's the sum and substance of your
[12] understanding?
[13]    A: Yes.
[14]    Q: Have you ever heard of the term special
[15] creation?
[16]    A: No.
[17]    Q: I interrupted the line of questioning I was on
[18] before, which was what exactly did you and Mr.
[19] Nilsen say to the board on October 18th in
[20] recommending the teachers' version or one of
[21] the teachers' versions of the change in the
[22] curriculum?
[23]    A: We were recommending Enclosure 11C because we
[24] felt that it was important that the teachers
[25] were okay with that and we've come a long way,

Page 172

[1] they've agreed to the language in the
[2] curriculum, they agreed to the book Of Pandas
[3] and People listed as a reference, they agreed
[4] to have it as a reference, and that with the
[5] board not having any concerns with what is
[6] going on in the classroom that there was no
[7] necessity to go the next step and enforce
[8] intelligent design to be in there when that
[9] would just create a situation in which the
[10] teachers who have to deliver it don't agree
[11] with.
[12]    Q: Did you say anything else about why you were
[13] recommending Version C?
[14]    A: I don't remember anything else.
[15]    Q: And who said that, you or Mr. Nilsen?
[16]    A: At one time or another probably we both
[17] reiterated our position.
[18]    Q: Were all members of the board present when you
[19] made that presentation?
[20]    A: I don't remember if they were all there.
[21]    Q: Did any member of the board respond to what you
[22] and Mr. Nilsen were saying?
[23]    A: I know Mr. Bonsell spoke. I can't remember
[24] exactly what he said. I know Mr. Buckingham
[25] spoke and Mr. Buckingham felt that it was very

Page 173

[1] important that intelligent design not be left
[2] out of the curriculum and recommended that
[3] Enclosure 11A be the language that the board
[4] adopted.
[5]    Q: Did he explain why it was important that
[6] intelligent design be part of the curriculum?
[7]    A: The only thing I remember Mr. Buckingham saying
[8] is that he felt that even though teachers were
[9] saying that they were offering other theories
[10] of evolution in the class to students that he
[11] felt that it's important that to assure that
[12] that happens down the road or with any new
[13] teacher that language be included in the
[14] curriculum.
[15]    Q: And did he say anything else?
[16]    A: I don't remember anything else.
[17]    Q: Then the curriculum came to a vote, correct?
[18]    A: Yes.
[19]    Q: Was there any statements made in support of the
[20] board curriculum committee's version of the
[21] curriculum change before that vote occurred?
[22]    A: I know Dr. Nilsen called me to the podium to
[23] give the administration's recommendation and I
[24] recommended to the board Enclosure C — or
[25] Enclosure 11C.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Michael Baksa
March 9, 2005

Page 174

[1]         And I believe I remember Mrs. Spahr
[2] talking and Mrs. Miller talking. I can't say
[3] whether it was before the vote or after the
[4] vote.
[5]     Q: Did anybody who was advocating a vote for
[6] version I guess it was 11A get up and speak in
[7] support of it?
[8]     A: No, I don't remember anyone saying anything for
[9] 11A.
[10]     Q: In articles after the resolution was voted on
[11] Angie Yingling has been quoted as saying that
[12] members of the board suggested that she would
[13] be atheist or unChristian if she didn't vote
[14] for the intelligent design resolution. Did you
[15] observe any remarks of that kind?
[16]     A: Yeah.
[17]     Q: And Casey Brown has been quoted as saying that
[18] school board members asked her whether she is
[19] born again. Did you observe anything like
[20] that?
[21]     A: No.
[22]     Q: Are you aware that the Discovery Institute
[23] released a press release criticizing Dover for
[24] passing the resolution it did?
[25]     A: Yes.

Page 175

[1]     Q: And how did you become aware of that?
[2]     A: I don't remember that.
[3]     Q: Did you participate in any discussions with
[4] anybody at the school district or school board
[5] about the Discovery Institute taking that
[6] position?
[7]     A: I might have talked to Dr. Nilsen about it.
[8]     Q: And describe your conversation.
[9]     A: I really don't recall specifics of that
[10] conversation. I just know that we did
[11] recognize that they had this press release, but
[12] I don't really recall specifically what we
[13] talked about.
[14]     Q: Are you aware that members of the Discovery
[15] Institute communicated with the school district
[16] directly about their curriculum change?
[17]     A: Yes.
[18]     Q: Have you participated in any of those
[19] discussions?
[20]     A: I was at a meeting with a representative from
[21] the Discovery Institute.
[22]     Q: And when did that meeting occur?
[23]     A: I guess prior to — sometime after the October
[24] 18th I think.
[25]     Q: Was it prior to or after the lawsuit was filed?

Page 176

[1]     A: Prior to.
[2]     Q: Where did that meeting occur?
[3]     A: At the administration office conference room.
[4]     Q: Who was there?
[5]     A: I was, Dr. Nilsen, Mr. Bonsell and I believe
[6] Mr. Buckingham and Mrs. Harkins.
[7]     Q: Who participated on behalf of the Discovery
[8] Institute?
[9]     A: I forget his name.
[10]     Q: Was it someone named Seth Cooper?
[11]     A: Yes.
[12]     Q: Do you know who initiated the meeting?
[13]     A: No.
[14]     Q: Was the discussion about the legality of
[15] teaching of the curriculum or the pedagogical
[16] merits of the curriculum?
[17]     A: The discussion, Discovery Institute felt that
[18]
[19]     MR. GILLEN: Wait. To the extent you
[20] understood you were receiving legal advice from
[21] Mr. Cooper with the board meeting, as a board
[22] for the purpose of getting that legal advice,
[23] don't disclose that information.
[24]         BY MR. ROTHSCHILD:
[25]     Q: I think I asked you the question, the

Page 177

[1] foundation for that, was the discussion of the
[2] board curriculum in the nature of did you
[3] discuss whether the change was legal or did you
[4] discuss the scientific or pedagogical merits of
[5] the change of the board curriculum?
[6]     MR. GILLEN: You can answer that.
[7]     A: Legal.
[8]         BY MR. ROTHSCHILD:
[9]     Q: Only legal?
[10]     A: Yeah, I would say so, yeah.
[11]     Q: Do you have any knowledge of how this meeting
[12] was arranged?
[13]     A: No.
[14]     Q: Do you know who arranged the meeting?
[15]     A: No.
[16]     Q: When this meeting began, and I'm going to tread
[17] carefully here. So, you know, try an answer
[18] just my limited question. We'll take it step
[19] by step. Who began the discussion?
[20]     A: I think it was Mr. Cooper.
[21]     Q: Was there any part of that discussion that
[22] included discussion that the Discovery
[23] Institute would represent the school district
[24] in any litigation over the policy?
[25]     MR. GILLEN: Eric, based on the

Michael Baksa
March 9, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

Page 178

[1] information that I have, I'm going to instruct
[2] him not to answer with respect to — I mean, I
[3] don't think there's any question that that
[4] meeting was one in which the communications
[5] took place for the purpose of securing legal
[6] advice.
[7]     Based on that understanding of the board
[8] members that I have received and what Mr.
[9] Bonsell (sic) has said today I'm going to
[10] instruct him not to answer as to what they
[11] discussed.
[12]     MR. ROTHSCHILD: Can you represent to me,
[13] Patrick, that the school district sought legal
[14] advice from the Discovery Institute?
[15]     MR. GILLEN: Yes, absolutely.
[16]     MR. ROTHSCHILD: Can you represent to me
[17] who did that?
[18]     MR. GILLEN: I know that Mr. Buckingham
[19] did as head of the board curriculum committee.
[20] I believe that others did as well, Mr. Bonsell,
[21] for example. I think they all had the sense,
[22] particularly at this meeting, that they were
[23] meeting for the purpose of receiving his legal
[24] advice.
[25]     MR. ROTHSCHILD: You know, you've produced

Page 179

[1] documents, and which I appreciate, in which Mr.
[2] Cooper is reaching out to the board. And you,
[3] obviously, recognize those are not privileged,
[4] that's why you've produced those. And he's
[5] basically reaching out to communicate his views
[6] to the board. You know, I'm concerned here
[7] that this meeting was of that same nature.
[8]     MR. GILLEN: I understand your concern.
[9] As you've indicated, to the extent I think
[10] that's a fair characterization, I have produced
[11] them. I do understand that he was, like a
[12] public interest lawyer, acting in public
[13] interest, soliciting them for the purpose of
[14] providing advice on initial public importance,
[15] but I do believe he was providing legal advice
[16] and that's the basis for my objection.
[17]     MR. ROTHSCHILD: Are you taking the
[18] position that if Mr. Cooper volunteered legal
[19] advice, his legal opinion on the legality of
[20] this curriculum, that that's protected even if
[21] nobody asked him to give that legal advice?
[22]     MR. GILLEN: I'm taking the position that
[23] if Mr. Cooper in his capacity as a lawyer
[24] offers legal advice and if the board accepts it
[25] and communicates with him for the purpose of

Page 180

[1] obtaining the advice he's offered, that is a
[2] privileged communication.
[3]     It's my understanding that this meeting
[4] and other communications were of that nature
[5] and that the board was, in fact, or the board
[6] members acting in their official capacity were
[7] accepting his offer of legal advice and
[8] communicating with Mr. Cooper as a lawyer for
[9] the purpose of obtaining it. That's the basis
[10] for my objection.
[11]     MR. ROTHSCHILD: We're going to have to
[12] pursue this, obviously, with other witnesses
[13] who made these arrangements.
[14]     MR. GILLEN: Understood.
[15]     (P Deposition Exhibit Number 25 marked for
[16] identification.)
[17]         BY MR. ROTHSCHILD:
[18]     Q: Mr. Baksa, do you recognize the document I've
[19] mark as Exhibit 25?
[20]     A: Yes.
[21]     Q: Is this an e-mail exchange between you and a
[22] gentleman named Brad Neal?
[23]     A: Yes.
[24]     Q: Have you seen this document in the last two
[25] weeks?

Page 181

[1]     A: No.
[2]     Q: Who is Brad Neal?
[3]     A: Brad Neal is a social studies teacher at the
[4] high school.
[5]     Q: His e-mail to you was sent October 19th.
[6] That's the day after the resolution was passed,
[7] correct?
[8]     A: Yes.
[9]     Q: In his first sentence he says, In light of last
[10] night's apparent change from a standards driven
[11] school district to "the living word driven"
[12] school district, and it goes on. What did you
[13] understand him to mean by change from standards
[14] driven to living word driven?
[15]     A: I don't know.
[16]     Q: You had no understanding?
[17]     A: I would be speculating. What I take from the
[18] e-mail is that he's making a joke of the
[19] board's adoption of the language from the vote
[20] on October 18th. I don't know. I didn't speak
[21] to him about what he meant by this e-mail.
[22]     Q: You understood him well enough to respond and
[23] say be careful what you ask for, right?
[24]     A: Yes.
[25]     Q: And you told him you had been given a copy of

---

Min-U-Script®   Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Michael Baksa
March 9, 2005

Page 182

[1] The Myth of Separation by David Barton to
[2] review from board members. Why did you call
[3] his attention to that fact in response to this
[4] e-mail?
[5]    A: Generally, his e-mail speaks to the involvement
[6] of the board in the curriculum. And, you know,
[7] the board — what I was saying back to Mr. Neal
[8] is that social studies is next year and Mr. —
[9] I believe it was Mr. Bonsell has already
[10] expressed concerns about aspects of the social
[11] studies curriculum.
[12]    At this point Mr. Neal is aware of that.
[13] Dr. Nilsen and Mr. Bonsell did meet with Mr.
[14] Hoover and Mrs. Neal and discuss aspects of the
[15] curriculum and I believe Mr. Hoover was
[16] familiar with the book and had read the book
[17] already.
[18]    Q: Was it Mr. Bonsell who gave you — you said you
[19] were given this book by the board members. Who
[20] were the board members who gave it to you?
[21]    A: I think it was just Mr. Bonsell.
[22]    Q: And did he say anything to you when he gave you
[23] this book?
[24]    A: Actually, it might have been given to — I
[25] don't remember him saying anything to me and it

Page 183

[1] actually might have been given to Dr. Nilsen
[2] first and he gave it to me. I don't remember.
[3]    Q: And in your e-mail you say feel free to borrow
[4] my copy to get an idea of where the board is
[5] coming from. At the time you sent this e-mail
[6] had you examined the book?
[7]    A: Just skimmed it.
[8]    Q: And what did you mean by, you know, get an idea
[9] of where the board is coming from?
[10]    A: Just that reading the book might help explain
[11] what concerns the board might have in our
[12] existing social studies curriculum.
[13]    Q: I mean, having skimmed the book and heard from
[14] Mr. Bonsell, what did you understand those
[15] concerns to be?
[16]    A: I never met with Mr. Bonsell about this.
[17]    Q: Do you know what The Myth of Separation is
[18] about?
[19]    A: In a vague sense.
[20]    Q: What's that?
[21]    A: That the separation of church and state might
[22] never have been the clear intent of our
[23] founding fathers. I couldn't explain it more
[24] than that.
[25]    Q: And you said that there's since been meetings

Page 184

[1] with you and Mr. Bonsell and Mr. Hoover and Mr.
[2] Neal?
[3]    A: No, I was never at those meetings.
[4]    Q: Okay. So you were not part of them. Did
[5] anybody report to you what was said in them?
[6]    A: I think Dr. Nilsen gave me like a one-page
[7] topic summary of what they discussed. I don't
[8] recall anything else. I know I didn't sit down
[9] with Dr. Nilsen and talk at great length about
[10] the meeting.
[11]    Q: What do you remember from the document
[12] summarizing the meeting?
[13]    A: I don't remember it.
[14]    Q: Is that a document you still have in your
[15] possession?
[16]    A: Yeah, it might be.
[17]    MR. ROTHSCHILD: I request the production
[18] of that document.
[19]    MR. GILLEN: Sure.
[20]         BY MR. ROTHSCHILD:
[21]    Q: Is it your understanding from receiving The
[22] Myth of Separation and getting a report on the
[23] views of Mr. Bonsell that Mr. Bonsell is trying
[24] to change the social studies curriculum to
[25] present a view about the founding that is more

Page 185

[1] religious in nature than is currently being
[2] taught?
[3]    MR. GILLEN: Objection, calls for
[4] speculation.
[5]    A: I haven't had that conversation with Mr.
[6] Bonsell. The only thing, when I first came on
[7] in 2002/2003 I know Mr. Bonsell did hand me a
[8] copy of one of George Washington's — his
[9] inaugural address or his speech and did express
[10] concern that he wanted to make sure that in our
[11] curriculum our students were being taught about
[12] our founding fathers and were being taught
[13] about the Constitution. I don't remember
[14] having a conversation with Mr. Bonsell about
[15] separation of church and state.
[16]         BY MR. ROTHSCHILD:
[17]    Q: Was there something specific in the inaugural
[18] address he was calling your attention to?
[19]    A: No, not that I recall.
[20]    Q: So it's just he wanted the inaugural address
[21] read, whatever it said?
[22]    A: I don't know that he wanted it read. It was
[23] just a document he gave me that he felt was
[24] important.
[25]    Q: And is that something you still have in your

Michael Baksa
March 9, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 186

[1] possession?

[2]  A: I might have that.

[3]  MR. ROTHSCHILD: Request the production of

[4] that as well.

[5]  BY MR. ROTHSCHILD:

[6]  Q: Mr. Baksa, if the school board said to you we

[7] want to change the biology curriculum so that

[8] in addition to teaching Darwin's theory of

[9] evolution we read to the students from the Book

[10] of Genesis, as a professional administrator and

[11] educator what do you feel that your

[12] responsibilities are in reacting to that?

[13]  A: Probably what I would tell them in that

[14] hypothetical case is that I would run something

[15] like that by our solicitor and get his opinion

[16] back to them.

[17]  Q: And would you independently — well, let me

[18] withdraw that. Is it your view that that would

[19] be legal?

[20]  A: In an instance where a board member is

[21] proposing something that might be legal or not

[22] legal I would be reluctant to give my legal

[23] opinion to a board member. I would let the

[24] solicitor give that to the board member.

[25]  Q: What about from a pedagogical perspective, if

Page 187

[1] they're presenting this as another version of

[2] the origin of life or the origin of species in

[3] a biology class, in your view is that

[4] appropriate?

[5]  A: Is what appropriate?

[6]  Q: If, for example, they change the curriculum to

[7] present to the students that there's Darwin's

[8] theory of evolution, but another theory of how

[9] life originated can be found — another

[10] scientific theory of how life originated can be

[11] found in the Books of Genesis.

[12]  A: Again, I would take that suggestion from them

[13] and run that by the solicitor and return the

[14] opinion of the solicitor to them.

[15]  Q: I'm not asking for the legality of it. I'm

[16] asking is that, in your view, appropriate

[17] science education?

[18]  A: And what I'm trying to explain is if presented

[19] with that hypothetical situation that's how I

[20] would proceed to answer a board's concern or a

[21] board's suggestion.

[22]  Q: You would only take steps to determine the

[23] legality, but not whether it has merit as a

[24] scientific proposition?

[25]  A: You first asked me about the legality of it.

Page 188

[1] If there was a question of legality I would

[2] always defer to the solicitor.

[3]  Q: And now I'm asking you — I then changed it and

[4] I said pedagogically, in terms of teaching

[5] these kids, it's going to be science class and,

[6] you know, you're going to tell them Darwin's

[7] got a theory of evolution and origins and we're

[8] going to talk to you about that, but we also

[9] want to tell you about the scientific theory of

[10] how life originated that can be found in the

[11] Books of Genesis.

[12]  A: Well, knowing what I do of the cases with

[13] creationism, if that were presented to me by a

[14] board member, knowing those legal backgrounds,

[15] I would suggest, again, that we get a legal

[16] opinion whether that would be something we

[17] could do.

[18]  Q: Would you also take steps to consult your

[19] science faculty about whether this is something

[20] that ought to be taught as scientific subject

[21] matter regardless of whether it's legal or not?

[22]  A: My first step would be legal. If the opinion

[23] came back that you can't do that that would end

[24] the matter. If the board pursued something,

[25] then that might be a next step to furnish other

Page 189

[1] opinions for the board to consider.

[2]  MR. ROTHSCHILD: Let's take a quick break

[3] and I'll try and wrap up.

[4]  (Recess taken)

[5]  BY MR. ROTHSCHILD:

[6]  Q: Mr. Baksa, do you know who donated pandas to

[7] the school?

[8]  A: No.

[9]  Q: How did you find out they were being donated?

[10]  A: Dr. Nilsen told me.

[11]  Q: And did you ask him who they were being donated

[12] from?

[13]  A: No.

[14]  MR. ROTHSCHILD: Let me mark this as an

[15] exhibit.

[16]  (P Deposition Exhibit Number 26 marked for

[17] identification.)

[18]  BY MR. ROTHSCHILD:

[19]  Q: Do you recognize that document?

[20]  A: Yes.

[21]  Q: And those are your notes?

[22]  A: Yes.

[23]  Q: And do you know when they're from?

[24]  A: This would have been prior to October 18th.

[25]  Q: And what is recorded in those notes?

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Michael Baksa
March 9, 2005

Page 190

[1]   A: The conversation with Mr. Buckingham is about
[2] any changes that he would be recommending for
[3] the curriculum.
[4]   Q: What specifically is written there?
[5]   A: The first line says, Wants language requiring
[6] teachers to use the books, take them out and —
[7] I have use from them, but I'm sure I mean teach
[8] from them.
[9]       The next line is okay with mentioning
[10] intelligent, which is intelligent design. So I
[11] think that's his confirmation of Enclosure 11A.
[12] And then I think his justification explanation
[13] about wanting the teachers to use the book is
[14] that he reported to me that he felt there were
[15] expectations from those who donated the books
[16] to use the books.
[17]   Q: And when he communicated that to you did he
[18] communicate who those people were?
[19]   A: No.
[20]   Q: And did you ask?
[21]   A: No.
[22]   Q: And I take it when he's referring to teaching
[23] — take them out and teach from them, he's
[24] referring to the Pandas books?
[25]   A: Yes.

Page 191

[1]   Q: And did you respond to that suggestion by Mr.
[2] Buckingham?
[3]   A: No.
[4]   Q: And what became of that?
[5]   A: That was resolved with having the Pandas books
[6] placed in the library as a reference.
[7]   Q: Did Mr. Buckingham ever express again his
[8] desire that they actually be taught from, for
[9] example, at the October 7th meeting or at any
[10] other meeting?
[11]   A: At one — I don't know whether it was a
[12] meeting, but I do remember Mr. Buckingham
[13] requesting — oh, we did review that in my
[14] notes, Mr. Buckingham requesting that the books
[15] be used, if it matches content in the Miller
[16] Levine and that the books be looked at side by
[17] side.
[18]   Q: That was earlier than this telephone
[19] conversation, correct?
[20]   A: I think so.
[21]   Q: After you had this telephone conversation did
[22] he pursue this anymore with you or with the
[23] curriculum committee or with the board that he
[24] actually wanted the books taught from?
[25]   A: I don't remember him doing that.

