# APPENDIX I

# TAB B

# In The Matter Of:

*Tammy Kitzmiller, et al.   v.*
*Dover Area School District, et al.*

---

*Alan Bonsell*
*January 3, 2005*

---

*Filius & McLucas Reporting Service, Inc.*
*1427 East Market Street, York, PA*
*4309 Linglestown Road, Harrisburg, PA*

*(717) 845-6418   or   (717) 236-0623*

*Original File AB010305.TXT, 95 Pages*
*Min-U-Script® File ID: 2912591983*

# Word Index included with this Min-U-Script®

**Tammy Kitzmiller, et al.   v.**
**Dover Area School District, et al.**

Alan Bonsel
January 3, 200

---

Page

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

TAMMY KITZMILLER; et al., .

Plaintiffs  .  CIVIL ACTION NO. 04-CV-2688

vs.    .

DOVER AREA SCHOOL DISTRICT, .  (JUDGE JONES)

et al.,    .

Defendants  .

Deposition of    : ALAN BONSELL

Taken by    : Plaintiffs

Date    : January 3, 2005, 1:45 p.m.

Before    : Vicki L. Fox, RMR,

Reporter-Notary

Place    : Two School Lane

Dover, Pennsylvania

APPEARANCES:

PEPPER HAMILTON LLP

BY:  ERIC J. ROTHSCHILD, ESQUIRE

AMERICANS UNITED

BY:  RICHARD B. KATSKEE, ESQUIRE

For - Plaintiffs

THOMAS MORE LAW CENTER

BY:  RICHARD THOMPSON, ESQUIRE

For - Defendants

Page 2

[1]    INDEX

[2]    WITNESS

[3] ALAN BONSELL    Examination

[4]   By Mr. Rothschild    3

[5]

[6]

[7]

[8]

[9]    EXHIBITS

Plaintiff Deposition

[10] Exhibit Number    Page

[11] 1. Complaint in Kitzmiller v. Dover Area School  10

[12] 2. Answer in Kitzmiller v. Dover Area School  10

     District.

[13]

     3. Dover Area School District, Board Press Release 17

[14] For Biology Curriculum -- 11-19-04; reposted 12-14-04.

[15] 4. NewsBank InfoWeb Articles from the York Dispatch  39

     and Daily Record.

[16]

     5. Dover Area School District Memorandums with 54

[17] Attachments, No. 000001 through 167.

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

Page 3

[1]    STIPULATION

[2]  It is hereby stipulated by and between the

[3]  respective parties that sealing, certification and filing

[4]  are waived; and that all objections except as to the form

[5]  of the question are reserved until the time of trial

[6]

[7]    MR. THOMPSON: It is our understanding that this

[8]  deposition is being taken pursuant to the Court Order

[9]  authorizing the preliminary discovery for purposes of

[10]  determining whether the plaintiffs will file a temporary

[11]  restraining order.

[12]    It is further limited to the origins and purpose

[13]  of the policy in question and what will transpire in

[14]  classroom on January 13th, 2005.

[15]

[16]    ALAN BONSELL, called as a witness, being duly

[17]  sworn, testified as follows:

[18]

[19]    BY MR. ROTHSCHILD:

[20]    Q: Good afternoon, Mr. Bonsell.

[21]    A: Good afternoon.

[22]    Q: I have introduced myself off the record. Let me do it

[23]  on the record. My name is Eric Rothschild. I am from

[24]  the law firm of Pepper Hamilton. I represent the

[25]  plaintiffs in the lawsuit against the Dover Area School

Page 4

[1]  District and its Board of Directors. And your

[2]  deposition is being taken in that matter.

[3]    Do you understand that?

[4]    A: Yes.

[5]    Q: I am joined here this afternoon by Richard Katskee who

[6]  is an attorney from Americans United for Separation of

[7]  Church and State and who is also representing the

[8]  plaintiffs in this matter.

[9]    Are you currently a member of the Dover Area

[10]  School Board?

[11]    A: Yes, I am.

[12]    Q: How long have you been a member?

[13]    A: It is three years.

[14]    Q: For some of that time, were you the President of the

[15]  Board?

[16]    A: Yes.

[17]    Q: For how long?

[18]    A: One year.

[19]    Q: Beginning?

[20]    A: I would say beginning I guess December of '03. December

[21]  of '03.

[22]    Q: Are you represented by counsel today?

[23]    A: Yes.

[24]    Q: Who is that?

[25]    A: Mr. Thompson.

---

Alan Bonsell
January 3, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 5

[1] Q: How did he become your counsel in this matter?
[2] A: How did he become our counsel in this matter? He became
[3] our counsel when we voted — the full Board voted to
[4] authorize the use of his group as counsel.
[5] Q: Prior to that — when was that?
[6] A: Within — what is the date? I'm not exactly sure of the
[7] exact date. It was within the last — I guess in the
[8] last 30 days, 60 days.
[9] Q: Prior to that time, did Mr. Thompson or his law firm
[10] represent the School District?
[11] A: Prior to that time? No.
[12] Q: Did the School District have any attorney/client
[13] relationship with Mr. Thompson prior to —
[14] MR. THOMPSON: Objection. Calls for legal
[15] conclusion.
[16] BY MR. ROTHSCHILD:
[17] Q: — prior to that time? Did you understand the School
[18] District or the School Board to have an attorney/client
[19] relationship with Mr. Thompson or his law firm prior to
[20] the vote?
[21] MR. THOMPSON: Same objection.
[22] BY MR. ROTHSCHILD:
[23] Q: You may answer.
[24] A: Repeat it again.
[25] Q: Did you understand the School District or School Board

Page 6

[1] to have an attorney/client relationship with
[2] Mr. Thompson or his law firm prior to the time that the
[3] Board voted to have the Thomas More Law Firm represent
[4] the District and the Board in this lawsuit?
[5] MR. THOMPSON: Same objection.
[6] A: Is that something I answer?
[7] MR. THOMPSON: Yes. Go ahead and answer it.
[8] A: Prior? Prior meaning?
[9] BY MR. ROTHSCHILD:
[10] Q: Before that vote.
[11] A: Not that I'm aware of.
[12] Q: Had you communicated with Mr. Thompson or anyone at the
[13] Thomas More Law Center prior to the vote?
[14] A: Repeat that again.
[15] Q: Did you have any communications with Mr. Thompson or his
[16] law firm prior to when the Board voted to engage his law
[17] firm to represent it?
[18] MR. THOMPSON: Prior meaning before.
[19] A: Yes.
[20] BY MR. ROTHSCHILD:
[21] Q: When did you have those communications?
[22] A: A short period before that.
[23] Q: Within a week?
[24] A: Within a week?
[25] Q: Prior to the vote.

Page 7

[1] A: Prior to the vote, probably.
[2] Q: Other than that communication, have you had any
[3] communications with Mr. Thompson or his law firm?
[4] A: I'm not sure prior. I mean if you are asking me down to
[5] specific minutes or days, I'm not sure.
[6] Q: I am trying to understand. You had the vote in
[7] December; correct? You voted to engage Mr. Thompson's
[8] law firm; correct?
[9] A: Well. That is why I said I believe that is what the
[10] date was. It was in December, beginning of December.
[11] But I am like off the top of my head, I just — it
[12] doesn't click into my head exactly what the date — the
[13] actual date of it was.
[14] Q: That is fine. If you don't remember the exact date, you
[15] can estimate or tell me the month.
[16] A: That is why I say within 30 to 60 days.
[17] Q: You had that vote?
[18] A: Yes.
[19] Q: Prior to today?
[20] A: Yes.
[21] Q: Prior to that vote, you also had communications with
[22] Mr. Thompson?
[23] A: Yes.
[24] Q: And when was that in relationship to the vote?
[25] A: Just a short period before that.

Page 8

[1] Q: Was that communication a short period before the vote
[2] the only time you had spoken to Mr. Thompson or his law
[3] firm?
[4] A: Basically, yes.
[5] Q: When you say basically, is there —
[6] A: I'm not exactly sure. I mean I have only discussed this
[7] with him for a short period of time before we voted to
[8] have him on.
[9] Q: Prior to that, you never talked to the man?
[10] A: No.
[11] Q: Or anyone else at his law firm?
[12] A: Not that I recall, no.
[13] Q: Do you know whether any other members of the Board had
[14] communicated to Mr. Thompson or his law firm prior to
[15] the vote — or let me — prior to November, 2004?
[16] A: I was told that, yes.
[17] Q: What were you told?
[18] A: That Bill Buckingham had communicated with him.
[19] Q: How did you find that out?
[20] A: How did I find that out? He mentioned something at a
[21] Board meeting.
[22] Q: Have you ever had your deposition taken before?
[23] A: No.
[24] Q: Have you ever testified at a trial?
[25] A: At a trial? I don't believe. Well, not like this, no.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Alan Bonsel
January 3, 2005

---

Page 9

[1]  Q: Have you testified in any kind of proceeding where you
[2] were asked to testify under oath?
[3]  A: Yes.
[4]  Q: What was that?
[5]  A: At Magistrate hearings.
[6]  Q: What were the circumstances that you testified at
[7] Magistrate hearings?
[8]  A: Rental, landlord/tenant.
[9]  Q: During the course of this deposition, I am going to ask
[10] you questions as I have already started doing, and you
[11] are going to give me answers. And Ms. Fox, the court
[12] reporter, will record our questions and answers.
[13]  In order to make that as easy as possible for her
[14] and to have a clear record, one thing I am going to try
[15] to do is speak more slowly. I would also ask that you
[16] wait until my questions are finished before you answer.
[17] And I will try to do the same for you. I will wait
[18] until your answers are done before I ask my next
[19] question.
[20]  A: Before we go on to that, can I take a quick second? I
[21] wanted to ask my attorney something, just quickly if I
[22] could.
[23]  MR. THOMPSON: Sure.
[24]  (The witness and his attorney confer outside the
[25] conference room.)

Page 10

[1]  A: Before we go on, I just wanted to make a correction, but
[2] just an addition. You asked about meeting with
[3] Mr. Thompson. We did meet with Mr. Thompson before the
[4] meeting that we voted on his firm and talked to him in
[5] executive session.
[6]  BY MR. ROTHSCHILD:
[7]  Q: Okay. Thank you. Just continuing my general deposition
[8] instructions, when you answer, I need you to answer
[9] audibly and in words. The kind of gestures or
[10] utterances we make that are not words that we would
[11] understand in normal conversation may not come out in
[12] the clear record in the transcript. As you have been,
[13] just please continue to use words in response to my
[14] questions.
[15]  A: Okay.
[16]  Q: As you have just done, you are always entitled to take a
[17] break if you need to talk to your attorney or otherwise
[18] take a rest from the process. Let me know, and we will
[19] do that.
[20]  Did you do anything to prepare for the deposition?
[21]  A: Prepare as far as?
[22]  Q: Did you do anything to get ready?
[23]  A: I just read over these, the Complaints and responses.
[24]  (Deposition Exhibits P-1 and P-2 were introduced.)
[25]

Page 11

[1]  BY MR. ROTHSCHILD:
[2]  Q: I am just going to go ahead and give you Plaintiff
[3] Exhibit 1, which is the complaint filed by the
[4] Plaintiffs and Plaintiff Exhibit 2, or P-2, which is the
[5] Answer that was provided to us by your counsel today.
[6]  Is that what you are referring to when you are
[7] talking about the Complaint and the response?
[8]  A: I believe so.
[9]  Q: When was the first time that you read the Answer?
[10]  A: The first time I read the Answer? Read this particular
[11] paper?
[12]  Q: Yes.
[13]  A: Yesterday.
[14]  Q: Had you read earlier drafts of the document before
[15] yesterday?
[16]  A: No.
[17]  Q: Did you review the entire Answer?
[18]  A: I have looked — I pretty much went over the entire
[19] document, yes.
[20]  Q: Were there any statements made in that document that you
[21] believe were incorrect?
[22]  A: No.
[23]  Q: Other than reading the Complaint and the Answer, what
[24] else did you do to prepare for the deposition?
[25]  A: What else did I prepare? I looked through the Of Pandas

Page 12

[1] and People book again. And that is basically what I
[2] did. Looking through, I mean if there were any papers
[3] that have been here that accumulated from Board meetings
[4] and things like that. Other than that, that is pretty
[5] much it.
[6]  Q: Did you meet with counsel?
[7]  A: Yes.
[8]  Q: When did you meet with counsel?
[9]  A: Last evening.
[10]  Q: How long did you meet with counsel?
[11]  A: A few hours.
[12]  Q: What attorneys were present?
[13]  A: Mr. Thompson and Mr. Gillen.
[14]  Q: Was anybody else present?
[15]  A: Any other —
[16]  Q: Anybody else, period, present at that session?
[17]  A: Yes.
[18]  Q: Who?
[19]  A: Dr. Nilsen, Sheila Harkins, Bill Buckingham, me of
[20] course, and Mike Baksa.
[21]  Q: You referred to the book Pandas, and you said you had
[22] looked at it again?
[23]  A: Just scanned it.
[24]  Q: When was the first time that you — when did you first
[25] become aware of the book Of Pandas And People?

---

Alan Bonsell
January 3, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

**Page 13**

[1]  A: A few months ago.

[2]  Q: Can you —

[3]  A: I don't know the exact date.

[4]  Q: Was it in the summer?

[5]  A: I'm not sure.

[6]  Q: Are you aware that 60 copies of this book were donated

[7] to the School District?

[8]  A: Yes.

[9]  Q: Who donated those books to the School District?

[10]  A: I don't know.

[11]  Q: You don't know?

[12]  A: No, I don't. The question again?

[13]  Q: Who donated those books?

[14]  A: Who donated the books? They wanted to remain anonymous.

[15]  Q: Do you know who donated them?

[16]  A: Do I know the people that donated them?

[17]  Q: Yes.

[18]  A: I don't know — I don't know all the people that donated

[19] them, no.

[20]  Q: Do you know any of people who donated them?

[21]  A: One.

[22]  Q: Who was that?

[23]  A: Donald Bonsell.

[24]  Q: Who is that?

[25]  A: He is my father.

---

**Page 14**

[1]  Q: Do you know the names of anybody else who donated these

[2] books?

[3]  A: No.

[4]  Q: How did you become aware that these individuals,

[5] including your father, intended to donate the books?

[6]  A: Repeat that again.

[7]  Q: How did you become aware that your father, as well as

[8] other individuals, intended to donate the Pandas books

[9] to the District?

[10]  A: I believe the offer was made after there was complaints

[11] of using School District money.

[12]  Q: Using School District money for what?

[13]  A: To buy the books. I believe —

[14]  Q: Who was the offer made to?

[15]  A: I'm not sure.

[16]  Q: When was the first time you became aware of the offer to

[17] donate the books?

[18]  A: After the complaint. The complaint from I believe it

[19] was from Barrie Callahan.

[20]  Q: How did you become aware of the offer?

[21]  A: I'm not sure of the exact way I became aware of it.

[22]  Q: Did your father say anything to you?

[23]  MR. THOMPSON: About what? Objection, vague.

[24]  BY MR. ROTHSCHILD:

[25]  Q: Did your father say anything to you about his intention

---

**Page 15**

[1] to donate books or his offer to donate books to the

[2] School District?

[3]  A: I am sure there was something said.

[4]  Q: This morning I took the deposition of School

[5] Superintendent Nilsen. He testified that you

[6] communicated to him the fact of this offer to donate the

[7] Pandas book. Is that accurate?

[8]  A: That I was going to donate the books?

[9]  Q: That you communicated to Mr. Nilsen that the offer was

[10] being made.

[11]  A: That is what I am saying. I don't remember exactly how

[12] it came about. That's what I am saying.

[13]  Q: Did you communicate to Mr. Nilsen that an offer was

[14] being made to donate Pandas to the District?

[15]  A: I'm not sure.

[16]  Q: Do you know where the Pandas books were purchased from?

[17]  A: No. I mean no.

[18]  Q: Did you contribute any money to the purchase of the

[19] Pandas books that were donated to the School District?

[20]  A: No.

[21]  Q: Did you suggest to your father that he donate the books?

[22]  A: No.

[23]  Q: Did you request that he donate the books?

[24]  A: No.

[25]  Q: Was the first time you heard anything about a donation

---

**Page**

[1] when your father told you he intended to do it?

[2]  A: Repeat that again.

[3]  Q: Was the first time you became aware of any possible

[4] donation when your father told you he intended to do it?

[5]  A: Well, he wasn't — I mean as far as I know, he wasn't

[6] the only person.

[7]  Q: You don't know who the other people are?

[8]  A: I don't know who the other people are.

[9]  Q: You have never spoken to anybody else who was involved

[10] with the donation?

[11]  A: I don't know the other people.

[12]  Q: The only person you could have spoken to about the books

[13] was your father; correct?

[14]  A: Yes. As far as donating the books, I guess they offered

[15] to pay for the books. And they got the books and gave

[16] them to the School District.

[17]  Q: They offered to whom? How was the offer communicated?

[18]  A: That is what I am saying. I am trying to think about

[19] exactly how it was done. I don't remember exactly how

[20] it was said or done.

[21]  Q: Prior to the offer to donate the books, had you heard of

[22] the book Of Pandas And People?

[23]  A: Prior to the offer to donate the books, at the Board

[24] meeting, I heard of the book.

[25]  Q: Prior to the time that the offer was made?

---

Min-U-Script®   Filins & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Alan Bonsell
January 3, 2005

Page 17

[1]   A: Yes.

[2]   (Deposition Exhibit P-3 was introduced.)

[3]   BY MR. ROTHSCHILD:

[4]   Q: Mr. Bonsell, I am going to show you a document that we

[5]   have marked as P-3.

[6]   MR. ROTHSCHILD: You should have a copy there,

[7]   Dick.

[8]   BY MR. ROTHSCHILD:

[9]   Q: Do you recognize that document?

[10]   A: Yes.

[11]   Q: What is that?

[12]   A: That is the Biology Curriculum Press Release from the

[13]   School District.

[14]   Q: Going down about two-thirds of the way down the page,

[15]   the first portion of italicized text which starts

[16]   students will be made aware of gaps and problems, do you

[17]   see that?

[18]   A: Yes.

[19]   Q: Do you recognize that to be the language that was added

[20]   to the biology curriculum as a result of the Board's

[21]   October 18th resolution?

[22]   A: Yes.

[23]   Q: Who prepared the text of this resolution?

[24]   A: Who prepared the text of the resolution?

[25]   Q: Who wrote it?

Page 18

[1]   A: Put together by — what would we call it — the

[2]   curriculum subcommittee along with Mr. Baksa.

[3]   Q: Can we use the term Board of Curriculum Committee to

[4]   refer to —

[5]   A: It is a subcommittee.

[6]   Q: It is a subcommittee. We will call it the Board

[7]   subcommittee. This is a subcommittee dedicated to the

[8]   subject of curriculum?

[9]   A: Is a subcommittee of the whole.

[10]   Q: Subcommittee of the whole Board?

[11]   A: Yes. It is a subcommittee. It is not the whole Board.

[12]   It is a sub, a small — a few Board members formed the

[13]   subcommittee.

[14]   Q: That subcommittee's responsibility is curriculum?

[15]   A: That is what they — what do you mean responsibility?

[16]   I am not sure what you mean by that.

[17]   Q: The group that you just referred to, what do you call

[18]   it? What is the name you give them?

[19]   A: The curriculum subcommittee.

[20]   Q: What are the responsibilities of the curriculum

[21]   subcommittee?

[22]   A: They look over curriculum, books, that type of thing.

[23]   Q: Were you a member of the curriculum subcommittee at the

[24]   time this resolution was drafted?

[25]   A: I wasn't a member. I was President of the Board.

Page 19

[1]   Q: In your role as President of the Board, did you have any

[2]   role or function with the subcommittee?

[3]   A: Well, the President de facto sort of is a member of all

[4]   of the subcommittees.

[5]   Q: Was it your practice as President of the Board to attend

[6]   the curriculum subcommittee meetings?

[7]   A: Sometimes.

[8]   Q: Did you have any — did you participate in drafting this

[9]   resolution?

[10]   A: Yes.

[11]   Q: What other members — individual members of the Board

[12]   participated in drafting this resolution?

[13]   A: There was Bill Buckingham, Sheila Harkins, Mike Baksa,

[14]   myself. And let me think if there was anybody else.

[15]   When you say drafting or input, are allowed input into

[16]   it? I am trying to get your full meaning of the

[17]   question.

[18]   Q: Who came up with the words that are in this resolution?

[19]   A: That probably would be it.

[20]   Q: Did anybody else who — did any other people who are

[21]   perhaps not members of the Board or employes of the

[22]   School District have any role in preparing this

[23]   resolution?

[24]   A: We go through a whole — did anybody else have a role in

[25]   this?

Page 20

[1]   Q: Participate in any way.

[2]   A: Other Board members can participate. Teachers,

[3]   administrators participate.

[4]   Q: Anybody from outside of the District participate,

[5]   outside organizations?

[6]   A: Yes. On this one, there was — I am not sure of the

[7]   exact terminology of it. I think it is somewhere in

[8]   here I read it. It was like an outside group that also

[9]   was given this statement to look at.

[10]   Q: What is the name of that outside group?

[11]   A: It is like the — I am trying to think. I am not sure

[12]   of the exact name of it. It is a group that looks at

[13]   all these — it is a group —

[14]   Q: Was it the Discovery Institute?

[15]   A: No, no, no. Here in the area. Here like the community,

[16]   you know.

[17]   Q: Is it like the citizen's curriculum committee?

[18]   A: Something like that, yes.

[19]   Q: Just to make sure we are on the same page, was there any

[20]   participation by any outside lawyers or outside group

[21]   like the Discovery Institute or anything fitting that

[22]   description?

