# APPENDIX I

# TAB C

# In The Matter Of:

*Tammy Kitzmiller, et al. v.*
*Dover Area School District, et al.*

---

*Alan Bonsell*
*April 13, 2005*

---

*Filius & McLucas Reporting Service, Inc.*
*1427 East Market Street, York, PA*
*4309 Linglestown Road, Harrisburg, PA*

*(717) 845-6418 or (717) 236-0623*

Original File AB041305.TXT, 99 Pages
Min-U-Script® File ID: 1328886582

**Word Index included with this Min-U-Script®**

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Alan Bonsell
April 13, 2005

Page 3

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

TAMMY KITZMILLER, et al., .

Plaintiffs  .  CIVIL ACTION NO. 04-CV-2688

vs.

DOVER AREA SCHOOL DISTRICT, .  (JUDGE JONES)

et al., .

Defendants    .

Deposition of          : ALAN BONSELL

Taken by              : Plaintiffs

Date                 : April 13, 2005, 10:00 a.m.

Before               : Vicki L. Fox, RMR,

Reporter-Notary

Place                : 200 One Keystone Plaza

North Front and Market Streets

Harrisburg, Pennsylvania

APPEARANCES:

PEPPER HAMILTON, LLP

BY:  ERIC ROTHSCHILD, ESQUIRE

For - Plaintiffs

THOMAS MORE LAW CENTER

BY:  PATRICK T. GILLEN, ESQUIRE

For - Defendants

Page 2

[1]          INDEX
[2]          WITNESS
[3] ALAN BONSELL          Examination
[4]
    By Mr. Rothschild          3
[5]
[6]
[7]
[8]
[9]          EXHIBITS
    Plaintiffs Deposition Exhibits      Page
[10]
[11] 38. E-mail of Mon, June 21, 2004, Seth Cooper to 34
    abonse@sover.k12.pa.us, page 001843.
[12]
    39. E-mail of Tues, October 19, 2004, Seth   34
[13] Cooper to abonse@dover.k12.pa.us, page 001855.
[14] 40. E-mail of Fri, Dec. 10, 2004, Seth Cooper 34
    to abonse@dover.k12.pa.us, pages 001941 and
[15] 001942.
[16] 41. Mr. Bonsell's Supreme Court - Curriculum 88
    Questions.
[17]
    42. Washington's Farewell Address, 1796, nine 92
[18] pages.
[19]
[20]
[21]
[22]
[23]
[24]
[25]

**STIPULATION**

[1]

[2] It is hereby stipulated by and between the

[3] respective parties that sealing, certification and filing

[4] are waived; and that all objections except as to the form

[5] of the question are reserved until the time of trial.

[6]

[7]     ALAN BONSELL, called as a witness, being duly

[8] sworn, was examined and testified, as follows:

[9]

[10]          BY MR. ROTHSCHILD:

[11]   Q: Good morning, Mr. Bonsell.

[12]   A: Good morning.

[13]   Q: Obviously, I have taken your deposition once before and

[14] given you some instructions about how we are going to

[15] proceed. I am going to assume you have some familiarity

[16] with the process?

[17]   A: A little bit.

[18]   Q: One thing I am going to try to do for Vicki's benefit is

[19] not talk too quickly.

[20]   A: I remember that.

[21]   Q: And one thing I am going to ask you to do is wait until

[22] my questions are finished before you answer. I realize

[23] most of the time you can anticipate what I am asking.

[24]     In a normal conversation, we would interrupt each

[25] other regularly for this process. If you could, try to

Page 4

[1] wait until I am done, and I will do my best to do the

[2] same for you.

[3]   A: Okay.

[4]   Q: Since you have already been deposed before, I can expect

[5] this deposition not to last very long, maybe a couple of

[6] hours. I'm inferring you think that is very long, but

[7] not as long as it otherwise might be. So hopefully, it

[8] will not be too long a process.

[9]     But as I said at the earlier deposition if you

[10] need a break at any time, let me know, and I will be

[11] happy to do that. I may initiate a break myself.

[12]     Have you read the transcript of your previous

[13] deposition in this case?

[14]   A: I have read over I believe most of it.

[15]   Q: You don't think you have read all of it?

[16]   A: It was right after it came out. I haven't seen it for a

[17] couple of months.

[18]   Q: So sitting here today, is there anything that you

[19] testified to in that prior deposition that you would

[20] like to change or modify today?

[21]   A: I don't believe so.

[22]   Q: Just for your benefit, we may refer to the deposition

[23] during the course of the morning, so I am going to give

[24] you a copy if you need to refer to it.

[25]   A: Okay.

Alan Bonsell
April 13, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

Page 5

[1]    Q: One of the things that I asked you — and I promise I
[2] won't repeat all my questions from the last time. But
[3] one of the things I asked you was when you had first
[4] heard about Intelligent Design.
[5]    My question and your answer to that question is on
[6] page 90 if you want to take a look.
[7]    A: (Witness complies.)
[8]    Q: If you see at line 14, I said when did you first hear of
[9] Intelligent Design, and you said I am not sure when the
[10] first time was. And I asked: More than a year ago?
[11] And you said: I'm not sure.
[12]    I just want to confirm is that still your answer
[13] today, that you don't know whether you first heard about
[14] Intelligent Design more than a year ago or less than a
[15] year ago?
[16]    A: I believe it has been more than a year ago I heard about
[17] Intelligent Design.
[18]    Q: That is sort of the purpose of my question. Let's see
[19] if we can further define that.
[20]    Sitting here today in April of 2005, you feel
[21] confident that you had heard of Intelligent Design more
[22] than a year ago, and we will use today's date rather
[23] than your previous deposition?
[24]    A: Yes.
[25]    Q: Do you know whether you had heard of Intelligent Design

Page 6

[1] more than two years ago?
[2]    A: There again, I believe it has been a few years since I
[3] have heard of Intelligent Design. But to answer you
[4] exactly when I first heard of it, I mean I can't tell
[5] you that.
[6]    Q: I'm sure I couldn't tell you when I first heard of
[7] Intelligent Design.
[8]    A: I would say it would be a few years.
[9]    Q: When you are using the word few, can you quantify that
[10] for me?
[11]    A: I would probably say three years, four years, something
[12] like that.
[13]    Q: Let me give you a copy of the Answer the defendants
[14] filed in the Complaint which we have marked as
[15] Plaintiffs Exhibit 2 previously. I have turned that
[16] document to page 6 to the — and I want to call your
[17] attention to the first full paragraph beginning the DASD
[18] Biology Curriculum Policy.
[19]    It says there that the purpose of that policy is
[20] enhancing the science curriculum by informing students
[21] about the existing scientific controversy surrounding
[22] Darwin's Theory of Evolution, including the fact that
[23] there are alternative scientific theories being advanced
[24] by scientists.
[25]    Does that answer — does that explanation in the

Page 7

[1] Answer filed by defendants accurately reflect your
[2] purpose in voting for the change to the biology
[3] curriculum?
[4]    A: Let me just read it here a second.
[5]    Q: Sure.
[6]    A: Okay. I'm sorry. And your question again is?
[7]    Q: Does the description of the purpose for the policy that
[8] is set forth in this answer that I just read, is that
[9] consistent with your purpose in voting for the
[10] resolution?
[11]    A: Pretty much so, yes. I mean — I mean that's a good
[12] explanation.
[13]    Q: Did you have any other purpose in voting for the
[14] resolution that changed the biology curriculum other
[15] than what is set forth on page six of the answer?
[16]    A: No, just to further their education.
[17]    Q: If it is all right with you as I ask the next series of
[18] questions, I want to just refer to the purpose. And in
[19] using the term the purpose, I am going to be referring
[20] to what is set forth on page six and your additional
[21] statement that you wanted to further the student's
[22] education.
[23]    Can we have that understanding?
[24]    A: Expand it, okay.
[25]    Q: Just so I don't have to keep repeating the text of the

Page 8

[1] purpose set forth in the answer.
[2]    A: Okay.
[3]    Q: When I am referring to the purpose, that is what I am
[4] referring to.
[5]    A: All right.
[6]    Q: Can you describe for me what information you relied upon
[7] in coming to the conclusion that the purpose was being
[8] advanced by the resolution modifying the biology
[9] curriculum?
[10]    A: Can you give me — are you talking about this now, or
[11] are you talking about — what curriculum are you talking
[12] about exactly so I know what I am answering to?
[13]    Q: You understand that this is a case about the —
[14]    A: I understand that. You are saying changing the biology
[15] curriculum. That one specific piece that you are
[16] talking about, or are you talking — I just want to make
[17] sure that we are on the same page. That's all.
[18]    Q: I understand. I am going to give you a copy of the
[19] Complaint that was filed. If you look at —
[20]    MR. GILLEN: Page 14, paragraph 33.
[21]    MR. ROTHSCHILD: It is actually on page two.
[22]    BY MR. ROTHSCHILD:
[23]    Q: Would you look at page two of the Complaint which we
[24] have marked as Exhibit 1? Do you see at the top of the
[25] page, the text beginning students will be made aware of

---

Min-U-Script®   Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Alan Bonsell
April 13, 2005

**Page 9**

[1] gaps/problems?

[2]     A: I just wanted to make sure. I just wanted to make sure

[3] I am giving you answers to what you are asking questions

[4] on.

[5]     Q: When I am referring to the resolution —

[6]     A: You are referring to that part of the curriculum, that

[7] is what you are talking about, okay.

[8]     Q: That is the change to the biology curriculum that

[9] occurred in 2004; correct?

[10]     A: Correct.

[11]     Q: And so now going back to my question, what information

[12] did you rely upon in coming to the conclusion that the

[13] purpose that we have just discussed was being advanced

[14] by this resolution?

[15]     A: That led to the change? That led to this?

[16]     Q: Yes. I want to know what information you used, you

[17] relied upon as you —

[18]     A: I relied upon scientific information.

[19]     Q: Can you describe that scientific information?

[20]     A: Just that we are talking about theories here. Basically

[21] it's that theories are theories. They are not facts.

[22] And we wanted to expand the educational process for the

[23] kids, and that was basically it. I mean just give them

[24] some more scientific information if possible.

[25]     Q: You in voting for the resolution had come to the

**Page 10**

[1] conclusion that this resolution would advance that

[2] purpose; correct?

[3]     A: This resolution would advance that purpose, yes.

[4]     Q: What I am trying to find out is what information you

[5] relied upon. I will ask more specifically. I am trying

[6] to find out any written information, any information you

[7] received orally. So that is what I am looking for.

[8]     What information —

[9]     A: These scientific things were something that I was

[10] interested in. I have read things about it. I have

[11] watched programs on TV. I have seen things and read

[12] things on the Internet. DVD's, that type of thing, that

[13] information to show that there are gaps, and there are

[14] other scientific theories out there.

[15]     Q: I am going to show you what has been marked as P-35 or

[16] Plaintiffs 35 which is Defendants Answers to

[17] Interrogatories, written questions that plaintiffs gave

[18] to defendants.

[19]     If you look at page six of this document, there's

[20] a description of the kind of information you personally

[21] reviewed. If you look about eight paragraphs down,

[22] there is a paragraph that begins Alan Bonsell.

[23]     Do you see that?

[24]     A: Yes.

[25]     Q: And what is stated there is basically what you are

**Page 11**

[1] telling me here, which is that you have reviewed

[2] information on the subjects of Evolution and Intelligent

[3] Design in books, it says here videotapes and DVD's and

[4] the Internet, but you can't recall the specific

[5] materials at this time?

[6]     A: Some of these ones — I mean looking up further on the

[7] page here Unlocking the Mysteries of Life, Icons of

[8] Evolution, different — like I said, I know Discovery

[9] Channel, I have watched that. They've had whole

[10] documentaries and things like that on Evolution and the

[11] processes of that. Icons of Evolution, other things.

[12]     See, the thing is I read bits and pieces of other

[13] books and things like that. Dembski has written books.

[14] I have read some information from his books. So I mean

[15] it is quite a long and varied list.

[16]     Q: Fair enough. I am just trying to get — I want to get

[17] your recollection. So let's start and sort of do this

[18] one by one. Let's talk about books first.

[19]     Can you identify by name or author any books you

[20] have read that informed you about Evolution and

[21] Intelligent Design that helped you make a decision about

[22] how to vote on the resolution?

[23]     A: Books I have read? That is a thing because it's so —

[24] this is from —

[25]     Q: Mr. Bonsell, if you can't remember, that is a perfectly

**Page 12**

[1] acceptable answer.

[2]     A: I am trying. I'm just not sure.

[3]     Q: You have read books or parts of books — if you could

[4] let me finish, please.

[5]     A: I am sorry.

[6]     Q: You have read books or parts of books containing

[7] writings by William Dembski?

[8]     A: Dembski, yes.

[9]     Q: What about by Michael Behe?

[10]     A: I have seen bits and pieces I believe of that book —

[11] what is it — Darwin's Black Box.

[12]     Q: One of the things listed in this interrogatory answer

[13] that you noticed was the book Icons of Evolution by

[14] Jonathan Wells. Did you read that book or any parts of

[15] that book?

[16]     A: I mean because there's a DVD title to that.

[17]     Q: Right. There's both.

[18]     A: That is what I mean. I am confused. I am not sure. To

[19] be honest, I just can't recall.

[20]     Q: You may have read the book, but you may have just seen

[21] the DVD?

[22]     A: The Icons of Evolution, I believe that's — the DVD, DVD

[23] and Unlocking Mysteries of Life, I have seen that.

[24]     Q: Both of those?

[25]     A: Yes. I can't recall. I just don't remember.

Alan Bonsell
April 13, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

**Page 13**

[1]   Q: And I take it from the answer in the interrogatory, and

[2] I think you may have said this at your prior deposition

[3] that you have reviewed the book Of Pandas and People?

[4]   A: I have looked over it.

[5]   Q: Did you read it cover to cover?

[6]   A: No.

[7]   Q: How did you look it over?

[8]   A: Well, I looked at the pages. I read some of the

[9] material. Like I said, it is like most of the time, I

[10] am not going to — in my business and things like that,

[11] I just don't have time to sit down and read a book cover

[12] to cover.

[13]    I read bits and pieces of information, different

[14] parts of chapters, that type of thing. So I have looked

[15] over the book to see if it looked scientific to me.

[16]   Q: Okay. And you did this in conjunction with your

[17] responsibilities as a Board member?

[18]   A: Oh, sure.

[19]   Q: Can you remember — and I will be happy to show you the

[20] book if it is helpful — specific chapters Of Pandas

[21] that you read?

[22]   A: Not off the top of my head, no.

[23]   Q: Would looking at the book help you with that?

[24]   A: It might. I'm not sure.

[25]   Q: I am going to go ahead and give you the book. You let

**Page 14**

[1] me know.

[2]    Again, Mr. Bonsell, as I said, I understand that

[3] you may not remember things. I am still going to ask

[4] the questions just to find out the limits of your

[5] memory. We all don't remember things. And particularly

[6] when it is a large volume of things we have read, for

[7] example, but I want to be able to exhaust that so I know

[8] exactly what you can and can't remember.

[9]    I have not flagged the pages for any particular

[10] reason except for my own interest.

[11]   MR. GILLEN: Off the record.

[12]   (An off-the-record discussion was had.)

[13]   A: Oh, my. I'm trying to remember. This was a year ago.

[14] I just don't recall exactly what I read and what I

[15] didn't read out of here. I remember I said looking over

[16] the book to see if — like I said I wanted to make sure

[17] it was a scientific look at this.

[18]    And from what I looked at and some of these

[19] chapters that I read or parts of chapters that I read,

[20] it looked like it to me.

[21]   Q: How did you make the judgment that it looked scientific?

[22]   A: Because we're talking about science. We're talking

[23] about — that's hard to explain exactly to put it into

[24] words.

[25]    Scientific in that it was talking about scientific

**Page 15**

[1] things, about looking at evidences, that type of thing.

[2] Just like all the science books I have read going

[3] through high school and college and that type of thing.

[4] It was on the same lines that I would have seen in a

[5] classroom setting.

[6]   Q: The text looked familiar — similar to science textbooks

[7] you have seen as a student and as a Board member?

[8]   A: Yes.

[9]   Q: On the subject of books, have we exhausted your memory

[10] of the books you have read that helped inform you about

[11] the subjects of Evolution and Intelligent Design such

[12] that you could make your vote on the Board resolution?

[13]   A: I said I'm sure there's other things I have read or seen

[14] or heard, but I just don't recall at this point.

[15]   Q: And I had limited my question to books. Let me go —

[16]   A: I'm sorry.

[17]   Q: That's fine. I understand when you say you can't

[18] remember more, it doesn't mean you didn't read more. It

[19] is fine you are clarifying that.

[20]    Going on to magazines, have you ever read

[21] magazines that relate to these subjects?

[22]   A: I'm sure I have looked at like books like Smithsonian

[23] and National Geographic and that type of thing in the

[24] past, sure.

[25]   Q: And can you identify any articles or authors of articles

**Page 16**

[1] or magazines specifically that you looked at?

[2]   A: Just what came up. Just recently I was hearing — that

[3] is not — in the scientific community, I have read what

[4] is going on in the scientific community, with what

[5] happened to the gentleman down in the Smithsonian.

[6]   Q: What gentleman are you referring to?

[7]   A: Just scientific things that are going on within the

[8] scientific community about this controversy.

[9]   Q: And when you are referring to someone at the

[10] Smithsonian, can you describe what you mean by that?

[11]   A: Someone that — I believe he is in charge of the

[12] magazine, and he had put in an article and basically was

[13] chastised for allowing articles other than Darwin's

[14] articles to be put into the magazine.

[15]   Q: How did that article come to your attention or that

[16] issue?

[17]   A: I think I read that in the Internet.

[18]   Q: Other than that issue, that subject matter, can you

[19] think of any other magazine articles that you have read?

[20]   A: Magazine articles, like I said, I have read — I have

[21] seen articles in magazines. I can't recall the exact

[22] titles of articles in magazines per se, but I mean I

[23] have read plenty of articles on this subject.

[24]   Q: Just can't remember the specific names?

[25]   A: Names of — article names? Not really, no.

---

Min-U-Script®   Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

**Alan Bonsell**
**April 13, 2005**

---

Page 17

[1]  Q: Sounds like you have done at least a fair amount of
[2] reading on these subjects, and I am interested to know
[3] whether your pursuit of information about these subjects
[4] started only after you became a member of the Board or
[5] whether you were reading on these subjects before you
[6] became a member of the Board.
[7]  A: I am interested — I have been interested in science all
[8] my life. I have interests in many, many subjects.
[9]  Q: And were you reading articles about Evolution and
[10] Intelligent Design prior to becoming a member of the
[11] Board?
[12]  A: I probably have. Evolution, I am sure. Intelligent
[13] Design, somewhere in that area I am sure because I know
[14] it is a newer theory.
[15]  Q: I am just curious. What made you start seeking out
[16] information to know subject of Intelligent Design?
[17]  A: It had piqued my curiosity because there are other
[18] theories out there, and there are many gaps in Darwin's
[19] Theory. And so it was to see what other scientists have
[20] to say about other ways of looking at the same evidence.
[21]  Q: Now you said you have read material on the Internet;
[22] correct?
[23]  A: Sure, yes.
[24]  Q: Can you remember with any specificity what websites or
[25] articles or authors that you read on the Internet?

Page 18

[1]  A: There again, a lot of the information you will see, it
[2] will be on a page or something like that, or somebody
[3] will send you an e-mail and say I read this, and this
[4] might be of interest to you.
[5]   The problem with saying where it came from on the
[6] Internet, there's millions of places they come from. To
[7] be specific, I didn't realize I was going to be asked
[8] that question. Maybe I could have went back and looked.
[9] Just off the top of my head, I don't recall.
[10]  Q: Again, I understand that. I am not asking you these
[11] questions to point out some flaw.
[12]  A: I know. I know. Okay.
[13]  Q: I am a college basketball fan, and I read to find out
[14] who is going early into the NBA draft. I have some
[15] information. I couldn't tell you every place I got that
[16] information from.
[17]   If that is your answer to the question I am
[18] asking, that is fine.
[19]  A: Okay.
[20]  Q: I have to ask the questions.
[21]  A: Okay.
[22]  Q: So I'm correct that you can't specifically identify the
[23] sources of any particular information you read on the
[24] Internet?
[25]  A: Not per se, no.

Page 19

[1]  Q: You said you have seen these two DVD's Icons of
[2] Evolution and Unlocking the Mystery of Life, what were
[3] the circumstances in which you viewed those? How did
[4] they come into your possession?
[5]  A: I purchased them.
[6]  Q: When did you purchase them?
[7]  A: It was — I am trying to think of when that was. I
[8] believe it would have been some months ago, but I am not
[9] exactly sure when.
[10]  Q: The resolution was voted on October 18th, 2004; is that
[11] consistent with your memory?
[12]  A: Of the change, this piece here?
[13]  Q: Yes.
[14]  A: Yes.
[15]  Q: Was your purchase of these two DVD's before or after
[16] that?
[17]  A: It was around the same time, or it could have been
[18] after. I'm not exactly sure. I'm not exactly sure
[19] when.
[20]  Q: Do you think you had viewed those — was the first time
[21] you viewed those DVD's after you personally had
[22] purchased them?
[23]  A: I think the Unlocking the Mysteries of Life, I am not
[24] sure if I saw that beforehand or not. The Icons was I
[25] think later. But the Unlocking the Mysteries, that was

Page 20

[1] I believe earlier. But I am not — I'm not sure. It
[2] could have been before. It could have been after. I'm
[3] just not sure.
[4]  Q: Was your first viewing of Unlocking the Mystery of a
[5] copy you had purchased or that was made —
[6]  A: That is what I am trying to remember, if it was somebody
[7] gave me a copy and then I purchased one, or if somebody
[8] told me about it, and I purchased it. I'm not sure.
[9]  MR. GILLEN: Alan —
[10]  A: I am trying.
[11]  MR. GILLEN: Trying to remember is what you should
[12] do to answer his questions, but it is also true if you
[13] can't remember, you can just tell him that. As he said,
[14] it is not a trick question.
[15]  A: I am trying to remember to be as truthful as I possibly
[16] can and try to remember everything I can possibly
[17] remember. When you are asking me questions exactly when
[18] a specific time in reference to a DVD, that is a tough
[19] question.
[20]   I just can't — I'm not positive I am just not
[21] sure.
[22]  BY MR. ROTHSCHILD:
[23]  Q: In that DVD Unlocking the Mystery of Life, there are
[24] appearances by a number of individuals such as Michael
[25] Behe; correct?

---

Alan Bonsell
April 13, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

**Page 21**

[1]   A: Yes.

[2]   Q: Stephen Meyer, do you remember him?

[3]   A: Stephen Meyer, yes.

[4]   Q: Scott Minnich?

[5]   A: Yes.

[6]   Q: Paul Nelson?

[7]   A: Name sounds familiar.

[8]   Q: Do you have an understanding of whether some or all of

[9]   those individuals have an association with the Discovery

[10]  Institute?

[11]  A: I think some of them do. I don't know whether all of

[12]  them do.

[13]  Q: Are you familiar with the Discovery Institute?

