# APPENDIX I

# TAB D

**In The Matter Of:**

*Tammy Kitzmiller, et al. v.*
*Dover Area School District, et al.*

---

*Donald Bonsell*
*March 10, 2005*

---

*Filius & McLucas Reporting Service, Inc.*
*1427 East Market Street, York, PA*
*4309 Linglestown Road, Harrisburg, PA*

*(717) 845-6418 or (717) 236-0623*

*Original File DB031805.TXT, 50 Pages*
*Min-U-Script® File ID: 1397883712*

**Word Index included with this Min-U-Script®**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

TAMMY KITZMILLER; et al., Plaintiffs

CIVIL ACTION NO. 04-CV-2688

vs.

DOVER AREA SCHOOL DISTRICT, et al., Defendants

(JUDGE JONES)

Deposition of : DONALD BONSELL
Taken by : Plaintiffs
Date : March 10, 2005, 10:00 a.m.
Before : Vicki L. Fox, RMR, Reporter-Notary
Place : 200 One Keystone Plaza
North Front & Market Sts.
Harrisburg, Pennsylvania

APPEARANCES:

PEPPER HAMILTON LLP
BY: JOSEPH FARBER, ESQUIRE
For - Plaintiffs

THOMAS MORE LAW CENTER
BY: PATRICK T. GILLEN, ESQUIRE
For - Defendants

INDEX

WITNESS

| DONALD BONSELL | Examination |
|---|---|
| By Mr. Farber | 3 |

EXHIBITS

| Plaintiff Deposition Exhibit Number | Page |
|---|---|
| 32. Dover Area Board of Directors, Biology Curriculum Press Release, pages 000049 and 000050. | 22 |
| 33. Home Science Catalog, Catalog No. 14, pages P 00044 and P 00043. | 41 |
| 34. Two articles from the "York Daily Record" Entitle Textbook Controversy Continues and Book Is Focus of More Debate. | 45 |

STIPULATION

It is hereby stipulated by and between the respective parties that sealing, certification and filing are waived; and that all objections except as to the form of the question are reserved until the time of trial.

DONALD BONSELL, called as a witness, being duly sworn, was examined and testified, as follows:

BY MR. FARBER:

Q: Don, my name is Joe Farber. We just met a moment ago.
A: Sure.
Q: I represent plaintiffs in a case captioned Kitzmiller vs. Dover Area School District and Dover Area School District Board of Directors. Have you ever been deposed before?
A: I don't think so in this official capacity as far as I remember. I don't remember, but I had one case one time that I — it was a tenant that sued me. We went to court on it. I guess then I testified on my behalf.
Q: You testified in court?
A: Yes. That's the only time I would say I was

ever deposed if you will as far as swearing to tell the truth other than my official duties in different positions that I have had with the Township.
Q: If I could, I will give you some background on the deposition process so you know what to expect today.
A: Sure.
Q: I will ask you questions, and you will answer them, and the court reporter will record what each of us says and what Mr. Gillen says.
If you could answer orally without nods or shaking of your head or saying ah-huh, that would help the reporter record clearly what you are saying.
The reporter can only record one person speaking at a time. So if you could let me ask my full question before beginning to answer, and I will try not to cut you off, that would be helpful.
A: That's fine.
Q: Please answer questions only if you fully understand them. If you give me an answer, I will assume that you have understood the question. Okay?

A: Excuse me just a minute. I do have in my one ear, I have a problem. I should be wearing a hearing aid. I don't have one so I may ask you to repeat on rare occasions since your voice is soft. So just bring it up just a tempo if you will.
Q: Thank you for letting me know.
A: Sure.
Q: As I said if I ask you a question and you give me an answer, I will assume that you have understood the question.
A: Sure.
Q: Is that okay?
A: Sure.
Q: If you don't understand the question, please let me know, and I will rephrase it.
A: Sure.
Q: And in answering questions, please don't speculate or guess. Only answer if you know the answer to the question.
A: Yes.
Q: Throughout the deposition, I will refer to the Dover Area School District as the School District and the Dover area High School Board of Directors as the School Board. Is that

okay?
A: Sure. Yes.
Q: And I will refer to the book Of Pandas and People, The Central Question of Biological Origin as Pandas; is that okay?
A: Repeat please.
Q: I will refer to the book Of Pandas and People, The Central Question of Biological Origin as Pandas?
A: Yes. Okay, fine.
Q: If you need a break at any time, please feel free to ask, and we can arrange that.
A: Fine.
Q: Just for identifying information, what is your home address?
A: 5011 Harmony Grove Road, Dover, PA 17315.
Q: How long have you lived in Dover?
A: Since 1979. I moved there in April of '79.
Q: Where did you move from?
A: From Shiloh, which is approximately six, eight miles from there. We sold our home, and we bought a farm in 1979.
Q: How old are you?
A: I'm sorry. 67. I can't believe it. Anyway, go ahead.

 Min-U-Script® Filius & McLucas Reporting Service, Inc.

Q: Are you married?
A: Yes. One son, and I have a daughter which is a daughter-in-law, but we refer to her as our daughter. And we have two grandchildren which are just fabulous people.
Q: Did your son go to the Dover area schools?
A: No. He graduated from West York High School in 19 something.
Q: Where is that?
A: West York is relatively close to York itself, just on the outer skirts of the York City boundaries. It is called West York High School, which is approximately eight miles from Dover School District.
Q: Did you graduate from high school?
A: Yes, I did, 1956.
Q: Did you attend college?
A: I attended college, but I attended college — I basically did a lot of college work, but most of it was predicated on what I needed to succeed with the job that I was on at that time.
I have about ten years of night school, approximately ten years off and on.
Q: Did you graduate from college?

A: No, I did not. But I had many, many seminars I attended. I have sheets and sheets of documents that I have successfully completed, but I do not have a degree per se.
Q: I understand. Do you have any scientific training?
A: Not really in the sense of other than my own personal readings and things like that, but I have no training per se in the sense that I have — I never went to school or actually went directly for it, for the specific reasoning for the scientific reason.
Q: Do you have any particular scientific knowledge?
A: Sure. Obviously, I read a lot. In reading a lot, I do read many things pertaining to this. I am very much interested in federal, state, many things. I get like three newspapers everyday, and I read a lot. I do a lot of reading.
Q: Is there a field of science that you have particular knowledge about?
A: Science, I think probably more in the medical field than anything else. As you start getting older in life, you start concentrating in the

medical fields — what's available, what isn't, what works, what doesn't work.
I had to concentrate — my wife and I, of course, we have a tendency as you get older to do that, become aware of what's out there.
Q: Are you represented by counsel today?
A: Yes.
Q: Who represents you?
MR. GILLEN: Let the record reflect that he has indicated Mr. Gillen.
A: I'm sorry.
MR. GILLEN: Pat Gillen. Joe, you can call me Pat. Thank you.
A: Mr. Gillen. Pat Gillen. I'm sorry. I was thinking about the firm rather than the name.

BY MR. FARBER:

Q: How did Pat become your lawyer?
A: Through notification and through a request to represent. I guess he represents — he represents the school, the system. And through that, that is how I got to know him — know him in the sense of the way we are here today.
Q: When you first spoke or communicated, did he contact you, or did you contact him?
A: No, he contacted me.

Q: When did he contact you?
A: Approximately a week, ten days ago, something like that. I'm not — I don't recall the date.
Q: Did he offer to represent you for purposes of this deposition?
A: Yes.
Q: For any other purposes?
A: No.
Q: What did he say to you when he called?
A: Basically what he said is you're going to be deposed. Is that the correct term?
Q: Yes.
A: And I will represent you when you are being deposed. And I will be counsel for you or something to that effect.
Q: Did you discuss anything else?
A: Not really. I mean in fact, I met him for the first time yesterday personally in person. I did not discuss any specifics about anything in particular though.
Q: Have you ever spoken with — Pat, you might have to help me here — Robert Muise?
MR. GILLEN: Correct.
A: What is the relationship? I am sorry. I don't understand the question.

BY MR. FARBER:

Q: Have you ever spoken with Robert Muise, who I will represent to you is another attorney at the Thomas More Law Center?

A: No.

Q: Have you ever spoken to Richard Thompson?

A: No.

Q: Have you ever spoken to Ron Turo?

A: No. Again these are no's predicated on my memory.

Q: Sure. Did you do anything to prepare for today's deposition?

A: No. Nothing other than the fact — no. No. Not really. No.

Q: For example, did you review any documents before coming in for today's deposition?

A: No, in the sense of — no, I didn't look at one document.

MR. GILLEN: Joe, if I may, I know that I have instructed you that our communications are confidential, but Joe is entitled — and not to be disclosed — but Joe is entitled to ask if we spoke prior to your coming here. I think that is what he is getting at.

A: Yes. I think I answered yes. Did I not? Did

I say yes?

BY MR. FARBER:

Q: You did.

MR. GILLEN: I just wanted to make certain.

A: That is okay.

BY MR. FARBER:

Q: Did you meet with Pat before coming in for today's deposition?

A: Yes, last evening at my home. And we — anyway, yes.

Q: Did anything that Pat said or showed you refresh your recollection of events?

A: No.

Q: Have you met or spoken with anyone other than Pat to prepare for this deposition?

A: No.

Q: Have you spoken with your son Alan in preparation for this deposition?

A: No.

Q: If it is all right with you, when I say Alan, I am referring to Alan Bonsell.

A: Obviously, I understand. Okay.

Q: Does your son Alan currently serve on the School Board?

A: Yes.

Q: How long has he served on the School Board?

A: I think he is ending his fourth year right now. Technically it is four years as of this coming December.

Q: Did he have any prior terms before this?

