# APPENDIX I

# TAB E

# In The Matter Of:

*Tammy Kitzmiller, et al.   v.*
*Dover Area School District, et al.*

---

*Carol Brown*
*May 16, 2005*

---

*Filius & McLucas Reporting Service, Inc.*
*1427 East Market Street, York, PA*
*4309 Linglestown Road, Harrisburg, PA*

*(717) 845-6418   or   (717) 236-0623*

*Original File CB051605.TXT, 227 Pages*
*Min-U-Script® File ID: 1314878087*

**Word Index included with this Min-U-Script®**

Tammy Kitzmiller, et al.  v.
Dover Area School District, et al.

Carol Brown
May 16, 2005

Page 2

[1]        IN THE UNITED STATES DISTRICT COURT
           FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
[2]
[3] TAMMY KITZMILLER; et al., .
[4]     Plaintiffs  . CIVIL ACTION NO. 04-CV-2688
[5]        vs.
[6] DOVER AREA SCHOOL DISTRICT,.   (JUDGE JONES)
    et al.,
[7]
        Defendants    .
[8]
[9]
[10]  Deposition of            : CAROL BROWN
[11]  Taken by                 : Defendants
[12]  Date                     : May 16, 2005, 10:15 a.m.
[13]  Before                   : Vicki L. Fox, RMR,
             Reporter-Notary
[14]
[15]  Place                    : Two School Lane
                   Dover, Pennsylvania
[16] APPEARANCES:
[17]  PEPPER HAMILTON LLP
       BY:  THOMAS B. SCHMIDT, III, ESQUIRE
[18]
[19]       For - Plaintiffs
[20]  THOMAS MORE LAW CENTER
       BY:  PATRICK T. GILLEN, ESQUIRE
[21]       For - Defendants
[22]  ALSO PRESENT:  Sheila Harkins
              Alan Bonsell
[23]
[24]
[25]

Page 2

[1]            INDEX
[2]            WITNESS
[3] CAROL BROWN          Examination
[4]   By Mr. Gillen          3
[5]
[6]

           EXHIBITS
[7]
    C. Brown Deposition
[8] Exhibit Number          Page
[9] 1. Photocopy of diagram of seating chart.  129
[10] 2. Resignation Speech of Casey (Carol H.)  204
     Brown, Monday, October 18, 2004.
[11]
     3. Comments re: Pledge Issue.        204
[12]
     4. Treaty of Tripoli.           204
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 3

                    STIPULATION
[1]
[2] It is hereby stipulated by and between the
[3] respective parties that sealing, certification and filing
[4] are waived; and that all objections except as to the form
[5] of the question are reserved until the time of trial.
[6]
[7]     CAROL HONOR BROWN, called as a witness, being
[8] duly affirmed, was examined and testified, as follows:
[9]              BY MR. GILLEN:
[10]  Q:  Good morning, Mrs. Brown. My name is Patrick Gillen,
[11] and I am one of the attorneys for the defendants in this
[12] lawsuit. Actually, all of them, Dover Area School
[13] District and the School Board.
[14]     With me here today is Tom Schmidt who is an
[15] attorney for the plaintiffs.
[16]     As you know, this is the time set for your
[17] deposition which is simply the process by which I get to
[18] ask you questions under oath for the purpose of
[19] uncovering evidence in this lawsuit.
[20]     As I see it, I am just trying to get your side of
[21] the story. Plainly, we know there is a dispute here.
[22] That is what I am trying to do.
[23]     Lawyers are very familiar with this process, but
[24] frequently a person who is not, who is the witness, is
[25] not. So let me introduce you to a few of the

Carol Brown                                                 Tammy Kitzmiller, et al.   v.
May 16, 2005                                      Dover Area School District, et al.

---

**Page 4**

[1] idiosyncrasies of the process.

[2]     First, I will ask you questions, and you give me

[3] answers. Because Vicki is transcribing, it is necessary

[4] that your answers be verbal. So please make an effort

[5] to answer in words, not gestures. You will be surprised

[6] at how many times we say ah-huh or nod our heads.

[7]     Second, the process tends to lay bare just how

[8] imprecise human communication is. If you find my

[9] questions unclear, please let me know, and I will try

[10] and clarify.

[11]     By the same token, if I am having a difficulty

[12] understanding your answer, please bear me as I try and

[13] make sure I understand what you are saying.

[14]     It is not an endurance test. If you want to take

[15] a break, please feel free to do so. If at any point I

[16] ask you a question that makes you feel uncomfortable,

[17] let me know. I will do my best to try to address your

[18] sensitivity consistent with my duty to serve my clients

[19] in this matter.

[20]     I think that is all we need to know to begin.

[21] Have you been deposed before?

[22]     A: Yes, I have.

[23]     Q: Can you tell me when?

[24]     A: I can tell you the most recent instance.

[25]     Q: Okay. Please do.

**Page 5**

[1]     A: I can't give you names because it is an ongoing thing,

[2] but I have been deposed as regards an ongoing lawsuit

[3] involving the School District that would have been in

[4] 2004.

[5]     Q: So is it my understanding that you have given testimony

[6] in connection with this matter already?

[7]     A: No. Not sworn testimony. This was a separate — is a

[8] separate ongoing lawsuit in which the District is

[9] engaged.

[10]     Q: What is the nature of that litigation?

[11]     A: I am sorry, sir. I don't know if I can say that.

[12]     Q: What do you mean by that, you don't know if you can say

[13] that?

[14]     A: I'm not sure what I am allowed to disclose related to

[15] that. It is not in any way related to this.

[16]     Q: Okay. Has a lawsuit been filed?

[17]     A: I'm not sure if — there's a formal court date, but

[18] sworn depositions have been taken. In fact, Dr. Nilsen

[19] was also deposed in this instance — or in that

[20] instance.

[21]     Q: And again, Mrs. Brown, this is not a trick question. I

[22] just want to get a sense for what you are referring to.

[23] I take it that the School District is a party to that

[24] litigation?

[25]     A: Not a party in the sense of defendant or plaintiff, but

**Page 6**

[1] a party in terms of witness — witnessing and giving

[2] evidence related to it. It is a libel. That is why I

[3] said I am not sure what I can really say about it.

[4]     Q: Then I don't want to needlessly ask you any question

[5] that would make you uncomfortable. You say it is a

[6] libel suit.

[7]     I understand you are not sure whether it is

[8] pending. Do you know who the plaintiff is, the person

[9] who is making the complaint?

[10]     A: An employe of the School District.

[11]     Q: Let's leave that for now. Let me just ask you: It

[12] appears that your testimony was not taken in connection

[13] with this proceeding you are talking about now in the

[14] way it is here today; is that correct?

[15]     A: No. That is not correct.

[16]     Q: Your testimony has been taken in a deposition where a

[17] stenographer has recorded your answers?

[18]     A: That's correct, and with lawyers.

[19]     Q: I am going to set that aside for now.

[20]     A: Three sets of lawyers.

[21]     Q: All right. Please for the sake of beginning again,

[22] let's state your full name for the record.

[23]     A: My full name is Carol Honor Brown.

[24]     Q: And your current address?

[25]     A: 5401 Davidsburg Road, Pennsylvania 17315-4146.

**Page 7**

[1]     Q: Are you currently employed?

[2]     A: No.

[3]     Q: As we sit here today, how would you like me to address

[4] you for the purpose of the deposition?

[5]     A: Mrs. Brown will do. Thank you, sir.

[6]     Q: And feel free to call me Pat in the event you have any

[7] questions.

[8]     As we sit here today, are you on any medication

[9] that might impair your ability to perceive and respond

[10] to my questions?

[11]     A: Not that I'm aware of.

[12]     Q: That is good. How about any handicap? Do you have any

[13] difficulty with hearing or sight that might impair our

[14] ability to communicate today?

[15]     A: I am partially blind.

[16]     Q: Can you see me okay?

[17]     A: Yes, I can.

[18]     Q: If we look back over from January, 2003 to the present,

[19] has there been any time during that period where you

[20] have been on medication that has impaired your ability

[21] to perceive and recall?

[22]     A: Perceive only in the sense of vision.

[23]     Q: Okay. And during that period, have you been capable of

[24] seeing adequate to perceive?

[25]     A: Yes.

---

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Carol Brown
May 16, 2005

**Page 8**

[1]   Q: Have you been driving during that period?

[2]   A: Some of the time I can drive. Some of it, I cannot. I

[3] am limited to daytime. I am sorry. I should have been

[4] more specific.

[5]   Q: That is fine. Thanks. I just want to make sure there

[6] is no difficulty here today.

[7]   A: No.

[8]   Q: Would you give me just a sense for your educational

[9] background?

[10]   A: I have the equivalent of a master's in secondary

[11] education.

[12]   Q: Let's start at high school. Where did you go to high

[13] school?

[14]   A: York Suburban, among others.

[15]   Q: What were the others?

[16]   A: Good heavens. I would have to go back. York City would

[17] have been the most recent.

[18]   Q: And then you obviously had some college. Where did you

[19] go to college?

[20]   A: I went to Millersville State College then, Trenton State

[21] College and Rutgers State University, the University of

[22] Pennsylvania.

[23]   And I studied midwife. I took my midwife training

[24] at Columbia Presbyterian in New York City. I took Army

[25] medic training at Fort Monmouth, New Jersey.

**Page 9**

[1]   Q: Excellent. Where did you get your degree from?

[2]   A: Rutgers University. Also Trenton State College.

[3]   Q: And that is the state university of New Jersey?

[4]   A: Yes, it is. Both are.

[5]   Q: And did you graduate with a BS from Rutgers?

[6]   A: Yes, I did.

[7]   Q: And the degree was in what?

[8]   A: Secondary education. World languages to make it

[9] politically correct today.

[10]   Q: And your master's was also in secondary education?

[11]   A: Yes. I did not complete my master's because I didn't

[12] finish my thesis work.

[13]   Q: Was that also in —

[14]   A: Yes, it was.

[15]   Q: Science plainly figures in this dispute here. Would you

[16] give me some sense for the post secondary education you

[17] have had in the sciences?

[18]   A: By course name?

[19]   Q: Yeah. Just look at your college courses.

[20]   A: Physics, Environmental Sciences.

[21]   Q: How about Biology?

[22]   A: That would be part of the Environmental Sciences. As a

[23] humanities major, I didn't have to take a lot of hard

[24] science fortunately.

[25]   Q: I took geology. Apart from the courses you have

**Page 10**

[1] referenced, have you had any other sort of post

[2] secondary coursework in the sciences?

[3]   A: I am not sure if archeology is considered a science, but

[4] archeology.

[5]   Q: It is. When did you take a course in archeology?

[6]   A: I wasn't taking courses in archeology. I was part of

[7] archeological digs for two summers.

[8]   Q: When was that?

[9]   A: I do beg your pardon?

[10]   Q: When was that?

[11]   A: That was back in the '60's, '66 and '67. 1966, 1967,

[12] sorry.

[13]   Q: That is quite all right. Have you retained counsel to

[14] represent you in connection with this deposition?

[15]   A: No.

[16]   Q: Have you had retained counsel to represent you more

[17] generally in connection with this litigation?

[18]   A: No.

[19]   Q: I am just going to ask you a few questions about who you

[20] may have spoken to in preparation for coming here today.

[21] Tell me did you speak with anyone in preparation for

[22] coming here today for your deposition?

[23]   A: My husband and I met with members of the Pepper Hamilton

[24] firm yesterday.

[25]   Q: And was that meeting in Harrisburg?

**Page 11**

[1]   A: No, it was at our home.

[2]   Q: Who did you meet with?

[3]   A: Eric Rothschild, and I am sorry I have forgotten the

[4] other gentleman's name.

[5]   Q: Steve Harvey perhaps?

[6]   A: No.

[7]   MR. SCHMIDT: It may have been Chris Lowe.

[8]   A: It was indeed. Thank you very much.

[9]   MR. GILLEN: Thanks, Tom.

[10]                     BY MR. GILLEN:

[11]   Q: How long did you meet with Mr. Rothschild and Mr. Lowe?

[12]   A: Approximately two hours.

[13]   Q: What did you discuss?

[14]   A: A basic timeline of events related to this and

[15] information related to this, things my husband and I

[16] heard.

[17]   Q: As you sit here today, tell me what you told

[18] Mr. Rothschild and Mr. Lowe?

[19]   A: Two hours?

[20]   Q: To the best of your recollection, just give me a sense

[21] for the subject matters.

[22]   A: Basically, again, the introductions, much as you did.

[23] We asked them if they minded if we smoked because my

[24] husband and I are both smokers. That was the

[25] introduction. We indicated if it was a problem, we

Carol Brown
May 16, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 12

[1] wouldn't smoke.

[2]     I also asked them if either was allergic to cats

[3] because we have a house full of cats. Neither

[4] fortunately was.

[5]     As regards this situation, we went through the

[6] timeline basically month by month related to the

[7] meetings we attended, the things we saw and heard.

[8]     Also, as regards certain executive sessions

[9] related to items that were not on point to the purpose

[10] of the executive session thereby not breaking executive

[11] privilege.

[12]     Q: What were those matters that related to the executive

[13] session but —

[14]     A: There were comments made regarding this situation that

[15] were not related to the purpose for which the executive

[16] session — rather sessions were called.

[17]     Q: What specific matters — let me ask you: Do you have an

[18] understanding that you should not disclose matters which

[19] are the subject matter of executive session?

[20]     A: That is correct. That is why I am not being specific as

[21] to the subject matter. In particular when one discusses

[22] employe situation or student situations, that remains

[23] confidential or litigation. Also I believe

[24] negotiations.

[25]     Q: Do I understand you correctly, Ms. Brown, that these

Page 13

[1] matters you have just listed — employe situations,

[2] student affairs litigation and negotiations are matters

[3] that you did not discuss yesterday?

[4]     A: Absolutely.

[5]     Q: But you did discuss the subject matter of this lawsuit?

[6]     A: Yes.

[7]     Q: Did you discuss what was said about the subject matter

[8] of this lawsuit, by which I mean the biology text,

[9] biology curriculum, Intelligent Design and Evolutionary

[10] Theory with the attorneys yesterday?

[11]     A: Yes.

[12]     Q: Did you discuss matters even if they were discussed in

[13] executive session related to those topics?

[14]     A: Yes.

[15]     Q: Did they go through the newspaper with you?

[16]     A: I beg your pardon?

[17]     Q: Did they go through the newspapers with you?

[18]     A: In what sense?

[19]     Q: Ask you to comment on stories that were — that appeared

[20] in local papers concerning this dispute.

[21]     A: Yes.

[22]     Q: Can you recall any specific questions they asked you

[23] about specific quotes in the paper?

[24]     A: We were asked as to the accuracy of those quotes.

[25]     Q: What did you say?

Page 14

[1]     A: They were accurate.

[2]     Q: I imagine there will be substantial overlap between the

[3] questions. Let's see. Apart from the two attorneys I have

[4] have referenced, Mr. Rothschild and Mr. Lowe, have you

[5] spoken with anyone else in preparation for coming here

[6] with your deposition?

[7]     A: My husband.

[8]     Q: Is that Jeff Brown?

[9]     A: Jeffrey Allen Brown.

[10]     Q: Apart from those persons then, Mr. Brown and Mr.

[11] Rothschild and Mr. Lowe, have you spoken with anyone in

[12] preparation for coming here for this deposition?

[13]     A: No.

[14]     Q: Did you review any documents with Mr. Rothschild and Mr.

[15] Lowe other than the newspaper articles?

[16]     A: The materials I provided for you.

[17]     Q: And you are referencing the materials that you brought

[18] today in compliance with the subpoena?

[19]     A: Yes.

[20]     Q: Thank you. I think I know the answer, but just let me

[21] make sure. Did you speak with any of the other

[22] plaintiffs in preparation for coming here today?

[23]     A: Former or current?

[24]     Q: The plaintiffs, in other words people who have appeared

[25] and are complaining in this lawsuit. Did you speak with

Page 15

[1] any of them in preparation for your deposition?

[2]     A: My apologies. I misunderstood. I was thinking in terms

[3] of defendants, former or current. No, I did not.

[4]     Q: And that was the next question. Did you speak with any

[5] former Board members in preparation for your deposition?

[6]     A: Not in preparation per se, but we did speak with Mrs.

[7] Yingling yesterday unrelated to this. It just so

[8] happened that we spoke with her yesterday.

[9]     Q: So did you ask her about her deposition?

[10]     A: No.

[11]     Q: Apart from Ms. I didn't think link, any other former

[12] Board members?

[13]     A: No.

[14]     Q: How about the science teachers, did you speak with any

[15] of the science teachers in preparation with your

[16] deposition?

[17]     A: Not in many months.

[18]     Q: You say not in many months. When did you speak with any

[19] of the science teachers last?

[20]     A: Probably January or February of this year. And just a

[21] social setting of saying hello at meetings.

[22]     Q: And at meetings, do you mean meetings of the School

[23] Board?

[24]     A: My apologies for not being precise. The School Board

[25] meetings which I attended as a civilian.

Min-U-Script®    Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

<div align="right">Carol Brown
May 16, 2005</div>

**Page 16**

[1] Q: That is quite all right. You have referenced some
[2] documents that you have brought here in response to the
[3] subpoena that I served on you.
[4]    Do you have any other documents that you think of
[5] as related to this litigation?
[6] A: No.
[7] Q: How about your computer, do you use your computer?
[8] A: Yes.
[9] Q: Did you check for e-mails or other documents that might
[10] be on your computer and also responsive to my subpoena?
[11] A: Yes.
[12] Q: Thank you very much. Did you check any backups that you
[13] might have of documents that were created or maintained
[14] on your computer?
[15] A: Since my hard drive crashed, it would not be necessary.
[16] There's nothing left. Thank you.
[17] Q: That is quite all right. Many a witness responds in
[18] just that way.
[19]    Let's see. I am going to ask you a few questions
[20] that are just designed to help me understand whether you
[21] have any relationships with people who are sort of the
[22] characters in this story, the parties, or witnesses in
[23] the litigation.
[24]    Let me ask you: Are you related by blood or
[25] marriage to any members of the School Board, current

**Page 17**

[1] members?
[2] A: No.
[3] Q: Have you had any relation by blood or marriage to any
[4] person who has been on the School Board since say
[5] January of 2002?
[6] A: No. Other than my husband.
[7] Q: Right. That is one I am aware of. How about anyone who
[8] is in the administration of Dover Area School District,
[9] do you have any relationships with them by blood or
[10] marriage?
[11] A: No.
[12] Q: More generally, employes of the School District, do you
[13] have any relationships by blood or marriage to them?
[14] A: Not that I am aware of.
[15] Q: That's fair enough. Let's look at the same set of
[16] people from a different standpoint, business dealings.
[17] Do you have any business dealings with anyone who is
[18] currently on the Dover Area School Board?
[19] A: No.
[20] Q: If we look back over the period January, 2002 forward,
[21] did you have any business dealings with anyone?
[22] A: No.
[23] Q: How about anyone on the administration of Dover Area
[24] Schools?
[25] A: No.

**Page 18**

[1] Q: How about any employes of Dover Area Schools?
[2] A: No.
[3] Q: Any friendships outside of your business on the Board
[4] with people who are currently on the School Board, do
[5] you have a relationship with them apart from your
[6] business as a School Board —
[7] A: Currently?
[8] Q: Yes.
[9] A: No.
[10] Q: How about if we look at people who were on the Board
[11] from January of 2002 forward and say friendships that
[12] you have with them apart from the relationship you had
[13] as a Board member doing Board business, did you have any
[14] friendships?
[15] A: Yes.
[16] Q: Who was that?
[17] A: Mrs. Harkins.
[18] Q: Anyone else?
[19] A: Mr. Bonsell.
[20] Q: Anyone else?
[21] A: Mrs. Yingling, Mrs. Cleaver, Mr. Wenrich,
[22] Mr. Buckingham, Dr. Nilsen, Denise Russell, Karen
[23] Holtzapple.
[24] Q: How did you come to know Denise Russell?
[25] A: I have known Denise Russell since I became a member of

**Page 19**

[1] the Board.
[2] Q: Are you still friends with her?
[3] A: Yes.
[4] Q: Have you spoken with her recently?
[5] A: No.
[6] Q: Have you spoken with her about the subject matter of
[7] this litigation?
[8] A: No, never.
[9] Q: How about Karen Holtzapple?
[10] A: We have never discussed this issue.
[11] Q: Do you have any shared memberships in organizations
[12] apart from the School Board with any of the current
[13] Board members?
[14] A: Not that I'm aware of.
[15] Q: How about persons who were on the Board since January of
[16] 2002 forward?
[17] A: Not that I'm aware of.
[18] Q: How about members of the Dover Area School
[19] administration, any shared memberships in clubs or civic
[20] organizations?
[21] A: Not that I am aware of. It is possible, but I am not
[22] aware of it.
[23] Q: There is a couple of science teachers that have figured
[24] prominently in this story. Do you have any friendships
[25] with Bert Spahr?

---

Filius & McLucas Reporting Service, Inc.     **Min-U-Script®**     **(7) Page 16 - Page 19**

Carol Brown
May 16, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

Page 20

[1]   A: No.

[2]   Q: Have you spoken with Bert Spahr lately about the

[3] litigation?

[4]   A: No. I have not spoken with any of them as I indicated

[5] to you since probably January or February when we met at

[6] meetings and passed pleasantries. Did not discuss this

[7] situation.

[8]   Q: Are you saying that you have never discussed the matter

[9] of the litigation with the science teachers outside of

[10] the Board setting, Board meetings?

[11]   A: No, I am not saying that.

[12]   Q: Tell me. That's why I am having difficulty

[13] understanding your answer. Have you spoken with the

[14] teachers at any time about the subject matter of this

[15] litigation?

[16]   A: Yes.

[17]   Q: Who did you speak with?

[18]   A: I have spoken with Mrs. Spahr, Mrs. Jennifer Miller and

[19] Mr. Robert Eshbach.

[20]   Q: Just give me a sense for when those conversations took

[21] place.

[22]   A: Prior to January of 2005.

[23]   Q: Were those conversations outside of Board meetings?

[24]   A: Yes.

[25]   Q: Can you give me some time period for when the

---

Page 21

[1] conversations took place with Bert Spahr?

[2]   A: I'm sorry. I would have to be fairly general here and

[3] say between the period of September and December of

[4] 2004. And the same with Mrs. Miller and Mr. Eshbach.

[5]   Q: And if we look at Mrs. Spahr, what did you discuss with

[6] Mrs. Spahr during that period?

[7]   A: Concerns related to what was happening on the Board.

[8]   Q: Can you be more specific?

[9]   A: Concerns relating to the curriculum and the effect on

[10] the educational processes of our students as relates to

[11] the biology situation.

[12]   Q: Okay.

[13]   A: And the same would be true for Mrs. Miller and

[14] Mr. Eshbach. Less so with Mr. Eshbach — or less

[15] frequently probably would be better.

[16]   Q: How about any discussions with Sandi Bowser?

[17]   A: None.

[18]   Q: Brad Neal?

[19]   A: None.

[20]   Q: Bill Miller?

[21]   A: None.

[22]   Q: How about Lonnie Langione?

[23]   A: None that I'm aware of.

[24]   Q: That is fine. I am just trying to get a sense of who

[25] you spoke with. Larry Snook?

---

Page 22

[1]   A: There have been discussions with Mr. Snook.

[2]   Q: When did those discussions take place?

[3]   A: There again, I will have to be a little more general.

[4] Probably between October and February — October of 2004

[5] and February, March — we will make it March of 2005.

[6]   Q: That's fine. And tell me what you can just in general

[7] about the nature of those discussions. What was the

[8] subject matter?

[9]   A: The Board decisions as relates to this and as relates to

[10] my decision to resign from the Board. And my decisions

[11] relating to whether or not I was planning to run again.

[12]   Also, we did have some discussions relating to

[13] media coverage and various interviews that we had done.

[14]   Q: I know you have spent some time serving the community on

[15] the School Board. What I would like to do is begin that

[16] part of this story from your perspective and get a sense

[17] for how you came to be on the Board and why and how some

[18] of these issues came up.

[19]   Tell me when did you first get on the School

[20] Board?

[21]   A: 1996.

[22]   Q: Were you elected or appointed?

[23]   A: I was elected.

[24]   Q: When was the primary for that election?

[25]   A: You want an exact date?

---

Page 23

[1]   Q: No.

[2]   A: May.

[3]   Q: And you were elected in the general election in

[4] November?

[5]   A: Yes.

[6]   Q: Why did you decide to run?

[7]   A: I am the parent of a special needs young adult. I had

[8] been working as a newspaper reporter, which I did for

[9] 23 years. I had covered a number of School Districts

[10] during that time period, but I had never been directly

[11] involved.

[12]   And having gone through a number of shall we say

[13] negative experiences as a parent of a special needs

[14] child and talking with other parents of special needs

[15] child within this District and neighboring Districts, I

[16] realized that it was time for me to get more directly

[17] involved, to be an advocate, if you will, for special

[18] needs children and the parents of those children to try

[19] and effect change from the inside.

[20]   Q: You mentioned a number of things there I would like to

[21] learn a little more about. You were a reporter covering

[22] School Districts?

[23]   A: One of the things that I did as a reporter.

[24]   Q: What School Districts did you cover?

[25]   A: I covered on a regular basis Northern and West Shore.

---

Min-U-Script®   Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Carol Brown
May 16, 2005

---

Page 24

[1] Q: Where are those School Districts?

[2] A: Northern York County is located in the Dillsburg area.

[3] West Shore is located in Mechanicsburg, but it does

[4] cover parts of both York and Cumberland Counties.

[5] Q: Did you cover Dover Area Schools?

[6] A: No, I did not. That is considered a conflict of

[7] interest because I live here.

[8] Q: Interesting. Do you know any of the reporters who have

[9] provided coverage in connection with this dispute?

[10] A: Yes, I do.

[11] Q: Which ones do you know?

[12] A: Good heavens. Lauri Lebo, Joseph Maldonado, Heidi

[13] Bernhard-Bubb. I have to stop and remember that one

[14] myself. Those are the main three I know locally.

[15] Q: How long have you known Lauri Lebo?

[16] A: Less than a year.

[17] Q: How did you come to know her?

[18] A: Through this situation.

[19] Q: How about Joe Maldonado?

[20] A: I'm not really sure. Probably two or three years.

[21] However long he has been covering the District. The

[22] same with Heidi. With Heidi, it has been off and on

[23] because she has had two pregnancies during the time

[24] period.

[25] Q: Did you come to know Joe Maldonado in connection with

---

Page 25

[1] your role as a member of the School Board?

[2] A: Yes, I did.

[3] Q: Same for Heidi?

[4] A: Yes.

[5] Q: Do you have a relationship with them currently? I mean

[6] are you friends? Do you talk?

[7] A: No, I wouldn't consider us friends.

[8] Q: How about Heidi Bernhard-Bubb?

[9] A: No.

[10] Q: How spoken with Lauri Lebo lately since you resigned

[11] from the Board?

[12] A: Yes. Actually, I ran into her jogging about a month

[13] ago.

[14] Q: Did you discuss the litigation?

[15] A: No, we didn't. It was strictly a hi, how are you doing.

[16] Q: How about Joe Maldonado, have you spoken with him

[17] recently?

[18] A: No.

[19] Q: How about Heidi Bernhard-Bubb?

[20] A: No.

[21] Q: You mentioned that you have one child at least who is

[22] attending Dover Area Schools?

[23] A: Did attend, but did not graduate from Dover. Two

[24] children.

[25] Q: I take it you have children?

---

Page 26

[1] A: Two children.

[2] Q: Give me their names, please?

[3] A: Eric Nicholas Brown. Eric is an architect. Did you

[4] want his age?

[5] Q: Did he graduate from Dover schools?

[6] A: No, he didn't.

[7] Q: Did he attend Dover schools?

[8] A: Yes, he did.

[9] Q: For how long did he attend Dover schools?

[10] A: Through ninth grade, kindergarten through ninth grade.

[11] So nine years.

[12] Q: And your other child?

[13] A: Julianna Elaine.

[14] Q: Did she attend Dover schools?

[15] A: She also attended Dover schools, but hers was first

[16] grade through tenth grade.

[17] Q: Is Julianna the child —

[18] A: Yes, she is a special needs child. She actually

[19] graduated from Central York High School because they had

[20] the programs that she needed. We did not, meaning Dover

[21] did not.

[22] And my son graduated from the Dallastown Schools

[23] because he wanted the computer technology programs and

[24] was able to go down there for those.

[25] Q: When you first ran for election in 1996, did you run on

---

Page 27

[1] a slate with other candidates?

[2] A: No, I did not.

[3] Q: Apart from the issue you have mentioned, were there any

[4] other issues that brought you out to run for that

[5] position?

[6] A: To give back to the community. I was raised to the

[7] concept of community service. I am an Army brat.

[8] Q: How long are the terms on the School Board?

[9] A: My first term was two years. I completed the term of

[10] someone who had left the District. Normal terms are

[11] four years.

[12] Q: I take it you ran again in 1998?

[13] A: Yes, I did.

[14] Q: Any particular issues bring you out for that election?

[15] A: Fiscal responsibility, continued service to my students

[16] because by then, it was far more than just the special

[17] needs children.

[18] Q: Did you run with anyone else?

[19] A: No, I did not.

[20] Q: 1998, a four-year term, and it put you into 2002?

[21] A: Well, it doesn't quite work out that way, but

[22] thereabouts.

[23] Q: When did you next have to run for School Board?

[24] A: I guess it was — I guess I am saying it wrong then. It

[25] was 2000 — or no, it is 2002 I guess. I don't know.

---

Carol Brown
May 16, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

Page 28

[1] Whatever, it ends this year. It would have ended this

[2] year.

[3]   Q: Now in that next election, which may well have been

[4] 2002, but it is the expired term, what brought you out

[5] for that election?

[6]   A: Continued desire to serve the community.

[7]   Q: Did you run alone or on a slate?

[8]   A: A slate.

[9]   Q: Who was on that slate?

[10]   A: Mr. Bonsell, Alan, Mrs. Harkins, Mrs. Yingling and

[11] myself.

[12]   Q: Any particular issues that you addressed as a group in

[13] connection with that election?

[14]   A: Student achievement and fiscal responsibility,

[15] especially as regards the building project at the high

[16] school.

[17]   Q: If you would, Mrs. Brown, just state with respect to

[18] fiscal responsibility, what did you see the issues as

[19] there?

[20]   A: The main issue was being accountable to the taxpayers of

[21] the School District and being aware of their abilities

[22] or lack of ability to continue to pay higher taxes.

[23]   Q: And you mentioned the school project?

[24]   A: Yes.

[25]   Q: Was there a specific way in which the school project

---

Page 29

[1] implicated those concerns?

[2]   A: Very much so. A number of us felt that the majority of

[3] the then current School Board were not being fiscally

[4] responsible, had not done enough to try and get funds

[5] back from the state.

[6]   Q: When you say a number of us, are you referring to your

[7] fellow candidates on that slate?

[8]   A: Not just those candidates.

[9]   Q: Who else?

[10]   A: Friends.

[11]   Q: Did your running mates share your views with respect to

[12] fiscal responsibility?

[13]   A: I believe so.

[14]   Q: How about student achievement, what was your concern

[15] there for specifically?

[16]   A: To continue to improve student achievement.

[17]   Q: Were there any particular gauges or standards that you

[18] were using to think that student achievement wasn't

[19] where it should be or could be?

[20]   A: One has only to look back at the records of the School

[21] District in terms of student achievement primarily on

[22] the SAT's.

[23]   Q: I take it you mean to see that there was a need for

[24] improvement?

[25]   A: Very much so. Also in the rankings of students in terms

---

Page 30

[1] of merit scholarships, and where our students were

[2] accepted and chose to attend colleges or post secondary

[3] education.

[4]   Q: Again, so far as you could tell, do you think that your

[5] running mates shared your convictions on that point?

[6]   A: Yes.

[7]   Q: Were there any other issues that you saw motivating

[8] yourself when you ran in November of 2002?

[9]   A: Yes.

[10]   Q: Just give me an idea what they are.

[11]   A: Vocational-technical education.

[12]   Q: What was your goal there?

[13]   A: I had the privilege of serving as the Dover

[14] representative to the York County School Of Technology

[15] for an extensive period of time. And my concern there

[16] was to see that the funds were available, the

[17] opportunities were available for students who were going

[18] into those areas.

[19]   Q: Any other issues that motivated you?

[20]   A: I would say those were the primary ones. There were

[21] other issues in terms of my personal fight to bring in

[22] all day kindergarten or what is termed today extended

[23] day kindergarten, and also to find some grant money

[24] whereby we might pilot programs for world languages on

[25] the elementary levels beginning at the latest in the

---

Page 31

[1] second grade, preferably in the first grade.

[2]   Q: Anything else?

[3]   A: I have to review in my own mind. I am not sure at that

[4] point if we had already piloted our character education,

[5] multi-cultural education programs, but they were

[6] certainly in the forefront of my mind. Those were for

[7] efforts which I had the privilege of being part of from

[8] my earliest days on the Board.

[9]   Q: Just give me a sense for those issues that are

[10] motivating you to participate in this public service.

[11] You mentioned character education.

[12] What were you getting at there, Mrs. Brown?

[13]   A: There is no question that society has changed through

[14] the years, and we are seeing social issues, social

[15] problems, if you will, that we did not see twenty,

[16] thirty years ago.

[17]   And we realize — and I am saying we in the sense

[18] of there were a number of us involved both on the Board

[19] and from the community who realized that we had to try

[20] and establish some sort of code of behavior that our

[21] students could adhere to or would adhere to within the

[22] school frame.

[23]   Q: Did you have anything specific in mind when you came to

[24] the Board in November, 2002 along those lines other than

[25] the need? It is plain that you saw a need.

---

Page 28 - Page 31  (10)

**Min-U-Script®**   Filius  &  McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Carol Brown
May 16, 2005

---

Page 32

[1]    A: We were already working on it.

[2]    Q: And by it, do you mean some sort of curriculum program

[3] that would give kids —

[4]    A: The first efforts along those lines began in 1997 under

[5] our former Assistant Superintendent the late Dr. Robert

[6] Hallman.

[7]    Q: He was already working on a program?

[8]    A: He presented it to the Board within my first year on the

[9] Board, the idea.

[10]    Q: And back at that time, did the Board approve this notion

[11] of —

[12]    A: We formed a Task Force to study the issues. It was then

[13] simply character education. The multi-cultural aspects

[14] came later.

[15]    Q: You have mentioned a number of issues here for the

[16] November, 2002 election or things that were bringing you

[17] back out to continue your service on the Board.

[18]    Did you discuss these other issues, character

[19] education, multi-cultural education with your running

[20] mates?

[21]    A: Yes.

[22]    Q: What was your sense of their response to your concerns;

[23] did they share them?

[24]    A: It was not necessarily a formal platform. Mrs. Harkins

[25] was serving on the committee with me at that time.

---

Page 33

[1]    Q: The character education committee?

[2]    A: The educational committee and the multi-cultural

[3] committees. They were still two separate committees.

[4] They were integrated within a year after that.

[5]    Q: And was it your sense that Sheila Harkins shared your

[6] view that it would be desirable to continue this

[7] program?

[8]    A: Yes.

[9]    Q: Can you recall anything she said specifically —

[10]    A: No.

[11]    Q: — relating to character education?

[12]    A: No.

[13]    Q: How about your other running mates, Mr. Bonsell?

[14]    A: Mr. Bonsell and Mrs. Yingling shared my concern for a

[15] sense of morality, if you will. I am trying to find the

[16] right words.

[17]    Q: Sure. You indicated that Dr. Hallman had a program he

[18] had already proposed?

[19]    A: He had proposed it by that time. He was deceased. And

[20] Dr. Nilsen came in as Assistant Superintendent and

[21] picked the program up, if you will.

[22]    Q: Did you settle on curriculum for that character

[23] education program?

[24]    A: Yes.

[25]    Q: Just tell me how was that done.

---

Page 34

[1]    A: The first pilot program was begun at Dover Elementary

[2] School. And if memory serves, it is four years now. We

[3] piloted at Dover Elementary because Dover Elementary

[4] offered a petri dish of the gamut of social strata,

[5] social situations.

[6]    Q: And how about in terms of a text for that program?

[7]    A: There was not one single text. Materials were drawn

[8] from many, many sources. Some of the best information

[9] is from Lions Quest through the Lion's Club. And they

[10] were very kind to us in giving us grant money to help us

[11] get that program off the ground.

[12]    Q: Who did that inquiry about potential source of

[13] information or text curriculum, materials that could be

[14] used in the character education program?

[15]    A: We all did.

[16]    Q: And that is the committee members?

[17]    A: Yes.

[18]    Q: You mentioned that Dr. Nilsen had some role in that

[19] process?

[20]    A: Yes, he did.

[21]    Q: Anyone else from the administration?

[22]    A: Denise Russell was part of it. There were quite a few

[23] teachers, but I don't recall all of the them, Mr. Steven

[24] Walker who was Principal at Dover Elementary.

[25]    Q: Just give me a general view of how you approached that.

---

Page 35

[1] It appears you had a committee that was set up to

[2] address it?

[3]    A: Yes.

[4]    Q: Was that a Board committee?

[5]    A: Yes, it was. It was also a District committee in that

[6] there was involvement with teachers and some community

[7] members. One needs to differentiate between a Board

[8] committee and a District committee.

[9]    Q: Do that for me. How do you see those as different?

[10]    A: They are very distinct. A Board committee is comprised

[11] of four or fewer Board members as per Code and usually

[12] at least one administrator.

[13]    A District community is usually comprised of one

[14] or more administrators, District teachers, and/or

[15] possibly Board members.

[16]    A community — there are also advisory committees.

[17] We have three types of committees in this District. The

[18] advisory committees are almost entirely comprised of

[19] community members, usually under the aegis of

[20] administrators, sometimes under Department heads. And

[21] then Task Forces which are separate entities usually

[22] formed for a specific period of time for a specific

[23] task.

[24]    Q: Okay. So I am just trying to get a sense for the

[25] process as it relates to the character development. You

---

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 40

[1] A: The Board to my way of thinking was unwilling to
[2] entertain opinions that ran contrary to their own
[3] thoughts or their own desires, the majority of the
[4] Board.
[5] Q: When you say majority of the Board, do you have a
[6] particular portion of the Board in mind, a voting block,
[7] or a group of people on the Board who you thought were
[8] not as open as you would like?
[9] A: Yes.
[10] Q: Give me those persons who sort of implicated this
[11] concern for accountability.
[12] A: Everyone except Mrs. Harkins, Mr. Wenrich, Mr. Brown and
[13] myself.
[14] Q: Were there any specific — as we go through it — and I
[15] know sometimes you recall more as you talk about
[16] something, was there any specific issue where you just
[17] saw what you thought was a lack of openness to other
[18] opinions on the part of these other Board members? Was
[19] there something that triggered that concern or brought
[20] it into sharper focus?
[21] A: The construction project, the proposed construction
[22] project at the high school.
[23] Q: What was it about that, the construction project, and
[24] the proposed contract that gave you this sense that hey,
[25] we need to listen more, or certain people need to listen

Page 41

[1] more to different opinions?
[2] A: It was my second construction project since becoming a
[3] member of the Board. I had seen the wastefulness in the
[4] prior project. In fact at that point in time,
[5] Mr. Bonsell's father, Don Bonsell was a member of the
[6] Board. He and I served together for a four-year period.
[7] And that project related to renovations at Leib
[8] Elementary School and the construction of the North
[9] Salem School. And Mr. Bonsell and I both saw a lot of
[10] wastage. But being newer members of the Board, we were
[11] most definitely not listened to. We asked a lot of
[12] questions.
[13] And going into the proposed high school project,
[14] we saw a lot of wastage. The expression champagne taste
[15] on a beer budget comes to mind.
[16] Q: Okay. And you have created a contrast here between sort
[17] of there's two projects, and you see waste in both?
[18] A: Yes.
[19] Q: I am looking at that from the standpoint of this concern
[20] you had as you ran again for accountability. Do I
[21] understand you or take your meaning that you are saying
[22] there's some Board members have a concern about wastage
[23] and others are not sufficiently open to it; what are you
[24] getting at there?
[25] A: I believe there were members of the Board who were not

Page 42

[1] sufficiently concerned about the financial burden on our
[2] taxpayers.
[3] Q: Okay. If you had to put your finger on those Board
[4] members you thought weren't sufficiently concerned about
[5] the tax burden that would follow from the building
[6] project, who would that be?
[7] A: Five of the nine as previously mentioned.
[8] Q: Other than that, this sense of hey, we are about to
[9] enter into a contract which is going to create a very
[10] real burden for taxpayers in the District, were there
[11] any other issues that implicated this concern for
[12] accountability?
[13] A: I would say there were differing viewpoints.
[14] Q: Differing viewpoints on what?
[15] A: On a variety of aspects of education. Some of us were
[16] more focused on say one group of students than another.
[17] Q: And this is in the November, 2002 period?
[18] A: I would say this would not simply be for that time
[19] period, but an overall picture of the Board. Any Board
[20] member coming to service has some sort of bias or
[21] program or viewpoint. I don't mean bias in terms of
[22] prejudice or as a pejorative term.
[23] Q: I agree. Based on their personal background —
[24] A: Absolutely, and experiences.
[25] Q: Okay. Let's look at that in terms of the November, 2002

Page 43

[1] election. Plainly, when I look at you, I see that
[2] elementary school multi-cultural language programs seems
[3] to arise in part from your background. You have
[4] mentioned the issues that brought you out in November of
[5] 2002.
[6] How about the other people who were in that
[7] election? If you had to look at your running mates,
[8] were there any particular issues you associated with
[9] them?
[10] A: I would simply have to say fiscal accountability,
[11] responsibility.
[12] Q: All right. Now if you get on the Board in November of
[13] 2002, that is not your first time anymore. You are a
[14] more experienced Board member.
[15] What positions did you have for the term beginning
[16] with that election?
[17] A: President of the Board, head of policy committee, and I
[18] stepped down as the main representative to the York
[19] County School Of Technology and took the alternate
[20] position.
[21] And as President of the Board, you are an ex
[22] officio member of all committees.
[23] Q: And you would become President when, in December of
[24] 2002?
[25] A: Yes, the reorganization meeting in the first week of

Carol Brown
May 16, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

**Page 44**

[1] December.

[2] Q: The policy committee is new to me. What is the subject

[3] matter of that committee?

[4] A: Job number one of a School Board member is to put

[5] together and to administer policy as relates to being in

[6] compliance and remaining in compliance with all state

[7] and federal mandates, both funded and unfunded, as all

[8] relevant state, in our case, I must correct Commonwealth

[9] laws and federal laws and guidelines.

[10] Q: So is that what the policy committee does; it strives to

[11] ensure compliance?

[12] A: Yes.

[13] Q: Does it formulate policy?

[14] A: Yes.

[15] Q: Does it formulate policy across the Board, or does it

[16] focus on these issues you have raised?

[17] A: Across the Board. I have been as chair of policy from the

[18] time I first joined the School Board or became a member

[19] of the School Board until the time I resigned.

[20] Q: Now in terms of selection as President of the Board, how

[21] does that happen, Mrs. Brown?

[22] A: You are elected by the Board during the reorganization

[23] meeting which must be held during the first week of

[24] December of every year as per Pennsylvania Public School

[25] Code of 1949, and amended in 1993, and again in 2002.

**Page 45**

[1] Q: Do you recall who voted for you?

[2] A: I do.

[3] Q: I mean I guess your running mates. Anyone else? Was it

[4] a contentious election?

[5] A: Most definitely.

[6] Q: Who was your — what shall I say — who did you vie with

[7] for that position?

[8] A: I didn't, but three of the Board members walked out.

[9] Q: Which three?

[10] A: Lonnie Langione, Larry Snook and Barrie Callahan. And I

[11] should correct myself I misspoke. They refused to come

[12] into the meeting until after the election for President

[13] had occurred.

[14] Q: Did they say why?

[15] A: They were opposed to everything that the new majority of

[16] the Board stood for, and it was contentious.

[17] Q: And do you think that it was among other things the

[18] building project issue that created animosity?

[19] A: I would say that would be the first one.

[20] Q: What other ones would create that sort of environment

[21] where they wouldn't show up for the reorganization

[22] meeting?

[23] A: They were filing a protest against the election and our

[24] approach to things. Two of the three subsequently

[25] resigned in January if memory serves.

**Page 46**

[1] Q: January of 2003?

[2] A: Yes.

[3] Q: Who had lost in that election? Who had been displaced;

[4] can you recall?

[5] A: No one had been displaced if you are talking about Board

[6] members.

[7] Q: Okay. And perhaps I am misunderstanding then. In the

[8] November of 2002 election?

[9] A: Yes.

[10] Q: Was there a rival slate that ran against —

[11] A: Very much so.

[12] Q: Who was on that slate?

[13] A: I can remember a couple. I can't remember the one

[14] person's name. James California was one of them. He

[15] had actually been turned out of office the preceding

[16] election. He had been a sitting Board member for four

[17] years. He came on at the same time I did.

[18] Q: There was Mr. California. Who else?

[19] A: A Randy Myers — and good grief — Annette Meisenheimer.

[20] I apologize; I have forgotten the fourth person's name.

[21] Q: That's all right. Were Mr. Langione, Mr. Snook or

[22] Barrie Callahan up for election in that?

[23] A: No, they were not. And Mrs. Harnish had chosen not to

[24] run again, as had Mr. Murphy.

[25] Q: So you have the reorganization meeting where these three

**Page 47**

[1] don't show up at all?

[2] A: They showed up after the election for President.

[3] Q: That brings into the 2002 period. I want to get a sense

[4] for it. You were on the Board policy committee, and you

[5] are the President of the Board?

[6] A: Yes, I am.

[7] Q: How about your other slate members at that time, what

[8] committees were they on?

[9] A: I will be perfectly honest, Mrs. Harkins became

[10] Treasurer of the Board. Mr. Bonsell I believe became

[11] head of curriculum. I don't remember all of the

[12] committee assignments. I am ashamed that I don't since

[13] the Board President does make those assignments.

[14] Mr. Wenrich was head of buildings and grounds.

[15] Mr. Brown was head of transportation. And Mr. Bonsell

[16] would have to correct me on this, but I believe he was

[17] also head of strategic planning.

[18] There were a variety of committee assignments.

[19] Most people serve on more than one committee.

[20] Q: And you appointed for those positions?

[21] A: Yes, I did.

[22] Q: How about Bill Buckingham, did he run in November?

[23] A: Mr. Buckingham and Mrs. Cleaver were appointed in

[24] January and February of 2003 upon the resignations of

[25] Mr. Langione and Mr. Snook.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Carol Brown
May 16, 2005

---

Page 48

[1]   Q: All right. And do you recall whether you gave them any
[2] committee assignments, or did they just fill in for the
[3] spots vacated by —
[4]   A: They probably would have.
[5]   Q: Want to take a break?
[6]   A: As you will.
[7]   (A recess was taken.)
[8]                 AFTER RECESS
[9]               BY MR. GILLEN:
[10]   Q: We are back on the record, and we are into the 2003
[11] period now. I want to get a sense for your activities
[12] on the Board and the way they relate more directly to
[13] some of the issues in this litigation.
[14]     You mentioned earlier the Pledge. I just want to
[15] get your sense for how that became an issue at the Board
[16] and sort of how the Board reacted to it and so on.
[17] Tell me what you recall about that, Mrs. Brown.
[18]   A: In October of 2003, as memory serves, a member of the
[19] audience, a former Board member Larry Snook brought up
[20] the current news items relating to an individual in
[21] California who was attempting to bring suit against the
[22] School District — and I don't recall the name of the
[23] exact School District — on behalf of his daughter.
[24]     My understanding is he was a practicing atheist,
[25] if one practices that, objecting to the use of the term

Page 49

[1] one nation under God specifically.
[2]     And Mr. Snook brought it up stating that he
[3] thought that we should take a stand as a Board favoring
[4] the Pledge of Allegiance as it is currently constituted.
[5] And I say that in the present tense because as it was
[6] constituted at that point in time continuing to the
[7] present time.
[8]   Q: Let me ask you when Mr. Snook, the former Board
[9] member —
[10]   A: Yes.
[11]   Q: — he resigned earlier this year. When he made that
[12] appeal at the Board meeting, did you have any sense for
[13] his motives or what might move him to do that?
[14]   A: I don't mean to ascribe motives to him. This was only
[15] my personal feeling. As Mr. Snook often had in the
[16] past, he — I believe he brought things up to stir the
[17] waters if you will.
[18]   Q: And that is why I asked. It lends itself to that
[19] interpretation. Tell me, did he manage to stir the
[20] waters?
[21]   A: Not at that point in time.
[22]   Q: Why do you say that, Mrs. Brown?
[23]   A: Because no one on the Board responded to his public
[24] comment at that meeting.
[25]   Q: This is the October —

Page 50

[1]   A: I will be honest and say I believe it was the second
[2] meeting in October, but it could well have been the
[3] first meeting in November.
[4]   Q: Anyone else second his motion?
[5]   A: He did not make a motion.
[6]   Q: I know.
[7]   A: He was simply making a comment during the open comment
[8] portion of the meeting at the beginning.
[9]   Q: Was Lonnie Langione present?
[10]   A: I do not honestly remember.
[11]   Q: That's fine. How about Barrie Callahan, do you recall
[12] her making any comments at that meeting about the
[13] Pledge?
[14]   A: No, she did not that I recall. As I have stated, I
[15] don't believe that anyone on the Board did respond to
[16] the comment. We simply moved on from there and thanked
[17] him for his comment.
[18]   Q: Did the Board take up the matter later in 2003?
[19]   A: Yes.
[20]   Q: Tell me what you can recall about that.
[21]   A: Mr. Wenrich was then President of the Board.
[22]     MR. SCHMIDT: May I interrupt? Is the meeting
[23] after the next reorganization meeting?
[24]   A: Mr. Wenrich was the Vice-President when I was President.
[25] He just the next year became President of the Board. He

Page 51

[1] was President of the Board at that point in time. This
[2] would have been prior to reorganization which always
[3] occurs the first meeting of December.
[4]               BY MR. GILLEN:
[5]   Q: Mrs. Brown, let me test your recollection on this point.
[6] Could it be that the election we have been referring to
[7] as November of 2002 was in November of 2001?
[8]   A: I do beg your pardon. I am not following you at all.
[9]   Q: If Noel Wenrich was President of the Board at this time
[10] — and we know there had to be a reorganization meeting
[11] for him to become President?
[12]   A: Yes.
[13]   Q: That would indicate that the reorganization meeting
[14] prior would be in December of 2002?
[15]   A: Yes, something to that effect.
[16]   Q: And that in turn would lend itself to the idea that the
[17] prior reorganization meeting from the previous December
[18] actually followed an election that was held in November
[19] of 2001?
[20]   A: That is why I said I don't recall. I am not thinking in
[21] terms of years to be honest.
[22]   Q: Not at all. Believe me, you have done better with dates
[23] than most witnesses. Tom and I are just trying to get
[24] the story line.
[25]   A: My apologies if I inadvertently misled you.

---

Filius & McLucas Reporting Service, Inc.     Min-U-Script®        (15)  Page 48 - Page 51

Carol Brown
May 16, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

**Page 52**

[1]    Q: Tell me what happened. Noel was President of the Board.

[2]    A: There were some private conversations about it. And I

[3] had expressed the opinion I didn't feel this was an area

[4] in which we should get involved because it is not our

[5] function as a Board of School Directors to be involved

[6] in the political arena.

[7]    That is why School Board members cross file. It

[8] is considered a non partisan in terms of political

[9] parties.

[10]    Q: And you saw this issue as a partisan political issue?

[11]    A: More to the point of it being outside the scope of a

[12] School Director's responsibilities.

[13]    Q: So sort of making a gesture outside of actual school

[14] business; is that your meaning?

[15]    A: Yes.

[16]    Q: Now Mr. Wenrich thought the Board should take it up?

[17]    A: As did Dr. Nilsen. Dr. Nilsen actually put together the

[18] motion as I understand it.

[19]    Q: Okay.

[20]    A: Excuse me. Let me correct that. Not motion,

[21] resolution.

[22]    Q: How about the other Board members at that time, do you

[23] recall their positions on the issue?

[24]    A: Six of the nine were in favor of it.

[25]    Q: Do you remember who voted against the resolution?

**Page 53**

[1]    A: Mrs. Harkins and my husband. I stand corrected. They

[2] both abstained from voting.

[3]    Q: That's two. How about yourself?

[4]    A: It is one of the two votes I cast during my tenure on

[5] the Board of which I am ashamed because I caved to

[6] pressure and voted to support the resolution.

[7]    Q: Do you remember the third person who voted against? You

[8] mentioned Sheila abstained?

[9]    A: I didn't say voted against. Who were against it.

[10]    Q: So there was Sheila Harkins abstained. I believe your

[11] husband abstained?

[12]    A: Abstained.

[13]    Q: And do you recall?

[14]    A: That was it.

[15]    Q: That's it. Only two abstained. Tell me then,

[16] Mrs. Brown, you voted for the resolution, but looking

[17] back, you regret it. What led you to do that?

[18]    A: To regret it?

[19]    Q: To vote for the resolution.

[20]    A: Because instead of voting my principles, I caved in to

[21] social pressure.

[22]    Q: I think I understand. The social pressure, do you mean

[23] just sort of the community sense, or was there something

[24] more direct and specific?

[25]    A: My fellow Board members.

**Page 54**

[1]    Q: Tell me, if you would, what sort of pressure you felt in

[2] connection with this vote on the resolution as it

[3] related to the Pledge.

[4]    A: Desiring to keep the approval of fellow Board members.

[5]    Q: Which members would that be?

[6]    A: The other members who voted for the resolution.

[7]    Q: And you reference that you felt the position was

[8] contrary to your principles. Tell me, if you would,

[9] what exactly you mean by that.

[10]    A: I believe very strongly in the separation of church and

[11] state, and I believed personally then that we were

[12] conceivably opening a can of worms.

[13]    Q: And what did you have in mind as this can of worms or

[14] the problems that might follow?

[15]    A: I believe very strongly in the separation of church and

[16] state.

[17]    Q: Do I take your meaning to be that you thought this

[18] resolution might run afoul of that belief?

[19]    A: Yes.

[20]    Q: How did you see them in tension or at odds?

[21]    A: I was concerned that we were going beyond the purview of

[22] our responsibilities and obligations.

[23]    Q: And what obligation are you getting at there?

[24]    A: Our obligation to represent all of the viewpoints and

[25] all of the beliefs of the members of our community.

**Page ?**

[1]    Q: And did you see the Pledge as it was recited at that

[2] time as somehow inconsistent with that goal of taking

[3] into account all of the views of all of the members of

[4] the community?

[5]    MR. SCHMIDT: Object to the form.

[6]    BY MR. GILLEN:

[7]    Q: You can answer. He is just objecting because the

[8] question is unclear, and it is admittedly.

[9] Mrs. Brown —

[10]    A: I object because I don't understand. I don't know what

[11] you want.

[12]    Q: I just want to get a sense for what your concern was

[13] there. We have got the Pledge. It has got under God in

[14] it as you have mentioned. There is a resolution in

[15] favor of the Pledge as currently recited.

[16]    You see that there was a tension there between

[17] that resolution and your responsibility if I understand

[18] you correctly to take into account the views of —

[19] different members of the community.

[20]    I am just trying to get you to be as specific as

[21] possible about how you see that conflict.

[22]    A: As a member of a School Board, as I have stated before,

[23] job one is to assure that our School District remains in

[24] compliance and is in compliance with all state and

[25] federal statutes, Commonwealth statutes. We are not

---

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Carol Brown
May 16, 2005

Page 56

[1] there to set a tone.

[2] Q: Okay.

[3] A: I grew up in a time period when we did not have under

[4] God in the Pledge of Allegiance. Under God was added

[5] when I was in second grade. I grew up in a time period

[6] when we had prayer in the school, when we had Bible

[7] reading in the school. That changed when I was in high

[8] school. It changed to reflect the tenor of the

[9] population of the United States.

[10] I was not old enough to understand, but it was the

[11] law of the land. It became the law of the land. My

[12] apologies for my impreciseness. And one nation under

[13] God, the Pledge as it is currently constituted, is the

[14] law of the land.

[15] As School Directors, it is not our place to change

[16] that law, but to obey it. As individuals outside, we

[17] have differing opinions, differing views. Each

[18] individual does. And we may express those opinions.

[19] But as members of a School Board, we are obligated

[20] to set our personal opinions aside and obey the law.

[21] Q: Okay. Now I do have a better sense for what you were

[22] getting at. And I take it that you saw the resolution

[23] as contrary to your understanding of what the law

[24] required?

[25] MR. SCHMIDT: Object to the form.

Page 57

[1] BY MR. GILLEN:

[2] Q: Is that accurate, Mrs. Brown?

[3] A: I'm not sure I am understanding what you're saying. But

[4] as relates to the law, no.

[5] Q: Okay. I don't mean to belabor it. I am trying to get a

[6] sense. You say it is a vote that you regret?

[7] A: Yes, it is.

[8] Q: And you say if I understand you correctly that you see

[9] some conflict between the Board voting to pass this

[10] resolution on the Pledge and their duties as School

[11] Board members?

[12] A: That's correct.

[13] Q: And when you speak of the duties of the School Board

[14] members, you mention that it is the duty to see that the

[15] District is in compliance with the law?

[16] A: That's correct.

[17] Q: It seems that you see a way in which these two didn't

[18] match, but were in conflict?

[19] A: Yes, I did.

[20] Q: That's fine. How about the other Board members? Do you

[21] recall any statements that the other Board members made

[22] on that resolution?

[23] A: Your question is unclear.

[24] Q: I take it the resolution was the subject of

[25] deliberations by the School Board?

Page 58

[1] A: Yes.

[2] Q: Let's take a look at that process and those

[3] deliberations. Just tell me, if you can, what you

[4] remember about the discussion that led up to the

[5] resolution.

[6] A: It was contentious and loud. We had a variety of media

[7] present. We had a roomful of spectators.

[8] Q: Now is this meeting in October of November of 2003?

[9] A: This was November 10th, 2003.

[10] Q: Let's focus on the public comment first. Did anything

[11] stick out in your memory as you sit here today, do you

[12] recall any comments that were made by the public?

[13] A: Yes.

[14] Q: Tell me what you can recall.

[15] A: There were a variety of comments. I would say 95 to

[16] 98 percent of the community members in the room — I am

[17] something now only of the community members —

[18] Q: Right.

[19] A: Not of administration staff and the like, were in favor

[20] of taking a strong religious stand.

[21] Q: Tell me when you say strong religious stand, what is

[22] providing the basis for that sense you had?

[23] A: The comments — there were comments from various Board

[24] members, and there were comments from various community

[25] members. One of the comments in particular was from a

Page 59

[1] young man in the audience who attacked my patriotism, my

[2] right to be — to call myself an American because I

[3] opposed the Board taking this position. He was not

[4] profane in that he did not swear at me.

[5] Q: Apart from that young man's insult, is there anything

[6] else that sticks out in your memory?

[7] A: There were a variety of statements made by Board

[8] members.

[9] Q: Tell me about those. Let me ask you, Mrs. Brown,

[10] anything else from the public comment that sticks out?

[11] I obviously I can see why you recall that. That is an

[12] offensive remark.

[13] Anything else that would stick out in your memory

[14] as a comment directed at the Board from the public?

[15] A: That — okay. I am going to say summarizing the tenor

[16] of the comments was to the effect that we needed to take

[17] a strong stand on morality, on God in the schools.

[18] I cited the one example where I myself was

[19] attacked directly because of the speech I made, but I

[20] was not the only one who had comments made against him

[21] or her. It was contentious, and it was very painful.

[22] And I would say that the most painful comments of all

[23] came from one Board member.

[24] Q: Okay. And I will ask you about that, Mrs. Brown, so you

[25] can get that out. But in terms of the sort of insults

Carol Brown
May 16, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 60

[1] or disparaging remarks from the public directed at Board
[2] members, who else was the subject of that kind of
[3] invective?
[4]     A: Mrs. Harkins, Mr. Brown.
[5]     Q: Can you recall the thrust of the comment that was
[6] directed at Mrs. Harkins?
[7]     A: Similar to what was directed towards me.
[8]     Q: And Mr. Brown, same thing?
[9]     A: Yes.
[10]     Q: All right. Let's look at the Board members. I take it
[11] that you have a recollection of an offensive comment
[12] that was directed at you by a Board member; is that
[13] accurate?
[14]     A: Not me specifically.
[15]     Q: Tell me what it is you are referencing here, a painful
[16] comment.
[17]     A: I am referencing comments made by my former fellow Board
[18] member Mr. Buckingham.
[19]     Q: What did Mr. Buckingham say that gave offense?
[20]     A: I cannot quote you exactly. Please understand that this
[21] is verbatim and per my own memory. He made comments to
[22] the effect that anyone who opposed such a resolution was
[23] un American and should return to his or her country of
[24] origin.
[25]     Q: Do you recall anything else Mr. Buckingham said during

Page 61

[1] this meeting?
[2]     A: No, I do not.
[3]     Q: Would you say that the comment you have just attributed
[4] to him was consistent with some of the sentiments
[5] expressed by the public?
[6]     A: Absolutely. But they were not sitting Board members.
[7] He was.
[8]     Q: Okay. I think you have indicated that Mr. Buckingham
[9] just sort of made a general comment; it wasn't directed
[10] at a specific person?
[11]     A: Yes, it was.
[12]     Q: It was directed at a specific person?
[13]     A: Yes.
[14]     Q: Who did you think it was directed at?
[15]     A: At the time he made it, I think it was specifically
[16] directed at one member of the audience. But he also
[17] made it in reference to anyone who opposed him on the
[18] Board. He made that very clear. I cannot quote you
[19] word for word.
[20]     Q: Okay. Nor would I ask you to. I realize you are just
[21] trying to remember. What gave you that sense; was it
[22] his words?
[23]     A: His words, the tone of his voice, his eye contact. I
[24] still had full vision at that time. I am aware of who
[25] he was looking at.

Page 62

[1]     Q: Did he look at the Board as a group or at individuals?
[2]     A: Individuals.
[3]     Q: Who did he look at so far as you could tell?
[4]     A: Mr. Brown, Mrs. Harkins, myself.
[5]     Q: How about the rest of the Board?
[6]     A: In what sense?
[7]     Q: Very good. Can you recall any comments that other Board
[8] members made on the issue?
[9]     A: Only in the most general sense, that other members of
[10] the Board felt very strongly, as did our Superintendent,
[11] and I felt that he was out of line. That is my personal
[12] opinion. I believe that Dr. Nilsen stepped beyond the
[13] purview of Superintendent as to his role during Board
[14] meetings based on my understanding and experience.
[15]     That we needed to take a strong stand on this,
[16] that was Dr. Nilsen's opinion and the opinion of the
[17] majority of the Board.
[18]     Q: Any other comments that stick out in your memory now as
[19] you kind of look back on it for me or try and recall for
[20] this deposition? A few comments you do remember.
[21] Anything else that you recall?
[22]     A: The tenor of the comments was about the same.
[23]     Q: Do you recall Mr. Buckingham saying anything about
[24] Christ dying on the cross?
[25]     A: He did not state that at that particular meeting. I am

Page

[1] very clear on that.
[2]     Q: You are confident he didn't make a statement to that
[3] effect at this meeting?
[4]     A: I recall the meeting at which he made the statement, and
[5] it was directed toward my husband.
[6]     Q: How about any discussion about separation of church and
[7] state at the Board meeting, did any Board member speak
[8] to that point?
[9]     A: I did.
[10]     Q: Just what did you say generally?
[11]     A: You have the copy of my speech.
[12]     Q: Okay. You produced that this morning in response —
[13]     A: I did indeed.
[14]     Q: We are now in the fall of 2003. And this is what, the
[15] November 10th meeting?
[16]     A: It was the November 10th, 2003 meeting.
[17]     Q: Did the Board vote on the resolution at that meeting?
[18]     A: Yes, we did.
[19]     Q: I think you indicated there was passage?
[20]     A: Yes, there was.
[21]     Q: How about if we look at 2003, and we are trying to get a
[22] sense for other issues that implicated your concern for
[23] religion, the separation of church and state, were there
[24] any other issues that came up in 2003 that you saw as
[25] implicating your concern for the separation of church

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Carol Brown
May 16, 2005

Page 64

[1] and state?

[2] A: Not in public Board meetings.

[3] Q: How about apart from public Board meetings?

[4] A: Early in the year, I had had a couple of discussions.

[5] Q: Early in 2003, a couple of discussions. How did they

[6] implicate your concern for the separation of church and

[7] state?

[8] A: There was no direct correlation. It was a privately

[9] held opinion.

[10] Q: That is what I am trying to get a sense for here. It is

[11] no big deal. What did you see from your standpoint that

[12] gave you some concern?

[13] A: When a new Board member is sworn in, he or she is

[14] assigned a mentor. That would be someone who is an

[15] experienced Board member.

[16] When Mr. Buckingham and Mrs. Cleaver were

[17] appointed to the Board, they were assigned mentors. If

[18] memory serves, Mr. Bonsell was assigned to be

[19] Mr. Buckingham's mentor, and I was assigned to be

[20] Mrs. Cleaver's mentor.

[21] And in that capacity, I had a number of meetings

[22] with her relating to Board member's duties and

[23] responsibilities, the kinds of things that happen,

[24] relating to being an adoptee, which is also something

[25] that is kind of a peculiarity of our District.

Page 65

[1] Each year, Board members are assigned to be part

[2] of a specific school within the District. Some of the

[3] schools have one member. Some have two because we have

[4] an overlap.

[5] Mrs. Cleaver was assigned to Dover Elementary. It

[6] so happened I believe one of her granddaughters was a

[7] student there. And as an adoptee of a school, I

[8] receive notices of all meetings, special things going

[9] on, plays, events, etcetera. And Mrs. Cleaver and I had

[10] a number of discussions about that.

[11] And at one point, she invited me to her home, and

[12] the discussion went well beyond School Board business.

[13] Q: Well, tell me about that. Obviously, it gave you some

[14] concern. Mrs. Cleaver invited you to her home. What

[15] was discussed, or what came to light that gave you

[16] concern?

[17] A: I'm afraid that I was responsible for opening the

[18] subject because I commented on the beautiful wooden

[19] carving of the Last Supper she had in her home. So in

[20] that sense, I opened the subject.

[21] She spoke of her trip to the Holy Land with her

[22] late husband and that segued into a discussion of

[23] Christianity and beliefs. And I had a fairly strong

[24] sense of her personal belief system at the end of that.

[25] And she questioned me about my own. And it gave me

Page 66

[1] pause.

[2] Q: Okay. That is what I am trying to get a sense for.

[3] What gave you pause?

[4] A: Because as I stated, I believe very strongly that when

[5] you are a member of the Board — and this is based not

[6] just on my own experience, my own belief, but my own

[7] studies, going to workshops, seminars and the like to

[8] educate myself on the responsibilities and duties of

[9] Board service — that one must keep one's personal

[10] beliefs to one side in order to successfully fulfill the

[11] duties of one's office and in representing the whole of

[12] the District community.

[13] And I was concerned based on what I heard that

[14] night as to whether Mrs. Cleaver would be able to do

[15] that. And we talked about things. And I tried to

[16] establish with her the importance of putting one's

[17] feelings aside, however difficult it is. And it is very

[18] difficult. I don't mean to minimize that.

[19] Q: Let me see if I can get a better sense for what did

[20] Mrs. Cleaver say that engendered this concern on your

[21] part?

[22] A: Mrs. Cleaver has very strong evangelical beliefs. My

[23] own beliefs are equally strong. But as I have stated,

[24] there is a separation of church and state. And beyond

[25] that, we are not elected by region in this School

Page 67

[1] District. We are not a large enough School District.

[2] Some School Districts are elected by — some

[3] boards of some School Districts are elected by region.

[4] For example, Northern York because of the large

[5] geographical boundaries, there are a number of regions.

[6] And one Board member or two Board members, depending on

[7] the size of the region, are elected to represent the

[8] people of that region.

[9] In the Dover School District because we are much

[10] smaller, we are elected at large. So we are elected to

[11] represent the whole. That is not one group of people.

[12] That is all.

[13] Q: Let me see if — you have this discussion with

[14] Mrs. Cleaver, and as you say it was kind of just an

[15] exchange between the two of you?

[16] A: Beyond the School Board business, yes.

[17] Q: I am trying to get a sense for what Mrs. Cleaver might

[18] have said that gave you this concern that you have

[19] articulated?

[20] A: Because she was new to Board service and had not had the

[21] opportunity to participate in the School Board Academy

[22] programs, which are presented by the Pennsylvania School

[23] Board Association, I am giving her information — I was

[24] giving her information more informally and was

[25] admittedly from my own viewpoint expressing job

Carol Brown
May 16, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 68

[1] responsibilities and so forth.

[2] And my concern remained — was and remained that

[3] she didn't quite follow me when I explained to her the

[4] importance of representing all viewpoints. You cannot

[5] simply interject — what I tried to get across to her

[6] was that you cannot simply interject just your own

[7] opinions however strongly held your beliefs are.

[8] Q: And was there anything specific she said that engendered

[9] this concern that she might?

[10] A: Not one specific snippet of conversation. Just the

[11] tone.

[12] Q: By the tone, Mrs. Brown, what do you mean, the strength

[13] of her conviction when she discussed her religious

[14] beliefs?

[15] A: My feeling. Simply my feeling was that it would be very

[16] difficult. It was going to be difficult for her to

[17] separate those. I am not saying that you abrogate or,

[18] you know, go against your belief systems, but you have

[19] to temper what you believe with an understanding of

[20] representing all of the people.

[21] Q: Okay. And —

[22] A: Being sensitive.

[23] Q: I think I do understand now what you are getting at.

[24] You came away thinking as a new Board member, she — it

[25] seems; tell me if I am wrong — that she might need to

Page 69

[1] have her sort of consciousness heightened about this

[2] public duty and this dimension of it as you see it?

[3] A: Yes. And I felt over time, she would see more and more

[4] how we operated. As I said, she was a brand new Board

[5] member. She had not had the opportunity to take the

[6] formal seminars or classes.

[7] Q: Did you discuss any specific issues that might come up?

[8] Did you bring anything —

[9] A: No, I did not.

[10] Q: Did she bring any issues to your attention?

[11] A: In what sense?

[12] Q: That implicated this concern you had.

[13] A: Not that I recall directly.

[14] Q: Now I think it seems that your testimony thus far has

[15] been about one meeting in which she —

[16] A: One particular, yes.

[17] Q: Were there any other meetings with Mrs. Cleaver —

[18] A: No.

[19] Q: — that contributed —

[20] A: Not in that way.

[21] Q: So let's look again at 2003. And looking for your

[22] recollection of any other issues that came up during

[23] that year that might have implicated your concern for

[24] the separation of church and state or religion in the

[25] schools, was there anything else in 2003?

Page 70

[1] A: Not that comes to mind specifically.

[2] Q: I am trying to remember was there any time in which

[3] prayer in the school became an issue? And I mean apart

[4] from the Pledge.

[5] A: I understand. To be honest, I don't recall

[6] specifically.

[7] Q: How about if we look at the issue that brought us here

[8] in the year 2003? Do you recall anything coming up that

[9] related to the biology text or the biology curriculum in

[10] 2003?

[11] A: As part of the normal cycle of textbook review, biology

[12] texts were part of that review. But we had a lot of

[13] budgetary constraints and did not at that time approve

[14] new textbooks.

[15] Q: Okay. This is in 2003?

[16] A: Yes.

[17] Q: Just try and give me the sense for the season. Was it

[18] winter, spring of 2003?

[19] A: It would have been late spring of 2003 as part of the

[20] budgetary process. I can't be more specific than it

[21] would have probably been April or May because we have to

[22] have our budget approved by the 30th of June of each

[23] year.

[24] Q: Right. If my memory serves from other depositions, that

[25] is when the Departments propose — in the spring they

Page

[1] propose the text purchases?

[2] A: Yes, March, April. Because we have as part of the

[3] budgetary review process, each Department, specifically

[4] in the middle and high school levels, presents textbooks

[5] for review. They make their recommendations.

[6] Q: And they present their recommendations to who?

[7] A: Subcommittees of the Board.

[8] Q: What committee is charged with that responsibility?

[9] A: The initial recommendations come through curriculum.

[10] But it would also be budget.

[11] Q: And let's see in 2003, who was in charge of the

[12] curriculum committee; can you recall?

[13] A: If memory serves, it was Mr. Bonsell.

[14] Q: So the recommendation would come in the spring of

[15] 2003. And then you mentioned fiscal concerns. It seems

[16] it came to a vote.

[17] A: The actual review process would have started in the late

[18] fall of 2002. The recommendations would have come

[19] forth in the spring, early spring.

[20] Somewhere around — and here, I can't be totally

[21] accurate. But somewhere around the latter part of

[22] February, beginning of March is when we begin our

[23] budgetary discussions.

[24] Q: Were you on the curriculum committee at that time?

[25] A: No, I was not.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Carol Brown
May 16, 2005

---

Page 72

[1]   Q: So recommendations in the spring, but you seem to recall
[2] a vote. When would that be, a vote on the text
[3] purchase? Do you recall it coming up for vote?

[4]   A: It would have been late spring.

[5]   Q: If we look at this again focusing on the biology text
[6] and the purchase of that book, do you recall it coming
[7] up in the fall of 2003, or had it been resolved by then?

[8]   A: We didn't approve the purchase of texts in the spring
[9] because of budgetary considerations. The review process
[10] had begun for the following year in the fall of 2003.

[11]   Q: Okay. I think I understand you now. In other words,
[12] they know as of the spring that they are not getting the
[13] book that year?

[14]   A: Yes, for the following year. Your process — when you
[15] approve a budget, it is for the following school year,
[16] not the current year.

[17]   So the review process begun in fall of 2002 — in
[18] other words, looking for new textbooks, etcetera, the
[19] textbooks that the Departments — whether it be science
[20] or elementary or whatever — would come up in the next
[21] year, early in the next year. And then it would become
[22] yes, we approve or don't approve, but it is based on
[23] budgetary considerations.

[24]   Every one group or one subject area of the
[25] curriculum is reviewed. It is a seven-year cycle if

---

Page 73

[1] memory serves.

[2]   Q: I think I am getting better now because I am confusing
[3] the school year and the calendar year.

[4]   A: Very different for you.

[5]   Q: Okay. In 2003, fiscal concerns nixed the book. Do you
[6] recall any discussion about the use of the biology text
[7] at that time, whether the teachers were using it?

[8]   A: There were discussions about that. My understanding —
[9] and I was not directly involved in that — but based on
[10] what I remember from Board meetings, my understanding
[11] was that — and perhaps this is colored by my own
[12] thoughts on it — the biology text that was then in use
[13] had perhaps not been well chosen because what we heard
[14] from the teachers was that it was not a very usable
[15] text, and they almost never used it.

[16]   Q: Okay. That is why I asked, Mrs. Brown. Was there any
[17] discussion of that when it came to whether we really
[18] need these books in 2003?

[19]   A: The text then in place had not been used very much. I
[20] believe Mrs. Harkins had said we haven't used these
[21] texts, why are we going to get new ones? And if I am
[22] misquoting her, I apologize. But that was one of the
[23] considerations. We all had that.

[24]   It was not the subject matter per se. It was why
[25] are we buying new textbooks when we have not used the

---

Page 74

[1] old ones.

[2]   Q: Do you recall any comments from the teachers in response
[3] to that query?

[4]   A: That's where my comment relating to perhaps an ill
[5] chosen text comes from. Mrs. Spahr, as head of the high
[6] school Science Department, spoke to us relating to the
[7] fact that they were not very useful.

[8]   They did not really — we had the standards from
[9] the state. And evidently, these textbooks were not
[10] usable — not very usable in light of the Pennsylvania
[11] standards from the Department of Education.

[12]   Q: How about do you recall any statements from members of
[13] the public in 2003 relating to the purchase of the
[14] biology texts?

[15]   A: Mrs. Callahan, that is former Board member Mrs. Barrie
[16] Callahan, wanted us to buy the new textbooks.

[17]   Q: At this point, she is no longer on the Board; is that
[18] correct?

[19]   A: I believe so.

[20]   Q: Do you recall any of the comments she made in support of
[21] her urging the Board to purchase the texts?

[22]   A: She did it so often. Basically, she just felt that we
[23] needed to spend whatever was necessary regardless.

[24]   Q: If you look at Mrs. Callahan's — to the extent she
[25] spoke to the biology text and try to give me the sense

---

Page 75

[1] you had, if any, for the thrust of her comments, what
[2] were her concerns in 2003?

[3]   A: It would be difficult for me to separate because she
[4] made similar comments — expressed similar concerns
[5] throughout the years that I served with her. Basically,
[6] whatever it costs to make sure that our kids get the
[7] very best.

[8]   There was not one particular item that stands out
[9] in my mind that she focused on. It would have been
[10] textbooks across the Board.

[11]   Focusing on one specific subject matter was simply
[12] I believe because they were the textbooks under review
[13] at that point in time. I don't think it would have
[14] mattered, the subject — what the subject matter
[15] covered.

[16]   Q: Let me ask you this: Earlier you mentioned there was
[17] some difference in judgment among Board members about
[18] accountability and particularly the fiscal burdens that
[19] followed from the use of tax dollars to do the business
[20] of Dover Area Schools.

[21]   If you look at Mrs. Callahan specifically, do you
[22] see her as more of a spender?

[23]   A: Yes.

[24]   Q: Because I am just trying to understand. It seems now
[25] and the way you are describing her position on the book,

---

Carol Brown
May 16, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 76

[1] it is basically if the kids need the book, or if the

[2] book is up, let's buy one; is that accurate?

[3]     A: Yes. That is strictly a personal opinion, but yes.

[4]     Q: Sure. All right. So if I understand you correctly now,

[5] the purchase is put off in the spring of 2003 because of

[6] fiscal concerns?

[7]     A: Yes.

[8]     Q: But then it seems you said therefore in the fall of

[9] 2003, they are going to start looking at it for the next

[10] year?

[11]     A: Yes, for the 2004-2005 school year.

[12]     Q: Now if we look at the fall of 2003, was there any — it

[13] seems from the process you have described, the teachers

[14] wouldn't be putting the recommendation back in front of

[15] the Board yet; would they?

[16]     A: No, not at that point.

[17]     Q: So did it come up at all, do you know, in the fall of

[18] 2003, the biology text?

[19]     A: In what context?

[20]     Q: That is what you. I am asking you it seems it should be

[21] off the radar, but I just want to see if you recall it.

[22]     A: I don't recall anything specific. I know that we were

[23] beginning a new review process.

[24]     Q: Right.

[25]     A: And part of that review process does involve a number of

Page 77

[1] stakeholders to use the old term again.

[2]     Q: Let's look at — again, I just want to keep us focused

[3] on the biology text wrapping up 2003, the stakeholders.

[4] Would they be implicated in the fall, or would they be

[5] waiting for the spring when the process begins again?

[6]     A: That varies. That would really depend on the time frame

[7] of their deliberations.

[8]     Q: Okay. It seems you really — do you remember it coming

[9] up in the fall of 2004, the biology text again?

[10]     A: Not really.

[11]     Q: How about any public comment or issues being made at

[12] Board meetings in the fall of 2003 about that decision

[13] of the Board not to buy the book?

[14]     A: Mrs. Callahan made some comments not supporting the

[15] Board's actions.

[16]     Q: Was Mrs. Callahan joined by others in criticizing the

[17] Board?

[18]     A: Yes.

[19]     Q: Who were they?

[20]     A: That changed over a number of meetings. If memory

[21] serves, Mr. Snook, Mr. Langione were also among those

[22] who expressed opinions.

[23]     Q: Okay. Let me ask you, Mrs. Brown, sitting on the Board

[24] at that time and hearing this criticism say from those

[25] individuals, did you think they had another agenda? Did

Page 78

[1] you think their criticism was in part politically

[2] motivated?

[3]     A: You are asking me to ascribe motivation?

[4]     Q: I understand your sensitivity on that point and respect

[5] it, but I do know that as a Board member, people come up

[6] and voice complaints, and over time, you look at them

[7] and say not this person again, not that same issue and

[8] so on?

[9]     A: Actually in point of fact, when any of the three came up

[10] to the podium, I shut my ears.

[11]     Q: Fair enough. Let me ask you: Is it because you saw

[12] them as sort of ginning up issues just for political

[13] issues?

[14]     A: I do beg your pardon. What was the expression?

[15]     Q: Ginning up issues?

[16]     A: Could you explain, please?

[17]     A: Sure. Whipping them up or looking for issues.

[18]     A: In other words, trying to make the Board look foolish?

[19]     Q: Yes.

[20]     A: Yes.

[21]     Q: All right. So now we get into December of 2003. Let me

[22] ask you: To the extent you can recall, was there a

[23] reorganization meeting in December of 2003?

[24]     A: Yes. There's always one.

[25]     Q: And tell me how that went to the best of your

Page

[1] recollection. Who shifted positions and why?

[2]     A: It is normal procedure to have the reorganization

[3] meeting.

[4]     Q: Okay.

[5]     A: And Mr. Bonsell was elected President, and Mrs. Harkins

[6] was elected Vice-President.

[7]     Q: I think you have indicated that election is by the

[8] Board?

[9]     A: Yes, it is. Not by secret ballot as per Public School

[10] Code.

[11]     Q: Is there a Treasurer?

[12]     A: Treasurers are elected in June of each year.

[13]     Q: Is that again by the Board?

[14]     A: Yes, it is.

[15]     Q: Did any other candidates throw their hat in the ring for

[16] either President or Vice-President, or how does it work?

[17] Are you nominated?

[18]     A: Yes, you are.

[19]     Q: Was more than one person nominated for either — for the

[20] Presidency for example?

[21]     A: I don't recall.

[22]     Q: How about Vice-Presidency?

[23]     A: I was also nominated. I had expressed desire to serve

[24] as Vice-President.

[25]     Q: Are there any rules that govern that?

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Carol Brown
May 16, 2005

**Page 80**

[1]    A: In terms of what?

[2]    Q: In terms of the degree — how often or frequently you

[3] can be an officer of the Board.

[4]    A: No.

[5]    Q: You had already been President?

[6]    A: That is correct.

[7]    Q: Had Mr. Bonsell been President before?

[8]    A: No.

[9]    Q: Had Bill Buckingham been President?

[10]    A: No.

[11]    Q: And Sheila Harkins, had she been President before?

[12]    A: No.

[13]    Q: Had you been Vice-President before?

[14]    A: No.

[15]    Q: It seems there is no set rotation or anything?

[16]    A: That is correct.

[17]    Q: Was the vote for the Vice-President position

[18] contentious?

[19]    A: No.

[20]    Q: Is there any expectation that the Vice-President become

[21] the next President, is there a custom?

[22]    A: No.

[23]    Q: There isn't.

[24]    A: I think it has been the cycle for the last couple of

[25] years, but there is no rule or anything like that.

**Page 81**

[1]    Q: Do Board members reach an understanding — let me ask

[2] you: When you guys ran, did you reach an understanding

[3] as to who would be President or who could be

[4] Vice-President and so on?

[5]    A: Not a formal understanding.

[6]    Q: How about as we approach the December, 2003 Board

[7] meeting, the reorganization meeting, did you have

[8] discussions with your former running mates about this

[9] process of nominating officers coming up in December?

[10]    A: Not about the process of nominating officers, no.

[11]    Q: You said you expressed interest in getting into the

[12] Vice-President position?

[13]    A: Yes, I did.

[14]    Q: Any specific issue that led you to express that

[15] interest?

[16]    A: No.

[17]    Q: Any other issues that came up during the December, 2003

[18] reorganization meeting that stick out?

[19]    A: I don't recall.

[20]    Q: How about if you look at the — we are leaving 2003, was

[21] the school project still a big issue?

[22]    A: I would have to say it would depend on who you talked

[23] to.

[24]    Q: How about yourself, how did you see it? Was it still an

[25] important part of your desire to serve on the Board?

**Page 82**

[1]    A: The school construction project was never part of my

[2] desire to serve on the Board.

[3]    Q: Forgive me if I misunderstood you. Wasn't that part of

[4] your concern for accountability and sensitivity to the

[5] tax burden?

[6]    A: The project itself was not my concern. The fiscal

[7] portion — what is the term — getting the biggest bang

[8] for one's buck I believe is the current term.

[9]    Q: Okay.

[10]    A: That was my concern. I would have to say I was also

[11] concerned that we have the best possible layout for our

[12] students in terms of classes.

[13]    Q: Layout meaning the organization of the school?

[14]    A: Yes. And security.

[15]    Q: I am just trying to get a sense for where you are in

[16] December of 2003 as we go into by all accounts a

[17] contentious year. You are still obviously committed to

[18] public service. You have not resigned. You actually

[19] have some interest in being Vice-President.

[20]    Were there any new issues that had come to light

[21] since your last election that sort of spurred you on or

[22] made you interested in being the Vice-President of the

[23] Board?

[24]    A: I expressed interest in being Vice-President because I

[25] had thought perhaps being one of the most — I was the

**Page 83**

[1] most senior member of the Board in terms of experience.

[2] I could bring something to the position.

[3]    Also, you know, I had served as President. I had

[4] that honor. But I had not had the opportunity to serve

[5] as Vice-President. The support was not there, and we

[6] went on from there.

[7]    Q: You say the support wasn't there. Was it just a

[8] question of giving everyone a shot, or was there

[9] something more?

[10]    A: I think it was.

[11]    Q: We are entering the contentious year that brings us

[12] here. I just want to get your recollection for how the

[13] process unfolds. If we set aside for a moment the

[14] things we know are going to be a big topic, which is the

[15] biology text, the biology curriculum, and I want you to

[16] look again at this concern you have for the separation

[17] of church and state, were there any other issues that

[18] came up in 2004 that you saw as implicating that

[19] concern?

[20]    A: I don't understand the question.

[21]    Q: Okay. I am sorry.

[22]    A: Are we in the year 2004 or 2003 at this point?

[23]    Q: 2004.

[24]    A: All right. We have now come into the January of 2004?

[25]    Q: Yes.

Carol Brown
May 16, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 84

[1]  A: I am trying to be clear in my own mind what year it is
[2]  we are in.
[3]  Q: I appreciate that. I know we are going to be talking
[4]  about the biology text and biology curriculum. Before
[5]  we do that and I try and see what you recall about that
[6]  process, I am wondering was there anything else that
[7]  came up during 2004 that implicated the concern you have
[8]  expressed for the separation of church and state?
[9]  A: I view everything that happened in 2004 as so totally
[10]  interconnected, I couldn't begin to separate them for
[11]  you.
[12]  Q: All right. Let's take a look at 2004 and start with
[13]  December through say March.
[14]  A: December is 2003. Forgive me.
[15]  Q: Forgive me. January through March.
[16]  A: Thank you.
[17]  Q: Do you recall any discussion of the biology text during
[18]  that period?
[19]  A: Committee selections were made by the President. That
[20]  would have been Mr. Bonsell at that time in January if
[21]  memory serves. Mr. Buckingham became chair of
[22]  curriculum. I was on the curriculum committee at that
[23]  point in time.
[24]  Obviously, the texts were being brought out for
[25]  review. Mr. Buckingham however was not present for all

Page 85

[1]  of that time period because of a personal situation.
[2]  Q: And what was the period of his absence there in 2004?
[3]  A: I don't actually recall.
[4]  Q: But you recall him being absent at least some of the
[5]  time during this winter-spring of 2004?
[6]  A: Yes, he was. I am sure the minutes of the meetings
[7]  would give you the dates exactly.
[8]  Q: Minutes of which meetings?
[9]  A: Of the Board meetings of that time period.
[10]  Q: Okay. I'm sorry. How about for your part looking at
[11]  that winter-spring 2004 period, January through March?
[12]  A: I am not aware I missed any meetings.
[13]  Q: Do you recall when the biology text was offered again?
[14]  A: April. Do you mean in the meetings themselves?
[15]  Q: The Board meetings. I am trying to get a sense for how
[16]  the process worked from your standpoint. Are all your
[17]  activities as a member of the curriculum committee at
[18]  School Board meetings, or do you meet apart from the
[19]  School Board meetings?
[20]  A: We meet apart from them.
[21]  Q: Do you recall meeting apart from the School Board as the
[22]  curriculum committee during the winter-spring period?
[23]  A: Yes.
[24]  Q: When?
[25]  A: April. May I look at my calendar? I can give you the

Page 86

[1]  date.
[2]  Q: Certainly.
[3]  A: If I can read it. I may stand corrected on this. I am
[4]  just looking. I do stand corrected. I will correct for
[5]  the record the meeting I was referring to was my own
[6]  policy committee meeting. I do apologize. And that was
[7]  on the 27th. That would be Tuesday, the 27th of April
[8]  of 2004.
[9]  The discussion with Mr. Buckingham was outside of
[10]  the meeting itself. The first very formal combined
[11]  curriculum meetings that I have occurred in May. So I
[12]  apologize.
[13]  Q: Thank you for being diligent. I am not trying to put
[14]  you on the spot. I appreciate it actually.
[15]  A: It is nice to be precise. I try.
[16]  Q: So you got April 27th you have indicated there was a
[17]  policy committee meeting?
[18]  A: Yes. And Mr. Buckingham was a member of that committee,
[19]  as was Mrs. Harkins, and myself as chair and
[20]  Mrs. Geesey. And, of course, Mr. Bonsell as President
[21]  was ex officio member.
[22]  Q: Now if I understand you correctly, Mrs. Brown, there was
[23]  some discussion of the biology text outside of this
[24]  April meeting?
[25]  A: Mr. Buckingham and I had a discussion. He had occasion

Page 87

[1]  — I not drive that day. He was kind enough to offer me
[2]  a ride home. And during that ride, we discussed the
[3]  role of faith in the schools.
[4]  Q: Do you recall what Mr. Buckingham said to you on that
[5]  topic?
[6]  A: He felt that it was important to bring God back into the
[7]  classroom.
[8]  Q: And when you had this conversation, did you have a sense
[9]  for what he meant by that?
[10]  A: I am not sure how much clearer one can be, other than to
[11]  say we want to bring God and faith back into the
[12]  classroom. What exactly do you want?
[13]  Q: That is what I am trying to get. Did he make any
[14]  specific recommendations for a course of action? Did he
[15]  say the kids should pray again in school?
[16]  A: Yes, he did.
[17]  Q: Anything else did he mention?
[18]  A: He felt that we should bring prayer and Bible reading
[19]  back into the schools. It so happens Mr. Buckingham and
[20]  I are the same age. So we both remember that time
[21]  period.
[22]  And there was a discussion relating to the
[23]  breakdown of society and morality. And Mr. Buckingham
[24]  attributed that to the removal of prayer, the Bible,
[25]  etcetera from our school systems.

Tammy Kitzmiller, et al.  v.
Dover Area School District, et al.

<div align="right">Carol Brown
May 16, 2005</div>

**Page 88**

[1]  Q: And I take it you had a discussion with him, and I am
[2] sure that he did not hear just plain yesses from you.
[3] How did you respond to Mr. Buckingham?
[4]  A: I said very little. I responded when necessary because
[5] I was frightened.
[6]  Q: Just so that I understand you correctly, when you say
[7] frightened, did you mean you felt uncomfortable with the
[8] sort of —
[9]  A: I was physically frightened of what he was saying.
[10]  Q: Okay. What do you mean by that, Mrs. Brown? Did you
[11] feel threatened?
[12]  A: No. I wasn't in fear of him. I was frightened of what
[13] he was saying and what I saw as a possibility of what
[14] could occur.
[15]  Q: Okay. Am I understanding you that it was along the
[16] lines of this concern you have expressed with respect to
[17] Mrs. Cleaver?
[18]  A: Yes. They were members of the same church. And he
[19] asked me the same questions she asked me.
[20]  Q: What was that?
[21]  A: Was I born again.
[22]  Q: And how did that conversation come up? Were you again
[23] discussing religion generally?
[24]  A: Actually, the conversation was — I guess you would say
[25] an offshoot of policies. Because we were discussing

**Page 89**

[1] public participation in meetings and so forth, and you
[2] kind of segue into other things.
[3]  Q: Do you recall what led you to segue into this specific
[4] area?
[5]  A: Something — I can't be — again, I cannot quote
[6] exactly. This is verbatim. We talked a little bit
[7] about some of our frustrations, our concerns about not
[8] just public participation, but student discipline.
[9] There has been a real change in discipline policies in
[10] this District during my tenure on the Board,
[11] specifically in the last three to four years.
[12]  We have a zero tolerance for certain things. How
[13] specific did you wish me to be?
[14]  Q: Well, go on. It seems what you are saying is that this
[15] part of the discussion is what —
[16]  A: Led into the rest.
[17]  Q: — led into the rest. So I would like to get a sense
[18] for the way the conversation went.
[19]  A: Okay. Our first zero tolerance came out of state law
[20] which was weapons. And the state went a little
[21] overboard, and it reached a point where by state
[22] mandate, we were required to expel elementary students
[23] who brought toenail clippers to school. Fortunately,
[24] that was modified, and we were allowed to use our best
[25] judgment on that. But we had to promulgate policies to

**Page 90**

[1] cover this. And over time, policies are reviewed by
[2] State Code and custom.
[3]  It is recommended that you review every policy at
[4] least once every three years. And you are talking many
[5] hundreds of policies.
[6]  So the zero tolerance — the first zero tolerance
[7] related to violence and weapons, or look alike weapons
[8] — and I won't going into that, but if you wish, I will
[9] define them for you.
[10]  The second zero tolerance came out of our efforts
[11] with the character education, and that is showing
[12] respect for other people, no bullying, no teasing,
[13] treating other people the way you would be treated
[14] yourself. And that relates also to one of the character
[15] education tenets of respect. And another tenet of
[16] responsibility.
[17]  The last no tolerance is harassment of any kind,
[18] whether it be racial intolerance, or sexual intolerance
[19] because of sexual orientation or inappropriate sexual
[20] behavior or insinuation. And we were reviewing public
[21] participation, public comments, and we were also
[22] reviewing those policies.
[23]  And naturally because again, you were talking
[24] about policies that do relate to morality for lack of a
[25] better word — and I apologize if that is not totally

**Page 91**

[1] accurate — that gets into the subject of personal
[2] beliefs.
[3]  Q: Sure. Now I understand exactly how the conversation
[4] flowed. And you have indicated some specific things
[5] that Mr. Buckingham mentioned. We need to get prayer in
[6] the schools, the Bible back in the schools.
[7]  Was there anything else that you can recall him
[8] mentioning during that conversation?
[9]  A: I found that sufficient to be frightening.
[10]  Q: I understand that. That was we are talking here late
[11] April of 2004?
[12]  A: Yes. I think I said the date; did I not?
[13] MR. SCHMIDT: April 27th.
[14]  A: Thank you.
[15] BY MR. GILLEN:
[16]  Q: I think you also indicated, Mrs. Brown, that then there
[17] was a formal meeting of the curriculum committee in May
[18] of 2004?
[19]  A: Yes.
[20]  Q: You were on the curriculum committee at that time?
[21]  A: Yes.
[22]  Q: Do you recall anything from that meeting?
[23]  A: Yes.
[24]  Q: Tell me if you would what you recall.
[25]  A: There were two subject areas of textbooks under

Carol Brown
May 16, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 92

[1] consideration. One was family and consumer sciences on
[2] the middle and high school levels, and the other was the
[3] science textbooks on the middle and high school levels
[4] specifically.
[5]      And we had a variety of texts available for
[6] review. And the Department heads gave their
[7] recommendations, and there was some discussion.
[8]      Q: Now this, as you indicated, is a formal meeting. Let's
[9] look from January, 2004 through this meeting in May,
[10] were there any prior meetings of the curriculum
[11] committee in 2004?
[12]      A: Not that I am aware of, but I will look. I know that
[13] there was a meeting prior to 2004 in late fall. And we
[14] were also — my apologies because we were also in the
[15] process of negotiating an Act 93 contract.
[16]      Q: I am not aware of what an Act 93 contract is.
[17]      A: My apologies. Act 93 covers most of our administrators,
[18] our technology coordinator, language arts supervisor,
[19] related areas.
[20]      Q: Employment contracts?
[21]      A: Yes. It is called Act 93 because of the positions.
[22]      Q: Good enough.
[23]      A: That is to the best of my recollection.
[24]      Q: Just so the record reflects it, Mrs. Brown, is that your
[25] — you have got a calendar. Is that a calendar for

Page 93

[1] 2004?
[2]      A: Yes, it is. It is my personal home calendar so it kind
[3] of contains a wealth of information not limited to the
[4] Dover Area School Board, York County School of
[5] Technology. York County School of Technology, my
[6] daughter's appointments, my husband's appointments, my
[7] appointments.
[8]      Q: All right.
[9]      A: And tax information which is why I keep it.
[10]      Q: It looks a lot cleaner than mine I will tell you. I
[11] understand why you brought it. I thank you for doing
[12] so.
[13]      Having looked at it, can you tell me whether you
[14] see there anything which points to a meeting of the
[15] Board curriculum committee prior to the one we are about
[16] to discuss which is May of 2004.
[17]      A: There was a curriculum committee meeting on the fourth
[18] of December, 2003.
[19]      Q: Now would you be on the curriculum committee at that
[20] time?
[21]      A: I was. And I apologize.
[22]      Q: Don't worry about it.
[23]      A: Otherwise, I wouldn't have had it down.
[24]      Q: I will ask you — it obviously didn't stick out. Do you
[25] recall any business that was conducted?

Page 94

[1]      A: No, I don't. And I have no notes. There is no
[2] reference here. So obviously, it didn't make an
[3] impression. How is that?
[4]      Q: That's fine. Let's look at this May meeting then of the
[5] curriculum committee. You have indicated that texts
[6] were up in two subject matters family and consumer
[7] science?
[8]      A: Yes.
[9]      Q: And let's look at that. It seems like a less
[10] problematic text area first.
[11]      A: Don't bet on it.
[12]      Q: Tell me what do you recall? What were the issues in
[13] play there?
[14]      A: Spending a lot of money that I didn't feel was
[15] necessary. I personally.
[16]      Q: What was your point there, Mrs. Brown? What were you
[17] getting at?
[18]      A: Family and consumer sciences wanted new textbooks in the
[19] electives of advanced levels of cooking. Also — and I
[20] am not — I can't be totally specific, but it was
[21] something related to the family, something with child
[22] development.
[23]      These were for elective courses, not required
[24] courses. And I did not feel that it was necessary to
[25] make those expenditures.

Page

[1]      Q: And is that part of your larger concern you have
[2] articulated about fiscal responsibility?
[3]      A: Yes, it is.
[4]      Q: Was there anything in those texts or any discussion of
[5] the substance of those texts?
[6]      A: Yes.
[7]      Q: Tell me, if you would, what you recall about that
[8] discussion.
[9]      A: Mrs. Whitehill represented — she was one of two
[10] representing the Family and Consumer Sciences
[11] Department. And I do not now recall the name of the
[12] other woman who was representing that Department.
[13]      But they articulated their reasons for asking for
[14] these texts, and we got into some discussion.
[15] Mrs. Harkins was there. And she I believe also had
[16] fiscal concerns related to those texts as to really —
[17] as to whether they were really necessary.
[18]      We are not talking a large group of students. And
[19] we really do have to look at the whole when we are
[20] looking at purchases that will be in the thousands of
[21] dollars.
[22]      Q: Okay. Setting aside the fiscal concern, was there
[23] anything else in the subject matter that was discussed?
[24] You mentioned child development. Was there anything
[25] about that?

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

<div align="right">Carol Brown
May 16, 2005</div>

---

**Page 96**

[1] A: The materials involved related to I believe family
[2] development or child development and the cooking. And
[3] my objection was specifically to the cooking text
[4] because I didn't feel they were necessary.
[5] Q: Do you recall anyone else on the committee making any
[6] objections to either what was in the text —
[7] A: I think it was not the subject matter within the
[8] textbooks. It was within the context of do we need them
[9] and how many students are going to be benefitted by the
[10] purchase of these texts.
[11] I believe that Mrs. Harkins and I shared similar
[12] concerns along those lines. It had nothing to do with
[13] what was actually contained in the texts. When you are
[14] talking about 20 to 30 students compared to 1,024, which
[15] was then the student body of the high school, one has to
[16] weigh where one can best spend the money one has.
[17] Q: Okay. I do think I have got a better sense for that.
[18] If we look at that text, how about Bill Buckingham, did
[19] he say anything about it?
[20] A: Not that I recall.
[21] Q: What was the other member?
[22] A: He was new to the committee, too.
[23] Q: And Heather Geesey was the other member; is that
[24] correct?
[25] A: No.

**Page 98**

[1] as I recall in his role as Assistant Superintendent and
[2] having responsibility for curriculum as Assistant
[3] Superintendent, was there. So basically, they made
[4] their cases for the various texts.
[5] Q: Let me just stop here and ask you when you had that
[6] meeting with Bill in the car when he was driving you
[7] home after the April 27th meeting, did Mr. Buckingham
[8] mention anything to you about the curriculum committee
[9] during that conversation?
[10] A: Not that I recall.
[11] Q: So now would this May, 2004 meeting be the first time in
[12] 2004 that the biology text has come up?
[13] A: In a formal way, yes, I believe so.
[14] Q: And you say in a formal way. Looking back on the period
[15] prior to May of 2004, was there any in any way, formal
[16] or informal, that the biology text came up prior to this
[17] meeting?
[18] A: There were no votes that I recall, no formal
[19] recommendations in public Board settings. We are
[20] talking to the best of my recollection here.
[21] Q: Sure.
[22] A: There had been discussion I believe during budgetary
[23] meetings, things like that. As to specific texts and
[24] contents of the text pro or con, I don't think there had
[25] been much, if any, discussion prior to this point in

---

**Page 97**

[1] Q: I am sorry.
[2] A: There were only three of us on curriculum other than
[3] Mr. Bonsell in his role as ex officio member as
[4] President of the Board. I don't recall that he was
[5] there.
[6] Q: Now you indicated that the biology text came up?
[7] A: Yes. Biology. I believe we also discussed physics and
[8] chemistry because you are talking science curriculum
[9] review.
[10] Q: All right. Tell me what you can. Can you recall
[11] anything about those discussions?
[12] A: Mrs. Spahr, Mrs. Miller and Mr. Eshbach — and I have to
[13] be honest, I think Mr. Eshbach was there for that
[14] meeting, but I may be in error — were there, and they
[15] made the presentation relating to the texts.
[16] Q: Okay. What do you recall about their case for the
[17] biology text?
[18] A: We reviewed a number of textbooks. And basically they
[19] presented the pros and cons of each one. The texts they
[20] were recommending was Modern Biology by Prentice Hall,
[21] if memory serves. And it was the same text that they
[22] had recommended the previous year that we had voted down
[23] because of budgetary constrictions.
[24] They related why they approved or disapproved of
[25] each text, the strengths and weaknesses. And Mr. Baksa,

**Page 99**

[1] time.
[2] Q: How about — it occurs to me now listening to you that
[3] everyone knows the biology text is going to be up again
[4] in 2004?
[5] A: When you say up again, I'm sorry, I have to say that the
[6] text we were then using is not the same text that was
[7] being recommended.
[8] Q: Right.
[9] A: Okay. As Board members, every Board member was afforded
[10] the opportunity to review every textbook up for review.
[11] They were available to borrow or to review in situ in
[12] the Assistant Superintendent's office.
[13] All you had to do was go in and ask. And you did
[14] not have to be — nor do you unless it has changed in
[15] recent months — be a formal member of the curriculum
[16] committee. If you are interested in reviewing any
[17] textbook at any time, any and every Board member is
[18] afforded that opportunity to freely review, not at one
[19] specific point in time.
[20] Q: Okay.
[21] A: Textbooks currently in use are available for review at
[22] any point in time by any Board member. There is not a
[23] time limit.
[24] Q: Okay. And so looking at this period in the spring then,
[25] once the teachers — first of all, there is a book that

---

Carol Brown
May 16, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 100

[1] is being used, and that is readily available?

[2] A: That's correct.

[3] Q: And then now there is a recommendation that they have

[4] come up with. Is that also available for review?

[5] A: Absolutely, and has been for some time prior to that.

[6] The teachers purchase, borrow, I think many times — and

[7] here I am not — I can't be totally accurate because I

[8] am not sure, that various textbook publishers do make

[9] available complimentary copies. I can't be sure of how

[10] many. But obviously, they want their texts out there in

[11] the field. They don't sell the texts; they don't make

[12] money.

[13] So it was not as though these were new texts in

[14] the fact that they had never been made available to

[15] anyone prior to this meeting. They were available. And

[16] several of them had been available for review since the

[17] preceding year which in this case would have referred to

[18] the 2002-2003 school year.

[19] Q: Now I understand better what you are getting at. In

[20] other words, the process is initiated again for this

[21] part of the year, but that doesn't mean we are starting

[22] from a blank slate?

[23] A: Absolutely not.

[24] Q: It occurs to me was there a retreat in the winter-spring

[25] period for 2004?

Page 101

[1] A: Please define retreat.

[2] Q: I guess what you guys what or what is sometimes referred to

[3] as a Board retreat, where you go to one of the

[4] facilities and have dinner and a discussion of Board

[5] business.

[6] Do you recall a retreat in the January through

[7] March or April period of 2004?

[8] A: No, I don't. Not to say there wasn't one. I just don't

[9] remember. Perhaps you can ask my husband that question

[10] tomorrow.

[11] Q: Okay. Well, how about taking a short break?

[12] A: As you will.

[13] (A luncheon recess was taken.)

[14] AFTER RECESS

[15] A: I want it very clear that I am not part of the

[16] plaintiffs' suit, nor am I associated in any way with

[17] the defendants' suit. When you asked me about my

[18] contact with lawyers for the plaintiffs and I indicated

[19] we had a meeting with them yesterday, they were kind

[20] enough to come to our home in order to accommodate our

[21] schedules because we were not able to match our

[22] schedules in any other way.

[23] I was not aware of the right for people not

[24] directly involved in a deposition to be present. My

[25] past experience with depositions has been — has given

Page 102

[1] me the understanding that only the legal professionals

[2] and the person being deposed, along with the reporter,

[3] were present at such depositions. And that was because

[4] of the confidentiality of the issues. So it was off

[5] putting for me to come in to this deposition to find

[6] other individuals present.

[7] I object on principle to it. Thank you.

[8] BY MR. GILLEN:

[9] Q: All right. Are you ready to pick up?

[10] A: Yes.

[11] Q: The May, 2004 meeting of the curriculum committee?

[12] A: Yes.

[13] Q: We have discussed the family and consumer science texts

[14] and some of the issues you saw there. We are getting to

[15] sort of the dead center heart of the dispute which is

[16] this biology text and the controversy that arose around

[17] the text in the biology curriculum.

[18] Tell me, Mrs. Brown, when you were present at this

[19] May meeting, who else was there?

[20] A: To the best of my recollection, there were two members

[21] from the Family Consumer Sciences Department. I did

[22] identify Mrs. Whitehill as being one of them. And I

[23] will be honest. I do not now recall the name of the

[24] other lady who was a part of that.

[25] To the best of my recollection representing the

Page 103

[1] Science Department were Mrs. Bert, short for Bertha,

[2] Spahr, head of the Science Department for the High

[3] school, Mrs. Jennifer Miller and I believe Mr. Eshbach.

[4] There was a third individual. That is to the best of my

[5] recollection.

[6] Representing the curriculum committee were the

[7] three members of that committee Mr. William Buckingham,

[8] who was Chair, Mrs. Sheila Harkins, who was then Board

[9] Vice-President and myself.

[10] Representing the administration to the best of my

[11] recollection was Mr. Michael Baksa. The area of

[12] curriculum falls under his purview in his role as

[13] Assistant Superintendent.

[14] Q: All right. You indicated that several books were up I

[15] believe. Chemistry?

[16] A: Chemistry, physics and biology. There may well have

[17] been an earth and science, but I don't recall that.

[18] Q: Okay. Now let's take the biology text out and just look

[19] at the physics and chemistry. Any discussion of those

[20] text recommendations by the teachers?

[21] A: I think I was the only one who commented, and I

[22] commented to the effect having reviewed the chemistry

[23] text being recommended, that had I had it in high

[24] school, I would have enjoyed chemistry a great deal

[25] more. It was — is an extremely well done text in the

Min-U-Script®   Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Carol Brown
May 16, 2005

Page 104

[1] presentation of material and also in the support,
[2] network available for students to utilize.
[3]   Q: Was there a particular reason that you had decided to
[4] examine that text?
[5]   A: I examined all of the texts. As a member of the
[6] curriculum committee, it was my responsibility to be
[7] familiar, to make myself familiar with the various texts
[8] under review. How could I otherwise make a
[9] knowledgeable decision myself?
[10]   Q: Okay. How about the physics text?
[11]   A: I reviewed that as well.
[12]   Q: Let's stick with the chemistry one. Anyone else make
[13] any comments to the chemistry text?
[14]   A: Not that I recall.
[15]   Q: How about the physics?
[16]   A: I am not sure if there were any comments made. I might
[17] have said something to the effect an interesting text,
[18] but I can't be sure. It was not anything controversial,
[19] how is that?
[20]   Q: Okay. That is a starter for sure. Then there is the
[21] biology text?
[22]   A: Yes.
[23]   Q: It seems you have a practice of reviewing all of the
[24] texts?
[25]   A: I had reviewed it the previous year and reviewed it once

Page 105

[1] again. Although admittedly, I had not read the whole
[2] text.
[3]   Q: Okay.
[4]   A: I will freely admit that science texts are not my
[5] favorite area, but I have a responsibility if I am a
[6] member of the curriculum committee to at least be
[7] familiar with the material which I am discussing and
[8] voting on.
[9]   Q: I see that. When you review them, let's just get a
[10] sense for that. Plainly, you have had some post
[11] secondary instruction in science?
[12]   A: Yes, I have.
[13]   Q: I think also you have indicated it is sort of a general
[14] review. What are you looking for as a curriculum
[15] committee member when you look at the text?
[16]   A: I think the first thing that — I will rephrase and say
[17] the first thing I do when I am reviewing a text is to
[18] compare it to the standards set forth by the State
[19] Department of Education to see how the broad outline of
[20] the course material falls into those requirements. Does
[21] it meet the requirements that the state set forth for
[22] us? If it doesn't, it is not going to be a very
[23] valuable text for use.
[24]   That is the first thing I look at regardless of
[25] the subject area. Obviously, I have some expertise in

Page 106

[1] other areas, less in some. In the areas in which I have
[2] less expertise, I will spend more time because it takes
[3] me a little longer to get it, particularly math. But
[4] having done that, then I will begin to sample chapter by
[5] chapter.
[6]   I will read it for understandability first, what
[7] kind of language does it use. And there again, you have
[8] to look at the grade levels on which this text is
[9] proposed for use. Beyond the grade levels themselves,
[10] you have to look at the class of students who are going
[11] to be using it.
[12]   Are these all regular education students? Are we
[13] going to be using it for special needs — special
[14] education students who are mainstreamed in this
[15] particular subject, or is this an advanced placement or
[16] honors text?
[17]   So you have to look at it within all of those
[18] contexts. And as you review it, as I said, I am looking
[19] at it for readability. Is this going to put me to sleep
[20] after five minutes? If it puts me to sleep, what is it
[21] going to do for the average high school student?
[22]   Because I am a little more academically oriented,
[23] if you will, than some students are. And this is the
[24] way I review something.
[25]   If it really catches my interest, and I will be

Page 107

[1] honest, for the first time in my life, I voluntarily
[2] read the chemistry text — a chemistry text cover to
[3] cover because I was fascinated by the approach. It is
[4] very, very different from the traditional.
[5]   And as far as the biology text was concerned, as I
[6] said, I had already reviewed it once and had given it a
[7] cursory secondary review. But after that meeting, then
[8] I did sit down with the text because it wasn't what I
[9] had read cover to cover. And I read it cover to cover
[10] in light again of the state requirements.
[11]   Q: Okay. And to the extent you can recall it, what was
[12] your sense for the way in which the text dovetailed with
[13] the state standards in biology?
[14]   A: Beyond the fact that it fit beautifully with our own
[15] curriculum guidelines, it could have been written for
[16] the state standards. It was not, but it married those
[17] standards so beautifully.
[18]   I was just very, very pleased because the text
[19] offered so much to our students. It offered a jumping
[20] off point in a way that some texts do not to pique their
[21] interest. It would include even the most nonscientific
[22] student's interest.
[23]   I would say that of the chemistry text as well. I
[24] was just tickled with our science texts because I
[25] thought we had found the best available.

Carol Brown
May 16, 2005

Tammy Kitzmiller, et al.    v.
Dover Area School District, et al.

**Page 108**

[1]    Q: And just to make sure I understand you, you mentioned
[2] the curriculum guidelines. Are those Dover's curriculum
[3] guidelines?
[4]    A: Yes.
[5]    Q: You sort of flipped through the curriculum
[6] guidelines and then look looked at the text to see how
[7] they matched up; am I understanding you correctly?
[8]    A: I would have to correct your term flipped through.
[9]    Q: I know that you —
[10]    A: I studied them.
[11]    Q: Then tell me so it was really actually a more precise
[12] matching that you went through?
[13]    A: Very precise matching in general and specifically. And
[14] just a perfect matching with the state academic
[15] requirements, the standards set forth.
[16]    Q: Can you recall any of the discussion that was had at the
[17] main meeting about the biology text?
[18]    A: There was not a great deal of discussion at that
[19] particular meeting, because I can't speak for everyone,
[20] but I know for Mr. Buckingham it was a new situation for
[21] him. He had not reviewed the texts.
[22]    Q: Now did he say that?
[23]    A: Yes. Perhaps not those exact words, but that was the
[24] flavor of what he said.
[25]    Q: How about Sheila Harkins, had she been on the curriculum

**Page 109**

[1] committee before?
[2]    A: Yes.
[3]    Q: It just occurred to me did you take Bill aside, either
[4] of you, and give him some guidance as to this is the way
[5] the process works?
[6]    A: No. That was the President's job.
[7]    Q: The President of the Board?
[8]    A: Yes. And the Superintendent.
[9]    Q: So did you say there wasn't a lot of discussion of the
[10] book at this meeting?
[11]    A: Not at that particular meeting beyond the — the biggest
[12] part of the discussion — and it was not really a
[13] discussion. It was explanation from the science
[14] teachers, by the science teachers relating to why they
[15] were recommending the texts.
[16]    Q: Did they —
[17]    A: And how they fit into our programs, as well as meeting
[18] the state requirements.
[19]    Q: Can you recall what the teachers said about the text at
[20] this May meeting? Start with Bert Spahr. Did she offer
[21] anything that stuck out in your mind?
[22]    A: She indicated — and it was seconded by the other
[23] science teachers there — that there was a consensus
[24] among the science staff that the text represented the
[25] best available texts on the market.

**Page 110**

[1]    Q: Are we referring to the text by Miller and Levin
[2] Biology?
[3]    A: All of them, individually and together that they were
[4] recommending.
[5]    MR. SCHMIDT: All three?
[6]                        BY MR. GILLEN:
[7]    Q: All three of the individual texts in the three subject
[8] matters?
[9]    A: Yes.
[10]    Q: And the biology text, was it the Miller and Levin
[11] textbook?
[12]    A: Yes, Prentice Hall's, yes.
[13]    Q: Let me ask you: You seem less certain of Bob Eshbach.
[14] Was Bryan Rehm perhaps at that May, 2004 meeting?
[15]    A: Bryan Rehm was not an employe of the District at that
[16] point in time I don't believe.
[17]    Q: I could be misrecollecting also.
[18]    A: I don't know. I will be honest and say my memory is
[19] stronger on those who made the most vocal comments.
[20]    Q: Sure. When you came away from this May, 2004 meeting of
[21] the curriculum committee, anything else that pointed to
[22] the controversy that was about to arise; did you come
[23] out of their concerned?
[24]    A: Not really.
[25]    Q: Do you recall if there was any discussion in that

**Page 11.**

[1] meeting, did Bill mention anything about Intelligent
[2] Design?
[3]    A: No.
[4]    Q: How about Of Pandas?
[5]    A: No.
[6]    Q: All right. What happened next from your perspective?
[7] What do you recall next if we look at the biology text
[8] issue?
[9]    A: To the best of my recollection, at the next meeting,
[10] Mr. — the next Board meeting, my apologies,
[11] Mr. Buckingham indicated that he couldn't bring anything
[12] for a vote because he hadn't had the opportunity to
[13] review the texts. If memory serves, Mrs. Callahan was
[14] somewhat vocal about it.
[15]    Q: The next Board meeting, would this be the second meeting
[16] in May or the first meeting in June?
[17]    A: No. This would have been around the first meeting in
[18] June.
[19]    Q: So it sounds like Mrs. Callahan or somebody brought the
[20] text to the attention of the Board. How did it come up?
[21]    A: It was part of the agenda if memory serves. And public
[22] comment was still allowed — permitted during individual
[23] discussions about items on the agenda.
[24]    Q: So public comment —
[25]    A: — was not —

Tammy Kitzmiller, et al. v.
Dover Area School District, et al.

Carol Brown
May 16, 2005

**Page 112**

[1] Q: — was interspersed with Board deliberations on a given
[2] subject?
[3]    A: At various times, yes.
[4]    Q: Practically, how would that happen? How would the
[5] person from the public —
[6]    A: Raise a hand and usually come forward. Sometimes in the
[7] case of Mr. Snook, just holler. He has a very
[8] penetrating voice.
[9]    Q: So it sounds like the biology text was on the agenda for
[10] the first meeting in June?
[11]    A: Right. It was not on the agenda for a vote.
[12]    Q: Tell me —
[13]    A: The first meeting of every month is what is called a
[14] planning meeting of the School Board. And unless it is
[15] something that we must approve immediately or
[16] retroactively, say in the case of an employment
[17] situation, we discuss most matters, get out questions,
[18] concerns, etcetera during planning meetings.
[19]    The other exception would be if we had student
[20] disciplinary hearings, there are certain procedures, we
[21] must follow. We have time constraints. Things must be
[22] done in a certain fashion by a certain time, and votes
[23] on those issues would be taken as needed during a
[24] planning session.
[25]    But the majority of the Board's business is voted

**Page 113**

[1] upon and approved or disapproved at the second.
[2]    So it is our normal schedule — the Board's normal
[3] schedule was a planning meeting the first Monday of the
[4] month, followed by a Board action meeting the second
[5] Monday of every month.
[6]    Obviously, certain holidays interfere, and Board
[7] meetings are then either rescheduled to the Tuesday —
[8] the first Tuesday, or depending on the scheduling
[9] situation, the Board meetings will then be the second
[10] and third Mondays of the month.
[11]    Q: Okay. So at this first meeting, it is a planning
[12] meeting?
[13]    A: Normally, it is primarily a planning meeting. We do not
[14] take a lot of action.
[15]    Q: Do you recall then why would the text be on that agenda?
[16]    A: Because the first agenda of the month basically includes
[17] everything that will be covered, will be coming up for
[18] discussion, recognition or approval.
[19]    Q: Okay. And can you tell me — can you recall how at this
[20] first meeting in June the biology text began to be
[21] discussed?
[22]    A: It would have been within the context of its placement
[23] on the agenda. Now items that — on each agenda, you
[24] would have items that were starred. These are the items
[25] that require immediate votes at that meeting. Items

**Page 114**

[1] that are not starred on a planning committee — planning
[2] meeting agenda, excuse me, do not require a vote at all.
[3] They could be what we call FYI, for your information,
[4] items. They could be items of recognition of students,
[5] staff, etcetera. Or they could be items that would
[6] require a vote at the following meeting or at a future
[7] meeting.
[8]    And then the Board sometimes will agree to what is
[9] termed a consent agenda. Certain of those items which
[10] are gone over at a planning meeting do not require
[11] certain — additional discussion. That would be say
[12] approval of the minutes of a previous meeting, or
[13] acceptance of a report from one of the committees, or a
[14] report from say the York County School of Technology,
[15] the York County High School, the Intermediate Unit —
[16] Lincoln Intermediate Unit, which is the Intermediate
[17] Unit to which Dover belongs. It might also be the
[18] business manager's report.
[19]    And if the Board agrees, then they are placed on a
[20] consent agenda. And then those items are voted upon
[21] during the regular meeting with one vote.
[22]    Q: So if we look at the sort of ordinary course of business
[23] here for the first meeting in June, am I understanding
[24] you correctly, Mrs. Brown, that essentially the biology
[25] text is up because it would be normally slated to go on

**Page 115**

[1] the agenda for the second meeting?
[2]    A: It would be approved, yes.
[3]    Q: It is an agenda item. How does that happen? Does the
[4] Board as a whole move through the agenda?
[5]    A: Yes.
[6]    Q: So it comes up curriculum issues, and that means Bill
[7] Buckingham — he was chair?
[8]    A: Yes.
[9]    Q: Then he makes a statement as to those items?
[10]    A: Yes, whoever is the chairman of a particular committee
[11] or the representative — and I mentioned some of those
[12] situations, the County School of Technology, the York
[13] County High School, the Intermediate Unit. You also
[14] have the Pennsylvania School Board representative. He
[15] or she is our representative to that particular
[16] governing body.
[17]    Also, the legislative representative, again, he or
[18] she is the liaison with the various legislative entities
[19] or individuals. Occasionally, you would have task force
[20] people who would be presenting certain types of reports.
[21]    Q: So looking at it in light of that sort of practice?
[22]    A: Yes.
[23]    Q: Is that why Mr. Buckingham then makes his observation I
[24] can't bring anything up; he is talking about the next
[25] meeting in June?

Carol Brown
May 16, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

**Page 116**

[1]     A: That was his choice. We members of the committee — at
[2] least I, as a member of the curriculum committee, was
[3] not aware of his decision prior to his making the
[4] statement at the meeting. I cannot speak for
[5] Mrs. Harkins.
[6]     Q: I thank you for bringing that up because I hadn't
[7] thought of that. Was there any discussion that you
[8] recall between the main meeting and this first meeting
[9] in June between the Board curriculum committee about the
[10] biology text?
[11]     A: I was not privy to any conversation that I recall.
[12]     Q: Thank you. It seems like this first meeting, the agenda
[13] item is reached. Mr. Buckingham makes the statement to
[14] the effect I am not prepared to bring anything up?
[15]     A: Right.
[16]     Q: And I take it from your comments, that he is saying take
[17] it up at the next meeting in June, the second meeting?
[18]     A: Yes, basically.
[19]     Q: And then you indicated that Barrie Callahan voiced an
[20] objection?
[21]     A: Right.
[22]     Q: Do you remember what she said?
[23]     A: Not specifically, but her objections followed the same
[24] pattern — tended to.
[25]     Q: That is the pattern you described earlier?

**Page 117**

[1]     A: Yes.
[2]     Q: All right. Any other discussion at that time between
[3] Mrs. Callahan and Mr. Buckingham about —
[4]     A: I don't recall. I believe there were some comments back
[5] and forth. There very often were, but I don't recall
[6] specifics.
[7]     Q: That's fair enough. How about among the Board members,
[8] did anyone else on the Board speak to the issue of
[9] putting the biology text on the agenda for the second
[10] meeting?
[11]     A: I don't recall. It is a little difficult for me because
[12] we have May and June being such disastrous months. And
[13] it is not always easy to differentiate.
[14]     Q: Okay.
[15]     A: A great deal happened in a very short period of time.
[16] And none of it was good.
[17]     Q: Now you say May and June were disastrous months?
[18]     A: Yes.
[19]     Q: We are speaking about 2004. Give me a sense,
[20] Mrs. Brown, for what you are referencing there.
[21]     A: Divisions among Board members during that time period
[22] became pronounced. And people, I believe — I believe
[23] began to blur the lines a great deal between individual
[24] personal beliefs and their responsibilities as School
[25] Directors, not simply as defined by the Public School

**Page 118**

[1] Code, or defined by the Pennsylvania Code of Ethics for
[2] School Board Directors, or not simply limited by the
[3] Code of Ethics for members of the National Board of
[4] School Directors — National association of School
[5] Directors, but personal codes of ethics.
[6]     Their responsibilities to the District, to the
[7] students and to the community were not adhered to.
[8]     Q: Let me ask you: If we look at just May, you said May
[9] and June.
[10]     A: And it could be April, May and June. I will be honest.
[11]     Q: And I do not expect you to have pinpoint recollection of
[12] dates and so on. I am just trying to get a sense for
[13] what were the issues in May of 2004 that you thought
[14] pointed to an increasing division? Was there something
[15] specific in May?
[16]     A: That is why I said to you, I am going to have to step
[17] back and be honest and say some of the things are
[18] running together for me.
[19]     Q: So could it be June and July?
[20]     A: We had no meetings in July.
[21]     Q: Then it must be May and June I suppose based on what you
[22] said?
[23]     A: And then into August, September and October.
[24]     Q: Is it this process that we are talking about, the
[25] biology text that you are referencing?

**Page 119**

[1]     A: Yes.
[2]     Q: The first meeting in June, Bill Buckingham has said I am
[3] not prepared to put it on the agenda for the next
[4] meeting, I haven't —
[5]     A: No. He said he didn't want to bring it up for a vote
[6] based on the fact that he had not reviewed the text.
[7]     Q: Any other —
[8]     MR. SCHMIDT: Can I interrupt one second?
[9]     MR. GILLEN: Sure.
[10]     A: I may be off a month.
[11]     MR. SCHMIDT: I just want to be clear so I don't
[12] have to go back on this.
[13]     Was it all of the science texts or just the
[14] biology text that Bill tabled for —
[15]     A: It was specifically the biology.
[16]     MR. SCHMIDT: I wasn't clear about that. Thank
[17] you.
[18]     BY MR. GILLEN:
[19]     Q: Any other Board comment at that time on his processing
[20] of the biology text?
[21]     A: Not publicly.
[22]     Q: Just let me ask you: Apart from Barrie Callahan, did
[23] anyone from the public section address the biology text
[24] issue during this first meeting in June?
[25]     A: It is quite possible. I don't recall.

---

Min-U-Script®     Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Carol Brown
May 16, 2005

---

**Page 120**

[1]  Q: We have been talking about the Board meeting proper,
[2] this first Board meeting in June. Do you recall any
[3] discussion among Board members about the biology text
[4] sort of apart from the formal Board meeting, this first
[5] Board meeting in June in this first week period of June?
[6]  A: You have asked me two different questions.
[7]  Q: Okay.
[8]  A: Now are we talking about discussion during the public
[9] Board meeting? I am not sure of your context when you
[10] ask me formal, informal. Please define for me.
[11]  Q: I think I understand you better. When you think of the
[12] Board meetings, do you think of the public portion and
[13] not the executive session?
[14]  A: Most certainly.
[15]  Q: I do understand that. For the purpose of my questions
[16] when I ask about the Board meeting, I am asking you
[17] about both the executive session and then the public
[18] portion of it.
[19]  A: Forgive me, sir. I would appreciate it if you
[20] differentiated because different rules apply.
[21]  Q: Let's look at that, and I will certainly attempt to
[22] indulge the way you look at it so we can communicate
[23] clearly.
[24]  How do you see the executive session as different
[25] from the public portion of the meetings of the School

**Page 121**

[1] Board?
[2]  A: There are very specific guidelines for an executive
[3] session. When one calls an executive session, in the case of
[4] prior to calling the executive session, in the case of
[5] an executive session that follows a Board meeting, you
[6] must announce — excuse me — the presiding officer of
[7] the Board must announce to the public the fact that an
[8] executive session will follow a Board meeting and the
[9] purpose for which the executive session is being called.
[10]  If an executive session occurs prior to the start
[11] of a Board meeting, the presiding officer then must as
[12] the first order of business give an explanation of the
[13] purpose for which that executive session was called and
[14] the fact that it had happened.
[15]  There are certain rare instances where an
[16] executive session that has occurred after a meeting is
[17] also mentioned at the prior — at the beginning of the
[18] next Board meeting. It does not happen very often, but
[19] occasionally, it can happen. Just as occasionally, a
[20] Board meeting is not adjourned. But there are very
[21] specific instances in Code where that may take place.
[22]  Now an executive session is confidential as
[23] long — this is my understanding. There are only
[24] certain reasons an executive session is to be called.
[25] It relates first to discussion of impending litigation

**Page 122**

[1] or ongoing litigation.
[2]  It can relate also to matters of negotiation, when
[3] contracts are in the process of negotiation, or if a
[4] contract settlement has been reached related to various
[5] labor relations contracts.
[6]  Executive sessions may be called to discuss issues
[7] regarding employment or employes of the School District.
[8] And in those cases where employes are not covered under
[9] labor contracts, salary ranges related can be discussed.
[10]  And the other relates to discussions of students
[11] who have been disciplined, there have been formal
[12] disciplinary hearings. Disciplinary hearings handled by
[13] the Board are only for the most grievous offenses.
[14] These are expulsion offenses.
[15]  Now that material is covered by confidentiality.
[16] By law based on the oath you take, you cannot disclose
[17] that information. If discussions on extraneous matters
[18] come up, they do not enjoy the same confidential
[19] privilege.
[20]  Q: And by extraneous matters, you mean matters outside of
[21] those you have just listed?
[22]  A: That's correct.
[23]  Q: Let's look at that, Mrs. Brown. For the first meeting
[24] of the School Board in June, was there an executive
[25] session?

**Page 123**

[1]  A: I don't recall.
[2]  Q: Do you recall any discussion relating to the biology
[3] text among Board members apart from the public portion
[4] of the Board meeting?
[5]  A: Yes.
[6]  Q: Tell me what you recall.
[7]  A: My husband and I talked about it at home.
[8]  Q: Tell me what you recall about those discussions. Was
[9] there a reason it came up?
[10]  A: Yes. I am a tree person. My husband is a forest
[11] person. I get into the details. He views the whole
[12] picture.
[13]  Even though School Director is not a paying job,
[14] if you are going to do it, I believe you should do it
[15] wholeheartedly, learn as much as you can, do the best
[16] that you can, give whatever is necessary to do the job
[17] right.
[18]  Different of us approach it differently. I
[19] expressed my concerns to him that Mr. Buckingham lacked
[20] the dedication necessary to be successful as chairperson
[21] of the curriculum committee. This was a private thing.
[22] These were my own misgivings, but I tend to look at
[23] things very differently.
[24]  Q: Sure. And what gave you that concern as of June? Is it
[25] that he hadn't reviewed the text?

---

Carol Brown
May 16, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 124

[1]   A: He had not availed himself of the opportunities. That
[2] is why I didn't use the term opportunity when stating or
[3] giving my opinion as to what was said.
[4]   Q: I am sorry. I am not following you there.
[5]   A: All right. As I stated prior to our lunch break, I
[6] believe, or words to that effect, the opportunity to
[7] review texts is there all of the time.
[8]   Q: Right. I do understand that.
[9]   A: Mr. Buckingham, as chair of the curriculum committee, I
[10] believe should have, I believe, I, should have availed
[11] himself of the opportunity to review all of the texts,
[12] or if nothing else availed himself of the opportunity to
[13] review the information already available on the various
[14] texts coming up for consideration.
[15]   Q: I see.
[16]   A: He did not do that.
[17]   Q: And that was the basis for the reservation you expressed
[18] to your husband?
[19]   A: Yes.
[20]   Q: Apart from the conversation with your husband, were you
[21] part of any conversations or privy to any conversations
[22] between Board members which addressed the biology text
[23] in the period between this first Board meeting in June
[24] and the second Board meeting in June?
[25]   A: I don't recall.

Page 125

[1]   Q: I think I asked you, but I want to make sure I got it
[2] right, how about in terms of public comment? Barrie
[3] Callahan voiced her concern?
[4]   A: Yes. I think Mr. Snook did as well. There again, I
[5] will be honest. Some of the comments tend to blur
[6] together, and I tended to shut my ears to some of the
[7] comments because it was the same thing month after
[8] month.
[9]   Q: How about let's look at the — we are going to the
[10] second Board meeting in June of 2004. Was the biology
[11] text brought up again?
[12]   A: Yes, it was.
[13]   Q: How did it come up?
[14]   A: Part of the agenda.
[15]   Q: So had the text been placed on the agenda despite
[16] Mr. Buckingham's comment at the first Board meeting in
[17] June?
[18]   A: I don't recall that Mr. Buckingham had requested a
[19] tabling of it, per se. He had simply indicated — and
[20] my memory may be faulty on this. My recollection is
[21] that he had indicated he didn't wish to bring it up for
[22] a vote because he had not had the opportunity — and I
[23] object to the words, I freely admit that — to review
[24] the text.
[25]   Q: So the second meeting comes up — occurs. How does the

Page 126

[1] text come up during the public portion of that Board
[2] meeting?
[3]   A: Mr. Buckingham indicated that he could not recommend the
[4] text because it was in his words — and I believe this
[5] is a fairly close quote — laced with Darwinism.
[6]   Q: Okay. When he used the phrase, did you have an
[7] understanding what he meant?
[8]   A: Yes, I did.
[9]   Q: How did you take that, Mrs. Brown?
[10]   A: By that time, I was very aware of Mr. Buckingham's
[11] personal religious beliefs. He had stated them to me
[12] very clearly. And it was my belief, understanding based
[13] on my experience with things he had said to me prior to
[14] that, and the way he voiced his objections, that he
[15] objected to the text because he viewed it as stating a
[16] certain way of viewing the origins of life.
[17]   Sorry if it is convoluted, but there it is.
[18]   Q: Don't worry about it. When you say origins of life,
[19] what are you referring to?
[20]   A: The origins of life, how did life begin, or where did it
[21] come from on earth, in the universe. And, of course,
[22] this was an area that we didn't cover in ninth grade
[23] biology.
[24]   Q: Okay. You said that by now, you were familiar with
[25] Mr. Buckingham's personal religious beliefs?

Page 127

[1]   A: Yes, I was.
[2]   Q: And I know you have talked about a conversation you had
[3] one time?
[4]   A: Yes.
[5]   Q: Were there other conversations you had had prior to this
[6] second Board meeting in June?
[7]   A: Yes.
[8]   Q: Tell me a little bit about those so I can get a better
[9] sense.
[10]   A: Very informal, maybe talking before meetings begin or
[11] just as a result of coming out of different committee
[12] meetings or whatever. I can't give you specifics
[13] because, you know, one does have a fair number of
[14] meetings during a month if one is a member of a Board
[15] and involved.
[16]   Q: Sure. Just if we look back at the second —
[17]   A: And telephone conversations. I apologize.
[18]   Q: And it seems from what you are saying that religious
[19] subject matter was a part of these conversations?
[20]   A: At times, yes.
[21]   Q: How would that come up? You have mentioned one
[22] situation where it sort of came up naturally in
[23] connection with the character issue as you said, the
[24] notion of there's trouble in the schools and kids need a
[25] code of behavior.

Min-U-Script®   Filius  &  McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Carol Brown
May 16, 2005

**Page 128**

[1]   Were there other ways that it would come up?

[2]   A: Mr. Gillen, my memory is good at some points, but I

[3] couldn't tell you specifics of what I ate last week much

[4] less what happened over a year ago in informal

[5] situations.

[6]   Q: All right. Then is there anything that — again, let's

[7] just try and look from the second Board meeting in June,

[8] everything that occurred before that, were there any

[9] other statements that Bill Buckingham had made to you

[10] that stuck out?

[11]   One plainly did, and you have told me about that.

[12] Any others?

[13]   A: I couldn't say definitely one way or the other. My

[14] apologies. As I said, I am sure my husband's memory

[15] will be different from mine, and he will remember

[16] different things.

[17]   Q: Okay. That is fine. It is really not a trick question.

[18] I am trying to understand how you saw the story unfold.

[19]   We have the second meeting in June here, and Bill

[20] says the biology text is laced with Darwinism. Do you

[21] recall anything else he said?

[22]   A: That wasn't sufficient? My apologies. Rhetorical

[23] question. Not specifically because all I could see were

[24] the headlines in the newspapers coming out of the

[25] meeting quite frankly.

**Page 129**

[1]   Q: And let me ask you: I mean did any other Board members

[2] speak to the biology text during that second meeting in

[3] June?

[4]   A: I'm not sure. I remember specifics. I have to be

[5] honest, my recollections are a bit colored by my own

[6] emotional reaction to things there.

[7]   Very early in the deposition I said about the can

[8] of worms being opened, and it wasn't a can of worms by

[9] then. It was not a can of worms at that point. It was

[10] how about a ton of cobras?

[11]   Q: Do you want to take a break?

[12]   A: No.

[13]   Q: How about you, Mrs. Brown, you were on the curriculum

[14] committee. Bill makes a statement about the text that

[15] plainly you don't share the sentiments he has expressed.

[16]   Did you or Sheila say anything at the public

[17] portion of the Board meeting that —

[18]   A: If you look at the diagram which I provided for you of

[19] the seating arrangement at that point in time, you will

[20] see that Mr. Buckingham was on my right. And I turned

[21] to him — that is the one in the yellow sheet.

[22]   MR. GILLEN: Please mark that.

[23]   (C. Brown Deposition Exhibit 1 was marked.)

[24]   A: In explanation of that, under secretary, you will notice

[25] I have two names listed because Karen Holtzapple served

**Page 130**

[1] as substitute Board secretary part of the time, and

[2] Denise Russell, who is our business manager and also

[3] Board secretary, was there part of the time.

[4]   But she has — she is very ill and was not always

[5] able to be there.

[6]   Q: Just take your time. Let the record show that

[7] Mrs. Brown is now looking at a diagram of the Board

[8] meeting that she kindly brought with her to today's

[9] deposition. I have marked a photocopy of that diagram

[10] as Carol Brown Exhibit 1. She is looking at the

[11] original she brought which is in blue and yellow and

[12] easier for her to see.

[13]   A: The reason I brought this, I thought perhaps it would

[14] help to clarify some of what some of us were able to

[15] hear that perhaps other individuals on the Board were

[16] not able to hear because as you can see, it is a

[17] modified V diagram. That was our seating arrangement.

[18]   And whereas — and I put Cunningham I see, and

[19] that should be Buckingham. Good heavens! A senior

[20] moment.

[21]   Mr. Buckingham was to my right, and Mrs. Geesey

[22] was to my left. And beyond her are where student

[23] representatives to the Board would normally sit.

[24]   I do apologize. Anyway, my husband was across the

[25] V, and he was seated next to Mrs. Cleaver.

**Page 131**

[1]   So you can see sometimes depending how someone

[2] spoke and depending which way the individual was facing,

[3] comments would be more or less audible. Also I was that

[4] beyond Mrs. Yingling, usually at the front tables the

[5] media were seated almost directly in front of Mrs.

[6] Yingling as a rule.

[7]   And on the opposite side of the V in front of our

[8] student representatives, you generally had the podium

[9] for public comment. And beyond that on that same side,

[10] most of the time various members of the administration,

[11] building principals, etcetera and teachers would be

[12] seated.

[13]   And in the middle section of the room tended to be

[14] the community members. And sort of the teachers tended

[15] to be around the back wherever they could find seats.

[16] When we had student/parent presentations, they would

[17] also be in that same general area.

[18]   So this is why I turned to Mr. Buckingham and

[19] asked him why he did not in that particular case apprise

[20] me of what he was going to do. And I am not sure how

[21] many people heard me because I was turning away from the

[22] audience and from my own microphone.

[23]   Q: So you told Mr. Buckingham why didn't you tell me you

[24] were going to make this criticism?

[25]   A: I asked him.

Filius & McLucas Reporting Service, Inc.   **Min-U-Script®**   (35) Page 128 - Page 131

Carol Brown
May 16, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 132

[1]   **Q:** Did he respond?

[2]   **A:** No, he did not.

[3]   **Q:** Here we are talking again about the public session of

[4] this meeting. Did any other Board members respond to

[5] Mr. Buckingham's criticism of the text?

[6]   **A:** If there were comments, they do not stand out in my mind

[7] at that moment in time.

[8]   **Q:** How about public reaction or reaction on the part of

[9] persons in the public?

[10]   **A:** I can't recall specifics. I know there was criticism,

[11] but there was often that.

[12]   **Q:** Can you recall who made the criticism?

[13]   **A:** I would be guessing and attributing without being

[14] absolutely certain.

[15]   **Q:** I appreciate that. All right. Now was there an

[16] executive session? I am not sure I got your answer.

[17]   Did any of the Board members speak to the text

[18] issue, the biology text?

[19]   **A:** I think there were a couple of comments. I will be

[20] honest. It might have been Mr. Wenrich, and it might

[21] have been across the way. I think one said we have been

[22] putting this off quite a while, but nothing that really

[23] stands out in my mind. I am sorry.

[24]   **Q:** How about Sheila, Sheila Harkins?

[25]   **A:** I don't recall.

Page 133

[1]   **Q:** Was there an executive session after this Board meeting?

[2]   **A:** Not that I recall, but there could well have been. You

[3] would have to confirm it from the minutes.

[4]   **Q:** Do you recall anything for the rest of June in terms of

[5] discussions among Board members about the biology text?

[6]   **A:** I know that there were discussions most of which I was

[7] not privy to. There are always rumors. Human beings

[8] are human beings.

[9]   **Q:** Tell me what you are referencing there.

[10]   **A:** I believe as I stated that that was the time period when

[11] there really began to be fairly strong divisions among

[12] Board members. There were telephone conversations of

[13] various types, various meetings. And just concerns were

[14] being expressed about what was going on in the District.

[15]   **Q:** Let me get a sense for those. Apparently you say you

[16] were not privy to these?

[17]   **A:** A lot of conversations, I was not privy to. I heard

[18] about them third hand I believe. Is that hearsay? I

[19] don't know. I am not a lawyer.

[20]   Mrs. Yingling would occasionally tell us she had

[21] been hearing so and so.

[22]   **Q:** Can you recall the specifics?

[23]   **A:** No, I would have said.

[24]   **Q:** How about the thrust of what she was hearing?

[25]   **A:** It was negative. Occasionally, we were hearing things

Page 134

[1] from community members as well. My husband more so than

[2] I.

[3]   **Q:** We are looking now just at June. Can you recall any

[4] community members approaching you in June to discuss the

[5] biology text?

[6]   **A:** No, not me personally.

[7]   **Q:** Do you recall anyone telling you about conversations

[8] that they had with community members relating to the

[9] biology texts?

[10]   **A:** Not specifics, no.

[11]   **Q:** You mentioned some telephone conversations. Are those

[12] conversations you had heard about through Angie

[13] Yingling?

[14]   **A:** No.

[15]   **Q:** What do you recall?

[16]   **A:** I spoke with Dr. Nilsen several times.

[17]   **Q:** What did Dr. Nilsen have to say?

[18]   **A:** I don't recall specifically. I was expressing my own

[19] concerns at that point.

[20]   **Q:** How did you express those at that time, Mrs. Brown?

[21] What did you tell Dr. Nilsen?

[22]   **A:** I told you so.

[23]   **Q:** That's a loaded observation. What were you getting at

[24] when you told Dr. Nilsen that you had told him so?

[25]   **A:** I told him that I thought it was ill advised to follow

Page 135

[1] up on what Larry Snook had proposed back in the fall of

[2] 2003 as regards the Pledge of Allegiance.

[3]   **Q:** Okay. And I take it —

[4]   **A:** Because I felt then we could be opening up a can of

[5] worms.

[6]   **Q:** And you see these two as connected. Tell me how

[7] exactly.

[8]   **A:** The last time we mixed politics and religion in this

[9] country, people got hurt and people died. My family

[10] came here because of religious persecution, because this

[11] country afforded freedom of religion, freedom from

[12] religion, freedom of choice. I don't have a lockstep on

[13] the truth. No human being does. I can only perceive

[14] with my limited physical senses.

[15]   I don't believe that I have the right to impose my

[16] beliefs, religious, social or otherwise on other people.

[17] Nor do they have the right to do it to me. I don't

[18] believe there is one path to the truth.

[19]   What I do believe is the golden rule, do unto

[20] others as you would have them do unto you. And that is

[21] what we have been teaching our children, not by that

[22] name, because of the religious connotation, teaching our

[23] children in our classes. And I was seeing us move away

[24] from that, and it frightened me once again.

[25]   We are here when we are members of the Board to

Min-U-Script®   Filius  &  McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Carol Brown
May 16, 2005

Page 136

[1] represent every individual in the community, whether he
[2] or she votes, whether he or she is black, white, green,
[3] purple, whether he or she — perhaps I should include
[4] it — is Muslim, Roman Catholic, atheist, agnostic,
[5] deist, or one of the other 2,001 — and I am guessing —
[6] religions in the world.
[7]    Q: Okay. And I can see that when Mr. Buckingham indicated
[8] he thought this biology text was laced with Darwinism,
[9] you see him as —
[10]    A: He was also making religious references to the
[11] crucifixion of the Christ.
[12]    Q: This is the June meetings?
[13]    A: As I recall. I am not sure. I think it was in the
[14] second one I believe.
[15]    Q: And this is what is implicating your concern for he has
[16] crossed the line?
[17]    A: Yes.
[18]    Q: Let me ask you now —
[19]    A: And he was using the term Creationism, sir.
[20]    Q: That is what I was going to ask you. Looking at these
[21] June meetings, do you recall Bill Buckingham using that
[22] term?
[23]    A: Yes, I do.
[24]    Q: Do you recall him teaching Creationism?
[25]    A: Bringing it back into the school. I cannot recall and

Page 137

[1] quote him directly by saying that I absolutely remember
[2] him using the term teach. I remember him saying bring
[3] it back into the school.
[4]    My inference of that may be different than someone
[5] else's.
[6]    Q: Let's look at the June meetings here, and I ask you do
[7] you recall him mentioning Intelligent Design during this
[8] period?
[9]    A: Never.
[10]    Q: Do you recall him mentioning the text Of Pandas?
[11]    A: Not at that point in time.
[12]    Q: Do you recall him discussing the biology text in terms
[13] of balance?
[14]    A: No. I don't recall him using that word.
[15]    Q: Do you recall him saying anything else about the biology
[16] text during these June meetings?
[17]    A: As I mentioned, there were religious statements made.
[18]    Q: How about were there any references to other scientific
[19] theories?
[20]    A: No.
[21]    Q: Do you recall anyone speaking at the public portion of
[22] the meetings in June addressing Creationism, teaching
[23] Creationism?
[24]    A: Here again, I can't be sure which meeting it occurred
[25] at, but Mrs. Buckingham did make a twenty minute speech.

Page 138

[1]    Q: Did you recall anyone else speaking during the Board
[2] meetings?
[3]    A: Not to that extent. Although if memory serves, and I
[4] will be honest, I am not sure if it was June or August,
[5] Mr. Bonsell's mother spoke at one point. But I will not
[6] say specifically I recall it was at June. It may well
[7] have been August.
[8]    Q: You say that Mr. Buckingham used the term Creationism?
[9]    A: Yes, he did before, during and after the meeting.
[10]    Q: Let me ask you about that. We talked about executive
[11] sessions occurring before the meetings or after?
[12]    A: This was not part of that.
[13]    Q: Tell me when did you have the conversations you are
[14] referencing?
[15]    A: I didn't. I overheard him speaking to the media.
[16]    Q: Were the discussions you are referencing now comments to
[17] the media after the June Board meetings?
[18]    A: At least one of them was, yes.
[19]    Q: Do you recall who Mr. Buckingham was speaking with?
[20]    A: One of the newspapers definitely, and I am not sure
[21] whether it was The Record or The Dispatch. I don't know
[22] everyone. And it was at least one television crew
[23] there. I don't watch very much television so I am
[24] sorry.
[25]    Q: That is fine. Obviously, you are recalling some things

Page 139

[1] here about June. Let me ask you: How about the other
[2] Board members, do you recall them responding to these
[3] comments?
[4]    A: I think there was some upset. I know my husband was
[5] upset, and Mr. Buckingham had directed a couple of
[6] comments his way.
[7]    Q: During these June meetings?
[8]    A: And later.
[9]    Q: Let's look at the June meetings. I am trying to get a
[10] sense for how the process unfolded here. Can you recall
[11] anything that Mr. Buckingham said to your husband during
[12] the June meetings?
[13]    A: I should prefer you ask my husband directly.
[14]    Q: I am just asking you can you recall anything?
[15]    A: Yes.
[16]    Q: Tell me what you can recall.
[17]    A: I can't recall specifics. That is why I am saying you
[18] should ask the person to whom it was directed really.
[19]    Q: Can you recall any response your husband gave to
[20] Mr. Buckingham's statements?
[21]    A: I think he was somewhat upset.
[22]    Q: Did he say so?
[23]    A: How do you mean that, sir?
[24]    Q: I mean I am asking you for your recollection of these
[25] June Board meetings.

Carol Brown
May 16, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

**Page 140**

[1]   A: I can't give you specific words, but I can tell you that
[2] there were some emotional confrontations.
[3]   Q: On the subject of the biology text?
[4]   A: On what had happened with the biology text and some of
[5] Mr. Buckingham's comments to my husband and on the
[6] subject in general.
[7]   Q: Okay. Now did these exchanges or comments take place
[8] during the June Board meetings?
[9]   A: Yes, they did, and then beyond. But I can't tell you
[10] specifics. I really don't recall. I am going to
[11] explain one, obviously, I am emotionally invested in
[12] this because I care very much about this School District
[13] and what happens to it. And what I was perceiving was a
[14] disaster for the School District. So one tends to
[15] become very narrowly focused, at least I do.
[16]   Secondarily, during that time period, in addition
[17] to that, I was going through some very serious medical
[18] issues so I was in constant pain. I did not take pain
[19] medication because I did not wish it to affect my
[20] ability to make good decisions. But as a result, I was
[21] very focused on certain things. I am sorry I cannot
[22] answer, but I am telling you why.
[23]   Q: Yes. Please understand, I am not doubting you in any
[24] way. I just know as we go through this process,
[25] sometimes you tend to remember more.

**Page 141**

[1]   A: I will tell you what I remember to the best of my
[2] ability. And there again because my husband and I
[3] served together, it is probably helpful because I look
[4] at it from one viewpoint, and he looks at it from a
[5] little different stance. And he will remember
[6] differently, perhaps the same things that I remember.
[7]   It will be in essence the same memory just from a
[8] different standpoint or viewpoint, the trees, the
[9] forest.
[10]   Q: Sure.
[11]   A: Certain things do stand out in my mind, statements that
[12] were made. I have been asked were the statements — and
[13] I believe you asked me — reported by the newspapers
[14] accurately? Yes, they were.
[15]   Have I looked back on all of those clippings? No,
[16] I have not because I can't read them. Okay? So any
[17] review I have done really has been verbal.
[18]   Q: In terms of verbal review, have you done any verbal
[19] review with anyone?
[20]   A: With my husband to try and remember when did that
[21] happen, you know, trying to place things in context.
[22] And, of course, Mr. Rothschild and Chris were there
[23] yesterday. I will get his name eventually. My
[24] apologies. And we were not always sure.
[25]   Q: That's fine.

**Page 142**

[1]   A: When I look at this, when I can read it, yes, sometimes
[2] it jogs. But I may be off on the dates here and there.
[3]   Q: Sure. I am not going to hold you to the dates.
[4]   A: Thank you.
[5]   Q: I am just trying to get the story line. Just in terms
[6] before we move on, June, we are talking about June. We
[7] know the text has come up. Bill has made some comments
[8] that have attracted notice and criticism. There has
[9] been tension on the Board.
[10]   If we look at June — and I am going to ask you to
[11] look across the Board at the other Board members here at
[12] your chart, do you recall them responding to
[13] Mr. Buckingham's comments during the meetings or
[14] afterward? Do you recall Angie Yingling in June of 2004
[15] how she responded to Bill's comments?
[16]   A: Good grief. With Angie, it is always hard to tell when
[17] she said what. Angie was concerned, I know that, about
[18] response from the community. She would get frustrated,
[19] but Mrs. Yingling did do that from time to time.
[20]   Again, I am trying to be honest. I was very
[21] narrowly focused. And nothing specific stands out other
[22] I was concerned for — my husband was very upset, and so
[23] was I.
[24]   Physical assault is always a bad thing. But one
[25] has to admit that occasionally, one would like to pop

**Page 14**

[1] someone else in the nose. And I am sure that I was not
[2] the only one feeling that towards other people.
[3]   Q: Are you referencing Mr. Buckingham?
[4]   A: Yes.
[5]   Q: How about Angie just in June of 2004 in terms of whether
[6] she is with Bill or doesn't agree with him; do you have
[7] any sense of that?
[8]   A: I am not sure. I am not sure.
[9]   Q: How about Jane Cleaver, did she react to Bill's
[10] comments?
[11]   A: Jane was very much in agreement with Mr. Buckingham.
[12]   Q: When you say in agreement, on what score? What do you
[13] mean in agreement, at what point?
[14]   A: Mrs. Cleaver and Mr. Buckingham — I know — I have
[15] personal knowledge; how is that — of the fact that they
[16] attended the same church and were friends of many years
[17] standing. And based on my personal knowledge and
[18] personal experience, they tended to vote the same way
[19] and express similar opinions.
[20]   Q: Now we are talking about the biology text in June. Is
[21] there anything that sticks out now as you think about it
[22] that Jane said?
[23]   A: Nothing specific other than she voiced support. I
[24] couldn't give you exact language.
[25]   Q: Voiced support for?

---

Page 140 - Page 143   (38)

Min-U-Script®   Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Carol Brown
May 16, 2005

Page 144

[1]   A: For Mr. Buckingham's viewpoints.

[2]   Q: On the biology text?

[3]   A: Yes.

[4]   Q: How about Mr. Bonsell, do you remember him saying

[5] anything when ---

[6]   A: Mr. Bonsell's reference point I believe was Intelligent

[7] Design. I may be in error. I believe from what I heard

[8] that Mr. Bonsell favored --- favored giving the two

[9] viewpoints of Intelligent Design and as they termed it

[10] Darwinism.

[11]   Q: Do you recall Mr. Bonsell referencing the text Of Pandas

[12] during the June meetings?

[13]   A: No, I don't.

[14]   Q: How about Dr. Nilsen? You indicated you had some

[15] conversations with him during this period. How about at

[16] the Board meetings, did he react to Mr. Buckingham's

[17] statement about the biology text that had been

[18] recommended by the teachers?

[19]   A: The administration also made the recommendation.

[20]   Q: Right.

[21]   A: Which meant that approval of the text required five

[22] votes rather than six to pass.

[23]   Q: I see.

[24]   A: He had also recommended approval of the recommendations

[25] of the teachers' Department heads. Beyond that, I don't

Page 145

[1] remember him making specific comments. He may well

[2] have.

[3]   Q: How about Noel Wenrich?

[4]   A: No one comment stands out. I know that Mr. Wenrich

[5] favors the viewpoint of Creationism, but I do not recall

[6] whether or not he spoke in favor or in opposition at

[7] that point in time.

[8]   Q: Do you recall Mr. Wenrich discussing Intelligent Design?

[9]   A: Not really.

[10]   Q: When Mr. Bonsell mentioned Intelligent Design, did

[11] anyone else speak to that theory or point? Did it spark

[12] a conversation?

[13]   A: I don't recall. And there was no definition of the

[14] term.

[15]   Q: At the Board meeting --- in other words?

[16]   A: I have never heard a definition of Intelligent Design or

[17] a specification of whether Intelligent Design referred

[18] to a single concept as in a single theory, in which case

[19] Intelligent Design would have initial capitalization, or

[20] an overall general concept in which case it would have

[21] small letters.

[22]   I have never heard in Board meetings a definition.

[23]   Q: All right.

[24]   A: So it would be a little difficult to make a decision how

[25] you believe.

Page 146

[1]   MR. SCHMIDT: Can you clear something up? Did

[2] Mr. Bonsell discuss Intelligent Design and refer to it

[3] during the June meeting?

[4]   A: I believe Mr. Bonsell referred to Intelligent Design,

[5] but I cannot recall him defining what he meant by

[6] Intelligent Design. That is why I explained I don't

[7] have a reference.

[8]   MR. SCHMIDT: I just wanted to try to keep the

[9] chronology straight.

[10]   A: My apologies.

[11]             BY MR. GILLEN:

[12]   Q: Were you talk about at the time June meetings?

[13]   A: I believe.

[14]   Q: I have asked you about Board meetings, and to make sure

[15] I don't miss anything, I know you have a distinction

[16] which you see in the law and custom between the

[17] executive sessions and so on.

[18]   Is there any other discussion that took place in

[19] the executive sessions relating to the biology text or

[20] Intelligent Design that you haven't told me about so far

[21] in June?

[22]   A: Not that I recall.

[23]   Q: Now at this time, you are on the Board curriculum

[24] committee. Let me ask you looking through June, do you

[25] recall any meetings of that committee? And I recognize

Page 147

[1] the difficulty of trying to pinpoint it precisely.

[2]   Think of it in relation to the May meeting. Do

[3] you recall any meetings in June?

[4]   A: We had a second meeting. I will be honest, and I was

[5] looking. I believe there was another meeting between

[6] June and July. Whether it was in June or whether it was

[7] in July, I will be honest and for some reason, I don't

[8] have it down. I admit I miss things.

[9]   There was another meeting at which point we

[10] discussed in depth Mr. Buckingham's objections to the

[11] text. If memory serves, his objections numbered 14 in a

[12] 1200 page text. We went through the objections one by

[13] one and discussed them.

[14]   I do recall his first objection was to the

[15] timeline of science history wherein mention was made of

[16] the time at which --- or during which --- the time period

[17] during which Mr. Darwin's theories of natural selections

[18] were first published, not of the descent of man.

[19]   And we were talking about evolution with small "e"

[20] which is what we have taught. We, I say we advisedly,

[21] the School District has taught.

[22]   Primarily, the mentions were related to

[23] information in Chapter 15 or thereabouts of the text

[24] from Prentice Hall.

[25]   In talking about natural selection, I believe one

Tammy Kitzmiller, et al. v.
Dover Area School District, et al.

Carol Brown
May 16, 2005

---

Page 152

[1]   Q: Do you recall the teachers discussing any materials that
[2] Mr. Buckingham had provided?
[3]   A: I don't recall that. Not to say it didn't happen. I
[4] just don't recall it.
[5]   Q: I understand. How about the text Of Pandas, do you
[6] recall that coming up during that meeting?
[7]   A: No.
[8]   Q: How about Intelligent Design, the term?
[9]   A: No. It was still Creationism, sir.
[10]   Q: All right. Let me ask you about that. When
[11] Mr. Buckingham is discussing Creationism as you recall,
[12] is he saying we should teach it?
[13]   A: As I said to you before, I cannot with sworn accuracy
[14] state that he used the term teach. I can however with
[15] sworn certainty say to you he wanted it back in the
[16] schools, and he so stated that.
[17]   Q: And you say he stated that when?
[18]   A: He stated it both in meeting, public School Board
[19] meeting, and he stated it in private committee meetings.
[20] Private is the wrong word, nonpublic.
[21]   Q: Okay.
[22]   A: Curriculum committee meetings.
[23]   Q: This is the meeting we are talking about now, this June
[24] meeting?
[25]   A: Now we are talking about — you asked me, and I can't

---

Page 153

[1] tell you if it was June or July because we were on
[2] hiatus as far as Board meetings in July. We did have a
[3] curriculum meeting in that time period.
[4]   Q: Let me ask you: If Mr. Buckingham makes these
[5] statements at these meetings, what sort of response is
[6] he getting from the teachers?
[7]   A: What we did was talk it out step by step, page by page,
[8] reference by reference. All right? The individual who
[9] destroyed the mural was reprimanded. He subsequently
[10] retired from the School District.
[11]   I don't think there are too many people who would
[12] say he had the right to do it. He destroyed school
[13] property, a donation from a student. Content aside, he
[14] did not have the right to make that decision.
[15]   It offended him personally, and it offended in
[16] particular his religious beliefs. I know that for a
[17] fact because the individual in question told me that
[18] face to face. But he took it upon himself to destroy
[19] that mural.
[20]   Mr. Buckingham stated in that meeting that he
[21] thought he had done — the individual had done the right
[22] thing, that we should have never had it in the school.
[23]   Q: And did he say why? Did he go into detail?
[24]   A: It offended him. It was the wrong message. It was
[25] obscene, and that is the term he used.

---

Page 154

[1]   Q: How about the teachers when Mr. Buckingham comes into
[2] this meeting, how are they responding to the notion
[3] that —
[4]   A: We had a situation where two of the teachers Mrs. Miller
[5] and Mr. Eshbach happened — still are to the best of my
[6] knowledge — ninth grade biology teachers among other
[7] things. And when going through Mr. Buckingham's
[8] objections, we discussed — and I mean all of us — it
[9] was sort of a round robin discussion of how they handled
[10] questions, and to the best of my recollection,
[11] Mrs. Miller and Mr. Eshbach indicated that in their
[12] combined teaching experience of some twenty odd years,
[13] they had perhaps had a half dozen questions from
[14] students regarding the origins of life.
[15]   And their custom was and remained to that point in
[16] time to tell the students this is a subject area you
[17] need to talk with your parents, your family members
[18] about and your Pastors. And it was not a policy
[19] promulgated by the School District, School Board. This
[20] was just their way of dealing with it.
[21]   Mrs. Spahr indicated that this was more than
[22] acceptable to the Science Department, that they did not
[23] feel that they were qualified to get into those areas.
[24] We did not teach the origins of life, religious or
[25] nonreligious theories.

---

Page 155

[1]   Mr. Buckingham indicated he could deal with that.
[2] And I think personally — my personal opinion is what
[3] made the difference was that Mr. Buckingham learned that
[4] Mrs. Miller is the daughter of the Pastor of the Shiloh
[5] United Church of Christ so she grew up in the faith.
[6] Mr. Eshbach is the son of Reverend Warren Eshbach, a
[7] retired Church of the Brethren Pastor and adjunct
[8] Professor at the Gettysburg I believe Theological
[9] Seminary. And this is their faith, and this is how they
[10] handled it.
[11]   So we went through the issues. We discussed them.
[12] And Mr. Buckingham indicated that he could live with it.
[13]   I also personally made the statement if he wished,
[14] because he was so concerned about the donations to the
[15] School District, that we would revisit in policy the
[16] policy relating to donations and gifts made to the
[17] School District.
[18]   And at the Superintendent's discretion, we would
[19] insert this into the policy, that at the
[20] Superintendent's discretion, the Superintendent —
[21] please be clear, not the Board — the Superintendent's
[22] discretion, a gift or donation would be either accepted
[23] or rejected. But it would be required that if the
[24] Superintendent chose not to accept a gift or donation, a
[25] written explanation must be provided to the individual

---

Carol Brown
May 16, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 156

[1] wishing to donate, etcetera.

[2] Obviously, it doesn't go with money. We take any

[3] money somebody wants to offer. Sorry.

[4] And I said that we will take it up in policy

[5] committee so that we can really zone in on this because

[6] we have confidence in our Superintendent, in his

[7] evaluation. But the acceptance of a gift would be

[8] centralized. It would be the Superintendent who makes

[9] the decision. And we did subsequently make those

[10] changes to policy.

[11] And based on that and the other discussions that

[12] had gone on, how things are handled, have been handled,

[13] there was a mention of a science teacher who had been

[14] employed by the District for some years, whose name

[15] escapes me, who kind of went off on his own once or

[16] twice and was severely reprimanded for it. But he was

[17] the exception. I couldn't even tell you what he did

[18] say, except he was a bit of an eccentric.

[19] And Mr. Buckingham said he could live with this,

[20] and we were comfortable with it.

[21] One thing that was brought up, Mr. Baksa had as

[22] part of review process gotten comments on some of the

[23] textbooks prior to this from different school districts,

[24] public school districts.

[25] He volunteered at that particular meeting to find

Page 157

[1] out if there were any other texts out in the marketplace

[2] that were being used by non parochial — not public, I

[3] am sorry — parochial schools, meaning nonpublic. He

[4] said he would check it out.

[5] There was no discussion as I recall of any other

[6] theories, specific theories. And at that point, we

[7] didn't have any other discussion related to any specific

[8] textbooks.

[9] Q: Okay.

[10] MR. SCHMIDT: While you are digesting all of that,

[11] may we take a five-minute break?

[12] MR. GILLEN: Sure.

[13] A: Sure.

[14] (A recess was taken.)

[15] AFTER RECESS

[16] BY MR. GILLEN:

[17] Q: We were talking about this curriculum committee meeting.

[18] A: Yes.

[19] Q: In June of July or somewhere in there.

[20] A: Right in there.

[21] Q: And you have told me a great deal about it. I want to

[22] just ask you a few other things just to make sure I am

[23] understanding you.

[24] You mentioned that Bert Spahr was there. Do you

[25] recall anything that Bert Spahr said about teaching

Page 158

[1] origins, whether origins were taught?

[2] A: All three of the teachers who were there were very clear

[3] about the fact that we have never taught origins of

[4] life. Ninth grade biology is physical science. It

[5] deals with the physical world around us.

[6] Here I am basically quoting curriculum guide for

[7] Dover, as well as state standards. We are teaching our

[8] children how to perceive and to understand the physical

[9] properties of the world around them, the things that

[10] they can taste, touch, see, feel, smell. And that is

[11] the province of biology. It is a physical science.

[12] Q: Okay. How about you mentioned teaching evolution with a

[13] small "e"?

[14] A: Yes.

[15] Q: What was your understanding of that?

[16] A: Evolution with a small "e" as I understand it as I have

[17] learned in my years is really adapting, surviving. You

[18] either adapt to conditions, or you don't survive as a

[19] species or as an individual.

[20] A native of Africa, to give you an example,

[21] obviously is a survivor by adaptation to the climate

[22] conditions. I as an American Caucasian could not

[23] survive in Africa. I burn hanging a load of wash

[24] outside. My skin, my eyes are not adaptable to the

[25] severe conditions of heat and sunlight that exists in

Page 1.

[1] Africa. But that didn't happen in one generation. That

[2] happened over time. Just to give you a small example of

[3] what I see as evolution in the human terms.

[4] Q: Is that what you understood the teachers to mean when

[5] they said evolution with a small "e"?

[6] A: Not so much dealing with human beings. I used that as

[7] an example because it would be familiar.

[8] But theirs is instruction in the adaptations more

[9] of the animal world, animal and plant world.

[10] Q: How about Bert Spahr, did she say anything else at the

[11] meeting that sticks out?

[12] A: Nothing specific that stands out. I mean we talked a

[13] lot about the need for the text because the textbooks in

[14] use at that time were just not compatible with either

[15] our curriculum guidelines or with the state standards.

[16] Q: You indicated Sheila was there. Anything that Sheila

[17] Harkins said that sticks out?

[18] A: The only thing that I recall is Sheila's asking what

[19] other textbooks are out there. That was fairly early in

[20] the discussion when — after Mr. Buckingham had come up

[21] with all of these objections.

[22] Q: Mike Baksa, what was his role? What do you recall about

[23] Mike's participation?

[24] A: Mike is a very good mediator, conciliator, if you will,

[25] very knowledgeable. He had volunteered as I said to

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Carol Brown
May 16, 2005

---

Page 160

[1] check out what some of the parochial or nonpublic
[2] schools were using in terms of texts.
[3]     I will give you an interesting note to that.
[4]     Q: Okay.
[5]     A: The Christian School of York uses Modern Biology by
[6] Prentice Hall without statement or comment. Just a side
[7] light.
[8]     Q: Okay. Let me ask you this: When you came away from
[9] this meeting in June, it seems like —
[10]     A: June or July.
[11]     Q: June or July, thank you. It seems like Bill said I am
[12] comfortable with that or I can live with that; am I
[13] correct?
[14]     A: My understanding is that we were good to go, we were
[15] going to get our text. I was very, very concerned about
[16] the time at that point because by state code, we must
[17] have text approval by the 31st of July for the coming
[18] school year. And we were having no meetings in July.
[19]     We queried that. And we were to use the term
[20] grandfathered clause in the sense that we were in
[21] process. We hadn't taken a final vote, but we did have
[22] recommendations for an approved text. That concerned
[23] me. I was okay once it was made clear we weren't going
[24] to get fined for it.
[25]     My other concern was whether or not we were going

---

Page 161

[1] to be able to get our textbooks in time to begin the
[2] school year. And, you know, you are talking about
[3] school districts all over the country. Good grief! We
[4] have got 501 school districts in the Commonwealth of
[5] Pennsylvania alone. Multiply that by 50 and think about
[6] the number of textbooks being ordered, and you begin to
[7] sweat whether or not the publishers can meet the needs.
[8] So that was another big concern for me.
[9]     Q: You have mentioned, Mrs. Brown, Bill talking about
[10] Creationism during this meeting; am I right?
[11]     A: Yes.
[12]     Q: How is that being received by the teachers? Are they
[13] responding to that, or is it just kind of ignored, or
[14] what?
[15]     A: All right. There is no single comment that stands out
[16] in my mind from any one of the three. The general
[17] consensus from my point of view was a concern, which was
[18] why they explained how they handled questions related to
[19] origins of life. That was to respond to I believe
[20] Mr. Buckingham's comments about the need to teach
[21] Creationism.
[22]     They made it clear that they felt they were not in
[23] the position to discuss the religious aspects or
[24] religious — possible religious hypotheses.
[25]     Q: Okay.

---

Page 162

[1]     A: They deal with proven scientific theories and the most
[2] accepted scientific theories as required by the state.
[3]     Q: Okay. So they had a concern. Anything else? Did they
[4] say anything else? Did anyone say hey, Bill, that is
[5] illegal or anything like that?
[6]     A: I don't believe they did. I did.
[7]     Q: You did? During this meeting here in June?
[8]     A: June or July. I don't think I used the term illegal. I
[9] believe I basically said I am not sure we can do this.
[10]     Q: Anyone else speak to that point?
[11]     A: Not that I recall.
[12]     Q: Let's look at July now. As you indicated —
[13]     A: There were no regular meetings for the School Board. We
[14] weren't supposed to have any meetings, anyway. Looking
[15] at my calendar, I had things for the York County School
[16] of Technology. There was a cyber education committee
[17] meeting — task force rather than committee. I was not
[18] involved with that, but my husband was.
[19]     In 2004, I also served as chairperson of the
[20] personnel committee, and I had a meeting with Dr. Nilsen
[21] to discuss the Board evaluation results. Each year, the
[22] Superintendent is evaluated by members of the Board
[23] individually via a survey questionnaire type of thing.
[24] And then the results are presented to him as part of a
[25] review process. And that is done by the committee chair

---

Page 163

[1] for personnel unless the President of the Board chooses
[2] to do likewise — otherwise. Excuse me.
[3]     Q: So am I understanding that you did Dr. Nilsen's review
[4] in 2004?
[5]     A: Yes, I did.
[6]     Q: To the extent you can recall, was that a satisfactory
[7] review?
[8]     A: Very satisfactory.
[9]     Q: Did you do Trudy Peterman's?
[10]     A: No, I did not because I was not Trudy Peterman's
[11] supervisor. Dr. Nilsen was. The only Board evaluation
[12] is for the Superintendent because he is directly
[13] responsible to us.
[14]     The building administrators, in the case of
[15] buildings that have an Assistant Principal, the
[16] Assistant Principal would be evaluated and reviewed by
[17] the Principal of the building. In the case of Building
[18] Principals, the review is by the Superintendent.
[19]     Q: Let me just stop for a minute and ask you about Trudy
[20] Peterman. Do you recall Trudy Peterman speaking to the
[21] biology text issue while you were on the Board?
[22]     A: Yes, she did.
[23]     Q: What do you recall about that, Mrs. Brown?
[24]     A: Nothing terribly specific. I know that she was upset
[25] about it, but then Dr. Peterman was upset about a lot of

---

Carol Brown
May 16, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

Page 164

[1] things.

[2]   Q: Give me a sense for that. As a Board member looking at

[3] Dr. Peterman, what was your appraisal of her conduct as

[4] a Principal? And let me —

[5]   A: It is not often that I am guilty of such misjudgment of

[6] an individual as I was of Dr. Peterman. I had very high

[7] hopes when we hired her. And by last summer, I could

[8] hardly wait for her to leave. Is that blunt enough?

[9]   Q: It is certainly very straightforward. What was it that

[10] produced your — what shall I say — disapproval of Dr.

[11] Peterman?

[12]   A: Dr. Peterman does not take criticism well. She is not

[13] big on chain of command. When working with Dr.

[14] Peterman, if you wanted to get something done, want her

[15] to do something, it takes combined efforts probably of a

[16] dozen or more people to get it through to her you are

[17] going to do this now.

[18]   I know that she consistently argued with Dr.

[19] Nilsen, was constantly second guessing everything that

[20] she was expected to — he asked her to do, anybody asked

[21] her to do. And she liked to play people against one

[22] another.

[23]   Q: How about in her public demeanor at Board meetings?

[24]   A: Do you remember earlier I made the comment that

[25] sometimes when one wants to physically pop someone in

---

Page 165

[1] the mouth or nose? I would have to say I am fairly

[2] certain I was not the only one who had that desire in

[3] meetings at times.

[4]   She often spoke of things that were better

[5] discussed in a different situation, and she openly went

[6] against her boss.

[7]   Q: Dr. Nilsen?

[8]   A: Yes.

[9]   Q: So am I understanding you correctly that she would

[10] contradict positions or statements —

[11]   A: Very much so.

[12]   Q: Of Dr. Nilsen?

[13]   A: Now on the positive side, I must say Dr. Peterman is one

[14] of the most brilliant women I have ever met.

[15]   Q: How about just in the sort of the mechanics of her

[16] presentation, was she respectful to the Board —

[17]   A: No.

[18]   Q: — when she addressed them? Do you recall any occasions

[19] where she spoke to the public rather than to the Board?

[20]   A: Constantly.

[21]   Q: Do you recall any occasions where she either gestured

[22] violently or pounded the podium in speaking?

[23]   A: Occasionally.

[24]   Q: Let me see if I understand you. Did you provide input

[25] to Dr. Nilsen that went into the review of Dr. Peterman?

---

Page 166

[1] In other words —

[2]   A: As part of being personnel chair?

[3]   Q: Yes.

[4]   A: No. Here again, I am not sure of confidentiality here.

[5] Dr. Nilsen and I discussed. Beyond that, I don't think

[6] I can tell you what.

[7]   Q: And I don't want to violate anything you have. I just

[8] want to get the sense for it. Let me ask you this:

[9] Were you party to discussions on the Board about Dr.

[10] Peterman's conduct at public Board meetings?

[11]   A: Yes.

[12]   Q: Did you express disapproval of Dr. Peterman's

[13] comportment to at the Board meetings?

[14]   A: Yes.

[15]   Q: Were you party to directives that the Board communicated

[16] to Dr. Nilsen to Dr. Peterman with respect to her

[17] conduct at the Board meetings?

[18]   A: Not beyond discussion at the Board level with Dr.

[19] Nilsen. It was Dr. Nilsen's place and right and

[20] responsibility to deal with the situation. And he did.

[21]   He talked with us as a Board in executive session

[22] regarding Dr. Peterman, as he did with various personnel

[23] issues. But it was his final decision how to deal with

[24] the issue. He was kind enough to keep me in the loop as

[25] chairperson of personnel, but it was his decision, not

---

Page 167

[1] mine.

[2]   Q: Let me ask you: Did he communicate to you at some point

[3] a set of guidelines he had given Dr. Peterman about her

[4] conduct at Board meetings?

[5]   A: Yes.

[6]   Q: When you heard those guidelines, did you agree with them

[7] in essence?

[8]   A: I didn't think they were strong enough.

[9]   Q: Okay.

[10]   A: No. Very seriously, I did a agree. I thought they were

[11] very appropriate. Dr. Nilsen was more constrained than

[12] I probably would have been.

[13]   Q: Thank you. It just occurred to me that I hadn't asked

[14] you about her.

[15]   The June meeting we have discussed, the Board

[16] curriculum committee where you come out of that meeting

[17] and you have the sense —

[18]   A: We are okay.

[19]   Q: We are okay. We are in July of 2004. And it is your

[20] recollection there is no Board meetings set for July?

[21]   A: Yes. And we may have had one, but I don't —

[22]   Q: Either way, does anything stick out in your memory today

[23] occurring in July of 2004 that relate to the biology

[24] text?

[25]   A: Okay. The latter part of July — and I didn't mark the

---

Min-U-Script®   Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Carol Brown
May 16, 2005

Page 168

[1] day — but in the latter part of July, the first mention
[2] of Of Pandas and People came about. But I didn't get it
[3] from Mr. Buckingham.
[4]    Q: Okay. Tell me, plainly remember it and sort of the time
[5] specifically, how did it come to your attention? How
[6] did the text of Of Pandas come to your attention?
[7]    A: Mr. Baksa.
[8]    Q: And how exactly? Did he give you a call?
[9]    A: Yes.
[10]    Q: Was it in connection with another contemplated meeting
[11] of the Board curriculum committee?
[12]    A: We were talking about curriculum, setting up meetings.
[13] He mentioned that Mr. Buckingham had gotten the text,
[14] and he and Dr. Nilsen had gotten one or more copies of
[15] it. I don't recall how many. And it was going to be
[16] brought up.
[17]    Q: And you say it was going to be brought up when?
[18]    A: As part of a discussion. I can't tell you a specific
[19] date was mentioned at that point. We are getting into
[20] August, and I may be a month off there.
[21]    But I only learned of Of Pandas and People second
[22] hand because Mr. Baksa told me about this.
[23] Mr. Buckingham never did me the courtesy of letting me
[24] know what was happening, even though I was a member of
[25] the curriculum committee.

Page 169

[1]    And my husband subsequently went to Mrs.
[2] Harkins's house because she had a copy I think through
[3] the District — in fact, I am pretty sure it was through
[4] the District — Of Pandas and People. May I just say
[5] the Pandas book?
[6]    Q: Yes.
[7]    A: Thank you. Of the Pandas book. And brought it home.
[8]    Q: Okay. You said Mike said it was going to be brought up.
[9] Tell me can you recall was it at a Board curriculum
[10] meeting or a meeting of the Board itself?
[11]    A: A meeting of the Board.
[12]    Q: So that would mean I believe the first meeting in
[13] August; does that sound right?
[14]    A: Something like that. Or it could have been the first
[15] meeting in September. In that time frame. As I said to
[16] you earlier, some of this runs together. And then
[17] everything was happening very quickly.
[18]    I can tell you — and I will try to cut to the
[19] chase here. We received the text on a Thursday at the
[20] end of the month. My husband and I read it from cover
[21] to cover through the weekend, and we discussed it.
[22]    And in essence, Mr. Buckingham brought it up at
[23] the meeting without having discussed it with us at a
[24] regular curriculum meeting. Whether or not he discussed
[25] it with any other member of the Board, I know that he

Page 170

[1] did not discuss it ahead of time with my husband, with
[2] myself, with Mr. Wenrich or with Mrs. Yingling. I
[3] cannot speak to the rest of the members of the Board as
[4] to their fore knowledge of the text itself or what
[5] Mr. Buckingham planned to propose.
[6]    Q: Okay. I want to make sure I am following you. When
[7] Mike said it was going to be brought up, you said it
[8] wasn't discussed at a curriculum committee meeting prior
[9] to it being brought before the whole Board?
[10]    A: That's correct.
[11]    Q: And that in fact you had to call Sheila, or did your
[12] husband have to stop by?
[13]    A: My husband talked with Sheila.
[14]    Q: And then it seems like there is a very short space of
[15] time between your actually getting the book, reviewing
[16] it, and it being in front of the Board?
[17]    A: That's correct.
[18]    Q: Tell me what was your sense of the text when you read
[19] it?
[20]    A: I researched the text online. It is published by an
[21] obscure publisher in Texas that is not a regular
[22] textbook publisher. The text itself was written for a
[23] college level, not for a high school level.
[24]    To my knowledge, based on my research — and I am
[25] only talking about my personal research — I could not

Page 171

[1] find any references to it being used in any high school,
[2] public or private, in the United States of America.
[3]    And the brief worldwide search that I did in terms
[4] of its usage, the only reference I could find to it was
[5] the fact that it is indeed contained in the reference
[6] section of the University of Oxford in England.
[7]    Now my research was not in any way exhaustive. I
[8] had a fairly short space of time when my vision allowed
[9] me to even be on the computer. So I would say I spent
[10] know more than eight hours. So I do not pretend to have
[11] exhaustive answers or definitive answers on where.
[12]    But the text was not written for anything but
[13] college and beyond in terms of level of understanding.
[14] It was not written for high school, and most definitely
[15] not for ninth grade students.
[16]    I am fairly well educated, and I had to get the
[17] dictionary out to inform myself as to the meaning of
[18] some of the vocabulary used.
[19]    Q: Okay. When I look at the course of action you have
[20] described, it seems consistent with the diligence you
[21] showed earlier in the year regarding the other texts?
[22]    A: I tried.
[23]    Q: And you have mentioned the readability scale, sort of
[24] the intelligibility for the grade level. Did you
[25] compare the text against the PA standards or the Dover

Carol Brown
May 16, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 172

[1] curriculum standards?

[2] A: Yes, I did.

[3] Q: What did you conclude in that regard?

[4] A: Because of its content and the way in which it is

[5] written, I would not say it fulfilled the standards of

[6] either.

[7] Q: Okay. And just give me a little more detail. Let me

[8] ask you this: At the time that you received word of the

[9] text from Mike Baksa, did he say the purpose for which

[10] the text was being proposed by Mr. Buckingham? More

[11] specifically, did he say Bill has come up with a book Of

[12] Pandas that he wants to use as a supplementary text?

[13] A: My understanding at that point in time, my own

[14] understanding alone, was that Mr. Buckingham wished to

[15] propose this as a side by side text.

[16] Q: Okay. And so you reviewed it with that in mind I take

[17] it?

[18] A: I reviewed it first and foremost as to its

[19] understandability for our students. And once I had

[20] really gotten into the main portion of the text, I

[21] stopped — well, my husband was reading it too. We did

[22] kind of take turns.

[23] But I really stopped and started pulling out my

[24] standards requirements. And then I was also reading

[25] with those in mind.

Page 173

[1] Q: Okay. Any other conclusions that you reached as a

[2] result of that review in this little short window

[3] relating to that text?

[4] A: Just that I didn't feel that it was appropriate. I am

[5] not sure what you are asking.

[6] Q: Well, I mean you have referenced some specific defects

[7] as you saw it in the text. It was not age appropriate.

[8] Difficult to read, made for college level. It didn't

[9] dovetail readily with the state standards?

[10] A: Or our own curriculum guide.

[11] Q: Did you look at it and just think it was not legitimate

[12] — a legitimate supplementary text?

[13] A: Absolutely.

[14] Q: What led you to that conclusion?

[15] A: In my research, I accessed reviews by various people in

[16] the educational field, specifically in the educational

[17] field of science, the sciences rather than English or

[18] Spanish. And the reviews I was able to read were not

[19] favorable. And they really dovetailed with what I was

[20] coming away with just reading it. I —

[21] Q: I am sorry.

[22] A: I am not sure what you want here.

[23] Q: I am just trying to get a sense for the reservations

[24] that you had about the text. Let me ask you: As a

[25] science text when you read it prior to looking at the

Page 174

[1] reviews, did you look at this and say this isn't

[2] science?

[3] MR. SCHMIDT: Object to the form.

[4] A: I am not a scientist. I could only look at it from the

[5] viewpoint of my own experience and understanding. I

[6] looked at it from the viewpoint of whether or not it was

[7] understandable.

[8] Besides the fact, I would think it would put most

[9] people to sleep within ten or fifteen minutes if you

[10] even got through the introduction. I looked at it from

[11] the viewpoint of our students, and I felt this was going

[12] to give them nothing but headaches and questions.

[13] Q: Okay. And then you said you got out on the Net and read

[14] some reviews?

[15] A: Yes.

[16] Q: It seemed like the reviews were consistent with your

[17] opinion; did I understand you correctly?

[18] A: Yes.

[19] Q: Tell me what criticisms of the text you took from the

[20] reviews.

[21] A: Basically, what I have already said. That it was not a

[22] good text in either content or understandability for

[23] students of any age. And they were talking more the

[24] college level, not the high school level because that

[25] was the level for which it was written.

Page 175

[1] I don't recall that I read any reviews as to the

[2] impact on high school students. It was related to the

[3] college level.

[4] Q: And let's speak to the content. Did you find reviews

[5] that were criticizing its content as science?

[6] A: Yes.

[7] Q: What do you recall about those reviewers? Just give me

[8] a sense.

[9] A: One word I do recall gobbledygook.

[10] Q: Did you have a sense it was religion when you read it?

[11] A: I read it and viewed it, and still view it, as a way to

[12] try and bring religious views in the back door.

[13] Q: Okay. Just looking at the text and based on your review

[14] at this time, what was it? Just tell me in general what

[15] gave you that impression.

[16] A: The authors of the text attempted to take

[17] known scientific theories that have been proven and bend

[18] them to fit a certain set of values.

[19] Q: Okay. Just give me a sense, what set of values do you

[20] see them trying to bend?

[21] A: Values is probably the wrong word. A certain mindset, a

[22] certain viewpoint that one cannot question, but there is

[23] some sort of supernatural agency beyond all life on

[24] earth and the universe. Now nowhere in the text is God

[25] mentioned by name. Okay? It doesn't say God got us,

**Tammy Kitzmiller, et al.   v.**
**Dover Area School District, et al.**

<div style="text-align: right">

**Carol Brown**
**May 16, 2005**

</div>

---

**Page 176**

[1] Mohammed or anything like that. I'm not saying that.

[2]   Nowhere does it say in the text that all life

[3] started with Adam and Eve in the Garden of Eden. It is

[4] not that blatant.

[5]   Q: Okay. Let me ask you though: Based on your reading,

[6] did you come away with that impression?

[7]   A: That was my impression of the author's intent.

[8]   Q: As distinct from the contents of the text?

[9]   A: It was my impression after reading the text that the

[10] author's intent was to bring a certain religious

[11] viewpoint into the classroom by the back door.

[12]   Q: And that religious viewpoint is? Just give me your

[13] sense for it.

[14]   A: My feeling, my personal feeling is that the

[15] viewpoint the authors were espousing or attempting to

[16] espouse was that of one belief system and one belief

[17] system only.

[18]   Q: What is that belief or what belief system do you see

[19] them espousing?

[20]   A: I can't read their minds, but I believe it was a

[21] Christian belief system.

[22]   Q: Was there anything in the text specifically that pointed

[23] you in that direction you thought?

[24]   A: The overall. Not one specific thing. As I have already

[25] stated, there is no mention of God or Creationism or the

---

**Page 177**

[1] Garden of Eden or Adam and Eve. There is not a literal

[2] Biblical interpretation mentioned.

[3]   It was the overall tone to me. One specific —

[4] no, I couldn't give you one specific thing. The

[5] approach seemed to be that the authors wanted to provide

[6] a supernatural explanation for everything.

[7]   Q: Did you see the book as a Creationist text?

[8]   A: Yes, I did. Intelligent Design, Creationism by another

[9] term.

[10]   Q: Is that how you see it?

[11]   A: Still do.

[12]   Q: So you get this book sort of here in July, and do you

[13] recall anything else that Mike Baksa said to you about

[14] the book when he talked to you?

[15]   A: Not really.

[16]   Q: Did he say anything about the book being made available

[17] to Board members?

[18]   A: I asked. I asked. I tend to do that.

[19]   Q: What did he say, or what did Mike tell you about that?

[20]   A: I'm not exactly sure of his wording, but to the effect

[21] they had one or more copies. He thought that Sheila

[22] Harkins had the one copy. It turned out that she did.

[23]   Q: Let's look then at the August meeting. This is plainly

[24] a contested meeting. What do you recall about that,

[25] Mrs. Brown?

---

**Page 178**

[1]   A: We get — again, we thought we were in good shape.

[2]   Q: What do you mean? Go ahead.

[3]   A: That everything was okay, was going to be okay. It was

[4] not a good situation. The contention was very open.

[5] The contention among — contentiousness among Board

[6] members was very open. Here again, I may be off a

[7] little bit time wise.

[8]   Q: Let me ask you: When you said you thought it was going

[9] to be okay, you thought that the Miller and Levin text

[10] would be approved?

[11]   A: We really did.

[12]   Q: And then as the meeting unfolded, you get to the

[13] curriculum part. Tell me then as best you can recall

[14] what happened next? Was there a motion to approve that

[15] text?

[16]   A: Yes.

[17]   Q: Then what happened?

[18]   A: It was defeated. It was defeated by a tie because one

[19] member was absent. Mrs. Cleaver was not at the meeting.

[20]   Q: Do you recall discussion surrounding the text at that

[21] time?

[22]   A: Yes.

[23]   Q: Tell me what you recall. What did Mr. Buckingham say

[24] about the vote on the Miller and Levin text?

[25]   A: Let's see if I can put it in brief. Essentially what he

---

**Page 179**

[1] said was that he would give us our textbook if we gave

[2] him his. In essence, he held it up for blackmail.

[3]   If we didn't approve Of Pandas as an adjunct text,

[4] he had the votes to see that we didn't get our biology

[5] book.

[6]   Q: Okay. Do you recall him stating the reasons for his

[7] position at that time?

[8]   A: I don't recall the exact language. But there again, he

[9] was referring to the death of Christ on the cross

[10] 2000 years, and people taking a stand for him.

[11]   Q: Tell me how that came up. Did you see that as connected

[12] to the biology text?

[13]   A: Yes.

[14]   Q: Why is that? Did he say something?

[15]   A: That's what we were talking about.

[16]   Q: What engendered that comment, or what produced that

[17] comment; can you recall?

[18]   A: We were discussing it. He wanted the School District to

[19] buy the texts with taxpayer funds. I know I made a

[20] comment. I believe Mr. Wenrich might have. Mr. Bonsell

[21] was also concerned about this and expressed concerns.

[22] And there was quite a discussion related to that.

[23]   Q: Okay. Tell me what you recall Mr. Bonsell saying about

[24] the text and Mr. Buckingham's effort to —

[25]   A: Mr. Bonsell's approach was from the Intelligent Design

---

Carol Brown
May 16, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 180

[1] standpoint. My impression was that he was very much
[2] opposed to the way Mr. Buckingham was handling it.
[3] Beyond that, you would have to ask Mr. Bonsell.
[4]    I can only interpret it from my own viewpoint. I
[5] know he was upset about it.
[6]    Q: Upset about what Mr. Buckingham was doing?
[7]    A: Yes.
[8]    Q: How about Sheila Harkins?
[9]    A: Mrs. Harkins voted with Mr. Buckingham.
[10]   Q: Did she speak to why she was voting that way; did she
[11] say?
[12]   A: She refused to give a reason. I can say that for
[13] certainty because I was one of three Board members who
[14] asked her.
[15]   Q: How about Noel Wenrich, do you remember him addressing
[16] Mr. Buckingham?
[17]   A: Yes, I do.
[18]   Q: Tell me what —
[19]   A: He was also in opposition to what Mr. Buckingham was
[20] trying to do. And Mr. Wenrich has publicly stated his
[21] support of Creationism, but he did not like the way that
[22] Mr. Buckingham was going about things.
[23]   Q: How about Intelligent Design? Did Mr. Wenrich speak to
[24] that during this August Board meeting?
[25]   A: I don't recall any specific comments, not to say he did

Page 181

[1] not make any. I know that he stood in vocal opposition
[2] to the way Mr. Buckingham was approaching things.
[3]   Q: Did he say why? Did he discuss the teachers or their
[4] position?
[5]   A: I don't recall specifics necessarily. Not one thing —
[6] not one single thing stands out in my mind.
[7]   Q: Sure. I understand. How about Heather Geesey, do you
[8] have a sense for her reaction to Bill Buckingham's —
[9]   A: She was in support of it.
[10]   Q: Did she say why?
[11]   A: Not anything specific that I recall.
[12]   Q: And you said Jane Cleaver was absent?
[13]   A: Yes.
[14]   Q: Was there heated discussion during this meeting?
[15]   A: Yes, there was and following the meeting.
[16]   Q: Tell me what you can recall about that discussion.
[17]   A: The discussion following the meeting or during?
[18]   Q: During.
[19]   A: As I stated, Mr. Buckingham was very vocal. His stand
[20] was that we should be doing this. There should be no
[21] question that we should be doing it because it is the
[22] right thing to do.
[23]    As he had stated in earlier meetings, including
[24] the June meeting, there is no separation of church and
[25] state. I am quoting him, not myself. That this is a

Page 182

[1] myth. And we are a Christian nation founded on
[2] Christian values, and anybody who doesn't like it should
[3] go home. My quote is not direct, but the gist is there.
[4]   Q: Okay. How about Angie Yingling, did she respond to
[5] Mr. Buckingham's comments?
[6]   A: Angie initially voted with Mr. Buckingham. She told me
[7] afterwards that she felt a great deal of pressure to do
[8] so.
[9]    Yes, our discussion got very hot and contentious.
[10] Members of the audience both pro and con spoke at some
[11] length. Angie changed her vote stating we need to give
[12] our kids their books.
[13]    And because she changed her vote and we were able
[14] to do a revote, we did approve the Prentice Hall text.
[15] And as everyone knows, we actually did get it in time to
[16] open the school year.
[17]    The teachers — let me be a little more specific.
[18] To the best of my recollection, Mrs. Spahr and
[19] Mrs. Miller, in particular, spoke at some length about
[20] their concerns about getting the text. They weren't
[21] speaking necessarily to the issue of Of Pandas and
[22] People. It was the concerns for the well being — well
[23] being is perhaps the wrong — but being able to meet the
[24] needs of the students.
[25]    They did object — I cannot give you exact

Page 1

[1] wording; I am sorry — as to what was said. The tenor I
[2] recall. And I recall very clearly what Mrs. Geesey said
[3] in response to the teachers' objection.
[4]   Q: Tell me that. What did Mrs. Geesey say?
[5]   A: Anyone who disagrees with the Board publicly and is an
[6] employe of the District should be fired.
[7]   Q: And —
[8]   A: She was looking at the teachers when she said it. And I
[9] turned to her and I said Heather, you cannot say that.
[10] And she did not respond to me. Nor did she respond
[11] after the meeting to the reporter who asked her about
[12] it.
[13]   Q: You told me that Angie said to you afterwards she felt
[14] she was under pressure or she felt pressure?
[15]   A: Yes, very much so.
[16]   Q: What did she say in that regard?
[17]   A: All right. Do you want to get into this now, finish the
[18] meeting, or which? Because we are going to have to back
[19] up.
[20]   Q: Back up in —
[21]   A: The comments — what happened after the meeting, okay, I
[22] did not hear the conversation Mr. Buckingham had with
[23] Angie. I shouldn't call it a conversation, rather I
[24] should call it confrontation and attack on
[25] Mr. Buckingham's part.

Min-U-Script®     Filius & McLucas Reporting Service, Inc.

<br>

Tammy Kitzmiller, et al.  v.
Dover Area School District, et al.

Carol Brown
May 16, 2005

Page 184

[1] The people who were privy to that were Mr. Brown,
[2] my husband, and Mr. Maldonado, the reporter from the
[3] York Daily Record.
[4] I am reporting only what I was told as regards
[5] that. If you would prefer, you can get it from the
[6] horse's mouth from Mr. Brown tomorrow.
[7] Q: Okay. I think I am understanding you better now. Are
[8] you saying that Angie Yingling's statement about feeling
[9] under pressure was made with your husband and
[10] Mr. Maldonado present, not you?
[11] A: No. What I am saying is what caused that was what
[12] happened when Mr. Buckingham verbally attacked her after
[13] the meeting. I was not privy to that conversation.
[14] My conversation to her was after the meeting was
[15] long over, like a day later. I spoke with her by phone,
[16] and she was an emotional wreck.
[17] I am sorry. May I get some water?
[18] Q: Most certainly. Now I see where you are coming from.
[19] Let's stay with the meeting and just in August. We have
[20] got this contentious vote on the text. Angie switches.
[21] I am not so much interested in the comments from
[22] the public, but the other Board members. Is there
[23] anything else you recall them saying?
[24] A: Mrs. Harkins — Mr. Buckingham's comments to the effect
[25] that he would give us our text if we gave him his,

Page 185

[1] everything comes out of that. I made the statement to
[2] the effect that we needed to have our texts approved by
[3] the 31st of July, and we were beyond that now, our
[4] primary text.
[5] Mrs. Harkins stated that a supplemental text could
[6] be approved at any time of year. And that is the truth.
[7] By Code, we are allowed to approve a supplemental text.
[8] But you cannot approve a supplemental text unless you
[9] have a primary text. And that was my response to her.
[10] Her response to me was you can approve a
[11] supplemental any time, and mine was not if you don't
[12] have a regular one first, if you don't have a main text.
[13] There was discussion about bringing it in as a
[14] supplemental text, a discussion of it being a reference,
[15] a discussion on whether it should be in the library or
[16] the classroom.
[17] Q: What do you recall? Let's run through those topics
[18] because that is kind of what we are discussing here.
[19] Did Mr. Buckingham advocate using Of Pandas as a
[20] supplemental text?
[21] A: Yes, and he wanted it in the classroom.
[22] Q: Did other Board members agree with him on that point,
[23] that it should be a supplemental text?
[24] A: It was mixed.
[25] Q: Tell me if you can, Alan Bonsell, can you recall whether

Page 186

[1] he stated a position on the use Of Pandas as a
[2] supplemental text?
[3] A: I can't be certain. I believe Mr. Bonsell — and I
[4] apologize. This is to the best of my recollection
[5] Mr. Bonsell favored it as a reference text — a
[6] reference material.
[7] I think what I recall is it was back and forth. I
[8] can't be certain of where everyone stood to be very
[9] honest. I know where a few people stood on the
[10] material, but not where everyone stood.
[11] I know that I was one of the few who vehemently
[12] objected to it in the classroom. My stated position was
[13] if you are going to offer this viewpoint, you must offer
[14] all the rest. If you are going to offer this hypothesis
[15] or theory of the origins of life, then we must offer all
[16] of them or we start getting into trouble.
[17] Q: And is that because you saw it as a religious
[18] hypothesis?
[19] A: Yes.
[20] Q: Was there any discussion of teaching Creationism at this
[21] August Board meeting?
[22] A: Not at this point. By now, we had reached a point where
[23] the term Intelligent Design was used, but the content
[24] remained Creationism.
[25] Q: And when you say that, Mrs. Brown, is that based on your

Page 187

[1] assessment of the content of Of Pandas?
[2] A: Not just my assessment, if you will, of the content of
[3] the text itself, but my assessment of what was being put
[4] forth in terms of what we should be teaching.
[5] The content did not change. The viewpoints did
[6] not change. Only the name for it changed. We no longer
[7] heard the term Creationism. We now heard the term
[8] Intelligent Design. There again, though, it was never
[9] defined as lower case or capitalized.
[10] Q: So do you recall anyone making that connection during
[11] the August Board meeting; do you recall any of the Board
[12] members making that?
[13] A: Making what connection?
[14] Q: Between Intelligent Design and Creationism.
[15] A: I have the sense based on the content of what was being
[16] said.
[17] Q: Okay. Tell me what —
[18] A: The viewpoints were still the same. We bring God back
[19] into the schools. We bring prayer back into the
[20] schools. We bring the religious viewpoint back into the
[21] schools — one religious viewpoint into the schools.
[22] And my sense of that viewpoint was that it was the
[23] viewpoint of a portion of the Christian community.
[24] Q: If we look at the Board members though, I mean you have
[25] attributed that view to Bill Buckingham, and you had

Carol Brown
May 16, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

**Page 188**

[1] some concern.

[2]     A: Six of our nine Board members at that point in time were

[3] members of the Evangelical Christian faith. A variety

[4] of churches, I am not saying one church, but that

[5] portion of the Christian faith.

[6]     Mrs. Harkins as I understand is a member of the

[7] Quaker faith. My husband is Lutheran Reformed, United

[8] Church of Christ because they merged together there, and

[9] I am Episcopalian.

[10]     Q: So what are you saying? Are you saying that you saw six

[11] of the nine Board members as religiously motivated?

[12]     A: I think that we all have very strong beliefs. What I am

[13] saying is that the viewpoint of the majority of the

[14] Board members was centered in one area of the Christian

[15] faith.

[16]     We were all members of Christian faiths who were

[17] members of the Board. I am just stating — saying —

[18] forgive me — that six of the Board members happened to

[19] be members of what is termed the Evangelical portion of

[20] the Christian religion.

[21]     Q: And I do understand you there. What I am trying to

[22] understand is you seem to have some sense that there was

[23] a religious motive here. Perhaps I am misunderstanding

[24] you.

[25]     Why do you see that as relevant, their religious

**Page 189**

[1] affiliation to our discussion of this August Board

[2] meeting?

[3]     A: This goes back to what I spoke about earlier. The

[4] separation of church and state, whatever your personal

[5] beliefs are, it is important in order to be a good

[6] member — a satisfactory member, a responsible member,

[7] however you want to term it —

[8]     Q: Sure.

[9]     A: — of a School District such as ours in which you were

[10] there to represent — you are there not to represent,

[11] but you are supposedly representing all of the

[12] viewpoints, all of the belief systems.

[13]     Q: I do understand.

[14]     A: All of that. You cannot espouse your own belief as the

[15] one belief. No one of us has that right.

[16]     Q: Let me see if I am understanding you. Do you see the

[17] support for adding Intelligent Design, adding an

[18] Intelligent Design text as advocating a specific

[19] Christian viewpoint?

[20]     A: Yes, I do.

[21]     Q: And that is why you have this sense that the Board

[22] members if they support Of Pandas are supporting that

[23] religious value; is that correct?

[24]     A: Almost without exception.

[25]     Q: Who is the exception?

**Page 190**

[1]     A: Sheila Harkins.

[2]     Q: So you see her as supporting Of Pandas but not because

[3] of her Evangelical Christian view?

[4]     A: She isn't Evangelical Christian. She is a Quaker — or

[5] she was. Forgive me. That is my past knowledge. I do

[6] not know her beliefs at this point in time.

[7]     I believe she had different reasons. I do not

[8] know what they were or are because she has stated in

[9] point of fact publicly and repeatedly that she believes

[10] in Evolution with a capital "E".

[11]     She has stated publicly, been quoted publicly in

[12] more than one media source, and she is on film, that she

[13] supports Darwin and the descent of man, etcetera.

[14]     Why she chose to support this, I don't know. I

[15] don't know if she chose to support it because she

[16] believed it would offer some other viewpoint or what.

[17]     At the same time, Mr. Noel Wenrich —

[18]     Q: Right.

[19]     A: — who is a very strong Evangelical Christian and

[20] supports Creationism, supports Intelligent Design, did

[21] not support its inclusion in the curriculum because he

[22] believed — and I am only quoting what he has stated to

[23] me, to others, to the media — that it violates the

[24] separation of church and state. There is a time and a

[25] place.

**Page 1**

[1]     Q: Okay. Let me move on, and perhaps I will get a better

[2] sense for your position. The text is approved. As you

[3] know, Of Pandas is not voted in in August as a

[4] supplemental text. The Miller and Levin text is

[5] approved.

[6]     Now we move into September. You are on the Board

[7] curriculum committee. When is the next time that the

[8] issue of Intelligent Design Theory comes to your

[9] attention?

[10]     A: Okay. We were scheduled to have a curriculum meeting on

[11] the 28th of September. It didn't happen. I can't tell

[12] you why, but it didn't happen.

[13]     In September, we were informed that there had been

[14] private donations of 50 to 60 — I am not sure which, in

[15] that ballpark — numbers of texts. They were anonymous

[16] contributions, which I have no problems with.

[17]     We had already put in place by a policy under my

[18] aegis as chair of the policy committee, approved it, put

[19] it into place to give the Superintendent the discretion

[20] to accept donations on his own hook without sitting down

[21] and hashing everything else.

[22]     So that is what happened. Dr. Nilsen in his

[23] office as Superintendent, his position, chose to accept

[24] the donations of 50 to 60 copies of Of Pandas. And they

[25] were placed in the classroom.

Min-U-Script®   Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Carol Brown
May 16, 2005

Page 192

[1]   Q: Do you remember any discussion of Intelligent Design as
[2] it relates to the biology curriculum during September?
[3]   A: No, I don't.
[4]   Q: When do you recall — or do you recall plainly it came
[5] to your attention in October. How did it come up?
[6]   A: It came to my attention prior to the beginning of
[7] October, and I don't know who instigated it. I know
[8] there had been discussion, very informal, about making
[9] it part of the curriculum.
[10]   And the viewpoint — part of the problem was we
[11] had an executive session in September. It was prior to
[12] the first Board meeting we think. And here I will be
[13] honest, my husband and I have hashed this over. Neither
[14] of us can remember which meeting it preceded.
[15]   We had an executive session dealing with problems
[16] with the high school construction. It was the only time
[17] we met in the high school conference room. We met with
[18] the people involved. I am trying to — because of
[19] confidentiality, beyond that, I won't go.
[20]   Extraneous to that — and I can't tell you who
[21] brought it up — but we got into the issue of the
[22] biology texts and teaching Intelligent Design. I was on
[23] the left of Mr. Bonsell. My husband Jeff was on the
[24] right. We were kind of arrayed around the conference
[25] table.

Page 193

[1]   It was brought up. And I made the point that if
[2] we are going to teach one, we have to teach all in order
[3] to remain in compliance with the law.
[4]   I believe that that was the first time I brought
[5] up the Supreme Court decision of 1987. I am not
[6] certain. I may have brought it up at a prior meeting,
[7] but I believe that was the first time.
[8]   And I stated I think we're going to get into
[9] trouble. And Mr. Bonsell stated we didn't have to
[10] present any other viewpoints. And I would very much
[11] appreciate it if you asked my husband this same
[12] question —
[13]   Q: Okay.
[14]   A: — as relates to this meeting in the conference room.
[15] It was not part of our stated objective for the
[16] executive session, and it was never mentioned as having
[17] taken place.
[18]   Q: Is there anything else you recall that related to this
[19] teaching of Intelligent Design at the executive session
[20] in September? Did Bill Buckingham say anything?
[21]   A: He was in favor of it, as was Mrs. Cleaver, and
[22] Mrs. Geesey. Those three I am aware were vocal in their
[23] support for the concept. I cannot give you specifics,
[24] and I don't recall comments by anyone else.
[25]   Q: Are you saying that you can't recall the specific

Page 194

[1] statements that they made during this?
[2]   A: That's correct. Not exact statements, only the gist.
[3]   Q: What was the gist as you recall it?
[4]   A: I just said it. The gist was that we should be teaching
[5] this.
[6]   Q: Let's get through September and go to October. What was
[7] the next development after this meeting? Plainly, it
[8] wasn't an agenda item?
[9]   A: No. The proposed changes to the curriculum.
[10]   Q: Tell me what you recall, how they came up.
[11]   A: As I started to state before, I am not sure who
[12] instigated them, who was responsible for making the
[13] initial suggestion.
[14]   I did miss part of a meeting at that point. I was
[15] there for part of the meeting. We got into the
[16] curriculum. It was a curriculum meeting; I apologize.
[17] I was not able to stay.
[18]   Mr. Baksa was kind enough to send me a copy of
[19] what was then being proposed as possible wording changes
[20] for the curriculum. And it included words to the effect
[21] that students would be made aware of gaps in Darwin's
[22] Theory, and that there are other theories out there.
[23]   That's verbatim. It's not exact. I can't quite
[24] see it, but that was pretty close. And I was a little
[25] concerned and offered, which I am sure you have, two

Page 195

[1] alternative wording suggestions for that.
[2]   I didn't like — Intelligent Design was in there.
[3] I was still very concerned. Both my suggested changes
[4] included gaps in Darwin's Theory, but were more general
[5] and did not include Intelligent Design.
[6]   I was still trying to remain within the framework
[7] of the law. I wanted to keep us out of trouble. And I
[8] believe my wording was to the effect that there are a
[9] variety of explanations for the origins of life, but I
[10] didn't use origins of life to my recollection. I am not
[11] sure. I may have used evolution. I don't recall.
[12]   Q: But did you have an understanding that under the change
[13] you proposed Intelligent Design Theory would still be
[14] sort of — the students would still be made aware of it?
[15]   A: I didn't know at that point in time.
[16]   Q: Okay.
[17]   A: These were just discussion points as far as I knew. Mr.
[18] Baksa called me. He sent me the material. He indicated
[19] that there were discussions on making changes to the
[20] curriculum guide.
[21]   Q: And am I understanding you correctly that you didn't
[22] make the meeting at which those proposed changes were
[23] discussed?
[24]   A: The meeting at which the changes were made. I don't
[25] know anything about the discussion.

Carol Brown
May 16, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

**Page 196**

[1]   Q: Let me ask you: You have referenced a Board curriculum

[2]   meeting in October relating to these —

[3]   A: That was between the first and second meetings in

[4]   October.

[5]   Q: Okay. And that was a Board curriculum committee

[6]   meeting?

[7]   A: That was indeed a Board curriculum committee meeting.

[8]   Q: Did you attend that meeting?

[9]   A: No, I did not. I had an doctor's appointment, and I was

[10]   not able to get back in time.

[11]   Q: Sure. I understand.

[12]   A: It was at that meeting to the best of my understanding

[13]   that the changes were made. I was also told that there

[14]   were no teachers involved in that, and there was no

[15]   citizen advisory curriculum meeting called for the

[16]   citizen advisory committee to give their input prior to

[17]   any Board decision. And no teachers were asked either.

[18]   Q: Who told you that?

[19]   A: Mr. Baksa. It was confirmed later by Mrs. Spahr.

[20]   Q: Let me ask you: Then was the first time you saw the

[21]   proposed curriculum change language that was offered by

[22]   the curriculum committee at the second Board meeting in

[23]   October?

[24]   A: That is correct.

[25]   Q: And tell me what you recall about that meeting. Just

**Page 197**

[1]   give me your overview. I have to get a sense for what

[2]   you saw was in play and what the positions were.

[3]   A: The three different versions were offered. I was told

[4]   by Mrs. Spahr after the meeting that they had only

[5]   received the information of what the Board was proposing

[6]   to do that morning, and they managed to get together at

[7]   some point during the day and offer and make

[8]   suggestions, four changes, and their own addition to

[9]   wit, the origins of life will not be taught. They

[10]   offered that revision.

[11]   And, of course, that was simply putting into

[12]   policy what had been custom. I believe there were 18

[13]   separate — very close to that, if not 18 — amendments

[14]   offered to change the proposed wording. And with the

[15]   exception of the addition of the words the origins of

[16]   life will not be taught, every proposed revision was

[17]   voted down.

[18]   Q: And give me your sense what do you think was at play at

[19]   the meeting there?

[20]   A: I don't understand.

[21]   Q: Well, I mean there's a whole bunch of votes as you and I

[22]   both know with people differing. How did you see the

[23]   purpose of all of the various amendments that were being

[24]   offered by certain Board members?

[25]   A: To circumvent the law of the land.

**Page 198**

[1]   Q: How do you see the problem? Just tell me. Is it

[2]   because you see Intelligent Design as religion?

[3]   A: Yes, I do.

[4]   Q: Let's look at some of the discussion that was had by

[5]   Board members about the changes that were being voted

[6]   upon.

[7]   Do you recall Mr. Bonsell making statements about

[8]   the proposed curriculum change?

[9]   A: Specific statements, no. I couldn't quote anything.

[10]   Q: Do you recall the gist of his statements?

[11]   A: No.

[12]   Q: How about Sheila Harkins, do you recall her expressing a

[13]   view as to the proposed curriculum change?

[14]   A: No.

[15]   Q: Bill Buckingham?

[16]   A: What I recall is his reiteration of past positions.

[17]   Q: What do you mean by that, Mrs. Brown?

[18]   A: He didn't use exactly the same wording, but to the

[19]   effect that someone died on the cross 2,000 years ago

[20]   for us; it was time for us to take a stand for him.

[21]   It was simply as I recall a reiteration of what he

[22]   had said before. My words are not exact.

[23]   Q: Let me ask you about Heather Geesey. Do you recall her

[24]   saying anything on the issue of the proposed curriculum

[25]   change?

**Page 199**

[1]   A: No one comment stands out, but her support was for

[2]   Mr. Buckingham's position.

[3]   Q: Did she say why?

[4]   A: Her support was for Mr. Buckingham's position and

[5]   reasoning. Is that better?

[6]   Q: How do you know that? Did she say anything that led you

[7]   to believe that?

[8]   A: Does the expression yes, thank you, God apply every time

[9]   we lost the revision vote?

[10]   Q: You recall her saying that I take it?

[11]   A: Every time.

[12]   Q: How about Jane Cleaver, do you recall her saying

[13]   anything?

[14]   A: I couldn't hear Jane. She is across the table from me.

[15]   Ask my husband.

[16]   Q: Now earlier you mentioned a discussion you had with

[17]   Angie Yingling after the August Board meeting. Tell me

[18]   about that.

[19]   A: What she spoke to me about — and this was just a phone

[20]   conversation we had — was that she felt she was

[21]   concerned about her own position, how she would be

[22]   perceived in the county — in the community, my

[23]   apologies, if she didn't go along with this.

[24]   Angie is a strong believer. But at the same time

[25]   — and here I am injecting my own opinion based on the

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Carol Brown
May 16, 2005

Page 200

[1] four plus years I have known her. Angie has a very
[2] strong belief system and a very strong faith in God, but
[3] she is also aware of her responsibilities and
[4] obligations when she served as a Board member. And for
[5] her first and foremost, it was her responsibility to the
[6] students.
[7]     At the same time, no one wants to be hated. And
[8] those of us who opposed the effort were already, had
[9] already been called a variety of names publicly and
[10] privately. We had received some not nice phone calls.
[11]     I am grateful to say that the vast majority
[12] however were very supportive of our position. But I
[13] think that Angie could not stand up to the pressure.
[14]     Q: So the conversation you were referencing after the
[15] August Board meeting, was that the pressure she was
[16] referring to?
[17]     A: Yes, she was. And the things that Bill had said to her
[18] must have been pretty bad.
[19]     Q: Those things you are referencing are statements she made
[20] to — Bill Buckingham made to Angie after that August
[21] Board meeting?
[22]     A: Mr. Buckingham made to her, at her. And I was not privy
[23] to those statements. Mr. Joe Maldonado, as I said
[24] before was, as was my husband. So I only have the
[25] smallest understanding of what was actually said, which

Page 201

[1] was that it was very hurtful, and he was very accusatory
[2] towards Angie.
[3]     Q: Okay. So now we are at this October 18th Board meeting?
[4]     A: 16th.
[5]     Q: Whatever. The second Board meeting in October?
[6]     A: I remember the date. I resigned.
[7]     Q: And the curriculum vote is up. Did Angie make
[8] statements about the proposed curriculum change?
[9]     A: Not really, but she did go along with it.
[10]     Q: Did she ever talk to you about going along?
[11]     A: Yes, she did.
[12]     Q: What did she tell you?
[13]     A: She was afraid that her business and personal life would
[14] be affected if she didn't go along with what the
[15] majority of the Board wanted.
[16]     Q: She mentioned her business. What was that? Does she
[17] have a business in the community?
[18]     A: She does a variety of things. She inherited her late
[19] husband's business, which is Yingling's Garage. I don't
[20] think she runs it anymore. Please excuse me. She had
[21] some legal issues. There were some problems with that,
[22] some things that she had been called to account for.
[23]     But she is involved with some other things. I
[24] know there is real estate and so forth.
[25]     Q: Was it your understanding of her comment that she meant

Page 202

[1] her business income and so on might suffer?
[2]     A: Yes.
[3]     Q: How about her personal life, was she any more specific
[4] about that?
[5]     A: Just that some people — she wasn't specific as to the
[6] names of individuals, but she did state that she had
[7] been called some fairly nasty names, and that she was
[8] being snubbed by people.
[9]     Q: Did she attribute any comments to other Board members?
[10]     A: Yes.
[11]     Q: I know that you have mentioned Bill Buckingham. Anyone
[12] else?
[13]     A: Not that I am personally aware of.
[14]     Q: I know there was this period here in October where this
[15] contemplated curriculum change is in front of the Board
[16] curriculum committee and then going up in front of
[17] committee.
[18]     Do you recall any of the Board members calling you
[19] at home during that period?
[20]     A: No, not who were members of the curriculum.
[21]     Q: How about just the Board generally? Do you recall
[22] Mr. Bonsell calling you and asking?
[23]     A: Mr. Bonsell did call me, and he wanted to talk with my
[24] husband, too. I passed the information along to my
[25] husband. At that point, I did not know what my own

Page 203

[1] actions were going to be, and I didn't go beyond that
[2] point with Mr. Bonsell.
[3]     Q: Just let me make sure I understand you. You are saying
[4] at this point in October, you didn't know what action
[5] you would take on the curriculum item?
[6]     A: Yes.
[7]     Q: You said you didn't go further with Mr. Bonsell. You
[8] didn't discuss the matter?
[9]     A: Correct.
[10]     Q: How about your husband, do you know whether he discussed
[11] the matter with Mr. Bonsell?
[12]     A: No, I don't. At this point, my husband and I were not
[13] — we were not discussing some things.
[14]     Q: With other —
[15]     A: With each other.
[16]     Q: And am I correct in understanding that you were not
[17] discussing certain Board matters with each other?
[18]     A: Yes.
[19]     Q: And the biology curriculum change that was up?
[20]     A: Yes.
[21]     Q: You weren't discussing that?
[22]     A: No.
[23]     Q: Was there a particular reason? Did you have a
[24] difference of opinion?
[25]     A: Not at all.

Carol Brown
May 16, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

Page 204

[1]  Q: Was there a particular reason you just decided not to
[2] discuss it?

[3]  A: Because I wouldn't discuss it.

[4]  Q: I think you said you resigned at the end of this second
[5] meeting?

[6]  A: Yes, I did. So did my husband.

[7]  Q: Let me ask you about that. Did you go into that meeting
[8] on the Board curriculum with the sense that if the
[9] curriculum change was approved, you would probably
[10] resign?

[11]  A: No.

[12]  Q: You didn't?

[13]  A: No. I went into that meeting knowing I was going to
[14] resign. I had made up my mind. Monday, the 18th of
[15] October, I mailed my formal resignation to the York
[16] County School of Technology and the York County School
[17] of Technology Authority. I mailed those no one time
[18] actually to be precise.

[19]  It was the same resignation I presented that night
[20] to the Dover Board, the one you have in your hand.

[21]  Q: Let me just ask you to look at that.

[22]  A: Do you want me to read it into the record?

[23]  Q: No, it will be part of the record.

[24]  (Carol Brown Deposition Exhibits 2, 3 and 4 were
[25] marked.)

---

Page 205

**BY MR. GILLEN:**

[1]

[2]  Q: Mrs. Brown, I just will get this over with quickly I
[3] hope. I have asked the reporter Vicki to mark this
[4] Carol Brown 2. I believe that is a copy of your
[5] resignation speech?

[6]  A: Yes, it is.

[7]  Q: Is it a true and accurate copy of your resignation
[8] speech?

[9]  A: It most certainly is.

[10]  Q: While we are at it, something has been marked Carol
[11] Brown 3. I believe that is a copy of the document —

[12]  A: Yes, it is.

[13]  Q: — you provided that is comments you made when the
[14] Pledge issue was up?

[15]  A: That's correct. And the date is at the top. And it is
[16] a correct and true copy if on the final page, there is a
[17] correction.

[18]  Q: Yes. Are those comments you made at a public Board
[19] meeting?

[20]  A: Yes, they are.

[21]  Q: Number 4, you brought it, I have marked. It is a copy
[22] of the Treaty of Tripoli?

[23]  A: Yes, it is.

[24]  Q: Good enough.

[25]  A: Signed by President John Adams.

---

Page 206

[1]  Q: Let's look at Carol Brown 2, and let me ask you a few
[2] questions.

[3]  You indicated that you knew you were going to
[4] resign when you came to this Board meeting?

[5]  A: Yes.

[6]  Q: And I think I know why. I just want you to explain to
[7] me what had brought you to the point of resignation.

[8]  A: I will go back two days prior to that. Saturday, the
[9] 16th of October was my husband's and my 20th wedding
[10] anniversary. We had planned to go out that night, and
[11] neither of us felt so inclined. It was a rare night
[12] when we had the house to ourselves.

[13]  And I had been avoiding discussing the situation
[14] for awhile because I was very conflicted. One doesn't
[15] give close to ten years of one's life on an average of
[16] 30 hours a week to something if one does not care a
[17] great deal about it.

[18]  And I particularly cared about my kids and their
[19] well being, and I felt that we were heading into a
[20] situation — I felt it so strongly — that we were
[21] heading into a situation in which there would be no
[22] winners, except maybe the lawyers. No offense. No
[23] offense.

[24]  MR. SCHMIDT: None taken.

[25]  A: And because I didn't even know where to start to talk

---

Page 2

[1] about it, for the first time in our relationship, I
[2] wouldn't open to my husband about it. And that night,
[3] we talked.

[4]  And it turned out that just as I had been
[5] contemplating resigning, so had my husband. And neither
[6] of us wanted to influence the other. And we talked all
[7] night basically. We talked about why we were on the
[8] School Board, what we felt we had accomplished, what we
[9] still wanted to accomplish, what we saw had been
[10] happening within the School District itself, the great
[11] things our kids have been doing.

[12]  And the incredible, I mean my gosh, our teachers
[13] have just been phenomenal. They work for the lowest
[14] pay, and they give us everything. And our
[15] administrators go so far beyond the call of duty, it is
[16] not funny.

[17]  We talked about all this and realized that neither
[18] of us was able to properly represent the people we cared
[19] about the most because our fellow Board members, all but
[20] one, possibly two exceptions, didn't even want to hear
[21] what we had to say anymore.

[22]  And I say this without pride or egotism, but I was
[23] the most senior Board member, not just in terms of
[24] length of service, but in terms of experience, expertise
[25] across the Board. I had been the policy chairperson for

---

Page 204 - Page 207   (54)

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Carol Brown
May 16, 2005

Page 208

[1] almost ten years. I had studied every aspect, or as
[2] much as a layman can, of school law. I kept myself
[3] apprised of every court case that related to things in
[4] which we were involved, and I gave the same attention
[5] and involvement to the York County School of Technology.
[6] I participated in negotiations at all levels at both
[7] School Districts.
[8]     My husband was directly and very seriously
[9] involved with all aspects of the building project. He
[10] was then chairperson of Buildings and Grounds and also
[11] the chair of the Buildings and Grounds Task Force which
[12] was a task force instituted every three to four years to
[13] just do a basic review of all of our buildings and our
[14] needs.
[15]     He was head of Transportation, had just concluded
[16] a very successful transportation contract that was
[17] extremely favorable to the School District for — it was
[18] for a five-year period.
[19]     But no one believed that we had anything to offer
[20] anymore in terms of what we were saying because we were
[21] saying what the majority of the Board did not want to
[22] hear from my viewpoint, my belief.
[23]     They repudiated anything we had to say or anything
[24] we offered to do. And this was I think felt by both of
[25] us.

Page 209

[1]     But I didn't make my final decision — even though
[2] I wrote out my resignation speech on Sunday night, as
[3] did my husband — his was a little more informal. I
[4] have got to have it in black and white and big enough so
[5] I can read it — until noontime Monday when I took the
[6] letters to the Post Office.
[7]     Q: Okay. Let me see. To understand you, you say you were
[8] saying something to the Board they didn't want to hear.
[9] It seems from the thrust of your comments, it is
[10] something that related to this issue, what we have been
[11] discussing here?
[12]     A: And related in greater measure to the limits of what a
[13] School Director or School Board member is allowed to do
[14] by code, custom, law.
[15]     Q: Tell me if you can what — as you see it now, you are on
[16] the point of resigning. What is it you said don't do
[17] this, this curriculum change is imprudent, is that the
[18] thrust of the comments that you are referencing in your
[19] testimony?
[20]     A: More than that. That was simply the tip of the iceberg.
[21] The proposed curriculum change was a manifestation of
[22] personal desire on the part of the majority of the Board
[23] I believe.
[24]     Q: Personal desire in what way?
[25]     A: Personal desire to institute — no. To take the School

Page 210

[1] District on to a path that was very different from the
[2] path we had been on.
[3]     Q: Just give me your sense for what path you thought the
[4] Board was interested in.
[5]     A: Everything I say is based on my personal opinion,
[6] belief. I feel the need to repeat that. I am not God,
[7] Goddess or even a demi God. But I saw the Board wanting
[8] to go far beyond what we are mandated to do by Code or
[9] custom.
[10]     Q: Tell me in what ways specifically.
[11]     A: Okay. You can make the arguments through the years. In
[12] 1987, the Supreme Court brought it to a head with their
[13] ruling against Louisiana — and I have forgotten now if
[14] it is a state or a Commonwealth. Put in whatever is
[15] appropriate.
[16]     Essentially what the Louisiana people were
[17] attempting to do was to head off modern science and take
[18] us back into the 19th Century. One can make the
[19] argument that the state of Kansas in 1999 attempted
[20] essentially the same thing, specifically the State Board
[21] of Education of the state of Kansas attempting to get
[22] rid of Evolution.
[23]     Q: Okay.
[24]     A: And in both cases, in the first case with Louisiana, the
[25] Supreme Court said no, no, no, you may not do that.

Page 211

[1] There is a separation of church and state, 1987.
[2]     In 1999, the state legislature and the voters —
[3] the good voters of the state of Kansas — told the state
[4] Board of Education the same thing, no, no, no, you may
[5] not do that.
[6]     And what I saw our Board doing is attempting to
[7] take that same path again. Whether or not it was called
[8] Creationism or Intelligent Design, I saw and still see
[9] the Board attempting to break that separation between
[10] church and state, to break the law, to go beyond our
[11] mandates.
[12]     Q: Okay. And now I see plainly that this curriculum issue,
[13] Intelligent Design, that's the basis for your stated
[14] concern.
[15]     Apart from that, was there anything else that you
[16] saw?
[17]     A: That was one of the biggest things. One of the last
[18] things I did before I resigned, because it was part of
[19] my resignation, and the first thing I did at the meeting
[20] after I resigned was to beg the Board once again to
[21] rethink their position; to take this out of curriculum;
[22] to take it out of biology and instead offer a separate
[23] class in comparative world religions.
[24]     And I had been suggesting that for many months
[25] since very early in the year when it first came up

Carol Brown
May 16, 2005

Tammy Kitzmiller, et al.  v.
Dover Area School District, et al.

**Page 212**

[1] because I believed then and I believe now this issue is
[2] a matter of faith. It is a matter we cannot touch,
[3] taste, feel, smell, see, hear. It is a matter of faith.
[4]     And if we are going to talk about faith and
[5] matters of faith, then open our students' minds to the
[6] faiths of the whole world, not just one. Open our
[7] students to the viewpoint of the Buddhists that the
[8] universe always has been. Open them up to the Native
[9] American, whatever. I am going beyond. What else?
[10]     Q: That's fine. I understand your position here. Again,
[11] that relates to the curriculum issue and so on. I am
[12] trying to get a sense if there is any other issue you
[13] saw that gave you concern.
[14]     Let's put it this way: You said you felt — you
[15] and your husband after speaking felt that the Board
[16] wasn't interested in listening to what you had to say?
[17]     A: What I felt was that the Board was not interested — and
[18] unfortunately, I am sorry to say I feel it even more
[19] strongly today — they were not interested in
[20] viewpoints, opinions or any information, factual or
[21] otherwise that does not agree with what they believe or
[22] want to see done or want to do.
[23]     Q: So sort of —
[24]     A: They are not responsive to the community. They don't
[25] want to hear what the community has to say unless it is

**Page 213**

[1] that portion of the community that absolutely agrees
[2] with their viewpoints.
[3]     Q: It seems like in this way, we have almost come full
[4] circle in that you have a sense of lack of
[5] accountability which sort of brought you on the Board in
[6] the first place?
[7]     A: That is not what brought me on the Board in the first
[8] place.
[9]     Q: Okay.
[10]     A: I ran as a parent of a special needs child because I saw
[11] a lot of problems and comments. Special needs children
[12] in that time were still kind of being shunted to one
[13] side.
[14]     What the law mandated, they got in services. But
[15] if you didn't know what to ask about, you didn't get
[16] anything. That is why I ran for the Board.
[17]     It wasn't until my third term that fiscal
[18] accountability came up. To cut to the chase, I was in
[19] the minority when I came on the Board. I was in the
[20] majority, if you will, at the beginning of my third term
[21] for approximately two years.
[22]     When I say in the majority, simpatico. All of the
[23] Board members for the one and only time were on the same
[24] wavelength. We were focused on certain things. We got
[25] a lot done.

**Page 214**

[1]     Now in that time period, the first thing I did
[2] when I was elected President was to take the show on the
[3] road to make us responsible to the community in which we
[4] served. Every meeting was at a different school. I
[5] made it policy as Board President because we needed to
[6] have that accountability.
[7]     You called them Board retreats. What we had were
[8] a series of meetings with various building
[9] administrators and staff members so that they could
[10] express their concerns, their needs. That is part of
[11] accountability.
[12]     We listened to the students. We heard what the
[13] community had to say. Okay. That was not present when
[14] I was first on the Board.
[15]     However, in that same time period, whether or not
[16] my fellow Board members agreed with me, there was always
[17] a respectful hearing. I don't mean listening. I mean
[18] hearing, and listening, and a response.
[19]     That changed. And when Mr. Bonsell became
[20] President, we didn't take our show on the road anymore.
[21] We stopped listening. We stopped hearing what our
[22] people had to say. And I say we, because I was a member
[23] of the Board. I was as guilty as anyone else. And then
[24] we stopped listening to each other.
[25]     Q: And I think that is what you said led you to this point

**Page 215**

[1] of resignation?
[2]     A: That's right.
[3]     Q: The sense, they didn't want —
[4]     A: And I could no longer properly represent the people. I
[5] couldn't be an advocate for either my fellow members of
[6] the community or for my kids.
[7]     Q: You felt you couldn't be effective as a Board member?
[8]     A: That's correct. Also, I felt it was important I have
[9] some credibility because I have served long and I
[10] believe honorably to the end. People do listen, and the
[11] media listens.
[12]     I felt that the only way the community would be
[13] made aware of exactly what was happening was by stepping
[14] down.
[15]     Q: So you were indicating your disapproval of the
[16] Board's —
[17]     A: More than that. All I was trying to do was wake people
[18] up. If you don't know what is going on, how do you
[19] change it, or how do you prevent it from happening?
[20]     If you are aware of what is going on and choose to
[21] do nothing, then it is on your head. The old Scottish
[22] verdict not proven or the old expression silence implies
[23] consent.
[24]     If you know about it and you don't do anything,
[25] then you deserve what you get.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Carol Brown
May 16, 2005

**Page 216**

[1]  Q: Okay.

[2]  A: But you have to know about it first. And even though
[3]  there had been some attention, there wasn't enough. And
[4]  we had to make sure the people understood. I felt I had
[5]  to. I owed them that.

[6]  Q: If we look at this exhibit, Carol Brown 2, that is your
[7]  resignation speech. Do you see that as kind of your
[8]  effort to wake people up?

[9]  A: It was my last attempt to wake the Board up.

[10]  Q: I glanced —

[11]  A: It was also to say thank you to our teachers and
[12]  administrators.

[13]  Q: I noticed that.

[14]  A: And our students.

[15]  Q: I did notice that. Let me just ask you, Mrs. Brown,
[16]  there's one, two — on the third page there, three
[17]  paragraphs down —

[18]  A: However, it has become increasingly evident; is that the
[19]  one?

[20]  Q: No. The third paragraph down.

[21]  A: A measure of that?

[22]  Q: Yes.

[23]  A: I have already indicated who did it and when it
[24]  happened.

[25]  Q: That is what I was going to ask you.

**Page 217**

[1]  A: Mrs. Cleaver and Mr. Buckingham, and I know that it is
[2]  in this.

[3]  Q: And the thing when I read it, there is this sense of a
[4]  person's beliefs be used as a yardstick to measure the
[5]  value of that service?

[6]  A: Absolutely.

[7]  Q: Why did you have that sense, that your beliefs were
[8]  being — or did you have a sense that —

[9]  A: I had said —

[10]  Q: I am sorry, Mrs. Brown. Vicki is saving me from a very
[11]  imprecise question. You have served a long time, and
[12]  you have achieved a lot. What struck me when I read
[13]  this over the lunch is I think you had told me about
[14]  these comments, but this last sentence is quite stark.

[15]  A: It was meant to be.

[16]  Q: Is there anything else that was said to you that
[17]  contributed to this statement here that a person's
[18]  beliefs be used as a yardstick to measure the value of
[19]  that service?

[20]  A: Yes.

[21]  Q: Tell me what.

[22]  A: I have stated — and I believe it is part of the record
[23]  — I am an Episcopalian. I will not give you the name
[24]  of the individual, I am sorry, because of that
[25]  individual's family, not because of the individual who

**Page 218**

[1]  said it.

[2]  I was told that the Episcopal Church is in the
[3]  same league as that of the Roman Catholic Church, and
[4]  that anyone who follows those practices is doomed to
[5]  hell.

[6]  Q: Do I take your meaning that a Board member made this
[7]  statement to you?

[8]  A: Yes, you do. I am sorry. You can find me in contempt
[9]  or anything else, but I will not tell you who said it.

[10]  Q: Hopefully, there is another way to address this. Let's
[11]  go off the record.

[12]  (An off-the-record discussion was had.)

[13]  BY MR. GILLEN:

[14]  Q: Mrs. Brown, you have indicated you don't want to give me
[15]  the name of the Board member who made the statement to
[16]  you. Let me ask you: Is this person still on the Board?

[17]  A: Yes, that person still is.

[18]  Q: Was the person on the Board beginning in January of
[19]  2004?

[20]  A: Yes, that person was.

[21]  Q: Tell me a little bit where the conversation took place
[22]  and how it came up, taking care for present purposes to
[23]  avoid giving me the person's name?

[24]  A: And sex.

[25]  Q: Fine.

**Page 219**

[1]  A: The conversation took place in January of 2005.

[2]  Q: Can you tell me —

[3]  A: The night of a Board meeting.

[4]  Q: I take it it was a conversation that took place after
[5]  the Board meeting?

[6]  A: It took place outside of the Board meeting.

[7]  Q: And can you just tell me how that — how this topic
[8]  arose?

[9]  A: There was an accidental meeting with the individual
[10]  during a recess.

[11]  Q: All right. And during that accidental meeting, were
[12]  you — what were you discussing?

[13]  A: We weren't.

[14]  Q: You weren't?

[15]  A: We weren't discussing anything.

[16]  Q: Okay. Some communication was had apparently?

[17]  A: Yes. I did not instigate the communication.

[18]  Q: It was at a recess of the January, 2005 Board meeting.
[19]  Was it a recess during the Board meeting?

[20]  A: Yes, it was.

[21]  Q: When the Board recesses, does it step out of the room
[22]  where the public Board meeting is?

[23]  A: It depends on the individual's preference. If the
[24]  presiding officer calls a recess, it is strictly up to
[25]  the individual Board member whether he or she chooses to

Carol Brown
May 16, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 220

[1] take advantage, go outside for a cigarette, go to the
[2] bathroom, or stay put and read notes.
[3]      Q: Where did this particular conversation take place?
[4]      A: It took place in the hall of the North Salem Elementary
[5] School outside of the cafeterium where most of our
[6] meetings are held.
[7]      Q: What sort of exchange produced this observation?
[8]      A: The exchange was on the other individual's part. I
[9] wouldn't call it an exchange. The individual indicated
[10] that my husband and I were responsible for causing
[11] destruction within the Board and the District, and it
[12] went on from there. At which point, I walked away.
[13]      Q: And causing destruction, was he referencing to this
[14] dispute and conflict over the curriculum change?
[15]      A: He or she, I believe was.
[16]      Q: Thank you. And just give me a sense for how your church
[17] membership came up.
[18]      A: I did not bring it up. I have no understanding of why
[19] the individual chose to bring that particular standpoint
[20] up or belief. I have never made any secret of my church
[21] membership. None of us really has.
[22]      Q: Sure. Apart from this comment which you have mentioned
[23] in January of 2005, were there any other comments?
[24]      A: By this individual?
[25]      Q: Well, from Board members directed to your religious

Page 221

[1] beliefs.
[2]      A: Yes.
[3]      Q: You have mentioned two, one by Mr. Buckingham, and one
[4] by Mrs. Cleaver. Besides those, any additional ones?
[5]      A: Just the meeting in the hallway.
[6]      Q: Are you running for School Board?
[7]      A: No, I am not.
[8]      Q: Is your husband running?
[9]      A: Yes, he is. Tomorrow is Election Day, and he will be
[10] here talking with you.
[11]      Q: I saw the signs coming in. Is he running with Angie
[12] Yingling?
[13]      A: No. She has chosen —he has nothing to do with the
[14] signs.
[15]      Q: You mentioned that there were two votes that you had —
[16]      A: The other vote occurred, it would have been in the first
[17] year of my second term. And the Honeywell people,
[18] Honeywell Energy Systems, etcetera, came and made a
[19] proposal to retrofit schools within the District to make
[20] not just our lights, but our energy systems more energy
[21] efficient.
[22]      And even though my husband is an electrician, I
[23] don't know that much. I was a little concerned because
[24] it seemed a bit pricey, but they promised us we would
[25] realize "x" amount of money in energy savings. I voted

Page 222

[1] for it. I came to deeply regret that vote because we
[2] didn't realize the energy savings. Okay? I still feel
[3] very guilty because I think it cost the School District
[4] about a million dollars overall.
[5]      So yes, that is my other vote that I deeply
[6] regret.
[7]      Q: You mentioned too that you recall at some point Alan
[8] Bonsell's mom making a comment at the public —
[9]      A: She made a speech.
[10]      Q: Tell me just if you can quickly what the tenor of her
[11] comments was.
[12]      A: The tenor of her comments to wit was we should be — she
[13] was willing to support the District in spending any
[14] amount of money to see this all through and bring faith
[15] back into the School District, into the schools. She
[16] didn't say School District. She said back into the
[17] schools. And she used the term God.
[18]      Q: Anything else you recall from her statement?
[19]      A: I belief that was the gist.
[20]      Q: You resigned at this meeting. Have you spoken with any
[21] of the other Board members who have resigned? Let me
[22] ask: Have you talked to Angie Yingling about these
[23] events since this lawsuit was filed?
[24]      A: We didn't really talk about it until — I am just
[25] trying — I want my timeline to be fairly accurate. I

Page 22_

[1] believe we spoke in November. When precisely in
[2] November, I will be honest I can't really tell you.
[3]      Angie is a dear friend. My friendship with her
[4] predated her being elected to the Board. And even
[5] though we didn't vote the same, it didn't affect our
[6] friendship. Unfortunately, that was not the case with
[7] most of the Board.
[8]      Q: Did you discuss this, the curriculum change and the
[9] controversy?
[10]      A: We actually didn't discuss it before because I wasn't
[11] discussing it at the end. We discussed it afterwards.
[12] I told her prior to the filing of the suit that I was
[13] regretfully convinced that before the new year, we would
[14] be in a lawsuit.
[15]      Q: Have you discussed the curriculum change with Noel
[16] Wenrich since you resigned?
[17]      A: Yes.
[18]      Q: When did you discuss it with him?
[19]      A: We discussed it many times. Noel and his wife Nancy are
[20] long time friends. In fact, I have taken care of their
[21] daughter since she was born. She was a premie, and I do
[22] have that strange medical background.
[23]      We have shared some of the same media interviews,
[24] if you will, not necessarily together. But did you get
[25] a call from so and so, like that. And many of the same

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Carol Brown
May 16, 2005

---

Page 224

[1] media people have contacted Mr. Wenrich as have
[2] contacted us.
[3]     Q: Did he give you his position on these events, the
[4] curriculum?
[5]     A: Yes.
[6]     Q: What did he tell you?
[7]     A: He was very upset about what happened. I didn't hear
[8] all of the contretemps that occurred between Mr. Wenrich
[9] and Mr. Buckingham. I heard about it from the teachers
[10] who witnessed it, from Mr. Wenrich himself, and from my
[11] husband who overheard part of it.
[12]     Mr. Wenrich's beliefs coincide with the majority
[13] of the Board, but Mr. Wenrich, like myself, believes in
[14] following the law, following procedure and living up to
[15] one's sworn oath and responsibilities to one's office.
[16] He felt as we did, that this was not the proper way to
[17] go.
[18]     And we have agreed to disagree on a number of
[19] things. It doesn't affect our friendship. He voted
[20] with Mr. Brown and myself against this. And it was
[21] Mr. Wenrich, who has an extraordinary background in
[22] Parliamentary procedure — he knows more about procedure
[23] than I can't imagine any ten people do — who made the
[24] proposals, tried to offer amendments, to amendments, to
[25] amendments. And he does it so beautifully.

Page 225

[1]     Q: It is an impressive record at that meeting. When you
[2] say his beliefs are those of the majority of the Board,
[3] what are you referring to exactly?
[4]     A: Mr. Wenrich, like the majority of the Board, is a member
[5] of one of the Evangelical Christian churches.
[6]     Q: How do you see their beliefs?
[7]     A: I beg your pardon?
[8]     Q: I mean you are saying that his beliefs are the beliefs
[9] of the majority of the Board, and you are saying that he
[10] is a member of the Evangelical Christian Church.
[11]     I am trying to get a sense in what way you see the
[12] beliefs of the Evangelical Church; what are you getting
[13] at there?
[14]     A: To my understanding, my personal knowledge and
[15] experience, a member of Evangelical Church — and a
[16] couple of examples of the churches that fall within that
[17] position or range would be the Assembly of God Church,
[18] the Church of the Nazarene —
[19]     Q: I am sorry. My question was imprecise. What beliefs as
[20] they touch on the biology curriculum, what are you
[21] getting at there?
[22]     A: And I cited the examples to explain why. These are
[23] churches that believe in a literal acceptance, belief in
[24] the King James version of the Bible; that every word of
[25] the King James version of the Bible is written in stone,

Page 226

[1] that is God given. You must accept and believe exactly,
[2] a literal interpretation.
[3]     Q: All right.
[4]     A: And I am not standing in judgment. I want that clear
[5] because I don't have the right.
[6]     MR. GILLEN: I have no further questions.
[7]     MR. SCHMIDT: No questions.
[8]     A: Thank you.
[9]     (The deposition was concluded at 5:47 p.m.)
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 227

COMMONWEALTH OF PENNSYLVANIA   :
COUNTY OF CUMBERLAND           :
    I, Vicki L. Fox, Reporter and Notary Public in and
for the Commonwealth of Pennsylvania and County of
Cumberland, do hereby certify that the foregoing
testimony was taken before me at the time and place
hereinbefore set forth, and that it is the testimony of:
            CAROL H. BROWN
    I further certify that said witness was by me duly
sworn to testify the whole and complete truth in said
cause; that the testimony then given was reported by me
stenographically, and subsequently transcribed under my
direction and supervision; and that the foregoing is a
full, true and correct transcript of my original
shorthand notes.
    I further certify that I am not counsel for nor
related to any of the parties to the foregoing cause,
nor employed by them or their attorneys, and am not
interested in the subject matter or outcome thereof.
Dated at Camp Hill, Pennsylvania, this 1st day of
June, 2005.
            Vicki L. Fox
            Reporter - Notary Public
(The foregoing certification does not apply to any
reproduction of the same by any means unless under the
direct control and/or supervision of the certifying
reporter.)

---

**Lawyer's Notes**

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Carol Brown
May 16, 2005

## 1

1 129:23; 130:10
1,024 96:14
10th 58:9; 63:15, 16
1200 147:12
14 147:11
15 147:23
16th 201:4; 206:9
17315-4146 6:25
18 197:12, 13
18th 201:3; 204:14
1949 44:25
1966 10:11
1967 10:11
1987 193:5; 210:12;
211:1
1993 44:25
1996 22:21; 26:25
1997 32:4
1998 27:12, 20
1999 210:19; 211:2
19th 210:18

## 2

2 204:24; 205:4; 206:1;
216:6
2,000 198:19
2,001 136:5
20 96:14
2000 27:25; 170:10
2001 51:7, 19
2002 17:5, 20; 18:11;
19:16; 27:20, 25; 28:4;
30:8; 31:24; 32:16; 37:12;
38:13; 39:7, 23; 42:17, 25;
43:5, 13, 24; 44:25; 46:8;
47:3; 51:7, 14; 71:18;
72:17
2002-2003 100:18
2003 7:18; 46:1; 47:24;
48:10, 18; 50:18; 58:8, 9;
63:14, 16, 21, 24; 64:5;
69:21, 25; 70:8, 10, 15, 18,
19; 71:11, 15; 72:7, 10;
73:5, 18; 74:13; 75:2; 76:5,
9, 12, 18; 77:3, 12; 78:21,
23; 81:6, 17, 20; 82:16;
83:22; 84:14; 93:18; 135:2
2004 5:4; 21:4; 22:4; 77:9;
83:18, 22, 23, 24; 84:7, 9,
12; 85:2, 5, 11; 86:8;
91:11, 18; 92:9, 11, 13;
93:1, 16; 98:11, 12, 15;
99:4; 100:25; 101:7;
102:11; 110:14, 20;
117:19; 118:13; 125:10;
142:14; 143:5; 162:19;
163:4; 167:19, 23; 218:19
2004-2005 76:11
2005 20:22; 22:5; 219:1,
18; 220:23

## 20th 206:9
23 23:9
27th 86:7, 7, 16; 91:13;
98:7
28th 191:11

## 3

3 204:24; 205:11
30 96:14; 206:16
30th 70:22
31st 160:17; 185:3

## 4

4 204:24; 205:21

## 5

50 161:5; 191:14, 24
501 161:4
5401 6:25
5:47 226:9

## 6

60 191:14, 24
60's 10:11
66 10:11
67 10:11

## 9

93 92:15, 16, 17, 21
95 58:15
98 58:16

## A

abilities 28:21
ability 7:9, 14, 20; 28:22;
140:20; 141:2
able 26:24; 66:14;
101:21; 130:5, 14, 16;
161:1; 173:18; 182:13, 23;
194:17; 196:10; 207:18
abrogate 68:17
absence 85:2
absent 85:4; 178:19;
181:12
Absolutely 13:4; 42:24;
61:6; 100:5, 23; 132:14;
137:1; 173:13; 213:1;
217:6
abstained 53:2, 8, 10, 11,
12, 15
academic 108:14
academically 106:22
Academy 67:21
accept 155:24; 191:20,

23; 226:1
acceptable 154:22
acceptance 114:13;
156:7; 225:23
accepted 30:2; 155:22;
162:2
accessed 173:15
accidental 219:9, 11
accommodate 101:20
accomplish 207:9
accomplished 207:8
account 55:3, 18; 201:22
Accountability 38:16,
17, 20, 22; 39:1, 23; 40:11;
41:20; 42:12; 43:10;
75:18; 82:4; 213:5, 18;
214:6, 11
accountable 28:20
accounts 82:16
accuracy 13:24; 152:13
accurate 14:1; 57:2;
60:13; 71:21; 76:2; 91:1;
100:7; 205:7; 222:25
accurately 141:14
accusatory 201:1
achieved 217:12
achievement 28:14;
29:14, 16, 18, 21
achievements 38:7
across 44:15, 17; 68:5;
75:10; 130:24; 132:21;
142:11; 199:14; 207:25
Act 92:15, 16, 17, 21
action 87:14; 113:4, 14;
171:19; 203:4
actions 77:15; 203:1
activities 48:11; 85:17
actual 52:13; 71:17
Actually 3:12; 25:12;
26:18; 46:15; 51:18;
52:17; 78:9; 82:18; 85:3;
86:14; 88:24; 96:13;
108:11; 170:15; 182:15;
200:25; 204:18; 223:10
Adam 150:23; 176:3;
177:1
Adams 205:25
adapt 158:18
adaptable 158:24
adaptation 158:21
adaptations 159:8
adapted 149:4
adapting 158:17
added 56:4
adding 189:17, 17
addition 37:11; 140:16;
197:8, 15
additional 37:11, 22;
114:11; 221:4
address 4:17; 6:24; 7:3;
35:2; 119:23; 218:10
addressed 28:12;
124:22; 165:18
addressing 137:22;

180:15
adequate 7:24
adhere 31:21, 21
adhered 118:7
adjourned 121:20
adjunct 155:7; 179:3
administer 44:5
administration 17:8, 23;
19:19; 34:21; 58:19;
103:10; 131:10; 144:19
administrator 35:12
administrators 35:14,
20; 36:13; 92:17; 163:14;
207:15; 214:9; 216:12
admit 105:4; 125:23;
142:25; 147:8
admittedly 55:8; 67:25;
105:1
adoptee 64:24; 65:7
adult 23:7
advanced 94:19; 106:15
advantage 220:1
advised 134:25
advisedly 147:20
advisory 35:16, 18;
36:20; 196:15, 16
advocate 23:17; 185:19;
215:5
advocating 189:18
aegis 35:19; 191:18
affairs 13:2
affect 140:19; 223:5;
224:19
affected 201:14
affiliation 189:1
affirmed 3:8
afforded 99:9, 18; 135:11
afoul 54:18
afraid 65:17; 201:13
Africa 158:20, 23; 159:1
afterward 142:14
afterwards 182:7;
183:13; 223:11
again 5:21; 6:21; 11:22;
22:3, 11; 27:12; 30:4; 39:8,
20; 41:20; 44:25; 46:24;
69:21; 72:5; 77:1, 2, 5, 9;
78:7; 79:13; 83:16; 85:13;
87:15; 88:21, 22; 89:5;
90:23; 99:3, 5; 100:20;
105:1; 106:7; 107:10;
115:17; 125:4, 11; 128:6;
132:3; 135:24; 137:24;
141:2; 142:20; 149:12;
166:4; 178:1, 6; 179:8;
187:8; 211:7, 20; 212:10
against 45:23; 46:10;
48:21; 52:25; 53:7, 9, 9;
59:20; 68:18; 164:21;
165:6; 171:25; 210:13;
224:20
age 26:4; 87:20; 173:7;
174:23
agency 175:23
agenda 77:25; 111:21,

23; 112:9, 11; 113:15, 16,
23, 23; 114:2, 9, 20; 115:1,
3, 4; 116:12; 117:9; 119:3;
125:14, 15; 194:8
agnostic 136:4
ago 25:13; 31:16; 128:4;
149:21; 198:19
agree 42:23; 114:8;
143:6; 167:6, 10; 185:22;
212:21
agreed 214:16; 224:18
agreement 143:11, 12,
13
agrees 114:19; 213:1
ah-huh 4:6
ahead 170:1; 178:2
Alan 28:10; 185:25; 222:7
alike 90:7
Allegiance 49:4; 56:4;
135:2
Allen 14:9
allergic 12:2
allowed 5:14; 89:24;
111:22; 171:8; 185:7;
209:13
almost 35:18; 73:15;
131:5; 189:24; 208:1;
213:3
alone 28:7; 161:5; 172:14
along 31:24; 32:4; 88:15;
96:12; 102:2; 149:3;
199:23; 201:9, 10, 14;
202:24
alternate 43:19
alternative 195:1
although 36:4; 105:1;
138:3
always 51:2; 78:24;
117:13; 130:4; 133:7;
141:24; 142:16, 24; 212:8;
214:16
amended 44:25
amendments 197:13,
23; 224:24, 24, 25
America 171:2
American 59:2; 60:23;
158:22; 212:9
among 8:14; 37:2; 45:17;
75:17; 77:21; 109:24;
117:7, 21; 120:3; 123:3;
133:5, 11; 156:4; 178:5, 5
amount 221:25; 222:14
anatomically 150:11
and/or 35:14
Angie 134:12; 142:14,
16, 17; 143:5; 182:4, 6, 11;
183:13, 23; 184:8, 20;
199:17, 24; 200:1, 13, 20;
201:2, 7; 221:11; 222:22;
223:3
animal 159:9, 9
animals 148:8
animosity 45:18
Annette 46:19
anniversary 206:10

Carol Brown
May 16, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

announce 121:6, 7
anonymous 191:15
anymore 43:13; 201:20; 207:21; 208:20; 214:20
Apart 9:25; 14:3, 10; 15:11; 18:5, 12; 19:12; 27:3; 59:5; 64:3; 70:3; 85:18, 20, 21; 119:22; 120:4; 123:3; 124:20; 211:15; 220:22
apologies 15:2, 24; 51:25; 56:12; 92:14, 17; 111:10; 128:14, 22; 141:24; 146:10; 199:23
apologize 46:20; 73:22; 86:6, 12; 90:25; 93:21; 127:17; 130:24; 186:4; 194:16
Apparently 133:15; 219:16
appeal 49:12
appeared 13:19; 14:24; 38:5
appears 6:12; 35:1
apply 120:20; 199:8
appointed 22:22; 47:20, 23; 64:17
appointment 196:9
appointments 93:6, 6, 7
appraisal 161:9
appreciate 84:3; 86:14; 120:19; 132:15; 193:11
apprise 131:19
apprised 208:3
approach 45:24; 81:6; 107:3; 123:18; 177:5; 179:25
approached 34:25
approaching 134:4; 181:2
appropriate 167:11; 173:4, 7; 210:15
approval 54:4; 113:18; 114:12; 144:21, 24; 160:17
approve 32:10; 70:13; 72:8, 15, 22, 22; 112:15; 178:14; 179:3; 182:14; 185:7, 8, 10
approved 70:22; 97:24; 113:1; 115:2; 160:22; 178:10; 185:2, 6; 191:2, 5, 18; 204:9
Approximately 11:12; 213:21
April 70:21; 71:2; 85:14, 25; 86:7, 16, 24; 91:11, 13; 98:7; 101:7; 118:10
Arlene 39:17
archeological 10:7
archeology 10:3, 4, 5, 6
architect 26:3
Area 3:12; 17:8, 18, 23; 18:1; 19:18; 24:2, 5; 25:22; 39:2; 52:3; 72:24; 75:20; 89:4; 93:4; 94:10; 103:11;

105:5, 25; 126:22; 131:17; 154:16; 188:14
areas 30:18; 37:5; 91:25; 92:19; 106:1, 1; 154:23
arena 52:6
argued 164:18
argument 210:19
arguments 210:11
arise 43:3; 110:22
Army 8:24; 27:7
arose 102:16; 219:8
around 39:22; 71:20, 21; 102:16; 111:17; 131:15; 158:5, 9; 192:24
arrangement 129:19; 130:17
arrayed 192:24
articles 14:15
articulated 67:19; 95:2, 13
arts 92:18
ascend 150:3
ascent 150:3
ascribe 49:14; 78:3
ashamed 47:12; 53:5
aside 6:19; 56:20; 66:17; 83:13; 95:22; 109:3; 153:13
aspect 208:1
aspects 32:13; 37:5; 42:15; 161:23; 208:9
assault 142:24
Assembly 225:17
assessment 187:1, 2, 3
assigned 64:14, 17, 18, 19; 65:1, 5
assignments 47:12, 13, 18; 48:2
Assistant 32:5; 33:20; 98:1, 2; 99:12; 103:13; 163:15, 16
associated 43:8; 101:16
Association 67:23; 118:4
assure 55:23
ate 128:3
atheist 48:24; 136:4
attack 183:24
attacked 59:1, 19; 184:12
attempt 120:21; 216:9
attempted 175:16; 210:19
attempting 48:21; 176:15; 210:17, 21; 211:6, 9
attend 25:23; 26:7, 9, 14; 30:2; 196:8
attended 12:7; 15:25; 26:15; 143:16
attending 25:22
attention 69:10; 111:20; 168:5, 6; 191:9; 192:5, 6; 208:4; 216:3
attorney 3:15

attorneys 3:11; 13:10; 14:3
attracted 142:8
attribute 202:9
attributed 61:3; 87:24; 187:25
attributing 132:13
audible 131:3
audience 48:19; 59:1; 61:16; 131:22; 182:10
August 118:23; 138:4, 7; 168:20; 169:13; 177:23; 180:24; 184:19; 186:21; 187:11; 189:1; 191:3; 199:17; 200:15, 20
author's 176:7, 10
Authority 204:17
authors 175:16; 176:15; 177:5
available 30:16, 17; 92:5; 99:11, 21; 100:1, 4, 9, 14, 15, 16; 104:2; 107:25; 109:25; 124:13; 177:16
availed 124:1, 10, 12
average 106:21; 206:15
avoid 218:23
avoiding 206:13
aware 7:11; 17:7, 14; 19:14, 17, 21, 22; 21:23; 28:21; 61:24; 85:12; 92:12, 16; 101:23; 116:3; 126:10; 193:22; 194:21; 195:14; 200:3; 202:13; 215:13, 20
away 68:24; 110:20; 131:21; 135:23; 160:8; 173:20; 176:6; 220:12
awhile 206:14

## B

back 7:18; 8:16; 10:11; 17:20; 27:6; 29:5, 20; 32:10, 17; 37:4; 48:10; 53:17; 62:19; 76:14; 87:6, 11, 19; 91:6; 98:14; 117:4; 118:17; 119:12; 127:16; 131:15; 135:1; 136:25; 137:3; 141:15; 152:15; 175:12; 176:11; 183:18, 20; 186:7; 187:18, 19, 20; 189:3; 196:10; 206:8; 210:18; 222:15, 16
background 8:9; 42:23; 43:3; 223:22; 224:21
backups 16:12
bad 142:24; 200:18
Baksa 97:25; 103:11; 149:14; 156:21; 159:22; 168:7, 22; 172:9; 177:13; 194:18; 195:18; 196:19
balance 137:13
ballot 79:9
ballpark 191:15
bang 82:7

bare 4:7
Barrie 39:17; 45:10; 46:22; 50:11; 74:15; 116:19; 119:22; 125:2
Based 42:23; 62:14; 66:5, 13; 72:22; 73:9; 118:21; 119:6; 122:16; 126:12; 143:17; 150:2; 156:11; 170:24; 175:13; 176:5; 186:25; 187:15; 199:25; 210:5
basic 11:14; 148:2; 208:13
Basically 112:2; 12:6; 74:22; 75:5; 76:1; 97:18; 98:3; 113:16; 116:18; 158:6; 162:9; 174:21; 207:7
basis 23:25; 58:22; 124:17; 211:13
bathroom 220:2
Beagle 148:22, 24
bear 4:12
beautiful 65:18
beautifully 107:14, 17; 224:25
became 18:25; 36:11, 15, 21; 44:18; 47:9, 10; 48:15; 50:25; 56:11; 70:3; 84:21; 117:22; 148:7; 214:19
become 43:23; 51:11; 72:21; 80:20; 140:15; 216:18
becoming 41:2
beer 41:15
beg 10:9; 13:16; 51:8; 78:14; 211:20; 225:7
began 32:4; 113:20; 117:23; 133:11
begin 4:20; 22:15; 71:22; 84:10; 106:4; 126:20; 127:10; 161:1, 6
beginning 6:21; 30:25; 43:15; 50:8; 71:22; 76:23; 121:17; 192:6; 213:20; 218:18
begins 77:5
begun 34:1; 72:10, 17
behalf 48:23
behavior 31:20; 90:20; 127:25
beings 133:7, 8; 159:6
belabor 57:5
belief 54:18; 65:24; 66:6; 68:18; 126:12; 176:16, 16, 18, 18, 21; 189:12, 14, 15; 200:2; 208:22; 220:20; 222:19; 225:23
beliefs 54:25; 65:23; 66:10, 22, 23; 68:7, 14; 91:2; 117:24; 126:11, 25; 135:16; 153:16; 188:12; 189:5; 190:6; 217:4, 7, 18; 221:1; 224:12; 225:2, 6, 8, 12, 19
believer 199:24

believes 190:9; 224:13
belongs 114:17
bend 175:17, 20
benefitted 96:9
Bernhard-Bubb 24:13; 25:8, 19
Bert 19:25; 20:2; 21:1; 103:1; 109:20; 149:12; 157:24, 25; 159:10
Bertha 103:1
Besides 174:8; 221:4
best 4:17; 11:20; 34:8; 36:15, 25; 75:7; 78:25; 82:11; 89:24; 92:23; 96:16; 98:20; 102:20, 25; 103:4, 10; 107:25; 109:25; 111:9; 123:15; 141:1; 154:5, 10; 178:13; 182:18; 186:4; 196:12
bet 94:11
better 21:15; 39:17; 51:22; 56:21; 66:19; 73:2; 90:25; 96:17; 100:19; 120:11; 127:8; 165:4; 184:7; 191:1; 199:5
beyond 36:18; 54:21; 62:12; 65:12; 66:24; 67:16; 106:9; 107:14; 109:11; 130:22; 131:4, 9; 140:9; 144:25; 166:5, 18; 171:13; 175:23; 180:3; 185:3; 192:19; 203:1; 207:15; 210:8; 211:10; 212:9
bias 42:20, 21
Bible 56:6; 87:18, 24; 91:6; 225:24, 25
Biblical 150:21, 22; 177:2; 161:8; 164:13; 209:4
big 64:11; 81:21; 83:14; 161:8; 164:13; 209:4
biggest 82:7; 109:11; 211:17
Bill 21:20; 47:22; 80:9; 96:18; 98:6; 109:3; 111:1; 115:6; 119:2, 14; 128:9, 19; 129:14; 136:21; 142:7; 143:6; 160:11; 161:9; 162:4; 172:11; 181:8; 187:25; 193:20; 198:15; 200:17, 20; 202:11
Bill's 142:15; 143:9
Biology 9:21; 13:8, 9; 21:11; 70:9, 9, 11; 72:5; 73:6, 12; 74:14, 25; 76:18; 77:3, 9; 83:15, 15; 84:4, 4, 17; 85:13; 86:23; 97:6, 7, 17, 20; 98:12, 16; 99:3; 102:16, 17; 103:16, 18; 104:21; 107:5, 13; 108:17; 110:2, 10; 111:7; 112:9; 113:20; 114:24; 116:10; 117:9; 118:25; 119:14, 15, 20, 23; 120:3; 123:2; 124:22; 125:10; 126:23; 128:20; 129:22; 132:18; 133:5; 134:5, 9; 136:8; 137:12, 15; 140:3, 4; 143:20; 144:2, 17; 146:19;

Min-U-Script®    Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Carol Brown
May 16, 2005

151:22; 154:6; 158:4, 11;
160:5; 163:21; 167:23;
179:4, 12; 192:2, 22;
203:19; 211:22; 225:20
**birds** 148:7; 149:5
**bit** 89:6; 127:8; 129:5;
156:18; 178:7; 218:21;
221:24
**black** 136:2; 209:4
**blackmail** 179:2
**blank** 100:22
**blatant** 176:4
**blind** 7:15
**block** 40:6
**blood** 16:24; 17:3, 9, 13
**blue** 130:11
**blunt** 164:8
**blur** 117:23; 125:5
**Board** 3:13; 15:5, 12, 23,
24; 16:25; 17:4, 18; 18:3,
4, 6, 10, 13, 13; 19:1, 12,
13, 15; 20:10, 10, 23; 21:7;
22:9, 10, 15, 17, 20; 25:1,
11; 27:8, 23; 29:3; 31:8,
18, 24; 32:8, 9, 10, 17;
35:4, 7, 10, 11, 15; 36:12,
14, 18; 37:21; 39:2, 13, 15,
21, 25; 40:1, 4, 5, 6, 7, 18;
41:3, 6, 10, 22, 25; 42:3,
19, 19; 43:12, 14, 17, 21;
44:4, 15, 17, 18, 19, 20,
22; 45:8, 16; 46:5, 16;
47:4, 5, 10, 13; 48:12, 15,
16, 19; 49:3, 8, 12, 23;
50:15, 18, 21, 25; 51:1, 9;
52:1, 5, 7, 16, 22; 53:5, 25;
54:4; 55:22; 56:19; 57:9,
11, 13, 20, 21, 25; 58:23;
59:3, 7, 14, 23; 60:1, 10,
12, 17; 61:6, 18; 62:1, 5, 7,
10, 13, 17; 63:7, 7, 17;
64:2, 3, 13, 15, 17, 22;
65:1, 12; 66:5, 9; 67:6, 6,
16, 20, 21, 23; 68:24; 69:4;
71:7; 73:10; 74:15, 17, 21;
75:10, 17; 76:15; 77:12,
13, 17, 23; 78:5, 18; 79:8,
13; 80:3; 81:1, 6, 25; 82:2,
23; 83:1; 85:9, 15, 18, 19,
21; 89:10; 93:4, 15; 97:4;
98:19; 99:9, 9, 17, 22;
101:3, 4; 103:8; 109:7;
111:10, 15, 20; 112:1, 14;
113:4, 6, 9; 114:8, 19;
115:4, 14; 116:9; 117:7, 8,
21; 118:2, 3; 119:19;
120:1, 2, 3, 4, 5, 9, 12, 16;
121:1, 5, 7, 8, 11, 18, 20;
122:13, 24; 123:3, 4;
124:22, 23, 24; 125:10, 16;
126:1; 127:6, 14; 128:7;
129:1, 17; 130:1, 3, 7, 15,
23; 132:4, 17; 133:1, 5, 12;
135:25; 138:1, 17; 139:2,
25; 140:8; 142:9, 11, 11;
144:16; 145:15, 22;
146:14, 23; 152:18; 153:2;
154:19; 155:21; 162:13,
21, 22; 163:1, 11, 21;

164:2, 23; 165:16, 19;
166:9, 10, 13, 15, 17, 18,
21; 167:4, 15, 20; 168:11;
169:9, 10, 11, 25; 170:3, 9,
16; 177:17; 178:5; 180:13,
24; 183:5; 184:22; 185:22;
186:21; 187:11, 11, 24;
188:2, 11, 14, 17, 18;
189:1, 21; 191:6; 192:12;
196:1, 5, 7, 17, 22; 197:5,
24; 198:5; 199:17; 200:4,
15, 21; 201:3, 5, 15; 202:9,
15, 18, 21; 203:17; 204:8,
20; 205:18; 206:4; 207:8,
19, 23, 25; 208:21; 209:8,
13, 22; 210:4, 7, 20; 211:4,
6, 9, 20; 212:15, 17; 213:5,
7, 16, 19, 23; 214:5, 7, 14,
16, 23; 215:7; 216:9;
218:6, 15, 16, 18; 219:3, 5,
6, 18, 19, 21, 22, 25;
220:11, 25; 221:6; 222:21;
223:4, 7; 224:13; 225:2, 4,
9
**Board's** 77:15; 112:25;
113:2; 215:16
**boards** 67:3
**Bob** 110:13
**body** 96:15; 115:16
**bone** 148:2, 6, 8, 10
**Bonsell** 18:19; 28:10;
33:13, 14; 41:5, 9; 47:10,
15; 64:18; 71:13; 79:5;
80:7; 84:20; 86:20; 97:3;
144:4, 8, 11; 145:10;
146:2, 4; 149:14, 15;
179:20, 23; 180:3; 185:25;
186:3, 5; 192:23; 193:9;
198:7; 202:22, 23; 203:2,
7, 11; 214:19
**Bonsell's** 41:5; 138:5;
144:6; 179:25; 222:8
**book** 72:6, 13; 73:5;
75:25; 76:1, 2; 77:13;
99:25; 109:10; 150:23;
151:5; 169:5, 7; 170:15;
172:11; 177:7, 12, 14, 16;
179:5
**books** 73:18; 103:14;
182:12
**born** 88:21; 223:21
**borrow** 99:11; 100:6
**boss** 165:6
**Both** 9:4; 11:24; 24:4;
31:18; 36:13; 41:9, 17;
44:7; 53:2; 87:20; 120:17;
152:18; 182:10; 195:3;
197:22; 208:6, 24; 210:24
**boundaries** 67:5
**Bowser** 21:16
**Brad** 21:18
**brand** 69:4
**brat** 27:7
**break** 4:15; 48:5; 101:11;
124:5; 129:11; 157:11;
211:9, 10
**breakdown** 87:23

**breaking** 12:10
**Brethren** 155:7
**brief** 171:3; 178:25
**brilliant** 165:14
**bring** 27:14; 30:21;
48:21; 69:8, 10; 83:2; 87:6,
11, 18; 111:11; 115:24;
116:14; 119:5; 125:21;
137:2; 175:12; 176:10;
187:18, 19, 20; 220:18, 19;
222:14
**bringing** 32:16; 116:6;
136:25; 151:22; 185:13
**brings** 47:3; 83:11
**broad** 105:19
**brought** 14:17; 16:2;
27:4; 28:4; 37:8, 11, 19,
21; 40:19; 43:4; 48:19;
49:2, 16; 70:7; 84:24;
89:23; 93:11; 111:19;
125:11; 130:8, 11, 13;
156:21; 168:16, 17; 169:7,
8, 22; 170:7, 9; 192:21;
193:1, 4, 6; 205:21; 206:7;
210:12; 213:5, 7
**BROWN** 3:7, 10; 5:21;
6:23; 7:5; 12:25; 14:8, 9,
10; 26:3; 28:17; 31:12;
38:3; 39:18; 40:12; 44:21;
47:15; 48:17; 49:22; 51:5;
53:16; 55:9; 57:2; 59:9, 24;
60:4, 8; 62:4; 68:12; 73:16;
77:23; 86:22; 88:10;
91:16; 92:24; 94:16;
102:18; 114:24; 117:20;
122:23; 126:9; 129:13, 23;
130:7, 10; 134:20; 161:9;
163:23; 177:25; 184:1, 6;
186:25; 198:17; 204:24;
205:2, 4, 11; 206:1; 216:6,
15; 217:10; 218:14;
224:20
**Bryan** 110:14, 15
**BS** 9:5
**buck** 82:8
**Buckingham** 18:22;
47:22, 23; 60:18, 19, 25;
61:8; 62:23; 64:16; 80:9;
84:21, 25; 86:9, 18, 25;
87:4, 19, 23; 88:3; 91:5;
96:18; 98:7; 103:7;
108:20; 111:11; 115:7, 23;
116:13; 117:3; 119:2;
123:19; 124:9; 125:18;
126:3; 128:9; 129:20;
130:19, 21; 131:18, 23;
136:7, 21; 137:25; 138:8,
18; 139:5, 11; 143:3, 11,
14; 148:17; 149:13, 17, 24;
150:16; 151:9, 22; 152:2,
11; 153:4, 20; 154:1;
155:1, 3, 12; 156:19;
159:20; 168:3, 13, 23;
169:22; 170:5; 172:10, 14;
178:23; 180:2, 6, 9, 16, 19,
22; 181:2, 19; 182:6;
183:22; 184:12; 185:19;
187:25; 193:20; 198:15;
200:20, 22; 202:11; 217:1;

221:3; 224:9
**Buckingham's** 64:19;
125:16; 126:10, 25; 132:5;
139:20; 140:5; 142:13;
144:1, 16; 147:10; 148:1;
150:7; 154:7; 161:20;
179:24; 181:8; 182:5;
183:25; 184:24; 199:2, 4
**Buddhists** 212:7
**budget** 41:15; 70:22;
71:10; 72:15
**budgetary** 70:13, 20;
71:3, 23; 72:9, 23; 97:23;
98:22
**building** 28:15; 42:5;
45:18; 131:11; 163:14, 17,
17; 208:9; 214:8
**buildings** 47:14; 163:15;
208:10, 11, 13
**bullying** 90:12
**bunch** 197:21
**burden** 42:1, 5, 10; 82:5
**burdens** 75:18
**burn** 158:23
**business** 17:16, 17, 21;
18:3, 6, 13; 52:14; 65:12;
67:16; 75:19; 93:25;
101:5; 112:25; 114:18, 22;
121:12; 130:2; 201:13, 16,
17, 19; 202:1
**buy** 74:16; 76:2; 77:13;
179:19
**buying** 73:25

# C

**C** 129:23
**cafeterium** 220:5
**calendar** 73:3; 85:25;
92:25, 25; 93:2; 162:15
**California** 46:14, 18;
48:21
**call** 7:6; 59:2; 114:3;
168:8; 170:11; 183:23, 24;
202:23; 207:15; 220:9;
223:25
**Callahan** 39:17; 45:10;
46:22; 50:11; 74:15, 16;
75:21; 77:14, 16; 111:13,
19; 116:19; 117:3; 119:22;
125:3
**Callahan's** 74:24
**called** 3:7; 12:16; 92:21;
112:13; 121:9, 13, 24;
122:6; 148:19; 195:18;
196:15; 200:9; 201:22;
202:7; 211:7; 214:7
**calling** 121:4; 202:18, 22
**calls** 121:3; 200:10;
219:24
**came** 2:17, 18; 31:23;
32:14; 33:20; 37:4; 46:17;
59:23; 63:24; 65:15;
68:24; 69:22; 71:16;
73:17; 78:9; 81:17; 83:18;
84:7; 89:19; 90:10; 97:6;

98:16; 110:20; 123:9;
127:22; 135:10; 160:8;
168:2; 179:11; 192:4, 6;
194:10; 206:4; 211:25;
213:18, 19; 218:22;
220:17; 221:18; 222:1
**Can** 4:23, 24; 5:11, 12;
6:3; 7:16, 17; 8:2; 13:22;
20:25; 21:8; 22:6; 33:9;
37:9; 46:4, 13; 50:20;
54:12, 13; 55:7; 58:3, 14;
59:11, 25; 60:5; 62:7;
66:19; 71:12; 78:22; 80:3;
85:25; 86:3; 87:10; 91:7;
93:13; 96:16; 97:10, 10;
101:9; 107:11; 108:16;
109:19; 113:19, 19; 119:8;
120:22; 121:19; 122:2, 9;
123:15, 16; 127:8; 129:7,
8, 9; 130:16; 131:1;
132:12; 133:22; 134:3;
135:4, 13; 136:7; 139:10,
14, 16, 19; 140:1; 142:1;
146:1; 150:17; 152:14;
156:5; 158:10; 160:12;
161:7; 162:9; 163:6;
166:6; 169:9, 18; 178:13,
25; 179:17; 180:4, 12;
181:16; 184:5; 185:10, 25,
25; 192:14; 208:2; 209:5,
15; 210:11, 18; 218:8;
219:2, 7; 222:10
**candidates** 27:1; 29:7, 8;
79:15
**capable** 7:23
**capacity** 64:21
**capital** 190:10
**capitalization** 145:19
**capitalized** 187:9
**car** 98:6
**care** 140:12; 206:16;
218:22; 223:20
**cared** 206:18; 207:18
**CAROL** 3:7; 6:23; 130:10;
204:24; 205:4, 10; 206:1;
216:6
**carving** 65:19
**case** 44:8; 97:16; 100:17;
112:7, 16; 121:4; 131:19;
145:18, 20; 163:14, 17;
187:9; 208:3; 210:24;
223:6
**cases** 98:4; 122:8;
210:24
**cast** 53:4
**catches** 106:25
**Catholic** 136:4; 218:3
**cats** 12:2, 3
**Caucasian** 158:22
**caused** 105:5; 184:11
**causing** 220:10, 13
**caved** 53:5, 20
**center** 102:15
**centered** 188:14
**Central** 26:19
**centralized** 156:8

Carol Brown
May 16, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Century 210:18
certain 12:8; 40:25;
89:12; 110:13; 112:20, 22,
22; 113:6; 114:9, 11;
115:20; 121:15, 24;
126:16; 132:14; 140:21;
141:11; 149:18; 165:2;
175:18, 21, 22; 176:10;
186:3, 8; 193:6; 197:24;
203:17; 213:24
certainly 31:6; 38:24;
86:2; 120:14, 21; 164:9;
184:18; 205:9
certainty 152:15; 180:13
certification 3:3
chain 164:13
chair 44:17; 84:21; 86:19;
103:8; 115:7; 124:9;
162:25; 166:2; 191:18;
208:11
chairman 115:10
chairperson 123:20;
162:19; 166:25; 207:25;
208:10
champagne 41:14
change 23:19; 56:15;
89:9; 187:5, 6; 195:12;
196:21; 197:14; 198:8, 13,
25; 201:8; 202:15; 203:19;
204:9; 209:17, 21; 215:19;
220:14; 223:8, 15
changed 31:13; 56:7, 8;
77:20; 99:14; 182:11, 13;
187:6; 214:19
changes 149:3, 5;
156:10; 194:9, 19; 195:3,
19, 22, 24; 196:13; 197:8;
198:5
chapter 106:4, 5; 147:23
character 31:4, 11;
32:13, 18; 33:1, 11, 22;
34:14; 35:25; 37:1; 90:11,
14; 127:23
characterization 151:14
characters 16:22
charge 71:11
charged 71:8
Charles 148:18
chart 142:12
chase 169:19; 213:18
check 16:9, 12; 157:4;
160:1
chemistry 97:8; 103:15,
16, 19, 22, 24; 104:12, 13;
107:2, 2, 23
child 23:14, 15; 25:21;
26:12, 17, 18; 94:21;
95:24; 96:2; 213:10
children 23:18, 18;
25:24, 25; 26:1; 27:17;
135:21, 23; 158:8; 213:11
choice 116:1; 135:12
choices 36:9
choose 215:20
chooses 163:1; 219:25
chose 30:2; 155:24;

190:14, 15; 191:23;
220:19
chosen 46:23; 73:13;
74:5; 221:13
Chris 11:7; 141:22
Christ 62:24; 136:11;
155:5; 179:9; 188:8
Christian 160:5; 176:21;
182:1, 2; 187:23; 188:3, 5,
14, 16, 20; 189:19; 190:3,
4, 19; 225:5, 10
Christianity 65:23
chronology 146:9
church 54:10, 15; 63:6,
23, 25; 64:6; 66:24; 69:24;
83:17; 84:8; 88:18;
143:16; 155:5, 7; 181:24;
188:4, 8; 189:4; 190:24;
211:1, 10; 218:2, 3;
220:16, 20; 225:10, 12, 15,
17, 18
churches 188:4; 225:5,
16, 23
cigarette 220:1
circle 213:4
circumvent 197:25
cited 59:18; 225:22
citizen 196:15, 16
citizens 36:20
City 8:16, 24
civic 19:19
civilian 15:25
clarify 4:10; 130:14
class 106:10; 211:23
classes 69:6; 82:12;
135:23
classroom 87:7, 12;
176:11; 185:16, 21;
186:12; 191:25
clause 160:20
cleaner 93:10
clear 37:17; 61:18; 63:1;
84:1; 101:15; 119:11, 16;
146:1; 155:21; 158:2;
160:23; 161:22; 226:4
clearer 87:10
clearly 120:23; 126:12;
183:2
Cleaver 18:21; 47:23;
64:16; 65:5, 9, 14; 66:14,
20, 22; 67:14, 17; 69:17;
88:17; 130:25; 143:9, 14;
178:19; 181:12; 199:21;
199:12; 217:1; 221:4
Cleaver's 64:20
clients 4:18
climate 158:21
clippers 89:23
clippings 141:15
close 126:5; 194:24;
197:13; 206:15
Club 34:9
clubs 19:19
cobras 129:10
code 31:20; 35:11; 44:25;

79:10; 90:2; 118:1, 1, 3;
121:21; 127:25; 160:16;
185:7; 209:14; 210:8
codes 118:5
coincide 224:12
college 8:18, 19, 20, 21;
9:2, 19; 170:23; 171:13;
173:8; 174:24; 175:3
colleges 30:2
colored 73:11; 129:5
Columbia 8:24
combined 86:10; 154:12;
164:15
comfortable 156:20;
160:12
coming 10:20, 22; 14:5,
12, 22; 42:20; 70:8; 72:3,
6; 77:8; 81:9; 113:17;
124:14; 127:11; 128:24;
152:6; 160:17; 173:20;
184:18; 221:11
command 164:13
comment 13:19; 49:24;
50:7, 7, 16, 17; 58:10;
59:10, 14; 60:5, 11, 16;
61:3, 9; 74:4; 77:11;
111:22, 24; 119:19; 125:2,
16; 131:9; 145:4; 160:6;
161:15; 164:24; 179:16,
17, 20; 199:1; 201:25;
220:22; 222:8
commented 65:18;
103:21, 22
comments 12:14; 50:12;
58:12, 15, 23, 23, 24, 25;
59:16, 20, 22; 60:17, 21;
62:7, 18, 20, 22; 74:2, 20;
75:1, 4; 77:14; 90:21;
104:13, 16; 110:19;
116:16; 117:4; 125:5, 7;
131:3; 132:6, 19; 138:16;
139:3, 6; 140:5, 7; 142:7,
13, 15; 143:10; 145:1;
156:22; 161:20; 180:25;
182:5; 183:21; 184:21, 24;
193:24; 202:9; 205:13, 18;
209:9, 18; 213:11; 217:14;
220:23; 222:11, 12
committed 82:17
committee 32:25; 33:1,
2; 34:16; 35:1, 4, 5, 8, 8,
10; 36:2, 5, 11, 12, 12, 16,
19, 21, 22; 43:17; 44:2, 3,
10; 47:4, 12, 18, 19; 48:2;
71:8, 12, 24; 84:19, 22;
85:17, 22; 86:6, 17, 18;
91:17, 20; 92:11; 93:15,
17, 19; 94:5; 96:5, 22;
98:8; 99:16; 102:11;
103:6, 7; 104:6; 105:6, 15;
109:1; 110:21; 114:1;
115:10; 116:1, 2, 9;
123:21; 124:9; 127:11;
129:14; 146:24, 25;
152:19, 22; 156:5; 157:17;
162:16, 17, 20, 25; 167:16;
168:11, 25; 170:8; 191:7,
18; 196:5, 7, 16, 22;
202:16, 17

committees 33:3, 3;
35:16, 17, 18; 43:22; 47:8;
114:13
Commonwealth 44:8;
55:25; 161:4; 210:14
communicate 7:14;
120:22; 167:2
communicated 166:15
communication 4:8;
219:16, 17
community 22:14; 27:6,
7; 28:6; 31:19; 35:6, 13,
16, 19; 36:14, 17; 38:20,
23; 39:6, 21; 53:23; 54:25;
55:4, 19; 58:16, 17, 24;
66:12; 118:7; 131:14;
134:1, 4, 8; 136:1; 142:18;
187:23; 199:22; 201:17;
212:24, 25; 213:1; 214:3,
13; 215:6, 12
comparative 211:23
compare 105:18; 171:25
compared 96:14
comparing 148:10
comparisons 148:2
compatible 159:14
complaining 14:25
complaint 6:9
complaints 78:6
complete 9:11
completed 27:9
compliance 14:18; 44:6,
6, 11; 55:24, 24; 57:15;
193:3
complimentary 100:9
comportment 166:13
composition 36:18
comprised 35:10, 13, 18
computer 16:7, 7, 10, 14;
26:23; 171:9
con 98:24; 182:10
conceivably 54:12
concept 27:7; 145:18,
20; 193:23
concern 29:14; 30:15;
33:14; 38:22; 39:25;
40:11, 19; 41:19, 22;
42:11; 55:12; 63:22, 25;
64:6, 12; 65:14, 16; 66:20;
67:18; 68:2, 9; 69:12, 23;
84:7; 88:16; 95:1, 22;
123:24; 125:3; 136:15;
160:25; 161:8, 17; 162:3;
188:1; 211:14; 212:13
concerned 42:1, 4;
54:21; 66:13; 82:11;
107:5; 110:23; 142:17, 22;
155:14; 160:15, 22;
179:21; 194:25; 195:3;
199:21; 221:23
concerning 13:20
Concerns 21:7, 9; 29:1;
32:22; 39:6; 71:15; 73:5;
75:2, 4; 76:6; 89:7; 95:16;
96:12; 112:18; 123:19;

133:13; 134:19; 179:21;
182:20, 22; 214:10
conciliator 159:24
conclude 172:3
concluded 208:15; 226:9
conclusion 173:14
conclusions 173:1
conditions 149:4;
158:18, 22, 25
conduct 164:3; 166:10,
17; 167:4
conducted 93:25
conference 192:17, 24;
193:14
conferring 36:24
confidence 156:6
confident 63:2
confidential 12:23;
121:22; 122:18
confidentiality 102:4;
122:15; 166:4; 192:19
confirm 133:3
confirmed 196:19
conflict 24:6; 55:21; 57:9,
18; 220:14
conflicted 206:14
confrontation 183:24
confrontations 140:2
confusing 73:2
connected 135:6; 179:11
connection 5:6; 6:12;
10:14, 17; 24:9, 25; 28:15,
54:2; 127:23; 168:10;
187:10, 13
connotation 135:22
cons 97:19
consciousness 69:1
consensus 109:23;
161:17
consent 114:9, 20;
215:23
consider 25:7
consideration 92:1;
124:14
considerations 72:9, 23;
73:23
considered 10:3; 24:6;
52:8
consistent 4:18; 61:4;
171:20; 174:16
consistently 164:18
constant 140:18
constantly 164:19;
165:20
constituencies 36:24
constituted 49:4, 6;
56:13
constrained 167:11
constraints 70:13;
112:21
constrictions 97:23
construction 40:21, 21,
23; 41:2, 8; 82:1; 192:16

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Carol Brown
May 16, 2005

consulting 36:23
consumer 92:1; 94:6, 18; 95:10; 102:13, 21
contact 61:23; 101:18
contacted 224:1, 2
contained 96:13; 171:5
contains 93:3
contemplated 168:10; 202:15
contemplating 207:5
contempt 218:8
Content 153:13; 172:4; 174:22; 175:4, 5; 186:23; 187:1, 2, 5, 15
contention 178:4, 5
contentious 45:4, 16; 58:6; 59:21; 80:18; 82:17; 83:11; 182:9; 184:20
contentiousness 178:5
contents 98:24; 176:8
contested 177:24
context 76:19; 96:8; 113:22; 120:9; 141:21; 151:20
contexts 106:18
continue 28:22; 29:16; 32:17; 33:6
continued 27:15; 28:6
continuing 49:6
contract 40:24; 42:9; 92:15, 16; 122:4; 208:16
contracts 92:20; 122:3, 5, 9
contradict 165:10
contrary 40:2; 54:8; 56:23
contrast 41:16
contretemps 224:8
contributed 69:19; 217:17
contributions 191:16
controversial 104:18
controversy 102:16; 110:22; 223:9
conversation 68:10; 87:8; 88:22, 24; 89:18; 91:3, 8; 98:9; 116:11; 124:20; 127:2; 145:12; 183:22, 23; 184:13, 14; 199:20; 200:14; 218:21; 219:1, 4; 220:3
conversations 20:20, 23; 21:1; 52:2; 124:21, 21; 127:5, 17, 19; 133:12, 17; 134:7, 11, 12; 138:13; 144:15
conviction 68:13
convictions 30:5
convinced 223:13
convoluted 126:17
cooking 94:19; 96:2, 3
coordinator 92:18
copies 84:6; 100:9; 168:14; 177:21; 191:24

copy 63:11; 169:2; 177:22; 194:18; 205:4, 7, 11, 16, 21
corrected 53:1; 86:3, 4
correction 205:17
correctly 12:25; 55:18; 57:8; 76:4; 86:22; 88:6; 108:7; 114:24; 165:9; 174:17; 195:21
correlation 64:8
cost 222:3
costs 75:6
counsel 10:13, 16
Counties 24:4
country 60:23; 135:9, 11; 161:3
County 24:2; 30:14; 43:19; 93:4, 5; 114:14, 15; 115:12, 13; 162:15; 199:22; 204:16, 16; 208:5
couple 19:23; 46:13; 64:4, 5; 80:24; 132:19; 139:5; 225:16
course 9:18; 10:5; 86:20; 87:14; 105:20; 114:22; 126:21; 141:22; 171:19; 197:11
courses 9:19, 25; 10:6; 94:23, 24
coursework 10:2
court 5:17; 193:5; 208:3; 210:12, 25
courtesy 168:23
cover 23:24; 24:4, 5; 90:1; 107:2, 3, 9, 9, 9, 9; 126:22; 169:20, 21
coverage 22:13; 24:9; 38:5
covered 23:9, 25; 75:15; 113:17; 122:8, 15
covering 23:21; 24:21
covers 92:17
crashed 16:15
create 42:9; 45:20
created 16:13; 41:16; 45:18
creation 150:19, 22; 151:7
Creationism 136:19, 24; 137:22, 23; 138:8; 145:5; 152:9, 11; 161:10, 21; 176:25; 177:8; 180:21; 186:20, 24; 187:7, 14; 190:20; 211:8
Creationist 177:7
credibility 215:9
crew 138:22
criticism 77:24; 78:1; 131:24; 132:5, 10, 12; 142:8; 164:12
criticisms 174:19
criticizing 77:16; 175:5; 198:19
crossed 136:16

crucifixion 136:11
Cumberland 24:4
Cunningham 130:18
current 6:24; 14:23; 15:3; 16:25; 19:12; 29:3; 48:20; 72:16; 82:8
currently 7:1; 17:18; 18:4, 7; 25:5; 49:4; 55:15; 56:13; 99:21
curriculum 13:9; 21:9; 32:2; 33:22; 34:13; 47:11; 70:9; 71:9, 12, 24; 72:25; 83:15; 84:4, 22, 22; 85:17, 22; 86:11; 91:17, 20; 92:10; 93:15, 17, 19; 94:5; 97:2, 8; 98:2, 8; 99:15; 102:11, 17; 103:6, 12; 104:6; 105:6, 14; 107:15; 108:2, 2, 5, 25; 110:21; 115:6; 116:2, 9; 123:21; 124:9; 129:13; 146:23; 152:22; 153:3; 157:17; 158:6; 159:15; 167:16; 168:11, 12, 25; 169:9, 24; 170:8; 172:1; 173:10; 178:13; 190:21; 191:7, 10; 192:2, 9; 194:9, 16, 16, 20; 195:20; 196:1, 5, 7, 15, 21, 22; 198:8, 13, 24; 201:7, 8; 202:15, 16, 20; 203:5, 19; 204:8, 9; 209:17, 21; 211:12, 21; 212:11; 220:14; 223:8, 15; 224:4; 225:20
cursory 107:7
custom 80:21; 90:2; 146:16; 154:15; 197:12; 209:14; 210:9
cut 169:18; 213:18
cyber 162:16
cycle 70:11; 72:25; 80:24

**D**

Daily 184:3
Dallastown 26:22
Darwin 148:19, 21; 190:13
Darwin's 147:17; 148:19; 194:21; 195:4
Darwinism 126:5; 128:20; 136:8; 144:10
date 5:17; 22:25; 86:1; 91:12; 168:19; 201:6; 205:15
dates 51:22; 65:7; 118:12; 142:2, 3
daughter 48:23; 155:4; 223:21
daughter's 93:6
Davidsburg 6:25
day 30:22, 23; 87:1; 168:1; 184:15; 197:7; 221:9
days 31:8; 206:8
daytime 8:3

dead 102:15
deal 64:11; 103:24; 108:18; 117:15, 23; 151:10; 155:1; 157:21; 162:1; 166:20, 23; 182:7; 206:17
dealing 154:20; 159:6; 192:15
dealings 17:16, 17, 21
deals 148:13; 158:5
dealt 148:1
dear 223:3
death 179:9
deceased 33:19
December 21:3; 43:23; 44:1, 24; 51:3, 14, 17; 78:21, 23; 81:6, 9, 17; 82:16; 84:13, 14; 93:18
decide 23:6
decided 104:3; 204:1
decision 22:10; 77:12; 104:9; 116:3; 145:24; 153:14; 156:9; 166:23, 25; 193:5; 196:17; 209:1
decisions 22:9, 10; 140:20
dedication 123:20
deeply 222:1, 5
defeated 178:18, 18
defects 173:6
defendant 5:25
defendants 3:11; 15:3; 101:17
define 90:9; 101:1; 120:10
defined 117:25; 118:1; 187:9
defining 146:5
definitely 41:11; 45:5; 128:13; 138:20; 171:14
definition 145:13, 16, 22
definitive 171:11
degree 9:1, 7; 80:2
deist 136:5
deliberations 57:25; 58:3; 77:7; 112:1
demeanor 164:23
demi 210:7
Denise 18:22, 24, 25; 34:22; 130:2
Department 35:20; 71:3; 74:6, 11; 92:6; 95:11, 12; 102:21; 103:1, 2; 105:19; 144:25; 154:22
Departments 70:25; 72:19
depend 77:6; 81:22
depending 67:6; 113:8; 131:1, 2
depends 219:23
depicted 150:10
depiction 150:2
deposed 4:21; 5:2, 19; 102:2

deposition 3:17; 6:16; 7:4; 10:14, 22; 14:6, 12; 15:1, 5, 9, 16; 62:20; 101:24; 102:5; 129:7, 23; 130:9; 204:24; 226:9
depositions 5:18; 70:24; 101:25; 102:3
depth 147:10
descended 151:6
descent 147:18; 150:4; 190:13
describe 36:16
described 76:13; 116:25; 150:13; 171:20
describing 75:25
deserve 215:25
Design 13:9; 111:2; 137:7; 144:7, 9; 145:8, 10, 16, 17, 19; 146:2, 4, 6, 20; 152:8; 177:8; 179:25; 180:23; 186:23; 187:8, 14; 189:17, 18; 190:20; 191:8; 192:1, 22; 193:19; 195:2, 5, 13; 198:2; 211:8, 13
designed 16:20
desirable 33:6
desire 28:6; 79:23; 81:25; 82:2; 165:2; 209:22, 24, 25
desires 40:3
Desiring 54:4
despite 125:15
destroy 153:18
destroyed 149:22; 150:5; 153:9, 12
destruction 220:11, 13
detail 153:23; 172:7
details 123:11
developed 148:10
development 35:25; 37:1; 94:22; 95:24; 96:2, 2; 148:4, 4; 150:10; 194:7
diagram 129:18; 130:7, 9, 17
dictionary 171:17
died 135:9; 198:19
difference 75:17; 155:3; 203:24
differences 148:11
different 17:16; 35:9; 37:5, 10, 21; 41:1; 55:19; 73:4; 107:4; 120:6, 20, 24; 123:18; 127:11; 128:15, 16; 137:4; 141:5, 8; 148:3; 156:23; 165:5; 190:7; 197:3; 210:1; 214:4
differentiate 35:7; 117:13
differentiated 120:20
differently 123:18, 23; 141:6
differing 42:13, 14; 56:17, 17; 197:22
difficult 66:17, 18; 68:16, 16; 75:3; 117:11; 145:24; 173:8

Carol Brown
May 16, 2005

Tammy Kitzmiller, et.al.   v.
Dover Area School District, et al.

difficulties 39:2
difficulty 4:11; 7:13; 8:6; 20:12; 147:1
digesting 157:10
digs 10:7
diligence 171:20
diligent 86:13
Dillsburg 24:2
dimension 69:2
dinner 101:4
dinosaurs 148:7
direct 53:24; 64:8; 182:3
directed 59:14; 60:1, 6, 7, 12; 61:9, 12, 14, 16; 63:5; 139:5, 18; 220:25
direction 176:23
directives 166:15
directly 23:10, 16; 48:12; 59:19; 69:13; 73:9; 101:24; 131:5; 137:1; 139:13; 163:12; 208:8
Director 123:13; 209:13
Director's 52:12
Directors 52:5; 56:15; 117:25; 118:2; 4, 5
disagree 224:18
disagrees 183:5
disapproval 164:10; 166:12; 215:15
disapproved 97:24; 113:1
disaster 140:14
disastrous 117:12, 17
disciplinary 112:20; 122:12, 12
discipline 89:8, 9
disciplined 122:11
disclose 5:14; 12:18; 122:16
discovered 148:21
discretion 155:18, 20, 22; 191:19
discuss 11:13; 13:3, 5, 7, 12; 20:6; 21:5; 25:14; 32:18; 36:7; 69:7; 93:16; 112:17; 122:6; 134:4; 146:2; 161:23; 162:21; 170:1; 181:3; 203:8; 204:2, 3; 223:8, 10, 18
discussed 13:12; 19:10; 20:8; 65:15; 68:13; 87:2; 95:23; 97:7; 102:13; 113:21; 122:9; 147:10, 13; 154:8; 155:11; 165:5; 166:5; 167:15; 169:21, 23, 24; 170:8; 195:23; 203:10; 223:11, 15, 19
discusses 12:21
discussing 88:23, 25; 105:7; 137:12; 145:8; 149:2; 152:1, 11; 179:18; 185:18; 203:13, 17, 21; 206:13; 209:11; 219:12, 15; 223:11
discussion 58:4; 63:6;
65:12, 22; 67:13; 73:6, 17; 84:17; 86:9, 23, 25; 87:22; 88:1; 89:15; 92:7; 95:4, 8, 14; 98:22, 25; 101:4; 103:19; 108:16, 18; 109:9, 12, 13; 110:25; 113:18; 114:11; 116:7; 117:2; 120:3, 8; 121:25; 123:2; 146:18; 151:21; 154:9; 157:5, 7; 159:20; 166:18; 168:18; 178:20; 179:22; 181:14, 16, 17; 182:9; 185:13, 14, 15; 186:20; 189:1; 192:1, 8; 197:3, 17, 25; 198:4; 199:16; 218:12
discussions 21:16; 22:1, 2, 7, 12; 64:4, 5; 65:10; 71:23; 73:8; 81:8; 97:11; 111:23; 122:10, 17; 123:8; 133:5, 6; 138:16; 156:11; 166:9; 195:19
dish 34:4
disparaging 60:1
Dispatch 138:21
displaced 46:3, 5
dispute 3:21; 9:15; 13:20; 24:9; 102:15; 220:14
distinct 35:10; 176:8
distinction 146:15
District 3:13; 5:3, 8, 23; 6:10; 17:8, 12; 23:15; 24:21; 27:10; 28:21; 29:21; 35:5, 8, 13, 14, 17; 36:12, 16; 42:10; 48:22, 23; 55:23; 57:15; 64:25; 65:2; 66:12; 67:1, 1, 9; 89:10; 110:15; 118:6; 122:7; 133:14; 140:12, 14; 147:21; 149:23; 153:10; 154:19; 155:15, 17; 156:14; 169:3, 4; 179:18; 183:6; 189:9; 207:10; 208:17; 210:1; 220:11; 221:19; 222:3, 13, 15, 16
Districts 23:9, 15, 22, 24; 24:1; 67:2, 3; 156:23, 24; 161:3, 4; 208:7
division 118:14
Divisions 117:21; 133:11
doctor's 196:9
document 205:11
documents 14:14; 16:2, 4, 9, 13
dog 148:25
dollars 75:19; 95:21; 222:4
Don 41:5
donate 156:1
donated 149:21
donation 153:13; 155:22, 24
donations 155:14, 16; 191:14, 20, 24
done 22:13; 29:4; 33:25; 51:22; 103:25; 106:4; 112:22; 141:17, 18; 153:21, 21; 162:25;
164:14; 212:22; 213:25
doomed 218:4
door 175:12; 176:11
doubting 140:23
Dover 3:12; 17:8, 18, 23; 18:1; 19:18; 24:5; 25:22, 23; 26:5, 7, 9, 14, 15, 20; 30:13; 34:1, 3, 3, 24; 65:5; 67:9; 75:20; 93:4; 114:17; 158:7; 171:25; 204:20
Dover's 108:2
dovetail 173:9
dovetailed 107:12; 173:19
down 26:24; 43:18; 93:23; 97:22; 107:8; 147:8; 191:20; 197:17; 215:14; 216:17, 20
dozen 154:13; 164:16
Dr 5:18; 18:22; 32:5; 33:17, 20; 34:18; 36:6; 52:17, 17; 62:12, 16; 134:16, 17, 21, 24; 144:14; 162:20; 163:3, 11, 25; 164:3, 6, 10, 12, 13, 18; 165:7, 12, 13, 25, 25; 166:5, 9, 12, 16, 16, 18, 19, 22; 167:3, 11; 168:14; 191:22
drawn 34:7
drive 8:2; 16:15; 87:1
driving 8:1; 98:6
duly 3:8
during 7:19, 23; 8:1; 21:6; 23:10; 24:23; 44:22, 23; 50:7; 53:4; 60:25; 62:13; 69:22; 81:17; 84:7, 17; 85:5, 22; 87:2; 89:10; 91:8; 98:9, 22; 111:22; 112:18, 23; 114:21; 117:21; 119:24; 120:8; 126:1; 127:14; 129:2; 137:7, 16; 138:1, 9; 139:7, 11; 140:8, 16; 142:13; 144:12, 15; 146:3; 147:16, 17; 149:18; 151:9, 12, 18; 152:6; 161:10; 162:7; 180:24; 181:14, 17, 18; 187:10; 192:2; 194:1; 197:7; 202:19; 219:10, 11, 19
duties 57:10, 13; 64:22; 66:8, 11
duty 4:18; 57:14; 69:2; 207:15
DVD's 151:18, 23
dying 62:24; 148:14

E

e 147:19; 158:13, 16; 159:5; 190:10
e-mails 16:9
earlier 48:14; 49:11; 75:16; 116:25; 164:24; 169:16; 171:21; 181:23; 189:3; 199:16
earliest 31:8
Early 64:4, 5; 71:19; 72:21; 129:7; 159:19; 211:25
ears 78:10; 125:6
earth 103:17; 126:21; 175:24
easier 130:12
easy 117:13
eccentric 156:18
Eden 150:24; 176:3; 177:1
educate 66:8
educated 171:16
education 8:11; 9:8, 10, 16; 30:3, 11; 31:4, 5, 11; 32:13, 19, 19; 33:1, 11, 23; 34:14; 42:15; 74:11; 90:11, 15; 105:19; 106:12, 14; 162:16; 210:21; 211:4
educational 8:8; 21:10; 33:2; 173:16, 16
effect 21:9; 23:19; 51:15; 59:16; 60:22; 63:3; 103:22; 104:17; 116:14; 124:6; 177:20; 184:24; 185:2; 194:20; 195:8; 198:19
effective 215:7
efficient 221:21
effort 4:4; 179:24; 200:8; 216:8
efforts 31:7; 32:4; 90:10; 164:15
egotism 207:22
eight 171:10
either 12:2; 79:16, 19; 96:6; 109:3; 113:7; 121:3; 155:22; 158:18; 159:14; 165:21; 167:22; 172:6; 174:22; 196:17; 215:5
Elaine 26:13
elected 22:22, 23; 23:3; 44:22; 66:25; 67:2, 3, 7, 10, 10; 79:5, 6, 12; 214:2; 223:4
election 22:24; 23:3; 26:25; 27:14; 28:3, 5, 13; 32:16; 37:7, 12; 38:4, 5, 13, 15; 39:22; 43:1, 7, 16; 45:4, 12, 23; 46:3, 8, 16, 22; 47:2; 51:6, 18; 79:7; 82:21; 221:9
elections 38:8
elective 94:23
electives 94:19
electoral 37:24
electrician 221:22
elementary 30:25; 34:1, 3, 3, 24; 41:8; 43:2; 65:5; 72:20; 89:22; 220:4
else 14:5; 18:18, 20; 27:18; 29:9; 31:2; 34:21; 45:3; 46:18; 50:4; 59:6, 10, 13; 60:2, 25; 62:21; 69:25; 84:6; 87:17; 91:7; 95:23;
96:5; 102:19; 104:12; 110:21; 117:8; 124:12; 128:21; 137:15; 138:1; 143:1; 145:11; 159:10; 162:3, 4, 10; 177:13; 184:23; 191:21; 193:18, 24; 202:12; 211:15; 212:9; 214:23; 217:16; 218:9; 222:18
else's 137:5
emotional 129:6; 140:2; 184:16
emotionally 140:11
employe 6:10; 12:22; 13:1; 110:15; 149:23, 23; 183:6
employed 7:1; 156:14
employes 17:12; 18:1; 122:7, 8
Employment 92:20; 112:16; 122:7
end 65:24; 169:20; 204:4; 215:10; 223:11
ended 28:1
ends 28:1
endurance 4:14
Energy 221:18, 20, 20, 25; 222:2
engaged 5:9
engendered 66:20; 68:8; 179:16
England 171:6
English 173:17
enjoy 122:18
enjoyed 103:24
enough 17:15; 29:4; 56:10; 67:1; 78:11; 87:1; 92:22; 101:20; 177:7; 164:8; 166:24; 167:8; 194:18; 205:24; 209:4; 216:3
ensure 44:11
enter 42:9
entering 83:11
entertain 40:2
entirely 35:18
entities 35:21; 115:18
environment 45:20
Environmental 9:20, 22
Episcopal 218:2
Episcopalian 188:9; 217:23
equally 66:23
equivalent 8:10
Eric 11:3; 26:3, 3
error 97:14; 144:7
escapes 116:5
Eshbach 20:19; 21:4, 14, 14; 97:12, 13; 103:3; 110:13; 149:13; 154:5, 11, 155:6, 6
especially 28:15
espouse 176:16; 189:14
espousing 176:15, 19

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Carol Brown
May 16, 2005

essence 141:7; 167:7;
169:22; 179:2
essentially 114:24;
178:25; 210:16, 20
establish 31:20; 66:16
estate 201:24
etcetera 65:9; 72:18;
87:25; 112:18; 114:5;
131:11; 156:1; 190:13;
221:18
Ethics 118:1, 3, 5
evaluated 162:22;
163:16
evaluation 156:7;
162:21; 163:11
evangelical 66:22;
188:3, 19; 190:3, 4, 19;
225:5, 10, 12, 15
Eve 150:23; 176:3; 177:1
even 13:12; 37:14;
107:21; 123:13; 156:17;
168:24; 171:9; 174:10;
206:25; 207:20; 209:1;
210:7; 212:18; 216:2;
221:22; 223:4
event 7:6
events 11:14; 65:9;
222:23; 224:3
eventually 141:23
Everyone 40:12; 83:8;
99:3; 108:19; 138:22;
182:15; 186:8, 10
evidence 3:19; 6:2
evident 149:17; 151:10;
216:18
evidently 74:9
evolution 147:19;
158:12, 16; 159:3, 5;
190:10; 195:11; 210:22
Evolutionary 13:9;
151:24
evolved 148:9
ex 43:21; 86:21; 97:3
exact 22:25; 48:23;
108:23; 143:24; 179:8;
182:25; 194:2, 23; 198:22
exactly 54:9; 60:20; 85:7;
87:12; 89:6; 91:3; 135:7;
151:3; 168:8; 177:20;
198:18; 215:13; 225:3;
226:1
examine 104:4
examined 3:8; 104:5
example 59:18; 67:4;
79:20; 158:20; 159:2, 7
examples 225:16, 22
Excellent 9:1
except 3:4; 40:12;
156:18; 206:22
exception 112:19;
151:14; 156:17; 189:24,
25; 197:15
exceptions 207:20
exchange 67:15; 220:7,
8, 9

exchanges 140:7
Excuse 52:20; 114:2;
121:6; 163:2; 201:20
executive 12:8, 10, 10,
12, 15, 19; 13:13; 120:13,
17, 24; 121:2, 3, 4, 5, 8, 9,
10, 13, 16, 22, 24; 122:6,
24; 132:16; 133:1; 138:10;
146:17, 19; 166:21;
192:11, 15; 193:16, 19
exhaustive 171:7, 11
Exhibit 129:23; 130:10;
216:6
Exhibits 204:24
exists 158:25
expect 118:11
expectation 80:20
expected 164:20
expel 89:22
expenditures 94:25
experience 62:14; 66:6;
83:1; 101:25; 126:13;
143:18; 154:12; 174:5;
207:24; 225:15
experienced 43:14;
64:15
experiences 23:13;
42:24
expertise 105:25; 106:2;
207:24
expired 28:4
explain 78:16; 140:11;
206:6; 225:22
explained 68:3; 146:6;
161:18
explanation 109:13;
121:12; 129:24; 155:25;
177:6
explanations 195:9
express 56:18; 81:14;
134:20; 143:19; 166:12;
214:10
expressed 52:3; 61:5;
75:4; 77:22; 79:23; 81:11;
82:24; 84:8; 88:16;
123:19; 124:17; 129:15;
133:14; 179:21
expressing 67:25;
134:18; 198:12
expression 41:14; 78:14;
199:8; 215:22
expulsion 122:14
extended 30:22
extensive 30:15
extent 74:24; 78:22;
107:11; 138:3; 163:6
extinct 148:16
extraneous 122:17, 20;
192:20
extraordinary 224:21
extremely 103:25;
208:17
eye 61:23
eyes 149:1; 158:24

F

face 153:18, 18
facilities 101:4
facing 131:2
fact 5:18; 41:4; 74:7; 78:9;
100:14; 107:14; 119:6;
121:7, 14; 143:15; 148:1;
153:17; 158:3; 169:3;
170:11; 171:5; 174:8;
190:9; 223:20
factual 212:20
fair 17:15; 37:1; 78:11;
117:7; 127:13
fairly 21:2; 36:21; 65:23;
126:5; 133:11; 159:19;
165:1; 171:8, 16; 202:7;
222:25
faith 87:3, 11; 155:5, 9;
188:3, 5, 7, 15; 200:2;
212:2, 3, 4, 5; 222:14
faiths 188:16; 212:6
fall 63:14; 71:18; 72:7, 10,
17; 76:8, 12, 17; 77:4, 9,
12; 92:13; 135:1; 225:16
falls 103:12; 105:20
false 150:8
familiar 3:23; 104:7, 7;
105:7; 126:24; 159:7
family 92:1; 94:6, 18, 21;
95:10; 96:1; 102:13, 21;
135:9; 148:20, 21; 149:3;
154:17; 217:25
far 27:16; 30:4; 62:3;
69:14; 107:5; 146:20;
153:2; 195:17; 207:15;
210:8
fascinated 107:3
fashion 112:22
father 41:5
faulty 125:20
favor 52:24; 55:15; 58:19;
145:6; 193:21
favorable 173:19; 208:17
favored 144:8, 8; 186:5
favoring 49:3
favorite 105:5
favors 145:5
fear 88:12
February 15:20; 20:5;
22:4, 5; 47:24; 71:22
federal 44:7, 9; 55:25
feel 4:15, 16; 7:6; 39:25;
52:3; 88:11; 94:14, 24;
96:4; 154:23; 158:10;
173:4; 210:6; 212:3, 18;
222:2
feeling 49:15; 68:15, 15;
143:2; 176:14, 14; 184:8
feelings 66:17
fellow 29:7; 53:25; 54:4;
60:17; 207:19; 214:16;
215:5
felt 29:2; 54:1, 7; 62:10,

11; 69:3; 74:22; 87:6, 18;
88:7; 135:4; 150:8; 151:1;
161:22; 174:11; 182:7;
183:13, 14; 199:20;
206:11, 19, 20; 207:8;
208:24; 212:14, 15, 17;
215:7, 8, 12; 216:4; 224:16
few 3:25; 10:19; 16:19;
34:22; 62:20; 157:22;
186:9, 11; 206:1
fewer 35:11
field 100:11; 173:16, 17
fifteen 174:9
fight 30:21
figure 38:14
figured 19:23
figures 9:15; 150:11
file 52:7
filed 5:16; 222:23
files 37:24; 38:1, 3
filing 3:3; 45:23; 223:12
fill 48:2
film 190:12
final 160:21; 166:23;
205:16; 209:1
financial 42:1
finch 148:18, 19, 20, 20
finches 149:3
find 4:8; 30:23; 33:15;
102:5; 131:15; 156:25;
171:1, 4; 175:4; 218:8
fine 8:5; 21:24; 22:6;
50:11; 57:20; 94:4;
128:17; 138:25; 141:25;
212:10; 218:25
fined 160:24
finger 42:3
finish 9:12; 183:17
fired 183:6
firm 10:24
First 4:2; 22:19; 26:15,
25; 27:9; 31:1; 32:4, 8;
34:1; 43:13, 25; 44:18, 23;
45:19; 50:3; 51:3; 58:10;
86:10; 89:19; 90:6; 94:10;
98:11; 99:25; 105:16, 17,
24; 106:6; 107:1; 111:16,
17; 112:10, 13; 113:3, 8,
11, 16, 20; 114:23; 116:8,
12; 119:2, 24; 120:2, 4, 5;
121:12, 25; 122:23;
124:23; 125:16; 147:14,
18; 149:20; 168:1; 169:12,
14; 172:18; 185:12;
192:12; 193:4, 7; 196:3,
20; 200:5; 207:1; 210:24;
211:19, 25; 213:6, 7;
214:1, 14; 216:2; 221:16
Fiscal 27:15; 28:14, 18;
29:12; 38:17; 43:10;
71:15; 73:5; 75:18; 76:6;
82:6; 95:2, 16, 22; 213:17
fiscally 29:3
fit 107:14; 109:17; 175:18
Five 42:7; 106:20; 144:21
five-minute 157:11

five-year 208:18
flavor 108:24
flipped 108:5, 8
flowed 91:4
focus 40:20; 44:16; 58:10
focused 42:16; 75:9;
77:2; 140:15, 21; 142:21;
213:24
focusing 72:5; 75:11
follow 42:5; 54:14; 68:3;
112:21; 121:8; 134:25
followed 51:18; 75:19;
113:4; 116:23
following 37:14; 51:8;
72:10, 14, 15; 114:6;
124:4; 170:6; 181:15, 17;
224:14, 14
follows 3:8; 121:5; 218:4
foolish 78:18
Force 32:12; 36:1, 7;
115:19; 162:17; 208:11,
12
Forces 35:21
fore 170:4
forefront 31:6
foremost 172:18; 200:5
forest 123:10; 141:9
Forgive 37:16; 82:3;
84:14, 15; 120:19; 188:18;
190:5
forgotten 11:3; 46:20;
210:13
form 3:4; 37:13, 16; 55:5;
56:25; 151:6; 174:3
formal 5:17; 32:24;
36:11; 69:6; 81:5; 86:10;
91:17; 92:8; 98:13, 14, 15,
18; 99:15; 120:4, 10;
122:11; 204:15
formed 32:12; 35:22;
36:6, 10
Former 14:23; 15:3, 5,
11; 32:5; 37:3; 48:19; 49:8;
60:17; 74:15; 81:18
formulate 44:13, 15
Fort 8:25
forth 68:1; 71:19; 89:1;
105:18, 21; 108:15; 117:5;
150:22, 24; 186:7; 187:4;
201:24
fortunately 9:24; 12:4;
89:23
forward 17:20; 18:11;
19:16; 36:8; 112:6
found 91:9; 107:25;
149:3
founded 182:1
four 27:11; 34:2; 35:11;
46:16; 89:11; 197:8;
200:1; 208:12
four-year 27:20; 41:6
fourth 46:20; 93:17
frame 31:22; 77:6; 169:15
framework 195:6
frankly 128:25

Carol Brown
May 16, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

free 4:15; 7:6
freedom 135:11, 11, 12
freely 99:18; 105:4;
125:23
frequently 3:24; 21:15;
80:2
friend 223:3
friends 19:2; 25:6, 7;
29:10; 143:16; 223:20
friendship 223:3, 6;
224:19
friendships 18:3, 11, 14;
19:24
frightened 88:5, 7, 9, 12;
135:24
frightening 91:9
front 76:14; 131:4, 5, 7;
170:16; 202:15, 16
frustrated 142:18
frustrations 89:7
fulfill 66:10
fulfilled 172:5
full 6:22, 23; 12:3; 61:24;
213:3
function 52:5; 148:3, 8,
11
funded 44:7
funds 29:4; 30:16; 179:19
funny 207:16
further 203:7; 226:6
future 114:6
FYI 114:3

## G

gamut 34:4
gaps 194:21; 195:4
Garage 201:19
Garden 150:24; 176:3;
177:1
gauges 29:17
gave 39:10; 40:24; 48:1;
60:19; 61:21; 64:12;
65:13, 15, 25; 66:3; 67:18;
92:6; 123:24; 139:19;
175:15; 179:1; 184:25;
208:4; 212:13
Geesey 86:20; 96:23;
130:21; 181:7; 183:2, 4;
193:22; 198:23
general 21:2; 22:3, 6;
23:3; 34:25; 61:9; 62:9;
105:13; 108:13; 131:17;
140:6; 145:20; 161:16;
175:14; 195:4
generally 10:17; 17:12;
36:23; 63:10; 88:23;
131:8; 202:21
generation 159:1
Genesis 150:23
gentleman's 11:4
geographical 67:5
geology 9:25
gesture 52:13

gestured 165:21
gestures 4:5
gets 91:1
Gettysburg 155:8
gift 155:22, 24; 156:7
gifts 155:16
GILLEN 3:9, 10; 11:9, 10;
37:15; 48:9; 51:4; 55:6;
57:1; 91:15; 102:8; 110:6;
119:9, 18; 128:2; 129:22;
146:11; 149:7; 157:12, 16;
205:1; 218:13; 226:6
ginning 78:12, 15
gist 182:3; 194:2, 3, 4;
198:10; 222:19
given 5:5; 101:25; 107:6;
112:1; 167:3; 226:1
giving 6:1; 34:10; 67:23,
24; 83:8; 124:3; 144:8;
218:23
glanced 216:10
goal 30:12; 55:2
gobbledygook 175:9
God 49:1; 55:13; 56:4, 4,
13; 59:17; 87:6, 11; 151:7;
175:24, 25; 176:25;
187:18; 199:8; 200:2;
210:6, 7; 222:17; 225:17;
226:1
Goddess 210:7
goes 189:3
golden 135:19
Good 3:10; 7:12; 8:16;
24:12; 46:19; 62:7; 92:22;
117:16; 128:2; 130:19;
140:20; 142:16; 159:24;
160:14; 161:3; 174:22;
178:1, 4; 189:5; 205:24;
211:3
gosh 207:12
govern 79:25
governing 115:16
grade 26:10, 10, 16, 16;
31:1, 1; 56:5; 106:8, 9;
126:22; 154:6; 158:4;
171:15, 24
graduate 9:5; 25:23; 26:5
graduated 26:19, 22
granddaughters 65:6
grandfathered 160:20
grant 30:23; 34:10
graphic 150:13
grateful 200:11
great 103:24; 108:18;
117:15, 23; 151:10;
157:21; 182:7; 206:17;
207:10
greater 209:12
green 136:2
grew 56:3, 5; 155:5
grief 46:19; 142:16; 161:3
grievous 122:13
ground 34:11
grounds 47:14; 208:10,
11

group 28:12; 40:7; 42:16;
62:1; 67:11; 72:24; 95:18
hashing 191:21
hat 79:15
hated 200:7
head 43:17; 47:11, 14,
15, 17; 74:5; 103:2;
208:15; 210:12, 17;
215:21
headaches 174:12
heading 206:19, 21
headlines 128:24
heads 4:6; 35:20; 92:6;
144:25
hear 88:2; 130:15, 16;
183:22; 199:14; 207:20;
208:22; 209:8; 212:3, 25;
224:7
heard 11:16; 12:7; 66:13;
73:13; 131:21; 133:17;
134:12; 144:7; 145:16, 22;
167:6; 187:7, 7; 214:12;
224:9
hearing 7:13; 77:24;
133:21, 24, 25; 214:17, 18,
21
hearings 112:20; 122:12,
12
hearsay 133:18
heart 102:15
heat 158:25
heated 181:14
Heather 96:23; 181:7;
183:9; 198:23
heavens 8:16; 24:12;
130:19
Heidi 24:12, 22, 22; 25:3,
8, 19
heightened 69:1
held 44:23; 51:18; 64:9;
68:7; 179:2; 220:6
hell 218:5
hello 15:21
help 16:20; 34:10; 130:14
helpful 141:3
hereby 3:2
hey 40:24; 42:8; 162:4
hi 25:15
hiatus 153:2
high 8:12, 12; 26:19;
28:15; 40:22; 41:13; 56:7;
71:4; 74:5; 92:2, 3; 96:15;
103:2, 23; 106:21; 114:15;
115:13; 164:6; 170:23;
171:1, 14; 174:24; 175:2;
192:16, 17
higher 28:22
himself 124:1, 11, 12;
153:18; 224:10
hired 34:7
history 147:15
hold 142:3
holidays 113:6
holler 112:7
Holtzapple 18:23; 19:9;

guess 27:24, 24, 25;
45:3; 88:24; 101:2
guessing 132:13; 136:5;
164:19
guidance 109:4
guide 158:6; 173:10;
195:20
guidelines 44:9; 107:15;
108:2, 3, 6; 121:2; 159:15;
167:3, 6
guilty 164:5; 214:23;
222:3
guys 81:2; 101:2

## H

half 154:13
Hall 97:20; 147:24; 160:6;
182:14; 220:4
Hall's 110:12
Heilman 32:6; 33:17;
36:6
hallway 221:5
Hamilton 10:23
hand 112:6; 133:18;
168:22; 204:20
handicap 7:12
handled 112:12; 154:9;
155:10; 156:12, 12;
161:18
handling 180:2
hanging 158:23
happen 44:21; 64:23;
112:4; 115:3; 121:18, 19;
141:21; 152:3; 159:1;
191:11, 12
happened 15:8; 52:1;
65:6; 84:9; 111:6; 117:15;
121:14; 128:4; 140:4;
154:5; 159:2; 178:14, 17;
183:21; 184:12; 188:18;
191:22; 216:24; 224:7
happening 21:7; 168:24;
169:17; 207:10; 215:13,
19
happens 87:19; 140:13
harassment 90:17
hard 9:23; 16:15; 142:16
hardly 164:8
Harkins 18:17; 28:10;
32:24; 33:5; 39:19; 40:12;
47:9; 53:1, 10; 60:4, 6;
62:4; 73:20; 79:5; 80:11;
86:19; 95:15; 96:11;
103:8; 108:25; 116:5;
132:24; 149:13; 159:17;
177:22; 180:8, 9; 184:24;
185:5; 188:6; 190:1;
198:12
Harkins's 169:2
Harnish 39:16; 46:23
Harrisburg 10:25
Harvey 11:5

hashed 192:13

129:25
Holy 65:21
home 11:1; 65:11, 14, 19;
87:2; 93:2; 98:7; 101:20;
123:7; 169:7; 182:3;
202:19
honest 47:9; 50:1; 51:21;
70:5; 97:13; 102:23;
107:1; 110:18; 118:10, 17;
125:5; 129:5; 132:20;
138:4; 142:20; 147:4, 7;
186:9; 192:13; 223:2
honestly 50:10
Honeywell 221:17, 18
HONOR 3:7; 6:23; 83:4
honorably 215:10
honors 106:16
hook 191:20
hope 205:3
Hopefully 218:10
hopes 164:7
horse's 184:6
hot 182:9
hours 11:12, 19; 171:10;
206:16
house 12:3; 169:2;
206:12
human 4:8; 133:7, 8;
135:13; 159:3, 6
humanities 9:23
hundreds 90:5
hurt 135:9
hurtful 201:1
husband 10:23; 11:15,
24; 14:7; 17:6; 39:18; 53:1,
11; 63:5; 65:22; 101:9;
123:7, 10; 124:18, 20;
130:24; 134:1; 139:4, 11,
13, 19; 140:5; 141:2, 20;
142:22; 162:18; 169:1, 20;
170:1, 12, 13; 172:21;
184:2, 9; 188:7; 192:13,
23; 193:11; 199:15;
200:24; 202:24, 25;
203:10, 12; 204:6; 207:2,
5; 208:8; 209:3; 212:15;
220:10; 221:8, 22; 224:11
husband's 93:6; 128:14;
201:19; 206:9
hypotheses 161:24
hypothesis 186:14, 18

## I

iceberg 209:20
idea 30:10; 32:9; 51:16;
148:22
identify 102:22
idiosyncrasies 4:1
ignored 161:13
ill 74:4; 130:4; 134:25
illegal 162:5, 8
imagine 14:2; 224:23
immediate 113:25

Min-U-Script®    Filius  &  McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Carol Brown
May 16, 2005

immediately 112:15
impact 175:2
impair 7:9, 13
impaired 7:20
impending 121:25
implicate 64:6
implicated 29:1; 38:22;
40:10; 42:11; 63:22;
69:12, 23; 77:4; 84:7
implicating 38:25; 63:25;
83:18; 136:15
implies 175:22
importance 66:16; 68:4
important 81:25; 87:6;
189:5; 215:8
impose 135:15
imprecise 4:8; 217:11;
225:19
impreciseness 56:12
impression 94:3;
175:15; 176:6, 7, 9; 180:1
impressive 225:1
improve 29:16
improvement 29:24
imprudent 209:17
inadvertently 51:25
inappropriate 90:19
inclined 206:11
include 136:3; 195:5
included 194:20; 195:4
includes 113:16
including 181:23
inclusion 190:21
income 202:1
inconsistent 55:2
increasing 118:14
increasingly 216:18
incredible 207:12
indeed 11:8; 63:13;
171:5; 196:7
index 151:16
indicate 51:13
indicated 11:25; 20:4;
33:17; 61:8; 63:19; 79:7;
86:16; 91:4, 16; 92:8; 94:5;
97:6; 101:18; 103:14;
105:13; 109:22; 111:11;
116:19; 125:19, 21; 126:3;
136:7; 144:14; 154:11, 21;
155:1, 12; 159:16; 162:12;
195:18; 206:3; 216:23;
218:14; 220:9
indicating 215:15
individual 48:20; 56:18;
103:4; 110:7; 111:22;
117:23; 131:2; 136:1;
153:8, 17, 21; 155:25;
158:19; 164:6; 217:24, 25;
219:9, 25; 220:9, 19, 24
individual's 217:25;
219:23; 220:8
individually 110:3;
162:23
individuals 56:16; 62:1,

2; 77:25; 102:6; 115:19;
130:15; 202:6
indulge 120:22
inference 137:4
influence 207:6
inform 171:17
informal 98:16; 120:10;
127:10; 128:4; 192:8;
209:3
informally 67:24
information 11:15; 34:8,
13; 36:8; 67:23, 24; 93:3,
9; 114:3; 122:17; 124:13;
147:23; 197:5; 202:24;
212:20
informed 36:9; 191:13
inherited 201:18
initial 71:9; 145:19;
194:13
initially 36:1, 6, 10; 182:6
initiated 100:20
injecting 199:25
input 165:24; 196:16
inquiry 34:12
insert 155:19
inside 23:19
insinuation 90:20
instance 4:24; 5:19, 20
instances 121:15, 21
instead 53:20; 211:22
instigate 219:17
instigated 192:7; 194:12
institute 209:25
instituted 208:12
instruction 105:11;
159:8
insult 59:5
insults 59:25
integrated 33:4
intelligent 13:9; 111:1;
137:7; 144:6, 9; 145:8, 10,
16, 17, 19; 146:2, 4, 6, 20;
152:8; 177:8; 179:25;
180:23; 186:23; 187:8, 14;
189:17, 18; 190:20; 191:8;
192:1, 22; 193:19; 195:2,
5, 13; 198:2; 211:8, 13
intelligibility 171:24
intent 176:7, 10
interconnected 84:10
interest 24:7; 81:11, 15;
82:19, 24; 106:25; 107:21,
22
interested 82:22; 99:16;
184:21; 210:4; 212:16, 17,
19
interesting 24:8; 104:17;
149:8; 160:3
interfere 13:6
interject 68:5, 6
intermediate 114:15, 16,
16; 115:13
interpret 180:4
interpretation 49:19;

177:2; 226:2
interrupt 50:22; 119:8
interspersed 112:1
interviews 22:13; 223:23
into 25:12; 27:20; 30:18;
37:23; 40:20; 41:13; 42:9;
45:12; 47:3; 48:10; 55:3,
18; 65:22; 78:21; 81:11;
82:16; 83:24; 87:6, 11, 19;
89:2, 3, 16, 17; 90:8; 91:1;
95:14; 105:20; 109:17;
118:23; 123:11; 136:25;
137:3; 153:23; 154:1, 23;
155:19; 165:25; 168:19;
172:20; 176:11; 183:17;
186:16; 187:19, 19, 20, 21;
191:6, 19; 192:21; 193:8;
194:15; 197:11; 204:7, 13,
22; 206:19, 21; 210:18;
222:15, 15, 16
intolerance 90:18, 18
introduce 3:25
introduction 11:25;
174:10
introductions 11:22
invective 60:3
invested 140:11
investigate 36:7
investigation 37:4
invited 65:11, 14
involve 76:25
involved 23:11, 17;
31:18; 36:14, 15; 52:4, 5;
73:9; 96:1; 101:24;
127:15; 162:18; 192:18;
196:14; 201:23; 208:4, 9
involvement 35:6; 208:5
involving 5:3
islands 149:4, 5
issue 19:10; 27:3; 28:20;
38:24; 39:23; 40:16;
45:18; 48:15; 52:10, 10,
23; 62:8; 70:3, 7; 78:7;
81:14, 21; 111:8; 117:8;
119:24; 127:23; 132:18;
148:13; 149:17; 163:21;
166:24; 182:21; 191:8;
192:21; 198:24; 205:14;
209:10; 211:12; 212:1, 11,
12
issues 22:18; 27:4, 14;
28:12, 18; 30:7, 19, 21;
31:9, 14; 32:12, 15, 18;
37:8, 11, 19, 20; 38:13, 21;
39:10; 42:11; 43:4, 8;
44:16; 48:13; 63:22, 24;
69:7, 10, 22; 77:11; 78:12,
13, 15, 17; 81:17; 82:20;
83:17; 94:12; 102:4, 14;
112:23; 115:6; 118:13;
122:6; 140:18; 155:11;
166:23; 201:21
item 75:8; 115:3; 116:13;
194:8; 203:5
items 12:9; 48:20;
111:23; 113:23, 24, 24, 25;
114:4, 4, 5, 9, 20; 115:9
kind 34:10; 36:5, 17, 21;

**J**

James 46:14; 225:24, 25
Jane 143:9, 11, 22;
181:12; 199:12, 14
January 7:18; 15:20;
17:5, 20; 18:11; 19:15;
20:5, 22; 45:25; 46:1;
47:24; 83:24; 84:15, 20;
85:11; 92:9; 101:6;
218:18; 219:1, 18; 220:23
Jeff 14:8; 39:18; 192:23
Jeffrey 14:9
Jennifer 20:18; 103:3
Jersey 8:25; 9:3
Job 44:4; 55:23; 67:25;
109:6; 123:13, 16
Joe 24:19, 25; 25:16;
200:23
jogging 25:12
jogs 142:2
John 205:25
joined 44:18; 77:16
Joseph 24:12
judgment 75:17; 89:25;
226:4
Julianna 26:13, 17
July 118:19, 20; 147:6, 7;
153:1, 2; 157:19; 160:10,
11, 17, 18; 162:8, 12;
167:19, 20, 23, 25; 168:1;
177:12; 185:3
jumping 107:19
June 70:22; 79:12;
111:16, 18; 112:10;
113:20; 114:23; 115:25;
116:9, 17; 117:12, 17;
118:9, 10, 19, 21; 119:2,
24; 120:2, 5, 5; 122:24;
123:24; 124:23, 24;
125:10, 17; 127:6; 128:7,
19; 129:3; 133:4; 134:3, 4;
136:12, 21; 137:6, 16, 22;
138:4, 6, 17; 139:1, 7, 9,
12, 25; 140:8; 142:6, 6, 10,
14; 143:5, 20; 144:12;
146:3, 1, 2, 21, 24; 147:3, 6,
6; 152:23; 153:1; 157:19;
160:9, 10, 11; 162:7, 8;
167:15; 181:24

**K**

Kansas 210:19, 21;
211:3
Karen 18:22; 19:9;
129:25
keep 36:3, 10; 54:4; 66:9;
77:2; 93:9; 146:8; 166:24;
195:7
kept 208:2
kids 32:3; 75:6; 76:1;
87:15; 127:24; 182:12;
206:18; 207:11; 215:6
kind 34:10; 36:5, 17, 21;

60:2; 62:19; 64:25; 67:14;
87:1; 89:2; 90:17; 93:2;
101:19; 106:7; 156:15;
161:13; 166:24; 172:22;
185:18; 192:24; 194:18;
213:12; 216:17
kindergarten 26:10;
30:22, 23
kindly 130:8
kinds 64:23
King 225:24, 25
knew 195:17; 206:3
knowing 204:13
knowledge 143:15, 17;
154:6; 170:4, 24; 190:5;
225:14
knowledgeable 104:9;
159:25
known 18:25; 24:15;
37:23; 39:17; 175:17;
200:1
knows 99:3; 182:15;
224:22

**L**

labor 122:5, 9
laced 126:5; 128:20;
136:8
lack 28:22; 39:1, 5, 10,
13; 40:17; 90:24; 213:4
lacked 123:19
lady 102:24
land 56:11, 11, 14; 46:21;
197:25
Langione 21:22; 39:18;
45:10; 46:21; 47:25; 50:9;
77:21
language 43:2; 92:18;
106:7; 143:24; 179:8;
196:21
languages 9:8; 30:24
large 67:1, 4, 10; 95:18
larger 95:1
Larry 21:25; 39:18;
45:10; 48:19; 135:1
last 15:19; 65:19; 80:24;
82:21; 89:11; 90:17;
128:3; 135:8; 164:7;
211:17; 216:9; 217:14
late 32:5; 65:22; 70:19;
71:17; 72:4; 91:10; 92:13;
201:18
lately 20:2; 25:10
later 32:14; 36:4, 14;
50:18; 139:8; 184:15;
196:19
latest 30:25
latter 71:21; 167:25;
168:1
Lauri 24:12, 15; 25:10
law 56:11, 11, 14, 16, 20,
23; 57:4, 15; 89:19;
122:16; 146:16; 193:3;
195:7; 197:25; 208:2;

Carol Brown
May 16, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

209:14; 211:10; 213:14;
224:14
laws 44:9, 9
lawsuit 3:12, 19; 5:2, 8,
16; 13:5, 8; 14:25; 222:23;
223:14
lawyer 133:19
Lawyers 3:23; 6:18, 20;
101:18; 206:22
lay 4:7
layman 208:2
layout 82:11, 13
league 218:3
learn 23:21; 123:15
learned 151:10; 155:3;
158:17; 168:21
learning 151:14
least 25:21; 35:12; 85:4;
90:4; 105:6; 116:2;
138:18, 22; 140:15
leave 6:11; 164:8
leaving 81:20
Lebo 24:12, 15; 25:10
led 53:17; 58:4; 81:14;
89:3, 16, 17; 173:14;
199:6; 214:25
left 16:16; 27:10; 130:22;
192:23
leg 148:8
legal 102:1; 201:21
legislative 115:17, 18
legislature 211:2
legitimate 173:11, 12
Leib 41:7
lend 51:16
lends 49:18
length 182:11, 19; 207:24
Less 21:14, 14; 24:16;
94:9; 106:1, 2; 110:13;
128:4; 131:3
letters 161:15; 209:6
letting 168:23
level 166:18; 170:23, 23;
171:13, 24; 173:8; 174:24,
24, 25; 175:3
levels 30:25; 71:4; 92:2,
3; 94:19; 106:8, 9; 208:6
Levin 110:1, 10; 178:9,
24; 191:4
liaison 115:18
libel 6:2, 6
library 185:15
life 107:1; 126:16, 18, 20,
20; 150:9; 154:14, 24;
158:4; 161:19; 175:23;
176:2; 186:15; 195:9, 10;
197:9, 16; 201:13; 202:3;
206:15
light 65:15; 74:10; 82:20;
107:10; 115:21; 160:7
lights 221:20.
liked 164:21
likewise 163:2
limit 99:23

limited 8:3; 93:3; 118:2;
135:14
limits 209:12
Lincoln 114:16
line 51:24; 62:11; 136:16;
142:5
lines 31:24; 32:4; 88:16;
96:12; 117:23
link 15:11
Lion's 34:9
Lions 34:9
listed 13:1; 122:21;
129:25; 151:16
listen 40:25, 25; 215:10
listened 41:11; 214:12
listening 99:2; 212:16;
214:17, 18, 21, 24
listens 215:11
literal 177:1; 225:23;
226:2
litigation 5:10, 24; 10:17;
12:23; 13:2; 16:5, 23; 19:7;
20:3, 9, 15; 25:14; 48:13;
121:25; 122:1
little 22:3; 23:21; 88:4;
89:6, 20; 106:3, 22;
117:11; 127:8; 141:5;
145:24; 150:15; 172:7;
173:2; 178:7; 182:17;
194:24; 209:3; 218:21;
221:23
live 24:7; 155:12; 156:19;
160:12
living 148:14; 224:14
load 158:23
loaded 134:23
local 13:20; 38:5
locally 24:14
located 24:2, 3
lockstep 135:12
long 11:11; 24:15, 21;
26:9; 27:8; 121:23;
184:15; 215:9; 217:11;
223:20
longer 74:17; 106:3;
187:6; 215:4
Lonnie 21:22; 39:18;
45:10; 50:9
look 7:18; 9:19; 17:15, 20;
18:10; 21:15; 29:20; 37:7;
42:25; 43:1, 7; 58:2; 60:10;
62:1, 3, 19; 63:21; 69:21;
70:7; 72:5; 74:24; 75:21;
76:12; 77:2; 78:6, 18;
81:20; 83:16; 84:12;
85:25; 90:7; 92:9, 12; 94:4,
9; 95:19; 96:18; 103:18;
105:15, 24; 106:8, 10, 17;
108:6; 111:7; 114:22;
118:8; 120:21, 22; 122:23;
123:22; 125:9; 127:16;
128:7; 129:18; 137:6;
139:9; 141:3; 142:1, 10,
11; 149:24; 162:12;
171:19; 173:11; 174:1, 4;
177:23; 187:24; 198:4;

204:21; 206:1; 216:6
looked 93:13; 108:6;
141:15; 151:5; 174:6, 10
looking 41:19; 53:16;
61:25; 69:21; 72:18; 76:9;
78:17; 85:10; 86:4; 95:20;
98:14; 99:24; 105:14;
106:18; 115:21; 130:7, 10;
134:3; 136:20; 146:24;
147:5; 162:14; 164:2;
173:25; 175:13; 183:8
looks 93:10; 141:4
loop 166:24
lost 46:3; 199:9
lot 9:23; 37:3; 41:9, 11,
14; 70:12; 93:10; 94:14;
109:9; 113:14; 133:17;
159:13; 163:25; 213:11,
25; 217:12
loud 58:6
Louisiana 210:13, 16, 24
Lowe 11:7, 11, 18; 14:4,
11, 15
lower 151:6; 187:9
lowest 207:13
lunch 124:5; 217:13
luncheon 101:13
Lutheran 188:7

M

mailed 204:15, 17
main 24:14; 28:20; 43:18;
108:17; 116:8; 172:20;
185:12
mainstreamed 106:14
maintained 16:13
major 9:23
majority 29:2; 40:3, 5;
45:15; 62:17; 112:25;
188:13; 200:11; 201:15;
208:21; 209:22; 213:20,
22; 224:12; 225:2, 4, 9
makes 4:16; 115:9, 23;
116:13; 129:14; 153:4;
156:8
making 6:9; 50:7, 12;
52:13; 96:5; 116:3;
136:10; 145:1; 187:10, 12,
13; 192:8; 194:12; 195:19;
198:7; 222:8
Maldonado 24:12, 19,
25; 25:16; 184:2, 10;
200:23
man 59:1; 147:18; 148:9;
150:3, 10, 17; 151:6;
190:13
man's 59:5
manage 49:19
managed 197:6
manager 130:2
manager's 114:18
mandate 89:22
mandated 210:8; 213:14
mandates 44:7; 211:11

manifestation 209:21
many 4:6; 15:17, 18;
16:17; 34:8, 8; 37:4; 90:4;
96:9; 100:6, 10; 131:21;
143:16; 153:11; 168:15;
211:24; 223:19, 25
March 22:5, 5; 71:2, 22;
84:13, 15; 85:11; 101:7
mark 129:22; 167:25;
205:3
marked 129:23; 130:9;
204:25; 205:10, 21
market 109:25
marketplace 157:1
marriage 16:25; 17:3, 10,
13
married 107:16
master's 8:10; 9:10, 11
match 57:18; 101:21
matched 108:7
matching 108:12, 13, 14
material 38:4; 104:1;
105:7, 20; 122:15; 151:15;
186:6, 10; 195:18
materials 14:16, 17;
34:7, 13; 38:8, 10; 96:1;
150:3; 151:11, 23; 152:1
mates 29:11; 30:5; 32:20;
33:13; 37:10, 21; 43:7;
45:3; 81:8
math 106:3
matter 4:19; 5:6; 12:19,
21; 15:5, 7; 19:6; 20:8, 14;
22:8; 44:3; 50:18; 73:24;
75:11, 14; 95:23; 96:7;
127:19; 203:8, 11; 212:2,
2, 3
mattered 75:14
matters 11:21; 12:12, 17,
18; 13:1, 2, 12; 94:6;
110:8; 112:17; 122:2, 17,
20, 20; 203:17; 212:5
may 10:20; 11:7; 23:2;
28:3; 36:4; 50:22; 56:18;
70:21; 85:25; 86:3, 11;
91:17; 92:9; 93:16; 94:4;
97:14; 98:11, 15; 102:11,
19; 103:16; 109:20;
110:14, 20; 111:16;
117:12, 17; 118:8, 8, 10,
13, 15, 21; 119:10; 121:21;
122:6; 125:20; 137:4;
138:6; 142:2; 144:7;
145:1; 147:2; 157:11;
167:21; 168:20; 169:4;
178:6; 184:17; 193:6;
195:11; 210:25; 211:4
maybe 127:10; 206:22
mean 5:12; 13:8; 15:22;
25:5; 29:23; 32:2; 38:17,
19; 42:21; 45:3; 49:14;
53:22; 54:9; 57:5; 66:18;
68:12; 70:3; 85:14; 88:7,
10; 100:21; 122:20; 129:1;
139:23, 24; 143:13;
151:21; 154:8; 159:4, 12;
169:12; 173:6; 178:2;

187:24; 197:21; 198:17;
207:12; 214:17, 17; 225:8
meaning 26:20; 41:21;
52:14; 54:17; 82:13;
149:9, 10; 157:3; 171:17;
218:6
means 115:6
meant 87:9; 126:7;
144:21; 146:5; 201:25;
217:15
measure 209:12; 216:21;
217:4, 18
mechanics 165:15
Mechanicsburg 24:3
media 22:13; 58:6; 131:5;
138:15, 17; 190:12, 23;
215:11; 223:23; 224:1
mediator 159:24
medic 8:25
medical 140:17; 223:22
medication 7:8, 20;
140:19
meet 11:2, 11; 85:18, 20;
105:21; 161:7; 182:23
meeting 10:25; 43:25;
44:23; 45:12, 22; 46:25;
49:12, 24; 50:2, 3, 8, 12,
22, 23; 51:3, 10, 13, 17;
58:8; 61:1; 62:25; 63:3, 4,
7, 15, 16, 17; 69:15; 78:23;
79:3; 81:7, 7, 18; 85:21;
86:5, 6, 10, 17, 24; 91:17,
22; 92:8, 9, 13; 93:14, 17
94:4; 97:14; 98:6, 7, 11,
17; 100:15; 101:19;
102:11, 19; 107:7; 108:17,
19; 109:10, 11, 17, 20;
110:14, 20; 111:1, 9, 10,
15, 15, 16, 17; 112:10, 13,
14; 113:3, 4, 11, 12, 13,
20, 25; 114:2, 6, 7, 10, 12,
21, 23; 115:1, 25; 116:4, 8,
8, 12, 17, 17; 117:10;
119:2, 4, 24; 120:1, 2, 4, 5,
9, 16; 121:5, 8, 11, 11, 18,
20; 122:23; 123:4; 124:23,
24; 125:10, 16, 25; 126:2;
127:6; 128:7, 19, 25;
129:2, 17; 130:8; 132:4;
133:1; 137:24; 138:9;
145:15; 146:3; 147:2, 4, 5,
9; 149:9, 10, 16, 18; 151:9,
12, 19, 23; 152:6, 18, 19,
23, 24; 153:3, 20; 154:2;
156:25; 157:17; 159:11;
160:9; 161:10; 162:7, 17,
20; 167:15, 16; 168:10;
169:10, 10, 11, 12, 15, 23,
24; 170:8; 177:23, 24;
178:12, 19; 180:24;
181:14, 15, 17, 24; 183:11,
18, 21; 184:13, 14, 19;
186:21; 187:11; 189:2;
191:10; 192:12, 14; 193:6,
14; 194:7, 14, 15, 16;
195:22, 24; 196:2, 6, 7,
12, 15, 22, 25; 197:4, 19;
199:17; 200:15, 21; 201:3,
5; 204:5, 7, 13; 205:19;

Min-U-Script®   Filius  &  McLucas Reporting Service, Inc.

**Tammy Kitzmiller, et al.  v.**
**Dover Area School District, et al.**

**Carol Brown**
**May 16, 2005**

206:4; 211:19; 214:4;
219:3, 5, 6, 9, 11, 18, 19,
22; 221:5; 222:20; 225:1
  neetings 12:7; 15:21,
22, 22, 25; 20:6, 10, 23;
62:14; 64:2, 3, 21; 65:8;
69:17; 73:10; 77:12, 20;
85:6, 8, 9, 12, 14, 15, 18,
19; 86:11; 89:1; 92:10;
98:23; 112:18; 113:7, 9;
118:20; 120:12, 25;
127:10, 12, 14; 133:13;
136:12, 21; 137:6, 16, 22;
138:2, 11, 17; 139:7, 9, 12,
25; 140:8; 142:13; 144:12,
16; 145:22; 146:12, 14, 25;
147:3; 149:15; 152:19, 22;
153:2, 5; 160:18; 162:13,
14; 164:23; 165:3; 166:10,
13, 17; 167:4, 20; 168:12;
181:23; 196:3; 214:8;
220:6
**Meisenheimer** 46:19
**member** 18:13, 25; 25:1;
39:25; 41:3, 5; 42:20;
43:14, 22; 44:4, 18; 46:16;
48:18, 19; 49:9; 55:22;
59:23; 60:12, 18; 61:16;
63:7; 64:13, 15; 65:3; 66:5;
67:6; 68:24; 69:5; 74:15;
78:5; 83:1; 85:17; 86:18,
21; 96:21, 23; 97:3; 99:9,
15, 17, 22; 104:5; 105:6,
15; 116:2; 127:14; 164:2;
168:24; 169:25; 178:19;
188:6; 189:6, 6, 6; 200:4;
207:23; 209:13; 214:22;
215:7; 218:6, 15; 219:25;
225:4, 10, 15
**member's** 64:22
**members** 10:23; 15:5,
12; 16:25; 17:1; 19:13, 18;
34:16; 35:7, 11, 15, 19;
36:14, 15, 17; 38:20;
40:18; 41:10, 22, 25; 42:4;
45:8; 46:6; 47:7; 52:7, 22;
53:25; 54:4, 5, 6, 25; 55:3,
19; 56:19; 57:11, 14, 20,
21; 58:16, 17, 24, 25; 59:8;
60:2, 10; 61:6; 62:8, 9;
65:1; 67:6; 74:12; 75:17;
81:1; 88:18; 99:9; 102:20;
103:7; 116:1; 117:7, 21;
118:3; 120:3; 123:3;
124:22; 129:1; 131:10, 14;
132:4, 17; 133:5, 12;
134:1, 4, 8; 135:25; 139:2;
142:11; 154:17; 162:22;
170:3; 177:17; 178:6;
180:13; 182:10; 184:22;
185:22; 187:12, 24; 188:2,
3, 11, 14, 16, 17, 18, 19;
189:22; 197:24; 198:5;
202:9, 18, 20; 207:19;
213:23; 214:9, 16; 215:5;
220:25; 222:21
**membership** 220:17, 21
**memberships** 19:11, 19
**memory** 34:2; 45:25;
48:18; 58:11; 59:6, 13;

60:21; 62:18; 64:18;
70:24; 71:13; 73:1; 77:20;
84:21; 97:21; 110:18;
111:13, 21; 125:20; 128:2,
14; 138:3; 141:7; 147:11;
167:22
**mention** 57:14; 87:17;
98:8; 111:1; 147:15;
149:20; 151:18; 156:13;
168:1; 176:25
**mentioned** 23:20; 25:21;
27:3; 28:23; 31:11; 32:15;
34:18; 36:1; 39:22; 42:7;
43:4; 48:14; 53:8; 55:14;
71:15; 75:16; 91:5; 95:24;
108:1; 115:11; 121:17;
127:21; 134:11; 137:17;
145:10; 150:16; 157:24;
158:12; 161:9; 168:13, 19;
171:23; 175:25; 177:2;
193:16; 199:16; 201:16;
202:11; 220:22; 221:3, 15;
222:7
**mentioning** 91:8; 137:7,
10
**mentions** 147:22; 151:15
**mentor** 64:14, 19, 20
**mentors** 64:17
**merged** 188:8
**merit** 30:1
**message** 151:2; 153:24
**met** 10:23; 20:5; 165:14;
192:17, 17
**Michael** 103:11
**microphone** 131:22
**middle** 71:4; 92:2, 3;
131:13
**midwife** 8:23, 23
**might** 7:9, 13; 16:9, 13;
30:24; 49:13; 54:14, 18;
67:17; 68:9, 25; 69:7, 23;
104:16; 114:17; 132:20,
20; 179:20; 202:1
**Mike** 159:22, 24; 169:8;
170:7; 172:9; 177:13, 19
**Mike's** 159:23
**Miller** 20:18; 21:4, 13, 20;
97:12; 103:3; 110:1, 10;
149:13; 154:4, 11; 155:4;
178:9, 24; 182:19; 191:4
**Millersville** 8:20
**million** 222:4
**mind** 31:3, 6, 23; 38:14;
40:6; 41:15; 54:13; 70:1;
75:9; 84:1; 109:21; 132:6,
23; 141:11; 148:6; 149:9;
161:16; 172:16, 25; 181:6;
204:14
**mind's** 149:1
**minded** 11:23
**minds** 176:20; 212:5
**mindset** 175:21
**mine** 93:10; 128:15;
167:1; 185:11
**minimize** 66:18
**minority** 213:19

**minute** 137:25; 163:19
**minutes** 85:6, 8; 106:20;
114:12; 133:3; 174:9
**misgivings** 123:22
**misjudgment** 164:5
**misleading** 151:3
**misled** 51:25
**misquoting** 73:22
**misrecollecting** 110:17
**miss** 146:15; 147:8;
194:14
**missed** 85:12
**misspoke** 45:11
**mistaken** 36:4
**misunderstanding** 46:7;
188:23
**misunderstood** 15:2;
82:3
**mixed** 135:8; 185:24
**Modern** 97:20; 160:5;
210:17
**modified** 89:24; 130:17
**Mohammed** 176:1
**mom** 222:8
**moment** 83:13; 130:20;
132:7
**Monday** 113:3, 5; 204:14;
209:5
**Mondays** 113:10
**money** 30:23; 34:10;
94:14; 96:16; 100:12;
156:2, 3; 221:25; 222:14
**Monmouth** 8:25
**month** 12:6, 6; 25:12;
112:13; 113:4, 5, 10, 16;
119:10; 125:7, 8; 127:14;
168:20; 169:20
**months** 15:17, 18; 99:15;
117:12, 17; 211:24
**morality** 33:15; 59:17;
87:23; 90:24
**more** 8:4; 10:16; 17:12;
21:8; 22:3, 3; 23:16, 21;
27:16; 35:14; 36:12;
40:15, 25; 41:1; 42:16;
43:14; 47:19; 48:12;
52:11; 53:24; 67:24; 69:3,
3; 70:20; 75:22; 79:19;
83:9; 103:25; 106:2, 22;
108:11; 131:3; 134:1;
140:25; 150:15; 154:21;
159:8; 164:16; 167:11;
168:14; 171:10; 172:7, 10;
174:23; 177:21; 182:17;
190:12; 195:4; 202:3;
209:3, 20; 212:18; 215:17;
221:20; 224:22
**morning** 3:10; 63:12;
197:6
**most** 4:24; 8:17; 41:11;
45:5; 47:19; 51:23; 59:22;
62:9; 82:25; 83:1; 92:17;
107:21; 110:19; 112:17;
120:14; 122:13; 131:10;
133:6; 162:1; 165:14;
171:14; 174:8; 184:18;

205:9; 207:19, 23; 220:5;
223:7
**mother** 138:5
**motion** 50:4, 5; 52:18, 20;
178:14
**motivated** 30:19; 37:10;
78:2; 188:11
**motivating** 30:7; 31:10
**motivation** 78:3
**motive** 188:23
**motives** 49:13, 14
**mouth** 165:1; 184:6
**move** 38:12; 49:13;
154:9; 135:23; 142:6;
191:1, 6
**moved** 50:16
**Mrs** 3:10; 5:21; 7:5; 15:6;
18:17, 21, 21; 20:18, 18;
21:4, 5, 6, 13; 28:10, 10,
17; 31:12; 32:24; 33:14;
38:3; 40:12; 44:21; 46:23;
47:9, 23; 48:17; 49:22;
51:5; 53:1, 16; 55:9; 57:2;
59:9, 24; 60:4, 6; 62:4;
64:16, 20; 65:5, 9, 14;
66:14, 20, 22; 67:14, 17;
68:12; 69:17; 73:16, 20;
74:5, 15, 15, 24; 75:21;
77:14, 16, 23; 79:5; 86:19,
20, 22; 88:10, 17; 91:16;
92:24; 94:16; 95:9, 15;
96:11; 97:12, 12; 102:18,
22; 103:1, 3, 8; 111:13, 19;
114:24; 116:5; 117:3, 20;
122:23; 126:9; 129:13;
130:7, 21, 25; 131:4, 5;
133:20; 134:20; 137:25;
142:19; 143:14; 149:12,
13, 13; 154:4, 11, 21;
155:4; 161:9; 163:23;
169:1; 170:2; 177:25;
178:19; 180:9; 182:18, 19;
183:2, 4; 184:24; 185:5;
186:25; 188:6; 193:21, 22;
196:19; 197:4; 198:17;
205:2; 216:15; 217:1, 10;
218:14; 221:4
**much** 11:8, 22; 16:12;
29:2, 25; 36:8; 46:11; 67:9;
73:19; 87:10; 98:25;
107:19; 123:15; 128:3;
138:23; 140:12; 143:11;
159:6; 165:11; 180:1;
183:15; 184:21; 193:10;
208:2; 221:23
**multi-cultural** 31:5;
32:13, 19; 33:2; 43:2
**Multiply** 161:5
**mural** 149:20, 24; 150:1,
5; 151:13; 153:9, 19
**Murphy** 39:19; 46:24
**Muslim** 136:4
**must** 44:8, 23; 66:9;
112:15, 21, 21; 118:21;
121:6, 7, 11; 155:25;
160:16; 165:13; 186:13,
15; 200:18; 226:1
**Myers** 46:19

**myself** 24:14; 28:11;
39:19; 40:13; 45:11; 59:2,
18; 62:4; 66:8; 86:19;
103:9; 104:7, 9; 149:14;
170:2; 171:17; 181:25;
208:2; 224:13, 20
**myth** 182:1

# N

**name** 3:10; 6:22, 23;
9:18; 11:4; 46:14, 20;
48:22; 95:11; 102:23;
135:22; 141:23; 156:14;
175:25; 187:6; 217:23;
218:15, 23
**named** 148:18
**names** 5:1; 26:2; 129:25;
200:9; 202:6, 7
**Nancy** 223:19
**narrowly** 140:15; 142:21
**nasty** 202:7
**nation** 49:1; 56:12; 182:1
**National** 118:3, 4
**native** 158:20; 212:8
**natural** 147:17, 25;
148:14
**naturally** 90:23; 127:22
**nature** 5:10; 22:7
**Nazarene** 225:18
**Neal** 21:18
**necessarily** 32:24;
181:5; 182:21; 223:24
**necessary** 4:3; 16:15;
74:23; 88:4; 94:15, 24;
95:17; 96:4; 123:16, 20
**need** 4:20; 29:23; 31:25,
25; 40:25, 25; 68:25;
73:18; 76:1; 91:5; 96:8;
127:24; 154:17; 159:13;
161:20; 182:11; 210:6
**needed** 26:20; 59:16;
62:15; 74:23; 112:23;
185:2; 214:5
**needlessly** 6:4
**needs** 23:7, 13, 14, 18;
26:18; 27:17; 35:7; 38:23;
106:13; 161:7; 182:24;
208:14; 213:10, 11;
214:10
**negative** 23:13; 133:25
**negotiating** 92:15
**negotiation** 122:2, 3
**negotiations** 12:24;
13:2; 208:6
**neighboring** 23:15
**Neither** 12:3; 192:13;
206:11; 207:5, 17
**Net** 174:13
**network** 104:2
**New** 8:24, 25; 9:3; 44:2;
45:15; 64:13; 67:20;
68:24; 69:4; 70:14; 72:18;
73:21, 25; 74:16; 76:23;
82:20; 94:18; 96:22;

Case 4:04-cv-02688-JEJ   Document 213-5   Filed 09/27/05   Page 70 of 77

Carol Brown
May 16, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

100:13; 108:20; 223:13
newer 41:10
news 48:20
newspaper 13:15; 14:15;
23:8
newspapers 13:17; 38:6;
128:24; 138:20; 141:13
next 15:4; 27:23; 28:3;
50:23, 25; 72:20, 21; 76:9;
80:21; 111:6, 7, 9, 10, 15;
115:24; 116:17; 119:3;
121:18; 130:25; 178:14;
191:7; 194:7
nice 86:15; 200:10
Nicholas 26:3
night 66:14; 204:19;
206:10, 11; 207:2, 7;
209:2; 219:3
Nilsen 5:18; 18:22; 33:20;
34:18; 52:17, 17; 62:12;
134:16, 17, 21, 24; 144:14;
162:20; 163:11; 164:19;
165:7, 12, 25; 166:5, 16,
19; 167:11; 168:14;
191:22
Nilsen's 62:16; 163:3;
166:19
nine 26:11; 42:7; 52:24;
188:2, 11
ninth 26:10, 10; 126:22;
154:6; 158:4; 171:15
nixed 73:5
nod 4:6
Noel 39:19; 51:9; 52:1;
145:3; 180:15; 190:17;
223:15, 19
nominated 79:17, 19, 23
nominating 81:9, 10
non 52:8; 157:2
None 21:17, 19, 21, 23;
117:16; 206:24; 220:21
nonpublic 152:20; 157:3;
160:1
nonreligious 154:25
nonscientific 107:21
noontime 204:17; 209:5
Nor 61:20; 99:14; 101:16;
135:17; 183:10
Normal 27:10; 70:11;
79:2; 113:2, 2
Normally 113:13;
114:25; 130:23
North 41:8; 220:4
Northern 23:25; 24:2;
67:4
nose 143:1; 165:1
note 160:3
notes 94:1; 220:2
notice 129:24; 142:8;
216:15
noticed 216:13
notices 65:8
notion 32:10; 127:24;
154:2
November 23:4; 30:8;

31:24; 32:16; 37:7, 12;
38:13; 39:7, 22; 42:17, 25;
43:4, 12; 46:8; 47:22; 50:3;
51:7, 7, 18; 58:8, 9; 63:15,
16; 223:1, 2
nowhere 175:24; 176:2
nudity 150:9
number 23:9, 12, 20;
29:2, 6; 31:18; 32:15;
37:19; 44:4; 64:21; 65:10;
67:5; 76:25; 77:20; 97:18;
127:13; 161:6; 205:21;
224:18
numbered 147:11
numbers 191:15



# O

oath 3:18; 122:16; 224:15
obey 56:16, 20
Object 37:13; 55:5, 10;
56:25; 102:7; 125:23;
174:3; 182:25
objected 37:16; 126:15;
150:1, 9; 151:1; 186:12
objecting 48:25; 55:7;
151:16
objection 96:3; 116:20;
147:14; 183:3
objections 3:4; 96:6;
116:23; 126:14; 147:10,
11, 12; 148:1, 17; 154:8;
159:21
objective 193:15
obligated 56:19
obligation 54:23, 24
obligations 54:22; 200:4
obscene 153:25
obscure 170:21
observation 115:23;
134:23; 220:7
obviously 8:18; 59:11;
65:13; 82:17; 84:24;
93:24; 94:2; 100:10;
105:25; 113:6; 138:25;
140:11; 156:2; 158:21
occasion 86:25
Occasionally 115:19;
121:19, 19; 133:20, 25;
142:25; 165:23
occasions 165:18, 21
occur 88:14
occurred 45:13; 86:11;
109:3; 121:16; 128:8;
137:24; 167:13; 221:16;
224:8
occurring 138:11;
167:23
occurs 51:3; 99:2;
100:24; 121:10; 125:25
October 22:4, 4; 48:18;
49:25; 50:2; 58:8; 118:23;
192:5, 7; 194:6; 196:2, 4,
23; 201:3, 5; 202:14;
203:4; 204:15; 206:9

odd 154:12
odds 54:20
off 24:22; 34:11; 76:5, 21;
102:4; 107:20; 119:10;
132:22; 142:2; 156:15;
168:20; 178:6; 210:17;
218:11
off-the-record 218:12
offended 153:15, 15, 24
offense 60:19; 206:22, 23
offenses 122:13, 14
offensive 59:12; 60:11
offer 87:1; 109:20; 156:3;
186:13, 13, 14, 15; 190:16;
197:7; 208:19; 211:22;
224:24
offered 34:4; 85:13;
107:19, 19; 194:25;
196:21; 197:3, 10, 14, 24;
208:24
office 46:15; 66:11;
99:12; 191:23; 209:6;
224:15
officer 80:3; 121:6, 11;
219:24
officers 81:9, 10
officio 43:22; 86:21; 97:3
offshoot 88:25
often 49:15; 74:22; 80:2;
117:5; 121:18; 132:11;
164:5; 165:4
old 56:10; 74:1; 77:1;
215:21, 22
once 90:4; 99:25; 104:25;
107:6; 135:24; 156:15;
160:23; 172:19; 211:20
one 3:11; 12:21; 17:7;
23:23; 24:13; 25:21;
29:20; 34:7; 35:7, 12, 13;
36:21; 37:8; 38:6; 42:16;
44:4; 45:19; 46:5, 13, 14;
47:19; 48:25; 49:1, 23;
53:4; 55:23; 56:12; 58:25;
59:18, 20, 23; 61:16; 65:3,
6, 11; 66:9, 10; 67:6, 11;
68:10; 69:15, 16; 72:24,
24; 73:22; 75:8, 11; 76:2;
78:24; 79:19; 82:25;
87:10; 90:14; 92:1; 93:15;
95:9; 96:15, 16, 16; 97:19;
99:18; 101:3, 8; 102:22;
103:21; 104:12; 114:13,
21; 119:8; 121:3; 127:3,
13, 14, 21; 128:11, 13;
129:21; 132:21; 135:18;
136:5, 14; 138:5, 18, 20,
22; 140:11, 14; 141:4;
142:24, 25; 143:2; 145:4;
147:12, 13, 25; 148:17;
156:21; 159:1; 161:16;
164:21, 25; 165:2, 13;
167:21; 168:14; 175:9, 22;
176:16, 16, 24; 177:3, 4,
21, 22; 178:18; 180:13;
181:5, 6; 185:12; 186:11;
187:21; 188:4, 14; 189:15,
15; 190:12; 193:2; 199:1;
200:7; 204:20; 206:14, 16;

207:20; 208:19; 210:18;
211:17, 17; 212:6; 213:12,
23; 216:16, 19; 221:3, 3;
225:5
one's 38:6; 66:9, 11, 16;
82:8; 206:15; 224:15, 15
ones 24:11; 30:20; 38:14;
45:20; 73:21; 74:1; 221:4
ongoing 5:1, 2, 8; 122:1
online 170:20
only 7:22; 29:20; 49:14;
53:15; 58:17; 59:20; 62:9;
97:2; 102:1; 103:21;
121:23; 122:13; 135:13;
143:2; 148:12; 151:15;
159:18; 163:11; 165:2;
168:21; 170:25; 171:4;
174:4; 176:17; 180:4;
184:4; 187:6; 190:22;
192:16; 194:2; 197:4;
200:24; 213:23; 215:12
open 38:23; 40:8; 41:23;
50:7; 178:4, 6; 182:16;
207:2; 212:5, 6, 8
opened 65:20; 129:8
opening 54:12; 65:17;
135:4
openly 165:5
openness 40:17
operated 69:4
opinion 52:3; 62:12, 16,
16; 64:9; 76:3; 124:3;
155:2; 174:17; 199:25;
203:24; 210:5
opinions 40:2, 18; 41:1;
56:17, 18, 20; 68:7; 77:22;
143:19; 212:20
opportunities 30:17;
124:1
opportunity 67:21; 69:5;
83:4; 99:10, 18; 111:12;
124:2, 6, 11, 12; 125:22
opposed 45:15; 59:3;
60:22; 61:17; 180:2; 200:8
opposite 131:7
opposition 145:6;
180:19; 181:1
order 66:10; 101:20;
121:12; 189:5; 193:2
ordered 161:6
ordinary 36:18; 114:22
organization 82:13
organizations 19:11, 20
orientation 90:19
oriented 106:22
origin 60:24
original 130:11
origins 126:16, 18, 20;
150:8, 17; 154:14, 24;
158:1, 1, 3; 161:19;
186:15; 195:9, 10; 197:9,
15
others 8:14, 15; 41:23;
77:16; 128:12; 135:20;
190:23
Otherwise 93:23; 104:8;

135:16; 163:2; 212:21
ours 189:9
ourselves 206:12
out 27:4, 14, 21; 28:4;
32:17; 37:9; 38:10; 43:4;
45:8; 46:15; 58:11; 59:6,
10, 13, 25; 62:11, 18; 75:8;
81:18; 84:24; 89:19;
90:10; 93:24; 100:10;
103:18; 109:21; 110:23;
112:17; 127:11; 128:10,
24; 132:6, 23; 141:11;
142:21; 143:21; 145:4;
148:8; 153:7; 157:1, 1, 4;
159:11, 12, 17, 19; 160:1;
161:15; 167:16, 22;
171:17; 172:23; 174:13;
177:22; 181:6; 185:1;
194:22; 195:7; 199:1;
206:10; 207:4; 209:2;
211:21, 22; 219:21
outline 105:19
outside 18:3; 20:9, 23;
52:11, 13; 56:16; 86:9, 23;
122:20; 158:24; 219:6;
220:1, 5
over 7:18; 17:20; 69:3;
77:20; 78:6; 90:1; 114:10;
128:4; 159:2; 161:3;
184:15; 192:13; 205:2;
217:13; 220:14
overall 42:19; 145:20;
176:24; 177:3; 222:4
overboard 89:21
overheard 138:15;
224:11
overlap 14:2; 65:4
overview 197:1
owed 216:5
own 31:3; 40:2, 3; 60:21;
65:25; 66:6, 6, 6, 23;
67:25; 68:6; 73:11; 84:1;
86:5; 107:14; 123:22;
129:5; 131:22; 134:18;
156:15; 172:13; 173:10;
174:5; 180:4; 189:14;
191:20; 197:8; 199:21, 25;
202:25
Oxford 171:6

# P

p.m 226:9
PA 171:25
page 147:12; 153:7, 7;
205:16; 216:16
pain 140:18, 18
painful 59:21, 22; 60:15
painted 149:20
Pandas 111:4; 137:10;
144:11; 152:5; 168:2, 6,
21; 169:4, 5, 7; 172:12;
179:3; 182:21; 185:19;
186:1; 187:1; 189:22;
190:2; 191:3, 24
paper 13:23

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Carol Brown
May 16, 2005

papers 13:20
paragraph 216:20
paragraphs 216:17
pardon 10:9; 13:16; 51:8; 78:14; 225:7
parent 23:7, 13; 213:10
parents 23:14, 18; 154:17
Parliamentary 224:22
parochial 157:2, 3; 160:1 31:7; 34:22; 39:13; 40:18; 43:3; 65:1; 66:21; 70:11, 12, 19; 71:2, 21; 76:25; 78:1; 81:25; 82:1, 3; 85:10; 89:15; 95:1; 100:21; 101:15; 102:24; 109:12; 111:21; 124:21; 125:14; 127:19; 130:1, 3; 132:8; 138:12; 149:2; 156:22; 162:24; 166:2; 167:25; 168:1, 18; 178:13; 183:25; 192:9, 10; 193:15; 194:14, 15; 204:23; 209:22; 211:18; 214:10; 217:22; 220:8; 224:11
partially 7:15
participate 31:10; 67:21
participated 208:6
participation 36:17; 89:1, 8; 90:21; 159:23
particular 12:21; 27:14; 28:12; 29:17; 40:6; 43:8; 58:25; 62:25; 69:16; 75:8; 104:3; 106:15; 108:19; 109:11; 115:10, 15; 131:19; 148:20; 149:16; 153:16; 156:25; 182:19; 203:23; 204:1; 220:3, 19
particularly 75:18; 106:3; 206:18
parties 3:3; 16:22; 52:9
partisan 52:8, 10
parts 24:4; 149:18
party 5:23, 25; 6:1; 166:9, 15
pass 57:9; 144:22
passage 63:19
passed 20:6; 202:24
past 49:16; 101:25; 190:5; 198:16
Pastor 155:4, 7
Pastors 154:18
Pat 7:6
path 135:18; 210:1, 2, 3; 211:7
Patrick 3:10
patriotism 59:1
pattern 116:24, 25
pause 66:1, 3
pay 28:22; 207:14
paying 123:13
peculiarity 64:25
pejorative 42:22
pending 6:8

penetrating 112:8
Pennsylvania 6:25; 8:22; 44:24; 67:22; 74:10; 115:14; 118:1; 161:5
people 14:24; 16:21; 17:16; 18:4, 10; 40:7, 25; 43:6; 47:19; 67:8, 11; 68:20; 78:5; 90:12, 13; 101:23; 115:20; 117:22; 131:21; 135:9, 9, 16; 143:2; 153:11; 164:16, 21; 168:2, 21; 169:4; 173:15; 174:9; 179:10; 182:22; 184:1; 186:9; 192:18; 197:22; 202:5, 8; 207:18; 210:16; 214:22; 215:4, 10, 17; 216:4, 8; 221:17; 224:1, 23
Pepper 10:23
per 15:6; 35:11; 44:24; 60:21; 73:24; 79:9; 125:19
perceive 7:9, 21, 22, 24; 135:13; 158:8
perceived 199:22
perceiving 140:13
percent 58:16
perfect 108:14
perfectly 47:9
perhaps 11:5; 46:7; 73:11, 13; 74:4; 82:25; 101:9; 108:23; 110:14; 130:13, 15; 136:3; 141:6; 154:13; 182:23; 188:23; 191:1
period 7:19, 23; 8:1; 17:20; 20:25; 21:3, 6; 23:10; 24:24; 30:15; 35:22; 41:6; 42:17, 19; 47:3; 48:11; 56:3, 5; 84:18; 85:1, 2, 9, 11, 22; 87:21; 98:14; 99:24; 100:25; 101:7; 117:15, 21; 120:5; 124:23; 133:10; 137:8; 140:16; 144:15; 147:16; 153:3; 202:14, 19; 208:18; 214:1, 15
permitted 111:22
persecution 135:10
person 3:24; 6:8; 17:4; 53:7; 61:10, 12; 78:7; 79:19; 102:2; 112:5; 123:10, 11; 139:18; 218:16, 17, 18, 20
person's 46:14, 20; 217:4, 17; 218:23
personal 30:21; 42:23; 49:15; 56:20; 62:11; 65:24; 66:9; 76:3; 85:1; 91:1; 93:2; 117:24; 118:5; 126:11, 25; 143:15, 17, 18; 155:2; 170:25; 176:14; 189:4; 201:13; 202:3; 209:22, 24, 25; 210:5; 225:14
personally 54:11; 94:15; 134:6; 151:13; 153:15; 155:2, 13; 202:13
personnel 162:20;

163:1; 166:2, 22, 25
persons 14:10; 19:15; 40:10; 132:9
perspective 22:16; 111:6
Peterman 163:20, 20, 25; 164:3, 6, 11, 12, 14; 165:13, 25; 166:16, 22; 167:3
Peterman's 163:9, 10; 166:10, 12
petri 34:4
phenomenal 207:13
phone 184:15; 199:19; 200:10
photocopy 130:9
phrase 126:6
physical 135:14; 142:24; 158:4, 5, 8, 11
physically 88:9; 164:25
Physics 9:20; 97:7; 103:16, 19; 104:10, 15
pick 102:9
picked 33:21
picture 42:19; 123:12; 148:18; 150:8
pilot 30:24; 34:1
piloted 31:4; 34:3
pinpoint 118:11; 147:1
pique 107:20
place 20:21; 21:1; 22:2; 56:15; 73:19; 121:21; 140:7; 141:21; 146:18; 166:19; 190:25; 191:17, 19; 193:17; 213:6, 8; 218:21; 219:1, 4, 6; 220:3, 4
placed 114:19; 125:15; 191:25
placement 106:15; 113:22
plain 31:25; 88:2
Plainly 3:21; 9:15; 37:8; 43:1; 105:10; 128:11; 129:15; 168:4; 177:23; 192:4; 194:7; 211:12
plaintiff 5:25; 6:8
plaintiffs 3:15; 14:22, 24; 101:16, 18
planned 170:5; 206:10
planning 22:11; 47:17; 112:14, 18, 24; 113:3, 11, 13; 114:1, 1, 10
plant 159:9
platform 32:24
play 94:13; 164:21; 197:2, 18
plays 65:9
pleasantries 20:6
please 4:4, 9, 12, 15, 25; 6:21; 26:2; 60:20; 78:16; 101:1; 120:10; 129:22; 140:23; 155:21; 201:20
pleased 107:18
Pledge 48:14; 49:4; 50:13; 54:3; 55:1, 13, 15;

56:4, 13; 57:10; 70:4; 135:2; 205:14
plus 200:1
podium 78:10; 131:8; 165:22
point 4:15; 12:9; 30:5; 31:4; 41:4; 49:6, 21; 51:1, 5; 52:11; 63:8; 65:11; 74:17; 75:15; 76:16; 78:4, 9; 83:22; 84:23; 89:21; 94:16; 98:25; 99:19, 22; 107:20; 110:16; 129:9, 19; 134:19; 137:11; 138:5; 143:13; 144:6; 145:7, 11; 147:9; 150:18; 154:15; 157:6; 160:16; 161:17; 162:10; 167:2; 168:19; 172:13; 185:22; 186:22, 22; 188:2; 190:6, 9; 193:1; 194:14; 195:15; 197:7; 202:25; 203:2, 4, 12; 206:7; 209:16; 214:25; 220:12; 222:7
pointed 110:21; 118:14; 176:22
points 93:14; 128:2; 195:17
policies 88:25; 89:9, 25; 90:1, 5, 22, 24
policy 43:17; 44:2, 5, 10, 13, 15, 17; 47:4; 86:6, 17; 90:3; 154:18; 155:15, 16, 19; 156:4, 10; 191:17, 18; 197:12; 207:25; 214:5
political 52:6, 8, 10; 78:12
politically 9:9; 78:1
politics 135:8
pop 142:25; 164:25
population 56:9
portion 40:6; 50:8; 82:7; 120:12, 18, 25; 123:3; 126:1; 129:17; 137:21; 172:20; 187:23; 188:5, 19; 213:1
portrayal 150:14
portraying 151:2
position 27:5; 43:20; 45:7; 54:7; 59:3; 75:25; 80:17; 81:12; 83:2; 161:23; 179:7; 181:4; 186:1, 12; 191:2, 23; 199:2, 4, 21; 200:12; 211:21; 212:10; 224:3; 225:17
positions 43:15; 47:20; 52:23; 79:1; 92:21; 165:10; 197:2; 198:16
positive 165:13
possibility 88:13
possible 19:21; 36:9; 55:21; 82:11; 119:25; 161:24; 194:19
possibly 35:15; 207:20
post 9:16; 10:1; 30:2; 105:10; 209:6
potential 34:12

pounded 165:22
Practically 112:4
practice 104:23; 115:21
practices 46:25; 218:4
practicing 48:24
pray 87:15
prayer 56:6; 70:3; 87:18, 24; 91:5; 187:19
preceded 192:14
preceding 46:15; 100:17
precise 15:24; 86:15; 108:11, 13; 204:18
precisely 147:1; 223:1
predated 223:4
prefer 139:13; 184:5
preferably 31:1
preference 219:23
pregnancies 24:23
prejudice 42:22
premie 223:21
Prentice 97:20; 110:12; 147:24; 160:6; 182:14
preparation 10:20, 21; 14:5, 12, 22; 15:1, 5, 6, 15
prepared 116:14; 119:3
Presbyterian 8:24
present 7:18; 49:5, 7; 50:9; 58:7; 71:6; 84:25; 101:24; 102:3, 6, 18; 184:10; 193:10; 214:13; 218:22
presentation 97:15; 104:1; 165:16
presentations 131:16
presented 32:8; 67:22; 97:19; 149:19; 150:8; 162:24; 204:19
presenting 115:20
presents 71:4
Presidency 79:20
President 39:17; 43:17, 21, 23; 44:20; 45:12; 47:2, 5, 13; 50:21, 24, 25; 51:1, 9, 11; 52:1; 79:5, 16; 80:5, 7, 9, 11, 21; 81:3; 83:3; 84:19; 86:20; 97:4; 109:7; 163:1; 205:25; 214:2, 5, 20
President's 109:6
presiding 121:6, 11; 219:24
pressure 53:6, 21, 22; 54:1; 182:7; 183:14, 14; 184:9; 200:13, 15
pretend 171:10
pretty 169:3; 194:24; 200:18
prevent 215:19
previous 51:17; 97:22; 104:25; 114:12
previously 42:7
pricey 221:24
pride 207:22
primarily 29:21; 113:13; 147:22

Filius & McLucas Reporting Service, Inc.    Min-U-Script®

(13)  papers - primarily

Carol Brown
May 16, 2005

Tammy Kitzmiller, et al.    v.
Dover Area School District, et al.

primary 22:24; 30:20; 185:4, 9
Principal 34:24; 163:15, 16, 17; 164:4
principals 131:11; 163:18
principle 102:7
principles 53:20; 54:8
Prior 20:22; 39:9; 41:4; 51:2, 14, 17; 92:10, 13; 93:15; 98:15, 16, 25; 100:5, 15; 116:3; 121:4, 10, 17; 124:5; 126:13; 127:5; 156:23; 170:8; 173:25; 192:6, 11; 193:6; 196:16; 206:8; 223:12
private 52:2; 123:21; 152:19, 20; 171:2; 191:14
privately 64:8; 200:10
privilege 12:11; 30:13; 31:7; 122:19
privy 116:11; 124:21; 133:7, 16, 17; 184:1, 13; 200:22
pro 98:24; 182:10
Probably 15:20; 20:5; 21:15; 22:4; 24:20; 48:4; 70:21; 141:3; 164:15; 167:12; 175:21; 204:9
problem 11:25; 37:5; 192:10; 198:1
problematic 94:10
problems 31:15; 54:14; 191:16; 192:15; 201:21; 213:11
procedure 79:2; 224:14, 22, 22
procedures 112:20
proceeding 6:13
process 3:17, 23; 4:1, 7; 34:19; 35:25; 36:23; 37:24; 58:2; 70:20; 71:3, 17; 72:9, 14, 17; 76:13, 23, 25; 77:5; 81:9, 10; 83:13; 84:6; 85:16; 92:15; 100:20; 109:5; 118:24; 122:3; 139:10; 140:24; 156:22; 160:21; 162:25
processes 21:10
processing 119:19
produced 63:12; 164:10; 179:16; 220:7
profane 59:4
professionals 102:1
Professor 155:8
program 32:2, 7; 33:7, 17, 21, 23; 34:1, 6, 11, 14; 37:1; 42:21
programs 26:20, 23; 30:24; 31:5; 43:2; 67:22; 109:17
project 28:15, 23, 25; 40:21, 22, 23; 41:2, 4, 7, 13; 42:6; 45:18; 81:21; 82:1, 6; 208:9
projects 41:17

prominently 19:24; 38:14
promised 221:24
promulgate 89:25
promulgated 154:19
pronounced 117:22
proper 120:1; 224:16
properly 207:18; 215:4
properties 158:9
property 153:13
proposal 221:19
proposals 224:24
propose 70:25; 71:1; 170:5; 172:15
proposed 33:18, 19; 40:21, 24; 41:13; 106:9; 135:1; 172:10; 194:9, 19; 195:13, 22; 196:21; 197:14, 16; 198:8, 13, 24; 201:8; 209:21
proposing 197:5
pros 97:19
protest 45:23
proud 38:6
proven 162:1; 175:17; 215:22
provide 165:24; 177:5
provided 14:16; 24:9; 129:18; 152:2; 155:25; 205:13
providing 58:22
province 158:11
public 31:10; 44:24; 49:23; 58:10, 12; 59:10, 14; 60:1; 61:5; 64:2, 3; 69:2; 74:13; 77:11; 79:9; 82:18; 89:1, 8; 90:20, 21; 98:19; 111:21, 24; 112:5; 117:25; 119:23; 120:8, 12, 17, 25; 121:7; 123:3; 125:2; 126:1; 129:16; 131:9; 132:3, 8, 9; 137:21; 152:18; 156:24; 157:2; 164:25; 165:19; 166:10; 171:2; 184:22; 205:18; 219:22; 222:8
publicly 119:21; 180:20; 183:5; 190:9, 11, 11; 200:9
published 147:18; 170:20
publisher 170:21, 22
publishers 100:8; 161:7
pulling 172:23
purchase 72:3, 6, 8; 74:13, 21; 76:5; 96:10; 100:6
purchases 71:1; 95:20
purple 136:3
purpose 3:18; 7:4; 12:9, 15; 36:25; 120:15; 121:9, 13; 172:9; 197:23
purposes 218:22
purview 54:21; 62:13; 103:12
put 27:20; 38:10; 42:3;

44:4; 52:17; 76:5; 86:13; 106:19; 119:3; 130:18; 150:22; 174:8; 178:25; 187:3; 191:17, 18; 210:14; 212:14; 220:2
puts 106:20
putting 66:16; 76:14; 102:5; 117:9; 132:22; 197:11

Q

Quaker 188:7; 190:4
qualified 154:23
queried 160:19
query 74:3
Quest 34:9
questionnaire 162:23
quickly 169:17; 205:2; 222:10
quite 10:13; 16:1, 17; 27:21; 34:22; 68:3; 119:25; 128:25; 132:22; 179:22; 194:23; 217:14
quote 60:20; 61:18; 89:5; 126:5; 137:1; 182:3; 198:9
quoted 190:11
quotes 13:23, 24
quoting 158:6; 181:25; 190:22

R

racial 90:18
radar 76:21
Raise 112:6
raised 27:6; 44:16
ran 25:12; 26:25; 27:12; 30:8; 40:2; 41:20; 46:10; 81:2; 213:10, 16
Randy 46:19
range 225:17
ranges 122:9
rankings 29:25
rare 121:15; 206:11
rather 12:16; 144:22; 162:17; 165:19; 173:17; 183:23
reach 81:1, 2
reached 89:21; 116:13; 122:4; 173:1; 186:22
react 143:9; 144:16
reacted 48:16
reaction 129:6; 132:8, 8; 181:8
read 86:3; 105:1; 106:6; 107:2, 9, 9; 141:16; 142:1; 169:20; 170:18; 173:8, 18, 25; 174:13; 175:1, 10, 11; 176:20; 204:22; 209:5; 217:3, 12; 220:2
readability 106:19; 171:23

readily 100:1; 173:9
reading 56:7; 87:18; 150:2; 172:21, 24; 173:20; 176:5, 9
ready 102:9
real 42:10; 89:9; 201:24
realize 31:17; 61:20; 221:25; 222:2
realized 23:16; 31:19; 207:17
really 6:3; 24:20; 73:17; 74:8; 77:6, 8, 10; 95:16, 17, 19; 106:25; 108:11; 109:12; 110:24; 128:17; 132:22; 133:11; 139:18; 140:10; 141:17; 145:9; 149:16; 156:5; 158:17; 172:20, 23; 173:19; 177:15; 178:11; 201:9; 220:21; 222:24; 223:2
reason 24:6, 3; 123:9; 130:13; 147:7; 180:12; 203:23; 204:1
reasoning 199:5
reasons 95:13; 121:24; 179:6; 190:7
recall 7:21; 13:22; 33:9; 34:23; 40:15; 45:1; 46:4; 48:1, 17, 22; 50:11, 14, 20; 51:20; 52:23; 53:13; 57:21; 58:12, 14; 59:11; 60:5, 25; 62:7, 19, 21, 23; 63:4; 69:13; 70:5, 8; 71:12; 72:1, 3, 6; 73:6; 74:2, 12, 20; 76:21, 22; 78:22; 79:21; 81:19; 84:5, 17; 85:3, 4, 13, 21; 87:4; 89:3; 91:7, 22, 24; 93:25; 94:12; 95:7, 11; 96:5, 20; 97:4, 10, 16; 98:1, 10, 18; 101:6; 102:23; 103:17; 104:14; 107:11; 108:16; 109:19; 110:25; 111:7; 113:15, 19; 116:8, 11; 117:4, 5, 11; 119:25; 120:2; 123:1, 2, 6, 8; 124:25; 125:18; 128:21; 132:10, 12, 25; 133:2, 4, 22; 134:3, 7, 15, 18; 136:13, 21, 24, 25; 137:7, 10, 12, 14, 15, 21; 138:1, 6, 19; 139:2, 10, 14, 16, 17, 19; 140:10; 142:12, 14; 144:11; 145:5, 8, 13; 146:5, 22, 25; 147:3, 14; 149:12, 15; 150:17; 151:18, 22; 152:1, 3, 4, 6; 11; 157:5, 25; 159:18, 22; 162:11; 163:6, 20, 23; 165:18, 21; 168:15; 169:9; 175:1, 7, 9; 177:13, 24; 178:13, 20, 23; 179:6, 8, 17, 23; 180:25; 181:5, 11, 16; 183:2, 2; 184:23; 185:17, 25; 186:7; 187:10, 11; 192:4, 4; 193:18, 24, 25; 194:3, 10; 195:11; 196:25; 198:7, 10, 12, 16, 21, 23; 199:10, 12; 202:18, 21; 222:7, 18

recalling 138:25
receive 65:8
received 14:12; 169:19; 172:8; 197:5; 200:10
recent 4:24; 8:17; 99:15
recently 19:4; 25:17
recess 48:7, 8; 101:13, 14; 157:14, 15; 219:10, 18, 19, 24
recesses 219:21
recited 55:1, 15
recognition 113:18; 114:4
recognize 146:25
recollection 11:20; 51:5; 60:11; 69:22; 79:1; 83:12; 92:23; 98:20; 102:20, 25; 103:5, 11; 111:9; 118:11; 125:20; 139:24; 154:10; 167:20; 182:18; 186:4; 195:10
recollections 129:5
recommend 126:3
recommendation 71:14; 76:14; 100:3; 144:19
recommendations 37:4; 71:5, 6, 9, 18; 72:1; 87:14; 92:7; 98:19; 103:20; 144:24; 160:22
recommended 90:3; 97:22; 99:7; 103:23; 144:18, 24
recommending 97:20, 109:15; 110:4
record 6:22; 48:10; 86:5; 92:24; 130:6; 138:21; 184:3; 204:22, 23; 217:22; 218:11; 225:1
recorded 6:17
records 29:20
refer 146:2
reference 54:7; 61:17; 94:2; 144:6; 146:7; 149:2; 151:11; 153:8, 8; 171:4, 5; 185:14; 186:5, 6
referenced 10:1; 14:4; 16:1; 173:6; 196:1
references 136:10; 137:18; 171:1
referencing 14:17; 60:15, 17; 117:20; 118:25; 133:9; 138:14, 16; 143:3; 144:11; 151:23; 200:14, 19; 209:18; 220:13
referred 100:17; 101:2; 145:17; 146:4; 150:21
referring 5:22; 29:6; 51:6; 86:5; 110:1; 126:19; 150:22; 179:9; 200:16; 225:3
reflect 56:8
reflects 92:24
Reformed 188:7
refused 45:11; 180:12
regard 172:3; 183:16

Tammy Kitzmiller, et al.  v.
Dover Area School District, et al.

Carol Brown
May 16, 2005

regarding 12:14; 122:7; 154:14; 166:22; 171:21
regardless 74:23; 105:24
regards 5:2; 12:5, 8; 28:15; 135:2; 184:4
region 66:25; 67:3, 7, 8
regions 67:5
regret 53:17, 18; 57:6; 222:1, 6
regretfully 223:13
regular 23:25; 106:12; 114:21; 162:13; 169:24; 170:21; 185:12
Rehm 110:14, 15
reiteration 198:16, 21
rejected 155:23
relate 38:8; 48:12; 90:24; 122:2; 167:23
related 5:14, 15; 6:2; 11:14, 15; 12:6, 9, 12, 15; 13:13; 16:5, 24; 21:7; 41:7; 54:3; 70:9; 90:7; 92:19; 94:21; 95:16; 96:1; 97:24; 122:4, 9; 147:22; 157:7; 161:18; 175:2; 179:22; 193:18; 208:3; 209:10, 12
relates 21:10; 22:9, 9; 35:25; 44:5; 57:4; 90:14; 121:25; 122:10; 192:2; 193:14; 212:11
relating 21:9; 22:11, 12; 33:11; 48:20; 64:22, 24; 74:4, 6, 13; 87:22; 97:15; 109:14; 123:2; 134:8; 146:19; 155:16; 173:3; 196:2
relation 17:3; 147:2
relations 122:5
relationship 18:5, 12; 25:5; 207:1
relationships 16:21; 17:9, 13
relevant 44:8; 188:25
religion 63:23; 69:24; 88:23; 135:8, 11, 12; 175:10; 188:20; 198:2
religions 136:6; 211:23
religious 58:20, 21; 68:13; 126:11, 25; 127:18; 135:10, 16, 22; 136:10; 137:17; 153:16; 154:24; 161:23, 24; 175:12; 176:10, 12; 186:17; 187:20, 21; 188:23, 25; 189:23; 220:25
religiously 188:11
remain 193:3; 195:6
remained 68:2, 2; 154:15; 186:24
remaining 44:6
remains 12:22; 55:23
remark 59:12
remarks 60:1
remember 24:13; 37:23; 46:13, 13; 47:11; 50:10;

52:25; 53:7; 58:4; 61:21; 62:20; 70:2; 73:10; 77:8; 87:20; 101:9; 116:22; 128:15; 129:4; 137:1, 2; 140:25; 141:1, 5, 6, 20; 144:4; 145:1; 148:23; 149:1, 16; 164:24; 168:4; 180:15; 192:1, 14; 201:6
removal 87:24
renovations 41:7
reorganization 43:25; 44:22; 45:21; 46:25; 50:23; 51:2, 10, 13, 17; 78:23; 79:2; 81:7, 18
repeat 210:6
repeatedly 190:9
rephrase 105:16
report 114:13, 14, 18
reported 141:13
reporter 23:8, 21, 23; 102:2; 183:11; 184:2; 205:3
reporters 24:8
reporting 184:4
reports 115:20
represent 10:14, 16; 54:24; 67:7, 11; 136:1; 189:10, 10; 207:18; 215:4
representative 30:14; 43:18; 115:11, 14, 15, 17
representatives 130:23; 131:8
represented 95:9; 109:24
representing 66:11; 68:4, 20; 95:10, 12; 102:25; 103:6, 10; 189:11
reprimanded 153:9; 156:16
repudiated 208:23
requested 125:18
require 113:25; 114:2, 6, 10
required 56:24; 89:22; 94:23; 144:21; 155:23; 162:2
requirements 105:20, 21; 107:10; 108:15; 109:18; 172:24
rescheduled 113:7
research 170:24, 25; 171:7; 173:15
researched 170:20
reservation 124:17
reservations 173:23
reserved 3:5
resign 22:10; 204:10, 14; 206:4
resignation 204:15, 19; 205:5, 7; 206:7; 209:22; 211:19; 215:1; 216:7
resignations 47:24
resigned 25:10; 44:19; 45:25; 49:11; 82:18; 201:6; 204:4; 211:18, 20;

222:20, 21; 223:16
resigning 207:5; 209:16
resolution 52:21, 25; 53:6, 16, 19; 54:2, 6, 18; 55:14, 17; 56:22; 57:10, 22, 24; 58:5; 60:22; 63:17
resolved 72:7
respect 28:17; 29:11; 78:4; 88:16; 90:12, 15; 166:16
respectful 165:16; 214:17
respective 3:3
respond 7:9; 50:15; 88:3; 132:1, 4; 161:19; 182:4; 183:10, 10
responded 49:23; 88:4; 142:15
responding 139:2; 142:12; 154:2; 161:13
responds 16:17
response 16:2; 32:22; 63:12; 74:2; 139:19; 142:18; 153:5; 183:3; 185:9, 10; 214:18
responsibilities 52:12; 54:22; 64:23; 66:8; 68:1; 117:24; 118:6; 200:3; 224:15
responsibility 27:15; 28:14, 18; 29:12; 43:11; 55:17; 71:8; 90:16; 95:2; 98:2; 104:6; 105:5; 166:20; 200:5
responsible 29:4; 65:17; 151:7; 163:13; 189:6; 194:12; 214:3; 220:10
responsive 16:10; 38:23; 212:24
responsiveness 39:5, 11, 13
rest 62:5; 89:16, 17; 133:4; 170:3; 186:14
result 127:11; 140:20; 173:2
results 162:21, 24
retained 10:13, 16
rethink 211:21
retired 153:10; 155:7
retreat 100:24; 101:1, 3, 6
retreats 214:7
retroactively 112:16
retrofit 221:19
return 60:23
Reverend 155:6
review 14:14; 31:3; 70:11, 12; 71:3, 5, 17; 72:9, 17; 75:12; 76:23, 25; 84:25; 90:3; 92:6; 97:9; 99:10, 10, 11, 18, 21; 100:4, 16; 104:8; 105:9, 14; 106:18, 24; 107:7; 111:13; 124:7, 11, 13; 125:23; 141:17, 18, 19; 156:22; 162:25; 163:3, 7, 18; 165:25; 173:2; 175:13;

208:13
reviewed 37:24; 72:25; 90:1; 97:18; 103:22; 104:11, 25, 25; 107:6; 108:21; 119:6; 123:25; 163:16; 172:16, 18
reviewers 175:7
reviewing 90:20, 22; 99:16; 104:23; 105:17; 170:15
reviews 173:15, 18; 174:1, 14, 16, 20; 175:1, 4
revision 197:10, 16; 199:9
revisit 155:15
revote 182:14
Rhetorical 128:22
rid 210:22
ride 87:2, 2
right 6:21; 10:13; 16:1, 17; 17:7; 33:16; 43:12; 46:21; 48:1; 58:18; 59:2; 60:10; 70:24; 76:4, 24; 78:21; 83:24; 84:12; 93:8; 97:10; 99:8; 101:23; 102:9; 103:14; 111:6; 112:11; 116:15, 21; 117:2; 123:17; 124:5, 8; 125:2; 128:6; 129:20; 130:21; 132:15; 135:15, 17; 144:20; 145:23; 149:19; 152:10; 153:8, 12, 14, 21; 157:20; 161:10, 15; 166:19; 169:13; 181:22; 183:17; 189:15; 190:18; 192:24; 215:2; 219:11; 226:3, 5
ring 79:15
rival 46:10
Road 6:25; 214:3, 20
Robert 20:19; 32:5
robin 154:9
Roger 39:19
role 25:1; 34:18; 62:13; 87:3; 97:3; 98:1; 103:12; 159:22
Roman 136:4; 218:3
room 58:16; 131:13; 192:17; 193:14; 219:21
roomful 38:7
rotation 80:15
Rothschild 3:3, 11, 18; 14:4, 11, 14; 141:22
round 154:9
rule 80:25; 131:6; 135:19
rules 79:25; 120:20
ruling 210:13
rumors 133:7
run 22:11; 23:6; 26:25; 27:4, 18, 23; 28:7; 46:24; 47:22; 54:18; 185:17
running 29:11; 30:5; 32:19; 33:13; 37:9, 21; 39:7; 43:7; 45:3; 81:8; 118:18; 221:6, 8, 11
runs 169:16; 201:20

Russell 18:22, 24, 25; 34:22; 130:2
Rutgers 8:21; 9:2, 5

S

sake 6:21
salary 122:9
Salem 41:9; 220:4
same 4:11; 17:15; 21:4, 13; 24:22; 25:3; 46:17; 60:8; 62:22; 78:7; 87:20; 88:18, 19; 97:21; 99:6; 116:23; 122:18; 125:7; 131:9, 17; 141:6, 7; 143:16, 18; 187:18; 190:17; 193:11; 198:18; 199:24; 200:7; 204:19; 208:4; 210:20; 211:4, 7; 213:23; 214:15; 218:3; 223:5, 23, 25
sample 106:4
Sandi 21:16
SAT's 29:22
satisfactory 163:6, 8; 189:6
Saturday 206:8
saving 217:10
savings 221:25; 222:2
saw 12:7; 30:7; 31:25; 40:17; 41:9, 14; 52:10; 56:22; 63:24; 78:11; 83:18; 88:13; 102:14; 128:18; 151:3; 173:7; 186:17; 188:10; 196:20; 197:2; 207:9; 210:7; 211:6, 8, 16; 212:13; 213:10; 221:11
saying 4:13; 15:21; 20:8, 11; 27:24; 31:17; 41:21; 57:3; 62:23; 68:17; 88:9, 13; 89:14; 116:16; 127:18; 137:1, 2, 15; 139:17; 144:4; 151:5, 6; 152:12; 176:1; 179:23; 184:8, 11, 23; 188:4, 10, 10, 13, 17; 193:25; 198:24; 199:10, 12; 203:3; 208:20, 21; 209:8; 225:8, 9
scale 171:23
schedule 113:2, 3
scheduled 191:10
schedules 101:21, 22
scheduling 113:8
Schmidt 3:14; 11:7; 37:13; 50:22; 55:5; 56:25; 91:13; 110:5; 119:8, 11, 16; 146:1, 8; 148:25; 157:10; 174:3; 206:24; 226:7
scholarships 30:1
School 3:12, 13; 5:3, 23; 6:10; 8:12, 13; 15:22, 24; 16:25; 17:4, 8, 12, 18; 18:4, 6; 19:12, 18; 22:15, 19; 23:9, 22, 24; 24:1;

Carol Brown
May 16, 2005

Tammy Kitzmiller, et al. v.
Dover Area School District, et al.

25:1; 26:19; 27:8, 23;
28:16, 21, 23, 25; 29:3, 20;
30:14; 31:22; 34:2; 40:22;
41:8, 9, 13; 43:2, 19; 44:4,
18, 19, 24; 48:22, 23; 52:5,
7, 12, 13; 55:22, 23; 56:6,
7, 8, 15, 19; 57:10, 13, 25;
65:2, 7, 12; 66:25; 67:1, 2,
3, 9, 16, 21, 22; 70:3; 71:4;
72:15; 73:3; 74:6; 76:11;
79:9; 81:21; 82:1, 13;
85:18, 19, 21; 87:15, 25;
89:23; 92:2, 3; 93:4, 4, 5;
96:15; 100:18; 103:3, 24;
106:21; 112:14; 114:14,
15; 115:12, 13, 14; 117:24,
25; 118:2, 4, 4; 120:25;
122:7, 24; 123:13; 136:25;
137:3; 140:12, 14; 147:21;
149:22, 23, 23; 152:18;
153:10, 12, 22; 154:19, 19;
155:15, 17; 156:23, 24;
160:5, 18; 161:2, 3, 4;
162:13, 15; 170:23; 171:1,
14; 174:24; 175:2; 179:18;
182:16; 189:9; 192:16, 17;
204:16, 16; 207:8, 10;
208:2, 5, 7, 17; 209:13, 13,
25; 214:4; 220:5; 221:6;
222:3, 15, 16

Schools 17:24; 18:1;
24:5; 25:22; 26:5, 7, 9, 14,
15, 22; 59:17; 65:3; 69:25;
75:20; 87:3, 19; 91:6, 6;
127:24; 152:16; 157:3;
160:2; 187:19, 20, 21, 21;
221:19; 222:15, 17

Science 9:15, 24; 10:3;
15:14, 15, 19; 19:23; 20:9;
72:19; 74:6; 92:3; 94:7;
97:8; 102:13; 103:1, 2, 17;
105:4, 11; 107:24; 109:13,
14, 23, 24; 119:13; 147:15;
154:22; 156:13; 158:4, 11;
173:17, 25; 174:2; 175:5;
210:17

sciences 9:17, 20, 22;
10:2; 92:1; 94:18; 95:10;
102:21; 173:17

scientific 137:18; 162:1,
2; 175:17

scientist 174:4

scope 52:11

score 143:12

Scottish 215:21

se 15:6; 73:24; 125:19

sealing 3:3

search 171:3

season 70:17

seated 130:25; 131:5, 12

seating 129:19; 130:17

seats 131:15

Second 4:7; 31:1; 41:2;
50:1, 4; 56:5; 90:10;
111:15; 113:1, 4, 9; 115:1;
116:17; 117:9; 119:8;
124:24; 125:10, 25; 127:6,
16; 128:7, 19; 129:2;

136:14; 147:4; 164:19;
168:21; 196:3, 22; 201:5;
204:4; 221:17

Secondarily 140:16

secondary 8:10; 9:8, 10,
16; 10:2; 30:2; 105:11;
107:7

seconded 109:22

secret 79:9; 220:20

secretary 129:24; 130:1,
3

section 119:23; 131:13;
148:12, 12; 171:6

security 82:14

seeing 7:24; 31:14;
36:25; 135:23

seem 72:1; 110:13;
188:22

seemed 174:16; 177:5;
221:24

seems 36:4, 23; 43:2;
57:17; 68:25; 69:14;
71:15; 75:24; 76:8, 13, 20;
77:8; 80:15; 89:14; 94:9;
104:23; 116:12; 127:18;
149:17; 160:9, 11; 170:14;
171:20; 209:9; 213:3

segue 89:2, 3

segued 65:22

selection 44:20; 147:25;
148:14

selections 84:19; 147:17

sell 100:11

seminars 66:7; 69:6

Seminary 155:9

send 194:18

senior 83:1; 130:19;
207:23

sense 5:22, 25; 7:22; 8:8;
9:16; 11:20; 13:18; 20:20;
21:24; 22:16; 31:9, 17;
32:22; 33:5, 15; 35:24;
38:12, 21; 39:10, 20, 24;
40:24; 42:8; 47:3; 48:11,
15; 49:12; 53:23; 55:12;
56:21; 57:6; 58:22; 61:21;
62:6, 9; 63:22; 64:10;
65:20, 24; 66:2, 19; 67:17;
69:11; 70:17; 74:25;
82:15; 85:15; 87:8; 89:17;
96:17; 105:10; 107:12;
117:19; 118:12; 127:9;
133:15; 139:10; 143:7;
160:20; 164:2; 166:8;
167:17; 170:18; 173:23;
175:8, 10, 19; 176:13;
181:8; 187:15, 22; 188:22;
189:21; 191:2; 197:1, 18;
204:8; 210:3; 212:12;
213:4; 215:3; 217:5, 7, 8;
220:16; 225:11

senses 135:14

sensitive 68:22

sensitivity 4:18; 78:4;
82:4

sent 195:18

sentence 217:14

sentiments 61:4; 129:15

separate 5:7, 8; 33:3;
35:21; 36:20; 68:17; 75:3;
84:10; 197:13; 211:22

separation 54:10, 15;
63:6, 23, 25; 64:6; 66:24;
69:24; 83:16; 84:8;
181:24; 189:4; 190:24;
211:1, 9

September 21:3; 118:23;
169:15; 191:6, 11, 13;
192:2, 11; 193:20; 194:6

series 214:8

serious 140:17

seriously 167:10; 208:8

serve 4:18; 28:6; 47:19;
79:23; 81:25; 82:2; 83:4

served 16:3; 39:21; 41:6;
44:17; 75:5; 83:3; 129:25;
141:3; 162:19; 200:4;
214:4; 215:9; 217:11

serves 34:2; 45:25;
48:18; 64:18; 70:24;
71:13; 73:1; 77:21; 84:21;
97:21; 111:13, 21; 138:3;
147:11

service 27:7, 15; 31:10;
32:17; 42:20; 66:9; 67:20;
82:18; 207:24; 217:5, 19

services 213:14

serving 22:14; 30:13;
32:25

session 12:10, 13, 16,
19; 13:13; 112:24; 120:13,
17, 24; 121:3, 3, 4, 5, 8, 9,
10, 13, 16, 22, 24; 122:25;
132:3, 16; 133:1; 166:21;
192:11, 15; 193:16, 19

sessions 12:8, 16; 122:6;
138:11; 146:17, 19

set 3:16; 6:19; 17:15;
35:1; 56:1, 20; 80:15;
83:13; 105:18, 21; 108:15;
167:3, 20; 175:18, 19

sets 6:20

setting 15:21; 20:10;
95:22; 168:12

settings 98:19

settle 33:22

settlement 122:4

seven-year 72:25

several 100:16; 103:14;
134:16

severe 158:25

severely 156:16

sex 218:24

sexual 90:18, 19, 19

shall 23:12; 45:6; 164:10

shape 178:1

share 29:11; 32:23;
129:15

shared 19:11, 19; 30:5;
33:5, 14; 96:11; 223:23

sharper 40:20

sheet 129:21

Sheila 33:5; 39:19; 53:8,
10; 80:11; 103:8; 108:25;
129:16; 132:24, 24;
159:16, 16; 170:11, 13;
177:21; 180:8; 190:1;
198:12

Sheila's 159:18

shifted 79:1

Shiloh 155:4

ship 148:23

Shirley 39:16

Shore 23:25; 24:3

short 101:11; 103:1;
117:15; 170:14; 171:8;
173:2

shot 83:8

show 45:21; 47:1; 130:6;
214:2, 20

showed 47:2; 171:21

showing 90:11; 148:4

shunted 213:12

shut 78:10; 125:16

side 32:0; 66:10; 131:7, 9;
160:6; 165:13; 172:15, 15;
213:13

sight 7:13

Signed 205:25

signs 221:11, 14

silence 215:22

Similar 60:7; 75:4, 4;
96:11; 143:19

similarities 148:11

similarity 148:6, 8

simpatico 213:22

simply 3:17; 32:13;
42:18; 43:10; 50:7, 16;
68:5, 6, 15; 75:11; 117:25;
118:2; 125:19; 197:11;
198:21; 209:20

single 34:7; 145:18, 18;
161:15; 181:6

sit 7:3, 8; 11:17; 58:11;
107:8; 130:23

sitting 46:16; 61:6; 77:23;
191:20

situ 99:11

situation 12:5, 14, 22;
20:7; 21:11; 24:18; 37:6;
85:1; 108:20; 112:17;
113:9; 127:22; 154:4;
165:5; 166:20; 178:4;
206:13, 20, 21

situations 12:22; 13:1;
34:5; 115:12; 128:5

Six 52:24; 144:22; 188:2,
10, 18

size 67:7

skin 158:24

slate 27:1; 28:7, 8, 9;
29:7; 38:10; 46:10, 12;
47:7; 100:22

slated 114:25

sleep 106:19, 20; 174:9

small 145:21; 147:19;
158:13, 16; 159:2, 5

smaller 67:10

smallest 200:25

smell 158:10; 212:3

smoke 12:1

smoked 11:23

smokers 11:24

snippet 68:10

Snook 21:25; 22:1;
39:18; 45:10; 46:21;
47:25; 48:19; 49:2, 8, 15;
77:21; 112:7; 125:4; 135:1

snubbed 202:8

social 15:21; 31:14, 14;
34:4, 5; 53:21, 22; 135:16

society 31:13; 87:23

somebody 111:19; 156:3

somehow 55:2

someone 27:10; 64:14;
131:1; 137:4; 143:1;
164:25; 198:19

sometimes 35:20; 40:15;
101:2; 112:6; 114:8;
131:1; 140:25; 142:1;
164:25

somewhat 111:14;
139:21

Somewhere 71:20, 21;
157:19

son 26:22; 155:6

sorry 5:11; 8:3; 10:12;
11:3; 21:2; 83:21; 85:10;
97:1; 99:5; 124:4; 126:17
132:23; 138:24; 140:21;
149:11; 156:3; 157:3;
173:21; 183:1; 184:17;
212:18; 217:10, 24; 218:8;
225:19

sort 10:1; 16:21; 31:20;
32:2; 36:25; 38:5; 40:10;
41:16; 42:20; 45:20;
48:16; 52:13; 53:23; 54:1;
59:25; 61:9; 69:1; 78:12;
82:21; 88:8; 102:15;
105:13; 108:5; 114:22;
115:21; 120:4; 127:22;
131:14; 153:5; 154:9;
165:15; 168:4; 171:23;
175:23; 177:12; 195:14;
212:23; 213:5; 220:7

sound 169:13

sounds 111:19; 112:9

source 34:12; 190:12

sources 34:8

space 170:14; 171:8

Spahr 19:25; 20:2, 18;
21:1, 5, 6; 74:5; 97:12;
103:2; 109:20; 149:12, 12;
154:21; 157:24, 25;
159:10; 182:18; 196:19;
197:4

Spanish 73:18

spark 145:11

speak 10:21; 14:21, 25,
15:4, 6, 14, 18; 20:17;
57:13; 63:7; 108:19;
116:4; 117:8; 129:2;

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Carol Brown
May 16, 2005

132:17; 145:11; 162:10;
170:3; 175:4; 180:10, 23
**speaking** 117:19;
137:21; 138:1, 15, 19;
163:20; 165:22; 182:21;
212:15
**special** 23:7, 13, 14, 17;
26:18; 27:16; 65:8;
106:13, 13; 213:10, 11
**species** 148:3, 5, 14, 15;
158:19
**specific** 8:4; 12:17, 20;
13:22, 23; 21:8; 28:25;
31:23; 35:22, 22; 38:21;
40:14, 16; 53:24; 55:20;
61:10, 12; 65:2; 68:8, 10;
69:7; 70:20; 75:11; 76:22;
81:14; 87:14; 89:3, 13;
91:4; 94:20; 98:23; 99:19;
118:15; 121:2, 21; 140:1;
142:21; 143:23; 145:1;
149:9; 150:21; 157:6, 7;
159:12; 163:24; 168:18;
173:6; 176:24; 177:3, 4;
180:25; 181:11; 182:17;
189:18; 193:25; 198:9;
202:3, 5
**specifically** 29:15; 33:9;
36:11; 49:1; 60:14; 61:15;
70:1, 6; 71:3; 75:21; 89:11;
92:4; 96:3; 108:13;
116:23; 119:15; 128:23;
134:18; 138:6; 168:5;
172:11; 173:16; 176:22;
210:10, 20
**specification** 145:17
**specifics** 39:12; 117:6;
127:12; 128:3; 129:4;
132:10; 133:22; 134:10;
139:17; 140:10; 181:5;
193:23
**specify** 151:3
**spectators** 58:7
**speech** 59:19; 63:11;
137:25; 205:5, 8; 209:2;
216:7; 222:9
**spelled** 148:23
**spend** 74:23; 96:16;
106:2
**spender** 75:22
**Spending** 94:14; 222:13
**spent** 22:14; 171:9
**spoke** 15:8; 21:25; 65:21;
74:6, 25; 131:2; 134:16;
138:5; 145:6; 150:16;
151:24; 165:4, 19; 182:10,
19; 184:15; 189:3; 199:19;
223:1
**spoken** 10:20; 14:5, 11;
19:4, 6; 20:2, 4, 13, 18;
25:10, 16; 222:20
**spot** 86:14
**spots** 48:3
**spring** 70:18, 19, 25;
71:14, 19, 19; 72:1, 4, 8,
12; 76:5; 77:5; 99:24
**spurred** 82:21

**staff** 58:19; 109:24;
114:5; 214:9
**stakeholders** 37:2; 77:1,
3
**stance** 141:5
**stand** 49:3; 53:1; 58:20,
21; 59:17; 62:15; 86:3, 4;
132:6; 141:11; 179:10;
181:19; 198:20; 200:13
**standards** 29:17; 74:8,
11; 105:18; 107:13, 16, 17;
108:15; 158:7; 159:15;
171:25; 172:1, 5, 24; 173:9
**standing** 143:17; 226:4
**standpoint** 17:16; 41:19;
64:11; 85:16; 141:8;
180:1; 220:19
**stands** 75:8; 132:23;
142:21; 145:4; 159:12;
161:15; 181:6; 199:1
**stark** 217:14
**start** 8:12; 76:9; 84:12;
109:20; 121:10; 186:16;
206:25
**started** 71:17; 172:23;
176:3; 194:11
**starter** 104:20
**starting** 100:21
**state** 6:22; 8:20, 20, 21;
9:2, 3; 28:17; 29:5; 44:6, 8;
54:11, 16; 55:24; 62:25;
63:7, 23; 64:1, 7; 66:24;
69:24; 74:9; 83:17; 84:8;
89:19, 20, 21; 90:2;
105:18, 21; 107:10, 13, 16;
108:14; 109:18; 152:14;
158:7; 159:15; 160:16;
162:2; 173:9; 181:25;
189:4; 190:24; 194:11;
202:6; 210:14, 19, 20, 21;
211:1, 2, 3, 3, 10
**stated** 37:19; 39:5; 50:14;
55:22; 66:4, 23; 124:5;
126:11; 133:10; 152:16,
17, 18, 19; 153:20; 176:25;
180:20; 181:19, 23; 185:5;
186:1, 12; 190:8, 11, 22;
193:8, 9, 15; 211:13;
217:22
**statement** 63:2, 4; 115:9;
116:4, 13; 129:14; 144:17;
155:13; 160:6; 184:8;
185:1; 217:17; 218:7, 15;
222:18
**statements** 57:21; 59:7;
74:12; 128:9; 137:17;
139:20; 141:11, 12; 153:5;
165:10; 194:1, 2; 198:7, 9,
10; 200:19, 23; 201:8
**States** 56:9; 171:2
**stating** 49:2; 124:2;
126:15; 179:6; 182:11;
188:17
**statutes** 55:25, 25
**stay** 184:19; 194:17;
220:2

**stenographer** 6:17
**step** 118:16; 153:7, 7;
219:21
**stepped** 43:18; 62:12
**stepping** 215:13
**Steve** 11:5
**Steven** 34:23
**stick** 58:11; 59:13; 62:18;
81:18; 93:24; 104:12;
148:7; 167:22
**sticks** 59:6, 10; 143:21;
159:11, 17
**still** 19:2; 33:3; 61:24;
81:21, 24; 82:17; 111:22;
152:9; 154:5; 175:11;
177:11; 187:18; 195:3, 6,
13, 14; 207:9; 211:8;
213:12; 218:16, 17; 222:2
**stipulated** 3:2
**STIPULATION** 3:1
**stir** 49:16, 19
**stone** 225:25
**stood** 45:16; 181:1;
186:8, 9, 10
**stop** 24:13; 98:5; 163:19;
170:12
**stopped** 172:21, 23;
214:21, 21, 24
**stories** 13:19
**story** 3:21; 16:22; 19:24;
22:16; 51:24; 128:18;
142:5; 150:23
**straight** 146:9
**straightforward** 164:9
**strange** 223:22
**strata** 34:4
**strategic** 47:17
**strength** 68:12
**strengths** 97:25
**strictly** 25:15; 76:3;
219:24
**strives** 44:10
**strong** 58:20, 21; 59:17;
62:15; 65:23; 66:22, 23;
133:11; 167:8; 188:12;
190:19; 199:24; 200:2, 2
**stronger** 110:19; 150:15
**strongly** 54:10, 15;
62:10; 66:4; 68:7; 151:1;
206:20; 212:19
**struck** 217:12
**structure** 148:7, 10
**structures** 148:2
**stuck** 109:21; 128:10
**student** 12:22; 13:2;
28:14; 29:14, 16, 18, 21;
65:7; 89:8; 96:15; 106:21;
112:19; 130:22; 131:8;
149:21, 22; 150:10;
153:13
**student's** 107:22; 150:1
**student/parent** 131:16
**students** 21:10; 27:15;
29:25; 30:1, 17; 31:21;
42:16; 82:12; 89:22;

95:18; 96:9, 14; 104:2;
106:10, 12, 14, 23; 107:19;
114:4; 118:7; 122:10;
151:8; 154:14, 16; 171:15;
172:19; 174:11, 23; 175:2;
182:24; 194:21; 195:14;
200:6; 212:5, 7; 214:12;
216:14
**studied** 8:23; 108:10;
208:1
**studies** 66:7
**study** 32:12
**Subcommittees** 71:7
**subject** 11:21; 12:19, 21;
13:5, 7; 19:6; 20:14; 22:8;
44:2; 57:24; 60:2; 65:18,
20; 72:24; 73:24; 75:11,
14, 14; 91:1, 25; 94:6;
95:23; 96:7; 105:25;
106:15; 110:7; 112:2;
127:19; 140:3, 6; 154:16
**subpoena** 14:18; 16:3,
10
**subsequently** 45:24;
149:22; 153:9; 156:9;
169:1
**subspecies** 148:20
**substance** 95:5
**substantial** 14:2; 36:22
**substitute** 130:1
**Suburban** 8:14
**successful** 123:20;
208:16
**successfully** 66:10
**suffer** 202:1
**sufficient** 91:9; 128:22
**sufficiently** 41:23; 42:1,
4
**suggested** 195:3
**suggesting** 211:24
**suggestion** 194:13
**suggestions** 195:1;
197:8
**suit** 6:6; 48:21; 101:16,
17; 223:12
**summarizing** 59:15
**summer** 164:7
**summers** 10:7
**Sunday** 209:2
**sunlight** 158:25
**Superintendent** 32:5;
33:20; 37:3; 62:10, 13;
98:1, 3; 103:13; 109:8;
155:20, 24; 156:6, 8;
162:22; 163:12, 18;
191:19, 23
**Superintendent's** 99:12;
155:18, 20, 21
**supernatural** 175:23;
177:6
**supervisor** 92:18;
163:11
**Supper** 65:19
**supplemental** 185:5, 7,
8, 11, 14, 20, 23; 186:2;

191:4
**supplementary** 172:12;
173:12
**support** 53:6; 74:20;
83:5, 7; 104:1; 143:23, 25;
180:21; 181:9; 189:17, 22;
190:14, 15, 21; 193:23;
199:1, 4; 222:13
**supporting** 77:14;
189:22; 190:2
**supportive** 200:12
**supports** 190:13, 20, 20
**suppose** 118:21
**supposed** 162:14
**supposedly** 189:11
**Supreme** 193:5; 210:12,
25
**sure** 4:13; 5:14, 17; 6:3, 7;
8:5; 10:3; 14:21; 24:20;
31:3; 33:17; 57:3; 75:6;
76:4; 78:17; 85:6; 87:10;
88:2; 91:3; 98:21; 100:8, 9;
104:16, 18, 20; 108:1;
110:20; 119:9; 120:9;
123:24; 125:1; 127:16;
128:14; 129:4; 131:20;
132:16; 136:13; 137:24;
138:4, 20; 141:10, 24;
142:3; 143:1, 8, 8; 146:14;
157:12, 13, 22; 162:9;
166:4; 169:3; 170:6;
173:5, 22; 177:20; 181:7;
189:8; 191:14; 194:11, 25;
195:11; 196:11; 203:3;
216:4; 220:22
**surprised** 4:5
**surrounding** 178:20
**survey** 162:23
**survive** 148:15; 158:18,
23
**surviving** 158:17
**survivor** 158:21
**swear** 5:5
**sweat** 161:7
**switches** 184:20
**sworn** 5:7, 18; 64:13;
152:13, 15; 224:15
**system** 65:24; 176:16,
17, 18, 21; 200:2
**systems** 68:18; 87:25;
189:12; 221:18, 20

## T

**table** 192:25; 199:14
**tabled** 119:14
**tables** 131:4
**tabling** 125:19
**talk** 25:6; 40:15; 146:12;
153:7; 154:17; 201:10;
202:23; 206:25; 212:4;
222:24
**talked** 66:15; 81:22; 89:6;
123:7; 127:2; 138:10;
159:12; 166:21; 170:13;

177:14; 207:3, 6, 7, 17; 222:22
**talking** 6:13; 23:14; 46:5; 84:3; 90:4, 23; 91:10; 95:18; 96:14; 97:8; 98:20; 115:24; 118:24; 120:1, 8; 127:10; 132:3; 142:6; 143:20; 147:19, 25; 152:23, 25; 157:17; 161:2, 9; 168:12; 170:25; 174:23; 179:15; 221:10
**talks** 148:13
**Task** 32:12; 35:21, 23; 36:1, 6; 115:19; 162:17; 208:11, 12
**taste** 41:14; 158:10; 212:3
**taught** 147:20, 21; 158:1, 3; 197:9, 16
**tax** 42:5; 75:19; 82:5; 93:9
**taxes** 28:22
**taxpayer** 179:19
**taxpayers** 28:20; 42:2, 10
**teach** 137:2; 152:12, 14; 154:24; 161:20; 193:2, 2
**teacher** 156:13
**teachers** 15:14, 15, 19; 19:23; 20:9, 14; 34:23; 35:6, 14; 36:13; 73:7, 14; 74:2; 76:13; 99:25; 100:6; 103:20; 109:14, 14, 19, 23; 131:11, 14; 144:18, 25; 152:1; 153:6; 154:1, 4, 6; 158:2; 159:4; 161:12; 181:3; 182:17; 183:3, 8; 196:14, 17; 207:12; 216:11; 224:9
**teaching** 135:21, 22; 136:24; 137:22; 151:8; 154:12; 157:25; 158:7, 12; 186:20; 187:4; 192:22; 193:19; 194:4
**teasing** 90:12
**technology** 26:23; 30:14; 43:19; 92:18; 93:5, 5; 114:14; 115:12; 162:16; 204:16, 17; 208:5
**telephone** 127:17; 133:12; 134:11
**television** 138:22, 23
**telling** 134:7; 140:22
**temper** 68:19
**ten** 174:9; 206:15; 208:1; 224:23
**tend** 123:22; 125:5; 140:25; 177:18
**tended** 116:24; 125:6; 131:13, 14; 143:18
**tends** 4:7; 140:14
**tenet** 90:15
**tenets** 90:15
**tenor** 56:8; 59:15; 62:22; 183:1; 222:10, 12
**tense** 49:5
**tension** 54:20; 55:16; 142:9
**tenth** 26:16
**tenure** 53:4; 89:10
**term** 27:9, 9, 20; 28:4; 42:22; 43:15; 48:25; 77:1; 82:7, 8; 108:8; 124:2; 136:19, 22; 137:2; 138:8; 145:14; 150:19; 152:8, 14; 153:25; 160:19; 162:8; 177:9; 186:23; 187:7, 7; 189:7; 213:17, 20; 221:17; 222:17
**termed** 30:22; 114:9; 144:9; 188:19
**terms** 6:1; 15:2; 27:8, 10; 29:21, 25; 30:21; 34:6; 42:21, 25; 44:20; 51:21; 52:8; 59:25; 80:1, 2; 82:12; 83:1; 125:2; 133:4; 137:12; 141:18; 142:5; 143:5; 151:16; 159:3; 160:2; 171:3, 13; 187:4; 207:23, 24; 208:20
**terribly** 163:24
**test** 4:14; 51:5
**testified** 3:8
**testimony** 5:5, 7; 6:12, 16; 69:14; 209:19
**Texas** 170:21
**textbook** 70:11; 99:10, 17; 100:8; 110:11; 151:17; 170:22; 179:1
**textbooks** 70:14; 71:4; 72:18, 19; 73:25; 74:9, 16; 75:10, 12; 91:25; 92:3; 94:18; 96:8; 97:18; 99:21; 156:23; 157:8; 159:13, 19; 161:1, 6
**texts** 70:12; 72:8; 73:21; 74:14, 21; 84:24; 92:5; 94:5; 95:4, 5, 14, 16; 96:10, 13; 97:15, 19; 98:4, 23; 100:10, 11, 13; 102:13; 104:5, 7, 24; 105:4; 107:20, 24; 108:21; 109:15, 25; 110:7; 111:13; 119:13; 124:7, 11, 14; 134:9; 157:1; 160:2; 171:21; 179:19; 185:2; 191:15; 192:22
**thanked** 50:16
**Thanks** 8:5; 11:9
**theirs** 159:8
**Theological** 155:8
**theories** 137:19; 147:17; 154:25; 157:6, 6; 162:1, 2; 175:17; 194:22
**Theory** 13:10; 145:11, 18; 151:24; 186:15; 191:8; 194:22; 195:4, 13
**thereabouts** 27:22; 147:23
**thereby** 12:10
**therefore** 76:8
**thesis** 9:12
**thinking** 15:2; 40:1; 51:20; 68:24
**third** 53:7; 103:4; 113:10; 133:18; 213:17, 20; 216:16, 20
**thirty** 31:16
**though** 100:13; 123:13; 168:24; 176:5; 187:8, 24; 209:1; 216:2; 221:22; 223:5
**thought** 40:7, 17; 42:4; 49:3; 52:16; 54:17; 82:25; 107:25; 116:7; 118:13; 130:13; 134:25; 136:8; 149:10; 153:21; 167:10; 176:23; 177:21; 178:1, 8, 9; 210:3
**thoughts** 40:3; 73:12; 150:2
**thousands** 95:20
**threatened** 88:11
**Three** 6:20; 24:14, 20; 35:17; 45:8, 9, 24; 46:25; 78:9; 89:11; 90:4; 97:2; 103:7; 110:5, 7, 7; 158:2; 161:16; 180:13; 193:22; 197:3; 208:12; 216:16
**throughout** 75:5
**throw** 79:15
**thrust** 60:5; 75:1; 133:24; 209:9, 18
**Thursday** 169:19
**thus** 69:14
**tickled** 107:24
**tie** 178:18
**timeline** 11:14; 12:6; 147:15; 222:25
**times** 4:6; 100:6; 112:3; 127:20; 134:16; 165:3; 223:19
**tip** 209:20
**today** 3:14; 6:14; 7:3, 8, 14; 8:6; 9:9; 10:20, 22; 11:17; 14:18, 22; 30:22; 58:11; 167:22; 212:19
**today's** 130:8
**toenail** 89:23
**together** 41:6; 44:5; 52:17; 110:3; 118:18; 125:6; 141:3; 169:16; 188:8; 197:6; 223:24
**token** 4:11
**told** 11:17; 128:11; 131:23; 134:22, 24, 24, 25; 146:20; 153:17; 157:21; 168:22; 182:6; 183:13; 184:4; 196:13, 18; 197:3; 211:3; 217:13; 218:2; 223:12
**tolerance** 89:12, 19; 90:6, 6, 10, 17
**Tom** 3:14; 11:9; 37:16; 51:23
**tomorrow** 101:10; 184:6; 221:9
**ton** 129:10
**tone** 56:1; 61:23; 68:11, 12; 177:3
**took** 8:23, 24; 9:25; 20:20; 21:1; 37:5; 43:19; 146:18; 149:17; 153:18; 174:19; 209:5; 218:21; 219:1, 4, 6; 220:4
**top** 205:15
**topic** 83:14; 87:5; 219:7
**topics** 13:13; 185:17
**totally** 71:20; 84:9; 90:25; 94:20; 100:7
**touch** 158:10; 212:2; 225:20
**toward** 63:5
**towards** 60:7; 143:2; 201:2
**traditional** 107:4
**training** 8:23, 25
**transcribing** 4:3
**transportation** 47:15; 208:15, 16
**Treasurer** 47:10; 79:11
**Treasurers** 79:12
**treated** 90:13
**treating** 90:13
**Treaty** 205:22
**tree** 123:10
**trees** 141:8
**Trenton** 8:20; 9:2
**trial** 3:5
**trick** 5:21; 128:17
**tried** 66:15; 68:5; 171:22; 224:24
**triggered** 40:19
**trip** 65:21
**Tripoli** 205:22
**trouble** 127:24; 186:16; 193:9; 195:7
**Trudy** 163:9, 10, 19, 20
**true** 21:13; 36:5; 205:7, 16
**truth** 135:13, 18; 151:8; 185:6
**try** 4:9, 12, 17; 23:18; 29:4; 31:19; 62:19; 70:17; 74:25; 84:5; 86:15; 128:7; 141:20; 146:8; 169:18; 175:12
**trying** 3:20, 22; 21:24; 33:15; 35:24; 39:20, 24; 51:23; 55:20; 57:5; 61:21; 63:21; 64:10; 66:2; 67:17; 70:2; 75:24; 78:18; 82:15; 84:1; 85:15; 86:13; 87:13; 118:12; 128:18; 139:9; 141:21; 142:5, 20; 147:1; 173:23; 175:20; 180:20; 188:21; 192:18; 195:6; 212:12; 215:17; 222:25; 225:11
**Tuesday** 86:7; 113:7, 8
**turn** 51:16
**turned** 46:15; 129:20; 131:18; 177:22; 183:9; 207:4
**turning** 131:21
**turns** 172:22
**twenty** 31:15; 137:25; 154:12
**twice** 156:16
**two** 10:7; 11:12, 19; 14:3; 24:20, 23; 25:23; 26:1; 27:9; 33:3; 41:17; 45:24; 53:3, 4, 15; 57:17; 65:3; 67:6, 15; 91:25; 94:6; 95:9; 102:20; 120:6; 129:25; 135:6; 144:8; 154:4; 194:25; 206:8; 207:20; 213:21; 216:16; 221:3, 15
**type** 162:23
**types** 35:17; 115:20; 133:13

## U

**uh** 60:23
**unclear** 4:9; 55:8; 57:23
**unclothed** 150:11
**uncomfortable** 4:16; 6:5; 88:7
**uncovering** 3:19
**under** 3:18; 32:4; 35:19, 20; 36:6; 49:1; 55:13; 56:3, 4, 12; 75:12; 91:25; 103:12; 104:8; 122:8; 129:24; 183:14; 184:9; 191:17; 195:12
**understandability** 106:6; 172:19; 174:22
**understandable** 174:7
**understood** 159:4; 216:4
**unfold** 128:18
**unfolded** 139:10; 178:12
**unfolds** 83:13
**unfortunately** 212:18; 223:6
**unfunded** 44:7
**Unit** 114:15, 16, 17; 115:13
**United** 56:9; 155:5; 171:2; 188:7
**universe** 126:21; 175:24; 212:8
**University** 8:21, 21; 9:2, 3; 171:6
**unless** 99:14; 112:14; 163:1; 185:8; 212:25
**unrelated** 15:7
**unto** 135:19, 20
**untruth** 151:2
**unwilling** 40:1
**up** 22:18; 33:21; 35:1; 45:21; 46:22; 47:1, 2; 48:19; 49:2, 16; 50:18; 52:16; 56:3, 5; 58:4; 63:24; 69:7, 22; 70:8; 72:3, 7, 20; 76:2, 17; 77:3, 9; 78:5, 9 12, 15, 17; 81:9, 17; 83:1 84:7; 88:22; 94:6; 97:6; 98:12, 16; 99:3, 5, 10; 100:4; 102:9; 103:14;

Tammy Kitzmiller, et al.  v.
Dover Area School District, et al.

Carol Brown
May 16, 2005

108:7; 111:20; 113:17;
114:25; 115:6, 24; 116:6,
14, 17; 119:5; 122:18;
23:9; 124:14; 125:11, 13,
21, 25; 126:1; 127:21, 22;
128:1; 135:1, 4; 142:7;
146:1; 152:6; 155:5;
156:4, 21; 159:20; 168:12,
16, 17; 169:8, 22; 170:7;
172:11; 179:2, 11; 183:19,
20; 192:5, 21; 193:1, 5, 6;
194:10; 200:13; 201:7;
202:16; 203:19; 204:14;
205:14; 211:25; 212:8;
213:18; 215:18; 216:8, 9;
218:22; 219:24; 220:17,
18, 20; 224:14
upon 47:24; 113:1;
114:20; 153:18; 198:6
upset 139:4, 5, 21;
142:22; 163:24, 25; 180:5,
6; 224:7
urging 74:21
usable 73:14; 74:10, 10
usage 171:4
use 16:7; 48:25; 73:6, 12;
75:19; 77:1; 89:24; 99:21;
105:23; 106:7, 9; 124:2;
159:14; 160:19; 172:12;
186:1; 195:10; 198:18
used 34:14; 73:15, 19,
20, 25; 100:1; 126:6;
138:8; 150:19; 152:14;
153:25; 157:2; 159:6;
162:8; 171:1, 18; 186:23;
195:11; 217:4, 18; 222:17
useful 74:7
uses 160:5
using 29:18; 73:7; 99:6;
106:11, 13; 136:19, 21;
137:2, 14; 160:22; 189:15
usually 35:11, 13, 19, 21;
112:6; 131:4
utilize 104:2

## V

V 130:17, 25; 131:7
vacated 48:3
valuable 105:23
value 189:23; 217:5, 18
values 175:18, 19, 21;
182:2
varies 77:6
variety 42:15; 47:18;
58:6, 15; 59:7; 92:5; 188:3;
195:9; 200:9; 201:18
various 22:13; 36:24;
58:23, 24; 98:4; 100:8;
104:7; 112:3; 115:18;
122:4; 124:13; 131:10;
133:13, 13; 148:4; 150:3;
166:22; 173:15; 197:23;
214:8
vast 200:11
vehemently 186:11

verbal 4:4; 141:17, 18, 18
verbally 184:12
verbatim 60:21; 89:6;
194:23
verdict 215:22
version 225:24, 25
versions 197:3
via 162:23
Vice-Presidency 79:22
Vice-President 50:24;
79:6, 16, 24; 80:13, 17, 20;
81:4, 12; 82:19, 22, 24;
83:5; 103:9
Vicki 4:3; 205:3; 217:10
videotapes 151:24
vie 45:6
view 33:6; 34:25; 84:9;
161:17; 175:11; 187:25;
190:3; 198:13
viewed 126:15; 175:11
viewing 126:16
viewpoint 42:21; 67:25;
141:4, 8; 145:5; 174:5, 6,
11; 175:22; 176:11, 12, 15;
180:4; 186:13; 187:20, 21,
22, 23; 188:13; 189:19;
190:16; 192:10; 208:22;
212:7
viewpoints 42:13, 14;
54:24; 68:4; 144:1, 9;
187:5, 18; 189:12; 193:10;
212:20; 213:2
views 29:11; 55:3, 18;
56:17; 123:11; 175:12
violate 166:7
violates 190:23
violence 90:7
violently 165:22
vision 7:22; 61:24; 171:8
vocabulary 171:18
vocal 110:19; 111:14;
181:1, 19; 193:22
Vocational-technical
30:11
voice 61:23; 78:6; 112:8
voiced 116:19; 125:3;
126:14; 143:23, 25
voluntarily 107:1
volunteered 156:25;
159:25
vote 53:19; 54:2; 57:6;
63:17; 71:16; 72:2, 2, 3;
80:17; 111:12; 112:11;
114:2, 6, 21; 119:5;
125:22; 143:18; 160:21;
178:24; 182:11, 13;
184:20; 199:9; 201:7;
221:16; 222:1, 5; 223:5
voted 45:1; 52:25; 53:6,
7, 9, 16; 54:6; 97:22;
112:25; 114:20; 180:9;
182:6; 191:3; 197:17;
198:5; 221:25; 224:19
voters 211:2, 3
votes 53:4; 98:18;

112:22; 113:25; 136:2;
144:22; 179:4; 197:21;
221:15
voting 40:6; 53:2, 20;
57:9; 105:8; 180:10
voyages 148:22

## W

wait 164:8
waiting 77:5
waived 3:4
wake 215:17; 216:8, 9
walked 45:8; 220:12
Walker 34:24
wants 156:3; 164:25;
172:12; 200:7
Warren 155:6
wash 158:23
wastage 41:10, 14, 22
waste 41:17
wastefulness 41:3
watch 138:23
water 184:17
waters 49:17, 20
wavelength 213:24
way 5:15; 6:14; 16:18;
27:21; 28:25; 36:15; 40:1;
48:12; 57:17; 69:20;
75:25; 89:18; 90:13;
98:13, 14, 15; 101:16, 22;
106:24; 107:12, 20; 109:4;
120:22; 126:14, 16;
128:13; 131:2; 132:21;
139:6; 140:24; 143:18;
148:13; 149:19; 154:20;
167:22; 171:7; 172:4;
175:11; 180:2, 10, 21;
181:2; 209:24; 212:14;
213:3; 215:12; 218:10;
224:16; 225:11
ways 128:1; 210:10
weaknesses 97:25
wealth 93:3
weapons 89:20; 90:7, 7
wedding 206:9
week 43:25; 44:23; 120:5;
128:3; 206:16
weekend 169:21
weigh 96:16
Wenrich 18:21; 39:19;
40:12; 47:14; 50:21, 24;
51:9; 52:16; 132:20;
145:3, 4, 8; 170:2; 179:20;
180:15, 20, 23; 190:17;
223:16; 224:1, 8, 10, 13,
21; 225:4
Wenrich's 224:12
weren't 42:4; 160:23;
162:14; 182:20; 203:21;
219:13, 14, 15
West 23:25; 24:3
whereas 130:18
whereby 30:24

wherein 147:15
wherever 131:15
Whipping 78:17
white 136:2; 209:4
Whitehill 95:9; 102:22
whole 66:11; 67:11;
95:19; 105:1; 115:4;
123:11; 170:9; 197:21;
212:6
wholeheartedly 123:15
whose 156:14
wife 223:19
William 103:7
willing 222:13
window 173:2
winners 206:22
winter 70:18
winter-spring 85:5, 11,
22; 100:24
wise 178:7
wish 89:13; 90:8; 125:21;
140:19
wished 155:13; 172:14
wishing 156:1
wit 197:9; 222:12
within 23:15; 31:21; 32:8;
33:4; 65:2; 96:7, 8; 106:17;
113:22; 174:9; 195:6;
207:10; 220:11; 221:19;
225:16
without 132:13; 160:6;
169:23; 189:24; 191:20;
207:22
witness 3:7, 24; 6:1;
16:17
witnessed 224:10
witnesses 16:22; 51:23
witnessing 6:1
woman 95:12
women 165:14
wondering 84:6
wooden 65:18
word 61:19, 19; 90:25;
137:14; 152:20; 172:8;
175:9, 21; 225:24
wording 177:20; 183:1;
194:19; 195:1, 8; 197:14;
198:18
words 4:5; 14:24; 33:16;
37:2; 61:22, 23; 72:11, 18;
78:18; 100:20; 108:23;
124:6; 125:23; 126:4;
140:1; 145:15; 166:1;
194:20; 197:15; 198:22
work 9:12; 27:21; 79:16;
207:13
worked 85:16
working 23:8; 32:1, 7;
164:13
works 109:5
workshops 66:7
World 9:8; 30:24; 136:6;
158:5, 9; 159:9, 9; 211:23;
212:6

worldwide 171:3
worms 54:12, 13; 129:8,
8, 9; 135:5
worry 93:22; 126:18
wrapping 77:3
wreck 184:16
written 107:15; 155:25;
170:22; 171:12, 14; 172:5;
174:25; 225:25
wrong 27:24; 68:25;
152:20; 153:24; 175:21;
182:23
wrote 209:2

## X

x 221:25

## Y

yardstick 217:4, 18
year 15:20; 24:16; 28:1,
2; 32:8; 33:4; 36:10; 44:24;
49:11; 50:25; 64:4; 65:1;
69:23; 70:8, 23; 72:10, 13,
14, 15, 16, 21, 21, 24;
73:3, 3; 76:10, 11; 79:12;
82:17; 83:11, 22; 84:1;
97:22; 100:17, 18, 21;
104:25; 128:4; 160:18;
161:2; 162:21; 171:21;
182:16; 185:6; 211:25;
221:17; 223:13
years 23:9; 24:20; 26:11;
27:9, 11; 31:14, 16; 34:2;
46:17; 51:21; 75:5; 80:25;
89:11; 90:4; 143:16;
149:21; 154:12; 156:14;
158:17; 179:10; 198:19;
200:1; 206:15; 208:1, 12;
210:11; 213:21
yellow 129:21; 130:11
yesses 88:2
yesterday 10:24; 13:3,
10; 15:7, 8; 101:19; 141:23
Yingling 15:7; 18:21;
28:10; 33:14; 131:4, 6;
133:20; 134:13; 142:14,
19; 170:2; 182:4; 199:17;
221:12; 222:22
Yingling's 184:8; 201:19
York 8:14, 16, 24; 24:2, 4;
26:19; 30:14; 43:18; 67:4;
93:4, 5; 114:14, 15;
115:12; 160:5; 162:15;
184:3; 204:15, 16; 208:5
young 23:7; 59:1, 5;
150:10

## Z

zero 89:12, 19; 90:6, 6, 10
zone 156:5