# APPENDIX I

# TAB G

**In The Matter Of:**

*Tammy Kitzmiller, et al. v.*
*Dover Area School District, et al.*

---

*William Buckingham*
*January 3, 2005*

---

*Filius & McLucas Reporting Service, Inc.*
*1427 East Market Street, York, PA*
*4309 Linglestown Road, Harrisburg, PA*

*(717) 845-6418 or (717) 236-0623*

*Original File WB010305.TXT, 141 Pages*
*Min-U-Script® File ID: 2722092160*

**Word Index included with this Min-U-Script®**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

TAMMY KITZMILLER; BRYAN and CHRISTY REHN; DEBORAH FENIMORE and JOEL LIEB; STEVEN STOUGH; BETH EVELAND; CYNTHIA SNEATH; JULIE SMITH; and ARALENE ("BARRIE") D. and FREDERICK B. CALLAHAN,
Plaintiffs .

. Civil Action No. 04-CV-2688(M.D.Pa.)

vs.

DOVER AREA SCHOOL DISTRICT; DOVER AREA SCHOOL DISTRICT BOARD OF DIRECTORS,
Defendants .

Deposition of: WILLIAM BUCKINGHAM

Taken by : Plaintiffs

Date : January 3, 2005, 1:45 p.m.

Place : Dover Area School District
Two School Lane
Dover, Pennsylvania

By : Bethann M. Mulay, Notary Public
Registered Professional Reporter

APPEARANCES:

PEPPER HAMILTON LLP
By: STEPHEN G. HARVEY, ESQ.
-and-
ACLU OF PENNSYLVANIA
By: WITOLD WALCZAK, ESQ.
For - Plaintiffs

THOMAS MORE LAW CENTER
By: PATRICK T. GILLEN, ESQ.
For - Defendants

ALSO PRESENT: David Depew
Beth Eveland
Cynthia Sneath

INDEX

WITNESS

| | Examination |
|---|---|
| WILLIAM BUCKINGHAM | |
| By Mr. Harvey | 4, 138 |
| By Mr. Gillen | 137, 139 |

EXHIBITS

| Plaintiff's Deposition Exhibit Number | Page Marked |
|---|---|
| 8. Verbatim Discussion at the 10/18/04 Board Meeting Under Curriculum | 127 |

STIPULATION

It is hereby stipulated by and between counsel for the respective parties that sealing, certification and filing are hereby waived; and all objections except as to the form of the question are reserved to the time of trial.

WILLIAM BUCKINGHAM, called as a witness, having been duly sworn, testified as follows:

MR. GILLEN: This deposition is being taken pursuant to the court order allowing limited preliminary discovery in this matter as I understand it relating to the question of the origins and purpose of the policy and what will take place in the classroom on January 13, 2005.

EXAMINATION

BY MR. HARVEY:

Q: Mr. Buckingham, good afternoon. My name is Steve Harvey, and I'm with the law firm of Pepper Hamilton, and we're here for your deposition today. Do you understand that?

A: Yes, I do.

Q: Have you ever given a deposition before?

A: Yes, I have.

Q: How many times?

A: Once or twice as a police officer.

Q: How long ago?

A: Going back 25 years.

Q: Let me briefly review the rules of a deposition. I'm going to ask you a series of questions, and you are required to answer my questions to the best of your knowledge and ability subject to the oath that you have taken. Do you understand that?

A: Yes, I do.

Q: If you do not understand one of my questions, will you please let me know and I'll rephrase the question?

A: Absolutely.

Q: And if you don't hear one of my questions, likewise ask me to speak up, and I will do so. Understood?

A: Yes, I understand.

Q: It's necessary that you give audible responses. The court reporter who is sitting to your left cannot record gestures, nods, grunts, the kind of things we use in ordinary conversation.

It is also necessary that you let me finish my question before you answer it, and I likewise will endeavor to let you finish answering my

question before I ask the next one because she can't write down when we're speaking both at the same time. Do you understand?

A: Yes, I do.

Q: Have you done anything to prepare yourself to be deposed today?

A: Done anything today?

Q: Done anything at all to prepare yourself to be deposed, whether today or any other time.

A: Met with the attorneys last night.

Q: Did you do anything else other than meet with the attorneys to prepare yourself to be deposed?

A: No.

Q: How long did you meet with the attorneys?

A: Maybe an hour and a half, two hours. I'm not sure.

Q: Who was present?

A: Mr. Thompson, this gentleman here.

MR. GILLEN: Pat Gillen.

A: Pat Gillen, I'm sorry, myself, Dr. Nilsen, Mr. Baksa.

BY MR. HARVEY:

Q: Did you review any documents in the course of that preparing?

A: We reviewed the lawsuit.

Q: You reviewed the complaint?

A: Yes.

Q: Did you review any other documents?

A: We reviewed was it the response?

MR. GILLEN: Answer.

A: Answer to questions.

BY MR. HARVEY:

Q: Did you review any other documents?

A: No.

Q: Now, do you have any documents in your possession — by possession I don't mean just necessarily with you today but at your home or office or other place that belongs to you — documents in your possession that relate to the subject matters of this lawsuit such as the board's resolution, intelligent design?

A: No, I don't.

Q: Do you use a personal computer?

A: My wife has one.

Q: Do you use it?

A: I play games with it.

Q: Do you use it to send e-mails?

A: On occasion.

Q: Did you ever use it to send e-mails that related to the subject matter of this lawsuit such as

Page 8

the board's resolution of October 18, intelligent design, creationism, or any other related topics?

A: It sounds reasonable that I might have, but I can't tell you. I don't know.

Q: Do you ever use that computer to access websites?

A: Yes.

Q: Did you ever use it to access websites that have information, material that would be relevant to this subject matter of this lawsuit such as intelligent design or creationism, evolution?

A: I have used the computer to contact the Thomas More Law Center on occasion, and I received e-mails from Seth Cooper from The Discovery Institute. On occasion I replied to those.

Q: Do you have copies of those?

A: No, I don't.

Q: Are they saved on the computer?

A: No, they're not.

Q: Were they erased?

A: I didn't save them. I'm not a computer expert. All I know is I didn't save them.

MR. HARVEY: Counsel, I'm going to ask that those be retained for use in this litigation in

Page 9

that if they're still available on the computer, and I suspect that they are, that they be made available.

MR. GILLEN: To the extent we can recover and identify them, I'll be glad to make them available to the extent they don't reflect attorney-client communication.

BY MR. HARVEY:

Q: Are you presently employed, Mr. Buckingham?

A: I'm retired.

Q: How long have you been retired?

A: Since '89. I was injured at work. I've had six back surgeries.

Q: What did you do before you were retired in 1989?

A: At that time I was a supervisor to York County Prison.

Q: Have you worked at all since 1989?

A: No.

Q: What's the highest level of education, formal education, that you've had?

A: I graduated from high school.

Q: Do you have any formal education in science other than the standard science classes in high school?

A: No.

Page 10

Q: Do you have any formal education in education?

A: No.

Q: Do you attend church?

A: Yes.

MR. GILLEN: Objection, relevance.

BY MR. HARVEY:

Q: You may answer the question.

A: I didn't hear what you said. You had your hand up to your mouth.

Q: Do you attend a church?

A: Am I to answer that?

MR. GILLEN: Yes.

A: Yes.

BY MR. HARVEY:

Q: What church do you attend?

A: Harmony Grove Community Church.

Q: Do you have a family?

A: Yes.

Q: Can you tell me who is in your immediate family?

A: My wife. You mean lives in my house?

Q: Well, do you have children as well?

A: I have three children.

Q: What are their ages?

A: I have a girl 39, twin boys 40.

Q: Did any of them attend the Dover School

Page 11

District?

A: They all did.

Q: Were you on the board at the time?

A: No.

Q: What's your wife's name?

A: Charlotte.

Q: How long have you been on the school board?

A: Approximately two years.

Q: Had you ever been on the school board before that?

A: No.

Q: Why did you run for the school board?

A: I ran for the school board because there were vacancies, and I feel that it's every citizen's duty to help out in government to the extent that they can.

Q: Have you held any positions on the school board such as heads of committees?

A: I was chair of the curriculum committee.

Q: Have you ever had any other positions other than that on the school board?

A: I was head of the— I can't think how it's worded. I'm chair of a committee that — student affairs.

Q: You're wearing a very prominent pin on your

lapel that's the cross, the crucifix, with the American flag in the background, correct?

A: Yes.

Q: I take it that that reflects your beliefs.

(Interruption)

BY MR. HARVEY:

Q: The pin that you're wearing, the cross, the crucifix, with the flag on it, that is a representation of your personal beliefs?

MR. GILLEN: Objection, relevance.

MR. HARVEY: I think his personal beliefs are very relevant to this litigation.

MR. GILLEN: You think that. I'm objecting on the grounds of relevance.

BY MR. HARVEY:

Q: Please answer the question.

A: Answer?

MR. GILLEN: Yes.

A: What beliefs?

BY MR. HARVEY:

Q: The ones that are reflected— Does the crucifix with the flag on it that you're wearing reflect your personal beliefs?

A: In what?

Q: In anything.

A: I believe a lot of things. I believe we have the greatest country in the world.

Q: I'm wondering if you can tell me what beliefs of yours that reflects.

A: To me this means God bless America.

Q: Good. Fair enough. Are you familiar with the scientific theory of evolution?

A: Yes, I am.

Q: Can you tell me what it is in general terms?

A: I'm not an expert in it, but I know it has to do with evolution within a species.

Q: Is it your understanding that it teaches that life forms evolved from a common ancestor?

A: I've heard that.

Q: Is the theory of evolution offensive to your personal religious beliefs?

A: No.

MR. GILLEN: Objection, relevance.

A: I'm sorry.

MR. GILLEN: Go ahead, you can answer.

BY MR. HARVEY:

Q: It does not offend your personal religious beliefs?

A: No, it doesn't.

Q: Do you believe in a literal reading of the book

of Genesis?

MR. GILLEN: Objection, relevance.

BY MR. HARVEY:

Q: Please answer the question.

A: I don't know— What was it?

Q: Do you believe in a literal reading of the book of Genesis as it relates to the story of creation?

A: My faith?

Q: I'm asking whether you believe in a literal reading of the book of Genesis in so far as it relates to the creation story.

A: That's one of the foundations of my faith.

Q: I'm just trying to understand here that you do believe in that literal reading.

A: That's one of the foundations of my faith.

Q: Do you have a belief about how long God took to create the Heaven and the earth and the—

MR. GILLEN: Objection, relevance.

BY MR. HARVEY:

Q: Do you have a belief about how long it took God to create the Heaven and the earth and the living species including man?

A: Yes.

Q: What is that belief?

A: My faith is based on the book of Genesis. It says in there six days.

Q: Is it your belief that those are six 24-hour days or six — or something else?

A: I have no opinion on that because it's in dispute.

Q: Do you believe that teaching of the scientific theory of evolution that life forms including man descended from a common ancestor?

MR. GILLEN: Objection, ambiguous.

A: Something for me, I have somewhat of a hearing loss, and when you talk like this, I don't get your question. I don't mean anything by it, but I just don't.

MR. HARVEY: I'm sorry, can you please read back my question.

(The court reporter read back the previous question.)

A: I don't really have an opinion on that because I'm not a scientist. I know it's a theory.

BY MR. HARVEY:

Q: But in any event, you don't view that as inconsistent with your own personal religious beliefs?

A: Do I believe it's inconsistent?

Page 16

Q: Yes.
A: Yeah.
Q: I'm going to rephrase that just because I think maybe it was unclear before. It's your view that the scientific theory of evolution in so far as it teaches that the life forms including man evolved from a common ancestor is inconsistent with your personal religious view about how God created life?
MR. GILLEN: Objection to the characterization of his testimony. I don't believe that's what he testified to.
MR. HARVEY: But he can tell me if that's correct or not.
A: I don't understand the question.
BY MR. HARVEY:
Q: Sure. I just want to be clear here. Am I correct in understanding that the theory of evolution in so far as it teaches that man evolved and life forms evolved from a common ancestor is inconsistent with your personal religious views?
MR. GILLEN: Objection, relevance.
A: The first part— I'm missing part of the question. Are you saying that evolved from a common ancestor?

Page 17

BY MR. HARVEY:
Q: I'll be happy to rephrase the question. I want to make sure we completely understand. It's my understanding, and I'm not a scientist either, that among other things that the theory of evolution teaches that the life forms including man evolved from a common ancestor. And I am asking you whether that view, that theory that the evolution of — that the theory of evolution teaches is inconsistent with your personal religious beliefs?
MR. GILLEN: Objection, relevance.
A: The way you stated the question that is not inconsistent with my personal beliefs.
BY MR. HARVEY:
Q: Why not?
A: Common ancestor, what is a common ancestor?
Q: What do you understand that to mean?
MR. GILLEN: Objection, foundation.
A: It can be what scientists consider two tiny amoeba way back zillions of years ago if you want it to be. It can be— For some people it can be Buddha. For somebody else it can be Allah. For a Christian it can be a Christian god, whatever.

Page 18

BY MR. HARVEY:
Q: I think you need to spell a couple of those things. You said boo?
A: Buddha.
Q: And the other one was Allah?
A: Allah.
Q: I'm sorry, I had a hard time hearing you that time.
A: I'm sorry.
Q: But let's just take it for a second that the common ancestor let's say is some single-celled organism many millions of years ago and that if that's what the theory of evolution teaches that that's the common ancestor, does that violate or is that inconsistent with your personal religious beliefs?
MR. GILLEN: Objection, relevance. Steve, I'm not going to let you keep asking him about his religious beliefs. It's not relevant, and it's harassing him. If you persist in this line of questioning, then I'll instruct him not to answer.
MR. HARVEY: Patrick, I am— I do believe it's relevant. I do not in any way mean it to be harassing. I'm just trying to understand what his beliefs are, and I think it is directly relevant to this litigation.

Page 19

MR. GILLEN: We'll find out from the judge if necessary.
MR. HARVEY: That's fine. But I'm just trying to understand here, and the testimony is a little unclear here, and we've just started this deposition. And I want to be very respectful of this gentleman's religious views, but I think they are, as we say, in play in this litigation to a certain degree. I'm going to ask you about them.
MR. GILLEN: No. You've asked him many times, and I'm not going to permit this line of questioning to go on indefinitely, and I don't think it's relevant. Go ahead.
MR. HARVEY: If you would like to instruct the witness not to answer on relevance grounds, you will be at your peril in this district.
MR. GILLEN: That's right. That's fine.
BY MR. HARVEY:
Q: Now, do you remember my question?
A: No.
MR. HARVEY: Can you read that back,

William Buckingham
January 3, 2005

Tammy Kitzmiller, et al. v.
Dover Area School District, et al.

Page 20

please.
(The court reporter read back the previous question.)
A: Ancestor to what?
BY MR. HARVEY:
Q: To all life forms including man.
A: The question was is that inconsistent with my beliefs?
Q: Yes.
A: Yes.
Q: Why is that inconsistent with your beliefs?
MR. GILLEN: Objection, relevance.
A: Why is it inconsistent with my beliefs?
BY MR. HARVEY:
Q: Yes.
A: My faith is founded on the book of Genesis.
Q: Can you explain further?
A: They're different.
Q: How are they different?
A: Do you want to do this again?
Q: I would like to make sure that the record is clear on this point.
A: Again, I'm not a scientist, but it's my understanding that in the theory of evolution where it goes back to the beginning of man it's

Page 21

happenstance, it just happened, and that is inconsistent with my faith.
Q: Let's see if we just can agree on who was on the board on October the 18th just so we're on the same common frame. We have you, we have Ms. Harkins, Ms. Geesey, Mr. Wenrich, Mr. Bonsell, Mr. and Mrs. Brown, Ms. Yingling, and Ms. Cleaver.
A: That sounds right.
Q: Now, have you ever had a discussion with any of those people about their beliefs, their religious views as they relate to the subject of evolution?
MR. GILLEN: Objection, relevance.
A: The answer is not that I recall.
BY MR. HARVEY:
Q: Have any of them ever shared their religious views with you as it relates to the subject of evolution?
A: Not that I recall.
Q: Now, I'm sure you're aware that the deliberations of the Dover Area School Board as it relates to the subject of intelligent design and the biology textbook has created a great deal of press attention.

Page 22

A: Yes.
Q: Do you read a paper daily?
A: No.
Q: Do you read any paper on a regular basis?
A: No.
Q: Do you get any papers delivered to your house?
A: Yes.
Q: Which ones?
A: The York Dispatch and York Daily Record.
Q: Does your wife read them?
A: I don't know.
Q: Do you ever discuss those?
A: Discuss what?
Q: The things that are in the newspaper.
A: The obituaries.
Q: Do you read what's written in there about the Dover school board?
A: I did at first. I don't anymore.
Q: Have you ever disputed anything that's been written in either The York Dispatch or the York Daily Record and attributed to you or the Dover school board?
MR. GILLEN: Objection, relevance.
A: Disputed with who?
BY MR. HARVEY:

Page 23

Q: Disputed it with the newspapers like write a letter to them or call them up and say you've got it wrong?
A: Yes.
Q: How many times?
A: I don't know, several.
Q: Did you in writing or by phone?
A: I usually talk to the reporter that comes to the meetings.
Q: Who's that?
A: Joe Maldonaldo.
Q: Now, are you aware of any inaccuracies in the reporting of the York Daily Record or The York Dispatch over the last year as it relates to the subject of intelligent design, the board's resolution, or its deliberations?
MR. GILLEN: Objection, relevance. Please answer.
A: Could you ask that again.
BY MR. HARVEY:
Q: Sure. Are you aware sitting here today of any inaccuracies in the reporting of The York Dispatch or the York Daily Record over the past year as it relates to the subjects that are at issue in this lawsuit, the biology curriculum in

Page 20 - Page 23 (8) Min-U-Script® Filius & McLucas Reporting Service, Inc.

particular?

MR. GILLEN: Objection, foundation.

A: Yes.

BY MR. HARVEY:

Q: What inaccuracies are you aware of?

A: You're going back over a year. I don't remember everything.

Q: Completely understand that you wouldn't remember everything. Do you remember anything?

A: Yes.

Q: Tell me what you remember that was inaccurate.

A: Well, just recently, I think it was last week, last week Mr. Maldonaldo put in the newspaper that I was back from my — where I was and indicated that I wouldn't say where I went because my attorney told me not to, and that's not true.

Q: How about other than that, are you aware of any other— Can you tell me any other inaccuracies sitting here today that you remember?

MR. GILLEN: Objection, foundation.

A: I know there were various and assorted statements attributed to me that were let's just say less than accurate.

BY MR. HARVEY:

Q: Any that you're aware of right now that you can tell me about?

A: I can just tell you that I know over the course of the year there were things attributed to me that weren't accurate. If you have something for me to see, I'll look at it and tell you.

Q: We're going to get to that in just a second. I just want to know you can't sitting here right now think of what those things were?

A: Well, it's been a while. Like I told you, I got tired of reading it. I don't read what they say anymore. I check the obituaries. I look at the sports and that's it. I don't care what people want to say. It's usually nothing relevant anyway.

Q: Sitting in front of you is a series of exhibits that we used this morning, and we're going to use the same ones this afternoon plus maybe some more. Right now I've got in front of you Deposition Exhibit 5 which is a compendium of articles from The York Dispatch and the York Daily Record.

MR. GILLEN: Did you say four or five?

MR. HARVEY: I meant four.

BY MR. HARVEY:

Q: I'm not going to ask you to look at this entire thing because that would take you the rest of the day, but I am going to ask you to look at some portions of it.

Now, if you turn to the June the 8th — it's in chronological order — York Dispatch, June the 8th, do you see the headline is Dover Debates Evolution in Biology Text, Book on hold Because it Doesn't Address Creationism. That's The York Dispatch June the 8th?

A: Apparently.

Q: Let me ask you, at or about this time, June the 8th, 2004, was the biology textbook for the ninth grade on hold because it didn't address creationism?

A: No.

Q: Was it ever on hold because it didn't address creationism?

A: No.

Q: Was it ever on hold?

A: Now we got to play with dates here. At first the science department wanted a book that was a 2002 model. We later found out there was one that came out that was dated 2004. So I don't know which book we're talking about because we

put the 2002 on hold to see if we could get the 2004.

Q: What about in or about June of 2004 of this year?

A: I don't know what the date was, but.

Q: Do you remember that the school faculty and administration recommended that the book Biology by Kenneth Miller be purchased?

A: The 2004 model?

Q: Yes.

A: Yes.

Q: Do you remember if that decision was put on hold for any reason by the board?

A: I know at that time we didn't have a full board. Somebody was on vacation. And I think the thought was to put it on hold until that person came back.

Q: Was that the only reason — only time it was ever on hold?

A: That was when it was on hold, as I recall.

Q: Was it ever put on hold because of the way it addressed evolution?

A: Because of the way— I don't understand the question.

Q: Well, let me— Let's look at this article right

William Buckingham
January 3, 2005

Tammy Kitzmiller, et al. v.
Dover Area School District, et al.

Page 28

here. If you turn to the second page of the article, please, the fourth paragraph down, Buckingham said — I'm reading from it, Buckingham said although the book had been available for review since May 2003, he had just recently reviewed the book himself and was disturbed that the book was laced with Darwinism.
MR. GILLEN: Objection, hearsay.
BY MR. HARVEY:
Q: Do you see that?
A: I see it.
Q: Did you say that?
A: In May of 2003?
Q: No, it doesn't say you said it in May of 2003. This is a story from June the 8th, 2004.
A: I know I was concerned that the only thing it talked about was Darwinism, and whether or not I used that exact statement, I don't know. But I know that was a concern.
Q: Did you say something like that?
A: I don't know what I said. I know I expressed a concern about it, but I don't know what the words were.
Q: What was the concern you expressed, please?

Page 29

A: Pardon?
Q: Please tell me what it is the concern that you expressed.
A: My concern that the book taught Darwin's theory of evolution and there are other scientific theories out there that I thought should be considered, also.
Q: If you go down three more paragraphs, it says, opposes separation of church and state: Buckingham said he believes the separation of church and state is mythical and not something he supports.
MR. GILLEN: Objection, hearsay.
BY MR. HARVEY:
Q: Did you say that?
A: I said in my opinion that is what I believe.
Q: Now, if you turn to the next page which is an article from The York Dispatch dated June the 9th. Are you at that section, that page?
A: Yes.
Q: This one says in the second paragraph, William Buckingham, a board member and head of the curriculum committee, said this week he was disturbed by a proposed high school biology textbook, the 2002 edition of Prentice Hall

Page 30

Biology, because it was laced with Darwinism.
MR. GILLEN: Objection, hearsay.
BY MR. HARVEY:
Q: Did you say that?
A: Not to my knowledge. I expressed a concern.
Q: Who did you express that concern to?
A: I guess— I'm not sure.
Q: Did you say it at a board meeting?
A: I'm not sure.
Q: Did you say it to a reporter?
A: Did I say that to a reporter?
Q: You said you expressed concern about the biology text. Am I correct in understanding that's your testimony?
A: Yes.
Q: You don't remember whether you said that in a board meeting, correct?
A: No, I don't.
Q: Do you know if you said that to a reporter?
A: Possibly. I don't know, though. When you say that, you don't mean this, you mean my concern.
Q: What you said. Now, if you look three paragraphs down in this same article, it says, a recommendation on the book will come from the curriculum committee which also includes board

Page 31

members Sheila Harkins and Casey Brown. Buckingham said the committee would look for a book that presented both creationism and evolution.
MR. GILLEN: Objection, hearsay.
MR. HARVEY: You can have a continuing objection on hearsay and relevance. You can have it to every question I ask.
MR. GILLEN: Okay. But I just want to make sure I've got a record on the newspaper reports.
MR. HARVEY: Understood. You can have that continuing objection all day long.
BY MR. HARVEY:
Q: Did you say that?
A: No.
Q: Did you say anything like that?
A: No.
Q: Do you have any explanation why this reporter would report this inaccurately?
A: I'd like to know why. I don't know. It's an ongoing problem.
Q: Do you ever use the word creationism?
A: In what context?
Q: In the context in referring to the creation of life.

Page 28 - Page 31 (10) Min-U-Script® Filius & McLucas Reporting Service, Inc.

Page 32

A: At church?
Q: Yeah, sure.
A: Yeah.
Q: Have you ever used it outside of church?
A: I'm 58 years old. I'm sure I did.
Q: That's very good. I would hope the answer to that was yes. Did you ever use it at any board meetings? Did you ever refer to creationism?
A: Not to my knowledge.
Q: Now, you told us you were concerned about the biology textbook. You just explained that to us a minute ago. Was the purchase of the new biology textbook held up because of your concern?
A: No.
Q: Was the purchase of a new biology textbook approved at one of the meetings of the board in June of 2004?
A: It was approved, but I'm not sure when.
Q: I think it was approved in August.
A: Could be.
Q: We'll get to that, but I'm sure. Did you vote for it? Did you vote for that?
A: In August?
Q: Yes.

