# In The Matter Of:

*Tammy Kitzmiller, et al. v.*
*Dover Area School District, et al.*

---

## William Buckingham
### March 31, 2005

---

*Filius & McLucas Reporting Service, Inc.*
*1427 East Market Street, York, PA*
*4309 Linglestown Road, Harrisburg, PA*

*(717) 845-6418 or (717) 236-0623*

Original File WB033105.TXT, 85 Pages
Min-U-Script® File ID: 2745601607

## Word Index included with this Min-U-Script®

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

William Buckingham
March 31, 2005

---

Page 2

[1]
[2]          IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
[3]
[4] TAMMY KITZMILLER, et al., .
[5]     Plaintiffs .  CIVIL ACTION NO. 04-CV-2688
[6]     vs. .
[7] DOVER AREA SCHOOL DISTRICT, .   (JUDGE JONES)
    et al., .
[8]
        Defendants .
[9]
[10]
[11]
        Deposition of              : WILLIAM BUCKINGHAM
[12]
        Taken by                   : Plaintiffs
[13]
        Date                       : March 31, 2005, 2:00 p.m.
[14]
        Before                     : Vicki L. Fox, RMR,
[15]             Reporter-Notary
[16]    Place                      : Two School Lane
                Dover, Pennsylvania
[17]
[18]
    APPEARANCES:
[19]
[20]  PEPPER HAMILTON LLP
      BY:  ERIC J. ROTHSCHILD, ESQUIRE
[21]
        For - Plaintiffs
[22]
[23]  THOMAS MORE LAW CENTER
      BY:  PATRICK T. GILLEN, ESQUIRE
[24]
        For - Defendants
[25]

---

[1]
[2]              INDEX
[3]             WITNESS
[4] WILLIAM BUCKINGHAM              Examination
[5]
    By Mr. Rothschild                 3
[6]
[7]
[8]
[9]
[10]             EXHIBITS
[11] Plaintiffs Deposition Exhibits       Page
[12] 2. Answer in Kitzmiller v. Dover Area School 14
     District.
[13]
     4. Dover Area School District Survey of Biology 29
[14] Books Used in Area Schools.
[15] 19. Feb, 2005 Dover Area School District News, 63
     Biology Curriculum Update.
[16]
     35. General Objections to Plaintiff's First Set  18
[17] Of Interrogatories.
[18] 36. Videotape Interview with William Buckingham, 81
     6/21/04.
[19]
[20]
[21]
[22]
[23]
[24]
[25]

---

Page 3

[1]              STIPULATION
[2]  It is hereby stipulated by and between the
[3]  respective parties that signing, certification and filing
[4]  are waived; and that all objections except as to the form
[5]  of the question are reserved until the time of trial.
[6]
[7]      WILLIAM BUCKINGHAM, called as a witness, being
[8]  duly sworn, was examined and testified, as follows:
[9]              BY MR. ROTHSCHILD:
[10]     Q: Good afternoon, Mr. Buckingham.
[11]     A: Good afternoon, sir.
[12]     Q: My name is Eric Rothschild. I am from the law firm of
[13]  Pepper, Hamilton, LLP, and I represent the plaintiffs in
[14]  the lawsuit captioned Tammy Kitzmiller, et al. vs.
[15]  Dover Area School District, et al. And your deposition
[16]  is being taken in this case.
[17]      Do you understand that?
[18]     A: Yes, I do.
[19]     Q: You have already appeared once for a deposition in this
[20]  case. I am not going to repeat all of the instructions
[21]  that my colleague Mr. Harvey gave you in that earlier
[22]  deposition, but I do want to remind that if you need a
[23]  break at any time during the proceedings, please let me
[24]  know, and I will be happy to do that. Let your counsel
[25]  know. I may even initiate one myself.

---

William Buckingham
March 31, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 4

[1] I understand that you have been having some
[2] physical problems that may require surgery, and I just
[3] want to inquire whether you're taking any medication for
[4] that physical condition?
[5] **A:** I take over the counter Motrin about 800 milligrams at a
[6] time.
[7] **Q:** And that's all?
[8] **A:** That's all.
[9] **Q:** Have you read the transcript of your earlier deposition
[10] in this case?
[11] **A:** Yes, I have.
[12] **Q:** Is there anything that you testified to during that
[13] deposition which was held on January 3rd, 2005 that you
[14] would like to change or modify?
[15] **A:** One thing, there was a question asked about whether or
[16] not anyone at my church or any of my acquaintances told
[17] me there were articles in the paper and explained what
[18] they were to some extent, and I answered no.
[19] As I recollect, I was told there were articles in
[20] the paper, but I wasn't told what they were. I just
[21] want to make that clear because it kind of even sounded
[22] funny to me. People did tell me there were articles in
[23] the paper, but I didn't look to see them. And I just
[24] was told they were there.
[25] **Q:** Other than that correction, is there anything else that

Page 5

[1] you after reading the deposition think you should
[2] correct?
[3] **A:** Not that I can think of at this time.
[4] **Q:** To the best of your recollection, all of your testimony
[5] was truthful?
[6] **A:** To the best of my knowledge and belief, yes.
[7] **Q:** There are just a few aspects of that prior testimony
[8] that I just want to confirm. One is that you never
[9] advocated the teaching of Creationism at any School
[10] Board meeting?
[11] **A:** No, I didn't.
[12] **Q:** You did not?
[13] **A:** I did not.
[14] **Q:** So that testimony is accurate?
[15] **A:** That's accurate.
[16] **Q:** In fact, you never referred to Creationism at all during
[17] School Board meetings?
[18] **A:** Not to my knowledge.
[19] **Q:** You also testified that you never described a biology
[20] book as laced with Darwinism. Is that still your
[21] testimony? And I am referring to in School Board
[22] meetings for the time being.
[23] **A:** As I think back, there was an exchange I believe between
[24] Mrs. Callahan and myself where she wanted to know why
[25] the biology book wasn't being approved as fast as she

Page 6

[1] thought it should be. And I didn't really want to go
[2] into it, but she kept pressing the matter. And I think
[3] at that time, I did say one of my concerns was that it
[4] was — I may have used — laced with Darwinism.
[5] **Q:** Mr. Buckingham, if you would look at the transcript of
[6] your deposition starting at page 29 at the bottom of the
[7] page, my colleague Mr. Harvey referring to a June 9th
[8] article in the York Dispatch asked you whether you said
[9] laced with Darwinism. And that continues on page 30.
[10] And you said not to my knowledge.
[11] Is that a correct description of your testimony?
[12] **A:** Yes, I think it is.
[13] **Q:** What has changed between your deposition on January 3rd
[14] and your deposition today to remind you that you did in
[15] fact use the words laced with Darwinism?
[16] **MR. GILLEN:** Objection to the characterization of
[17] his testimony and therefore the form of the question.
[18] BY MR. ROTHSCHILD:
[19] **Q:** You may answer.
[20] **A:** Would you ask the question again?
[21] **Q:** What has changed between January 3rd when you gave your
[22] first deposition and today when you are giving your
[23] second deposition to remind you that you did in fact use
[24] the term — the phrase laced with Darwinism at a School
[25] Board meeting?

Page 7

[1] **MR. GILLEN:** Same objection.
[2] **A:** I am not sure I used it. I said I may have used laced
[3] with Darwinism. And I thought back to the exchange
[4] between Mrs. Callahan and myself, and it seems to me I
[5] may have, but I am not sure.
[6] BY MR. ROTHSCHILD:
[7] **Q:** Okay.
[8] **A:** And I thought about that after the deposition. And
[9] that's my testimony now.
[10] **Q:** It was also your testimony that you never used the
[11] phrase this country wasn't founded on Muslim beliefs or
[12] evolution; this country was founded on Christianity? It
[13] was your testimony that you never said that at a School
[14] Board meeting?
[15] **MR. GILLEN:** Objection to the extent he can recall
[16] his testimony. Then he can answer it.
[17] BY MR. ROTHSCHILD:
[18] **Q:** Why don't you look at page 44 of your transcript,
[19] Mr. Buckingham?
[20] **A:** (Witness complies.)
[21] **Q:** Do you see at the bottom of the page you said you never
[22] said that?
[23] **A:** In the context of the Intelligent Design issue, I did
[24] not say that. That was said during the debate about
[25] taking under God out of the Pledge of Allegiance. It

illiam Buckingham
arch 31, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

**Page 12**

[1]  Q: Why was that?

[3]  A: Because I couldn't see any reason to take it out.

[1]  Q: Was there any proposal in Dover to take under God out of

[1] the Pledge of Allegiance as it is recited by the

[5] students in the Dover Area School District?

[5]  A: Other than this, no.

[7]  Q: Other than this what?

[8]  A: Other than the discussions we had, no.

[9]  Q: Nobody was initiating a proposal to actually take it

[10] out; were they?

[11]  A: No.

[12]  Q: Mr. Buckingham, do you have a checking account?

[13]  A: Yes, I do.

[14]  Q: Do you share that checking account with your wife?

[15]  A: Yes.

[16]  Q: Are both names on that account?

[17]  A: Yes.

[18]  Q: And both of you can write checks out of that account?

[19]  A: Yes.

[20]  Q: You only have one checking account between the two of

[21] you?

[22]  A: Yes.

[23]  Q: And do you keep a register of checks you write?

[24]  A: Yes.

[25]  Q: And in that register, do you record who you wrote the

**Page 13**

[1] check to?

[2]  A: Yes.

[3]  Q: And the date of the check?

[4]  A: Yes.

[5]  Q: And the amount?

[6]  A: Yes.

[7]  Q: And I assume like the rest of the world, you receive

[8] statements from the bank —

[9]  A: Yes.

[10]  Q: — recording your transactions?

[11]  A: Yes.

[12]  Q: And in that statement, there are also canceled checks

[13] that have been drawn on the bank?

[14]  A: They are little tiny things. They are not really check

[15] sized. But we do get something.

[16]  Q: You don't get back the check indicating that it has been

[17] paid?

[18]  A: No.

[19]  Q: Do you keep your check registers?

[20]  A: My wife does.

[21]  Q: And do you know what she does with them?

[22]  A: We usually hang on to them.

[23]  Q: Do you know how long you hang on to them for?

[24]  A: No specific amount of time. When we figure we don't

[25] need it anymore, we get rid of them.

---

**Page 14**

[1]  Q: More than a year?

[2]  A: Probably.

[3]  Q: What about the bank statements, do you hang on to those?

[4]  A: My wife does.

[5]  Q: Do you know how long she hangs on to them for?

[6]  A: Same answer. That is her ballpark. I don't get into

[7] it. She does that.

[8]  Q: Do you have like a folder or a file cabinet that she

[9] puts those in?

[10]  A: I don't know what she does with them.

[11]  Q: Mr. Buckingham, I am going to show you the answer that

[12] was filed on behalf of defendants in this case. It has

[13] been marked as Plaintiff Exhibit 2.

[14]  This is a document you have seen before; correct?

[15]  A: I think I did, yeah.

[16]  Q: You reviewed it before it was filed on — before it was

[17] executed on January 3rd, 2004?

[18]  A: Okay.

[19]  Q: Is that correct?

[20]  A: Yes.

[21]  Q: I would like you to turn to page —

[22]  A: This is 2005.

[23]  Q: Thank you. Thanks for the correction. You reviewed it

[24] before that date; is that correct?

[25]  A: I don't know if it was before or after.

**Page 15**

[1]  Q: Did you review it before your first deposition in this

[2] case?

[3]  A: Yes.

[4]  Q: And that just for your information was January 3rd.

[5]  A: Okay.

[6]  Q: If you could turn to page six of the answer?

[7]  A: (Witness complies.)

[8]  Q: The first full paragraph reads — and I will try to do

[9] this slowly — the DASD biology curriculum policy does

[10] not advance religion, but merely provides the students

[11] of Dover High School with an honest science education

[12] for the valid and clearly secular purpose of enhancing

[13] the science curriculum by informing students about the

[14] existing scientific controversy surrounding Darwin's

[15] Theory of Evolution, including the fact that there are

[16] alternative scientific theories being advanced by

[17] scientists.

[18]  Does the purpose described in that answer

[19] accurately describe your purpose in voting for the

[20] October 18th resolution that modified the biology

[21] curriculum?

[22]  A: Yes.

[23]  Q: What information did you rely on in coming to the

[24] conclusion that the resolution does enhance the science

[25] curriculum by informing students about the existing

---

**Min-U-Script®**    Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

William Buckingham
March 31, 2005

---

Page 16

[1] scientific controversy surrounding Darwin's Theory of
[2] Evolution including the fact that there are alternative
[3] scientific theories being advanced by scientists?
[4]     A: I am not sure I understand your question, but I will try
[5] to answer it. It was done with the purpose of giving
[6] the students a more well rounded education as opposed to
[7] just teaching one theory.
[8]     Q: That is basically what is described in this answer;
[9] isn't it?
[10]     A: Yes.
[11]     Q: What information did you rely upon in coming to the
[12] conclusion that the resolution in fact did advance that
[13] purpose?
[14]     A: Common sense.
[15]     Q: Anything else?
[16]     A: Well, multiple theories. You have more to learn from in
[17] multiple theories than you do with one theory.
[18]     Q: Did you rely on anything -- did you base your conclusion
[19] that that purpose was being advanced on anything you
[20] read?
[21]     A: No.
[22]     Q: Did you base your belief that that purpose was being
[23] advanced by anything that was told to you?
[24]     MR. GILLEN: I object to the form of the question
[25] because I think it is vague.

---

Page 17

[1]     BY MR. ROTHSCHILD:
[2]     Q: You described your purpose in voting for the resolution;
[3] correct? You just described it?
[4]     A: Yeah.
[5]     Q: And I am trying to find out — and you believe that
[6] purpose was in fact being advanced by your vote;
[7] correct?
[8]     A: Yes.
[9]     Q: I want to know what information you relied upon. You
[10] have said common sense. You have said there was nothing
[11] you read.
[12]     I want to find out was there anything anybody told
[13] you that made you believe that that purpose was in fact
[14] being advanced?
[15]     A: No.
[16]     Q: Did you provide any materials to any other Board members
[17] to assist them in deciding how to vote on the
[18] resolution?
[19]     A: There was information sent to me by the Discovery
[20] Institute that I provided to the school. The Science
[21] Department had access to it. The Board members had
[22] access to it.
[23]     I obtained I think from Amazon.com a copy of Of
[24] Pandas and People, and the school shortly thereafter I
[25] think got four or five more copies. They were passed

---

Page 18

[1] around. And that is the extent of it.
[2]     Q: So do you know whether any Board members actually
[3] reviewed those materials?
[4]     A: I can't speak for them.
[5]     Q: Did you review those materials?
[6]     A: Yes.
[7]     Q: One of those materials is Of Pandas; correct?
[8]     A: Yes.
[9]     Q: Did you feel when you reviewed Pandas you understood it?
[10]     A: I didn't attempt to understand it fully. I wanted to
[11] make sure it didn't have a religious overtone.
[12]     Q: How did you go about doing that?
[13]     A: By reading it.
[14]     Q: Did you read it cover to cover?
[15]     A: I didn't read every single page. I skimmed through it.
[16] I looked for key words, that kind of thing.
[17]     Q: What kind of key words were you looking for?
[18]     A: God, Christianity, Bible, creation. It wasn't there.
[19]     MR. ROTHSCHILD: Could we mark this as an exhibit?
[20]     (Plaintiffs Exhibit 35 was marked.)
[21]     BY MR. ROTHSCHILD:
[22]     Q: Mr. Buckingham, the document I have marked as Plaintiff
[23] Exhibit 35 are the Defendants' Answers to the
[24] Plaintiff's First Set of Interrogatories, which are
[25] questions that the plaintiffs have asked defendants to

---

Page 19

[1] answer in writing. Do you understand that?
[2]     A: Yes.
[3]     Q: Have you seen this document before?
[4]     A: I don't remember seeing it.
[5]     Q: Could you turn to page six? Maybe it is already turned
[6] for you.
[7]     A: It's there.
[8]     Q: Actually, it would make more sense to turn to page five
[9] and look at question number six. And I am paraphrasing,
[10] but the question basically asks for identification of
[11] documents or materials used or relied upon by School
[12] Board members in selecting a biology textbook or
[13] developing the policy amending the biology curriculum.
[14]     And then if you turn over to page six, there is an
[15] answer describing your activities. And it goes from the
[16] top of the page to past half the page. I would ask if
[17] you would read that and advise me whether the
[18] information contained is accurate.
[19]     A: (Witness complies.) It seems to be.
[20]     Q: Other than the materials that are described
[21] underneath — other than the materials which the answer
[22] says that you reviewed, were any other materials given
[23] to the Board to help them decide how to vote on the
[24] October 18th resolution?
[25]     A: Not to my knowledge.

---

William Buckingham
March 31, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

**Page 20**

[1]  Q: Did anybody make any kind of oral presentation to the
[2] Board or any Board member or group of Board members to
[3] assist them in deciding how to vote on the resolution?
[4]  A: Are you talking other than the public coming to the
[5] podium?
[6]  Q: Yes.
[7]  A: No.
[8]  Q: Did you have any discussions with Board members in which
[9] you tried to persuade them to vote for the resolution?
[10]  A: No.
[11]  Q: Were you a participant in any discussions of that kind?
[12]  A: No.
[13]  Q: Did you ever participate in discussions with Board
[14] members in which you described your understanding of
[15] Intelligent Design?
[16]  A: Not that I know of.
[17]  Q: Did you ever participate in discussions with members of
[18] the Board in which another Board member described his or
[19] her understanding of Intelligent Design?
[20]  A: Not that I recall.
[21]  Q: Did you ever call the National Academy of Science for
[22] information about teaching biology to high school
[23] students?
[24]  A: No.
[25]  Q: Or about biology textbooks?

**Page 21**

[1]  A: No.
[2]  Q: What about the American Association for the Advancement
[3] of Science, did you ever call them for information about
[4] teaching biology to high school students?
[5]  A: No.
[6]  Q: Or about biology textbooks?
[7]  A: No.
[8]  Q: Same two questions for the American Federation of
[9] Biology Teachers?
[10]  A: No.
[11]  Q: Any other organizations?
[12]  A: No.
[13]  Q: Do you know whether any other Board member called any of
[14] the organizations I just named in order to get
[15] information about teaching biology to high school
[16] students or about biology textbooks?
[17]  A: I don't know either way.
[18]  Q: What about any member of the administration?
[19]  A: I can't speak for them.
[20]  Q: Are you aware that Mr. Baksa called several local
[21] Christian high schools to find out what biology text
[22] book they were using?
[23]  A: No.
[24]  Q: I am going to show you a document that was previously
[25] marked Plaintiff Exhibit 13. Have you ever seen that

**Page 22**

[1] document or anything similar to it?
[2]  A: Not to my knowledge.
[3]  Q: Is it your understanding that Intelligent Design is a
[4] scientifically sound concept?
[5]  A: I think it is a scientific theory.
[6]  Q: And if you can just answer my question, do you have an
[7] understanding of whether it a sound science, good
[8] science?
[9]  A: I am not a scientist. I can't answer that.
[10]  Q: You do have an understanding that it is a scientific
[11] theory?
[12]  A: Yes.
[13]  Q: On what information do you base your understanding that
[14] Intelligent Design is a scientific theory?
[15]  A: Without being able to name them, I know there are a vast
[16] number of scientists who support Intelligent Design as a
[17] scientific theory.
[18]  Q: How do you know that?
[19]  A: I read information about it.
[20]  Q: Where did you read that information?
[21]  A: Partly from the materials that I provided to the school.
[22] I am talking about the documents that were mentioned in
[23] a previous exhibit. And books that I read.
[24]  Q: Can you identify any of those books?
[25]  A: Not off the top of my head, no.

