# APPENDIX I

# TAB J

## In The Matter Of:

*Tammy Kitzmiller, et al.   v.*
*Dover Area School District, et al.*

---

*Robert Eshbach*
*May 20, 2005*

---

*Filius & McLucas Reporting Service, Inc.*
*1427 East Market Street, York, PA*
*4309 Linglestown Road, Harrisburg, PA*

*(717) 845-6418   or   (717) 236-0623*

Original File RE052005.TXT, 167 Pages
Min-U-Script® File ID: 1344321023

## Word Index included with this Min-U-Script®

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Robert Eshbach
May 20, 2005

Page 2

[1]         IN THE UNITED STATES DISTRICT COURT
           FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
[2]
[3] TAMMY KITZMILLER; et al., .
[4]   Plaintiffs  .  CIVIL ACTION NO. 04-CV-2688
[5]   vs.
[6] DOVER AREA SCHOOL DISTRICT, .  (JUDGE JONES)
     et al., .
[7]
      Defendants
[8]
[9]
[10] Deposition of            : ROBERT ESHBACH
[11] Taken by                 : Defendants
[12] Date                     : May 20, 2005, 9:00 a.m.
[13] Before                   : Vicki L. Fox, RMR,
                 Reporter-Notary
[14]
      Place                   : Two School Lane
[15]                            Dover, Pennsylvania
[16] APPEARANCES:
[17]   AMERICAN CIVIL LIBERTIES FOUNDATION OF PA
        BY: PAULA K. KNUDSEN, ESQUIRE
[18]
         For - plaintiffs
[19]
       THOMAS MORE LAW CENTER
[20]  BY: PATRICK T. GILLEN, ESQUIRE
[21]     For - Defendants
[22]  KILLIAN & GEPHART LLP
        BY: JANE GOWEN PENNY, ESQUIRE
[23]
         For - Robert Eshbach
[24]
       ALSO PRESENT: Michael Baksa
[25]

Page 2

[1]                INDEX
[2]
                 WITNESS
[3]
     ROBERT ESHBACH            Examination
[4]
       By Mr. Gillen           3
[5]
       By Ms. Knudsen          166
[6]
[7]
               EXHIBITS
[8]
     Eshbach Deposition Exhibits        Page
[9]
     1. Packet of documents produced by Robert Eshbach for   152
[10] his deposition.
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 3

[1]                STIPULATION
[2] It is hereby stipulated by and between the
[3] respective parties that sealing, certification and filing
[4] are waived; and that all objections except as to the form
[5] of the question are reserved until the time of trial.
[6]
[7]    ROBERT ESHBACH, called as a witness, being duly
[8] sworn, was examined and testified, as follows:
[9]
[10]            BY MR. GILLEN:
[11]   Q: Good morning.
[12]   A: Good morning.
[13]   Q: My name is Pat Gillen. I introduced myself to you off
[14] the record. I do it now again for the record. I am one
[15] of the attorneys for the defendants in this case.
[16]    As you know, this is the time and place set for
[17] your deposition, which as I see it is my opportunity to
[18] get your side of the story.
[19]    Plainly, we have a dispute. People view
[20] developments in different ways, and this is my chance to
[21] get you to give me some information.
[22]    There's a few facets of this deposition process
[23] that are sort of unique. Let me bring them to your
[24] attention. The first is that Vicki transcribes our
[25] exchanges, and that in turn places a premium on verbal

Robert Eshbach
May 20, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

Page 4

[1] responses. So please try to respond verbally to my
[2] questions as opposed to gestures and head nods and
[3] sounds like ah-huh which we frequently use when we are
[4] speaking.
[5]     If you don't, Vicki will generally bring that to
[6] your attention, and we will try to correct that.
[7]     Secondly because the deposition is transcribed, it
[8] also places a premium on allowing me to finish my
[9] questions before you begin to answer. And again in our
[10] general day-to-day conversation, it is remarkable how
[11] frequently we don't allow the other person to finish
[12] because we have an idea of what they are asking.
[13]     Here, try and wait until I am done with my
[14] question. With me sometimes that is difficult because I
[15] will pause, but we will try and keep the transcript in
[16] good shape.
[17]     The process also tends to highlight how imprecise
[18] human communication is. You may find some of my
[19] questions are unclear, not know what I am getting at or
[20] what I am asking you. If that is the case, tell me, and
[21] I will do my best to refine the question and make it
[22] more precise.
[23]     By the same token, please know that I am trying to
[24] understand your answer. So if I sort of follow up or
[25] ask the question in a different way, it is not because I

Page 5

[1] wish to harass you, it is because I am trying to
[2] understand where you are coming from.
[3]     If any of my questions are unclear or make you
[4] feel uncomfortable, please let me know. And I will do
[5] my best to address any sensitivity that I can.
[6]     The deposition is not an endurance process. If
[7] you want to take a break, please let me know, and we can
[8] do that. I think that is it for the general guidelines.
[9]     Q: Would you please state your full name for the record?
[10]     A: Robert Warren Eshbach.
[11]     Q: Please spell it.
[12]     A: E-s-h-b-a-c-h.
[13]     Q: Where do you reside?
[14]     A: 5192 West Canal Road, Dover, Pennsylvania.
[15]     Q: And I have reason to believe you are currently employed?
[16]     A: That is correct.
[17]     Q: Where are you employed?
[18]     A: I am employed at Dover Area High School.
[19]     Q: In your capacity as a teacher?
[20]     A: Correct.
[21]     Q: What do you teach?
[22]     A: I teach environmental science and biology.
[23]     Q: How would you like me to address you for the purpose of
[24] the deposition?
[25]     A: It is up to you. I have no problem.

Page 6

[1]     Q: Is Bob okay?
[2]     A: Anything by Bob.
[3]     Q: Rob?
[4]     A: That is fine.
[5]     Q: Feel free to call me Pat if my questions are unclear and
[6] you need to address me.
[7]     A: Thank you.
[8]     Q: No problem. Rob, give me a sketch of your educational
[9] background beginning with high school.
[10]     A: I graduated from Dover Area High School in 1989. Then
[11] got my bachelor's of science degree in biology from York
[12] College of Pennsylvania. I graduated in May of 1995.
[13]     Q: And where were you employed after graduation?
[14]     A: Right after graduation, I was employed with York Health
[15] System as a lab technician. And from there, I went to a
[16] professional lawn care company called Ehrlich Green
[17] Team.
[18]     Q: And next?
[19]     A: Then during that time period, I received my teaching
[20] certification from Wilson College in Chambersburg,
[21] Pennsylvania and became employed at Dover Area High
[22] School.
[23]     Q: What year is that?
[24]     A: 2002-2003 school year.
[25]     Q: And in terms of your post secondary education focused on

Page 7

[1] biology, Rob, give me a sense for your coursework?
[2]     A: Sure. Obviously Principles of Biology, Microbiology,
[3] Anatomy and Physiology. Do you want 1 and 2's?
[4]     Q: No, that's fine.
[5]     A: Chemistry, some Organic Chemistry, Genetics, Plant
[6] Taxonomy.
[7]     Q: Did you have any coursework that focused particularly on
[8] Evolutionary Theory?
[9]     A: That would have been included in our Principles of
[10] Biology as well as mentioned in Genetics and possibly
[11] even Anthropology.
[12]     Q: Any post undergraduate instruction in biology?
[13]     A: Not at this point.
[14]     Q: A few questions about who you may have spoken with in
[15] preparation for today's deposition. I see that you are
[16] retained by counsel, and I take it you have consulted
[17] with counsel?
[18]     MS. PENNY: Has retained counsel.
[19]     BY MR. GILLEN:
[20]     Q: Has retained counsel. I take it you have spoken with
[21] your attorney to prepare for the deposition?
[22]     A: Yes, sir.
[23]     Q: Apart from your attorney, whom have you spoken with in
[24] preparation for the deposition, anyone?
[25]     A: To prepare for the deposition?

---

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Robert Eshbach
May 20, 2005

---

Page 8

[1]  Q: Yes.

[2]  A: No one.

[3]  Q: Did you speak with anyone in anticipation of the

[4] deposition?

[5]  A: At the time, I had not been subpoenaed for a deposition.

[6]  Q: Tell me what you are referring to, Rob.

[7]  A: There was a point I spoke with Paula Knudsen.

[8]  Q: I was going to ask you about that also. Apart from the

[9] discussions with plaintiff's counsel, have you spoken

[10] with anyone else, in other words, to try and gather

[11] information or refresh your recollection for the

[12] deposition?

[13]  A: Conversed with other members of the Science Department.

[14]  Q: Okay.

[15]  A: Not in a formal setting by any means.

[16]  Q: Just give me a sense for those exchanges.

[17]  A: Basically just reviewed timeline, that sort of thing, of

[18] when events took place.

[19]  Q: When you reviewed the timeline, Rob, were you reviewing

[20] the timelines that have been provided to me in response

[21] to the subpoena?

[22]  A: Yes, sir.

[23]  Q: Have you spoken with Jen Miller and Bert Spahr in the

[24] last two days about the depositions?

[25]  A: No. Nothing regarding what took place in the

---

Page 9

[1] deposition.

[2]  Q: Have you spoken with them about matters that they were

[3] curious about in the aftermath of their depositions?

[4]  A: The only conversation that took place was a matter of

[5] time, how long the deposition took.

[6]  Q: I hope they were charitable. I know you had a few

[7] conversations with plaintiffs' counsel.

[8]  A: Okay.

[9]  Q: When were they, Rob?

[10]  A: The first formal conversation that took place would have

[11] been somewhere around the end of November, beginning of

[12] December.

[13]  Q: Was that a discussion with Mr. Rothschild?

[14]  A: Yes, he was present.

[15]  Q: Who else?

[16]  A: Ms. Knudsen.

[17]  Q: What did you discuss at that time?

[18]  A: Events that were being reported in the newspaper, local

[19] newspapers I guess.

[20]  Q: Anything more specific than that that you can recall

[21] about your exchanges?

[22]  A: No, sir.

[23]  Q: Second meeting with plaintiffs' counsel?

[24]  A: Second again formal meeting with counsel would have been

[25] the Friday before April 28th.

---

Page 10

[1]  Q: So that is recently?

[2]  A: Correct, 2005.

[3]  Q: What did you discuss at that time?

[4]  A: Basically, just some of the same things we are

[5] discussing right now, background information, my

[6] education, again the timeline that you have right there

[7] in front of you.

[8]  Q: Did you have any communications with plaintiffs' counsel

[9] apart from these meetings we have referenced?

[10]  A: A few telephone conversations, yes.

[11]  Q: Any specific matters you can recall that were discussed

[12] during those conversations?

[13]  A: Again, things that were occurring in the newspaper,

[14] articles whether or not those newspaper articles were

[15] accurate.

[16]  Q: Have you spoken with any of the plaintiffs since the

[17] lawsuit was filed?

[18]  A: Yes.

[19]  Q: Who have you spoken with?

[20]  A: Tammy Kitzmiller, Cindy Sneath, Bryan and Christy Rehm.

[21]  Q: For Bryan and Christy Rehm, what have you discussed with

[22] them?

[23]  A: Regarding the lawsuit or anything?

[24]  Q: Good question, Rob. The lawsuit, the biology text

[25] selection process, the biology curriculum change, the

---

Page 11

[1] book Of Pandas or Intelligent Design.

[2]  A: Mostly just informational things. Nothing specific.

[3] The fact that the lawsuit — when the lawsuit was filed,

[4] they were plaintiffs. Perhaps whether or not they were

[5] present at a deposition or not, that sort of thing.

[6]  Q: For Cindy Sneath, same basic subject matter?

[7]  A: Yes.

[8]  Q: Tammy Kitzmiller?

[9]  A: Probably the same. She is one that I have had the least

[10] amount of conversation with.

[11]  Q: Just let me ask you a few names to see if — well, have

[12] you spoken with any persons who are on the Dover Area

[13] School District School Board about the subject matter of

[14] the litigation since October 18th, 2004?

[15]  A: Not that I can recall.

[16]  Q: All right. Plainly, Rob, you know that there is a

[17] dispute here in the community surrounding the selection

[18] of the biology text and the biology curriculum. I would

[19] like to ask you to focus your recollection on that.

[20] Let's look at it from the period prior to January 2002.

[21]     I would like to ask you if you look at that period

[22] up until January of 2002, do you recall the biology text

[23] or biology curriculum being a point of controversy?

[24]  A: I was not employed with the District at that point in

[25] time.

---

Robert Eshbach
May 20, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

**Page 12**

[1]   Q: That's right. Forgive me. When did you start?

[2]   A: It would have been August, 2002.

[3]   Q: So let's look at that period. August of 2002 through

[4]   January of 2003, were there any concerns that came to

[5]   your attention relating to the biology text or the

[6]   biology curriculum?

[7]   A: From who?

[8]   Q: From anyone.

[9]   A: No, not that I can recall.

[10]   Q: Rob, if you would please look at a packet of documents

[11]   that has been marked as Miller 5. If you flip to about

[12]   two-thirds of the way through, there is an e-mail there

[13]   from Robert Hamilton dated December 15th, 2004.

[14]   A: Yes.

[15]   Q: If you would also look at Miller 6, and get about a

[16]   quarter of the way into that pack, you will see an

[17]   e-mail again from Mr. Hamilton this time dated 3-28-2005

[18]   with the subject line I have not forgotten.

[19]   A: 3-28, 1:30 PM?

[20]   Q: Yes.

[21]   A: Yes.

[22]   Q: I would like to ask you, do you know Mr. Hamilton?

[23]   A: Yes, he was my ninth grade biology teacher. And I had

[24]   kept or became — gotten myself in contact with him once

[25]   I became certified as a teacher, once I completed my

---

**Page 13**

[1]   courses at Wilson.

[2]   Q: And have you had discussions with Mr. Hamilton about the

[3]   subject matter of this dispute?

[4]   A: No, not personally.

[5]   Q: Have you heard anything about conversations with

[6]   Mr. Hamilton that relate to the subject matter of this

[7]   dispute, by which I mean the selection of the biology

[8]   text, the curriculum change, Intelligent Design or the

[9]   text Of Pandas and People?

[10]   A: Not conversations with him, no.

[11]   Q: How about from anyone else, have you heard any

[12]   statements attributed Mr. Hamilton?

[13]   A: Regarding his e-mails, yes.

[14]   Q: Tell me about that, Rob.

[15]   A: Basically the discussion took place with Bertha Spahr,

[16]   the head of our Science Department. And what was

[17]   presented to me were the two documents in front of us.

[18]   Q: If you look behind the e-mail dated 3-28-05, the subject

[19]   I have not forgotten, you will find another one that is

[20]   3-28-05, 1:30, a short note, did you see that?

[21]   A: Yes, I did see that.

[22]   Q: What did Bert say to you in connection with these

[23]   e-mails?

[24]   A: The fact just that she — Mr. Hamilton had contacted

[25]   her, and there was some interesting information in the

---

**Page 14**

[1]   first e-mail, and she did let me read it. And again,

[2]   when she was contacted the second time, again, just a

[3]   point of interest.

[4]   Q: About when did this conversation with Bert take place?

[5]   A: Time of day or month?

[6]   Q: Month. These are e-mails that are from December and

[7]   March. Was it around that time?

[8]   A: Yes. Of course, this e-mail my guess was since this was

[9]   sent on the 15th, if the 16th was a weekday, she would

[10]   have talked to me about it the following day she

[11]   received it.

[12]   This e-mail — or it could have even been the same

[13]   day. Since it was 11:38 in the morning when she got it,

[14]   she could have spoken to me about it at lunchtime.

[15]   Since the one dated 3-28-05 was at 1:30 PM, it is

[16]   possible she could have spoken with me on the same date

[17]   at the end of the day about it.

[18]   Q: Sure. Do you recall anything Bert said to you in

[19]   connection with the e-mails?

[20]   A: I got an e-mail from Mr. Hamilton. Would you like to

[21]   read it?

[22]   Q: All right. Let's look at the story as it unfolds

[23]   beginning in 2003. If we look at the first quarter of

[24]   that month from say January through April — of March, I

[25]   am sorry, do you have any recollection of the biology

---

**Page 15**

[1]   text or the biology curriculum being an issue during

[2]   that first part of 2003?

[3]   A: There was some rumblings starting to occur regarding the

[4]   curriculum.

[5]   Q: Tell me about those rumblings, Rob.

[6]   A: It had come to my attention that there was some

[7]   questioning taking place regarding the teaching of

[8]   Darwin's Theory of Evolution in biology class.

[9]   Q: Okay. How did that come to your attention?

[10]   A: More than likely, it would have been my — that year my

[11]   mentor teacher — since it was my first year, we have a

[12]   mentor teacher — was Mrs. Spahr. And she is also my

[13]   Department chair. So I am sure that that conversation

[14]   came from her.

[15]   Q: Are you sure that it occurred in the first part of the

[16]   year here between January and March?

[17]   A: I can't be sure, no. It occurred either the end of '02

[18]   to the beginning of '03.

[19]   Q: Can you recall anything that Bert said to you?

[20]   A: As I stated before, just that there was some questioning

[21]   by some Board members or a Board member regarding how we

[22]   taught the Theory of Darwin's — I am sorry — Darwin's

[23]   Theory of Evolution.

[24]   Q: Did she tell you which Board members?

[25]   A: During that time period, it would have been I believe

---

Page 12 - Page 15  (6)

**Min-U-Script®   Filius & McLucas Reporting Service, Inc.**

Tammy Kitzmiller, et al.    v.
Dover Area School District, et al.

Robert Eshbach
May 20, 2005

---

Page 16

[1] towards the end of the time period you are referring to,

[2] yes.

[3]    Q: What did she tell you?

[4]    A: The fact that there had been a conversation between she

[5] and Mr. Baksa at the end of one day about three o'clock,

[6] and that again, question was arising from a Board member

[7] how this section was taught.

[8]    Q: Let me show you or ask you to look at a document that

[9] has been marked as Miller 1.

[10]    A: It's right here.

[11]    Q: Does that look familiar to you, Rob?

[12]    A: Yes, sir.

[13]    Q: Tell me how you became familiar with that document.

[14]    A: The first time I saw this document was an afternoon

[15] after school. Looking at the date of April 1st, 2003,

[16] it very well could have been that date or the date

[17] thereafter April 2nd.

[18]    Q: How did you come to see it?

[19]    A: I was working one evening in my room after school. I

[20] was a first year teacher at that point just trying to

[21] keep my head above water. And Dr. Peterman, the

[22] Principal at the high school at that time, came through

[23] the hallway, and she saw me working in there.

[24]    I believe she asked me if I had seen Mrs. Spahr.

[25] And I said I saw her going out as if she was leaving.

---

Page 17

[1] And she said okay. And she said I wanted you to see

[2] this since this document pertains to you. You are part

[3] of this document. It pertains somewhat to you.

[4]    Q: Did she show you the memo dated April 1, 2003 at that

[5] time?

[6]    A: Yes, sir. She handed it to me.

[7]    Q: Did you look it over?

[8]    A: Yes. I don't know that I read it in depth, but I

[9] scanned it. And what brought my attention were

[10] basically the format and the five questions stated here

[11] at the bottom.

[12]    Q: Had you spoken with Bert Spahr prior to seeing this memo

[13] or was it afterward?

[14]    A: In regards to?

[15]    Q: Just about the rumblings you have referenced, about

[16] presentation of Evolutionary Theory?

[17]    A: Prior, prior to seeing this memo.

[18]    Q: Did you have any discussion with Dr. Peterman about the

[19] memo?

[20]    A: I am sure there was a little bit of discussion at the

[21] time she hand it to me, yes.

[22]    Q: Do you recall any of that exchange?

[23]    A: Again, she wanted me to see it because I was one of the

[24] untenured teachers that she speaks about at the bottom.

[25] She told me that this was what she was going to send to

---

Page 18

[1] the administration. Hopefully, this would put the issue

[2] to rest.

[3]    Q: You say you scanned it. Did you have any discussion

[4] with her about the contents of the memo?

[5]    A: Sure.

[6]    Q: Can you recall the nature of that exchange?

[7]    A: To the best of my recollection, what was in the memo,

[8] the fact that yes, Mrs. Spahr did tell me about her

[9] conversation with Mr. Baksa and the split between

[10] wanting the idea of Creationism taught, as well as the

[11] Theory of Evolution.

[12]    And one particular question that she has written

[13] here that I know that I commented about, which would

[14] have been question number two, which states which theory

[15] of Creationism are we to teach since we have students

[16] from various religious backgrounds.

[17]    Q: Let me ask you to turn your mind back again to the

[18] exchange with Bert Spahr which you recall as being prior

[19] to this memo.

[20]    A: Sure.

[21]    Q: Do you recall her attributing any statements to Mr.

[22] Baksa during that conversation?

[23]    A: In what way?

[24]    Q: Well, did she say to you that Mr. Baksa had indicated a

[25] Board member wanted Creationism to be presented? Do you

---

Page 19

[1] specifically recall the use of the term Creationism?

[2]    A: Yes.

[3]    Q: Do you recall any discussion of balance in the

[4] curriculum?

[5]    A: Yes.

[6]    Q: Do you recall any discussion of presenting other

[7] theories?

[8]    A: Other than what?

[9]    Q: Other than Evolution.

[10]    A: Yes.

[11]    Q: In general?

[12]    A: Yes.

[13]    Q: And did you prior — do you recall Bert Spahr mentioning

[14] Intelligent Design?

[15]    A: No.

[16]    Q: Is there anything else you recall about what Bert Spahr

[17] said to you during that conversation?

[18]    A: Yes.

[19]    Q: What?

[20]    A: As I recall, she had asked Mr. Baksa, who was the person

[21] of interest on the Board.

[22]    Q: Did she tell you who Mr. Baksa said?

[23]    A: Yes.

[24]    Q: Who was that?

[25]    A: Mr. Bonsell.

---

Robert Eshbach
May 20, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

[1] Q: Anyone else?

[2] A: Not that I recall, no.

[3] Q: All right. Did Dr. Peterman leave the memo dated
[4] April 1, 2003 and marked as Exhibit 1 with you?

[5] A: No, I handed it back to her.

[6] Q: As of the time of your receipt of this memo, had you as
[7] a teacher had any experience with students having
[8] questions about the presentation of Evolutionary Theory?

[9] A: In that fall semester when I had a biology class, I
[10] presented Darwin's Theory of Evolution as it relates to
[11] origin of species which is outlined in our curriculum.
[12] And as I recall, there may have been some questions of
[13] what is your belief, that sort of thing, from students.

[14] Q: Did you have any discussion with Dr. Peterman about any
[15] discussion of Creationism in your biology classes?

[16] A: At that point?

[17] Q: Yes.

[18] A: Not that I can recall specifically. Not — I didn't —
[19] there was no mention of this is what I said, this is how
[20] I presented it or anything like that.

[21] Q: How about in the discussion with Bert Spahr that was
[22] prior to this memo as you recall it, had you spoken with
[23] her about how you addressed the matter in your class?

[24] A: Just the fact that the part of Darwin's theory that we
[25] were going to look at and concentrate on was the origin

[1] of species and how species have changed over time. I
[2] wasn't there to teach, to talk about, to mention origin
[3] of life.

[4] I understand that some people may have some
[5] different views on that, and those views are fine for
[6] everybody. What I wanted to focus on was how things had
[7] changed since life has been here with origin of species.

[8] Q: Just to make sure I am understanding you, how do you
[9] differentiate those two topics that you have just
[10] discussed, origin of life and origin of species?

[11] A: Basically what I had said. Origin of life basically
[12] deals with how life began on earth. Origin of species
[13] in my mind deals with how speciation changes in life
[14] have occurred since we've been here — or since life has
[15] been here, not we.

[16] Q: Again, forgive me. I am just trying to understand. It
[17] seems like it is sort a of technical distinction.

[18] When you say origins of life, do you mean
[19] biological life from a single cell forward? Is that
[20] what you are getting at.

[21] A: Yes.

[22] Q: Then when you say origin of species, what is your
[23] conception of that, Rob, in light of your training?
[24] What do you think is comprised in that second heading?

[25] A: Origin of species deals with how species have changed

[1] over time. One examples is the finches that Darwin
[2] found in various places in the world and how they were
[3] all a type of finch, but because of their environment,
[4] their genotype and phenotype changed over time with what
[5] that environment offered them.

[6] Q: So is that sort of change within a species?

[7] A: Yes.

[8] Q: Did you at this time, were you addressing — what shall
[9] I say — the connection between various species?

[10] A: No.

[11] Q: If you look at this memo, Rob, about halfway through
[12] that first paragraph there, there is a sentence she
[13] explained to Mr. Baksa that all biology teachers state
[14] that another Theory of Evolution is Creationism, but
[15] Creationism per se is not taught since it is not
[16] addressed by the standards.

[17] Did you have any discussion with Dr. Peterman
[18] about teaching Creationism at any time prior to this
[19] memo?

[20] A: Not other than the fact that, again, what I had said
[21] earlier. She may have said — she may have asked at one
[22] point how do you approach the subject. I had reiterated
[23] to her as well that I am concerned with origin of
[24] species and how species have changed over time. While
[25] there are some other ideas about how we got here, we are

[1] not going — I am really not interested in that part of
[2] the evolution. I am interested in how things have
[3] changed since life has been here.

[4] Q: And let me ask you this: It seems from the information
[5] I have thus far that part of the reason the biology
[6] teachers chose to present Evolutionary Theory in the way
[7] you have described is because there were just practical
[8] limitations in terms of time available to try and get
[9] that concept across to students; is that true?

[10] A: That's correct.

[11] Q: If you look at the second paragraph of Exhibit Miller 1,
[12] there is a second sentence that says I advised them to
[13] continue to mention that Creationism is another
[14] alternate Theory of Evolution.

[15] Then it goes on however, as Principal, I am
[16] uncomfortable with this topic.

[17] Do you recall receiving any instruction from Dr.
[18] Peterman regarding teaching in the classroom?

[19] A: I think it may have been just the fact that, again, when
[20] I explained to her what I just explained earlier, she said
[21] good, keep doing the good job you are doing.

[22] Q: How about Bert Spahr, do you recall receiving any
[23] guidance from Bert Spahr around April, 2003 relating to
[24] the presentation of Evolutionary Theory and the topic of
[25] Creationism?

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

**Page 24**

[1] A: I receive a lot of guidance from Mrs. Spahr so it is
[2] hard to factor out if any one of those things dealt with
[3] Creationism or Evolution. I honestly don't recall.
[4] Q: That's fine. What I am asking is here you have had a
[5] discussion with Bert as your mentor. And now we have a
[6] memo that kind of addresses the same subject matter. We
[7] are in the spring of 2003, and I am just wondering as
[8] you look at it or try and recall it, did Bert come to
[9] you and say I spoke with Dr. Peterman, and she said we
[10] should just keep going, she said to do x, y, z? Did you
[11] have such a discussion?
[12] A: A discussion over a lunch may have taken place. I do
[13] not recall if there was anything specific. Basically
[14] with the fact that we had gotten the reassurance from
[15] Dr. Peterman, keep doing what you are doing, that —
[16] Q: That was it?
[17] A: That was about the end of it.
[18] Q: Let's look at this period from April of 2003 forward —
[19] A: Okay.
[20] Q: — through the end of the summer.
[21] A: Through the end of the summer of 2003.
[22] Q: Right, before the beginning of the next school year.
[23] A: Okay.
[24] Q: Was the topic of Evolutionary Theory, Evolution — I
[25] mean Creationism, was that the subject matter of

**Page 25**

[1] discussion during that period?
[2] A: Not as I recall it, no.
[3] Q: So that would bring us to — let me ask you this: We
[4] are looking at January through say August now of 2003.
[5] The text selection process was taking place?
[6] A: Yes.
[7] Q: Tell me what you can recall about that.
[8] A: Sure. Up until this point, Departments were on a
[9] basically seven-year rotation as I recall when it was
[10] time for their Department to get new textbooks. And
[11] that spring of 2003 would have been the Science
[12] Department's year to select a new textbook.
[13] As one of the teachers at that point who had been
[14] teaching biology, I was given the opportunity to take a
[15] look at different textbooks and give my two cents worth.
[16] Q: And did you end up selecting a text to recommend?
[17] A: Personally or as a Department?
[18] Q: As a Department.
[19] A: Yes. At that point, we had chose the Miller-Levin, 2002
[20] edition.
[21] Q: Now again looking at this period from January, 2003
[22] through say August, 2003, up to August, had you had any
[23] discussions with any members of the School Board
[24] relating to the selection of the biology text?
[25] A: Personally, I had not, no.

**Page 26**

[1] Q: Apart from the discussions which we have covered thus
[2] far, had you heard of any discussions with Board members
[3] from anyone in the administration or your Department?
[4] A: Yes.
[5] Q: What had you heard?
[6] A: Basically, the textbooks at that point had not been
[7] approved somewhere in that time period that we are
[8] discussing. They wanted — as a matter of fact, they
[9] may have even requested a few copies of the 1998 edition
[10] of the biology book that we had to see.
[11] Q: By they, you mean the Board curriculum?
[12] A: The Board members. I am not sure — at that point, I
[13] don't know who.
[14] Q: Apart from hearing that, did you hear anything else
[15] about any inquiries or actions by Board members relating
[16] to the selection of the biology text or the biology
[17] curriculum?
[18] A: Not during that time frame you have asked.
[19] Q: Do you have a sense that perhaps copies of the 1998
[20] edition of Miller and Levin were requested by some Board
[21] members for examination? Do you recall hearing anything
[22] about — question? Go ahead, Rob.
[23] A: That may not fall into that time period that we are
[24] discussing.
[25] Q: I understand that you are just trying to piece it

**Page 2**

[1] together. How about again trying to isolate events
[2] during that chronological period, had you heard anything
[3] in terms of budgetary considerations that might impact
[4] the purchase of the text recommended by the Department?
[5] A: Yes. Dr. Peterman had come back to us, meaning the
[6] teachers, faculty members, saying you need to trim your
[7] budgets down, find where you can cut.
[8] Q: How about had you heard anything relating to whether or
[9] not the biology text was actually being used?
[10] A: By who?
[11] Q: By the teachers or the students.
[12] A: Just the fact that in other classes — and, again, I
[13] don't know if it was during this time period, but I
[14] would imagine that it was because that is when we used
[15] this book — not all classes were able to have or all
[16] students in classes had a textbook in hand outside of
[17] classrooms because we had a time period where two
[18] classes, meaning freshman class and sophomore class,
[19] were having biology at the same time.
[20] Q: Was that in connection with the change in the state
[21] standards?
[22] A: Yes. And the addition of a new course.
[23] Q: I just want to confirm this with you. It is my
[24] understanding in addition, there was some change in the
[25] way various topics were presented, by which I mean some

Robert Eshbach
May 20, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 28

[1] topics that were at one time presented in connection
[2] with biology were actually spread out over other
[3] courses, moved to like earth science or similar courses;
[4] is that correct, Rob?
[5] A: It was my understanding that yes. And, again, this
[6] would be prior to when I was a teacher here. Some of
[7] the topics covered in biology were moved to the new
[8] environment ecology class or what we call STS.
[9] Q: Again, I know it is hard, but just to the extent you
[10] can, focus your attention on this period from January up
[11] to August 2003.
[12] Had you had any discussions with the
[13] administration about the selection of the text?
[14] A: Not other than the fact that in that January when we
[15] were doing our budgeting and ordering, we listed which
[16] textbooks the biology teachers had decided, how many
[17] copies we would need.
[18] And we were basically in a period of waiting once
[19] we found out that those — when we were told we needed
[20] to cut budgets whether or not those textbooks would come
[21] forth.
[22] Q: Sure. This exhibit Miller 1 expresses a concern for
[23] untenured teachers and the way in which this issue of
[24] presentation of Evolutionary Theory might have an
[25] adverse impact on that. I know from speaking of Bert

Page 29

[1] that she had that concern in her mind also.
[2] Did you have any discussions with the
[3] administration regarding this issue, the presentation of
[4] Evolutionary theory and whether it might have an impact
[5] on your employment status at Dover during that period
[6] from January through up to August, 2003?
[7] A: Yes, sir. That conversation would have been with Dr.
[8] Peterman.
[9] Q: Is that the conversation you have already told me about?
[10] A: Yes.
[11] Q: Just on that topic, Rob, tell me what was the nature of
[12] your communication to Dr. Peterman.
[13] A: Again, since I was one of the untenured teachers that
[14] she was speaking about in the bottom of this memo, she
[15] had concerns with the fact that it has been — there was
[16] already a court case that basically decided that — let
[17] me back up.
[18] It was not in the state standards. Creationism
[19] was not in the state standards. As a matter of fact,
[20] the state standards for science were actually held up
[21] for a few months while people in the legislature were
[22] deciding this. And then that the fact that there even
[23] was a court case. And that point, I didn't know what
[24] the court case was. That basically stated something to
[25] the fact that Creationism was not to be taught in

Page 30

[1] biology class.
[2] And she had a problem with Board members wanting
[3] us to teach that, especially as untenured teachers, what
[4] that could do to our future as teachers.
[5] Q: I take it she expressed that concern to you in the
[6] conversation you were recounting that surrounded this
[7] April 1 memo?
[8] A: Yes, sir.
[9] Q: Did you for your part — is there anything else you
[10] recall telling her?
[11] A: I don't know that I told her anything. I may have — I
[12] do recall giving her an article somewhere in that time
[13] frame that sort of addressed the whole issue of how
[14] people approach Creationism versus Evolution.
[15] Q: Okay. What was your purpose there, Rob?
[16] A: Just to say hey, this is out there. Take a look at it.
[17] It is sort of interesting reading.
[18] Q: Now apart from this discussion with Dr. Peterman, did
[19] you talk to anyone else in the administration about
[20] these issues, the presentation of Evolutionary Theory?
[21] A: In that time frame, I don't recall. It is quite
[22] possible that Mr. Baksa and I in a conversation
[23] somewhere may have — in passing may have said
[24] something. As I recall, there was no formal meeting.
[25] Q: As you sit here today, can you recall any exchange?

Page 31

[1] A: Not — again not during that — you are saying up to
[2] August of 2003?
[3] Q: Yes.
[4] A: No. I really can't.
[5] Q: Do you recall any exchange about that issue at any time
[6] afterwards?
[7] A: Sure, yes.
[8] Q: Just give me a sense for when.
[9] A: Let's see. Probably a little bit later in the fall of
[10] 2003. Actually, that would be — correct, the fall of
[11] 2003. Maybe it would have been the spring of 2003.
[12] MR. GILLEN: Hold on. I want to take a brief
[13] break.
[14] (A recess was taken.)
[15] BY MR. GILLEN:
[16] Q: All right, Rob. You mentioned the fall of 2003. If we
[17] look at the document that has been marked as Miller 4
[18] and turn to the first page there with the number one
[19] circled in the upper right-hand corner, you will see a
[20] meeting for the fall of 2003 between Mr. Bonsell and the
[21] Science Department.
[22] A: What page, one?
[23] Q: One.
[24] A: Got you. Fall, 2003, Mr. Bonsell.
[25] Q: Let me ask you, Rob, do you recall the meeting with

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Robert Eshbach
May 20, 2005

Page 32

[1] Mr. Bonsell?

[2]   A: Yes, sir.

[3]   Q: At that time, who was there?

[4]   A: As I recollect, each member of the Science Department

[5] who would have been Jen Miller, Bob Linker, Leslie

[6] Prall, Bertha Spahr, myself. Did I say Bryan Rehm yet?

[7]   Q: You did not.

[8]   A: Mr. Baksa, Mr. Bonsell and maybe even Shane Miller, our

[9] Assistant Principal.

[10]   Q: How about Dr. Peterman?

[11]   A: I believe she may have been come in late or maybe left

[12] early. It seems to me she was there, but she may not

[13] have been there the whole time.

[14]   Q: How about Richard Nilsen?

[15]   A: At that meeting, I do not believe he was present as I

[16] recall.

[17]   Q: Do you have a specific recollection of those science

[18] faculty being there, or do you just have a notion that

[19] the whole Department was there?

[20]   A: I have a recollection of them being there. I was going

[21] through my head thinking where we were sitting and who

[22] was sitting where.

[23]   Q: How about apart from Mr. Bonsell, any other Board

[24] members?

[25]   A: No, sir.

Page 33

[1]   Q: What led to the meeting, or how did you learn there was

[2] going to be a meeting?

[3]   A: Again, when we came back in the fall for the next

[4] semester, again there started to be some rumblings

[5] questioning how we taught the Theory of Evolution.

[6]   Q: Tell me about those rumblings, Rob.

[7]   A: Again, Board member questioning how we did that,

[8] inquiring what we taught within the scope of the Theory

[9] of Evolution and how it was taught.

[10]   Q: Are these inquiries apart from the ones in the spring?

[11]   A: I don't know if they are a part or a continuation.

[12]   Q: What gives you the sense that there was something

[13] additional to?

[14]   A: Just the fact that it had started up again.

[15]   Q: That is what I am trying to get at, Rob. You say it had

[16] started up again. Why do you say that?

[17]   A: After the April 1st memo from Dr. Peterman, you know,

[18] that time period tends to be sort of the beginning of

[19] the last stretch of the year. We get busy focusing on

[20] we got to get so much material done by the end of the

[21] semester, finals.

[22]     In the back of my mind, it seems that either I

[23] didn't pay attention; being a first year teacher, I

[24] didn't hear about it. It just seemed like things seemed

[25] to calm down a little bit in regards to the Creationism

Page 34

[1] versus Evolution discussion.

[2]   Q: You say calmed down a bit. Do you mean that the

[3] attention being given to the issue in light of the

[4] exchanges in the spring had subsided so far as you knew?

[5]   A: Yes.

[6]   Q: And that is what I am trying to get at, Rob, here. You

[7] have a sense that there is a continued concern. And

[8] what I am trying to learn is did you hear something new,

[9] or did you just know that since the issue had been

[10] brought up, it was still in the mind of the faculty; do

[11] you know?

[12]   A: I don't think that it was a new issue. I think a

[13] continued issue would be the same thing. It was sort of

[14] brought up again.

[15]   Q: How was it brought up again, or how do you know that?

[16]   A: I believe it was Mr. Baksa. And I don't know — again,

[17] it wasn't necessarily a formal meeting. It may have

[18] just been in discussion. I don't know that it was a

[19] discussion with me. It could have been passed on to me

[20] that there was questions about how we taught the Theory

[21] of Evolution in our biology classroom.

[22]   Q: Do you recall the discussions with Mr. Baksa you are

[23] referencing specifically?

[24]   A: It seemed to me that again perhaps at the end of a

[25] school day, I may have been present in Mrs. Spahr's room

Page 35

[1] emptying a coffee pot or whatever, and the discussion

[2] was taking place. That sort of thing. I don't know

[3] that it was addressed to me. I don't recall.

[4]   Q: All right. So you had the sense that there is this

[5] issue that — there has been no resolution or anything?

[6]   A: Correct.

[7]   Q: And you have got this — you mention the communications

[8] with Mr. Baksa. Anything else in terms of rumblings

[9] prior to the fall meeting that you specifically recall?

[10] Did any Board members come to you personally?

[11]   A: No, no.

[12]   Q: Did any of your colleagues in the Science Department

[13] come to you to recount communications with Board

[14] members?

[15]   A: Not that I recall, no.

[16]   Q: Did anyone from the administration apart from this

[17] conversation you seem to recall with Mike Baksa come to

[18] you and address the issue?

[19]   A: Not that I recall.

[20]   Q: So we are getting up in this fall meeting. Just

[21] practically speaking, did you get a memo, or did you —

[22] how did you learn there was going to be a meeting?

[23]   A: Probably through a Science Department meeting, and the

[24] information was passed on to us by our Department Chair

[25] Mrs. Spahr.

Robert Eshbach
May 20, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

**Page 36**

[1]   Q: Do you recall doing anything in preparation for the
[2]   meeting?
[3]   A: Not specifically, no.
[4]   Q: Tell me how the meeting unfolded from your perspective.
[5]   A: Sure. We were asked to attend a meeting that would take
[6]   place basically with the Science Department and
[7]   Mr. Bonsell. He wanted to discuss the issue of again
[8]   how the Theory of Evolution was presented in biology
[9]   class and what was presented basically.
[10]     It was a very cordial meeting I would say overall
[11]   as a Science Department, and as well, we may have even
[12]   had discussions with Mr. Baksa that we thought things
[13]   went well. We thought we had maybe cleared up some
[14]   discrepancies that were out there, of what people were
[15]   saying were taking place in the science class.
[16]   Q: Do you recall anything that Mr. Bonsell said? How did
[17]   the meeting open?
[18]   A: Mr. Baksa introduced us all personally to Mr. Bonsell.
[19]   I am sure he did not know all of us at the time. It was
[20]   the first time I had been formally introduced to him,
[21]   Mr. Bonsell.
[22]     Basically, he just introduced or stated what the
[23]   objective of the meeting was, was to just inform
[24]   Mr. Bonsell basically how the Theory of Evolution was
[25]   approached, the fact that — and I don't know if Mr.

**Page 37**

[1]   Baksa said this, but it was somewhere stated that we
[2]   teach origins of species. We are not focusing on
[3]   origins of life.
[4]   Q: So there is kind of an introduction. Do you recall
[5]   anything that Mr. Bonsell said during the meeting?
[6]   A: It seemed to me that he got a better understanding of
[7]   the difference between the two, origin of life and
[8]   origin of species. To the best of my recollection, that
[9]   is it.
[10]   Q: Do you recall him expressing any specific concerns or
[11]   asking any specific questions?
[12]   A: There seemed to be again a tone of how we approach the
[13]   subject, did we in fact. I recall Jen Miller stating —
[14]   and maybe even Bob Linker — how they approached the
[15]   subject, what they were there to talk about, that sort
[16]   of thing, how they were going to teach the section on
[17]   Evolution.
[18]   Q: Do you recall speaking at the meeting yourself?
[19]   A: I am sure I probably chimed in a little bit. Jen Miller
[20]   and I have a way of sort complementing each other when
[21]   we speak. If there's a gap, I will sort of chime in and
[22]   fill in that gap. The same goes with me. She will
[23]   chime in and fill the gap for me or clarify if we feel
[24]   it is not clear.
[25]   Q: Do you recall any discussion that related to specific

**Page 38**

[1]   scientific issues? Was there any discussion of carbon
[2]   dating, fossil record, any specific topics, were they
[3]   discussed?
[4]   A: There may have been a brief statement or issue — not an
[5]   issue, that would be an overstatement, just a brief
[6]   statement made about carbon dating and whether or not —
[7]   Mr. Bonsell even — he may have even said I don't
[8]   believe in that, something to that effect.
[9]     There was nothing — there was certainly no long
[10]   discussion over it.
[11]   Q: How about do you recall Bert Spahr bringing some
[12]   materials to the meeting?
[13]   A: Yes. I am certain that she probably did have some
[14]   things.
[15]   Q: Do you recall any discussion relating to the legality of
[16]   teaching Creationism in the biology class?
[17]   A: Yes. As I recall, there was a question of the legality,
[18]   and she may have even brought with her some research
[19]   that was pulled on the subject.
[20]   Q: Do you recall Mr. Bonsell asking for a copy of the
[21]   materials?
[22]   A: I am not so sure he didn't have the materials prior to
[23]   that. He may have asked for them at that meeting.
[24]   Somewhere along the line, I know that he did receive the
[25]   material. Timewise, I am not sure how it unfolded. I

**Page 39**

[1]   just can't recall.
[2]   Q: You say you know that he got the material at some point?
[3]   A: I may be a year ahead of myself.
[4]   Q: Understood. Let me ask you this though: Do you think
[5]   that when he received the materials, he was on the Board
[6]   curriculum committee as a member?
[7]   A: I don't recall.
[8]   Q: Do you recall Intelligent Design coming up during this
[9]   meeting?
[10]   A: During that meeting in the fall of 2003, I do not recall
[11]   that, no.
[12]   Q: How about do you recall any mention of the Discovery
[13]   Institute or the book Of Pandas at that time?
[14]   A: No; no, sir.
[15]   Q: Not Of Pandas?
[16]   A: No.
[17]   Q: How about Discovery Institute?
[18]   A: I do not recall that coming up in this particular
[19]   meeting. No, not at all.
[20]   Q: Do you recall anything that Dr. Peterman said?
[21]   A: No, we did most of the talking quite frankly.
[22]   Q: By we, you mean Jen Miller?
[23]   A: I mean the Science Department in general.
[24]   Q: Do you recall Bryan Rehm saying anything at the meeting?
[25]   A: Yes, he did speak. And it may have been he who brought

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Robert Eshbach
May 20, 2005

---

**Page 40**

[1] up carbon dating and natural selection because I know we
[2] did teach that. That is a section in our environmental
[3] ecology class.
[4]    Q: Do you recall any exchange between Mr. Rehm and
[5] Mr. Bonsell relating to those topics?
[6]    A: Nothing outstanding.
[7]    Q: You say you left there with a sense that it was a
[8] cordial meeting, and you thought that Mr. Bonsell had a
[9] better idea of the actual nature of the presentation in
[10] the classroom; is that right, Rob?
[11]    A: Yes, sir.
[12]    Q: If we look at this fall, 2003 period to the close of
[13] 2003, are there any other discussions you recall with
[14] Mr. Bonsell relating to this issue?
[15]    A: No, sir.
[16]    Q: How about any other Board members?
[17]    A: During that time period of the fall of 2003 to mid —
[18]    Q: Right.
[19]    A: 2003 or to the end of 2003?
[20]    Q: Yes.
[21]    A: Nothing that stands out in my mind.
[22]    Q: How about the administration, did you have any
[23] discussions with any members of the administration which
[24] you saw as connected either topically or otherwise to
[25] this fall meeting with Mr. Bonsell?

**Page 41**

[1]    A: Maybe just the fact had they heard anything about our
[2] biology books, whether or not they were going to be
[3] ordered.
[4]    Q: That is what I was going to ask you about. It is the
[5] fall now. The biology text has not been purchased.
[6]    Did you hear anything about that?
[7]    A: Just questioning are they going to be purchased, where
[8] are they, why haven't they been purchased, that sort of
[9] thing.
[10]    Q: Anything more specific than that?
[11]    A: During that time period, no.
[12]    Q: That brings us to the beginning of 2004. Again, let's
[13] just try and look at the first three months of that
[14] year, Rob.
[15]    Did any of the issues that are at the heart of
[16] this story, the selection of the biology text, the
[17] biology curriculum, or Intelligent Design, or Of Pandas
[18] come to your attention during that early part of 2003?
[19]    A: I am sorry. I think you meant 2004.
[20]    Q: Yes. Thanks.
[21]    A: No. Not with me personally.
[22]    Q: Did you hear anything from your colleagues in the
[23] Science Department?
[24]    A: Just the fact that there had been some curriculum
[25] committee meetings and the discussion of books.

---

**Page 42**

[1]    Q: Again, we are in the beginning of 2004. Tell me to the
[2] extent you can what you recall about what you heard
[3] during that period.
[4]    A: I know that there had been at least one curriculum
[5] committee meeting in which members of the Science
[6] Department, and even other departments who were vying
[7] for textbooks, took place.
[8]    Q: Anything relating to the biology text during those
[9] discussions?
[10]    A: Just again, whether or not the biology book was going to
[11] be purchased, discussions as to perhaps why we needed a
[12] new biology book.
[13]    Q: That is what I want to ask you about, Rob. Do you
[14] recall inquiries along the lines of the book use during
[15] that period or hearing about them?
[16]    A: I do recall hearing about them, yes.
[17]    Q: Who did you hear about them from?
[18]    A: Again, more than likely my Department head Mrs. Spahr.
[19]    Q: Were you ever asked to provide information about the way
[20] in which you incorporated the text into your classroom
[21] instruction?
[22]    A: During that time period of the spring of 2004, there
[23] very well could have been a question regarding that.
[24]    Q: Now in the prior year, the Department had selected the
[25] Miller and Levin text. Do you recall whether there was

**Page 43**

[1] a renewed examination of the text here in the spring of
[2] 2004 on the part of the Science Department, or did you
[3] guys stick with your prior recommendation and not bother
[4] at looking at other texts again?
[5]    A: During the spring of 2004, give me a specific month to
[6] month.
[7]    Q: Well, say January through March is what we are looking
[8] at now.
[9]    A: No, we had stuck with our recommendation.
[10]    Q: How about the administration? Anyone coming to you on
[11] the part of the administration to ask you questions
[12] about the text or text usage?
[13]    A: During that time period, not that I can recall.
[14]    Q: How about did you personally have any discussions with
[15] Board members during that part of 2004 relating to the
[16] biology text?
[17]    A: Up until March, 2004?
[18]    Q: Right.
[19]    A: Is that the question?
[20]    Q: Yes.
[21]    A: No, I did not personally.
[22]    Q: Let's look from March through June.
[23]    A: Okay.
[24]    Q: You are wrapping up the spring semester there, 2004.
[25] Tell me what happened next relating to the selection of

---

Robert Eshbach
May 20, 2005

**Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.**

Page 44

[1] the biology text and biology curriculum that you can
[2] remember.
[3]   A: There started to be — again as I recall, I was told
[4] that Barrie Callahan, who was a former Board member and
[5] a member of the community, questioned the Board at a
[6] public meeting number one or two — I don't know what
[7] specific order — where are the biology books, and if we
[8] don't have them, where is the money that was set aside
[9] for the biology books.
[10]   Q: Did you know Barrie Callahan at that time?
[11]   A: I knew the name. I had no idea who she was.
[12]   Q: During this period, Rob, do you ever recall anyone
[13] telling you that Barrie Callahan was telling the Board
[14] the children didn't have books?
[15]   A: I recall Mrs. Spahr just again telling me basically what
[16] I just told you. She was pushing the Board to find out
[17] either, one, where the money was; two, where the books
[18] were.
[19]   Q: If you look at the timeline that the Science Department
[20] provided here, Miller 4, again on that page with the
[21] number one circled in the upper right-hand corner, you
[22] will see there is an entry for June, 2004 and a
[23] curriculum committee meeting?
[24]   A: Yes, sir.
[25]   Q: Just think back here for a moment and let me ask you:

Page 45

[1] Prior to this meeting in June reflecting the timeline,
[2] can you think of any other meetings relating to the
[3] biology text or the biology curriculum with the Board
[4] curriculum committee?
[5]   A: That I was present at?
[6]   Q: Yes.
[7]   A: No. I was not present at any other Board meetings
[8] between the meeting in the fall of 2003 with Mr. Bonsell
[9] prior to June of 2004.
[10]   Q: Good enough. Then do you have a sense for when this
[11] meeting took place in June?
[12]   A: Yes, sir, very much so.
[13]   Q: When did it take place?
[14]   A: It was the last teacher day of the 2003-2004 school
[15] year.
[16]   Q: I will ask — although I would be somewhat surprised if
[17] you remember — do you remember the specific date?
[18]   A: It would have to be around the 15th. I know it seemed
[19] like we were going forever.
[20]   Q: Do you know whether you had attended any School Board
[21] meetings prior to this meeting of the Board curriculum
[22] committee in June of 2004?
[23]   A: Prior to, there was a June 14th meeting. If that
[24] meeting took place the 15th, which I am not a hundred
[25] percent certain that it did, I did attend a June 14th

Page 46

[1] Board meeting.
[2]   Q: Was that the first meeting that you attended the School
[3] Board since you had hired on at the District, or had you
[4] attended others?
[5]   A: I believe that was probably the first. It may have been
[6] the second because I attended one when I was hired. I
[7] do know I attended one when I was hired the night that
[8] they voted on and introduced me as a new teacher.
[9]       The only other thing that I would question is
[10] whether that was the first Board meeting in June or not.
[11]   Q: If you would look at the packet that has Miller 3, and
[12] you will see that there was an earlier Board meeting in
[13] June, June 7th, 2004. There is an agenda for that
[14] meeting.
[15]   A: Yes, sir.
[16]   Q: Would you take a quick look over the agenda there?
[17]   A: (Witness complies.) I was not at this meeting.
[18]   Q: Then if you will continue flipping through that pile,
[19] Rob, you will see an agenda for the June 14th, 2004
[20] meeting, the first page of which has SB in the upper
[21] right-hand corner?
[22]   A: Yes, sir.
[23]   Q: SB, do you have any idea who SB is?
[24]   A: Yes, sir.
[25]   Q: Who is that?

Page 47

[1]   A: Sandi Bowser. That is my handwriting.
[2]   Q: Just why did you jot that there, Rob?
[3]   A: Just because when we were gathering documents for you,
[4] we were compiling and we didn't want to get people's —
[5] we wanted to make sure people got their documents back.
[6] The easiest way to do that was just to mark their
[7] initials up at the top.
[8]   Q: If you continue flipping through, Rob, you will see a
[9] second agenda for the meeting on June 14th, 2004.
[10]   A: Yes, sir.
[11]   Q: There is handwriting there. You are one of the last
[12] suspects. Is that your handwriting?
[13]   A: That's me.
[14]   Q: I thought it might be. If you would, just flip through
[15] these two sets of agenda for June 14, 2004.
[16]   A: Sure. Okay.
[17]   Q: I want to ask you, first of all, is there a specific
[18] reason that you attended the June 14th School Board
[19] meeting?
[20]   A: Yes.
[21]   Q: Tell me what that is.
[22]   A: One of the issues that we were concerned about as
[23] faculty members was an English position of whether or
[24] not that was going to be filled or not. We were
[25] encouraged by our Building Principal at the time to show

Robert Eshbach
May 20, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

Page 48

[1] a standing. It would be good for faculty members to
[2] come in support of keeping this — as I recall it was an
[3] English position.
[4]    Q: Was that Dr. Peterman?
[5]    A: Yes, sir.
[6]    Q: Tell me, do you recall anything from that meeting?
[7]    A: I recall quite a bit from that meeting.
[8]    Q: What do you recall, Rob? How did the meeting open?
[9]    A: Pledge of Allegiance.
[10]    Q: Sure. I would love you to be more specific. We know
[11] that the biology text was at issue at that meeting.
[12] From the standpoint of that issue and how it was the
[13] subject of discussion, tell me how the meeting unfolded.
[14]    Do you remember Barrie Callahan being there at
[15] that meeting?
[16]    A: Yes, sir.
[17]    Q: Do you remember her speaking during public comment?
[18]    A: Yes, sir.
[19]    Q: Do you recall if she was the first person to offer
[20] public comment that day?
[21]    A: I do not recall.
[22]    Q: Tell me what you recall about what Mrs. Callahan said.
[23]    A: Again, I think her point of interest centered around the
[24] purchase of these biology books and why was it being
[25] held up.

Page 49

[1]    Q: Okay. Do you recall Mrs. Callahan receiving any
[2] information from any Board member in response to that
[3] inquiry?
[4]    A: I recall statements being made. I don't know at what
[5] point in the meeting that they were made.
[6]    Q: Tell me, what do you recall coming from Board members
[7] that touched on the biology text?
[8]    A: A large discussion took place back and forth between
[9] Board members, themselves as well as community members.
[10] As I recall, it became a pretty heated discussion.
[11]    Q: Do you recall any specifics, I mean statements that were
[12] made?
[13]    A: Sure.
[14]    Q: Tell me what you recall.
[15]    A: I recall Mrs. Buckingham standing up and reading from
[16] notes that she had taken a rather lengthy statement
[17] regarding Creationism.
[18]    Q: Apart from Mrs. Buckingham, do you remember anyone else
[19] speaking from the public?
[20]    A: Yes, I believe my father spoke at that meeting Warren
[21] Eshbach.
[22]    Q: What was the thrust of your father's comments?
[23]    A: Basically the fact that by this point, there was some
[24] division between the Board. And I don't recall his
[25] verbiage, but he thought it was wise that everyone

Page 50

[1] should get refocused on what the real issue was.
[2]    Q: Can you be a little more specific, Rob? Leading up to
[3] this June 14th meeting, there was some press coverage;
[4] is that correct?
[5]    A: I know there was definite press coverage after the
[6] June 14th meeting. I don't know how much there was
[7] prior to the June 14th meeting.
[8]    Q: Fair enough. But you know that Charlotte Buckingham as
[9] you recall showed up and read a statement?
[10]    A: Yes, sir.
[11]    Q: And if I look at your notations on the minutes — the
[12] agenda for the June 14th meeting, I see you have got two
[13] phrases here jotted down. Does that trigger any report?
[14]    A: That tolerance does not mean acceptance, I think that
[15] was probably a notation I made to myself in regards to
[16] the fact that they didn't — they — what now had become
[17] a few Board members, as well as some community members
[18] did not agree with what was being taught as the Theory
[19] of Evolution in biology class.
[20]    It was going to be their effort to make their
[21] point be heard.
[22]    Q: I think I am understanding you. In other words, it
[23] seems you gleaned from the exchanges at this meeting
[24] that certain people had objections to the presentation
[25] of the Evolutionary Theory?

Page 51

[1]    A: That's correct.
[2]    Q: And this notation here, tolerance does not mean
[3] acceptance, is your thought that teaching it or letting
[4] others hear it doesn't mean you have to accept it?
[5]    A: Correct.
[6]    Q: Is that right, Rob?
[7]    A: Correct.
[8]    Q: Beneath that you have got a little handwritten notation
[9] someone died on the cross 2,000 years ago, and beneath
[10] Mr. Buckingham is referenced?
[11]    A: Yes.
[12]    Q: Do you recall him saying that?
[13]    A: Yes. Exchanges became very heated. I am not sure if
[14] that was directed to another Board member or to a
[15] community member. But that was openly blurted out
[16] during this time.
[17]    Q: Let's look at the public comment again. Do you recall
[18] anybody else saying anything touching on this issue of
[19] the biology text or the presentation of Evolutionary
[20] Theory, Creationism from the public comment?
[21]    A: No specifics.
[22]    Q: Let's look at the Board and their response to this
[23] issue. You have indicated there was some exchanges
[24] between Board members.
[25]    Can you recall anything about those exchanges?

---

Robert Eshbach
May 20, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

Page 52

[1]   A: I know there was some exchange between Mrs. Brown and
[2] Mr. Buckingham, as well as Mr. Brown and Mr. Buckingham.
[3]   Q: Do you recall any specifics?
[4]   A: Again, just an argument — argumentative statements
[5] regarding the issue of Creationism and the Theory of
[6] Evolution being taught. I am recalling another
[7] statement that was made. I can't be sure if it was made
[8] at this Board meeting.
[9]   Q: That's fine. Tell me what statement are you recalling?
[10]   A: The book is laced with Darwinism.
[11]   Q: Do you think it might have been at that meeting?
[12]   A: It may well have been. I cannot verify that.
[13]   Q: I understand. Who made that statement?
[14]   A: Mr. Buckingham.
[15]   Q: If you would look back, Rob, at the first agenda for the
[16] June 14th meeting, you will see some notations there.
[17] One is Bonsell Intelligent Design.
[18]   Do you recall any discussion of Intelligent Design
[19] at this June meeting?
[20]   A: This was basically the first that I had that Creationism
[21] had been referred to as Intelligent Design as I recall.
[22]   Q: Now you say referred to as Intelligent Design. Do you
[23] equate the two, Rob?
[24]   A: Yes. Very much so.
[25]   Q: Do you know whether Mr. Bonsell equates the two?

Page 53

[1]   A: I do not know.
[2]   Q: But do you recall him using that term during the
[3] meeting?
[4]   A: I do not recall it. Probably my recollection is because
[5] I have this document in front of me. And somewhere I do
[6] recall him saying Intelligent Design. I would not have
[7] remembered that it was at this meeting if this document
[8] would not be in front of me.
[9]   Q: Fair enough. There is a notation beneath the one I just
[10] referred that says C Brown, uphold law. Do you recall
[11] any discussion about the legality of presenting
[12] Intelligent Design or Creationism during this meeting?
[13]   A: Yes. Again, that was some of that banter that took
[14] place between Board members on what their stance was or
[15] where they stood on the issue.
[16]   Q: Do you recall any specifics of those exchanges?
[17]   A: Again, just the fact that Casey Brown felt that
[18] introducing Creationism would go against what the law
[19] would allow.
[20]   Q: And you have referenced the term Creationism several
[21] times. Do you remember Board members using that term?
[22]   A: Yes.
[23]   Q: Who?
[24]   A: Mr. Buckingham. At that meeting, Mr. Buckingham.
[25]   Q: Was there anyone else on the Board who used that term?

Page 54

[1]   A: At this meeting or anywhere along the line?
[2]   Q: Let me ask you anywhere along the line.
[3]   A: I can't recall. I recall — I do remember that in the
[4] meeting with Mr. Bonsell — now this goes back in time
[5] to the fall of 2003 — that during that discussion of
[6] how we presented origins of life and with that carbon
[7] dating, that may have been mentioned, that Creationism
[8] was mentioned.
[9]   Q: Sure.
[10]   A: At that point, I did not take any notes. I don't have
[11] any documents.
[12]   Q: That's fine. So Creationism came up at that meeting in
[13] the fall of 2003. Do you remember how it came up?
[14]   A: Just again, as to how we introduced the section
[15] introducing origins of species versus origins of life.
[16]   Q: Do you recall whether Bert Spahr addressed that issue in
[17] connection with her materials?
[18]   A: Yes, I believe that she did.
[19]   Q: Back to this June 14th, 2004 meeting just to try and
[20] refresh your recollection, let me ask you about specific
[21] Board members. There is Noel Wenrich?
[22]   A: Yes.
[23]   Q: Do you remember him saying anything?
[24]   A: Specifically at the June, 2004 meeting, I cannot recall.
[25]   Q: How about at any time then?

Page 55

[1]   A: Yes. At the August 2nd or 4th, 2004 Board meeting.
[2]   Q: We will get to that. How about Jane Cleaver, do you
[3] recall her being at this June 14th meeting?
[4]   A: She was not at one of the meetings. I think she was
[5] present at this meeting.
[6]   Q: Right. I can tell you she wasn't at the August 1st.
[7]   A: To the best of my recollection, she was at this one.
[8]   Q: Do you recall her saying anything?
[9]   A: Nothing specific.
[10]   Q: Do you have an impression as to her speaking to the
[11] issue at all?
[12]   A: No.
[13]   Q: How about Angie Yingling?
[14]   A: Again, at the June 14th meeting, no.
[15]   Q: Who else? Sheila Harkins?
[16]   A: At the June 14th meeting, nothing specific.
[17]   Q: Apart from what you have described that you recall
[18] Mr. Buckingham saying, anything else?
[19]   A: No.
[20]   Q: In terms of Jeff Brown, can you recall any specifics of
[21] what he is saying?
[22]   A: I remember him banging on the table. Nothing specific
[23] as to what was said.
[24]   Q: If you flip through further down that stack of documents
[25] in Miller 3, Rob, you will find a set of minutes for

---

Min-U-Script®   Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Robert Eshbach
May 20, 2005

---

**Page 56**

[1] July 12th, 2004. Are you there?

[2] A: Yes, sir.

[3] Q: Before we do that though, if you would look at Miller 2,

[4] let's start with that document.

[5] A: (Witness complies.)

[6] Q: All right. Rob, we are looking at Miller Exhibit 2 at a

[7] document that has the title Survey of Biology Books Used

[8] In Area Schools, and a notation given to Jen Miller

[9] spring, 2004 in the upper right-hand corner.

[10] And then if you flip a page, you will see another

[11] document which references a biology text put out by Bob

[12] Jones University Press.

[13] A: Yes, sir.

[14] Q: If you flip to the next page, you will see a set of

[15] handwritten notes with Curriculum Committee at the top

[16] and the date 6-4-04 in the upper right-hand corner?

[17] A: Okay.

[18] Q: Flip again, and you will see a typewritten document

[19] Teacher's Edition Prentice Hall Biology, Miller/Levin

[20] with a handwritten notation given to Jen Miller in the

[21] upper right-hand corner?

[22] A: Yes, sir.

[23] Q: Would you please look at those?

[24] A: (Witness complies.)

[25] Q: In addition, if you would skip a page and continue

---

**Page 57**

[1] looking, you will see a chart that has a heading Beyond

[2] the Evolution Versus Creation Debate with another

[3] notation in the upper right-hand corner given to me by

[4] Mr. Baksa.

[5] Looking at those, Rob, do they bring to mind some

[6] meetings of the Board curriculum committee in the spring

[7] and summer of 2004?

[8] A: Yes, sir.

[9] Q: Tell me what you can recall about those meetings. Was

[10] there more than one?

[11] A: In the spring of 2004?

[12] Q: Yes. This first document entitled Survey of Biology

[13] Books Used in Area Schools, Jen Miller made a notation

[14] spring of 2004. Do you recall seeing that document?

[15] A: Yes.

[16] Q: Do you recall when you saw it?

[17] A: It would have had to be at the June curriculum meeting

[18] that I attended on that last day of school.

[19] Q: If we flip through, we see at least one set of

[20] handwritten notes here has the date 6-04-04. Would it

[21] be around that time at least?

[22] A: Yes, it would be around that time.

[23] Q: But it seems you recall it being closer in time to the

[24] June 14th Board meeting; is that right, Rob?

[25] A: As I recall, yes.

---

**Page 58**

[1] Q: Tell me what you recall about the meeting. Who was

[2] there?

[3] A: The meeting that took place on the last day of school?

[4] Q: Yes. The curriculum committee meeting in June that you

[5] are remembering.

[6] A: Jen Miller, Bertha Spahr, myself, Mr. Buckingham,

[7] Mrs. Brown, Mrs. Harkins, and Mr. Baksa.

[8] Q: Dr. Peterman?

[9] A: I do not believe so.

[10] Q: Dr. Nilsen?

[11] A: He may have stepped in and stepped out type of thing.

[12] Q: How did this meeting come to take place? Do you recall

[13] anything about that?

[14] A: Basically, I was informed that the curriculum committee

[15] wanted to meet with some members of the Science

[16] Department to discuss whether or not this textbook

[17] purchase.

[18] Q: Was going to take place?

[19] A: I don't even know if we can say that. It was just

[20] whether to — to discuss textbooks.

[21] Q: And did you have any discussion with your colleagues in

[22] preparation for this meeting?

[23] A: Only the fact that it may have even been that morning,

[24] Mrs. Spahr asked me if I wanted to go to it with her and

[25] Jen.

---

**Page 59**

[1] Q: Did she encourage you to attend?

[2] A: I guess.

[3] Q: In terms of describing the purpose of the meeting, did

[4] she give you any more detail than you have given me thus

[5] far?

[6] A: No.

[7] Q: Do you recall whether you had received any materials

[8] from Discovery Institute — really I should say

[9] materials by Discovery Institute — prior to this

[10] meeting?

[11] A: Me personally?

[12] Q: Yeah.

[13] A: I had received nothing.

[14] Q: Do you know whether either Bert Spahr or Jen Miller or

[15] any of your other colleagues in the Science Department

[16] had received materials from Discovery School for review

[17] prior to this meeting?

[18] A: Would we have received them directly from Discovery

[19] Institute?

[20] Q: No. Had anyone passed any materials from Discovery

[21] Institute, a DVD, a videotape?

[22] A: Yes.

[23] Q: Had you viewed a videotape prior to coming to this

[24] meeting?

[25] A: Yes.

---

Robert Eshbach
May 20, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 60

[1]    Q: Do you recall the title of that videotape?

[2]    A: Not off the top of my head, no.

[3]    Q: How about any DVD's; had you looked at DVD's?

[4]    A: The only thing I looked at prior to that meeting was the

[5] video, the VHS.

[6]    Q: Can you recall the general subject matter of the video?

[7]    A: Sure. The DVD was basically put together to show that

[8] there were indeed these holes in Darwin's Theory of

[9] Evolution. I believe that it even pointed out how one

[10] teacher in a high school biology class had been

[11] questioned by administration over the fact that he was

[12] introducing some doubt about Darwin's Theory of

[13] Evolution in terms of origins of life.

[14]    Q: You said DVD, but you indicated you reviewed a

[15] videotape; right?

[16]    A: That's correct.

[17]    Q: Does Icons of Evolution sound correct?

[18]    A: That very well may be the title.

[19]    Q: So essentially problems in Evolutionary Theory was the

[20] subject matter of the tape; is that correct?

[21]    A: According to the publisher of the video.

[22]    Q: Let me see if I understand your reservation correctly.

[23] It seems like the videotape presented what the publisher

[24] saw as problems, but you were less certain, or not?

[25]    A: Yes. I would say I was less certain than that.

Page 61

[1]    Q: Anything other than the videotape? Had you looked at Of

[2] Pandas as of this time?

[3]    A: I didn't even know Of Pandas and People existed.

[4]    Q: Tell me what you can recall about the meeting, how it

[5] opened and what was said.

[6]    A: Again, the curriculum meeting on that last day of

[7] school?

[8]    Q: Yes.

[9]    A: Again, we were in this room. Mr. Baksa started the

[10] meeting and basically just with a quick overview,

[11] synopsis why we were here. We were discussing some

[12] textbook use and some — some of what some may have felt

[13] were some discrepancies and some problems with the

[14] section of Evolution in the Miller-Levin textbook.

[15]    Q: Okay. If we look at this document that is in Miller 2

[16] — and it is a set of handwritten notes headed

[17] Curriculum Committee — if you take a quick look through

[18] that, Rob, you see page numbers and some jottings.

[19] I don't think this is your document; is it?

[20]    A: No, sir. This is not my document.

[21]    Q: Do you recall seeing it at the meeting?

[22]    A: I do not recall having it at the meeting.

[23]    Q: Do you recall a discussion relating to specific pages of

[24] the text recommended by the Biology Department?

[25]    A: Yes, sir.

Page 62

[1]    Q: Tell me what you recall about that discussion.

[2]    A: Basically, Mr. Buckingham was voicing his concerns about

[3] the Evolution section of the Miller-Levin textbook, and

[4] he was documenting — perhaps documenting isn't the

[5] right word. He was stating where he felt that he did

[6] not agree with what the Miller-Levin textbook was

[7] stating.

[8]    Q: If we look at the next page of Exhibit 2, we see a

[9] document entitled Teacher's Edition, Prentice Hall

[10] Biology. And at the foot of that, there's a couple of

[11] lines which were submitted for your consideration by

[12] William L. Buckingham, School Board member.

[13] Do you recall seeing this in connection with that

[14] meeting?

[15]    A: Yes, sir. As I recall, this was even handed out to us

[16] at the meeting.

[17]    Q: And do you recall anything that Mr. Buckingham said

[18] during the meeting describing his concerns?

[19]    A: Yes. He had some specific concerns with these sections.

[20] I am certain that there was a 2002 edition of the

[21] Miller-Levin textbook here. There may have been several

[22] copies of it here, or we may have brought them with us.

[23] I am not sure how they were here.

[24] But we went over these areas and talked about

[25] them. Some of them were more in length than others.

Page 63

[1]    Q: Rob, can you recall anything specifically relating to

[2] this entry for page 440?

[3]    A: Development Genes and Body Plants?

[4]    Q: Yes.

[5]    A: I don't remember anything specific about that section.

[6]    Q: Fair enough. I just wanted to see if any of this helps

[7] you recall some of the concerns articulated by

[8] Mr. Buckingham at this meeting.

[9] The next entry is for page 13.

[10]    A: This was a caption beside a photograph, and it may have

[11] been just a caption in the teacher's edition that would

[12] not have shown up in the student edition.

[13]    Q: How about the next entry there for page 381? It has a

[14] text descent with modification. Do you recall any

[15] discussion of that?

[16]    A: Yes, very much so.

[17]    Q: Tell me what you recall.

[18]    A: And this again, now that I see it, it says teacher to

[19] teacher selection at the bottom of the page. This is

[20] probably the part that just appeared in the teacher's

[21] edition. It would not have showed up in the student

[22] edition.

[23] I think it gave some suggestions on how to get the

[24] point of descent with modification across to students.

[25] Sometimes students get confused about this. I had a

Min-U-Script®   Filius  &  McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Robert Eshbach
May 20, 2005

Page 64

[1] discussion in the meeting — it was vocal — about this
[2] section.
[3]    Q: Tell me what you said.
[4]    A: Basically, there was some — I think the statement was
[5] made at some point in the meeting — I don't know if it
[6] was prior to this section or during this section — that
[7] Mr. Buckingham didn't believe that man came from
[8] monkeys.
[9]    This is the part of Darwin's Theory that I guess
[10] he is referring to when he says that he doesn't agree
[11] with man coming from monkeys. I had stated that my
[12] interpretation of Darwin's Theory was a little bit
[13] different than his interpretation of Darwin's Theory.
[14]    Descent with modification to me means that all
[15] life, whether it be a single cell organism or this
[16] millions and billions of celled organism, you and I
[17] sitting here, had something in common. He said this
[18] years ago. We now know that that common ingredient is
[19] DNA.
[20]    Whether it be a single celled organism,
[21] multi-celled organism, that common ingredient that ties
[22] us all together is DNA. And his interpretation and my
[23] interpretation were obviously different. But I did
[24] state the fact that why would God reinvent the wheel
[25] every time new life came about?

Page 65

[1]    Q: Do you recall Mr. Buckingham responding to that
[2] observation on your part?
[3]    A: It may have been something to the effect — but
[4] certainly not quoted — I don't see it that way.
[5]    Q: Okay. Do you recall anything else that Mr. Buckingham
[6] said during the meeting?
[7]    A: Said to me personally?
[8]    Q: No.
[9]    A: Or said to me during the meeting?
[10]    Q: Yes.
[11]    A: Again, he was hell bent on this whole man coming from
[12] monkeys issue.
[13]    Q: Okay.
[14]    A: As a matter of fact, there was a bit of a heated
[15] exchange between he and Mrs. Spahr at that point. Even
[16] questions asked about we understand he had pictures at a
[17] Board meeting about a mural that was done by a senior
[18] student as a senior focal project.
[19]    She asked where he received those pictures, and he
[20] would not reveal his sources.
[21]    Q: Any other comment about that mural at this meeting?
[22]    A: The fact that it was basically blatantly removed, stolen
[23] from the Science Department and burned.
[24]    Q: And who conveyed that information?
[25]    A: Mrs. Spahr.

Page 66

[1]    Q: And did Mr. Buckingham respond to that information?
[2]    A: I don't recall any specific response. There was an
[3] exchange.
[4]    Q: About that mural, Rob, you mentioned that early in 2003,
[5] Bert had brought some concerns relating to the
[6] presentation of Evolutionary Theory to your attention?
[7] Did she mention the mural to you at that time?
[8]    A: It would have been my first day as an employe. And
[9] perhaps maybe it wasn't even a contract day. It was a
[10] day prior to our school year beginning.
[11]    We came in. When I say we, it was myself, another
[12] environmental science teacher and Mrs. Spahr to stamp
[13] brand new books in that we had gotten for the new STS
[14] class.
[15]    She had told me that when she entered the building
[16] — I don't know whether it was that day or a previous
[17] day — she had realized that this mural had been removed
[18] from the classroom.
[19]    Q: Okay.
[20]    A: And she was upset about it and questioning — told me
[21] she had questioned what happened to it.
[22]    Q: So now we are in this June, 2004 Board meeting.
[23]    A: Curriculum committee meeting.
[24]    Q: Thank you, curriculum committee meeting, and the mural
[25] has come up again. If I understand currently, Bert is

Page 67

[1] asking Mr. Buckingham do you have a picture of that
[2] mural, and how did you get it?
[3]    A: Correct.
[4]    Q: And he didn't respond?
[5]    A: His response was I won't reveal where I got that from.
[6]    Q: Now going down this list again, Rob, further — let me
[7] just ask you: You told me something that I had not
[8] heard before, this notion of descent with modification
[9] as perhaps reflecting a common ingredient sort of to
[10] life.
[11]    When you discussed origin of life versus origin of
[12] species with Mr. Bonsell in the fall of 2003, had you
[13] communicated that idea to him?
[14]    A: No.
[15]    Q: Good enough. Going down this list here, page 382, the
[16] paragraph about evidence of evolution, that entry, does
[17] that trigger any recollection on your part?
[18]    A: Not off the top of my head, no.
[19]    Q: Just go down to the next one, Rob, the one for page 382.
[20] Does that —
[21]    A: Not without a book present, no.
[22]    Q: Do you recall Mr. Buckingham making any statements about
[23] his concern that certain claims were being made for
[24] Evolutionary Theory that weren't supported by the
[25] evidence?

Robert Eshbach
May 20, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 68

[1] A: Yes. And I do recall a conversation over one of these
[2] sections about pictures of embryos that the video points
[3] out were falsified to support Darwin's Theory of
[4] Evolution.
[5] Q: And those were pictures appearing in the Miller-Levin
[6] text?
[7] A: No. Actually, I don't think those pictures do appear in
[8] the Miller-Levin text. They were brought up in that
[9] video. They may be in the Miller-Levin text. Again,
[10] without having it in front of me —
[11] Q: Sure. And any reference to the text has to be what
[12] edition. Forgive me. Anything else that you remember
[13] from this discussion with Mr. Buckingham?
[14] A: Centered around this or centered around the meeting?
[15] Q: The meeting just generally.
[16] A: The very last thing that was asked of Mr. Buckingham,
[17] Mrs. Harkins and Mrs. Brown, basically it was — I guess
[18] because Mr. Buckingham was the head of the curriculum
[19] committee I believe was his title, she wanted to know
[20] that her teachers were going home for the summer, could
[21] they count on a vote of approval for this textbook so
[22] that they had some time to prepare some new lessons that
[23] would match the new textbook.
[24] Q: And did you leave the meeting with a sense as to whether
[25] the text would be approved by the Board?

Page 69

[1] A: Yes, we did.
[2] Q: What was that sense, Rob?
[3] A: He — when I say he, Mr. Buckingham — led us to believe
[4] that yes, the books would be approved.
[5] Q: How about the Discovery Institute and the presentation
[6] of gaps and problems, was there a discussion of
[7] presenting gaps and problems in Evolutionary Theory at
[8] this June meeting?
[9] A: There may have been some discussion as to whether or not
[10] we agreed, meaning Jen Miller and I who had taught
[11] biology — whether or not we would agree that there were
[12] some — and the gaps was language of theirs, meaning
[13] Mr. Buckingham and the curriculum committee — did we
[14] agree there were some gaps in Darwin's Theory.
[15] Q: And do you recall how you and Jen responded to that
[16] inquiry?
[17] A: To the best of my recollection, we agreed that there
[18] were some areas where the evidence did not yet support
[19] Darwin's Theory. As I recall, we did not use the word
[20] gaps.
[21] Q: How about Intelligent Design, do you recall that being
[22] discussed during this meeting?
[23] A: Not per se, no.
[24] Q: You say not per se. What do you mean?
[25] A: I don't recall the words Intelligent Design being said.

Page 70

[1] Q: Do you recall that they definitely weren't said?
[2] A: No.
[3] Q: Did I ask you this: Did Of Pandas come up at this point
[4] or not?
[5] A: No, it did not come up at this point.
[6] Q: If we would look here at these pages of Miller 2 that I
[7] asked you to look at, you have the list Survey of
[8] Biology Books.
[9] Do you recall any discussion of that document or
[10] those books at this meeting, Rob?
[11] A: At this particular meeting, yes, I believe that there
[12] was some discussion at this particular meeting about the
[13] books that were used at some surrounding school
[14] districts.
[15] Q: What do you recall about that discussion?
[16] A: I'm not sure if it was at this meeting or if it was at a
[17] prior discussion that I had had what these books — what
[18] the surrounding School Districts or what a few of the
[19] surrounding School Districts used in our area in biology
[20] class. And it all centered around Darwin's Theory of
[21] Evolution and how it was presented at these other
[22] schools.
[23] Q: If you flip over, you see this text here by Bob Jones
[24] University Press. Do you recall any discussion of that
[25] book?

Page 71

[1] A: Yes, I recall some discussion as to this being a
[2] possible book of use instead of the Miller-Levin book.
[3] Q: Who do you recall making a statement to that effect,
[4] Rob?
[5] A: Mr. Buckingham.
[6] Q: Do you recall whether he had a book, or was this all you
[7] saw?
[8] A: I did not see a book. I believe the statement was made
[9] by Mr. Buckingham that Alan had a book that he thought
[10] would be pretty good.
[11] Q: Did Mr. Buckingham give more detail? Let me ask you
[12] this: Did you receive this document prior to the
[13] meeting the document?
[14] A: I personally did not. I think that Mrs. Miller received
[15] this either at the meeting or prior to the meeting. It
[16] may have been something that was just laid on the table.
[17] I don't recall.
[18] Q: All right. And then you recall Mr. Buckingham saying
[19] Alan has a text he thinks would be good?
[20] A: Correct.
[21] Q: Did you understand it to be a reference to this text?
[22] A: That was my understanding.
[23] Q: Did he say that? Did Bill Buckingham say that text
[24] there by Bob Jones University?
[25] A: I do remember Mrs. Spahr saying Bob Jones University is

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Robert Eshbach
May 20, 2005

Page 72

[1] a — something to the effect that is a Fundamentalist —
[2] they would have their own view of what Evolution would
[3] be.
[4]    Q: Sure, Rob. That is why I am asking. Just look at the
[5] description of this book here. The second paragraph is
[6] Biology for Christian Schools is a high school textbook
[7] for Bible believing Christians.
[8]    If this book was discussed, did the science
[9] faculty react?
[10]    A: Yeah. That is basically what our reaction was. This is
[11] going to be slanted because it is our understanding that
[12] Bob Jones University is pretty Fundamentalist. I don't
[13] know if Bob Jones is a university. I don't know if it
[14] is just a publisher. I don't know what the background
[15] of Bob Jones is.
[16]    I know when I made reference to this, more than
[17] one person said that's going to be a Fundamentalist
[18] publication. They are going to have more of a
[19] Fundamentalist view of Evolution and Creationism.
[20]    Q: Okay. You made reference to this. What are you getting
[21] at there, Rob? Do you recall discussing this with
[22] others?
[23]    A: Yes. As a matter of fact, I discussed it with my
[24] father.
[25]    Q: Was that before the meeting or after?

Page 73

[1]    A: As I recall, it was after the meeting after we had
[2] discussed this.
[3]    Q: Looking at the meeting, do you recall any discussion of
[4] the legality of using this text?
[5]    A: I do believe that Mrs. Spahr said she felt that would
[6] not be a good text to introduce into our biology class
[7] because we are a public school, and there would be some
[8] legality issues there.
[9]    Q: Okay.
[10]    A: Whether or not that was said in the meeting to everybody
[11] or whether that was said to us as members of the
[12] Department, I do not recall.
[13]    Q: Flip through, Rob, back to that part of Exhibit 2 which
[14] is this chart headed Beyond Evolution Versus Creation
[15] Debate.
[16]    A: Yes, sir.
[17]    Q: Do you recall whether you had received this document
[18] prior to this meeting?
[19]    A: I received a copy. I am not certain if Mrs. Miller made
[20] a copy for me, or if several copies were given out.
[21]    Q: Was there any discussion of this — of these two pages
[22] here at the meeting?
[23]    A: Taking a look at it is about the best as I can recall.
[24]    Q: Do you recall someone advising you to take a look at it
[25] or asking you to?

Page 74

[1]    A: I recall it being handed to me and saying take a look at
[2] it. I don't recall if it was Mrs. Spahr, the Department
[3] head. I don't recall if it was Mr. Baksa. Again, end
[4] of the year, and I am looking to get out of here. I
[5] just take it.
[6]    Q: Understandable. We are looking at this June, 2004
[7] curriculum committee meeting.
[8]    A: Yes, sir.
[9]    Q: How about Sheila Harkins, do you recall her
[10] participating?
[11]    A: Yes, sir.
[12]    Q: Do you recall anything she said?
[13]    A: Yes, sir. As a matter of fact, she doesn't know how our
[14] students can get through this section. She found it
[15] very boring and in fact fell asleep while she was
[16] reading it.
[17]    Q: When she says this section, is that the section of the
[18] Miller-Levin text that dealt with Evolutionary Theory?
[19]    A: Yes, sir.
[20]    Q: Did she say anything else?
[21]    A: Probably.
[22]    Q: I know. Anything you can recall?
[23]    A: Nothing that impressed me.
[24]    Q: That's two different things. Do you recall anything she
[25] said?

Page 7

[1]    A: No, I really don't.
[2]    Q: How about you said Casey Brown was there?
[3]    A: Yes.
[4]    Q: Do you recall anything that Casey Brown said?
[5]    A: Yes, as a matter of fact.
[6]    Q: Tell me what you recall.
[7]    A: She became very — I don't know if the word I want to
[8] use is passionate, but she appealed to Bill and said
[9] Bill, we can't put our students and can't put our
[10] teachers in this position referring to the fact that it
[11] was our impression that he was pushing for the Bob Jones
[12] University Press book.
[13]    She felt that would be a clear violation of the
[14] law to introduce that into the public school system.
[15]    Q: Did he respond to that contention?
[16]    A: Things seemed to get a little bit quiet. And as I
[17] recall, the meeting started to wind down. And it was
[18] from then that Mrs. Spahr asked if she could assure her
[19] teachers that the book would be — the Miller-Levin book
[20] would be ordered so that they could prepare some lessons
[21] to match up with the new edition over the summer.
[22]    Q: You said that you left the meeting thinking that
[23] Mr. Buckingham was going to approve it?
[24]    A: According to his response, yes, we left the meeting
[25] thinking that that would take place. The ordering of

Robert Eshbach
May 20, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 76

[1] the new book — the approval of the new book would take
[2] place, the Miller-Levin 2002 edition would take place.
[3]   Q: Looking at this meeting here in June, Rob, anything else
[4] that you remember occurring that relates to these issues
[5] that we are discussing here, the biology text?
[6]   A: Referring to the curriculum meeting in June or the Board
[7] meeting in June?
[8]   Q: Let's try and wrap up on the curriculum committee
[9] meeting now. Anything else you can think of?
[10]   A: No, sir.
[11]   Q: How about if we take one last look at that June 14th
[12] Board meeting. Let me ask you do you think that this
[13] curriculum committee meeting happened before or after
[14] that second Board meeting in June? Could it have
[15] happened the same day?
[16]   A: I don't think it did.
[17]   Q: Okay. Do you recall anything else about the June 14th
[18] meeting as we sit here and talk about it?
[19]   A: The June 14th curriculum committee meeting or — I am
[20] sorry — the June 14th Board meeting?
[21]   Q: Yes.
[22]   A: No.
[23]   Q: I am just trying to understand how the story unfolds.
[24] We have got the June 14th meeting where Mr. Buckingham
[25] is offering some pretty heated comments so far as you

Page 77

[1] can recall. Then we have got a Board curriculum meeting
[2] where it seems he has got concerns, they are fairly
[3] specific, and you have addressed them.
[4]   And then you leave with his assurance the text
[5] will be approved?
[6]   A: Correct. That's why I think that the Board meeting took
[7] place prior to the curriculum committee meeting.
[8]   Q: All right. Let's take a brief break.
[9]   (A recess was taken.)
[10]                         AFTER RECESS
[11]                         BY MR. GILLEN:
[12]   Q: Rob, if you would, I would ask you to look at Miller 3,
[13] the agenda for the July 12th Board meeting. Tell me,
[14] Rob, did you go to any of the Board meetings in July,
[15] 2004?
[16]   A: As best as I can recall, I did not attend any meetings
[17] in July, 2004.
[18]   Q: Then if you would, Rob, look at Miller 2 for a document
[19] titled Changes in the 2002 and 2004 Copyright Biology
[20] Books. Do you recognize that, Rob?
[21]   A: I recognize it, yes.
[22]   Q: Your response indicates that you may not have had too
[23] much to do with the document; is that true?
[24]   A: That is correct.
[25]   Q: Do you recall participating in any comparison of the

Page 78

[1] 2002 and 2004 editions of the text Biology by Miller and
[2] Levin?
[3]   A: In comparisons, no.
[4]   Q: If we are looking at July, 2004, Rob, as you look back
[5] in your memory can you think of any developments
[6] touching on the issues we are discussing now, the
[7] selection of the biology text, the biology curriculum?
[8]   A: Yes, sir.
[9]   Q: Tell me.
[10]   A: Somewhere around the end of — somewhere around that
[11] June curriculum meeting, after assurance of getting from
[12] Mr. Buckingham the textbooks would be approved, I made a
[13] phone call to the book rep of Prentice Hall and asked
[14] for another copy of a teacher edition I believe of
[15] Prentice Hall Biology book.
[16]   Q: And why did you do that, Rob?
[17]   A: Off the top of my head, I think it was probably because
[18] those books were sent through for us to review. Two or
[19] three of them got sent, and I was without a 2002
[20] version. I did not have a 2002 version of a Prentice
[21] Hall Biology teacher edition book.
[22]   Q: I see. Because some of the Board curriculum committee
[23] had a copy to review, and some of the faculty had a
[24] copy, but you didn't get one; right?
[25]   A: Right. Somewhere along the line, I didn't get one.

Page 79

[1]   Q: You called to get your own?
[2]   A: Right.
[3]   Q: Anything else that occurred between this June Board
[4] curriculum committee meeting and August touching on the
[5] biology text or biology curriculum?
[6]   A: Yes. The book was — the book rep sent me the book.
[7] They actually sent it to school. I think that Mrs.
[8] Spahr happened to be in one day and saw a package and
[9] wondered he's not going to get that until he comes back.
[10] I wonder what that is. We have a very good
[11] relationship, he won't mind if I open I to see what it
[12] is type thing.
[13]   She had no idea what it was. She probably didn't
[14] know I had contacted Prentice Hall for the request.
[15]   Q: And that is how she learned there was a 2004 edition?
[16]   A: That's correct.
[17]   Q: And then that is in turn what triggered the comparison
[18] of the 2002 and 2004 editions?
[19]   A: As far as I know, yes.
[20]   Q: We look here at Miller 4, the page with the number one
[21] circled in the upper right hand corner and see an entry
[22] for July, 2004 which I would ask you to look at.
[23]   A: Yes.
[24]   Q: Looking at that, Rob, does that trigger any
[25] recollections of exchanges you had with your colleagues

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Robert Eshbach
May 20, 2005

---

Page 80

[1] concerning the differences between the versions?

[2]     A: Just the fact that Mrs. Spahr did call me and said did

[3] you know there was a new edition to the Miller-Levin

[4] book? I said no. How did you know?

[5]     She said I opened up this package for you. I hope

[6] you didn't mind. Of course, I did not mind. She said

[7] it came to my attention that there is a new book out.

[8] All this time we're looking at an old book. We thought

[9] it was a new book. Now it is an old book. There is a

[10] new edition.

[11]     Q: Did she say anything else like here we go again, or we

[12] have to start the whole process again?

[13]     A: She may have just stated that she and Mrs. Miller and

[14] Mr. Baksa were getting together to go over some

[15] differences between the two. Or maybe she had even

[16] called me after they had done that. I don't recall when

[17] — if it was before or after that I spoke to her about

[18] that.

[19]     Q: Did you ever have any discussions with her colleagues

[20] around this time relating to the conclusions they drew

[21] from their comparison of the editions?

[22]     A: Yes. There was some discussion over the phone basically

[23] stating that the 2004 edition they felt covered the

[24] topics, but yet used some verbiage that may be less

[25] offensive to those on the Board who found the 2002

---

Page 81

[1] edition laced with Darwinism.

[2]     Q: Is that the way someone put it to you, Rob, or are those

[3] your words?

[4]     A: Probably a little bit of both. I don't think it was

[5] quoted quote for quote, word for word, but it was put

[6] into that text, that idea that it was less offensive to

[7] some of those on the Board.

[8]     Hopefully, they would see it in less offensive in

[9] hopes that yes, it would be ordered.

[10]     Q: Was there any discussion between you and your colleagues

[11] about the presentation of Evolutionary Theory from the

[12] standpoint of the 2004 edition making more modest claims

[13] for what could be shown by the evidence?

[14]     A: No, sir. The only thing again that was really stated —

[15] and, again, I don't know that it was prior to them — my

[16] guess is it had to be after they had looked at the two

[17] together.

[18]     This edition seemed to be less offensive in the

[19] way it stated — the way it made some claims and stated

[20] some information.

[21]     Q: Sure. And that is what I am trying to get at, Rob. Can

[22] you recall any specific discussion relating to the way

[23] it made claims?

[24]     A: No, sir, I can't. I was not in the loop. I mean I was

[25] not involved in comparing the two.

---

Page 82

[1]     Q: Good enough. And you don't recall any of these

[2] exchanges with colleagues going into that kind of

[3] detail?

[4]     A: Not at that point in time, no.

[5]     Q: Did they later?

[6]     A: I do recall there being mention about — and it may have

[7] been on my own inquiry — how is it different, what did

[8] you find different, how was it quote/unquote less

[9] offensive type thing.

[10]     Q: That is what I am getting at. Do you have a sense for

[11] when that discussion —

[12]     A: I had to be prior to the August meeting in which the

[13] books were to be approved, but after I knew that they

[14] had gotten together and looked at the two to see how

[15] they differed.

[16]     Q: Do you recall any information you were given in response

[17] to that inquiry?

[18]     A: Not specifics. I do recall that yes, there were a few

[19] areas. And it was I believe stated to me that they

[20] jotted them down. If I wanted a copy of it, we will see

[21] that you get one type thing. That was between probably

[22] Mrs. Spahr and myself on the telephone.

[23]     Q: Good enough. And you say you jotted them down. What

[24] we have looked at here in Miller 2 is a typewritten list

[25] of changes?

---

Page 83

[1]     A: Right. Somewhere, it was typed up.

[2]     Q: Did you receive this perhaps from Bert in the period

[3] July, August, 2004?

[4]     A: I would imagine that neither of us made a special trip

[5] to either drop it off or pick it up.

[6]     Q: If you just look at that, Rob, now it has got these

[7] listed items one through 16. Does that trigger any

[8] specific recollection on your part as to the sorts of

[9] changes that were found and the way in which they were

[10] described by your colleagues in these conversations or

[11] in the conversation you have referenced?

[12]     A: Only to the fact that in that phone conversation, Mrs.

[13] Spahr may well have had a list similar to this list or

[14] this list in front of her and said these are some of the

[15] things we found. There is nothing specific that I

[16] recall.

[17]     Q: Again the overall conclusion she drew from the review

[18] was she thought the 2004 edition would be more

[19] acceptable to the Board?

[20]     A: Correct.

[21]     Q: And did she specifically reference Mr. Buckingham?

[22]     A: I think she probably referenced the curriculum

[23] committee.

[24]     Q: Looking at that, Rob, with this June meeting, did you

[25] have a sense that Mr. Buckingham was driving the train

---

Robert Eshbach
May 20, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

Page 84

[1] so to speak, that he was the source of the concerns?

[2] A: No.

[3] Q: Why not?

[4] A: Because of the background of some of these previous

[5] meetings either that I was told about it or that I

[6] attended.

[7] Q: Let's look at that. What are you referring to?

[8] A: Knowing the fact that- — and the rest of the Science

[9] Department met with Mr. Bonsell back in the fall of 2003

[10] and now we are up to the spring of 2004, and some of the

[11] same questioning about the same sections in the book

[12] referring to Evolution, of course, was being questioned,

[13] I made some connection that Mr. Buckingham may not be

[14] pushing this alone.

[15] Q: Okay. You saw a certain similarity?

[16] A: That's correct.

[17] Q: Can you be more specific on that, Rob?

[18] A: Just, again, the fact that Mr. Bonsell was questioning

[19] how we taught Darwin's Theory of Evolution versus

[20] Mr. Buckingham's thoughts on how we taught the Theory of

[21] Evolution; and the fact that he was several times

[22] stating it's not his belief that man comes from monkeys;

[23] and this was his feeling that we must be teaching this

[24] according to the pictures of the mural that he saw.

[25] Q: And the he there is Mr. Buckingham; right?

Page 85

[1] A: Yes, sir.

[2] Q: I do see how the concerns of Mr. Bonsell and the

[3] concerns of Mr. Buckingham both focus around the

[4] presentation of Evolutionary Theory.

[5] A: Correct.

[6] Q: Apart from that similarity, was there anything that was

[7] specifically said by both?

[8] A: Just the fact that Mr. Buckingham referred in that June

[9] curriculum meeting that Alan, meaning Alan Bonsell, had

[10] a copy — referred to the book from Bob Jones

[11] University, he had a book that he thought would be

[12] acceptable.

[13] Q: You say Mr. Buckingham stated that Alan had a book he

[14] thought would be acceptable. I understand that you link

[15] that with the Bob Jones University Press book?

[16] A: Correct.

[17] Q: Did Mr. Buckingham say that expressly, or was that an

[18] inference on your part?

[19] A: As I recall to the best of my knowledge, that document,

[20] that synopsis was in the hand of Mr. Buckingham or on

[21] the table and he pointed to it saying that Alan has a

[22] book that I think will be acceptable.

[23] Q: And again, I want to make sure I understand the nature

[24] of that. Was there any response from the teachers to

[25] that observation?

Page 86

[1] A: Sure. The fact that it was from Bob Jones University.

[2] And again, the fact that that is known to some as being

[3] more of a Fundamentalist view or idealistic —

[4] Fundamentalistic Idealism of Bob Jones University, that

[5] is going to be slanted towards a Creationism view of

[6] science.

[7] Q: And if I remember, Rob, you said this kind of wrapped up

[8] the meeting?

[9] A: Things — whether people were tired, whether people were

[10] hot, both, all of the above, the tone started to cool

[11] down.

[12] Q: And was it at this point that Casey Brown said we can't

[13] put the teachers in this predicament?

[14] A: Yes. She appealed with some passion about that. She

[15] appealed to Bill about that.

[16] Q: It was a forceful statement on her part?

[17] A: More of a tender statement on her part.

[18] Q: Okay. And did he respond to that?

[19] A: There seemed to be some silence. That is when Mrs.

[20] Spahr did ask —

[21] Q: Good enough.

[22] A: — about the books being approved.

[23] Q: Other than this information relating to the 2004 edition

[24] and the comparison, anything else happen between the

[25] June meeting of the Board curriculum committee and the

Page 87

[1] August 2nd School Board meeting?

[2] A: Only that I do know that the book vote was pushed back

[3] because of the fact they found a 2004 edition was out

[4] there. So the book — the original book vote I believe

[5] was to take place in the end of July.

[6] And upon recommendation from Dr. Nilsen, they

[7] pushed the book vote back so they had time to review the

[8] 2004 edition.

[9] Q: Forgive me, but looking back at that June, 2004 meeting

[10] again, any discussion of contemplated changes to the

[11] curriculum at that meeting?

[12] A: As far as I can recollect, nothing was ever stated that

[13] or questioned the curriculum per se. We were asked if

[14] we could agree upon that there were quote/unquote gaps

[15] in Darwin's Theory.

[16] And our response was well, we realized that there

[17] were some areas where there was not a lot of evidence to

[18] support his theory, and we could compromise to that. We

[19] would share that.

[20] Q: Rob, to make sure I am understanding you, in other words

[21] you compromised in the sense that you indicated a

[22] willingness to present that information to the students?

[23] A: The information that, yes, there were indeed areas of

[24] Darwin's Theory where evidence was not there to support

[25] it. There was certainly other areas that had loads of

---

Min-U-Script®    Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.  v.
Dover Area School District, et al.

Robert Eshbach
May 20, 2005

---

Page 88

[1] support by evidence. But yes, we have no problem with
[2] stating that.
[3]    Q: Sure. How about Intelligent Design, was there a
[4] reference to that concept at that meeting?
[5]    A: Again, I do not recall those words being said. There
[6] were some discussions when I had talked about the way I
[7] interpreted common descent with DNA that were made in
[8] reference to God, why would God reinvent the wheel every
[9] time he wanted to create new life. That was the closest
[10] thing that I recall to being stated about any
[11] quote/unquote Intelligent Design.
[12]    Q: How about looking at that, Casey Brown, do you recall
[13] her addressing the issue of Intelligent Design or
[14] presenting other theories?
[15]    A: I do not recall.
[16]    Q: And Sheila Harkins?
[17]    A: I do not recall.
[18]    Q: And in terms of the curriculum, do you — I mean there
[19] is this sense you have that there's gaps and we will
[20] present them, but do you recall anything else that
[21] relates to curriculum change?
[22]    A: No. As far as I can recollect, there was no talk about
[23] changing the curriculum to state that.
[24]    Q: All right. Then in July, the book is pushed back
[25] because there is a 2004 edition; correct?

Page 89

[1]    A: Correct.
[2]    Q: Then we get into August 2nd. You can look at Miller 3.
[3] There is an agenda for the August 2nd meeting.
[4]    Were you at that meeting, Rob?
[5]    A: Yes, sir.
[6]    Q: Do you recall anything that occurred at it?
[7]    A: Yes, sir.
[8]    Q: Tell me what you remember.
[9]    A: The vote came for the biology books, and the decision
[10] was split four to four, which meant that there must have
[11] been — one of the Board members must have been absent.
[12] If I recall, it was Mrs. Cleaver.
[13]    From there, a heated discussion amongst the Board
[14] members, and even there may have been some discussion
[15] with community members — from the Board and community
[16] members about that.
[17]    Q: All right.
[18]    MR. GILLEN: The pizza is here so let's take a
[19] break.
[20]    (A recess was taken.)
[21]           AFTER RECESS
[22]    Q: When we left off for the break, Rob, we were talking
[23] about getting into the August 2nd meeting. I just want
[24] to ask you as you sit here today, you go into this
[25] meeting with a textbook vote.

Page 90

[1]    Had you heard of Of Pandas prior to that meeting?
[2]    A: I may have been told about an additional book that was
[3] given to Jen Miller to review.
[4]    Q: If you were told that, who would have told you that?
[5]    A: It had to be Mrs. Spahr that would have told me during a
[6] telephone conversation.
[7]    Q: That is why I asked. I know that you had some
[8] discussion about the changes in the versions. I wanted
[9] to know whether you could recall whether Bert Spahr, Jen
[10] Miller brought to your attention an additional text that
[11] was being discussed around the July period.
[12]    A: It was brought up in that period of time.
[13]    Q: Good enough. So you entered this July 2nd meeting. And
[14] let me ask you, Rob, as you went to the Board meeting,
[15] did you have an expectation concerning whether the Board
[16] would approve the purchase of the 2004 edition of the
[17] Miller-Levin text?
[18]    A: No.
[19]    Q: Why was that? I mean you came away from the June
[20] meeting thinking it was a go.
[21]    A: At that point, I would have been here two years, and I
[22] came to realize you didn't expect anything from the
[23] Board.
[24]    Q: What do you mean by that, just difficult to predict in
[25] its action?

Page 9

[1]    A: Difficult to predict in every action.
[2]    Q: Give me some sense for what you are getting at there
[3] just before you go on.
[4]    A: You were just never — you became sort of immune to
[5] being surprised by what the Board would do and how they
[6] would vote.
[7]    Q: You say you had been here for about two years at this
[8] time?
[9]    A: Yes. I had completed two school years at that point.
[10]    Q: Give me some sense for the conduct that creates this
[11] sense on your part than —
[12]    A: Again, going back to my first year here, there was
[13] rumblings and discussions which brought forth the memo
[14] from Trudy Peterman about how we teach Darwin's Theory
[15] of Evolution. Then it sort of calmed down.
[16]    Then it sort of flared up again in the fall when
[17] Mr. Bonsell wanted to meet with us. Other budget cuts
[18] had to be made, just things — we were to order books.
[19] It was our year to order books. Well, that got pushed
[20] off.
[21]    Again, things just — anything that happened,
[22] nothing came as a surprise to me.
[23]    Q: I think I have a better sense right now. In terms of
[24] this story line that we have traced through here from
[25] your arrival up until this is August, 2004, had you ever

---

Robert Eshbach
May 20, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

**Page 92**

[1] been directed to change your in class instruction during
[2] that period?
[3]   A: To change? No.
[4]   Q: Had anyone from the administration ever come to you and
[5] said you are going to be teaching Creationism next year?
[6]   A: No, not in those words.
[7]   Q: In any words to that effect?
[8]   A: The only thing I can recall is again when Dr. Peterman
[9] asked — and it was referenced in the memo — was just
[10] how we approached the whole subject of Darwin's Theory
[11] of Evolution, and did we open up with the fact that we
[12] weren't going to speak about origins of life, and how we
[13] got here is really not what we are concerned about.
[14]   Q: Let me make sure I understand you. Did Dr. Peterman
[15] tell you to do that?
[16]   A: No. She came to me — if you recall, I think it said in
[17] that statement about I have encouraged teachers to do
[18] what they have — I have advised all biology teachers —
[19] Biology 1 teachers to teach the approved School Board
[20] curriculum for Biology 1. I have advised them to
[21] continue to mention that Creationism is another
[22] alternate Theory of Evolution.
[23]   That was the only talk of mentioning how we were
[24] to teach anything. It wasn't how to teach it. It was
[25] just you are doing good, keep up what you are doing.

**Page 93**

[1]   Q: Good enough. So you get into that August 2nd Board
[2] meeting, and the biology text is up. Tell me what you
[3] recall about the meeting.
[4]   A: Again, I was not going to be surprised by anything. I
[5] think, as a matter of fact, I was reading a copy of my
[6] Lancaster Farming paper while things were going on.
[7]   And the Board vote came up, and it was split
[8] four/four. As I had stated, one member was not there.
[9] So that is why there was a four/four even vote.
[10]   And then discussion — a heated discussion came
[11] about from these within the Board members themselves, as
[12] well as some Board members and some community members.
[13]   Q: Okay. Looking at the exchanges among the Board members,
[14] can you recall any specifics of those exchanges?
[15]   A: Sure. At that point, Mr. Buckingham made his statement
[16] that he would not accept approval for the purchase of
[17] the biology book unless this book Of Pandas and People
[18] was bought as a companion book to the text.
[19]   Q: Okay.
[20]   A: And from there, there was discussion between
[21] Mr. Wenrich, Mr. Buckingham, Mr. And Mrs. Brown back and
[22] forth within the Board.
[23]   Q: In terms of that back and forth, Rob, do you remember
[24] any of it, the specifics?
[25]   A: Sure.

**Page 94**

[1]   Q: Tell me what you can remember.
[2]   A: I believe Noel Wenrich stated that he felt as though we
[3] were holding the students hostage by not allowing this
[4] textbook to be purchased, and that that was not done in
[5] good faith.
[6]   Again, I remember Jeff Brown pounding on the table
[7] making a point that it was not right. There was
[8] discussion about the Of Pandas and People book and the
[9] question was even asked by Mrs. Brown, since I was the
[10] only Science Department member there, if I had indeed
[11] seen this book or heard of the book, anything like that.
[12]   Q: Did you respond to that inquiry?
[13]   A: My response was that no, I had not seen the book.
[14]   Q: Any other communications between you and Board members
[15] at that meeting?
[16]   A: I believe Sheila Harkins made a statement that Jen
[17] Miller had the book for two weeks. She doesn't know why
[18] it might not have been passed on to other members in
[19] the Department. But that was sort of the statement, and she
[20] was looking at me when it was stated.
[21]   Q: I see what you are getting at there. Anything else? Do
[22] you recall the exchanges there?
[23]   A: Again, there was some exchange between possibly a
[24] community member or two and the Board.
[25]   Q: Okay. Can you recall any specifics of that?

**Page 95**

[1]   A: Between the communication?
[2]   Q: Yes.
[3]   A: Not exactly, no. Just again, what is the big problem
[4] with ordering these textbooks type of thing.
[5]   Q: Let's look at it from the standpoint of the Board. Do
[6] you remember anything that Mr. Bonsell said at this
[7] August 2nd meeting?
[8]   A: Yes. While he said he agreed with Mr. Buckingham on the
[9] fact that he would like to see — or at least like to
[10] have students be given other options to the Theory of
[11] Evolution by Darwin, he could not in good conscience
[12] vote against the book at this short time prior to the
[13] school year starting. Again, not verbatim.
[14]   Q: I am not asking for verbatim. I am asking for the
[15] thrust of the comments as you recall.
[16]   How about Sheila Harkins, do you recall her —
[17] apart from the comment you have already recounted —
[18] saying anything?
[19]   A: Again, there shouldn't be a problem with having an
[20] additional book to give students another view. As I
[21] recall, that is about it.
[22]   Q: Let's see. Noel Wenrich, you have mentioned his views.
[23] Anything else you recall him saying?
[24]   A: Again, just the fact that he was very upset. He also
[25] may not agree with Darwin's Theory. He felt — it came

Min-U-Script®   Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Robert Eshbach
May 20, 2005

---

Page 96

[1] out that his beliefs/feelings, views were more toward
[2] the Creationism side. But he could not in good faith
[3] vote against the textbook at this late of the date. It
[4] was unfair what they were asking them to do.
[5]    Q: Mr. Bonsell, do you recall him saying when he discussed
[6] other theories Intelligent Design?
[7]    A: At that Board meeting, he may well have.
[8]    Q: How about Noel Wenrich, do you recall him —
[9]    A: I do not recall him stating that.
[10]    Q: That's fine. Who else was there? Angie Yingling, do
[11] you recall her making any statement?
[12]    A: Yes. As a matter of fact, I do recall her making a
[13] statement.
[14]    Q: Tell me what you remember.
[15]    A: I believe someone called for a revote on the issue, and
[16] she changed her vote from a no to a yes, and basically
[17] said I don't care. I just want the kids to have their
[18] books.
[19]    Q: You have mentioned Jeff Brown. How about Casey Brown,
[20] do you recall anything she said at the Board meeting?
[21]    A: Nothing specific other than the fact that again, she was
[22] passionate as well as — and I do recall she was sitting
[23] close to Mr. Buckingham and saying come on, Bill, don't
[24] put us in this position. It was something again to this
[25] effect. Haven't we been through this enough already?

Page 97

[1]    Q: And did you have a sense for what she was referring to?
[2]    A: The fact that again, they were bringing up the whole
[3] issue of — they were centered around the teaching of
[4] Darwinism, and the fact that — I will say
[5] Mr. Buckingham because I believe she was speaking to him
[6] at that time — wanted the companion book included that
[7] referred to Creationism.
[8]    Q: When you say companion book, are you referring to Of
[9] Pandas?
[10]    A: Yes, sir.
[11]    Q: How about Heather Geesey, do you recall anything she
[12] said?
[13]    A: Nothing outstanding at that point.
[14]    Q: In terms of public comment directed at the Board
[15] concerning the biology text or biology curriculum, the
[16] teaching of Evolution or Intelligent Design or
[17] Creationism, do you recall anything that touched on
[18] those issues? Was Barrie Callahan there?
[19]    A: I am rather certain that yes, she was there, as well as
[20] Lonnie Langione.
[21]    Q: Can you remember anything Lonnie Langione said?
[22]    A: No, not specifics.
[23]    Q: How about Barrie Callahan? Rob, if you would, look at
[24] Miller 3. After the agenda for the August 2nd meeting,
[25] there's some handwritten notes. Those are not your

Page 98

[1] notes I know. If you would just glance at those.
[2]    A: (Witness complies.)
[3]    Q: Does that spark any recollection on your part?
[4]    A: This did not occur at the August 2nd Board meeting. I
[5] can tell you that.
[6]    Q: Is that because of the dating there you see?
[7]    A: No. Actually because I am looking at statements that
[8] were made, and I was not present as I recall these
[9] statements being made.
[10]    Q: Good enough. So you know how the vote came out. Were
[11] you privy to any discussion with Board members in the
[12] immediate aftermath of the August 2nd Board meeting?
[13]    A: Only the fact that I was standing in the cafeteria of
[14] North Salem School, and Mr. Buckingham made a beeline
[15] for Angie Yingling and was talking about why did she do
[16] this, why did she did this. They thought they had an
[17] agreement.
[18]    Q: Was he upset with Ms. Yingling?
[19]    A: I would say to the bystander, it would come across as
[20] upset, yes.
[21]    Q: Do you recall anything else that he said to Mrs.
[22] Yingling?
[23]    A: The conversation took sort of a low tone then, and
[24] things were not said as loud.
[25]    Q: Other than that, were you privy to any discussions among

Page 99

[1] the Board members in the aftermath of that August 2nd
[2] meeting?
[3]    A: Not that I can recall, no.
[4]    Q: I know you were at this June meeting. And that also was
[5] somewhat shall we say tumultuous?
[6]    A: Yes.
[7]    Q: Were you privy to any discussion involving Board members
[8] in the aftermath of that June 14th meeting?
[9]    A: Not that I can recall.
[10]    Q: Well, if you look at Miller 4 and the page with the
[11] number two circled in the upper right-hand corner, you
[12] will see an entry in that timeline which the science
[13] faculty has provided for August 30th, 2004.
[14]    What I would like to know is between this August
[15] 2nd Board meeting and August 30th, the end of the month,
[16] can you recall any developments touching on the issues
[17] we are discussing here?
[18]    Now the text has been approved. That is kind of
[19] not an issue, but there is Of Pandas plainly and
[20] Intelligent Design as presented in that book.
[21]    Anything between the August 2nd Board meeting and
[22] August 30th that you can recall?
[23]    A: Not that I was present at, no.
[24]    Q: How about hearing about it?
[25]    A: When you referred me to these notes after the August

---

Robert Eshbach
May 20, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 100

[1] 2nd —

[2]    Q: Agenda?

[3]    A: Yes, agenda of the Board meeting.

[4]    Q: In Miller Exhibit 3, with the notation my notes from a

[5] Board meeting in September I think in the upper

[6] right-hand corner?

[7]    A: That's correct. I recall someone telling me that a

[8] biology teacher from the Wrightsville area, Columbia

[9] area stood up and spoke. And that is about it from

[10] between those two time periods.

[11]    Q: Stood up and spoke at the August 2nd meeting?

[12]    A: No. I was at the August 2nd meeting. Well, I take that

[13] back. There may not have been another meeting in

[14] August. They may have — they may have — I don't want

[15] to say cancelled, but they may have decided not to meet

[16] at that second meeting in August because of some

[17] vacations.

[18]    That may have come at a later point. That may

[19] have come after August 30th.

[20]    Q: That is all right. Specific dates aren't all that

[21] important.

[22]    A: I apologize.

[23]    Q: Don't worry. We have got this entry for the August 30th

[24] curriculum committee meeting. Do you recall that?

[25]    A: Yes, sir.

Page 101

[1]    Q: Tell me what you remember.

[2]    A: We met in the conference room of the Guidance Department

[3] on August 30th. Would you like me to state who was

[4] there as I recall?

[5]    Q: Yes. Thanks.

[6]    A: Mrs. Spahr, Mrs. Miller, myself, Mr. Reidel, who is now

[7] our new Principal, Casey Brown, Sheila Harkins, Alan

[8] Bonsell. Mr. Buckingham was there at the beginning of

[9] the meeting. Mr. Baksa, Dr. Nilsen.

[10]    Q: All right. Do you recall getting notice of this meeting

[11] and how — where and when it was going to take place?

[12]    A: Sure. It was conveyed to me I think prior to coming

[13] back to school that day. I don't think it just happened

[14] that morning. But we were told — when I say we, the

[15] Science Department and actually I think it was probably

[16] Mrs. Spahr that told me being the Department head, that

[17] there was going to be a meeting with the curriculum

[18] committee that we were to attend, and the time and place

[19] it was going to take place.

[20]    Q: How did the meeting open?

[21]    A: Again, I think it was Mr. Baksa who again just sort of

[22] introduced us. There had been some questioning by

[23] Mrs. Brown at this point of how much money was being

[24] spent on investigating the idea of incorporating a

[25] different idea Creationism into the classroom — I am

Page 102

[1] sorry — biology classroom curriculum, that sort of

[2] thing.

[3]    Also, we were looking — the discussion centered

[4] around purchasing the book Of Pandas and People as a

[5] companion textbook to the Miller-Levin 2004 edition.

[6]    Q: You said there had been some questioning by Casey Brown

[7] regarding Creationism. Did she use that word at the

[8] meeting?

[9]    A: I think she did, yes, to the best of my recollection.

[10]    Q: And what followed from that?

[11]    A: Sure. There have even been — and maybe I just need to

[12] back up just a second.

[13]    Q: Sure.

[14]    A: During some of these discussions at Board meetings,

[15] there was questions as to where is our solicitor at this

[16] point, why aren't we getting input from him.

[17]    So at the beginning of this meeting of

[18] August 30th, some of these things were going to be

[19] answered. And we were given a document that appears to

[20] be an e-mail from the solicitor Steve Russell.

[21]    And I know off the top of my head without looking

[22] I don't know who it was addressed to, but it was

[23] somebody in administration. It was given to us as

[24] basically what the opinion of the solicitor was.

[25]    And then added to that, Mrs. Brown had some idea

Page 103

[1] of what expenses they had already — a rough idea of

[2] what they had spent looking into incorporating this

[3] idea, belief of Creationism into the biology curriculum.

[4]    Q: If you would look at Miller 5, you will see an e-mail

[5] dated August 26, 2004 from Stephen S. Russell to R.

[6] Nilsen.

[7]    A: How far back is that?

[8]    Q: Not that far back. Are you there?

[9]    A: Yes, sir.

[10]    Q: Is that the e-mail you just referenced?

[11]    A: Yes, sir.

[12]    Q: Any discussion occasioned by this e-mail?

[13]    A: Those are my notes on the bottom — middle and

[14] right-hand side of the paper. It was handed to us.

[15] Discussions were going on, and I was reading this as

[16] some discussion was taking place circling — boxing up

[17] to section 1983, underlining a few pieces here at the

[18] bottom, and then trying to add on as I picked things up

[19] in the conversation as I was reading and trying to make

[20] a few notes.

[21]    This was basically just given to us to say that we

[22] have contacted the solicitor, this is his response.

[23]    Q: Okay. What else took place at that August 30th meeting?

[24]    A: Discussions on whether or not every student was going to

[25] be given the Of Pandas and People book or whether they

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Robert Eshbach
May 20, 2005

---

**Page 104**

[1] were going to be made available as a reference to the
[2] students in the classrooms.
[3]   And Mr. Buckingham stated that he needed to leave
[4] because he had a doctor's appointment.
[5]   Q: Okay. You indicated earlier that Casey Brown raised
[6] some issues about cost. Was there a discussion about
[7] the potential cost of the Of Pandas book to the
[8] District?
[9]   A: Definitely. Because if there was — you know, we had
[10] been asked to cut our budgets in the past. Were we
[11] going to be able to budget for this new textbook? When
[12] they approved the budget — this is very rough. As they
[13] approved the budget for that year, they didn't take into
[14] account, the budgeting for all these textbooks.
[15]   Q: How about the use of Of Pandas? I see here that you
[16] have got a note at the bottom of this e-mail that says
[17] each student be given this book with textbook and
[18] attributes that statement to Buckingham?
[19]   A: Yes. He made that statement. He was rather adamant
[20] about that prior to him leaving for the doctor's
[21] appointment. That's where he stood. That was the
[22] position that he took.
[23]   Q: Do you recall any discussion by Mr. Buckingham touching
[24] on whether the book would be purchased or might be
[25] donated?

---

**Page 105**

[1]   A: There was discussion about that. I don't know that it
[2] took place prior to him leaving or after he left. I am
[3] not sure who brought the discussion up about it being
[4] donated.
[5]   Q: Well, I am trying to figure out the best way. Tell me
[6] what else you remember about it.
[7]   A: Sure. He left and then discussions revolved around
[8] whether or not each person would have this book or
[9] whether it would be placed in classrooms as a reference
[10] book.
[11]   I do recall Dr. Nilsen directing questions and
[12] conversation to Mrs. Harkins and basically asking her
[13] point blank do we have your support, will we have your
[14] support on having this book implemented as a reference
[15] book, not as someone — not as every student having it.
[16]   Q: And why was Dr. Nilsen approaching it from that
[17] standpoint, had the science faculty said reference text
[18] is one thing, supplementary text is another?
[19]   A: I would imagine somewhere in the spirit of compromise,
[20] it did come up, and we said look, we are opposed to
[21] every student having this textbook, especially when you
[22] have been on us about making budget cuts.
[23]   However we will compromise. If you want it in the
[24] classroom, we can stomach it as a reference textbook.
[25]   Q: And you say stomach it, Rob, what are you getting at

---

**Page 106**

[1] there?
[2]   A: There were some things in that textbook that we flat out
[3] do not agree with. Let me reiterate that. I do not
[4] agree with.
[5]   There are sections where I question the science of
[6] the information that is in that book. And one of them
[7] being the main focus of whether or not Intelligent
[8] Design is science, I very much object to that.
[9]   Q: Then when I look down here at this e-mail, there is
[10] another series of notations in your hand under grade
[11] level. And there is three sort of dotted —
[12]   A: Right.
[13]   Q: — items. Were they concerns you had, Rob?
[14]   A: Yes. The book — to read the book, it's a very complex
[15] book. It does not read easy for anyone, let alone a
[16] ninth grade student. I think that was my reference
[17] there to grade level.
[18]   Reference material for the teacher, maybe that was
[19] the best way to have it in our classroom. I think these
[20] were probably some ideas, plus some notes I was writing
[21] down, or somebody brought that up. How about it just
[22] being reference material that the teacher can reference
[23] if someone has a question? Maybe it would be better to
[24] have classroom sets. We could have 23 in each room. I
[25] am not sure where the number 23 came from. Why not 25?

---

**Page 10**

[1] I don't know.
[2]   Or were these classroom sets going to be
[3] distributed so the students could carry them all the
[4] time? Ideas of which I guess we were looking for
[5] answers for.
[6]   Q: And then so it seems like the discussion moved in the
[7] direction of Dr. Nilsen saying to Sheila Harkins do we
[8] have your support for use of Of Pandas, the text, as a
[9] reference text?
[10]   A: That's correct.
[11]   Q: And as you sit here, Rob, was that sort of the direction
[12] that the administration and the teachers were moving
[13] that discussion in?
[14]   A: Yes.
[15]   Q: How about curriculum change, was that discussed at this
[16] meeting?
[17]   A: Not that I recall, no.
[18]   Q: Was there any discussion at the August 30th meeting
[19] about the use of Of Pandas and in connection with that
[20] discussion comments addressed to whether Intelligent
[21] Design or the concepts presented in Of Pandas would be
[22] taught by the teachers?
[23]   A: Not that I can recall. Our discussion centered around
[24] this book as reference material only.
[25]   Q: And that is what I am getting at. When you say

---

Robert Eshbach
May 20, 2005

Page 108

[1] reference material, only one of the things you indicated
[2] is you had some reservations about the text. I
[3] understand that.
[4]     Did you have reservations about presenting that
[5] material to the students in the classroom that were
[6] expressed during this August 30th meeting?
[7]     A: I am sorry. Repeat your question.
[8]     Q: Sure. I am just trying to understand how events
[9] unfolded here. Mr. Buckingham wants the students to
[10] have the book in the classroom with them.
[11]     Let me ask you: Did he express any ideas about
[12] teachers teaching from the books in the classroom?
[13]     A: Yes. He wanted those books to be either with the
[14] student or out available. And we went over Darwin's
[15] Theory of Evolution and what I gather in such a way that
[16] we could say this is how Darwin's Theory of Evolution
[17] follows it, but this is how also this textbook views it.
[18]     Q: Now when he expresses that desire on his part, did you
[19] as a science faculty respond to that?
[20]     A: I am sure we didn't sit there with our mouths shut.
[21]     Q: Right. It seems to me that you probably objected?
[22]     A: If we didn't make it — if we did not make a statement
[23] at that point about our objection to it — and I don't
[24] recall whether or not and what direction it went — I
[25] feel confident that our position was made soon

Page 109

[1] thereafter.
[2]     Q: Okay. That's good enough. Do you recall any
[3] discussions between you the science faculty and the
[4] administration about the text of Of Pandas prior to this
[5] August 30th meeting? In other words, going into the
[6] meeting, did you guys put your heads together?
[7]     A: Not entirely too much because as I recall, this was our
[8] first day back. So we didn't — maybe our second day.
[9] So we did not have a whole lot of time. There was some
[10] inservicing taking place.
[11]     Q: Okay.
[12]     A: As a matter of fact, this may well have been the second
[13] day that we were back. There were not many days we were back
[14] then until this meeting occurred.
[15]     As I recall, it was not like — there was not like
[16] a sit down meeting of how are we going to approach this
[17] type of thing.
[18]     Q: Let's look at the other Board members present. The
[19] timeline indicates Mr. Bonsell was present.
[20]     Do you remember him being there?
[21]     A: Yes, sir, as I stated prior.
[22]     Q: Do you recall anything Mr. Bonsell said during that
[23] meeting?
[24]     A: Something to the effect that he thought he could get
[25] Bill to agree to have them used as references in the

Page 110

[1] classroom instead of having each student carry a book.
[2]     And that statement would have been made after
[3] Mr. Buckingham had left for his doctor's appointment.
[4]     Q: Do you recall Mr. Bonsell saying anything to the effect
[5] of not everyone on the Board sees things the way
[6] Mr. Buckingham does?
[7]     A: Yes. That very well could have been a statement that he
[8] made. It does not stick out in my mind.
[9]     Q: But as you sit here today, do you think after
[10] Mr. Buckingham left, that was sort of the direction of
[11] Mr. Bonsell's comments? In other words, Bill wants —
[12]     A: His direction was that not everyone was —
[13]     Q: Adamant?
[14]     A: — adamant. That is a good word.
[15]     Q: Fine. How about anything else Mr. Bonsell said?
[16]     A: Not that I can recall.
[17]     Q: Do you recall him talking about or elaborating upon the
[18] desire that the students be given other theories in the
[19] classroom?
[20]     A: Not necessarily from that meeting, but from that prior
[21] August 2nd meeting when he stated that he agreed with
[22] Mr. Buckingham and his views, but he didn't think that
[23] it was right that he was holding up the textbooks in the
[24] position that he was, that the students may not have the
[25] books.

Page 111

[1]     Q: Is that the comment you gave me earlier that Mr. Bonsell
[2] made?
[3]     A: Yes.
[4]     Q: How about Sheila Harkins, do you remember her
[5] participating in the meeting?
[6]     A: In the curriculum committee meeting on August 30th?
[7]     Q: Yes.
[8]     A: Yes, in the manner that she was directed by Dr.
[9] Nilsen — maybe not directed. The conversation was
[10] directed by Dr. Nilsen to her whether or not she would
[11] agree to having the Of Pandas and People book as a
[12] reference.
[13]     Q: Did she respond to that?
[14]     A: I think after a few minutes of talking, she made a
[15] decision.
[16]     Q: What did she say?
[17]     A: Yes, I guess she could agree to that.
[18]     Q: How about Mr. Bonsell, did he respond to that same sort
[19] of inquiry?
[20]     A: Nothing sticks out in my mind whether he did or did not.
[21]     Q: How about your colleagues, do you recall anything Bert
[22] Spahr said?
[23]     A: I think perhaps that she had sort of maybe gotten a look
[24] from us as to whether we would approve a compromise on
[25] having the students have it as a reference book and said

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Robert Eshbach
May 20, 2005

---

**Page 112**

[1] something yeah, maybe we can work that out, or I think
[2] we can compromise in this area with the teachers.
[3]     Q: Do you recall Bert addressing any proposed curriculum
[4] change or the possibility of curriculum change in light
[5] of the inclusion of the Of Pandas as a reference text in
[6] the classroom?
[7]     A: As I recall, I am not sure that that came up at this
[8] point as a curriculum change. I don't know that it was
[9] discussed as being anything in the curriculum.
[10]     Q: All right. How about Jen Miller, do you recall did she
[11] participate in this August 30th meeting?
[12]     A: Yes, she was there.
[13]     Q: Anything she said that you can remember?
[14]     A: I know that she — I know that she did some speaking,
[15] and I don't know if it was at this meeting. But
[16] Mrs. Harkins just said that she explained Evolution just
[17] so nice, and if she did that in her classes, that was
[18] just fine with her.
[19]     Q: So it seems, Rob, from what you are saying that there
[20] was some discussion of what was being presented in
[21] class. Let me ask you: Looking at that, does that make
[22] you remember any discussion of whether or how Of Pandas
[23] might be integrated into classroom presentation?
[24]     A: Sure. It was to be integrated when we taught Darwin's
[25] Theory of Evolution, and it was to be used as an — it

**Page 113**

[1] was to be used as an alternative way of looking at this
[2] section of how we came about.
[3]     Q: Let me see if I am understanding it. It seems like
[4] Evolutionary Theory is going to be presented. There is
[5] this notion that in some way, the Board — at least some
[6] of these Board members desire the content of Of Pandas
[7] to be presented to the students alongside?
[8]     A: That's correct.
[9]     Q: Okay. Anything else that you recall from the
[10] August 30th meeting?
[11]     A: No.
[12]     Q: That is fine. What is next as you see it, Rob? We have
[13] got on the timeline here, there is a mystery entry as I
[14] think of it now. Looking at Miller —
[15]     A: We don't have anything either. I know what you are
[16] looking at.
[17]     Q: Miller 4, page two —
[18]     A: This would have been an inservice day at the beginning
[19] of the school year.
[20]     MS. PENNY: September 14th?
[21]     A: Yes.
[22]     MR. GILLEN: Thanks, Jane.
[23]     A: I think the reason we remember that is because it is a
[24] Fair Day or Student Day at the York Fair, and they get
[25] in for free or something. It all sort of stuck in our

**Page 114**

[1] minds that we met with at least Mr. Baksa that day and
[2] maybe discussed some things regarding the whole Of
[3] Pandas — but nobody could really nail anything
[4] different down.
[5]     It stuck in our mind that yes, there was a
[6] meeting. But, you know, we didn't keep notes so we have
[7] no idea what was discussed.
[8]     Q: Good enough. Then the next entry in that timeline you
[9] provided, Miller Exhibit 4, the page with two circled in
[10] the upper right-hand corner is an entry for October 8th.
[11]     So we have got now a period between August 30th
[12] and October 8th. Tell me, Rob, as you sit here today,
[13] do you recall any developments concerning the issues we
[14] have discussed today in that time period between
[15] August 30th and October 8th?
[16]     A: It seems to me that there was by this time some
[17] discussion about changing the biology curriculum. As
[18] far as those discussions went, I'm not a hundred percent
[19] sure. There may have been some e-mails that were sent
[20] back and forth. I just cannot recall —
[21]     Q: Okay. That's fine.
[22]     A: — without looking it up.
[23]     Q: Now the entry for October 8th, do you recall anything, a
[24] meeting on that day or around that time?
[25]     A: I am not sure if it was a meeting per se where we all

**Page 115**

[1] sat down, or if it was just a nonchalant visit from Mr.
[2] Baksa and said hey, here are some changes that may be
[3] made or that will be made.
[4]     Q: There was a Board meeting on October 4th, 2004, Rob.
[5] You can see the agenda if you like by looking at Miller
[6] 3, the minutes.
[7]     Did you attend that Board meeting?
[8]     A: Just refresh me. What was the date one more time?
[9]     Q: October 4th, 2004. It would be before this meeting on
[10] October 8th.
[11]     A: I did not attend this meeting.
[12]     Q: So then it seems in terms of anything definite you can
[13] recall, the next thing would be this October 8th
[14] meeting; is that right?
[15]     A: That's correct.
[16]     Q: Tell me what do you remember?
[17]     A: It was quite a dog and pony show, rather chaotic. In my
[18] opinion, some things got out of hand. Statements were
[19] made from Board members to members of the community as
[20] well as faculty members.
[21]     Q: Let me stop you there. Are you thinking of the
[22] October 18th Board meeting where the curriculum change
[23] went in?
[24]     A: Isn't that where we are at?
[25]     Q: No.

---

Robert Eshbach
May 20, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 116

[1]   A: We are still on October fourth?

[2]   Q: Don't worry about it. October 8th, this notation.

[3]   A: My apologies. I misunderstood you.

[4]   Q: That's fine. While we are at it, Rob, look through

[5] Miller Exhibit 3 at this document which is stamped with

[6] Draft in the middle and is headed Planned Instruction

[7] Curriculum Guide Part A with the course description as

[8] the study of life.

[9]   A: Yes, that is my doodling.

[10]   Q: Let me ask you: Do these documents, the timeline

[11] reference to an October 8th meeting and then this draft,

[12] do you associate those?

[13]   A: The October 8th meeting?

[14]   Q: Yes.

[15]   A: And this draft?

[16]   Q: Yes.

[17]   A: May I take a second to look at it a little bit closer?

[18]   Q: Yes, please do.

[19]   A: Okay. Yes.

[20]   Q: Looking at those, Rob, tell me what you remember.

[21]   A: As I recall, there was a meeting — I can't recall

[22] because I may be getting my dates mixed up. I know that

[23] this was given to us. This change in the curriculum was

[24] given to us.

[25]   I don't know that this was in a sit down meeting

Page 117

[1] or if this was, again, just passed on for your

[2] information type thing.

[3]   I do recall seeing this. Like I said, this is my

[4] doodling. So it makes me think that we sat down and had

[5] a discussion about this. Otherwise, I wouldn't have had

[6] the note up here thinking about what I have to pick up

[7] from the hardware store.

[8]   Q: Spray adhesive?

[9]   A: Yes. I doubt this was handed to me in passing. It

[10] looks to me like this is what I do when I sit down when

[11] I am at a meeting.

[12]   Q: That is why I asked because the timeline here for the

[13] October 8th entry references being presented with a

[14] change in curriculum.

[15]   A: I am sure that this is it.

[16]   Q: All right. Tell me what you remember that relates to

[17] this October 8th meeting and this document referring to

[18] which has Draft stamped across the middle?

[19]   A: I do recall getting this draft. I do recall reviewing

[20] it. Looking down here seeing on day one under time —

[21] the heading is Time (week/classes). The sixth entry

[22] says one day, and it says students will be able to list

[23] evidences used to support Darwin's Theory of origin of

[24] species.

[25]   And following that, it says student will be made

Page 118

[1] aware of gaps/problems in Darwin's Theory and of other

[2] Theories of Evolution, including but not limited to

[3] Intelligent Design.

[4]   Q: Okay. And then if you look in the column headed

[5] Materials and Resources, there is a reference to the

[6] text Of Pandas and People?

[7]   A: Again, that is my doodling.

[8]   Q: Good enough. Tell me, Rob, with these documents in mind

[9] what do you recall about the October 8th meeting?

[10]   A: I recall being a little pissed off quite frankly that

[11] these changes were made without any input from the

[12] Science Department.

[13]   Q: When you say that, Rob, if you look at the part here

[14] under the Units Content/Concepts column and the last

[15] entry which you have described the student will be made

[16] aware of gaps and problems, hadn't you discussed that in

[17] the summer there?

[18]   A: Yes, we had certainly discussed that we would be willing

[19] to make students aware that there were some places in

[20] Darwin's Theory where there was not evidence to support

[21] Darwin's Theory of Evolution.

[22]   Q: And then if you look to the column from Materials and

[23] Resources, there had been some discussion at the

[24] October 30th meeting about using Of Pandas as a

[25] reference text?

Page 119

[1]   A: Correct.

[2]   Q: I take it that your ire was directed at this specific

[3] reference to Intelligent Design; is that right?

[4]   A: As well as including a reference book Of Pandas and

[5] People.

[6]   Q: What was it about that, Rob, that you saw as

[7] objectionable?

[8]   A: In no other science curriculum, at least my own

[9] curriculum for what we call STS or Environmental

[10] Ecology, we don't list what our references are. I mean

[11] we use quite a few reference books throughout the

[12] course, different courses, and we don't go down through

[13] and state exactly what those references are.

[14]   Q: Other than that, was there anything else about —

[15]   A: Adding of the words included but not limited to

[16] Intelligent Design.

[17]   Q: With respect to your objection to the listing of the

[18] text Of Pandas as a reference in the curriculum, do you

[19] recall any discussion on that point at the October 8th

[20] meeting?

[21]   A: On why this was listed as a reference book?

[22]   Q: Yes.

[23]   A: Yes. I do recall some.

[24]   Q: What do you recall?

[25]   A: Just the fact that there was contention within our

Min-U-Script®   Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Robert Eshbach
May 20, 2005

**Page 120**

[1] Department as to why this had to be listed on the
[2] curriculum when no other books that we used as
[3] reference — whether it be biology or chemistry or
[4] environmental science — were listed.
[5]     Q: All right. I should have asked you this before. Who
[6] was at this October 8th meeting?
[7]     A: To the best of my recollection, it would have been Jen
[8] Miller, Bertha Spahr, Bob Linker, Leslie Prall, Dave
[9] Taylor, Mr. Baksa.
[10]     Q: Dr. Nilsen?
[11]     A: Myself and Dr. Nilsen.
[12]     Q: Do you recall either Dr. Nilsen or Mr. Baksa addressing
[13] the objection you have expressed to the inclusion of the
[14] text Of Pandas and People in the materials and resources
[15] column?
[16]     A: I am sorry. I am trying to remember dates and just
[17] think if this was the meeting we were all at it, or if
[18] it was a different meeting that occurred.
[19]     Q: It is hard to put together.
[20]     A: Could you restate your question?
[21]     Q: Sure. You indicate that the Science Department objected
[22] to the inclusion of the text Of Pandas in the column
[23] Materials and Resources.
[24]     Do you recall the administration responding to
[25] that expressed concern?

**Page 121**

[1]     A: There was a response. And I think one of the response
[2] was what other reference books do you use in other
[3] classes?
[4]     Q: All right. Anything else that you remember on that
[5] point?
[6]     A: Not major. Basically, okay, point taken. Doesn't mean
[7] we are going to change anything.
[8]     Q: Did you yourself see that as particularly significant,
[9] Rob?
[10]     A: Well, I bracketed it there so there was some concern
[11] there from me, yes.
[12]     Q: And why?
[13]     A: Basically two reasons. One, this book is very difficult
[14] to read. It is way above a ninth grader's reading
[15] comprehension — most ninth grader's reading
[16] comprehension. And the fact that, again, it is not good
[17] science from my standpoint.
[18]     Q: Just in terms of it being on the curriculum, from my
[19] perspective looking at it from the outside, what does it
[20] matter. But I know you had some concern, and that is
[21] what I am trying to figure out.
[22]     A: It does matter because here we are listing a reference
[23] material for a biology class which I feel has poor
[24] material in it, poor information.
[25]     Q: Okay. I understand that. Anything else?

**Page 122**

[1]     A: No.
[2]     Q: How about this line that you have highlighted to us —
[3] for us, including but not limited to Intelligent Design,
[4] was there discussion on that point?
[5]     A: I am certain there was discussion.
[6]     Q: Do you remember the thrust of that discussion?
[7]     A: The thrust dealt around our — when I say our, the
[8] Science Department's — objection to including the words
[9] Intelligent Design in our curriculum. Again, it
[10] centered around the fact that as scientists, this is not
[11] science. Intelligent Design is not science. And why
[12] would we include something that is not science in our
[13] science curriculum?
[14]     Q: You said that a couple of times, Rob. When you say it
[15] is not science, why; what are you getting at there?
[16]     A: Science is a systematic way of gaining knowledge. To do
[17] that, the system we use is scientific method. There's
[18] some key steps in the scientific method.
[19]     It starts with observing. It is followed by what
[20] we call facts. Facts are observations that have been
[21] made more than one time, have been made several times.
[22] For something to be a fact, it is something that has
[23] been observed several times.
[24]     For instance, it is a fact that you and I are
[25] sitting in a deposition right now. Other people have

**Page 12**

[1] observed that.
[2]     From there, the hypothesis is formed would be the
[3] next step. A hypothesis is a testable explanation for
[4] something that takes place. Some people want to call it
[5] and educated guess. But it an educated guess that has
[6] to be able to be tested. You have to be able to test
[7] it.
[8]     From that, we get to experimentation. We are
[9] going to test that hypothesis through an experiment.
[10] And whether it is your belief or not, or whether it is
[11] my belief, is indifferent. I cannot, nor has anyone
[12] else been able to, provide me with a test that I can do
[13] in a lab to tell me whether or not there is an
[14] intelligent designer.
[15]     Therefore, as we teach science in our
[16] understanding of what science is, science does not deal
[17] with beliefs. There is no way to test a belief. So
[18] therefore, it is not science.
[19]     Q: When you say that Intelligent Design Theory is not
[20] science, is that statement made with reference to this
[21] notion of testability you have just described?
[22]     A: Yes.
[23]     Q: And just by way of contrast, let me ask you is it your
[24] understanding that the full gamut of hypotheses advanced
[25] in Evolutionary Theory are testable in the sense you

Robert Eshbach
May 20, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 124

[1] have just described?

[2]   A: Yes, from my understanding.

[3]   Q: Just let me ask you this: Have you read any materials
[4] dealing with the concept of irreducible complexity?

[5]   A: Not other than what information has been presented in a
[6] Power Point presentation from Dr. Behe at a symposium at
[7] the high school.

[8]   Q: And based on that, do you have any understanding
[9] concerning whether the concept of irreducible complexity
[10] is a hypothesis that is being advanced for the purposes
[11] of determining whether intelligence as opposed to random
[12] developments can be identified and isolated?

[13]   A: A little bit. I am certainly not well versed in the
[14] subject.

[15]   Q: I understand. How about the concept of specified
[16] complexity, do you have any familiarity with that
[17] concept?

[18]   A: Again if it was mentioned in his presentation, it would
[19] have been the first time that I have heard those words
[20] used in that format.

[21]   Q: I think I know, but let me just ask: Do you have any
[22] understanding concerning whether the concept of
[23] specified complexity is an effort to render testable and
[24] isolate events that might occur by chance from those
[25] that might not?

Page 125

[1]   A: It may be. I don't know enough about it.

[2]   Q: Okay. Fine. So when this was in the curriculum, Rob, I
[3] understand that you objected. Do you recall how the
[4] administration responded to the concerns expressed by
[5] the science faculty at this October 8th meeting?

[6]   A: They listened to us. As I recall, they asked us to come
[7] up with a draft that would be acceptable to us.

[8]   MR. GILLEN: Let's take a break.

[9]   (A recess was taken.)

[10]   **AFTER RECESS**

[11]   **BY MR. GILLEN:**

[12]   Q: Rob, let me ask you I know that as of that August
[13] meeting where you have some jottings on the e-mail, that
[14] you had some information about the text Of Pandas and
[15] People and things such as readability.

[16]   Can you recall exactly — let me ask you: Did you
[17] read the text yourself?

[18]   A: By that time, by the time that August 30th meeting took
[19] place, I had been given a copy of it. It was taken
[20] read it cover to cover. I have read sections of it.

[21]   Q: Okay. Is that the case today? Basically you have —

[22]   A: Today, I don't even have a copy of it. It was taken
[23] from me by someone who needed it. Oh, I am sorry. I
[24] passed my copy on to Bob Linker who is teaching biology
[25] this semester. That's where it went.

Page 126

[1]   Q: Have you read it cover to cover since?

[2]   A: No.

[3]   Q: So it seems like you got it, you skimmed it for content
[4] and some of the things we talked about readability and
[5] so on, and that is it; is that right?

[6]   A: That is correct.

[7]   Q: All right. So we are at this October 8th meeting now.
[8] I just want to ask: Is there anything else you recall
[9] about the discussion of this curriculum draft document?

[10]   A: Yes. At this meeting, we were — we were basically told
[11] that this was not necessarily an administrative change.
[12] They wanted us to know that this was a directive given
[13] by the Board.

[14]   Q: Okay. Did they reference a specific Board member?

[15]   A: No, sir.

[16]   Q: Now if we look at the timeline, Rob, that the science
[17] faculty developed, which is Miller 4, and we are on that
[18] page two again, beneath the October 8th entry, there is
[19] two asterisks. It says we amended the curriculum to
[20] remove ID from it. Rejected by committee.
[21]   And then there is an entry after that for
[22] October 12th and 15th.
[23]   With that in mind, I would like you to look at
[24] Miller 7.

[25]   A: Okay.

Page 127

[1]   Q: I would like you to look at the version of the
[2] curriculum document or page that is Bates stamped 20 and
[3] occurs behind the cover memo which references enclosure
[4] XI-B. See that, Rob?

[5]   A: Yes.

[6]   Q: If you look at that version of the curriculum, look down
[7] to the last entry under the column Unit
[8] Content/Concepts.

[9]   A: Yes, sir. I am with you.

[10]   Q: Does that look like the amended version proposed by the
[11] science faculty?

[12]   A: Yes.

[13]   Q: If you look in the Materials and Resources column, if
[14] you look down there, you will see Of Pandas has been
[15] omitted?

[16]   A: Yes.

[17]   Q: Does that make you pretty confident this is —

[18]   A: Yes.

[19]   Q: Tell me what you recall — or do you recall specific
[20] events occurring between the October 8th meeting we just
[21] talked about and the October 18th Board meeting relating
[22] to the curriculum change?

[23]   A: Yes. Again, I believe it was at the end of the
[24] October 8th meeting that Mr. Baksa said turn in your
[25] recommendation for the curriculum change, that type of

Min-U-Script®   Filius & McLucas Reporting Service, Inc.

**Tammy Kitzmiller, et al.   v.**
**Dover Area School District, et al.**

**Robert Eshbach**
**May 20, 2005**

Page 128

[1] thing. And that is when the curriculum was altered by
[2] us to reflect what we would settle for as a compromise.
[3]   Q: And as you look at it now, Rob, what were you guys
[4] after? I think I know, but tell me.
[5]   A: We wanted to drop from the Materials and Resources List
[6] the reference to the book Of Pandas and People. And
[7] while we weren't wild about the students will be made
[8] aware of gaps in Darwin's Theory and other Theories of
[9] Evolution, we compromised to leave it that way and take
[10] out included, but not limited to, Intelligent Design.
[11]   Q: You say you weren't wild about that. Why not, Rob?
[12]   A: The verbiage made aware of gaps in Darwin's Theory was
[13] never — we did not come up with that verbiage way of
[14] stating that.
[15]   Q: Now if we look at the timeline there with that page
[16] number two circled in the upper right-hand corner which
[17] is part of Miller Exhibit 4, there is a reference there
[18] to developments between October 12th and 15th.
[19]   Do you recall?
[20]   A: It was told to — I am not sure whether it was Mrs.
[21] Spahr at this point — it may have been Mrs. Miller —
[22] that there now was going to be possibly a third
[23] rendition of the curriculum to be offered at the next
[24] Board meeting where a new curriculum or a new page of
[25] curriculum was to be adopted for the Biology Department.

Page 129

[1]   Q: And do you recall anything else that Bert told you about
[2] that?
[3]   A: I am not sure that it was Bert who told me that. But it
[4] had to do with the fact that there was going to be a
[5] statement put at the bottom of the curriculum, whether
[6] it be an asterisk or footnote, that origins of life
[7] would not be taught.
[8]   Q: Did you have any discussion concerning the purpose of
[9] that note?
[10]   A: Well, I had a few words. I don't know that it was much
[11] of a discussion. It may have been a thought to myself.
[12] I don't know whether I gave that thought out loud or
[13] not.
[14]   Q: What was your thought, Rob?
[15]   A: Then what the hell is all the commotion about if we are
[16] not teaching origins of life? This has nothing to do
[17] with what we are teaching then.
[18]   Q: Did you ever bring that sort of concern to anyone's
[19] attention?
[20]   A: Certainly.
[21]   Q: When and how?
[22]   A: I would have tried to be a little bit more diplomatic
[23] about it. It would have taken place between more than
[24] likely myself, Mrs. Spahr, Mrs. Miller, Mr. Baksa, Dr.
[25] Nilsen.

Page 130

[1]   Q: Do you recall though?
[2]   A: Specifically in a meeting did I say we don't teach that?
[3] I don't know if I said it to someone directly or if
[4] somewhere in a discussion that was not necessarily a sit
[5] down meeting that I may have reiterated that.
[6]   Q: Do you recall Bert saying anything to you along the
[7] lines of if the note is in there, what does Intelligent
[8] Design have to do with it since Intelligent Design has
[9] to do with the origins of life?
[10]   A: Sure. Like I said, it wasn't a thought of mine that
[11] occurred out loud or if it was through a conversation
[12] with someone else. It may well have been a conversation
[13] with her regarding the subject of the fact that
[14] Intelligent Design does deal with origins of life.
[15]   Q: Rob, look at Miller 7.
[16]   A: Yes.
[17]   Q: There is a cover letter that references XI-C. Look at
[18] the back of that, you will see another draft curriculum
[19] with two parts of it highlighted and blocked out.
[20]   A: Yes, sir.
[21]   Q: Look at that, do you recall seeing this?
[22]   A: Yes, sir; I did see this.
[23]   Q: When did you see that?
[24]   A: I saw this somewhere prior to that October 18th Board
[25] meeting, but after we had sent our recommendation for

Page 13

[1] the curriculum change.
[2]   Q: That's the recommendation we have just looked at under
[3] enclosure XI-B?
[4]   A: That's correct.
[5]   Q: Good. Now let me ask you: Do you recall any discussion
[6] between yourself and your colleagues relating to this
[7] document which is Bates stamped 22 and the last page of
[8] Miller 7?
[9]   A: The note was not ours.
[10]   Q: You are getting at what I want to ask you about. Do you
[11] recall discussions within your colleagues about the note?
[12]   A: Just the fact that again, the note is not ours. It is
[13] nice — so it appears there. But it sort of is limiting
[14] now in the fact that are we even able to discuss
[15] anything about origins of life?
[16]   Q: Okay. I am not sure I understand you there, Rob. What
[17] are you getting at?
[18]   A: Until this point — in the past, I will put it that way,
[19] if questions would arise when we were introducing
[20] Darwin's Theory of Evolution and the origin of species,
[21] if things were questioned about where do you think we
[22] come from, we were able to say that's not really the
[23] direction we're going to take.
[24]   What my belief in this matter really doesn't
[25] matter. We are not looking to get off subject. If you

Robert Eshbach
May 20, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 132

[1] have any questions, see me after class type thing. It
[2] was not — we didn't hesitate to say that.
[3]     We felt once this was on there, oh, gosh, okay,
[4] now it is stated it is not taught. Not that it ever
[5] was, but how are we going to address a discussion issue?
[6] Are we going to direct it in the same way, or are we
[7] going to say we are not going to go there? That sort of
[8] thing.
[9]     There was nothing — this wasn't a formal sit
[10] down. This was sort of in passing with colleagues.
[11]     Q: Do you recall did you personally have any discussion
[12] with members of the administration about the note?
[13]     A: Not that I recall, no.
[14]     Q: Do you recall them addressing the concern you have just
[15] expressed?
[16]     A: Do I recall who addressing?
[17]     Q: The administration addressing the concern you just
[18] expressed.
[19]     A: No, sir.
[20]     Q: Do you recall bringing that concern to their attention
[21] prior to the October 18th, 2004 Board meeting?
[22]     A: I recall discussing it with Mrs. Miller. I do not
[23] recall whether or not any of us brought that matter up
[24] with administration.
[25]     Q: All right. If you would, Rob, just take a quick look at

Page 133

[1] these — the B and the C documents. I just want to get
[2] your sense for how they —
[3]     A: Okay.
[4]     Q: If I have it right, what do you see as the differences
[5] between the two?
[6]     A: Obviously, what is highlighted in black.
[7]     Q: Right.
[8]     A: Again, the reference book Of Pandas and People appears
[9] again. A note has now been added to the bottom of the
[10] area listed as concepts.
[11]     Q: And that is the note the origins of life is not taught?
[12]     A: That is correct.
[13]     Q: And then the last entry in Unit Content/Concepts is
[14] different. It seems to differ from the teacher's
[15] suggestion in that gaps and problems, gaps and problems
[16] instead of gaps is mentioned; is that right?
[17]     A: Yes.
[18]     Q: Now you recall seeing this prior to the Board meeting,
[19] but do you know when?
[20]     A: Just maybe a day, if it was not even the same day.
[21]     Q: Okay.
[22]     A: I don't recall if it was a day or two prior to the
[23] October 18th Board meeting or if it was on the day of
[24] the October 18th Board meeting.
[25]     Q: That's the last thing I want to ask you about. If you

Page 134

[1] look at the cover memos there, you will see a couple of
[2] things. The cover memo for the XI-B is attached are the
[3] recommended changes to the biology curriculum from the
[4] administration and the staff.
[5]     And then if you look at the cover letter for XI-C,
[6] you will see attached is a second draft of the
[7] recommended changes to the biology curriculum from the
[8] administration and the staff.
[9]     A: Yes.
[10]     Q: Going into the October 18th Board meeting, do you recall
[11] any comments to you by members of the administration
[12] directed towards the possible outcome of the Board
[13] meeting that evening?
[14]     A: Not from specific administrators, no. I do not recall.
[15]     Q: Did you have a sense as you went into that meeting of
[16] what curriculum had been given to the Board as the
[17] administration and staff recommendation?
[18]     A: I was under the presumption it was the one that we had
[19] turned in that took out under Materials and Resources
[20] the book Of Pandas and People and dropped the words
[21] including, but not limited to, Intelligent Design.
[22]     Q: So you say you were under the presumption it was XI-B?
[23]     A: That is correct.
[24]     Q: But you recall seeing XI-C?
[25]     A: I recall hearing about the note, and it seems to me that

Page 135

[1] yes, I did see it because it was highlighted. And it
[2] doesn't show up here on black and white copy. But on
[3] the original, it may have been highlighted in a green.
[4] This block may have been highlighted in green or yellow
[5] which makes me think that yes, I saw it.
[6]     Q: And then you say you attended the October 18th meeting;
[7] correct?
[8]     A: Yes.
[9]     Q: Do you recall in the lead up to that meeting Dr. Nilsen
[10] making any comments to the teachers? I think Bert said
[11] something like whatever happens, don't clap?
[12]     A: That was actually at the meeting — that was at the
[13] October 18th Board meeting. That was not prior — that
[14] was during the beginning of the meeting. That was not
[15] prior to the meeting.
[16]     Q: Then let's get there. Let's get to the meeting before
[17] the actual session starts. Do you recall any
[18] discussions between Dr. Nilsen and the science faculty?
[19]     A: During the session, I do recall a statement made by Dr.
[20] Nilsen, whatever you do, don't clap.
[21]     Q: Did you have any sense for what he was getting at there?
[22]     A: No.
[23]     Q: Did you personally discuss with him at any time prior to
[24] the meeting what he was going to recommend as the
[25] administration's/staff version?

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Robert Eshbach
May 20, 2005

---

**Page 136**

[1]  A: Personally, I do not believe so.

[2]  Q: Did you hear anything from your colleagues about

[3]  discussions on that topic?

[4]  A: I honestly don't think that I did hear anything of

[5]  discussion. Not that I recall.

[6]  Q: Tell me, Rob, what do you remember from that meeting

[7]  that relates to the curriculum change?

[8]  A: Well, as stated before, it was quite a lively meeting.

[9]  There was discussions in public comment. And I don't

[10]  know that it occurred before the vote — I believe it

[11]  did occur prior to the vote of the curriculum

[12]  discussions from the public.

[13]  Our Department Chair Mrs. Bertha Spahr made a

[14]  statement concerning the change in curriculum.

[15]  Prior to the vote, there was again discussion —

[16]  well, let me back up. There was a comment reflected to

[17]  her from Mr. Buckingham as she completed her statement

[18]  and was sitting down.

[19]  Q: Do you recall that comment, Rob?

[20]  A: Yes.

[21]  Q: What was it?

[22]  A: The statement referred to where did she get her law

[23]  degree.

[24]  Q: Okay. Anything else he said that comes to mind?

[25]  A: Directed to her?

**Page 137**

[1]  Q: Let's go through it the way you are remembering it. She

[2]  spoke. He responded in that way. What was next?

[3]  A: More people spoke. There was discussion — continued

[4]  discussion about the Of Pandas and People book. Heather

[5]  Geesey, a Board member, made a statement.

[6]  Q: Do you recall what she said?

[7]  A: The statement dealt with well, if the teachers don't

[8]  like it, they should be fired. And that was in

[9]  reference — let me stop. If the teachers don't like

[10]  it, they should be fired. They're the ones that picked

[11]  the book. That was in reference to the discussion on

[12]  the Of Pandas and People book.

[13]  Q: Okay.

[14]  A: The discussion was centered within the Board on which

[15]  version they were going to vote on. It was a discussion

[16]  about whether or not this reference book Of Pandas and

[17]  People would be listed in the curriculum.

[18]  At some point within the discussion, there was a

[19]  remark made by Heather Geesey that if the teachers

[20]  didn't like the book, then they should be fired; they

[21]  picked it. It was something to that effect.

[22]  Q: And you understood her to be referring to the book Of

[23]  Pandas?

[24]  A: That is correct.

[25]  Q: What else do you recall? Anything else?

**Page 138**

[1]  A: I remember what our response was when that statement was

[2]  made. Mrs. Miller, Mrs. Spahr and myself looked at each

[3]  other and went directly to the podium to be addressed —

[4]  to clarify that we did not pick this book. That book

[5]  was agreed to be placed in the classroom as a reference

[6]  book was our compromise.

[7]  Q: Okay. Apart from that, anything else that you recall —

[8]  let's look at the Board members —

[9]  A: Okay.

[10]  Q: — and what they were saying. Do you recall questions

[11]  being directed to the Board about whether or not

[12]  teachers would be required to teach Intelligent Design?

[13]  A: Yes, I do recall that. I recall that statement.

[14]  Q: Do you recall how any members of the Board responded to

[15]  that inquiry?

[16]  A: I don't know that it was a Board member that responded.

[17]  As I recall, it may have been Dr. Nilsen that responded.

[18]  Q: That is what I was getting at. Did the administration

[19]  respond to that inquiry?

[20]  A: Yes, sir.

[21]  Q: What did they say?

[22]  A: I believe the response that Dr. Nilsen gave was either

[23]  that Intelligent Design would not be taught or something

[24]  to the fact of the origin is not being taught so

[25]  therefore Intelligent Design will not be taught.

**Page 139**

[1]  Q: Anything else about the teaching in the classroom, any

[2]  other comments from Board members?

[3]  A: The recommendation by Dr. Nilsen and Mr. Baksa was to

[4]  adopt the curriculum that was proposed by the faculty

[5]  members of the Science Department.

[6]  Q: And by that, Rob, do you mean the XI-B, Bates stamped

[7]  number 19, which is part of Exhibit 7, Miller 7?

[8]  A: Which is referring to the Bates stamped 20?

[9]  Q: Yes.

[10]  A: Yes, that is what I am referring to.

[11]  Q: Okay. Thanks. That is the one that the science faculty

[12]  had proposed; is that correct?

[13]  A: Yes, that's correct.

[14]  Q: So let's again look in your mind's eye at the Board

[15]  members. Can you recall anything that Alan Bonsell said

[16]  that night?

[17]  A: I can't recall anything he said. I can basically only

[18]  recall what he didn't say.

[19]  Q: What do you mean by that, Rob?

[20]  A: It became a very chaotic meeting. A shouting match

[21]  among the Board between themselves, between some

[22]  community members. And he basically said nothing, nor

[23]  even lifted his hand to bang the gavel.

[24]  Q: So it sounds like things got out of hand as you recall

[25]  it, Rob?

---

**Robert Eshbach**
**May 20, 2005**

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

Page 140

[1]  A: Most certainly.

[2]  Q: That is all I am trying to get at, what you remember

[3]  from those exchanges. It sounds like the Board members

[4]  were at odds.

[5]  Do you recall any statements that they were

[6]  exchanging?

[7]  A: There was some comments I even think — I don't know

[8]  what led up to them. It had to do with somebody's

[9]  patronage.

[10]  Q: Patriotism?

[11]  A: Patriotism. I apologize. That is right.

[12]  Q: That is all right.

[13]  A: That would have been directed to Mr. Brown.

[14]  Q: Do you recall how he responded to this comment; do you

[15]  remember?

[16]  A: Banging on the table and shouting back maybe to the

[17]  effect how dare you bring that into this discussion. It

[18]  was one big zoo.

[19]  Q: I understand. How about Noel Wenrich, do you remember

[20]  anything Mr. Wenrich said?

[21]  A: I remember some shouting. I don't remember specifics.

[22]  I mean by this time, you're scratching yourself on the

[23]  head wondering what the hell am I doing here.

[24]  Q: How about Jane Cleaver, do you recall her saying

[25]  anything?

---

Page 141

[1]  A: I do not.

[2]  Q: Angie Yingling?

[3]  A: Yes, I recall her saying quite a bit. Actually, even

[4]  directed in my way at the end of the Board meeting.

[5]  Q: Tell me about that, Rob.

[6]  A: I happened to be standing at the side of the cafeteria

[7]  with Mr. Baksa. And she came up blurting out that she

[8]  didn't know why so many people thought that Bertha

[9]  Shaeberle, referring to Bertha Spahr, because Shaeberle

[10]  was her —

[11]  Q: Maiden name?

[12]  A: It was her prior married name. It was not her maiden

[13]  name. Why they thought she was such a great teacher for

[14]  when she was in school, she was sleeping around I

[15]  believe was the term she used with her students.

[16]  Q: Apart from that, anything else?

[17]  A: I was a little disappointed by the fact I had an

[18]  Assistant Administrator beside me that said nothing to

[19]  the fact that that was unprofessional, that he would not

[20]  tolerate someone talking about his staff like that.

[21]  Q: I understand. Do you want to take a minute, Rob? It is

[22]  evident you have a lot of respect for Bert.

[23]  (A recess was taken.)

[24]

[25]

**AFTER RECESS**
**BY MR. GILLEN:**

---

Page 142

[1]  Q: All right. Rob, we were talking about comments by Angie

[2]  Yingling, and you referenced a comment after the

[3]  meeting.

[4]  How about during the Board meeting, did she speak

[5]  to the issue at all of this curriculum change that was

[6]  contemplated?

[7]  A: Other than the fact that she had no idea what she was

[8]  voting on and had to ask whoever she was sitting beside

[9]  which version are we voting on, I am lost, not that I

[10]  recall.

[11]  Q: There was a lot of Parliamentary maneuvers that night?

[12]  A: Yes, there was.

[13]  Q: Do you recall any discussion among the Board members

[14]  about that, the purpose of those Parliamentary

[15]  maneuvers?

[16]  A: No, I don't recall.

[17]  Q: Were you able to follow it as that process unfolded?

[18]  Could you follow the various questions that were being

[19]  presented and voted on?

[20]  A: They did a lot of referring to version A, version B,

[21]  version C which nobody had except Board members as I am

[22]  aware. I know that Mrs. Miller, nor Mrs. Spahr, nor

[23]  myself had a copy of as far as I know version A, version

[24]  B and version C to be able to — when they would say

[25]  refer to version a, we had no idea which one was version

---

Page 143

[1]  A, which one was version B, which one was version C.

[2]  Q: So you may have seen the curriculum changes, but you

[3]  hadn't seen the cover memos?

[4]  A: That's correct. When they were making reference to the

[5]  A, B and C, everybody else in the audience as far as I

[6]  know had no idea what they were talking about.

[7]  Q: Did they speak to Intelligent Design? Was there any

[8]  discussion about that?

[9]  A: There was because it was in version A of the curriculum

[10]  change.

[11]  Q: XI-A, that is the Board curriculum committee's version?

[12]  A: Yes.

[13]  Q: Do you recall any discussion about Intelligent Design by

[14]  the Board members? Were some criticizing the concept?

[15]  Were others supporting it? Anything like that?

[16]  A: As far as I know, there was question from Casey and Jeff

[17]  Brown as to whether or not this was legal. They had

[18]  real questions as whether or not this could be

[19]  implemented without legal ramifications.

[20]  Q: And do you recall any other Board members responding to

[21]  those concerns about the legality of the proposed

[22]  curriculum change?

[23]  A: It sticks out in my mind that Mr. Buckingham was very

[24]  vocal and again said that basically, you are not a

[25]  lawyer; let the Courts decide that type of thing.

---

Min-U-Script®   Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Robert Eshbach
May 20, 2005

**Page 144**

[1]   Q: How about Sheila Harkins, do you recall her speaking to
[2] the curriculum change that was up for a vote that night?
[3]   A: I really don't. There were so many people blaring,
[4] shouting, arguing. Who knows what she said. I cannot
[5] recall.
[6]   Q: I understand. I am asking you to recall events that
[7] occurred a while back. How about Creationism, was that
[8] word still being used in October? Were people arguing
[9] about that?
[10]   A: By this time, there was a switch in verbiage. Before
[11] where I had heard Mr. Buckingham use the term creation
[12] science, the words were now Intelligent Design being
[13] said.
[14]   Q: And do you recall Buckingham talking about Intelligent
[15] Design that night?
[16]   A: I am sure there was discussion about it, again, because
[17] it shows up on this curriculum. As in to what capacity
[18] there was talk about it, I do not recall.
[19]   Q: And your comments here, that is what I am looking for.
[20] We know that is part of one of the proposed curriculum
[21] changes. I am trying to see if you recall anything that
[22] the Board members said which spoke to the substance of
[23] the theory, the controversial nature of the theory,
[24] anything like that?
[25]   A: I cannot recall.

**Page 145**

[1]   Q: How about comments by your colleagues? Bert Spahr made
[2] a presentation?
[3]   A: That's correct.
[4]   Q: What do you recall about — did she check with you
[5] before she spoke?
[6]   A: Yes. We had a Department meeting as I recall. And I
[7] don't know that she encouraged, but we all encouraged
[8] each other that, yes, we would be there at this Board
[9] meeting. It was important that we be there. And she
[10] was going to make a statement on the Department's behalf
[11] as Chairperson.
[12]   She wrote her statement, rewrote the statement. I
[13] am not even so sure — I think I read it while she was
[14] drafting it type of thing.
[15]   Q: Did you collaborate with her, or did she ask you to look
[16] at it and give her feedback?
[17]   A: I think so. Is this a good way to state this? That
[18] sort of thing. Am I correct in my — she not being a
[19] biology teacher, am I correct in my understanding of
[20] this, something like that.
[21]   Q: Sure. Do you know if she did the same with Jen Miller?
[22]   A: I can't answer that. I presume that she did. By this
[23] time, our rooms were right across from each other. It
[24] was very easy. I was very accessible, as she was very
[25] accessible to me.

**Page 146**

[1]   Q: How about in terms of commenting at the meeting, did any
[2] of your colleagues speak besides Bert Spahr?
[3]   A: Colleagues from the Science Department?
[4]   Q: Yes.
[5]   A: No, sir.
[6]   Q: How about any other colleagues, period?
[7]   A: As I recall, yes. Jere Wynegar, who was at that point
[8] Co-President in our Dover Area Education Association,
[9] spoke.
[10]   Q: What was the thrust of his comments?
[11]   A: Again, that not only was the Science Department not
[12] recommending this change, but on behalf of the
[13] Educational Association, they did not recommend this
[14] change as well.
[15]   Q: Did he say why?
[16]   A: I believe it was sent around due to the fact there could
[17] be legal ramifications by doing this.
[18]   Q: Do you recall any response by the Board to his expressed
[19] concern?
[20]   A: Nothing specific.
[21]   Q: Was there reference that night to having checked with
[22] the solicitor that you can recall?
[23]   A: It sticks in my mind that yes, somebody did say where is
[24] the solicitor? Why is he not present at this meeting?
[25] This is a decision that is going to be made that will

**Page 147**

[1] likely have some legal ramification, and you, as a
[2] Board, don't even have him present.
[3]   Q: Was there any response to that observation?
[4]   A: I believe that Mr. Bonsell, being President, addressed
[5] that stating that they had indeed spoken to the
[6] solicitor about the issue, and there was no problem.
[7] Again, that is not a direct quote.
[8]   Q: Understood. That was just the gist of his response as
[9] you recall it?
[10]   A: Correct.
[11]   Q: Do you remember anything else from that night? Rob,
[12] were you privy to any conversations involving Board
[13] members after the Board meeting ended?
[14]   A: Only the one I wish I hadn't been with Mrs. Yingling.
[15] No other Board members.
[16]   Q: How about just if you look at the period October 18th
[17] forward, have you spoken with anyone who was on the
[18] Board on October 18th about the curriculum change since
[19] then?
[20]   A: Yes, as a matter of fact.
[21]   Q: Who did you speak with?
[22]   A: Mr. Bonsell.
[23]   Q: When was that conversation?
[24]   A: As I recall, it was in late November, November 24th,
[25] 2004.

Robert Eshbach
May 20, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

Page 148

[1]   Q: You date it pretty precisely.

[2]   A: I take it back. It was December 16th.

[3]   Q: Before we get there — and forgive me actually for

[4] pointing this out. This meeting ended. When it ended,

[5] Rob, plainly you knew that the curriculum change had

[6] been put in place that entailed the mention of

[7] Intelligent Design?

[8]   A: Right.

[9]   Q: As you came away from the meeting, what was your

[10] thought?

[11]   A: To myself, very discouraging. A little bit lapping your

[12] wounds and figuring out where you're going to go next,

[13] what direction you are going to take as far as where

[14] this is leading us to.

[15]   Q: And that was my question. As a biology teacher coming

[16] away from that October 18th meeting, you have looked at

[17] some curriculum language about making students aware of

[18] Intelligent Design. I know Jen said I wanted to know

[19] kind of what this meant for my instruction.

[20]   Did you have similar thoughts?

[21]   A: At that point, that semester, I was not teaching

[22] biology. So that was not a specific thought of mine.

[23]   Q: So then what happened next from your perspective? We

[24] know the statement is the next development; right?

[25]   A: Page three?

---

Page 149

[1]   Q: Page three of the teacher's timeline, which is Miller 4,

[2] with number three circled in the upper right-hand

[3] corner.

[4]   Did you participate in any revisions of the draft

[5] statement, Rob?

[6]   A: Of the four paragraphs?

[7]   Q: Yes.

[8]   A: I was not instrumental in the capacity of correcting it.

[9] I was asked to take a look at it when it was corrected

[10] and give my input.

[11]   Q: Okay. And you say was corrected. Are you referencing

[12] the changes that were suggested by Jen Miller?

[13]   A: Yes, sir.

[14]   Q: And it sounds to me from what you have said that after

[15] Jen was done with her suggested revisions, she showed it

[16] to you?

[17]   A: That's how I recall it, yes.

[18]   Q: Did you recommend any changes to the work product that

[19] Jennifer Miller showed you?

[20]   A: Not that I recall. I didn't want to touch it.

[21]   Q: You say you didn't want to touch it. Why was that, Rob?

[22]   A: I really didn't like the document. I didn't like what

[23] the statement said.

[24]   Q: And was there something in particular? Do you want to

[25] look at it?

---

Page 150

[1]   A: If you don't mind.

[2]   Q: Not at all. Look at Miller Exhibit 5. I guess we could

[3] start with this document which has Jen Miller sent

[4] corrections 11/5/04 on the top, and it is a draft

[5] version of the statement?

[6]   A: Is that about halfway?

[7]   Q: Yes, I would say. It is the statement that eventually

[8] became the November 19th press release.

[9]   A: Okay. I think I am there.

[10]   Q: Look at that page, Rob. And then there is another one

[11] after that. There is an e-mail with a heading Teaching

[12] Evolution Teacher Version.doc on the top.

[13]   A: Yes.

[14]   Q: When you look at those, Rob, do they refresh your

[15] recollection concerning any reservations you might have

[16] had about the statement?

[17]   A: Yes.

[18]   Q: Tell me.

[19]   A: Again, I am not happy about the fact that we are

[20] mentioning Intelligent Design, which I see as not

[21] science in the science classroom and referencing this

[22] book which I feel is poorly written Of Pandas and People

[23] to students.

[24]   Q: Okay. Apart from that, was there anything else that

[25] gave you concern?

---

Page 151

[1]   A: Not at this time, no.

[2]   Q: How about since?

[3]   A: Is there anything in that document that gives me concern

[4] since?

[5]   Q: Yes. I mean I realize at some level that the policy

[6] requires it to be read. You have got reservations

[7] record?

[8]   A: Right.

[9]   Q: I understand that. I am just wondering if there is

[10] anything more specific.

[11]   A: I guess what had bothered me about the policy is that we

[12] were instructed by the administration to quote/unquote

[13] give our input I guess would be the word. I felt uneasy

[14] about that because I did not — I didn't want that input

[15] to be construed as we were agreeing with reading it.

[16]   Q: With that in mind, Rob, I would like you to look through

[17] a photocopy or a group of photocopies of documents that

[18] you provided to me today in response to the subpoena

[19] that was served on you?

[20]   A: I believe they are under this pile.

[21]   Q: You have got the originals. If you page through there

[22] towards the end about an eighth of the way from the

[23] back, you will see a memo dated December 7, 2004 to you

[24] and others from Mike Baksa?

[25]   MS. KNUDSEN: What is the date, Pat?

---

Min-U-Script®   Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Robert Eshbach
May 20, 2005

Page 152

[1]   MR. GILLEN: 12/7/2004.

[2]                   BY MR. GILLEN:

[3]   Q: Does this look like a packet of documents you gave to me

[4] this morning?

[5]   A: Yes.

[6]   MR. GILLEN: Please mark that as Eshbach 1.

[7]   (Eshbach Deposition Exhibit 1 was marked.)

[8]                   BY MR. GILLEN:

[9]   Q: Rob, are you looking at that?

[10]   A: Yes, sir.

[11]   Q: Then you see at the bottom of that memo a handwritten

[12] note.

[13]   A: There's actually two. I don't know that you got the

[14] copy. Did you get the back?

[15]   Q: Yes. I understand that these are your thoughts. That

[16] is what I wanted to get at, Rob. If you look at it,

[17] there is a note in your hand at the bottom of that memo?

[18]   A: Yes.

[19]   Q: Does that express the concern you were just getting at

[20] about the statement?

[21]   A: Definitely, yes.

[22]   Q: So you felt that by providing some input into the

[23] statement, it could be construed or seen by others in

[24] the community as approving of the curriculum change?

[25]   A: Not even so much as in the community. It concerned me

Page 153

[1] more with science colleagues.

[2]   Q: In the profession?

[3]   A: In the profession, yes.

[4]   Q: And then you noted on the back of this page, there is

[5] another handwritten note that says — and that is in

[6] your hand; right?

[7]   A: Yes, sir.

[8]   Q: And there is an observation you took us out of the

[9] curriculum writing?

[10]   A: Yes.

[11]   Q: And what are you getting at there, Rob?

[12]   A: This paper was probably in a folder that I had with me

[13] when I attended a meeting on December 16th, 2004.

[14]   Q: Okay. Tell me about that meeting.

[15]   A: Sure. The meeting was called in response to a press

[16] release, I guess you could say, that the Science

[17] Department — that our DAEA, our Association, our local

[18] Dover Area Educational Association put out on our

[19] behalf.

[20]   The meeting was with Mr. Bonsell, which Mr. Baksa

[21] attended, Jen Miller, Bill Miller, who is our Past

[22] Co-President of the Association and myself.

[23]   He was questioning why we put this press release

[24] out.

[25]   MS. PENNY: Bonsell was questioning that?

Page 154

[1]   A: Yes, ma'am.

[2]                   BY MR. GILLEN:

[3]   Q: And when did that press release go out from the DAEA on

[4] behalf of the science teachers, Rob, do you recall? It

[5] had to be prior to this date; right?

[6]   A: Yes, it was. It was somewhere between — somewhere

[7] after that November 24th meeting that took place prior

[8] to the December 16th meeting that took place.

[9]   Q: Okay.

[10]   A: I know that is not much help.

[11]   Q: That's all right. What was the thrust of that release

[12] as you recall?

[13]   A: I believe a portion of it may be included in the packet

[14] in which I — or the packet that you got from me this

[15] morning. It dealt with the fact that we wanted to

[16] clarify a prior press release from the School District

[17] that is dated —

[18]   Q: November 19th.

[19]   A: That we believed overstated our involvement in the

[20] development of this four paragraph statement that was to

[21] be read to students concerning the gaps in Darwin's

[22] Theory and Intelligent Design.

[23]   It may be that the copy you have is not the final

[24] draft. It may just be a compilation of thoughts that

[25] turned into that.

Page 155

[1]   Q: Look at Miller 5. There is the press release there.

[2]   A: Okay.

[3]   Q: Looking at that press release which has the date

[4] November 19, 2004 at the top in black marker and is

[5] headed Dover Area Board of Directors Biology Curriculum

[6] Press Release, is that the press release from the

[7] administration that you are referring to?

[8]   A: From the District, yes.

[9]   Q: You said, Rob, you thought this overstated the

[10] participation of the faculty?

[11]   A: Yes, sir.

[12]   Q: What are you getting at there?

[13]   A: At the bottom of page one of that document, the Dover

[14] Area Board of Directors Biology Curriculum Press

[15] Release, it is stated that the Assistant Superintendent

[16] in charge of Curriculum Development Mr. Baksa in

[17] coordination with the Science Department teachers,

[18] District Solicitor and School Board has developed the

[19] following procedural statement to use in implementing

[20] the new biology curriculum language.

[21]   Q: Okay. What is it about that statement that you object

[22] to, Rob?

[23]   A: To the lay person reading this, which was in the

[24] newspaper and disseminated to the public, it gives the

[25] impression that the Science Department developed —

obert Eshbach
ay 20, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 156

[1] together with these others listed developed this
[2] statement.
[3]     It was felt that that was an overstatement, or
[4] they were giving us credit for more than we wanted
[5] credit for.
[6]     Q: And, Rob, again just to make sure I understand, is that
[7] because you felt like it indicated teachers approved of
[8] the curriculum change?
[9]     A: Yes.
[10]     Q: So it wasn't so much that there had been no
[11] participation, but you felt it was — tell me how you
[12] felt.
[13]     A: It was not intended to say that we weren't included in
[14] the decision; we weren't included in the steps that led
[15] up to this decision. It was simply to say don't give us
[16] more credit than we want credit for. We were not
[17] instrumental in implementing this. We don't want credit
[18] for being instrumental in implementing this.
[19]     Q: If I understand you correctly, Rob, what you are saying
[20] today is you didn't want people to have the impression
[21] that the science faculty approved of the curriculum
[22] change incorporating the reference to Intelligent
[23] Design; is that right?
[24]     A: Approved of, agreed to, not only the curriculum change,
[25] but the statement that was going to be read to the

Page 157

[1] students.
[2]     Q: Now let's look at the period of time from October 18th
[3] forward. You mentioned this meeting about the press
[4] release and some discussions with Mr. Bonsell.
[5]     What did he say at that meeting that you can
[6] recall?
[7]     A: You are referring to the meeting of December 16th?
[8]     Q: Correct. Were there any meetings between you involving
[9] Board members between October 18th and this
[10] December 16th meeting?
[11]     A: Not that I can recall off the top of my head.
[12]     Q: Did you have any discussion with any members of the
[13] School Board between October 18th and this December 16th
[14] meeting?
[15]     A: Not that I can recall.
[16]     Q: Let's go on from there. Then what happened at this
[17] meeting?
[18]     A: This was a meeting that as far as I know Mr. Bonsell
[19] wanted to have. He was upset about the statement that
[20] came out from Dover Area Education Association on behalf
[21] of the Science Department which said basically the fact
[22] that it says we developed this is an overstatement.
[23]     Q: All right. And did he say that? What did Mr. Bonsell
[24] say?
[25]     A: Basically, he was upset with that. And I believe

Page 158

[1] sitting in this room, he stated that he felt like we
[2] were going to throw a monkey wrench in this whole thing
[3] because now it looked like we didn't want it.
[4]     Q: Was there any discussion on these points?
[5]     A: A little bit. That's where these notes came from on the
[6] bottom of the memorandum dated December 7th, 2004 that
[7] you have initially directed me to.
[8]     Q: Okay. Just tell me looking at those notes, Rob, do you
[9] remember what was said?
[10]     A: Basically, he couldn't understand why we would do this.
[11] And to the best of my recollection, of course, he felt
[12] the Science Department was onboard with this and didn't
[13] understand why at this point we would jeopardize the
[14] whole thing, the whole thing referring to the inclusion
[15] of the words Intelligent Design in the curriculum and
[16] the reading of the four paragraph statement.
[17]     And he felt as though we — I guess he felt a
[18] little bit betrayed, miffed off at the Science
[19] Department.
[20]     Q: Okay. And were there any other Board members present at
[21] that meeting?
[22]     A: No.
[23]     Q: In terms of response from the science faculty, what do
[24] you remember, Rob?
[25]     A: We kept our responses limited at that point. We left

Page 159

[1] our Association representative speak for us. My
[2] recollection was that he did.
[3]     I did make a response when he stated that the
[4] change in curriculum wasn't that much different from
[5] that of which the teachers suggested.
[6]     Q: Okay. Do I understand you correctly, Rob, that he is
[7] referencing to the differences between the XI-B version
[8] suggested by the teachers, and XI-C which was also
[9] billed as administration and staff in the final version?
[10]     A: He is referring to B which the teachers recommended and
[11] whatever letter that final draft that was actually
[12] adopted was.
[13]     Q: Okay. Well, you know the final version actually —
[14]     A: I know. That is why I am not —
[15]     Q: That is all right. It didn't exist until after the
[16] voting was had.
[17]     A: Right.
[18]     Q: That is what I am getting at. When Mr. Bonsell is
[19] looking back at how he understood the administration and
[20] staff position as of October 18th, he had those two
[21] versions XI-B and XI-C in front of him. So he told you
[22] there is not that big a difference.
[23]     Did you guys get into any discussion of that?
[24]     A: A little bit, yes.
[25]     Q: Tell me what you recall about that.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Robert Eshbach
May 20, 2005

Page 160

[1] A: My recollection of the discussion dealt with the fact
[2] that there wasn't that much of a difference. The only
[3] difference was one thing, that the words Intelligent
[4] Design were in the curriculum, the version that was
[5] adopted.
[6] Q: Sure. And did he respond to that?
[7] A: Actually, that was his saying. My response was then why
[8] are they there?
[9] Q: Okay. Did he say anything in response to that?
[10] A: Not that I recall. There was a little bit of silence.
[11] Q: Now at that time, you've got the statement is out in
[12] front of you, and there's this expectation that the
[13] statement is going to be read.
[14] Was there any discussion at this meeting about
[15] teaching Intelligent Design or any of the issues that
[16] had been the focus of discussion from say August through
[17] October 18th?
[18] A: As I recall, it focused on the fact that centered around
[19] this press release that DAEA put out on behalf of the
[20] Science Department.
[21] Q: And let me just for the record, Rob, let's look at
[22] Miller Exhibit 3. There is a document in there dated
[23] November 19th, 2004 in the upper left-hand corner.
[24] A: Yes, sir.
[25] Q: It is signed by the science faculty and Sandi Bowser.

Page 161

[1] Is that the document you have been referring to?
[2] A: That was the response to their press release. When I
[3] say their, that was the School Board's press release.
[4] This was not the actual document that appeared in the
[5] DAEA press release, but it contained the information
[6] stated in this reply.
[7] Q: So is that the substance of the science faculty's
[8] position?
[9] A: Yes, sir.
[10] Q: So this meeting then on the 16th is pretty much
[11] concerned with those issues, the press release issues?
[12] A: Yes, sir.
[13] Q: Anything else you recall from this meeting?
[14] A: Nothing that sticks out in my mind right at this moment.
[15] MS. PENNY: Before you leave this, check the
[16] exhibit number you were just referencing, Miller
[17] Exhibit 3? It should be Miller Exhibit 5.
[18] MR. GILLEN: You are right. Jane, I thank you,
[19] again. I am picking them up in piles at this point.
[20] That's good.
[21] BY MR. GILLEN:
[22] Q: Rob, let me just ask you: Did you go to any Board
[23] meetings in November of 2004?
[24] A: Not that I recall.
[25] Q: How about the December Board meetings?

Page 162

[1] A: Yes, sir.
[2] Q: Do you recall which one you went to?
[3] A: It was the one prior to Christmas in which the Board
[4] approved to have the Thomas More Law Center represent
[5] them.
[6] Q: Do you recall any statements relating to the biology
[7] curriculum at that meeting?
[8] A: Directly related to the biology?
[9] Q: Did anyone seize this opportunity to get back into the
[10] merits of the change?
[11] A: Not that I recall because as I believe, the lawsuit was
[12] filed at that point and things were moving forward.
[13] There was discussion about that, but not about the
[14] curriculum or the biology in particular.
[15] Q: Let me ask you: At any time since October 18th, 2004,
[16] have you spoken with any Board members about the
[17] curriculum change other than the discussions we have
[18] already talked about today?
[19] A: Not that I can recall, no.
[20] Q: How about any former Board members? Did you speak with
[21] Jane Cleaver?
[22] A: No, sir.
[23] Q: Noel Wenrich?
[24] A: I did not speak with him, no.
[25] Q: Casey Brown?

Page 163

[1] A: Regarding the change in curriculum?
[2] Q: Yes. Or the biology text or generally the conduct of
[3] the Board in matters relating to the dispute here.
[4] A: I spoke with her, not directly at any of those things
[5] that you have just —
[6] Q: What did you speak with her about?
[7] A: I got a phone call from her. My wife got a phone call
[8] from her actually and left a message, and I returned the
[9] telephone call.
[10] Q: What was it about?
[11] A: The message she left was that, if I recall, an
[12] Associated Press reporter had contacted her by the name
[13] of Martha Raphael maybe. And that she gave her my
[14] telephone number and suggested that she talk with me.
[15] Q: Was Casey Brown basically giving you a heads-up, you
[16] might get a call from a media person?
[17] A: As a matter of fact, I believe that was the point of her
[18] calling.
[19] Q: How about Angie Yingling, did you ever speak with her
[20] about the curriculum change?
[21] A: No.
[22] Q: Sheila Harkins?
[23] A: No, sir.
[24] Q: Bill Buckingham?
[25] A: No, sir. Not that I can recall.

Robert Eshbach
May 20, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

Page 164

[1] Q: If I look at Miller Exhibit 6, Rob, it looks like you
[2] spoke with Mr. Rothschild about the Dr. Peterman memo?
[3] A: I did not speak with him directly about the memo.
[4] Q: Okay. What did you speak about?
[5] A: Well, it was my number that he called during a lunch
[6] period of Mrs. Spahr's and mine. And he then asked if
[7] he could speak with Mrs. Spahr, if she was available. I
[8] turned the phone over to her.
[9] Q: Well, if you look at the packet of documents that we
[10] have marked as Eshbach Exhibit 1, three pages in, Rob,
[11] there is a portion of an e-mail —
[12] A: Yes, sir.
[13] Q: — dated Sunday November 21st, 2004 from Eric Hicks.
[14] You have got some handwritten notations there?
[15] A: Yes, sir.
[16] Q: What do these notations reflect?
[17] A: This was an e-mail sent to me randomly I guess from
[18] someone who I have never met. But he took the time to
[19] write this in much of an involved e-mail. I thought out
[20] of professional courtesy, I felt I should take the time
[21] to respond to him.
[22] These notes were basically my thoughts as I read
[23] his e-mail to me and were more than likely involved in a
[24] response that I sent back to him.
[25] Q: Do you recall responding?

Page 165

[1] A: I am certain that I did.
[2] Q: Further down in that pile, there is a statement to the
[3] Dover Area School District by Warren M. Eshbach. Is
[4] that your dad?
[5] A: Yes, sir, that is.
[6] Q: Did he give you that document?
[7] A: Yes, sir, he did.
[8] Q: And am I correct that that reflects the substance of his
[9] comments to the Board on October 18th, 2004?
[10] A: I am not certain that that is in regards to —
[11] Q: It could have been later? I say that because he says
[12] what brings us here today.
[13] A: Right.
[14] Q: But he says recent decisions.
[15] A: I am not so certain that this was not on the
[16] December 20th — or at the December 20th Board meeting.
[17] Q: Why do you think of that Board meeting, Rob?
[18] A: Because I know he gave a statement there, and I know he
[19] took the time to write it out. As I recall when he was
[20] finished his statement, he gave it to me.
[21] Q: Anything else about that December 20th meeting that
[22] sticks out? Is that the meeting at which counsel was
[23] selected?
[24] A: Yes.
[25] MR. GILLEN: I have no further questions.

Page 166

[1] MS. KNUDSEN: I have just have one in follow up.
[2] Jane, I am going to butt ahead of you.
[3] BY MS. KNUDSEN:
[4] Q: You were talking about the October 8th meeting in 2004,
[5] and you said they said this was not an administrative
[6] charge or change; this was a directive of the Board.
[7] Who was the they you were referring to, Dr. Nilsen
[8] or Mr. Baksa?
[9] A: Both were present at the beginning of that meeting.
[10] Q: You think both of them made statements to that effect?
[11] A: I recall one of them speaking. I don't recall which one
[12] was speaking.
[13] MS. KNUDSEN: Thank you.
[14] MS. PENNY: No questions.
[15] (The deposition was concluded at 3:00 p.m.)
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 167

COMMONWEALTH OF PENNSYLVANIA   :
COUNTY OF CUMBERLAND            :

I, Vicki L. Fox, Reporter and Notary Public in and
for the Commonwealth of Pennsylvania and County of
Cumberland, do hereby certify that the foregoing
testimony was taken before me at the time and place
hereinbefore set forth, and that it is the testimony of:

ROBERT ESHBACH

I further certify that said witness was by me duly
sworn to testify the whole and complete truth in said
cause; that the testimony then given was reported by me
stenographically, and subsequently transcribed under my
direction and supervision; and that the foregoing is a
full, true and correct transcript of my original
shorthand notes.

I further certify that I am not counsel for nor
related to any of the parties to the foregoing cause,
nor employed by them or their attorneys, and am not
interested in the subject matter or outcome thereof.
Dated at Camp Hill, Pennsylvania, this 25th day of
May, 2005.

Vicki L. Fox
Reporter - Notary Public

(The foregoing certification does not apply to any
reproduction of the same by any means unless under the
direct control and/or supervision of the certifying
reporter.)

---

**Lawyer's Notes**

Tammy Kitzmiller, et al. v.
Dover Area School District, et al.

Robert Eshbach
May 20, 2005

**0**

02 15:17
03 15:18

**1**

1 7:3; 16:9; 17:4; 20:4, 4;
23:11; 28:22; 30:7; 92:19,
20; 152:6, 7; 164:10
11/5/04 150:4
11:38 14:13
12/7/2004 152:1
12th 56:1; 77:13; 126:22;
128:18
13 63:9
14 47:15
14th 45:23, 25; 46:19;
47:9, 18; 50:3, 6, 7, 12;
52:16; 54:19; 55:3, 14, 16;
57:24; 76:11, 17, 19, 20,
24; 99:8; 113:20
15th 12:13; 14:9; 45:18,
24; 126:22; 128:18
16 83:7
16th 14:9; 148:2; 153:13;
154:8; 157:7, 10, 13;
161:10
18th 11:14; 115:22;
127:21; 130:24; 132:21;
133:23, 24; 134:10; 135:6,
13; 147:16, 18; 148:16;
157:2, 9, 13; 159:20;
160:17; 162:15; 165:9
19 139:7; 155:4
1983 103:17
1989 6:10
1995 6:12
1998 26:9, 19
19th 150:8; 154:18;
160:23
1:30 12:19; 13:20; 14:15
1st 16:15; 33:17; 55:6·

**2**

2 56:3, 6; 61:15; 62:8;
70:6; 73:13; 77:18; 82:24
2's 7:3
2,000 51:9
20 127:2; 139:8
2002 11:20, 22; 12:2, 3;
25:19; 62:20; 76:2; 77:19;
78:1, 19, 20; 79:18; 80:25
2002-2003 6:24
2003 12:4; 14:23; 15:2;
16:15; 17:4; 20:4; 23:23;
24:7, 18, 21; 25:4, 11, 21,
22; 28:11; 29:6; 31:2, 10,
11, 11, 16, 20, 24; 39:10;
40:12, 13, 17, 19, 19;
41:18; 45:8; 54:5, 13; 66:4;
67:12; 84:9

2003-2004 45:14
2004 11:14; 12:13; 41:12,
19; 42:1, 22; 43:2, 5, 15,
17, 24; 44:22; 45:9, 22;
46:13, 19; 47:9, 15; 54:19,
24; 55:1; 56:1, 9; 57:7, 11,
14; 66:22; 74:6; 77:15, 17,
19; 78:1, 4; 79:15, 18, 22;
80:23; 81:12; 83:3, 18;
84:10; 86:23; 87:3, 8, 9;
88:25; 90:16; 91:25;
99:13; 102:5; 103:5;
115:4, 9; 132:21; 147:25;
151:23; 153:13; 155:4;
158:6; 160:23; 161:23;
162:15; 164:13; 165:9;
166:4
2005 10:2
20th 165:16, 16, 21
21st 164:13
22 131:7
23 106:24, 25
24th 147:24; 154:7
25 106:25
28th 9:25
2nd 16:17; 55:1; 87:1;
89:2, 3, 23; 90:13; 93:1;
95:7; 97:24; 98:4, 12; 99:1,
15, 21; 100:1, 11, 12;
110:21

**3**

3 46:11; 55:25; 77:12;
89:2; 97:24; 100:4; 115:6;
116:5; 160:22; 161:17
3-28 12:19
3-28-05 13:18, 20; 14:15
3-28-2005 12:17
30th 99:13, 15, 22;
100:19, 23; 101:3; 102:18;
103:23; 107:18; 108:6;
109:5; 111:6; 112:11;
113:10; 114:11, 15;
118:24; 125:18
381 63:13
382 67:15, 19
3:00 166:15

**4**

4 31:17; 44:20; 79:20;
99:10; 113:17; 114:9;
126:17; 128:17; 149:1
440 63:2
4th 55:1; 115:4, 9

**5**

5 12:11; 103:4; 150:2;
155:1; 161:17
5192 5:14

**6**

6 12:15; 164:1
6-04-04 57:20
6-4-04 56:16

**7**

7 126:24; 130:15; 131:8;
139:7, 7; 151:23
7th 46:13; 158:6

**8**

8th 114:10, 12, 15, 23;
115:10, 13; 116:2, 11, 13;
117:13, 17; 118:9; 119:19;
120:6; 125:5; 126:7, 18;
127:20, 24; 166:4

**A**

able 27:15; 104:11;
117:22; 123:6, 6, 12;
131:14, 22; 142:17, 24
above 16:21; 86:10;
121:14
absent 89:11
accept 51:4; 93:16
acceptable 83:19; 85:12,
14, 22; 125:7
acceptance 50:14; 51:3
accessible 145:24, 25
According 60:21; 75:24;
84:24
account 104:14
accurate 10:15
across 23:9; 63:24;
98:19; 117:18; 145:23
action 90:25; 91:1
actions 26:15
actual 40:9; 135:17;
161:4
actually 27:9; 28:2;
29:20; 31:10; 68:7; 79:7;
98:7; 101:15; 135:12;
141:3; 148:3; 152:13;
159:11, 13; 160:7; 163:8
adamant 104:19; 110:13,
14
add 103:18
added 102:25; 133:9
Adding 119:15
addition 27:22, 24; 56:25
additional 33:13; 90:2,
10; 95:20
address 5:5, 23; 6:6;
35:18; 132:5
addressed 20:23; 22:16;
30:13; 35:3; 54:16; 77:3;
102:22; 107:20; 138:3;
147:4

addresses 24:6
addressing 22:8; 88:13;
112:3; 120:12; 132:14, 16,
17
adhesive 117:8
administration 18:1;
26:3; 28:13; 29:3; 30:19;
35:16; 40:22, 23; 43:10,
11; 60:11; 92:4; 102:23;
107:12; 109:4; 120:24;
125:4; 132:12, 17, 24;
134:4, 8, 11, 17; 138:18;
151:12; 155:7; 159:9, 19
administration's/staff
135:25
administrative 126:11;
166:5
Administrator 141:18
administrators 134:14
adopt 139:4
adopted 128:25; 159:12;
160:5
advanced 123:24;
124:10
adverse 28:25
advised 23:12; 92:18, 20
advising 73:24
aftermath 9:3; 98:12;
99:1, 8
afternoon 16:14
afterward 17:13
afterwards 31:6
again 3:14; 4:9; 9:24;
10:6, 13; 12:17; 14:1, 2;
16:6; 17:23; 18:17; 21:16;
22:20; 23:19; 25:21; 27:1,
1; 28:5, 9; 29:13; 31:1;
33:3, 4, 7, 14, 16; 34:14,
15, 16, 24; 36:7; 37:12;
41:12; 42:1, 10, 18; 43:4;
44:3, 15, 20; 48:23; 51:17;
52:4; 53:13, 17; 54:14;
55:14; 56:18; 61:6, 9;
63:18; 65:11; 66:25; 67:6;
68:9; 74:3; 80:11, 12;
81:14, 15; 83:17; 84:18;
85:23; 86:2; 87:10; 88:5;
91:12, 16, 21; 92:8; 93:4;
94:6, 23; 95:3, 13, 19, 24;
96:21, 24; 97:2; 101:21,
21; 117:1; 118:7; 121:16;
122:9; 124:18; 126:18;
127:23; 131:12; 133:8, 9;
136:15; 139:14; 143:24;
144:16; 146:11; 147:7;
150:19; 156:6; 161:19
against 53:18; 95:12;
96:3
agenda 46:13, 16, 19;
47:9, 15; 50:12; 52:15;
77:13; 89:3; 97:24; 100:2,
3; 115:5
ago 51:9; 64:18
agree 50:18; 62:6; 64:10;
69:11, 14; 87:14; 95:25;
106:3, 4; 109:25; 111:11,
17

agreed 69:10, 17; 95:8;
110:21; 138:5; 156:24
agreeing 151:15
agreement 98:17
ah-huh 4:3
ahead 26:22; 39:3; 166:2
Alan 71:9, 19; 85:9, 9, 13,
21; 101:7; 139:15
Allegiance 48:9
allow 4:11; 53:19
allowing 4:8; 94:3
alone 84:14; 106:15
along 38:24; 42:14; 54:1,
2; 78:25; 130:6
alongside 113:7
altered 128:1
alternate 23:14; 92:22
alternative 113:1
although 45:16
amended 126:19; 127:10
among 93:13; 98:25;
139:21; 142:13
amongst 89:13
amount 11:10
Anatomy 7:3
Angie 55:13; 96:10;
98:15; 141:2; 142:1;
163:19
answered 102:19
Anthropology 7:11
anticipation 8:3
Apart 7:23; 8:8; 10:9;
26:1, 14; 30:18; 32:23;
33:10; 35:16; 49:18;
55:17; 85:6; 95:17; 138:7;
141:16; 150:24
apologies 116:3
apologize 100:22;
140:11
appealed 75:8; 86:14, 15
appear 68:7
appeared 63:20; 161:4
appearing 68:5
appears 102:19; 131:13;
133:8
appointment 104:4, 21;
110:3
approach 22:22; 30:14;
37:12; 109:16
approached 36:25;
37:14; 92:10
approaching 105:16
approval 68:21; 76:1;
93:16
approve 75:23; 90:16;
111:24
approved 26:7; 68:25;
69:4; 77:5; 78:12; 82:13;
86:22; 92:19; 99:18;
104:12, 13; 156:7, 21, 24;
162:4
approving 152:24
April 9:25; 14:24; 16:15,
17; 17:4; 20:4; 23:23;

Robert Eshbach
May 20, 2005

24:18; 30:7; 33:17
**Area** 5:18; 6:10, 21;
11:12; 56:8; 57:13; 70:19;
100:8, 9; 112:2; 133:10;
146:8; 153:18; 155:5, 14;
157:20; 165:3
**areas** 62:24; 69:18;
82:19; 87:17, 23, 25
**arguing** 144:4, 8
**argument** 52:4
**argumentative** 52:4
**arise** 131:19
**arising** 16:6
**around** 9:11; 14:7; 23:23;
45:18; 48:23; 57:21, 22;
68:14, 14; 70:20; 78:10,
10; 80:20; 85:3; 90:11;
97:3; 102:4; 105:7;
107:23; 114:24; 122:7, 10;
141:14; 146:16; 160:18
**arrival** 91:25
**article** 30:12
**articles** 10:14, 14
**articulated** 63:7
**aside** 44:8
**asleep** 74:15
**Assistant** 32:9; 141:18;
155:15
**associate** 116:12
**Associated** 163:12
**Association** 146:8, 13;
153:17, 18, 22; 157:20;
159:1
**assurance** 77:4; 78:11
**assure** 75:18
**asterisk** 129:6
**asterisks** 126:19
**attached** 134:2, 6
**attend** 36:5; 45:25; 59:1;
77:16; 101:18; 115:7, 11
**attended** 45:20; 46:2, 4,
6, 7; 47:18; 57:18; 84:6;
135:6; 153:13, 21
**attention** 3:24; 4:6; 12:5;
15:6, 9; 17:9; 28:10; 33:23;
34:3; 41:18; 66:6; 80:7;
90:10; 129:19; 132:20
**attorney** 7:21, 23
**attorneys** 3:15
**attributed** 13:12
**attributes** 104:18
**attributing** 18:21
**audience** 143:5
**August** 12:2, 3; 25:4, 22,
22; 28:11; 29:6; 31:2; 55:1,
6; 79:4; 82:12; 83:3; 87:1;
89:2, 3, 23; 91:25; 93:1;
95:7; 97:24; 98:4, 12; 99:1,
13, 14, 15, 21, 22, 25;
100:11, 12, 14, 16, 19, 23;
101:3; 102:18; 103:5, 23;
107:18; 108:6; 109:5;
110:21; 111:6; 112:11;
113:10; 114:11, 15;
125:12, 18; 160:16

**available** 23:8; 104:1;
108:14; 164:7
**aware** 118:1, 16, 19;
128:8, 12; 142:22; 148:17
**away** 90:19; 148:9, 16

# B

**B** 133:1; 142:20, 24;
143:1, 5; 159:10
**bachelor's** 6:11
**back** 18:17; 20:5; 27:5;
29:17; 33:3, 22; 44:25;
47:5; 49:8; 52:15; 54:4, 19;
73:13; 78:4; 79:9; 84:9;
87:2, 7, 9; 88:24; 91:12;
93:21, 23; 100:13; 101:13;
102:12; 103:7, 8; 109:8,
13, 13; 114:20; 130:18;
136:16; 140:16; 144:7;
148:2; 151:23; 152:14;
153:4; 159:19; 162:9;
164:24
**background** 6:9; 10:5;
72:14; 84:4
**backgrounds** 18:16
**Baksa** 16:5; 18:9, 22, 24;
19:20, 22; 22:13; 30:22;
32:8; 34:16, 22; 35:8, 17;
36:12, 18; 37:1; 57:4; 58:7;
61:9; 74:3; 80:14; 101:9,
21; 114:1; 115:2; 120:9,
12; 127:24; 129:24; 139:3;
141:7; 151:24; 153:20;
155:16; 166:8
**balance** 19:3
**bang** 139:23
**banging** 55:22; 140:16
**banter** 53:13
**Barrie** 44:4, 10, 13;
48:14; 97:18, 23
**based** 124:8
**basic** 11:6
**Basically** 8:17; 10:4;
13:15; 17:10; 21:11, 11;
24:13; 25:9; 26:6; 28:18;
29:16, 24; 36:6, 9, 22, 24;
44:15; 49:23; 52:20;
58:14; 60:7; 61:10; 62:2;
64:4; 65:22; 68:17; 72:10;
80:22; 96:16; 102:24;
103:21; 105:12; 121:6, 13;
125:21; 126:10; 139:17,
22; 143:24; 157:21, 25;
158:10; 163:15; 164:22
**Bates** 127:2; 131:7;
139:6, 8
**became** 6:21; 12:24, 25;
16:13; 49:10; 51:13; 75:7;
91:4; 139:20; 150:8
**become** 50:16
**beeline** 98:14
**began** 21:12
**begin** 4:9
**beginning** 6:9; 9:11;
14:23; 15:18; 24:22;

33:18; 41:12; 42:1; 66:10;
101:8; 102:17; 113:18;
135:14; 166:9
**behalf** 145:10; 146:12;
153:19; 154:4; 157:20;
160:19
**Behe** 124:6
**behind** 13:18; 127:3
**belief** 20:13; 84:22;
103:3; 123:10, 11, 17;
131:24
**beliefs** 123:17
**beliefs/feelings** 96:1
**believing** 72:7
**Beneath** 51:8, 9; 53:9;
126:18
**bent** 65:11
**Bert** 8:23; 13:22; 14:4, 18;
15:19; 17:12; 18:18;
19:13, 16; 20:21; 23:22,
23; 24:5, 8; 28:25; 38:11;
54:16; 59:14; 66:5, 25;
83:2; 90:9; 111:21; 112:3;
129:1, 3; 130:6; 135:10;
141:22; 145:1; 146:2
**Bertha** 13:15; 32:6; 58:6;
120:8; 136:13; 141:8, 9
**beside** 63:10; 141:18;
142:8
**besides** 146:2
**best** 4:21; 5:5; 18:7; 37:8;
55:7; 69:17; 73:23; 77:16;
85:19; 102:9; 105:5;
106:19; 120:7; 158:11
**betrayed** 158:18
**better** 37:6; 40:9; 91:23;
106:23
**Beyond** 57:1; 73:14
**Bible** 72:7
**big** 95:3; 140:18; 159:22
**Bill** 71:23; 75:8, 9; 86:15;
96:23; 109:25; 110:11;
153:21; 163:24
**billed** 159:9
**billions** 64:16
**biological** 21:19
**biology** 5:22; 6:11; 7:1, 2,
10, 12; 10:24, 25; 11:18,
18, 22, 23; 12:5, 6, 23;
13:7; 14:25; 15:1, 8; 20:9,
15; 22:13; 23:5; 25:14, 24;
26:10, 16, 16; 27:9, 19;
28:2, 7, 16; 30:1; 34:21;
36:8; 38:16; 41:2, 5, 16,
17; 42:8, 10, 12; 43:16;
44:1, 1, 7, 9; 45:3, 3;
48:11, 24; 49:7; 50:19;
51:19; 56:7, 11, 19; 57:12;
60:10; 61:24; 62:10;
69:11; 70:8, 19; 72:6; 73:6;
76:5; 77:19; 78:1, 7, 7, 15,
20; 79:5, 5; 89:9; 92:18,
19, 20; 93:2, 17; 97:15, 15;
100:8; 102:1; 103:3;
114:17; 120:3; 121:23;
125:24; 128:25; 134:3, 7;
145:19; 148:15, 22; 155:5,

14, 20; 162:6, 8, 14; 163:2
**bit** 17:20; 31:9; 33:25;
34:2; 37:19; 48:7; 64:12;
65:14; 75:16; 81:4;
116:17; 124:13; 129:22;
141:3; 148:11; 158:5, 18;
159:24; 160:10
**black** 133:6; 135:2; 155:4
**blank** 105:13
**blaring** 144:3
**blatantly** 65:22
**block** 135:4
**blocked** 130:19
**blurted** 51:15
**blurting** 141:7
**Board** 11:13; 15:21, 21,
24; 16:6; 18:25; 19:21;
25:23; 26:2, 11, 12, 15, 20;
30:2; 32:23; 33:7; 35:10,
13; 39:5; 40:16; 43:15;
44:4, 5, 13, 16; 45:3, 7, 20,
21; 46:1, 3, 10, 12; 47:18;
49:2, 6, 9, 24; 50:17;
51:14, 22, 24; 52:8; 53:14,
21, 25; 54:21; 55:1; 57:6,
24; 62:12; 65:17; 66:22;
68:25; 76:6, 12, 14, 20;
77:1, 6, 13, 14; 78:22;
79:3; 80:25; 81:7; 83:19;
86:25; 87:1; 89:11, 13, 15;
90:14, 15, 23; 91:5; 92:19;
93:1, 7, 11, 12, 13, 22;
94:14, 24; 95:5; 96:7, 20;
97:14; 98:4, 11, 12; 99:1,
7, 15, 21; 100:3, 5; 102:14;
109:18; 110:5; 113:5, 6;
115:4, 7, 19, 22; 126:13,
14; 127:21; 128:24;
130:24; 132:21; 133:18,
23, 24; 134:10, 12, 16;
135:13; 137:5, 14; 138:8,
11, 14, 16; 139:2, 14, 21;
140:3; 141:4; 142:4, 13,
21; 143:11, 14, 20; 144:22;
145:8; 146:18; 147:2, 12,
13, 15, 18; 155:5, 14, 18;
157:9, 13; 158:20; 161:22,
25; 162:3, 16, 20; 163:3;
165:9, 16, 17; 166:6
**Board's** 161:3
**Bob** 6:1, 2; 32:5; 37:14;
56:11; 70:23; 71:24, 25;
72:12, 13, 15; 75:11;
85:10, 15; 86:1, 4; 120:8;
125:24
**Body** 63:3
**Bonsell** 19:25; 31:20, 24;
32:1, 8, 23; 36:7, 16, 18,
21, 24; 37:5; 38:7, 20;
40:5, 8, 14, 25; 45:8;
52:17, 25; 54:4; 67:12;
84:9, 18; 85:2, 9; 91:17;
95:6; 96:5; 101:18; 109:19,
22; 110:4, 15; 111:1, 18;
139:15; 147:4, 22; 153:20,
25; 157:4, 18, 23; 159:18
**Bonsell's** 110:11
**book** 11:1; 26:10; 27:15;

39:13; 42:10, 12, 14;
52:10; 67:21; 70:25; 71:2,
2, 6, 8, 9; 72:5, 8; 75:12,
19, 19; 76:1, 1; 78:13, 15,
21; 79:6, 6, 6; 80:4, 7, 8, 9,
9; 84:11; 85:10, 11, 13, 15,
22; 87:2, 4, 4, 7; 88:24;
90:2; 93:17, 17, 18; 94:8,
11, 11, 13, 17; 95:12, 20;
97:6, 8; 99:20; 102:4;
103:25; 104:7, 17, 24;
105:8, 10, 14, 15; 106:6,
14, 14, 15; 107:24; 108:10;
110:1; 111:11, 25; 119:4,
21; 121:13; 128:6; 133:8;
134:20; 137:4, 11, 12, 16,
20, 22; 138:4, 4, 6; 150:22
**books** 41:2, 25; 44:7, 9,
14, 17; 48:24; 56:7; 57:13;
66:13; 69:4; 70:8, 10, 13,
17; 77:20; 78:18; 82:13;
86:22; 89:9; 91:18, 19;
96:18; 108:12, 13; 110:25;
119:11; 120:2; 121:2
**boring** 74:15
**both** 81:4; 85:3, 7; 86:10;
166:9, 10
**bother** 43:3
**bothered** 151:11
**bottom** 17:11, 24; 29:14;
63:19; 103:13, 18; 104:16;
129:5; 133:9; 152:11, 17;
155:13; 158:6
**bought** 93:18
**Bowser** 47:1; 160:25
**boxing** 103:16
**bracketed** 121:10
**brand** 66:13
**break** 5:7; 31:13; 77:8;
89:19, 22; 125:8
**brief** 31:12; 38:4, 5; 77:8
**bring** 3:23; 4:5; 25:3;
57:5; 129:18; 140:17
**bringing** 38:11; 97:2;
132:20
**brings** 41:12; 165:12
**brought** 17:9; 34:10, 14,
15; 38:18; 39:25; 62:22;
66:5; 68:8; 90:10, 12;
91:13; 105:3; 106:21;
132:23
**Brown** 52:1, 2; 53:10, 17;
55:20; 58:7; 68:17; 75:2, 4;
86:12; 88:12; 93:21; 94:6,
9; 96:19, 19; 101:7, 23;
102:6, 25; 104:5; 140:13;
143:17; 162:25; 163:15
**Bryan** 10:20, 21; 32:6;
39:24
**Buckingham** 49:15, 18;
50:8; 51:10; 52:2, 2, 14;
53:24, 24; 55:18; 58:6;
62:2, 12, 17; 63:8; 64:7;
65:1, 5; 66:1; 67:1, 22;
68:13, 16, 18; 69:3, 13;
71:5, 9, 11, 18, 23; 75:23;
76:24; 78:12; 83:21, 25;
84:13, 25; 85:3, 8, 13, 17,

**Min-U-Script®**   **Filius & McLucas Reporting Service, Inc.**

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Robert Eshbach
May 20, 2005

20; 93:15, 21; 95:8; 96:23;
97:5; 98:14; 101:8; 104:3,
18, 23; 108:9; 110:3, 6, 10,
22; 136:17; 143:23;
144:11, 14; 163:24
**Buckingham's** 84:20
**budget** 91:17; 104:11,
12, 13; 105:22
**budgetary** 27:3
**budgeting** 28:15; 104:14
**budgets** 27:7; 28:20;
104:10
**Building** 47:25; 66:15
**burned** 65:23
**busy** 33:19
**butt** 166:2
**bystander** 98:19

## C

**C** 53:10; 133:1; 142:21,
24; 143:1, 5
**cafeteria** 98:13; 141:6
**call** 6:5; 28:8; 78:13; 80:2;
119:9; 122:20; 123:4;
163:7, 7, 9, 16
**Callahan** 44:24; 10, 13;
48:14, 22; 49:1; 97:18, 23
**called** 3:7; 6:16; 79:1;
80:16; 96:15; 153:15;
164:5
**calling** 163:18
**calm** 33:25
**calmed** 34:2; 91:15
**came** 12:4; 15:14; 16:22;
33:3; 54:12, 13; 64:15, 25;
66:11; 80:7; 89:9; 90:19,
22; 91:22; 92:16; 93:7, 10;
95:25; 98:10; 106:25;
112:7; 113:2; 141:7;
148:9; 157:20; 158:5
**can** 5:5, 7; 9:20; 10:11;
11:15; 12:9; 15:19; 18:6;
20:18; 25:7; 27:7; 28:10;
30:25; 42:2; 43:13; 44:1;
45:2; 50:2; 51:25; 55:6, 20;
57:9; 58:19; 60:6; 61:4;
63:1; 73:23; 74:14, 22;
76:9; 77:1, 16; 78:5; 81:21;
84:17; 87:12; 88:22; 89:2;
92:8; 93:14; 94:1, 25;
97:21; 98:5; 99:3, 9, 16,
22; 105:24; 106:22;
107:23; 110:16; 112:1, 2,
13; 115:5, 12; 123:12;
124:12; 125:16; 139:15,
17; 146:22; 157:5, 11, 15;
162:19; 163:25
**Canal** 5:14
**cancelled** 100:15
**capacity** 5:19; 144:17;
149:8
**caption** 63:10, 11
**carbon** 38:1, 6; 40:1; 54:6
**care** 6:16; 96:17

**carry** 107:3; 110:1
**case** 3:15; 4:20; 29:16,
23, 24; 125:21
**Casey** 53:17; 75:2, 4;
86:12; 88:12; 96:19;
101:7; 102:6; 104:5;
143:16; 162:25; 163:15
**cell** 21:19; 64:15
**celled** 64:16, 20
**Center** 162:4
**centered** 48:23; 68:14,
14; 70:20; 97:3; 102:3;
107:23; 122:10; 137:14;
160:18
**cents** 25:15
**certain** 38:13; 45:25;
50:24; 60:24, 25; 62:20;
67:23; 73:19; 84:15;
97:19; 122:5; 165:1, 10, 15
**certainly** 38:9; 65:4;
87:25; 118:18; 124:13;
129:20; 140:1
**certification** 3:3; 6:20
**certified** 12:25
**chair** 15:13; 35:24;
136:13
**Chairperson** 145:11
**Chambersburg** 6:20
**chance** 3:20; 124:24
**change** 10:25; 13:8; 22:6;
27:20, 24; 88:21; 92:1, 3;
107:15; 112:4, 4, 8;
115:22; 116:23; 117:14;
121:7; 126:11; 127:22, 25;
131:1; 136:7, 14; 142:5;
143:10, 22; 144:2; 146:12,
14; 147:18; 148:5; 152:24;
156:8, 22, 24; 159:4;
162:10, 17; 163:1, 10;
166:6
**changed** 21:1, 7, 25;
22:4, 24; 23:3; 96:16
**changes** 21:13; 77:19;
82:25; 83:9; 87:10; 90:8;
115:2; 118:11; 134:3, 7;
143:2; 144:21; 149:12, 18
**changing** 88:23; 114:17
**chaotic** 115:17; 139:20
**charge** 155:16; 166:6
**charitable** 9:6
**Charlotte** 50:8
**chart** 57:1; 73:14
**check** 145:4; 161:15
**checked** 146:21
**Chemistry** 73:5; 120:3
**children** 44:14
**chime** 37:21, 23
**chimed** 37:19
**chose** 23:6; 25:19
**Christian** 72:6
**Christians** 72:7
**Christmas** 162:3
**Christy** 10:20, 21
**chronological** 27:2
**Cindy** 10:20; 11:6

**circled** 31:19; 44:21;
79:21; 99:11; 114:9;
128:16; 149:7
**circling** 103:16
**claims** 67:23; 81:12, 19,
23
**clap** 135:11, 20
**clarify** 37:23; 138:4;
154:16
**class** 15:8; 20:9, 23;
27:18, 18; 28:8; 30:1; 36:9,
15; 38:16; 40:3; 50:19;
60:10; 66:14; 70:20; 73:6;
92:1; 112:21; 121:23;
132:1
**classes** 20:15; 27:12, 15,
16, 18; 112:17; 121:3
**classroom** 23:18; 34:21;
40:10; 42:20; 66:18;
101:25; 102:1; 105:24;
106:19, 24; 107:2; 108:5,
10, 12; 110:1, 19; 112:6,
23; 138:5; 139:1; 150:21
**classrooms** 27:17;
104:2; 105:9
**clear** 37:24; 75:13
**cleared** 36:13
**Cleaver** 55:2; 89:12;
140:24; 162:21
**close** 40:12; 96:23
**closer** 57:23; 116:17
**closest** 88:9
**Co-President** 146:8;
153:22
**coffee** 35:1
**collaborate** 145:15
**colleagues** 35:12; 41:22;
58:21; 59:15; 79:25;
80:19; 81:10; 82:2; 83:10;
111:21; 131:6, 11; 132:10;
136:2; 145:1; 146:2, 3, 6;
153:1
**College** 6:12, 20
**Columbia** 100:8
**column** 118:4, 14, 22;
120:15, 22; 127:7, 13
**coming** 5:2; 39:8, 18;
43:10; 49:6; 59:23; 64:11;
65:11; 101:12; 148:15
**comment** 48:17, 20;
51:17, 20; 65:21; 95:17;
97:14; 111:1; 136:9, 16,
19; 140:14; 142:2
**commented** 18:13
**commenting** 146:1
**comments** 49:22; 76:25;
95:15; 107:20; 110:11;
134:11; 135:10; 139:2;
140:7; 142:1; 144:19;
145:1; 146:10; 165:9
**committee** 39:6; 41:25;
42:5; 44:23; 45:4, 22;
56:15; 57:6; 58:4, 14;
61:17; 66:23, 24; 68:19;
69:13; 74:7; 76:8, 13, 19;
77:7; 78:22; 79:4; 83:23;

86:25; 100:24; 101:18;
111:6; 126:20
**committee's** 143:11
**common** 64:17, 18, 21;
67:9; 88:7
**commotion** 129:15
**communicated** 67:13
**communication** 4:18;
29:12; 95:1
**communications** 10:8;
35:7, 13; 94:14
**community** 11:17; 44:5;
49:9; 50:17; 51:15; 89:15,
15; 93:12; 94:24; 115:19;
139:22; 152:24, 25
**companion** 93:18; 97:6,
8; 102:5
**company** 6:16
**comparing** 81:25
**comparison** 77:25;
79:17; 80:21; 86:24
**comparisons** 78:3
**compilation** 154:24
**compiling** 47:4
**complementing** 37:20
**completed** 12:25; 91:9;
136:17
**complex** 106:14
**complexity** 124:4, 9, 16,
23
**complies** 46:17; 56:5, 24;
98:2
**comprehension** 121:15,
16
**comprised** 21:24
**compromise** 87:18;
105:19, 23; 111:24; 112:2;
128:2; 138:6
**compromised** 87:21;
128:9
**concentrate** 20:25
**concept** 23:9; 88:4;
124:4, 9, 15, 17, 22;
143:14
**conception** 21:23
**concepts** 107:21; 133:10
**concern** 28:22; 29:1;
30:5; 34:7; 67:23; 120:25;
121:10, 20; 129:18;
132:14, 17, 20; 146:19;
150:25; 151:3; 152:19
**concerned** 22:23; 47:22;
92:13; 152:25; 161:11
**concerning** 80:1; 90:15;
97:15; 114:13; 124:9, 22;
129:8; 136:14; 150:15;
154:21
**concerns** 12:4; 29:15;
37:10; 62:2, 18, 19; 63:7;
66:5; 77:2; 84:1; 85:2, 3;
106:13; 125:4; 143:21
**concluded** 166:15
**conclusion** 83:17
**conclusions** 80:20
**conduct** 91:10; 163:2

**conference** 101:2
**confident** 108:25; 127:17
**confirm** 27:23
**confused** 63:25
**connected** 40:24
**connection** 13:22;
14:19; 22:9; 27:20; 28:1;
54:17; 62:13; 84:13;
107:19
**conscience** 95:11
**consideration** 62:11
**considerations** 27:3
**construed** 151:15;
152:23
**consulted** 7:16
**contact** 12:24
**contacted** 13:24; 14:2;
79:14; 103:22; 163:12
**contained** 161:5
**contemplated** 87:10;
142:6
**content** 113:6; 126:3
**Content/Concepts**
118:14; 127:8; 133:13
**contention** 75:15;
119:25
**contents** 18:4
**continuation** 33:11
**continue** 23:13; 46:18;
47:8; 56:25; 92:21
**continued** 34:7, 13;
137:3
**contract** 66:9
**contrast** 123:23
**controversial** 144:23
**controversy** 11:23
**conversation** 4:10; 9:4,
10; 11:10; 14:4; 15:13;
16:4; 18:9, 22; 19:17; 29:?;
9; 30:6, 22; 31:9; 68:1;
83:11, 12; 90:6; 98:23;
103:19; 105:12; 111:9;
130:11, 12; 147:23
**conversations** 9:7;
10:10, 12; 13:5, 10; 83:1?
147:12
**Conversed** 8:13
**conveyed** 65:24; 101:?
**cool** 86:10
**coordination** 155:17
**copies** 26:9, 19; 28:17;
62:22; 73:20
**copy** 38:20; 73:19, 20;
78:14, 23, 24; 82:20;
85:10; 93:5; 125:19, 22,
24; 135:2; 142:23; 152:?
154:23
**Copyright** 77:19
**cordial** 36:10; 40:8
**corner** 31:19; 44:21;
46:21; 56:9, 16, 21; 57:?
79:21; 99:11; 100:6;
114:10; 128:16; 149:3;
160:23
**corrected** 149:9, 11

Robert Eshbach
May 20, 2005

Tammy Kitzmiller, et al.  v.
Dover Area School District, et al.

correcting 149:8
corrections 150:4
correctly 60:22; 156:19; 159:6
cost 104:6, 7
counsel 7:16, 17, 18, 20; 8:9; 9:7, 23, 24; 10:8; 165:22
count 68:21
couple 62:10; 122:14; 134:1
course 14:8; 27:22; 80:6; 84:12; 116:7; 119:12; 158:11
courses 13:1; 28:3, 3; 119:12
coursework 7:1, 7
court 29:16, 23, 24
courtesy 164:20
Courts 143:25
cover 125:20, 20; 126:1, 1; 127:3; 130:17; 134:1, 2, 5; 143:3
coverage 50:3, 5
covered 26:1; 28:7; 80:23
create 88:9
creates 91:10
Creation 57:2; 73:14; 144:11
Creationism 18:10, 15, 25; 19:1; 20:15; 22:14, 15, 18; 23:13, 25; 24:3, 25; 29:18, 25; 30:14; 33:25; 38:16; 49:17; 51:20; 52:5, 20; 53:12, 18, 20; 54:7, 12; 72:19; 86:5; 92:5, 21; 96:2; 97:7, 17; 101:25; 102:7; 103:3; 144:7
credit 156:4, 5, 16, 16, 17
criticizing 143:14
cross 51:9
curious 9:3
currently 5:15; 66:25
curriculum 10:25; 11:18, 23; 12:6; 13:8; 15:1, 4; 19:4; 20:11; 26:11, 17; 39:6; 41:17, 24; 42:4; 44:1, 23; 45:3, 4, 21; 56:15; 57:6, 17; 58:4, 14; 61:6, 17; 66:23, 24; 68:18; 69:13; 74:7; 76:6, 8, 13, 19; 77:1, 7; 78:7, 11, 22; 79:4, 5; 83:22; 85:9; 86:25; 87:11, 13; 88:18, 21, 23; 92:20; 97:15; 100:24; 101:17; 102:1; 103:3; 107:15; 111:6; 112:3, 4, 8, 9; 114:17; 115:22; 116:7, 23; 117:14; 119:8, 9, 18; 120:2; 121:18; 122:9, 13; 125:2; 126:9, 19; 127:2, 6, 22, 25; 128:1, 23, 24, 25; 129:5; 130:18; 131:1; 134:3, 7, 16; 136:7, 11, 14; 137:17; 139:4; 142:5; 143:2, 9, 11, 22; 144:2, 17,

20; 147:18; 148:5, 17; 152:24; 153:9; 155:5, 14, 16, 20; 156:8, 21, 24; 158:15; 159:4; 160:4; 162:7, 14, 17; 163:1, 20
cut 27:7; 28:20; 104:10
cuts 91:17; 105:22

D

dad 165:4
DAEA 153:17; 154:3; 160:19; 161:5
dare 140:17
Darwin 22:1; 95:11
Darwin's 15:8, 22, 22; 20:10, 24; 60:8, 12; 64:9, 12, 13; 68:3; 69:14, 19; 70:20; 84:19; 87:15, 24; 91:14; 92:10; 95:25; 108:14, 16; 112:24; 117:23; 118:1, 20, 21; 128:8, 12; 131:20; 154:21
Darwinism 52:10; 81:1; 97:4
date 14:16; 16:15, 16, 16; 45:17; 56:16; 57:20; 96:3; 115:8; 148:1; 151:25; 154:5; 155:3
dated 12:13, 17; 13:18; 14:15; 17:4; 20:3; 103:5; 151:23; 154:17; 158:6; 160:22; 164:13
dates 100:20; 116:22; 120:16
dating 38:2, 6; 40:1; 54:7; 98:6
Dave 120:8
day 14:5, 10, 13, 17; 16:5; 34:25; 45:14; 48:20; 57:18; 58:3; 61:6; 66:8, 9, 10, 16, 17; 76:15; 79:8; 101:13; 109:8, 8, 13; 113:18, 24, 24; 114:1, 24; 117:20, 22; 133:20, 20, 22, 23
day-to-day 4:10
days 8:24; 109:13
deal 123:16; 130:14
dealing 124:4
deals 21:12, 13, 25
dealt 24:2; 74:18; 122:7; 137:7; 154:15; 160:1
Debate 57:2; 73:15
December 9:12; 12:13; 14:6; 148:2; 151:23; 153:13; 154:8; 157:7, 10, 13; 158:6; 161:25; 165:16, 16, 21
decide 143:25
decided 28:16; 29:16; 100:15
deciding 29:22
decision 89:9; 111:15; 146:25; 156:14, 15

decisions 165:14
defendants 3:15
definite 50:5; 115:12
definitely 70:1; 104:9; 152:21
degree 6:11; 136:23
Department 8:13; 13:16; 15:13; 25:10, 17, 18; 26:3; 27:4; 31:21; 32:4, 19; 35:12, 23, 24; 36:6, 11; 39:23; 41:23; 42:6, 18, 24; 43:2; 44:19; 58:16; 59:15; 61:24; 65:23; 73:12; 74:2; 84:9; 94:10, 19; 101:2, 15, 16; 118:12; 120:1, 21; 128:25; 136:13; 139:5; 145:6; 146:3, 11; 153:17; 155:17, 25; 157:21; 158:12, 19; 160:20
Department's 25:12; 122:8; 145:10
Departments 25:8; 42:6
deposition 3:17, 22; 4:7; 5:6, 24; 7:15, 21, 24, 25; 8:4, 5, 12; 9:1, 5; 11:5; 122:25; 152:7; 166:15
depositions 8:24; 9:3
depth 17:8
descent 63:14, 24; 64:14; 67:8; 88:7
described 23:7; 55:17; 83:10; 118:15; 123:21; 124:1
describing 59:3; 62:18
description 72:5; 116:7
Design 11:1; 13:8; 19:14; 39:8; 41:17; 52:17, 18, 21, 22; 53:6, 12; 69:21, 25; 88:3, 11, 13; 96:6; 97:16; 99:20; 106:8; 107:21; 118:3; 119:3, 16; 122:3, 9, 11; 123:15; 128:10; 130:8, 8, 14; 134:21; 138:12, 23, 25; 143:7, 13; 144:12, 15; 148:7, 18; 150:20; 154:22; 156:23; 158:15; 160:4, 15
designer 123:11
desire 108:18; 110:18; 113:6
detail 59:4; 71:11; 82:3
determining 124:11
developed 126:17; 155:18, 25; 156:1; 157:22
Development 63:3; 148:24; 154:20; 155:16
developments 3:20; 78:5; 99:16; 114:13; 124:12; 128:18
died 51:9
differ 133:14
differed 82:15
difference 37:7; 159:22; 160:2, 3
differences 80:1, 15; 133:4; 159:7
different 3:20; 4:25; 21:5;

25:15; 64:13, 23; 74:24; 82:7, 8; 101:25; 114:4; 119:12; 120:18; 133:14; 159:4
differentiate 21:9
difficult 4:14; 90:24; 91:1; 121:13
diplomatic 129:22
direct 126:12; 147:7
directed 51:14; 92:1; 97:14; 111:8, 9, 10; 119:2; 134:12; 136:25; 138:11; 140:13; 141:4; 158:7
directing 105:11
direction 107:7, 11; 108:24; 110:10, 12; 131:23; 148:13
directive 126:12; 166:6
directly 59:18; 130:3; 138:3; 162:8; 163:4; 164:3
Directors 155:5, 14
disappointed 141:17
discouraging 148:11
Discovery 39:12, 17; 59:8, 9, 16, 18, 20; 60:9
discrepancies 36:14; 61:13
discuss 9:17; 10:3; 36:7; 58:16, 20; 131:14; 135:23
discussed 10:11, 21; 21:10; 38:3; 67:11; 69:22; 72:8, 23; 73:2; 90:11; 96:5; 107:15; 112:9; 114:2, 7, 14; 118:16, 18
discussing 10:5; 26:8, 24; 61:11; 72:21; 76:5; 78:6; 99:17; 132:22
discussion 9:13; 13:15; 17:18, 20; 18:3; 19:3, 6; 20:14, 15, 21; 22:17; 24:5, 11, 12; 25:1; 30:18; 34:1, 18, 19; 35:1; 37:25; 38:1, 10, 15; 41:25; 48:13; 49:8, 10; 52:18; 53:11; 54:5; 58:21; 61:23; 62:1; 63:15; 64:1; 68:13; 69:6, 9; 70:9, 12, 15, 17, 24; 71:1; 73:3, 21; 80:22; 81:10, 22; 82:11; 87:10; 89:13, 14; 90:8; 93:10, 10, 20; 94:8; 98:11; 99:7; 102:3; 103:12, 16; 104:6, 23; 105:1, 3; 107:6, 13, 18, 20, 23; 112:20, 22; 114:17; 117:5; 118:23; 119:19; 122:4, 5, 6; 126:9; 129:8, 11; 130:4; 131:5; 132:5, 11; 136:5, 15; 137:3, 4, 11, 14, 15, 18; 140:17; 142:13; 143:8, 13; 144:16; 157:12; 158:4; 159:23; 160:1, 14, 16; 162:13
discussions 8:9; 13:2; 25:23; 26:1, 2; 28:12; 29:2; 34:22; 36:12; 40:13, 23; 42:9, 11; 43:14; 80:19; 88:6; 91:13; 98:25; 102:14; 103:15, 24; 105:7;

109:3; 114:18; 131:11; 135:18; 136:3, 9, 12; 157:4; 162:17
dispute 3:19; 11:17; 13:3, 7; 163:3
disseminated 155:24
distinction 21:17
distributed 107:3
District 11:13, 24; 46:3; 104:8; 154:16; 155:8, 18; 165:3
districts 70:14, 18, 19
division 49:24
DNA 64:19, 22; 88:7
doctor's 104:4, 20; 110:3
document 16:8, 13, 14; 17:2, 3; 31:17; 53:5, 7; 56:4, 7, 11, 18; 57:12, 14; 61:15, 19, 20; 62:9; 70:9; 71:12, 13; 73:17; 77:18, 23; 85:19; 102:19; 116:5; 117:17; 126:9; 127:2; 131:7; 149:22; 150:3; 151:3; 155:13; 160:22; 161:1, 4; 165:6
documenting 62:4, 4
documents 12:10; 13:17; 47:3, 5; 54:11; 55:24; 116:10; 118:8; 133:1; 151:17; 152:3; 164:9
dog 115:17
donated 104:25; 105:4
done 4:13; 33:20; 65:17; 80:16; 94:4; 149:15
doodling 116:9; 117:4; 118:7
dotted 106:11
doubt 60:12; 117:9
Dover 5:14, 18; 6:10, 21; 11:12; 29:5; 146:8; 153:18; 155:5, 13; 157:20; 165:3
down 27:7; 33:25; 34:2; 50:13; 55:24; 67:6, 15, 19; 75:17; 82:20, 23; 86:11; 91:15; 106:9, 21; 109:16; 114:4; 115:1; 116:25; 117:4, 10, 20; 119:12; 127:6, 14; 130:5; 132:10; 136:18; 165:2
Dr 16:21; 17:18; 20:3, 14; 22:17; 23:17; 24:9, 15; 27:5; 29:7, 12; 30:18; 32:10; 33:17; 39:20; 48:4; 58:8, 10; 87:6; 92:8, 14; 101:9; 105:11, 16; 107:7; 111:8, 10; 120:10, 11, 12; 124:6; 129:24; 135:9, 18, 19; 138:17, 22; 139:3; 164:2; 166:7
Draft 116:6, 11, 15; 117:18, 19; 125:7; 126:9; 130:18; 134:6; 149:4; 150:4; 154:24; 159:11
drafting 145:14
drew 80:20; 83:17

Min-U-Script®   Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Robert Eshbach
May 20, 2005

**driving** 83:25
**drop** 83:5; 128:5
**dropped** 134:20
**due** 146:16
**duly** 3:7
**during** 6:19; 10:12; 15:1, 25; 18:22; 19:17; 25:1; 26:18; 27:2, 13; 29:5; 31:1; 37:5; 39:8, 10; 40:17; 41:11, 18; 42:3, 8, 14, 22; 43:5, 13, 15; 44:12; 48:17; 51:16; 53:2, 12; 54:5; 62:18; 64:6; 65:6, 9; 69:22; 90:5; 92:1; 102:14; 108:6; 109:22; 135:14, 19; 142:4; 164:5
**DVD** 59:21; 60:7, 14
**DVD's** 60:3, 3

**E**

**e-mail** 12:12, 17; 13:18; 14:1, 8, 12, 20; 102:20; 103:4, 10, 12; 104:16; 106:9; 125:13; 150:11; 164:11, 17, 19, 23
**e-mails** 13:13, 23; 14:6, 19; 114:19
**E-s-h-b-a-c-h** 5:12
**earlier** 22:21; 46:12; 104:5; 111:1
**early** 32:12; 41:18; 66:4
**earth** 21:12; 28:3
**easiest** 47:6
**easy** 106:15; 145:24
**ecology** 28:8; 40:3; 119:10
**edition** 25:20; 26:9, 20; 56:19; 62:9, 20; 63:11, 12, 21, 22; 68:12; 75:21; 76:2; 78:14, 21; 79:15; 80:3, 10, 23; 81:1, 12, 18; 83:18; 86:23; 87:3, 8; 88:25; 90:16; 102:5
**editions** 78:1; 79:18; 80:21
**educated** 123:5, 5
**education** 6:25; 10:6; 146:8; 157:20
**educational** 6:8; 146:13; 153:18
**effect** 38:8; 65:3; 71:3; 72:1; 92:7; 96:25; 109:24; 110:4; 137:21; 140:17; 166:10
**effort** 50:20; 124:23
**Ehrlich** 6:16
**eighth** 151:22
**either** 15:17; 33:22; 40:24; 44:17; 59:14; 71:15; 83:5; 84:5; 108:13; 113:15; 120:12; 138:22
**elaborating** 110:17
**else** 8:10; 9:15; 13:11; 19:16; 20:1; 26:14; 30:9,

19; 35:8; 49:18; 51:18; 53:25; 55:15, 18; 65:5; 68:12; 74:20; 76:3, 9, 17; 79:3; 80:11; 86:24; 88:20; 94:21; 95:23; 96:10; 98:21; 103:23; 105:6; 110:15; 113:9; 119:14; 121:4, 25; 123:12; 126:8; 129:1; 130:12; 136:24; 137:25, 25; 138:7; 139:1; 141:16; 143:5; 147:11; 150:24; 161:13; 165:21
**embryos** 68:2
**employe** 66:8
**employed** 5:15, 17, 18; 6:13, 14, 21; 11:24
**employment** 29:5
**emptying** 35:1
**enclosure** 127:3; 131:3
**encourage** 59:1
**encouraged** 47:25; 92:17; 145:7, 7
**end** 9:11; 14:17; 15:17; 16:1, 5; 24:17, 20, 21; 25:16; 33:20; 34:24; 40:19; 74:3; 78:10; 87:5; 99:15; 127:23; 141:4; 151:22
**ended** 147:13; 148:4, 4
**endurance** 5:6
**English** 47:23; 48:3
**enough** 45:10; 50:8; 53:9; 63:6; 67:15; 82:1, 23; 86:21; 90:13; 93:1; 96:25; 98:10; 109:2; 114:8; 118:8; 125:1
**entailed** 148:6
**entered** 66:15; 90:13
**entirely** 109:7
**entitled** 57:12; 62:9
**entry** 44:22; 63:2, 9, 13; 67:16; 79:21; 99:12; 100:23; 113:13; 114:8, 10, 23; 117:13, 21; 118:15; 126:18, 21; 127:7; 133:13
**environment** 22:3, 5; 28:8
**environmental** 5:22; 40:2; 66:12; 119:9; 120:4
**equate** 52:23
**equates** 52:25
**Eric** 164:13
**ESHBACH** 3:7; 5:10; 49:21; 152:6, 7; 164:10; 165:3
**especially** 30:3; 105:21
**essentially** 60:19
**even** 7:11; 14:12; 26:9; 29:22; 32:8; 36:11; 37:14; 38:7, 7, 18; 42:6; 58:19, 23; 60:9; 61:3; 62:15; 65:15; 66:9; 80:15; 89:14; 93:9; 94:9; 102:11; 125:22; 131:14; 133:20; 139:23; 140:7; 141:3; 145:13; 147:2; 152:25

**evening** 16:19; 134:13
**events** 8:18; 9:18; 27:1; 108:8; 124:24; 127:20; 144:6
**eventually** 150:7
**everybody** 21:6; 73:10; 143:5
**everyone** 49:25; 110:5, 12
**evidence** 67:16, 25; 69:18; 81:13; 87:17, 24; 88:1; 118:20
**evidences** 117:23
**evident** 141:22
**Evolution** 15:8, 23; 18:11; 19:9; 20:10; 22:14; 23:2, 14; 24:3, 24; 30:14; 33:5, 9; 34:1, 21; 36:8, 24; 37:17; 50:19; 52:6; 57:2; 60:9, 13, 17; 61:14; 62:3; 67:16; 68:4; 70:21; 72:2, 19; 73:14; 84:12, 19, 21; 91:15; 92:11, 22; 95:11; 97:16; 108:15, 16; 112:16, 25; 118:2, 21; 128:9; 131:20; 150:12
**Evolutionary** 7:8; 17:16; 20:8; 23:6, 24; 24:24; 28:24; 29:4; 30:20; 50:25; 51:19; 60:19; 66:6; 67:24; 69:7; 74:18; 81:11; 85:4; 113:4; 123:25
**exactly** 95:3; 119:13; 125:16
**examination** 26:21; 43:1
**examined** 3:8
**examples** 22:1
**except** 3:4; 142:21
**exchange** 17:22; 18:6, 18; 30:25; 31:5; 40:4; 52:1; 65:15; 66:3; 94:23
**exchanges** 3:25; 8:16; 9:21; 34:4; 50:23; 51:13, 23, 25; 53:16; 79:25; 82:2; 93:13, 14; 94:22; 140:3
**exchanging** 140:6
**Exhibit** 20:4; 23:11; 28:22; 56:6; 62:8; 73:13; 100:4; 114:9; 116:5; 128:17; 139:7; 150:2; 152:7; 160:22; 161:16, 17, 17; 164:1, 10
**exist** 159:15
**existed** 61:3
**expect** 90:22
**expectation** 90:15; 160:12
**expenses** 103:1
**experience** 20:7
**experiment** 123:9
**experimentation** 123:8
**explained** 22:13; 23:20, 20; 112:16
**explanation** 123:3
**express** 108:11; 152:19
**expressed** 30:5; 108:6;

120:13, 25; 125:4; 132:15, 18; 146:18
**expresses** 28:22; 108:18
**expressing** 37:10
**expressly** 85:17
**extent** 28:9; 42:2
**eye** 139:14

**F**

**facets** 3:22
**fact** 11:3; 13:24; 16:4; 18:8; 20:24; 22:20; 23:19; 24:14; 26:8; 27:12; 28:14; 29:15, 19, 22, 25; 33:14; 36:25; 37:13; 41:1, 24; 49:23; 50:16; 53:17; 58:23; 60:11; 64:24; 65:14, 22; 72:23; 74:13, 15; 75:5, 10; 80:2; 83:12; 84:8, 18, 21; 85:8; 86:1, 2; 87:3; 92:11; 93:5; 95:9, 24; 96:12, 21; 97:2, 4; 98:13; 109:12; 119:25; 121:16; 122:10, 22, 24; 129:4; 130:13; 131:12, 14; 138:24; 141:17, 19; 142:7; 146:16; 147:20; 150:19; 154:15; 157:21; 160:1, 18; 163:17
**factor** 24:2
**facts** 122:20, 20
**faculty** 27:6; 32:18; 34:10; 47:23; 48:1; 72:9; 78:23; 99:13; 105:17; 108:19; 109:3; 115:20; 125:5; 126:17; 127:11; 135:18; 139:4, 11; 155:10; 156:21; 158:23; 160:25
**faculty's** 161:7
**Fair** 50:8; 53:9; 63:6; 113:24, 24
**fairly** 77:2
**faith** 94:5; 96:2
**fall** 20:9; 26:23; 31:9, 10, 16, 20, 24; 33:3; 35:9, 20; 39:10; 40:12, 17, 25; 41:5; 45:8; 54:5, 13; 67:12; 84:9; 91:16
**falsified** 68:3
**familiar** 16:11, 13
**familiarity** 124:16
**far** 23:5; 26:2; 34:4; 59:5; 76:25; 79:19; 87:12; 88:22; 103:7, 8; 114:18; 142:23; 143:5, 16; 148:13; 157:18
**Farming** 93:6
**father** 49:20; 72:24
**father's** 49:22
**feedback** 145:16
**feel** 5:4; 6:5; 37:23; 108:25; 121:23; 150:22
**feeling** 84:23
**fell** 74:15

**felt** 53:17; 61:12; 62:5; 73:5; 75:13; 80:23; 94:2; 95:25; 132:3; 151:13; 152:22; 156:3, 7, 11, 12; 158:1, 11, 17, 17; 164:20
**few** 3:22; 7:14; 9:6; 10:10; 11:11; 26:9; 29:21; 50:17; 70:18; 82:18; 103:17, 20; 111:14; 119:11; 129:10
**figure** 105:5; 121:21
**figuring** 148:12
**filed** 10:17; 11:3; 162:12
**filing** 3:3
**fill** 37:22, 23
**filled** 47:24
**final** 154:23; 159:9, 11, 13
**finals** 33:21
**finch** 22:3
**finches** 22:1
**find** 4:18; 13:19; 27:7; 44:16; 55:25; 82:8
**fine** 6:4; 7:4; 21:5; 24:4; 52:9; 54:12; 96:10; 110:15; 112:18; 113:12; 114:21; 116:4; 125:2
**finish** 4:8, 11
**finished** 165:20
**fired** 137:8, 10, 20
**first** 3:24; 9:10; 14:1, 23; 15:2, 11, 15; 16:14, 20; 22:12; 31:18; 33:23; 36:20; 41:13; 46:2, 5, 10, 20; 47:17; 48:19; 52:15, 20; 57:12; 66:8; 91:12; 109:8; 124:19
**five** 17:10
**flared** 91:16
**flat** 106:2
**flip** 12:11; 47:14; 55:24; 56:10, 14, 18; 57:19; 70:23; 73:13
**flipping** 46:18; 47:8
**focal** 65:18
**focus** 11:19; 21:6; 28:10; 85:3; 106:7; 160:16
**focused** 6:25; 7:7; 160:18
**focusing** 33:19; 37:2
**folder** 153:12
**follow** 4:24; 142:17, 18; 166:1
**followed** 102:10; 122:15
**following** 14:10; 117:25; 155:19
**follows** 3:8; 108:17
**foot** 62:10
**footnote** 129:6
**forceful** 86:16
**forever** 45:19
**Forgive** 12:1; 21:16; 68:12; 87:9; 148:3
**forgotten** 12:18; 13:19
**form** 3:4
**formal** 8:15; 9:10, 24;

Robert Eshbach
May 20, 2005

30:24; 34:17; 132:9
formally 36:20
format 17:10; 124:20
formed 123:2
former 44:4; 162:20
forth 28:21; 49:8; 91:13;
93:22, 23; 114:20
forward 21:19; 24:18;
147:17; 157:3; 162:12
fossil 38:2
found 22:2; 28:19; 74:14;
80:25; 83:9, 15; 87:3
four 89:10, 10; 149:6;
154:20; 158:16
four/four 93:8, 9
fourth 116:1
frame 26:18; 30:13, 21
frankly 39:21; 118:10
free 6:5; 113:25
frequently 4:3, 11
freshman 27:18
Friday 9:25
front 10:7; 13:17; 53:5, 8;
68:10; 83:14; 159:21;
160:12
full 5:9; 123:24
Fundamentalist 72:1,
12, 17, 19; 86:3
Fundamentalist 86:4
further 55:24; 67:6;
165:2, 25
future 30:4

**G**

gaining 122:16
gamut 123:24
gap 37:21, 22, 23
gaps 69:6, 7, 12, 14, 20;
87:14; 88:19; 118:16;
128:8, 12; 133:15, 15, 16;
154:21
gaps/problems 118:1
gather 8:10; 108:15
gathering 47:3
gave 63:23; 111:1;
129:12; 138:22; 150:25;
152:3; 163:13; 165:18, 20
gavel 139:23
Geesey 97:11; 137:5, 19
general 4:10; 5:8; 19:11;
39:23; 60:6
generally 4:5; 68:15;
163:2
Genes 63:3
Genetics 7:5, 10
genotype 22:4
gestures 4:2
GILLEN 3:10, 13; 7:19;
31:12, 15; 77:11; 89:18;
113:22; 125:8, 11; 141:25;
152:1, 2, 6, 8; 154:2;
161:18, 21; 165:25

gist 147:8
given 25:14; 34:3; 56:8,
20; 57:3; 59:4; 73:20;
82:16; 90:3; 95:10;
102:19, 23; 103:21, 25;
104:17; 110:18; 116:23,
24; 125:19; 126:12;
134:16
gives 33:12; 151:3;
155:24
giving 30:12; 156:4;
163:15
glance 98:1
gleaned 50:23
God 64:24; 88:8, 8
goes 23:15; 37:22; 54:4
Good 3:11, 12; 4:16;
10:24; 23:21, 21; 45:10;
48:1; 67:15; 71:10, 19;
73:6; 79:10; 82:1, 23;
86:21; 90:13; 92:25; 93:1;
94:5; 95:11; 96:2; 98:10;
109:2; 110:14; 114:8;
118:8; 121:16; 131:5;
145:17; 161:20
gosh 132:3
grade 12:23; 106:10, 16,
17
grader's 121:14, 15
graduated 6:10, 12
graduation 6:13, 14
great 141:13
Green 6:16; 135:3, 4
group 151:17
guess 9:19; 14:8; 59:2;
64:9; 68:17; 81:16; 107:4;
111:17; 123:5, 5; 150:2;
151:11, 13; 153:16;
158:17; 164:17
guidance 23:23; 24:1;
101:2
Guide 116:7
guidelines 5:8
guys 43:3; 109:6; 128:3;
159:23

**H**

halfway 22:11; 150:6
Hall 56:19; 62:9; 78:13,
15, 21; 79:14
hallway 16:23
Hamilton 12:13, 17, 22;
13:2, 6, 12, 24; 14:20
hand 17:21; 27:16; 79:21;
85:20; 106:10; 115:18;
139:23, 24; 152:17; 153:6
handed 17:6; 20:5;
62:15; 74:1; 103:14; 117:9
handwriting 47:1, 11, 12
handwritten 51:8; 56:15,
20; 57:20; 61:16; 97:25;
152:11; 153:5; 164:14
happen 86:24
happened 43:25; 66:21;

76:13, 15; 79:8; 91:21;
101:13; 141:6; 148:23;
157:16
happens 135:11
happy 150:19
harass 5:1
hard 24:2; 28:9; 120:19
hardware 117:7
Harkins 55:15; 58:7;
68:17; 74:9; 88:16; 94:16;
95:16; 101:7; 105:12;
107:7; 111:4; 112:16;
144:1; 163:22
head 4:2; 13:16; 16:21;
32:21; 42:18; 60:2; 67:18;
68:18; 74:3; 78:17;
101:16; 102:21; 140:23;
157:11
headed 61:16; 73:14;
116:6; 118:4; 155:5
heading 21:24; 57:1;
117:21; 150:11
heads 109:6
heads-up 163:15
Health 6:14
hear 26:14; 33:24; 34:8;
41:6, 22; 42:17; 51:4;
136:2, 4
heard 13:5, 11; 26:2, 5;
27:2, 8; 41:1; 42:2; 50:21;
67:8; 90:1; 94:11; 124:19;
144:11
hearing 26:14, 21; 42:15,
16; 99:24; 134:25
heart 41:15
heated 49:10; 51:13;
65:14; 76:25; 89:13; 93:10
Heather 97:11; 137:4, 19
held 29:20; 48:25
hell 65:11; 129:15;
140:23
help 154:10
helps 63:6
hereby 3:2
hesitate 132:2
hey 30:16; 115:2
Hicks 164:13
High 5:18; 6:9, 10, 21;
16:22; 60:10; 72:6; 124:7
highlight 4:17
highlighted 122:2;
130:19; 133:6; 135:1, 3, 4
hired 46:3, 6, 7
Hold 31:12
holding 94:3; 110:23
holes 60:8
home 68:20
honestly 24:3; 136:4
hope 9:6; 80:5
Hopefully 18:1; 81:8
hopes 81:9
hostage 94:3
hot 86:10
human 4:18

hundred 45:24; 114:18
hypotheses 123:24
hypothesis 123:2, 3, 9;
124:10

**I**

icons 60:17
ID 126:20
idea 4:12; 18:10; 40:9;
44:11; 46:23; 67:13;
79:13; 81:6; 101:24, 25;
102:25; 103:1, 3; 114:7;
142:7, 25; 143:6
Idealism 86:4
idealistic 86:3
ideas 22:25; 106:20;
107:4; 108:11
identified 124:12
imagine 27:14; 83:4;
105:19
immediate 98:12
immune 91:4
impact 27:3; 28:25; 29:4
implemented 105:14;
143:19
implementing 155:19;
156:17, 18
important 100:21; 145:9
imprecise 4:17
impressed 74:23
impression 55:10;
75:11; 155:25; 156:20
include 122:17
included 7:9; 97:6;
119:15; 128:10; 154:13;
156:13, 14
including 118:2; 119:4;
122:3, 8; 134:21
inclusion 112:5; 120:13,
22; 158:14
incorporated 42:20
incorporating 101:24;
103:2; 156:22
indeed 60:8; 87:23;
94:10; 147:5
indicate 120:21
indicated 18:24; 51:23;
60:14; 87:21; 104:5;
108:1; 156:7
indicates 77:22; 109:19
indifferent 123:11
inference 85:18
inform 36:23
information 3:21; 8:11;
10:5; 13:25; 23:4; 35:24;
42:19; 49:2; 65:24; 66:1;
81:20; 82:16; 86:23;
87:22, 23; 106:6; 117:2;
121:24; 124:5; 125:14;
161:5
informational 11:2
informed 58:14
ingredient 64:18, 21;

67:9
initially 158:7
initials 47:7
input 102:16; 118:11;
149:10; 151:13, 14;
152:22
inquiries 26:15; 33:10;
42:14
inquiring 33:8
inquiry 49:3; 69:16; 82:7,
17; 94:12; 111:19; 138:15,
19
inservice 113:18
inservicing 109:10
instance 122:24
instead 71:2; 110:1;
133:16
Institute 39:13, 17; 59:8,
9, 19, 21; 69:5
instructed 151:12
instruction 7:12; 23:17;
42:21; 92:1; 116:6; 148:19
instrumental 149:8;
156:17, 18
integrated 112:23, 24
intelligence 124:11
Intelligent 11:1; 13:8;
19:14; 39:8; 41:17; 52:17,
18, 21, 22; 53:6, 12; 69:21,
25; 88:3, 11, 13; 96:6;
97:16; 99:20; 106:7;
107:20; 118:3; 119:3, 16;
122:3, 9, 11; 123:14, 19;
128:10; 130:7, 8, 14;
134:21; 138:12, 23, 25;
143:7, 13; 144:12, 14;
148:7, 18; 150:20; 154:22;
156:22; 158:15; 160:3, 15
intended 156:13
interest 14:3; 19:21;
48:23
interested 23:1, 2
interesting 13:25; 30:17
interpretation 64:12, 13,
22, 23
interpreted 88:7
into 12:16; 26:23; 42:20;
73:6; 75:14; 81:6; 82:2;
89:2, 23, 24; 93:1; 101:25;
103:2, 3; 104:13; 109:5;
112:23; 134:10, 15;
140:17; 152:22; 154:25;
159:23; 162:9
introduce 73:6; 75:14
introduced 3:13; 36:18,
20, 22; 46:8; 54:14; 101:22
introducing 53:18;
54:15; 60:12; 131:19
introduction 37:4
investigating 101:24
involved 81:25; 164:19,
23
involvement 154:19
involving 99:7; 147:12;
157:8

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Robert Eshbach
May 20, 2005

ire 119:2
irreducible 124:4, 9
isolate 27:1; 124:24
isolated 124:12
issue 15:1; 18:1; 28:23;
29:3; 30:13; 31:5; 34:3, 9,
12, 13; 35:5, 18; 36:7;
38:4, 5; 40:14; 48:11, 12;
50:1; 51:18, 23; 52:5;
53:15; 54:16; 55:11;
65:12; 88:13; 96:15; 97:3;
99:19; 132:5; 142:5; 147:6
issues 30:20; 38:1;
41:15; 47:22; 73:8; 76:4;
78:6; 97:18; 99:16; 104:6;
114:13; 160:15; 161:11,
11
items 83:7; 106:13

**J**

Jane 55:2; 113:22;
140:24; 161:18; 162:21;
166:2
January 11:20, 22; 12:4;
14:24; 15:16; 25:4, 21;
28:10, 14; 29:6; 43:7
Jeff 55:20; 94:6; 96:19;
143:16
Jen 8:23; 32:5; 37:13, 19;
39:22; 56:8, 20; 57:13;
58:6, 25; 59:14; 69:10, 15;
90:3, 9; 94:16; 112:10;
120:7; 145:21; 148:18;
149:12, 15; 150:3; 153:21
Jennifer 149:19
jeopardize 158:13
Jere 146:7
job 23:21
Jones 56:12; 70:23;
71:24, 25; 72:12, 13, 15;
75:11; 85:10, 15; 86:1, 4
jot 47:2
jotted 50:13; 82:20, 23
jottings 61:18; 125:13
July 56:1, 1; 77:13, 14,
17; 78:4; 79:22; 83:3; 87:5;
88:24; 90:11, 13
June 43:22; 44:22; 45:1,
9, 11, 22, 23, 25; 46:10,
13, 13, 19; 47:9, 15, 18;
50:3, 6, 7, 12; 52:16, 19;
54:19, 24; 55:3, 14, 16;
57:17, 24; 58:4; 66:22;
69:8; 74:6; 76:3, 6, 7, 11,
14, 17, 19, 20, 24; 78:11;
79:3; 83:24; 85:8; 86:25;
87:9; 90:19; 99:4, 8

**K**

keep 4:15; 16:21; 23:21;
24:10, 15; 92:25; 114:6
keeping 48:2
kept 12:24; 158:25

key 122:18
kids 96:17
kind 24:6; 37:4; 82:2;
86:7; 99:18; 148:19
Kitzmiller 10:20; 11:8
knew 34:4; 44:11; 82:13;
148:5
Knowing 84:8
knowledge 85:19;
122:16
known 86:2
knows 144:4
Knudsen 8:7; 9:16;
151:25; 166:1, 3, 13

**L**

L 62:12
lab 6:15; 123:13
laced 52:10; 81:1
laid 71:16
Lancaster 93:6
Langione 97:20, 21
language 69:12; 148:17;
155:20
lapping 148:11
large 49:8
last 8:24; 33:19; 45:14;
47:11; 57:18; 58:3; 61:6;
68:16; 76:11; 118:14;
127:7; 131:7; 133:13, 25
late 32:11; 96:3; 147:24
later 31:9; 82:5; 100:18;
165:11
law 53:10, 18; 75:14;
136:22; 162:4
lawn 6:16
lawsuit 10:17, 23, 24;
11:3, 3; 162:11
lawyer 143:25
lay 155:23
lead 135:9
Leading 50:2; 148:14
learn 33:1; 34:8; 35:22
learned 79:15
least 11:9; 42:4; 57:19,
21; 95:9; 113:5; 114:1;
119:8
leave 20:3; 68:24; 77:4;
104:3; 128:9; 161:15
leaving 16:25; 104:20;
105:2
led 33:1; 69:3; 140:8;
156:14
left 32:11; 40:7; 75:22, 24;
89:22; 105:2, 7; 110:3, 10;
158:25; 163:8, 11
left-hand 160:23
legal 143:17, 19; 146:17;
147:1
legality 38:15, 17; 53:11;
73:4, 8; 143:21
legislature 29:21

length 62:25
lengthy 49:16
Leslie 32:5; 120:8
less 60:24, 25; 80:24;
81:6, 8, 18; 82:8
lessons 68:22; 75:20
letter 130:17; 134:5;
159:11
letting 51:3
level 106:11, 17; 151:5
Levin 26:20; 42:25; 78:2
life 21:3, 7, 10, 11, 12, 13,
14, 18, 19; 23:3; 37:3, 7;
54:6, 15; 60:13; 64:15, 25;
67:10, 11; 88:9; 92:12;
116:8; 129:6, 16; 130:9,
14; 131:15; 133:11
lifted 139:23
light 21:23; 34:3; 112:4
likely 15:10; 42:18;
129:24; 147:1; 164:23
limitations 23:8
limited 118:2; 119:15;
122:3; 128:10; 134:21;
158:25
limiting 131:13
line 12:18; 38:24; 54:1, 2;
78:25; 91:24; 122:2
lines 42:14; 62:11; 130:7
link 85:14
Linker 32:5; 37:14; 120:8;
125:24
list 67:6, 15; 70:7; 82:24;
83:13, 13, 14; 117:22;
119:10; 128:5
listed 28:15; 83:7;
119:21; 120:1, 4; 133:10;
137:17; 156:1
listened 125:6
listing 119:17; 121:22
litigation 11:14
little 17:20; 31:9; 33:25;
37:19; 50:2; 51:8; 64:12;
75:16; 81:4; 116:17;
118:10; 124:13; 129:22;
141:17; 148:11; 158:5, 18;
159:24; 160:10
lively 136:8
loads 87:25
local 9:18; 153:17
long 9:5; 38:9
Lonnie 97:20, 21
look 11:20, 21; 12:3, 10,
15; 13:18; 14:22, 23; 16:8,
11; 17:7; 20:25; 22:11;
23:11; 24:8, 18; 25:15;
30:16; 31:17; 40:12;
41:13; 43:22; 44:19;
46:11, 16; 50:11; 51:17,
22; 52:15; 56:3, 23; 61:15,
17; 62:8; 70:6, 7; 72:4;
73:23, 24; 74:1; 76:11;
77:12, 18; 78:4; 79:20, 22;
83:6; 84:7; 89:2; 95:5;
97:23; 99:10; 103:4;
105:20; 106:9; 109:18;

111:23; 116:4, 17; 118:4,
13, 22; 126:16, 23; 127:1,
6, 6, 10, 13, 14; 128:3, 15;
130:15, 17, 21; 132:25;
134:1, 5; 138:8; 139:14;
145:15; 147:16; 149:9, 25;
150:2, 10, 14; 151:16;
152:3, 16; 155:1; 157:2;
160:21; 164:1, 9
looked 60:3, 4; 61:1;
81:16; 82:14, 24; 131:2;
138:2; 148:16; 158:3
Looking 16:15; 25:4, 21;
43:4, 7; 56:6; 57:1, 5; 73:3;
74:4, 6; 76:3; 78:4; 79:24;
80:8; 83:24; 87:9; 88:12;
93:13; 94:20; 98:7; 102:3,
21; 103:2; 107:4; 112:21;
113:1, 14, 16; 114:22;
115:5; 116:20; 117:20;
121:19; 131:25; 144:19;
152:9; 155:3; 158:8;
159:19
looks 117:10; 164:1
loop 81:24
lost 142:9
lot 24:1; 87:17; 109:9;
141:22; 142:11, 20
loud 98:24; 129:12;
130:11
love 48:10
low 98:23
lunch 24:12; 164:5
lunchtime 14:14

**M**

M 165:3
ma'am 154:1
Maiden 141:11, 12
main 106:7
major 121:6
makes 117:4; 135:5
making 67:22; 71:3;
81:12; 94:7; 96:11, 12;
105:22; 135:10; 143:4;
148:17
man 64:7, 11; 65:11;
84:22
maneuvers 142:11, 15
manner 111:8
many 28:16; 109:13;
141:8; 144:3
March 14:7, 24; 15:16;
43:7, 17, 22
mark 47:6; 152:6
marked 12:11; 16:9;
20:4; 31:17; 152:7; 164:10
marker 155:4
married 141:12
Martha 163:13
match 68:23; 75:21;
139:20
material 33:20; 38:25;
39:2; 106:18, 22; 107:24;

108:1, 5; 121:23, 24
materials 38:12, 21, 22;
39:5; 54:17; 59:7, 9, 16,
20; 118:5, 22; 120:14, 23;
124:3; 127:13; 128:5;
134:19
matter 9:4; 11:6, 13; 13:3,
6; 20:23; 24:6, 25; 26:8;
29:19; 60:6, 20; 65:14;
72:23; 74:13; 75:5; 93:5;
96:12; 109:12; 121:20, 22;
131:24, 25; 132:23;
147:20; 163:17
matters 9:2; 10:11; 163:3
may 4:18; 6:12; 7:14;
20:12; 21:4; 22:21, 21;
23:19; 24:12; 26:9, 23;
30:11, 23, 23; 32:11, 12;
34:17, 25; 36:11; 38:4, 7,
18, 23; 39:3, 25; 46:5;
52:12; 54:7; 58:11, 23;
60:18; 61:12; 62:21, 22;
63:10; 65:3; 68:9; 69:9;
71:16; 77:22; 80:13, 24;
82:6; 83:13; 84:13; 89:14;
90:2; 95:25; 96:7; 100:13,
14, 14, 15, 18, 18; 109:12;
110:24; 114:19; 115:2;
116:17, 22; 125:1; 128:21;
129:11; 130:5, 12; 135:3,
4; 138:17; 143:2; 154:13,
23, 24
Maybe 31:11; 32:8, 11;
36:13; 37:14; 41:1; 66:9;
80:15; 102:11; 106:18, 23;
109:8; 111:9, 23; 112:1;
114:2; 133:20; 140:16;
163:13
mean 13:7; 21:18; 24:25;
26:11; 27:25; 34:2; 39:22,
23; 49:11; 50:14; 51:2, 4;
69:24; 81:24; 88:18;
90:19, 24; 119:10; 121:6;
139:6, 19; 140:22; 151:5
meaning 27:5, 18; 69:10
12; 85:9
means 8:15; 64:14
meant 41:19; 89:10;
148:19
media 163:16
meet 58:15; 91:17;
100:15
meeting 9:23, 24; 30:24;
31:20, 25; 32:15; 33:1, 2;
34:17; 35:9, 20, 22, 23;
36:2, 4, 5, 10, 17, 23; 37:1,
18; 38:12, 23; 39:9, 10, 11,
24; 40:8, 25; 42:5; 44:6,
23; 45:1, 8, 11, 21, 23, 24
47:9, 19; 48:6, 7, 8, 11, 11,
15; 49:5, 20; 50:3, 6, 7, 1,
23; 52:8, 11, 16, 19; 53:3,
7, 12, 24; 54:1, 4, 12, 19,
24; 55:1, 3, 5, 14, 16;
57:17, 24; 58:1, 3, 4, 12,
22; 59:3, 10, 17, 24; 60:4,
61:4, 6, 10, 21; 62:2; 62:14,
16, 18; 63:8; 64:1, 5; 65:

Case 4:04-cv-02688-JEJ   Document 216   Filed 09/28/05   Page 53 of 59

Robert Eshbach
May 20, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

9, 17, 21; 66:22, 23, 24;
68:14, 15, 24; 69:8, 22;
70:10, 11, 12, 16; 71:13,
15, 15; 72:25; 73:1, 3, 10,
18, 22; 74:7; 75:17, 22, 24;
76:3, 6, 7, 9, 12, 13, 14, 18,
19, 20, 24; 77:1, 6, 7, 13;
78:11; 79:4; 82:12; 83:24;
85:9; 86:8, 25; 87:1, 9, 11;
88:4; 89:3, 4, 23, 25; 90:1,
13, 14, 20; 93:2, 3; 94:15;
95:7; 96:7, 20; 97:24; 98:4,
12; 99:2, 4, 8, 15, 21;
100:3, 5, 11, 12, 13, 16,
24; 101:9, 10, 17, 20;
102:8, 17; 103:23; 107:16,
18; 108:6; 109:5, 6, 14, 16,
23; 110:20, 21; 111:5, 6;
112:11, 15; 113:10; 114:6,
24, 25; 115:4, 7, 9, 11, 14,
22; 116:11, 13, 21, 25;
117:11, 17; 118:9, 24;
119:20; 120:6, 17, 18;
125:5, 13, 18; 126:7, 10;
127:20, 21, 24; 128:24;
130:2, 5, 25; 132:21;
133:18, 23, 24; 134:10, 13,
15; 135:6, 9, 12, 13, 14,
15, 16, 24; 136:6, 8;
139:20; 141:4; 142:3, 4;
145:6, 9; 146:1, 24;
147:13; 148:4, 9, 16;
153:13, 14, 15, 20; 154:7,
8; 157:3, 5, 7, 10, 14, 17,
18; 158:21; 160:14;
161:10, 13; 162:7; 165:16,
17, 21, 22; 166:4, 9

**meetings** 10:9; 41:25;
45:2, 7, 21; 55:4; 57:6, 9;
77:14, 16; 84:5; 102:14;
157:8; 161:23, 25
**member** 15:21; 16:6;
18:25; 32:4; 33:7; 39:6;
44:4, 5; 49:2; 51:14, 15;
62:12; 93:8; 94:10, 24;
126:14; 137:5; 138:16
**members** 8:13; 15:21,
24; 25:23; 26:2, 12, 15, 21;
27:6; 30:2; 32:24; 35:10,
14; 40:16, 23; 42:5; 43:15;
47:23; 48:1; 49:6, 9, 9;
50:17, 17; 52:14; 53:14,
21; 54:21; 58:15; 73:11;
89:11, 14, 15, 16; 93:11,
12, 12, 13; 94:14, 18;
98:11; 99:1, 7; 109:18;
113:6; 115:19, 19, 20;
132:12; 134:11; 138:8, 14;
139:2, 5, 15, 22; 140:3;
142:13, 21; 143:14, 20;
144:22; 147:13, 15; 157:9,
12; 158:20; 162:16, 20
**memo** 17:4, 12, 17, 19;
18:4, 7, 19; 20:3, 6, 22;
22:11, 19; 24:6; 29:14;
30:7; 33:17; 35:21; 91:13;
92:9; 127:3; 134:2;
151:23; 152:11, 17; 164:2,
3
**memorandum** 158:6

**memory** 78:5
**memos** 134:1; 143:3
**mention** 20:19; 21:2;
23:13; 35:7; 39:12; 66:7;
82:6; 92:21; 148:6
**mentioned** 7:10; 31:16;
54:7, 8; 66:4; 95:22; 96:19;
124:18; 133:16; 157:3
**mentioning** 19:13;
92:23; 150:20
**mentor** 15:11, 12; 24:5
**merits** 162:10
**message** 163:8, 11
**met** 84:9; 101:2; 114:1;
164:18
**method** 122:17, 18
**Microbiology** 7:2
**mid** 40:17
**middle** 103:13; 116:6;
117:18
**miffed** 158:18
**might** 27:3; 28:24; 29:4;
47:14; 52:11; 94:18;
104:24; 112:23; 124:24,
25; 150:15; 163:16
**Mike** 35:17; 151:24
**Miller** 8:23; 12:11, 15;
16:9; 23:11; 26:20; 28:22;
31:17; 32:5, 8; 37:13, 19;
39:22; 42:25; 44:20;
46:11; 55:25; 56:3, 6, 8,
20; 57:13; 58:6; 59:14;
61:15; 69:10; 70:6; 71:14;
73:19; 77:12, 18; 78:1;
79:20; 80:13; 82:24; 89:2;
90:3, 10; 94:17; 97:24;
99:10; 100:4; 101:6;
103:4; 112:10; 113:14, 17;
114:9; 115:5; 116:5;
120:8; 126:17, 24; 128:17,
21; 129:24; 130:15; 131:8;
132:22; 138:2; 139:7;
142:22; 145:21; 149:1, 12,
19; 150:2, 3; 153:21, 21;
155:1; 160:22; 161:16, 17;
164:1
**Miller-Levin** 25:19;
61:14; 62:3, 6, 21; 68:5, 8,
9; 71:2; 74:18; 75:19; 76:2;
80:3; 90:17; 102:5
**Miller/Levin** 56:19
**millions** 64:16
**mind** 18:17; 21:13; 29:1;
33:22; 34:10; 40:21; 57:5;
79:11; 80:6, 6; 110:8;
111:20; 114:5; 118:8;
126:23; 136:24; 143:23;
146:23; 150:11; 151:16;
161:14
**mind's** 139:14
**minds** 114:1
**mine** 130:10; 148:22;
164:6
**minute** 141:21
**minutes** 50:11; 55:25;
111:14; 115:6
**misunderstood** 116:3

**mixed** 116:22
**modest** 81:12
**modification** 63:14, 24;
64:14; 67:8
**moment** 44:25; 161:14
**money** 44:8, 17; 101:23
**monkey** 158:2
**monkeys** 64:8, 11; 65:12;
84:22
**month** 14:5, 6, 24; 43:5,
6; 99:15
**months** 29:21; 41:13
**more** 4:22; 9:20; 15:10;
41:10; 42:18; 48:10; 50:2;
57:10; 59:4; 62:25; 71:17;
72:16, 18; 81:12; 83:18;
84:17; 86:3, 17; 96:1;
115:8; 122:21; 129:22, 23;
137:3; 151:10; 153:1;
156:4, 16; 162:4; 164:23
**morning** 3:11, 12; 14:13;
58:23; 101:14; 152:4;
154:15
**most** 39:21; 121:15;
140:1
**Mostly** 11:2
**mouths** 108:20
**moved** 38:3, 7; 107:6
**moving** 107:12; 162:12
**Mrs** 15:12; 16:24; 18:8;
24:1; 34:25; 35:25; 42:18;
44:15; 48:22; 49:1, 15, 18;
52:1; 58:7, 7, 24; 65:15,
25; 66:12; 68:17, 17;
71:14, 25; 73:5, 19; 74:2;
75:18; 79:7; 80:2, 13;
82:22; 83:12; 86:19;
89:12; 90:5; 93:21; 94:9;
98:21; 101:6, 6, 16, 23;
102:25; 105:12; 112:16;
128:20, 21; 129:24, 24;
132:22; 136:13; 138:2, 2;
142:22, 22; 147:14; 164:6,
7
**much** 33:20; 45:12; 50:6;
52:24; 63:16; 77:23;
101:23; 106:8; 109:7;
129:10; 152:25; 154:10;
156:10; 159:4; 160:2;
161:10; 164:19
**multi-celled** 64:21
**mural** 65:17, 21; 66:4, 7,
17, 24; 67:2; 84:24
**must** 84:23; 89:10, 11
**myself** 3:13; 12:24; 32:6;
39:3; 50:15; 58:6; 66:11;
82:22; 101:6; 120:11;
129:11, 24; 138:2; 142:23;
148:11; 153:22
**mystery** 113:13

# N

**nail** 114:3
**name** 3:13; 5:9; 44:11;
141:11, 12, 13; 163:12

**names** 11:11
**natural** 40:1
**nature** 18:6; 29:11; 40:9;
85:23; 144:23
**necessarily** 34:17;
110:20; 126:11; 130:4
**need** 6:6; 27:6; 28:17;
102:11
**needed** 28:19; 42:11;
104:3; 125:23
**neither** 83:4
**new** 25:10, 12; 27:22;
28:7; 34:8, 12; 42:12; 46:8;
64:25; 66:13, 13; 68:22,
23; 75:21; 76:1, 1; 80:3, 7,
9, 10; 88:9; 101:7; 104:11;
128:24, 24; 155:20
**newspaper** 9:18; 10:13,
14; 155:24
**newspapers** 9:19
**next** 6:18; 24:22; 33:3;
43:25; 56:14; 62:8; 63:9,
13; 67:19; 92:5; 113:12;
114:8; 115:13; 123:3;
128:23; 137:2; 148:12, 23,
24
**nice** 112:17; 131:13
**night** 46:7; 139:16;
142:11; 144:2, 15; 146:21;
147:11
**Nilsen** 32:14; 58:10; 87:6;
101:9; 103:6; 105:11, 16;
107:7; 111:9, 10; 120:10,
11, 12; 129:25; 135:9, 18,
20; 138:17, 22; 139:3;
166:7
**ninth** 12:23; 106:16;
121:14, 15
**nobody** 114:3; 142:21
**nods** 4:2
**Noel** 54:21; 94:2; 95:22;
96:8; 140:19; 162:23
**nonchalant** 115:1
**nor** 123:11; 139:22;
142:22, 22
**North** 98:14
**notation** 50:15; 51:2, 8;
53:9; 56:8, 20; 57:3, 13;
100:4; 116:2
**notations** 51:12; 52:16;
106:10; 164:14, 16
**note** 13:20; 104:16;
117:6; 129:9; 130:7;
131:9, 11, 12; 132:12;
133:9, 11; 134:25; 152:12,
17; 153:5
**noted** 153:4
**notes** 49:16; 54:10;
56:15; 57:20; 61:16;
97:25; 98:1; 99:25; 100:4;
103:13, 20; 106:20; 114:6;
158:5, 8; 164:22
**notice** 101:10
**notion** 32:18; 67:8;
113:5; 123:21
**November** 9:11; 147:24,

24; 150:8; 154:7, 18;
155:4; 160:23; 161:23;
164:13
**number** 13:14; 31:18;
44:6, 21; 79:20; 99:11;
106:25; 128:16; 139:7;
149:2; 161:16; 163:14;
164:5
**numbers** 61:18

# O

**o'clock** 16:5
**object** 106:8; 155:21
**objected** 108:21; 120:21;
125:3
**objection** 108:23;
119:17; 120:13; 122:8
**objectionable** 119:7
**objections** 3:4; 50:24
**objective** 36:23
**observation** 65:2; 85:25;
147:3; 153:8
**observations** 122:20
**observed** 122:23; 123:1
**observing** 122:19
**Obviously** 7:2; 64:23;
133:6
**occasioned** 103:12
**occur** 15:3; 98:4; 124:24;
136:11
**occurred** 15:15, 17;
21:14; 79:3; 89:6; 109:14;
120:18; 130:11; 136:10;
144:7
**occurring** 10:13; 76:4;
127:20
**occurs** 127:3
**October** 11:14; 114:10,
12, 15, 23; 115:4, 9, 10,
13, 22; 116:1, 2, 11, 13;
117:13, 17; 118:9, 24;
119:19; 120:6; 125:5;
126:7, 18, 22; 127:20, 21,
24; 128:18; 130:24;
132:21; 133:23, 24;
134:10; 135:6, 13; 144:8;
147:16, 18; 148:16; 157:2,
9, 13; 159:20; 160:17;
162:15; 165:9; 166:4
**odds** 140:4
**off** 3:13; 60:2; 67:18;
78:17; 83:5; 89:22; 91:20;
102:21; 118:10; 131:25;
157:11; 158:18
**offensive** 80:25; 81:6, 8,
18; 82:9
**offer** 48:19
**offered** 22:5; 128:23
**offering** 76:25
**old** 80:8, 9
**omitted** 127:15
**onboard** 158:12
**once** 12:24, 25; 28:18;
132:3

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

one 3:14; 8:2; 11:9; 13:19;
14:15; 16:5, 19; 17:23;
18:12; 22:1, 21; 24:2;
25:13; 28:1; 29:13; 31:18,
22, 23; 42:4; 44:6, 17, 21;
46:6, 7; 47:11, 22; 52:17;
53:9; 55:4, 7; 57:10, 19;
60:9; 67:19, 19; 68:1;
72:17; 76:11; 78:24, 25;
79:8, 20; 82:21; 83:7;
89:11; 93:8; 105:18;
106:6; 108:1; 115:8;
117:20, 22; 121:1, 13;
122:21; 134:18; 139:11;
140:18; 142:25; 143:1, 1;
144:20; 147:14; 150:10;
155:13; 160:3; 162:2, 3;
166:1, 11, 11
ones 33:10; 137:10
only 9:4; 46:9; 58:23;
60:4; 81:14; 83:12; 87:2;
92:8, 23; 94:10; 98:13;
107:24; 108:1; 139:17;
146:11; 147:14; 156:24;
160:2
open 36:17; 48:8; 79:11;
92:11; 101:20
opened 61:5; 80:5
openly 51:15
opinion 102:24; 115:18
opportunity 3:17; 25:14;
162:9
opposed 4:2; 105:20;
124:11
options 95:10
order 44:7; 91:18, 19
ordered 41:3; 75:20; 81:9
ordering 28:15; 75:25;
95:4
Organic 7:5
organism 64:15, 16, 20,
21
origin 20:11, 25; 21:2, 7,
10, 10, 11, 12, 22, 25;
22:23; 37:7, 8; 67:11, 11;
117:23; 131:20; 138:24
original 87:4; 135:3
originals 151:21
origins 21:18; 37:2, 3;
54:6, 15, 15; 60:13; 92:12;
129:6, 16; 130:9, 14;
131:15; 133:11
others 46:4; 51:4; 62:25;
72:22; 143:15; 151:24;
152:23; 156:1
otherwise 40:24; 117:5
ours 131:9, 12
out 16:25; 24:2; 28:2, 19;
30:16; 36:14; 40:21;
44:16; 51:15; 56:11;
58:11; 60:9; 62:15; 68:3;
73:20; 74:4; 80:7; 87:3;
96:1; 98:10; 105:5; 106:2;
108:14; 110:8; 111:20;
112:1; 115:18; 121:21;
128:10; 129:12; 130:11,
19; 134:19; 139:24; 141:7;

143:23; 148:4, 12; 153:8,
18, 24; 154:3; 157:20;
160:11, 19; 161:14;
164:19; 165:19, 22
outcome 134:12
outlined 20:11
outside 27:16; 121:19
outstanding 40:6; 97:13
over 17:7; 21:1; 22:1, 4,
24; 24:12; 28:2; 38:10;
46:16; 60:11; 62:24; 68:1;
70:23; 75:21; 80:14, 22;
108:14; 164:8
overall 36:10; 83:17
overstated 154:19;
155:9
overstatement 38:5;
156:3; 157:22
overview 61:10
own 72:2; 79:1; 82:7;
119:8

# P

p.m 166:15
pack 12:16
package 79:8; 80:5
packet 12:10; 46:11;
152:3; 154:13, 14; 164:9
page 31:18, 22; 44:20;
46:20; 56:10, 14, 25;
61:18; 62:8; 63:2, 9, 13,
19; 67:15, 19; 79:20;
99:10; 113:17; 114:9;
126:18; 127:2; 128:15, 24;
131:7; 148:25; 149:1;
150:10; 151:21; 153:4;
155:13
pages 61:23; 70:6; 73:21;
164:10
Pandas 11:1; 13:9;
39:13, 15; 41:17; 61:2, 3;
70:3; 90:1; 93:17; 94:8;
97:9; 99:19; 102:4;
103:25; 104:7, 15; 107:8,
19, 21; 109:4; 111:11;
112:5, 22; 113:6; 114:3;
118:6, 24; 119:4, 18;
120:14, 22; 125:14;
127:14; 128:6; 133:8;
134:20; 137:4, 12, 16, 23;
150:22
paper 93:6; 103:14;
153:12
paragraph 22:12; 23:11;
67:16; 72:5; 154:20;
158:16
paragraphs 149:6
Parliamentary 142:11,
14
part 15:2, 15; 17:2; 20:24;
23:1, 5; 30:9; 33:11; 41:18;
43:2, 11, 15; 63:20; 64:9;
65:2; 67:17; 73:13; 83:8;
85:18; 86:16, 17; 91:11;
98:3; 108:18; 116:7;

118:13; 128:17; 139:7;
144:20
participate 112:11;
149:4
participating 74:10;
77:25; 111:5
participation 155:10;
156:11
particular 18:12; 39:18;
70:11, 12; 149:24; 162:14
particularly 7:7; 121:8
parties 3:3
parts 130:19
passed 34:19; 35:24;
59:20; 94:18; 117:1;
125:24
passing 30:23; 117:9;
132:10
passion 86:14
passionate 75:8; 96:22
past 104:10; 131:18;
153:21
Pat 3:13; 6:5; 151:25
Patriotism 140:10, 11
patronage 140:9
Paula 8:7
pause 4:15
pay 33:23
Pennsylvania 5:14;
6:12, 21
PENNY 7:18; 113:20;
153:25; 161:15; 166:14
People 3:19; 13:9; 21:4;
29:21; 30:14; 36:14; 47:5;
50:24; 61:3; 86:9, 9; 93:17;
94:8; 102:4; 103:25;
111:11; 118:6; 119:5;
120:14; 122:25; 123:4;
125:15; 128:6; 133:8;
134:20; 137:3, 4, 12, 17;
141:8; 144:3, 8; 150:22;
156:20
people's 47:4
per 21:5; 69:23, 24;
87:13; 114:25
percent 45:25; 114:18
Perhaps 11:4; 26:19;
34:24; 42:11; 62:4; 66:9;
67:9; 83:2; 111:23
period 6:19; 11:20, 21;
12:3; 15:25; 16:1; 24:18;
25:1, 21; 26:7, 23; 27:2,
13, 17; 28:10, 18; 29:5;
33:18; 40:12, 17; 41:11;
42:3, 15, 22; 43:13; 44:12;
83:2; 90:11, 12; 92:2;
114:11, 14; 146:6; 147:16;
157:2; 164:6
periods 100:10
person 4:11; 19:20;
48:19; 72:17; 105:8;
155:23; 163:16
personally 13:4; 25:17,
25; 35:10; 36:18; 41:21;
43:14, 21; 59:11; 65:7;
71:14; 132:11; 135:23;

136:1
persons 11:12
perspective 36:4;
121:19; 148:23
pertains 17:2, 3
Peterman 16:21; 17:18;
20:3, 14; 22:17; 23:18;
24:9, 15; 27:5; 29:8, 12;
30:18; 32:10; 33:17;
39:20; 48:4; 58:8; 91:14;
92:8, 14; 164:2
phenotype 22:4
phone 78:13; 80:22;
83:12; 163:7, 7; 164:8
photocopies 151:17
photocopy 151:17
photograph 63:10
phrases 50:13
Physiology 7:3
pick 83:5; 117:6; 138:4
picked 103:18; 137:10,
21
picking 161:19
picture 67:1
pictures 65:16, 19; 68:2,
5, 7; 84:24
piece 26:25
pieces 103:17
pile 46:18; 151:20; 165:2
piles 161:19
pissed 118:10
pizza 89:18
place 3:16; 8:18, 25; 9:4,
10; 13:15; 14:4; 15:7;
24:12; 25:5; 35:2; 36:6, 15;
42:7; 45:11, 13, 24; 49:8;
53:14; 58:3, 12, 18; 75:25;
76:2, 2; 77:7; 87:5; 101:11,
18, 19; 103:16, 23; 105:2;
109:10; 123:4; 125:19;
129:23; 148:6; 154:7, 8
placed 105:9; 138:5
places 3:25; 4:8; 22:2;
118:19
Plainly 3:19; 11:16;
99:19; 148:5
plaintiff's 8:9
plaintiffs 9:7, 23; 10:8,
16; 11:4
Planned 116:6
Plant 7:5
Plants 63:3
please 4:1, 23; 5:4, 7, 9,
11; 12:10; 56:23; 116:18;
152:6
Pledge 48:9
plus 106:20
PM 12:19; 14:15
podium 138:3
point 7:13; 8:7; 11:23, 24;
14:3; 16:20; 20:16; 22:22;
25:8, 13, 19; 26:6, 12;
29:23; 39:2; 48:23; 49:5,
23; 50:21; 54:10; 63:24;
64:5; 65:15; 70:3, 5; 82:4;

86:12; 90:21; 91:9; 93:15;
94:7; 97:13; 100:18;
101:23; 102:16; 105:13;
108:23; 112:8; 119:19;
121:5, 6; 122:4; 124:6;
128:21; 131:18; 137:18;
146:7; 148:21; 158:13, 25;
161:19; 162:12; 163:17
pointed 60:9; 85:21
pointing 148:4
points 68:2; 158:4
policy 151:5, 11
pony 115:17
poor 121:23, 24
poorly 150:22
portion 154:13; 164:11
position 47:23; 48:3;
75:10; 96:24; 104:22;
108:25; 110:24; 159:20;
161:8
possibility 112:4
possible 14:16; 30:22;
71:2; 134:12
possibly 7:10; 94:23;
128:22
post 6:25; 7:12
pot 35:1
potential 104:7
pounding 94:6
Power 124:6
practical 23:7
practically 35:21
Prall 32:6; 120:8
precise 4:22
precisely 148:1
predicament 86:13
predict 90:24; 91:1
premium 3:25; 4:8
Prentice 56:19; 62:9;
78:13, 15, 20; 79:14
preparation 7:15, 24;
36:1; 58:22
prepare 7:21, 25; 68:22
75:20
present 9:14; 11:5; 23:6
32:15; 34:25; 45:5, 7; 55
67:21; 87:22; 88:20; 98:1
99:23; 109:18, 19; 146:2
147:2; 158:20; 166:9
presentation 17:16;
20:8; 23:24; 28:24; 29:3
30:20; 40:9; 50:24; 51:1
66:6; 69:5; 81:11; 85:4;
112:23; 124:6, 18; 145:
presented 13:17; 18:2
20:10, 20; 27:25; 28:1;
36:8, 9; 54:6; 60:23; 70:
99:20; 107:21; 112:20;
113:4, 7; 117:13; 124:5:
142:19
presenting 19:6; 53:1
69:7; 88:14; 108:4
President 147:4
press 50:3, 5; 56:12;
70:24; 75:12; 85:15;

Robert Eshbach
May 20, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

50:8; 153:15, 23; 154:3,
6; 155:1, 3, 6, 6, 14;
57:3; 160:19; 161:2, 3, 5,
1; 163:12
presume 145:22
presumption 134:18, 22
pretty 49:10; 71:10;
72:12; 76:25; 127:17;
148:1; 161:10
previous 66:16; 84:4
Principal 16:22; 23:15;
32:9; 47:25; 101:7
Principles 7:2, 9
prior 11:20; 17:12, 17, 17;
18:18; 19:13; 20:22;
22:18; 28:6; 35:9; 38:22;
42:24; 43:3; 45:1, 9, 21,
23; 50:7; 59:9, 17, 23;
60:4; 64:6; 66:10; 70:17;
71:12, 15; 73:18; 77:7;
81:15; 82:12; 90:1; 95:12;
101:12; 104:20; 105:2;
109:4, 21; 110:20; 130:24;
132:21; 133:18, 22;
135:13, 15, 23; 136:11, 15;
141:12; 154:5, 7, 16; 162:3
privy 98:11, 25; 99:7;
147:12
Probably 11:9; 31:9;
35:23; 37:19; 38:13; 46:5;
50:15; 53:4; 63:20; 74:21;
78:17; 79:13; 81:4; 82:21;
83:22; 101:15; 106:20;
108:21; 153:12
problem 5:25; 6:8; 30:2;
88:1; 95:3, 19; 147:6
problems 60:19, 24;
61:13; 69:6, 7; 118:16;
133:15, 15
procedural 155:19
process 3:22; 4:17; 5:6;
10:25; 25:5; 80:12; 142:17
product 149:18
profession 153:2, 3
professional 6:16;
164:20
project 65:18
proposed 112:3; 127:10;
139:4, 12; 143:21; 144:20
provide 42:19; 123:12
provided 8:20; 44:20;
99:13; 114:9; 151:18
providing 152:22
public 44:6; 48:17, 20;
49:19; 51:17, 20; 73:7;
75:14; 97:14; 136:9, 12;
155:24
publication 72:18
publisher 60:21, 23;
72:14
pulled 38:19
purchase 27:4; 48:24;
58:17; 90:16; 93:16
purchased 41:5, 7, 8;
42:11; 94:4; 104:24
purchasing 102:4

purpose 5:23; 30:15;
59:3; 129:8; 142:14
purposes 124:10
pushed 87:2, 7; 88:24;
91:19
pushing 44:16; 75:11;
84:14
put 18:1; 56:11; 60:7;
75:9, 9; 81:2, 5; 86:13;
96:24; 109:6; 120:19;
129:5; 131:18; 148:6;
153:18, 23; 160:19

## Q

quarter 12:16; 14:23
quick 46:16; 61:10, 17;
132:25
quiet 75:16
quite 30:21; 39:21; 48:7;
115:17; 118:10; 119:11;
136:8; 141:3
quote 81:5, 5; 147:7
quote/unquote 82:8;
87:14; 88:11; 151:12
quoted 65:4; 81:5

## R

R 105:5
raised 104:5
ramification 147:1
ramifications 143:19;
146:17
random 124:11
randomly 164:17
Raphael 163:13
rather 49:16; 97:19;
104:19; 115:17
react 72:9
reaction 72:10
read 14:1, 21; 17:8; 50:9;
106:14, 15; 121:14; 124:3;
125:17, 20, 20; 126:1;
145:13; 151:6; 154:21;
156:25; 160:13; 164:22
readability 125:15; 126:4
reading 30:17; 49:15;
74:16; 93:5; 103:15, 19;
121:14, 15; 151:15;
155:23; 158:16
real 50:1; 143:18
realize 90:22; 151:5
realized 66:17; 87:16
really 23:1; 31:4; 59:8;
75:1; 81:14; 92:13; 114:3;
131:22, 24; 144:3; 149:22
reason 5:15; 23:5; 47:18;
113:23
reasons 121:13
reassurance 24:14
recall 9:20; 10:11; 11:15,
22; 12:9; 14:18; 15:19;
17:22; 18:6, 18, 21; 19:1,

3, 6, 13, 16, 20; 20:2, 12,
18, 22; 23:17, 22; 24:3, 8,
13; 25:2, 7, 9; 26:21;
30:10, 12, 21, 24, 25; 31:5,
25; 32:16; 34:22; 35:3, 9,
15, 17, 19; 36:1, 16; 37:4,
10, 13, 18, 25; 38:11, 15,
17, 20; 39:1, 7, 8, 10, 12,
18, 20, 24; 40:4, 13; 42:2,
14, 16, 25; 43:13; 44:3, 12,
15; 48:2, 6, 7, 8, 19, 21, 22;
49:1, 4, 6, 10, 11, 14, 15,
24; 50:9; 51:12, 17, 25;
52:3, 18, 21; 53:2, 4, 6, 10,
16; 54:3, 3, 16, 24; 55:3, 8,
17, 20; 57:9, 14, 16, 23,
25; 58:1, 12; 59:7; 60:1, 6;
61:4, 21, 22, 23; 62:1, 13,
15, 17; 63:1, 7, 14, 17;
65:1, 5; 66:2; 67:22; 68:1;
69:15, 19, 21, 25; 70:1, 9,
15, 24; 71:1, 3, 6, 17, 18;
72:21; 73:1, 3, 12, 17, 23,
24; 74:1, 2, 3, 9, 12, 22, 24;
75:4, 6, 17; 76:17; 77:1,
16, 25; 80:16; 81:22; 82:1,
6, 16, 18; 83:16; 85:19;
88:5, 10, 12, 15, 17, 20;
89:6, 12; 90:9; 92:8, 16;
93:3, 14; 94:22, 25; 95:15,
16, 21, 23; 96:5, 8, 9, 11,
12, 20, 22; 97:11, 17; 98:8,
21; 99:3, 9, 16, 22; 100:7,
24; 101:4, 10; 104:23;
105:11; 107:17, 23;
108:24; 109:2, 7, 15, 22;
110:4, 16, 17; 111:21;
112:3, 7, 10; 113:9;
114:13, 20, 23; 115:13;
116:21, 21; 117:3, 19, 19;
118:9, 10; 119:19, 23, 24;
120:12, 24; 125:3, 6, 16;
126:8; 127:19, 19; 128:19;
129:1; 130:1, 6, 21; 131:5,
11; 132:11, 13, 14, 16, 20,
22, 23; 133:18, 22; 134:10,
14, 24, 25; 135:9, 17, 19;
136:5, 19; 137:6, 25;
138:7, 10, 13, 13, 14, 17;
139:15, 17, 18, 24; 140:5,
14, 24; 141:3; 142:10, 13,
16; 143:13, 20; 144:1, 5, 6,
14, 18, 21, 25; 145:4, 6;
146:7, 18, 22; 147:9, 24;
149:17, 20; 154:4, 12;
157:6, 11, 15; 159:25;
160:10, 18; 161:13, 24;
162:2, 6, 11, 19; 163:11,
25; 164:25; 165:19;
166:11, 11
recalling 52:6, 9
receipt 20:6
receive 24:1; 38:24;
71:12; 83:2
received 6:19; 14:11;
39:5; 59:7, 13, 16, 18;
65:19; 71:14; 73:17, 19
receiving 23:17, 22; 49:1
recent 165:14
recently 10:1

recess 31:14; 77:9, 10;
89:20, 21; 125:9, 10;
141:23, 24
recognize 77:20, 21
recollect 32:4; 87:12;
88:22
recollection 8:11; 11:19;
14:25; 18:7; 32:17, 20;
37:8; 53:4; 54:20; 55:7;
67:17; 69:17; 83:8; 98:3;
102:9; 120:7; 150:15;
158:11; 159:2; 160:1
recollections 79:25
recommend 25:16;
135:24; 146:13; 149:18
recommendation 43:3,
9; 87:6; 127:25; 130:25;
131:2; 134:17; 139:3
recommended 27:4;
61:24; 134:3, 7; 159:10
recommending 146:12
record 3:14, 14; 5:9;
38:2; 151:7; 160:21
recount 35:13
recounted 95:17
recounting 30:6
refer 142:25
reference 68:11; 71:21;
72:16, 20; 83:21; 88:4, 8;
104:1; 105:9, 14, 17, 24;
106:16, 18, 22, 22; 107:9,
24; 108:1; 111:12, 25;
112:5; 116:11; 118:5, 25;
119:3, 4, 11, 18, 21; 120:3;
121:2, 22; 123:20; 126:14;
128:6, 17; 133:8; 137:9,
11, 16; 138:5; 143:4;
146:21; 156:22
referenced 10:9; 17:15;
51:10; 53:20; 83:11, 22;
92:9; 103:10; 142:2
references 56:11;
109:25; 117:13; 119:10,
13; 127:3; 130:17
referencing 34:23;
149:11; 150:21; 159:7;
161:16
referred 52:21, 22; 53:10;
85:8, 10; 97:7; 99:25;
136:22
referring 8:6; 16:1;
64:10; 75:10; 76:6; 84:7,
12; 97:1, 8; 117:17;
137:22; 139:8, 10; 141:9;
142:20; 155:7; 157:7;
158:14; 159:10; 161:1;
166:7
refine 4:21
reflect 128:2; 164:16
reflected 136:16
reflecting 45:1; 67:9
reflects 165:8
refocused 50:1
refresh 8:11; 54:20;
115:8; 150:14
regarding 8:25; 10:23;

13:13; 15:3, 7, 21; 23:18;
29:3; 42:23; 49:17; 52:5;
102:7; 114:2; 130:13;
163:1
regards 17:14; 33:25;
50:15; 165:10
Rehm 10:20, 21; 32:6;
39:24; 40:4
Reidel 101:6
reinvent 64:24; 88:8
reiterate 106:3
reiterated 22:22; 130:5
Rejected 126:20
relate 13:6
related 37:25; 162:8
relates 20:10; 76:4;
88:21; 117:16; 136:7
relating 12:5; 23:23;
25:24; 26:15; 27:8; 38:15;
40:5, 14; 42:8; 43:15, 25;
45:2; 61:23; 63:1; 66:5;
80:20; 81:22; 86:23;
127:21; 131:6; 162:6;
163:3
relationship 79:11
release 150:8; 153:16,
23; 154:3, 11, 16; 155:1, 3,
6, 6, 15; 157:4; 160:19;
161:2, 3, 5, 11
religious 18:16
remark 137:19
remarkable 4:10
remember 44:2; 45:17,
17; 48:14, 17; 49:18;
53:21; 54:3, 13, 23; 55:22;
63:5; 68:12; 71:25; 76:4;
86:7; 89:8; 93:23; 94:1, 6;
95:6; 96:14; 97:21; 101:1;
105:6; 109:20; 111:4;
112:13, 22; 113:23;
115:16; 116:20; 117:16;
120:16; 121:4; 122:6;
136:6; 138:1; 140:2, 15,
19, 21, 21; 147:11; 158:9,
24
remembered 53:7
remembering 58:5;
137:1
remove 126:20
removed 65:22; 66:17
render 124:23
rendition 128:23
renewed 43:1
rep 78:13; 79:6
Repeat 108:7
reply 161:6
report 50:13
reported 9:18
reporter 163:12
represent 162:4
representative 159:1
request 79:14
requested 26:9, 20
required 138:12
requires 151:6

Case 4:04-cv-02688-JEJ   Document 216   Filed 09/28/05   Page 56 of 59

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Robert Eshbach
May 20, 2005

research 38:18
reservation 60:22
reservations 108:2, 4;
150:15; 151:6
reserved 3:5
reside 5:13
resolution 35:5
Resources 118:5, 23;
120:14, 23; 127:13; 128:5;
134:19
respect 119:17; 141:22
respective 3:3
respond 4:1; 66:1; 67:4;
75:15; 86:18; 94:12;
108:19; 111:13, 18;
138:19; 160:6; 164:21
responded 69:15; 125:4;
137:2; 138:14, 16, 17;
140:14
responding 65:1;
120:24; 143:20; 164:25
response 8:20; 49:2;
51:22; 66:2; 67:5; 75:24;
77:22; 82:16; 85:24;
87:16; 94:13; 103:22;
121:1, 1; 138:1, 22;
146:18; 147:3, 8; 151:18;
153:15; 158:23; 159:3;
160:7, 9; 161:2; 164:24
responses 4:1; 158:25
rest 18:2; 84:8
restate 120:20
retained 7:16, 18, 20
returned 163:8
reveal 65:20; 67:5
review 59:16; 78:18, 23;
83:17; 87:7; 90:3
reviewed 8:17, 19; 60:14
reviewing 8:19; 117:19
revisions 149:4, 15
revolved 105:7
revote 96:15
rewrote 145:12
Richard 32:14
Right 6:14; 10:5, 6; 11:16;
12:1; 14:22; 16:10; 20:3;
24:22; 31:16; 35:4; 40:10,
18; 43:18; 51:6; 55:6; 56:6;
57:24; 60:15; 62:5; 71:18;
77:8; 78:24, 25; 79:2, 21;
83:1; 84:25; 88:24; 89:17;
91:23; 94:7; 100:20;
101:10; 106:12; 108:21;
110:23; 112:10; 115:14;
117:16; 119:3; 120:5;
121:4; 122:25; 126:5, 7;
132:25; 133:4, 7, 16;
140:11, 12; 142:1; 145:23;
148:8, 24; 151:8; 153:6;
154:5, 11; 156:23; 157:23;
159:15, 17; 161:14, 18;
165:13
right-hand 31:19; 44:21;
46:21; 56:9, 16, 21; 57:3;
99:11; 100:6; 103:14;
114:10; 128:16; 149:2

Road 5:14
Rob 6:3, 8; 7:1; 8:6, 19;
9:9; 10:24; 11:16; 12:19;
13:14; 15:5; 16:11; 21:23;
22:11; 26:22; 28:4; 29:11;
30:15; 31:16, 25; 33:6, 15;
34:6; 40:10; 41:14; 42:13;
44:12; 46:19; 47:2, 8; 48:8;
50:2; 51:6; 52:15, 23;
55:25; 56:6; 57:5, 24;
61:18; 63:1; 66:4; 67:6, 19;
69:2; 70:10; 71:4; 72:4, 21;
73:13; 76:3; 77:12, 14, 18,
20; 78:4, 16; 79:24; 81:2,
21; 83:6, 24; 84:17; 86:7;
87:20; 89:4, 22; 90:14;
93:23; 97:23; 105:25;
106:13; 107:11; 112:19;
113:12; 114:12; 115:4;
116:4, 20; 118:8, 13;
119:6; 121:9; 122:14;
125:2, 12; 126:16; 127:4;
128:3, 11; 129:14; 130:15;
131:16; 132:25; 136:6, 19;
139:6, 19, 25; 141:5, 21;
142:1; 147:11; 148:5;
149:5, 21; 150:10, 14;
151:16; 152:9, 16; 153:11;
154:4; 155:9, 22; 156:6,
19; 158:8, 24; 159:6;
160:21; 161:22; 164:1, 10;
165:17
ROBERT 3:7; 5:10; 12:13
room 16:19; 34:25; 61:9;
101:2; 106:24; 158:1
rooms 145:23
rotation 25:9
Rothschild 9:13; 164:2
rough 103:1; 104:12
rumblings 15:3, 5; 17:15;
33:4, 6; 35:8; 91:13
Russell 102:20; 103:5

S

S 103:5
Salem 98:14
same 4:23; 10:4; 11:6, 9;
14:12, 16; 24:6; 27:19;
34:13; 37:22; 76:15;
84:11, 11; 111:18; 132:6;
133:20; 145:21
Sandi 47:1; 160:25
sat 115:1; 117:4
saw 16:14, 23, 25; 40:24;
57:16; 60:24; 71:7; 79:8;
84:15, 24; 119:6; 130:24;
135:5
saying 27:6; 31:1; 36:15;
39:24; 51:12, 18; 53:6;
54:23; 55:8, 18, 21; 71:18,
25; 74:1; 85:21; 95:18, 23;
96:5, 23; 107:7; 110:4;
112:19; 130:6; 138:10;
124:24; 141:3; 156:19;
160:7
SB 46:20, 23, 23

scanned 17:9; 18:3
School 5:18; 6:9, 10, 22,
24; 11:13, 13; 16:15, 19,
22; 24:22; 25:23; 34:25;
45:14, 20; 46:2; 47:18;
57:18; 58:3; 59:16; 60:10;
61:7; 62:12; 66:10; 70:13,
18, 19; 72:6; 73:7; 75:14;
79:7; 87:1; 91:9; 92:19;
95:13; 98:14; 101:13;
113:19; 124:7; 141:14;
143:24; 155:18; 157:13;
161:3; 165:3
Schools 56:8; 57:13;
70:22; 72:6
science 5:22; 6:11; 8:13;
13:16; 25:11; 28:3; 29:20;
31:21; 32:4, 17; 35:12, 23;
36:6, 11, 15; 39:23; 41:23;
42:5; 43:2; 44:19; 58:15;
59:15; 65:23; 66:12; 72:8;
84:8; 86:6; 94:10; 99:12;
101:15; 105:17; 106:5, 8;
108:19; 109:3; 118:12;
119:8; 120:4, 21; 121:17;
122:8, 11, 11, 12, 13, 15,
16; 123:15, 16, 16, 18, 20;
125:5; 126:16; 127:11;
135:18; 139:5, 11; 144:12;
146:3, 11; 150:21, 21;
153:1, 16; 154:4; 155:17,
25; 156:21; 157:21;
158:12, 18, 23; 160:20, 25;
161:7
scientific 38:1; 122:17,
18
scientists 122:10
scope 33:8
scratching 140:22
se 22:15; 69:23, 24;
87:13; 114:25
sealing 3:3
Second 9:23, 24; 14:2;
21:24; 23:11, 12; 46:6;
47:9; 72:5; 76:14; 100:16;
102:12; 109:8, 12; 116:17;
134:6
secondary 6:25
Secondly 4:7
section 16:7; 37:16; 40:2;
54:14; 61:14; 62:3; 63:5;
64:2, 6, 6; 74:14, 17, 17;
103:17; 113:2
sections 62:19; 68:2;
84:11; 106:5; 125:20
seeing 17:12, 17; 57:14;
61:21; 62:13; 117:3, 20;
130:21; 133:18; 134:24
seem 35:17
seemed 33:24, 24; 34:24;
37:6, 12; 45:18; 75:16;
81:18; 86:19
seems 21:17; 23:4;
32:12; 33:22; 50:23;
57:23; 60:23; 77:2; 107:6;
108:21; 112:19; 113:3;
114:16; 115:12; 126:3;
133:14; 134:25

sees 110:5
seize 162:9
select 25:12
selected 42:24; 165:23
selecting 25:16
selection 10:25; 11:17;
13:7; 25:5, 24; 26:16;
28:13; 40:1; 41:16; 43:25;
63:19; 78:7
semester 20:9; 33:4, 21;
43:24; 125:25; 148:21
send 17:25
senior 65:17, 18
sense 7:1; 8:16; 26:19;
31:8; 33:12; 34:7; 35:4;
40:7; 45:10; 68:24; 69:2;
82:10; 83:25; 87:21;
88:19; 91:2, 10, 11, 23;
97:1; 123:25; 133:2;
134:15; 135:21
sensitivity 5:5
sent 14:9; 78:18, 19; 79:6,
7; 114:19; 130:25; 146:16;
150:3; 164:17, 24
sentence 22:12; 23:12
September 100:5;
113:20
series 106:10
served 151:19
session 135:17, 19
set 3:16; 44:8; 55:25;
56:14; 57:19; 61:16
sets 47:15; 106:24; 107:2
setting 8:15
settle 128:2
seven-year 25:9
several 53:20; 62:21;
73:20; 84:21; 122:21, 23
Shaeberle 141:9, 9
shall 22:8; 99:5
Shane 32:8
shape 4:16
share 87:19
Sheila 55:15; 74:9; 88:16;
94:16; 95:16; 101:7;
107:7; 111:4; 144:1;
163:22
short 13:20; 95:12
shouting 139:20; 140:16,
21; 144:4
show 16:8; 17:4; 47:25;
60:7; 115:17; 135:2
showed 50:9; 63:21;
149:15, 19
shown 63:12; 81:13
shows 144:17
shut 108:20
side 3:18; 96:2; 103:14;
141:6
signed 160:25
significant 121:8
silence 86:19; 160:10
similar 28:3; 83:13;
148:20

similarity 84:15; 85:6
simply 156:15
single 21:19; 64:15, 20
sit 30:25; 76:18; 89:24;
107:11; 108:20; 109:16;
110:9; 114:12; 116:25;
117:10; 130:4; 132:9
sitting 32:21, 22; 64:17;
96:22; 122:25; 136:18;
142:8; 158:1
sixth 117:21
sketch 6:8
skimmed 126:3
skip 56:25
slanted 72:11; 86:5
sleeping 141:14
Sneath 10:20; 11:6
solicitor 102:15, 20, 24;
103:22; 146:22, 24; 147:6;
155:18
somebody 102:23;
106:21; 146:23
somebody's 140:8
someone 51:9; 73:24;
81:2; 96:15; 100:7;
105:15; 106:23; 125:23;
130:3, 12; 141:20; 164:18
sometimes 4:14; 63:25
somewhat 17:3; 45:16;
99:5
somewhere 9:11; 26:7;
30:12, 23; 37:1; 38:24;
53:5; 78:10, 10, 25; 83:1;
105:19; 130:4, 24; 154:6, 6
soon 108:25
sophomore 27:18
sorry 14:25; 15:22;
41:9; 76:20; 102:1;
108:7; 120:16; 125:23
sort 3:23; 4:24; 8:17;
11:5; 20:13; 21:17; 22:6;
30:13, 17; 33:18; 34:13;
35:2; 37:15, 20, 21; 41:8;
67:9; 91:4, 15, 16; 94:19;
98:23; 101:21; 102:1;
106:11; 107:11; 110:10;
111:16, 23; 113:25;
129:18; 131:13; 132:7, 10;
145:18
sorts 83:8
sound 60:17
sounds 4:3; 139:24;
140:3; 149:14
source 84:1
sources 65:20
Spahr 8:23; 13:15; 15:17;
16:24; 17:12; 18:8, 18;
19:13, 16; 20:21; 23:22,
23; 24:1; 32:6; 35:25;
38:11; 42:18; 44:15;
54:16; 58:6, 24; 59:14;
65:15, 25; 66:12; 71:25;
73:5; 74:2; 75:18; 79:8;
80:2; 82:22; 83:13; 86:20;
90:5, 9; 101:6, 16; 111:2;
120:8; 128:21; 129:24;

Robert Eshbach
May 20, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

136:13; 138:2; 141:9;
142:22; 145:1; 146:2;
164:7
**Spahr's** 34:25; 164:6
**spark** 98:3
**speak** 8:3; 37:21; 39:25;
84:1; 92:12; 142:4; 143:7;
146:2; 147:21; 159:1;
162:20, 24; 163:6, 19;
164:3, 4, 7
**speaking** 4:4; 28:25;
29:14; 35:21; 37:18;
48:17; 49:19; 55:10; 97:5;
112:14; 144:1; 166:11, 12
**speaks** 17:24
**special** 83:4
**speciation** 21:13
**species** 20:11; 21:1, 1, 7,
10, 12, 22, 25, 25; 22:6, 9,
24, 24; 37:2, 8; 54:15;
67:12; 117:24; 131:20
**specific** 9:20; 10:11;
11:2; 24:13; 32:17; 37:10,
11, 25; 38:2; 41:10; 43:5;
44:7; 45:17; 47:17; 48:10;
50:2; 54:20; 55:9, 16, 22;
61:23; 62:19; 63:5; 66:2;
77:3; 81:22; 83:8, 15;
84:17; 96:21; 100:20;
119:2; 126:14; 127:19;
134:14; 146:20; 148:22;
151:10
**specifically** 19:1; 20:18;
34:23; 35:9; 36:3; 54:24;
63:1; 83:21; 85:7; 130:2
**specifics** 49:11; 51:21;
52:3; 53:16; 55:20; 82:18;
93:14, 24; 94:25; 97:22;
140:21
**specified** 124:15, 23
**spell** 5:11
**spent** 101:24; 103:2
**spirit** 105:19
**split** 18:9; 89:10; 93:7
**spoke** 8:7; 24:9; 49:20;
80:17; 100:9, 11; 137:2, 3;
144:22; 145:5; 146:9;
163:4; 164:2
**spoken** 7:14, 20, 23; 8:9,
23; 9:2; 10:16, 19; 11:12;
14:14, 16; 17:12; 20:22;
147:5, 17; 162:16
**Spray** 117:8
**spread** 28:2
**spring** 24:7; 25:11;
31:11; 33:10; 34:4; 42:22;
43:1, 5, 24; 56:9; 57:6, 11,
14; 84:10
**stack** 55:24
**staff** 134:4, 8, 17; 141:20;
159:9, 20
**stamp** 66:12
**stamped** 116:5; 117:18;
127:2; 131:7; 139:6, 8
**stance** 53:14
**standards** 22:16; 27:21;

29:18, 19, 20
**standing** 48:1; 49:15;
98:13; 141:6
**standpoint** 48:12; 81:12;
95:5; 105:17; 121:17
**stands** 40:21
**start** 12:1; 56:4; 80:12;
150:3
**started** 33:4, 14, 16; 44:3;
61:9; 75:17; 86:10
**starting** 15:3; 95:13
**starts** 122:19; 135:17
**state** 5:9; 22:13; 27:20;
29:18, 19, 20; 64:24;
88:23; 101:3; 119:13;
145:17
**stated** 15:20; 17:10;
29:24; 36:22; 37:1; 64:11;
80:13; 81:14, 19, 19;
82:19; 85:13; 87:12;
88:10; 93:8; 94:2, 20;
104:3; 109:21; 110:21;
132:4; 136:8; 155:15;
158:1; 159:3; 161:6
**statement** 38:4, 6; 49:16;
50:9; 52:7, 9, 13; 64:4;
71:3, 8; 86:16, 17; 92:17;
93:15; 94:16, 19; 96:11,
13; 104:18, 19; 108:22;
110:2, 7; 123:20; 129:5;
135:19; 136:14, 17, 22;
137:5, 7; 138:1, 13;
145:10, 12, 12; 148:24;
149:5, 23; 150:5, 7, 16;
152:20, 23; 154:20;
155:19, 21; 156:2, 25;
157:19; 158:16; 160:11,
13; 165:2, 18, 20
**statements** 13:12; 18:21;
49:4, 11; 52:4; 67:22; 98:7,
9; 115:18; 140:5; 162:6;
166:10
**states** 18:14
**stating** 37:13; 62:5, 7;
80:23; 84:22; 88:2; 96:9;
128:14; 147:5
**status** 29:5
**step** 123:3
**Stephen** 103:5
**stepped** 58:11, 11
**steps** 122:18; 156:14
**Steve** 102:20
**stick** 43:3; 110:8
**sticks** 111:20; 143:23;
146:23; 161:14; 165:22
**still** 34:10; 116:1; 144:8
**stipulated** 3:2
**STIPULATION** 3:1
**stolen** 65:22
**stomach** 105:24, 25
**stood** 53:15; 100:9, 11;
104:21
**stop** 115:21; 137:9
**store** 117:7
**story** 3:18; 14:22; 41:16;
76:23; 91:24

**stretch** 33:19
**STS** 28:8; 66:13; 119:9
**stuck** 43:9; 113:25; 114:5
**student** 63:12, 21; 65:18;
103:24; 104:17; 105:15,
21; 106:16; 108:14; 110:1;
113:24; 117:25; 118:15
**students** 18:15; 20:7, 13;
23:9; 27:11, 16; 63:24, 25;
74:14; 75:9; 87:22; 94:3;
95:10, 20; 104:2; 107:3;
108:5, 9; 110:18, 24;
111:25; 113:7; 117:22;
118:19; 128:7; 141:15;
148:17; 150:23; 154:21;
157:1
**study** 116:8
**subject** 11:6, 13; 12:18;
13:3, 6, 18; 22:22; 24:6,
25; 37:13, 15; 38:19;
48:13; 60:6, 20; 92:10;
124:14; 130:13; 131:25
**submitted** 62:11
**subpoena** 8:21; 151:18
**subpoenaed** 8:5
**subsided** 34:4
**substance** 144:22;
161:7; 165:8
**suggested** 149:12, 15;
159:5, 8; 163:14
**suggestion** 133:15
**suggestions** 63:23
**summer** 24:20, 21; 57:7;
68:20; 75:21; 118:17
**Sunday** 164:13
**Superintendent** 155:15
**supplementary** 105:18
**support** 48:2; 68:3;
69:18; 87:18, 24; 88:1;
105:13, 14; 107:8; 117:23;
118:20
**supported** 67:24
**supporting** 143:15
**Sure** 7:2; 14:18; 15:13,
15, 17; 17:20; 18:5, 20;
21:8; 25:8; 26:12; 28:22;
31:7; 36:5, 19; 37:19;
38:22, 25; 47:5, 16; 48:10;
49:13; 51:13; 52:7; 54:9;
60:7; 62:23; 68:11; 70:16;
72:4; 81:21; 85:23; 86:1;
87:20; 88:3; 92:14; 93:15,
25; 101:12; 102:11, 13;
105:3, 7; 106:25; 108:8,
20; 112:7, 24; 114:19, 25;
117:15; 120:21; 128:20;
129:3; 130:10; 131:16;
144:16; 145:13, 21;
153:15; 156:6; 160:6
**surprise** 91:22
**surprised** 45:16; 91:5;
93:4
**surrounded** 30:6
**surrounding** 11:17;
70:13, 18, 19
**Survey** 56:7; 57:12; 70:7

**suspects** 47:12
**switch** 144:10
**sworn** 3:8
**symposium** 124:6
**synopsis** 61:11; 85:20
**System** 6:15; 75:14;
122:17
**systematic** 122:16

## T

**table** 55:22; 71:16; 85:21;
94:6; 140:16
**talk** 21:2; 30:19; 37:15;
76:18; 88:22; 92:23;
144:18; 163:14
**talked** 14:10; 62:24; 88:6;
126:4; 127:21; 162:18
**talking** 39:21; 89:22;
98:15; 110:17; 111:14;
141:20; 142:1; 143:6;
144:14; 166:4
**Tammy** 10:20; 11:8
**tape** 60:20
**taught** 15:22; 16:7;
18:10; 22:15; 29:25; 33:5,
8, 9; 34:20; 50:18; 52:6;
69:10; 84:19, 20; 107:22;
112:24; 129:7; 132:4;
133:11; 138:23, 24, 25
**Taxonomy** 7:6
**Taylor** 120:9
**teach** 5:21, 22; 18:15;
21:2; 30:3; 37:2, 16; 40:2;
91:14; 92:19, 24, 24;
123:15; 130:2; 138:12
**teacher** 5:19; 12:23, 25;
15:11, 12; 16:20; 20:7;
28:6; 33:23; 45:14; 46:8;
60:10; 63:18, 19; 66:12;
78:14, 21; 100:8; 106:18,
22; 141:13; 145:19;
148:15; 150:12
**Teacher's** 56:19; 62:9;
63:11, 20; 133:14; 149:1
**teachers** 17:24; 22:13;
23:6; 25:13; 27:6, 11;
28:16, 23; 29:13; 30:3, 4;
68:20; 75:10, 19; 85:24;
86:13; 92:17, 18, 19;
107:12, 22; 108:12; 112:2;
135:10; 137:7, 9, 19;
138:12; 154:4; 155:17;
156:7; 159:5, 8, 10
**teaching** 6:19; 15:7;
22:18; 23:18; 25:14;
38:16; 51:3; 84:23; 92:5;
97:3, 16; 108:12; 125:24;
129:16, 17; 139:1; 148:21;
150:11; 160:15
**Team** 6:17
**technical** 21:17
**technician** 6:15
**telephone** 10:10; 82:22;
90:6; 163:9, 14
**telling** 30:10; 44:13, 13,

15; 100:7
**tender** 86:17
**tends** 4:17; 33:18
**term** 19:1; 53:2, 20, 21,
25; 141:15; 144:11
**terms** 6:25; 23:8; 27:3;
35:8; 55:20; 59:3; 60:13;
88:18; 91:23; 93:23;
97:14; 115:12; 121:18;
146:1; 158:23
**test** 123:6, 9, 12, 17
**testability** 123:21
**testable** 123:3, 25;
124:23
**tested** 123:6
**testified** 3:8
**textbook** 25:12; 27:16;
58:16; 61:12, 14; 62:3, 6,
21; 68:21, 23; 72:6; 89:25;
94:4; 96:3; 102:5; 104:11,
17; 105:21, 24; 106:2;
108:17
**textbooks** 25:10, 15;
26:6; 28:16, 20; 42:7;
58:20; 78:12; 95:4;
104:14; 110:23
**texts** 43:4
**Thanks** 41:20; 101:5;
113:22; 139:11
**theirs** 69:12
**theories** 19:7; 88:14;
96:6; 110:18; 118:2; 128:8
**Theory** 7:8; 15:8, 22, 23;
17:16; 18:11, 14; 20:8, 10,
24; 22:14; 23:6, 14, 24;
24:24; 28:24; 29:4; 30:20;
33:5, 8; 34:20; 36:8, 24;
50:18, 25; 51:20; 52:5;
60:8, 12, 19; 64:9, 12, 13;
66:6; 67:24; 68:3; 69:7, 14,
19; 70:20; 74:18; 81:11;
84:19, 20; 85:4; 87:15, 18,
24; 91:14; 92:10, 22;
95:10, 25; 108:15, 16;
112:25; 113:4; 117:23;
118:1, 20, 21; 123:19, 25;
128:8, 12; 131:20; 144:23,
23; 154:22
**thereafter** 16:17; 109:1
**Therefore** 123:15, 18;
138:25
**thinking** 32:21; 75:22,
25; 90:20; 115:21; 117:6
**third** 128:22
**Thomas** 162:4
**though** 39:4; 56:3; 94:2;
130:1; 158:17
**thought** 36:12, 13; 40:8;
47:14; 49:25; 51:3; 71:9;
80:8; 83:18; 85:11, 14;
98:16; 109:24; 129:11, 12,
14; 130:10; 141:8, 13;
148:10, 22; 155:9; 164:19
**thoughts** 84:20; 148:20;
152:15; 154:24; 164:22
**three** 16:5; 41:13; 78:19;
106:11; 148:25; 149:1, 2;

Tammy Kitzmiller, et al.    v.
Dover Area School District, et al.

Robert Eshbach
May 20, 2005

164:10
throughout 119:11
throw 158:2
thrust 49:22; 95:15;
122:6, 7; 146:10; 154:11
thus 23:5; 26:1; 59:4
ties 64:21
timeline 8:17, 19; 10:6;
44:19; 45:1; 99:12;
109:19; 113:13; 114:8;
116:10; 117:12; 126:16;
128:15; 149:1
timelines 8:20
times 53:21; 84:21;
122:14, 21, 23
Timewise 38:25
tired 86:9
title 56:7; 60:1, 18; 68:19
titled 77:19
today 30:25; 89:24;
110:9; 114:12, 14; 125:21,
22; 151:18; 156:20;
162:18; 165:12
today's 7:15
together 27:1; 60:7;
64:22; 80:14; 81:17;
82:14; 109:6; 120:19;
156:1
token 4:23
told 17:25; 28:19; 29:9;
30:11; 44:3, 16; 66:15, 20;
67:7; 84:5; 90:2, 4, 4, 5;
101:14, 16; 126:10;
128:20; 129:1, 3; 159:21
tolerance 50:14; 51:2
tolerate 141:20
tone 37:12; 86:10; 98:23
took 8:18, 25; 9:4, 5, 10;
13:15; 42:7; 45:11, 24;
49:8; 53:13; 58:3; 77:6;
98:23; 103:23; 104:22;
105:2; 125:18; 134:19;
153:8; 154:7, 8; 164:18;
165:19
top 47:7; 56:15; 60:2;
67:18; 78:17; 102:21;
150:4, 12; 155:4; 157:11
topic 23:16, 24; 24:24;
29:11; 136:3
topically 40:24
topics 21:9; 27:25; 28:1,
7; 38:2; 40:5; 80:24
touch 149:20, 21
touched 49:7; 97:17
touching 51:18; 78:6;
79:4; 99:16; 104:23
toward 96:1
towards 16:1; 86:5;
134:12; 151:22
traced 91:24
train 83:25
training 21:23
transcribed 4:7
transcribes 3:24
transcript 4:15

trial 3:5
tried 129:22
trigger 50:13; 67:17;
79:24; 83:7
triggered 79:17
trim 27:6
trip 83:4
Trudy 91:14
true 23:9; 77:23
try 4:1, 6, 13, 15; 8:10;
23:8; 24:8; 41:13; 54:19;
76:8
trying 4:23; 5:1; 16:20;
21:16; 26:25; 27:1; 33:15;
34:6, 8; 76:23; 81:21;
103:18, 19; 105:5; 108:8;
120:16; 121:21; 140:2;
144:21
tumultuous 99:5
turn 3:25; 18:17; 31:18;
79:17; 127:24
turned 134:19; 154:25;
166:8
two 8:24; 13:17; 18:14;
21:9; 25:15; 27:17; 37:7;
44:6, 17; 47:15; 50:12;
52:23, 25; 73:21; 74:24;
78:18; 80:15; 81:16, 25;
82:14; 90:21; 91:7, 9;
94:17, 24; 99:11; 100:10;
113:17; 114:9; 121:13;
126:18, 19; 128:16;
130:19; 133:5, 22; 152:13;
159:20
two-thirds 129:1
type 22:3; 58:11; 79:12;
82:9, 21; 95:4; 109:17;
117:2; 127:25; 132:1;
143:25; 145:14
typed 83:1
typewritten 56:18; 82:24

## U

unclear 4:19; 5:3; 6:5
uncomfortable 5:4;
23:16
under 106:10; 117:20;
118:14; 127:7; 131:2;
134:18, 19, 22; 151:20
undergraduate 7:12
underlining 103:17
Understandable 74:6
Understood 39:4;
137:22; 147:8; 159:19
uneasy 151:13
unfair 96:4
unfolded 36:4; 38:25;
48:13; 108:9; 142:17
unfolds 14:22; 76:23
unique 3:23
Unit 127:7; 133:13
Units 118:14
University 56:12; 70:24;
71:24, 25; 72:12, 13;

75:12; 85:11, 15; 86:1, 4
unless 93:17
unprofessional 141:19
untenured 17:24; 28:23;
29:13; 30:3
up 4:24; 5:25; 11:22; 25:8,
16, 22; 28:10; 29:6, 17, 20;
31:1; 33:14, 16; 34:10, 14,
15; 35:20; 36:13; 39:8, 18;
40:1; 43:17, 24; 47:7;
48:25; 49:15; 50:2, 9;
54:12, 13; 63:12, 21;
66:25; 68:8; 70:3, 5; 75:21;
76:8; 80:5; 83:1, 5; 84:10;
86:7; 90:12; 91:16, 25;
92:11, 25; 93:2, 7; 97:2;
100:9, 11; 102:12; 103:16,
18; 105:3, 20; 106:21;
110:23; 112:7; 114:22;
116:22; 117:6, 6; 125:7;
128:13; 132:23; 135:2, 9;
136:16; 140:8; 141:7;
144:2, 17; 156:15; 161:19;
166:1
uphold 53:10
upon 87:6, 14; 110:17
upper 31:19; 44:21;
46:20; 56:9, 16, 21; 57:3;
79:21; 99:11; 100:5;
114:10; 128:16; 149:2;
160:23
upset 66:20; 95:24;
98:18, 20; 157:19, 25
usage 43:12
use 4:3; 19:1; 42:14;
61:12; 69:19; 71:2; 75:8;
102:7; 104:15; 107:8, 19;
119:11; 121:2; 122:17;
144:11; 155:19
used 27:9, 14; 53:25;
56:7; 57:13; 70:13, 19;
80:24; 109:25; 112:25;
113:1; 117:23; 120:2;
124:20; 141:15; 144:8
using 53:2, 21; 73:4;
118:24

## V

vacations 100:17
various 18:16; 22:2, 9;
27:25; 142:18
verbal 3:25
verbally 4:1
verbatim 95:13, 14
verbiage 49:25; 80:24;
128:12, 13; 144:10
verify 52:12
versed 124:13
version 78:20, 20; 127:1,
6, 10; 135:25; 137:15;
142:9, 20, 20, 21, 23, 23,
24, 25, 25; 143:1, 1, 9, 11;
150:5; 159:7, 9, 13; 160:4
Version.doc 150:12
versions 80:1; 90:8;

159:21
versus 30:14; 34:1;
54:15; 57:2; 67:11; 73:14;
84:19
VHS 60:5
Vicki 3:24; 4:5
video 60:5, 6, 21; 68:2, 9
videotape 59:21, 23;
60:1, 15, 23; 61:1
view 3:19; 72:2, 19; 86:3,
5; 95:20
viewed 59:23
views 21:5, 5; 95:22;
96:1; 108:17; 110:22
violation 75:13
visit 115:1
vocal 64:1; 143:24
voicing 62:2
vote 68:21; 87:2, 4, 7;
88:24; 89:9, 25; 91:6; 93:7,
9; 95:12; 96:3, 16; 98:10;
136:10, 11, 15; 137:15;
144:2
voted 46:8; 142:19
voting 142:8, 9; 159:16
vying 42:6

## W

wait 4:13
waiting 28:18
waived 3:4
wants 108:9; 110:11
Warren 5:10; 49:20;
165:3
water 16:21
way 4:25; 12:12, 16;
18:23; 23:6; 27:25; 28:23;
37:20; 42:19; 47:6; 65:4;
81:2, 19, 19, 22; 83:9;
88:6; 105:5; 106:19;
108:15; 110:5; 113:1, 5;
121:14; 122:16; 123:17,
23; 128:9, 13; 131:18;
132:6; 137:1, 2; 141:4;
145:17; 151:22
ways 3:20
week/classes 117:21
weekday 14:9
weeks 94:17
Wenrich 54:21; 93:21;
94:2; 95:22; 96:8; 140:19,
20; 162:23
weren't 67:24; 70:1;
92:12; 128:7, 11; 156:13,
14
West 5:14
wheel 64:24; 88:8
white 135:2
whole 30:13; 32:13, 19;
65:11; 80:12; 92:10; 97:2;
109:9; 114:2; 158:2, 14, 14
wife 163:7
wild 128:7, 11

159:21
William 62:12
willing 118:18
willingness 87:22
Wilson 6:20; 13:1
wind 75:17
wise 49:25
wish 5:1; 147:14
within 22:6; 33:8; 93:11,
22; 119:25; 137:14, 18
without 67:21; 68:10;
78:19; 102:21; 114:22;
118:11; 143:19
witness 3:7; 46:17; 56:5,
24; 98:2
wonder 79:10
wondered 79:9
wondering 24:7; 140:23;
151:9
word 62:5; 69:19; 75:7;
81:5, 5; 102:7; 110:14;
144:8; 151:13
words 8:10; 50:22; 69:25;
81:3; 87:20; 88:5; 92:6, 7;
109:5; 110:11; 119:15;
122:8; 124:19; 129:10;
134:20; 144:12; 158:15;
160:3
work 112:1; 149:18
working 16:19, 23
world 22:2
worry 100:23; 116:2
worth 25:15
wounds 148:12
wrap 76:8
wrapped 86:7
wrapping 43:24
wrench 158:2
Wrightsville 100:8
write 164:19; 165:19
writing 106:20; 153:9
written 18:12; 150:22
wrote 145:12
Wynegar 146:7

## X

x 24:10
XI-A 143:11
XI-B 127:4; 131:3; 134:2,
22; 139:6; 159:7, 21
XI-C 130:17; 134:5, 24;
159:8, 21

## Y

y 24:10
year 6:23, 24; 15:10, 1?
16; 16:20; 24:22; 25:12
33:19, 23; 39:3; 41:14;
42:24; 45:15; 66:10; 74
91:12, 19; 92:5; 95:13;
104:13; 113:19
years 51:9; 64:18; 90:?

Robert Eshbach
May 20, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

91:7, 9
**yellow** 135:4
**Yingling** 55:13; 96:10;
98:15, 18, 22; 141:2;
142:2; 147:14; 163:19
**York** 6:11, 14; 113:24

## Z

**z** 24:10
**zoo** 140:18