# APPENDIX I

# TAB K

# In The Matter Of:

*Tammy Kitzmiller, et al.   v.*
*Dover Area School District, et al.*

---

### Heather Geesey
### March 10, 2005

---

## Filius & McLucas Reporting Service, Inc.
### 1427 East Market Street, York, PA
### 4309 Linglestown Road, Harrisburg, PA

### (717) 845-6418   or   (717) 236-0623

Original File HG031005.TXT, 122 Pages
Min-U-Script® File ID: 3817974781

## Word Index included with this Min-U-Script®

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Heather Geesey
March 10, 2005

Page 2

[1]     IN THE UNITED STATES DISTRICT COURT
         FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
[2]
[3] TAMMY KITZMILLER; et al., .
[4]   Plaintiffs  .  CIVIL ACTION NO. 04-CV-2688
[5]   vs.
[6] DOVER AREA SCHOOL DISTRICT,.  (JUDGE JONES)
     et al.,
[7]
      Defendants
[8]
[9]
[10]
      Deposition of             : HEATHER GEESEY
[11]
      Taken by                  : Plaintiffs
[12]
      Date                      : March 10, 2005, 10:00 a.m.
[13]
      Before                    : Vicki L. Fox, RMR,
[14]                               Reporter-Notary
[15]   Place                    : 200 One Keystone Plaza
            North Front & Market Street
[16]         Harrisburg, Pennsylvania
[17]
[18] APPEARANCES:
[19]  PEPPER HAMILTON LLP
       BY: THOMAS B. SCHMIDT, III, ESQUIRE
[20]
         For - Plaintiffs
[21]
[22]  THOMAS MORE LAW CENTER
       BY: PATRICK T. GILLEN, ESQUIRE
[23]
         For - Defendants
[24]
[25]

Page 2

[1]           INDEX
[2]          WITNESS
[3] HEATHER GEESEY          Examination
[4]   By Mr. Schmidt                 3
[5]
[6]          EXHIBITS
[7] Plaintiff Deposition
     Exhibit Number          Page
[8]
[9] 4. NewsBank InfoWeb Articles from the York Dispatch 38
     and Daily Record, pages 6 and 7.
[10]
     5. Dover Area School District Memorandums with  70
[11] attachments, pages 000003, 000004, 00011, 00019 through
     000029, 000121 through 000126.
[12]
     19. Dover Area School District News dated February —
[13] 2005.
[14] 28. Dover Area School District School Board Meeting 45
     Agenda, Monday, June 14, 2004, pages 000230 through
[15] 000243.
[16] 29. Wed., October 20, 2004 e-mail, HADLEY96@aol.com 100
     To mlise@dover.k12.pa.us.
[17]
     30. Photocopy from NewsLibrary, June 20, 2004, York 106
[18] Sunday News, Letter to the Editor.
[19] 31. Letter; Textbook quest explained written by Heather  110
     Geesey appear in the "York Daily Record".
[20]
[21]
[22]
[23]
[24]
[25]

Page 3

[1]           STIPULATION
[2] It is hereby stipulated by and between the
[3] respective parties that sealing, certification and filing
[4] are waived; and that all objections except as to the form
[5] of the question are reserved until the time of trial.
[6]
[7]     HEATHER GEESEY, called as a witness, being duly
[8] sworn, was examined and testified, as follows:
[9]
[10]         BY MR. SCHMIDT:
[11]   Q: Ms. Geesey, my name is Tom Schmidt. We've met before
[12] the deposition started. I am one of the attorneys for
[13] Plaintiffs in a lawsuit that we refer to sometimes as
[14] the Kitzmiller case or the Dover School District case.
[15]     You are a defendant in that lawsuit; is that
[16] right?
[17]   A: Yes.
[18]   Q: I know you have had the opportunity to speak to your
[19] attorney about the deposition procedure, but let me
[20] explain my ground rules and be sure we have an agreement
[21] about that before we get started.
[22]     The basic ground rule is that because everything
[23] we say here is going to be transcribed verbatim, that
[24] you and I have to be as clear as we can in questions and
[25] answers.

Heather Geesey
March 10, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

**Page 4**

[1]  A: Okay.
[2]  Q: That means we have to wait until the other person
[3]  finishes before we start. And we have to do everything
[4]  in some verbal form so that it can be transcribed.
[5]  Do you understand that?
[6]  A: Yes.
[7]  Q: I will do my best to make my questions clear. But if
[8]  you don't understand a question for any reason, please
[9]  tell me so that I can fix the problem, and we can be
[10]  sure that you have answered a question that you
[11]  understand. Okay?
[12]  A: Okay.
[13]  Q: Do you have any questions before we start?
[14]  A: No.
[15]  Q: Let me ask a few questions about you, not many, but just
[16]  a few.
[17]  Would you tell us your home address?
[18]  A: 3750 Admire Road, Dover, Pennsylvania 17315.
[19]  Q: You will probably to speak up just a little bit and
[20]  speak to Vicki if you would.
[21]  How long have you lived at that address?
[22]  A: Five years.
[23]  Q: Who lives there with you?
[24]  A: My husband and my three children.
[25]  Q: How old are your children?

**Page 5**

[1]  A: Twelve, eight and five.
[2]  Q: Do any of them attend schools in the Dover School
[3]  District?
[4]  A: Yes.
[5]  Q: Do all of them attend school in the Dover School
[6]  District?
[7]  A: No.
[8]  Q: The twelve year old and the eight year old?
[9]  A: Yes.
[10]  Q: Do you mind telling me their names?
[11]  A: Justin and Joshua.
[12]  Q: What is the five year old's name?
[13]  A: Jacob.
[14]  Q: I am going to ask you a few questions about your own
[15]  educational background.
[16]  A: Okay.
[17]  Q: Did you complete high school?
[18]  A: Yes.
[19]  Q: What high school and when?
[20]  A: 1991, Christian School of York.
[21]  Q: Did you attend school after high school graduation?
[22]  A: No.
[23]  Q: Have you attended any kind of educational program of any
[24]  duration since 1991?
[25]  A: No.

**Page 6**

[1]  Q: Did you attend any high school other than Christian
[2]  School of York?
[3]  A: Yes.
[4]  Q: Which one?
[5]  A: Montoursville briefly.
[6]  Q: I am trying to remember my Pennsylvania geography.
[7]  Montoursville is up near Sunbury?
[8]  A: Williamsport.
[9]  Q: Did you move down to the York area with your family?
[10]  A: There was just a brief period that I went up there, and
[11]  I was at CSY before and after. It was just one marking
[12]  period that I went up there.
[13]  Q: After you graduated from high school, did you become
[14]  employed by anyone?
[15]  A: Yes.
[16]  Q: What were you work experiences after high school? Let's
[17]  start with the first job you had.
[18]  A: Photography.
[19]  Q: What did you do as a photographer?
[20]  A: Sales.
[21]  Q: Sales?
[22]  A: Yes.
[23]  Q: Did you work for a particular photographer?
[24]  A: Kinder Foto.
[25]  Q: Where was that business located?

**Page 7**

[1]  A: York.
[2]  Q: How long did you work for them?
[3]  A: Three months.
[4]  Q: Any jobs after that?
[5]  A: Yes.
[6]  Q: What?
[7]  A: Dyncorp.
[8]  Q: What kind of business is that?
[9]  A: Data entry.
[10]  Q: What did you do for Dyncorp, data entry?
[11]  A: Yes.
[12]  Q: How long did you work for them?
[13]  A: A year and a half, in that area.
[14]  Q: Any jobs after that?
[15]  A: I don't believe so. Volunteer work, but not paying
[16]  positions.
[17]  Q: Let me ask you a question or two about volunteer work.
[18]  Did you work as a volunteer for any extended period of
[19]  time with any organization of any kind?
[20]  A: Yes.
[21]  Q: Can you tell me what organization?
[22]  A: Northern Regional Police Department.
[23]  Q: What did you do for the Police Department?
[24]  A: Right now, I am in a program called Youth Panel.
[25]  Q: What does the Youth Panel do?

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Heather Geesey
March 10, 2005

Page 8

[1]   A: We punish first time offenders. Instead of them going
[2] through a court system, they can come to us and we will
[3] see them for their contract and get them on the right
[4] track.
[5]   Q: So it is kind of a diversionary program for juveniles?
[6]   A: Yes.
[7]   Q: How long have you been involved with that work?
[8]   A: This summer will either be three or four years.
[9]   Q: And the Northern Regional Police Department is a —
[10] let's see if I can get this right — it is an inter
[11] municipal agency that operates in the northern part of
[12] York County covering several municipalities?
[13]   A: Sure.
[14]   Q: Does that sound right?
[15]   A: Yes.
[16]   Q: This is a volunteer, not a paying position?
[17]   A: Correct.
[18]   Q: Any other organizations that you have done any volunteer
[19] work over an extended period of time?
[20]   A: The school.
[21]   Q: What have you done for the school?
[22]   A: Everything.
[23]   Q: Give me a couple of examples.
[24]   A: PTO, birthday patrol, library aide, homeroom mother.
[25]   Q: When you have been involved with the PTO, have you ever

Page 9

[1] been an officer of that organization?
[2]   A: Yes.
[3]   Q: Tell me what you were and when.
[4]   A: Vice-President for one of them. I am not going to be
[5] able to remember the year.
[6]   Q: Okay. That was Vice-President of the PTO?
[7]   A: Of one of them. I belong to three.
[8]   Q: In the schools as they go up?
[9]   A: Yes. A secretary.
[10]   Q: Have you ever done any thing for the School District
[11] where you were compensated for your work?
[12]   A: No.
[13]   Q: Are you on officer of the PTO now?
[14]   A: Yes.
[15]   Q: Which one?
[16]   A: Dover Intermediate School, secretary.
[17]   Q: When did you first join the School Board in Dover?
[18]   A: December of 2003.
[19]   Q: Were you elected to the Board or appointed to the Board?
[20]   A: Elected.
[21]   Q: When was the election?
[22]   A: November of '03.
[23]   Q: Was that the first time you ran for election to the
[24] School Board?
[25]   A: Yes.

Page 10

[1]   Q: Congratulations. When you ran for election to the
[2] School Board in 2003, were you part of a slate or group
[3] of candidates that were running together?
[4]   A: No.
[5]   Q: You ran on your own?
[6]   A: Yes.
[7]   Q: Have you ever held any other public elected office?
[8]   A: No.
[9]   Q: Have you ever run for any other public elected position?
[10]   A: No.
[11]   Q: How was it that you were seated as a School Board member
[12] in December instead of the following year?
[13]   A: That's the reorganization meeting, December.
[14]   Q: Have you ever served on any committees of the School
[15] Board?
[16]   A: No. Before I was elected or after?
[17]   Q: After.
[18]   A: Yes.
[19]   Q: What committees?
[20]   A: Policy.
[21]   Q: Was that a committee you were appointed to in December
[22] of 2003?
[23]   A: Or shortly thereafter.
[24]   Q: What kind of work does the policy committee do for the
[25] School Board?

Page 11

[1]   A: We review the policy and set policy, help set policy.
[2]   Q: Give me an example of the kind of policies that you
[3] review or set.
[4]   A: Anything from procedures.
[5]   Q: Okay. Let me ask a different question. That was a
[6] little vague.
[7]     Do you work on policies that have to do with how
[8] the Board conducts its business, or are the policies you
[9] work on policies like student dress codes or conduct
[10] codes or employment related policies as three examples?
[11]   A: Everything.
[12]   Q: Everything?
[13]   A: Yes.
[14]   Q: If there is a policy whether it affects an employe, a
[15] student or even how the Board conducts business, that
[16] would be under the heading of policy for your
[17] committee's work?
[18]   A: Yes and no. Some things are already set so we don't —
[19] how the Board conducts its business, that's a law. So
[20] it is set. So I'm not sure.
[21]   Q: Okay. But if the school, for instance, has a policy
[22] about student conduct, that is something that could
[23] possibly come before your policy committee?
[24]   A: Yes.
[25]   Q: And the same would be true of say an aspect of how

Heather Geesey
March 10, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 12

[1] employes conduct themselves as School District employes?

[2]    A: It could. That could be a contract issue.

[3]    Q: Okay. My recollection is that one of the matters that

[4] the Board has dealt with is how people have

[5] opportunities to speak at Board meetings.

[6]    Is that the kind of policy that your committee

[7] would also have worked on?

[8]    A: Yes.

[9]    Q: Maybe you can tell me a little bit more about that just

[10] to fill me in on what that policy involves.

[11]    A: How it is set up?

[12]    Q: Yes. What is the rule now?

[13]    A: That they may speak two different times during the

[14] meeting, before and after.

[15]    Q: Before the Board's published agenda and at the end of

[16] the meeting?

[17]    A: Yes.

[18]    Q: That is an open mike opportunity?

[19]    A: Yes.

[20]    Q: Do they have to limit their comments to any particular

[21] subjects?

[22]    A: Right now before the meeting, it is agenda items only.

[23] After the meeting, it is anything.

[24]    Q: Have you had a position on the policy committee that

[25] represented an officer position like chair, vice chair,

Page 13

[1] another position like that?

[2]    A: Not the first year. This year, I am chair.

[3]    Q: So that the record is clear, by first year, you mean

[4] 2004; is that right?

[5]    A: Yes.

[6]    Q: And this year, you mean the current year, 2005?

[7]    A: Yes. For the last two months, yes.

[8]    Q: Were you personally involved in drafting or preparing

[9] the current policy on public participation in Board

[10] meetings?

[11]    A: Say that again.

[12]    Q: Yes. Were you personally involved in drafting or

[13] preparing, composing in some fashion the current policy

[14] for public participation in Board meetings?

[15]    A: Not the first draft.

[16]    Q: Who did it?

[17]    A: Dr. Nilsen.

[18]    Q: That is the Superintendent of the District?

[19]    A: Yes.

[20]    Q: Was the policy we have been discussing a change from the

[21] practice that had existed before?

[22]    A: It was to reword it better.

[23]    Q: Was there a problem that this rewording was meant to

[24] address?

[25]    A: It was just to update.

Page 14

[1]    Q: Maybe I should ask the question a different way. What

[2] was the change that was made? I don't mean — you don't

[3] have to have memorized it and give me the exact words,

[4] but how was the new policy different or better than the

[5] old one?

[6]    A: It's just clearer. I mean they talk before and after,

[7] and now they still talk before and after. It is just

[8] clearer.

[9]    Q: You said in response to an earlier question that you

[10] didn't work personally on the first draft.

[11]    Did you work on any subsequent version of the

[12] policy?

[13]    A: He just handed to me — Dr. Nilsen gave it to me. I

[14] looked it over, and I put my changes on the paper. And

[15] then they gave it to the next committee to look over.

[16]    Q: When did all of this take place?

[17]    A: February.

[18]    Q: Of this year?

[19]    A: Yes.

[20]    Q: To be sure I tied everything down, have you served on

[21] any other committees of the Board besides the policy

[22] committee?

[23]    A: This year or last year?

[24]    Q: Of say 2004.

[25]    A: LIU.

Page 15

[1]    Q: What is that?

[2]    A: That is sort of not a committee. It is a subcommittee.

[3] It is the Special Ed.

[4]    Q: LIU?

[5]    A: Yes, Lincoln Intermediate Unit.

[6]    Q: Is that the Intermediate Unit that the Dover School

[7] District belongs to?

[8]    A: Yes.

[9]    Q: Is this kind of a liaison committee between the School

[10] District and the Intermediate Unit?

[11]    A: Yes.

[12]    Q: What do you do as a member of the liaison committee?

[13]    A: This year, basically nothing because I do not hold a

[14] seat. We share it with another School District, and it

[15] is their turn. So there's information, and I bring it

[16] to the Board.

[17]    Q: It is an informational role —

[18]    A: Yes.

[19]    Q: — rather than a governing role; is that right?

[20]    A: Yes.

[21]    Q: Any other committee or similar assignments besides the

[22] policy committee and the LIU liaison position?

[23]    A: There's — I mean when things come up like field trip

[24] committee, I sit on stuff like that. But nothing that

[25] has like — nothing that is standard. Last year that

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Heather Geesey
March 10, 2005

---

**Page 16**

[1] was my only thing because I was new was policy.

[2]   Q: How about in 2005?

[3]   A: Curriculum and policy.

[4]   Q: You are on the curriculum committee? I am sorry. I

[5] interrupted you.

[6]   You are on curriculum and policy?

[7]   A: Yes.

[8]   Q: And you are chair of the policy committee?

[9]   A: This year, yes.

[10]   Q: Do you have an officer position on the curriculum

[11] committee?

[12]   A: No.

[13]   Q: When you were first appointed to the policy committee,

[14] had you requested to be on that committee?

[15]   A: Yes.

[16]   Q: When you were appointed to the curriculum committee, did

[17] you request an appointment to that committee?

[18]   A: Yes.

[19]   Q: Has it been the practice to your knowledge at the Dover

[20] School District that members of the Board ask for

[21] committee assignments and are given those assignments?

[22]   A: Yes.

[23]   Q: Why did you ask to be on the curriculum committee?

[24]   A: It's more interesting than some of the other ones, and I

[25] understood it better than some of the other ones.

**Page 17**

[1]   Q: When you joined the policy committee, were you given an

[2] explanation or orientation from anybody about what the

[3] work of the committee was?

[4]   A: No.

[5]   Q: When you joined the curriculum committee, did anyone

[6] associated with the School District give you a kind of

[7] introduction or orientation or overview of the work of

[8] the committee?

[9]   A: No.

[10]   Q: Did you receive any written materials about the

[11] responsibilities of a curriculum committee when you

[12] joined the committee?

[13]   A: No.

[14]   Q: Are you an officer of the Dover School District Board?

[15]   A: Yes.

[16]   Q: What is your position?

[17]   A: Vice-President.

[18]   Q: When did you become Vice-President?

[19]   A: December of '04.

[20]   Q: Had you been an officer the prior year?

[21]   A: No.

[22]   Q: How many Vice-Presidents are there?

[23]   A: One.

[24]   Q: How do you become a Vice-President at the Dover School

[25] Board?

**Page 18**

[1]   A: Default.

[2]   Q: Is it by election or by appointment?

[3]   A: Appointment. Voting, the Board votes.

[4]   Q: You said default. Does that mean that people aren't

[5] elected unless they are willing to serve?

[6]   A: No. No.

[7]   Q: Tell me what you mean.

[8]   A: They are nominated whether you want to be nominated or

[9] not.

[10]   Q: Was anyone else nominated besides you?

[11]   A: No.

[12]   Q: It wasn't a contested election?

[13]   A: No.

[14]   Q: Did you know you were going to be nominated?

[15]   A: That night.

[16]   Q: Could you have declined the nomination and the election?

[17]   A: Yes.

[18]   Q: Who asked you if you would be nominated; do you

[19] remember?

[20]   A: Sheila.

[21]   Q: Is it the case in Dover that if you are Vice-President

[22] of the Board you are the President the following year?

[23]   A: No.

[24]   Q: Is the President of the Board elected by the Board?

[25]   A: Yes.

**Page 19**

[1]   Q: How long is your term as Vice-President?

[2]   A: One year.

[3]   Q: Until the next organization meeting?

[4]   A: Yes.

[5]   Q: How would you describe your responsibilities as

[6] Vice-President?

[7]   A: I would have to fill in for Sheila at the meeting if she

[8] was absent.

[9]   Q: Any other roles?

[10]   A: No.

[11]   Q: I have a few questions about how the Board works, how it

[12] does its work.

[13]   A: Okay.

[14]   Q: How often does the Board meet?

[15]   A: Twice a month unless it is summer.

[16]   Q: When it meets on a twice a month basis, is that on a

[17] regular day like the first and third Tuesday or

[18] something like that?

[19]   A: First and second Monday unless it is a holiday.

[20]   Q: So it meets two weeks, and then it is off two weeks?

[21]   A: Yes.

[22]   Q: What is the summer schedule?

[23]   A: Once a month.

[24]   Q: And the summer is June, July and August?

[25]   A: July and August.

---

Filius & McLucas Reporting Service, Inc.       Min-U-Script®                (7) Page 16 - Page 19

Heather Geesey
March 10, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

Page 20

[1]  **Q:** Let's talk about 2004 so we don't confuse the situation.
[2]  Was the meeting scheduled the same in 2004 as you have
[3]  just described?
[4]  **A:** Yes.
[5]  **Q:** As a Board member in 2004, did you receive an agenda in
[6]  advance of the meeting, or did you receive the agenda
[7]  when you arrived at the meeting?
[8]  **A:** In advance.
[9]  **Q:** How long in advance?
[10] **A:** The Thursday before the Monday.
[11] **Q:** Did you receive materials with the agenda? The
[12] materials that I am referring to are the kind that you
[13] were considering at the meeting.
[14] **A:** Yes.
[15] **Q:** Are they mailed or delivered to you, or do you pick them
[16] up at the School District office?
[17] **A:** Delivered.
[18] **Q:** Do those materials that you receive on the Thursday
[19] before the meeting include the minutes of the previous
[20] meeting?
[21] **A:** Yes.
[22] **Q:** At the Dover School District, do you have what I will
[23] call for lack of a better term a mailbox at the office
[24] where people can leave things for you to pick up that
[25] have to do with your role as a Board member?

Page 21

[1]  **A:** No.
[2]  **Q:** Did that question make sense to you?
[3]  **A:** Yes.
[4]  **Q:** So you have an idea what I mean?
[5]  **A:** Yes. No mailbox.
[6]  **Q:** Okay. We heard from the Assistant Superintendent
[7]  yesterday that someone who was employed by the School
[8]  District clips newspaper articles from the local papers
[9]  that have anything to do with the District.
[10] **A:** Okay.
[11] **Q:** Do you receive copies of such articles as part of the
[12] materials you get from the School District?
[13] **A:** No.
[14] **Q:** Do you subscribe to any of the local papers?
[15] **A:** No.
[16] **Q:** Do you ever see any of the local papers?
[17] **A:** York Sunday News.
[18] **Q:** Just the Sunday?
[19] **A:** No.
[20] **Q:** You don't get a daily paper?
[21] **A:** No.
[22] **Q:** That is by choice obviously?
[23] **A:** Sunday, coupons.
[24] **Q:** Do you read the Sunday paper?
[25] **A:** Yes.

Page 22

[1]  **Q:** What is your principal source of local news?
[2]  **A:** The News at Night, Fox 43.
[3]  **Q:** That is a local television station; is that right?
[4]  **A:** Yes.
[5]  **Q:** I am going to jump back a little bit. Did you review
[6]  any documents in anticipation of today's deposition?
[7]  **A:** No.
[8]  **Q:** Let me ask you a couple more specific examples.
[9]  **A:** Okay.
[10] **Q:** Have you ever seen the Complaint that was filed to start
[11] this litigation?
[12] **A:** Yes.
[13] **Q:** Have you seen the Answer that was filed on your behalf
[14] by your attorneys?
[15] **A:** No.
[16] **Q:** Have you seen any of the other documents that have been
[17] filed in the case? And that includes briefs and motions
[18] and so on.
[19] **A:** No.
[20] **Q:** Have you seen documents that include things like
[21] e-mails, correspondence, minutes, memos, that sort of
[22] document?
[23]      I know it is a very general description, but have
[24] you looked at anything that has anything to do with this
[25] case?

Page 23

[1]  **A:** No.
[2]  **Q:** When you get your agenda on the Thursday before the
[3]  meeting and whatever documents come with it, what do you
[4]  do with that agenda and those documents? I am talking
[5]  about your ordinary practice.
[6]  **A:** I set it aside until the kids go to bed. If I have time
[7]  that night, I will read it. Some time before the
[8]  meeting, I read it. Most of it. I have three kids.
[9]  When I have time.
[10] **Q:** You do it?
[11] **A:** Yes.
[12] **Q:** When you are doing laundry, you don't. Okay. When you
[13] go to the meeting, again, the usual — and I will ask
[14] you to tell me if you can remember any time you didn't
[15] do what you usually do.
[16] **A:** Okay.
[17] **Q:** Let me ask you about the usual. Do you take the agenda
[18] and any documents that came with it to the meeting?
[19] **A:** Some.
[20] **Q:** But not all?
[21] **A:** No.
[22] **Q:** Why not?
[23] **A:** Each time they give you like the budget, where we are
[24] financially. And that is really thick. That stays
[25] behind. I usually take the agenda and things that I

---

**Min-U-Script®**   Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Heather Geesey
March 10, 2005

**Page 24**

[1] know I have questions on.

[2] **Q: Okay. At the meeting, what is your ordinary practice**
[3] **with the agenda? Let me give you a better example of**
[4] **what I mean.**

[5]     For instance if I am at a meeting with an agenda,
[6] I often scribble my notes right on the agenda so I can
[7] keep track of what is going on at the meeting.

[8]     What are your work habits at the meeting in terms
[9] of taking notes or using the documents that you bring
[10] with you?

[11] **A: I do not take notes. I try not — anything on my desk,**
[12] I try not to have anything because the reporters and the
[13] news stations are there. So I try to leave it as is.

[14] **Q: And so by leaving it as is, you don't write on or mark**
[15] up the documents that the School District gave you that
[16] you bring to the meeting?

[17] **A: Only if it is like pick up milk on the way home,**
[18] something that has nothing to do with it.

[19] **Q: I think you said, but I want to be sure I understood,**
[20] that you do not make any notes of what happens at a
[21] School Board meeting; is that right?

[22] **A: No. Ask it again.**

[23] **Q: Sure. Do you — as part of your usual practice, do you**
[24] make notes during School Board meetings?

[25] **A: What kind of notes?**

**Page 25**

[1] **Q: Any notes.**

[2] **A: Yes, because getting the laundry would be a note and**
[3] getting milk would be a note.

[4] **Q: That's fair. Is it part of your usual practice to make**
[5] notes about the work of the School Board?

[6] **A: No.**

[7] **Q: Tell me again why you don't do that.**

[8] **A: It is a public meeting. I'm private. I don't want**
[9] anyone knowing my — I keep it all in my head. I just
[10] don't want anyone in my stuff.

[11] **Q: Have you ever been asked by anyone for copies of your**
[12] documents that you bring to a School Board meeting or
[13] copies of notes that you might have made?

