# APPENDIX I

# TAB N

# In The Matter Of:

*Tammy Kitzmiller, et al.   v.*
*Dover Area School District, et al.*

---

*Jennifer Miller*
*May 18, 2005*

---

*Filius & McLucas Reporting Service, Inc.*
*1427 East Market Street, York, PA*
*4309 Linglestown Road, Harrisburg, PA*

*(717) 845-6418   or   (717) 236-0623*

Original File JM051805.TXT, 181 Pages
Min-U-Script® File ID: 1037567757

# Word Index included with this Min-U-Script®

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Jennifer Miller
May 18, 2005

Page 2

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

TAMMY KITZMILLER, et al., .
    Plaintiffs  .  CIVIL ACTION NO. 04-CV-2688
        vs.
DOVER AREA SCHOOL DISTRICT,.  (JUDGE JONES)
et al.,
    Defendants    .

Deposition of              : JENNIFER MILLER
Taken by                   : Defendants
Date                       : May 18, 2005, 10:00 a.m.
Before                     : Vicki L. Fox, RMR,
            Reporter-Notary
Place                      : Two School Lane
            Dover, Pennsylvania

APPEARANCES:
    PEPPER HAMILTON LLP
    BY: CHRISTOPHER J. LOWE, ESQUIRE
        For - Plaintiffs
    THOMAS MORE LAW CENTER
    BY: PATRICK T. GILLEN, ESQUIRE
        For - Defendants
    KILLIAN & GEPHART LLP
    BY: JANE GOWEN PENNY, ESQUIRE
        For - Jennifer Miller
    ALSO PRESENT:  Michael Baksa

Page 2

[1]            INDEX
[2]              WITNESS
[3] JENNIFER MILLER          Examination
[4]   By Mr. Gillen               3
[5]
[6]
[7]              EXHIBITS
    J. Miller Deposition
[8] Exhibit Number          Page
[9] 1. April 1, 2003 memo from Trudy K. Peterman to Mr. 20
    Michael Baksa, Mr. Larry R. Redding and Mrs. Bertha
[10] Spahr, re: Creationism As It Relates to the Approved
    School Board Biology I Curriculum, and attachments.
[11]
    2. February 11, 2003 memo from Dr. Trudy K. Peterman  48
[12] To Dr. Richard Nilsen, Mr. Mike Baksa and Mrs.
    Denise Russell, re: Budge Justifications for Science
[13] Department for 2003-2004 Budget Year, and attachments.
[14] 3. Packet of Dover Area School District School Board  61
    Meeting Minutes and notes of Jennifer Miller.
[15]
    4. Eight pages of handwritten notes made by Jennifer  64
[16] Miller.
[17] 5. Packet of documents produced by Jennifer Miller. 64
[18] 6. Packet of documents produced by Jennifer Miller. 64
[19] 7. October 13, 2004 memos, Michael Baksa to Board 110
    Of Directors with attachments.
[20]
[21]
[22]
[23]
[24]
[25]

Page 3

[1]              STIPULATION
[2] It is hereby stipulated by and between the
[3] respective parties that sealing, certification and filing
[4] are waived; and that all objections except as to the form
[5] of the question are reserved until the time of trial.
[6]
[7]    JENNIFER LYNNE MILLER, called as a witness, being
[8] duly sworn, was examined and testified, as follows:
[9]            BY MR. GILLEN:
[10]   Q: Good morning, Mrs. Miller. My name is Pat Gillen, and I
[11] am one of the attorneys for the defendants in this case.
[12]   A: Okay.
[13]   Q: As you know, this is the time and place set for your
[14] deposition which I see as just my opportunity to get
[15] your side of the story.
[16]   A: Okay.
[17]   Q: Plainly, there is a dispute here. Different people have
[18] different perspectives on what happened and what the
[19] issues are. This is my chance to get that from you.
[20]   A: Okay.
[21]   Q: There are a few aspects of this process that are rather
[22] unusual. The first is that Vicki records everything we
[23] say. And therefore, that places a premium on our
[24] responses being verbal as opposed to gestures or head
[25] nods which you will find we do quite frequently.

Page 4

[1]    Also, I ask questions, and you give answers. It
[2] is a good idea to let me finish asking my question
[3] before you begin to answer.
[4]    Now I frankly confess that I pause a lot when I'm
[5] delivering my question. Bear with me, and I will do the
[6] same for you.
[7]   A: Okay.
[8]   Q: Relatedly, the process tends to lay bare the imprecision
[9] of human communication. You may listen to my question
[10] and say what is he asking. If that is the case, if you
[11] don't understand my question, please let me know, and I
[12] will try and rephrase it and make it more precise.
[13]    By the same token, if I am following up on an
[14] answer, please understand I am not trying to harass you.
[15] I am trying to make sure I understand what you are
[16] telling me.
[17]    Let's see. If I ask any question that makes you
[18] feel uncomfortable, please let me know, and I will do my
[19] best to avoid any sensitive point to the extent that I
[20] can.
[21]    The process is not an endurance contest. If you
[22] want to take a break, please let me know, and we can do
[23] that.
[24]   A: Okay.
[25]   Q: Have you ever been deposed before?

nnifer Miller
ay 18, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

**Page 5**

[ ]  A: No.

[ ]  Q: Would you please state and spell your full name for the

[ ] record?

[ ]  A: Jennifer Lynne Miller.

[5]  Q: I have reason to believe you are currently employed?

[6]  A: I am.

[7]  Q: Would you tell me where?

[8]  A: Dover Area School District at the high school.

[9]  Q: Where do you currently reside?

[0]  A: York, Pennsylvania.

[11]  Q: Just give us your address?

[12]  A: 100 White Fence Lane, York, Pennsylvania.

[13]  Q: As we sit here today, do you have any handicap that

[14] would impair your ability to perceive my questions and

[15] respond?

[16]  A: No.

[17]  Q: Are you on any medication that might inhibit your

[18] ability?

[19]  A: No.

[20]  Q: If we look at from say January of 2002 forward, at any

[21] time during that period, were you on any medication that

[22] might impair your ability to recall, to perceive?

[23]  A: No.

[24]  Q: Did you have any health problems that might impair your

[25] ability to recall?

**Page 6**

[1]  A: No.

[2]  Q: I see that you are represented by counsel.

[3]  A: Yes.

[4]  Q: And just tell me when did you retain counsel?

[5] .  A: I guess January. Officially, January, February, 2005.

[6]  Q: And did you retain counsel for the purpose of this

[7] litigation?

[8]  A: Yes.

[9]  MR. GILLEN: And forgive me, Jane, what is your

[10] full name?

[11]  MS. PENNY: Jane Penny.

[12]                    BY MR. GILLEN:

[13]  Q: Jane Penny is of the firm that you retained?

[14]  A: Yes.

[15]  Q: I am going tow ask you a few questions about people you

[16] might have spoken with in preparation for the

[17] deposition.

[18]  Did you speak with your lawyer?

[19]  A: Yes.

[20]  Q: When I ask you these questions, I am not trying to pry

[21] into the communications that you had with your lawyers

[22] that were confidential; that is with no other person

[23] present. Okay?

[24]  A: Okay.

[25]  Q: Apart from your lawyers, did you speak with anyone else

**Page 7**

[1] in preparation for today's deposition?

[2]  A: I guess Monday after school, I met with our lawyers and

[3] Bertha Spahr, Rob Eshbach, Bob Linker and Sandi Bowser

[4] were also in the room.

[5]  Q: Do you know whether they are all represented by the same

[6] attorneys?

[7]  A: Yes, they are.

[8]  Q: Apart from that discussion, have you consulted or

[9] communicated with anyone else in preparation for the

[10] deposition?

[11]  A: No.

[12]  Q: Have you met at any time with counsel for the

[13] plaintiffs?

[14]  A: Yes.

[15]  Q: When did that meeting occur?

[16]  A: We had a meeting sometime in December I believe of 2004

[17] — and let's see — and I guess just April, 2005.

[18]  Q: Were there any other meetings?

[19]  A: No, not face-to-face meetings.

[20]  Q: Let's look at the two meetings first. The one in

[21] December of 2004, do you remember the names of the

[22] attorneys you met with?

[23]  A: Paula Knudsen and Eric Rothschild.

[24]  Q: Who else was present at that meeting?

[25]  A: I believe Bill Miller, who is a member of our DAEA, our

**Page 8**

[1] representation from our Association here at Dover.

[2]  Q: Is that a union?

[3]  A: Yes. Union representation. And Rob Eshbach and Bertha

[4] Spahr. And I believe Sandi Bowser was there; although,

[5] I couldn't be positive.

[6]  Q: And generally speaking, what did you discuss at that

[7] meeting in December of 2004?

[8]  A: Basically, gathering background information, when did we

[9] meet with so and so, what was said, that kind of thing,

[10] background.

[11]  Q: When you say background information, I take it it is

[12] information bearing on the selection of the biology

[13] text?

[14]  A: Right, right.

[15]  Q: And the biology curriculum?

[16]  A: Yes.

[17]  Q: The meeting more recently in April of 2005, who did you

[18] meet with at that time?

[19]  A: That was just Paula Knudsen.

[20]  Q: Who else was present?

[21]  A: Sandi Bowser, Rob Eshbach and Bertha Spahr.

[22]  Q: Apart from these meetings, have you had any other

[23] communications with —

[24]  A: Yes.

[25]  Q: Tell me when those occurred.

Tammy Kitzmiller, et al. v.
Dover Area School District, et al.

Jennifer Miller
May 18, 2005

**Page 9**

[1] A: I first got a call from Eric Rothschild I believe it was
[2] sometime late October of 2004.
[3] Q: And tell me what you discussed with Mr. Rothschild at
[4] that time.
[5] A: He informed me that he was a lawyer with Pepper
[6] Hamilton, and that he was possibly representing parents
[7] in the case, and that — basically, just more
[8] background. When did this happen, and who did you meet
[9] with, and that kind of thing.
[10] Q: Apart from this telephone conversation, did you have
[11] other conversations?
[12] A: There were a couple of times when Eric would e-mail for
[13] information. I know just recently, there was a request
[14] for a textbook that we looked at in ordering the biology
[15] textbook. He asked for a new phone number of certain
[16] people and things like that.
[17] Q: Recently, you say there was an inquiry regarding a
[18] textbook.
[19] A: Yes.
[20] Q: That occurred via e-mail?
[21] A: Yes.
[22] Q: Did you include that e-mail?
[23] A: Yes, that is in there.
[24] Q: Thank you very much. Apart from these two conversations
[25] or communications with Mr. Rothschild you have

**Page 10**

[1] referenced, were there others?
[2] A: I just had — the only one was Paula called me — I
[3] don't know — several weeks ago just to make me aware of
[4] information that came out in another deposition that she
[5] felt that I should be aware of.
[6] Q: What information was that?
[7] A: That Angie Yingling referred to me as the teacher that
[8] wears tight pants. She thought that I should be aware
[9] of that. That was it.
[10] Q: Angie's deposition was colorful to say the least. I
[11] think everyone blushed at some point.
[12] Anything else in terms of communications with
[13] other persons?
[14] A: Not that I can recall.
[15] Q: Or lawyers for the plaintiffs?
[16] A: No.
[17] Q: How about documents, have you reviewed documents in
[18] preparation for today's deposition?
[19] A: Yes.
[20] Q: Tell me if you can just what were the nature of the
[21] documents in general?
[22] A: Most of the documents that we have put together, just
[23] sort of looking over the timeline to make sure we have
[24] that down. Just background, communications, that kind
[25] of thing.

**Page 11**

[1] Q: And the documents you have referenced, did you provide
[2] those in response to the subpoena?
[3] A: Yes.
[4] Q: Did you speak with any of the plaintiffs in preparation
[5] for the deposition?
[6] A: No.
[7] Q: Have you reviewed any of the deposition transcripts from
[8] the proceedings thus far?
[9] A: Yes.
[10] Q: Which transcripts have you reviewed?
[11] A: I have read I guess the first four which would have been
[12] Bonsell's, Buckingham's, Nilsen's and Harkins' I
[13] believe, those four. And I just recently read Charlotte
[14] Buckingham's, too.
[15] Q: Did you have any conversations with former Board members
[16] in connection with this deposition?
[17] A: No.
[18] Q: Apart from the discussion with your colleagues that you
[19] had with counsel, have you had discussions with your
[20] colleagues about your deposition?
[21] A: No, not apart from with counsel.
[22] Q: It appears you have been quite thorough in your response
[23] to my subpoena, and I appreciate that. Just let me ask
[24] you a few questions to see if there is anything you
[25] might have neglected inadvertently.

**Page 12**

[1] Do you use your home computer in connection with
[2] your work as a schoolteacher?
[3] A: Not typically, no.
[4] Q: Did you check that computer?
[5] A: No, I don't think I did.
[6] Q: Do you have any recollection of generating documents
[7] relating to the subject matter of this litigation on
[8] your home computer?
[9] A: No. The only thing would have been the e-mails that I
[10] told you about with Eric. That would have been it that
[11] I can recall.
[12] Q: I know or I believe at some point plaintiffs' counsel
[13] served a subpoena on you?
[14] A: Yes.
[15] Q: Are the documents that you produced to me today
[16] identical to those you have produced for them?
[17] A: Yes.
[18] Q: Thank you. How would you prefer I address you for the
[19] purpose of this deposition?
[20] A: Jen, Jennifer. It doesn't matter.
[21] Q: Feel free to call me Pat if my questions are imprecise.
[22] Jen, if you would, give me a brief sketch of your
[23] educational background beginning with high school.
[24] A: Graduated from high school from Spring Grove High
[25] School, went to Elizabethtown College. I graduated with

Jennifer Miller
May 18, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 13

[1] a bachelor of science degree in biology and secondary
[2] education. I'm certified to teach biology and general
[3] science. And I have a master's degree from Penn State
[4] in teaching and the curriculum.
[5]     Q: In terms of your biology major, what sort of coursework
[6] did you take as an undergraduate?
[7]     A: Oh, my. I mean General Biology 1 and 2. I had
[8] Molecular Biology. Goodness. Physiology. That's
[9] terrible. Development and Evolution was a course that I
[10] had. Genetics, Ecology. I am sure there was more.
[11]     Q: That is quite all right. Let me be a little more
[12] specific. You have indicated you have at least one
[13] course that seems focused on Evolutionary Theory?
[14]     A: Yes.
[15]     Q: Who taught that course?
[16]     A: Professor Hoffman. Dr. Hoffman I guess that was.
[17]     Q: And about what year would that be?
[18]     A: I believe that was my junior year. So that would have
[19] been '91-'92, somewhere around there.
[20]     Q: And Molecular Biology — let me ask you this: Apart
[21] from this course on Development and Evolution, did you
[22] have any other course which had Evolutionary Theory as a
[23] main focus of the area of inquiry?
[24]     A: Probably not as a main focus. But I think in General
[25] Biology, you covered it, too. But not in the depth that

Page 14

[1] you would in the specific course.
[2]     Q: Molecular Biology?
[3]     A: Yes.
[4]     Q: When did you take that?
[5]     A: I believe that was my sophomore year which would have
[6] been '90, '91.
[7]     Q: Who taught that course?
[8]     A: Dr. Polanowski.
[9]     Q: You indicated you had been certified by the state for
[10] teaching biology?
[11]     A: Yes.
[12]     Q: What does that entail?
[13]     A: You mean like what courses can I teach?
[14]     Q: No. What did you have to do in order to be certified?
[15]     A: To be certified, you have to take tests in your specific
[16] area, and then a general sort of teacher test to be
[17] certified.
[18]     Q: So there is a written examination?
[19]     A: Yes.
[20]     Q: And your subject matter was biology?
[21]     A: Yes.
[22]     Q: And your master's from Penn State, when did you get
[23] that?
[24]     A: I believe '99. It would have been May or June of '99 I
[25] believe.

Page 15

[1]     Q: And what was that in?
[2]     A: Teaching and the curriculum.
[3]     Q: Was it teaching in general or teaching specific to your
[4] area of focus?
[5]     A: In general.
[6]     Q: How about the focus on curriculum, was that in general
[7] also?
[8]     A: Yes.
[9]     Q: Did any of the coursework or work that you did in
[10] connection with getting your master's specifically
[11] address biology curriculum?
[12]     A: No.
[13]     Q: I am going to ask you a few questions just to see if you
[14] have any relations with — certain kinds of relations
[15] with any of the other persons who are involved in this
[16] dispute.
[17]     A: Okay.
[18]     Q: Do you have any relations by blood or marriage to anyone
[19] who has been on the Dover Area School District School
[20] Board since January of 2002?
[21]     A: No, I don't believe so.
[22]     Q: How about anyone who has been in the administration?
[23]     A: No.
[24]     Q: How about anyone who has employed by Dover area schools?
[25]     A: I have to think. I'm not sure. There may be a teacher

Page 16

[1] or secretary or something, but no administration or
[2] anything like that.
[3]     Q: It seems a remote relation?
[4]     A: Yes, it is not direct.
[5]     Q: How about any business dealings, have you had any
[6] business dealings with anyone who has been on the Dover
[7] Area School District School Board since January of 2002?
[8]     A: No.
[9]     Q: The administration?
[10]     A: No. Other than day-to-day. They are my boss.
[11]     Q: That's a comprehensive answer. How about any shared
[12] memberships in organizations with Dover Area School
[13] Board members since January of 2002?
[14]     A: I don't believe so, no.
[15]     Q: Members of the administration?
[16]     A: Unless they are part of a teacher type thing, no.
[17]     Q: That's fine. How about you indicated that you are a
[18] member of a union representing teachers?
[19]     A: Yes.
[20]     Q: Do you have any relationship outside your sort of work
[21] here at the school with Sandi Bowser?
[22]     A: No.
[23]     Q: Bill Miller?
[24]     A: No.
[25]     Q: Brad Neal?

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Jennifer Miller
May 18, 2005

[1]  A: No.

[2]  Q: Give me a sense of your employment history. When did

[3]  you start teaching?

[4]  A: I started teaching the '93-'94 school year.

[5]  Q: Where did you start?

[6]  A: Here at Dover.

[7]  Q: What subject matter?

[8]  A: My first year, I taught Biology and it was called Techno

[9]  Science at that time, which is basically an

[10]  environmental science. Since then, I basically taught

[11]  Biology and Biology 2 which later became Anatomy and

[12]  Physiology.

[13]  Q: And subsequently?

[14]  A: Subsequently what?

[15]  Q: What did you teach?

[16]  A: Since?

[17]  Q: Since the first year.

[18]  A: Since the first year, it has been Biology, Anatomy and

[19]  Physiology.

[20]  Q: We know that the biology text and changes to the biology

[21]  curriculum are sort of the focal point of this dispute.

[22]  I want to get a sense for what you recall about how this

[23]  dispute unfolded.

[24]  A: Okay.

[25]  Q: If we look at the period up until January of 2002, and

[1]  everything before that, were these issues on the radar

[2]  screen so to speak prior to January of 2002?

[3]  A: No, not that I'm aware of.

[4]  Q: How about for the year 2002, do you recall the biology

[5]  text or the biology curriculum being a focal point of

[6]  attention by the Board?

[7]  A: No.

[8]  Q: That brings us to 2003. How about that year if we look

[9]  at that year from January through say May of 2003?

[10]  A: Yes. The only thing that I can remember is a mention

[11]  from Bertha Spahr, who is the Department head, of

[12]  conversations that I guess that were held between Mr.

[13]  Baksa and her, or Dr. Peterman and her, on teaching

[14]  equal time Creationism and Evolution in the biology

[15]  classroom.

[16]  Q: Okay. Give me a sense for when that conversation

[17]  occurred.

[18]  A: I couldn't pinpoint it. Probably spring of 2003.

[19]  Q: April, May?

[20]  A: Right, somewhere around there.

[21]  Q: And tell me what did Bert Spahr tell you?

[22]  A: I believe it was just something like we better, you

[23]  know, keep our guard up. This is what was asked of me

[24]  or discussed. Something like that.

[25]  And basically after that, I mean other than that

[1]  conversation, I don't remember much else being

[2]  discussed.

[3]  Q: Did she attribute any statements to Mike Baksa?

[4]  A: Not in particular, no. She just had — I believe she

[5]  said he had come to her and talked to her about it, his

[6]  concerns or whatever.

[7]  Q: Let me be more specific. You used the word Creationism.

[8]  Did Bert say that Mike had told her someone wanted to

[9]  teach Creationism?

[10]  A: I remember it that way, yes.

[11]  Q: Do you recall her saying anything about equal time for

[12]  other theories?

[13]  A: I believe that she said equal time Creationism and

[14]  Evolution.

[15]  Q: Apart from that statement, was there anything else that

[16]  Bert told you and attributed to Mike Baksa?

[17]  A: Not that I can recall, no.

[18]  Q: Did she mention Dr. Nilsen in that conversation?

[19]  A: I don't believe so, no.

[20]  Q: How about Dr. Peterman?

[21]  A: I just know that after Mr. Baksa came to her, then she

[22]  went to Dr. Peterman with her concerns. I know she was

[23]  concerned with at that time, we had two untenured

[24]  teachers teaching biology and subjecting them to

[25]  criticism or whatever. The subject sort of was a leery

[1]  one. She went to Dr. Peterman with her concerns.

[2]  I don't know any specific statements that Dr.

[3]  Peterman made because I was not in that meeting when she

[4]  went to her.

[5]  Q: Fair enough. Did she state what her concerns were for

[6]  the untenured teachers?

[7]  A: Just that there has been court cases that say you can't

[8]  teach Creationism. So she was concerned if this is

[9]  coming, then you have some untenured teachers that would

[10]  be teaching it. She was concerned for — I don't

[11]  know — I don't know if I want to ask for their jobs.

[12]  Younger teachers and putting them in that position I

[13]  guess.

[14]  Q: You said that Bert said we need to keep on our guard?

[15]  A: Yes. Something to that effect, yeah.

[16]  Q: Sure. Did she say anything else that elaborated on that

[17]  point?

[18]  A: Not that I can recall.

[19]  Q: Did Bert ever show you a memo reflecting —

[20]  A: No.

[21]  Q: — her conversation?

[22]  A: No. I have seen it recently. But not at that time, I

[23]  didn't, no.

[24]  MS. PENNY: Off the record.

[25]  (J. Miller Deposition Exhibit 1 was marked.)

ennifer Miller
lay 18, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 21

BY MR. GILLEN:

[1]

[2]   Q: Would you take a minute to look that over, Jen?

[3]   A: Sure. Okay.

[4]   Q: There's a few things in there I would like to ask you

[5]   about. If you look at that first paragraph about midway

[6]   through, you will see a sentence which says that she —

[7]   referencing Ms. Spahr — explained to Mr. Baksa that all

[8]   biology teachers state that another theory of Evolution

[9]   is Creationism, but Creationism per se is not taught

[10]   since it is not addressed by the standards.

[11]   Did you have any discussion with Bert Spahr about

[12]   whether Creationism was referenced prior to April 1st,

[13]   2003?

[14]   A: Not that I can recall. I don't know if I would agree

[15]   with what she says there, but I don't necessarily recall

[16]   her — we may have had a conversation, but I don't

[17]   remember any specifics if we had.

[18]   Q: That's fine. Everyone realizes you are trying to

[19]   remember things from April of 2003.

[20]   A: Right.

[21]   Q: What do you mean when you say I don't agree with what

[22]   she says there?

[23]   A: I will just tell you the way I teach Evolution is I have

[24]   never really had a problem with students in my classroom

[25]   disagreeing or having a whole lot of controversy because

Page 22

[1]   the very first day that I teach Evolution, I ask them

[2]   what their definition of Evolution is.

[3]   We always get all kinds of different things,

[4]   monkeys, we came from monkeys and all kinds of things

[5]   like that. Then I try to put to rest the first day that

[6]   what we are going to teach is Evolution is change over

[7]   time.

[8]   And I basically tell them I don't believe — I

[9]   can't care how they believe life began. We are not

[10]   going to hit that. We are going to look at once life is

[11]   here, what has happened to it since.

[12]   I wouldn't say that I necessarily stated that

[13]   another theory is Creationism because I try to put that

[14]   at rest in the beginning and not get into the origin of

[15]   life type thing.

[16]   Q: Okay. And that is part of the reason I asked you the

[17]   question. You say change over time an origin of life.

[18]   Where do you start in your presentation of Evolutionary

[19]   Theory, Jen; how do you present that concept to your

[20]   students?

[21]   A: That conversation I just told you is basically the first

[22]   day. And then we look at — we start with Darwin and

[23]   his background, how he went on his trip and what

[24]   evidence he collected and that kind of thing and how he

[25]   came up with his theory of natural selection.

Page 23

[1]   I always tell them that Darwin didn't really come

[2]   up with Evolution, that most people knew that things

[3]   changed. That Darwin was the one that came up with

[4]   natural selection, a mechanism for how things changed.

[5]   Then we look from there at basically natural

[6]   selection and competition and how finches — how do you

[7]   think a finch got here? There's all kinds of different

[8]   species of finches. How do we get all these different

[9]   species of finches? We look at that.

[10]   Q: Am I understanding you correctly that you don't look at

[11]   sort of the microbiological part of the process?

[12]   A: Right. Right.

[13]   Q: Don't look at the larger sort of what cosmological part

[14]   of the process, the Big Bang?

[15]   A: Right, right.

[16]   Q: And then you have referenced a sort of diversification

[17]   of species?

[18]   A: Yes.

[19]   Q: Do you focus on change within species?

[20]   A: Yes. But like by isolation, for example, a finch could

[21]   become two species of finches because they don't

[22]   interbreed anymore. They would still be two separate

[23]   species of finches, but they are still a finch.

[24]   Q: You are the biology teacher. How is that level of

[25]   change you have just described by your profession?

Page 24

[1]   A: To me, I call it speciation. That is what that is

[2]   called. Origin of species or speciation, becoming new

[3]   species.

[4]   Q: You have referenced origin of life. Do you see that as

[5]   another way of saying origin of species, or it's two

[6]   different concepts?

[7]   A: I see that as two different things.

[8]   Q: Tell me how.

[9]   A: Origin of life is how life began from a single molecule

[10]   up to the many organisms that we have today. Whereas

[11]   speciation is just as I said, how a finch becomes

[12]   different species of finches or how a turtle becomes

[13]   different species of turtles.

[14]   Q: Forgive me. High school biology was my last biology.

[15]   This sort of comes up in these depositions. You are the

[16]   teacher so I want to get a sense for what about the

[17]   connection between species or the diversification of

[18]   species?

[19]   A: That is one part of Darwin's Theory, the interconnection

[20]   between different species. But again, I try to

[21]   concentrate on not going back into what became what

[22]   necessarily, sort of like a timeline of life

[23]   necessarily. I try to stay away from that.

[24]   I go with, like I said, speciation.

[25]   Q: How about if we look at the origin of man? I am not

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Jennifer Miller
May 18, 2005

**Page 25**

[1] sure how that is described in Evolutionary Theory. But
[2] that topic, do you present on that?
[3]   A: No.
[4]   Q: Did you ever present on that?
[5]   A: Not that I can recall, no.
[6]   Q: Did you see that subject as outside — what shall I say
[7] — the parameters of presentation that you have
[8] described to me thus far?
[9]   A: It definitely — I wouldn't even say it's part of
[10] Darwin's Theory, the origin of man. But it is part of
[11] sort of the whole — can fall under the Evolution. But
[12] again, I try to stick with some of Darwin's Theory and
[13] speciation. I see it as two separate things.
[14]   Q: I take it from your answers that it was never the
[15] subject of your classroom instruction?
[16]   A: Right. I couldn't tell you what other classrooms do.
[17]   Q: If we look at the second paragraph of this document
[18] which has been marked as Exhibit 1, and which I will
[19] just say for the record is a memo from Dr. Peterman
[20] dated April 1st, 2003 to Mike Baksa and others, the
[21] second paragraph of that memo, the second sentence says
[22] I advise them to continue to mention that Creationism is
[23] another alternate theory of Evolution.
[24]   A: Yes.
[25]   Q: Did you ever receive instruction from anyone along those

**Page 26**

[1] lines?
[2]   A: I don't recall ever Dr. Peterman, no, saying anything
[3] like that to us.
[4]   Q: How about Bert Spahr, did she ever give you a direction
[5] along those lines?
[6]   A: I think she may have said continue teaching as is, you
[7] know, as you are.
[8]   Q: And that statement, do you connect that with this memo
[9] or the discussion you had with Bert?
[10]   A: Probably, yeah. When she was sort of explaining that
[11] this occurred, and she explained just to continue
[12] teaching as we are to our standards and things like
[13] that.
[14]   Q: When you spoke with Bert, did she reference this memo?
[15]   A: I don't — I couldn't tell you. I don't know if she did
[16] or not.
[17]   Q: That's fine. I just want to get a sense for what you
[18] recall. That's all.
[19]   So we have this discussion in the spring of 2003,
[20] April or May. When does the school year end?
[21]   A: Beginning of June; first, second week of June.
[22]   Q: I think you said you don't recall anything really
[23] happening after that?
[24]   A: No.
[25]   Q: Let's look at the fall of 2003. Let me ask you: Did

**Page 27**

[1] the biology text or biology curriculum come to your
[2] attention in the fall?
[3]   A: Yes.
[4]   Q: Tell me how.
[5]   A: We were asked to sit in a meeting with Mr. Bonsell to
[6] go over his concerns I guess with how Evolution was
[7] taught in the biology classes.
[8]   Q: You say fall of 2003. Can you date it any more
[9] precisely?
[10]   A: No. I don't remember.
[11]   Q: That's fine.
[12]   A: I am guessing — no, I don't know. I don't know when it
[13] was.
[14]   Q: That's quite all right and not unusual.
[15]   A: I know it was the fall because I remember having
[16] discussions that his son was going to take biology in
[17] the spring. So I know it was before. Our spring
[18] semester would have started in January.
[19]   Q: All right. I jumped to this a little early. Let me ask
[20] you this: In 2003 in the spring, was the biology text
[21] up for purchase?
[22]   A: I have to think. We got the textbook this year,
[23] 2004-2005. I guess it would have been, yes.
[24]   Q: Let's shift back to the spring, say the first half of
[25] the year of 2003. Let me ask you: Do you recall the

**Page 28**

[1] biology text being a subject of discussion?
[2]   A: No. The only — I believe if I remember correctly that
[3] year, we were up for new textbooks because there's a
[4] rotation. Each Department gets them a certain number of
[5] years. And the Science Department was up to get new
[6] textbooks.
[7]   I believe that was the year that they put off all
[8] purchase of any textbooks, the School Board did, until
[9] the next year. They wanted to wait a year I guess. I
[10] am assuming it was to save money.
[11]   Q: You say you're assuming. Did you hear anything about
[12] fiscal pressure?
[13]   A: I think so. I don't know. I was told probably — I
[14] remember something about using the fund balance the next
[15] year to purchase the textbooks or something. No
[16] textbooks were purchased that year as far as I know.
[17]   Q: Give me a sense for when you got that news. Did that
[18] utterly cut short even the selection process, or had the
[19] selection occurred, and then you got the word we are not
[20] going to buy them?
[21]   A: I believe that the selection had occurred because we
[22] have to have our budgets done in January. So I believe
[23] we had already put in for textbooks, and then we had
[24] heard that no one was getting them that year.
[25]   Q: If you look at the ordinary cycle of text selection and

**Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.**

**Page 29**

[1] budget process for the School District, does that give
[2] you a sense for when you would have — the text
[3] selection would have occurred and the news of no
[4] purchase would have been given? That is a very awkward
[5] question.
[6]   A: No, we always put them in in January. The budget I
[7] believe goes out in the summer. Sometime between
[8] January and June, we had heard that they weren't doing
[9] any textbooks at some point.
[10]   Q: Good enough. So we are in the fall of 2003 then?
[11]   A: Yes.
[12]   Q: And there is a meeting with Alan Bonsell?
[13]   A: Yes.
[14]   Q: Do you know why you were meeting with Alan Bonsell? Was
[15] it his capacity as head of the curriculum committee?
[16]   A: Yes. I believe so at that point, yes.
[17]   Q: And how did you get word of the meeting?
[18]   A: I'm assuming — I don't remember specifically, but I'm
[19] assuming Mrs. Spahr would have told us as a Science
[20] Department that we were asked to meet.
[21]   Q: If we use this meeting as a marker and then the
[22] discussion you have already recalled, anything else come
[23] to mind between that discussion with Bert in the spring
[24] and this notification from Bert that there is going to
[25] be a meeting of the curriculum committee?

**Page 30**

[1]   A: No, not that I recall.
[2]   Q: When Bert Spahr told you there was going to be a meeting
[3] with Alan Bonsell, did she give you more information
[4] about that?
[5]   A: I believe that it was just on be prepared to explain how
[6] you teach Evolution, that he had concerns of how
[7] Evolution was taught.
[8]   Q: At that time, did she tell you the nature of his
[9] concerns?
[10]   A: Other than that his son was going to be taking biology
[11] in the spring, I don't recall anything.
[12]   Q: Where was the meeting?
[13]   A: I believe that was in one of the conference rooms at the
[14] High School. It might have been in the Principal's
[15] Office. I don't remember specifically.
[16]   Q: Who was there?
[17]   A: I can't remember if all of the Science Department was
[18] there, but I remember a good number of us were there.
[19] There's seven of us. I would say at least over half of
[20] us was there.
[21]   Obviously, Mr. Bonsell was there. I can't
[22] remember if — I am assuming it was Mr. Baksa. He was
[23] usually in on all of the meetings. I can't remember
[24] if — I think — I am trying to think in the fall of
[25] 2003, I think maybe Dr. Peterman was there also.

**Page 31**

[1]   Q: You mentioned the Science Department is fairly large.
[2] Was this meeting addressing science generally or
[3] biology?
[4]   A: It was the topic of Evolution. It was specifically
[5] biology, but I know that there were other members that
[6] don't teach biology there. It was the whole Science
[7] Department that was asked to come.
[8]   Q: At that time, who was in the Science Department? There
[9] is Bert Spahr?
[10]   A: Yes.
[11]   Q: Rob Eshbach?
[12]   A: Rob Eshbach and myself, Robert Linker, Leslie Prall,
[13] Bryan Rehm, Dave Taylor. I'm thinking. I think that
[14] that would basically cover it.
[15]   Q: Of those names, do you think Bert Spahr was there?
[16]   A: Yes.
[17]   Q: Rob Eshbach?
[18]   A: Yes.
[19]   Q: Robert Linker?
[20]   A: That one, I am not sure of. I don't know.
[21]   Q: Leslie Prall?
[22]   A: I think she might have been there. Not a hundred
[23] percent positive.
[24]   Q: How about Bryan Rehm?
[25]   A: Yes, he was there.

**Page 32**

[1]   Q: And Dave Taylor?
[2]   A: That one, I am not sure of.
[3]   Q: And you are not sure of Dr. Peterman?
[4]   A: I think she was there. I couldn't say with a hundred
[5] percent certainty.
[6]   Q: How about Dr. Nilsen?
[7]   A: I don't believe so. I don't remember that he was there.
[8]   Q: Was Alan Bonsell the only Board member there?
[9]   A: Yes.
[10]   Q: Tell me what you can recall about that meeting. Wait.
[11] Let me stop you. I'm sorry.
[12]   Did you have any discussion with any of your
[13] colleagues or members of administration or School Board
[14] prior to attending this meeting with Mr. Bonsell?
[15]   A: Not that I can recall, no.
[16]   Q: Earlier, Bert had said something to the effect of be on
[17] guard?
[18]   A: Right.
[19]   Q: Did she express similar concerns in —
[20]   A: I was going to say if anything, it would have been a
[21] discussion among Department members. You know what I
[22] mean? But I don't remember anything with administration
[23] or the School Board before we went in.
[24]   Q: When she told you to be prepared to explain how you
[25] teach Evolutionary Theory, did you have an understanding

**Min-U-Script®**     **Filius & McLucas Reporting Service, Inc.**

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Jennifer Miller
May 18, 2005

**Page 33**

[1] of what she was getting at?

[2]    A: Not necessarily. I remember conversations — I don't

[3] know if it was with Bertha — I believe Mr. Baksa. I

[4] don't remember if it was this meeting or another

[5] meeting, but I remember someone giving us background on

[6] some of Mr. Bonsell's beliefs, where he may be coming

[7] from.

[8]    Q: And you say background on Mr. Bonsell's beliefs was

[9] provided by someone?

[10]    A: Yeah.

[11]    Q: A couple of things. Do you think it was in preparation

[12] for this meeting?

[13]    A: It may have been. I believe it was, yeah.

[14]    Q: Let me see if I can help you in this way. Did you have

[15] another meeting with Mr. Bonsell about the biology

[16] curriculum while he was head of the Board curriculum

[17] committee?

[18]    A: Not that I can recall. He was at meetings where he was

[19] Board President, but I don't believe there was another

[20] meeting with him as head of Board curriculum.

[21]    Q: Does this make you say —

[22]    A: That is why I say it probably was this.

[23]    Q: Do you recall who gave you this background on

[24] Mr. Bonsell's beliefs?

[25]    A: I think it was Mr. Baksa.

**Page 34**

[1]    Q: Do you recall what background you received?

[2]    A: Just that Mr. Bonsell — I remember the conversation of

[3] him being I guess what is called a Young Earth Theorist

[4] that only believe life is a little over 2,000 years old,

[5] does not believe necessarily in some of the carbon

[6] dating and fossil records that prove that life is older

[7] than 2,000 years old.

[8]    Q: Do you recall any mention of Intelligent Design?

[9]    A: No.

[10]    Q: Any mention of Of Pandas and People?

[11]    A: No.

[12]    Q: Any mention of balance in the text that was being used

[13] at that time?

[14]    A: Not that I can recall, no.

[15]    Q: Any mention of specific concerns about the text that was

[16] in use?

[17]    A: No. Not that I can recall, no.

[18]    Q: Apart from this background you believe you received in

[19] preparation for this meeting, any other discussions with

[20] your colleagues leading up to the meeting?

[21]    A: Not that I can remember, no.

[22]    Q: Tell me how the meeting unfolded to the extent you can

[23] remember.

[24]    A: Again, he was asking how we taught Evolution, how was it

[25] presented in the biology classroom. And I explained to

**Page 35**

[1] him, just as I explained to you earlier, how I approach

[2] Evolution.

[3]    And we did explain to him — he was concerned with

[4] — I remember talking about the origin of life. He was

[5] concerned with do we look at the origin of life. And we

[6] explained to him no, that we did explain the difference

[7] between origin of life and origin of species and

[8] speciation, and that is what we covered.

[9]    And to the best of my recollection when we left

[10] the meeting, we thought that he was — we left on good

[11] terms. There was no, you know, heated debate or

[12] anything like that.

[13]    We had assumed that his concerns were addressed

[14] and that he was satisfied with how we taught Evolution

[15] when we left that meeting.

[16]    Q: Let me ask about that. Was it just an exchange, a sort

[17] of cordial exchange, or was there any — what shall I

[18] say — animosity?

[19]    A: No, I don't remember any.

[20]    Q: Do you recall anything that Mr. Bonsell said?

[21]    A: No, I couldn't quote him saying anything in particular.

[22]    Q: You said that he had a concern related to the origins of

[23] life?

[24]    A: Yes.

[25]    Q: When he used that term, did you get a sense for what he

**Page 36**

[1] meant?

[2]    A: Again, when you're talking about origins of life, that's

[3] when you get into some of the aspects of Evolution that

[4] are the most controversial because it would talk about

[5] how one species would become another species or that

[6] kind of thing.

[7]    Q: But did he say anything that addressed those subjects

[8] you have just described?

[9]    A: I can't remember specifically, no.

[10]    Q: You explained how you teach biology. Who were the other

[11] biology teachers at that time?

[12]    A: It would have been Leslie Prall and Robert Linker. And

[13] Rob Eshbach was teaching it — I don't remember what

[14] year — but he was teaching at least a couple of classes

[15] at some point. So he would have taught it or was

[16] currently teaching it. I can't remember.

[17]    Q: Did they all give an individual explanation?

[18]    A: Not that I can remember, no. I think that they sort —

[19] I don't know if they elected me as the spokesperson or

[20] what.

[21]    Q: Was it basically you gave your explanation, and they

[22] said me, too?

[23]    A: Basically, yes.

[24]    Q: How about did Creationism come up during that meeting?

[25]    A: I don't remember that it did, no.

**Tammy Kitzmiller, et al.   v.**
**Dover Area School District, et al.**

Jennifer Miller
May 18, 2005

Page 41

[1]   Q: Looking at that fall meeting again, did the teachers
[2] explain whether or not this issue was even an issue for
[3] the students to Mr. Bonsell? And by this issue, I mean
[4] Evolutionary Theory.
[5]   A: That came up at some point. I am not sure if it was at
[6] that meeting or not. But at some point, I think we were
[7] asked did you ever have a problem in our classrooms.
[8] Like I said, I can't be sure if it was at that meeting
[9] or not. There was that discussion at some point.
[10]   Q: Do you recall — I know this is hard, but I am just
[11] trying to prompt you.
[12]   Do you recall whether Mr. Bonsell asked that
[13] question?
[14]   A: No, I don't remember that. I don't know if he did or
[15] not.
[16]   Q: You say he mentioned his son was going to be taking
[17] biology in the upcoming year. Is that a reference to
[18] the 2003-2004 school year?
[19]   A: Yes.
[20]   Q: We're in 2004. Let's just break it up into quarters.
[21] In the beginning of that year, January through March,
[22] did the biology text or biology curriculum come to your
[23] attention then as a big issue?
[24]   A: The only — the thing that would have happened with the
[25] biology text, at that point again since we were up for a

Page 42

[1] biology text, we would have put it in our budget again
[2] in January when our budget went in in January.
[3]   Most of my recollection of meetings I would say
[4] would fall after that. Sort of in the spring of 2004.
[5]   Q: Just in terms of the text selection process, do you
[6] recall whether there was any renewed examination of
[7] texts in 2004, or did you guys stick with what you had
[8] come up with in 2003?
[9]   A: There may have been renewed examination, asked if there
[10] was any updated versions or editions or things like
[11] that.
[12]   Q: How do you get that word of updated version? Do you
[13] have to make inquiry, or does the publisher tell you?
[14]   A: A little of both. Sometimes, the publisher if they know
[15] we are up for textbook selection will send up preview
[16] copies of editions.
[17]   Sometimes, we get catalogs, and we may call the
[18] publishers and ask for specific texts that we may want
[19] to look at.
[20]   Q: In the ordinary course of business, it would be sometime
[21] in this early part of the year that the Department would
[22] put in with the Board —
[23]   A: Yes.
[24]   Q: — for inclusion of the text in the budget?
[25]   A: Yes. January is when we have to submit our budget to

Page 43

[1] Mrs. Spahr.
[2]   Q: But at least for these first three months, no back and
[3] forth yet about the text?
[4]   A: No. Not that I can remember, no.
[5]   MR. GILLEN: Let's take a brief break.
[6]   (A recess was taken.)
[7]                     AFTER RECESS
[8]                     BY MR. GILLEN:
[9]   Q: Let me ask you, Jen, we are looking at 2004 from January
[10] through March. Did you attend any School Board meetings
[11] during that period?
[12]   A: I don't remember. I don't remember if I did. If I did,
[13] I would have them in my documents — well, if I saved
[14] them that is, if I saved the minutes. But I don't
[15] remember in particular.
[16]   Q: How about attendance at Board meetings just generally,
[17] do you have a practice of going as a general matter?
[18]   A: Not in general. There are occasions if a topic is going
[19] to come up. I remember a possibility of eliminating a
[20] position that a lot of teachers went. When the building
[21] project was, I went to those meetings.
[22]   When this topic came up that related to my
[23] textbook or my curriculum, I went.
[24]   Q: If we look at that as your sort of polestar there, a
[25] Board meeting coming up that would relate to your area

Page 44

[1] of teaching and we look at 2003, did you go to any Board
[2] meetings in 2003 because you thought the biology text or
[3] biology curriculum would come up?
[4]   A: I don't believe so. There were occasions that I went,
[5] but I don't remember if it was because the textbook was
[6] going to come up or not.
[7]   Q: Was 2003 a big year for the building project?
[8]   A: I don't remember.
[9]   Q: Every year is a big year.
[10]   A: I don't think it was necessarily a big year for the
[11] building project, no. I couldn't tell you if I went to
[12] 2003 or not. I don't remember.
[13]   Q: Then for this period say January through March of 2003,
[14] don't have any recollection of being —
[15]   A: I don't remember if I was there or not.
[16]   Q: If we look at the period between March and June of 2004,
[17] did anything occur during that period that touched on
[18] the biology text, biology curriculum?
[19]   A: As far as meetings and things?
[20]   Q: Yes.
[21]   A: Yes.
[22]   Q: Tell me what you can remember.
[23]   A: I don't remember how many meetings we had, but there
[24] were several meetings with the Board curriculum
[25] committee again that touched on how we teach Evolution,

nnifer Miller
lay 18, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 45

[1] the textbooks, concerns with the textbook and things
[2] like that.
[3]     Q: Let's look at you said there's several meetings. How
[4] many during that period between March and June do you
[5] think?
[6]     A: I would say at least two or three.
[7]     Q: These are meetings with the Board curriculum committee?
[8]     A: Yes.
[9]     Q: Looking at this period between March and June of 2004,
[10] were there Department meetings apart from the Board
[11] curriculum committee meetings?
[12]     A: Yes. We would have Department meetings typically once a
[13] month or something, Science Department meetings.
[14]     Q: And your answer points to imprecision in my question.
[15] Were there Department meetings at which the biology text
[16] and biology curriculum were discussed?
[17]     A: I would assume that during one of the Department
[18] meetings — no, it wouldn't have been then. It would
[19] have been fall of 2003 is when we would have been
[20] looking at biology textbooks and picking and sort of
[21] collaborating on which one we liked.
[22]     Q: Okay.
[23]     A: But specific Department meetings, I don't remember any
[24] that just dealt with that, no.
[25]     Q: Did it come up — did the subject of biology text come

Page 46

[1] up during Department meetings in this period between
[2] March and June?
[3]     A: I would imagine that they did. I can't remember
[4] specifically.
[5]     Q: Right.
[6]     A: But I would imagine that they did.
[7]     Q: All right. There's several Board curriculum meetings.
[8] Tell me what you can remember about those. The first
[9] one, any sense for what month that might be in if we
[10] look at April, May, and June?
[11]     A: My recollection is it seemed like a lot of them were
[12] towards the end of the school year. So it would have
[13] been May or June.
[14]     I remember specifically one was like on the last
[15] day of school. I remember that one because we were
[16] called to a meeting on the last day of school. I know
[17] that there were meetings prior to that, and I can't
[18] remember when specifically they were.
[19]     Q: You say several, what do you think during that period?
[20]     A: Including that one at the end, like I said, I think
[21] three, four.
[22]     Q: Tell me do you have distinct recollections like the
[23] first meeting and what occasioned that?
[24]     A: I remember a meeting I believe it was at the high school
[25] where again the topic of a textbooks came up and didn't

Page 47

[1] like the way Evolution was presented in the textbook or
[2] Darwinism was presented in the textbook.
[3]     Q: All right. Let's get a fix on who was there. This is
[4] 2004.
[5]     A: Right. The curriculum committee would have been Sheila
[6] Harkins, Bill Buckingham and Casey Brown.
[7]     Q: All right.
[8]     A: The Department — I mean I know that for the most part,
[9] it was Mrs. Spahr and I and Rob Eshbach seemed to be the
[10] three that attended a lot of the meetings. I can't
[11] remember if other Department members were there. Some
[12] were there at some meetings and then others not. But
[13] the three of us were at most of the meetings.
[14]     Q: You say at this meeting concerns were expressed about
[15] the text. Who expressed those concerns?
[16]     A: We had gotten a list from Mr. Baksa of Mr. Buckingham's
[17] concerns with the textbook. He had pages with his
[18] concerns with paragraphs or things like that that were
[19] in the textbook.
[20]     Q: When did you get that list?
[21]     A: Again, I would assume it was around this time, spring
[22] some time.
[23]     Q: When Mr. Baksa gave you that list, did Mike say anything
[24] else to you?
[25]     A: I don't remember any specific quotes, but I believe we

Page 48

[1] were to take a look at those pages and see if we could
[2] see what his concerns were, take a look at those pages.
[3]     Q: Did you look at the pages that were identified prior to
[4] the meeting?
[5]     A: I believe so, yeah.
[6]     Q: What were you trying to do when you looked at them, get
[7] a sense for the —
[8]     A: What his concerns were. Get a sense of what his
[9] concerns were with the textbook.
[10]     Q: I guess I am just trying to figure out how you would be
[11] able to do that. You are looking at pages. Was it a
[12] handwritten list you received?
[13]     A: I got both. I think I got both a handwritten and a
[14] typed list.
[15]     Q: Did you keep that?
[16]     A: I think it is in the packet, yes.
[17]     Q: That is the problem. Off the record.
[18]     (An off-the-record discussion was had.)
[19]     (J. Miller Deposition Exhibit 2 was marked.)
[20]                 BY MR. GILLEN:
[21]     Q: Jen, I have shown you a document which we have marked as
[22] Miller 2. It is a set of pages really that you provided
[23] in response to my subpoena which speak in some way to
[24] the questions I have been asking you about the period
[25] sort of after March through June of 2004.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Jennifer Miller
May 18, 2005

**Page 49**

[1] Would you look through that and see if there is
[2] anything that helps you — that you believe will help
[3] you recall the events of that period?
[4] A: (Witness complies.)
[5] Q: Is there anything? What I am interested in is the
[6] subject of these meetings during this period with the
[7] Board curriculum committee.
[8] A: Yes.
[9] Q: You have indicated that some concerns were expressed
[10] about the text, and you received a listing of pages. Do
[11] you find that?
[12] A: Yes.
[13] Q: What does it look like?
[14] A: It says Curriculum Committee. It is written. And then
[15] the page behind that is the typed version.
[16] Q: Excellent. And we are referring to a handwritten page
[17] first that has Curriculum Committee on the top and the
[18] date 6-4-04 on the right-hand top?
[19] A: Yes.
[20] Q: What is this, Jen?
[21] A: This was a list of concerns — written concerns from
[22] Mr. Buckingham.
[23] Q: You received this from who?
[24] A: Mr. Baksa.
[25] Q: An then the document behind it is a typed version of it?

**Page 50**

[1] A: Yes.
[2] Q: Which has a first entry that begins with page 440 and a
[3] notation in the right-hand top that says given to Jen
[4] Miller.
[5] Do you know, Jen, as you look at these documents
[6] now whether they were given to you at the same time?
[7] A: My recollection is I got the typed version first and the
[8] written ones later.
[9] Q: Let's look at this meeting where you were presented with
[10] a list of reservations about the text.
[11] Did you have any discussion with anyone in the
[12] Science Department before going into this meeting with
[13] the Board curriculum committee?
[14] A: We may have gone over these together, the pages and sort
[15] of looked at the pages in the book to see where his
[16] concerns were. I don't remember any particular
[17] discussions.
[18] Q: That is what I was going to ask you. Did you and your
[19] colleagues reach a consensus about these pages and their
[20] contents before going to this meeting?
[21] A: I believe so, yes.
[22] Q: Tell me what that was.
[23] A: As far as what we thought his concerns were?
[24] Q: His concerns and your response.
[25] A: Most of his concerns seemed to deal with man's evolving.

**Page 51**

[1] I remember we also mentioned that he looked at the
[2] teacher's edition, and some of these concerns were the
[3] teacher to teacher section, or where it says applying
[4] concepts or something like that may have been only in
[5] the teacher's edition. It would not have been seen in
[6] the student edition that the students would have gotten.
[7] Q: Was the general sense that, again, some of the concerns
[8] were misplaced?
[9] A: I don't know exactly what you mean by misplaced.
[10] Q: In light of what you just described, if it is the
[11] teacher's manual and not in the student's version, that
[12] is kind of not a real issue.
[13] A: Right. But the teacher would be the only one privy to
[14] that information. The students wouldn't see it. If
[15] they were concerned with what the students would see,
[16] that wouldn't necessarily be an issue.
[17] Q: Tell me what happened when you got into the meeting.
[18] How did it begin?
[19] A: I am sure there was an introduction of everyone. Oh,
[20] my! I don't know specifically. Like I said, some of
[21] these run together of different meetings.
[22] Q: Do you recall Mr. Buckingham saying anything?
[23] A: At some of these meetings, I know there was some heated
[24] exchange between Mrs. Spahr and Mr. Buckingham.
[25] Q: Well, we have got two different pages and two meetings.

**Page 52**

[1] This meeting — the one that is dated indicates 6-4-04.
[2] The one that is not dated, can't speak to that.
[3] Are you looking at the typewritten page?
[4] A: Yes.
[5] Q: And you believe you received that first?
[6] A: I believe that I saw this before the handwritten
[7] version.
[8] Q: Do you remember if this first meeting during this period
[9] is the one where there was this heated exchange or not?
[10] A: I think so, yes.
[11] Q: Tell me about that.
[12] A: Somehow it got around to the history of the mural that
[13] was taken down from a room in the Science Department —
[14] or in the science classroom. And I think Mr. Buckingham
[15] stated that — I think Mrs. Spahr asked him if he saw
[16] the — apparently, the mural was burned and asked him if
[17] he knew who had burned it.
[18] And he stated something like — something to the
[19] effect that he gleefully saw it burn or something like
[20] that. So I remember that part of it.
[21] Q: How did that come up?
[22] A: Again, looking at the issues with the textbook, like I
[23] said, a lot of them had to do with man's Evolution.
[24] Again, it kept coming up.
[25] I know Mrs. Spahr said several times if I hear the

nnifer Miller
ay 18, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 53

[1] word monkeys to man again, I am going to scream or
[2] something. We kept hearing monkeys to man, monkeys to
[3] man. And we kept explaining that that is not the part
[4] of Evolution that we taught.
[5]    And I know it came up something about the mural.
[6] How can you explain the mural being in the classroom
[7] which depicted what you typically see of the monkeys
[8] going to man? You have seen that picture. A student
[9] had done that. How can you say that you don't teach it
[10] when that mural is in the back of the room?
[11]    Somehow it came around to that mural being in the
[12] back of the room.
[13]    Q: Apart from this exchange that you have recounted,
[14] anything else that sticks out from that meeting?
[15]    A: I think it was our first meeting. I remember — after
[16] that heated exchange, I remember at the end of that
[17] meeting, Mr. Buckingham and Mrs. Spahr shaking hands or
[18] something and saying no hard feelings, that type of
[19] thing at the end of the meeting.
[20]    As I said before, most of these meetings where
[21] they might have been heated during the meeting, we
[22] always left feeling that we had accomplished something
[23] or that we had explained our position, that kind of
[24] thing.
[25]    Q: Let me ask you about that. Did Sheila Harkins say

Page 54

[1] anything?
[2]    A: Again, I don't know which meeting it was. I remember
[3] Sheila being there, and we were looking at textbooks. I
[4] think at that time, we were looking at other family and
[5] consumer science textbooks. We may have had some family
[6] and consumer science people here also.
[7]    I remember her pointing out the family and
[8] consumer science textbooks, that they weren't — they
[9] weren't different enough from the last edition to
[10] warrant ordering a new one.
[11]    Then I remember her saying something about the
[12] biology textbooks, that she fell asleep reading it so
[13] she doesn't really know much about the biology because
[14] she fell asleep reading that. I remember that.
[15]    Her concern — I would say where she was coming
[16] from most often in the meetings was cost of textbooks or
[17] did it warrant getting new ones, were they different
[18] enough from the old ones to order new textbooks.
[19]    I would say hers was more of a fiscal — looking
[20] at the fiscal end of it than others.
[21]    Q: How about Casey Brown; when Mr. Buckingham's
[22] reservations were discussed, did she say anything?
[23]    A: I am sure she did. I don't know. I seem to remember
[24] her saying — sort of echoing what we saw in the Dr.
[25] Peterman memo, you know, whose religion are we going to

Page 55

[1] teach? The topic of religion came up somehow. Like I
[2] say, I can't remember all the details. I don't remember
[3] anything specific that she said necessarily.
[4]    Q: Well, it sounds like you explained to Mr. Buckingham
[5] what you had explained to Mr. Bonsell, which is we don't
[6] get into that?
[7]    A: Yes.
[8]    Q: Is that correct?
[9]    A: Yes. I would say we did that several times.
[10]    Q: You say that you left the meeting feeling that — having
[11] a similar sense that concerns had been addressed?
[12]    A: Yes.
[13]    Q: Was there any other discussion at the meeting that you
[14] can recall now? Did any of your peers speak up?
[15]    A: I imagine that they did. I know Mrs. Spahr spoke. I
[16] also remember discussions during this time, again
[17] concerns that we don't — constantly the monkeys to man
[18] and Evolution is not a fact came up.
[19]    Over these meetings I believe is where we came up
[20] with the compromise that we would be willing to point
[21] out that Darwin's Theory is not necessarily a fact; that
[22] there are parts of Darwin's Theory that don't have as
[23] much evidence as others.
[24]    Again, we left that thinking that that was a
[25] compromise on our part. We would be willing to do that.

Page 56

[1] Even though we already did it, let's put it in the
[2] curriculum that states that. We explained we already do
[3] that.
[4]    So through these meetings, somewhere came the
[5] change in the curriculum that said that gaps —
[6]    Q: Students will be made aware of gaps and problems?
[7]    A: Right, in Darwin's Theory. Somewhere in that time frame
[8] is where that came out.
[9]    Q: Let me ask you: Do you remember having received any
[10] materials in connection with these meetings during the
[11] spring period, DVD's, videotapes?
[12]    A: Yes, yes. We got an — I don't remember who it was
[13] from, but Mr. Baksa brought over to the Science
[14] Department. One of the last days of school, we sat down
[15] and watched a videotape. I believe it was called Icons
[16] of Evolution that we had watched that was given to us by
[17] — I am remembering Buckingham that got the tape and
[18] gave it to us.
[19]    Q: Anything else? Did you see Of Pandas as of that time?
[20]    A: I don't believe so.
[21]    Q: You mentioned that Bert Spahr said monkeys to man, I
[22] don't want to hear that again. Did Mr. Buckingham
[23] express any other concerns about the presentation of the
[24] text not being balanced?
[25]    A: The main focus was the Evolution of man, and again, the

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Jennifer Miller
May 18, 2005

Page 57

[1] origins of life issues that we talked about before.

[2]     Q: You said there was some discussion of the theory being
[3] presented as a fact. Did Mrs. Brown say anything on
[4] that point?

[5]     A: I can't remember anything specific that she would have
[6] said, no. No quotes or anything like that.

[7]     Q: Did you come away from these meetings in the spring with
[8] a sense of where Casey Brown stood with respect to
[9] presenting other theories?

[10]     A: Well, not necessarily other theories. I know at one
[11] point, Mr. Baksa — I can't remember when this was, the
[12] summer or spring, when it was. Someone — I think it
[13] was Mr. Baksa mentioned to me that she was having him
[14] read books on existentialism or something like that.

[15]     If we — I don't know. Whether or not she was
[16] going to push that, we didn't know. But I would say
[17] that she was — it seemed that she was sort of in
[18] opposition to the other Board members I guess in their
[19] concerns, that she didn't have some of those same
[20] concerns I guess. Other than that, I mean nothing in
[21] particular.

[22]     Q: Let's look at it maybe in terms of the materials from
[23] Discovery Institute. You say you went over a videotape
[24] that you think was called Icons of Evolution.
[25]     Did you get any DVD's at that time?

Page 58

[1]     A: That is the one I can remember. I don't remember any
[2] others.

[3]     Q: How about you mentioned some consideration of other
[4] texts; what do you recall touching on that?

[5]     A: When we considered texts to put into the budget, we
[6] looked at the prominent publishers. But we were given
[7] copies of books that were used by other local Christian
[8] schools and what textbooks they used.

[9]     Q: Do you know who provided that?

[10]     A: Mr. Baksa.

[11]     Q: Do you know whether — do you recall Mr. Buckingham ever
[12] requesting that?

[13]     A: I wasn't — I don't remember if that came out of a
[14] meeting or anything, no, that I was in attendance.

[15]     Q: In the packet that you have given us, there is a
[16] document that says Survey of Biology Books Used in Area
[17] Schools. Is that the document you are referring to,
[18] Jen?

[19]     A: Yes.

[20]     Q: Behind that in the packet that we have marked Exhibit 2,
[21] there is a Product Profile that references a text
[22] Biology put out by Bob Jones University Press.

[23]     Do you recall any discussion of that text?

[24]     A: If I remember correctly, this came out of, again, one of
[25] the meetings. My recollection is for some reason, I

Page 59

[1] think Bonsell — I may be wrong — mentioned that there
[2] may be other textbooks out there that we could look at.
[3] This was given to us by Mr. Baksa so I was assuming he
[4] researched specific ones.

[5]     I don't know if he was told to research certain
[6] ones or not, but this was given to us by him.

[7]     Q: How about any discussion of this text we are looking at
[8] Biology by Bob Jones University Press, was that actually
[9] discussed, or did you just get the piece of paper?

[10]     A: I don't believe that it was discussed at a meeting — at
[11] a specific Board curriculum meeting. I think Mr. Baksa
[12] may have said to me or others, that this one we can't
[13] use because of the context of it being specifically
[14] Christians and God and things like that.

[15]     Q: Further down in this packet, there is a chart entitled
[16] Beyond the Evolution Versus Creation Debate. You have a
[17] notation on the top here that says given to me by Baksa,
[18] spring 2004.

[19]     What do you recall about this document, Jen?

[20]     A: I found these documents in the front of my preview copy
[21] of the textbook. So I don't think there was much
[22] discussion, or maybe given to us saying look these over.
[23] I don't believe there was much discussion about them.
[24] This is sort of food for thought or background
[25] information.

Page 60

[1]     I don't remember specific discussions of them.

[2]     Q: Preview copy of the text, you are referring to the text
[3] Biology by Miller and Levin?

[4]     A: Yes.

[5]     Q: And by this time, was it clear that the Department was
[6] in favor of purchasing that text?

[7]     A: Yes.

[8]     Q: Let's look at the Board meetings in June?

[9]     A: Board meetings?

[10]     Q: Yes. Let's see what you recall about those Board
[11] meetings. Did you go to the Board meetings in June?

[12]     A: Yes.

[13]     Q: Of 2004?

[14]     A: Yes.

[15]     Q: Was there a particular reason?

[16]     A: Again, I knew the biology textbooks were coming up as a
[17] discussion item. I don't remember if they were a vote
[18] item at that point or not. I don't recall if it was or
[19] not.

[20]     I remember the June 14th meeting. There were a
[21] lot of teachers there because Dr. Peterman had told us
[22] that there was a possibility that they were eliminating
[23] an English position somewhere. She said for teachers to
[24] come and show support for them not to eliminate the
[25] position. I remember that meeting, that there were a

Filius  &  McLucas Reporting Service, Inc.     Min-U-Script®     (17) Page 57 - Page 60

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

### Page 61

[1] lot of us in attendance.

[2]    Q: I am going to give you sets of what I think you kindly

[3] provided to me which I think based on what you told me

[4] is a grouping of Board minutes that you had; is that

[5] right?

[6]    A: Yes.

[7]    Q: Do you recognize those, Jen?

[8]    A: Yes.

[9]    Q: If you look at this packet, it starts with minutes for

[10] June 7th, 2004.

[11]    (J. Miller Deposition Exhibit 3 was marked.)

[12]          BY MR. GILLEN:

[13]    Q: Now, Jen, I am showing you a packet of Board minutes

[14] that have been marked as Exhibit 3 which were minutes

[15] you provided to me in response to the subpoena. You

[16] know, as well as I, that they start with minutes for

[17] June 7th.

[18]    And there is a notation in the upper right-hand

[19] corner of the first set of minutes for June 7th of SB.

[20] Do you know whose handwriting that is?

[21]    A: The handwriting I believe is when we went through and

[22] got our information together for the subpoenas, we went

[23] through and wrote whose copy this was. It was probably

[24] mine or Rob's notation that this was from Sandi Bowser.

[25] We got this from — her minutes from Sandi Bowser.

### Page 62

[1]    Q: And there are handwritten notations on this first set of

[2] minutes for June 7th, 2004. Did you put them on, or

[3] were they on Sandi Bowser's copy?

[4]    A: Those would have been Sandi Bowser's notations.

[5]    Q: Were you at the June 7th meeting?

[6]    A: I am looking at what occurred.

[7]    Q: In terms of science books, I note the chemistry book was

[8] up.

[9]    A: Looking at this, it doesn't seem familiar. So I would

[10] say that I was not at this meeting.

[11]    Q: The next set of minutes then does relate to June 14th,

[12] 2004. There is a notation in the upper right-hand

[13] corner SB. I take it Sandi Bowser provided those

[14] minutes?

[15]    A: Yes.

[16]    Q: And therefore, it is her handwriting that is on the

[17] minutes?

[18]    A: Yes.

[19]    Q: Were you at this Board meeting?

[20]    A: Yes.

[21]    Q: Tell me what you recall about that Board meeting.

[22]    A: Well, I remember my picture being on the front of the

[23] paper for this one looking very confused. I have —

[24] actually, I could tell you better. I don't know why

[25] they are not in here.

### Page 63

[1]    I have minutes of this meeting.

[2]    Q: There is a second set I was going to ask you about.

[3]    A: That is Rob's.

[4]    Q: So the second set of Board minutes of June 14th with the

[5] smaller handwriting —

[6]    A: Yes.

[7]    Q: — and notation tolerance does not mean acceptance —

[8]    A: Yes.

[9]    Q: — that appears to be Rob Eshbach's?

[10]    A: Yes. I know I have notes on this one. But this meeting

[11] I remember is the one that Mrs. Buckingham stood up and

[12] spoke. She quoted Bible verses during the public

[13] comment section.

[14]    This is the one where Mr. Buckingham — I believe

[15] this is the one where he was asked — he mentioned — I

[16] think this is the one where he was asked to tone down

[17] some of his remarks from previous meetings.

[18]    Q: Who asked him to do that?

[19]    A: I think he just made the statement that he was asked. I

[20] don't know who asked him. I don't know. But I remember

[21] him saying something to the effect that I am who I am,

[22] and if you don't like it, you can vote me out at that

[23] meeting.

[24]    And that was the meeting that he said 2,000 years

[25] ago, someone died on the cross. Someone needs to stand

### Page 64

[1] up for him or something to that effect.

[2]    Q: You mentioned that you think you have notes relating to

[3] this meeting?

[4]    A: I do.

[5]    Q: Is that true, Jen?

[6]    MS. PENNY: Can we go off the record one second?

[7]    MR. GILLEN: Sure.

[8]    (An off-the-record discussion was had.)

[9]    (A recess was taken.)

[10]          AFTERNOON SESSION

[11]    MR. GILLEN: Please mark these.

[12]    (J. Miller Deposition Exhibits 4 through 6 were

[13] marked.)

[14]          BY MR. GILLEN:

[15]    Q: Jen, I have given you packets of documents marked Miller

[16] 4 through 6. I ask you to take a quick look through

[17] them and let me know if they appear to be the documents

[18] that you provided to me this morning.

[19]    A: Yes.

[20]    Q: Now let's return our attention to the June, 2004 period

[21] and that portion of Exhibit 3 which is your notes from

[22] the June 14th meeting.

[23]    What I would like to do is go through those and

[24] have you tell me what these notations reflect and to the

[25] extent you can any memories they prompt. The page I am

**Tammy Kitzmiller, et al.   v.**
**Dover Area School District, et al.**

**Jennifer Miller**
**May 18, 2005**

---

**Page 65**

[1] looking at is entitled The Cutting Edge Hair Styling
[2] Salon. There is June 24th below that heading. Above
[3] the stationery that has been Xeroxed is the notation my
[4] notes from June 14th Board meeting.
[5]    Are those your notes, Jen?
[6]    A: Yes.
[7]    Q: Tell me what those notations reflect.
[8]    A: Most of these are comments that were made. I tried to
[9] write down things that people said at the meeting,
[10] either Board members, or sometimes it was public
[11] comment, that kind of thing.
[12]    Q: So the first one is Bonsell, Intelligent Design Theory.
[13] What is that?
[14]    A: I am thinking that he mentioned Intelligent Design
[15] Theory at the meeting, and I may have put a question
[16] mark behind it because of the word theory. That was my
[17] notation that, you know, I didn't believe it was a
[18] scientific theory.
[19]    Q: Let me ask you: Prior to this June 14th notation, had
[20] you heard of Intelligent Design?
[21]    A: I don't have anything written down so it was about this
[22] time that the Intelligent Design issue came up.
[23]    Q: And your comment seems to indicate that there was some
[24] reflection on the topic. Prior to this June 14th
[25] meeting, had you done any research prior to that

**Page 66**

[1] meeting?
[2]    A: I don't believe so, no.
[3]    Q: Looking at it in light of those observations you have
[4] just made, do you think that you would have had a
[5] question about Intelligent Design and its status as a
[6] theory on this day?
[7]    A: Yes, I think that's why I had the question marks. It
[8] was either that reason or that I hadn't heard of it
[9] before.
[10]    Q: How about papers should stick to reporting the facts,
[11] does that trigger any —
[12]    A: That was something Bonsell had said addressing the
[13] newspaper reporters, that they should stick to reporting
[14] the facts.
[15]    Q: Mistrust between students, parents and teachers, does
[16] that trigger anything?
[17]    A: Just that he may have said something that maybe them not
[18] reporting the facts or that because of this, there is a
[19] mistrust between the students, parents and teachers.
[20]    Q: You have a notation for Casey. I take it Casey Brown?
[21]    A: Yes.
[22]    Q: One nation, equal rights, sworn to uphold the law, set
[23] aside personal beliefs, does that trigger any
[24] recollections on your part?
[25]    A: She quoted that or she said that at the meeting.

**Page 67**

[1]    Q: And a notation with Noel, I take it Noel Wenrich?
[2]    A: Yes.
[3]    Q: Says all teach of a creation?
[4]    A: By that I remember that he mentioned all religions, no
[5] matter what religion it is, teach of a creation of some
[6] sort or a creator of some sort.
[7]    Q: Do you have any recollection as to how that came up?
[8]    A: During this time, there was a lot of public comment and
[9] comment in the newspaper about the textbooks. And I
[10] know the quote was in there about being laced with
[11] Darwinism and that kind of thing.
[12]    Creationism came up. I don't remember how
[13] exactly, but it was part of these conversations at the
[14] Board meetings.
[15]    Q: Let me ask you: Do you remember Barrie Callahan being
[16] at these Board meetings?
[17]    A: Yes.
[18]    Q: Do you have any recollection of Mrs. Callahan accusing
[19] Mr. Buckingham of wanting to teach Creationism?
[20]    A: I was thinking I had — no, not in this meeting. I
[21] didn't quote her as saying anything. I don't remember.
[22] I know she spoke several times. If I don't have it
[23] written down so I don't remember if she said anything.
[24]    Q: Can you recall anything about her comments?
[25]    A: I know — again, I don't know what meeting this was at.

**Page 68**

[1] I guess this would have been afterwards. I remember her
[2] making a comment something about the origin of life and
[3] Intelligent Design.
[4]    On the curriculum, it says no origins of life will
[5] be taught. She said it is contradictory to say no
[6] origins of life will be taught and then put Intelligent
[7] Design into the curriculum.
[8]    That was later. So I don't remember anything in
[9] particular at these meetings.
[10]    Q: If we flip to the next page, it has a notation on the
[11] top Evolution with a sort of cloud circle around it.
[12] Not origin of life, change over time.
[13]    Is that your notation?
[14]    A: Yes, that is just probably my thoughts. I tend to write
[15] things down. As people are speaking, I write my
[16] thoughts or my sort of response to them even though I
[17] don't speak.
[18]    I think this was my response to things that I had
[19] heard. That Evolution was — I don't see — as I have
[20] told them in curriculum committee meetings, Evolution is
[21] not the origin of life. It simply means change over
[22] time. And that is what we teach.
[23]    Q: Beneath the notation I just referenced, there is another
[24] comment appalled at saying I'm not a good Christian.
[25]    Was that your observation, Jen?

---

nnifer Miller
ay 18, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 69

[1]    A: Yes.
[3]    Q: Why did you write that?
[3]    A: Something was said about that we — again I think I said
[4] this before that something — well, 2,000 years ago
[5] someone has to stand up — someone needs to stand up for
[6] him.
[7]    It came out at these meetings basically if you are
[8] not willing to stand up against this Evolution and not
[9] willing to stand up against it, then you are not a good
[10] Christian. I wrote that as they pointed to me that I am
[11] appalled at someone telling me that I am not a good
[12] Christian because I don't stand up for this.
[13]    Q: You took offense at the implication you couldn't be a
[14] good Christian and believe in Evolution?
[15]    A: Right.
[16]    Q: The next page starts with a notation attributed to
[17] Buckingham - found on Christianity, can't take away my
[18] right to practice. Trace your history, and if you find
[19] a monkey, let me know.
[20]    I think I know what that notation reflects, but I
[21] will ask anyway because I have to. Does that trigger
[22] any recollections on your part, Jen?
[23]    A: Again, at some point, I don't know what part of the
[24] meeting this was, but Mr. Buckingham stated just what I
[25] have there that this country was founded on

Page 70

[1] Christianity, and you can't take away my right to
[2] practice.
[3]    And again going back to the monkeys and man issue,
[4] he said trace your history. If you find a monkey in
[5] your past, let me know.
[6]    Q: And at the bottom of that page there's a notation that
[7] begins Trudy. Is that Trudy Peterman?
[8]    A: Yes.
[9]    Q: There is a reference there to Bible Club. Does that
[10] trigger any recollection on your part from this meeting?
[11]    A: She stood up and basically reiterated what now I know is
[12] in that memo. One of her point was, you know, that if
[13] religion is to be taught, whose religion are we going to
[14] teach? That we can't single out one religion over
[15] another, that type of thing.
[16]    Those people that want to practice their religion
[17] in school, we do have a Bible Club and that kind of
[18] thing for that forum.
[19]    Q: Apart from the notations that you have here, do you
[20] recall anything specifically said by any Board member?
[21]    A: Just as I said, the 2,000 years ago. I don't have that
[22] noted on here, but I am sure that that was said at this
[23] meeting.
[24]    Q: How about anything by Alan Bonsell besides the
[25] Intelligent Design comment?

Page 71

[1]    A: Not that I remember, no.
[2]    Q: Sheila Harkins?
[3]    A: No.
[4]    Q: Angie Yingling?
[5]    A: Not at this one, no.
[6]    Q: How about Jane Cleaver?
[7]    A: No.
[8]    Q: You have one comment attributed to Noel Wenrich. Do you
[9] remember anything else he might have said?
[10]    A: Not at this meeting, no.
[11]    Q: So this is the second meeting in June. I want you to
[12] look now at Exhibit 4.
[13]    A: (Witness complies.) All right.
[14]    Q: If you look at the second page of Exhibit 4, it has the
[15] number one circled in the right-hand corner. If you
[16] look there, you will see a notation to June, 2004 and a
[17] curriculum committee meeting?
[18]    A: Yes, I see it.
[19]    Q: Does that notation reflect your sense of whatever
[20] understanding you had coming away from that meeting?
[21]    A: Yes. And I believe if I remember correctly, that was
[22] the day of the Board meeting because I think that that
[23] was the very last meeting we had of the school year.
[24] That would have been the 14th, and we went to the Board
[25] meeting that night.

Page 72

[1]    Q: Now that puts us into July. I see that on the last page
[2] you just referred to, page number one in Exhibit 4,
[3] there is a notation there relating to July, 2004?
[4]    A: Yes.
[5]    Q: It references a new edition of the Miller and Levin
[6] text?
[7]    A: Yes.
[8]    Q: Tell me about that.
[9]    A: Again when we left the June meeting, we were assured
[10] that we would get our books. And then somehow I found
[11] out — I was in the District in July — middle of July,
[12] I think it was around the 18th or 19th because I was in
[13] charge of planning the inservice time for this year. I
[14] was in the District.
[15]    And I don't remember if — I am pretty sure Mrs.
[16] Spahr called me at home one evening and said that they
[17] passed on the books some time in here, end of June,
[18] early July they passed on approving the books because
[19] there was a new edition that came out.
[20]    It was no use ordering a 2002 edition when the new
[21] one had just come out.
[22]    Q: And they is the Board?
[23]    A: Yes.
[24]    Q: So what happened next?
[25]    A: Somewhere around there, I think it was the second day I

**Min-U-Script®**   Filius & McLucas Reporting Service, Inc.

**Tammy Kitzmiller, et al.   v.**
**Dover Area School District, et al.**

**Jennifer Miller**
**May 18, 2005**

Page 73

[1] was here for planning those inservices, we met with —
[2] it was either in Dr. Nilsen's or Mr. Baksa's office, we
[3] page by page, chapter by chapter, line by line went
[4] through the evolution chapters in the 2002 edition and
[5] 2004 edition to review if there was any difference
[6] between 2002 and 2004.
[7]     Q: If you would, Jen, please look at Miller Exhibit 2 for
[8] this page which is entitled Changes in 2002 and 2004
[9] Copyright Biology books from Prentice Hall.
[10]     A: (Witness complies.)
[11]     Q: Looking at that, Jen, does that reflect your findings as
[12] a result of the examination you have just described?
[13]     A: Yes.
[14]     Q: And apart from the notations here — or tell me in
[15] general what sense you had about differences in the two
[16] texts.
[17]     A: We felt that the 2004 edition as far as this controversy
[18] goes was much — I don't know if I want to say it
[19] didn't — it seemed to be aware of the controversy
[20] because I thought it took a lot of the more
[21] controversial statements out and replaced them with sort
[22] of blander language if you want to say it that way.
[23]     Q: Let me ask you: In terms of concern that had been
[24] expressed about presenting theory as fact, did you see
[25] the changes addressing the manner of presentation of

Page 74

[1] Evolutionary Theory?
[2]     A: Yes. And even a lot of Mr. Buckingham's concerns that
[3] he had given us originally with some of the references
[4] to man's Evolution were taken out, or — you know, the
[5] wording was much better, less controversial.
[6]     Q: I want to make sure I understand you there, Jen. Would
[7] you say that the wording was changed in such a way as to
[8] make assertions in that area seem more tentative? Let
[9] me put it this way: Less factual and more theoretical?
[10]     A: Not — not necessarily. Maybe to some extent. But I
[11] don't — I guess because coming — me looking even at
[12] the 2002 edition, I didn't see it necessarily as it was
[13] presented as a fact in the first place. That was
[14] somebody else's concern.
[15]     Me looking at it, I wouldn't say that necessarily.
[16] But for someone else looking at it that had concerns,
[17] then maybe they could see it that way.
[18]     Q: That is all I am getting at. You had a sense that the
[19] changes addressed his concerns. I am trying to figure
[20] out how.
[21]     A: Yes, I am trying to look over some of the things to give
[22] you an example. Here like at number three instead of
[23] whatever it was presented as evidence of Evolution, it
[24] was replaced with could finally explain many of his
[25] observations. It just looks like it is not as strong

Page 75

[1] language I guess you want to say.
[2]     It did seem like there was more that pointed out
[3] some — that made sure they pointed out where the gaps
[4] were, or where there was less evidence in the field of
[5] Evolution than the previous edition did.
[6]     Q: Okay. Did you have any discussion with Mr. Buckingham,
[7] yourself, about these findings?
[8]     A: No.
[9]     Q: I think you said that you sat down with Bert Spahr and
[10] Mike Baksa?
[11]     A: Yes.
[12]     Q: And I see here at the head of this page, there is a
[13] notation July of 2004?
[14]     A: Yes.
[15]     Q: Is that the time of the meeting?
[16]     A: Yes. I remember somewhere around the 18th or 19th.
[17] Yes, because I think that was the days I was here to
[18] plan the inservices.
[19]     Q: Do you recall anything that Bert Spahr said during the
[20] meeting?
[21]     A: No, nothing in particular, other than the books hadn't
[22] been, you know, approved because of the 2004 edition.
[23] Nothing in particular.
[24]     Q: How about Mike Baksa, do you remember anything that he
[25] said?

Page 76

[1]     A: We were pretty much in agreement that this seemed to
[2] present it in a much less controversial way, but I don't
[3] know.
[4]     Q: Did you anticipate any action as a result of your
[5] meeting when you left this meeting?
[6]     A: I remember thinking that they should be — having a
[7] discussion that the Board should be more satisfied with
[8] this edition perhaps than they were with the 2002
[9] edition.
[10]     This is the time when I was here that Mr. Baksa
[11] gave me a copy of Of Pandas and People to read, this
[12] meeting.
[13]     Q: Thank you. I was going to ask you about that. This
[14] meeting was kind of mid July?
[15]     A: Yes.
[16]     Q: Do you recall any discussion of Of Pandas at that time?
[17]     A: No. I think I was given the book, asked to take it
[18] home, read over it, get back to him and tell him what I
[19] thought, that kind of thing.
[20]     Q: Was Bert Spahr given a copy as well?
[21]     A: I don't recall at that meeting if she was or not. I
[22] know she read it because I remember her making specific
[23] comments about certain parts of the book later on. But
[24] I don't remember if it was at that meeting or not.
[25]     Q: Did you get back to Mike with feedback about your

nnifer Miller
ay 18, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

Page 77

| opinion on Of Pandas?

]   A: I don't think that — I know that my opinions were made
] at another meeting in the fall. I don't remember if we
] were in contact before then, before school was back in
₃ session about the Of Pandas book.

₇   Q: Let's look at Exhibit 3, the minutes for the July 12th
₇ meeting. Did you attend that meeting?

₃]   A: I would have to look.

₃]   Q: Okay.

₃]   A: July 12th?

1]   Q: Yes.

₂]   A: The minutes are not in here in Exhibit 3.

₃]   Q: There is an SB set.

₄]   A: There, they are. Okay. Let me see.

₅]   Q: I see you have no notes from the meeting?

[6]   A: Right.

[7]   Q: I am just wondering if you may have attended and taken
[8] no notes.

[9]   A: I do not believe I was at that meeting because as I see
[20] here in the minutes, that was the meeting where they
[21] tabled to the next meeting the approval of the textbook.
[22] I was not at that meeting.

[23]   Q: Good enough. That brings us to the August 2nd meeting.
[24] Did you go to that one?

[25]   A: No, I was on vacation at that time.

---

Page 78

[1]   Q: You picked a good time to be on vacation. When did you
[2] return from vacation?

[3]   A: It was somewhere shortly after there. It was the first
[4] week of August that we went. We left like July 31st.

[5]   Q: Upon your return, were you greeted with any news
[6] relating to the biology text or the biology curriculum?

[7]   A: Yes. I believe — I think it was Rob Eshbach told me
[8] that at that meeting, Mrs. Harkins said something —
[9] they mentioned the Of Pandas book, and she mentioned
[10] that I had the copy, and I had had it for several weeks.
[11] And she didn't get a chance to look over it because I
[12] had the copy.

[13]   So I don't remember if I was in contact with Mr.
[14] Baksa, if he asked for me to bring it back, or did I
[15] have a chance to look over it. But I did bring it back
[16] in at some point.

[17]   Q: At some point?

[18]   A: Yes.

[19]   Q: Let me ask you a question. If you look at Miller 4 and
[20] the page with the one circled in the upper right-hand
[21] corner, there is a notation down there relating to
[22] August, 2004 Board vote?

[23]   A: Yes.

[24]   Q: Where did you get that information?

[25]   A: That's Bertha Spahr's handwriting. She put it in the

---

Page 79

[1] timeline. I do remember them telling me that the — at
[2] that meeting, I mean this is what I was told, that they
[3] were up to approve the biology textbooks again, and
[4] Mr. Buckingham said he would approve it if Of Pandas and
[5] People was also approved as a supplemental text.

[6]   There was a five/three split, and someone
[7] switched, and it was four/four. And they approved the
[8] textbooks finally.

[9]   Q: Let me ask you, Jen, Miller 4, is that a document that
[10] you created?

[11]   A: On top?

[12]   Q: Yes, the first page of four.

[13]   A: No, that is Mrs. Spahr's handwriting.

[14]   Q: You have indicated that the next page is as well?

[15]   A: Yes.

[16]   Q: Was this created by her?

[17]   A: Yes. We had input. I mean as we tried to remember
[18] dates, we sat down together and tried to remember when
[19] did this happen, when did this happen.

[20]   Q: That's fine. There is a reference on page two of
[21] Exhibit 4 to an August 30th, 2004 curriculum committee
[22] meeting?

[23]   A: Yes.

[24]   Q: Did you attend that meeting?

[25]   A: Yes.

---

Page 80

[1]   Q: Now let's look at the time in August between your return
[2] from vacation and prior to this meeting. Had you had
[3] any discussions with Bert Spahr about Of Pandas?

[4]   A: I believe so. I believe she had read it. And whether
[5] it was on the phone, probably a phone conversation,
[6] discussing sort of our thoughts as we read it.

[7]   Q: You had reviewed it as of this telephone conversation?

[8]   A: Yes, yes.

[9]   Q: What did Bert Spahr tell you about her opinion
[10] concerning Of Pandas?

[11]   A: I remember her pointing out some of the science was
[12] faulty in it. I remember her saying something I think
[13] it was Oparin Theory, that was a chemistry theory, and
[14] she was upset at how they portrayed that.

[15]   Q: Did she say why?

[16]   A: I don't remember the chemistry of it.

[17]   Q: It was a chemistry related —

[18]   A: Yes, yes. I think that is who it was. But also that
[19] she was having trouble reading it because the level was
[20] very high.

[21]   And I had done — during this time before this
[22] August 30th meeting, I had done a readability study on
[23] it — two different readability studies online. So we
[24] discussed that also.

[25]   Q: How do you do that, Jen?

---

Min-U-Script®   Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Jennifer Miller
May 18, 2005

Page 81

[1] A: You go on — it is a typical when you are reviewing
[2] textbooks — we learned this in our undergraduate study
[3] — when you are reviewing textbooks, you look at a
[4] readability, and it tells you what grade level it is
[5] geared towards.
[6]    You put in how many words in a sentence and how
[7] many syllables in each word. You have to count them out
[8] and things like that. And it gives you a grade level of
[9] the Of Pandas book.
[10] Q: Apart from what Bert said about this chemical theory,
[11] did she say anything else?
[12] A: The two big things I can remember is that, you know, a
[13] lot of the things were — some of the inferences made
[14] was, you know, bad science and the reading level. Those
[15] are the two things that I can remember.
[16] Q: How about you for your part?
[17] A: Some of the same things. I remember having sticky
[18] notes. I took them out when I gave them back. I don't
[19] know where they are now. I remember having sticky notes
[20] pointing to things and having questions about certain
[21] parts. I know that I don't have those anymore. I can't
[22] say specifically, but.
[23] Q: That is all right. Did you talk to any of your other
[24] colleagues about Of Pandas prior to this August 30th
[25] meeting?

Page 82

[1] A: Not that I can remember.
[2] Q: Did you talk to my Board members?
[3] A: No.
[4] Q: How about any other of the plaintiffs?
[5] A: No.
[6] Q: How about Barrie Callahan?
[7] A: No.
[8] Q: We have a note indicating there was an August 30th
[9] curriculum committee meeting. Do you remember that?
[10] A: Yes.
[11] Q: Tell me what you can remember about that.
[12] A: That was a meeting — again, we were talking mainly
[13] about the Of Pandas and People book. And if I am not
[14] mistaken, this is the meeting that the curriculum
[15] committee was there. And Mr. Bonsell was there, too.
[16]    This is one of them — it might have been the next
[17] one that he was at back from the 2003 meeting, and we
[18] were discussing — we, the Science Department, and again
[19] probably mostly Bertha Spahr and I were the spokesmen
[20] there. I don't remember exactly who all was there.
[21]    We were discussing the Of Pandas book. Our
[22] concerns with the readability study, our concerns with
[23] some of the science of it in the textbook. The
[24] readability was definitely not appropriate for a ninth
[25] grade level.

Page 83

[1] And I remember Bertha asking again point blank to
[2] Mr. Buckingham if he could explain some of the things in
[3] there. And he mentioned that any good student will go
[4] home and look it up. You don't need to understand it as
[5] you are reading it.
[6]    That point — at some point, I believe Dr. Nilsen
[7] was at that meeting. My recollection is that his
[8] suggestion was sort of a compromise, that we place the
[9] books in the classroom as a reference and not
[10] necessarily hand it out to each student.
[11]    I do remember Mr. Bonsell I believe at that
[12] meeting because I believe Mr. Buckingham did leave early
[13] for some doctor's appointment at that meeting, and
[14] Mr. Bonsell saying after he left not every Board member
[15] is in agreement with Mr. Buckingham that it should be in
[16] the hands of every student. That maybe placing it as a
[17] reference would be a better use of the textbook.
[18] Q: Okay. Let's see. Do you remember anything — do you
[19] know if Sheila Harkins was there?
[20] A: Yes, I believe — it says curriculum committee, yes, she
[21] was there.
[22] Q: Do you recall anything that Sheila Harkins said?
[23] A: I believe it was at this meeting that, again, we
[24] explained how we teach Evolution. And my recollection
[25] is that at that meeting is when Sheila said after I

Page 84

[1] explained how we teach Evolution that she said if
[2] everyone did it like Jen did, then there won't be a
[3] problem. This would be fine. I agree with everything
[4] Jen just said.
[5] Q: And how about Casey Brown, was she there?
[6] A: I believe so, yes.
[7] Q: Do you recall anything she said?
[8] A: Not — no. Not that I can put my finger on.
[9] Q: What about the idea of putting it in the text — the
[10] text Of Pandas in the classroom as a reference? How did
[11] you and Bert Spahr as faculty respond to that?
[12] A: Let's say that we didn't like the book necessarily in
[13] the classroom at all. But again, I think that we had
[14] said that we would be willing to compromise. If they
[15] wanted to get a couple for the classroom, not — I am
[16] pretty sure that at that point, it was just what if we
[17] got five, two, three to five books per classroom. If
[18] kids wanted to look at it, they could take it home.
[19]    I don't think we were too keen on the idea of
[20] having it there. But if it was to be a compromise to
[21] having every student have it, then we would be willing
[22] to have a couple of copies if kids wanted to take it
[23] home.
[24] Q: What was driving your objection, Jen, to them having it?
[25] What was your concern to the students having the book?

ennifer Miller
Iay 18, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

**Page 85**

[1] A: Several things. It's not — we teach to the standards.
[2] It is not in the standards. At that point, it wasn't in
[3] the curriculum.
[4]    Again, we thought parts of that was too high of a
[5] reading level for our ninth graders. And some of the
[6] science, we didn't believe was sound.
[7]    Q: Okay. And anything else you took with you from that
[8] meeting, Jen? Did you have a sense that there was a
[9] resolution?
[10]    A: Again, yeah, we felt that okay, if we were going to
[11] get these Of Pandas books, we would get several copies
[12] to be placed in the classroom as a reference and be
[13] done.
[14]    Q: Do you recall a discussion of Intelligent Design at that
[15] time?
[16]    A: Well, since the Of Pandas book goes over Intelligent
[17] Design, I would say yes.
[18]    Q: How about was there any discussion of curriculum change
[19] related to the use of Of Pandas?
[20]    A: No. I don't believe there was at that point.
[21]    Q: Did you see any future developments that would be
[22] resulting from the meeting when you left? Did you think
[23] there was going to be more deliberations on the part of
[24] the Board curriculum committee, or were you just kind of
[25] uncertain where things were?

**Page 86**

[1]    A: I think yeah, probably more uncertain or thinking again
[2] where is this going type thing.
[3]    Q: Okay. That would bring us into September. Let me ask
[4] you: Did you attend any Board meetings in September?
[5]    A: Yes.
[6]    Q: You did?
[7]    A: I have notes from a September 14th meeting. I can't be
[8] sure because I don't have the minutes attached, but it
[9] was some time I believe in September.
[10]    Q: And you are looking at the notes which are in Miller
[11] Exhibit 3 which have a notation in the upper right-hand
[12] corner My Notes from the Board Meeting In September I
[13] think?
[14]    A: Yes.
[15]    Q: Looking at that, Jen, why do you think it is from
[16] September?
[17]    A: Probably because of where it was maybe in my stack of
[18] stuff, that it was before October. So I was assuming
[19] that it was before the actual curriculum change
[20] implementation took place in October.
[21]    Q: There's some notations here. The first is one that is
[22] linked to Barrie Callahan?
[23]    A: Yes.
[24]    Q: And it indicates she is asking the question about what
[25] will happen with Of Pandas and People. Does that

**Page 87**

[1] notation you made, does it trigger any recollection
[2] about what Barrie Callahan said at the meeting?
[3]    A: I think she was asking what are they going to do with Of
[4] Pandas and People. Where are they going to put it? Is
[5] it going to be a supplemental text? Are they going to
[6] put it in the classroom, that type of thing.
[7]    Q: Is Barrie Callahan speaking during the public comment
[8] portion of the meeting?
[9]    A: Yes.
[10]    Q: Do you recall if it was during the beginning of the
[11] meeting or during it?
[12]    A: I assume it was at the beginning, but I couldn't be
[13] sure.
[14]    Q: There is an comment there attributed to Larry Snook?
[15]    A: Yes.
[16]    Q: What is that comment getting at? What is that notation
[17] getting at?
[18]    A: He must have asked the question about Act 72, and then
[19] asked — I think probably something like we're having
[20] discussions about Act 72, and so how can we then spend
[21] money on a second textbook? When it is foolish where we
[22] cut other monies from other places, why spend money on
[23] the second textbook Of Pandas and People?
[24]    Q: What is Act 72?
[25]    A: How do I explain that? Act 72 is the gambling, whether

**Page 88**

[1] we take state money from gambling.
[2]    Q: Then there is a notation for Amanda Heilman?
[3]    A: I'm assuming just a community member. I wrote down her
[4] name. I don't really remember much. I am assuming she
[5] said something close to that.
[6]    Q: What I am trying to do, Jen, is just get a sense for
[7] these comments are being offered at the public portion
[8] of the meeting.
[9]    With Barrie Callahan, I can see she's still
[10] wondering what is going to happen to Of Pandas. Did
[11] these other people's comments follow on hers?
[12]    A: I believe so, yes. Yes.
[13]    Q: Do you recall any comments by Board members made in
[14] response to any of the comments reflected on this page?
[15]    A: No. I think at this time they had pretty much toned
[16] down their comments, or they were not speaking out as
[17] much as they had been in June of that year.
[18]    Q: This is the September Board meeting. We know Of Pandas
[19] is still at issue so to speak?
[20]    A: Yes.
[21]    Q: If you look at September, do you recall any meetings of
[22] the Board curriculum committee?
[23]    A: No. I would say not because we don't have them
[24] recorded. So I would say not.
[25]    Q: Do you recall any discussions with your colleagues about

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Jennifer Miller
May 18, 2005

**Page 89**

[1] the issue of Of Pandas?
[2]    A: Not anything in particular. I am sure we were
[3] discussing it, but I don't remember, you know. Have you
[4] heard anything, that kind of thing, what's going on with
[5] the books, but nothing in particular.
[6]    Q: Let me ask you as a teacher now, the book that you
[7] recommended has been approved on August 2nd?
[8]    A: Yes.
[9]    Q: And there is this notion of bringing another book as a
[10] supplementary text?
[11]    A: Yes.
[12]    Q: You have got a Board curriculum committee meeting in
[13] August. Is there still — and Mr. Buckingham was there.
[14]    Is anyone still accusing him of wanting to teach
[15] Creationism; is that still a flash point, or are we
[16] focused on the use of the text? What is the state of
[17] affairs at that August 30th Board meeting?
[18]    A: At the Board meeting?
[19]    Q: Curriculum meeting, I'm sorry.
[20]    A: Let me read her notes again. I think at this point,
[21] most of it was the book. I believe there was still some
[22] discussion of Intelligent Design versus Creationism
[23] because I think maybe at this Board meeting is where
[24] Mrs. Spahr brought again some of her court cases. And
[25] in one of them, it had something about Intelligent

**Page 90**

[1] Design, you know, may you teach Intelligent Design in a
[2] biology classroom.
[3]    And she had — I don't know - opinions or
[4] something of someone. I don't know where she printed it
[5] off the Internet, the research she had done.
[6]    There was still some discussion of not just the
[7] textbook, but Intelligent Design, is it the same as
[8] Creationism, is it different than Creationism, yes.
[9]    Q: If we turn our mind back to the August 30th Board
[10] curriculum committee meeting with Mr. Bonsell there and
[11] so on and focus on this equation or this linkage here
[12] that some people are making, do you recall Mr. Bonsell
[13] speaking to that linkage, whether Intelligent Design was
[14] Creationism or distinct, whether it was a scientific
[15] theory?
[16]    A: No, I can't remember anything in particular. Obviously,
[17] I did get a sense — and I can't remember anything
[18] particular that he said, but I did get a sense that he
[19] did believe that Intelligent Design was separate from
[20] Creationism and could be presented in a biology
[21] classroom, and that's why the Of Pandas and People book
[22] was there.
[23]    Like I said, I can't remember any specific quotes,
[24] but that's the sense that I came away with.
[25]    Q: That he was viewing Intelligent Design as not

**Page 91**

[1] Creationism —
[2]    A: Yes.
[3]    Q: — and therefore appropriate?
[4]    A: Yes.
[5]    Q: How about Bill Buckingham, did he say anything at that
[6] meeting of August 30th about that?
[7]    A: I can't remember anything in particular, no. But it
[8] seemed that, you know, they were all pretty much in
[9] agreement I would say.
[10]    Casey Brown, I am assuming she was there, but she
[11] would have not been in agreement with adding Intelligent
[12] Design and the Pandas book.
[13]    But the other two seemed like they were in
[14] agreement with Mr. Bonsell.
[15]    Q: And your sense for Casey Brown's position, what are you
[16] relying on there, Jen?
[17]    A: Statements — again, I can't remember any particular
[18] statement, but statements that were made at different
[19] meetings. Again, it sort of goes back to is this
[20] religion, and we should stay away from this, that type
[21] of thing. I guess looking at it the same way we were,
[22] is it a science, that kind of thing.
[23]    Q: Was it your sense that Casey Brown equated Creationism
[24] and Intelligent Design, or how did you see her position?
[25]    A: I would say that — I don't know if she equated it, but

**Page 92**

[1] she thought there was enough gray area there, that we
[2] should stay away from putting it in. There was enough
[3] gray area there that it could be construed as
[4] Creationism or whatever.
[5]    Q: And that is something that has occurred to me as we are
[6] talking. Bert Spahr, you think she showed up to this
[7] meeting with some legal opinions?
[8]    A: Yes.
[9]    Q: Was there a discussion of the potential liability?
[10]    A: Yes.
[11]    Q: Did Bert Spahr speak specifically to that?
[12]    A: Yes. I know she read part of her — whatever she had
[13] printed off word for word. I remember her saying
[14] several times what part of the legal and
[15] unconstitutional - she used three words there — don't
[16] you understand. So yes, there was some discussion of
[17] that, yes.
[18]    Q: And how about the Board members who were present at the
[19] meeting, did they respond to that?
[20]    A: I think some questions were asked, where are you getting
[21] your information, who are you getting your information
[22] from. The information we get is saying that you can
[23] present this. So there was sort of this back and forth.
[24] The information we are getting is saying we can't
[25] present this, and the information saying we can. So,

nnifer Miller
ay 18, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

**Page 93**

yes.

Q: Do you remember anyone saying we are going to be sued?

A: No, not particularly. If anyone, it would have been Casey Brown because that was her concern mostly. But I couldn't say that she definitely said it at that meeting.

[7] Q: How about Bert Spahr, was she concerned again for the
[8] untenured teachers?

[9] A: Yes.

[10] Q: Did she bring that to the attention of the Board
[11] members?

[12] A: Yes.

[13] Q: Do you recall any response by Board members?

[14] A: No.

[15] Q: If you would, Jen, I would ask you to look at Exhibit 5.
[16] About a quarter of the way through the packet, there is
[17] an e-mail from Stephen Russell dated August 26th?

[18] A: Yes I will find it. There it is, yes.

[19] Q: Would you take a quick look at that?

[20] A: (Witness complies.)

[21] Q: There is a notation in the upper right-hand corner. Is
[22] that your handwriting?

[23] A: Yes.

[24] Q: This is the same meeting, right, the August 30th, 2004
[25] meeting?

**Page 94**

[1] A: Yes.

[2] Q: There are notations it looks like in another hand below
[3] yours on the first page of that e-mail?

[4] A: Yes.

[5] Q: Whose handwriting is that?

[6] A: That would be Rob Eshbach's.

[7] Q: And I see there some comments which seem to reflect the
[8] criticisms you had advanced of the text of Of Pandas
[9] earlier; is that accurate?

[10] A: In the middle here?

[11] Q: Yes.

[12] A: Yes. I am assuming that is what he had there about the
[13] grade level, yes.

[14] Q: And a comment at the bottom attributed to
[15] Mr. Buckingham, each student be given this book with
[16] textbook, that was his stated position before he left
[17] that meeting; correct?

[18] A: Yes.

[19] Q: Looking at this, does it make you think there was some
[20] discussion just along the lines you suggested of we
[21] don't think we will be sued?

[22] A: Yes, yes. And as I recall, this was handed out to show
[23] Steve Russell, who would have been the District
[24] Solicitor, their opinion on this issue.

[25] Q: And looking at September again, do you recall anything

---

**Page 95**

[1] else that happened in September that touched on these
[2] two issues? Now it is the Of Pandas text and the
[3] curriculum change.

[4] A: No, I can't pinpoint anything.

[5] Q: When Of Pandas was discussed at the August 30th meeting,
[6] did you have any discussion relating to what would be
[7] presented in the classroom?

[8] A: Wow! I am sure we did. I am trying to think. At that
[9] point, I don't think that that was discussed too much.
[10] Just maybe at that point that we mentioned that there is
[11] this book, again, if the students want to use it, they
[12] can, or have it available to them in the classroom, that
[13] type of thing. I don't remember much other than that.

[14] Q: Let me be more specific. It seems like the
[15] August 30th meeting from what you told me the issue is
[16] in what way the text Of Pandas is going to be in the
[17] classroom. It has been donated.

[18] Is it going to be as a reference text, or is each
[19] student going to get it; is that correct?

[20] A: At that point, it wasn't donated I don't think. At that
[21] point, I don't think we knew how we were getting the
[22] textbooks. It was before it was donated.

[23] Q: Fair enough. But am I correct that those were the
[24] options that were being discussed?

[25] A: Right. Whether every student gets a copy to be handed

**Page 96**

[1] out with the textbook, or whether there is several in
[2] the classroom or a whole classroom set, that kind of
[3] thing.

[4] Q: I think you said that you thought if it was in the class
[5] as a reference text, that was more acceptable to you?

[6] A: Right. More acceptable than handing it out to every
[7] student, yes.

[8] Q: Did you think that this was going to change your
[9] classroom instruction?

[10] A: At that point, other than having to mention this book,
[11] no. I mean mentioning the book would have been
[12] different than what I had done in the past.

[13] Q: But in terms of your presentation of Evolutionary
[14] Theory, did you see any impact being discussed?

[15] A: No. At that point, I did not think it would be any
[16] different.

[17] Q: So from — and nothing else in September, right?

[18] A: Not that I can remember.

[19] Q: So we move into October. And there's a note on Exhibit
[20] 4, the page with two circled in the upper right-hand
[21] corner, that references October 8, 2004.

[22] A: Yes.

[23] Q: Take a look at that notation.

[24] A: (Witness complies.)

[25] Q: Do you have a recollection of a meeting on October 8th?

---

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Jennifer Miller
May 18, 2005

**Page 97**

[1]   **A:** Yes.

[2]   **Q:** Do you have a recollection apart from that notation? In

[3]   other words, are you relying on the notation for what

[4]   you remember, or do you remember the meeting as you sit

[5]   here today?

[6]   **A:** I would have to look back and see if — I don't remember

[7]   if October 8th was an inservice meeting or what it was,

[8]   but I remember Mr. Baksa coming to us and handing to us

[9]   the curriculum change that the Board curriculum

[10]  committee wanted to implement.

[11]  **Q:** Do you have a copy of that? Let me ask you: Was it one

[12]  of the three versions?

[13]  **A:** Yes, it would be probably in the Board packet. It is in

[14]  the Board packets.

[15]  **Q:** Which is Exhibit 3?

[16]  **A:** The Board minutes.

[17]  **Q:** Minutes for October 18th, 2004?

[18]  **A:** Yes, October 18th. It is the one that says I believe

[19]  draft on it.

[20]  **Q:** Before I content myself with that reference, I just want

[21]  to make sure there is not another document in there that

[22]  says draft. In different packets, there is an abundance

[23]  of drafts.

[24]     If you look at the front page of the minutes for

[25]  October 18th, 2004 contained in Miller 3, you will see a

**Page 98**

[1]   reference to an October 4th, 2004 School Board meeting?

[2]   **A:** October 4th?

[3]   **Q:** Yes. At the top there, they generally approve the

[4]   minutes. All I want to know, Jen, is if you went to

[5]   that October 4, 2004 meeting?

[6]   **A:** Let me look and see if something brings — it is looking

[7]   familiar. I would say there is a good possibility that

[8]   I went, yes. Yeah. I am pretty sure that I went to

[9]   this meeting.

[10]  **Q:** Do you recall any discussion of the biology curriculum

[11]  at the October 4, 2004 Board meeting?

[12]  **A:** No, I believe that that was the meeting that it was just

[13]  put in the curriculum that it was just like a FYI, that

[14]  the Superintendent was approving the donation of two

[15]  classroom sets of Of Pandas and People.

[16]  **Q:** Okay. Now so that brings us to this October 8th meeting

[17]  in which you recall a draft being presented to you?

[18]  **A:** Well, the draft was not presented to us the 18th

[19]  Board meeting. It was before that.

[20]  **Q:** You are right. I am referring to the October 8th

[21]  meeting.

[22]  **A:** Okay. Not a Board meeting, but a —

[23]  **Q:** Right.

[24]  **Q:** Right.

[25]  **Q:** And it was during that meeting, if I understand you

**Page 99**

[1]   correctly, that the document labeled draft was presented

[2]   to you; correct?

[3]   **A:** Yes.

[4]   **Q:** And that document has the notation in the upper

[5]   right-hand corner that says spray adhesive for future

[6]   reference?

[7]   **A:** Yes.

[8]   **Q:** Tell me, Jen, what was your reaction to seeing the

[9]   draft?

[10]  **A:** We were very upset at seeing that.

[11]  **Q:** And why?

[12]  **A:** Again as I said, it seemed like when we came out of a

[13]  lot of these meetings, that things had been settled.

[14]  Again at that August 30th meeting, we were in agreement

[15]  that okay, if we needed to the reference of Of Pandas

[16]  and People would be in the classroom, but again we

[17]  didn't want Intelligent Design. We were uncomfortable

[18]  having to teach it or, you know, having to present it.

[19]  And then we get this that says that they will be made

[20]  aware of Intelligent Design.

[21]  **Q:** Okay. Who was at the October 8th meeting?

[22]  **A:** I believe that one was just in my room. I think Baksa

[23]  came over or Bertha was there. At that point, I believe

[24]  — although I can't be sure — Rob Eshbach I think was

[25]  definitely there and possibly Leslie Prall and Bob

**Page 100**

[1]   Linker since they were biology teachers also.

[2]   **Q:** Do you recall if Mike called you up and said I am coming

[3]   over with a proposed curriculum change?

[4]   **A:** I believe, yes.

[5]   **Q:** Do you recall anything else Mike Baksa said to you?

[6]   **A:** No.

[7]   **Q:** You indicated that you felt somewhat surprised by this?

[8]   **A:** Yes.

[9]   **Q:** How about Bert Spahr, what was her reaction?

[10]  **A:** Surprised, angry.

[11]  **Q:** If you look at the page where we are referring to with

[12]  the draft stamped across the middle in the right hand

[13]  lower corner, there is a reference Of Pandas and People?

[14]  **A:** Yes.

[15]  **Q:** Then there is some little handwritten hash mark there.

[16]  Did that portion of it surprise you?

[17]  **A:** Yes. We were upset with that portion also because we

[18]  don't list any other reference textbooks in our

[19]  curriculum. If you look through the biology curriculum,

[20]  nowhere is there listed a reference text. And we all

[21]  have reference texts that we have in our classrooms,

[22]  other biology books that students can use.

[23]     I have a science encyclopedia in our classroom. I

[24]  don't list that necessarily because that could be —

[25]  students could use it at any time. We were upset that

nnifer Miller
ay 18, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

Page 101

[1] that one was singled out.

[2]   Q: And why? What was it about the singling out that you
[3] saw as inappropriate?

[4]   A: Again at that point, we were unsure putting these words
[5] and putting this in our actual curriculum, now we are
[6] asking the question okay, do we have to teach this, do
[7] we have to specifically teach from the text, that kind
[8] of thing.

[9]   By putting it in there as part of our curriculum,
[10] those are the kinds of questions that came up that we
[11] were very uncomfortable with teaching Intelligent
[12] Design, teaching from the textbook, and that kind of
[13] thing.

[14]   Q: Did you have any discussion at this October 8th meeting
[15] about whether you would be required to teach Intelligent
[16] Design?

[17]   A: I think so. I remember at some point asking for
[18] specific direction, what are we to say, what are we to
[19] do in regards to this.

[20]   Q: And in regards to this, do you mean the curriculum
[21] change which says students will be made aware of
[22] gaps/problems in Darwin's Theory and of other theories
[23] of Evolution including, but not limited, to Intelligent
[24] Design?

[25]   A: Yes.

---

Page 102

[1]   Q: There is a reference there to gaps/problems in Darwin's
[2] Theory. Did that surprise you?

[3]   A: No, because that is what we had agreed to in June I
[4] guess it was, that we would be willing to point out up
[5] to that point.

[6]   Q: How about the reference to other Theories of Evolution;
[7] had that been discussed?

[8]   A: I believe that we did discuss that because in our
[9] textbook, it does talk about things that led up to
[10] Darwin's — his theory of natural selection; that there
[11] are — Lemarck is in there and some other scientists
[12] that sort of influenced Darwin. That we felt was okay
[13] because those were what led up to the formulation of his
[14] theories.

[15]   Q: So you indicated that you had some questions. How about
[16] Bert Spahr, did she have questions?

[17]   A: Yes.

[18]   Q: Do you recall what she said?

[19]   A: I have to get my timeline straight. I don't think that
[20] it was in — I don't think it was in this meeting yet.
[21] This I believe was just a quick meeting with just Mr.
[22] Baksa. He handed this to us, asked us what we thought.

[23]   We said at that point, we don't want those words
[24] Intelligent Design in our curriculum. We are okay up to
[25] of other Theories of Evolution, period. And I remember

---

Page 103

[1] him taking that back to the curriculum committee I am
[2] assuming at that point, that we wanted the reference of
[3] Of Pandas and People off and we wanted the words
[4] including, but not limited to, Intelligent Design out of
[5] the curriculum.

[6]   Q: How about Rob Eshbach, do you recall him saying
[7] anything?

[8]   A: I don't remember anything in particular, no.

[9]   Q: You indicated you had some concern about are we going to
[10] be required to teach this. Did Mike Baksa address that
[11] concern during this October 8th meeting?

[12]   A: To me at that point, I am remembering that it was still
[13] up in the air. Because I remember that I asked that
[14] question at the October 18th Board meeting of the Board.
[15] So to me, I would think that it was all up in the air at
[16] this point.

[17]   I don't know if we were unsure or he was unsure
[18] exactly at this point what this meant, where they were
[19] going to go with this.

[20]   Q: All right. If you look at the page of Miller 4 that has
[21] two circled there in the upper right-hand corner,
[22] there's two asterisks after the entry for October 8th
[23] that say it looks like we have amended the curriculum to
[24] remove ID from it, it is rejected by the committee.

[25]   Does that prompt any recollection on your part as

---

Page 104

[1] to what happened after you made your suggestions about
[2] the draft?

[3]   A: Again, we told Mr. Baksa we wanted that out. And then I
[4] am assuming that she put that in there — it was
[5] rejected by the committee simply because when we saw the
[6] minutes for the October 18th meeting, it was included.
[7] I mean that was one of the versions that was included.

[8]   So you know, I am not exactly sure. I don't
[9] remember them coming back saying it was definitely
[10] rejected by the committee or anything like that.
[11] Nothing in particular.

[12]   Q: That is what I was asking. You say she, is that Bert
[13] Spahr?

[14]   A: Yes.

[15]   Q: She created this document?

[16]   A: Yes.

[17]   Q: There is a note in there that refers to October 12th
[18] through 15th?

[19]   A: Yes.

[20]   Q: So we have got a period here between an October meeting
[21] where the teachers have said we want Intelligent Design
[22] out, and then we know the Board meeting is on
[23] October 18th.

[24]   If we focus on that period, do you recall further
[25] discussions with the administration relating to the

---

ennifer Miller
Aay 18, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

**Page 109**

[1] what we had to do, but we were the ones that had to do
[2] it in the classroom. We did feel liable. I think we
[3] said that in several meetings.
[4]     We were worried that someone could sue us for
[5] saying certain things in the classroom.
[6]     Q: Did the administration ever respond to those concerns?
[7]     A: Not until probably November. Not at this time.
[8]     Q: All right. What is next, the October 18th Board
[9] meeting?
[10]     A: Yes.
[11]     Q: Did you go?
[12]     A: Yes.
[13]     Q: Did you go because of the biology curriculum issue?
[14]     A: Absolutely.
[15]     Q: When you went, did you have the document we have been
[16] referring to as draft with you?
[17]     A: I believe so, yes.
[18]     Q: Did you have other versions?
[19]     A: I don't think I took any with me. I think they were
[20] given to us possibly even at the meeting. I was sitting
[21] beside Mrs. Spahr. So probably given to her perhaps the
[22] version A, B and C.
[23]     Q: Do you think it would help if you had those in front of
[24] you?
[25]     A: Are they here?

**Page 110**

[1]     Q: I don't think so. Let me see.
[2]     A: There's two of them here. It says C.
[3]     (J. Miller Deposition Exhibit 7 was marked.
[4]                 BY MR. GILLEN:
[5]     Q: Jen, I am giving you documents we have marked as Miller
[6] 7.
[7]     A: Yes.
[8]     Q: Would you take a look through that, please, noting that
[9] some are two-sided copies and some are not?
[10]     A: (Witness complies. Okay.
[11]     Q: Do those look familiar to you?
[12]     A: Yes.
[13]     Q: With that in mind, do you have notes that relate to the
[14] October 18th Board meeting?
[15]     A: October 18th?
[16]     Q: Yes.
[17]     A: I believe I do. Maybe, I don't. I don't believe that I
[18] do.
[19]     Q: I think you are right. All right.
[20]     A: I think Mrs. Spahr had notes from that meeting, but I
[21] don't believe that I have any.
[22]     Q: Tell me what you remember, Jen, about that October 13th
[23] Board meeting.
[24]     A: It is the 18th.
[25]     Q: 18th, I am sorry.

**Page 111**

[1]     A: There was public comment at the beginning. I know that
[2] Mrs. Spahr stood up and prepared a statement that she
[3] read to the Board.
[4]     I believe that at that time would have been one of
[5] our Co-Presidents of our Association made a statement to
[6] the Board.
[7]     Q: Let's start with Mrs. Spahr. Do you remember the thrust
[8] of her comments to the Board?
[9]     A: She — basically that we wanted no parts of Intelligent
[10] Design. I remember her quoting court cases that had to
[11] do with Intelligent Design/Creationism type thing. I
[12] guess Creationism more so.
[13]     And I remember she definitely quoted court cases
[14] because I remember Mr. Buckingham making the comment
[15] where did you get your law degree after she was doing
[16] that. That is why I remember her quoting those.
[17]     Q: All right. Any other Board members react to Bert
[18] Spahr's comments?
[19]     A: That is the one I remember. I don't remember others,
[20] no.
[21]     Q: You indicated that someone else spoke, a Union rep?
[22]     A: I believe Jere Wynegar spoke. That was the meeting that
[23] he spoke at. He at that time was Co-President of the
[24] Association.
[25]     Q: Co-President with who?

**Page 112**

[1]     A: Sandi Bowser. He is no longer Co-President, but he was
[2] at that time.
[3]     Q: Do you recall the thrust of his comments?
[4]     A: Same type of comments about not including Intelligent
[5] Design. I think there was something about — I can't
[6] remember. Something about being — I don't know if it
[7] was being represented, or they are being backed by —
[8] these were comments that were from Dover and the Union
[9] as a whole, maybe PSEA and that type of thing. That we
[10] were backed by those types of organizations. But
[11] nothing in more detail than that.
[12]     Q: When Mrs. Spahr and Mr. Wynegar spoke, do you recall any
[13] of them bringing up whether or not the teachers were
[14] going to be required to teach it?
[15]     A: I don't recall. I believe Mrs. Spahr handed you a copy
[16] of her — of the speech she gave. I am sure you can
[17] look, but I don't recall it in particular now.
[18]     Q: How about Creationism, was Bert Spahr equating
[19] Intelligent Design with Creationism?
[20]     A: I believe yes because she was quoting again cases, and
[21] there has been no cases on Intelligent Design. I am
[22] only assuming she was using the Court cases on
[23] Creationism.
[24]     Q: Let's just run through the Board. I know you remember
[25] Mr. Buckingham responding to her. How about Alan

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Jennifer Miller
May 18, 2005

**Page 113**

[1] Bonsell?

[2] A: I don't remember, no.

[3] Q: Sheila Harkins?

[4] A: No, I don't remember anything.

[5] Q: Noel Wenrich?

[6] A: No.

[7] Q: Jane Cleaver?

[8] A: No.

[9] Q: Angie Yingling?

[10] A: No.

[11] Q: All right. Two speakers. Any other public comment?

[12] Did you speak at that meeting, Jen?

[13] A: I didn't stand up and have a prepared statement, but

[14] when questions were asked — I remember jumping up to

[15] the podium at one point because of something Heather

[16] Geesey said later in the meeting. I remember being

[17] asked a question by Mrs. Harkins.

[18] So I didn't prepare anything, but I was responding

[19] to things that were said.

[20] Q: What did Heather Geesey say that required an

[21] explanation?

[22] A: Let me see if I got this right. Heather Geesey said

[23] something about — something was said — I think it was

[24] from the Browns. I am assuming something was being said

[25] about a lawsuit and the possibility if we pass this, or

**Page 114**

[1] now that this is passed or something — I don't know if

[2] it was before or after it was passed.

[3] Something was said about a lawsuit and that we

[4] could be sued. And she said — it was our understanding

[5] she was referring to the teachers — if they sue us,

[6] then they should be fired because they agreed with this.

[7] And that caused me to jump up out of my seat and

[8] go to the podium and tell them that we did not agree

[9] with this, the change to the curriculum.

[10] Q: Okay. When you say this, what are you getting at

[11] that point in time?

[12] A: The curriculum change, the adding of the words

[13] Intelligent Design to the curriculum.

[14] Q: I just want to make sure I don't neglect this. Jen, in

[15] Miller 3, there's some notes that have October 18th in

[16] the left-hand — upper left-hand corner.

[17] Is that your handwriting or Bert Spahr's?

[18] A: That is Bertha's.

[19] Q: Later on in the same pack, there's some notes like this,

[20] Jen?

[21] A: Yes. That was I believe my notes at the November 1st

[22] meeting because that was right after November 1st.

[23] Q: Thank you very much. I just wanted to make sure. Back

[24] to the October 18th meeting. If you would, look at

[25] Miller 7.

**Page 115**

[1] A: (Witness complies.) Yes.

[2] Q: Just look at and compare the enclosures marked XI-A,

[3] XI-B and XI-C.

[4] A: Yes.

[5] Q: If you look at the portion of Exhibit 7 that has the

[6] Bates stamp number 17 in the lower right-hand corner —

[7] A: Yes.

[8] Q: — you will see that the cover letter describes the

[9] following document as the recommended changes to the

[10] biology curriculum from the Board curriculum committee.

[11] A: Yes.

[12] Q: Would you take a look at that?

[13] A: Yes.

[14] Q: Now if we look under the column Units

[15] Content/Concepts/Process, at the foot of that page you

[16] will see what I believe are text identical to that in

[17] the draft we discussed earlier?

[18] A: Yes.

[19] Q: Now if we go to the next page, which is Bates stamped —

[20] if you go to the page Bates stamped 19 referencing

[21] enclosure XI-B, you will see the cover letter describes

[22] it as the recommended changes to the biology curriculum

[23] for the administration and staff?

[24] A: Yes.

[25] Q: And then the following document which is Bates stamped

**Page 116**

[1] page 20 or has Bates stamp number 20, what is that, Jen?

[2] A: That is what we had agreed to as a change to our

[3] curriculum. We would be willing to point out that there

[4] are gaps in some parts of Darwin's Theory and of other

[5] Theories of Evolution, period.

[6] Q: I note that the reference under the column headed

[7] Materials and Resources, the reference to Of Pandas is

[8] out?

[9] A: Yes.

[10] Q: If we turn to the next page of Exhibit 7 which has the

[11] Bates stamp number 21 in the lower right-hand corner and

[12] references XI-C, you see there is attached is a second

[13] draft to the recommended changes to the biology

[14] curriculum of the administration and staff.

[15] A: Well, this is the first time I have seen this. This

[16] upsets me because that was not the recommendation from

[17] the staff because it has the words Intelligent Design

[18] it. Oh, no, it does not. Okay. Never mind.

[19] Q: That's right, Jen. That is what I was going to ask you

[20] about. I think you have answered my question, but is

[21] this the first time you have seen it, or looking at it

[22] now —

[23] A: This is the first time I have seen the memorandums that

[24] were attached. We had gotten these at the Board

[25] meeting, but I don't believe we had the memorandums that

nnifer Miller
ay 18, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 117

[1] were attached.

[3] **Q:** By these, you mean the referenced enclosures; in other

[5] words, the cover memos?

[6] **A:** The cover memos, yes.

[7] **Q:** They reference the enclosure. You hadn't seen the cover

[9] memos?

[10] **A:** Yes.

[11] **Q:** But you had seen the enclosures?

[13] **A:** Yes.

[14] **Q:** With that in mind, I would like you to look at this

[16] enclosure which is XI-C and tell me what you notice is

[17] different.

[18] **A:** There is a note at the bottom that says origins of life

[19] is not taught. And the reference to Of Pandas and

[20] People is still — is there.

[21] **Q:** And if I am not mistaken, the entry under UNIT

[22] Content/Concepts has been changed slightly to read

[23] students will be made aware of gaps and problems in

[24] Darwin's Theory and of other Theories of Evolution.

[25] So on the one hand, problems has been taken from
the Board curriculum committee's version; is that
correct, Jen?

**A:** It looks like it, yes.

**Q:** On the other hand, the reference to Intelligent Design
has been omitted?

Page 118

[1] **A:** Yes.

[2] **Q:** Now with that in mind, when you went to the

[3] October 18th, 2004 Board meeting, does XI-C, this last

[4] document we are looking at, seem to reflect what you

[5] thought the administration and staff was going into the

[6] meeting with?

[7] **A:** My recollection is that — and I believe that Dr. Nilsen

[8] even came over to us at one point during the meeting and

[9] said which version do you want, and we said we want B.

[10] **Q:** That's why I am asking you because the cover letter

[11] describes it as a set of recommended changes from

[12] administration and staff.

[13] **A:** Right. Like I said, that is the first time I had seen

[14] that. I was not aware that that included staff on

[15] there.

[16] **Q:** Well, do you have any recollection of discussions with

[17] Mr. Baksa between October 8th and October 18th

[18] addressing these points of conflict that are being

[19] reflected in the changes to the various enclosures?

[20] **A:** The only thing that I can remember, like I said, is when

[21] Dr. Nilsen came to me and said Mr. Bonsell wanted to add

[22] the origins of life is not taught at the bottom. Dr.

[23] Nilsen was saying he thought that was a good idea, that

[24] that would sort of alleviate some of our fears.

[25] I think I said to him at that point I am not sure

Page 119

[1] if it does; that he could put that in there because we

[2] had explained to them several times we didn't teach

[3] origins of life. It didn't matter if it was there or

[4] not.

[5] And again, my recollection is that Dr. Nilsen had

[6] said that if we are handing out these books — if

[7] students are taking them home, then the reference had to

[8] be there.

[9] I don't know. I can't remember any other specific

[10] conversations other than that.

[11] **Q:** How about if we focus on the note and look at your

[12] discussions throughout. I mean if I am understanding

[13] you correctly, you have said it was always your point

[14] that origins is not taught?

[15] **A:** Right.

[16] **Q:** If I am not mistaken, Bert Spahr had the same position?

[17] **A:** Yes, yes.

[18] **Q:** Do you have a definite recollection of that not being

[19] discussed as a possible addition on the part of

[20] teachers?

[21] **A:** I think at that point, we probably said, you know, if it

[22] has to be there, fine. Again, we don't teach origins of

[23] life, anyway. If it is on there, it is not a big deal

[24] because it is what we already do.

[25] **Q:** Remember anything else? You said Heather Geesey made a

Page 120

[1] comment.

[2] How about Sheila Harkins, did she ask you a

[3] question?

[4] **A:** Yes. I think that I recall her asking me at the Board

[5] meeting something about — because if I remember

[6] correctly, the part that was eventually voted upon or

[7] that they were looking at was part A with the addition

[8] of the note origins of life will not be taught. That

[9] was added from Part C to Part A. That was the final

[10] thing that was approved.

[11] I think I remember her asking me something about

[12] that origins of life, will that inhibit you from talking

[13] about anything in the classroom? I believe that was her

[14] question to me at that Board meeting.

[15] **Q:** What was your response?

[16] **A:** I think — if I remember correctly, I think that I said

[17] that even though we don't teach it, with it being there,

[18] it made me a little more uncomfortable with questions

[19] that may come up in the classroom.

[20] Are we allowed to discuss that? If there is a

[21] question, can we discuss that type of thing if that is

[22] in the curriculum? So she was asking about that, does

[23] it inhibit sort of discussion in the classroom.

[24] **Q:** Do you recall any other Board members addressing the

[25] note or its purpose?

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Jennifer Miller
May 18, 2005

**Page 121**

[1] A: Not that I can recall, no.

[2] Q: Do you recall any of the Board members addressing or

[3] explaining the term origins of life as it is used in the

[4] note?

[5] A: I don't — no, no, I don't remember that.

[6] Q: All right. As we sit here and think about this meeting,

[7] Jen, and we are focused on the biology curriculum change

[8] at this point, anything else stick out about the

[9] meeting? For one thing, it seems like it was

[10] contentious?

[11] A: Yes. There were several times when Noel Wenrich had

[12] tried to change — several times he had tried to change

[13] wording or language. I don't remember. It was so

[14] confusing.

[15] They voted. I don't know how many times where

[16] they would vote like is it okay to change it, and then

[17] they would go through another round and say are we going

[18] to accept that change. There were so many rounds of

[19] voting that I sort of lost track of what they were

[20] voting on sometimes.

[21] I remember then they took a break at one point. I

[22] think it did get contentious there between

[23] Mr. Buckingham and Mr. Wenrich at some points because he

[24] was trying to do this.

[25] Q: And by this, you mean the Parliamentary maneuvers of

**Page 122**

[1] Mr. Wenrich?

[2] A: Yes. He was trying to get — he was trying to get the

[3] language sort of — he was trying to take Intelligent

[4] Design is what he had done several times to this.

[5] Q: And that is Mr. Wenrich?

[6] A: Yes. He was trying to do that. I remember at a break

[7] at some point, we were confused. I was sitting at a

[8] table with Mrs. Spahr and Dr. Nilsen came over and said

[9] which version do you want? And we said we want B. And

[10] he said whatever happens, don't clap. And we had no

[11] idea what that meant because we didn't get what we

[12] wanted so we had no reason to clap. So I don't know

[13] what that meant at that point.

[14] Q: Let's focus on the Board members. Do you remember Jane

[15] Cleaver saying anything?

[16] A: No. At some point, she wasn't around a whole lot. I

[17] don't even remember if she was at the meeting or not. I

[18] am sure they keep track of who is in attendance, but I

[19] don't remember.

[20] Q: Sure. And Mr. Wenrich, do you recall anything that he

[21] said during this portion of the Board meeting?

[22] A: Like I said, he was trying to get the wording changed.

[23] I don't remember anything in particular, no, that I

[24] could —

[25] Q: How about Sheila Harkins, apart from the question that

**Page 123**

[1] she asked you, do you recall anything else she said?

[2] A: No.

[3] Q: Angie Yingling?

[4] A: The only thing I remember about Angie Yingling was that

[5] she was sort of our swing vote when they were actually

[6] voting on this A. She had passed on her vote, and it

[7] was a four-four tie, and they went to her. And she

[8] hesitated and hesitated and then finally voted it in.

[9] I don't remember anything particular that she said

[10] other than that action.

[11] Q: Okay. Focusing again on the existence of this XI-C, do

[12] you recall Bert Spahr making any comment about that

[13] enclosure?

[14] A: No. I don't know if it was part of what she spoke at

[15] the beginning of the meeting or not. Because I

[16] believe — I don't think she did because at that meeting

[17] I believe that we had gotten these three different

[18] versions at that meeting. I don't think she would have

[19] had time to prepare anything about any of these.

[20] Q: I guess that is what I am asking, Jen. From the way you

[21] seem to be recalling it now, you would be only expecting

[22] two versions. But you show up, and you get three.

[23] And the third, XI-C, is entitled Recommendation

[24] from the Administration and Staff. Some parts, you can

[25] see how they got there, but you don't have a distinct

**Page 124**

[1] recollection of formulating a separate version it seems?

[2] A: Right. I don't remember that.

[3] Q: Let me ask you that. Although you don't have a

[4] recollection of formulating a third version, it seems

[5] your discussions with Mike Baksa were about the

[6] additions that are reflected in XI-C?

[7] A: Right. And like I said, there were so many versions

[8] going back and forth, is this okay, that kind of thing,

[9] so like I said, the two at the beginning I definitely

[10] remember. The third one is sort of you know — I

[11] remember having like you said discussions about them,

[12] but I don't remember if he sat down and officially said

[13] this is okay, or if we have to, this is okay. I don't

[14] remember in particular.

[15] Q: Let me ask you this: Do you remember sort of your views

[16] being solicited on those issues, the note and use of Of

[17] Pandas as a reference?

[18] A: Like I said, I know Nilsen came to talk to me about

[19] those, and we discussed those two things, yes.

[20] Q: How about reaction by any of your other colleagues to

[21] the various versions that were being voted upon at the

[22] October 18th, 2004 meeting; Bob Eshbach, did he say

[23] anything?

[24] A: At the meeting?

[25] Q: Yes, at the meeting.

---

Filius & McLucas Reporting Service, Inc.     Min-U-Script®     **(33)  Page 121 - Page 12**

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Jennifer Miller
May 18, 2005

Page 129

[1] was there or not. That, I don't remember.

[2] Q: All right. So after October 18th, what did you see,

[3] Jen, as the next step?

[4] MR. GILLEN: Off the record.

[5] (An off-the-record discussion was had.)

[6]                AFTER RECESS

[7]               BY MR. GILLEN:

[8] Q: Jen, if you would look at Miller 3, you will see minutes

[9] for the November 1st, 2004 Board meeting.

[10] A: Yes.

[11] Q: Before we get to those, I would just like to ask you if

[12] you look — I want to focus your attention on the events

[13] between the October 18th, 2004 Board meeting which voted

[14] in the curriculum change and then this November 1st,

[15] 2004 Board meeting.

[16] Can you recall events from that period bearing on

[17] the curriculum change, what was next in this story?

[18] A: At some point in there, we had told administration —

[19] again, I think Mr. Baksa was in on that discussion that

[20] at this point, we want specific direction as to if this

[21] is going to be in our curriculum, what are we to say.

[22] What exactly word for word are we going to say

[23] Q: With that in mind, Jen, I would like for you to look at

[24] Miller 5 and this document. I believe you will find —

[25] it looks like it is an e-mail from Bert Spahr, it has

Page 130

[1] got a handwritten notation 10/28/04 at the top.

[2] A: There, it is. Yes.

[3] Q: Does that look familiar to you?

[4] A: Yes.

[5] Q: That has got a handwritten notation 10/28/04. That

[6] would be ten days after the Board meeting. Do you

[7] recall any events between October 18th and October 28th?

[8] A: No.

[9] Q: Do you think that this e-mail, which is a statement, a

[10] District note on the teaching of Evolution to be read to

[11] all biology classes, is that the next development in the

[12] story?

[13] A: Yes.

[14] Q: Did you mark this document up, Jen?

[15] A: Yes.

[16] Q: Tell me sort of how you got it and what you understood

[17] its purpose to be?

[18] A: It was again from our request, that we would like

[19] specific directions as to what we are going to say. It

[20] was given to us to look over — to be as it says at the

[21] top, to be read to all biology classes.

[22] Q: Okay. There's some handwritten notations there which

[23] you have indicated are yours; right?

[24] A: Yes.

[25] Q: Tell me what you were getting at with those notations.

Page 131

[1] A: We had gotten this. When I originally got this to look

[2] over, I believe our original instinct was to do nothing

[3] with it. Again, we wanted directions as to what we were

[4] to say after discussing it with one of our Union

[5] meetings. Tom Scott was there. We discussed it with

[6] him. We showed him this.

[7] Q: Don't tell me what Tom Scott —

[8] A: Right, right. It was basically decided that we were

[9] being asked by administration to change this, to look

[10] over it, to make changes, that type of thing. So

[11] basically you could change it for any science

[12] inaccuracies. If there's errors in the science, that we

[13] could change those.

[14] Q: Do you know who generated this document that you in turn

[15] marked up?

[16] A: Mr. Baksa.

[17] Q: And did you speak with Mr. Baksa about his draft or the

[18] purpose of his draft?

[19] A: Through e-mails, yes. I mean it says at the top, it is

[20] to be read. Again, we wanted direction. If this

[21] Intelligent Design is going to be in our classroom, we

[22] wanted direction as to what we were to say.

[23] This was our understanding of what we were to say.

[24] Q: And you marked it up, Jen. Tell me why.

[25] A: At the bottom are some of my changes. Let's see here.

Page 132

[1] I wanted the — I added the definition of a theory. I

[2] thought a scientific theory, the definition of what a

[3] scientific theory should be in there. I added that.

[4] Again, that was more of the science of it.

[5] You can see I rewrote some of the things. I

[6] didn't change too much.

[7] The other thing that I believe — here where it

[8] says individuals may subscribe to other theories of

[9] Evolution including Intelligent Design, I again reworded

[10] that because I didn't believe that Intelligent Design is

[11] a theory of Evolution. To me, it is counter to

[12] evolution so it can't therefore be a theory of

[13] Evolution.

[14] Most of the other stuff I believe I left as is. I

[15] may have switched it from one paragraph to the next, but

[16] I left it pretty much.

[17] Q: If you look at the paragraph that is at the bottom of

[18] the page?

[19] A: Mine or the typewritten?

[20] Q: Good question. The paragraph at the bottom with the two

[21] circled.

[22] A: Okay.

[23] Q: Read that. What were you getting at there, Jen?

[24] A: I believe — I mean if you look at where the two is

[25] circled up above in the typewritten, I think that I just

nnifer Miller
ay 18, 2005

Page 133

[1] took what was in number one there. At the very end, it
[1] says including Intelligent Design which accounts for the
[1] origin of species with an explanation different than
[1] Darwin's.
[3]    I believe that I just took that and moved it down
[5] to the second one where I have Intelligent Design is an
[1] explanation of the origin of life that differs from
[3] Darwin's view.
[8]    So I basically took the word theory out of
[10] Intelligent Design and put view instead of theory.
[1] Otherwise, that text isn't much different from what was
[2] written.
[3]    Q: How about the reference there to origin of life?
[4]    A: Again as I said before, Intelligent Design — reading
[15] the Of Pandas and People is an explanation of the origin
[16] of life.
[17]    Q: And by that, Jen, do you mean that it was addressing
[18] aspects of biological theory that you did not address in
[19] your classroom presentation or what? I am trying to see
[20] what you were getting at there.
[21]    A: Well, I guess so. Because in his definition, he has
[22] which accounts for the origin of species. We had tried
[23] to differentiate between the origin of species and the
[24] origin of life.
[25]    I was using my science background to say that

Page 134

[1] Intelligent Design isn't necessarily a theory — a view
[2] on the origin of species. It is more on the origin of
[3] life.
[4]    Q: When you suggested that change, did you give any
[5] consideration to the way in which that might relate to
[6] the curriculum change that had been voted on by the
[7] Board?
[8]    A: Like what; in what ways?
[9]    Q: You know, it seems like these terms have been sort of
[10] bandied about, used by you in a more technical sense,
[11] used by others in sort of a vaguer sense.
[12]    The curriculum change says that origins of life
[13] will not be taught. And this change says Intelligent
[14] Design is an explanation of the origin of life.
[15]    Were you — I mean it is plain or it seems to —
[16] do I understand you correctly you understood Intelligent
[17] Design as being a theory that addressed the origin of
[18] life?
[19]    A: Yes.
[20]    Q: Is that why you were describing it that way here?
[21]    A: Yes.
[22]    Q: So in a sense then, this change as proposed seems to
[23] reflect the curriculum change. Or was that your goal?
[24]    A: My goal was simply to look at and change it for the
[25] science of it basically. I mean I don't think that I

Page 135

[1] necessarily had the curriculum change in the back of my
[2] mind as I was doing this.
[3]    But my goal was to simply change it, as I said,
[4] for the science. I added the definition of a scientific
[5] theory and those types of things to it.
[6]    Q: Okay. If you look back up at the top typewritten
[7] paragraph Darwin's Theory of Evolution continues to be
[8] the dominant scientific explanation for the origins of a
[9] species.
[10]    At least this statement as incorporated in your
[11] changes would have described Darwin's Theory of
[12] Evolution as one addressing the origin of species, and
[13] Intelligent Design Theory as one addressing the origin
[14] of life.
[15]    Do you see them as properly contrasted in that
[16] way?
[17]    A: Yes, I would say so. I mean if anybody was at the
[18] Michael Behe lecture here at the school — at the School
[19] District, he essentially said the same thing. So that
[20] there are parts of the Theory of Evolution in the origin
[21] of species that he has no problems with. And it is the
[22] part of Evolution that deals with the origin of life
[23] where his theory comes into play.
[24]    Q: And, Jen, just so I am understanding you, his reference
[25] to the origins of life you understood to mean what part

Page 136

[1] of that process, the microbiological?
[2]    A: The history of — yes, how things came to be basically.
[3] Again Intelligent Design would say that we see complex
[4] things that could not have come through small, little
[5] steps like natural selection. They had to have been by
[6] an intelligent designer.
[7]    That to me, is origin of life. Where did life
[8] come from?
[9]    Q: I am understanding you better. So when you look at
[10] Evolutionary Theory then, I know how you presented it,
[11] but as a biologist, do you consider Evolutionary Theory
[12] as not addressing that part of the process of life you
[13] have just described, the origins of life forward to
[14] species?
[15]    A: I think that there is a part of it that does, yes. I
[16] think that the overall umbrella of Evolutionary Theory,
[17] yes, there is a part of it that does address origins of
[18] life.
[19]    Again, what is taught in the biology curriculum
[20] here is not — and we stay away from that issue because
[21] that is a controversial issue.
[22]    Q: And I think I understand this page better now, but this
[23] different description of the two theories, Theories of
[24] Evolution as addressing origins of species, Intelligent
[25] Design theory as addressing origin of life was based on

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Jennifer Miller
May 18, 2005

Page 137

[1] your assessment of the thrust of those theories?

[2]    A: Sure.

[3]    Q: Now there is a note there above the first typewritten

[4] paragraph. It says scientific explanation. Then above

[5] that has handwritten remove by them.

[6]    What are you getting at there, Jen?

[7]    A: That was after the final draft was done, which is

[8] probably several pages back here, maybe two pages back

[9] in that. I was just sort of making notes comparing my

[10] version that I sent to what the final version was, the

[11] final draft was.

[12]    Q: Let's look at that, Jen, and just give me a sense for

[13] how this unfolded here. The next page is another —

[14]    A: That is the actual typewritten e-mail that I sent. And

[15] the bold is stuff that I had changed.

[16]    Q: Those changes reflect the handwritten notations we have

[17] just discussed?

[18]    A: Yes. They may not be exact, but this typewritten

[19] version is what I e-mailed.

[20]    Q: We're looking now at the next page in Exhibit 5 which

[21] has a handwritten notation 11/5/04 at the top. It's

[22] bolded and numbered; right?

[23]    A: Right.

[24]    Q: Those changes, you have already talked about right?

[25]    A: Yes.

Page 138

[1]    Q: Then the next page which bears the date 11/15/04 on the

[2] bottom left, what is that, Jen?

[3]    A: I believe that's — I don't think it is the very final

[4] version, but that's the version after I sent mine, what

[5] came back as a draft again.

[6]    Q: If you look at Exhibit 4, the handwritten notes, page

[7] three circled in the upper right-hand corner, we have

[8] got kind of a timeline you have worked out. I just want

[9] to make sure these match.

[10]    October 28, 2004, presented draft to be read to

[11] biology classes written by Mr. Baksa?

[12]    A: Yes.

[13]    Q: And that is the document that has 10/28/04 on the top?

[14]    A: Yes.

[15]    Q: Look further down Exhibit 4, page three, you will see an

[16] entry for November 5th, 2004, Jen sends corrections to

[17] draft?

[18]    A: Yes.

[19]    Q: Is that the second document we looked at?

[20]    A: Yes.

[21]    Q: Which has a date 11/5/04?

[22]    A: Yes.

[23]    Q: Now November, if we look again at Exhibit 2, page number

[24] three, there is an entry November 15, 2004, Mr. Baksa

[25] removed definition of theory from draft?

Page 139

[1]    MS. PENNY: Exhibit 2?

[2]            BY MR. GILLEN:

[3]    Q: Exhibit 2.

[4]    A: I think it is Exhibit 4.

[5]    MR. GILLEN: I am sorry. You are right, Jane.

[6] Exhibit 4?

[7]            BY MR. GILLEN:

[8]    Q: Right?

[9]    A: Yes.

[10]    Q: Is that this third document we have been looking at with

[11] the date 11/15/04 noted?

[12]    A: Yes.

[13]    Q: The question I have is this, Jen: In Exhibit 4,

[14] numbered page three, the entry for November 15th, 2004,

[15] says Mr. Baksa removed definition of theory from draft.

[16]    Now if I look at the document which reflects your

[17] changes dated November 5th, '04, I don't see a

[18] definition of theory.

[19]    A: It is in the second paragraph.

[20]    Q: Okay.

[21]    A: Mine says because Darwin's Theory is a theory, there is

[22] a significant amount of evidence that supports the

[23] theory; although, it is still being tested as new

[24] evidence is discovered.

[25]    The version on the 15th says because Darwin's

Page 140

[1] Theory is a theory, it is still being tested as new

[2] evidence is discovered. That's the definition of theory

[3] that was removed.

[4]    Q: All right. I just want to make sure I understand what

[5] you mean there. In the document dated 11/5/04, where is

[6] the definition of theory?

[7]    A: In the second paragraph.

[8]    Q: Okay.

[9]    A: Where it says because Darwin's Theory is a theory —

[10] right there is the definition, this is the definition of

[11] theory — there is a significant amount of evidence that

[12] supports the theory.

[13]    Q: Okay. It wasn't clear to me. That's fine. What did

[14] you see as the important issues, Jen, that were being

[15] worked out here in the competing versions of this

[16] statement?

[17]    I see that you said you were trying to focus on

[18] the scientific content of it and make it accurate. Is

[19] there anything else?

[20]    A: No. That that was my goal to — for the science of it.

[21] So it was scientifically for the most part accurate.

[22]    Q: Do you know, Jen, if there is a further version of that

[23] statement?

[24]    A: Yes. It would be somewhere around November 19th I

[25] believe is when the press release was released. That is

ennifer Miller
lay 18, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 141

[1] in this same — what are we in, 5?

[2]    Q: Yes. There you have it.

[3]    A: It is on the — I only have one page of this. It is

[4] double sided. It was on the back of that page. I have

[5] it.

[6]    MS. PENNY: Off the record.

[7]    (An off-the-record discussion was had.)

[8]                    BY MR. GILLEN:

[9]    Q: Have we got it now, Jen?

[10]    A: Yes.

[11]    Q: You have shown me pages from Exhibit 5 with a

[12] handwritten notation handed to us on 11/19/04 by Baksa

[13] in the upper left-hand corner; correct?

[14]    A: Yes.

[15]    Q: And the second page of that document has four indented

[16] paragraphs?

[17]    A: Yes.

[18]    Q: As you look at those, Jen, is that the final version of

[19] the statement?

[20]    A: I believe so.

[21]    Q: Have the documents that we have discussed been

[22] precursors to this?

[23]    A: Yes.

[24]    Q: There is a definition of theory in that statement, Jen?

[25]    A: Yes.

Page 142

[1]    Q: Do you know where that came from?

[2]    A: I believe that was through e-mails. Again, when Mr.

[3] Baksa sent me this, the last copy that we were talking

[4] about, he asked what I thought. I said that you removed

[5] the definition of theory. I think it needs to be there.

[6]    Q: Okay. And did he ask you for a definition or I guess

[7] what I am asking is did you provide that definition?

[8]    A: Yes.

[9]    Q: Let's flip back to Exhibit 3, the minutes for the

[10] November 1st Board meeting. Looking finally at that

[11] statement, did you have any objections to that statement

[12] when it came out, to the scientific substance of it?

[13]    A: No. Our objection was the wording at the bottom of the

[14] first page where it said in coordination with the

[15] Science Department teachers because we felt like that

[16] implied that we agreed with Intelligent Design and that

[17] type of thing.

[18]    And that is why the letter that is attached to

[19] that was sent — or behind that was sent.

[20]    Q: Okay. So you felt — looking at that document is a

[21] portion of Exhibit 5, a page that has November 19, 2004

[22] in the upper left-hand corner; correct?

[23]    A: Yes.

[24]    Q: Signed by a number of the science teachers and the Union

[25] representative?

Page 143

[1]    A: Yes.

[2]    Q: Does that state your basis for objection?

[3]    A: Yes.

[4]    Q: And if I understand you right, Jen, it was that you felt

[5] that — you were opposed to the addition of Intelligent

[6] Design to the curriculum, but you felt like that press

[7] release when it indicated input in the statement tended

[8] to make it look like you agreed with the addition of it?

[9]    A: Yes.

[10]    Q: Let's look at the minutes for the November 1st Board

[11] meeting. Did you attend that meeting?

[12]    A: Yes.

[13]    Q: I see you have got some notes that follow those minutes.

[14] There are some names listed there Cynthia Corbett, be

[15] Bryan Rehm, Michael Arnold. Why are those —

[16]    A: I believe at that point, they were listed as people that

[17] were running for the Board to replace I guess at that

[18] point the Browns. I guess it was the Browns and

[19] Mr. Wenrich and Jane Cleaver. They were all leaving.

[20] The Browns had resigned, and Wenrich and Cleaver were

[21] leaving because they moved I believe.

[22]    Q: Then if you look at the next page of your notes, there

[23] is some blocked comment there, we have met with

[24] curriculum committee agreed to —

[25]    A: I don't remember what that is.

Page 144

[1]    Q: Didn't complete that thought?

[2]    A: No.

[3]    Q: Beneath that, evolution equals?

[4]    A: I don't know.

[5]    Q: You are not alone in that. Beneath that, Bonsell, some

[6] comments attributed to him. Does that trigger any

[7] recollection on your part as to what Mr. Bonsell said at

[8] the November 1, 2004 Board meeting?

[9]    A: Just something to the effect that some parts of the

[10] October 18th meeting — and I think again instance of

[11] Mr. Buckingham's statements to Mrs. Spahr after she read

[12] and some of his other comments to other people as they

[13] spoke, we felt that someone should have stood up and

[14] said something to squash some of those comments.

[15]    And so I think — I don't know if it was a member

[16] of the Association or what, but someone communicated

[17] that to the administration. So I think he was making

[18] the statement that he also was not happy with the last

[19] Board meeting. He needed to sort of calm everything

[20] down.

[21]    Q: Just to make sure, I understand that some of the

[22] exchanges were not very civil?

[23]    A: Right.

[24]    Q: There's some notes here from Noel Wenrich. Noel flipped

[25] out. What is that reflecting?

**Min-U-Script®**     Filius & McLucas Reporting Service, Inc.

**Tammy Kitzmiller, et al.   v.**
**Dover Area School District, et al.**

Jennifer Miller
May 18, 2005

Page 145

[1]  A: He yelled — got up very — basically was yelling at
[2] Mr. Buckingham that he needed to apologize, that he was
[3] telling them at the last meeting that he was
[4] unpatriotic. He was questioning his patriotism,
[5] questioning his religion. And that he needed to
[6] apologize.
[7]  He was told to sit down, and he kept yelling. And
[8] he eventually walked out and was yelling the whole time
[9] that he was walking out.
[10]  Q: Walking out of the Board meeting?
[11]  A: Yes.
[12]  Q: There is a comment for Snook?
[13]  A: Yes.
[14]  Q: Was he just asking about who was donating Of Pandas?
[15]  A: Yes.
[16]  Q: And then Barrie, is that Barrie Callahan?
[17]  A: Yes. There's a quote that I had said earlier. That
[18] must be the meeting that she addressed that, that she
[19] thought the entire book is on origins of life and that
[20] is a contradictions if we can't teach origins of life.
[21]  Q: And the contradictions she is pointing to is between the
[22] curriculum note —
[23]  A: Yes.
[24]  Q: — origins of life is not taught and the notion that
[25] Intelligent Design addresses?

Page 146

[1]  A: Yes.
[2]  Q: During that exchange, was there any discussion by any of
[3] the Board members of we're not asking the teachers to
[4] teach it?
[5]  A: I believe so, yes. I don't remember if it was at this
[6] specific meeting, but I remember that being said at
[7] Board meetings.
[8]  Q: Let's just run through the rest of these notations. You
[9] have got a notation for Baksa, solicitor's opinions
[10] given to the Board?
[11]  A: I think someone asked — I guess the previous question
[12] — I guess Barrie asked what was the solicitor's opinion
[13] of this addition to the curriculum. And I think at that
[14] point Mr. Baksa stood up and said that they were getting
[15] the solicitor's opinions, and they were cautionary to
[16] the Board.
[17]  I don't know what that last statement — and I
[18] have a quote that they were being as safe as possible.
[19]  Q: There's Nilsen, no specific direction to change any
[20] wording. Do you recall that?
[21]  A: That the solicitors had given them no specific direction
[22] to change any wording in the curriculum change.
[23]  Q: Then Barrie, that is Barrie Callahan; right?
[24]  A: Yes.
[25]  Q: Listened to tape recording of public record?

Page 147

[1]  A: She wanted to listen to the tape recordings of the
[2] October 18th meeting.
[3]  Q: Then there's some notation for Nilsen about the right of
[4] the Board to decide if it's public record?
[5]  A: Yes.
[6]  Q: And then a notation there that is under Nilsen's name
[7] that says other areas to look at, Buckingham, not at
[8] this time; do you recall?
[9]  A: I believe that was Barrie talking again. Dr. Nilsen
[10] answered her. And then Barrie spoke again and said now
[11] that you changed the biology curriculum, what areas are
[12] you going to go after next? What curriculum are you
[13] going to go after next? She was addressing that to Mr.
[14] Buckingham.
[15]  And he replied none at this time, or not at this
[16] time.
[17]  Q: Bryan Rehm, anything that he said that jumps out?
[18]  A: He was reiterating that the behavior at the last meeting
[19] was unacceptable. He also asked to hear the tape, and
[20] he was sorry that he couldn't hear it.
[21]  Q: Then there's some comments for Casey Brown.
[22]  A: I have February there, but that was October. Reconsider
[23] the actions taken on the 18th. She hopes that they will
[24] reconsider the actions taken on the 18th of October, not
[25] February.

Page 148

[1]  She thought that students were being ridiculed.
[2] It was going to cost taxpayers money. And she wanted to
[3] offer a compromise, that they can teach a course in
[4] comparative religions, and it could be in that course
[5] instead of in the science class. And then I have that
[6] quote from her.
[7]  Q: That quote is thou shall do unto others as you would
[8] have them do unto you?
[9]  A: Yes.
[10]  Q: What was she getting at there?
[11]  A: My understanding was that she was telling the Board that
[12] you should treat others as you would like to be treated.
[13] Stop making some of the comments that you are making,
[14] some of the heated comments that were made at previous
[15] meetings.
[16]  Q: You don't think that was tied to the notation above it
[17] to the course on comparative religions?
[18]  A: No, I don't believe so.
[19]  Q: The next page, there is a reference to cash registers?
[20]  A: At some point in the meeting, they discussed old out
[21] dated cash registers and what they were to do with them.
[22] They had asked — I didn't know his name — Mr.
[23] Bonsell's father something about looking at them, or how
[24] much would they get for them at auction.
[25]  And I just had that he didn't hear because he

nnifer Miller
ay 18, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 149

[1] looked up and said sorry, I was reading my Outdoor Life.

[2] I just thought it was funny so I included that.

[3]   Q: It sounds like the Board meetings were scintillating.

[4]   A: They were very interesting, yes.

[5]   Q: Let me ask you if you would look at this November 1st

[6] Board meeting, was the curriculum — apart from these

[7] comments you have referenced, was the curriculum issue

[8] much discussed?

[9]   A: I don't believe so, no.

[10]   Q: Do you recall any of the Board members speaking to the

[11] curriculum change at the Board meeting?

[12]   A: Other than here where Noel Wenrich was addressing the

[13] previous one and Casey said please reconsider the

[14] actions taken on October 18th, I don't remember any, no.

[15]   Q: Do you remember any reply on the part of any Board

[16] members to the comments made by Casey Brown?

[17]   A: No.

[18]   Q: Looking at the period between October 18th and this

[19] Board meeting on November 1st, did you have — there has

[20] been some discussions or communications relating to this

[21] statement.

[22]   Did you have any communications with Dr. Nilsen

[23] relating to this statement?

[24]   A: I don't believe so. Not until after the press release.

[25]   Q: Did you have any conversations with Mike Baksa about the

Page 150

[1] statement?

[2]   A: I think it was just those e-mails back and forth.

[3]   Q: About revisions to the drafts?

[4]   A: Yes.

[5]   Q: How about your colleagues, apart from your meeting with

[6] Mr. Scott, did you have any discussions with your

[7] colleagues about the statement?

[8]   A: Again, I think originally we were leery. We didn't want

[9] anything to do with it. That was our discussion. But

[10] other than that, I think that was it.

[11]   We really — it was not like anything with reading

[12] the statement or that kind of thing.

[13]   Q: In this period between October 18th and November 1st,

[14] did you speak with any Board members individually?

[15]   A: No.

[16]   Q: How about any people that just left the Board, Noel

[17] Wenrich?

[18]   A: No.

[19]   Q: Angie Yingling?

[20]   A: No.

[21]   Q: She was still on at that time. Casey Brown apart from

[22] the hug?

[23]   A: No.

[24]   Q: Jeff Brown?

[25]   A: No.

Page 151

[1]   Q: Did you ever speak to Don Bonsell about the matter?

[2]   A: No.

[3]   Q: It looks like the next minutes relate to December. Let

[4] me ask you: When the press release was released by the

[5] administration containing the statement, the final

[6] version, was there any discussion between the

[7] administration and the faculty at that time relating to

[8] implementation of the statement?

[9]   A: I don't believe so. I know that we had discussions of

[10] that after the press release was released, but I don't

[11] remember any before that.

[12]   Q: Okay. So tell me what the discussions were after the

[13] press release was released.

[14]   A: We had a meeting I have here the 24th of November. It

[15] was in this room where we met with Dr. Nilsen and Mr.

[16] Baksa and some Union representatives. I am trying to

[17] think who else was there. I know Bill Miller was there

[18] and Brad Neal were there as part of the Union

[19] representation. I know Rob Eshbach was there, and

[20] Bertha Spahr was there.

[21]   And again, we addressed our concerns. Dr. Nilsen

[22] wanted to know basically why we sent him the statement

[23] that said that we —

[24]   Q: Dated November 19, 2004?

[25]   A: Yes, that we all signed.

Page 152

[1]   Q: So there was some discussion of the statement?

[2]   A: Yes.

[3]   Q: And I take it — was there anything apart from —

[4] anything communicated by the teachers to the

[5] administration apart from what was contained in the

[6] statement, itself?

[7]   A: Written like this?

[8]   Q: No. In the meeting, what was said?

[9]   A: Basically, that we have come out negatively against

[10] this, and we do not want to be lumped in with — because

[11] at that point, we were getting lots of e-mails that said

[12] stand up to the Board. Lots of our colleagues were

[13] saying you need to get this Intelligent Design out.

[14]   We didn't want it said that we were in agreement

[15] with the Intelligent Design — putting Intelligent

[16] Design into our curriculum. This is my notes.

[17]   Dr. Nilsen told us that the purpose of the press

[18] release was — I have he said he was protecting himself

[19] and us. Again, I think we reiterated that we wanted

[20] someone to stand up and say they support the teachers or

[21] something. And I believe he said you have come out

[22] negatively against this, and they agreed that we had

[23] been nothing but cooperative.

[24]   And at that point, I know that he gave us a

[25] statement that he was going to read on the Gary Sutton

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Jennifer Miller
May 18, 2005

Page 153

[1] Show.

[2]   Q: Okay. Apart from that — what are you looking at there?

[3]   A: It is at the very beginning of Exhibit 5.

[4]   Q: Thanks. This is meeting on 11/24?

[5]   A: Yes.

[6]   Q: Were any of the Board members present?

[7]   A: No. I don't believe so.

[8]   Q: And at that time, did you express any reservations about

[9] the statement itself?

[10]   A: I know that I remember Bill Miller, again the

[11] representative from the Union, saying that we would like

[12] no parts of this. I remember him saying that, I think

[13] even holding the statement up. We would like to be as

[14] far away from this as possible, or something to that

[15] effect.

[16]   Q: Anything more specific?

[17]   A: There was a lot of discussion on whether my changes

[18] constituted — there was a lot of words, did that

[19] constitute develop the procedure and that kind of thing.

[20] It was a lot of, again, upset about the wording of the

[21] press release.

[22]   Q: Are you getting at there your notion that your input was

[23] sort of narrow and technical as opposed to implying any

[24] endorsement of the curriculum change itself?

[25]   A: Exactly, right. I can change it does not necessarily

Page 154

[1] mean I agree with it.

[2]   Q: The second page of Exhibit 5?

[3]   A: Yes.

[4]   Q: There's some notes there less is more, keep it short,

[5] untrue version of what we said, correcting inaccuracies

[6] scientifically of draft supplied. Is that getting at

[7] what you just explained?

[8]   A: Yes. I believe these are Leslie Prall's notes so she

[9] must have been at that meeting, too.

[10]   Q: There is a notation there of a meeting on November 24th.

[11]   A: She has a.m. meeting and then p.m. meeting. I am not

[12] exactly sure. I don't remember what the difference

[13] there was.

[14]   Q: There a protect in class notation there at the bottom,

[15] does that spark any memory on your part?

[16]   A: Again, the only thing I can remember is back to what he

[17] was saying — Dr. Nilsen was saying his purpose of the

[18] press release was to protect us. Again, we were saying

[19] how we were feeling pressure by being put in the middle

[20] here again.

[21]   Is there a possibility that we could be sued? And

[22] I remember that Dr. Nilsen was saying that the purpose

[23] of his press release was to try to protect us of what

[24] was said in the classroom.

[25]   Q: Looking at this handwriting, you think it is Leslie

Page 155

[1] Prall's?

[2]   A: Yes.

[3]   Q: How about there is a notation there stack of Bibles?

[4]   A: I think if I remember correctly, something was said — I

[5] don't even know what context it was — I can swear on a

[6] stack of Bibles. I think that is what she wrote. I

[7] don't know.

[8]   Q: If you flip that page over all, you'll see a few other

[9] notes. I want to see if they spark any recollection on

[10] your part.

[11]   There is a note there phrase by directive of the

[12] Super and Assistant. Does that make you think of

[13] anything?

[14]   A: No, I don't — I don't know. I don't know what that is.

[15]   Q: Legal issues, do not speak to media?

[16]   A: We had a question at that meeting whether or not because

[17] we had been getting all kinds of media attention,

[18] questions from the media, we had asked them is it okay,

[19] can we speak to the media?

[20]   He said there is no gag order on. If you are

[21] speaking to the media, just make sure that your

[22] statements are true and correct.

[23]   Q: The next page looks like handwritten notes that have you

[24] brought it on on the top. Is that your writing, Jen?

[25]   A: Yes.

Page 156

[1]   Q: Were these notes from this meeting in November?

[2]   A: No.

[3]   Q: So what happened after the November 24th meeting?

[4]   A: I mean the next thing on our timeline is in December —

[5] December, the lawsuit was filed. I guess it was

[6] around— after the — I guess before this in November,

[7] I know that we had e-mailed Mr. Baksa that we would like

[8] our — when we write a curriculum, it says who wrote the

[9] curriculum at the top.

[10]   Since they had made those changes in Intelligent

[11] Design we disagreed with, we asked for our names to be

[12] removed from the curriculum. I know that was in

[13] November, but I think that was early November.

[14]   Q: Look at Exhibit 3, minutes for the December 1, 2004

[15] Board meeting.

[16]   A: December?

[17]   Q: December. December 1, 2004.

[18]   A: Okay.

[19]   Q: Are those your notes?

[20]   A: Yes.

[21]   Q: If you flip over to the second page beneath the agenda,

[22] Item X, Students Report, there is a notation there. It

[23] says Heather Geesey, our business is for you offended.

[24] What is that reference? What was going on at this

[25] meeting?

ennifer Miller
May 18, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

Page 157

[1]   A: At this meeting, I believe there was people upset about
[2] changes in public comment, that they were going to
[3] change the public comment; that it was only going to be
[4] for agenda items only. Because obviously, there was a
[5] lot of people that wanted to speak to the Intelligent
[6] Design issue.
[7]   So they were making some changes that — I have
[8] there beside public comment, that the public comment
[9] before the meeting was only for items on the agenda.
[10] And after the meeting, you could make any comment, but
[11] you couldn't ask any direct questions of the Board.
[12]   If you wanted to ask a direct question, you could
[13] e-mail them, or call them, and write them down ahead of
[14] time, and they would answer them then.
[15]   Q: So your comments on that page, Jen, are they related to
[16] that portion of the discussion?
[17]   A: Yes, I believe so.
[18]   Q: Flip over to page six of the minutes.
[19]   A: (Witness complies.)
[20]   Q: XIV is Curriculum. Was the Intelligent Design
[21] curriculum change discussed at this point in the
[22] meeting?
[23]   A: No.
[24]   Q: There is a comment, it's a lot of fun, it's not like
[25] this. Did Angie Yingling say that?

---

Page 158

[1]   A: Yes.
[2]   Q: Next page, the public comment section, there's some
[3] notes there. I just want to see what you —
[4]   A: Barrie Callahan, I think she may have been — she may
[5] have been addressing, goodness, the case in Georgia I
[6] believe where they had the stickers removed, and she
[7] wanted to add her own sticker to the books. And it is
[8] above there. I stuck it to my notes when I copied it.
[9] She wanted to offer her own stickers.
[10]   Q: All right. Did she bring that to the attention of the
[11] Board?
[12]   A: Yes, yes.
[13]   Q: Do you recall any response on the part of the Board
[14] members; did they dignify that situation with a
[15] response?
[16]   A: No, no.
[17]   Q: There is a Larry there. Who is that?
[18]   A: Larry Snook. He was asking — he said basically, he
[19] couldn't care less about the curriculum. He wanted to
[20] know who was going to pay the bills. If there was a
[21] legal — if there was legal issues, who was going to pay
[22] the bills? Would the taxpayers pay the legal bills?
[23]   And we had been cutting field trips. So how can
[24] they cut field trips and then pay for legal bills,
[25] basically?

---

Page 159

[1]   Q: Then Angie, there is a comment attributed to Angie.
[2] What is that?
[3]   A: I believe at that time, she said that she definitely
[4] wanted to revisit the issue of Intelligent Design.
[5]   Q: Was there any response on the part of the Board to that
[6] suggestion?
[7]   A: I don't believe so because that is why I have question
[8] marks there. It was just sort of one statement, and
[9] that was it. I was wondering what that meant.
[10]   Q: When you say wondering what that meant, I mean what are
[11] you getting at, Jen?
[12]   A: When she said revisit the issue, did that mean she
[13] wanted to force another vote? What did that mean? Was
[14] she going to discuss it at another meeting? I didn't
[15] know exactly at that point what that meant.
[16]   Q: Then there's some comments for Noel Wenrich. What is
[17] that all about? Is he speaking as a member of the
[18] public at this point?
[19]   A: Yes. I don't know if those were — he stood up and
[20] asked a question because then I have an arrow there to
[21] Sheila Harkins who said that this is not the time for
[22] questions. And she had said a couple of times during
[23] there, do we need a five-minute break? She had taken a
[24] five-minute break before. I think she said that again
[25] there, that people were not using proper decorum.

---

Page 160

[1]   I think that was Sheila Harkins, not Noel. He may
[2] have said something before that, but I don't have it
[3] written down.
[4]   Q: Flip the page over. There is a statement attributed to
[5] Lonnie. Is that Lonnie Langione?
[6]   A: Yes.
[7]   Q: Did he address the Board's action in changing the
[8] curriculum?
[9]   A: No. His was on he appreciated his time as Board. He
[10] said it is a thankless job. And that compensation
[11] should not be — because you don't get paid to be a
[12] School Board Director, it is not in the money, but it is
[13] in the kids.
[14]   His suggestion was to make sure they have a
[15] solicitor present at meetings.
[16]   Q: Did he say why?
[17]   A: Because he thought that they were getting into some
[18] legal issues with the public comment and the Sunshine
[19] Law. And I think part of that was the Intelligent
[20] Design issue, also.
[21]   Q: Did he reference that?
[22]   A: I don't think so. I guess I assumed that.
[23]   Q: How about Jeff Brown? There is a comment. What did
[24] Jeff say?
[25]   A: I think he was just reminding them that they are public

---

Min-U-Script®      Filius & McLucas Reporting Service, Inc.

**Tammy Kitzmiller, et al.   v.**
**Dover Area School District, et al.**

**Jennifer Miller**
**May 18, 2005**

---

Page 161

[1] servants, that they need to serve the public, and he
[2] felt that they were looking down their noses at others.
[3] He is glad he resigned from the group.
[4]   Q: Did he elaborate on that looking down noses at others?
[5]   A: I don't believe so.
[6]   Q: Then there's some notes that are linked to Alan Bonsell?
[7]   A: Yes. Someone mentioned something about a quorum, and I
[8] don't know what that was in reference to exactly. But
[9] that that was checked out, and that their attorneys have
[10] looked at statements, and no laws are being broken.
[11]   And then he was — at the end here, he was saying
[12] that before he was a member of the Board if he had to
[13] address the Board, he tried to be very respectful. He
[14] didn't yell out. If I was gaveled, I sat down. I
[15] didn't keep talking. And that the public comment that
[16] they were implementing was the same way that it was when
[17] Lonnie Langione, Larry Snook and Barrie Callahan were on
[18] the Board.
[19]   Q: Apart from these notes and whatever recollection you
[20] have, do you remember anything else that transpired at
[21] this Board meeting?
[22]   A: No.
[23]   Q: Anything else relating to the statement in the period
[24] between November 19th of the press release and this
[25] December 1st Board meeting? Any other exchanges with

Page 162

[1] the Board between you and the Board members about the
[2] curriculum change or statement?
[3]   A: No.
[4]   Q: Any exchanges you can remember between you and members
[5] of the administration regarding the statement?
[6]   A: Are you saying after November 19th?
[7]   Q: Yes.
[8]   A: Other than the meeting that we had on November 24th, I
[9] can't remember any in particular, no.
[10]   Q: If you look at the next portion of Exhibit 5, it is
[11] Board minutes for the December 20th meeting. Did you go
[12] to that?
[13]   A: Yes.
[14]   Q: You have got some notes here. Warren Eshbach, is he
[15] related to Bob Eshbach?
[16]   A: Yes, Rob Eshbach.
[17]   Q: I am sorry, Rob. Looks like he was counseling caution?
[18]   A: Yes.
[19]   Q: Do you recall the thrust of his comments?
[20]   A: This was a meeting where it was called to approve Thomas
[21] More Law Center. All of these people were I guess
[22] giving their opinions on whether or not to hire or not
[23] to hire Thomas More Law Center.
[24]   And I believe Mr. Eshbach's comments were that
[25] this community, I have there it is fractured at this

Page 163

[1] time. There's a lot of fighting in the community, and
[2] that the comment under there is I believe from someone
[3] on the Board. My recollection is Sheila Harkins that he
[4] has to limit his comments to the agenda, to make sure he
[5] limits those comments. Because that is why they were
[6] having the comment period.
[7]   He did switch and say don't hire Thomas More until
[8] a discussion is held with reason on all sides.
[9]   Q: All right. There is a comment there referring to Jeff
[10] Brown don't hire Thomas More, it exists to promote the
[11] Christian religion.
[12]   The Board has said it is not promoting a specific
[13] religion?
[14]   A: Yes.
[15]   Q: Do you recall Mr. Brown making a statement to that
[16] effect?
[17]   A: Yes.
[18]   Q: Anything else you recall about what he said?
[19]   A: No, that was the gist. That if they are promoting
[20] science education and not promoting religion, then they
[21] shouldn't hire the Thomas More Law Center.
[22]   Q: The next page, there is a reference to Mr. Bonsell?
[23]   A: Yes.
[24]   Q: What do you recall about his statement?
[25]   A: I remember him standing up and at first saying something

Page 164

[1] to the effect that everyone who is speaking against the
[2] Board are people who have left the Board. And again, I
[3] think he was reminded to stick to the topic of hiring
[4] the Thomas More Law Center. And he said I am sorry, I
[5] will stick to the topic.
[6]   He just basically said he thought that the Board
[7] was being courageous. He said to the Board God bless
[8] you, and he said it's time and that the people behind
[9] you — there are people behind you in the community.
[10]   Q: Is that a reference to Don Bonsell?
[11]   A: Yes.
[12]   Q: We are through December. Now January is coming up. Did
[13] you have an expectation, Jen, as to when you would be
[14] reading the statement set forth in the press release?
[15]   A: At the beginning of our Evolution unit, yes.
[16]   Q: Was that based on the discussion you had at the
[17] November 24th meeting; was that worked out or fleshed
[18] out?
[19]   A: I believe so, yes.
[20]   MR. GILLEN: I am almost done. Can we take a
[21] short break?
[22]   MS. PENNY: Sure.
[23]   A: Sure.
[24]   (A recess was taken.)
[25]

---

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

Page 165

[1]
[2]                    AFTER RECESS
[3]                   BY MR. GILLEN:
[4]    Q: Okay, Jen, let's wrap this up here. A statement has
[5] been worked out — there is some expectation that you
[6] are going to read the statement. You said you are going
[7] to read that statement in January is when it came up?
[8]    A: That is when Evolution would have started, yes.
[9]    Q: What was it mid January, January 15th?
[10]   A: Sounds about right, yes.
[11]   Q: Between the period we just got done with the
[12] December 1st Board minutes and January 15th, did you
[13] have any discussions with any members of the Board about
[14] the curriculum change, its purpose or so on?
[15]   A: We were called to a meeting in December, December 16th
[16] with Alan Bonsell because he was upset with some — a
[17] teacher comments, staff comments that appeared in some
[18] of the newspapers after the District press release.
[19]   Q: Just tell me briefly was any other Board member present?
[20]   A: No.
[21]   Q: What was said at that meeting?
[22]   A: Let's see if I have notes.
[23]   Q: Do you have notes on that, Jen?
[24]   A: Yes, it is — let me not mix things up. It is in
[25] Exhibit 5.

Page 166

[1]    Q: Thank you.
[2]    A: It would be about the third page back.
[3]    Q: Got you.
[4]    A: And again, there was some discussion of —
[5]    Q: Looks like you were looking for some guidance?
[6]    A: Yes. I went with questions, yes, of how this was going
[7] to be handled. What can I discuss, what can't I
[8] discuss, who is handing out the books.
[9]       I know I had a question with the no origins of
[10] life being taught. I do current events in my class. I
[11] had a student bring in there was a new human fossil
[12] found. Is it okay to talk about that kind of thing if a
[13] student brings it in as a current event?
[14]      If no origins of life are to be taught, does that
[15] constitute origins of life? That kind of thing.
[16]   Q: Do you recall receiving a response subsequently?
[17]   A: Yes. We got — Mr. Baksa gave us a current event
[18] policy, a Board policy on current events.
[19]   Q: There is a reference in this page of notes which has a
[20] date 12/16/04 in the bottom right-hand corner just above
[21] a notation my questions at the meeting with Baksa and
[22] Bonsell.
[23]      There is a notation there to Intelligent Design,
[24] not a theory. What was that getting at, Jen?
[25]   A: I think we reiterated with that we didn't believe

Page 167

[1] Intelligent Design was a scientific theory.
[2]    Q: Was that for the reason you stated earlier about
[3] testability?
[4]    A: Yes.
[5]    Q: The majority of Board voted Intelligent Design. What
[6] does that reflect?
[7]    A: Just that there was a majority — I don't know who said
[8] or if I said it, or someone said it that the majority of
[9] the Board did vote for Intelligent Design. I don't
[10] remember specifically.
[11]   Q: Did you go to the Board with these statements already
[12] jotted down, or are they —
[13]   A: I think that I was thinking of these questions. I went
[14] to the meeting with these in hand, yes.
[15]   Q: You think the asterisk that points to the top of the
[16] page were the points you brought in and the notations
[17] below were the notations you added?
[18]   A: Yes.
[19]   Q: Flip the page over. There's some statements there we
[20] cooperated up to the point, and it goes on. Did you
[21] make those statements at the meeting, Jen?
[22]   A: Again, I am a writer so I think that these were my
[23] thoughts that I had written down. Prior to the meeting,
[24] when I get upset, I tend to write things down, and it
[25] makes me feel better if I get them down on paper.

Page 168

[1]      So I think that these were just sort of my
[2] statements that I had written for myself. I may have
[3] said some of them at the meeting.
[4]    Q: Let me ask you just take a look at them real quick.
[5]    A: Okay.
[6]    Q: Do you recall making any of those statements at the
[7] meeting?
[8]    A: I do remember saying — Mr. Bonsell was saying he was
[9] confused by some of the statements in the press because
[10] we were coming out against the Board, and he thought
[11] that we had been cooperating all along.
[12]      And I do remember saying that you're right, we
[13] cooperated up until the point that you added Intelligent
[14] Design into the curriculum. And then, you know, we
[15] didn't agree with that. Our cooperation at that point
[16] stopped. So I do remember saying that.
[17]      I know that it was told at that meeting that we
[18] don't think the words Intelligent Design should be in
[19] our curriculum.
[20]   Q: There's some comments here that Intelligent Design
[21] doesn't belong in a science classroom. Did you express
[22] that thought during the meeting?
[23]   A: I don't remember specifically, but again, it had been
[24] relayed that we didn't think it was a science.
[25]   Q: Do you recall Mr. Bonsell responding to any of your

---

Min-U-Script®    Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Jennifer Miller
May 18, 2005

---

Page 169

[1] observations?

[2]    A: The one thing I remember at the end of that meeting is
[3] that there was a suggestion that there were so many
[4] people talking to the press, that maybe we all make some
[5] sort of community statement, the Board, the
[6] administration, the staff to the press. But I think in
[7] the end, we decided against that statement.

[8]    I remember in that meeting, again, there was the
[9] question of did we cooperate, did we develop the
[10] statement. And I remember him directing — asking me
[11] specifically didn't you change parts of this.

[12]    And again, we explained the position that we
[13] changed it for the science. Other than that, I don't.

[14]    Q: Do you recall anything else? Any exchanges between
[15] Mr. Bonsell and your colleagues?

[16]    A: No. I don't — I don't remember in particular. No, not
[17] anything specific.

[18]    Q: Okay. Was there administration present?

[19]    A: Yes. Mr. Baksa was there.

[20]    Q: Any exchanges between the science faculty and Mr. Baksa
[21] bearing on the curriculum change or the statement?

[22]    A: I am sure we discussed things, but I don't remember in
[23] particular.

[24]    Q: There's a notion in here that Intelligent Design has
[25] religious content. Is anyone bringing up the idea that

Page 170

[1] you are doing this to teach religion?

[2]    A: I don't believe at this meeting, no. I mean at those
[3] previous meetings where I said that Mrs. Spahr had
[4] brought her court cases. I think that was brought up
[5] then. But probably not any more at this point.

[6]    Q: When Mrs. Spahr is bringing up these court cases and she
[7] sees it as Intelligent Design, as Creationism, is she
[8] sort of telling — attributing to the Board the purpose
[9] of teaching religion? Is that the way she sees it, or
[10] does she think that the theory is a religious theory
[11] whether they know it or not?

[12]    A: I would say more so the second one.

[13]    Q: She sees it as religious theory, and she is trying to
[14] make that clear to them?

[15]    A: Yes.

[16]    Q: You said this before, but I just want to make sure I
[17] understand you. Did you get the sense that they thought
[18] it was a scientific theory?

[19]    A: Early on, I would say that I don't think that topic came
[20] up a whole lot. Probably by this point, they were
[21] saying it was a science, yes.

[22]    Q: Apart from this meeting with Mr. Bonsell, did you have
[23] any other conversations with any Board members in
[24] December or January of — December of 2004, January of
[25] 2005 about the curriculum change?

Page 171

[1]    A: I don't believe so.

[2]    Q: Now how about with the administration, any other
[3] discussions with the administration?

[4]    A: Up until this December, is that what you are asking?

[5]    Q: We have pretty much covered up to December 1st. And
[6] from December 1st forward through January 2005, any
[7] other discussions with the administration that stick
[8] out?

[9]    A: Here in our timeline, we have a January 5th meeting with
[10] Mr. Baksa to discuss the distribution of excusal forms
[11] and parents letters that were to go out to students.

[12]    Q: Let me ask you is the remainder of the story, at least
[13] in the short term through January 2005 as you see it,
[14] does it turn around the reading of the statement and the
[15] position that you took eventually?

[16]    A: Yes.

[17]    Q: And I understand that eventually, the science faculty
[18] decided they didn't want to read that statement?

[19]    A: Yes.

[20]    Q: Give me your reasons briefly.

[21]    A: Again, we had — as I said, Bill Miller had said at
[22] several of the meetings that we would like nothing to do
[23] with this. We were meeting, and I remember the January
[24] 5th meeting, that there was a possibility at that point
[25] that we were discussing the excusal forms. I remember

Page 172

[1] it being said this could all blow over because the
[2] plaintiffs could file a TRO against this whole thing,
[3] and we wouldn't have to worry about reading it or
[4] anything.

[5]    And then I believe it was the next day we were
[6] told — there should be an e-mail somewhere from Mr.
[7] Baksa that said they were not filing a TRO. So at that
[8] point, we decided that we needed to stand up and say
[9] since this wasn't going to be taken away by the TRO,
[10] that we needed to stand up and say we didn't want to
[11] read this.

[12]    Q: All right. Let's look at Exhibit 6, Jen, please.

[13]    A: (Witness complies.)

[14]    Q: Three pages in, first entry at the top is dated April 6,
[15] 2005.

[16]    A: How many pages is it?

[17]    Q: Three pages in.

[18]    A: The stapled packet, okay.

[19]    Q: The notation at the top, Eric — I take it that is my
[20] colleague and friend as a result of this litigation Eric
[21] Rothschild — called Rob — Is that Rob Eshbach?

[22]    A: Yes.

[23]    Q: — at school while we were at lunch to ask about the
[24] memo from Dr. Peterman?

[25]    A: Yes.

---

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

Page 173

1   Q: Is that the April 1, 2003 memo we looked at earlier?

3   A: Yes.

5   Q: Did you have any discussion with Mr. Eshbach about that
6   memo?

7   A: I remember once it was faxed — I don't believe at that
8   point. But once it was faxed, I think that we had a
9   discussion of do we remember this memo, do we remember
10   seeing this memo.

11   I remember helping Mrs. Spahr look through all of
12   her paperwork to see if she had a copy of the memo.

13   Q: Did Mr. Eshbach say anything to you about the memo?

14   A: When we were discussing it, he said that he remembers
15   seeing that memo because he was working after school
16   late one evening, and Dr. Peterman came — I believe he
17   assumed looking for Mrs. Spahr. She wasn't there so she
18   stopped and talked to him and sort of showed him that
19   memo.

20   He didn't remember it word for word, but he
21   remembered at one point it had points, and he remembered
22   seeing those points.

23   Q: If we jump down to 4/8/05, it says Eric called to speak
24   about the accuracy of the memo. Did he speak with you?

25   A: No.

   Q: Who did he speak with?

   A: Mrs. Spahr.

---

Page 174

[1]   Q: Did Mrs. Spahr tell you what she told Eric?

[2]   A: Other than what is here, no.

[3]   Q: By what is here, do you mean the points listed under the
[4]   entry for 4/9?

[5]   A: Yes.

[6]   Q: Let me ask you about that. Eric called. Did he call
[7]   you?

[8]   A: No.

[9]   Q: He was speaking with Mrs. Spahr?

[10]   A: Yes.

[11]   Q: These notes here, the numbered points underneath the
[12]   entries for April 9, 2005, the first one says asked if
[13]   the information was accurate. I responded yes.

[14]   Is that what Bert told you?

[15]   A: Yes.

[16]   Q: Asked if mentioning Creationism and if giving it
[17]   50 percent was accurate. I responded or equal time was
[18]   probably correct.

[19]   Did Bert tell you that?

[20]   A: Yes. She didn't know if she remembered it as exactly
[21]   50 percent Creationism, 50 percent Evolution, but she
[22]   remembered it more like equal time was given to
[23]   Creationism and Evolution.

[24]   Q: Number three, what does that mean to you, Jen?

[25]   A: She said that — and I'll quote — and you will probably

---

Page 175

[1]   hear this tomorrow several times — in my calmest
[2]   Sicilian tone, I looked at him and asked which Board
[3]   member was asking for this, and he responded Alan
[4]   Bonsell.

[5]   Q: There is a notation indicating that Mr. Buckingham was
[6]   deposed again. Did Bert Spahr tell you anything about
[7]   any discussion with Mr. Rothschild about the deposition
[8]   of Mr. Buckingham?

[9]   A: No.

[10]   Q: Part of the way through this pack labeled number six,
[11]   there is an e-mail dated 3/28/05 to Bert Spahr from
[12]   Robert Hamilton. Did you know Mr. Hamilton?

[13]   A: Yes.

[14]   Q: Did Mr. Hamilton ever mention the Creationism
[15]   controversy to you?

[16]   A: Not to me, no, I don't believe.

[17]   Q: Do you have any information concerning Mr. Hamilton's
[18]   relating a controversy concerning Creationism to any
[19]   person at Dover Area School District?

[20]   A: Bert - I mean I am assuming he had talked with Bertha
[21]   because Bertha was aware of this. So other than that —

[22]   Q: When you say this, do you mean this incident that
[23]   appears to be recounted in this e-mail?

[24]   A: Yes.

[25]   Q: Did Bert tell you anything about it?

---

Page 176

[1]   A: Originally or after this?

[2]   Q: At any time.

[3]   A: I don't believe, no, that I heard anything about it
[4]   until we were getting documents together, and I might
[5]   have seen this e-mail, that we discussed this.

[6]   Q: Did she ever explain what this might refer to?

[7]   A: I can't remember if this is coming from Bertha or Rob or
[8]   who it was. I don't remember if it was directly from
[9]   Mr. Hamilton.

[10]   I had subsequently seen Mr. Hamilton at actually
[11]   several funerals that he talked to me. And he had said
[12]   — I remember him, the one quote — and again, I don't
[13]   know if this is directly from him or Bertha — that
[14]   someone had come to him — and at that point, I have no
[15]   idea who that someone was — asking about the inclusion
[16]   of Creationism in the biology classroom.

[17]   And his quote was as soon as you teach Evolution
[18]   in your Sunday schools, we will teach Creationism in the
[19]   biology classroom. Mr. Hamilton, I took over for him.

[20]   He was also a biology teacher before he became
[21]   Principal. This would have been very near and dear to
[22]   him.

[23]   Q: Did he tell you who made that inquiry of him?

[24]   A: No.

[25]   Q: Did he indicate whether it was a member of the Dover

---

Tammy Kitzmiller, et al.  v.
Dover Area School District, et al.

Jennifer Miller
May 18, 2005

---

**Page 177**

[1] Area School District School Board?

[2]   A: No. We had assumed it was, but I couldn't tell you that

[3] for sure.

[4]   Q: Do you have reason to believe that Mr. Eshbach spoke

[5] with Mr. Hamilton about this incident referenced in the

[6] March 28th e-mail?

[7]   A: As I said, I don't remember who told me. I can't

[8] remember if it was Bertha or if it was Rob Eshbach that

[9] told me his quote.

[10]   Q: You say you spoke with him a few times. Did he

[11] elaborate on this —

[12]   A: No.

[13]   Q: — incident?

[14]   A: Not on this issue.

[15]   Q: At the back of this packet, there's some notes, Jen.

[16] When I look at the notes, it looks like they are notes

[17] from the forum in Elizabethtown?

[18]   A: Yes.

[19]   Q: Did you attend that forum?

[20]   A: Yes.

[21]   Q: After having attended that forum, do you still think

[22] Intelligent Design is not science?

[23]   A: Yes.

[24]   Q: Why is that?

[25]   A: Again, as I said before because there is no test that

**Page 178**

[1] you can do that proves that an intelligent being,

[2] designer, whatever you want to call it is responsible

[3] for the things that we see here on earth.

[4]   Q: Have you ever spoken with Kenneth Miller?

[5]   A: Through e-mails just very briefly. I think I e-mailed

[6] him about new editions of the textbook at one point.

[7] That was probably our original order, what was the

[8] latest edition, is there a new edition coming out soon.

[9]   He e-mailed us to show support. If he would

[10] like — if we would like him to come to speak to us on

[11] this issue, he would, or offer any guidance, any

[12] symposium type things, the same as Dr. Behe presented

[13] here.

[14]   Q: At the back of this packet numbered Miller-6, there's

[15] Answers to Interrogatories?

[16]   A: Yes.

[17]   Q: Where did they come from?

[18]   A: That was the subpoena I guess that we got from Thomas

[19] More Law Center handed to us in January. And there were

[20] questions that we were told to answer — or to be

[21] prepared to answer. So I typed them up, again my way of

[22] writing everything down.

[23]   Q: Were they Interrogatories?

[24]   A: Yes.

[25]   Q: Served on the District?

**Page 179**

[1]   A: Yes, it was.

[2]   Q: Was the administration collecting information to respond

[3] to interrogatories?

[4]   A: We were given the piece of paper and told to collect

[5] information, documents, and that these were the

[6] questions we were told to answer.

[7]   Q: Were they written questions?

[8]   A: Yes.

[9]   Q: Is this information that you prepared?

[10]   A: Yes, just me.

[11]   Q: Did the other members of the science faculty prepare

[12] answers?

[13]   A: I am not sure. This was just mine. We were told not to

[14] discuss with each other, to answer them on your own.

[15] This was just me.

[16]   Q: At the beginning of this deposition, we noted that you

[17] had talked with some attorneys representing the

[18] plaintiffs in this matter?

[19]   A: Yes.

[20]   Q: We have had a pretty extensive discussion of some of the

[21] events here today. Is there anything that you told

[22] those lawyers for the plaintiffs that I haven't

[23] discussed with you?

[24]   A: No.

[25]   MR. GILLEN: I have no further questions.

**Page 180**

[1]   MR. LOWE: I just have a couple. No, I am joking.

[2]   MR. GILLEN: Thanks, Jen.

[3]   (The deposition was concluded at 4:50 p.m.)

---

Jennifer Miller
May 18, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 181

COMMONWEALTH OF PENNSYLVANIA   :
COUNTY OF CUMBERLAND            :

   I, Vicki L. Fox, Reporter and Notary Public in and
for the Commonwealth of Pennsylvania and County of
Cumberland, do hereby certify that the foregoing
testimony was taken before me at the time and place
hereinbefore set forth, and that it is the testimony of:

        JENNIFER MILLER

   I further certify that said witness was by me duly
sworn to testify the whole and complete truth in said
cause; that the testimony then given was reported by me
stenographically, and subsequently transcribed under my
direction and supervision; and that the foregoing is a
full, true and correct transcript of my original
shorthand notes.

   I further certify that I am not counsel for nor
related to any of the parties to the foregoing cause,
nor employed by them or their attorneys, and am not
interested in the subject matter or outcome thereof.

Dated at Camp Hill, Pennsylvania, this 24th day of
May, 2005.

        Vicki L. Fox
        Reporter - Notary Public

(The foregoing certification does not apply to any
reproduction of the same by any means unless under the
direct control and/or supervision of the certifying
reporter.)

Min-U-Script®       Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

# 0

04 139:17

# 1

1 13:7; 20:25; 25:18;
144:8; 156:14, 17; 173:1
10/28/04 130:1, 5; 138:13
100 5:12
11/15/04 138:1; 139:11
11/19/04 141:12
11/24 153:4
11/5/04 137:21; 138:21;
140:5
12/16/04 166:20
12th 77:6, 10; 104:17
13th 110:22
14th 60:20; 62:11; 63:4;
44:22; 65:4, 19, 24; 71:24;
86:7
15 138:24
15th 104:18; 139:14, 25;
165:9, 12
16th 165:15
17 115:6
18th 72:12; 75:16; 97:17,
18, 25; 98:18; 103:14;
104:6, 23; 105:3, 21;
106:21; 109:8; 110:14, 15,
24, 25; 114:15, 24; 118:3,
17; 124:22; 128:19; 129:2,
13; 130:7; 144:10; 147:2,
23, 24; 149:14, 18; 150:13
19 115:20; 142:21; 151:24
19th 72:12; 75:16;
140:24; 161:24; 162:6
1st 21:12; 25:20; 114:21,
22; 129:9, 14; 142:10;
143:10; 149:5, 19; 150:13;
161:25; 165:12; 171:5, 6

# 2

2 13:7; 17:11; 48:19, 22;
58:20; 73:7; 138:23;
139:1, 3
2,000 34:4, 7; 63:24; 69:4;
70:21
20 116:1, 1
2002 5:20; 15:20; 16:7,
13; 17:25; 18:2, 4; 72:20;
73:4, 6, 8; 74:12; 76:8
2003 18:8, 9, 18; 21:13,
19; 25:20; 26:19, 25; 27:8,
20, 25; 29:10; 30:25; 38:3,
10, 12, 18; 39:9, 18; 42:8;
44:1, 2, 7, 12, 13; 45:19;
82:17; 173:1
2003-2004 38:11; 41:18
2004 7:16, 21; 8:7; 9:2;
39:8; 41:20; 42:4, 7; 43:9;
44:16; 45:9; 47:4; 48:25;
59:18; 60:13; 61:10; 62:2,
12; 64:20; 71:16; 72:3;
73:5, 6, 8, 17; 75:13, 22;
78:22; 79:21; 93:24;
96:21; 97:17, 25; 98:1, 5,
11; 106:21; 118:3; 124:22;
129:9, 13, 15; 138:10, 16,
24; 139:14; 142:21; 144:8;
151:24; 156:14, 17;
170:24
2004-2005 27:23
2005 6:5; 7:17; 8:17;
170:25; 171:6, 13; 172:15;
174:12
20th 162:11
21 116:11
24th 65:2; 151:14;
154:10; 156:3; 162:8;
164:17
26th 93:17
28 138:10
28th 130:7; 177:6
2nd 77:23; 89:7

# 3

3 61:11, 14; 64:21; 77:6,
12; 86:11; 97:15, 25;
114:15; 129:8; 142:9;
156:14
3/28/05 175:11
30th 79:21; 80:22; 81:24;
82:8; 89:17; 90:9; 91:6;
93:24; 95:5, 15; 99:14;
106:20
31st 78:4

# 4

4 64:12, 16; 71:12, 14;
72:2; 78:19; 79:9, 21;
96:20; 98:5, 11; 103:20;
138:6, 15; 139:4, 6, 13
4/8/05 173:21
4/9 174:4
440 50:2
4:50 180:3
4th 98:1, 2

# 5

5 93:15; 129:24; 137:20;
141:1, 11; 142:21; 153:3;
154:2; 162:10; 165:25
50 174:17, 21, 21
5th 138:16; 139:17;
171:9, 24

# 6

6 64:12, 16; 172:12, 14;
178:14
6-4-04 49:18; 52:1

# 7

7 110:3, 6; 114:25; 115:5;
116:10
72 87:18, 20, 24, 25
7th 61:10, 17, 19; 62:2, 5

# 8

8 96:21
8th 96:25; 97:7; 98:16, 20;
99:21; 101:14; 103:11, 22;
118:17; 128:19

# 9

9 174:12
90 14:6
91 14:6
91-'92 13:19
93-'94 17:4
99 14:24, 24

# A

a.m 154:11
ability 5:14, 18, 22, 25
able 48:11
Above 65:2; 132:25;
137:3, 4; 148:16; 158:8;
166:20
Absolutely 109:14
abundance 97:22
accept 121:18
acceptable 96:5, 6
acceptance 63:7
accomplished 53:22
accounts 133:2, 22
accuracy 173:22
accurate 94:9; 140:18,
21; 174:13, 17
accusing 67:18; 89:14
across 100:12
Act 87:18, 20, 24, 25
action 76:4; 123:10;
160:7
actions 147:23, 24;
149:14
actual 86:19; 101:5;
137:14
actually 59:8; 62:24;
105:4; 123:5; 176:10
add 105:7; 118:21; 158:7
added 120:9; 132:1, 3;
135:4; 167:17; 168:13
adding 91:11; 114:12
addition 119:19; 120:7;
143:5, 8; 146:13
additions 124:6; 125:15
address 5:11; 12:18;
15:11; 103:10; 133:18;
136:17; 160:7; 161:13
addressed 21:10; 35:13;
36:7; 38:2, 8; 55:11; 74:19;
134:17; 145:18; 151:21
addresses 145:25
addressing 31:2; 66:12;
73:25; 118:18; 120:24;
121:2; 133:17; 135:12, 13;
136:12, 24, 25; 147:13;
149:12; 158:5
adhesive 99:5
administration 15:22;
16:1, 9, 15; 32:13, 22;
38:4; 104:25; 108:17;
109:6; 115:23; 116:14;
118:5, 12; 123:24; 127:1,
12, 18; 128:5, 7; 129:18;
131:9; 144:17; 151:5, 7;
152:5; 162:5; 169:6, 18;
171:2, 3, 7; 179:2
advanced 94:8
advise 25:22
affairs 89:17
aftermath 126:6
AFTERNOON 64:10
afterwards 68:1
again 24:20; 25:12;
34:24; 36:2; 38:25; 39:20,
22; 40:13; 41:1, 25; 42:1;
44:25; 46:25; 47:21; 51:7;
52:22, 24; 53:1; 54:2;
55:16, 24; 56:22, 25;
58:24; 60:16; 67:25; 69:3,
23; 70:3; 72:9; 79:3; 82:12,
18; 83:1, 23; 84:13; 85:4,
10; 86:1; 89:20, 24; 91:17,
19; 93:7; 94:25; 95:11;
99:12, 14, 16; 101:4;
104:3; 105:18; 107:12, 13;
108:2, 7; 112:20; 119:5,
22; 123:11; 129:19;
130:18; 131:3, 20; 132:4,
9; 133:14; 136:3, 19;
138:5, 23; 142:2; 144:10;
147:9, 10; 150:8; 151:21;
152:19; 153:10, 20;
154:16, 18, 20; 159:24;
164:2; 166:4; 167:22;
168:23; 169:8, 12; 171:21;
175:6; 176:12; 177:25;
178:21
against 69:8, 9; 152:9,
22; 164:1; 168:10; 169:7;
172:2
agenda 156:21; 157:4, 9;
163:4
ago 10:3; 63:25; 69:4;
70:21
agree 21:14, 21; 84:3;
114:8; 154:1; 168:15
agreed 102:3; 114:6;
116:2; 142:16; 143:8, 24;
152:22
agreement 76:1; 83:15;
91:9, 11, 14; 99:14; 152:14
ahead 40:15; 125:17;
157:13
air 103:13, 15
Alan 29:12, 14; 30:3;
32:8; 70:24; 112:25;
161:6; 165:16; 175:3
alleviate 118:24
allowed 120:20
almost 38:15; 164:20
alone 144:5
along 25:25; 26:5; 94:20;
108:16; 168:11
alternate 25:23
although 8:4; 99:24;
124:3; 139:23
always 22:3; 23:1; 29:6;
40:4; 53:22; 119:13
Amanda 88:2
amended 103:23
among 32:21; 38:20
amount 139:22; 140:11
Anatomy 17:11, 18
Angie 10:7; 71:4; 113:9;
123:3, 4; 150:19; 157:25;
159:1, 1
Angie's 10:8
angry 100:10
animosity 35:18
answered 116:20;
147:10
anticipate 76:4
anymore 23:22; 81:21
Apart 6:25; 7:8; 8:22;
9:10, 24; 11:18, 21; 13:20;
19:15; 34:18; 45:10;
53:13; 70:19; 73:14;
81:10; 97:2; 122:25;
149:6; 150:5, 21; 152:3, 5;
153:2; 161:19; 170:22
apologize 145:2, 6
appalled 68:24; 69:11
apparently 52:16
appear 64:17
appeared 165:17
appears 11:22; 63:9;
175:23
applying 51:3
appointment 83:13
appreciate 11:23
appreciated 160:9
apprehensive 39:25;
40:5, 6
approach 35:1
appropriate 82:24; 91:3
approval 77:21
approve 79:3, 4; 98:3;
108:6; 128:25; 162:20
approved 75:22; 79:5, 7;
89:7; 120:10
approving 72:18; 98:14
April 7:17; 8:17; 18:19;
21:12, 19; 25:20; 26:20;
46:10; 172:14; 173:1;
174:12
Area 5:8; 13:23; 14:16;
15:4, 19, 24; 16:7, 12;
43:25; 58:16; 74:8; 92:1, 3;

Jennifer Miller
May 18, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

75:19; 177:1
areas 147:7, 11
Arnold 143:15
around 13:19; 18:20;
17:21; 52:12; 53:11;
58:11; 72:12, 25; 75:16;
122:16; 140:24; 156:6;
171:14
arrow 159:20
articles 108:4
aside 66:23
asleep 54:12, 14
aspects 3:21; 36:3;
133:18
assertions 74:8
assessment 137:1
Assistant 155:12
Association 8:1; 111:5,
24; 144:16
assume 45:17; 47:21;
87:12
assumed 35:13; 37:24;
160:22; 173:15; 177:2
assuming 28:10, 11;
29:18, 19; 30:22; 59:3;
86:18; 88:3, 4; 91:10;
94:12; 103:2; 104:4;
112:22; 113:24; 175:20
assured 72:9
asterisk 167:15
asterisks 103:22
atheists 107:21
attached 86:8; 116:12,
24; 117:1; 142:18
attend 43:10; 77:7; 79:24;
86:4; 143:11; 177:19
attendance 43:16; 58:14;
61:1; 122:18
attended 47:10; 77:17;
177:21
attending 32:14
attention 18:6; 27:2;
41:23; 64:20; 93:10;
108:18; 129:12; 155:17;
158:10
attorneys 3:11; 7:6, 22;
161:9; 179:17
attribute 19:3
attributed 19:16; 69:16;
71:8; 87:14; 94:14; 144:6;
159:1; 160:4
attributing 170:8
auction 148:24
August 77:23; 78:4, 22;
79:21; 80:1, 22; 81:24;
82:8; 89:7, 13, 17; 90:9;
91:6; 93:17, 24; 95:5, 15;
99:14; 106:20
available 95:12
avoid 4:19
aware 10:3, 5, 8; 18:3;
56:6; 73:19; 99:20;
101:21; 106:23; 107:1, 2;
117:18; 118:14; 175:21
away 24:23; 57:7; 69:17;

70:1; 71:20; 90:24; 91:20;
92:2; 136:20; 153:14;
172:9
awkward 29:4

**B**

B 109:22; 118:9; 122:9;
127:10, 20, 21
bachelor 13:1
back 24:21; 27:24; 43:2;
53:10, 12; 70:3; 76:18, 25;
77:4; 78:14, 15; 81:18;
82:17; 90:9; 91:19; 92:23;
97:6; 103:1; 104:9;
114:23; 124:8; 126:21;
128:20, 24; 135:1, 6;
137:8, 8; 138:5; 141:4;
142:9; 150:2; 154:16;
166:2; 177:15; 178:14
backed 112:7, 10
background 8:8, 10, 11;
9:8; 10:24; 12:23; 22:23;
33:5, 8, 23; 34:1, 18;
59:24; 133:25
bad 81:14
Baksa 18:13; 19:3, 16,
21; 21:7; 25:20; 30:22;
33:3, 25; 38:6; 47:16, 23;
49:24; 56:13; 57:11, 13;
58:10; 59:3, 11, 17; 75:10,
24; 76:10; 78:14; 97:8;
99:22; 100:5; 102:22;
103:10; 104:3; 118:17;
124:5; 126:24; 127:9;
128:3, 4, 17; 129:19;
131:16, 17; 138:11, 24;
139:15; 141:12; 142:3;
146:9, 14; 149:25; 151:16;
156:7; 166:17, 21; 169:19,
20; 171:10; 172:7
Baksa's 73:2; 127:23, 25
balance 28:14; 34:12
balanced 56:24
bandied 134:10
Bang 23:14
bare 4:8
Barrie 67:15; 82:6; 86:22;
87:2, 7; 88:9; 145:16, 16;
146:12, 23, 23; 147:9, 10;
158:4; 161:17
based 61:3; 136:25;
164:16
Basically 8:8; 9:7; 17:9,
10; 18:25; 22:8, 21; 23:5;
31:14; 36:21, 23; 69:7;
70:11; 106:24; 111:9;
127:11, 11; 131:8, 11;
133:9; 134:25; 136:2;
145:1; 151:22; 152:9;
158:18, 25; 164:6
basis 143:2
Bates 115:6, 19, 20, 25;
116:1, 11
Bear 4:5
bearing 8:12; 129:16;
169:21

bears 138:1
became 17:11; 24:21;
176:20
become 23:21; 36:5
becomes 24:11, 12
becoming 24:2
began 22:9; 24:9
begin 4:3; 51:18
beginning 12:23; 22:14;
26:21; 41:21; 87:10, 12;
111:1; 123:15; 124:9;
153:3; 164:15; 179:16
begins 50:2; 70:7
behavior 147:18
Behe 135:18; 178:12
behind 49:15, 25; 58:20;
65:16; 142:19; 164:8, 9
beliefs 33:6, 8, 24; 66:23
belong 168:21
below 65:2; 94:2; 167:17
Beneath 68:23; 144:3, 5;
156:21
Bert 18:21; 19:8, 16;
20:14, 19; 21:11; 26:4, 9,
14; 29:23, 24; 30:2; 31:9,
15; 32:16; 37:1, 5; 39:5,
17, 25; 56:21; 75:9, 19;
76:20; 80:3, 9; 81:10;
84:11; 92:6, 11; 93:7;
100:9; 102:16; 104:12;
111:17; 112:18; 114:17;
119:16; 123:12; 129:25;
174:14, 19; 175:6, 11, 20,
25
Bertha 7:3; 8:5, 21;
18:11; 33:3; 78:25; 82:19;
83:1; 99:23; 151:20;
175:20, 21; 176:7, 13;
177:8
Bertha's 114:18; 125:10
beside 109:21; 157:8
besides 70:24
best 4:19; 35:9; 40:16
better 18:22; 37:18;
62:24; 74:5; 83:17; 136:9,
22; 167:25
Beyond 59:16
Bible 63:12; 70:9, 17
Bibles 155:3, 6
Big 23:14; 41:23; 44:7, 9,
10; 81:12; 119:23
Bill 7:25; 16:23; 47:6;
91:5; 151:17; 153:10;
171:21
bills 158:20, 22, 22, 24
biological 133:18
biologist 136:11
biology 8:12, 15; 9:14;
13:1, 2, 5, 7, 8; 20, 25;
14:2, 10, 20; 15:11; 17:8,
11, 11, 18, 20, 20; 18:4, 5,
14; 19:24; 21:8; 23:24;
24:14, 14; 27:1, 1, 7, 16,
20; 28:1; 30:10; 31:3, 5, 6;
33:15; 34:25; 36:10, 11;
39:13; 41:17, 22, 22, 25;

42:1; 44:2, 3, 18, 18;
45:15, 16, 20, 25; 54:12,
13; 58:16, 22; 59:8; 60:3,
16; 73:9; 78:6, 6; 79:3;
90:2, 20; 98:10; 100:1, 19,
22; 109:13; 115:10, 22;
116:13; 121:7; 130:11, 21;
136:19; 138:11; 147:11;
176:16, 19, 20
bit 105:13
blander 73:22
blank 83:1
bless 164:7
blocked 143:23
blood 15:18
blow 172:1
blushed 10:11
Board 11:15; 15:20; 16:7,
13; 18:6; 28:8; 32:8, 13,
23; 33:16, 19, 20; 39:10;
42:22; 43:10, 16, 25; 44:1,
24; 45:7, 10; 46:7; 49:7;
50:13; 57:18; 59:11; 60:8,
9, 10, 11; 61:4, 13; 62:19,
21; 63:4; 65:4, 10; 67:14,
16; 70:20; 71:22, 24;
72:22; 76:7; 78:22; 82:2;
83:14; 85:24; 86:4, 12;
88:13, 18, 22; 89:12, 17,
18, 23; 90:9; 92:18; 93:10,
13; 97:9, 13, 14, 16; 98:1,
11, 19, 22; 103:14, 14;
104:22; 105:4, 21; 106:21;
109:8; 110:14, 23; 111:3,
6, 8, 17; 112:24; 115:10;
116:24; 117:21; 118:3;
120:4, 14, 24; 121:2;
122:14, 21; 126:7; 127:2;
128:2, 6, 10; 129:9, 13, 15;
130:6; 134:7; 142:10;
143:10, 17; 144:8, 19;
145:10; 146:3, 7, 10, 16;
147:4; 148:11; 149:3, 6,
10, 11, 15, 19; 150:14, 16;
152:12; 153:6; 156:15;
157:11; 158:11, 13; 159:5;
160:9, 12; 161:12, 13, 18,
21, 25; 162:1, 1, 11; 163:3,
12; 164:2, 2, 6, 7; 165:12,
13, 19; 166:18; 167:5, 9,
11; 168:10; 169:5; 170:8,
23; 175:2; 177:1
Board's 160:7
Bob 7:3; 58:22; 59:8;
99:25; 124:22; 125:5;
162:15
bold 137:15
bolded 137:22
Bonsell 27:5; 29:12, 14;
30:3, 21; 32:8, 14; 33:15;
34:2; 35:20; 39:11; 41:3,
12; 55:5; 59:1; 65:12;
66:12; 70:24; 82:15;
83:11, 14; 90:10, 12;
91:14; 105:7; 106:10;
113:1; 118:21; 144:5, 7;
151:1; 161:6; 163:22;
164:10; 165:16; 166:22;
168:8, 25; 169:15; 170:22;

175:4
Bonsell's 11:12; 33:6, 8,
24; 38:1; 148:23
book 50:15; 62:7; 76:17,
23; 77:5; 78:9; 81:9; 82:13,
21; 84:12, 25; 85:16; 89:6,
9, 21; 90:21; 91:12; 94:15;
95:11; 96:10, 11; 145:19
books 57:14; 58:7, 16;
62:7; 72:10, 17, 18; 73:9;
75:21; 83:9; 84:17; 85:11;
89:5; 100:22; 119:6;
158:7; 166:8
boss 16:10
both 42:14; 48:13, 13;
125:2; 126:9
bottom 70:6; 94:14;
105:7, 11, 12; 117:13;
118:22; 131:25; 132:17,
20; 138:2; 142:13; 154:14;
166:20
Bowser 7:3; 8:4, 21;
16:21; 61:24, 25; 62:13;
112:1
Bowser's 62:3, 4
Brad 16:25; 151:18
break 4:22; 41:20; 43:5;
121:21; 122:6; 159:23, 24;
164:21
brief 12:22; 43:5
briefly 165:19; 171:20;
178:5
bring 78:14, 15; 86:3;
93:10; 158:10; 166:11
bringing 37:5; 89:9;
108:18; 112:13; 169:25;
170:6
brings 18:8; 77:23; 98:6,
16; 166:13
broken 161:10
brought 56:13; 89:24;
155:24; 167:16; 170:4, 4
Brown 47:6; 54:21; 57:3,
8; 66:20; 84:5; 91:10, 23;
93:4; 126:8; 147:21;
149:16; 150:21, 24;
160:23; 163:10, 15
Brown's 91:15
Browns 113:24; 143:18,
18, 20
Bryan 31:13, 24; 143:15;
147:17
Buckingham 47:6;
49:22; 51:22, 24; 52:14;
53:17; 55:4; 56:17, 22;
58:11; 63:11, 14; 67:19;
69:17, 24; 75:6; 79:4; 83:2,
12, 15; 89:13; 91:5; 94:15;
111:14; 112:25; 121:23;
145:2; 147:7, 14; 175:5, 8
Buckingham's 11:12,
14; 47:16; 54:21; 74:2;
144:11
budget 29:1, 6; 42:1, 2,
24, 25; 58:5
budgets 28:22
building 43:20; 44:7, 11

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Jennifer Miller
May 18, 2005

burn 52:19
burned 52:16, 17
business 16:5, 6; 42:20;
156:23
buy 28:20

# C

C 109:22; 110:2; 120:9;
127:10
calendar 38:15, 18;
39:18
call 9:1; 12:21; 24:1;
42:17; 157:13; 174:6;
178:2
Callahan 67:15, 18; 82:6;
86:22; 87:2, 7; 88:9;
145:16; 146:23; 158:4;
161:17
called 3:7; 10:2; 17:8;
24:2; 34:3; 46:16; 56:15;
57:24; 72:16; 100:2;
162:20; 165:15; 172:21;
173:21; 174:6
calm 144:19
calmest 175:1
came 10:4; 19:21; 22:4,
25; 23:3; 40:22; 41:5;
43:22; 46:25; 53:5, 11;
55:1, 18, 19; 56:4, 8;
58:13, 24; 65:22; 67:7, 12;
69:7; 72:19; 90:24; 99:12,
23; 101:10; 105:4, 14;
118:8, 21; 122:8; 124:18;
136:2; 138:5; 142:1, 12;
165:7; 170:19; 173:14
can 4:20, 22; 10:14, 20;
12:11; 14:13; 18:10;
19:17; 20:18; 21:14; 25:5,
11; 27:8; 32:10, 15; 33:14,
18; 34:14, 17, 21, 22;
36:18; 43:4; 44:22; 46:8;
53:6, 9; 55:14; 58:1; 63:22;
64:6, 25; 67:24; 81:12, 15;
82:1, 11; 84:8; 87:20; 88:9;
92:22, 25; 95:12; 96:18;
100:22; 107:13, 17, 22;
112:16; 118:20; 120:21;
121:3; 123:24; 129:16;
132:5; 148:3; 153:25;
154:16; 155:5, 19; 158:23;
162:4; 164:20; 166:7;
178:1
capacity 29:15
carbon 34:5
care 22:9; 158:19
case 3:11; 4:10; 9:7;
108:5, 10; 158:5
cases 20:7; 37:10; 89:24;
111:10, 13; 112:20, 21, 22;
170:4, 6
Casey 47:6; 54:21; 57:8;
66:20, 20; 84:5; 91:10, 15,
23; 93:4; 126:8; 147:21;
149:13, 16; 150:21
cash 148:19, 21
catalogs 42:17

caused 105:13; 114:7
caution 162:17
cautionary 146:15
Center 162:21, 23;
163:21; 164:4; 178:19
certain 9:15; 15:14; 28:4;
59:5; 76:23; 81:20; 109:5
certainty 32:5
certification 3:3
certified 13:2; 14:9, 14,
15, 17
chance 3:19; 78:11, 15
change 22:6, 17; 23:19,
25; 56:5; 68:12, 21; 85:18;
86:19; 95:3; 96:8; 97:9;
100:3; 101:21; 105:1;
114:9, 12; 116:2; 121:7,
12, 12, 16, 18; 129:14, 17;
131:9, 11, 13; 132:6;
134:4, 6, 12, 13, 22, 23,
24; 135:1, 3; 146:19, 22, .
22; 149:11; 153:24, 25;
157:3, 21; 162:2; 165:14;
169:11, 21; 170:25
changed 23:3, 4; 74:7;
117:17; 122:22; 137:15;
147:11; 169:13
changes 17:20; 73:8, 25;
74:19; 115:9, 22; 116:13;
118:11, 19; 127:12;
131:10, 25; 135:11;
137:16, 24; 139:17;
153:17; 156:10; 157:2, 7
changing 160:7
chapter 73:3, 3
chapters 73:4
charge 72:13
Charlotte 11:13
chart 59:15
check 12:4
checked 161:9
chemical 81:10
chemistry 62:7; 80:13,
16, 17
Christian 58:7; 68:24;
69:10, 12, 14; 163:11
Christianity 69:17; 70:1
Christians 59:14
church 108:15
circle 68:11
circled 71:15; 78:20;
96:20; 103:21; 132:21, 25;
138:7
civil 144:22
clap 122:10, 12
class 96:4; 148:5;
154:14; 166:10
classes 27:7; 36:14;
130:11, 21; 138:11
classroom 18:15; 21:24;
25:15; 34:25; 37:10;
52:14; 53:6; 83:9; 84:10,
13, 15, 17; 85:12; 87:6;
90:2, 21; 95:7, 12, 17;
96:2, 2, 9; 98:15; 99:16;

100:23; 109:2, 5; 120:13,
19, 23; 131:21; 133:19;
154:24; 168:21; 176:16,
19
classrooms 25:16; 41:7;
100:21; 126:1
clear 60:5; 126:3; 140:13;
170:14
cleared 125:11
Cleaver 71:6; 113:7;
122:15; 143:19, 20
close 39:18; 88:5
cloud 68:11
Club 70:9, 17
Co-President 111:23,
25; 112:1
Co-Presidents 111:5
collaborating 45:21
colleague 172:20
colleagues 11:18, 20;
32:13; 34:20; 38:20, 21;
50:19; 81:24; 88:25;
106:22; 124:20; 126:14;
150:5, 7; 152:12; 169:15
collect 179:4
collected 22:24
collecting 179:2
College 12:25
colorful 10:10
column 115:14; 116:6
coming 20:9; 33:6; 39:3,
21, 21; 43:25; 52:24;
54:15; 60:16; 71:20;
74:11; 97:8; 100:2; 104:9;
106:8; 164:12; 168:10;
176:7; 178:8
comment 63:13; 65:11,
23; 67:8, 9; 68:2, 24;
70:25; 71:8; 87:7, 14, 16;
94:14; 111:1, 14; 113:11;
120:1; 123:12; 127:23, 25,
25; 143:23; 145:12; 157:2,
3, 8, 8, 10, 24; 158:2;
159:1; 160:18, 23; 161:15;
163:2, 6, 9
comments 65:8; 67:24;
76:23; 88:7, 11, 13, 14, 16;
94:7; 111:8, 18; 112:3, 4,
8; 144:6, 12, 14; 147:21;
148:13, 14; 149:7, 16;
157:15; 159:16; 162:19,
24; 163:4, 5; 165:17, 17;
168:20
committee 29:15, 25;
33:17; 44:25; 45:7, 11;
47:5; 49:7, 14, 17; 50:13;
68:20; 71:17; 79:21; 82:9,
15; 83:20; 85:24; 88:22;
89:12; 90:10; 97:10;
103:1, 24; 104:5, 10;
115:10; 143:24
committee's 117:21
communicated 7:9;
144:16; 152:4
communication 4:9;
38:4; 128:23
communications 6:21;

8:23; 9:25; 10:12, 24;
149:20, 22
community 88:3; 162:25;
163:1; 164:9; 169:5
comparative 148:4, 17
compare 115:2
comparing 137:9
compensation 160:10
competing 140:15
competition 23:6
complete 144:1
complex 136:3
complies 49:4; 71:13;
73:10; 93:20; 96:24;
110:10; 115:1; 157:19;
172:13
comprehensive 16:11
compromise 55:20, 25;
83:8; 84:14, 20; 125:15;
148:3
computer 12:1, 4, 8
concentrate 24:21
concept 22:19
concepts 24:6; 51:4
concern 35:22; 40:19;
54:15; 73:23; 74:14;
84:25; 93:4; 103:9, 11;
106:14
concerned 19:23; 20:8,
10; 35:3, 5; 51:15; 93:7;
105:24; 108:20
concerning 80:10;
175:17, 18
concerns 19:6, 22; 20:1,
5; 27:6; 30:6, 9; 32:19;
34:15; 35:13; 38:2, 8; 45:1;
47:14, 15, 17, 18; 48:2, 8,
9; 49:9, 21, 11; 50:16, 23,
24, 25; 51:2, 7; 55:11, 17;
56:23; 57:19, 20; 74:2, 16,
19; 82:22, 22; 105:18;
109:6; 151:21
concluded 180:3
conclusion 39:9
conference 30:13
confess 4:4
confidential 6:22
conflict 118:18
confused 62:23; 122:7;
168:9
confusing 121:14
connect 26:8
connected 38:5
connection 11:16; 12:1;
15:10; 24:17; 56:10
consensus 40:1; 50:19
consider 136:11
consideration 40:18;
58:3; 134:5
considered 58:5
constantly 55:17
constitute 153:19;
166:15
constituted 153:18

construed 92:3
consulted 7:8
consumer 54:5, 6, 8
contact 77:4; 78:13
contained 97:25; 152:5
containing 151:5
content 97:20; 140:18;
169:25
Content/Concepts
117:17
Content/Concep-
ts/Process 115:15
contentious 121:10, 22
contents 50:20
contest 4:21
context 59:13; 155:5
continue 25:22; 26:6, 11
continues 135:7
contradictions 145:20,
21
contradictory 68:5
contrasted 135:15
controversial 36:4;
73:21; 74:5; 76:2; 136:21
controversy 21:25;
73:17, 19; 175:15, 18
conversation 9:10;
18:16; 19:1, 18; 20:21;
21:16; 22:21; 34:2; 80:5, 7;
106:13; 126:24
conversations 9:11, 24;
11:15; 18:12; 33:2; 67:13;
119:10; 149:25; 170:23
cooperate 169:9
cooperated 167:20;
168:13
cooperating 168:11
cooperation 168:15
cooperative 125:14, 22;
152:23
coordination 142:14
copied 180:3
copies 42:16; 58:7;
84:22; 85:11; 110:9
copy 59:20; 60:2; 61:23;
62:3; 76:11, 20; 78:10, 12;
95:25; 97:11; 112:15;
142:3; 173:10
Copyright 73:9
Corbett 143:14
cordial 35:17
corner 61:19; 62:13;
71:15; 78:21; 86:12;
93:21; 96:21; 99:5;
100:13; 103:21; 114:16;
115:6; 116:11; 138:7;
141:13; 142:22; 166:20
correcting 154:5
corrections 138:16
correctly 23:10; 28:2;
58:24; 71:21; 99:1; 107:6;
119:13; 120:6, 16; 134:16;
155:4
cosmological 23:13

Case 4:04-cv-02688-JEJ   Document 216-5   Filed 09/28/05   Page 49 of 59

Jennifer Miller
May 18, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

cost 54:16; 148:2
counsel 6:2, 4, 6; 7:12;
11:19, 21; 12:12
counseling 162:17
count 81:7
counter 132:11
country 69:25
couple 9:12; 33:11;
36:14; 84:15, 22; 159:22;
180:1
courageous 164:7
course 13:9, 13, 15, 21,
22; 14:1, 7; 42:20; 148:3,
4, 17
courses 14:13
coursework 13:5; 15:9
court 20:7; 37:9; 89:24;
111:10, 13; 112:22; 170:4,
6
cover 31:14; 115:8, 21;
117:3, 4, 5; 118:10
covered 13:25; 35:8;
37:10; 106:5; 171:5
create 107:17
created 79:10, 16;
104:15
Creation 59:16; 67:3, 5
Creationism 18:14; 19:7,
9, 13; 20:8; 21:9, 9, 12;
22:13; 25:22; 36:24;
37:10; 67:12, 19; 89:15,
22; 90:8, 8, 14, 20; 91:1,
23; 92:4; 108:9, 15;
111:12; 112:18, 19, 23;
125:8; 170:7; 174:16, 21,
23; 175:14, 18; 176:16, 18
creator 67:6
criticism 19:25
criticisms 94:8
cross 63:25
crying 126:9
current 166:10, 13, 17,
18
currently 5:5, 9; 36:16
curriculum 8:15; 13:4;
15:2, 6, 11; 17:21; 18:5;
27:1; 29:15, 25; 33:16, 16,
20; 41:22; 43:23; 44:3, 18,
24; 45:7, 11, 16; 46:7;
47:5; 49:7, 14, 17; 50:13;
56:2, 5; 59:11; 68:4, 7, 20;
71:17; 78:6; 79:21; 82:9,
14; 83:20; 85:3, 18, 24;
86:19; 88:22; 89:12, 19;
90:10; 95:3; 97:9, 9; 98:10,
13; 100:3, 19, 19; 101:5, 9,
20; 102:24; 103:1, 5, 23;
105:1; 106:5, 23; 109:13;
114:9, 12, 13; 115:10, 10,
22; 116:3, 14; 117:21;
120:22; 121:7; 126:4;
129:14, 17, 21; 134:6, 12,
23; 135:1; 136:19; 143:6,
24; 145:22; 146:13, 22;
147:11, 12; 149:6, 7, 11;
152:16; 153:24; 156:8, 9,
12; 157:20, 21; 158:19;

160:8; 162:2; 165:14;
168:14, 19; 169:21;
170:25
cut 28:18; 87:22; 158:24
Cutting 65:1; 158:23
cycle 28:25
Cynthia 143:14

**D**

DAEA 7:25
Darwin 22:22; 23:1, 3;
102:12
Darwin's 24:19; 25:10,
12; 55:21, 22; 56:7;
101:22; 102:1, 10; 116:4;
117:19; 133:4, 8; 135:7,
11; 139:21, 25; 140:9
Darwinism 47:2; 67:11
date 27:8; 49:18; 138:1,
21; 139:11; 166:20
dated 25:20; 52:1, 2;
93:17; 139:17; 140:5;
148:21; 151:24; 172:14;
175:11
dates 79:18
dating 34:6
Dave 31:13; 32:1
day 22:1, 5, 22; 46:15, 16;
66:6; 71:22; 72:25; 172:5
day-to-day 16:10
days 38:16; 56:14; 75:17;
130:6
deal 50:25; 106:17;
119:23
dealings 16:5, 6
deals 135:22
dealt 45:24
dear 176:21
debate 35:11; 59:16
December 7:16, 21; 8:7;
151:3; 156:4, 5, 14, 16, 17,
17; 161:25; 162:11;
164:12; 165:12, 15, 15;
170:24, 24; 171:4, 5, 6
decide 147:4
decided 131:8; 169:7;
171:18; 172:8
decorum 159:25
defendants 3:11
deferred 127:8
defers 128:3
definite 119:18
definitely 25:9; 82:24;
93:5; 99:25; 104:9;
107:23; 111:13; 124:9;
159:3
definition 22:2; 132:1, 2;
133:21; 135:4; 138:25;
139:15, 18; 140:2, 6, 10,
10; 141:24; 142:5, 6, 7
degree 13:1, 3; 108:22;
111:15
deliberations 85:23

delivering 4:5
Department 18:11; 28:4,
5; 29:20; 30:17; 31:1, 7, 8;
32:21; 40:11; 42:21;
45:10, 12, 13, 15, 17, 23;
46:1; 47:8, 11; 50:12;
52:13; 56:14; 60:5; 82:18;
105:15; 106:12; 107:14;
142:15
Department's 40:16
depicted 53:7
deposed 4:25; 175:6
deposition 3:14; 6:17;
7:1, 10; 10:4, 10, 18; 11:5,
7, 16, 20; 12:19; 20:25;
48:19; 61:11; 64:12;
110:3; 175:7; 179:16;
180:3
depositions 24:15
depth 13:25
describe 37:19
described 23:25; 25:1, 8;
36:8; 51:10; 73:12;
135:11; 136:13
describes 115:8, 21;
118:11
describing 134:20
description 136:23
Design 34:8; 65:12, 14,
20, 22; 66:5; 68:3, 7;
70:25; 85:14, 17; 89:22;
90:1, 1, 7, 13, 19, 25;
91:12, 24; 99:17, 20;
101:12, 16, 24; 102:24;
103:4; 104:21; 105:19;
106:15; 107:15, 22; 108:9;
111:10; 112:5, 19, 21;
114:13; 116:17; 117:24;
122:4; 125:23; 126:4;
131:21; 132:9, 10; 133:2,
6, 10, 14; 134:1, 14, 17;
135:13; 136:3, 25; 142:16;
143:6; 145:25; 152:13, 15,
16; 156:11; 157:6, 20;
159:4; 160:20; 166:23;
167:1, 5, 9; 168:14, 18, 20;
169:24; 170:7; 177:22
Design/Creationism
111:11
designer 107:18, 20, 24;
136:6; 178:2
detail 37:20; 107:1;
112:11
details 55:2
determine 108:10, 11
develop 153:19; 169:9
Development 13:9, 21;
130:11
developments 85:21
dictating 108:25
died 63:25
difference 35:6; 73:5;
154:12
differences 73:15
Different 3:17, 18; 22:3;
23:7, 8; 24:6, 7, 12, 13, 20;
38:12; 51:21, 25; 54:9, 17;

80:23; 90:8; 91:18; 96:12,
16; 97:22; 117:12; 123:17;
133:3, 11; 136:23
differentiate 133:23
differs 133:7
dignify 158:11
direct 16:4; 157:11, 12
directing 169:10
direction 26:4; 101:18;
129:20; 131:20, 22;
146:19, 21
directions 130:19; 131:3
directive 155:11
directly 106:16; 176:8, 13
Director 160:12
disagreed 156:11
disagreeing 21:25
disappointed 127:13, 17
discharge 40:19, 21
discovered 139:24;
140:2
Discovery 57:23
discuss 8:6; 102:8;
120:20, 21; 159:14; 166:7,
8; 171:10; 179:14
discussed 9:3; 18:24;
19:2; 45:16; 54:22; 59:9,
10; 80:24; 95:5, 9, 24;
96:14; 102:7; 115:17;
119:19; 124:19; 131:5;
137:17; 141:21; 148:20;
149:8; 157:21; 169:22;
176:5; 179:23
discussing 38:24; 80:6;
82:18, 21; 89:3; 131:4;
171:25; 173:12
discussion 7:8; 11:18;
21:11; 26:9, 19; 28:1;
29:22, 23; 32:12, 21;
38:21; 41:9; 48:18; 50:11;
55:13; 57:2; 58:23; 59:7,
76:7, 16; 85:14, 18; 89:22;
90:6; 92:9, 16; 94:20; 95:6;
98:10; 101:14; 105:9;
106:22; 120:23; 126:7, 15;
128:9, 13; 129:5, 19;
141:7; 146:2; 150:9;
151:6; 152:1; 153:17;
157:16; 163:8; 164:16;
166:4; 173:3, 7; 175:7;
179:20
discussions 11:19;
27:16; 34:19; 38:23;
39:13; 50:17; 55:16; 60:1;
80:3; 87:20; 88:25;
104:25; 108:17; 118:16;
119:12; 124:5, 11; 126:20;
149:20; 150:6; 151:9, 12;
165:13; 171:3, 7
disgusted 125:13
dispute 3:17; 15:16;
17:21, 23
distinct 46:22; 90:14;
123:25
distribution 171:10
District 5:8; 15:19; 16:7;

29:1; 72:11, 14; 94:23;
108:5, 21; 130:10; 135:19;
165:18; 175:19; 177:1;
178:25
diversification 23:16;
24:17
doctor's 83:13
document 25:17; 48:21;
49:25; 58:16, 17; 59:19;
79:9; 97:21; 99:1, 4;
104:15; 109:15; 115:9, 25;
118:4; 129:24; 130:14;
131:14; 138:13, 19;
139:10, 16; 140:5; 141:15;
142:20
documents 10:17, 17,
21, 22; 11:1; 12:6, 15;
43:13; 50:5; 59:20; 64:15,
17; 110:5; 141:21; 176:4;
179:5
dominant 135:8
Don 151:1; 164:10
donated 95:17, 20, 22
donating 145:14
donation 98:14
done 28:22; 53:9; 65:25;
80:21, 22; 85:13; 90:5;
96:12; 122:4; 137:7;
164:20; 165:11
double 141:4
Dover 5:8; 8:1; 15:19, 24;
16:6, 12; 17:6; 112:8;
175:19; 176:25
down 10:24; 39:21;
52:13; 56:14; 59:15;
63:16; 65:9, 21; 67:23;
68:15; 75:9; 78:21; 79:18;
88:3, 16; 106:9; 124:12;
125:18; 128:17; 133:5;
138:15; 144:20; 145:7;
157:13; 160:3; 161:2, 4,
14; 167:12, 23, 24, 25;
173:21; 178:22
Dr 13:16; 14:8; 18:13;
19:18, 20, 22; 20:1, 2;
25:19; 26:2; 30:25; 32:3, 6;
37:15; 54:24; 60:21; 73:2;
83:6; 105:4, 23; 118:7, 21,
22; 119:5; 122:8; 126:21,
25; 128:14; 147:9; 149:22;
151:15, 21; 152:17;
154:17, 22; 172:24;
173:14; 178:12
draft 97:19, 22; 98:17, 18;
99:1, 9; 100:12; 104:2;
109:16; 115:17; 116:13;
131:17, 18; 137:7, 11;
138:5, 10, 17, 25; 139:15;
154:6
drafts 97:23; 150:3
driving 84:24
duly 3:8
during 5:21; 36:24;
43:11; 44:17; 45:4, 17;
46:1, 19; 49:6; 52:8; 53:21;
55:16; 56:10; 63:12; 67:8;
75:19; 80:21; 87:7, 10, 11;
98:25; 103:11; 118:8;

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Jennifer Miller
May 18, 2005

122:21; 125:9; 146:2;
159:22; 168:22
DVD's 56:11; 57:25

# E

e-mail 9:12, 20, 22; 93:17;
94:3; 129:25; 130:9;
137:14; 157:13; 172:6;
175:11, 23; 176:5; 177:6
e-mailed 137:19; 156:7;
178:5, 9
e-mails 12:9; 128:20;
131:19; 142:2; 150:2;
152:11; 178:5
Earlier 32:16; 35:1; 94:9;
107:10; 115:17; 145:17;
167:2; 173:1
early 27:19; 42:21; 72:18;
83:12; 156:13; 170:19
Earth 34:3; 178:3
echoing 54:24
Ecology 13:10
Edge 65:1
edition 51:2, 5, 6; 54:9;
72:5, 19, 20; 73:4, 5, 17;
74:12; 75:5, 22; 76:8, 9;
178:8, 8
editions 42:10, 16; 178:6
education 13:2; 163:20
educational 12:23
effect 20:15; 32:16;
52:19; 63:21; 64:1;
106:18; 144:9; 153:15;
163:16; 164:1
either 65:10; 66:8; 73:2
elaborate 161:4; 177:11
elaborated 20:16
elected 36:19
eliminate 60:24
eliminating 43:19; 60:22
Elizabethtown 12:25;
177:17
else 6:25; 7:9, 24; 8:20;
10:12; 19:1, 15; 20:16;
29:22; 38:9; 47:24; 53:14;
56:19; 71:9; 74:16; 81:11;
85:7; 95:1; 96:17; 100:5;
108:1; 111:21; 119:25;
121:8; 123:1; 125:7;
140:19; 151:17; 161:20,
23; 163:18; 169:14
else's 74:14
employed 5:5; 15:24
employment 17:2
enclosure 115:21; 117:5,
11; 123:13
enclosures 115:2; 117:2,
8; 118:19
encyclopedia 100:23
end 26:20; 38:3, 10, 12,
17; 39:22; 46:12, 20;
53:16, 19; 54:20; 72:17;
126:10; 133:1; 161:11;
169:2, 7

ended 125:3
endorsement 153:24
endurance 4:21
English 60:23
enough 20:5; 29:10;
54:9, 18; 77:23; 92:1, 2;
95:23
entail 14:12
entailed 107:4
entire 145:19
entitled 59:15; 65:1; 73:8;
123:23
entries 174:12
entry 50:2; 103:22;
106:23; 117:16; 138:16,
24; 139:14; 172:14; 174:4
environmental 17:10
equal 18:14; 19:11, 13;
66:22; 174:17, 22
equals 144:3
equated 91:23, 25
equating 112:18
equation 90:11
Eric 7:23; 9:1, 12; 12:10;
172:19, 20; 173:21; 174:1,
6
errors 131:12
Eshbach 7:3; 8:3, 21;
31:11, 12, 17; 36:13; 47:9;
78:7; 99:24; 103:6;
124:22; 151:19; 162:14,
15, 16; 172:21; 173:3, 11;
177:4, 8
Eshbach's 63:9; 94:6;
162:24
essentially 135:19
even 25:9; 28:18; 41:2;
56:1; 68:16; 74:2, 11;
109:20; 118:8; 120:17;
122:17; 153:13; 155:5
evening 72:16; 173:14
event 37:18; 166:13, 17
events 49:3; 129:12, 16;
130:7; 166:10, 18; 179:21
eventually 120:6; 145:8;
171:15, 17
everyone 10:11; 21:18;
51:19; 84:2; 164:1
evidence 22:24; 55:23;
74:23; 75:4; 139:22, 24;
140:2, 11
Evolution 13:9, 21;
18:14; 19:14; 21:8, 23;
22:1, 2, 6; 23:2; 25:11, 23;
27:6; 30:6, 7; 31:4; 34:24;
35:2, 14; 36:3; 44:25; 47:1;
52:23; 53:4; 55:18; 56:16,
25; 57:24; 59:16; 68:11,
19, 20; 69:8, 14; 73:4;
74:4, 23; 75:5; 83:24; 84:1;
101:23; 102:6, 25; 116:5;
117:19; 130:10; 132:9, 11,
12, 13; 135:7, 12, 20, 22;
136:24; 144:3; 164:15;
165:8; 174:21, 23; 176:17
Evolutionary 13:13, 22;

22:18; 25:1; 32:25; 41:4;
74:1; 96:13; 156:10, 11, 16
evolving 50:25
exact 137:18
exactly 51:9; 67:13;
82:20; 103:18; 104:8;
107:9; 129:22; 153:25;
154:12; 159:15; 161:8;
174:20
examination 14:18; 42:6,
9; 73:12
examined 3:8
example 23:20; 74:22
Excellent 49:16
except 3:4
exchange 35:16, 17;
51:24; 52:9; 53:13, 16;
146:2
exchanges 144:22;
161:25; 162:4; 169:14, 20
excusal 171:10, 25
Exhibit 20:25; 25:18;
48:19; 58:20; 61:11, 14;
64:21; 71:12, 14; 72:2;
73:7; 77:6, 12; 79:21;
86:11; 93:15; 96:19;
97:15; 110:3; 115:5;
116:10; 137:20; 138:6, 15,
23; 139:1, 3, 4, 6, 13;
141:11; 142:9, 21; 153:3;
154:2; 156:14; 162:10;
165:25; 172:12
Exhibits 64:12
existence 123:11
existentialism 57:14
exists 163:10
expectation 164:13;
165:5
expecting 123:21
explain 50:5; 32:24; 35:3,
6; 41:2; 53:6; 74:24; 83:2;
87:25; 176:6
explained 21:7; 26:11;
34:25; 35:1, 6; 36:10;
53:23; 55:4, 5; 56:2; 83:24;
84:1; 105:25; 106:2;
119:2; 154:7; 169:12
explaining 26:10; 53:3;
121:3 ¬
explanation 36:17, 21;
106:6, 7; 113:21; 133:3, 7,
15; 134:14; 135:8; 137:4
express 32:19; 56:23;
153:8; 168:21
expressed 47:14, 15;
49:9; 73:24
extensive 179:20
extent 4:19; 34:22; 64:25;
74:10

# F

face-to-face 7:19
fact 55:18, 21; 57:3;
73:24; 74:13

facts 66:10, 14, 18
factual 74:9
faculty 84:11; 151:7;
169:20; 171:17; 179:11
Fair 20:5; 95:23
fairly 31:1
fall 25:11; 26:25; 27:2, 8,
15; 29:10; 30:24; 39:5;
41:1; 42:4; 45:19; 77:3;
107:24; 108:7
falls 107:15
familiar 62:9; 98:7;
110:11; 130:3
family 54:4, 5, 7
far 11:8; 25:8; 28:16;
44:19; 50:23; 73:17;
153:14
father 148:23
faulty 80:12
favor 60:6
faxed 173:5, 6
fears 118:24
February 6:5; 147:22, 25
feedback 76:25
feel 4:18; 12:21; 109:2;
167:25
feeling 53:22; 55:10;
127:17; 154:19
feelings 53:18
tell 54:12, 14; 108:12
felt 10:5; 73:17; 85:10;
100:7; 102:12; 108:9, 23;
125:14, 18; 126:25;
142:15, 20; 143:4, 6;
144:13; 161:2
Fence 5:12
few 3:21; 6:15; 11:24;
15:13; 21:4; 155:8; 177:10
field 75:4; 158:23, 24
fighting 163:1
figure 40:18; 48:10;
74:19
file 172:2
filed 156:5
filing 3:3; 172:7
final 120:9; 137:7, 10, 11;
138:3; 141:18; 151:5
finally 74:24; 79:8; 123:8;
142:10
finch 23:7, 20, 23; 24:11
finches 23:6, 8, 9, 21, 23;
24:12
find 3:25; 49:11; 69:18;
70:4; 93:18; 129:24
findings 73:1; 75:7
fine 16:17; 21:18; 26:17;
27:11; 79:20; 84:3;
119:22; 140:13
finger 84:8
finish 4:2
fired 114:6
firm 6:13
first 3:22; 7:20; 9:1;
11:11; 17:8, 17, 18; 21:5;

22:1, 5, 21; 26:21; 27:24;
43:2; 46:8, 23; 49:17; 50:2,
7; 52:5, 8; 53:15; 61:19;
62:1; 65:12; 74:13; 78:3;
79:12; 86:21; 94:3; 106:9;
108:5; 116:15, 21, 23;
118:13; 137:3; 142:14;
163:25; 172:14; 174:12
fiscal 28:12; 54:19, 20
five 84:17, 17
five-minute 159:23, 24
five/three 79:6
fix 37:19; 47:3
flash 89:15
fleshed 164:17
flip 68:10; 142:9; 155:8;
156:21; 157:18; 160:4;
167:19
flipped 144:24
focal 17:21; 18:5
focus 13:23, 24; 15:4, 6;
23:19; 56:25; 90:11;
104:24; 119:11; 122:14;
129:12; 140:17
focused 13:13; 38:17;
89:16; 121:7
Focusing 125:11
follow 88:11; 143:13
following 4:13; 115:9, 25
follows 3:8
food 59:24
foolish 87:21
foot 115:15
force 159:13
forgive 6:9; 24:14
form 3:4
former 11:15
forms 171:10, 25
formulating 124:1, 4
formulation 102:13
forth 43:3; 92:23; 124:8;
128:20, 24; 150:2; 164:14
forum 70:18; 177:17, 19,
21
forward 5:20; 136:13;
171:6
fossil 34:6; 166:11
found 59:20; 69:17;
72:10; 166:12
founded 69:25
four 11:11, 13; 46:21;
79:12; 141:15
four-four 123:7
four/four 79:7
fractured 162:25
frame 56:7
frankly 4:4
free 12:21
frequently 3:25
friend 172:20
front 59:20; 62:22; 97:24;
109:23
full 5:2; 6:10

ennifer Miller
lay 18, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

n 157:24
nd 28:14
nerals 176:11
nny 149:2
urther 59:15; 104:24;
38:15; 140:22; 179:25
uture 85:21; 99:5
FYI 98:13

## G

jag 155:20
jambling 87:25; 88:1
japs 56:5, 6; 75:3; 116:4;
117:18; 125:24
japs/problems 101:22;
102:1
Gary 152:25
gathering 8:8
gave 33:23; 36:21; 47:23;
56:18; 76:11; 81:18;
112:16; 152:24; 166:17
gaveled 161:14
geared 81:5
Geesey 113:16, 20, 22;
119:25; 125:2; 156:23
general 10:21; 13:2, 7,
24; 14:16; 15:3, 5, 6;
43:17, 18; 51:7; 73:15
generally 8:6; 31:2;
43:16; 98:3; 107:12
generated 131:14
generating 12:6
Genetics 13:10
Georgia 158:5
gestures 3:24
gets 28:4; 95:25
GILLEN 3:9, 10; 6:9, 12;
21:1; 43:5, 8; 48:20; 61:12;
64:7, 11, 14; 110:4; 129:4,
7; 139:2, 5, 7; 141:8;
164:20; 165:3; 179:25;
180:2
gist 163:19
given 29:4; 50:3, 6;
56:16; 58:6, 15; 59:3, 6,
17, 22; 64:15; 74:3; 76:17,
20; 94:15; 109:20, 21;
130:20; 146:10, 21;
174:22; 179:4
gives 81:8
giving 33:5; 110:5;
126:10; 162:22; 174:16
glad 161:3
gleefully 52:19
goal 134:23, 24; 135:3;
140:20
God 59:14; 107:20; 166:7
goes 29:7; 73:18; 85:16;
91:19; 167:20
Good 3:10; 4:2; 29:10;
30:18; 35:10; 68:24; 69:9,
11, 14; 77:23; 78:1; 83:3;
98:7; 105:11; 118:23;

132:20
Goodness 13:8; 158:5
grade 81:4, 8; 82:25;
94:13
graders 85:5
Graduated 12:24, 25
gray 92:1, 3
great 106:12, 19
greeted 78:5
group 108:25; 161:3
grouping 61:4
Grove 12:24
guard 18:23; 20:14;
32:17
guess 6:5; 7:2, 17; 11:11;
13:16; 18:12; 20:13; 27:6,
23; 28:9; 34:3; 37:9, 24;
48:10; 57:18, 20; 68:1;
74:11; 75:1; 91:21; 102:4;
107:13; 108:10; 111:12;
123:20; 125:13; 133:21;
142:6; 143:17, 18; 146:11,
12; 156:5, 6; 160:22;
162:21; 178:18
guessing 27:12
guidance 166:5; 178:11
guys 42:7

## H

Hair 65:1
half 27:24; 30:19
Hall 73:9
Hamilton 9:6; 175:12, 12,
14; 176:9, 10, 19; 177:5
Hamilton's 175:17
hand 83:10; 94:2; 100:12;
117:20, 24; 167:14
handed 94:22; 95:25;
102:22; 112:15; 141:12;
178:19
handicap 5:13
handing 96:6; 97:8;
119:6; 166:8
handled 166:7
hands 53:17; 83:16
handwriting 61:20, 21;
62:16; 63:5; 78:25; 79:13;
93:22; 94:5; 114:17;
154:25
handwritten 48:12, 13;
49:16; 52:6; 62:1; 100:15;
130:1, 5, 22; 137:5, 16, 21;
138:6; 141:12; 155:23
happen 9:8; 79:19, 19;
86:25; 88:10; 126:17
happened 3:18; 22:11;
38:14; 41:24; 51:17;
72:24; 95:1; 104:1; 156:3
happening 26:23
happens 122:10
happy 144:18
harass 4:14
hard 41:10; 53:18

Harkins 11:12; 47:6;
53:25; 71:2; 78:8; 83:19,
22; 113:3, 17; 120:2;
122:25; 159:21; 160:1;
163:3
hash 100:15
head 3:24; 18:11; 29:15;
33:16, 20; 40:12; 75:12;
105:15; 106:12
headed 116:6
heading 65:2
health 5:24
hear 28:11; 52:25; 56:22;
147:19, 20; 148:25; 175:1
heard 28:24; 29:8; 65:20;
66:8; 68:19; 89:4; 176:3
hearing 53:2
heated 55:11; 51:23;
52:9; 53:16, 21; 148:14
Heather 113:15, 20, 22;
119:25; 125:1; 156:23
Heilman 88:2
held 18:12; 163:8
help 33:14; 49:2; 109:23
helping 173:9
helps 37:18; 49:2
hereby 3:2
hesitated 123:8, 8
high 5:8; 12:23, 24, 24;
24:14; 30:14; 46:24;
80:20; 85:4
himself 152:18
hire 162:22, 23; 163:7,
10, 21
hiring 164:3
history 17:2; 52:12;
69:18; 70:4; 136:2
hit 22:10
Hoffman 13:16, 16
holding 153:13
home 12:1, 8; 72:16;
76:18; 83:4; 84:18, 23;
106:3; 119:7
hopes 147:23
hug 126:10; 150:22
human 4:9; 166:11
hundred 31:22; 32:4
husband 126:9

## I

Icons 56:15; 57:24
ID 103:24
idea 4:2; 84:9, 19; 118:23;
122:11; 169:25; 176:15
identical 12:16; 115:16
identified 48:3
imagine 38:24; 46:3, 6;
55:15
impact 96:14
impair 5:14, 22, 24
implement 97:10
implementation 86:20;

151:6
implementing 161:16
implication 69:13
implied 142:16
implying 153:23
important 140:14
imprecise 12:21
imprecision 4:8; 45:14
impression 40:3
inaccuracies 131:12;
154:5
inadvertently 11:25
inappropriate 101:3
incident 175:22; 177:5,
13
include 9:22
included 104:6, 7;
118:14; 149:2
Including 46:20; 101:23;
103:4; 112:4; 132:9; 133:2
inclusion 42:24; 125:23;
176:15
incorporated 135:10
indented 141:15
indicate 65:23; 176:25
indicated 13:12; 14:9;
16:17; 49:9; 79:14; 100:7;
102:15; 103:9; 111:21;
130:23; 143:7
indicates 52:1; 86:24
indicating 82:8; 175:5
individual 36:17
individually 150:14
individuals 132:8
inferences 81:13
influenced 102:12
information 8:8, 11, 12;
9:13; 10:4, 6; 30:3; 37:8,
14; 51:14; 59:25; 61:22;
78:24; 92:21, 21, 22, 24,
25; 174:13; 175:17; 179:2,
5, 9
informed 9:5
inhibit 5:17; 120:12, 23
input 79:17; 125:16;
143:7; 153:22
inquiry 9:17; 13:23;
42:13; 176:23
inservice 72:13; 97:7
inservices 73:1; 75:18
instead 74:22; 105:15;
133:10; 148:5
instinct 131:2
Institute 57:23
instruction 25:15, 25;
96:9
Intelligent 34:8; 65:12,
14, 20, 22; 66:5; 68:3, 6;
70:25; 85:14, 16; 89:22,
25; 90:1, 7, 13, 19, 25;
91:11, 24; 99:17, 20;
101:11, 15, 23; 102:24;
103:4; 104:21; 105:19;
106:15; 107:15, 17, 19, 24;

108:8; 111:9, 11; 112:4,
19, 21; 114:13; 116:17;
117:24; 122:3; 125:23;
126:4; 131:21; 132:9, 10;
133:2, 6, 10, 14; 134:1, 13,
16; 135:13; 136:3, 6, 24;
142:16; 143:5; 145:25;
152:13, 15, 15; 156:10;
157:5, 20; 159:4; 160:19;
166:23; 167:1, 5, 9;
168:13, 18, 20; 169:24;
170:7; 177:22; 178:1
interaction 39:10
interbreed 23:22
interconnection 24:19
interested 49:5
interesting 149:4
interests 40:16
Internet 37:9; 90:5
Interrogatories 178:15,
23; 179:3
into 6:21; 22:14; 24:21;
36:3; 39:8; 41:20; 50:12;
51:17; 55:6; 58:5; 68:7;
72:1; 86:3; 96:19; 118:5;
135:23; 152:16; 160:17;
168:14
introduction 51:19
involved 15:15
isolation 23:20
issue 40:25; 41:2, 2, 3,
23; 51:12, 16; 65:22; 70:3;
88:19; 89:1; 94:24; 95:15;
109:13; 125:22; 127:9;
136:20, 21; 149:7; 157:6;
159:4, 12; 160:20; 177:14;
178:11
issues 3:19; 18:1; 39:19;
52:22; 57:1; 95:2; 124:16;
126:2; 128:18; 140:14;
155:15; 158:21; 160:18
item 60:17, 18; 156:22
items 157:4, 9

## J

J 20:25; 48:19; 61:11;
64:12; 110:3
Jane 6:9, 11, 13; 71:6;
113:7; 122:14; 139:5;
143:19
January 5:20; 6:5, 5;
15:20; 16:7, 13; 17:25;
18:2, 9; 27:18; 28:22; 29:6,
8; 41:21; 42:2, 2, 25; 43:9;
44:13; 164:12; 165:7, 9, 9,
12; 170:24, 24; 171:6, 9,
13, 23; 178:19
Jeff 150:24; 160:23, 24;
163:9
Jen 12:20, 22; 21:2;
22:19; 39:4; 43:9; 48:21;
49:20; 50:3, 5; 58:18;
59:19; 61:7, 13; 64:5, 15;
65:5; 68:25; 69:22; 73:7,
11; 74:6; 79:9; 80:25; 84:2,
4, 24; 85:8; 86:15; 88:6;

Tammy Kitzmiller, et al.  v.
Dover Area School District, et al.

Jennifer Miller
May 18, 2005

91:16; 93:15; 98:4; 99:8;
106:10; 107:8; 110:5, 22;
113:12; 114:14, 20; 116:1,
19; 117:22; 121:7; 123:20;
125:21; 127:18; 129:3, 8,
23; 130:14; 131:24;
132:23; 133:17; 135:24;
137:6, 12; 138:2, 16;
139:13; 140:14, 22; 141:9,
18, 24; 143:4; 155:24;
157:15; 159:11; 164:13;
165:4, 23; 166:24; 167:21;
172:12; 174:24; 177:15;
180:2
JENNIFER 3:7; 5:4;
12:20
Jere 111:22
job 160:10
jobs 20:11
joking 180:1
Jones 58:22; 59:8
jotted 167:12
July 72:1, 3, 11, 11, 18;
75:13; 76:14; 77:6, 10;
78:4
jump 114:7; 173:21
jumped 27:19; 125:2
jumping 113:14
jumps 147:17
June 14:24; 26:21, 21;
29:8; 44:16; 45:4, 9; 46:2,
10, 13; 48:25; 60:8, 11, 20;
61:10, 17, 19; 62:2, 5, 11;
63:4; 64:20, 22; 65:2, 4,
19, 24; 71:11, 16; 72:9, 17;
88:17; 102:3
junior 13:18

## K

keen 84:19
keep 18:23; 20:14; 40:15;
48:15; 122:18; 154:4;
161:15
Kenneth 178:4
kept 52:24; 53:2, 3; 145:7
kids 84:18, 22; 160:13
kind 8:9; 9:9; 10:24;
22:24; 36:6; 39:3, 23;
51:12; 53:23; 65:11;
67:11; 70:17; 76:14, 19;
85:24; 89:4; 91:22; 96:2;
101:7, 12; 108:13; 124:8;
126:1; 127:4; 128:21;
138:8; 150:12; 153:19;
166:12, 15
kindly 61:2
kinds 15:14; 22:3, 4;
23:7; 101:10; 155:17
knew 23:2; 52:17; 60:16;
95:21
Knudsen 7:23; 8:19

## L

labeled 99:1; 175:10
laced 67:10
Lane 5:12
Langione 160:5; 161:17
language 73:22; 75:1;
106:22; 121:13; 122:3
large 31:1
larger 23:13
Larry 87:14; 158:17, 18;
161:17
last 24:14; 46:14, 16;
54:9; 56:14; 71:23; 72:1;
118:3; 142:3; 144:18;
145:3; 146:17; 147:18
late 9:2; 173:14
later 17:11; 50:8; 68:8;
76:23; 113:16; 114:19
latest 178:8
law 66:22; 111:15;
160:19; 162:21, 23;
163:21; 164:4; 178:19
lawful 108:12
laws 161:10
lawsuit 113:25; 114:3;
156:5
lawsuits 108:7
lawyer 6:18; 9:5
lawyers 6:21, 25; 7:2;
10:15; 179:22
lay 4:8
leading 34:20
learned 81:2
least 10:10; 13:12; 30:19;
36:14; 43:2; 45:6; 128:13;
135:10; 171:12
leave 83:12
leaving 143:19, 21
lecture 135:18
led 102:9, 13
leery 19:25; 39:2, 21;
150:8
left 35:9, 10, 15; 38:1, 6;
53:22; 55:10, 24; 72:9;
76:5; 78:4; 83:14; 85:22;
94:16; 126:14; 132:14, 16;
138:2; 150:16; 164:2
left-hand 114:16, 16;
141:13; 142:22
legal 92:7, 14; 155:15;
158:21, 21, 22, 24; 160:18
Lemarck 102:11
Leslie 31:12, 21; 36:12;
99:25; 154:8, 25
less 74:5, 9; 75:4; 76:2;
154:4; 158:19
letter 115:8, 21; 118:10;
142:18
letters 171:11
level 23:24; 80:19; 81:4,
8, 14; 82:25; 85:5; 94:13
Levin 60:3; 72:5

liability 40:19, 21, 25;
92:9; 100:8; 109:2
liable 109:2
life 22:9, 10, 15, 17; 24:4,
9, 9, 22; 34:4, 6; 35:4, 5, 7,
23; 36:2; 57:1; 68:2, 4, 6,
12, 21; 105:8; 117:13;
118:22; 119:3, 23; 120:8,
12; 121:3; 133:7, 13, 16,
24; 134:3, 12, 14, 18;
135:14, 22, 25; 136:7, 7,
12, 13, 18, 25; 145:19, 20,
24; 149:1; 166:10, 14, 15
light 39:5; 51:10; 66:3
liked 45:21
limit 163:4
limited 101:23; 103:4
limits 163:5
line 73:3, 3
lines 26:1, 5; 94:20
linkage 90:11, 13
linked 86:22; 161:6
Linker 7:3; 31:12, 19;
36:12; 100:1; 125:5
list 47:16, 20, 23; 48:12,
14; 49:21; 50:10; 100:18,
24; 106:1
listed 100:20; 106:3;
143:14, 16; 174:3
listen 4:9; 125:16; 147:1
Listened 146:25
listing 49:10
litigation 6:7; 12:7;
172:20
little 13:11; 27:19; 34:4;
39:1, 20; 42:14; 100:15;
105:13; 120:18; 136:4
local 58:7
longer 112:1
Lonnie 160:5; 161:17
look 5:20; 7:20; 17:25;
18:8; 21:2, 5; 22:10, 22;
23:5, 9, 10, 13; 24:25;
25:17; 26:25; 28:25; 35:5;
38:2; 39:4, 8; 40:11, 12;
42:19; 43:24; 44:1, 16;
45:3; 46:10; 48:1, 2, 3;
49:1, 13; 50:5, 9; 57:22;
59:2, 22; 60:8; 61:9; 64:16;
71:12, 14, 16; 73:7; 74:21;
77:6, 8; 78:11, 15, 19;
80:1; 81:3; 83:4; 84:18;
88:21; 93:15, 19; 96:23;
97:6, 24; 98:6; 100:11, 19;
103:20; 110:8, 11; 112:17;
114:24; 115:2, 5, 12, 14;
117:10; 119:11; 129:8, 12,
23; 130:3, 20; 131:1, 9;
132:17, 24; 134:24; 135:6;
136:9; 137:12; 138:6, 15,
23; 139:16; 141:18; 143:8,
10, 22; 147:7; 149:5;
156:14; 162:10; 168:4;
172:12; 173:9; 177:16
looked 9:14; 48:6; 50:15;
51:1; 58:6; 138:19; 149:1;
161:10; 173:1; 175:2

looking 10:23; 40:15;
41:1; 43:9; 45:9, 20; 48:11;
52:3, 22; 54:3, 4, 19; 59:7;
62:6, 9, 23; 65:1; 66:3;
73:11; 74:11, 15, 16;
86:10, 15; 91:21; 94:19,
25; 98:6; 116:21; 118:4;
120:7; 127:6, 16; 137:20;
139:10; 142:10, 20;
148:23; 149:18; 153:2;
154:25; 161:2, 4; 166:5;
173:15
looks 74:25; 94:2;
103:23; 117:23; 129:25;
151:3; 155:23; 162:17;
166:5; 177:16
lost 121:19
lot 4:4; 21:25; 43:20;
46:11; 47:10; 52:23;
60:21; 61:1; 67:8; 73:20;
74:2; 81:13; 99:13;
108:23; 122:16; 126:18;
128:24; 153:17, 18, 20;
157:5, 24; 163:1; 170:20
lots 152:11, 12
LOWE 180:1
lower 100:13; 115:6;
116:11
lumped 152:10
lunch 172:23
LYNNE 3:7; 5:4

## M

main 13:23, 24; 56:25
mainly 82:12
major 13:5
majority 167:5, 7, 8
makes 4:17; 167:25
making 68:2; 76:22;
90:12; 106:25; 111:14;
123:12; 137:9; 144:17;
148:13, 13; 157:7; 163:15;
168:6
man 24:25; 25:10; 53:1, 2,
3, 8; 55:17; 56:21, 25; 70:3
man's 50:25; 52:23; 74:4
maneuvers 121:25
manner 73:25
manual 51:11
many 24:10; 37:12;
44:23; 45:4; 74:24; 81:6, 7;
121:15, 18; 124:7; 169:3;
172:16
March 41:21; 43:10;
44:13, 16; 45:4, 9; 46:2;
48:25; 177:6
mark 64:11; 65:16;
100:15; 130:14
marked 20:25; 25:18;
48:19, 21; 58:20; 61:11,
14; 64:13, 15; 110:3, 5;
115:2; 131:15, 24
marker 29:21
marks 66:7; 159:8

marriage 15:18
master's 13:3; 14:22;
15:10
match 138:9
materials 37:5; 56:10;
57:22; 116:7
matter 12:7, 20; 14:20;
17:7; 39:11; 43:17; 67:5;
119:3; 151:1; 179:18
may 4:9; 14:24; 15:25;
18:9, 19; 21:16; 26:6, 20;
33:6, 13; 38:6; 39:1; 42:9,
17, 18; 46:10, 13; 50:14;
51:4; 54:5; 59:1, 2, 12;
65:15; 66:17; 77:17; 90:1;
106:16; 120:19; 132:8, 15;
137:18; 158:4, 4; 160:1;
168:2
maybe 30:25; 39:1, 20;
57:22; 59:22; 66:17;
74:10, 17; 83:16; 86:17;
89:23; 95:10; 110:17;
112:9; 126:25; 137:8;
169:4
mean 13:7; 14:13; 18:25;
21:21; 32:22; 37:23; 38:7;
39:2, 4; 40:7; 41:3; 47:8;
51:9; 57:20; 63:7; 79:2, 17;
96:11; 101:20; 104:7;
106:25, 25; 107:1; 117:2;
119:12; 121:25; 127:14;
131:19; 132:24; 133:17;
134:15, 25; 135:17, 25;
140:5; 154:1; 156:4;
159:10, 12, 13; 170:2;
174:3, 24; 175:20, 22
means 68:21
meant 36:1; 103:18;
106:24; 107:5; 122:11, 13;
159:9, 10, 15
mechanism 23:4
media 155:15, 17, 18, 19,
21
medication 5:17, 21
meet 8:9, 18; 9:8; 29:20
meeting 7:15, 16, 24; 8:7,
17; 20:3; 27:5; 29:12, 14,
17, 21, 25; 30:2, 12; 31:2;
32:10, 14; 33:4, 5, 12, 15,
20; 34:19, 20, 22; 35:10,
15; 36:24; 37:2, 6, 7, 11,
14, 19; 38:3, 5, 6, 22; 39:5,
11, 18, 19, 23, 25; 41:1, 6,
8; 43:25; 46:16, 23, 24;
47:14; 48:4; 50:9, 12, 20;
51:17; 52:1, 8; 53:14, 15,
17, 19, 21; 54:2; 55:10, 13;
58:14; 59:10, 11; 60:20,
25; 62:5, 10, 19, 21; 63:1,
10, 23, 24; 64:3, 22; 65:4,
9, 15, 25; 66:1, 25; 67:20,
25; 69:24; 70:10, 23;
71:10, 11, 17, 20, 22, 23,
25; 72:9; 75:15, 20; 76:5,
5, 12, 14, 21, 24; 77:3, 7, 7,
15, 19, 20, 21, 22, 23;
78:8; 79:2, 22, 24; 80:2,
22; 81:25; 82:9, 12, 14, 17;
83:7, 12, 13, 23, 25; 85:8,

ennifer Miller
ay 18, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

2; 86:7, 12; 87:2, 8, 11;
8:8, 18; 89:12, 17, 18, 19,
3; 90:10; 91:6; 92:7, 19;
3:6, 24, 25; 94:17; 95:5,
5; 96:25; 97:4, 7; 98:1, 5,
11, 12, 16, 19, 21, 22,
5; 99:14, 21; 101:14;
.02:20, 21; 103:11, 14;
.04:6, 20, 22; 105:4, 22;
:06:21; 109:9, 20; 110:14,
20, 23; 111:22; 113:12, 16;
114:22, 24; 116:25; 118:3,
5, 8; 120:5, 14; 121:6, 9;
122:17, 21; 123:15, 16, 18;
124:22, 24, 25; 125:7, 8;
126:6, 8, 15, 19, 21, 23;
127:6, 20; 128:10, 15;
129:9, 13, 15; 130:6;
142:10; 143:11, 11; 144:8,
10, 19; 145:3, 10, 18;
146:6; 147:2, 18; 148:20;
149:6, 11, 19; 150:5;
151:14; 152:8; 153:4;
154:9, 10, 11, 11; 155:16;
156:1, 3, 15, 25; 157:1, 9,
10, 22; 159:14; 161:21, 25;
162:8, 11, 20; 164:17;
165:15, 21; 166:21;
167:14, 21, 23; 168:3, 7,
17, 22; 169:2, 8; 170:2, 22;
171:9, 23, 24
**meetings** 17:8, 19, 20;
8:22; 30:23; 33:18; 37:12;
42:3; 43:10, 16, 21; 44:2,
19, 23, 24; 45:3, 7, 10, 11,
12, 13, 15, 18, 23; 46:1, 7,
17; 47:10, 12, 13; 49:6;
51:21, 23, 25; 53:20;
54:16; 55:19; 56:4, 10;
57:7; 58:25; 60:8, 9, 11,
11; 63:17; 67:14, 16; 68:9,
20; 69:7; 86:4; 88:21;
91:19; 99:13; 109:3;
131:5; 146:7; 148:15;
149:3; 160:15; 170:3;
171:22
**member** 7:25; 16:18;
32:8; 70:20; 83:14; 88:3;
144:15; 159:17; 161:12;
165:19; 175:3; 176:25
**members** 11:15; 16:13,
15; 31:5; 32:13, 21; 39:10;
47:11; 57:18; 65:10; 82:2;
88:13; 92:18; 93:11, 13;
111:17; 120:24; 121:2;
122:14; 126:7; 146:3;
149:10, 16; 150:14; 153:6;
158:14; 162:1, 4; 165:13;
170:23; 179:11
**memberships** 16:12
**memo** 20:19; 25:19, 21;
26:8, 14; 54:25; 70:12;
172:24; 173:1, 4, 7, 8, 10,
11, 13, 17, 22
**memorandums** 116:23,
25
**memories** 64:25
**memory** 154:15
**memos** 117:3, 4, 6

**mention** 18:10; 19:18;
25:22; 34:8, 10, 12, 15;
96:10; 175:14
**mentioned** 31:1; 41:16;
51:1; 56:21; 57:13; 58:3;
59:1; 63:15; 64:2; 65:14;
67:4; 78:9, 9; 83:3; 95:10;
161:7
**mentioning** 96:11;
106:25; 174:16
**met** 7:2, 12, 22; 73:1;
143:23; 151:15
**Michael** 135:18; 143:15
**microbiological** 23:11;
136:1
**mid** 76:14; 165:9
**middle** 72:11; 94:10;
100:12; 108:24; 154:19
**midway** 21:5
**might** 5:17, 22, 24; 6:16;
11:25; 30:14; 31:22;
37:20; 46:9; 53:21; 71:9;
82:16; 134:5; 176:4, 6
**Mike** 19:3, 8, 16; 25:20;
47:23; 75:10, 24; 76:25;
100:2, 5; 103:10; 124:5;
128:17, 17; 149:25
**MILLER** 3:7, 10; 5:4;
7:25; 16:23; 20:25; 48:19,
22; 50:4; 60:3; 61:11;
64:12, 15; 72:5; 73:7;
78:19; 79:9; 86:10; 97:25;
103:20; 110:3, 5; 114:15,
25; 129:8, 24; 151:17;
153:10; 171:21; 178:4, 14
**mind** 29:23; 40:16; 90:9;
110:13; 116:18; 117:10;
118:2; 129:23; 135:2
**mine** 61:24; 132:19;
138:4; 139:21; 179:13
**minute** 21:2; 126:21
**minutes** 43:14; 61:4, 9,
13, 14, 16, 19, 25; 62:2,
11, 14, 17; 63:1, 4; 77:6,
12, 20; 86:8; 97:16, 17, 24;
98:4; 104:6; 129:8; 142:9;
143:10, 13; 151:3; 156:14;
157:18; 162:11; 165:12
**misplaced** 51:8, 9
**mistaken** 82:14; 117:16;
119:16
**Mistrust** 66:15, 19
**mix** 165:24
**Molecular** 13:8, 20; 14:2
**molecule** 24:9
**Monday** 7:2
**money** 28:10; 87:21, 22;
88:1; 148:2; 160:12
**monies** 87:22
**monkey** 69:19; 70:4
**monkeys** 22:4; 53:1, 2,
2, 7; 55:17; 56:21; 70:3
**month** 45:13; 46:9
**months** 43:2
**more** 4:12; 8:17; 9:7;
13:10, 11; 19:7; 27:8; 30:3;

37:20; 38:14; 39:2; 40:24;
54:19; 73:20; 74:8, 9; 75:2;
76:7; 85:23; 86:1; 95:14;
96:5, 6; 111:12; 112:11;
120:18; 127:13; 132:4;
134:2, 10; 153:16; 154:4;
162:21, 23; 163:7, 10, 21;
164:4; 170:5, 12; 174:22;
178:19
**morning** 3:10; 64:18
**Most** 10:22; 23:2; 36:4;
42:3; 47:8, 13; 50:25;
53:20; 54:16; 65:8; 89:21;
132:14; 140:21
**mostly** 82:19; 93:4
**move** 96:19
**moved** 133:5; 143:21
**moving** 39:8
**Mrs** 3:10; 29:19; 40:4;
43:1; 47:9; 51:24; 52:15,
25; 53:17; 55:15; 57:3;
63:11; 67:18; 72:15; 78:8;
79:13; 89:24; 105:14;
109:21; 110:20; 111:2, 7;
112:12, 15; 113:17; 122:8;
144:11; 170:3, 6; 173:9,
15, 25; 174:1, 9
**much** 9:24; 19:1; 54:13;
55:23; 59:21, 23; 73:18;
74:5; 76:1, 2; 88:4, 15, 17;
91:8; 95:9, 13; 114:23;
132:6, 16; 133:11; 148:24;
149:8; 171:5
**mural** 52:12, 16; 53:5, 6,
10, 11
**must** 87:18; 145:18;
154:9
**myself** 31:12; 97:20;
168:2

**N**

**name** 3:10; 5:2; 6:10;
88:4; 147:6; 148:22
**names** 7:21; 31:15;
143:14; 156:11
**narrow** 153:23
**nation** 66:22
**natural** 22:25; 23:4, 5;
102:10; 136:5
**nature** 10:20; 30:8
**Neal** 16:25; 151:18
**near** 176:21
**necessarily** 21:15;
22:12; 24:22, 23; 33:2;
34:5; 37:21; 40:23; 44:10;
51:16; 55:3, 21; 57:10;
74:10, 12, 15; 83:10;
84:12; 100:24; 108:3;
134:1; 135:1; 153:25
**need** 20:14; 83:4; 152:13;
159:23; 161:1
**needed** 99:15; 127:1;
144:19; 145:2, 5; 172:8, 10
**needs** 63:25; 69:5; 142:5
**negatively** 152:9, 22

**neglect** 114:14
**neglected** 11:25
**new** 9:15; 24:2; 28:3, 5;
54:10, 17, 18; 72:5, 19, 20;
139:23; 140:1; 166:11;
178:6, 8
**news** 28:17; 29:3; 78:5
**newspaper** 66:13; 67:9
**newspapers** 108:4;
165:18
**next** 28:9, 14; 39:3, 21;
62:11; 68:10; 69:16;
72:24; 77:21; 79:14;
82:16; 109:8; 115:19;
116:10; 129:3, 17; 130:11;
132:15; 137:13, 20; 138:1;
143:22; 147:12, 13;
148:19; 151:3; 155:23;
156:4; 158:2; 162:10;
163:22; 172:5
**night** 71:25
**Nilsen** 19:18; 32:6; 83:6;
105:4, 23; 118:7, 21, 23;
119:5; 122:8; 124:18;
126:22, 25; 128:2, 2, 14;
146:19; 147:3, 9; 149:22;
151:15, 21; 152:17;
154:17, 22
**Nilsen's** 11:12; 73:2;
147:6
**ninth** 82:24; 85:5
**nods** 3:25
**Noel** 67:1, 1; 71:8; 113:5;
121:11; 144:24, 24;
149:12; 150:16; 159:16;
160:1
**none** 147:15
**nontenured** 40:13, 17
**noses** 161:2, 4
**notation** 50:3; 59:17;
61:18, 24; 62:12; 63:7;
65:3, 17, 19; 66:20; 67:1;
68:10, 13, 23; 69:16, 20;
70:6; 71:16, 19; 72:3;
75:13; 78:21; 86:11; 87:1,
16; 88:2; 93:21; 96:23;
97:2, 3; 99:4; 130:1, 5;
137:21; 141:12; 146:9;
147:3, 6; 148:16; 154:10,
14; 155:3; 156:22; 166:21,
23; 172:19; 175:5
**notations** 62:1, 4; 64:24;
65:7; 70:19; 73:14; 86:21;
94:2; 130:22, 25; 137:16;
146:8; 167:16, 17
**note** 62:7; 82:8; 96:19;
104:17; 105:7, 10; 116:6;
117:13; 119:11; 120:8, 25;
121:4; 124:16; 128:14;
130:10; 137:3; 145:22;
155:11
**noted** 70:22; 139:11;
179:16
**notes** 63:10; 64:2, 21;
65:4, 5; 77:15, 18; 81:18,
19; 86:7, 10, 12; 89:20;
110:13, 20; 114:15, 19, 21;
137:9; 138:6; 143:13, 22;

144:24; 152:16; 154:4, 8;
155:9, 23; 156:1, 19;
158:3, 8; 161:6, 19;
162:14; 165:22, 23;
166:19; 174:11; 177:15,
16, 16
**notice** 117:11
**notification** 29:24
**noting** 110:8
**notion** 89:9; 145:24;
153:22; 169:24
**November** 109:7;
114:21, 22; 129:9, 14;
138:16, 23, 24; 139:14, 17;
140:24; 142:10, 21;
143:10; 144:8; 149:5, 19;
150:13; 151:14, 24;
154:10; 156:1, 3, 6, 13, 13;
161:24; 162:6, 8; 164:17
**nowhere** 100:20
**number** 9:15; 28:4;
30:18; 71:15; 72:2; 74:22;
115:6; 116:1, 11; 133:1;
138:23; 142:24; 174:24;
175:10
**numbered** 137:22;
139:14; 174:11; 178:14

**O**

**objection** 84:24; 142:13;
143:2
**objections** 3:4; 142:11
**observation** 68:25
**observations** 66:3;
74:25; 169:1
**Obviously** 30:21; 90:16;
157:4
**occasioned** 46:23
**occasions** 43:18; 44:4
**occur** 7:15; 44:17
**occurred** 8:25; 9:20;
18:17; 26:11; 28:19, 21;
29:3; 62:6; 92:5
**October** 9:2; 86:18, 20;
96:19, 21, 25; 97:7, 17, 18,
25; 98:1, 2, 5, 11, 16, 20;
99:21; 101:14; 103:11, 14,
22; 104:6, 17, 20, 23;
105:3, 21; 106:21; 109:8;
110:14, 15, 22; 114:15, 24;
118:3, 17, 17; 124:22;
128:19, 19; 129:2, 13;
130:7, 7; 138:10; 144:10;
147:2, 22, 24; 149:14, 18;
150:13
**odd** 106:9
**Off** 20:24; 28:7; 37:9;
48:17; 64:6; 90:5; 92:13;
103:3; 129:4; 141:6
**off-the-record** 48:18;
64:8; 129:5; 141:7
**offended** 156:23
**offense** 69:13
**offer** 148:3; 158:9; 178:11
**offered** 88:7

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Jennifer Miller
May 18, 2005

**Office** 30:15; 73:2
**Officially** 6:5; 124:12
**often** 54:16
**old** 34:4, 7; 54:18; 148:20
**older** 34:6
**omitted** 117:25
**once** 22:10; 38:14; 45:12; 173:5, 6
**one** 3:11; 7:20; 10:2; 13:12; 20:1; 23:3; 24:19; 28:24; 30:13; 31:20; 32:2; 36:5; 45:17, 21; 46:9, 14, 15, 20; 51:13; 52:1, 2, 9; 54:10; 56:14; 57:10; 58:1, 24; 59:12; 62:23; 63:10, 11, 14, 15, 16; 64:6; 65:12; 66:22; 70:12, 14; 71:5, 8, 15; 72:2, 16, 21; 77:24; 78:20; 82:16, 17; 86:21; 89:25; 97:11, 18; 99:22; 101:1; 104:7; 111:4, 19; 113:15; 117:20; 118:8; 121:9, 21; 124:10; 125:1; 127:7; 128:9, 11, 25; 131:4; 132:15; 133:1, 6; 135:12, 13; 141:3; 149:13; 159:8; 169:2; 170:12; 173:14, 19; 174:12; 176:12; 178:6
**ones** 50:8; 54:17, 18; 59:4, 6; 109:1
**online** 80:23
**only** 10:2; 12:9; 18:10; 28:2; 32:8; 34:4; 41:24; 51:4, 13; 112:22; 118:20; 123:4, 21; 125:25; 126:17; 141:3; 154:16; 157:3, 4, 9
**Oparin** 80:13
**opinion** 77:1; 80:9; 94:24; 146:12
**opinions** 77:2; 90:3; 92:7; 146:9, 15; 162:22
**opportunity** 3:14
**opposed** 3:24; 143:5; 153:23
**opposition** 57:18
**options** 95:24
**order** 14:14; 54:18; 155:20; 178:7
**ordering** 9:14; 54:10; 72:20
**ordinary** 28:25; 42:20
**organisms** 24:10
**organizations** 16:12; 112:10
**origin** 22:14, 17; 24:2, 4, 5, 9, 25; 25:10; 35:4, 5, 7, 7; 68:2, 12, 21; 133:3, 7, 13, 15, 22, 23, 24; 134:2, 2, 14, 17; 135:12, 13, 20, 22; 136:7, 25
**original** 131:2; 178:7
**originally** 74:3; 131:1; 150:8; 176:1
**origins** 35:22; 36:2; 57:1; 68:4, 6; 105:8; 117:13; 118:22; 119:3, 14, 22;

120:8, 12; 121:3; 134:12; 135:8, 25; 136:13, 17, 24; 145:19, 20, 24; 166:9, 14, 15
**others** 10:1; 25:20; 47:12; 54:20; 55:23; 58:2; 59:12; 106:1; 111:19; 134:11; 148:7, 12; 161:2, 4
**Otherwise** 133:11
**out** 10:4; 29:7; 38:24; 40:11, 12; 48:10; 53:14; 54:7; 55:21; 56:8; 58:13, 22, 24; 59:2; 63:22; 69:7; 70:14; 72:11, 19, 21; 73:21; 74:4, 20; 75:2, 3; 80:11; 81:7, 18; 83:10; 88:16; 94:22; 96:1, 6; 99:12; 101:1, 2; 102:4; 103:4; 104:3, 22; 107:20; 114:7; 116:3, 8; 119:6; 121:8; 125:7, 24; 133:9; 138:8; 140:15; 142:12; 144:25; 145:8, 9, 10; 147:17; 148:20; 152:9, 13, 21; 161:9, 14; 164:17, 18; 165:5; 166:8; 168:10; 171:8, 11; 178:8
**outcome** 38:22
**Outdoor** 149:1
**outside** 16:20; 25:6
**over** 10:23; 21:2; 22:6, 17; 27:6; 30:19; 34:4; 50:14; 55:19; 56:13; 57:23; 59:22; 68:12, 21; 70:14; 74:21; 76:18; 78:11, 15; 85:16; 99:23; 100:3; 118:8; 122:8; 125:11; 130:20; 131:2, 10; 155:8; 156:21; 157:18; 160:4; 167:19; 172:1; 176:19
**overall** 136:16
**own** 158:7, 9; 179:14

# P

**p.m** 154:11; 180:3
**pack** 114:19; 175:10
**packet** 48:16; 58:15, 20; 59:15; 61:9, 13; 93:16; 97:13; 172:18; 177:15; 178:14
**packets** 64:15; 97:14, 22
**page** 49:15, 16; 50:2; 52:3; 64:25; 68:10; 69:16; 70:6; 71:14; 72:1, 2; 73:3, 3, 8; 75:12; 78:20; 79:12, 14, 20; 88:14; 94:3; 96:20; 97:24; 100:11; 103:20; 115:15, 19, 20; 116:1, 10; 132:18; 136:22; 137:13, 20; 138:1, 6, 15, 23; 139:14; 141:3, 4, 15; 142:14, 21; 143:22; 148:19; 154:2; 155:8, 23; 156:21; 157:15, 18; 158:2; 160:4; 163:22; 166:2, 19; 167:16, 19

**pages** 47:17; 48:1, 2, 3, 11, 22; 49:10; 50:14, 15, 19; 51:25; 137:8, 8; 141:11; 172:14, 16, 17
**paid** 160:11
**Pandas** 34:10; 56:19; 76:11, 16; 77:1, 5; 78:9; 79:4; 80:3, 10; 81:9, 24; 82:13, 21; 84:10; 85:11, 16, 19; 86:25; 87:4, 23; 88:10, 18; 89:1; 90:21; 91:12; 94:8; 95:2, 5, 16; 98:15; 99:15; 100:13; 103:3; 105:20; 116:7; 117:14; 124:17; 125:25; 133:15; 145:14
**pants** 10:8
**paper** 59:9; 62:23; 167:25; 179:4
**papers** 66:10
**paperwork** 173:10
**paragraph** 21:5; 25:17, 21; 132:15, 17, 20; 135:7; 137:4; 139:19; 140:7
**paragraphs** 47:18; 141:16
**parameter** 107:16
**parameters** 25:7
**parent** 106:4
**parents** 9:6; 66:15, 19; 171:11
**Parliamentary** 121:25
**part** 16:16; 22:16; 23:11, 13; 24:19; 25:9, 10; 40:22; 42:21; 47:8; 52:20; 53:3; 55:25; 66:24; 67:13; 69:22, 23; 70:10; 81:16; 85:23; 92:12, 14; 101:9; 103:25; 119:19; 120:6, 7, 9, 9; 123:14; 135:22, 25; 136:12, 15, 17; 140:21; 144:7; 149:15; 151:18; 154:15; 155:10; 158:13; 159:5; 160:19; 175:10
**particular** 19:4; 35:21; 37:17, 22; 43:15; 50:16; 57:21; 60:15; 68:9; 75:21, 23; 89:2, 5; 90:16, 18; 91:7, 17; 103:8; 104:11; 106:19; 107:14; 112:17; 122:23; 123:9; 124:14; 125:9; 126:19; 128:10, 25; 162:9; 169:16, 23
**particularly** 93:3
**parties** 3:3
**parts** 55:22; 76:23; 81:21; 85:4; 111:9; 116:4; 123:24; 126:3; 135:20; 144:9; 153:12; 169:11
**pass** 113:25
**passed** 72:17, 18; 114:1, 2; 123:6
**past** 70:5; 96:12
**Pat** 3:10; 12:21
**patriotism** 145:4
**Paula** 7:23; 8:19; 10:2
**pause** 4:4

**pay** 158:20, 21, 22, 24
**peers** 55:14
**Penn** 13:3; 14:22
**Pennsylvania** 5:10, 12
**PENNY** 6:11, 11, 13; 20:24; 64:6; 139:1; 141:6; 164:22
**people** 3:17; 6:15; 9:16; 23:2; 34:10; 54:6; 65:9; 68:15; 70:16; 76:11; 79:5; 82:13; 86:25; 87:4, 23; 90:12, 21; 98:15; 99:16; 100:13; 103:3; 105:20; 117:15; 125:25; 133:15; 143:16; 144:12; 150:16; 157:1, 5; 159:25; 162:21; 164:2, 8, 9; 169:4
**people's** 88:11
**Pepper** 9:5
**per** 21:9; 84:17
**perceive** 5:14, 22
**perceived** 38:21
**percent** 31:23; 32:5; 174:17, 21, 21
**perhaps** 76:8; 109:21
**period** 5:21; 17:25; 38:2; 39:17; 43:11; 44:13, 16, 17; 45:4, 9; 46:1, 19; 48:24; 49:3, 6; 52:8; 56:11; 64:20; 102:25; 104:20, 24; 106:20; 116:5; 128:18; 129:16; 149:18; 150:13; 161:23; 163:6; 165:11
**person** 6:22; 175:19
**personal** 66:23; 108:20, 22
**personality** 40:4
**persons** 10:13; 15:15
**perspectives** 3:18
**pessimist** 40:9, 10
**Peterman** 18:13; 19:20, 22; 20:1, 3; 25:19; 26:2; 30:25; 32:3; 37:15; 54:25; 60:21; 70:7; 172:24; 173:14
**phone** 9:15; 80:5, 5
**phrase** 155:11
**Physiology** 13:8; 17:12, 19
**picked** 78:1
**picking** 45:20
**picture** 53:8; 62:22
**piece** 59:9; 179:4
**pine** 38:15
**pinpoint** 18:18; 95:4
**place** 3:13; 74:13; 83:8; 86:20
**placed** 85:12
**places** 3:23; 87:22
**placing** 83:16
**plain** 134:15
**Plainly** 3:17
**plaintiffs** 7:13; 10:15; 11:4; 12:12; 82:4; 172:2; 179:18, 22

**plan** 75:18
**planning** 72:13; 73:1
**play** 135:23
**please** 4:11, 14, 18, 22; 5:2; 64:11; 73:7; 110:8; 149:13; 172:12
**podium** 113:15; 114:8; 125:3
**point** 4:19; 10:11; 12:12; 17:21; 18:5; 20:17; 29:9, 16; 36:15; 41:5, 6, 9, 25; 55:20; 57:4, 11; 60:18; 69:23; 70:12; 78:16, 17; 83:1, 6, 6; 84:16; 85:2, 20; 89:15, 20; 95:9, 10, 20, 21; 96:10, 15; 99:23; 101:4, 17; 102:4, 5, 23; 103:2, 12, 16, 18; 106:19; 107:4; 113:15; 114:11; 116:3; 118:8, 25; 119:13, 21; 121:8, 21; 122:7, 13, 16; 125:14, 18, 21, 24; 126:17; 127:8; 128:10, 12; 129:18, 20; 143:16, 18; 146:14; 148:20; 152:11, 24; 157:21; 159:15, 18; 167:20; 168:13, 15; 170:5, 20; 171:24; 172:8; 173:6, 19; 176:14; 178:6
**pointed** 69:10; 75:2, 3
**pointing** 54:7; 80:11; 81:20; 145:21
**points** 45:14; 118:18; 121:23; 167:15, 16; 173:19, 20; 174:3, 11
**Polanowski** 43:24
**polestar** 43:24
**policy** 166:18, 18
**portion** 64:21; 87:8; 88:7; 100:16, 17; 115:5; 122:21; 142:21; 157:16; 162:10
**portrayed** 80:14
**position** 20:12; 43:20; 53:23; 60:23, 25; 91:15, 24; 94:16; 119:16; 127:2; 169:12; 171:15
**positive** 8:5; 31:23; 37:25; 105:21
**possibility** 43:19; 60:22; 98:7; 113:25; 154:21; 171:24
**possible** 119:19; 146:18; 153:14
**possibly** 9:6; 99:25; 109:20
**potential** 92:9
**practice** 43:17; 69:18; 70:2, 16
**Prall** 31:12, 21; 36:12; 99:25
**Prall's** 154:8; 155:1
**precise** 4:12
**precisely** 27:9
**precursors** 141:22
**prefer** 12:18
**premium** 3:23

Case 4:04-cv-02688-JEJ   Document 216-5   Filed 09/28/05   Page 55 of 59

Jennifer Miller
May 18, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Prentice 73:9
preparation 6:16; 7:1, 9;
  0:18; 11:4; 33:11; 34:19
prepare 113:18; 123:19;
  179:11
prepared 30:5; 32:24;
  111:2; 113:13; 178:21;
  179:9
present 6:23; 7:24; 8:20;
  22:19; 25:2, 4; 76:2; 92:18,
  23, 25; 99:18; 153:6;
  160:15; 165:19; 169:18
presentation 22:18;
  25:7; 56:23; 73:25; 96:13;
  133:19
presented 34:25; 39:19;
  47:1, 2; 50:9; 57:3; 74:13,
  23; 90:20; 95:7; 98:17, 18;
  99:1; 136:10; 138:10;
  178:12
presenting 57:9; 73:24
President 33:19
Press 58:22; 59:8;
  140:25; 143:6; 149:24;
  151:4, 10, 13; 152:17;
  153:21; 154:18, 23;
  161:24; 164:14; 165:18;
  168:9; 169:4, 6
pressure 28:12; 154:19
pretty 72:15; 76:1; 84:16;
  88:15; 91:8; 98:8; 132:16;
  171:5; 179:20
preview 42:15; 59:20;
  60:2
previous 63:17; 75:5;
  146:11; 148:14; 149:13;
  170:3
Principal 176:21
Principal's 30:14
printed 37:9; 90:4; 92:13
prior 18:2; 21:12; 32:14;
  46:17; 48:3; 65:19, 24, 25;
  80:2; 81:24; 128:14;
  167:23
privy 51:13
Probably 13:24; 18:18;
  26:10; 28:13; 33:22;
  39:22; 40:5; 61:23; 68:14;
  80:5; 82:19; 86:1, 17;
  87:19; 97:13; 109:7, 21;
  119:21; 137:8; 170:5, 20;
  174:18, 25; 178:7
problem 21:24; 41:7;
  48:17; 84:3
problems 5:24; 56:6;
  117:18, 20; 135:21
procedure 153:19
proceedings 11:8
process 3:21; 4:8, 21;
  23:11, 14; 28:18; 29:1;
  42:5; 136:1, 12
produced 12:15, 16
Product 58:21
profession 23:25
Professor 33:16
Profile 58:21

project 43:21; 44:7, 11
prominent 58:6
prominently 40:18
promote 163:10
promoting 163:12, 19,
  20
prompt 41:11; 64:25;
  103:25
proof 107:19, 21
proper 159:25
properly 135:15
proposed 100:3; 105:1;
  134:22
protect 154:14, 18, 23
protecting 152:18
prove 34:6; 107:23
proves 178:1
provide 11:1; 142:7
provided 33:9; 48:22;
  58:9; 61:3, 15; 62:13;
  64:18
pry 6:20
PSEA 112:9
public 63:12; 65:10; 67:8;
  87:7; 88:7; 111:1; 113:11;
  114:25; 147:4; 157:2, 3, 8,
  8; 158:2; 159:18; 160:18,
  25; 161:1, 15
publisher 42:13, 14
publishers 42:18; 58:6
purchase 27:21; 28:8,
  15; 29:4
purchased 28:16; 39:15
purchasing 60:6
purpose 6:6; 12:19;
  120:25; 130:17; 131:18;
  152:17; 154:17, 22;
  165:14; 170:8
push 57:16
put 10:22; 22:5, 13; 28:7,
  23; 29:6; 42:1, 22; 56:1;
  58:5, 22; 62:2; 65:15; 68:6;
  74:9; 78:25; 81:6; 84:8;
  87:4, 6; 98:13; 104:4;
  105:10, 11; 119:1; 126:4;
  133:10; 154:19
puts 72:1
putting 20:12; 84:9; 92:2;
  101:4, 5, 9; 152:15

Q

quarter 93:16
quarters 41:20
quick 64:16; 93:19;
  102:21; 168:4
quite 3:25; 11:22; 13:11;
  27:14
quorum 161:7
quote 35:21; 67:10, 21;
  145:17; 146:18; 148:6, 7;
  174:25; 176:12, 17; 177:9
quoted 63:12; 66:25;
  111:13

quotes 47:25; 57:6;
  90:23; 108:3
quoting 111:10, 16;
  112:20

R

radar 18:1
rather 3:21
reach 50:19
react 111:17
reaction 99:8; 100:9;
  124:20
read 11:11, 13; 57:14;
  76:11, 18, 22; 80:4, 6;
  89:20; 92:12; 111:3;
  117:17; 130:10, 21;
  131:20; 132:23; 138:10;
  144:11; 152:25; 165:6, 7;
  171:18; 172:11
readability 80:22, 23;
  81:4; 82:22, 24
reading 54:12, 14; 80:19;
  81:14; 83:5; 85:5; 133:14;
  149:1; 150:11; 164:14;
  171:14; 172:3
real 51:12; 168:4
realizes 21:18
really 21:24; 23:1; 26:22;
  37:22; 48:22; 54:13; 88:4;
  150:11
realm 107:25
reason 5:5; 22:16; 58:25;
  60:15; 66:8; 122:12;
  163:8; 167:2; 177:4
reasons 107:10; 171:20
recall 5:22, 25; 10:14;
  12:11; 17:22; 18:4; 19:11,
  17; 20:18; 21:14, 15; 25:5;
  26:22, 18, 22; 27:25; 30:1,
  11; 32:10, 15; 33:18, 23;
  34:1, 8, 14, 17; 35:20;
  37:5, 15; 41:10, 12; 42:6;
  49:3; 51:22; 55:14; 58:4,
  11, 23; 59:19; 60:10, 18;
  62:21; 67:24; 70:20;
  75:19; 76:16, 21; 83:22;
  84:7; 85:14; 87:10; 88:13,
  21, 25; 90:12; 93:13;
  94:22, 25; 98:10, 17;
  100:2, 5; 102:18; 103:6;
  104:24; 105:23; 106:14;
  112:3, 12, 15, 17; 120:4,
  24; 121:1, 2; 122:20;
  123:1, 12; 126:21; 128:23;
  129:16; 130:7; 146:20;
  147:8; 149:10; 158:13;
  162:19; 163:15, 18, 24;
  166:16; 168:6, 25; 169:14
recalled 29:22
recalling 123:21
receive 25:25; 38:4
received 34:1, 18; 48:12;
  49:10, 23; 52:5; 56:9
receiving 166:16
recently 8:17; 9:13, 17;

11:13; 20:22
recess 43:6, 7; 64:9;
  129:6; 164:24; 165:2
recognition 127:7, 16
recognize 61:7
recollecting 37:18
recollection 12:6; 35:9;
  42:3; 44:14; 46:11; 50:7;
  58:25; 67:7, 18; 70:10;
  83:7, 24; 87:1; 96:25; 97:2;
  103:25; 118:7, 16; 119:5,
  18; 124:1, 4; 128:4; 144:7;
  155:9; 161:19; 163:3
recollections 46:22;
  66:24; 69:22
recommend 127:12
recommendation
  116:16; 123:23
recommended 89:7;
  115:9, 22; 116:13; 118:11
Reconsider 147:22, 24;
  149:13
record 5:3; 20:24; 25:19;
  48:17; 64:6; 129:4; 141:6;
  146:25; 147:4
recorded 88:24
recording 146:25
recordings 147:1
records 3:22; 34:6
recounted 53:13; 175:23
refer 176:6
reference 26:14; 41:17;
  70:9; 79:20; 83:9, 17;
  84:10; 85:12; 95:18; 96:5;
  97:20; 98:1; 99:6, 15;
  100:13, 18, 20, 21; 102:1,
  6; 103:2; 105:25; 106:3;
  116:6, 7; 117:5, 14, 24;
  119:7; 124:17; 126:1;
  133:13; 135:24; 148:19;
  156:24; 160:21; 161:8;
  163:22; 164:10; 166:19
referenced 10:1; 11:1;
  21:12; 23:16; 24:4; 68:23;
  117:2; 149:7; 177:5
references 58:21; 72:5;
  74:3; 96:21; 116:12
referencing 21:7;
  115:20; 125:22; 127:19
referred 10:7; 72:2
referring 49:16; 58:17;
  60:2; 98:20; 100:11;
  109:16; 114:5; 163:9
refers 104:17
reflect 64:24; 65:7; 71:19;
  73:11; 94:7; 118:4;
  134:23; 137:16; 167:6
reflected 88:14; 118:19;
  124:6; 128:14
reflecting 20:19; 144:25
reflection 65:24
reflects 69:20; 139:16
regarding 9:17; 162:5
regards 101:19, 20
registers 148:19, 21

Rehm 31:13, 24; 143:15;
  147:17
reiterated 39:22; 70:11;
  152:19; 166:25
reiterating 147:18
rejected 103:24; 104:5,
  10
relate 43:25; 62:11;
  110:13; 134:5; 151:3
related 35:22; 43:22;
  80:17; 85:19; 127:23;
  157:15; 162:15
Relatedly 4:8
relating 12:7; 64:2; 72:3;
  78:6, 21; 95:6; 104:25;
  149:20, 23; 151:7; 161:23;
  175:18
relation 16:3
relations 15:14, 14, 18
relationship 16:20
relayed 168:24
release 140:25; 143:7;
  149:24; 151:4, 10, 13;
  152:18; 153:21; 154:18,
  23; 161:24; 164:14;
  165:18
released 140:25; 151:4,
  10, 13
religion 54:25; 55:1;
  67:5; 70:13, 13, 14, 16;
  91:20; 145:5; 163:11, 13,
  20; 170:1, 9
religions 67:4; 148:4, 17
religious 169:25; 170:10,
  13
relying 91:16; 97:3
remainder 171:12
remained 39:25
remarks 63:17
remember 7:21; 18:10;
  19:1, 10; 21:17, 19; 27:10,
  15; 28:2, 14; 29:18; 30:15,
  17, 18, 22, 23; 32:7, 22;
  33:2, 4, 5; 34:2, 21, 23;
  35:4, 19; 36:9, 13, 16, 18,
  25; 37:2, 4, 7, 11, 13, 22;
  38:19, 23; 41:14; 43:4, 12,
  12, 15, 19; 44:5, 8, 12, 15,
  22, 23; 45:23; 46:3, 8, 14,
  15, 18, 24; 47:11, 25;
  50:16; 51:1; 52:8, 20;
  53:15, 16; 54:2, 7, 11, 14,
  23; 55:2, 2, 16; 56:9, 12;
  57:5, 11; 58:1, 1, 13, 24;
  60:1, 17, 20, 25; 62:22;
  63:11, 20; 67:4, 12, 15, 21,
  23; 68:1, 8; 71:1, 9, 21;
  72:15; 75:16, 24; 76:6, 22,
  24; 77:3; 78:13; 79:1, 17,
  18; 80:11, 12, 16; 81:12,
  15, 17, 19; 82:1, 9, 11, 20;
  83:1, 11, 18; 88:4; 89:3;
  90:16, 17, 23; 91:7, 17;
  92:13; 93:2; 95:13; 96:18;
  97:4, 4, 6, 8; 101:17;
  102:25; 103:8, 13; 104:9;
  105:2, 8, 9, 16; 106:6, 8;

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Jennifer Miller
May 18, 2005

110:22; 111:7, 10, 13, 14,
16, 19, 19; 112:6, 24;
113:2, 4, 14, 16; 118:20;
119:9, 25; 120:5, 11, 16;
121:5, 13, 21; 122:6, 14,
17, 19, 23; 123:4, 9; 124:2,
10, 11, 12, 14, 15; 125:3,
9; 126:9, 11, 19, 23; 127:7,
16; 128:11, 25; 129:1;
143:25; 146:5, 6; 149:14,
15; 151:11; 153:10, 12;
154:12, 16, 22; 155:4;
161:20; 162:4, 9; 163:25;
167:10; 168:8, 12, 16, 23;
169:2, 8, 10, 16, 22;
171:23, 25; 173:5, 7, 7, 9,
18; 176:7, 8, 12; 177:7, 8
remembered 173:19, 19;
174:20, 22
remembering 56:17;
103:12
remembers 173:12
reminded 164:3
reminding 160:25
remote 16:3
remove 103:24; 137:5
removed 138:25; 139:15;
140:3; 142:4; 156:12;
158:6
renewed 42:6, 9
rep 111:21
rephrase 4:12
replace 143:17
replaced 73:21; 74:24
replied 147:15
reply 149:15
Report 156:22
reporters 66:13
reporting 66:10, 13, 18
representation 8:1, 3;
151:19
representative 142:25;
153:11
representatives 151:16
represented 6:2; 7:5;
112:7
representing 9:6; 16:18;
179:17
request 9:13; 130:18
requesting 58:12
required 101:15; 103:10;
112:14; 113:20
research 59:5; 65:25;
90:5
researched 59:4
reservations 50:10;
54:22; 153:8
reserved 3:5
reside 5:9
resignations 126:18
resigned 126:9; 143:20;
161:3
resolution 85:9
Resources 116:7
respect 57:8

respectful 161:13
respective 3:3
respond 5:15; 84:11;
92:19; 109:6; 179:2
responded 174:13, 17;
175:3
responding 106:14;
112:25; 113:18; 168:25
response 11:2, 22;
48:23; 50:24; 61:15;
68:16, 18; 88:14; 93:13;
120:15; 158:13, 15; 159:5;
166:16
responses 3:24
responsible 178:2
rest 22:5, 14; 146:8
result 73:12; 76:4;
125:12; 172:20
resulting 85:22
retain 6:4, 6
retained 6:13
return 64:20; 78:2, 5;
80:1
review 73:5
reviewed 10:17; 11:7, 10;
80:7
reviewing 81:1, 3
revisions 150:3
revisit 159:4, 12
reworded 132:9
rewrote 132:5
ridiculed 148:1
Right 8:14, 14; 13:11;
18:20; 21:20; 23:12, 12,
15, 15; 25:16; 27:14, 19;
32:18; 38:17; 46:5, 7; 47:3,
5, 7; 51:13; 56:7; 61:5;
69:15, 18; 70:1; 71:13;
77:16; 81:23; 93:24;
95:25; 96:6, 17; 98:20, 23,
24; 100:12; 103:20; 107:8;
109:8; 110:19, 19; 111:17;
113:11, 22; 114:22;
116:19; 118:13; 119:15;
121:6; 124:2, 7; 125:11;
127:20; 128:8; 129:2;
130:23; 131:8, 8; 137:22,
23, 24; 139:5, 8; 140:4, 10;
143:4; 144:23; 146:23;
147:3; 153:25; 158:10;
163:9; 165:10; 168:12;
172:12
right-hand 49:18; 50:3;
61:18; 62:12; 71:15;
78:20; 86:11; 93:21;
96:20; 99:5; 103:21;
115:6; 116:11; 138:7;
166:20
rights 66:22
Rob 7:3; 8:3, 21; 31:11,
12, 17; 36:13; 47:9; 63:9;
78:7; 94:6; 99:24; 103:6;
151:19; 162:16, 17;
172:21, 21; 176:7; 177:8
Rob's 61:24; 63:3
Robert 31:12, 19; 36:12;

175:12
room 7:4; 52:13; 53:10,
12; 99:22; 105:5; 151:15
rooms 30:13
rotation 28:4
Rothschild 7:23; 9:1, 3,
25; 172:21; 175:7
round 121:17
rounds 121:18
run 51:21; 112:24; 146:8
running 143:17
Russell 93:17; 94:23

# S

safe 146:18
Salon 65:2
same 4:6, 13; 7:5; 40:11;
50:6; 57:19; 81:17; 90:7;
91:21; 93:24; 105:24;
112:4; 114:19; 119:16;
128:18; 135:19; 141:1;
161:16; 178:12
Sandi 7:3; 8:4, 21; 16:21;
61:24, 25; 62:3, 4, 13;
112:1
sat 56:14; 75:9; 79:18;
124:12; 161:14
satisfied 35:14; 76:7;
126:2
satisfy 105:10
save 28:10
saved 43:13, 14
saw 38:5; 52:6, 15, 19;
54:24; 101:3; 104:5
saying 19:11; 24:5; 26:2;
35:21; 51:22; 53:18;
54:11, 24; 59:22; 63:21;
67:21; 68:24; 80:12;
83:14; 92:13, 22, 24, 25;
93:2; 103:6; 104:9; 109:5;
118:23; 122:15; 126:11;
128:4; 152:13; 153:11, 12;
154:17, 17, 18, 22; 161:11;
162:6; 163:25; 168:8, 8,
12, 16; 170:21
SB 61:19; 62:13; 77:13
School 5:8, 8; 7:12; 12:23,
24, 25; 15:19, 19; 16:7, 7,
12, 21; 17:4; 24:14; 26:20;
28:8; 29:1; 30:14; 32:13,
23; 38:11, 12, 16; 41:18;
43:10; 46:12, 15, 16, 24;
56:14; 70:17; 71:23; 77:4;
98:1; 108:5; 135:18, 18;
160:12; 172:23; 173:13;
175:19; 177:1, 1
schools 15:24; 58:8, 17;
176:18
schoolteacher 12:2
science 13:1, 3; 17:9, 10;
28:5; 29:19; 30:17; 31:1, 2,
6, 8; 40:16; 45:13; 50:12;
52:13, 14; 54:5, 6, 8;
56:13; 62:7; 80:11; 81:14;
82:18, 23; 85:6; 91:22;

100:23; 107:13, 16, 16, 22,
25; 108:16; 131:11, 12;
132:4; 133:25; 134:25;
135:4; 140:20; 142:15, 24;
148:5; 163:20; 168:21, 24;
169:13, 20; 170:21;
171:17; 177:22; 179:11
scientific 65:18; 90:14;
132:2, 3; 135:4, 8; 137:4;
140:18; 142:12; 167:1;
170:18
scientifically 140:21;
154:6
scientists 102:11
scintillating 149:3
Scott 131:5, 7; 150:6
scream 53:1
screen 18:2
se 21:9
sealing 3:3
seat 114:7
second 25:17, 21, 21;
26:21; 63:2, 4; 64:6; 71:11,
14; 72:25; 87:21, 23;
116:12; 133:6; 138:19;
139:19; 140:7; 141:15;
154:2; 156:21; 170:12
secondary 13:1
secretary 16:1
section 51:3; 63:13;
158:2
seeing 99:8, 10; 173:8,
13, 20
seem 54:23; 62:9; 74:8;
75:2; 94:7; 118:4; 123:21
seemed 46:11; 47:9;
50:25; 57:17; 73:19; 76:1;
91:8, 13; 99:12; 125:16
seems 13:13; 163:1; 40:1;
65:23; 95:14; 121:9;
124:1, 4; 134:9, 15, 22
sees 170:7, 9, 13
selection 8:12; 22:25;
23:4, 6; 28:18, 19, 21, 25;
29:3; 42:5, 15; 102:10;
136:5
semester 27:18
send 42:15
sends 138:16
sense 17:2, 22; 18:16;
24:16; 26:17; 28:17; 29:2;
35:25; 46:9; 48:7, 8; 51:7;
55:11; 57:8; 71:19; 73:15;
74:18; 85:8; 88:6; 90:17,
18, 24; 91:15, 23; 125:12;
127:23; 134:10, 11, 22;
137:12; 170:17
sensitive 4:19
sent 137:10, 14; 138:4;
142:3, 19, 19; 151:22
sentence 21:6; 25:21;
81:6
separate 23:22; 25:13;
90:19; 124:1
separation 108:14
September 86:3, 4, 7, 9,

12, 16; 88:18, 21; 94:25;
95:1; 96:17
servants 161:1
serve 161:1
served 12:13; 178:25
SESSION 44:10; 77:5
set 3:13; 48:22; 61:19;
62:1, 11; 63:2, 4; 66:22;
77:13; 96:2; 118:11;
164:14
sets 61:2; 98:15
settled 99:13
seven 30:19
several 10:3; 44:24; 45:3;
46:7, 19; 52:25; 55:9;
67:22; 78:10; 85:1, 11;
92:14; 96:1; 109:3; 119:2;
121:11, 12; 122:4; 137:8;
171:22; 175:1; 176:11
shaking 53:17
shall 25:6; 35:17; 148:7
share 40:1
shared 16:11
Sheila 47:5; 53:25; 54:3;
71:2; 83:19, 22, 25; 113:3;
120:2; 122:25; 159:21;
160:1; 163:3
shell 126:16
shift 27:24
shock 126:20
shocked 126:16
short 28:18; 154:4;
164:21; 171:13
shortly 78:3
show 20:19; 60:24;
94:22; 123:22; 153:1;
178:9
showed 92:6; 131:6;
173:16
showing 61:13
shown 48:21; 141:11
Sicilian 175:2
side 3:15
sided 141:4
sides 163:8
Signed 142:24; 151:25
significant 139:22;
140:11
similar 32:19; 55:11
simply 68:21; 104:5;
134:24; 135:3
single 24:9; 70:14
singled 101:1
singling 101:2
sit 5:13; 27:5; 37:19; 97:4;
121:6; 128:17; 145:7
sitting 106:9; 109:20;
122:7
situation 158:14
six 157:18; 175:10
sketch 117:17
slightly 117:17
small 136:4

Jennifer Miller
May 18, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

**smaller** 63:5
**smoke** 125:11
**Snook** 87:14; 145:12;
158:18; 161:17
**solicited** 124:16
**Solicitor** 94:24; 160:15
**solicitor's** 146:9, 12, 15
**solicitors** 146:21
**solved** 126:3
**somebody** 74:14
**Somehow** 52:12; 53:11;
55:1; 72:10
**someone** 19:8; 33:5, 9;
57:12; 63:25, 25; 69:5, 5,
11; 74:16; 79:6; 90:4;
108:11; 109:4; 111:21;
127:1, 2; 144:13, 16;
146:11; 152:20; 161:7;
163:2; 167:8; 176:14, 15
**sometime** 7:16; 9:2;
29:7; 42:20
**Sometimes** 37:18; 42:14,
17; 65:10; 121:20
**somewhat** 100:7
**somewhere** 13:19;
18:20; 40:2; 56:4, 7; 60:23;
72:25; 75:16; 78:3;
140:24; 172:6
**son** 27:16; 30:10; 41:16
**soon** 176:17; 178:8
**sophomore** 14:5
**sorry** 32:11; 37:3; 89:19;
110:25; 139:5; 147:20;
149:1; 162:17; 164:4
**sort** 10:23; 13:5; 14:16;
16:20; 17:21; 19:25;
23:11, 13, 16; 24:15, 22;
25:11; 26:10; 35:16;
36:18; 40:17; 42:4; 43:24;
45:20; 48:25; 50:14;
54:24; 57:17; 59:24; 67:6,
6; 68:11, 16; 73:21; 80:6;
83:8; 91:19; 92:23;
102:12; 108:25; 118:24;
120:23; 121:19; 122:3;
123:5; 124:10, 15; 125:18;
126:16, 20; 130:16; 134:9,
11; 137:9; 144:19; 153:23;
159:8; 168:1; 169:5;
170:8; 173:16
**sound** 85:6
**sounds** 55:4; 149:3;
165:10
**Spahr** 7:3; 8:4, 21; 18:11,
21; 21:7, 11; 26:4; 29:19;
30:2; 31:9, 15; 37:5; 39:17,
25; 43:1; 47:9; 51:24;
52:15, 25; 53:17; 55:15;
56:21; 72:16; 75:9, 19;
76:20; 80:3, 9; 82:19;
84:11; 89:24; 92:6, 11;
93:7; 100:9; 102:16;
104:13; 105:14; 109:21;
110:20; 111:2, 7; 112:12,
15, 18; 119:16; 122:8;
123:12; 129:25; 144:11;
151:20; 170:3, 6; 173:9,

15, 25; 174:1, 9; 175:6, 11
**Spahr's** 40:4; 78:25;
79:13; 111:18; 114:17
**spark** 154:15; 155:9
**speak** 6:18, 25; 11:4;
18:2; 40:23; 48:23; 52:2;
55:14; 68:17; 88:19;
92:11; 113:12; 127:9;
131:17; 150:14; 151:1;
155:15, 19; 157:5; 173:21,
22, 24; 178:10
**speakers** 113:11
**speaking** 8:6; 68:15;
87:7; 88:16; 90:13;
105:16; 125:3, 4; 126:22;
149:10; 155:21; 159:17;
164:1; 174:9
**speciation** 24:1, 2, 11,
24; 25:13; 35:8
**species** 23:8, 9, 17, 19,
21, 23; 24:2, 3, 5, 12, 13,
17, 18, 20; 35:7; 36:5, 5;
133:3, 22, 23; 134:2;
135:9, 12, 21; 136:14, 24
**specific** 13:12; 14:1, 15;
15:3; 19:7; 20:2; 34:15;
38:23; 42:18; 45:23;
47:25; 55:3; 57:5; 59:4, 11;
60:1; 76:22; 90:23; 95:14;
101:18; 119:9; 129:20;
130:19; 146:6, 19, 21;
153:16; 163:12; 169:17
**specifically** 15:10;
29:18; 30:15; 31:4; 36:9;
37:13; 46:4, 14, 18; 51:20;
59:13; 70:20; 81:22;
92:11; 101:7; 125:23;
127:24; 167:10; 168:23;
169:11
**specifics** 21:17
**speech** 112:16; 125:10
**spell** 5:2
**spend** 87:20, 22
**split** 79:6
**spoke** 26:14; 55:15;
63:12; 67:22; 111:21, 22,
23; 112:12; 123:14;
144:13; 147:10; 177:4, 10
**spoken** 6:16; 178:4
**spokesmen** 82:19
**spokesperson** 36:19
**spray** 99:5
**Spring** 12:24; 18:18;
26:19; 27:17, 17, 20, 24;
29:23; 30:11; 39:6; 42:4;
47:21; 56:11; 57:7, 12;
59:18
**squash** 144:14
**stack** 86:17; 155:3, 6
**stacks** 37:8
**staff** 115:23; 116:14, 17;
118:5, 12, 14; 123:24;
127:12, 18; 128:5, 7;
165:17; 169:6
**stamp** 115:6; 116:1, 11
**stamped** 100:12; 115:19,
20, 25

**stand** 63:25; 69:5, 5, 8, 9,
12; 113:13; 127:1, 3;
152:12, 20; 172:8, 10
**standards** 21:10; 26:12;
85:1, 2
**standing** 163:25
**stapled** 172:18
**start** 17:3, 5; 22:18, 22;
61:16; 117:7
**started** 17:4; 27:18;
106:12; 165:8
**starts** 61:9; 69:16
**state** 5:2; 13:3; 14:9, 22;
20:5; 21:8; 88:1; 89:16;
105:19; 108:15; 127:3;
143:2
**statement** 19:15; 26:8;
63:19; 91:18; 111:2, 5;
113:13; 125:2; 130:9;
135:10; 140:16, 23;
141:19, 24; 142:11, 11;
143:7; 144:18; 146:17;
149:21, 23; 150:1, 7, 12;
151:5, 8, 22; 152:1, 6, 25;
153:9, 13; 159:8; 160:4;
161:23; 162:2, 5; 163:15,
24; 164:14; 165:4, 6, 7;
169:5, 7, 10, 21; 171:14,
18
**statements** 19:3; 20:2;
73:21; 91:17, 18; 144:11;
155:22; 161:10; 167:11,
19, 21; 168:2, 6, 9
**states** 56:2
**stationery** 65:3
**status** 66:5
**stay** 24:23; 91:20; 92:2;
136:20
**step** 129:3
**Stephen** 93:17
**steps** 136:5
**Steve** 94:23
**stick** 25:12; 42:7; 66:10,
13; 121:8; 125:7; 164:3, 5;
171:7
**sticker** 158:7
**stickers** 158:6, 9
**sticks** 53:14
**sticky** 81:17, 19
**still** 23:22, 23; 88:9, 19;
89:13, 14, 15, 21; 90:6;
103:12; 107:4; 117:15;
139:23; 140:1; 150:21;
177:21
**stipulated** 3:2
**STIPULATION** 3:1
**stood** 57:8; 63:11; 70:11;
111:2; 144:13; 146:14;
159:19
**stop** 32:11; 148:13
**stopped** 168:16; 173:16
**story** 3:15; 129:17;
130:12; 171:12

**straight** 102:19
**strong** 74:25
**stuck** 108:23; 158:8
**student** 51:6; 53:8; 83:3,
10, 16; 84:21; 94:15;
95:19, 25; 96:7; 106:4;
166:11, 13
**student's** 51:11
**students** 21:24; 22:20;
41:3; 51:6, 14, 15; 56:6;
66:15, 19; 84:25; 95:11;
100:22, 25; 101:21; 106:2,
23; 117:18; 119:7; 148:1;
156:22; 171:11
**studies** 80:23
**study** 80:22; 81:2; 82:22
**stuff** 86:18; 132:14;
137:15
**Styling** 65:1
**subject** 12:7; 14:20; 17:7;
19:25; 25:6, 15; 28:1;
39:11; 45:25; 49:6; 128:9
**subjecting** 19:24
**subjects** 36:7
**submit** 42:25
**subpoena** 11:2, 23;
12:13; 48:23; 61:15;
178:18
**subpoenas** 61:22
**subscribe** 132:8
**subsequently** 17:13, 14;
166:16; 176:10
**substance** 142:12
**sue** 109:4; 114:5
**sued** 93:2; 94:21; 114:4;
154:21
**suggested** 94:20; 134:4
**suggestion** 83:8; 159:6;
160:14; 169:3
**suggestions** 104:1
**summer** 29:7; 57:12
**Sunday** 176:18
**Sunshine** 160:18
**Super** 155:12
**Superintendent** 98:14;
127:2
**supplemental** 79:5; 87:5
**supplementary** 89:10
**supplied** 154:6
**support** 60:24; 127:5, 14;
128:3; 152:20; 178:9
**supported** 127:7
**supports** 139:22; 140:12
**sure** 4:15; 10:23; 13:10;
15:25; 20:16; 21:3; 25:1;
31:20; 32:2, 3; 37:24;
40:17; 41:5, 8; 51:19;
54:23; 64:7; 70:22; 72:15;
74:6; 75:3; 84:16; 86:8;
87:13; 89:2; 95:8; 97:21;
98:8; 99:24; 104:8;
106:16; 107:3; 112:16;
114:14, 23; 118:25;
122:18, 20; 126:16; 137:2;
138:9; 140:4; 144:21;

154:12; 155:21; 160:14;
163:4; 164:22, 23; 169:22;
170:16; 177:3; 179:13
**surprise** 100:16; 102:2
**surprised** 100:7, 10
**Survey** 58:16
**Sutton** 152:25
**swear** 155:5
**swing** 123:5
**switch** 163:7
**switched** 79:7; 132:15
**sworn** 3:8; 66:22
**syllables** 81:7
**symposium** 178:12

# T

**table** 122:8
**tabled** 77:21
**talk** 36:4; 38:20; 81:23;
82:2; 102:9; 124:18;
128:17; 166:12
**talked** 19:5; 57:1; 137:24;
173:16; 175:20; 176:11;
179:17
**talking** 35:4; 36:2; 38:10,
11, 12; 82:12; 92:6;
106:11; 120:12; 142:3;
147:9; 161:15; 169:4
**tape** 56:17; 146:25;
147:1, 19
**taught** 13:15; 14:7; 17:8,
10; 21:9; 27:7; 30:7; 34:24;
35:14; 36:15; 53:4; 68:5, 6;
70:13; 105:8; 117:14;
118:22; 119:14; 120:8;
134:13; 136:19; 145:24;
166:10, 14
**taxpayers** 148:2; 158:22
**Taylor** 31:13; 32:1
**teach** 13:2; 14:13; 17:15;
19:9; 20:8; 21:23; 22:1, 6;
30:6; 31:6; 32:25; 36:10;
44:25; 53:9; 55:1; 67:3, 5,
19; 68:22; 70:14; 83:24;
84:1; 85:1; 89:14; 90:1;
99:18; 101:6, 7, 15;
103:10; 105:24; 106:15;
107:7, 8; 112:14; 119:2,
22; 120:17; 145:20; 146:4;
148:3; 170:1; 176:17, 18
**teacher** 10:7; 14:16;
15:25; 16:16; 23:24;
24:16; 38:14; 51:3, 3, 13;
89:6; 165:17; 176:20
**teacher's** 51:2, 5, 11
**teachers** 16:18; 19:24;
20:6, 9, 12; 21:8; 36:11;
40:12, 17; 41:1; 43:20;
60:21, 23; 66:15, 19; 93:8;
100:1; 104:21; 112:13;
114:5; 119:20; 127:5, 14;
142:15, 24; 146:3; 152:4,
20
**teaching** 13:4; 14:10;
15:2, 3, 3; 17:3, 4; 18:13;

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Jennifer Miller
May 18, 2005

19:24; 20:10; 26:6, 12;
36:13, 14, 16; 44:1;
101:11, 12; 130:10; 170:9
technical 134:10; 153:23
Techno 17:8
telephone 9:10; 80:7
telling 4:16; 69:11; 79:1;
126:12; 145:3; 148:11;
170:8
tells 81:4
ten 130:6
tend 38:15; 68:14; 167:24
tended 39:4; 143:7
tends 4:8; 40:10
tension 105:14
tentative 74:8
tenure 40:25
term 35:25; 121:3; 125:7;
171:13
terms 10:12; 13:5; 35:11;
42:5; 57:22; 62:7; 73:23;
96:13; 134:9
terrible 13:9
test 14:16; 107:17, 22;
108:5, 10; 177:25
testability 167:3
testable 107:16
tested 108:8; 139:23;
140:1
testified 3:8
tests 14:15
textbook 9:14, 15, 18;
27:22; 42:15; 43:23; 44:5;
45:1; 47:1, 2, 17, 19; 48:9;
52:22; 59:21; 77:21;
82:23; 83:17; 87:21, 23;
90:7; 94:16; 96:1; 101:12;
102:9; 178:6
textbooks 28:3, 6, 8, 15,
16, 23; 29:9; 45:1, 20;
46:25; 54:3, 5, 8, 12, 16,
18; 58:8; 59:2; 60:16; 67:9;
79:3, 8; 81:2, 3; 95:22;
100:18
texts 42:7, 18; 58:4, 5;
73:16; 100:21; 105:25
thankless 160:10
Thanks 153:4; 180:2
theoretical 74:9
theories 19:12; 57:9, 10;
101:22; 102:6, 14, 25;
116:5; 117:19; 132:8;
136:23, 23; 137:1
Theorist 34:3
Theory 13:13, 22; 21:8;
22:13, 19, 25; 24:19; 25:1,
10, 12, 23; 32:25; 41:4;
55:21, 22; 56:7; 57:2;
65:12, 15, 16, 18; 66:6;
73:24; 74:1; 80:13, 13;
81:10; 90:15; 96:14;
101:22; 102:2, 10; 107:1;
116:4; 117:19; 132:1, 2, 3,
11, 12; 133:9, 10, 18;
134:1, 17; 135:5, 7, 11, 13,
20, 23; 136:10, 11, 16, 25;

138:25; 139:15, 18, 21, 21,
23; 140:1, 1, 2, 6, 9, 9, 11,
12; 141:24; 142:5; 166:24;
167:1; 170:10, 10, 13, 19
therefore 3:23; 62:16;
91:3; 107:24; 132:12
thinking 31:13; 38:1;
40:24; 55:24; 65:14;
67:20; 76:6; 86:1; 105:9;
167:13
third 123:23; 124:4, 10;
139:10; 166:2
Thomas 162:20, 23;
163:7, 10, 21; 164:4;
178:18
thorough 11:22
thou 148:7
though 56:1; 68:16;
120:17; 125:1
thought 10:8; 35:10;
38:16, 25; 39:23; 44:2;
50:23; 59:24; 73:20;
76:19; 85:4; 92:1; 96:4;
102:22; 106:8; 107:3;
118:5, 23; 126:2; 132:2;
142:4; 144:1; 145:19;
148:1; 149:2; 160:17;
164:6; 168:10, 22; 170:17
thoughts 68:14, 16; 80:6;
167:23
three 43:2; 45:6; 46:21;
47:10, 13; 74:22; 84:17;
92:15; 97:12; 123:17, 22;
138:7, 15, 24; 139:14;
172:14, 17; 174:24
throughout 119:12
thrust 111:7; 112:3;
137:1; 162:19
thus 11:8; 25:8
tie 123:7
tied 148:16
tight 10:8
timeline 10:23; 24:22;
79:1; 102:19; 138:8;
156:4; 171:9
times 9:12; 52:25; 55:9;
67:22; 92:14; 119:2;
121:11, 12, 15; 122:4;
159:22; 175:1; 177:10
today 5:13; 12:15; 24:10;
97:5; 179:21
today's 7:1; 10:18
together 10:22; 50:14;
51:21; 61:22; 79:18; 176:4
token 4:13
told 12:10; 19:8, 16;
22:21; 28:13; 29:19; 30:2;
32:24; 39:20; 59:5; 60:21;
61:3; 68:20; 78:7; 79:2;
95:15; 104:3; 105:6, 23;
127:20; 129:18; 145:7;
152:17; 168:17; 172:6;
174:1, 14; 177:7, 9;
178:20; 179:4, 6, 13, 21
tolerance 63:7
Tom 131:5, 7
tomorrow 175:1

tone 63:16; 175:2
toned 88:15
took 69:13; 73:20; 81:18;
85:7; 86:20; 109:19;
121:21; 133:1, 5, 9;
171:15; 176:19
top 49:17, 18; 50:3;
59:17; 68:11; 79:11; 98:3;
130:1, 21; 131:19; 155:6;
137:21; 138:13; 155:24;
156:9; 167:15; 172:14, 19
topic 25:2; 31:4; 43:18,
22; 46:25; 55:1; 65:24;
164:3, 5; 170:19
touched 44:17, 25; 95:1
touching 58:4
tow 6:15
towards 46:12; 81:5
Trace 69:18; 70:4
track 121:19; 122:18
transcripts 11:7, 10
transpired 161:20
treat 148:12
treated 148:12
trial 3:5
tried 65:8; 79:17, 18;
121:12, 12; 126:12, 12;
133:22; 161:13
trigger 66:11, 16, 23;
69:21; 70:10; 87:1; 144:6
trip 22:23
trips 158:23, 24
TRO 172:2, 7, 9
trouble 80:19
Trudy 70:7, 7
true 64:5; 155:22
try 4:12; 22:5, 13; 24:20,
23; 25:12; 40:15; 154:23
trying 4:14, 15; 6:20;
21:18; 30:24; 40:12;
41:11; 48:6, 10; 74:19, 21;
88:6; 95:8; 121:24; 122:2,
2, 3, 6, 22; 125:15; 133:19;
140:17; 151:16; 170:13
turn 90:9; 116:10; 131:14;
171:14
turtle 24:12
turtles 24:13
two 7:20; 9:24; 19:23;
23:21, 22; 24:5, 7; 25:13;
45:6; 51:25, 25; 73:15;
79:20; 80:23; 81:12, 15;
84:17; 91:13; 95:2; 96:20;
98:14; 103:21, 22; 110:2;
113:11; 123:22; 124:9, 19;
128:6; 132:20, 24; 136:23;
137:8
two-sided 110:9
type 16:16; 22:15; 53:18;
70:15; 86:2; 87:6; 91:20;
95:13; 108:15; 111:11;
112:4, 9; 120:21; 131:10;
142:17; 178:12
typed 48:14; 49:15, 25;
50:7; 178:21

types 112:10; 135:5
typewritten 52:3; 132:19,
25; 135:6; 137:3, 14, 18
typical 81:1
typically 12:3; 45:12;
53:7

## U

umbrella 136:16
unacceptable 147:19
uncertain 85:25; 86:1
uncomfortable 4:18;
99:17; 101:11; 108:9;
120:18
unconstitutional 92:15
under 25:11; 40:13;
107:15, 25; 108:8; 115:14;
116:6; 117:16; 147:6;
163:2; 174:3
undergraduate 13:6;
81:2
underneath 174:11
understood 130:16;
134:16; 135:25
unfolded 17:23; 34:22;
137:13
union 8:2, 3; 16:18;
111:21; 112:8; 131:4;
142:24; 151:16, 18;
153:11
UNIT 117:16; 164:15
Units 115:14
University 58:22; 59:8
unlawful 108:12
Unless 16:16; 125:9
unpatriotic 145:4
unsure 101:4; 103:17, 17
untenured 19:23; 20:6,
9; 93:8
unto 148:7, 8
untrue 154:5
unusual 3:22; 27:14
up 4:13; 17:25; 18:23;
22:25; 23:2, 3; 24:10, 15;
27:21; 28:3, 5; 34:20;
36:24; 40:22; 41:5, 20, 25;
42:8, 15, 15; 43:19, 22, 25;
44:3, 6; 45:25; 46:1, 25;
52:21, 24; 53:5; 55:1, 14,
18, 19; 60:16; 62:8; 63:11;
64:1; 65:22; 67:7, 12; 69:5,
5, 8, 9, 12; 70:11; 79:3;
83:4; 92:6; 100:2; 101:10;
102:4, 9, 13, 24; 103:13,
15; 111:2; 112:13; 113:13,
14; 114:7; 120:19; 123:22;
125:2, 3, 13; 127:1, 3;
130:14; 131:15, 24;
132:25; 135:6; 144:13;
145:1; 146:14; 149:1;
152:12, 20; 153:13;
159:19; 163:25; 164:12;
165:4, 7, 24; 167:20;
168:13; 169:25; 170:4, 6,
20; 171:4, 5; 172:8, 10;

178:21
upcoming 41:17
updated 42:10, 12
uphold 66:22
Upon 78:5; 120:6; 124:21
upper 61:18; 62:12;
78:20; 86:11; 93:21;
96:20; 99:4; 103:21;
114:16; 138:7; 141:13;
142:22
upset 80:14; 99:10;
100:17, 25; 153:20; 157:1;
165:16; 167:24
upsets 116:16
use 12:1; 29:21; 34:16;
59:13; 72:20; 83:17;
85:19; 89:16; 95:11;
100:22, 25; 124:16
used 19:7; 34:12; 35:25;
58:7, 8, 16; 92:15; 121:3;
125:8; 134:10, 11
using 28:14; 112:22;
133:25; 159:25
usually 30:23
utterly 28:18

## V

vacation 77:25; 78:1, 2;
80:2
vague 107:3
vaguer 134:11
various 118:19; 124:21
verbal 3:24
verses 63:12
version 42:12; 49:15, 25;
50:7; 51:11; 52:7; 109:22;
117:21; 118:9; 122:9;
124:1, 4; 127:10; 128:5,
21; 137:10, 10, 19; 138:4,
4; 139:25; 140:22; 141:18;
151:6; 154:5
versions 42:10; 97:12;
104:7; 109:18; 123:18, 22;
124:7, 21; 128:7; 140:15
Versus 59:16; 89:22
via 9:20
Vicki 3:22
videotape 56:15; 57:23
videotapes 56:11
view 133:8, 10; 134:1
viewing 90:25
views 124:15
vote 60:17; 63:22; 78:22;
121:16; 123:5, 6; 159:13;
167:9
voted 120:6; 121:15;
123:8; 124:21; 125:19;
129:13; 134:6; 167:5
voting 121:19, 20; 123:6;
125:11

Jennifer Miller
May 18, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

# W

wait 28:9; 32:10
waived 3:4
walked 38:24; 105:16; 145:8
walking 145:9, 10
warrant 54:10, 17
Warren 162:14
watched 56:15, 16
way 19:10; 21:23; 24:5; 33:14; 47:1; 48:23; 73:22; 74:7, 9, 17; 76:2; 91:21; 93:16; 95:16; 123:20; 134:5, 20; 135:16; 161:16; 170:9; 175:10; 178:21
ways 134:8
wears 10:8
week 26:21; 78:4
weeks 10:3; 78:10
Wenrich 67:1; 71:8; 113:5; 121:11, 23; 122:1, 5, 20; 143:19, 20; 144:24; 149:12; 150:17; 159:16
weren't 29:8; 54:8, 9; 107:3
what's 89:4
Whereas 24:10
White 5:12
whole 21:25; 25:11; 31:6; 96:2; 108:14; 112:9; 122:16; 145:8; 170:20; 172:2
whose 54:25; 61:20, 23; 70:13; 94:5
willing 55:20, 25; 69:8, 9; 84:14, 21; 102:4; 116:3; 125:24, 25
within 23:19
witness 3:7; 49:4; 71:13; 73:10; 93:20; 96:24; 110:10; 115:1; 157:19; 172:13
wondering 77:17; 88:10; 159:9, 10
word 19:7; 28:19; 29:17; 42:12; 53:1; 65:16; 81:7; 92:13, 13; 129:22, 22; 133:9; 173:18, 18
wording 74:5, 7; 121:13; 122:22; 142:13; 146:20, 22; 153:20
words 81:6; 92:15; 97:3; 101:4; 102:23; 103:3; 114:12; 116:17; 117:3; 127:19; 128:2; 153:18; 168:18
work 12:2; 15:9; 16:20; 106:18; 125:19
worked 138:8; 140:15; 164:17; 165:5
working 173:13
worried 40:20; 108:2, 7, 14; 109:4

worry 172:3
Wow 95:8
wrap 165:4
write 65:9; 68:14, 15; 69:2; 156:8; 157:13; 167:24
writer 167:22
writing 155:24; 178:22
written 14:18; 49:14, 21; 50:8; 65:21; 67:23; 133:12; 138:11; 152:7; 160:3; 167:23; 168:2; 179:7
wrong 59:1
wrote 61:23; 69:10; 88:3; 155:6; 156:8
Wynegar 111:22; 112:12

# X

X 156:22
Xeroxed 65:3
XI-A 115:2
XI-B 115:3, 21; 127:24
XI-C 115:3; 116:12; 117:11; 118:3; 123:11, 23; 124:6; 127:19, 24; 128:14
XIV 157:20

# Y

year 13:17, 18; 14:5; 17:4, 8, 17, 18; 18:4, 8, 9; 26:20; 27:22, 25; 28:3, 7, 9, 9, 15, 16, 24; 36:14; 38:11, 18; 39:9, 18; 41:17, 18, 21; 42:21; 44:7, 9, 9, 10; 46:12; 71:23; 72:13; 88:17
years 28:5; 34:4, 7; 38:13, 15, 16; 63:24; 69:4; 70:21
yell 161:14
yelled 145:1
yelling 145:1, 7, 8
Yingling 10:7; 71:4; 113:9; 123:3, 4; 150:19; 157:25
York 5:10, 12
Young 34:3
Younger 20:12