# APPENDIX I

# TAB O

# In The Matter Of:

*Tammy Kitzmiller, et al.   v.*
*Dover Area School District, et al.*

---

*Richard Nilsen*
*January 3, 2005*

---

*Filius & McLucas Reporting Service, Inc.*
*1427 East Market Street, York, PA*
*4309 Linglestown Road, Harrisburg, PA*

*(717) 845-6418   or   (717) 236-0623*

Original File RN010305.TXT, 114 Pages
Min-U-Script® File ID: 3385283062

# Word Index included with this Min-U-Script®

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Richard Nilsen
January 3, 200[5]

---

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

TAMMY KITZMILLER; et al., .
    Plaintiffs  .  CIVIL ACTION NO. 04-CV-2688
    vs.
DOVER AREA SCHOOL DISTRICT.   (JUDGE JONES)
et al.,  .
    Defendants

Deposition of      : RICHARD NILSEN
Taken by          : Plaintiffs
Date            : January 3, 2005, 9:30 a.m.
Before          : Vicki L. Fox, RMR,
        Reporter-Notary
Place          : Two School Lane
        Dover, Pennsylvania

APPEARANCES:
    PEPPER HAMILTON LLP
    BY: ERIC J. ROTHSCHILD, ESQUIRE
    ACLU OF PENNSYLVANIA
    BY: WITOLD WALCZAK, ESQUIRE
      For - Plaintiffs
    THOMAS MORE LAW CENTER
    BY: PATRICK T. GILLEN, ESQUIRE
      For - Defendants
    PARTIES: BETH EVELAND
        CYNTHIA SNEATH
        ARALENE AND FREDERICK CALLAHAN

---

Page 2

[1]          INDEX
[2]          WITNESS
[3] RICHARD NILSEN      Examination
[4]  By Mr. Rothschild     3, 111
[5]  By Mr. Gillen       108
[6]
[7]
[8]
[9]        EXHIBITS
[10] Plaintiff Deposition
    Exhibit Number     Page
[11]
  1. Complaint in Kitzmiller v. Dover Area School  7
[12] District.
[13] 2. Answer in Kitzmiller v. Dover Area School  7
    District.
[14]
  3. Dover Area School District, Board Press Release 48
[15] For Biology Curriculum --- 11-19-04; reposted 12-14-04.
[16] 4. NewsBank InfoWeb Articles from the York Dispatch 53
    and Daily Record.
[17]
  5. Dover Area School District Memorandums with 14
[18] Attachments, No. 000001 through 167.
[19] 8. Dover Area School District Biology I Planned 46
    Course/Curriculum Guide.
[20]
[21]
[22]
[23]
[24]
[25]

---

Page 3

[1]          STIPULATION
[2] It is hereby stipulated by and between the
[3] respective parties that sealing, certification and filing
[4] are waived; and that all objections except as to the form
[5] of the question are reserved until the time of trial.
[6]
[7]    RICHARD NILSEN, called as a witness, being duly
[8] sworn, was examined and testified, as follows:
[9]
[10]        BY MR. ROTHSCHILD:
[11]  Q: Good morning, Dr. Nilsen.
[12]  A: Good morning.
[13]  MR. GILLEN: I simply wish to note for the record
[14] that this deposition is being taken pursuant to the
[15] Court Order authorizing limited preliminary discovery
[16] for the purpose of determining whether the plaintiffs
[17] wish to file a temporary restraining order. That is our
[18] understanding of the Court's Order. And that the
[19] inquiry is limited in general to the origins of the
[20] policy at issue, its purpose and the events in the
[21] classroom on January 13th, 2005.
[22]  MR. ROTHSCHILD: That is a fair description of the
[23] Judge's rulings.
[24]
[25]

---

Page 4

[1]        BY MR. ROTHSCHILD:
[2]  Q: Good morning, Mr. Nilsen. I have introduced myself off
[3] the record, but let me introduce myself on the record.
[4] My name is Eric Rothschild. I am from the law firm of
[5] Pepper, Hamilton, and I am here representing the
[6] Plaintiffs in the lawsuit against the Dover Area School
[7] District and Dover Area School District Board of
[8] Directors. And your deposition is going to be taken in
[9] that matter.
[10]  Do you understand that?
[11]  A: Yes.
[12]  Q: I am joined here at the deposition by Vic Walczak of the
[13] ACLU.
[14]  Mr. Nilsen, what is your current employment?
[15]  A: Dover Area School District.
[16]  Q: What is your position at the Dover Area School District?
[17]  A: Superintendent.
[18]  Q: How long have you held that position?
[19]  A: Three years.
[20]  Q: Have you ever had your deposition taken before?
[21]  A: Yes.
[22]  Q: What were the circumstances?
[23]  A: Deposition with this situation or any deposition?
[24]  Q: Any deposition.
[25]  A: Court matter dealing with an employe.

---

Richard Nilsen
January 3, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

Page 5

[1] Q: And that was in your capacity as a Superintendent?

[2] A: Yes.

[3] Q: And is that the only time you have had your deposition

[4] taken?

[5] A: Yes.

[6] Q: Are you represented by counsel today?

[7] A: Yes.

[8] Q: And who is that attorney?

[9] A: The gentleman to my right Patrick Gillen.

[10] Q: What were the circumstances in which you engaged him to

[11] represent you?

[12] A: The Dover Area School Board elected Thomas More Center

[13] to represent the School District.

[14] Q: When did that happen?

[15] A: Sometime in the middle of December.

[16] Q: Prior to that, did you have any attorney/client

[17] relationship with Mr. Nilsen or his law firm?

[18] A: Mr. Nilsen or his law firm?

[19] Q: I am sorry, Mr. Gillen or his law firm. I apologize.

[20] A: No.

[21] Q: Do you know whether the School District had any

[22] attorney/client relationship with Mr. Gillen and his law

[23] firm prior to that decision in the middle of December?

[24] A: No.

[25] Q: Do you know whether the School Board had any

---

Page 6

[1] attorney/client relationship with Mr. Gillen or his law

[2] firm prior to that decision in the middle of December?

[3] A: I can't speak to that.

[4] Q: You don't know one way or the other?

[5] A: No.

[6] Q: Do you know whether any individual members of the School

[7] Board had an attorney/client relationship with

[8] Mr. Gillen or his law firm?

[9] A: I don't know that.

[10] Q: You have had a deposition taken before, but I am just

[11] going to remind you a little bit about the process and

[12] some of the ground rules.

[13] I am going to ask you questions hopefully slower

[14] than I have been before, and you will answer. Our

[15] questions and answers will be taken down by Ms. Fox, the

[16] court reporter.

[17] In order to get a clear record and to make her job

[18] a little easier, one thing I am going to do is slow

[19] down. Some other things we can do is I am going to ask

[20] that you allow me to finish my questions before you

[21] answer so that she can get my entire question. And I

[22] will try to do the same while you are answering.

[23] Do you understand that?

[24] A: Yes.

[25] Q: I also need you to answer audibly with words as you have

---

Page 7

[1] been rather than with gestures or nods or audible sounds

[2] that are not words because the record will not be clear

[3] if you communicate in that fashion.

[4] Do you understand that?

[5] A: Yes.

[6] Q: If there is any question that I ask you that you don't

[7] understand, please let me know, and I will try and

[8] clarify for you; okay?

[9] A: Yes.

[10] Q: This is not an endurance contest. You should feel free

[11] to take a break at any time. Just please let me know,

[12] and then we will go off the record, and we will all take

[13] a break. Okay?

[14] A: Yes.

[15] (Plaintiff Deposition Exhibit 1 was marked.)

[16] BY MR. ROTHSCHILD:

[17] Q: I am going to show you two documents that we have marked

[18] as P-1 and P-2. The first document, P-1 is the

[19] Complaint filed by plaintiffs in this matter.

[20] Could you take a look at that?

[21] A: (Witness complies.)

[22] Q: Have you seen that document before?

[23] A: Yes.

[24] (Plaintiff Deposition Exhibit 2 was marked.)

[25]

---

Page 8

[1] BY MR. ROTHSCHILD:

[2] Q: I am going to show you a document we have marked as P-2

[3] which is the Answer filed on behalf of the School

[4] District and the School District Board of Directors —

[5] or the Answer that was provided to us today. I don't

[6] know whether it was filed with the Court yet.

[7] MR. GILLEN: Right. Do you have a copy for me?

[8] MR. ROTHSCHILD: Sure.

[9] A: Yes.

[10] BY MR. ROTHSCHILD:

[11] Q: I just handed you P-2, which is the Answer that was

[12] prepared on behalf of the School District and the School

[13] Board and provided to us today.

[14] Have you seen that document?

[15] A: Yes.

[16] Q: Have you read through the answer?

[17] A: Yes.

[18] Q: To the best of your knowledge, is the information

[19] contained in that Answer correct?

[20] A: To the best of my knowledge, yes.

[21] Q: Is there anything in the Answer that you saw that you

[22] disagreed with?

[23] A: No.

[24] Q: Did you do anything to prepare for this deposition?

[25] A: Yes.

---

Min-U-Script®   Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Richard Nilsen
January 3, 200!

Page 9

[1]  **Q:** What did you do?

[2]  **A:** Met with the attorneys.

[3]  **Q:** When did you do that?

[4]  **A:** Last night.

[5]  **Q:** Where did you meet?

[6]  **A:** Here.

[7]  **Q:** For how long?

[8]  **A:** Four hours.

[9]  **Q:** Was anybody else — which attorneys were present?

[10] **A:** Mr. Pat Gillen and Dick Thompson.

[11] **Q:** Was anybody else present during that meeting?

[12] **A:** Yes.

[13] **Q:** Who else was present?

[14] **A:** Mr. Alan Bonsell, Mrs. Sheila Harkins, Mr. Bill
[15] Buckingham and Mr. Mike Baksa.

[16] **Q:** The first three individuals you mentioned are members of
[17] the School Board?

[18] **A:** Yes.

[19] **Q:** What is Mr. Baksa's position?

[20] **A:** Assistant Superintendent.

[21] **Q:** Other than meeting with counsel last night, have you had
[22] any other communications?

[23] **MR. GILLEN:** Objection, unclear. Meeting in
[24] person?

[25] **MR. ROTHSCHILD:** Yes.

Page 10

[1]  **MR. GILLEN:** Okay, meeting in person.

[2]  **BY MR. ROTHSCHILD:**

[3]  **Q:** Other than your meeting in person with counsel last
[4]  night, have you had any other face-to-face in person
[5]  meetings with Mr. Gillen or Mr. Thompson or anybody else
[6]  representing the School District or School Board in this
[7]  lawsuit?

[8]  **A:** Yes.

[9]  **Q:** Who did you meet with?

[10] **A:** I met with Mr. Thompson.

[11] **Q:** When was that?

[12] **A:** On two occasions.

[13] **Q:** What were those occasions?

[14] **A:** The School Board meeting and the meeting with the Judge
[15] in Washington — in Harrisburg.

[16] **Q:** Are those the only — does that exhaust all the
[17] face-to-face meetings between you and counsel?

[18] **A:** No.

[19] **Q:** What other face-to-face meetings have you had with
[20] counsel?

[21] **A:** At the same time, Robert Muise from Thomas More.

[22] **Q:** When you say at the same time, do you mean —

[23] **A:** The Board meeting and the meeting with the Judge.

[24] **Q:** Does that exhaust all your meetings with counsel for the
[25] District in this matter?

Page 11

[1]  **MR. GILLEN:** Objection.

[2]  **BY MR. ROTHSCHILD:**

[3]  **Q:** Face-to-face meetings.

[4]  **MR. GILLEN:** Thank you.

[5]  **A:** Yes.

[6]  **BY MR. ROTHSCHILD:**

[7]  **Q:** Have you also had communications with him by phone?

[8]  **A:** Yes.

[9]  **Q:** On how many occasions?

[10] **A:** Between five and ten.

[11] **Q:** Prior to the Thomas More Law Center being engaged as
[12] counsel in the middle of December, did you have any
[13] communications of any kind with the Thomas More Law
[14] Center?

[15] **A:** Yes.

[16] **Q:** When were those?

[17] **A:** In the fall sometime.

[18] **Q:** Can you estimate what month?

[19] **A:** No.

[20] **Q:** What were the circumstances that you had communications
[21] with the Thomas More Law Center?

[22] **A:** A question about Of Pandas And People book.

[23] **Q:** Who participated in that call?

[24] **A:** Dick Thompson and me.

[25] **Q:** Who initiated the contact?

Page 12

[1]  **A:** I did.

[2]  **Q:** What caused you to call the Thomas More Law Center?

[3]  **A:** My own question.

[4]  **Q:** What was your question?

[5]  **A:** Whether he knew of any School District that was using
[6]  the book.

[7]  **Q:** How did you become aware of the Thomas More Law Center
[8]  before making the call?

[9]  **A:** Mr. Bill Buckingham, a School Board member, said —
[10] communicated about the Law Center.

[11] **Q:** Did you get an answer to your question from
[12] Mr. Thompson?

[13] **A:** Yes.

[14] **Q:** What was that answer?

[15] **A:** He was not aware of any School District that used the
[16] book.

[17] **Q:** Was that the entire substance of your conversations?

[18] **A:** Yes.

[19] **Q:** Do you know whether Mr. Buckingham had communicated
[20] with
[21] the Thomas More Law Center prior to the time you called
[22] them?

[23] **A:** I won't speak anything about what Mr. Buckingham did or
[24] did not do. I don't remember.

[25] **Q:** You don't know?

[26] **A:** Or I forgot.

Richard Nilsen
January 3, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 13

[1]    Q: Could you turn to Exhibit P-1?

[2]    A: (Witness complies.)

[3]    Q: Starting on the first page, the Complaint states that

[4] the School District Board passed a resolution and then

[5] states the text of a resolution.

[6]    Do you recognize the language on the top of page

[7] two of the Complaint starting with students will be made

[8] aware of gaps/problems in Darwin's theory as being the

[9] content of the resolution that the School District Board

[10] passed on October 18th modifying the biology curriculum?

[11]    A: Yes.

[12]    Q: Do you know who prepared the text of the resolution?

[13]    A: Yes.

[14]    Q: Who prepared it?

[15]    A: The School Board members.

[16]    Q: Do you know which School Board members prepared the

[17] text?

[18]    A: No.

[19]    Q: Do you know whether anyone besides School Board members

[20] participated in preparing the resolution?

[21]    A: The resolution you speak of was a combination of many

[22] different documents. The documents that were used were

[23] prepared from the Assistant Superintendent's Office.

[24]    Q: When you are talking about preparing the documents, you

[25] are talking about literally typing them up and running

Page 14

[1] them off?

[2]    A: I am talking about that as well as generating the

[3] information.

[4]    Q: Who drafted the text? Who participated in the drafting

[5] of the text of the resolution other than the School

[6] Board members, if anyone?

[7]    A: Again, you are not hearing. The resolution was a

[8] combination of three different documents.

[9]    Q: Okay.

[10]    A: Those three different documents generated out of the

[11] Assistant Superintendent's Office. The document you see

[12] in front of you is a combination of those three

[13] documents. So the specific resolution in front of you

[14] that is noted on top of page two is a combination of a

[15] discussion that happened on October 18th from three

[16] different documents.

[17]    (Deposition Exhibit P-5 was marked.)

[18]           BY MR. ROTHSCHILD:

[19]    Q: I am going to show you a document that we have marked as

[20] P-5. It is a composite of the initial production

[21] provided by your counsel to plaintiffs on Thursday,

[22] December 30th. It begins with the numbers 000001 and

[23] concludes with the numbers 000167.

[24]    MR. GILLEN: Look through them.

[25]

Page 15

[1]           BY MR. ROTHSCHILD:

[2]    Q: Mr. Nilsen, I am going to ask you about a specific group

[3] of documents in this collection which begin with the

[4] numbers 000139 and end with the numbers 000151.

[5]    Are the documents beginning at 146 and ending at

[6] 151 the three documents you are referring to from which

[7] the final Board resolution was comprised?

[8]    A: Can you repeat the numbers, again, please? 146 to what?

[9]    Q: 151.

[10]    A: Yes.

[11]    Q: If you could, turn to page 148 which is a memo

[12] indicating that these are the recommended changes to the

[13] biology curriculum from the Board curriculum committee.

[14] Do you see that?

[15]    A: Yes.

[16]    Q: Do you know who prepared the language in the recommended

[17] change underneath this memo?

[18]    A: Could you define prepared?

[19]    Q: Who devised the language?

[20]    A: No, I don't know.

[21]    Q: How did you first become aware of this recommended

[22] change from the Board of Curriculum Committee?

[23]    A: Mr. Baksa, who is on 148, gave it to me to give as an

[24] attachment to the Board agenda.

[25]    Q: He did not tell you who had prepared the language?

Page 16

[1]    A: No.

[2]    Q: Mr. Nilsen, the draft resolution uses the term

[3] Intelligent Design. What do you understand Intelligent

[4] Design to mean as used in this resolution?

[5]    A: Which resolution?

[6]    Q: The resolution that is the final resolution that is set

[7] forth in the Complaint.

[8]    A: That scientifically, evolution has a design.

[9]    Q: Anything else?

[10]    A: No.

[11]    Q: Where did you gain that understanding?

[12]    A: In discussions I have had with numerous individuals.

[13]    Q: Can you identify those individuals?

[14]    A: Counsel, Board members.

[15]    Q: Anybody else?

[16]    A: To my recollection, no.

[17]    Q: When you refer to counsel, are you referring to

[18] attorneys from the Thomas More Law Center?

[19]    A: Yes.

[20]    Q: Are there specific Board members that imparted that

[21] understanding to you?

[22]    A: Yes.

[23]    Q: Who?

[24]    A: Present Board members.

[25]    Q: Can you name them? I don't mean name all the present

Min-U-Script®   Filius  &  McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Richard Nilse
January 3, 200

---

**Page 17**

[1] Board members. I mean the ones that imparted the
[2] understanding.
[3]    A: I would end up saying in a general sense all of the
[4] present Board members, I have had discussions with the
[5] definition of Intelligent Design which would necessitate
[6] me to name all of them.
[7]    Q: So it would be all?
[8]    A: To the best of my recollection.
[9]    Q: You used the phrase that scientifically evolution has a
[10] design. What do you mean by evolution in that sentence?
[11]    A: The evolving nature.
[12]    Q: That's it?
[13]    A: Yes.
[14]    Q: Other than talking to these Board members and lawyers,
[15] did you do anything else to investigate the subject of
[16] Intelligent Design?
[17]    A: No.
[18]    Q: Do you know whether anybody else employed by the — have
[19] you asked anybody else employed by the School District
[20] to investigate Intelligent Design?
[21]    A: Specifically Intelligent Design, no.
[22]    Q: Why do you qualify that by specifically?
[23]    A: The responsibility of the Curriculum Director Assistant
[24] Principal's is to research everything in the area of
[25] curriculum. So I would have required of him to research

**Page 18**

[1] anything that is associated with curriculum.
[2]    Q: Who are you referring to?
[3]    A: Mr. Baksa.
[4]    Q: Do you know whether Mr. Baksa did any investigation of
[5] Intelligent Design?
[6]    A: I do not know that.
[7]    Q: Did you ever specifically instruct him to investigate
[8] Intelligent Design?
[9]    A: No.
[10]    Q: Did you ever specifically instruct any members of the
[11] Dover High School faculty to investigate Intelligent
[12] Design?
[13]    A: No.
[14]    Q: Does Intelligent Design differ from Darwin's theory of
[15] evolution?
[16]    A: I don't know.
[17]    Q: Do you understand Intelligent Design to involve the work
[18] of a master intellect?
[19]    A: No, not solely.
[20]    Q: Does the concept of Intelligent Design involve in any
[21] way the work of a master intellect?
[22]    A: Is that possible as part of it? Yes.
[23]    Q: What leads you to say that?
[24]    A: There are other concepts beyond master intellect.
[25]    Q: What are the other concepts?

**Page 19**

[1]    A: There is a design function beyond the randomness of
[2] Darwinian theory.
[3]    Q: What is the mechanism for that design function?
[4]    A: Don't know.
[5]    Q: Do you know of any other explanation for the operation
[6] of design function other than that of a master
[7] intellect?
[8]    A: How do you define master intellect?
[9]    Q: Are you aware of Intelligent Design asserting that there
[10] — that a master intellect is working?
[11]    A: How do you define master intellect?
[12]    Q: Using the terms from the textbook, are you not familiar
[13] with the term master intellect?
[14]    A: I'm not familiar with it as you define it.
[15]    Q: Have you heard the term master intellect used in
[16] relationship to Intelligent Design?
[17]    A: Not that I can recall.
[18]    Q: Okay. What do you understand the term intelligent to
[19] mean in the phrase Intelligent Design?
[20]    A: That there is no randomness.
[21]    Q: When was the first time you heard about Intelligent
[22] Design?
[23]    A: July of 2004.
[24]    Q: How did you hear about it?
[25]    A: I don't recall.

**Page 2**

[1]    Q: Do you know what person or persons brought the idea of
[2] Intelligent Design to your attention?
[3]    A: No.
[4]    Q: Do you remember any of the circumstances in which
[5] Intelligent Design came to your attention?
[6]    A: No.
[7]    Q: When was the first time you heard of the Pandas book?
[8] When I refer to Pandas book, do you know what I am
[9] referring to?
[10]    A: Yes.
[11]    Q: That is the book that has been donated to the School
[12] District?
[13]    A: Is that a question?
[14]    Q: Yes.
[15]    A: Yes.
[16]    Q: When was the first time you heard of the Pandas book?
[17]    A: My recollection is in July of 2004.
[18]    Q: How did you become aware of the Pandas book?
[19]    A: Mr. Buckingham, a School Board member.
[20]    Q: How did he bring it to your attention?
[21]    A: That he was interested in having that book as part of
[22] the curriculum.
[23]    Q: Did he say why he wanted that book as part of the
[24] curriculum?
[25]    A: My recollection is that he wanted that as another

---

Richard Nilsen
January 3, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 21

[1] discussion item.

[2]   Q: Another discussion item for what?

[3]   A: For the biology curriculum.

[4]   Q: Why did he want that as another discussion item?

[5]   A: I won't speak for Mr. Buckingham.

[6]   Q: Did he say why he wanted it as another discussion item?

[7]   A: My recollection is he wanted other options discussed

[8] beyond what was in the teacher, administration

[9] recommended book.

[10]   Q: Did you have an understanding as to why he wanted other

[11] options?

[12]   A: I believe he was trying for a balanced view.

[13]   Q: Why do you think he wanted a balanced view?

[14]   A: I won't speak to that.

[15]   Q: What was your understanding of why he wanted a balanced

[16] view?

[17]   A: Because he believed the Darwinian theory was not the

[18] only theory.

[19]   Q: Did you have an understanding of what he meant when he

[20] said he wanted a balanced view?

[21]   A: I am sorry. I thought I answered that he wanted other

[22] options.

[23]   Q: Was he specific about what kind of other options he

[24] wanted?

[25]   A: I'm sorry. Could you state that again?

Page 22

[1]   Q: Did he state what other kind of options he wanted in the

[2] biology curriculum when evolution was taught?

[3]   A: Beyond the Of Pandas and People book? To me, no, not

[4] that I can recollect.

[5]   Q: Could you turn to page six in Exhibit P-2 which is the

[6] Answer?

[7]   A: (Witness complies.)

[8]   Q: In the first full paragraph, the Answer states that the

[9] DASD Biology Curriculum Policy does not advance

[10] religion, but merely provides the students of Dover High

[11] School with an honest science education for the valid

[12] and clearly secular purpose of enhancing the science

[13] curriculum by informing students about the existing

[14] scientific controversy surrounding Darwin's Theory of

[15] Evolution, including the fact that there are alternative

[16] scientific theories being advanced by scientists.

[17]   Do you understand that to be an accurate

[18] recitation of the District's purpose in changing the

[19] biology curriculum?

[20]   A: Yes.

[21]   Q: Does that state the — is that a full statement of the

[22] District and Board's purpose in amending the biology

[23] curriculum?

[24]   A: Yes.

[25]   Q: Do the District have any other purpose in amending the

Page 23

[1] biology curriculum?

[2]   A: When you say District, who are you speaking of?

[3]   Q: The School District which you work for.

[4]   A: Again, you need to differentiate that. Meaning there

[5] are various components of the School District. There is

[6] Board members. There is administration. There is

[7] teachers, and there is me. I can't speak for anybody

[8] beyond me.

[9]   Q: Okay. Can you speak for administration?

[10]   A: I can only speak for me.

[11]   Q: Does this statement here reflect your understanding of

[12] the purpose in amending the biology curriculum?

[13]   A: My purpose, yes.

[14]   Q: Did you have any other purpose?

[15]   A: No.

[16]   Q: To your understanding, does this reflect the Board's

[17] understanding in amending the biology curriculum?

[18]   A: I won't speak for the Board.

[19]   Q: Do you have any understanding in what the Board's

[20] purpose was in amending the biology curriculum?

[21]   A: I can state it this way: The Board members that I'm

[22] aware of that reviewed this paragraph supported this

[23] paragraph.

[24]   Q: Other than the fact that they reviewed and supported

[25] this paragraph, do you have any other understanding

Page 24

[1] about what the Board's purpose was in passing the

[2] resolution that amended the biology curriculum?

[3]   A: No.

[4]   Q: What Board members were you referring to who reviewed

[5] this paragraph?

[6]   A: Mrs. Harkins, Board President, Mr. Buckingham and

[7] Mr. Bonsell.

