# APPENDIX I

# TAB P

# In The Matter Of:

*Tammy Kitzmiller, et al.   v.*
*Dover Area School District, et al.*

---

*Richard Nilsen*
*April 14, 2005*

---

*Filius & McLucas Reporting Service, Inc.*
*1427 East Market Street, York, PA*
*4309 Linglestown Road, Harrisburg, PA*

*(717) 845-6418   or   (717) 236-0623*

Original File RN041405.TXT, 98 Pages
Min-U-Script® File ID: 0878714387

**Word Index included with this Min-U-Script®**

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Richard Nilsen
April 14, 2005

Page 2

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

TAMMY KITZMILLER, et al., .
    Plaintiffs  .  CIVIL ACTION NO. 04-CV-2688
    vs.
DOVER AREA SCHOOL DISTRICT,.  (JUDGE JONES)
et al.,
    Defendants
Deposition of                  : RICHARD NILSEN
Taken by                       : Plaintiffs
Date                           : April 14, 2005, 10:00 a.m.
Before                         : Vicki L. Fox, RMR,
              Reporter-Notary
Place                          : 200 One Keystone Plaza
        North Front and Market Streets
            Harrisburg, Pennsylvania
APPEARANCES:
    PEPPER HAMILTON LLP
    BY: THOMAS B. SCHMIDT, III, ESQUIRE
        For - Plaintiffs
    THOMAS MORE LAW CENTER
    BY: PATRICK T. GILLEN, ESQUIRE
        For - Defendants

[1]              INDEX
[2]            WITNESS
[3] RICHARD NILSEN          Examination
[4]    By Mr. Schmidt            3
       By Mr. Gillen             95
[5]
[6]
[7]           EXHIBITS
[8] Plaintiffs Deposition Exhibits        Page
[9] 43. Administrator's Biology Statement in Biology 51
    Class, Pages 001099 and 001100.
[10]
    44. Excerpts from Dover Area School District's 65
[11] Superintendent's Weekly Updates of November 5,
    2004, November 12, 2004, November 19, 2004,
[12] December 3, 2004, December 10, 2004 and
    December 17, 2004, Pages 001115 through 001117.
[13]
    45. Copy of 10/19/04 E-mail from Richard Nilsen to 76
[14] Bertha Spahr; Eshbach, Robert; Jennifer Miller;
    Prall, Leslie, re: Board Action, Page 000341.
[15]
    46. Copy of 10/19/04 E-mail from Richard Nilsen to 77
[16] Jere Wynegar and Sandi Bowser, re: Board Meeting,
    Page 000342.
[17]
    47. Copy of 10/20/04 E-mail, Richard Nilsen to 78
[18] Joel Riedel, re: Department Chair Meeting, Page
    000344.
[19]
    48. Copy of Memo of November 30, 2004, Sandi   81
[20] Bowser to Dr. Richard Nilsen, Re: As per your
    request, Page 000361.
[21]
    49. Copy of January 6, 2005 Memo to Dr. Richard 83
[22] Nilsen from Bertha Spahr, Jennifer Miller, Robert
    Linker, Robert Eshbach, Leslie Prall, Brian Bahn,
[23] David Taylor, Vickie Davis, Re: Reading Statement
    on Intelligent Design, Pages 000387 and 000388.
[24]
    50. Excerpts from Superintendent's Weekly Updates   84
[25] of January 7, 2005, January 14, 2005 and January
    19, 2005, Pages 00118 through 001120.

Richard Nilsen
April 14, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

Page 3

**STIPULATION**

[1]
[2] It is hereby stipulated by and between the
[3] respective parties that sealing, certification and filing
[4] are waived; and that all objections except as to the form
[5] of the question are reserved until the time of trial.
[6]
[7]    RICHARD NILSEN, called as a witness, being duly
[8] sworn, was examined and testified, as follows:
[9]

[10]    **BY MR. SCHMIDT:**

[11]    Q: Good morning, Mr. Nilsen. My name is Tom Schmidt. I am
[12] an attorney with Pepper Hamilton, which is one of the
[13] groups of attorneys involved in what we call the Dover
[14] School District litigation. You might think of it as
[15] the Kitzmiller litigation.
[16]    I know you have been deposed in this case once
[17] before shortly after the Complaint was filed. I am
[18] going to do my best not to go over the same territory a
[19] second time. I'm sure there will be some overlapping.
[20] In fact, there will be some areas that I will
[21] intentionally follow up on, but I will do my best not to
[22] repeat much of that questioning.
[23]    A: Thank you very much.
[24]    Q: If you think I am not keeping my commitment on that,
[25] just holler, and I will see if I need to be reminded. I

---

Page 4

[1] will do what I can to fix the line of questioning. That
[2] is my plan this morning.
[3]    I do have a number of documents that I will
[4] probably look at with you today. Some of them I am sure
[5] you have seen in connection with that earlier
[6] deposition, but I did my best to be efficient. We will
[7] probably look at them again.
[8]    Let me repeat very quickly the instructions that
[9] Mr. Rothschild gave you at that first deposition. The
[10] important instruction is that you not answer a question
[11] unless you are sure or you're comfortable that you
[12] understand it.
[13]    If you have any problems with a question I pose to
[14] you, please let me know, and I will do my best to fix
[15] it.
[16]    . All right?
[17]    A: Thank you.
[18]    Q: I know you were very good at the first deposition at
[19] accommodating the court reporter and making all of your
[20] responses verbal so they can be transcribed. I would
[21] appreciate it if you would do so.
[22]    Finally, I have a habit of pausing right before
[23] the end of a question to see if I need to edit it or fix
[24] it. Please give me a chance to finish before you start
[25] talking so we don't overlap, and I will do my best to

---

Page 5

[1] accommodate you in the same way. Okay?
[2]    A: Okay.
[3]    Q: Do you have any questions or comments that you would
[4] like to make before we start?
[5]    A: Not at this time, no.
[6]    Q: Have you reviewed the transcript of the deposition that
[7] was taken on January 3rd?
[8]    A: My deposition?
[9]    Q: Yes.
[10]    A: Yes, I have.
[11]    Q: Have you submitted any corrections to that deposition?
[12]    A: No, I have not.
[13]    Q: Do you have any changes to any of the testimony you gave
[14] at that time that you would like to bring to our
[15] attention?
[16]    A: No, I do not.
[17]    Q: Have you reviewed the transcripts of other depositions
[18] that have been taken in this litigation?
[19]    A: Yes, I have.
[20]    Q: Which ones?
[21]    A: Mr. Baksa's, Ms. Geesey's, Mr. Bonsell's, Alan
[22] Bonsell's. And I'm not sure, but my recollection may be
[23] also in all fairness of disclosure Mr. Buckingham's.
[24]    Q: Mr. Buckingham I think has been deposed twice. Have you
[25] reviewed both transcripts?

---

Page 6

[1]    A: No.
[2]    Q: And when you said Mr. Bonsell and then you paused and
[3] said Alan Bonsell, did you review the transcript of Alan
[4] Bonsell's father's deposition?
[5]    A: No, that is why I clarified. I was aware there were two
[6] and wanted to make sure there was no misunderstanding.
[7]    Q: Have you reviewed the transcripts of any depositions of
[8] plaintiffs in this case?
[9]    A: No.
[10]    Q: A few more questions about the litigation and how the
[11] litigation is being handled. The defendants are the
[12] School District and the School Board.
[13]    Is it accurate to say that you are the principal
[14] contact on behalf of the District and the Board with
[15] counsel?
[16]    A: I don't understand that question. Who is contacting —
[17]    Q: You are represented by an attorney here today
[18] Mr. Gillen?
[19]    A: Yes.
[20]    Q: Who is with a firm of attorneys?
[21]    A: Yes.
[22]    Q: They represent the defendants in the litigation; is that
[23] right?
[24]    A: Yes.
[25]    Q: Are you the principal contact person for the defendants

---

Page 3 - Page 6   (4)          **Min-U-Script®   Filius & McLucas Reporting Service, Inc.**

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Richard Nilsen
April 14, 2005

**Page 7**

[1] in the dealings between defendants and their attorneys?

[2] A: I am not sure what your definition of principal is.

[3] Q: Okay. Are you authorized to speak for the defendants

[4] when you speak with Mr. Gillen and the attorneys that he

[5] works with in matters involving how the litigation is

[6] being conducted?

[7] MR. GILLEN: Object to form.

[8] A: Only in the capacity of being specifically directed by

[9] the majority of the Board.

[10] **BY MR. SCHMIDT:**

[11] Q: I was asking the question awkwardly. I apologize. It

[12] wasn't meant to be a trick question.

[13] You are the Superintendent of the Dover Area

[14] School District?

[15] A: That is correct.

[16] Q: You are its chief executive?

[17] A: That's correct.

[18] Q: You report directly to the Board?

[19] A: That is correct.

[20] Q: Your powers and responsibilities are dictated in part by

[21] state statute; is that right?

[22] A: That is correct.

[23] Q: And some regulations I suspect?

[24] A: Yes.

[25] Q: And you also have an employment contract with the Board;

**Page 8**

[1] is that correct?

[2] A: That is correct.

[3] Q: In Mr. Baksa's deposition, which you have reviewed,

[4] there was some testimony about his work with one or both

[5] curriculum committees in 2004, work involving the

[6] selection of a new biology textbook for the ninth grade

[7] at the Dover Area High School.

[8] Do you recall his testimony on that subject?

[9] A: I recall parts of the testimony.

[10] Q: Mr. Baksa testified that at some time after June, 2004,

[11] he made some inquiries about what biology textbooks were

[12] being used by parochial schools that operate near Dover;

[13] do you recall that testimony?

[14] A: Yes.

[15] Q: Do you recall telling Mr. Baksa that he should make

[16] those inquiries about what biology textbooks were being

[17] used by those parochial schools?

[18] A: I do not recall that, no.

[19] Q: Do you know anything about Mr. Baksa's making such an

[20] inquiry?

[21] A: Yes.

[22] Q: What do you know about it?

[23] A: I know that he did make the inquiry based on the fact

[24] that he developed a memo that I believe is part of the

[25] submitted documents in reviewing, if recollection is

**Page 9**

[1] correct, three of the districts — or I am sorry —

[2] three of the schools and which biology books they were

[3] using.

[4] Q: What was your role in 2004 in the work of the curriculum

[5] committee's to select or recommend, rather, new

[6] textbooks in the School District?

[7] A: My role as Superintendent were to place the book that

[8] Mr. Baksa as Director of Curriculum Instruction — to

[9] place his recommendation on the Board agenda.

[10] Q: It sounds like your role is passive. You simply take

[11] whatever Baksa gives you and put it on the agenda

[12] without making any judgments about whether it is an

[13] appropriate recommendation; am I right about that?

[14] A: Passive to the extent of where Mr. Baksa in his capacity

[15] makes the recommendation. In this case and in most

[16] cases, his recommendation has been put on where I have

[17] not questioned his recommendation beyond the fact that

[18] did he follow procedure. And when he communicated to me

[19] he did, it was placed on the agenda.

[20] Q: Mr. Baksa described some of the work that he did with

[21] the curriculum committees in the summer of 2004. I

[22] believe from his testimony that this inquiry to the

[23] parochial schools followed a June meeting of the School

[24] District Board when the biology textbook issue was

[25] discussed.

**Page 10**

[1] Were you at that School Board meeting?

[2] A: Yes.

[3] Q: Do you recall the discussion about biology textbooks in

[4] the high school?

[5] A: I remember the discussion, the specifics. I am not sure

[6] I remember all of them.

[7] Q: What do you remember of the discussion?

[8] A: I remember that Mr. Buckingham had some concerns about

[9] the textbook and was interested in looking at other

[10] options.

[11] Q: What do you recall he said about his concerns about the

[12] textbook?

[13] A: I believe he communicated his dissatisfaction with how

[14] the Darwinian Theory of Evolution was presented in the

[15] book.

[16] Q: Was his dissatisfaction with how the Darwinian Theory

[17] was presented, or was his dissatisfaction with the

[18] absence of any other theory being presented?

[19] A: My only recollection is how the Darwinian Theory was

[20] presented.

[21] Q: What did he say about his dissatisfaction?

[22] A: He documented — and again the documentation I believe

[23] you have — of areas of concern about how evolution was

[24] being presented in the book. Beyond that, I don't

[25] recollect what was specifically stated and/or written.

Richard Nilsen
April 14, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

Page 11

[1]   **Q:** Did you make any notes yourself of the discussion of the
[2]   biology textbook at that June Board meeting?
[3]   **A:** No.
[4]   **Q:** Do you have a practice of making notes during Board
[5]   meetings?
[6]   **A:** Yes.
[7]   **Q:** What do you do with those notes?
[8]   **A:** All the notes I take are actions the Board has requested
[9]   me to do and/or any changes in future agenda items.
[10]  Once those items have been completed, those notes are
[11]  thrown out.
[12]  **Q:** Did you make notes of the discussion of the biology
[13]  textbook at the June meeting?
[14]  **A:** No.
[15]  **Q:** Did you have any conversation with Mr. Baksa after that
[16]  meeting about the actions that should follow in
[17]  connection with Mr. Buckingham's concerns or any other
[18]  discussion that happened at that June meeting?
[19]  **A:** Yes.
[20]  **Q:** What was that discussion with Baksa?
[21]  **A:** My discussion with Mr. Baksa was he had to decide what
[22]  direction he was going to go with as it related to the
[23]  textbook and when the textbook decision was to be made.
[24]  **Q:** At that time, I mean at the time of your discussion with
[25]  Mr. Baksa, what did you think the directions were that

Page 12

[1]   he needed to consider?
[2]   **A:** I think he needed to consider answering whatever
[3]   concerns Mr. Buckingham and/or any other Board member
[4]   had with the present recommended book Miller and Levin
[5]   Biology.
[6]   **Q:** I understand that. But what did you think his options
[7]   were? You referred — and I am using the word options.
[8]   You referred to he needed to decide what direction he
[9]   was going to go in. That suggests to me that there
[10]  were — there was more than one direction available to
[11]  Baksa.
[12]  What did you have in mind when you had that
[13]  conversation with him?
[14]  **A:** I don't recommend — my apologies. I don't recollect
[15]  the full conversation, but obviously, there would be
[16]  two. One would be to continue the conversation on the
[17]  current book. Or two, look for other options that
[18]  possibly anybody and everybody would be satisfied with.
[19]  **Q:** Did you give him any suggestions for how to find out
[20]  more about other options than simply persisting with the
[21]  Miller and Levin book?
[22]  **A:** Again, I don't remember any specific. It would not be
[23]  out of character for me to tell him to call and make
[24]  sure he has contacted every other district and everyone
[25]  he knows of to see if there would have been another

Page 13

[1]   textbook.
[2]   Now do I remember that specific conversation? No.
[3]   Would it be out of my character? Again, no.
[4]   **Q:** Is it possible that in that conversation you suggested
[5]   that he not only contact other public school districts
[6]   but that he contact parochial schools in the area?
[7]   **A:** It is possible I told him to contact everybody and
[8]   anybody that he hadn't contacted before.
[9]   **Q:** When you first saw the memorandum reporting on his
[10]  contacts with parochial schools, what did you do with
[11]  that information?
[12]  **A:** Read it.
[13]  **Q:** Did you talk to him about it?
[14]  **A:** Yes, but I don't remember the conversation.
[15]  **Q:** Were you surprised when you got the memorandum to see
[16]  that it only reported on contacts with parochial schools
[17]  and didn't provide any information about contacts with
[18]  other area schools?
[19]  **A:** No.
[20]  **Q:** I ask why not?
[21]  **A:** Because I would have assumed he would have contacted the
[22]  other parochial schools beforehand.
[23]  **Q:** Did you mean most of the other public schools?
[24]  **A:** Yes, my apologies.
[25]  **Q:** Did you know that he actually did make those contacts?

Page 14

[1]   **A:** No, I don't know that as a fact.
[2]   **Q:** Did you suggest at any time to Mr. Baksa that he speak
[3]   with any of the families that are providing home
[4]   schooling in your district —
[5]   **A:** No.
[6]   **Q:** — to see what textbooks they used?
[7]   **A:** No.
[8]   **Q:** Did you make any inquiries on your own about alternative
[9]   biology textbooks? That is alternatives to Miller and
[10]  Levin.
[11]  **A:** No.
[12]  **Q:** What was done, if you know, with the information that
[13]  Mr. Baksa collected about the books being used in
[14]  parochial schools?
[15]  **A:** I do not know.
[16]  **Q:** Did you share the memorandum or that information with
[17]  any Board member?
[18]  **A:** I have no recollection of that.
[19]  **Q:** Did you ask Mr. Baksa to share that information with any
[20]  Board member?
[21]  **A:** I have no recollection of that either.
[22]  **Q:** I am trying to understand what happened when he
[23]  developed the information. You received the
[24]  information, and the sense I have is that it landed on a
[25]  piece of paper, and the piece of paper landed in a

---

**Min-U-Script®**   Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Richard Nilsen
April 14, 2005

---

**Page 15**

[1] drawer or in a file, and that no use was made of it.

[2]   A: Well —

[3]   Q: I'm trying to figure out what use was made of that

[4] information since somebody went to the trouble to

[5] collect it.

[6]   A: Well, I think that is a question that needs to be

[7] directed to Mr. Baksa being the generated information and

[8] it was his responsibility to research and make the

[9] recommendation on the textbook.

[10]   Q: Did you see at this time, which is after the June Board

[11] meeting, that the selection of a biology textbook was

[12] not just the selection of another textbook but had

[13] become a matter of primary interest to the Board, at

[14] least in terms of its curriculum responsibilities?

[15]   A: I am sorry. I don't understand the question.

[16]   Q: It was a cumbersome question. Can you remember any

[17] other debate and discussion involving the teachers, the

[18] administration and the Board on a textbook selection

[19] that has the same characteristics as what you and the

[20] District have been through since last June on the

[21] selection of a biology textbook?

[22]   A: Yes.

[23]   Q: Which textbook was that?

[24]   A: The chemistry book the prior year and the family

[25] consumer science books the prior year.

**Page 16**

[1]   Q: What was the controversy involving the chemistry book?

[2]   A: The financial issue, as well as the issue of whether the

[3] teachers needed the book or not.

[4]   Q: By financial, you mean the cost of the book?

[5]   A: The ability for the District to pay for a new book.

[6]   Q: I assume whether the teachers needed it or not was an

[7] aspect of that financial decision?

[8]   A: Yes.

[9]   Q: And the other book was family consumer science?

[10]   A: That is correct.

[11]   Q: What was the controversy surrounding that?

[12]   A: The controversy surrounded whether it was an identical

[13] replacement of the book that the faculty already had,

[14] and the issue of whether the Board could once again

[15] finance a textbook that the teachers already had in

[16] their possession.

[17]   Q: It strikes me that both of those controversies — and I

[18] will use that word in quotes — involved basically

[19] financial considerations, cost considerations. It

[20] appears to me that the discussions about the biology

[21] book involve its contents.

[22]   Can you think of any other situation when a book

[23] is being considered by the Board for inclusion in the

[24] curriculum when there has been this kind of attention

[25] and controversy devoted to that subject?

**Page 17**

[1]   A: I will clarify your question. The family consumer

[2] science book was content issue based on the fact that

[3] they thought the content was already in our curriculum

[4] and didn't see the reason to purchase another book that

[5] had the same content.

[6]   Q: Okay.

[7]   A: Not specifically along the same lines, but along the

[8] same general conversation. The District gets a donation

[9] from the county on a book pamphlet that we give to our

[10] students that has a number of agencies listed in it, and

[11] a Board member and a parent had a considerable concern

[12] on the information that was in the book, specifically

[13] dealing with comments dealing with sexual education and

[14] issues concerning specific agencies that was in there.

[15]   To the point of where we ended up sending home

[16] information prior to the students receiving the books,

[17] as well as a discussion of whether to even continue

[18] handing out the individual books.

[19]   And through my experience, not only in this

[20] district, but other districts, any time we have adopted

[21] a health curriculum, there has always been conversations

[22] zeroing in on what is and what is not taught as it

[23] relates to the curriculum.

[24]   Mr. Bonsell and I had conversations and I believe

[25] a third party, but nonetheless I believe Mr. Bonsell has

**Page 18**

[1] also talked to Mr. Baksa about the health curriculum in

[2] our education dealing with abstinence.

[3]   I know Mr. Baksa is meeting next week, if not the

[4] following week, with another Board member dealing with

[5] our drug and alcohol curriculum, specifically where

[6] inhalants are being taught.

[7]   If your question is does the Board hold

[8] discussions on multiple issues with content beyond this

[9] individual issue, my experience is yes.

[10]   Q: On those issues where the Board has either demonstrated

[11] or expressed a keen interest in a decision like the

[12] distribution of a pamphlet, or the selection of a

[13] textbook, is it your practice as Mr. Baksa's supervisor

[14] and as the Superintendent of Schools to basically say we

[15] have got to pay attention to this, get it right, be sure

[16] that we do what we need to do to be giving all the

[17] information to the Board and do the best job we can?

[18]   You don't treat it as a routine matter; do you?

[19]   MR. GILLEN: I object to the form.

[20]   A: I think it is a routine matter. I think the routine

[21] matter of the Board's reviewing curriculum and making

[22] comments about curriculum is routine. Board members

[23] historically have had conversations about what is in the

[24] curriculum, and their recommendations on what should be

[25] in the curriculum, and what type of curriculum should be

---

Filius & McLucas Reporting Service, Inc.       Min-U-Script®       (7)  Page 15 - Page 18

Richard Nilsen
April 14, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

**Page 19**

[1] placed in our planned courses. That is a routine
[2] matter.
[3]              BY MR. SCHMIDT:
[4]    Q: At the time of the June meeting in 2004, had you ever
[5] heard of the notion of Intelligent Design?
[6]    A: Not that I can remember, no.
[7]    Q: Do you remember your first contact with the Discovery
[8] Institute? And by you in this case, I am referring to
[9] you personally.
[10]   A: Me personally, yes.
[11]   Q: When did that contact take place?
[12]   A: The fall of 2004.
[13]   Q: Where did the contact take place?
[14]   A: Over the phone.
[15]   Q: Who else was involved in the telephone contact?
[16]   A: No one else.
[17]   Q: That wasn't meant to be a trick question. You were on
[18] the phone. Who else was on the phone; somebody from the
[19] Discovery Institute?
[20]   A: Yes.
[21]   Q: Do you remember who it was?
[22]   A: No, I don't.
[23]   Q: Do you know someone named Seth Cooper?
[24]   A: Yes.
[25]   Q: There is a deposition exhibit that has previously been

**Page 20**

[1] marked as Plaintiff 38 which I would ask you to take a
[2] look at?
[3]    A: (Witness complies.)
[4]    MR. GILLEN: Tom, I mentioned to Eric yesterday
[5] that 40, I have a problem with in that I am not sure if
[6] it wasn't inadvertently provided. I need to go back to
[7] the office and check on that.
[8]    MR. SCHMIDT: Okay.
[9]    MR. GILLEN: Thank you.
[10]             BY MR. SCHMIDT:
[11]   Q: Dr. Nilsen, have you seen this document before today?
[12]   A: I have reviewed over 2,000 documents. Does this jump
[13] out at me? No. Would I have reviewed it before? I
[14] believe so.
[15]   Q: Do you recall seeing this e-mail at about the time it
[16] was sent in June of 2004?
[17]   A: Not to my recollection, no.
[18]   Q: Were you aware in June of 2004 that Seth Cooper or
[19] anyone from the Discovery Institute was reaching out and
[20] trying to contact Mr. Bonsell?
[21]   A: Not to my recollection, no.
[22]   Q: If you would, look at the e-mail address at the top of
[23] Plaintiffs 38. Is the e-mail address for Mr. Bonsell
[24] one that is provided by the School District?
[25]   A: Yes.