Page 192

[1]   Q: You referred earlier in the testimony to
[2] Michael Behe. Is that someone you've met?
[3]   A: No.
[4]   Q: Have you read anything he's written?
[5]   A: No.
[6]   (P Deposition Exhibit Number 27 marked for
[7] identification.)
[8]             BY MR. ROTHSCHILD:
[9]   Q: Mr. Baksa, do you recognize this document?
[10]   A: Yes.
[11]   Q: Looking at the first page marked 975 there's a
[12] message note. Whose handwriting is that?
[13]   A: My secretary's.
[14]   Q: And who is Miriam Parsons?
[15]   A: Someone who read about us and is a writer
[16] herself.
[17]   Q: And she called you, I take it?
[18]   A: Yes.
[19]   Q: And you called her back?
[20]   A: Yes.
[21]   Q: And describe the conversation you had with her.
[22]   A: In general she just communicated to me that
[23] she's a, just from my notes, a writer and is
[24] supportive of teaching Bible science and
[25] offered her services to in-service our teachers

Page 193

[1] or come to talk to us if we wanted to.
[2]   Q: Did she say why she was calling you?
[3]   A: Just because she read about us in the
[4] newspaper.
[5]   Q: Read what about you in the newspaper?
[6]   A: I don't know.
[7]   Q: When she used the words Bible science did she
[8] describe what she meant by that?
[9]   A: I did that now. I'm just looking at my notes.
[10] It says Bible has huge degree of science. I
[11] just vaguely remember her either writing a book
[12] that describes how to use the Bible to teach
[13] science or her — I think I remember her saying
[14] she has talked to groups about that.
[15]   Q: And how did you respond to the information she
[16] was sharing with you and the offers she made to
[17] you?
[18]   A: I listened.
[19]   Q: Did you ask any questions?
[20]   A: No.
[21]   Q: Did you say, well, that's not useful for us
[22] here or that's not what we're doing or anything
[23] to that effect?
[24]   A: No.
[25]   Q: Did you ask her how she had come to the

Michael Baksa
March 9, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 194

[1] understanding that her expertise in creationism
[2] and Bible science would be useful for you?
[3] A: No.
[4] Q: During the course of this testimony you've
[5] described how Mr. Bonsell has expressed some
[6] issues or concerns relating to the social
[7] studies curriculum. Has any individual board
[8] member or the board as a whole identified any
[9] other curriculum issues which they have
[10] concerns or issues about?
[11] A: I would say that differently. I don't know
[12] that Mr. Bonsell reviewed the social studies
[13] curriculum. He just thought it was important
[14] that in a curriculum the Constitution is taught
[15] and the founding fathers are taught.
[16] Q: And he also, apparently, sent this book, Myth
[17] of Separation, to the administration?
[18] A: I believe he gave that to Dr. Nilsen, yes.
[19] Q: Other than that and what we've discussed about
[20] the biology curriculum can you think of any
[21] other aspects of curriculum where the board or
[22] individual board members has expressed
[23] concerns, raised issues or made suggestions
[24] about how the curriculum should be changed?
[25] A: Again, Mrs. Brown did have concerns with the

Page 195

[1] family consumer science curriculum, the
[2] foundations of that curriculum. In fact, at
[3] one point Mrs. Brown reviewed the entire
[4] program studies for the high school and made
[5] suggestions that we return to some former
[6] curriculum courses that had been deleted in the
[7] current years.
[8] Q: What about limiting the question to current
[9] members of the board, other than what you've
[10] already described, do you have any further
[11] answer to my question?
[12] A: What's the question?
[13] Q: The same question that you responded with
[14] discussion about Mrs. Brown, have the board or
[15] individual board members raised concerns or
[16] issues about any aspect of any curriculum item
[17] or made suggestions about how the curriculum
[18] should be added to, modified or subtracted
[19] from?
[20] A: I can only think of Mr. Bonsell and social
[21] studies.
[22] MR. ROTHSCHILD: Those are all my
[23] questions. Do you have any, Pat?
[24] MR. GILLEN: I just have a few.
[25] EXAMINATION

Page 196

BY MR. GILLEN:
[2] Q: Eric was just asking about subjects in the
[3] curriculum. I wanted to ask you, has any board
[4] member expressed concerns about the curriculum
[5] touching on sex education?
[6] A: Yes. That — yes.
[7] Q: Okay. I thought that perhaps at this moment in
[8] time you weren't remembering that.
[9] I think this is clear from your testimony,
[10] but I just want to ask you for the record. At
[11] any point in —
[12] A: If I could interrupt. There is a current board
[13] member, Mrs. Geesy, who did express concern
[14] about inhalants in that curriculum piece. It's
[15] the health curriculum.
[16] Q: At any point in this process did any board
[17] member direct you to take steps to implement
[18] the teaching of creationism?
[19] A: No.
[20] MR. GILLEN: I have no further questions.
[21] EXAMINATION
[22] BY MR. ROTHSCHILD:
[23] Q: Which board members raised issues about the
[24] teaching of sex education?
[25] A: When I came to the Dover district the math

Page 197

[1] curriculum and the health curriculum were under
[2] review and they were implemented in the year I
[3] started, 2002/2003.
[4] So those concerns were communicated to me
[5] by Dr. Nilsen as having come to him during his
[6] role as assistant superintendent in bringing
[7] those curriculums to review and revision. So I
[8] don't — I'm not aware of particular board
[9] members' names who raised the issues.
[10] Q: Were you aware of the nature of the issue?
[11] A: Generally it has to do with contraceptives and
[12] abstinence and how much information you should
[13] give students about that information for them
[14] to make good decisions.
[15] Q: And do you have an understanding of what the
[16] board members who raised concerns, what their
[17] preference was?
[18] A: No, I don't, I don't remember that.
[19] Q: The question I'm going to ask you right now I'm
[20] not trying to solicit any communications that
[21] happened with counsel or in the presence of
[22] counsel. So putting any communications that
[23] fit that description aside, has there been any
[24] discussion — are you aware of any discussion
[25] by the board or among board members about

**Tammy Kitzmiller, et al.   v.**
**Dover Area School District, et al.**

Michael Baksa
March 9, 2005

Page 198

[1] changing the intelligent design — about
[2] reversing the curriculum change to biology that
[3] was put in effect on October 18th? Have board
[4] members said we shouldn't do this, we should
[5] change it back?
[6]    A: The only board member I'm aware of that — and
[7] that's from — actually, I believe it's from
[8] newspaper reports. I don't think I heard it.
[9] But I think Mrs. Yingling has made statements
[10] to that effect.
[11]    Q: Other than that you're not aware of anybody
[12] who's done that?
[13]    A: Right.
[14]    Q: And has there been any discussion of that
[15] nature that you've participated in, just any
[16] discussion to reconsider that curriculum?
[17]    A: No.
[18]    MR. ROTHSCHILD: I have no further
[19] questions.
[20]    MR. GILLEN: Nor do I.
[21]    MR. ROTHSCHILD: Thank you very much.
[22]    (Whereupon, the deposition concluded at
[23] 4:50 p.m.)
[24]
[25]

Page 199

[1]
   COMMONWEALTH OF PENNSYLVANIA )
[2]
   COUNTY OF DAUPHIN          )
[3]
   I, Susan D. Kashmere, Reporter and Notary
[4] Public in and for the Commonwealth of Pennsylvania
   and County of Dauphin, do hereby certify that the
[5] foregoing deposition was taken before me at the time
   and place hereinbefore set forth, and that it is the
[6] testimony of
[7]         MICHAEL BAKSA
[8]    I further certify that said witness was by
   me duly sworn to testify the whole and complete truth
[9] in said cause; that the testimony then given was
   reported by me stenographically, and subsequently
[10] transcribed under my direction and supervision; and
   that the foregoing is a full, true, and correct
[11] transcript of my original shorthand notes.
[12]    I further certify that I am not counsel
   for or related to any of the parties to the foregoing
[13] cause, or employed by them or their attorneys, and am
   not interested in the subject matter or outcome
[14] thereof.
[15]    Dated at Harrisburg, Pennsylvania, this
   15th day of March, 2005.
[16]
[17]
[18]        Susan D. Kashmere, RPR
        Reporter - Notary Public
[19]
[20] My commission expires
   April 18, 2008.
[21]
[22]
[23]
[24]
[25]

**Lawyer's Notes**

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Michael Baksa
March 9, 2005

## 1

1 19:9, 11, 12, 14, 18;
70:11; 120:17
10 49:10; 51:8
1084 52:1, 6
10:30 7:10
10th 19:24
11 51:17
11A 165:23; 166:24;
167:7; 173:3; 174:6, 9;
190:11
11B 165:24
11C 165:25; 166:2, 15;
171:23; 173:25
12 36:12, 14; 52:12
12.0 61:13
12/31 86:4
12th 63:10
13 8:2; 57:19
13th 166:18
14 60:6
15 105:8
15th 86:2, 14, 24
16 114:2
17 118:10, 16
18 129:21
18th 32:25; 72:22; 73:8;
77:9; 108:20; 109:4, 21,
24; 153:22, 23; 164:24;
165:14; 166:3; 167:15, 18;
168:14, 16, 25; 171:19;
175:24; 181:20; 189:24;
198:3
19 151:11
1983 10:5
19th 181:5
1st 39:4; 41:22; 42:2, 11

## 2

2 70:11
20 153:3, 7, 8, 9, 25; 154:5
2000 87:3
2000-years-ago 90:11
2002 42:14; 148:15
2002/2003 12:21; 185:7;
197:3
2003 30:16; 37:24; 39:4;
41:22; 42:2, 11; 72:11;
128:6, 19, 22; 129:25;
130:16
2004 21:11; 30:17, 17, 17,
21; 32:25; 37:12, 25; 48:8;
49:17; 55:1; 58:22; 64:13;
66:17; 67:13; 68:16; 76:3,
8, 20; 78:13, 13; 86:2, 14,
25; 101:8; 106:16; 112:12,
25; 113:1, 11; 114:21;
128:18; 134:24; 148:18;
159:7; 166:18
2004/2005 33:25
208 51:21

20th 153:20; 154:4
21 153:3, 7, 8, 9, 25; 154:5
212 50:12, 17; 51:9
213 50:15; 51:10
21st 153:21; 154:4
22 159:2, 5; 161:22
23 159:2, 5; 162:22;
163:10
24 70:10; 133:18; 166:18,
21
24th 118:21; 135:21;
154:19; 162:12
25 70:11; 180:15, 19
26 189:16
27 192:6
29 154:10
2nd 135:12, 21

## 3

32 154:10
35 159:14; 161:21
36 8:22; 162:22

## 4

4 66:5
4:50 198:23
4th 114:21

## 5

5 11:10; 20:4
50/50 41:2; 42:16, 19;
43:9; 44:2; 46:6; 47:3
55 118:17; 121:19
56 113:21; 114:10; 117:1;
121:18; 122:9; 124:6
58 134:22, 24; 136:19;
141:2
5:30 7:10

## 6

6/24 136:13
6/24/04 114:10
60 113:21
68 70:10
69 70:11

## 7

7th 159:7; 160:4; 168:21;
191:9

## 8

8 32:9
83 10:5
89 8:24; 9:25

897 140:10
8th 66:17

## 9

9 38:22; 68:16; 78:13
952 60:10; 61:1
953 61:6
954 61:11
955 60:11; 63:15
975 192:11
9th 71:13; 78:12

## A

aback 133:13
able 35:13; 116:9;
120:21; 140:17; 168:5;
169:21
absolutely 178:15
abstinence 197:12
Academy 84:21
accept 165:1
acceptable 75:9; 139:12
accepted 27:11; 138:25
accepting 28:6; 180:7
accepts 179:24
accommodation 99:1
according 35:17; 89:14;
155:3; 171:9
account 14:15; 33:11;
47:5
accurate 71:22; 72:1, 3;
74:24
accurately 71:21
across 170:11
act 99:10, 14
acting 40:13; 179:12;
180:6
action 99:6, 12; 133:23;
135:25
activities 84:23; 88:7
actually 19:7; 30:15;
52:9; 60:13; 80:1; 88:20;
108:10; 117:25; 118:8;
126:12; 139:2; 152:23;
160:4; 182:24; 183:1;
191:8, 24; 198:7
add 109:24; 161:24
added 32:23; 162:2, 23;
195:18
adding 28:12; 72:23;
133:20
addition 26:2; 85:22;
122:7; 186:8
additional 111:5, 6;
134:14; 166:14
Additionally 40:9
address 72:5; 76:12;
77:20; 117:4, 5; 185:9, 18,
20
addressed 116:23;
117:19, 24; 131:25

addressing 123:3; 132:8
adequate 76:17
administration 9:19;
24:11; 40:19; 64:4;
102:17; 164:9; 168:9, 11;
176:3; 194:17
administration's
161:23; 173:23
administrative 99:7
administrator 61:17;
186:10
administrators 41:1
adopted 147:18; 173:4
adoption 117:18; 156:1;
181:19
adoptions 124:22
advance 8:4; 160:1
advice 85:8; 176:20, 22;
178:6, 14, 24; 179:14, 15,
19, 21, 24; 180:1, 7
advise 40:10
advisory 18:3, 11, 24;
19:1, 5, 12, 23; 20:6, 14,
20, 25; 21:10, 23; 22:3;
29:6
advocated 169:9
advocating 174:5
affiliated 13:5
affirmatively 157:23
afternoon 166:2; 167:15
afterwards 44:5; 48:14;
133:10
Again 20:8; 26:5; 27:15;
64:22; 77:10; 79:8; 83:5;
85:9; 106:11; 109:15, 22;
113:8; 117:13; 121:1, 7;
127:21; 129:15; 139:9;
145:11; 155:24; 165:21;
169:11, 19; 174:19;
187:12; 188:15; 191:7;
194:25
Against 92:4; 133:14
agenda 18:22; 25:19;
92:9
ago 7:20; 87:3
agree 6:6; 67:4; 136:22;
138:13; 140:6; 149:23, 25;
172:10
agreeable 151:4, 5, 7;
166:5
agreed 96:4; 122:24;
134:2; 166:14; 172:1, 2, 3
agreement 97:1; 98:19,
23; 123:17; 134:5; 139:10;
163:19
ahead 18:18; 28:1; 49:20;
52:10; 58:5; 65:16; 89:5;
118:9; 162:7; 167:4
aid 152:3
al 4:18, 19
Alan 79:2; 91:18; 94:14,
19; 128:6; 142:17, 19, 20;
143:14; 160:20, 22; 161:1
allow 6:2; 35:19
along 92:15; 143:14

alongside 47:4; 80:24;
81:9; 125:24
alternate 40:12
alternative 40:5; 41:20,
25; 42:9; 44:10, 13; 53:8;
77:22; 124:8; 128:9;
131:10; 138:9
alternatives 41:7
always 188:2
among 25:9; 101:19;
132:15; 197:25
Amy 63:19; 152:1
Angie 174:11
answered 88:22; 117:20
anticipate 5:25
anticipated 123:5
anymore 95:19; 191:22
apes 78:17; 121:5
apologize 122:20
apparent 181:10
apparently 194:16
appear 19:4; 49:16;
113:24
appears 50:20; 51:20;
124:6
appreciate 179:1
appropriate 62:17;
122:16; 187:4, 5, 16
appropriateness 62:25
approval 24:20, 25;
25:20; 110:22; 122:11;
134:11
approve 25:22; 26:14, 24
approved 18:25; 27:2, 5,
24; 28:2; 76:21; 168:3, 4
approves 26:9
Approximately 7:10
April 19:24; 21:1, 18, 21,
25; 39:4; 41:22; 42:1, 10;
130:16
Area 4:18; 11:2; 17:5;
38:14; 51:13; 55:9;
150:24; 152:12
areas 36:16
arises 145:8
arising 83:14; 110:12;
126:5; 156:10
armed 133:14
arose 27:13
around 8:2; 9:24, 25;
37:24; 39:4; 41:1; 64:20;
86:24; 101:7; 120:18
arranged 177:12, 14
arrangements 180:13
article 66:13, 16, 17, 21,
23; 67:8; 68:15, 16; 71:7,
13; 74:19; 78:12, 13; 79:7;
86:3, 3, 6, 6, 11, 13, 14, 17,
21
articles 64:1, 6, 7, 17, 20,
23, 24; 66:9, 14; 67:3;
80:20, 25; 81:3, 5, 10, 11,
14, 16, 21; 82:7, 9, 13;
86:2; 87:2; 89:10, 19;
90:22; 92:7; 104:14;

Michael Baksa
March 9, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

105:23, 24; 106:20; 107:1;
174:10
**artifacts** 123:15
**arts** 31:1, 2, 7; 36:11, 14
**aside** 28:9; 31:20;
106:13, 13; 108:16, 16;
197:23
**aspect** 195:16
**aspects** 182:10, 14;
194:21
**assertion** 148:5; 152:13
**assess** 35:21; 36:2, 23
**assessment** 36:9; 84:24
**assignment** 55:23
**assistant** 11:1, 7, 18;
12:2, 5; 59:15; 71:9, 16,
22; 119:17; 197:6
**associate** 56:1; 95:19, 22
**associating** 16:21
**associations** 84:19
**assume** 101:15; 103:5;
139:1; 142:18
**assumed** 131:16
**assumption** 82:12, 14;
131:11, 13, 20, 21, 23;
133:4; 146:3
**assure** 125:16, 18, 25;
127:14; 129:13; 173:11
**assured** 123:19
**atheist** 174:13
**atomic** 146:12
**attend** 13:14; 17:4, 7, 8,
11, 16; 18:4; 29:9; 57:13
**attended** 10:13; 12:13,
16; 13:2; 160:8
**attending** 15:8, 15; 69:16
**attention** 13:14; 129:8;
141:20; 147:17; 182:5;
185:18
**attorney** 7:12
**attributed** 87:3; 92:11;
155:2
**attributes** 79:7
**August** 30:17; 134:24;
135:12, 21; 136:5, 9, 10,
16; 137:19; 140:1, 22;
141:1; 148:20; 152:17;
162:10
**Aumen** 152:1
**author** 17:1
**authorities** 36:5
**avail** 85:1
**available** 17:15; 23:23;
108:15
**aware** 32:18; 43:25;
63:20; 64:16; 74:3, 7, 12,
15; 77:24; 84:22, 23;
102:24; 103:1, 2; 106:1;
107:9; 108:22, 23; 109:2;
112:2, 15; 127:22; 128:19;
138:21; 139:3, 4; 145:11,
16, 18; 154:11; 166:6, 8;
169:15; 174:22; 175:1, 14;
182:12; 197:8, 10, 24;
198:6, 11

**away** 92:10; 136:8

# B

**B** 166:24; 167:7; 168:10
**back** 23:6; 30:18; 41:5;
44:18; 53:10, 10; 54:24;
66:22; 70:8; 114:18;
125:2; 127:11; 129:3;
134:12; 135:15; 136:5;
152:16; 153:24; 154:16;
162:6; 167:9; 182:7;
186:16; 188:23; 192:19;
198:5
**background** 36:8, 11, 15
**backgrounds** 188:14
**backtrack** 16:16
**BAKSA** 4:8, 12; 8:12;
47:22; 49:17; 52:16;
57:22; 59:14; 60:9, 19;
63:20; 66:8; 71:10, 17, 23;
74:22; 80:3; 86:1; 87:24;
92:24; 97:3; 108:1;
130:14; 138:10; 148:21;
158:18; 159:11; 180:18;
186:6; 189:6; 192:9
**balance** 78:18; 79:10;
155:8, 9, 10
**balanced** 83:2, 4; 154:24
**Barton** 182:1
**based** 35:3; 152:13;
177:25; 178:7
**basically** 179:5
**basis** 179:16; 180:9
**Bates** 19:14; 51:9, 10, 21;
52:6; 60:10; 116:25;
118:16; 159:13; 161:21;
162:22
**bear** 113:20
**bearing** 114:7
**became** 103:2; 112:4, 7;
157:5; 191:4
**become** 112:15; 175:1
**becomes** 44:14
**becoming** 11:18
**began** 177:16, 19
**begin** 51:19
**beginning** 46:18; 110:2;
140:9
**behalf** 176:7
**Behe** 35:7; 149:9; 192:2
**behind** 86:14
**belief** 171:8
**beliefs** 72:7; 79:16;
145:10; 158:6
**believes** 68:10
**belongs** 137:25
**below** 125:15
**Bernhard-Bubb** 86:7
**Bert** 40:2; 41:5; 106:9, 19,
19
**Bertha** 130:17
**besides** 62:11; 120:1, 2;
161:10