[23]   A: No, no. Not for that. I mean we had our attorneys look

[24]   at all of that.

[25]   Q: At that time, your attorneys were Stock and Leader?

Alan Bonsell
January 3, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 21

[1] A: Yes.

[2] Q: But nobody from outside the District was involved in

[3] creating the language that's in this resolution?

[4] A: No.

[5] Q: Mr. Bonsell, in this resolution, the term Intelligent

[6] Design is used. What do you understand Intelligent

[7] Design to mean as used in this resolution?

[8] A: Intelligent Design is a scientific theory.

[9] Q: Do you know anything — do you understand Intelligent

[10] Design to mean anything more than it is a scientific

[11] theory as used in this resolution?

[12] A: I have done some reading on it. And I have seen that it

[13] is a scientific theory that differs from Darwin's

[14] Theory.

[15] Q: How does it differ from Darwin's Theory?

[16] A: How does it differ? From what I have read and from the

[17] scientists that I have read about, basically Darwin — I

[18] mean this is very generalized. But Darwin is everything

[19] basically happened by chance. Where Intelligent Design

[20] says that it didn't happen that way. It was the

[21] opposite theory.

[22] Q: How did it happen if it didn't happen by chance?

[23] A: I can't answer that.

[24] Q: The reading you did, when did you do this reading?

[25] A: I read different things over a number of years.

Page 22

[1] Q: About Intelligent Design?

[2] A: About Intelligent Design, about Darwinism. I like to

[3] read on all different subjects.

[4] Q: What materials did you read to educate yourself about

[5] Intelligent Design prior to the time this resolution was

[6] passed?

[7] A: Just various books on the subject. I don't know the

[8] names off the top of my head. But what stuck with me,

[9] I am not worried so much about the book titles is what

[10] information that I get from them.

[11]    With the scientists, a lot of world renowned

[12] scientists believe in this theory.

[13] Q: Are you aware that the Pandas book states that life

[14] itself owes its origin to a master intellect?

[15] A: I didn't read that.

[16] Q: Were you aware that that is part of what Intelligent

[17] Design asserts?

[18] A: Who said that Intelligent Design says that?

[19] Q: It is in the book you have accepted.

[20] MR. THOMPSON: Would you show him the page?

[21] MR. ROTHSCHILD: Sure.

[22]       BY MR. ROTHSCHILD:

[23] Q: On page 58, it is yellow tabbed.

[24] A: Right here?

[25] Q: Yes.

Page 23

[1] A: All right.

[2] Q: Prior to reading that text, was it your understanding

[3] that part of Intelligent Design was the assertion that

[4] there was a master intellect?

[5] A: Not necessarily.

[6] Q: Do you understand Intelligent Design to involve the

[7] actions of an intelligent designer?

[8] A: Not necessarily.

[9] Q: How does Intelligent Design occur without the actions of

[10] an intelligent designer?

[11] A: You are asking me to speculate on science. This says

[12] the parallel strongly suggests. It doesn't say that it

[13] does.

[14] Q: What do you understand the term intelligent means in the

[15] statement Intelligent Design?

[16] A: Intelligent versus chance. I mean it is life is much

[17] too complex to have happened strictly by chance.

[18] Q: So what is the alternative? What is your understanding

[19] of what the alternative is?

[20] A: That it is complex and somehow was designed.

[21] Q: By who?

[22] A: I can't answer who or what or by that. I don't know.

[23] Q: Do you understand the reference to an intelligent

[24] designer to be a reference to God?

[25] MR. THOMPSON: Objection. That calls for a

Page

[1] conclusion. And I am not sure where — are you getting

[2] it from that book?

[3] MR. ROTHSCHILD: Getting what from that book?

[4] MR. THOMPSON: That question.

[5] MR. ROTHSCHILD: No. I am asking him is it his

[6] understanding.

[7] MR. THOMPSON: He has already answered the

[8] question.

[9] MR. ROTHSCHILD: No, he hasn't.

[10] MR. THOMPSON: Asked and answered.

[11]       BY MR. ROTHSCHILD:

[12] Q: You can answer the question.

[13] A: Repeat the question.

[14] Q: Do you understand the intelligent designer to be God?

[15] A: Not necessarily.

[16] Q: What are the alternatives? If the intelligent designer

[17] was not God, what are the alternatives?

[18] A: Something that science hasn't found yet. That is why it

[19] is a theory.

[20] Q: What was the Board's purpose in passing the resolution

[21] amending the biology curriculum?

[22] A: To make a level playing field when it comes to

[23] scientific discussion.

[24] Q: What do you mean by a level playing field?

[25] A: Well, it is because these are only theories. We want

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Alan Bonse
January 3, 200

**Page 25**

[1] our children to critically think. Science is, you know,
[2] the search for truth. So why wouldn't you want to —
[3] and the thing is too that we are not requiring the
[4] teaching of any of this anyway.
[5]     Q: Why do you say you are not requiring the teaching?
[6]     A: That is exactly what it says in our release. We are not
[7] teaching it.
[8]     Q: What do you understand the school teachers will be doing
[9] in class as a result of the change in the biology
[10] curriculum?
[11]     A: They will be doing exactly what it says in here. They
[12] will be reading a statement to them.
[13]     Q: And in your view, is reading that statement teaching or
[14] not teaching?
[15]     A: No. It is not teaching.
[16]     Q: When the students hear that statement, will they be
[17] learning?
[18]     A: They will be being made aware of.
[19]     Q: Will they be learning, Mr. Bonsell?
[20]     MR. THOMPSON: He has answered the question.
[21] Asked and answered.
[22]                 BY MR. ROTHSCHILD:
[23]     Q: You may answer the question.
[24]     A: They will be made aware of.
[25]     Q: Will they be learning or not learning, Mr. Bonsell?

**Page 26**

[1]     MR. THOMPSON: Objection, asked and answered. You
[2] are getting argumentative. You have asked the same
[3] question over and over again.
[4]     MR. ROTHSCHILD: I have not. I am asking for an
[5] answer to my question.
[6]     MR. THOMPSON: He just said he would be aware of
[7] is what he means it is, and it is not teaching.
[8]                 BY MR. ROTHSCHILD:
[9]     Q: In your view, Mr. Bonsell, as a member of the School
[10] Board, when the students hear the statement that you are
[11] requiring teachers to read, will be learning or not
[12] learning?
[13]     A: In what context do you mean?
[14]     Q: Mr. Bonsell, did you go to school?
[15]     A: Did I go to school?
[16]     Q: Yes.
[17]     A: Yes.
[18]     Q: Is that a yes?
[19]     A: Yes.
[20]     Q: Did you learn in school?
[21]     A: Yes.
[22]     Q: Do you understand what the word learn means?
[23]     A: To be taught, to teach. That is why I am saying. I
[24] need to know what your definition of that is because I
[25] am not going to get caught in these —

**Page 2**

[1]     Q: I am going to ask you the same question. If you are not
[2] able to answer, please tell me.
[3]     When the students hear the statement that you are
[4] requiring school teachers to read, will they be
[5] learning?
[6]     MR. THOMPSON: Asked and answered. Objection.
[7] Asked and answered several times now.
[8]     A: So what do we do?
[9]     MR. ROTHSCHILD: He has objected.
[10]     MR. THOMPSON: I have objected. He has answered
[11] the question. He said it is not learning. It is making
[12] aware of.
[13]     You don't like his answer, but you can't keep on
[14] asking the same question.
[15]     MR. ROTHSCHILD: He didn't say it was not
[16] learning.
[17]     MR. THOMPSON: It is not learning.
[18]                 BY MR. ROTHSCHILD:
[19]     Q: Is that your answer?
[20]     A: If learning is teaching, no.
[21]     Q: I want a yes or no. Are they learning or not learning?
[22]     A: Like what I just said, if your definition of learning is
[23] teaching, then no.
[24]     Q: Nobody's definition of learning is teaching. I am
[25] asking what the students are doing. Are they learning

**Page 2**

[1] when they hear that statement?
[2]     MR. THOMPSON: Objection, asked and answered. You
[3] are now being argumentative.
[4]                 BY MR. ROTHSCHILD:
[5]     Q: Unless your attorney instructs you not to answer, you
[6] are required to answer my question.
[7]     MR. THOMPSON: I instruct him not to answer it.
[8] You have asked him several times. You are being
[9] argumentative. The record reflects the number of times
[10] you have asked him the same question.
[11]     MR. ROTHSCHILD: You are instructing him not to
[12] answer?
[13]     MR. THOMPSON: I am instructing him not to answer.
[14]     MR. ROTHSCHILD: On what basis?
[15]     MR. THOMPSON: On the basis you are now merely
[16] annoying, harassing and being argumentative with the
[17] client. He has answered your question several times.
[18] You don't like the answer so you keep on asking him the
[19] same question.
[20]     MR. ROTHSCHILD: We will take it up with the
[21] Court. I think that is an improper instruction not to
[22] answer. There is no privilege.
[23]     MR. THOMPSON: Your questions are improper. You
[24] are engaged in argumentative questions with the witness.
[25] I think I have a responsibility not to allow this to

**Alan Bonsell**
**January 3, 2005**

Page 29

[1] turn into that kind of a proceeding.
[2] MR. ROTHSCHILD: Very well.
[3] BY MR. ROTHSCHILD:
[4] Q: You stated that the Board's purpose was to make a level
[5] playing field. Did it have any other purpose besides
[6] making a level playing field?
[7] A: Which I said about having critical thinking in our
[8] schools, and to take up this — this is obviously why we
[9] are here, because it is — what is the word I am looking
[10] for?
[11] It's something — well, another reason, too, is —
[12] let me collect my thoughts here. We're responsible to
[13] work with the community to teach our children. My
[14] daughter is going to be in ninth grade next year, and I
[15] want to be able to work with the teachers, with the
[16] community, with the Board, with everyone to have our
[17] kids be able to take up these issues and also to be able
[18] to, like I said again, to critically think about them,
[19] to search for the truth.
[20] Q: Prior to the Board passing the resolution, in your view,
[21] was there not a level playing field and were students
[22] not allowed to critically think about scientific issues?
[23] A: When there's theories and they are only teaching one
[24] theory or showing one theory — but, again, we are not
[25] teaching these other theories, anyway. But at least by

Page 30

[1] reading this, the children know that there are other
[2] theories out there, scientific theories.
[3] Q: When you use the term scientific theory, what do you
[4] mean?
[5] A: As a theory or — which?
[6] Q: You used the term scientific theory. I want to
[7] understand what you mean by that.
[8] A: Well, Darwin's scientific theory, they have what they
[9] believe is true, and they have evidence for that or what
[10] they feel is evidence that points towards a theory.
[11] It's the same way with any theory. It is
[12] somebody's basically opinion and what scientific
[13] evidence that they have that points towards their
[14] theory, the theory being correct or not. There again,
[15] but that is a theory.
[16] Q: What do you base your opinion on that Intelligent Design
[17] is also a scientific theory — or that Intelligent
[18] Design is a scientific theory?
[19] A: What do I base it on? Well, like I said, the people I
[20] read, some of the scientists such as Albert Einstein
[21] believed in Intelligent Design. You have statistical
[22] science, probability science that points to Intelligent
[23] Design being the case and not by chance. You can look
[24] at all different — goodness. I don't know how much you
[25] want.

Page 31

[1] Q: I guess I want to be more precise in my question. What
[2] makes you conclude that it is a scientific theory as
[3] opposed to something that scientists talk about?
[4] A: Scientists talk about — you are talking about
[5] Intelligent Design now?
[6] Q: Yes.
[7] A: Scientists talk about Intelligent Design all the time.
[8] I don't know as a scientific theory.
[9] Q: Are you aware of any specific scientist who has said
[10] Intelligent Design is a scientific theory?
[11] A: Well, Albert Einstein. I believe I just read an article
[12] — I don't have the scientist's name, but I just read an
[13] article from Rick Santorum, United States Senator, that
[14] there was a paper that we should look into all these
[15] different things. There were three hundred scientists
[16] on this paper.
[17] Q: Do you know whether those three hundred scientists have
[18] said that Intelligent Design is a scientific theory?
[19] A: No.
[20] Q: If you were to find out that there were no scientists
[21] that consider Intelligent Design a scientific theory,
[22] would that cause you to reconsider whether Intelligent
[23] Design should be presented alongside evolution a theory?
[24] A: If there are no scientists? That isn't the case.
[25] Q: If that were the case, would it cause you to reconsider

Page

[1] whether —
[2] A: I would look at all of the information.
[3] Q: And if after reviewing all of the information you came
[4] to the realization that in fact nobody is presenting
[5] Intelligent Design as a scientific theory, would that
[6] cause you to reconsider presenting it as such to the
[7] students at Dover?
[8] MR. THOMPSON: Objection. Assuming facts not in
[9] evidence. There is no indication that that is the case.
[10] A: Again, we are not teaching it.
[11] BY MR. ROTHSCHILD:
[12] Q: I think I used the word presenting it. Would it cause
[13] you to reconsider presenting Intelligent Design as a
[14] scientific theory?
[15] A: I would look at all of the information as I do with
[16] everything.
[17] Q: Is there any information that you could learn about
[18] Intelligent Design that would cause you to reconsider
[19] whether it should be presented alongside evolution as a
[20] scientific theory?
[21] A: Again, the question?
[22] Q: Is there any information that you could learn that would
[23] cause you to reconsider presenting Intelligent Design as
[24] a scientific theory?
[25] A: There's information everyday being brought forward. I

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Alan Bons[...]
January 3, 20[...]

---

**Page 33**

[1] would look at all of the information.

[2]     Q: Is it your opinion that prior to passing this resolution

[3] there was not a level playing field in the Dover School

[4] District?

[5]     A: Not when you are teaching one theory as fact.

[6]     Q: What leads you to conclude that one theory was being

[7] taught as fact?

[8]     A: If there is only one theory presented. But even —

[9]     Q: Is it your testimony if only one theory is being

[10] presented, then it is being presented as fact? You

[11] didn't finish issue your sentence.

[12]     A: I just wanted to say again, going back to this again

[13] because your questioning is — we aren't teaching

[14] Intelligent Design.

[15]     Q: Let's put that subject aside. You said that the purpose

[16] of the resolution — one of the purposes was to create a

[17] level playing field.

[18]     I am asking the question: Before this resolution

[19] was passed, was there not a level playing field in the

[20] Dover School District?

[21]     A: I don't believe so.

[22]     Q: Why is that?

[23]     A: Because, again, I want the kids to critically be able to

[24] think about these things and learn. That is what

[25] science is, a search for truth.

---

**Page 34**

[1]     Q: Prior to this resolution being passed, was there any

[2] prohibition against children critically thinking in

[3] science class?

[4]     A: Was there any prohibition?

[5]     Q: Was there anything interfering with them critically

[6] thinking?

[7]     A: I don't know.

[8]     Q: So why was this resolution necessary if there was no

[9] impediment to children critically thinking before it was

[10] passed?

[11]     A: I don't know. To the prohibition, I don't know. I'm

[12] trying to understand your questions.

[13]     Q: You said that one of the purposes in passing this

[14] resolution was to make a level playing field. And when

[15] I asked you whether there was a level playing field, you

[16] then turned to the issue of whether children were

[17] allowed to critically think.

[18]     I am asking you was there any anything stopping

[19] them from critically thinking before that resolution was

[20] passed?

[21]     A: When I say critically think is to — there's other

[22] theories except one theory out there. I'm not sure I

[23] understand your question to answer it properly I guess.

[24]     Q: Okay.

[25]     A: I am trying to.

---

**Page [...]**

[1]     Q: Where do you live, Mr. Bonsell?

[2]     A: My address?

[3]     Q: Do you live in Dover Township?

[4]     A: Yes.

[5]     Q: How long have you lived in Dover?

[6]     A: Oh, my goodness! I have lived in Dover 25 years.

[7]     Q: What do you do for a living?

[8]     A: I am self-employed.

[9]     Q: What do you do?

[10]     A: I have an auto repair shop.

[11]     Q: Have you had any other careers besides owning the auto

[12] repair shop during your adulthood?

[13]     A: Careers?

[14]     Q: Job.

[15]     A: I was a real estate agent right out of college.

[16]     Q: Anything else?

[17]     A: Not really, no.

[18]     Q: Did you graduate from college?

[19]     A: Yes.

[20]     Q: What school?

[21]     A: I graduated from York College.

[22]     Q: What was your major?

[23]     A: Business.

[24]     Q: Did you take any science classes at York College?

[25]     A: I'm sure.

---

**Page [...]**

[1]     Q: Do you remember what they were?

[2]     A: Not off the top of my head, no.

[3]     Q: What year did you graduate?

[4]     A: '82.

[5]     Q: Do you read — regularly read any newspapers?

[6]     A: Yes.

[7]     Q: What newspapers do you read?

[8]     A: The Dispatch.

[9]     Q: Anything else?

[10]     A: Occasionally, The Daily Record.

[11]     Q: Mr. Bonsell, you are aware there has been quite a bit of

[12] reporting about the issue of the biology curriculum in

[13] both The York Dispatch and York Daily Record?

[14]     A: Yes.

[15]     Q: Have you made a point of reading the articles about the

[16] subject?

[17]     A: I have read quite a few of them.

[18]     Q: Have you ever contacted any of the newspapers to advise

[19] them that they had misquoted you or misrepresented

[20] statements you had made?

[21]     A: Oh, yeah.

[22]     Q: When have you done that?

[23]     A: Numerous times I have talked to reporters and told them

[24] that what they have written is not writing it correctly.

[25] What was said wasn't said, you know. Things reported

---

Alan Bonsell
January 3, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 37

[1] weren't even discussed. So yeah.

[2]    Q: Have you asked any newspaper to issue a correction or

[3] retraction?

[4]    A: I have said things to the reporters, but they have never

[5] done a retraction, no.

[6]    Q: Have you specifically asked them to do a retraction?

[7]    A: I know I talked about the one telling the — hold on a

[8] second. I talked to the one reporter from The Dispatch

[9] about a report that she had written — or I should say

[10] the newspaper wrote that was not factual. And she said

[11] yes, she tried to get a retraction, but they wouldn't

[12] retract it.

[13]    Q: Do you remember what the subject matter of that article

[14] was?

[15]    A: It had to do with our high school building.

[16]    Q: Not the biology curriculum?

[17]    A: Not in this particular case, no.

[18]    Q: Let's limit the subject matter to the biology

[19] curriculum.

[20]    A: Okay, the biology curriculum.

[21]    Q: Have you ever asked any newspaper to issue a correction

[22] or retraction for anything they reported about the

[23] biology curriculum?

[24]    A: I have asked them to report it correctly. I have asked

[25] them to quit reporting the wrong things all the time and

Page 38

[1] given them examples. So if that is what you mean, I

[2] have done that numerous times.

[3]    Q: Have you ever asked any paper to actually issue a

[4] retraction or a correction?

[5]    A: The paper itself I have asked them to do it. I have

[6] asked the newspaper reporters.

[7]    Q: I am including reporters as part of the paper. Have you

[8] actually said can you please correct what you said or

[9] retract what you said?

[10]    A: I said please correct what you are saying and put in

[11] what is really being said and done at the school.

[12]    Q: Have you ever told any of the reporters over at the

[13] newspaper itself that you personally were being

[14] misquoted or that statements you made were being

[15] misrepresented?

[16]    A: Statements that I — I would have to say yes.

[17]    Q: Can you remember any specific statements?

[18]    A: It is just like I said, when all these newsletters and

[19] things that you are saying about, things they reported

[20] about or we have said or whatever and inserted words

[21] that weren't — I mean have different meanings. Things

[22] are taken out of context, only reporting part.

[23]       You have to say two sentences, and they only

[24] report one, you can make what was said totally

[25] different. Different things along those lines.

Page 39

[1]    Q: But have you ever asked the reporter please correct

[2] something you reported I said because I didn't say that,

[3] or I didn't say it that way?

[4]    A: I have asked reporters — I mean I have asked reporters

[5] to change what they are reporting because what we voted

[6] on, what we did, what we are talking about is not what

[7] they are reporting. So I am sure I would be in that of

[8] what is being said.

[9]    Q: Did you ever write to any reporter or the newspaper and

[10] ask and state in writing that they had reported

[11] something incorrectly?

[12]    A: I went right straight to the reporter that has his name

[13] on the article.

[14]    Q: That is fine. But I am asking did you do it in writing?

[15]    A: Did I do it in writing?

[16]    Q: Yes.

[17]    A: In this particular subject?

[18]    Q: On the subject of the biology curriculum.

[19]    A: I don't recall doing it in writing.

[20]    (Deposition Exhibit P-4 was introduced.)

[21]         BY MR. ROTHSCHILD:

[22]    Q: Mr. Bonsell, I am going to give you a collection of

[23] documents we have marked as P-4. They are a collection

[24] of articles I believe all from The York Dispatch and The

[25] York Daily Record. I am not representing that they are

Page ..

[1] every single item that was written on the subject, but

[2] we have tried to be comprehensive.

[3]    MR. ROTHSCHILD: Dick, you should have a copy.

[4]    MR. THOMPSON: I think I have seen those. I will

[5] just look over his shoulder.

[6]         BY MR. ROTHSCHILD:

[7]    Q: I am going to ask you to look at some of the articles in

[8] this collection.

[9]    A: Okay.

[10]    Q: If you could turn a few pages to the June 9th, 2004 York

[11] Daily Record Article.

[12]    A: (Witness complies.)

[13]    Q: Written by Maldonado.

[14]    A: Is it June 9th?

[15]    Q: Is Mr. Maldonado one of the reporters you have spoken to

[16] about reporting things incorrectly?