[14]  A: Yes.

[15]  Q: How are you familiar with them?

[16]  A: Just knowing them, that they are a large group of

[17]  scientists that I believe have looked at the scientific

[18]  evidence out there and have some other theories of their

[19]  own, what they have come up with by looking at the same

[20]  evidence that the Darwin scientists have looked at.

[21]  Q: Do you associate them with the idea of Intelligent

[22]  Design?

[23]  A: I believe that probably most of them adhere to that.

[24]  Q: Do you have a recollection of when you first became

[25]  aware of the Discovery Institute?

**Page 22**

[1]   A: I believe that would have been last year some time.

[2]   Q: Did you become aware of them in connection with the

[3]   Board's consideration of the biology curriculum?

[4]   A: Yes, it was before the curriculum change.

[5]   Q: What I am sort of getting at is you have described a lot

[6]   of reading and investigation into the subjects of

[7]   Evolution and Intelligent Design, and I am trying to get

[8]   a sense of whether you were aware of the Discovery

[9]   Institute from your sort of personal reading before this

[10]  issue sort of came up before the Board.

[11]  A: I think somewhere along the line, it came up in

[12]  discussions about this group.

[13]  Q: Discussions by the Board?

[14]  A: I don't know if it was at a Board meeting or anything

[15]  like that. But there were discussions that were

[16]  somewhere last year that there's these scientists, this

[17]  group the Discovery Institute.

[18]  Q: And I think you just said a minute ago they are a group

[19]  of scientists that are involved in the issue of

[20]  Intelligent Design?

[21]  A: I believe so, yes.

[22]  Q: Do you have an understanding of whether they are the

[23]  leading group of scientists on this subject?

[24]  A: If they are the leading group of scientists? I mean

[25]  some of the scientists that might be in the group are

**Page 23**

[1]   probably leading scientists. I don't know if the whole

[2]   group is or not.

[3]   Q: Are you familiar with any other organizations that are

[4]   actively researching or promoting Intelligent Design?

[5]   A: Groups?

[6]   Q: Yes. Organizations, think tanks, anything like that.

[7]   A: Not by name.

[8]   Q: We have now talked about these two DVD's. Can you

[9]   recall any other DVD's or videos that you have watched

[10]  on the subjects of Evolution or Intelligent Design?

[11]  With the same instruction, if you can't remember

[12]  names —

[13]  A: I can't remember.

[14]  Q: What about TV programs, can you name any TV programs?

[15]  A: Discovery, I remember them having a TV program. I am

[16]  pretty sure it was on the Discovery Channel. It was a

[17]  whole program on basically the Piltdown man.

[18]  Q: Anything else you can think of by way of TV shows?

[19]  A: There again, I am sure other shows on that. I mean

[20]  sometimes, the National Geographic will have something.

[21]  I have seen other — because I am not sure exactly the

[22]  channel per se. I am pretty sure this was on the

[23]  Discovery Channel.

[24]  And some of the National Geographics puts the

[25]  specials on. They had another one I believe on the

**Page 24**

[1]   Discovery Channel on Evolution and the animals and how

[2]   they evolved from bear animals to whales and things like

[3]   that. Just a couple of things that stick in my head at

[4]   the time right now.

[5]   Q: Putting aside television shows and just focusing on

[6]   DVD's, videotapes, written materials, have you ever

[7]   given things that you have read or reviewed to another

[8]   Board member for their consideration on these topics?

[9]   A: I think this video, I think I've offered — I'm not

[10]  sure. I have given the video to people that were

[11]  interested. In the same way they are curious in this

[12]  subject and wanted to see it.

[13]  I'm trying to think if the Board members — they

[14]  probably watched this video, but I am not sure.

[15]  Q: You don't know one way or the other?

[16]  A: I'm not positive.

[17]  Q: When you have talked about giving this video out, did

[18]  that occur before or after the resolution was passed?

[19]  A: I believe that most of that — well, I believe that has

[20]  been since.

[21]  Q: Has any Board member given you written materials or

[22]  e-mails attaching written material or videotapes or

[23]  DVD's for your consideration on the subject? Let's

[24]  qualify that before you voted on the October 18th

[25]  resolution.

---

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Alan Bonsell
April 13, 2005

Page 25

[1] A: I believe we were given information from the Discovery
[2] Institute. I believe I have looked at their websites
[3] and that type of thing.
[4] Q: That was before the October 18th resolution?
[5] A: Yes. I believe so.
[6] Q: Who gave you those materials?
[7] A: I believe that was Mr. Buckingham.
[8] Q: Do you remember what kind of materials he distributed?
[9] A: Not per se. Probably information about them or from
[10] them, that type of thing.
[11] Q: Written materials?
[12] A: I don't recall exactly if it was written or he discussed
[13] it with me. I remember the Discovery Institute's name
[14] coming up. I remember thinking about — I remember
[15] looking at their website and going in and reading some
[16] of the information.
[17] They have a whole list of scientific information
[18] on there if you want to read about all those subjects.
[19] Q: When Mr. Buckingham gave you information about the
[20] Discovery Institute, did he give you legal information
[21] or other information?
[22] A: Legal information?
[23] Q: Legal information.
[1] A: I don't recall if it was legal or not legal information.
[25] Q: Can you tell me what he did tell you about the Discovery

Page 26

[1] Institute or what information he gave you from the
[2] Discovery Institute?
[3] A: I think it was basically Discovery Institute is the
[4] scientists. I am not sure if that is the first time I
[5] heard about it, but I believe it's just information that
[6] was discussed about here's a group of scientists that
[7] have other theories.
[8] Q: So would it be fair to say that what he was doing was sort of
[9] calling the fact of their existence to your attention?
[10] A: There again, I am not sure if it was the time first time
[11] I heard of them or not would have been that time. I'm
[12] not sure when.
[13] Q: When he communicated this to you, did he communicate
[14] that to all Board members, or was this in private?
[15] A: You would have to ask him. I'm not sure.
[16] Q: Can you remember the specific interaction?
[17] A: No.
[18] Q: Other than Mr. Buckingham giving you information about
[19] the Discovery Institute, can you remember any other
[20] information that Mr. Buckingham gave you? And I am
[21] talking right now about sort of written information,
[22] tangible things, written information or tapes or DVD's.
[23] A: I just don't recall.
[24] Q: What about any other Board member, did any other Board
[25] member give you any written materials, tapes, DVD's on

Page 27

[1] these subjects?
[2] A: I don't believe DVD's. Written material is possible,
[3] but I'm not sure.
[4] Q: If somebody gave you written materials on these
[5] subjects, would you still have them?
[6] A: I have no idea.
[7] Q: When you have gone on the Internet to investigate these
[8] subjects on your own, what kind of search terms do you
[9] use?
[10] A: Search terms? Probably if I am looking for Intelligent
[11] Design, I probably put in Intelligent Design. If it is
[12] Evolution, I put in Evolution.
[13] Specifically off the top of my head, I just —
[14] that is not something I have a precise thing that I
[15] always go in and do the same thing. I don't know.
[16] Q: Have you ever seen a biology textbook published by Bob
[17] Jones University, Biology for Christians?
[18] A: Not that I know of.
[19] Q: When you voted for the resolution and you voted
[20] understanding it would advance the purpose we have
[21] described before, did you base your belief that purpose
[22] was being advanced on anything that anybody told you? I
[23] am now on the subject of sort of verbal communication.
[24] A: Anybody told me or a Board member told me?
[25] Q: Anybody.

Page 28

[1] A: What specifically are you asking?
[2] Q: Anybody. You have described that you have done a fair
[3] amount of reading. Some of it, you can recollect. A
[4] lot of it, you can't.
[5] Now I want to move on to — what I am trying to
[6] understand is how you have learned about these subjects.
[7] Now I am moving on to the subject have you talked to
[8] anybody about it in a way that informed your
[9] understanding so that when you voted for the Board
[10] resolution, you felt that the purpose described in the
[11] answer was being advanced?
[12] A: I'm trying to understand. You are asking if anybody
[13] told me something that would have led me to say yes,
[14] this is the right thing to do?
[15] Q: That's right. You could have talked to Michael Behe.
[16] You could have talked to Richard Dawkins.
[17] A: Not per se anybody in particular, no.
[18] Q: Can you remember anybody at all?
[19] A: I don't recall.
[20] Q: Did you ever make any presentations to the Board or any
[21] individual Board members — let me just limit that. Did
[22] you ever make a presentation to the Board to persuade
[23] Board members to vote for the resolution? Did you ever
[24] get up and talk to the Board about why they should vote
[25] for the resolution?

Alan Bonsell
April 13, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 29

[1] A: I don't recall ever getting up at a meeting and talking
[2] to the Board about it.
[3] Q: What about in any setting with the Board?
[4] A: I don't recall specific times that I would have done
[5] that. We might have had conversations, but I don't know
[6] specifics if that's what you are looking for.
[7] Q: Is it your recollection that you may have had
[8] conversations with individual Board members in which you
[9] tried to persuade them to vote for the resolution?
[10] A: I don't know specifics, but I am sure we probably
[11] discussed the resolution, and that it would be good for
[12] the education that we are talking about, other
[13] scientific theories along those lines that we have
[14] probably talked about. I don't know a specific that I
[15] can give you a moment in time that I could tell you.
[16] Q: Can you give me any information on it, dates, who was
[17] involved in those discussions and what was said?
[18] A: Not really. Again, like to be specific like that, I
[19] mean you're talking about — you know, it could have
[20] been at a Board meeting, could have been a casual
[21] conversation. It could have been, whatever.
[22] I don't have any specific point in time that I
[23] wish I could give you. I don't. I am sure it was
[24] discussed. It wasn't just thrown out there.
[25] Q: Can you give me any information about what was

Page 30

[1] discussed?
[2] A: Again, basically that I mean this is a scientific
[3] theory, and that this is going to expand the kid's
[4] education by allowing other theories to be mentioned.
[5] Q: That was said you said to other Board members?
[6] A: I'm sure I have said that. If you are asking me a
[7] specific point in time when I said it, I mean —
[8] Q: Did any Board members ask questions about the resolution
[9] or the proposed resolution in those conversations?
[10] A: Well, we wanted to make sure that what we did was
[11] proper, legal, constitutional. We made sure when we
[12] looked at all of this, we even had the attorney look at
[13] this before we ever — because that was one of the
[14] things that we wanted to make sure was happening. That
[15] we weren't crossing any lines anywhere that could be
[16] construed as anything but scientific. And they told us
[17] it was okay.
[18] MR. GILLEN: I don't want you to disclose
[19] communications of your lawyer to you.
[20] A: Okay.
[21] MR. GILLEN: You can say that you were asked, and
[22] that is fine.
[23] BY MR. ROTHSCHILD:
[24] Q: And your understanding after making those inquiries was
[25] that what you were doing was constitutional?

Page 31

[1] MR. GILLEN: You can answer that question.
[2] A: Yes.
[3] BY MR. ROTHSCHILD:
[4] Q: Your understanding was that the information you were
[5] presenting to the students was scientific information?
[6] A: Yes.
[7] Q: Were any materials distributed to the Board as a whole
[8] to help them make their decision about how to vote on
[9] the resolution?
[10] A: I don't recall. I'm not sure.
[11] Q: Did anybody, whether on the Board or not, get up and
[12] speak to the Board about the issues relating to
[13] Intelligent Design and the change to the biology
[14] curriculum?
[15] A: Can you be more specific?
[16] Q: Did anybody get up — were any people with expertise in
[17] the area of science or Evolution or Intelligent Design,
[18] did any of them ever make a presentation to the Board
[19] about the issues?
[20] A: Make a presentation to the Board?
[21] Q: Yes, or come talk to the Board.
[22] A: I guess that would be — I would have to stop for a
[23] second. I would have to ask my attorney a question.
[24] Q: Let me just qualify this. Maybe this will help. Limit
[25] my question to before the resolution was voted.

Page 32

[1] MR. GILLEN: And, Eric, if I may, an implicit
[2] premise of Eric's is not legal communication with
[3] lawyers.
[4] BY MR. ROTHSCHILD:
[5] Q: I don't agree with that entirely. If the answer is yes,
[6] some lawyers came and talked to us before we voted, I
[7] want to know that fact. There may be a limitation.
[8] A: That is why I said I would like to speak to him.
[9] MR. ROTHSCHILD: This would be a good time to take
[10] a break. Why don't we do that?
[11] (A recess was taken.)
[12] AFTER RECESS
[13] A: The Discovery Institute came and gave us a legal
[14] representation — or not representation, but legal —
[15] what is the word I am looking for?
[16] BY MR. ROTHSCHILD:
[17] Q: Presentation.
[18] A: Thank you.
[19] Q: Do you remember when that occurred?
[20] A: That was before the resolution.
[21] Q: Was the entire Board in attendance for that
[22] presentation?
[23] A: I'm not sure if all of the Board was there or not. I
[24] think most of the Board was there, but I don't know if
[25] all of the Board was there.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

**Alan Bonsell**
**April 13, 2005**

---

Page 33

[1] Q: Did this presentation occur in executive session?

[2] A: Yes.

[3] Q: How many people came from the Discovery Institute?

[4] A: I think there was one or two.

[5] Q: Do you remember names? I will say some names and see if

[6] they refresh your recollection. Seth Cooper?

[7] A: That sounds familiar.

[8] Q: Mark Ryland?

[9] A: I'm not sure. Seth Cooper, that sounds like that might

[10] have been one of them.

[11] Q: And you're confident that that presentation occurred

[12] before the vote?

[13] A: Yes.

[14] Q: Did the Discovery Institute come and make presentations

[15] to the Board after the vote?

[16] A: I don't believe so.

[17] Q: The presentation by the Discovery Institute, was only

[18] legal information provided, or were there other non

[19] legal?

[20] A: It was a legal presentation is what I took it as.

[21] Q: Can you — I am sorry. Other than Board members and the

[22] individuals from the Discovery Institute, was anybody

[23] else in attendance?

[1] A: I am not sure if the administrators were there or not.

[25] The Superintendent might have been there.

---

Page 34

[1] Q: Can you explain how this meeting came about? How was it

[2] arranged?

[3] A: I believe they asked to speak to us.

[4] Q: Who did they make that request to?

[5] A: It was either someone on the Board or the

[6] Superintendent, through the Superintendent.

[7] Q: Did they say what the purpose in coming to talk to

[8] you?

[9] A: I believe it was with the legal ends of it.

[10] Q: While we're on the subject, I am going to show you a

[11] group of e-mails that was produced in this matter.

[12] (Plaintiff Deposition Exhibits 38, 39 and 40 were

[13] marked.)

[14] BY MR. ROTHSCHILD:

[15] Q: Mr. Bonsell, do you recognize the three documents we

[16] have marked as 38, 39 and 40?

[17] MR. GILLEN: Eric, this exhibit 40 appears to me

[18] to be an inadvertent disclosure which I will have to

[19] revisit after the deposition.

[20] MR. ROTHSCHILD: I am not sure the basis for that,

[21] but maybe we can get some clarification in Mr.

[22] Bonsell's answer about the timing of the Discovery

[23] Institute interactions with the Board.

[24] MR. GILLEN: Okay.

[25] BY MR. ROTHSCHILD:

---

Page 35

[1] Q: Mr. Bonsell, I have handed you three e-mails. Do you

[2] recognize these as e-mails you received from Seth

[3] Cooper?

[4] A: Not exactly, no. The thing is this is two — this isn't

[5] normally where I get my e-mails from. This is an

[6] e-mail box that's at the School District, ABONSE at.

[7] A lot of these e-mails, a lot of these things, I

[8] don't get. Number one, I have a hard time in getting in

[9] to get them, and I have had major problems with my

[10] computers and viruses over the last year. As a matter

[11] of fact, my one computer I just threw in the trash

[12] because I couldn't take it anymore. I don't know if I

[13] have seen these before or not to be honest with you.

[14] I am almost sure I haven't seen this one before,

[15] number 40. But the other two Seth Cooper, I mean I know

[16] the name Seth Cooper. Whether I saw this e-mail or not,

[17] I don't know because this wasn't sent to my normal —

[18] see, the e-mails like if people are going to correspond

[19] to me from the Board or the Administration Office, they

[20] don't send it to this e-mail address.

[21] Q: Mr. Bonsell, regardless of whether you saw these or not,

[22] the inference I draw from these three e-mails, the last

[23] of which is December 10, 2004 from Seth Cooper, is that

[24] the Discovery Institute had not made contact with the

[25] Board until sometime after December 10th because Mr.

---

Page 36

[1] Cooper is in that e-mail saying I hope to finally reach

[2] you sometime very soon.

[3] I am giving my own observation. I am not asking

[4] you to agree. It doesn't look consistent with someone

[5] who has already spoken to you before October 18th.

[6] I am just trying to get some clarification.

[7] A: I'm almost positive that we met with him before October

[8] 18th. I mean it's almost — I am almost sure. I am not

[9] saying we didn't meet again after October 18th, but no,

[10] I am almost positive that we met before October 18th.

[11] Q: Is it possible that you also met afterwards?

[12] A: It is possible. Now that I am thinking about it, it's

[13] possible that we met afterwards, too.

[14] Q: Other than face to face meetings, did you ever interact

[15] with Mr. Cooper by phone or by e-mail?

[16] A: I think I talked to him — I think I talked to him on

[17] the phone about them wanting to talk to us or whatever.

[18] Q: Do you think that was a conversation that occurred ahead

[19] of the first meeting that you recall?

[20] A: I would think so.

[21] Q: So you believe you were involved in sort of arranging

[22] the logistics of them coming in to talk to you?

[23] A: It is possible. I don't know — I don't recall the

[24] exact conversation, but I remember I am pretty sure that

[25] I did talk to him on the phone. It could have been

---

Alan Bonsell
April 13, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 37

[1] about that, about hey, we want to come talk to you about
[2] these legal situations.
[3]   Q: Do you remember the first time you talked to Mr. Cooper,
[4] did he call you or did you call him?
[5]   A: I think — I believe he called. I think he initiated
[6] it.
[7]   Q: Did he say why he was calling?
[8]   A: I believe to talk about this — what we were doing at
[9] the School District with this particular subject.
[10]   Q: And did he say how he knew what you were doing?
[11]   A: I don't remember exactly how he found out about it, no.
[12]   Q: Are you aware that after the resolution went into
[13] effect, the Discovery Institute issued a press release
[14] stating their position that they didn't think the change
[15] in the biology curriculum was a good idea?
[16]   A: I think I saw something along that line.
[17]   Q: Do you have an understanding of why the Discovery
[18] Institute took that position?
[19]   A: My personal opinion?
[20]   Q: Do you have an understanding of why they thought the
[21] policy was not appropriate?
[22]   MR. GILLEN: Apart from an understanding about
[23] legal issues, I am instructing you not to answer that
[24] question to the extent your understanding is based on
[25] legal advice that they provided to you.

Page 38

[1]     BY MR. ROTHSCHILD:
[2]   Q: Let's take it in parts. Do you have an understanding of
[3] why the Discovery Institute took that position? And
[4] that is a yes, no question.
[5]   A: I have an opinion on it. I don't know if — I am not
[6] sure if I am answering the question you are asking.
[7]   Q: The yes, no question I am asking can include an
[8] understanding based on legal advice. I am asking the
[9] question: Do you have an understanding of why the
[10] Discovery Institute is opposed to the policy? And I am
[11] only asking for a yes no answer.
[12]   If that answer — if that understanding — if you
[13] have that understanding and it is based on the fact that
[14] you have had legal communications, you are still
[15] required to give me a yes no answer.
[16]   A: I believe that —
[17]   MR. GILLEN: Answer the question yes or no. Do
[18] you have an understanding concerning why Discovery
[19] Institute took its position?
[20]   A: I believe I do.
[21]     BY MR. ROTHSCHILD:
[22]   Q: What is the source of that understanding?
[23]   A: Just from these legal conversations that we have had.
[24]   Q: Other than the legal conversations, you have no other
[25] understanding?

Page 39

[1]   A: I think that's where the information would have come
[2] from.
[3]   Q: Just to go over this and make sure I am correct, it is
[4] your testimony today that you have no recollection of
[5] seeing Exhibit 40?
[6]   A: Let's just put it this way: I can't recall seeing this,
[7] but you know.
[8]   Q: You can't rule it out with an absolute certainty?
[9]   A: No, because they are addressed to my e-mail address.
[10] There is that chance. But I just don't recall being
[11] that these were to like I said not my normal e-mail
[12] address, that a lot of this stuff I didn't get.
[13]   Q: Does anybody else have access to that e-mail site? Can
[14] anybody else pull up these e-mails?
[15]   A: Can anybody else pull them up?
[16]   Q: Yes. Let me make it more clear. These e-mails are
[17] coming into an e-mail that is for your duties as a Board
[18] member as opposed to a personal e-mail?
[19]   A: Yes. It is just set up for a Board member. I guess
[20] they are set up for the Board members through the School
[21] District.
[22]   Q: Do you need a password to access that e-mail?
[23]   A: I believe so.
[24]   Q: Is that a password that you select?
[25]   A: I believe.