A: No.

Q: Four year terms?

A: No.

Q: Did he run for School Board?

A: Yes.

Q: Has he ever communicated to you why he ran for School Board?

A: Well, I can — obviously, he was very much concerned about being a School Board member because he has got two children that go to Dover schools. He is civic minded. He wants to contribute his time and efforts to many things. One of them is the school. I really, really am very proud of that fact.

Q: Has he ever discussed with you his goals as a School Board member?

A: No. No. As far as his goal, no.

Q: Has he ever discussed what he hoped to achieve as a School Board member?

A: No. And I will predicate that on one thing is the fact that this is a group of nine. Goals are something that the group as a whole should work together. I'm sure that's the case.

If there is a goal — and I am sure there are some goals — I don't know what they are necessarily.

Q: Did Alan ever discuss goals or objectives related to the curriculum at the high school with you?

A: See, I personally served on the Board four years prior to Alan coming on — or approximately four years prior to that. And as far as talking shop, if you will, it is a rarity because I don't bother him with that because he has enough on his plate. Plus I do go to meetings sometimes to update my own thinking on the subject.

Q: Did Alan campaign for his position on the School Board?

A: Yes.

Q: Can you identify any of the themes of his campaign?

A: Well, they had a sheet out, and they advertised their own personal reasons for running for the

Page 15

School Board. They were all predicated on we're going to be a major help in the community. That is basically the group's theme. We want to be service to our community.

There's many things that they listed. I don't recall what they are.

Q: Do you have a copy of that sheet?

A: No.

MR. FARBER: Pat, do you know if that sheet has been produced?

MR. GILLEN: I don't know if that sheet exists. I would have to say right now, no. I don't think any such sheet was produced. Frankly, I don't think it was requested. But I will check.

MR. FARBER: Please.

BY MR. FARBER:

Q: Was high school curriculum a theme or issue in Alan's campaign for School Board?

A: Again?

Q: Was the Dover Area High School curriculum a theme or an issue of Alan's campaign for School Board?

A: No. As far as I know, it wasn't something that was a full focus. I think it was an overall

Page 16

focus on everything regarding the school, costs, taxpayer's money and many things. This is a big theme at that time because he wasn't that familiar — that's my opinion.

Q: Have you ever communicated with Alan about Creationism?

A: Communicated in what respect?

Q: Have you ever spoken with Alan about Creationism?

A: We have spoken many things regarding many subjects. Over a period of years, I would probably make the assumption I probably did. But specifically knowing what we talked about, I can't really give you it verbatim.

Q: You can't recall the specifics of any conversations with Alan about Creationism?

A: No. Because so many times when you talk to a son or a child — or not a child, a man — I mean I don't see him terribly often. We communicate about a lot of things.

In general conversations, it's always many, many different issues. Because of father and son, we have a lot in common in the business world and so forth. I can't specifically give you examples.

Page 17

Q: Have you ever communicated with Alan about Intelligent Design?

A: I really don't think so specifically about Intelligent Design because I was very familiar with Intelligent Design because I attended some of the sessions that they were discussing.

Q: Which sessions do you mean?

A: The School Board. I go when I am not a Township Supervisor. I have one meeting a month that I don't go to, and I usually try to attend the School Board.

Q: You have attended School Board sessions where Intelligent Design was discussed?

A: Yes.

Q: Do you remember the dates even approximately of those sessions?

A: It has probably been the last two months sometime. I don't know. I don't really recall what the dates would have been.

Q: Do you recall any of the content of the discussion of Intelligent Design?

A: I remember that we had a particular resident at that time that was very adamant about it, and there was a lot of discussion within the room with different people.

Page 18

Q: What was said during that discussion?

A: Like all — like anything else, everybody has their own idea regarding the issue and so forth. And being specific other than that particular individual, a person by the name of Barrie Callahan, she was very adamant and very confrontational with the Board regarding the issue as I recall.

Q: What was Barrie Callahan's position on Intelligent Design to your recollection?

A: Well, my recollection is the fact obviously she disagreed with the introduction of it as I recall.

Q: What do you mean by the introduction of Intelligent Design?

A: Meaning that the Board had the Intelligent Design, and they were talking about it openly with the people because there were questions regarding it from many of the folks that were there.

She was very, very — I mean the conduct and so forth was just — she used to be on the School Board. Then she was — she did not win reelection. And she has become quite confrontational with the issue regarding

basically anything regarding the school.

Q: Do you recall if the School Board meetings you have attended where Intelligent Design was discussed were after October 18th, 2004 or before?

A: I'm sorry, sir. I don't recall dates. I would speculate, and I can't do that.

Q: If it would refresh your recollection October 18th, 2004 was the date that the resolution introducing Intelligent Design into the curriculum was passed?

A: If you say so, I'll believe that.

Q: Given that, do you remember if the Board meetings you have attended where Intelligent Design was discussed were before or after October 18, 2004?

A: I honestly can't tell you one way or the other. I don't recall. Dates are really immaterial to me when I go to meetings like that.

Q: Have you ever discussed the place of religion in schools with Alan?

A: I am sorry?

Q: Have you ever discussed the place of religion in schools with Alan?

A: The place?

Q: Have you ever discussed the proper role of religion in schools with Alan?

A: Specifically in generalities, I don't recall. Like I said, I have a lot of conversation with family members and outside people. I have a dialogue going with a lot of people due to the fact of my position.

Just the other night, we had over a hundred some people there at a meeting. This is on the Township Supervisor position I carry.

Q: When you said because of your position, you were referring to the Township Supervisor position?

A: I am sorry?

Q: In response to a previous question, you said because of your position.

A: People many times will approach me, especially on subjects regarding the Township and so forth if they see me out.

Q: Your position then is Township Supervisor?

A: I am presently serving my sixth year, sixth year on a term of six years. I am presently serving my last year before reelection which is coming up in the primary in May.

Q: In general, do you recall any of the content of

discussions you might have had with Alan about the proper place of religion in schools?

A: Are you asking for my personal on this? Are you asking for a general response?

Q: I am asking if you personally recall any of the general content of your discussions with Alan about the place of religion in schools?

A: As far as my personal, I will use my personal self. And that is I personally feel that if the law states that subjects or particular issues are going to be taught, that's the way it is. I have no problem with that.

Because if a particular curriculum is there and it is mandated by the state or the federal government, so be it. That is the law, and that is what we adhere to. I don't encourage anybody dissecting that or bypassing that.

Q: Have you ever discussed the views you just expressed with Alan?

A: Specifically, no. In generalities, perhaps. Again, these are topics that I hear at the Boards when I go. And very rarely do I bring them home to roost because he has got — you know, he has got some responsibility. And I

don't add to that responsibility. Being the father, I don't take that privilege.

Q: In generalities, what was the content of your discussion with Alan on these matters?

A: That's like I was saying, what did I discuss with him. As far as generalities is concerned, I believe if I was again trying to recall — and I don't recall verbatim what we discussed. I'm certain that my son is pretty well in focus with my beliefs. And that doesn't mean we always coincide. We don't always agree.

In this case, he is a law-abiding man, and he will adhere to the rules of the school, as well as the state and the government because his position is that. His position, I'm sure he takes very seriously.

(Plaintiffs Exhibit 32 was marked.)

BY MR. FARBER:

Q: I would like to introduce Plaintiffs Exhibit 32. Don, do you recognize this document?

A: I recognize — I remember specific more about the fact of what Dr. Nilsen said. I saw this document. I really didn't study it in detail other than the fact that at the end of it, Dr. Nilsen is speaking.

The Doctor has directed the teachers will teach Intelligent Design. I am only repeating a few of the sentences. That is all. It is not necessary.
Q: Do you see at the top of the document the title Dover Area Boards of Directors Biology Curriculum Press Release?
A: Yes. I understand that.
Q: Did I read that correctly?
A: It appears you did. Biology Curriculum Press Release, yes.
Q: Do you see the first indented paragraph: Students will be made aware of gaps/problems in Darwin's Theory and of other theories of evolution including, but not limited to, Intelligent Design. The Origins of Life is not taught.
A: Yes, I see it.
Q: Do you recognize that language?
A: I recognize it in the sense that I am just refreshing myself. If I would have been asked to quote what is here, I probably wouldn't have been able to due to the fact that it has been some time since I have seen the document.
What is your specific question?

Q: Do you recognize this language as the text of an October 18th, 2004 resolution passed by the School Board?
A: Students will be made aware of gaps/problems in Darwin's Theory and other theories of evolution including, but not limited, to Intelligent Design. The Origins of Life is not taught. I recognize that.
Q: Do you recognize it as the text of a resolution passed by the Dover School Board?
A: Be specific. What am I looking for?
Q: The first indented paragraph on the first page that you just read.
A: Okay.
MR. GILLEN: Can we take a break, Joe?
MR. FARBER: Sure.
MR. GILLEN: I am not sure he understands.
(A recess was taken.)

AFTER RECESS

BY MR. FARBER:

Q: Don, again if I could direct your attention to the first indented paragraph on Plaintiffs Exhibit 32 which reads students will be made aware of gaps/problems in Darwin's Theory and of other theories of evolution included, but

not limited to, Intelligent Design. The Origins of Life is not taught.
Do you recognize that passage as the text of a School Board resolution that was passed?
A: I did not participate in this document or any parts of it. Okay? So recognizing portions of it or all of it really, I honestly cannot tell you that I am familiar with it to be able to discuss it.
Q: Do you remember the School Board ever passing a resolution related to Intelligent Design?
A: I don't recall. And I don't recall anything pertaining to that because again, I go to Board meetings, but there are many times it is only in and out. So I cannot tell you anything other than that.
Q: Sitting here today, are you aware that the School Board passed a resolution relating to Intelligent Design?
A: According to what you are saying, apparently it was true. I don't know or I don't recall.
Q: Did you learn that the School Board passed that resolution by reading Plaintiffs Exhibit 32, or did you know that they passed the resolution some time before reading Plaintiffs Exhibit 32?