Page 33

A: Yeah.
Q: You voted for the new biology textbook?
A: Absolutely. To the best of my knowledge, I did. It was always our intent to buy that book.
Q: Please turn the page two pages up to the York Daily Record, June 9th. This is another article from the York Daily Record. And this one says third paragraph down, board member William Buckingham who sits on the curriculum committee said a book had been under consideration but was declined because of its one-sided references to evolution. Do you see that?
A: I see it.
Q: Did I read that correctly?
A: That's what it says.
Q: Is that what you said?
A: No.
Q: Did you say anything like that?
A: No.
Q: Next paragraph says, quotes, it's inexcusable to teach from a book that says man descended from apes and monkeys. We want a book that gives balance to education. Did you say that?
A: Not to my knowledge.
Q: The next one says, Buckingham and other board

Page 34

members are looking for a book that teaches creationism and evolution. Do you see that?
A: I see it.
Q: Did I read that correctly?
A: You read what it says there.
Q: Is that true that you and other board members were looking for such a book?
A: No.
Q: What kind of book were you looking for?
A: A book that would give other theories, scientific theories.
Q: Such as?
A: You mean a book title?
Q: No, I'm sorry, such as what other scientific theories?
A: There are a lot of scientific theories. You know, it's not— You know, whatever theories that teachers are interested in teaching, you know, we don't have a problem with.
Q: Right. But you just said you wanted one that teaches other scientific theories, and I just want to know what other scientific theories as it relates to this—
A: There's the big bang theory. There's intelligent design, whatever.

Page 35

Q: Well, the big bang theory wouldn't be covered in the biology textbook, would it?
A: I don't know.
Q: Any other theories that you wanted covered other than the big bang or intelligent design?
A: I don't have any on the top of my head.
Q: But I meant back then, not referring to now, but back then in June when you were considering this subject, were there other theories that you wanted considered other than evolution?
A: Any theories that teachers thought plausible to teach, scientific theories.
Q: Do you have any specific ones in mind?
A: Did I then?
Q: Yes.
A: I was interested in the scientific theory of intelligent design.
Q: Any others other than intelligent design?
A: Any other theory that the teachers thought plausible to teach, you know, scientific theory.
Q: I guess I want to know do you have anything specific other than intelligent design?
A: I'm not a scientist. I just want the students to get a well-rounded education scientifically.
Q: Now, the next— If we go to that article, the

Page 36

next paragraph says — I'm sorry, the last paragraph on the page, the one that carries over to the next page says, board president Alan Bonsell disagreed, saying there were only two theories, creationism and evolution, that could possibly be taught. He said as long as both were taught as theories, there would be no problem for the district. Do you see that?

A: I see it.

Q: Do you ever remember him saying that?

A: I don't remember him saying that.

Q: Do you remember him saying anything like that?

A: No.

Q: Then if you continue down the next paragraph it says, quotes, have you ever heard of brainwashing, Buckingham asked Pell, if students are taught only evolution, it stops becoming theory and becomes fact. Did you say that?

A: Who's Pell?

Q: I think he's a person that's referred to in this article. Feel free to just refer to the previous page.

A: I did say something like that but in the context that if you teach one thing over and over— I mean, it can be four and four is seven. If you

Page 37

teach it over and over, it becomes fact to somebody. It was in that context. I wanted other theories, other scientific theories, to be presented in the classroom alongside of Darwin's theory of evolution.

Q: So you do recall — you did make the statement that's reported over there in the paper, the one about brainwashing?

A: That's not what I said.

MR. GILLEN: Objection to the characterization of his testimony.

BY MR. HARVEY:

Q: I'm sorry, what did you say?

A: Could you repeat what I said.

(The court reporter read the referred-to portion of testimony.)

A: I'll stand by that.

BY MR. HARVEY:

Q: That's what you said at the time. I'm asking you what you said at the time.

A: I said something similar, but I won't say I said those words.

Q: You said something similar to what is on the page here about brainwashing—

A: Yes.

Page 38

Q: —this paragraph? Okay. Now, you referred to you wanted other theories taught. You just said that, correct?

A: Other scientific theories.

Q: Other scientific theories. When you say theory, what do you mean?

A: Something that's scientifically debatable.

Q: Do you understand that the theory of evolution and the word theory as used in that context refers to an explanation that is commonly accepted and generally accepted in the scientific community that explains a wide range of phenomena?

A: No.

Q: So that's not what you mean when you say theory, correct?

A: That's not what you asked me.

Q: Fair enough. Next paragraph says, after the meeting, Buckingham said all he wants is a book that offers balance between what he said are Christian view of creationism and evolution.

A: Never said it.

Q: Next he said you said, he said there needn't be consideration of the beliefs of Hindus, Buddhists, Muslims, or other faiths and views.

Page 39

And then this purports to be a direct quote, this country wasn't founded on Muslim beliefs or evolution, close quotes, he said, open quotes, this country was founded on Christianity, and our students should be taught as such, close quotes. Did you say that?

A: I said— That goes back to a debate we had on taking under God out of the Pledge, and the reason I said that is because the Pledge doesn't refer to a specific God. It can be the Hindu God, it can be the Buddhist God, whoever they want it to be. In that context I said something similar to that.

Q: You didn't say it at or about this time, June 9th, as reported?

A: No, did not, no.

Q: Have you said that more than one time in your life?

A: Not that I know of.

Q: Well, one of the plaintiffs in this lawsuit, Ms. Eveland, wrote a letter to the editor of the York Sunday News on June the 20th in which she said she was upset that you said, quotes, this country wasn't founded on Muslim beliefs or evolution, this country was founded on

Tammy Kitzmiller, et al. v. Dover Area School District, et al.

William Buckingham
January 3, 2005

Page 40

Christianity, and our students should be taught as such, close quotes.

MR. GILLEN: Objection, hearsay to her statements, to the letter, and to the newspaper piece. Go ahead.

MR. HARVEY: Continuing objection granted again.

A: That was 11 days after that was in the paper. I don't know if she got that from that or where it came from, but I'm telling you that was the context it was used in.

BY MR. HARVEY:

Q: Did you write a letter to the paper in response to Ms. Eveland's letter?

MR. GILLEN: Objection, relevance.

A: Not that I remember. I don't usually give them fodder.

BY MR. HARVEY:

Q: Did you ever respond at all to her letter?

MR. GILLEN: Objection, relevance.

A: I never saw it that I recall.

BY MR. HARVEY:

Q: Let's turn to the next page of this exhibit, June the 10th. By the way, did anybody report to you at the time? Did you see any of this in

Page 41

the paper at the time, the things that we've looked at?

A: I stopped reading that stuff in the paper. It got to be— I never thought it would get like this, and I just got tired of looking at it. Like I say, I would open the paper, read the obituaries, see how my fighting Phils did, and that was about it.

Q: Did anybody come up to you and say in the community, your wife, your friends, anybody come up to you and say — tell you that these things are being written in the paper?

A: Not that I recall, no.

Q: Nobody at your church mentioned it to you?

A: Not that I recall.

Q: If you look at the third paragraph of this article which is in the York Daily Record on June the 10th, it says, quotes, during this past Monday night's board meeting, board members Alan Bonsell, Noel Wenrich, and Buckingham spoke aggressively in favor of having a biology book that includes theories of creation as part the text, close quotes. Do you see that?

A: I see it.

Q: Is that true?

Page 42

A: No.

Q: Next paragraph says, all I'm asking for is balance, Buckingham said. Did you say that?

A: With regards to teaching other scientific theories along with Darwin's theory of evolution, I could have said something like that.

Q: And then the next paragraph says, asked if he thought this might violate the separation of church and state, Buckingham called the law, quotes, a myth, close quotes. Did you say that?

A: Whenever I say that, it's my opinion. It's not the opinion of the school board. It's my opinion. That's true.

Q: Do you believe your opinion is correct?

A: I believe it's my opinion. It doesn't have to be correct.

Q: Well, you try to hold opinions that are at least in your mind correct, I would hope.

MR. GILLEN: Objection, calls for speculation.

BY MR. HARVEY:

Q: Isn't that true?

A: I don't understand the question.

Q: Do you hold opinions that you do not believe to

Page 43

be correct?

A: Do I hold opinions I think might not be correct? I'm not perfect. As life's evolving, opinions change with time and knowledge.

Q: More or less theory of evolution. Mr. Buckingham, I don't want to get into your—

A: But you will anyway, right? I'm sorry. I'm sorry. I was just trying to be funny.

Q: I didn't even hear it. Understand, my purpose is not to embarrass you here in any way today, but I have to ask you this, there was a report in the paper that you were — went to the hospital earlier in the year for some problems that you were having with Oxycontin.

A: That's true.

Q: Then there was an editorial in one of these papers that I would say applauded you for your forthright manner in which you dealt with that situation. Were you aware of that?

A: Yes.

Q: Let's take a look at that. It's June the 20th, York Sunday News. Please take a moment to read that. Have you had a chance to read that editorial of June the 20th, 2004 in the York Sunday News?

Filius & McLucas Reporting Service, Inc. Min-U-Script® (13) Page 40 - Page 43

William Buckingham
January 3, 2005

Tammy Kitzmiller, et al. v.
Dover Area School District, et al.

Page 44

A: Yes, I have.
Q: Had you read it before today?
A: I don't remember reading this.
Q: Did anybody mention this to you?
A: I would have to say no. I remember— I would have to say no.
Q: It says here that in addition to applauding you for the forthright way in which you dealt with your personal issue relating to Oxycontin, it says that you had made the following statements, quotes, this country wasn't founded on Muslim beliefs or evolution. This country was founded on Christianity, and our students should be taught as such, close quotes. And it also says, quotes, 2,000 years ago someone died on a cross, can't someone take a stand for him, close quotes. Do you see that?
A: Yes, I do.
Q: Did you make either of those statements?
A: Not at this time. The this country wasn't founded on Muslim beliefs or evolution, this country was founded on Christianity, I never said that.
Q: You never said that at all.
A: Not to my knowledge.

Page 45

Q: You never said the statement about Muslim beliefs or evolution, you never said that at all. Is that your testimony?
A: I don't recall saying that, no.
Q: How about back in 2003 in relation to the Pledge of Allegiance, did you say it then?
A: I don't think I did.
Q: The other one, 2,000 years ago someone died on a cross, can't someone take a stand for him, did you say that?
A: That goes back to taking it out of the Pledge.
Q: So it's your testimony that you didn't make either of these statements at any time in the period of June of 2004?
A: That's correct.
Q: Did it ever come to your attention that the paper was reporting that you had said these things in June of 2004?
A: Not that I recall.
Q: So you were totally unaware— When did you learn— I mean, you know now sitting here today, you know now that the paper was reporting that you said these things in June of 2004. Did you know that before today, before this deposition?

Page 46

A: I don't think I did.
Q: Did you read the complaint in this matter?
A: Yes, I did.
Q: It's in there. Did you see it in there?
A: Yes.
Q: So you must have known it then, right?
A: Well, I didn't see this until today. I thought you meant this.
Q: So that's amazing. Before today you didn't even know that these things were being reported about you. Is that correct?
A: That's true. That's true.
Q: Now, do you remember there was a board meeting on or about June the 7th of— I'm always asking about—
A: That sounds right.
Q: Do you remember that there were two meetings in June?
A: Yes.
Q: Do you remember what happened at those meetings?
A: No.
Q: Do you remember anything what happened at those meetings?
A: Nope.
Q: Well, please turn to York Dispatch article of

Page 4.

June 15th, 2004.
A: Okay.
Q: It says here at the top, nearly a hundred Dover residents and teachers attended last night's school board meeting to continue debating whether creationism should be taught alongside evolution in the high school biology curriculum. Do you see that? Do you see where it says that?
A: I see where it says that.
Q: In fact, why don't you take a second and read that article.
A: Oh, you want me to read it?
Q: Yes, please, to yourself. Now, do you remember after reading that the June 14th meeting? I'll tell you I looked at the calendar, and I know that — I believe anyway that the meetings were on June the 17th and June the 14th. Do you remember anything about that June 14th meeting?
A: To sit here and say do I remember it, no.
Q: Do you remember a meeting at which a hundred people showed up?
A: We've had several meetings where a good many people showed up.
Q: Do you remember a meeting in June where there was an intense discussion about the biology

Page 44 - Page 47 (14) Min-U-Script® Filius & McLucas Reporting Service, Inc.

Page 52

Q: This next one says, his remarks were echoed by his wife, Charlotte Buckingham, who said that teaching evolution was in direct opposition to God's teaching and that the people of Dover could not in good conscience allow the district to teach anything but creationism. Do you see that?

A: I see it.

Q: Do you remember did she say that at the meeting?

MR. GILLEN: Objection, foundation, characterization of what the passage purports to demonstrate, but go ahead.

A: I would say she said something similar to that. I don't know that it was those words.

BY MR. HARVEY:

Q: Now, if you go down to the second paragraph up from the bottom, it says, Assistant Superintendent Michael Baksa said the curriculum committee made up of Brown, Buckingham, and Sheila Harkins is scheduled to meet tomorrow to look for a book that will make everyone happy. Do you see that?

A: Yes.

Q: This was June the 15th. That's suggesting that there was to be a meeting on June the 16th. Was there a meeting of the curriculum committee on June the 16th?

Page 53

A: I don't know.

Q: Can't remember?

A: I can't remember.

Q: At this meeting was there any reference to creationism by any of the board members?

A: I can't remember the meeting.

Q: Well, we just— You said you did remember your wife saying something along the lines—

A: Oh, I thought you were talking about the next day.

Q: Apologize. We're back to the board meeting now. Do you remember anybody at that board meeting on the board saying anything about creationism?

A: They could have said something to the effect that we're not teaching creationism. I don't know.

Q: So you don't remember anybody saying anything about creationism?

A: No.

Q: In other words, I'm correct?

A: You're correct.

Q: Do you believe that your wife used the word creationism?

Page 54

A: I don't know if she did or not.

Q: If you turn the page, there's another article on the same subject. It's the York Daily Record of June the 15th.

A: Okay.

Q: The third paragraph down it says that — it says that you said that, quotes, nowhere in the Constitution does it call for separation of church and state, close quotes. And my question is, did you say that?

A: No.

Q: Two paragraphs down it said, quotes, Buckingham said while growing up his generation prayed and read from the Bible during school. Then he said, liberals in, quotes, black robes, close quotes, were taking away the rights of Christians, close quotes. Did you say that?

A: I remember saying something like that while we were growing up my generation prayed and read from the Bible and I don't remember it hurting anyone. I don't—

Q: But you didn't say anything about liberals in black robes taking away the rights of Christians or did you?

A: I don't remember saying anything like that.

Page 55

Q: Further on down, the second paragraph from the bottom it says, but in reference to its teaching of Darwinism he said, quotes, I challenge you, the audience, to trace your roots to the monkey you came from, close quotes. My question is, did you say that?

A: I might have.

Q: I missed one. Two paragraphs up is the quote, 2,000 years ago someone died on a cross, he said, can't someone take a stand for him. Again, not something you recall saying?

A: I didn't say it then.

MR. GILLEN: Objection to the characterization of his testimony. Go ahead.

BY MR. HARVEY:

Q: That's good, maybe a clarification. I can't remember, is it your testimony that you remember you didn't say that or you don't remember saying that?

A: I didn't say it.

Q: Understood. Then if you turn the page still on this June the 15th article of the York Daily Record it said, this is the fourth paragraph, quotes, also during public comments Buckingham's wife, Charlotte Buckingham, argued that

Page 56

evolution teaches nothing but lies. After quoting several verses from the book of Genesis in the Bible, she asked how can we allow anything else to be taught in our schools. During her time, she repeated gospel verses telling people how to become born-again Christians and said evolution was in direct violation of the teachings of the Bible. Do you remember your wife saying those things that are attributed to her there?

A: I know she got up and talked. I don't remember— I can't tell you exactly what she said. I really can't.

Q: Do you remember her quoting from the Bible?

A: No. I'm not saying she didn't. I'm just saying I don't remember.

Q: Then a little bit further down three more paragraphs it says, during the meeting, Buckingham told those in attendance that he had been asked to tone down his Christian remarks, quotes, but I must be who I am and not politically correct, he said, close quotes. Did you say that?

A: Not all of it.

Q: What part did you say?

Page 57

A: What I said was I must be who I am and I'm not politically correct.

Q: You didn't say anything about being asked to tone down your Christian remarks?

A: Not to my knowledge. And I think I must be who I am and not politically correct was in response to something somebody said to me. That was an answer. And I don't remember what led to that.

Q: The school district received a number of copies of the book Of Pandas and People, correct?

A: Yes.

Q: Do you know how many copies?

A: I've been told there were 60. I haven't seen them.

Q: Do you know where that came from, who donated them?

A: No, I don't.

Q: You have no idea?

A: I have thoughts, but I don't know.

Q: What are your thoughts?

A: I think it could have a tie to Alan Bonsell who was board president at that time.

Q: Why do you think— I know you're not saying it was, but why do you think it might have ties to Mr. Bonsell?

Page 58

A: Because he was the president of the board at that time, and I just deduced from that that.

Q: Have you read Of Pandas and People?

A: I glanced through it.

Q: How much time did you spend glancing through it?

A: A day, maybe two.

Q: Can you tell me what you can remember from the book?

A: I looked at that book a long time ago and, no, I can't.

Q: When was it that you glanced through it?

A: It was a couple months before we got them.

Q: Where did you get a copy of it?

A: I ordered one.

Q: From where?

A: You know, I don't even know. It was over the computer. I think Amazon.com maybe. I know there were scientific theories in there, but to recall what the theories were, no, I don't.

Q: It discusses intelligent design primarily, doesn't it?

A: I guess that would be a fair characterization, scientifically discussing intelligent design.

Q: Were you ever at a board meeting where someone asked who donated the book to the school, in

Page 59

fact, Larry Snook, a former board member, asking who donated it?

A: I think he expressed a wonder type thing over where they came from. I don't think— I don't remember anybody asking directly where they came from.

Q: Were you curious to know where it came from?

A: I know they came from someone in the public sector. I know we didn't use taxpayer funds to pay for it.

Q: Did you ask where it came from?

A: No.

Q: Why didn't you ask?

A: Didn't want to know.

Q: Why didn't you want to know?

A: What purpose would it serve?

Q: Well, because you're a board member and the school district is part of your responsibility as a board member, and maybe knowing where these books came from would be something that you should know.

A: No. I think it was a wonderful gesture, and I didn't concern myself with where they came from.

Q: What is intelligent design? Can you describe it for me?

William Buckingham
January 3, 2005

Tammy Kitzmiller, et al. v.
Dover Area School District, et al.

Page 60

A: It's a scientific theory relative to the complexities of life.
MR. HARVEY: Can you read that back. I'm sorry, I didn't get that.
(The court reporter read back the previous answer.)
BY MR. HARVEY:
Q: What does the scientific theory state or hold or say?
A: I'm sorry, I didn't— There's noise out there.
Q: What does this scientific theory of intelligent design according to you what does it stand for?
A: It could come from a tiny amoeba that generated a process whereby complex things evolved.
MR. HARVEY: I'm sorry, could you read that back.
(The court reporter read back the previous answer.)
BY MR. HARVEY:
Q: What could come from a tiny amoeba?
A: I'm not a scientist.
Q: I'm just trying to understand so we can have a working understanding here of what intelligent design is if we can. Do you have an understanding in very simple terms of what

Page 61

intelligent design stands for? What does it teach?
A: Other than what I expressed, that's— Scientists, a lot of scientists— Don't ask me the names. I can't tell you where it came from. A lot of scientists believe that back through time, something, molecules, amoeba, whatever, evolved into the complexities of life we have now.
Q: That's the theory of intelligent design?
A: You asked me my understanding of it. I'm not a scientist. I can't go into detail and debate you on it.
Q: I don't want you to debate me on it. I don't want you to debate anybody on it.
A: It's a scientific theory.
Q: How is it different from evolution to your understanding?
A: I don't understand the question.
Q: Do you understand the theory of intelligent design to be different from the theory of evolution?
A: Yes.
Q: You do?
A: Yes.

Page 62

Q: Just to be clear, we're using theory now in the same way that you defined it earlier in the deposition.
A: Okay.
Q: Just refresh my recollection, how did you use the term theory?
A: Can you tell me how I defined it?
Q: No way she's going to be able to go back.
A: I don't remember what I said.
Q: I think you said something about something that's not proven.
MR. GILLEN: Something scientifically debatable is what my notes reflect, Stephen.
A: I'll stand by that.
BY MR. HARVEY:
Q: So when we say— I'm using it the way you used it. So my question is, how is intelligent design different from evolution, if at all?
A: They're different theories in that some scientists believe that— We're going back over the same ground, I think. Some scientists believe that it could be tiny amoeba again — I'll go back there — generated a process where the complexities of life occurred, not as random I'll say as what the process of evolution would

Page 63

dictate.
Q: I'm still— Maybe I'm confused because I had my own idea of what it meant because I just glanced at Of Pandas and People. But let me just tell you a few things that I was under the impression that intelligent design, some ideas that it advanced, and you can tell me whether you understand me to be correct or not.
One, I understood that intelligent design said that life and living things were created or begun by some intelligent designer, some intelligent being. Is that your understanding?
A: No.
Q: Do you have any understanding like that?
A: No. Do you suppose we could soon take a break?
Q: Sure.
(Recess taken)
BY MR. HARVEY:
Q: Mr. Buckingham, does intelligent design teach that life like a manufactured object is the result of intelligent shaping of matter?
A: I think one— I think intelligent design expresses an order as opposed to the theory of evolution which talks about chance.
Q: It expresses an order you said?

Page 60 - Page 63 (18) Min-U-Script® Filius & McLucas Reporting Service, Inc.

Page 64

A: An orderly process to things.
Q: Who or what directed that order?
A: I don't know.
Q: But my question was, does intelligent design teach that life like a manufactured object is the result of intelligent shaping of matter?
A: I don't know about shaping. I think there's an order in intelligent design that's not in evolution. Whether or not it's shaping, I don't know.
Q: Does intelligent design teach that life itself owes its origin to a master intellect?
A: A master intellect?
Q: Yes.
A: I won't say that, no.
Q: Is that something you would want presented to the students at Dover High School?
MR. GILLEN: Objection, calls for speculation.
A: A master intellect?
BY MR. HARVEY:
Q: Yes. Would you want the students told that life itself owes its origin to a master intellect?
A: No.
Q: Would you want the students told that

Page 65

intelligent design locates the origins of new organisms in an immaterial cause, in a blueprint, a plan, a pattern devised by an intelligent agent?
MR. GILLEN: Objection, calls for speculation.
A: I don't even understand what that means.
BY MR. HARVEY:
Q: Do you want me to read—
A: Is there a way to simplify the question?
Q: Okay, sure. Would you want the students taught that intelligent design teaches that new organisms were caused by or created in accordance with a plan devised by an intelligent agent?
A: No.
Q: Does intelligent design teach that various forms of life began abruptly through an intelligent agency?
MR. GILLEN: Objection, foundation.
A: Could you repeat the question.
BY MR. HARVEY:
Q: Does intelligent design teach that the various forms of life began abruptly through an intelligent agency?

Page 66

A: I don't believe so.
Q: Was that something you would want the students taught?
MR. GILLEN: Objection, calls for speculation.
A: That's not up to me. I don't think so, no.
BY MR. HARVEY:
Q: But personally you wouldn't want that, right?
A: No.
Q: I mean, in other words, I'm correct?
A: Yes.
Q: Does intelligent design teach that similarities between organisms are explained because there was a common designer as opposed to a common ancestor?
A: I don't believe it says that.
Q: Would you want students taught that similarities between organisms are explained as being due to a common designer?
MR. GILLEN: Objection, hypothetical and calls for speculation.
A: So I'm supposed to answer that?
MR. GILLEN: Yes.
MR. HARVEY: Yes.
A: I hate to— Can you say it one more time,

Page 67

please.
BY MR. HARVEY:
Q: Sure. Would you want the students taught that similarities between organisms are explained as being due to a common designer?
A: No.
Q: Where did the school district board of directors get the idea to include intelligent design in the curriculum?
MR. GILLEN: Objection to the extent the question calls him to answer for other board members.
A: I first heard of it from the board president, Alan Bonsell.
BY MR. HARVEY:
Q: When was that?
A: When I first came on the board. That would have been approximately two years ago.
Q: What did he say about it then?
A: I can't give you a quote on what he said. I just know it was mentioned.
Q: When is the next time you heard of it?
A: I don't know.
Q: Well, we know that it made its way into the board resolution of October 18, correct?