**Page 23**

[1]  Q: How did you decide for yourself that a book that you
[2] read actually had valid science? I could have written a
[3] book about my scientific theory, but I don't have any
[4] expertise.
[5]  How did you make that determination that what you
[6] were reading was in fact good science?
[7]  A: Because I read the opinions of other scientists, other
[8] books. I learned where scientists supported it.
[9]  Q: Mr. Buckingham, are you aware that in February of 2005,
[10] John Marburger, who is the science adviser to President
[11] Bush, stated that Intelligent Design is not a scientific
[12] theory, and I don't regard Intelligent Design as a
[13] scientific topic? Are you aware of those statements?
[14]  A: I don't know that that happened at all.
[15]  Q: If that did happen, that would be inconsistent with your
[16] understanding of Intelligent Design; correct?
[17]  A: I don't know if that happened.
[18]  Q: But if that did happen, that would be inconsistent with
[19] your understanding of Intelligent Design; correct?
[20]  A: I would have to hear what he said. You are saying — it
[21] could be out of context for all I know. I don't know.
[22]  Q: But if he said what I just represented to you, that
[23] would be inconsistent with your understanding; correct?
[24]  A: Could you repeat it again?
[25]  Q: Intelligent Design is not a scientific theory. That is

---

Min-U-Script®   Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

William Buckingham
March 31, 2005

[1] inconsistent with your understanding; correct?

[2]   A: Yes.

[3]   Q: And I don't regard Intelligent Design as a scientific

[4] topic, that would be even more inconsistent with your

[5] understanding?

[6]   A: Are you saying he said that?

[7]   Q: I am saying he said that.

[8]   A: Could you repeat it?

[9]   Q: I don't regard Intelligent Design as a scientific topic.

[10]   A: I don't agree with that.

[11]   Q: You had discussed before that you had talked to the

[12] Discovery Institute. Do you understand the Discovery

[13] Institute to have some knowledge about Intelligent

[14] Design?

[15]   A: I understand that now.

[16]   Q: And when you first contacted them during the summer of

[17] 2004 —

[18]   A: I never contacted them. They contacted me.

[19]   Q: Okay.

[20]   MR. GILLEN: Let him finish his question.

[21]   A: I am sorry.

[22]       BY MR. ROTHSCHILD:

[23]   Q: When did you come to your understanding that the

[24] Discovery Institute knew something about Intelligent

[25] Design?

[1]   A: The first time they called me.

[2]   Q: Do you understand them to be experts on the topic of

[3] Intelligent Design?

[4]   A: I don't know that much about them and their Intelligent

[5] Design capabilities.

[6]   Q: I am going to read to you some text reported by the

[7] "Seattle Times" in a newspaper article that came out

[8] just today Thursday, March 31, 2005. It is reporting

[9] what was said by Steven Meyer, who is the Director of

[10] the Discovery Institute Center for Science and Culture.

[11]   Have you heard of Mr. Meyer?

[12]   A: No.

[13]   Q: Mr. Meyer said the School Board in Dover, Pennsylvania

[14] got it wrong when it required instruction in Intelligent

[15] Design. Intelligent Design isn't established enough yet

[16] for that, Meyer says.

[17]   Were you aware of that statement.

[18]   A: That statement is in error, but I'm not aware of it.

[19]   Q: Why do you say that statement is in error?

[20]   A: We don't require instruction in Intelligent Design.

[21]   Q: Do you understand his statement that Intelligent Design

[22] isn't established enough for instruction to be in error?

[23]   A: Could you repeat that?

[24]   MR. GILLEN: Objection to the form of the

[25] question.

[1]       BY MR. ROTHSCHILD:

[2]   Q: Mr. Meyer said Intelligent Design isn't established

[3] enough for that. Reading the article, the that is

[4] instruction.

[5]   Do you have any basis for disagreeing with

[6] Mr. Meyer's characterization of Intelligent Design?

[7]   A: I guess there are plenty of other scientists that think

[8] it is a scientific theory.

[9]   Q: None of which you can name?

[10]   A: Not sitting right here, no.

[11]   Q: Do you know who the experts are for the defendants in

[12] this case?

[13]   A: No.

[14]   Q: Is it fair to say, Mr. Buckingham, that to the best of

[15] your knowledge any information that individual Board

[16] members had about Intelligent Design at the time they

[17] voted for the resolution was information that they had

[18] gathered themselves?

[19]   A: Are you saying independently or as a Board?

[20]   Q: Independently.

[21]   A: I don't agree with that.

[22]   Q: What was presented to the Board as a group to help them

[23] decide how to vote?

[24]   A: The books were presented to the Board. The information

[25] that was sent to us by the Discovery Institute was

[1] provided to the Board.

[2]   Q: The materials from the Discovery Institute were not

[3] provided directly to the Board; correct?

[4]   A: I am a Board member. They were provided to me, and I

[5] turned them over to the school.

[6]   Q: To the administration; correct?

[7]   A: Yes.

[8]   Q: You don't know what efforts, if any, other Board members

[9] took to review those materials?

[10]   A: I can't speak for them.

[11]   Q: You don't know?

[12]   A: True.

[13]   Q: And you also don't know whether individual Board members

[14] reviewed Pandas, correct?

[15]   A: I know they did. I don't know that every one did. I

[16] know that at least a majority did.

[17]   Q: When you're referring to when you say a majority did?

[18]   A: I did. Alan Bonsell did. Noel Wenrich did. Janie

[19] Cleaver did. Casey Brown did. Jeff Brown did.

[20]   Q: Other than those —

[21]   A: Seven.

[22]   Q: Other than those — other than the review Of Pandas and

[23] having the opportunity to review the Discovery Institute

[24] materials, you are not aware of any other information

[25] that Board members had to base their decision on?

illiam Buckingham                                                    Tammy Kitzmiller, et al.   v.
arch 31, 2005                                                    Dover Area School District, et al.

Page 28

[1]   A: Other than that, I don't know what they had.

[2]   Q: Other than that, it would be whatever they found out
[3] individually; correct?

[4]   A: Correct.

[5]   Q: Has it ever been your position as a member of the School
[6] Board that Creationism should be taught to Dover
[7] students?

[8]   A: No.

[9]   Q: Mr. Buckingham, do you remember in June of last year
[10] being interviewed by a reporter from the Channel Fox 43?

[11]   A: I am not good on the date, but I know it happened.

[12]   Q: I am going to show you the footage from that interview.
[13] We only have what they broadcast, not whatever else you
[14] might have said.

[15]   (At this time, the tape was played.)

[16]              BY MR. ROTHSCHILD:

[17]   Q: Mr. Buckingham, have you seen the interview that I just
[18] played before?

[19]   A: No, I haven't.

[20]   Q: And when I say before, I don't mean just when it
[21] happened, but at any time.

[22]   A: I haven't seen it, no.

[23]   Q: Does the footage that I just played show you speaking?

[24]   A: Yes, it does.

[25]   Q: As I said to you, the footage that I played is all that

Page 29

[1] we have. Do you remember saying anything else in that
[2] interview?

[3]   A: I barely remember that, but I remember it.

[4]   Q: And I am correct in understanding you have not seen this
[5] tape at any time?

[6]   A: No.

[7]   Q: Am I correct that you said in that interview, the book
[8] that was presented to me was laced with Darwinism from
[9] beginning to end?

[10]   A: Yes.

[11]   Q: That is the same expression that you now acknowledge you
[12] may have used in an exchange with Ms. Callahan at a
[13] School Board meeting?

[14]   A: Yes.

[15]   Q: And that phrase was in fact reported by the York
[16] Dispatch and York Daily Record reporters at the time —
[17] right after that meeting; correct?

[18]   A: It could have been.

[19]   Q: Do you want to see some — do you want to see the
[20] articles to confirm it?

[21]   A: If you say it is there, I believe it is there.

[22]   Q: Why don't we just show you so there is no confusion
[23] about that? Mr. Buckingham, I am going to show you an
[24] article that was compiled as part of Exhibit 4, a June
[25] 9th, 2004 article in the York Dispatch. In that

Page 30

[1] article, it in fact reports that you stated you were
[2] disturbed by the proposed high school biology textbook
[3] because it was laced with Darwinism; is that what it
[4] says?

[5]   A: I am trying to find that. That is what it says.

[6]   Q: And that's what you now acknowledge having said at the
[7] meeting?

[8]   A: Yes.

[9]   Q: And the same phrase you used in the interview with Fox
[10] 43; correct?

[11]   A: Yes.

[12]   Q: You also said in that interview that it's okay to teach
[13] Darwin, but you have to balance it with something else
[14] such as Creationism; is that correct?

[15]   A: I said that.

[16]   Q: So at least in that interview, in fact, it was your
[17] position that Creationism should be taught to Dover High
[18] School students?

[19]   A: No, it wasn't. I misspoke. I kind of got ambushed in
[20] the parking lot. And the words Intelligent Design just
[21] would not come to my mind. I couldn't think of them.

[22]   Because so many people on the opposite side were
[23] talking Creationism all the time, it just popped into my
[24] mind, and I said it. That was not my position. I
[25] misspoke.

Page 31

[1]   Q: So what you meant to say in that interview was
[2] Intelligent Design?

[3]   A: Absolutely.

[4]   Q: Instead you said Creationism?

[5]   A: Yes, I did.

[6]   Q: Is that possibly a product of the fact that those are
[7] indistinguishable in your mind, Mr. Buckingham?

[8]   A: No. They are very distinguishable.

[9]   Q: Mr. Buckingham, I am going to show you some more
[10] articles. In that same June 9th article we just looked
[11] at, the reporter says that you said the committee would
[12] look for a book that presented both Creationism and
[13] evolution; correct?

[14]   A: That is what that says, yes.

[15]   Q: And then if we look a whole different reporter,
[16] Mr. Maldonado from the York Daily Record, said that you
[17] spoke aggressively in having a biology book that
[18] includes theories of Creation as part of the text. All
[19] I am asking for is balance.

[20]   Is that what it says?

[21]   A: That's what it says.

[22]   Q: And so that the reporters of the York newspapers
[23] understood you to be saying Creationism; is that
[24] correct?

[25]   A: Those reporters at the York newspapers sat right beside

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

William Buckingham
March 31, 2005

---

Page 32

[1] each other and watch each other's notes. I did not say
[2] Creationism. I think that is a lot of the problems.
[3] They both get the same thing.
[4]    Q: You didn't say Creationism at those meeting, but the
[5] reporters thought you did?
[6]    A: I don't know what they thought, if I did or not.
[7]    Q: They reported you did?
[8]    A: Yes.
[9]    Q: And we see you on tape in fact again same expression,
[10] got to balance evolution or balance Darwin with
[11] Creationism. And you can't deny that you said that;
[12] right?
[13]    A: I am not denying I said that, but I am denying I said
[14] those things at the meeting.
[15]    Q: So the reporters got it wrong?
[16]    A: They usually do.
[17]    Q: And they in fact anticipated what you were going to say
[18] a week or so later in an interview?
[19]    A: I don't know how they got it. Maybe they talked to that
[20] reporter. I don't know. I don't know. I know they sat
[21] beside each other.
[22]    I know time after time after time, we would talk
[23] Intelligent Design, and they would put Creationism in
[24] the paper the next day. You don't just have to take
[25] that from me. Talk to the other Board members and the

---

Page 33

[1] administration. That is fact.
[2]    Q: Mr. Buckingham, this case is going to go to trial in
[3] September. You have newspaper articles, two different
[4] reporters reporting that you used the word Creationism.
[5]    A: That's fine.
[6]    Q: We are going to have witnesses that are going to come
[7] in, and some are going to say I heard him use the word
[8] Creationism.
[9]    We are going to have this tape here that shows
[10] that you in fact did use the word Creationism in the
[11] exact same context as the reporters said you did in the
[12] meetings.
[13]    I want to make sure here because you are
[14] testifying under oath that that is going to be your
[15] testimony, that you in fact never used the word
[16] Creationism in the public school Board meeting?
[17]    A: To the best of my knowledge and belief, I never used
[18] that word in a public School Board meeting.
[19]    Q: You testified that your first contact with the Discovery
[20] Institute was a phone call from the Discovery Institute;
[21] correct?
[22]    A: That's correct.
[23]    Q: And do you remember who the person was who called you?
[24]    A: Seth Cooper, an attorney.
[25]    Q: What did Mr. Cooper say to you when you picked up the

---

Page 34

[1] phone?
[2]    A: I couldn't even come close to telling you. That was a
[3] long time ago.
[4]    Q: What did you talk about with Mr. Cooper?
[5]    A: He explained that he was an attorney. And I know when I
[6] found out he was an attorney, I wanted to get legal
[7] advice as far as he could provide, as far as Intelligent
[8] Design was concerned.
[9]    And we talked about Intelligent Design, and we
[10] talked about the gaps in Darwin's Theory of Evolution.
[11]    Q: Did he offer legal advice when he called that first
[12] time?
[13]    A: Yes, he offered to represent us.
[14]    Q: Was that the first thing he said?
[15]    A: That was not the first thing he said, no. The first
[16] thing he said obviously was hello, my name is Seth
[17] Cooper, and I am an attorney with the Discovery
[18] Institute. This is what we are all about.
[19]    Don't ask me. I don't remember anymore. I said
[20] great. I could stand to talk to an attorney right now.
[21] I said here is what is going on. I said legally, how do
[22] you see us? And he told me at that time that —
[23]    MR. GILLEN: Bill, I don't want you to disclose
[24] any legal advice that he gave you.
[25]    BY MR. ROTHSCHILD:

---

Page 35

[1]    Q: Was the first thing — after the pleasantries, the first
[2] thing you said in response to his introduction was I
[3] want legal advice?
[4]    A: To that effect, yes.
[5]    Q: Did you ask for any advice other than legal advice?
[6]    A: Everything we talked had to do with legalities of
[7] Intelligent Design and Darwin's Theory and the gaps.
[8] That was about it.
[9]    Q: It was only about the legalities of Darwin's Theory?
[10]    A: That's not what I said. I said the legalities of
[11] Darwin's Theory, gaps, teaching the gaps in it and
[12] Intelligent Design being put into the curriculum.
[13]    Q: Did you say to — did you describe to Mr. Cooper what
[14] kind of legal advice you needed?
[15]    A: I don't remember. I just talked legal advice. I didn't
[16] specifically say what kind of legal advice. I assumed
[17] because I was on the School Board and we were involved
[18] in this, he would know.
[19]    Q: I just want to make sure I get this absolutely clear. I
[20] am sorry to be a little bit repetitive. I think this is
[21] a point where we have to be precise.
[22]    Did you ask for any kind of advice other than
[23] legal advice?
[24]    A: No.
[25]    Q: Did he give you any advice other than legal advice?

---

William Buckingham
March 31, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

**Page 36**

[1]  A: No.

[2]  Q: Did you talk to anybody else at the Discovery Institute

[3] during this phone call?

[4]  A: I need to correct what I just told you. He did send us

[5] that information.

[6]  Q: He sent you — fair enough. He sent you the DVD?

[7]  A: Right.

[8]  Q: And I think a book?

[9]  A: Right.

[10]  Q: Okay. But in this phone call, you only asked for legal

[11] advice, and he only gave you legal advice?

[12]  A: What we talked about was under the umbrella of legal

[13] advice in my mind.

[14]  Q: I just need to be clear. In your mind, nothing other

[15] than legal advice?

[16]  A: Right.

[17]  Q: Did anybody else participate in the phone call that day?

[18]  A: No.

[19]  Q: Did you ever speak to anybody else at the Discovery

[20] Institute?

[21]  A: I think the only person I ever talked to was Seth

[22] Cooper.

[23]  Q: How many times have you spoken to Seth Cooper?

[24]  A: Three or four.

[25]  Q: Can you give me estimates of the time periods? When was

---

**Page 37**

[1] the first call?

[2]  A: I can't. I can't.

[3]  Q: Summer, fall, winter?

[4]  A: It was about the time the story broke about the

[5] Intelligent Design issue because he got it off the

[6] Internet and called me. So that's the best I can do.

[7]  Q: In relation to the two June School Board meetings that

[8] we have been discussing, can you put it in some time

[9] frame? Is it within the month?

[10]  A: No.

[11]  Q: If we put —

[12]  A: He might know, but I...

[13]  Q: If we put the June Board meetings as sort of one

[14] boundary and the vote on the October 18th resolution as

[15] another boundary, was the first phone call in between

[16] those two times?

[17]  A: We talked in between those two times, but I don't know

[18] if that was the first phone call.

[19]  Q: Did he initiate all the calls, or did you sometimes call

[20] him?

[21]  A: He usually called me.

[22]  Q: Always?

[23]  A: I returned a call. He would leave a message, and I

[24] would call him back to see what he wanted. That was the

[25] only time I called him.

---

**Page 38**

[1]  Q: You never took the initiative in terms of wanting to

[2] talk to him?

[3]  A: Not that I recall.

[4]  Q: In those subsequent phone calls, were they like the

[5] first phone call, always for legal advice?

[6]  A: Yes.

[7]  Q: You were always asking for legal advice?

[8]  A: It was my understanding that once we had a legal advice

[9] umbrella, so to speak, our calls were under that

[10] umbrella.

[11]  Q: Did you understand the actual advice he was giving to be

[12] legal advice?

[13]  A: Yes.

[14]  Q: He didn't give you restaurant recommendations?

[15]  A: No.

[16]  Q: And even in the discussion of the curriculum issues, you

[17] always understood that to be legal advice?

[18]  A: Yes.

[19]  Q: Not educational advice?

[20]  A: No.

[21]  Q: Going back to first phone call, tell me everything he

[22] told you.

[23]  A: No way.

[24]  MR. GILLEN: Sure, certainly. I object and

[25] instruct you not to answer based on my belief that you

---

**Page 39**

[1] had an attorney/client relationship with Seth Cooper in

[2] which he offered and you communicated with him for the

[3] purpose of receiving his legal advice as a lawyer which

[4] you asked for and accepted as a member of the Dover Area

[5] School District School Board and head of its curriculum

[6] committee.

[7]  MR. ROTHSCHILD: Will you give that same

[8] instruction for each subsequent conversation with Seth

[9] Cooper?