[14] **A: No.**

[15] **Q: When the meeting is over, what do you do with the**
[16] materials that you brought with you?

[17] **A: Take them home, and I throw them away.**

[18] **Q: Do you have a file? And by file I mean in the biggest**
[19] sense, it could be a box or a basket or a drawer, a file
[20] of materials at your home that have anything to do with
[21] your service on the Board of the Dover School District?

[22] **A: Only the policy book and the State's standards — it is**
[23] not standards. It is a state law book. Those two
[24] books.

[25] **Q: Where did you get those books?**

**Page 26**

[1] **A: The administration.**

[2] **Q: They gave those books to you when you became a Board**
[3] member?

[4] **A: Yes.**

[5] **Q: I am going to ask the same question just because I want**
[6] to be sure I understand. When you — let me start that
[7] a different way. Take the one out.

[8]     After the Board meeting, whatever documents you
[9] receive from the School District are destroyed or
[10] discarded by you; is that what you are telling us?

[11] **A: Yes.**

[12] **Q: Why do you do that?**

[13] **A: Because I do not need them. If I save them, they would**
[14] stack up.

[15] **Q: Do you recall being asked by your attorneys in this case**
[16] if you had any documents that had anything to do with
[17] this litigation?

[18] **A: Yes.**

[19] **Q: Did you provide any documents to your attorneys in**
[20] response to that request?

[21] **A: No.**

[22] **Q: And why not?**

[23] **A: I don't have any.**

[24] **Q: That is called double knotting just to be sure.**

[25]     MR. GILLEN: Thank you, Tom, for clarifying that.

**Page 27**

[1]     BY MR. SCHMIDT:

[2] **Q: I think what started this line of questions — and I**
[3] want to go back to be sure I understand your answer. I
[4] had asked you whether you reviewed any documents in
[5] anticipation of this deposition. Then I gave you a
[6] couple of examples including the Complaint, and you had
[7] reviewed that at some time, and you don't recall
[8] reviewing the Answer.

[9]     Now my question is: Did you look at any other
[10] documents of any kind in anticipation of this
[11] deposition?

[12] **A: Not on my own, no.**

[13] **Q: Were you provided documents to review by your attorney?**

[14] **A: Yes.**

[15] **Q: By anyone else?**

[16] **A: No.**

[17]     MR. GILLEN: Again, Tom, thank you for clarifying
[18] that.

[19]     BY MR. SCHMIDT:

[20] **Q: I'm going to show you a few documents, some of which**
[21] will be marked as exhibits before and some of which
[22] will be new. Let me give you a little bit of background
[23] so you understand where they are coming from.

[24]     Each side in this litigation has responded to
[25] requests for documents that are related to the case, and

Heather Geesey
March 10, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 28

[1] plaintiffs have produced documents. The defendants have
[2] produced documents to us. And in fact now as often
[3] happens in litigation, we probably have several thousand
[4] pages of documents, many of them copies of other
[5] documents in the same stack.
[6]    As I explained when we started, I will do my best
[7] to give these to you in an orderly way. If I fumble
[8] around, it is mostly to avoid duplicating what has
[9] already been looked at by someone else or has already
[10] been marked in some fashion.
[11]    But we are going to be formal in the sense that
[12] each of these documents will be given a number or has
[13] been given a number called an exhibit number. We are
[14] using P for plaintiffs. So I might refer to a document
[15] as P-1 or P-3, but you will have the chance to look at
[16] it.
[17]    Your counsel probably has told you this, but let
[18] me emphasize that when I give you a document, you have
[19] the right to read through it from beginning to end to be
[20] sure you are comfortable with it before you answer any
[21] questions. Okay?
[22]    A: Okay.
[23]    Q: While I am looking, let me ask a question about 2004. I
[24] know you were not on the curriculum committee, but had
[25] you ever attended meetings of the curriculum committee?

Page 29

[1]    A: No.
[2]    Q: Before June of 2004, had you been aware of any activity
[3] involving the selection of a new biology textbook for
[4] the ninth grade at the Dover High School?
[5]    A: No.
[6]    Q: Do you recall a discussion at the first June meeting in
[7] 2004, a discussion during the Board meeting about the
[8] biology textbook for the ninth grade at the Dover High
[9] School?
[10]    A: Yes. I don't know if it was the first or second
[11] meeting, but yes.
[12]    Q: I might be wrong about the meeting. Tell me what you
[13] remember about the discussion at any June meeting in
[14] 2004.
[15]    A: We needed to purchase a new biology book. It was their
[16] time.
[17]    Q: Who provided that information as you heard it at that
[18] first meeting?
[19]    A: The curriculum committee chair. That should have been
[20] Bill.
[21]    Q: Was that Bill Buckingham?
[22]    A: Yes.
[23]    Q: Do you recall what he said about the selection of a
[24] biology textbook for the ninth grade?
[25]    A: We — it was just — it was the seven year schedule. We

Page 30

[1] needed to purchase a new book. He was still looking
[2] because this one wasn't balanced.
[3]    Q: What did he say about the book, if anything, in addition
[4] to the statement you just made that it wasn't balanced?
[5]    A: It only presented one theory, and he wanted more than
[6] one.
[7]    Q: One theory of what?
[8]    A: Darwin evolution, Darwin's theory of evolution.
[9]    Q: Can you tell me any more about what he said about the
[10] textbook?
[11]    A: No.
[12]    Q: Can you tell me what he said about its presentation of
[13] Darwin's theory of evolution?
[14]    A: No.
[15]    Q: Did anyone else speak at that meeting that you recall
[16] about the subject we are considering right now, which is
[17] the selection of a biology textbook or Darwin's Theory
[18] of evolution?
[19]    A: I don't remember.
[20]    Q: The notes that I have are that Mr. Buckingham made
[21] comments at the June 7th meeting.
[22]    A: Okay.
[23]    Q: And understanding the regular schedule that you
[24] described earlier, that would have been the first June
[25] meeting?

Page 31

[1]    A: Yes.
[2]    Q: Right?
[3]    A: Yes.
[4]    Q: Do you recall him saying that the textbook that was
[5] under consideration was laced with Darwinism?
[6]    A: No.
[7]    Q: What did he say he wanted to balance Darwinism with at
[8] that meeting?
[9]    A: At that meeting, I don't know. He wanted another theory
[10] at that time. At that time, I don't think he knew.
[11]    Q: Did he say any theory would do; it just has to be
[12] another one or something to that effect?
[13]    A: No.
[14]    Q: What did he say?
[15]    A: Just another theory, another scientific theory.
[16]    Q: What was your understanding of what he was talking about
[17] at that meetings at June 7?
[18]    A: That they were going to continue looking for another
[19] book until they found one that had more than one theory.
[20]    Q: What was your understanding of what the candidates were
[21] for another theory?
[22]    A: I didn't. It wasn't my — that is not my committee so I
[23] didn't have to understand.
[24]    Q: Did you ask any questions?
[25]    A: No.

Min-U-Script®    Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Heather Geesey
March 10, 2005

---

**Page 32**

[1] Q: Is it your testimony today that you didn't really
[2] understand what he was talking about?
[3] A: I knew what he was talking about, but I don't — I
[4] couldn't go into theory and tell you what theory — what
[5] all the scientific theories are. I knew he wanted a
[6] balanced curriculum.
[7] Q: Just to be sure I understand it, you didn't understand
[8] at the time what he meant by a balanced presentation of
[9] evolution?
[10] A: That's incorrect. No. I do understand that he wanted
[11] more than one theory.
[12] Q: What did you — this is what I am trying to get at. I
[13] am not trying to argue with you. I just want to
[14] understand what you thought he meant by more than one
[15] theory.
[16] A: Just another scientific theory like the one presented.
[17] Just another one.
[18] Q: Did he explain what other one he was considering or
[19] seeking to consider?
[20] A: No.
[21] Q: Did you have any questions about that?
[22] A: No.
[23] Q: Did you have any understanding about what he was
[24] referring to when he said another theory?
[25] A: No.

**Page 33**

[1] Q: Did anyone ask him any questions that you remember?
[2] A: No. Not that I remember.
[3] Q: Was there any discussion of his comments?
[4] A: Not that I remember.
[5] Q: There's an allegation in this Complaint which says that
[6] Mr. Buckingham told the Board he was looking for a book
[7] that offered balance between the Biblical view of
[8] creation and Darwin's theory of evolution.
[9] Is that allegation consistent with your memory of
[10] what was said at the meeting by Mr. Buckingham?
[11] A: No.
[12] Q: What is it about that allegation that you don't recall
[13] being said?
[14] A: I do not remember him ever saying — I don't remember
[15] him ever saying what the other — what he wanted to
[16] balance it with.
[17] Q: Do you remember Mr. Buckingham saying that this country
[18] was founded on Christianity, and our students should be
[19] taught as such?
[20] A: No.
[21] Q: Do you have a memory that he didn't make such a
[22] statement?
[23] A: No.
[24] Q: You just don't remember?
[25] A: I just don't remember.

**Page 34**

[1] Q: When the June 7 meeting was over, did you view this as
[2] an important issue for the Board's consideration?
[3] A: It was something I knew they still had to work on, but
[4] it wasn't my committee. So I didn't really have to
[5] think about it.
[6] Q: Were there any other textbook purchase decisions that
[7] were before the Board at that time?
[8] A: No.
[9] Q: Did you become aware of news reports of that meeting
[10] after the meeting was over?
[11] A: No.
[12] Q: Was there any discussion among Board members after the
[13] June 7 meeting about the news reports of what had
[14] transpired at that meeting?
[15] A: I don't know if it was the June 7th or the other one,
[16] but I remember there was fallacies. It was incorrect.
[17] Q: The other one meaning the June 14th meeting?
[18] A: Right. I don't know — I can't tell the meetings apart.
[19] They run together so I'm not sure. But I remember
[20] people saying what was reported was incorrect.
[21] Q: Tell me which people you are referring to.
[22] A: The Board saying that they were quoted, and it wasn't
[23] true.
[24] Q: Which members of the Board do you remember?
[25] A: Bill, but I don't remember anybody else.

**Page 35**

[1] Q: Do you recall what Mr. Buckingham said was untrue in
[2] news reports of the June 14 or June 7 meeting?
[3] A: No.
[4] Q: Did you ever look at the articles that described those
[5] meetings to learn more about what Mr. Buckingham said
[6] had been reported inaccurately?
[7] A: No.
[8] Q: Was there any discussion with any other Board members
[9] about the accuracy or inaccuracy of the news reports of
[10] the June meetings?
[11] A: No. It is an ongoing thing, so no.
[12] Q: What is an ongoing thing?
[13] A: The inaccuracies of the newspaper.
[14] Q: How do you know if you don't read the paper that they
[15] are inaccurate?
[16] A: Because everyone says.
[17] Q: Let me put that question in a slightly different way to
[18] be fair about it.
[19] Have you ever looked at any of the news reports
[20] about Dover School District Board meetings that took
[21] place in 2004, printed ones?
[22] A: Yes.
[23] Q: Which reports have you looked at?
[24] A: In October, and I was misquoted.
[25] Q: You are referring to the reports of the October Board

---

Filius & McLucas Reporting Service, Inc.      Min-U-Script®      (11) Page 32 - Page 35

Heather Geesey
March 10, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 36

[1] meetings?

[2]   A: Yes.

[3]   Q: Have you looked at any other print news reports of

[4] School Board meetings besides the reports of the October

[5] meetings?

[6]   A: Yes.

[7]   Q: When?

[8]   A: I don't know.

[9]   Q: Was it in anticipation of this deposition?

[10]   A: No.

[11]   Q: Was it about the time of the publication of those news

[12] reports?

[13]   A: I don't know.

[14]   Q: Do you recall looking at any news articles about any

[15] meetings other than the October meetings?

[16]   A: I have, but I don't know what they are.

[17]   Q: Why did you look at those particular news reports?

[18]   A: When my name is in the paper, people will tell me your

[19] name is in the paper, so I will pick up the paper.

[20]   Q: When you have done that, when somebody has said your

[21] name is in the paper and you pick up the paper, have you

[22] read the entire news article in which your name appears?

[23]   A: If I have time.

[24]   Q: Have you ever complained to the publisher of the paper

[25] about any inaccuracy in what you have read in these news

Page 37

[1] articles?

[2]   A: Yes.

[3]   Q: When did you do that?

[4]   A: In October. There have been other times, but I can't

[5] give you dates.

[6]   Q: Let me be a little more specific about the summer of

[7] 2004.

[8]   A: Okay.

[9]   Q: Are you able to tell me today that any of the news

[10] reports of the two June Board meetings are inaccurate?

[11]   A: Repeat it.

[12]   Q: I understand that your reading of the local papers is

[13] limited?

[14]   A: Right.

[15]   Q: And I am asking you whether you are able to tell me that

[16] you have reviewed or read any of the news reports about

[17] the June meetings — let me finish — and that you have

[18] found inaccuracies in those reports?

[19]   A: It's two different questions.

[20]   Q: Right. I know, but I'm trying to sum it up. Let me ask

[21] it a different way because I asked you to tell me if you

[22] have a problem with the question.

[23]   A: Okay.

[24]   Q: Are you able to say today that you have ever read any

[25] newspaper reports of either of the June Board meetings?

Page 38

[1]   A: I don't think I have, no.

[2]   Q: Because you haven't, you would be unable to say whether

[3] they are accurate or inaccurate, is that a fair

[4] statement?

[5]   A: If they were presented to me and I can remember, I could

[6] say yes or no that happened or that didn't happen. But

[7] off the top of my head...

[8]   Q: Okay. Same question about the August meeting. There

[9] was one in August. I think it was August the third.

[10]   A: Okay.

[11]   Q: Do you recall reading any news reports of the August

[12] meeting?

[13]   A: No.

[14]   Q: I think you have said that you did read reports of one

[15] or more of the October meetings?

[16]   A: Okay.

[17]   Q: And you did find an inaccuracy in some report, and you

[18] responded to that; is that right?

[19]   A: Yes, I did find an inaccuracy, and I did respond to the

[20] reporter, yes.

[21]   Q: We have marked in this case as Plaintiffs Exhibit 4 a

[22] packet of newspaper articles, copies of newspaper

[23] articles. The pages aren't numbered. I think your

[24] attorney has a set there.

[25]   MR. SCHMIDT: Let me ask, Patrick, if you would go

Page 39

[1] six pages in on P-4.

[2]   MR. GILLEN: "York Daily Record" June 9th, 2004?

[3]   MR. SCHMIDT: Yes, that's right. Will you show

[4] the witness?

[5]   MR. GILLEN: Sure. Off the record.

[6]   (A recess was taken.)

[7]               AFTER RECESS

[8]               BY MR. SCHMIDT:

[9]   Q: Have you had an opportunity to review these two pages

[10] from Exhibit P-4?

[11]   A: Yes.

[12]   Q: For future reference, this appears to be an

[13] electronically generated copy of an article from the

[14] local section of the "York Daily Record" that appeared

[15] on June 9, 2004. The headline of the article says

[16] "Dover Schools Still Debating Biology Text. A Board

[17] Member says a book was rejected because it didn't offer

[18] Creationism. And the author is Joseph Maldonado.

[19]     Did I get that down accurately?

[20]   A: Yes.

[21]   Q: That is so anybody in the future can find the two pages

[22] we are looking for.

[23]   A: Yes.

[24]   Q: Do you know Mr. Maldonado?

[25]   A: Yes.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Heather Geesey
March 10, 2005

Page 40

[1]   Q: Do you know him personally or just in his role as a
[2] journalist who attends School Board meetings?
[3]   A: Not personally.
[4]   Q: Just as a journalist?
[5]   A: Yes.
[6]   Q: The article starts by saying that a School Board member
[7] Barry Callahan repeated a request for a new biology
[8] books.
[9]   Is that consistent with your memory of what
[10] happened at the meeting?
[11]   A: Yes.
[12]   Q: It goes on to say that William Buckingham, who sits on
[13] the curriculum committee, said a book by Miller and
[14] Levine called Biology had been under consideration.
[15]   Is that consistent with your memory of the
[16] meeting?
[17]   A: I don't know. I'm not sure if that is the text.
[18]   Q: I am just using this as a springboard to ask questions.
[19]   A: Yes.
[20]   Q: Do you recall that at the meeting when Barry Callahan
[21] brought up the subject of a new biology book, that Bill
[22] Buckingham said there is a book called Biology by Miller
[23] and Levine that is under consideration?
[24]   A: Yes, he did say there was a book under consideration.
[25] I'm — it's probably called Biology, but I am not sure

Page 41

[1] if that is —
[2]   Q: So you remember that he said a book was under
[3] consideration?
[4]   A: A text was under, yes, but I don't — I can't check. I
[5] mean I don't know if Joe is correct. I don't want to
[6] speak for him.
[7]   Q: Just to be clear about your answer, you remember that
[8] Buckingham said a book was under consideration, but you
[9] don't remember the title or the authors?
[10]   A: Right, right.
[11]   Q: Is it consistent with your memory of Mr. Buckingham's
[12] comments that he said the book was not acceptable to the
[13] curriculum committee because of a one-sided reference to
[14] evolution?
[15]   A: Yes.
[16]   Q: Did he use those exact words, or were there other words
[17] he used that conveyed the same meaning?
[18]   A: Other words.
[19]   Q: What words do you recall?
[20]   A: It wasn't balanced.
[21]   Q: If you look down one paragraph, there's some quoted
[22] language there. The quote says, "It is inexcusable to
[23] teach from a book that says man descended from apes and
[24] monkeys."
[25]   Do you recall Buckingham saying anything like

Page 42

[1] that?
[2]   A: No.
[3]   Q: Do you recall him making the next statement that appears
[4] in quotes "we want a book that gives balance to
[5] education?"
[6]   A: No.
[7]   Q: Do you recall him saying anything like that?
[8]   A: Yes.
[9]   Q: What is your best memory of what he said?
[10]   A: He wanted a book that had balance.
[11]   Q: Did Buckingham tell the Board that his committee was
[12] looking for a book that teaches Creationism and
[13] evolution?
[14]   A: No.
[15]   Q: Do you recall hearing the phrase or word or term
[16] Creationism at this June meeting?
[17]   A: No.
[18]   Q: Had you ever heard that term before?
[19]   A: In my personal life?
[20]   Q: Anytime.
[21]   A: Or in a Board — Creationism, yes.
[22]   Q: What was your understanding of what the word or term
[23] Creationism means at the time of the June 7 Board
[24] meeting?
[25]   A: Creationism wasn't part of our Board meeting.

Page 43

[1]   Q: That wasn't my question.
[2]   A: What did I understand it to mean then?
[3]   Q: On June 7, 2004. I'm not asking you about the Board. I
[4] am asking about you.
[5]   What was your understanding at that time of the
[6] meaning of Creationism?
[7]   A: My religion teaches Genesis One.
[8]   Q: Is that your understanding of what Creationism means?
[9]   A: Yes.
[10]   Q: Do you remember a student making any comment about
[11] Mr. Buckingham's statements about the biology textbook?
[12]   A: No.
[13]   Q: Do you recall that there was no statement by a student,
[14] or do you simply not recall whether anything like that
[15] happened?
[16]   A: I don't recall.
[17]   Q: If you would look down to the paragraph that refers to a
[18] former student named Max Pell, just to be sure I
[19] understand your answer, is it that you don't recall
[20] whether or not such a thing happened, or do you have a
[21] memory that no such thing happened?
[22]   A: I'm not sure whether it happened or not.
[23]   Q: You just don't remember?
[24]   A: I don't remember.
[25]   Q: Do you recall Mr. Bonsell saying that there really are

Heather Geesey
March 10, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

**Page 44**

[1] only two theories that could be taught evolution and
[2] Creationism?
[3]   A: No.
[4]   Q: Do you recall that he made no such statement?
[5]   A: Correct. He did not.
[6]   Q: At the end of this article, there are statements that
[7] Buckingham is reported to have made involving balance
[8] between what he said are Christian views of Creationism
[9] and evolution.
[10]   Did you hear him make any such statement?
[11]   A: No.
[12]   Q: Were you with Mr. Buckingham at all times after the
[13] meeting on June 7?
[14]   A: No.
[15]   Q: Is it possible that he could have made those statements
[16] in someone else's hearing and not yours?
[17]   A: Yes.
[18]   Q: Do you know whether or not he was interviewed by
[19] Mr. Maldonado after the meeting?
[20]   A: No.
[21]   Q: So these statements that are reported in this article
[22] could have been made by Buckingham to Maldonado or
[23] somebody else as far as you know?
[24]   A: I wasn't there. I don't know.
[25]   Q: So they could have been made; is that right?

**Page 45**

[1]   A: I left the building so I don't know.
[2]   Q: Okay. Did the subject of the biology textbook come up
[3] at the next meeting of the Board on June 14?
[4]   A: I don't know.
[5]   Q: Were you at that meeting?
[6]   A: Yes.
[7]   Q: Do you not remember what happened at that meeting?
[8]   A: They all run together.
[9]   Q: I am going to show you a document that I will have
[10] marked as P-28.
[11]   (Exhibit P-28 was marked.)
[12]       BY MR. SCHMIDT:
[13]   Q: While you look at it, I will say for the record that
[14] P-28 consists of copies of documents that were produced
[15] by defendants in this case with Bates numbers 230
[16] through 251.
[17]   My impression is — but I will ask you a question
[18] or two about these documents. My impression is that
[19] these pages are copies of the agenda for the June 14
[20] meeting. I believe there are multiple versions of the
[21] agenda, and there are versions of the agenda because
[22] they include handwriting that may or may not be yours.
[23] We will find that out in a few minutes.
[24]   So you can look them over, and I will ask you a
[25] few questions.

**Page 46**

[1]   MR. GILLEN: For the record, Tom, I know Eric
[2] asked me this yesterday, I can represent to you now that
[3] I believe these documents were produced by the teachers
[4] to Dover Area School District as part of our responses
[5] to your requests for production of documents.
[6]       BY MR. SCHMIDT:
[7]   Q: I am going to change my instructions to you, and I am
[8] going to change the identification of the exhibit.
[9]   A: Okay.
[10]   Q: Exhibit 28 will consist of pages 230 through 243. Pages
[11] 244 through 251 appear to be an agenda for July, the
[12] July meeting, not the June meeting. So let's pull those
[13] off.
[14]   MR. GILLEN: Here they are.
[15]   A: They are the same.
[16]       BY MR. SCHMIDT:
[17]   Q: Let me ask you a couple of questions. These are not
[18] documents that you produced or that I produced. So
[19] there may be some questions that we can explore to
[20] straighten out what appear to be things that are not
[21] entirely consistent.
[22]   Let me ask you, first of all, whether the
[23] handwriting on these pages 230 through 243 is your
[24] handwriting?
[25]   A: No.

**Page 47**

[1]   Q: I think you have already testified to this, but let's be
[2] sure it is tied down. Did you attend the June 14
[3] meeting?
[4]   A: Yes.
[5]   Q: Have you ever missed a School Board meeting?
[6]   A: Yes.
[7]   Q: When one?
[8]   A: March of '04. I think there was another one, but I
[9] can't remember.
[10]   Q: The first March or second March?
[11]   A: I don't know.
[12]   Q: One or both?
[13]   A: One.
[14]   Q: Do you have any reason to think that the pages that we
[15] have in front of us in P-28 are not the agendas for the
[16] School Board meeting on June 14?
[17]   A: No.
[18]   Q: Would you look at pages 232 and 240?
[19]   A: (Witness complies.)
[20]   Q: Do you have those in front of you?
[21]   A: Yes.
[22]   Q: They appear to have similar but not identical
[23] information on them. For instance, if you look at 240
[24] VII A, 1, there is a reference to a fourth grade
[25] teacher?

---

**Tammy Kitzmiller, et al.   v.**
**Dover Area School District, et al.**

**Heather Geesey**
**March 10, 2005**

---

Page 48

[1]    A: Correct.

[2]    Q: And on page 232, there's additional information under

[3] the heading background information provided; do you see

[4] that?

[5]    A: Yes.

[6]    Q: Can you tell me why the agenda for the June 14 meeting

[7] would come out in two different formats?

[8]    A: They all do.

[9]    Q: Can you explain why that is?

[10]    A: One would be Board/Administration copy, and one would be

[11] general public information.

[12]    Q: Using these two pages as an example, which is the Board

[13] copy and which is the public copy?

[14]    A: 232 would be Board/Adminisration. 240 would be public.

[15]    Q: And does the presence of that additional information

[16] explain why the Board copy is eight pages long and the

[17] public copy is six?

[18]    A: It should. I didn't take notice, but adding more would

[19] make it longer.

[20]    Q: Look at pages 237 and 243.

[21]    A: (Witness complies.) Okay.

[22]    Q: Is there any reference under X Curriculum to the biology

[23] textbook for the ninth grade for the high school?

[24]    A: No.

[25]    Q: Do you recall any discussion at that meeting of the

---

Page 49

[1] biology textbook for the ninth grade in the high school?

[2]    A: No.

[3]    Q: Go back to the first page of P-28 which is page number

[4] 230. Do you have that in front of you?

[5]    A: Yes.

[6]    Q: Do you see it in the bottom right-hand corner?

[7]    A: Yes.

[8]    Q: This is the Board/Administration version of the agenda;

[9] right?

[10]    A: Yes.

[11]    Q: Okay. You have already testified that the handwriting

[12] on this page is not your handwriting; correct?

[13]    A: Correct.

[14]    Q: Do you recognize the handwriting?

[15]    A: No.

[16]    Q: Right in the center of the page, there is a reference to

[17] or the words appear — I am quoting now — intelligent

[18] design. Do you see that?

[19]    A: Yes.

[20]    Q: Do you recall a discussion by anyone or a statement by

[21] anyone at the June 14 meeting involving the words

[22] intelligent design?

[23]    A: No.

[24]    Q: Do you recall that there was no such statement or

[25] discussion at that meeting?

---

Page 50

[1]    A: No.

[2]    Q: Do you recall any discussion at that meeting of the

[3] biology textbook issue — in other words, the question

[4] of purchasing a biology book for the ninth grade at the

[5] Dover High School?

[6]    A: I would say no. I don't know what meeting.

[7]    Q: This is the June 14 meeting.

[8]    A: I don't know.