[8]   Q: Do you know whether any other Board members have

[9] reviewed the Answer?

[10]   A: No.

[11]   Q: You don't know, or you know they have not?

[12]   A: I don't know if anybody has reviewed it. All I know is

[13] who reviewed it last night.

[14]   Q: Have you read the Pandas book?

[15]   A: No. I have looked at it, skimmed it, but I have not

[16] read it.

[17]   Q: Do you live in Dover?

[18]   A: No.

[19]   Q: Where do you live?

[20]   A: Fairview Township, West Shore School District.

[21]   Q: Prior to working as Superintendent for the Dover Area

[22] School District, what was your job?

[23]   A: Assistant Superintendent for the Dover Area School

[24] District.

[25]   Q: How long did you hold that position?

Min-U-Script®     Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Richard Nilse
January 3, 200

---

Page 25

[1]  A: Three and a half years.

[2]  Q: When you were Assistant Superintendent, did you have

[3] responsibilities for curriculum as Mr. Baksa does now?

[4]  A: Yes.

[5]  Q: And prior to becoming Assistant Superintendent, what did

[6] you do?

[7]  A: Director of Curriculum Instruction.

[8]  Q: For Dover area?

[9]  A: No. Big Springs School District.

[10]  Q: How long did you hold that position?

[11]  A: Five years. Five or six.

[12]  Q: And prior to that?

[13]  A: High School Principal, Big Springs School District.

[14]  Q: How long did you hold that position?

[15]  A: Total five years.

[16]  Q: You used the word total. Was it broken up?

[17]  A: Yes.

[18]  Q: Why was that?

[19]  A: I was acting one year, then returned to the Assistant

[20] Principal's position. I then went to another District

[21] for three years, then returned for four.

[22]  Q: When you were in the other District, were you also

[23] Principal?

[24]  A: Yes.

[25]  Q: Prior to taking positions as a Principal or Assistant

Page 26

[1] Principal, were you ever a schoolteacher?

[2]  A: Yes.

[3]  Q: What subjects did you teach?

[4]  A: Social studies.

[5]  Q: How long did you do that?

[6]  A: Five and a half years.

[7]  Q: Where did you get your degree?

[8]  A: Which one?

[9]  Q: What degrees do you have?

[10]  A: I have an undergraduate BA in social studies from Gordon

[11] College. I have a Master's in Administration from

[12] Shippensburg University, and I have a doctorate from

[13] Temple University. So I am actually Dr. Nilsen.

[14]  Q: During any of your college and post graduate education,

[15] did you take any science courses?

[16]  A: No. Wait a minute. You said undergraduate?

[17]  MR. GILLEN: He did I believe.

[18]  A: Yes.

[19]  BY MR. ROTHSCHILD:

[20]  Q: Did you take any biology courses?

[21]  A: No. I took a theory of science I believe.

[22]  Q: While you were an undergraduate?

[23]  A: Yes.

[24]  Q: That is the only science subject you can remember taking

[25] as an undergraduate?

---

Page 2

[1]  A: No. I am sorry. That is over 30 years ago. That is

[2] all I remember.

[3]  Q: Have you attended any courses or lectures or seminars

[4] relating to the subjects of evolution, Intelligent

[5] Design, creation or Creationism?

[6]  A: No.

[7]  Q: How often does the Dover Area School Board meet?

[8]  A: Usually twice a month.

[9]  Q: Do you attend all those meetings?

[10]  A: Yes.

[11]  Q: Who keeps the minutes of those meetings?

[12]  A: The secretary.

[13]  Q: How is the secretary position selected?

[14]  A: To clarify, the Board approves a secretary. Our current

[15] secretary of the Board is battling cancer and has not

[16] been in the District for over a year and a half. We

[17] have had an Acting Secretary who the Board formally

[18] approved as Assistant Secretary.

[19]  On one occasion, October 18th, we had an

[20] additional individual sit in as the Board secretary.

[21]  Q: In place of the Acting Secretary?

[22]  A: Yes.

[23]  Q: Is it the practice of the Board to record the meeting?

[24]  A: Yes.

[25]  Q: What is done with those recordings after the meeting is

Page 28

[1] completed?

[2]  A: They are kept until the Board officially approves the

[3] minutes. After the approval of the minutes, the tapes

[4] are destroyed.

[5]  Q: Who developed the policy of destroying the tapes after

[6] the minutes are approved?

[7]  A: Don't know. It happened prior to me.

[8]  Q: Are there any circumstances where the full Board meets

[9] that is not open to the public?

[10]  A: Yes.

[11]  Q: Is there a name for those kinds of meetings?

[12]  A: Executive session.

[13]  Q: Do you attend those sessions?

[14]  A: Some.

[15]  Q: What are the — let me back up. Is it your

[16] responsibility to attend all the full public Board

[17] meetings?

[18]  A: Yes.

[19]  Q: What are the circumstances where you will attend an

[20] executive session meeting?

[21]  A: If requested by the Board to attend.

[22]  Q: Does anyone record what is said in the executive session

[23] meetings?

[24]  A: No.

[25]  Q: Who developed the policy of not recording executive

---

**Richard Nilsen**
**January 3, 2005**

Page 29

[1] session meetings?

[2]    A: Don't know.

[3]    Q: Are any minutes produced for executive session meetings?

[4]    A: No.

[5]    (Aralene D. And Frederick B. Callahan exit the

[6] conference room.)

[7]                BY MR. ROTHSCHILD:

[8]    Q: Is it your practice to take notes during Board meetings?

[9]    A: Yes.

[10]    Q: What do you do with those notes after the meeting is

[11] concluded?

[12]    A: After I have implemented what my notes say, I destroy

[13] them.

[14]    Q: Is it your practice to take notes at executive sessions?

[15]    A: Yes.

[16]    Q: Is it also your practice to destroy those notes after

[17] you have implemented whatever your responsibilities are?

[18]    A: Yes.

[19]    Q: Do you memorialize your task lists from those meetings

[20] in any other form such as on your computer?

[21]    A: No.

[22]    Q: Does the Board have a curriculum committee?

[23]    A: Yes.

[24]    Q: How is the curriculum committee selected?

[25]    A: The Board President.

Page 30

[1]    Q: Is there a chair of the curriculum committee?

[2]    A: Yes.

[3]    Q: How is that person selected?

[4]    A: Board President.

[5]    Q: How are the members of the curriculum committee

[6] selected?

[7]    A: Board President.

[8]    Q: How often does the curriculum committee meet?

[9]    A: When required.

[10]    Q: Are there any regularly scheduled meetings?

[11]    A: No.

[12]    Q: How is a meeting scheduled?

[13]    A: When either a Board chairperson requests or the

[14] Assistant Superintendent for Curriculum requests.

[15]    MR. ROTHSCHILD: Can you read that back?

[16]    (Last question and answer were read by the court

[17] reporter.)

[18]                BY MR. ROTHSCHILD:

[19]    Q: When you say a Board chairperson, you are referring to

[20] the chair of the curriculum committee?

[21]    A: Yes.

[22]    Q: Who attends the curriculum committee meetings?

[23]    A: Which curriculum committee meeting?

[24]    Q: Any curriculum committee meetings.

[25]    A: There are two separate curriculum committees.

Page 31

[1]    Q: Can you describe those two committees?

[2]    A: There is the Board curriculum committee, and then there

[3] is the community curriculum committee.

[4]    Q: Let's start with the Board curriculum committee. Who

[5] are the members of the Board curriculum committee?

[6]    A: The Board members and the Assistant Superintendent.

[7]    Q: Does anybody besides those individuals attend curriculum

[8] committee meetings?

[9]    A: If requested, yes.

[10]    Q: Does faculty attend curriculum committee meetings?

[11]    A: Which curriculum committee meeting?

[12]    Q: The Board curriculum committee.

[13]    A: If requested, yes.

[14]    Q: What are the circumstances under which a faculty member

[15] is requested to attend curriculum committee meetings?

[16]    A: If there is a question about a specific issue that the

[17] Board is reviewing, or it could be another

[18] administrator.

[19]    Q: In your experience, has it been the Board curriculum

[20] committee's practice to include faculty in the subject

[21] matter being discussed by the curriculum committee?

[22]    A: Which curriculum committee?

[23]    Q: The Board curriculum committee. If the subject is

[24] chemistry, has it been the committee's practice to

[25] invite a chemistry teacher?

Page 32

[1]    A: No.

[2]    Q: What is the community curriculum committee?

[3]    A: The committee chaired by the Assistant Superintendent

[4] for curriculum that has teachers, community members,

[5] Board members and administrators on it.

[6]    Q: Can you describe the functions of each of these

[7] committees in developing curriculum for the School

[8] District?

[9]    A: The Assistant Superintendent is in charge of developing

[10] the curriculum in conjunction with the teachers, brings

[11] those recommendations to the community curriculum

[12] committee, then brings those recommendations to the

[13] Board curriculum committee meeting.

[14]    Q: And then would the next step in the process be —

[15]    A: To the full Board.

[16]    Q: Just to make sure the answer is clear, the process is

[17] that the Assistant Superintendent and faculty make

[18] recommendations first to the community curriculum

[19] committee, then their recommendations go on to the Board

[20] curriculum committee, and their recommendations then go

[21] on to the full Board?

[22]    A: Yes.

[23]    Q: Is that practice the subject of written policy?

[24]    A: No.

[25]    Q: How was that practice developed?

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Richard Nilsen
January 3, 2005

Page 33

[1]    A: Prior to when I arrived.
[2]    Q: Did you follow that practice during the time that you
[3] were Assistant Superintendent?
[4]    A: Yes.
[5]    Q: Did you ever deviate from that practice?
[6]    A: I don't remember deviating from it.
[7]    Q: Has that continued to be the practice during your tenure
[8] as Superintendent?
[9]    A: Yes.
[10]    Q: Are you aware of that ever being deviated from?
[11]    A: To my knowledge, no.
[12]    Q: Do you know whether that practice was deviated from in
[13] the development of the change in the biology curriculum?
[14]    A: It was not deviated.
[15]    Q: So it's your understanding that the process was that the
[16] Assistant Superintendent and faculty made
[17] recommendations to the community curriculum committee,
[18] and they made recommendations to the Board committee,
[19] and then their recommendations were made to the full
[20] Board?
[21]    A: Yes. And in fact, there is an intermediate step of
[22] where when the Board was reviewing — when the Board
[23] District — I'm sorry. When the Board curriculum
[24] committee had recommendations that were going to the
[25] full Board, the Assistant Superintendent sent to the

Page 34

[1] full curriculum committee what those changes were after
[2] they had their original recommendation.
[3]    So they were involved not in the official meeting,
[4] but in the communication of what the Board curriculum
[5] committee was doing.
[6]    Q: A little while ago, you described your communications
[7] with the Thomas More Law Center in the fall of 2004.
[8]    Other than that communication, have you had any
[9] communications with anybody outside the District prior
[10] to the October 18th, 2004 resolution being passed
[11] regarding the biology curriculum?
[12]    A: Yes.
[13]    Q: Who have you had communications with?
[14]    A: Hundreds of e-mails, letters and phone calls.
[15]    Q: Prior to the resolution being passed?
[16]    A: Oh, my apologies.
[17]    Q: That's all right.
[18]    A: You are talking about the October 18th resolution?
[19]    Q: Correct.
[20]    A: I do not remember anybody prior to the October 18th me
[21] personally communicating with.
[22]    Q: Do you know whether anybody employed by the School
[23] District had communications with anybody outside of the
[24] District about the biology curriculum?
[25]    A: I cannot speak to that. I don't know.

Page 35

[1]    Q: Do you know whether anybody on the School Board had
[2] communications regarding the biology curriculum with
[3] individuals or organizations outside the District?
[4]    A: Prior to October 18th?
[5]    Q: Correct.
[6]    A: I can't speak to that.
[7]    Q: So you don't know?
[8]    A: I'm not sure.
[9]    Q: It is possible?
[10]    A: Is it possible?
[11]    Q: Yes.
[12]    A: Anything is possible.
[13]    Q: Do you have any knowledge? Is this I don't remember, or
[14] you don't know at all?
[15]    A: My comment is I know of individuals that have discussed
[16] topics. I don't know whether it was before the October
[17] 18th or after.
[18]    Q: What individuals are you referring to?
[19]    A: Mr. Bill Buckingham and Mr. Alan Bonsell.
[20]    Q: Do you know who they have talked to?
[21]    A: I can't speak for them.
[22]    Q: You used the phrase speak for them. I want to make sure
[23] that we are distinguishing between something you don't
[24] know and something you don't want to say.
[25]    Is it something you don't know or something you

Page 36

[1] don't want to say?
[2]    A: I don't want to say.
[3]    Q: I would like your knowledge about who they have spoken
[4] to.
[5]    MR. GILLEN: If I might, Eric. Do you know
[6] meaning do you know personally versus do you have an
[7] understanding? Maybe if you asked it that way.
[8]    MR. ROTHSCHILD: I think either.
[9]    A: For a fact, unequivocally on the record, I don't know.
[10]    BY MR. ROTHSCHILD:
[11]    Q: Do you have an understanding of whether Mr. Buckingham
[12] or Mr. Bonsell have talked to anybody outside of the
[13] District?
[14]    A: I have an understanding.
[15]    Q: What is your understanding?
[16]    A: That Mr. Buckingham also spoke with the Discovery
[17] Institute.
[18]    Q: What is your understanding of what the Discovery
[19] Institute is?
[20]    A: It is an organization in western United States that
[21] deals with scientific options.
[22]    Q: How do you know that?
[23]    A: I have talked with their attorneys.
[24]    Q: When did you talk to their attorneys?
[25]    A: Face-to-face, sometime in December. And over the past

Richard Nilsen
January 3, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

Page 37

[1] two weeks periodically.

[2]     MR. GILLEN: Were any of those discussions in

[3] connection with the requests for legal advice about the

[4] subject matter of this dispute?

[5]     A: Yes.

[6]     MR. GILLEN: To the extent that those

[7] conversations relate to discussions you had with

[8] Discovery Institute attorneys seeking legal advice in

[9] connection with this dispute, do not respond.

[10]     A: Okay.

[11]                 BY MR. ROTHSCHILD:

[12]     Q: Can you tell me circumstances in which you did — the

[13] circumstances that resulted in you having discussions

[14] with the Discovery Institute?

[15]     A: The legal matter.

[16]     Q: Did you call them, or did they call you?

[17]     A: They called us.

[18]     Q: What did they say when they called you?

[19]     A: They wanted to discuss the lawsuit.

[20]     Q: Who did you talk with there?

[21]     A: Seth Cooper, And another gentleman whose name I forget.

[22]     Q: Do you know if Seth Cooper is a lawyer?

[23]     A: That is my understanding.

[24]     Q: Do you know if the other person was a lawyer?

[25]     A: Yes.

Page 38

[1]     Q: What did you say when they said they wanted to discuss

[2] the lawsuit?

[3]     A: Come on in and discuss it.

[4]     Q: And when did you have that first contact?

[5]     A: The meeting was set up sometime in December.

[6]     Q: Were you ever authorized by the School Board to have

[7] communications with the Discovery Institute?

[8]     A: Officially, no.

[9]     Q: When was your next contact with them?

[10]     A: Prior to the Board meeting on — I'm trying to remember

[11] the date — the 18th.

[12]     MR. GILLEN: Of?

[13]     A: December.

[14]                 BY MR. ROTHSCHILD:

[15]     Q: Where did you meet?

[16]     A: North Salem Elementary.

[17]     Q: How did your discussions with them at that meeting

[18] begin?

[19]     A: A discussion on whether they would be the law firm.

[20]     MR. GILLEN: I'm sorry, Eric. Again, you can

[21] discuss how they begin, but don't discuss the subject

[22] matter of the discussion.

[23]     MR. ROTHSCHILD: Patrick, we need to really

[24] discuss whether this is an attorney/client communication

[25] here because Mr. Nilsen didn't seek them out for legal

Page 39

[1] advice. They called him.

[2]     MR. GILLEN: If you think — that is fine.

[3] Attorneys can — particularly in public interest —

[4] solicit clients which is my understanding of what

[5] occurred here. I believe they have an attorney/client

[6] relationship, anyway.

[7]                 BY MR. ROTHSCHILD:

[8]     Q: Is it your understanding that the School District has an

[9] attorney/client relationship with the Discovery

[10] Institute?

[11]     A: I can't define what that definition. Did they discuss

[12] the lawsuit with them? The answer is yes.

[13]     Q: Did you enter into a legal engagement with them? Have

[14] you retained them?

[15]     A: Official document, no.

[16]     Q: Have you verbally retained them?

[17]     A: I'm not sure what verbally retained them means.

[18]     Q: Have you said I want you to be my lawyer?

[19]     A: No.

[20]     MR. ROTHSCHILD: I don't think any of these

[21] communications are privileged.

[22]     MR. GILLEN: I believe that they are. Have they

[23] offered — have you communicated to them with the

[24] understanding they offering you legal advice which

[25] you wanted?

Page 40

[1]     A: Yes.

[2]                 BY MR. ROTHSCHILD:

[3]     Q: How did you communicate to them your interest in having

[4] their legal advice?

[5]     A: There are certain aspects of the case we have asked

[6] questions about that they have given us advice for.

[7]     MR. ROTHSCHILD: I am going to move on from this,

[8] Patrick, and reserve my rights on the position. I may

[9] come back to it in the deposition. I don't want to slow

[10] us down here.

[11]     MR. GILLEN: Exactly.

[12]                 BY MR. ROTHSCHILD:

[13]     Q: Mr. Nilsen, did there come a time when the Pandas book

[14] was donated to the School District?

[15]     A: Yes.

[16]     Q: Who donated the Pandas books?

[17]     A: I don't know.

[18]     Q: What?

[19]     A: I do not know.

[20]     Q: How did you become aware of the opportunity to receive

[21] these books?

[22]     A: Mr. Bonsell told me that there are individuals that were

[23] willing to donate the books.

[24]     Q: When did he tell you that?

[25]     A: Sometime in the fall. I don't know when. I don't

---

Min-U-Script®   Filius  &  McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Richard Nilse
January 3, 200

---

Page 41

[1] remember.

[2] **Q:** How did you respond to that offer?

[3] **A:** I will accept any free books any day of the week as long
[4] as they are appropriate.

[5] **Q:** Did you ask him who was donating the books?

[6] **A:** No.

[7] **Q:** Have you heard anything from anybody in the community
[8] about who donated the books?

[9] **A:** No.

[10] **Q:** Have you been asked by members of the community to find
[11] out who donated the books?

[12] **A:** I am sorry. Ask that question again.

[13] **Q:** Has anybody in the community either directly to you or
[14] in public School Board meetings indicated their interest
[15] in knowing who donated the books?

[16] **A:** Yes.

[17] **Q:** How have you responded to those requests?

[18] **A:** I didn't respond.

[19] **Q:** Is there a reason you think the community shouldn't know
[20] who is donating these books that have created a
[21] controversy?

[22] **MR. GILLEN:** Objection. Foundation, speculation.

[23]                   BY MR. ROTHSCHILD:

[24] **Q:** You can answer, Mr. Nilsen.

[25] **A:** I am sorry. The question again?

---

Page 42

[1] **Q:** Is there a reason that you have not tried to satisfy the
[2] community's interest in finding out who is donating
[3] these books that are causing controversy in the
[4] community?

[5] **A:** I don't want individuals who donate free information,
[6] free materials, free books to be the center of a
[7] controversy.

[8] **Q:** Do you know where the books were purchased from?

[9] **MR. GILLEN:** Objection. Again, speculation.

[10] **A:** I will phrase it this way: We, the District, purchased
[11] five books. I'm familiar or at least saw at one time
[12] where they were purchased, those five books. Sixty, no.

[13] **Q:** Where were the five books purchased from?

[14] **A:** I don't remember.

[15] **Q:** What were the circumstances causing the District to
[16] purchase the books?

[17] **A:** Mr. Baksa wanted copies for review, and community
[18] members wanted to review copies.

[19] **Q:** Did Mr. Bonsell indicate whether he had any role in the
[20] donation of the books?

[21] **A:** No, he didn't tell me.

[22] **Q:** What was done with the books when they arrived at the
[23] school?

[24] **A:** Mr. Bonsell gave them to Mr. Baksa.

[25] **Q:** What did Mr. Baksa do with them?

---

Page 4:

[1] **A:** Don't know.

[2] **Q:** Where are the books now?

[3] **A:** Don't know.

[4] **Q:** Mr. Nilsen, if you could turn to page five of the Answer
[5] which was P-2.

[6] **MR. GILLEN:** Eric, are you going to break?

[7] **MR. ROTHSCHILD:** We can break after this question.

[8] **MR. GILLEN:** Fine.

[9] **A:** Page five?

[10]                   BY MR. ROTHSCHILD:

[11] **Q:** Yes, of P-2.

[12] **A:** Yes.

[13] **Q:** Do you see at the end of the paragraph beginning there
[14] is no DASD Intelligent Design policy, there is a
[15] statement that the Pandas book is located in the school
[16] library?

[17] **A:** Okay.

[18] **Q:** Do you see that?

[19] **A:** Yes.

[20] **Q:** Do you know whether that is true?

[21] **A:** That's where it's headed. I don't know where it
[22] currently is due to the fact that it is waiting to be
[23] stamped. Whether it is physically housed at this exact
[24] second, I don't know where it is. But that is where it
[25] is going to.

---

Page 44

[1] **Q:** How do you know that's where it is going to?

[2] **A:** Because I directed it to go there.

[3] **Q:** When did you direct that the books be put in the school
[4] library?

[5] **A:** Late December 22nd or 23rd.

[6] **Q:** Where were they before then, before you gave that
[7] direction?

[8] **A:** Don't know.

[9] **Q:** Did you have an understanding of where they were?

[10] **A:** Either with the high school principal or with the
[11] storage facility in the science room.

[12] **Q:** Why did you give that directive?

[13] **A:** Which directive?

[14] **Q:** To place the books in the school library.

[15] **A:** Mr. Baksa and I on the 22nd and 23rd came across the
[16] fact that in the high school library, there is an
[17] evolution, Creationism center where the high school
[18] librarian has fifteen to twenty books on this topic.

[19]     We were there for a high school student council
[20] breakfast and were talking to the librarian. And the
[21] librarian communicated to us that she had a whole unit
[22] on the Creationism, evolution of the theories debate.
[23] And therefore, Mr. Baksa and I agreed, and I directed
[24] the best place for the books would end up being with all
[25] the other books that the District has on that topic.

---

Filius & McLucas Reporting Service, Inc.     Min-U-Script®          (13) Page 41 - Page 44

Richard Nilsen
January 3, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 45

[1]   Q: Is it your intention that's where the books will remain
[2]   throughout the school year?
[3]   A: Housed there. I cannot tell you whether the librarian
[4]   may end up by request of a teacher bring whatever books
[5]   in the library to the individual classroom. But they
[6]   will be signed out and remain in the library as a home.
[7]   MR. ROTHSCHILD: Do you want to take a break?
[8]   MR. GILLEN: Yes.
[9]   (A recess was taken from 10:35 to 10:45.)
[10]
[11]         AFTER RECESS
[12]
[13]      BY MR. ROTHSCHILD:
[14]   Q: Good morning, Dr. Nilsen, what newspapers do you read as
[15]   a general practice?
[16]   A: If I might before that question, let me clarify two
[17]   additional questions you had prior to the break.
[18]   Q: Sure.
[19]   A: When I ended up saying they are not in the library, my
[20]   comment was the fact that they are not on the shelves. We
[21]   are waiting for a stamp to be made. The donations are
[22]   physically in boxes within the office of the library.
[23]   Secondly, your question as it relates to a teacher
[24]   bringing out the book, that would be housed within all
[25]   the other books that are in that topic. It wouldn't be

Page 46

[1]   just one individual book leaving the library.
[2]   A lot of teachers in units — for example, when I
[3]   taught Indians, I would actually have all of the Indian
[4]   books being taken out into my classroom so the kids
[5]   could end up taking them.
[6]   The only time this book would be taken out of the
[7]   library would be in the context of the whole group of
[8]   books being taken. A teacher wouldn't take an
[9]   individual book.
[10]   Q: Is the decision about whether to take that whole group
[11]   of books and bring them to a classroom being left to the
[12]   teacher's discretion?
[13]   A: Solely. The whole curriculum matter instructional piece
[14]   is the teachers discretion.
[15]   Q: When you say the whole curriculum matter, you are
[16]   talking about this curriculum matter that is the subject
[17]   of this lawsuit?
[18]   A: I am talking beyond this issue as well.
[19]   (Deposition Exhibit P-8 was marked.)
[20]      BY MR. ROTHSCHILD:
[21]   Q: So why don't we — to make sure the record is perfectly
[22]   clear, I am going to mark — I am going to give you the
[23]   document we have marked as P-8 which is the — do you
[24]   recognize what this document is?
[25]   A: Yes.