**Page 21**

[1]    Q: Is an e-mail address provided by the School District for
[2] all of its Board members?
[3]    A: Provided, yes. Accessed by all of them, no.
[4]    Q: How do you know that?
[5]    A: I have had Board members tell me that they don't want
[6] the e-mail address. In fact when we provided it to
[7] them, one Board member in specific — a prior Board
[8] member said she doesn't like the computer and doesn't
[9] want to have access in the computer and has no interest
[10] in the computer.
[11]    Other Board members have told me that they don't
[12] have time to access it and would prefer their own
[13] personal e-mail addresses as the contact. Other Board
[14] members have said they don't — even though they use the
[15] computer would prefer not to be contacted.
[16]    So we have provided it to all of the Board
[17] members, but then housed within the scope of Board
[18] members, some have chosen not to access it. Some have
[19] chosen not to have it. Some have chosen to have
[20] different e-mails.
[21]   Q: What do you know about Mr. Bonsell's use of the District
[22] provided e-mail?
[23]   A: Beyond him telling me he has had frustration accessing
[24] his own personal e-mail, nothing.
[25]   Q: Can a Board member access e-mail using that address from

**Page 22**

[1] a location other than the School District's office?
[2]    A: Yes.
[3]    Q: To turn that question around, so they don't have to go
[4] to the School District to access the e-mail; do they?
[5]    A: No, offsite.
[6]    Q: Did you — and I am referring again to you — hear
[7] anything from the Discovery Institute in June or July of
[8] 2004 that represented an effort to reach out to you on
[9] the subject matter addressed in Exhibit 38?
[10]   A: No.
[11]   Q: Did you know of an organization called the Discovery
[12] Institute in the summer of 2004?
[13]   A: I heard of the Institute. Whether my knowledge base was
[14] beyond the name, I can't speak to that.
[15]   Q: What did you — well, let me ask the question a
[16] different way. Who did you hear about the Discovery
[17] Institute from in the summer of 2004?
[18]   A: Mr. Buckingham.
[19]   Q: Do you recall anything that he said to you about the
[20] Discovery Institute?
[21]   A: No.
[22]   Q: I am going to show you what has been marked as Exhibit
[23] 39. Do you recall seeing that e-mail at about the time
[24] it was sent?
[25]   A: Do I have specific recollection? No. Once again, as

---

**Min-U-Script®**   **Filius & McLucas Reporting Service, Inc.**

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Richard Nilsen
April 14, 2005

---

Page 23

[1] with my prior answer, it would not surprise me that I
[2] would have seen it in some capacity.
[3]   Q: As I understood your prior answer, you thought you had
[4] seen 38 in the course of reviewing documents for this
[5] litigation?
[6]   A: That is correct.
[7]   Q: Is your answer the same for 39?
[8]   A: That is correct.
[9]   Q: The date on 39 is October 19, 2004. Let's put it in
[10] context.
[11]   There was a School Board meeting on October 18th,
[12] 2004; is that correct?
[13]   A: That's correct.
[14]   Q: Is that the meeting that a decision was made about the
[15] biology curriculum?
[16]   A: That is correct.
[17]   Q: Had you had any contact with the Discovery Institute
[18] prior to the Board meeting of October 18th?
[19]   A: I can't tell you with absolute knowledge when my
[20] conversations with the Discovery Institute was.
[21]   Q: Had you reviewed any materials either published or made
[22] available by the Discovery Institute prior to the Board
[23] meeting of October 18?
[24]   A: My recollection is that Mr. Buckingham gave me two
[25] DVD's. Whether they were processed by the Discovery

---

Page 24

[1] Institute or not, I cannot tell you because I don't
[2] remember. And I did not look at them, but I was in
[3] possession of those. And I gave them to Mr. Baksa.
[4]   But as far as research and reviewing, I can't
[5] speak to that. There was a conversation I had with the
[6] Superintendent up in Wisconsin who was directly involved
[7] with the Discovery Institute. I can't tell you what
[8] timing she gave me on information that she had received
[9] from the Discovery Institute, whether it was before the
[10] 18th or after the 18th. I just remember it being in the
[11] fall.
[12]   Q: Have you ever reviewed the DVD's that Mr. Buckingham
[13] gave you?
[14]   A: I did not review the DVD's Mr. Buckingham gave me;
[15] although, Mr. Bonsell gave me the same DVD's later on,
[16] and I did review them later on.
[17]   Q: When did you review those DVD's?
[18]   A: Within a time frame of two to three months ago.
[19]   Q: After the litigation was filed?
[20]   A: Yes.
[21]   Q: What did you tell Mr. Baksa about the DVD's when you
[22] gave them to him?
[23]   A: Beyond the fact that Mr. Buckingham gave me these as
[24] something he may want to take a look at, I don't
[25] remember anything about that.

---

Page 25

[1]   Q: Why did you think Mr. Baksa might want to take a look at
[2] them?
[3]   A: Because a Board member was communicating that this is a
[4] curricular interest of his.
[5]   Q: When Mr. Buckingham gave you the DVD's, did he say that
[6] they had anything to do with the selection of a biology
[7] textbook?
[8]   A: I don't remember any conversation I had with him
[9] concerning it.
[10]   Q: Did you have any understanding why he gave you the
[11] DVD's?
[12]   A: He was interested in the curriculum that was presented
[13] in the DVD's.
[14]   Q: What did he say about what that curriculum was?
[15]   A: I can't remember.
[16]   Q: Through the time of the Board meeting in October,
[17] October 18th, did Mr. Buckingham tell you anything about
[18] his contacts with the Discovery Institute?
[19]   A: Yes.
[20]   Q: What did he tell you?
[21]   A: I don't remember. I know he was in contact with them,
[22] but I don't remember any information about the
[23] specifics.
[24]   Q: Do you recall any discussion at a Board meeting at which
[25] Mr. Buckingham either advised the Board that he was in

---

Page 26

[1] touch with the Discovery Institute or that the Board
[2] told Mr. Buckingham that he was authorized to be in
[3] touch with the Institute on its behalf prior to the
[4] October 18th meeting?
[5]   A: You have two separate questions.
[6]   Q: Right. That is a bad habit I have. Sorry.
[7]   A: The first question I think you asked is did
[8] Mr. Buckingham tell the Board that he was in
[9] conversation with the Discovery Institute, and my
[10] recollection is yes.
[11]   Did the Board direct him to be in conversation
[12] with the Discovery Institute? I do not remember that
[13] directive, no.
[14]   Q: Okay. I am going to show you what has been marked as
[15] Plaintiffs 40 and ask just a few questions about that.
[16]   MR. SCHMIDT: I understand you may have some
[17] reservations about any testimony about that document.
[18]   MR. GILLEN: Thank you. Tom, in other words, I
[19] don't want him to testify about any discussion
[20] about these recommendations just so you understand where
[21] I am coming from.
[22]   MR. SCHMIDT: I do.
[23]   MR. GILLEN: Thank you, Tom.
[24]   BY MR. SCHMIDT:
[25]   Q: You have had a chance to look at Plaintiffs 40?

---

Richard Nilsen
April 14, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

Page 27

[1]  A: Yes.

[2]  Q: Do you recall seeing that e-mail at around the time it

[3]  was sent by Seth Cooper which I think is December?

[4]  A: I can't speak to the specific time period. I can speak

[5]  to the fact that I remember his recommendations.

[6]  Q: Recognizing the concern that has been expressed by

[7]  Mr. Gillen, I don't want you to tell me about the

[8]  discussion of any recommendations, but I do want you to

[9]  tell me when you became aware that such a recommendation

[10]  had been made.

[11]  A: It would be about that time period.

[12]  Q: What is the date on that e-mail? I don't have it in

[13]  front of me.

[14]  A: December 10th, 2005 — 2004. My apologies.

[15]  Q: What was the context or setting when you became aware of

[16]  his recommendation?

[17]  A: The Board President and I had a conversation.

[18]  Q: The Board President at that time was Alan Bonsell?

[19]  A: Mrs. Sheila Harkins.

[20]  Q: Sorry. My memory is middle aged, too.

[21]  A: It changes in December.

[22]  Q: Was anyone else present for that discussion with Sheila

[23]  Harkins?

[24]  A: It was over the phone, no.

[25]  Q: Plaintiffs 40 includes a statement by Seth Cooper that

---

Page 28

[1]  he has been in touch with Heather Geesey prior to the

[2]  e-mail and has been communicating with her.

[3]  Do you recall seeing that in Exhibit 40?

[4]  A: Do I remember seeing it? No. But I remember that

[5]  issue, yes.

[6]  Q: Do you recall that Heather Geesey had either been given

[7]  or taken on any responsibility to be in touch with the

[8]  Discovery Institute at any time prior to the December

[9]  10th e-mail?

[10]  MR. GILLEN: Object to the form.

[11]  A: I remember Ms. Geesey in some capacity discussing this

[12]  issue with the Board President. In what capacity, I

[13]  can't speak to.

[14]        BY MR. SCHMIDT:

[15]  Q: Do you recall where that discussion took place?

[16]  A: No.

[17]  Q: Do you recall when it took place about?

[18]  A: About the same time. Approximately December 10th.

[19]  Q: Did you ever meet personally with Seth Cooper?

[20]  A: Yes.

[21]  Q: Where was that meeting?

[22]  A: In the administrative office.

[23]  Q: When was that meeting? Let me ask the question an

[24]  easier way.

[25]  Isn't it true that the meeting took place after

---

Page 29

[1]  the December 10th e-mail?

[2]  A: Yes.

[3]  Q: Who else was present at the meeting?

[4]  A: Ms. Geesey, who was now Vice-President of the Board;

[5]  Sheila Harkins, who is now President of the Board; I

[6]  believe Mr. Bonsell, myself, Seth Cooper. And I don't

[7]  remember whether Mr. Baksa was there or not.

[8]  Q: Who arranged the meeting?

[9]  A: Arranged?

[10]  Q: Yes.

[11]  A: Or requested?

[12]  Q: Let's start with requested. I understand that Seth

[13]  Cooper requested the meeting?

[14]  A: Yes.

[15]  Q: Was there a person among those you have identified who

[16]  attended who are associated with the School District who

[17]  became the — if you don't mind the colloquial phrase —

[18]  the point person for setting up the meeting?

[19]  A: That would be me.

[20]  Q: Why did you set up the meeting?

[21]  A: Because I discussed his request to meet with the Board

[22]  President, and the Board President then directed me to

[23]  set up a meeting.

[24]  Q: How long was the meeting; do you remember?

[25]  A: No.

---

Page 30

[1]  Q: Did you take any notes of the meeting?

[2]  A: I don't remember any, no.

[3]  Q: Did you meet with Mr. Cooper more than once?

[4]  A: Yes.

[5]  Q: When was the next time you met with him?

[6]  A: Prior to a School Board meeting.

[7]  Q: Which one?

[8]  A: I don't remember.

[9]  Q: Was it in December?

[10]  A: I don't remember.

[11]  Q: Was it before or after the litigation was filed?

[12]  A: After.

[13]  Q: Was there anyone else present at the meeting?

[14]  A: Yes.

[15]  Q: Who?

[16]  A: I believe Mr. Cooper, another individual from the

[17]  Discovery Institute, Board members, myself, and Mr.

[18]  Baksa.

[19]  Q: Anyone from Thomas More there?

[20]  A: No.

[21]  Q: In trying to put the dates in context, does it seem most

[22]  likely that this meeting took place in connection with

[23]  the January Board meeting?

[24]  A: I'm sorry. I am not sure I understand what the

[25]  reference is for the January Board meeting.

---

Min-U-Script®    Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Richard Nilsen
April 14, 2005

---

Page 31

[1]   Q: I thought you said the meeting took place prior to a
[2] Board meeting. Maybe I put prior to close to the
[3] meeting.
[4]   A: It was prior to one of the Board meetings when we were
[5] deciding who would be our — who would be included in a
[6] defense.
[7]   Q: Has the School District retained the Discovery Institute
[8] to represent it in connection with this litigation?
[9]   MR. GILLEN: Object to the form.
[10]   A: No.
[11]         BY MR. SCHMIDT:
[12]   Q: Has the School District retained Mr. Cooper as its
[13] attorney?
[14]   A: No.
[15]   Q: Has the School District ever paid any money to Mr.
[16] Cooper or the Discovery Institute for any reason?
[17]   A: I don't know whether we have purchased materials from
[18] them or not. But beyond purchasing materials, no.
[19]   Q: Following either the first or the second meeting you
[20] have testified about, has the School District exchanged
[21] any written communications with the Discovery Institute
[22] putting aside the purchase of materials?
[23]   A: Not that I'm aware of, no.
[24]   Q: Following the Board meeting at which the District
[25] considered whether to include Mr. Cooper and/or the

Page 32

[1] Discovery Institute as part of its legal team, did you
[2] communicate with the Discovery Institute or Mr. Cooper
[3] on that subject?
[4]   A: No.
[5]   Q: To your knowledge, is the Discovery Institute and/or Mr.
[6] Cooper still waiting for an answer from the District on
[7] that subject?
[8]   A: No.
[9]   Q: Did somebody communicate with them?
[10]   A: That, I do not know. I do know that as public record,
[11] the Board made action on hiring the Thomas More Center.
[12]   Q: It is your assumption that somehow that information was
[13] conveyed to the Discovery Institute and Mr. Cooper, but
[14] you weren't the person who conveyed that information?
[15]   A: That's correct.
[16]   MR. GILLEN: Can we take a break for two minutes?
[17]   MR. SCHMIDT: Sure.
[18]   (A recess was taken.)
[19]         AFTER RECESS
[20]   MR. SCHMIDT: I am not going to pursue questions
[21] about the recommendations made by the Discovery
[22] Institute, the discussions about it, reasons why it
[23] wasn't followed because I understand it is your position
[24] that that is all privileged.
[25]   And while we disagree about the privilege, I think

Page 33

[1] the agreement that you made with Eric earlier is that we
[2] are simply going to reserve our rights to pursue that in
[3] the future if we chose to. But I am not going to burden
[4] the record with a whole lot of questions that you then
[5] instruct the witness not to answer. I think that is a
[6] question we will put aside.
[7]   MR. GILLEN: Thank you, Tom, exactly. And for my
[8] part, I have tried to let you guys get the surrounding
[9] circumstances. And then if there is an issue there, if
[10] you guys want to press it, we can do that.
[11]         BY MR. SCHMIDT:
[12]   Q: I have a few questions just about some of the mechanics
[13] of how you assist the Board do its work. I understand
[14] from one deposition I have taken that the Board members
[15] receive a written agenda and a packet of materials prior
[16] to each Board meeting.
[17]   Am I right on that understanding?
[18]   A: That's correct.
[19]   Q: Is it your office that assembles those materials and
[20] sends it out to the Board members?
[21]   A: That is correct.
[22]   Q: Is it done under your supervision?
[23]   A: That is correct.
[24]   Q: Who actually prepares the agenda; is that something that
[25] you have a role in?

Page 34

[1]   A: Yes.
[2]   Q: What is your role?
[3]   A: I do the draft agenda based on recommendations from each
[4] of my supervisors and department chairs. When I say
[5] department, I am not talking about faculty. I am
[6] talking about buildings and grounds, business,
[7] transportation, food service.
[8]   Once the draft has been developed, I then meet
[9] with the Board President and we both review it. And
[10] when the Board President is satisfied with the agenda,
[11] then it becomes the final agenda that gets sent out.
[12]   Q: I know there has been discovery and some testimony about
[13] the preparation of minutes of Board meetings. I have a
[14] few questions about that.
[15]   I understand that there is a person who is
[16] nominally the secretary of the Board. Am I right about
[17] that?
[18]   A: Please define nominally.
[19]   Q: Is there a member of the Board elected or appointed as
[20] secretary?
[21]   A: No.
[22]   Q: Is there a paid employe of the District who is the
[23] secretary for purposes of Board meetings?
[24]   A: Yes.
[25]   Q: Is it that person's responsibility to prepare written

---

Richard Nilsen
April 14, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

**Page 35**

[1] minutes of each Board meeting?

[2]  A: Yes.

[3]  Q: When the minutes are prepared, do you review them before

[4] they are distributed to the Board?

[5]  A: Yes.

[6]  Q: Why do you review them?

[7]  A: For accuracy of information.

[8]  Q: It is my understanding that the Board meetings are

[9] recorded on a tape. Am I right on that understanding?

[10]  A: Yes.

[11]  Q: What happens to the tapes?

[12]  A: Up to the 18th of October, once the Board ended up

[13] approving the minutes, they were either destroyed — and

[14] this goes beyond my Superintendency — or recorded over.

[15]  Q: When you review the minutes for accuracy, do you also

[16] listen to the tape?

[17]  A: No.

[18]  Q: Has it ever happened that a verbatim transcription of a

[19] tape of a Board meeting has been made?

[20]  A: Yes.

[21]  Q: How often has that happened?

[22]  A: I will only speak to my understanding.

[23]  Q: Right. That is all I am asking about.

[24]  A: Once.

[25]  Q: Which meeting?

---

**Page 36**

[1]  A: October 18, 2004.

[2]  Q: Who made the decision to transcribe that tape?

[3]  MR. GILLEN: Object to the form.

[4]  A: I don't remember.

[5]  BY MR. SCHMIDT:

[6]  Q: Did you review the transcript of the tape for accuracy?

[7]  A: I read the transcript. I did not listen to the tape and

[8] the transcript at the same time, no.

[9]  Q: What is your understanding of the reason for making a

[10] transcript of that tape?

[11]  MR. GILLEN: Object to the form.

[12]  A: My recollection is that it was a comment made by Ms.

[13] Geesey during the Board meeting that received media

[14] attention, and she believed she was misquoted and wanted

[15] documentation to prove that she did not say what the

[16] newspaper reported her in saying.

[17]  BY MR. SCHMIDT:

[18]  Q: Is the comment that you have just referred to her

[19] reported statement about teachers being fired if they

[20] sought separate legal representation?

[21]  A: That's the newspaper quote. That's not what she nor I

[22] believe she said.

[23]  Q: I understand that. But that was the reported statement?

[24]  A: Yes.

[25]  Q: That led to the request that the tape be transcribed; is

---

**Page 37**

[1] that right?

[2]  A: I'm not going to on the record to say that was the sole

[3] issue, but that's my recollection because that's the

[4] research that I was directed to do to find out if we

[5] could prove that that was not said.

[6]  Q: What do you recall that she actually said?

[7]  A: The background was in conversing, the Board was

[8] discussing the language of the curriculum, and at the

[9] same time the teachers were voicing their concern about

[10] the language.

[11]  And a Board member asked whether the solicitor had

[12] reviewed the language and approved it, and the answer

[13] was yes. And then Ms. Geesey ended up saying well, if

[14] that is incorrect, then we should fire him, referring

[15] directly to the solicitor. But the inference from the

[16] teachers was she was referring to them. She used the

[17] pronoun and obviously not the noun.

[18]  But it was my recollection — and in similar

[19] fashion I believe the majority of the Board — that she

[20] was talking about the solicitor. If she was talking

[21] about the teachers, I would have pointed her to

[22] specifics that that would not have been an issue that

[23] she had either the authority to do or the ability to do,

[24] or an issue that is a fireable offense.

[25]  The reason that I did not convey is that she does

---

**Page 38**

[1] have the authority as a Board member to hire and fire

[2] the solicitor, but she does not have the authority to

[3] fire specifically unilaterally or collectively as a

[4] Board any teachers. So I never made it an issue.

[5]  The first time I realized that it was perceived

[6] differently was when the paper reported it the next

[7] morning.

[8]  Q: Did you bring the newspaper report to Ms. Geesey?

[9]  A: No.

[10]  Q: Do you have a practice in your office of looking at

[11] articles that appear in print that involve the Dover

[12] Area School District?

[13]  A: Yes.

[14]  Q: Who is assigned the task of reviewing the papers, or do

[15] you do that yourself?

[16]  A: The District operator.

[17]  Q: Do you share those clips with members of the Board?

[18]  A: Some clips, yes, but not all of them.

[19]  Q: Do you maintain a file of those clippings?

[20]  A: I don't.

[21]  Q: Does somebody in the School District office?

[22]  A: I do not believe so, no. Not all of them, no.

[23]  Q: What happens after the clippings are made?

[24]  A: My copy? I have thrown — after I have read the

[25] articles with the exception of this case, I have thrown

---

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Richard Nilsen
April 14, 2005

---

**Page 39**

[1] them out.

[2]   Q: Have you ever responded to a news article by either

[3] providing additional information to the news media or

[4] attempted to correct what you believe was inaccurately

[5] reported?

[6]   A: No.

[7]   Q: Is there anyone on your staff who has as his or her

[8] responsibilities dealing with the news media?

[9]   A: Yes.

[10]   Q: Who was?

[11]   A: Mr. Troy Wiestling, an elementary principal.

[12]   Q: What are his responsibilities?

[13]   A: Media relations.

[14]   Q: For the whole District?

[15]   A: Yes.

[16]   Q: As an elementary school principal?

[17]   A: Yes.

[18]   Q: Was he ever given responsibility for dealing with the

[19] media in connection with the selection of a biology

[20] textbook or the discussions surrounding that decision

[21] that took place in the summer and fall of 2004?

[22]   A: No.