**best** 6:5; 29:17; 95:18
**better** 35:13; 83:2, 4
**Bible** 16:22; 89:14;
171:10; 192:24; 193:7, 10,
12; 194:2
**Bill** 38:19; 89:6; 119:12;
125:15, 23; 127:13, 18
**biology** 6:25, 25; 20:16;
21:12; 22:4, 5, 8; 23:14;
25:23, 24; 26:12; 28:5, 9;
30:8, 9, 20; 31:15, 19, 23;
32:4, 14, 23; 38:15; 42:3;
48:3, 10, 22; 49:6; 50:5;
53:6; 57:10; 59:18; 61:23;
63:22, 22; 66:1, 2; 67:19,
22, 22; 71:24; 72:18; 73:7,
9; 75:22; 82:4; 84:5; 87:20,
21; 90:12; 91:14; 97:7;
103:11; 106:14; 109:5, 24;
114:10; 115:15; 118:18;
120:3; 122:8; 123:25;
126:8; 132:1; 133:24;
134:17, 18; 136:1; 142:4;
144:9; 146:2; 148:22;
153:15; 186:7; 187:3;
194:20; 198:2
**bit** 14:2; 44:5; 101:25;
160:18
**Black** 35:8; 92:9
**Board** 8:13; 17:5, 9, 12,
17, 22, 24; 18:12, 21, 22;
21:22; 22:2, 12, 14, 16, 21,
23, 24; 23:5, 9, 10, 17, 23;
24:5, 6, 15, 18, 19, 23, 25;
25:2, 5, 13, 15, 19, 20, 21;
26:4, 9, 13, 14, 16, 19;
28:6, 10, 11; 29:4, 9, 13,
15, 18; 30:6; 31:17; 32:25;
34:11, 14; 37:20; 38:5, 6;
39:22; 40:4, 6, 19, 22, 25;
41:6; 42:5, 15; 45:21, 23;
46:9, 16; 47:23; 48:1, 1, 5,
8, 15; 49:6, 6; 53:17;
54:11, 16; 55:12; 56:20;
58:22; 59:5, 8; 60:2; 61:1;
63:13; 65:13; 67:13, 21;
68:17; 69:17, 20; 70:20,
20, 25; 75:9, 13; 76:13, 21;
77:18; 78:1, 22; 79:1;
80:22; 81:6, 8; 82:2, 3, 20,
22, 23; 83:15, 17; 84:10;
88:20; 89:1; 90:6, 17; 91:5,
25; 93:18; 97:13; 98:7;
103:19, 21, 23, 25; 104:2,
5, 9; 105:24; 106:3, 15, 24;
107:1, 5, 14, 20; 108:7, 7,
11, 13, 15, 19, 25; 109:18;
110:9, 14, 17, 19, 21, 24;
111:1, 2, 9, 15, 20, 20;
112:5; 114:14; 119:20, 21;
120:5, 10; 128:7; 130:12;
131:5, 8; 135:13, 25;
136:24; 138:2, 2; 139:11;
140:21; 143:12, 22, 22;
144:2; 146:18; 147:6, 16,
22; 148:1; 150:24; 151:2,
3; 154:1, 2, 21; 155:14, 25;
156:17; 158:12, 21, 23, 24;
159:6, 16, 18, 20; 160:12,
13, 16, 18, 23, 24; 161:2,

4, 17, 19; 163:8, 25;
164:12, 24, 24; 165:8, 10,
12, 17, 19, 23, 24; 166:5,
5, 7, 8, 13, 19; 167:10, 13,
15; 168:1, 9, 15, 20; 169:1,
1, 9, 13, 17, 23; 170:1;
171:19; 172:5, 18, 21;
173:3, 20, 24; 174:12, 18;
175:4; 176:21, 21; 177:2,
5; 178:7, 19; 179:2, 6, 24;
180:5, 5; 182:2, 6, 7, 19,
20; 183:4, 9, 11; 186:6, 20,
23, 24; 188:14, 24; 189:1;
191:23; 194:7, 8, 21, 22;
195:9, 14, 15; 196:3, 12,
16, 23; 197:8, 16, 25, 25;
198:3, 6
**board's** 76:16; 156:3;
163:3; 181:19; 187:20, 21
**Bob** 53:3, 7; 54:7; 55:14;
56:11, 16, 23; 93:23;
94:11; 95:8
**Bonsell** 8:6; 40:25; 42:5,
6, 21; 43:20; 44:6, 11;
45:10, 23; 46:6; 47:2;
72:12, 12; 79:2, 6; 83:18;
84:1, 9; 91:18; 94:14;
95:19; 104:15; 105:22;
128:6, 22; 129:25; 130:9,
18; 131:25; 132:3, 6, 13,
18; 133:2, 10; 142:19;
143:15; 148:7, 8, 13;
154:25; 156:24; 158:3, 25;
159:25; 160:9, 22; 161:7,
23; 163:23; 167:21;
172:23; 176:5; 178:9, 20;
182:9, 13, 18, 21; 183:14,
16; 184:1, 23, 23; 185:6, 7,
14; 194:5, 12; 195:20
**Bonsell's** 46:22; 132:21;
162:23; 163:6, 10
**book** 7:1; 17:1; 30:8;
33:18; 34:15; 38:17; 42:8;
44:8; 45:11; 48:3, 10;
54:11, 16; 61:22; 62:3, 4,
4, 6; 63:5; 67:11; 68:19;
74:4, 15, 23; 75:4, 7, 9, 12,
24; 77:2, 11, 24; 78:16, 18,
22; 79:9; 82:15, 19, 25;
83:2; 84:1, 2, 5; 94:6, 12,
15; 100:1, 18, 23; 103:8,
20; 104:3; 106:1, 15;
108:12, 18; 134:17;
135:14, 18; 136:6; 141:8;
142:8; 157:10; 170:16;
172:2; 182:16, 16, 19, 23;
183:6, 10, 13; 186:9;
190:13; 193:11; 194:16
**books** 13:25; 31:5, 8, 9,
21, 23; 32:5; 53:19; 54:2,
4, 13, 17, 21; 55:3, 8;
59:11; 94:9; 103:9;
118:18; 134:7, 11; 187:11;
188:11; 190:6, 15, 16, 24;
191:5, 14, 16, 24
**born** 174:19
**borrow** 183:3
**both** 5:20; 23:21; 52:15;
68:19; 87:2; 92:6; 102:11;
123:8; 125:15, 18, 23;

126:1, 1, 2; 127:13, 14;
128:10, 21; 133:4; 148:7;
151:5; 152:25; 155:25;
172:16
**bottom** 32:17; 86:4;
122:9, 17; 133:19; 154:10
**Box** 35:8
**Brad** 180:22; 181:2, 3
**break** 6:10, 13; 7:11;
47:19; 92:21; 107:23;
189:2
**breaks** 6:14
**bring** 111:11
**bringing** 70:24; 197:6
**brought** 13:13; 88:21;
94:11; 110:25; 111:12;
126:7, 10; 128:4; 132:7;
138:20, 22
**Brown** 27:8, 15; 121:23;
123:7, 23; 134:8; 159:1,
25; 160:25; 161:8; 174:17;
194:25; 195:3, 14
**Buckingham** 8:5; 34:15,
17; 37:14; 38:19; 48:12,
16, 19; 61:2; 64:12; 67:10,
14; 68:9, 18, 20; 69:9, 16;
78:15, 21; 79:9; 80:10, 13,
21; 81:7; 83:18; 84:4, 10;
87:3, 5, 12; 89:13, 17;
92:11; 99:24; 101:20, 25;
102:18; 103:9; 104:7, 23;
107:15; 111:14; 112:2, 16;
18; 114:25; 115:1, 4, 12,
14, 25; 116:1, 24; 117:4, 8,
16, 22; 121:2, 7, 13;
122:10; 123:19; 134:6, 10;
158:25; 160:1, 9; 161:1, 7;
162:2, 8, 13; 163:17, 23;
172:24, 25; 173:7; 176:6;
178:18; 190:1; 191:2, 7,
12, 14
**Buckingham's** 104:19;
117:19
**building** 64:5
**buildings** 28:25
**bunch** 117:11
**business** 26:21
**Butterfield** 31:6; 36:13;
63:5, 9
**buying** 143:4

# C

**C** 166:25; 167:7; 168:8,
12; 172:13; 173:24
**call** 18:2; 61:21; 74:11;
92:1; 108:17; 141:2, 21;
182:2
**Callahan** 48:25
**called** 4:8; 61:19; 71:23;
100:9; 142:6, 9; 147:17,
19; 159:17; 173:22;
192:17, 19
**calling** 185:18; 193:2
**calls** 43:1; 73:20; 77:5,
16; 92:3; 109:9; 150:17;

**Min-U-Script®**   Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al. v.
Dover Area School District, et al.

Michael Baksa
March 9, 2005

185:3
came 12:11; 22:1; 30:24;
51:1; 52:3; 55:17; 94:25;
129:18; 134:8; 136:5;
141:19; 155:8, 8; 171:9;
173:17; 185:6; 188:23;
196:25
can 5:22, 25; 6:5; 9:22;
11:19; 19:3, 21; 24:8;
25:25; 26:10; 27:6, 13;
28:5, 9; 29:25; 39:14;
41:10; 43:7; 51:11; 53:9,
24, 25; 60:21; 65:6; 67:5;
73:23; 76:19; 80:15;
81:19; 85:18; 86:8, 18;
87:16; 97:1; 112:23;
114:5; 117:9; 118:24;
124:6, 25; 125:16, 25;
127:11, 14; 129:13, 20;
150:18; 151:9; 167:2, 4;
177:6; 178:12, 16; 187:9,
10; 188:10; 194:20;
195:20
capacity 179:23; 180:6
captioned 4:17
careful 97:12, 16; 181:23
carefully 177:17
case 22:4; 32:13; 100:10;
133:14; 137:20; 148:12;
186:14
cases 88:24; 141:11;
188:12
Casey 127:9; 174:17
cause 20:23; 27:21
caused 27:10; 94:21
cautious 97:25
CDs 100:4, 5; 101:13
Center 112:3, 17, 20;
113:3, 6, 16; 141:14
certain 52:6; 84:2
Certainly 36:4; 66:23;
88:24
certificate 10:8
certification 4:4
chair 25:15; 42:5; 121:24
chairman 111:9
chairperson 25:21;
111:2, 4
challenged 138:24
chance 33:11
change 21:15; 22:5;
25:24; 26:1; 28:11; 30:9;
63:22; 72:14; 73:8; 94:21;
109:21; 117:15; 119:1;
123:24; 135:17; 158:19;
171:21; 173:21; 175:16;
177:3, 5; 181:10, 13;
184:24; 186:7; 187:6;
198:2, 5
changed 146:9; 161:23;
188:3; 194:24
changes 22:8, 10, 12;
76:9; 138:8; 154:17, 23;
158:25; 159:8; 163:15;
190:2
changing 28:14; 96:12;

136:1; 198:1
chapters 75:15
characterization 53:22;
70:4; 74:24; 85:7; 89:5;
115:15; 147:21; 179:10
characterized 91:4
characterizes 76:16
check 125:3
chemistry 10:21; 31:23
choose 101:20
chose 82:18
Christian 13:10; 79:11
Christianity 79:17; 80:11
Christians 92:10
chronological 113:25
chronologically 134:19;
153:19
church 68:10; 183:21;
185:15
circumstances 20:23;
28:22; 29:12; 38:3; 50:25;
52:19; 79:21, 24
cited 17:1
citizen 70:23
clarify 44:5
clarifying 118:13
class 27:14; 60:24;
67:19; 72:18; 73:7;
123:12; 126:19; 133:17;
155:7; 173:10; 187:3;
188:5
classes 9:13; 61:23;
62:3, 5; 99:5; 144:11;
146:2
classroom 12:18; 40:8;
80:8; 121:4, 12; 123:15;
132:6, 10; 141:9; 142:8;
172:6
classroomm 122:3
classrooms 46:20;
132:21
clay 138:18
clear 5:19, 23; 29:3;
46:10; 50:10; 51:24;
95:10, 15; 102:6; 125:9;
166:17; 183:22; 196:9
clearly 46:3; 95:24
closely 97:22
Coldwater 119:7
colleagues 150:5
collection 66:8, 17
collective 60:14
collectively 48:2
College 10:3; 11:20;
12:25; 13:10; 92:25
coming 27:5, 25; 69:20;
90:23; 94:1; 125:6;
156:17; 183:5, 9
comment 94:11
comments 22:11; 46:23;
91:3; 92:15, 17
committee 17:16, 19, 23,
23; 18:2, 3, 11, 24; 19:1, 5,
12, 23; 20:24, 25; 21:5, 16,

18, 23; 22:3, 7, 9, 14, 22,
23; 23:6, 10, 17, 24; 24:6,
16, 18, 19, 23; 25:5, 15;
26:17, 19; 28:20, 23; 29:4,
6, 10, 13; 30:7; 42:6;
48:15; 53:18; 54:11;
58:22; 59:6, 8; 68:18;
75:10, 13; 82:21, 23;
103:21; 106:4, 16; 107:11,
18; 108:2, 14; 110:13, 18,
19; 111:1, 9, 15, 20;
114:15, 20, 22; 115:3;
118:21; 119:19, 20; 120:6;
121:24; 128:7; 135:6, 23;
136:24; 138:3; 140:22, 23;
151:2; 154:2; 158:21, 23;
159:17, 18, 21; 160:11, 25;
161:5; 163:9; 166:12, 13;
167:14, 16; 168:2, 21;
169:1, 10; 178:19; 191:23
committee's 169:2, 24;
173:20
communicate 25:12;
45:18; 97:25; 102:20;
116:16; 164:5; 169:22;
179:5; 190:18
communicated 25:18;
45:20; 110:14, 21; 111:8;
112:24; 113:17; 117:7;
118:24; 121:2; 146:18;
168:13, 14; 175:15;
190:17; 192:22; 197:4
communicates 110:24;
179:25
communicating 78:24;
115:19; 168:24; 180:8
communication 180:2
communications 110:7;
33:21; 104:20, 24; 111:16;
167:11; 178:4; 180:4;
197:20, 22
community 15:22; 17:25;
67:25; 91:23; 139:16;
144:21; 149:13; 150:3;
164:18
compilation 66:14; 130:3
compiled 66:8
compiling 130:19
complaint 105:20
completed 9:8, 9, 16;
154:6
completing 10:14
complexities 33:9
complexity 33:11
component 27:4
components 26:21; 27:3
comprehensive 9:11
compromise 168:5
concept 16:5, 7, 12, 16;
35:23; 36:18, 24, 25;
42:16; 120:12; 170:14
concepts 80:5; 144:6, 9,
10; 146:19
concern 43:23; 46:25;
47:3; 83:14, 15, 16; 91:24;
98:3; 115:16; 131:5;
179:8; 185:10; 187:20;

196:13
concerned 46:19; 75:14,
18; 117:22; 131:8; 158:13;
179:6
concerns 25:14; 27:20;
42:7; 44:7; 45:6, 10; 46:16;
68:1; 77:20; 84:3, 6, 8;
116:4, 7, 10, 12, 14, 19,
22; 117:5, 11, 19; 128:8;
130:22; 132:1, 8, 22;
133:2; 134:14; 139:10;
155:9, 14; 156:4, 5; 172:5;
182:10; 183:11, 15; 194:6,
10, 23, 25; 195:15; 196:4;
197:4, 16
concluded 198:22
conclusion 75:23; 76:2;
146:3
Conestoga 12:9
conference 176:3
confident 93:15; 115:6;
148:23
confirm 93:14; 94:8;
113:24
confirmation 190:11
conflict 93:8; 123:16
conjunction 87:20;
152:4
connection 56:4; 142:3
consecutively 118:3, 14
consensus 161:18
consider 99:14; 189:1
consideration 106:4
considered 21:13;
110:20; 144:13
consistent 20:11; 80:14;
124:2
Constitution 185:13;
194:14
consult 188:18
consultation 37:4
consulted 137:12; 140:6;
142:1
consumer 26:17; 27:1, 7;
29:20; 30:4, 25; 31:24;
195:1
contact 54:9
contacted 85:19; 111:23;
112:1, 2, 16; 113:2
contacting 57:7
contemporaries 157:9,
21
contemporary 157:17
content 37:2, 19; 40:23;
80:17, 17; 119:22; 120:1,
18, 20; 123:11; 191:15
contents 66:21
context 38:14; 68:23;
87:12, 15; 88:10
continually 41:18
continue 40:11; 74:22
continues 71:10
continuing 75:7
contraceptives 197:11
controversial 144:25;

145:5
controversy 13:19, 23;
14:10, 12; 15:9, 13, 14, 22;
16:2; 145:8
convene 25:9
convened 21:17
convenience 66:25
conversation 39:20;
40:2; 41:15; 43:22; 44:4, 6;
46:2; 61:2, 24; 97:3;
120:24; 157:16; 175:8, 10;
185:5, 14; 190:1; 191:19,
21; 192:21
conversations 27:19;
35:14; 54:16; 72:10;
140:11; 156:22
Cooper 176:10, 21;
177:20; 179:2, 18, 23;
180:8
copies 64:8; 103:21, 22;
108:14; 118:9
copy 50:24; 118:7;
181:25; 183:4; 185:8
corner 58:9
cost 112:22
council 20:6, 14, 20;
21:11; 57:13; 97:16; 99:9;
159:6
counsel 4:3; 7:5; 8:1, 4,
8; 23:15; 51:2, 24; 94:24;
112:4, 7; 129:10; 197:21,
22
country 79:15, 16; 80:10;
92:10
couple 57:16; 68:9;
74:20; 123:2
course 9:10; 10:20, 23,
24; 26:21; 27:15; 28:1;
35:18; 154:21; 194:4
courses 10:18; 12:13;
195:6
court 4:23; 5:8, 23; 6:19;
53:11; 70:12
courtesy 97:24
cover 119:5; 120:7
covered 77:14
crafted 154:13
create 172:9
created 24:3; 78:2;
152:2, 4, 23; 153:22
creating 5:10, 19; 84:4
creation 15:1; 43:16;
80:6; 89:14; 171:15
creationism 8:14; 12:15;
14:23; 39:23; 40:6, 7, 9,
11, 17; 46:19; 47:5, 24;
48:4, 13, 17, 20, 21, 23;
49:7; 64:13; 67:18; 68:2, 4,
19, 22, 24; 69:4, 5, 13, 18,
21; 70:2, 7, 17, 18, 24;
78:23; 79:3, 11; 80:8, 23;
81:9, 13; 82:5, 5, 10, 15,
16, 19, 25; 88:14, 17, 18;
89:2, 3, 6, 16; 90:2, 7;
91:25; 92:2, 3; 120:23;
121:20; 128:11; 130:9, 19,

Case 4:04-cv-02688-JEJ   Document 213   Filed 09/27/05   Page 57 of 66

Michael Baksa
March 9, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

21, 22; 131:5, 11, 17;
133:7, 15; 140:13, 19;
158:9; 169:20; 170:6;
171:2, 7, 8; 188:13; 194:1;
196:18
**credible** 152:11
**criticize** 120:10
**criticizing** 174:23
**cross** 87:4
**current** 71:23; 85:20;
167:25; 168:1; 195:7, 8;
196:12
**Currently** 9:14; 11:1;
142:2; 185:1
**curriculum** 6:25; 11:8;
17:19, 22, 24; 18:3, 11, 13,
24, 25; 19:5, 11, 23; 20:5,
14, 16, 20, 25; 21:2, 3, 7,
10, 12, 15, 20, 23; 22:3, 5,
6, 7, 9, 14, 22, 23; 23:5, 9,
10, 14, 17, 21, 21, 24;
24:6, 7, 10, 16, 18, 19, 23;
25:5, 15, 21, 23, 24; 26:2,
2, 3, 7, 12, 14, 16, 18, 19,
22; 27:1, 4, 7; 28:5, 9, 12,
13, 14, 15, 19, 23; 29:4, 9,
13, 16; 30:5, 7, 9, 24;
31:22; 32:14, 24; 33:2, 5;
36:12, 16, 20, 21; 37:1, 8;
38:15; 40:23; 41:21; 42:3,
4, 6; 43:19; 48:15; 53:17;
54:11; 57:13; 58:22; 59:6,
8; 63:23; 66:2; 67:22;
71:25; 72:24; 73:9; 75:10,
13; 80:16; 82:21, 23;
87:21; 88:13; 90:12; 97:7;
103:11, 21; 106:4, 16;
107:11, 17; 108:2, 14;
109:5, 21, 25; 110:13, 17,
19, 23; 111:1, 15; 114:14,
20, 22; 115:2; 118:20;
119:19, 19; 120:6; 121:9;
122:1, 4, 8, 17, 19, 22;
123:4, 6, 9, 11, 16, 25;
124:2, 8, 16, 22; 125:4;
126:8, 19; 127:4, 10;
128:7; 133:20, 24; 134:1,
3, 8, 18; 135:6, 22; 136:1,
12, 24; 137:21; 138:1, 3;
139:2; 140:21, 22; 142:22;
143:9, 19, 19; 146:9;
148:17; 151:2, 4; 152:16,
18; 153:15; 154:1; 155:11,
16, 23; 156:1; 158:20, 21,
23; 159:6, 7, 16, 18, 20;
160:10, 24; 161:5, 19;
163:9; 165:6; 166:12, 13;
167:14, 16; 168:2, 17, 21;
169:1, 2, 10, 12, 24; 170:4;
171:22; 172:2; 173:2, 6,
14, 17, 20, 21; 175:16;
176:15, 16; 177:2, 5;
178:19; 179:20; 182:6, 11,
15; 183:12; 184:24;
185:11; 186:7; 187:6;
190:3; 191:23; 194:7, 9,
13, 14, 20, 21, 24; 195:1,
2, 6, 16, 17; 196:3, 4, 14,
15; 197:1, 1; 198:2, 16
**curriculums** 25:16;