[17]    A: Yes.

[18]    Q: This article refers to a Monday night Board meeting — a

[19] Monday night Board meeting before June 9th, 2004. Do

[20] you see that in the first paragraph?

[21]    A: High school Monday night Board meeting, yes, okay.

[22]    Q: At the bottom of the page, there is a statement

[23] attributed to you. It says Board President Alan Bonsell

[24] disagreed. And it is disagreeing with something that a

[25] student said saying there were only two theories

Min-U-Script®    Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Alan Bonse
January 3, 20(

---

**Page 41**

[1] Creationism and evolution that could possibly be taught.

[2] He said as long as both were taught as theories, there

[3] would be no problems for the District.

[4]   A: I didn't say that. What is your question? I am sorry.

[5]   Q: Were you aware that this statement was reported in the

[6] newspaper?

[7]   A: I'm not sure in this particular case.

[8]   Q: Did you say at that meeting that there were only two

[9] theories that could possibly be taught, Creationism and

[10] evolution?

[11]   A: I didn't say Creationism. I never have.

[12]   Q: It says that your — is it your testimony that you have

[13] never talked about Creationism in a School Board

[14] meeting?

[15]   A: Not in this context. I did not say that, no.

[16]   Q: Have you ever raised —

[17]   A: Not that I recall.

[18]   Q: Let me finish my question.

[19]   A: I am sorry. I thought you were repeating the question

[20] you just said.

[21]   Q: Have you ever discussed the issue of Creationism at a

[22] public Board meeting?

[23]   A: No.

[24]   Q: Have any Board members discussed the issue of

[25] Creationism at School Board meetings, public School

---

**Page 42**

[1] Board meetings?

[2]   A: Clarify that a little bit more. What do you mean has

[3] anybody?

[4]   Q: Has anybody brought up the subject?

[5]   A: Mentioned the word?

[6]   Q: Has anybody brought up the subject of teaching

[7] Creationism in the Dover schools?

[8]   A: I don't recall.

[9]   Q: At the bottom of the page, there is a quote attributed

[10] to Mr. Buckingham — this country wasn't founded on

[11] Muslim beliefs or evolution. This country was founded

[12] on Christianity, and our students should be taught as

[13] such.

[14]   Are you aware of whether Mr. Buckingham made that

[15] statement?

[16]   A: I'm not. No, I am not aware. It was after the meeting.

[17]   Q: Turn to the next article.

[18]   A: (Witness complies.)

[19]   Q: Again, this is a reference to the Monday night Board

[20] meeting?

[21]   A: The same one?

[22]   Q: The article is the next day so I think it is a fair

[23] inference. It says Board members Alan Bonsell, Noel

[24] Wenrich and Buckingham spoke aggressively in favor of

[25] having a biology book that includes theories of creation

---

**Page 4**

[1] as part of the text.

[2]   Were you aware that that was reported?

[3]   A: I'm not sure if it was reported or not reported. You

[4] have it looks like many more articles than I have read.

[5]   Q: Did you speak aggressively — did you speak in favor of

[6] having a biology book that includes theories of

[7] creation?

[8]   A: No.

[9]   Q: Did Mr. Wenrich?

[10]   A: I don't believe he did either.

[11]   Q: Did Mr. Buckingham?

[12]   A: From what I am reading in this context, I don't — they

[13] are saying the three of us spoke aggressively. I don't

[14] recall. I'm not sure.

[15]   Q: During this time period June 10th, 2004, was the School

[16] District in the process of selecting and purchasing a

[17] new biology textbook?

[18]   A: At what time?

[19]   Q: During that time period June, 2004.

[20]   A: Yes. Over the summer, they were looking into the

[21] possibility of purchasing another textbook.

[22]   Q: Had the science faculty recommended a textbook?

[23]   A: The science faculty did recommend a textbook.

[24]   Q: Was the textbook they recommended the one that was

[25] ultimately purchased, the Miller and Levin textbook?

---

**Page 4**

[1]   A: Yes.

[2]   Q: During the process of selecting the book, did the Board

[3] or any committee of the Board ever undertake to find a

[4] different biology textbook for the school than the one

[5] that the faculty had recommended?

[6]   A: I wasn't in those meetings. I don't know if they did or

[7] they didn't.

[8]   Q: Was there any effort to find any book that included

[9] Creationism as part of the text?

[10]   A: There again, I wasn't in those meetings that would have

[11] done something like that. You are asking me to

[12] speculate. So I mean if you are asking that question,

[13] if I am speculating, I would say no.

[14]   Q: If you don't know —

[15]   A: I don't know.

[16]   Q: Just to be clear, Mr. Bonsell, if you don't know at all,

[17] that is what you should answer. If you know because

[18] somebody told you it was discussed at a meeting, then

[19] you should — then —

[20]   A: Okay.

[21]   Q: I want to know if you know that.

[22]   A: Okay.

[23]   Q: Do you know not from participating in a meeting, but

[24] from other sources that there was an effort to look for

[25] a textbook that included Creationism?

---

Alan Bonsell
January 3, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 45

[1]   A: Not that I recall. Could I just take a quick second
[2]   break? I just want to ask my attorney one other
[3]   question?
[4]   MR. THOMPSON: Sure.
[5]   (The witness and his attorney exit the conference
[6]   room to confer.)
[7]          BY MR. ROTHSCHILD:
[8]   Q: Mr. Bonsell, if you could turn to page — to the June
[9]   15th article in the York Dispatch by Heidi
[10]  Bernhard-Bubb.
[11]  A: (Witness complies.)
[12]  Q: Okay?
[13]  A: Okay.
[14]  Q: Is Ms. Bernhard-Bubb another one of these reporters who
[15]  gets stuff wrong about the biology curriculum issue?
[16]  A: Yes.
[17]  Q: At the very beginning of her article, it says nearly a
[18]  hundred Dover residents and teachers attended last
[19]  night's School Board meeting to continue debating
[20]  whether Creationism should taught alongside evolution in
[21]  the high school's biology curriculum.
[22]      Does this article accurately report that
[23]  Creationism was being debated at School Board meetings?
[24]  A: Absolutely not.
[25]  Q: There was no discussion about Creationism?

Page 46

[1]   A: No.
[2]   Q: So as we look through these articles — this
[3]   uninterrupted series of articles about June meetings
[4]   that talk about Creationism being debated at the School
[5]   Board meetings and statements made by School Board
[6]   members, including yourself, about Creationism, all of
[7]   those are just fabricated?
[8]   A: Fabricated?
[9]   Q: Yes, fabricated.
[10]  A: Fabricated? You mean she just made them all up, is that
[11]  what you mean?
[12]  Q: There's a lot of statements in here about people talking
[13]  about Creationism. I think you are suggesting to me it
[14]  never happened.
[15]  A: All this debate about Creationism, yes, that never did
[16]  happen. It was not a debate about Creationism.
[17]  Q: Was there debate about the biology book in these
[18]  meetings?
[19]  A: I believe there was a debate about biology books at
[20]  different meetings.
[21]  Q: Were there debate about the biology books in the June
[22]  meetings?
[23]  A: I believe so.
[24]  Q: What was the nature of the debate? What was being
[25]  debated?

Page 47

[1]   A: Of whether to buy this textbook or not.
[2]   Q: What were the competing positions in favor of and
[3]   against buying the textbook?
[4]   A: The thing is with all of the books, we look at to see if
[5]   they need to be bought or not. The prior science book
[6]   that was bought, biology book, was picked by the
[7]   teachers. This was before I was here. It was picked by
[8]   the teachers, and then they never used it.
[9]      And so before we go buying a lot of books, we want
[10]  to make sure that this book they are going to use. And
[11]  anybody else — any questions, the whole Board gets —
[12]  if anybody has questions about anything, they can ask
[13]  questions about it.
[14]  Q: Was the debate about this biology book just about
[15]  whether it was necessary to have a new book or was there
[16]  more to the debate?
[17]  A: I think there was more to the debate.
[18]  Q: Was the more to the debate include what the recommended
[19]  biology textbook had to say about the subject of
[20]  evolution?
[21]  A: About what it had to say? I believe one Board member
[22]  brought it up.
[23]  Q: What Board member was that?
[24]  A: Mr. Buckingham.
[25]  Q: What did Mr. Buckingham have to say about this portrayal

Page 48

[1]   of evolution in the biology textbook being recommended
[2]   by the teachers?
[3]   A: I believe if I — I don't know his precise words. They
[4]   wanted to continue looking for another book. Continue
[5]   looking I guess.
[6]   Q: What was it about the text on the subject of evolution
[7]   that caused Mr. Buckingham to want to look for a
[8]   different book?
[9]   A: I'm not sure exactly what he said.
[10]  Q: Can you remember any issues he identified about the
[11]  evolution section of the textbook?
[12]  A: Just that that was one of the things he was concerned
[13]  about.
[14]  Q: What were the nature of his concerns?
[15]  A: I'm trying — what I remember is just about the
[16]  evolutionary part of it.
[17]  Q: It was scientifically wrong?
[18]  A: I don't know. I'm not sure all what he said about it.
[19]  Q: So you can't remember anything he said about it, but you
[20]  are sure all this discussion about Creationism is just
[21]  made up?
[22]  A: I am sure about that. I mean you have to ask
[23]  Mr. Buckingham what he said.
[24]  Q: If you could go to the next page of that article, four
[25]  full paragraphs down, a statement is attributed to Mr.

Min-U-Script®   Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al. v.
Dover Area School District, et al.

Alan Bonsel
January 3, 200

Page 49

[1] Buckingham — nearly two thousand years ago, someone
[2] died on a cross for us. Shouldn't we have the courage
[3] to stand up for him?
[4] Did Mr. Buckingham make that statement?
[5] A: I'm not sure he said that. I'm not sure he said that at
[6] this meeting.
[7] Q: Do you recall him saying — making that statement at any
[8] School Board meetings? It is a pretty powerful
[9] statement to say at a School Board meeting.
[10] A: I don't think it has to do with what we are talking
[11] about, not.
[12] Q: Do you think he made that statement at a meeting?
[13] A: I'm not positive. I think he said something along those
[14] lines, but I don't believe it was — it had to do with
[15] this.
[16] Q: What do you believe it had to do with?
[17] A: There was a year ago — before this, there was another
[18] discussion on the pledge, but this was the year before.
[19] Q: You think he did make a statement along those lines
[20] regarding the pledge?
[21] A: To be honest, I'm not sure when he said it or if it —
[22] if this is exactly what he said, I'm just not sure.
[23] Q: Mr. Bonsell, do you take notes during School Board
[24] meetings?
[25] A: Do I take notes?

Page 50

[1] Q: Yes.
[2] A: I guess occasionally, I would. It's not — I don't
[3] believe — it is not a habit, no.
[4] Q: What do you do with those notes after the meeting?
[5] A: Most of the time, I throw them out.
[6] Q: Do you ever keep them?
[7] A: Do I ever keep any note that I have ever written? It is
[8] possible. But it is not something I do normally.
[9] Q: After the two thousand years ago statement, there is
[10] again another statement suggesting that you and
[11] Mr. Wenrich agreed with Mr. Buckingham that Creationism
[12] should be taught to balance evolution?
[13] A: I did not say Creationism should be taught, no. I don't
[14] believe that is what Noel said either I don't believe.
[15] Q: After that, there is a statement attributed to Mr.
[16] Buckingham that the liberal agenda was chipping away at
[17] the rights of Christians in this country.
[18] Do you know if he made that statement?
[19] A: I'm not sure if he said that or not.
[20] Q: After that, there are remarks attributed to
[21] Mr. Buckingham's wife Charlotte on the subject of
[22] Creationism.
[23] Do you remember her saying what is attributed to
[24] her in the article?
[25] A: I remember Mrs. Buckingham coming up and talking at

Page 51

[1] public comment, but I don't remember what she said.
[2] Q: What efforts did the Board make to find a different
[3] biology book than the book recommended by the teachers?
[4] A: I'm not sure. You have to ask the biology subcommittee.
[5] Q: The biology subcommittee?
[6] A: I am sorry, the curriculum subcommittee.
[7] Q: I didn't think you had that many.
[8] A: There's so many words.
[9] Q: During your tenure as President, was it your practice to
[10] attend curriculum subcommittee meetings?
[11] A: Just like I said, just occasionally.
[12] Q: Other than the public School Board meetings and
[13] curriculum committee meetings, was it your experience
[14] that individual members of the Board would get together
[15] to discuss issues relating to Board business?
[16] Let's take a break after you answer that question.
[17] A: Would you repeat it, again?
[18] Q: In your experience, other than public Board meetings and
[19] committee meetings, was it the practice of individual
[20] members of the Board to get together on occasion to
[21] discuss Board business?
[22] A: You are talking about a group of Board members?
[23] Q: Two members, three members. Not in any official
[24] capacity, but —
[25] A: Board members would discuss things on all sorts of

Page 52

[1] issues.
[2] Q: Outside of the meetings and Board meetings and committee
[3] meetings?
[4] A: I would imagine, yes.
[5] Q: You have had those kind of discussions?
[6] A: Sure.
[7] Q: Okay. Let's take a break.
[8] (A recess was taken from 3:10 p.m. to 3:30 p.m.)
[9]
[10] AFTER RECESS
[11] BY MR. ROTHSCHILD:
[12] Q: Mr. Bonsell, did the Board ask Mr. Baksa to look for
[13] biology textbooks that could be used instead of the
[14] Miller Levin book?
[15] A: I believe — I believe so.
[16] Q: What instructions was Mr. Baksa given?
[17] A: Just I believe just to see if there's any other books
[18] out there to compare them to this book.
[19] Q: These books are really big. What was he supposed to
[20] look for that was different than the Miller book?
[21] A: They were really big?
[22] Q: These were really big books. What characteristics was
[23] Mr. Baksa supposed to look for that he would look to
[24] distinguish them from the Miller Levin book?
[25] MR. THOMPSON: I object as a confusing and vague

Alan Bonsell
January 3, 2005

Tammy Kitzmiller, et al. v.
Dover Area School District, et al.

---

Page 53

[1] question. When you say big, are you talking about the

[2] size of the book?

[3] MR. ROTHSCHILD: I will withdraw that part of my

[4] question.

[5] BY MR. ROTHSCHILD:

[6] Q: What was Mr. Baksa supposed to look for that would

[7] distinguish other books —

[8] A: I believe it was just to look at other — see if there

[9] is other biology books out there, and see if any of them

[10] would correspond that we could use besides this just to

[11] have — so there's more to choose from than just one.

[12] Q: Was Mr. Baksa instructed to look at those textbooks in

[13] terms of how they portrayed any particular subject

[14] matter?

[15] A: Well, first off, to make sure that they teach everything

[16] that is mandated for us to teach, and also I believe to

[17] look at the different books with the evolutionary

[18] content of them, to see what other books have in them.

[19] Q: And what was the Board looking to see? What difference

[20] was it looking to see?

[21] A: Just to see what was out there.

[22] Q: Did Mr. Baksa report back about his search? Let me

[23] withdraw that for a moment. Did the Board instruct Mr.

[24] Baksa where he should do his search, how he should do

[25] his search?

Page 54

[1] A: How he should do it? I don't recall that.

[2] Q: Did Mr. Baksa report back to the Board?

[3] A: From what I remember, he basically came back with this

[4] particular book, this was the book. Although, we were

[5] able to get an actually more up-to-date book. By doing

[6] our search, we got a newer more up-to-date book by the

[7] same company.

[8] (Deposition Exhibit P-5 was introduced.)

[9] BY MR. ROTHSCHILD:

[10] Q: Mr. Bonsell, I am going to show you a document I have

[11] marked as P-5. If you could, turn to page 55 in the

[12] collection. This is a collection of the documents that

[13] were produced to Plaintiffs by your counsel.

[14] A: 000055?

[15] Q: 000055, yes. Do you recognize that document?

[16] A: I can't really make out what it says.

[17] Q: I am sure you can make out some of it. Do you recognize

[18] the printed text on the document?

[19] A: I believe so.

[20] Q: Do you recognize this to be the product of Mr. Baksa's

[21] efforts to find other biology books?

[22] A: I believe this is just part of his effort.

[23] Q: What are we missing here?

[24] A: I am not saying we are missing anything. I am just

[25] saying you have to ask Mr. Baksa. I didn't — I wasn't

---

Page 55

[1] there when he did the search.

[2] Q: But you —

[3] A: I guess I shouldn't guess. I'm not sure.

[4] Q: Did you receive — is this document something that you

[5] were provided?

[6] A: It looks familiar. I mean you have these many documents

[7] here.

[8] Q: I only have what your counsel has provided.

[9] A: Sure. I understand that. What I am saying is there's a

[10] ton of documents here. And this, I mean it looks

[11] familiar.

[12] Q: If you turn to page 44 in this same collection, you will

[13] see that there is a different version of this without

[14] the handwriting.

[15] A: Okay.

[16] Q: I will represent to you that these are the only

[17] documents relating survey of biology books that are in

[18] this document production.

[19] A: Okay.

[20] Q: Do you have any understanding of why the only survey of

[21] biology books that is reported — the only schools whose

[22] biology books are being reported on here are private

[23] denominational schools?

[24] A: No.

[25] Q: Was Mr. Baksa given an instruction to find out what

Page

[1] Christian schools are teaching or using?

[2] A: Are you saying — gee, again, I am sorry.

[3] Q: Did the Board instruct Mr. Baksa to find out what the

[4] private denominational schools are using?

[5] A: I don't know if he was instructed to do it or he did

[6] this on his own. I'm not sure.

[7] Q: Can you think of any reason why Mr. Baksa would do a

[8] search only of private denominational schools if he

[9] hadn't been instructed to do that?

[10] MR. THOMPSON: Objection. Offering facts not in

[11] evidence, speculation. Go ahead and answer it.

[12] A: Again?

[13] BY MR. ROTHSCHILD:

[14] Q: Do you have any understanding why Mr. Baksa would be

[15] reporting only on the books used by private

[16] denominational schools?

[17] A: No. Are we done with these newsletters?

[18] Q: For the time being. Mr. Bonsell, the first page in this

[19] document production 000001 is a memo from Mr. Baksa to

[20] yourself, Casey Brown, Bill Buckingham and Sheila

[21] Harkins advising of a meeting of the Board curriculum

[22] committee to discuss the biology curriculum.

[23] Do you see that?

[24] A: Yes.

[25] Q: Is that a meeting you attended?

---

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Alan Bonse
January 3, 200

Page 57

[1]  A: I'm not sure.

[2]  Q: If you could turn to page 36, there's a document setting

[3] forth various proposed curriculum changes. I want you

[4] to let me know when you are there.

[5]  A: October 7th?

[6]  Q: Yes.

[7]  A: Yes.

[8]  Q: Do you recognize this document?

[9]  A: Yes.

[10]  Q: What is this document?

[11]  A: It looks like it is a Board curriculum meeting.

[12]  Q: From the contents of the document, does this look like a

[13] meeting that you attended?

[14]  A: It looks that way, yes.

[15]  Q: Does the information on this document reflect what was

[16] discussed at that meeting?

[17]  A: Is that the only page? It looks correct.

[18]  Q: Is it fair to say that the subject matter being

[19] discussed in this meeting was part of the process that

[20] resulted in the October 18th resolution?

[21]  A: I believe so.

[22]  Q: And this indicates that the meeting occurred October 7th

[23] which is the date that was scheduled on this first page?

[24]  A: Okay. That could be. I was looking at the date

[25] September 28. I didn't look — I am sorry.

Page 58

[1]  Q: I am not trying to confuse you.

[2]  A: There is a lot of dates with all sorts of meetings and

[3] subcommittees.

[4]  Q: Would you say this is a fair characterization, Mr.

[5] Bonsell, that on September 28th Mr. Baksa scheduled a

[6] meeting to occur on October 7th; on October 7th, there's

[7] discussion of proposed curriculum changes; and

[8] ultimately a curriculum change did occur as a result of

[9] the resolution on October 18th?

[10]  A: The subcommittee proposes. It is the full Board that

[11] would decide what does or doesn't get changed. All they

[12] all — because it is only a couple of people on the

[13] curriculum committee that talk about it and bring

[14] forward what they think is best. And the Board decides

[15] at that point. They don't.

[16]  Q: I am not suggesting they decided. But that was

[17] basically the course of events?

[18]  A: And you are saying the meeting was held on what? The

[19] regular Board meeting was what?

[20]  Q: October 18th when the resolution was voted in.

[21]  A: Okay. That sounds right.

[22]  Q: What were the circumstances leading to the Board's

[23] decision to discuss changing the curriculum? How did

[24] you get there?

[25]  A: Discuss the changes of the curriculum?

Page 5

[1]  Q: Why were you talking about this on October 7th? Whose

[2] idea was it?

[3]  A: Well, everybody. It looks like different people had

[4] different ideas on the subject — very similar, but

[5] close together the same ideas.

[6]  Q: Who initiated the subject matter? Why was there even a

[7] discussion about changing the biology curriculum?

[8]  A: I guess it was to give the students to be aware of other

[9] theories of evolution.

[10]  Q: Right. But where did the idea originate? Did you

[11] propose it? Did Mr. Buckingham propose it? How did it

[12] happen?

[13]  A: To be honest, I'm not sure what the exact — you want

[14] the exact time of who started it and what was said?

[15] That, I can't tell you.

[16]  Q: I don't need exact, Mr. Bonsell. But somebody at some

[17] point in this process said we need to change the biology

[18] curriculum, let's have a meeting?

[19]  A: I think it was obviously the majority of the Board

[20] because they voted on it to do it.

[21]  Q: Before this October 7th meeting — people didn't show up

[22] to this meeting with no idea of what was going to

[23] happen. There was an intention to discuss the

[24] curriculum; correct?