Page 40

[1]   Q: Do you know whether anybody besides yourself has that
[2] password?
[3]   A: That, I don't know.
[4]   Q: Do you know as a general practice whether anybody
[5] associated with the School Board or School District
[6] administration regularly reads the e-mails that come
[7] into this e-mail address?
[8]   A: I'm not sure. I don't know.
[9]   Q: Does the fact that the Discovery Institute, which as we
[10] previously discussed is an organization involved in the
[11] subject of Intelligent Design, does that fact that they
[12] have come out publicly opposing the Dover policy
[13] influence in any way your belief that this is in fact a
[14] positive contribution to the children's scientific
[15] education?
[16]   A: Do I believe it still is?
[17]   Q: Yes.
[18]   A: Yes.
[19]   Q: Not withstanding the fact the Discovery Institute has —
[20]   A: You have to know their legal reasons for that.
[21]   Q: And you know those?
[22]   A: I believe I do.
[23]   Q: So nothing you have learned has changed your view that
[24] presenting Intelligent Design to the students — nothing
[25] you have learned from the Discovery Institute has

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Alan Bonsell
April 13, 2005

Page 41

[1] changed your belief that presenting Intelligent Design
[4] to the Dover students is helpful from a scientific
[3] education perspective?
[4]    A: I believe it's helpful. It expands it, but we are not
[5] teaching it. We are only making the kids aware of it.
[6]    Q: I didn't use the word teach. I said present. Nothing
[7] you have learned from the Discovery Institute has
[8] changed your view that making students aware of
[9] Intelligent Design enhances their science education?
[10]    A: Could you repeat that again?
[11]    Q: I want to confirm that nothing you have learned from the
[12] Discovery Institute has changed your view that making
[13] students aware of Intelligent Design enhances their
[14] science education?
[15]    A: Has changed my view? Absolutely not.
[16]    Q: Now we went off on this subject when I asked you about
[17] whether anybody had made any presentation to the Board
[18] in relation to the resolution they would have to vote
[19] on, you talked about the Discovery Institute and didn't
[20] describe it because you described it as a legal
[21] communication.
[22]       Now I want to put the Discovery Institute aside
[23] and ask whether other than the Discovery Institute
[24] anybody made any presentation to the Board on the
[25] subject of Intelligent Design or the subject matter of

Page 42

[1] the resolution?
[2]    A: I don't believe they made a presentation, no.
[3]    Q: Did you ever participate in any discussion with Board
[4] members in which you described your own understanding of
[5] Intelligent Design?
[6]    A: Did I describe my own understanding? I'm sure more than
[7] likely I have.
[8]    Q: Can you remember who you had those conversations with?
[9]    A: I mean I can't specifically tell you, there again
[10] because you are asking me to pinpoint exact times when I
[11] could remember exactly when I said to each particular
[12] member, but I more than likely have said these things to
[13] the members of the Board.
[14]    Q: All the members of the Board?
[15]    A: Probably.
[16]    Q: You think you have described your own understanding of
[17] Intelligent Design to all the other Board members?
[18]    A: There again, if you are asking me specifically when that
[19] happened, I don't know.
[20]    Q: I am not.
[21]    A: Generalities, I think I probably have.
[22]    Q: Have other Board members described their understanding
[23] of Intelligent Design?
[24]    A: I can't recall specifics, but they probably have said
[25] something along those lines, but I'm not sure. I'm not

Page 43

[1] positive.
[2]    Q: Can you remember if any particular members of the Board
[3] expressed their understanding of Intelligent Design?
[4]    A: I can't recall.
[5]    Q: Did you ever contact any organizations other than the
[6] Discovery Institute for information about teaching
[7] biology to high school students? As an example, the
[8] National Academy of Sciences, did you ever contact them?
[9]    A: Not that I remember, no.
[10]    Q: What about the American Association for the Advancement
[11] of Science?
[12]    A: Not that I recall.
[13]    Q: What about the American Federation of Biology Teachers?
[14]    A: Not that I recall.
[15]    Q: Any other organizations other than what we have
[16] discussed with the Discovery Institute?
[17]    A: Contacted organizations personally to ask them about
[18] this particular subject, not that I can remember at this
[19] point.
[20]    Q: Do you know whether any other member of the Board ever
[21] did that putting aside the Discovery Institute?
[22]    A: I don't know. You would have to ask them.
[23]    Q: Do you know whether any member of the administration
[24] ever did that?
[25]    A: There again, you would have to ask them.

Page 44

[1]    Q: Fair enough. Now I think from your previous deposition
[2] my understanding is that you never advocated the
[3] teaching of Creationism at any Board meetings; is that
[4] consistent with your —
[5]    A: Correct.
[6]    Q: And just to be clear, you understand Creationism to
[7] include the tenent that creatures were formed as they
[8] now exist?
[8]    A: Are you asking my personal beliefs now?
[10]    Q: Yes. Your understanding of what Creationism.
[11]    A: My personal belief is yes, I believe in Creationism, and
[12] I believe in the Bible and what it says.
[13]    Q: Part of that is that creatures were formed as they now
[14] exist?
[15]    A: Yes. Species were, yes.
[16]    Q: For example, birds with their feathers, beaks and wings?
[17]    A: Okay.
[18]    Q: You agree with that?
[19]    A: Yes.
[20]    Q: And fish with fins and scales?
[21]    A: Again, you are asking my personal opinion?
[22]    Q: Is that part of your understanding of what Creationism
[23] provides?
[24]    A: That could be part of it, yes.
[25]    Q: Putting aside Board meetings, has it ever been your

Alan Bonsell
April 13, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

Page 45

[1] position as a member of the School Board that
[2] Creationism should be taught to Dover students?

[3]     A: No.

[4]     Q: I am going to show you a document that was marked as
[5] Plaintiff Exhibit 9. This is an April 1st, 2003 memo
[6] from former Principal Peterman. And there's no
[7] indication that it was sent to you at least on the
[8] document, but I am still asking the question.

[9]     Do you recognize this document?

[10]     A: I have never seen this document.

[11]     Q: In this document at the end of the first paragraph, this
[12] document is Ms. Peterman reporting on a conversation she
[13] had with Bertha Spahr. And part of what she is
[14] reporting here is the last sentence of the first
[15] paragraph.

[16]     Mr. Baksa further stated to Mrs. Spahr on March
[17] 31st, 2003 that this Board member wanted fifty percent
[18] of the topic of Evolution to involve the teaching of
[19] Creationism.

[20]     And my question for you is: Did you ever — did
[21] you personally ever express that to Mr. Baksa, that you
[22] wanted fifty percent of the topic of Evolution to
[23] involve the teaching of Creationism?

[24]     A: No.

[25]     Q: Did you ever express to Mr. Baksa or in Mr. Baksa's

---

Page 46

[1] presence that you wanted fifty percent of something else
[2] to be taught along with the topic of Evolution?

[3]     A: No, I don't believe so.

[4]     Q: In his deposition, Mr. Baksa referred to a Board
[5] retreat. Have you ever had a Board retreat?

[6]     A: Yes, just had one.

[7]     Q: What Mr. Baksa testified to, he did not testify that you
[8] used the word Creationism, but he did testify that at a
[9] Board retreat where administrators were around that you
[10] mentioned something about 50/50. This is Mr. Baksa's
[11] testimony.

[12]     I asked when he used the word 50/50, what was he
[13] referring to? And he answered I believe Mr. Bonsell was
[14] referring that if we spent a day teaching Darwin's
[15] Theory, we should spend a day teaching another theory.

[16]     Giving you the benefit of what Mr. Baksa said,
[17] does that refresh your recollection about things you
[18] might have said on the subject —

[19]     A: If I would have said something, if you are teaching
[20] something dogmatically, that is a theory. To be fair
[21] with other — but there's other scientific theories out
[22] there.

[23]     I mean a Board retreat, if this was said at a
[24] Board retreat, the time you get to talk is when you are
[25] standing in line waiting to get food. A Board retreat

---

Page 47

[1] is not like a weekend. This is like an evening where
[2] you get together with administrators.

[3]     You meet. The first thing you do is they open the
[4] cafeteria line. You go through the cafeteria line, talk
[5] for a couple of minutes. You go back and eat. You go
[6] on with your meeting about what's going on in the School
[7] District.

[8]     This would have been — if something was said like
[9] that, it would have been a casual conversation just
[10] probably standing in line waiting to go get our food.

[11]     Q: You don't get to golf at St. Andrews?

[12]     A: No. Unfortunately, no. This is at our fifth and sixth
[13] grade school building. That is our retreat.

[14]     Q: But giving you the information I have just described to
[15] you that Mr. Baksa remembered this 50/50 concept coming
[16] up at a Board retreat, does that refresh your
[17] recollection at all about what you were talking about on
[18] the subject of Evolution?

[19]     A: You are going back to this paper again, this note from
[20] Trudy Peterman?

[21]     Q: Understand, I showed this document to Mr. Peterman
[22] (sic), and he definitely remembered a conversation with
[23] you. Now he testified that he does not remember the use
[24] of the word Creationism, but he does remember this 50/50
[25] concept.

---

Page 48

[1]     I think he suggested that Ms. Spahr may have
[2] understood him incorrectly, but he was pretty clear that
[3] he was talking about something. This didn't come out of
[4] thin air. There was this 50/50 concept.

[5]     MR. GILLEN: Eric, you said Mr. Peterman. He
[6] meant Mr. Baksa.

[7]     BY MR. ROTHSCHILD:

[8]     Q: Yes.

[9]     A: Mr. Baksa said this?

[10]     Q: Yes. Mr. Baksa saw this memo from Mrs. Peterman. He
[11] said — I am paraphrasing, of course — I don't think
[12] any Board member talked about the teaching of
[13] Creationism.

[14]     A: No, absolutely not.

[15]     Q: But he did remember this concept of 50/50 was something in
[16] the sense that this concept of 50/50 was something he
[17] had a recollection of, and he attributed it to you at a
[18] Board retreat.

[19]     A: There again, this was — this would have been casual
[20] conversation. If it was said, I am sure it was said at
[21] 50/50. That sounds like something being fair. I don't
[22] know. I am just not sure.

[23]     Q: Do you have a recollection of during this time period
[24] advocating the teaching of something else 50/50 or
[25] equally with the teaching of Evolution?

---

Min-U-Script®   Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Alan Bonsell
April 13, 2005

Page 49

[1]  A: I just don't recall. I mean I just don't.

[2]  Q: I am going to show you an exhibit we have marked as

[3] P-19. Do you recognize?

[4]  A: Is it all right if I fill my glass up?

[5]  Q: Absolutely. Do you recognize P-19, Mr. Bonsell?

[6]  A: Yes.

[7]  Q: What is it?

[8]  A: It is a District newsletter that we put out.

[9]  Q: When you say we, who are you referring to?

[10]  A: The School District put out.

[11]  Q: Did the Board have a role in the — any role as regards

[12] this newsletter?

[13]  A: Yes.

[14]  Q: What was that role?

[15]  A: I am the one that initiated this newsletter being put

[16] out.

[17]  Q: Describe how that came about.

[18]  A: Well, basically, the information that was coming out of

[19] our local media was very misinforming and inaccurate.

[20] And I wanted to get the truth out to our community

[21] because the community is the one — I mean they are the

[22] ones that pay the bills. They are the ones in charge.

[23]  They are the ones — and I want them to know

[4] exactly what was going on. I wanted this newsletter to

[25] go out. And the Board agreed with me to put this out to

Page 50

[1] update everyone.

[2]  We tried different things. But when the news

[3] media isn't cooperative of getting the truth out, you

[4] have to do it on your own.

[5]  Q: Did you come up with this idea of a newsletter on your

[6] own?

[7]  A: Yes.

[8]  Q: What were the circumstances in which you proposed it to

[9] the Board?

[10]  A: Just what I just said. It is basically — the Board

[11] agreed. I mean they were tired of seeing misinformation

[12] and inaccuracies in our legal media, newspapers, TV,

[13] everything. I mean so we wanted to get it out.

[14]  We were concerned with our constituency that the

[15] community in Dover, that they got the truth. And we

[16] wanted to put something together that told them exactly

[17] what the truth was, word for word the statement read to

[18] the kids. Basically, that is it.

[19]  Q: Did you propose this at a Board meeting?

[20]  A: Probably.

[21]  Q: At a public session or an executive session?

[22]  A: I don't remember exactly.

[23]  Q: Was there a vote on whether to have a newsletter?

[24]  A: I don't know if there was an official vote per se, but

[25] there was a vote that the Board agreed to do it and

Page 51

[1] thought it was a good idea to do it.

[2]  Q: Once the Board had agreed that this was a good idea,

[3] describe the process for the creation of the document.

[4] What happened next?

[5]  A: The creation of the document?

[6]  Q: Let me ask — let me withdraw that. Who created this

[7] document, the contents of it?

[8]  A: Well, it was together with the Board and the

[9] administration and our counsel.

[10]  Q: When you are referring to counsel now, what counsel are

[11] you referring to?

[12]  A: Thomas More.

[13]  Q: Was anybody given the assignment to basically prepare

[14] the document, to come up with its contents?

[15]  A: It was discussed what to be put in. We had

[16] discussion — I had discussions with Thomas More, people

[17] in Thomas More.

[18]  I had discussions with Dr. Nilsen at different

[19] times. And, you know, these are things we're looking

[20] for, whatever, to try to put this together. And

[21] basically, then came up with the document.

[22]  Q: Did you sort of brainstorm ideas first about what would

[23] go in it?

[24]  A: I believe — yeah, we talked about what we wanted to put

[25] in. That's what I said earlier about different things.

Page 52

[1] We wanted the people to know exactly what was going on,

[2] exactly the truth of what was going on because they

[3] hadn't gotten it up to this point.

[4]  Q: Was any specific individual or group of individuals

[5] assigned to actually prepare the newsletter, to write it

[6] up and put it on newsprint?

[7]  A: Well, like I said, we discussed it. I believe the

[8] printing came out from — I forget his name — Thomas

[9] More. We discussed it. They came up with sort of how

[10] it looks.

[11]  And then we went over everything to make sure what

[12] we discussed was in it. I believe you have to ask Dr.

[13] Nilsen about it. I am sure he did because he put it

[14] together to be sent out then at that point.

[15]  Q: So is it fair to say it was actually the Thomas More Law

[16] Center that developed the contents of it, the written

[17] contents?

[18]  A: Not really. Not really. Because this person, he was in

[19] charge of doing this kind of work of I guess newsletters

[20] or whatever. But the content of what was going to be

[21] put in and what was going to be said, we basically are

[22] the ones that came up with that.

[23]  Q: When you say the we, who are the we that came up with

[24] it?

[25]  A: I mean I guess I was sort of in charge with that. A lot

Alan Bonsell
April 13, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 53

[1] of it, but Dr. Nilsen also looked at it. Everybody got
[2] to look at this and make sure everybody didn't have a
[3] problem with it. We wanted to make sure everything was
[4] right. There again, I wanted to make sure that the
[5] people got the truth.
[6]    Q: Maybe I can put a finer point on it. One of the things
[7] on the first page is an article, an editorial by Senator
[8] Santorum?
[9]    A: Yes.
[10]   Q: That was taken verbatim from the newspaper; correct?
[11]   A: Correct. That was an editorial.
[12]   Q: Below that, there is a text of the statement read to
[13] students that was in existence before this newsletter
[14] ever was developed; correct?
[15]   A: Yes, because this was what was read to the students.
[16]   Q: On the left side and then going over to the second page
[17] are a series of what is titled Frequently Asked
[18] Questions; do you see that?
[19]   A: Yes.
[20]   Q: Who prepared that section of the document? And I am
[21] talking about the entire Frequently Asked Questions
[22] section.
[23]   A: Who prepared that? There again, it was more of a group
[24] thing, a group effort, or a few individual's efforts I
[25] believe to put this together.

Page 54

[1]    Q: That is what I really want to know.
[2]    A: I mean there again, I was talking and talking with the
[3] man from Thomas More about what we wanted to put in.
[4] Here are these things. These are the questions that
[5] people come up and ask you.
[6]    What is the theory? What is this? What is the
[7] theory? I am hearing this. I am hearing that. Is it
[8] being taught because the newspaper is saying all along,
[9] it was being taught.
[10]   Is this religious? Because that's what they are
[11] saying, it is religious. It is not. And so we wanted
[12] to answer the questions that the public was asking.
[13]   Q: And so two of the questions you have here are what is
[14] the Theory of Evolution, and what is the Theory of
[15] Intelligent Design.
[16]   Are those two of the questions you thought the
[17] public wanted answers to?
[18]   A: Yes.
[19]   Q: And then there are answers given, and they are a few
[20] paragraphs long. Who developed those answers?
[21]   A: Well, I think as I said, there was discussions. And
[22] then Thomas More put it together and then gave it to us,
[23] and we reviewed it again. And then the administration
[24] reviewed it again. And then the Board reviewed it
[25] again, and then it went out.

Page 55

[1]    There again, I think it was a group thing through
[2] all three -- administration, Board and Thomas More.
[3]    Q: Did the Board vote to -- once the contents of the
[4] newsletter was complete, did the Board vote that this
[5] would in fact be sent out?
[6]    A: They all -- as far as my recollection of it, everybody
[7] reviewed this. Nobody had a problem with it. They
[8] thought it was a good thing to send out so we sent it
[9] out.
[10]   Q: There wasn't an official vote?
[11]   A: Some of these things you don't take official votes at a
[12] Board meeting. There's lots of things that we say we
[13] are going to do this and that. It is not you have to
[14] wait for a Board meeting to be able to do something.
[15]   I just want to make it clear for the deposition
[16] that this wasn't something out of the ordinary. This is
[17] something that happens all the time.
[18]   Q: This was an example of where the Board members reviewed
[19] this and sort of came to a consensus that this was
[20] something you should do?
[21]   A: Yes. Because we wanted to get the truth out.
[22]   Q: Do you remember were all the Board members involved with
[23] this, reviewing it? Let me make it clear. Did all
[24] Board members review this newsletter?
[25]   A: As far as I know, they did.

Page 56

[1]    Q: Let's get back to these two questions that I am focusing
[2] on -- what is the Theory of Evolution, what is the
[3] Theory of Intelligent Design.
[4]    Who drafted the answers to those two questions?
[5]    A: Well, there again, I believe we talked about this. But
[6] then Thomas More, the man that does these type of
[7] things, put it together and then gave it to us.
[8]    Q: He actually took -- he was the one who came up with the
[9] words that would be the answer to these questions?
[10]   A: I don't know if he came up with all the words. I think
[11] he came up with the words through our conversations of
[12] what we wanted to put in and got a sense of what exactly
[13] the Board had in mind.
[14]   Q: So the answers to these questions and all of the
[15] questions are ones that are consistent with what the
[16] Board wanted communicated to the District?
[17]   A: The answers to questions, yes. Because like I said
[18] again, these are questions that we were hearing from the
[19] community, or they're coming from the community because
[20] they are being misinformed by the media.
[21]   Q: And you wanted to answer the community?
[22]   A: We wanted to get the truth out to the community.
[23]   Q: And in your view, the answers that are in this
[24] newsletter are truthful answers?
[25]   A: I believe so.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Alan Bonsell
April 13, 2005

Page 57

[1] Q: And you understand them to be correct?

[2] A: I believe so.

[3] Q: Let's take the question what is the Theory of Evolution.

[4] It starts: The word Evolution has several meanings, and

[5] those supporting Darwin's Theory of Evolution use that

[6] confusion in definition to their advantage.

[7] Is that something you understand to be correct?

[8] A: Yes.

[9] Q: What is the basis for that understanding?

[10] A: Because from my personal understanding of it, from what

[11] I see even when I read, or when people talk about it?

[12] Q: Mr. Bonsell, you voted for this. You are telling me

[13] this is a truthful, correct representation to the School

[14] District.

[15] I want to know what your basis is for believing

[16] that to be so.

[17] A: I believe because you go — there's Darwin's Theory

[18] involves adaptation over time and origin of species.

[19] When you start talking about origin of species because a

[20] lot of people, a lot of these scientists write these

[21] articles. And I read editorials that this is a fact.

[22] It is not a theory. It is a fact.

[23] When you push them for information, they go from

[ ] origins and start talking about adaptation. I don't

[25] think many people have a problem with adaptation over

Page 58

[1] time. That's what I believe this is saying here. The

[2] word Evolution has several meanings, because it does.

[3] Darwin has more than — it's not one — it is more than

[4] one.

[5] Q: You think Evolution has several meanings. You think

[6] that is accurate?

[7] A: Because Evolution is a broad term.

[8] Q: So the answer is yes?

[9] A: When you are talking about Darwin.

[10] Q: And who are the supporters of Darwin's Theory who use

[11] confusion in definition to their advantage? It sounds

[12] pretty insidious.

[13] A: Use it to their advantage?

[14] Q: Yes. Who does that?

[15] A: I don't know if I can specifically name names. There

[16] again, things I have just read just recently from

[17] professors and different things like that, they will put

[18] in the information and start talking about it as fact

[19] and go right back. They will stop there, and then start

[20] talking about the other side of Evolution.

[21] So I don't have any particular names off the top

[22] of my head, again, because I read this information.

[23] Q: You can't name any of those, t-h-o-s-e, who are using

[24] confusion in definition to their advantage?

[25] A: Off the top of my head, I can't name you a specific

Page 59

[1] person, but I see it and read it all the time. I have

[2] seen it. So there again, that is my personal opinion.

[3] Q: Okay. Then it goes to say Evolution can mean something

[4] as simple as change over time which is not controversial

[5] and is supported by most people.

[6] Is that what you are talking about when you say

[7] adaptation over time?

[8] A: Yes.

[9] Q: Am I correct in understanding your understanding is

[10] adaptation within a species?

[11] A: Yes.

[12] Q: And it says here is not controversial. What do you mean

[13] by that?

[14] A: I believe that is pretty much something that most people

[15] agree with. See that is why I am saying, that Evolution

[16] is a very broad term. In other words, you ask one

[17] person what their definition of that is, and it could be

[18] different than what your definition is.

[19] Q: And it says is supported by most people. What is the

[20] basis for that? Let me withdraw that.

[21] When the newsletter says is it supported by most

[22] people, what people are we talking about?

[23] A: I would think that is people, scientists, people in

[24] general.

[25] Q: Which?

Page 60

[1] A: I think it could be both.

[2] Q: So your understanding is that this change over time is

[3] supported by most scientists?

[4] A: I would think so.

[5] Q: And it is also supported by most people, people

[6] generally?

[7] A: If you are saying if you are distinguishing between

[8] scientists, I don't know where you are at here. Are we

[9] talking scientific, or are we talking in general? What

[10] are we talking about?

[11] Because Evolution is a broad term. Your

[12] definition and mine might be two different things.

[13] Q: Mr. Bonsell, your definition is key here because this is

[14] your newsletter that you supported, and it says is

[15] truthful and accurate.

[16] I want to understand when you tell this community

[17]

[18] A: I think most scientists support that part of that

[19] theory. I think most scientists do.

[20] Q: Which is adaptation within species?

[21] A: Yes, change over — yes.

[22] Q: And the statement here is supported by most people. Are

[23] you representing to me that that is supposed to mean

[24] most scientists?

[25] A: I believe.

Alan Bonsell
April 13, 2005

Tammy Kitzmiller, et al.  v.
Dover Area School District, et al.

Page 61

[1]  Q: And not most people generally?
[2]  A: There again, I guess it could be either, or, or both. I
[3]  mean scientifically, we are talking scientifically. I
[4]  believe most scientists from what I have seen and read,
[5]  that that part of it is not a problem.
[6]     There is not the controversy. There is not the
[7]  gaps or something that you can see, that you can go out
[8]  and see in the lab and see that.
[9]  Q: But again, I didn't write this, Mr. Bonsell. You did,
[10]  or you voted to approve it. I want to make sure I
[11]  understand what we are talking about here.
[12]     It doesn't say supported by most scientists. It
[13]  says supported by most people. What are you trying to
[14]  communicate to this School District about what is
[15]  controversial and what is not controversial?
[16]  A: What is controversial is the next part of it. That is
[17]  what is controversial.
[18]  Q: You are saying adaptation within a species, not
[19]  controversial; right?
[20]  A: Yes.
[21]  Q: When you are saying not controversial, I want to get
[22]  some clarification here. Is it not controversial among
[23]  scientists, not controversial among people generally, or
[24]  do you not know?
[25]  MR. GILLEN: Eric, I think he has answered. I

Page 62

[1]  object to the form because I think he has answered that
[2]  question.
[3]     BY MR. ROTHSCHILD:
[4]  Q: I am not sure what the answer is. Maybe you can tell me
[5]  what you think the answer is.
[6]  MR. GILLEN: I don't want to testify for the
[7]  witness.
[8]  MR. ROTHSCHILD: Then let's get it from him.
[9]  MR. GILLEN: Right.
[10]     BY MR. ROTHSCHILD:
[11]  Q: You have made a statement to this School about —
[12]  A: I believe that most scientists don't have a problem with
[13]  that.
[14]  Q: Is that what the Board was trying to communicate in that
[15]  passage?
[16]  A: I believe so.
[17]  Q: All right. Then you said there's another — I think you
[18]  are then saying that the next aspect of it is
[19]  controversial; is that fair?
[20]  A: Yes.
[21]  Q: And that aspect of it includes Evolution working to
[22]  create new species; is that fair?
[23]  A: I believe. If I understand what you are saying, yes.
[24]  Q: And what you are trying to communicate to the School
[25]  District is that that aspect of Evolution is

Page 63

[1]  controversial; correct?
[2]  A: Well, basically, there's two different parts of it.
[3]  That's where I think we are trying to get at. There's
[4]  what says here change over time, and then there is
[5]  Evolution in its biological sense means the process
[6]  whereby life arose from nonliving matter and
[7]  subsequently developed by nature means namely natural
[8]  selection acting on random variations.
[9]  Q: Okay.
[10]  A: I think that — it's basically showing that there are
[11]  two sides. It is just not one. There is actually two
[12]  different distinct things here that Darwin talks about.
[13]  Q: One is variation within a species, and the other is
[14]  effectively the —
[15]  A: It says here Evolution can mean something as simple as
[16]  change over time, and Evolution can mean what I just
[17]  read.
[18]  Q: Okay. And that second part includes the concept that
[19]  new species can develop from preexisting species,
[20]  correct?
[21]  A: Where it says that life arose from nonliving matter and
[22]  subsequently developed by natural means, namely natural
[23]  selection acting on random variations, I think it is
[24]  more an informational thing to show there's two sides to
[25]  it.