A: Again, I don't recall specific times or dates regarding this issue, no.
Q: I am not asking for a specific time or date. Before today, were you aware that the School Board passed a resolution relating to Intelligent Design at any time?
A: I don't recall.
Q: Did you ever discuss with Alan a potential School Board resolution related to Intelligent Design?
A: Not to my knowledge.
Q: Did you ever discuss a School Board resolution related to Intelligent Design with anyone other than Alan?
A: Not that I recall.
Q: Have you ever discussed with Alan potential changes to the high school biology curriculum?
A: No. Not that I recall.
Q: Have you ever discussed with Alan the high school curriculum in any respect?
A: No. I would say no. Just simply no.
Q: Have you ever discussed the high school curriculum with any current or former members of the School Board?
A: If I did, I don't recall the specifics of it.

Page 27

Q: Have you ever discussed the high school curriculum with William Buckingham?
A: No.
Q: With Sheila Harkins?
A: I don't recall if I did.
Q: With Angie Zeigler-Yingling?
A: No.
Q: With Jane Cleaver?
A: No.
Q: With Heather Geesey?
A: No.
Q: With Noel Wenrich?
A: Again, the no is premised on the fact of my memory.
Q: I understand.
A: Okay.
Q: With Jeff or Carol Brown?
A: Again, I would simply have to say if I did, it is not a recollection that I can bring and focus on.
Q: Have you ever discussed selection of high school biology textbooks with Alan?
A: I am sorry?
Q: Have you ever discussed the selection of high school biology textbooks with Alan?

Page 28

A: No.
Q: Have you ever discussed the selection of high school biology textbooks with anyone other than Alan?
A: Not specific, no.
Q: Have you ever discussed the selection of high school biology texts with any current or former School Board members?
A: If I did, I don't recall the particulars about it.
Q: Do you recall if you supported the School Board resolution regarding Intelligent Design before or at the time of its passage?
A: In what respect?
Q: Did you think it was a good idea?
A: Well, as far as my personal opinion on it, as far as putting this and making it available in the context that it is, I saw nothing wrong with that.
Q: When you say making this available, what are you referring to?
A: In the sense of the Intelligent Design. As far as giving it to where the students — perhaps I think it was going to be put into the library or something, whatever, so that they could

Page 29

perhaps have a chance to evaluate it if they want to.
Q: Do you know if Alan supported the School Board resolution relating to Intelligent Design?
A: I would have to make that assumption, but I don't know specifically anything regarding his thoughts on it other than the fact that the record will speak for itself.
Q: Do you know why he supported the resolution?
A: Why he supported it? I guess because obviously the Board, I guess, were interested in presenting it. I don't know. I wasn't privy to it. I am not privy to their personal meetings, their personnel meetings and whatever they may have discussed behind closed doors.
Q: If I could direct your attention to the fourth paragraph on Plaintiffs Exhibit 32, the Biology Curriculum Press Release, could you take a moment to read that paragraph please? It begins the District also received.
A: I have it. Thank you. (Witness complies.) Fine. Question?
MR. FARBER: Pat, could we stipulate that Of Pandas and People in that paragraph refers to the book Of Pandas and People, The Central

Page 30

Question of Biological Origins?
MR. GILLEN: Most certainly.
MR. FARBER: Published by The Foundation For Thoughts and Ethics?
MR. GILLEN: So far as I know. I agree that certainly that reference there is to the text that you described at the outset of the deposition.
MR. FARBER: Thanks.
MR. GILLEN: You are welcome.

BY MR. FARBER:

Q: Don, what do you know about the book Of Pandas and People?
A: I personally have never read it so I really am not an expert on it.
Q: How did you learn of the book Of Pandas and People?
A: Well, obviously through conversation that you hear when you attend the meetings.
Q: Which meetings do you mean?
A: Whenever I attended some of the School Board meetings, you would hear the word Pandas and Intelligent Design, whatever.
Q: You first heard of the book Of Pandas and People at a public meeting of the School Board?

A: To the best of my knowledge, I would say that is probably true because I don't recall exactly when I did hear it or the time or the date. It wasn't something that was of terrible importance to me at that time.

Q: Who first mentioned the book Of Pandas and People?

A: I don't recall. It was part of the whole conversations that you hear when you are there. It has been brought up I am sure several times. I don't recall when.

Q: The first time you heard Pandas mentioned, was it mentioned by a School Board member?

A: I don't recall.

Q: Have you ever discussed Pandas with Alan?

A: Not that I can recall.

Q: Did you donate copies of Pandas to the high school?

A: Excuse me. Intelligent Design?

MR. GILLEN: He is referring to the text Of Pandas.

A: Okay.

BY MR. FARBER:

Q: Did you donate copies of Pandas to the high school?

A: Let us have a moment, will you please? Just a two minute break.

MR. FARBER: Sure.

MR. GILLEN: Sure.

(A recess was taken.)

AFTER RECESS

A: I am sorry.

BY MR. FARBER:

Q: Don, I will represent to you that Of Pandas and People is a book about Intelligent Design.

A: Fine.

Q: Did you donate Pandas to the high school?

A: Yes.

Q: Why did you do that?

A: The event that occurred during the one particular meeting, again, we are going back to Barrie Callahan who was an ex Board meeting. Barrie Callahan served on the Board.

When they mentioned this in the meeting, right away she came forward and said this is going to cost the school system money. And she was very much concerned about the materialistic part of this from the sense of dollars.

And after hearing that, and she always made — she always makes very big issues about

anything that she can possibly make issues from. I don't know her motivation other than the fact I heard it.

And I said well, after that, I said to my son, I said your mother and I will buy the books. That's fine. We will take that off the table.

Because this is not the first time I helped the school system. When I was on School Board, I donated other things to the school. I was happy to do this for the school because I think it is important that the community helps them wherever possible.

Q: What other things have you donated when you were on the School Board?

A: When I was a School Board member, I donated a large truckload of lumber that I brought to them and said here is a gift for your shop. And they unloaded it.

I have a large trailer that I pulled in with my truck. I just took it over to the shop. And without any fanfare, they unloaded it and said thanks, Don, and went on.

Q: Have you donated anything else?

A: I attempted one time to donate seven — I

purchased from a distributor seven handicap water coolers, the handicap style, which are fairly expensive because it fits against the wall in such a way that the handicapped in their wheelchairs can use it.

I attempted to do that. I spent about twelve hours at one particular location waiting for these handicaps to come up, and I purchased them for $125.00. And they are worth about $700.00 apiece, and they were brand new.

This was a warehouse where a man was going out — a bankruptcy sale, but it was all new merchandise, stainless steel. I took the $125.00 slip into the school system, and said I got you a treat.

Except at this particular time since I spent so much time, the only thing I wanted reimbursed for was the $125.00, and I had the slip that I paid for. They refused it. I don't know.

Larry Reeser then was, of course — he was the head of grounds. He looked at them and identified them as what I said they would be. And I said, well, okay. So obviously they went out — and I guess that was the previous School

Page 35

Board that I was on. They went out and spent apparently $4200.00 worth of — I don't know. I don't know that mentality. I can't understand it. I had this canceled check and everything else to prove my purchase.

Q: Have you ever donated anything else to the School District?

A: I donated a lot of time helping wherever I could and so forth. Mostly being a School Board member, your time is a major thing that you have to contribute to it. Not have to, but should and do. That is the nature of the School Board position.

Q: Did you donate the books by yourself or with others?

A: No. We paid for the books ourselves, but there was one other donation.

Q: Who did that donation come from?

A: Mr. Buckingham, meaning a donation in the sense that it came to us.

Q: Did Mr. Buckingham contribute money towards paying for the books?

A: I have no idea, sir. The only thing I know is he gave us money towards the purchase of the books. I don't know where the money originated

Page 36

from, if it was his personally or not. I didn't ask him.

Q: But Mr. Buckingham gave you money towards the purchase of Pandas?

A: Yes. He gave us a check.

Q: How did you divide payment for Pandas between yourself and Mr. Buckingham?

A: I just simply made up the difference. And obviously, I think you have it probably, the receipt for what I paid.

Q: I'm not sure I do. Do you recall the price that you paid for Pandas?

A: Twelve hundred and some odd dollars I believe. I think it was right around that. It was 60 books at something like 20 dollars apiece or 20 some dollars apiece.

Q: Do you recall how much Mr. Buckingham contributed towards the twelve hundred or so dollars?

A: In the seven hundred dollar range probably. I don't recall exact number. I really don't because it didn't matter to me because I was going to do it anyway.

Q: Did you ever discuss the donation of Pandas to the high school with Mr. Buckingham?

Page 37

A: No. In the sense of — no. I volunteered to do it. Obviously, the volunteer went out, and somebody knew that I was going to be buying the books and apparently gave me the check.

I didn't discuss anything with him, where the money came from or anything else.

Q: How did you receive the check from Mr. Buckingham?

A: I'm not positive. It was either — I have a lot of rental properties. Many times, our folks drop checks off indiscriminately. Many times, we usually use a wooden box on our front porch. Normally, they just drop it into the box.

In this particular case, it was either in the screen door or the box. I don't recall.

Q: I apologize if I have asked this before, but did you ever communicate in any way with Alan about the donation of Pandas?

A: Nothing specific as I remember other than the fact I told him we would be interested in purchasing the books.

Q: When did you tell him that?