A: Yes.
Q: Do you know how it got its way into the board resolution? Where did it first come from?
A: First came— It was mentioned to me by Alan Bonsell.
Q: Then after that, was it ever mentioned again?
A: I don't know that it was.
Q: Well, you were on the curriculum committee in the summer of 2004?
A: Yes.
Q: And the curriculum committee looked at it, didn't they?
A: I won't say the curriculum committee did. I did.
Q: What did you do to look at it?
A: I researched through— I looked it up on a computer.
Q: Where did you look?
A: I probably just put intelligent design, and it went where it took me. I couldn't tell you where that was.
Q: Do you remember what websites you went to?
A: No.
Q: Did you end up talking to anybody in person either — I mean live over the phone or in

person about it?
A: About intelligent design?
Q: Yes.
A: My attorneys.
Q: When was that?
A: It's several months ago anyway. I don't know.
Q: Who were your attorneys?
A: It was Thomas More Law Center, people there.
Q: Who at the Thomas More Law Center?
A: Richard Thompson.
Q: Anybody else?
A: I believe he's the only one I talked to there.
Q: Let's see if we can just get a little bit of a time frame. Please go to Plaintiff's Exhibit 5. It's in front of you. Go to Page 42. Do you see that?
A: Yes, I do.
Q: Have you ever seen it before?
A: Yes.
Q: What is it?
A: It's a paper I transmitted to the superintendent of schools.
Q: In it you were asking the superintendent to purchase 220 copies of, Of Pandas and People?
MR. GILLEN: Objection to the

characterization.
A: What was the question?

BY MR. HARVEY:

Q: Were you asking that 220 copies of, Of Pandas and People be purchased?
A: Yes.
Q: Was that request granted?
A: It never got to that stage.
Q: Was it the subject of discussion at a board meeting?
A: I don't believe it was. As I recall, I talked this through with Dr. Nilsen and Mr. Baksa, and to my recollection it was agreed that this wasn't a good idea.
Q: Why wasn't it a good idea?
A: The funds that would be expended. And in hindsight it shouldn't be taught from. I used a bad choice of words.
Q: When was that conversation with Mr. Baksa and— Who did you say it was with, Mr. Baksa and Mr. Nilsen?
A: Yes. It would have been the 25th of July.
Q: Now, why shouldn't it be taught from?
A: Well, we feel better with it being used as a supplement to a regular textbook, a regular

biology textbook. This book in and of itself doesn't cover everything that is in a regular biology textbook. And as a supplement, we felt better about it, I felt better about it as opposed to just having it, period.
Q: Now, there was a meeting of the board on August the 2nd. Do you remember that?
A: I don't know dates. It could be.
Q: Please take Exhibit 4 which is the compendium of articles and turn to The York Dispatch article of August the 3rd, 2004.
MR. GILLEN: I take it I have a standing objection as hearsay to all the newspaper articles?
MR. HARVEY: Yes.
A: August the what?

BY MR. HARVEY:

Q: August the 3rd of 2004.
A: The one from The Dispatch?
Q: Yes, York Dispatch.
A: Okay.
Q: It says in the first paragraph it said, a divided Dover Area school board approved a ninth grade biology textbook last night, but the debate over teaching creationism alongside

evolution in the district is far from over. Do you see that? Why don't you take a moment to read that article.

A: Okay.

Q: Does that refresh your recollection about the meeting that was held on August the 2nd, this board meeting of 2004?

A: I don't agree with what is stated on that paper, but it refreshes my recollection about the meeting.

Q: Tell me what you remember about the meeting.

A: Well, for one thing we didn't have a debate over teaching creationism.

Q: Just tell me what you remember about the meeting.

A: Without this, not much.

Q: Does this help you remember some things about the meeting?

A: Yes.

Q: What does it help you remember?

A: I can see the errors in here, and it comes to my mind as I see the errors as to what actually transpired.

Q: Tell me what actually transpired.

A: Going by this?

Q: According to your memory, yes, as refreshed by this document.

A: The third paragraph, the reason that happened is because we had a school board member that wasn't there that was a part of this process. And I—

Q: The reason that what happened? I'm sorry, I didn't mean to cut you off. Go ahead.

A: We're talking about the— It says, William Buckingham, the head of the school board curriculum committee, who brought up the issue of teaching creationism in June, said he would approve the biology textbook, the 2004 edition of Prentice Hall Biology only in conjunction with a companion text that teaches intelligent design. I never spoke about teaching creationism.

Q: Is the rest of that statement true?

A: I would say it's not because I don't— I didn't say that it taught intelligent design. I indicated the book leading toward intelligent design. I don't think I said it taught it.

Q: Right. But, in other words, you indicated at that meeting that you weren't going to vote in favor of approving the biology textbook unless there was a companion text that covered the

subject of intelligent design, correct?

A: On the proviso that we didn't have a remaining board member that was on vacation in Florida and I wanted her to be a part of the process.

Q: Why did you want her to be a part of the process?

A: Because she's a school board member and she should have a vote.

Q: Well, it says in the first one it reports that there were two votes on the subject and the first one was deadlocked four-four and you were against approving the biology textbook. Is that correct?

A: Without the presence of the other school board member, that's true.

Q: And then it was voted on. One board member changed their mind. That was Angie Yingling. And then it was passed. Is that correct?

A: Essentially that's correct.

Q: Is there any part of that that's incorrect?

A: I'll let it go at that.

Q: Now, there's an article a little further on, on August 4 where it says — you're quoted as saying— It's August 4 in the York Daily Record.

A: I have an August 4th— Okay, I've got it.

Q: Six paragraphs down it says that you said, if we don't get our book, you don't get yours.

A: I don't remember saying that.

Q: Did you not say that or you don't remember that?

A: I don't remember it.

Q: Then if you turn to the next page, the fourth paragraph down it says, but as Buckingham approached her, Mrs. Yingling, he said I can't believe you did that. Do you know what you've done. And then to that Yingling replied, I feel you were blackmailing them. I just want the kids to have their books. Do you remember that exchange between you and Ms. Yingling?

A: I remember an exchange. I don't remember the blackmailing thing. I know she wanted the kids to have their books, and I told her they're going to get their books. That wasn't an issue.

Q: Did you say I can't believe you did that, do you know what you've done?

A: Yes.

Q: What did you mean by that?

A: What happened was we had the four to four vote. Another board member who sat two chairs away from her threw a tantrum and scared her, and she

Page 76

changed her vote.
Q: Who was that?
A: Jeff Brown.
Q: How did he throw a tantrum?
A: He was pounding on the table and screaming, and he even stood up once, and she felt intimidated.
Q: What did he scream, anything in particular?
A: I don't remember what he screamed. I know it was just extremely loud and it was like a temper tantrum.
Q: So in the end the book, the biology textbook, was approved for purchase, correct?
A: Yes.
Q: Without the companion text—
A: Yes.
Q: —Of Pandas, right?
A: Yes.
Q: But Of Pandas was later donated to the board — excuse me, to the school district?
A: That's correct.
Q: Now, when you said in that exchange with Ms. Yingling you said do you know what you've done, what did you mean by that?
A: She left herself be intimidated by another board member.

Page 77

Q: Now, if you look— Go back to The York Dispatch of August 3. It's just a couple articles back.
A: York Dispatch of August 3?
Q: York Dispatch Of August 3, the one that begins, Michigan law center offers a defense of creationism. In the second paragraph it said, William Buckingham said he has received a letter from Americans United threatening to sue.
A: Yes.
Q: Did you receive such a letter?
A: I received a letter, but the word creation is— I don't know if they said that or if they said intelligent design.
Q: Where is that letter today?
A: I don't even think— I don't have it anymore.
Q: Did your counsel ask you to give them any documents that you had that related to this lawsuit?
A: No.
Q: Do you have any documents in your possession?
A: I don't keep things anymore. We get so much paperwork you just can't keep it. You just can't.
Q: Then two paragraphs down there's a reference to a letter from Richard Thompson of the Thomas

Page 78

More Law Center in which he said, quotes, a textbook adopted by the school board that presents an alternative theory to evolution does not violate the Constitution as long as the alternative theory is appropriately presented, close quotes. Do you see that?
A: I see it.
Q: You did, in fact, get such a letter from Mr. Thompson?
A: I got letters from him. I don't know if he said that or not. I honestly don't.
Q: A little further down it says, Buckingham said that the Thomas More Law Center had recommended the text Of Pandas and People. Do you see that?
A: Yes, I do.
Q: Did you say that?
A: No.
Q: Is it true?
A: No.
Q: Thomas More Law Center didn't recommend the text?
A: No. They just told me the book was there. They didn't recommend it yet.
Q: Had you ever heard of it before?
A: No.

Page 79

Q: Now, did you do any research about the text Of Pandas and People?
A: What do you mean research?
Q: Check it out to make sure it's a good book.
A: I ordered it.
Q: But other than that, did you do anything? Did you talk to anybody about it?
A: No.
Q: Did the school board look at the book other than you?
A: Eventually.
MR. GILLEN: Objection, foundation.
MR. HARVEY: When?
A: It was a way down the road.

BY MR. HARVEY:

Q: When was that?
A: I don't know.
Q: How did the school board look at it?
A: What do you mean how did they look at it?
Q: I mean, did you give them copies, or how did the other school board members come to learn about Pandas?
A: As I recall, I gave my copy to Dr. Nilsen to read, and they got a couple more copies, and they were passed around.

Tammy Kitzmiller, et al. v. Dover Area School District, et al.

William Buckingham
January 3, 2005

Page 80

Q: Did the school board consult with anybody about the text Of Pandas and People?
A: I don't understand the question.
Q: Well, the school board asked the teachers what it thought about the text Of Pandas and People, right?
A: Yes.
Q: And they were against it, correct?
A: Yes.
Q: So there's a set of professional educators that you talked to about this. Were there any other professional educators that you talked to about this book?
A: Not that I recall. And their objection wasn't over what the book was about. It was about they thought it was written over the heads of some of the students.
Q: Did you talk to anyone else about this book, professional educators, scientists, anyone?
A: No.
Q: Now, a few minutes ago you said that you talked to the Thomas More Law Center about intelligent design. Do you remember that?
A: Yes.
Q: You said you spoke to Mr. Thompson about it?

Page 81

A: That's true.
Q: Was that conversation before or after this meeting in August?
A: I'm not sure.
Q: Did you talk to Mr. Thompson for the purpose of finding out information about intelligent design?
A: I think I probably asked him what he knows about it and what our standing would be.
Q: When was the first time you talked to Mr. Thompson?
A: I don't know.
Q: Was it on the phone?
A: Oh, yeah.
Q: Well, this meeting here on August the 2nd of 2004, was it in 2004 that you talked to Mr. Thompson?
A: Yes.
Q: Was it around the same time as the meeting in August?
A: I don't know.
Q: Do you remember why you spoke to him the first time, what was your purpose in talking to him?
A: To see if he had any experience with the scientific concept of intelligent design and

Page 82

what that might be.
Q: Did you call him?
A: Yes.
Q: Did you speak with him about that subject?
A: Yes.
Q: Did you tell him why you were calling?
A: I'm sure I did.
Q: What did you tell him about why you were calling?
A: I imagine I explained to him that it was—
MR. GILLEN: I just want to make sure to the extent that communications occurred in connection with your call requesting legal advice and the legal standing on the issue, don't provide that information.
BY MR. HARVEY:
Q: You can answer the question.
A: I can't.
Q: Why not?
A: That's why I called.
Q: I thought you just told me it was to ask him about intelligent design.
A: I told you I called to ask him if he had experience in the scientific concept of intelligent design and where he thought we would

Page 83

stand if we used it.
Q: Did you tell other people on the board that you were going to make that call?
A: No.
Q: So this was a call that you just made on your own?
MR. GILLEN: Objection to the characterization of how he was acting, in what capacity.
A: I was gathering information.
BY MR. HARVEY:
Q: Did you report this information to the board?
A: Yes.
Q: When did you report it to the board?
A: After I talked to the Thomas More Law Center.
Q: What did you tell the board?
A: Told them I talked to the Thomas More Law Center.
Q: What did you tell them about that?
MR. GILLEN: Objection to the extent that you sought and obtained legal advice from anyone at the center and communicated that legal advice to the board. Don't communicate that information.
MR. HARVEY: Patrick, I don't think under

Filius & McLucas Reporting Service, Inc. Min-U-Script® (23) Page 80 - Page 8:

any conceivable theory was the board a client of the Thomas More Law Center at that time. He might conceivably himself. Arguably there was an attorney-client relationship there, but that did not extend to the board at that time on whose behalf he was not acting. And his communications to the board, therefore, waived it, and I'd like to know what he told them.

MR. GILLEN: I don't know. I'm not sure. I don't know what the understanding of all the board members was at that time. It's my understanding he was acting in his capacity as a board member seeking legal advice for the benefit of the board.

MR. HARVEY: He just told me that he didn't talk to anybody about it before he did that, so I think the question is answered.

MR. GILLEN: I'm not sure that's what he said.

MR. HARVEY: I'm quite sure that's what he said.

MR. GILLEN: I'm going to instruct him not to answer to the extent he sought legal advice in his capacity as a board member and communicated that legal advice to the board.

Q: What did you tell the board about your conversation with Mr. Thompson?

MR. GILLEN: Don't answer to the extent it's legal advice you were given and communicated to the board members as board members meeting as a board.

A: That's all it would have been. It would have been an executive session. It wouldn't have been in the board meeting.

BY MR. HARVEY:

Q: When was that executive session?

A: I don't know.

Q: Do you remember what you told the executive session of the board?

A: Not exactly, no.

Q: Do you remember generally?

A: No.

Q: Take a look at Plaintiff's Deposition Exhibit 7. That's a page from the Thomas More Law Center website. Have you ever seen it before?

A: I don't know that I have or haven't to be honest with you.

Q: The second sentence says, quotes, our purpose is to be the sword and shield for people of faith providing legal representation without charge to

defend and protect Christians and their religious beliefs in the public square. Do you see that?

A: Yes.

Q: Did you understand that to be the purpose of the Thomas More— Sitting here today, do you understand that to be the purpose of the Thomas More Law Center?

MR. GILLEN: Objection, relevance.

A: Do I understand that to be the purpose?

BY MR. HARVEY:

Q: Yes.

A: I understand that's what it says.

Q: Did you understand that that was the purpose of the Thomas More Law Center when you first contacted them?

A: No.

Q: What did you think it was?

A: I thought it was a group of attorneys that I could get some legal advice from.

Q: Did you recognize that it was dedicated to advancing Christian beliefs?

MR. GILLEN: Objection to the characterization of the mission of the center.

A: It never crossed my mind either way.

BY MR. HARVEY:

Q: Did you think about calling the ACLU or Americans United?

A: No.

Q: Did you think about calling any other organizations?

A: No.

Q: Where did you get the name for the Thomas More Law Center?

A: I'm not sure how I got it. I just— I don't know if someone mentioned it to me. To tell you the truth, I don't know. I think someone mentioned it to me. Who it would have been, I don't know.

Q: Is it a Catholic organization?

A: I don't know.

MR. GILLEN: Objection, relevance.

BY MR. HARVEY:

Q: So we were talking before about where you got the idea for intelligent — where the idea of intelligent design in the board resolution came from, and I want to direct you now to yet another exhibit, Mr. Buckingham. If you go to what's been marked in front of you, that big stack of stuff, Page Number 1 of that exhibit,

Page 88

that's a memo, right?
A: Appears to be.
Q: It's from whom?
A: Mr. Baksa.
Q: Who is Mr. Baksa?
A: Assistant superintendent of the schools.
Q: It's calling for a meeting of the board curriculum committee on Thursday, October 7th, correct?
A: Yes.
Q: You were the head of that committee?
A: Pardon?
Q: You were the head of that committee?
A: Yes.
Q: Now go to Page 36, please. There's a page there that says at the top, Board Curriculum Council Meeting, October 7, 2004, Proposed Curriculum Changes. Do you see that?
A: Yes.
Q: Have you ever seen this page before?
A: I may have.
Q: Please take a moment to look at it and tell me whether you've ever seen it before.
MR. GILLEN: If I may, Stephen, to avoid any unnecessary waste of time, there's two

Page 89

versions of that document. One has handwritten notes. One does not. Page 35 does not have the handwritten notes. Did you see either of them just for Stephen's benefit?
A: It's possible. To tell you I remember specific paper out of all the papers we see, you know, it wouldn't be fair to me or you.
BY MR. HARVEY:
Q: So you don't remember seeing this?
A: No.
Q: Well, at the top it says, recommendations, and it says, students— It has a recommendation apparently from the administration and staff, one from Mr. Bonsell, one from Casey Brown, and one from you.
A: Okay.
Q: And they all differ slightly. Do you see that?
A: Yes.
Q: I want to know if that's your recollection of what all your various views were.
A: That's my recollection. I just didn't know if I saw this paper before.
Q: Okay, fine. So you wanted— Under Number 4, you wanted something that would say students will be made aware of other theories of

Page 90

evolution including, but not limited to, intelligent design, right?
A: True.
Q: Mr. Bonsell according to the handwritten comment that's been written in there wanted the same thing?
MR. GILLEN: Objection to the surmise as to what that handwritten comment says.
MR. HARVEY: Fair enough.
BY MR. HARVEY:
Q: Did Mr. Bonsell want the same thing as you?
A: I don't know.
Q: Well, did you attend curriculum meetings with Mr. Bonsell?
A: Yes.
Q: How many did you attend?
A: Several.
Q: Tell me when those meetings were to the best of your recollection.
A: I couldn't come close.
Q: Were the faculty and staff represented at those meetings?
A: Yes.
Q: Were the faculty and staff represented at all of those meetings?

Page 91

A: No.
Q: Do you know how many meetings there were? Was it two, three, or four or more?
A: At least four. The last one— Well, there was at least four.
Q: Was it fair to say that the staff didn't want a reference to intelligent design?
A: What staff?
Q: The faculty I mean.
A: That's true.
Q: And that you did want a reference to intelligent design?
A: That's true.
Q: Do you remember what Ms. Brown's view was?
A: I think she was opposed to it.
Q: What about Mr. Bonsell, did he want a reference to intelligent design or not?
A: He did— There was a point where he wasn't sure, and there was a point where he did. I'm not sure where we are here.
Q: Now, so at least at this point as of October 7th you were the one who wanted intelligent design included in the revised curriculum?
A: I was one of the people that did. I wasn't the only one.

William Buckingham
January 3, 2005

Tammy Kitzmiller, et al. v.
Dover Area School District, et al.

Page 92

Q: Who were the others?
A: Sheila Harkins, Janie Cleaver, Heather Geesey. Was Heather there then. I'm not sure if Heather Geesey was on the board then. I know she wanted it.
Q: I believe she was.
A: Okay, she wanted it. Angie Yingling indicated she did. Noel Wenrich wanted it. I guess that's about it.
Q: What about Alan Bonsell?
A: Alan wanted it.
Q: So that's everybody but the Browns wanted it?
A: I guess so.
Q: You just told me that's at the time of October the 18th. Do I understand that correctly?
A: No. We're talking about October the 7th, aren't we?
Q: Yes, good clarification. Had the matter been discussed with the entire board as of October 7?
A: I'm sure it had.
Q: In other words, how did you know all these people wanted it?
A: I'm sure it was talked about at the board meetings.
Q: Do you remember when? Prior to October the

Page 93

18th?
A: Definitely.
Q: It was definitely talked about prior to October 18th?
A: Absolutely.
Q: Do you remember when?
A: Several occasions. I'm sure we did actually have meetings it didn't come up.
Q: Were the only discussions that were held about it at board meetings, formal board meetings, either in executive session or otherwise, or were there discussions of it outside of formal board meetings?
A: Some board meetings.
Q: Well, it was discussed at the curriculum meeting, right?
A: Well, that was our job, yeah.
Q: So it was discussed at curriculum meetings, and it was discussed at several board meetings?
A: Yes.
Q: Was it ever discussed in any other meetings like maybe a meeting you had with somebody at your house?
A: No. Nobody ever comes to my house from here.
Q: Did you ever have any discussions with any other

Page 94

board members, you know, at a coffee shop, at your church, at your place of business, or anyplace else?
A: No.
Q: Did you ever talk about it on the phone with any of the board members?
A: The only time I talked about it on the phone was with reference to Janie Cleaver. I was wondering if she was going to be back for the board meeting. That is my recollection. And I think she called me from Florida. I didn't even know how to call her. I know there was a concern over whether she'd be back for the board meeting or not.
Q: Did the board ever review any materials— Were any materials presented to the board about intelligent design, telling them what it was?
A: Other than the book, I don't believe so.
Q: Did the board ever talk to anybody about what the concept of intelligent design was such as—
A: Not to my knowledge.
Q: I'm still trying to understand how the subject of intelligent design got introduced. You said that Alan Bonsell talked to you about it a long time prior to this.

Page 95

A: Right after I come on the board.
Q: And then you said you talked to Mr. Thompson about it one time but that was just about the legal status of it, correct?
A: Well, I wanted to know about the legal status of it, and I wanted to know what he knew about it.
Q: What did he tell you about what he knew about it apart from the legal status?
A: I don't remember.
Q: Were you the one who was pushing the idea of including intelligent design in the curriculum?
A: I wouldn't characterize it that way.
Q: How would you characterize it?
A: I was one that I would say I kept the conversation going.
Q: Why did you keep the conversation going?
A: Because I wanted other scientific theories alongside of Darwin's theory of evolution, you know, other scientific theories so the students would have a more rounded scientific education as far as other theories go.
Q: Was your only personal reason so they would have a more well-rounded education?
MR. GILLEN: Objection, relevance. Go ahead, answer.

Page 92 - Page 95 (26) Min-U-Script® Filius & McLucas Reporting Service, Inc.

A: Absolutely.

BY MR. HARVEY:

Q: Did you consider alternatives to other aspects of the curriculum? Why only evolution did you want to provide alternative theories on?

A: As I recall, we had a meeting involving Mrs. Spahr and some of the people in the science department, and we encouraged them to come up with other theories. You know, I'm not a scientist. I don't know all the theories out there. I became aware that this scientific theory existed, and I just felt that more than one scientific theory should be mentioned in the classroom.

Q: Scientific theories for — that relate to the origins of life and— Is that what you mean?

A: Whatever. It doesn't have to be that.

Q: You weren't asking her to come up with other scientific theories, for example, with respect to the creation of volcanoes, were you?

A: If she wanted to. It was a blanket statement. You know, there are different theories for different things. We just wanted alternative theories to different things, you know, to well round an education.

Q: So you told Ms. Spahr that you wanted alternative theories for all aspects of the science curriculum?

A: I didn't say that. I didn't say that.

Q: What did you say?

A: In the course of our meeting, that was the gist of what was discussed. I can't tell you who said what. I don't know. And at that meeting— Well, that's all I can say.

Q: But the only one that you insisted that there be an alternative to was the theory of evolution, correct?

A: I wouldn't say I insisted at that time. I just recognized that as one of the scientific theories out there. It was one I could call by name. If there were other scientific theories that she wanted to introduce, we were fine with that.

Q: How do you know intelligent design is a scientific theory?

A: It's a scientific theory because a lot of scientists back it. They have a lot to say about that.

Q: How do you know that a lot of scientists back it?

A: I read about it.

Q: Where did you read about it?

A: Different articles.

Q: Can you remember any of them?

A: Not off the top of my head. And also I received a call from The Discovery Institute. And I talked to an attorney there. He called me. I didn't even know they existed. He sent information to us.

Q: Who was the attorney?

A: Seth Cooper.

Q: What did he tell you?

MR. GILLEN: Again, to the extent he provided you with legal advice and you went to him for that or you discussed that, he offered and you accepted it, don't communicate that.

BY MR. HARVEY:

Q: He contacted you, Mr. Cooper, right?

A: Yes.

Q: You didn't seek him out?

A: No.

Q: So you weren't seeking any information from him. He was reaching out to you, correct?

A: Once he called me, I was seeking information from him.

Q: What was the information you were seeking from him?

A: The same as when I talked to Mr. Thompson. I didn't know anything about The Discovery Institute, what they espoused or anything like that. I just wanted to know what he knew about it.

Q: What he knew about what?

A: Intelligent design.

Q: What did he tell you?

A: I can't recall. That was a long time ago.

Q: Do you remember anything he said to you?

A: I remember that—

MR. GILLEN: Apart from legal advice he gave you.

A: Right. He talked about Darwin's theory, and he provided information to me that I gave to the science department for the school — or the teachers and the administration to review regarding Darwin's theory.

BY MR. HARVEY:

Q: What was that information that he gave you?