[10]  MR. GILLEN: Yes. Based on my knowledge as of

[11] this date, I do. Thank you.

[12]  BY MR. ROTHSCHILD:

[13]  Q: Did you ever communicate what Seth Cooper and you talked

[14] about to anyone else, including, but not limited, to

[15] other School Board members?

[16]  A: No. The only thing I did with regard to Seth Cooper was

[17] transmit what he gave me as far as literature to the

[18] School Board — to the administration.

[19]  Q: You never described your conversations with him to

[20] anybody else?

[21]  A: No.

[22]  Q: Now I am going to ask you some similar questions for the

[23] Thomas More Law Center.

[24]  MR. GILLEN: Could we take a break, Eric?

[25]  MR. ROTHSCHILD: Absolutely.

---

**Min-U-Script®**

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

William Buckingham
March 31, 2005

---

**Page 40**

[1]     (A recess was taken.)

[2]            AFTER RECESS

[3]         BY MR ROTHSCHILD:

[4]     Q: Mr. Buckingham, I am going to ask you some questions

[5] about the Thomas More Law Center similar to those I

[6] asked you regarding the Discovery Institute. And if

[7] your lawyer hasn't already, I'll caution you to take

[8] your time because I am asking questions to find out the

[9] legal relationship, and it may will be that your

[10] attorney will instruct you not to answer. But I need to

[11] ask the questions to make sure I understand everything

[12] that I am allowed to find out.

[13]     When was the first time you contacted the Thomas

[14] More Law Center or had contact with the Thomas More Law

[15] Center?

[16]     A: It was some time shortly after the subject of

[17] Intelligent Design came up at the School Board meetings.

[18]     Q: Mr. Buckingham, when you talk about the subject of

[19] Intelligent Design coming up, are you referring to a

[20] specific meeting or time period?

[21]     A: A time period when Intelligent Design came up, I can't

[22] tell you when that was.

[23]     Q: In your previous deposition and a little bit today, I

[24] have shown you some — we have shown you some articles

[25] from June of 2004 in which the reporters characterized

---

**Page 41**

[1] the issue as Creationism.

[2]     Is it your testimony that in those meetings in

[3] June, the topic that was actually being discussed was

[4] Intelligent Design?

[5]     A: Yes.

[6]     Q: Not different meetings, those are the meetings where

[7] Intelligent Design first came up?

[8]     A: I am saying that the meetings when they said Creationism

[9] came it, it didn't come up. Intelligent Design came up.

[10] I am not saying it was at that specific meeting.

[11]     Q: You referred to your exchange with Ms. Callahan in which

[12] you may have used the expression laced with Darwinism.

[13]     Are those the same meetings where Intelligent

[14] Design came up?

[15]     A: I don't think Intelligent Design came up at that time.

[16]     Q: Okay.

[17]     A: I'm not sure though.

[18]     Q: Do you remember that at one of the School Board

[19] meetings, you had a somewhat heated exchange with a

[20] student named Max Pell about the issue of the biology

[21] curriculum?

[22]     A: I remember the student. I didn't realize what his name

[23] was. Yes, I remember that. I wouldn't characterize it

[24] as heated.

[25]     Q: Fair enough. You had an exchange with a student?

---

**Page 42**

[1]     A: We talked.

[2]     Q: Talked in public?

[3]     A: Yes.

[4]     Q: And it was about the biology curriculum?

[5]     A: Yes.

[6]     Q: Okay. And I'm going to show you — just to give us some

[7] sort of chronological grounding, here is an article by

[8] Mr. Maldonado in the June 9th York Daily Record, and you

[9] can see he is talking about Monday night's Board

[10] meeting; right?

[11]     A: Yes.

[12]     Q: You see there's reference to Ms. Callahan?

[13]     A: Yes.

[14]     Q: And then there's a reference to the Board looking for a

[15] book that teaches Creationism and evolution?

[16]     A: I see that.

[17]     Q: You disagree that that was what was said?

[18]     A: They said that all the time, and we never said that.

[19]     Q: It goes on to discuss Max Pell, a student, a former

[20] student. Do you see that?

[21]     A: Yes.

[22]     Q: And then it goes on to say that you said — you asked

[23] Pell if students are taught — I am sorry. Let me take

[24] the clip off. I am sorry to be over your shoulder. If

[25] students are taught only evolution, it stops becoming

---

**Page 43**

[1] theory and becomes fact; do you see that?

[2]     A: Yes.

[3]     Q: Is that consistent with what you remember about your

[4] exchange with the student?

[5]     A: I said that, but I don't know if it was at that time

[6] with him or not. I don't remember exactly what I said

[7] back and forth to him. I know I said that.

[8]     Q: This is all — this is a June 9th article, and it is

[9] referring to a meeting that happened on a Monday. And I

[10] think if we looked at the calendar, we would find that

[11] June 9th was a Wednesday — or it was a Tuesday or a

[12] Wednesday.

[13]     A meeting that happened around June 7th, is that

[14] fair, around that time period?

[15]     Q: Okay. Using that to sort of ground yourself

[16] chronologically, and if that is when you had the

[17] exchange with Ms. Callahan and the exchange with the

[18] student, at those meetings, were you discussing

[19] Intelligent Design?

[20]     A: I don't know if we were discussing Intelligent Design at

[21] that time or if we were just discussing Darwin's Theory.

[22]     Q: Okay.

[23]     A: And the origins of life being taught. I'm not — I

[24] don't know.

[25]     Q: Okay. You just have no memory whether Intelligent

---

illiam Buckingham
arch 31, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

Page 44

Design was being discussed though?

A: I don't know if it was that night or not. We didn't
, discuss it every night.

Q: Thank God. And do you remember that there was a vote in
August of 2004 about whether to approve the biology
textbook?

A: Yes.

Q: And it was in fact approved?

A: It was approved. When you mention dates, I don't know.
I know the book was approved.

Q: I am just trying to use — trying to have some markers
to help refresh your recollection. During these course
of events, when did Intelligent Design come up? Did it
come up in the early June meeting, or you just have no
memory, whatsoever?

A: I don't know when it came up. I can't tell you.

Q: All right. Going back to the questions about the Thomas
More Law Center, you said at some point, you had a
discussion with them?

A: Yes.

Q: To your knowledge, it was sometime after the issue of
Intelligent Design came up?

A: Yes.

Q: In this case, who initiated the conversation?

A: I did.

---

Page 45

[1]   Q: You called them up on the phone?

[2]   A: Yes.

[3]   Q: And I think when Mr. Harvey asked you the last time, you

[4] couldn't remember how you got their name or how you

[5] chose a Michigan law firm to call about this?

[6]   A: I think I said that someone mentioned it to me, but I

[7] don't know who it was.

[8]   Q: When it was mentioned to you, there's a lot of law

[9] firms, including my own, much closer to Dover than

[10] Detroit, Michigan.

[11]   Did that person describe in any way why you ought

[12] to call a Michigan law firm as opposed to a Dover law

[13] firm, a York law firm or a Philadelphia law firm?

[14]   A: It had to do with — I think the person I talked —

[15] whoever it was said there's a possibility they would

[16] represent us for free if we got sued.

[17]   Q: Okay. Was that the only information you knew about this

[18] law firm before you called them?

[19]   A: I was told they were top quality, and that it would be

[20] worth giving them a call. So I did.

[21]   Q: It proved out pretty well?

[22]   A: Absolutely.

[23]   MR. GILLEN: Thank you, Eric.

[24]   BY MR. ROTHSCHILD:

[25]   Q: Did you know anything about — did you go on the website

---

Page 46

[1] to find out anything about them?

[2]   A: No.

[3]   Q: Did you review any materials about them?

[4]   A: No.

[5]   Q: Did you know whether they had any area of legal

[6] specialty?

[7]   A: No.

[8]   Q: Did you know whether they had any sort of mission

[9] statement?

[10]   A: No.

[11]   Q: What was your purpose in calling the Thomas More Law

[12] Center?

[13]   A: To find out who they were, what they were about, and if

[14] it would be appropriate for them to represent us in the

[15] Intelligent Design issue.

[16]   Q: Did your purposes include seeking legal advice?

[17]   A: Absolutely.

[18]   Q: Did you have any other purpose in calling them?

[19]   A: No, I didn't.

[20]   Q: Did you ask for legal advice when you talked to them?

[21]   A: Yes, I did.

[22]   Q: Did you ask for any other kind of advice?

[23]   A: No.

[24]   Q: Did you receive legal advice from the Thomas More Law

[25] Center?

---

Page 47

[1]   A: Yes.

[2]   Q: Did you receive any other kind of advice?

[3]   A: I don't think so.

[4]   Q: Did you communicate anything about your conversations

[5] with the Thomas More Law Center to anyone else?

[6]   A: I indicated to the Board that there was a possibility

[7] that the Thomas More Law Center would represent us, that

[8] they said they would represent us in the event we were

[9] sued by the ACLU or whoever they are, the United for the

[10] Separation of Church and State.

[11]   Q: Did you disclose to anybody else, including but not

[12] limited to the Board, the substance of the legal advice

[13] that you received from the Thomas More Law Center?

[14]   A: No.

[15]   Q: Who did you talk to during those conversations? Let me

[16] withdraw that for a moment.

[17]   How many conversations did you have with the

[18] Thomas More Law Center prior to the time they actually

[19] were engaged to represent the defendants?

[20]   MR. GILLEN: Objection to the form of the

[21] question.

[22]   MR. ROTHSCHILD: Basis?

[23]   MR. GILLEN: The basis is that you are creating a

[24] formal criteria for engagement that I don't think

[25] applies to the attorney/client relationship. But you

---

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

William Buckingham
March 31, 2005

Page 48

[1] can answer it if you can.
[2]     I believe Mr. Rothschild is referring to the
[3] Board's vote to have us represent the Board as such.
[4]     MR. ROTHSCHILD: Right.
[5]     A: Could you ask the question again?
[6]          BY MR. ROTHSCHILD:
[7]     Q: Prior to the Board voting to engage the Thomas More Law
[8] Center to represent them in a lawsuit, how many
[9] conversations did you have with individuals from the
[10] Thomas More Law Center?
[11]     A: As a representative of the Board, right then and there I
[12] accepted their help on behalf of the Board. When the
[13] vote was made to formally accept their help, I wasn't
[14] there.
[15]     Q: Okay. The first time you called, did anybody on the
[16] Board know that you were going to call the Thomas More
[17] Law Center? Did you tell anybody in advance I am
[18] calling these guys up to find out whether they can help
[19] us?
[20]     A: I don't remember if I did or not.
[21]     Q: Up to the vote to engage the Thomas More Law Center,
[22] which I understand you weren't at, how many times do you
[23] think you talked to them?
[24]     A: Four or five times.
[25]     Q: Who initiated those calls?

Page 49

[1]     A: They were back and forth.
[2]     Q: And in all of these calls, you were seeking legal
[3] advice, and they were providing legal advice?
[4]     A: Yes.
[5]     Q: And nothing else?
[6]     A: No.
[7]     Q: Starting with the first — who did you have the first
[8] conversation with, which individual?
[9]     A: Richard Thompson.
[10]     Q: Tell me what you talked about.
[11]     MR. GILLEN: Objection and instruction not to
[12] answer to the extent that the discussions entailed
[13] communications between the two parties for the purpose
[14] of securing legal advice.
[15]          BY MR. ROTHSCHILD:
[16]     Q: Subject to that instruction, can you give me any answer?
[17]     A: No, sir.
[18]     Q: You can't answer if you are following that instruction?
[19]     A: Correct.
[20]     MR. ROTHSCHILD: For all subsequent conversations
[21] between Mr. Buckingham and the Thomas More Center, will
[22] you give the same instruction?
[23]     MR. GILLEN: I will, Eric.
[24]          BY MR. ROTHSCHILD:
[25]     Q: Did you contribute any money towards purchasing the

Page 50

[1] Pandas books that were donated to the high school?
[2]     A: No, sir.
[3]     Q: Did you collect any money which was then contributed
[4] towards the purchase of the Pandas book?
[5]     A: The money was donated to me.
[6]     Q: So money was donated to you for what?
[7]     A: For the purchase of the books Of Pandas and People.
[8]     Q: Describe to me how that donation came about.
[9]     A: I made a short statement prior to the beginning of our
[10] church one Sunday. I left people in the congregation
[11] know that the need existed. I explained I wasn't asking
[12] for any money, but if they felt led to help in that
[13] endeavor, feel free to do so.
[14]     Q: What did you do that?
[15]     A: Why did I do what?
[16]     Q: Why did you ask your fellow church congregants to donate
[17] money to the purchase Of Pandas?
[18]     A: Because my church congregation is basically the people
[19] we fellowship with. We don't have a lot of friends. We
[20] don't go to night clubs. We don't go dancing. We don't
[21] go to bars. We hang with the people we go to church
[22] with. They are our friends, and they are the people
[23] that I talk to.
[24]     Q: Did you get up in church and sort of make a plea or
[25] presentation?

Page 51

[1]     A: It wasn't in church. It was prior to church starting.
[2] And it wasn't a plea. It was just letting them know
[3] that a need existed. I explained I was not asking for
[4] any money, but if they would like to help, feel free to
[5] do so.
[6]     Q: Describe the logistics or circumstances of that
[7] communication. Where were you? Who were you talking
[8] to?
[9]     A: I was in front of the church talking to the
[10] congregation.
[11]     Q: Were you talking to members sort of coming in the door
[12] one by one, or were there people standing around?
[13]     A: There were people sitting in the pews.
[14]     Q: So you were in church?
[15]     A: Yes.
[16]     Q: Did this happen during a Sunday church service?
[17]     A: No, it happened prior. It was before church started.
[18]     Q: So was it on a Sunday?
[19]     A: Yes.
[20]     Q: And did you get up at the pulpit?
[21]     A: No.
[22]     Q: Where did you stand?
[23]     A: I stood just in front of the pews.
[24]     Q: Did you ask your minister for permission to do this?
[25]     A: I asked one of the elders.

William Buckingham
March 31, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 52

[1]   Q: And what did you say to the elder in asking permission?

[2]   A: I don't remember.

[3]   Q: So before services started, you got up and spoke to the

[4]   congregation?

[5]   A: Yes.

[6]   Q: And what did you say to them?

[7]   A: Just what I said before. I told them that there was a

[8]   need, that we would like to acquire these books. We

[9]   don't want to use taxpayers' dollars to do it. There is

[10]   a need to come up with the money for these books.

[11]   If you feel led to donate, fine. I am not asking

[12]   for money. I am just letting you know there's a need

[13]   there.

[14]   Q: Did you describe what the need was?

[15]   A: I just did.

[16]   Q: Did you describe why there was a need?

[17]   A: I just did. We wanted to purchase these books, and we

[18]   didn't want to use taxpayer dollars to do it.

[19]   Q: Did you explain to the congregation why you wanted to

[20]   purchase the books?

[21]   A: I almost had to. I think I told them that we wanted the

[22]   books to use as a supplement to use with the regular

[23]   biology book.

[24]   Q: Did you explain why you wanted to do that?

[25]   A: That is going back. I don't know. I didn't talk more

Page 53

[1]   than maybe 35, 45 seconds. I wasn't up there that long.

[2]   It wasn't a question and answer thing or anything like

[3]   that. It was just extremely brief.

[4]   Q: Did anybody at your church come up and talk to you? Did

[5]   anybody at your church ever talk to you about the

[6]   subject after you made that presentation?

[7]   A: Yes.

[8]   Q: Many people?

[9]   A: Yes.

[10]   Q: Did they ask you questions?

[11]   A: I am sure they did.

[12]   Q: What kind of questions were you asked?

[13]   A: I don't remember. I know we talked. I don't remember

[14]   what was said or what was asked.

[15]   Q: Did they ever ask you to describe why, you know, Pandas

[16]   would be a good supplement?

[17]   A: No.

[18]   Q: Did they ever ask you why you were showing support for

[19]   the Pandas book?

[20]   A: No.

[21]   Q: Did you in fact receive contributions? Did people at

[22]   your church contribute?

[23]   A: Yes.

[24]   Q: How many?

[25]   A: I don't know.

Page 54

[1]   Q: Can you — how much money — when they contributed, did

[2]   they contribute to you, meaning give the money to you?

[3]   A: Nobody handed me money.

[4]   Q: So how do you know they contributed?

[5]   A: Because I got the money.

[6]   Q: How did you receive the money?

[7]   A: At the church, there are mailboxes you can have that

[8]   basically were for the Pastor to transmit information to

[9]   the various members. And envelopes would be put in my

[10]   mailbox with cash in them.

[11]   Q: All cash?

[12]   A: There was a check.

[13]   Q: Who did you receive the check from?

[14]   MR. GILLEN: Do you want to talk to me?

[15]   A: I would like to speak to my attorney.

[16]   MR. GILLEN: Can we take a break, Eric?

[17]   MR. ROTHSCHILD: Yes.

[18]   (A recess was taken.)

[19]             AFTER RECESS

[20]         BY MR. ROTHSCHILD:

[21]   Q: Mr. Buckingham, I understand you have some concerns

[22]   about maintaining the confidentiality of the individual

[23]   who contributed by check to the purchase of the Pandas

[24]   book?

[25]   A: That's correct.

Page 55

[1]   Q: I am going to reserve my rights on that. I am not

[2]   agreeing that I will never ask that question, but we

[3]   will pass over it for now in this deposition with the

[4]   following qualification: Can you answer whether that

[5]   individual is or was a member of the Dover School Board?

[6]   A: No. Absolutely not.

[7]   Q: Is that person related in any way to a member of the

[8]   Dover School Board?

[9]   A: No.

[10]   Q: Do you know the identity of the individuals who donated

[11]   the cash?

[12]   A: No, I don't.

[13]   Q: They were all anonymous donations?

[14]   A: Absolutely.

[15]   Q: And how much money did you collect from your fellow

[16]   congregants?

[17]   A: $850.00.

[18]   Q: What did you do with that money?

[19]   A: I deposited it in my checking account.

[20]   Q: And did it remain there for all time?

[21]   A: I wrote a check to Mr. Don Bonsell, and I gave that

[22]   check to his son Alan.

[23]   Q: How did you transmit the check to Alan?

[24]   A: I just handed it to him.

[25]   Q: Did you tell Alan what it was for?

**Tammy Kitzmiller, et al.   v.**
**Dover Area School District, et al.**

**William Buckingham**
**March 31, 2005**

Page 56

[1] A: Yes.

[2] Q: What did you say?

[3] A: I said this is for the books we were going to get, and

[4] it is marked on the check.

[5] Q: The check was actually made to Donald Bonsell?

[6] A: Yes.

[7] Q: Why did you write a check to Donald Bonsell?

[8] A: It was my understanding he was going to make the actual

[9] purchase and donate the books.

[10] Q: Mr. Buckingham, could you turn to page 57 in your

[11] deposition transcript?

[12] A: (Witness complies.) Yes.