[9]    Q: Several people have reported that at the June 14

[10] meeting, Mr. Buckingham said that two thousand years

[11] ago, someone died on a cross, can't someone take a stand

[12] for him; do you recall him making that statement?

[13]    A: No.

[14]    Q: Do you have a clear enough memory of that meeting to say

[15] today that he didn't make that statement?

[16]    A: No.

[17]    Q: Did you attend the July meeting of the School Board?

[18]    A: Yes.

[19]    Q: Do you recall any discussion at that meeting of the

[20] purchase of a biology textbook for the ninth grade at

[21] the high school?

[22]    A: No.

[23]    Q: If you would think back to the summer of 2004, in the

[24] summer before the August meeting, do you remember what

[25] you thought the status of the purchase of a biology

---

Page 51

[1] textbook was?

[2]    A: No. It wasn't my committee, so no.

[3]    Q: Do you recall during the summer of 2004 having any

[4] discussions with anyone, whether a School Board member,

[5] an employe of the District or an ordinary person, a

[6] discussion about the purchase of a biology textbook for

[7] the ninth grade?

[8]    A: No.

[9]    Q: Did you do anything during that time period to inform

[10] yourself about either the book called Biology that was

[11] under consideration, the Miller Levine book, or the

[12] subject of intelligent design?

[13]    A: No.

[14]    MR. SCHMIDT: Off the record.

[15]    (An off-the-record discussion was had.)

[16]                    BY MR. SCHMIDT:

[17]    Q: Mrs. Geesey, I am going to show you a document that is

[18] part of what has previously been marked as P-5. And the

[19] specific part of P-5 I am going to show you is Bates

[20] numbered 121 through 126.

[21]    MR. GILLEN: Do you want to take a break? She has

[22] young kids.

[23]    (A recess was taken.)

[24]

[25]

---

Heather Geesey
March 10, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

Page 52

[1]                    AFTER RECESS
[2]              BY MR. SCHMIDT:
[3]    Q: We are at the August minutes; right?
[4]    A: Yes.
[5]    Q: Tell me when you are finished. Have you had a chance to
[6] look at this exhibit?
[7]    A: Yes.
[8]    Q: It is P-5, and the pages —
[9]    MR. GILLEN: Bates 121 through 125 I think.
[10]              BY MR. SCHMIDT:
[11]    Q: 126.
[12]    A: Yes.
[13]    Q: Let me show you a document.
[14]    MR. SCHMIDT: And, Patrick, if you don't mind, I
[15] will walk around. I am not going to mark it as an
[16] exhibit, but I do have a question about it.
[17]    It is Bates stamped P-215 through 220 which means
[18] if I understand the Bates numbering system that this has
[19] been produced by plaintiffs in this case.
[20]    I just ask you to put that next to the document
[21] you are looking at. It appears to be the minutes of the
[22] August meeting, but in a slightly different format.
[23]    Can you explain why the documents appear to be
[24] different?
[25]    A: No.

---

Page 53

[1]    Q: Are the minutes of the Board's meetings available on the
[2] Board's website?
[3]    A: Yes.
[4]    Q: Is it possible that the P-document I just showed you is
[5] printed from the website?
[6]    A: It could be. It is on there, but I have never gotten on
[7] to see. Yes, that's possible.
[8]    Q: Do you recognize the document that is part of P-5, the
[9] 121 through 126 —
[10]    A: Yes.
[11]    Q: — as a format that you receive from the School
[12] District?
[13]    A: Yes.
[14]    Q: Do you get copies of the minutes with the agenda for the
[15] subsequent meeting? Is that how it works?
[16]    A: Sometimes yes.
[17]    Q: Sometimes no?
[18]    A: Correct.
[19]    Q: Why not?
[20]    A: Probably time. Sometimes, they are mailed. They may
[21] come the same day, but one is in the mail and one is
[22] delivered.
[23]    Q: Do you recall attending the August 2, 2004 School Board
[24] meeting?
[25]    A: Yes.

---

Page 54

[1]    Q: Do you recall reviewing the minutes of that meeting in
[2] the form that they appear now in front of you as part of
[3] P-5; do you recall reviewing those at any time after the
[4] meeting?
[5]    A: Yes.
[6]    Q: What is your usual practice with Board meeting minutes?
[7]    A: I usually make sure the roll call is correct for me
[8] personally because I have been listed as not being there
[9] or there, and I have had it corrected.
[10]    Q: Anything else that you look at as your normal practice?
[11]    A: I go down through votes, and that is about it.
[12]    Q: Have you have had the opportunity to read these
[13] minutes. I am going to ask what is probably an unfair
[14] question.
[15]    But if you hadn't read the minutes, would you have
[16] any memory of what transpired at the August, 2004
[17] meeting?
[18]    A: No.
[19]    Q: Having read the minutes, has your memory been refreshed
[20] about what happened at that meeting?
[21]    A: Yes.
[22]    Q: I ask you to turn, if you would, to the page that is
[23] Bates numbered 124.
[24]    A: Okay.
[25]    Q: Under the heading Curriculum, there is a subparagraph

---

Page 55

[1] three that refers to the ninth grade biology book;
[2] correct?
[3]    A: Yes.
[4]    Q: Do you recall now that your memory has been refreshed
[5] the discussion of the purchase of that book?
[6]    A: Yes.
[7]    Q: What do you remember?
[8]    A: That Bill was unhappy because the other book, the
[9] reference book, was taken off the agenda.
[10]    Q: What is the reference book you are referring to?
[11]    A: Of Pandas and People.
[12]    Q: What did Mr. Buckingham say that made you understand he
[13] was unhappy?
[14]    A: That it was removed off of the agenda, and it was
[15] supposed to be there.
[16]    Q: Let me ask it this way: Were you ever aware that the
[17] book Of Pandas and People was on the agenda?
[18]    A: No.
[19]    Q: I am trying to understand the mechanics of taking
[20] something off the agenda.
[21]    You get an agenda the Thursday before the meeting;
[22] right?
[23]    A: Correct.
[24]    Q: Was there any reference to a book titled Of Pandas and
[25] People in the agenda that you received the Thursday or

---

                    Min-U-Script®   Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Heather Geesey
March 10, 2005

---

Page 56

[1] about that time before the August meeting in 2004?

[2]    A: I don't know.

[3]    Q: Had you ever heard of a book called Of Pandas and People

[4] before the August meeting?

[5]    A: Yes, I have heard of it. I don't know when.

[6]    Q: Had you heard of the book Of Pandas and People in

[7] connection with your being a member of the School Board?

[8]    A: Yes.

[9]    Q: How did you hear of it?

[10]    A: That is a book that Bill brought up so we can use it as

[11] a reference book to balance the curriculum.

[12]    Q: When did he bring it up?

[13]    A: I don't know.

[14]    Q: Well, did he bring it up at a Board meeting or in some

[15] other context?

[16]    A: A Board meeting.

[17]    Q: I am just trying to put it together. So far, we have

[18] had two meetings in June and one in July.

[19]    Did he discuss the book Of Pandas and People at

[20] any of those three Board meetings?

[21]    A: Yes.

[22]    Q: Do you remember which one?

[23]    A: No.

[24]    Q: Do you remember what he said about it?

[25]    A: That it was another scientific theory, but I don't know

---

Page 57

[1] if that was Bill or Alan.

[2]    Q: By that, do you mean Alan Bonsell?

[3]    A: Yes.

[4]    Q: B-o-n-s-e-l-l?

[5]    A: Yes.

[6]    Q: Is he a member of the Board?

[7]    A: Yes.

[8]    Q: Did you participate in any discussion of the book called

[9] Of Pandas and People at a Board meeting during the

[10] summer of 2004, you personally?

[11]    A: No.

[12]    Q: When the meeting of August second rolled around, what

[13] did you know about Of Pandas and People, if anything,

[14] other than Mr. Buckingham's statement that it was or

[15] that it presented a balanced view of evolution?

[16]    A: Nothing.

[17]    Q: Had you made any effort to find out more about that

[18] book?

[19]    A: No.

[20]    Q: Let's go back to the meeting itself. You said I think

[21] — you can tell me if I get this wrong. I think you

[22] said that when the issue of the biology textbook came up

[23] under the curriculum portion of the agenda, that

[24] Mr. Buckingham said he was unhappy that Of Pandas and

[25] People was not on the agenda.

---

Page 58

[1]    Can you say anything more that you remember about

[2] his comments?

[3]    A: No.

[4]    Q: Can you remember what anyone else said in response to

[5] Mr. Buckingham's comment or on that same general

[6] subject?

[7]    A: Dr. Nilsen would have explained to him why it was

[8] removed, but I don't remember what their conversation

[9] would have been.

[10]    Q: At that time, did you have any understanding of why the

[11] book of Pandas and People was removed from the agenda?

[12]    A: No.

[13]    Q: What happened after Mr. Buckingham expressed his

[14] unhappiness and as you supposed was the case Dr. Nilsen

[15] explained why it was taken off, what happened next?

[16]    A: We voted.

[17]    Q: And what did you vote on?

[18]    A: The textbook.

[19]    Q: Is that the biology book by Miller and Levine?

[20]    A: I would assume so, yes.

[21]    Q: All right. Let me be a little bit more general. You

[22] voted? You personally voted?

[23]    A: Yes.

[24]    Q: What did you vote on?

[25]    A: The biology textbook that the teachers and the

---

Page 59

[1] curriculum committee recommended.

[2]    Q: And how did you vote?

[3]    A: No.

[4]    Q: Why?

[5]    A: Because there was still unresolved issues. And since I

[6] am not on that committee, to me my way of — if I would

[7] have voted no, then it gave a chance for things to be

[8] resolved.

[9]    Q: What were the unresolved issues?

[10]    A: Bill had a problem with the Pandas book being removed.

[11] And if that's removed, then you go right back to the

[12] beginning. So it was just — since I am not on that

[13] committee, to me in my mind everybody has to be happy in

[14] order for me to vote. It has to — there was just too

[15] many issues yet.

[16]    Q: I want to be sure I understand this in a way that is

[17] fair to what happened.

[18]    Is it your testimony that you voted against the

[19] biology book for some — let me say it a different way.

[20]    Let me tell you my understanding of what you just

[21] testified to. My understanding is that you voted no so

[22] that the book wouldn't be approved to give

[23] Mr. Buckingham an opportunity to work out these

[24] unresolved issues; is that a fair summary of your

[25] testimony?

---

Heather Geesey
March 10, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 60

[1] A: Yes, but I voted no knowing that the textbook would be
[2] approved eventually.
[3] Q: How did you know that?
[4] A: It has to be.
[5] Q: Does a particular textbook have to be approved or does
[6] some textbook have to be approved eventually? I asked
[7] that question in that awkward way because I don't think
[8] I understand your —
[9] A: When the cycle is up, they will receive a textbook. The
[10] teachers will bring a new textbook to us.
[11] Q: Here is what I think you are saying: I think you said
[12] that some biology textbook is going to have to be
[13] approved because it's at the end of the seven year
[14] cycle?
[15] A: Correct.
[16] Q: Is it your testimony that this particular biology
[17] textbook was going to have to be approved or just that
[18] some book would have to be approved?
[19] A: I don't know what I was thinking.
[20] Q: Okay. I need to ask a question that you may have
[21] already answered, but I want to be sure I understand.
[22] You said that you voted no because there were
[23] still unresolved issues, and I need to know what you
[24] understood those unresolved issues to be.
[25] I think you told me that one of them at least was

Page 61

[1] the issue involving the use Of Pandas and People?
[2] A: Correct.
[3] Q: Any other unresolved issues?
[4] A: The teachers were unhappy.
[5] Q: Which teachers were unhappy?
[6] A: The biology teachers.
[7] Q: What was their unhappiness?
[8] A: They were afraid of being sued.
[9] Q: By?
[10] A: I don't know.
[11] Q: Who said what about being sued?
[12] A: One of the biology teachers said about being sued.
[13] Q: Do you remember which biology teacher?
[14] A: I would assume Bert Spahr.
[15] Q: S-p-a-h-r?
[16] A: Yes.
[17] Q: Is this Mr. or Mrs. Spahr?
[18] A: Mrs.
[19] Q: What was her position? I mean how is she employed by
[20] the School District? What does she do for the School
[21] District?
[22] A: She is a biology teacher.
[23] Q: Is she the head of the Biology Department?
[24] A: I believe so.
[25] Q: Did she speak at the meeting that we are talking about,

Page 62

[1] the August 2 meeting on this subject?
[2] A: She speaks at meetings. I don't know if it was this
[3] one.
[4] Q: Do you recall her saying anything at the August 2nd
[5] meeting about being sued?
[6] A: No.
[7] Q: Do you remember her saying anything at any meeting about
[8] being sued?
[9] A: Yes.
[10] Q: Do you remember what she said?
[11] A: That if they were made to teach religion, they can be
[12] sued.
[13] Q: Do you remember anything else that she said?
[14] A: That she felt they weren't a part of this in choosing
[15] the textbook.
[16] Q: What did you understand her to mean when she said they
[17] weren't a part of this?
[18] A: I don't know because she was a part of it. So I didn't
[19] really understand where she was coming from because I
[20] knew she was a part of it.
[21] Q: I'm sorry. I interrupted you. Go ahead. How did you
[22] know she was a part of it?
[23] A: The administration said they were.
[24] Q: Just to be clear, what do you mean by it?
[25] A: There is another curriculum committee that has teachers

Page 63

[1] on it. She said she wasn't a part of it, and she was.
[2] Q: At some point during the summer of 2004, Bert Spahr,
[3] science teacher, said two things; that she was not or
[4] they were not part of this — and I will come back to
[5] what this means in that context — and that they were
[6] afraid of being sued.
[7] And I understand that the afraid of being sued
[8] referred to something she said about teaching religion
[9] in the science curriculum?
[10] A: Correct.
[11] Q: Can you tell me any more about your understanding of
[12] what she meant when she said that?
[13] A: She thought we were going to make them teach religion.
[14] Q: Again, what did you understand her to be referring to
[15] when she said that?
[16] A: I don't know because we weren't. We weren't doing that.
[17] So to me it was an unfounded statement.
[18] Q: What do you think she was referring to?
[19] A: The Pandas book.
[20] Q: How did you come to understand that connecting teaching
[21] religion with the Panda book was not accurate?
[22] A: Because the Panda book is not religion.
[23] Q: Have you read the Panda book?
[24] A: No.
[25] Q: Do you own the Panda book?

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Heather Geesey
March 10, 2005

---

Page 64

[1]  A: No.
[2]  Q: Have you ever seen the Panda book?
[3]  A: Yes.
[4]  Q: Where?
[5]  A: It is there.
[6]  Q: By there, you mean the one that is next to me?
[7]  A: Yes.
[8]  Q: Have you ever seen it anyplace else?
[9]  A: Yes.
[10] Q: Where?
[11] A: I believe someone had a copy at the meeting. It was
[12] available to take.
[13] Q: And at the meeting, are you referring now to the August
[14] 2nd meeting?
[15] A: No.
[16] Q: Did anyone ever offer you the opportunity to read the
[17] Panda book?
[18] A: Yes.
[19] Q: Who?
[20] A: Administration.
[21] Q: When?
[22] A: I don't know.
[23] Q: Was it after October of 2004?
[24] A: Yes. Yes.
[25] Q: I sensed a hesitation in the answer. I didn't mean

Page 65

[1]  August. I meant October.
[2]  Did you have the opportunity from the
[3]  administration to read the book Of Pandas and People
[4]  sometime after October of 2004?
[5]  A: Yes.
[6]  Q: Had you been given that opportunity before October of
[7]  2004?
[8]  A: Yes.
[9]  Q: By whom?
[10] A: The administration.
[11] Q: How did they do that?
[12] A: They had a copy at the building. If we wanted it, we
[13] could take it.
[14] Q: Did you ever do that?
[15] A: No.
[16] Q: Do you know if anyone ever did?
[17] A: No.
[18] Q: I want to come back to this discussion. I am not trying
[19] to beat a dead horse to death as Casey Stengel used to
[20] say, but I need to understand a little bit more about
[21] what happened.
[22] You have a memory of Bert Spahr saying something
[23] about the science teachers' involvement in some process
[24] and about a fear of being sued, but you don't remember
[25] whether that was at the August meeting or at an earlier

Page 66

[1]  meeting; is that correct?
[2]  A: Correct.
[3]  Q: Any other open issues that caused you to vote no on the
[4]  purchase of this book at the August 2nd meeting?
[5]  A: The price, that was still an issue for me.
[6]  Q: Why?
[7]  A: It was expensive to me. At that time, it was my first
[8]  book purchase. So that was expensive to me. Now I know
[9]  better.
[10] Q: Was the price of the book ever described by
[11] Mr. Buckingham or any other member of the curriculum
[12] committee as an issue that caused any hesitation —
[13] A: No.
[14] Q: — on their part in purchasing?
[15] A: No.
[16] Q: After the tie vote, the 4/4 vote, do you recall the
[17] discussion that followed? I am just saying that the
[18] minutes said discussion followed. Do you recall the
[19] discussion?
[20] A: No.
[21] Q: Do you recall another vote?
[22] A: It is here so yes.
[23] Q: I know it is here. But this is one of those things that
[24] lawyers do to torture themselves and witnesses. If
[25] you've read this, you've said you have had your

Page 67

[1]  recollection refreshed.
[2]  But without just reading it back to me now, do you
[3]  remember anything that happened at that meeting after
[4]  the four-four vote that initially disapproved the
[5]  purchase of this book?
[6]  A: Yes.
[7]  Q: What do you remember?
[8]  A: That they needed to order a book — they wanted — I
[9]  think it was Mrs. Brown saying the kids need their book
[10] before the start of school.
[11] Q: So then what happened?
[12] A: We voted again.
[13] Q: And what was the outcome of that vote?
[14] A: Five, three.
[15] Q: Did you vote for approval or against it?
[16] A: Against it.
[17] Q: For what reason?
[18] A: The same as before.
[19] Q: Unresolved issues?
[20] A: Yes.
[21] Q: And there were three — the Buckingham's issue about Of
[22] Pandas and People, Bert Spahr's statements about fear of
[23] litigation and the price?
[24] A: Yes.
[25] Q: Did the subject of Of Pandas and People come up during

---

Heather Geesey
March 10, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

Page 68

[1] the discussion that followed the initial vote?

[2] **A:** I don't know.

[3] **Q:** Did the School District ever acquire copies of the book

[4] Of Pandas and People?

[5] **A:** For the children?

[6] **Q:** For any reason.

[7] **A:** They might have bought one copy. That was the one in

[8] the office. I'm not sure. That could have been given

[9] to them. I don't know.

[10] **Q:** Just one question about that. Do you remember at all

[11] when the District acquired the copy in the office that

[12] you were invited to read?

[13] **A:** No.

[14] **Q:** I did have one more question just to be sure we have

[15] talked about this.

[16]    Do you remember whether that was something that

[17] happened before the August meeting or not?

[18] **A:** No.

[19] **Q:** Do you know whether the School District ever was given

[20] copies of the book Of Pandas and People?

[21] **A:** Yes.

[22] **Q:** What do you know about that?

[23] **A:** There was a donation of like 50 or 60 books.

[24] **Q:** Do you know who made the donation?

[25] **A:** Alan's dad.

---

Page 69

[1] **Q:** That is Mr. Bonsell?

[2] **A:** Yes.

[3] **Q:** I think his first name is David?

[4] **A:** Donald.

[5] **Q:** Do you know when that donation was made?

[6] **A:** No.

[7] **Q:** Do you recall any discussion at the August two meeting

[8] that connected the donation of those books to the

[9] approval of the biology book?

[10] **A:** Repeat that.

[11] **Q:** Do you recall any discussion at the August meeting that

[12] tied or connected the donation of the book called Of

[13] Pandas and People to the approval of the biology

[14] textbook?

[15] **A:** No.

[16] **Q:** After the vote on August 2nd approving the book, what in

[17] your mind became of the unresolved issues? And

[18] remember, there were the three that you were concerned

[19] about.

[20] **A:** Well, the price — that didn't matter anymore because

[21] they bought it. Of Pandas, I think they were still

[22] working on that. I think that might have been part of

[23] the discussion with Dr. Nilsen, that that would be

[24] later. And the teachers, I don't remember.

[25] **Q:** Okay. Tell me what you remember about the further

---

Page 70

[1] consideration Of Pandas and People book? Do you

[2] remember anything that was said at the August meeting

[3] about what was to be done about that book?

[4] **A:** No. It was just unresolved.

[5] **Q:** When did you become aware of the consideration of a

[6] change to the science curriculum for the ninth grade?

[7] **A:** October.

[8] **Q:** There were two meetings in October; is that right?

[9] **A:** I would assume so.

[10] **Q:** The norm was two meetings?

[11] **A:** Yes.

[12] **Q:** Are the meetings that we have discussed the first Monday

[13] and second Monday, are they both open to the public?

[14] **A:** Yes.

[15] **Q:** Is the first meeting sometimes referred to as a planning

[16] meeting?

[17] **A:** Yes.

[18] **Q:** If you have Exhibit 5 still in front of you, could you

[19] turn back to the pages that are Bates numbered 19

[20] through 27?

[21] **A:** Okay.

[22] **Q:** I will tell you that the page that is Bates numbered 19

[23] has a heading Dover Area School District Memorandum to

[24] Board of Directors from Michael Baksa? Who was Michael

[25] Baksa?

---

Page 71

[1] **A:** The Assistant Superintendent.

[2] **Q:** The date on the memo is October 13th, 2004. It says Re:

[3] Biology Curriculum. At the bottom, it says enclosure

[4] XI-B.

[5]    Do you see that?

[6] **A:** Yes.

[7] **Q:** Do you remember receiving this memorandum from Mr. Baksa

[8] on or around October 13th?

[9] **A:** It would have been in the Board packet.

[10] **Q:** And the reference to the enclosure ties it into a

[11] portion of the agenda?

[12] **A:** Yes.

[13] **Q:** Is that right? Now you said it would have been part of

[14] the Board packet. Do you actually remember receiving

[15] it?

[16] **A:** Not this right here.

[17] **Q:** By this right here you mean?

[18] **A:** I remember the following pages.

[19] **Q:** And are the following pages 20 through 27, not including

[20] the handwriting?

[21] **A:** Similar, if not the same.

[22] **Q:** Look at 20.

[23] **MR. GILLEN:** Wait.

[24]                **BY MR. SCHMIDT:**

[25] **Q:** Look at 20 if you would. Do you see that?

---

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Heather Geesey
March 10, 2005

Page 72

[1] A: Yes.

[2] Q: Do you remember seeing this particular page before?

[3] A: Yes.

[4] Q: Would you look at the bottom entry under the second

[5] column that says unit contents/concepts/process; do you

[6] see that?

[7] A: Yes, yes.

[8] Q: The bottom entry in that column on this page says

[9] students will be made aware of gaps in Darwin's theory

[10] and of other theories of evolution?

[11] A: Correct.

[12] Q: Correct?

[13] A: Yes.

[14] Q: Okay. Do you remember receiving anything more with the

[15] Board packet than these two pages on this subject?

[16] A: Yes.

[17] Q: On this subject, what else did you get?

[18] A: Another copy similar to this.

[19] Q: All right. Is it in this group of documents that we are

[20] looking at?

[21] A: Yes.

[22] Q: What page number?

[23] A: 22.

[24] Q: All right. Turn back to 21.

[25] A: (Witness complies.)

Page 73

[1] Q: Do you see that?

[2] A: Yes.

[3] Q: That is a memorandum from Mr. Baksa dated October 18th,

[4] 2004; correct?

[5] A: Correct.

[6] Q: It refers to enclosure XI-C?

[7] A: Yes.

[8] Q: Did the amendment come out with the Board packet, or did

[9] it arrive in your hands on the day of the meeting?

[10] A: I don't know.

[11] Q: Back to page 20, again.

[12] A: Yes.

[13] Q: See it?

[14] A: Yes.

[15] Q: Back to that section of the text I referred to before.

[16] When you read this, what was your understanding was

[17] being referred to by the phrase "other theories of

[18] evolution"?

[19] A: Whatever the curriculum committee came up with.

[20] Q: What was your understanding?

[21] A: The other theory that they presented in the book Of

[22] Pandas and People.

[23] Q: Let's turn to page 22, the page that came out with the

[24] October 18 memorandum.

[25] A: Okay.

Page 74

[1] Q: The entry under the same column at the bottom says

[2] students will be made aware of gaps, problems in

[3] Darwin's Theory and of other theories of evolution.

[4] Note: The origins of life is not taught.

[5] Did I read that correctly?

[6] A: Correct.

[7] Q: What is the source in your knowledge — to your

[8] knowledge of the amendment?

[9] A: The teachers added that.

[10] Q: Added what?

[11] A: The origins of life.

[12] Q: Is not taught?

[13] A: Is not taught.

[14] Q: How do you know the teachers added that?

[15] A: I was told.

[16] Q: By who?

[17] A: The administration.

[18] Q: Look at page 27. Do you see that?

[19] A: Yes.

[20] Q: In the same column, in the same location, there's

[21] language that says students will be made aware of

[22] gaps/problems in Darwin's theory and of other theories

[23] of evolution, including but not limited to intelligent

[24] design.

[25] Did you ever see that proposal?

Page 75

[1] A: Yes.

[2] Q: When?

[3] A: At that meeting.

[4] Q: The meeting of October 18th?

[5] A: Yes.

[6] Q: I am sorry to jump around, but I only have two more

[7] jumps to make. If you would go back to page 22, again.

[8] A: Okay.

[9] Q: Do you see that?

[10] A: Yes.

[11] Q: In the bottom of the right-hand column which is headed

[12] Materials and Resources, there is a reference to Of

[13] Pandas and People. Do you see that?

[14] A: Yes.

[15] Q: And if you look at the first version of the curriculum

[16] that came out, there is no reference to Of Pandas and

[17] People. Look at page 20.

[18] A: (Witness complies.) Correct.

[19] Q: Correct?

[20] A: Yes.

[21] Q: To your knowledge, who is responsible for having

[22] inserted the reference Of Pandas and People in the

[23] amended curriculum when it came out?

[24] A: I would assume the curriculum committee.

[25] Q: Anybody tell you that was the case?

Heather Geesey
March 10, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 76

[1] **A:** No.