Page 47

[1]   Q: What is it?
[2]   A: It is the Biology 1 Planned Course/Curriculum Guide.
[3]   Q: Could you turn to the pages in the document which is
[4]   fairly near the end describing the curriculum item that
[5]   is the subject of this lawsuit?
[6]   A: Could you show me what page you are talking about?
[7]   Q: They don't look like they are numbered.
[8]   A: Can you then show me?
[9]   Q: They are one, two, three, four from the back.
[10]   A: I have it.
[11]   Q: Do you recognize the subject matter at the very bottom
[12]   where it says students will be made aware of
[13]   gaps/problems as the language added to the biology
[14]   curriculum through the October 18th resolution that is
[15]   the subject of this lawsuit?
[16]   A: Yes.
[17]   Q: Is it your testimony that how this subject matter is
[18]   taught in the classroom is left to the discretion of the
[19]   individual teachers?
[20]   A: Yes and no. Yes, it is with the exception that the
[21]   teachers ask for additional direction.
[22]   Q: And what was the result of their request for additional
[23]   direction?
[24]   A: The four paragraphs that they are required to read. So
[25]   the only change from last year to this year's

Page 48

[1]   instruction is those four paragraphs.
[2]   Q: Just so that the record is clear on that subject —
[3]   MR. GILLEN: That press release policy is Exhibit
[4]   1 to the Answer if you care to reference it.
[5]   MR. ROTHSCHILD: I think I will mark it as a
[6]   separate exhibit, but thanks.
[7]   (Deposition Exhibit P-3 was marked.)
[8]      BY MR. ROTHSCHILD:
[9]   Q: I am going to show you a document marked P-3. Do you
[10]   recognize that document?
[11]   A: Yes, I do.
[12]   Q: What is that?
[13]   A: Dover Press Release.
[14]   Q: And is the statement that you were referring to in your
[15]   answer before that the teachers are required to read, is
[16]   that found in this press release?
[17]   A: Yes.
[18]   Q: Where does that begin?
[19]   A: The last two paragraphs on the first page.
[20]   Q: Where does it end?
[21]   A: The first two paragraphs on the second page.
[22]   Q: And teachers are required to read that paragraph?
[23]   A: Yes.
[24]   Q: Beyond reading that paragraph, do teachers have
[25]   discretion as to how to teach the subject matter that

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Richard Nilsen
January 3, 200[

---

**Page 49**

[1] is — that was added to the biology curriculum through
[2] the October 18th resolution?
[3] A: Yes.
[4] Q: Total discretion?
[5] A: Total.
[6] Q: Am I correct in understanding your testimony that
[7] teachers are not required to bring the Pandas book into
[8] their classroom when they teach this unit?
[9] A: That's correct.
[10] Q: Is anybody else besides teachers allowed to take those
[11] textbooks, the Pandas textbooks out of the library?
[12] A: Students.
[13] Q: Mr. Nilsen, when I asked you about your prior
[14] experience, you talked about serving as Assistant
[15] Principal, Principal, Assistant Superintendent and
[16] Superintendent in various school districts.
[17] In any school districts that you have been an
[18] administrator in, has the subject of Intelligent Design
[19] be part of the curriculum?
[20] A: No.
[21] Q: What about the subject of Creationism?
[22] A: Not that I'm aware of.
[23] Q: If I extend that question to any school district in
[24] which you have taught, would your answer be the same?
[25] A: Yes.

**Page 50**

[1] Q: What newspapers do you read as a regular matter?
[2] A: The Patriot News and the two York County papers.
[3] Q: Do you read the two York County papers everyday?
[4] A: I read the — I have a secretary pull all related
[5] educational articles.
[6] Q: Do those clippings include the articles that have been
[7] written about the biology curriculum issue during 2004?
[8] A: Yes.
[9] Q: Have you ever asked any newspapers to correct anything
[10] that has been reported about the biology curriculum?
[11] MR. GILLEN: Objection, relevance. Answer,
[12] please. I'm sorry.
[13] A: I have asked them to read the press release on the
[14] District web page.
[15] BY MR. ROTHSCHILD:
[16] Q: Other than that, have you ever asked the newspapers to
[17] correct anything reported about the biology curriculum?
[18] MR. GILLEN: Same objection.
[19] A: I don't remember.
[20] BY MR. ROTHSCHILD:
[21] Q: Have you ever asked them to retract any item reported
[22] about the biology curriculum?
[23] MR. GILLEN: Objection, relevance.
[24] A: No.
[25]

**Page 51**

[1] BY MR. ROTHSCHILD:
[2] Q: Have you ever communicated to any newspaper that you
[3] have been misquoted regarding the subject of the biology
[4] curriculum?
[5] MR. GILLEN: Objection, relevance.
[6] A: No.
[7] BY MR. ROTHSCHILD:
[8] Q: Have you ever communicated to any newspaper that any
[9] other individual has been misquoted regarding the
[10] biology curriculum?
[11] MR. GILLEN: Objection, relevance.
[12] A: Sorry. Could you ask that question again?
[13] BY MR. ROTHSCHILD:
[14] Q: Have you ever communicated to any newspaper that any
[15] individual besides yourself was misquoted or
[16] misrepresented in the reporting about the biology
[17] curriculum?
[18] MR. GILLEN: Same objection.
[19] A: Housed within the press release is a sentence that says
[20] many statements have been personal statements and
[21] opinions from the media, community members and Board
[22] members which are completely inaccurate or false. That
[23] has been communicated publicly.
[24] BY MR. ROTHSCHILD:
[25] Q: Is that the only way that that has been communicated?

**Page 52**

[1] A: Yes.
[2] Q: Are you aware of anybody else involved with the biology
[3] curriculum, School District employes or School Board
[4] members communicating to any newspaper that they have
[5] been misquoted or their statements misrepresented?
[6] MR. GILLEN: Objection, relevance.
[7] A: I am sorry. Ask that question again.
[8] BY MR. ROTHSCHILD:
[9] Q: Are you aware of anybody else involved with this biology
[10] curriculum issue, School Board members or employes of
[11] the School District communicating to the newspapers that
[12] they misreported something or misquoted them?
[13] A: Yes.
[14] Q: Who has done that?
[15] A: Mr. Bonsell and Mr. Buckingham.
[16] Q: What statements reported in the newspaper articles —
[17] A: I can't speak to that.
[18] MR. GILLEN: Objection, relevance.
[19] BY MR. ROTHSCHILD:
[20] Q: How do you know that they communicated that to the
[21] newspapers?
[22] A: They individually told me that they had talked to
[23] reporters about their misstatements and
[24] misrepresentations.
[25] MR. GILLEN: Whose misstatement and

---

Richard Nilsen
January 3, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 53

[1] misrepresentations?

[2]    A: Mr. Bonsell's and Mr. Buckingham's.

[3]    MR. ROTHSCHILD: Can we take a short break?

[4]    MR. GILLEN: Certainly.

[5]    (A recess was taken from 11:00 a.m. to 11:10 a.m.)

[6]

[7]              AFTER RECESS

[8]

[9]    (Deposition Exhibit P-4 was marked.)

[10]              BY MR. ROTHSCHILD:

[11]    Q: Mr. Nilsen, I am going to show you a collection of

[12] newspaper articles that we have marked collectively as

[13] Exhibit P-4. I am not representing that this is every

[14] article written on the subject of the Dover biology

[15] curriculum, but it is a large collection of articles

[16] primarily from the York Dispatch and the York Daily

[17] Record.

[18]    MR. GILLEN: If I can, just for the record, I am

[19] going to object to the use of the newspaper articles to

[20] question him on the ground that they are all hearsay,

[21] and statements contained therein are hearsay. But go

[22] ahead.

[23]    MR. ROTHSCHILD: I disagree with your objection,

[24] but we will proceed.

[25]

Page 54

[1]              BY MR. ROTHSCHILD:

[2]    Q: Mr. Nilsen, if you could turn to on the very first page

[3] of this collection, there is a June 8th, 2004 article

[4] from the York Dispatch. It contains near the top of the

[5] document some statements attributed to you.

[6]    Were you aware that the newspaper reported these

[7] statements?

[8]    A: Which statements?

[9]    Q: Beginning with but Dover Area Superintendent Richard

[10] Nilsen and continuing the next four paragraphs through

[11] options and theories.

[12]    MR. GILLEN: For the record, I object to all the

[13] statements on the grounds that they are hearsay.

[14]    A: I am sorry. What is your question?

[15]              BY MR. ROTHSCHILD:

[16]    Q: Were you aware that the newspaper reported these

[17] statements made by yourself?

[18]    A: No.

[19]    Q: Did you make the statements reported in this newspaper?

[20]    A: I remember the first three. I don't remember the last

[21] one.

[22]    Q: So you don't remember — do you remember being asked

[23] about the evolution versus Creationism debate?

[24]    A: Yes.

[25]    Q: What did you understand that to mean, that question to

Page 55

[1] mean?

[2]    A: Which question?

[3]    Q: You said you do remember being asked about the evolution

[4] versus Creationism debate?

[5]    A: No. I didn't say I remember being asked that.

[6]    Q: Were you asked about the evolution versus Creationism

[7] debate by this reporter?

[8]    A: Yes.

[9]    Q: What did you understand to be meant about the phrase

[10] evolution versus Creationism debate?

[11]    A: As I said before, I don't remember this specific

[12] question.

[13]    Q: Let's clarify. You do remember being asked about the

[14] evolution versus Creationism debate by this reporter?

[15]    A: No, I do not remember that question.

[16]    Q: Do you remember being asked by any reporter about the

[17] evolution versus Creationism debate?

[18]    A: No, I do not remember that specific.

[19]    Q: Do you remember any questions by the reporters about the

[20] issue of evolution versus Creationism?

[21]    A: No, I do not remember that.

[22]    Q: Do you remember being asked any questions by reporters

[23] during the June, 2004 period about the teaching of

[24] Creationism?

[25]    A: No, I do not remember that.

Page

[1]    Q: If you would, turn to the next news article.

[2]    A: Page three?

[3]    Q: Yes. It is the news article June 9th, 2004 also from

[4] the York Dispatch.

[5]    A: Okay.

[6]    Q: About I think it is five paragraphs down, the paragraph

[7] begins a recommendation on the book. Do you see that?

[8]    A: Yes.

[9]    Q: Do you see the second sentence of that paragraph states

[10] Buckingham said the committee would look for a book that

[11] presented both Creationism and evolution; do you see

[12] that?

[13]    A: Yes.

[14]    Q: Were you aware that the newspaper reported that

[15] statement by Mr. Buckingham?

[16]    A: No.

[17]    Q: Do you remember Mr. Buckingham making any statements

[18] about the curriculum committee looking for a book that

[19] presented both Creationism and evolution?

[20]    A: I don't remember that, no.

[21]    Q: Do you remember him making statements like that at any

[22] time?

[23]    A: No.

[24]    Q: Do you remember Mr. Buckingham ever bringing up the

[25] subject of Creationism at any School Board meeting?

Min-U-Script®    Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Richard Nilser
January 3, 200!

Page 57

[1]   A: Not that I can remember.

[2]   Q: Do you remember any other School Board member bringing

[3] up the subject of Creationism at any School Board

[4] meeting?

[5]   A: Not that I can remember.

[6]   Q: If you can turn to the next page.

[7]   A: (Witness complies.)

[8]   Q: Do you see there is a paragraph which begins with the

[9] words Assistant Superintendent Michael Baksa?

[10]   A: Yes.

[11]   Q: And two paragraphs down from that, the article reports

[12] that Mr. Baksa said that teachers may make reference to

[13] Creationism in class. Do you see that?

[14]   A: Yes.

[15]   Q: Were you aware that —

[16]   MR. GILLEN: Objection, hearsay.

[17]            BY MR. ROTHSCHILD:

[18]   Q: Were you aware that the newspaper reported that

[19] statement by Mr. Baksa?

[20]   A: I don't remember that, no.

[21]   Q: Do you know whether Mr. Baksa made that statement?

[22]   A: I don't remember that.

[23]   Q: Do you remember Mr. Baksa ever making any statements

[24] about teachers making reference to Creationism in class?

[25]   A: No, I do not.

Page 58

[1]   Q: Would you turn to the next article which is a June 9th,

[2] 2004 article from the York Daily Record?

[3]   A: (Witness complies.)

[4]   Q: Do you see at the bottom of the paragraph — it reports

[5] Board President Alan Bonsell disagreed saying there were

[6] only two theories (Creationism and evolution) that could

[7] possibly be taught. Are you aware —

[8]   MR. GILLEN: Objection, hearsay.

[9]            BY MR. ROTHSCHILD:

[10]   Q: Are you aware of the newspaper reporting that statement

[11] by Mr. Bonsell?

[12]   A: I do not remember that, no.

[13]   Q: Do you remember Mr. Bonsell making that statement?

[14]   A: No, I do not.

[15]   Q: Do you remember Mr. Bonsell making any reference to

[16] Creationism at any time in a Board meeting?

[17]   A: At a Board meeting, I do not remember that, no.

[18]   MR. ROTHSCHILD: Pat, as we go through these

[19] articles, you can have a standing objection to hearsay.

[20] I don't agree with it, but you won't have waived it by

[21] not making it each time.

[22]   MR. GILLEN: Okay.

[23]            BY MR. ROTHSCHILD:

[24]   Q: Could you turn to the next article which is a June 10th,

[25] 2004 article from the York Daily Record?

Page 59

[1]   A: (Witness complies.)

[2]   Q: In the third paragraph, it says during this past Monday

[3] night's Board meeting, Board members Alan Bonsell, Noel

[4] Wenrich, and Buckingham spoke aggressively in fair of

[5] have a biology book that includes creation as part of

[6] the text.

[7]   Were you aware that the newspaper reported that?

[8]   A: No.

[9]   Q: Do you recall any of those individuals speaking in favor

[10] of a biology book that includes theories of Creationism

[11] as part of the text?

[12]   A: No.

[13]   Q: Could you turn to the article, the June 14th, 2004 York

[14] Daily Record article?

[15]   A: Are these in order?

[16]   Q: They are in the chronological order, yes.

[17]   A: Okay.

[18]   Q: In the second paragraph, it is reported that at Monday's

[19] School Board meeting, William Buckingham said as part of

[20] a search for a new biology book, he and others are

[21] looking for one that offers balance between Christian

[22] views of creation and Darwin's Theory of Evolution.

[23]   Were you aware —

[24]   A: That is not June 14th.

[25]   MR. GILLEN: He is looking at the second piece.

Page 60

[1] Turn the page.

[2]            BY MR. ROTHSCHILD:

[3]   Q: Sorry about that.

[4]   A: There's two 14's.

[5]   Q: Do you see the second paragraph?

[6]   A: Yes.

[7]   Q: Were you aware that the newspaper reported those

[8] statements by Mr. Buckingham?

[9]   A: No.

[10]   Q: Do you remember Mr. Buckingham making those statements?

[11]   A: No.

[12]   Q: Do you have a personal understanding of what is meant by

[13] the term Creationism?

[14]   A: Yes.

[15]   Q: What is your understanding?

[16]   A: My understanding is creation refers to the Biblical

[17] account of the origins of life.

[18]   Q: Anything else?

[19]   A: No.

[20]   Q: Do you know that to be a scientific proposition?

[21]   A: I do or do not. I have no comment on that.

[22]   Q: You don't have an understanding?

[23]   A: No.

[24]   Q: In the same article two paragraphs down, the paper

[25] reports that Mr. Buckingham said this country wasn't

Richard Nilsen
January 3, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

**Page 61**

[1] founded on Muslim beliefs or evolution. He said this
[2] country was founded on Christianity, and our students
[3] should be taught as such.
[4]   Were you aware that the paper reported that
[5] statement?
[6]   A: I'm aware of the context, not the specific verbiage.
[7]   Q: Explain what you mean by that.
[8]   A: Meaning I am aware of the fact that the paper reported
[9] that he made comments associated with Muslim beliefs and
[10] Christianity. But as far as those specific words, I
[11] don't remember those specific words.
[12]   Q: Okay. Did you actually hear Mr. Buckingham say anything
[13] on the subject?
[14]   A: Which subject?
[15]   Q: The subject captured in those words, if not the specific
[16] words.
[17]   A: Which subject? There's a number of subjects.
[18]   Q: The subject of Muslim beliefs and the country being
[19] founded on Christianity?
[20]   A: I am sorry. The question again?
[21]   Q: Did you ever hear Mr. Buckingham make statements to that
[22] effect?
[23]   A: Yes.
[24]   Q: Can you describe the circumstances in which he made
[25] those statements?

**Page 62**

[1]   A: No.
[2]   Q: Was it at a School Board meeting?
[3]   A: Yes.
[4]   Q: How was it that you came to hear what was being said?
[5]   A: He said it at a School Board meeting.
[6]   Q: But you don't remember anything else about the
[7] circumstances in which he said it?
[8]   A: No.
[9]   Q: Did you respond to that in any way?
[10]   A: No.
[11]   Q: Do you agree with those statements?
[12]   A: Which statements?
[13]   Q: The statements about this country wasn't founded on
[14] Muslim beliefs or evolution. This country was founded
[15] on Christianity and our students should be taught as
[16] such.
[17]   A: Housed within that are four or five different
[18] components. I do not know whether this country was
[19] founded or was not founded on Muslim beliefs. I do not
[20] know whether this country wasn't founded on evolution.
[21] This country was founded on Christianity?
[22]   Q: You agree with that?
[23]   A: No.
[24]   Q: What about the statement our students should be taught
[25] as such?

**Page 63**

[1]   A: I don't believe that. I wouldn't expect students to be
[2] taught as such.
[3]   Q: Was there any reaction to this statement by
[4] Mr. Buckingham by anybody there at the meeting?
[5]   A: I don't know whether there was or was not.
[6]   Q: Could you turn to the article from the York Dispatch
[7] dated June 15, 2004 entitled Church State Issue Divides.
[8] If you can turn to the page — the second page.
[9]   A: (Witness complies.)
[10]   Q: Five paragraphs down or the fourth full paragraph there
[11] is a paragraph that says nearly 2,000 years ago, someone
[12] died on a cross for us. Shouldn't we have the courage
[13] to stand up for him — attributed to Mr. Buckingham.
[14]   Were you aware that the paper reported that
[15] statement?
[16]   A: No.
[17]   Q: Do you know whether Mr. Buckingham made that statement?
[18]   A: Yes.
[19]   Q: When did he make it?
[20]   A: That, I don't remember.
[21]   Q: Was it at a Board meeting?
[22]   A: Yes.
[23]   Q: What was being discussed when he made that statement?
[24]   A: I don't remember.
[25]   Q: Do you remember whether the biology curriculum was being

**Page 64**

[1] discussed?
[2]   A: My recollection is that it was not being discussed at
[3] that time period.
[4]   Q: But you have no recollection of what other subject
[5] matter was being discussed?
[6]   A: No.
[7]   Q: The next paragraph says that Board members Alan Bonsell
[8] and Noel Wenrich agreed with Buckingham saying
[9] Creationism should be taught to balance evolution.
[10]   Do you remember Mr. Bonsell or Mr. Wenrich making
[11] statements about Creationism being taught to balance
[12] evolution?
[13]   A: No.
[14]   Q: Mr. Nilsen, do I understand you correctly that not
[15] withstanding the fact that there are many articles
[16] during this June period about discussion about teaching
[17] Creationism, you have no recollection of the subject of
[18] Creationism at any School Board meeting?
[19]   A: That's correct.
[20]   Q: Have the School Board members expressed to you in any
[21] other setting their desire to have Creationism taught in
[22] the public school?
[23]   A: No. Exact opposite.
[24]   Q: What do you mean by the exact opposite?
[25]   A: They don't want the origins of life taught at all.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Richard Nilse
January 3, 200!

Page 65

[1] Creationism speaks to the origins of life. If you note
[2] as you highlighted, the planned course, the Board
[3] adopted the section that says origins of life will not
[4] be taught.
[5]    Q: Do you understand Intelligent Design to have any — to
[6] involve at all the issue of the origins of life?
[7]    A: I'm not that aware of the theory.
[8]    Q: You don't know one way or the other?
[9]    A: No.
[10]    Q: During 2004, was the District in the process of
[11] purchasing a new biology textbook?
[12]    A: Yes.
[13]    Q: Have you been involved in the purchase of other
[14] textbooks besides the biology textbook?
[15]    A: Yes.
[16]    Q: What is the typical process for selecting and purchasing
[17] a new textbook?
[18]    A: The teachers make a recommendation to the Assistant
[19] Superintendent. The Assistant Superintendent makes a
[20] recommendation to the curriculum district committee.
[21] The district committee makes a recommendation to the
[22] district board committee, and the district board
[23] committee makes a recommendation to the full Board.
[24]    Q: That is the same process we went through for developing
[25] curriculum?

Page 66

[1]    A: Yes, sir.
[2]    Q: Did the teachers make a recommendation in 2004 for the
[3] purchase of a particular biology textbook?
[4]    A: Yes.
[5]    Q: What was that?
[6]    A: The Princeton (sic) Hall when it was adopted in August,
[7] Miller Levin.
[8]    Q: When did they make that recommendation?
[9]    A: They made that recommendation in 2003.
[10]    Q: Did the Assistant Superintendent accept that
[11] recommendation?
[12]    A: Yes.
[13]    Q: Let me back track. When in 2003?
[14]    A: The Spring of 2003.
[15]    Q: The Assistant Superintendent accepted that
[16] recommendation?
[17]    A: Yes.
[18]    Q: Did the district curriculum committee accept that
[19] recommendation?
[20]    A: I can't speak to that. I wasn't there.
[21]    Q: Did the Board curriculum committee ever instruct the
[22] district or any employe of the district to look for
[23] other textbooks?
[24]    A: I can't speak to that. I wasn't in the meetings.
[25]    Q: You are not aware of that otherwise?

Page 67

[1]    Q: Did Mr. Baksa ever tell you that he had been instructed
[2] to look for other textbooks?
[3]    A: I don't recollect him telling me he was looking for
[4] other textbooks.
[5]    Q: Do you know whether the Board on their own, the Board of
[6] the Curriculum Committee or individual members of the
[7] Board looked for other textbooks to use rather than the
[8] Miller Levin book?
[9]    A: I am not aware of that, no.
[10]    Q: Mr. Nilsen, can you look back again at Exhibit 8 which
[11] is the biology curriculum —
[12]    A: (Witness complies.)
[13]    Q: — to the same pages that we were looking at before?
[14]    A: (Witness complies.)
[15]    Q: It is about four pages back.
[16]    MR. GILLEN: It is four from the back.
[17]    A: I have it now.
[18]             BY MR. ROTHSCHILD:
[19]    Q: For the subject matter that is the issue in this
[20] litigation, the language involving gaps and problems and
[21] Intelligent Design, it states that the instructional
[22] strategies, learning practices, activities and
[23] experiences will be lecture; is that right?
[24]    A: Yes.
[25]    Q: What will the teachers present in that lecture?

Page 68

[1]    A: Going back to a conversation I had with you prior, they
[2] have within the context of what is outlined here full
[3] authority to teach whatever you choose housed within
[4] this planned course.
[5]    They requested on November 24th a followup and
[6] explanation of how to teach what is under the unit and
[7] what the Board adopted and were therefore given those
[8] four paragraphs. Beyond lecture, what that exactly
[9] means, I didn't write this so I don't know what they
[10] were speaking of.
[11]    Q: Who did write that?
[12]    A: The teachers in conjunction with Mr. Baksa.
[13]    Q: Wrote the statement lecture?
[14]    A: Yes.
[15]    Q: But beyond reading the statement, they can lecture
[16] however they please?
[17]    A: Yes, within the context of what is there meaning the
[18] unit — they can't lecture whatever they want to. An
[19] example would be they can't go off and start talking
[20] about World War II because that is not the unit.
[21]    Q: Fair enough. You said that the four paragraph statement
[22] there required to read was prepared in response to their
[23] request for guidance?
[24]    A: Yes.
[25]    Q: Other than — let me withdraw that for a moment. Who

Richard Nilsen
January 3, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

**Page 69**

[1] prepared that statement?

[2] A: Mr. Baksa in conjunction with Board members and

[3] teachers.

[4] Q: Other than providing the teachers that statement which

[5] they are required to read, have the teachers been given

[6] any other guidance about how to present this unit?

[7] A: Yes.

[8] Q: What other guidance?

[9] A: If any student brings up the question of either any

[10] other Creationism or any other origins of life, they

[11] have been directed not to speak to that, but to give

[12] that information and that question directly to either

[13] their parents and/or their own research.

[14] Q: Let me make sure I got that right. If any student

[15] brings up either Creationism or origins of life, they

[16] are directed not to answer, but to instruct the students

[17] to ask their parents or do their own research?

[18] A: Yes.

[19] Q: Have the teachers been given any other guidance besides

[20] that directive?

[21] A: No.

[22] Q: Who gave the teachers that directive?

[23] A: Me.

[24] Q: How was that communicated?

[25] A: November 24th, 1:05, this office, this room.

**Page 70**

[1] Q: Sitting around a table?

[2] A: Yes.

[3] Q: Who was present for that meeting?

[4] A: Mr. Baksa, myself, the Union President, Bill Miller,

[5] Past President, and the Science Department.

[6] Q: Did you instruct them how they — how they were required

[7] to answer any other kinds of questions by students

[8] relating to this unit?

[9] A: They were instructed not to answer any questions dealing

[10] with the origins of life. Any other questions in

[11] Darwinian Theory or anything else that is discussed is

[12] within their own domain.

[13] Q: Did you give them any instructions about how to answer

[14] questions about the subject of Intelligent Design?

[15] A: Yes.

[16] Q: What instructions were those?

[17] A: Not to discuss it. Report — any student requesting

[18] that is to immediately go back to either their parents

[19] or their own research, not a topic of discussion.

[20] Q: Why?

[21] A: Why was Mr. Miller the past President?

[22] Q: No. Well done.

[23] A: I figured at 11:30, you needed it.

[24] Q: Why did you give the teachers the directive not to

[25] answer any questions about Intelligent Design?

**Page 71**

[1] A: I didn't want to be sitting in a meeting with you across

[2] the table in a legal suit.

[3] Q: Is that the only reason?