[23]   Q: I am going to show you a document that has been marked

[24] previously as Plaintiff Exhibit 3. I ask you to take a

[25] look at this.

**Page 40**

[1]   A: (Witness complies.)

[2]   Q: Have you had an opportunity to look at P-3, Dr. Nilsen?

[3]   A: Yes, I have.

[4]   Q: This is a Board Press Release for Biology Curriculum.

[5] It appears, as I am looking at the title, to be dated

[6] November 19, 2004 reposted December 14, 2004.

[7] Am I reading that headline correctly?

[8]   A: That is correct.

[9]   Q: Does this two page exhibit appear to be something

[10] printed from the District's website?

[11]   A: Yes.

[12]   Q: Who wrote this press release?

[13]   A: I wrote the press release. The first indentation, the

[14] Board adopted. The second four paragraph indentation

[15] Mr. Baksa wrote in conjunction with the teachers and the

[16] Board.

[17]   Q: As I am following the chronology we have discussed this

[18] morning, the original press release, the one that was

[19] posted on November 19th, appeared before your meeting

[20] with Seth Cooper and the Discovery Institute; right?

[21]   A: Yes.

[22]   Q: Was the press release changed between November 19th and

[23] December 14th?

[24]   A: Yes.

[25]   Q: How was it changed?

---

**Page 41**

[1]   A: Nothing substantial. I believe there was a typo and a

[2] grammatical issue.

[3]   Q: Why was it reposted on December 14th?

[4]   A: Because we had updated the grammatical and the typo.

[5]   Q: If you look on the second page, which is Bates numbered

[6] P1308, I direct your attention to the paragraph

[7] following the indented material.

[8] The second sentence says that you have directed

[9] that no teacher will teach Intelligent Design,

[10] Creationism or present his or her or the Board's

[11] religious beliefs. That's the end of that quote.

[12] Those are your words?

[13]   A: Yes.

[14]   Q: You wrote that?

[15]   A: Yes.

[16]   Q: How did you direct the teachers as referred to in that

[17] sentence?

[18]   A: November 24th in my office with the whole Science

[19] Department, Union Representative Mr. Miller, Mr. Baksa,

[20] myself, we held a meeting with the teachers and

[21] discussed implementation of the biology curriculum.

[22] And the teachers ended up repeatedly concerned

[23] with their issue of requiring to be teaching Creationism

[24] and/or Intelligent Design.

[25] And I told them repeatedly at least two that I

**Page 42**

[1] recollect and possibly three times, that they are not to

[2] teach Intelligent Design, and they are not to teach

[3] Creationism.

[4] And the concern was raised that there may be

[5] religious conversation, and it is generally a practice

[6] in education that there are topics that should not be

[7] discussed. And I think the legal history will reflect

[8] teachers should not be presenting their own religious

[9] beliefs.

[10]   Q: Your sentence refers to the Board's religious beliefs.

[11] What are the Board's religious beliefs?

[12]   A: I don't know.

[13]   Q: Why did you include a direction to the teachers and a

[14] statement in this press release that the teachers were

[15] not to teach the Board's religious beliefs?

[16]   A: Because I think there was a belief in some science

[17] teachers that Board members had individual religious

[18] beliefs.

[19]   Q: What was your understanding of the basis for that belief

[20] by the science teachers?

[21]   A: I thought they believed that the Board — or at least

[22] individual members in all fairness, because the Board is

[23] seen as a collective, and it is not; it is

[24] individuals — had a religious intent of the action.

[25] And my comment to them was that's not an area of

---

**Richard Nilsen**
**April 14, 2005**

**Tammy Kitzmiller, et al.  v.**
**Dover Area School District, et al.**

---

**Page 43**

[1] conversation. No one's religious beliefs is an area of
[2] conversation to be discussed in individual classrooms.
[3]   Q: Why did you direct them not to teach Creationism?
[4]   A: It is illegal.
[5]   Q: What is your understanding of Creationism? What were
[6] you referring to when you used that term in this
[7] sentence?
[8]   A: I was referring to their statement of Creationism,
[9] meaning that they believed they are being required to
[10] teach Creationism. So I was not interested in my
[11] definition, as much as I was interested in their
[12] definition. And I don't know what their definition was
[13] except they believed they were teaching a subject matter
[14] called Creationism.
[15]   My answer to them was no, you are going to teach
[16] the individual standards as required by the Pennsylvania
[17] Department of Education.
[18]   But getting back to your original question, my
[19] definition of Creationism, I think as defined in the
[20] court case a Judeo-Christian Biblical reference to the
[21] origins of life.
[22]   Q: When you first prepared this press release in November
[23] of 2004, did you have an understanding that teaching
[24] Creationism as you understood it was illegal?
[25]   A: Yes.

**Page 44**

[1]   Q: How did you come to have that understanding?
[2]   A: I think it amounts to being common knowledge of various
[3] and very specific legal cases in administration,
[4] conversations and/or education. We all are taught
[5] certain individual cases. And whether I received that
[6] information about Aguillard in my undergraduate or
[7] graduate or consistent reading, I can't speak to it.
[8] But I was familiar with that case.
[9]   Q: Why did you direct the teachers not to teach Intelligent
[10] Design?
[11]   A: Two reasons. One, they didn't want to teach Intelligent
[12] Design, and that was not their interest. And I
[13] supported them in that.
[14]   And secondly, it is not curricular directed
[15] meaning we are standards driven, and we end up dealing
[16] with the individual standards that are presented. And
[17] as stated earlier, we don't have enough time to cover
[18] all the material that we end up covering. The state
[19] requires us to touch base on the Darwinian Theory and
[20] discuss that. And we do discuss that.
[21]   And due to the time constraints, as well as it
[22] currently not being in the state standards, they were
[23] directed not to teach it.
[24]   Q: What was your understanding of the teachers' reasons for
[25] not wanting to teach Intelligent Design?

**Page 45**

[1]   A: I believe they thought and they stated they thought it
[2] was illegal.
[3]   Q: What did they say made it illegal?
[4]   A: I don't remember. They just repeatedly said they
[5] thought it would put them in a situation of where they
[6] would get sued. The reasons behind that, I don't
[7] remember.
[8]   Q: If I understand the answer you gave a moment or two ago,
[9] you supported your teachers in their position of not
[10] wishing to teach Intelligent Design?
[11]   A: That's correct.
[12]   Q: So you shared some understanding of why they took that
[13] position?
[14]   A: No. Their position was that it would be illegal. I
[15] never said that issue. My issue was we only teach the
[16] standards, and currently that piece is not in the
[17] standards.
[18]   Q: Did you express that view to the Board in October when
[19] they were making their curricular decision that they
[20] were adding something in the curriculum that was not in
[21] the standards and that you thought that was
[22] inappropriate?
[23]   MR. GILLEN: Object to the form.
[24]   A: I communicated to the Board my recommendation of what
[25] should be placed in the curriculum. I did not

**Page 46**

[1] communicate what or did not speak specifically to the
[2] Intelligent Design issue at all.
[3]   BY MR. SCHMIDT:
[4]   Q: I just want to be sure I understand the sentence before
[5] I move on to another topic. The teachers told you they
[6] didn't want to teach Intelligent Design?
[7]   A: That is correct.
[8]   Q: They told you that they thought it was illegal to teach
[9] Intelligent Design?
[10]   A: That is correct.
[11]   Q: You don't recall any understanding about why they
[12] thought it was illegal?
[13]   A: No, I don't remember why.
[14]   Q: Do you recall any discussion by the teachers that
[15] Intelligent Design was not science and for that reason
[16] wasn't an appropriate part of the biology curriculum?
[17]   A: After the November 24th meeting, yes.
[18]   Q: Do you recall any discussion with the teachers at the
[19] time of the meeting we are testifying about that
[20] Intelligent Design was religious in content and that is
[21] why teaching it would be illegal?
[22]   A: On November 24th?
[23]   Q: Well, let's try not to get the dates confused. This
[24] press release is issued for the first time on November
[25] 19th, and I believe your testimony has been that the

---

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Richard Nilsen
April 14, 2005

---

**Page 47**

[1] meeting with the teachers took place before the release
[2] was issued.
[3]   A: No. This press release was issued before I met with the
[4] teachers.
[5]   Q: So when it says in this sentence we are going over that
[6] you have directed, it really means you will direct them
[7] not to teach certain subjects?
[8]   A: Yes.
[9]   Q: Okay. I am with you now.
[10]   MR. GILLEN: Me, too.
[11]       BY MR. SCHMIDT:
[12]   Q: I think my question was whether during the discussion
[13] with the teachers, you came to understand that at least
[14] some of them believed teaching Intelligent Design was
[15] illegal because it had religion as part of its content?
[16]   A: I don't remember if anyone ended up specifically stating
[17] that. I do remember them stating teaching Creationism
[18] was illegal, and I agreed with that.
[19]     Whether they ended up saying at that time period
[20] they believed Intelligent Design was religious and
[21] therefore illegal, I don't remember that at that time
[22] period.
[23]   Q: To put this in context, you predicted what you were
[24] going to tell them about a week before you actually had
[25] your meeting with them.

**Page 48**

[1]     Why was it before you had your discussion with the
[2] teachers about any of the subjects covered in this
[3] sentence we have been going over that you were directing
[4] them not to teach Intelligent Design?
[5]   A: Because I think the way the Board adopted the
[6] curriculum, they were not to teach Intelligent Design.
[7] Meaning if you interpret the prior paragraph, it doesn't
[8] say to teach Intelligent Design.
[9]     And I'm on record twice at two different Board
[10] meetings when a former Board member asked are teachers
[11] going to teach Intelligent Design, I said no in both
[12] instances.
[13]     It is my interpretation of what the Board did on
[14] October 18th that they are not teaching Intelligent
[15] Design. So it was my interpretation and directive to
[16] them as I saw that piece that that is what my direction
[17] was.
[18]     The Board member — former Board member basically
[19] said that the teachers would not be aware of what to do
[20] with that sentence. And I directed Mr. Baksa to flesh
[21] out the interpretation, and that is the four paragraph
[22] sentence.
[23]     And then in the November 24th, I reiterated once
[24] again that they are not teaching Intelligent Design.
[25]   Q: What was your understanding of the District's position

**Page 49**

[1] that teachers were not to teach Intelligent Design?
[2]   A: I am sorry. I don't understand that.
[3]   Q: Okay. Why weren't the teachers to teach Intelligent
[4] Design?
[5]   A: Based on the fact that it is not one of the standards.
[6]   Q: My reading of the curriculum documents tells me that the
[7] amount of time devoted to Evolution is 19 days?
[8]   A: No.
[9]   Q: How much time is devoted to Evolution?
[10]   A: One to two days.
[11]   Q: What is the origin of life debate that is referred to in
[12] the next sentence of Exhibit P-3?
[13]   A: The origins of life debate is the origin of the creation
[14] or beginning, the genesis, if you would, not using
[15] Biblical references, but the beginning part of man.
[16]   Q: Of man?
[17]   A: Yes.
[18]   Q: What is Darwin's opinion about the origin of life as you
[19] understand it? I am now looking at the next sentence.
[20]   A: I don't know.
[21]   Q: What did you mean when you put that sentence in the
[22] release?
[23]   A: The Board believes that there are other options and
[24] discussions on Darwin's opinion on the origins of life,
[25] and I have communicated that.

**Page 50**

[1]   Q: The sentence reads the School Board has noted that there
[2] are opinions other than Darwin's on the origin of
[3] life — end of quote.
[4]     Do you know what Darwin's opinions on the origin
[5] of life are?
[6]   A: No.
[7]   Q: Did you make any inquiry about what the Board had in
[8] mind when it said there are other opinions?
[9]   A: No. But my context was some Board members differed with
[10] Darwin's concept of origins of life and communicated
[11] such publicly.
[12]   Q: Why did you capitalize origin of life in these
[13] sentences?
[14]   A: I have no idea.
[15]   Q: Are you aware of any opinions other than Darwin's
[16] opinion on the origin of life, whatever that may be?
[17]   A: Yes.
[18]   Q: What are the other opinions that you are aware of?
[19]   A: There is the opinion — and I have no idea how to spell
[20] it — Plantaria, whatever it is, where there are aliens
[21] that have come in some capacity. The whole conversation
[22] dealing with the pyramids and the structure that the
[23] earth was created by an outside force, whatever that —
[24] either alien as defined as an entity beyond homo sapiens
[25] on earth.

---

Richard Nilsen
April 14, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

**Page 51**

[1]  There is the Big Bang Theory of where the
[2] beginning of time was created out of an explosion in
[3] some capacity. And there is also the conversation that
[4] there is a Godlike entity that created earth and
[5] everything on it.
[6]  **MR. SCHMIDT:** Off the record, please.
[7]  (An off-the-record discussion was had.)
[8]  (Plaintiffs Exhibit 43 was marked.)
[9]  **BY MR. SCHMIDT:**
[10]  **Q:** Dr. Nilsen, have you had an opportunity to review
[11] Plaintiffs Exhibit 43?
[12]  **A:** Yes, I have.
[13]  **Q:** Identify the document, please.
[14]  **A:** The document is Administrator's Biology Statement in
[15] Biology Class.
[16]  **Q:** Bates numbered 1099110O. Do you know who prepared this
[17] document?
[18]  **A:** Yes.
[19]  **Q:** Who?
[20]  **A:** I did.
[21]  **Q:** What use was made of the document?
[22]  **A:** The document was read in total by either myself or Mr.
[23] Baksa.
[24]  **Q:** Verbatim?
[25]  **A:** 99.9 percent.

**Page 52**

[1]  **Q:** Was it the plan to stick —
[2]  **A:** As close as possible.
[3]  **Q:** Paragraph five on page two of the document includes a
[4] statement that there will be no other discussion of the
[5] issue and your teachers will not answer any questions on
[6] this issue.
[7]  What is this issue that is referred to in that
[8] paragraph?
[9]  **A:** The issue of Intelligent Design.
[10]  **Q:** When you prepared what has been marked as P-43, what was
[11] your understanding of the difference between the
[12] Intelligent Design explanation of the origin of life and
[13] Darwin's explanation of the origin of life?
[14]  **A:** When I prepared the document?
[15]  **Q:** Right.
[16]  **A:** At that time, I don't think I had an understanding.
[17]  **Q:** Do you recall when you prepared the document?
[18]  **A:** Yes.
[19]  **Q:** When?
[20]  **A:** It would have been in mid January.
[21]  **Q:** Do you have an understanding now?
[22]  **A:** I have somewhat of an understanding. I don't think I
[23] have a total understanding.
[24]  **Q:** I can't ask for perfection, but what is your present
[25] understanding?

**Page 53**

[1]  **A:** Intelligent Design refers to an order. Darwin refers to
[2] randomness.
[3]  **Q:** And how do those two notions that you have just stated
[4] have to do with the origin of life?
[5]  **A:** As it relates to Darwin, there could be a randomness. I
[6] think his theory is survival of the fittest. And
[7] Intelligent Design has a specific design to it, not a
[8] randomness.
[9]  **Q:** I think I took that from the order versus random. But
[10] what do those two notions have to do with what you have
[11] used the phrase and it is used in this document the
[12] origin of life; do you have any understanding of the
[13] relationship between the two concepts you have referred
[14] to and the origin of life?
[15]  **A:** Not beyond what I have said, no.
[16]  **Q:** You have been an educator for going on 20 years?
[17]  **A:** Twenty-nine.
[18]  **Q:** Twenty-nine years. Can you recall any instance in your
[19] career as an educator when students have been directed
[20] that they are not to discuss topics, and teachers are
[21] not permitted to comment on topics with students?
[22]  **MR. GILLEN:** Object to the form.
[23]  **A:** Yes.
[24]  **BY MR. SCHMIDT:**
[25]  **Q:** Can you give me another circumstance besides this one?

**Page 54**

[1]  **A:** Political affiliation, sexual education, issues within
[2] the community that are highly politically charged.
[3]  **Q:** And religion?
[4]  **A:** And religion.
[5]  **Q:** Did any parents or students ever contact you after the
[6] statement was read?
[7]  **A:** Not that I remember, no.
[8]  **Q:** I am going to show you a document that has been marked
[9] previously as Plaintiffs 9. Have you had an opportunity
[10] to look at Exhibit P-9?
[11]  **A:** Look at it. Read it in total, no.
[12]  **Q:** Let me ask you some questions. If you need to review it
[13] in any detail, just let me know. This is a document
[14] that contains Bates numbered pages 944 through 951. Let
[15] me ask you to turn first to page 946.
[16]  **A:** (Witness complies.)
[17]  **Q:** Do you recognize this document?
[18]  **A:** Yes.
[19]  **Q:** Is this the Biology One Curriculum that was in place
[20] before October 18th, 2004?
[21]  **A:** To the best of my ability, yes.
[22]  **Q:** I need your help to understand it. As I read this
[23] document, it suggested to me that there were 19 days out
[24] of the biology curriculum devoted to natural selection,
[25] the mechanism of Evolution and the origins of bio

---

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Richard Nilsen
April 14, 2005

**Page 55**

[1] diversity. Have I read the top line correctly?

[2]  A: That's correct.

[3]  Q: And it appears, for instance, that the references to

[4] Darwin, Darwin's Theory of the origin of species and

[5] issues involving Evolution are spread throughout this 19

[6] day period?

[7]  A: That is what is written here, correct.

[8]  Q: As I understood your testimony a few moments ago, it was

[9] the Theory of Evolution was limited to two days in the

[10] biology curriculum. Did I mishear your testimony?

[11]  A: You did not.

[12]  Q: Can you explain why you say two days and this appears to

[13] say 19?

[14]  A: The ugliness that every Superintendent and Assistant

[15] Superintendent has is the fact that teachers teach not

[16] solely the outline of the planned instruction. This

[17] obviously is the case.

[18]  Because when asking the specific teachers how many

[19] days they spend on the theory, they said two. So I am

[20] following what they have told us is the reality versus

[21] what is in the planned course. Meaning this document is

[22] obviously the instructional guide, but not what is in

[23] practice.

[24]  Q: As Superintendent, are you concerned that the guide's

[25] call for 19 days of instruction and your teachers are

**Page 56**

[1] telling you they are only devoting two?

[2]  A: I think you noted my introductory comment of the

[3] ugliness of it, and the answer is yes. Whether the

[4] planned course is misdone or the instruction is misdone,

[5] I can't speak to that. But obviously, both should be

[6] similar.

[7]  Q: Back to page 944, have you seen this memorandum before

[8] today, the memorandum from Trudy Peterman to Mr. Baksa,

[9] Mr. Redding and Mrs. Spahr dated April 1, 2003?

[10]  A: Yes.

[11]  Q: I am assuming you saw it in the course of preparing

[12] documents for discovery in this case, but did you see it

[13] about the time it was issued?

[14]  A: I have no recollection of that except to say that it is

[15] carbon copied to me, and I would expect within my

[16] responsibilities that I would have come across it.

[17]  Q: Would you have read it?

[18]  A: Yes.

[19]  Q: Do you recall doing anything in response to or following

[20] receipt of this memorandum?

[21]  A: No.

[22]  Q: You don't recall any discussions with Mr. Baksa or Mrs.

[23] Spahr about it?

[24]  A: No. Let me rephrase that. About this specific memo

[25] with Mr. Baksa?

**Page 57**

[1]  Q: Yes.

[2]  A: Do I recollect anything? No, I don't.

[3]  Q: Were you concerned?

[4]  A: My apologies. Let me rephrase that. At the time.

[5] Obviously, I have had conversations since then.

[6]  Q: I understand. The first paragraph in the memo indicates

[7] that your science teachers are teaching that Creationism

[8] is an alternative theory of Evolution which I believe

[9] you testified a little while ago would be illegal in

[10] your understanding.

[11]  What did you do when you learned about what your

[12] teachers were doing in Biology I?

[13]  MR. GILLEN: I object to the form.

[14]  A: What did I do?

[15]  BY MR. SCHMIDT:

[16]  Q: Yes.

[17]  A: Nothing. I didn't think they were doing it.

[18]  Q: You didn't think they were doing it?

[19]  A: No.

[20]  Q: I will ask you to look at a sentence that starts five

[21] lines down in paragraph one on Bates page 944. She — I

[22] think referring to Mrs. Spahr — explained to Mr. Baksa

[23] that all biology teachers state that another theory of

[24] Evolution is Creationism. I know that is not the end of

[25] the sentence, but let me ask a question about that.

**Page 58**

[1]  If teachers were making that statement in their

[2] biology classes, is it your understanding that that

[3] would be improper?

[4]  MR. GILLEN: Object to the form.

[5]  BY MR. SCHMIDT:

[6]  Q: I am trying to avoid the word illegal even though that

[7] is a notion you used earlier.

[8]  A: No, I don't because I define teach and present other

[9] theories not teaching.

[10]  Q: So mentioning —

[11]  A: That there are other theories.

[12]  Q: I will say my question again. If I understand the

[13] distinction you are making, that to stand in front of a

[14] classroom sand say there is a theory or a belief in

[15] Creationism in the context of teaching Evolution is

[16] acceptable, but to go beyond that and describe what

[17] Creationism means or do anything more than simply

[18] mentioning it would be improper?

[19]  A: Correct.

[20]  Q: If a student says gee, teach, you just used the word

[21] Creationism, what does that mean, the teacher is

[22] supposed to say I am sorry, I can't tell you?

[23]  A: That's correct.

[24]  Q: Do you know who the Board member is that is referred to

[25] in the last sentence of that first paragraph, the Board

Richard Nilsen
April 14, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 59

[1] member is supposed to have wanted fifty percent of the
[2] teaching of Evolution to involve Creationism?
[3]   A: Only indirectly.
[4]   Q: Who is it?
[5]   A: In my discussions with Mr. Baksa, he communicated to me
[6] that he believed they are referring to Mr. Bonsell.
[7]   Q: Without going over each of the five questions that are
[8] posed in paragraph two of Trudy Peterman's memorandum,
[9] do you know if those questions were ever answered by Mr.
[10] Baksa or anyone else in the administration of the School
[11] District?
[12]   A: No, I do not know.
[13]   Q: Did you direct anyone to provide those answers?
[14]   A: No.
[15]   Q: Do you believe when you saw this memorandum that it
[16] raised important issues that required some attention by
[17] the administration?
[18]   A: Yes, but not in the direction you are heading.
[19]   Q: What attention did you think it required to.
[20]   A: To make sure that the principal was telling the truth.
[21]   Q: What part of what is in this exhibit did you think was
[22] untruthful?
[23]   A: The third line, the third sentence Mr. Baksa mentioned
[24] that a Board member wanted Creationism taught in Biology
[25] I class.