197:7
**cut** 21:24
**cycle** 30:24; 31:22; 42:5

# D

**Daily** 78:14; 86:15;
131:22
**Darwin** 14:16; 35:17;
44:8; 75:14, 16, 19; 76:10;
155:3; 157:18
**Darwin's** 32:19; 35:8;
42:8, 22; 43:24; 45:1, 8,
10; 46:17; 47:4; 73:14;
77:4, 11, 15, 21; 83:3;
119:13; 138:9; 142:23;
149:1; 152:10; 154:11;
157:9; 186:8; 187:7; 188:6
**Darwinism** 67:11, 15
**date** 19:24; 114:20, 23
**David** 182:1
**day** 23:1; 42:22, 23;
165:9, 16, 17, 18; 167:18;
168:22; 181:6
**days** 119:4
**dealing** 26:11
**dealt** 13:23; 75:15;
128:11
**December** 112:12
**decide** 159:21
**decided** 136:21
**deciding** 164:13
**decision** 37:5; 163:17
**decisions** 197:14
**defend** 112:21
**defendant's** 19:18
**defendants** 8:19; 19:6;
113:21
**defer** 35:24; 37:6; 188:2
**deficiencies** 145:3
**define** 171:4
**definite** 40:23
**definition** 147:4
**definitions** 14:24
**degree** 9:16, 18, 20; 10:2,
6, 14; 193:10
**delay** 26:25; 27:10, 21
**deleted** 195:6
**deliver** 172:10
**delivered** 27:9
**demoninational** 13:4
**demonstrate** 83:20
**dep** 97:1
**department** 94:8;
101:13; 153:14; 158:4
**Depending** 23:2
**depicted** 121:4
**deposed** 5:1, 2
**deposition** 4:19; 6:17;
7:21; 3:2:9; 38:22; 47:23;
49:10; 51:17; 52:12;
57:19; 60:6; 66:5; 105:8;
110:3; 114:2; 118:10;

129:21; 151:11; 153:3;
159:2; 166:21; 180:15;
189:16; 192:6; 198:22
**depositions** 8:5; 96:3
**derive** 98:4
**descended** 78:17
**describe** 11:19; 16:24;
19:21; 39:17; 54:24;
87:11; 113:5; 159:13, 14;
163:12; 175:8; 192:21;
193:8
**described** 22:13; 26:6;
99:23; 103:7; 104:6;
194:5; 195:10
**describes** 193:12
**describing** 111:19;
166:20
**description** 20:3; 56:11,
16, 22; 93:24; 197:23
**design** 12:15; 13:17;
32:15, 21; 33:3, 4, 8, 18;
34:20; 35:1, 11, 22; 36:2,
10; 37:23; 38:4; 43:12;
70:19; 73:3, 12, 18, 24;
74:3, 8; 91:17; 100:10;
103:11; 104:11; 106:3, 17;
107:16; 108:3, 8; 109:1, 6,
7; 120:22, 25; 121:19;
123:1; 124:7, 10, 20;
125:8, 11, 19, 24; 126:5, 7,
12, 15, 18; 127:1, 5, 15,
18; 128:1, 4, 12, 17, 20;
129:1; 133:21; 136:15;
137:3, 15, 20, 25; 138:6, 7,
20, 22; 139:8, 15; 140:8,
11, 13, 18; 141:12, 22;
143:18; 144:2; 149:7, 11,
12, 18; 150:10, 15, 22;
152:8, 9, 14; 162:3, 9, 25;
163:18; 165:3; 168:18;
169:11, 20; 170:4, 6, 14,
23; 172:8; 173:1, 6;
174:14; 190:10; 198:1
**designer** 170:21
**desire** 8:14; 47:24; 80:23;
81:8; 191:8
**desk** 60:18; 170:14
**determination** 150:14
**determine** 17:14; 20:15;
116:4; 119:23; 187:22
**determined** 99:9; 143:25
**develop** 77:19; 139:2;
143:11, 14; 151:3, 6;
152:18; 155:22, 25
**developed** 24:11, 11;
148:17; 166:2
**developing** 60:23; 143:9;
153:14
**development** 11:9, 16;
110:5; 138:11; 152:16
**devise** 26:7
**devoted** 17:23
**dialogue** 69:15
**dictated** 37:2
**died** 87:4
**different** 14:1, 15, 16, 24,
25; 31:8; 42:2; 76:5;

131:24; 132:10; 157:18;
158:24; 164:16
**differently** 92:8; 194:11
**differs** 73:14; 152:10;
159:8
**difficulty** 129:16
**direct** 41:4; 196:17
**directed** 48:15; 77:18;
82:21, 24; 95:10; 136:25
**direction** 46:10
**directive** 40:19
**directly** 44:18; 48:5, 6;
175:16
**Directors** 8:13
**discard** 22:19; 23:4
**discarded** 23:2
**disclose** 176:23
**Discovery** 102:23, 25;
103:4; 104:21, 24; 105:3;
111:16, 17, 21, 24; 174:22;
175:5, 14, 21; 176:7, 17;
177:22; 178:14
**discuss** 25:9; 37:19;
62:8; 136:6; 137:15;
177:3, 4; 182:14
**discussed** 37:8; 87:22;
90:13; 91:10; 132:19;
178:11; 184:7; 194:19
**discussion** 13:17; 20:15;
30:8; 38:6; 46:22; 55:11;
59:11; 68:4; 71:4; 88:6;
91:13; 94:1; 97:10; 122:6;
127:17; 163:12; 165:7;
176:14, 17; 177:1, 19, 21,
22; 195:14; 197:24, 24;
198:14, 16
**discussions** 90:16;
91:16; 138:19; 154:21;
175:3, 19
**Dispatch** 66:18; 68:16;
71:13; 86:3, 7; 131:22
**dispute** 66:9
**dissertation** 9:12
**distinction** 127:21;
140:12; 149:19
**distribute** 64:8; 99:4;
141:10
**distributed** 107:1;
165:25
**District** 4:19; 8:4, 10;
11:2, 14; 19:8; 30:23; 31:5;
51:13; 61:17; 74:21; 75:6;
76:7; 77:12; 81:23; 88:12;
112:5, 10; 113:7, 16;
151:18; 152:13; 175:4, 15;
177:23; 178:13; 181:11,
12; 196:25
**disturbed** 67:10
**diversity** 123:9
**doctorate** 9:10, 10, 13
**Document** 19:9, 11, 12,
13, 17; 20:1, 2, 3, 9; 23:3;
38:20, 25; 39:7, 9; 50:11;
51:1, 9, 16, 21, 25; 52:5,
16, 20; 56:7; 57:22; 59:1;
60:14; 94:25; 99:20;

105:11, 13; 114:5, 19;
121:17; 151:14, 20; 160:3,
6; 161:21; 180:18, 24;
184:11, 14, 18; 185:23;
189:19; 192:9
**documents** 6:18, 20, 23;
23:7, 25; 24:4, 21; 25:6;
34:12, 14; 49:25; 50:7;
51:12; 60:9, 15; 88:16;
94:23; 113:20; 128:10, 11,
21, 22, 24; 129:1, 2, 3, 6, 9;
130:3, 6, 8; 132:4; 140:10;
153:24; 159:6, 10; 166:25;
167:2; 170:11; 179:1
**donated** 122:2; 189:6, 9,
11; 190:15
**done** 5:24; 46:11; 56:14;
98:10; 115:21; 119:15;
138:1; 140:16; 198:12
**doubt** 90:9
**Dover** 4:18; 8:10, 13, 14;
11:2, 19; 12:11, 22; 15:17;
17:5; 30:22; 31:5; 38:14;
47:25; 51:13; 55:9; 64:1, 6;
72:18; 73:16; 81:6; 91:23;
94:2; 97:4; 144:6, 23;
146:8, 20; 150:24; 152:12;
174:23; 196:25
**down** 5:9, 18; 61:12;
67:9; 68:9; 71:8, 15, 15;
74:20; 78:14; 79:1;
115:11; 116:15; 142:16;
173:12; 184:8
**Dr** 13:13; 31:6; 35:7;
36:13; 39:18, 23; 40:10,
13; 54:3; 55:19; 63:5, 9;
85:24; 95:10; 101:23;
106:22; 114:16; 131:16;
136:7, 10, 11; 141:23, 24;
142:1; 143:7; 151:21;
165:1, 21; 168:13; 173:22;
175:7; 176:5; 182:13;
183:1; 184:6, 9; 189:10;
194:18; 197:5
**draft** 134:3; 136:12;
137:1; 143:11, 14, 20, 21,
23; 153:1, 18, 20, 22;
154:14; 158:22, 22; 162:8,
14; 163:21; 167:23
**drafted** 156:19; 162:11
**drafting** 145:25
**draw** 45:7
**drawing** 127:21
**drawn** 146:3
**drink** 6:11
**Drive** 8:22
**driven** 181:10, 11, 14, 14
**duly** 4:9
**duplicating** 27:8
**during** 6:10; 18:6, 8; 21:1;
26:13; 42:4; 60:23; 64:13,
25; 69:25; 80:25; 81:12;
90:11; 91:16; 93:11;
106:16; 124:15; 194:4;
197:5
**duties** 11:6
**DVD** 101:15, 16; 102:2;

Case 4:04-cv-02688-JEJ   Document 213   Filed 09/27/05   Page 58 of 66

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Michael Baksa
March 9, 2005

119:7, 11
DVDs 100:17; 103:8;
104:1

# E

e-mail 22:10; 33:16;
180:21; 181:5, 18, 21;
182:4, 5; 183:3, 5
earlier 47:22; 64:11; 76:5;
96:1; 99:23; 126:10;
128:16; 191:18; 192:1
early 42:13; 72:10; 97:5
earth 16:8, 17, 25
Economic 32:6
edition 76:3, 8; 148:14,
18, 18; 152:18
editions 85:20
education 9:7, 15, 19;
10:7, 9; 11:15; 36:1, 23;
56:2; 78:18; 80:3; 187:17;
196:5, 24
educational 36:8; 64:6
educator 186:11
effect 68:13, 21; 92:13;
193:23; 198:3, 10
eight 12:4; 71:15; 135:16
either 24:3; 28:12; 31:6;
33:16; 52:16; 103:8;
111:14; 119:8; 131:3;
139:19; 140:20, 25; 147:4;
149:10; 193:11
else 7:3, 14, 16; 9:5;
33:12; 34:17; 43:9; 45:3;
101:12; 106:6; 111:21, 22;
113:17; 125:6; 151:24;
154:4; 161:10; 168:4;
169:23; 172:12, 14;
173:15, 16; 184:8
Enclosure 165:23, 25;
166:2, 15; 168:6, 8, 10, 12;
171:23; 173:3, 24, 25;
190:11
enclosures 166:20, 24;
167:6
end 79:7; 116:22; 122:10;
133:25; 136:4, 8, 10;
188:23
ended 127:8; 163:22
endorsed 152:10
endurance 6:9
enforce 172:7
English 10:7; 11:25
enough 27:16; 181:22
enter 134:3
entire 66:23; 103:23;
111:15; 120:7; 129:19;
195:3
entirely 153:16
entries 163:15
entry 162:24; 163:6
equating 169:19
Era 9:2, 4
Eric 4:14; 50:20; 66:25;
69:24, 25; 70:1, 9; 100:17;

177:25; 196:2
erroneous 147:10, 12
errors 39:16
Eshbach 94:5; 117:20
estimate 9:22; 112:23;
119:5
et 4:18, 19
even 36:15; 54:5; 62:7;
113:11; 126:19; 128:3;
129:6; 147:4; 173:8;
179:20
evening 12:16
events 6:24; 114:22
eventually 135:17
everyone 64:10; 74:23;
75:8, 12; 134:2
evidence 83:6
evolution 12:14, 17;
13:19; 14:10, 13; 15:10,
13, 15, 19, 24; 16:3; 32:20;
35:17; 40:12, 16; 45:1, 1,
9; 68:20; 71:25; 72:14;
77:12, 14, 22; 78:23; 79:3,
11, 16; 80:24; 81:9; 83:3,
11, 21; 84:14; 85:1; 93:1,
8; 100:7, 18, 23; 101:18;
104:12; 106:2, 18; 108:9;
117:14; 119:1, 6; 120:2;
121:4, 13; 122:13, 25;
124:9, 19; 125:24; 131:9;
132:2; 144:5, 13, 19, 20,
24; 145:12, 19; 146:15, 20;
147:19; 148:3, 10; 149:1,
1; 154:12, 23; 155:2, 22;
156:9, 14, 20; 157:7, 10,
13, 18, 25; 158:8, 14;
173:10; 186:9; 187:8;
188:7
exact 48:11; 92:16
exactly 9:23; 103:5;
171:18; 172:24
EXAMINATION 4:10;
195:25; 196:21
examine 119:21
examined 99:9; 183:6
examining 33:9; 75:15
example 20:9; 22:14;
38:5; 40:1; 109:3; 138:8,
23; 157:17; 178:21; 187:6;
191:9
examples 81:25
exams 9:12
except 4:5; 96:4; 153:25
exchange 26:23; 180:21
excused 99:5, 13
executive 17:8, 11;
18:15; 22:15; 23:3
exhausted 99:25
Exhibit 32:9; 38:22; 49:9,
10; 51:8, 17; 52:12; 57:19;
60:6; 66:5; 105:8; 114:2;
118:10, 16; 129:21;
151:10, 11; 153:3; 159:2;
161:22; 162:22; 163:10;
166:18, 21; 180:15, 19;
189:15, 16; 192:6

exhibits 153:6, 9; 154:5;
159:5
existence 124:11; 171:9
existing 183:12
expectations 190:15
expected 123:5
expecting 48:18
experience 119:17;
120:9
expertise 37:7; 84:11;
150:11; 194:1
explain 21:7; 27:6, 13;
35:10; 99:18; 108:4;
113:14; 118:24; 124:12;
131:3; 137:9; 140:7, 15;
147:6; 157:2; 173:5;
183:10, 23; 187:18
explained 72:12; 132:5;
139:15
explaining 126:14;
137:25
explanation 73:13, 18;
107:16; 119:2; 190:12
exploring 113:11; 149:14
exposition 115:24
expounding 14:1
express 8:13; 46:21;
48:2; 69:21; 92:25;
140:20; 164:2; 185:9;
191:7; 196:13
expressed 42:7; 45:6,
10; 46:25; 47:24; 81:7, 8;
83:16; 91:24; 132:1;
136:14; 154:22; 156:7;
182:10; 194:5, 22; 196:9
expressing 16:7; 80:23
extent 42:25; 129:14;
147:21; 156:16; 176:19;
179:9
extremely 51:3

# F

fact 45:11, 19; 72:21;
73:17; 75:19, 24; 76:11,
12; 77:21; 83:6, 11, 22;
91:24; 102:24; 133:5;
145:8, 15; 146:6, 10, 12,
12, 22, 25; 147:1, 8, 13,
14, 15, 19; 148:3, 4, 13,
25; 150:22; 152:21; 157:3;
160:17; 180:5; 182:3;
195:2
faculty 27:11; 28:6, 19,
22; 29:2, 8, 12; 30:6; 32:1;
117:3; 161:13, 15; 164:17;
188:19
faculty's 164:5, 6
failed 99:3
fair 16:6; 45:21; 138:15;
146:16; 156:12; 161:25;
179:10
fairly 80:20; 84:25;
148:23; 149:13
fall 21:11; 42:13; 153:20

familiar 182:16
familiarity 171:1
family 26:17, 25; 30:3, 25;
31:24; 72:7; 195:1
far 89:15; 104:8; 139:20;
144:19
fast 5:21
fathers 183:23; 185:12;
194:15
fear 169:14
February 31:11; 97:5
federal 11:10
feel 29:16; 34:21; 35:21;
36:7, 17, 22; 37:16; 66:22;
98:15; 123:19; 150:9, 11,
13, 21; 155:20; 169:19;
183:3; 186:11
feeling 145:14; 170:3
felt 27:8, 15; 97:21; 98:17;
99:6; 140:16; 147:9;
148:8, 12; 158:12, 14;
165:3; 171:24; 172:25;
173:8, 11; 176:17; 185:23;
190:14
few 18:22; 64:16; 81:25;
82:1; 86:1; 116:2; 149:16;
195:24
field 36:5
File 22:18; 129:19
filed 175:25
files 51:2; 52:3; 129:18
filing 4:4
final 159:22; 163:3
finalized 164:1
finally 82:18
find 53:6; 55:24; 85:4;
142:7; 151:5; 167:1; 189:9
finding 33:9; 53:1; 55:14;
60:2; 84:7; 104:19;
141:16; 169:23
fine 6:12, 15; 96:25;
155:6; 163:24
finish 6:3, 4, 5; 122:20;
126:3
finished 21:21
finishing 9:14
firm 4:15; 71:3; 113:10
firm's 141:13
first 5:6; 6:19; 12:20, 22;
30:19, 24; 37:22; 38:10,
11, 13, 17; 39:12, 14, 18; 41:9;
42:4; 46:15; 48:10, 13;
60:17; 66:16; 101:23;
111:4; 114:9; 118:13, 25;
119:1; 125:9; 126:6;
128:7; 135:3; 143:20;
153:1; 169:8; 181:9;
183:2; 185:6; 187:25;
188:22; 190:5; 192:11
fit 20:2; 120:20; 122:3, 4;
197:23
fits 123:10
five 12:3, 9; 71:10; 119:4
flawless 142:24
flaws 119:13; 120:11, 18;

142:25
flip 81:4; 114:5; 118:2
follow 23:1
follow-up 41:15
following 21:4; 31:14
follows 4:9; 78:21
forget 176:9
forgotten 94:12
form 4:6; 60:14; 96:4, 15;
158:9
formal 57:17; 88:19
formatted 152:1
former 195:5
forms 99:4
forth 14:8; 40:22; 135:15
forward 112:14; 127:8
found 32:16; 58:25; 86:3;
120:18; 141:19; 155:10;
187:9, 11; 188:10
foundation 43:5; 73:4;
76:17; 177:1
foundations 195:2
founded 79:15, 16; 80:11
founding 183:23;
184:25; 185:12; 194:15
four 12:4, 8; 30:15; 31:24;
67:9; 78:14; 119:4;
135:16, 17
frame 87:16
frames 135:12
free 183:3
frequently 152:7
freshman 10:20
Friday 99:3
front 52:15; 78:6; 80:18;
89:10
full 24:25; 25:13; 108:7, 7;
135:13; 154:2; 158:23
fully 149:15
Fundamentals 26:20;
27:3, 14; 29:23; 30:5
furnish 188:25
further 95:1, 2; 125:10;
129:4; 154:17; 195:10;
196:20; 198:18
future 96:20

# G

gain 33:14
gaps 72:5, 24; 76:4, 14,
22; 77:1, 2, 4, 11, 15; 78:5,
9; 154:11; 157:1
gaps/problems 32:19
gave 34:14, 15, 16; 35:2;
38:19; 46:4; 55:10; 56:10,
15, 19; 63:5; 101:13, 23;
103:3; 104:7; 106:19, 20;
116:1; 128:21; 130:3, 6;
153:1; 182:18, 20, 22;
183:2; 184:6; 185:23;
194:18
Geesy 109:3; 196:13