[25]  A: From the meeting — from these meetings prior to this,

Page

[1] the Board meetings.

[2]  Q: Explain to me the process that led to changing the

[3] curriculum. Where did the idea originate?

[4]  A: Going the whole way back to the books, looking at the

[5] books, looking at the books that they had before that

[6] they didn't use, this was all brought up through buying

[7] the new books. That is when this all started from the

[8] discussions back sometime over the summer. I'm not

[9] sure.

[10]  I thought we already covered that with the books.

[11] Then bringing that — was it Prentice Hall? I am not

[12] sure of the name of the book, the biology book, the

[13] textbook that the kids were going to use.

[14]  Q: And when who initiated the idea of changing the biology

[15] curriculum?

[16]  A: I guess through the curriculum subcommittee. I am

[17] guessing.

[18]  Q: When you got a notice on September 28th to attend a

[19] meeting to discuss the biology curriculum, did you have

[20] any idea why a meeting was being held or was this a

[21] complete surprise to you?

[22]  A: If I remember correctly, I knew what the meeting was

[23] going to be.

[24]  Q: How did you know that?

[25]  A: I guess from discussions at meetings. I'm not — there

Alan Bonsell
January 3, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 61

[1] again, I'm not sure.
[2] Q: Do you know if Mr. Buckingham originated the idea of
[3] changing the biology curriculum?
[4] A: To be honest, I'm not sure if he was — proposed the
[5] changes.
[6] Q: Let me go back to actually not 36, but 35.
[7] A: On this?
[8] A: Yes. This document has four different recommendations.
[9] One is attributed to the administration and staff. A
[10] second is attributed to yourself, which is identical to
[11] the staff's except for you add the word problems to
[12] gaps. Two recommendations are by Casey Brown, and one
[13] by Mr. Buckingham.
[14] Does this document accurately reflect the
[15] recommendation you made at this meeting?
[16] A: I believe so.
[17] Q: When did you prepare the language that was your
[18] recommendation?
[19] A: When did I prepare it?
[20] Q: Yes.
[21] A: Well, I believe part of this was an exchange during the
[22] meeting. I'm not sure if all of this was done prior to
[23] the meeting.
[24] Q: So this was basically the position you related on at the
[25] meeting that you would like to have in the biology

Page 62

[1] curriculum.
[2] A: I believe so. That is what — yes.
[3] Q: Your recommended language says students will be made
[4] aware of gaps/problems in Darwin's Theory.
[5] What are the gaps and problems that you — what
[6] gaps and problems did you understand Darwin's Theory to
[7] have when you proposed this curriculum change?
[8] A: What problems?
[9] Q: Yes.
[10] A: Well, complexity problems. You have problems with
[11] transitional fossils, being there is none. And all the
[12] different steps with Darwinism to have to get from here
[13] to there, and Darwin can't explain something coming from
[14] nothing.
[15] And with the scientists that I read about, with
[16] the statistical problems with Darwin to get where he
[17] wants, and plus Darwin's own words.
[18] Q: What words are you referring to?
[19] A: He had problems with the — I believe it was the eye
[20] that he basically — I don't know verbatim. But
[21] basically couldn't really explain how that happened, the
[22] eye of any species.
[23] Q: And then your proposed language continues students will
[24] be made aware of other theories of evolution.
[25] What were you referring to by other theories of

Page 63

[1] evolution?
[2] A: Other theories that are out there.
[3] Q: What theories are those?
[4] A: You have — I believe you have theories that I have
[5] heard of. I believe the chaos theory. You have
[6] Intelligent Design theory. There's people out there
[7] that believe that we came — aliens brought us here.
[8] Q: Also people who believe in the strict interpretation of
[9] the Bible?
[10] A: There's people that believe that.
[11] Q: Was it your intention that students be made aware of
[12] that theory, the Biblical theory?
[13] A: No, because that was one of the things I wanted to make
[14] sure we didn't teach religion. That was absolutely,
[15] positively we weren't teaching religion. And again,
[16] what we are doing now, we are not teaching now either.
[17] We are not teaching anything but what is required by the
[18] state.
[19] Q: I understand we have a disagreement about what teaching
[20] is here.
[21] A: Yes.
[22] Q: But accepting your definition, why are you taking the
[23] position that teachers can't teach Intelligent Design?
[24] A: At this point what is mandated from the school — from
[25] the state is, you know, we are standards driven. We are

Page

[1] going to make sure that the kids get everything that is
[2] supposed to be taught to them, that is required for them
[3] from the federal government, from the state government,
[4] what is mandated to us. We are going to make sure that
[5] happens.
[6] Q: Why not also teach Intelligent Design?
[7] A: For one, you don't have time. And for one, we wanted to
[8] make sure that people realize that we were just saying
[9] there's other theories out there. If you want to learn
[10] about them, go to the library and get a book. We are
[11] not requiring it.
[12] Q: What is your understanding of what a teacher is supposed
[13] to do if a student goes and reads the book and asks her
[14] questions in class?
[15] A: Asks her questions in class? Well, the teacher is going
[16] to inform them that they are going to have to go to
[17] their parents, ask them their opinions on this matter.
[18] Maybe go back to the book and read some more and get
[19] some other information. She or he — they are not going
[20] to get into teaching that.
[21] Q: Why?
[22] A: Because that was what our — what we said we were going
[23] to do in our statement.
[24] Q: If it is important for students to know about this, why
[25] aren't you letting them talk about it?

**Tammy Kitzmiller, et al.   v.**
**Dover Area School District, et al.**

**Alan Bonsel**
**January 3, 2005**

Page 65

[1]     A: I believe I just answered that. Because of the time
[2] situation, and also we weren't going to get into the
[3] possibility of teaching religion.
[4]     Q: So if the teachers answer questions about Intelligent
[5] Design, there is the possibility that she would be
[6] getting into religion?
[7]     A: No, not in Intelligent Design.
[8]     Q: That is what I was asking you about.
[9]     A: No, no. That is not religion. You asked me a while ago
[10] about other things, about other theories.
[11]     Q: I am not asking about that now.
[12]     A: Please then be specific. I don't understand what you
[13] said then. Reask the question again.
[14]     Q: I am asking you why if it is useful for the children to
[15] hear about Intelligent Design, you don't allow them to
[16] ask questions about it?
[17]     A: Why you don't allow them to ask questions about it?
[18] Again, time constraints. And also, that was what the
[19] Board wanted to do. That is what the majority of the
[20] Board wanted. That is what the policy was.
[21]     Q: And I am asking you why that policy?
[22]     MR. THOMPSON: I think that has been asked and
[23] answered a couple of times.
[24]     MR. ROTHSCHILD: No, it hasn't.
[25]     MR. THOMPSON: He said time limitations. Then he

Page 66

[1] said we have to teach to standards. I think he has said
[2] those two things a couple of times now.
[3]     BY MR. ROTHSCHILD:
[4]     Q: Mr. Bonsell, could you turn to the exhibit, the press
[5] release? Have I given that to you?
[6]     A: I think you took that back. It is in the back of one of
[7] these. There it is. I still have it.
[8]     Q: If you turn to the second page — or let me back up for
[9] a minute. This is a press release of the School Board;
[10] correct?
[11]     A: Yes.
[12]     Q: This is something the Board approved?
[13]     A: Yes.
[14]     Q: And you voted for it?
[15]     A: Yes.
[16]     Q: On the second page of the document, the Board states
[17] School Districts are forums for inquiry and critical
[18] discussions. And the District's revised biology
[19] curriculum provides an opportunity for open critical
[20] discussion — the real heart of scientific practice.
[21]     Was that the Board's objective in approving the
[22] biology curriculum?
[23]     A: Yes.
[24]     Q: How was that objective furthered by presenting
[25] Intelligent Design and allowing no discussion of it?

Page 67

[1]     A: Because it makes the students think. You know, instead
[2] of being taught just — you are being taught by a
[3] mandate one theory. All this says is that there's other
[4] theories out there, and if you want to learn about them.
[5] And so this way if they are interested, it is just being
[6] made aware of.
[7]     Q: But they are not allowed to engage in open, critical
[8] discussion of them in the classroom?
[9]     A: I believe that is what it says, yes.
[10]     Q: One of the things the teachers are required to tell the
[11] students is that Darwin's Theory is a theory and not a
[12] fact; correct?
[13]     A: Because Darwin's Theory is a theory, it continues to be
[14] tested as new evidence is discovered. A theory is not a
[15] fact.
[16]     Q: What was the purpose in having teachers tell their
[17] students that?
[18]     A: Because theories, number one, aren't facts. And number
[19] two, it is the only theory being presented when there's
[20] other theories out there.
[21]     Q: Is evolution the only scientific theory being taught to
[22] Dover area students?
[23]     A: I am sorry. Again?
[24]     Q: Is Darwin's Theory the only scientific theory that is
[25] taught to Dover students?

Page 68

[1]     A: The only scientific theory when it comes to evolution?
[2]     Q: Any kind.
[3]     A: I don't know.
[4]     Q: You don't whether students are learning about any other
[5] theories?
[6]     A: I don't know their whole science curriculum.
[7]     Q: Have you made any effort to find out what other theories
[8] are being taught — scientific theories are being taught
[9] to Dover students?
[10]     A: Did I make any effort to find out what else is being
[11] taught?
[12]     Q: Yes.
[13]     A: Not outside I mean of this subject now you are talking
[14] about?
[15]     Q: Yes.
[16]     A: No.
[17]     Q: Do you require teachers to tell students that any other
[18] scientific theory is a theory, not a fact?
[19]     A: I wouldn't know unless I looked at the curriculum.
[20]     Q: You haven't made any effort to determine whether that is
[21] occurring or not?
[22]     A: No.
[23]     Q: You have only made sure that students are being told
[24] that evolution is a theory, not a fact?
[25]     A: In this particular case, yes.

Alan Bonsell
January 3, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 69

[1] Q: That is the only — so far as you know, that is the only
[2] scientific theory that is being treated in that fashion?
[3] A: I don't know that.
[4] Q: You have made no effort to find that out?
[5] A: I have not made an effort to find out.
[6] Q: Do you understand the gravity is a theory?
[7] A: I am sorry?
[8] Q: Do you understand gravity is a theory?
[9] A: It's a law.
[10] Q: You don't believe gravity is a theory?
[11] A: I believe gravity — it is the law of gravity, not the
[12] theory of gravity.
[13] Q: Have you heard of germ theory?
[14] A: Have I heard of it?
[15] Q: Yes.
[16] A: I don't recall.
[17] Q: Have you ever heard of atomic theory?
[18] A: Atomic theory? I believe.
[19] Q: Do you understand the theory of evolution to be any less
[20] well accepted in the scientific community than those
[21] other theories?
[22] A: I don't know enough about those other theories to
[23] comment.
[24] Q: Do you know what the Dover science faculty position is
[25] about Intelligent Design — about the presentation of

Page 70

[1] Intelligent Design?
[2] A: In what aspect do you mean?
[3] Q: Do you know what their position is about the curriculum
[4] item that requires them to present Intelligent Design as
[5] a different theory than evolution?
[6] A: Basically.
[7] Q: What is your understanding?
[8] A: Well, from what I understand, they helped to edit this.
[9] These paragraphs that are going to be read to the
[10] student, they helped edit those.
[11] And basically the curriculum change that we made
[12] and what they suggested and what ended up being approved
[13] was almost identical.
[14] Q: Do you know what the difference was though, Mr. Bonsell?
[15] A: I believe the only difference was the words not limited
[16] to Intelligent Design.
[17] Q: Do you know why the science faculty opposed using the
[18] words Intelligent Design in the change to the
[19] curriculum?
[20] A: I believe their main concern is they were afraid of
[21] being sued.
[22] Q: Did they express anything to the Board about — did any
[23] science faculty express to the Board their views on the
[24] validity of Intelligent Design as a scientific
[25] proposition?

Page 71

[1] A: The validity of the scientific — I don't recall. I am
[2] sorry. Please repeat that again.
[3] Q: Did the science faculty ever make their position known
[4] to the Board about what they thought about Intelligent
[5] Design, about the validity of Intelligent Design as a
[6] scientific proposition?
[7] A: They had said that they had no problem. Like I said,
[8] their piece that they came up with was basically saying
[9] the exact same thing as what we approved. So I guess I
[10] mean —
[11] Q: Except for the aspect of Intelligent Design; correct?
[12] A: No. Theirs had other theories of evolution included.
[13] Q: Did it have the reference to Intelligent Design?
[14] A: Theirs did not.
[15] Q: Theirs did not. Did they ever express their views to
[16] the Board about what they thought about the validity of
[17] Intelligent Design as a scientific proposition?
[18] A: I think they were worried about being sued.
[19] Q: That is not answering my question.
[20] A: I don't recall them.
[21] Q: Did the Board ever ask the science faculty what their
[22] position was on the validity of Intelligent Design as a
[23] scientific proposition?
[24] A: I mean the features that were spoken to numerous times
[25] by Mr. Baksa — I mean we've met. They have edited

Page .

[1] these things. I'm not sure. Again, repeat the
[2] question.
[3] Q: Did the Board ever ask the science faculty whether they
[4] thought Intelligent Design was scientifically valid?
[5] A: I believe it was probably discussed as far as, you know,
[6] discussing all of this.
[7] Q: What is the basis for your belief Mr. Bonsell, you
[8] know or you don't know.
[9] A: I am not sure. I'm trying to remember back through all
[10] these conversations and everything else. I am trying to
[11] be as — I want to be as truthful as possible. And it's
[12] — that is why I am saying it takes time to try to
[13] remember these things.
[14] Q: Can you think of any other instances where science
[15] curriculum was added to or changed with content that the
[16] Science Department did not agree with?
[17] A: I don't know.
[18] Q: Can you remember any instance where the Board ever
[19] changed the science curriculum recommended by the
[20] science faculty?
[21] A: There again, I don't know.
[22] Q: Can you remember any time where the Board did not accept
[23] the recommendation of the science faculty about the
[24] purchase of a science textbook?
[25] A: We questioned almost every book that is brought up. So

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Alan Bonsel
January 3, 200

**Page 73**

[1] not just science, but almost every book that is brought
[2] up. Whether it is on a cycle or not on the cycle, we
[3] question the validity of buying the book.
[4]   Q: Can you recall the Board ever questioning the merits of
[5] purchasing a book based on the content contained in the
[6] book?
[7]   A: I don't know.
[8]   Q: Did you ever consult the Science Department about
[9] whether the Pandas book was appropriate for high school
[10] students?
[11]   A: What I recall is they didn't have a problem using it as
[12] a reference book.
[13]   Q: Was there ever a time when the Board discussed using
[14] Pandas as more than a reference book, but as an actual
[15] book to be taught out of — as you use the term taught?
[16]   A: Okay. I'm sorry. Please repeat.
[17]   Q: Was there ever any discussion of actually using the
[18] Pandas book as a book that would be taught out of, that
[19] would be read out of, or that would be taught out of as
[20] you have used the word taught?
[21]   A: I believe there was discussion.
[22]   Q: And what was the result of that discussion?
[23]   A: The majority of the Board decided not to do that.
[24]   Q: Why was that?
[25]   MR. THOMPSON: Objection. Calls for speculation

**Page 74**

[1] as to what other Board members thought.
[2]        BY MR. ROTHSCHILD:
[3]   Q: What was your understanding of why the Board decided not
[4] to do that?
[5]   A: Basically because it was going to be used as a reference
[6] book.
[7]   Q: Why was it decided to be used as a reference book, not
[8] as a book to be —
[9]   A: Because we weren't —
[10]   MR. THOMPSON: Again, same objection if you are
[11] talking about why being the why of the Board.
[12]        BY MR. ROTHSCHILD:
[13]   Q: What is your understanding of why the Board voted to use
[14] Pandas only as a reference, not as a regularly used
[15] textbook?
[16]   A: Because as you go through the press release here, we are
[17] not teaching it.
[18]   Q: When the decision was made — the press release was
[19] issued a long time after the decision was made not to
[20] use it as a regular textbook?
[21]   A: The wording all here was done was after the book — the
[22] book was never voted on — the book was never voted on
[23] to be a textbook.
[24]   Q: What is your understanding of why 60 books were donated
[25] to the school?

**Page 75**

[1]   MR. THOMPSON: Objection, vague. Calls for a
[2] conclusion. Speculative. Go ahead and answer if you
[3] can.
[4]   A: If the students wanted to use it, there would be copies
[5] there for the students to look at if they wanted to.
[6]        BY MR. ROTHSCHILD:
[7]   Q: Where did you gain that understanding?
[8]   A: From basically the number of students in the class.
[9]   Q: Did you have any discussion with your father about how
[10] many books he should donate?
[11]   A: As far as a number? The number would have to have
[12] come — probably as far as a number.
[13]   Q: You suggested a number or your father?
[14]   A: No. No. My father didn't suggest a number.
[15]   Q: You just said probably, and I am trying to understand
[16] what you mean by probably.
[17]   Did you suggest to your father how many books he
[18] should donate?
[19]   A: Probably.
[20]   Q: Describe the conversation for me.
[21]   A: That is why I am saying from before, I don't remember
[22] the conversation per se.
[23]   Q: What were the circumstances that caused you to say I
[24] think 50, dad, or 60?
[25]   A: That is what I said about the students — the number of

**Page 7**

[1] students in the class.
[2]   Q: Was that suggestion made in response to a question?
[3]   A: No. Just that about how many students would be in the
[4] biology classes would be 60.
[5]   Q: I understand that. I am trying to understand how your
[6] father learned that it would be a good idea to purchase
[7] 60.
[8]   A: Like I said, probably from me.
[9]   Q: Why did you give him that suggestion?
[10]   A: Because that is how many students are in the classroom.
[11]   Q: What were the circumstances in which you gave him that
[12] suggestion?
[13]   A: I am saying I don't know the precise conversation we had
[14] about it. Other than 60 books for the number of kids in
[15] the class. If, you know, they wanted to look at the
[16] books, there would be enough books.
[17]   Q: You can't remember anything else about your
[18] conversations with your father about his donating 60
[19] books to the School District of which you are a School
[20] Board member?
[21]   A: I don't remember if —
[22]   MR. THOMPSON: Objection. I just don't
[23] understand. Maybe you can read back. Have we
[24] established the fact that his father donated 60 books to
[25] the school? I don't know that that has ever been said.

**Alan Bonsell**
**January 3, 2005**

Page 77

[1] I think that was in your question.

[2]    A: I mean I don't know who donated all of the books. You

[3] didn't ask — because I don't know who donated all of

[4] the books.

[5]         BY MR. ROTHSCHILD:

[6]    Q: But your father was one of them?

[7]    A: That is the only person I know.

[8]    Q: You just don't know how many of the 60?

[9]    A: I don't know. I have no idea about that goings on about

[10] it, of who donated, or how much they donated. I mean

[11] that wasn't — my father is my father. I'm me.

[12]    Q: But you had an interaction with him in which you told

[13] him 60 books would be a good idea?

[14]    A: Probably.

[15]    Q: You can't remember how this subject matter came up?

[16]    A: I believe I said before that it was because the comments

[17] of Barrie Callahan objecting to — what I remember is

[18] objecting to the school spending money on them. So I

[19] guess here is a group of people that said we will donate

[20] them.

[21]    Q: And one member of that group of people told you?

[22]    A: That they would donate the books. But I don't know —

[23] like I said, I don't know the group of people.

[24]    Q: In the School District statement, it says that

[25] Mr. Nilsen has directed that no teacher will teach

Page 78

[1] Intelligent Design or Creationism or present his or her

[2] or the Board's religious beliefs.

[3]     What do you understand by the use of the term

[4] Creationism, what does Creationism mean?

[5]    A: You mean my opinion on what Creationism is?

[6]    Q: This is your Board's press release. What does

[7] Creationism mean in this press release?

[8]    A: I guess this would be the religious — what you would

[9] call the Bible version of origins.

[10]    Q: Is that your personal understanding of what Creationism

[11] means?

[12]    A: That is — I mean the definition of Creationism, you ask

[13] 50 people, there will be 50 different definitions. So I

[14] mean that's my personal definition of that. I'm not

[15] saying that is everybody's definition.

[16]    Q: Your personal definition is the Bible version of

[17] origins; is that right?

[18]    A: That is very general, but yeah.

[19]    Q: Anything else that would fall —

[20]    A: I mean the Bible version of creation of man and animals,

[21] that type of thing.

[22]    Q: Would you agree that one aspect of Creationism is that

[23] creatures were originally made as they now exist, humans

[24] were humans, birds have feathers, fish have fins?

[25]    A: You are asking my personal opinion?

Page 79

[1]    Q: Is that your understanding of what Creationism is?

[2]    A: My personal opinion?

[3]    Q: Yes.

[4]    A: You are saying that — again, repeat it again.

[5]    Q: Is your understanding of Creationism, does it include

[6] the tenet that creatures were formed as they now exist,

[7] birds having feathers?

[8]    A: You mean species?

[9]    Q: Yes.

[10]    A: Yes.

[11]    Q: And is it part of your understanding of Creationism that

[12] those separate species, birds, fish, humans do not share

[13] common ancestors?

[14]    A: In respect to Creationism now we are talking about?

[15]    Q: Yes, still Creationism.

[16]    A: Yes.

[17]    Q: Do you know what Intelligent Design — what position

[18] Intelligent Design takes on that issue of common

[19] descent?

[20]    A: Well, Intelligent Design is not Creationism. Let's

[21] start off by saying that. Intelligent Design is a

[22] scientific theory. And as far as, you know, you are

[23] wanting my understanding of Intelligent Design now? Is

[24] that what you are asking?