Page 64

[1]  Q: Is what you are trying to communicate to the School
[2]  District that that second aspect is controversial?
[3]  A: Well, it's just showing that there's two different sides
[4]  to the Evolutionary Theory. There's the change, simple
[5]  change over time, and then there is what is written here
[6]  the biological sense of how life arose.
[7]     You are talking about change over time, and you
[8]  are talking about origins of life or where life arose.
[9]  It is just basically showing two different things.
[10]  Although, they just added the thing that nobody really
[11]  has a problem with that first part. It is not saying
[12]  that they have a problem with — it is just — I don't
[13]  know. I mean it is pretty plain in what it says.
[14]  Q: You have made a point about one aspect of Evolution
[15]  being noncontroversial. That is right in the
[16]  newsletter?
[17]  A: Yes.
[18]  Q: Then you describe a second part. Are you or are you not
[19]  trying to communicate to the School District that this
[20]  second aspect of Evolution is controversial?
[21]  A: Well, the origin of life, that's what this whole
[22]  controversy is about. The origins of life is a
[23]  controversial subject. I think everybody here would
[24]  agree with it.
[25]  Q: Let me make sure I understand what you mean by the

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

**Alan Bonsell**
**April 13, 2005**

Page 65

origin of life. That is the term used in this
[2] newsletter. It is used in the resolution where it says
[3] origins of life is not taught. I want to make sure I
[4] understand exactly what your understanding is of the
[5] term origin of life as used by the School Board.
[6]     A: Again, we put out the newsletter here. It's showing
[7] that Darwin's Theory is that life arose from nonliving
[8] matter and subsequently developed by namely natural
[9] selection acting on random variations. I believe that
[10] is I guess a simplified version of what that is.
[11]     Q: You are not answering, Mr. Bonsell. I want your
[12] understanding of what the term origins of life means.
[13] Let's go back to the resolution where it says origins of
[14] life is not taught.
[15]     A: Okay.
[16]     Q: What is not taught, what is origins of life?
[17]     A: This section on Darwinism wouldn't be taught because it
[18] discusses origins of life.
[19]     Q: What is origins of life? Forget the newsletter.
[20]     A: How life arose, where is the origins of life. Where is
[21] the origins of life, that is self-explanatory I guess.
[22]     Q: It is not necessarily self-explanatory. That is why I
[23] want to make sure I understand.
[ ]     Does the origin of the human species fall under
[25] the category of origins of life?

Page 66

[1]     A: Repeat that again?
[2]     Q: Does the origin of humans fall under the subject of
[3] origins of life?
[4]     A: Is what you are asking where did humans come from fall
[5] under origins of life?
[6]     Q: Right. Your understanding.
[7]     A: Where life started, where life came from, it would be
[8] origins of life.
[9]     Q: You are not answering my question.
[10]     A: I am not answering it but not answering what you want me
[11] to.
[12]     Q: Does the origins of humans fall under origins of life?
[13]     A: I guess it would.
[14]     Q: And the origins of, for example, amphibians, does that
[15] fall under origins of life?
[16]     A: I am just trying to understand.
[17]     Q: Let me try and be a little more explanatory. One issue
[18] that origins of life might refer to is where did
[19] literally biological life start. There's ideas out
[20] there about, for example, there is some soup there and
[21] eventually simple biological organisms arose. It's very
[22] complicated, and I think many scientists would
[23] acknowledge it's an area where we've got a lot to learn.
[24] That is one thing.
[25]     If you are asking me what could origins of life

Page 67

[1] mean, that is one thing I would put in that bucket.
[2] That's one understanding.
[3]     And I want to understand is that all you are
[4] talking about, or are you talking about that, or the
[5] origins of new species or both?
[6]     A: I am trying to understand the question. I am trying to
[7] understand the question because I thought I answered the
[8] question, but you say I am not answering the question.
[9]     MR. GILLEN: Could we go off the record for a
[10] second?
[11]     (An off-the-record discussion was had.)
[12]                 BY MR. ROTHSCHILD:
[13]     Q: Let me ask a question. In the resolution that is the
[14] subject of this lawsuit, part of the resolution says
[15] origins of life is not taught.
[16]     That was part of the resolution you voted for;
[17] correct?
[18]     A: Yes.
[19]     Q: I want your understanding of what origins of life means
[20] in that resolution or that sentence?
[21]     A: That basically origins of life of where things came from
[22] won't be taught.
[23]     Q: Now when we talk about where things came from, I want to
[24] make sure I understand what you mean by that. Does the
[25] question where did humans come from fall under that

Page 68

[1] description?
[2]     A: Yes.
[3]     Q: So under your understanding of the resolution, Dover
[4] school teachers are not allowed to teach where humans
[5] came from?
[6]     A: Yes.
[7]     Q: Whether that's out of thin air, or descending from some
[8] kind of primates, either one would be off limits?
[9]     MR. GILLEN: Object to the form again.
[10]                 BY MR. ROTHSCHILD:
[11]     Q: You can answer.
[12]     A: Yes.
[13]     Q: And similarly, would it be the case that a teacher could
[14] not teach that, for example, amphibians descended from
[15] some other species?
[16]     MR. GILLEN: Object to the form.
[17]     A: If it goes back to the origins, yes.
[18]                 BY MR. ROTHSCHILD:
[19]     Q: Is that your understanding of origins?
[20]     A: Basically, yes.
[21]     Q: Can Dover science teachers teach the concept of common
[22] descent, meaning current species — current separate
[23] species have common ancestors?
[24]     MR. GILLEN: Object to the form.
[25]     A: We don't teach that.

**Alan Bonsell**
**April 13, 2005**

**Tammy Kitzmiller, et al.   v.**
**Dover Area School District, et al.**

Page 69

[1]            BY MR. ROTHSCHILD:

[2]      Q: And they are not permitted to teach that under the

[3] resolution?

[4]      MR. GILLEN: Object to the form.

[5]      A: Under the resolution that was put in.

[6]            BY MR. ROTHSCHILD:

[7]      Q: So is it a fair characterization of your understanding

[8] of the resolution that all that Dover teachers are

[9] allowed to teach is how Evolution affects variation

[10] within a species?

[11]      MR. GILLEN: Object to the form.

[12]      A: That is what we do now. That's what we did before.

[13]            BY MR. ROTHSCHILD:

[14]      Q: And your understanding is that the resolution confirms

[15] that, that that is what is supposed to be done?

[16]      MR. GILLEN: Object to the form.

[17]      A: Yes, correct. The only difference between last year and

[18] this year is the four little paragraphs that is read.

[19] That is the only thing that is different.

[20]            BY MR. ROTHSCHILD:

[21]      Q: Going to the concept of Intelligent Design, is it your

[22] understanding that Intelligent Design is a scientific

[23] concept or theory that addresses the origins of life as

[24] you have defined it during —

[25]      A: It could.

Page 70

[1]      Q: Could or does?

[2]      A: Well, I mean a part of it would.

[3]      Q: So Intelligent Design is a scientific explanation of

[4] origins of life and some parts of Evolutionary Theory

[5] are a scientific explanation of origins of life as you

[6] have defined?

[7]      A: Parts of each are, yes.

[8]      Q: Going to the question what is the theory of Intelligent

[9] Design in the second paragraph, the newsletter says in

[10] simple terms on a molecular level, scientist have

[11] discovered a purposeful arrangement of parts which

[12] cannot be explained by Darwin's Theory.

[13]      Who drafted that section of the answer — and in

[14] fact that entire paragraph?

[15]      A: It probably came from — like I said after discussions

[16] on these different things, I believe this would have

[17] been — I can't remember his name — someone from Thomas

[18] More. But like again, this is through conversations

[19] that it was put together.

[20]      Q: And looking at that entire paragraph that begins in

[21] simple terms, do you understand that paragraph to be

[22] scientifically accurate?

[23]      A: I believe so.

[24]      Q: What is the basis for that belief?

[25]      A: What I read is I believe this is more technically talked

Page 71

[1] about irreducible complexity in which you have units

[2] that if you take any one of the parts away, they don't

[3] work. And they are saying is that Darwin's Theory

[4] cannot explain that.

[5]      Q: But it is not just — who is the they you are referring

[6] to?

[7]      A: Scientists.

[8]      Q: But it is not just the scientists who are saying this.

[9] This Board is saying it. It is saying that there is a

[10] purposeful arrangement of parts which cannot be

[11] explained by Darwin's Theory.

[12]      Do you know that to be true?

[13]      A: What I know about it.

[14]      MR. GILLEN: Object to the form.

[15]            BY MR. ROTHSCHILD:

[16]      Q: You know that that is scientifically correct, you

[17] know —

[18]      A: I am not a scientist. It is just what I have seen. The

[19] thing is this is what is the theory of Intelligent

[20] Design, and they are just — it is just explaining what

[21] that theory is.

[22]      Q: But part of what you are communicating to the residents

[23] of the — the people in the School District is that this

[24] purposeful arrangement of parts cannot be explained by

[25] Darwin's Theory?

Page 72

[1]      A: Okay.

[2]      Q: Do you know that that is correct? I know that is part

[3] of the Intelligent Design argument. Do you know that is

[4] correct?

[5]      MR. GILLEN: Object to the form.

[6]      A: I believe it to be correct.

[7]            BY MR. ROTHSCHILD:

[8]      Q: And what is the basis for that belief, because

[9] proponents of Intelligent Design say it?

[10]      A: They say it, and they show their evidences for it.

[11]      Q: What are the evidences for it?

[12]      A: There again what I said about irreducible complexity.

[13]      Q: Do you understand that irreducible complexity has

[14] established itself as being certainly correct?

[15]      A: It is just saying that Darwin's Theory can't explain it.

[16] I mean I don't know of any Darwin's Theory that can

[17] explain that. That is what it is saying.

[18]      Q: So you are representing to this School District that in

[19] fact the people who have come up with the irreducible

[20] complexity have in fact come up with information that

[21] cannot be explained by Darwin's Theory?

[22]      MR. GILLEN: Object to the form.

[23]      A: Not that I have seen.

[24]            BY MR. ROTHSCHILD:

[25]      Q: So Darwin's Theory is wrong in this respect, that is

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Alan Bonsell
April 13, 2005

Page 73

what you are communicating to the School District.

[1] A: Darwin — if they have something that can explain it,
[3] that is why they are theories.
[4] Q: You have obviously heard of this concept of irreducible
[5] complexity. What reading have you done to confirm for
[6] yourself that it is scientifically sound?
[7] A: Well, I've again on the video. I've read some other
[8] information on it. I have talked to — I have talked to
[9] I guess — let's see, who was that?
[10] There again, I guess it goes back to the way I
[11] answered before. It is from all the different things I
[12] have read or seen and the people I have talked to, or
[13] TV, videos, books. I mean going back to that whole
[14] thing again is where I got my information from.
[15] I mean there again, you want specifics. I don't
[16] know if I can give you that.
[17] Q: Do you understand irreducible complexity to be a concept
[18] that Michael Behe —
[19] A: Yes. He is basically I believe the founder of that part
[20] of it.
[21] Q: Have you read any analyses or criticisms of Mr. Behe's
[22] irreducible complexity concept?
[23] A: I have read some articles and papers and things like
[24] that about it.
[25] Q: That oppose what he is saying?

Page 74

[1] A: I believe so.
[2] Q: Can you name any of those?
[3] A: No.
[4] Q: And to the best of your recollection, do you remember if
[5] some of them say irreducible complexity, this is wrong,
[6] that irreducible complexity as described by Mr. Behe
[7] doesn't support the proposition he suggests?
[8] A: I don't know if they go into that per se like that.
[9] They try to bring some inferences in. But like I said,
[10] the things that I have read — and, again, this is
[11] coming from me — is that so far, I mean, again, that's
[12] still a theory.
[13] But what I am saying it says cannot be explained
[14] by Darwin's Theory. It is not really explained at this
[15] point. Maybe sometime down the road, it will be. That
[16] is why it's a theory. These are all theories.
[17] Q: And so based on your understanding, Mr. Behe has got the
[18] better of the argument right now?
[19] A: From what I can see personally.
[20] Q: That's what you are explaining to the School District,
[21] that this argument about irreducible complexity
[22] contradicts what people are saying about Darwin?
[23] A: This is what scientists that believe in this theory are
[24] saying. Can we have a break for a second?
[25] MR. ROTHSCHILD: Sure.

Page 75

[1] (A recess was taken.)
[2] AFTER RECESS
[3] BY MR. ROTHSCHILD:
[4] Q: Mr. Bonsell, is it a fair description of the process for
[5] creating this newsletter that there was discussion
[6] between the Board and this gentleman from Thomas More
[7] that he drafted the language and then gave a draft to
[8] the Board to review?
[9] A: Basically.
[10] Q: And what was the form of his draft language? Did it
[11] look like a newsletter, or was it in some other form?
[12] MR. GILLEN: Object to the form.
[13] BY MR. ROTHSCHILD:
[14] Q: What did you get to review?
[15] A: Yes, because it was something that looked like a
[16] newsletter type format that could easily be read, that
[17] people could look at and want to read it. We wanted as
[18] many people to read it as possible so they would know
[19] what is right.
[20] Q: So the first written draft of these frequently asked
[21] questions and answers was presented to the Board in the
[22] form of a newsletter?
[23] A: I believe in some respect, yes.
[24] Q: And once you, the Board, received that first draft from
[25] Thomas More, was there any editing of the frequently

Page 76

[1] asked questions section?
[2] A: I am not positive on that. I know it was condensed down
[3] to put on one page so we could send it out. I am not
[4] sure to be honest.
[5] Q: Did you keep a copy of the first written document that
[6] you received from the Thomas More Law Center?
[7] A: I don't recall.
[8] Q: Were there more than one draft before the final version
[9] was completed?
[10] A: There might have been, but I am not sure.
[11] Q: Do you remember whether there were edits to the text of
[12] the frequently asked questions section?
[13] A: That, I don't recall either.
[14] MR. ROTHSCHILD: Patrick, I request production of
[15] all drafts of this newsletter, including component parts
[16] of it.
[17] MR. GILLEN: Okay. I think that is responsive.
[18] BY MR. ROTHSCHILD:
[19] Q: In the newsletter in the frequently asked questions
[20] section, there is a question are there religious
[21] implications to the Theory of ID? The answer to it says
[22] not any more so than the religious implications of
[23] Darwinism. Then it continues with a few quotes related
[24] to Darwin.
[25] Is it your understanding that there are religious

**Alan Bonsell**
**April 13, 2005**

**Tammy Kitzmiller, et al.   v.**
**Dover Area School District, et al.**

Page 77

[1] implications to the Theory of Intelligent Design?
[2]   A: Not what we are doing, no. I mean, just what it says
[3] here. Again, I guess this is more of a legal answer
[4] than —
[5]   Q: Let me ask you for your understanding. Are there
[6] religious implications to the Theory of ID?
[7]   A: That is not easy to answer in a sentence.
[8]   Q: Mr. Bonsell, it seems to be a question — you put this
[9] question in here because it's a question you are getting
[10] from the members of your School District; is that right?
[11]   A: Because that is what they were saying, that this is
[12] Creationism, or this is that, or this is religion, and
[13] that is what the newspapers were saying.
[14]   Q: Understood. And so because of the way the newspapers
[15] were reporting this subject, a question that School
[16] District members are asking is are there religious
[17] implications to the theory of ID; is that fair?
[18]   A: There could be.
[19]   Q: There could be what? There could be questions or there
[20] could be implications?
[21]   A: Just I mean there again, I need — I'm not sure — I am
[22] trying to answer your question. I am not sure how you
[23] are asking the question.
[24]   Could there be religious implications of
[25] Intelligent Design? You could make religious

Page 78

[1] implications, but that doesn't mean that they are true.
[2] That is what this whole thing is about; isn't it?
[3]   Q: Do you understand there to be religious implications to
[4] the Theory of ID?
[5]   A: What we did with ID is there's not religion in it. It
[6] is scientific plain and simple. Whether you could say
[7] it is religious implications, what we did is not
[8] religious in any way, shape or form.
[9]   Q: Your testimony is that there is no religious aspect to
[10] what is being presented to the students?
[11]   A: Correct. Absolutely.
[12]   Q: Let's put that aside. And I am asking you do you
[13] understand there to be religious implications to the
[14] Theory of ID?
[15]   A: Again, someone could try to make that religious
[16] implications. I wouldn't.
[17]   Q: You would not?
[18]   A: Like I said, again, ID, what we did is not religious.
[19]   Q: Okay. I want to distinguish here between what you're
[20] presenting to the students, which I understand you are
[21] saying no religion in that, and now I am trying to ask
[22] you the question I am not asking you to answer what some
[23] people could construe from Intelligent Design, or what I
[24] might construe, and what has been asserted in the
[25] Complaint.

Page 79

[1]   I want your understanding. You seem to have read
[2] fairly widely on this subject. I want your
[3] understanding about the Theory of ID. Are there
[4] religious implications from the Theory of ID? Alan
[5] Bonsell's understanding.
[6]   A: Not the theory itself unless you could past the theory.
[7]   Q: What do you mean by that?
[8]   A: If you start discussions of who or what the intelligence
[9] is, someone could try to make that religious
[10] implication. But the science of Intelligent Design is
[11] that, science.
[12]   Q: The science stops short of the who or what?
[13]   A: Yes. They don't get into any religious aspects of it.
[14] It is simply science. It is a different theory.
[15] Looking at the same evidence as Darwin has, and they
[16] came up with a different theory.
[17]   They are not looking at different evidence. They
[18] are looking at the exact same evidence maybe with a
[19] different pair of glasses on, how they see it.
[20]   Q: Your understanding is that the science of Intelligent
[21] Design stops short of —
[22]   A: Yes.
[23]   Q: — defining who the designer was?
[24]   A: Yes.
[25]   Q: And how it did the designing, it stopped short of doing

Page 80

[1] that?
[2]   A: It just says intelligence. We are not saying if it is
[3] — who or what it is.
[4]   Q: Or how?
[5]   A: Or how.
[6]   Q: Mr. Bonsell, do you understand Intelligent Design Theory
[7] to require consideration of the supernatural?
[8]   A: No. They're looking at the same evidence as Darwinism.
[9]   Q: You don't understand supernatural actors or causes to
[10] have any part of Intelligent Design Theory?
[11]   A: They are saying they are looking at the evidences —
[12]   Q: Is that a yes or no?
[13]   A: Say it again.
[14]   Q: Do you understand Intelligent Design to involve
[15] consideration of supernatural actors or causes?
[16]   A: It doesn't get into that, no.
[17]   Q: If it did get into that, would you consider that proper
[18] to be taught to students in science classes?
[19]   A: Not if it got into any religious aspects, no, because we
[20] are not allowed to do. We wouldn't do that.
[21]           BY MR. ROTHSCHILD:
[22]   Q: You understand the discussion of the supernatural to be
[23] a religious aspect?
[24]   MR. GILLEN: Object to the form.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Alan Bonsell
April 13, 2005

---

Page 81

[1] A: Depending on what you are talking about. I mean there
[2] again, because now you are past the point of where
[3] Intelligent Design stops. Now you are saying who or
[4] what this intelligence is.
[5] BY MR. ROTHSCHILD:
[6] Q: But I am asking do you understand —
[7] A: But Intelligent Design isn't that. It doesn't discuss
[8] that. It doesn't go into that. It doesn't discuss any
[9] of that.
[10] Q: So your understanding is Intelligent Design does not
[11] involve the supernatural?
[12] A: If I am understanding your question right, I believe
[13] not.
[14] Q: If a subject did involve consideration of the
[15] supernatural, would you agree with me that that should
[16] not be taught in science class?
[17] MR. GILLEN: Object to the form.
[18] A: If you are going into religion, it shouldn't be taught
[19] in science class. I don't know what your definition of
[20] that is. The supernatural, I need a specific definition
[21] of what supernatural — what do you mean by that.
[22] BY MR. ROTHSCHILD:
[23] Q: Have you ever used the term supernatural?
[24] A: Have I ever used supernatural?
[25] Q: Or read the word supernatural?

Page 82

[1] A: I imagine I have at some point or other.
[2] Q: What is your understanding of what that word means?
[3] A: That is the thing I am asking your question.
[4] MR. GILLEN: Objection.
[5] A: You want me to answer your question of supernatural. I
[6] need to know what your definition is so I can answer it
[7] properly. Not what my definition is.
[8] BY MR. ROTHSCHILD:
[9] Q: I need to have your understanding. I need to know what
[10] you understand by the word supernatural.
[11] A: Again going back, I believe that — what my
[12] understanding of supernatural is, something that — I
[13] don't know what my — my definition of supernatural, I
[14] guess something that can't be explained by what we can
[15] see.
[16] Q: Okay.
[17] A: Is that your definition?
[18] Q: Using your definition, would you agree that discussion
[19] of the supernatural or topics relating to the
[20] supernatural do not belong in science class?
[21] MR. GILLEN: Object to the form.
[22] A: There again, the form — I'm saying is that no
[23] discussion of religion should be in biology — we are
[24] not — that should not be. Can we talk about — as long
[25] as we are not getting into religion, I mean we aren't

Page 83

[1] supposed to do, we are not going to do that, and we
[2] aren't doing that. So I mean I don't know what else I
[3] can tell you.
[4] Q: Using the word supernatural rather than religion, would
[5] you agree with me that topics that involve consideration
[6] of the supernatural do not belong in the science class?
[7] MR. GILLEN: Object to the form.
[8] A: There again, it depends on what your — because you are
[9] talk being Intelligent Design, you are talking about an
[10] intelligence. I don't know if your definition of
[11] intelligence, if that would be supernatural or not.
[12] I want to answer your question, but I don't really
[13] know how to respond to that.
[14] BY MR. ROTHSCHILD:
[15] Q: Do you understand the intelligent designer in the
[16] concept of Intelligent Design to be a natural actor, a
[17] supernatural actor, or you just don't know?
[18] A: There is no discussion of that, who that is or what that
[19] is.
[20] Q: Do you have any understanding from your reading of the
[21] Intelligent Design that the actor could be a natural
[22] actor?
[23] A: Anything is possible.
[24] Q: Mr. Bonsell, was there a Board meeting this week?
[25] A: On Monday.