A: At the time when Barrie Callahan came forward and made such a loud statement regarding the

Page 38

school, and the school was going to be responsible and so forth and so on.

I wanted to take it. I just wanted then to do it because this is the way my wife and I are. If we can help in any way to ease the burden of the taxpayers, we will do it.

Q: Did you tell Alan at a School Board meeting —

A: No.

Q: — that you would donate Pandas?

A: Not to my knowledge. I'm sure it would have been probably either in a break or something like that. I just mentioned to him that we will take care of the books with no fanfare. It wasn't something we announced.

Q: What did he say in response to your offer to take care of the books?

A: That is up to you, dad, as I recall.

Q: Anything else?

A: Not that I recall.

Q: Was Alan in favor of the introduction of Pandas into the school?

A: That is something that I can't respond to due to the fact that I think this is something that Alan personally would have to reply to.

Q: Do you know if Alan was in favor of the

Min-U-Script® Filius & McLucas Reporting Service, Inc.

Page 39

introduction of the books, the Pandas books into the school?

A: The same response. It is something that he would have to respond to. I don't like to quote somebody. That's all.

Q: I'm not asking for a quotation from Alan.

A: I understand.

Q: I am just asking if you know whether he was in favor of the introduction of Pandas into the school?

A: I really can't answer that because I am not positive. I am not sure.

Q: Do you think he was in favor of the introduction of Pandas into the high school?

A: Same response.

Q: How did Mr. Buckingham find out that you were interested in donating copies of Pandas to the high school?

A: I would have to make the assumption it was known after I told my son I was interested in doing it. How he acquired that information, I don't know. I didn't go around telling everybody about my donation. I don't do that.

Q: Did you tell anyone other than your son that you were interested in donating copies of

Page 40

Pandas to the high school?

A: Obviously, I told my wife. We discussed it before. She is totally aware of it. Like I said again, I don't go around telling people my donations to charity or to anything else.

Q: Is it fair to say that to your recollection you didn't tell anyone about your interest in donating Pandas to the high school in this case?

A: Like I said, all I had to do was mention it to my son. And obviously whatever he did with the information, it was up to him.

But he had — obviously, they were aware of it, meaning he was aware of it. I think at that time, he was board President if I'm not mistaken. Again, I did not make an announcement about this.

Q: So you didn't speak to any other members about your interest in donating Pandas to the high school?

A: Not that I recall.

Q: To any School District employee?

A: Not that I recall.

Q: Who did you order Pandas from?

A: I am not sure. I would have to look at the

Page 41

document.

Q: I have a document that might help.

A: You have it there. I don't recall exactly who it was from. We just simply called and gave them a credit card number.

MR. GILLEN: Can we go off the record for a second?

(An off-the-record discussion was had.)

(Plaintiffs Exhibit 33 was marked.)

BY MR. FARBER:

Q: Don, do you recognize Plaintiffs Exhibit 33 entitled "Home Science Catalog"?

A: I honestly don't recall ever seeing this.

Q: Have you ever seen —

A: This specific, I don't remember seeing it.

Q: Have you seen the second page?

A: Again, I will have to say the same thing. I don't recall ever seeing it. Sorry.

Q: How did you find out — I am sorry. Did you order Pandas or did someone else order the book?

A: No, we ordered them as far as I know. We called, and they said give us your credit card I guess is the way it worked. And we ordered the 60 books.

Page 42

Specifically who, when and so forth is between my wife and I.

Q: Who did you call to order the books?

A: Whatever the ad — whomever, whatever that document says. I don't recall specifics on it without looking at the actual bill or whatever we have.

Q: How did you find out who to call to order the books?

A: Most likely somebody that was knowledgeable about it. And it is conceivable it was my son, but I don't recall the details of it because I know she got the information from someplace. We're just very much interested in helping.

Q: Did your wife find out who to order the books from?

A: Between the two of us, one of us found out. I don't recall which one because it was — it really wasn't something that I was interested in pursuing, you know, where do we get the information, as long as we got it.

Q: Before you ordered the books, or your wife ordered the books, did you know anything about the book's publisher?

A: No. I had never — to the best of my

Page 43

knowledge, I never read the book or was party to the book as far as knowledge.

Q: Do you now know anything about the book's publisher?

A: Publisher?

Q: Yes.

A: No. I never pursued the publisher or anything pertaining to the publisher.

Q: If it would refresh your recollection, I will represent to you that Pandas publisher is the Foundation for Thought and Ethics.

A: Okay. I will take your word for it.

Q: Do you know anything about the Foundation for Thought and Ethics?

A: No, I am not familiar with it.

Q: After the Pandas books were ordered, were they shipped to you personally?

A: Yes, as far as I recall. I don't know in what vehicle they came or how they were delivered. They were delivered I know.

Q: Did they arrive at your house?

A: As far as I know they did, yes.

Q: What did you do with the books after they arrived?

A: As far as I know, they were given to the Board.

Page 44

I don't remember who got them. We just made sure that they were available. I don't know the particulars of it.

Q: Did someone come to pick the books up from your house?

A: I don't know. I really don't know. I don't recall.

Q: Would your wife know if someone came to pick the books up from your house?

A: I have no idea. We really never — it was never entered into our conversation who is going to get the books and how and so forth.

There was never a discussion between us other than ordering the books. And I sanctioned that, and obviously she agreed.

Q: After the books were picked up, did they go first to the School Board or a School Board member?

A: I really cannot say because I don't recall. I wasn't — I didn't deliver them myself. And again, these are things I am just simply frankly telling you the way it is. That's all.

Q: Do you know if the books, the Pandas books ever arrived at the high school?

A: I have no idea where the point of origin went.

Page 45

In other words, I don't know who they were delivered to. I don't recall.

Q: So you don't know if the books are in the high school now?

A: I really would make the assumption they are someplace between my place and the high school. Somebody got them, and I don't recall who did because I wasn't party to it.

Q: Did you attend any School Board meetings in June of 2004?

A: 2004, June? I really don't know, sir. I don't recall.

(Plaintiffs Exhibit 34 was marked.)

BY MR. FARBER:

Q: I would like to introduce Plaintiffs Exhibit 34.

Don, I will represent to you that these are copies of an article from the "York Daily Record" entitled Textbook Controversy Continues dated June 14, 2004, and an article from the "York Daily Record" entitled Book Is Focus of More Debate dated June 15, 2004.

A: This is page 22. What page are you on? I am sorry. The dates?

Q: If you remove the paper clip, you will see

Page 46

there are two separate stapled documents.

A: Okay. Go ahead.

Q: Do you see that one is entitled Textbook Controversy Continued?

A: Yes.

Q: And the other is entitled Book Is Focus of More Debate?

A: Yes.

Q: Do you recognize these documents?

A: I really don't recognize them per se because I don't recall because there was so much in the newspapers that I would glance at a lot of it. I really didn't pay too much attention to it because there was always something. I don't have specific knowledge of when —

MR. GILLEN: Joe, just for the record, and I know this is sort of covered by our stipulation, but to be entirely clear, I am going to have a hearsay objection to the newspaper reports and statements therein.

MR. FARBER: Fair enough.

MR. GILLEN: Good enough.

BY MR. FARBER:

Q: Do you read the "York Daily Record"?

A: Read in the sense of occasionally, I will look

at it. Usually, I only look at certain segments of it.

Q: Do you have a subscription to the "York Daily Record"?

A: Right now, they are giving us a year subscription for nothing. They volunteered to do that, and I said fine.

Q: If I could direct your attention to the second paragraph of the article entitled Textbook Controversy Continues.

A: The second paragraph, okay.

Q: It says at last Monday's School Board meeting, Board member William Buckingham said as part of a search for a new biology book, he and others are looking for one that offers balance between Christian views of creation and Darwin's Theory of Evolution.

Did I read that correctly?

A: It appears that you have, yes.

Q: Do you recall Mr. Buckingham ever making that statement?

A: No, I do not. If he made it, I don't recall that he made it. Plus I had to be at the meeting, and I'm not sure if I was.

Q: Did Mr. Buckingham ever say anything similar to

that statement?

A: Not to my knowledge.

Q: Skipping down two paragraphs, does this paragraph read: This country wasn't founded on Muslim beliefs or evolution," he said. This country was founded on Christianity, and our students should be taught as such"?

A: Does it read that?

Q: Yes.

A: Yes, of course.

Q: Do you recall Mr. Buckingham ever making that statement?

A: No, I don't recall that.

Q: Do you recall Mr. Buckingham ever making a statement similar to that?

A: Not to my knowledge.

Q: Do you recall any School Board member making a statement similar to that?

A: No, I don't, no. Not to the best of my knowledge.

Q: Skipping to the article entitled Book Is Focus of More Debate.

A: Okay. Go ahead.

Q: Does the third paragraph state: Nowhere in the Constitution does it call for a separation of

Church and state?

A: Yes, that is what it says.

Q: Do you recall Mr. Buckingham making a statement similar to that?

A: No, I don't recall that.

Q: Do you recall any School Board member making a statement similar to that?

A: No, I don't recall anything like that being said. Just one quick thing. I had to be there probably. I did not necessarily attend every meeting.

Q: I understand. Skipping to the sixth paragraph.

A: I'm sorry. What is that?

MR. GILLEN: Would you like us to take a moment or two, Joe?

(The deposition was concluded 11:39 a.m.)

COMMONWEALTH OF PENNSYLVANIA :

COUNTY OF CUMBERLAND :

I, Vicki L. Fox, Reporter and Notary Public in and for the Commonwealth of Pennsylvania and County of Cumberland, do hereby certify that the foregoing testimony was taken before me at the time and place hereinbefore set forth, and that it is the testimony of:

DONALD BONSELL

I further certify that said witness was by me duly sworn to testify the whole and complete truth in said cause; that the testimony then given was reported by me stenographically, and subsequently transcribed under my direction and supervision; and that the foregoing is a full, true and correct transcript of my original shorthand notes.