A: There were others — there were scientists in there that had opinions differing in many respects from Darwin's.

William Buckingham
January 3, 2005

Tammy Kitzmiller, et al. v.
Dover Area School District, et al.

Page 100

Q: Was this in writing that he gave you this information?
A: It was a DVD, a videotape, a book or two.
Q: The Discovery Institute gave you a videotape, a DVD, and a book or two?
A: Yes.
MR. HARVEY: Counsel, why weren't these produced?
MR. GILLEN: You know, a couple of things. First of all, I'm not sure they're responsive. Second, I have to be honest, I wasn't sure exactly what they provided. We asked for everything and provided you in a very short period of time everything we could lay our hands on including over a hundred pages of documents which were copied over the break and in addition provided things this morning that just came to light last night.
This I can say is the first time I've heard of these documents. In the event I determine that they're responsive, I will gladly turn them over to you.
BY MR. HARVEY:
Q: Where are they now?
A: They were turned over to Dr. Nilsen. He turned

Page 101

them over to someone in the science department. That's the last I saw of them. I donated those to the school.
Q: Were they ever reviewed by the board?
A: Not to my knowledge.
Q: Did you review them?
A: Yes.
Q: How long did it take you to review them?
A: A couple of days.
Q: Do you remember any of the discussions that the board had about the subject of intelligent design?
A: Not verbatim, no.
Q: Do you remember anybody discussing why they wanted it taught or presented?
A: What does presented mean?
Q: You don't know what I mean by presented?
A: No.
Q: Okay. Why did they want it taught?
A: They didn't.
MR. GILLEN: Objection to—
BY MR. HARVEY:
Q: They didn't want it taught. What did they want done?
A: They wanted the scientific theory of intelligent

Page 102

design mentioned.
Q: Did they say why they wanted it mentioned?
A: They who?
Q: The board members.
A: The board members?
Q: Yes.
A: Because it's a scientific theory and we felt that it would be a good addition to the class to go along with Darwin's theory of evolution.
Q: Which school board members said that?
A: I don't know.
Q: I mean, do you remember specifically what people said—
A: No.
Q: —about why they wanted it?
A: No. I was talking about me. I'm sorry.
Q: That's okay. So was there ever any discussion on the board about the reason for mentioning intelligent design?
A: Yes.
Q: What was that?
A: To present a balanced view of scientific theories.
Q: When was that?
A: Different times. I couldn't give you dates.

Page 103

Q: Balance between what? I mean, what were you balancing?
A: Different scientific theories, not necessarily one critical of the other, just other things.
Q: Do you remember who specifically said that?
A: No.
Q: Did Sheila Harkins ever say that?
A: I don't know.
Q: Did any of the board members ever express any other ideas why they wanted intelligent design mentioned to the students?
A: I don't know.
Q: In other words, you don't remember?
A: I didn't— There were meetings I was absent at, so I can't tell you. While I was there, I don't remember ever hearing.
Q: Why not teach the theory of intelligent design? Why did you just want it mentioned instead of taught?
A: Because we were afraid we were getting into a gray area that we didn't want to go into.
Q: What do you mean by a gray area?
A: We just wanted to have it mentioned and have the students be able to have an alternative theory, not necessarily opposed by Darwin or opposing

Page 100 - Page 103 (28) Min-U-Script® Filius & McLucas Reporting Service, Inc.

Page 104

Darwin, that would help them round out their scientific education. We stayed within the guidelines of the PSPA. That was our intent.

Q: I'm still not sure I understand. Why is it a gray area in your mind? Why was it a gray area?

A: Well, I didn't— The teachers weren't comfortable teaching it, and I didn't want to force it on them if they weren't comfortable teaching it.

Q: You said earlier in this deposition that you wanted the teachers to teach any theories they thought plausible.

MR. GILLEN: Objection to the characterization of his testimony. I don't believe he said that.

MR. WALCZAK: It's a quote.

A: What I said was scientific theories they thought were plausible.

BY MR. HARVEY:

Q: So teachers could teach any scientific theory they thought plausible?

A: With the—

Q: You can answer the question.

MR. GILLEN: Objection, calls for speculation. But go ahead, answer.

Page 105

A: With limitations and by approval of the board.

BY MR. HARVEY:

Q: Why did you want them to teach any theories that they thought plausible?

MR. GILLEN: Objection to the characterization of his testimony.

A: I didn't get your question. I'm sorry.

BY MR. HARVEY:

Q: Why did you want the teachers to be able to teach any theories they thought plausible?

MR. GILLEN: Same objection.

A: In an effort to round out the scientific education of the students in the class.

BY MR. HARVEY:

Q: Is it a concern of you that the mainstream scientific community doesn't accept intelligent design as scientific teaching at all?

MR. GILLEN: Objection, foundation.

A: I don't know that that's true, so it's not a concern for me.

BY MR. HARVEY:

Q: I mean, you don't recognize that it's true that the scientific community doesn't — the mainstream scientific community at the very least does not accept intelligent design as

Page 106

valid science?

MR. GILLEN: Same objection.

A: What constitutes mainstream?

BY MR. HARVEY:

Q: I'm just asking you if you have an understanding on that subject.

A: I know there are a lot of scientists that oppose some parts of Darwin's theory of evolution, and I know there are scientists who support aspects of intelligent design.

Q: If the teachers didn't want to teach it, why are you making them mention it?

A: Again, as part of an effort to round out the scientific education of the students.

Q: I know that's true, but you're not a professional science educator, correct?

A: That's correct.

Q: You don't know anything really about science. Isn't that correct?

A: I wouldn't say that.

Q: Well, you know very little about science?

A: I know water is H O.

Q: You don't have any background in science beyond what's—

A: I'm not a professional.

Page 107

Q: Are you a very knowledgeable lay person?

A: With regards to what?

Q: Science.

A: Depends on what very knowledgeable means.

Q: Do you subscribe to any scientific publications?

A: No.

Q: Have you ever?

A: No.

Q: Do you follow science developments?

A: Yes.

Q: Where?

A: Discovery channel, things like that on TV.

Q: Other than that, do you read about it in any newspapers?

A: Yeah.

Q: Which ones, York Daily Record?

A: York Dispatch. We only have two.

Q: Well, you don't read those regularly, correct? I mean, you already told me that.

A: I don't read the letters to the editor, and I don't pay attention to what they say about this issue.

Q: Well, you told me you read the obituaries and the sports page very clearly earlier, correct?

A: Yeah. But I didn't say that was all I read.

Page 108

Q: In any event, you've got teachers that are professional science educators, and you pay them money to teach the students, correct?
A: That's true.
Q: Why did you disregard their advice on this?
MR. GILLEN: Objection, foundation.
A: I won't say we disregarded it. They didn't want to teach it, and they don't have to.
BY MR. HARVEY:
Q: Well, they didn't want it mentioned. Isn't that correct?
A: There were some teachers that indicated that they weren't comfortable with mentioning that.
Q: So why did you overrule them, these professional science educators?
A: It's our job as a school board to set the curriculum. I won't say we overruled them because their concern was that because intelligent design was in the curriculum that we were forcing them to teach it. We told them multiple times no.
Q: You were just forcing them to mention it?
A: To acknowledge that that scientific theory does exist.
Q: Right. But they were against that, correct?

Page 109

A: Yes.
Q: Why did you force them to mention it when they didn't want to as professional science educators?
A: As school board— As a school board, we thought it was in the best interest of the students to do that.
Q: That's I mean— I mean, I would hope that would be true.
A: It is true.
Q: But why did you think it was in the best interest of the students to overrule the professional science educators?
A: I think the science educators were operating out of fear. And, again, we thought it would be in the best interest of the students and a way to step towards giving them a fuller scientific education to mention this theory and other theories.
Q: Why do you think the school teachers were operating out of fear?
A: I guess they're afraid of the ACLU. I don't know. You have to ask them that.
Q: Did they ever tell you they were afraid?
A: They said they were afraid of being sued.

Page 110

Q: What did they say they were afraid of being sued about?
A: Intelligent design. They were afraid it would be considered something else.
Q: But that was all later when they said that they were afraid of being sued. Initially they were just against teaching it or mentioning it. Isn't that correct?
A: That's not correct. They always had a background of being afraid they'd be sued.
Q: Now, was the board meeting on October the 18th taped?
A: I don't know. As I recall, our normal secretary was out, and someone else was operating the equipment, and I think there was something — something happened with the taping process. That's my recollection.
Q: Do you remember what happened at the meeting October 18th?
A: With regards to?
Q: Intelligent design and the board's resolution.
A: Did we establish that we passed it then?
Q: Yes.
A: Yeah.
Q: Do you remember the discussion that took place?

Page 111

A: As I recall, yes.
Q: Do you remember that approximately 11 people from the public stood up and spoke about it?
A: I don't know how many people.
Q: Do you remember that 10 of them spoke against it?
A: No, I don't remember that.
Q: Do you remember anyone speaking for it?
A: Yes.
Q: Who was that?
A: You know, they come to the podium. They give a name. And I know that the people normally that come and speak against it are either relatives or friends of teachers.
Q: Why would relatives and friends of teachers speak against it?
A: I don't know.
MR. GILLEN: Objection, foundation.
A: Don't know.
BY MR. HARVEY:
Q: Angie Yingling voted for the resolution on October 18th, correct?
A: Yes.
Q: Did you know that she later stated that she felt pressured to do that because people called her

Page 112

an atheist if they didn't support it?
A: She never told me that.
Q: Did you ever hear that?
A: Not from her.
Q: Did you hear it from anybody?
A: I might have. I think I did hear it from somebody, but I don't know who.
Q: Was it true? Did anybody say that to her?
A: Not to my knowledge.
Q: Did you have any conversations with her about it?
A: About being an atheist?
Q: About pressuring her to support the resolution.
A: Did I— I don't understand the question.
Q: Did you have any conversations with Ms. Yingling about supporting the resolution?
A: Yes.
Q: Tell me about that conversation, everything you can remember.
A: I just asked her how she felt about it.
Q: What did she say?
A: She said I'll support you a hundred percent.
Q: Did you say anything else to her?
A: No, not that I recall. I don't know what else I would have said.

Page 113

Q: Did you hear that Casey Brown said that people asked her whether she was born again?
A: I remember that.
Q: Did you ever hear anybody asking Casey if she was born again?
A: Never.
Q: Would you agree that would be inappropriate at a board meeting?
A: Absolutely. It's appropriate anywhere — inappropriate, I'm sorry.
Q: I'm sorry?
A: Inappropriate. I think I said appropriate. I'm sorry, I misspoke.
MR. HARVEY: Why don't we just take about a five-minute break.
A: That would be great. Thank you.
(Recess taken)
BY MR. HARVEY:
Q: Mr. Buckingham, I don't mean to get into your personal issues again, but I think I need to ask this question as well, and that is there is a pretty big disconnect in this case between what the newspapers are saying and what the witnesses that we've talked to today are saying to us, especially you. You did have some drug issue in

Page 114

your recent past or somewhat recent past. Is it your understanding that that would in any way affect your memory or ability to remember these things?
A: I didn't understand that, but Oxycontin is a relatively new drug, and the long-term effects of it aren't known, so I don't know. They could well be. I don't know.
Q: Are you taking anything like cold medicine or anything today that would affect your ability to remember the events correctly?
A: No. I have a Hall's right now.
Q: How old are you?
A: Fifty-eight.
Q: How is your memory generally?
A: Do you want my version or my wife's?
Q: Generally what's your version?
A: I'd say average.
Q: The board resolution is quoted in the complaint in this matter, and I think you've admitted it, so we don't need to go into it. Well, it's right on the second page of the complaint which is Deposition Exhibit 1 right up at the top. Who drafted that language?
A: I think it was a combination of— Although not

Page 115

in the same room at the same time obviously, it's a combination of the teachers, the administration, and the curriculum committee.
Q: What language did the teachers add?
A: Pardon?
Q: Looking at that resolution there, the teachers added the language, note: origins of life is not taught.
MR. GILLEN: Objection, speculation.
BY MR. HARVEY:
Q: Isn't that right?
A: It could be.
Q: Do you remember?
A: No, not for sure.
Q: Okay. What language did the curriculum committee draft?
A: There were three proposals. Without having them in front of me, I can't tell you.
Q: Well, in that case why don't you pick up Deposition Exhibit 5 and turn to about four-fifths of the way through.
MR. GILLEN: I think it's 133 or thereabouts. I could be wrong.
BY MR. HARVEY:
Q: One thirty-nine, do you see that that's the

William Buckingham
January 3, 2005

Tammy Kitzmiller, et al. v.
Dover Area School District, et al.

Page 116

agenda for the meeting?
A: Yes.
Q: Then if you go to Page 145 under the curriculum, it says, copies of the changes have been sent to the district curriculum advisory council and the science department. Do you see that under background information?
A: Yes.
Q: Just above that it refers to the approved changes to the biology curriculum, and there's a reference to the enclosures?
A: Yes.
Q: Was the material that was considered at this meeting was it shared with the district curriculum advisory council?
A: I can't say if it was or not. I know I didn't. I don't know if anyone else did or not.
Q: What is the district curriculum advisory council?
A: It's my understanding it's made up of people from the community and possibly some teachers.
Q: Then if you go on and you look at attached to this are three different enclosures. The first one is at 146 and 147. Do you see that?
A: Um-hum.

Page 117

Q: The cover memo says, the first one, that's Exhibit XI-B, they're out of order here, is the recommended change from the administration and staff. Do you see that? It's 147.
A: Yes.
Q: This one came from the staff?
A: One forty-seven?
Q: Right. This is the one that came from the faculty, right? And there's no reference to intelligent design or Of Pandas and People?
A: Where do you see it was recommended by somebody?
Q: There's a cover memo.
A: Oh, on the cover memo.
Q: Page 146.
A: Yes, I see that now.
Q: This is what came from the staff. Then the next one if you go to Page 148 and 149, look at the memo on 148. This is the one that came from the curriculum committee.
A: Right. I read that.
Q: It says there's a reference to intelligent design and a reference to Of Pandas and People.
MR. GILLEN: Excuse me if I may, Steve. Just for the record, I believe that the documents that you're referencing are the ones

Page 118

that are properly associated with the memos, but I know that the packet I produced they were stapled and these are not. I believe that it's not problematic.
MR. HARVEY: These are in the same order that you produced according to the numbers.
MR. GILLEN: Then it is my belief they were properly associated with the cover memo.
MR. HARVEY: Right.

BY MR. HARVEY:

Q: So then if you look now if you go to the minutes for the meeting which is on 160— Are you on Page 160?
A: Yes.
Q: Up at the top it says that it was Enclosure XI-A that was approved with also the addition of the words the origins of life is not taught.
A: I see that.
Q: So now Enclosure XI-A, just to refresh your recollection, was the one that came from the curriculum committee.
A: The one that has intelligent design in it?
Q: Yes, and the reference. My question is, who on the curriculum committee drafted that language, or was it somebody else? I mean, it might have

Page 119

been somebody outside of the curriculum committee. Who drafted it?
A: It was the curriculum committee, Mr. Baksa, and Alan Bonsell came up with that.
Q: Did you have any conversations with anybody from the Thomas More Law Center about that language prior to the vote on October the 18th?
A: Not that I recall.
Q: Do you know if anyone else did?
A: Not to my knowledge.
Q: Then the words that were added, the origins of life is not taught, what does that mean?
MR. GILLEN: Objection, foundation.

BY MR. HARVEY:

Q: You were there. What did you think that meant?
A: The teachers at that time indicated they were going — wanted to teach Darwin's theory of evolution as within species development, and that was put in there to protect them and to try to avoid a controversy down the road.
Q: Why was it in there to avoid a controversy down the road?
A: We didn't want— We kind of reached a compromise to where the origin of life would not be taught, period, not through intelligent

Page 116 - Page 119 (32)
Min-U-Script® Filius & McLucas Reporting Service, Inc.

Page 120

design, not by Darwin's theory. It was kind of— It was for them as well as — the teachers as well as anybody else so they felt more comfortable.

Q: Whose idea was it that intelligent design would just be mentioned and not taught? Where did that come from?

A: It came from the board as a whole.

Q: Was there discussion on that?

A: In a— I'm sure there had to be.

Q: Did you have a discussion with anyone from the Thomas More Law Center about that?

A: No.

Q: Did you have a discussion with anybody about that outside of the board?

A: No, me personally, no. I don't know if anyone else did or not.

Q: How many times prior to October 18th did you talk to anyone from the Thomas More Law Center?

MR. GILLEN: Objection, relevance.

A: Maybe two, three times, three times, maybe four.

BY MR. HARVEY:

Q: In person or on the phone?

A: On the phone.

Q: Was there ever any in-person meetings before

Page 121

October 18th?

A: No.

Q: Now, you did talk to the Thomas More Law Center about representing the school board and the school district in any lawsuit before October 18th, correct?

MR. GILLEN: Objection, relevance.

A: That was discussed.

BY MR. HARVEY:

Q: What did you tell the board about that?

A: I told them that the Thomas More Law Center offered to represent us in any legal proceedings that might result as a result of intelligent design.

Q: Did the Thomas More Law Center say that to you in writing, or was that oral?

A: I was told that over the phone, and there was a follow-up letter.

MR. HARVEY: Counsel, could you produce that letter?

MR. GILLEN: I could and I believe— I'll check, but I believe I will.

BY MR. HARVEY:

Q: Tell me everything you can remember about the discussion of the board resolution on

Page 122

October 18th that was discussed on October 18th at the board meeting.

A: I know when it came up for a vote Mr. Wenrich had some reservations about how we went about the process, and he made several attempts to remove intelligent design from the wording. And that pretty much was the crux. I mean, it look a long time because he kept rewording things and bringing them up. That was pretty much the crux of it. Then we finally were able to vote on it as it was presented, and it was approved.

Q: Do you remember anything else that was said at the meeting?

A: By?

Q: Anybody about the board resolution. For example, did Mr. Wenrich say why he wanted to take the word intelligent design out?

A: He said he was in favor of the concept of intelligent design but he didn't like the manner in which we brought it to where it was. He wanted more involvement from the teachers in the process.

Q: He was upset that the two school teachers were being disregarded. Isn't that correct?

MR. GILLEN: Objection.

Page 123

A: In his opinion they were, but they weren't.

BY MR. HARVEY:

Q: That's what he was saying at the meeting?

A: That was his perception.

Q: Well, in what sense weren't they being disregarded?

A: They weren't being disregarded. That was just his perception that they were.

Q: I know. But they didn't want reference to intelligent design, correct?

A: That's true.

Q: So in what sense weren't they being disregarded?

A: Because we met with them over a period of five or six months trying to get this thing resolved. We made compromises and so forth. In that regards they weren't being disregarded. We listened to everything they said. We made a decision.

Q: You just disagreed with them, correct?

A: On that point, yes.

Q: Now, did Heather Geesey say something about if they, the faculty, requested Stock and Leader they should be fired?

A: No.

Q: Well, please take Exhibit 4 and turn to the

Page 124

Daily Record article of October 19.

A: By Joe Maldonaldo?

Q: Yes. Now, turn to the second page of that, the fourth paragraph up from the bottom. It says, if they requested Stock and Leader they (the faculty) should be fired said board member Heather Geesey. They agreed to the book and the changes in the curriculum.

A: She did not say that.

Q: She didn't say that. Did she say something like that?

A: What she said is if Stock and Leader gave us faulty advice Stock and Leader should be fired, and the teachers took it the wrong way.

Q: Did Stock and Leader give advice on the subject?

A: Yes.

Q: Who did they give that advice to?

A: The whole board.

Q: How did they do it, by letter, presentation?

A: They just told us.

Q: Were you present when they told you?

A: Yes.

Q: Where did that take place?

A: It was a legal thing, so it might have been— I'm not sure. I'm just not sure.

Page 125

Q: But you were sure that it was made to the whole board?

A: That's my recollection. I won't guarantee it a hundred percent, but that's my recollection.

Q: Because Ms. Harkins said that it was said to her alone.

A: It could be. I know we got it, the board got it.

MR. GILLEN: Objection to the extent your question leads to the speculation both couldn't have happened.

BY MR. HARVEY:

Q: If you look at the next paragraph, it says, Spahr said the faculty only agreed to the Pandas book as a compromise to address Buckingham's concern that students have alternative materials to study in addition to the regular text. Do you see that?

A: I see it.

Q: Did she say that?

A: I don't remember her saying that. I'm not saying she didn't, but I don't remember it.

Q: Did she say at the end of that, we didn't know you were going to do this?

MR. GILLEN: Objection, foundation.

Page 126

A: Do what?

BY MR. HARVEY:

Q: Well, let's read those two paragraphs. Spahr also said that not only did her department not approve the new wording, they were not invited to help write it. We didn't know you were going to do this, she said.

A: That's not true.

Q: Why is it not true?

A: She did know what we were going to do. They knew every step of the way.

Q: Then farther on down in the next paragraph it says, the administration said it too did not support the change as it was written. Is that true, the administration didn't support it?

A: That's not my recollection.

Q: Then finally at the end it refers to a shouting match between you and Mr. Wenrich. Was there a shouting match between you and Mr. Wenrich at the end?

A: No. He shouted at me. I just walked away.

Q: Did you say anything to question his patriotism or his religious beliefs?

A: Absolutely not.

Q: Now, if you would now just turn please—

Page 127

MR. HARVEY: Actually we need a new deposition exhibit here.

(Plaintiff's Deposition Exhibit #6 marked for identification)

BY MR. HARVEY:

Q: I'm handing you what's been marked as Deposition Exhibit 6. It's documents that were produced this morning by your counsel. Please take a moment to look at it. I'm going to ask you to review with me a portion of this. Your counsel told us that this was a transcript of the board meeting on the 18th at least to the extent that it exists because the entire transcript is not available we are told.

A: Okay.

Q: This was supposed to be a transcript of the entire tape to the extent it exists?

MR. GILLEN: My understanding, Steve, is that this is a transcript that was made of the tape of the meeting which is the whole of the tape. As we've discussed, apparently there was an error in the recording meeting such that the whole meeting was not recorded and, therefore, the transcript— You know, there are proceedings that weren't recorded and,

Tammy Kitzmiller, et al. v.
Dover Area School District, et al.

William Buckingham
January 3, 2005

Page 128

therefore, could not be transcribed.

But my understanding is to the extent the district has the tape you've got both the tape and this, a transcript, that was made and came to light yesterday in my discussions with the superintendent.

MR. HARVEY: The transcript that I listened to had Bertha Spahr on it or what I understood to be Bertha Spahr, and I don't see anything in here from Bertha Spahr.

MR. GILLEN: You know, I don't know. I mean, I just— I can't— You know, obviously I can't vouch for its authenticity or completeness. I know it's a transcript.

MR. HARVEY: Well, then I thought that it had that. Let's put that aside for just a second. I'll read it more closely in a break, and we'll get back to that so we don't waste any time here.

BY MR. HARVEY:

Q: Are you aware that the Dover — that The Discovery Institute has said that it does not support what the—

(Interruption)

BY MR. HARVEY:

Page 129

Q: Were you aware whether The Discovery Institute made a public statement that the — that they don't endorse or support what the Dover School District has done?

MR. GILLEN: Objection, relevance.

A: I haven't seen it. I've heard it.

BY MR. HARVEY:

Q: Now, if you'll turn to the article of the Daily Record on the 20th on the third page of that.

A: Third page. I only have two pages.

Q: The one on October 20th.

A: Or did I turn two at once?

Q: There are actually two on October 20th. The title is Dover Curriculum Move Likely a First.

A: Okay.

Q: It says there that — I'm talking now the sixth paragraph down — it says, but the sentence about intelligent design, referring to the board resolution, was added by committee members Buckingham, Alan Bonsell, and Sheila Harkins at a meeting not attended by district staff.

A: How far down?

Q: Sixth paragraph down, but the sentence about intelligent design was added by.

A: Okay, I see that.

Page 130

Q: Is that true?

A: Yes.

Q: Now, I'd like to ask you some questions about the implementation of the policy of the board resolution. It's your understanding that— What's your understanding of how this is going to be implemented, the board's resolution?

A: It's my understanding that the teachers are going to teach Darwin's theory of evolution and through the course of that teaching or in the process of that teaching, at some point in time it will be mentioned to the students that other scientific theories exist and intelligent design is one of those theories, scientific theories.

Q: What if students have questions about intelligent design, what are they going to be told?

MR. GILLEN: Objection, foundation.

BY MR. HARVEY:

Q: Do you know?

A: They're supposed to take those questions home to their parents or take them to a pastor at church. The books that are donated they have access to those if they want to take one home and read it, discuss it with parents, whatever.

Page 131

Q: Has there ever been a time when you've been on the board when views of the teachers in the school district have been not followed?