[13] Q: Do you see midway through the — or towards the top of

[14] the page Mr. Harvey asked you the School District

[15] received a number of copies of the book Of Pandas and

[16] People, correct, and you answered yes?

[17] A: Yes.

[18] Q: He asked do you know how many copies? You said I've

[19] been told there were 60. I haven't seen them.

[20] Then he asked you: Do you know where that came

[21] from, who donated them? No, I don't.

[22] That testimony was not accurate either; was it?

[23] A: At that time I knew in theory that Mr. Bonsell was going

[24] to donate the books, but I didn't know he actually did

[25] at that time.

Page 57

[1] Q: Mr. Buckingham, when did you give your check to Donald

[2] Bonsell?

[3] A: I didn't give it to Donald.

[4] Q: When did you give the check made out to Donald to Alan

[5] Bonsell?

[6] A: It was prior to a School Board meeting. It would be

[7] close to the date of the check.

[8] Q: And you have your check register so we can see —

[9] A: I have a copy of the check.

[10] MR. ROTHSCHILD: I would like a copy of that

[11] check.

[12] MR. GILLEN: Yes. Once that testimony of Donald

[13] came to light, I asked him to get it. We will provide

[14] it to you.

[15] BY MR. ROTHSCHILD:

[16] Q: By January 3rd, 2005, you knew who had donated the

[17] books; didn't you?

[18] A: I was told who was going to donate it. I didn't know

[19] for a fact who actually did until later.

[20] Q: Until later when?

[21] A: Maybe a couple of weeks.

[22] Q: A couple of weeks after what?

[23] A: After they were donated.

[24] Q: Do you know when they were donated, Mr. Bonsell?

[25] A: I am Mr. Buckingham.

Page 58

[1] Q: Mr. Buckingham, I am sorry.

[2] A: Not for sure.

[3] Q: You knew before January 3rd, 2005; didn't you?

[4] A: Yes.

[5] Q: And yet you said under oath that you didn't know who had

[6] donated them; is that right?

[7] A: At one point I said that, but I think I clarified it

[8] later.

[9] Q: You said you think it could be tied to Alan Bonsell

[10] further down the page?

[11] A: Yes.

[12] Q: You never said you knew it was Donald Bonsell; correct?

[13] MR. GILLEN: Do you recall seeing it upon your

[14] review of the transcript, a reference to Don Bonsell?

[15] A: Are you asking me if I am recalling now?

[16] MR. GILLEN: Based on your review.

[17] A: Based on the review of the transcript, I realize it was

[18] Donald Bonsell at that time. I didn't realize it was

[19] then, but I do now.

[20] BY MR. ROTHSCHILD:

[21] Q: On January 3rd, 2005, you did not know that Donald

[22] Bonsell donated the books?

[23] A: It didn't come to my mind at that time. That's all I

[24] can tell you.

[25] Q: That is not example where this transcript — where your

Page 59

[1] testimony is inaccurate; isn't that right?

[2] A: My recollection was inaccurate.

[3] Q: You understand, Mr. Buckingham, when we took your

[4] deposition on January 3rd, 2005, the purpose in taking

[5] that deposition was so that plaintiffs could make a

[6] decision about whether to go into court to seek a

[7] restraining order against the implementation of the

[8] policy adopted on October 18th; did you understand that?

[9] A: I was never told that, but I believe that to be true.

[10] Q: So getting accurate and truthful information was

[11] important; do you understand that?

[12] A: I gave the information to the best of my knowledge at

[13] the time. If I misspoke or forgot something, that's how

[14] it was.

[15] Q: Can you explain to me how your recollection has been

[16] refreshed between January 3rd, 2005 and today so that

[17] you now remember that it was Donald Bonsell who donated

[18] the books?

[19] A: Through reading the transcript, and I got a copy of the

[20] check. I wasn't sure exactly when I was aware that

[21] Donald Bonsell bought the books. I knew that was the

[22] plan. But I don't think anyone actually ever came out

[23] and told me he bought the books. That's an

[24] understanding.

[25] Q: You wouldn't have donated $850.00 to Mr. Bonsell if you

William Buckingham
March 31, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

Page 60

[1] didn't think it was being used for the books; would you?

[2] A: That was the plan. But for all I know, he deposited it,

[3] and somebody else got them. I don't know. Just like

[4] people donated to me; I didn't buy the books.

[5] Q: Did you ever talk to Mr. Bonsell about the issue of

[6] donating the Pandas books?

[7] A: I almost never talk to him except to say hi or something

[8] like that.

[9] Q: He wasn't the person that gave you the name of the

[10] Thomas More Law Center; was it?

[11] A: It wasn't him, but I don't remember who it was.

[12] Q: Are you familiar with the fact that a group called

[13] Debunk Creation has offered to donate books to the Dover

[14] School District?

[15] A: Yes.

[16] Q: And have you looked at any of those books?

[17] A: They were in my possession, but I didn't look at them.

[18] I had this problem with my knee and a lot of pain and

[19] other issues, and I gave them back to Mrs. Harkins.

[20] Q: What is your understanding of what the Board's role is

[21] going to be in terms of whether or not the District

[22] accepts that donation?

[23] A: It is my understanding the Board is going to review the

[24] books and make a decision.

[25] Q: Will that require a vote?

Page 61

[1] A: I am not sure if it will or not.

[2] Q: Was that same process followed in terms of accepting the

[3] Pandas book?

[4] A: The process of reviewing the book, yes.

[5] Q: And the Board deciding?

[6] MR. GILLEN: Objection to the extent it assumes

[7] the Board decided.

[8] BY MR. ROTHSCHILD:

[9] Q: I am asking did the Board decide to accept Pandas or did

[10] the administration?

[11] A: The administration did.

[12] Q: Who is going to decide about the donation from Debunk

[13] Creation, the Board or the administration?

[14] A: I don't know that that has been decided yet.

[15] Q: Is there any reason why the Board would take a different

[16] position with the books offered by Debunk Creation than

[17] the book offered by Donald Bonsell?

[18] MR. GILLEN: Objection, calls for speculation.

[19] A: Could you ask me the question again?

[20] BY MR. ROTHSCHILD:

[21] Q: I am trying to understand why it would even be an issue

[22] about — if the administration decided on Pandas, why

[23] isn't the administration — why isn't it certain that

[24] the administration will also decide for the Debunk

[25] Creation books?

Page 62

[1] A: Maybe they would. I don't know that they won't. I

[2] haven't heard.

[3] Q: Is there any reason why the Board would take a different

[4] role for the Debunk Creation books than it took for

[5] Pandas?

[6] MR. GILLEN: Objection to the form of the question

[7] to the extent it characterizes the Board's role with

[8] respect to Pandas and the Board's role with respect to

[9] the Debunk Creation donation.

[10] A: I don't know that they did take a different role.

[11] BY MR. ROTHSCHILD:

[12] Q: You don't know what the role is going to be one way or

[13] the other?

[14] A: No.

[15] Q: It hasn't been decided?

[16] A: In what respect?

[17] Q: What the Board's role is going to be with the Debunk

[18] Creation books.

[19] A: That's not entirely true. I know the Board is going to

[20] look at the books, but I don't know who is going to make

[21] the ultimate decision about whether or not they get

[22] accepted.

[23] Q: Awhile ago, there was an issue about a mural that was in

[24] the science classroom; is that right?

[25] A: True.

Page 63

[1] Q: Can you describe for me what that mural looked like?

[2] A: I have never seen it.

[3] Q: Did you — there was some controversy over that mural?

[4] A: Yes, that was a couple of years before I got on the

[5] Board.

[6] Q: And I think the issue was the mural was actually

[7] destroyed or defaced; is that right?

[8] A: That's what I heard.

[9] Q: You were not on the Board when that occurred?

[10] A: I didn't even know it existed.

[11] Q: Did you have any involvement as a community member in

[12] any issue surrounding that mural?

[13] A: In what respect?

[14] Q: Protesting it, making your views known.

[15] A: I didn't know it existed. I couldn't have protested.

[16] Q: Fair enough. Mr. Buckingham, did you ever say in the

[17] presence of other Board members — and excuse my

[18] language here — that people who were not members of

[19] your church would be damned to hell?

[20] A: No.

[21] Q: Did you ever hear any other Board member talk like that?

[22] A: No.

[23] Q: I am going to show you a document that has been marked

[24] as Plaintiff Exhibit 19. Do you recognize this

[25] document?

---

Min-U-Script®    Filius & McLucas Reporting Service, Inc.

**Tammy Kitzmiller, et al.   v.**
**Dover Area School District, et al.**

**William Buckingham**
**March 31, 2005**

Page 64

[1] A: I have heard about this, but I don't think I ever read
[2] it.
[3] Q: And if you didn't read it, I assume you didn't have any
[4] role in its creation?
[5] A: I don't even know what it is.
[6] Q: Do you want to take a minute and look it over and see if
[7] your memory is refreshed?
[8] A: (Witness complies.) I was talking about Santorum's
[9] thing up here.
[10] Q: Take your time. I don't want to mislead you. Why don't
[11] you take your time and look at the whole document?
[12] A: Do you want me to read the whole thing or just the
[13] bottom of page one?
[14] Q: Look at the entire document. My first question, which
[15] you answered but maybe not realizing what the document
[16] was, do you recognize this document, the entire
[17] document?
[18] A: Some of it.
[19] MR. GILLEN: Go ahead. Answer the question he
[20] asked: Do you recognize the entire document?
[21] A: No.
[22]           BY MR. ROTHSCHILD:
[23] Q: Do you recognize parts of this document?
[24] A: Yes.
[25] Q: What parts?

Page 65

[1] A: The bottom part on page one.
[2] Q: Which is the text of the statement that is read to
[3] students?
[4] A: Yes.
[5] Q: But the sort of the — I will call this the newsletter
[6] — the newsletter, as an entire document, you are not
[7] familiar with?
[8] A: No, I am not.
[9] Q: Were you aware that a newsletter of this type was being
[10] prepared and sent to people in the Dover Area School
[11] District?
[12] A: I know something was being sent. I don't remember this.
[13] Q: Do you remember whether the Board had a vote to approve
[14] distributing this newsletter?
[15] A: No, I don't.
[16] Q: Tell me what you do remember about this document or the
[17] fact of this document.
[18] A: The bottom of page one.
[19] Q: I understand you remember this content, but I am really
[20] referring to the whole newsletter. You knew something
[21] like this was being prepared?
[22] A: I knew something was coming out, but I didn't read it
[23] myself.
[24] Q: Tell me what you did know about the document.
[25] A: I just knew that an explanatory document was being sent

Page 66

[1] out to the resident of the District to try to clarify
[2] some of the questions they had with regards to
[3] Intelligent Design.
[4] Q: How did you find out about that?
[5] A: Through I think Dr. Nilsen told us.
[6] Q: Do you have an understanding of who was creating this
[7] document?
[8] A: The administration, somebody in the administration. I
[9] don't know who.
[10] Q: Do you have an understanding of who was involved in its
[11] creation besides administration?
[12] A: No.
[13] Q: Do you have an understanding of what the purpose was in
[14] preparing and distributing this newsletter?
[15] A: To try to answer some of the questions people had about
[16] Intelligent Design and clarify some of the misleading
[17] articles that were in the papers.
[18] Q: Where did you develop that understanding of the purpose?
[19] A: I believe that was verbally communicated to us from Dr.
[20] Nilsen. It was either Dr. Nilsen or Mr. Baksa. I am
[21] not sure which.
[22] Q: When you say verbally communicated to us, who is the us?
[23] A: The School Board.
[24] Q: Was that done at a School Board meeting?
[25] A: I imagine. I'm not sure.

Page 67

[1] Q: For example, there is a series of frequently asked
[2] questions and then some answers to them that start on
[3] the first page and continue over to the second page.
[4] You never reviewed that material?
[5] A: Not to my knowledge, no.
[6] Q: And if you look at the second page, there's some pretty
[7] detailed discussion about what is the theory of
[8] Intelligent Design. Do you see that?
[9] A: Yes.
[10] Q: Do you know where the material that comprises the answer
[11] came from?
[12] A: No, I don't.
[13] Q: You don't know who wrote it?
[14] A: No.
[15] Q: If you want to read it over, do you have any position on
[16] whether it is in fact accurate?
[17] A: Do you want me to read it?
[18] Q: Sure.
[19] A: (Witness complies.) Okay.
[20] Q: Do you know whether the answer to the question what is
[21] the theory of Intelligent Design, the answer that is in
[22] this document in fact is accurate?
[23] A: It is satisfactory with me. I am not a scientist. I
[24] can't say whether it is accurate or not.
[25] Q: And when you say it is satisfactory, what do you mean by

William Buckingham
March 31, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 68

[1] that if you don't know it is accurate?

[2] A: I don't see a religious overtone to it. And it does

[3] offer an explanation, an alternative theory.

[4] Q: In terms of whether it is scientifically accurate, you

[5] don't know one way or the other?

[6] A: No. Do you care if we take another break?

[7] MR. ROTHSCHILD: That's fine. We won't be much

[8] longer, but that is fine.

[9] (A recess was taken.)

[10] AFTER RECESS

[11] BY MR. ROTHSCHILD:

[12] Q: Mr. Buckingham, have you ever seen a picture of the

[13] mural?

[14] A: Yes.

[15] Q: How did you come in possession of that picture?

[16] A: Somebody gave it to me in an envelope. It was at the —

[17] a guy by the name of Larry Reeser gave it to me. He

[18] used to be the — what was he? Head of buildings and

[19] grounds or something like that. He had pictures of it.

[20] Q: That picture that he gave you, did he give that to you

[21] before or after it was destroyed?

[22] A: It was years after.

[23] Q: Did he have any involvement with destroying the mural?

[24] A: Not to my knowledge.

[25] Q: What was your understanding of his purpose in giving you

Page 69

[1] this picture?

[2] A: I was out at his farm. Because he worked here, I heard

[3] about the mural. I said have you ever seen a mural like

[4] that? He said I have picture of it, and he gave me the

[5] picture.

[6] Q: Why don't you describe for me what the mural looks like?

[7] A: It showed —

[8] Q: Or looked like.

[9] A: It showed monkeys progressing into man.

[10] Q: And do you know who — and that mural was on a science

[11] class wall for a time?

[12] A: Yes.

[13] Q: Do you know how it got there?

[14] A: I believe a student donated it, and someone hung it.

[15] Q: And when you saw the picture of it, did you have an

[16] opinion of it?

[17] A: I was just surprised it was there.

[18] Q: Why was that?

[19] A: Because to the best of my knowledge, the School Board

[20] hadn't approved it, and a donation has to be approved by

[21] the School Board.

[22] Q: And that is true for all donations?

[23] A: Yes.

[24] Q: I'm sorry. Did you find the mural offensive other than

[25] it may have been accepted without following procedures?

Page 70

[1] A: I was just surprised it was there.

[2] Q: Why were you suprised? You said you were surprised

[3] because it hadn't been properly approved. Was there any

[4] other reason you were surprised?

[5] A: No.

[6] Q: Nothing to do with the content of the mural?

[7] A: I didn't think it was appropriate. But the bottom line

[8] is it wasn't approved by the School Board, and it

[9] shouldn't have been hung.

[10] Q: Why didn't you think it was appropriate?

[11] A: Because for one thing, the genitals that hung out on the

[12] monkeys strongly resembled human genitals. I didn't

[13] think young people should be subjected to that in a

[14] classroom on a daily basis.

[15] Q: Got to get those monkeys into underwear.

[16] A: Diapers maybe, something.

[17] Q: Did you ever take that picture and use it in any kind of

[18] School Board presentation or discussion?

[19] A: The only time I used that that I can recall was when a

[20] student — I guess it was Mr. Pell — came to the

[21] podium, and he made the statement that the origin of

[22] life has never been taught in the Dover School District.

[23] And at that time, I took the pictures and

[24] approached the President of the Board and asked if I

[25] could show these to Mr. Pell. And I did.

Page 71

[1] Q: And why did you show that to him in response to the

[2] assertion the origins of life has never been taught?

[3] A: Because to my way of thinking, you can't say you don't

[4] teach the origins of life and have a huge mural hanging

[5] in the room where you don't teach it.

[6] Q: Did you understand the depiction of the development of

[7] man from other creatures to be an example of presenting

[8] the origins of life?

[9] A: Could you repeat the question?

[10] Q: The mural depicted man descending from other creatures,

[11] apes or monkeys; correct?

[12] A: Yes.

[13] Q: Did you understand that depiction to be a presentation

[14] of or teaching of the origins of life?

[15] A: Origins of human life.

[16] Q: Origins of human life?

[17] A: Yes.

[18] Q: When in the Dover curriculum that you approved on

[19] October 18, where it says origins of life is not taught,

[20] do you understand that to apply to the origins of human

[21] life?

[22] A: Yes.

[23] Q: Is your understanding now that origins of human life are

[24] not taught?

[25] A: That is my understanding.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

William Buckingham
March 31, 2005

Page 72

[1]   Q: That is your understanding of the intention of the Board
[2] in approving the resolution?
[3]   A: Approving the resolution had to do with origin of life,
[4] period which in my mind would also include origin of
[5] human life.
[6]   Q: So your understanding of what the Board was trying to do
[7] in that resolution was at least in part forbid the
[8] teaching of the origins of any life, including the
[9] origin of human life?
[10]   MR. GELLIN: Object to the characterization of his
[11] understanding.
[12]   A: That was at the request of the teachers because they
[13] wanted some guidance.
[14]            BY MR. ROTHSCHILD:
[15]   Q: As a Board member, you approved that?
[16]   A: Approved what?
[17]   Q: That resolution including that language?
[18]   A: Yes.
[19]   Q: Your understanding of the language you approved was that
[20] origins of life will not be taught in any respect
[21] including the origins of human life?
[22]   A: To my way of thinking, that is under the umbrella of
[23] origins of life.
[24]   Q: Do you understand origins of human life to be different
[25] than evolution? Let me rephrase that. Do you

Page 73

[1] understand the subject matter of the origins of human
[2] life to be a separate subject than evolution?
[3] .  A: Not necessarily.
[4]   Q: So origins of human life is a component of evolution?
[5]   A: It can be looked at that way.
[6]   Q: And your understanding is it is okay to teach
[7] evolution — under the resolution, it is still
[8] permissible to teach evolution, but not origins of human
[9] life?
[10]   A: Evolution within a species.
[11]   Q: Within a species?
[12]   A: Right.
[13]   Q: Am I correct in understanding that it would be improper
[14] under your understanding of the resolution to teach
[15] anything about the development of a new species?
[16]   A: Developing a new species, I don't see where that ties
[17] into origins of life.
[18]   Q: You are saying it is okay to teach evolution within a
[19] species; right?
[20]   A: Yes.
[21]   Q: Is it your position that under the Board's resolution,
[22] the school cannot teach evolution from one species to
[23] another species?
[24]   A: That has nothing to do with what is in the statement
[25] there. We are going back to the origins of life.