[2] **Q:** Now I haven't asked you to look at the minutes of the

[3] October 18 meeting yet.

[4]   Do you have any memory of what happened at that

[5] meeting?

[6] **A:** Yes.

[7] **Q:** What do you remember?

[8] **A:** I was misquoted.

[9] **Q:** Pardon?

[10] **A:** I was misquoted. That is why it sticks in my head.

[11] **Q:** Do you have any other memory of what happened at that

[12] meeting?

[13] **A:** We voted to change the curriculum to add one of these

[14] three.

[15] **Q:** I am going to have to borrow your book for a second. I

[16] am going to show you P-5 again, but I am going to direct

[17] your attention to pages 153 through 160 which appear to

[18] be the print version of the minutes of the October 18thk

[19] meeting. You don't have to read all of that; although,

[20] you are welcome to do so.

[21]   Let me ask you to turn to the section under the

[22] heading Curriculum which is number six.

[23] **A:** (Witness complies.)

[24] **Q:** Have you found it?

[25] **A:** Yes.

Page 77

[1] **Q:** When I compare the materials that we looked at a few

[2] minutes ago with this, it appears that Buckingham moved

[3] for approval of the curriculum that included the

[4] statement students will be made aware of gaps/problems

[5] in Darwin's theory and of other theories of evolution

[6] including, but not limited to, intelligent design.

[7]   I think that is what appears as enclosure 11a?

[8] **A:** Okay.

[9] **Q:** All right. Just for anybody who wants to check my

[10] reading, that is pages Bates 24 and 25.

[11] **MR. GILLEN:** That is fine, Tom.

[12] **MR. SCHMIDT:** Sorry to make it so drawn out.

[13] **MR. GILLEN:** No problem.

[14]       **BY MR. SCHMIDT:**

[15] **Q:** Then there was a motion to table that. As I turn the

[16] page of the minutes, it appears that you voted against

[17] tabling that motion.

[18]   Why did you do it that way?

[19] **A:** Because I liked the curriculum change. I thought that

[20] everybody was happy. That's just what — I mean that

[21] was the recommendation from the Curriculum Board, and I

[22] rely on them for my information. So I did not want to

[23] table it.

[24] **Q:** When you voted not to table, were you prepared to vote

[25] to approve the motion?

Page 78

[1] **A:** I believe so, yes.

[2] **Q:** At that time on October 18th, what did you understand

[3] intelligent design to mean?

[4] **A:** It was another scientific theory.

[5] **Q:** And what was the theory of intelligent design?

[6] **A:** Just another one that differs from Darwin's view of

[7] evolution.

[8] **Q:** How does it differ?

[9] **A:** I don't know.

[10] **Q:** How do you know it differs?

[11] **A:** Because I was — that's what the curriculum committee

[12] came back with. It's just another scientific theory

[13] that differs. So I was relying on them.

[14] **Q:** Did anyone from the curriculum committee either at a

[15] Board meeting or in some communication outside of a

[16] Board meeting tell you what intelligent design involved?

[17] **A:** No.

[18] **Q:** Had you ever heard the phrase "intelligent design"

[19] before you received the Board materials?

[20] **A:** Did I hear it in reference to school or reference in the

[21] world?

[22] **Q:** Anywhere.

[23] **A:** Yes.

[24] **Q:** Where?

[25] **A:** I don't know. Just in my knowledge.

Page 79

[1] **Q:** Before the first time you heard it in connection with

[2] school, right?

[3] **A:** Yes.

[4] **Q:** What was your understanding of the phrase intelligent

[5] design?

[6] **A:** Another theory.

[7] **Q:** Okay. What was the theory?

[8] **A:** I don't know.

[9] **Q:** I am not asking — it is not — let me finish my

[10] question because I want you to be sure and to

[11] understand. I am not asking you a test question.

[12] **A:** Okay.

[13] **Q:** There aren't any wrong answers to my question. So you

[14] are not going to be graded on whether you're right or

[15] wrong in describing intelligent design.

[16]   I want to know what you thought that phrase meant.

[17] **A:** That things didn't happen by evolving.

[18] **Q:** How did they happen?

[19] **A:** Just a plan. There was a design.

[20] **Q:** What more can you tell me about that? Whose design is

[21] it?

[22] **A:** I don't know.

[23] **Q:** What did you think? It is not a test question. There

[24] is no right or wrong answer.

[25] **A:** I guess it depends on who you are on what it means.

**Tammy Kitzmiller, et al.   v.**
**Dover Area School District, et al.**

**Heather Geesey**
**March 10, 2005**

---

Page 80

[1] Q: I am asking you, Heather Geesey, what you understood
[2] intelligent design to mean in 2004?
[3] A: Just another scientific theory. I really didn't think
[4] much about it. It was just another thing the kids were
[5] going to learn.
[6] Q: You put it back in the school context. Let me take it
[7] back out again because I do want to understand why you
[8] acted — and you did act — you acted based on what you
[9] knew I guess. So I want to know what you knew.
[10] In 2004, what you understood about intelligent
[11] design as you have testified so far, but I have a couple
[12] of follow up questions, is that it was a theory; right?
[13] A: Correct.
[14] Q: That it was a theory that explained how things came to
[15] be; right?
[16] A: Correct.
[17] Q: And things — the world we live in; right?
[18] A: Correct.
[19] Q: And that theory was that things came to be through a
[20] plan or a design; right?
[21] A: Correct.
[22] Q: In your understanding, where did the plan or the design
[23] come from?
[24] A: I don't know. I don't have to know. I just have to
[25] approve the book.

Page 81

[1] Q: No, I am not talking about the book. I am not talking
[2] about the curriculum change. I am talking about you,
[3] what is in your mind. All right.
[4] In 2004, you told me and us that you had some
[5] familiarity with the phrase intelligent design?
[6] A: Right.
[7] Q: And I think you have said that you associated that
[8] phrase with certain ideas; there were things that went
[9] with that phrase in your mind?
[10] A: Right.
[11] Q: And that the things that went with it were that it was a
[12] theory, that it explained how things came to be, and it
[13] said things came to be through some kind of plan or
[14] design; right?
[15] A: Correct.
[16] Q: Now I am not talking about October the 18th. We will
[17] come to it, but I am not talking about that yet.
[18] What else was in your mind about intelligent
[19] design? For instance, did you have any thought about
[20] where the plan or the design came from?
[21] A: No.
[22] Q: You never thought about that?
[23] A: No.
[24] Q: Did you ever associate the plan or the design that you
[25] have just testified about with Genesis I?

Page 82

[1] A: No.
[2] Q: Never?
[3] A: No.
[4] Q: Okay. On October 18th when you voted to include the
[5] phrase intelligent design in the curriculum, what were
[6] you voting on?
[7] A: To change the curriculum.
[8] Q: To include intelligent design?
[9] A: Correct.
[10] Q: Which meant what?
[11] A: Another theory was going to be taught — well, not
[12] taught. They were going — made aware of another
[13] theory.
[14] Q: What was in your mind about the difference between made
[15] aware of versus taught?
[16] A: We are standards driven. We can only teach — we only
[17] have time to teach the standards. To balance it, they
[18] were going to be made aware.
[19] Q: Maybe you can try me on that again, what the difference
[20] is in the classroom being taught something and being
[21] made aware of something.
[22] A: To be taught is to — I mean the teacher teaches the
[23] subject, the class. Made aware is mentioning it.
[24] Q: You have said that you understood on October 18th that
[25] intelligent design was another theory of evolution.

Page 83

[1] Can you tell me — and I know this will probably
[2] sound to you like we are covering the same ground, but
[3] before I move on, I want to be sure I understand it.
[4] Can you tell me what that other theory is that is
[5] represented by intelligent design?
[6] A: Repeat the question. I am sorry.
[7] Q: You have said that you understood that intelligent
[8] design is another theory of evolution.
[9] Can you tell me what the content of that theory
[10] is? I mean what am I supposed to understand as the
[11] theory of intelligent design? Can you explain what was
[12] in your mind on October 18th when you voted to include
[13] it?
[14] A: That's more than one question.
[15] Q: Right. So you understand what the question is, what is
[16] the content of intelligent design theory?
[17] A: That it is another scientific theory that just differs
[18] from Darwin's view a little.
[19] Q: How does it differ? I am not asking about what was in
[20] your head from way back whenever you first heard about
[21] it.
[22] What was in your head when you voted on October
[23] 18th?
[24] A: To pass the curriculum.
[25] Q: Right. What were you voting to approve as the other

---

**Heather Geesey**
**March 10, 2005**

**Tammy Kitzmiller, et al.   v.**
**Dover Area School District, et al.**

---

Page 84

[1] theory of evolution?

[2]   A: Intelligent design.

[3]   Q: What is intelligent design?

[4]   A: Another scientific theory.

[5]   Q: What is the theory?

[6]   A: I don't know.

[7]   Q: Why did you vote to approve it then?

[8]   A: Because the curriculum committee came back with that,

[9] and I rely on them for their information. And that is

[10] what they wanted to do.

[11]   Q: No criticisms apply in the way I am going to ask this

[12] question. But is it your testimony that you didn't

[13] really know what intelligent design was, and you were

[14] relying on the curriculum committee entirely?

[15]   A: Yes and no.

[16]   Q: What part is yes and what part is no?

[17]   A: Yes, I was relying on them. And to me, intelligent

[18] design is another scientific theory. So to me, that was

[19] my definition.

[20]   Q: I guess what I am having — what I am struggling with is

[21] you say it is another theory, but you can't tell me what

[22] it is.

[23]   What is the theory? You voted to approve it?

[24]   A: Right.

[25]   Q: What is it?

Page 85

[1]   A: In that sense, I was relying on them for that part, yes.

[2]   Q: Are you unable to tell me what the theory of intelligent

[3] design consists of?

[4]   A: Yes. I don't know. I am confused by the question.

[5]   Q: If I asked you to write down on a piece of paper

[6] intelligent design means fill in the blank?

[7]   A: Correct.

[8]   Q: What are you going to say? What are you going to tell

[9] me?

[10]   A: That it is a scientific theory.

[11]   Q: Which is what? What is in the theory? That is just

[12] like the general description of what it is.

[13]   What is the content of it? What does it mean?

[14]   A: I don't know everything about it.

[15]   Q: What do you know about it? Not everything, but

[16] anything.

[17]   A: That it is just — I don't know. What I am saying is —

[18] you keep asking so what I am saying must not be the

[19] right answer.

[20]   Q: No, no, there is no wrong answer. I admit I have gone

[21] over this now probably too many times. But I am trying

[22] to understand what is in the box called intelligent

[23] design theory.

[24]   What is the theory? I could give examples, but I

[25] don't want to confuse the issue because you voted on it.

Page 86

[1]   I guess I am trying to decide what you knew about

[2] intelligent design or thought you knew about it when you

[3] said yes, this has to be our new curriculum.

[4]   And if you can't tell me, you can't tell me. That

[5] is the answer. I just want to give you a chance to

[6] explain why you voted that way.

[7]   A: Because that is what the curriculum committee came back

[8] with, and that is — they were satisfied. That gave us

[9] a balanced view. That solved our problem.

[10]   Q: What do you understand that the members of the

[11] curriculum committee did to learn about intelligent

[12] design?

[13]   A: Alan said he read. So I assumed that is how he learned

[14] about everything.

[15]   Q: You mean Alan Bonsell?

[16]   A: Yes.

[17]   Q: Did he say what he had read?

[18]   A: Scientific journals and stuff like that I believe is

[19] what he reads.

[20]   Q: Did anyone else from the curriculum committee say what

[21] they had done to become familiar with intelligent

[22] design?

[23]   A: No.

[24]   Q: Do you remember anything more specific about what

[25] Mr. Bonsell said he had read or relied on?

Page 87

[1]   A: No.

[2]   Q: Did Mr. Buckingham indicate that he had read or relied

[3] on anything when he was moving to include a reference to

[4] intelligent design in the curriculum?

[5]   A: No.

[6]   Q: Did he refer to any books, videotapes, other materials

[7] he got?

[8]   A: No.

[9]   Q: Did he refer to any organizations that had provided

[10] information to him?

[11]   A: No.

[12]   Q: Did anybody from the School District administration say

[13] that they had done anything to acquire information about

[14] intelligent design?

[15]   A: No.

[16]   Q: Did any of the teachers provide any information to the

[17] Board about intelligent design?

[18]   A: No.

[19]   Q: Did any of the teachers express any concern about

[20] including a reference to intelligent design in the

[21] curriculum?

[22]   A: Yes.

[23]   Q: Who?

[24]   A: Bert Spahr.

[25]   Q: What did she say?

---

**Min-U-Script®   Filius & McLucas Reporting Service, Inc.**

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Heather Geesey
March 10, 2005

---

Page 88

[1]  A: She thought that it was religion.
[2]  Q: Did you agree or disagree with her?
[3]  A: Disagree.
[4]  Q: Why?
[5]  A: Because it's not religion.
[6]  Q: How do you know if you don't know what it is?
[7]  A: It is not Creationism. It is not Genesis is what I
[8]  believe, what my faith believes. So Alan and Bill kept
[9]  telling her it wasn't religion, it wasn't religion. She
[10]  just wasn't listening.
[11]  Q: Do you have any knowledge of your own to support your
[12]  position that intelligent design does not involve
[13]  religion?
[14]  A: Repeat the question.
[15]  Q: Yes. Are you relying entirely on what Alan Bonsell and
[16]  Bill Buckingham said to Bert Spahr in response to her
[17]  statement that intelligent design involved religion?
[18]  A: No.
[19]  Q: What else are you relying on?
[20]  A: My Christian background.
[21]  Q: What does your Christian background tell you about
[22]  intelligent design?
[23]  A: We weren't taught that in Christian schools so it is
[24]  not —
[25]  Q: All right. I just want to be sure I follow the thought

Page 89

[1]  process. You are saying that because you weren't taught
[2]  about intelligent design in the schools you attended,
[3]  that in your mind, that means that intelligent design
[4]  doesn't involve religion?
[5]  A: Correct.
[6]  Q: Just to be sure I can put this answer together with your
[7]  earlier testimony, you are not saying, are you, that you
[8]  know enough about intelligent design itself to say
[9]  whether or not it has any connection with religion?
[10]  Does that question make sense?
[11]  A: No. To me, it is more than one.
[12]  Q: Let me ask it a different way. I will try to summarize
[13]  because I know it has been a long morning.
[14]  My understanding is that you don't really know
[15]  what the intelligent design theory is; do you?
[16]  A: It is a scientific theory so it wouldn't be religion.
[17]  Q: How do you know intelligent design is a scientific
[18]  theory; because somebody told you so?
[19]  A: Yes.
[20]  Q: Who, Buckingham, Bonsell?
[21]  A: Yes.
[22]  Q: What do you know, yourself, that you are relying on to
[23]  say that intelligent design is a scientific theory?
[24]  A: That other scientists believe in it, and it's — it's
[25]  always with evolution so it is science. So, to me, it is

Page 90

[1]  separate.
[2]  Q: What did you do, read, study, hear that leads you to say
[3]  that scientists believe in intelligent design?
[4]  A: Alan had said that. And since this whole thing started,
[5]  other scientists have — people have said other
[6]  scientists have come out and said this is not science —
[7]  that intelligent design is science.
[8]  Q: Who has come out and said that to you?
[9]  A: I just heard it. I don't know.
[10]  Q: Who did you hear it from; anybody besides Alan Bonsell?
[11]  A: Bill would have said it, too.
[12]  Q: I am sort of back to where I was before. It sounds to
[13]  me as if what you knew in October of 2004 about
[14]  intelligent design you learned from Bonsell and
[15]  Buckingham, and you were relying on what they told you
[16]  about it; is that right?
[17]  A: Yes.
[18]  Q: And is it right that you didn't have any independent
[19]  knowledge about what was involved in the intelligent
[20]  design theory?
[21]  A: Yes.
[22]  MR. GILLEN: I don't want to interrupt the flow,
[23]  but it is 12:40. We have been here about — if you have
[24]  a lot more, I would like to take lunch. I just want to
[25]  get a sense of where you are at.

Page 91

[1]  MR. SCHMIDT: Off the record.
[2]  (An off-the-record discussion was had.)
[3]  BY MR. SCHMIDT:
[4]  Q: I think we were talking about what you learned about ID
[5]  from other people. I guess I just have a follow-up
[6]  question which is that I know that the school
[7]  administration told you as a Board member that there was
[8]  a copy Of Pandas and People at the administration
[9]  office.
[10]  My question is: Did Mr. Bonsell or Mr. Buckingham
[11]  offer you any resources on intelligent design, books,
[12]  videos, articles, anything at all?
[13]  A: No
[14]  Q: Did you ask for anything?
[15]  A: No.
[16]  Q: What did you understand the science teachers' position
[17]  to be on including a reference to intelligent design in
[18]  the curriculum; were they for it or against it?
[19]  A: Against it.
[20]  Q: Why?
[21]  A: I don't know.
[22]  Q: As you knew?
[23]  A: They don't want to be sued.
[24]  Q: They didn't want to be sued?
[25]  A: Right.

---

Heather Geesey
March 10, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 92

[1]   Q: Did you ever hear from anyone that a science teacher —
[2] any science teacher opposed it because they believed it
[3] was not science?
[4]   A: Yes.
[5]   Q: What did you hear on that subject?
[6]   A: They believed it wasn't science.
[7]   Q: Who explained that position?
[8]   A: The Biology Department.
[9]   Q: Was that Bert Spahr?
[10]   A: Yes.
[11]   Q: Can you recall any words, what she said?
[12]   A: No.
[13]   Q: Did you ask any questions to learn more about what their
[14] position was?
[15]   A: No.
[16]   Q: In the not quite a year — I guess it had been December
[17] to October — that you had been a member of the Board,
[18] had any other curriculum issues come before the Board
[19] that you recall?
[20]   A: Not that I recall.
[21]   Q: Tell me why you didn't accept the science teachers'
[22] position that intelligent design was not science?
[23]   A: I was told it wasn't.
[24]   Q: You were told?
[25]   A: It wasn't. Wait. Repeat your question. I'm sorry.

Page 93

[1]   MR. SCHMIDT: Why don't I ask Vicki to read it
[2] back to be sure I haven't confused myself?
[3]   (The question: "Tell me why you didn't accept the
[4] science teachers' position that intelligent design was
[5] not science," was read by the reporter.)
[6]   BY MR. SCHMIDT:
[7]   Q: Can you answer that question?
[8]   A: I was told that it was.
[9]   Q: By Bonsell and Buckingham?
[10]   A: Yes.
[11]   Q: Let me ask the question a slightly different way. Why
[12] did you accept the position of Bonsell and Buckingham
[13] who are not science teachers instead of the position of
[14] the District's science teachers about a scientific
[15] issue?
[16]   A: They are the curriculum committee. That is their job.
[17] It's my job to refer to them.
[18]   Q: To defer to them?
[19]   A: To get my knowledge from them.
[20]   Q: Does the curriculum committee rely on the subject matter
[21] teachers in formulating curriculum?
[22]   A: Yes.
[23]   Q: Do you think that is appropriate?
[24]   A: Yes.
[25]   Q: In this case when the subject matter teachers didn't

Page 94

[1] agree with the content of the curriculum on subject
[2] matter grounds, why did you defer to the lay members of
[3] the curriculum committee?
[4]   A: Because the biology teachers said they weren't a part of
[5] it, and they were. I didn't believe them. Their
[6] credibility to me was not there.
[7]   Q: I know you used that expression that they weren't a part
[8] of it. I think that was something that you said in
[9] almost exactly those words a little earlier.
[10]   Tell me so I understand what you mean when you say
[11] the biology teachers said they weren't a part of it.
[12]   A: They said they weren't a part of this process.
[13]   Q: Of which process?
[14]   A: Of selecting the text, of making the curriculum.
[15]   Q: Okay. We looked at, for example, three different
[16] versions of the curriculum a little while ago. They
[17] were attached to memos that Mr. Baksa sent out in
[18] October.
[19]   One included a reference to intelligent design.
[20] One did not. And then there was a middle one that
[21] included the phrase note: origins of life is not taught.
[22]   We can go back and look, but that is my memory of
[23] the three versions — or at least three versions that
[24] were out there.
[25]   I thought your testimony earlier was that the

Page 95

[1] science teachers were the ones who suggested the
[2] addition of the statement note: origins of life is not
[3] taught; right?
[4]   A: Correct.
[5]   Q: Is it your present understanding that the science
[6] teachers had approved the draft of the curriculum that
[7] included the reference to intelligent design?
[8]   A: Yes.
[9]   Q: Who told you that?
[10]   A: I don't know.
[11]   Q: Did a science teacher tell you that?
[12]   A: No.
[13]   Q: Isn't it inconsistent with what you think the science
[14] teachers' position was? Isn't it their position that
[15] there shouldn't have been a reference to intelligent
[16] design?
[17]   A: No, it is not inconsistent.
[18]   Q: There is a reference in the curriculum that was adopted
[19] in October to gaps and problems in the Darwinian Theory
[20] of Evolution.
[21]   What are the gaps and problems that the curriculum
[22] refers to?
[23]   A: I don't know.
[24]   Q: Who were you relying on as your I guess comfort source
[25] for voting for that change if you didn't know what the

**Tammy Kitzmiller, et al.  v.**
**Dover Area School District, et al.**

**Heather Geesey**
**March 10, 2005**

---

Page 96

[1] gaps and problems were?

[2]     A: The curriculum committee.

[3]     Q: When you say the curriculum committee, do you mean

[4] anybody other than Bonsell and Buckingham?

[5]     A: There should be a third member, but I don't know. I was

[6] relying on Bill and Alan, yes.

[7]     Q: I have about four more questions on this whole subject,

[8] and then we will move to something else.

[9]     A: Okay.

[10]     Q: To this date, to today which is March 10th, have you

[11] ever looked at the contents of the book Of Pandas and

[12] People?

[13]     A: No.

[14]     Q: Have you ever looked at the contents of the biology

[15] textbook by Miller and Levine that was approved in

[16] August?

[17]     A: No.

[18]     Q: Do you have any opinion yourself about whether your

[19] biology textbook by Miller and Levine provides a

[20] balanced approach to the teaching of evolution?

[21]     A: No.

[22]     Q: Again on that subject, you are relying entirely on

[23] Bonsell and Buckingham?

[24]     A: Yes.

[25]     Q: Do you know Noel Wenrich?

---

Page 97

[1]     A: Yes.

[2]     Q: How do you know him?

[3]     A: He was on the Board.

[4]     Q: When did he leave the Board?

[5]     A: November.

[6]     Q: Of 2004; is that right?

[7]     A: I assume so.

[8]     Q: He was on the Board during the time of the October 18th

[9] meeting we have been discussing; wasn't he?

[10]     A: Yes.

[11]     Q: Did he vote in favor of the change to the curriculum or

[12] against it; do you recall?

[13]     A: I think he was in favor.

[14]     Q: Do you recall any discussion that Mr. Wenrich

[15] participated in to remove any reference to intelligent

[16] design from the curriculum?

[17]     A: I don't remember.

[18]     Q: Do you remember Carol Brown resigning at the end of the

[19] October meeting?

[20]     A: She resigned. I don't know when.

[21]     Q: Do you know why?

[22]     A: No.

[23]     Q: Do you remember her making any statement explaining?

[24]     A: She read a long letter.

[25]     Q: At the October meeting?

---

Page 98

[1]     A: I don't know when.

[2]     Q: Do you remember what the letter said?

[3]     A: No.

[4]     Q: Do you remember if it had anything to do with the

[5] adoption of the intelligent design curriculum?

[6]     A: I would assume so, but I don't know.

[7]     Q: Have you ever seen the text of the letter?

[8]     A: No.

[9]     Q: Did she give copies to Board members?

[10]     A: No.

[11]     Q: Do you remember a discussion at the October meeting

[12] about the possibility that the Board and the School

[13] District might be sued if they adopted the proposed

[14] change to the curriculum?

[15]     A: No.

[16]     Q: Do you remember if anyone discussed whether the Board's

[17] and the District's regular solicitor would represent the

[18] district in the event of any lawsuit?

[19]     A: Repeat that again.

[20]     Q: Sure. Do you remember any discussion about whether the

[21] District's solicitor would represent it in the event of

[22] any lawsuit over the change in the curriculum?

[23]     A: No.

[24]     Q: Do you remember any discussion about whether the

[25] teachers could be represented by the District's

---

Page 99

[1] solicitor?

[2]     A: No.

[3]     Q: Do you remember making a statement that if the faculty

[4] insisted on separate legal representation, they should

[5] be fired?

[6]     A: No.

[7]     Q: Do you remember any newspaper article quoting you as

[8] having made such a statement?

[9]     A: Yes.

[10]     Q: How did you learn about that newspaper article?

[11]     A: I read it.

[12]     Q: How did you come to read it?

[13]     A: I'm not sure.

[14]     Q: Did somebody bring it to your attention?

[15]     A: I don't know.

[16]     Q: You don't get the paper at your home?

[17]     A: Correct.

[18]     Q: And the School District doesn't send you clippings at

[19] least not ordinarily; is that right?

[20]     A: Correct.

[21]     Q: But you don't remember how you came across this article?

[22]     A: No.

[23]     Q: Did you do anything about it?

[24]     A: Yes.

[25]     Q: What?

---

**Heather Geesey**
**March 10, 2005**

**Tammy Kitzmiller, et al.   v.**
**Dover Area School District, et al.**

---

Page 100

[1]    **A:** I spoke to the reporter.

[2]    **Q:** Who was the reporter?

[3]    **A:** Joe Maldonado.

[4]    **Q:** What was the substance of that discussion?

[5]    **A:** I told him I did not say that. I said you know I did

[6]  not say that. And he said so, I am putting my kids

[7]  through college.

[8]    **Q:** When did you have that discussion?

[9]    **A:** Shortly after that was in the paper.

[10]   **Q:** I am going to have this marked as Exhibit 29.

[11]   (Deposition Exhibit 29 was marked.)

[12]            **BY MR. SCHMIDT:**

[13]   **Q:** Have you seen this document before?

[14]   **A:** Yes.

[15]   **Q:** When?

[16]   **A:** When I typed it.

[17]   **Q:** Have you seen this document with the handwriting on it

[18] before?