[4] A: I believe it is a topic of discussion that should be

[5] discussed with parents, not the School District.

[6] Q: What is it about Intelligent Design which is part of the

[7] school's biology curriculum which makes it —

[8] MR. GILLEN: Objection, foundation,

[9] characterization.

[10] BY MR. ROTHSCHILD:

[11] Q: What is it about Intelligent Design that makes it a

[12] subject appropriate for discussion with parents, but not

[13] in the school?

[14] A: The school has decided that the curriculum should focus

[15] on the Darwinian theory and not focus on other options

[16] due to time constraints.

[17] Q: Is that the only reason — is time constraints the only

[18] reason that the school has decided it should focus on

[19] Darwin and not other options?

[20] A: We are specifically, as the press release says, a

[21] standards driven curriculum and only address the

[22] standards.

[23] Q: What is the purpose of addressing this section of the

[24] curriculum if it is not going to be discussed, not part

[25] of the standards?

**Page**

[1] A: The purpose is there are individual students that have

[2] other opinions beyond the Darwinian. We did not want to

[3] be discrimination. We firmly believe that any

[4] individual has a right to their own beliefs. We do not

[5] want to be discriminatory.

[6] We are required to teach Darwin. We are also

[7] required not to be discriminatory.

[8] Q: How do you know that there are individual students that

[9] have other opinions besides Darwin's?

[10] A: I have talked to other students.

[11] Q: Is your understanding that the individual opinion

[12] that these students hold different from Darwin's theory

[13] is Intelligent Design?

[14] MR. GILLEN: Objection, foundation.

[15] A: Could you ask that question, again?

[16] BY MR. ROTHSCHILD:

[17] Q: Is your understanding that the individual beliefs

[18] that these individuals hold different from Darwin's

[19] theory include Intelligent Design?

[20] A: Some, yes.

[21] Q: When did you become aware that students believed in

[22] Intelligent Design?

[23] A: Since I have been in education.

[24] Q: Mr. Nilsen, didn't you testify that the first time you

[25] became aware of Intelligent Design was July, 2004?

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Richard Nilsen
January 3, 200?

Page 73

[1]     A: I am extrapolating the definition of Intelligent Design.
[2] Did in 1972 someone tell me that they believed in
[3] Intelligent Design? No.
[4]     Am I telling you in 1972, a student communicated
[5] to me that they felt there was an order to the universe,
[6] the answer to that would be yes.
[7]     Q: When the student expressed that order of the universe,
[8] he was expressing a religious belief, wasn't it?
[9]     MR. GILLEN: Objection.
[10]    A: No.
[11]            BY MR. ROTHSCHILD:
[12]    Q: You understood him to be expressing a scientific belief?
[13]    A: I was — or I was accepting that he had a belief as a
[14] number of students separate from evolution.
[15]    Q: Did you understand those students' beliefs to be based
[16] on any scientific information?
[17]    A: I'm not sure they understood the scientific information
[18] behind it. But I have come to believe since then that
[19] there is scientific information that supports their
[20] beliefs.
[21]    Q: How have you come to that belief?
[22]    A: In reading.
[23]    Q: What have you read?
[24]    A: Articles dealing with Creationism, Intelligent Design,
[25] Darwinian debate.

Page 74

[1]     Q: When did you read these articles?
[2]     A: The past 50 — 45 years.
[3]     Q: When these students expressed to you their view of order
[4] in the universe or Intelligent Design broadly defined,
[5] did you understand them to be expressing it to you as
[6] something that they thought was assigned of a scientific
[7] contest, or was it something they believed of, a matter
[8] of religious faith?
[9]     A: Without question, scientific.
[10]    Q: So in these past 45 to 50 years of reading, did you read
[11] about Intelligent Design?
[12]    A: Yes.
[13]    Q: So when you said before that the first time you heard
[14] about Intelligent Design was July, 2004, that wasn't
[15] true; was it?
[16]    A: Yes, it was. I defined the 40 years since July. I have
[17] read since July.
[18]    Q: So no Intelligent Design before July, and all of it
[19] after?
[20]    A: Yes.
[21]    Q: But you read something different of a scientific content
[22] regarding the issue of Creationism?
[23]    A: No. I ended up reading scientific content as it relates
[24] to scientific content.
[25]    Q: Putting aside what you have learned since July of 2004,

Page 75

[1] did you read anything — any scientific materials
[2] regarding the issue of Creationism?
[3]     A: Yes.
[4]     Q: What materials have you read?
[5]     A: I can't quote them. I don't remember.
[6]     Q: They caused you to conclude that Creationism is a
[7] scientific concept?
[8]     MR. GILLEN: Objection, characterization.
[9]     A: I have not said to you that Creationism is a scientific
[10] concept. What I have said to you is that Intelligent
[11] Design is a scientific concept.
[12]            BY MR. ROTHSCHILD:
[13]    Q: Let's go back to Intelligent Design. You are testifying
[14] that you have done reading about Intelligent Design
[15] since July?
[16]    A: Since July.
[17]    Q: Didn't you answer before when I asked you what you have
[18] done to investigate the subject of Intelligent Design,
[19] you read something?
[20]    MR. GILLEN: Objection to the characterization of
[21] his testimony.
[22]    A: I am not saying I did an investigation. I am saying I
[23] read it. Meaning there is a difference between
[24] researching it, and people end up sending me articles
[25] that I read since that time period.

Page 7?

[1]     Q: When I asked you at the beginning of the deposition what
[2] do you understand Intelligent Design to mean, and you
[3] said that scientifically, evolution has a design and
[4] nothing else. That was what you gleaned from your
[5] reading?
[6]     A: Could you read that again, please?
[7]     Q: I asked you at the beginning of this deposition what do
[8] you understand Intelligent Design to mean?
[9]     A: Correct.
[10]    Q: You said that scientifically, evolution has a design. I
[11] asked you if you meant had any other understanding about
[12] Intelligent Design other than that, and you said no?
[13]    A: Correct.
[14]    Q: That is all you have learned from the reading you have
[15] done?
[16]    A: Correct.
[17]    Q: Going back to the issue of Creationism, is it your
[18] understanding that there is scientific content to the
[19] concept of Creationism?
[20]    MR. GILLEN: Objection, foundation.
[21]    A: I am sorry. I don't understand your question. You are
[22] going to have to explain it more.
[23]            BY MR. ROTHSCHILD:
[24]    Q: When you answered my question about the reading you did,
[25] you said you have done reading about Creationism and

Richard Nilsen
January 3, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 77

[1] Intelligent Design and the controversy about Darwin?

[2] A: Correct.

[3] Q: What did you mean by the term Creationism?

[4] A: As I said before, Creationism I define as the Biblical
[5] reference of the origins of life.

[6] Q: Do you think that — and that is something that is
[7] articulated in the Bible among other places; correct?

[8] A: Correct.

[9] Q: Are you aware of any scientific support for that version
[10] of the origin of life?

[11] A: No.

[12] Q: Would you agree as an educator that Creationism should
[13] not be taught in public school science classes?

[14] A: Yes.

[15] Q: Why is that?

[16] A: Aguillard.

[17] Q: That is the Supreme Court decision?

[18] A: Yes.

[19] Q: What do you understand Aguillard to provide?

[20] MR. GILLEN: Objection, foundation.

[21] A: That specific Creationism curriculum should not be
[22] taught as a planned course.

[23] BY MR. ROTHSCHILD:

[24] Q: Do you have an understanding of what was meant by
[25] Creationism in that decision?

Page 78

[1] A: No.

[2] Q: Other than the fact that a Court said you can't do it,
[3] do you have any other viewpoint as an educator about
[4] whether Creationism should taught in science class?

[5] A: That one trumps everything.

[6] Q: If that decision was overturned, what would your opinion
[7] be as an educator?

[8] A: Ask the specific question.

[9] Q: Putting the Supreme Court decision aside, do you believe
[10] Creationism should taught in public school science
[11] classes?

[12] A: No.

[13] Q: Why is that?

[14] A: Because it is religious in nature.

[15] Q: Why do you believe that?

[16] A: As alluded to, my definition of Creationism is a
[17] Biblical context, and the Biblical context is religious.

[18] Q: Could you turn to I believe it is Exhibit P — it is the
[19] one you are holding in your right hand — P-3 which is
[20] the press release?

[21] A: (Witness complies.)

[22] Q: Actually before we turn to that, can you explain to me
[23] how Intelligent Design the different from Creationism?

[24] A: Creationism is based on the Biblical context.

[25] Intelligent Design is based upon what I defined

Page 79

[1] Intelligent Design as.

[2] Q: Which is that evolution was the product of design?

[3] A: Yes.

[4] Q: The curriculum states that students will be made aware
[5] of gaps and problems in Darwin's theory.

[6] What is meant by the statement there are gaps and
[7] problems in Darwin's Theory?

[8] A: Darwin's Theory is a theory and is not based in fact so
[9] there are issues with Darwin's Theory.

[10] Q: Do you expect teachers to identify any specific gaps or
[11] problems to the students?

[12] A: I don't know what they teach.

[13] Q: The curriculum item does not state that there are any
[14] gaps or problems with Intelligent Design.

[15] Is it your understanding that there are no gaps or
[16] problems in Intelligent Design?

[17] A: We are not teaching Intelligent Design.

[18] Q: You say we are not teaching Intelligent Design. Why do
[19] you say that?

[20] A: Because they are not.

[21] Q: The teachers are required to — Intelligent Design is
[22] part of the curriculum; correct?

[23] A: No.

[24] Q: Intelligent Design is identified in the curriculum?

[25] A: Yes. Identified, yes.

Page 8__

[1] Q: And students are to be made aware of Intelligent Design?

[2] A: Yes.

[3] Q: And teachers are required to read a statement that
[4] includes the following paragraph: Intelligent Design is
[5] an explanation of the origin of life that differs from
[6] Darwin's view?

[7] A: Yes.

[8] Q: And continues it with further reference to Intelligent
[9] Design?

[10] A: Yes.

[11] Q: Wouldn't you agree that is teaching, Mr. Nilsen?

[12] A: No.

[13] Q: What do you call that if it is not teaching?

[14] A: Making aware.

[15] Q: Making aware is different from teaching?

[16] A: Yes.

[17] Q: Don't you agree, Mr. Nilsen, that anything a teacher
[18] presents of a substantive nature to their students is
[19] teaching?

[20] A: No.

[21] MR. GILLEN: Objection, leading.

[22] MR. ROTHSCHILD: He's not my witness.

[23] MR. GILLEN: You can't lead.

[24]

[25] BY MR. ROTHSCHILD:

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Richard Nilsen
January 3, 200

---

**Page 81**

[1]    Q: You draw a distinction between making aware and
[2] teaching?
[3]    A: Yes.
[4]    Q: Do you believe the students will be learning as they
[5] listen to the statement?
[6]    A: Yes.
[7]    Q: So they will be learning?
[8]    A: Yes.
[9]    Q: One of the things that the students will be learning is
[10] that there are gaps and problems in Darwin's Theory;
[11] correct?
[12]    A: Yes.
[13]    Q: But at the same time that the teachers present that
[14] statement, they will not be presenting to the students
[15] the fact of whether there are gaps and problems in
[16] Intelligent Design; correct?
[17]    A: That's correct.
[18]    Q: So the students will learn that there are gaps and
[19] problems in Darwin's Theory, but they will not learn
[20] that there are gaps and problems in Intelligent Design?
[21]    A: That's correct.
[22]    Q: Would you agree that that is misleading the students?
[23]    A: No.
[24]    Q: You don't think the students will be misled by the fact
[25] that they are being told that there are gaps and

**Page 82**

[1] problems in one theory, but there are not gaps and
[2] problems in the other explanation?
[3]    A: No.
[4]    Q: That is not because you believe that there are no gaps
[5] and problems in Intelligent Design; is it?
[6]    A: That's correct.
[7]    Q: You don't know one way or the other; do you?
[8]    A: No.
[9]    Q: The required statement also compels teachers to tell the
[10] students that Darwin's Theory is a theory and not a
[11] fact; correct?
[12]    A: Yes.
[13]    Q: Now Darwin's Theory is not the only theory being taught
[14] to students in the Dover School District; is it?
[15]    A: That's correct.
[16]    Q: It is not the only scientific theory?
[17]    A: That's correct.
[18]    Q: What is the significance to your understanding of
[19] characterizing a scientific concept as a theory? What
[20] does that mean to you?
[21]    A: That it can't be proven in the lab.
[22]    Q: Anything else?
[23]    A: No.
[24]    Q: What was the purpose of including that statement in the
[25] curriculum?

**Page 83**

[1]    A: I can't speak to that. I wasn't involved in the
[2] discussions.
[3]    Q: Does the School Board require teachers to tell students
[4] that any other theory is a theory, not a fact?
[5]    A: I'm not aware of any.
[6]    Q: Can you explain why evolution is singled out among all
[7] scientific theories taught to Dover students as being a
[8] theory, not a fact?
[9]    A: Again, I was not involved in the discussions.
[10]    Q: Have you ever made any effort to make sure that students
[11] are made aware that other theories are just theories,
[12] not facts?
[13]    A: No.
[14]    Q: Do you require teachers to make students aware that
[15] there are gaps and problems in any other scientific
[16] theories besides Darwin's Theory?
[17]    A: No.
[18]    Q: Do you believe that is because all the other theories
[19] don't have any gaps and problems?
[20]    A: No.
[21]    Q: Again, this is Darwin's Theory being singled out?
[22]    A: I won't use those words, no.
[23]    Q: It is the only one being treated that way?
[24]    A: Yes.
[25]    Q: In the resolution, it says that students will be made

**Page 84**

[1] aware of other theories of evolution including, but not
[2] limited to, Intelligent Design.
[3]    What other theories are being referred to in that
[4] resolution?
[5]    A: I don't know.
[6]    Q: Are you aware of any other theories of evolution?
[7]    MR. GILLEN: Objection on the grounds the question
[8] is ambiguous. You asked are you aware of any other
[9] theories of evolution.
[10]          BY MR. ROTHSCHILD:
[11]    Q: Other than Darwin's Theory and Intelligent Design, are
[12] you aware of any other theories?
[13]    MR. GILLEN: Objection to the characterization of
[14] Intelligent Design.
[15]    MR. ROTHSCHILD: Fair point. Let me withdraw it.
[16]          BY MR. ROTHSCHILD:
[17]    Q: Do you consider Intelligent Design a theory of
[18] evolution?
[19]    A: How are you defining evolution?
[20]    Q: I will make it simpler. Do you consider Intelligent
[21] Design a scientific theory?
[22]    A: Yes.
[23]    Q: On what do you base that opinion?
[24]    A: Scientists that have said it is.
[25]    Q: What scientists are you referring to?

---

Richard Nilsen
January 3, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 85

[1]    A: I don't have any of memory, but I have read and heard
[2] that there are 300 more, and Lehigh University
[3] scientists have stated Intelligent Design is a
[4] scientific theory.
[5]    Q: What do you understand the phrase theories of evolution
[6] to mean in this resolution?
[7]    A: I am sorry. The question again?
[8]    Q: What do you understand the phrase other theories of
[9] evolution to mean in this resolution?
[10]    A: Other theories that explain species changing.
[11]    Q: And do you read Intelligent Design to be included by the
[12] text of this resolution as one of those other theories
[13] of evolution?
[14]    A: Yes.
[15]    Q: So your understanding is Intelligent Design is one of
[16] these other theories of species changing?
[17]    A: Yes.
[18]    Q: Can you name any other theories of species changing?
[19]    A: No.
[20]    Q: The statement that the teachers are required to read
[21] mentions Darwin's Theory, and it refers to Intelligent
[22] Design as an explanation of the origin of life, but it
[23] doesn't in any way mention the possibility that there
[24] might be other theories.
[25]    Why is that?

Page 86

[1]    A: I am sorry? Could you —
[2]    Q: The statement that the teachers are supposed to read —
[3]    A: Yes.
[4]    Q: — identifies Darwin's Theory, and it describes
[5] Intelligent Design as an explanation of the origin of
[6] life that differs from Darwin's view, but it doesn't
[7] indicate in any way that there are other theories of
[8] evolution.
[9]    Why is that?
[10]    A: Missed.
[11]    Q: I am sorry?
[12]    A: Missed.
[13]    Q: Does that mean teachers are not permitted to describe
[14] other theories of evolution?
[15]    A: No.
[16]    Q: What is a teacher supposed to do if a student asks her
[17] to explain Intelligent Design?
[18]    A: As stated earlier, communicate that that is a very good
[19] question, but that they are to designate that to a
[20] parent and/or their own research.
[21]    Q: What is the teacher supposed to do if a student asks her
[22] to identify who the intelligent designer is?
[23]    A: Once again, that is a great question. You decide that
[24] on your own.
[25]    Q: What is a teacher supposed to do if a student asks her

Page 87

[1] to identify other theories of evolution?
[2]    MR. GILLEN: Objection. Calls for speculation.
[3]    A: They can either communicate what they know or
[4] communicate that they don't know.
[5]    BY MR. ROTHSCHILD:
[6]    Q: Mr. Nilsen, at the end of the second to last paragraph
[7] of this press release, it states school districts are
[8] forums for inquiry and critical discussions. The above
[9] statement and the District's revised biology curriculum
[10] together provide an opportunity for open critical
[11] discussion — the real heart of scientific practice.
[12]    Who wrote that?
[13]    A: I did.
[14]    Q: Is that your objective in including this subject matter
[15] in the biology curriculum?
[16]    A: First of all, I didn't include it. I am implementing
[17] it. So you have to rephrase that question.
[18]    Q: And it is your responsibility to implement this policy?
[19]    A: Correct.
[20]    Q: Do you understand that is what is being achieved by this
[21] policy?
[22]    A: What?
[23]    Q: Inquiry and critical discussion?
[24]    A: As it relates to the gaps, yes.
[25]    Q: Not as it relates to Intelligent Design?

Page 88

[1]    A: No.
[2]    Q: You are not allowing any critical discussion?
[3]    A: No.
[4]    Q: You are not allowing any open discussion?
[5]    A: Not on Intelligent Design.
[6]    Q: Again, for the gaps, it is only evolution that you are
[7] encouraging open critical discussion about gaps and
[8] problems, not any other scientific theory?
[9]    A: Because that is the only scientific theory they are
[10] talking about. Again, in the book dealing with
[11] Darwinian Theory, that is the only thing the standards
[12] are requiring us to teach. In the book, there are
[13] sections on it that talk about the gaps and the
[14] problems.
[15]    All we are doing is telling them to follow — the
[16] state requires us to do — to follow what is in the
[17] book.
[18]    Q: But there's a lot of other scientific theories that the
[19] state standards require you to teach; correct?
[20]    A: I am sorry?
[21]    Q: There are a lot of other scientific theories that the
[22] state is requiring you to teach?
[23]    A: Yes.
[24]    Q: And you are not explicitly encouraging open and critical
[25] discussion of the gaps and problems in those theories;

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Richard Nilsen
January 3, 2005

---

Page 89

[1] are you?

[2] A: Oh, yes. We would want open discussions on every

[3] subject.

[4] Q: Other than Darwin's Theory of Evolution, you are not

[5] explicitly stating it and telling the students to be

[6] aware of gaps and problems in those other scientific

[7] theories?

[8] MR. GILLEN: Objection, characterization.

[9] A: Have we formally put it in writing? No. Have we had it

[10] as a practice? Yes.

[11] BY MR. ROTHSCHILD:

[12] Q: And that practice has existed for how long?

[13] A: Since the beginning of Aristotle's education.

[14] Q: That practice was in effect in the Dover School District

[15] during all the years you have been Assistant

[16] Superintendent and Superintendent?

[17] A: Yes.

[18] Q: And that practice was in effect and something that could

[19] be done for Darwin's Theory before this whole issue

[20] arose; correct?

[21] A: Yes.

[22] Q: But nevertheless, you are implementing a policy that

[23] requires that it be explicitly pointed out to the

[24] students only for Darwin's Theory of Evolution?

[25] MR. GILLEN: Objection to the characterization.

---

Page 90

[1] A: Am I following what the Board has directed me to do?

[2] Yes.

[3] BY MR. ROTHSCHILD:

[4] Q: Do you have an understanding of why the Board has

[5] singled out evolution among all the scientific theories

[6] taught to the Dover School District students —

[7] A: No.

[8] Q: Let me just finish my question.

[9] A: Sorry. You paused.

[10] Q: — for having gaps and problems?

[11] A: No.

[12] Q: What are teachers supposed to do if a student reads

[13] Pandas and asks questions to the teacher about the book?

[14] A: I refer back to what I said originally. If it is a

[15] discussion dealing with Intelligent Design, the answer

[16] is go research that on your own additionally and/or ask

[17] your parents or whoever you so choose. It is not a

[18] discussion item.

[19] Q: Why are you forbidding open and critical discussion

[20] about Intelligent Design, but not any other theory of

[21] evolution?

[22] A: The concerns of the teachers.

[23] Q: What concerns of those?

[24] A: They believe they are liable if they open that

[25] discussion.

---

Page 91

[1] Q: Is that the only reason that you forbid open critical

[2] discussion of Intelligent Design?

[3] A: Yes. Beyond the time frame as noted earlier.

[4] Q: Have you told the teachers that that is why you are

[5] forbidding open and critical discussion of the topic of

[6] Intelligent Design?

[7] MR. GILLEN: Objection to the characterization of

[8] the policy.

[9] A: They communicated that was their concern. I

[10] communicated the directive to protect their concern.

[11] BY MR. ROTHSCHILD:

[12] Q: Did you tell them that was why you had issued that

[13] directive?

[14] A: Phrased to the extent where they were concerned about

[15] the liability issue, and I then said your directive to

[16] cover you in that case then is not to discuss it.

[17] Q: You said that to them, this is to cover you?

[18] A: Yes.

[19] Q: Who did you say that to?

[20] A: The individuals in the November 24th meeting.

[21] Q: Is that the entire science faculty?

[22] A: Yes.

[23] Q: Did anybody outside the District participate in the

[24] creation of the press release?

[25] A: Define outside of the district.

---

Page 92

[1] Q: Anybody not employed by the School District or members

[2] of the School Board.

[3] A: No.

[4] Q: Was any counsel involved?

[5] A: As employed by the District? The answer is yes, counsel

[6] was involved.

[7] Q: Was that Stock and Leader?

[8] A: Yes.

[9] Q: Could you turn back to page six of the Answer which was

[10] Plaintiffs Exhibit 2?

[11] A: (Witness complies.) I am sorry. I am going to

[12] interrupt. For purposes of my day, I was told you were

[13] going to end at twelve o'clock. Are you looking further

[14] out than that?

[15] Q: I thought we would go to 12:30 and take an hour break.

[16] MR. GILLEN: Yes.

[17] BY MR. ROTHSCHILD:

[18] Q: Do you recall earlier in the deposition I asked you

[19] about that statement of the valid and clearly secular

[20] purpose?

[21] A: Which statement?

[22] Q: In the first full paragraph of page six.

[23] A: Yes.

[24] Q: And you said you couldn't speak for the Board, but this

[25] correctly expressed your purpose?

---

Richard Nilsen
January 3, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 93

[1]   A: Yes.

[2]   Q: Can you explain how the science curriculum has been

[3]  enhanced beyond how it previously existed by the change

[4]  in the curriculum?

[5]   A: Students prior to the change only knew that there was

[6]  one theory, Darwin's, and there were students that held

[7]  other theories. And those that were priorly

[8]  discriminated against, now know there are other theories

[9]  and can believe those other theories and not believe the

[10]  School District is discriminating against their beliefs.

[11]   Q: When you use the term theories, do you mean scientific

[12]  theories?

[13]   A: Yes.

[14]   Q: As of the time this resolution was passed, had you done

[15]  anything to ensure yourself that Intelligent Design was

[16]  in fact a scientific theory?

[17]   A: No.

[18]   Q: Have you done anything since to assure yourself that

[19]  Intelligent Design is a scientific theory?

[20]   A: I will answer that as I did before. Have I done any

[21]  specific research on Intelligent Design? No. Have I

[22]  been given items on Intelligent Design that I have read

[23]  since then? The answer is yes.

[24]   Q: And based on those materials, you have assured yourself

[25]  that Intelligent Design is a scientific theory?

Page 94

[1]   A: Yes.

[2]   Q: And have you assured yourself it is a valid scientific

[3]  theory?

[4]   A: Yes.

[5]   MR. GILLEN: Objection.

[6]   BY MR. ROTHSCHILD:

[7]   Q: What materials that you have looked at have caused you

[8]  believe that it is a valid scientific theory?

[9]   A: Scientists with vignettes (sp.) That reflect a knowledge

[10]  base have stated thus.

[11]   Q: I am not familiar with the term you just used.

[12]   A: Vignettes are basically their resumes.

[13]   Q: Do you have any understanding of how Intelligent Design

[14]  is viewed by the scientific community generally?

[15]   A: No.

[16]   Q: Do you think that is important to your determination of

[17]  whether you are actually presenting a valid scientific

[18]  theory to the students?

[19]   A: No.

[20]   Q: Does it matter to you in terms of achieving this purpose

[21]  whether there is any scientific merit to Intelligent

[22]  Design?

[23]   A: It goes back to the original belief. Obviously, you and

[24]  I differ. I don't believe in our science classroom we

[25]  are teaching Intelligent Design. I do believe that

Page 95

[1]  there are kids that do believe in Intelligent Design.

[2]  So we are not teaching it. We are accepting beliefs in

[3]  other students that they believe differently than what

[4]  is being taught in that class.

[5]   Q: For limited purpose, it is not important whether it is a

[6]  valid scientific belief or not?