Page 60

[1]   Q: What is untruthful about that statement?
[2]   A: I am not aware of that, nor is Mr. Baksa aware of that
[3] conversation. Nor did I ever hear a Board member
[4] mention that in any capacity. Neither did Mr. Baksa.
[5]   Q: When you read that if you thought it was untrue, what
[6] did you do?
[7]   A: The germane area was directed to Mr. Baksa. It is his
[8] responsibility to take care of that additional quote.
[9] It is my responsibility to deal with the Principals, the
[10] behavior.
[11]   Q: What did you do with it?
[12]   A: It reflected in her evaluation.
[13]   Q: In what way?
[14]   A: Her behavior was evaluated. Her conversations were
[15] evaluated negatively.
[16]   Q: When did her evaluation take place?
[17]   A: June of 2003 and June of 2004, at the end of each of her
[18] two years.
[19]   Q: Now as I read this memorandum, the first paragraph, it
[20] appears to me that Trudy Peterman is reporting on a
[21] conversation that she had with Mrs. Spahr in which Mrs.
[22] Spahr recounts a conversation with Mr. Baksa.
[23]   Have you taken any disciplinary action with Mrs.
[24] Spahr for misstating or misrepresenting a conversation
[25] she had with Mr. Baksa?

Page 61

[1]   A: No.
[2]   Q: Why not?
[3]   A: Two reasons. One is the Superintendent doesn't have
[4] direct supervision in the evaluation of teachers. Those
[5] are the individual responsibilities of the building
[6] principal.
[7]   And secondly, this conversational capacity would
[8] end up being between the conversation of Mr. Baksa, Dr.
[9] Peterman and her eventual responsibilities of
[10] evaluation.
[11]   Q: I misunderstood that answer.
[12]   A: Meaning if Mrs. Spahr is misquoting Mr. Baksa, it would
[13] be Mr. Baksa's responsibility to communicate to Dr.
[14] Peterman of the misquotation.
[15]   Q: Do you know whether he did that or not?
[16]   A: No, I do not know that.
[17]   Q: As I understand what happened in response to the two
[18] sentences that appear at the beginning of — I am sorry
[19] — three sentences that appear at the beginning of this
[20] exhibit, Dr. Peterman is disciplined for having made a
[21] statement that she heard from Mrs. Spahr, but Mrs. Spahr
[22] is not disciplined for having made the original
[23] statement which you and Mr. Baksa think is untrue?
[24]   MR. GILLEN: Object to the form.
[25]   A: I can speak to the first which is yes. I can't speak to

Page 62

[1] the other point based on the fact that I have not an
[2] understanding of what Dr. Peterman did and what Mr.
[3] Baksa did with the individual teacher.
[4]   Q: Did you ask Dr. Peterman what she did in her supervision
[5] of Mrs. Spahr about this subject?
[6]   A: No, not this subject, no.
[7]   Q: Is it your position as the Superintendent that when
[8] somebody that you are evaluating repeats the statement
[9] of another person, if that statement turns out to be
[10] untrue, that the person you supervise bears the
[11] responsibility for that untruth?
[12]   Let me withdraw the question. It's too big. I
[13] have already got your answer on it. I understand what
[14] you did.
[15]   MR. GILLEN: Thank you, Tom.
[16]   BY MR. SCHMIDT:
[17]   Q: Did you have any further discussion with Mr. Baksa about
[18] the subject of his reported conversation with Mrs. Spahr
[19] on the topics that are addressed in this memorandum?
[20]   A: Yes.
[21]   Q: When did you have that conversation with him?
[22]   A: Over the past year.
[23]   Q: Did you have a conversation with him around the time
[24] that this memorandum was issued in April of '03?
[25]   A: In a general sense, yes. As it relates to specifics,

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Richard Nilsen
April 14, 2005

---

**Page 63**

[1] no.

[2] Q: How did you reach the determination to give Dr. Peterman

[3] a bad evaluation because of what appears in this first

[4] paragraph without doing an investigation —

[5] MR. GILLEN: Object to the form.

[6] BY MR. SCHMIDT:

[7] Q: — with Mr. Baksa?

[8] MR. GILLEN: I am sorry.

[9] MR. SCHMIDT: That is all right. I paused.

[10] A: The evaluation was not solely based on this individual

[11] action. It was significantly broader obviously than

[12] this. And the behavior reflected not solely the

[13] information, but the process of the information.

[14] BY MR. SCHMIDT:

[15] Q: Did you ever instruct Dr. Peterman about how she was to

[16] behave or interact with the Board at Board meetings?

[17] A: Yes.

[18] Q: What instructions did you give her?

[19] A: The Board directed me to direct to her that when she

[20] came to Board meetings, that she like every other

[21] individual was to be recognized prior to coming to the

[22] podium, was to direct her comments to the Board and not

[23] the constituents.

[4] She was also not to raise her voice. She was also

[25] not to pound the podium. And she was to be on point,

---

**Page 64**

[1] not wander off a point.

[2] Q: Did you give her those directions in writing?

[3] A: Yes.

[4] Q: Is that the current state of her instructions with

[5] respect to Board meetings?

[6] A: She is no longer employed.

[7] Q: Was she fired?

[8] A: No. She has since gone to another district where she is

[9] in litigation with the Superintendent because the

[10] Superintendent put her on leave, as the prior district

[11] also put her on leave. So out of three districts, two

[12] out of the three, she was put on leave for behavior

[13] unbecoming to an administrator.

[14] Q: I would like to show you a document that has previously

[15] been marked as Plaintiffs 28. I just have a quick

[16] question or two about this.

[17] Dr. Nilsen, at least initially, you can probably

[18] answer my question by looking at the first page. If

[19] someone else has already asked this, I apologize to you.

[20] But is this your handwriting on this document?

[21] A: No.

[22] Q: Do you know whose it is?

[23] A: Without certainty. But it does look like Mr. Baksa's.

[24] It is neater than mine.

[25] MR. GILLEN: Off the record.

---

**Page 65**

[1] (An off-the-record discussion was had.)

[2] BY MR. SCHMIDT:

[3] Q: If you look back to Bates page 238, do you recognize

[4] that handwriting?

[5] A: No.

[6] Q: Do you recall Mr. Buckingham making a statement about

[7] someone died on the cross for us two thousand years ago

[8] at the June, 2004 meeting?

[9] A: No.

[10] (Plaintiffs Deposition Exhibit 44 was marked.)

[11] BY MR. SCHMIDT:

[12] Q: Dr. Nilsen, I am showing you a document that has been

[13] marked as Plaintiffs Exhibit 44, Bates pages 1115

[14] through 1117. Please take a look at it.

[15] A: (Witness complies.)

[16] Q: Have you had a chance to look at the document?

[17] A: Yes.

[18] Q: These appear to be excerpts from a document generally

[19] titled Superintendent's Weekly Update. Am I correct

[20] about that?

[21] A: Yes.

[22] Q: What is the Superintendent's Weekly Update?

[23] A: That is sent to all Board members, a weekly report on

[24] events that happen on non Board meeting weeks as well as

[25] during Board meeting weeks.

---

**Page 66**

[1] Q: Does anyone else receive a copy of the update?

[2] A: The administrative staff and the Board members.

[3] Q: Is it available to the public?

[4] A: No.

[5] Q: When you said administrative staff?

[6] A: Principals and Department Supervisors.

[7] Q: Who is the Mr. Russell referred to at the top of the

[8] first page of this?

[9] A: He is the District Solicitor.

[10] Q: The document begins with an Update dated November 5,

[11] 2004. Is that the date this is published if you will?

[12] A: Disseminated.

[13] Q: Disseminated on the 5th, okay. This one starts with B.

[14] right under the title. Is that a mistake, or was a

[15] section redacted before the document was copied; do you

[16] know?

[17] A: The directions was to communicate to all of the

[18] documents that I had in possession that dealt with the

[19] case. We ended up for the purpose of efficiency

[20] eliminating all of my Superintendent report's peripheral

[21] information.

[22] So the only thing that was listed on the sheet

[23] were items. For example if you turn to the next page,

[24] 1116, you will note under the December 3rd, it begins

[25] with a C.

---

Richard Nilsen
April 14, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 67

[1] Q: All right. So they have been redacted or cut and
[2] pasted?
[3] A: Yes.
[4] Q: What we will have when we go through this is the
[5] publication date and then whatever was within the
[6] Superintendent's Weekly Update that has anything to do
[7] with this case?
[8] A: That is correct.
[9] Q: Just give me one moment. If you look at page 1117,
[10] there is a paragraph numbered five just above the middle
[11] of the page.
[12] You had testified a while ago about a conversation
[13] with someone from a Wisconsin School District. Is this
[14] the conversation —
[15] A: Yes.
[16] Q: — that you were referring to? Do you have what you
[17] describe in the last sentence or second to the last
[18] sentence of paragraph five as the Grantsburg
[19] information.
[20] Do you have that separately maintained in your
[21] office?
[22] A: Yes.
[23] Q: Has that been produced in this litigation?
[24] A: It is my understanding —
[25] MR. GILLEN: Can we take two minutes?

Page 68

[1] (An off-the-record discussion was had.)
[2] (A recess was taken.)
[3] **AFTER RECESS**
[4] **BY MR. SCHMIDT:**
[5] Q: Dr. Nilsen, let me show you what has been marked or a
[6] part of what has been marked as Plaintiffs Deposition
[7] Exhibit 6, which has on it Bates numbers P-1616 through
[8] P-1622.
[9] Have you ever seen this document before?
[10] A: Yes.
[11] Q: Is this the transcription of the tape of the October
[12] 18th Board meeting?
[13] MR. GILLEN: Object to the form.
[14] A: It is a transcription of the discussion on the
[15] curriculum piece. I do not believe it is the
[16] transcription of the full tape.
[17] Q: The tape is of the entire meeting; is that correct?
[18] A: No. There was two tapes. And the second tape, if you
[19] go to P-1622, it ends. The second tape did not record.
[20] So the District is in possession of one tape that
[21] recorded and a second tape that has nothing on it.
[22] Q: The tape that recorded, does it include material other
[23] than what appears in Plaintiffs Deposition Exhibit 6?
[24] A: I believe so, yes.
[25] Q: Was this written transcription prepared under your

Page 69

[1] supervision or ultimately your supervision?
[2] A: Yes.
[3] Q: Who actually prepared it?
[4] A: I believe the Board secretary, one of the Board
[5] secretaries.
[6] Q: I think you testified earlier that you did not compare
[7] the transcript to the tape; am I right about that?
[8] A: That is correct.
[9] Q: Did you review the transcript to verify — to confirm
[10] its general accuracy compared to your memory of the
[11] discussion?
[12] A: Yes.
[13] Q: Did you find it to be generally accurate?
[14] A: Yes.
[15] Q: Was the transcript edited? And by that I mean did
[16] somebody do for the Board members what Vicki does for
[17] me, take out all the ah's and the bad grammar and
[18] punctuation and clean it up?
[19] A: No.
[20] Q: This Vicki is the person I am referring to.
[21] A: No.
[22] Q: So this is verbatim to the best of your understanding?
[23] A: The secretary may have self edited, but I can't speak to
[24] whether she did that or not. It is as close to the
[25] content — I can't speak to whether someone said ah or

Page 70

[1] the and she eliminated those. Nonetheless, I think what
[2] was stated there clearly was transcribed.
[3] Q: Does the discussion that concerned Mrs. Geesey appear
[4] anywhere in this transcript?
[5] A: No.
[6] Q: I am trying to understand why the transcript was made.
[7] A: We didn't know where it ended.
[8] Q: You knew if you listened to it.
[9] A: I didn't listen to it.
[10] Q: Look at page P-1619.
[11] A: (Witness complies.)
[12] Q: I am trying to understand what the process was in doing
[13] this. If you would go down from the top, it goes
[14] Bonsell, Brown, Bonsell, Nilsen, Brown. Do you see that
[15] sequence?
[16] A: Yes.
[17] Q: And then there is a statement noted on minutes. Is that
[18] a reference by the person who made this transcript that
[19] the voting is recorded on the minutes, and that the
[20] discussion around the vote is not actually being
[21] transcribed here? Does that question make sense?
[22] A: Yes and yes.
[23] Q: Looking further down just to confirm my understanding of
[24] your answers after we go Bonsell, Bonsell, Harkins
[25] Bonsell, Wenrich, Brown, where Mrs. Brown seconds a

Min-U-Script®   Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Richard Nilsen
April 14, 2005

---

**Page 71**

[1] motion, then there is a statement that says noted on
[2] minutes, question called, noted on minutes, vote on
[3] amended motion, noted on minutes, that is not what
[4] somebody actually said in this verbatim transcript; that
[5] just says to the reader information is available in the
[6] minutes?
[7]    A: No. What she is requesting is that the minutes reflect
[8] exactly what she is doing.
[9]    Q: Who is requesting that?
[10]    A: Mrs. Brown. She wants the minutes to say that she did
[11] exactly what she did.
[12]    Q: So this statement here or this series of short sentences
[13] that I just read is a transcription of what Mrs. Brown
[14] said; that is your testimony as well?
[15]    A: That is correct.
[16]    Q: Where is the transcription of how people voted then?
[17] Where are the ayes and nays?
[18]    A: They would be the Board minutes.
[19]    Q: How do I know that by looking at this? It is not a
[20] verbatim transcript then; am I right?
[21]    A: No, it is a verbatim transcript.
[22]    Q: When somebody says I vote yes, if it is verbatim that is
[23] going to be in here, but it is not. I am just trying to
[24] understand how to read it. I am not trying to be
[25] argumentative.

**Page 72**

[1]    A: Understand.
[2]    MR. GILLEN: Off the record.
[3]    (An off-the-record discussion was had.)
[4]    A: I believe this conversation never got to a vote. I
[5] think there are these pages dealing solely with the
[6] discussion, and the vote never got to the final vote
[7] because there are votes.
[8]    For example if you go to P-1619, the mid section,
[9] people are saying second, and people are saying moved.
[10]    Example: Bonsell, Brown, Bonsell, Nilsen, Brown, Brown,
[11] Bonsell, Bonsell, Harkins, Bonsell, Wenrich. Wenrich
[12] moves. I move to amend the motion, and Mrs. Brown
[13] seconds it. And then they call for the question.
[14]                    BY MR. SCHMIDT:
[15]    Q: Just to follow along if we are doing this
[16] conversational, if you look at that place that we were
[17] reading before, it says vote on amended motion - noted
[18] on minutes.
[19]    A: Okay.
[20]    Q: I will tell you the way I read that. That was the
[21] actual mechanics of voting is not recorded here, but it
[22] does show up on the minutes. I am not trying to make a
[23] big deal out of this.
[24]    A: No, no. To be candid, you may be correct, and I may be
[25] incorrect.

**Page 73**

[1]    Q: We will find out. We will listen to the tape.
[2]    A: So your question because it does the more I look at this
[3] reflect votes that should have been noted. So what the
[4] secretary most likely did — she should have put these
[5] in parentheses because the inference was noted on
[6] minutes, maybe Mrs. Brown did not say noted on minutes.
[7] But yet, it is a reflection of that. You may be
[8] correct.
[9]    Q: We will see. I just was curious when I read it again,
[10] and I thought I would ask you.
[11]    A: Interesting.
[12]    Q: Could you look — before you put that to one side, let
[13] me say that I don't recall there was a lot of
[14] questioning about this at the first deposition.
[15]    MR. GILLEN: Nor do I, Tom.
[16]    MR. SCHMIDT: I do have a few more questions.
[17]    MR. GILLEN: That is fine.
[18]                    BY MR. SCHMIDT:
[19]    Q: If you look at the last page of this exhibit which is
[20] Bates 1622.
[21]    A: (Witness complies.)
[22]    Q: I am asking you to look specifically at your statement.
[23]    A: (Witness complies.)
[24]    Q: Okay?
[25]    A: Yes.

**Page 74**

[1]    Q: If you look at the paragraph that is next to your name
[2] — let me ask you first: Is that an accurate
[3] transcription of what you said at the October 18th
[4] meeting?
[5]    A: To the best of my ability, yes.
[6]    Q: The second sentence says quote I think the faculty and
[7] administration see a concern as it relates to teaching a
[8] specific dogma.
[9]    I am assuming you are referring back to the
[10] reference to Intelligent Design in the previous
[11] sentence.
[12]    Why was the faculty and administration concerned
[13] about teaching a specific dogma?
[14]    A: Well, I think there's two separate issues. I think the
[15] faculty believed Intelligent Design was something they
[16] did not want to teach because they thought it was
[17] illegal.
[18]    Our reference is the fact that it is not a
[19] standards driven concept.
[20]    Q: You will have to explain to me a little bit more. What
[21] is the connection between teaching a specific dogma, in
[22] your words, and, first, the faculty's belief that
[23] teaching Intelligent Design was illegal?
[24]    A: Well, a specific idea that's not in the standards has
[25] difficulty with the standards driven district. Meaning

---

Richard Nilsen
April 14, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 75

[1] if somebody brings in something that is not in the
[2] standards, and at this time there is discussion I was
[3] not familiar with what Intelligent Design was, I just
[4] knew it was not in the standards, so if somebody brings
[5] in something specific that is not in the standards, I
[6] have a difficulty with that.
[7]    And the definition of dogma is a general issue.
[8]    Q: What is your definition?
[9]    A: Something that intellectually is independent.
[10]    Q: Give me an example.
[11]    A: Wave theory versus linear theory for the theory of
[12] light.
[13]    Q: Have you ever heard either of those theories referred to
[14] by anybody as dogma?
[15]    A: No.
[16]    Q: Have you ever heard of religious beliefs referred to as
[17] dogma?
[18]    A: Yes.
[19]    Q: Looking down, there is a sentence that starts this way
[20] — I am not going to read it out loud. There is a
[21] sentence that starts because I do believe. Can you find
[22] that?
[23]    A: Yes.
[24]    Q: Can you explain what you meant in that sentence
[25] including what apparently was not audible to the person

Page 76

[1] making the transcription?
[2]    A: I have no idea.
[3]    Q: All right. In the last sentence, you seem to be saying
[4] that if a discussion — let me tell you how I read that
[5] sentence. It seems to be saying that if there is a
[6] required discussion of Intelligent Design, you have the
[7] fear that someone will misinterpret something.
[8]    What was your fear?
[9]    A: Reflecting on what the teachers were saying, I think it
[10] was perceived as the teachers were perceiving it and
[11] other individuals were perceiving it as a religious
[12] issue.
[13]    Q: Do you remember what else you said, what is not
[14] transcribed here?
[15]    A: No.
[16]    (Plaintiffs Deposition Exhibit 45 was marked.)
[17]    BY MR. SCHMIDT:
[18]    Q: Dr. Nilsen, have you had a chance to look at P-45?
[19]    A: Yes.
[20]    Q: Are the recipients of this October 19th e-mail science
[21] teachers?
[22]    A: Yes.
[23]    Q: Are they all of the high school science teachers?
[24]    A: No.
[25]    Q: Why did you write to these particular science teachers?

Page 77

[1]    A: They are the individuals that teach biology and the
[2] topic that was adopted at the prior Board meeting.
[3]    Q: What was the discussion you had with these folks about
[4] the Board's action on October 18th?
[5]    A: I think what generated this memo was the November 24th
[6] meeting with the teachers.
[7]    Q: That is the one you have already testified about?
[8]    A: Yes.
[9]    (Plaintiffs Deposition Exhibit 46 was marked.)
[10]    BY MR. SCHMIDT:
[11]    Q: I would like you to look at a document marked P-46.
[12] While we're waiting for you to look at it, let me put on
[13] the record that P-45 is Bates P-341 and P-46 is Bates
[14] 342. Have you looked at P-46?
[15]    A: Yes.
[16]    Q: Who are Jere — is it Wynegar?
[17]    A: Wynegar.
[18]    Q: And Sandi Bowser?
[19]    A: Union Presidents.
[20]    Q: Does this refer to the decision about the biology
[21] curriculum?
[22]    A: Yes.
[23]    Q: Do you recall what Jere and Sandi said or did at the
[24] Board meeting on this subject?
[25]    A: My recollection is that Sandi did not say anything, but

Page 78

[1] Jere did as per the direction of the memo congratulating
[2] him on his comments.
[3]    Q: Do you recall what they were?
[4]    A: No. I just remember him doing a very good job of it.
[5]    Q: Was he speaking in opposition to the adoption of the
[6] curriculum change?
[7]    A: No. I think he was speaking to including the teachers
[8] in the process and making sure the teachers were
[9] involved in the process.
[10]    Q: Do you recall the discussion that you had with Jere and
[11] Sandi after this e-mail was sent, if you had one?
[12]    A: The discussion was included in the 24th. Sandi and a
[13] different union rep were at the November 24th meeting.
[14]    (Plaintiffs Deposition Exhibit 47 was marked.)
[15]    BY MR. SCHMIDT:
[16]    Q: Have you had a chance the look at what has been marked
[17] as P-47?
[18]    A: Yes.
[19]    Q: Which is Bates 344. Who is Joel Riedel?
[20]    A: High School Principal.
[21]    Q: Is he still the Principal?
[22]    A: Yes.
[23]    Q: Did you have the meeting that is requested in the first
[24] paragraph of Exhibit 47?
[25]    A: Yes and no.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Richard Nilsen
April 14, 2005

**Page 79**

[1]   Q: Tell me the yes part and then the no part.

[2]   A: The meeting lasted two minutes.

[3]   Q: So everyone was there, but it didn't last very long?

[4]   A: Two minutes.

[5]   Q: What was the discussion at the two minute meeting?

[6]   A: The union representative at the time period ended up

[7] saying that she was recommending that none of the

[8] Department Chair people speak to me. And I concluded

[9] that based on that fact, there was no reason to have a

[10] meeting if I can't have a discussion.

[11]   Q: If you look at the third paragraph of P-47, it starts I

[12] would request they communicate their concerns. Do you

[13] see that?

[14]   A: Yes.

[15]   Q: It appears to end with in caps INTELLIGENT DESIGN. Am I

[16] reading the paragraph incorrectly on this e-mail?

[17]   A: Are you talking about the paragraph — yes.

[18]   Q: Is that paragraph accurate?

[19]   A: Yes.

[20]   Q: I am going to show you what has been marked as P-27. I

[21] apologize if you have already been questioned on this,

[22] but I do have one question.

[23]   P-27 is a two-page document Bates number 975, 976.

[24] I assume you have seen these before in the course of

[25] document production.

**Page 80**

[1]   Let me ask you about page 975. Is that your

[2] handwriting?