Michael Baksa
March 9, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

general 5:4; 10:22; 15:17, 19; 24:10, 14; 26:6; 91:2; 110:12; 146:3; 158:11; 192:22
Generally 18:19; 23:2; 25:4; 37:1; 93:2; 117:6; 138:21, 25; 144:13, 25; 145:12, 18; 182:5; 197:11
generated 39:21
Genesis 171:10; 186:10; 187:11; 188:11
gentleman 180:22
George 185:8
germ 146:10
gestures 5:14
gets 117:11
gift 121:25; 122:1, 16; 123:3, 10, 16
gifted 30:25
gifts 124:1
Gillen 7:12; 8:9; 19:13; 42:25; 43:5; 45:14; 49:19; 50:20; 51:4, 19; 52:5; 53:21; 58:3; 65:5, 15, 21; 66:3, 25; 70:3, 6; 73:4, 20; 76:15; 77:5, 16; 81:17; 85:6, 15; 89:4; 91:1; 96:7, 18, 25; 100:16; 106:8; 109:9; 112:6; 129:13; 141:23, 24; 142:1, 6; 147:20; 150:17; 153:10; 160:21; 176:19; 177:6, 25; 178:15, 18; 179:8, 22; 180:14; 184:19; 185:3; 195:24; 196:1, 20; 198:20
given 34:10, 12; 49:17; 75:20; 77:2; 94:14; 99:24; 102:11, 17; 103:13; 104:13; 105:22, 23; 129:10, 17; 181:25; 182:19, 24; 183:1
gives 78:1
giving 5:8; 115:14; 130:7; 158:1
glad 50:23; 51:4
goal 139:9
goals 11:14
God 90:24
goes 181:12
Good 4:12; 15:4; 39:25; 62:8; 92:20; 102:1; 197:14
Governor 12:5
grade 9:7; 26:21; 62:18; 63:1, 10
grades 12:3
graduate 9:17; 147:1
granted 99:17
gravity 146:11
great 184:9
group 54:1; 60:9; 101:1
groups 193:14
growing 152:11
guess 9:17; 174:6; 175:23
Guide 32:14; 124:8, 16;

134:4
gun 39:25

## H

habits 27:4
Hake 54:8
Hake's 61:9
half 165:10
Hamilton 4:16
hand 32:12; 107:15; 129:7; 161:16; 185:7
handed 59:1; 132:17; 160:6
Handing 50:24
handling 36:13
handouts 106:9
hands 88:16
handwriting 49:22; 50:4; 52:1, 11; 56:7, 8; 58:1, 9, 14; 60:19; 61:6, 11, 13, 14; 63:16, 18; 114:7; 162:23, 25; 192:12
handwritten 49:16; 58:4, 7, 8; 60:17, 22; 113:22, 23; 116:25; 159:9
handwrote 163:5
happen 23:20; 29:20, 23; 41:4; 68:6
happened 29:25; 31:18; 134:5, 16; 136:4; 139:19; 158:18; 197:21
happening 163:22
happens 18:23; 173:12
happy 6:13; 74:23; 75:8, 12
hard 33:11; 129:5
Harkins 8:6; 104:13; 105:23; 160:9, 10, 12, 16; 161:1, 4, 7; 163:20; 176:5
Harrisburg 13:2
head 89:11; 128:6; 178:19
headed 114:10, 19; 115:2
heading 148:25
headings 58:10
heads 40:3; 41:6; 46:4
health 146:15; 197:1
hear 36:5
heard 8:12; 37:22; 38:4, 10, 10, 13, 17; 44:2, 3; 46:5, 15; 47:2; 48:14; 80:1, 10; 88:4, 25; 104:20; 105:17, 18; 128:17; 169:8; 171:14; 183:13; 198:8
hearing 79:25; 82:22; 87:13; 88:2, 8; 90:15; 111:25; 125:22; 126:7; 131:7
hearsay 49:19; 58:4; 67:3; 96:2
Heather 109:3
Heidi 86:6
held 11:4; 21:11; 140:15

help 5:22; 183:10
helpful 51:3; 52:4
here's 121:7; 138:5
hereby 4:2, 4
herself 192:16
hey 164:15
High 8:14; 10:9; 11:22; 12:6, 10, 17; 14:4; 27:9; 38:14; 55:9; 72:18; 73:17; 94:2; 97:4; 142:4; 144:6; 181:4; 195:4
higher 61:13; 63:10
historical 13:22
history 11:19; 13:18; 141:13
hold 134:4
holds 33:8
holes 142:22
home 52:25; 53:2; 54:6, 7; 55:17, 19, 22; 56:1; 57:8; 94:20; 95:11, 13
Hoover 182:14, 15; 184:1
hour 13:16; 165:10, 10
hours 8:2
huge 193:10
Hum-um 105:16
husband 90:5
hypothetical 186:14; 187:19

## I

Icons 100:6, 18, 23; 101:18; 104:3; 119:6
idea 15:4; 43:10; 50:6; 92:8, 15; 123:13; 130:21; 147:2; 149:6; 157:6; 168:17; 183:4, 8
identical 153:25
identification 32:10; 38:23; 49:11; 51:18; 52:13; 57:20; 60:7; 66:6; 105:9; 114:3; 118:11; 129:22; 151:12; 153:4; 159:3; 166:22; 180:16; 189:17; 192:7
identified 76:14; 194:8
identifies 77:2, 11
identify 75:24; 76:22
ignored 40:21; 41:10
immediately 28:7; 133:22
implement 196:17
implementation 21:4
implemented 23:22; 40:24; 197:2
implementing 73:8; 98:20
implications 14:3, 7; 88:12
implies 147:22
importance 179:14
important 34:22; 165:4; 171:24; 173:1, 5, 11;

185:24; 194:13
in-service 192:25
inaccuracies 39:16
inaugural 185:9, 17, 20
inch 128:23
include 98:12; 140:10; 165:2
included 31:22; 48:4, 23; 49:7; 61:4; 72:23; 82:16; 132:12; 139:8; 143:23; 144:3; 159:23; 161:15; 162:9; 168:17; 169:12; 173:13; 177:22
includes 11:13; 17:24; 29:2; 156:19
including 32:20; 82:7; 83:10; 110:22; 122:25; 124:9, 19; 127:5; 162:24
inconsistent 145:9
incorrect 39:11
indeed 158:14
independently 186:17
Indiana 10:11, 19
indicate 24:19; 93:7
indicated 44:7; 64:11; 179:9
indicating 140:5
individual 28:11; 82:3; 83:15, 17; 104:2, 4; 107:14; 119:20; 141:10; 145:17; 194:7, 22; 195:15
individuals 69:23; 149:17; 161:11
inexcusable 78:16
information 40:14; 57:3; 58:19; 63:11; 94:15; 111:5, 7; 118:17, 20; 176:23; 178:1; 193:15; 197:12, 13
informed 46:7; 62:3
informing 99:5
inhalants 196:14
initial 94:24, 24; 179:14
Initially 43:23; 94:16; 154:25; 156:23
initiate 6:14; 133:1
initiated 26:3; 28:11; 95:7; 125:8, 9; 132:24; 176:12
initiatives 21:3
input 78:1
inquiries 62:16; 84:16
inquiry 124:14; 141:4
instance 26:1, 11; 28:10; 31:16; 46:15; 99:2; 186:20
instances 21:19; 26:16; 28:4; 39:24, 24; 97:23
instead 120:23; 121:20
Institute 102:23, 25; 103:4; 104:21, 24; 105:4; 111:16, 18, 21, 24; 174:22; 175:5, 15, 21; 176:8, 17; 177:23; 178:14
instruct 178:1, 10
instructed 93:16

instruction 54:25; 59:23; 93:12; 142:4; 144:1; 156:6
instructions 5:5; 103:1 115:18
insubordinate 97:15
insubordination 99:10, 15
intelligence 129:7
intelligent 12:15; 13:17; 32:15, 21; 33:3, 4, 8, 18; 34:20; 35:1, 10, 22; 36:2, 10; 37:23; 38:4; 45:12; 70:19; 73:2, 12, 17, 24; 74:3, 7; 91:17; 100:10; 103:11; 104:10; 106:3, 17; 107:16; 108:2, 8; 109:1, 5, 7; 120:22, 25; 121:19; 123:1; 124:7, 10, 20; 125:8, 11, 19, 24; 126:5, 7, 12, 15, 18, 25; 127:5, 15, 18; 128:1, 4, 12, 17, 20; 129:1; 133:21; 136:14; 137:3, 15, 20, 25; 138:5, 7, 20, 22; 139:8, 15; 140:8, 11, 13, 18; 141:12, 22; 143:18; 144:2; 149:7, 11, 12, 17; 150:10, 14, 22; 152:8, 9, 13; 162:3, 9, 25; 163:18; 165:3; 168:18; 169:11, 19; 170:3, 6, 14, 21, 23; 172:8; 173:1, 6; 174:14; 190:10, 10; 198:1
intent 46:7; 155:15; 183:22
intentions 47:8
interactions 13:22
interest 41:19; 48:3; 179:12, 13
interested 60:2; 90:6; 91:25
interpreted 169:15
interrogatives 7:23
Interrogatories 7:24; 141:25
interrupt 196:12
interrupted 171:17
Interruption 106:10
interview 91:4
into 14:19; 84:17; 89:11; 122:2; 127:3; 134:3; 142:21; 171:9
introduce 4:13
introduced 4:12
investigate 85:13, 16
investigating 57:8
investigation 55:16; 62:24
investigations 57:9; 84:17
invite 29:11
invited 29:13; 30:2, 6
involved 30:21; 61:16; 109:16; 110:5; 112:4, 7; 142:10, 14; 149:17
involvement 151:22, 24; 182:5

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Michael Baksa
March 9, 2005

involving 141:11
**issue** 20:16; 27:6, 13, 17; 29:21, 24; 31:20; 42:12; 64:1; 67:21; 69:17; 109:4; 113:5; 124:4, 5; 126:8; 132:8; 136:1; 156:10; 197:10
**issues** 45:20; 66:9; 110:12, 17; 115:19; 117:4; 156:16; 194:6, 9, 10, 23; 195:16; 196:23; 197:9
**item** 25:19; 32:16; 33:2, 5; 125:10; 129:7; 133:20; 148:17; 155:23; 195:16
**items** 115:15, 20

**J**

**January** 73:8; 77:9; 114:21
**Jen** 97:14; 169:16
**Jennifer** 50:4; 97:4
**Joe** 82:11, 12, 17
**join** 160:13
**joke** 181:18
**Jones** 53:3, 7; 54:7; 55:14; 56:11, 16, 23; 93:23; 94:11; 95:8
**Joseph** 86:15
**judge** 150:2
**judged** 97:15
**judgment** 36:15, 17; 80:18; 84:12; 116:14; 150:21; 151:1; 156:5
**judgments** 150:4
**July** 30:17; 37:12; 58:22; 112:25; 134:21, 25; 135:2, 5; 136:2, 8
**jumps** 39:25
**June** 21:21; 30:17; 37:24; 38:1, 1, 2; 48:8; 55:1; 64:13, 18, 23, 24, 25; 66:17; 67:13, 25; 68:16; 69:19; 70:22; 71:13; 78:12, 13; 80:25; 81:5, 12; 82:11; 86:2, 14, 24; 87:9; 89:22, 24; 90:12, 23; 91:12, 13, 22; 92:17; 101:8; 116:22; 118:21; 133:18; 135:3, 21; 137:6, 14; 139:6, 14; 140:21, 21; 154:19; 162:11
**justification** 190:12

**K**

**K** 36:12, 14
**keep** 22:24; 23:4; 46:7, 8; 52:15; 69:3; 120:15; 162:15
**keeps** 19:2
**kids** 188:5
**kind** 36:22; 107:17; 108:24; 121:21; 133:13; 174:15

**Kitzmiller** 4:18
**klieg** 149:4
**knew** 55:20; 169:5
**knowing** 122:12; 129:16; 149:16; 188:12, 14
**knowledge** 84:9, 13; 112:13; 149:12; 150:6; 177:11
**known** 54:7; 144:21, 25
**knows** 126:19

**L**

**laced** 67:11, 14
**lack** 42:8
**lacking** 155:11
**Lamarck** 157:17, 20
**Lancaster** 9:2, 3; 12:10
**language** 22:8; 31:1, 2, 7; 32:17, 23; 33:2; 36:11, 13; 61:3; 109:24; 123:14; 124:17; 125:1, 4; 127:3; 134:1, 3, 8; 136:12, 23; 137:1, 4, 7, 10; 138:19; 139:8, 11; 140:1; 143:24; 146:6; 147:7; 148:8; 151:4; 154:9, 18; 155:12, 15; 156:1, 19, 20; 157:5; 159:22; 162:9, 11; 163:4, 5, 9, 13, 21, 21, 23; 164:1, 3, 6, 7, 14, 25; 165:2, 4; 166:7, 9, 11, 14; 167:12, 16, 23, 25; 168:1, 17, 23; 169:2, 5, 9, 14, 17, 24; 172:1; 173:3, 13; 181:19; 190:5
**large** 139:17
**last** 9:7, 15, 16; 10:23; 50:7, 11, 15, 17; 53:10; 62:20; 79:8; 180:24; 181:9
**later** 22:1; 82:17; 102:4; 119:9; 128:25; 129:8; 169:13
**law** 4:15; 112:3, 17, 20; 113:3, 5, 10, 15; 141:13, 14
**lawsuit** 4:17; 49:3; 112:11; 175:25
**lawyer** 6:12; 179:12, 23; 180:8
**lawyers** 8:10
**learn** 13:20; 116:7
**learned** 13:22; 57:3; 109:8; 155:5; 169:13
**learning** 74:13, 15, 17; 112:19
**least** 30:13; 106:23
**lecture** 13:18, 20; 92:24
**lectures** 12:13
**led** 44:9
**left** 72:6; 121:15, 17; 122:21; 173:1
**legal** 80:4, 7, 9, 19; 88:16, 23; 176:20, 22; 177:3, 7, 9; 178:5, 13, 23; 179:15, 18,

19, 21, 24; 180:7; 186:19, 21, 22, 22; 188:14, 15, 21, 22
**legality** 130:20; 176:14; 179:19; 187:15, 23, 25; 188:1
**legally** 80:15; 140:17; 169:21
**legitimate** 116:13
**Lehigh** 9:21; 35:6; 149:10
**length** 16:22; 184:9
**Lenker** 158:7
**less** 144:20
**level** 9:15; 61:13; 137:24
**levels** 29:1
**Levine** 59:10; 75:4; 76:3, 8, 20; 82:18; 83:10; 106:15; 108:18; 122:12; 135:14, 18; 191:16
**liberal** 92:9
**liberals** 92:8
**Liberty** 141:21; 142:2, 12
**library** 74:4, 16; 191:6
**Life** 32:22; 33:9; 44:14, 16; 47:6; 72:5, 6, 9, 13, 17, 24; 73:3, 13, 16, 19; 100:10; 117:14, 23; 119:4; 121:8; 122:15; 133:5; 155:1; 167:20; 187:2, 9, 10; 188:10
**light** 181:9
**lights** 149:5
**liked** 61:4
**limited** 32:21; 122:25; 124:10, 20; 149:13; 162:24; 177:18
**limiting** 195:8
**line** 16:5; 119:1; 120:16, 22; 121:1, 19; 142:17; 143:2; 171:17; 190:5, 9
**lines** 14:15, 20; 15:1; 70:10, 11; 92:15; 143:14
**list** 54:10; 84:4; 85:25, 25; 99:25; 158:1
**listed** 18:7; 161:7; 172:3
**listened** 193:18
**listening** 43:18; 116:12; 150:23
**lists** 118:4
**literal** 171:9
**literature** 33:16, 20
**litigation** 19:6; 23:8; 25:25; 30:10; 66:10; 177:24
**little** 5:17; 14:2; 44:5; 101:25; 170:7, 9
**live** 8:21; 139:11
**lived** 8:23
**Living** 71:24; 181:11, 14
**LLP** 4:16
**local** 54:4; 81:22
**located** 20:18
**long** 7:9; 8:1, 23; 11:4; 12:7; 13:15; 41:18; 46:2;

149:14; 171:25
**longer** 62:5; 132:7
**look** 19:13, 22; 23:6; 39:14; 46:11; 48:16; 51:6; 54:3, 13, 21; 55:17; 66:16; 68:18; 72:4; 74:19, 23; 75:7; 82:25; 85:8; 90:24; 95:5, 14; 121:25; 123:7; 127:9, 10; 148:2; 150:13; 159:19; 164:8, 15; 167:2
**looked** 23:12; 55:22; 83:9; 93:24; 110:2; 128:15; 132:19; 134:7; 163:15; 191:16
**looking** 21:9; 41:7; 52:22; 53:14, 19; 54:1; 55:8; 60:21; 71:19; 78:22; 82:4, 15; 83:1; 85:22; 117:17; 123:13, 24; 129:3; 130:12; 132:9; 133:12; 148:14, 21; 153:25; 162:14; 164:12; 192:11; 193:9
**looks** 25:6; 120:17; 125:18; 161:22
**loop** 46:8
**lot** 8:3; 41:9; 63:21; 81:3, 11; 128:10; 129:17
**lunch** 7:11; 143:4
**Luncheon** 92:22

**M**

**mail** 22:10; 33:17, 21
**mainstream** 52:23; 53:15, 20; 54:2
**maintained** 104:16
**makes** 25:6; 118:15
**making** 36:14; 60:12; 67:12; 68:21; 74:2, 12; 77:12; 82:12; 92:12; 96:11; 99:20; 116:14; 119:12; 127:22; 137:11; 138:21; 139:3; 150:25; 156:3, 5; 157:14; 169:15; 181:18
**Maldonado** 82:11; 86:15, 22
**man** 78:16; 121:5
**many** 4:25; 10:16; 30:12; 39:24; 66:14; 144:9, 10; 170:2
**mark** 38:20; 49:9; 51:16; 52:10; 57:18; 60:5; 113:20; 151:9; 159:5; 166:17; 180:19; 189:14
**marked** 19:18; 20:4; 32:10, 13; 38:22, 25; 49:10; 51:7, 17; 52:12, 17; 56:6; 57:19, 22; 60:6, 10; 66:6, 10; 84:3; 105:8, 11; 114:2, 9; 118:10, 16; 129:21; 151:11, 14; 153:4, 6; 154:5; 159:3; 166:21; 180:15; 189:16; 192:6, 11
**marker** 42:11
**marks** 159:9

**marquee** 149:4
**married** 16:9
**Marsha** 54:8; 61:8
**master's** 9:17
**matches** 123:10; 191:15
**material** 60:3; 119:5; 133:3
**materials** 24:15; 33:23; 34:3; 99:23; 100:20; 101:1, 9, 11, 19; 102:12, 17, 21; 103:3, 7, 10, 13, 17, 18, 24; 104:10, 11, 16, 25; 106:2, 7, 17; 107:4; 108:8, 19, 22; 111:18, 19; 128:14; 129:24; 130:20; 132:11, 15, 17, 18
**math** 196:25
**matter** 4:20; 24:10; 27:22; 34:24; 37:8; 84:21; 97:24; 110:12; 126:23; 132:16; 148:16; 163:16, 25; 188:21, 24
**Max** 67:17
**may** 6:13; 23:4; 29:5; 31:9; 46:11, 11; 50:20; 62:21; 100:21; 101:2; 105:22, 23; 111:6; 145:15; 162:10, 13
**maybe** 7:20; 13:16; 53:9; 118:23; 141:23
**mean** 11:11; 13:5; 14:13, 21, 22; 15:12; 33:4; 41:25; 45:9; 47:7; 71:2; 72:8; 75:8; 83:4, 13; 96:7; 101:15; 107:15; 113:9; 117:7; 124:12, 14; 125:5; 129:16; 138:12; 145:11; 150:2; 156:21; 157:24; 169:25; 178:2; 181:13; 183:8, 13; 190:7
**means** 145:22; 171:3
**meant** 16:18; 83:21; 157:6, 12; 165:16; 181:21; 193:8
**meantime** 134:5
**mechanisms** 33:10
**Media** 119:7
**meet** 7:5, 9; 8:11; 20:21; 21:25; 22:7; 23:18; 116:6; 182:13
**meeting** 18:8; 19:1; 20:23; 21:10; 22:25; 24:2, 6; 25:4, 20; 28:24; 30:16; 38:5; 39:19; 48:9; 59:2; 67:21; 68:17; 69:6, 7, 17, 19; 82:23; 87:20; 89:22; 90:12; 91:5; 92:18; 94:7, 9; 98:21; 111:11, 13; 114:10, 14, 16, 22, 24; 116:21; 117:1, 3, 17; 118:21; 119:8, 9; 121:16, 23; 122:6, 10; 123:17; 124:15; 126:4, 14; 127:2, 8, 24; 128:5; 132:3, 12, 16, 19, 20, 24; 133:1, 8, 18, 22, 23, 25; 134:10, 20, 23, 24; 135:1, 2, 3, 5, 9, 12, 13, 21; 136:3, 4, 7, 9, 9, 11, 13, 21;