[25]    Q: Is that also an tenet of Intelligent Design that humans,

Page

[1] birds and fish don't share common ancestors?

[2]    A: As far as everything started from one animal, is that

[3] what you are saying?

[4]    Q: Just the question of whether they share common

[5] ancestors. You answered that question as regards

[6] Creationism. I am asking whether you have an

[7] understanding of whether Intelligent Design supports the

[8] same proposition, that birds and fish and humans do not

[9] have common ancestors.

[10]    A: I think Intelligent Design is saying that life couldn't

[11] have gotten here by chance. That is basically I believe

[12] what they are saying.

[13]    Q: But is one of the things that Intelligent Design is

[14] saying that the separate species, birds, fish, men do not

[15] share common ancestors? If you don't know, say you

[16] don't know.

[17]    A: Well, I'm not sure.

[18]    Q: Do you have a personal view of which concept

[19] Creationism, Intelligent Design evolution is more

[20] accurate?

[21]    A: You are asking for my personal views now?

[22]    Q: Yes.

[23]    A: As far as Intelligent Design, Creationism or what?

[24]    Q: Or Darwin's Theory.

[25]    A: Do I think one more than another?

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Alan Bonse
January 3, 200

---

**Page 81**

[1] Q: Yes.

[2] A: Yes.

[3] Q: What is that?

[4] A: I believe in the Creationism.

[5] Q: Do you believe Creationism is a scientific theory?

[6] A: A scientific theory? Intelligent Design is a scientific

[7] theory. I guess Creationism would not be.

[8] Q: Have you attended any courses or lectures or seminars

[9] relating to the subjects of evolution, Intelligent

[10] Design or Creationism? I know you said you have done

[11] reading.

[12] A: Seminars?

[13] Q: Yes.

[14] A: Attended seminars? I don't believe I have attended

[15] seminars.

[16] Q: Lectures, courses?

[17] A: I can't recall.

[18] Q: Do you belong to a church?

[19] A: Yes.

[20] Q: What church is that?

[21] A: Church of the Open Door.

[22] Q: Has the subject matter of Intelligent Design been

[23] discussed at your church?

[24] A: I don't — I don't — I really — I really can't answer

[25] that, if it has ever been discussed. I'm not sure.

**Page 82**

[1] Q: Have you ever —

[2] A: I don't recall it being.

[3] Q: The press has reported that Casey Brown stated that she

[4] was asked by members of the Board whether she was Born

[5] Again.

[6] Are you aware of that occurring?

[7] A: No.

[8] Q: Ms. Yingling has been quoted in the press as stating she

[9] was encouraged to vote for the October 18th resolution

[10] by assertions that she was an atheist or un Christian.

[11] Are you aware of that occurring?

[12] A: No. I remember her — I also remember reading in the

[13] paper that she said the reason she voted for it is so

[14] that people didn't think she was an atheist.

[15] Q: You are not aware of anybody on the Board —

[16] A: She didn't say anything about being pressured.

[17] Q: You are not aware —

[18] A: I am not aware of anything like that. No, absolutely

[19] not. I think that is false, totally false.

[20] Q: Have you ever spoken to anybody at the Discovery

[21] Institute?

[22] A: Yes.

[23] Q: When was that?

[24] A: Just recently.

[25] Q: Can you describe the circumstances of your

---

**Page 8**

[1] communications with the Discovery Institute?

[2] A: Just basically things that they wanted.

[3] MR. THOMPSON: We are going to be getting involved

[4] in attorney/client privilege here so we have to be

[5] careful. Be very careful in answering his question that

[6] you don't reveal what you and the Discovery Institute

[7] lawyers discussed.

[8] MR. ROTHSCHILD: As I said to Mr. Gillen, I am not

[9] sure I agree with you that the attorney/client privilege

[10] applies here.

[11]         BY MR. ROTHSCHILD:

[12] Q: I want to start without asking for any content of your

[13] communication for you to describe to me how it came to

[14] be that you had communication with the Discovery

[15] Institute, again, taking care not to tell me what was

[16] said.

[17] A: They had called and left a message for me to call them.

[18] Q: What did they say on their message?

[19] A: Basically that they just wanted to discuss things that

[20] they were, if I remember correctly, reading it in the

[21] newspapers and things like that. You know, it was on

[22] the AP wire so it was everywhere.

[23] Q: What did you do in response to that call?

[24] A: I did talk to them, but it was only I believe — only

[25] like once or twice that I ever like talked to them. It

**Page 8**

[1] wasn't like I had many conversations with them or

[2] anything like that.

[3] Q: Was your first actual conversation returning the call

[4] that they had left on your voice message?

[5] A: I believe so.

[6] Q: What did you say when you first made contact with

[7] somebody at the Discovery Institute?

[8] A: Just I was returning your call and was inquiring what

[9] the message was for.

[10] Q: Who did you talk to?

[11] A: I believe it was Seth Cooper, an attorney.

[12] Q: How did he respond to your statement returning your

[13] call? What did he say to you?

[14] A: He just said they wanted to discuss what we were doing

[15] at the School District.

[16] Q: Did he offer to represent you at that point?

[17] A: I don't recall.

[18] Q: In your conversations, did Mr. Cooper or any other

[19] attorney at the Discovery Institute ever offer to

[20] represent you or the School District?

[21] A: I would like to just take another break to ask my

[22] attorney a question.

[23] Q: That is fine.

[24] (The witness and his attorney exit the conference

[25] room to confer.)

---

Alan Bonsell
January 3, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 85

[1] MR. ROTHSCHILD: Would you please read the last
[2] question?
[3]     (The question: In your conversations, did
[4] Mr. Cooper or any other attorney at the Discovery
[5] Institute ever offer to represent you or the School
[6] District, was read by the reporter.)
[7] A: I believe it would be yes.
[8]                 BY MR. ROTHSCHILD:
[9] Q: When did that happen?
[10] A: That would have been in executive session.
[11] Q: When you are referring to this executive session, is
[12] that a circumstance where the Discovery Institute
[13] actually came out and met with the Board?
[14] A: Yes.
[15] Q: Prior to that session, was there any discussion between
[16] you and the Discovery Institute lawyers about them
[17] representing you in this litigation?
[18] A: Well, they had met to talk about what we were doing, and
[19] they brought a lawyer in to talk to us about it. So I
[20] guess that I am not sure what that constitutes legally.
[21] MR. THOMPSON: I understand your issues here, and
[22] we have some issues as well. We have to research I
[23] guess more thoroughly as to whether the attorney/client
[24] privilege actually takes place.
[25] But for the purposes of not waiving it, I think I

Page 86

[1] am going to exercise that objection and direct my client
[2] at this time not to answer any questions regarding their
[3] conversations with the Discovery Institute lawyers.
[4] MR. ROTHSCHILD: I will accept that proposal.
[5] Obviously, we don't waive the right to take that
[6] discovery if it is later determined that privilege did
[7] not apply.
[8]     I think we can talk more about this later. It may
[9] make sense for you to gather the facts and make a
[10] representation about what occurred, and maybe we will
[11] stand down on this. I think we can both agree to put
[12] this off to another day.
[13] MR. THOMPSON: Fine. Fine.
[14]                 BY MR. ROTHSCHILD:
[15] Q: Other than the communications with lawyers that you just
[16] referred to, did you personally have any other
[17] interactions with the Discovery Institute?
[18] A: I think they were all attorneys that I spoke to.
[19] Q: What I am really referring to is had you talked to
[20] anybody at the Discovery Institute at any earlier time?
[21] A: No, no. I don't believe so, no.
[22] Q: Do you know whether any other member of the Board talked
[23] to the Discovery Institute?
[24] A: That, I don't know. I'm not sure.
[25] Q: Have you ever talked to anybody at the Institute for

Page 87

[1] Creation Research?
[2] A: No.
[3] Q: Do you know whether anybody else on the Board talked to
[4] anybody from that organization?
[5] A: That, I don't know.
[6] MR. THOMPSON: Do you want to take a break or are
[7] you —
[8] MR. ROTHSCHILD: I think I am pretty near the end.
[9] Let me go through a few short questions, and we can take
[10] a break.
[11] MR. THOMPSON: Okay.
[12]                 BY MR. ROTHSCHILD:
[13] Q: Mr. Bonsell, do you know when the subject matter in the
[14] curriculum regarding Intelligent Design and gaps and
[15] problems in Darwin's Theory will be presented to the
[16] ninth grade students?
[17] A: I believe the first one is in January.
[18] Q: Do you know what date?
[19] A: Well, let's go back. Ask me that question again. I am
[20] sorry.
[21] Q: Your understanding is that as a result of the October
[22] 18th resolution, at a minimum, teachers are going to be
[23] required to read a statement to the students?
[24] A: Yes.
[25] Q: Do you know when that will happen?

Page

[1] A: I believe it is January 13th, but I'm not positive on
[2] that. I'm not positive. Dr. Nilsen would know better.
[3] There again, maybe I shouldn't answer that because I'm
[4] not positive on the exact date.
[5] MR. ROTHSCHILD: Why don't we take a ten minute
[6] break? I am almost done.
[7]     (A recess was taken from 4:40 p.m. to 5:00 p.m.)
[8]
[9]                 AFTER RECESS
[10]
[11]                 BY MR. ROTHSCHILD:
[12] Q: Mr. Bonsell, just to summarize earlier testimony, am I
[13] correct that your understanding about the scientific
[14] merit of Intelligent Design is based on things that you
[15] have read?
[16] A: Repeat that again.
[17] Q: Am I correct that your understanding about the
[18] scientific merit of Intelligent Design is based on
[19] things that you have read?
[20] A: Well, read, seen, heard I mean.
[21] Q: What do you mean by seen and heard?
[22] A: Well, I mean museums, that type of thing. I mean I see
[23] things, read things, hear things. I mean TV, shows. I
[24] mean it is not limited to just one.
[25] Q: Is it fair to say that your understanding about the

Min-U-Script®    Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Alan Bonse
January 3, 200

---

**Page 89**

[1] scientific merit of Intelligent Design is not based on
[2] anything that anybody has told you, anybody you have
[3] spoken to?
[4]    A: I can't be sure of that, no.
[5]    Q: Can you think of anybody with a scientific background or
[6] scientific expertise with whom you have discussed the
[7] merits of — the scientific merits of Intelligent
[8] Design?
[9]    A: You are saying have I talked to Professors?
[10]    Q: Anybody who has a scientific background. Cast a broad
[11] net.
[12]    A: I would think at some time I would have.
[13]    Q: Can you name anyone?
[14]    A: No. I can't recall names, no.
[15]    Q: Why do you think you would have talked to somebody with
[16] a scientific background about this subject?
[17]    A: Why?
[18]    Q: Yes.
[19]    A: Because of the years of reading about it. Like I said
[20] before, going to museums, going here, going there. I
[21] would think that somewhere along the line, I would have
[22] talked — I mean you are asking me did I ever talk to
[23] anybody ever? You know, that casts a pretty broad net.
[24]    Q: Sitting here today, you can't think of a single
[25] individual?

**Page 90**

[1]    A: I can't recall a name off the top of my head.
[2]    Q: And have you had any conversations of that type in the
[3] last year with somebody with a scientific background
[4] about Intelligent Design?
[5]    A: I can't recall.
[6]    Q: In the last two years?
[7]    A: I'm not sure.
[8]    Q: In the last five years?
[9]    A: I already answered that.
[10]    Q: What was your answer?
[11]    A: You asked me a broad question in the beginning. I said
[12] I couldn't name anybody I could think of off the top of
[13] my head.
[14]    Q: Okay. When do you feel you first heard of Intelligent
[15] Design?
[16]    A: I'm not sure when that first time was.
[17]    Q: More than a year ago?
[18]    A: I'm not sure.
[19]    Q: Are you aware that the concept of Intelligent Design
[20] includes the idea that life is the result of intelligent
[21] shaping of matter?
[22]    A: Again, please?
[23]    Q: Are you aware that Intelligent Design includes the idea
[24] that life is the result of intelligent shaping of
[25] matter?

**Page 9**

[1]    A: Intelligent shaping of matter, you are saying is that a
[2] possibility?
[3]    Q: Are you aware that that is one proposition stated?
[4]    A: That is one possibility. Okay. If you are saying that,
[5] you are reading that from somewhere?
[6]    Q: I am asking you: Are you aware that Intelligent Design
[7] includes that concept?
[8]    A: I am sorry. Sorry to keep making you repeat it. What
[9] — aware of which concept again?
[10]    Q: That life is the result of intelligent shaping of
[11] matter.
[12]    A: Intelligent shaping of matter? I suppose.
[13]    Q: Do you think that that proposition is something that
[14] should be taught to school children?
[15]    A: We are not teaching it.
[16]    Q: Do you think that subject is something that should be
[17] presented to school children?
[18]    A: That would be a different subject to be discussed, but
[19] that is not what we are doing here.
[20]    Q: If that was what was being presented to school children,
[21] would you think that was okay?
[22]    A: That is something I would have to look at. I can't
[23] answer a question like that right off.
[24]    Q: Are you aware that Intelligent Design locates the origin
[25] of new organisms in an immaterial cause, in a blueprint,

**Page 9**

[1] a plan, a pattern devised by an intelligent agent?
[2]    A: Say that again.
[3]    Q: Do you understand that Intelligent Design provides that
[4] the origin of new organisms is from an immaterial cause
[5] and a blueprint, a plan, a pattern devised by an
[6] intelligent agent?
[7]    A: I don't really understand what you just said as far as
[8] precisely or what that means. I would need more
[9] specific —
[10]    Q: Do you think that is something that is appropriately
[11] presented to school children?
[12]    MR. THOMPSON: Objection. He says he doesn't
[13] understand it. That would be a confusing question.
[14]    BY MR. ROTHSCHILD:
[15]    Q: You can answer.
[16]    A: Would that be —
[17]    Q: That statement, is that something that would be
[18] appropriately presented to school children?
[19]    A: Again, we are not teaching Intelligent Design so you're
[20] asking me hypotheticals.
[21]    Q: You are making students aware of Intelligent Design?
[22]    A: And we are giving them this statement.
[23]    Q: Making them aware of Intelligent Design?
[24]    A: If they want to go, there is a book they can learn, but
[25] it's not required. It's not going to be taught.

---

**Alan Bonsell**
**January 3, 2005**

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 93

[1]   You're asking me hypothetical questions. I don't
[2]  understand the question being it is a hypothetical thing
[3]  because that's not what we are doing here.
[4]   Q: Are you aware that Intelligent Design provides that
[5]  similarities between organisms are explained as being
[6]  due to a common designer?
[7]   A: Organisms — say it again.
[8]   Q: That the similarities between organisms are explained by
[9]  the fact that they were created by a common designer?
[10]   A: I guess that could be a theory of Intelligent Design.
[11]   Q: Do you know whether it is or it isn't?
[12]   A: Do I know whether it is or isn't?
[13]   Q: Do you know whether that is part of what Intelligent
[14]  Design argues?
[15]   A: That precise sentence, no, I don't know if that does or
[16]  not.
[17]   Q: Do you think that is something that is appropriately
[18]  presented to school children?
[19]   A: There again, we are not presenting it to school
[20]  children. We are not teaching. We are not doing that.
[21]  Again, you are asking me hypotheticals.
[22]   Q: You are neither teaching, nor presenting Intelligent
[23]  Design to students?
[24]   A: We are not teaching Intelligent Design to students. We
[25]  are saying these one, two, three, four paragraphs to the

Page 94

[1]  students. We are making them aware of just exactly what
[2]  the press release says. So again, that is —
[3]   Q: So — go ahead. Finish, Mr. Bonsell.
[4]   A: No, that is fine.
[5]   Q: Is it fair to say then is it your interpretation of what
[6]  the Board is doing that it is making students aware that
[7]  there is something called Intelligent Design, but not
[8]  telling them what it is?
[9]   A: That there's other theories out there because it says
[10]  gaps in the theories exist. The theory — let's see.
[11]  Basically, just what it says here, that is what we are
[12]  going to tell them.
[13]   Q: Is it fair to say what you are telling them is that
[14]  Intelligent Design exists, but not telling them what it
[15]  is?
[16]   A: That there's other theories out there, yes. We are not
[17]  teaching it. There's a reference book. If they want to
[18]  go look at it, they are more than welcome to look at it.
[19]  We are not requiring them to look at it. We are not
[20]  going to teach it. We are not going to test it. We are
[21]  not going to do any of that.
[22]   MR. ROTHSCHILD: I have no further questions.
[23]  Thank you.
[24]   MR. THOMPSON: No questions. Thank you.
[25]   (The deposition concluded at 5:15 p.m.)

Page 95

COMMONWEALTH OF PENNSYLVANIA   :
COUNTY OF CUMBERLAND

I, Vicki L. Fox, Reporter and Notary Public in and
for the Commonwealth of Pennsylvania and County of
Cumberland, do hereby certify that the foregoing
testimony was taken before me at the time and place
hereinbefore set forth, and that it is the testimony of:
ALAN BONSELL
I further certify that said witness was by me duly
sworn to testify the whole and complete truth in said
cause; that the testimony then given was reported by me
stenographically, and subsequently transcribed under my
direction and supervision; and that the foregoing is a
full, true and correct transcript of my original
shorthand notes.
I further certify that I am not counsel for nor
related to any of the parties to the foregoing cause,
nor employed by them or their attorneys, and am not
interested in the subject matter or outcome thereof.
Dated at Camp Hill, Pennsylvania, this 4th day of
January, 2005.
         Vicki L. Fox
         Reporter - Notary Public
(The foregoing certification does not apply to any
reproduction of the same by any means unless under the
direct control and/or supervision of the certifying
reporter.)

Min-U-Script®   Filius & McLucas Reporting Service, Inc.

**Lawyer's Notes**

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Alan Bonsell
January 3, 2005

# 0

000001 56:19
000055 54:14, 15
03 4:20, 21

# 1

1 11:3
10th 43:15
13th 3:14; 88:1
15th 45:9
18th 17:21; 57:20; 58:9,
20; 82:9; 87:22

# 2

2 11:4
2004 8:15; 40:10, 19;
43:15, 19
2005 3:14
25 35:6
28 57:25
28th 58:5; 60:18

# 3

30 5:8; 7:16
35 61:6
36 57:2; 61:6
3:10 52:8
3:30 52:8

# 4

44 55:12
4:40 88:7

# 5

50 75:24; 78:13, 13
55 54:11
58 22:23
5:00 88:7
5:15 94:25

# 6

60 5:8; 7:16; 13:6; 74:24;
75:24; 76:4, 7, 14, 18, 24;
77:8, 13

# 7

7th 57:5, 22; 58:6, 6; 59:1,
21

# 8

82 36:4

# 9

9th 40:10, 14, 19

# A

able 27:2; 29:15, 17, 17;
33:23; 54:5
Absolutely 45:24; 63:14;
82:18
accept 72:22; 86:4
accepted 22:19; 69:20
accepting 63:22
accumulated 12:3
accurate 15:7; 80:20
accurately 45:22; 61:14
actions 23:7, 9
actual 7:13; 73:14; 84:3
actually 38:3, 8; 54:5;
61:6; 73:17; 85:13, 24
add 61:11
added 17:19; 72:15
addition 10:2
address 35:2
administration 61:9
administrators 20:3
adulthood 35:12
advise 36:18
advising 56:21
afraid 70:20
afternoon 3:20, 21; 4:5
again 5:24; 6:14; 12:1,
22; 13:12; 14:6; 16:2; 26:3;
29:18, 24; 30:14; 32:10,
21; 33:12, 12, 23; 42:19;
44:10; 50:10; 51:17; 56:2,
12; 61:1; 63:15; 65:13, 18;
67:23; 71:2; 72:1, 21;
74:10; 79:4, 4; 82:5; 83:15;
87:19; 88:3, 16; 90:22;
91:9; 92:2, 19; 93:7, 19,
21; 94:2
against 3:25; 34:2; 47:3
agenda 50:16
agent 35:15; 92:1, 6
aggressively 42:24;
43:5, 13
ago 13:1; 49:1, 17; 50:9;
65:9; 90:17
agree 72:16; 78:22; 83:9;
86:11
agreed 50:11
ahead 6:7; 11:2; 56:11;
75:2; 94:3
ALAN 1:16; 40:23; 42:23
Albert 30:20; 31:11
aliens 63:7

allow 28:25; 65:15, 17
allowed 19:15; 29:22;
34:17; 67:7
allowing 66:25
almost 70:13; 72:25;
73:1; 88:6
along 18:2; 38:25; 49:13,
19; 89:21
alongside 31:23; 32:19;
45:20
alternative 23:18, 19
alternatives 24:16, 17
Although 54:4
always 10:16
amending 24:21
Americans 4:6
ancestors 79:13; 80:1, 5,
9, 15
animal 80:2
animals 78:20
annoying 28:16
anonymous 13:14
answered 24:7, 10;
25:20, 21; 26:1; 27:6, 7,
10; 28:2, 17; 65:1, 23;
80:5; 90:9
AP 83:22
applies 83:10
apply 86:7
appropriate 73:9
appropriately 92:10, 18;
93:17
approved 66:12; 70:12;
71:9
approving 66:21
Area 3:25; 4:9; 20:15;
67:22
argues 93:14
argumentative 26:2;
28:3, 9, 16, 24
article 31:11, 13; 37:13;
39:13; 40:11, 18; 42:17,
22; 45:9, 17, 22; 48:24;
50:24
articles 36:15; 39:24;
40:7; 43:4; 46:2, 3
aside 33:15
aspect 70:2; 71:11; 78:22
assertion 23:3
assertions 82:10
asserts 22:17
Assuming 32:8
atheist 82:10, 14
atomic 69:17, 18
attend 19:5; 51:10; 60:18
attended 45:18; 56:25;
57:13; 81:8, 14, 14
attorney 4:6; 9:21, 24;
10:17; 28:5; 45:2, 5; 84:11,
19, 22, 24; 85:4
attorney/client 5:12, 18;
6:1; 83:4, 9; 85:23
attorneys 12:12; 20:23,
25; 86:18

attributed 40:23; 42:9;
48:25; 50:15, 20, 23; 61:9,
10
audibly 10:9
authorize 5:4
authorizing 3:9
auto 35:10, 11
aware 6:11; 12:25; 13:6;
14:4, 7, 16, 20, 21; 16:3;
17:16; 22:13, 16; 25:18,
24; 26:6; 27:12; 31:9;
36:11; 41:5; 42:14, 16;
43:2; 59:8; 62:4, 24; 63:11;
67:6; 82:6, 11, 15, 17, 18;
90:19, 23; 91:3, 6, 9, 24;
92:21, 23; 93:4; 94:1, 6
away 50:16