Page 84

[1] Q: Did you attend?
[2] A: Yes.
[3] Q: Was there a public comment period?
[4] A: There was two.
[5] Q: During the public comment period, did your wife get up
[6] and speak?
[7] A: No.
[8] Q: Did any Board member's wives get up and speak?
[9] A: No.
[10] Q: Did anybody get up and speak about the subject of
[11] Intelligent Design?
[12] A: Community members had given us support for what we were
[13] doing.
[14] Q: Do you remember the names of the community members?
[15] A: Myers was one, and Bowers was one.
[16] Q: Was that meeting taped?
[17] A: It should have been.
[18] MR. ROTHSCHILD: I would request production of
[19] that tape.
[20] MR. GILLEN: Okay.
[21] BY MR. ROTHSCHILD:
[22] Q: Mr. Bonsell, we are nearing the end here. Are you
[23] familiar with a book called Myth of Separation?
[24] A: I believe so. Who is that by?
[25] Q: I will show you a copy. It's by David Barton.

---

Alan Bonsell
April 13, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

Page 85

[1]   A: Yes.
[2]   Q: Have you read this book?
[3]   A: Yes.
[4]   Q: What is it about?
[5]   A: It talks about the founding fathers, Supreme Court
[6] cases, laws, different things about showing how the
[7] founding fathers and the Constitution basically describe
[8] things or prescribe things, and how they are today. I
[9] guess that is another controversial issue.
[10]   Q: Does Mr. Barton have an argument or thesis in his book?
[11] Does he state a particular point of view on these
[12] subjects?
[13]   A: Yes, I believe he does.
[14]   Q: What is that point of view?
[15]   A: What I think he is trying to show is the way things are
[16] now and the way the founding fathers had originally
[17] intended them have changed over time.
[18]   Q: On any specific topic?
[19]   A: I guess through — well, he talked about the Myth of
[20] Separation.
[21]   Q: So he is not talking about the takings clause for
[22] example?
[23]   A: No.
[24]   Q: Or criminal due process?
[25]   A: No.

---

Page 86

[1]   Q: He is talking about the involvement of religion in
[2] public life; is that fair?
[3]   A: The separation of church and state.
[4]   Q: What is his particular point of view about the
[5] separation?
[6]   A: I believe that his particular point of view is that he
[7] shows through the founding fathers and court — original
[8] Supreme Court decisions and different things that what
[9] they are saying now and what the founding fathers were
[10] saying were two different things; that there isn't this
[11] I guess this wall there.
[12]   Q: The founding fathers did not have a wall, but that is
[13] how we have now treated it?
[14]   A: I think that is pretty much basically what he is saying.
[15]   Q: Do you remember when you read this book?
[16]   A: No, I don't remember when I read it.
[17]   Q: Within the last five years?
[18]   A: I am not sure when it was.
[19]   Q: It was published in '92.
[20]   A: Okay. I don't know if it has been within five years.
[21] It could have been before that. I am just not sure. I
[22] am not sure if I read the whole — I have read a lot of
[23] it.
[24]   Q: Did you find his argument persuasive?
[25]   A: Yes, I did. I did find it persuasive.

---

Page 87

[1]   Q: Did you ever recommend this book to any members of the
[2] School Board?
[3]   A: I could have.
[4]   Q: Did you ever give this book to any members of the School
[5] Board?
[6]   A: I'm not sure.
[7]   Q: Did you ever give this book to anybody in school
[8] administration or school faculty?
[9]   A: There again, I might have, but I'm not sure if I have or
[10] not. I could have. Either way.
[11]   Q: You just don't know one way or the other?
[12]   A: I'm not sure.
[13]   Q: Do you remember having a conversation with anybody in
[14] school administration or school faculty about the book?
[15]   A: I could have very well mentioned the book to someone
[16] that it is a good read.
[17]   Q: You have no recollection of that?
[18]   A: Not specifically. I'm sorry.
[19]   Q: Have you had any conversations with school
[20] administration or school faculty about the social
[21] studies curriculum?
[22]   A: Yes. I have had discussions with many things on
[23] curriculum.
[24]   Q: Do you remember anything specific about social studies?
[25]   A: I think we talked about — let's see. What was that? I

---

Page 88

[1] think it had to do with judicial activism.
[2]   Q: Who did you talk to?
[3]   A: It might have been Dr. Nilsen.
[4]   (Plaintiffs Deposition Exhibit 41 was marked.)
[5]                     BY MR. ROTHSCHILD:
[6]   Q: Do you recognize the document we have just marked
[7] Exhibit 41?
[8]   A: I don't recognize it, but that doesn't mean I didn't get
[9] it. I just don't — this isn't to me. It looks like it
[10] is to someone else.
[11]   Q: Does looking at this document refresh your recollection
[12] at all about what you may have discussed with Dr. Nilsen
[13] about the social studies curriculum?
[14]   A: Like I just said, I believe it was the founding fathers
[15] that discussed one of things — I think it was with the
[16] founding fathers, are they teaching about the founding
[17] fathers with the Constitution and things like that. And
[18] basically just curious of what was and what wasn't.
[19]   Q: You do remember a conversation with Mr. Nilsen?
[20]   A: Yeah. That is what I said, yes.
[21]   Q: In that conversation, were you just gathering
[22] information about what was being taught or were you also
[23] making recommendations about what should be taught?
[24]   A: I really wasn't making recommendations. I was just
[25] wondering what they did or didn't do, is this something

---

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Alan Bonsell
April 13, 2005

Page 89

they do or don't do.

[2]   Being on the curriculum, just questions that I had
[3] to see what they did or didn't teach, or what things,
[4] how they instructed the kids.

[5]   Q: Did you have particular items which you asked about; Dr.
[6] Nilsen, do you teach X, do you teach Y?

[7]   A: I think it was curiosity on the founding fathers and
[8] things like that because I think it is important for all
[9] our students to know where we came from, the founding
[10] fathers. They are the ones that put all this together,
[11] what we live by today, the Constitution and what exactly
[12] is — I mean just finding out.

[13]   Because it says here curriculum questions, and
[14] these are just questions of what is going on.

[15]   Q: You got information from Dr. Nilsen? Did you get
[16] information from Dr. Nilsen?

[17]   A: I think I got some information, but it wasn't that
[18] extensive or anything like that. After that, there
[19] really wasn't anything done like that at all.

[20]   Q: Based on what you have learned, do you believe that any
[21] aspects of the social studies curriculum should be
[22] changed or supplemented?

[23]   A: From what I recall, I guess not. There was nothing put
[1] forward to change it.

[25]   Q: At the bottom under miscellaneous, one of the headings

Page 90

[1] — and I understand you may not have written it — says
[2] do discuss why the Court has taken on "more power".

[3]   Do you have any recollection of what that refers
[4] to?

[5]   A: Probably just judicial activism if they have taken on
[6] more power. Is the Courts now more powerful than what
[7] they were at the time of when the Constitution was
[8] written?

[9]   Q: Was that information responsive to any question you were
[10] asking?

[11]   A: I guess just to see what — there again, just to see
[12] what was being taught.

[13]   Q: Do you have any understanding what this PR 80 percent
[14] approval rating is?

[15]   A: No, I don't. I don't know what that is. I don't recall
[16] what that is. PR, no.

[17]   Q: It didn't make any sense to me either.

[18]   MR. GILLEN: Nor me.

[19]             BY MR. ROTHSCHILD:

[20]   Q: And then there is a subheading do discuss current
[21] religious gains in Court. And under that, it says
[22] pledge, Bible clubs, Bible release programs.

[23]   Do you know what that refers to?

[24]   A: Really, I don't. I was just looking at that. Do
[25] discuss religious gains in court, I am just not sure.

Page 91

[1]   Q: Did you have any discussion with Mr. Nilsen about
[2] whether Supreme Court decisions relating to religious
[3] issues were being discussed in the social studies class?

[4]   A: I don't remember that. But there again, give me — ask
[5] me the question again.

[6]   Q: I am trying to understand did you initiate with Dr.
[7] Nilsen the subject of whether Court decisions relating
[8] to religious issues were being discussed in social
[9] studies class?

[10]   A: They were just talking more about the founding fathers
[11] and the judicial things, how they have changed over the
[12] years from two hundred years ago to today. I don't
[13] recall this.

[14]   Q: There are a lot of topics that applies to affirmative
[15] action?

[16]   A: Yes.

[17]   Q: Abortion?

[18]   A: That is why I am saying that could be almost anything.

[19]   Q: I am trying to understand why in this document, there is
[20] a specific reference to decisions relating to religious
[21] matters.

[22]   A: I understand. To be honest, I'm not sure.

[23]   Q: You don't remember whether that specific topic was
[24] discussed or not?

[25]   A: Like Bible release programs, that just doesn't ring a

Page 92

[1] bell at all. I just don't know.

[2]   Q: That is another one that mystified me. It was like work
[3] release. But just on the general subject of Court
[4] decisions relating to religious issues, this doesn't
[5] ring a bell with you whether it was discussed or not?

[6]   A: Sorry. Again?

[7]   Q: I am just trying to make sure — you recall a discussion
[8] with Dr. Nilsen; right?

[9]   A: Yes.

[10]   Q: What I am trying to make sure of is do you have any
[11] recollection of this specific issue of Court decisions
[12] regarding religious issues being discussed?

[13]   A: I don't remember it, no. Like I said, we talked of the
[14] founding fathers. I remember founding fathers, and I
[15] remember about Courts. But I don't remember specifics
[16] of that. I don't remember this.

[17]   Q: It could have happened?

[18]   A: It is possible I guess. I just don't know.

[19]   MR. ROTHSCHILD: Mark this as 42, and we really
[20] are nearing an end here.

[21]   (Plaintiffs Exhibit 42 was marked.)

[22]             BY MR. ROTHSCHILD:

[23]   Q: Before we discuss Exhibit 42, just going back to the
[24] frequently asked question for a minute, we discussed
[25] those questions regarding the Theory of Intelligent

Alan Bonsell
April 13, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

Page 93

[1] Design and the Theory of Evolution.

[2]    I just wanted to ask: Do you know whether any

[3] scientists or scientific experts were consulted to

[4] prepare the answers to those questions for the

[5] newsletter?

[6]    A: No.

[7]    Q: And what about do you know whether any scientific

[8] materials were consulted in order to prepare those

[9] answers?

[10]    A: I don't know.

[11]    Q: Going to Exhibit 42, do you recognize that document?

[12]    MR. ROTHSCHILD: Did I give you a copy of that?

[13]    MR. GILLEN: No. Thank you.

[14]    A: Yes, sure.

[15]                BY MR. ROTHSCHILD:

[16]    Q: What is this document?

[17]    A: It is George Washington's Farewell Address of 1796.

[18]    Q: Is this something that you provided to anybody at the

[19] school?

[20]    A: I think I gave it to someone in administration, but I am

[21] not sure.

[22]    Q: You can't remember who it was? Mr. Baksa maybe?

[23]    A: It might have been him. It might have been Dr. Nilsen.

[24] I am not sure.

[25]    Q: What was your purpose in giving this document to school

---

Page 94

[1] administration?

[2]    A: I just thought it was — I mean George Washington is one

[3] of my heroes I guess. I just thought it was an awesome

[4] thing. I thought he should, if he had a chance, look at

[5] it and read it. I am not sure, but I know Dr. Nilsen is

[6] a history — used to be a history teacher.

[7]    Q: Was it part of your purpose that this document might be

[8] presented to students?

[9]    A: Well, I just wanted him to look at it and see what they

[10] thought about it. Like I said because going back to

[11] this, nothing was ever done.

[12]    Q: Was there anything particular about this address that

[13] you thought made it a powerful document?

[14]    A: I think the whole thing. The whole thing is a powerful

[15] document coming from Washington. Without him, we

[16] probably wouldn't have had a Constitution. Today we

[17] probably wouldn't have a country today if it wasn't for

[18] him.

[19]    Q: There was nothing specific in the substance that was

[20] causing you to recommend it?

[21]    A: I haven't read this for a while. I mean just overall,

[22] the government and how it should be run and that type of

[23] thing. I mean this had to do I guess with the

[24] government class or something like that.

[25]    Q: Mr. Bonsell, I asked you whether it was your purpose

---

Page 95

[1] that this be presented to students. And I think you

[2] sort of answered that it wasn't presented to students.

[3]    Was that your goal that this would be presented to

[4] students when you gave it to the administration?

[5]    A: I don't know at this time. I wanted them to read it and

[6] see what they thought of it.

[7]    Q: When did you run for the School Board for the first

[8] time?

[9]    A: I guess it was 2000-2001.

[10]    Q: When you ran, did you run with a slate of candidates?

[11]    A: Yes.

[12]    Q: Who were those people?

[13]    A: Casey Brown, Angie Yingling, Sheila Harkins and myself.

[14]    Q: And during the course of that campaign, did you have

[15] meetings with this group to discuss the campaign?

[16]    A: I am sure.

[17]    Q: Where did those meetings typically take place?

[18]    A: I am sure probably at my house or on the phone. I mean

[19] I guess when you say meetings, I mean —

[20]    Q: When working together in your campaign, did you ever

[21] discuss what you wanted to accomplish if you were

[22] elected?

[23]    A: I think we had a list of accomplishments we wanted to

[24] do. We put them on flyers and handed those out to

[25] people. Because we had — there was a number of things

---

Page 96

[1] that we put out that we wanted to accomplish.

[2]    Q: And besides what you actually put out in public, did you

[3] also have just discussions among yourself here is what

[4] we want to do?

[5]    A: Well, here's what we want to do? I don't know if we

[6] brought agendas like that. It is more or less we had

[7] these goals in mind. We wanted to make Dover the best

[8] School District in the county.

[9]    And there was an issue at the time with a building

[10] project and spending tens of millions of dollars on a

[11] building project and different things like that.

[12] Community involvement. I am trying to think of what the

[13] issues were that we ran on.

[14]    Q: But you did have conversations amongst yourselves about

[15] what your goals were; right?

[16]    A: Probably.

[17]    Q: Did you ever talk to the former Principal Hamilton about

[18] what you wanted to teach or how you wanted Evolution

[19] taught in biology class?

[20]    A: Hamilton?

[21]    Q: Bob Hamilton.

[22]    A: Boy, not that I recall.

[23]    Q: Am I correct in understanding that in biology class

[24] after the statement is read to the students, they are

[25] not allowed to ask questions about the statement; is

---

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Alan Bonsell
April 13, 2005

---

Page 97

[1] that your understanding?

[2]    A: Correct.

[3]    Q: Including no questions about Intelligent Design?

[4]    MR. GILLEN: Object to the form.

[5]    A: Yeah, they read a statement, and that was it. And they

[6] go on with their class.

[7]            BY MR. ROTHSCHILD:

[8]    Q: The students are not allowed to ask questions about it?

[9]    MR. GILLEN: Object to the form.

[10]           BY MR. ROTHSCHILD:

[11]   Q: Is that correct, Mr. Bonsell?

[12]   A: Yes.

[13]   Q: Can you name any other subject taught at Dover High

[14] School in which no questions are allowed from the

[15] students?

[16]   MR. GILLEN: Object to the form.

[17]   A: I haven't looked at every one to see if that is the case

[18] or not. I wouldn't know.

[19]           BY MR. ROTHSCHILD:

[20]   Q: You are not aware of any policy in any other class where

[21] students are told no questions?

[22]   MR. GILLEN: Object to the form.

[23]   A: I am not aware, but I don't know that for a fact either.

[24]   MR. ROTHSCHILD: No further questions,

[25] Mr. Bonsell. Thank you.

---

Page 98

[1]    MR. GILLEN: No further questions. Thank you.

[2]    (The deposition was concluded at 12:51 p.m.)

[3]

[4]

[5]

[6]

[7]

[8]

[9]

[10]

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

---

Page 99

COMMONWEALTH OF PENNSYLVANIA  :
COUNTY OF CUMBERLAND             :

I, Vicki L. Fox, Reporter and Notary Public in and
for the Commonwealth of Pennsylvania and County of
Cumberland, do hereby certify that the foregoing
testimony was taken before me at the time and place
hereinbefore set forth, and that it is the testimony of:

ALAN BONSELL

I further certify that said witness was by me duly
sworn to testify the whole and complete truth in said
cause; that the testimony then given was reported by me
stenographically, and subsequently transcribed under my
direction and supervision; and that the foregoing is a
full, true and correct transcript of my original
shorthand notes.

I further certify that I am not counsel for nor
related to any of the parties to the foregoing cause,
nor employed by them or their attorneys, and am not
interested in the subject matter or outcome thereof.

Dated at Camp Hill, Pennsylvania, this 29th day of
April, 2005.

Vicki L. Fox
Reporter - Notary Public

(The foregoing certification does not apply to any
reproduction of the same by any means unless under the
direct control and/or supervision of the certifying
reporter.)

---

**Lawyer's Notes**

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Alan Bonsell
April 13, 2005

## 1

1 8:24
10 35:23
10th 35:25
12:51 98:2
14 5:8; 8:20
1796 93:17
18th 19:10; 24:24; 25:4;
36:5, 8, 9, 10
1st 45:5

## 2

2 6:15
2000-2001 95:9
2003 45:5, 17
2004 9:9; 19:10; 35:23
2005 5:20

## 3

31st 45:17
33 8:20
35 10:16
38 34:12, 16
39 34:12, 16

## 4

40 34:12, 16, 17; 35:15;
39:5
41 88:4, 7
42 92:19, 21, 23; 93:11

## 5

50/50 46:10, 12; 47:15,
24; 48:4, 16, 21, 24

## 6

6 6:16

## 8

80 90:13

## 9

9 45:5
90 5:6
92 86:19

## A

able 14:7; 55:14
ABONSE 35:6

Abortion 91:17
absolute 39:8
Absolutely 41:15; 48:14;
49:5; 78:11
Academy 43:4
acceptable 12:1
access 39:13, 22
accomplish 95:21; 96:1
accomplishments
95:23
accurate 58:6; 60:15;
70:22
accurately 7:1
acknowledge 66:23
acting 63:8, 23; 65:9
action 91:15
actively 23:4
activism 88:1; 90:5
actor 83:16, 17, 21, 22
actors 80:9, 15
actually 8:21; 52:5, 15;
56:8; 63:11; 96:2
adaptation 57:18, 24, 25;
59:7, 10; 60:20; 61:18
added 64:10
additional 7:20
address 35:20; 39:9, 12;
40:7; 93:17; 94:12
addressed 39:9
addresses 69:23
adhere 21:23
Administration 35:19;
40:6; 43:23; 51:9; 54:23;
55:2; 87:8, 14, 20; 93:20;
94:1; 95:4
administrators 33:24;
46:9; 47:2
advance 10:1, 3; 27:20
advanced 6:23; 8:8;
9:13; 27:22; 28:11
Advancement 43:10
advantage 57:6; 58:11,
13, 24
advice 37:25; 38:8
advocated 44:2
advocating 48:24
affects 69:9
affirmative 91:14
afterwards 36:11, 13
again 6:2; 7:6; 14:2; 18:1,
10; 23:19; 26:10; 29:18;
30:2; 36:9; 41:10; 42:9, 18;
43:25; 44:21; 47:19;
48:19; 53:4, 23; 54:2, 23,
24, 25; 55:1; 56:5, 18;
58:16, 22; 59:2; 61:2, 9;
65:6; 66:1; 68:9; 70:18;
72:12; 73:7, 10, 14, 15;
74:10, 11; 77:3, 21; 78:15,
18; 80:13; 81:2; 82:11, 22;
83:8; 87:9; 90:11; 91:4, 5;
92:6
agendas 96:6
ago 5:10, 14, 15, 16, 22;

6:1; 14:13; 19:8; 22:18;
91:12
agree 32:5; 36:4; 44:18;
59:15; 64:24; 81:15;
82:18; 83:5
agreed 49:25; 50:11, 25;
51:2
ahead 13:25; 36:18
air 48:4; 68:7
ALAN 3:7; 10:22; 20:9;
79:4
allowed 68:4; 69:9;
80:21; 96:25; 97:8, 14
allowing 16:13; 30:4
almost 35:14; 36:7, 8, 8,
10; 91:18
along 22:11; 29:13;
37:16; 42:25; 46:2; 54:8
alternative 6:23
Although 64:10
always 27:15
American 43:10, 13
among 61:22, 23; 96:3
amongst 96:14
amount 17:1; 28:3
amphibians 66:14; 68:14
analyses 73:21
ancestors 68:23
Andrews 47:11
Angie 95:13
animals 24:1, 2
answered 46:13; 61:25;
62:1; 67:7; 73:11; 95:2
anticipate 3:23
anymore 35:12
Apart 37:22
appearances 20:24
appears 34:17
applies 91:14
appropriate 37:21
approval 90:14
approve 61:10
April 5:20; 45:5
area 17:13; 31:17; 66:23
argument 72:3; 74:18,
21; 85:10; 86:24
arose 63:6, 21; 64:6, 8;
65:7, 20; 66:21
around 19:17; 46:9
arranged 34:2
arrangement 70:11;
71:10, 24
arranging 36:21
article 16:12, 15, 25; 53:7
articles 15:25, 25; 16:13,
14, 19, 20, 21, 22, 23;
17:9, 25; 57:21; 73:23
aside 24:5; 41:22; 43:21;
44:25; 78:12
aspect 62:18, 21, 25;
64:2, 14, 20; 78:9; 80:24
aspects 79:13; 80:20;
89:21

asserted 78:24
assigned 52:5
assignment 51:13
associate 21:21
associated 40:5
association 21:9; 43:10
assume 3:15
attaching 24:22
attend 84:1
attendance 32:21; 33:23
attention 6:17; 16:15;
26:9
attorney 30:12; 31:23
attributed 48:17
author 11:19
authors 15:25; 17:25
aware 8:25; 21:25; 22:2,
8; 37:12; 41:5, 8, 13;
97:20, 23
away 71:2
awesome 94:3