I further certify that I am not counsel for nor related to any of the parties to the foregoing cause, nor employed by them or their attorneys, and am not interested in the subject matter or outcome thereof.

Dated at Camp Hill, Pennsylvania, this 24th day of March, 2005.

Vicki L. Fox
Reporter - Notary Public

(The foregoing certification does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.)

COMMONWEALTH OF PENNSYLVANIA :
: ss.
COUNTY OF CUMBERLAND :

I, Vicki L. Fox, Reporter and Notary Public in and for the Commonwealth of Pennsylvania and the County of Cumberland, do hereby certify that the foregoing is the testimony of:

Donald Bonsell

I further certify that said witness was by me duly sworn to testify the whole and complete truth in said cause; that the testimony then given was reported by me stenographically, and subsequently transcribed under my direction and supervision; and that the foregoing is a full, true and correct transcript of my original shorthand notes.

I further certify that the transcript was submitted to the deponent either by counsel or through our office and was available to be reviewed after March 28, 2005 for a period of approximately 30 days. Included with the transcript was a certificate-correction form, instructions for reading and signing said form, and a stamped self-addressed envelope.

As of this date, the aforementioned certificate-correction form has not been returned to our office for inclusion with the original transcript.

Dated at Camp Hill, Pennsylvania this 28th day of April, 2005.

Vicki Fox
Reporter - Notary Public

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Vicki L. Fox, Notary Public
Camp Hill Boro, Cumberland County
My Commission Expires Apr. 1, 2008
Member, Pennsylvania Association Of Notaries

Lawyer's Notes

## $

$125.00 34:9, 14, 18
$200.00 35:2
$700.00 34:10

## 1

11:39 49:16
14 45:20
15 45:22
17315 6:16
18 19:16
18th 19:4, 9; 24:2
19 7:8
1956 7:16
1979 6:18, 22

## 2

20 36:15, 15
2004 19:4, 9, 16; 24:2; 45:10, 11, 20, 22
22 45:23

## 3

32 22:17, 20; 24:23; 25:23, 25; 29:17
33 41:9, 11
34 45:13, 16

## 5

5011 6:16

## 6

60 36:14; 41:25
67 6:24

## 7

79 6:18

## A

a.m 49:16
able 23:23; 25:8
According 25:20
achieve 13:24
acquired 39:21
actual 42:6
actually 8:10
ad 42:4
adamant 17:23; 18:6
add 22:1
address 6:15
adhere 21:16; 22:13
advertised 14:24
Again 11:9; 15:20; 21:22; 22:7; 24:21; 25:13; 26:1; 27:13, 18; 32:16; 40:4, 16; 41:17; 44:21
against 34:3
ago 3:13; 10:2
agree 22:11; 30:5
agreed 44:15
ah-huh 4:13
ahead 6:25; 46:2; 48:23
aid 5:3
Alan 12:18, 21, 22, 24; 14:8, 12, 19; 16:5, 8, 16; 17:1; 19:21, 24; 20:2; 21:1, 6, 20; 22:4; 26:8, 14, 16, 19; 27:22, 25; 28:4; 29:3; 31:15; 37:18; 38:7, 20, 24, 25; 39:6
Alan's 15:19, 22
always 16:21; 22:11, 11; 32:24, 25; 46:14
Angie 27:6
announced 38:14
announcement 40:17
answered 11:25
apiece 34:10; 36:15, 16
apologize 37:17
apparently 25:20; 35:2; 37:4
appears 23:10; 47:19
approach 20:17
approximately 6:20; 7:13, 24; 10:2; 14:13; 17:15
April 6:18
Area 3:16, 17; 5:23, 24; 7:6; 15:21; 23:6
around 36:14; 39:22; 40:4
arrange 6:12
arrive 43:21
arrived 43:24; 44:24
article 45:18, 20; 47:9; 48:21
assume 4:24; 5:10
assumption 16:12; 29:5; 39:19; 45:5
attempted 33:25; 34:6
attend 7:17; 17:11; 30:19; 45:9; 49:10
attended 7:18, 18; 8:2; 17:5, 12; 19:3, 14; 30:21
attention 24:21; 29:16; 46:13; 47:8
attorney 11:3
available 9:1; 28:17, 20; 44:2
aware 9:5; 23:13; 24:4, 24; 25:17; 26:4; 40:3, 13, 14
away 32:20

## B

back 32:16
background 4:5
balance 47:15
bankruptcy 34:12
Barrie 18:6, 9; 32:17, 18; 37:24
basically 7:19; 10:10; 15:3; 19:1
become 9:5, 17; 18:24
beginning 4:18
begins 29:20
behalf 3:23
behind 29:15
beliefs 22:10; 48:5
best 31:1; 42:25; 48:19
big 16:3; 32:25
bill 42:6
Biological 6:4, 8; 30:1
Biology 23:6, 10; 26:17; 27:22, 25; 28:3, 7; 29:17; 47:14
Board 3:17; 5:24, 25; 12:25; 13:2, 10, 13, 15, 22, 25; 14:11, 20; 15:1, 19, 23; 17:8, 11, 12; 18:7, 16, 23; 19:2, 13; 24:3, 10; 25:4, 10, 13, 18, 22; 26:5, 9, 12, 24; 28:8, 11; 29:3, 11; 30:21, 25; 31:13; 32:17, 18; 33:10, 15, 16; 35:1, 10, 13; 38:7; 40:15; 43:25; 44:17, 17; 45:9; 47:12, 13; 48:17; 49:6
Boards 21:23; 23:6
BONSELL 3:8; 12:22
book 6:3, 7; 29:25; 30:12, 16, 24; 31:6; 32:10; 41:21; 43:1, 2; 45:21; 46:6; 47:14; 48:21
book's 42:24; 43:3
books 33:6; 35:14, 16, 22, 25; 36:15; 37:4, 22; 38:13, 16; 39:1, 1; 41:25; 42:3, 9, 15, 22, 23; 43:16, 23; 44:4, 9, 12, 14, 16, 23, 23; 45:3
bother 14:15
bought 6:22
boundaries 7:12
box 37:12, 14, 16
brand 34:10
break 6:11; 24:15; 32:2; 38:11
bring 5:5; 21:23; 27:19
brought 31:10; 33:17
Brown 27:17
Buckingham 27:2; 35:19, 21; 36:3, 7, 17, 25; 37:8; 39:16; 47:13, 20, 25; 48:11, 14; 49:3
burden 38:6
business 16:24
buy 33:5
buying 37:3
bypassing 21:17

## C

call 9:13; 42:3, 8; 48:25
Callahan 18:6; 32:17, 18; 37:24
Callahan's 18:9
called 3:8; 7:12; 10:9; 41:4, 23
came 32:20; 35:20; 37:6, 24; 43:19; 44:8
campaign 14:19, 23; 15:19, 22
can 4:16; 6:12; 9:12; 13:14; 14:22; 24:15; 27:19; 31:16; 33:1; 34:5; 38:5; 41:6
canceled 35:4
capacity 3:19
captioned 3:15
card 41:5, 23
care 38:13, 16
Carol 27:17
carry 20:10
case 3:15, 21; 14:4; 22:12; 37:15; 40:9
Catalog 41:12
Center 11:4
Central 6:4, 8; 29:25
certain 12:5; 22:9; 47:1
certainly 30:2, 6
certification 3:3
chance 29:1
changes 26:17
charity 40:5
check 15:15; 35:4; 36:5; 37:4, 7
checks 37:11
child 16:18, 18
children 13:16
Christian 47:16
Christianity 48:6
Church 49:1
City 7:11
civic 13:17
clear 46:18
clearly 4:14
Cleaver 27:8
clip 45:25
close 7:10
closed 29:15
coincide 22:11
college 7:17, 18, 18, 19, 25
coming 11:16, 23; 12:8; 13:4; 14:12; 20:24
common 16:23
communicate 16:20; 37:18
communicated 9:23; 13:12; 16:5, 7; 17:1
communications 11:20
community 15:3, 4; 33:12
completed 8:3
complies 29:21
conceivable 42:11
concentrate 9:3
concentrating 8:25
concerned 13:15; 22:6; 32:22
concluded 49:16
conduct 18:21
confidential 11:21
confrontational 18:7, 25
Constitution 48:25
contact 9:24, 24; 10:1
contacted 9:25
content 17:20; 20:25; 21:6; 22:3
context 28:18
Continued 46:4
Continues 45:19; 47:10
contribute 13:18; 35:11, 21
contributed 36:18
Controversy 45:19; 46:4; 47:10
conversation 20:4; 30:18; 44:11
conversations 16:16, 21; 31:9
coolers 34:2
copies 31:17, 24; 39:17, 25; 45:18
copy 15:7
correctly 23:9; 47:18
cost 32:21
costs 16:2
counsel 9:6; 10:14
country 48:4, 6
course 9:4; 34:21; 48:10
court 3:22, 24; 4:10
covered 46:17
creation 47:16
Creationism 16:6, 9, 16
credit 41:5, 23
current 26:23; 28:7
currently 12:24
curriculum 14:9; 15:18, 21; 19:11; 21:13; 23:7, 1[illegible] 26:17, 20, 23; 27:2; 29:1[illegible]
cut 4:19