A: Say that again, I'm sorry.

Q: Has there ever been a time when you've been on the school board where the views of the teachers were not followed on a matter?

A: I'm not involved in some of the subcommittees. I can't answer that one way or the other. I don't know.

Q: I'd like you to— So, in other words, not to your knowledge?

A: I don't know, six, one half dozen of the other.

Q: Please take a look at Deposition Exhibit 2. This is the answer to the complaint in this matter.

A: Okay.

Q: On Page 2 and 3 it contains a long quote from the Congressional Record of something that Senator Santorum had inserted into the record. Do you see that?

A: Yeah.

Q: Have you ever seen that before?

A: Before when?

Q: Before today.

Filius & McLucas Reporting Service, Inc. Min-U-Script® (35) Page 128 - Page 131

Page 132

A: I saw it last night.
Q: Before last night, had you ever seen it before?
A: No.
Q: Did the board ever discuss it?
A: Not to my knowledge.
Q: Did the board ever discuss the No Child Left Behind Act?
A: Oh, yeah.
Q: Did it discuss it in reference to the biology curriculum?
A: No.
Q: Turn to Page 4. There's references to two Supreme Court cases.
A: Okay.
Q: Did the board ever discuss either of those references?
A: Not to my knowledge.
Q: Did you ever read this answer before yesterday?
A: No.
Q: Did you ever see any parts of it before yesterday?
A: No.
Q: Do you know what creationism is?
A: Yes.
Q: What is creationism in your view?

Page 133

A: In my view?
Q: Or your understanding.
A: Pretty much the book of Genesis.
Q: That subject has never come up at any school board meeting to your recollection?
A: In what context?
Q: In any context.
A: Any context at all? It's been brought up by the teachers.
Q: When was it brought up by the teachers?
A: Different times we talked about intelligent design they kept rolling it over into creationism.
Q: Was that at the board meetings?
A: Yeah.
Q: So the teachers mentioned creationism at board meetings?
A: Yes.
Q: What did they say about that?
A: They were afraid that intelligent design would be perceived as a back doorway to get creationism into the curriculum.
Q: Do you know when that was said, what board meetings?
A: It was said on different occasions at different

Page 134

board meetings throughout this process.
Q: Which teachers?
A: Bertha Spahr, Jen Miller.
Q: What was said in response to that by any people on the board?
A: We indicated that it is not our intent to teach creationism. It is not our intent to teach intelligent design. Our intent is to explain to the students that there are other theories, scientific theories, along with Darwin's theory of evolution.
Q: Earlier today I asked you about whether the theory of evolution was inconsistent with your personal religious beliefs, and you told me it was. You don't need to confirm that. Just kind of remember—
A: I think I said it wasn't.
Q: No. You definitely said that the theory of evolution was inconsistent with your personal religious beliefs at least to the extent that it taught that life forms were derived from a common ancestor.
A: Origins of life, yes.
Q: Is the theory of intelligent design as you've phrased it, is that inconsistent with your

Page 135

personal beliefs in any respect?
MR. GILLEN: Objection, relevance.
A: It depends on what context it's put in.
BY MR. HARVEY:
Q: Well, any context.
A: In any context, no, it's not inconsistent.
Q: Do you know who developed the press release that's attached as an exhibit to the answer in this matter?
A: The administration did. Exactly who it was, I don't know, but it came from the administration.
Q: Did you have any role in that?
A: No.
Q: Did you review any drafts of it?
A: No.
Q: I just need to clarify one thing from earlier. We asked— I asked you what was your purpose in supporting the board resolution of October 18th. Do you remember that?
A: Yes.
Q: And you told me some things about having a balance between various—
A: Scientific theories.
Q: Right. And I'm not sure whether I asked you specifically what was said by the other board

Page 136

members about the purpose of the resolution or even if you remember hearing anything about that.

A: That was consistent with what I said earlier to you.

Q: Do you remember statements made by the board members?

A: Absolutely.

Q: Which board members?

A: Alan Bonsell, Sheila Harkins, Heather Geesey, Janie Cleaver, myself, Noel Wenrich. I guess that's it.

Q: And you remember all of those people speaking up about the purpose?

A: Yes, I do.

Q: Was that on October 18th?

A: I won't say it was on October 18th. That happened I would say within a period of three meetings, two before and October the 18th.

Q: It was all, as I understand, a balanced presentation of these theories, correct?

MR. GILLEN: Objection to the characterization of the testimony.

BY MR. HARVEY:

Q: Well, I just want to understand.

Page 137

A: I don't understand the question anyway.

Q: These board members expressed a purpose that was consistent with the purpose that you told me that you shared which was for a balanced presentation of—

A: Of other scientific theories.

Q: Right.

A: Yes.

Q: Did anybody mention any other purposes?

A: No.

MR. HARVEY: I just would like to confer with counsel for a second.

(Recess taken)

EXAMINATION

BY MR. GILLEN:

Q: Mr. Buckingham, earlier Mr. Harvey asked you a question about a statement which is here on the second page of an article from June 15, 2004 from The York Dispatch entitled, Church State Issue Divides, Creationism Draws 100 to Dover Meeting. And the quoted statement is, nearly 2,000 years ago someone died on a cross for us, shouldn't we have the courage to stand up for him. For the sake of insuring the transcript is clear, I want to ask you, did you make that

Page 138

statement in connection with the biology curriculum?

A: No.

MR. HARVEY: Objection to the form of the question, leading, improper.

BY MR. GILLEN:

Q: Did you make that statement at any time?

A: Yes.

MR. HARVEY: Same objection.

BY MR. GILLEN:

Q: When you made that statement, do you have some idea when you made the statement?

A: Yes.

Q: When?

A: It was occurring during the debate about whether or not to take under God out of the Pledge of Allegiance.

MR. GILLEN: I just want the—

REEXAMINATION

BY MR. HARVEY:

Q: What did you mean when you said it at that time?

A: That was in response to something I believe, I'm not sure, but I believe it was Mrs. Brown said to me. I was attacked because of my stance on keeping under God in the Pledge. It didn't

Page 139

refer to a specific God. I did when I made that statement. But under God could be the God you want it to be, you know, depending on your faith. And that was in response to something that was said to me. And it was directed at the person that said it. It wasn't directed to anybody else.

Q: But it was said in a public board meeting?

A: Yes.

Q: And it was a reference to Jesus Christ?

A: No.

Q: Two thousand years ago a man died on a cross, that wasn't a reference to Jesus Christ?

A: I'm sorry, I misunderstood what you said. Yes, that's true.

Q: So at least on that occasion you interjected your own personal religious views into the board meeting. Isn't that correct?

A: As much as I was talking to the board member sitting beside me, yes.

MR. HARVEY: I don't have any further questions.

MR. GILLEN: I just have two others.

REEXAMINATION

BY MR. GILLEN:

Page 140

Q: Mr. Buckingham, was it ever your purpose to prevent the teaching of evolution in Dover Area public schools?

A: No.

Q: Was it ever your purpose to prevent the purchase of the Miller and Levine textbook Biology that was recommended by the teachers?

A: No.

MR. HARVEY: Objection, leading.

MR. GILLEN: I have no further questions.

MR. HARVEY: I don't have any further questions.

(The deposition concluded at 5:29 p.m.)

Page 141

COMMONWEALTH OF PENNSYLVANIA :

COUNTY OF YORK :

I, Bethann M. Mulay, Reporter and Notary Public in and for the Commonwealth of Pennsylvania and County of York, do hereby certify that the foregoing deposition was taken before me at the time and place hereinbefore set forth, and that it is the testimony of:

WILLIAM BUCKINGHAM

I further certify that said witness was by me duly sworn to testify the whole and complete truth in said cause; that the testimony then given was reported by me stenographically, and subsequently transcribed under my direction and supervision; and that the foregoing is a full, true and correct transcript of my original shorthand notes.

I further certify that I am not counsel for or related to any of the parties to the foregoing cause, or employed by them or their attorneys, and am not interested in the subject matter or outcome thereof.

Dated at York, Pennsylvania this 4th day of January, 2005.

Bethann M. Mulay
Registered Professional Reporter
Notary Public

The foregoing certification of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.

## Lawyer's Notes

#

**#6** 127:3

1

**1** 87:25; 114:23
**10** 111:5
**100** 137:20
**10th** 40:24; 41:18
**11** 40:8; 111:2
**13** 4:15
**133** 115:22
**145** 116:3
**146** 116:24; 117:14
**147** 116:24; 117:4
**148** 117:17, 18
**149** 117:17
**14th** 47:14, 17, 18
**15** 137:18
**15th** 47:1; 52:24; 54:4; 55:22
**160** 118:12, 13
**16th** 52:25; 53:2
**17th** 47:17
**18** 8:1; 67:25
**18th** 21:4; 92:15; 93:1, 4; 110:11, 19; 111:22; 119:7; 120:18; 121:1, 6; 122:1, 1; 127:12; 135:18; 136:16, 17, 19
**19** 124:1
**1989** 9:14, 17

2

**2** 131:14, 18
**2,000** 44:15; 45:8; 49:9; 55:9; 137:22
**2002** 25:23; 27:1; 29:25; 48:14
**2003** 28:5, 14, 15; 45:5
**2004** 25:13, 24; 27:2, 3, 9; 28:16; 32:18; 43:24; 45:14, 18, 23; 47:1; 48:15; 68:9; 71:11, 18; 72:7; 73:12; 81:16, 16; 88:17; 137:18
**2005** 4:15
**20th** 39:22; 43:21, 24; 129:9, 11, 13
**220** 69:24; 70:4
**24-hour** 15:3
**25** 5:3
**25th** 70:22
**2nd** 71:7; 72:6; 81:15

3

**3** 77:2, 3, 4; 131:18
**35** 89:2
**36** 88:15
**39** 10:24
**3rd** 71:11, 18

4

**4** 71:9; 74:23, 24; 89:23; 123:25; 132:12
**40** 10:24
**42** 69:15
**4th** 75:1

5

**5** 69:14; 115:20
**58** 32:5
**5:29** 140:13

6

**6** 127:7
**60** 57:13

7

**7** 85:18; 88:17; 92:19
**7th** 46:14; 88:8; 91:21; 92:16

8

**89** 9:12
**8th** 25:5, 7, 10, 13; 28:16

9

**9th** 29:19; 33:6; 39:15

A

**ability** 5:7; 114:3, 10
**able** 62:8; 103:24; 105:9; 122:10
**above** 116:9
**abruptly** 65:18, 24
**absent** 103:14
**Absolutely** 5:14; 33:3; 49:13; 93:5; 96:1; 113:9; 126:24; 136:8
**accept** 105:16, 25
**accepted** 38:11, 11; 98:16
**access** 8:6, 9; 130:24
**accordance** 65:14
**according** 60:12; 73:1; 90:4; 118:6
**accurate** 24:24
**acknowledge** 108:23
**ACLU** 87:2; 109:22
**act** 50:24; 132:7
**acting** 83:8; 84:6, 12
**actually** 72:22, 24; 93:7; 127:1; 129:13
**add** 115:4
**added** 115:7; 119:11; 129:19, 24
**addition** 44:7; 48:17; 100:16; 102:8; 118:16; 125:17
**Address** 25:9, 14, 17; 125:15
**addressed** 27:22
**administration** 27:7; 89:13; 99:19; 115:3; 117:3; 126:13, 15; 135:10, 11
**admitted** 114:20
**adopted** 78:2
**advanced** 63:7
**advancing** 86:22
**advice** 82:14; 83:21, 22; 84:13, 23, 25; 85:4; 86:20; 98:14; 99:14; 108:5; 124:13, 15, 17
**advisory** 116:5, 15, 18
**affairs** 11:24
**affect** 114:3, 10
**afraid** 103:20; 109:22, 24, 25; 110:1, 3, 6, 10; 133:20
**afternoon** 4:18
**again** 20:20, 23; 23:19; 40:7; 49:8; 55:11; 62:22; 68:6; 98:13; 106:13; 109:15; 113:2, 5, 20; 131:4
**against** 74:12; 80:8; 108:25; 110:7; 111:5, 13, 16
**agency** 65:19, 25
**agenda** 50:5; 51:17; 116:1
**agent** 65:4, 15
**ages** 10:23
**aggressively** 41:21
**ago** 5:2; 17:22; 18:13; 32:12; 44:15; 45:8; 49:9; 55:9; 58:9; 67:18; 69:6; 80:21; 99:11; 137:22; 139:12
**agree** 21:3; 72:8; 113:7
**agreed** 49:21; 70:13; 124:7; 125:14
**ahead** 13:20; 19:17; 40:5; 52:12; 55:14; 73:7; 95:25; 104:25
**Alan** 36:3; 41:19; 49:20; 57:21; 67:14; 68:4; 92:10, 11; 94:24; 119:4; 129:20; 136:10
**Allah** 17:25; 18:6, 7
**Allegiance** 45:6; 138:17
**allow** 52:5; 56:3
**allowing** 4:11
**alone** 125:6
**along** 42:5; 53:10; 102:9; 134:10
**alongside** 37:4; 47:6; 71:25; 95:18
**alternative** 78:3, 5; 96:5, 23; 97:2, 11; 103:24; 125:16
**alternatives** 96:3
**although** 28:4; 114:25
**always** 33:4; 46:14; 110:9
**amazing** 46:9
**Amazon.com** 58:17
**ambiguous** 15:10
**America** 13:5
**American** 12:2
**Americans** 77:8; 87:3
**amoeba** 17:22; 60:13, 20; 61:7; 62:22
**among** 17:6
**ancestor** 13:13; 15:9; 16:7, 21; 17:1, 8, 18, 18; 18:12, 15; 20:4; 66:15; 134:22
**Angie** 74:17; 92:7; 111:21
**answered** 84:17
**anymore** 22:18; 77:15, 21
**anyplace** 94:3
**apart** 95:8; 99:14
**apes** 33:22
**apologize** 50:8, 12, 22; 53:13
**apologized** 49:25
**apologizing** 50:13, 21
**Apparently** 25:11; 89:13; 127:21
**Appears** 88:2
**applauded** 43:17
**applauding** 44:7
**approached** 75:9
**appropriate** 113:9, 12
**appropriately** 78:5
**approval** 105:1
**approve** 73:12; 126:5
**approved** 32:17, 19, 20; 71:23; 76:12; 116:9; 118:16; 122:11
**approving** 73:24; 74:12
**Approximately** 11:8; 67:18; 111:2
**Area** 21:22; 71:23; 103:21, 22; 104:5, 5; 140:2
**Arguably** 84:3
**argued** 55:25
**around** 79:25; 81:19
**article** 27:25; 28:2; 29:18; 30:23; 33:6; 35:25; 36:21; 41:17; 46:25; 47:11; 54:2; 55:22; 71:10; 72:3; 74:22; 124:1; 129:8; 137:18
**articles** 71:10, 14; 77:2; 98:3
**aside** 128:16
**aspects** 96:3; 97:2; 106:9
**Assistant** 52:17; 88:6
**associated** 118:1, 8
**assorted** 24:22
**atheist** 112:1, 12
**attached** 116:22; 135:8
**attacked** 138:24
**attempts** 122:5
**attend** 10:3, 10, 15, 25; 90:13, 16
**attendance** 56:19
**attended** 47:4; 129:21
**attention** 21:25; 45:16; 107:21
**attorney** 24:16; 98:7, 10
**attorney-client** 9:7; 84:4
**attorneys** 6:10, 12, 14; 69:4, 7; 86:19
**attributed** 22:21; 24:23; 56:10
**audible** 5:19
**audience** 55:4
**August** 32:20, 24; 71:6, 11, 16, 18; 72:6; 74:23, 24; 75:1; 77:2, 3, 4; 81:3, 15, 20
**authenticity** 128:13
**available** 9:1, 3, 6; 28:5; 127:14
**average** 114:18
**avoid** 88:24; 119:20, 21
**aware** 21:21; 23:12, 21; 24:5, 18; 43:19; 89:25; 96:11; 128:21; 129:1
**away** 50:5; 51:17; 54:16, 23; 75:24; 126:21

B

**back** 5:3; 9:13; 15:16, 17; 17:22; 19:25; 20:2, 25; 24:6, 14; 27:17; 35:7, 8; 39:7; 45:5, 11; 53:13; 60:3, 5, 16, 17; 61:6; 62:8, 20, 23; 77:1, 2; 94:9, 13; 97:22, 24; 128:18; 133:21
**background** 12:2; 106:23; 110:10; 116:7
**bad** 70:18
**Baksa** 6:21; 52:18; 70:12, 19, 20; 88:4, 5; 119:3
**balance** 33:23; 38:20; 42:3; 49:22; 103:1; 135:22
**balanced** 102:22; 136:20; 137:4
**balancing** 103:2
**bang** 34:24; 35:1, 5
**based** 15:1
**basis** 22:4
**became** 96:11
**become** 56:6
**becomes** 36:18; 37:1
**becoming** 36:17

began 65:18, 24
beginning 20:25
begins 77:4
begun 63:11
behalf 84:6
Behind 132:7
belief 14:17, 21, 25; 15:3; 48:25; 118:7
beliefs 12:4, 9, 11, 19, 23; 13:3, 16, 23; 15:24; 17:12, 15; 18:17, 20; 19:2; 20:8, 11, 13; 21:11; 38:24; 39:2, 24; 44:12, 21; 45:2; 50:3; 86:2, 22; 126:23; 134:14, 20; 135:1
believes 29:10
belongs 7:13
benefit 84:14; 89:4
Bertha 128:8, 9, 10; 134:3
beside 139:20
best 5:7; 33:3; 48:25; 90:18; 109:6, 11, 16
better 70:24; 71:4, 4
beyond 106:23
Bible 54:14, 20; 56:3, 8, 14
big 34:24; 35:1, 5; 87:24; 113:22
biology 21:24; 23:25; 25:8, 13; 27:7; 29:24; 30:1, 12; 32:11, 13, 16; 33:2; 35:2; 41:21; 47:7, 25; 48:1; 49:14; 71:1, 3, 24; 73:12, 13, 24; 74:12; 76:11; 116:10; 132:9; 138:1; 140:6
bit 56:17; 69:13
black 54:15, 23
blackmailing 75:12, 16
blanket 96:21
bless 13:5
blueprint 65:3
board 11:3, 7, 9, 12, 13, 17, 21; 21:4, 22; 22:17, 22; 27:13, 14; 29:22; 30:8, 17, 25; 32:7, 17; 33:8, 25; 34:6; 36:3; 41:19, 19; 42:13; 46:13; 47:5; 49:4, 20; 53:7, 13, 14, 15; 57:22; 58:1, 24; 59:1, 17, 19; 67:7, 11, 13, 17, 25; 68:2; 70:9; 71:6, 23; 72:7; 73:4, 9; 74:3, 7, 14, 16; 75:24; 76:18, 24; 78:2; 79:9, 18, 21; 80:1, 4; 83:2, 12, 14, 16, 23; 84:1, 5, 7, 11, 13, 14, 24, 25; 85:1, 5, 5, 6, 9, 14; 87:21; 88:7, 16; 92:4, 19, 23; 93:10, 10, 13, 14, 19; 94:1, 6, 10, 13, 15, 16, 19; 95:1; 101:4, 11; 102:4, 5, 10, 18; 103:9; 105:1; 108:16; 109:5, 5; 110:11; 113:8; 114:19; 120:8, 15; 121:4, 10, 25; 122:2, 15; 124:6, 18; 125:2, 7; 127:11; 129:18; 130:4; 131:2, 6; 132:4, 6, 15; 133:5, 14, 16, 23; 134:1, 5; 135:18, 25; 136:6, 9; 137:2; 139:8, 17, 19
board's 7:16; 8:1; 23:15; 110:21; 130:7
Bonsell 21:7; 36:4; 41:20; 49:21; 57:21, 25; 67:14; 68:5; 89:14; 90:4, 11, 14; 91:16; 92:10; 94:24; 119:4; 129:20; 136:10
boo 18:4
book 13:25; 14:6, 11; 15:1; 20:16; 25:8, 22, 25; 27:7; 28:4, 6, 7; 29:4; 30:24; 31:3; 33:4, 10, 21, 22; 34:1, 7, 9, 10, 13; 38:19; 41:21; 48:15; 49:7; 52:21; 56:2; 57:10; 58:8, 9, 25; 71:1; 73:20; 75:3; 76:11; 78:22; 79:4, 9; 80:13, 15, 18; 94:18; 100:3, 5; 124:7; 125:15; 133:3
books 59:20; 75:13, 17, 18; 130:23
born 113:2, 5
born-again 56:6
both 6:2; 31:3; 36:6; 125:10; 128:3
bottom 52:17; 55:2; 124:4
boys 10:24
brainwashing 36:16; 37:8, 24
break 63:15; 100:16; 113:15; 128:17
briefly 5:4
bringing 122:9
brought 48:17; 49:6; 73:10; 122:20; 133:8, 10
Brown 21:7; 31:1; 52:19; 76:3; 89:14; 113:1; 138:23
Brown's 91:14
Browns 92:12
BUCKINGHAM 4:8, 18; 9:9; 28:3, 4; 29:10, 22; 31:2; 33:9, 25; 36:16; 38:19; 41:20; 42:3, 10; 43:6; 49:4, 21, 25; 52:2, 19; 54:12; 55:25; 56:19; 63:19; 73:9; 75:8; 77:7; 78:12; 87:23; 113:19; 129:20; 137:16; 140:1
Buckingham's 55:24; 125:15
Buddha 17:24; 18:5
Buddhist 39:11
Buddhists 38:25
business 94:2
buy 33:4