Page 74

[1]   Q: Right.
[2]   A: Not one species to another.
[3]   Q: Okay. Under the resolution, can a teacher teach to the
[4] student that humans descended from other non human
[5] creatures?
[6]   A: No.
[7]   Q: Can a teacher teach that wolves descended from some
[8] other non canine species?
[9]   A: Again, the statement talks origins of life, period. Not
[10] one species to another.
[11]   Q: I am trying to understand.
[12]   A: You are coming from where I talked about evolution
[13] within species. And you want to know if they can cross
[14] and create something new?
[15]   Q: I am not asking for the — I am asking whether teachers
[16] could teach, for example, that wolves descended from
[17] some ancestor that was not a wolf or not a canine at
[18] all; is that permissible?
[19]   A: In some respects, it would be because I know farmers
[20] breed different animals and come up with something else.
[21]   Q: So in the case of humans, it would be improper to teach
[22] that they descended from some non human creature;
[23] correct? That is your position?
[24]   A: Yes.
[25]   Q: I am trying to ask you is that true for any other

Page 75

[1] animal?
[2]   A: I don't understand the question.
[3]   Q: You said we —
[4]   A: We came from a non human? Are you saying another animal
[5] came from a non human? I don't understand your
[6] question.
[7]   Q: Can you teach that animals, for example, the modern day
[8] animals, an elephant or wolf descended from some other
[9] kind of animal that is not an elephant or a wolf; is
[10] that allowed? ·
[11]   A: Based on what science is available that they can use to
[12] show that it happened, I don't see a problem with that.
[13]   Q: And if there is science that is available to demonstrate
[14] that humans descended from some other animal that is not
[15] defined as human, that is not permissible?
[16]   A: That's true.
[17]   Q: Do you believe that is the understanding of your fellow
[18] Board members who voted for the resolution?
[19]   A: We gave the teachers what they wanted, yes.
[20]   Q: You think that is the —
[21]   A: Yes.
[22]   Q: — Board members' understanding?
[23]   A: Yes.
[24]   Q: Mr. Buckingham, did you become aware at any time that
[25] the Discovery Institute opposed the resolution adopted

illiam Buckingham
arch 31, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

**Page 76**

| by the Dover Area School Board?

A: Which resolution?

Q: The October 18th resolution.

A: About Intelligent Design?

Q: Right.

A: Yes.

Q: When did you become aware of that?

A: Sometime prior to that, Mr. Cooper advised that —

MR. GILLEN: Objection, excuse me. Instruction

not to answer with respect to advice given by

Mr. Cooper.

BY MR. ROTHSCHILD:

Q: Is your understanding about the Discovery Institute's

position on this derived solely from legal

communications with the Discovery Institute?

A: Yes.

Q: Were you aware the Discovery Institute actually issued a

press release criticizing the Dover Area School Board

for the policy that they had approved?

A: I heard they did that. I haven't seen it.

Q: I think you said before you understand that the

Discovery Institute are experts about Intelligent

Design?

A: I don't know that.

Q: Fair enough. Are you familiar with the position of any

**Page 77**

[1] scientific organizations about whether Intelligent

[2] Design should be presented to students other than the

[3] Discovery Institute?

[4] A: Organizations?

[5] Q: Scientific organizations. For example, do you know what

[6] the National Academy of Science's position is?

[7] A: No.

[8] Q: The American Association for the Advancement of Science?

[9] A: No.

[10] Q: No other similar organizations?

[11] A: No.

[12] Q: So you are not aware of any scientific organization

[13] that — let me withdraw that. Going back to the

[14] Discovery Institute, when Mr. Cooper first called you

[15] and introduced himself, did he communicate to you in

[16] that first statement that we are knowledgeable about

[17] Intelligent Design?

[18] A: The first sentence?

[19] Q: When he called you up, and he is a stranger to you;

[20] correct?

[21] A: Correct.

[22] Q: He says to you I'm Seth Cooper, and I am a lawyer for

[23] the Discovery Institute; correct?

[24] A: Yes.

[25] Q: Did he describe who the Discovery Institute was?

**Page 78**

[1] A: I don't think he did. I think — I don't think he did.

[2] He told me they were a secular think tank.

[3] Q: That is the words he used, a secular think tank?

[4] A: Yes.

[5] Q: Did he say this is why I am calling you?

[6] A: He told me he got information about what was going on

[7] here off the Internet and that led to the phone call.

[8] Q: Did he represent in any way that he was knowledgeable

[9] about the subject of Intelligent Design — or the think

[10] tank was?

[11] A: Should I answer that?

[12] MR. GILLEN: Certainly.

[13] MR. ROTHSCHILD: It is not legal advice.

[14] A: Can you ask the question again?

[15] MR. GILLEN: I think Eric is asking how did you

[16] come to know Mr. Cooper was able to give you advice

[17] relating to law and Intelligent Design.

[18] A: Can you ask me that question?

[19] BY MR. ROTHSCHILD:

[20] Q: When Mr. Cooper represented to you who he was and who

[21] the Discovery Institute was, did he in any way describe

[22] their knowledge or expertise in the area of Intelligent

[23] Design?

[24] A: He just indicated that they were working along those

[25] lines researching that sort of thing.

**Page 79**

[1] Q: Researching Intelligent Design?

[2] A: Yes.

[3] Q: So this is the one organization or think tank that you

[4] have ever spoken to that has ever espoused any knowledge

[5] about Intelligent Design; right?

[6] A: Could you ask that question again?

[7] Q: In this whole process of developing the biology

[8] curriculum, there is one organization you have talked to

[9] who has told you we know about Intelligent Design;

[10] right?

[11] A: That's not true.

[12] Q: What other organizations?

[13] A: The Thomas More Law Center.

[14] Q: Do you understand the Thomas Moore Law Center to be a

[15] scientific organization in any way?

[16] A: I don't know all about them.

[17] Q: You know them as a law firm?

[18] A: True.

[19] Q: Put Thomas More aside. Other than the Thomas More Law

[20] Center, whose scientific expertise I am not going to

[21] question in this deposition, the Discovery Institute is

[22] the only other organization you have talked to about

[23] Intelligent Design; correct?

[24] A: True.

[25] Q: And that organization, the self described secular think

---

Min-U-Script®   Filius  &  McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

William Buckingham
March 31, 2005

---

Page 80

[1] tank researching Intelligent Design took the position
[2] that it was a mistake to teach Intelligent Design; is
[3] that right?
[4]   A: That is wrong.
[5]   Q: How is that wrong?
[6]   A: For one thing, we are not teaching Intelligent Design.
[7] For another thing, they didn't say it wasn't proper to
[8] do that. Are you sure you want me to —
[9]   MR. GILLEN: No. In fact I told you several
[10] times, Bill, to the extent you are referring to
[11] conversations that are legal advice with Seth Cooper,
[12] you don't answer.
[13]   Is the conversation you are about to relate one of
[14] those conversations?
[15]   A: Yes.
[16]   MR. GILLEN: Then please don't answer. Thank you.
[17] As your lawyer, I thank you.
[18]   A: Thank you. Punch me in the shoulder.
[19]   MR. GILLEN: Forgive me if I was —
[20]   A: That's fine.
[21]         BY MR. ROTHSCHILD:
[22]   Q: And you say you did not see the press release from the
[23] Discovery Institute?
[24]   A: True.
[25]   Q: You are aware of it?

Page 81

[1]   A: I heard it was issued, yes.
[2]   Q: Did you know anything about the content of it?
[3]   A: No.
[4]   Q: And so just to bring this point hopefully to a halt, am
[5] I correct in understanding that your understanding about
[6] the Discovery Institute's position about Dover's policy,
[7] you know that only through communications with
[8] Mr. Cooper?
[9]   A: True.
[10]   Q: That you understand to have been legal communications?
[11]   A: True.
[12]   MR. ROTHSCHILD: Give me a couple of minutes, and
[13] I think we are done.
[14]   MR. GILLEN: Certainly.
[15]   (A recess was taken.)
[16]         AFTER RECESS
[17] (Plaintiffs Exhibit 36 was marked.)
[18]         BY MR. ROTHSCHILD:
[19]   Q: I am going to mark as Exhibit 36 the footage from Fox 43
[20] of the interview with Mr. Buckingham that was shown to
[21] him during the deposition, each party to retain their
[22] own copies.
[23]   And with that Mr. Buckingham, I thank you for
[24] appearing a second time. Best of luck with all of your
[25] medical developments.

Page 82

[1]   A: Thank you.
[2]   MR. GILLEN: Again, for the record, I would like
[3] to thank Eric for his consideration of Bill's medical
[4] condition. We just went off the record, and Bill has
[5] asked me to bring something to your attention for the
[6] record by way of explanation.
[7]         BY MR. GILLEN:
[8]   Q: Bill, it is true that today Mr. Rothschild has asked you
[9] several questions about your recollection, different
[10] recollections and your ability to recall.
[11]   Based on a discussion that we have had, I have an
[12] understanding you have some medical problems that touch
[13] some on that. I would like you to just briefly explain
[14] those for the record.
[15]   A: I have had six back surgeries, real serious back
[16] surgeries. I was hurt on work, and I was on Oxycontin,
[17] a lot of it.
[18]   And I went to the Caron Foundation and got help.
[19] And when I left, and through almost all of the process
[20] we talked about today, I am still going through
[21] withdrawal. My memory just is a mess.
[22]   I will be honest with you, I have people trying to
[23] find out what the long term effects of Oxycontin are and
[24] nobody knows. You can ask me a question today, and I
[25] don't have the answer, and tomorrow I do. It is just

Page 83

[1] something that's there.
[2]   That is my explanation really for some of the
[3] discrepancies. I didn't really want to get into this.
[4] But I told my attorney, I feel bad about that. I don't
[5] come to these things to mislead and lie. But I do the
[6] best I can.
[7]   I took an awful lot of Oxycontin, and it led to a
[8] lot of problems. And one of them is my memory. I just
[9] don't remember things. I do the best I can. Sometimes,
[10] it is not accurate.
[11]   MR. ROTHSCHILD: Thank you for explaining that,
[12] Mr. Buckingham.
[13]         BY MR. ROTHSCHILD:
[14]   Q: Am I correct in understanding that the problem you are
[15] describing was present when you had your deposition
[16] taken the first time?
[17]   A: Yes.
[18]   Q: And it is similarly present today?
[19]   A: Yes.
[20]   Q: And so when Mr. Harvey asked you questions or I ask you
[21] questions trying to get the best recollection of events
[22] that occurred some months ago, you can't be certain that
[23] your recollection will in fact be accurate?
[24]   A: I do the best I can, but I can't be a hundred percent
[25] sure. There's things when I say I don't remember, I

---

Page 84

[1] truly don't remember. That bothers me more than anybody

[2] else because I was a Detective on a Police Department.

[3] I mean I could do my job as good as anyone can. And I

[4] am just not the same me anymore.

[5]    **Q:** Okay. Just to make sure I understand, we have asked you

[6] a lot of questions about various School Board meetings.

[7] What I am gathering from what you have just described is

[8] because of the medical issue and the medications you

[9] took, we can't necessarily rely that those recollections

[10] are going to be accurate?

[11]    **A:** They are going to be as accurate as I can make them.

[12] That's all I can say.

[13]    **Q:** Limited by the very problems you just described?

[14]    **A:** Yes.

[15]    **MR. ROTHSCHILD:** Thank you.

[16]    **MR. GILLEN:** Thank you.

[17]    (The deposition was concluded at 3:30 p.m.)

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

Page 85

COMMONWEALTH OF PENNSYLVANIA   :

COUNTY OF CUMBERLAND              :

   I, Vicki L. Fox, Reporter and Notary Public in and

for the Commonwealth of Pennsylvania and County of

Cumberland, do hereby certify that the foregoing

testimony was taken before me at the time and place

hereinbefore set forth, and that it is the testimony of:

         WILLIAM BUCKINGHAM

I further certify that said witness was by me duly

sworn to testify the whole and complete truth in said

cause; that the testimony then given was reported by me

stenographically, and subsequently transcribed under my

direction and supervision; and that the foregoing is a

full, true and correct transcript of my original

shorthand notes.

   I further certify that I am not counsel for nor

related to any of the parties to the foregoing cause,

nor employed by them or their attorneys, and am not

interested in the subject matter or outcome thereof.

Dated at Camp Hill, Pennsylvania, this 7th day of

April, 2005.

         Vicki L. Fox

         Reporter - Notary Public

(The foregoing certification does not apply to any

reproduction of the same by any means unless under the

direct control and/or supervision of the certifying

reporter.)

**Tammy Kitzmiller, et al.   v.**
**Dover Area School District, et al.**

**William Buckingham**
**March 31, 2005**

## $

**$850.00** 55:17; 59:25

## 1

**13** 21:25
**18** 71:19
**18th** 15:20; 19:24; 37:14; 59:8; 76:3
**19** 63:24

## 2

**2** 14:13
**2,000** 10:15
**2003** 9:3
**2004** 14:17; 24:17; 29:25; 40:25; 44:5
**2005** 4:13; 14:22; 23:9; 25:8; 57:16; 58:3, 21; 59:4, 16
**29** 6:6

## 3

**30** 6:9
**31** 25:8
**35** 18:20, 23; 53:1
**36** 81:17, 19
**3:30** 84:17
**3rd** 4:13; 6:13, 21; 14:17; 15:4; 57:16; 58:3, 21; 59:4, 16

## 4

**4** 29:24
**43** 28:10; 30:10; 81:19
**44** 7:18
**45** 8:7, 23; 53:1

## 5

**57** 56:10

## 6

**60** 56:19

## 7

**7th** 43:13

## 8

**800** 4:5

## 9

**9th** 6:7; 29:25; 31:10; 42:8; 43:8, 11

## A

**ability** 82:10
**able** 22:15; 78:16
**Absolutely** 31:3; 35:19; 39:25; 45:22; 46:17; 55:6, 14
**Academy** 20:21; 77:6
**accept** 48:13; 61:9
**accepted** 39:4; 48:12; 62:22; 69:25
**accepting** 61:2
**accepts** 60:22
**access** 17:21, 22
**account** 12:12, 14, 16, 18, 20; 55:19
**accurate** 5:14, 15; 10:18, 19; 19:18; 56:22; 59:10; 67:16, 22, 24; 68:1, 4; 83:10, 23; 84:10, 11
**accurately** 15:19
**acknowledge** 29:11; 30:6
**ACLU** 47:9
**acquaintances** 4:16
**acquire** 52:8
**activities** 19:15
**actual** 38:11; 56:8
**actually** 12:9; 18:2; 19:8; 23:2; 41:3; 47:18; 56:5, 24; 57:19; 59:22; 63:6; 76:17
**administration** 11:12; 21:18; 27:6; 33:1; 39:18; 61:10, 11, 13, 22, 23, 24; 66:8, 8, 11
**adopted** 59:8; 75:25
**advance** 15:10; 16:12; 48:17
**advanced** 15:16; 16:3, 19, 23; 17:6, 14
**Advancement** 21:2; 77:8
**advice** 34:7, 11, 24; 35:3, 5, 5, 14, 15, 16, 22, 23, 25; 36:11, 11, 13, 15; 38:5, 7, 8, 11, 12, 17, 19; 39:3; 46:16, 20, 22, 24; 47:2, 12; 49:3, 3, 14; 76:10; 78:13, 16; 80:11
**advise** 19:17
**advised** 76:8
**adviser** 23:10
**advocated** 5:9
**afternoon** 3:10, 11
**again** 6:20; 23:24; 32:9; 48:5; 61:19; 74:9; 78:14; 79:6; 82:2
**against** 59:7
**aggressively** 31:17

**ago** 10:15; 34:3; 62:23; 83:22
**agree** 24:10; 26:21
**agreeing** 55:2
**ahead** 64:19
**al** 3:14, 15
**Alan** 11:21; 27:18; 55:22, 23, 25; 57:4; 58:9
**Allegiance** 7:25; 8:10; 9:4; 10:22, 25; 11:5, 9; 12:4
**allowed** 40:12; 75:10
**almost** 9:10; 52:21; 60:7; 82:19
**along** 78:24
**alternative** 15:16; 16:2; 68:3
**Always** 37:22; 38:5, 7, 17
**Amazon.com** 17:23
**ambushed** 30:19
**amending** 19:13
**American** 21:2, 8; 77:8
**amount** 13:5, 24
**ancestor** 74:17
**animal** 75:1, 4, 9, 14
**animals** 74:20; 75:7, 8
**anonymous** 55:13
**answered** 4:18; 9:2; 10:13; 56:16; 64:15
**anticipated** 32:17
**anymore** 13:25; 34:19; 84:4
**apes** 71:11
**appeared** 3:19
**appearing** 81:24
**applies** 47:25
**apply** 71:20
**approached** 70:24
**appropriate** 46:14; 70:7, 10
**approve** 44:5; 65:13
**approved** 5:25; 44:8, 9, 10; 69:20, 20; 70:3, 8; 71:18; 72:15, 16, 19; 76:19
**approving** 72:2, 3
**Area** 3:15; 12:5; 39:4; 46:5; 65:10; 76:1, 18; 78:22
**around** 18:1; 43:13, 14; 51:12
**article** 6:8; 25:7; 26:3; 29:24, 25; 30:1; 31:10; 42:7; 43:8
**articles** 4:17, 19, 22; 29:20; 31:10; 33:3; 40:24; 66:17
**aside** 79:19
**aspect** 10:4, 14
**aspects** 5:7
**assertion** 71:2
**assist** 17:17; 20:3
**Association** 21:2; 77:8
**assume** 13:7; 64:3

**assumed** 35:16
**assumes** 61:6
**attempt** 18:10
**attention** 82:5
**attorney** 33:24; 34:5, 6, 17, 20; 40:10; 54:15; 83:4
**attorney/client** 39:1; 47:25
**August** 44:5
**available** 75:11, 13
**aware** 21:20; 23:9, 13; 25:17, 18; 27:24; 59:20; 65:9; 75:24; 76:7, 17; 77:12; 80:25
**awful** 83:7
**Awhile** 62:23

## B

**back** 5:23; 7:3; 8:17; 9:3; 13:16; 37:24; 38:21; 43:7; 44:17; 49:1; 52:25; 60:19; 73:25; 77:13; 82:15, 15
**bad** 83:4
**Baksa** 21:20; 66:20
**balance** 30:13; 31:19; 32:10, 10
**ballpark** 14:6
**bank** 13:8, 13; 14:3
**barely** 29:3
**bars** 50:21
**base** 16:18, 22; 22:13; 27:25
**based** 38:25; 39:10; 58:16, 17; 75:11; 82:11
**basically** 16:8; 19:10; 50:18; 54:8
**basis** 26:5; 47:22, 23; 70:14
**become** 75:24; 76:7
**becomes** 43:1
**becoming** 42:25
**beginning** 29:9; 50:9
**behalf** 14:12; 48:12
**belief** 5:6; 16:22; 53:17; 38:25
**beliefs** 7:11; 8:24; 9:24
**beside** 31:25; 52:21
**besides** 66:11
**best** 5:4, 6; 26:14; 33:17; 37:6; 59:12; 69:19; 81:24; 83:6, 9, 21, 24
**Bible** 18:18
**big** 11:13, 14
**Bill** 34:23; 80:10; 82:4, 8
**Bill's** 82:3
**biology** 5:19, 25; 10:18; 15:9, 20; 19:12, 13; 20:22, 25; 21:4, 6, 9, 15, 16, 21; 30:2; 31:17; 41:20; 42:4; 44:5; 52:23; 79:7
**bit** 35:20; 40:23
**Board** 5:10, 17, 21; 6:25;