[19]   **A:** No.

[20]   **Q:** Let me say that what we are marking as P-29 has been

[21] Bates stamped 346. It is part of the defendants'

[22] production.

[23]    It is a copy of an e-mail dated Wednesday, October

[24] 20th, 2004 at 9:11 a.m..

[25]    Did you send this e-mail?

Page 101

[1]    **A:** Yes.

[2]    **Q:** Is HADLEY96 at aol.com your home e-mail address?

[3]    **A:** Yes.

[4]    **Q:** Just checking. When you were asked to produce documents

[5] by counsel for the defendants, did you produce copies of

[6] any things that were on your e-mail?

[7]    **A:** I don't have anything.

[8]    **Q:** How do you know?

[9]    **A:** I don't save anything.

[10]   **Q:** Were there any items that you either sent or received by

[11] e-mail that had anything to do with your service as a

[12] member of the Dover Area School District Board of

[13] Directors?

[14]   **A:** No.

[15]   **Q:** This is the only one?

[16]   **A:** Yes.

[17]   **Q:** How can you be so sure?

[18]   **A:** That is my home e-mail address. I don't use that.

[19] There's nothing there.

[20]   **Q:** Do you use any other e-mail address?

[21]   **A:** There is a school one, and there is nothing on there

[22] either.

[23]   **Q:** When you say there is a school one, do you receive

[24] school e-mails at your home?

[25]   **A:** Yes.

Page 102

[1]    **Q:** At a different address, but on your home computer?

[2]    **A:** You can access through, yes.

[3]    **Q:** I don't want to be confusing, and I'm easily confused on

[4] this subject.

[5]    You have a computer at your home; right?

[6]    **A:** Yes.

[7]    **Q:** And you have a school based address because you are a

[8] member of the School Board; is that right?

[9]    **A:** I access their website because there's an e-mail there.

[10]   **Q:** So you can use the School District's website to exchange

[11] e-mails with people?

[12]   **A:** Yes.

[13]   **Q:** Do you do that? Have you ever done it?

[14]   **A:** I have.

[15]   **Q:** Have you done it daily, weekly, monthly?

[16]   **A:** No. I remember doing it for the boys' teachers at the

[17] beginning of the year.

[18]   **Q:** Can you think of any occasion other than the example

[19] that we are looking at right now, P-29, when you have

[20] used the School District's e-mail facility to send or

[21] receive an e-mail?

[22]   **A:** Yes.

[23]   **Q:** On what subjects?

[24]   **A:** Anything that has to do with the school. That is how

[25] they reach me. I am a public servant.

Page 103

[1]    **Q:** Do you ever print e-mails at your home?

[2]    **A:** No.

[3]    **Q:** Did you ever make any attempt to recover e-mails from

[4] your computer?

[5]    **A:** Dr. Nilsen did that for us.

[6]    **Q:** For you?

[7]    **A:** And supplied them. For all of the e-mail addresses for

[8] the school, and he supplied them.

[9]    **Q:** Through your counsel?

[10]   **MR. SCHMIDT:** Counsel is indicating yes.

[11]   **MR. GILLEN:** Yes.

[12]   **MR. SCHMIDT:** Got you.

[13]            **BY MR. SCHMIDT:**

[14]   **Q:** Why did you send this e-mail?

[15]   **A:** I was upset that the rest of the teachers in the

[16] District that weren't at this meeting would read this,

[17] especially my children's teachers, and I wanted them to

[18] know that it was not true.

[19]   **Q:** And what was not true was the statement that you thought

[20] the faculty should be fired if they wanted a separate

[21] representation in the event of a lawsuit?

[22]   **A:** Repeat that.

[23]   **Q:** Okay. Let's make it easy. Here is the statement in the

[24] news report. And this is from a news article by Joseph

[25] Maldonado published in the Daily Record on Tuesday,

---

**Tammy Kitzmiller, et al.   v.**
**Dover Area School District, et al.**

**Heather Geesey**
**March 10, 2005**

---

Page 104

[1] October 19, 2004.

[2]    Quote — if they requested Stock and Leader, they

[3] (the faculty) should be fired — close quote — said

[4] Board member Heather Geesey. They agreed to the book

[5] and the changes in curriculum — close quote.

[6]    Is that the statement in a newspaper to which you

[7] are referring in this e-mail has been marked as P-29?

[8]    A: Yes.

[9]    Q: Did you talk to Maldonado as you have described a

[10] conversation with him before or after you sent this

[11] e-mail?

[12]    A: I don't know.

[13]    Q: Did you talk to him in person or by telephone?

[14]    A: In person.

[15]    Q: Where?

[16]    A: Dover Intermediate School.

[17]    Q: Within days, weeks, months?

[18]    A: Days. Shortly.

[19]    Q: Was it a chance meeting or something that you had made

[20] an arrangement to have?

[21]    A: It was chance.

[22]    Q: Can you turn back - you already have it there — to

[23] Exhibit five in the fat book that is in front of you, to

[24] page eleven?

[25]    A: (Witness complies.) I went to five up here. Was that

---

Page 105

[1] wrong?

[2]    Q: Hang on. I believe it is. Let me look a second. Do

[3] you have Bates number 11 in front of you?

[4]    A: Yes.

[5]    Q: Have you ever seen this before?

[6]    A: Not that I recall.

[7]    Q: Do you recall saying at the October 28 meeting that —

[8] I'm sorry. I take that back. Let me start again.

[9]    Do you remember at the October 18th meeting

[10] somebody named Larry Snook speaking on the use Of Pandas

[11] and People as a reference book in the new curriculum?

[12]    A: No.

[13]    Q: Do you know who Larry Snook is?

[14]    A: Yes.

[15]    Q: Who is he?

[16]    A: An Ex-Board member, yes.

[17]    Q: Do you recall him reading a section from the book?

[18]    A: No.

[19]    Q: Do you recall him saying that the District was likely to

[20] be sued if it adopted the proposed new curriculum?

[21]    A: I don't remember.

[22]    Q: Do you recall saying yourself that you weren't likely to

[23] be sued and that you had a lot of confidence in the

[24] District's lawyers?

[25]    A: Yes.

---

Page 106

[1]    Q: If you would stay in Exhibit 5 and look at pages 3 and

[2] 4.

[3]    A: (Witness complies.)

[4]    Q: Did you ever see this memorandum before?

[5]    A: Yes.

[6]    Q: And the second page, you have seen before?

[7]    A: I have seen the second page before.

[8]    Q: Do you remember in what way you saw it?

[9]    A: It is on the District website.

[10]    Q: Did you see it before the November 3rd meeting?

[11]    A: I don't recall.

[12]    Q: Do you remember voting to adopt it at a meeting of the

[13] School Board?

[14]    A: Yes.

[15]    Q: Do you remember which meeting?

[16]    A: No.

[17]    Q: Give me a few minutes here.

[18]    (Plaintiff Exhibit 30 was marked.)

[19]             BY MR. SCHMIDT:

[20]    Q: I am showing you something that has been marked as P-30

[21] which is a one page document, not Bates numbered, except

[22] it may be part of P-4. I don't know. I haven't looked

[23] through it, but we will mark it separately.

[24]    MR. GILLEN: That is fine.

[25]             BY MR. SCHMIDT:

---

Page 107

[1]    Q: While you look at it, I will represent for the record

[2] that this is an electronic print of a letter that was

[3] apparently published in the York Sunday News on June

[4] 20th, 2004.

[5]    Have you seen this letter before?

[6]    A: Yes.

[7]    Q: When did you see it?

[8]    A: In the newspaper.

[9]    Q: The day it appeared?

[10]    A: Yes.

[11]    Q: I think you did tell us you got the Sunday paper?

[12]    A: Yes.

[13]    Q: When you saw this letter in the paper on June 20th, did

[14] you recognize the quoted statement by Mr. Buckingham as

[15] something he had said at a June Board meeting?

[16]    A: No.

[17]    Q: Did you do anything in response to this?

[18]    A: Yes.

[19]    Q: What did you do?

[20]    A: I wrote a letter.

[21]    Q: Before you wrote your letter, did you confer with anyone

[22] on the Board of the Dover School District?

[23]    A: No.

[24]    Q: Did you consider conferring with Superintendent Nilsen?

[25]    A: No.

---

Heather Geesey
March 10, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 108

[1] **Q:** Did you talk with anybody about the letter that you
[2] wrote?
[3] **A:** No.
[4] **Q:** If you look at the last paragraph of P-30, the one that
[5] starts if this was simply a matter of selecting a text,
[6] do you see that?
[7] **A:** Yes.
[8] **Q:** There is a sentence in there that refers to Creationism
[9] as — well, it says Creationism is religion, plain and
[10] simple. Do you agree with that statement?
[11] **A:** No.
[12] **Q:** I thought you told me earlier that you believed
[13] Creationism is a reference to Genesis 1?
[14] **A:** It can be.
[15] **Q:** That is how you would use the word; isn't it?
[16] **A:** Correct.
[17] **Q:** What other meanings are you aware of that attach to the
[18] word Creationism?
[19] **A:** Other religions have their own meanings.
[20] **Q:** Own meanings?
[21] **A:** Yes.
[22] **Q:** But do you agree that Creationism is religious whether
[23] it is your religion or a different religion?
[24] **A:** My religion teaches that it is. But again, it doesn't
[25] have to be.

Page 109

[1] **Q:** Tell me what you understand to be Creationism that is
[2] not religious.
[3] **A:** I don't know because it is not my knowledge.
[4] **Q:** I don't understand your answer which is a reverse
[5] because usually you have trouble with my questions.
[6]    In your understanding of — I will put it
[7] differently. In your use of the term Creationism, you
[8] associate that with your religious belief and in
[9] particular with the first chapter of Genesis; correct.
[10] **A:** Yes.
[11] **Q:** I think you said a moment or two ago that you understand
[12] that other religions may have different views of
[13] Creationism.
[14]    Did I understand your testimony correctly?
[15] **A:** Yes.
[16] **Q:** Is there any use of the term Creationism that you are
[17] familiar with that is not associated with religion?
[18] **A:** I don't know.
[19] **Q:** Are you aware of any? I am only asking for your
[20] knowledge. Again, it is not a test. There is not an
[21] abstract correct answer. It is just what you know.
[22] **A:** I don't know.
[23] **Q:** I take your answer to be that you don't know of any use
[24] of the term Creationism that isn't associated with
[25] religion?

Page 110

[1] **A:** Correct.
[2]    (Plaintiff Deposition Exhibit 31 was marked.)
[3]        **BY MR. SCHMIDT:**
[4] **Q:** I am going to show you a document that has been marked
[5] P-31, which is an electronic reprint of a letter that
[6] was published in the "York Daily Record" on June 27,
[7] 2004. It appears to be a letter that you wrote.
[8]    Is that right?
[9] **A:** Part of it.
[10] **Q:** Okay. What do you mean by part of it?
[11] **A:** That is not my title. That was the editor.
[12] **Q:** I understand. Let's be clear so there isn't a
[13] misunderstanding. This is an electronic reprint of
[14] something that appeared in the paper.
[15]    Let's make it clear that it includes a letter you
[16] wrote, but there is editorial material here that was not
[17] provided by you?
[18] **A:** Okay.
[19] **Q:** Correct?
[20] **A:** Yes.
[21] **Q:** For example, did you use the phrase textbook quest
[22] explained?
[23] **A:** No.
[24] **Q:** There is a paragraph right near the top which says under
[25] the statement Abstract (Document Summary), did you write

Page 111

[1] that abstract, or is that something that an editor took
[2] out of your letter?
[3] **A:** To the best of my knowledge, that is what I wrote.
[4] **Q:** But it was taken out of the letter by the editor?
[5] **A:** Right.
[6] **Q:** And printed that way?
[7] **A:** Right.
[8] **Q:** The letter that you wrote, as I understand it, is the
[9] four paragraphs that start this letter and run down to
[10] your name; correct?
[11] **A:** Correct.
[12] **Q:** Did the paper leave anything out of your letter?
[13] **A:** I don't know.
[14] **Q:** Did you save a copy of it?
[15] **A:** No.
[16] **Q:** Did you see it when it appeared in the paper?
[17] **A:** Yes.
[18] **Q:** Did you know when it was going to appear in the paper?
[19] **A:** No.
[20] **Q:** How did you come across it since you don't get the daily
[21] paper?
[22] **A:** It was in Sunday's.
[23] **Q:** It was in a Sunday paper?
[24] **A:** Yes.
[25] **Q:** Did you clip it?

**Tammy Kitzmiller, et al.   v.**
**Dover Area School District, et al.**

**Heather Geesey**
**March 10, 2005**

---

Page 112

[1]   A: No.

[2]   Q: When you read it in the paper, did you have the reaction

[3] oh, they left something out?

[4]   A: I don't remember having that reaction.

[5]   Q: As far as you know, does what appears here that we have

[6] now described as your letter represent in its complete

[7] state the letter that you wrote to the paper?

[8]   A: As far as I know, yes.

[9]   Q: When you sent the letter to the paper, did you send

[10] copies to anybody else?

[11]   A: No.

[12]   Q: Not to the Board or Dr. Nilsen?

[13]   A: No.

[14]   Q: How about to individual members of the Board like

[15] Buckingham or Bonsell?

[16]   A: I don't believe so.

[17]   Q: Did you mail your letter or send it by e-mail?

[18]   A: E-mail.

[19]   Q: Go ahead.

[20]   A: I am sorry. It wasn't e-mail. It's their website.

[21]   Q: You prepared the letter on your home computer and sent

[22] it electronically?

[23]   A: It was on the newspaper's website from my home computer,

[24] correct.

[25]   Q: Look at your second paragraph.

Page 113

[1]   A: (Witness complies.)

[2]   Q: What do you mean by teaching revisionist history?

[3]   A: She was attacking Bill, and I was just saying by the

[4] way, this is what I believe.

[5]   Q: Okay.

[6]   A: And we aren't —

[7]   Q: What did you mean though when you said that you believe

[8] — I have to put the negative back in or my question

[9] won't make sense.

[10]   What did you mean when you used the statement I do

[11] not believe in teaching revisionist history; what did

[12] you mean by revision is history.

[13]   A: That we weren't making up history. That it's just what

[14] it was. It was a fact. Whatever happened happened.

[15]   Q: Isn't this what you mean, you mean that the fact is that

[16] this country was founded on Christian beliefs and

[17] principles and if we behave differently, that is

[18] revisionist history; is that what you meant?

[19]   A: Correct.

[20]   Q: The next paragraph, the first sentence says — quote —

[21] all we are trying to accomplish with this task is to

[22] choose a biology book that teaches the most prevalent

[23] theories — end quote.

[24]   What are the prevalent theories that you are

[25] referring to in this letter?

Page 114

[1]   A: Whatever that the curriculum committee came up with,

[2] that should have been what I was referring to. I was

[3] just explaining to her what we were trying to do.

[4]   Q: I know we had this discussion around the October meeting

[5] and the amendment to the curriculum. This is now in

[6] June at this point. There hasn't even been a motion to

[7] vote on the Levine and Miller textbook.

[8]   What was your understanding in June about what the

[9] curriculum committee wanted to do with prevalent

[10] theories?

[11]   A: To balance, to have a balanced curriculum.

[12]   Q: Balance Darwin's theory of evolution with what?

[13]   A: More than one theory.

[14]   Q: More than one theory. Any theory?

[15]   A: Any, yes.

[16]   Q: Any theory would do?

[17]   A: Any scientific theory.

[18]   Q: And what were the candidates as far as you knew when you

[19] wrote this letter?

[20]   A: I did not know any.

[21]   Q: Why did you feel qualified to write the letter

[22] describing what the curriculum committee was trying to

[23] accomplish since you weren't a member of the committee

[24] and weren't familiar with what they were considering?

[25]   A: I don't know.

Page 115

[1]   Q: Why did you write the letter?

[2]   A: She upset me.

[3]   Q: Okay. I understand she upset you. But why did you

[4] write the letter?

[5]   A: She attacked me saying that I was going against my

[6] mission statement, and I was not.

[7]   Q: Next sentence in this third paragraph says the

[8] definition of theory is merely a speculative or an ideal

[9] circumstance.

[10]   Does that statement apply to the theory of

[11] intelligent design?

[12]   A: I don't know.

[13]   Q: Do you agree that intelligent design is a theory?

[14]   A: Yes.

[15]   Q: So do you believe that intelligent design is a

[16] speculative or an ideal circumstance?

[17]   A: It could be. I don't know.

[18]   Q: That sort of falls into a yes or no category. It is a

[19] theory; right? Do you agree it is a theory or is it a

[20] fact?

[21]   A: It's a theory.

[22]   Q: And does that make intelligent design a speculative or

[23] an ideal circumstance as you wrote in your letter?

[24]   A: I don't know. I would assume so. I don't know.

[25]   Q: As you sit here today, do you believe that intelligent

---

**Filius & McLucas Reporting Service, Inc.**      **Min-U-Script®**      **(31)  Page 112 - Page 115**

Heather Geesey
March 10, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

Page 116

[1] design is speculative, or do you believe that it is
[2] factual?
[3]    A: I don't know. It is a theory.
[4]    Q: I understand, but my question is: Do you believe that
[5] intelligent design is speculative?
[6]    A: Yes.
[7]    Q: Your last paragraph says you can teach Creationism
[8] without its being Christianity. What did you mean by
[9] that?
[10]   A: I was telling her what she could do. She kept putting
[11] the two together, and I pulled it apart. I was just
[12] telling her what she can do.
[13]   Q: Well, tell me how anyone can teach Creationism without
[14] its being Christianity.
[15]   A: Different religions have different creation stories.
[16]   Q: Do you know of any?
[17]   A: I know mine.
[18]   Q: Do you know that any other religions have different
[19] creation stories?
[20]   A: No.
[21]   Q: Then how do you know that they do?
[22]   A: Because not all of them are like mine.
[23]   Q: How do you know?
[24]   A: Because other people believe in other things.
[25]   Q: How do you know? I am not being facetious. I really

Page 117

[1] want to know what is in your head.
[2]    A: Because they are not like me. They don't believe like
[3] me. They don't have the same morals, values. They are
[4] different.
[5]    Q: Is it your belief that you can teach Creationism without
[6] it being Christianity by using the creation story from a
[7] different religion?
[8]    A: Can you repeat that, please?
[9]    Q: I am just trying to take this apart so I can understand
[10] it.
[11]   Is it your view that you can teach Creationism
[12] without it being Christianity; that is your statement so
[13] far, right?
[14]   A: Yes.
[15]   Q: By using a creation story from another religion?
[16]   A: Yes.
[17]   Q: Can you teach Creationism in your view without using
[18] some creation story from some religion?
[19]   A: I don't know.
[20]   Q: What did you mean in the next sentence where you said it
[21] can be presented as a higher power. And I am assuming
[22] by it that you mean Creationism.
[23]   First tell me if I'm right about that.
[24]   A: Yes.
[25]   Q: What did you mean by presented as a higher power?

Page 118

[1]    A: I did not want to offend her. I did not know what she
[2] believed, if she believed in a religion so I didn't want
[3] to assume and offend her so I just put higher power.
[4]    Q: I understand your intent not to be offensive to Beth
[5] Eveland, but what does the phrase a higher power mean?
[6]    A: It varies. It depends on who you are and what you
[7] believe. It could be a number of things.
[8]    Q: What did you mean when you used it here?
[9]    A: Just what I said, whatever she believed.
[10]   Q: I will tell you that when I read your letter and saw the
[11] phrase a higher power, I assumed from a familiarity with
[12] that phrase that by higher power you meant something
[13] outside the natural order of things; is that right?
[14]   A: Yes.
[15]   Q: Without putting a name on it?
[16]   A: Yes.
[17]   Q: Did you ever have a response to this letter?
[18]   A: Not that I'm aware of.
[19]   Q: Do you know Beth Eveland?
[20]   A: Personally, no. I know who she is now.
[21]   Q: Was it your point in sending this letter that
[22] Creationism is an alternative theory to Darwinian
[23] evolution?
[24]   A: No.
[25]   Q: Is Creationism an alternative theory —

Page 119

[1]    A: No.
[2]    Q: — to evolution? What is the difference?
[3]    A: One is science, and one is religion. That is me
[4] personally.
[5]    Q: Mrs. Geesey, I think this is my last exhibit. I am
[6] showing you what has been previously marked as P-19
[7] which is a two page document titled Dover Area School
[8] District News.
[9]    Have you seen this document before?
[10]   A: Yes.
[11]   Q: Was the issuance of this document approved by the School
[12] Board?
[13]   A: Yes.
[14]   Q: Did you participate in any meeting where that approval
[15] was made?
[16]   A: Yes.
[17]   Q: Who prepared this document?
[18]   A: I don't know.
[19]   Q: Was it prepared by a Board member?
[20]   A: No.
[21]   Q: Was it prepared by a Board committee?
[22]   A: No.
[23]   Q: Was it reviewed by a Board committee?
[24]   A: I don't know.
[25]   Q: It is called as a subtitle Biology Curriculum Update.

---

Min-U-Script®       Filius  &  McLucas Reporting Service, Inc.

**Tammy Kitzmiller, et al.   v.**
**Dover Area School District, et al.**

**Heather Geesey**
**March 10, 2005**

Page 120

[1] When this document was issued, you were a member of the
[2] curriculum committee.
[3]     Did you in that capacity review the document
[4] before it was issued?
[5]     **A:** No.
[6]     **Q:** You were at the same time a member of the policy
[7] committee. And the introductory paragraph says that it
[8] is being issued because of some misunderstandings about
[9] the District's policy.
[10]     In your policy committee role, did you review the
[11] draft of this document?
[12]     **A:** No.
[13]     **Q:** Did you ever see any draft versions of this document
[14] before the Board acted to approve its publication?
[15]     **A:** Not that I remember.
[16]     **Q:** Who presented it to the Board for approval?
[17]     **A:** It was either in our packet or Dr. Nilsen.
[18]     **Q:** Was there any discussion by the Board of the text of
[19] this document before it was approved?
[20]     **A:** Not that I can remember.
[21]     **Q:** Did you review it from beginning to end before you voted
[22] to approve it?
[23]     **A:** I read — I don't know. I remember reading that. I
[24] don't know if I read it word for word.
[25]     **Q:** I made an assumption that you voted to approve it. Did

Page 121

[1] you do that?
[2]     **A:** Yes.
[3]     **Q:** Why did you approve sending this out?
[4]     **A:** To inform the public.
[5]     **Q:** Has the School District ever sent out a document like
[6] this before?
[7]     **A:** I don't know.
[8]     **Q:** Did you ever receive one as a parent or a resident of
[9] the District?
[10]     **A:** We receive District newsletters, District mailings, yes.
[11]     **Q:** Did you ever receive a document in this form?
[12]     **A:** I don't remember.
[13]     **MR. SCHMIDT:** That is all I have.
[14]     **MR. GILLEN:** That is all I have, too. I will just
[15] leave it at that.
[16]     (The deposition was concluded at 1:50 p.m.)
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 122

COMMONWEALTH OF PENNSYLVANIA   :
COUNTY OF CUMBERLAND            :
     I, Vicki L. Fox, Reporter and Notary Public in and
for the Commonwealth of Pennsylvania and County of
Cumberland, do hereby certify that the foregoing
testimony was taken before me at the time and place
hereinbefore set forth, and that it is the testimony of:
               BETH GEESEY
I further certify that said witness was by me duly
sworn to testify the whole and complete truth in said
cause; that the testimony then given was reported by me
stenographically, and subsequently transcribed under my
direction and supervision; and that the foregoing is a
full, true and correct transcript of my original
shorthand notes.
     I further certify that I am not counsel for nor
related to any of the parties to the foregoing cause,
nor employed by them or their attorneys, and am not
interested in the subject matter or outcome thereof.
Dated at Camp Hill, Pennsylvania, this 15th day of
March, 2005.
               Vicki L. Fox
               Reporter - Notary Public
(The foregoing certification does not apply to any
reproduction of the same by any means unless under the
direct control and/or supervision of the certifying
reporter.)