[7]   A: Yes.

[8]   Q: There are also kids who belief in the Biblical version

[9]  of creation; correct?

[10]   A: Yes.

[11]   Q: You talked to them I am sure; right?

[12]   A: Yes.

[13]   Q: So you could achieve the same objective by making

[14]  students aware that some people believe the Biblical

[15]  version?

[16]   A: I am not sure what your question is on that.

[17]   Q: Is there a reason why you haven't included the Biblical

[18]  version as one of the beliefs that you want to not

[19]  discriminate against?

[20]   A: I didn't put it in. So I don't know what the

[21]  conversation and the reasoning was behind what was

[22]  chosen.

[23]   Q: Is there any distinction in your mind between a

[24]  curriculum item that makes students aware that there is

[25]  a Biblical version viewpoint about creation and one like

Page 96

[1]  the one you have here that makes them aware of

[2]  Intelligent Design?

[3]   A: Yes.

[4]   Q: What is the difference?

[5]   A: One is religious, and one is not.

[6]   MR. ROTHSCHILD: We'll take a two minute break.

[7]   MR. GILLEN: Sure.

[8]   (A recess was taken from 12:20 a.m. to 12:25 a.m.)

[9]

[10]   AFTER RECESS

[11]   BY MR. ROTHSCHILD:

[12]   Q: Dr. Nilsen, I apologize. I have been calling you Mr.

[13]  Nilsen frequently. I apologize for that.

[14]   A: No problem.

[15]   Q: You worked hard for it. I didn't mean to disrespect

[16]  you.

[17]   In a couple of instances in the book Pandas, the

[18]  statement is made that life itself owes its origin to a

[19]  master intellect. Are you aware of that statement?

[20]   A: No.

[21]   Q: What do you understand that statement to mean?

[22]   MR. GILLEN: Objection, speculation.

[23]   A: I am sorry. What is the question?

[24]

[25]   BY MR. ROTHSCHILD:

**Tammy Kitzmiller, et al.   v.**
**Dover Area School District, et al.**

**Richard Nilse**
**January 3, 200**

Page 97

[1] Q: Do you have an understanding of what that statement
[2] means?

[3] A: Can you please read it again, please?

[4] Q: Life itself owes its origin to a master intellect.

[5] A: I don't have an understanding of what that means.

[6] Q: Just listening to that passage, what is your
[7] understanding of what a master intellect would be?

[8] A: I would never take a sentence out of context. I would
[9] have to read the whole context.

[10] Q: Would you like to look at the book?

[11] A: Sure. Tell me where it is.

[12] Q: It's at the very end. You may need to read more for
[13] context.

[14] A: Where is the statement?

[15] Q: You see where I put the yellow tabs at the very end? It
[16] says master intellect.

[17] A: Oh. Your question is?

[18] Q: What do you understand a master intellect to be
[19] referring to?

[20] MR. GILLEN: Objection, foundation.

[21] A: I don't know.

[22] BY MR. ROTHSCHILD:

[23] Q: Do you have any explanation for what a master intellect
[24] could be referring to in terms of the creation or
[25] development of species other than to God?

Page 98

[1] A: Yes.

[2] Q: What?

[3] A: Aliens.

[4] Q: Can you think of anything else?

[5] A: No.

[6] Q: Using master intellect in that context, it must mean God
[7] or aliens?

[8] A: In this context, yes.

[9] Q: Also in the book — and I will show you the passages —
[10] it states — and this is on pages 99 and 100 of the book
[11] — it states Intelligent Design means that various forms
[12] of life began abruptly through an intelligent agency
[13] with their distinctive features already intact — fish
[14] with fins and scales, birds with feathers, beaks and
[15] wings, etcetera.

[16] Do you have any understanding of what kind of
[17] actor could have caused forms of life to begin abruptly
[18] as described here other than God?

[19] A: Let me see the paragraph. Where the yellow tab is?

[20] Q: Bottom of page 99 leading over to 100.

[21] A: Again, I am sorry. Your question is?

[22] Q: Do you have any — do you have an understanding of what
[23] that could be referring to that could create life
[24] abruptly as described other than God?

[25] A: Again, aliens.

Page 9

[1] Q: And that is it?

[2] A: Yes.

[3] Q: Do you understand Intelligent Design to be in any way
[4] referring to the work of aliens?

[5] A: Yes.

[6] Q: Where did you get that understanding?

[7] A: Board members have communicated that.

[8] Q: Is that your only source of understanding?

[9] A: I am sorry. Phrase the question.

[10] Q: Is that the only basis for your understanding that
[11] Intelligent Design could be referring to the acts of
[12] aliens?

[13] A: Again, I have not researched Intelligent Design
[14] thoroughly so I don't intend to be an expert on it.

[15] Have individuals — specific Board members communicated
[16] to me that they believe Intelligent Design refers to
[17] aliens? Yes.

[18] Could it be more than that? I would not be an
[19] expert to define that issue. I am not going to debate
[20] the Intelligent Design issue.

[21] Q: Are you familiar with the beliefs of the Raelians?

[22] A: Sounds familiar, but I can't be specific enough to say
[23] yes.

[24] Q: Do you know anything about their beliefs or principles?

[25] A: No.

Page 10

[1] Q: What Board members told you that Intelligent Design is
[2] about the work of aliens?

[3] A: She said it is a possibility that it could be a work of
[4] aliens.

[5] Q: Who is that?

[6] A: Angie Yingling.

[7] Q: Anybody else?

[8] A: No.

[9] Q: Ms. Yingling has been quoted in the newspapers as
[10] stating that persons on the Board called her an atheist
[11] or un Christian in urging her to vote for the
[12] resolution.

[13] Are you aware of those statements?

[14] A: As I read in the newspaper?

[15] Q: Are you aware that that has been reported, that she said
[16] she had been called that?

[17] A: Ask that question again.

[18] Q: Are you aware that Ms. Yingling made that accusation,
[19] that she had been called un Christian and atheist?

[20] A: I remember reading that in the newspaper, yes.

[21] Q: Are you aware of those statements actually having been
[22] made other than the fact that —

[23] A: No.

[24] Q: — she said it? Do you understand the concept that
[25] creatures were created abruptly in their present form,

Richard Nilsen
January 3, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 101

[1] birds with feathers, fish with fins to be a tenet of
[2] Creationism?
[3]    A: I don't know enough about Creationism to say whether
[4] that is the only tenet.
[5]    Q: Do you know it to be a tenet of Creationism?
[6]    A: Yes.
[7]    Q: Do you understand it to be a tenet of Creationism that
[8] humans were created in their present form?
[9]    A: Again, I am not an expert on what Creationism is or is
[10] not. I can't speak to that because there are many
[11] different theories and concepts within the umbrella
[12] called Creationism.
[13]    Q: So it could be more than just the Biblical theory of
[14] Creationism or Biblical idea of Creationism?
[15]    A: Yes.
[16]    Q: Do you have an understanding of other concepts of
[17] Creationism or just the Biblical concept?
[18]    A: There are other concepts of Creationism, sure.
[19]    Q: Is there anything consistent across theories or concepts
[20] of Creationism that causes you to put them under the
[21] umbrella of Creationism?
[22]    MR. GILLEN: Objection, foundation.
[23]    A: I am sorry. The question?
[24]          BY MR. ROTHSCHILD:
[25]    Q: Is there anything consistent across different concepts

Page 102

[1] of Creationism that causes you to put them all under the
[2] definition of Creationism?
[3]    A: As defined by the public religious.
[4]    Q: Anything else?
[5]    A: No.
[6]    Q: The District produced to us an audiotape of the October
[7] 18th meeting in which much of the discussion about the
[8] biology curriculum or some of the discussion of the
[9] biology curriculum was cut off.
[10]    Do you know how that happened?
[11]    A: Yes.
[12]    Q: How is that?
[13]    A: Giving you the background as I alluded to before, the
[14] secretary is fighting cancer. Our second Board
[15] secretary had a son that was involved in a wrestling
[16] match.
[17]    So our third individual Ed Hermance — that is
[18] actually the third Board secretary — when he went to
[19] change the tape, he communicated to me that he left the
[20] tape on pause. When he hit play, the pause was still on
[21] so it did not record the second half of the Board
[22] meeting.
[23]    Q: Okay. Has the Board developed a policy or — strike
[24] that. Is there any policy in effect in the District to
[25] allow students to opt out of the discussion of or

Page 103

[1] presentation of Intelligent Design?
[2]    A: Yes. If you look in your minutes, your packet, I
[3] believe the Assistant Superintendent developed a letter
[4] that is going out.
[5]    Q: And has that letter been approved by the Board?
[6]    A: The Board will not approve it. It is not a Board issue.
[7]    Q: That is something that the administration is doing on
[8] its own?
[9]    A: Yes.
[10]    Q: Who decided to do that?
[11]    A: In any controversial subject matter by Pennsylvania
[12] Code, a teacher — I am sorry — a parent can opt out of
[13] any conversation due to religious purposes. We do send
[14] periodic letters on subject matters that are of
[15] controversy.
[16]    I directed the Assistant Superintendent to develop
[17] a letter on this controversy to make sure that anybody
[18] above and beyond knew of that option.
[19]    Q: If you could turn to the — and I really am near the end
[20] here. If you can turn to I believe it is Exhibit 4. It
[21] is the production — or maybe 5. I am sorry. It is 5.
[22] Turn to the page stamped 74.
[23]    A: (Witness complies.)
[24]    Q: This is a memo you prepared notifying the Board about
[25] the Complaint?

Page 104

[1]    A: Yes.
[2]    Q: In the second paragraph, you note for the Board the
[3] eleven parents who have filed suit. Is there any reason
[4] that you called that particularly to their attention?
[5]    A: The Board members requested it.
[6]    Q: Which Board members?
[7]    A: Board President Mrs. Harkins asked who filed the suit.
[8]    Q: What was your understanding of why she was asking that
[9] question?
[10]    MR. GILLEN: Objection, foundation.
[11]    A: I don't know. I can't speak for her.
[12]          BY MR. ROTHSCHILD:
[13]    Q: Are you aware of any discussion about members of the
[14] School Board or employes of the School District or their
[15] representatives planning to contact any of the
[16] plaintiffs to discuss the lawsuit?
[17]    A: Read that question, again.
[18]    Q: Has there been any discussion that you are aware of
[19] among School Board members or employes of the School
[20] District about contacting plaintiffs to discuss the
[21] lawsuit?
[22]    A: No.
[23]    Q: Turn to page 37.
[24]    A: (Witness complies.)
[25]    Q: Do you know whose handwritten notes those are?

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Richard Nilser
January 3, 2005

Page 105

[1]   A: Mr. Mike Baksa.

[2]   Q: If you turn to page 39 —

[3]   A: (Witness complies.)

[4]   Q: — do you recognize the document marked page 39?

[5]   A: Yes.

[6]   Q: Was that something that was submitted to the School

[7] District?

[8]   A: I believe this was submitted to Mr. Mike Baksa.

[9]   Q: By Mr. Buckingham?

[10]   A: That is my understanding.

[11]   Q: Do you know what the purpose was for this document?

[12]   A: I believe he had questions on the Miller Levin book.

[13]   Q: Mr. Baksa had questions?

[14]   A: Mr. Buckingham did.

[15]   Q: If you could, turn to page 55.

[16]   A: (Witness complies.)

[17]   Q: Do you recognize those notes?

[18]   A: Yes.

[19]   Q: Whose handwriting?

[20]   A: Mr. Baksa's.

[21]   Q: This document, the printed text states that it is a

[22] survey of biology books used in area schools and has a

[23] couple of schools filled in.

[24]   Who created the printed text of this document?

[25]   A: Mr. Baksa.

Page 106

[1]   Q: Was this a survey that he conducted?

[2]   A: His office.

[3]   Q: What was the purpose of the survey?

[4]   MR. GILLEN: Objection, foundation.

[5]   A: To find out what other districts or high schools, what

[6] other biology books they had.

[7]                      BY MR. ROTHSCHILD:

[8]   Q: The only schools listed here are private denominational

[9] schools; correct?

[10]   A: Yes.

[11]   Q: Why did Mr. Baksa do this survey?

[12]   MR. GILLEN: Objection, foundation.

[13]   A: I don't know. You have to ask him.

[14]                      BY MR. ROTHSCHILD:

[15]   Q: Were you aware he had done this survey?

[16]   A: Yes.

[17]   Q: When did you become aware of it?

[18]   A: Sometime this summer.

[19]   Q: How did you become aware of it?

[20]   A: He communicated to me orally that he had done so.

[21]   Q: Did you ask him why he had done so?

[22]   A: No. I knew why.

[23]   Q: Why?

[24]   A: The Board had asked the question, if not the community

[25] had asked the question — one or the other — who and

Page 107

[1] what other books were used in what other school

[2] districts.

[3]   Q: Do you know whether it was the Board or the community?

[4]   A: No, I don't. It is one or the other.

[5]   Q: Do you know why the survey was limited to denominational

[6] schools?

[7]   A: Not with certainty.

[8]   Q: Do you have any understanding?

[9]   A: No, because there could have been different reasons.

[10]   Q: Do you know whether the intention in doing this survey

[11] was to identify books other than the Miller Levin book

[12] that was being considered as the possible biology

[13] textbook for the Dover District?

[14]   A: Again, I wouldn't define it solely in that area.

[15] Whenever we adopt a textbook, we try to research as much

[16] as possible who is using what and where.

[17]   Q: Is it your practice for other textbooks to find out what

[18] private denominational schools are using?

[19]   A: It is our practice to find out as many districts as

[20] possible.

[21]   Q: These aren't districts. These are private

[22] denominational schools. Is that your practice to find

[23] out what private denominational schools are using?

[24]   A: Again, I answered it to the extent of where it is our

[25] practice to find as many as possible. Whether those

Page 108

[1] were forgotten or not or added later, I do not know

[2] because I did not do the research.

[3]   Q: Are you aware of other textbook searchs where private

[4] denominational schools have been surveyed?

[5]   A: Yes.

[6]   Q: For what kind of textbooks?

[7]   A: I directed when I was Assistant Superintendent the

[8] secretary to contact all schools in York County. I

[9] never limited to public or private.

[10]   Q: Did you ever instruct that search to be just directed at

[11] private denominational schools?

[12]   A: No.

[13]   MR. ROTHSCHILD: Thank you very much. I

[14] appreciate your patience.

[15]                      BY MR. GILLEN:

[16]   Q: Richard, just a few questions that I would like to ask

[17] to make sure that everything is very clear.

[18]   Earlier, Mr. Rothschild asked you about teacher's

[19] discretion in the curriculum. I would like to ask you

[20] simply do teachers have curriculum discretion to teach

[21] Intelligent Design?

[22]   A: No.

[23]   Q: Do teachers have discretion to lecture on Intelligent

[24] Design?

[25]   A: No.

Richard Nilsen
January 3, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 109

[1] Q: In the event as Mr. Rothschild has pointed out the
[2] curriculum policy that was adopted calls for students
[3] will be made aware of gaps/problems in Darwin's Theory,
[4] do you have an understanding of how students are made
[5] aware of gaps?
[6] A: By their own research. Read that question again.
[7] Q: Do you have an understanding — let me ask you this:
[8] Have you directed teachers as to how to make students
[9] aware of gaps and problems in Darwin's Theory?
[10] A: Beyond the textbook that they currently have and the
[11] textbook that the teachers requested has sections in it
[12] that speaks to the gaps and problems.
[13] Q: Earlier, Mr. Rothschild asked you about a newspaper
[14] article dated June 14th, 2004 from the York Daily
[15] Record. It contains a statement that was attributed to
[16] Mr. Buckingham.
[17] I want you to look carefully at this portion of
[18] the statement again which was read.
[19] MR. ROTHSCHILD: Can you tell me what page you are
[20] looking at?
[21] MR. GILLEN: Certainly. The June 14th, 2004
[22] article. Yes, that is the one.
[23] BY MR. GILLEN:
[24] Q: It contains a statement this country wasn't founded on
[25] Muslim beliefs or evolution — close the quote.

Page 110

[1] I ask you again: Do you recall Mr. Buckingham
[2] making that statement, this country wasn't founded on
[3] Muslim beliefs or evolution?
[4] A: No. I don't remember that.
[5] Q: As I focus your attention on that statement, what is
[6] inaccurate in your recollection about it now?
[7] A: I don't remember him saying either. I don't remember
[8] him saying that whole sentence. I don't remember him
[9] saying this country wasn't founded on Muslim beliefs or
[10] evolution. I don't remember him saying that in total.
[11] Q: Just to be clear again, is it that you both don't
[12] remember him saying this country wasn't founded on
[13] evolution?
[14] A: Agreed.
[15] Q: And this country wasn't founded on Muslim beliefs?
[16] A: Both.
[17] Q: Right. Okay. I just wanted to make that clear. I am
[18] not sure it was entirely clear.
[19] MR. ROTHSCHILD: Can I just follow up on that
[20] point?
[21] MR. GILLEN: As soon as I am done.
[22] MR. ROTHSCHILD: I just thought it would easier.
[23] That is fine.
[24] BY MR. GILLEN:
[25] Q: Just to be clear on this, do you have an understanding

Page 111

[1] of whether Intelligent Design posits a thesis with
[2] respect to an intelligent agent?
[3] A: I am sorry. The question again?
[4] Q: Do you have an understanding concerning whether
[5] Intelligent Design posits a thesis with respect to the
[6] nature of an intelligent agent?
[7] MR. ROTHSCHILD: Objection, form.
[8] A: I am sorry. You are going to have to do that one more
[9] time.
[10] BY MR. GILLEN:
[11] Q: Do you have an understanding concerning whether
[12] Intelligent Design posits —
[13] A: What does posits mean?
[14] Q: Teaches, advances a thesis with respect to the nature of
[15] an intelligent agent?
[16] A: I don't know.
[17] MR. GILLEN: That is all I have.
[18] BY MR. ROTHSCHILD:
[19] Q: Just going back to the sentence in the news article, do
[20] you recall Mr. Buckingham saying the second part of the
[21] quote here this country was founded on Christianity and
[22] our students should be taught as such?
[23] A: No.
[24] Q: Taking the whole quoted section there Muslim beliefs,
[25] evolution, Christianity, the whole thing, do you

Page 112

[1] remember Mr. Buckingham saying anything to that effect?
[2] A: Do I remember him saying in conversation about Muslims?
[3] Do I remember him saying in conversations about
[4] Christianity? Yes. Within that context, no, I do not
[5] remember it.
[6] Q: Meaning not anything to do with the biology curriculum?
[7] A: Not that I remember, no.
[8] Q: And just one more question. You testified in response
[9] to your counsel's question that teachers have no
[10] discretion to lecture on Intelligent Design.
[11] Isn't it the case that the biology curriculum says
[12] that they will lecture on this very subject matter? It
[13] says lecture is the instructional strategy for the unit
[14] that includes the presentation of Intelligent Design?
[15] A: But not Intelligent Design. They are not to teach
[16] Intelligent Design.
[17] Q: But they are going to read the statement which informs
[18] students about Intelligent Design; is that correct?
[19] A: That's correct.
[20] Q: That is a lecture; correct?
[21] MR. GILLEN: Objection, characterization.
[22] A: No. It is not. A lecture is more than just reading a
[23] statement. A lecture is an expanded presentation. If I
[24] lecture something, it is more than just reading a
[25] statement.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Richard Nilsen
January 3, 2005

Page 113

[1]           BY MR. ROTHSCHILD:

[2]       Q: So the instructional strategy of lecture does not apply

[3]  to the curriculum item regarding Intelligent Design?

[4]       A: That's correct, as so defined by you.

[5]       Q: As what is defined by me?

[6]       A: You are conveying that lecture is a full explanation.

[7]       Q: I didn't define it. You defined it.

[8]       A: Okay. Then I defined it then.

[9]       MR. ROTHSCHILD: Thank you. I appreciate your

[10] taking all the time.

[11]      MR. GILLEN: Thank you.

[12]      (The deposition was concluded at 12:55 p.m.)

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

Page 114

COMMONWEALTH OF PENNSYLVANIA   :

COUNTY OF CUMBERLAND              :

I, Vicki L. Fox, Reporter and Notary Public in and
for the Commonwealth of Pennsylvania and County of
Cumberland, do hereby certify that the foregoing
testimony was taken before me at the time and place
hereinbefore set forth, and that it is the testimony of:

RICHARD NILSEN

I further certify that said witness was by me duly
sworn to testify the whole and complete truth in said
cause; that the testimony then given was reported by me
stenographically, and subsequently transcribed under my
direction and supervision; and that the foregoing is a
full, true and correct transcript of my original
shorthand notes.

I further certify that I am not counsel for nor
related to any of the parties to the foregoing cause,
nor employed by them or their attorneys, and am not
interested in the subject matter or outcome thereof.
Dated at Camp Hill, Pennsylvania, this 3rd day of
January, 2005.

Vicki L. Fox

Reporter - Notary Public

(The foregoing certification does not apply to any
reproduction of the same by any means unless under the
direct control and/or supervision of the certifying
reporter.)

Filius  &  McLucas Reporting Service, Inc.        Min-U-Script®        (31)  Page 113 - Page 114

**Lawyer's Notes**

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Richard Nilsen
January 3, 2005

## 0

000001 14:22
000139 15:4
000151 15:4
000167 14:23

## 1

1 7:15; 48:4
100 98:10, 20
10:35 45:9
10:45 45:9
10th 58:24
11:00 53:5
11:10 53:5
11:30 70:23
12:20 96:8
12:25 96:8
12:30 92:15
12:55 113:12
13th 3:21
14's 60:4
146 15:5, 8
148 15:11, 23
14th 59:13, 24; 109:14, 21
15 63:7
151 15:6, 9
18th 13:10; 14:15; 27:19; 34:10, 18, 20; 35:4, 17; 38:11; 47:14; 49:2; 102:7
1972 73:2, 4
1:05 69:25

## 2

2 7:24; 92:10
2,000 63:11
2003 66:9, 13, 14
2004 19:23; 20:17; 34:7, 10; 50:7; 54:3; 55:23; 56:3; 58:2, 25; 59:13; 63:7; 65:10; 66:2; 72:25; 74:14, 25; 109:14, 21
2005 3:21
22nd 44:5, 15
23rd 44:5, 15
24th 68:5; 69:25; 91:20

## 3

30 27:1
300 85:2
30th 14:22
37 104:23
39 105:2, 4

## 4

4 103:20
40 74:16
45 74:2, 10

## 5

5 103:21, 21
50 74:2, 10
55 105:15

## 7

74 103:22

## 8

8 67:10
8th 54:3

## 9

99 98:10, 20
9th 56:3; 58:1

## A

a.m 53:5, 5; 96:8, 8
above 87:8; 103:18
abruptly 98:12, 17, 24; 100:25
accept 41:3; 66:10, 18
accepted 66:15
accepting 73:13; 95:2
account 60:17
accurate 22:17
accusation 100:18
achieve 95:13
achieved 87:20
achieving 94:20
ACLU 4:13
across 44:15; 71:1; 101:19, 25
acting 25:19; 27:17, 21
activities 67:22
actor 98:17
acts 99:11
actually 26:13; 46:3; 61:12; 78:22; 94:17; 100:21; 102:18
added 47:13; 49:1; 108:1
additional 27:20; 45:17; 47:21, 22
additionally 90:16
address 71:21
addressing 71:23
administration 21:8; 23:6, 9; 26:11; 103:7
administrator 31:18; 49:18
administrators 32:5
adopt 107:15
adopted 65:3; 66:6; 68:7; 109:2
advance 22:9
advanced 22:16
advances 111:14
advice 37:3, 8; 39:1, 24; 40:4, 6
Again 14:7; 15:8; 21:25; 23:4; 38:20; 41:12, 25; 42:9; 51:12; 52:7; 61:20; 67:10; 72:15; 76:6; 83:9, 21; 85:7; 86:23; 88:6, 10; 97:3; 98:21, 25; 99:13; 100:17; 101:9; 104:17; 107:14, 24; 109:6, 18; 110:1, 11; 111:3
against 4:6; 93:8, 10; 95:19
agency 98:12
agenda 15:24
agent 111:2, 6, 15
aggressively 59:4
ago 27:1; 34:6; 63:11
agree 58:20; 62:11, 22; 77:12; 80:11, 17; 81:22
agreed 44:23; 64:8; 110:14
Aguillard 77:16, 19
ahead 53:22
Alan 9:14; 35:19; 58:5; 59:3; 64:7
Aliens 98:3, 7, 25; 99:4, 12, 17; 100:2, 4
allow 6:20; 102:25
allowed 49:10
allowing 88:2, 4
alluded 78:16; 102:13
alternative 22:15
ambiguous 84:8
amended 24:2
amending 22:22, 25; 23:12, 17, 20
among 77:7; 83:6; 90:5; 104:19
and/or 69:13; 86:20; 90:16
Angle 100:6
answered 21:21; 76:24; 107:24
apologies 34:16
apologize 5:19; 96:12, 13
apply 113:2
appreciate 108:14; 113:9
appropriate 41:4; 71:12
approval 28:3
approve 103:6
approved 27:18; 28:6; 103:5
approves 27:14; 28:2
Aralene 29:5