[3]   A: No.

[4]   Q: Do you know whose handwriting it is?

[5]   A: Mr. Baksa's.

[6]   Q: Did you ever speak with Miriam Parsons of Connecticut?

[7]   A: Not to my recollection, no.

[8]   Q: Do you know if he did?

[9]   A: No, I do not know.

[10]   Q: Did you ever discuss with him a conversation that

[11] appears to be summarized by the notes on page P-975?

[12]   A: To my best recollection, no.

[13]   Q: Would you turn to the second page of this exhibit?

[14]   A: (Witness complies.)

[15]   Q: Is that your handwriting on the page?

[16]   A: Yes.

[17]   Q: What does it say?

[18]   A: Mike, please see me, press, reason status of sentence.

[19]   Q: What did you intend to convey by that note?

[20]   A: I wanted Mike to see me about the above paragraph.

[21]   Q: That is the paragraph written to you by Alan Bonsell?

[22]   A: That is correct.

[23]   Q: What did you want to see Mike about in that paragraph?

[24]   A: I believe if my recollection is correct, this is the

[25] genesis of the press release that was generated.

**Page 81**

[1]   Q: The one first published on November 19th?

[2]   A: That's my recollection, yes.

[3]   Q: When you use the term reason or reasons, what were you

[4] referring to?

[5]   A: Telling him why I wanted him to see me concerning this.

[6]   Q: And status of sentence, what does that refer to?

[7]   A: How the sentence was used.

[8]   Q: Which sentence?

[9]   A: The sentence on the page.

[10]   Q: I am sorry?

[11]   A: The sentence on the page.

[12]   Q: Which one?

[13]   A: The one from Mr. Bonsell.

[14]   Q: I see a paragraph of three or four sentences. Are you

[15] referring to any one in particular?

[16]   A: No, the whole paragraph.

[17]   Q: So when you say status of sentence, you are referring to

[18] the typed portion that appears above on the page?

[19]   A: Yes.

[20]   Q: Why did you call it a sentence?

[21]   A: It was 1:45 in the afternoon. It should have been

[22] sentences. My apologies.

[23]   Q: No apology needed.

[24]   (Plaintiffs Deposition Exhibit 48 was marked.)

[25]                    BY MR. SCHMIDT:

**Page 82**

[1]   Q: Dr. Nilsen, I am showing you what has been marked

[2] Plaintiff Exhibit 48, Bates number 361. Have you had a

[3] chance to look at P-48?

[4]   A: Yes.

[5]   Q: Can you help me decipher that? It appears to be a

[6] memorandum dated November 30th, 2004 to you from Sandi

[7] Bowser with copies to the people identified. And then

[8] there is a re line as per your request.

[9]   Who was requesting what?

[10]   A: I was. This came out of the November 24th Board meeting

[11] of where the union was requesting specific actions

[12] verbally, and I communicated to her that I wanted all

[13] union communications in writing.

[14]   Q: On all subjects, or just what is referred to here as

[15] Creationism, Intelligent Design?

[16]   A: On all subjects where they are requesting a specific

[17] action being done.

[18]   Q: So you wanted everything from the union in writing?

[19]   A: Yes.

[20]   Q: If there was an action requested?

[21]   A: Yes.

[22]   Q: To be sure I understand it, what this seems to say is

[23] that any communication by a union member pertaining to

[24] Creationism/Intelligent Design shall be in written form

[25] and forwarded to the DAEA President; right?

Richard Nilsen
April 14, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 83

[1] MR. GILLEN: Object to form.

[2] A: That is what they are requesting, yes.

[3] BY MR. SCHMIDT:

[4] Q: I understand that, yes. Has that been done?

[5] A: To the best of my understanding, yes.

[6] (Plaintiffs Deposition Exhibit 49 was marked.)

[7] BY MR. SCHMIDT:

[8] Q: Dr. Nilsen, I have showed you what has been marked as

[9] Plaintiffs Exhibit 49, 000387 and 000388. This is a

[10] memorandum dated January 6, 2005 from science teachers

[11] in the high school to you.

[12] Did you receive this memorandum at about the time

[13] it was dated?

[14] A: Yes.

[15] Q: Does this memorandum reflect the concerns of the science

[16] faculty that were expressed to you at the meeting on

[17] November 24th?

[18] A: No.

[19] Q: What is difference between this memorandum and the

[20] concerns expressed at that meeting?

[21] A: On November 24th, there was no communication about a

[22] Code of Professional Practices.

[23] Q: What about the concerns that Intelligent Design is not

[24] science and is not an accepted scientific theory, and

[25] that's why they were opposed to having to teach it or

Page 84

[1] even mention it in the classroom?

[2] A: That was what was communicated on the 24th.

[3] Q: Didn't they also communicate at that time that they were

[4] concerned about the religious content or implications of

[5] Intelligent Design?

[6] A: I don't remember specifically their rationale. And in

[7] fact, at the 24th meeting, they never once discussed an

[8] opt out issue.

[9] (Plaintiffs Deposition Exhibit 50 was marked.)

[10] BY MR. SCHMIDT:

[11] Q: Dr. Nilsen, I have shown you what has been marked

[12] Plaintiffs Exhibit 50, which is Bates pages 1118 through

[13] 1120 and appears to be a current set of sections of the

[14] Superintendent's Weekly Update that were put together in

[15] a cut and paste form for January 7th, 14th and 19th; is

[16] that what we have got?

[17] A: Yes.

[18] Q: Are there similar updates for the months of February,

[19] March and now the first week in April?

[20] A: Yes.

[21] Q: Are there any discussions in any of those updates of the

[22] biology curriculum or related topics?

[23] A: Yes.

[24] Q: What is the Dover Ministerium?

[25] A: A group of ministers that meet on a monthly basis.

Page 85

[1] Q: All denominations?

[2] A: Yes.

[3] Q: Have you attended their luncheons on any occasions other

[4] than the one that is referred to on page 1120?

[5] A: Yes.

[6] Q: Do you do that by invitation? I mean their invitation.

[7] A: Both. Meaning there are times I have contacted them,

[8] and there are times they have contacted me.

[9] Q: Who is Pastor Rowand?

[10] A: A Board member.

[11] Q: If you look at page 1120, do you recall what you told

[12] the Ministerium when you and Mr. Baksa attended the

[13] luncheon that is referred to in that paragraph six?

[14] A: I reviewed to them the implementation. I reviewed with

[15] them the four paragraph statement and answered any

[16] questions that they ended up having.

[17] Q: If they asked you any questions about Intelligent

[18] Design, you didn't say you weren't going to discuss it;

[19] did you?

[20] MR. GILLEN: Object to the form.

[21] MR. SCHMIDT: I withdraw the question. That was

[22] meant as a tease.

[23] BY MR. SCHMIDT:

[24] Q: If you look at that paragraph, number six, second line,

[25] the last word, is that meant to be divisive instead of

Page 86

[1] decisive?

[2] A: Where?

[3] Q: Page 1120, second line, last word, paragraph six.

[4] A: That's correct. It should be divisive.

[5] Q: Why were you concerned about the divisive effect of what

[6] you referred to as our situation?

[7] A: It was communicated to me that individuals in the

[8] community from the religious groups, in fact one of the

[9] plaintiffs is a former Pastor and one of the defendants

[10] is a Pastor.

[11] So any time you end up with individuals on both

[12] sides, I have a concern. I wanted to make sure that it

[13] doesn't become a divisive conversation within any

[14] community, but especially that community.

[15] Q: Any other concerns about the divisive effect of your

[16] situation in the Dover community?

[17] A: Myriads of concerns.

[18] Q: Dr. Nilsen, I have shown you what has previously been

[19] marked as Plaintiffs Exhibit 19, which is a copy of the

[20] DASD News dated February 19, 2005.

[21] Dr. Nilsen, who decided to publish this Biology

[22] Curriculum Update?

[23] A: The School Board.

[24] Q: When was that decision made?

[25] A: Late January, early February.

Min-U-Script®   Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Richard Nilsen
April 14, 2005

---

**Page 87**

[1]  Q: Did you participate in making that decision?

[2]  A: No.

[3]  Q: Were you part of the discussion leading up to that

[4]  decision?

[5]  A: Yes.

[6]  Q: What was your position on whether or not to publish this

[7]  Update?

[8]  A: I think any time you can communicate accurate

[9]  information and educate the community, I am always for

[10]  it.

[11]  Q: Who wrote the text of the newsletter?

[12]  A: I believe it was a combination between originally

[13]  Mr. Bonsell, a Board member, individuals from the Thomas

[14]  More Center and other individuals on the Board

[15]  collective.

[16]  Q: What was your role in preparing the contents of

[17]  newsletter?

[18]  A: I filled in three facts; combined three pages into two;

[19]  and arranged the information that could be on two pages.

[20]  Q: It sounds like you were the editor of the newsletter?

[21]  A: Don't have a language arts background. I won't say

[22]  editor as much as publisher.

[23]  Q: You said you filled in I think you said three facts.

[24]  Was that f-a-c-t-s or f-a-x?

[25]  A: F-a-c-t-s, specifically one of the items was how many

---

**Page 88**

[1]  students were opted out. That information was not

[2]  available beyond my desk. I think another information

[3]  was the date the event happened. I think there was one

[4]  other specific item of information that I provided.

[5]  Q: If you look on the first page of Exhibit 19, there's a

[6]  section called Frequently Asked Questions. Who among

[7]  the people that you have told us prepared the contents?

[8]  Who wrote this section?

[9]  MR. GILLEN: Object to form.

[10]  A: I can't tell you who developed it beyond the fact that I

[11]  know Mr. Bonsell was working with the Thomas More

[12]  Center, and the draft I received was from the Thomas

[13]  More Center.

[14]  MR. SCHMIDT: I need a two minute break because I

[15]  have a note that is not here. If I can go get that, my

[16]  office is right down the haul.

[17]  (An off-the-record discussion was had.)

[18]  (A recess was taken.)

[19]  **AFTER RECESS**

[20]  **BY MR. SCHMIDT:**

[21]  Q: I am going to show you what has previously been marked

[22]  as Exhibit 41. Have you had an opportunity to look at

[23]  41?

[24]  A: Yes.

[25]  Q: Have you ever seen this before?

---

**Page 89**

[1]  A: Yes.

[2]  Q: Can you tell us what it is?

[3]  A: It is a summary of a conversation I had with the two

[4]  high school social studies teachers, a one Doug Hoover

[5]  and Brad Neal.

[6]  Q: What was the conversation about?

[7]  A: The government curriculum as it relates to what is being

[8]  taught in that curriculum and overall of the social

[9]  studies curriculum.

[10]  It refers back to I think a conversation you had

[11]  before or a question you had before whether any other

[12]  Board members have any other questions beyond the

[13]  science and look at any other beyond the science.

[14]  Mr. Bonsell also asked some questions about the

[15]  activism of the Courts, whether we address that or

[16]  whether we include or have a discussion in relationship

[17]  to the founding fathers.

[18]  Q: When did you have the conversation with Hoover and Neal?

[19]  A: I would say sometime in '04. Probably the spring of

[20]  '04.

[21]  Q: Who prepared this document?

[22]  A: I did.

[23]  Q: Is this a document prepared in anticipation of the

[24]  conversation as a kind of outline of what is to be

[25]  discussed, or was it a document prepared to memorialize

---

**Page 90**

[1]  the conversation?

[2]  A: Memorialize the conversation.

[3]  Q: What happened after the conversation that had anything

[4]  to do with the subject of the conversation?

[5]  A: It ended. Meaning if you look at the top after talking

[6]  to Doug Hoover and Brad Neal, along with myself,

[7]  generated four options to address Mr. Bonsell's

[8]  question.

[9]  One was to review the information that they

[10]  provided, Mr. Bonsell. Two, discuss Mr. Hoover and Brad

[11]  Neal with Mr. Bonsell. Third is they invited Mr.

[12]  Bonsell into their government class in April. And the

[13]  opportunity to discuss or doing all three.

[14]  I presented those options to Mr. Bonsell, and he

[15]  said he was too busy at that time period to do any of

[16]  the above and was satisfied after my conversation that

[17]  we did end up having the founding fathers, as well as a

[18]  discussion on the Supreme Court activism piece.

[19]  In addition to that, the social studies curriculum

[20]  is up for review next year. And he decided at that time

[21]  period not to do anything more.

[22]  Q: Under C, miscellaneous, I understand now reading this

[23]  document in context with your comments that Hoover and

[24]  Neal plan to include a discussion in their courses on

[25]  what are referred to as religious gains in court?

---

Richard Nilsen
April 14, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 91

[1] MR. GILLEN: Objection. Object to form.

[2]

[3] A: No. Hoover and Neal were not directed to do anything.

[4] BY MR. SCHMIDT:

[5] Q: I didn't say they were directed to do it. I understood

[6] your comments about what is done in this memorandum that

[7] following the conversation you had with Hoover and Neal,

[8] that they will in their courses discuss current

[9] religious gains in court, specifically with respect to

[10] the pledge, Bible clubs and Bible release programs.

[11] MR. GILLEN: Object to form.

[12] A: Your phraseology of that question, specifically the word

[13] will reflects a direction. I would prefer to state that

[14] they do that. Meaning there was no directive that they

[15] will in the future. It is the fact that they do already

[16] discuss that.

[17] Q: Fine.

[18] A: That is why I differentiate that.

[19] Q: Do they discuss any other Supreme Court cases besides

[20] those that involve religious topics like the three that

[21] are mentioned in C2?

[22] A: Yes.

[23] Q: Do they discuss topics that might even come under the

[24] heading of court activism — I think that is the phrase

[25] you used — other than these three religious issues?

Page 92

[1] A: Yes.

[2] Q: Why weren't they mentioned in your memorandum because

[3] they weren't part of the discussion you had with them?

[4] A: I think two of those topics were items of discussion

[5] that the Board had gone through during the school year

[6] 2004 and 2005 and were current at the national levels.

[7] Specifically if you remember last year, there was

[8] the pledge conversation that came out of the in God we

[9] trust issue I believe out of California. And the Board

[10] also dealt with that issue because we had a former Board

[11] member come to the Board and discuss his request then

[12] the Board make a statement on that issue.

[13] So the conversation generated out of what the

[14] Board was looking at currently and what was currently of

[15] national attention. And one could imagine the far

[16] reaching implications of an activistic Board — I am

[17] sorry — an activistic Supreme Court whether they

[18] decided to get into that issue or not.

[19] It was a conversation that we had of what was

[20] currently happening within the Supreme Court. Because

[21] there is the irony from a historical perspective — and

[22] I remember this conversation with them — that

[23] conservatism criticizes the Supreme Court for its

[24] activistic stand.

[25] But the only way you can solve that is have an

Page 93

[1] activistic stand against what the Supreme Court had

[2] already done. There was a conversation we had about

[3] what was currently being discussed in the national

[4] paper, as well as what impact the Board — I am sorry —

[5] what impact the Supreme Court had directly on schools.

[6] Q: Okay. Let me just go back to explain one line of

[7] testimony you gave earlier this morning. I had asked

[8] you a couple of questions about the origin of life

[9] debate and what your understanding is of origin of life.

[10] As I reflect back on your testimony, I am not sure

[11] I understand what you mean when you refer in the

[12] documents have written and what you are

[13] understanding is about the policy of the Board when it

[14] refers to origin of life.

[15] If you will bear with me for a minute, could you

[16] explain it again?

[17] A: My apologies, but I think you asked three different

[18] questions.

[19] Q: I am sure I did. That is the topic. If you would, tell

[20] me again what your understanding is, Dr. Nilsen's

[21] understanding is of the term origin of life?

[22] A: The beginning of mankind.

[23] Q: Is it your understanding that that is what the Board

[24] meant when it included that term in its revised biology

[25] curriculum?

Page 94

[1] A: I can't speak for the Board except to say that comment

[2] is a reflection of what the teachers said they were

[3] doing.

[4] Q: Okay. That might be part of where I am getting lost.

[5] What comment is a reflection of what the teachers said

[6] they are doing?

[7] A: Origins of life is not taught.

[8] Q: Teachers say we're not teaching origins of life; is that

[9] what you are saying?

[10] A: Yes.

[11] Q: And when the teachers say we are not teaching origins of

[12] life, what do you understand them to be saying?

[13] A: They are not teaching macro evolution.

[14] Q: What do you mean by macro evolution?

[15] A: The Big Bang Theory, the jumping from species to species

[16] piece of Darwinian Theory.

[17] Q: And is it your understanding as the Superintendent of

[18] the Dover Area School District that when the Board

[19] adopted its amended or revised curriculum, it was

[20] reflecting that understanding of what the teachers were

[21] doing?

[22] A: Yes.

[23] MR. SCHMIDT: All right. That is all I have.

[24] Thank you. I appreciate your staying through lunch to

[25] get this completed.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Richard Nilsen
April 14, 2005

Page 95

[1]   MR. GILLEN: I just have a few questions, Tom.
[2]                    BY MR. GILLEN:
[3]   Q: Mr. Schmidt asked you a few questions. One set of them
[4] related to Plaintiffs Deposition Exhibit 9 which is that
[5] memo from Dr. Peterman. Tom asked you did you take
[6] action in light of that, and you said no.
[7]    Just to be clear on this point, at the time that
[8] you received this memo, did Dr. Peterman have a lot of
[9] credibility with you?
[10]   A: Zero.
[11]   Q: Was it in large measure because this memo came from Dr.
[12] Peterman which explained your inaction?
[13]   A: Two things. One, first of all, I knew no one was
[14] discussing either from the administrative standpoint, or
[15] the Board standpoint, or Mr. Baksa's standpoint, or my
[16] standpoint any discussion of Creationism. So a memo
[17] that generated and stated that there was a discussion of
[18] Creationism had absolutely a non starter.
[19]    Secondly, as it related to Dr. Peterman, I didn't
[20] believe anything she put in writing anyway. In fact,
[21] one of the prior evaluations I had with her was to stop
[22] putting things in writing because she would put things
[23] in writing prior to knowing what actually was the
[4] reality. And I had to spend time with her going back
[25] and correcting what was on the record.

Page 96

[1]    She had a long history of putting things in
[2] writing that were inaccurate that we had to go back and
[3] correct.
[4]    She had dictated to the faculty that she no longer
[5] would talk to any faculty members, and that the only way
[6] she would communicate with faculty members is through
[7] Department Chairs. And the only way that Department
[8] Chairs could talk to her is if they requested a meeting.
[9]    And then in the middle of that year '03-'04, she
[10] communicated the Department Chair, she would no longer
[11] talk to them. So she generated information that was
[12] totally inaccurate in memo format.
[13]    So her credibility with me in any written format
[14] was absolutely nonexistent. And eventually, it was
[15] reflected in the end of the year evaluations.
[16]   Q: Tom also directed your attention to Plaintiff Exhibit
[17] 48. When I looked at it here today, I noticed that it
[18] said any future communication pertaining to
[19] Creationism/Intelligent Design intended for the Science
[20] Department shall be in written form.
[21]    Is it accurate that the teachers when they
[22] discussed Intelligent Design equated it with Creationism
[23] in the way they have here in this memo?
[24]   A: Yes. There was never any communication ever on
[25] Creationism. And they had a behavior of equating both,

Page 97

[1] and therefore the memo would end up being tied to both.
[2]   Q: Tom asked you questions about religion and dogma. Was
[3] it clear in their communications that they equated
[4] Creationism with religion?
[5]   A: Yes.
[6]   MR. GILLEN: Those are the only questions I have.
[7]   MR. SCHMIDT: Nothing further.
[8]    (The deposition was concluded at 1:30 p.m.)
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 98

COMMONWEALTH OF PENNSYLVANIA   :
COUNTY OF CUMBERLAND               :
   I, Vicki L. Fox, Reporter and Notary Public in and
for the Commonwealth of Pennsylvania and County of
Cumberland, do hereby certify that the foregoing
testimony was taken before me at the time and place
hereinbefore set forth, and that it is the testimony of:
               RICHARD NILSEN
I further certify that said witness was by me duly
sworn to testify the whole and complete truth in said
cause; that the testimony then given was reported by me
stenographically, and subsequently transcribed under my
direction and supervision; and that the foregoing is a
full, true and correct transcript of my original
shorthand notes.
   I further certify that I am not counsel for nor
related to any of the parties to the foregoing cause,
nor employed by them or their attorneys, and am not
interested in the subject matter or outcome thereof.
Dated at Camp Hill, Pennsylvania, this 29th day of
April, 2005.
               Vicki L. Fox
               Reporter - Notary Public
(The foregoing certification does not apply to any
reproduction of the same by any means unless under the
direct control and/or supervision of the certifying
reporter.)

**Lawyer's Notes**

Tammy Kitzmiller, et al. v.
Dover Area School District, et al.