Michael Baksa
March 9, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

16, 17, 20, 24; 137:6, 14,
19; 139:7, 14; 140:21, 22,
23; 141:1; 143:8, 10;
144:4; 152:17; 154:19;
158:3, 21; 159:7, 17;
160:1, 4, 8, 17; 161:8, 10,
16, 17; 162:10, 12; 163:12;
164:21, 25; 165:8, 11, 12,
17, 23, 24, 25; 168:15;
169:17; 175:20, 22; 176:2,
12, 21; 177:11, 14, 16;
178:4, 22, 23; 179:7;
180:3; 184:10, 12; 191:9,
10, 12

meetings 17:5, 16; 18:4,
6, 13, 21; 22:15, 16, 20;
23:11; 28:20; 29:5, 9, 14;
30:7, 13, 15, 18; 64:13, 18,
24; 67:13, 25; 69:10, 14,
21; 70:25; 81:5; 87:9;
91:12, 13, 22; 106:25;
107:12; 135:22; 138:2;
140:25; 160:14; 169:1;
183:25; 184:3

meets 21:1, 18; 111:2
Melanie 61:12, 15, 16
member 8:12; 37:20;
38:6; 40:6; 45:21, 23;
47:23; 48:1, 5; 54:16;
65:13; 84:10; 91:5; 93:18;
98:7; 104:9; 107:20;
119:20; 147:6, 22; 148:1;
160:10; 172:21; 186:20,
23, 24; 188:14; 194:8;
196:4, 13, 17; 198:6

members 17:24, 25;
26:4; 28:11; 29:8, 18; 30:6;
34:10, 13; 40:4; 41:6; 49:6;
55:12; 61:1; 63:13; 67:24;
78:22; 80:22; 81:8; 82:3;
83:16, 17; 90:5, 17; 91:23;
94:2; 103:19; 104:2, 5;
105:24; 107:14; 108:11,
25; 109:17; 110:9; 120:9;
124:18; 130:12; 131:8;
147:16; 150:24; 154:21;
159:17, 21; 160:25;
172:18; 174:12, 18;
175:14; 178:8; 180:6;
182:2, 19, 20; 194:22;
195:9, 15; 196:23; 197:9,
16, 25; 198:4

membership 28:25; 29:1
memo 39:21; 41:16, 22;
45:18; 47:10, 14; 60:18,
22; 130:16
memorandum 39:3;
166:18; 167:1
memorialize 155:16
memorialized 72:21
memory 20:8; 43:15;
87:25; 93:15
mention 40:11, 16, 17;
75:20; 76:4; 91:17; 109:5;
122:24; 124:7, 11, 18;
126:18; 158:5
mentioned 28:16; 41:2;
48:13; 54:6; 91:18;
127:18, 19; 128:20;

143:18; 157:9, 22
mentioning 16:23;
158:2, 9, 13; 190:9
mentions 124:8
merit 187:23
merits 15:23; 16:2; 36:10;
176:16; 177:4
message 192:12
Messiah 12:16, 24, 25;
13:3, 4; 92:25
met 7:8, 12, 14; 8:3; 30:4;
72:11; 94:8; 115:8; 132:4;
168:20; 183:16; 192:2
MICHAEL 4:8; 60:18;
71:9, 16, 23; 149:9; 192:2
Middle 12:3; 88:6; 136:8
Mifflin 12:6
might 14:4; 15:1, 3; 16:6,
8, 8; 18:22; 20:2; 21:20,
21; 22:1; 23:25; 33:17;
34:12; 40:17; 44:9; 46:5, 6,
10; 52:24; 53:7; 54:5, 5;
56:13; 63:12; 85:23; 91:4,
18; 97:14; 98:3, 11;
101:22; 102:4, 22; 104:13,
14; 106:9, 25; 111:8, 17;
113:16; 114:17; 116:8;
123:14, 15, 16; 126:9;
129:6, 7; 130:11; 133:3;
145:17; 147:5; 155:2, 10;
168:5; 169:17; 170:11;
175:7; 182:24; 183:1, 10,
11, 21; 184:16; 186:2, 21;
188:25
Mike 65:6; 147:23
Miller 59:10; 75:3; 76:3, 8,
20; 82:18; 83:10; 97:4;
106:15; 108:18; 122:11;
135:14, 18; 174:2; 191:15
Miller's 50:5; 169:16
mind 56:1; 89:15; 134:12
minuses 59:6
minutes 18:12, 14, 23;
19:5, 11, 15, 21, 24; 20:6,
14; 163:16, 25
Miriam 192:14
misleading 76:16; 83:7;
149:3
missing 153:17
mission 13:6, 8
modification 21:12;
122:7; 153:14
modified 195:18
modify 109:4
moment 126:13; 196:7
monkeys 78:17
month 27:5, 25
Moravian 10:3, 14
more 4:24; 5:19; 20:22;
35:9; 60:3; 69:6; 79:1;
81:4; 82:1; 112:3, 9, 16,
20; 113:2, 5, 15; 117:6, 9;
141:14; 144:20, 22;
147:22; 152:5; 166:9;
183:23; 184:25
morning 4:12; 93:25

morning's 93:11
motion 25:22
motivate 145:17
move 147:3
moved 9:25
movement 88:19
moving 127:8
Mrs 27:8, 15; 39:20, 22;
41:18; 45:25; 46:13, 14,
18, 24; 47:15; 88:15;
89:12, 17; 104:13; 106:19,
25; 117:18; 121:23; 123:6;
128:9, 21, 25; 130:8;
131:7, 10, 20; 132:17;
134:8; 136:13, 21; 140:9,
12; 159:1; 160:9, 10, 12,
15, 25; 161:1, 4, 8; 163:20;
169:25; 174:1, 2; 176:6;
182:14; 194:25; 195:3, 14;
196:13; 198:9
much 37:2; 98:18; 119:6;
197:12; 198:21
mural 121:1, 3
murals 123:14
Muslim 79:15
myself 4:13, 14; 6:14;
31:6; 51:8; 114:15;
121:11; 125:3, 21; 132:18
Mystery 100:9
Myth 182:1; 183:17;
184:22; 194:16
mythical 68:11

N

name 4:14; 163:10; 176:9
named 67:17; 161:11;
176:10; 180:22
names 197:9
narrow 90:21
National 84:21, 22
nationally 85:11
nature 60:3; 80:25;
170:15; 177:2; 179:7;
180:4; 185:1; 197:10;
198:15
Neal 180:22; 181:2, 3;
182:7, 12, 14; 184:2
necessary 96:16; 97:18;
98:1
necessity 172:7
need 5:13; 6:2, 10; 36:1,
5, 7, 22; 46:11, 11; 66:22;
96:11, 19; 110:13; 113:6;
150:13
needed 27:16; 77:3
needs 110:20, 21
neither 82:20
New 9:2, 4; 44:3; 74:21;
75:2; 137:1; 168:22;
173:12
news 66:8; 74:19; 151:18
newspaper 63:25; 65:3,
11, 12, 24; 67:2; 89:10, 18;
193:4, 5; 198:8

newspapers 8:25; 90:19
next 9:11; 18:25; 23:1;
51:10; 67:16; 68:15; 72:2;
78:12; 79:14; 86:13;
114:19; 119:4, 12; 120:16,
22; 121:1, 20; 136:2, 3;
143:2; 158:18; 168:10, 22;
172:7; 182:8; 188:25;
190:9
night's 181:10
Nilsen 8:5; 13:13; 13:3;
54:3, 12, 15, 25; 55:11, 19;
56:17; 60:1; 65:20; 85:24;
93:15; 95:10; 98:8;
101:23; 103:18; 104:10;
106:22; 107:7; 136:7, 10,
11; 143:7; 151:21; 152:2;
156:7; 165:1, 21; 168:14;
171:19; 172:15, 22;
173:22; 175:7; 176:5;
182:13; 183:1; 184:6, 9;
189:10; 194:18; 197:5
Nilsen's 93:12
nine 135:16
ninth 26:22; 62:18; 63:1
Noah 79:5
Nobody 113:12; 126:19;
127:19, 20; 138:1, 4;
139:14; 179:21
nonverbal 5:14
nor 40:6; 41:4; 82:20;
198:20
normally 155:13
notable 87:24
notations 58:4, 8, 8;
60:22; 124:6
Note 32:21; 119:4, 12;
121:11; 125:2, 21; 167:19;
192:12
notes 13:21; 18:7, 12, 13,
16, 21, 22; 22:13, 17, 23,
24, 25; 23:5, 7, 10; 49:16;
61:1; 113:22, 23; 114:21,
24; 115:9, 9, 11; 116:25;
117:1; 118:1, 23, 25;
119:2; 121:15; 124:12, 14;
127:13; 133:18, 19;
134:22, 22, 25; 135:10;
136:19, 20; 141:1; 142:20;
189:21, 25; 191:14;
192:23; 193:9
Number 32:9; 38:22;
39:12, 16; 46:25; 49:10;
51:17; 52:1, 6, 12; 57:19;
60:6; 66:5; 76:9; 81:10;
96:1; 105:8; 114:2, 9;
118:10; 129:21; 151:11;
152:11; 161:22; 162:22;
166:21; 180:15; 189:16;
192:6
numbered 19:25; 50:12;
114:1; 115:9; 118:3, 14
numbers 113:21; 115:10;
116:2; 153:3; 159:2
numerical 60:12

O

Oak 8:22
oath 95:17
object 58:3; 96:14, 19
objected 169:11
Objection 42:25; 43:5;
45:14; 49:19; 53:21; 65:5,
15, 21; 66:3; 67:2, 5, 6;
70:3; 73:4, 20; 76:15; 77:5,
16; 81:17; 85:6, 15; 89:4;
91:1; 106:8; 109:9; 112:6;
147:20; 150:17; 179:16;
180:10; 185:3
objections 4:5; 96:2, 4,
10, 11, 17
objectives 56:2, 3
observation 146:4
observe 174:15, 19
obtaining 180:1, 9
obviously 179:3; 180:12
occasion 18:19
occasionally 22:15; 91:3
occasions 30:12; 47:1
occur 25:5; 54:25; 71:4;
101:6; 145:15; 152:21;
165:7; 175:22; 176:2
occurred 15:2; 71:2;
87:17; 88:1; 101:7; 173:21
October 32:25; 72:22;
108:20; 109:4, 20, 23;
113:1; 153:22, 23; 159:7;
160:4; 164:24; 165:14;
166:3, 18; 168:14, 16, 21,
25; 171:19; 175:23; 181:5,
20; 189:24; 191:9; 198:3
Octorara 12:3
odd 59:14; 88:5; 131:2
off 4:13, 22; 31:2; 134:12
offer 120:18; 180:7
offered 180:1; 192:25
offering 157:3; 173:9
offers 79:10; 179:24;
193:16
office 64:8; 176:3
official 180:6
officially 27:24
Often 5:25; 20:20; 23:17
old 94:9
omitting 148:11
Once 20:22; 101:4;
102:8, 13, 15; 121:3
One 4:22; 5:12; 20:2, 18;
27:19; 43:9; 49:2, 14; 50:9,
12, 24; 54:8; 55:10; 58:10;
60:4; 69:6, 7; 73:11; 87:8;
88:14; 89:15; 95:25;
98:10; 100:6, 9; 101:13,
17, 20, 24; 102:2, 4, 10,
14; 104:13; 106:23; 114:9;
131:8; 132:2; 134:13;
138:8; 144:5; 147:3, 22;
150:1; 154:1, 2; 158:7;
159:8, 13; 171:20; 172:16;

Min-U-Script®   Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

**Michael Baksa**
**March 9, 2005**

178:4; 185:8; 191:11;
195:3
one-page 184:6
ones 82:7
only 20:9, 18; 21:18; 28:4;
32:7; 35:14; 40:14; 45:12;
46:17; 79:2; 86:19;
100:13, 21; 102:2, 10;
105:18; 131:8; 132:2;
135:16; 141:19; 142:23;
144:5; 146:15; 155:1;
161:24; 173:7; 177:9;
185:6; 187:22; 195:20;
198:6
operated 96:14
operating 96:23
opinion 80:7; 88:18, 24;
125:11, 12; 141:9; 179:19;
186:15, 23; 187:14;
188:16, 22
opinions 127:25; 150:23;
189:1
opposed 5:14; 59:24;
137:9
opting 99:12
order 5:12; 23:7; 25:9;
36:9; 60:12; 83:20;
103:20; 113:25
ordered 103:22
organization 55:25;
57:14; 95:14
organizations 84:22;
85:2, 12
origin 72:6, 8; 73:13, 19;
121:8; 187:2, 2
original 60:14
originally 116:1; 139:24;
154:14; 166:10
originated 187:9, 10;
188:10
origins 14:16; 32:22;
44:14, 16; 47:6; 72:5, 13,
17, 24; 73:3, 16; 117:14,
23; 119:3; 122:15; 133:4;
155:1; 167:20; 188:7
others 116:23; 152:3;
158:2; 178:20
otherwise 16:9; 38:7;
62:8; 93:20
ought 188:20
out 14:14; 21:24; 44:1;
52:24; 55:14, 24; 59:1;
69:4; 85:5; 90:23; 97:1;
99:12; 104:19; 107:15;
110:13; 119:13; 122:20;
126:17; 129:20; 136:23;
138:12; 140:1; 141:16;
142:7; 145:8; 146:15, 20;
152:17; 158:6; 160:6;
163:14; 166:12, 17;
169:23; 173:2; 179:2, 5;
189:9; 190:6, 23
outcome 26:23
outside 119:5
over 5:4; 6:22; 7:8; 50:17;
72:14; 91:24; 117:15;
119:1; 121:15; 122:13;

167:23; 168:23; 177:24
overreacts 39:24
overstated 75:20; 83:7
own 40:13; 53:1; 55:21;
75:23; 109:8; 143:23;
152:3; 156:13

**P**

P 32:9; 38:22; 49:10;
51:17; 52:12; 57:19; 60:6;
66:5; 105:8; 114:2;
118:10; 129:21; 151:11;
153:3; 159:2; 166:21;
180:15; 189:16; 192:6
P-10 49:9, 13, 15
P-11 51:16; 52:17; 56:6
P-12 52:11, 17
P-13 57:18, 23
P-14 60:5, 10
P-15 105:11
P-16 113:20
P-19 151:15
P-4 66:11
P-8 32:13
P-9 38:21; 39:1
p.m 198:23
pace 5:20
packaged 41:9
pad 60:18
page 32:15, 18; 49:15;
50:14; 51:10; 60:17; 67:8;
70:10; 71:12, 14; 114:9,
19; 115:10; 116:2, 11;
117:6, 6, 25; 118:14, 15,
25; 121:18; 122:5; 124:6;
125:10; 133:19; 134:22;
136:19; 141:1; 142:17;
147:16; 152:6; 192:11
pages 39:13, 15; 49:15,
23; 50:21; 51:6; 70:11;
84:2, 5; 114:6; 115:8;
116:5; 118:2; 148:6;
154:10
Panda 136:6
Pandas 33:19; 34:15;
37:10, 16, 19; 38:18;
61:22; 62:17; 63:1; 77:24;
100:1, 19; 103:20; 106:1,
13; 108:9, 10, 12, 16;
141:23; 142:3, 7; 170:16;
172:2; 189:6; 190:24;
191:5
papers 63:23; 64:17;
81:22
paragraph 67:16; 72:2,
4; 79:8, 14
paragraphs 67:9; 68:9;
71:8, 11, 15, 15, 19; 74:20;
78:14; 79:1
parent 92:1
parents 145:13
parochial 54:4, 13, 17,
22; 55:3, 8, 24; 56:3; 57:7;
58:16, 20; 59:12, 17, 23;

85:4, 13, 23; 93:13; 95:13;
118:5
Parsons 192:14
part 5:6; 24:7; 52:7;
55:23; 105:19; 129:11;
137:20; 157:5; 167:1;
173:6; 177:21; 184:4
participant 119:18
participate 28:19, 23;
175:3
participated 175:18;
176:7; 198:15
participating 7:16
particular 31:13; 34:13;
35:25; 36:8, 18, 24; 46:24;
99:2; 110:25; 120:11;
170:24, 25; 197:8
particularly 178:22
parties 4:3
pass 166:17
passed 32:25; 34:1;
72:22; 163:14; 181:6
passing 174:24
past 6:22; 21:19
Pat 50:24; 95:25; 100:12;
195:23
Patrick 178:13
pedagogical 176:15;
177:4; 186:25
pedagogically 188:4
Pell 67:17, 20
Penn 11:22
Pennsylvania 8:22;
10:12; 11:23
people 21:6; 33:19; 34:6,
6; 38:18; 57:16; 61:22;
63:1; 69:16, 20; 77:24;
100:1, 19; 103:20; 131:4;
135:16; 142:3, 7; 145:18;
172:3; 190:18
people's 126:21; 145:9
Peoples 170:16
Pepper 4:15
perceived 145:9
perception 128:3;
130:25
perfect 20:8
perfectly 95:23
perhaps 80:22; 196:7
period 33:22; 60:23;
70:1, 21; 81:1, 5, 12;
112:14, 23; 117:15;
125:19; 135:25; 149:14;
170:12
periods 131:24
Perkasie 11:23
person 67:17; 110:15,
23; 111:4
personal 72:6
personally 5:2; 41:3;
75:22; 97:21; 155:20
perspective 186:25
Peterman 39:5, 18, 23;
40:10, 13; 41:11; 47:11,
15; 114:16; 130:17, 24;

131:13, 16, 20
philosopher 138:17
phone 7:8, 16, 18; 92:1, 3
phrase 92:7
pick 23:25; 148:1
picked 127:20
piece 124:21, 22; 127:10;
129:7; 161:19; 196:14
pieces 21:7
piloted 27:23; 31:9
place 64:9; 123:18, 20;
133:23; 178:5
placed 25:19; 191:6
Plaintiff's 51:8
plaintiffs 4:16; 49:2;
51:14, 22
plan 11:9, 11, 12, 12, 15,
16, 17; 133:23
plans 40:23
playdough 138:12, 16
players 13:25
please 6:9, 12; 70:9;
151:10
plus 123:20
pluses 59:6
podium 173:22
point 9:9; 34:22; 40:18;
46:9; 77:13; 83:19, 24;
119:12, 13; 132:9; 137:11;
143:25; 154:4; 170:24;
182:12; 195:3; 196:11, 16
pointed 148:5
policies 123:8; 124:21;
127:9; 134:7
policy 121:24, 25; 122:1,
16, 17; 123:3, 4, 6, 25;
177:24
population 53:1
portion 35:10
position 11:4; 14:6;
76:17; 97:5, 14, 19; 98:12;
137:3; 150:2; 170:3;
172:17; 175:6; 179:18, 22
positive 102:22
possession 184:15;
186:1
possible 43:20; 50:4;
71:2
potential 125:4
practice 17:4, 8; 18:7, 10;
22:13; 24:14; 63:25; 64:3,
9; 72:21
precedence 88:16
precisely 48:18
prefacing 158:8
preference 197:17
premises 44:9; 45:7
preparation 109:16;
159:15
prepare 6:16; 7:3, 21, 22;
116:9
prepared 21:20; 24:24;
151:20
preposition 112:6

presence 197:21
present 7:14; 14:9; 21:7;
22:12; 39:19; 43:24;
44:16, 17; 59:1; 107:4;
124:18; 138:5; 147:11;
148:13; 156:25; 172:18;
184:25; 187:7
presentation 12:16;
13:13, 15; 42:7; 44:8;
46:16; 58:24; 59:5; 75:14;
76:10; 83:3; 108:1, 25;
147:10; 154:22; 156:13;
172:19
presented 21:4, 16, 22;
41:8; 44:10; 45:11; 58:21;
60:11; 68:19; 77:23; 83:2,
5, 22; 106:16; 108:22;
118:20; 122:2; 126:2;
127:14; 135:3; 136:11;
147:13; 149:5; 155:4, 6;
169:13; 187:18; 188:13
presenter 14:8; 16:11
presenting 40:4; 41:19,
24; 44:13, 19; 84:7, 13, 25;
121:13; 133:3; 138:23;
155:22; 156:9; 157:12, 24;
187:1
presents 82:4
preserve 96:19, 21
preserved 96:10, 12, 17
President 79:2; 160:12,
13, 16, 18, 22; 161:2
press 174:23; 175:11
pretty 37:2; 87:24; 88:5;
168:20, 22
prevent 123:14
Previous 53:11; 96:3
PREVIOUSLY 32:9, 13;
66:5, 10; 96:13; 142:10
Primarily 11:8; 13:18;
24:13; 33:24
principal 12:2, 5, 9;
29:25; 30:2, 3; 39:4; 62:21
principles 93:9
Prior 11:18; 15:8, 15;
42:1; 70:13; 104:19;
108:19; 112:3, 15; 155:14,
22; 156:9; 165:8, 12, 24;
168:14; 169:5; 175:23, 25;
176:1; 189:24
private 13:24
privileged 179:3; 180:2
probably 4:24; 7:20; 8:2;
29:3; 37:24; 39:14; 55:1;
61:8; 168:3, 3; 172:16;
186:13
problem 45:13, 16
problematic 44:15
problems 75:21; 93:4;
144:22; 156:13; 161:24
procedures 98:19
proceed 134:13; 187:20
process 4:25; 5:6, 12;
6:10; 21:24; 24:7; 26:6;
31:4; 94:10; 196:16
produce 23:7, 14; 143:20