# B

back 33:12; 53:22; 54:2,
3; 60:4, 8; 61:6; 64:18;
66:6, 6, 8; 72:9; 76:23;
87:19
background 89:5, 10,
16; 90:3
Baksa 12:20; 18:2; 19:13;
52:12, 16, 23; 53:6, 12, 22,
24; 54:2, 25; 55:25; 56:3,
7, 14, 19; 58:5; 71:25
Baksa's 54:20
balance 50:12
Barrie 14:19; 77:17
base 30:16, 19
based 73:5; 88:14, 18;
89:1
Basically 8:4, 5; 12:1;
21:17, 19; 30:12; 54:3;
58:17; 61:24; 62:20, 21;
70:6, 11; 71:8; 74:5; 75:8;
80:11; 83:2, 19; 94:11
basis 28:14, 15; 72:7
became 5:2; 14:16, 21;
16:3
become 5:1, 2; 12:25;
14:4, 7, 20
Beginning 4:19, 20; 7:10;
45:17; 90:11
belief 72:7
beliefs 42:11; 78:2
belong 81:18
Bernhard-Bubb 45:10,
14
besides 29:5; 35:11;
53:10
best 58:14
better 88:2
Bible 63:9; 78:9, 16, 20
Biblical 63:12
bids 80:14
big 52:19, 21, 22; 53:1
Bill 8:18; 12:19; 19:13;
56:20
Biology 17:12, 20; 24:21;
25:9; 36:12; 37:16, 18, 20,

23; 39:18; 42:25; 43:6, 17;
44:4; 45:15, 21; 46:17, 19,
21; 47:6, 14, 19; 48:1;
51:3, 4, 5; 52:13; 53:9;
54:21; 55:17, 21, 22;
56:22; 59:7, 17; 60:12, 14,
19; 61:3, 25; 66:18, 22;
76:4
birds 78:24; 79:7, 12;
80:1, 8
bit 36:11; 42:2
blueprint 91:25; 92:5
Board 4:1, 10, 15; 5:3, 18
25; 6:3, 4, 16; 8:13, 21;
12:3; 16:23; 18:3, 6, 10,
11, 12, 25; 19:1, 5, 11, 21;
20:2; 26:10; 29:16, 20;
40:18, 19, 21, 23; 41:13,
22, 24, 25; 42:1, 19, 23;
44:2, 3; 45:19, 23; 46:5, 5;
47:11, 21, 23; 49:8, 9, 23;
51:2, 12, 14, 15, 18, 20,
21, 22, 25; 52:2, 12; 53:19,
23; 54:2; 56:3, 21; 57:11;
58:10, 14, 19; 59:19; 60:1;
65:19, 20; 66:9, 12, 16;
70:22, 23; 71:4, 16, 21;
72:3, 18, 22; 73:4, 13, 23;
74:1, 3, 11, 13; 76:20;
82:4, 15; 85:13; 86:22;
87:3; 94:6
Board's 17:20; 24:20;
29:4; 58:22; 66:21; 78:2, 6
BONSELL 3:16, 20;
13:23; 17:4; 21:5; 25:19,
25; 26:9, 14; 35:1; 36:11;
39:22; 40:23; 42:23;
44:16; 45:8; 49:23; 52:12
54:10; 56:18; 58:5; 59:16;
66:4; 70:14; 72:7; 87:13;
88:12; 94:3
book 12:1, 21, 25; 13:6;
15:7; 16:22, 24; 22:9, 13,
19; 24:2, 3; 42:25; 43:6;
44:2, 8; 46:17; 47:5, 6, 10,
14, 15; 48:4, 8; 51:3, 3;
52:14, 18, 20, 24; 53:2;
54:4, 4, 5, 6; 60:12, 12;
64:10, 13, 18; 72:25; 73:1
3, 5, 6, 9, 9, 12, 14, 15, 18,
18; 74:6, 7, 8, 21, 22, 22;
92:24; 94:17
books 13:9, 13, 14; 14:2,
5, 8, 13, 17; 15:1, 1, 8, 16,
19, 21, 23; 16:12, 14, 15,
15, 21, 23; 18:22; 22:7;
46:19, 21; 47:4, 9; 52:17,
19, 22; 53:7, 9, 17, 18;
54:21; 55:17, 21, 22;
56:15; 60:4, 5, 5, 7, 10;
74:24; 75:10, 17; 76:14,
16, 16, 19, 24; 77:2, 4, 13,
22
Born 82:4
both 36:13; 41:2; 86:11
bottom 40:22; 42:9
bought 47:5, 6
break 10:17; 45:2; 51:16
52:7; 84:21; 87:6, 10; 88:

Alan Bonsell
January 3, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

bring 58:13
bringing 60:11
broad 89:10, 23; 90:11
brought 32:25; 42:4, 6; 47:22; 60:6; 63:7; 72:25; 73:1; 85:19
Brown 56:20; 61:12; 82:3
Buckingham 8:18; 12:19; 19:13; 42:10, 14, 24; 43:11; 47:24, 25; 48:7, 23; 49:1, 4; 50:11, 16, 25; 56:20; 59:11; 61:2, 13
Buckingham's 50:21
building 37:15
Business 35:23; 51:15, 21
buy 14:13; 47:1
buying 47:3, 9; 60:6; 73:3

**C**

call 18:1, 6, 17; 78:9; 83:17, 23; 84:3, 8, 13
Callahan 14:19; 77:17
called 3:16; 83:17; 94:7
Calls 5:14; 23:25; 73:25; 75:1
came 15:12; 19:18; 32:3; 54:3; 63:7; 71:8; 77:15; 83:13; 85:13
can 7:15; 9:20; 13:2; 18:3; 20:2; 24:12; 30:23; 38:8, 17, 24; 47:12; 48:10; 54:17; 56:7; 72:14, 18, 22; 73:4; 75:3; 76:23; 82:25; 86:8, 11; 87:9; 89:5, 13; 92:15, 24
capacity 51:24
care 83:15
careers 35:11, 13
careful 83:5, 5
case 30:23; 31:24, 25; 32:9; 37:17; 41:7; 68:25
Casey 56:20; 61:12; 82:3
Cast 89:10
casts 89:23
caught 26:25
cause 31:22, 25; 32:6, 12, 18, 23; 91:25; 92:4
caused 48:7; 75:23
Center 6:13
certification 3:3
chance 21:19, 22; 23:16, 17; 30:23; 80:11
change 25:9; 39:5; 58:8; 59:17; 62:7; 70:11, 18
changed 58:11; 72:15, 19
changes 57:3; 58:7, 25; 61:5
changing 58:23; 59:7; 60:2, 14; 61:3
chaos 63:5
characteristics 52:22

characterization 58:4
Charlotte 50:21
children 25:1; 29:13; 30:1; 34:2, 9, 16; 65:14; 91:14, 17, 20; 92:11, 18; 93:18, 20
chipping 50:16
choose 53:11
Christian 56:1; 82:10
Christianity 42:1
Christians 50:17
Church 4:7; 81:18, 20, 21, 23
circumstance 85:12
circumstances 9:6; 58:22; 75:23; 76:11; 82:25
citizen's 72:17
Clarify 42:2
class 25:9; 34:3; 64:14, 15; 75:8; 76:1, 15
classes 35:24; 76:4
classroom 3:14; 67:8; 76:10
clear 9:14; 10:12; 44:16
click 7:12
client 28:17; 86:1
close 59:5
collect 29:12
collection 29:22, 23; 40:8; 54:12, 12; 55:12
college 35:15, 18, 21, 24
coming 50:25; 62:13
comment 51:1; 69:23
comments 77:16
Committee 18:3; 20:17; 44:3; 51:13, 19; 52:2; 56:22; 58:13
common 79:13, 18; 80:1, 4, 9, 15; 93:6, 9
communicate 15:13
communicated 6:12; 8:14, 18; 15:6, 9; 16:17
communication 7:2; 8:1; 83:13, 14
communications 6:15, 21; 7:3, 21; 83:1; 86:15
community 20:15; 29:13, 16; 69:20
company 54:7
compare 52:18
competing 47:2
complaint 11:3, 7, 23; 14:18, 18
Complaints 10:23; 14:10
complete 60:21
complex 23:17, 20
complexity 62:10
complies 40:12; 42:18; 45:11
comprehensive 40:2
concept 80:18; 90:19; 91:7, 9
concern 70:20

concerned 48:12
concerns 48:14
conclude 31:2; 33:6
concluded 94:25
conclusion 5:15; 24:1; 75:2
confer 9:24; 45:6; 84:25
conference 9:25; 45:5; 84:24
confuse 58:1
confusing 52:25; 92:13
consider 31:21
constitutes 85:20
constraints 65:18
consult 73:8
contact 84:6
contacted 36:18
contained 73:5
content 53:18; 72:15; 73:5; 83:12
contents 57:12
context 26:13; 38:22; 41:15; 43:12
continue 10:13; 45:19; 48:4, 4
continues 62:23; 67:13
continuing 10:7
contribute 15:18
conversation 10:11; 75:20, 22; 76:13; 84:3
conversations 72:10; 76:18; 84:1, 18; 85:3; 86:3; 90:2
Cooper 84:11, 18; 85:4
copies 13:6; 75:4
copy 17:6; 40:3
correction 10:1; 37:2, 21; 38:4
correctly 36:24; 37:24; 60:22; 83:20
correspond 53:10
counsel 4:22; 5:1, 2, 3, 4; 11:5; 12:6, 8, 10; 54:13; 55:8
country 42:10, 11; 50:17
couple 58:12; 65:23; 66:2
courage 49:2
course 9:9; 12:20; 58:17
courses 81:8, 16
Court 3:8; 9:11; 28:21
covered 60:10
create 33:16
created 93:9
creating 21:3
creation 42:25; 43:7; 78:20; 87:1
Creationism 41:1, 9, 11, 13, 21, 25; 42:7; 44:9, 25; 45:20, 23, 25; 46:4, 6, 13, 15, 16; 48:20; 50:11, 13, 22; 78:1, 4, 4, 5, 7, 10, 12, 22; 79:1, 5, 11, 14, 15, 20; 80:6, 19, 23; 81:4, 5, 7, 10

creatures 78:23; 79:6
critical 29:7; 66:17, 19; 67:7
critically 25:1; 29:18, 22; 33:23; 34:2, 5, 9, 17, 19, 21
cross 49:2
currently 4:9
Curriculum 17:12, 20; 18:2, 3, 8, 14, 19, 20, 22, 23; 19:6; 20:17; 24:21; 25:10; 36:12; 37:16, 19, 20, 23; 39:18; 45:15, 21; 51:6, 10, 13; 56:21, 22; 57:3, 11; 58:7, 8, 13, 23, 25; 59:7, 18, 24; 60:3, 15, 16, 19; 61:3; 62:1, 7; 66:19, 22; 68:6, 19; 70:3, 11, 19; 72:15, 19; 87:14
cycle 73:2, 2

**D**

dad 75:24
Daily 36:10, 13; 39:25; 40:11
Darwin 21:17, 18; 62:13, 16
Darwin's 21:13, 15; 30:8; 62:4, 6, 17; 67:11, 13, 24; 80:24; 87:15
Darwinism 22:2; 62:12
date 5:6, 7; 7:10, 12, 13, 14; 13:3; 57:23, 24; 87:18; 88:4
dates 58:22
daughter 29:14
day 42:22; 86:12
days 5:8, 8; 7:5, 16
de 19:3
debate 46:15, 16, 17, 19, 21, 24; 47:14, 16, 17, 18
debated 45:23; 46:4, 25
debating 45:19
December 4:20, 20; 7:7, 10, 10
decide 58:11
decided 58:16; 73:23; 74:3, 7
decides 58:14
decision 58:23; 74:18, 19
dedicated 18:7
definition 26:24; 27:22, 24; 63:22; 78:12, 14, 15, 16
definitions 78:13
denominational 55:23; 56:4, 8, 16
Department 72:16; 73:8
deposition 3:8; 4:2; 8:22; 9:9; 10:7, 20, 24; 11:24; 15:4; 17:2; 39:20; 54:8; 94:25
descent 79:19

Describe 75:20; 82:25; 83:13
description 20:22
Design 21:6, 7, 8, 10, 15; 22:1, 2, 5, 11, 18; 23:3, 6, 9, 15; 30:16, 18, 21, 23; 31:5, 7, 10, 18, 21, 23; 32:5, 13, 18, 23; 33:14; 63:6, 23; 64:6; 65:5, 7, 15; 66:25; 69:25; 70:1, 4, 16, 18, 24; 71:5, 5, 11, 13, 17, 22; 72:4; 78:1; 79:17, 18, 20, 21, 23, 25; 80:7, 10, 13, 19, 23; 81:6, 10, 22; 87:14; 88:14, 18; 89:1, 8; 90:4, 15, 19, 23; 91:6, 24; 92:3, 19, 21, 23; 93:4, 10, 14, 23, 24; 94:7, 14
designed 23:20
designer 23:7, 10, 24; 24:14, 16; 93:6, 9
determine 68:20
determined 86:6
determining 3:10
devised 92:1, 5
Dick 17:7; 40:3
died 49:2
differ 21:15, 16
difference 53:19; 70:14, 15
different 21:25; 22:3; 30:24; 31:15; 38:21, 25, 25; 44:4; 46:20; 48:8; 51:-7 52:20; 53:17; 55:13; 59:-7 4; 61:8; 62:12; 70:5; 78:- 91:18
differs 21:13
direct 86:1
directed 77:25
Directors 4:1
disagreed 40:24
disagreeing 40:24
disagreement 63:19
discovered 67:14
discovery 3:9; 20:14, 21; 82:20; 83:1, 6, 14; 84:7, 19; 85:4, 12, 16; 86:3, 6, 17, 20, 23
discuss 51:15, 21, 25; 56:22; 58:23, 25; 59:23; 60:19; 83:19; 84:14
discussed 8:6; 37:1; 41:21, 24; 44:18; 57:16, 19; 72:5; 73:13; 81:23, 25; 83:7; 89:6; 91:18
discussing 72:6
discussion 24:23; 45:25; 48:20; 49:18; 58:7; 59:7; 66:20, 25; 67:8; 73:17, 21, 22; 75:9; 85:15
discussions 52:5; 60:8, 25; 66:18
Dispatch 36:8, 13; 37:39:24; 45:9
distinguish 52:24; 53
District 4:1; 5:10, 12, 18,

**Tammy Kitzmiller, et al.   v.**
**Dover Area School District, et al.**

**Alan Bonsell**
**January 3, 2005**

25; 6:4; 13:7, 9; 14:9, 11, 12; 15:2, 14, 19; 16:16; 17:13; 19:22; 20:4; 21:2; 33:4, 20; 41:3; 43:16; 76:19; 77:24; 84:15, 20; 85:6
**District's** 66:18
**Districts** 66:17
**document** 11:14, 19, 20; 17:4, 9; 54:10, 15, 18; 55:4, 18; 56:19; 57:2, 8, 10, 12, 15; 61:8, 14; 66:16
**documents** 39:23; 54:12; 55:6, 10, 17
**Donald** 13:23
**donate** 14:5, 8, 17; 15:1, 1, 6, 8, 14, 21, 23; 16:21, 23; 75:10, 18; 77:19, 22
**donated** 13:6, 9, 13, 14, 15, 16, 18, 20; 14:1; 15:19; 74:24; 76:24; 77:2, 3, 10, 10
**donating** 16:14; 76:18
**donation** 15:25; 16:4, 10
**done** 9:18; 10:16; 16:19, 20; 21:12; 36:22; 37:5; 38:2, 11; 44:11; 56:17; 61:22; 74:21; 81:10; 88:6
**Door** 81:21
**Dover** 3:25; 4:9; 32:7; 33:3, 20; 35:3, 5, 6; 42:7; 45:18; 67:22, 25; 68:9; 69:24
**down** 7:4; 17:14, 14; 48:25; 86:11
**Dr** 12:19; 88:2
**drafted** 18:24
**drafting** 19:8, 12, 15
**drafts** 11:14
**driven** 63:25
**due** 93:6
**duly** 3:16
**During** 9:9; 35:12; 43:15, 19; 44:2; 49:23; 51:9; 61:21

**E**

**earlier** 11:14; 86:20; 88:12
**easy** 9:13
**edit** 70:8, 10
**edited** 71:25
**educate** 22:4
**effort** 44:8, 24; 54:22; 68:7, 10, 20; 69:4, 5
**efforts** 51:2; 54:21
**Einstein** 30:20; 31:11
**either** 43:10; 50:14; 63:16
**else** 8:11; 11:24, 25; 12:14, 16; 14:1; 16:9; 19:14, 20, 24; 35:16; 36:9; 47:11; 68:10; 72:10; 76:17; 78:19; 87:3
**employes** 19:21

**encouraged** 82:9
**end** 87:8
**ended** 70:12
**engage** 6:16; 7:7; 67:7
**engaged** 28:24
**enough** 69:22; 76:16
**entire** 11:17, 18
**entitled** 10:16
**Eric** 3:23
**established** 76:24
**estate** 35:15
**estimate** 7:15
**even** 33:8; 37:1; 59:6
**evening** 12:9
**events** 58:17
**everybody** 59:3
**everybody's** 78:15
**everyday** 32:25
**everyone** 29:16
**everywhere** 83:22
**evidence** 30:9, 10, 13; 32:9; 56:11; 67:14
**evolution** 31:23; 32:19; 41:1, 10; 42:11; 45:20; 47:20; 48:1, 6, 11; 50:12; 59:9; 62:24; 63:1; 67:21; 68:1, 24; 69:19; 70:5; 71:12; 80:19; 81:9
**evolutionary** 48:16; 53:17
**exact** 5:7; 7:14; 13:3; 14:21; 20:7, 12; 59:13, 14, 16; 71:9; 88:4
**exactly** 5:6; 7:12; 8:6; 15:11; 16:19, 19; 25:6, 11; 48:9; 49:22; 94:1
**examples** 38:1
**except** 3:4; 34:22; 61:11; 71:11
**exchange** 61:21
**executive** 10:5; 85:10, 11
**exercise** 86:1
**Exhibit** 11:3, 4; 17:2; 39:20; 54:8; 66:4
**Exhibits** 10:24
**exist** 78:23; 79:6; 94:10
**exists** 94:14
**exit** 45:5; 84:24
**experience** 51:13, 18
**expertise** 89:6
**Explain** 60:2; 62:13, 21
**explained** 93:5, 8
**express** 70:22, 23; 71:15
**eye** 62:19, 22

**F**

**fabricated** 46:7, 8, 9, 10
**fact** 15:6; 32:4; 33:5, 7, 10; 67:12, 15; 68:18, 24; 76:24; 93:9
**facto** 19:3

**facts** 32:8; 56:10; 67:18; 86:9
**factual** 37:10
**faculty** 43:22, 23; 44:5; 69:24; 70:17, 23; 71:3, 21; 72:3, 20, 23
**fair** 42:22; 57:18; 58:4; 88:25; 94:5, 13
**fall** 78:19
**false** 82:19, 19
**familiar** 55:6, 11
**far** 10:21; 16:5, 14; 69:1; 72:5; 75:11, 12; 79:22; 80:2, 23; 92:7
**fashion** 69:2
**father** 13:25; 14:5, 7, 22, 25; 15:21; 16:1, 4, 13; 75:9, 13, 14, 17; 76:6, 18, 24; 77:6, 11, 11
**favor** 42:24; 43:5; 47:2
**feathers** 78:24; 79:7
**features** 71:24
**federal** 64:3
**feel** 30:10; 90:14
**few** 12:11; 13:1; 18:12; 36:17; 40:10; 87:9
**field** 24:22, 24; 29:5, 6, 21; 33:3, 17, 19; 34:14, 15
**file** 3:10
**filed** 11:3
**filing** 3:3
**find** 8:19, 20; 31:20; 44:3, 8; 51:2; 54:21; 55:25; 56:3; 68:7, 10; 69:4, 5
**fine** 7:14; 39:14; 84:23; 86:13, 13; 94:4
**finish** 33:11; 41:18; 94:3
**finished** 9:16
**fins** 78:24
**firm** 3:24; 5:9, 19; 6:2, 3, 16, 17; 7:3, 8; 8:3, 11, 14; 10:4
**first** 11:9, 10; 12:24, 24; 14:16; 15:25; 16:3; 17:15; 40:20; 53:15; 56:18; 57:23; 84:3, 6; 87:17; 90:14, 16
**fish** 78:24; 79:12; 80:1, 8, 14
**fitting** 20:21
**five** 90:8
**follows** 3:17
**form** 3:4
**formed** 18:12; 79:6
**forth** 57:3
**forums** 66:17
**forward** 32:25; 58:14
**fossils** 62:11
**found** 24:18
**founded** 42:10, 11
**four** 46:24; 61:8; 93:25
**Fox** 9:11
**full** 5:3; 19:16; 48:25; 58:10