## B

back 9:11; 18:8; 47:5, 19;
56:1; 58:19; 65:13; 68:17;
73:10, 13; 82:11; 92:23;
94:10
Baksa 45:16, 21, 25;
46:4, 7, 16; 47:15; 48:6, 9,
10; 93:22
Baksa's 45:25; 46:10
Barton 84:25; 85:10
base 27:21
based 37:24; 38:8, 13;
74:17; 89:20
Basically 9:20, 23; 10:25;
16:12; 23:17; 26:3; 30:2;
49:18; 50:10, 18; 51:13,
21; 52:21; 63:2, 10; 64:9;
67:21; 68:20; 73:19; 75:9;
85:7; 86:14; 88:18
basis 34:20; 57:9, 15;
59:20; 70:24; 72:8
basketball 18:13
beaks 44:16
bear 24:2
became 17:4, 6; 21:24
become 22:2
becoming 17:10
beforehand 19:24
beginning 6:17; 8:25
begins 10:22; 70:20
Behe 12:9; 20:25; 28:15;
73:18; 74:6, 17
Behe's 73:21
belief 27:21; 40:13; 41:1;
44:11; 70:24; 72:8
beliefs 44:9
believing 57:15
bell 92:1, 5
belong 82:20; 83:6
Below 53:12

benefit 3:18; 4:22; 46:16
Bertha 45:13
besides 40:1; 96:2
best 4:1; 74:4; 96:7
better 74:18
Bible 44:12; 90:22, 22;
91:25
bills 49:22
biological 63:5; 64:6;
66:19, 21
Biology 6:18; 7:2, 14; 8:8,
14; 9:8; 22:3; 27:16, 17;
31:13; 37:15; 43:7, 13;
82:23; 96:19, 23
birds 44:16
bit 3:17
bits 11:12; 12:10; 13:13
Black 12:11
Board 13:17; 15:7, 12;
17:4, 6, 11; 22:10, 13, 14;
24:8, 13, 21; 26:14, 24, 24;
27:24; 28:9, 20, 21, 22, 23,
24; 29:2, 3, 8, 20; 30:5, 8;
31:7, 11, 12, 18, 20, 21;
32:21, 23, 24, 25; 33:15,
21; 34:5, 23; 35:19, 25;
39:17, 19, 20; 40:5; 41:17,
24; 42:3, 13, 14, 17, 22;
43:2, 20; 44:3, 25; 45:1,
17; 46:4, 5, 9, 23, 24, 25;
47:16; 48:12, 18; 49:11,
25; 50:9, 10, 19, 25; 51:2,
8; 54:24; 55:2, 3, 4, 12, 14,
18, 22, 24; 56:13, 16;
62:14; 65:5; 71:9; 75:6, 8,
21, 24; 83:24; 84:8; 87:2,
5; 95:7
Board's 22:3
Bob 27:16; 96:21
BONSELL 3:7, 11; 10:22;
11:25; 14:2; 34:15; 35:1,
21; 46:13; 49:5; 57:12;
60:13; 61:9; 65:11; 75:4;
77:8; 80:6; 83:24; 84:22;
94:25; 97:11, 25
Bonsell's 34:22; 79:5
book 12:10, 13, 14, 15,
20; 13:3, 11, 15, 20, 23,
25; 14:16; 84:23; 85:2, 10;
86:15; 87:1, 4, 7, 14, 15
books 11:3, 13, 13, 14,
18, 19, 23; 12:3, 3, 6, 6;
15:2, 9, 10, 15, 22; 73:13
both 12:17, 24; 60:1;
61:2; 67:5
bottom 89:25
Bowers 84:15
Box 12:11; 35:6
Boy 96:22
brainstorm 51:22
break 4:10, 11; 32:10;
74:24
bring 74:9
broad 58:7; 59:16; 60:11
brought 96:6
Brown 95:13

Alan Bonsell
April 13, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

bucket 67:1
Buckingham 25:7, 19;
26:18, 20
building 47:13; 96:9, 11
business 13:10

## C

cafeteria 47:4, 4
call 6:16; 37:4, 4
called 3:7; 37:5; 84:23
calling 26:9; 37:7
came 4:16; 16:2; 18:5;
22:10, 11; 32:6, 13; 33:3;
34:1; 49:17; 51:21; 52:8, 9,
22, 23; 55:19; 56:8, 10, 11;
66:7; 67:21, 23; 68:5;
70:15; 79:16; 89:9
campaign 95:14, 15, 20
can 3:23; 4:4; 5:19; 6:9;
7:23; 8:6, 10; 9:19; 11:19;
13:19; 14:8; 15:25; 16:10,
18; 17:24; 20:13, 16, 16;
23:8, 14, 18; 25:25; 26:16,
19; 28:3, 18; 29:15, 16, 25;
30:21; 31:1, 15; 33:21;
34:1, 21; 38:7; 39:13, 15;
42:8; 43:2, 18; 53:6; 58:15;
59:3; 61:7, 7; 62:4; 63:15,
16, 19; 68:11, 21; 72:16;
73:2, 16; 74:2, 19, 24;
82:6, 14, 24; 83:3; 97:13
candidates 95:10
case 4:13; 8:13; 68:13;
97:17
cases 85:6
Casey 95:13
casual 29:20; 47:9; 48:19
category 65:25
causes 80:9, 15
causing 94:20
Center 52:16; 76:6
certainly 72:14
certainty 39:8
certification 3:3
chance 39:10; 94:4
change 4:20; 7:2; 9:8, 15;
19:12; 22:4; 31:13; 37:14;
59:4; 60:2, 21; 63:4, 16;
64:4, 5, 7; 89:24
changed 7:14; 40:23;
41:1, 8, 12, 15; 85:17;
89:22; 91:11
changing 8:14
Channel 11:9; 23:16, 22,
23; 24:1
chapters 13:14, 20;
14:19, 19
characterization 69:7
charge 16:11; 49:22;
52:19, 25
chastised 16:13
children's 40:14
Christians 27:17

church 86:3
circumstances 19:3;
50:8
clarification 34:21; 36:6;
61:22
clarifying 15:19
class 81:16, 19; 82:20;
83:6; 91:3, 9; 94:24; 96:19,
23; 97:6, 20
classes 80:18
classroom 15:5
clause 85:21
clear 39:16; 44:6; 48:2;
55:15, 23
clubs 90:22
college 15:3; 18:13
coming 8:7; 9:12; 25:14;
34:7; 36:22; 39:17; 47:15;
49:18; 56:19; 74:11; 94:15
comment 84:3, 5
common 68:21, 23
communicate 26:13;
61:14; 62:14, 24; 64:1, 19
communicated 26:13;
56:16
communicating 71:22;
73:1
communication 27:23;
32:2; 41:21
communications 30:19;
38:14
community 16:3, 4, 8;
49:20, 21; 50:15; 56:19,
19, 21, 22; 60:16; 84:12,
14; 96:12
Complaint 6:14; 8:19, 23;
78:25
complete 55:4
completed 76:9
complexity 71:1; 72:12,
13, 20; 73:5, 17, 22; 74:5,
6, 21
complicated 66:22
complies 5:7
component 76:15
computer 35:11
computers 35:10
concept 47:15, 25; 48:4,
16; 63:18; 68:21; 69:21,
23; 73:4, 17, 22; 83:16
concerned 50:14
concerning 38:18
concluded 98:2
conclusion 8:7; 9:12;
10:1
condensed 76:2
confident 5:21; 33:11
confirm 5:12; 41:11; 73:5
confirms 69:14
confused 12:18
confusion 57:6; 58:11,
24
conjunction 13:16
connection 22:2

consensus 55:19
consider 80:17
consideration 22:3;
24:8, 23; 80:7, 15; 81:14;
83:5
consistent 7:9; 19:11;
36:4; 44:4; 56:15
constituency 50:14
Constitution 85:7; 88:17;
89:11; 90:7; 94:16
constitutional 30:11, 25
construe 78:23, 24
construed 30:16
consulted 93:3, 8
contact 35:24; 43:5, 8
Contacted 43:17
containing 12:6
content 52:20
contents 51:7, 14; 52:16,
17; 55:3
continues 76:23
contradicts 74:22
contribution 40:14
controversial 59:4, 12;
61:15, 15, 16, 17, 19, 21,
22, 23; 62:19; 63:1; 64:2,
20, 23; 85:9
controversy 6:21; 16:8;
61:6; 64:22
conversation 3:24;
29:21; 36:18, 24; 45:12;
47:9, 22; 48:20; 87:13;
88:19, 21
conversations 29:5, 8;
30:9; 38:23, 24; 42:8;
56:11; 70:18; 87:19; 96:14
Cooper 33:6, 9; 35:3, 15,
16, 23; 36:1, 15; 37:3
cooperative 50:3
copy 4:24; 6:13; 8:18;
20:5, 7; 76:5; 84:25; 93:12
correspond 35:18
counsel 51:9, 10, 10
country 94:17
county 96:8
couple 4:5, 17; 24:3; 47:5
course 4:23; 48:11;
95:14
Court 85:5; 86:7, 8; 90:2,
21, 25; 91:2, 7; 92:3, 11
Courts 90:6; 92:15
cover 13:5, 5, 11, 12
create 62:22
created 51:6
creating 75:5
creation 51:3, 5
Creationism 44:3, 6, 10,
11, 22; 45:2, 19, 23; 46:8;
47:24; 48:13; 77:12
creatures 44:7, 13
criminal 85:24
criticisms 73:21
crossing 30:15

curiosity 17:17; 89:7
curious 17:15; 24:11;
88:18
current 68:22, 22; 90:20
Curriculum 6:18, 20; 7:3,
14; 8:9, 11, 15; 9:6, 8;
22:3, 4; 31:14; 37:15;
87:21, 23; 88:13; 89:2, 13,
21

## D

Darwin 21:20; 58:3, 9;
63:12; 73:2; 74:22; 76:24;
79:15
Darwin's 6:22; 12:11;
16:13; 17:18; 46:14; 57:5,
17; 58:10; 65:7; 70:12;
71:3, 11, 25; 72:15, 16, 21,
25; 74:14
Darwinism 65:17; 76:23;
80:8
DASD 6:17
date 5:22
dates 29:16
David 84:25
Dawkins 28:16
day 46:14, 15
December 35:23, 25
decision 11:21; 31:8
decisions 86:8; 91:2, 7,
20; 92:4, 11
defendants 6:13; 7:1;
10:16, 18
define 5:19
defined 69:24; 70:6
defining 79:23
definitely 47:22
definition 57:6; 58:11,
24; 59:17, 18; 60:12, 13;
81:19, 20; 82:6, 7, 13, 17,
18; 83:10
Dembski 11:13; 12:7, 8
Depending 81:1
depends 83:8
deposed 4:4
deposition 3:13; 4:5, 9,
13, 19, 22; 5:23; 13:2;
34:12, 19; 44:1; 46:4;
55:15; 88:4; 98:2
descended 68:14
descending 68:7
descent 68:22
describe 8:6; 9:19;
16:10; 41:20; 42:6; 49:17;
51:3; 64:18; 85:7
described 25:7; 27:21;
28:2, 10; 41:20; 42:4, 16,
22; 47:14; 74:6
description 7:7; 10:20;
68:1; 75:4
Design 5:4, 9, 14, 17, 21,
25; 6:3, 7; 11:3, 21; 15:11;
17:10, 13, 16; 21:22; 22:7,

20; 23:4, 10; 27:11, 11;
31:13, 17; 40:11, 24; 41:1,
9, 13, 25; 42:5, 17, 23;
43:3; 54:15; 56:3; 69:21,
22; 70:3, 9; 71:20; 72:3, 9,
77:1, 25; 78:23; 79:10, 21;
80:6, 10, 14; 81:3, 7, 10;
83:9, 16, 21; 84:11; 93:1;
97:3
designer 79:23; 83:15
designing 79:25
develop 63:19
developed 52:16; 53:14;
54:20; 63:7, 22; 65:8
difference 69:17
different 11:8; 13:13;
50:2; 51:18, 25; 58:17;
59:18; 60:12; 63:2, 12;
64:3, 9; 69:19; 70:16;
73:11; 79:14, 16, 17, 19;
85:6; 86:8, 10; 96:11
disclose 30:18
disclosure 34:18
discovered 70:11
Discovery 11:8; 21:9, 13,
25; 22:8, 17; 23:15, 16, 23;
24:1; 25:1, 13, 20, 25;
26:2, 3, 19; 32:13; 33:3,
14, 17, 22; 34:22; 35:24;
37:13, 17; 38:3, 10, 18;
40:9, 19, 25; 41:7, 12, 19,
22, 23; 43:6, 16, 21
discuss 81:7, 8; 90:2, 2,
25; 92:23; 95:15, 21
discussed 9:13; 25:12;
26:6; 29:11, 24; 30:1;
40:10; 43:16; 51:15; 52:7,
9, 12; 88:12, 15; 91:3, 8,
24; 92:5, 12, 24
discusses 65:18
discussion 14:12; 42:3;
51:16; 67:11; 75:5; 80:23;
82:18, 23; 83:18; 91:1;
92:7
discussions 22:12, 13,
15; 29:17; 51:16, 18;
54:21; 70:15; 79:8; 87:22;
96:3
distinct 63:12
distinguish 78:19
distinguishing 60:7
distributed 25:8; 31:7
District 35:6; 37:9; 39:21;
40:5; 47:7; 49:8, 10; 56:16;
57:14; 61:14; 62:25; 64:2,
19; 71:23; 72:18; 73:1;
74:20; 77:10, 16; 96:8
document 6:16; 10:19;
45:4, 8, 9, 10, 11, 12;
47:21; 51:3, 5, 7, 14, 21;
53:20; 76:5; 88:6, 11;
91:19; 93:11, 16, 25; 94:
13, 15
documentaries 11:10
documents 34:15
dogmatically 46:20
dollars 96:10

Min-U-Script®   Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Alan Bonsell
April 13, 2005

done 4:1; 17:1; 28:2;
29:4; 69:15; 73:5; 89:19;
94:11
Dover 40:12; 41:2; 45:2;
50:15; 68:3, 21; 69:8; 96:7;
97:13
down 10:21; 13:11; 16:5;
74:15; 76:2
Dr 51:18; 52:12; 53:1;
88:3, 12; 89:5, 15, 16;
91:6; 92:8; 93:23; 94:5
draft 18:14; 75:7, 10, 20,
24; 76:8
drafted 56:4; 70:13; 75:7
drafts 76:15
draw 35:22
due 85:24
duly 3:7
during 4:23; 48:23;
69:24; 84:5; 95:14
duties 39:17
DVD 12:16, 21, 22, 22;
20:18, 23
DVD's 10:12; 11:3; 19:1,
15, 21; 23:8, 9; 24:6, 23;
26:22, 25; 27:2

**E**

e 35:5
e-mail 18:3; 35:6, 16, 20;
36:1, 15; 39:9, 11, 13, 17,
18, 22; 40:7
e-mails 44:22; 34:11;
35:1, 2, 7, 18, 22; 39:14,
16; 40:6
earlier 4:9; 20:1; 51:25
early 18:14
easily 75:16
easy 77:7
eat 47:5
editing 75:25
editorial 53:7, 11
editorials 57:21
edits 76:11
education 71:6, 22;
29:12; 30:4; 40:15; 41:3, 9,
14
educational 9:22
effect 37:13
effectively 63:14
effort 53:24
efforts 53:24
eight 10:21
either 34:5; 61:2; 68:8;
76:13; 87:10; 90:17; 97:23
elected 95:22
else 23:18; 33:23; 39:13,
14, 15; 46:1; 48:24; 83:2;
88:10
end 45:11; 84:22; 92:20
ends 34:9
enhances 41:9, 13

enhancing 6:20
enough 11:16; 44:1
entire 32:21; 53:21;
70:14, 20
entirely 32:5
equally 48:25
Eric 32:1; 34:17; 48:5;
61:25
Eric's 32:2
established 72:14
even 30:12
evening 47:1
eventually 66:21
Everybody 53:1, 2; 55:6;
64:23
everyone 50:1
evidence 17:20; 21:18,
20; 79:15, 17, 18; 80:8
evidences 15:1; 72:10,
11; 80:11
Evolution 6:22; 11:2, 8,
10, 11, 20; 12:13, 22;
15:11; 17:9, 12; 19:2; 22:7;
23:10; 24:1; 27:12, 12;
31:17; 45:18, 22; 46:2;
47:18; 48:25; 54:14; 56:2;
57:3, 4, 5; 58:2, 5, 7, 20;
59:3, 15; 60:11; 62:21, 25;
63:5, 15, 16; 64:14, 20;
69:9; 93:1; 96:18
Evolutionary 64:4; 70:4
evolved 24:2
exact 16:21; 36:24;
42:10; 79:18
exactly 6:4; 8:12; 14:8,
14, 23; 19:9, 18, 18; 20:17;
23:21; 25:12; 35:4; 37:11;
42:11; 49:24; 50:16, 22;
52:1, 2; 56:12; 65:4; 89:11
examined 3:8
example 14:7; 43:7;
44:16; 55:18; 66:14, 20;
68:14; 85:22
except 3:4; 14:10
executive 33:1; 50:21
exhaust 14:7
exhausted 15:9
Exhibit 6:15; 8:24; 34:17;
39:5; 45:5; 49:2; 88:4, 7;
92:21, 23; 93:11
Exhibits 34:12
exist 44:8, 14
existence 26:9; 53:13
existing 6:21
Expand 7:24; 9:22; 30:3
expands 41:4
expect 4:4
expertise 31:16
experts 93:3
explain 14:23; 34:1; 71:4;
72:15, 17; 73:2
explained 70:12; 71:11,
24; 72:21; 74:13, 14; 82:14
explaining 71:20; 74:20

explanation 6:25; 7:12;
70:3, 5
explanatory 66:17
express 45:21, 25
expressed 43:3
extensive 89:18
extent 37:24

**F**

face 36:14, 14
fact 6:22; 26:9; 32:7;
35:11; 38:13; 40:9, 11, 13,
19; 55:5; 57:21, 22; 58:18;
70:14; 72:19, 20; 97:23
facts 9:21
faculty 87:8, 14, 20
Fair 11:16; 17:1; 26:8;
28:2; 44:1; 46:20; 48:21;
52:15; 62:19, 22; 69:7;
75:4; 77:17; 86:2
fairly 79:2
fall 65:24; 66:2, 4, 12, 15;
67:25
familiar 15:6; 21:7, 13,
15; 23:3; 33:7; 84:23
familiarity 3:15
fan 18:13
far 55:6, 25; 74:11
Farewell 93:17
fathers 85:5, 7, 16; 86:7,
9, 12; 88:14, 16, 17; 89:7,
10; 91:10; 92:14, 14
feathers 44:16
Federation 43:13
feel 5:20
felt 28:10
few 6:2, 8, 9; 53:24;
54:19; 76:23
fifth 47:12
fifty 45:17, 22; 46:1
filed 6:14; 7:1; 8:19
filing 3:3
fill 49:4
final 76:8
finally 36:1
find 10:4, 6; 14:4; 18:13;
86:24, 25
finding 89:12
fine 15:17, 19; 18:18;
30:22
finer 53:6
finish 12:4
finished 3:22
fins 44:20
first 5:3, 8, 10, 13; 6:4, 6,
17; 11:18; 19:20; 20:4;
21:24; 26:4, 10; 36:19;
37:3; 45:11, 14; 47:3;
51:22; 53:7; 64:11; 75:20,
24; 76:5; 95:7
fish 44:20
five 86:17, 20

flagged 14:9
flaw 18:11
flyers 95:24
focusing 24:5; 56:1
follows 3:8
food 46:25; 47:10
forget 52:8; 65:19
form 3:4; 62:1; 68:9, 16,
24; 69:4, 11, 16; 71:14;
72:5, 22; 75:10, 11, 12, 22;
78:8; 80:19, 25; 81:17;
82:21, 22; 83:7; 97:4, 9,
16, 22
format 75:16
formed 44:7, 13
former 45:6; 96:17
forth 7:8, 15, 20; 8:1
forward 89:24
found 37:11
founder 73:19
founding 85:5, 7, 16;
86:7, 9, 12; 88:14, 16, 16;
89:7, 9; 91:10; 92:14, 14
four 6:11; 69:18
Frequently 53:17, 21;
75:20, 25; 76:12, 19; 92:24
full 6:17
further 5:19; 7:16, 21;
11:6; 45:16; 97:24; 98:1

**G**

gains 90:21, 25
gaps 10:13; 17:18; 61:7
gaps/problems 9:1
gathering 88:21
gave 10:17; 20:7; 25:6,
19; 26:1, 20; 27:4; 32:13;
54:22; 56:7; 75:7; 93:20;
95:4
general 40:4; 59:24;
60:9; 92:3
Generalities 42:21
generally 60:6; 61:1, 23
gentleman 16:5, 6; 75:6
Geographic 15:23; 23:20
Geographics 23:24
George 93:17; 94:2
GILLEN 8:20; 14:11;
20:9, 11; 30:18, 21; 31:1;
32:1; 34:17, 24; 37:22;
38:17; 48:5; 61:25; 62:6, 9;
67:9; 68:9, 16, 24; 69:4,
11, 16; 71:14; 72:5, 22;
75:12; 76:17; 80:19, 25;
81:17; 82:4, 21; 83:7;
84:20; 90:18; 93:13; 97:4,
9, 16, 22; 98:1
given 3:14; 24:7, 10, 21;
25:1; 51:13; 54:19; 84:12
giving 9:3; 24:17; 26:18;
36:3; 46:16; 47:14; 93:25
glass 49:4
glasses 79:19

goal 95:3
goals 96:7, 15
goes 59:3; 68:17; 73:10
golf 47:11
Good 3:11, 12; 7:11;
29:11; 32:9; 37:15; 51:1, 2;
55:8; 87:16
government 94:22, 24
grade 47:13
group 21:16; 22:12, 17,
18, 23, 24, 25; 23:2; 26:6;
34:11; 52:4; 53:23, 24;
55:1; 95:15
Groups 23:5
guess 31:22; 39:19;
52:19, 25; 61:2; 65:10, 21;
66:13; 73:9, 10; 77:3;
82:14; 85:9, 19; 86:11;
89:23; 90:11; 92:18; 94:3,
23; 95:9, 19

**H**

Hamilton 96:17, 20, 21
handed 35:1; 95:24
happened 16:5; 42:19;
51:4; 92:17
happening 30:14
happens 55:17
happy 4:11; 13:19
hard 14:23; 35:8
Harkins 95:13
head 13:22; 18:9; 24:3;
27:13; 58:22, 25
headings 89:25
hear 5:8
heard 5:4, 13, 16, 21, 25;
6:3, 4, 6; 15:14; 26:5, 11;
73:4
hearing 16:2; 54:7, 7;
56:18
help 13:23; 31:8, 24
helped 11:21; 15:10
helpful 15:3; 46:12, 4
here's 26:6; 96:5
hereby 3:2
heroes 94:3
hey 37:1
high 15:3; 43:7; 97:13
history 94:6, 6
honest 12:19; 35:13;
76:4; 91:22
hope 36:1
hopefully 4:7
hours 4:6
house 95:18
human 65:24
humans 66:2, 4, 12;
67:25; 68:4
hundred 91:12