## D

dad 38:17
Daily 45:18, 21; 46:24; 47:3
Darwin's 23:14; 24:5, [illegible] 47:16

date 10:3; 19:9; 26:3; 31:3
dated 45:20, 22
dates 17:15, 19; 19:6, 18; 26:1; 45:24
daughter 7:2, 4
daughter-in-law 7:3
days 10:2
Debate 45:22; 46:7; 48:22
December 13:5
degree 8:4
deliver 44:20
delivered 43:19, 20; 45:2
deposed 3:18; 4:1; 10:11, 14
deposition 4:6; 5:22; 10:5; 11:12, 16; 12:9, 16, 19; 30:8; 49:16
described 30:7
Design 17:2, 4, 5, 13, 21; 18:10, 15, 17; 19:3, 10, 15; 23:2, 16; 24:7; 25:1, 11, 19; 26:6, 10, 13; 28:12, 22; 29:4; 30:23; 31:19; 32:10
detail 22:23
details 42:12
dialogue 20:6
difference 36:8
different 4:3; 16:22; 17:25
direct 24:21; 29:16; 47:8
directed 23:1
directly 8:11
Directors 3:17; 5:25; 23:6
disagreed 18:12
disclosed 11:22
discuss 10:16, 19; 14:8; 22:5; 25:9; 26:8, 12; 36:24; 37:5
discussed 13:21, 24; 17:13; 19:4, 15, 20, 23; 20:1; 21:19; 22:8; 26:16, 19, 22; 27:1, 21, 24; 28:2, 6; 29:15; 31:15; 40:2
discussing 17:6
discussion 17:21, 24; 18:1; 22:4; 41:8; 44:13
discussions 21:1, 6
dissecting 21:17
distributor 34:1
District 3:16, 17; 5:23, 24; 7:14; 29:20; 35:7; 40:22
divide 36:6
Doctor 23:1
document 11:18; 22:20, 23; 23:5, 24; 25:5; 41:1, 2; 42:5
documents 8:3; 11:15; 46:1, 9
dollar 36:20
dollars 32:23; 36:13, 15, 16, 19
Don 3:12; 22:20; 24:21; 30:12; 32:9; 33:23; 41:11; 45:17
DONALD 3:8
donate 31:17, 24; 32:12; 33:25; 35:14; 38:9
donated 33:10, 14, 16, 24; 35:6, 8
donating 39:17, 25; 40:8, 19
donation 35:17, 18, 19; 36:24; 37:19; 39:23
donations 40:5
door 37:16
doors 29:15
Dover 3:16, 17; 5:23, 24; 6:16, 17; 7:6, 14; 13:17; 15:21; 23:6; 24:10
down 48:3
Dr 22:22, 24
drop 37:11, 13
due 20:6; 23:23; 38:22
duly 3:9
during 18:1; 32:15
duties 4:2

## E

ear 5:2
ease 38:5
effect 10:15
efforts 13:18
eight 6:20; 7:13
either 37:9, 15; 38:11
else 8:24; 10:16; 18:2; 33:24; 35:5, 6; 37:6; 38:18; 40:5; 41:20
employes 40:22
encourage 21:17
end 22:24
ending 13:3
enough 14:16; 46:21, 22
entered 44:11
entirely 46:18
entitled 11:21, 22; 41:12; 45:19, 21; 46:3, 6; 47:9; 48:21
especially 20:17
Ethics 30:4; 43:11, 14
evaluate 29:1
even 17:15
evening 12:10
event 32:15
events 12:13
everybody 18:2; 39:23
everyday 8:19
evolution 23:15; 24:5, 25; 47:17; 48:5
ex 32:17
exact 36:21
exactly 31:2; 41:3
examined 3:9
example 11:15
examples 16:25
except 3:5; 34:16
Excuse 5:1; 31:19
Exhibit 22:17, 19; 24:23; 25:23, 25; 29:17; 41:9, 11; 45:13, 15
exists 15:12
expect 4:7
expensive 34:3
expert 30:15
expressed 21:20

## F

fabulous 7:5
fact 10:17; 11:13; 13:20; 14:2; 18:11; 20:7; 22:22, 24; 23:23; 27:13; 29:7; 33:3; 37:21; 38:23
fair 40:6; 46:21
fairly 34:3
familiar 16:4; 17:4; 25:8; 43:15
family 20:5
fanfare 33:22; 38:13
far 3:20; 4:1; 13:23; 14:14; 15:24; 21:8; 22:6; 28:16, 17, 22; 30:5; 41:22; 43:2, 18, 22, 25
FARBER 3:11, 12; 9:16; 11:1; 12:2, 7; 15:9, 16, 17; 22:18; 24:16, 20; 29:23; 30:3, 9, 11; 31:23; 32:3, 8; 41:10; 45:14; 46:21, 23
farm 6:22
father 16:22; 22:2
favor 38:20, 25; 39:9, 13
federal 8:17; 21:15
feel 6:11; 21:9
few 23:3
field 8:21, 24
fields 9:1
filing 3:4
find 39:16; 41:19; 42:8, 15
fine 4:21; 6:10, 13; 29:22; 32:11; 33:6; 47:7
firm 9:15
first 9:23; 10:18; 23:12; 24:12, 12, 22; 30:24; 31:6, 12; 33:8; 44:17
fits 34:3
focus 15:25; 16:1; 22:9; 27:20; 45:21; 46:6; 48:21
folks 18:19; 37:11
follows 3:10
form 3:5
former 26:23; 28:7
forth 16:24; 18:4, 22; 20:18; 35:9; 38:2; 42:1; 44:12
forward 32:20; 37:24
found 42:17
Foundation 30:3; 43:11, 13
founded 48:4, 6
four 13:4, 8; 14:11, 13
fourth 13:3; 29:16
Frankly 15:14; 44:22
free 6:12
front 37:12
full 4:18; 15:25
fully 4:22

## G

gaps/problems 23:13; 24:4, 24
gave 35:24; 36:3, 5; 37:4; 41:4
Geesey 27:10
general 16:21; 20:25; 21:4, 6
generalities 20:3; 21:21; 22:3, 6
gift 33:18
Gillen 4:11; 9:9, 10, 12, 12, 14, 14; 10:23; 11:19; 12:4; 15:11; 24:15, 17; 30:2, 5, 10; 31:20; 32:4; 41:6; 46:16, 22; 49:14
Given 19:13; 43:25
giving 28:23; 47:5
glance 46:12
goal 13:23; 14:5
goals 13:21; 14:2, 6, 8
good 28:15; 46:22
government 21:15; 22:14
graduate 7:15, 25
graduated 7:7
grandchildren 7:4
grounds 34:22
group 14:2, 3
group's 15:3
Grove 6:16
guess 3:22; 5:19; 9:19; 29:10, 11; 34:25; 41:24

## H

handicap 34:1, 2
handicapped 34:4
handicaps 34:8
happy 33:11
Harkins 27:4
Harmony 6:16
head 4:13; 34:22
hear 21:22; 30:19, 22; 31:3, 9
heard 30:24; 31:12; 33:3
hearing 5:3; 32:24
hearsay 46:19
Heather 27:10
help 4:14; 10:22; 15:2; 38:5; 41:2
helped 33:9
helpful 4:20
helping 35:8; 42:14
helps 33:12
hereby 3:2
High 5:24; 7:7, 12, 15; 14:9; 15:18, 21; 26:17, 19, 22; 27:1, 21, 24; 28:2, 6; 31:17, 24; 32:12; 36:25; 39:14, 18; 40:1, 8, 19; 44:24; 45:3, 6
home 6:15, 21; 12:10; 21:24; 41:12
honestly 19:17; 25:7; 41:13
hoped 13:24
hours 34:7
house 43:21; 44:5, 9
hundred 20:9; 36:13, 18, 20

## I

idea 18:3; 28:15; 35:23; 44:10, 25
identified 34:23
identify 14:22
identifying 6:14
immaterial 19:18
importance 31:5
important 33:12
included 24:25
including 23:15; 24:6
indented 23:12; 24:12, 22
indicated 9:10
indiscriminately 37:11
individual 18:5
information 6:14; 39:21; 40:12; 42:13, 21
instructed 11:20
Intelligent 17:2, 4, 5, 13, 21; 18:10, 15, 16; 19:3, 10, 14; 23:2, 16; 24:6; 25:1, 11, 19; 26:6, 9, 13; 28:12, 22; 29:4; 30:23; 31:19; 32:10
interest 40:7, 19
interested 8:17; 29:11; 37:21; 39:17, 20, 25; 42:14, 19
into 19:10; 28:24; 34:14; 37:13; 38:21; 39:2, 9, 14; 44:11
introduce 22:19; 45:15
introducing 19:10
introduction 18:12, 14; 38:20; 39:1, 9, 14
issue 15:18, 22; 18:3, 25; 26:2
issues 16:22; 21:11; 32:25; 33:1

**J**

Jane 27:8
Jeff 27:17
job 7:21
Joe 3:12; 9:12; 11:19, 21, 22; 24:15; 46:16; 49:15
June 45:10, 11, 20, 22

**K**

Kitzmiller 3:16
knew 37:3
knowing 16:13
knowledge 8:14, 22; 26:11; 31:1; 38:10; 43:1, 2; 46:15; 48:2, 16, 20
knowledgeable 42:10
known 39:20

**L**

language 23:19; 24:1
large 33:17, 20
Larry 34:21
last 12:10; 17:17; 20:23; 47:12
Law 11:4; 21:10, 15
law-abiding 22:12
lawyer 9:17
learn 25:22; 30:16
letting 5:7
library 28:24
life 8:25; 23:16; 24:7; 25:2
likely 42:10
limited 23:15; 24:6; 25:1
listed 15:5
lived 6:17
location 34:7
long 6:17; 13:2; 42:21
look 11:17; 40:25; 46:25; 47:1
looked 34:22
looking 24:11; 42:6; 47:15
lot 7:19; 8:15, 16, 19, 19; 16:20, 23; 17:24; 20:4, 6; 35:8; 37:10; 46:12
loud 37:25
lumber 33:17