## C

calendar 47:15
call 23:2; 51:23; 54:8; 82:2, 13; 83:3, 5; 94:12; 97:15; 98:6
called 4:8; 42:10; 82:20, 23; 94:11; 98:7, 24; 111:25
calling 82:6, 9; 87:2, 5; 88:7
calls 42:20; 64:18; 65:5; 66:4, 21; 67:11; 104:24
came 25:24; 27:17; 40:10; 55:5; 57:15; 59:4, 5, 7, 8, 11, 20, 23; 61:5; 67:17; 68:4; 87:21; 100:17; 117:6, 8, 16, 18; 118:20; 119:4; 120:8; 122:3; 128:4; 135:11
can 9:4; 10:19; 11:16; 13:3, 9, 20; 15:15; 16:13; 17:21, 23, 24, 24, 25; 19:25; 20:17; 21:3; 24:19; 31:6, 7, 11; 36:25; 39:10, 11; 48:8; 56:3; 58:7, 7; 59:24; 60:3, 22, 24; 62:7; 63:7; 66:25; 69:13; 72:21; 82:17; 97:9; 98:4; 100:19; 104:23; 112:19; 121:24
capacity 83:9; 84:12, 24
carries 36:2
case 113:22; 115:19
cases 132:13
Casey 31:1; 89:14; 113:1, 4
Catholic 87:15
cause 65:2
caused 65:13
Center 8:14; 69:8, 9; 77:5; 78:1, 13, 20; 80:22; 83:15, 18, 22; 84:2; 85:19; 86:8, 15, 24; 87:9; 119:6; 120:12, 19; 121:3, 11, 15
certain 19:12
certification 4:4
chair 11:19, 23
chairs 75:24
challenge 55:3
chance 43:23; 63:24
change 43:4; 117:3; 126:14
changed 74:17; 76:1
Changes 88:18; 116:4, 10; 124:8
channel 107:12
characterization 16:11; 37:11; 52:11; 55:14; 58:22; 70:1; 83:8; 86:24; 104:14; 105:6; 136:23
characterize 95:12, 13
charge 85:25
Charlotte 11:6; 52:2; 55:25
Check 79:4; 121:22
Child 132:6
children 10:21, 22
chipping 50:5; 51:17
choice 70:18
Christ 139:10, 13
Christian 17:25, 25; 38:21; 56:20; 57:4; 86:22
Christianity 39:4; 40:1; 44:13, 22; 50:4
Christians 50:6; 51:18; 54:17, 23; 56:7; 86:1
chronological 25:6
church 10:3, 10, 15, 16; 29:9, 11; 32:1, 4; 41:14; 42:10; 49:8; 54:9; 94:2; 130:23; 137:19
citizen's 11:14
clarification 55:16; 92:18
clarify 135:16
class 102:8; 105:13
classes 9:23
classroom 4:15; 37:4; 48:17; 96:14
clear 16:17; 20:22; 51:15; 62:1; 137:25
clearly 107:24
Cleaver 21:8; 92:2; 94:8; 136:11
client 84:1
close 39:3, 5; 40:2; 41:23; 42:11; 44:14, 16; 49:11; 50:6; 54:9, 15, 17; 55:5; 56:22; 78:6; 90:20
closely 128:17
coffee 94:1
cold 114:9
combination 114:25; 115:2
comfortable 104:7, 8; 108:13; 120:4
comment 90:4, 8
comments 55:24
committee 11:19, 23; 29:23; 30:25; 31:2; 33:9; 49:5; 52:19; 53:1; 68:8, 11, 13; 73:10; 88:8, 11, 13; 115:3, 16; 117:19; 118:21, 24; 119:2, 3; 129:19
committees 11:18
common 13:13; 15:9; 16:7, 20; 17:1, 8, 18, 18; 18:12, 15; 21:5; 66:14, 14, 19; 67:5; 134:22
commonly 38:10
communicate 83:23; 98:16
communicated 83:22; 84:25; 85:5
communication 9:7
communications 82:12; 84:7
Community 10:16; 38:12; 41:10; 50:2; 105:16, 23, 24; 116:21
companion 73:14, 25; 76:14
compendium 71:9
complaint 7:1; 46:2; 114:19, 22; 131:15
completely 17:4; 24:8
completeness 128:14
complex 60:14
complexities 60:2; 61:8; 62:24
compromise 119:24; 125:15
compromises 123:15
computer 7:18; 8:6, 13, 19, 22; 9:1; 58:17; 68:17
conceivable 84:1
conceivably 84:3
concept 81:25; 82:24; 94:20; 122:18
concern 28:20, 23, 25; 29:2, 4; 30:5, 6, 12, 21; 32:14; 59:23; 94:13; 105:15, 20; 108:18; 125:16
concerned 28:17; 32:10
concluded 140:13
confer 137:11
confirm 134:15
confused 63:2
Congressional 131:19
conjunction 73:13
connection 82:13; 138:1
conscience 52:5
consider 17:21; 96:3
consideration 33:10; 38:24
considered 29:7; 35:10; 110:4; 116:13
considering 35:8
consistent 136:4; 137:3
constitutes 106:3
Constitution 54:8; 78:4
consult 80:1
contact 8:13
contacted 86:16; 98:18
contains 131:18
context 31:23, 24; 36:23; 37:2; 38:9; 39:12; 40:11; 48:23; 133:6, 7, 8; 135:3, 5, 6
continue 36:14; 47:5
continuing 31:6, 12; 40:6
controversy 119:20, 21
conversation 5:22; 70:19; 81:2; 85:2; 95:15, 16; 112:18
conversations 112:10, 15; 119:5
Cooper 8:15; 98:11, 18
copied 100:16
copies 8:17; 57:9, 12; 69:24; 70:4; 79:20, 24; 116:4
copy 58:13; 79:23

correctly 33:14; 34:4; 92:15; 114:11
Council 88:16; 116:5, 15, 19
counsel 4:3; 8:24; 77:16; 100:7; 121:19; 127:8, 10; 137:12
country 13:2; 39:2, 4, 24, 25; 44:11, 12, 20, 22; 50:3, 6; 51:18
County 9:15
couple 18:3; 58:12; 77:2; 79:24; 100:9; 101:9
courage 49:10; 137:23
course 6:23; 97:6; 130:10
court 4:11; 5:20; 15:17; 20:2; 37:15; 60:5, 17; 132:13
cover 71:2; 117:1, 12, 13; 118:8
covered 35:1, 4; 73:25
create 14:18, 22
created 16:9; 21:24; 63:10; 65:13
creation 14:8, 12; 31:24; 41:22; 77:11; 96:20
creationism 8:2, 12; 25:9, 15, 18; 31:3, 22; 32:8; 34:2; 36:5; 38:21; 47:6; 48:22; 49:22; 52:6; 53:7, 15, 17, 20, 25; 71:25; 72:13; 73:11, 16; 77:6; 132:23, 25; 133:13, 16, 22; 134:7; 137:20
critical 103:4
cross 12:1, 7; 44:15; 45:9; 49:9; 55:9; 137:22; 139:12
crossed 86:25
crucifix 12:1, 8, 21
crux 122:7, 9
curious 59:7
curriculum 11:19; 23:25; 29:23; 30:25; 33:9; 47:7; 48:1; 49:5; 52:18; 53:1; 67:9; 68:8, 11, 13; 73:10; 88:8, 16, 17; 90:13; 91:23; 93:15, 18; 95:11; 96:4; 97:3; 108:17, 19; 115:3, 15; 116:3, 5, 10, 15, 18; 117:19; 118:21, 24; 119:1, 3; 124:8; 129:14; 132:10; 133:22; 138:2
cut 73:7

D

daily 22:2, 9, 21; 23:13, 23; 33:6, 7; 41:17; 54:3; 55:22; 74:24; 107:16; 124:1; 129:8
Darwin 103:25; 104:1
Darwin's 29:4; 37:4; 42:5; 48:18; 95:18; 99:16, 20, 25; 102:9; 106:8; 119:17; 120:1; 130:9; 134:10
Darwinism 28:8, 18; 30:1; 55:3
date 27:5
dated 25:24; 29:18
dates 25:21; 71:8; 102:25
day 25:3; 31:12; 53:12; 58:6
days 15:2, 4; 40:8; 101:9
deadlocked 74:11
deal 21:25
dealt 43:18; 44:8
debatable 38:7; 62:13
debate 39:7; 48:13; 61:12, 14, 15; 71:25; 72:12; 138:15
Debates 25:8
debating 47:5
decision 27:12; 123:18
declined 33:11
dedicated 86:21
deduced 58:2
defend 86:1
defends 50:16
defense 77:5
defined 62:2, 7
Definitely 93:2, 3; 134:18
degree 19:12
deliberations 21:22; 23:16
delivered 22:6
demonstrate 52:12
department 25:22; 96:8; 99:18; 101:1; 116:6; 126:4
depending 139:3
Depends 107:4; 135:3
deposed 6:6, 9, 12
deposition 4:10, 21, 23; 5:4; 19:9; 45:25; 62:3; 85:18; 104:10; 114:23; 115:20; 127:2, 3, 6; 131:14; 140:13
derived 134:21
descended 15:9; 33:21
describe 59:24
design 7:16; 8:2, 12; 21:23; 23:15; 34:25; 35:5, 17, 18, 22; 48:20; 58:20, 23; 59:24; 60:12, 24; 61:1, 10, 21; 62:18; 63:6, 9, 19, 22; 64:4, 8, 11; 65:1, 12, 17, 23; 66:12; 67:8; 68:19; 69:2; 73:15, 19, 21; 74:1; 77:13; 80:23; 81:7, 25; 82:22, 25; 87:21; 90:2; 91:7, 12, 17, 22; 94:17, 20, 23; 95:11; 97:19; 99:9; 101:12; 102:1, 19; 103:10, 17; 105:17, 25; 106:10; 108:19; 110:3, 21; 117:10, 22; 118:22; 120:1, 5; 121:14; 122:6, 17, 19; 123:10; 129:18, 24; 130:13, 16; 133:12, 20; 134:8, 24
designer 63:11; 66:14, 19; 67:5
detail 61:12
determine 100:20
developed 135:7
development 119:18
developments 107:9
devised 65:3, 14
dictate 63:1
died 44:15; 45:8; 49:9; 55:9; 137:22; 139:12
differ 89:17
different 20:18, 19; 48:3; 61:17, 21; 62:18, 19; 96:22, 23, 24; 98:3; 102:25; 103:3; 116:23; 133:11, 25, 25
differing 99:24
direct 39:1; 52:3; 56:7; 87:22
directed 64:2; 139:5, 6
directly 19:2; 59:5
directors 67:7
disagreed 36:4; 123:19
disconnect 113:22
discovery 4:12; 8:15; 98:6; 99:4; 100:4; 107:12; 128:22; 129:1
discuss 22:12, 13; 130:25; 132:4, 6, 9, 15
discussed 92:19; 93:15, 18, 19, 21; 97:7; 98:15; 121:8; 122:1; 127:21
discusses 58:20
discussing 58:23; 101:14
discussion 21:10; 47:25; 70:9; 102:17; 110:25; 120:9, 11, 14; 121:25
discussions 48:4, 9, 10, 12; 93:9, 12, 25; 101:10; 128:5
Dispatch 22:9, 20; 23:14, 23; 25:6, 10; 29:18; 46:25; 71:10, 19, 20; 77:1, 3, 4; 107:17; 137:19
dispute 15:6
disputed 22:19, 24; 23:1
disregard 108:5
disregarded 108:7; 122:24; 123:6, 7, 12, 16
District 11:1; 19:20; 36:8; 52:5; 57:9; 59:18; 67:7; 72:1; 76:19; 116:5, 14, 18; 121:5; 128:3; 129:4, 21; 131:3
disturbed 28:7; 29:24
divided 71:23
Divides 137:20
document 73:2; 89:1
documents 6:23; 7:3, 8, 10, 14; 77:17, 20; 100:15, 20; 117:25; 127:7
donated 57:15; 58:25; 59:2; 76:18; 101:2; 130:23
done 6:5, 7, 8; 75:11, 20; 76:23; 101:24; 129:4
doorway 133:21
Dover 10:25; 21:22; 22:17, 21; 25:7; 47:3; 52:4; 64:17; 71:23; 128:21; 129:3, 14; 137:20; 140:2
down 6:2; 28:2; 29:8; 30:23; 33:8; 36:14; 52:16; 54:6, 12; 55:1; 56:17, 20; 57:4; 75:2, 8; 77:24; 78:12; 79:14; 119:20, 21; 126:12; 129:17, 22, 23
dozen 131:13
Dr 6:20; 70:12; 79:23; 100:25
draft 115:16
drafted 114:24; 118:24; 119:2
drafts 135:14
Draws 137:20
drug 113:25; 114:6
due 66:18; 67:5
duly 4:9
during 41:18; 54:14; 55:24; 56:5, 18; 138:15
duty 11:15
DVD 100:3, 5

E

e-mails 7:22, 24; 8:15
earlier 43:13; 62:2; 104:10; 107:24; 134:12; 135:16; 136:4; 137:16
earth 14:18, 22
echoed 52:1
edition 29:25; 73:12
editor 39:21; 107:20
editorial 43:16, 24
education 9:19, 20, 22; 10:1, 1; 33:23; 35:24; 95:20, 23; 96:25; 104:2; 105:13; 106:14; 109:18
educator 106:16
educators 80:10, 12, 19; 108:2, 15; 109:4, 13, 14
effect 53:16
effects 114:6
effort 105:12; 106:13
either 17:5; 22:20; 44:19; 45:13; 49:12; 68:25; 86:25; 89:3; 93:11; 111:13; 132:15
else 6:11; 15:4; 17:24; 51:10; 56:4; 69:11; 80:18; 94:3; 110:4, 14; 112:23, 24; 116:17; 118:25; 119:9; 120:3, 17; 122:12; 139:7
embarrass 43:10
employed 9:9
Enclosure 118:15, 19
enclosures 116:11, 23
encouraged 96:8
end 68:24; 76:11; 125:23; 126:17, 20
endeavor 5:25
endorse 129:3
enough 13:6; 38:18; 90:9
entire 25:1; 92:19; 127:13, 17
entitled 137:19
equipment 110:15
erased 8:21
error 127:22
errors 72:21, 22
especially 113:25
espoused 99:5
Essentially 74:19
establish 110:22
Eveland 39:21
Eveland's 40:14
even 43:9; 46:9; 58:16; 65:7; 76:6; 77:15; 94:11; 98:8; 136:2
event 15:22; 100:20; 108:1
events 114:11
Eventually 79:11
everybody 92:12
everyone 52:21
evolution 8:12; 13:7, 11, 15; 15:8; 16:5, 19; 17:7, 10, 10; 18:14; 20:24; 21:13, 19; 25:8; 27:22; 29:5; 31:4; 33:12; 34:2; 35:10; 36:5, 17; 37:5; 38:8, 21; 39:3, 25; 42:6; 43:5; 44:12, 21; 45:2; 47:7; 48:18; 49:23; 52:3; 56:1, 7; 61:17, 22; 62:18, 25; 63:24; 64:9; 72:1; 78:3; 90:1; 95:18; 96:4; 97:11; 102:9; 106:8; 119:18; 130:9; 134:11, 13, 19; 140:2
evolved 13:13; 16:7, 20, 20, 25; 17:8; 60:14; 61:8
evolving 43:3
exact 28:19
exactly 56:12; 85:15; 100:12; 135:10
EXAMINATION 4:16; 137:14
example 96:19; 122:16
except 4:5
exchange 75:14, 15; 76:21
excuse 76:19; 117:23
executive 85:8, 11, 13; 93:11
exhibit 40:23; 69:14; 71:9; 85:18; 87:23, 25; 114:23; 115:20; 117:2; 123:25; 127:2, 3, 7; 131:14; 135:8
exist 108:24; 130:13
existed 96:12; 98:8

exists 127:13, 17
expended 70:16
experience 81:24; 82:24
expert 8:22; 13:10
explain 20:17; 134:8
explained 32:11; 66:13, 18; 67:4; 82:10
explains 38:12
explanation 31:18; 38:10
express 30:6; 103:9
expressed 28:22, 25; 29:3; 30:5, 12; 59:3; 61:3; 137:2
expresses 63:23, 25
extend 84:5
extent 9:4, 6; 11:15; 67:10; 82:12; 83:20; 84:23; 85:3; 98:13; 125:9; 127:12, 17; 128:2; 134:20
extremely 76:9

F

fact 36:18; 37:1; 47:10; 59:1; 78:8
faculty 27:6; 90:21, 24; 91:9; 117:9; 123:22; 124:6; 125:14
Fair 13:6; 38:18; 58:22; 89:7; 90:9; 91:6
faith 14:9, 13, 16; 15:1; 20:16; 21:2; 85:24; 139:4
faiths 38:25
familiar 13:6
family 10:17, 19
far 14:11; 16:6, 19; 72:1; 95:21; 129:22
farther 126:12
faulty 124:13
favor 41:21; 73:24; 122:18
fear 109:15, 21
feel 11:14; 36:21; 70:24; 75:11
felt 71:3, 4; 76:6; 96:12; 102:7; 111:24; 112:20; 120:3
few 63:5; 80:21
Fifty-eight 114:14
fighting 41:7
filing 4:4
finally 122:10; 126:17
find 19:4
finding 81:6
fine 19:6, 21; 89:23; 97:17
finish 5:23, 25
fired 123:23; 124:6, 13
firm 4:19
first 16:24; 22:18; 25:21; 51:15; 67:13, 17; 68:3, 4; 71:22; 74:9, 11; 81:10, 22; 86:15; 100:10, 19; 116:23; 117:1; 129:14
five 123:13
five-minute 113:15
flag 12:2, 8, 22
Florida 74:3; 94:11
fodder 40:17
follow 107:9
follow-up 121:18
followed 131:3, 7
following 44:10
follows 4:9
force 104:8; 109:2
forcing 108:20, 22
form 4:5; 138:4
formal 9:19, 22; 10:1; 93:10, 12
former 59:1
forms 13:13; 15:8; 16:6, 20; 17:7; 20:6; 65:17, 24; 134:21
forth 123:15
forthright 43:18; 44:8
forty-seven 117:7
found 25:23
foundation 17:20; 24:2, 21; 49:16; 52:10; 65:20; 79:12; 105:18; 108:6; 111:18; 119:13; 125:25; 130:18
foundations 14:13, 16
founded 20:16; 39:2, 4, 24, 25; 44:11, 12, 21, 22; 50:3
four 36:25, 25; 75:23, 23; 91:3, 4, 5; 120:21
four-fifths 115:21
four-four 74:11
fourth 28:2; 49:3; 55:23; 75:7; 124:4
frame 21:5; 69:14
free 36:21
friends 41:10; 111:14, 15
front 69:15; 87:24; 115:18
full 27:14
fuller 109:17
funds 59:9; 70:16
funny 43:8
further 20:17; 55:1; 56:17; 74:22; 78:12; 139:21; 140:10, 11

G

games 7:21
gathering 83:10
gave 79:23; 99:15, 17, 22; 100:1, 4; 124:12
Geesey 21:6; 92:2, 4; 123:21; 124:7; 136:10
general 13:9; 48:7
generally 38:11; 85:16; 114:15, 17
generated 60:13; 62:23
generation 54:13, 19
Genesis 14:1, 7, 11; 15:1; 20:16; 56:2; 133:3
gentleman 6:18
gentleman's 19:10
gesture 59:22
gestures 5:21
GILLEN 4:10; 6:19, 19, 20; 7:5; 9:4; 10:5, 12; 12:10, 13, 18; 13:18, 20; 14:2, 19; 15:10; 16:10, 23; 17:13, 20; 18:18; 19:4, 14, 21; 20:12; 21:14; 22:23; 23:17; 24:2, 21; 28:9; 29:13; 30:2; 31:5, 9; 37:10; 40:3, 15, 20; 42:20; 49:16; 51:21; 52:10; 55:13; 62:12; 64:18; 65:5, 20; 66:4, 20, 23; 67:10; 69:25; 71:12; 79:12; 82:11; 83:7, 20; 84:9, 18, 22; 85:3; 86:9, 23; 87:17; 88:24; 90:7; 95:24; 98:13; 99:14; 100:9; 101:21; 104:13, 24; 105:5, 11, 18; 106:2; 108:6; 111:18; 115:9, 22; 117:23; 118:7; 119:13; 120:20; 121:7, 21; 122:25; 125:9, 25; 127:18; 128:11; 129:5; 130:18; 135:2; 136:22; 137:15; 138:6, 10, 18; 139:23, 25; 140:10
girl 10:24
gist 97:6
given 4:23; 85:4
gives 33:22
giving 109:17
glad 9:5
gladly 100:21
glanced 58:4, 11; 63:3
glancing 58:5
God 13:5; 14:17, 21; 16:9; 18:1; 39:8, 10, 11, 11; 138:16, 25; 139:1, 2, 2
God's 52:4
goes 20:25; 39:7; 45:11
good 4:18; 13:6; 32:6; 47:22; 52:5; 55:16; 70:14, 15; 79:4; 92:18; 102:8
gospel 56:5
government 11:15
grade 25:14; 71:24
graduated 9:21
granted 40:6; 70:7
gray 103:21, 22; 104:5, 5
great 21:24; 113:16
greatest 13:2
ground 62:21
grounds 12:14; 19:19
group 86:19
Grove 10:16
growing 54:13, 19
grunts 5:21
guarantee 125:3
guess 30:7; 35:21; 58:22; 92:8, 13; 109:22; 136:11
guidelines 104:3

H

H 106:22
half 6:15; 131:13
Hall 29:25; 73:13
Hall's 114:12
Hamilton 4:20
hand 10:8
handing 127:6
hands 100:14
handwritten 89:1, 3; 90:4, 8
happened 21:1; 46:20, 22; 49:24; 73:3, 6; 75:23; 110:16, 18; 125:11; 136:18
happenstance 21:1
happy 17:3; 52:21
harassing 18:21; 19:1
hard 18:8
Harkins 21:6; 31:1; 52:20; 92:2; 103:7; 125:5; 129:20; 136:10
Harmony 10:16
HARVEY 4:17, 19; 6:22; 7:7; 8:24; 9:8; 10:6, 14; 12:6, 11, 15, 20; 13:21; 14:3, 20; 15:15, 21; 16:13, 16; 17:2, 16; 18:2, 24; 19:6, 18, 22, 25; 20:5, 14; 21:16; 22:25; 23:20; 24:4, 25; 28:10; 29:14; 30:3; 31:6, 11, 13; 37:12, 18; 40:6, 12, 18, 22; 42:22; 49:19; 51:25; 52:15; 55:15; 60:3, 7, 15, 19; 62:15; 63:18; 64:21; 65:8, 22; 66:7, 24; 67:2, 15; 70:3; 71:15, 17; 79:13, 15; 82:16; 83:11, 25; 84:15, 20; 85:10; 86:11; 87:1, 18; 89:8; 90:9, 10; 96:2; 98:17; 99:21; 100:7, 23; 101:22; 104:19; 105:2, 8, 14, 21; 106:4; 108:9; 111:20; 113:14, 18; 115:10, 24; 118:5, 9, 10; 119:14; 120:22; 121:9, 19, 23; 123:2; 125:12; 126:2; 127:1, 5; 128:7, 15, 20, 25; 129:7; 130:19; 135:4; 136:24; 137:11, 16; 138:4, 9, 20; 139:21; 140:9, 11
hate 66:25
head 11:22; 29:22; 35:6; 49:5; 73:9; 88:11, 13; 98:5
headline 25:7
heads 11:18; 80:16
hear 5:15; 10:8; 43:9; 112:3, 5, 6; 113:1, 4
heard 13:14; 36:15; 67:13, 22; 78:24; 100:19; 129:6
hearing 15:11; 18:8; 103:16; 136:2
hearsay 28:9; 29:13; 30:2; 31:5, 7; 40:3; 71:13
Heather 92:2, 3, 3; 123:21; 124:7; 136:10
Heaven 14:18, 22
held 11:17; 32:13; 72:6; 93:9
help 11:15; 72:17, 20; 104:1; 126:6
hereby 4:2, 4
herself 76:24
high 9:21, 23; 29:24; 47:7; 64:17
highest 9:19
himself 28:6; 84:3
hindsight 70:17
Hindu 39:10
Hindus 38:24
hold 25:8, 14, 17, 20; 27:1, 12, 16, 19, 20, 21; 42:18, 25; 43:2; 60:8
home 7:12; 130:21, 24
honest 85:21; 100:11
honestly 78:11
hope 32:6; 42:19; 109:8
hospital 43:13
hour 6:15
hours 6:15
house 10:20; 22:6; 93:23 24
human 50:10
hundred 47:3, 20; 100:15; 112:22; 125:4
hurting 54:20
hypothetical 66:20

I

idea 57:18; 63:3; 67:8; 70:14, 15; 87:20, 20; 95:10; 120:5; 138:12
ideas 63:6; 103:10
identification 127:4
identify 9:5
imagine 82:10
immaterial 65:2
immediate 10:19
implementation 130:4
implemented 130:7
impression 63:5
improper 138:5
in-person 120:25
inaccuracies 23:12, 22; 24:5, 19
inaccurate 24:11
inaccurately 31:19
inappropriate 113:7, 1[illegible] 12
include 67:8
included 91:23

includes 30:25; 41:22
including 14:23; 15:8; 16:6; 17:7; 20:6; 90:1; 95:11; 100:15
inconsistent 15:23, 25; 16:8, 21; 17:11, 15; 18:16; 20:7, 11, 13; 21:2; 134:13, 19, 25; 135:6
incorrect 74:20
indefinitely 19:16
indicated 24:15; 73:20, 22; 92:7; 108:12; 119:16; 134:6
inexcusable 33:20
information 8:10; 81:6; 82:15; 83:10, 12, 24; 98:9, 22, 24; 99:1, 17, 22; 100:2; 116:7
Initially 110:6
injured 9:12
inserted 131:20
insisted 97:10, 13
instead 103:18
Institute 8:16; 98:6; 99:5; 100:4; 128:22; 129:1
instruct 18:22; 19:18; 84:22
insuring 137:24
intellect 64:12, 13, 20, 23
intelligent 7:16; 8:2, 12; 21:23; 23:15; 34:25; 35:5, 17, 18, 22; 48:20; 58:20, 23; 59:24; 60:11, 23; 61:1, 10, 20; 62:17; 63:6, 9, 11, 12, 19, 21, 22; 64:4, 6, 8, 11; 65:1, 4, 12, 14, 17, 18, 23, 25; 66:12; 67:8; 68:19; 69:2; 73:14, 19, 20; 74:1; 77:13; 80:22; 81:6, 25; 82:22, 25; 87:20, 21; 90:2; 91:7, 11, 17, 22; 94:17, 20, 23; 95:11; 97:19; 99:9; 101:11, 25; 102:19; 103:10, 17; 105:16, 25; 106:10; 108:19; 110:3, 21; 117:10, 21; 118:22; 119:25; 120:5; 121:13; 122:6, 17, 19; 123:10; 129:18, 24; 130:13, 16; 133:11, 20; 134:8, 24
intense 47:25; 48:3
intent 33:4; 104:3; 134:6, 7, 8
interest 109:6, 12, 16
interested 34:18; 35:16
interjected 139:16
Interruption 12:5; 128:24
intimidated 76:6, 24
into 43:6; 48:17; 61:8, 12; 67:24; 68:2; 103:20, 21; 113:19; 114:21; 131:20; 133:12, 22; 139:17
introduce 97:17
introduced 94:23
invited 126:5
involved 131:8
involvement 122:21
involving 96:6
issue 23:25; 44:9; 49:6; 50:18; 73:10; 75:18; 82:14; 107:22; 113:25; 137:20
issues 113:20