**7:14; 9:9, 11, 19, 22; 10:2, 24; 11:17, 18; 17:16, 21; 18:2; 19:12, 23; 20:2, 2, 2, 8, 13, 18, 18; 21:13; 25:13; 26:15, 19, 22, 24; 27:1, 3, 4, 8, 13, 25; 28:6; 29:13; 32:25; 33:16, 18; 35:17; 37:7, 13; 39:5, 15, 18; 40:17; 41:18; 42:9, 14; 47:6, 12; 48:3, 7, 11, 12, 16; 55:5, 8; 57:6; 60:23; 61:5, 7, 9, 13, 15; 62:3, 19; 63:5, 9, 17, 21; 65:13; 66:23, 24; 69:19, 21; 70:8, 18, 24; 72:1, 6, 15; 75:18, 22; 76:1, 18; 84:6**
**Board's** 48:3; 60:20; 62:7, 8, 17; 73:21
**Bonsell** 11:21; 27:18; 55:21; 56:5, 7, 23; 57:2, 5, 24; 58:9, 12, 14, 18, 22; 59:17, 21, 25; 60:5; 61:17
**book** 5:20, 25; 21:22; 23:1, 3; 29:7; 31:12, 17; 36:8; 42:15; 44:10; 50:4; 52:23; 53:19; 54:24; 56:15; 61:3, 4, 17
**books** 22:23, 24; 23:8; 26:24; 50:1, 7; 52:8, 10, 17, 20, 22; 56:3, 9, 24; 57:17; 58:22; 59:18, 21, 23; 60:1, 4, 6, 13, 16, 24; 61:16, 25; 62:4, 18, 20
**both** 11:5; 12:16, 18; 31:12; 32:3
**bothers** 84:1
**bottom** 6:6; 7:21; 64:13; 65:1, 18; 70:7
**bought** 59:21, 23
**boundary** 37:14, 15
**break** 3:23; 39:24; 54:16; 68:6
**breed** 74:20
**brief** 53:3
**briefly** 82:5
**bring** 81:4; 82:5
**broadcast** 28:13
**broke** 37:4
**Brown** 27:19, 19
**BUCKINGHAM** 3:7, 10; 6:5; 7:19; 8:12; 12:12; 14:11; 18:22; 23:9; 26:14; 28:9, 17; 29:23; 31:7, 9; 33:2; 40:4, 18; 49:21; 54:21; 56:10; 57:1, 25; 58:1; 59:3; 63:16; 68:12; 75:24; 81:20, 23; 83:12
**buildings** 68:18
**Bush** 23:11
**buy** 60:4

## C

**cabinet** 14:8
**calendar** 43:10
**call** 20:21; 21:3; 33:20;

William Buckingham
March 31, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

36:3, 10, 17; 37:1, 15, 18,
19, 23, 24; 38:5, 21; 45:5,
12, 20; 48:16; 65:5; 78:7
**Callahan** 5:24; 7:4;
29:12; 41:11; 42:12; 43:17
**called** 3:7; 21:13, 20;
25:1; 33:23; 34:11; 37:6,
21, 25; 45:1, 18; 48:15;
60:12; 77:14, 19
**calling** 46:11, 18; 48:18;
78:5
**calls** 37:19; 38:4, 9;
48:25; 49:2; 61:18
**came** 25:7; 40:17, 21;
41:7, 9, 9, 14, 15; 44:16,
22; 50:8; 56:20; 57:13;
59:22; 67:11; 70:20; 75:4,
5
**can** 5:3; 7:15, 16; 11:4;
12:18; 22:6, 24; 26:9;
36:25; 37:6, 8; 42:9; 48:1,
1, 18; 49:16; 54:1, 7, 16;
55:4; 57:8; 58:24; 59:15;
63:1; 70:19; 73:5; 74:3, 7,
13; 75:7, 11; 78:14, 18;
82:24; 83:6, 9, 24; 84:3,
11, 12
**canceled** 13:12
**canine** 74:8, 17
**capabilities** 25:5
**captioned** 3:14
**care** 68:6
**Caron** 82:18
**case** 3:16, 20; 4:10;
14:12; 15:2; 26:12; 33:2;
44:24; 74:21
**Casey** 27:19
**cash** 54:10, 11; 55:11
**caused** 11:5
**caution** 40:7
**Center** 25:10; 39:23;
40:5, 14, 15; 44:18; 46:12,
25; 47:5, 7, 13, 18; 48:8,
10, 17, 21; 49:21; 60:10;
79:13, 14, 20
**certain** 61:23; 83:22
**certainly** 38:24; 78:12;
81:14
**certification** 3:3
**change** 4:14; 11:2
**changed** 6:13, 21
**Channel** 28:10
**characterization** 6:16;
9:17; 26:6; 72:10
**characterize** 41:23
**characterized** 40:25
**characterizes** 62:7
**check** 13:1, 3, 14, 16, 19;
54:12, 13, 23; 55:21, 22,
23; 56:4, 5, 7; 57:1, 4, 7, 8,
9, 11; 59:20
**checking** 12:12, 14, 20;
55:19
**checks** 12:18, 23; 13:12
**chose** 45:5

**Christian** 8:5; 21:21
**Christianity** 7:12; 9:25;
18:18
**chronological** 42:7
**chronologically** 43:16
**church** 4:16; 47:10;
50:10, 16, 18, 21, 24; 51:1,
1, 9, 14, 16, 17; 53:4, 5, 22;
54:7; 63:19
**circumstances** 51:6
**clarified** 58:7
**clarify** 66:1, 16
**class** 69:11
**classroom** 62:24; 70:14
**clear** 4:21; 35:19; 36:14
**clearly** 15:12
**Cleaver** 27:19
**clip** 42:24
**close** 34:2; 57:7
**closer** 45:9
**clubs** 50:20
**colleague** 3:21; 6:7
**collect** 50:3; 55:15
**coming** 15:23; 16:11;
20:4; 40:19; 51:11; 65:22;
74:12
**committee** 31:11; 39:6
**Common** 16:14; 17:10
**communicate** 39:13;
47:4; 77:15
**communicated** 39:2;
66:19, 22
**communication** 51:7
**communications** 49:13;
76:15; 81:7, 10
**community** 63:11
**compiled** 29:24
**complies** 7:20; 8:8; 15:7;
19:19; 56:12; 64:8; 67:19
**component** 73:4
**comprises** 67:10
**concept** 22:4
**concerned** 34:8
**concerns** 6:3; 54:21
**concluded** 84:17
**conclusion** 15:24; 16:12,
18
**condition** 4:4; 82:4
**confidentiality** 54:22
**confirm** 5:8; 29:20
**confusion** 29:22
**congregants** 50:16;
55:16
**congregation** 50:10, 18;
51:10; 52:4, 19
**consideration** 82:3
**consistent** 43:3
**contact** 33:19; 40:14
**contacted** 24:16, 18, 18;
40:13
**contained** 19:18
**content** 65:19; 70:6; 81:2
**context** 7:23; 9:21; 10:25;

23:21; 33:11
**continue** 8:7; 67:3
**continues** 6:9
**contribute** 49:25; 53:22;
54:2
**contributed** 50:3; 54:1,
4, 23
**contributions** 53:21
**controversy** 10:22;
15:14; 16:1; 63:3
**conversation** 39:8;
44:24; 49:8; 80:13
**conversations** 39:19;
47:4, 15, 17; 48:9; 49:20;
80:11, 14
**Cooper** 33:24, 25; 34:4,
17; 35:13; 36:22, 23; 39:1,
9, 13, 16; 76:8, 11; 77:14,
22; 78:16, 20; 80:11; 81:8
**copies** 17:25; 56:15, 18;
81:22
**copy** 17:23; 57:9, 10;
59:19
**correcting** 10:5
**correction** 4:25; 14:23
**counsel** 3:24
**counter** 4:5
**country** 7:11, 12; 9:23,
25
**couple** 57:21, 22; 63:4;
81:12
**course** 44:12
**Court** 11:8; 59:6
**cover** 18:14, 14
**create** 74:14
**creating** 47:23; 66:6
**creation** 18:18; 31:18;
60:13; 61:13, 16, 25; 62:4,
9, 18; 64:4; 66:11
**Creationism** 5:9, 16;
28:6; 30:14, 17, 23; 31:4,
12, 23; 32:2, 4, 11, 23;
33:4, 8, 10, 16; 41:1, 8;
42:15
**creature** 74:22
**creatures** 71:7, 10; 74:5
**criteria** 47:24
**criticizing** 76:18
**cross** 10:16; 74:13
**Culture** 25:11
**curriculum** 10:18; 15:9,
13, 21, 25; 19:13; 35:12;
38:16; 39:5; 41:21; 42:4;
71:18; 79:8

# D

**Daily** 29:16; 31:16; 42:8;
70:14
**damned** 63:19
**dancing** 50:20
**Darwin** 30:13; 32:10
**Darwin's** 15:14; 16:1;
34:10; 35:7, 9, 11; 43:21

**Darwinism** 5:20; 6:4, 9,
15, 24; 7:3; 29:8; 30:3;
41:12
**DASD** 15:9
**date** 13:3; 14:24; 28:11;
39:11; 57:7
**dates** 44:9
**day** 32:24; 36:17; 75:7
**deal** 11:13, 14
**debate** 7:24; 11:14
**Debunk** 60:13; 61:12, 16,
24; 62:4, 9, 17
**decide** 19:23; 23:1;
26:23; 61:9, 12, 24
**decided** 61:7, 14, 22;
62:15
**deciding** 17:17; 20:3;
61:5
**decision** 27:25; 59:6;
60:24; 62:21
**defaced** 63:7
**defendants** 14:12;
18:23, 25; 26:11; 47:19
**defined** 75:15
**demonstrate** 75:13
**deny** 32:11
**denying** 32:13, 13
**Department** 17:21; 84:2
**depicted** 71:10
**depiction** 71:6, 13
**deposited** 55:19; 60:2
**deposition** 3:15, 19, 22;
4:9, 13; 5:1; 6:6, 13, 14,
22, 23; 7:8; 10:12; 15:1;
40:23; 55:3; 56:11; 59:4, 5;
79:21; 81:21; 83:15; 84:17
**derived** 76:14
**descended** 74:4, 7, 16,
22; 75:8, 14
**descending** 71:10
**describe** 14:4; 15:19;
35:13; 45:11; 50:8; 51:6;
52:14, 16; 53:15; 63:1;
69:6; 77:25; 78:21
**described** 5:19; 15:18;
16:8; 17:2, 3; 19:20; 20:14,
18; 39:19; 79:25; 84:7, 13
**describing** 19:15; 83:15
**description** 6:11
**Design** 7:23; 20:15, 19;
22:3, 14, 16; 23:11, 12, 16,
19, 25; 24:3, 9, 14, 25;
25:3, 5, 15, 15, 20, 21;
26:2, 6, 16; 30:20; 31:2;
32:23; 34:8, 9; 35:7, 12;
37:5; 40:17, 19, 21; 41:4,
7, 9, 14, 15; 43:19, 20;
44:1, 13, 22; 46:15; 66:3,
16; 67:8, 21; 76:4, 23;
77:2, 17; 78:9, 17, 23;
79:1, 5, 9, 23; 80:1, 2, 6
**destroyed** 63:7; 68:21
**destroying** 68:23
**detailed** 67:7
**Detective** 84:2

**determination** 23:5
**Detroit** 45:10
**develop** 66:18
**developing** 19:13; 73:16;
79:7
**development** 71:6;
73:15
**developments** 81:25
**Diapers** 70:16
**different** 31:15; 33:3;
41:6; 61:15; 62:3, 10;
72:24; 74:20; 82:9
**directly** 27:3
**Director** 25:9
**disagree** 42:17
**disagreeing** 26:5
**disclose** 34:23; 47:11
**Discovery** 17:19; 24:12,
12, 24; 25:10; 26:25; 27:2,
23; 33:19, 20; 34:17; 36:2,
19; 40:6; 75:25; 76:13, 15,
17, 22; 77:3, 14, 23, 25;
78:21; 79:21; 80:23; 81:6
**discrepancies** 83:3
**discuss** 42:19; 44:3
**discussed** 24:11; 41:3;
44:1
**discussing** 9:8; 37:8;
43:18, 20, 21
**discussion** 9:12; 10:17;
11:7; 38:16; 44:19; 67:7;
70:18; 82:11
**discussions** 12:8; 20:8,
11, 13, 17; 49:12
**Dispatch** 6:8; 29:16, 25
**distinction** 10:11
**distinguishable** 31:8
**distributing** 65:14; 66:14
**District** 3:15; 12:5; 39:5;
56:14; 60:14, 21; 65:11;
66:1; 70:22
**disturbed** 30:2
**document** 14:14; 18:22;
19:3; 21:24; 22:1; 23:23,
25; 64:11, 14, 15, 16, 17,
20, 23; 65:6, 16, 17, 24,
25; 66:7; 67:22
**documents** 19:11; 22:22
**dollars** 52:9, 18
**Don** 55:21; 58:14
**Donald** 56:5, 7; 57:1, 3, 4,
12; 58:12, 18, 21; 59:17,
21; 61:17
**donate** 50:16; 52:11;
56:9, 24; 57:18; 60:13
**donated** 50:1, 5, 6; 55:10;
56:21; 57:16, 23, 24; 58:6,
22; 59:17, 25; 60:4; 69:14
**donating** 60:6
**donation** 60:6; 60:22;
61:12; 62:9; 69:20
**donations** 55:13; 69:22
**done** 16:5; 66:24; 81:13
**door** 51:11

Min-U-Script®   Filius  &  McLucas Reporting Service, Inc.

**Dover** 3:15; 12:3, 5; 15:11; 25:13; 28:6; 30:17; 39:4; 45:9, 12; 55:5, 8; 60:13; 65:10; 70:22; 71:18; 76:1, 18
**Dover's** 81:6
**down** 58:10
**Dr** 66:5, 19, 20
**drawn** 13:13
**dried** 10:16
**duly** 3:8
**dunk** 11:13
**during** 3:23; 4:12; 5:16; 7:24; 8:1, 2, 16; 9:8, 10; 24:16; 36:3; 44:12; 47:15; 51:16; 81:21
**DVD** 36:6

### E

**earlier** 3:21; 4:9
**early** 44:14
**education** 15:11; 16:6
**educational** 38:19
**effect** 35:4
**effects** 82:23
**efforts** 27:8
**either** 21:17; 56:22; 66:20
**elder** 52:1
**elders** 51:25
**elephant** 75:8, 9
**else** 6:25; 16:15; 28:13; 29:1; 30:13; 36:2, 17, 19; 39:14, 20; 47:5, 11; 49:5; 60:3; 74:20; 84:2
**end** 29:9
**endeavor** 50:13
**engage** 48:7, 21
**engaged** 47:19
**engagement** 47:24
**enhance** 15:24
**enhancing** 15:12
**enough** 25:15, 22; 26:3; 36:6; 41:25; 63:16; 76:25
**entailed** 49:12
**entire** 64:14, 16, 20; 65:6
**entirely** 62:19
**envelope** 68:16
**envelopes** 54:9
**Eric** 3:12; 39:24; 45:23; 49:23; 54:16; 78:15; 82:3
**error** 25:18, 19, 22
**espoused** 81:24
**established** 25:15, 22; 26:2
**estimates** 36:25
**et** 3:14, 15
**even** 3:25; 4:21; 24:4; 34:2; 38:16; 61:21; 63:10; 64:5
**event** 47:8
**events** 44:13; 83:21

**evolution** 7:12; 8:25; 9:24; 15:15; 16:2; 31:13; 32:10; 34:10; 42:15, 25; 72:25; 73:2, 4, 7, 8, 10, 18, 22; 74:12
**exact** 33:11
**exactly** 43:6; 59:20
**examined** 3:8
**example** 58:25; 67:1; 71:7; 74:16; 75:7; 77:5
**except** 3:4; 60:7
**exchange** 5:23; 7:3; 29:12; 41:11, 19, 25; 43:4, 17, 17
**excuse** 63:17; 76:9
**executed** 14:17
**Exhibit** 14:13; 18:19, 20, 23; 21:25; 22:23; 29:24; 63:24; 81:17, 19
**existed** 50:11; 51:3; 63:10, 15
**existing** 15:14, 25
**expertise** 23:4; 78:22; 79:20
**experts** 25:2; 26:11; 76:22
**explain** 52:19, 24; 59:15; 82:13
**explained** 4:17; 34:5; 50:11; 51:3
**explaining** 83:11
**explanation** 68:3; 82:6; 83:2
**explanatory** 65:25
**expression** 29:11; 32:9; 41:12
**extent** 4:18; 7:15; 18:1; 49:12; 61:6; 62:7; 80:10
**extremely** 53:3

### F

**fact** 5:16; 6:15, 23; 15:15; 16:2, 12; 17:6, 13; 23:6; 29:15; 30:1, 16; 31:6; 32:9, 17; 33:1, 10, 15; 43:1; 44:8; 53:21; 57:19; 60:12; 65:17; 67:16, 22; 80:9; 83:23
**fair** 26:14; 36:6; 41:25; 43:14; 63:16; 76:25
**faiths** 8:22
**fall** 37:3
**familiar** 60:12; 65:7; 76:25
**far** 34:7, 7; 39:17
**farm** 69:2
**farmers** 74:19
**fast** 5:25
**February** 23:9
**Federation** 21:8
**feel** 18:9; 50:13; 51:4; 52:11; 83:4
**fellow** 50:16; 55:15;

**75:17**
**fellowship** 50:19
**felt** 50:12
**few** 5:7
**figure** 13:24
**file** 14:8
**filed** 11:8; 14:12, 16
**filing** 3:3
**find** 17:5, 12; 21:21; 30:5; 40:8, 12; 43:10; 46:1, 13; 48:18; 66:4; 69:24; 82:23
**fine** 33:5; 52:11; 68:7, 8; 80:20
**finish** 24:20
**firm** 3:12; 45:5, 12, 13, 13, 13, 18; 79:17
**firms** 45:9
**first** 6:22; 15:1, 8; 18:24; 24:16; 25:1; 33:19; 34:11, 14, 15, 15; 35:1, 1; 37:1, 15, 18; 38:5, 21; 40:13; 41:7; 48:15; 49:7, 7; 64:14; 67:3; 77:14, 16, 18; 83:16
**five** 17:25; 19:8; 48:24
**folder** 14:8
**followed** 61:2
**following** 49:18; 55:4; 69:25
**follows** 3:8
**footage** 28:12, 23, 25; 81:19
**forbid** 72:7
**Forgive** 80:19
**forgot** 59:13
**form** 3:4; 6:17; 9:18; 16:24; 25:24; 47:20; 62:6
**formal** 47:24
**formally** 48:13
**former** 42:19
**forth** 43:7; 49:1
**found** 28:2; 34:6
**Foundation** 82:18
**founded** 7:11, 12; 9:24, 25
**four** 17:25; 36:24; 48:24
**Fox** 28:10; 30:9; 81:19
**frame** 37:9
**free** 45:16; 50:13; 51:4
**frequently** 67:1
**friends** 50:19, 22
**front** 51:9, 23
**full** 15:8
**fully** 18:10
**funny** 4:22
**further** 58:10