**Lawyer's Notes**

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Heather Geesey
March 10, 2005

**0**

03 9:22
04 17:19; 47:8

**1**

1 47:24; 108:13
10th 96:10
11 105:3
11a 77:7
121 51:20; 52:9; 53:9
124 54:23
125 52:9
126 51:20; 52:11; 53:9
12:40 90:23
13th 71:2, 8
14 35:2; 45:3, 19; 47:2, 16; 48:6; 49:21; 50:7, 9
14th 34:17
153 76:17
160 76:17
17315 4:18
18 73:24; 76:3
18th 73:3; 75:4; 78:2; 81:16; 82:4, 24; 83:12, 23; 97:8; 105:9
18thk 76:18
19 70:19, 22; 104:1
1991 5:20, 24
1:50 121:16

**2**

2 53:23; 62:1
20 71:19, 22, 25; 73:11; 75:17
2003 9:18; 10:2, 22
2004 13:4; 14:24; 20:1, 2, 5; 28:23; 29:2, 7, 14; 35:21; 37:7; 39:2, 15; 43:3; 50:23; 51:3; 53:23; 54:16; 56:1; 57:10; 63:2; 64:23; 65:4, 7; 71:2; 73:4; 80:2, 10; 81:4; 90:13; 97:6; 100:24; 104:1; 107:4; 110:7
2005 13:6; 16:2
20th 100:24; 107:4, 13
21 72:24
22 72:23; 73:23; 75:7
220 52:17
230 45:15; 46:10, 23; 49:4
232 47:18; 48:2, 14
237 48:20
24 77:10
240 47:18, 23; 48:14
243 46:10, 23; 48:20
244 46:11
25 77:10
251 45:16; 46:11

27 70:20; 71:19; 74:18; 110:6
28 46:10; 105:7
29 100:10, 11
2nd 62:4; 64:14; 66:4; 69:16

**3**

3 106:1
30 106:18
31 110:2
346 100:21
3750 4:18
3rd 106:10

**4**

4 38:21; 106:2
4/4 66:16
43 22:2

**5**

5 70:18; 106:1
50 68:23

**6**

60 68:23

**7**

7 31:17; 34:1, 13; 35:2; 42:23; 43:3; 44:13
7th 30:21; 34:15

**9**

9 39:15
9:11 100:24
9th 39:2

**A**

a.m 100:24
able 9:5; 37:9, 15, 24
absent 19:8
abstract 109:21; 110:25; 111:1
accept 92:21; 93:3, 12
acceptable 41:12
access 102:2, 9
accomplish 113:21; 114:23
accuracy 35:9
accurate 38:3; 63:21
accurately 39:19
acquire 68:3; 87:13

acquired 68:11
across 99:21; 111:20
act 80:8
acted 80:8, 8; 120:14
activity 29:2
actually 71:14
add 76:13
added 74:9, 10, 14
adding 48:18
addition 30:3; 95:2
additional 48:2, 15
address 4:17, 21; 13:24; 101:2, 18, 20; 102:1, 7
addresses 103:7
administration 26:1; 62:23; 64:20; 65:3, 10; 74:17; 87:12; 91:7, 8
Admire 4:18
admit 85:20
adopt 106:12
adopted 95:18; 98:13; 105:20
adoption 98:5
advance 20:6, 8, 9
affects 11:14
afraid 61:8; 63:6, 7
again 13:11; 23:13; 24:22; 25:7; 27:17; 63:14; 67:12; 73:11; 75:7; 76:16; 80:7; 82:19; 96:22; 98:19; 105:8; 108:24; 109:20
against 59:18; 67:15, 16; 77:16; 91:18, 19; 97:12; 115:5
agency 8:11
agenda 12:15, 22; 20:5, 6, 11; 23:2, 4, 17, 25; 24:3, 5, 6; 45:19, 21, 21; 46:11; 48:6; 49:8; 53:14; 55:9, 14, 17, 20, 21, 25; 57:23, 25; 58:11; 71:11
agendas 47:15
ago 50:11; 77:2; 94:16; 109:11
agree 88:2; 94:1; 108:10, 22; 115:13, 19
agreed 104:4
agreement 3:20
ahead 62:21; 112:19
aide 8:24
Alan 57:1, 2; 86:13, 15; 88:8, 15; 90:4, 10; 96:6
Alan's 68:25
allegation 33:5, 9, 12
almost 94:9
alternative 118:22, 25
although 76:19
always 89:25
amended 75:23
amendment 73:8; 74:8; 114:5
among 34:12
answered 4:10; 60:21

anticipation 22:6; 27:5, 10; 36:9
anymore 69:20
anyplace 64:8
aol.com 101:2
apart 34:18; 116:11; 117:9
apes 41:23
apparently 107:3
appear 46:11, 20; 47:22; 49:17; 52:23; 54:2; 76:17; 111:18
appeared 39:14; 107:9; 110:14; 111:16
appears 36:22; 39:12; 42:3; 52:21; 77:2, 7, 16; 110:7; 112:5
apply 84:11; 115:10
appointed 9:19; 10:21; 16:13, 16
appointment 16:17; 18:2, 3
approach 96:20
appropriate 93:23
approval 67:15; 69:9, 13; 77:3; 119:14; 120:16
approve 77:25; 80:25; 83:25; 84:7, 23; 120:14, 22, 25; 121:3
approved 59:22; 60:2, 5, 6, 13, 17, 18; 95:6; 96:15; 119:11; 120:19
approving 69:16
area 6:9; 7:13; 46:4; 70:23; 101:12; 119:7
argue 32:13
around 28:8; 52:15; 57:12; 71:8; 75:6; 114:4
arrangement 104:20
arrive 73:9
arrived 20:7
article 36:22; 39:13, 15; 40:6; 44:6, 21; 99:7, 10, 21; 103:24
articles 21:8, 11; 35:4; 36:14; 37:1; 38:22, 23; 91:12
aside 23:6
aspect 11:25
assignments 15:21; 16:21, 21
Assistant 21:6; 71:1
associate 81:24; 109:8
associated 17:6; 81:7; 109:17, 24
assume 58:20; 61:14; 70:9; 75:24; 97:7; 98:6; 115:24; 118:3
assumed 86:13; 118:11
assuming 117:21
assumption 120:25
attach 108:17
attached 94:17
attacked 115:5

attacking 113:3
attempt 103:3
attend 5:2, 5, 21; 6:1; 47:2; 50:17
attended 5:23; 28:25; 89:2
attending 53:23
attends 40:2
attention 76:17; 99:14
attorney 3:19; 27:13; 38:24
attorneys 3:12; 22:14; 26:15, 19
August 19:24, 25; 38:8, 9, 9, 11; 50:24; 52:3, 22; 53:23; 54:16; 56:1, 4; 57:12; 62:1, 4; 64:13; 65:1, 25; 66:4; 68:17; 69:7, 11, 16; 70:2; 96:16
author 39:18
authors 41:9
available 53:1; 64:12
avoid 28:8
aware 29:2; 34:9; 55:16; 70:5; 72:9; 74:2, 21; 77:4; 82:12, 15, 18, 21, 23; 108:17; 109:19; 118:18
away 25:17
awkward 60:7

**B**

B-o-n-s-e-l-l 57:4
back 22:5; 27:3; 49:3; 50:23; 57:20; 59:11; 63:4; 65:18; 67:2; 70:19; 72:24; 73:11, 15; 75:7; 78:12; 80:6, 7; 83:20; 84:8; 86:7; 90:12; 93:2; 94:22; 104:22; 105:8; 113:8
background 5:15; 27:22; 48:3; 88:20, 21
Baksa 70:24, 25; 71:7; 73:3; 94:17
balance 31:7; 33:7, 16; 42:4, 10; 44:7; 56:11; 82:17; 114:11, 12
balanced 30:2, 4; 32:6, 8; 41:20; 57:15; 86:9; 96:20; 114:11
Barry 40:7, 20
based 80:8; 102:7
basic 3:22
basically 15:13
basis 19:16
basket 25:19
Bates 45:15; 51:19; 52:9, 17, 18; 54:23; 70:19, 22; 77:10; 100:21; 105:3; 106:21
beat 65:19
became 26:2; 69:17
become 6:13; 17:18, 24; 34:9; 70:5; 86:21

Filus & McLucas Reporting Service, Inc.    Min-U-Script®

(1)  03 - become

Heather Geesey
March 10, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

bed 23:6
beginning 28:19; 59:12;
102:17; 120:21
behalf 22:13
behave 113:17
behind 23:25
belief 109:8; 117:5
beliefs 113:16
believes 88:8
belong 9:7
belongs 15:7
Bert 61:14; 63:2; 65:22;
67:22; 87:24; 88:16; 92:9
besides 14:21; 15:21;
18:10; 36:4; 90:10
best 4:7; 28:6; 42:9; 111:3
Beth 118:4, 19
better 13:22; 14:4; 16:25;
20:23; 24:3; 66:9
Biblical 33:7
biggest 25:18
Bill 29:20, 21; 34:25;
40:21; 55:8; 56:10; 57:1;
59:10; 88:8, 16; 90:11;
96:6; 113:3
biology 29:3, 8, 15, 24;
30:17; 39:16; 40:7, 14, 21,
22, 25; 43:11; 45:2; 48:22;
49:1; 50:3, 4, 20, 25; 51:6,
10; 55:1; 57:22; 58:19, 25;
59:19; 60:12, 16; 61:6, 12,
13, 22, 23; 69:9, 13; 71:3;
92:8; 94:4, 11; 96:14, 19;
113:22; 119:25
birthday 8:24
bit 4:19; 12:9; 22:5; 27:22;
58:21; 65:20
blank 85:6
Board 9:17, 19, 19, 24;
10:2, 11, 15, 25; 11:8, 15,
19; 12:4, 5; 13:9, 14;
14:21; 15:16; 16:20;
17:14, 25; 18:3, 22, 24, 24;
19:11, 14; 20:5, 25; 24:21,
24; 25:5, 12, 21; 26:2, 8;
29:7; 33:6; 34:7, 12, 22,
24; 35:8, 20, 25; 36:4;
37:10, 25; 39:16; 40:2, 6;
42:11, 21, 23, 25; 43:3;
45:3; 47:5, 16; 48:12, 16;
50:17; 51:4; 53:23; 54:6;
56:7, 14, 16, 20; 57:6, 9;
70:24; 71:9, 14; 72:15;
73:8; 77:21; 78:15, 16, 19;
87:17; 91:7; 92:17, 18;
97:3, 4, 8; 98:9, 12;
101:12; 102:8; 104:4;
106:13; 107:15, 22;
112:12, 14; 119:12, 19, 21,
23; 120:14, 16, 18
Board's 12:15; 34:2;
53:1, 2; 98:16
Board/Administration
48:14
Board/Administration
48:10; 49:8
Bonsell 43:25; 57:2;

69:1; 86:15, 25; 88:15;
89:20; 90:10, 14; 91:10;
93:9, 12; 96:4, 23; 112:15
book 25:22, 23; 29:15;
30:1, 3; 31:19; 33:6; 39:17;
40:13, 21, 22, 24; 41:2, 8,
12, 23; 42:4, 10, 12; 50:4;
51:10, 11; 55:1, 5, 8, 9, 10,
17, 24; 56:3, 6, 10, 11, 19;
57:8, 18; 58:11, 19; 59:10,
19, 22; 60:18; 63:19, 21,
22, 23, 25; 64:2, 17; 65:3;
66:4, 8, 10; 67:5, 8, 9;
68:3, 20; 69:9, 12, 16;
70:1, 3; 73:21; 76:15;
80:25; 81:1; 96:11; 104:4,
23; 105:11, 17; 113:22
books 25:24, 25; 26:2;
40:8; 68:23; 69:8; 87:6;
91:11
borrow 76:15
both 47:12; 70:13
bottom 49:6; 71:3; 72:4,
8; 74:1; 75:11
bought 68:7; 69:21
box 25:19; 85:22
boys 102:16
break 51:21
brief 6:10
briefly 6:5
briefs 22:17
bring 15:15; 24:9, 16;
25:12; 56:12, 14; 60:10;
99:14
brought 25:16; 40:21;
56:10
Brown 67:9; 97:18
Buckingham 29:21;
30:20; 33:6, 10, 17; 35:1,
5; 40:12, 22; 41:8, 25;
42:11; 44:7, 12, 22; 50:10;
55:12; 57:24; 58:13;
59:23; 66:11; 77:2; 87:2;
88:16; 89:20; 90:15;
91:10; 93:9, 12; 96:4, 23;
107:14; 112:15
Buckingham's 41:11;
43:11; 57:14; 58:5; 67:21
budget 23:23
building 45:1; 65:12
business 6:25; 7:8; 11:8,
15, 19

# C

call 20:23; 54:7
Callahan 40:7, 20
called 3:7; 7:24; 26:24;
28:13; 40:14, 22, 25;
51:10; 56:3; 57:8; 69:12;
85:22; 119:25
came 23:18; 57:22;
73:19, 23; 75:16, 23;
78:12; 80:14, 19; 81:12,
13, 20; 84:8; 86:7; 99:21;
114:1

can 3:24; 4:4, 9, 9; 7:21;
8:2, 10; 12:9; 20:24; 23:14;
24:6; 30:9, 12; 38:5; 39:21;
45:24; 46:2, 19; 48:6, 9;
52:23; 56:10; 57:21; 58:1,
4; 62:11; 63:11; 79:20;
82:16, 19; 83:1, 4, 9, 11;
89:6; 92:11; 93:7; 94:22;
101:17; 102:2, 10, 18;
104:22; 108:14; 116:7, 12,
13; 117:5, 8, 9, 11, 17, 21;
120:20
candidates 10:3; 31:20;
114:18
capacity 120:3
Carol 97:18
case 3:14, 14; 18:21;
22:17, 25; 26:15; 27:25;
38:21; 45:15; 52:19;
58:14; 75:25; 93:25
Casey 65:19
category 115:18
caused 66:3, 12
center 49:16
certain 81:8
certification 3:3
chair 12:25, 25; 13:2;
16:8; 29:19
chance 28:15; 52:5; 59:7;
86:5; 104:19, 21
change 13:20; 14:2; 46:7,
8; 70:6; 76:13; 77:19; 81:2;
82:7; 95:25; 97:11; 98:14,
22
changes 14:14; 104:5
chapter 109:9
check 41:4; 77:9
checking 101:4
children 4:24, 25; 68:5
children's 103:17
choice 21:22
choose 113:22
choosing 62:14
Christian 5:20; 6:1; 44:8;
88:20, 21, 23; 113:16
Christianity 33:18;
116:8, 14; 117:6, 12
circumstance 115:9, 16,
23
clarifying 26:25; 27:17
class 82:23
classroom 82:20
clear 3:24; 4:7; 13:3;
41:7; 50:14; 62:24;
110:12, 15
clearer 14:6, 8
clip 111:25
clippings 99:18
clips 21:8
close 104:3, 5
codes 11:9, 10
college 100:7
column 72:5, 8; 74:1, 20;
75:11

comfort 95:24
comfortable 28:20
coming 27:23; 62:19
comment 43:10; 58:5
comments 12:20; 30:21;
33:3; 41:12; 58:2
committee 10:21, 24;
11:23; 12:6, 24; 14:15, 22;
15:2, 9, 12, 21, 22, 24;
16:4, 8, 11, 13, 14, 16, 17,
21, 23; 17:1, 3, 5, 8, 11, 12;
28:24, 25; 29:19; 31:22;
34:4; 40:13; 41:13; 42:11;
51:2; 59:1, 6, 13; 62:25;
66:12; 73:19; 75:24;
78:11, 14; 84:8, 14; 86:7,
11, 20; 93:16, 20; 94:3;
96:2, 3; 114:1, 9, 22, 23;
119:21, 23; 120:2, 7, 10
committee's 11:17
committees 10:14, 19;
14:21
communication 78:15
compare 77:1
compensated 9:11
complained 36:24
Complaint 22:10; 27:6;
33:5
complete 5:17; 112:6
complies 47:19; 48:21;
72:25; 75:18; 76:23;
104:25; 106:3; 113:1
composing 13:13
computer 102:1, 5;
103:4; 112:21, 23
concern 87:19
concerned 69:18
concluded 121:16
conduct 11:9, 22; 12:1
conducts 11:8, 15, 19
confer 107:21
conferring 107:24
confidence 105:23
confuse 20:1; 85:25
confused 85:4; 93:2;
102:3
confusing 102:3
Congratulations 10:1
connected 69:8, 12
connecting 63:20
connection 56:7; 79:1;
89:9
consider 32:19; 107:24
consideration 31:5;
34:2; 40:14, 23, 24; 41:3,
8; 51:11; 70:1, 5
considering 20:13;
30:16; 32:18; 114:24
consist 46:10
consistent 33:9; 40:9,
15; 41:11; 46:21
consists 45:14; 85:3
content 83:9, 16; 85:13;
94:1

contents 96:11, 14
contents/concep-
ts/process 72:5
contested 18:12
context 56:15; 63:5; 80:6
continue 31:18
contract 8:3; 12:2
conversation 58:8;
104:10
conveyed 41:17
copies 21:11; 25:11, 13;
28:4; 38:22; 45:14, 19;
53:14; 68:3, 20; 98:9;
101:5; 112:10
copy 39:13; 48:10, 13,
13, 16, 17; 64:11; 65:12;
68:7, 11; 72:18; 91:8;
100:23; 111:14
corner 49:6
corrected 54:9
correctly 74:5; 109:14
correspondence 22:21
counsel 28:17; 101:5;
103:9, 10
country 33:17; 113:16
County 8:12
couple 8:23; 22:8; 27:6;
46:17; 80:11
coupons 21:23
court 8:2
covering 8:12; 83:2
creation 33:8; 116:15,
19; 117:6, 15, 18
Creationism 39:18;
42:12, 16, 21, 23, 25; 43:6,
8; 44:2, 8; 88:7; 108:8, 9,
13, 18, 22; 109:1, 7, 13,
16, 24; 116:7, 13; 117:5,
11, 17, 22; 118:22, 25
credibility 94:6
criticisms 84:11
cross 50:11
CSY 6:11
current 13:6, 9, 13
Curriculum 16:3, 4, 6,
10, 16, 23; 17:5, 11; 28:24,
25; 29:19; 32:6; 40:13;
41:13; 48:22; 54:25;
56:11; 57:23; 59:1; 62:25;
63:9; 66:11; 70:6; 71:3;
73:19; 75:15, 23, 24;
76:13, 22; 77:3, 19, 21;
78:11, 14; 81:2; 82:5, 7;
83:24; 84:8, 14; 86:3, 7,
11, 20; 87:4, 21; 91:18;
92:18; 93:16, 20, 21; 94:1,
3, 14, 16; 95:6, 18, 21;
96:2, 3; 97:11, 16; 98:5,
14, 22; 104:5; 105:11, 20;
114:1, 5, 9, 11, 22; 119:25;
120:2
cycle 60:9, 14

bed - cycle   (2)

Min-U-Script®   Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Heather Geesey
March 10, 2005

# D

dad 68:25
daily 21:20; 39:2, 14;
102:15; 103:25; 110:6;
111:20
Darwin 30:8
Darwin's 30:8, 13, 17;
33:8; 72:9; 74:3, 22; 77:5;
78:6; 83:18; 114:12
Darwinian 95:19; 118:22
Darwinism 31:5, 7
Data 7:9, 10
date 71:2; 96:10
dated 73:3; 100:23
dates 37:5
David 69:3
day 19:17; 53:21; 73:9;
107:9
days 104:17, 18
dead 65:19
dealt 12:4
death 65:19
Debating 39:16
December 9:18; 10:12,
13, 21; 17:19; 92:16
decide 86:1
decisions 34:6
declined 18:16
Default 18:1, 4
defendant 3:15
defendants 28:1; 45:15;
100:21; 101:5
defer 93:18; 94:2
definition 84:19; 115:8
delivered 20:15, 17;
53:22
Department 7:22, 23;
8:9; 61:23; 92:8
depends 79:25; 118:6
deposition 3:12, 19;
22:6; 27:5, 11; 36:9;
100:11; 110:2; 121:16
descended 41:23
describe 19:5
described 20:3; 30:24;
35:4; 66:10; 104:9; 112:6
describing 79:15;
114:22
description 22:23; 85:12
design 49:18, 22; 51:12;
74:24; 77:6; 78:3, 5, 16,
18; 79:5, 15, 19, 20; 80:2,
11, 20, 22; 81:5, 14, 19,
20, 24; 82:5, 8, 25; 83:5, 8,
11, 16; 84:2, 3, 13, 18;
85:3, 6, 23; 86:2, 12, 22;
87:4, 14, 17, 20; 88:12, 17,
22; 89:2, 3, 8, 15, 17, 23;
90:3, 7, 14, 20; 91:11, 17;
92:22; 93:4; 94:19; 95:7,
16; 97:16; 98:5; 115:11,
13, 15, 22; 116:1, 5

desk 24:11
destroyed 26:9
died 50:11
differ 78:8; 83:19
difference 82:14, 19;
119:2
different 11:5; 12:13;
14:1, 4; 26:7; 35:17; 37:19,
21; 48:7; 52:22, 24; 59:19;
89:12; 93:11; 94:15;
102:1; 108:23; 109:12;
116:15, 15, 18; 117:4, 7
differently 109:7; 113:17
differs 78:6, 10, 13; 83:17
direct 76:16
Directors 70:24; 101:13
disagree 88:2, 3
disapproved 67:4
discarded 26:10
discuss 56:19
discussed 70:12; 98:16
discussing 13:20; 97:9
discussion 29:6, 7, 13;
33:3; 34:12; 35:8; 48:25;
49:20, 25; 50:2, 19; 51:6,
15; 55:5; 57:8; 65:18;
66:17, 18, 19; 68:1; 69:7,
11, 23; 91:2; 97:14; 98:11,
20, 24; 100:4, 8; 114:4;
120:18
discussions 51:4
District 3:14; 5:3, 6; 9:10;
12:1; 13:18; 15:7, 10, 14;
16:20; 17:6, 14; 20:16, 22;
21:8, 9, 12; 24:15; 25:21;
26:9; 35:20; 46:4; 51:5;
53:12; 61:20, 21; 68:3, 11,
19; 70:23; 87:12; 98:13,
18; 99:18; 101:12; 103:16;
105:19; 106:9; 107:22;
119:8; 121:5, 9, 10, 10
District's 93:14; 98:17,
21, 25; 102:10, 20; 105:24;
120:9
diversionary 8:5
document 22:22; 28:14,
18; 45:9; 51:17; 52:13, 20;
53:8; 100:13, 17; 106:21;
110:4, 25; 119:7, 9, 11, 17;
120:1, 3, 11, 13, 19; 121:5,
11
documents 22:6, 16, 20;
23:3, 4, 18; 24:9, 15;
25:12; 26:8, 16, 19; 27:4,
10, 13, 20, 25; 28:1, 2, 4, 5,
12; 45:14, 18; 46:3, 5, 18;
52:23; 72:19; 101:4
Donald 69:4
donation 68:23, 24; 69:5,
8, 12
done 8:18, 21; 9:10;
36:20; 70:3; 86:21; 87:13;
102:13, 15
double 26:24
Dover 3:14; 4:18; 5:2, 5;
9:16, 17; 15:6; 16:19;

17:14, 24; 18:21; 20:22;
25:21; 29:4, 8; 35:20;
39:16; 46:4; 50:5; 70:23;
101:12; 104:16; 107:22;
119:7
down 6:9; 14:20; 39:19;
41:21; 43:17; 47:2; 54:11;
85:5; 111:9
Dr 13:17; 14:13; 58:7, 14;
69:23; 103:5; 112:12;
120:17
draft 13:15; 14:10; 95:6;
120:11, 13
drafting 13:8, 12
drawer 25:19
drawn 77:12
dress 11:9
driven 82:16
duly 3:7
duplicating 28:8
duration 5:24
during 12:13; 24:24;
29:7; 51:3, 9; 57:9; 63:2;
67:25; 97:8
Dyncorp 7:7, 10

# E

e-mail 100:23, 25; 101:2,
6, 11, 18, 20; 102:9, 20,
21; 103:7, 14; 104:7, 11;
112:17, 18, 20
e-mails 22:21; 101:24;
102:11; 103:1, 3
earlier 14:9; 30:24; 65:25;
89:7; 94:9, 25; 108:12
easily 102:3
easy 103:23
Ed 15:3
editor 110:11; 111:1, 4
editorial 110:16
education 42:5
educational 5:15, 23
effect 31:12
effort 57:17
eight 5:1, 8; 48:16
either 8:8; 37:25; 51:10;
78:14; 101:10, 22; 120:17
elected 9:19, 20; 10:7, 9,
16; 18:5, 24
election 9:21, 23; 10:1;
18:2, 12, 16
electronic 107:2; 110:5,
13
electronically 39:13;
112:22
eleven 104:24
else 18:10; 27:15; 28:9;
30:15; 34:25; 44:23;
54:10; 58:4; 62:13; 64:8;
72:17; 81:18; 86:20;
88:19; 96:8; 112:10
else's 44:16
emphasize 28:18

employe 11:14; 51:5
employed 6:14; 21:7;
61:19
employes 12:1, 1
employment 11:10
enclosure 71:3, 10; 73:6;
77:7
end 12:15; 28:19; 44:6;
60:13; 97:18; 113:23;
120:21
enough 50:14; 89:8
entire 36:22
entirely 46:21; 84:14;
88:15; 96:22
entry 7:9, 10; 72:4, 8;
74:1
Eric 46:1
especially 103:17
Eveland 118:5, 19
even 11:15; 114:6
event 98:18, 21; 103:21
eventually 60:2, 6
everybody 59:13; 77:20
everyone 35:16
evolution 30:8, 8, 13, 18;
32:9; 33:8; 41:14; 42:13;
44:1, 9; 57:15; 72:10;
73:18; 74:3, 23; 77:5; 78:7;
82:25; 83:8; 84:1; 89:25;
95:20; 96:20; 114:12;
118:23; 119:2
evolving 79:17
Ex-Board 105:16
exact 14:3; 41:16
exactly 94:9
examined 3:8
example 11:2; 24:3;
48:12; 94:15; 102:18;
110:21
examples 8:23; 11:10;
22:8; 27:6; 85:24
except 3:4; 106:21
exchange 102:10
exhibit 28:13; 38:21;
39:10; 45:11; 46:8, 10;
52:6, 16; 70:18; 100:10,
11; 104:23; 106:1, 18;
110:2; 119:5
exhibits 27:21
existed 13:21
expensive 66:7, 8
experiences 6:16
explain 3:20; 32:18; 48:9,
16; 52:23; 83:11; 86:6
explained 28:6; 58:7, 15;
80:14; 81:12; 92:7; 110:22
explaining 97:23; 114:3
explanation 17:2
explore 46:19
express 87:19
expressed 58:13
expression 94:7
extended 7:18; 8:19

# F

facetious 116:25
facility 102:20
fact 28:2; 113:14, 15;
115:20
factual 116:2
faculty 99:3; 103:20;
104:3
fair 25:4; 35:18; 38:3;
59:17, 24
faith 88:8
fallacies 34:16
falls 115:18
familiar 86:21; 109:17;
114:24
familiarity 81:5; 118:11
family 6:9
far 44:23; 56:17; 80:11;
112:5, 8; 114:18; 117:13
fashion 13:13; 28:10
fat 104:23
favor 97:11, 13
fear 65:24; 67:22
February 14:17
feel 114:21
felt 62:14
few 4:15, 16; 5:14; 19:11;
27:20; 45:23, 25; 77:1;
106:17
field 15:23
file 25:18, 18, 19
filed 22:10, 13, 17
filing 3:3
fill 12:10; 19:7; 85:6
financially 23:24
find 38:17, 19; 39:21;
45:23; 57:17
fine 77:11; 106:24
finish 37:17; 79:9
finished 52:5
finishes 4:3
fired 99:5; 103:20; 104:3
first 6:17; 8:1; 9:17, 23;
13:2, 3, 15; 14:10; 16:13;
19:17, 19; 29:6, 10, 18;
30:24; 46:22; 47:10; 49:3;
66:7; 69:3; 70:12, 15;
75:15; 79:1; 83:20; 109:9;
113:20; 117:23
Five 4:22; 5:1, 12; 67:14;
104:23, 25
fix 4:9
flow 90:22
follow 80:12; 88:25
follow-up 91:5
followed 66:17, 18; 68:1
following 10:12; 18:22;
71:18, 19
follows 3:8
form 3:4; 4:4; 54:2;
121:11