Area 4:6, 7, 15, 16; 5:12; 17:24; 24:21, 23; 25:8; 27:7; 54:9; 105:22; 107:14
Aristotle's 89:13
arose 89:20
around 70:1
arrived 33:1; 42:22
article 53:14; 54:3; 56:1, 3; 57:11; 58:1, 2, 24, 25; 59:13, 14; 60:24; 63:6; 109:14, 22; 111:19
articles 50:5, 6; 52:16; 53:12, 15, 19; 58:19; 64:15; 73:24; 74:1; 75:24
articulated 77:7
aside 74:25; 78:9
aspects 40:5
asserting 19:9
assigned 74:6
Assistant 9:20; 13:23; 14:11; 17:23; 24:23; 25:2, 5, 19, 25; 27:18; 30:14; 31:6; 32:3, 9, 17; 33:3, 16, 25; 49:14, 15; 57:9; 65:18, 19; 66:10, 15; 89:15; 103:3, 16; 108:7
associated 18:1; 61:9
assure 93:18
assured 93:24; 94:2
atheist 100:10, 19
attachment 15:24
attend 27:9; 28:13, 16, 19, 21; 31:7, 10, 15
attended 27:3
attends 30:22
attention 20:2, 5, 20; 104:4; 110:5
attorney 5:8
attorney/client 5:16, 22; 6:1, 7; 38:24; 39:5, 9
attorneys 9:2, 9; 16:18; 36:23, 24; 37:8; 39:3
attributed 54:5; 63:13; 109:15
audible 7:1
audibly 6:25
audiotape 102:6
August 66:6
authority 68:3
authorized 38:6
authorizing 3:15
aware 12:7, 15; 13:8; 15:21; 19:9; 20:18; 23:22; 33:10; 40:20; 47:12; 49:22; 52:2, 9; 54:6, 16; 56:14; 57:15, 18; 58:7, 10; 59:7, 23; 60:7; 61:4, 6, 8; 63:14; 65:7; 66:25; 67:9; 72:21, 25; 77:9; 79:4; 80:1, 14, 15; 81:1; 83:5, 11, 14; 84:1, 6, 8, 12; 89:6; 95:14, 24; 96:1, 19; 100:13, 15, 18, 21; 104:13, 18; 106:15, 17, 19; 108:3; 109:3, 5, 9

## B

B 29:5
BA 26:10
back 28:15; 30:15; 40:9; 47:9; 66:13; 67:10, 15, 16; 68:1; 70:18; 75:13; 76:17; 90:14; 92:9; 94:23; 111:15
background 102:13
Baksa 9:15; 15:23; 18:3, 4; 25:3; 42:17, 24, 25; 44:15, 23; 57:9, 12, 19, 21, 23; 67:1; 68:12; 69:2; 70:4; 105:1, 8, 13, 25; 106:11
Baksa's 9:19; 105:20
balance 59:21; 64:9, 11
balanced 21:12, 13, 15, 20
base 84:23; 94:10
based 73:15; 78:24, 25; 79:8; 93:24
basically 94:12
basis 99:10
battling 27:15
beaks 98:14
became 72:25
become 12:7; 15:21; 20:18; 40:20; 72:21; 106:17, 19
becoming 25:5
began 98:12
begin 15:3; 38:18, 21; 48:18; 98:17
beginning 15:5; 43:13; 54:9; 76:1, 7; 89:13
begins 14:22; 56:7; 57:8
behalf 8:3, 12
behind 73:18; 95:21
belief 73:8, 12, 13, 21; 94:23; 95:6, 8
beliefs 61:1, 9, 18; 62:14, 19; 72:4, 17; 73:15, 20; 93:10; 95:2, 18; 99:21, 24; 109:25; 110:3, 9, 15; 111:24
besides 13:19; 31:7; 49:10; 51:15; 65:14; 69:19; 72:9; 83:16
best 8:18, 20; 17:8; 44:24
beyond 18:24; 19:1; 21:8; 22:3; 23:8; 46:18; 48:24; 68:8, 15; 72:2; 91:3; 93:3; 103:18; 109:10
Bible 77:7
Biblical 60:16; 77:4; 78:17, 17, 24; 95:8, 14, 17, 25; 101:13, 14, 17
Big 25:9, 13
Bill 9:14; 12:9; 35:19; 70:
biology 13:10; 15:13; 21:3; 22:2, 9, 19, 22; 23:1, 12, 17, 20; 24:2; 26:20; 33:13; 34:11, 24; 35:2; 47:2, 13; 49:1; 50:7, 10,

Richard Nilsen
January 3, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

17, 22; 51:3, 10, 16; 52:2, 9; 53:14; 59:5, 10, 20; 63:25; 65:11, 14; 66:3; 67:11; 71:7; 87:9, 15; 102:8, 9; 105:22; 106:6; 107:12; 112:6, 11
**birds** 98:14; 101:1
**bit** 6:11
**Board** 4:7; 5:12, 25; 6:7; 8:4, 13; 9:17; 10:6, 14, 23; 12:9; 13:4, 9, 15, 16, 19; 14:6; 15:7, 13, 22, 24; 16:14, 20, 24; 17:1, 4, 14; 20:19; 23:6, 18, 21; 24:4, 6, 8; 27:7, 14, 15, 17, 20, 23; 28:2, 8, 16, 21; 29:8, 22, 25; 30:4, 7, 13, 19; 31:2, 4, 5, 6, 12, 17, 19, 23; 32:5, 13, 15, 19, 21; 33:18, 20, 22, 22, 23, 25; 34:4; 35:1; 38:6, 10; 41:14; 51:21; 52:3, 10; 56:25; 57:2, 3; 58:5, 16, 17; 59:3, 3, 19; 62:2, 5; 63:21; 64:7, 18, 20; 65:2, 22, 22, 23; 66:21; 67:5, 5, 7; 68:7; 69:2; 83:3; 90:1, 4; 92:2, 24; 99:7, 15; 100:1, 10; 102:14, 18, 21, 23; 103:5, 6, 6, 24; 104:2, 5, 6, 7, 14, 19; 106:24; 107:3
**Board's** 22:22; 23:16, 19; 24:1
**Bonsell** 9:14; 24:7; 35:19; 36:12; 40:22; 42:19, 24; 52:15; 58:5, 11, 13, 15; 59:3; 64:7, 10
**Bonsell's** 53:2
**book** 11:22; 12:6, 16; 20:7, 8, 11, 16, 18, 21, 23; 21:9; 22:3; 24:14; 40:13; 43:15; 45:24; 46:1, 6, 9; 49:7; 56:7, 10, 18; 59:5, 10, 20; 67:8; 88:10, 12, 17; 90:13; 96:17; 97:10; 98:9, 10; 105:12; 107:11
**books** 40:16, 21, 23; 41:3, 5, 8, 11, 15, 20; 42:3, 6, 8, 11, 12, 13, 16, 20, 22; 43:2; 44:3, 14, 18, 24, 25; 45:1, 4, 25; 46:4, 8, 11; 105:22; 106:6; 107:1, 11
**both** 56:11, 19; 110:11, 16
**bottom** 47:11; 58:4; 98:20
**boxes** 45:22
**break** 7:11, 13; 43:6, 7; 45:7, 17; 53:3; 92:15; 96:6
**breakfast** 44:20
**bring** 20:20; 45:4; 46:11; 49:7
**bringing** 45:24; 56:24; 57:2
**brings** 32:10, 12; 69:9, 15
**broadly** 74:4
**broken** 25:16
**brought** 20:1

**Buckingham** 9:15; 12:9, 19, 22; 20:19; 21:5; 24:6; 35:19; 36:11, 16; 52:15; 56:10, 15, 17, 24; 59:4, 19; 60:8, 10, 25; 61:12, 21; 63:4, 13, 17; 64:8; 105:9, 14; 109:16; 110:1; 111:20; 112:1
**Buckingham's** 53:2

# C

**call** 11:23; 12:2, 8; 37:16, 16; 80:13
**Callahan** 29:5
**called** 3:7; 12:20; 37:17, 18; 39:1; 100:10, 16, 19; 101:12; 104:4
**calling** 96:12
**calls** 34:14; 87:2; 109:2
**came** 20:5; 44:15; 62:4
**can** 6:19, 21; 11:18; 15:8; 16:13, 25; 19:17; 22:4; 23:9, 10, 21; 26:24; 30:15; 31:1; 32:6; 37:12; 38:20; 39:3; 41:24; 43:7; 47:8; 53:3, 18; 57:1, 5, 6; 58:19; 61:24; 63:8; 67:10; 68:15; 78:22; 83:6; 85:18; 87:3; 93:2, 9; 97:3; 98:4; 103:12, 20; 109:19; 110:19
**cancer** 27:15; 102:14
**capacity** 5:1
**captured** 61:15
**care** 48:4
**carefully** 109:17
**case** 40:5; 91:16; 112:11
**caused** 2:12; 75:6; 94:7; 98:17
**causes** 101:20; 102:1
**causing** 42:3, 15
**Center** 5:12; 11:11, 14, 21; 12:2, 7, 10, 20; 16:18; 34:7; 42:6; 44:17
**certain** 40:5
**Certainly** 53:4; 109:21
**certainty** 107:7
**certification** 3:3
**chair** 30:1, 20
**chaired** 32:3
**chairperson** 30:13, 19
**change** 15:17, 22; 33:13; 47:25; 93:3, 5; 102:19
**changes** 15:12; 34:1
**changing** 22:18; 85:10, 16, 18
**characterization** 71:9; 75:8, 20; 84:13; 89:8, 25; 91:7; 112:21
**characterizing** 82:19
**charge** 32:9
**chemistry** 31:24, 25
**choose** 68:3; 90:17
**chosen** 95:22

**Christian** 59:21; 100:11, 19
**Christianity** 61:2, 10, 19; 62:15, 21; 111:21, 25; 112:4
**chronological** 59:16
**Church** 63:7
**circumstances** 4:22; 5:10; 11:20; 20:4; 28:8, 19; 31:14; 37:12, 13; 42:15; 61:24; 62:7
**clarify** 7:8; 27:14; 45:16; 55:13
**class** 57:13, 24; 78:4; 95:4
**classes** 77:13; 78:11
**classroom** 3:21; 45:5; 46:4, 11; 47:18; 49:8; 94:24
**clear** 6:17; 7:2; 32:16; 46:22; 48:2; 108:17; 110:11, 17, 18, 25
**clearly** 22:12; 92:19
**clients** 39:4
**clippings** 50:6
**close** 109:25
**Code** 103:12
**collection** 15:3; 53:11, 15; 54:3
**collectively** 53:12
**College** 26:11, 14
**combination** 13:21; 14:8, 12, 14
**comment** 35:15; 45:20; 60:21
**comments** 61:9
**committee** 15:13, 22; 29:22, 24; 30:1, 5, 8, 20, 22, 23, 24; 31:3, 2, 4, 5, 8, 10, 11, 12, 15, 21, 22, 23; 32:2, 3, 12, 13, 19, 20; 33:17, 18, 24; 34:1, 5; 56:10, 18; 65:20, 21, 22, 23; 66:18, 21; 67:6
**committee's** 31:20, 24
**committees** 30:25; 31:1; 32:7
**communicate** 7:3; 40:3; 86:18; 87:3, 4
**communicated** 12:10, 19; 39:23; 44:21; 51:2, 8, 14, 23, 25; 52:20; 69:24; 73:4; 91:9, 10; 99:7, 15; 102:19; 106:20
**communicating** 34:21; 52:4, 11
**communication** 34:4, 8; 38:24
**communications** 9:22; 11:7, 13, 20; 34:6, 9, 13, 23; 35:2; 38:7; 39:21
**community** 31:3; 32:2, 4, 11, 18; 33:17; 41:7, 10, 13, 19; 42:4, 17; 51:21; 94:14; 106:24; 107:3
**community's** 42:2

**compels** 82:9
**Complaint** 7:19; 13:3, 7; 16:7; 103:25
**completed** 28:1
**completely** 51:22
**complies** 7:21; 13:2; 22:7; 57:7; 58:3; 59:1; 63:9; 67:12, 14; 78:21; 92:11; 103:23; 104:24; 105:3, 16
**components** 23:5; 62:18
**composite** 14:20
**comprised** 15:7
**computer** 29:20
**concept** 18:20; 75:7, 10, 11; 76:19; 82:19; 100:24; 101:17
**concepts** 18:24, 25; 101:11, 16, 18, 19, 25
**concern** 91:9, 10
**concerned** 91:14
**concerning** 111:4, 11
**concerns** 90:22, 23
**conclude** 75:6
**concluded** 29:11; 113:12
**concludes** 14:23
**conducted** 106:1
**conference** 29:6
**conjunction** 32:10; 68:12; 69:2
**connection** 37:3, 9
**consider** 84:17, 20
**considered** 107:12
**consistent** 101:19, 25
**constraints** 71:16, 17
**contact** 11:25; 38:4, 9; 104:15; 108:8
**contacting** 104:20
**contained** 8:19; 53:21
**contains** 54:4; 109:15, 24
**content** 13:9; 74:21, 23, 24; 76:18
**contest** 7:10; 74:7
**context** 46:7; 61:6; 68:2, 17; 78:17, 17, 24; 97:8, 9, 13; 98:6, 8; 112:4
**continued** 33:7
**continues** 80:8
**continuing** 54:10
**controversial** 103:11
**controversy** 22:14; 41:21; 42:3, 7; 77:1; 103:15, 17
**conversation** 68:1; 95:21; 103:13; 112:2
**conversations** 12:17; 37:7; 112:3
**conveying** 113:6
**Cooper** 37:21, 22
**copies** 42:17, 18
**copy** 8:7
**correctly** 64:14; 92:25,

**council** 44:19
**counsel** 5:6; 9:21; 10:3, 17, 20, 24; 11:12; 14:21; 16:14, 17; 92:4, 5
**counsel's** 112:9
**country** 60:25; 61:2, 18; 62:13, 14, 18, 20, 21; 109:24; 110:2, 9, 12, 15; 111:21
**County** 50:2, 3; 108:8
**couple** 96:17; 105:23
**courage** 63:12
**course** 65:2; 68:4; 77:22
**Course/Curriculum** 47:2
**courses** 26:15, 20; 27:3
**Court** 3:15; 4:25; 6:16; 8:6; 30:16; 77:17; 78:2, 9
**Court's** 3:18
**cover** 91:16, 17
**create** 98:23
**created** 41:20; 100:25; 101:8; 105:24
**creation** 27:5; 59:5, 22; 60:16; 91:24; 95:9, 25; 97:24
**Creationism** 27:5; 44:17, 22; 49:21; 54:23; 55:4, 6, 10, 14, 17, 20, 24; 56:11, 19, 25; 57:3, 13, 24; 58:6, 16; 59:10; 60:13; 64:9, 1''[?] 17, 18, 21; 65:1; 69:10, 1.. 73:24; 74:22; 75:2, 6, 9; 76:17, 19, 25; 77:3, 4, 12, 21, 25; 78:4, 10, 16, 23, 24; 101:2, 3, 5, 7, 9, 12, 14, 14, 17, 18, 20, 21; 102:1, 2
**creatures** 100:25
**critical** 87:8, 10, 23; 88:2, 7, 24; 90:19; 91:1, 5
**cross** 63:12
**current** 4:14; 27:14
**currently** 43:22; 109:10
**curriculum** 13:10; 15:13, 13, 22; 17:23, 25; 18:1; 20:22, 24; 21:3; 22:2, 9, 13, 19, 23; 23:1, 12, 17, 20; 24:2; 25:3, 7; 29:22, 24; 30:1, 5, 8, 14, 20, 22, 23, 24, 25; 31:2, 3, 4, 5, 7, 10, 11, 12, 15, 19, 21, 22, 23; 32:2, 4, 7, 10, 11, 13, 18, 20; 33:13, 17, 23; 34:1, 4, 11, 24; 35:2; 46:13, 15, 16; 47:4, 14; 49:1, 19; 50:7, 10, 17, 22; 51:4, 10, 17; 52:3, 10; 53:15; 56:18; 63:25; 65:20, 25; 66:18, 21; 67:6, 11; 71:7, 14, 21, 24; 77:21; 79:4, 13, 22, 7''[?] 82:25; 87:9, 15; 93:2, 4; 95:24; 102:8, 9; 108:19, 20; 109:2; 112:6, 11; 11
**cut** 102:9

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Richard Nilsen
January 3, 2005

# D

D 29:5
Daily 53:16; 58:2; 25;
59:14; 109:14
Darwin 71:19; 72:6; 77:1
Darwin's 13:8; 18:14;
22:14; 59:22; 72:9, 12, 18;
79:5, 7, 8, 9; 80:6; 81:10,
19; 82:10, 13; 83:16, 21;
84:11; 85:21; 86:4, 6; 89:4,
19, 24; 93:6; 109:3, 9
Darwinian 19:2; 21:17;
70:11; 71:15; 72:2; 73:25;
88:11
DASD 22:9; 43:14
date 38:11
dated 63:7; 109:14
day 41:3; 92:12
dealing 4:25; 70:9; 73:24;
88:10; 90:15
deals 36:21
debate 44:22; 54:23;
55:4, 7, 10, 14, 17; 73:25;
99:19
December 5:15, 23; 6:2;
11:12; 14:22; 36:25; 38:5,
13; 44:5
decide 86:23
decided 71:14, 18;
103:10
decision 5:23; 6:2; 46:10;
77:17, 25; 78:6, 9
define 15:18; 19:8, 11,
14; 39:11; 77:4; 91:25;
99:19; 107:14; 113:7
defined 74:4, 16; 78:25;
102:3; 113:4, 5, 7, 8
defining 84:19
definition 17:5; 39:11;
73:1; 78:16; 102:2
degree 26:7
degrees 26:9
denominational 106:8;
107:5, 18, 22, 23; 108:4,
11
Department 70:5
deposition 3:14; 4:8, 12,
20, 23, 23, 24; 5:3; 6:10;
7:15, 24; 8:24; 14:17; 40:9;
46:19; 48:7; 53:9; 76:1, 7;
92:18; 113:12
describe 31:1; 32:6;
61:24; 86:13
described 34:6; 98:18,
24
describes 86:4
describing 47:4
description 3:22
Design 16:3, 4, 8; 17:5,
10, 16, 20, 21; 18:5, 8, 12,
14, 17, 20; 19:1, 3, 6, 9, 16,
19, 22; 20:2, 5; 27:5;
43:14; 49:18; 65:5; 67:21;

70:14, 25; 71:6, 11; 72:13,
19, 22, 25; 73:1, 3, 24;
74:4, 11, 14, 18; 75:11, 13,
14, 18; 76:2, 3, 8, 10, 12;
77:1; 78:23, 25; 79:1, 2,
14, 16, 17, 18, 21, 24;
80:1, 4, 9; 81:16, 20; 82:5;
84:2, 11, 14, 17, 21; 85:3,
11, 15, 22; 86:5, 17; 87:25;
88:5; 90:15, 20; 91:2, 6;
93:15, 19, 21, 22, 25;
94:13, 22, 25; 95:1; 96:2;
98:11; 99:3, 11, 13, 16, 20;
100:1; 103:1; 108:21, 24;
111:1, 5, 12; 112:10, 14,
15, 16, 18; 113:3
designate 86:19
designer 86:22
desire 64:21
destroy 29:12, 16
destroyed 28:4
destroying 28:5
determination 94:16
determining 3:16
develop 103:16
developed 28:5, 25;
32:25; 102:23; 103:3
developing 32:7, 9;
65:24
development 33:13;
97:25
deviate 33:5
deviated 33:10, 12, 14
deviating 33:6
devised 15:19
Dick 9:10; 11:24
died 63:12
differ 18:14; 94:24
difference 75:23; 96:4
different 13:22; 14:8, 10,
16; 62:17; 72:12, 18;
74:21; 78:23; 80:15;
101:11, 25; 107:9
differentiate 23:4
differently 95:3
differs 80:5; 86:6
direct 44:3
directed 44:2, 23; 69:11,
16; 90:1; 103:16; 108:7,
10; 109:8
direction 44:7; 47:21, 23
directive 44:12, 13;
69:20, 22; 70:24; 91:10,
13, 15
directly 41:13; 69:12
Director 17:23; 25:7
Directors 4:8; 8:4
disagree 53:23
disagreed 8:22; 58:5
discovery 3:15; 36:16,
18; 37:8, 14; 38:7; 39:9
discretion 46:12, 14;
47:18; 48:25; 49:4;
108:19, 20, 23; 110:21
discriminate 95:19

discriminated 93:8
discriminating 93:10
discrimination 72:3
discriminatory 72:5, 7
discuss 37:19; 38:1, 3,
21, 21, 24; 39:11; 70:17;
91:16; 104:16, 20
discussed 21:7; 31:21;
35:15; 63:23; 64:1, 2, 5;
70:11; 71:5, 24
discussion 14:15; 21:1,
2, 4, 6; 38:19, 22; 64:16;
70:19; 71:4, 12; 87:11, 23;
88:2, 4, 7, 25; 90:15, 18,
19, 25; 91:2, 5; 102:7, 8,
25; 104:13, 18
discussions 16:12; 17:4;
37:2, 7, 13; 38:17; 83:2, 9;
87:8; 89:2
Dispatch 53:16; 54:4;
56:4; 63:6
dispute 37:4, 9
disrespect 96:15
distinction 81:1; 95:23
distinctive 98:13
distinguishing 35:23
District 4:7, 7, 15, 16;
5:13, 21; 8:4, 4, 12; 10:6,
25; 12:5, 15; 13:4, 9;
17:19; 20:12; 22:22, 25;
23:2, 3, 5; 24:20, 22, 24;
25:9, 13, 20, 22; 27:16;
32:8; 33:23; 34:9, 23, 24;
35:3; 36:13; 39:8; 40:14;
42:10, 15; 44:25; 49:23;
50:14; 52:3, 11; 65:10, 20,
21, 22, 22; 66:18, 22, 22;
71:5; 82:14; 89:14; 90:6;
91:23, 25; 92:1, 5; 93:10;
102:6, 24; 104:14, 20;
105:7; 107:13
District's 22:18; 87:9
districts 49:16, 17; 87:7;
106:5; 107:2, 19, 21
Divides 63:7
doctorate 26:12
document 7:18, 22; 8:2,
14; 14:11, 19; 39:15;
46:23, 24; 47:3; 48:9, 10;
54:5; 105:4, 11, 21, 24
documents 7:17; 13:22,
22, 24; 14:8, 10, 13, 16;
15:3, 5, 6
domain 70:12
donate 40:23; 42:5
donated 20:11; 40:14,
16; 41:8, 11, 15
donating 41:5, 20; 42:2
donation 42:20
donations 45:21
done 27:25; 42:22; 52:14;
70:22; 75:14, 18, 19;
76:15, 25; 89:19; 93:14,
18, 20; 106:15, 20, 21;
110:21
Dover 4:6, 7, 15, 16; 5:12;

18:11; 22:10; 24:17, 21,
23; 25:8; 27:7; 48:13;
53:14; 54:9; 82:14; 83:7;
89:14; 90:6; 107:13
down 6:15, 19; 40:10;
56:6; 57:11; 60:24; 63:10
Dr 3:11; 26:13; 45:14;
96:12
draft 16:2
drafted 14:4
drafting 14:4
draw 81:1
driven 71:21
due 43:22; 71:16; 103:13
duly 3:7
during 9:11; 26:14; 29:8;
33:2, 7; 50:7; 55:23; 59:2;
64:16; 65:10; 89:15

# E

e-mails 34:14
earlier 86:18; 91:3; 92:18;
108:18; 109:13
easier 6:18; 110:22
Ed 102:17
education 22:11; 26:14;
72:23; 89:13
educational 50:5
educator 77:12; 78:3, 7
effect 61:22; 89:14, 18;
102:24; 112:1
effort 83:10
either 30:13; 36:8; 41:13;
44:10; 69:9, 12, 15; 70:18;
87:3; 110:7
elected 5:12
Elementary 38:16
eleven 104:3
else 9:9, 11, 13; 10:5;
16:9, 15; 17:15, 18, 19;
49:10; 52:2, 9; 60:18; 62:6;
70:11; 76:4; 82:22; 98:4;
100:7; 102:4
employe 4:25; 66:22
employed 17:18, 19;
34:22; 92:1, 5
employes 52:3, 10;
104:14, 19
employment 4:14
encouraging 88:7, 24
end 15:4; 17:3; 43:13;
44:24; 45:4; 46:5; 47:4;
48:20; 75:24; 87:6; 92:13;
97:12, 15; 103:19
ended 45:19; 74:23
ending 15:5
endurance 7:10
engaged 5:10; 11:11
engagement 39:13
enhanced 93:3
enhancing 22:12
enough 68:21; 99:22;

101:3
ensure 93:15
enter 39:13
entire 6:21; 12:17; 91:21
entirely 110:18
entitled 63:7
Eric 4:4; 36:5; 38:20; 43:6
estimate 11:18
etcetera 98:15
event 109:1
events 3:20
everyday 50:3
evolution 16:8; 17:9, 10;
18:15; 22:2, 15; 27:4;
44:17, 22; 54:23; 55:3, 6,
10, 14, 17, 20; 56:11, 19;
58:6; 59:22; 61:1; 62:14,
20; 64:9, 12; 73:4; 76:3,
10; 79:2; 83:6; 84:1, 6, 9,
18, 19; 85:5, 9, 13; 86:8,
14; 87:1; 88:6; 89:4, 24;
90:5, 21; 109:25; 110:3,
10, 13; 111:25
evolving 17:11
exact 43:23; 64:23, 24
Exactly 40:11; 68:8
examined 3:8
example 46:2; 68:19
except 3:4
exception 47:20
Executive 28:12, 20, 22,
25; 29:3, 14
exhaust 10:16, 24
Exhibit 7:15, 24; 13:1;
14:17; 22:5; 46:19; 48:3, 6,
7; 53:9, 13; 67:10; 78:18;
92:10; 103:20
existed 89:12; 93:3
existing 22:13
exit 29:5
expanded 112:23
expect 63:1; 79:10
experience 31:19; 49:14
experiences 67:23
expert 99:14, 19; 101:9
Explain 61:7; 76:22;
78:22; 83:6; 85:10; 86:17;
93:2
explanation 19:5; 68:6;
80:5; 82:2; 85:22; 86:5;
97:23; 113:6
explicitly 88:24; 89:5, 23
expressed 64:20; 73:7;
74:3; 92:25
expressing 73:8, 12;
74:5
extend 49:23
extent 37:6; 91:14;
107:24
extrapolating 73:1