Richard Nilsen
April 14, 2005

**0**

000387 83:9
000388 83:9
03 62:24
03-'04 96:9
04 89:19, 20

**1**

1 56:9
10991100 51:16
10th 27:14; 28:9, 18; 29:1
1115 65:13
1116 66:24
1117 65:14; 67:9
1118 84:12
1120 84:13; 85:4, 11; 86:3
14 40:6
14th 40:23; 41:3; 84:15
1622 73:20
18 23:23; 36:1
18th 23:11, 18; 24:10, 10;
25:17; 26:4; 35:12; 48:14;
54:20; 68:12; 74:3; 77:4
19 23:9; 40:6; 49:7; 54:23;
55:5, 13, 25; 86:19, 20;
38:5
19th 40:19, 22; 46:25;
76:20; 81:1; 84:15
1:30 97:8
1:45 81:21

**2**

2,000 20:12
20 53:16
2003 56:9; 60:17
2004 8:5, 10; 9:4, 21;
19:4, 12; 20:16, 18; 22:8,
12, 17; 23:9, 12; 27:14;
36:1; 39:21; 40:6, 6; 43:23;
54:20; 60:17; 65:8; 66:11;
82:6; 92:6
2005 27:14; 83:10; 86:20;
92:6
238 65:3
24th 41:18; 46:17, 22;
48:23; 77:5; 78:12, 13;
82:10; 83:17, 21; 84:2, 7
28 64:15

**3**

3 39:24
30th 82:6
342 77:14
344 78:19
361 82:2
38 20:1, 23; 22:9; 23:4
39 22:23; 23:7, 9

**3rd** 5:7; 66:24

**4**

40 20:5; 26:15, 25; 27:25;
28:3
41 88:22, 23
43 51:8, 11
44 65:10, 13
45 76:16
46 77:9
47 78:14, 24
48 81:24; 82:2; 96:17
49 83:6, 9

**5**

5 66:10
50 84:9, 12
5th 66:13

**6**

6 68:7, 23; 83:10

**7**

7th 84:15

**9**

9 54:9; 95:4
944 54:14; 56:7; 57:21
946 54:15
951 54:14
975 79:23; 80:1
976 79:23
99.9 51:25

**A**

ability 16:5; 37:23; 54:21;
74:5
above 67:10; 80:20;
81:18; 90:16
absence 10:18
absolute 23:19
absolutely 95:18; 96:14
abstinence 18:2
acceptable 58:16
accepted 83:24
access 21:9, 12, 18, 25;
22:4
Accessed 21:3
accessing 21:23
accommodate 5:1
accommodating 4:19
accuracy 35:7, 15; 36:6;
69:10

accurate 6:13; 69:13;
74:2; 79:18; 87:8; 96:21
across 56:16
action 32:11; 42:24;
60:23; 63:11; 77:4; 82:17,
20; 95:6
actions 11:8, 16; 82:11
activism 89:15; 90:18;
91:24
activistic 92:16, 17, 24;
93:1
actual 72:21
actually 13:25; 33:24;
37:6; 47:24; 69:3; 70:20;
71:4; 95:23
adding 45:20
addition 90:19
additional 39:3; 60:8
address 20:22, 23; 21:1,
6, 25; 89:15; 90:7
addressed 22:9; 62:19
addresses 21:13
administration 15:18;
44:3; 59:10, 17; 74:7, 12
administrative 28:22;
66:2, 5; 95:14
administrator 64:13
Administrator's 51:14
adopted 17:20; 40:14;
48:5; 77:2; 94:19
adoption 78:5
advised 25:25
affiliation 54:1
afternoon 81:21
again 4:7; 10:22; 12:22;
13:3; 16:14; 22:6, 25;
48:24; 58:12; 73:9; 93:16,
20
against 93:1
aged 27:20
agencies 17:10, 14
agenda 9:9, 11, 19; 11:9;
33:15, 24; 34:3, 10, 11
ago 24:18; 45:8; 55:8;
57:9; 65:7; 67:12
agreed 47:18
agreement 33:1
Aguillard 44:6
ah 69:25
above 67:10; 80:20;
ah's 69:17
Alan 5:21; 6:3, 3; 27:18;
80:21
alcohol 18:5
alien 50:24
aliens 50:20
along 17:7, 7; 72:15; 90:6
alternative 14:8; 57:8
alternatives 14:9
although 24:15
always 17:21; 87:9
amend 72:12
amended 71:3; 72:17;
94:19

among 29:15; 88:6
amount 49:7
amounts 44:2
and/or 10:25; 11:9; 12:3;
31:25; 32:5; 41:24; 44:4
answered 59:9; 85:15
anticipation 89:23
apologies 12:14; 13:24;
27:14; 57:4; 81:22; 93:17
apologize 7:11; 64:19;
79:21
apology 81:23
apparently 75:25
appear 38:11; 40:9;
61:18, 19; 65:18; 70:3
appeared 40:19
appears 16:20; 40:5;
55:3, 12; 60:20; 63:3;
68:23; 79:15; 80:11;
81:18; 82:5; 84:13
appointed 34:19
appreciate 4:21; 94:24
appropriate 9:13; 46:16
approved 37:12
approving 35:13
Approximately 28:18
April 56:9; 62:24; 84:19;
90:12
Area 7:13; 8:7; 13:6, 18;
38:12; 42:25; 43:1; 60:7;
94:18
areas 3:20; 10:23
argumentative 71:25
around 22:3; 27:2; 62:23;
70:20
arranged 29:8, 9; 87:19
article 39:2
articles 38:11, 25
arts 87:21
aside 31:22; 33:6
aspect 16:7
assembles 33:19
assigned 38:14
assist 33:13
Assistant 55:14
associated 29:16
assume 16:6; 79:24
assumed 13:21
assuming 56:11; 74:9
assumption 32:12
attempted 39:4
attended 29:16; 85:3, 12
attention 5:15; 16:24;
18:15; 36:14; 41:6; 59:16,
19; 92:15; 96:16
attorney 3:12; 6:17;
31:13
attorneys 3:13; 6:20; 7:1,
4
audible 75:25
authority 37:23; 38:1, 2
authorized 7:3; 26:2
available 12:10; 23:22;

66:3; 71:5; 88:2
avoid 58:6
aware 6:5; 20:18; 27:9,
15; 31:23; 48:19; 50:15,
18; 60:2, 2
awkwardly 7:11
ayes 71:17

**B**

B 66:13
back 20:6; 43:18; 56:7;
65:3; 74:9; 89:10; 93:6, 10;
95:24; 96:2
background 37:7; 87:21
bad 26:6; 63:3; 69:17
Baksa 8:10, 15; 9:8, 11,
14, 20; 11:15, 20, 21, 25;
12:11; 14:2, 13, 19; 15:7;
18:1, 3; 24:3, 21; 25:1;
29:7; 30:18; 40:15; 41:19;
48:20; 51:23; 56:8, 22, 25;
57:22; 59:5, 10, 23; 60:2,
4, 7, 22, 25; 61:8, 12, 23;
62:3, 17; 63:7; 85:12
Baksa's 5:21; 8:3, 19;
18:13; 61:13; 64:23; 80:5;
95:15
Bang 51:1; 94:15
base 22:13; 44:19
based 8:23; 17:2; 34:3;
49:5; 62:1; 63:10; 79:9
basically 16:18; 18:14;
48:18
basis 42:19; 84:25
Bates 41:5; 51:16; 54:14;
57:21; 65:3, 13; 68:7;
73:20; 77:13, 13; 78:19;
79:23; 82:2; 84:12
bear 93:15
bears 62:10
became 27:9, 15; 29:17
become 15:13; 86:13
becomes 34:11
beforehand 13:22
beginning 49:14, 15;
51:2; 61:18, 19; 93:22
begins 66:10, 24
behalf 6:14; 26:3
behave 63:16
behavior 60:10, 14;
63:12; 64:12; 96:25
behind 45:6
belief 42:16, 19; 58:14;
74:22
beliefs 41:11; 42:9, 10,
11, 15, 18; 43:1; 75:16
believes 49:23
besides 53:25; 91:19
best 3:18, 21; 4:6, 14, 25;
18:17; 54:21; 69:22; 74:5;
80:12; 83:5
beyond 9:17; 10:24;
18:8; 21:23; 22:14; 24:23;

**Richard Nilsen**
**April 14, 2005**

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

31:18; 35:14; 50:24;
53:15; 58:16; 88:2, 10;
89:12, 13
Bible 91:10, 10
Biblical 43:20; 49:15
Big 51:1; 62:12; 72:23;
94:15
bio 54:25
biology 8:6, 11, 16; 9:2,
24; 10:3; 11:2, 12; 12:5;
14:9; 15:11, 21; 16:20;
23:15; 25:6; 39:19; 40:4;
41:21; 46:16; 51:14, 15;
54:19, 24; 55:10; 57:12,
23; 58:2; 59:24; 77:1, 20;
84:22; 86:21; 93:24
bit 74:20
Board 6:12, 14; 7:9, 18,
25; 9:9, 24; 10:1; 11:2, 4,
8; 12:3; 14:17, 20; 15:10,
13, 18; 16:14, 23; 17:11;
18:4, 7, 10, 17, 22; 21:2, 5,
7, 7, 11, 13, 16, 17, 25;
23:11, 18, 22; 25:3, 16, 24,
25; 26:1, 8, 11; 27:17, 18;
28:12; 29:4, 5, 21, 22;
30:6, 17, 23, 25; 31:2, 4,
24; 32:11; 33:13, 14, 16,
20; 34:9, 10, 13, 16, 19,
23; 35:1, 4, 8, 12, 19;
36:13; 37:7, 11, 19; 38:1,
4, 17; 40:4, 14, 16; 42:17,
21, 22; 45:18, 24; 48:5, 9,
10, 13, 18, 18; 49:23; 50:1,
7, 9; 58:24, 25; 59:24;
60:3; 63:16, 16, 19, 20, 22;
64:5; 65:23, 24, 25; 66:2;
68:12; 69:4, 4, 16; 71:18;
77:2, 24; 82:10; 85:10;
86:23; 87:13, 14; 89:12;
92:5, 9, 10, 11, 12, 14, 16;
93:4, 13, 23; 94:1, 18;
95:15
Board's 18:21; 41:10;
42:10, 11, 15; 77:4
Bonsell 6:2, 3; 17:24, 25;
20:20, 23; 24:15; 27:18;
29:6; 59:6; 70:14, 14, 24,
24, 25; 72:10, 10, 11, 11,
11; 80:21; 81:13; 87:13;
88:11; 89:14; 90:10, 11,
12, 14
Bonsell's 5:21, 22; 6:4;
21:21; 90:7
book 9:7; 10:15, 24; 12:4,
17, 21; 15:24; 16:1, 3, 4, 5,
9, 13, 21, 22; 17:2, 4, 9, 12
books 9:2; 14:13; 15:25;
17:16, 18
both 5:25; 8:4; 16:17;
34:9; 48:11; 56:5; 85:7;
86:11; 96:25; 97:1
Bowser 77:18; 82:7
Brad 89:5; 90:6, 10
break 32:16; 88:14
bring 5:14; 38:8
brings 75:1, 4
broader 63:11

Brown 70:14, 14, 25, 25;
71:10, 13; 72:10, 10, 10,
12; 73:6
Buckingham 5:24; 10:8;
12:3; 22:18; 23:24; 24:12,
14, 23; 25:5, 17, 25; 26:2,
8; 65:6
Buckingham's 5:23;
11:17
building 61:5
buildings 34:6
burden 33:3
business 34:6
busy 90:15

## C

C 66:25; 90:22
C2 91:21
California 92:9
call 3:13; 12:23; 55:25;
72:13; 81:20
called 3:7; 22:11; 43:14;
71:2; 88:6
came 47:13; 63:20;
82:10; 92:8; 95:11
can 4:1, 20; 15:16; 16:22;
18:17; 19:6; 21:25; 27:4;
32:16; 33:10; 53:18, 25;
55:12; 61:25; 64:17;
67:25; 75:21, 24; 82:5;
87:8; 88:15; 89:2; 92:25
candid 72:24
capacity 7:8; 9:14; 23:2;
28:11, 12; 50:21; 51:3;
60:4; 61:7
capitalize 50:12
caps 79:15
carbon 56:15
care 60:8
career 53:19
case 3:16; 6:8; 9:15; 19:8;
38:25; 43:20; 44:8; 55:17;
56:12; 66:19; 67:7
cases 9:16; 44:3, 5; 91:19
Center 32:11; 87:14;
88:12, 13
certain 44:5; 47:7
certainty 64:23
certification 3:3
Chair 79:8; 96:10
chairs 34:4; 96:7, 8
chance 4:24, 25; 26:5;
65:16; 76:18; 78:16; 82:3
change 78:6
changed 40:22, 25
changes 5:13; 11:9;
27:21
character 12:23; 13:3
characteristics 15:19
charged 54:2
check 20:7
chemistry 15:24; 16:1

chief 7:16
chose 33:3
chosen 21:18, 19, 19
chronology 40:17
circumstance 53:25
circumstances 33:9
clarified 6:5
clarify 17:1
Class 51:15; 59:25; 90:12
classes 58:2
classroom 58:14; 84:1
classrooms 43:2
clean 69:18
clear 95:7; 97:3
clearly 70:2
clippings 38:19, 23
clips 38:17, 18
close 31:2; 52:2; 69:24
clubs 91:10
Code 83:22
collect 15:5
collected 14:13
collective 42:23; 87:15
collectively 38:3
colloquial 29:17
combination 87:12
combined 87:18
comfortable 4:11
coming 26:21; 63:21
comment 36:12, 18;
42:25; 53:21; 56:2; 94:1, 5
comments 5:3; 17:13;
18:22; 63:22; 78:2; 90:23;
91:6
commitment 3:24
committee's 9:5
committees 8:5; 9:21
common 44:2
communicate 32:2, 9;
46:1; 61:13; 66:17; 79:12;
84:3; 87:8; 96:6
communicated 9:18;
10:13; 45:24; 49:25;
50:10; 59:5; 82:12; 84:2;
86:7; 96:10
communicating 25:3;
28:2
communication 82:23;
83:21; 96:18, 24
communications 31:21;
82:13; 97:3
community 54:2; 86:8,
14, 14, 16; 87:9
compare 69:6
compared 69:10
Complaint 3:17
completed 11:10; 94:25
complies 20:3; 40:1;
54:16; 65:15; 70:11;
73:21, 23; 80:14
computer 21:8, 9, 10, 15
concept 50:10; 74:19
concepts 53:13

concern 10:23; 17:11;
27:6; 37:9; 42:4; 74:7;
86:12
concerned 41:22; 55:24;
57:3; 70:3; 74:12; 84:4;
86:5
concerning 17:14; 25:9;
81:5
concerns 10:8, 11;
11:17; 12:5; 79:12; 83:15,
20, 23; 86:15, 17
concluded 79:8; 97:8
conducted 7:6
confirm 69:9; 70:23
confused 46:23
congratulating 78:1
conjunction 40:15
Connecticut 80:6
connection 4:5; 11:17;
30:22; 31:8; 39:19; 74:21
conservatism 92:23
consider 12:1, 2
considerable 17:11
considerations 16:19,
19
considered 16:23; 31:25
consistent 44:7
constituents 63:23
constraints 44:21
consumer 15:25; 16:9;
17:1
contact 6:14, 25; 13:5, 6,
7; 19:7, 11, 13, 15; 20:20;
21:13; 23:17; 25:21; 54:5
contacted 12:24; 13:8,
21; 21:15; 85:7, 8
contacting 6:16
contacts 13:10, 16, 17,
25; 25:18
contains 54:14
content 17:2, 3, 5; 18:8;
46:20; 47:15; 69:25; 84:4
contents 16:21; 87:16;
88:7
context 23:10; 27:15;
30:21; 47:23; 50:9; 58:15;
90:23
continue 12:16; 17:17
contract 7:25
controversies 16:17
controversy 16:1, 11,
11, 25
conversation 11:15;
12:13, 15, 16; 13:2, 4, 14;
17:8; 24:5; 25:8; 26:9, 11;
27:17; 42:5; 43:1, 2; 50:21;
51:3; 60:3, 21, 22, 24;
61:8; 62:18, 21, 23; 67:12,
14; 72:4; 80:10; 86:13;
89:3, 6, 10, 18, 24; 90:1, 2,
3, 4, 16; 91:7; 92:8, 13, 19,
22; 93:2
conversational 61:7;
72:16
conversations 17:21,

24; 18:23; 23:20; 44:4;
57:5; 60:14
conversing 37:7
convey 37:25; 80:19
conveyed 32:13, 14
Cooper 19:23; 20:18;
27:3, 25; 28:19; 29:6, 13;
30:3, 16; 31:12, 16, 25;
32:2, 6, 13; 40:20
copied 56:15; 66:15
copies 82:7
copy 38:24; 66:1; 86:19
correcting 95:25
corrections 5:11
correctly 40:7; 55:1
cost 16:4, 19
counsel 6:15
county 17:9
couple 93:9
course 23:4; 55:21; 56:4,
11; 79:24
courses 19:1; 90:24;
91:8
court 4:19; 43:20; 90:18,
25; 91:9, 19, 24; 92:17, 20,
23; 93:1, 5
Courts 89:15
cover 44:17
covered 48:2
covering 44:18
created 50:23; 51:2, 4
creation 49:13
Creationism 41:10, 23;
42:3; 43:3, 5, 8, 10, 14, 19,
24; 47:17; 57:7, 24; 58:15,
17, 21; 59:2, 24; 82:15;
95:16, 18; 96:22, 25; 97:4
Creationism/Intelligent
82:24; 96:19
credibility 95:9; 96:13
criticizes 92:23
cross 65:7
cumbersome 15:16
curious 73:9
current 12:17; 64:4; 91:8;
92:6
currently 44:22; 45:16;
92:14, 14, 20; 93:3
curricular 25:4; 44:14;
45:19
curriculum 8:5; 9:4, 8,
21; 15:14; 16:24; 17:3, 21,
23; 18:1, 5, 21, 22, 24, 25,
25; 23:15; 25:12, 14; 37:
40:4; 41:21; 45:20, 25;
46:16; 48:6; 49:6; 54:19,
24; 55:10; 68:15; 77:21;
78:6; 84:22; 86:22; 89:7, 8,
9; 90:19; 93:25; 94:19
cut 67:1; 84:15

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Richard Nilsen
April 14, 2005

# D

OAEA 82:25
Darwin 53:1, 5; 55:4
Darwin's 49:18, 24; 50:2, 4, 10, 15; 52:13; 55:4
Darwinian 10:14, 16, 19; 44:19; 94:16
DASD 86:20
date 23:9; 27:12; 66:11; 67:5; 88:3
dated 40:5; 56:9; 66:10; 82:6; 83:10, 13; 86:20
dates 30:21; 46:23
day 55:6
days 49:7, 10; 54:23; 55:9, 12, 19, 25
deal 60:9; 72:23
dealing 17:13, 13; 18:2, 4; 39:8, 18; 44:15; 50:22; 72:5
dealings 7:1
dealt 66:18; 92:10
debate 15:17; 49:11, 13; 93:9
December 27:3, 14, 21; 28:8, 18; 29:1; 30:9; 40:6, 23; 41:3; 66:24
decide 11:21; 12:8
decided 86:21; 90:20; 92:18
deciding 31:5
decipher 82:5
decision 11:23; 16:7; 18:11; 23:14; 36:2; 39:20; 45:19; 77:20; 86:24; 87:1, 4
decisive 86:1
defendants 6:11, 22, 25; 7:1, 3; 86:9
defense 31:6
define 34:18; 58:8
defined 43:19; 50:24
definition 7:2; 43:11, 12, 12, 19; 75:7, 8
demonstrated 18:10
denominations 85:1
department 34:4, 5; 41:19; 43:17; 66:6; 79:8; 96:7, 7, 10, 20
deposed 3:16; 5:24
deposition 4:6, 9, 18; 5:6, 8, 11; 6:4; 8:3; 19:25; 33:14; 65:10; 68:6, 23; 73:14; 76:16; 77:9; 78:14; 81:24; 83:6; 84:9; 95:4; 97:8
depositions 5:17; 6:7
describe 58:16; 67:17
described 9:20
Design 19:5; 41:9, 24; 42:2; 44:10, 12, 25; 45:10; 46:2, 6, 9, 15, 20; 47:14,

20; 48:4, 6, 8, 11, 15, 24; 49:1, 4; 52:9, 12; 53:1, 7, 7; 74:10, 15, 23; 75:3; 76:6; 79:15; 82:15, 24; 83:23; 84:5; 85:18; 96:19, 22
desk 88:2
destroyed 35:13
detail 54:13
determination 63:2
developed 8:24; 14:23; 34:8; 88:10
devoted 16:25; 49:7, 9; 54:24
devoting 56:1
dictated 7:20; 96:4
died 65:7
differed 50:9
difference 52:11; 83:19
different 21:20; 22:16; 48:9; 78:13; 93:17
differentiate 91:18
differently 38:6
difficulty 74:25; 75:6
direct 26:11; 41:6, 16; 43:3; 44:9; 47:6; 59:13; 61:4; 63:19, 22
directed 7:8; 15:7; 29:22; 37:4; 41:8; 44:14, 23; 47:6; 48:20; 53:19; 60:7; 63:19; 91:3, 5; 96:16
directing 48:3
direction 11:22; 12:8, 10; 42:13; 48:16; 59:18; 78:1; 91:13
directions 11:25; 64:2; 66:17
directive 26:13; 48:15; 91:14
directly 7:18; 24:6; 37:15; 93:5
Director 9:8
disagree 32:25
disciplinary 60:23
disciplined 61:20, 22
disclosure 5:23
Discovery 19:7, 19; 20:19; 22:7, 11, 16, 20; 23:17, 20, 22, 25; 24:7, 9; 25:18; 26:1, 9, 12; 28:8; 30:17; 31:7, 16, 21; 32:1, 2, 5, 13, 21; 34:12; 40:20; 56:12
discuss 44:20, 20; 53:20; 80:10; 85:18; 90:10, 13; 91:8, 16, 19, 23; 92:11
discussed 9:25; 29:21; 40:17; 41:21; 42:7; 43:2; 84:7; 89:25; 93:3; 96:22
discussing 28:11; 37:8; 95:14
discussion 10:3, 5, 7; 11:1, 12, 18, 20, 21, 24; 15:17; 17:17; 25:24; 26:19; 27:8, 22; 28:15;

46:14, 18; 47:12; 48:1; 51:7; 52:4; 62:17; 65:1; 68:1, 14; 69:11; 70:3, 20; 72:3, 6; 75:2; 76:4, 6; 77:3; 78:10, 12; 79:5, 10; 87:3; 88:17; 89:16; 90:18, 24; 92:3, 4; 95:16, 17
discussions 16:20; 18:8; 32:22; 39:20; 49:24; 56:22; 59:5; 84:21
dissatisfaction 10:13, 16, 17, 21
Disseminated 66:12, 13
distinction 58:13
distributed 35:4
distribution 18:12
District 3:14; 6:12, 14; 7:14; 9:6, 24; 12:24; 14:4; 15:20; 16:5; 17:8, 20; 20:24; 21:1, 21; 22:4; 29:16; 31:7, 12, 15, 20, 24; 32:6; 34:22; 38:12, 16, 21; 39:14; 59:11; 64:8, 10; 66:9; 67:13; 68:20; 74:25; 94:18
District's 22:1; 40:10; 48:25
districts 9:1; 13:5; 17:20; 64:11
diversity 55:1
divisive 85:25; 86:4, 5, 13, 15
document 20:11; 26:17; 39:23; 51:13, 14, 17, 21, 22; 52:3, 14, 17; 53:11; 54:8, 13, 17, 23; 55:21; 64:14, 20; 65:12, 16, 18; 66:10, 15; 68:9; 77:11; 79:23, 25; 89:21, 23, 25; 90:23
documentation 10:22; 36:15
documented 10:22
documents 4:3; 8:25; 20:12; 23:4; 49:6; 56:12; 66:18; 93:12
dogma 74:8, 13, 21; 75:7, 14, 17; 97:2
donation 17:8
done 14:12; 33:22; 82:17; 83:4; 91:6; 93:2
Doug 89:4; 90:6
Dover 3:13; 7:13; 8:7, 12; 38:11; 84:24; 86:16; 94:18
down 57:21; 70:13, 23; 75:19; 88:16
Dr 20:11; 40:2; 51:10; 61:8, 13, 20; 62:2, 4; 63:2, 15; 64:17; 65:12; 68:5; 76:18; 82:1; 83:8; 84:11; 86:18, 21; 93:20; 95:5, 8, 11, 19
draft 34:3, 8; 88:12
drawer 15:1
driven 44:15; 74:19, 25
drug 18:5

due 44:21
duly 3:7
during 11:4; 36:13; 47:12; 65:25; 92:5
DVD's 23:25; 24:12, 14, 15, 17, 21; 25:5, 11, 13