Michael Baksa
March 9, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

produced 19:6, 7; 23:13;
51:7, 12, 14, 21, 22; 58:12;
128:10; 178:25; 179:4, 10
product 25:1; 58:16;
153:13; 154:6
production 6:19; 19:18;
20:4, 10; 52:8; 94:23;
104:18; 113:22; 129:11;
184:17; 186:3
professional 11:9, 16;
80:3; 186:10
professionals 164:18
professor 35:7
professors 149:9
program 21:8; 27:23;
195:4
programs 11:10
project 55:12
properly 84:13; 119:23
proponents 149:10
proposed 22:10; 23:21;
74:21; 75:2; 159:7;
163:14; 166:10, 11
proposes 145:20
proposing 163:22;
166:7; 186:21
proposition 138:15;
187:24
protected 179:20
proven 147:15
provide 101:11; 103:18;
111:6
provided 37:13; 51:2;
54:10; 85:25; 100:24;
101:4; 103:3; 106:3;
108:7, 11, 19; 119:8;
129:10, 25
providing 104:1, 4;
106:6; 130:8; 179:14, 15
public 14:4, 11; 15:20;
16:13; 17:4; 18:21; 22:16;
38:5; 55:9; 59:16, 24;
67:12; 80:5, 15; 82:6, 22;
88:6, 21; 89:2, 8; 93:2;
111:11, 12; 144:24;
145:12; 179:12, 12, 14
publicly 13:23
publish 18:12, 23
published 18:14; 56:23;
64:21
publishers 31:9; 52:23;
53:15, 20; 54:2; 57:13;
59:4; 85:20
publishing 55:15
pull 64:5
pulled 81:21
purchase 6:25; 26:25;
30:8, 22; 31:5, 10, 13;
63:21; 66:1; 87:21; 134:17
purchased 30:21; 31:21,
25; 32:2, 5; 108:13
purchasing 48:3
purpose 115:24; 116:17;
176:22; 178:5, 23; 179:13,
25; 180:9

purposes 39:15
pursue 180:12; 191:22
pursued 127:20; 188:24
put 14:8; 31:2; 36:19, 21;
80:17; 87:16; 97:18;
98:11, 15; 99:10, 21;
126:17; 129:5; 133:23;
134:4; 135:11; 142:21;
143:24; 168:18; 198:3
Putting 28:9; 31:19;
40:22; 97:23; 98:3;
106:13, 13; 108:16, 16;
122:18; 124:15; 164:16;
197:22
puzzle 124:21

## Q

Q 14:2
qualification 146:21
qualified 35:4, 9, 21;
36:2, 17; 150:9
qualifies 147:3
quick 189:2
quickly 5:17
quite 64:16; 133:10;
160:18
quote 48:19
quoted 79:14; 174:11, 17
quotes 78:15

## R

R 60:18
raise 27:17
raised 42:15; 44:12;
45:20; 68:1; 117:4, 11;
194:23; 195:15; 196:23;
197:9, 16
raising 42:11
randomly 34:6
Randy 61:12; 62:14, 20
range 60:10
rationale 99:22
reach 75:23
reaching 179:2, 5
reacted 40:21
reacting 90:23; 186:12
reaction 41:16; 88:4, 9;
169:8, 23
read 9:1; 33:6, 15, 18;
35:3; 36:6; 37:10; 53:9, 10,
11; 56:24; 57:1; 60:24;
61:5; 63:25; 64:10, 20, 24;
66:19, 23; 70:8, 11; 73:7;
74:6; 77:8, 14, 20; 78:2;
80:24; 81:21; 83:10; 86:8,
18, 24; 98:13; 99:20;
114:12; 128:24; 146:1;
151:6; 170:8, 10, 18, 23;
182:16; 185:21, 22; 186:9;
192:4, 15; 193:3, 5
readability 62:18, 25;
63:6

reading 57:2; 61:13;
74:2; 81:11, 14, 16; 82:6,
13, 13; 86:5, 11, 16; 98:20;
99:13; 157:15; 170:16;
171:10; 183:10
reaffirmed 122:13
realize 101:2
really 10:21; 35:24; 46:1,
2, 7; 80:16; 87:18; 102:14;
117:10; 126:9, 23; 148:16;
158:10; 171:5; 175:9, 12
reason 21:15; 32:5, 7;
55:10, 22; 77:3; 90:9;
111:25; 115:2; 142:6, 9;
161:15
reasons 32:6
reassurances 123:21
recall 30:1; 46:1; 91:12;
96:3; 100:6, 8; 102:14;
106:20, 23; 120:23; 123:8;
126:9; 158:1; 175:9, 12;
184:8; 185:19
receive 10:1; 22:9
received 9:16; 33:20, 22;
39:3; 47:10, 14; 50:21;
101:19; 102:4, 13; 104:17,
25; 109:14; 111:18; 132:3;
158:24; 159:25; 178:8
receiving 33:24; 132:11;
176:20; 178:23; 184:21
recent 94:1
receptionist 64:4
Recess 47:20; 92:22;
107:24; 158:16; 189:4
recognize 38:25; 48:25;
49:18, 22, 25; 50:18; 51:8;
52:16; 56:8; 57:22; 60:15;
63:15; 86:21; 114:6;
151:14; 153:6; 159:10;
175:11; 179:3; 180:18;
189:19; 192:9
recognized 85:11
recollect 20:11
recollection 6:24; 47:13;
68:7; 71:3; 94:18, 22;
95:18; 118:19; 126:6
recommend 136:23;
165:22
recommendation 24:24;
25:2, 7, 10, 12; 31:12, 17;
59:7, 9; 110:22; 144:1;
154:16; 158:19; 161:20,
24; 163:3; 164:9, 13;
164:4; 168:11; 173:23
recommendations 28:6;
57:5; 84:20; 103:14;
158:24; 159:15, 19, 20, 24;
164:8
recommended 13:14;
25:17; 26:15, 24; 27:11;
32:1; 75:4; 76:20; 163:9;
165:1; 167:13; 173:2, 24
recommending 16:12;
76:12; 164:19; 168:2, 12;
171:20, 23; 172:13; 190:2
reconsider 198:16
record 4:13, 14, 23; 51:5,

24; 58:3; 78:14; 86:15;
102:6; 131:22; 166:16;
196:10
recorded 125:20; 189:25
Reeve 61:12; 62:14, 21
refer 71:19; 98:1
reference 71:8, 16;
125:12; 140:10; 142:19;
172:3, 4; 191:6
references 37:18
referencing 125:22;
129:4
referred 54:1; 68:24;
129:24; 192:1
referring 8:9; 16:17;
19:19; 20:5; 29:4, 5; 33:15;
42:20, 21; 44:23; 45:19;
50:11; 53:16; 58:7, 10;
75:2, 3; 114:11; 115:10;
116:2; 128:25; 129:1, 9;
130:4; 166:24, 25; 167:7;
170:10; 190:22, 24
refers 33:2; 67:16;
120:19; 124:25
reflect 122:1; 123:9
refresh 6:23
regarding 142:2
regardless 140:2;
188:21
regards 97:6; 134:16
regularly 8:25; 24:5;
80:21
reiterated 172:17
rejected 31:17; 74:21
related 23:13; 103:10;
104:11; 123:25
relates 66:1
relating 6:24; 12:14;
27:7; 66:9; 104:10; 106:2,
17; 108:8; 109:1; 141:22;
194:6
release 151:18; 174:23;
175:11
released 174:23
relevance 65:5, 15; 91:1;
96:2, 10, 21
relevant 154:9
religion 13:6
religious 13:6; 47:5;
60:3; 67:18; 80:5; 93:9;
145:10; 170:14, 17, 22;
185:1
reluctant 186:22
remarks 169:16; 174:15
remember 10:18, 21;
16:23; 17:2; 27:18; 28:5,
10; 34:18; 38:3, 9, 16;
41:17; 42:10, 13; 44:4, 22;
46:2, 24; 47:18; 48:11, 12,
19, 21, 24; 49:5; 50:3;
52:25; 55:6, 18; 56:10, 13,
15, 19; 57:15; 59:13;
67:12, 14, 20, 24; 68:3, 3,
5, 8, 12, 14, 20, 22, 23;
69:2, 5, 8, 12, 12, 14, 15,
19, 20, 22, 24, 25; 70:18,

19, 21, 23; 71:5, 6; 76:25;
78:9, 19, 24; 79:4, 5, 12,
18, 23, 24; 81:11, 15; 82:6
9, 10, 12, 13, 17; 83:12,
25; 84:1, 4; 86:5, 11, 16;
87:5, 8, 10, 11, 13, 15, 19,
23; 88:2, 3, 8, 11; 89:1, 6,
8, 9, 12; 90:14, 15, 15, 16,
20, 22; 91:2, 20; 92:12, 14,
16, 19; 93:25; 94:5; 95:3;
100:11; 101:17, 22, 24;
103:5; 104:1, 4, 8; 105:14,
15, 19; 107:2, 19, 21;
108:12; 111:22, 25;
112:18, 19; 113:19;
120:14; 125:7, 7; 128:2,
25; 129:2; 133:9; 135:19;
137:11; 138:23; 139:18;
148:6, 7, 9; 156:11;
158:10, 11; 172:14, 20, 23;
173:7, 16; 174:1, 8; 175:2;
182:25; 183:2; 184:11, 13;
185:13; 191:12, 25;
193:11, 13; 197:18
remembered 53:2; 64:12
remembering 88:10;
196:8
repeated 80:21
repeatedly 169:25
rephrase 53:25
report 111:14; 125:1;
184:5, 22
reported 46:22; 65:3, 17
19, 25; 67:9; 71:20; 81:6
89:18; 90:10; 92:6;
155:13; 190:14
reporter 4:23; 5:9, 23;
53:12; 65:2, 11, 24; 70:12
reporters 82:1; 91:3;
131:21
reporting 63:21; 68:17;
82:2; 89:21; 90:18; 91:6,
10
reports 130:17; 198:8
represent 4:16; 66:11;
112:10; 113:6, 16; 177:23;
178:12, 16
representation 50:25;
52:2; 60:13; 113:10, 12
representative 175:20
representatives 57:14
represented 100:14;
119:24
representing 8:10;
66:12; 155:17
request 98:24; 99:16, 19,
21; 184:17; 186:3
requested 6:18
requesting 99:13;
191:13, 14
required 46:19
requiring 190:5
research 74:4; 94:20;
95:11, 12; 140:16; 150:5
researchers 149:11
reserved 4:6; 96:5, 8
residents 151:19

Case 4:04-cv-02688-JEJ   Document 213   Filed 09/27/05   Page 64 of 66

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Michael Baksa
March 9, 2005

resolution 32:24; 34:1;
72:22, 23; 108:20; 109:17,
19, 20, 23; 110:6; 174:10,
14, 24; 181:6
resolved 191:5
resource 150:12
resources 85:2
respect 52:5; 70:5;
148:23; 149:3; 178:2
respective 4:3
respond 22:11; 41:11;
46:13; 47:11; 116:18;
126:11; 172:21; 181:22;
191:1; 193:15
responded 99:1; 165:20;
195:13
responds 117:12
response 55:5; 63:7;
94:13; 182:3
responsibilities 11:6;
186:12
responsibility 36:12;
43:19; 64:5; 96:15
responsible 11:8; 21:6;
36:14; 110:8
responsive 23:7
rest 6:11; 39:13; 68:23;
102:12; 108:15; 110:24
restate 81:19
result 168:7
resulted 77:25; 163:13;
166:14; 168:8
retained 112:9
retreat 40:25; 42:15, 16
return 78:11; 187:13;
195:5
returning 84:2; 133:18
reversing 198:2
review 6:18, 20; 20:13;
21:25; 22:7; 24:1, 7, 21;
25:1; 39:7, 9; 56:22; 75:22;
101:9, 14; 102:1; 108:15;
119:10; 120:6, 17, 20;
143:12; 182:2; 191:13;
197:2, 7
reviewed 19:7; 21:5;
60:25; 85:21; 98:21;
115:8; 154:15; 194:12;
195:3
reviewing 21:23; 52:22;
80:20; 84:1; 94:23
revising 121:25
revision 197:7
revisions 122:16
Rich 143:4, 6
Riddle 69:24, 25; 70:1, 6,
9, 16, 19
Ridge 11:22
right 9:24; 10:25; 72:19;
73:14; 78:11; 86:5; 91:11;
93:19; 95:22; 113:13, 14;
118:15; 120:15; 124:4;
126:20; 131:13, 23; 135:7;
138:12, 13; 142:5, 13;
144:11; 146:13; 149:23;

160:20, 22; 162:15;
164:11, 15; 181:23;
197:19; 198:13
rights 92:10
rigorous 27:16
risk 97:24; 98:4, 11, 16;
99:11
risky 97:18; 99:6
road 173:12
robes 92:9
role 151:8; 155:24; 197:6
room 6:11; 48:25; 176:3
roster 29:1
ROTHSCHILD 4:11, 15;
19:16; 32:11; 38:20, 24;
43:2, 6; 45:15; 47:19, 21;
49:12, 21; 50:23; 51:7, 11,
15, 23; 52:9, 14; 53:13, 23;
57:18, 21; 58:6; 60:5, 8;
65:8, 18, 23; 66:7; 67:4, 7;
70:5, 8, 13, 15; 73:6, 22;
76:18; 77:7; 78:3; 81:20;
85:10, 17; 89:7; 91:8;
92:20, 23; 95:25; 96:9, 21;
97:2; 100:12, 22; 105:10;
106:12; 107:22, 25;
109:12; 112:8; 114:4;
118:12; 129:15, 23;
147:25; 150:20; 151:9, 13;
153:5, 12; 158:17; 159:4;
160:21; 161:3; 166:23;
176:24; 177:8; 178:12, 16,
25; 179:17; 180:11, 17;
184:17, 20; 185:16; 186:3,
5; 189:2, 5, 14, 18; 192:8;
195:22; 196:22; 198:18,
21
Roughly 145:23
run 124:17, 25; 186:14;
187:13
Russell 141:2

S

Same 65:21; 66:3; 85:15;
124:24; 131:13; 165:17,
18; 170:6, 7; 179:7; 195:13
satisfied 132:7
saw 50:9, 11, 14; 52:19;
97:22
saying 6:1, 3; 35:4;
48:20; 49:5; 67:14; 68:12,
22; 69:3, 5; 78:15, 19, 21;
79:4, 5, 12, 15, 18, 24;
87:6, 8, 12; 89:6; 90:20,
24; 96:18; 113:15; 120:19;
121:7, 9; 126:25; 128:18;
132:6; 136:22; 148:9, 10;
156:11; 160:15; 162:14;
168:9; 172:22; 173:7, 9;
174:8, 11, 17; 182:7, 25;
193:13
scheduled 20:24; 24:5;
27:5
School 4:18; 8:4, 10, 13,
15; 10:10, 16; 11:2, 23;
12:3, 6, 10, 17; 13:5, 24;

17:5; 19:8; 26:4; 27:9;
30:22; 31:5, 17; 33:25;
34:10, 13; 37:20; 38:5, 6,
14; 42:14; 48:8; 51:13;
55:9; 59:16; 60:2; 61:17;
65:13; 67:13, 21; 68:17;
69:4, 17; 70:25; 72:18;
73:17; 76:6, 13; 80:5, 15,
22; 81:23; 82:2, 3; 84:10;
88:6; 91:24; 94:2; 97:5, 6;
112:4, 5, 10; 113:6;
120:10; 135:13; 141:19;
142:4; 144:6; 147:6, 16;
148:1; 150:24; 152:12;
169:17; 174:18; 175:4, 4,
15; 177:23; 178:13; 181:4,
11, 12; 186:6; 189:7; 195:4
school's 71:24
schoolers 53:3; 54:6, 7;
55:18, 20, 23; 57:8; 94:20;
95:11, 14
schooling 52:25; 56:2
schools 14:5, 11; 15:20;
16:13; 47:25; 54:4, 9, 13,
18, 22; 55:3, 8, 24; 56:3;
57:7, 10, 15; 58:17, 20;
59:12, 17, 19, 23, 24;
61:10; 64:7; 82:6, 10; 85:4,
13, 23; 93:2, 13; 95:13;
118:5; 119:22; 130:10;
141:3, 5, 8, 16; 144:24;
145:13
science 10:9, 18, 20, 22,
24; 26:18; 27:1, 7; 29:20;
30:4, 25, 25; 31:22, 25;
33:7; 34:21; 35:5, 12; 36:3;
37:17, 18; 41:21; 42:4;
71:24, 25; 84:11, 21, 22;
94:3, 7; 97:22; 101:13, 21;
114:15; 117:3; 120:14;
121:4; 126:19; 128:13;
132:4, 13; 139:2, 25;
144:10; 145:22; 146:2;
153:14; 154:7; 158:4;
164:17, 17; 187:17; 188:5,
19; 192:24; 193:7, 10, 13;
194:2; 195:1
scientific 15:22, 23; 16:2;
35:10, 22; 36:10, 24;
44:21, 24; 45:1; 84:13, 20;
85:12; 93:1, 7; 100:10;
119:21; 120:1, 12; 139:5,
16; 144:5, 14, 16, 21, 22;
145:2; 146:19, 24, 25;
147:2, 5; 149:8, 13, 21, 22;
150:3, 10, 15, 23; 152:9,
14; 177:4; 187:10, 24;
188:9, 20
scientifically 36:19;
138:14
scientist 33:7; 34:20;
35:4
scientists 149:20, 22;
152:11
sealing 4:4
search 52:21; 95:6, 19
searching 53:8; 54:17
second 6:19; 31:1; 67:8;
71:14; 79:8; 86:21; 152:6;

166:3
secretaries 54:9
secretary 19:1; 53:5;
58:12; 61:9; 95:3, 4; 134:2;
152:1
secretary's 63:19;
192:13
sectarian 13:4
section 116:3; 121:20
sections 116:5
secured 57:12
securing 178:5
seeing 50:17; 107:2
seeking 125:12
select 31:8
selected 163:13
selecting 85:19
selection 31:4; 48:10
seminar 13:12
seminars 12:14
send 143:11
sense 13:19; 118:15;
155:3; 178:21; 183:19
sensitive 15:20; 145:1, 4,
19
sensitivity 145:7
sent 34:3, 4, 6; 104:18;
151:18; 154:1, 2, 16;
158:22; 181:5; 183:5;
194:16
sentence 122:20; 126:3;
181:9
separate 17:22; 121:21;
124:4; 163:20
separately 77:4
separation 68:10; 182:1;
183:17, 21; 184:22;
185:15; 194:17
September 30:16; 72:11;
132:14; 153:20, 21; 154:4;
158:3
seriously 127:15
services 27:8; 192:25
session 15:8, 16; 23:3
sessions 17:8, 11; 18:15
set 116:21; 136:10;
141:9; 150:4
Seth 176:10
sets 11:14
seven 27:3; 71:8, 14
sex 196:5, 24
share 116:8, 20
shared 103:25; 106:22,
24; 128:12
sharing 104:25; 193:16
sheet 116:1, 3; 118:4
Sheila 143:4; 163:24
short 163:14; 168:6
shortcomings 75:21, 25;
76:14, 24, 25
Shortly 134:10
show 19:17; 20:1, 3;
51:24; 118:8; 130:9;

142:24; 143:22; 147:17
showing 105:11
shown 81:25; 82:8
sic 178:9
side 191:16, 17
signed 137:7
similar 56:2; 108:6;
148:24
simply 18:13; 25:5; 40:2;
41:4; 46:4; 83:5; 116:15
single 26:1, 11
singled 146:15, 20
sit 51:5; 184:8
sites 147:16
sitting 43:18; 95:17
situation 172:9; 187:19
six 11:12, 22
skimmed 83:7, 13
slightly 92:7
slow 5:18
social 181:3; 182:8, 10;
183:12; 184:24; 194:6, 12;
195:20
softened 76:9
sole 43:25
solely 156:17
solicit 34:8; 197:20
soliciting 179:13
solicitor 125:1, 3, 13;
141:4, 7; 186:15, 24;
187:13, 14; 188:2
solicitor's 88:18
solidify 155:12
somebody 94:10; 125:6
somebody's 124:13
someone 61:19; 87:4, 4;
89:12; 176:10; 192:2, 15
Sometime 37:12, 24;
55:1; 70:22; 101:7, 8;
128:18; 175:23
sometimes 5:17; 18:19;
20:22; 110:25
sorry 9:3; 59:20; 62:23;
79:8; 81:2; 153:23
sort 106:14; 108:16;
129:20; 137:24
sought 178:13
sound 35:22; 36:3, 19
soundness 36:23, 25
source 16:15, 24; 56:5;
109:14
Spahr 39:20, 22; 40:2;
41:5, 16, 18; 45:20, 25;
46:13, 14, 18, 24; 47:14,
16; 88:15; 106:9, 19, 19,
25; 117:18; 128:9, 21, 25;
129:10, 24; 130:6, 8, 19,
25; 131:7, 10, 21; 132:12,
17; 136:14, 21; 137:2;
140:5, 9, 12; 169:25; 174:1
Spahr's 130:17
speak 5:20; 8:1, 8; 33:17;
70:1; 91:22; 108:3;
127:24; 174:6; 181:20