**function** 19:2
**further** 3:12; 94:22
**furthered** 66:24

**G**

**gain** 75:7
**gaps** 17:16; 61:12; 62:5, 6; 87:14; 94:10
**gaps/problems** 62:4
**gather** 86:9
**gave** 16:15; 76:11
**gee** 56:2
**general** 10:7; 78:18
**generalized** 21:18
**germ** 69:13
**gestures** 10:9
**gets** 45:15; 47:11
**Gillen** 12:13; 83:8
**given** 20:9; 38:1; 52:16; 55:25; 66:5
**giving** 92:22
**God** 23:24; 24:14, 17
**goes** 64:13
**goings** 77:9
**Good** 3:20, 21; 76:6; 77:13
**goodness** 30:24; 35:6
**government** 64:3, 3
**grade** 29:14; 87:16
**graduate** 35:18; 36:3
**graduated** 35:21
**gravity** 69:6, 8, 10, 11, 12
**group** 5:4; 18:17; 20:8, 10, 12, 13, 20; 51:22; 77:19, 21, 23
**guess** 4:20; 5:7; 16:14; 31:1; 34:23; 48:5; 50:2; 55:3, 3; 59:8; 60:16, 25; 71:9; 77:19; 78:8; 81:7; 85:20, 23; 93:10
**guessing** 60:17

**H**

**habit** 50:3
**Hali** 60:11
**Hamilton** 3:24
**handwriting** 55:14
**happen** 21:20, 22, 22; 46:16; 59:12, 23; 85:9; 87:25
**happened** 21:19; 23:17; 46:14; 62:21
**happens** 64:5
**harassing** 28:16
**Harkins** 12:19; 19:13; 56:21
**head** 7:11, 12; 22:8; 36:2; 90:1, 13
**hear** 25:16; 26:10; 27:3;

28:1; 65:15; 88:23
**heard** 15:25; 16:21, 24; 63:5; 69:13, 14, 17; 88:20, 21; 90:14
**hearings** 9:5, 7
**heart** 66:20
**Heidi** 45:9
**held** 58:18; 60:20
**helped** 70:8, 10
**hereby** 3:2
**high** 37:15; 40:21; 45:21; 73:9
**hold** 37:7
**honest** 49:21; 59:13; 61:4
**hours** 12:11
**humans** 78:23, 24; 79:12, 25; 80:8
**hundred** 31:15, 17; 45:18
**hypothetical** 93:1, 2
**hypotheticals** 92:20; 93:21

**I**

**idea** 59:2, 10, 22; 60:3, 14, 20; 61:2; 76:6; 77:9, 13; 90:20, 23
**ideas** 59:4, 5
**identical** 61:10; 70:13
**identified** 48:10
**imagine** 52:4
**immaterial** 91:25; 92:4
**impediment** 34:9
**important** 64:3
**improper** 28:21, 23
**include** 47:18; 79:5
**included** 44:8, 25; 71:12
**includes** 42:25; 43:6; 90:20, 23; 91:7
**including** 14:5; 38:7; 46:6
**incorrect** 11:21
**incorrectly** 39:11; 40:16
**indicates** 57:22
**indication** 32:9
**individual** 19:11; 51:14, 19; 89:25
**individuals** 14:4, 8
**inference** 42:23
**inform** 64:16
**information** 22:10; 32:2, 3, 15, 17, 22, 25; 33:1; 57:15; 64:19
**initiated** 59:6; 60:14
**input** 19:15, 15
**inquiring** 84:8
**inquiry** 66:17
**inserted** 38:20
**instance** 72:18
**instances** 72:14
**instead** 52:13; 67:1
**Institute** 20:14, 21;

**Alan Bonsell**
**January 3, 2005**

82:21; 83:1, 6, 15; 84:7,
19; 85:5, 12, 16; 86:3, 17,
20, 23, 25
**instruct** 28:7; 53:23; 56:3
**instructed** 53:12; 56:5, 9
**instructing** 28:11, 13
**instruction** 28:21; 55:25
**instructions** 10:8; 52:16
**instructs** 28:5
**intellect** 22:14; 23:4
**intelligent** 21:5, 6, 8, 9,
19; 22:1, 2, 5, 16, 18; 23:3,
6, 7, 9, 10, 14, 15, 16, 23;
24:14, 16; 30:16, 17, 21,
22; 31:5, 7, 10, 18, 21, 22;
32:5, 13, 18, 23; 33:14;
63:6, 23; 64:6; 65:4, 7, 15;
66:25; 69:25; 70:1, 4, 16,
18, 24; 71:4, 5, 11, 13, 17,
22; 72:4; 78:1; 79:17, 18,
20, 21, 23, 25; 80:7, 10,
13, 19, 23; 81:6, 9, 22;
87:14; 88:14, 18; 89:1, 7;
90:4, 14, 19, 20, 23, 24;
91:1, 6, 10, 12, 24; 92:1, 3,
6, 19, 21, 23; 93:4, 10, 13,
22, 24; 94:7, 14
**intended** 14:5, 8; 16:1, 4
**intention** 14:25; 59:23;
63:11
**interaction** 77:12
**interactions** 86:17
**interested** 67:5
**interfering** 34:5
**interpretation** 63:8; 94:5
**into** 7:12; 19:15; 29:1;
31:14; 43:20; 64:20; 65:2,
6
**introduced** 3:22; 10:24;
17:2; 39:20; 54:8
**involve** 23:6
**involved** 16:9; 21:2; 83:3
**issue** 33:11; 34:16;
36:12; 37:2, 21; 38:3;
41:21, 24; 45:15; 79:18
**issued** 74:19
**issues** 29:17, 22; 48:10;
51:15; 52:1; 85:21, 22
**italicized** 17:15
**item** 40:1; 70:4

## J

**January** 3:14; 87:17;
88:1
**Job** 35:14
**joined** 4:5
**June** 40:10, 14, 19;
43:15, 19; 45:8; 46:3, 21

## K

**Katskee** 4:5
**keep** 27:13; 28:18; 50:6,

7; 91:8
**kids** 29:17; 33:23; 60:13;
64:1; 76:14
**kind** 9:1; 10:9; 29:1; 52:5;
68:2
**knew** 60:22
**known** 71:3

## L

**landlord/tenant** 9:8
**language** 17:19; 21:3;
61:17; 62:3, 23
**last** 5:7, 8; 12:9; 45:18;
85:1; 90:3, 6, 8
**later** 66:6, 8
**law** 3:24; 5:9, 19; 6:2, 3,
13, 16, 16; 7:3, 8; 8:2, 11,
14; 69:9, 11
**lawsuit** 3:25; 6:4
**lawyer** 85:19
**lawyers** 20:20; 83:7;
85:16; 86:3, 15
**Leader** 20:25
**leading** 58:22
**leads** 33:6
**learn** 26:20, 22; 32:17,
22; 33:24; 64:9; 67:4;
92:24
**learned** 76:6
**learning** 25:17, 19, 25,
25; 26:11, 12; 27:5, 11, 16,
17, 20, 21, 21, 22, 24, 25;
68:4
**least** 29:25
**lectures** 81:8, 16
**led** 60:2
**left** 83:17; 84:4
**legal** 5:14
**legally** 85:20
**less** 69:19
**letting** 64:25
**level** 24:22, 24; 29:4, 6,
21; 33:3, 17, 19; 34:14, 15
**Levin** 43:25; 52:14, 24
**liberal** 50:16
**library** 64:10
**life** 22:13; 23:16; 80:10;
90:20, 24; 91:10
**limit** 37:18
**limitations** 65:25
**limited** 3:12; 70:15; 88:24
**line** 89:21
**lines** 38:25; 49:14, 19
**litigation** 85:17
**little** 42:2
**live** 35:1, 3
**lived** 35:5, 6
**living** 35:7
**locates** 91:24
**long** 4:12, 17; 12:10;
35:5; 41:2; 74:19

**look** 18:22; 20:9, 23;
30:23; 31:14; 32:2, 15;
33:1; 40:5, 7; 44:24; 46:2;
47:4; 48:7; 52:12, 20, 23,
23; 53:6, 8, 12, 17; 57:12,
25; 75:5; 76:15; 91:22;
94:18, 18, 19
**looked** 11:18, 25; 12:22;
68:19
**Looking** 12:2; 29:9;
43:20; 48:4, 5; 53:19, 20;
57:24; 60:4, 5
**looks** 20:12; 43:4; 55:6,
10; 57:11, 14, 17; 59:3
**lot** 22:11; 46:12; 47:9;
58:2

## M

**Magistrate** 9:5, 7
**main** 70:20
**major** 35:22
**majority** 59:19; 65:19;
73:23
**makes** 31:2; 67:1
**making** 27:11; 29:6; 49:7;
91:8; 92:21, 23; 94:1, 6
**Maldonado** 40:13, 15
**man** 8:9; 78:20
**mandate** 67:3
**mandated** 53:16; 63:24;
64:4
**many** 43:4; 51:7, 8; 55:6;
75:10, 17; 76:3, 10; 77:8;
84:1
**marked** 17:5; 39:23;
54:11
**master** 22:14; 23:4
**materials** 22:4
**matter** 4:2, 8; 5:1, 2;
37:13, 18; 53:14; 57:18;
59:6; 64:17; 77:15; 81:22;
87:13; 90:21, 25; 91:1, 11,
12
**may** 5:23; 10:11; 25:23;
86:8
**Maybe** 64:18; 76:23;
86:10; 88:3
**mean** 7:4; 8:6; 12:2;
15:17; 16:5; 18:15, 16;
20:23; 21:7, 10, 18; 23:16;
24:24; 26:13; 30:4, 7; 38:1,
21; 39:4; 42:2; 44:12;
46:10, 11; 48:22; 55:6, 10;
68:13; 70:2; 71:10, 24, 25;
75:16; 77:2, 10; 78:4, 5, 7,
12, 14, 20; 79:8; 88:20, 21,
22, 22, 23, 24; 89:2
**meaning** 6:8, 18; 19:16
**meanings** 38:21
**means** 23:14; 26:7, 22;
78:11; 92:8
**meet** 10:3; 12:6, 8, 10
**meeting** 8:21; 10:2, 4;
16:24; 40:18, 19, 21; 41:8,

14, 22; 42:16, 20; 44:18,
23; 45:19; 49:6, 9, 12;
50:4; 56:21, 25; 57:11, 13,
16, 19, 22; 58:6, 18, 19;
59:18, 21, 22, 25; 60:19,
20, 22; 61:15, 22, 23, 25
**meetings** 12:3; 19:6;
41:25; 42:1; 44:6, 10;
45:23; 46:3, 5, 18, 20, 22;
49:8, 24; 51:10, 12, 13, 18,
19; 52:2, 2, 3; 58:2; 59:25;
60:1, 25
**member** 4:9, 12; 18:23,
25; 19:3; 26:9; 47:21, 23;
76:20; 77:21; 86:22
**members** 8:13; 18:12;
19:11, 11, 21; 20:2; 41:24;
42:23; 46:6; 51:14, 20, 22,
23, 23, 25; 74:1; 82:4
**memo** 56:19
**men** 80:14
**mentioned** 8:20; 42:5
**merely** 28:15
**merit** 88:14, 18; 89:1
**merits** 73:4; 89:7, 7
**message** 83:17, 18; 84:4,
9
**met** 71:25; 85:13, 18
**Mike** 12:20; 19:13
**Miller** 43:25; 52:14, 20, 24
**minimum** 87:22
**minute** 66:9; 88:5
**minutes** 7:5
**misquoted** 36:19; 38:14
**misrepresented** 36:19;
38:15
**missing** 54:23, 24
**moment** 53:23
**Monday** 40:18, 19, 21;
42:19
**money** 14:11, 12; 15:18;
77:18
**month** 7:15
**months** 13:1
**More** 6:3, 13; 9:15; 21:10;
31:1; 42:2; 43:4; 47:16, 17,
18; 53:11; 54:5, 6; 64:18;
73:14; 80:19, 25; 85:23;
86:8; 90:17; 92:8; 94:18
**morning** 15:4
**Most** 50:5
**Mrs** 50:25
**much** 11:18; 12:5; 22:9;
23:16; 30:24; 77:10
**museums** 88:22; 89:20
**Muslim** 42:11
**myself** 3:22; 19:14

## N

**name** 3:23; 18:18; 20:10,
12; 31:12; 39:12; 60:12;
89:13; 90:1, 12
**names** 14:1; 22:8; 89:14

**nature** 46:24; 48:14
**near** 87:8
**nearly** 45:17; 49:1
**necessarily** 23:5, 8;
24:15
**necessary** 34:8; 47:1⁵
**need** 10:8, 17; 26:24;
47:5; 59:16, 17; 92:8
**neither** 89:22
**net** 89:11, 23
**new** 43:17; 47:15; 60:7;
67:14; 91:25; 92:4
**newer** 54:6
**newsletters** 38:18; 56:17
**newspaper** 37:2, 10, 21;
38:6, 13; 39:9; 41:6
**newspapers** 36:5, 7, 18;
83:21
**next** 9:18; 29:14; 42:17,
22; 48:24
**night** 40:18, 19, 21; 42:19
**night's** 45:19
**Nilsen** 12:19; 15:5, 9, 13;
77:25; 88:2
**ninth** 29:14; 87:16
**nobody** 21:2; 32:4
**Nobody's** 27:24
**Noel** 42:23; 50:14
**none** 62:11
**nor** 93:22
**normal** 10:11
**normally** 50:8
**note** 50:7
**notes** 49:23, 25; 50:4
**notice** 60:18
**November** 8:15
**number** 21:25; 28:9;
67:18, 18; 75:8, 11, 11, 12,
13, 14, 25; 76:14
**Numerous** 36:23; 38:2;
71:24

## O

**oath** 9:2
**object** 52:25
**objected** 27:9, 10
**objecting** 77:17, 18
**Objection** 5:14, 21; 6:5;
14:23; 23:25; 26:1; 27:6;
28:2; 32:8; 56:10; 73:25;
74:10; 75:1; 76:22; 86:1;
92:12
**objections** 3:4
**objective** 66:21, 24
**obviously** 29:8; 59:19;
86:5
**occasion** 51:20
**Occasionally** 36:10;
50:2; 51:11
**occur** 23:9; 58:6, 8
**occurred** 57:22; 86:
**occurring** 68:21; 82:6,

Tammy Kitzmiller, et al. v.
Dover Area School District, et al.

Alan Bonsell
January 3, 2005

11
October 17:21; 57:5, 20, 22; 58:6, 6, 9, 20; 59:1, 21; 82:9; 87:21
off 3:22; 7:11; 22:8; 36:2; 53:15; 79:21; 86:12; 90:1, 12; 91:23
offer 14:10, 14, 16, 20; 15:1, 6, 9, 13; 16:17, 21, 23, 25; 84:16, 19; 85:5
offered 16:14, 17
Offering 56:10
official 51:23
once 83:25
One 4:18; 9:14; 13:21; 20:6; 29:23, 24; 33:5, 6, 8, 9, 16; 34:13, 22; 37:7, 8; 38:24; 40:15; 42:21; 43:24; 44:4; 45:2, 14; 47:21; 48:12; 53:11; 61:9, 12; 63:13; 64:7, 7; 66:6; 67:3, 10, 18; 77:6, 21; 78:22; 80:2, 13, 25; 87:17; 88:24; 91:3, 4; 93:25
only 8:2, 6; 16:6, 12; 24:25; 29:23; 33:8, 9; 38:22, 23; 40:25; 41:8; 55:8, 16, 20, 21; 56:8, 15; 57:17; 58:12; 67:19, 21, 24; 68:1, 23; 69:1, 1; 70:15; 74:14; 77:7; 83:24, 24
open 66:19; 67:7; 81:21
opinion 30:12, 16; 33:2; 78:5, 25; 79:2
opinions 64:17
opportunity 66:19
opposed 31:3; 70:17
opposite 21:21
Order 3:8, 11; 9:13
organisms 91:25; 92:4; 93:5, 7, 8
organization 87:4
organizations 20:5
origin 22:14; 91:24; 92:4
originally 78:23
originate 59:10; 60:3
originated 61:2
origins 3:12; 78:9, 17
otherwise 10:17
out 8:19, 20; 10:11; 30:2; 31:20; 34:22; 35:15; 38:22; 50:5; 52:18; 53:9, 21; 54:16, 17; 55:25; 56:3; 63:2, 6; 64:9; 67:4, 20; 68:7, 10; 69:4, 5; 73:15, 18, 19, 19; 85:13; 94:9, 16
outside 9:24; 20:4, 5, 8, 10, 20, 20; 21:2; 52:2; 68:13
over 10:23; 11:18; 18:22; 21:25; 26:3, 3; 38:12; 40:5; 43:20; 60:8
owes 22:14
own 56:6; 62:17
owning 35:11

P

P-1 10:24
P-2 10:24; 11:4
P-3 17:2, 5
P-4 39:20, 23
P-5 54:8, 11
p.m 52:8, 8; 88:7, 7; 94:25
page 17:14; 20:19; 22:20, 23; 40:22; 42:9; 45:8; 48:24; 54:11; 55:12; 56:18; 57:2, 17, 23; 66:8, 16
pages 40:10
Pandas 11:25; 12:21, 25; 14:8; 15:7, 14, 16, 19; 16:22; 22:13; 73:9, 14, 18; 74:14
paper 11:11; 31:14, 16; 38:3, 5, 7; 82:13
papers 12:2
paragraph 40:20
paragraphs 48:25; 70:9; 93:25
parallel 23:12
parents 64:17
part 22:16; 23:3; 38:7, 22; 43:1; 44:9; 48:16; 53:3; 54:22; 57:19; 61:21; 79:11; 93:13
participate 19:8; 20:1, 2, 3, 4
participated 19:12
participating 44:23
participation 20:20
particular 11:10; 37:17; 39:17; 41:7; 53:13; 54:4; 68:25
parties 3:3
passed 22:6; 33:19; 34:1, 10, 20
passing 24:20; 29:20; 33:2; 34:13
pattern 92:1, 5
pay 16:15
People 12:1, 25; 13:16, 18, 20; 16:7, 8, 11, 22; 19:20; 30:19; 46:12; 58:12; 59:3, 21; 63:6, 8, 10; 64:8; 77:19, 21, 23; 78:13; 82:14
Pepper 3:24
per 75:22
perhaps 19:21
period 6:22; 7:25; 8:1, 7; 12:16; 43:15, 19
person 16:6, 12; 77:7
personal 78:10, 14, 16, 25; 79:2; 80:18, 21
personally 38:13; 86:16
picked 47:6, 7
piece 71:8
place 85:24

Plaintiff 11:2, 4
plaintiffs 3:10, 25; 4:8; 11:4; 54:13
plan 92:1, 5
playing 24:22, 24; 29:5, 6, 21; 33:3, 17, 19; 34:14, 15
please 10:13; 27:2; 38:8, 10; 39:1; 65:12; 71:2; 73:16; 85:1; 90:22
pledge 49:18, 20
plus 62:17
point 36:15; 58:15; 59:17; 63:24; 84:16
points 30:10, 13, 22
policy 3:13; 65:20, 21
portion 17:15
portrayal 47:25
portrayed 53:13
position 61:24; 63:23; 69:24; 70:3; 71:3, 22; 79:17
positions 47:2
positive 49:13; 88:1, 2, 4
positively 63:15
possibility 43:21; 65:3, 5; 91:2, 4
possible 9:13; 16:3; 50:8; 72:11
possibly 41:1, 9
powerful 49:8
practice 19:5; 51:9, 19; 66:20
precise 31:1; 48:3; 76:13; 93:15
precisely 92:8
preliminary 3:9
Prentice 60:11
prepare 10:20, 21; 11:24, 25; 61:17, 19
prepared 17:23, 24
preparing 19:22
present 12:12, 14, 16; 70:4; 78:1
presentation 69:25
presented 31:23; 32:19; 33:8, 10, 10; 67:19; 87:15; 91:17, 20; 92:11, 18; 93:18
presenting 32:4, 6, 12, 13, 23; 66:24; 93:19, 22
President 4:14; 18:25; 19:1, 3, 5; 40:23; 51:9
Press 17:12; 66:4, 9; 74:16, 18; 78:6, 7; 82:3, 8; 94:2
pressured 82:16
pretty 11:18; 12:4; 49:8; 87:8; 89:23
printed 54:18
Prior 5:5, 9, 11, 13, 17, 19; 6:2, 8, 8, 13, 16, 18, 25; 7:1, 4, 19, 21; 8:9, 14, 15; 16:21, 23, 25; 22:5; 23:2; 29:20; 33:2; 34:1; 47:5;

59:25; 61:22; 85:15
private 55:22; 56:4, 8, 15
privilege 28:22; 83:4, 9; 85:24; 86:6
probability 30:22
probably 7:1; 19:19; 72:5; 75:12, 15, 16, 19; 76:8; 77:14
problem 71:7; 73:11
problems 17:16; 41:3; 61:11; 62:5, 6, 8, 10, 10, 16, 19; 87:15
proceeding 9:1; 29:1
process 10:18; 43:16; 44:2; 57:19; 59:17; 60:2
produced 54:13
product 54:20
production 55:18; 56:19
Professors 89:9
prohibition 34:2, 4, 11
properly 34:23
proposal 86:4
propose 59:11, 11
proposed 57:3; 58:7; 61:4; 62:7, 23
proposes 58:10
proposition 70:25; 71:6, 17, 23; 80:8; 91:3, 13
provided 11:5; 55:5, 8
provides 66:19; 92:3; 93:4
public 41:22, 25; 51:1, 12, 18
purchase 15:18; 72:24; 76:6
purchased 15:16; 43:25
purchasing 43:16, 21; 73:5
purpose 3:12; 24:20; 29:4, 5; 33:15; 67:16
purposes 3:9; 33:16; 34:13; 85:25
pursuant 3:8
Put 18:1; 33:15; 38:10; 86:11