Alan Bonsell
April 13, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

# I

**Icons** 11:7, 11; 12:13, 22; 19:1, 24
**ID** 76:21; 77:6, 17; 78:4, 5, 14, 18; 79:3, 4
**idea** 21:21; 27:6; 37:15; 50:5; 51:1, 2
**ideas** 51:22; 66:19
**identify** 11:19; 15:25; 18:22
**imagine** 82:1
**implication** 79:10
**implications** 76:21, 22; 77:1, 6, 17, 20, 24; 78:1, 3, 7, 13, 16; 79:4
**implicit** 32:1
**important** 89:8
**inaccuracies** 50:12
**inaccurate** 49:19
**inadvertent** 34:18
**include** 38:7; 44:7
**includes** 62:21; 63:18
**including** 6:22; 76:15; 97:3
**incorrectly** 48:2
**indication** 45:7
**individual** 28:21; 29:8; 52:4
**individual's** 53:24
**individuals** 20:24; 21:9; 33:22; 52:4
**inference** 35:22
**inferences** 74:9
**inferring** 4:6
**influence** 40:1
**inform** 15:10
**information** 8:6; 9:11, 16, 18, 19, 24; 10:4, 6, 6, 8, 13, 20; 11:2, 14; 13:13; 17:3, 16; 18:1, 15, 16, 23; 25:1, 9, 16, 17, 19, 20, 21, 22, 23, 24; 26:1, 5, 18, 20, 21, 22; 29:16, 23; 31:4, 5; 33:18; 39:1; 43:6; 47:14; 49:18; 57:23; 58:18, 22; 72:20; 73:8, 14; 88:22; 89:15, 16, 17; 90:9
**informational** 63:24
**informed** 11:20; 28:8
**informing** 6:20
**initiate** 4:11; 91:6
**initiated** 37:5; 49:15
**inquiries** 30:24
**insidious** 58:12
**Institute** 21:10, 13, 25; 22:9, 17; 25:2, 20; 26:1, 2, 3, 19; 32:13; 33:3, 14, 17, 22; 34:23; 35:24; 37:13, 18; 38:3, 10, 19; 40:9, 19, 25; 41:7, 12, 19, 22, 23; 43:6, 16, 21
**Institute's** 25:13

**instructed** 89:4
**instructing** 37:23
**instruction** 23:11
**instructions** 3:14
**intelligence** 79:8; 80:2; 81:4; 83:10, 11
**intelligent** 5:4, 9, 14, 17, 21, 25; 6:3, 7; 11:2, 21; 15:11; 17:10, 12, 16; 21:21; 22:7, 20; 23:4, 10; 27:10, 11; 31:13, 17; 40:11, 24; 41:1, 9, 13, 25; 42:5, 17, 23; 43:3; 54:15; 56:3; 69:21, 22; 70:3, 8; 71:19; 72:3, 9; 77:1, 25; 78:23; 79:10, 20; 80:6, 10, 14; 81:3, 7, 10; 83:9, 15, 16, 21; 84:11; 92:25; 97:3
**intended** 85:17
**interact** 36:14
**interaction** 26:16
**interactions** 34:23
**interest** 14:10; 18:4
**interested** 10:10; 17:2, 7, 7; 24:11
**interests** 17:8
**Internet** 10:12; 11:4; 16:17; 17:21, 25; 18:6, 24; 27:7
**Interrogatories** 10:17
**interrogatory** 12:12; 13:1
**interrupt** 3:24
**into** 14:23; 16:14; 18:14; 19:4; 22:6; 37:12; 39:17; 40:7; 74:8; 79:13; 80:16, 17, 20; 81:8, 18; 82:25
**investigate** 27:7
**investigation** 22:6
**involve** 45:18, 23; 80:14; 81:11, 14; 83:5
**involved** 22:19; 29:17; 36:21; 40:10; 55:22
**involvement** 86:1; 96:12
**involves** 57:18
**irreducible** 71:1; 72:12, 13, 19; 73:4, 17, 22; 74:5, 6, 21
**issue** 16:16, 18; 22:10, 19; 66:17; 85:9; 92:11; 96:9
**issued** 37:13
**issues** 31:12, 19; 37:23; 91:3, 8; 92:4, 12; 96:13
**items** 89:5

# J

**Jonathan** 12:14
**Jones** 27:17
**judgment** 14:21
**judicial** 88:1; 90:5; 91:11

# K

**keep** 7:25; 76:5
**key** 60:13
**kid's** 30:3
**kids** 9:23; 41:5; 50:18; 89:4
**kind** 10:20; 25:8; 27:8; 52:19; 68:8
**knew** 37:10
**knowing** 21:16

# L

**lab** 61:8
**language** 75:7, 10
**large** 14:6; 21:16
**last** 4:5; 5:2; 22:1, 16; 35:10, 22; 45:14; 69:17; 86:17
**later** 19:25
**Law** 52:15; 76:6
**laws** 85:6
**lawsuit** 67:14
**lawyer** 30:19
**lawyers** 32:3, 6
**leading** 22:23, 24; 23:1
**learn** 66:23
**learned** 28:6; 40:23, 25; 41:7, 11; 89:20
**least** 17:1; 45:7
**led** 9:15, 15; 28:13
**left** 53:16
**legal** 25:20, 22, 23, 24, 24; 30:11; 32:2, 13, 14; 33:18, 19, 20; 34:9; 37:2, 23, 25; 38:8, 14, 23, 24; 40:20; 41:20; 50:12; 77:3
**less** 5:14; 96:6
**level** 70:10
**Life** 11:7; 12:23; 17:8; 19:2, 23; 20:23; 63:6, 21; 64:6, 8, 8, 21, 22; 65:1, 3, 5, 7, 12, 14, 16, 18, 19, 20, 20, 21, 25; 66:3, 5, 7, 7, 8, 12, 15, 18, 19, 25; 67:15, 19, 21; 69:23; 70:4, 5; 86:2
**likely** 42:7, 12
**limit** 28:21; 31:24
**limitation** 32:7
**limited** 15:15
**limits** 14:4; 68:8
**line** 5:8; 22:11; 37:16; 46:25; 47:4, 4, 10
**lines** 15:4; 29:13; 30:15; 42:25
**list** 11:15; 25:17; 95:23
**listed** 12:12
**literally** 66:19
**little** 3:17; 66:17; 69:18
**live** 89:11
**local** 49:19

**logistics** 36:22
**long** 4:5, 6, 7, 8; 11:15; 54:20; 82:24
**look** 5:6; 8:19, 23; 10:19, 21; 13:7; 14:17; 30:12; 36:4; 53:2; 75:11, 17; 94:4, 9
**looked** 13:4, 8, 14, 15; 14:18, 20, 21; 15:6, 22; 16:1; 18:8; 21:17, 20; 25:2; 30:12; 53:1; 75:15; 97:17
**looking** 10:7; 11:6; 13:23; 14:15; 15:1; 17:20; 21:19; 25:15; 27:10; 29:6; 32:15; 51:19; 70:20; 79:15, 17, 18; 80:8, 11; 88:11; 90:24
**looks** 52:10; 88:9
**lot** 18:1; 22:5; 28:4; 35:7, 7; 39:12; 52:25; 57:20, 20; 66:23; 86:22; 91:14
**lots** 55:12

# M

**magazine** 16:12, 14, 19, 20
**magazines** 15:20, 21; 16:1, 21, 22
**mails** 35:5
**major** 35:9
**making** 30:24; 41:5, 8, 12; 88:23, 24
**man** 23:17; 54:3; 56:6
**many** 17:8, 8, 18; 33:3; 57:25; 66:22; 75:18; 87:22
**March** 45:16
**Mark** 33:8; 92:19
**marked** 6:14; 8:24; 10:15; 34:13, 16; 45:4; 49:2; 88:4, 6; 92:21
**material** 13:9; 17:21; 24:22; 27:2
**materials** 11:5; 24:6, 21; 25:6, 8, 11; 26:25; 27:4; 31:7; 93:8
**matter** 16:18; 34:11; 35:10; 41:25; 63:6, 21; 65:8
**matters** 91:21
**may** 4:1, 12; 12:20, 20; 13:2; 14:3; 29:7; 32:1, 7; 48:1; 88:12; 90:1
**maybe** 4:5; 18:8; 31:24; 34:21; 53:6; 62:4; 74:15; 79:18; 93:22
**mean** 6:4; 7:11, 11; 9:23; 11:6, 14; 12:16, 18; 15:18; 16:10, 22; 22:24; 23:19; 29:19; 30:2, 7; 35:15; 36:8; 42:9; 46:23; 49:1, 21; 50:11, 13; 52:25; 54:2; 59:3, 12; 60:23; 61:3; 63:15, 16; 64:13, 25; 67:1, 24; 70:2; 72:16; 73:13, 15; 74:11; 77:2, 21; 78:1; 79:7; 81:1, 21; 82:25; 83:2; 88:8;

**89:12; 94:2, 21, 23; 95:18, 19**
**meaning** 68:22
**meanings** 57:4; 58:2, 5
**means** 63:5, 7, 22; 65:12, 67:19; 82:2
**meant** 48:6
**media** 34:9, 19; 50:3, 12; 56:20
**meet** 36:9; 47:3
**meeting** 22:14; 29:1, 20; 34:1; 36:19; 47:6; 50:19; 55:12, 14; 83:24; 84:16
**meetings** 36:14; 44:3, 25; 95:15, 17, 19
**member** 13:17; 15:7; 17:4, 6, 10; 24:8, 21; 26:24, 25; 27:24; 39:18, 19; 42:12; 43:20, 23; 45:1, 17; 48:12
**member's** 84:8
**members** 24:13; 26:14; 28:21, 23; 29:8; 30:5, 8; 33:21; 39:20; 42:4, 13, 14, 17, 22; 43:2; 55:18, 22, 24; 77:10, 16; 84:12, 14; 87:1, 4
**memo** 45:5; 48:10, 15
**memory** 14:5; 15:9; 19:11
**mentioned** 30:4; 46:10; 87:15
**met** 36:7, 10, 11, 13
**Meyer** 21:2, 3
**Michael** 12:9; 20:24; 28:15; 73:18
**might** 4:7; 13:24; 18:4; 22:25; 29:5; 33:9, 25; 46:18; 60:12; 66:18; 76:10; 78:24; 87:9; 88:3; 93:23, 23; 94:7
**millions** 18:6; 96:10
**mind** 56:13; 96:7
**mine** 60:12
**Minnich** 21:4
**minute** 22:18; 92:24
**minutes** 47:5
**miscellaneous** 89:25
**misinformation** 50:11
**misinformed** 56:20
**misinforming** 49:19
**modify** 4:20
**modifying** 8:8
**molecular** 70:10
**moment** 29:15
**Monday** 83:25
**months** 4:17; 19:8
**More** 5:10, 14, 16, 21; 6:1; 9:24; 10:5; 15:18, 18; 31:15; 39:16; 42:6, 12; 51:12, 16, 17; 52:9, 15; 53:23; 54:3, 22; 55:2; 56:6; 58:3, 3; 63:24; 66:17; 70:18, 25; 75:6, 25; 76:6, 8, 22; 77:3; 90:2, 6, 6;

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Alan Bonsell
April 13, 2005

91:10; 96:6
morning 3:11, 12; 4:23
lost 3:23; 4:14; 13:9;
21:23; 24:19; 32:24; 59:5,
14, 19, 21; 60:3, 5, 18, 19,
22, 24; 61:1, 4, 12, 13;
62:12
move 28:5
moving 28:7
Mrs 45:16; 48:10
much 7:11; 59:14; 86:14
Myers 84:15
myself 4:11; 95:13
Mysteries 11:7; 12:23;
19:23, 25
Mystery 19:2; 20:4, 23
mystified 92:2
Myth 84:23; 85:19

## N

name 11:19; 21:7; 23:7,
14; 25:13; 35:16; 52:8;
58:15, 23, 25; 70:17; 74:2;
97:13
namely 63:7, 22; 65:8
names 16:24, 25, 25;
23:12; 33:5, 5; 58:15, 21;
84:14
National 15:23; 23:20,
24; 43:8
natural 63:7, 22, 22; 65:8;
83:16, 21
nature 63:7
NBA 18:14
nearing 84:22; 92:20
necessarily 65:22
need 4:10, 24; 39:22;
77:21; 81:20; 82:6, 9, 9
Nelson 21:6
new 62:22; 63:19; 67:5
newer 17:14
news 50:2
newsletter 49:8, 12, 15,
24; 50:5, 23; 52:5; 53:13;
55:4, 24; 56:24; 59:21;
60:14; 64:16; 65:2, 6, 19;
70:9; 75:5, 11, 16, 22;
76:15, 19; 93:5
newsletters 52:19
newspaper 53:10; 54:8
newspapers 50:12;
77:13, 14
newsprint 52:6
next 7:17; 51:4; 61:16;
62:18
Nilsen 51:18; 52:13; 53:1;
88:3, 12, 19; 89:6, 15, 16;
91:1, 7; 92:8; 93:23; 94:5
Nobody 55:7; 64:10
non 33:18
noncontroversial 64:15
nonliving 63:6, 21; 65:7

Nor 90:18
normal 3:24; 35:17;
39:11
normally 35:5
note 47:19
noticed 12:13
number 20:24; 35:8, 15;
95:25

## O

object 62:1; 68:9, 16, 24;
69:4, 11, 16; 71:14; 72:5,
22; 75:12; 80:25; 81:17;
82:21; 83:7; 97:4, 9, 16, 22
Objection 80:19; 82:4
objections 3:4
observation 36:3
Obviously 3:13; 73:4
occur 24:18; 33:1
occurred 9:9; 32:19;
33:11; 36:18
October 19:10; 24:24;
25:4; 36:5, 7, 9, 10
off 13:22; 14:11; 18:9;
27:13; 41:16; 58:21, 25;
67:9; 68:8
off-the-record 14:12;
67:11
offered 24:9
Office 35:19
official 50:24; 55:10, 11
once 3:13; 51:2; 55:3;
75:24
One 3:18, 21; 5:1, 3; 8:15;
11:18, 18; 12:12; 20:7;
23:25; 24:15; 30:13; 33:4,
10; 35:8, 11, 14; 46:6;
49:15, 21; 53:6; 56:8; 58:3,
4; 59:16; 63:11, 13; 64:14;
66:17, 24; 67:1, 2; 68:8;
71:2; 76:3, 8; 84:15, 15;
87:11; 88:15; 89:25; 92:2;
94:2; 97:17
ones 11:6; 49:22, 22, 23;
52:22; 56:15; 89:10
only 17:4; 33:17; 38:11;
41:5; 69:17, 19
open 47:3
opinion 37:19; 38:5;
44:21; 59:2
oppose 73:25
opposed 38:10; 39:18
opposing 40:12
orally 10:7
order 93:8
ordinary 55:16
organisms 66:21
organization 40:10
organizations 23:3, 6;
43:5, 15, 17
origin 57:18, 19; 64:21;
65:1, 5, 24; 66:2
original 86:7

originally 85:16
origins 57:24; 64:8, 22;
65:3, 12, 13, 16, 18, 19,
20, 21, 25; 66:3, 5, 8, 12,
12, 14, 15, 18, 25; 67:5,
15, 19, 21; 68:17, 19;
69:23; 70:4, 5
otherwise 4:7
out 4:16; 10:4, 6, 14; 14:4,
15; 17:15, 18; 18:11, 13;
21:18; 24:17; 29:24;
37:11; 39:8; 40:12; 46:21;
48:3; 49:8, 18, 20, 20,
25, 25; 50:3, 13; 52:8, 14;
54:25; 55:5, 8, 9, 16, 21;
56:22; 61:7; 65:6; 66:19;
68:7; 76:3; 89:12; 95:24;
96:1, 2
over 4:14; 13:4, 7, 15;
14:15; 35:10; 39:3; 52:11;
53:16; 57:18, 25; 59:4, 7;
60:2, 21; 63:4, 16; 64:5, 7;
85:17; 91:11
overall 94:21
own 14:10; 21:19; 27:8;
36:3; 42:4, 6, 16; 50:4, 6

## P

P-19 49:3, 5
P-35 10:15
p.m 98:2
page 5:6; 6:16; 7:15, 20;
8:17, 20, 21, 23, 25; 10:19;
11:7; 18:2; 53:7, 16; 76:3
pages 13:8; 14:9
pair 79:19
Pandas 13:3, 20
paper 47:19
papers 73:23
paragraph 6:17; 8:20;
10:22; 45:11, 15; 70:9, 14,
20, 21
paragraphs 10:21;
54:20; 69:18
paraphrasing 48:11
part 9:6; 44:13, 22, 24;
45:13; 60:18; 61:5, 16;
63:18; 64:11, 18; 67:14,
16; 70:2; 71:22; 72:2;
73:19; 80:10; 94:7
participate 42:3
particular 14:9; 18:23;
28:17; 37:9; 42:11; 43:2,
18; 58:21; 85:11; 86:4, 6;
89:5; 94:12
particularly 14:5
parties 3:3
parts 12:3, 6, 14; 13:14;
14:19; 38:2; 63:2; 70:4, 7,
11; 71:2, 10, 24; 76:15
passage 62:15
passed 24:18
password 39:22, 24;
40:2

past 15:24; 79:6; 81:2
Patrick 76:14
pay 49:22
People 13:3; 24:10;
31:16; 33:3; 35:18; 51:16;
52:1; 53:5; 54:5; 57:11, 20,
25; 59:5, 14, 19, 22, 22,
23, 23; 60:5, 5, 22; 61:1,
13, 23; 71:23; 72:19;
73:12; 74:22; 75:17, 18;
78:23; 95:12, 25
per 16:22; 18:25; 23:22;
25:9; 28:17; 50:24; 74:8
percent 45:17, 22; 46:1;
90:13
perfectly 11:25
period 48:23; 84:3, 5
permitted 69:2
person 52:18; 59:1, 17
personal 22:9; 37:19;
39:18; 44:9, 11, 21; 57:10;
59:2
personally 10:20; 19:21;
43:17; 45:21; 74:19
perspective 41:3
persuade 28:22; 29:9
persuasive 86:24, 25
Peterman 45:6, 12;
47:20, 21; 48:5, 10
phone 36:15, 17, 25;
95:18
piece 8:15; 19:12
pieces 11:12; 12:10;
13:13
Piltdown 23:17
pinpoint 42:10
piqued 17:17
place 18:15; 95:17
places 18:6
plain 64:13; 78:6
Plaintiff 34:12; 45:5
Plaintiffs 6:15; 10:16, 17;
88:4; 92:21
please 12:4
pledge 90:22
plenty 16:23
point 15:14; 18:11; 29:22;
30:7; 43:19; 52:3, 14; 53:6;
64:14; 74:15; 81:2; 82:1;
85:11, 14; 86:4, 6
Policy 6:18, 19; 7:7;
37:21; 38:10; 40:12; 97:20
position 37:14, 18; 38:3,
19; 45:1
positive 20:20; 24:16;
36:7, 10; 40:14; 43:1; 76:2
possession 19:4
possible 9:24; 27:2;
36:11, 12, 13, 23; 75:18;
83:23; 92:18
possibly 20:15, 16
power 90:2, 6
powerful 90:6; 94:13, 14

PR 90:13, 16
practice 40:4
precise 27:14
preexisting 63:19
premise 32:2
prepare 51:13; 52:5;
93:4, 8
prepared 53:20, 23
prescribe 85:8
presence 46:1
present 41:6
presentation 28:22;
31:18, 20; 32:17, 22; 33:1,
11, 17, 20; 41:17, 24; 42:2
presentations 28:20;
33:14
presented 75:21; 78:10;
94:8; 95:1, 2, 3
presenting 31:5; 40:24;
41:1; 78:20
press 37:13
Pretty 7:11; 23:16, 22;
36:24; 48:2; 58:12; 59:14;
64:13; 86:14
previous 4:12; 5:23; 44:1
previously 6:15; 40:10
primates 68:8
Principal 45:6; 96:17
printing 52:8
prior 4:19; 13:2; 17:10
private 26:14
probably 6:11; 17:12;
21:23; 23:1; 24:14; 25:9;
27:10, 11; 29:10, 14;
42:15, 21, 24; 47:10;
50:20; 70:15; 90:5; 94:16,
17; 95:18; 96:16
problem 18:5; 53:3; 55:7;
57:25; 61:5; 62:12; 64:11,
12
problems 35:9
proceed 3:15
process 3:16, 25; 4:8;
9:22; 51:3; 63:5; 75:4;
85:24
processes 11:11
produced 34:11
production 76:14; 84:18
professors 58:17
program 23:15, 17
programs 10:11; 23:14,
14; 90:22; 91:25
project 96:10, 11
promise 5:1
promoting 23:4
proper 30:11; 80:17
properly 82:7
proponents 72:9
propose 50:19
proposed 30:9; 50:8
proposition 74:7
provided 33:18; 37:25;
93:18

Case 4:04-cv-02688-JEJ   Document 213-3   Filed 09/27/05   Page 34 of 36

Alan Bonsell
April 13, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

provides 44:23
public 50:21; 54:12, 17;
84:3, 5; 86:2; 96:2
publicly 40:12
published 27:16; 86:19
pull 39:14, 15
purchase 19:6, 15
purchased 19:5, 22;
20:5, 7, 8
purpose 5:18; 6:19; 7:2,
7, 9, 13, 18, 19; 8:1, 3, 7;
9:13; 10:2, 3; 27:20, 21;
28:10; 34:7; 93:25; 94:7,
25
purposeful 70:11; 71:10,
24
pursuit 17:3
push 57:23
put 14:23; 16:12, 14;
27:11, 12; 39:6; 41:22;
49:8, 10, 15, 25; 50:16;
51:15, 20, 24; 52:6, 13, 21;
53:6, 25; 54:3, 22; 56:7,
12; 58:17; 65:6; 67:1; 69:5;
70:19; 76:3; 77:8; 78:12;
89:10, 23; 95:24; 96:1, 2
puts 23:24
Putting 24:5; 43:21;
44:25

## Q

qualify 24:24; 31:24
quantify 6:9
quickly 3:19
quite 11:15
quotes 76:23

## R

ran 95:10; 96:13
random 63:8, 23; 65:9
rather 5:22; 83:4
rating 90:14
reach 36:1
read 4:12, 14, 15; 7:4, 8;
10:10, 11; 11:12, 14, 20,
23; 12:3, 6, 14, 20; 13:5, 8,
11, 13, 21; 14:6, 14, 15,
19, 19; 15:2, 10, 13, 18,
20; 16:3, 17, 19, 20, 23;
17:21, 25; 18:3, 13, 23;
24:7; 25:18; 50:17; 53:12,
15; 57:11, 21; 58:16, 22;
59:1; 61:4; 63:17; 69:18;
70:25; 73:7, 12, 21, 23;
74:10; 75:16, 17, 18; 79:1;
81:25; 85:2; 86:15, 16, 22,
22; 87:16; 94:5, 21; 95:5;
96:24; 97:5
reading 17:2, 5, 9; 22:6,
9; 25:15; 28:3; 73:5; 83:20
reads 40:6
realize 3:22; 18:7

really 16:25; 29:18;
52:18, 18; 54:1; 64:10;
74:14; 83:12; 88:24;
89:19; 90:24; 92:19
reason 14:10
reasons 40:20
recall 11:4; 12:19, 25;
14:14; 15:14; 16:21; 18:9;
23:9; 25:12, 24; 26:23;
28:19; 29:1, 4; 31:10;
36:19, 23; 39:6, 10; 42:24;
43:4, 1 2, 14; 49:1; 76:7,
13; 89:23; 90:15; 91:13;
92:7; 96:22
received 10:7; 35:2;
75:24; 76:6
recently 16:2; 58:16
recess 32:11, 12; 75:1, 2
recognize 34:15; 35:2;
45:9; 49:3, 5; 88:6, 8;
93:11
recollect 28:3
recollection 11:17;
21:24; 29:7; 33:6; 39:4;
46:17; 47:17; 48:17, 23;
55:6; 74:4; 87:17; 88:11;
90:3; 92:11
recommend 87:1; 94:20
recommendations
88:23, 24
record 14:11; 67:9
refer 4:22, 24; 7:18; 66:18
reference 20:18; 91:20
referred 46:4
referring 7:19; 8:3, 4; 9:5,
6; 16:6, 9; 46:13, 14; 49:9;
51:10, 11; 71:5
refers 90:3, 23
reflect 7:1
refresh 33:6; 46:17;
47:16; 88:11
regarding 92:12, 25
regardless 35:21
regards 49:11
regularly 3:25; 40:6
relate 15:21
related 76:23
relating 31:12; 82:19;
91:2, 7, 20; 92:4
relation 41:18
release 37:13; 90:22;
91:25; 92:3
relied 8:6; 9:17, 18; 10:5
religion 77:12; 78:5, 21;
81:18; 82:23, 25; 83:4;
86:1
religious 54:10, 11;
76:20, 22, 25; 77:6, 16, 24,
25; 78:3, 7, 8, 9, 13, 15, 18;
79:4, 9, 13; 80:20, 24;
90:21, 25; 91:2, 8, 20;
92:4, 12
rely 9:12
remember 3:20; 11:25;
12:25; 13:19; 14:3, 5, 8,