**M**

major 15:2; 35:10
makes 32:25
making 28:17, 20; 47:20; 48:11, 14, 17; 49:3, 6
man 16:18; 22:12; 34:11
mandated 21:14
many 8:1, 1, 16, 18; 13:18; 15:5; 16:2, 10, 10, 17, 22, 22; 18:19; 20:17; 25:14; 37:10, 11
marked 22:17; 41:9; 45:13
married 7:1
materialistic 32:22
matter 36:22
matters 22:4
may 5:3; 11:19; 20:24; 29:15
mean 10:17; 16:19; 17:7; 18:14, 21; 22:10; 30:20
Meaning 18:16; 35:19; 40:14
medical 8:23; 9:1
meet 12:8
meeting 17:9; 20:9; 30:25; 32:16, 17, 19; 38:7; 47:12, 24; 49:11
meetings 14:17; 19:2, 14, 19; 25:14; 29:14, 14; 30:19, 20, 22; 45:9
member 13:15, 22, 25; 31:13; 33:16; 35:10; 44:18; 47:13; 48:17; 49:6
members 20:5; 26:23; 28:8; 40:18
memory 11:10; 27:14
mentality 35:3
mention 40:10
mentioned 31:6, 12, 13; 32:19; 38:12
merchandise 34:13
met 3:12; 10:17; 12:15
might 10:21; 21:1; 41:2
miles 6:21; 7:13
minded 13:17
minute 5:1; 32:2
mistaken 40:16
moment 3:13; 29:19; 32:1; 49:15
Monday's 47:12
money 16:2; 32:21; 35:21, 24, 25; 36:3; 37:6
month 17:10
months 17:17
more 8:23; 11:4; 22:21; 45:22; 46:6; 48:22
most 7:19; 30:2; 42:10
Mostly 35:9
mother 33:5
motivation 33:2
move 6:19
moved 6:18
much 8:17; 13:14; 32:22; 34:17; 36:17; 42:14; 46:11, 13
Muise 10:22; 11:2
Muslim 48:5
myself 23:21; 44:20

**N**

name 3:12; 9:15; 18:5
nature 35:12
necessarily 14:7; 49:10
necessary 23:4
need 6:11
needed 7:20
new 34:10, 12; 47:14
newspaper 46:20
newspapers 8:18; 46:12
night 7:23; 20:8
Nilsen 22:22, 25
nine 14:2
no's 11:9
nods 4:12
Noel 27:12
Normally 37:13
notification 9:18
Nowhere 48:24
number 36:21; 41:5

**O**

objection 46:19
objections 3:4
objectives 14:8
Obviously 8:15; 12:23; 13:14; 18:11; 29:10; 30:18; 34:24; 36:9; 37:2; 40:2, 11, 13; 44:15
occasionally 46:25
occasions 5:4
occurred 32:15
October 19:4, 8, 16; 24:2
odd 36:13
off 4:19; 7:24; 33:6; 37:11; 41:6
off-the-record 41:8
offer 10:4; 38:15
offers 47:15
official 3:19; 4:2
often 16:19
old 6:23
older 8:25; 9:4
one 3:21, 21; 4:16; 5:1, 3; 7:2; 11:17; 13:19; 14:1; 17:9; 19:17; 32:15; 33:25; 34:7; 35:17; 42:17, 18; 46:3; 47:15; 49:9
only 3:25; 4:16, 22; 5:19; 23:2; 25:14; 34:17; 35:23; 47:1
openly 18:17
opinion 16:4; 28:16
orally 4:12
order 40:24; 41:20, 20; 42:3, 8, 15
ordered 41:22, 24; 42:22, 23; 43:16
ordering 44:14
Origin 6:5, 8; 44:25
originated 35:25
Origins 23:16; 24:7; 25:2; 30:1
others 35:15; 47:14
ourselves 35:16
out 9:5; 14:24; 20:19; 25:15; 34:12, 25; 35:1; 37:2; 39:16; 41:19; 42:8, 15, 17
outer 7:11
outset 30:7
outside 20:5
Over 16:11; 20:8; 33:21
overall 15:25
own 8:7; 14:17, 25; 18:3

**P**

PA 6:16
page 24:12; 41:16; 45:23, 23
paid 34:19; 35:16; 36:10, 12
Pandas 6:3, 5, 7, 9; 29:24, 25; 30:12, 16, 22, 24; 31:6, 12, 15, 17, 21, 24; 32:9, 12; 36:4, 6, 12, 24; 37:19; 38:9, 20; 39:1, 9, 14, 17; 40:1, 8, 19, 24; 41:20; 43:10, 16; 44:23
paper 45:25
paragraph 23:12; 24:12, 22; 29:17, 19, 24; 47:9, 11; 48:4, 24; 49:12
paragraphs 48:3
part 31:8; 32:23; 47:13
participate 25:5
particular 8:13, 22; 10:20; 17:22; 18:5; 21:10, 13; 32:16; 34:7, 16; 37:15
particulars 28:9; 44:3
parties 3:3
parts 25:6
party 43:1; 45:8
passage 25:3; 28:13
passed 19:11; 24:2, 10; 25:4, 18, 22, 24; 26:5
passing 25:10
Pat 9:12, 13, 14, 17; 10:21; 12:8, 12, 16; 15:9; 29:23
pay 46:13
paying 35:22
payment 36:6
People 6:4, 7; 7:5; 17:25; 18:18; 20:5, 6, 9, 17; 29:24, 25; 30:13, 17, 25; 31:7; 32:10; 40:4
per 8:4, 9; 46:10
perhaps 21:21; 28:23; 29:1
period 16:11
person 4:16; 10:18; 18:5
personal 8:8; 14:25; 21:3, 8, 8; 28:16; 29:13
personally 10:18; 14:11; 21:5, 9; 30:14; 36:1; 38:24; 43:17
personnel 29:14
pertaining 8:16; 25:13; 43:8
pick 44:4, 8
picked 44:16
place 19:20, 23, 25; 21:2, 7; 45:6
plaintiffs 3:15; 22:17, 19; 24:22; 25:23, 25; 29:17; 41:9, 11; 45:13, 15
plate 14:16
Please 4:22; 5:15, 18; 6:6, 11; 15:16; 29:19; 32:1
Plus 14:16; 47:23
point 44:25
porch 37:13
portions 25:6
position 14:19; 18:9; 20:7, 10, 11, 13, 16, 20; 22:15, 15; 35:13
positions 4:3
positive 37:9; 39:12
possible 33:13
possibly 33:1
potential 26:8, 16
predicate 14:1
predicated 7:20; 11:9; 15:1
premised 27:13
preparation 12:19
prepare 11:11; 12:16
presenting 29:12
presently 20:21, 22
President 40:15
Press 23:7, 10; 29:18
pretty 22:9
previous 20:15; 34:25
price 36:11
primary 20:24
prior 11:23; 13:6; 14:12, 13
privilege 22:2
privy 29:12, 13
probably 8:23; 16:12, 12, 17:17; 23:22; 31:2; 36:9, 20; 38:11; 49:10
problem 5:2; 21:12
process 4:6
produced 15:10, 13
proper 20:1; 21:2
properties 37:10
proud 13:20
prove 35:5
public 30:25
Published 30:3
publisher 42:24; 43:4, 5, 7, 8, 10
pulled 33:20

purchase 35:5, 24; 36:4
purchased 34:1, 8
purchasing 37:22
purposes 10:4, 7
pursued 43:7
pursuing 42:20
put 28:24
putting 28:17

Q

quick 49:9
quite 18:24
quotation 39:6
quote 23:22; 39:5

R

ran 13:12
range 36:20
rare 5:4
rarely 21:23
rarity 14:15
rather 9:15
read 8:15, 16, 19; 23:9; 24:13; 29:19; 30:14; 43:1; 46:24, 25; 47:18; 48:4, 8
reading 8:15, 20; 25:23, 25
readings 8:8
reads 24:23
really 8:7; 10:17; 11:14; 13:19, 20; 16:14; 17:3, 18; 19:18; 22:23; 25:7; 30:14; 36:21; 39:11; 42:19; 44:6, 10, 19; 45:5, 11; 46:10, 13
reason 8:12
reasoning 8:11
reasons 14:25
recall 10:3; 15:6; 16:15; 17:18, 20; 18:8, 13; 19:2, 6, 18; 20:3, 25; 21:5; 22:7, 8; 25:12, 12, 21; 26:1, 7, 15, 18, 25; 27:5; 28:9, 11; 31:2, 8, 11, 14, 16; 36:11, 17, 21; 37:16; 38:17, 19; 40:21, 23; 41:3, 13, 18; 42:5, 12, 18; 43:18; 44:7, 19; 45:2, 7, 12; 46:11; 47:20, 22; 48:11, 13, 14, 17; 49:3, 5, 6, 8
receipt 36:10
receive 37:7
received 29:20
recess 24:18, 19; 32:5, 6
recognize 22:20, 21; 23:19, 20; 24:1, 8, 9; 25:3; 41:11; 46:9, 10
recognizing 25:6
recollection 12:13; 18:10, 11; 19:8; 27:19; 40:6; 43:9
record 4:10, 14, 16; 9:9; 29:8; 41:6; 45:19, 21; 46:16, 24; 47:4
reelection 18:24; 20:23
Reeser 34:21
refer 5:22; 6:3, 7; 7:3
reference 30:6
referring 12:22; 20:12; 28:21; 31:20
refers 29:24
reflect 9:9
refresh 12:13; 19:8; 43:9
refreshing 23:21
refused 34:19
regarding 16:1, 10; 18:3, 7, 19, 25; 19:1; 20:18; 26:2; 28:12; 29:6; 37:25
reimbursed 34:18
related 14:9; 25:11; 26:9, 13
relating 25:18; 26:5; 29:4
relationship 10:24
relatively 7:10
Release 23:7, 11; 29:18
religion 19:20, 23; 20:2; 21:2, 7
remember 3:20, 20; 17:15, 22; 19:13; 22:21; 25:10; 37:20; 41:15; 44:1
remove 45:25
rental 37:10
repeat 5:4; 6:6
repeating 23:2
rephrase 5:16
reply 38:24
reporter 4:10, 14, 16
reports 46:20
represent 3:15; 9:19; 10:4, 13; 11:3; 32:9; 43:10; 45:17
represented 9:6
represents 9:8, 19, 20
request 9:18
requested 15:14
reserved 3:6
resident 17:22
resolution 19:9; 24:2, 9; 25:4, 11, 18, 23, 24; 26:5, 9, 12; 28:12; 29:4, 9
respect 16:7; 26:20; 28:14
respective 3:3
respond 38:22; 39:4
response 20:15; 21:4; 38:15; 39:3, 15
responsibility 21:25; 22:1
responsible 38:2
review 11:15
Richard 11:6
right 12:21; 13:3; 15:12; 32:20; 36:14; 47:5
Road 6:16
Robert 10:22; 11:2
role 20:1
Ron 11:8
room 17:24
roost 21:24
rules 22:13
run 13:10
running 14:25