J

Janie 92:2; 94:8; 136:11
January 4:15
Jeff 76:3
Jen 134:3
Jesus 139:10, 13
job 93:17; 108:16
Joe 23:11; 124:2
judge 19:4
July 70:22
June 25:5, 7, 10, 12; 27:3; 28:16; 29:18; 32:18; 33:6; 35:8; 39:15, 22; 40:24; 41:18; 43:21, 24; 45:14, 18, 23; 46:14, 18; 47:1, 14, 17, 17, 18, 24; 52:24, 25; 53:2; 54:4; 55:22; 73:11; 137:18

K

keep 18:19; 77:21, 22; 95:16
keeping 138:25
Kenneth 27:8
kept 95:14; 122:8; 133:12
kids 75:13, 16
kind 5:21; 34:9; 50:14; 119:23; 120:1; 134:15
knew 95:6, 7; 99:6, 8; 126:11
knowing 59:19
knowledge 5:7; 30:5; 32:9; 33:3, 24; 43:4; 44:25; 48:25; 57:5; 94:21; 101:5; 112:9; 119:10; 131:12; 132:5, 17
knowledgeable 107:1, 4
known 46:6; 114:7
knows 81:8

L

laced 28:7; 30:1
language 114:24; 115:4, 7, 15; 118:24; 119:6
lapel 12:1
Larry 59:1
last 6:10; 23:14; 24:12, 13; 36:1; 47:4; 49:6; 71:24; 91:4; 100:18; 101:2; 132:1, 2
later 25:23; 76:18; 110:5; 111:24
law 4:19; 8:14; 42:10; 69:8, 9; 77:5; 78:1, 13, 20; 80:22; 83:15, 17; 84:2; 85:19; 86:8, 15; 87:9; 119:6; 120:12, 19; 121:3, 11, 15
lawsuit 6:25; 7:15, 25; 8:11; 23:25; 39:20; 77:18; 121:5
lay 100:14; 107:1
Leader 123:22; 124:5, 12, 13, 15
leading 73:20; 138:5; 140:9
leads 125:10
learn 45:21; 79:21
least 42:18; 91:4, 5, 21; 105:25; 127:12; 134:20; 139:16
led 57:8
left 5:20; 76:24; 132:6
legal 82:13, 14; 83:21, 22; 84:13, 23, 25; 85:4, 25; 86:20; 95:4, 5, 8; 98:14; 99:14; 121:12; 124:24
less 24:24; 43:5
letter 23:2; 39:21; 40:4, 13, 14, 19; 77:7, 10, 11, 14, 25; 78:8; 121:18, 20; 124:19
letters 78:10; 107:20
level 9:19
Levine 140:6
liberal 50:5; 51:17
liberals 54:15, 22
lies 56:1
life 13:13; 15:8; 16:6, 9, 20; 17:7; 20:6; 31:25; 39:18; 60:2; 61:8; 62:24; 63:10, 20; 64:5, 11, 22; 65:18, 24; 96:16; 115:7; 118:17; 119:12, 24; 134:21, 23
life's 43:3
light 100:18; 128:5
Likely 129:14
likewise 5:16, 24
limitations 105:1
limited 4:11; 90:1
line 18:21; 19:15
lines 53:10
listened 123:17; 128:7
literal 13:25; 14:6, 10, 15
litigation 8:25; 12:12; 19:3, 12
little 19:8; 51:9; 56:17; 69:13; 74:22; 78:12; 106:21
live 68:25
lives 10:20
living 14:23; 63:10
locates 65:1
long 5:2; 6:14; 9:11; 11:7; 14:17, 21; 31:12; 36:6; 58:9; 78:4; 94:24; 99:11; 101:8; 122:8; 131:18
long-term 114:6
look 25:1, 3; 27:25; 30:22; 31:2; 41:16; 43:21; 52:21; 68:15, 18; 77:1; 79:9, 18, 19; 85:18; 88:22; 116:22; 117:17; 118:11; 122:7; 125:13; 127:9; 131:14
looked 41:2; 47:15; 58:9; 68:11, 16
looking 34:1, 7, 9; 41:5; 49:3; 115:6
loss 15:12
lot 13:1; 34:16; 61:4, 6; 97:21, 22, 24; 106:7
loud 51:9; 76:9

M

mainstream 105:15, 24; 106:3
making 106:12
Maldonaldo 23:11; 24:13; 124:2
man 14:23; 15:9; 16:7, 19; 17:8; 20:6, 25; 33:21; 139:12
manner 43:18; 51:1, 3; 122:19
manufactured 63:20; 64:5
many 4:25; 18:13; 19:14; 23:5; 47:22; 57:12; 90:16; 91:2; 99:24; 111:4; 120:18
marked 87:24; 127:3, 6
master 64:12, 13, 20, 23
match 126:18, 19
material 8:10; 116:13
materials 94:15, 16; 125:16
matter 4:12; 7:25; 8:11; 46:2; 63:21; 64:6; 92:18; 114:20; 131:7, 16; 135:9
matters 7:15
may 10:7; 28:5, 14, 15; 88:21, 24; 117:23
Maybe 6:15; 16:4; 55:16; 58:6, 17; 59:19; 63:2; 93:22; 120:21, 21
mean 7:11; 10:20; 15:13; 17:19; 18:25; 30:21, 21; 34:13; 36:25; 38:6, 15; 45:21; 66:10; 68:25; 73:7; 75:22; 76:23; 79:3, 19, 20; 91:9; 96:16; 101:16, 17; 102:12; 103:1, 22; 105:22; 107:19; 109:8, 8; 113:19; 118:25; 119:12; 122:7; 128:12; 138:21
means 13:5; 65:7; 107:4
meant 35:7; 46:8; 63:3; 119:15
medicine 114:9
meet 6:11, 14; 52:20
meeting 30:8, 17; 38:19; 41:19; 46:13; 47:5, 14, 18, 20, 24; 49:17; 50:9; 52:9, 25; 53:1, 6, 8, 13, 14; 56:18; 58:24; 70:10; 71:6; 72:6, 7, 10, 11, 15, 18; 73:23; 81:3, 15, 19; 85:6, 9; 88:7, 17; 93:16, 22; 94:10, 14; 96:6; 97:6, 8; 110:11, 18; 113:8; 116:1, 14; 118:12; 122:2, 13; 123:3; 127:12, 20, 22, 23; 129:21; 133:5; 137:21; 139:8, 18
meetings 23:9; 32:8, 17; 46:17, 20, 23; 47:16, 22; 48:3, 8; 90:13, 18, 22, 25; 91:2; 92:24; 93:8, 10, 10, 13, 14, 18, 19, 21; 103:14; 120:25; 133:14, 17, 24; 134:1; 136:19
member 29:22; 33:8; 49:4; 59:1, 17, 19; 73:4; 74:3, 7, 15, 16; 75:24; 76:25; 84:13, 24; 124:6; 139:19
members 31:1; 34:1, 6; 41:19; 49:20; 53:7; 67:12; 79:21; 84:11; 85:5, 6; 94:1, 6; 102:4, 5, 10; 103:9; 129:19; 136:1, 7, 9; 137:2
memo 88:1; 117:1, 12, 13, 18; 118:8
memory 73:1; 114:3, 15
memos 118:1
mention 44:4; 48:19; 106:12; 108:22; 109:2, 18; 137:9
mentioned 41:14; 48:22; 67:21; 68:4, 6; 87:11, 13; 96:13; 102:1, 2; 103:11, 18, 23; 108:10; 120:6; 130:12; 133:16
mentioning 102:18; 108:13; 110:7
Met 6:10; 123:13
Michael 52:18
Michigan 77:5
might 8:4; 42:9; 43:2; 50:23; 51:7, 9; 55:7; 57:24 82:1; 84:3; 112:6; 118:25; 121:13; 124:24
Miller 27:8; 134:3; 140:6
millions 18:13
mind 35:13; 42:19; 72:22 74:17; 86:25; 104:5
mind-set 51:22
minute 32:12
minutes 80:21; 118:11
missed 55:8
missing 16:24
mission 86:24
misspoke 113:13
misunderstood 139:14
model 25:23; 27:9
molecules 61:7

**moment** 43:22; 72:2; 88:22; 127:9
**Monday** 41:19
**money** 108:3
**monkey** 55:4
**monkeys** 33:22
**months** 58:12; 69:6; 123:14
**More** 8:14; 29:8; 39:17; 43:5; 56:17; 66:25; 69:8, 9; 78:1, 13, 20; 79:24; 80:22; 83:15, 17; 84:2; 85:19; 86:6, 8, 15; 87:8; 91:3; 95:20, 23; 96:12; 119:6; 120:3, 12, 19; 121:3, 11, 15; 122:21; 128:17
**morning** 100:17; 127:8
**mouth** 10:9
**Move** 129:14
**Mrs** 21:7; 75:9; 96:7; 138:23
**much** 50:23; 58:5; 72:16; 77:21; 122:7, 9; 133:3; 139:19
**multiple** 108:21
**Muslim** 39:2, 24; 44:11, 21; 45:1
**Muslims** 38:25
**must** 46:6; 56:21; 57:1, 5
**myself** 6:20; 50:16; 51:22; 59:23; 136:11
**myth** 42:11
**mythical** 29:11

# N

**name** 4:18; 11:5; 87:8; 97:16; 111:12
**names** 61:5
**nearly** 47:3; 49:9; 137:21
**necessarily** 7:12; 103:3, 25
**necessary** 5:19, 23; 19:5
**need** 18:3; 113:20; 114:21; 127:1; 134:15; 135:16
**needn't** 38:23
**new** 32:12, 16; 33:2; 65:1, 12; 114:6; 126:5; 127:1
**News** 39:22; 43:22, 25
**newspaper** 22:14; 24:13; 31:10; 40:4; 71:13
**newspapers** 23:1; 107:14; 113:23
**next** 6:1; 29:17; 33:20, 25; 35:25; 36:1, 3, 14; 38:18, 23; 40:23; 42:2, 8; 49:20, 25; 51:14; 52:1; 53:11; 67:22; 75:7; 117:16; 125:13; 126:12
**night** 6:10; 71:24; 100:18; 132:1, 2
**night's** 41:19; 47:4
**Nilsen** 6:20; 70:12, 21; 79:23; 100:25
**ninth** 25:14; 71:23
**Nobody** 41:14; 48:22; 93:24
**nods** 5:21
**Noel** 41:20; 49:21; 92:8; 136:11
**noise** 60:10
**Nope** 46:24
**normal** 110:13
**normally** 111:12
**note** 115:7
**notes** 62:13; 89:2, 3
**nowhere** 54:7
**number** 57:9; 87:25; 89:23
**numbers** 118:6

# O

**O** 106:22
**oath** 5:8
**obituaries** 22:15; 41:7; 107:23
**object** 63:20; 64:5
**objecting** 12:13
**Objection** 10:5; 12:10; 13:18; 14:2, 19; 15:10; 16:10, 23; 17:13, 20; 18:18; 20:12; 21:14; 22:23; 23:17; 24:2, 21; 28:9; 29:13; 30:2; 31:5, 7, 12; 37:10; 40:3, 6, 15, 20; 42:20; 49:16; 51:21; 52:10; 55:13; 64:18; 65:5, 20; 66:4, 20; 67:10; 69:25; 71:13; 79:12; 80:14; 83:7, 20; 86:9, 23; 87:17; 90:7; 95:24; 101:21; 104:13, 24; 105:5, 11, 18; 106:2; 108:6; 111:18; 115:9; 119:13; 120:20; 121:7; 122:25; 125:9, 25; 129:5; 130:18; 135:2; 136:22; 138:4, 9; 140:9
**objections** 4:5
**obtained** 83:21
**obviously** 115:1; 128:12
**occasion** 7:23; 8:14, 16; 139:16
**occasions** 93:7; 133:25
**occurred** 62:24; 82:12
**occurring** 138:15
**October** 8:1; 21:4; 67:25; 88:8, 17; 91:21; 92:14, 16, 19, 25; 93:4; 110:11, 19; 111:22; 119:7; 120:18; 121:1, 6; 122:1, 1; 124:1; 129:11, 13; 135:18; 136:16, 17, 19
**off** 73:7; 98:5
**offend** 13:22
**offending** 50:1, 8
**offensive** 13:15
**offered** 98:15; 121:12
**offers** 38:20; 77:5
**office** 7:13
**officer** 5:1
**old** 32:5; 114:13
**Once** 5:1; 76:6; 98:24; 129:12
**one** 5:11, 15; 6:1; 7:19; 14:13, 16; 18:6; 25:23; 29:21; 32:17; 33:7, 25; 34:20; 36:2, 24; 37:7; 39:17, 20; 43:16; 45:8; 52:1; 55:8; 58:14; 63:9, 22; 66:25; 69:12; 71:19; 72:12; 74:9, 11, 16; 77:4; 89:1, 2, 14, 14, 15; 91:4, 22, 24, 25; 95:3, 10, 14; 96:13; 97:10, 14, 15; 103:4; 115:25; 116:24; 117:1, 6, 7, 8, 17, 18; 118:20, 22; 129:11; 130:14, 24; 131:9, 13; 135:16
**one-sided** 33:11
**ones** 12:21; 22:8; 35:13; 48:5; 107:16; 117:25
**ongoing** 31:21
**only** 27:18, 18; 28:17; 36:4, 17; 69:12; 73:13; 91:25; 93:9; 94:7; 95:22; 96:4; 97:10; 107:17; 125:14; 126:4; 129:10
**open** 39:3; 41:6
**operating** 109:14, 21; 110:14
**opinion** 15:5, 19; 29:16; 42:12, 13, 14, 15, 16; 123:1
**opinions** 42:18, 25; 43:2, 3; 99:24
**opponents** 49:3
**oppose** 106:7
**opposed** 63:23; 66:14; 71:5; 91:15; 103:25
**opposes** 29:9
**opposing** 103:25
**opposition** 49:7, 14; 52:3
**oral** 121:16
**order** 4:11; 25:6; 63:23, 25; 64:2, 8; 117:2; 118:5
**ordered** 58:14; 79:5
**orderly** 64:1
**ordinary** 5:22
**organism** 18:13
**organisms** 65:2, 13; 66:13, 18; 67:4
**organization** 87:15
**organizations** 87:6
**origin** 64:12, 23; 119:24
**origins** 4:14; 65:1; 96:16; 115:7; 118:17; 119:11; 134:23
**others** 35:18; 92:1; 99:23; 139:23
**otherwise** 93:11
**out** 11:15; 19:4; 25:23, 24; 29:6; 39:8; 45:11; 60:10; 79:4; 81:6; 89:6; 96:10; 97:15; 98:20, 23; 104:1; 105:12; 106:13; 109:14, 21; 110:14; 117:2; 122:17; 138:16
**outside** 32:4; 93:12; 119:1; 120:15
**over** 23:14, 23; 24:6; 36:2, 24, 24; 37:1, 1, 7; 48:14; 58:16; 59:3; 62:20; 68:25; 71:25; 72:1, 12; 80:15, 16; 94:13; 100:15, 16, 22, 25; 101:1; 121:17; 123:13; 133:12
**overrule** 108:14; 109:12
**overruled** 108:17
**owes** 64:12, 23
**own** 15:23; 63:3; 83:6; 139:17
**Oxycontin** 43:14; 44:9; 114:5

# P

**p.m** 140:13
**packet** 118:2
**page** 28:1; 29:17, 19; 33:5; 36:2, 3, 22; 37:24; 40:23; 49:2; 54:2; 55:21; 69:15; 75:7; 85:19; 87:25; 88:15, 15, 20; 89:2; 107:24; 114:22; 116:3; 117:14, 17; 118:13; 124:3; 129:9, 10; 131:18; 132:12; 137:18
**pages** 33:5; 100:15; 129:10
**Pandas** 57:10; 58:3; 63:4; 69:24; 70:4; 76:16, 18; 78:14; 79:2, 22; 80:2, 5; 117:10, 22; 125:14
**paper** 22:2, 4; 37:7; 40:8, 13; 41:1, 3, 6, 12; 43:12; 45:17, 22; 69:21; 72:8; 89:6, 22
**papers** 22:6; 43:17; 89:6
**paperwork** 77:22
**paragraph** 28:2; 29:21; 33:8, 20; 36:1, 2, 14; 38:1, 18; 41:16; 42:2, 8; 49:3, 20, 25; 51:14; 52:16; 54:6; 55:1, 23; 71:22; 73:3; 75:8; 77:6; 124:4; 125:13; 126:12; 129:17, 23
**paragraphs** 29:8; 30:23; 54:12; 55:8; 56:18; 75:2; 77:24; 126:3
**Pardon** 29:1; 48:11; 88:12; 115:5
**parents** 130:22, 25
**part** 16:24, 24; 41:22; 56:25; 59:18; 73:5; 74:4, 5, 20; 106:13
**particular** 24:1; 76:7
**particulars** 48:6; 49:17
**parties** 4:3
**parts** 106:8; 132:20
**passage** 52:11
**passed** 74:18; 79:25; 110:22
**past** 23:23; 41:18; 114:1, 1
**pastor** 130:22
**Pat** 6:19, 20
**Patrick** 18:24; 83:25
**patriotism** 126:22
**pattern** 65:3
**pay** 59:10; 107:21; 108:2
**Pell** 36:16, 19
**people** 17:23; 21:11; 47:21, 23; 50:14; 52:4; 56:6; 57:10; 58:3; 63:4; 69:8, 24; 70:5; 78:14; 79:2; 80:2, 5; 83:2; 85:24; 91:24; 92:22; 96:7; 102:12; 111:2, 4, 12, 25; 113:1; 116:20; 117:10, 22; 134:4; 136:13
**Pepper** 4:20
**perceived** 133:21
**percent** 112:22; 125:4
**perception** 123:4, 8
**perfect** 43:3
**peril** 19:20
**period** 45:14; 71:5; 100:14; 119:25; 123:13; 136:18
**permit** 19:15
**persist** 18:21
**person** 27:16; 36:20; 50:16; 68:24; 69:1; 107:1; 120:23; 139:6
**personal** 7:18; 12:9, 11, 23; 13:16, 22; 15:23; 16:8, 21; 17:11, 15; 18:16; 44:9; 50:15; 95:22; 113:20; 134:14, 19; 135:1; 139:17
**personally** 66:8; 120:16
**phenomena** 38:13
**Phils** 41:7
**phone** 23:7; 68:25; 81:13; 94:5, 7; 120:23, 24; 121:17
**phrased** 134:25
**pick** 115:19
**piece** 40:5
**pin** 11:25; 12:7
**place** 4:15; 7:13; 94:2; 110:25; 124:23
**Plaintiff's** 69:14; 85:18; 127:3
**plaintiffs** 39:20
**plan** 65:3, 14
**plausible** 35:11, 20; 104:12, 18, 21; 105:4, 10
**play** 7:21; 19:11; 25:21
**please** 5:12; 12:16; 14:4 15:15; 20:1; 23:17; 28:2, 25; 29:2; 33:5; 43:22; 46:25; 47:13; 67:1; 69:14;

71:9; 88:15, 22; 123:25; 126:25; 127:8; 131:14
Pledge 39:8, 9; 45:5, 11; 138:16, 25
podium 50:15; 111:11
point 20:22; 91:18, 19, 21; 123:20; 130:11
police 5:1
policy 4:14; 130:4
politically 56:22; 57:2, 6
portion 37:16; 127:10
portions 25:4
position 49:4
positions 11:17, 20
possession 7:11, 11, 14; 77:20
possible 49:18; 89:5
Possibly 30:20; 36:6; 116:21
pounding 76:5
prayed 54:13, 19
preliminary 4:12
Prentice 29:25; 73:13
prepare 6:5, 8, 12
preparing 6:24
presence 74:14
present 6:17; 102:22; 124:21
presentation 124:19; 136:21; 137:5
presented 31:3; 37:4; 64:16; 78:5; 94:16; 101:15, 16, 17; 122:11
presently 9:9
presents 78:3
president 36:3; 57:22; 58:1; 67:13
press 21:25; 135:7
pressured 111:25
pressuring 112:13
pretty 113:22; 122:7, 9; 133:3
prevent 140:2, 5
previous 15:17; 20:2; 36:22; 60:5, 17
primarily 58:20
prior 50:9; 92:25; 93:3; 94:25; 119:7; 120:18
Prison 9:16
probably 68:19; 81:8
problem 31:21; 34:19; 36:8
problematic 118:4
problems 43:13
proceedings 121:12; 127:25
process 60:14; 62:23, 25; 64:1; 73:5; 74:4, 6; 110:16; 122:5, 22; 130:11; 134:1
produce 121:19
produced 100:8; 118:2, 6; 127:7
professional 50:24; 51:6, 8; 80:10, 12, 19; 106:16, 25; 108:2, 14; 109:3, 13
prominent 11:25
properly 118:1, 8
proposals 115:17
proposed 29:24; 88:17
protect 86:1; 119:19
proven 62:11
provide 82:15; 96:5
provided 98:14; 99:17; 100:12, 13, 17
providing 85:25
proviso 74:2
PSPA 104:3
public 55:24; 59:8; 86:2; 111:3; 129:2; 139:8; 140:3
publications 107:5
purchase 32:12, 16; 69:24; 76:12; 140:5
purchased 27:8; 70:5
purports 39:1; 52:11
purpose 4:14; 43:9; 59:16; 81:5, 23; 85:23; 86:5, 7, 10, 14; 135:17; 136:1, 14; 137:2, 3; 140:1, 5
purposes 137:9
pursuant 4:11
pushing 95:10
put 24:13; 27:1, 12, 16, 21; 51:22; 68:19; 119:19; 128:16; 135:3

## Q

quite 84:20
quote 39:1; 49:8; 55:8; 67:20; 104:16; 131:18
quoted 74:23; 114:19; 137:21
quotes 33:20; 36:15; 39:3, 3, 6, 23; 40:2; 41:18, 23; 42:11, 11; 44:11, 14, 15, 17; 49:11; 50:5, 7; 51:16; 54:7, 9, 12, 15, 16, 17; 55:3, 5, 24; 56:21, 22; 78:1, 6; 85:23
quoting 56:2, 14