### G

**gaps** 34:10; 35:7, 11, 11
**gathered** 26:18
**gathering** 84:7
**gave** 3:21; 6:21; 34:24;

36:11; 39:17; 55:21; 59:12; 60:9, 19; 68:16, 17, 20; 69:4; 75:19
**GELLIN** 72:10
**genitals** 70:11, 12
**GILLEN** 6:16; 7:1, 15; 9:17; 16:24; 24:20; 25:24; 34:23; 38:24; 39:10, 24; 45:23; 47:20, 23; 49:11, 23; 54:14, 16; 57:12; 58:13, 16; 61:6, 18; 62:6; 64:19; 76:9; 78:12, 15; 80:9, 16, 19; 81:14; 82:2, 7; 84:16
**given** 19:22; 76:10
**giving** 6:22; 16:5; 38:11; 45:20; 68:25
**God** 7:25; 8:3, 3, 4, 5, 6, 20, 20; 11:9; 12:3; 18:18; 44:4
**goes** 19:15; 42:19, 22
**Good** 3:10, 11; 22:7; 23:6; 28:11; 53:16; 84:3
**great** 34:20
**ground** 43:15
**grounding** 42:7
**grounds** 68:19
**group** 20:2; 26:22; 60:12
**guess** 8:1; 11:10; 26:7; 70:20
**guidance** 72:13
**guy** 68:17
**guys** 48:18

### H

**half** 19:16
**halt** 81:4
**Hamilton** 3:13
**handed** 54:3; 55:24
**hang** 13:22, 23; 14:3; 50:21
**hanging** 71:4
**hangs** 14:5
**happen** 23:15, 18; 51:16
**happened** 23:14, 17; 28:11, 21; 43:9, 13; 51:17; 75:12
**happy** 3:24
**Harkins** 60:19
**Harvey** 3:21; 6:7; 8:9, 23; 9:15; 45:3; 56:14; 83:20
**head** 22:25; 39:5; 68:18
**hear** 23:20; 63:21
**heard** 25:11; 33:7; 62:2; 63:8; 64:1; 69:2; 76:20; 81:1
**heated** 11:15; 41:19, 24
**held** 4:13
**hell** 63:19
**hello** 34:16
**help** 19:23; 26:22; 44:12; 48:12, 13, 18; 50:12; 51:4; 82:18

**hereby** 3:2
**hi** 60:7
**High** 15:11; 20:22; 21:4, 15, 21; 30:2, 17; 50:1
**himself** 77:15
**honest** 11:12; 15:11; 82:22
**hopefully** 81:4
**huge** 71:4
**human** 70:12; 71:15, 16, 20, 23; 72:5, 9, 21, 24; 73:1, 4, 8; 74:4, 22; 75:4, 5, 15
**humans** 74:4, 21; 75:14
**hundred** 83:24
**hung** 69:14; 70:9, 11
**hurt** 82:16

### I

**identification** 19:10
**identify** 22:24
**identity** 55:10
**imagine** 66:25
**implementation** 59:7
**important** 59:11
**improper** 73:13; 74:21
**inaccurate** 59:1, 2
**include** 46:16; 72:4
**includes** 31:18
**including** 15:15; 16:2; 39:14; 45:9; 47:11; 72:8, 17, 21
**inconsistent** 23:15, 18, 23; 24:1, 4
**independently** 26:19, 20
**indicated** 47:6; 78:24
**indicating** 13:16
**indistinguishable** 31:7
**individual** 26:15; 27:13; 49:8; 54:22; 55:5
**individually** 28:3
**individuals** 48:9; 55:10
**information** 15:4, 23; 16:11; 17:9, 19; 19:18; 20:22; 21:3, 15; 22:13, 19, 20; 26:15, 17, 24; 27:24; 36:5; 45:17; 54:8; 59:10, 12; 78:6
**informing** 15:13, 25
**initiate** 3:25; 37:19
**initiated** 44:24; 48:25
**initiating** 12:9
**initiative** 38:1
**inquire** 4:3
**Instead** 31:4
**Institute** 17:20; 24:12, 13, 24; 25:10; 26:25; 27:2, 23; 33:20, 20; 34:18; 36:2, 20; 40:6; 75:25; 76:15, 17, 22; 77:3, 14, 23, 25; 78:21; 79:21; 80:23
**institute's** 76:13; 81:6

William Buckingham
March 31, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

instruct 38:25; 40:10
instruction 25:14, 20, 22;
26:4; 39:8; 49:11, 16, 18,
22; 76:9
instructions 3:20
intelligent 7:23; 20:15,
19; 22:3, 14, 16; 23:11, 12,
16, 19, 25; 24:3, 9, 13, 24;
25:3, 4, 14, 15, 20, 21;
26:2, 6, 16; 30:20; 31:2;
32:23; 34:7, 9; 35:7, 12;
37:5; 40:17, 19, 21; 41:4,
7, 9, 13, 15; 43:19, 20, 25;
44:13, 22; 46:15; 66:3, 16;
67:8, 21; 76:4, 22; 77:1,
17; 78:9, 17, 22; 79:1, 5, 9,
23; 80:1, 2, 6
intention 72:1
Internet 37:6; 78:7
Interrogatories 18:24
interview 28:12, 17; 29:2,
7; 30:9, 12, 16; 31:1;
32:18; 81:20
interviewed 28:10
into 6:2; 11:14, 14; 14:6;
30:23; 35:12; 59:6; 69:9;
70:15; 73:17; 83:3
introduced 77:15
introduction 35:2
involved 35:17; 66:10
involvement 63:11;
68:23
issue 7:23; 10:25; 11:4;
37:5; 41:1, 20; 44:21;
46:15; 60:5; 61:21; 62:23;
63:6, 12; 84:8
issued 76:17; 81:1
issues 38:16; 60:19

**J**

Janie 27:18
January 4:13; 6:13, 21;
14:17; 15:4; 57:16; 58:3,
21; 59:4, 16
Jeff 27:19
job 84:3
Joe 8:14, 18
John 23:10
June 6:7; 28:9; 29:24;
31:10; 37:7, 13; 40:25;
41:3; 42:8; 43:8, 11, 13;
44:14

**K**

keep 12:23; 13:19
keeping 11:11
kept 6:2
key 18:16, 17
kind 4:21; 18:16, 17; 20:1,
11; 30:19; 35:14, 16, 22;
46:22; 47:2; 53:12; 70:17;
75:9

Kitzmiller 3:14
knee 60:18
knew 8:14; 24:24; 45:17;
56:23; 57:16; 58:3, 12;
59:21; 65:20, 22, 25
knowledge 5:6, 18; 6:10;
19:25; 22:2; 24:13; 26:15;
33:17; 39:10; 44:21;
59:12; 67:5; 68:24; 69:19;
78:22; 79:4
knowledgeable 77:16;
78:8
known 63:14
knows 82:24

**L**

laced 5:20; 6:4, 9, 15, 24;
7:2; 29:8; 30:3; 41:12
language 63:18; 72:17,
19
Larry 68:17
last 10:14; 28:9; 45:3
later 32:18; 57:19, 20;
58:8
law 3:12; 39:23; 40:5, 14,
14; 44:18; 45:5, 8, 12, 12,
13, 13, 18; 46:11, 24; 47:5,
7, 13, 18; 48:7, 10, 17, 21;
60:10; 78:17; 79:13, 14,
17, 19
lawsuit 3:14; 11:8; 48:8
lawyer 39:3; 40:7; 77:22;
80:17
learn 16:16
learned 23:8
least 27:16; 30:16; 72:7
leave 37:23
led 50:12; 52:11; 78:7;
83:7
left 50:10; 82:19
legal 34:6, 11, 24; 35:3, 5,
14, 15, 16, 23, 25; 36:10,
11, 12, 15; 38:5, 7, 8, 12,
17; 39:3; 40:9; 46:5, 16,
20, 24; 47:12; 49:2, 3, 14;
76:14; 78:13; 80:11; 81:10
legalities 35:6, 9, 10
legally 34:21
letting 51:2; 52:12
lie 83:5
life 43:23; 70:22; 71:2, 4,
8, 14, 15, 16, 19, 21, 23;
72:3, 5, 8, 9, 20, 21, 23, 24;
73:2, 4, 9, 17, 25; 74:9
light 57:13
limited 39:14; 47:12;
84:13
line 70:7
lines 78:25
literature 39:17
little 13:14; 35:20; 40:23
LLP 3:13
local 21:20

logistics 51:6
long 13:23; 14:5; 34:3;
53:1; 82:23
longer 68:8
look 4:23; 6:5; 7:18; 8:23;
19:9; 31:12, 15; 60:17;
62:20; 64:6, 11, 14; 67:6
looked 18:16; 31:10;
60:16; 63:1; 69:8;
73:5
looking 18:17; 42:14
looks 69:6
lot 30:20; 32:2; 45:8;
50:19; 60:18; 82:17; 83:7,
8; 84:6
luck 81:24

**M**

mailbox 54:10
mailboxes 54:7
maintaining 54:22
majority 27:16, 17
making 63:14
Maldonado 8:15, 18;
31:16; 42:8
man 10:15; 69:9; 71:7, 10
many 30:22; 36:23;
47:17; 48:8, 22; 53:8, 24;
56:18
Marburger 23:10
March 25:8
mark 18:19; 81:19
marked 14:13; 18:20, 22;
21:25; 56:4; 63:23; 81:17
markers 44:11
material 67:4, 10
materials 17:16; 18:3, 5,
7; 19:11, 20, 21, 22; 22:21;
27:2, 9, 24; 46:3
matter 6:2; 73:1
Max 41:20; 42:19
may 3:25; 4:2; 6:4, 19;
7:2, 5; 29:12; 40:9; 41:12;
69:25
Maybe 19:5; 32:19; 53:1;
57:21; 62:1; 64:15; 70:16
mean 28:20; 67:25; 84:3
meaning 54:2
meant 8:19; 9:20; 31:1
medical 81:25; 82:3, 12;
84:8
medication 4:3
medications 84:8
meeting 5:10; 6:25; 7:14;
8:1, 2, 15, 16; 9:7, 9, 11,
19, 22; 10:2, 9, 10; 29:13,
17; 30:7; 32:4, 14; 33:16,
18; 40:20; 41:10; 42:10;
43:9, 13; 44:14; 57:6;
66:24
meetings 5:17, 22;
33:12; 37:7, 13; 40:17;
41:2, 6, 6, 8, 13, 19; 43:18;

84:6
member 10:24; 11:17,
18; 20:2, 18; 21:13, 18;
27:4; 28:5; 39:4; 55:5, 7;
63:11, 21; 72:15
members 17:16, 21;
18:2; 19:12; 20:2, 8, 14,
17; 26:16; 27:8, 13, 25;
32:25; 39:15; 51:11; 54:9;
63:17, 18; 75:18, 22
memory 43:25; 44:15;
64:7; 82:21; 83:8
mention 8:20; 44:9
mentioned 22:22; 45:6, 8
merely 15:10
mess 82:21
message 37:23
Meyer 25:9, 11, 13, 16;
26:2
Meyer's 26:6
Michigan 45:5, 10, 12
midway 56:13
might 11:20; 28:14; 37:12
milligrams 4:5
mind 30:21, 24; 31:7;
36:13, 14; 58:23; 72:4
minister 51:24
minute 64:6
minutes 81:12
mislead 64:10; 83:5
misleading 66:16
mission 46:8
misspoke 30:19, 25;
59:13
mistake 80:2
misunderstood 10:6
modern 75:7
modified 15:20
modify 4:14
moment 47:16
Monday 42:9; 43:9
money 49:25; 50:3, 5, 6,
12, 17; 51:4; 52:10, 12;
54:1, 2, 3, 5, 6; 55:15, 18
monkeys 69:9; 70:12, 15;
71:11
month 37:9
months 83:22
Moore 79:14
More 14:1; 16:6, 16;
17:25; 19:8; 24:4; 31:9;
39:23; 40:5, 14, 14; 44:18;
46:11, 24; 47:5, 7, 13, 18;
48:7, 10, 16, 21; 49:21;
52:25; 60:10; 79:13, 19,
19; 84:1
Motrin 4:5
Mrs 5:24; 7:4; 60:19
much 25:4; 45:9; 54:1;
55:15; 68:7
multiple 16:16, 17
mural 62:23; 63:1, 3, 6,
12; 68:13, 23; 69:3, 3, 6,
10, 24; 70:6; 71:4, 10

Muslim 7:11; 8:24; 9:24
myself 3:25; 5:24; 7:4;
65:23

**N**

name 3:12; 22:15; 26:9;
34:16; 41:22; 45:4; 60:9;
68:17
named 21:14; 41:20
names 12:16
National 20:21; 77:6
necessarily 73:3; 84:9
need 3:22; 13:25; 36:4,
14; 40:10; 50:11; 51:3;
52:8, 10, 12, 14, 16
needed 35:14
new 73:15, 16; 74:14
newsletter 65:5, 6, 9, 14,
20; 66:14
newspaper 25:7; 33:3
newspapers 31:22, 25
next 32:24
night 44:2, 3; 50:20
night's 42:9
Nilsen 66:5, 20, 20
Nobody 12:9; 54:3; 82:24
Noel 11:21; 27:18
non 74:4, 8, 22; 75:4, 5
None 26:9
notes 32:1
number 19:9; 22:16;
56:15

**O**

oath 33:14; 58:5
object 16:24; 38:24;
72:10
Objection 6:16; 7:1, 15;
9:17; 25:24; 47:20; 49:11;
61:6, 18; 62:6; 76:9
objections 3:4
obtained 17:23
obviously 34:16
occurred 63:9; 83:22
October 15:20; 19:24;
37:14; 59:8; 71:19; 76:3
off 22:25; 37:5; 42:24;
78:7; 82:4
offended 8:4, 21
offensive 69:24
offer 34:11; 68:3
offered 34:13; 39:2;
60:13; 61:16, 17
once 3:19; 38:8; 57:12
one 3:25; 4:15; 5:8; 6:3;
8:21; 10:14; 11:16; 12:20;
16:7, 17; 18:7; 27:15;
37:13; 41:18; 50:10;
51:12, 12, 25; 58:7; 62:12;
64:13; 65:1, 18; 68:5;
70:11; 73:22; 74:2, 10;

**Tammy Kitzmiller, et al.   v.**
**Dover Area School District, et al.**

79:3, 8; 80:6, 13; 83:8
only 19:10; 12:20; 28:13;
35:9; 36:10, 11, 21; 37:25;
39:16; 42:25; 45:17;
70:19; 79:22; 81:7
opinion 69:16
opinions 23:7
opportunity 27:23
opposed 16:6; 45:12;
75:25
opposite 30:22
oral 20:1
order 21:14; 59:7
organization 77:12;
79:3, 8, 15, 22, 25
organizations 21:11, 14;
77:1, 4, 5, 10; 79:12
origin 70:21; 72:3, 4, 9
origins 43:23; 71:2, 4, 8,
14, 15, 16, 19, 20, 23;
72:8, 20, 21, 23, 24; 73:1,
4, 8, 17, 25; 74:9
other's 32:1
ought 45:11
out 7:25; 11:9; 12:2, 3, 10,
18; 17:5, 12; 21:21; 23:21;
25:7; 28:2; 34:6; 40:8, 12;
45:21; 46:1, 13; 48:18;
57:4; 59:22; 65:22; 66:1, 4;
69:2; 70:11; 82:23
outside 9:21
over 4:5; 19:14; 27:5;
42:24; 55:3; 63:3; 64:6;
67:3, 15
overtone 18:11; 68:2
own 45:9; 81:22
Oxycontin 82:16, 23;
83:7

**P**

p.m 84:17
page 6:6, 7, 9; 7:18, 21;
8:7, 23; 14:21; 15:6; 18:15;
19:5, 8, 14, 16, 16; 56:10,
14; 58:10; 64:13; 65:1, 18;
67:3, 3, 6
paid 13:17
pain 60:18
Pandas 17:24; 18:7, 9;
27:14, 22; 50:1, 4, 7, 17;
53:15, 19; 54:23; 56:15;
60:6; 61:3, 9, 22; 62:5, 8
paper 4:17, 20, 23; 32:24
papers 66:17
paragraph 15:8
paraphrasing 19:9
parking 30:20
part 29:24; 31:18; 65:1;
72:7
participant 20:11
participate 20:13, 17;
36:17
particular 11:18

parties 3:3; 49:13
Partly 22:17
parts 64:23, 25
party 81:21
pass 11:10; 55:3
passed 17:25
past 19:16
Pastor 54:8
Pell 41:20; 42:19, 23;
70:20, 25
Pennsylvania 25:13
People 4:22; 8:4; 17:24;
30:22; 50:7, 10, 18, 21, 22;
51:12, 13; 53:8, 21; 56:16;
60:4; 63:18; 65:10; 66:15;
70:13; 82:22
Pepper 3:13
percent 83:24
period 40:20, 21; 43:14;
72:4; 74:9
periods 36:25
permissible 78:8; 74:18;
75:15
permission 51:24; 52:1
person 33:23; 36:21;
45:11, 14; 55:7; 60:9
persuade 20:9
pews 51:13, 23
Philadelphia 45:13
phone 33:20; 34:1; 36:3,
10, 17; 37:15, 18; 38:4, 5,
21; 45:1; 78:7
phrase 6:24; 7:11; 29:15;
30:9
physical 4:2, 4
picked 33:24
picture 68:12, 15, 20;
69:1, 4, 5, 15; 70:17
pictures 68:19; 70:23
Plaintiff 14:13; 18:22;
21:25; 63:24
Plaintiff's 18:24
plaintiffs 3:13; 18:20, 25;
59:5; 81:17
plan 59:22; 60:2
played 28:15, 18, 23, 25
plea 50:24; 51:2
pleasantries 35:1
please 3:23; 80:16
Pledge 7:25; 8:10; 9:4;
10:21, 25; 11:5, 9; 12:4
plenty 26:7
podium 20:5; 70:21
point 35:21; 44:18; 58:7;
81:4
Police 84:2
policy 15:9; 19:13; 59:8;
76:19; 81:6
popped 30:23
position 28:5; 30:17, 24;
61:16; 67:15; 73:21;
74:23; 76:14, 25; 77:6;
80:1; 81:6

possession 60:17; 68:15
possibility 45:15; 47:6
possibly 31:6
precise 35:21
prepared 65:10, 21
preparing 66:14
presence 63:17
present 83:15, 18
presentation 20:1;
50:25; 53:6; 70:18; 71:13
presented 26:22, 24;
29:8; 31:12; 77:2
presenting 71:7
President 23:10; 70:24
press 76:18; 80:22
pressing 6:2
pretty 45:21; 67:6
previous 22:23; 40:23
previously 21:24
prior 5:7; 10:4, 14; 47:18;
48:7; 50:9; 51:1, 17; 57:6;
76:8
Probably 14:2
problem 60:18; 75:12;
83:14
problems 4:2; 32:2;
82:12; 83:8; 84:13
procedures 69:25
proceedings 3:23
process 61:2, 4; 79:7;
82:19
product 31:6
progressing 69:9
proper 80:7
properly 70:3
proposal 12:5, 9
propose 11:18
proposed 30:2
protested 63:15
Protesting 63:14
proved 45:21
provide 17:16; 34:7;
57:13
provided 17:20; 22:21;
27:1, 3, 4
provides 15:10
providing 49:3
public 20:4; 33:16, 18;
42:2
pulpit 51:20
Punch 80:18
purchase 50:4, 7, 17;
52:17, 20; 54:23; 56:9
purchasing 49:25
purpose 15:12, 18, 19;
16:5, 13, 19, 22; 17:2, 6,
13; 39:3; 46:11, 18; 49:13;
59:4; 66:13, 18; 68:25
purposes 46:16
put 32:23; 35:12; 37:8,
11, 13; 54:9; 79:19
puts 14:9