Case 4:04-cv-02688-JEJ   Document 216-2   Filed 09/28/05   Page 38 of 42

Heather Geesey                                                    Tammy Kitzmiller, et al.   v.
March 10, 2005                                              Dover Area School District, et al.

formal 28:11
format 52:22; 53:11
formats 48:7
former 43:18
formulating 93:21
Foto 6:24
found 31:19; 37:18;
  76:24
founded 33:18; 113:16
four 8:8; 96:7; 111:9
four-four 67:4
fourth 47:24
Fox 22:2
front 47:15, 20; 49:4;
  54:2; 70:18; 104:23; 105:3
fumble 28:7
further 69:25
future 39:12, 21

## G

gaps 72:9; 74:2; 95:19,
  21; 96:1
gaps/problems 74:22;
  77:4
gave 14:13, 15; 24:15;
  26:2; 27:5; 59:9; 86:8
GEESEY 3:7, 11; 51:17;
  80:1; 104:4; 119:5
general 22:23; 48:11;
  58:5, 21; 85:12
generated 39:13
Genesis 43:7; 81:25;
  88:7; 108:13; 109:9
geography 6:6
GILLEN 26:25; 27:17;
  39:2, 5; 46:1, 14; 51:21;
  52:9; 71:23; 77:11, 13;
  90:22; 103:11; 106:24;
  121:14
given 16:21; 17:1; 28:12,
  13; 65:6; 68:8, 19
gives 42:4
goes 40:12
governing 15:19
grade 29:4, 8, 24; 47:24;
  48:23; 49:1; 50:4, 20; 51:7;
  55:1; 70:6
graded 79:14
graduated 6:13
graduation 5:21
ground 3:20, 22; 83:2
grounds 94:2
group 10:2; 72:19
guess 79:25; 80:9; 84:20;
  86:1; 91:5; 92:16; 95:24

## H

habits 24:8
HADLEY96 101:2
half 7:13

handed 14:13
hands 73:9
handwriting 45:22;
  46:23, 24; 49:11, 12, 14;
  71:20; 100:17
Hang 105:2
happen 38:6; 79:17, 18
happened 38:6; 40:10;
  43:15, 20, 21, 22; 45:7;
  54:20; 58:13, 15; 59:17;
  65:21; 67:3, 11; 68:17;
  76:4, 11; 113:14, 14
happens 24:20; 28:3
happy 59:13; 77:20
head 25:9; 38:7; 61:23;
  76:10; 83:20, 22; 117:1
headed 75:11
heading 11:16; 48:3;
  54:25; 70:23; 76:22
headline 39:15
hear 44:10; 56:9; 78:20;
  90:2, 10; 92:1, 5
heard 21:6; 29:17; 42:18;
  56:3, 5, 6; 78:18; 79:1;
  83:20; 90:9
hearing 42:15; 44:16
HEATHER 3:7; 80:1;
  104:4
held 10:7
help 11:1
hereby 3:2
hesitation 64:25; 66:12
high 5:17, 19, 21; 6:1, 13,
  16; 29:4, 8; 48:23; 49:1;
  50:5, 21
higher 117:21, 25; 118:3,
  5, 11, 12
history 113:2, 11, 12, 13,
  18
hold 15:13
holiday 19:19
home 4:17; 24:17; 25:17,
  20; 99:16; 101:2, 18, 24;
  102:1, 5; 103:11; 112:21, 23
homeroom 8:24
horse 65:19
husband 4:24

## I

ID 91:4
idea 21:4
ideal 115:8, 16, 23
ideas 81:8
identical 47:22
identification 46:8
important 34:2
impression 45:17, 18
inaccuracies 35:13;
  37:18
inaccuracy 35:9; 36:25;
  38:17, 19
inaccurate 35:15; 37:10;

58:3
inaccurately 35:6
include 20:19; 22:20;
  45:22; 82:4, 8; 83:12; 87:3
included 77:3; 94:19, 21;
  95:7
includes 22:17; 110:15
including 27:6; 71:19;
  74:23; 77:6; 87:20; 91:17
inconsistent 95:13, 17
incorrect 32:10; 34:16,
  20
independent 90:18
indicate 87:2
indicating 103:10
individual 112:14
inexcusable 41:22
inform 51:9; 121:4
information 15:15;
  29:17; 47:23; 48:2, 3, 11,
  15; 77:22; 84:9; 87:10, 13,
  16
informational 15:17
initial 68:1
initially 67:4
inserted 75:22
insisted 99:4
instance 11:21; 24:5;
  47:23; 81:19
Instead 8:1; 10:12; 93:13
instructions 46:7
intelligent 49:17, 22;
  51:12; 74:23; 77:6; 78:3, 5,
  16, 18; 79:4, 15; 80:2, 10;
  81:5, 18; 82:5, 8, 25; 83:5,
  7, 11, 16; 84:2, 3, 13, 17;
  85:2, 6, 22; 86:2, 11, 21;
  87:4, 14, 17, 20; 88:12, 17,
  22; 89:2, 3, 8, 15, 17, 23;
  90:3, 7, 14, 19; 91:11, 17;
  92:22; 93:4; 94:19; 95:7,
  15; 97:15; 98:5; 115:11,
  13, 15, 22, 25; 116:5
intent 118:4
inter 8:10
interesting 16:24
Intermediate 9:16; 15:5,
  6, 10; 104:16
interrupt 90:22
interrupted 16:5; 62:21
interviewed 44:18
into 32:4; 71:10; 115:18
introduction 17:7
introductory 120:7
invited 68:12
involve 88:12; 89:4
involved 8:7, 25; 13:8,
  12; 78:16; 88:17; 90:19
involvement 65:23
involves 12:10
involving 29:3; 44:7;
  49:21; 61:1
issuance 119:11
issue 12:2; 34:2; 50:3;

58:3
57:22; 61:1; 66:5, 12;
  67:21; 85:25; 93:15
issued 120:1, 4, 8
issues 59:5, 9, 15, 24;
  60:23, 24; 61:3; 66:3;
  67:19; 69:17; 92:18
items 12:22; 101:10

## J

Jacob 5:13
job 6:17; 93:16, 17
jobs 7:4, 14
Joe 41:5; 100:3
join 9:17
joined 17:1, 5, 12
Joseph 39:18; 103:24
Joshua 5:11
journalist 40:2, 4
journals 86:18
July 19:24, 25; 46:11, 12;
  50:17; 56:18
jump 22:5; 75:6
jumps 75:7
June 19:24; 29:2, 6, 13;
  30:21, 24; 31:17; 34:1, 13,
  15, 17; 35:2, 2, 10; 37:10,
  17, 25; 39:2, 15; 42:16, 23;
  43:3; 44:13; 45:3, 19;
  46:12; 47:2, 16; 48:9;
  49:21; 50:7, 9; 56:18;
  107:3, 13, 15; 110:6;
  114:6, 8
Justin 5:11
juveniles 8:5

## K

keep 24:7; 25:9; 85:18
kept 88:8; 116:10
kids 23:6, 8; 51:22; 67:9;
  80:4; 100:6
kind 5:23; 7:8, 19; 8:5;
  10:24; 11:2; 12:6; 15:9;
  17:6; 20:12; 24:25; 27:10;
  81:13
Kinder 6:24
Kitzmiller 3:14
knew 31:10; 32:3, 5; 34:3;
  62:20; 80:9, 9; 86:1, 2;
  90:13; 91:22; 114:18
knotting 26:24
knowing 25:9; 60:1
knowledge 16:19; 74:7,
  8; 75:21; 78:25; 88:11;
  90:19; 93:19; 109:3, 20;
  111:3

## L

laced 31:5
lack 20:23
language 41:22; 74:21

Larry 105:10, 13
last 13:7; 14:23; 15:25;
  108:4; 116:7; 119:5
later 69:24
laundry 23:12; 25:2
law 11:19; 25:23
lawsuit 3:13, 15; 98:18,
  22; 103:21
lawyers 66:24; 105:24
lay 94:2
Leader 104:2
leads 90:2
learn 35:5; 80:5; 86:11;
  92:13; 99:10
learned 86:13; 90:14;
  91:4
least 60:25; 94:23; 99:19
leave 20:24; 24:13; 97:4;
  111:12; 121:15
leaving 24:14
left 45:1; 112:3
legal 99:4
letter 97:24; 98:2, 7;
  107:2, 5, 13, 20, 21; 108:1;
  110:5, 7, 15; 111:2, 4, 8, 9,
  12; 112:6, 7, 9, 17, 21;
  113:25; 114:19, 21; 115:1,
  4, 23; 118:10, 17, 21
Levine 40:14, 23; 51:11;
  58:19; 96:15, 19; 114:7
liaison 15:9, 12, 22
library 8:24
life 42:19; 74:4, 11; 94:21;
  95:2
liked 77:19
likely 105:19, 22
limit 12:20
limited 37:13; 74:23; 77:6
Lincoln 15:5
line 27:2
listed 54:8
listening 88:10
litigation 22:11; 26:17;
  27:24; 28:3; 67:23
little 4:19; 11:6; 12:9;
  22:5; 27:22; 37:6; 58:21;
  65:20; 83:18; 94:9, 16
LIU 14:25; 15:4, 22
live 80:17
lived 4:21
lives 4:23
local 21:8, 14, 16; 22:1, 3;
  37:12; 39:14
located 6:25
location 74:20
long 4:21; 7:2, 12; 8:7;
  19:1; 20:9; 48:16; 89:13;
  97:24
longer 48:19
look 14:15; 27:9; 28:15;
  35:4; 36:17; 41:21; 43:17;
  45:13, 24; 47:18, 23;
  48:20; 52:6; 54:10; 71:22,
  25; 72:4; 74:18; 75:15, 17;

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Heather Geesey
March 10, 2005

76:2; 94:22; 105:2; 106:1;
107:1; 108:4; 112:25
**looked** 14:14; 22:24;
28:9; 35:19, 23; 36:3; 77:1;
94:15; 96:11, 14; 106:22
**looking** 28:23; 30:1;
31:18; 33:6; 36:14; 39:22;
42:12; 52:21; 72:20;
102:19
**lot** 90:24; 105:23
**lunch** 90:24

## M

**mail** 53:21; 112:17
**mailbox** 20:23; 21:5
**mailed** 20:15; 53:20
**mailings** 121:10
**making** 42:3; 43:10;
50:12; 94:14; 97:23; 99:3;
113:13
**Maldonado** 39:18, 24;
44:19, 22; 100:3; 103:25;
104:9
**man** 41:23
**many** 4:15; 17:22; 28:4;
59:15; 85:21
**March** 47:8, 10, 10; 96:10
**mark** 24:14; 52:15;
106:23
**marked** 27:21; 28:10;
38:21; 45:10, 11; 51:18;
100:10, 11; 104:7; 106:18,
20; 110:2, 4; 119:6
**marking** 6:11; 100:20
**material** 110:16
**materials** 17:10; 20:11,
12, 18; 21:12; 25:16, 20;
75:12; 77:1; 78:19; 87:6
**matter** 69:20; 93:20, 25;
94:2; 108:5
**matters** 12:3
**Max** 43:18
**may** 12:9; 45:22, 22;
46:19; 53:20; 60:20;
106:22; 109:12
**Maybe** 12:9; 14:1; 82:19
**mean** 13:3, 6; 14:2, 6;
15:23; 18:4, 7; 21:4; 24:4;
25:18; 41:5; 43:2; 57:2;
61:19; 62:16, 24; 64:6, 25;
71:17; 77:20; 78:3; 80:2;
82:22; 83:10; 85:13;
86:15; 94:10; 96:3;
110:10; 113:2, 7, 10, 12,
15, 15; 116:8; 117:20, 22,
25; 118:5, 8
**meaning** 34:17; 41:17;
43:6
**meanings** 108:17, 19, 20
**means** 4:2; 42:23; 43:8;
52:17; 63:5; 79:25; 85:6;
89:3
**meant** 13:23; 32:8, 14;
63:12; 65:1; 79:16; 82:10;

113:18; 118:12
**mechanics** 55:19
**meet** 19:14
**meeting** 10:13; 12:14, 16,
22, 23; 19:3, 7; 20:2, 6, 7,
13, 19, 20; 23:3, 8, 13, 18;
24:2, 5, 7, 8, 16, 21; 25:8,
12, 15; 26:8; 29:6, 7, 11,
12, 13, 18; 30:15, 21, 25;
31:8, 9; 33:10; 34:1, 9, 10,
13, 14, 17; 35:2; 38:8, 12;
40:10, 16, 20; 42:16, 24,
25; 44:13, 19; 45:3, 5, 7,
20; 46:12, 12; 47:3, 5, 16;
48:6, 25; 49:21, 25; 50:2,
6, 7, 10, 14, 17, 19, 24;
52:22; 53:15, 24; 54:1, 4,
6, 17, 20; 55:21; 56:1, 4,
14, 16; 57:9, 12, 20; 61:25;
62:1, 5, 7; 64:11, 13, 14;
65:25; 66:1, 4; 67:3; 68:17;
69:7, 11; 70:2, 15, 16;
73:9; 75:3, 4; 76:3, 5, 12,
19; 78:15, 16; 97:9, 19, 25;
98:11; 103:16; 104:19;
105:7, 9; 106:10, 12, 15;
107:15; 114:4; 119:14
**meetings** 12:5; 13:10,
14; 24:24; 28:25; 31:17;
34:18; 35:5, 10, 20; 36:1,
4, 5, 15, 15; 37:10, 17, 25;
38:15; 40:2; 53:1; 56:18,
20; 62:2; 70:8, 10, 12
**meets** 19:16, 20
**member** 10:11; 15:12;
20:5, 25; 26:3; 39:17; 40:6;
51:4; 56:7; 57:6; 66:11;
91:7; 92:17; 96:5; 101:12;
102:8; 104:4; 105:16;
114:23; 119:19; 120:1, 6
**members** 16:20; 34:12,
24; 35:8; 86:10; 94:2; 98:9;
112:14
**memo** 71:2
**Memorandum** 70:23;
71:7; 73:3, 24; 106:4
**memorized** 14:3
**memory** 33:9, 21; 40:9,
15; 41:11; 42:9; 43:21;
50:14; 54:16, 19; 55:4;
65:22; 76:4, 11; 94:22
**memos** 22:21; 94:17
**mentioning** 82:23
**merely** 115:8
**met** 3:11
**Michael** 70:24, 24
**middle** 94:20
**might** 25:13; 28:14;
29:12; 68:7; 69:22; 98:13
**mike** 12:18
**milk** 24:17; 25:3
**Miller** 40:13, 22; 51:11;
58:19; 96:15, 19; 114:7
**mind** 5:10; 52:14; 59:13;
69:17; 81:3, 9, 18; 82:14;
83:12; 89:3
**mine** 116:17, 22

**minutes** 20:19; 22:21;
45:23; 52:3, 21; 53:1, 14;
54:1, 6, 13, 15, 19; 66:18;
76:2, 18; 77:2, 16; 106:17
**misquoted** 35:24; 76:8,
10
**missed** 47:5
**mission** 115:6
**misunderstanding**
110:13
**misunderstandings**
120:8
**moment** 109:11
**Monday** 19:19; 20:10;
70:12, 13
**monkeys** 41:24
**month** 19:15, 16, 23
**monthly** 102:15
**months** 7:3; 13:7; 104:17
**Montoursville** 6:5, 7
**morals** 117:3
**more** 12:9; 16:24; 22:8;
30:5, 9; 31:19; 32:11, 14;
35:5; 37:6; 38:15; 48:18;
57:17; 58:1, 21; 63:11;
65:20; 68:14; 72:14; 75:6;
79:20; 83:14; 86:24;
89:11; 90:24; 92:13; 96:7;
114:13, 14
**morning** 89:13
**Most** 23:8; 113:22
**mostly** 28:8
**mother** 8:24
**motion** 77:15, 17, 25;
114:6
**motions** 22:17
**move** 6:9; 83:3; 96:8
**moved** 77:2
**moving** 87:3
**Mrs** 51:17; 61:17, 18;
67:9; 119:5
**much** 80:4
**multiple** 45:20
**municipal** 8:11
**municipalities** 8:12
**must** 85:18
**myself** 93:2

## N

**name** 3:11; 5:12; 36:18,
19, 21, 22; 69:3; 111:10;
118:15
**named** 43:18; 105:10
**names** 5:10
**natural** 118:13
**near** 6:7; 110:24
**need** 26:13; 60:20, 23;
65:20; 67:9
**needed** 29:15; 30:1; 67:8
**negative** 113:8
**new** 14:4; 16:1; 27:22;
29:3, 15; 30:1; 40:7, 21;

60:10; 86:3; 105:11, 20
**News** 21:17; 22:1, 2;
24:13; 34:9, 13; 35:2, 9,
19; 36:3, 11, 14, 17, 22,
25; 37:9, 16; 38:11;
103:24, 24; 107:3; 119:8
**newsletters** 121:10
**newspaper** 21:8; 35:13;
37:25; 38:22, 22; 99:7, 10;
104:6; 107:8
**newspaper's** 112:23
**next** 14:15; 19:3; 42:3;
45:3; 52:20; 58:15; 64:6;
113:20; 115:7; 117:20
**night** 18:15; 22:2; 23:7
**Nilsen** 13:17; 14:13; 58:7,
14; 69:23; 103:5; 107:24;
112:12; 120:17
**ninth** 29:4, 8, 24; 48:23;
49:1; 50:4, 20; 51:7; 55:1;
70:6
**Noel** 96:25
**nominated** 18:8, 8, 10,
14, 18
**nomination** 18:16
**norm** 70:10
**normal** 54:10
**Northern** 7:22; 8:9, 11
**note** 25:2, 3; 74:4; 94:21;
95:2
**notes** 24:6, 9, 11, 20, 24,
25; 25:1, 5, 13; 30:20
**notice** 48:18
**November** 9:22; 97:5;
106:10
**number** 28:12, 13, 13;
49:3; 72:22; 76:22; 105:3;
118:7
**numbered** 38:23; 51:20;
54:23; 70:19, 22; 106:21
**numbering** 52:18
**numbers** 45:15

## O

**objections** 3:4
**obviously** 21:22
**occasion** 102:18
**October** 35:24, 25; 36:4,
15; 37:4; 38:15; 64:23;
65:1, 4, 6; 70:7, 8; 71:2, 8;
73:3, 24; 75:4; 76:3, 18;
78:2; 81:16; 82:4, 24;
83:12, 22; 90:13; 92:17;
94:18; 95:19; 97:8, 19, 25;
98:11; 100:23; 104:1;
105:7, 9; 114:4
**off** 19:20; 38:7; 39:5;
46:13; 51:14; 55:9, 14, 20;
58:15; 91:1
**off-the-record** 51:15;
91:2
**offend** 118:1, 3
**offenders** 8:1
**offensive** 118:4

**offer** 39:17; 64:16; 91:11
**offered** 33:7
**office** 10:7; 20:16, 23;
68:8, 11; 91:9
**officer** 9:1, 13; 12:25;
16:10; 17:14, 20
**often** 19:14; 24:6; 28:2
**old** 4:25; 5:8, 8; 14:5
**old's** 5:12
**Once** 19:23
**one** 3:12; 6:4, 11; 9:4, 7,
15; 12:3; 14:5; 17:23; 19:2;
26:7; 30:2, 5, 6, 7; 31:12,
19, 19; 32:11, 14, 16, 17,
18; 34:15, 17; 38:9, 14;
41:21; 43:7; 47:7, 8, 12,
13; 48:10, 10; 53:21, 21;
56:18, 22; 60:25; 61:12;
62:3; 64:6; 66:23; 68:7, 7,
10, 14; 76:13; 78:6; 83:14;
89:11; 94:19, 20, 20;
101:15, 21, 23; 106:21;
108:4; 114:13, 14; 119:3,
3; 121:8
**one-sided** 41:13
**ones** 16:24, 25; 35:21;
95:1
**ongoing** 35:11, 12
**only** 12:22; 16:1; 24:17;
25:22; 30:5; 44:1; 75:6;
82:16, 16; 101:15; 109:19
**open** 12:18; 66:3; 70:13
**operates** 8:11
**opinion** 96:18
**opportunities** 12:5
**opportunity** 3:18; 12:18;
39:9; 54:12; 59:23; 64:16;
65:2, 6
**opposed** 92:2
**order** 59:14; 67:8; 118:13
**orderly** 28:7
**ordinarily** 99:19
**ordinary** 23:5; 24:2; 51:5
**organization** 7:19, 21;
9:1; 19:3
**organizations** 8:18; 87:9
**orientation** 17:2, 7
**origins** 74:4, 11; 94:21;
95:2
**out** 26:7; 45:23; 46:20;
48:7; 57:17; 59:23; 73:8,
23; 75:16, 23; 77:12; 80:7;
90:6, 8; 94:17, 24; 111:2,
4, 12; 112:3; 121:3, 5
**outcome** 67:13
**outside** 78:15; 118:13
**over** 8:19; 14:14, 15;
25:15; 34:1, 10; 45:24;
85:21; 98:22
**overview** 17:7
**own** 5:14; 10:5; 27:12;
63:25; 88:11; 108:19, 20

Filius  &  McLucas  Reporting  Service,  Inc.      Min-U-Script®

(5)  looked - own

Heather Geesey
March 10, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

# P

P 28:14
P-1 28:15
P-19 119:6
P-215 52:17
P-28 45:10, 11, 14; 47:15;
49:3
P-29 100:20; 102:19;
104:7
P-3 28:15
P-30 106:20; 108:4
P-31 110:5
P-4 39:1, 10; 106:22
P-5 51:18, 19; 52:8; 53:8;
54:3; 76:16
P-document 53:4
p.m 121:16
packet 38:22; 71:9, 14;
72:15; 73:8; 120:17
page 48:2; 49:3, 3, 12, 16;
54:22; 70:22; 72:2, 8, 22;
73:11, 23, 23; 74:18; 75:7,
17; 77:16; 104:24; 106:6,
7, 21; 119:7
pages 28:4; 38:23; 39:1,
9, 21; 45:19; 46:10, 10, 23;
47:14, 18; 48:12, 16, 20;
52:8; 70:19; 71:18, 19;
72:15; 76:17; 77:10; 106:1
Panda 63:21, 22, 23, 25;
64:2, 17
Pandas 55:11, 17, 24;
56:3, 6, 19; 57:9, 13, 24;
58:11; 59:10; 61:1; 63:19;
65:3; 67:22, 25; 68:4, 20;
69:13, 21; 70:1; 73:22;
75:13, 16, 22; 91:8; 96:11;
105:10
Panel 7:24, 25
paper 14:14; 21:20, 24;
35:14; 36:18, 19, 19, 21,
21, 24; 85:5; 99:16; 100:9;
107:11, 13; 110:14;
111:12, 16, 18, 21, 23;
112:2, 7, 9
papers 21:8, 14, 16;
37:12
paragraph 41:21; 43:17;
108:4; 110:24; 112:25;
113:20; 115:7; 116:7;
120:7
paragraphs 111:9
Pardon 76:9
parent 121:8
part 8:11; 10:2; 21:11;
24:23; 25:4; 42:25; 46:4;
51:18, 19; 53:8; 54:2;
62:14, 17, 18, 20, 22; 63:1,
4; 66:14; 69:22; 71:13;
84:16, 16; 85:1; 94:4, 7,
11, 12; 100:21; 106:22;
110:9, 10
participate 57:8; 119:14
participated 97:15

participation 13:9, 14
particular 6:23; 12:20;
36:17; 60:5, 16; 72:2;
109:9
parties 3:3
pass 83:24
Patrick 38:25; 52:14
patrol 8:24
paying 7:15; 8:16
Pell 43:18
Pennsylvania 4:18; 6:6
people 12:4; 18:4; 20:24;
34:20, 21; 36:18; 50:9;
55:11, 17, 25; 56:3, 6, 19;
57:9, 13, 25; 58:11; 61:1;
65:3; 67:22, 25; 68:4, 20;
69:13; 70:1; 73:22; 75:13,
17, 22; 90:5; 91:5, 8;
96:12; 102:11; 105:11;
116:24
period 6:10, 12; 7:18;
8:19; 51:9
person 4:2; 51:5; 104:13,
14
personal 42:19
personally 13:8, 12;
14:10; 40:1, 3; 54:8; 57:10;
58:22; 118:20; 119:4
photographer 61:9, 23
Photography 6:18
phrase 42:15; 73:17;
78:18; 79:4, 16; 81:5, 8, 9;
82:5; 94:21; 110:21;
118:5, 11, 12
pick 20:15, 24; 24:17;
36:19, 21
piece 85:5
place 14:16; 35:21
plain 108:9
Plaintiff 106:18; 110:2
Plaintiffs 3:13; 28:1, 14;
38:21; 52:19
plan 79:19; 80:20, 22;
81:13, 20, 24
planning 70:15
please 4:8; 117:8
point 63:2; 114:6; 118:21
Police 7:22, 23; 8:9
policies 11:2, 7, 8, 9, 10
Policy 10:20, 24; 11:1, 1,
1, 14, 16, 21, 23; 12:6, 10,
24; 13:9, 13, 20; 14:4, 12,
21; 15:22; 16:1, 3, 6, 8, 13;
17:1; 25:22; 120:6, 9, 10
portion 57:23; 71:11
position 8:16; 10:9;
12:24, 25; 13:1; 15:22;
16:10; 17:16; 61:19;
88:12; 91:16; 92:7, 14, 22;
93:4, 12, 13; 95:14, 14
positions 7:16
possibility 98:12
possible 44:15; 53:4, 7
possibly 11:23
power 117:21, 25; 118:3,