Filius  &  McLucas Reporting Service, Inc.     Min-U-Script®     (3)  D - extrapolating

Richard Nilsen
January 3, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

**F**

face-to-face 10:4, 17, 19; 11:3; 36:25
facility 44:11
fact 22:15; 23:24; 33:21; 36:9; 43:22; 44:16; 45:20; 61:8; 64:15; 78:2; 79:8; 81:15, 24; 82:11; 83:4, 8; 93:16; 100:22
facts 83:12
faculty 18:11; 31:10, 14, 20; 32:17; 33:16; 91:21
fair 3:22; 59:4; 68:21; 84:15
fairly 47:4
Fairview 24:20
faith 74:8
fall 11:17; 34:7; 40:25
false 51:22
familiar 19:12, 14; 42:11; 94:11; 99:21, 22
far 61:10
fashion 7:3
favor 59:9
feathers 98:14; 101:1
features 98:13
feel 7:10
felt 73:5
few 108:16
fifteen 44:18
fighting 102:14
figured 70:23
file 3:17
filed 7:19; 8:3, 6; 104:3, 7
filing 3:3
filled 105:23
final 15:7; 16:6
find 41:10; 106:5; 107:17, 19, 22, 25
finding 42:2
fine 39:2; 43:8; 110:23
finish 6:20; 90:8
fins 98:14; 101:1
firm 4:4; 5:17, 18, 19, 23; 6:2, 8; 38:19
firmly 72:3
first 7:18; 9:16; 13:3; 15:21; 19:21; 20:7, 16; 22:8; 32:18; 38:4; 48:19, 21; 54:2, 20; 72:24; 74:13; 87:16; 92:22
fish 98:13; 101:1
five 11:10; 25:11, 11, 15; 26:6; 42:11, 12, 13; 43:4, 9; 56:6; 62:17; 63:10
focus 71:14, 15, 18; 110:5
follow 33:2; 88:15, 16; 110:19
following 80:4; 90:1
follows 3:8

followup 68:5
forbid 91:1
forbidding 90:19; 91:5
forget 37:21
forgot 12:25
forgotten 108:1
form 3:4; 29:20; 100:25; 101:8; 111:7
formally 27:17; 89:9
forms 98:11, 17
forth 16:7
forums 87:8
found 48:16
Foundation 41:22; 71:8; 72:14; 76:20; 77:20; 97:20; 101:22; 104:10; 106:4, 12
founded 61:1, 2, 19; 62:13, 14, 19, 19, 20, 21; 109:24; 110:2, 9, 12, 15; 111:21
Four 9:8; 25:21; 47:9, 24; 48:1; 54:10; 62:17; 67:15, 16; 68:8, 21
fourth 63:10
Fox 6:15
frame 91:3
Frederick 29:5
free 7:10; 41:3; 42:5, 6, 6
frequently 96:13
front 14:12, 13
full 22:8, 21; 28:8, 16; 32:15, 21; 33:19, 25; 34:1; 63:10; 65:23; 68:2; 92:22; 113:6
function 19:1, 3, 6
functions 32:6
further 80:8; 92:13

**G**

gain 16:11
gaps 67:20; 79:5, 6, 10, 14, 15; 81:10, 15, 18, 20, 25; 82:1, 4; 83:15, 19; 87:24; 88:6, 7, 13, 25; 89:6; 90:10; 109:5, 9, 12
gaps/problems 13:8; 47:13; 109:3
gave 15:23; 42:24; 44:6; 69:22
general 3:19; 17:3; 45:15
generally 94:14
generated 14:10
generating 14:2
gentleman 5:9; 37:21
gestures 7:1
GILLEN 3:13; 5:9, 19, 22; 6:1, 8; 8:7; 9:10, 23; 10:1, 5; 11:1, 4; 14:24; 26:17; 36:5; 37:2, 6; 38:12, 20; 39:2, 22; 40:11; 41:22; 42:9; 43:6, 8; 45:8; 48:3; 50:11, 18, 23; 51:5, 11, 18;

52:6, 18, 25; 53:4, 18; 54:12; 57:16; 58:8, 22; 59:25; 67:16; 71:8; 72:14; 73:9; 75:8, 20; 76:20; 77:20; 80:21, 23; 84:7, 13; 87:2; 89:8, 25; 91:7; 92:16; 94:5; 96:7, 22; 97:20; 101:22; 104:10; 106:4, 12; 108:15; 109:21, 23; 110:21, 24; 111:10, 17; 112:21; 113:11
given 40:6; 68:7; 69:5, 19; 93:22
Giving 102:13
gleaned 76:4
God 97:25; 98:6, 18, 24
goes 94:23
Good 3:11, 12; 4:2; 45:14; 86:18
Gordon 26:10
graduate 26:14
great 86:23
ground 6:12; 53:20
grounds 54:13; 84:7
group 15:2; 46:7, 10
guidance 68:23; 69:6, 8, 19
Guide 47:2

**H**

half 25:1; 26:6; 27:16; 102:21
Hall 66:6
Hamilton 4:5
hand 78:19
handed 8:11
handwriting 105:19
handwritten 104:25
happen 5:14
happened 14:15; 28:7; 102:10
hard 96:15
Harkins 9:14; 24:6; 104:7
Harrisburg 10:15
headed 43:21
hear 19:24; 61:12, 21; 62:4
heard 19:15, 21; 20:7, 16; 41:7; 74:13; 85:1
hearing 14:7
hearsay 53:20, 21; 54:13; 57:16; 58:8, 19
heart 87:11
held 4:18; 93:6
hereby 3:2
Hermance 102:17
High 18:11; 22:10; 25:13; 44:10, 16, 17, 19; 106:5
highlighted 65:2
hit 102:20
hold 24:25; 25:10, 14; 72:12, 18

holding 78:19
home 45:6
honest 22:11
hopefully 6:13
hour 92:15
hours 9:8
housed 43:23; 45:3, 24; 51:19; 62:17; 68:3
humans 101:8
Hundreds 34:14

**I**

idea 20:1; 101:14
identified 79:24, 25
identifies 86:4
identify 16:13; 79:10; 86:22; 87:1; 107:11
II 68:20
immediately 70:18
imparted 16:20; 17:1
implement 87:18
implemented 29:12, 17
implementing 87:16; 89:22
important 94:16; 95:5
inaccurate 51:22; 110:6
include 31:20; 50:6; 72:19; 87:16
included 85:11; 95:17
includes 59:5, 10; 80:4; 112:14
including 22:15; 82:24; 84:1; 87:14
Indian 46:3
Indians 46:3
indicate 42:19; 86:7
indicated 41:14
indicating 15:12
individual 6:6; 27:20; 45:5; 46:1, 9; 47:19; 51:9, 15; 67:6; 72:1, 4, 8, 11, 17; 102:17
individually 52:22
individuals 9:16; 16:12, 13; 31:7; 35:3, 15, 18; 40:22; 42:5; 59:9; 72:18; 91:20; 99:15
information 8:18; 14:3; 42:5; 69:12; 73:16, 17, 19
informing 22:13
informs 112:17
initial 14:20
initiated 11:25
inquiry 3:19; 87:8, 23
instances 96:17
Institute 36:17, 19; 37:8, 14; 38:7; 39:10
instruct 18:7, 10; 66:21; 69:16; 70:6; 108:10
instructed 67:1; 70:9
instruction 25:7; 48:1

instructional 46:13; 67:21; 112:13; 113:2
instructions 70:13, 16
intact 98:13
intellect 18:18, 21, 24; 19:7, 8, 10, 11, 13, 15; 96:19; 97:4, 7, 16, 18, 23; 98:6
intelligent 16:3, 3; 17:5, 16, 20, 21; 18:5, 8, 11, 14, 17, 20; 19:9, 16, 18, 19, 21; 20:2, 5; 27:4; 43:14; 49:18; 65:5; 67:21; 70:14, 25; 71:6, 11; 72:13, 19, 22, 25; 73:1, 3, 24; 74:4, 11, 14, 18; 75:10, 13, 14, 18; 76:2, 8, 12; 77:1; 78:23, 25; 79:1, 14, 16, 17, 18, 21, 24; 80:1, 4, 8; 81:16, 20; 82:5; 84:2, 11, 14, 17, 20; 85:3, 11, 15, 21; 86:5, 17, 22; 87:25; 88:5; 90:15, 20; 91:2, 6; 93:15, 19, 21, 22, 25; 94:13, 21, 25; 95:1; 96:2; 98:11, 12; 99:3, 11, 13, 16, 20; 100:1; 103:1; 108:21, 23; 111:1, 2, 5, 6, 12, 15; 112:10, 14, 15, 16, 18; 113:3
intend 99:14
intention 45:1; 107:10
interest 39:3; 40:3; 41:14; 42:2
interested 20:21
intermediate 33:21
interrupt 92:12
into 39:13; 46:4; 49:7
introduce 4:3
introduced 4:2
investigate 17:15, 20; 18:7, 11; 75:18
investigation 18:4; 75:22
invite 31:25
involve 18:17, 20; 65:6
involved 34:3; 52:2, 9; 65:13; 83:1, 9; 92:4, 6; 102:15
involving 67:20
issue 3:20; 31:16; 46:18; 50:7; 52:10; 55:20; 63:7; 65:6; 67:19; 74:22; 75:2; 76:17; 89:19; 91:15; 99:19, 20; 103:6
issued 91:12
issues 79:9
item 21:1, 2, 4, 6; 47:4; 50:21; 79:13; 90:18; 95:24; 113:3
items 93:22

**J**

January 3:21
job 6:17; 24:22
joined 4:12

face-to-face - joined   (4)

Min-U-Script®         Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Richard Nilsen
January 3, 2005

Judge 10:14, 23
Judge's 3:23
July 19:23; 20:17; 72:25;
74:14, 16, 17, 18, 25;
75:15, 16
June 54:3; 55:23; 56:3;
58:1, 24; 59:13, 24; 63:7;
64:16; 109:14, 21

## K

keeps 27:11
kept 28:2
kids 46:4; 95:1, 8
kind 11:13; 21:23; 22:1;
98:16; 108:6
kinds 28:11; 70:7
knew 12:5; 93:5; 103:18;
106:22
knowing 41:15
knowledge 8:18, 20;
33:11; 35:13; 36:3; 94:9

## L

lab 82:21
language 13:6; 15:16,
19, 25; 47:13; 67:20
large 53:15
Last 9:4, 21; 10:3; 24:13;
30:16; 47:25; 48:19;
54:20; 87:6
Late 44:5
later 108:1
law 4:4; 5:17, 18, 19, 22;
6:1, 8; 11:11, 13, 21; 12:2,
7, 10, 20; 16:18; 34:7;
38:19
lawsuit 4:6; 10:7; 37:19;
38:2; 39:12; 46:17; 47:5,
15; 104:16, 21
lawyer 37:22, 24; 39:18
lawyers 17:14
lead 80:23
Leader 92:7
leading 80:21; 98:20
leads 18:23
learn 81:18, 19
learned 74:25; 76:14
learning 67:22; 81:4, 7, 9
least 42:11
leaving 46:1
lecture 67:23, 25; 68:8,
13, 15, 18; 108:23; 112:10,
12, 13, 20, 22, 23, 24;
113:2, 6
lectures 27:3
left 46:11; 47:18; 102:19
legal 37:3, 8, 15; 38:25;
39:13, 24; 40:4; 71:2
Lehigh 85:2
letter 103:3, 5, 17
letters 34:14; 103:14

Levin 66:7; 67:8; 105:12;
107:11
liability 91:15
liable 90:24
librarian 44:18, 20, 21;
45:3
library 43:16; 44:4, 14,
16; 45:5, 6, 19, 22; 46:1, 7;
49:11
life 60:17; 64:25; 65:1, 3,
6; 69:10, 15; 70:10; 77:5,
10; 80:5; 85:22; 86:6;
96:18; 97:4; 98:12, 17, 23
limited 3:15, 19; 84:2;
95:5; 107:5; 108:9
listed 106:8
listen 81:5
listening 97:6
lists 29:19
literally 13:25
litigation 67:20
little 6:11, 18; 34:6
live 24:17, 19
located 43:15
long 4:18; 9:7; 24:25;
25:10, 14; 26:5; 41:3;
89:12
look 7:20; 14:24; 47:7;
56:10; 66:22; 67:2, 10;
97:10; 103:2; 109:17
looked 24:15; 67:7; 94:7
looking 56:18; 59:21, 25;
67:3, 13; 92:13; 109:20
lot 46:2; 88:18, 21

## M

makes 65:19, 21, 23;
71:7, 11; 95:24; 96:1
making 12:8; 56:17, 21;
57:23, 24; 58:13, 15, 21;
60:10; 64:10; 80:14, 15;
81:1; 95:13; 110:2
many 11:9; 13:21; 51:20;
64:15; 101:10; 107:19, 25
mark 46:22; 48:5
marked 7:15, 17, 24; 8:2;
14:17, 19; 46:19, 23; 48:7,
9; 53:9, 12; 105:4
master 18:18, 21, 24;
19:6, 8, 10, 11, 13, 15;
96:19; 97:4, 7, 16, 18, 23;
98:6
Master's 26:11
match 102:16
materials 42:6; 75:1, 4;
93:24; 94:7
matter 4:9, 25; 7:19;
10:25; 31:21; 37:4, 15;
38:22; 46:13, 15, 16;
47:11, 17; 48:25; 50:1;
64:5; 67:19; 74:7; 87:14;
94:20; 103:11; 112:12
matters 103:14
may 40:8; 45:4; 57:12;

97:12
Maybe 36:7; 103:21
mean 10:22; 16:4, 25;
17:1, 10; 19:19; 54:25;
55:1; 61:7; 64:24; 76:2, 8;
77:3; 82:20; 85:6, 9; 86:13;
93:11; 96:15, 21; 98:6;
111:13
Meaning 23:4; 36:6; 61:8;
68:17; 75:23; 111:2, 6
means 39:17; 68:9; 97:2,
5; 98:11
meant 21:19; 55:9; 60:12;
76:11; 77:24; 79:6
mechanism 19:3
media 51:21
meet 9:5; 10:9; 27:7; 30:8;
38:15
meeting 9:11, 21, 23;
10:1, 3, 14, 14, 23, 23;
27:23, 25; 28:20; 29:10;
30:12, 23; 31:11; 32:13;
34:3; 38:5, 10, 17; 56:25;
57:4; 58:16, 17; 59:3, 19;
62:2, 5; 63:4, 21; 64:18;
70:3; 71:1; 91:20; 102:7,
22
meetings 10:5, 17, 19,
24; 11:3; 27:9, 11; 28:11,
17, 23; 29:1, 3, 8, 19;
30:10, 22, 24; 31:8, 10, 15;
41:14; 66:24
meets 28:8
member 12:9; 20:19;
31:14; 57:2
members 6:6; 9:16;
13:15, 16, 19; 14:6; 16:14,
20, 24; 17:1, 4, 14; 18:10;
23:6, 21; 24:4, 8; 30:5;
31:5, 6; 32:4, 5; 41:10;
42:18; 51:21, 22; 52:4, 10;
59:3; 64:7, 20; 67:6; 69:2;
92:1; 99:7, 15; 100:1;
104:5, 6, 13, 19
memo 15:11, 17; 103:24
memorialize 29:19
memory 85:1
mention 85:23
mentioned 9:16
mentions 85:21
merely 22:10
merit 94:21
Met 9:2; 10:10
Michael 57:9
middle 5:15, 23; 6:2;
11:12
might 36:5; 45:16; 85:24
Mike 9:15; 105:1, 8
Miller 66:7; 67:8; 70:4, 21;
105:12; 107:11
mind 95:23.
minute 26:16; 96:6
minutes 27:11; 28:3, 3, 6;
29:3; 103:2
misleading 81:22

misled 81:24
misquoted 51:3, 9, 15;
52:5, 12
misreported 52:12
misrepresentations
52:24; 53:1
misrepresented 51:16;
52:5
Missed 86:10, 12
misstatement 52:25
misstatements 52:23
modifying 13:10
moment 68:25
Monday 59:2
Monday's 59:18
month 11:18; 27:8
More 5:12; 10:21; 11:11,
13, 21; 12:2, 7, 20; 16:18;
34:7; 76:22; 85:2; 97:12;
99:18; 101:13; 111:8;
112:8, 22, 24
morning 3:11, 12; 4:2;
45:14
move 40:7
Mrs 9:14; 24:6; 104:7
much 102:7; 107:15;
108:13
Muise 10:21
Muslim 61:1, 9, 18;
62:14, 19; 109:25; 110:3,
9, 15; 111:24
Muslims 112:2
must 98:6
myself 4:2, 3; 70:4

## N

name 4:4; 16:25, 25;
17:6; 28:11; 37:21; 85:18
nature 17:11; 78:14;
80:18; 111:6, 14
near 47:4; 54:4; 103:19
nearly 63:11
necessitate 17:5
need 6:25; 23:4; 38:23;
97:12
needed 70:23
nevertheless 89:22
new 59:20; 65:11, 17
News 50:2; 56:1, 3;
111:19
newspaper 51:2, 8, 14;
52:4, 16; 53:12, 19; 54:6,
16, 19; 56:14; 57:18;
58:10; 59:7; 60:7; 100:14,
20; 109:13
newspapers 45:14; 50:1,
9, 16; 52:11, 21; 100:9
next 32:14; 38:9; 54:10;
56:1; 57:6; 58:1, 24; 64:7
night 9:4, 21; 10:4; 24:13
night's 59:3
NILSEN 3:7, 11; 4:2, 14;

5:17, 18; 15:2; 16:2; 26:13;
38:25; 40:13; 41:24; 43:4;
45:14; 49:13; 53:11; 54:2,
10; 64:14; 67:10; 72:24;
80:11, 17; 87:6; 96:12, 13
nods 7:1
Noel 59:3; 64:8
North 38:16
note 3:13; 65:1; 104:2
noted 14:14; 91:3
notes 29:8, 10, 12, 14, 16
104:25; 105:17
notifying 103:24
November 68:5; 69:25;
91:20
number 61:17; 73:14
numbered 47:7
numbers 14:22, 23; 15:4
4, 8
numerous 16:12

## O

o'clock 92:13
object 53:19; 54:12
Objection 9:23; 11:1;
41:22; 42:9; 50:11, 18, 23
51:5, 11, 18; 52:6, 18;
53:23; 57:16; 58:8, 19;
71:8; 72:14; 73:9; 75:8, 20
76:20; 77:20; 80:21; 84:7,
13; 87:2; 89:8, 25; 91:7;
94:5; 96:22; 97:20;
101:22; 104:10; 106:4, 12
111:7; 112:21
objections 3:4
objective 87:14; 95:13
Obviously 94:23
occasion 27:19
occasions 10:12, 13;
11:9
occurred 39:5
October 13:10; 14:15;
27:19; 34:10, 18, 20; 35:4
16; 47:14; 49:2; 102:6
off 4:2; 7:12; 14:1; 68:19;
102:9
offer 41:2
offered 39:23
offering 39:24
offers 59:21
Office 13:23; 14:11;
45:22; 69:25; 106:2
official 34:3; 39:15
officially 28:2; 38:8
often 27:7; 30:8
Once 86:23
one 6:4, 18; 25:19; 26:8;
27:19; 42:11; 46:1; 47:9;
54:21; 59:21; 65:8; 78:5,
19; 81:9; 82:1, 7; 83:23;
85:12, 15; 93:6; 95:18, 25
96:1, 5, 5; 106:25; 107:4;
109:22; 111:8; 112:8

Case 4:04-cv-02688-JEJ   Document 216-6   Filed 09/28/05   Page 38 of 41

Richard Nilsen
January 3, 2005                                                              Tammy Kitzmiller, et al.   v.
                                                                             Dover Area School District, et al.

ones 17:1
only 5:3; 10:16; 21:18; 23:10; 26:24; 46:6; 47:25; 51:25; 58:6; 71:3, 17, 17, 21; 82:13, 16; 83:23; 88:6, 9, 11; 89:24; 91:1; 93:5; 99:8, 10; 101:4; 106:8
open 28:9; 87:10; 88:4, 7, 24; 89:2; 90:19, 24; 91:1, 5
operation 19:5
opinion 72:11; 78:6; 84:23
opinions 51:21; 72:2, 9
opportunity 40:20; 87:10
opposite 64:23, 24
opt 102:25; 103:12
option 103:18
options 21:7, 11, 22, 23; 22:1; 36:21; 54:11; 71:15, 19
orally 106:20
Order 3:15, 17, 18; 6:17; 59:15, 16; 73:5, 7; 74:3
organization 36:20
organizations 35:3
origin 77:10; 80:5; 85:22; 86:5; 96:18; 97:4
original 34:2; 94:23
originally 90:14
origins 3:19; 60:17; 64:25; 65:1, 3, 6; 69:10, 15; 70:10; 77:5
others 59:20
otherwise 66:25
out 14:10; 38:25; 41:11; 42:2; 45:6, 24; 46:4, 6; 49:11; 83:6, 21; 89:23; 90:5; 92:14; 97:8; 102:25; 103:4, 12; 106:5; 107:17, 19, 23; 109:1
outlined 68:2
outside 34:9, 23; 35:3; 36:12; 91:23, 25
over 27:1, 16; 36:25; 98:20
overturned 78:6
owes 96:18; 97:4
own 12:3; 67:5; 69:13, 17; 70:12, 19; 72:4; 86:20, 24; 90:16; 103:8; 109:6

              P

P 78:18
P-1 7:18, 18; 13:1
P-2 7:18; 8:2, 11; 22:5; 43:5, 11
P-3 48:7, 9; 78:19
P-4 53:9, 13
P-5 14:17, 20
P-8 46:19, 23
p.m 113:12
packet 103:2
page 13:3, 6; 14:14;

15:11; 22:5; 43:4, 9; 47:6; 48:19, 21; 50:14; 54:2; 56:2; 57:6; 60:1; 63:8, 8; 92:9, 22; 98:20; 103:22; 104:23; 105:2, 4, 15; 109:19
pages 47:3; 67:13, 15; 98:10
Pandas 11:22; 20:7, 8, 16, 18; 22:3; 24:14; 40:13, 16; 43:15; 49:7, 11; 90:13; 96:17
paper 60:24; 61:4, 8; 63:14
papers 50:2, 3
paragraph 22:8; 23:22, 23, 25; 24:5; 43:13; 48:22, 24; 56:6, 9; 57:8; 58:4; 59:2, 18; 60:5; 63:10, 11; 64:7; 68:21; 80:4; 87:6; 92:22; 98:19; 104:2
paragraphs 47:24; 48:1, 19, 21; 54:10; 56:6; 57:11; 60:24; 63:10; 68:8
parent 86:20; 103:12
parents 69:13, 17; 70:18; 71:5, 12; 90:17; 104:3
part 18:22; 20:21, 23; 49:19; 59:5, 11, 19; 71:6, 24; 79:22; 111:20
participate 91:23
participated 11:23; 13:20; 14:4
particular 66:3
particularly 39:3; 104:4
parties 3:3
passage 97:6
passages 98:9
passed 13:4, 10; 34:10, 15; 93:14
passing 24:1
past 36:25; 59:2; 70:5, 21; 74:2, 10
Pat 9:10; 58:18
patience 108:14
Patrick 5:9; 38:23; 40:8
Patriot 50:2
pause 102:20, 20
paused 90:9
Pennsylvania 103:11
People 11:22; 22:3; 75:24; 95:14
Pepper 4:5
perfectly 46:21
period 55:23; 64:3, 16; 75:25
periodic 103:14
periodically 37:1
permitted 86:13
person 9:24; 10:1, 3, 4; 20:1; 30:3; 37:24
personal 51:20; 60:12
personally 34:21; 36:6
persons 20:1; 100:10

phone 11:7; 34:14
phrase 17:9; 19:19; 35:22; 42:10; 55:9; 85:5, 8; 99:9
Phrased 91:14
physically 43:23; 45:22
piece 46:13; 59:25
place 27:21; 44:14, 24
places 77:7
Plaintiff 7:15, 24
plaintiffs 3:16; 4:6; 7:19; 14:21; 92:10; 104:16, 20
Planned 47:2; 65:2; 68:4; 77:22
planning 104:15
play 102:20
please 7:7, 11; 15:8; 50:12; 68:16; 76:6; 97:3, 3
point 84:15; 110:20
pointed 89:23; 109:1
policy 3:20; 22:9; 28:5, 25; 32:23; 43:14; 48:3; 87:18, 21; 89:22; 91:8; 102:23, 24; 109:2
portion 109:17
position 4:16, 18; 9:19; 24:25; 25:10, 14, 20; 27:13; 40:8
positions 25:25
posits 111:1, 5, 12, 13
possibility 85:23; 100:3
possible 18:22; 35:9, 10, 12; 107:12, 16, 20, 25
possibly 58:7
post 26:14
practice 27:23; 29:8, 14, 16; 31:20, 24; 32:23, 25; 33:2, 5, 7, 12; 45:15; 87:11; 89:10, 12, 14, 18; 107:17, 19, 22, 25
practices 67:22
preliminary 3:15
prepare 8:24
prepared 8:12; 13:12, 14, 16, 23; 15:16, 18, 25; 68:22; 69:1; 103:24
preparing 13:20, 24
present 9:9, 11, 13; 16:24, 25; 17:4; 67:25; 69:6; 70:3; 81:13; 100:25; 101:8
presentation 103:1; 112:14, 23
presented 56:11, 19
presenting 81:14; 94:17
presents 80:18
President 24:6; 29:25; 30:4, 7; 58:5; 70:4, 5, 21; 104:7
press 48:3, 13, 16; 50:13; 51:19; 71:20; 78:20; 87:7; 91:24
previously 93:3
primarily 53:16