# E

e-mail 20:15, 22, 23; 21:1, 6, 13, 22, 24, 25; 22:4, 23; 27:2, 12; 28:2, 9; 29:1; 76:20; 78:11; 79:16
e-mails 21:20
earlier 4:5; 33:1; 44:17; 58:7; 69:6; 93:7
early 86:25
earth 50:23, 25; 51:4
easier 28:24
edit 4:23
edited 69:15, 23
editor 87:20, 22
educate 87:9
education 17:13; 18:2; 42:6; 43:17; 44:4; 54:1
educator 53:16, 19
effect 86:5, 15
efficiency 66:19
efficient 4:6
effort 22:8
either 14:21; 18:10; 23:21; 25:25; 28:6; 31:19; 35:13; 37:23; 39:2; 50:24; 51:22; 75:13; 95:14
elected 34:19
elementary 39:11, 16
eliminated 70:1
eliminating 66:20
else 19:15, 16, 18; 27:22; 29:3; 30:13; 59:10; 64:19; 66:1; 76:13
employe 34:22
employed 64:6
employment 7:25
end 4:23; 41:11; 44:15, 18; 50:3; 57:24; 60:17; 61:8; 79:15; 86:11; 90:17; 96:15; 97:1
ended 17:15; 35:12; 37:13; 41:12; 47:16, 19; 66:19; 70:7; 79:6; 85:16; 90:5
ends 68:19
enough 44:17
entire 68:17
entity 50:24; 51:4
equated 96:22; 97:3
equating 96:25
Eric 20:4; 33:1
especially 86:14
evaluated 60:14, 15
evaluating 62:8
evaluation 60:12, 16;

61:4, 10; 63:3, 10
evaluations 95:21; 96:15
even 17:17; 21:14; 58:6; 84:1; 91:23
event 88:3
events 65:24
eventual 61:9
eventually 96:14
everybody 12:18; 13:7
everyone 12:24; 79:3
Evolution 10:14, 23; 49:7, 9; 54:25; 55:5, 9; 57:8, 24; 58:15; 59:2; 94:13, 14
exactly 33:7; 71:8, 11
examined 3:8
example 66:23; 72:8, 10; 75:10
except 3:4; 43:13; 56:14; 94:1
exception 38:25
excerpts 65:18
exchanged 31:20
executive 7:16
exhibit 19:25; 22:9, 22; 28:3; 39:24; 40:9; 49:12; 51:8, 11; 54:10; 59:21; 61:20; 65:10, 13; 68:7, 23; 73:19; 76:16; 77:9; 78:14, 24; 80:13; 81:24; 82:2; 83:6, 9; 84:9, 12; 86:19; 88:5, 22; 95:4; 96:16
expect 56:15
experience 17:19; 18:9
explain 55:12; 74:20; 75:24; 93:6, 16
explained 57:22; 95:12
explanation 52:12, 13
explosion 51:2
express 45:18
expressed 18:11; 27:6; 83:16, 20
extent 9:14

# F

f-a-c-t-s 87:24, 25
f-a-x 87:24
fact 3:20; 8:23; 9:17; 14:1; 17:2; 21:6; 24:23; 27:5; 49:5; 55:15; 62:1; 74:18; 79:9; 84:7; 86:8; 88:10; 91:15; 95:20
facts 87:18, 23
faculty 16:13; 34:5; 74:6, 12, 15; 83:16; 96:4, 5, 6
faculty's 74:22
fairness 5:23; 42:22
fall 19:12; 24:11; 39:21
familiar 4:6; 79:3
families 14:3
family 15:24; 16:9; 17:1
far 24:4; 92:15

Tammy Kitzmiller, et al.  v.
Dover Area School District, et al.

Richard Nilsen
April 14, 2005

large 95:11
last 15:20; 58:25; 67:17,
?; 73:19; 76:3; 79:3;
85:25; 86:3; 92:7
lasted 79:2
Late 86:25
later 24:15, 16
leading 87:3
learned 57:11
least 15:14; 41:25; 42:21;
47:13; 64:17
leave 64:10, 11, 12
led 36:25
legal 32:1; 36:20; 42:7;
44:3
levels 92:6
Levin 12:4, 21; 14:10
life 43:21; 49:11, 13, 18,
24; 50:3, 5, 10, 12, 16;
52:12, 13; 53:4, 12, 14;
93:8, 9, 14, 21; 94:7, 8, 12
light 75:12; 95:6
likely 30:22; 73:4
limited 55:9
line 4:1; 55:1; 59:23; 82:8;
85:24; 86:3; 93:6
linear 75:11
lines 17:7; 57:21
'isted 17:10; 66:22
.isten 35:16; 36:7; 70:9;
73:1
listened 70:8
litigation 3:14, 15; 5:18;
6:10, 11, 22; 7:5; 23:5;
24:19; 30:11; 31:8; 64:9;
67:23
little 57:9; 74:20
location 22:1
long 29:24; 79:3; 96:1
longer 64:6; 96:4, 10
look 4:4, 7; 12:17; 20:2,
22; 24:2, 24; 25:1; 26:25;
39:25; 40:2; 41:5; 54:10,
11; 57:20; 64:23; 65:3, 14,
16; 67:9; 70:10; 72:16;
73:2, 12, 19, 22; 74:1;
76:18; 77:11, 12; 78:16;
79:11; 82:3; 85:11, 24;
88:5, 22; 89:13; 90:5
looked 77:14; 96:17
looking 10:9; 38:10; 40:5;
49:19; 64:18; 70:23;
71:19; 75:19; 92:14
lost 94:4
lot 33:4; 73:13; 95:8
loud 75:20
lunch 94:24
luncheon 85:13
luncheons 85:3

## M

macro 94:13, 14

maintain 38:19
maintained 67:20
majority 7:9; 37:19
makes 9:15
making 4:19; 8:19; 9:12;
11:4; 18:21; 36:9; 45:19;
58:1, 13; 65:6; 76:1; 78:8;
87:1
man 49:15, 16
mankind 93:22
many 55:18; 87:25
March 84:19
marked 20:1; 22:22;
26:14; 39:23; 51:8; 52:10;
54:8; 64:15; 65:10, 13;
68:5, 6; 76:16; 77:9, 11;
78:14, 16; 79:20; 81:24;
82:1; 83:6, 8; 84:9, 11;
86:19; 88:21
material 41:7; 44:18;
68:22
materials 23:21; 31:17,
18, 22; 33:15, 19
matter 15:13; 18:18, 20,
21; 19:2; 22:9; 43:13
matters 7:5
may 5:22; 24:24; 26:16;
42:4; 50:16; 69:23; 72:24,
24; 73:7
Maybe 31:2; 73:6
mean 11:24; 13:23; 16:4;
49:21; 58:21; 69:15; 85:6;
93:11; 94:14
meaning 43:9; 44:15;
48:7; 55:21; 61:12; 74:25;
85:7; 90:5; 91:14
means 47:6; 58:17
meant 7:12; 19:17; 75:24;
85:22, 25; 93:24
measure 95:11
mechanics 33:12; 72:21
mechanism 54:25
media 36:13; 39:3, 8, 13,
19
meet 28:19; 29:21; 30:3;
34:8; 84:25
meeting 9:23; 10:1; 11:2,
13, 16, 18; 15:11; 18:3;
19:4; 23:11, 14, 18, 23;
25:16, 24; 26:4; 28:21, 23,
25; 29:3, 8, 13, 18, 20, 25;
24:30:1, 6, 13, 22, 23, 25;
31:1, 2, 3, 19, 24; 33:16;
35:1, 19, 25; 36:13; 40:19;
41:20; 46:17, 19; 47:1, 25;
65:8, 24, 25; 68:12, 17;
74:4; 77:2, 6, 24; 78:13,
23; 79:2, 5, 10; 82:10;
83:16, 20; 84:7; 96:8
meetings 11:5; 31:4;
34:13, 23; 35:8; 48:10;
63:16, 20; 64:5
member 12:3; 14:17, 20;
17:11; 18:4; 21:7, 8, 25;
25:3; 34:19; 37:11; 38:1;
48:10, 18, 18; 58:24; 59:1,

24; 60:3; 82:23; 85:10;
87:13; 92:11
members 18:22; 21:2, 5,
11, 14, 17, 18; 30:17;
33:14, 20; 38:17; 42:17,
22; 50:9; 65:23; 66:2;
69:16; 89:12; 96:5, 6
memo 8:24; 56:24; 57:6;
77:5; 78:1; 95:5, 8, 11, 16;
96:12, 23; 97:1
memorandum 13:9, 15;
14:16; 56:7, 8, 20; 59:8,
15; 60:19; 62:19, 24; 82:6;
83:10, 12, 15, 19; 91:6;
92:2
memorialize 89:25; 90:2
memory 27:20; 69:10
mention 60:4; 84:1
mentioned 20:4; 59:23;
91:21; 92:2
mentioning 58:10, 18
met 30:5; 47:3
mid 52:20; 72:8
middle 27:20; 67:10; 96:9
might 3:14; 25:1; 91:23;
94:4
Mike 80:18, 20, 23
Miller 12:4, 21; 14:9;
41:19
mind 12:12; 29:17; 50:8
mine 64:24
Ministerium 84:24; 85:12
ministers 84:25
minute 79:5; 88:14; 93:15
minutes 32:16; 34:13;
35:1, 3, 13, 15; 67:25;
70:17, 19; 71:2, 2, 3, 6, 7,
10, 18; 72:18, 22; 73:6, 6;
79:2, 4
Miriam 80:6
miscellaneous 90:22
misdone 56:4, 4
mishear 55:10
misinterpret 76:7
misquotation 61:14
misquoted 36:14
misquoting 61:12
misrepresenting 60:24
misstating 60:24
mistake 66:14
misunderstanding 6:6
misunderstood 61:11
moment 45:8; 67:9
moments 55:8
money 31:15
monthly 84:25
months 24:18; 84:18
more 6:10; 12:10, 20;
30:3, 19; 32:11; 58:17;
73:2, 16; 74:20; 87:14;
88:11, 13; 90:21
morning 3:11; 4:2; 38:7;
40:18; 93:7
most 9:15; 13:23; 30:21;

73:4
motion 71:1, 3; 72:12, 17
move 46:5; 72:12
moved 72:9
moves 72:12
Mrs 27:19; 56:9, 22;
57:22; 60:21, 21, 23;
61:12, 21, 21; 62:5, 18;
70:3, 25; 71:10, 13; 72:12;
73:6
much 3:22, 23; 43:11;
49:9; 87:22
multiple 18:8
Myriads 86:17
myself 29:6; 30:17;
41:20; 51:22; 90:6

## N

name 3:11; 22:14; 74:1
named 19:23
national 92:6, 15; 93:3
natural 54:24
nays 71:17
Neal 89:5, 18; 90:6, 11,
24; 91:3, 7
near 8:12
neater 64:24
need 3:25; 4:23; 18:16;
20:6; 54:12, 22; 88:14
needed 12:1, 2, 8; 16:3,
6; 81:23
needs 15:6
negatively 60:15
Neither 60:4
new 8:6; 9:5; 16:5
news 39:2, 3, 8; 86:20
newsletter 87:11, 17, 20
newspaper 36:16, 21;
38:8
next 18:3; 30:5; 38:6;
49:12, 19; 66:23; 74:1;
90:20
NILSEN 3:7, 11; 20:11;
40:2; 51:10; 64:17; 65:12;
68:5; 70:14; 72:10; 76:18;
82:1; 83:8; 84:11; 86:18,
21
Nilsen's 93:20
ninth 8:6
nominally 34:16, 18
non 65:24; 95:18
none 79:7
nonetheless 17:25; 70:1
nonexistent 96:14
nor 36:21; 60:2, 3; 73:15
note 66:24; 80:19; 88:15
noted 50:1; 56:2; 70:17;
71:1, 2, 3; 72:17; 73:3, 5, 6
notes 11:1, 4, 7, 8, 10, 12;
30:1; 80:11
noticed 96:17
notion 19:5; 58:7

notions 53:3, 10
noun 37:17
November 40:6, 19, 22;
41:18; 43:22; 46:17, 22,
24; 48:23; 66:10; 77:5;
78:13; 81:1; 82:6, 10;
83:17, 21
number 4:3; 17:10;
79:23; 82:2; 85:24
numbered 41:5; 51:16;
54:14; 67:10
numbers 68:7

## O

Object 7:7; 18:19; 28:10;
31:9; 36:3, 11; 45:23;
53:22; 57:13; 58:4; 61:24;
63:5; 68:13; 83:1; 85:20;
88:9; 91:1, 11
Objection 91:1
objections 3:4
obviously 12:15; 37:17;
55:17, 22; 56:5; 57:5;
63:11
occasions 85:3
October 23:9, 11, 18, 23;
25:16, 17; 26:4; 35:12;
36:1; 45:18; 48:14; 54:20;
68:11; 74:3; 76:20; 77:4
Off 51:6; 64:1, 25; 72:2
off-the-record 51:7;
65:1; 68:1; 72:3; 88:17
offense 37:24
office 20:7; 22:1; 28:22;
33:19; 38:10, 21; 41:18;
67:21; 88:16
offsite 22:5
often 35:21
once 3:16; 11:10; 16:14;
22:25; 30:3; 34:8; 35:12,
24; 48:23; 84:7
one 3:12; 8:4; 12:10, 16;
19:16; 20:24; 21:7; 30:7;
31:4; 33:14; 40:18; 44:11;
49:5, 10; 53:25; 54:19;
57:21; 61:3; 66:13; 67:9;
68:20; 69:4; 73:12; 77:7;
78:11; 79:22; 81:1, 12, 13,
15; 85:4; 86:8, 9; 87:25;
88:3; 89:4; 90:9; 92:15;
93:6; 95:3, 13, 13, 21
one's 43:1
ones 5:20
Only 7:8; 10:19; 13:5, 16;
17:19; 35:22; 45:15; 56:1;
59:3; 66:22; 92:25; 96:5, 7;
97:6
operate 8:12
operator 38:16
opinion 49:18, 24; 50:16,
19
opinions 50:2, 4, 8, 15,
18
opportunity 40:2; 51:10;

Richard Nilsen
April 14, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

54:9; 88:22; 90:13
opposed 83:25
opposition 78:5
opt 84:8
opted 88:1
options 10:10; 12:6, 7, 17, 20; 49:23; 90:7, 14
order 53:1, 9
organization 22:11
origin 49:11, 13, 18; 50:2, 4, 12, 16; 52:12, 13; 53:4, 12, 14; 55:4; 93:8, 9, 14, 21
original 40:18; 43:18; 61:22
originally 87:12
origins 43:21; 49:13, 24; 50:10; 54:25; 94:7, 8, 11
out 11:1; 12:19, 23; 13:3; 15:3; 17:18; 20:13, 19; 22:8; 33:20; 34:11; 37:4; 39:1; 48:21; 51:2; 54:23; 62:9; 64:11, 12; 69:17; 72:23; 73:1; 75:20; 82:10; 84:8; 88:1; 92:8, 9, 13
outline 55:16; 89:24
outside 50:23
over 3:18; 19:14; 20:12; 27:24; 35:14; 47:5; 48:3; 59:7; 62:22
overall 89:8
overlap 4:25
overlapping 3:19
own 14:8; 21:12, 24; 42:8

**P**

P-1616 68:7
P-1619 70:10; 72:8
P-1622 68:8, 19
P-27 79:20, 23
P-3 40:2; 49:12
P-341 77:13
P-43 52:10
P-45 76:18; 77:13
P-46 77:11, 13, 14
P-47 78:17; 79:11
P-48 82:3
P-9 54:10
P-975 80:11
p.m 97:8
P1308 41:6
packet 33:15
page 40:9; 41:5; 52:3; 54:15; 56:7; 57:21; 64:18; 65:3; 66:8, 23; 67:9, 11; 70:10; 73:19; 80:1, 11, 13, 15; 81:9, 11, 18; 85:4, 11; 86:3; 88:5
pages 54:14; 65:13; 72:5; 84:12; 87:18, 19
paid 31:15; 34:22

pamphlet 17:9; 18:12
paper 1 4:25, 25; 38:6; 93:4
papers 38:14
paragraph 40:14; 41:6; 48:7, 21 ; 52:3, 8; 57:6, 21; 58:25; 59:8; 60:19; 63:4; 67:10, 1 8; 74:1; 78:24; 79:11, 16, 17, 18; 80:20, 21, 23; 81:14, 16; 85:13, 15, 24; 86:3
parent 17:11
parentheses 73:5
parents 54:5
parochial 8:12, 17; 9:23; 13:6, 1O, 16, 22; 14:14
Parsons 80:6
part 7:20; 8:24; 32:1; 33:8; 46:16; 47:15; 49:15; 59:21; 68:6; 79:1, 1; 87:3; 92:3; 94:4
participate 87:1
particular 76:25; 81:15
parties 3:3
parts 8:9
party 17:25
passive 9:10, 14
past 62:22
paste 84:15
pasted 67:2
Pastor 85:9; 86:9, 10
paused 6:2; 63:9
pausing 4:22
pay 16:5; 18:15
Pennsylvania 43:16
people 71:16; 72:9, 9; 79:8; 82:7; 88:7
Pepper 3:12
per 78:1; 82:8
perceived 38:5; 76:10
perceiving 76:10, 11
percent 51:25; 59:1
perfection 52:24
period 27:4, 11; 47:19, 22; 55:6; 79:6; 90:15, 21
peripheral 66:20
permitted 53:21
persisting 12:20
person 6:25; 29:15, 18; 32:14; 34:15; 62:9, 10; 69:20; 70:18; 75:25
person's 34:25
personal 21:13, 24
personally 19:9, 10; 28:19
perspective 92:21
pertaining 82:23; 96:18
Peterman 56:8; 60:20; 61:9, 14, 20; 62:2, 4; 63:2, 15; 95:5, 8, 12, 19
Peterman's 59:8
phone 19:14, 18, 18; 27:24

phrase 29:17; 53:11; 91:24
phraseology 91:12
piece 14:25, 25; 45:16; 48:16; 68:15; 90:18; 94:16
place 9:7, 9; 19:11, 13; 28:15, 17, 25; 30:22; 31:1; 39:21; 47:1; 54:19; 60:16; 72:16
placed 9:19; 19:1; 45:25
Plaintiff 20:1; 39:24; 82:2; 96:16
plaintiffs 6:8; 20:23; 26:15, 25; 27:25; 51:8, 11; 54:9; 64:15; 65:10, 13; 68:6, 23; 76:16; 77:9; 78:14; 81:24; 83:6, 9; 84:9, 12; 86:9, 19; 95:4
plan 4:2; 52:1; 90:24
planned 19:1; 55:16, 21; 56:4
Plantaria 50:20
please 4:14, 24; 34:18; 51:6, 13; 65:14; 80:18
pledge 91:10; 92:8
podium 63:22, 25
point 17:15; 29:18; 62:1; 63:25; 64:1; 95:7
pointed 37:21
policy 93:13
Political 54:1
politically 54:2
portion 81:18
pose 4:13
posed 59:8
position 32:23; 45:9, 13, 14; 48:25; 62:7; 87:6
possession 16:16; 24:3; 66:18; 68:20
possible 13:4, 7; 52:2
possibly 12:18; 42:1
posted 40:19
pound 63:25
powers 7:20
practice 11:4; 18:13; 38:10; 42:5; 55:23
Practices 83:22
predicted 47:23
prefer 21:12, 15; 91:13
preparation 34:13
prepare 34:25
prepared 35:3; 43:22; 51:16; 52:10, 14, 17; 68:25; 69:3; 88:7; 89:21, 23, 25
prepares 33:24
preparing 56:11; 87:16
present 12:4; 27:22; 29:3; 30:13; 41:10; 52:24; 58:8
presented 10:14, 17, 18, 20, 24; 25:12; 44:16; 90:14
presenting 42:8
President 27:17, 18;

28:12; 29:5, 22, 22; 34:9, 10; 82:25
Presidents 77:19
press 33:10; 40:4, 12, 13, 18, 22; 42:14; 43:22; 46:24; 47:3; 80:18, 25
previous 74:10
previously 19:25; 39:24; 54:9; 64:14; 86:18; 88:21
primary 15:13
principal 6:13, 25; 7:2; 39:11, 16; 59:20; 61:6; 78:20, 21
Principals 60:9; 66:6
print 38:11
printed 40:10
prior 15:24, 25; 17:16; 21:7; 23:1, 3, 18, 22; 26:3; 28:1, 8; 30:6; 31:1, 2, 4; 33:15; 48:7; 63:21; 64:10; 77:2; 95:21, 23
privilege 32:25
privileged 32:24
probably 4:4, 7; 64:17; 89:19
problem 20:5
problems 4:13
procedure 9:18
process 63:13; 70:12; 78:8, 9
processed 23:25
produced 67:23
production 79:25
Professional 83:22
programs 91:10
pronoun 37:17
prove 36:15; 37:5
provide 13:17; 59:13
provided 20:6, 24; 21:1, 3, 6, 16, 22; 88:4; 90:10
providing 14:3; 39:3
public 13:5, 23; 32:10; 66:3
publication 67:5
publicly 50:11
publish 86:21; 87:6
published 23:21; 66:11; 81:1
publisher 87:22
punctuation 69:18
purchase 17:4; 31:22
purchased 31:17
purchasing 31:18
purpose 66:19
purposes 34:23
pursue 32:20; 33:2
put 9:11, 16; 23:9; 30:21; 31:2; 33:6; 45:5; 47:23; 49:21; 64:10, 11, 12; 73:4, 12; 77:12; 84:14; 95:20, 22
putting 31:22; 95:22; 96:1
pyramids 50:22