Michael Baksa
March 9, 2005

Tammy Kitzmiller, et al.    v.
Dover Area School District, et al.

speaker 92:25
speaking 44:25; 47:13; 67:21; 68:25; 70:20; 89:16, 17; 90:1, 4
speaks 182:5
special 11:15; 171:14
species 72:15; 117:16; 122:14; 138:11; 187:2
specific 11:14; 25:23; 27:18; 29:15; 55:10; 66:20; 80:17; 84:23; 97:11; 116:4; 117:9, 10; 141:13; 148:6; 158:2; 185:17
specifically 15:1; 48:16; 71:1; 81:7; 82:24; 83:25; 89:11; 91:2, 7; 92:14; 106:21; 145:16; 175:12; 190:4
specifics 175:9
speculating 162:19; 181:17
speculation 43:1; 45:14; 73:21; 77:6, 17; 109:10; 150:18; 185:4
speech 185:9
spend 42:23
spent 42:22
split 46:6; 47:3
spoke 7:8, 18; 63:12; 67:25; 89:24; 169:14; 172:23, 25
spoken 63:13; 105:3
spring 49:17
square 134:13
staff 30:3; 94:3; 116:16, 18, 20; 117:11, 13; 159:16; 161:20; 164:10
staff's 159:19
stage 147:3
stamp 117:1; 159:13
stamped 19:14; 51:9, 10, 21; 52:6; 118:16; 161:21; 162:22
stand 87:5; 97:17
standard 106:14; 108:17
standards 37:3; 122:3, 4; 123:11; 150:3; 181:10, 13
standing 67:2, 5; 97:13
standpoint 62:18; 63:1
start 22:21; 64:3; 148:25
started 41:23; 197:3
starting 71:7
starts 118:17; 142:17
state 11:13; 14:6; 37:2; 68:11; 183:21; 185:15
statement 60:24, 25; 61:4; 67:12, 16; 68:21; 72:16; 73:7, 11; 74:1, 2, 6, 14; 77:8, 13, 19, 25; 78:2, 4, 6, 10; 80:14; 83:11, 21; 87:2, 24; 88:2, 8, 11; 90:11; 98:13, 18, 20; 99:14; 146:1; 151:6; 156:2
statements 67:3; 92:11,

12; 173:19; 198:9
states 72:5
stating 32:18
status 48:9; 139:16; 144:20; 150:6
step 9:11; 143:20; 172:7; 177:18, 19; 188:22, 25
steps 85:15; 123:2; 187:22; 188:18; 196:17
stick 37:3
still 27:23; 40:3, 10; 41:7, 24, 25; 62:2, 7, 11; 94:18; 147:14; 168:6; 184:14; 185:25
stipulated 4:2
STIPULATION 4:1
stories 90:10
story 44:16
strange 59:22
Strasburg 8:22
strategic 11:9, 11, 12
Strategy 105:12, 18
strengthened 148:12
stressed 117:13
strike 59:14, 22
strikes 131:2
student 141:10; 156:2
student's 148:24
students 14:10; 27:22; 32:18; 36:20; 43:25; 44:9; 45:7; 59:17; 61:5; 62:19; 63:2; 73:12, 19; 74:2, 6, 9, 13; 77:3, 9, 13, 23; 78:4; 79:17; 80:6, 11; 83:8; 99:4; 119:24; 120:13; 138:6, 21; 139:3; 144:7, 17, 23; 145:14; 146:1, 5, 8, 9, 20; 149:4; 151:7; 154:10; 156:25; 169:15; 173:10; 185:11; 186:9; 187:7; 197:13
studies 181:3; 182:8, 11; 183:12; 184:24; 194:7, 12; 195:4, 21
study 63:6; 148:25
stuff 129:17; 138:18
subject 25:25; 27:21; 30:10; 37:7; 66:13, 15; 70:16; 77:14; 84:14, 21; 93:23, 25; 103:10; 104:12; 106:18; 109:1; 126:12; 132:15, 20; 133:7; 165:5; 188:20
subjects 12:14; 196:2
submission 111:10
submit 24:15
submitted 11:13; 98:24; 99:20
substance 38:9; 171:11
substantive 96:11; 137:24
substantively 137:16
subtracted 195:18
subtracting 28:13
subtraction 26:3

Success 26:20; 27:3, 14; 29:23; 30:5
successful 5:19
Sue 5:8
sued 113:13
suggest 138:10; 188:15
suggested 16:22; 95:6; 125:4; 138:7; 143:15; 174:12
suggesting 31:18
suggestion 124:13; 125:5; 126:17; 167:21; 187:12, 21; 191:1
suggestions 115:18, 22; 194:23; 195:5, 17
suit 105:19
suitable 120:21
sum 100:20; 171:11
summarize 24:8
summarizing 184:12
summary 184:7
summer 113:10
superintendent 11:1, 7, 18; 25:18; 59:15; 71:9, 16, 22; 98:25; 119:18; 197:6
supervisor 31:7
supplement 133:24
support 68:25, 25; 70:20; 88:24; 90:5; 92:4; 165:4; 173:19; 174:7
supported 93:5
supportive 162:16; 192:24
supports 68:12
sure 6:2; 8:17; 13:3; 30:4; 47:9; 61:8; 62:6, 21; 63:14; 67:15; 69:3; 86:9, 19; 91:19; 95:23; 96:7; 99:25; 102:6; 104:15; 106:13; 114:13; 123:6; 125:3; 127:12; 140:24; 148:7; 162:7; 163:18; 166:16; 167:3, 17, 19, 22; 168:20, 22; 184:19; 185:10; 190:7
surprise 136:14
surprised 133:11; 137:2, 13
survey 57:17; 58:16; 59:16; 61:9; 93:12; 118:17
sworn 4:9
synonymous 140:14
system 59:16

**T**

table 134:12
talk 5:17; 6:11; 14:20; 33:20; 40:4; 41:3, 24; 42:1, 1; 62:1; 70:16; 121:8; 123:3; 133:11, 15; 148:10; 184:9; 188:8; 193:1
talked 14:23, 23; 16:5; 47:16; 70:6; 88:15; 95:1, 2; 111:17; 117:24; 122:18, 22; 124:15; 127:4, 16;

158:7; 167:21; 175:7, 13; 193:14
talking 41:2, 17; 42:24; 43:4, 10, 21; 48:9; 82:9, 11, 17; 88:20; 89:2, 3, 8, 13; 90:8; 94:10; 101:24; 113:9; 118:6; 120:24; 121:17; 123:23; 124:5; 125:7; 133:9; 138:16, 17, 18; 170:9; 174:2, 2
talks 40:9
tape 101:25; 120:17
task 152:18
taught 8:14; 11:22, 25; 16:13; 27:22; 32:22; 39:23; 40:8; 45:8; 46:20; 47:4, 25; 55:9; 62:4; 67:19; 72:18, 25; 73:16, 19; 74:17; 75:19; 77:21; 79:4, 18; 80:12, 24; 81:9, 13; 82:5; 85:14; 93:2; 119:22; 123:12; 125:16, 24; 127:13; 130:10; 131:6; 133:5, 6; 141:24; 144:6, 17, 23; 146:5, 8, 19; 167:20; 185:2, 11, 12; 188:20; 191:8, 24; 194:14, 15
teach 11:24; 35:19; 36:20; 71:25; 72:13, 14; 78:16; 80:5; 117:13, 14; 119:3; 130:18; 131:16; 140:17; 142:22; 169:18; 190:7, 23; 193:12
teacher 33:7; 34:21; 35:5, 12; 50:5; 62:4, 5; 97:4; 153:18, 20; 173:13; 181:3
teacher's 148:21
teachers 17:25; 24:3, 12, 13, 14; 26:7, 15, 24; 29:16, 19; 31:8, 11; 35:14, 24; 37:1, 4, 7; 40:15; 43:24; 51:12, 22; 52:8, 22; 53:17; 54:10; 55:12; 56:12; 57:12; 58:23; 59:2, 3; 60:25; 63:12; 72:10, 12; 75:4, 10; 76:11, 20; 77:19, 20; 78:1; 82:20, 24; 85:19, 25; 97:6, 22; 98:21; 101:21; 102:3, 11; 103:22; 108:13; 114:15; 116:8; 119:2, 10; 120:19; 121:9, 11; 122:12; 123:20; 126:11, 25; 127:17, 24; 128:13; 132:4, 5, 13; 133:12, 16; 136:5, 25; 137:12; 139:7, 11, 25; 140:6; 142:22, 24; 143:11, 21; 151:3; 152:19, 24; 153:2; 154:7, 15; 155:12, 17, 21, 25; 156:4, 8, 12, 23; 157:12, 23; 158:1, 4, 5, 11, 20, 22; 165:2, 4; 166:4, 6, 13; 167:12, 16; 168:12, 16; 169:22; 171:20, 21, 24; 172:10; 173:8; 190:6, 13; 192:25
teaches 78:23

teaching 10:7; 12:17; 13:19; 14:4; 35:16; 40:15; 42:2, 22, 23; 58:20; 59:17; 68:1; 69:1; 73:24; 74:9; 80:8; 82:10; 84:20; 85:5; 88:17, 18; 90:1, 6; 91:25; 93:5; 117:23; 119:3; 122:13, 15; 127:18, 22; 128:8; 130:20, 22; 132:2, 20, 23; 141:11; 154:25; 155:1; 158:8; 176:15; 186:8; 188:4; 190:22; 192:24; 196:18, 24
Technical 27:9
technology 11:17
telephone 61:2; 191:18, 21
telling 87:25; 169:18
tells 78:4
tenable 170:4
tend 5:17; 52:7
tentative 134:1
tenure 26:13; 31:16
term 14:12; 15:12; 72:8; 171:1, 3, 6, 14
terminology 162:2
terms 55:14; 58:15; 90:22; 137:16, 24; 141:16; 143:9; 146:25; 152:23; 188:4
test 6:10
testified 4:9; 93:11
testifying 95:17
testimony 64:11; 74:8; 93:11; 128:16; 147:21; 192:1; 194:4; 196:9
Texas 61:18
textbook 30:20; 31:13, 15, 18, 19; 32:4; 59:4; 63:22; 66:1; 67:22; 71:23; 74:22; 75:3, 23; 76:11; 82:4; 83:20; 87:21; 91:14; 93:24; 94:1; 106:14; 108:9, 11; 115:16, 20; 117:18; 120:7; 123:21; 124:23; 141:6; 147:10, 18; 148:2, 22; 151:5; 155:11; 156:2; 157:22
textbooks 21:2, 8; 23:23; 25:16; 26:18; 27:1; 30:22; 31:24; 52:21, 24; 53:1, 6, 9; 83:9; 84:12, 25; 93:13; 108:17; 118:5; 120:5, 11; 135:4
texts 57:10, 12; 59:3, 4, 7; 85:16, 21, 21, 23; 128:8
theirs 168:3
theories 14:14, 18, 25; 32:20; 35:20; 40:17; 41:20; 42:9; 43:20; 44:1, 20, 21, 24, 25; 77:22; 79:7; 122:24; 124:9, 19; 127:4; 128:9; 133:21; 138:8, 9, 22; 139:4, 5; 144:16, 22; 154:12; 156:20, 25; 157:3, 7, 10, 12, 25; 158:6, 14; 173:9

**Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.**

**Michael Baksa
March 9, 2005**

theory 15:23; 16:3;
32:19; 33:8; 35:17; 40:5,
12; 41:25; 42:8, 22, 23;
43:9, 24, 25; 44:10, 13, 14,
15; 45:9, 11, 12; 46:17, 17;
47:4; 67:18; 73:3, 18;
75:25; 77:4, 12, 15, 21;
78:5; 83:3; 85:1; 93:1, 8;
119:14; 120:12; 131:9, 10;
132:2; 138:10; 142:23;
144:14; 145:12, 14, 19, 22;
146:2, 6, 7, 10, 10, 11, 11,
12, 12, 21, 25; 147:1, 7,
14, 19; 148:3, 4, 11, 12;
149:1, 5, 8, 21, 23; 150:11,
15, 23; 152:7, 8, 9, 14;
154:11; 155:2; 157:18;
186:8; 187:8, 8, 10; 188:7,
9
therein 67:3
thick 128:23
thinking 35:6; 62:20;
94:17, 19; 102:9
third 11:5; 23:19
Thomas 112:3, 9, 16, 20;
113:2, 5, 15; 141:14; 152:5
though 36:7; 91:19; 92:2;
129:6; 173:8
thought 14:9; 15:3;
23:13; 29:5; 53:2; 55:16;
94:14; 95:2, 3, 13; 98:11;
102:7; 124:17; 128:16;
133:25; 137:17; 139:12;
164:6; 194:13; 196:7
three 10:17; 30:13; 100:4,
4; 101:3; 103:8; 161:11
three-quarters 142:16
throughout 46:14
throw 111:6
till 135:21; 136:8; 153:23
times 110:25; 170:2
Title 11:10; 100:6, 18
titled 11:10; 19:23;
105:12; 159:6
titles 100:7
to-do 22:25
today 51:5; 95:17; 99:23;
178:9
together 29:19; 37:5;
124:23
told 4:22; 39:22; 77:4;
115:12; 146:10; 162:18;
170:2; 181:25; 189:10
Tomball 61:17; 62:22;
141:20, 24; 142:10, 14
took 10:19, 20, 24; 41:4;
85:16; 98:12; 137:2;
156:22; 167:15, 22;
168:22; 178:5
topic 15:20; 68:4; 70:24;
94:13; 120:2, 16; 126:4;
137:14, 15; 184:7
topics 120:8
total 8:2; 100:20
touch 102:25
touching 196:5

training 35:16, 25; 36:8,
23
transcript 5:11, 19, 23
transmittal 109:17
transmitting 110:8
tread 177:16
trial 4:7; 96:24
Trudy 39:5, 18
try 5:18; 24:22; 135:11;
139:9; 177:17; 189:3
trying 44:5; 84:24; 139:1,
4; 156:3, 4; 184:23;
187:18; 197:20
turn 51:13; 67:8; 68:15;
78:12; 86:1, 13; 152:6
turned 32:14; 140:1
turning 61:6, 11; 63:15;
114:18
two 6:22; 26:16; 28:4;
39:12, 15; 49:15, 22; 50:7,
12, 15, 17, 21; 51:6; 63:23;
64:17; 79:1, 2; 100:7, 13,
17, 21; 101:3; 102:10;
103:8, 9; 104:14; 115:6;
131:24; 134:7; 153:6;
159:5, 10; 180:24
two-year 170:12
type 20:10; 35:25; 57:17;
124:16
typed 116:1
typewritten 58:12, 15;
116:11
Typically 20:25; 21:18,
25; 22:25; 23:20, 25; 31:6,
11; 145:13; 160:13

## U

ultimate 26:23
ultimately 25:1; 27:2, 10;
147:15; 163:8
Um-hum 8:18; 131:14;
149:2
unbalanced 155:21
uncertainty 101:2
unChristian 174:13
under 58:9; 95:17; 96:14,
23; 125:10; 130:10; 133:4;
163:10; 197:1
undergraduate 10:1
underscored 120:12
understood 16:9; 37:16;
137:6; 176:20; 180:14;
181:22
unit 40:16
universities 84:19
University 9:21; 10:11,
13, 19; 35:6; 53:3, 7;
55:15; 56:11, 16, 23;
93:23; 141:22; 142:2;
149:10
Unlocking 100:9
unsound 138:14
up 9:14; 23:1; 24:1; 40:3;

41:6; 46:4; 54:24; 58:8;
67:20; 70:24; 88:21;
89:13, 17; 90:1; 94:1, 11;
97:13; 108:3; 111:11, 12;
116:21; 117:11; 122:23;
125:10; 126:7, 10; 127:25;
128:4; 133:7; 136:10;
138:20, 22; 148:1; 153:23,
24; 154:4, 18; 162:6;
163:22; 174:6; 189:3
upon 57:2
upset 121:2, 6
upshot 28:2; 143:8
use 6:11; 43:15; 57:16;
62:9; 69:6; 94:8; 96:20;
119:6; 120:21; 123:21;
136:6; 138:20; 141:9;
142:2; 190:6, 7, 13, 16;
193:12
used 14:1, 12; 15:12;
33:4; 42:19; 48:6; 54:21;
59:12; 61:22; 62:4, 7; 69:8,
9, 13; 76:6, 6; 77:1, 1;
141:17, 20; 142:7; 146:7;
191:15; 193:7
useful 193:21; 194:2
using 42:10; 43:12;
44:20; 53:3, 7; 54:5; 55:4,
18, 23, 24; 57:9, 11; 62:2,
12; 64:12; 85:24; 93:14;
95:11, 15; 141:3, 5, 8;
148:18
Usually 111:12
utterances 5:15

## V

vague 81:18; 183:19
vaguely 193:11
vagueness 106:8
Valley 12:9
variations 161:18
vehicle 110:15
verbal 108:25
Verbally 41:13; 65:9;
124:17
version 51:25; 52:10, 17;
56:6; 148:22, 24; 162:15;
171:20; 172:13; 173:20;
174:6; 187:1
versions 76:5; 162:21;
171:21
versus 4:18
video 100:3
videos 34:16; 100:14;
101:3
videotapes 100:4
View 8:22; 14:8; 73:14;
140:15, 20; 152:10;
154:22; 156:7; 184:25;
186:18; 187:3, 16
views 14:1; 69:21; 79:11;
93:1; 164:2, 5, 7; 179:5;
184:23
volunteered 179:18

vote 167:18; 168:19;
173:17, 21; 174:3, 4, 5, 13;
181:19
voted 109:3, 20, 23;
110:10; 135:14, 18;
160:18; 164:25; 167:10;
169:3; 174:10
votes 135:15, 17
voting 108:20

## W

wait 5:24; 176:19
waived 4:5
walk 134:18
wants 79:9; 119:13;
130:18; 131:5; 190:5
warned 97:14
Washington's 185:8
way 40:21; 41:23; 86:19;
93:7, 8; 103:2; 116:13;
126:11; 127:25; 138:24;
142:16; 145:15; 150:1;
155:21; 156:8; 170:18;
171:25
website 53:5; 95:4
Wedge 105:12, 18
week 7:20
weeks 6:22; 50:8, 12, 15,
18; 180:25
welcome 81:3
Wenrich 79:5
weren't 34:10; 132:9;
155:5; 158:13; 196:8
What's 9:15; 118:24;
125:19; 140:7; 145:3, 24;
153:17; 183:20; 195:12
whenever 46:9
Whereupon 198:22
who's 48:25; 53:15;
143:6; 198:12
whole 110:14, 20; 111:3;
151:3; 156:9; 194:8
whose 44:15, 16; 51:1;
52:3; 58:2; 61:6, 11, 14;
63:18; 129:18; 192:12
Widener 9:14
wife 4:23
willing 112:21
Window 61:12, 15, 16
withdraw 70:13; 84:17;
108:10; 126:13; 186:18
withdrew 134:11
within 72:15; 82:11;
117:15; 122:14; 163:16,
25; 165:10
without 21:22; 22:2;
48:18; 51:25; 76:17;
80:17; 88:10; 99:5;
112:21; 136:2; 148:10;
166:10
witness 4:8; 106:6
witnesses 4:25; 5:5;
180:12

word 42:19; 43:16; 44:20;
48:6; 64:12; 69:10, 13;
76:25; 145:21; 148:11;
157:20; 161:24; 181:11,
14
wording 48:12
words 5:13; 43:12; 69:6;
82:22; 92:16; 96:9, 18;
116:2; 127:16; 193:7
work 5:12; 9:10; 11:19,
20; 17:1; 31:7; 33:10; 35:7,
19; 77:18; 97:1, 21;
124:23; 136:25; 143:10,
23; 145:25; 151:1; 153:13;
154:6; 155:24
working 41:20
works 36:6
world 147:2, 5; 171:8
worried 76:13
wrap 189:3
write 37:1; 127:3; 163:2
writer 192:15, 23
writing 41:13; 65:9;
90:25; 122:22; 193:11
written 13:25; 35:7;
47:15; 64:23; 66:13, 14;
89:23; 111:10; 190:4;
192:4
wrong 19:3; 90:19, 25;
91:10; 100:13; 140:7;
155:21; 156:8
wrote 153:1; 154:14

## Y

year 9:22; 10:4, 20; 11:5;
12:20, 22; 20:22; 21:5;
23:19; 27:2; 30:24; 31:1, 2,
3, 10, 14; 33:25; 42:4, 14;
182:8; 197:2
years 10:16; 11:12, 22;
12:4, 8, 9; 87:3; 195:7
yesterday 7:8, 9
Yingling 174:11; 198:9
York 27:9; 63:23; 64:17;
66:18; 68:16; 71:13;
78:14; 86:2, 7, 15; 131:22,
22
younger 14:24; 16:8, 17,
25