Q

quick 9:20; 45:1
quickly 9:21
quit 37:25
quite 36:11, 17
quote 42:9
quoted 82:8

R

raised 41:16
read 10:23; 11:9, 10, 10, 14; 20:8; 21:16, 17, 25; 22:3, 4, 15; 26:11; 27:4; 30:20; 31:11, 12; 36:5, 5, 7, 17; 43:4; 62:15; 64:18;

70:9; 73:19; 76:23; 85:1, 6; 87:23; 88:15, 19, 20, 23
reading 11:23; 21:12, 24, 24; 23:2; 25:12, 13; 30:1; 36:15; 43:12; 81:11; 82:12; 83:20; 89:19; 91:5
reads 64:13
ready 10:22
real 35:15; 66:20
realization 32:4
realize 64:8
really 35:17; 38:11; 52:19, 21, 22; 54:16; 62:21; 81:24, 24; 86:19; 92:7
Reask 65:13
reason 29:11; 56:7; 82:13
recall 8:12; 39:19; 41:17; 42:8; 43:14; 45:1; 49:7; 54:1; 69:16; 71:1, 20; 73:4, 11; 81:17; 82:2; 84:17; 89:14; 90:1, 5
receive 55:4
recently 82:24
recess 52:8, 10; 88:7, 9
recognize 17:9, 19; 54:15, 17, 20; 57:8
recommend 43:23
recommendation 61:15, 18; 72:23
recommendations 61:8, 12
recommended 43:22, 24; 44:5; 47:18; 48:1; 51:3; 62:3; 72:19
reconsider 31:22, 25; 32:6, 13, 18, 23
record 3:22, 23; 9:12, 14; 10:12; 28:9; 36:10, 13; 39:25; 40:11
refer 18:4
reference 23:23, 24; 42:19; 71:13; 73:12, 14; 74:5, 7, 14; 94:17
referred 12:21; 18:17; 86:16
referring 11:6; 62:18, 2; 85:11; 86:19
refers 40:18
reflect 57:15; 61:14
reflects 28:9
regarding 49:20; 86:2; 87:14
regards 80:5
regular 58:19; 74:20
regularly 36:5; 74:14
related 61:24
relating 51:15; 55:17; 81:9
relationship 5:13, 19; 6:1; 7:24
Release 17:12; 25:6; 66:5, 9; 74:16, 18; 78:6, 94:2

Alan Bonsell
January 3, 2005

religion 63:14, 15; 65:3, 6, 9
religious 78:2, 8
remain 13:14
remarks 50:20
remember 7:14; 15:11; 16:19; 36:1; 37:13; 38:17; 48:10, 15, 19; 50:23, 25; 51:1; 54:3; 60:22; 72:9, 13, 18, 22; 75:21; 76:17, 21; 77:15, 17; 82:12, 12; 83:20
renowned 22:11
Rental 9:8
repair 35:10, 12
Repeat 5:24; 6:14; 14:6; 16:2; 24:13; 51:17; 71:2; 72:1; 73:16; 79:4; 88:16; 91:8
repeating 41:19
report 37:9, 24; 38:24; 45:22; 53:22; 54:2
reported 36:25; 37:22; 38:19; 39:2, 10; 41:5; 43:2, 3, 3; 55:21, 22; 82:3
reporter 9:12; 37:8; 39:1, 9, 12; 85:6
reporters 36:23; 37:4; 38:6, 7, 12; 39:4, 4; 40:15; 45:14
reporting 36:12; 37:25; 38:22; 39:5, 7; 40:16; 56:15
represent 3:24; 5:10; 6:3, 17; 55:16; 84:16, 20; 85:5
representation 86:10
represented 4:22
representing 4:7; 39:25; 85:17
request 15:23
require 68:17
required 28:6; 63:17; 64:2; 67:10; 87:23; 92:25
requires 70:4
requiring 25:3, 5; 26:11; 27:4; 64:11; 94:19
research 85:22; 87:1
reserved 3:5
residents 45:18
resolution 17:21, 23, 24; 18:24; 19:9, 12, 18, 23; 21:3, 5, 7, 11; 22:5; 24:20; 29:20; 33:2, 16, 18; 34:1, 8, 14, 19; 57:20; 58:9, 20; 82:9; 87:22
respect 79:14
respective 3:3
respond 84:12
response 10:13; 11:7; 76:2; 83:23
responses 10:23
responsibilities 18:20
responsibility 18:14, 15; 28:25
responsible 29:12
rest 10:18

restraining 3:11
result 17:20; 25:9; 58:8; 73:22; 87:21; 90:20, 24; 91:10
resulted 57:20
retract 37:12; 38:9
retraction 37:3, 5, 6, 11, 22; 38:4
returning 84:3, 8, 12
reveal 83:6
review 11:17
reviewing 32:3
revised 66:18
Richard 4:5
Rick 31:13
Right 22:24; 23:1; 35:15; 39:12; 58:21; 59:10; 78:17; 86:5; 91:23
rights 50:17
role 19:1, 2, 22, 24
room 9:25; 45:6; 84:25
ROTHSCHILD 3:19, 23; 5:16, 22; 6:9, 20; 10:6; 11:1; 14:24; 17:3, 6, 8; 22:21, 22; 24:3, 5, 9, 11; 25:22; 26:4, 8; 27:9, 15, 18; 28:4, 11, 14, 20; 29:2, 3; 32:11; 39:21; 40:3, 6; 45:7; 52:11; 53:3, 5; 54:9; 56:13; 65:24; 66:3; 74:2, 12; 75:6; 77:5; 83:8, 11; 85:1, 8; 86:4, 14; 87:8, 12; 88:5, 11; 92:14; 94:22

## S

Same 5:21; 6:5; 9:17; 20:19; 26:2; 27:1, 14; 28:10, 19; 30:11; 42:21; 54:7; 55:12; 59:5; 71:9; 74:10; 80:8
Santorum 31:13
saying 15:11, 12; 16:18; 26:23; 38:10, 19; 40:25; 43:13; 49:7; 50:23; 54:24, 25; 55:9; 56:2; 58:18; 64:8; 71:8; 72:12; 75:21; 76:13; 78:15; 79:24, 21; 80:3, 10, 12, 14; 89:9; 91:1, 4; 93:25
scanned 12:23
scheduled 57:23; 58:5
School 3:25; 4:10; 5:10, 12, 17, 18, 25, 25; 13:7, 9; 14:11, 12; 15:2, 4, 19; 16:16; 17:13; 19:22; 25:8; 26:9, 14, 15, 20; 27:4; 33:3, 20; 35:20; 37:15; 38:11; 40:21; 41:13, 25, 25; 43:15; 44:4; 45:19, 23; 46:4, 5; 49:8, 9, 23; 51:12; 63:24; 66:9, 17; 73:9; 74:25; 76:19, 19, 25; 77:18, 24; 84:15, 20; 85:5; 91:14, 17, 20; 92:11, 18; 93:18, 19
school's 45:21

schools 29:8; 42:7; 55:21, 23; 56:1, 4, 8, 16
science 23:11; 24:18; 25:1; 30:22, 22; 33:25; 34:3; 35:24; 43:22, 23; 47:5; 68:6; 69:24; 70:17, 23; 71:3, 21; 72:3, 14, 16, 19, 20, 23, 24; 73:1, 8
scientific 21:8, 10, 13; 24:23; 29:22; 30:2, 3, 6, 8, 12, 17, 18; 31:2, 8, 10, 18, 21; 32:5, 14, 20, 24; 66:20; 67:21, 24; 68:1, 8, 18; 69:2, 20; 70:24; 71:1, 6, 17, 23; 79:22; 81:5, 6, 6; 88:13, 18; 89:1, 5, 6, 7, 10, 16; 90:3
scientifically 48:17; 72:4
scientist 31:9
scientist's 31:12
scientists 21:17; 22:11, 12; 30:20; 31:3, 4, 7, 15, 17, 20, 24; 62:15
se 75:22
sealing 3:3
search 25:2; 29:19; 33:25; 53:22, 24, 25; 54:6; 55:1; 56:8
second 9:20; 37:8; 45:1; 61:10; 66:8, 16
section 48:11
selecting 43:16; 44:2
self-employed 35:8
seminars 81:8, 12, 14, 15
Senator 31:13
sense 86:9
sentence 33:11; 93:15
sentences 38:23
separate 79:12; 80:14
Separation 4:6
September 57:25; 58:5; 60:18
series 46:3
session 10:5; 12:16; 85:10, 11, 15
Seth 84:11
setting 57:2
several 27:7; 28:8, 17
shaping 90:21, 24; 91:1, 10, 12
share 79:12; 80:1, 4, 15
Sheila 12:19; 19:13; 56:20
shop 35:10, 12
short 6:22; 7:25; 8:1, 7; 87:9
shoulder 40:5
show 17:4; 22:20; 54:10; 59:21
showing 29:24
shows 88:23
similar 59:4
similarities 93:5, 8
single 40:1; 89:24

Sitting 89:24
situation 65:2
size 53:2
slowly 9:15
small 18:12
somebody 44:18; 59:16; 84:7; 89:15; 90:3
somebody's 30:12
somehow 23:20
someone 49:1
sometime 60:8
Sometimes 19:7
somewhere 20:7; 89:21; 91:5
sorry 41:4, 19; 51:6; 56:2; 57:25; 67:23; 69:7; 71:2; 73:16; 87:20; 91:8, 8
sort 19:3
sorts 51:25; 58:2
sounds 58:21
sources 44:24
speak 9:15; 43:5, 5
species 62:22; 79:8, 12; 80:14
specific 7:5; 31:9; 38:17; 65:12; 92:9
specifically 37:6
speculate 23:11; 44:12
speculating 44:13
speculation 56:11; 73:25
Speculative 75:2
spending 77:18
spoke 42:24; 43:13; 86:18
spoken 8:2; 16:9, 12; 40:15; 71:24; 82:20; 89:3
staff 61:9
staff's 61:11
stand 49:3; 86:11
standards 63:25; 66:1
start 79:21; 83:12
started 9:10; 59:14; 60:7; 80:2
starts 17:15
State 4:7; 39:10; 63:18, 25; 64:3
stated 29:4; 82:3; 91:3
statement 20:9; 23:15; 25:12, 13, 16; 26:10; 27:3; 28:1; 40:22; 41:5; 42:15; 48:25; 49:4, 7, 9, 12, 19; 50:9, 10, 15, 18; 64:23; 77:24; 84:12; 87:23; 92:17, 22
statements 11:20; 36:20; 38:14, 16, 17; 46:5, 12
states 22:13; 31:13; 66:16
stating 82:8
statistical 30:21; 62:16
steps 62:12
still 66:7; 79:15
stipulated 3:2

STIPULATION 3:1
Stock 20:25
stopping 34:18
straight 39:12
strict 63:8
strictly 23:17
strongly 23:12
stuck 22:8
student 40:25; 64:13; 70:10
students 17:16; 25:16; 26:10; 27:3, 25; 29:21; 32:7; 42:12; 59:8; 62:3, 23; 63:11; 64:24; 67:1, 11, 17, 22, 25; 68:4, 9, 17, 23; 73:10; 75:4, 5, 8, 25; 76:1, 3, 10; 87:16, 23; 92:21; 93:23, 24; 94:1, 6
stuff 45:15
sub 18:12
subcommittee 18:2, 5, 6, 7, 7, 9, 10, 11, 13, 19, 21, 23; 19:2, 6; 51:4, 5, 6, 10; 58:10; 60:16
subcommittee's 18:14
subcommittees 19:4; 58:3
subject 18:8; 22:7; 33:15; 36:16; 37:13, 18; 39:17, 18; 40:1; 42:4, 6; 47:19; 48:6; 50:21; 53:13; 57:18; 59:4, 6; 68:13; 77:15; 81:22; 87:13; 89:16; 91:16, 18
subjects 22:3; 81:9
sued 70:21; 71:18
suggest 15:21; 75:14, 17
suggested 70:12; 75:13
suggesting 46:13; 50:10; 58:16
suggestion 76:2, 9, 12
suggests 23:12
summarize 88:12
summer 13:4; 43:20; 60:8
Superintendent 15:5
supports 80:7
suppose 91:12
supposed 52:19, 23; 53:6; 64:2, 12
sure 5:6; 7:4, 5; 8:6; 9:23; 13:5; 14:15, 21; 15:3, 15; 18:16; 20:6, 11, 19; 22:21; 24:1; 34:22; 35:25; 39:7; 41:7; 43:3, 14; 45:4; 47:10; 48:9, 18, 20, 22; 49:9, 5, 21, 22; 50:19; 51:4; 52:6; 53:15; 54:17; 55:3, 9; 56:6; 57:1; 59:13; 60:9, 12; 61:1, 4, 22; 63:14; 64:1, 4, 8; 68:23; 72:1, 9; 80:17; 81:25; 83:9; 85:20; 86:; 89:4; 90:7, 16, 18
surprise 60:21
survey 55:17, 20

religion - survey   (6)

Filius  &  McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Alan Bonsell
January 3, 2005

sworn 3:17

# T

tabbed 22:23
talk 10:17; 31:3, 4, 7; 46:4; 58:13; 64:25; 83:24; 84:10; 85:18, 19; 86:8; 89:22
talked 8:9; 10:4; 36:23; 37:7, 8; 41:13; 83:25; 86:19, 22, 25; 87:3; 89:9, 15, 22
talking 11:7; 31:4; 39:6; 46:12; 49:10; 50:25; 51:22; 53:1; 59:1; 68:13; 74:11; 79:14
taught 26:23; 33:7; 41:1, 2, 9; 42:12; 45:20; 50:12, 13; 64:2; 67:2, 2, 21, 25; 68:8, 8, 11; 73:15, 15, 18, 19, 20; 91:14; 92:25
teach 26:23; 29:13; 53:15, 16; 63:14, 23; 64:6; 66:1; 77:25; 94:20
teacher 64:12, 15; 77:25
Teachers 20:2; 25:8; 26:11; 27:4; 29:15; 45:18; 47:7, 8; 48:2; 51:3; 63:23; 65:4; 67:10, 16; 68:17; 87:22
teaching 25:4, 5, 7, 13, 14, 15; 26:7; 27:20, 23, 24; 29:23, 25; 32:10; 33:5, 13; 42:6; 56:1; 63:15, 16, 17, 19; 64:20; 65:3; 74:17; 91:15; 92:19; 93:20, 22, 24; 94:17
telling 37:7; 94:8, 13, 14
temporary 3:10
ten 88:5
tenet 79:6, 25
tenure 51:9
term 18:3; 21:5; 23:14; 30:3, 6; 73:15; 78:3
terminology 20:7
terms 53:13
test 94:20
tested 67:14
testified 3:17; 8:24; 9:1, 6; 15:5
testify 9:2
testimony 33:9; 41:12; 88:12
textbook 43:17, 21, 22, 23, 24, 25; 44:4, 25; 47:1, 3, 19; 48:1, 11; 60:13; 72:24; 74:15, 20, 23
textbooks 52:13; 53:12
Theirs 71:12, 14, 15
theories 24:25; 29:23, 25; 30:2, 2; 34:22; 40:25; 41:2, 9; 42:25; 43:6; 59:9; 62:24, 25; 63:2, 3, 4; 64:9; 65:10; 67:4, 18, 20; 68:5, 7, 8; 69:21, 22; 71:12;

94:9, 10, 16
theory 21:8, 11, 13, 14, 15, 21; 22:12; 24:19; 29:24, 24; 30:3, 5, 6, 8, 10, 11, 14, 14, 15, 17, 18; 31:2, 8, 10, 18, 21, 23; 32:5, 14, 20, 24; 33:5, 6, 8, 9; 34:22; 62:4, 6; 63:5, 6, 12, 12; 67:3, 11, 11, 13, 13, 14, 19, 21, 24, 24; 68:1, 18, 18, 24; 69:2, 6, 8, 10, 12, 13, 17, 18, 19; 70:5; 79:22; 80:24; 81:5, 6, 7; 87:15; 93:10; 94:10
thinking 29:7; 34:2, 6, 9, 19
Thomas 6:3, 13
THOMPSON 3:7; 4:25; 5:9, 13, 14, 19, 21; 6:2, 5, 7, 12, 15, 18; 7:3, 22; 8:2, 14; 9:23; 10:3, 3; 12:13; 14:23; 22:20; 23:25; 24:4, 7, 10; 25:20; 26:1, 6; 27:6, 10, 17; 28:2, 7, 13, 15, 23; 32:8; 40:4; 45:4; 52:25; 56:10; 65:22, 25; 73:25; 74:10; 75:1; 76:22; 83:3; 85:21; 86:13; 87:6, 11; 92:12; 94:24
Thompson's 7:7
thoroughly 85:23
though 70:14
thought 41:19; 60:10; 71:4, 16; 72:4; 74:1
thoughts 29:12
thousand 49:1; 50:9
three 4:13; 31:15, 17; 43:13; 51:23; 93:25
throw 50:5
times 27:7; 28:8, 9, 17; 36:23; 38:2; 65:23; 66:2; 71:24
titles 22:9
today 4:22; 7:19; 11:5; 89:24
together 18:1; 51:14, 20; 59:5
told 8:16, 17; 16:1, 4; 36:23; 38:12; 44:18; 68:23; 77:12, 21; 89:2
ton 55:10
took 15:4; 66:6
top 7:11; 22:8; 36:2; 90:1, 12
totally 38:24; 82:19
towards 30:10, 13
Township 35:3
transcript 10:12
transitional 62:11
transpire 3:13
treated 69:2
trial 3:5; 8:24, 25
tried 37:11; 40:2
true 30:9
truth 25:2; 29:19; 33:25

truthful 72:11
try 9:14, 17; 72:12
trying 7:6; 16:18; 19:16; 20:11; 34:12, 25; 48:15; 58:1; 72:9, 10; 75:15; 76:5
turn 29:1; 40:10; 42:17; 45:8; 54:11; 55:12; 57:2; 66:4, 8
turned 34:16
TV 88:23
twice 83:25
two 38:23; 40:25; 41:8; 49:1; 50:9; 51:23; 61:12; 66:2; 67:19; 90:6; 93:25
two-thirds 17:14
type 18:22; 78:21; 88:22; 90:2

# U

ultimately 43:25; 58:8
un 82:10
under 9:2
undertake 44:3
uninterrupted 46:3
United 4:6; 31:13
Unless 28:5; 68:19
up 19:18; 28:20; 29:8, 17; 42:4, 6; 46:10; 47:22; 48:21; 49:3; 50:25; 59:21; 60:6; 66:8; 70:12; 71:8; 72:25; 73:2; 77:15
up-to-date 54:5, 6
use 5:4; 10:13; 18:3; 30:3; 47:10; 53:10; 60:6, 13; 73:15; 74:13, 20; 75:4; 78:3
used 21:6, 7, 11; 30:6; 32:12; 47:8; 52:13; 56:15; 73:20; 74:5, 7, 14
useful 65:14
using 14:11, 12; 56:1, 4; 70:17; 73:11, 13, 17
utterances 10:10

# V

vague 14:23; 52:25; 75:1
valid 72:4
validity 70:24; 71:1, 5, 16, 22; 73:3
various 22:7; 57:3
verbatim 62:20
version 55:13; 78:9, 16, 20
versus 23:16
view 25:13; 26:9; 29:20; 80:18
views 70:23; 71:15; 80:21
voice 84:4
vote 5:20; 6:10, 13, 25; 7:1, 6, 17, 21, 24; 8:1, 15; 82:9

voted 5:3, 3; 6:3, 16; 7:7; 8:7; 10:4; 39:5; 58:20; 59:20; 66:14; 74:13, 22, 22; 82:13

# W

wait 9:16, 17
waive 86:5
waived 3:4
waiving 85:25
wants 62:17
way 14:21; 17:14; 20:1; 21:20; 30:11; 39:3; 57:14; 60:4; 67:5
week 6:23, 24
welcome 94:18
Wenrich 42:24; 43:9; 50:11
weren't 37:1; 38:21; 63:15; 65:2; 74:9
whole 18:9, 10, 11; 19:24; 47:11; 60:4; 68:6
whose 55:21; 59:1
wife 50:21
wire 83:22
withdraw 53:3, 23
Within 5:6, 7; 6:23, 24; 7:16
without 23:9; 55:13; 83:12
witness 3:16; 9:24; 28:24; 40:12; 42:18; 45:5, 11; 84:24
word 26:22; 29:9; 32:12; 42:5; 61:11; 73:20
wording 74:21
words 10:9, 10, 13; 19:18; 38:20; 48:3; 51:8; 62:17, 18; 70:15, 18
work 29:13, 15
world 22:11
worried 22:9; 71:18
write 39:9
writing 36:24; 39:10, 14, 15, 19
written 36:24; 37:9; 40:1, 13; 50:7
wrong 37:25; 45:15; 48:17
wrote 17:25; 37:10

# Y

year 4:18; 29:14; 36:3; 49:17, 18; 90:3, 17
years 4:13; 21:25; 35:6; 49:1; 50:9; 89:19; 90:6, 8
yellow 22:23
Yesterday 11:13, 15
Yingling 82:8
York 35:21, 24; 36:13, 13; 39:24, 25; 40:10; 45:9

Filius & McLucas Reporting Service, Inc.      Min-U-Script®

(7)   sworn - Yor