13, 15; 15:18; 16:24;
17:24; 20:6, 11, 13, 15, 16,
17; 21:2; 23:11, 13, 15;
25:8, 13, 14, 14; 26:16, 19;
28:18; 32:19; 33:5; 36:24;
37:3, 11; 42:8, 11; 43:2, 9,
18; 47:23, 24; 48:15;
50:22; 55:22; 70:17; 74:4;
76:11; 84:14; 86:15, 16;
87:13, 24; 88:19; 91:4, 23;
92:13, 14, 15, 15, 16;
93:22
remembered 47:15, 22
repeat 5:2; 41:10; 66:1
repeating 7:25
reporting 45:12, 14;
77:15
representation 32:14,
14; 57:13
representing 60:23;
72:18
request 34:4; 76:14;
84:18
require 80:7
required 38:15
researching 23:4
reserved 3:5
residents 71:22
resolution 7:10, 14; 8:8;
9:5, 14, 25; 10:1, 3; 11:22;
15:12; 19:10; 24:18, 25;
25:4; 27:19; 28:10, 23, 25;
29:9, 11; 30:8, 9; 31:9, 25;
32:20; 37:12; 41:18; 42:1;
65:2, 13; 67:13, 14, 16, 20;
68:3; 69:3, 5, 8, 14
respect 72:25; 75:23
respective 3:3
respond 83:13
responsibilities 13:17
responsive 76:17; 90:9
retreat 46:5, 5, 9, 23, 24,
25; 47:13, 16; 48:18
review 55:24; 75:8, 14
reviewed 10:21; 11:1;
13:3; 24:7; 54:23, 24, 24;
55:7, 18
reviewing 55:23
revisit 34:19
Richard 28:16
right 4:16; 7:17; 8:5;
12:17; 24:4; 26:21; 28:14,
15; 49:4; 53:4; 58:19;
61:19; 62:9, 17; 64:15;
66:6; 74:18; 75:19; 77:10;
81:12; 92:8; 96:15
ring 91:25; 92:5
road 74:15
role 49:11, 11, 14
ROTHSCHILD 3:10;
8:21, 22; 20:22; 30:23;
31:3; 32:4, 9, 16; 34:14,
20, 25; 38:1, 21; 48:7;
62:3, 8, 10; 67:12; 68:10,
18; 69:1, 6, 13, 20; 71:15;
72:7, 24; 74:25; 75:3, 13;

13, 15; 15:18; 16:24;
17:24; 20:6, 11, 13, 15, 16,
17; 21:2; 23:11, 13, 15;
25:8, 13, 14, 14; 26:16, 19;
28:18; 32:19; 33:5; 36:24;
37:3, 11; 42:8, 11; 43:2, 9,
18; 47:23, 24; 48:15;
50:22; 55:22; 70:17; 74:4;
76:11; 84:14; 86:15, 16;
87:13, 24; 88:19; 91:4, 23;
92:13, 14, 15, 15, 16;
93:22
rule 39:8
run 94:22; 95:7, 10
Ryland 33:8

## S

same 4:2; 8:17; 15:4;
17:20; 19:17; 21:19;
23:11; 24:11; 27:15;
79:15, 18; 80:8
Santorum 53:8
saw 19:24; 35:16, 21;
37:16; 48:10
saying 8:14; 18:5; 36:1,
9; 54:8, 11; 58:1; 59:15;
60:7; 61:18, 21; 62:18, 23;
64:11; 71:3, 8, 9, 9; 72:15,
17; 73:25; 74:13, 22, 24;
77:11, 13; 78:21; 80:2, 11;
81:3; 82:22; 86:9, 10, 14;
91:18
scales 44:20
school 15:3; 35:6; 37:9;
39:20; 40:5, 5; 43:7; 45:1;
47:6, 13; 49:10; 57:13;
61:14; 62:11, 24; 64:1, 19;
65:5; 68:4; 71:23; 72:18;
73:1; 74:20; 77:10, 15;
87:2, 4, 7, 8, 14, 14, 19, 20;
93:19, 25; 95:7; 96:8;
97:14
science 6:20; 14:22;
15:2, 6; 17:7; 31:17; 41:9,
14; 43:11; 68:21; 79:10,
11, 12, 14, 20; 80:18;
81:16, 19; 82:20; 83:6
Sciences 43:8
scientific 6:21, 23; 9:18,
19, 24; 10:9, 14; 13:15;
14:17, 21, 25, 25; 16:3, 4,
7, 8; 21:17; 25:17; 29:13;
30:2, 16; 31:5; 40:14; 41:2;
46:21; 60:9; 69:22; 70:3, 5;
78:6; 93:3, 7
scientifically 61:3, 3;
70:22; 71:16; 73:6
scientist 70:10; 71:18
scientists 6:24; 17:19;
21:17, 20; 22:16, 19, 23,
24, 25; 23:1; 26:4, 6;
57:20; 59:23; 60:3, 8, 18,
19, 24; 61:4, 12, 23; 62:12;
66:22; 71:7, 8; 74:23; 93:3
Scott 21:4
se 16:22; 18:25; 23:22;
25:9; 28:17; 50:24; 74:8
sealing 3:3
search 27:8, 10
second 7:4; 31:23; 53:16;
63:18; 64:2, 18, 20; 67:10;
70:9; 74:24
section 53:20, 22; 65:17;
70:13; 76:1, 12, 20

76:14, 18; 80:22; 81:5, 22;
82:8; 83:14; 84:18, 21;
88:5; 90:19; 92:19, 22;
93:12, 15; 97:7, 10, 19, 24
rule 39:8
run 94:22; 95:7, 10
Ryland 33:8

seeing 39:5, 6; 50:11
seeking 17:15
seem 79:1
seems 77:8
select 39:24
selection 63:8, 23; 65:9
self-explanatory 65:21,
22
Senator 53:7
send 18:3; 35:20; 55:8;
76:3
sense 22:8; 48:15, 16;
56:12; 63:5; 64:6; 90:17
sent 35:17; 45:7; 52:14;
55:5, 8
sentence 45:14; 67:20;
77:7
separate 68:22
Separation 84:23; 85:20;
86:3, 5
series 7:17; 53:17
session 33:1; 50:21, 21
set 7:8, 15, 20; 8:1; 39:19,
20
Seth 33:6, 9; 35:2, 15, 16,
23
setting 15:5; 29:3
several 57:4; 58:2, 5
shape 78:8
Sheila 95:13
short 79:12, 21, 25
show 10:13, 15; 13:19;
34:10; 45:4; 49:2; 63:24;
72:10; 84:25; 85:15
showed 47:21
showing 63:10; 64:3, 9;
65:6; 85:6
shows 23:18, 19; 24:5;
86:7
sic 47:22
side 53:16; 58:20
sides 63:11, 24; 64:3
similar 15:6
similarly 68:13
simple 59:4; 63:15; 64:4;
66:21; 70:10, 21; 78:6
simplified 65:10
simply 79:14
sit 13:11
site 39:13
sitting 4:18; 5:20
situations 37:2
six 7:15, 20; 10:19
sixth 47:12
slate 95:10
Smithsonian 15:22;
16:5, 10
social 87:20, 24; 88:13;
89:21; 91:3, 8
somebody 18:2; 20:6, 7;
27:4
someone 16:9, 11; 34:5;
36:4; 70:17; 78:15; 79:9;

87:15; 88:10; 93:20
**sometime** 35:25; 36:2;
   4:15
**sometimes** 23:20
**somewhere** 17:13;
   22:11, 16
**soon** 36:2
**sorry** 7:6; 12:5; 15:16;
   33:21; 87:18; 92:6
**sort** 5:18; 11:17; 22:5, 9,
   10; 26:8, 21; 27:23; 36:21;
   51:22; 52:9, 25; 55:19;
   95:2
**sound** 73:6
**Sounds** 11:7; 21:7; 33:7,
   9; 48:21; 58:11
**soup** 66:20
**source** 38:22
**sources** 18:23
**Spahr** 45:13, 16; 48:1
**speak** 31:12; 32:8; 34:3;
   84:6, 8, 10
**specials** 23:25
**Species** 44:15; 57:18, 19;
   59:10; 60:20; 61:18;
   62:22; 63:13, 19, 19;
   65:24; 67:5; 68:15, 22, 23;
   69:10
**specific** 8:15; 11:4;
   13:20; 16:24; 18:7; 20:18;
   26:16; 29:4, 14, 18, 22;
   30:7; 31:15; 52:4; 58:25;
   81:20; 85:18; 87:24;
   91:20, 23; 92:11; 94:19
**specifically** 10:5; 16:1;
   18:22; 27:13; 28:1; 42:9,
   18; 58:15; 87:18
**specificity** 17:14
**specifics** 29:6, 10; 42:24;
   73:15; 92:15
**spend** 46:14
**spending** 96:10
**spent** 46:14
**spoken** 36:5
**St** 47:11
**standing** 46:25; 47:10
**start** 11:17; 17:15; 57:19,
   24; 58:18, 19; 66:19; 79:8
**started** 17:4; 66:7
**starts** 57:4
**state** 85:11; 86:3
**stated** 10:25; 45:16
**statement** 7:21; 50:17;
   53:12; 60:22; 62:11;
   96:24, 25; 97:5
**stating** 37:14
**Stephen** 21:2, 3
**stick** 24:3
**still** 5:12; 14:3; 27:5;
   38:14; 40:16; 45:8; 74:12
**stipulated** 3:2
**STIPULATION** 3:1
**stop** 31:22; 58:19
**stopped** 79:25

**stops** 79:12, 21; 81:3
**student** 15:7
**student's** 7:21
**students** 6:20; 8:25;
   31:5; 40:24; 41:2, 8, 13;
   43:7; 45:2; 53:13, 15;
   78:10, 20; 80:18; 89:9;
   94:8; 95:1, 2, 4; 96:24;
   97:8, 15, 21
**studies** 87:21, 24; 88:13;
   89:21; 91:3, 9
**stuff** 39:12
**subheading** 90:20
**subject** 15:9; 16:18, 23;
   17:16; 22:23; 24:12, 23;
   27:23; 28:7; 34:10; 37:9;
   40:11; 41:16, 25, 25;
   43:18; 46:18; 47:18;
   64:23; 66:2; 67:14; 77:15;
   79:2; 81:14; 84:10; 91:7;
   92:3; 97:13
**subjects** 11:2; 15:11, 21;
   17:2, 3, 5, 8; 22:6; 23:10;
   25:18; 27:1, 5, 8; 28:6;
   85:12
**subsequently** 63:7, 22;
   65:8
**substance** 94:19
**suggested** 48:1
**suggests** 74:7
**Superintendent** 33:25;
   34:6, 6
**supernatural** 80:7, 9, 15,
   23; 81:11, 15, 20, 21, 23,
   24, 25; 82:5, 10, 12, 13,
   19, 20; 83:4, 6, 11, 17
**supplemented** 89:22
**support** 60:18; 74:7;
   84:12
**supported** 59:5, 19, 21;
   60:3, 5, 14, 22; 61:12, 13
**supporters** 58:10
**supporting** 57:5
**supposed** 60:23; 69:15;
   83:1
**Supreme** 85:5; 86:8; 91:2
**sure** 5:9, 11; 6:6; 7:5;
   8:17; 9:2, 2; 12:2, 18;
   13:18, 24; 14:16; 15:13,
   22, 24; 17:12, 13, 23; 19:9,
   18, 18, 24; 20:1, 3, 8, 21;
   23:16, 19, 21, 22; 24:10,
   14; 26:4, 10, 12, 15; 27:3;
   29:10, 23; 30:6, 10, 11, 14;
   31:10; 32:23; 33:9, 24;
   34:20; 35:14; 36:8, 24;
   38:6; 39:3; 40:8; 42:6, 25;
   48:20, 22; 52:11, 13; 53:2,
   3, 4; 61:10; 62:4; 64:25;
   65:3, 23; 67:24; 74:25;
   76:4, 10; 77:21, 22; 86:18,
   21, 22; 87:6, 9, 12; 90:25;
   91:22; 92:7, 10; 93:14, 21,
   24; 94:5; 95:16, 18
**surrounding** 6:21
**sworn** 3:8

**T**

t-h-o-s-e 58:23
**takings** 85:21
**talk** 3:19; 11:18; 28:24;
   31:21; 34:7; 36:17, 22, 25;
   37:1, 8; 46:24; 47:4; 57:11;
   67:23; 82:24; 83:9; 88:2;
   96:17
**talked** 23:8; 24:17; 28:7,
   15, 16; 29:14; 32:6; 36:16,
   16; 37:3; 41:19; 48:12;
   51:24; 56:5; 70:25; 73:8, 8,
   12; 85:19; 87:25; 92:13
**talking** 8:10, 11, 11, 16,
   16; 9:7, 20; 14:22, 22, 25;
   26:21; 29:1, 12, 19; 47:17;
   48:3; 53:21; 54:2, 2; 57:19,
   24; 58:9, 18, 20; 59:6, 22;
   60:9, 9, 10; 61:3, 11; 64:7,
   8; 67:4, 4; 81:1; 83:9;
   85:21; 86:1; 91:10
**talks** 63:12; 85:5
**tangible** 26:22
**tanks** 23:6
**tape** 84:19
**taped** 84:16
**tapes** 26:22, 25
**taught** 45:2; 46:2; 54:8, 9;
   65:3, 14, 16, 17; 67:15, 22;
   80:18; 81:16, 18; 88:22,
   23; 90:12; 96:19; 97:13
**teach** 41:6; 68:4, 14, 21,
   25; 69:2, 9; 89:3, 6, 6;
   96:18
**teacher** 68:13; 94:6
**Teachers** 43:13; 68:4,
   21; 69:8
**teaching** 41:5; 43:6;
   44:3; 45:18, 23; 46:14, 15,
   19; 48:12, 24, 25; 88:16
**technically** 70:25
**television** 24:5
**telling** 11:1; 57:12
**tenent** 44:7
**tens** 96:10
**term** 7:19; 58:7; 59:16;
   60:11; 65:1, 5, 12; 81:23
**terms** 27:8, 10; 70:10, 21
**testified** 3:8; 4:19; 46:7;
   47:23
**testify** 46:7, 8; 62:6
**testimony** 39:4; 46:11;
   78:9
**textbook** 27:16
**textbooks** 15:6
**theories** 6:23; 9:20, 21,
   21; 10:14; 17:18; 21:18;
   26:7; 29:13; 30:4; 46:21;
   73:3; 74:16
**Theory** 6:22; 17:14, 19;
   30:3; 46:15, 15, 20; 54:6,
   7, 14, 14; 56:2, 3; 57:3, 5,
   17, 22; 58:10; 60:19; 64:4;
   65:7; 69:23; 70:4, 8, 12;

71:3, 11, 19, 21, 25; 72:15,
   16, 21, 25; 74:12, 14, 16,
   23; 76:21; 77:1, 6, 17;
   78:4, 14; 79:3, 4, 6, 6, 14,
   16; 80:6, 10; 92:25; 93:1
**thesis** 85:10
**thin** 48:4; 68:7
**thinking** 25:14; 36:12
**Thomas** 51:12, 16, 17;
   52:8, 15; 54:3, 22; 55:2;
   56:6; 70:17; 75:6, 25; 76:6
**thought** 37:20; 51:1;
   54:16; 55:8; 67:7; 94:2, 3,
   4, 10, 13; 95:6
**three** 6:11; 34:15; 35:1,
   22; 55:2
**threw** 35:11
**thrown** 29:24
**times** 29:4; 42:10; 51:19
**timing** 34:22
**tired** 50:11
**title** 12:16
**titled** 53:17
**titles** 16:22
**today** 4:18, 20; 5:13, 20;
   39:4; 85:8; 89:11; 91:12;
   94:16, 17
**today's** 5:22
**together** 47:2; 50:16;
   51:8, 20; 52:14; 53:25;
   54:22; 56:7; 70:19; 89:10;
   95:20
**told** 20:8; 27:22, 24, 24;
   28:13; 30:16; 50:16; 97:21
**took** 33:20; 37:18; 38:3,
   19; 56:8
**top** 8:24; 13:22; 18:9;
   27:13; 58:21, 25
**topic** 45:18, 22; 46:2;
   85:18; 91:23
**topics** 24:8; 82:19; 83:5;
   91:14
**tough** 20:18
**transcript** 4:12
**trash** 35:11
**treated** 86:13
**trial** 3:5
**trick** 20:14
**tried** 29:9; 50:2
**Trudy** 47:20
**true** 20:12; 71:12; 78:1
**truth** 49:20; 50:3, 15, 17;
   52:2; 53:5; 55:21; 56:22
**truthful** 20:15; 56:24;
   57:13; 60:15
**try** 3:18, 25; 20:16; 51:20;
   66:17; 74:9; 78:15; 79:9
**trying** 10:4, 5; 11:16;
   12:2; 14:13; 19:7; 20:6, 10,
   11, 15; 22:7; 24:13; 28:5,
   12; 36:6; 61:13; 62:14, 24;
   63:3; 64:1, 19; 66:16; 67:6,
   6; 77:22; 78:21; 85:15;
   91:6, 19; 92:7, 10; 96:12
**turned** 6:15

**TV** 10:11; 23:14, 14, 15,
   18; 50:12; 73:13
**two** 6:1; 8:21, 23; 19:1,
   15; 23:8; 33:4; 35:4, 15;
   54:13, 16; 56:1, 4; 60:12;
   63:2, 11, 11, 24; 64:3, 9;
   84:4; 86:10; 91:12
**type** 10:12; 13:14; 15:1, 3,
   23; 25:3, 10; 56:6; 75:16;
   94:22
**typically** 95:17

**U**

**under** 65:24; 66:2, 5, 12,
   15; 67:25; 68:3; 69:2, 5;
   89:25; 90:21
**understood** 48:2; 77:14
**Unfortunately** 47:12
**units** 71:1
**University** 27:17
**unless** 79:6
**Unlocking** 11:7; 12:23;
   19:2, 23, 25; 20:4, 23
**up** 11:6; 16:2; 21:19;
   22:10, 11; 25:14; 28:24;
   29:1; 31:11, 16; 39:14, 15,
   19, 20; 47:16; 49:4; 50:5;
   51:14, 21; 52:3, 6, 9, 22,
   23; 54:5; 56:8, 10, 11;
   72:19, 20; 79:16; 84:5, 8,
   10
**update** 50:1
**upon** 8:6; 9:12, 17, 18;
   10:5
**use** 5:22; 27:9; 41:6;
   47:23; 57:5; 58:10, 13
**used** 9:16; 46:8, 12; 65:1,
   2, 5; 81:23, 24; 94:6
**using** 6:9; 7:19; 58:23;
   82:18; 83:4

**V**

**variation** 63:13; 69:9
**variations** 63:8, 23; 65:9
**varied** 11:15
**verbal** 27:23
**verbatim** 53:10
**version** 65:10; 76:8
**Vicki's** 3:18
**video** 24:9, 10, 14, 17;
   73:7
**videos** 23:9; 73:13
**videotapes** 11:3; 24:6,
   12
**view** 40:23; 41:8, 12, 15;
   56:23; 85:11, 14; 86:4, 6
**viewed** 19:3, 20, 21
**viewing** 20:4
**viruses** 35:10
**volume** 14:6
**vote** 11:22; 15:12; 28:23,
   24; 29:9; 31:8; 33:12, 15;

Alan Bonsell
April 13, 2005

Tammy Kitzmiller, et al. v.
Dover Area School District, et al.

41:18; 50:23, 24, 25; 55:3,
4, 10
**voted** 19:10; 24:24;
27:19, 19; 28:9; 31:25;
32:6; 57:12; 61:10; 67:16
**votes** 55:11
**voting** 7:2, 9, 13; 9:25

## W

**wait** 3:21; 4:1; 55:14
**waiting** 46:25; 47:10
**waived** 3:4
**wall** 86:11, 12
**Washington** 94:2, 15
**Washington's** 93:17
**watched** 10:11; 11:9;
23:9; 24:14
**way** 23:18; 24:11, 15;
28:8; 39:6; 40:13; 73:10;
77:14; 78:8; 85:15, 16;
87:10, 11
**ways** 17:20
**website** 25:15
**websites** 17:24; 25:2
**week** 83:24
**weekend** 47:1
**Wells** 12:14
**weren't** 30:15
**whales** 24:2
**what's** 47:6
**whereby** 63:6
**whole** 11:9; 23:1, 17;
25:17; 31:7; 64:21; 73:13;
78:2; 86:22; 94:14, 14
**widely** 79:2
**wife** 84:5
**William** 12:7
**wings** 44:16
**wish** 29:23
**withdraw** 51:6; 59:20
**within** 16:7; 59:10; 60:20;
61:18; 63:13; 69:10;
86:17, 20
**Without** 94:15
**withstanding** 40:19
**witness** 3:7; 5:7; 62:7
**wives** 84:8
**wondering** 88:25
**word** 6:9; 32:15; 41:6;
46:8, 12; 47:24; 50:17, 17;
57:4; 58:2; 81:25; 82:2, 10;
83:4
**words** 14:24; 56:9, 10,
11; 59:16
**work** 52:19; 71:3; 92:2
**working** 62:21; 95:20
**write** 52:5; 57:20; 61:9
**writings** 12:7
**written** 10:6, 17; 11:13;
24:6, 21, 22; 25:11, 12;
26:21, 22, 25; 27:2, 4;
52:16; 64:5; 75:20; 76:5;

90:1, 8
**wrong** 72:25; 74:5

## X

X 89:6

## Y

Y 89:6
**year** 5:10, 14, 15, 16, 22;
14:13; 22:1, 16; 35:10;
69:17, 18
**years** 6:1, 2, 8, 11, 11;
86:17, 20; 91:12, 12
**Yingling** 95:13