S

sale 34:12
same 39:3, 15; 41:17
sanctioned 44:15
saw 22:22; 28:18
saying 4:13, 15; 22:5; 25:20
School 3:16, 17; 5:23, 23, 24, 25; 7:7, 13, 14, 15, 23; 8:10; 9:20; 12:25; 13:2, 10, 13, 15, 19, 22, 25; 14:9, 20; 15:1, 18, 19, 21, 22; 16:1; 17:8, 11, 12; 18:23; 19:1, 2; 22:13; 24:3, 10; 25:4, 10, 18, 22; 26:4, 9, 12, 17, 20, 22, 24; 27:1, 22, 25; 28:3, 7, 8, 11; 29:3; 30:21, 25; 31:13, 18, 25; 32:12, 21; 33:9, 9, 10, 11, 15, 16; 34:14, 25; 35:7, 9, 13; 36:25; 38:1, 1, 7, 21; 39:2, 10, 14, 18; 40:1, 8, 20, 22; 44:17, 17, 24; 45:4, 6, 9; 47:12; 48:17; 49:6
schools 7:6; 13:17; 19:21, 24; 20:2; 21:2, 7
science 8:21, 23; 41:12
scientific 8:5, 12, 13
screen 37:16
se 8:4, 9; 46:10
sealing 3:3
search 47:14
second 41:7, 16; 47:8, 11
seeing 41:13, 15, 18
segments 47:2
selection 27:21, 24; 28:2, 6
self 21:9
seminars 8:1
sense 8:7, 9; 9:22; 11:17; 23:20; 28:22; 32:23; 35:19; 37:1; 46:25
sentences 23:3
separate 46:1
separation 48:25
seriously 22:16
serve 12:24
served 13:2; 14:11; 32:18
service 15:4
serving 20:21, 23
sessions 17:6, 7, 12, 16
seven 33:25; 34:1; 36:20
several 31:10
shaking 4:13
sheet 14:24; 15:7, 10, 11, 13
sheets 8:2, 2
Sheila 27:4
Shiloh 6:20
shipped 43:17
shop 14:14; 33:18, 22
showed 12:12
similar 47:25; 48:15, 18; 49:4, 7
simply 26:21; 27:18; 36:8; 41:4; 44:21
Sitting 25:17
six 6:20; 20:22
sixth 20:21, 21; 49:12
Skipping 48:3, 21; 49:12
skirts 7:11
slip 34:14, 19
soft 5:5
sold 6:21
somebody 37:3; 39:5; 42:10; 45:7
someone 41:20; 44:4, 8
someplace 42:13; 45:6
sometime 17:18
sometimes 14:17
son 7:2, 6; 12:18, 24; 16:18, 23; 22:9; 33:5; 39:20, 24; 40:11; 42:11
sorry 6:24; 9:11, 14; 10:24; 19:6, 22; 20:14; 27:23; 32:7; 41:18, 19; 45:24; 49:13
sort 46:17
speak 29:8; 40:18
speaking 4:17; 22:25
specific 8:11; 18:4; 22:21; 23:25; 24:11; 26:1, 3; 28:5; 37:20; 41:15; 46:15
specifically 16:13, 25; 17:3; 20:3; 21:21; 29:6; 42:1
specifics 10:19; 16:15; 26:25; 42:5
speculate 5:19; 19:7
spent 34:6, 17; 35:1
spoke 9:23; 11:23
spoken 10:21; 11:2, 6, 8; 12:15, 18; 16:8, 10
stainless 34:13
stapled 46:1
start 8:24, 25
state 8:17; 21:14; 22:14; 48:24; 49:1
statement 37:25; 47:21; 48:1, 12, 15, 18; 49:3, 7
statements 46:20
states 21:10
steel 34:13
stipulate 29:23
stipulated 3:2
STIPULATION 3:1; 46:18
Students 23:13; 24:4, 23; 28:23; 48:7
study 22:23
style 34:2
subject 14:18
subjects 16:11; 20:18; 21:10
subscription 47:3, 6
succeed 7:21
successfully 8:3
sued 3:22
Supervisor 17:9; 20:10, 12, 20
supported 28:11; 29:3, 9, 10
Sure 3:14; 4:8; 5:8, 12, 14, 17; 6:2; 8:15; 11:11; 14:4, 5; 22:15; 24:16, 17; 31:10; 32:3, 4; 36:11; 38:10; 39:12; 40:25; 44:2; 47:24
swearing 4:1
sworn 3:9
system 9:20; 32:21; 33:9; 34:14

T

table 33:7
talk 16:17
talked 16:13
talking 14:14; 18:17
taught 21:11; 23:17; 24:7; 25:2; 48:7
taxpayer's 16:2
taxpayers 38:6
teach 23:2
teachers 23:1
Technically 13:4
telling 39:22; 40:4; 44:22
tempo 5:5
ten 7:23, 24; 10:2
tenant 3:21
tendency 9:4
term 10:11; 20:22
terms 13:6, 8
terrible 31:4
terribly 16:19
testified 3:9, 23, 24
Textbook 45:19; 46:3; 47:9
textbooks 27:22, 25; 28:3
texts 28:7
Thanks 30:9; 33:23
theme 15:4, 18, 22; 16:3
themes 14:22
theories 23:14; 24:5, 25
Theory 23:14; 24:5, 2[illegible]; 47:16
therein 46:20
thinking 9:15; 14:18

third 48:24
Thomas 11:4
Thompson 11:6
though 10:20
Thought 43:11, 14
thoughts 29:7; 30:4
three 8:18
Throughout 5:22
times 16:17; 20:17; 25:14; 26:1; 31:10; 37:10, 12
title 23:5
today 4:7; 9:6, 22; 25:17; 26:4
today's 11:12, 16; 12:9
together 14:4
told 37:21; 39:20; 40:2
took 33:21; 34:13
top 23:5
topics 21:22
totally 40:3
towards 35:21, 24; 36:3, 18
Township 4:4; 17:9; 20:10, 12, 18, 20
trailer 33:20
training 8:6, 9
treat 34:15
trial 3:6
truck 33:21
truckload 33:17
true 25:21; 31:2
truth 4:2
try 4:19; 17:10
trying 22:7
Turo 11:8
twelve 34:7; 36:13, 18
two 7:4; 13:16; 17:17; 32:2; 42:17; 46:1; 48:3; 49:15

U

understands 24:17
understood 4:24; 5:11
unloaded 33:19, 22
up 5:5; 20:24; 31:10; 34:8; 36:8; 38:17; 40:12; 44:4, 9, 16
update 14:17
use 21:8; 34:5; 37:12
used 18:22
usually 17:10; 37:12; 47:1

V

vehicle 43:19
verbatim 16:14; 22:8
views 21:19; 47:16
voice 5:4
volunteer 37:2
volunteered 37:1; 47:6
vs 3:16

W

waiting 34:7
waived 3:4
wall 34:4
wants 13:17
warehouse 34:11
water 34:2
way 9:22; 19:17; 21:11; 34:4; 37:18; 38:4, 5; 41:24; 44:22
wearing 5:2
week 10:2
welcome 30:10
Wenrich 27:12
West 7:7, 10, 12
what's 9:1, 5
wheelchairs 34:5
Whenever 30:21
wherever 33:13; 35:8
whole 14:3; 31:8
whomever 42:4
wife 9:3; 38:4; 40:2; 42:2, 15, 22; 44:8
William 27:2; 47:13
win 18:23
within 17:24
without 4:12; 33:22; 42:6
witness 3:8; 29:21
wooden 37:12
word 30:22; 43:12
words 45:1
work 7:19; 9:2; 14:4
worked 41:24
works 9:2
world 16:24
worth 34:9; 35:2
wrong 28:18

Y

year 13:3, 8; 20:21, 22, 23; 47:5
years 7:23, 24; 13:4; 14:12, 13; 16:11; 20:22
yesterday 10:18
York 7:7, 10, 10, 11, 12; 45:18, 21; 46:24; 47:3

Z

Zeigler-Yingling 27:6