## R

raising 51:12
ran 11:13
random 62:24
range 38:12
reached 119:23
reaching 98:23
read 15:15, 17; 19:25; 20:2; 22:2, 4, 10, 16; 33:14; 34:4, 5; 37:15; 41:6; 43:22, 23; 44:2; 46:2; 47:10, 12; 54:14, 19; 58:3; 60:3, 5, 15, 17; 65:9; 72:3; 79:24; 98:1, 2; 107:13, 18, 20, 23, 25; 117:20; 126:3; 128:17; 130:25; 132:18
reading 13:25; 14:6, 11, 15; 28:3; 41:3; 44:3; 47:14
really 15:19; 56:13; 106:18
reason 27:13, 18; 39:9; 73:3, 6; 95:22; 102:18
reasonable 8:4
recall 21:15, 20; 27:20; 37:6; 40:21; 41:13, 15; 45:4, 19; 49:17; 55:11; 58:19; 70:11; 79:23; 80:14; 96:6; 99:11; 110:13; 111:1; 112:24; 119:8
receive 77:10
received 8:14; 57:9; 77:7, 11; 98:5
recent 114:1, 1
recently 24:12; 28:6
Recess 63:17; 113:17; 137:13
recognize 86:21; 105:22
recognized 97:14
recollection 62:5; 70:13; 72:5, 9; 89:19, 21; 90:19; 94:10; 110:17; 118:20; 125:3, 4; 126:16; 133:5
recommend 78:20, 23
recommendation 30:24; 89:12
recommendations 89:11
recommended 27:7; 78:13; 117:3, 11; 140:7
record 5:21; 20:21; 22:9, 21; 23:13, 23; 31:10; 33:6, 7; 41:17; 54:3; 55:23; 74:25; 107:16; 117:24; 124:1; 129:9; 131:19, 20
recorded 127:23, 25
recording 127:22
recover 9:4
REEXAMINATION 138:19; 139:24
refer 32:8; 36:21; 39:10; 139:1
reference 53:6; 55:2; 77:24; 91:7, 11, 16; 94:8; 116:11; 117:9, 21, 22; 118:23; 123:9; 132:9; 139:10, 13
references 33:11; 132:12, 16
referencing 117:25
referred 36:20; 38:1
referred-to 37:15
referring 31:24; 35:7; 129:18
refers 38:10; 116:9; 126:17
reflect 9:6; 12:22; 62:13
reflected 12:21
reflects 12:4; 13:4
refresh 62:5; 72:5; 118:19
refreshed 73:1
refreshes 72:9
regarding 99:20
regards 42:4; 107:2; 110:20; 123:16
regular 22:4; 70:25, 25; 71:2; 125:17
regularly 107:18
relate 7:14; 21:12; 96:15
related 7:24; 8:3; 77:17
relates 14:7, 12; 21:18, 23; 23:14, 24; 34:23
relating 4:13; 44:9
relation 45:5
relationship 84:4
relative 60:1
relatively 114:6
relatives 111:13, 15
release 135:7
relevance 10:5; 12:10, 14; 13:18; 14:2, 19; 16:23; 17:13; 18:18; 19:19; 20:12; 21:14; 22:23; 23:17; 31:7; 40:15, 20; 86:9; 87:17; 95:24; 120:20; 121:7; 129:5; 135:2
relevant 8:10; 12:12; 18:20, 25; 19:3, 17
religions 50:4
religious 13:16, 22; 15:23; 16:8, 22; 17:12; 18:17, 20; 19:10; 21:12, 17; 86:2; 126:23; 134:14, 20; 139:17
remaining 74:2
remarks 50:2; 52:1; 56:20; 57:4
remember 19:23; 24:6, 8, 9, 11, 20; 27:6, 12; 30:16; 36:10, 11, 12; 40:16; 44:3, 5; 46:13, 17, 20, 22; 47:13, 18, 19, 20, 24; 48:2, 5, 10, 12, 13, 21; 49:11; 50:20, 21; 51:1, 19; 52:9; 53:4, 5, 8, 9, 14, 19; 54:18, 20, 25; 55:17, 17, 18; 56:9, 12, 14, 16; 57:8; 58:7; 59:5; 62:9; 68:22; 71:7; 72:11, 14, 17, 20; 75:4, 5, 6, 13, 15, 15; 76:8; 80:23; 81:22; 85:13, 16; 89:5, 9; 91:14; 92:25; 93:6; 95:9; 98:4; 99:12, 13; 101:10, 14; 102:12; 103:5, 13, 16; 110:18, 25; 111:2, 5, 7, 8; 112:19; 113:3; 114:3, 11; 115:13; 121:24; 122:12; 125:21, 22; 134:16; 135:19; 136:2, 6, 13
remove 122:6
repeat 37:14; 65:21
repeated 56:5
rephrase 5:12; 16:3; 17:3
replied 8:16; 75:11
report 31:19; 40:24; 43:11; 83:12, 14
reported 37:7; 39:15; 46:10
reporter 5:20; 15:17; 20:2; 23:8; 30:10, 11, 19; 31:18; 37:15; 60:5, 17
reporting 23:13, 22; 45:17, 22
reports 31:10; 74:9
represent 121:12
representation 12:9; 85:25
represented 90:21, 24
representing 121:4
request 70:7
requested 123:22; 124:5
requesting 82:13
required 5:6
research 79:1, 3
researched 68:16
reservations 122:4
reserved 4:6
residents 47:4; 50:1, 9
resolution 7:16; 8:1; 23:16; 67:25; 68:3; 87:21; 110:21; 111:21; 112:13, 16; 114:19; 115:6; 121:25; 122:15; 129:19; 130:5, 7; 135:18; 136:1
resolved 123:14
respect 96:19; 135:1
respectful 19:10
respective 4:3
respects 99:25
respond 40:19
response 7:4; 40:13; 51:24; 57:6; 134:4; 138:22; 139:4
responses 5:19
responsibility 59:18
responsive 100:10, 21
rest 25:2; 50:11; 73:17
result 63:21; 64:6; 121:13, 13
retained 8:25
retired 9:10, 11, 14
review 5:4; 6:23; 7:3, 8; 28:5; 94:15; 99:19; 101:6, 8; 127:10; 135:14
reviewed 6:25; 7:1, 4; 28:6; 101:4
revised 91:23
rewording 122:8
Richard 69:10; 77:25
right 19:21; 21:9; 27:25; 34:20; 43:7; 46:6, 16; 51:6; 66:8; 73:22; 76:16; 80:6; 88:1; 90:2; 93:16; 95:1; 98:18; 99:16; 108:25; 114:12, 22, 23; 115:11;

117:8, 9, 20; 118:9; 135:24; 137:7
**rights** 50:6; 51:17; 54:16, 23
**road** 79:14; 119:20, 22
**robes** 54:15, 23
**role** 135:12
**rolling** 133:12
**room** 115:1
**roots** 55:4
**round** 96:25; 104:1; 105:12; 106:13
**rounded** 95:20
**rules** 5:4
**run** 11:12

**S**

**sake** 137:24
**same** 6:3; 21:5; 30:23; 54:3; 62:2, 21; 81:19; 90:5, 11; 99:3; 105:11; 106:2; 115:1, 1; 118:5; 138:9
**Santorum** 131:20
**sat** 75:24
**save** 8:22, 23
**saved** 8:19
**saw** 40:21; 89:22; 101:2; 132:1
**saying** 16:25; 36:4, 10, 11, 12; 45:4; 49:12, 22; 51:19; 53:10, 15, 19; 54:18, 25; 55:11, 18; 56:9, 15, 15; 57:23; 74:24; 75:4; 113:23, 24; 123:3; 125:21, 22
**scared** 75:25
**scheduled** 52:20
**school** 9:21, 24; 10:25; 11:7, 9, 12, 13, 17, 21; 21:22; 22:17, 22; 27:6; 29:24; 42:13; 47:5, 7; 54:14; 57:9; 58:25; 59:18; 64:17; 67:7; 71:23; 73:4, 9; 74:7, 14; 76:19; 78:2; 79:9, 18, 21; 80:1, 4; 99:18; 101:3; 102:10; 108:16; 109:5, 5, 20; 121:4, 5; 122:23; 129:3; 131:3, 6; 133:4
**schools** 56:4; 69:22; 88:6; 140:3
**science** 9:22, 23; 25:22; 96:7; 97:3; 99:18; 101:1; 106:1, 16, 18, 21, 23; 107:3, 9; 108:2, 15; 109:3, 13, 14; 116:6
**scientific** 13:7; 15:7; 16:5; 29:5; 34:11, 14, 16, 21, 22; 35:12, 16, 20; 37:3; 38:4, 5, 12; 42:4; 48:16; 58:18; 60:1, 8, 11; 61:16; 81:25; 82:24; 95:17, 19, 20; 96:11, 13, 15, 19; 97:14, 16, 20, 21; 101:25; 102:7, 22; 103:3; 104:2, 17, 20; 105:12, 16, 17, 23, 24; 106:14; 107:5; 108:23; 109:17; 130:13, 14; 134:10; 135:23; 137:6
**scientifically** 35:24; 38:7; 58:23; 62:12
**scientist** 15:20; 17:5; 20:23; 35:23; 60:21; 61:12; 96:10
**scientists** 17:21; 61:4, 4, 6; 62:20, 21; 80:19; 97:22, 24; 99:23; 106:7, 9
**scream** 76:7
**screamed** 76:8
**screaming** 76:5
**sealing** 4:3
**second** 18:11; 28:1; 29:21; 47:10; 52:16; 55:1; 77:6; 85:23; 100:11; 114:22; 124:3; 128:17; 137:12, 18
**secretary** 110:13
**section** 29:19
**sector** 59:9
**seeing** 89:9
**seek** 98:20
**seeking** 84:13; 98:22, 24; 99:1
**Senator** 131:20
**send** 7:22, 24
**sense** 123:5, 12
**sent** 98:8; 116:4
**sentence** 85:23; 129:17, 23
**separation** 29:9, 10; 42:9; 49:7; 54:8
**series** 5:5
**serve** 59:16
**session** 85:8, 11, 14; 93:11
**set** 80:10; 108:16
**Seth** 8:15; 98:11
**seven** 36:25
**several** 23:6; 47:22; 48:8; 56:2; 69:6; 90:17; 93:7, 19; 122:5
**shaping** 63:21; 64:6, 7, 9
**shared** 21:17; 116:14; 137:4
**Sheila** 31:1; 52:20; 92:2; 103:7; 129:20; 136:10
**shield** 85:24
**shop** 94:1
**short** 100:13
**shouted** 126:21
**shouting** 126:17, 19
**showed** 47:21, 23
**similar** 37:21, 23; 39:13; 52:13
**similarities** 66:12, 17; 67:4
**simple** 60:25
**simplify** 65:10
**single-celled** 18:12
**sit** 47:19
**sits** 33:9
**sitting** 5:20; 23:21; 24:20; 45:21; 86:6; 139:20
**situation** 43:19
**six** 9:12; 15:2, 3, 4; 75:2; 123:14; 131:13
**sixth** 129:16, 23
**slightly** 89:17
**Snook** 59:1
**somebody** 17:24; 27:15; 37:2; 57:7; 93:22; 112:7; 117:11; 118:25; 119:1
**someone** 44:15, 16; 45:8, 9; 49:9; 55:9, 10; 58:24; 59:8; 87:11, 12; 101:1; 110:14; 137:22
**Sometimes** 50:14
**somewhat** 15:11; 114:1
**soon** 63:15
**sorry** 6:20; 13:19; 15:15; 18:8, 10; 34:14; 36:1; 37:13; 43:7, 8; 60:4, 10, 15; 73:6; 102:16; 105:7; 113:10, 11, 13; 131:4; 139:14
**sought** 83:21; 84:23
**sounds** 8:4; 21:9; 46:16
**Spahr** 96:7; 97:1; 125:14; 126:3; 128:8, 9, 10; 134:3
**speak** 5:16; 82:4; 111:13, 16
**speaking** 6:2; 111:8; 136:13
**species** 13:11; 14:23; 119:18
**specific** 35:13, 22; 39:10; 89:5; 139:1
**specifically** 48:2; 102:12; 103:5; 135:25
**speculation** 42:21; 51:21; 64:19; 65:6; 66:5, 21; 104:25; 115:9; 125:10
**spell** 18:3
**spend** 58:5
**spoke** 41:20; 51:9; 73:15; 80:25; 81:22; 111:3, 5
**sports** 107:24
**square** 86:2
**stack** 87:25
**staff** 89:13; 90:21, 24; 91:6, 8; 117:4, 6, 16; 129:21
**stage** 70:8
**stance** 138:24
**stand** 37:17; 44:16; 45:9; 49:10, 14; 55:10; 60:12; 62:14; 83:1; 137:23
**standard** 9:23
**standing** 71:12; 81:9; 82:14
**stands** 61:1
**stapled** 118:3
**started** 19:8
**state** 29:9, 11; 42:10; 49:8; 54:9; 60:8; 137:19
**stated** 17:14; 72:8; 111:24
**statement** 28:19; 37:6; 45:1; 73:17; 96:21; 129:2; 137:17, 21; 138:1, 7, 11, 12; 139:2
**statements** 24:23; 40:4; 44:10, 19; 45:13; 136:6
**status** 95:4, 5, 8
**stayed** 104:2
**step** 109:17; 126:11
**Stephen** 62:13; 88:24
**Stephen's** 89:4
**Steve** 4:19; 18:18; 117:23; 127:18
**still** 9:1; 55:21; 63:2; 94:22; 104:4
**stipulated** 4:2
**STIPULATION** 4:1
**Stock** 123:22; 124:5, 12, 13, 15
**stood** 49:6; 76:6; 111:3
**stopped** 41:3
**stops** 36:17
**story** 14:7, 12; 28:16
**student** 11:24
**students** 35:23; 36:16; 39:5; 40:1; 44:13; 64:17, 22, 25; 65:11; 66:2, 17; 67:3; 80:17; 89:12, 24; 95:19; 103:11, 24; 105:13; 106:14; 108:3; 109:6, 12, 16; 125:16; 130:12, 15; 134:9
**study** 125:17
**stuff** 41:3; 87:25
**subcommittees** 131:8
**subject** 5:7; 7:15, 25; 8:11; 21:12, 18, 23; 23:15; 35:9; 54:3; 70:9; 74:1, 10; 82:4; 94:22; 101:11; 106:6; 124:15; 133:4
**subjects** 23:24
**subscribe** 107:5
**sue** 77:8
**sued** 109:25; 110:1, 6, 10
**suggesting** 52:24
**summer** 68:9
**Sunday** 39:22; 43:22, 25
**Superintendent** 52:18; 69:21, 23; 88:6; 128:6
**supervisor** 9:15
**supplement** 70:25; 71:3
**support** 106:9; 112:1, 13, 22; 126:14, 15; 128:23; 129:3
**supporting** 112:16; 135:18
**supports** 29:12
**suppose** 63:15
**supposed** 66:22; 127:16; 130:21
**Supreme** 132:13
**sure** 6:16; 16:17; 17:4; 20:21; 21:21; 23:21; 30:7, 9; 31:10; 32:2, 5, 19, 22; 63:16; 65:11; 67:3; 79:4; 81:4; 82:7, 11; 84:9, 18, 20; 87:10; 91:19, 20; 92:3, 20, 23; 93:7; 100:10, 11; 104:4; 115:14; 120:10; 124:25, 25; 125:1; 135:24; 138:23
**surgeries** 9:13
**surmise** 90:7
**suspect** 9:2
**sword** 85:24
**sworn** 4:9

**T**

**table** 76:5
**talk** 15:12; 23:8; 79:7; 80:18; 81:5; 84:16; 94:5, 19; 120:19; 121:3
**talked** 28:18; 56:11; 69:12; 70:11; 80:11, 12, 21; 81:10, 16; 83:15, 17; 92:23; 93:3; 94:7, 24; 95:2; 98:7; 99:3, 16; 113:24; 133:11
**talking** 25:25; 53:11; 68:24; 73:8; 81:23; 87:19; 92:16; 102:16; 129:16; 139:19
**talks** 63:24
**tantrum** 75:25; 76:4, 10
**tape** 127:17, 20, 21; 128:3, 3
**taped** 110:12
**taping** 110:16
**taught** 29:4; 36:6, 7, 17; 38:2; 39:5; 40:1; 44:14; 47:6; 49:22; 56:4; 65:11; 66:3, 17; 67:3; 70:17, 23; 73:19, 21; 101:15, 19, 23; 103:19; 115:8; 118:17; 119:12, 25; 120:6; 134:21
**taxpayer** 59:9
**teach** 33:21; 35:12, 20; 36:24; 37:1; 52:6; 61:2; 63:19; 64:5, 11; 65:17, 23; 66:12; 103:17; 104:11, 20; 105:3, 10; 106:11; 108:3, 8, 20; 119:17; 130:9; 134:6, 7
**teachers** 34:18; 35:11, 19; 47:4; 50:1, 8; 80:4; 99:19; 104:6, 11, 20; 105:9; 106:11; 108:1, 12; 109:20; 111:14, 15; 115:2, 4, 6; 116:21; 119:16; 120:2; 122:21, 23; 124:14; 130:8; 131:2, 6; 133:9, 10, 16; 134:2; 140:7
**teaches** 13:12; 16:6, 19, 17:7, 11; 18:14; 34:1, 21; 56:1; 65:12; 73:14
**teaching** 15:7; 34:18;

42:4; 52:3, 4; 53:17; 55:2; 71:25; 72:13; 73:11, 15; 104:7, 9; 105:17; 110:7; 130:10, 11; 140:2
teachings 56:8
telling 40:10; 56:6; 94:17
temper 76:9
term 62:6
terms 13:9; 60:25
testified 4:9; 16:12
testimony 16:11; 19:7; 30:14; 37:11, 16; 45:3, 12; 48:24; 51:15; 55:14, 17; 104:14; 105:6; 136:23
textbook 21:24; 25:13; 29:25; 32:11, 13, 16; 33:2; 35:2; 48:1, 4, 9; 49:15; 70:25; 71:1, 3, 24; 73:12, 24; 74:12; 76:11; 78:2; 140:6
theories 29:6; 34:10, 11, 15, 16, 17, 21, 22; 35:4, 9, 11, 12; 36:5, 7; 37:3, 3; 38:2, 4, 5; 41:22; 42:5; 48:16, 19; 58:18, 19; 62:19; 89:25; 95:17, 19, 21; 96:5, 9, 10, 15, 19, 22, 24; 97:2, 15, 16; 102:23; 103:3; 104:11, 17; 105:3, 10; 109:19; 130:13, 14, 14; 134:9, 10; 135:23; 136:21; 137:6
theory 13:7, 15; 15:8, 20; 16:5, 18; 17:6, 9, 10; 18:14; 20:24; 29:4; 34:24; 35:1, 16, 19, 20; 36:18; 37:5; 38:5, 8, 9, 15; 42:5; 43:5; 48:18; 60:1, 8, 11; 61:10, 16, 20, 21; 62:1, 6; 63:23; 78:3, 5; 84:1; 95:18; 96:12, 13; 97:11, 20, 21; 99:16, 20; 101:25; 102:7, 9; 103:17, 24; 104:20; 106:8; 108:23; 109:18; 119:17; 120:1; 130:9; 134:10, 13, 18, 24
thereabouts 115:23
therefore 84:7; 127:23; 128:1
thinking 51:7
third 33:8; 41:16; 54:6; 73:3; 129:9, 10
thirty-nine 115:25
Thomas 8:13; 69:8, 9; 77:25; 78:13, 20; 80:22; 83:15, 17; 84:2; 85:19; 86:6, 7, 15; 87:8; 119:6; 120:12, 19; 121:3, 11, 15
Thompson 6:18; 69:10; 77:25; 78:9; 80:25; 81:5, 11, 17; 85:2; 95:2; 99:3
though 30:20
thought 27:16; 29:6; 35:11, 19; 41:4; 42:9; 46:7; 48:15; 53:11; 80:5, 16; 82:21, 25; 86:19; 104:12, 17, 21; 105:4, 10; 109:5, 15; 128:15
thoughts 57:19, 20
thousand 139:12
threatening 77:8
three 10:22; 29:8; 30:22; 56:17; 91:3; 115:17; 116:23; 120:21, 21; 136:18
threw 75:25
throughout 134:1
throw 76:4
Thursday 88:8
tie 57:21
ties 57:24
times 4:25; 19:15; 23:5; 102:25; 108:21; 120:18, 21, 21; 133:11
tiny 17:21; 60:13, 20; 62:22
tired 41:5
title 34:13; 129:14
today 4:21; 6:6, 7, 9; 7:12; 23:21; 24:20; 43:10; 44:2; 45:22, 24; 46:7, 9; 77:14; 86:6; 113:24; 114:10; 131:25; 134:12
told 24:16; 32:10; 56:19; 57:13; 64:22, 25; 75:17; 78:22; 82:21, 23; 83:17; 84:8, 15; 85:13; 92:14; 97:1; 107:19, 23; 108:20; 112:2; 121:11, 17; 124:20, 21; 127:11, 14; 130:17; 134:14; 135:21; 137:3
tomorrow 52:20
tone 56:20; 57:4
took 14:17, 21; 68:20; 110:25; 124:14
top 35:6; 47:3; 88:16; 89:11; 98:5; 114:23; 118:15
topics 8:3
totally 45:20
toward 73:20
towards 109:17
trace 55:4
transcribed 128:1
transcript 127:11, 13, 16, 19, 24; 128:4, 7, 14; 137:24
transmitted 69:21
transpired 72:23, 24
trial 4:6
true 24:17; 34:6; 41:25; 42:14, 23; 43:15; 46:12, 12; 49:1; 73:17; 74:15; 78:18; 81:1; 90:3; 91:10, 13; 105:19, 22; 106:15; 108:4; 109:9, 10; 112:8; 123:11; 126:8, 9, 15; 130:1; 139:15
truth 87:12
try 42:18; 119:19
trying 14:14; 19:1, 7; 43:8; 60:22; 94:22; 123:14
turn 25:5; 28:1; 29:17; 33:5; 40:23; 46:25; 49:2; 54:2; 55:21; 71:10; 75:7; 100:21; 115:20; 123:25; 124:3; 126:25; 129:8, 12; 132:12
turned 100:25, 25
TV 107:12
twice 5:1
twin 10:24
two 6:15; 11:8; 17:21; 33:5; 36:4; 46:17; 54:12; 55:8; 58:6; 67:18; 74:10; 75:24; 77:24; 88:25; 91:3; 100:3, 5; 107:17; 120:21; 122:23; 126:3; 129:10, 12, 13; 132:12; 136:19; 139:12, 23
type 59:3

# U

Um-hum 116:25
unapologetic 50:2
unaware 45:20
unclear 16:4; 19:8
under 33:10; 39:8; 63:5; 83:25; 89:23; 116:3, 6; 138:16, 25; 139:2
Understood 5:17; 31:11; 55:21; 63:9; 128:8
United 77:8; 87:3
unless 73:24
unnecessary 88:25
up 5:16; 10:9; 23:2; 32:13; 33:5; 41:9, 11; 47:21, 23; 49:6, 11; 52:16, 19; 54:13, 19; 55:8; 56:11; 66:6; 68:16, 24; 73:10; 76:6; 93:8; 96:8, 18; 111:3; 114:23; 115:19; 116:20; 118:15; 119:4; 122:3, 9; 124:4; 133:4, 8, 10; 136:13; 137:23
upset 39:23; 122:23
use 5:22; 7:18, 20, 22, 24; 8:6, 9, 25; 31:22; 32:7; 59:9; 62:5
used 8:13; 28:19; 32:4; 38:9; 40:11; 53:24; 62:16; 70:17, 24; 83:1
using 62:1, 16
usually 23:8; 40:16

# V

vacancies 11:14
vacation 27:15; 74:3
valid 106:1
various 24:22; 65:17, 23; 89:20; 135:22
verbatim 101:13
versa 48:15
verses 56:2, 5
version 114:16, 17
versions 89:1
vice 48:15
videotape 100:3, 4
view 15:22; 16:4, 8; 17:9; 38:21; 91:14; 102:22; 132:25; 133:1
views 16:22; 19:10; 21:12, 18; 38:25; 89:20; 131:2, 6; 139:17
violate 18:15; 42:9; 78:4
violation 56:8
voice 51:12
volcanoes 96:20
vote 32:22, 23; 73:23; 74:8; 75:23; 76:1; 119:7; 122:3, 10
voted 33:2; 74:16; 111:21
votes 74:10
vouch 128:13

# W

waived 4:4; 84:7
WALCZAK 104:16
walked 126:21
wants 38:19
waste 88:25; 128:18
water 106:22
way 17:14, 22; 18:25; 27:21, 23; 40:24; 43:10; 44:8; 51:6; 62:2, 8, 16; 65:10; 67:24; 68:2; 79:14; 86:25; 95:12; 109:16; 114:2; 115:21; 124:14; 126:11; 131:9
wearing 11:25; 12:7, 22
website 85:20
websites 8:7, 9; 68:22
week 24:12, 13; 29:23; 49:6
well-rounded 35:24; 95:23
Wenrich 21:6; 41:20; 49:21; 92:8; 122:3, 16; 126:18, 19; 136:11
weren't 73:23; 96:18; 98:22; 100:7; 104:6, 8; 108:13; 123:1, 5, 7, 12, 16; 127:25
What's 9:19; 11:5; 22:16; 87:24; 106:24; 114:17; 127:6; 130:6
Whenever 42:12
whereby 60:14
Who's 23:10; 36:19
whole 120:8; 124:18; 125:1; 127:20, 23
whose 84:6; 120:5
wide 38:12
wife 7:19; 10:20; 22:10; 41:10; 52:2; 53:10, 24; 55:25; 56:9
wife's 11:5; 114:16
WILLIAM 4:8; 29:21; 33:8; 49:4; 73:8; 77:7
within 13:11; 104:2; 119:18; 136:18
Without 72:16; 74:14; 76:14; 85:25; 115:17
witness 4:8; 19:19
witnesses 113:23
wonder 59:3
wonderful 59:22
wondering 13:3; 94:9
word 31:22; 38:9; 53:24; 77:11; 122:17
worded 11:23
wording 122:6; 126:5
words 28:24; 37:22; 50:20; 52:14; 53:22; 66:10; 70:18; 73:22; 92:21; 103:13; 118:17; 119:11; 131:11
work 9:12
worked 9:17
working 60:23
world 13:2
write 6:2; 23:1; 40:13; 126:6
writing 23:7; 100:1; 121:16
written 22:16, 20; 41:12; 80:16; 90:5; 126:14
wrong 23:3; 115:23; 124:14
wrote 39:21

# X

XI-A 118:15, 19
XI-B 117:2

# Y

year 23:14, 24; 24:6; 27:4; 43:13
years 5:3; 11:8; 17:22; 18:13; 32:5; 44:15; 45:8; 49:9; 55:9; 67:18; 137:22; 139:12
yesterday 128:5; 132:18, 21
Yingling 21:7; 74:17; 75:9, 11, 14; 76:22; 92:7; 111:21; 112:15
York 9:15; 22:9, 9, 20, 20; 23:13, 13, 22, 23; 25:6, 10; 29:18; 33:5, 7; 39:22; 41:17; 43:22, 24; 46:25; 54:3; 55:22; 71:10, 20; 74:24; 77:1, 3, 4; 107:16, 17; 137:19

# Z

zillions 17:22