**Q**

qualification 55:4
quality 45:19

**R**

read 4:9; 16:20; 17:11;
18:14, 15; 19:17; 22:19,
20, 23; 23:2, 7; 25:6; 64:1,
3, 12; 65:2, 22; 67:15, 17
reading 5:1; 8:7; 18:13;
23:6; 26:3; 59:19
reads 15:8
real 82:15
realize 41:22; 58:17, 18
realizing 64:15
really 6:1; 13:14; 65:19;
83:2, 3
reason 8:2; 12:2; 61:15;
62:3; 70:4
recall 7:15; 8:15; 9:2, 10;
20:20; 38:3; 58:13; 70:19;
82:10
recalling 58:15
receive 3:17; 46:24; 47:2;
53:21; 54:6, 13
received 47:13; 56:15
receiving 39:3
recess 40:1, 2; 54:18, 19;
68:9, 10; 81:15, 16
recited 12:4
recognize 63:24; 64:16,
20, 23
recollect 4:19
recollection 5:4; 10:20;
44:12; 59:2, 15; 82:9;
83:21, 23
recollections 82:10;
84:9
recommendations
38:14
record 12:25; 29:16;
31:16; 42:8; 82:2, 4, 6, 14
recording 13:10
Reeser 68:17
refer 8:3
reference 42:12, 14;
58:14
referendum 11:10, 19,
24
referred 5:16; 41:11
referring 5:21; 6:7;
27:17; 40:19; 43:9; 48:2;
65:20; 80:10
reflect 8:17
refresh 44:12
refreshed 59:16; 64:17
regard 23:12; 24:3, 9;
39:16
regarding 11:4; 40:6
regards 66:2

register 12:23, 25; 57:8
registers 13:19
regular 52:22
relate 80:13
related 55:7
relating 78:17
relation 8:10; 9:3; 10:17,
20, 21; 37:7
relationship 39:1; 40:9;
47:25
release 76:18; 80:22
relied 17:9; 19:11
religion 15:10
religious 18:11; 68:2
rely 15:23; 16:11, 18; 84:9
remain 55:20
remember 9:14, 15, 19;
19:4; 28:9; 29:1, 3, 3;
23:23; 34:19; 35:15;
41:18, 22, 23; 43:3, 6;
44:4; 45:4; 48:20; 52:2;
53:13, 13; 59:17; 60:11;
65:12, 13, 16, 19; 83:9, 25;
84:1
remembered 9:7
remind 3:22; 6:14, 23
repeat 3:20; 23:24; 24:8;
25:23; 71:9
repetitive 35:20
rephrase 72:25
reported 25:6; 29:15;
32:7
reporter 9:8, 12; 10:10;
28:10; 31:11, 15; 32:20
reporters 29:16; 31:22,
25; 32:5, 15; 33:4, 11;
40:25
reporting 25:8; 33:4
reports 30:1
represent 3:13; 34:13;
45:16; 46:14; 47:7, 8, 19;
48:3, 8; 78:8
representative 48:11
represented 23:22;
78:20
request 72:12
require 4:2; 25:20; 60:25
required 21:4
researching 78:25; 79:1;
80:1
resembled 70:12
reserve 55:1
reserved 3:5
resident 66:1
resolution 15:20, 24;
16:12; 17:2, 18; 19:24;
20:3, 9; 26:17; 37:14; 72:2,
3, 7, 17; 73:7, 14, 21; 74:3;
75:16, 25; 76:2, 3
respect 62:8, 8, 16;
63:13; 72:20; 76:10
respective 3:3
respects 74:19
response 10:23; 11:16;

William Buckingham
March 31, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

:5:2; 71:1
est 13:7
restaurant 38:14
restraining 59:7
retain 81:21
returned 37:23
review 15:1; 18:5; 27:9, 22, 23; 46:3; 58:14, 16, 17; 60:23
reviewed 14:16, 23; 18:3, 9; 19:22; 27:14; 67:4
reviewing 61:4
Richard 49:9
rid 13:25
right 10:22; 26:10; 29:17; 31:25; 32:12; 34:20; 36:7, 9, 16; 42:10; 44:17; 48:4, 11; 58:6; 59:1; 62:24; 63:7; 73:12, 19; 74:1; 76:5; 79:5, 10; 80:3
rights 55:1
role 60:20; 62:4, 7, 8, 10, 12, 17; 64:4
room 71:5
ROTHSCHILD 3:9, 12; 6:18; 7:6, 17; 17:1; 18:19, 21; 24:22; 26:1; 28:16; 34:25; 39:7, 12, 25; 40:3; 45:24; 47:22; 48:2, 4, 6; 49:15, 20, 24; 54:17, 20; 57:10, 15; 58:20; 61:8, 20; 62:11; 64:22; 68:7, 11; 72:14; 76:12; 78:13, 19; 80:21; 81:12, 18; 82:8; 83:11, 13; 84:15
rounded 16:6

## S

Same 7:1; 8:9; 14:6; 21:8; 29:11; 30:9; 31:10; 32:3, 9; 33:11; 39:7; 41:13; 49:22; 61:2; 84:4
Santorum's 64:8
sat 31:25; 32:20
satisfactory 67:23, 25
saw 69:15
saying 8:16; 9:2, 7, 14, 16, 19; 23:20; 24:6, 7; 26:19; 29:1; 31:23; 41:8, 10; 73:18; 75:4
School 3:15; 5:9, 17, 21; 6:24; 7:13; 9:8, 11, 19, 22; 10:2, 23; 11:16, 18; 12:5; 15:11; 17:20, 24; 19:11; 20:22; 21:4, 15; 22:21; 25:13; 27:5; 28:5; 29:13; 30:2, 18; 33:16, 18; 35:17; 37:7; 39:5, 5, 15, 18; 40:17; 41:18; 50:1; 55:5, 8; 56:14; 57:6; 60:14; 65:10; 66:23, 24; 69:19, 21; 70:8, 18, 22; 73:22; 76:1, 18; 84:6
schools 21:21
science 15:11, 13, 24;

17:20; 20:21; 21:3; 22:7, 8; 23:2, 6, 10; 25:10; 62:24; 69:10; 75:11, 13; 77:8
Science's 77:6
scientific 15:14, 16; 16:1, 3; 22:5, 10, 14, 17; 23:3, 11, 13, 25; 24:3, 9; 26:8; 77:1, 5, 12; 79:15, 20
scientifically 22:4; 68:4
scientist 22:9; 67:23
scientists 15:17; 16:3; 22:16; 23:7, 8; 26:7
Seattle 25:7
second 6:23; 67:3, 6; 81:24
seconds 53:1
secular 15:12; 78:2, 3; 79:25
securing 49:14
seeing 19:4; 58:13
seek 59:6
seeking 46:16; 49:2
seems 7:4; 19:19
selecting 19:12
self 79:25
send 36:4
sense 16:14; 17:10; 19:8
sent 17:19; 26:25; 36:6, 6; 65:10, 12, 25
sentence 77:18
separate 73:2
Separation 47:10
September 33:3
series 67:1
serious 82:15
service 51:16
services 52:3
Set 18:24
Seth 33:24; 34:16; 36:21, 23; 39:1, 8, 13, 16; 77:22; 80:11
Seven 27:21
several 21:20; 80:9; 82:9
share 12:14
short 50:9
shortly 17:24; 40:16
shoulder 42:24; 80:18
show 14:11; 21:24; 28:12, 23; 29:22, 23; 31:9; 42:6; 63:23; 70:25; 71:1; 75:12
showed 69:7, 9
showing 53:18
shown 40:24, 24; 81:20
shows 33:9
side 30:22
signing 3:3
similar 22:1; 39:22; 40:5; 77:10
similarly 83:18
single 18:15
sitting 26:10; 51:13
six 15:6; 19:5, 9, 14;

82:15
sized 13:15
skimmed 18:15
slam 11:13
slowly 15:9
solely 76:14
somebody 11:8, 20; 60:3; 66:8; 68:16
someone 45:6; 69:14
sometime 44:21; 76:8
sometimes 11:14; 37:19; 83:9
somewhat 11:15; 41:19
son 55:22
sorry 24:21; 35:20; 42:23, 24; 58:1; 69:24
sort 37:13; 42:7; 43:15; 46:8; 50:24; 51:11; 65:5; 78:25
sound 22:4, 7
sounded 4:21
speak 18:4; 21:19; 27:10; 36:19; 38:9; 54:15
speaking 28:23
specialty 46:6
species 73:10, 11, 15, 16, 19, 22, 23; 74:2, 8, 10, 13
specific 8:3, 20; 13:24; 40:20; 41:10
specifically 35:16
speculation 61:18
spoke 31:17; 52:3
spoken 36:23; 79:4
stand 10:16; 34:20; 51:22
standing 51:12
start 67:2
started 51:17; 52:3
starting 6:6; 49:7; 51:1
State 47:10
stated 23:11; 30:1
statement 8:10, 24; 13:12; 25:17, 18, 19, 21; 46:9; 50:9; 65:2; 70:21; 73:24; 74:9; 77:16
statements 11:6; 13:8; 14:3; 23:13
Steven 25:9
still 5:20; 73:7; 82:20
stipulated 3:2
STIPULATION 3:1
stood 51:23
stops 42:25
story 37:4
stranger 77:19
strongly 70:12
student 21:20, 22, 25; 42:19, 20; 43:4, 18; 69:14; 70:20; 74:4
students 12:5; 15:10, 13, 25; 16:6; 20:23; 21:4, 16; 28:7; 30:18; 42:23, 25; 65:3; 77:2

subject 40:16, 18; 49:16; 53:6; 73:1, 2; 78:9
subjected 70:13
subsequent 38:4; 39:8; 49:20
substance 47:12
sued 45:16; 47:9
summer 24:16; 37:3
Sunday 50:10; 51:16, 18
supplement 52:22; 53:16
support 11:24; 22:16; 53:18
supported 23:8
supporting 11:11
Supreme 11:7
suprised 70:2
sure 7:2, 5; 11:20, 21; 16:4; 18:11; 33:13; 35:19; 38:24; 40:11; 41:17; 53:11; 58:2; 59:20; 61:1; 66:21, 25; 67:18; 80:8; 83:25; 84:5
surgeries 82:15, 16
surgery 4:2
surprised 69:17; 70:1, 2, 4
surrounding 15:14; 16:1; 63:12
sworn 3:8

## T

talk 32:22, 25; 34:4, 20; 36:2; 38:2; 40:18; 47:15; 50:23; 52:25; 53:4, 5; 54:14; 60:5, 7; 63:21
talked 8:14; 9:20; 10:9; 24:11; 32:19; 34:9, 10; 35:6, 15; 36:12, 21; 37:17; 39:13; 42:1, 2; 45:14; 46:20; 48:23; 49:10; 53:13; 74:12; 79:8, 22; 82:20
talking 9:21; 10:7, 7; 11:8; 20:4; 22:22; 30:23; 42:9; 51:7, 9, 11; 64:8
talks 74:9
Tammy 3:14
tank 78:2, 3, 10; 79:3; 80:1
tape 28:15; 29:5; 32:9; 33:9
taught 28:6; 30:17; 42:23, 25; 43:23; 70:22; 71:2, 19, 24; 72:20
taxpayer 52:18
taxpayers 52:9
teach 30:12; 71:4, 5; 73:6, 8, 14, 18, 22; 74:3, 7, 16, 21; 75:7; 80:2
teacher 74:3, 7
Teachers 21:9; 72:12; 74:15; 75:19
teaches 42:15

teaching 5:9; 16:7; 20:22; 21:4, 15; 35:11; 71:14; 72:8; 80:6
telling 34:2
term 6:24; 82:23
terms 38:1; 60:21; 61:2; 68:4
testified 3:8; 4:12; 5:19; 33:19
testify 10:11
testifying 33:14
testimony 5:4, 7, 14, 21; 6:11, 17; 7:9, 10, 13, 16; 9:1, 13, 23; 10:4, 14, 15; 33:15; 41:2; 56:22; 57:12; 59:1
textbook 19:12; 30:2; 44:6
textbooks 20:25; 21:6, 16
Thanks 14:23
theories 15:16; 16:3, 16, 17; 31:18
Theory 15:15; 16:1, 7, 17; 22:5, 11, 14, 17; 23:3, 12, 25; 26:8; 34:10; 35:7, 9, 11; 43:1, 21; 56:23; 67:7, 21; 68:3
thereafter 17:24
therefore 6:17; 8:21
thinking 10:8; 71:3; 72:22
Thomas 39:23; 40:5, 13, 14; 44:17; 46:11, 24; 47:5, 7, 13, 18; 48:7, 10, 16, 21; 49:21; 60:10; 79:13, 14, 19, 19
Thompson 49:9
though 41:17; 44:1
thought 6:1; 7:3, 8; 9:21; 10:7, 9; 11:12; 32:5, 6
Three 36:24
Thursday 25:8
tied 58:9
ties 73:16
Times 25:7; 36:23; 37:16, 17; 48:22, 24; 80:10
tiny 13:14
today 6:14, 22; 10:5; 25:8; 40:23; 59:16; 82:8, 20, 24; 83:18
told 4:16, 19, 20, 24; 8:19; 16:23; 17:12; 34:22; 36:4; 38:22; 45:19; 52:7, 21; 56:19; 57:18; 59:9, 23; 66:5; 78:2, 6; 79:9; 80:9; 83:4
tomorrow 82:25
took 27:9; 38:1; 59:3; 62:4; 70:23; 80:1; 83:7; 84:9
top 19:16; 22:25; 45:19; 56:13
topic 23:13; 24:4, 9; 25:2; 41:3

Min-U-Script®   Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

William Buckingham
March 31, 2005

touch 82:12

towards 49:25; 50:4;
56:13

transactions 13:10

transcript 4:9; 6:5; 7:18;
56:11; 58:14, 17, 25; 59:19

transmit 39:17; 54:8;
55:23

trial 3:5; 33:2

tried 20:9

True 27:12; 59:9; 62:19,
25; 69:22; 74:25; 75:16;
79:11, 18, 24; 80:24; 81:9,
11; 82:8

truly 84:1

truthful 5:5; 59:10

try 15:8; 16:4; 66:1, 15

trying 17:5; 30:5; 44:11,
11; 61:21; 72:6; 74:11, 25;
82:22; 83:21

Tuesday 43:11

turn 14:21; 15:6; 19:5, 8,
14; 56:10

turned 11:13; 19:5; 27:5

two 12:20; 21:8; 33:3;
37:7, 16, 17; 49:13

type 65:9

# U

ultimate 62:21

umbrella 36:12; 38:9, 10;
72:22

under 7:25; 8:3, 20; 11:9;
12:3; 33:14; 36:12; 38:9;
58:5; 72:22; 73:7, 14, 21;
74:3

underneath 19:21

understood 18:9; 31:23;
38:17

underwear 70:15

United 47:9

up 10:16; 33:25; 40:17,
19, 21; 41:7, 9, 9, 14, 15;
44:13, 14, 16, 22; 45:1;
48:18, 21; 50:24; 51:20;
52:3, 10; 53:1, 4; 64:9;
74:20; 77:19

upon 16:11; 17:9; 19:11;
58:13

use 6:15, 23; 33:7, 10;
44:11; 52:9, 18, 22, 22;
70:17; 75:11

used 6:4; 7:2, 2, 10;
19:11; 29:12; 30:9; 33:4,
15, 17; 41:12; 60:1; 68:18;
70:19; 78:3

using 21:22; 43:15

usually 13:22; 32:16;
37:21

# V

vague 16:25

valid 15:12; 23:2

various 54:9; 84:6

vast 22:15

verbally 66:19, 22

views 63:14

vote 17:6, 17; 19:23; 20:3,
9; 26:23; 37:14; 44:4; 48:3,
13, 21; 60:25; 65:13

voted 26:17; 75:18

voting 15:19; 17:2; 48:7

vs 3:14

# W

waived 3:4

wall 69:11

watch 32:1

way 10:13; 21:17; 38:23;
45:11; 55:7; 62:12; 68:5;
71:3; 72:22; 73:5; 78:8, 21;
79:15; 82:6

website 45:25

Wednesday 43:11, 12

week 32:18

weeks 57:21, 22

Wenrich 11:21; 27:18

weren't 48:22

whatsoever 44:15

whole 31:15; 64:11, 12;
65:20; 79:7

whose 79:20

wife 12:14; 13:20; 14:4

WILLIAM 3:7

winter 37:3

withdraw 47:16; 77:13

withdrawal 82:21

within 37:9; 73:10, 11, 18;
74:13

Without 22:15; 69:25

witness 3:7; 7:20; 8:8;
15:7; 19:19; 56:12; 64:8;
67:19

witnesses 33:6

wolf 74:17; 75:8, 9

wolves 74:7, 16

word 33:4, 7, 10, 15, 18

words 6:15; 18:16, 17;
30:20; 78:3

work 82:16

worked 69:2

working 78:24

world 13:7

worth 45:20

write 12:18, 23; 56:7

writing 19:1

written 23:2

wrong 25:14; 32:15; 80:4,
5

wrote 12:25; 55:21; 67:13

# Y

year 14:1; 28:9

years 10:15; 63:4; 68:22

York 6:8; 29:15, 16, 25;
31:16, 22, 25; 42:8; 45:13

young 70:13