5, 11, 12
practice 13:21; 16:19;
23:5; 24:2, 23; 25:4; 54:6,
10
prepared 77:24; 112:21;
119:17, 19, 21
preparing 13:8, 13
presence 48:15
present 95:5
presentation 30:12; 32:8
presented 30:5; 32:16;
38:5; 57:15; 73:21;
117:21, 25; 120:16
President 18:22, 24
prevalent 113:22, 24;
114:9
previous 20:19
previously 51:18; 119:6
price 66:5, 10; 67:23;
69:20
principal 22:1
principles 113:17
print 36:3; 76:18; 103:1;
107:2
printed 35:21; 53:5;
111:6
prior 17:20
private 25:8
probably 4:19; 28:3, 17;
40:25; 53:20; 54:13; 83:1;
85:21
problem 4:9; 13:23;
37:22; 59:10; 77:13; 86:9
problems 74:2; 95:19,
21; 96:1
procedure 3:19
procedures 11:4
process 65:23; 89:1;
94:12, 13
produce 101:4, 5
produced 28:1, 2; 45:14;
46:3, 18, 18; 52:19
production 46:5; 100:22
program 5:23; 7:24; 8:5
proposal 74:25
proposed 98:13; 105:20
provide 26:19; 87:16
provided 27:13; 29:17;
48:3; 87:9; 110:17
provides 96:19
PTO 8:24, 25; 9:6, 13
public 10:7, 9; 13:9, 14;
25:8; 48:11, 13, 14, 17;
70:13; 102:25; 121:4
publication 36:11;
120:14
published 12:15; 103:25;
107:3; 110:6
publisher 36:24
pull 46:12
pulled 116:11
punish 8:1
purchase 29:15; 30:1;
34:6; 50:20, 25; 51:6; 55:5;

66:4, 8; 67:5
purchasing 50:4; 66:14
put 14:14; 35:17; 52:20;
56:17; 80:6; 89:6; 109:6;
113:8; 118:3
putting 100:6; 116:10;
118:15

# Q

qualified 114:21
quest 110:21
quite 92:16
quote 41:22; 104:2, 3, 5;
113:20, 23
quoted 34:22; 41:21;
107:14
quotes 42:4
quoting 49:17; 99:7

# R

ran 9:23; 10:1, 5
rather 15:19
Re 71:2
reach 102:25
reaction 112:2, 4
read 21:24; 23:7, 8;
28:19; 35:14; 36:22, 25;
37:16, 24; 38:14; 54:12,
15, 19; 63:23; 64:16; 65:3;
66:25; 68:12; 73:16; 74:5;
76:19; 86:13, 17, 25; 87:2;
90:2; 93:1, 5; 97:24; 99:11,
12; 103:16; 112:2; 118:10;
120:23, 24
reading 37:12; 38:11;
67:2; 77:10; 105:17;
120:23
reads 86:19
really 23:24; 32:1; 34:4;
43:25; 62:19; 80:3; 84:13;
89:14; 116:25
reason 4:8; 47:14; 67:17;
68:6
recall 26:15; 27:7; 29:6,
23; 30:15; 31:4; 33:12;
35:1; 36:14; 38:11; 40:20;
41:19, 25; 42:3, 7, 15;
43:13, 14, 16, 19, 25; 44:4;
48:25; 49:20, 24; 50:2, 12,
19; 51:3; 53:23; 54:1, 3;
55:4; 62:4; 66:16, 18, 21;
69:7, 11; 92:11, 19, 20;
97:12, 14; 105:6, 7, 17, 19,
22; 106:11
receive 17:10; 20:5, 6,
11, 18; 21:11; 26:9; 53:11;
60:9; 101:23; 102:21;
121:8, 10, 11
received 55:25; 78:19;
101:10
receiving 71:7, 14; 72:14
recess 39:6, 7; 51:23;
52:1

recognize 49:14; 53:8;
107:14
recollection 12:3; 67:1
recommendation 77:.
recommended 59:1
record 13:3; 39:2, 5, 14;
45:13; 46:1; 51:14; 91:1;
103:25; 107:1; 110:6
recover 103:3
refer 3:13; 28:14; 87:6, 9;
93:17
reference 39:12; 41:13;
47:24; 48:22; 49:16; 55:9,
10, 24; 56:11; 71:10;
75:12, 16, 22; 78:20, 20;
87:3, 20; 91:17; 94:19;
95:7, 15, 18; 97:15;
105:11; 108:13
referred 63:8; 70:15;
73:15, 17
referring 20:12; 32:24;
34:21; 35:25; 55:10;
63:14, 18; 64:13; 104:7;
113:25; 114:2
refers 43:17; 55:1; 73:6;
95:22; 108:8
refreshed 54:19; 55:4;
67:1
Regional 7:22; 8:9
regular 19:17; 30:23;
98:17
rejected 39:17
related 11:10; 27:25
relied 86:25; 87:2
religion 43:7; 62:11;
63:8, 13, 21, 22; 88:1, 5, 9,
9, 13, 17; 89:4, 9, 16;
108:9, 23, 23, 24; 109:17,
25; 117:7, 15, 18; 118:2;
119:3
religions 108:19; 109:12;
116:15, 18
religious 108:22; 109:2,
8
rely 77:22; 84:9; 93:20
relying 78:13; 84:14, 17;
85:1; 88:15, 19; 89:22;
90:15; 95:24; 96:6, 22
remember 6:6; 9:5;
18:19; 23:14; 29:13;
30:19; 33:1, 2, 4, 14, 14,
17, 24, 25; 34:16, 19, 24,
25; 38:5; 41:2, 7, 9; 43:10,
23, 24; 45:7; 47:9; 50:24;
55:7; 56:22, 24; 58:1, 4, 8;
61:13; 62:7, 10, 13; 65:24;
67:3, 7; 68:10, 16; 69:18,
24, 25; 70:2; 71:7, 14, 18;
72:2, 14; 76:7; 86:24;
97:17, 18, 23; 98:2, 4, 11,
16, 20, 24; 99:3, 7, 21;
102:16; 105:9, 21; 106:8
12, 15; 112:4; 120:15, 20,
23; 121:12
remove 97:15
removed 55:14; 58:8, 11;
59:10, 11

Tammy Kitzmiller, et al. v.
Dover Area School District, et al.

Heather Geesey
March 10, 2005

Case 4:04-cv-02688-JEJ   Document 216-2   Filed 09/28/05   Page 41 of 42

reorganization 10:13
Repeat 37:11; 69:10;
83:6; 88:14; 92:25; 98:19;
103:22; 117:8
repeated 40:7
report 38:17; 103:24
reported 34:20; 35:6;
44:7, 21; 50:9
reporter 38:20; 93:5;
100:1, 2
reporters 24:12
reports 34:9, 13; 35:2, 9,
19, 23, 25; 36:3, 4, 12, 17;
37:10, 16, 18, 25; 38:11,
14
represent 46:2; 98:17,
21; 107:1; 112:6
representation 99:4;
103:21
represented 12:25; 83:5;
98:25
reprint 110:5, 13
request 16:17; 26:20;
40:7
requested 16:14; 104:2
requests 27:25; 46:5
reserved 3:5
resident 121:8
resigned 97:20
resigning 97:18
resolved 59:8
Resources 75:12; 91:11
respective 3:3
respond 38:19
responded 27:24; 38:18
response 14:9; 26:20;
58:4; 88:16; 107:17;
118:17
responses 46:4
responsibilities 17:11;
19:5
responsible 75:21
rest 103:15
reverse 109:4
review 11:1, 3; 22:5;
27:13; 39:9; 120:3, 10, 21
reviewed 27:4, 7; 37:16;
119:23
reviewing 27:8; 54:1, 3
revision 113:12
revisionist 113:2, 11, 18
reword 13:22
rewording 13:23
right 3:16; 7:24; 8:3, 10,
14; 12:22; 13:4; 15:19;
22:3; 24:6, 21; 28:19;
30:16; 31:2; 34:18; 37:14,
20; 38:18; 39:3; 41:10, 10;
44:25; 49:9, 16; 52:3;
55:22; 58:21; 59:11; 70:8;
71:13, 16, 17; 72:19, 24;
77:9; 79:2, 14, 24; 80:12,
15, 17, 20; 81:3, 6, 10, 14;
83:15, 25; 84:24; 85:19;
88:25; 90:16, 18; 91:25;

95:3; 97:6; 99:19; 102:5, 8,
19; 110:8, 24; 111:5, 7;
115:19; 117:13, 23;
118:13
right-hand 49:6; 75:11
Road 4:18
role 15:17, 19; 20:25;
40:1; 120:10
roles 19:9
roll 54:7
rolled 57:12
rule 3:22; 12:12
rules 3:20
run 10:9; 34:19; 45:8;
111:9
running 10:3

S

S-p-a-h-r 61:15
Sales 6:20, 21
same 11:25; 20:2; 26:5;
28:5; 38:8; 41:17; 46:15;
53:21; 58:5; 67:18; 71:21;
74:1, 20, 20; 83:2; 117:3;
120:6
satisfied 86:8
save 26:13; 101:9;
111:14
saw 106:8; 107:13;
118:10
saying 31:4; 33:14, 15,
17; 34:20, 22; 40:6; 41:25;
42:7; 43:25; 60:11; 62:4, 7;
65:22; 66:17; 67:9; 85:17,
18; 89:1, 7; 105:7, 19, 22;
113:3; 115:5
schedule 19:22; 29:25;
30:23
scheduled 20:2
SCHMIDT 3:10, 11; 27:1,
19; 38:25; 39:3, 8; 45:12;
46:6, 16; 51:14, 16; 52:2,
10, 14; 71:24; 77:12, 14;
91:1, 3; 93:1, 6; 100:12;
103:10, 12, 13; 106:19, 25;
110:3; 121:13
School 3:14; 5:2, 5, 5, 17,
19, 20, 21, 21; 6:1, 2, 13,
16; 8:20, 21; 9:10, 16, 17,
24; 10:2, 11, 14, 25; 11:21;
12:1; 15:6, 9, 14; 16:20;
17:6, 14, 24; 20:16, 22;
21:7, 12; 24:15, 21, 24;
25:5, 12, 21; 26:9; 29:4, 9;
35:20; 36:4; 40:2, 6; 46:4;
47:5, 16; 48:23; 49:1; 50:5,
17, 21; 51:4; 53:11, 23;
56:7; 61:20, 20; 67:10;
68:3, 19; 70:23; 78:20;
79:2; 80:6; 87:12; 91:6;
98:12; 99:18; 101:12, 21,
23, 24; 102:7, 8, 10, 20,
24; 103:8; 104:16; 106:13;
107:22; 119:7, 11; 121:5
schools 5:2; 9:8; 39:16;

88:23; 89:2
science 63:3, 9; 65:23;
70:6; 89:25; 90:6, 7; 91:16;
92:1, 2, 3, 6, 21, 22; 93:4,
5, 13, 14; 95:1, 5, 11, 13;
119:3
scientific 31:15; 32:5, 16;
56:25; 78:4, 12; 80:3;
83:17; 84:4, 18; 85:10;
86:18; 89:16, 17, 23;
93:14; 114:17
scientists 89:24; 90:3, 5,
6
scribble 24:6
sealing 3:3
seat 15:14
seated 10:11
second 19:19; 29:10;
47:10; 57:12; 70:13; 72:4;
76:15; 105:2; 106:6, 7;
112:25
secretary 9:9, 16
section 39:14; 73:15;
76:21; 105:17
seeing 72:2
seeking 32:19
selecting 94:14; 108:5
selection 29:3, 23; 30:17
send 99:18; 100:25;
102:20; 103:14; 112:9, 17
sending 118:21; 121:3
sense 21:2; 25:19; 28:11;
85:1; 89:10; 90:25; 113:9
sensed 64:25
sent 94:17; 101:10;
104:10; 112:9, 21; 121:5
sentence 108:8; 113:20;
115:7; 117:20
separate 90:1; 99:4;
103:20
separately 106:23
servant 102:25
serve 18:5
served 10:14; 14:20
service 25:21; 101:11
set 11:1, 1, 3, 18, 20;
12:11; 23:6; 38:24
seven 29:25; 60:13
several 8:12; 28:3; 50:9
share 15:14
Sheila 18:20; 19:7
shortly 10:23; 100:9;
104:18
show 27:20; 39:3; 45:9;
51:17, 19; 52:13; 76:16;
110:4
showed 53:4
showing 106:20; 119:6
side 27:24
similar 15:21; 47:22;
71:21; 72:18
simple 108:10
simply 43:14; 108:5
sit 15:24; 115:25

sits 40:12
situation 20:1
six 39:1; 48:17; 76:22
slate 10:2
slightly 35:17; 52:22;
93:11
Snook 105:10, 13
solicitor 98:17, 21; 99:1
solved 86:9
somebody 36:20; 44:23;
89:18; 99:14; 105:10
someone 21:7; 28:9;
44:16; 50:11, 11; 64:11
sometime 65:4
sometimes 3:13; 53:16,
17, 20; 70:15
sorry 16:4; 62:21; 75:6;
77:12; 83:6; 92:25; 105:8;
112:20
sort 15:2; 22:21; 90:12;
115:18
sound 8:14; 83:2
sounds 90:12
source 22:1; 74:7; 95:24
Spahr 61:14, 17; 63:2;
65:22; 87:24; 88:16; 92:9
Spahr's 67:22
speak 3:18; 4:19, 20;
12:5, 13; 30:15; 41:6;
61:25
speaking 105:10
speaks 62:2
Special 15:3
specific 22:8; 37:6;
51:19; 86:24
speculative 115:8, 16,
22; 116:1, 5
spoke 100:1
springboard 40:18
stack 26:14; 28:5
stamped 52:17; 100:21
stand 50:11
standard 15:25
standards 25:22, 23;
82:16, 17
start 4:3, 13; 6:17; 22:10;
26:6; 67:10; 105:8; 111:9
started 3:12, 21; 27:2;
28:6; 90:4
starts 40:6; 108:5
state 25:23; 112:7
State's 25:22
statement 30:4; 33:22;
38:4; 42:3; 43:13; 44:4, 10;
49:20, 24; 50:12, 15;
57:14; 63:17; 77:4; 88:17;
95:2; 97:23; 99:3, 8;
103:19, 23; 104:6; 107:14;
108:10; 110:25; 113:10;
115:6, 10; 117:12
statements 43:11; 44:6,
15, 21; 67:22
station 22:3
stations 24:13

status 50:25
stay 106:11
stays 23:24
Stengel 65:19
sticks 76:10
still 14:7; 30:1; 34:3;
39:16; 59:5; 60:23; 66:5;
69:21; 70:18
stipulated 3:2
STIPULATION 3:1
Stock 104:2
stories 116:15, 19
story 117:6, 15, 18
straighten 46:20
struggling 84:20
student 11:9, 15, 22;
43:10, 13, 18
students 33:18; 72:9;
74:2, 21; 77:4
study 90:2
stuff 15:24; 25:10; 86:18
subcommittee 15:2
subject 30:16; 40:21;
45:2; 51:12; 58:6; 62:1;
67:25; 72:15, 17; 82:23;
92:5; 93:20, 25; 94:1; 96:7,
22; 102:4
subjects 12:21; 102:23
subparagraph 54:25
subscribe 21:14
subsequent 14:11;
53:15
substance 100:4
subtitle 119:25
sued 61:8, 11, 12; 62:5, 8,
12; 63:6, 7; 65:24; 91:23,
24; 98:13; 105:20, 23
suggested 95:1
sum 37:20
summarize 89:12
summary 59:24; 110:25
summer 8:8; 19:15, 22,
24; 37:6; 50:23, 24; 51:3;
57:10; 63:2
Sunbury 6:7
Sunday 21:17, 18, 23, 24;
107:3, 11; 111:23
Sunday's 111:22
Superintendent 13:18;
21:6; 71:1; 107:24
supplied 103:7, 8
support 88:11
supposed 55:15; 58:14;
83:10
sure 3:20; 4:10; 8:13;
11:20; 14:20; 24:19, 23;
26:6, 24; 27:3; 28:20; 32:7;
34:19; 39:5; 40:17, 25;
43:18, 22; 47:2; 54:7;
59:16; 60:21; 68:8, 14;
79:10; 83:3; 88:25; 89:6;
93:2; 98:20; 99:13; 101:17
sworn 3:8
system 8:2; 52:18

**Heather Geesey**
**March 10, 2005**

**Tammy Kitzmiller, et al.   v.**
**Dover Area School District, et al.**

# T

**table** 77:15, 23, 24
**tabling** 77:17
**talk** 14:6, 7; 20:1; 104:9, 13; 108:1
**talked** 68:15
**talking** 23:4; 31:16; 32:2, 3; 61:25; 81:1, 1, 2, 16, 17; 91:4
**task** 113:21
**taught** 33:19; 44:1; 74:4, 12, 13; 82:11, 12, 15, 20, 22; 88:23; 89:1; 94:21; 95:3
**teach** 41:23; 62:11; 63:13; 82:16, 17; 116:7, 13; 117:5, 11, 17
**teacher** 47:25; 61:13, 22; 63:3; 82:22; 92:1, 2; 95:11
**teachers** 46:3; 58:25; 60:10; 61:4, 5, 6, 12; 62:25; 65:23; 69:24; 74:9, 14; 87:16, 19; 91:16; 92:21; 93:4, 13, 14, 21, 25; 94:4, 11; 95:1, 6, 14; 98:25; 102:16; 103:15, 17
**teaches** 42:12; 43:7; 82:22; 108:24; 113:22
**teaching** 63:8, 20; 96:20; 113:2, 11
**telephone** 104:13
**television** 22:3
**telling** 5:10; 26:10; 88:9; 116:10, 12
**term** 19:1; 20:23; 42:15, 18, 22; 109:7, 16, 24
**terms** 24:8
**test** 79:11, 23; 109:20
**testified** 3:8; 47:1; 49:11; 59:21; 80:11; 81:25
**testimony** 32:1; 59:18, 25; 60:16; 84:12; 89:7; 94:25; 109:14
**textbook** 29:3, 8, 24; 30:10, 17; 31:4; 34:6; 43:11; 45:2; 48:23; 49:1; 50:3, 20; 51:1, 6; 57:22; 58:18, 25; 60:1, 5, 6, 9, 10, 12, 17; 62:15; 69:14; 96:15, 19; 110:21; 114:7
**theories** 32:5; 44:1; 72:10; 73:17; 74:3, 22; 77:5; 113:23, 24; 114:10
**theory** 30:5, 7, 8, 13, 17; 31:9, 11, 15, 15, 19, 21; 32:4, 4, 11, 15, 16, 24; 33:8; 56:25; 72:9; 73:21; 74:3, 22; 77:5; 78:4, 5, 12; 79:6, 7; 80:3, 12, 14, 19; 81:12; 82:11, 13, 25; 83:4, 8, 9, 11, 16, 17; 84:1, 4, 5, 18, 21, 23; 85:2, 10, 11, 23, 24; 89:15, 16, 18, 23; 90:20; 95:19; 114:12, 13, 14, 14, 16, 17; 115:8, 10,

13, 19, 19, 21; 116:3; 118:22, 25
**thereafter** 10:23
**thick** 23:24
**thinking** 60:19
**third** 19:17; 38:9; 96:5; 115:7
**though** 113:7
**thought** 32:14; 50:25; 63:13; 77:19; 79:16; 81:19, 22; 86:2; 88:1, 25; 94:25; 103:19; 108:12
**thousand** 28:3; 50:10
**three** 4:24; 7:3; 8:8; 9:7; 11:10; 23:8; 55:1; 56:20; 67:14, 21; 69:18; 76:14; 94:15, 23, 23
**throw** 25:17
**Thursday** 20:10, 18; 23:2; 55:21, 25
**tie** 66:16
**tied** 14:20; 47:2; 69:12
**ties** 71:10
**times** 12:13; 37:4; 44:12; 85:21
**title** 41:9; 110:11
**titled** 55:24; 119:7
**today** 32:1; 37:9, 24; 50:15; 96:10; 115:25
**today's** 22:6
**together** 10:3; 34:19; 45:8; 56:17; 89:6; 116:11
**told** 28:17; 33:6; 60:25; 74:15; 81:4; 89:18; 90:15; 91:7; 92:23, 24; 93:8; 95:9; 100:5; 108:12
**Tom** 3:11; 26:25; 27:17; 46:1; 77:11
**took** 35:20; 111:1
**top** 38:7; 110:24
**torture** 66:24
**track** 8:4; 24:7
**transcribed** 3:23; 4:4
**transpired** 34:14; 54:16
**trial** 3:5
**trip** 15:23
**trouble** 109:5
**true** 11:25; 34:23; 103:18, 19
**try** 24:11, 12, 13; 82:19; 89:12
**trying** 6:6; 32:12, 13; 37:20; 55:19; 56:17; 65:18; 85:21; 86:1; 113:21; 114:3, 22; 117:9
**Tuesday** 19:17; 103:25
**turn** 15:15; 54:22; 70:19; 72:24; 73:23; 76:21; 77:15; 104:22
**Twelve** 5:1, 8
**Twice** 19:15, 16
**two** 7:17; 12:13; 13:7; 19:20, 20; 25:23; 37:10, 19; 39:9, 21; 44:1; 45:18;

48:7, 12; 50:10; 56:18; 63:3; 69:7; 70:8, 10; 72:15; 75:6; 109:11; 116:11; 119:7
**typed** 100:16

# U

**unable** 38:2; 85:2
**under** 11:16; 31:5; 40:14, 23, 24; 41:2, 4, 8; 48:2, 22; 51:11; 54:25; 57:23; 72:4; 74:1; 76:21; 110:24
**understood** 16:25; 24:19; 60:24; 80:1, 10; 82:24; 83:7
**unfair** 54:13
**unfounded** 63:17
**unhappiness** 58:14; 61:7
**unhappy** 55:8, 13; 57:24; 61:4, 5
**Unit** 15:5, 6, 10; 72:5
**unless** 18:5; 19:15, 19
**unresolved** 59:5, 9, 24; 60:23, 24; 61:3; 67:19; 69:17; 70:4
**untrue** 35:1
**up** 4:19; 6:7, 10, 12; 9:8; 12:11; 15:23; 20:16, 24; 24:15, 17; 26:14; 36:19, 21; 37:20; 40:21; 45:2; 56:10, 12, 14; 57:22; 60:9; 67:25; 73:19; 80:12; 104:25; 113:13; 114:1
**update** 13:25; 119:25
**upset** 103:15; 115:2, 3
**use** 41:16; 56:10; 61:1; 101:18, 20; 102:10; 105:10; 108:15; 109:7, 16, 23; 110:21
**used** 41:17; 65:19; 94:7; 102:20; 113:10; 118:8
**using** 24:9; 28:14; 40:18; 48:12; 117:6, 15, 17
**usual** 23:13, 17; 24:23; 25:4; 54:6
**usually** 23:15, 25; 54:7; 109:5

# V

**vague** 11:6
**values** 117:3
**varies** 118:6
**verbal** 4:4
**verbatim** 3:23
**version** 14:11; 49:8; 75:15; 76:18
**versions** 45:20, 21; 94:16, 23, 23; 120:13
**versus** 82:15
**vice** 12:25
**Vice-President** 9:4, 6;

17:17, 18, 24; 18:21; 19:1, 6
**Vice-Presidents** 17:22
**Vicki** 4:20; 93:1
**videos** 91:12
**videotapes** 87:6
**view** 33:7; 34:1; 57:15; 78:6; 83:18; 86:9; 117:11, 17
**views** 44:8; 109:12
**VII** 47:24
**Volunteer** 7:15, 17, 18; 8:16, 18
**vote** 58:17, 24; 59:2, 14; 66:3, 16, 16, 21; 67:4, 13, 15; 68:1; 69:16; 77:24; 84:7; 97:11; 114:7
**voted** 58:16, 22, 22; 59:7, 18, 21; 60:1, 22; 67:12; 76:13; 77:16, 24; 82:4; 83:12, 22; 84:23; 85:25; 86:6; 120:21, 25
**votes** 18:3; 54:11
**Voting** 18:3; 82:6; 83:25; 95:25; 106:12

# W

**wait** 4:2; 71:23; 92:25
**waived** 3:4
**walk** 52:15
**wants** 77:9
**way** 14:1; 24:17; 26:7; 28:7; 35:17; 37:21; 55:16; 59:6, 16, 19; 60:7; 77:18; 83:20; 84:11; 86:6; 89:12; 93:11; 106:8; 111:6; 113:4
**website** 53:2, 5; 102:9, 10; 106:9; 112:20, 23
**Wednesday** 100:23
**weekly** 102:15
**weeks** 19:20, 20; 104:17
**welcome** 76:20
**Wenrich** 96:25; 97:14
**weren't** 62:14, 17; 63:16, 16; 88:23; 89:1; 94:4, 7, 11, 12; 103:16; 105:22; 113:13; 114:23, 24
**whenever** 83:20
**whole** 90:4; 96:7
**Whose** 79:20
**William** 40:12
**Williamsport** 6:8
**willing** 18:5
**Within** 104:17
**without** 67:2; 116:8, 13; 117:5, 12, 17; 118:15
**witness** 3:17; 34:9; 47:19; 48:21; 72:25; 75:18; 76:23; 104:25; 106:3; 113:1
**witnesses** 66:24
**word** 42:15, 22; 108:15, 18; 120:24, 24

**words** 14:3; 41:16, 16, 18, 19; 49:17, 21; 50:3; 92:11; 94:9
**work** 6:16, 23; 7:2, 12, 17, 18; 8:7, 19; 9:11; 10:24; 11:7, 9, 17; 14:10, 11; 17:3, 7; 19:12; 24:8; 25:5; 34:3; 59:23
**worked** 12:7
**working** 69:22
**works** 19:11; 53:15
**world** 78:21; 80:17
**write** 24:14; 85:5; 110:25; 114:21; 115:1, 4
**written** 17:10
**wrong** 29:12; 57:21; 79:13, 15, 24; 85:20; 105:1
**wrote** 107:20, 21; 108:2; 110:7, 16; 111:3, 8; 112:7; 114:19; 115:23

# X

**X** 48:22
**XI-B** 71:4
**XI-C** 73:6

# Y

**year** 5:8, 8, 12; 7:13; 9:5; 10:12; 13:2, 2, 3, 6, 6; 14:18, 23, 23; 15:13, 25; 16:9; 17:20; 18:22; 19:2; 29:25; 60:13; 92:16; 102:17
**years** 4:22; 8:8; 50:10
**yesterday** 21:7; 46:2
**York** 5:20; 6:2, 9; 7:1; 8:12; 21:17; 39:2, 14; 107:3; 110:6
**young** 51:22
**Youth** 7:24, 25