Princeton 66:6
Principal 25:13, 23, 25; 26:1; 44:10; 49:15, 15
Principal's 17:24; 25:20
principles 99:24
printed 105:21, 24
Prior 5:16, 23; 6:2; 11:11; 12:20; 24:21; 25:5, 12, 25; 28:7; 33:1; 34:9, 15, 20; 35:4; 38:10; 45:17; 49:13; 68:1; 93:5
priorly 93:7
private 106:8; 107:18, 21, 23; 108:3, 9, 11
privileged 39:21
problem 96:14
problems 67:20; 79:5, 7, 11, 14, 16; 81:10, 15, 19, 20; 82:1, 2, 5; 83:15, 19; 88:8, 14, 25; 89:6; 90:10; 109:9, 12
proceed 63:4
process 6:11; 32:14, 16; 33:15; 65:10, 16, 24
produced 29:3; 102:6
product 79:2
production 14:20; 103:21
proposition 60:20
protect 91:10
proven 82:21
provide 77:19; 87:10
provided 8:5, 13; 14:21
provides 22:10
providing 69:4
public 28:9, 16; 39:3; 41:14; 64:22; 77:13; 78:10; 102:3; 108:9
publicly 51:23
pull 50:4
purchase 42:16; 65:13; 66:3
purchased 42:8, 10, 12, 13
purchasing 65:11, 16
purpose 3:16, 20; 22:12, 18, 22, 25; 23:12, 13, 14, 20; 24:1; 71:23; 72:1; 82:24; 92:20, 25; 94:20; 95:5; 105:11; 106:3
purposes 92:12; 103:13
pursuant 3:14
put 44:3; 89:9; 95:20; 97:15; 101:20; 102:1
Putting 74:25; 78:9

              Q

qualify 17:22
quote 75:5; 109:25; 111:21
quoted 100:9; 111:24

              R

Raelians 99:21
randomness 19:1, 20
rather 7:1; 67:7
reaction 63:3
read 8:16; 24:14, 16; 30:15, 16; 45:14; 47:24; 48:15, 22; 50:3, 3, 4, 13; 68:22; 69:5; 73:23; 74:1, 10, 17, 21; 75:1, 4, 23, 25; 76:6; 80:3; 85:1, 11, 20; 86:2; 93:22; 97:3, 9, 12; 100:14; 104:17; 109:6, 18; 112:17
reading 48:24; 68:15; 73:22; 74:10, 23; 75:14; 76:5, 14, 24, 25; 100:20; 112:22, 24
reads 90:12
real 87:11
really 38:23; 103:19
reason 41:19; 42:1; 71:3, 17, 18; 91:1; 95:17; 104:3
reasoning 95:21
reasons 107:9
recall 19:17, 25; 59:9; 92:18; 110:1; 111:20
receive 40:20
recess 45:9, 11; 53:5, 7; 96:8, 10
recitation 22:18
recognize 13:6; 46:24; 47:11; 48:10; 105:4, 17
recollect 22:4; 67:3
recollection 16:16; 17:8; 20:17, 25; 21:7; 64:2, 4, 17; 110:6
recommendation 34:2; 56:7; 65:18, 20, 21, 23; 66:2, 8, 9, 11, 16, 19
recommendations 32:11, 12, 18, 19, 20; 33:17, 18, 19, 24
recommended 15:12, 16, 21; 21:9
record 3:13; 4:3, 3; 6:17; 7:2, 12; 27:23; 28:22; 36:9; 46:21; 48:2; 53:17, 18; 54:12; 58:2, 25; 59:14; 102:21; 109:15
recording 28:25
recordings 27:25
refer 16:17; 20:8; 90:14
reference 48:4; 57:12, 24; 58:15; 77:5; 80:8
referred 84:3
referring 15:6; 16:17; 18:2; 20:9; 24:4; 30:19; 35:18; 48:14; 44:25; 97:19, 24; 98:23; 99:4, .
refers 60:16; 85:21; 99:16
reflect 23:11, 16; 94:9

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Richard Nilsen
January 3, 2005

regarding 34:11; 35:2;
51:3, 9; 74:22; 75:2; 113:3
regular 50:1
regularly 30:10
relate 37:7
related 50:4
relates 45:23; 74:23;
87:24, 25
relating 27:4; 70:8
relationship 5:17, 22;
6:1, 7; 19:16; 39:6, 9
release 48:3, 13, 16;
50:13; 51:19; 71:20;
78:20; 87:7; 91:24
relevance 50:11, 23;
51:5, 11; 52:6, 18
religion 22:10
religious 73:8; 74:8;
78:14, 17; 96:5; 102:3;
103:13
remain 45:1, 6
remember 12:23; 20:4;
26:24; 27:2; 33:6; 34:20;
35:13; 38:10; 41:1; 42:14;
50:19; 54:20, 20, 22, 22;
55:3, 5, 11, 13, 15, 16, 18,
19, 21, 22, 25; 56:17, 20,
21, 24; 57:1, 2, 5, 20, 22,
23; 58:12, 13, 15, 17;
60:10; 61:11; 62:6; 63:20,
24, 25; 64:10; 75:5;
100:20; 110:4, 7, 7, 8, 10,
12; 112:1, 2, 3, 5, 7
remind 6:11
repeat 15:8
rephrase 87:17
Report 70:17
reported 50:10, 17, 21;
52:16; 54:6, 16, 19; 56:14;
57:18; 59:7, 18; 60:7; 61:4,
8; 63:14; 100:15
reporter 6:16; 30:17;
55:7, 14, 16
reporters 52:23; 55:19,
22
reporting 51:16; 58:10
reports 57:11; 58:4;
60:25
represent 5:11, 13
representatives 104:15
represented 5:6
representing 4:5; 10:6;
53:13
request 45:4; 47:22;
68:23
requested 28:21; 31:9,
13, 15; 68:5; 104:5; 109:11
requesting 70:17
requests 30:13, 14; 37:3;
41:17
require 83:3, 14; 88:19
required 17:25; 30:9;
47:24; 48:15, 22; 49:7;
68:22; 69:5; 70:6; 72:6, 7;
79:21; 80:3; 82:9; 85:20

requires 88:16; 89:23
requiring 88:12, 22
research 17:24, 25;
69:13, 17; 70:19; 86:20;
90:16; 93:21; 107:15;
108:2; 109:6
researched 99:13
researching 75:24
reserve 40:8
reserved 3:5
resolution 13:4, 5, 9, 12,
20, 21; 14:5, 7, 13; 15:7;
16:2, 4, 5, 6, 6; 24:2;
34:10, 15, 18; 47:14; 49:2;
83:25; 84:4; 85:6, 9, 12;
93:14; 100:12
respect 111:2, 5, 14
respective 3:3
respond 37:9; 41:2, 18;
62:9
responded 41:17
response 68:22; 112:8
responsibilities 25:3;
29:17
responsibility 17:23;
28:16; 87:18
restraining 3:17
result 47:22
resulted 37:13
resumes 94:12
retained 39:14, 16, 17
retract 50:21
returned 25:19, 21
review 42:17, 18
reviewed 23:22, 24; 24:4,
9, 12, 13
reviewing 31:17; 33:22
revised 87:9
RICHARD 3:7; 54:9;
108:16
right 5:9; 8:7; 34:17;
67:23; 69:14; 72:4; 78:19;
95:11; 110:17
rights 40:8
Robert 10:21
role 42:19
room 29:6; 44:11; 69:25
ROTHSCHILD 3:10, 22;
4:1, 4; 7:16; 8:1, 8, 10;
9:25; 10:2; 11:2, 6; 14:18;
15:1; 26:19; 29:7; 30:15,
18; 36:8, 10; 37:11; 38:14,
23; 39:7, 20; 40:2, 7, 12;
41:23; 43:7, 10; 45:7, 13;
46:20; 48:5, 8; 50:15, 20;
51:1, 7, 13, 24; 52:8, 19;
53:3, 10, 23; 54:1, 15;
57:17; 58:9, 18, 23; 60:2;
67:18; 71:10; 72:16;
73:11; 75:12; 76:23;
77:23; 80:22, 25; 84:10,
15, 16; 87:5; 89:11; 90:3;
91:11; 92:17; 94:6; 96:6,
11, 25; 97:22; 101:24;
104:12; 106:7, 14; 108:13,

18; 109:1, 13, 19; 110:19,
22; 111:7, 18; 113:1, 9
rules 6:12
rulings 3:23
running 13:25

# S

Salem 38:16
same 6:22; 10:21, 22;
49:24; 50:18; 51:18;
60:24; 65:24; 67:13;
81:13; 95:13
satisfy 42:1
saw 8:21; 42:11
saying 17:3; 45:19; 58:5;
64:8; 75:22, 22; 110:7, 8,
9, 10, 12; 111:20; 112:1, 2,
3
scales 98:14
scheduled 30:10, 12
School 4:6, 7, 15, 16;
5:12, 13, 21, 25; 6:6; 8:3,
4, 12, 12; 9:17; 10:6, 6, 14;
12:5, 9, 15; 13:4, 9, 15, 16,
19; 14:5; 17:19; 18:11;
20:11, 19; 22:11; 23:3, 5;
24:20, 22, 23; 25:9, 13, 13;
27:7; 32:7; 34:22; 35:1;
38:6; 39:8; 40:14; 41:14;
42:23; 43:15; 44:3, 10, 14,
16, 17, 19; 45:2; 49:16, 17,
23; 52:3, 3, 10, 11; 56:25;
57:2, 3; 59:19; 62:2, 5;
64:18, 20, 22; 71:5, 13, 14,
18; 77:13; 78:10; 82:14;
83:3; 87:7; 89:14; 90:6;
92:1, 2; 93:10; 104:14, 14,
19, 19; 105:6; 107:1
school's 71:7
schools 105:22, 23;
106:5, 8, 9; 107:6, 18, 22,
23; 108:4, 8, 11
schoolteacher 26:1
science 22:11, 12; 26:15,
21, 24; 44:11; 70:5; 77:13;
78:4, 10; 91:21; 93:2;
94:24
scientific 22:14, 16;
36:21; 60:20; 73:12, 16,
17, 19; 74:6, 9, 21, 23, 24;
75:1, 7, 9, 11; 76:18; 77:9;
82:16, 19; 83:7, 15; 84:21;
85:4; 87:11; 88:8, 9, 18,
21; 89:6; 90:5; 93:11, 16,
19, 25; 94:2, 8, 14, 17, 21;
95:6
scientifically 16:8; 17:9;
76:3, 10
scientists 22:16; 84:24,
25; 85:3; 94:9
sealing 3:3
search 59:20; 108:10
searchs 108:3
second 43:24; 48:21;
56:9; 59:18, 25; 60:5; 63:8;

87:6; 102:14, 21; 104:2;
111:20
Secondly 45:23
secretary 27:12, 13, 14,
15, 17, 18, 20, 21; 50:4;
102:14, 15, 18; 108:8
section 65:3; 71:23;
111:24
sections 88:13; 109:11
secular 22:12; 92:19
seek 38:25
seeking 37:8
selected 27:13; 29:24;
30:3, 6
selecting 65:16
seminars 27:3
send 103:13
sending 75:24
sense 17:3
sent 33:25
sentence 17:10; 51:19;
56:9; 97:8; 110:8; 111:19
separate 30:25; 48:6;
73:14
serving 49:14
session 28:12, 20, 22;
29:1, 3
sessions 28:13; 29:14
set 16:6; 38:5
Seth 37:21, 22
setting 64:21
Sheila 9:14
shelves 45:20
Shippensburg 26:12
Shore 24:20
short 53:3
show 7:17; 8:2; 14:19;
47:6, 8; 48:9; 53:11; 98:9
sic 66:6
signed 45:6
significance 82:18
simpler 84:20
simply 3:13; 108:20
singled 83:6, 21; 90:5
sit 27:20
Sitting 70:1; 71:1
situation 4:23
six 22:5; 25:11; 92:9, 22
Sixty 42:12
skimmed 24:15
slow 6:18; 40:9
slower 6:13
Social 26:4, 10
solely 18:19; 46:13;
107:14
solicit 39:4
someone 63:11; 73:2
Sometime 5:15; 11:17;
36:25; 38:5; 40:25; 106:18
son 102:15
soon 110:21
sorry 5:19; 21:21, 25;

27:1; 33:23; 38:20; 41:12,
25; 50:12; 51:12; 52:7;
54:14; 60:3; 61:20; 76:21;
85:7; 86:1, 11; 88:20; 90:9;
92:11; 96:23; 98:21; 99:9;
101:23; 103:12, 21; 111:3,
8
sounds 7:1; 99:22
source 99:8
sp 94:9
speak 6:3; 12:22; 13:21;
21:5, 14; 23:7, 9, 10, 18;
34:25; 35:6, 21, 22; 52:17;
66:20, 24; 69:11; 83:1;
92:24; 101:10; 104:11
speaking 23:2; 59:9;
68:10
speaks 65:1; 109:12
species 85:10, 16, 18;
97:25
specific 14:13; 15:2;
16:20; 21:23; 31:16;
55:11, 18; 61:6, 10, 11, 15;
77:21; 78:8; 79:10; 93:21;
99:15, 22
Specifically 17:21, 22;
18:7, 10; 71:20
speculation 41:22; 42:9;
87:2; 96:22
spoke 36:16; 59:4
spoken 36:3
Spring 66:14
Springs 25:9, 13
stamp 45:21
stamped 43:23; 103:22
stand 63:13
standards 71:21, 22, 25;
88:11, 19
standing 58:19
start 31:4; 68:19
Starting 13:3, 7
state 21:25; 22:1, 21;
23:21; 63:7; 79:13; 88:16,
19, 22
stated 85:3; 86:18; 94:10
statement 22:21; 23:11;
43:15; 48:14; 56:15;
57:19, 21; 58:10, 13; 61:5;
62:24; 63:3, 15, 17, 23;
68:13, 15, 21; 69:1, 4;
79:6; 80:3; 81:5, 14; 82:9,
24; 85:20; 86:2; 87:9;
92:19, 21; 96:18, 19, 21;
97:1, 14; 109:15, 18, 24;
110:2, 5; 112:17, 23, 25
statements 51:20, 20;
52:5, 16; 53:21; 54:5, 7, 8,
13, 17, 19; 56:17, 21;
57:23; 60:8, 10; 61:21, 25;
62:11, 12, 13; 64:11;
100:13, 21
states 13:3, 5; 22:8;
36:20; 56:9; 67:21; 79:4;
87:7; 98:11, 11; 105:21
stating 89:5; 100:10
step 32:14; 33:21

Richard Nilsen
January 3, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

still 102:20
stipulated 3:2
STIPULATION 3:1
Stock 92:7
storage 44:11
strategies 67:22
strategy 112:13; 113:2
strike 102:23
student 44:19; 69:9, 14;
70:17; 73:4, 7; 86:16, 21,
25; 90:12
students 13:7; 22:10, 13;
47:12; 49:12; 61:2; 62:15,
24; 63:1; 69:16; 70:7; 72:1,
8, 10, 12, 21; 73:14, 15;
74:3; 79:4, 11; 80:1, 18;
81:4, 9, 14, 18, 22, 24;
82:10, 14; 83:3, 7, 10, 14,
25; 89:5, 24; 90:6; 93:5, 6;
94:18; 95:3, 14, 24;
102:25; 109:2, 4, 8;
111:22; 112:18
studies 26:4, 10
subject 17:15; 26:24;
31:20, 23; 32:23; 37:4;
38:21; 46:16; 47:5, 11, 15,
17; 48:2, 25; 49:18, 21;
51:3; 53:14; 56:25; 57:3;
61:13, 14, 15, 17, 18; 64:4,
17; 67:19; 70:14; 71:12;
75:18; 87:14; 89:3;
103:11, 14; 112:12
subjects 26:3; 27:4;
61:17
submitted 105:6, 8
substance 12:17
substantive 80:18
suit 71:2; 104:3, 7
summer 106:18
Superintendent 4:17;
5:1; 9:20; 24:21, 23; 25:2,
5; 30:14; 31:6; 32:3, 9, 17;
33:3, 8, 16, 25; 49:15, 16;
54:9; 57:9; 65:19, 19;
66:10, 15; 89:16, 16;
103:3, 16; 108:7
Superintendent's 13:23;
14:11
support 77:9
supported 23:22, 24
supports 73:19
supposed 86:2, 16, 21,
25; 90:12
Supreme 77:17; 78:9
Sure 8:8; 32:16; 35:8, 22;
39:17; 45:18; 46:21;
69:14; 73:17; 83:10;
95:11, 16; 96:7; 97:11;
101:18; 103:17; 108:17;
110:18
surrounding 22:14
survey 105:22; 106:1, 3,
11, 15; 107:5, 10
surveyed 108:4
sworn 3:8

T

tab 98:19
table 70:1; 71:2
tabs 97:15
talk 36:24; 37:20; 88:13
talked 35:20; 36:12, 23;
49:14; 52:22; 72:10; 95:11
talking 13:24, 25; 14:2;
17:14; 34:18; 44:20;
46:16, 18; 47:6; 68:19;
88:10
tape 102:19, 20
tapes 28:3, 5
task 29:19
taught 22:2; 46:3; 47:18;
49:24; 58:7; 61:3; 62:15,
24; 63:2; 64:9, 11, 21, 25;
65:4; 77:13, 22; 78:4, 10;
82:13; 83:7; 90:6; 95:4;
111:22
teach 26:3; 48:25; 49:8;
68:3, 6; 72:6; 79:12; 88:12,
19, 22; 108:20; 112:15
teacher 21:8; 31:25;
45:4, 23; 46:8; 80:17;
86:16, 21, 25; 90:13;
103:12
teacher's 46:12; 108:18
teachers 23:7; 32:4, 10;
46:2, 14; 47:19, 21; 48:15,
22, 24; 49:7, 10; 57:12, 24;
65:18; 66:2; 67:25; 68:12;
69:3, 4, 5, 19, 22; 70:24;
79:10, 21; 80:3; 81:13;
82:9; 83:3, 14; 85:20; 86:2,
13; 90:12, 22; 91:4;
108:20, 23; 109:8, 11;
112:9
Teaches 111:14
teaching 55:23; 64:16;
79:17, 18; 80:11, 13, 15,
19; 81:2; 94:25; 95:2
telling 67:3; 73:4; 88:15;
89:5
Temple 26:13
temporary 3:17
ten 11:10
tenet 101:1, 4, 5, 7
tenure 33:7
term 16:2; 19:13, 15, 18;
60:13; 77:3; 93:11; 94:11
terms 19:12; 94:20; 97:24
testified 3:8; 112:8
testify 72:24
testifying 75:13
testimony 47:17; 49:6;
75:21
textbook 19:12; 65:11,
14, 17; 66:3; 107:13, 15;
108:3; 109:10, 11
textbooks 49:11, 11;
65:14; 66:23; 67:2, 4, 7;
107:17; 108:6

thanks 48:6
theories 22:16; 44:22;
54:11; 58:6; 59:10; 83:7,
11, 11, 16, 18; 84:1, 3, 6, 9,
12; 85:5, 8, 10, 12, 16, 18,
24; 86:7, 14; 87:1; 88:18,
21, 25; 89:7; 90:5; 93:7, 8,
9, 11, 12; 101:11, 19
theory 13:8; 18:14; 19:2;
21:17, 18; 22:14; 26:21;
59:22; 65:7; 70:11; 71:15;
72:12, 19; 79:5, 7, 8, 8, 9;
81:10, 19; 82:1, 10, 10, 13,
13, 16, 19; 83:4, 4, 8, 16,
21; 84:11, 17, 21; 85:4, 21;
86:4; 88:8, 9, 11; 89:4, 19,
24; 90:20; 93:6, 16, 19, 25;
94:3, 8, 18; 101:13; 109:3,
9
therefore 44:23; 68:7
therein 53:21
thesis 111:1, 5, 14
third 59:2; 102:17, 18
Thomas 5:12; 10:21;
11:11, 13, 21; 12:2, 7, 20;
16:18; 34:7
Thompson 9:10; 10:5,
10; 11:24; 12:12
thoroughly 99:14
thought 21:21; 74:6;
92:15; 110:22
Three 4:19; 9:16; 14:8,
10, 12, 15; 15:6; 25:1, 21;
47:9; 54:20; 56:2
throughout 45:2
Thursday 14:21
thus 94:10
today 5:6; 8:5, 13
together 87:10
told 40:22; 52:22; 81:25;
91:4; 92:12; 100:1
took 26:21
top 13:6; 14:14; 54:4
topic 44:18, 25; 45:25;
70:19; 71:4; 91:5
topics 35:16
Total 25:15, 16; 49:4, 5;
110:10
Township 24:20
track 66:13
treated 83:23
trial 3:5
tried 42:1
true 43:20; 74:15
trumps 78:5
try 6:22; 7:7; 107:15
trying 21:12; 38:10
turn 13:1; 15:11; 22:5;
43:4; 47:3; 54:2; 56:1;
57:6; 58:1, 24; 59:13; 60:1;
63:6, 8; 78:18, 22; 99:19
103:19, 20, 22; 104:23;
105:2, 15
twelve 92:13
twenty 44:18

twice 27:8
two 7:17; 10:12; 13:7;
14:14; 30:25; 31:1; 37:1;
45:16; 47:9; 48:19, 21;
50:2, 3; 57:11; 58:6; 60:4,
24; 96:6
typical 65:16
typing 13:25

U

umbrella 101:11, 21
un 100:11, 19
unclear 9:23
under 31:14; 68:6;
101:20; 102:1
undergraduate 26:10,
16, 22, 25
underneath 15:17
understood 73:12, 17
unequivocally 36:9
Union 70:4
unit 44:21; 49:8; 68:6, 18,
20; 69:6; 70:8; 112:13
United 36:20
units 46:2
universe 73:5, 7; 74:4
University 26:12, 13;
85:2
up 13:25; 17:3; 25:16;
28:15; 38:5; 44:24; 45:4,
19; 46:5; 56:24; 57:3;
63:13; 69:9, 15; 74:23;
75:24; 110:19
upon 78:25
urging 100:11
use 53:19; 67:7; 83:22;
93:11
used 12:15; 13:22; 16:4;
17:9; 19:15; 25:16; 35:22;
94:11; 105:22; 107:1
uses 16:2
using 12:5; 19:12; 98:6;
107:16, 18, 23
Usually 27:8

V

valid 22:11; 92:19; 94:2,
8, 17; 95:6
various 23:5; 49:16;
98:11
verbally 39:16, 17
verbiage 61:6
version 77:9; 95:8, 15,
18, 25
versus 36:6; 54:23; 55:4,
6, 10, 14, 17, 20
Vic 4:12
view 21:12, 13, 16, 20;
74:3; 80:6; 86:6
viewed 94:14
viewpoint 78:3; 95:25

views 59:22
vignettes 94:9, 12
vote 100:11

W

Wait 26:16
waiting 43:22; 45:21
waived 3:4; 58:20
Waiczak 4:12
War 68:20
Washington 10:15
way 6:4; 18:21; 23:21;
36:7; 42:10; 51:25; 62:9;
65:8; 82:7; 83:23; 85:23;
86:7; 99:3
web 50:14
week 41:3
weeks 37:1
Wenrich 59:4; 64:8, 10
West 24:20
western 36:20
Whenever 107:15
whole 44:21; 46:7, 10, 13,
15; 89:19; 97:9; 110:8;
111:24, 25
whose 37:21; 52:25;
104:25; 105:19
William 59:19
willing 40:23
wings 98:15
wish 3:13, 17
withdraw 68:25; 84:15
within 45:22, 24; 51:19;
62:17; 68:2, 3, 17; 70:12;
101:11; 112:4
Without 74:9
withstanding 64:15
witness 3:7; 7:21; 13:2;
22:7; 57:7; 58:3; 59:1;
63:9; 67:12, 14; 78:21;
80:22; 92:11; 103:23;
104:24; 105:3, 16
word 25:16
words 6:25; 7:2; 57:9;
61:10, 11, 15, 16; 83:22
work 18:17, 21; 23:3;
99:4; 100:2, 3
worked 96:15
working 19:10; 24:21
World 68:20
wrestling 102:15
write 68:9, 11
writing 89:9
written 32:23; 50:7; 53:14
Wrote 68:13; 87:12

Y

year 25:19; 27:16; 45:
47:25
year's 47:25

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Richard Nilsen
January 3, 2005

**years** 4:19; 25:1, 11, 15,
21; 26:6; 27:1; 63:11; 74:2,
10, 16; 89:15
**yellow** 97:15; 98:19
**Yingling** 100:6, 9, 18
**York** 50:2, 3; 53:16, 16;
54:4; 56:4; 58:2, 25; 59:13;
63:6; 108:8; 109:14