**Q**

quick 64:15
quickly 4:8
quote 36:21; 41:11; 50:3; 60:8; 74:6
quotes 16:18

**R**

raise 63:24
raised 42:4; 59:16
random 53:9
randomness 53:2, 5, 8
rather 9:5
rationale 84:6
re 82:8
reach 22:8; 63:2
reaching 20:19; 92:16
Read 13:12; 36:7; 38:24; 51:22; 54:6, 11, 22; 55:1; 56:17; 60:5, 19; 71:13, 24; 72:20; 73:9; 75:20; 76:4
reader 71:5
reading 40:7; 44:7; 49:6; 72:17; 79:16; 90:22
reads 50:1
reality 55:20; 95:24
realized 38:5
really 47:6
reason 17:4; 31:16; 36:9; 37:25; 46:15; 79:9; 80:18; 81:3
reasons 32:22; 44:11, 24; 45:6; 61:3; 81:3
recall 8:8, 9, 13, 15, 18; 10:3, 11; 20:15; 22:19, 23; 25:24; 27:2; 28:3, 6, 15, 17; 37:6; 46:11, 14, 18; 52:17; 53:18; 56:19, 22; 65:6; 73:13; 77:23; 78:3, 10; 85:11
receipt 56:20
receive 33:15; 66:1; 83:12
received 14:23; 24:8; 36:13; 44:5; 88:12; 95:8
receiving 17:16
recess 32:18, 19; 68:2, 3; 88:18, 19
recipients 76:20
recognize 54:17; 65:3
recognized 63:21
Recognizing 27:6
recollect 10:25; 12:14; 42:1; 57:2
recollection 5:22; 8:25; 10:19; 14:18, 21; 20:17, 21; 22:25; 23:24; 26:10; 36:12; 37:3, 18; 56:14; 77:25; 80:7, 12, 24; 81:2
recommend 9:5; 12:14
recommendation 9:9,

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Richard Nilsen
April 14, 2005

13, 15, 16, 17; 15:9; 27:9, 16; 45:24

ecommendations 18:24; 26:20; 27:5, 8; 32:21; 34:3
recommended 12:4
recommending 79:7
record 32:10; 33:4; 37:2; 48:9; 51:6; 64:25; 68:19; 72:2; 77:13; 95:25
recorded 35:9, 14; 68:21, 22; 70:19; 72:21
recounts 60:22
redacted 66:15; 67:1
Redding 56:9
refer 77:20; 81:6; 93:11
reference 30:25; 43:20; 70:18; 74:10, 18
references 49:15; 55:3
referred 12:7, 8; 36:18; 41:16; 49:11; 52:7; 53:13; 58:24; 66:7; 75:13, 16; 82:14; 85:4, 13; 86:6; 90:25
referring 19:8; 22:6; 37:14, 16; 43:6, 8; 57:22; 59:6; 67:16; 69:20; 74:9; 81:4, 15, 17
refers 42:10; 53:1, 1; 89:10; 93:14
reflect 42:7; 71:7; 73:3; 83:15; 93:10
reflected 60:12; 63:12; 96:15
Reflecting 76:9; 94:20
reflection 73:7; 94:2, 5
reflects 91:13
regulations 7:23
reiterated 48:23
related 11:22; 84:22; 95:4, 19
relates 17:23; 53:5; 62:25; 74:7; 89:7
relations 39:13
relationship 53:13; 89:16
Release 40:4, 12, 13, 18, 22; 42:14; 43:22; 46:24; 47:1, 3; 49:22; 80:25; 91:10
religion 47:15; 54:3, 4; 97:2, 4
religious 41:11; 42:5, 8, 10, 11, 15, 17, 24; 43:1; 46:20; 47:20; 75:16; 76:11; 84:4; 86:8; 90:25; 91:9, 20, 25
remember 10:5, 6, 7, 8; 12:22; 13:2, 14; 15:16; 19:6, 7, 21; 24:2, 10, 25; 25:8, 15, 21, 22; 26:12; 27:5; 28:4, 4, 11; 29:7, 24; 30:2, 8, 10; 36:4; 45:4, 7; 46:13; 47:16, 17, 21; 54:7; 76:13; 78:4; 84:6; 92:7, 22
reminded 3:25

rep 78:13
repeat 3:22; 4:8
repeatedly 41:22, 25; 45:4
repeats 62:8
rephrase 56:24; 57:4
replacement 16:13
report 7:18; 38:8; 65:23
report's 66:20
reported 13:16; 36:16, 19, 23; 38:6; 39:5; 62:18
reporter 4:19
reporting 13:9; 60:20
reposted 40:6; 41:3
represent 6:22; 31:8
representation 36:20
Representative 41:19; 79:6
represented 6:17; 22:8
request 29:21; 36:25; 79:12; 82:8; 92:11
requested 11:8; 29:11, 12, 13; 78:23; 82:20; 96:8
requesting 71:7, 9; 82:9, 11, 16; 83:2
required 43:9, 16; 59:16, 19; 76:6
requires 44:19
requiring 41:23
research 15:8; 24:4; 37:4
reservations 26:17
reserve 33:2
reserved 3:5
respect 64:5; 91:9
respective 3:3
responded 39:2
response 56:19; 61:17
responses 4:20
responsibilities 7:20; 15:14; 39:8, 12; 56:16; 61:5, 9
responsibility 15:8; 28:7; 34:25; 39:18; 60:8, 9; 61:13; 62:11
retained 31:7, 12
review 6:3; 24:14, 16, 17; 34:9; 35:3, 6, 15; 36:6; 51:10; 54:12; 69:9; 90:9, 20
reviewed 5:6, 17, 25; 6:7; 8:3; 20:12, 13; 23:21; 24:12; 37:12; 85:14, 14
reviewing 8:25; 18:21; 23:4; 24:4; 38:14
revised 54:24; 94:19
RICHARD 3:7
Riedel 78:19
right 4:16, 22; 6:23; 7:21; 9:13; 18:15; 26:6; 33:17; 34:16; 35:9, 23; 37:1; 40:20; 52:15; 63:9; 66:14; 67:1; 69:7; 71:20; 76:3; 82:25; 88:16; 94:23
rights 33:2

role 9:4, 7, 10; 33:25; 34:2; 87:16
Rothschild 4:9
routine 18:18, 20, 20, 22; 19:1
Rowand 85:9
Russell 66:7

## S

same 3:18; 5:1; 15:19; 17:5, 7, 8; 23:7; 24:15; 28:18; 36:8; 37:9
sand 58:14
Sandi 77:18, 23, 25; 78:11, 12; 82:6
sapiens 50:24
satisfied 12:18; 34:10; 90:16
saw 13:9; 48:16; 56:11; 59:15
saying 36:16; 37:13; 47:19; 72:9, 9; 76:3, 5, 9; 79:7; 94:9, 12
SCHMIDT 3:10, 11; 7:10; 19:3; 20:8, 10; 26:16, 22, 24; 28:14; 31:11; 32:17, 20; 33:11; 36:5, 17; 46:3; 47:11; 51:6, 9; 53:24; 57:15; 58:5; 62:16; 63:6, 9, 14; 65:2, 11; 68:4; 72:14; 73:16, 18; 76:17; 77:10; 78:15; 81:25; 83:3, 7; 84:10; 85:21, 23; 88:14, 20; 91:4; 94:23; 95:3; 97:7
School 3:14; 6:12, 12; 7:14; 8:7; 9:6, 23; 10:1, 4; 13:5; 20:24; 21:1; 22:1, 4; 23:11; 29:16; 30:6; 31:7, 12, 15, 20; 38:12, 21; 39:16; 50:1; 59:10; 67:13; 76:23; 78:20; 83:11; 86:23; 89:4; 92:5; 94:18
schooling 14:4
schools 8:12, 17; 9:2, 23; 13:6, 10, 16, 18, 22, 23; 14:14; 18:14; 93:5
science 15:25; 16:9; 17:2; 41:18; 42:16, 20; 46:15; 57:7; 76:20, 23, 25; 83:10, 15, 24; 89:13, 13; 96:19
scientific 83:24
scope 21:17
sealing 3:3
second 3:19; 31:19; 40:14; 41:5, 8; 67:17; 68:18, 19, 21; 72:9; 74:6; 80:13; 84:13; 85:24; 86:3
secondly 44:14; 61:7; 95:19
seconds 70:25; 72:13
secretaries 69:5
secretary 34:16, 20, 23; 69:4, 23; 73:4
section 66:15; 72:8; 88:6,

8
sections 84:13
seeing 20:15; 22:23; 27:2; 28:3, 4
seem 30:21; 76:3
seems 76:5; 82:22
select 76:5
selection 8:6; 15:11, 12, 18, 21; 18:12; 25:6; 39:19; 54:24
self 69:23
sending 17:15
sends 33:20
sense 14:24; 62:25; 70:21
sent 20:16; 22:24; 27:3; 34:11; 65:23; 78:11
sentence 41:8, 17; 42:10; 43:7; 46:4; 47:5; 48:3, 20, 22; 49:12, 19, 21; 50:1; 57:20, 25; 58:25; 59:23; 67:17, 18; 74:6, 11; 75:19, 21, 24; 76:3, 5; 80:18; 81:6, 7, 8, 9, 11, 17, 20
sentences 50:13; 61:18, 19; 71:12; 81:14, 22
separate 26:5; 36:20; 74:14
separately 67:20
sequence 70:15
series 71:12
service 34:7
set 29:20, 23; 84:13; 95:3
Seth 19:23; 20:18; 27:3, 25; 28:19; 29:6, 12; 40:20
setting 27:15; 29:18
sexual 17:13; 54:1
shall 82:24; 96:20
share 14:16, 19; 38:17
shared 45:12
sheet 66:22
Sheila 27:19, 22; 29:5
short 71:12
shortly 3:17
show 22:22; 26:14; 39:23; 54:8; 64:14; 68:5; 72:22; 79:20; 88:21
showed 83:8
showing 65:12; 82:1
shown 84:11; 86:18
side 73:12
sides 86:12
significantly 63:11
similar 37:18; 56:6; 84:18
simply 9:10; 12:20; 33:2; 58:17
situation 16:22; 45:5; 86:6, 16
six 85:13, 24; 86:3
social 89:4, 8; 90:19
sole 37:2
solely 55:16; 63:10, 12; 72:5

solicitor 37:11, 15, 20; 38:2; 66:9
solve 92:25
somebody 15:4; 19:18; 32:9; 38:21; 62:8; 69:16; 71:4, 22; 75:1, 4
somehow 32:12
someone 19:23; 64:19; 65:7; 67:13; 69:25; 76:7
sometime 89:19
somewhat 52:22
sorry 9:1; 15:15; 26:6; 27:20; 30:24; 49:2; 58:22; 61:18; 63:8; 81:10; 92:17; 93:4
sought 36:20
sounds 9:10; 87:20
Spahr 56:9, 23; 57:22; 60:21, 22, 24; 61:12, 21, 21; 62:5, 18
speak 7:3, 4; 14:2; 22:14; 24:5; 27:4, 4; 28:13; 35:22; 44:7; 46:1; 56:5; 61:25, 25; 69:23, 25; 79:8; 80:6; 94:1
speaking 78:5, 7
species 55:4; 94:15, 15
specific 12:22; 13:2; 17:14; 21:7; 22:25; 27:4; 44:3; 53:7; 55:18; 56:24; 74:8, 13, 21, 24; 75:5; 82:11, 16; 88:4
specifically 7:8; 10:25; 17:7, 12; 18:5; 38:3; 46:1; 47:16; 73:22; 84:6; 87:25; 91:9, 12; 92:7
specifics 10:5; 25:23; 37:22; 62:25
spell 50:19
spend 55:19; 95:24
spread 55:5
spring 89:19
staff 39:7; 66:2, 5
stand 58:13; 92:24; 93:1
standards 43:16; 44:15, 16, 22; 45:16, 17, 21; 49:5; 74:19, 24, 25; 75:2, 4, 5
standpoint 59:14, 15, 15, 16
start 4:24; 5:4; 29:12
starter 95:18
starts 57:20; 66:13; 75:19, 21; 79:11
state 7:21; 44:18, 22; 57:23; 64:4; 91:13
stated 10:25; 44:17; 45:1; 53:3; 70:2; 95:17
statement 27:25; 36:19, 23; 42:14; 43:8; 51:14; 52:4; 54:6; 58:1; 60:1; 61:21, 23; 62:8, 9; 65:6; 70:17; 71:1, 12; 73:22; 85:15; 92:12
stating 47:16, 17
status 80:18; 81:6, 17
statute 7:21

Richard Nilsen
April 14, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

staying 94:24
stick 52:1
still 32:6; 78:21
stipulated 3:2
STIPULATION 3:1
stop 95:21
strikes 16:17
structure 50:22
student 58:20
students 17:10, 16;
53:19, 21; 54:5; 88:1
studies 89:4, 9; 90:19
subject 8:8; 16:25; 22:9;
32:3, 7; 43:13; 62:5, 6, 18;
77:24; 90:4
subjects 47:7; 48:2;
82:14, 16
submitted 5:11; 8:25
substantial 41:1
sued 45:6
suggest 14:2
suggested 13:4; 54:23
suggestions 12:19
suggests 12:9
summarized 80:11
summary 89:3
summer 9:21; 22:12, 17;
39:21
Superintendency 35:14
Superintendent 7:13;
9:7; 18:14; 24:6; 55:14, 15,
24; 61:3; 62:7; 64:9, 10;
66:20; 94:17
Superintendent's 65:19,
22; 67:6; 84:14
supervise 62:10
supervision 33:22; 61:4;
62:4; 69:1, 1
supervisor 18:13
supervisors 34:4; 66:6
supported 44:13; 45:9
supposed 58:22; 59:1
Supreme 90:18; 91:19;
92:17, 20, 23; 93:1, 5
sure 3:19; 4:4, 11; 5:22;
6:6; 7:2; 10:5; 12:24;
18:15; 20:5; 30:24; 32:17;
46:4; 59:20; 78:8; 82:22;
86:12; 93:10, 19
surprise 23:1
surprised 13:15
surrounded 16:12
surrounding 16:11;
33:8; 39:20
survival 53:6
suspect 7:23
sworn 3:8

T

talk 13:13; 96:5, 8, 11
talked 18:1
talking 4:25; 34:5, 6;

37:20, 20; 79:17; 90:5
tape 3 5:9, 16, 19; 36:2, 6,
7, 10, 25; 68:11, 16, 17,
18, 19, 20, 21, 22; 69:7;
73:1
tapes 35:11; 68:18
task 38:14
taught 17:22; 18:6; 44:4;
59:24; 89:8; 94:7
teach 41:9; 42:2, 2, 15;
43:3, 1 0, 15; 44:9, 11, 23,
25; 45: 10, 15; 46:6, 8;
47:7; 48:4, 6, 8, 11; 49:1,
3; 55:1 5; 58:8, 20; 74:16;
77:1; 83:25
teacher 41:9; 58:21; 62:3
teachers 15:17; 16:3, 6,
15; 36:19; 37:9, 16, 21;
38:4; 40:15; 41:16, 20, 22;
42:8, 13, 14, 17, 20; 44:9,
24; 45:9; 46:5, 14, 18;
47:1, 4, 13; 48:2, 10, 19;
49:1, 3; 52:5; 53:20; 55:15,
18, 25; 57:7, 12, 23; 58:1;
61:4; 76:9, 10, 21, 23, 25;
77:6; 78:7, 8; 83:10; 89:4;
94:2, 5, 8, 11, 20; 96:21
teaching 41:23; 43:13,
23; 46:21; 47:14, 17;
48:14, 24; 57:7; 58:9, 15;
59:2; 74:7, 13, 21, 23;
94:8, 11, 13
team 32:1
tease 85:22
telephone 19:15
telling 8:15; 21:23; 56:1;
59:20; 81:5
tells 49:6
term 43:6; 81:3; 93:21, 24
terms 15:14
territory 3:18
testified 3:8; 8:10; 31:20;
57:9; 67:12; 69:6; 77:7
testify 26:19
testifying 46:19
testimony 5:13; 8:4, 8, 9,
13; 9:22; 26:17; 34:12;
46:25; 55:8, 10; 71:14;
93:7, 10
textbook 8:6; 9:24; 10:9,
12; 1 1:2, 13, 23, 23; 13:1;
15:9, 11, 12, 18, 21, 23;
16:1 5; 18:13; 25:7; 39:20
textbooks 8:11, 16; 9:6;
10:3; 14:6, 9
theories 58:9, 11; 75:13
Theory 10:14, 16, 18, 19;
44:1 9; 51:1; 53:6; 55:4, 9,
19; 57:8, 23; 58:14; 75:11,
11, 1 1; 83:24; 94:15, 16
therefore 47:21; 97:1
third 17:25; 59:23, 23;
79:1 1; 90:11
Thomas 30:19; 32:11;
87:1 3; 88:11, 12
though 21:14; 58:6

thought 17:3; 23:3; 31:1;
42:21; 45:1, 1, 5, 21; 46:8,
12; 60:5; 73:10; 74:16
thousand 65:7
three 9:1, 2; 24:18; 42:1;
61:19; 64:11, 12; 81:14;
87:18, 18, 23; 90:13;
91:20, 25; 93:17
throughout 55:5
thrown 11:11; 38:24, 25
tied 97:1
times 42:1; 85:7, 8
timing 24:8
title 40:5; 66:14
titled 65:19
today 4:4; 6:17; 20:11;
56:8; 96:17
together 84:14
told 13:7; 21:11; 26:2;
41:25; 46:5, 8; 55:20;
85:11; 88:7
Tom 3:11; 20:4; 26:18, 23;
33:7; 62:15; 73:15; 95:1, 5;
96:16; 97:2
took 28:15, 17, 25; 30:22;
31:1; 39:21; 45:12; 47:1;
53:9
top 20:22; 55:1; 66:7;
70:13; 90:5
topic 46:5; 77:2; 93:19
topics 42:6; 53:20, 21;
62:19; 84:22; 91:20, 23;
92:4
total 51:22; 52:23; 54:11
totally 96:12
touch 26:1, 3; 28:1, 7;
44:19
transcribe 36:2
transcribed 4:20; 36:25;
70:2, 21; 76:14
transcript 5:6; 6:3; 36:6,
7, 8, 10; 69:7, 9, 15; 70:4,
6, 18; 71:4, 20, 21
transcription 35:18;
68:11, 14, 16, 25; 71:13,
16; 74:3; 76:1
transcripts 5:17, 25; 6:7
transportation 34:7
treat 18:18
trial 3:5
trick 7:12; 19:17
tried 33:8
trouble 15:4
Troy 39:11
Trudy 56:8; 59:8; 60:20
true 28:25
trust 92:9
truth 59:20
try 46:23
trying 14:22; 15:3; 20:20;
30:21; 58:6; 70:6, 12;
71:23, 24; 72:22
turn 22:3; 54:15; 66:23;
80:13

turns 62:9
Twenty-nine 53:17, 18
twice 5:24; 48:9
two 6:5; 12:16, 17; 23:24;
24:18; 26:5; 32:16; 40:9;
41:25; 44:11; 45:8; 48:9;
49:10; 52:3; 53:3, 10, 13;
55:9, 12, 19; 56:1; 59:8;
60:18; 61:3, 17; 64:11, 16;
65:7; 67:25; 68:18; 74:14;
79:2, 4, 5; 87:18, 19;
88:14; 89:3; 90:10; 92:4;
95:13
two-page 79:23
type 18:25
typed 81:18
typo 41:1, 4

U

ugliness 55:14; 56:3
ultimately 69:1
unbecoming 64:13
under 33:22; 66:14, 24;
68:25; 90:22; 91:23
undergraduate 44:6
understood 23:3; 43:24;
55:8; 91:5
unilaterally 38:3
Union 41:19; 77:19;
78:13; 79:6; 82:11, 13, 18,
23
unless 4:11
untrue 60:5; 61:23; 62:10
untruth 62:11
untruthful 59:22; 60:1
up 3:21; 17:15; 24:6;
29:18, 20, 23; 35:12, 12;
37:13; 41:22; 44:15, 18;
47:16, 19; 61:8; 66:19;
69:18; 72:22; 79:6; 85:16;
86:11; 87:3; 90:17, 20;
97:1
Update 65:19, 22; 66:1,
10; 67:6; 84:14; 86:22;
87:7
updated 41:4
updates 84:18, 21
use 15:1, 3; 16:18; 21:14,
21; 51:21; 81:3
used 8:12, 17; 14:6, 13;
37:16; 43:6; 53:11, 11;
58:7, 20; 81:7; 91:25
using 9:3; 12:7; 21:25;
49:14

V

various 44:2
verbal 4:20
verbally 82:12
verbatim 35:18; 51:24;
69:22; 71:4, 20, 21, 22
verify 69:9

versus 53:9; 55:20; 75:11
Vice-President 29:4
Vicki 69:16, 20
view 45:18
voice 63:24
voicing 37:9
vote 70:20; 71:2, 22; 72:4,
6, 6, 17
voted 71:16
votes 72:7; 73:3
voting 70:19; 72:21

W

waiting 32:6; 77:12
waived 3:4
wander 64:1
wants 71:10
Wave 75:11
way 5:1; 22:16; 28:24;
48:5; 60:13; 72:20; 75:19;
92:25; 96:5, 7, 23
website 40:10
week 18:3, 4; 47:24;
84:19
Weekly 65:19, 22, 23;
67:6; 84:14
weeks 65:24, 25
Wenrich 70:25; 72:11, 1 1
weren't 32:14; 49:3;
85:18; 92:2, 3
whole 33:4; 39:14; 41:18;
50:21; 81:16
whose 64:22; 80:4
Wiestling 39:11
Wisconsin 24:6; 67:13
wishing 45:10
withdraw 62:12; 85:21
within 21:17; 24:18; 54:1;
56:15; 67:5; 86:13; 92:20
without 9:12; 59:7; 63:4;
64:23
witness 3:7; 20:3; 33:5;
40:1; 54:16; 65:15; 70:11;
73:21, 23; 80:14
word 12:7; 16:18; 58:6,
20; 85:25; 86:3; 91:12
words 26:18; 41:12;
74:22
work 8:4, 5; 9:4, 20; 33:13
working 88:11
works 7:5
write 76:25
writing 64:2; 82:13, 18;
95:20, 22, 23; 96:2
written 10:25; 31:21;
33:15; 34:25; 55:7; 68:2
80:21; 82:24; 93:12;
96:13, 20
wrote 40:12, 13, 15;
41:14; 87:11; 88:8
Wynegar 77:16, 17

Min-U-Script®   Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

## Y

**year** 15:24, 25; 62:22;
90:20; 92:5, 7; 96:9, 15
**years** 53:16, 18; 60:18;
65:7
**yesterday** 20:4

## Z

**Zero** 95:10
**zeroing** 17:22