# APPENDIX I

# TAB Q

## In The Matter Of:

*Tammy Kitzmiller, et al.   v.*
*Dover Area School District, et al.*

---

*Trudy Peterman*
*April 7, 2005*

---

*Filius & McLucas Reporting Service, Inc.*
*1427 East Market Street, York, PA*
*4309 Linglestown Road, Harrisburg, PA*

*(717) 845-6418   or   (717) 236-0623*

Original File TP040705.TXT, 94 Pages
Min-U-Script® File ID: 3482585800

## Word Index included with this Min-U-Script®

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Trudy Peterman
April 7, 2005

---

**Page 3**

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

TAMMY KITZMILLER, et al.,

   Plaintiffs   .   CIVIL ACTION NO. 04-CV-2688

   vs.   .

DOVER AREA SCHOOL DISTRICT,.   (JUDGE JONES)

et al.,   .

   Defendants   .

| | |
|---|---|
| Deposition of | : TRUDY PETERMAN |
| Taken by | : Plaintiffs |
| Date | : April 7, 2005, 9:00 a.m. |
| Before | : Vicki L. Fox, RMR, |
| | Reporter-Notary |
| Place | : 200 One Keystone Plaza |
| | North Front and Market Streets |
| | Harrisburg, Pennsylvania |

APPEARANCES:

   PEPPER HAMILTON, LLP

   BY:  ERIC ROTHSCHILD, ESQUIRE

      For - Plaintiffs

   THOMAS MORE LAW CENTER

   BY:  PATRICK T. GILLEN, ESQUIRE

      For - Defendants

---

**Page 2**

INDEX

WITNESS

[2]

[3] TRUDY PETERMAN     Examination

[4]

   By Mr. Rothschild     3, 89

[5]    By Mr. Gillen     21

[6]

[7]

[8]

[9]

   EXHIBITS

[10]

Plaintiffs Deposition Exhibits     Page

[11]

   4. Newspaper Articles.     7

[12]

   9. Memo from Trudy K. Peterman, Mr. Baksa, Mr.     17

[13] Redding, Mrs. Spahr.

[14] 37. June 4th Board minutes.     17

[15]

[16]

[17]

[18]

[19]

[20]

[22]

[23]

[24]

[25]

---

**Page 3**

[1]       **STIPULATION**

[2] It is hereby stipulated by and between the

[3] respective parties that sealing, certification and filing

[4] are waived; and that all objections except as to the form

[5] of the question are reserved until the time of trial.

[6]

[7]    TRUDY PETERMAN, called as a witness, being duly

[8] sworn, was examined and testified, as follows:

[9]       **BY MR. ROTHSCHILD:**

[10]   **Q:** Good morning, Ms. Peterman.

[11]   **A:** Good morning.

[12]   **Q:** Dr. Peterman, I apologize. It doesn't matter. My name

[13] is Eric Rothschild. I represent the plaintiffs in the

[14] lawsuit captioned Kitzmiller, et al. versus the Dover

[15] Area School District and Dover Area School District

[16] Board of Directors.

[17]    And your deposition has been noticed through a

[18] subpoena, and you are here to testify in a deposition in

[19] that case; do you understand that?

[20]   **A:** Yes, sir.

[21]   **Q:** Have you had your deposition taken before?

[22]   **A:** Yes.

[23]   **Q:** On how many occasions?

[24]   **A:** I believe once.

[25]   **Q:** Do you remember the circumstances of that deposition?

---

**Page 4**

[1]   **A:** Yes.

[2]   **Q:** What were those?

[3]   **A:** It was a court case in Virginia.

[4]   **Q:** Were you a party to that case?

[5]   **A:** Yes, I was.

[6]   **Q:** Can you give me just a general description of what it

[7] was about?

[8]   **A:** I was the plaintiff in that case. And it was a case

[9] against a School Board in which they had nonrenewed me

[10] over an issue of mold. The school that I inherited had

[11] mold, and I would not falsify records saying that the

[12] school didn't have any mold. And it was basically over

[13] that.

[14]   **Q:** I am just going to give you sort of a very brief

[15] description of the deposition process we are going to

[16] have today. I am going to ask you questions, and you

[17] are going to give answers.

[18]    After I am done, Mr. Gillen may have some

[19] questions for you. The question and answer will be

[20] transcribed by the court reporter creating a written

[21] document recording our questions and answers today.

[22]    In order for that record to be clear, first of

[23] all, I need to speak slowly for the court reporter's

[24] benefit. And if you could do the same, that would be

[25] helpful.

---

rudy Peterman
pril 7, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 5

[ ]   I also need you to answer with words rather than
[ ] with nods of the head or other kinds of verbal cues that
[ ] wouldn't be clear on the written record.
[ ]   Do you understand that?
[ ]   A: Yes, sir.
[ ]   Q: The product of this question and answer, as I said, will
[ ] be a document called the transcript. You have the
[ ] option if you would like to review that transcript
[ ] before it becomes finalized, we call it read and sign.
[ ] That means once you get the transcript, you have thirty
[ ] days to review it, see if there is any errors in the
[ ] transcript and make us aware of those errors.
[ ]   Do you want to do that?
[ ]   A: Yes, sir.
[ ]   Q: I expect this deposition to be very short, at least from
[ ] my standpoint. But if at any time you would like to
[ ] take a break during the process, please let me know,
[ ] and, of course, we will do that. Okay?
[ ]   A: Yes, sir.
[ ]   Q: Were you ever the Principal at Dover High School?
[ ]   A: Yes, sir; I was.
[ ]   Q: When did you first take that position?
[ ]   A: I took that position in July of — I'm trying to think
[ ] here — of 2002.
[ ]   Q: Are you still the Principal of Dover Area High School?

Page 6

[ ]   A: No, sir; I am not.
[ ]   Q: When did you leave?
[ ]   A: I left in — I believe my ending date was July, 2004.
[ ]   Q: Why did you leave?
[ ]   A: I left because I got a better position. I went from a
[ ] Principal to an Assistant Superintendent of Schools.
[ ] And also, there was a lot of controversy going on in
[ ] Dover with the School Board, and it was just an
[ ] uncomfortable employment situation.
[ ]   Q: When you refer to controversy, are you referring to
[ ] anything specifically?
[ ]   A: There was the controversy over the Creationism issue,
[ ] and I personally did not appreciate how the School Board
[ ] at School Board meetings treated my faculty and members
[ ] of the public who chose to speak out for and against
[ ] certain issues.
[ ]   Q: I am going to ask you some followup questions regarding
[ ] those observations. But before that, I just want to
[ ] learn a little bit about your background.
[ ]   Have you ever been a schoolteacher?
[ ]   A: Yes, sir.
[ ]   Q: What grades did you teach?
[ ]   A: I a taught grades nine through twelve. I was a
[ ] secondary English/Latin teacher.
[ ]   Q: What are your degrees in?

Page 7

[1]   A: My first degree, I received a Bachelor of Science in
[2] Secondary Education, English from Penn State University
[3] in 1977. In 1984, I received my Master's in College
[4] Administration from Penn State University.
[5]   In 1996, I received my Principal Certification
[6] from Indiana University of Pennsylvania. And in 1999, I
[7] received my Doctorate in Educational Administration and
[8] Leadership Studies from Indiana University of
[9] Pennsylvania.
[10]   Q: How long were you a schoolteacher?
[11]   A: I was a schoolteacher in the public schools for 14
[12] years.
[13]   Q: I am going to show you a document that we have
[14] previously marked as Plaintiff Deposition Exhibit 9.
[15]   Do you recognize this document?
[16]   A: Yes, sir; I do.
[17]   Q: Can you describe what it is?
[18]   A: This is a communication to the Assistant Superintendent
[19] of the Dover Schools Mr. Michael Baksa; Larry Redding,
[20] my Assistant Principal, and Mrs. Bertha Spahr. It is
[21] regarding Creationism as it relates to the Approved
[22] School Board Biology One Curriculum.
[23]   Q: Is this a document you created?
[24]   A: Yes, sir.
[25]   Q: Is that your written signature next to your name on the

Page 8

[1] document?
[2]   A: Yes it is.
[3]   Q: Did you create this document on or around the time it
[4] was dated April 1st, 2003?
[5]   A: Yes, I did.
[6]   Q: In the first paragraph of this document, you refer to a
[7] conversation that you had with Mrs. Spahr on April 1st,
[8] 2003. Do you remember that conversation?
[9]   A: Yes.
[10]   Q: And in that first paragraph, you discuss what Mrs. Spahr
[11] told you about her conversation with Mr. Baksa; is that
[12] right?
[13]   A: Yes, sir.
[14]   Q: And included in that paragraph is the statement that —
[15] you record in that paragraph that Mr. Baksa further
[16] stated to Mrs. Spahr on March 31st, 2003 that this Board
[17] member wanted fifty percent of the topic of Evolution to
[18] involve the teaching of Creationism.
[19]   Now that text that I just read there is something
[20] Mrs. Spahr told you; correct?
[21]   A: Yes.
[22]   Q: You were not part of Mrs. Spahr and Mr. Baksa's
[23] conversation?
[24]   A: No, I was not.
[25]   Q: You did not separately learn this information from Mr.

**Min-U-Script®**    Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Trudy Peterman
April 7, 2005

---

Page 9

[1] Baksa?

[2] **A:** No.

[3] **Q:** Nor from any School Board member?

[4] **A:** This particular information?

[5] **Q:** Yes.

[6] **A:** No.

[7] **Q:** Does this first paragraph accurately record what Mrs.

[8] Spahr told you on April 1st, 2003?

[9] **A:** Yes, it does.

[10] **Q:** The sentence I read at the end of the paragraph refers

[11] to a Board member wanting fifty percent of the topic of

[12] Evolution to involve the teaching of Creationism.

[13] Did Mrs. Spahr advise you about her understanding

[14] as to who the Board member was?

[15] **A:** Yes, she did.

[16] **Q:** Who did she say?

[17] **A:** She said Alan Bonsell, however you want to pronounce it.

[18] **Q:** And then following that paragraph describing your

[19] recording your conversation with Mrs. Spahr, you raise a

[20] number of issues and questions for Mr. Baksa; is that

[21] fair?

[22] **A:** Yes. The reason I raised the issues is because I had

[23] two nontenured biology teachers, and I didn't want them

[24] to be accused of erroneously representing the approved

[25] School Board curriculum at that time.

---

Page 10

[1] **Q:** Did Mrs. Spahr ever communicate to you, whether verbally

[2] or in writing, that your account of your conversation

[3] with her was in any way incorrect?

[4] **A:** No, sir.

[5] **Q:** Did Mr. Baksa ever communicate to you whether verbally

[6] or in writing that your account — that the account you

[7] were reporting misrepresented his conversation with Mrs.

[8] Spahr?

[9] **A:** No, sir.

[10] **Q:** Did Mr. Baksa ever respond to your memo in any way?

[11] **A:** No, sir.

[12] **Q:** Did anybody in school administration respond to the

[13] memo?

[14] **A:** I believe Dr. Nilsen noted that he had received it.

[15] **Q:** And other than noting his receipt, did he in any other

[16] way respond to the content of this memo?

[17] **A:** Not that I recall.

[18] **Q:** Have you ever heard any member of the Dover School

[19] District Board express a desire to have Creationism

[20] taught in the high school?

[21] **A:** Yes, sir.

[22] **Q:** What Board member did you hear express that desire?

[23] **A:** William Buckingham.

[24] **Q:** What were the circumstances in which you heard him say

[25] that?

---

Page 11

[1] **A:** There were two circumstances. First, he was at that

[2] time I believe head of the curriculum committee. And

[3] there was a meeting among the following people: Mr.

[4] Baksa, myself, Mr. Buckingham, Bert Spahr, Rob Eshbach,

[5] and Jennifer Miller. And Mr. Buckingham had brought in

[6] some textbooks.

[7] This meeting was in the spring of 2004. I don't

[8] recall the date. And he wanted us to view a videotape.

[9] I am not sure of the exact organization, but I think it

[10] was some think tank out of Seattle, Washington.

[11] And he wanted us to view the videotape because

[12] people on the videotape discussed Creationism; and at

[13] that time, we were going to order a textbook from Levin

[14] and Miller. And I believe Dr. Miller was interviewed on

[15] that tape.

[16] And the term Creationism was used by several

[17] people. Mrs. Spahr several times through several of our

[18] book meeting sessions brought up the fact about the 1987

[19] Supreme Court case Edward vs. Aguillard or whatever and

[20] noted that basically Creationism could not be taught in

[21] a science course which that case directly referred to.

[22] The other time that religious things were stated

[23] was in the June, 2004 Board meeting. In that Board

[24] meeting, I don't recall Mr. Buckingham's terminology,

[25] but he said something to the effect that 2,000 years

---

Page 12

[1] ago, a man died on that cross, something to the effect

[2] for all of us.

[3] And also in that Board meeting, his wife got up in

[4] public comment and said why we should have Creationism

[5] and religion in the schools. She quoted several Bible

[6] verses which I can't recall. And that's what I remember

[7] about Mr. Buckingham's comments.

[8] **Q:** Did this June, 2004 meeting include discussion of the

[9] biology curriculum or biology textbooks?

[10] **A:** Mrs. Spahr spoke at that meeting about the textbook

[11] issue. And she also gave like a legal history of

[12] Creationism in public education.

[13] **Q:** Did Mr. Buckingham use the word Creationism? Do you

[14] remember whether Mr. Buckingham used the word

[15] Creationism in that meeting where he also said 2,000

[16] years ago?

[17] **A:** As best as I can recall, I do believe he used the term

[18] Creationism.

[19] **Q:** Is your recollection that Ms. Spahr also used the word

[20] Creationism in order to describe what could not be done?

[21] **A:** Yes.

[22] **Q:** Did Mr. Buckingham in any way dispute the suggestion

[23] that that was what the Board was trying to do?

[24] **A:** I don't recall because — during my tenure as Principal

[25] during the two years that I was there, the only term

---

rudy Peterman
pril 7, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 13

that I was familiar with was Creationism. Obviously, it
is the title of my memo.

I never heard quote/unquote Intelligent Design
Theory come into play until July, 2004 right before I
was getting ready to depart from the District to assume
another position.

Q: And do you remember what the circumstances were that you
did hear about Intelligent Design in July?

A: I don't recall accurately. I don't know whether it was
in a newspaper article or whether it had been some
discussion. There was a discussion I believe about they
were looking at some Christian schools and some
parochial school science textbooks.

They were looking at what Mr. Buckingham termed a
Christian textbook, and then the book Of Pandas and
People was brought up. It seemed that the Intelligent
Design Theory was kind of synonymous with the
presentation Of Pandas and People's textbook.

Q: Am I correct in understanding from your description that
you do not recall Intelligent Design being referred to
in that June meeting?

A: No.

MR. GILLEN: Objection to the form.

BY MR. ROTHSCHILD:

Q: Tell me what you know about this review of parochial

Page 14

schools to find out what they were teaching.

A: The review I remember as some of the schools were
actually teaching the Levin Miller book. And I can
remember just about the book review, we had to like
xerox sections where books mentioned like Creationism
specifically. And that's just about all I recall.

Q: Do you know who did this investigation of parochial
schools?

A: Mr. Buckingham I think called around to several local
schools.

Q: And then you refer to a Christian textbook. What did
you mean by that?

A: I don't recall the exact name of the textbook, but he
referred to a book as this was a book chosen by either
parochial or Christian schools. I don't recall. We
reviewed so many books that I just don't recall the
name.

Q: Did Mr. Buckingham or any other Board member urge the
acquisition of that Christian textbook?

A: Not during my tenure. I think this was just at the
inception of the discussion of these different books
that were used by Christian schools or parochial
schools.

Q: I would like to go back to the meeting, the first
instance of a discussion of Creationism in the meeting

Page 15

[1] that included yourself, Mr. Baksa, Mr. Buckingham and
[2] three of the science teachers.
[3]     Did Mr. Buckingham in that circumstance actually
[4] use the word Creationism?
[5] A: Yes, he did.
[6] Q: Do you remember what he said about it?
[7] A: I believe he was in a discussion with Mrs. Spahr about
[8] this issue. Also I know that Mr. Eshbach and
[9] Mrs. Miller at that point revealed — and I had already
[10] had known it — that both of their fathers were
[11] ministers, and that they were PK's, preacher's kids, and
[12] that they did not — that they did not believe in the
[13] teaching of Creationism as biology teachers.
[14]     And during my tenure at Dover, we did not teach
[15] the origin of life. We taught the origin of species,
[16] which is an entirely different subject.
[17] Q: When you use the term origin of life, what do you mean
[18] by that?
[19] A: We never got into — there was never any discussion
[20] about when a fetus became a baby. There was no
[21] discussion about that. There was no discussion of
[22] basically the beginning of life.
[23]     When I talk about the origin of species, the only
[24] thing that was ever discussed in the Dover curriculum
[25] were possibly three or four days about Darwin's survival

Page 16

[1] of the fittest and adaptive selection. And basically,
[2] we used the example of the 13 different kinds of finches
[3] that were on the Galapagos Islands. That is the only —
[4] of the 19 days spent on the chapter of Evolution, only
[5] three or four days even mentioned Darwin.
[6] Q: When Mr. Eshbach and Ms. Miller expressed their view
[7] that as biology teachers they didn't believe Creationism
[8] should be taught, did Mr. Buckingham respond to that?
[9] A: He always had a response that he just felt that this was
[10] what was needed in schools. I don't think he just meant
[11] Dover schools. I think he meant all schools.
[12] Q: The this he thought was needed was the teaching of
[13] Creationism?
[14] A: Yes.
[15] Q: Do you remember what the movie was called that he had
[16] you watch?
[17] A: No, I don't.
[18] Q: Did he give any commentary about the movie other than
[19] asking you to see it?
[20] A: He several times stated that the video which he wanted
[21] my science teachers to see — and I only saw parts of
[22] it; they saw the whole thing. That this video shot
[23] holes in Darwin's Theory.
[24] Q: That is the only comment he made that you can recall?
[25] A: Yes.

Tammy Kitzmiller, et al. v.
Dover Area School District, et al.

Trudy Peterman
April 7, 2005

Page 17

[1] (Plaintiffs Deposition Exhibit 37 was marked.)
[2] **BY MR. ROTHSCHILD:**
[3] Q: Just on the June meeting —
[4] A: If I could add something. At that meeting in the spring
[5] of 2004, also I believe Sheila Harkins was there.
[6] Q: And did she speak at all during the meeting?
[7] A: She did speak, but nothing that I recall at this time.
[8] I can't recollect anything that stands out.
[9] Q: Sure. I just want to go back to the June meeting. The
[10] document we have marked as Plaintiffs Deposition Exhibit
[11] 37 are Board minutes from June 14th, 2004.
[12] Do you see that?
[13] A: Yes.
[14] Q: And I believe in the second paragraph it indicates that
[15] you were present at that meeting?
[16] A: Yes.
[17] Q: And I just want to show you we have a group of newspaper
[18] articles relating to the controversy that we have
[19] previously marked as Plaintiff Deposition Exhibit 4. I
[20] would just like you to take a look at the article dated
[21] June 15th, 2004 in the compilation authored by Joseph
[22] Maldonado, which is the day after the meeting which I
[23] just gave you the minutes for. Is that right?
[24] A: Yes. The meeting was June 14th. This is dated June
[25] 15th.

Page 18

[1] Q: And the article begins at Monday evening's Dover Area
[2] School Board meeting, William Buckingham apologized to
[3] anyone he may have offended with the comments he made at
[4] last week's Board meeting during discussions over a new
[5] biology book for the high school.
[6] And then it goes on I guess about six paragraphs
[7] down to quote him as saying 2,000 years ago someone died
[8] on a cross, can't someone take a stand for him; do you
[9] see that?
[10] A: Yes, sir.
[11] Q: Is that consistent with your recollection that he in
[12] fact said those words on or around June 14th, 2004?
[13] A: Yes, that is absolutely consistent with what I heard.
[14] Q: Going over to the next page, about four paragraphs down
[15] there is a reference to his wife Charlotte Buckingham's
[16] appearance during public comments in which she quoted
[17] from the book of Genesis and asked how can we allow
[18] anything else to be taught in our schools?
[19] Is the information reported about Mrs. Buckingham
[20] consistent with your recollection?
[21] A: Yes, it is.
[22] Q: And both the quote attributed to Mr. Buckingham and the
[23] comments attributed to Mrs. Buckingham, is it consistent
[24] with your memory that occurred?
[25] A: Yes.

Page 19

[1] Q: At the same meeting?
[2] A: Yes, it is. They did occur at the same meeting.
[3] Q: Just one last question. Have you maintained any
[4] documents relating to your tenure as Principal at Dover
[5] High School?
[6] A: No, I have not. I left everything in the office.
[7] Q: I have no further questions.
[8] MR. GILLEN: Could we take a brief break? I have
[9] got a few.
[10] A: Sure.
[11] (A recess was taken.)
[12] **AFTER RECESS**
[13] **BY MR. ROTHSCHILD:**
[14] Q: Dr. Peterman, one thing you said earlier in your
[15] testimony was that you didn't like how the School Board
[16] treated your faculty and members of the public who got
[17] up to make comments at School Board meetings.
[18] Can you describe what bothered you?
[19] A: I am going to be — obviously, I am going to be
[20] perfectly blunt with what I say here. At one of my
[21] first School Board meetings, a member of the School
[22] Board called a woman who was giving an opinion whom she
[23] disagreed with a bitch, and I was absolutely appalled.
[24] The same Board member, who was Mrs. Yingling, at
[25] one of the Board members asked for a break because she

Page 20

[1] had to pee. And she said that right in public.
[2] And I didn't like at times how they addressed Mrs.
[3] Spahr. Mrs. Spahr has been teaching in that District
[4] for over 35 years. She is revered in the community.
[5] She has won every chemistry award that a public school
[6] educator can win. She has taught the children of the
[7] children of the children.
[8] I was very, as a Principal, defensive of my
[9] faculty whom I felt always acted in a professional
[10] manner. And I feel that if we go back to Stephen Covey,
[11] at times we just have to agree to disagree. And there
[12] was no give and take with the School Board. And the
[13] lack of professionalism in micromanaging was something
[14] that I was not used to.
[15] Q: When you refer to School Board members who — I will use
[16] the phrase — acted disrespectfully to the faculty, is
[17] that a fair characterization?
[18] A: Yes.
[19] Q: Are there specific faculty members that you are thinking
[20] about in terms of that interaction?
[21] A: Yes.
[22] Q: Who was that?
[23] A: I didn't like how Mr. Buckingham I believe it was at the
[24] June meeting asked Mrs. Spahr where she got her
[25] information, or at times he — I don't recall exactly —

Page 21

[1] where she got her degree. I didn't know what he meant,
[1] either her science degree or law degree. I didn't know
[1] what he meant by that.
[1]     I didn't like how they handled a situation with a
[1] particular teacher who had a DUI. I was obviously
[1] Principal of record. He was a very popular football
[1] coach. In the state of Pennsylvania, no one has ever
[1] lost a job over a DUI. They took away his football
[1] position, which they could do. But I didn't like how
[1] the whole thing transpired.
[1]     Q: Ms. Peterman, I know you were no longer Principal at
[1] this point, but did you attend the meeting at which the
[1] School Board voted in the new biology policy to add
[1] Intelligent Design to the curriculum?
[1]     A: No.
[1]     MR. ROTHSCHILD: I have no more questions. Thank
[1] you.
[1]                 BY MR. GILLEN:
[1]     Q: Good morning, Dr. Peterman. We met off the record. Let
[1] me introduce myself for the record. My name is Pat
[1] Gillen, and I am one of the attorneys for the School
[1] Board.
[1]     Mr. Rothschild has asked you a couple of
[1] questions. I have a few follow-up. The rules that he
[1] gave you apply here, which if you are tired, fatigued

Page 22

[1] and want to take a break, let me know, and we can do
[1] that.
[1]     I just want to get a better idea for myself about
[1] what you know that relates to this biology curriculum
[1] and the biology text.
[1]     If I ask you to look at 2003, was there any time
[1] in 2003 when the biology text, biology curriculum, any
[1] of that came to your attention?
[1]     A: I think in the spring of 2003 when they were getting
[1] ready to select a new textbook was when a lot of this
[1] started.
[1]     Q: The spring of 2003?
[1]     A: Yes.
[1]     Q: What do you recall from that period of time that relates
[1] to what I will call the issues in this litigation, the
[1] selection of the biology text, the biology curriculum?
[1]     A: It was after — it was on that — when Mrs. Spahr told
[1] me about the March 31st, 2003 conversation she had had
[1] with Mr. Baksa when I think this really started.
[1] And at that point, they had already been reviewing some
[1] of the textbooks. I believe the Department looked at
[1] eight different biology textbooks. That is my
[1] recollection.
[1]     And they actually went down and looked at the
[1] different aspects in terms of standards and in terms of

Page 23

[1] the approved School Board curriculum at that time.
[2]     And they felt that the Levin and Miller book
[3] addressed the issues in the current curriculum of which
[4] I was under the best of any of the textbooks.
[5]     Q: And we see Mr. Rothschild has asked you questions about
[6] this Exhibit 9, which is your memorandum.
[7]     A: Yes.
[8]     Q: If we take that as a marker again, I am just trying to
[9] get a sense for the development of events through 2003.
[10] Was there anything after this discussion you recount
[11] here in this memo for the remainder of the 2003 year
[12] that stood out in your mind and related to the biology
[13] textbook, biology curriculum?
[14]     A: Yes.
[15]     Q: Tell me, please.
[16]     A: After this memo was written — my Assistant Principal at
[17] the time was Mr. Larry Redding. I think it was after
[18] the memo had been written and there had been some
[19] discussions that Mr. Baksa had — and I don't know who,
[20] whether they be with Alan Bonsell or Mr. Buckingham.
[21] Mr. Baksa was in my office with Larry Redding present.
[22] And the issue of Creationism did come up along with a
[23] selection of textbooks.
[24]     And Mr. Baksa made the statement that you don't
[25] understand where Rich stands on these issues. And as I

Page 24

[1] recollect, Mr. Redding said to Mr. Baksa, but it's your
[2] job as the Assistant Superintendent in charge of
[3] curriculum to give the best advice possible in regard to
[4] the curriculum.
[5]     And that was the first indication that I had
[6] personally as a Principal that perhaps what Mr. Baksa
[7] was attempting to say is that Dr. Nilsen had very strong
[8] views on this subject also.
[9]     Q: Let me ask you about that. When Mr. Redding — how do
[10] you spell Redding?
[11]     A: R-e-d-d-i-n-g.
[12]     Q: When he was addressing Mr. Baksa — and I take it that
[13] the thrust of his comments is that Mr. Baksa owed Dr.
[14] Nilsen his best advice as Assistant Principal, what did
[15] Mr. Redding think he was discussing, what issue did he
[16] think Mr. Baksa owed Dr. Nilsen advice on?
[17]     A: We were basically discussing the issue of the current
[18] curriculum and the adoption of the textbooks.
[19]     Q: But what more specifically, what about the text came up
[20] that would lead Mr. Redding to make such a statement?
[21]     A: The teaching of religion in public schools.
[22]     Q: Tell me what you recall about that? How was that
[23] discussed? Did Mike Baksa say well, they want to teach
[24] religion?
[25]     A: The crux of that discussion as I recall was brief. It

**Tammy Kitzmiller, et al.  v.**
**Dover Area School District, et al.**

**Trudy Peterman**
**April 7, 2005**

---

Page 25

[1] n was not long, attorney Gillen.

[2] It was just something that I felt that Mr. Baksa

[3] was expressing his frustration. If I had to

[4] characterize it, he was extremely frustrated with the

[5] entire situation as it was at that time.

[6] And at that time, we had no idea that it was going

[7] to take the life on that it did. I think Mr. Redding

[8] was making a comment that, you know, just as I am an

[9] Assistant Superintendent now, that there are issues that

[10] come up that you have to advise the Superintendent with

[11] your experience and with what you know about law. Maybe

[12] we should stay away from this issue.

[13] Q: Forgive me. I am just trying to get a better sense for

[14] actually what is producing this discussion and what is

[15] being said. I see that you have got this memo here.

[16] And you indicated that Dr. Nilsen told you I got the

[17] memo?

[18] A: Yes.

[19] Q: You said that Mr. Baksa never got back to you about it?

[20] A: He actually never did, but he never talked about the

[21] memo specifically. But did the subject of Creationism

[22] and the science textbooks come up? Obviously, because

[23] we tried to get them adopted at several Board meetings,

[24] and they would always take the biology books off, or the

[25] biology books were never a part of that adoption.

Page 26

[1] Q: We are talking about the 2003 year?

[2] A: Yes.

[3] Q: And, again, I am trying to get the best recollection

[4] that you have as to how that year unfolded. We have the

[5] memo?

[6] A: Yes.

[7] Q: You have mentioned two things so far, a conversation in

[8] your office with Mr. Redding and Mr. Baksa?

[9] A: Yes.

[10] Q: And also a notion of the books coming up and trying to

[11] get them adopted, and they were taken off the agenda?

[12] A: In 2003, we were reviewing the books. We were looking

[13] at them. The subject of Creationism had come up through

[14] Mr. Baksa and Mrs. Spahr. And we were still continuing

[15] to look at books that the School Board may be

[16] recommended to us.

[17] And as the 2003 year went into the 2004 year, we

[18] actually went back and reviewed the books that we had

[19] already reviewed because we were trying to attempt to

[20] get the books passed because we needed them.

[21] Also I don't recall when the 2003 year ended and

[22] merged into 2004, there was that one specific meeting

[23] that I know that we set up where the science teachers

[24] had a conversation about the textbooks with certain

[25] Board members.

Page 27

[1] I believe also there was an earlier meeting. I

[2] don't know if it was late in 2003 or early in 2004 where

[3] the science teachers just met with Mr. Bonsell and had a

[4] discussion with him. I know that that attended, but I

[5] don't believe I was at that meeting.

[6] So I think there were — to give you a sense of

[7] what was happening, there was obviously some concern on

[8] the School Board's part about the content of some of the

[9] science books. So we were in 2003, after March, we were

[10] reviewing books, continuing to review books, reviewing

[11] books again. And discussions about Creationism and the

[12] law, you know, were held in some meetings and were

[13] brought up at certain School Board meetings.

[14] And about the time that I exited the District in

[15] July of 2004 was the first time that I had heard

[16] Intelligent Design being brought into the conversation.

[17] Q: And I know this is somewhat difficult, but this is my

[18] chance to ask you some questions. Let's try and if we

[19] can focus first on 2003.

[20] A: Okay.

[21] Q: I know you have this memo here. You have referenced a

[22] couple of things so far. I am trying to get my best

[23] sense for what you recall about those.

[24] So far you have referenced a conversation with

[25] Larry Redding and Mike Baksa?

Page 28

[1] A: Yes.

[2] Q: Do you believe that was in 2003?

[3] A: Yes, that was definitely in 2003. It was before the

[4] school year ended. Then you asked about 2003. This is

[5] happening very late in the school year.

[6] When June of 2003 came and the teachers left, it

[7] kind of was in hiatus over the summer, July and August.

[8] I don't think the issue surfaced again until we returned

[9] to school in August, September. And then we started

[10] reviewing the textbooks again.

[11] And it seemed that as the 2003 year ended, like in

[12] December, we were still reviewing the textbooks and

[13] meeting with Mr. Baksa and certain School Board members

[14] that were on the curriculum committee or who wanted to

[15] attend to try to get a sense of like what they wanted,

[16] what we were looking for as teachers and administrators

[17] and what our curriculum was. That's what I recall.

[18] Q: So we have in 2003, we have got the memo. Now we have

[19] got — give me a sense for — you said there was sort of

[20] a hiatus that you recall during the summer?

[21] A: Yes.

[22] Q: And the issue as you recall came up again in the fall?

[23] A: Yes, because we were still in the process of reviewing

[24] the textbooks.

[25] Q: Okay. Do you recall meetings addressing the text in the

---

rudy Peterman
pril 7, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 29

] fall of 2003?

]    **A:** Yes. The science teachers met as a Department I think

] during some inservice days.

]    **Q:** Okay.

]    **A:** I do believe in early 2003, that there was a meeting

] held with Mr. Baksa and some of the science teachers. I

] believe the teachers in the meeting were Bert Spahr, Rob

] Eshbach and Mrs. Miller again. And I do not believe I

] was in that meeting. But they met I believe with

] Mr. Bonsell.

]    **Q:** And forgive me, Dr. Peterman, I just want to make sure I

] understand you. You said early 2003. Did you mean late

] 2003?

]    **A:** What I meant was early in the 2003-2004 school year.

]    **Q:** Fall?

]    **A:** Fall. I would say in September, October. My years are

] different. My years fiscally end June 30th. My school

] year begins usually August or September so it is

] confusing.

]    **Q:** I understand.

]    **A:** Sure.

]    **Q:** You have indicated you weren't present at that meeting?

]    **A:** I don't believe I was present at that meeting. I was

] present at a meeting that was held in 2004 with

] Mr. Buckingham and I believe Mrs. Harkins and the other

Page 30

| people that I have already said.

   **Q:** That's fine. Again looking at 2003, your best

| recollection is that there was this meeting with

| teachers, and you weren't present?

   **A:** Yes.

   **Q:** Now again looking at 2003 and with my better

| understanding of how you look at the school year, say

| the fall of 2003, do you recall Board meetings at which

| the subject of the biology text or biology curriculum

| came up?

   **A:** I am really trying to recall. There may have been some

| instances where it was talked about, but it was more so

| talked about at the spring of the 2004. I think that —

| to answer the question where it became more apparent was

| as the — as we are going out of the 2003 year, toward

| December, I think as this issue started to take life,

| there was some talk between myself and Mrs. Spahr about

| the concern that two of our biology teachers were

| nontenured. And I know that Mrs. Spahr was checking

| with PSEA to try to get some advice for her younger

| teachers.

   So I think there were several issues going on. We

| were looking at textbooks in the fall of 2003. The

| issue of Creationism which had arisen in March of 2003

| was still present. And now we had a third issue coming

Page 31

[1] up as we exit 2003 and start to go into the spring of

[2] 2004.

[3]    We had the issue of, well, if they do want

[4] Creationism taught, what do we do with our nontenured

[5] teachers who don't want to break the current law?

[6]    If I could separate the three major issues that I

[7] was looking at in this one aspect — and we were still—

[8] even though I raised the issues here, it was becoming

[9] more apparent to me that perhaps, one, they were going

[10] to change our curriculum, which didn't occur under my

[11] tenure; and if they did change our curriculum, how were

[12] we going to handle our nontenured teachers?

[13]    **Q:** Okay. And again, forgive me, I don't wish to belabor

[14] these points, but in your answer you made a number of

[15] statements, and that's exactly what I am trying to get

[16] to.

[17]    You said as the issue began to take life as we

[18] moved through December of 2003, you said Creationism was

[19] still present as you saw it. And you had this concern

[20] for the teachers.

[21]    What I am trying to understand, Dr. Peterman, is

[22] what is actually happening during this period that is

[23] leading you to make that sort of observation? In other

[24] words, I see the memo. I know that that reflects in

[25] some measure a discussion you had with Bert Spahr.

Page 32

[1]    We know there is a hiatus through the summer of

[2] 2003, and I understand how the school year works. We

[3] get into the fall.

[4]    **A:** There is a meeting.

[5]    **Q:** There is a meeting?

[6]    **A:** That Mike Baksa holds with some of the science teachers

[7] and I believe Alan Bonsell. And the issue is raised

[8] again about Creationism.

[9]    **Q:** Let's talk about that. You weren't at that meeting;

[10] correct?

[11]    **A:** I wasn't at the meeting. And all I know about the

[12] meeting is briefly what Mrs. Spahr told me.

[13]    **Q:** Tell me what Mrs. Spahr told you.

[14]    **A:** Basically that the issue of Creationism was raised

[15] again, and she felt that the meeting went well in that

[16] Mr. Bonsell perhaps now understood the difference

[17] between teaching the origin of life versus the origin of

[18] species. And again, I can't answer a lot of questions

[19] because I was not at the meeting.

[20]    **Q:** I understand that. And really all you are doing here it

[21] is kind of like this memo, I am just asking for your

[22] best recollection of what Bert Spahr told you at this

[23] meeting in 2003.

[24]    You have indicated that the Creationism issue was

[25] raised again. Can you recall any specific statements

**Min-U-Script®**     Filius & McLucas Reporting Service, Inc.

**Tammy Kitzmiller, et al.   v.**
**Dover Area School District, et al.**

**Trudy Peterman**
**April 7, 2005**

---

Page 33

[1] she attributed to Alan Bonsell?

[2] A: No, I don't. It was just a general statement that the

[3] Creationism issue was raised again.

[4] Q: Right. Okay. You said that Bert thought the meeting

[5] went well?

[6] A: That perhaps Mr. Bonsell had achieved a new

[7] understanding of what was basically taught in the

[8] Biology One curriculum.

[9] Q: And was she any more specific in that regard? Did she

[10] say what she believed Mr. Bonsell had come into the

[11] meeting, what sort of understanding he had?

[12] A: No.

[13] Q: Did she say a new understanding, a new and better

[14] understanding of what was actually taught, did she

[15] describe what she meant by that?

[16] A: Not that I recall.

[17] Q: You have offered a distinction between the origins of

[18] life and the origins of —

[19] A: Of species.

[20] Q: And it appears from your answer that that came up in

[21] this discussion with Bert Spahr and her recount of the

[22] meeting in the fall of 2003?

[23] A: Yes.

[24] Q: Give me your understanding of what Bert Spahr was

[25] getting at there.

Page 34

[1] A: Not that I want to put words in Mrs. Spahr's mouth. I

[2] believe that what they were trying to establish again

[3] was that Evolution — that the way we taught Evolution

[4] was Evolution was a change over time. And we were

[5] looking at how species could adapt, or perhaps how

[6] species became extinct, or through their adaptation many

[7] different species could be created.

[8] That is what they were in my opinion attempting to

[9] get across to Mr. Bonsell. They were not looking for

[10] how the earth was created. They were not getting into

[11] the Christian-Judeo Genesis explanation of how life

[12] began. That's not a part of our science curriculum.

[13] Q: In that regard, did Bert Spahr indicate the concerns

[14] that Mr. Bonsell had?

[15] A: I don't recall specifically.

[16] Q: Is there anything else you can recall that you learned

[17] from persons who attended this meeting about what

[18] transpired at the meeting?

[19] A: No.

[20] Q: Back to that conversation with Larry — I believe it is

[21] Larry Redding?

[22] A: Redding.

[23] Q: — and Mike Baksa in your office. I know from what your

[24] prior answer was that Larry Redding said you should give

[25] better advice —or you owe your advice to Dr. Nilsen on

Page 35

[1] this issue.

[2] If we look at that discussion, what is the issue

[3] that you are talking about?

[4] A: You probably have to ask Larry Redding what he meant.

[5] But in my opinion, it was a brief discussion where Mike

[6] Baksa was extremely frustrated with the subject of

[7] Creationism, and he was just expressing his frustration.

[8] And you would have to ask Mr. Baksa what he meant.

[9] But the thing that I recall about that

[10] conversation was he said that Rich, who was Dr. Nilsen,

[11] had different views too about Creationism. And the

[12] conversation led me to believe that Dr. Nilsen's beliefs

[13] were akin to those of the current majority of the School

[14] Board.

[15] Q: Let's focus on what Mike said because I'm trying to get

[16] a sense for this conversation. Mike is frustrated?

[17] A: Yes.

[18] Q: And I understand your answer means frustrated at the

[19] issue of Creationism in the biology curriculum or

[20] biology text; is that accurate, Dr. Peterman?

[21] A: I would say he was just frustrated with the entire

[22] situation. His job as head of curriculum was to get

[23] textbooks to the teachers, to make sure that the

[24] teachers had gone over the books.

[25] I think that we probably had reviewed the books

Page 36

[1] three or four for — at that time, we were beginning to

[2] review the books. And what was occurring was we were

[3] beginning to review the books, and he was just simply

[4] frustrated because he — you're going to have the ask

[5] him.

[6] In my opinion, he was frustrated not only with the

[7] subject of religion in schools; he was frustrated with

[8] how many times are we going to have to look at this.

[9] And he was implying that the Superintendent perhaps had

[10] differing or unique views too about that issue.

[11] Q: And I do understand the sense that you had in this

[12] conversation. What I am trying to get at, Dr. Peterman,

[13] is what Mike Baksa said that would give you that

[14] impression.

[15] A: He just simply said Rich has differing or unique views

[16] on this subject, too. That is all I can say about the

[17] matter.

[18] Q: Did he say what the views were?

[19] A: No.

[20] Q: You have referenced that that led you to conclude that

[21] or to suppose that Rich Nilsen's views were consistent

[22] with those of the Board, the majority of the Board?

[23] A: Those are my views. Mr. Baksa did not say that. He

[24] simply made a statement that you don't understand, Rich

[25] has differing and unique views on this subject, too.

---

rudy Peterman
April 7, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 37

Q: Okay. This subject is?

A: Creationism as it pertains to reviewing textbooks.

Q: Did he state the nature of Dr. Nilsen's view?

A: No, he did not.

Q: Was there any discussion of the nature of Board members' views?

A: I think in that conversation, it was just again a brief conversation about we're trying to get these books adopted. Now Creationism had occurred. And that's what I recall.

You are trying to get answers from me that, Patrick, I just don't have.

Q: I understand that, Dr. Peterman. I am just trying to understand how you could come away from the conversation with the impression that, first of all, what sort of understanding you had of Mike Baksa's frustration.

I mean I think everyone involved in this process was frustrated at the ordinary administrative rigamarole here. What I am trying to do here is understand how you come away from this conversation thinking that — what substance you attributed to Mike Baksa's frustration. I take it now —

MR. ROTHSCHILD: You can finish, but I want to object.

MR. GILLEN: Go ahead.

Page 38

MR. ROTHSCHILD: I object to your characterization of the evidence. It lacks foundation.

BY MR. GILLEN:

Q: That is what I am trying to get, Dr. Peterman. When you came away from this conversation, you had a sense that Mike is frustrated. I want to know what you thought the source of his frustration was and what he said that contributed to the impression which you plainly had for the meeting.

A: The source of his frustration, one more time, was reviewing textbooks. His frustration was on the subject of Creationism. And it was very well known that my views were that Creationism does not belong in the Biology One curriculum.

And Larry Redding, when Mr. Baksa made the statement but you don't understand, Rich has differing and unique views on this job, all Larry Redding said is well, it is your job as the Assistant Superintendent of schools to give him your input and the best advice you can give. End of conversation.

Q: And that's what I am getting at. At any time, did Mike Baksa say the Board wants to teach Creationism?

A: As I recall that conversation, he was frustrated because he had had conversations with several Board members where yes, they wanted to teach Creationism.

Page 39

[1]   Q: Now what did Mike say about that; is that what he told
[2] you?
[3]   A: I believe that the issue — I don't know how the
[4] conversation started. I can only recollect — and I am
[5] going to say it one more time and hopefully we can move
[6] on; okay?
[7]   Q: We will move on when I am done asking my questions and
[8] get a straightforward answer, Dr. Peterman.
[9]   A: I am trying to do the best that I can.
[10]   Q: I understand that.
[11]   A: All right. But I am not going to have words put in my
[12] mouth. I don't remember how the conversation started,
[13] but it was a brief conversation. We were all frustrated
[14] over the subject of textbooks and Creationism.
[15]   Mr. Baksa made the following statement: You don't
[16] understand, Rich has differing and unique views on this
[17] subject, too. Mr. Redding simply replied well, your job
[18] as Assistant Superintendent of Schools is to give him
[19] the best advice that you know how. And then I believe
[20] we moved on to another topic.
[21]   MR. ROTHSCHILD: I object to the tone you are
[22] taking with the witness, which is completely
[23] unwarranted.
[24]        BY MR. GILLEN:
[25]   Q: Let me ask you this: Did Mike at any time during this

Page 40

[1] conversation to the extent you recall it indicate that
[2] the Board wanted to teach Creationism?
[3]   A: Yes.
[4]   Q: How did he indicate that?
[5]   A: He had indicated that by — I don't recall how the
[6] conversation started, but the conversation was about the
[7] reviewing and hopefully the eventual adoption of
[8] textbooks. And somewhere in there, Creationism was
[9] mentioned. I don't remember exactly what he said.
[10]   But I mean since March of 2003, there had been
[11] conversations among all of the administrators, even at
[12] the monthly administrative meetings, about this issue.
[13] And I don't recall those specific conversations. But it
[14] was an issue. It was an issue that started in the
[15] spring of 2003 and continued to this day.
[16]   Q: Just stay focused on this meeting with Larry Redding and
[17] Mike Baksa. Is there anything you recall about what he
[18] said specifically?
[19]   A: No.
[20]   Q: You have mentioned some meetings, administrative
[21] meetings in 2003?
[22]   A: There were monthly administrative meetings throughout my
[23] two years at Dover.
[24]   Q: Can you tell me as you sit here today, do you recall the
[25] discussion of Creationism in biology coming up in any of

udy Peterman
ril 7, 2005

**Tammy Kitzmiller, et al.   v.**
**Dover Area School District, et al.**

---

Page 45

I don't remember specific dates, but there wasn't a week that went by that this issue was really not discussed unless we were on break.

Q: And again let's focus between January and June. And can you recall the substance of any of these communications with any Board member? Did you speak with any Board member?

A: I spoke in the spring with Mr. Buckingham at some of these meetings.

Q: Okay. These were the meetings that we have addressed in some measure earlier?

A: Yes.

Q: Apart from that, did you speak with any Board member from January through June of 2004 regarding the biology text or biology curriculum?

A: The only other Board member that I spoke to was Casey Brown because Mrs. Brown vehemently disagreed with the substance of the majority of the current School Board members. And in the June meeting, as I recall, she read a statement of how she strongly disagreed with the teaching of Creationism in the public schools.

Q: And you indicate you spoke with Mrs. Brown?

A: Yes. I believe it was a brief phone conversation. And her views were very well known.

Q: What was the substance of your telephone conversation

---

Page 46

with Casey Brown?

A: Just that, you know, she disagreed with the stance of the current Board, and I appreciated her views because I agreed with her.

Q: Again looking at the period of January through June of 2004, which is the Board meetings we have addressed a little, any other conversations with any other Board members about the biology text or biology curriculum?

A: Not that I recall.

Q: You have indicated there was some ongoing discussion with teachers. Can you recall any specifics of those discussions?

A: Ms. Prahl was very concerned about her tenure. Mr. Eshbach was very concerned about his tenure. Mr. Eshbach's father is Reverend Eshbach. He is a faculty member at Susquehanna University. He also addressed the Board on certain occasions.

Mr. Eshbach — Reverend Eshbach asked to meet with me. I met with him. He supplied me with certain pieces of literature written by experts in the field. I read that literature and thanked him very much for the information.

Other conversation, parents, you know —

Q: Let's keep that out of it. Just stick with the teachers.

---

Page 47

[1] A: Teachers?
[2] Q: Yes.
[3] A: That was the conversation. And Mrs. Spahr, being the
[4] Department head and being there as long as she had, was
[5] very protective of her teachers. This was an area of
[6] concern.
[7] Mrs. Spahr and Mr. Eshbach and Mrs. Miller
[8] thoroughly researched this issue in terms of law, also
[9] consulted with the PSEA, and had reams of paper
[10] documenting this. They shared that with me. And that
[11] was my conversation with the teachers.
[12] There were several areas. They were frustrated
[13] with the issue. By the spring and end of the school
[14] year 2004 year, they were tired of reviewing the same
[15] textbooks. They were frustrated with giving the same
[16] information to the School Board only to be told to
[17] review it one more time. And they were concerned about
[18] tenure issues.
[19] And there was an overwhelming concern that would
[20] this School Board change the current School Board
[21] curriculum.
[22] Q: Okay. You mentioned the tenure thing and the legal
[23] research?
[24] A: Yes.
[25] Q: What did the legal research relate to specifically?

---

Page 48

[1] A: It related to all of the court cases leading up to the
[2] Supreme Court 1987 decision, which I have already
[3] mentioned. And some of the research also went back.
[4] Intelligent Design Theory didn't come into those
[5] particular terminologies until the early 1990's.
[6] It was basically Science Creation Theory, and then
[7] this new terminology came in. That is all I recall.
[8] Q: Again looking at this period January through June, 2004
[9] and as a marker June is the Board meetings you have
[10] referenced, did you have any conversations with Dr.
[11] Nilsen about this issue?
[12] A: Not that I recall.
[13] Q: How about Mike Baksa?
[14] A: Mike and I would have conversations about setting up
[15] meetings. We would have conversations about looking at
[16] our current curriculum and looking at standards. Dover
[17] touted itself as being a standards driven School
[18] District. Creationism is not one of the standards.
[19] However, Evolution is.
[20] Q: Do you recall anything Mike said to you as it related to
[21] the biology curriculum and state standards?
[22] A: Just that the current curriculum when I was the
[23] Principal was in line with state standards.
[24] Q: Did he ever tell you the Board wanted to teach
[25] Creationism?

---

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Trudy Peterman
April 7, 2005

Page 49

[1] MR. ROTHSCHILD: During this specific time?
[2]        BY MR. GILLEN:
[3]    Q: Yes, during this period of January through June of 2004.
[4]    A: I don't recall any specific comments or anything, but it
[5] was general knowledge that the Board wanted to teach
[6] Creationism.
[7]    Q: When you say it was general knowledge, what was your
[8] basis for that belief that it was general knowledge the
[9] Board wanted to teach Creationism?
[10]    A: From this memo on the terms that were used from April
[11] 1st, 2003 until the time I left were Creationism. I
[12] only recall Intelligent Design Theory being brought into
[13] the conversation in July, 2004 near the time I was
[14] exiting the District.
[15]    Q: And complete that thought for me, please, Dr. Peterman.
[16] What is it that is leading you to believe — you have
[17] got this conversation. I understand that. You have got
[18] the memorandum, forgive me, Plaintiff Exhibit 9. That
[19] is a specific conversation, and I understand that.
[20]    Anything else I mean —
[21]    A: Comments made that I don't remember specifically at
[22] certain Board meetings. I believe at the May Board
[23] meeting, Mr. Buckingham said if you don't like the way
[24] it is here, he said to people who were not born in
[25] America, then you can go back to where you came from.

Page 50

[1]    Then in the June meeting, he apologized for those
[2] comments because Dover has many different nationalities.
[3] And at I believe the June Board meeting, one of our
[4] particular students of the Hindu faith got up and said
[5] that he was insulted by what Mr. Buckingham had said.
[6]    Q: Okay. You have said Mr. Buckingham made a comment about
[7] if you don't like it in America, go back to your country
[8] in effect?
[9]    A: Yes.
[10]    Q: Is it your understanding that comment was made in May of
[11] 2004?
[12]    A: It was made at some time in the spring of 2004. It
[13] could have been the April meeting. It could have been
[14] at the May meeting. But I do know that later on, I
[15] believe at either the May or June Board meeting, Mr.
[16] Buckingham read a statement that he apologized. He did
[17] not mean to insult anybody of foreign nationality.
[18]    Q: Is it your understanding that that comment was made with
[19] reference to the biology text?
[20]    A: That comment was not made — Mr. Buckingham at the
[21] meetings when he would speak would put in his views
[22] about Christianity and how he viewed morals. And at
[23] times, it was very difficult to separate what he was
[24] talking about.
[25]    But did I take that as specifically — I took it

Page 51

[1] as specifically, that if you weren't a person who
[2] espoused our Christian views, if you came from another
[3] country, you could just go back to where you came from.
[4]    Q: That is what I am trying to understand; how this comment
[5] was made and why you seem to link it to the biology text
[6] and biology curriculum.
[7]    A: As I recall, Mr. Buckingham made the comments — I think
[8] he read an opening statement, and those comments were in
[9] there. I also recall at one of the spring Board
[10] meetings, a Professor of Philosophy from the community
[11] got up and spoke. And I believe this was at the same
[12] time Mr. Buckingham's comments came out.
[13]    And all of these issues involved Creationism, are
[14] we losing our America, so on and so forth.
[15]    Q: Again, let me just try and understand you. Is it your
[16] recollection today that the biology textbook issue was
[17] discussed in the May Board meetings?
[18]    A: I honestly can't recall whether it was discussed or not
[19] about the textbooks. I do know issues of morality in
[20] America were discussed.
[21]    Q: You have indicated that — let me ask you this: Again
[22] in that spring period, do you recall any Board members
[23] addressing the biology text or biology curriculum with
[24] you?
[25]    A: One on one?

Page 52

[1]    Q: Yes.
[2]    A: No.
[3]    Q: At Board meetings?
[4]    A: At Board meetings at the June meeting, yes. The whole
[5] June meeting was about the biology textbooks. People
[6] from the community spoke. Bert Spahr I spoke.
[7]    Q: Okay. Let me ask you with respect to the June meetings,
[8] do you know how the issue of the biology text came up at
[9] those meetings?
[10]    A: There was adoption of science textbooks, not only
[11] biology books. And the teachers wanted to know why the
[12] biology books were not being adopted. They were also
[13] fighting for the adoption of the biology books.
[14]    Q: So was it an agenda item, or did someone come to the
[15] podium and bring it up?
[16]    A: People spoke from the podium. It was also on the agenda
[17] of the June meeting if you check it. There was adoption
[18] I believe of family and consumer science books, of
[19] chemistry books. There were other books being adopted.
[20]    So the topic of textbook adoption was very much
[21] alive at the June meeting.
[22]    Q: You indicated that you were in attendance. Bert Spahr
[23] spoke. Who else can you recall being at that meeting
[24] that spoke from the public?
[25]    A: Mrs. Buckingham spoke at that meeting.

Filius & McLucas Reporting Service, Inc.    Min-U-Script®    (15) Page 49 - Page 52

Page 53

Q: Okay.

A: I believe Reverend Eshbach spoke at that meeting. I spoke at that meeting.

Q: Had you discussed with others prior to coming to that meeting the idea of showing up for the purpose of addressing this issue?

A: It was very well known that that issue was going to be talked about at that Board meeting because it was about adoption of textbooks, and all the science books were being adopted except the biology textbooks.

And a former Board member had also spoken in May. Mrs. Callahan attended several Board meetings and wanted to know why the biology textbooks were not adopted because the books that they had, we were not using because they did not align with our curriculum. And so she wanted children to have a textbook.

It was a sore subject with her because being a former Board member, she wanted to make sure that every child had adequate textbooks, had adequate equipment to receive an education. She did not believe that the current state of biology in Dover was adequate. We needed textbooks. We had not had a textbook in quite a while.

When they had adopted the textbook that was supposedly being used, right after it was adopted, the

Page 54

state came in with the science standards, and it didn't meet these standards. And that sometimes happens.

Q: You have some recollection of statements that Mr. Buckingham made?

A: Yes.

Q: How about the other Board members, do you recall anyone else saying anything at that first meeting in June?

A: I recall Casey Brown reading a statement where she objected to bringing religion into the public schools.

Q: Did you have an understanding as to what she was referencing when she discussed bringing religion into the public schools?

A: Absolutely. She went down over a legal discussion. She cited cases. She stated court decisions.

Q: Forgive me. My question was imprecise. Did you understand her to be addressing this notion of the biology curriculum?

A: She was addressing Creationism and why it didn't belong in public schools.

Q: Do you remember any of the other Board members saying anything?

A: Mr. Bonsell spoke, but I don't recall anything specifically.

Q: Do you recall the term Intelligent Design coming up at this meeting?

Page 55

[1] A: No, I do not.

[2] Q: Were you familiar with Intelligent Design Theory in the
[3] spring, in June of 2004?

[4] A: The first that I heard Intelligent Design mentioned was
[5] in July of 2004.

[6] Q: Did you go to both meetings in June, can you recall,
[7] June of 2004?

[8] A: As I recall, yes, I did.

[9] Q: Do you have a recollection concerning whether this issue
[10] was discussed at both meetings?

[11] A: I don't recall specifically.

[12] Q: If we just look at — take June meetings together and
[13] take the biology text — your biology text and biology
[14] curriculum is the issues, do you recall any discussion
[15] Of Pandas at the June meeting, the text Of Pandas and
[16] People?

[17] A: Not specifically. I don't recall that.

[18] Q: Do you recall Mr. Buckingham saying anything about other
[19] texts at the School Board meetings?

[20] MR. ROTHSCHILD: The June meetings?

[21] BY MR. GILLEN:

[22] Q: Yes.

[23] MR. ROTHSCHILD: Can I get clarification? Do you
[24] mean other specific texts?

[25] BY MR. GILLEN:

Page 56

[1] Q: Yes. Other texts. Was there a discussion of other
[2] texts?

[3]

[4] MR. ROTHSCHILD: I want a clarification here.
[5] Other texts meaning the prospect of other texts, or
[6] Pandas has a name, another specific named text?

[7] BY MR. GILLEN:

[8] Q: Other alternative biology texts.

[9] MR. ROTHSCHILD: Objection.

[10] A: Not that I recall.

[11] BY MR. GILLEN:

[12] Q: How about do you recall him discussing the
[13] characteristics of the Miller and Levin text and what he
[14] thought was unsatisfactory? Did he make any comments
[15] about the text?

[16] A: Mr. Buckingham — and I don't recall at that specific
[17] meeting — had gone through and written some comments
[18] down. What those comments were, I don't recall at this
[19] time. But it was his analysis of the textbooks and his
[20] analysis alone.

[21] Q: And I appreciate that. I am trying to get a sense
[22] there's obviously an exchange taking place here at these
[23] meetings which you have recounted, people getting up
[24] expressing concerns and then some comments by the Board.

[25] I am trying to get a sense for what Board members

**Tammy Kitzmiller, et al.   v.**
**Dover Area School District, et al.**

**Trudy Peterman**
**April 7, 2005**

---

Page 57

[1] — how they responded. And I know that you recall some
[2] statements attributed to Mr. Buckingham?
[3]   A: Yes.
[4]   Q: You have indicated Casey Brown?
[5]   A: Yes.
[6]   Q: And I am trying to get a sense for the substance of
[7] these exchanges from now. At this point from the
[8] standpoint of the Board members, were they — people are
[9] getting up and raising concerns.
[10]   Is there any response back to the effect of hey, I
[11] don't think the text is the ideal text at these Board
[12] meetings in June of 2004?
[13]   A: As I recall, I can't remember any specific thing about
[14] any specific text. The comments were basically over
[15] Creationism and whether it should be taught in the
[16] public schools.
[17]   The comments were about — I believe in some of
[18] the textbooks, there was a disclaimer which said there
[19] are other alternate theories out there, Creationism
[20] being one of them. In fact, I believe that statement is
[21] made in the Levin and Miller book.
[22]   But I don't recall any specific people from the —
[23] people from the public who were getting up were
[24] basically talking about their views of whether they
[25] believed religion should be taught in public schools or

Page 58

[1] not. That is what the debate was about.
[2]   Long ago, the Levin Miller book even though it may
[3] have started some of this discussion, the books were
[4] sort of like put on a back burner, and the debate was no
[5] longer over getting a biology book. The debate became
[6] whether we should teach Creationism in the public
[7] schools.
[8]   Q: I do understand that. And that's just the reason for my
[9] question. You got up and said there's people getting up
[10] saying we don't want Creationism taught in biology
[11] class; we don't want religion taught in schools?
[12]   A: Yes.
[13]   Q: And let me just ask you then to be more specific if I
[14] can. Did the Board ever say we think you can teach
[15] Creationism, and we think it is legal?
[16]   MR. ROTHSCHILD: Object to the form.
[17]   A: I don't recall any specific statement. But from
[18] Mr. Buckingham's statements, it was very clear that he
[19] felt that Creationism should be taught in school. He
[20] did make — there was some discussion — brief
[21] discussion of the Constitution, and I don't recall the
[22] specific comments, but Mr. Buckingham basically alluded
[23] to the fact that there was nothing in the constitution
[24] that recognized separation of church and state.
[25]   And from that, I took personally — I don't know

Page 59

[1] what other people took. But I took personally that he
[2] felt that because there was nothing in his opinion in
[3] the Constitution that addressed separation of church
[4] versus state, that it was okay to teach religions in
[5] schools.
[6]   BY MR. GILLEN:
[7]   Q: And if we get to the religion that is at issue here, you
[8] understood it to mean Creationism; is that correct?
[9]   A: Yes.
[10]   Q: I know this is a little confusing. We have talked about
[11] June Board meetings where the issue came up, and you
[12] were in attendance and made some statements. You have
[13] referenced a meeting in your prior answers with Mike
[14] Baksa.
[15]   Were you present at that meeting I think you said
[16] in the spring?
[17]   A: With Mr. Cunningham, Sheila, Mrs. Spahr, Mrs. Miller and
[18] Mr. Eshbach.
[19]   MR. ROTHSCHILD: You said Cunningham. Did you
[20] mean —
[21]   A: Buckingham.
[22]   BY MR. GILLEN:
[23]   Q: I want to understand that meeting. Mike Baksa was
[24] present. Do you recall him saying anything?
[25]   A: We basically met one more time. He started the meeting

Page 60

[1] to review the textbooks and to hear the additional
[2] concerns of Mr. Buckingham. That's when Mr. Buckingham
[3] brought out his analysis of the Levin & Miller book.
[4]   And then he had a box of other books that he had
[5] been reviewing. And then he said that he had done some
[6] calling around on his own, looking at the books that
[7] were in use in York County and maybe some Christian and
[8] parochial schools.
[9]   Q: Okay. What did Mike Baksa say in response to these
[10] issues raised by Mr. Buckingham; can you recall?
[11]   A: I don't recall after that that he did much talking. The
[12] talking then was done by Mrs. Miller, Mr. Eshbach and
[13] Mrs. Spahr. They basically reviewed all of the books
[14] that they had reviewed.
[15]   They reviewed one more time the approved science
[16] textbook curriculum, and one more time Mrs. Spahr laid
[17] out the fact that the law stated that there was a
[18] separation of church and state in the 1987 law case.
[19]   Q: Do you recall anything that Mr. Buckingham said in
[20] response to these issues raised?
[21]   A: Mr. Buckingham said he wanted the Science Department to
[22] watch a video. The Science Department did so. They did
[23] so on inservice day. I came up and saw part of it.
[24]   As I recollect, Dr. Miller was in the video. It
[25] was from some think tank in Seattle.

---

rudy Peterman
pril 7, 2005

Tammy Kitzmiller, et al. v.
Dover Area School District, et al.

Page 61

Q: Okay.

A: That is all I remember.

Q: If we look at anything else Mr. Buckingham said in this meeting we are discussing now with Mike Baksa, Mr. Buckingham, Sheila Harkins and the teachers, the have raised these concerns, and he said look, I have got these sources I would like you to look at.

Can you recall anything else he said at that meeting.

A: No, I don't really recall a lot about what he said. I do remember the term Creationism being used in that meeting. Whether it was used by Mr. Buckingham or Mrs. Spahr or one of the other teachers, I don't recall. But I do recall the term Creationism being used in that meeting.

Q: Do you recall Mr. Buckingham using the term Intelligent Design at that meeting?

A: No, I do not.

Q: Do you have a definite recollection it wasn't used or it is hard to —

A: The first time that I ever heard the term Intelligent Design was in July of 2004.

Q: So let me ask you, again, I just want to make sure I understand you. We are talking about this meeting in the spring.

Page 62

Do you have a definite recollection that term wasn't used?

MR. ROTHSCHILD: Objection, asked and answered.

A: I don't think the term was used in that meeting because I never heard the term Intelligent Design until July of 2004.

BY MR. GILLEN:

Q: When he referenced the sources that he wanted the teachers to look at, do you have any recollection of how he described those sources, here are some things to look at?

A: He simply said that he had been in contact with people who operated a think tank in Seattle. He wanted the teachers to view a video.

Q: He didn't say what was on the video, or did he describe it?

A: In brief, he simply said that the video shot holes in Darwin's Theory.

Q: Anything else you recall from this meeting we are discussing now with yourself?

A: No.

Q: Were there other meetings afterwards? Do you know if there were any follow-ups to this specific meeting?

A: Not that I recall.

Q: So you left Dover in July I think you have told us?

Page 63

[1] A: Yes.

[2] Q: Did you attend any School Board meetings in July?

[3] A: No, I was not permitted to.

[4] Q: I think we have probably covered it all, but I just as

[5] we sit here and we look at this issue of the biology

[6] text and to some extent the biology curriculum, is there

[7] anything else you recall over your tenure at Dover Area

[8] School District as the Principal that touches on those

[9] issues, the biology text, the biology curriculum, the

[10] book Of Pandas?

[11] A: Yes.

[12] Q: Tell me.

[13] A: When I first started in Dover in July — I believe it

[14] was July 29th of 2002 — my first week on the job, a

[15] mural was missing from the Science Department. And it

[16] had been donated to the school prior to my tenure by an

[17] art student.

[18] The student's senior project had been to design an

[19] Evolution mural, and he had like apes going into man.

[20] And it was hung in one of the science teacher's rooms.

[21] Mrs. Spahr came to myself and Larry Redding in August

[22] and said the mural was missing.

[23] I had never seen the mural so I didn't know what

[24] it was. So Mr. Redding conducted an investigation. And

[25] it was found at that time the Director of Buildings and

Page 64

[1] Grounds, whose name was Mr. Larry Reeser, destroyed the

[2] mural.

[3] And Mr. Redding wrote a letter of reprimand to

[4] Mr. Reeser telling him that he had destroyed a donated

[5] piece of artwork that had been donated to the school,

[6] that was the property of the school, and that he had no

[7] right to destroy this mural. And Mr. Reeser said yes,

[8] he did because it went against his Christian views.

[9] During the spring of 2004, I don't know at what

[10] meeting it was, Mr. Buckingham read a statement, and

[11] there was some discussion about that mural, how

[12] offensive it was and how could it be hung in a science

[13] classroom. And it was explained to him by Bert Spahr

[14] that that was one child's interpretation of Evolution.

[15] And it was not a mural that was endorsed by the Science

[16] Department, but they did accept it as a gift, as they

[17] would because they had other student's senior projects

[18] displayed.

[19] And in my opinion, it seemed that somehow that

[20] mural got twisted and caught up in this whole

[21] discussion. And I think my personal opinion is that

[22] perhaps some of the School Board members thought that

[23] that's what was being taught in our science classes.

[24] And it wasn't being taught at all.

[25] Q: Let me ask about that. You do see connection. I have a

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

**Trudy Peterman**
**April 7, 2005**

Page 65

, sense for why.

[2] Do you recall what Mr. Buckingham said about the
[3] mural?
[4] A: Patrick, I don't recall specifically. But there was
[5] either something said in a spring Board meeting, or
[6] there was something said in that meeting in the spring
[7] that Mr. Baksa had with me and the three science
[8] teachers, and Mrs. Harkins was there, that he found that
[9] tremendously offensive. And if that was representative
[10] of what was being taught in science classes, he found it
[11] offensive.
[12] Q: You recall Mr. Buckingham saying that?
[13] A: Yeah.
[14] Q: Who else was present?
[15] A: If it happened at a Board meeting, there would be many
[16] people present. If it happened at the meeting with Mr.
[17] Baksa, those people that I previously mentioned would
[18] have been there.
[19] Q: Apart from this sense you have that he found it
[20] offensive, is there anything else you recall him saying
[21] about the mural?
[22] A: No. That is pretty much what I recall.
[23] Q: You say that Mr. Reeser was disciplined or reprimanded?
[24] A: He received a letter.
[25] Q: Do you know if the Board had a role in that disciplinary

Page 66

[1] action?
[2] A: No, I don't. Because it sort of like was happening when
[3] I was coming in. Because I had never seen the mural, I
[4] didn't even know what I was looking for. So Mr. Redding
[5] handled it.
[6] Q: Do you recall any reaction on the part of anyone to
[7] Mr. Buckingham's statements about the mural?
[8] A: No. I don't recall.
[9] Q: You had a sense I think, an opinion that perhaps the
[10] mural is in some way related to what the Board thought
[11] was being taught.
[12] Make that more specific if you can. What is the
[13] basis for that sense?
[14] A: I think that as I recall Mr. Buckingham's statement, he
[15] just attributed that mural to what was being taught in
[16] our science classes. And Mrs. Spahr tried to explain
[17] that that is not being taught at all. It was one
[18] child's view of Evolution.
[19] And because I never saw the mural, from my
[20] understanding of everybody that saw it, it was a
[21] beautiful piece of artwork. The child really put his
[22] heart and soul into it.
[23] Later on, I guess when the child who was a
[24] graduate found out that it had been destroyed, he said
[25] all he had to do was call him, and he would have come

Page 67

[1] and gotten it. He didn't want it to be destroyed. It
[2] was something he had spent a lot of time on.
[3] Q: Yes. Apart from Mr. Buckingham's comments, do you
[4] remember any comments by other Board members about that
[5] mural?
[6] A: No, I do not.
[7] Q: Just give me a sense for what is your last course work
[8] you did in science.
[9] A: Last course work I did in science? In high school, I
[10] took biology, microbiology. In college, I took Biology
[11] 1, Biology 2. I took Physics 1, Physics 2.
[12] MR. ROTHSCHILD: I think she has got us beat,
[13] Patrick.
[14] A: In my avocation, I am a wolf researcher. I belong to
[15] Defenders of Wildlife. I study and I went on a research
[16] study to Yellowstone National Park because I was
[17] interested — they had one of the first wolf rescues in
[18] the United States.
[19] They brought in the Canadian wolves. And I wanted
[20] to see wolves in the wild because I had read about it
[21] for years and had been fascinated with it.
[22] BY MR. GILLEN:
[23] Q: My question was broad. I will try and save you time.
[24] Just in terms of — the subject matter here is
[25] Evolutionary Theory, Intelligent Design Theory, although

Page 68

[1] some debate that.
[2] What education do you have that relates to that
[3] portion of biology curriculum, the Theory of Evolution?
[4] A: Basically, I studied it in high school. I studied it in
[5] college. And when I became the Principal of Dover and
[6] it became an issue, I read up on it.
[7] Q: What did you do to read up on it?
[8] A: It is very hard to get away from this. Everybody knows
[9] that I was a Principal of Dover. This case has made
[10] national news. So I get people from all over the
[11] country, my cousin's families sending me articles saying
[12] your last School District is famous.
[13] One of my friends was in a doctor's office, and
[14] she discovered this magazine Testing Darwin. She sent
[15] it to me. There's a pretty fascinating article in here
[16] about Avida and their take on Intelligent Design.
[17] Avida is a software program which is just
[18] fascinating. They basically create computer organisms
[19] that have 19 — that go through 19 mutations. If they
[20] take away one of the mutations, it does not complete the
[21] cycle of the mathematical equation that it is working.
[22] It is absolutely fascinating.
[23] MR. ROTHSCHILD: Do you want her to identify the
[24] article?
[25] BY MR. GILLEN:

---

Page 69

BY MR. GILLEN:

Q: Yes. It is plain I can see that you have done some reading after school in the subject for reasons we can all understand.

How about Intelligent Design Theory, have you ever looked into that?

A: Intelligent Design Theory, again, is creation theory. It basically goes back to the 18th century theologian William Paley.

Q: Let me try and save you and us time. Just in terms of let's look at it from the '90's, are you acquainted with any scientists that are proponents of Intelligent Designer Theory?

A: Not specific, but I do know that Intelligent Design Theory is a theory where there has to be an intelligent designer because life is too complicated just to have evolved on its own through billions of years.

Q: Have you read any text that deals with Intelligent Design Theory?

A: No. I have not read Of Pandas and People.

Q: That is fine. Anything else, Darwin's Black Box for example, have you read that text?

A: No.

Q: While you were the Principal at Dover Area High School, were you ever directed to instruct the teachers to teach

---

Page 70

Intelligent Design?

A: No.

Q: You have referenced this concern about the nontenured teachers. I think you said Leslie Prahl and Bob Eshbach?

A: Yes.

Q: When you raised those concerns, did you ever receive a response from Dr. Nilsen?

A: No.

Q: Ever receive a response from Mike Baksa?

A: No.

Q: Did you bring those concerns to the attention of the Board?

A: Yes, I did. I believe in the June Board meeting when I spoke, I basically raised those concerns. I raised the concerns of what theory of Creationism are we going to teach, and are the science teachers qualified to teach Creationism since they are just certified in biology.

MR. GILLEN: I want to take a brief break, Eric, I am finishing up here.

MR. ROTHSCHILD: Okay.

(A recess was taken.)

AFTER RECESS
BY MR. GILLEN:

Q: Dr. Peterman, I am getting close to ending up here. If

---

Page 71

[1] you direct your attention back to Plaintiffs Exhibit 9,
[2] which is the memorandum that you produced on April 1st
[3] 2003?
[4]   A: Yes.
[5]   Q: Again, I want to make sure I understand where you are
[6] coming from on that. I think you told Mr. Rothschild
[7] earlier you hadn't spoken with Mike Baksa prior to
[8] preparing this memo?
[9]   A: Yes.
[10]   Q: You were relying on Bert Spahr's recount to you. Let me
[11] ask you: Did Bert use the term Creationism?
[12]   A: Yes.
[13]   Q: Did she say that Mr. Baksa had used the term
[14] Creationism?
[15]   A: Yes.
[16]   Q: What did she say Mr. Baksa had said?
[17]   A: Basically, that he had had a meeting with Mr. Alan
[18] Bonsell, and Mr. Bonsell said that he wanted Creationism
[19] taught when Evolution was taught, and he wanted fifty
[20] percent of the topic of Evolution to be Creationism.
[21]   Q: This memo was dated April 1st, 2003?
[22]   A: Yes.
[23]   Q: Did any Board member approach you and direct the
[24] teaching of Creationism?
[25]   A: No, sir.

---

Page 72

[1]   Q: If you look at the second paragraph of that memo, the
[2] second sentence says I advised him to continue to
[3] mention that Creationism is another alternative theory
[4] of Evolution.
[5]   Can you recall what advice you gave Bert Spahr, or
[6] who was them referring to?
[7]   A: The teachers and Mrs. Spahr. Mrs. Spahr explained to me
[8] that they had always just stated the sentence, and it
[9] was also in our current biology book that Creationism is
[10] another alternate theory of Evolution.
[11]   And I told her to continue with that practice
[12] because it had been the practice prior to my tenure.
[13]   Q: Then you go on later on in the memo to say there are
[14] questions that must be answered prior to Creationism
[15] being taught as fifty percent of the Evolution
[16] curriculum. In the public school arena, Creationism
[17] must always be mentioned as an alternative theory, but
[18] public school teachers are teachers of content area and
[19] not to be perceived as teachers of religious
[20] instruction.
[21]   A: Yes.
[22]   Q: Looking at the memo, I understand I think what you were
[23] getting at there. But I would like to get a better
[24] sense for the advice that you gave the teachers and why
[25] you thought that advice was proper.

---

**Tammy Kitzmiller, et al.   v.**
**Dover Area School District, et al.**

**Trudy Peterman**
**April 7, 2005**

---

Page 73

[1]      A: The advice I gave the teachers and Mrs. Spahr was the
[2] following: Continue to state the sentence that
[3] Creationism is an alternate theory of Evolution. The
[4] textbook at the time also mentioned it. There was one
[5] sentence Creationism is an alternate theory.
[6]      I told them not to get into any discussions of
[7] religion as we did not want to be in violation of the
[8] Supreme Court case of 1987. And then I told them that I
[9] would await further direction from the Central Office.
[10]      Q: I just want to make sure I understand you. I take it
[11] that you understood the instructions you gave your
[12] teachers to be instructions to pursue a course of action
[13] you believed was legal?
[14]      A: That's the course of action that had always been taken
[15] in Dover. And it is legal to my knowledge to state that
[16] there are other theories of Evolution, Creationism being
[17] one of them.
[18]      Q: Did any of your teachers get back to you with respect to
[19] those instructions?
[20]      A: Mrs. Spahr basically said she would tell them to do so.
[21] And that's what they had always done. It wasn't a
[22] really big deal to them. That's what they had always
[23] done.
[24]      Q: Apart from — give me a better sense. Exactly what did
[25] Mrs. Spahr tell you to the extent you can recall it

Page 74

[1] about how Creationism was referenced in the classroom?
[2]      A: There was always a statement made by the teacher that
[3] there were other theories, Creationism being one of
[4] them, to Evolution. And there was a sentence in the
[5] textbook, and that was it.
[6]      Q: Did she tell you or did you discuss the way in which the
[7] text referenced other theories?
[8]      A: I think it was always the practice in Dover to tell the
[9] students in Biology One that there were other theories,
[10] and that Darwinism was just one theory.
[11]      Q: As we sit here today, do you have an understanding
[12] concerning the impact that the biology curriculum change
[13] has on classroom instruction during the biology classes
[14] dealing with Evolution in the Dover High School?
[15]      MR. ROTHSCHILD: Objection, lack of foundation.
[16] She is not at the school.
[17]           BY MR. GILLEN:
[18]      Q: That is why I said do you have an understanding.
[19]      MR. ROTHSCHILD: Objection.
[20]      A: I don't feel that I can adequately answer that because
[21] during my tenure, we did teach the approved biology
[22] curriculum and the state standards. And when the School
[23] Board changed the curriculum, I was not a part of that.
[24] I was out of the District.
[25]           BY MR. GILLEN:

Page 75

[1]      Q: That is fine. I just wanted to make sure of that. Have
[2] you spoken with anyone in preparation for your
[3] deposition today?
[4]      A: When Mr. Rothschild telephoned me, I asked him if he
[5] could send me a copy of my memo. I said I recall
[6] writing one, but I don't have a copy of it. I said I
[7] had left everything there.
[8]      And then I recall asking him what if I didn't want
[9] to come, and he said there are two kinds of subpoenas,
[10] the kind that the Policeman shows up at your door, or
[11] the kind that is very friendly. I said I would rather
[12] take the friendly one.
[13]      Q: Looking at this memo Exhibit 9, you highlighted a number
[14] of questions. I just want to note did anyone ever get
[15] back to you with answers to those specific questions?
[16]      A: No. Because even at the June, 2004 Board meeting I was
[17] still asking those same questions.
[18]      Q: You have referenced a couple of things, some prior
[19] litigation with the School Board and then some conduct
[20] at School Board meetings. I want to ask you a few
[21] questions about that.
[22]      Give me, if you will, how long have you been in
[23] education?
[24]      A: 25 years. You can still look this good and this young
[25] and be in education 25 years.

Page 76

[1]      Q: I am happy for you.
[2]      MR. ROTHSCHILD: You go, girl!
[3]           BY MR. GILLEN:
[4]      Q: I think it is a life that would give a lot of pleasure
[5] and make for a long and satisfying one. Let's see. How
[6] can we do this?
[7]      Well, just give me, if you will a sketch, of how
[8] you started out and what your path was.
[9]      A: I started out as an English/Latin teacher. I taught
[10] basically English for fourteen years in the public
[11] schools.
[12]      Q: Excuse me. I don't want to cut you off, but I do want
[13] to accelerate this so I don't waste your time.
[14]      Fourteen years in the same school?
[15]      A: No. In a variety of public schools. And then I became
[16] an administrator. I have been a high school principal
[17] of three comprehensive high schools and a vo-tech
[18] school. And currently, I am an Assistant
[19] Superintendent.
[20]      Q: Just to give me a sense, fourteen years and how many
[21] different schools?
[22]      A: I was in my hometown School District Altoona, I am going
[23] to say three or four. I don't have any curriculum vitae
[24] in front of me.
[25]      Q: That is fine. I understand. There those 14 years of

---

rudy Peterman
April 7, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 77

these different schools, were you engaged in any
litigation?

**A:** No.

**Q:** Did you file any grievances?

**A:** No.

**Q:** While employed there?

**A:** No.

**Q:** Were any grievances filed against you?

**A:** As a teacher, none.

**Q:** How about as a peer?

**A:** As a principal?

**Q:** No, I am just looking — forgive me.

**A:** No.

**Q:** In those 14 years, essentially I am trying to get a
sense for whether there was litigation or complaints
brought to the attention of the administration, your
superiors, during those years?

**A:** No.

**Q:** You indicated that you became an administrator. When
did you first enter the ranks of administration?

**A:** I became an administrator in 1996.

**Q:** Where was your first post as an administrator?

**A:** I was a Principal for three years at Cambria Heights in
Patton, Pennsylvania.

**Q:** After that?

Page 78

**A:** After that, I was Principal for four years at the
Indiana County Technology Center in Indiana,
Pennsylvania.

**Q:** After that?

**A:** Let me see. After that, I went to Virginia, and I was
Principal for one year in the Fauquier County Public
Schools. That is in Warrington, Virginia.

**Q:** Then after Virginia?

**A:** I spent two years at Dover. And now I am in my current
position.

**Q:** Where is that?

**A:** Johnstown, Pennsylvania.

**Q:** If we look at your three years as Principal in Cambria,
PA, was there any litigation that came out of that?

**A:** No.

**Q:** How about were there grievances that you filed?

**A:** I didn't file any grievances.

**Q:** Were there any grievances filed against you?

**A:** One.

**Q:** What was the nature of that?

**A:** My physical education teacher kept on wearing revealing
tops.

**Q:** What was the resolution?

**A:** The resolution was she does not wear the tops anymore.

**Q:** Independent County, four years of Principal there?

Page 79

[1]   **A:** No grievances, no litigation.

[2]   **Q:** No grievances against you?

[3]   **A:** No.

[4]   **Q:** How about one year in Fauquier?

[5]   **A:** Yes, I did file a lawsuit against the Fauquier County

[6]   Public Schools.

[7]   **Q:** Is that the mold suit you referenced?

[8]   **A:** That was the mold issue. And that never came to

[9]   fruition. It was handled by a mediator, Federal Judge

[10]  Robert Merhige, who just recently passed away. A very

[11]  good man basically.

[12]  **Q:** That is fine.

[13]  **A:** It was nothing.

[14]  **Q:** Was the suit resolved?

[15]  **A:** Yes, it went through mediation.

[16]  **Q:** What about your time at Dover, did that result in

[17]  litigation?

[18]  **A:** No.

[19]  **Q:** Were there any grievances filed against you?

[20]  **A:** One, and then it was withdrawn. And that was over the

[21]  football coach. I didn't recommend — I only

[22]  recommended him, and the School Board wouldn't hire him.

[23]  So what was the use? I didn't want to hurt the

[24]  children. We needed a football coach.

[25]  **Q:** Is this the football coach who had the DUI?

Page 80

[1]   **A:** Yes.

[2]   **Q:** You wouldn't recommend him for his position as coach?

[3]   **A:** I did the first time, and then the School Board did not

[4]   — they opened the position, of which he could apply

[5]   for. There weren't that many applicants.

[6]   I did recommend him only because there was another

[7]   coach who had a DUI, and they didn't do anything to him.

[8]   **Q:** The second time around you didn't recommend him, and he

[9]   filed a grievance against you for that?

[10]  **A:** Yes. And then he withdrew it.

[11]  **Q:** Any other grievances or complaints against you while at

[12]  Dover?

[13]  **A:** No.

[14]  **Q:** Have there been occasions where you have threatened

[15]  litigation or grievances?

[16]  **A:** At Dover?

[17]  **Q:** Yes.

[18]  **A:** I would say my relationship with Dr. Nilsen at times

[19]  became testy, and I would bring in Mr. O'Donnell, who

[20]  was the Act 93 chair and represented the administrators.

[21]  He at times would meet with me and Dr. Nilsen, but I

[22]  never threatened any lawsuit.

[23]  I simply at times would tell Dr. Nilsen I would be

[24]  going to Mr. O'Donnell to voice my concerns.

[25]  **Q:** Mr. O'Donnell's first name?

Page 81

[1] **A:** William.

[2] **Q:** What were the issues that led you to — what were the

[3] disputes that arose between yourself and Dr. Nilsen that

[4] led you to seek the aid of Mr. O'Donnell?

[5] **A:** I was pretty outspoken at times in what I believed. I

[6] just don't think either the School Board or Dr. Nilsen

[7] appreciated it.

[8] I was not permitted to speak at School Board

[9] meetings. Dr. Nilsen wrote me a directive that I was

[10] only to speak when asked. And at most school meetings,

[11] I got asked. And when I answered, I answered honestly.

[12] After the June meeting, he told me that I was not

[13] permitted to attend. And it was a double edged sword

[14] because I lived in the community. And maybe I couldn't

[15] attend as a Principal, but I could attend as a community

[16] member.

[17] **Q:** And you have referenced the School Board meeting

[18] situation. I will get back to that. If we look at

[19] these disputes with Dr. Nilsen, what was the subject

[20] matter? Was that one of them, or were there other

[21] matters that came up?

[22] **A:** There were other matters. But right now, I honestly

[23] can't recall because I just, you know, I just move on.

[24] I am just trying to — when I first went there, the

[25] Board was really down on Mr. Redding. I had to handle

Page 82

[1] certain incidents with him. I had to set up a mediation

[2] between him and the current School Board President.

[3] One of the issues was when I recommended the

[4] original football coach. It was because I felt he was

[5] the best applicant.

[6] I just think that different people sometimes have

[7] a different managerial and leadership style. There is

[8] nothing wrong with either one of you. It is just that

[9] your styles are not compatible. And I would say that

[10] Dr. Nilsen and I just didn't have compatible styles.

[11] He was a good Superintendent as far as I could

[12] see. He was very visible, but we just did not

[13] particularly work well together.

[14] **Q:** Okay.

[15] **A:** I was also there during a very controversial building

[16] project. I was the Principal of record. So, you know,

[17] if the meetings weren't on — if the School Board

[18] meetings weren't — when I first went there, the

[19] controversy was the building project.

[20] This current School Board had stopped a previous

[21] School Board in the middle of a building project. When

[22] I took over Dover, there was a great big auditorium with

[23] a hole in it. They had stopped it. The building was in

[24] rather disarray. It was a very contentious building

[25] project which really had to be finished because you had

Page 83

[1] a building with a hole in it. So I mean there were just

[2] issues all the time.

[3] **Q:** I am trying to get a sense for the friction with the

[4] Board or with the administration, and I see there is

[5] some issues that have come up.

[6] Did you ever receive a reprimand while you were at

[7] Dover?

[8] **A:** I don't — the only thing — I received satisfactory

[9] evaluations, but I always felt that Dr. Nilsen was

[10] really harder on me. And he always gave me a one which

[11] was the lowest score you could get in Board — my

[12] relationship with the School Board. That really upset

[13] me because I always — every controversy in Dover always

[14] began with the high school and ended with the high

[15] school.

[16] And to me, it wouldn't have mattered who had been

[17] the High School Principal. You would have — they would

[18] have been facing the same issues that I had been facing.

[19] And if you had given your honest opinion — and I just

[20] really felt on the Creationism issue that we were going

[21] down a wrong road. I would have stopped it a long time

[22] ago.

[23] And it was just — I don't believe in the

[24] micromanagement of school systems, and some

[25] Superintendents do.

Page 84

[1] **Q:** You have referenced the Creationism dispute again. Was

[2] that a source of friction between you and Dr. Nilsen?

[3] **A:** I think it was because I think he did not like me being

[4] so outspoken about it. And he — you would have to ask

[5] him, but I don't think he appreciated the fact that I

[6] was very opinionated about it and backed my teachers.

[7] **Q:** Did he ever talk to you about it?

[8] **A:** Only when I got the letter from him not to speak at any

[9] School Board meeting. And the he called me over and

[10] said that the Board didn't appreciate your comments, and

[11] they don't want you to attend any School Board meetings

[12] again. And I said fine.

[13] **Q:** What comments was he referring to?

[14] **A:** Probably the comments I had made like what Creationism

[15] Theory are we going to teach, and are the science

[16] teachers, teachers of science or teachers of religion?

[17] **Q:** When did you make those comments?

[18] **A:** In June.

[19] **Q:** Did Dr. Nilsen tell you that that is the comments he was

[20] referring to?

[21] **A:** No. But those are the comments that I made, and he said

[22] he didn't want me speaking out like that anymore.

[23] **Q:** Were there other things that you made comment on?

[24] **A:** Not that I recall.

[25] **Q:** Did he discuss comportment at Board meetings with you?

udy Peterman
ril 7, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

A: The only time — at one time, he accused me of beating my fist on a table. I said that can't be because there was no table in front of me. It was seated in a chair. And it was a Kralltown, and there were pews.

I said what table did I hit? And that was never disputed. He said at times, he did not care for my tone of voice. And I just told him I didn't think it was my tone of voice. I thought it was my opinion that got him, not my tone of voice.

Q: You said you go to bat for your teachers, and you think that produced some animosity. Did Dr. Nilsen ever make a statement that led you to believe that?

A: Not that I recall.

Q: Did you in your role as Principal, did you see yourself as an advocate for the teachers or part of the administration?

A: I saw myself as the chief administrator of that building who had the duty to make sure that all of the children were educated in a safe and responsible environment.

I think there were things that Dr. Nilsen would tell you that I did very well. I was an excellent disciplinarian. I am very well schooled in curriculum.

I think he would tell you that I ran the building project as well as any general ever would have, and for a woman, I didn't do badly. Actually, he gave me an

eight, the highest score I was there on the building project.

He told me — when I left the District, he told me that I was his brightest administrator.

Q: Speaking with you today, I can see why he would say that. What I am trying to get a sense for is you said you were told don't speak at Board meetings. And that is what I am trying to understand now.

What produced that kind of reaction on the part of the Board?

MR. ROTHSCHILD: Objection. Asks for speculation.

BY MR. GILLEN:

Q: In other words, Dr. Peterman, you were told — you're the Principal, and they told you don't speak at Board meetings. That strikes me as we sit here today, and I get a chance to discuss this with you, as unusual. I am trying to —

A: Extremely unusual.

Q: I am trying to figure out what conduct, what explanation was given to you for that directive?

A: Basically, they didn't want me expressing my views. And the only reason I can speculate is because my views differed from the majority's. That is truly speculation.

Q: That is very fair of you. Did anyone say anything to

[1] you as to why? Did Dr. Nilsen say Dr. Peterman, you
[2] have been instructed not to speak at Board meetings
[3] because they don't like the substance of your positions?
[4] A: He only said that at that time, I believe Mr. Bonsell
[5] was the President. And he said the President will
[6] request your presence if — that's the only thing that
[7] was said to me — if needed.
[8] By that time, in all honesty, I knew I was leaving
[9] so I didn't care. It was just like one less battle I
[10] had to fight. I really wanted to leave Dover anyway
[11] because it wasn't a conducive educational atmosphere
[12] that I was looking for.
[13] Q: What time was that directive given?
[14] A: It was given after the June Board meeting.
[15] Q: You indicated that you had some reservations about the
[16] conduct of Board members?
[17] A: Yes.
[18] Q: Early on, you said you attributed a comment to Angie
[19] Yingling?
[20] A: Yes.
[21] Q: Was there anything else that you saw that — did you
[22] bring that concern to the attention of the Board?
[23] A: No.
[24] Q: Doctor, any other Board members engage in conduct that
[25] gave you pause?

[1] MR. ROTHSCHILD: We went through all this ground
[2] with my questions, Patrick.
[3] MR. GILLEN: No.
[4] MR. ROTHSCHILD: Yes.
[5] A: I am going to stick with the examples that I have given.
[6] I just felt at times that there was an extreme lack of
[7] professionalism by the Board. And I didn't like some of
[8] the comments made because I found them demeaning and
[9] degrading to both students and community members and to
[10] faculty.
[11] BY MR. GILLEN:
[12] Q: Two other things. Are you engaged in litigation
[13] presently?
[14] A: Yes.
[15] Q: Against your current employer?
[16] A: Yes, I am unfortunately.
[17] Q: Refresh my memory, please. Who is your current
[18] employer?
[19] A: Th Greater Johnstown School District.
[20] Q: What is the nature of that litigation?
[21] A: I am not — my attorney doesn't want me to —
[22] Q: Just the general subject matter.
[23] A: It involves violations in special education, and I am in
[24] charge of special education. And I notified the
[25] District that there were certain things that they were

**Tammy Kitzmiller, et al.   v.**
**Dover Area School District, et al.**

**Trudy Peterman**
**April 7, 2005**

Page 89

[1] not in compliance with.

[2]  Because I did that, some actions were taken

[3] against me because they took it personally, and I was

[4] only trying to get them in line because we are going to

[5] be monitored next year by the state. And if you know

[6] anything about my reputation, I will not break the law.

[7] And it a very uncomfortable position to be in.

[8]  Q: That is fine. I respect that. Have any grievances been

[9] filed against you?

[10]  A: In fact, I am the only administrator in Greater

[11] Johnstown who doesn't have any grievances filed against

[12] her at this time.

[13]  Q: How about since you left the Dover Area School District,

[14] have you spoken with any persons who are on the Board

[15] since January of 2003 about this controversy?

[16]  A: No.

[17]  MR. GILLEN: I have no further questions.

[18]  MR. ROTHSCHILD: I just have a couple followup

[19] questions.

[20]  BY MR. ROTHSCHILD:

[21]  Q: You referred before to the statement that the biology

[22] teachers would make when they taught Evolution that

[23] there are other theories including Creationism?

[24]  A: Yes.

[25]  Q: Did the teachers describe Creationism as another

Page 90

[1] scientific theory?

[2]  A: All I can answer that, Eric, is they just stated that

[3] sentence that it was another alternate theory, and then

[4] they moved on. I don't think they classified it as

[5] either scientific or religious. It was just

[6] Creationism, we are moving on.

[7]  Q: When you received this directive not to speak at public

[8] School Board meetings, was that directive given to you

[9] in writing?

[10]  A: Yes, it was.

[11]  Q: And I assume it said don't speak at public School Board

[12] meetings?

[13]  A: It said please don't speak at public — it actually

[14] happened before the June meeting because they were upset

[15] I think when I spoke out about the football coach. I

[16] had to be recognized by the School Board President. So

[17] at the very next meeting, I was asked a question. And I

[18] looked right up and I said am I permitted to answer the

[19] question?

[20]  I was not aware at that time that there were only

[21] two School Board members aware of this directive, the

[22] President and the Vice-President. Nobody else on the

[23] Board was aware that I was gagged. And at that point, I

[24] believe Mrs. Callahan was still on the Board and wanted

[25] to know why I was going through all of this — why I was

Page 91

[1] going through all of this.

[2]  I don't know whether she spoke as a Board member

[3] or a citizen, why isn't she allowed to speak. Then I

[4] was given I believe another written directive that I did

[5] not have to ask for permission to speak at School Board

[6] meetings when recognized, but I would not violate the

[7] directive.

[8]  Q: And did the directive indicate whether the instruction

[9] was coming from the Board as opposed to administration?

[10]  A: It was the wish of Alan Bonsell, and I forget there was

[11] another School Board member. He is no longer a School

[12] Board member. I believe he moved to Lancaster. I

[13] forget his name. It's Noel Wenrich.

[14]  Q: That was actually stated in the directive in the written

[15] document?

[16]  A: I have to review it if I still have it. I believe it

[17] was. I had to be recognized by either the President or

[18] the Vice-President.

[19]  Q: Did the directive indicate why this instruction was

[20] being given in writing?

[21]  A: Basically, no.

[22]  Q: Then am I correct in understanding you received a later

[23] directive not to attend Board meetings at all?

[24]  A: Yes, that was after the June meeting.

[25]  Q: Did that come in writing as well?

Page 92

[1]  A: Yes, it did, sir.

[2]  Q: At the time you received that directive, had you

[3] submitted your resignation?

[4]  A: I don't believe I had.

[5]  Q: How was that — let me go back to the directive about

[6] not speaking. How was that delivered to you? Was it

[7] given to you by hand or mailed to you?

[8]  A: I think I received it in inner school mail.

[9]  Q: When you received that directive about not speaking, who

[10] was it from? Who did it say it was from?

[11]  A: Dr. Nilsen.

[12]  Q: Did you go to him and say why am I receiving this

[13] directive?

[14]  A: No.

[15]  Q: Did you ever have any conversation with him about that?

[16]  A: I believe there was one brief conversation in an

[17] evaluation or something. He accused me of hitting a

[18] table. And I said I can be really, really pressed and

[19] pressed, and I rarely lose my temper. And it is not my

[20] nature to jump up and hit anything.

[21]  And he said well, certain Board members recalled

[22] it. But yet if you talked to other Board members, they

[23] didn't recall it at all.

[24]  Q: And the directive not to attend School Board meetings

[25] also, it was in writing?

Trudy Peterman
April 7, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 93

A: It was in writing, and it was from Dr. Nilsen.

Q: And also came through inner office mail?

A: Yes.

Q: And after you received that directive not to attend, did you ever attend any further meetings in perhaps your capacity as a community member?

A: No.

Q: Did the directive instructing you not to attend explain why that instruction was being given in writing?

A: No. It just said I was not to attend. If I was to attend, I would receive I guess an invitation or be told specifically what the topics were that I was to discuss.

Q: Did you have any conversation with Dr. Nilsen about that directive?

A: No.

Q: What about with any Board member?

A: No.

MR. ROTHSCHILD: Patrick, I am going to ask that you produce those directives.

MR. GILLEN: I will look into that. I don't see any problem right now.

MR. ROTHSCHILD: I have no further questions. Thank you very much.

MR. GILLEN: Thank you for coming down.

(The deposition was concluded at 11:40 a.m.)

Page 94

COMMONWEALTH OF PENNSYLVANIA   :
COUNTY OF CUMBERLAND          :

I, Vicki L. Fox, Reporter and Notary Public in and for the Commonwealth of Pennsylvania and County of Cumberland, do hereby certify that the foregoing testimony was taken before me at the time and place hereinbefore set forth, and that it is the testimony of:

TRUDY PETERMAN

I further certify that said witness was by me duly sworn to testify the whole and complete truth in said cause; that the testimony then given was reported by me stenographically, and subsequently transcribed under my direction and supervision; and that the foregoing is a full, true and correct transcript of my original shorthand notes.

I further certify that I am not counsel for nor related to any of the parties to the foregoing cause, nor employed by them or their attorneys, and am not interested in the subject matter or outcome thereof.

Dated at Camp Hill, Pennsylvania, this 20th day of June, 2005.

Vicki L. Fox

Reporter - Notary Public

(The foregoing certification does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.)

**Lawyer's Notes**

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Trudy Peterman
April 7, 2005

# 1

1 67:11, 11
11:40 93:25
13 16:2
14 7:11; 76:25; 77:14
14th 17:11, 24; 18:12
15th 17:21, 25
18th 69:8
19 16:4; 68:19, 19
1977 7:3
1984 7:3
1987 11:18; 48:2; 60:18; 73:8
1990's 48:5
1996 7:5; 77:21
1999 7:6
1st 8:4, 7; 9:8; 49:11; 71:2, 21

# 2

2 67:11, 11
2,000 11:25; 12:15; 18:7
2002 5:24; 63:14
2003 8:4, 8, 16; 9:8; 22:6, 7, 9, 12, 18; 23:9, 11; 26:1, 12, 17, 21; 27:2, 9, 19; 28:2, 3, 4, 6, 11, 18; 29:1, 5, 12, 13; 30:2, 6, 8, 15, 23, 24; 31:1, 18; 32:2, 23; 33:22; 40:10, 15, 21; 41:8; 42:17, 22; 43:11; 49:11; 71:3, 21; 89:15
2003-2004 29:14
2004 6:3; 11:7, 23; 12:8; 13:4; 17:5, 11, 21; 18:12; 26:17, 22; 27:2, 15; 29:24; 30:13; 31:2; 41:10; 43:3, 9, 10; 44:3; 45:14; 46:6; 47:14; 48:8; 49:3, 13; 50:11, 12; 55:3, 5, 7; 57:12; 61:22; 62:6; 64:9; 75:16
25 75:24, 25
29th 63:14
2nd 43:6

# 3

30th 29:17
31st 8:16; 22:18
35 20:4
37 17:1, 11

# 4

4 17:19

# 9

9 7:14; 23:6; 49:18; 71:1; 75:13
90's 69:11
93 80:20

# A

a.m 93:25
absolutely 18:13; 19:23; 54:13; 68:22
accelerate 76:13
accept 64:16
account 10:2, 6, 6
accurate 35:20
accurately 9:7; 13:9
accused 9:24; 85:1; 92:17
achieved 33:6
acquainted 69:11
acquisition 14:19
across 34:9; 44:23
Act 80:20
acted 20:9, 16
action 66:1; 73:12, 14
actions 89:2
actually 14:3; 15:3; 22:24; 25:14, 20; 26:18; 31:22; 33:14; 85:25; 90:13; 91:14
adapt 34:5
adaptation 34:6
adaptive 16:1
add 17:4; 21:13
additional 60:1
addressed 20:2; 23:3; 45:10; 46:6, 17; 59:3
addressing 24:12; 28:25; 51:23; 53:6; 54:16, 18
adequate 53:19, 19, 21
adequately 74:20
Administration 7:4, 7; 10:12; 77:16, 20; 83:4; 85:16; 91:9
administrative 37:18; 40:12, 20, 22
administrator 76:16; 77:19, 21, 22; 85:17; 86:4; 89:10
administrators 28:16; 40:11; 41:12; 80:20
adopted 25:23; 26:11; 37:9; 52:12, 19; 53:10, 13, 24, 25
adoption 24:18; 25:25; 40:7; 52:10, 13, 17, 20; 53:9
advice 24:3, 14, 16; 30:20; 34:25, 25; 38:19; 39:19; 43:19; 72:5, 24, 25; 73:1

advise 9:13; 25:10
advised 72:2
advocate 85:15
afterwards 62:22
again 23:8; 26:3, 27:11; 28:8, 10, 22; 29:8; 30:2, 6; 31:13; 32:8, 15, 18, 25; 33:3; 34:2; 37:7; 43:16; 45:4; 46:5; 48:8; 51:15, 21; 61:23; 69:7; 71:5; 84:1, 12
against 4:9; 6:15; 64:8; 77:8; 78:18; 79:2, 5, 19; 80:9, 11; 88:15; 89:3, 9, 11
agenda 26:11; 52:14, 16
ago 12:1, 16; 18:7; 41:7; 58:2; 83:22
agree 20:11
agreed 46:4
Aguillard 11:19
ahead 37:25
aid 81:4
akin 35:13
al 3:14
Alan 9:17; 23:20; 32:7; 33:1; 42:16; 71:17; 91:10
align 53:15
alive 52:21
allow 18:17
allowed 91:3
alluded 58:22
alone 56:20
along 23:22
alternate 57:19; 72:10; 73:3, 5; 90:3
alternative 56:8; 72:3, 17
although 67:25
Altoona 76:22
always 16:9; 20:9; 25:24; 72:8, 17; 73:14, 21, 22; 74:2, 8; 83:9, 10, 13, 13
America 49:25; 50:7; 51:14, 20
among 11:3; 40:11
analysis 56:19, 20; 60:3
Angie 87:18
animosity 85:11
answered 62:3; 72:14; 81:11, 11
anymore 78:24; 84:22
apart 42:7; 45:13; 65:19; 67:3; 73:24
apes 63:19
apologize 3:12
apologized 18:2; 50:1, 16
appalled 19:23
apparent 30:14; 31:9
appearance 18:16
appears 33:20
applicant 82:5
applicants 80:5
apply 21:25; 80:4
appreciate 6:13; 56:21;

84:10
appreciated 46:3; 81:7; 84:5
approach 71:23
Approved 7:21; 9:24; 23:1; 60:15; 74:21
April 8:4, 7; 9:8; 42:13; 44:17; 49:10; 50:13; 71:2, 21
Area 3:15, 15; 5:25; 18:1; 47:5; 63:7; 69:24; 72:18; 89:13
areas 47:12
arena 72:16
arisen 30:24
arose 81:3
around 8:3; 14:9; 18:12; 43:5; 60:6; 80:8
art 63:17
article 13:10; 17:20; 18:1; 68:15, 24
articles 17:18; 68:11
artwork 64:5; 66:21
aspect 31:7
aspects 22:25
Assistant 6:6; 7:18, 20; 23:16; 24:2, 14; 25:9; 38:18; 39:18; 76:18
assume 13:5; 90:11
atmosphere 87:11
attempt 26:19
attempting 24:7; 34:8
attend 21:12; 28:15; 63:2; 81:13, 15, 15; 84:11; 91:23; 92:24; 93:4, 5, 8, 10, 11
attendance 52:22; 59:12
attended 27:4; 34:17; 53:12
attention 22:8; 41:22; 42:8; 43:9; 44:6; 70:12; 71:1; 77:16; 87:22
attorney 25:1; 88:21
attorneys 21:21
attributed 18:22, 23; 33:1; 37:21; 57:2; 66:15; 87:18
auditorium 82:22
August 28:7, 9; 29:18; 43:6; 63:21
authored 17:21
authors 44:21
Avida 68:16, 17
avocation 67:14
await 73:9
award 20:5
aware 5:12; 90:20, 21, 23
away 21:8; 25:12; 37:14, 20; 38:5; 42:5; 68:8, 20; 79:10

# B

baby 15:20
Bachelor 7:1
back 14:24; 17:9; 20:10; 25:19; 26:18; 34:20; 48:3; 49:25; 50:7; 51:3; 57:10; 58:4; 69:8; 71:1; 73:18; 75:15; 81:18; 92:5
backed 84:6
background 6:19
badly 85:25
Baksa 7:19; 8:11, 15; 9:1, 20; 10:5, 10; 11:4; 15:1; 22:19; 23:19, 21, 24; 24:1, 6, 12, 13, 16, 23; 25:2, 19; 26:8, 14; 27:25; 28:13; 29:6; 32:6; 34:23; 35:6, 8; 36:13, 23; 38:15, 22; 39:15; 40:17; 42:20; 44:13; 48:13; 59:14, 23; 60:9; 61:4; 65:7, 17; 70:10; 71:7, 13, 16
Baksa's 8:22; 37:16, 21; 42:25
basically 4:12; 11:20; 15:22; 16:1, 24; 17:14; 32:14; 33:7; 48:6; 57:14, 24; 58:22; 59:25; 60:13; 68:4, 18; 69:8; 70:15; 71:17; 73:20; 76:10; 79:11; 86:21; 91:21
basis 49:8; 66:13
bat 85:10
battle 87:9
beat 67:12
beating 85:1
beautiful 66:21
became 15:20; 30:14; 34:6; 58:5; 68:5, 6; 76:15; 77:19, 21; 80:19
becomes 5:9
becoming 31:8; 43:14, 25
began 31:17; 34:12; 83:14
beginning 15:22; 36:1, 3
begins 18:1; 29:18
belabor 31:13
belief 49:8
beliefs 35:12
belong 38:13; 54:18; 67:14
benefit 4:24
Bert 11:4; 29:7; 31:25; 32:22; 33:4, 21, 24; 34:13; 44:23; 52:6, 22; 64:13; 71:10, 11; 72:5
Bertha 7:20
best 12:17; 23:4; 24:3, 14; 26:3; 27:22; 30:2; 32:22; 38:19; 39:9, 19; 41:17; 42:2; 43:7; 82:5
better 6:5; 22:3; 25:13; 30:6; 33:13; 34:25; 72:23;

3:24
Bible 12:5
big 73:22; 82:22
billions 69:17
biology 7:22; 9:23; 12:9,
   15:13; 16:7; 18:5; 21:13;
   2:4, 5, 7, 7, 16, 16, 22;
   3:12, 13; 25:24, 25; 30:9,
   18; 33:8; 35:19, 20;
   8:14; 40:25; 42:23; 44:5,
   ; 45:14, 15; 46:8, 8;
   8:21; 50:19; 51:5, 6, 16,
   3, 23; 52:5, 8, 11, 12, 13;
   3:10, 13, 21; 54:17;
   5:13, 13, 13; 56:8; 58:5,
   0; 63:5, 6, 9, 9; 67:10, 10,
   1; 68:3; 70:18; 72:9; 74:9,
   2, 13, 21; 89:21
it 6:19
itch 19:23
Black 69:21
blunt 19:20
Board 3:16; 4:9; 6:8, 13,
   4; 7:22; 8:16; 9:3, 11, 14,
   5; 10:19, 22; 11:23, 23;
   8:2, 4; 19:15, 17, 21, 22,
   4, 25; 20:12, 15; 21:13,
   2; 23:1; 25:23; 26:15, 25;
   7:13; 28:13; 30:8; 35:14;
   6:22, 22; 37:5; 38:22, 24;
   0:2; 41:11; 43:16; 44:15,
   6; 45:6, 6, 13, 16, 18;
   6:3, 6, 7, 17; 47:16, 20,
   0; 48:9, 24; 49:5, 9, 22,
   2; 50:3, 15; 51:9, 17, 22;
   2:3, 4; 53:8, 11, 12, 18;
   4:6, 20; 55:19; 56:24, 25;
   7:8, 11; 58:14; 59:11;
   3:2; 64:22; 65:5, 15, 25;
   6:10; 67:4; 70:13, 14;
   1:23; 74:23; 75:16, 19,
   0; 79:22; 80:3; 81:6, 8,
   7, 25; 82:2, 17, 20, 21;
   3:4, 11, 12; 84:9, 10, 11,
   5; 86:7, 10, 14; 87:2, 14,
   6, 22, 24; 88:7; 89:14;
   0:8, 11, 16, 21, 23, 24;
   1:2, 5, 9, 11, 12, 23;
   2:21, 22, 24; 93:16
Board's 27:8
Bob 70:4
Bonsell 9:17; 23:20;
   7:3; 29:10; 32:7, 16; 33:1,
   , 10; 34:9, 14; 42:17;
   4:22; 71:18, 18; 87:4;
   1:10
book 11:18; 13:15; 14:3,
   , 14, 14; 18:5, 17; 23:2;
   4:16; 57:21; 58:2, 5; 60:3;
   3:10; 72:9
books 14:5, 16, 21;
   5:24, 25; 26:10, 12, 15,
   8, 20; 27:9, 10, 10, 11;
   5:24, 25; 36:2, 3; 37:8;
   2:11, 12, 13, 18, 19, 19;
   3:9, 14; 58:3; 60:4, 6, 13
born 49:24

**both** 15:10; 18:22; 41:23;
   55:6, 10; 88:9
**bothered** 19:18
**box** 60:4; 69:21
**break** 5:17; 19:8, 25;
   22:1; 31:5; 45:3; 70:19;
   89:6
**brief** 4:14; 19:8; 24:25;
   35:5; 37:7; 39:13; 45:23;
   58:20; 62:17; 70:19; 92:16
**briefly** 32:12
**brightest** 86:4
**bring** 52:15; 70:12;
   80:19; 87:22
**bringing** 54:9, 11
**broad** 67:23
**brought** 11:5, 18; 13:16;
   27:13, 16; 49:12; 60:3;
   67:19; 77:16
**Brown** 45:17, 17, 22;
   46:1; 54:8; 57:4
**Buckingham** 10:23;
   11:4, 5; 12:13, 14, 22;
   13:14; 14:9, 18; 15:1, 3;
   16:8; 18:2, 19, 22, 23;
   20:23; 23:20; 29:25;
   44:18, 19; 45:8; 49:23;
   50:5, 6, 16, 20; 51:7;
   52:25; 54:4; 55:18; 56:16;
   57:2; 58:22; 59:21; 60:2, 2,
   10, 19, 21; 61:3, 5, 12, 16;
   64:10; 65:2, 12
**Buckingham's** 11:24;
   12:7; 18:15; 51:12; 58:18;
   66:7, 14; 67:3
**building** 82:15, 19, 21,
   23, 24; 83:1; 85:17, 23;
   86:1
**Buildings** 63:25
**burner** 58:4

## C

**call** 5:9; 22:15; 66:25
**Callahan** 53:12; 90:24
**called** 3:7; 5:7; 14:9;
   16:15; 19:22; 84:9
**calling** 60:6
**Cambria** 77:23; 78:13
**came** 22:8; 24:19; 28:6,
   22; 30:10; 33:20; 38:5;
   41:21; 44:6; 48:7; 49:25;
   51:2, 3, 12; 52:8; 54:1;
   59:11; 60:23; 63:21;
   78:14; 79:8; 81:21; 93:2
**Can** 4:7; 7:17; 12:17;
   14:3; 16:24; 18:17; 19:18;
   20:6; 22:1; 27:19; 32:25;
   34:16; 36:16; 37:23;
   38:20; 39:4, 5, 9; 40:24;
   41:4, 16, 18, 21; 42:2;
   45:4; 46:11; 49:25; 52:23;
   55:6, 23; 58:14, 14; 60:10;
   61:8; 66:12; 69:2, 3; 72:5;
   73:25; 74:20; 75:24; 76:6;
   86:5, 22; 90:2; 92:18

**Canadian** 67:19
**capacity** 44:6; 93:6
**captioned** 3:14
**care** 85:6; 87:9
**case** 3:19; 4:3, 4, 8, 8;
   11:19, 21; 60:18; 68:9;
   73:8
**cases** 48:1; 54:14
**Casey** 45:16; 46:1; 54:8;
   57:4
**caught** 64:20
**Center** 78:2
**Central** 73:9
**century** 69:8
**certain** 6:16; 26:24;
   27:13; 28:13; 46:17, 19;
   49:22; 82:1; 88:25; 92:21
**certification** 3:3; 7:5
**certified** 70:18
**chair** 80:20; 85:3
**chance** 27:18; 86:16
**change** 31:10, 11; 34:4;
   47:20; 74:12
**changed** 74:23
**chapter** 16:4
**characteristics** 56:13
**characterization** 20:17;
   38:1
**characterize** 25:4
**charge** 24:2; 88:24
**Charlotte** 18:15
**check** 52:17
**checking** 30:19
**chemistry** 20:5; 52:19
**chief** 85:17
**child** 53:19; 66:21, 23
**child's** 64:14; 66:18
**children** 20:6, 7, 7; 53:16;
   79:24; 85:18
**chose** 6:15
**chosen** 14:14
**Christian** 13:12, 15;
   14:11, 15, 19, 22; 51:2;
   60:7; 64:8
**Christian-Judeo** 34:11
**Christianity** 50:22
**church** 58:24; 59:3;
   60:18
**circumstance** 15:3
**circumstances** 3:25;
   10:24; 11:1; 13:7
**cited** 54:14
**citizen** 91:3
**clarification** 55:23; 56:4
**class** 58:11
**classes** 64:23; 65:10;
   66:16; 74:13
**classified** 90:4
**classroom** 64:13; 74:1,
   13
**clear** 4:22; 5:3; 58:18
**close** 70:25
**coach** 21:7; 79:21, 24,

25; 80:2, 7; 82:4; 90:15
**College** 7:3; 67:10; 68:5
**coming** 26:10; 30:25;
   40:25; 43:18; 53:4; 54:24;
   66:3; 71:6; 91:9; 93:24
**comment** 12:4; 16:24;
   25:8; 50:6, 10, 18, 20;
   51:4; 84:23; 87:18
**commentary** 16:18
**comments** 12:7; 18:3,
   16, 23; 19:17; 24:13; 41:2,
   3, 4; 43:1; 49:4, 21; 50:2;
   51:7, 8, 12; 56:14, 17, 18,
   24; 57:14, 17; 58:22; 67:3,
   4; 84:10, 13, 14, 17, 19,
   21; 88:8
**committee** 11:2; 28:14
**communicate** 10:1, 5
**communication** 7:18
**communications** 45:5
**community** 20:4; 43:24;
   51:10; 52:6; 81:14, 15;
   88:9; 93:6
**compatible** 82:9, 10
**compilation** 17:21
**complaints** 77:15; 80:11
**complete** 49:15; 68:20
**completely** 39:22
**compliance** 89:1
**complicated** 69:16
**comportment** 84:25
**comprehensive** 76:17
**computer** 68:18
**concern** 27:7; 30:18;
   31:19; 47:6, 19; 70:3;
   87:22
**concerned** 46:13, 14;
   47:17
**concerning** 55:9; 74:12
**concerns** 34:13; 41:25;
   56:24; 57:9; 60:2; 61:6;
   70:7, 12, 15, 16; 80:24
**conclude** 36:20
**concluded** 93:25
**conducive** 87:11
**conduct** 75:19; 86:19;
   87:16, 24
**conducted** 63:24
**confusing** 29:19; 59:10
**connection** 64:25
**consistent** 18:11, 13, 20,
   23; 36:21
**Constitution** 58:21, 23;
   59:3
**consulted** 47:9
**consumer** 52:18
**contact** 62:12
**contacted** 44:21
**content** 10:16; 27:8;
   72:18
**contentious** 82:24
**continue** 72:2, 11; 73:2
**continued** 40:15
**continuing** 26:14; 27:10

**contributed** 38:8; 41:24
**controversial** 82:15
**controversy** 6:7, 10, 12;
   17:18; 82:19; 83:13; 89:15
**conversation** 8:7, 8, 11,
   23; 9:19; 10:2, 7; 22:18;
   26:7, 24; 27:16, 24; 34:20;
   35:10, 12, 16; 36:12; 37:7,
   8, 14, 20; 38:5, 20, 23;
   39:4, 12, 13; 40:1, 6, 6;
   45:23, 25; 46:23; 47:3, 11;
   49:13, 17, 19; 92:15, 16;
   93:13
**conversations** 38:24;
   40:11, 13; 41:10; 46:7;
   48:10, 14, 15
**copy** 75:5, 6
**country** 44:23; 50:7;
   51:3; 68:11
**County** 60:7; 78:2, 6, 25;
   79:5
**couple** 21:23; 27:22;
   75:18; 89:18
**course** 5:18; 11:21; 67:7,
   9; 73:12, 14
**court** 4:3, 20, 23; 11:19;
   48:1, 2; 54:14; 73:8
**cousin's** 68:11
**covered** 63:4
**Covey** 20:10
**create** 8:3; 68:18
**created** 7:23; 34:7, 10
**creating** 4:20
**Creation** 48:6; 69:7
**Creationism** 6:12; 7:21;
   8:18; 9:12; 10:19; 11:12,
   16, 20; 12:4, 12, 13, 15,
   18, 20; 13:1; 14:5, 25;
   15:4, 13; 16:7, 13; 23:22;
   25:21; 26:13; 27:11;
   30:24; 31:4, 18; 32:8, 14,
   24; 33:3; 35:7, 11, 19;
   37:2, 9; 38:12, 13, 22, 25;
   39:14; 40:2, 8, 25; 41:11;
   45:21; 48:18, 25; 49:6, 9,
   11; 51:13; 54:18; 57:15,
   19; 58:6, 10, 15, 19; 59:8;
   61:11, 14; 70:16, 18;
   71:11, 14, 18, 20, 24; 72:3,
   9, 14, 16; 73:3, 5, 16; 74:1,
   3; 83:20; 84:1, 14; 89:23,
   25; 90:6
**cross** 12:1; 18:8
**crux** 24:25
**cues** 5:2
**Cunningham** 59:17, 19
**current** 23:3; 24:17; 31:5;
   35:13; 45:18; 46:3; 47:20;
   48:16, 22; 53:21; 72:9;
   78:9; 82:2, 20; 88:15, 17
**currently** 76:18
**Curriculum** 7:22; 9:25;
   11:2; 12:9; 15:24; 21:14;
   22:4, 7, 16; 23:1, 3, 13;
   24:3, 4, 18; 28:14, 17;
   30:9; 31:10, 11; 33:8;
   34:12; 35:19, 22; 38:14;

Tammy Kitzmiller, et al.  v.
Dover Area School District, et al.

Trudy Peterman
April 7, 2005

44:6; 45:15; 46:8; 47:21;
48:16, 21, 22; 51:6, 23;
52:15; 54:17; 55:14;
60:16; 63:6, 9; 68:3; 72:16;
74:12, 22, 23; 76:23; 85:22
cut 76:12
cycle 68:21

## D

Darwin 16:5; 68:14
Darwin's 15:25; 16:23;
62:18; 69:21
Darwinism 74:10
date 6:3; 11:8; 41:15, 15
dated 8:4; 17:20, 24;
71:21
dates 45:1
day 17:22; 40:15; 60:23
days 5:11; 15:25; 16:4, 5;
29:3
deal 73:22
dealing 74:14
deals 69:18
debate 58:1, 4, 5; 68:1
December 28:12; 30:16;
31:18
decision 48:2
decisions 54:14
defenders 67:15
defensive 20:8
definite 61:19; 62:1
definitely 28:3
degrading 88:9
degree 7:1; 21:1, 2, 2
degrees 6:25
delivered 92:6
demeaning 88:8
depart 13:5
Department 22:21; 29:2;
47:4; 60:21, 22; 63:15;
64:16
deposition 3:17, 18, 21,
25; 4:15; 5:15; 7:14; 17:1,
10, 19; 75:3; 93:25
describe 7:17; 12:20;
19:18; 33:15; 62:15; 89:25
described 62:10
describing 9:18
description 4:6, 15;
13:19
Design 13:3, 8, 17, 20;
21:14; 27:16; 48:4; 49:12;
54:24; 55:2, 4; 61:17, 22;
62:5; 63:18; 67:25; 68:16;
69:5, 7, 14, 19; 70:1
Designer 69:13, 16
desire 10:19, 22
destroy 64:7
destroyed 64:1, 4; 66:24;
67:1
development 23:9
developments 44:5

died 12:1; 18:7
differed 86:23
difference 32:16
different 14:21; 15:16;
16:2; 22:22, 25; 29:17;
34:7; 35:11; 50:2; 76:21;
77:1; 82:6, 7
differing 36:10, 15, 25;
38:16; 39:16
difficult 27:17; 41:16;
42:1; 50:23
direct 71:1, 23
directed 69:25
direction 73:9
directive 81:9; 86:20;
87:13; 90:7, 8, 21; 91:4, 7,
8, 14, 19, 23; 92:2, 5, 9, 13,
24; 93:4, 8, 14
directives 93:19
directly 11:21
Director 63:25
Directors 3:16
disagree 20:11
disagreed 19:23; 45:17,
20; 46:2
disarray 82:24
disciplinarian 85:22
disciplinary 65:25
disciplined 65:23
disclaimer 57:18
discovered 68:14
discuss 8:10; 44:16;
74:6; 84:25; 86:16; 93:12
discussed 11:12; 15:24;
24:23; 42:15; 45:3; 51:17,
18, 20; 53:4; 54:11; 55:10
discussing 24:15, 17;
56:12; 61:4; 62:20
discussion 12:8; 13:11,
11; 14:21, 25; 15:7, 19, 21,
21; 23:10; 24:25; 25:14;
27:4; 31:25; 33:21; 35:2, 5;
37:5; 40:25; 44:9; 46:10;
54:13; 55:14; 56:1; 58:3,
20, 21; 64:11, 21
discussions 18:4; 23:19;
27:11; 44:10, 12; 46:12;
73:6
displayed 64:18
dispute 12:22; 84:1
disputed 85:6
disputes 81:3, 19
disrespectfully 20:16
distinction 33:17
District 3:15, 15; 10:19;
13:5; 20:3; 27:14; 43:5;
48:18; 49:14; 63:8; 68:12;
74:24; 76:22; 86:3; 88:19,
25; 89:13
Doctor 87:24
doctor's 68:13
Doctorate 7:7
document 4:21; 5:7;
7:13, 15, 23; 8:1, 3, 6;
17:10; 42:7; 91:15

documenting 47:10
documents 19:4
donated 63:16; 64:4, 5
done 4:18; 12:20; 39:7;
41:16; 60:5, 12; 69:2;
73:21, 23
door 75:10
double 81:13
Dover 3:14, 15; 5:20, 25;
6:8; 7:19; 10:18; 15:14, 24;
16:11; 18:1; 19:4; 40:23;
41:9; 43:5; 48:16; 50:2;
53:21; 62:25; 63:7, 13;
68:5, 9; 69:24; 73:15; 74:8,
14; 78:9; 79:16; 80:12, 16;
82:22; 83:7, 13; 87:10;
89:13
down 18:7, 14; 22:24;
54:13; 56:18; 81:25;
83:21; 93:24
Dr 3:12; 10:14; 11:14;
19:14; 21:19; 24:7, 13, 16;
25:16; 29:11; 31:21;
34:25; 35:10, 12, 20;
36:12; 37:3, 13; 38:4; 39:8;
42:25; 44:21; 48:10;
49:15; 60:24; 70:8, 25;
80:18, 21, 23; 81:3, 6, 9,
19; 82:10; 83:9; 84:2, 19;
85:11, 20; 86:13; 87:1, 1;
92:11; 93:1, 13
driven 48:17
DUI 21:5, 8; 79:25; 80:7
duly 3:7
during 5:17; 12:24, 25;
14:20; 15:14; 17:6; 18:4,
16; 28:20; 29:3; 31:22;
39:25; 41:8; 49:1, 3; 64:9;
74:13, 21; 77:17; 82:15
duty 85:18

## E

e-mails 44:22, 23, 24
earlier 13:14; 27:1; 45:11;
71:7
early 27:2; 29:5, 12, 14;
48:5; 87:18
earth 34:10
edged 81:13
editorials 43:23
educated 85:19
Education 7:2; 12:12;
53:20; 68:2; 75:23, 25;
78:21; 88:23, 24
Educational 7:7; 87:11
educator 20:6
Edward 11:19
effect 11:25; 12:1; 50:8;
57:10
eight 22:22; 86:1
either 14:14; 21:2; 50:15;
65:5; 81:6; 82:8; 90:5;
91:17
else 18:18; 34:16; 42:22;

49:20; 52:23; 54:7; 61:3, 8;
62:19; 63:7; 65:14, 20;
69:21; 87:21; 90:22
employed 77:6
employer 88:15, 18
employment 6:9; 41:9
end 9:10; 29:17; 38:20;
43:5; 47:13
ended 26:21; 28:4, 11;
41:9; 83:14
ending 6:3; 70:25
endorsed 64:15
engage 87:24
engaged 77:1; 88:12
English 7:2; 76:10
English/Latin 6:24; 76:9
enter 77:20
entire 25:5; 35:21
entirely 15:16
environment 85:19
equation 68:21
equipment 53:19
Eric 3:13; 70:19; 90:2
erroneously 9:24
errors 5:11, 12
Eshbach 11:4; 15:8;
16:6; 29:8; 46:14, 15, 18,
18; 47:7; 53:2; 59:18;
60:12; 70:5
Eshbach's 46:15
espoused 51:2
essentially 77:14
establish 34:2
et 3:14
evaluation 92:17
evaluations 83:9
even 16:5; 31:8; 40:11;
58:2; 66:4; 75:16
evening's 18:1
events 23:9
eventual 40:7
everybody 66:20; 68:8
everyone 37:17; 44:22
evidence 38:2; 42:8, 11
Evolution 8:17; 9:12;
16:4; 34:3, 3, 4; 48:19;
63:19; 64:14; 66:18; 68:3;
71:19, 20; 72:4, 10, 15;
73:3, 16; 74:4, 14; 89:22
Evolutionary 67:25
evolved 69:17
exact 11:9; 14:13
exactly 20:25; 31:15;
40:9; 73:24
examined 3:8
example 16:2; 69:22
examples 88:5
excellent 85:21
except 3:4; 53:10
exchange 56:22
exchanges 57:7
Excuse 76:12

Exhibit 7:14; 17:1, 10, 19;
23:6; 49:18; 71:1; 75:13
exit 31:1
exited 27:14
exiting 49:14
expect 5:15
experience 25:11
experts 46:20
explain 66:16; 93:8
explained 64:13; 72:7
explanation 34:11; 86:19
express 10:19, 22
expressed 16:6
expressing 25:3; 35:7;
56:24; 86:21
extent 40:1; 63:6; 73:25
extinct 34:6
extreme 88:6
extremely 25:4; 35:6;
41:16; 43:14; 86:18

## F

facing 83:18, 18
fact 11:18; 18:12; 57:20;
58:23; 60:17; 84:5; 89:10
faculty 6:14; 19:16; 20:9,
16, 19; 46:16; 88:10
fair 9:21; 20:17; 86:25
fairness 41:13
faith 50:4
fall 28:22; 29:1, 15, 16;
30:8, 23; 32:3; 33:22;
42:17
falsify 4:11
familiar 13:1; 55:2
families 68:11
family 52:18
famous 68:12
far 26:7; 27:22, 24; 41:21;
82:11
fascinated 67:21
fascinating 68:15, 18, 22
father 46:15
fathers 15:10
fatigued 21:25
Fauquier 78:6; 79:4, 5
Federal 79:9
feel 20:10; 74:20
felt 16:9; 20:9; 23:2; 25:2;
32:15; 58:19; 59:2; 82:4;
83:9, 20; 88:6
fetus 15:20
few 19:9; 21:24; 75:20
field 46:20
fifty 8:17; 9:11; 71:19;
72:15
fight 87:10
fighting 52:13
figure 86:19
file 77:4; 78:17; 79:5
filed 77:8; 78:16, 18;

rudy Peterman
April 7, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

9:19; 80:9; 89:9, 11
ling 3:3
inalized 5:9
inches 16:2
nd 14:1
ne 30:2; 69:21; 75:1;
6:25; 79:12; 84:12; 89:8
inish 37:23
inished 82:25
inishing 70:20
irst 4:22; 5:22; 7:1; 8:6,
0; 9:7; 11:1; 14:24; 19:21;
4:5; 27:15, 19; 37:15;
1:21; 54:7; 55:4; 61:21;
3:13, 14; 67:17; 77:20,
2; 80:3, 25; 81:24; 82:18
scally 29:17
st 85:2
ttest 16:1
ocus 27:19; 35:15; 45:4
ocused 40:16
ollow-up 21:24
ollow-ups 62:23
ollowing 9:18; 11:3;
9:15; 44:12; 73:2
ollows 3:8
ollowup 6:17; 89:18
ootball 21:6, 8; 79:21,
4, 25; 82:4; 90:15
oreign 50:17
orget 91:10, 13
orgive 25:13; 29:11;
1:13; 49:14; 54:15; 77:12
orm 3:4; 13:23; 58:16
ormer 53:11, 18
orth 51:14
ound 63:25; 65:8, 10, 19;
6:24; 88:8
oundation 38:2; 74:15
our 15:25; 16:5; 18:14;
6:1; 76:23; 78:1, 25
ourteen 76:10, 14, 20
ankly 42:7
iction 83:3; 84:2
iendly 75:11, 12
iends 68:13
ont 76:24; 85:3
uition 79:9
ustrated 25:4; 35:6, 16,
8, 21; 36:4, 6, 7; 37:18;
8:6, 23; 39:13; 43:14;
7:12, 15
ustration 25:3; 35:7;
7:16, 21; 38:7, 10, 11
urther 8:15; 19:7; 73:9;
9:17; 93:5, 22

### G

agged 90:23
alapagos 16:3
ave 12:11; 17:23; 21:25;
4:19; 72:5, 24; 73:1, 11;

83:10; 85:25; 87:25
**general** 4:6; 33:2; 41:2;
49:5, 7, 8; 85:24; 88:22
**Genesis** 18:17; 34:11
**gift** 64:16
**Gillen** 4:18; 13:23; 19:8;
21:18, 21; 25:1; 37:25;
38:3; 39:24; 42:12; 49:2;
55:21, 25; 56:7, 11; 59:6,
22; 62:7; 67:22; 68:25;
69:1; 70:19, 24; 74:17, 25;
76:3; 86:12; 88:3, 11;
89:17; 93:20, 24
**girl** 76:2
**given** 83:19; 86:20;
87:13, 14; 88:5; 90:8; 91:4,
20; 92:7; 93:9
**giving** 19:22; 43:15, 18;
47:15
**goes** 18:6; 69:8
**Good** 3:10, 11; 21:19;
75:24; 79:11; 82:11
**grades** 6:22, 23
**graduate** 66:24
**great** 82:22
**Greater** 43:6; 88:19;
89:10
**grievance** 80:9
**grievances** 77:4, 8;
78:16, 17, 18; 79:1, 2, 19;
80:11, 15; 89:8, 11
**ground** 88:1
**Grounds** 64:1
**group** 17:17
**guess** 18:6; 66:23; 93:11

### H

**hand** 92:7
**handle** 31:12; 81:25
**handled** 21:4; 66:5; 79:9
**happened** 41:7; 65:15,
16; 90:14
**happening** 27:7; 28:5;
31:22; 66:2
**happens** 54:2
**happy** 76:1
**harass** 41:25
**hard** 61:20; 68:8
**harder** 83:10
**Harkins** 17:5; 29:25;
61:5; 65:8
**head** 5:2; 11:2; 35:22;
47:4
**hear** 10:22; 13:8; 60:1
**heard** 10:18, 24; 13:3;
18:13; 27:15; 55:4; 61:21;
62:5
**hearing** 42:16
**heart** 66:22
**Heights** 77:23
**held** 27:12; 29:6, 24
**helpful** 4:25

**hereby** 3:2
**hey** 57:10
**hiatus** 28:7, 20; 32:1
**High** 5:20, 25; 10:20;
18:5; 19:5; 67:9; 68:4;
69:24; 74:14; 76:16, 17;
83:14, 14, 17
**highest** 86:1
**highlighted** 75:13
**Hindu** 50:4
**hire** 79:22
**history** 12:11
**hit** 85:5; 92:20
**hitting** 92:17
**holds** 32:6
**hole** 82:23; 83:1
**holes** 16:23; 62:17
**hometown** 76:22
**honest** 83:19
**honestly** 41:6; 51:18;
81:11, 22
**honesty** 87:8
**hopefully** 39:5; 40:7
**hung** 63:20; 64:12
**hurt** 79:23

### I

**idea** 22:3; 25:6; 41:4; 53:5
**ideal** 57:11
**identify** 68:23
**impact** 74:12
**implying** 36:9
**imprecise** 54:15
**impression** 36:14;
37:15; 38:8
**inception** 14:21
**incidents** 82:1
**include** 12:8
**included** 8:14; 15:1
**including** 89:23
**incorrect** 10:3
**Independent** 78:25
**Indiana** 7:6, 8; 78:2, 2
**indicate** 34:13; 40:1, 4;
45:22; 91:8, 19
**indicated** 25:16; 29:22;
32:24; 40:5; 46:10; 51:21;
52:22; 57:4; 77:19; 87:15
**indicates** 17:14
**indication** 24:5
**information** 8:25; 9:4;
18:19; 20:25; 43:15;
46:22; 47:16
**inherited** 4:10
**inner** 92:8; 93:2
**input** 38:19
**inservice** 29:3; 60:23
**instance** 14:25
**instances** 30:12
**instruct** 69:25
**instructed** 87:2

**instructing** 93:8
**instruction** 72:20; 74:13;
91:8, 19; 93:9
**instructions** 73:11, 12,
19
**insult** 50:17
**insulted** 50:5
**Intelligent** 13:8, 16, 20;
21:14; 27:16; 48:4; 49:12;
54:24; 55:2, 4; 61:16, 21;
62:5; 67:25; 68:16; 69:5, 7,
12, 14, 15, 18; 70:1
**interaction** 20:20
**interested** 67:17
**interpretation** 64:14
**interviewed** 11:14
**into** 13:4; 15:19; 26:17,
22; 27:16; 31:1; 32:3;
33:10; 34:10; 43:3, 10;
48:4; 49:12; 54:9, 11;
63:19; 66:22; 69:6; 73:6;
93:20
**introduce** 21:20
**investigation** 14:7; 63:24
**invitation** 93:11
**involve** 8:18; 9:12
**involved** 37:17; 51:13
**involves** 88:23
**Islands** 16:3
**issue** 4:10; 6:12; 12:11;
15:8; 23:22; 24:15, 17;
25:12; 28:8, 22; 30:16, 24,
25; 31:3, 17; 32:7, 14, 24;
33:3; 35:1, 2, 19; 36:10;
39:3; 40:12, 14, 14; 41:8,
10, 23; 42:4, 15; 43:7, 17,
24; 44:9, 24; 45:2; 47:8,
13; 48:11; 51:16; 52:8;
53:6, 7; 55:9; 59:7, 11;
63:5; 68:6; 79:8; 83:20
**issues** 6:16; 9:20, 22;
22:15; 23:3, 25; 25:9;
30:22; 31:6, 8; 47:18;
51:13, 19; 55:14; 60:10,
20; 63:9; 81:2; 82:3; 83:2,
5, 18
**item** 52:14

### J

**January** 44:2, 3; 45:4, 14;
46:5; 48:8; 49:3; 89:15
**Jennifer** 11:5
**job** 21:8; 24:2; 35:22;
38:18; 39:17; 63:14
**Johnstown** 43:6; 78:12;
88:19; 89:11
**Joseph** 17:21
**Judge** 79:9
**July** 5:2, 6:3; 13:4, 8;
27:15; 28:7; 41:9; 43:4, 5;
49:13; 55:5; 61:22; 62:5,
25; 63:2, 13, 14
**jump** 92:20
**June** 11:23; 12:8; 13:21;

17:3, 9, 11, 21, 24, 24;
18:12; 20:24; 28:6; 29:17;
44:3, 4; 45:4, 14, 19; 46:5;
48:8, 9; 49:3; 50:1, 3, 15;
52:4, 5, 7, 17, 21; 54:7;
55:3, 6, 7, 12, 15, 20;
57:12; 59:11; 70:14;
75:16; 81:12; 84:18;
87:14; 90:14; 91:24

### K

**keep** 46:24
**kept** 43:8; 78:21
**kids** 15:11
**kind** 13:17; 28:7; 32:21;
41:20; 75:10, 11; 86:9
**kinds** 5:2; 16:2; 75:9
**Kitzmiller** 3:14
**knew** 87:8
**knowledge** 49:5, 7, 8;
73:15
**known** 15:10; 38:12;
45:24; 53:7
**knows** 68:8
**Kralltown** 85:4

### L

**lack** 20:13; 74:15; 88:6
**lacks** 38:2
**laid** 60:16
**Lancaster** 91:12
**Larry** 7:19; 23:17, 21;
27:25; 34:20, 21, 24; 35:4;
38:15, 17; 40:16; 42:20;
63:21; 64:1
**last** 18:4; 19:3; 67:7, 9;
68:12
**late** 27:2; 28:5; 29:12
**later** 50:14; 66:23; 72:13;
91:22
**law** 21:2; 25:11; 27:12;
31:5; 47:8; 60:18; 81:8; 89:6
**lawsuit** 3:14; 79:5; 80:22
**lead** 24:20
**Leadership** 7:8; 82:7
**leading** 31:23; 48:1;
4:9:16
**learn** 6:19; 8:25
**learned** 34:16
**least** 5:15
**leave** 6:2, 4; 87:10
**leaving** 87:8
**led** 35:12; 36:20; 81:2, 4;
85:12
**left** 6:3, 5; 19:6; 28:6;
43:5; 49:11; 62:25; 75:7;
86:3; 89:13
**legal** 12:11; 47:22, 25;
54:13; 58:15; 75:13, 15
**Leslie** 70:4
**less** 87:9

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Trudy Peterman
April 7, 2005

letter 64:3; 65:24; 84:8
Levin 11:13; 14:3; 23:2; 6:13; 57:21; 58:2; 60:3
life 15:15, 17, 22; 25:7; 30:16; 31:17; 32:17; 33:18; 34:11; 43:17; 69:16; 76:4
line 48:23; 89:4
link 51:5
literature 46:20, 21
litigation 22:15; 75:19; 77:2, 15; 78:14; 79:1, 17; 80:15; 88:12, 20
little 6:19; 46:7; 59:10
lived 81:14
local 14:9
long 7:10; 25:1; 47:4; 58:2; 75:22; 76:5; 83:21
longer 21:11; 58:5; 91:11
look 17:20; 22:6; 26:15; 30:7; 35:2; 36:8; 44:2; 55:12; 61:3, 6, 7; 62:9, 10; 63:5; 69:11; 72:1; 75:24; 78:13; 81:18; 93:20
looked 22:21, 24; 69:6; 90:18
looking 13:12, 14; 26:12; 28:16; 30:2, 6, 23; 31:7; 34:5, 9; 46:5; 48:8, 15, 16; 60:6; 66:4; 72:22; 75:13; 7:12; 87:12
lose 92:19
losing 51:14
lost 21:8
lot 6:7; 22:10; 32:18; 42:7, 8; 61:10; 67:2; 76:4
lowest 83:11

## M

magazine 68:14
mail 92:8; 93:2
mailed 92:7
maintained 19:3
major 31:6
majority 35:13; 36:22; 45:18
majority's 86:23
making 25:8
Maldonado 17:22
man 12:1; 63:19; 79:11
managerial 82:7
manner 20:10
many 3:23; 14:16; 34:6; 36:8; 41:10; 44:14, 15; 50:2; 65:15; 76:20; 80:5
March 8:16; 22:18; 27:9; 40:24; 40:10; 41:8
marked 7:14; 17:1, 10, 19
marker 23:8; 48:9
Master's 7:3
mathematical 68:21
matter 3:12; 36:17;

mattered 83:16
matters 81:21, 22
may 4:18; 18:3; 26:15; 30:11; 44:18; 49:22; 50:10, 14, 15; 51:17; 53:11; 58:2
Maybe 25:11; 60:7; 81:14
mean 14:12; 15:17; 29:12; 37:17; 40:10; 41:25; 49:20; 50:17; 55:24; 59:8, 20; 83:1
meaning 56:5
means 5:10; 35:18
meant 16:10, 11; 21:1, 3; 29:14; 33:15; 35:4, 8
measure 31:25; 45:11
mediation 79:15; 82:1
mediator 79:9
meet 46:18; 54:2; 80:21
meeting 11:3, 7, 18, 23, 24; 12:3, 8, 10, 15; 13:21; 14:24, 25; 17:3, 4, 6, 9, 15, 22, 24; 18:2, 4; 19:1, 2; 20:24; 21:12; 26:22; 27:1, 5; 28:13; 29:5, 7, 9, 22, 23, 24; 30:3; 32:4, 5, 9, 11, 12, 15, 19, 23; 33:4, 11, 22; 34:17, 18; 38:9; 40:16; 42:16, 20; 44:3; 45:19; 49:23; 50:1, 3, 13, 14, 15; 52:4, 5, 17, 21, 23, 25; 53:2, 3, 5, 8; 54:7, 25; 55:15; 56:17; 59:13, 15, 23, 25; 61:4, 9, 12, 15, 17, 24; 62:4, 19, 23; 64:10; 65:5, 6, 15, 16; 70:14; 71:17; 75:16; 81:12, 17; 84:9; 87:14; 90:14, 17; 91:24
meetings 6:14; 19:17, 21; 25:23; 27:12, 13; 28:25; 30:8; 40:12, 20, 21, 22; 41:1, 1; 42:14; 44:14, 15, 20; 45:9, 10; 46:6; 48:9, 15; 49:22; 50:21; 51:10, 17; 52:3, 4, 7, 9; 53:12; 55:6, 10, 12, 19, 20; 56:23; 57:12; 59:11; 62:22; 63:2; 75:20; 81:9, 10; 82:17, 18; 84:11, 25; 86:7, 15; 87:2; 90:8, 12; 91:6, 23; 92:24; 93:5
member 8:17; 9:3, 11, 14; 10:18, 22; 14:18; 19:21, 24; 45:6, 7, 13, 16; 46:16; 53:11, 18; 71:23; 81:16; 91:2, 11, 12; 93:6, 16
members 6:14; 19:16, 25; 20:15, 19; 26:25; 28:13; 37:5; 38:24; 41:11; 44:16; 45:19; 46:8; 51:22; 54:6, 20; 56:25; 57:8; 64:22; 67:4; 87:16, 24; 88:9; 90:21; 92:21, 22
memo 10:10, 13, 16; 13:2; 23:11, 16, 18; 25:15, 17, 21; 26:5; 27:21; 28:18;

31:24; 32:21; 41:20; 42:4; 49:10; 71:8, 21; 72:1, 13, 22; 75:5, 13
memorandum 23:6; 49:18; 71:2
memory 18:24; 88:17
memos 43:20
mention 72:3
mentioned 14:5; 16:5; 26:7; 40:9, 20; 47:22; 48:3; 55:4; 65:17; 72:17; 73:4
merged 26:22
Merhige 79:10
met 21:19; 27:3; 29:2, 9; 44:15; 46:19; 59:25
Michael 7:19
microbiology 67:10
micromanagement 83:24
micromanaging 20:13
middle 82:21
Mike 24:23; 27:25; 32:6; 34:23; 35:5, 15, 16; 36:13; 37:16, 21; 38:6, 21; 39:1, 25; 40:17; 42:20, 25; 48:13, 14, 20; 59:13, 23; 60:9; 61:4; 70:10; 71:7
Miller 11:5, 14, 14; 14:3; 15:9; 16:6; 23:2; 29:8; 44:21; 47:7; 56:13; 57:21; 58:2; 59:17; 60:3, 12, 24
mind 23:12
ministers 15:11
minutes 17:11, 23
mischaracterizes 42:10
misrepresented 10:7
missing 63:15, 22
mold 4:10, 11, 12; 79:7, 8
moment 42:4
Monday 18:1
monitored 89:5
monthly 40:12, 22; 41:1
morality 51:19
morals 50:22
more 21:16; 24:19; 30:12, 14; 31:9; 33:9; 38:10; 39:5; 43:20; 47:17; 58:13; 59:25; 60:15, 16; 66:12
morning 3:10, 11; 21:19
most 81:10
mouth 34:1; 39:12
move 39:5, 7; 43:3; 81:23
moved 31:18; 39:20; 90:4; 91:12
movie 16:15, 18
moving 90:6
Mrs 7:20; 8:7, 10, 16, 20, 22; 9:7, 13; 10:1, 7; 11:17; 12:10; 15:7, 9; 18:19, 23; 19:24; 20:2, 3, 24; 22:17; 26:14; 29:8, 25; 30:17, 19; 32:12, 13; 34:1; 45:17, 22; 47:3, 7, 7; 52:25; 53:12; 59:17, 17; 60:12, 13, 16; 61:12; 63:21; 65:8; 66:16;

72:7, 7; 73:1, 20, 25; 90:24
much 46:21; 52:20; 60:11; 65:22; 93:23
mural 63:15, 19, 22, 23; 64:2, 7, 11, 15, 20; 65:3, 21; 66:3, 7, 10, 15, 19; 67:5
must 72:14, 17
mutations 68:19, 20
myself 11:4; 21:20; 22:3; 30:17; 63:21; 85:17

## N

name 3:12; 7:25; 14:13, 17; 21:20; 56:6; 64:1; 80:25; 91:13
named 56:6
National 67:16; 68:10
nationalities 50:2
nationality 50:17
nature 37:3, 5; 78:20; 88:20; 92:20
near 49:13
need 4:23; 5:1
needed 16:10, 12; 26:20; 53:22; 79:24; 87:7
new 18:4; 21:13; 22:10; 33:6, 13, 13; 48:7
news 68:10
newspaper 13:10; 17:17; 43:24
next 7:25; 18:14; 43:8; 89:5; 90:17
Nilsen 10:14; 24:7, 14, 16; 25:16; 34:25; 35:10; 42:25; 48:11; 70:8; 80:18, 21, 23; 81:3, 6, 9, 19; 82:10; 83:9; 84:2, 19; 85:11, 20; 87:1; 92:11; 93:1, 13
Nilsen's 35:12; 36:21; 37:3
nine 6:23
Nobody 90:22
nods 5:2
Noel 91:13
none 77:9
nonrenewed 4:9
nontenured 9:23; 30:19; 31:4, 12; 70:3
Nor 9:3
note 75:14
noted 10:14; 11:20
noticed 3:17
notified 88:24
noting 10:15
notion 26:10; 54:16
number 9:20; 31:14; 75:13

## O

O'Donnell 80:19, 24; 81:4
O'Donnell's 80:25
object 37:24; 38:1; 39:21; 58:16
objected 54:9
Objection 13:23; 42:10; 56:9; 62:3; 74:15, 19; 86:11
objections 3:4
observation 31:23
observations 6:18
Obviously 13:1; 19:19; 21:5; 25:22; 27:7; 56:22
occasions 3:23; 46:17; 80:14
occur 19:2; 31:10
occurred 18:24; 37:9
occurring 36:2
October 29:16
off 21:19; 25:24; 26:11; 76:12
offended 18:3
offensive 64:12; 65:9, 11, 20
offered 33:17
office 19:6; 23:21; 26:8; 34:23; 68:13; 73:9; 93:2
once 3:24; 5:10
One 7:22; 19:3, 14, 20, 25; 21:7, 21; 26:22; 31:7, 9; 33:8; 38:10, 14; 39:5; 44:17, 20, 21; 47:17; 48:18; 50:3; 51:9, 25, 25; 57:20; 59:25; 60:15, 16; 61:13; 63:20; 64:14; 66:17; 67:17; 68:13, 20; 73:4, 17; 74:3, 9, 10; 75:6, 12; 76:5; 78:6, 19; 79:4, 20; 81:20; 82:3, 8; 83:10; 85:1; 87:9; 92:16
ongoing 46:10
only 12:25; 15:23; 16:3, 4, 21, 24; 36:6; 39:4; 45:16; 47:16; 49:12; 52:10; 79:21; 80:6; 81:10; 83:8; 84:8; 85:1; 86:22; 87:4, 6; 89:4, 10; 90:20
opened 80:4
opening 51:8
operated 62:13
opinion 19:22; 34:8; 35:5; 36:6; 59:2; 64:19, 21; 66:9; 83:19; 85:8
opinionated 84:6
opposed 91:9
option 5:8
order 4:22; 11:13; 12:20
ordinary 37:18
organisms 68:18
organization 11:9
origin 15:15, 15, 17, 23;

**Trudy Peterman**
**April 7, 2005**

Tammy Kitzmiller, et al.   v.
**Dover Area School District, et al.**

2:17, 17
riginal 82:4
rigins 33:17, 18
thers 53:4
ut 6:15; 11:10; 14:1;
 7:8; 23:12; 30:15; 42:1;
 3:19, 21; 44:4; 46:24;
 1:12; 57:19; 60:3, 17;
 6:24; 74:24; 76:8, 9;
 8:14; 84:22; 86:19; 90:15
utspoken 81:5; 84:4
ver 4:10, 12; 6:12; 18:4,
 4; 20:4; 21:8; 28:7; 34:4;
 5:24; 39:14; 43:15, 16,
 5; 54:13; 57:14; 58:5;
 3:7; 68:10; 79:20; 82:22;
 4:9
verwhelming 47:19
we 34:25
wed 24:13, 16
wn 60:6; 69:17

**P**

'A 78:14
age 18:14
aid 42:8
aley 69:9
andas 13:15, 18; 55:15,
 5; 56:6; 63:10; 69:20
aper 47:9
aragraph 8:6, 10, 14,
 5; 9:7, 10, 18; 17:14; 72:1
aragraphs 18:6, 14
arents 46:23
ark 67:16
arochial 13:13, 25;
 4:7, 15, 22; 60:8
art 8:22; 25:25; 27:8;
 4:12; 60:23; 66:6; 74:23;
 5:15; 86:9
articular 9:4; 21:5; 48:5;
 0:4
articularly 82:13
arties 3:3
arts 16:21
arty 4:4
assed 26:20; 79:10
at 21:20
ath 76:8
atrick 37:12; 42:5; 65:4;
 7:13; 88:2; 93:18
atton 77:24
ause 87:25
ee 20:1
eer 77:10
enn 7:2, 4
ennsylvania 7:6, 9;
 1:7; 77:24; 78:3, 12
eople 11:3, 12, 17;
 3:16; 30:1; 44:24; 49:24;
 2:5, 16; 55:16; 56:23;
 7:8, 22, 23; 58:9; 59:1;

62:12; 65:16, 17; 68:10;
 69:20; 82:6
People's 13:18
perceived 72:19
percent 8:17; 9:11;
 71:20; 72:15
perfectly 19:20
perhaps 24:6; 31:9;
 32:16; 33:6; 34:5; 36:9;
 64:22; 66:9; 93:5
period 22:14; 31:22;
 44:7; 46:5; 48:8; 49:3;
 51:22
permission 91:5
permitted 63:3; 81:8, 13;
 90:18
person 51:1
personal 64:21
personally 6:13; 24:6;
 58:25; 59:1; 89:3
persons 34:17; 89:14
perspective 41:19
pertains 37:2
PETERMAN 3:7, 10, 12;
 19:14; 21:11, 19; 29:11;
 31:21; 35:20; 36:12;
 37:13; 38:4; 39:8; 49:15;
 70:25; 86:13; 87:1
pews 85:4
Philosophy 51:10
phone 45:23
phrase 20:16
physical 78:21
Physics 67:11, 11
piece 64:5; 66:21
pieces 46:19
pinpoint 41:14
PK's 15:11
place 56:22
plain 69:2
plainly 38:8
plaintiff 4:8; 7:14; 17:19;
 49:18
plaintiffs 3:13; 17:1, 10;
 71:1
play 13:4
played 43:19, 21
please 5:17; 23:15;
 41:13; 49:15; 88:17; 90:13
pleasure 76:4
podium 52:15, 16
point 15:9; 21:12; 22:20;
 57:7; 90:23
points 31:14
polarized 43:25
Policeman 75:10
policy 21:13
popular 21:6
portion 68:3
position 52:23; 6:5;
 13:6; 21:9; 78:10; 80:2, 4;
 89:7
positions 87:3

possible 24:3
possibly 15:25
post 77:22
practice 72:11, 12; 74:8
Prahl 46:13; 70:4
preacher's 15:11
preparation 75:2
preparing 71:8
presence 87:6
present 17:15; 23:21;
 29:22, 23, 24; 30:4, 25;
 31:19; 59:15, 24; 65:14, 16
presentation 13:18
presently 88:13
President 82:2; 87:5, 5;
 90:16, 22; 91:17
press 43:20, 22; 44:4
pressed 92:18, 19
pretty 65:22; 68:15; 81:5
previous 82:20
previously 7:14; 17:19;
 65:17
Principal 5:20, 25; 6:6;
 7:5, 20; 12:24; 19:4; 20:8;
 41:19; 43:3; 44:7; 48:23;
 63:8; 68:5, 9; 69:24; 76:16;
 77:11, 23; 78:1, 6, 13, 25;
 81:15; 82:16; 83:17;
 85:14; 86:14
prior 34:24; 53:4; 59:13;
 63:16; 71:7; 72:12, 14;
 75:18
probably 35:4, 25; 63:4;
 84:14
problem 93:21
process 4:15; 5:17;
 28:23; 37:17
produce 93:19
produced 71:2; 85:11;
 86:9
producing 25:14
product 5:6
professional 20:9
professionalism 20:13;
 88:7
Professor 51:10
program 68:17
project 63:18; 82:16, 19,
 21, 25; 85:24; 86:2
projects 64:17
pronounce 9:17
proper 72:25
property 64:6
proponents 69:12
prospect 56:5
protective 47:5
PSEA 30:20; 43:18; 47:9
public 6:15; 7:11; 12:4,
 12; 18:16; 19:16; 20:1, 5;
 24:21; 45:21; 52:24; 54:9,
 12, 19; 57:16, 23, 25; 58:6;
 72:16, 18; 76:10, 15; 78:6;
 79:6; 90:7, 11, 13

purpose 53:5
pursue 73:12
put 34:1; 39:11; 50:21;
 58:4; 66:21

**Q**

qualified 70:17
quite 42:7; 55:22
quote 18:7, 22
quote/unquote 13:3
quoted 12:5; 18:16

**R**

R-e-d-d-i-n-g 24:11
raise 9:19; 44:13
raised 9:22; 31:8; 32:7,
 14, 25; 33:3; 60:10, 20;
 61:6; 70:7, 15, 15
raising 57:9
ran 85:23
ranks 77:20
rarely 41:16; 92:19
rather 5:1; 75:11; 82:24
reaction 66:6; 86:9
read 5:9; 8:19; 9:10;
 45:19; 46:20; 50:16; 51:8;
 64:10; 67:20; 68:6, 7;
 69:18, 20, 22
reading 54:8; 69:3
ready 13:5; 22:10
really 22:19; 30:11;
 32:20; 45:2; 61:10; 66:21;
 73:22; 81:25; 82:25;
 83:10, 12, 20; 87:10;
 92:18, 18
reams 47:9
reason 9:22; 58:8; 86:22
reasons 69:3
recall 10:17; 11:8, 24;
 12:6, 17, 24; 13:9, 20;
 14:6, 13, 15, 16; 16:24;
 17:7; 20:25; 22:14; 24:22,
 25; 26:21; 27:23; 28:17,
 20, 22, 25; 30:8, 11; 32:25;
 33:16; 34:15, 16; 35:9;
 37:10; 38:22; 40:1, 5, 13,
 17, 24; 41:7; 42:15, 16, 24;
 44:15, 17; 45:5, 19; 46:9,
 11; 48:7, 12, 20; 49:4, 12;
 51:7, 9, 18, 22; 52:23;
 54:6, 8, 22, 24; 55:6, 8, 11,
 14, 17, 18; 56:10, 12, 16,
 18; 57:1, 13, 22; 58:17, 21;
 59:24; 60:10, 11, 19; 61:8,
 10, 13, 14, 16; 62:19, 24;
 63:7; 65:2, 4, 12, 20, 22;
 66:6, 8, 14; 72:5; 73:25;
 75:5, 8; 81:23; 84:24;
 85:13; 92:23
recalled 92:21
receipt 10:15
receive 53:20; 70:7, 10;
 83:6; 93:11

received 7:1, 3, 5, 7;
 10:14; 65:24; 83:8; 90:7;
 91:22; 92:2, 8, 9; 93:4
receiving 44:24; 92:12
recently 79:10
recess 19:11, 12; 70:22,
 23
recognize 7:15
recognized 58:24; 90:16;
 91:6, 17
recollect 17:8; 24:1;
 39:4; 60:24
recollection 12:19;
 18:11, 20; 22:23; 26:3;
 30:3; 32:22; 43:7; 51:16;
 54:3; 55:9; 61:19; 62:1, 9
recommend 79:21; 80:2,
 6, 8
recommended 26:16;
 79:22; 82:3
record 4:22; 5:3; 8:15;
 9:7; 21:6, 19, 20; 82:16
recording 4:21; 9:19
records 4:11
recount 23:10; 33:21;
 71:10
recounted 43:1; 56:23
Redding 7:19; 23:17, 21;
 24:1, 9, 10, 15, 20; 25:7;
 26:8; 27:25; 34:21, 22, 24;
 35:4; 38:15, 17; 39:17;
 40:16; 42:20; 63:21, 24;
 64:3; 66:4; 81:25
Reeser 64:1, 4, 7; 65:23
refer 6:10; 8:6; 14:11;
 20:15
reference 18:15; 50:19
referenced 27:21, 24;
 36:20; 48:10; 59:13; 62:8;
 70:3; 74:1, 7; 75:18; 79:7;
 81:17; 84:1
referencing 54:11
referred 11:21; 13:20;
 14:14; 89:21
referring 6:10; 44:11, 12;
 72:6; 84:13, 20
refers 9:10
reflects 31:24
Refresh 88:17
regard 24:3; 33:9; 34:13
regarding 6:17; 7:21;
 45:14
relate 47:25
related 23:12; 48:1, 20;
 66:10
relates 7:21; 22:4, 14;
 42:22; 68:2
relating 17:18; 19:4; 44:5
relationship 80:18;
 83:12
religion 12:5; 24:21, 24;
 36:7; 43:25; 54:9, 11;
 57:25; 58:11; 59:7; 73:7;
 84:16
religions 59:4

**Min-U-Script®**   Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Trudy Peterman
April 7, 2005

**religious** 11:22; 72:19; 90:5
**relying** 71:10
**remainder** 23:11
**remember** 3:25; 8:8; 12:6, 14; 13:7; 14:2, 4; 15:6; 16:15; 39:12; 40:9; 41:2, 3; 45:1; 49:21; 54:20; 57:13; 61:2, 11; 67:4
**replied** 39:17
**reported** 18:19
**reporter** 4:20
**reporter's** 4:23
**reporting** 10:7
**represent** 3:13
**representative** 65:9
**represented** 80:20
**representing** 9:24
**reprimand** 64:3; 83:6
**reprimanded** 65:23
**reputation** 89:6
**request** 87:6
**rescues** 67:17
**research** 47:23, 25; 48:3; 67:15
**researched** 47:8
**researcher** 67:14
**reservations** 87:15
**reserved** 3:5
**resignation** 89:23
**resolution** 78:23, 24
**resolved** 79:4
**respect** 52:7; 73:18; 89:8
**respective** 3:3
**respond** 10:10, 12, 16; 16:8
**responded** 57:1
**response** 16:9; 57:10; 60:9, 20; 70:8, 10
**responsible** 85:19
**result** 79:16
**returned** 28:8
**revealed** 15:9
**revealing** 78:21
**revered** 20:4
**Reverend** 46:15, 18; 53:2
**review** 5:8, 11; 13:25; 14:2, 4; 27:10; 36:2, 3; 47:17; 60:1; 91:16
**reviewed** 14:16; 26:18, 19; 35:25; 43:13; 60:13, 14, 15
**reviewing** 22:20; 26:12; 27:10, 10; 28:10, 12, 23; 37:2; 38:11; 40:7; 43:10, 11, 12; 44:19; 47:14; 60:5
**Rich** 23:25; 35:10; 36:15, 1, 24; 38:16; 39:16
**rigamarole** 37:18
**right** 8:12; 13:4; 17:23; 20:1; 33:4; 39:11; 43:19; 53:25; 64:7; 81:22; 90:18; 93:21

**road** 83:21
**Rob** 11:4; 29:7
**Robert** 79:10
**role** 65:25; 85:14
**rooms** 63:20
**ROTHSCHILD** 3:9, 13; 13:24; 17:2; 19:13; 21:16, 23; 23:5; 37:23; 38:1; 39:21; 42:10; 49:1; 55:20, 23; 56:4, 9; 58:16; 59:19; 62:3; 67:12; 68:23; 70:21; 71:6; 74:15, 19; 75:4; 76:2; 86:11; 88:1, 4; 89:18, 20; 93:18, 22
**rules** 21:24

# S

**safe** 85:19
**same** 4:24; 19:1, 2, 24; 43:15; 47:14, 15; 51:11; 75:17; 76:14; 83:18
**satisfactory** 83:8
**satisfying** 76:5
**save** 67:23; 69:10
**saw** 16:21, 22; 31:19; 42:2; 43:24; 60:23; 66:19, 20; 85:17; 87:21
**saying** 4:11; 18:7; 54:7, 20; 55:18; 58:10; 59:24; 65:12, 20; 68:11
**School** 3:15, 15; 4:9, 10, 12; 5:20, 25; 6:8, 13, 14; 7:22; 9:3, 25; 10:12, 18, 20; 13:13; 18:2, 5; 19:5, 15, 17, 21, 21; 20:5, 12, 15; 21:13, 21; 23:1; 26:15; 27:8, 13; 28:4, 5, 9, 13; 29:14, 17; 30:7; 32:2; 35:13; 43:16; 45:18; 47:13, 16, 20, 20; 48:17; 55:19; 58:19; 63:2, 8, 16; 64:5, 6, 22; 67:9; 68:4, 12; 69:3, 24; 72:16, 18; 74:14, 16, 22; 75:19, 20; 76:14, 16, 18, 22; 79:22; 80:3; 81:6, 8, 10, 17; 82:2, 17, 20, 21; 83:12, 14, 15, 17, 24; 84:9, 11; 88:19; 89:13; 90:8, 11, 16, 21; 91:5, 11, 11; 92:8, 24
**schooled** 85:22
**Schools** 6:6; 7:11, 19; 12:5; 13:12; 14:1, 2, 8, 10, 15, 22, 23; 16:10, 11, 11; 18:18; 24:21; 36:7; 38:19; 39:18; 44:1; 45:21; 54:9, 12, 19; 57:16, 25; 58:7, 11; 59:5; 60:8; 76:11, 15, 17, 21; 77:1; 78:7; 79:6
**schoolteacher** 6:20; 7:10, 11
**Science** 7:1; 11:21; 13:13; 15:2; 16:21; 21:2; 25:22; 26:23; 27:3, 9; 29:2, 6; 32:6; 34:12; 44:18; 48:6; 52:10, 18; 53:9; 54:1;

**60:15, 21, 22; 63:15, 20; 64:12, 15, 23; 65:7, 10; 66:16; 67:8, 9; 70:17; 84:15, 16
**scientific** 90:1, 5
**scientists** 69:12
**score** 83:11; 86:1
**sealing** 3:3
**seated** 85:3
**Seattle** 11:10; 60:25; 62:13
**second** 17:14; 72:1, 2; 80:8
**secondary** 6:24; 7:2
**sections** 14:5
**seek** 81:4
**seem** 51:5
**seemed** 13:16; 28:11; 64:19
**select** 22:10
**selection** 16:1; 22:16; 23:23; 42:23
**send** 75:5
**sending** 68:11
**senior** 63:18; 64:17
**sense** 23:9; 25:13; 27:6, 23; 28:15, 19; 35:16; 36:11; 38:5; 41:23; 42:6, 13; 44:10; 56:21, 25; 57:6; 65:1, 19; 66:9, 13; 67:7; 72:24; 73:24; 76:20; 77:15; 83:3; 86:6
**sent** 68:14
**sentence** 9:10; 72:2, 8; 73:2, 5; 74:4; 90:3
**separate** 31:6; 44:16; 50:23
**separately** 8:25
**separation** 58:24; 59:3; 60:18
**September** 28:9; 29:16, 18
**sessions** 11:18
**set** 26:23; 82:1
**setting** 44:14; 48:14
**several** 11:16, 17, 17; 12:5; 14:9; 16:20; 25:23; 30:22; 38:24; 41:7; 47:12; 53:12
**shared** 47:10
**Sheila** 17:5; 59:17; 61:5
**short** 5:15
**shot** 16:22; 62:17
**show** 7:13; 17:17
**showing** 53:5
**shows** 75:10
**sign** 5:9
**signature** 7:25
**simply** 36:3, 15, 24; 39:17; 62:12, 17; 80:23
**sit** 40:24; 63:5; 74:11; 86:15
**sitting** 42:1
**situation** 6:9; 21:4; 25:5;

**35:22; 81:18
**six** 18:16
**sketch** 76:7
**slowly** 4:23
**software** 68:17
**somehow** 64:19
**someone** 18:7, 8; 52:14
**sometimes** 54:2; 82:6
**somewhat** 27:17
**somewhere** 40:8
**sore** 53:17
**sort** 4:14; 28:19; 31:23; 33:11; 37:15; 58:4; 66:2
**soul** 66:22
**source** 38:7, 10; 84:2
**sources** 61:7; 62:8, 10
**Spahr** 7:20; 8:7, 10, 16, 20, 22; 9:8, 13, 19; 10:1, 8; 11:4, 17; 12:10, 19; 15:7; 20:3, 3, 24; 22:17; 26:14; 29:7; 30:17, 19; 31:25; 32:12, 13, 22; 33:21, 24; 34:13; 44:23; 47:3, 7; 52:6, 22; 59:17; 60:13, 16; 61:13; 63:21; 64:13; 66:16; 72:5, 7, 7; 73:1, 20, 25
**Spahr's** 34:1; 71:10
**speak** 4:23; 6:15; 17:6, 7; 42:25; 45:6, 13; 50:21; 81:8, 10; 84:8; 86:7, 14; 87:2; 90:7, 11, 13; 91:3, 5
**speaking** 84:22; 86:5; 92:6, 9
**special** 88:23, 24
**species** 15:15, 23; 32:18; 33:19; 34:5, 6, 7
**specific** 20:19; 26:22; 32:25; 33:9; 40:13; 41:3; 45:1; 49:1, 4, 19; 55:24; 56:6, 16; 57:13, 14, 22; 58:13, 17, 22; 62:23; 66:12; 69:14; 75:15
**specifically** 6:11; 14:6; 24:19; 25:21; 34:15; 40:18; 41:1, 14, 24; 47:25; 49:21; 50:25; 51:1; 54:23; 55:11, 17; 65:4; 93:12
**specifics** 42:15; 46:11
**speculate** 86:22
**speculation** 86:11, 24
**spell** 24:10
**spent** 16:4; 67:2; 78:9
**spoke** 12:10; 45:8, 16, 22; 51:11; 52:6, 6, 6, 16, 23, 24, 25; 53:2, 3; 54:22; 70:15; 90:15; 91:2
**spoken** 53:11; 71:7; 75:2; 89:14
**spring** 11:7; 17:4; 22:9, 12; 30:13; 31:1; 40:15; 45:8; 47:13; 50:12; 51:9, 22; 55:3; 59:16; 61:25; 64:9; 65:5, 6
**stance** 46:2

**stand** 18:8
**standards** 22:25; 48:16, 17, 18, 21, 23; 54:1, 2; 74:22
**standpoint** 5:16; 57:8
**stands** 17:8; 23:25
**start** 31:1
**started** 22:11, 19; 28:9; 30:16; 39:4, 12; 40:6, 14; 42:4; 43:6; 58:3; 59:25; 63:13; 76:8, 9
**starting** 43:17
**State** 7:2, 4; 21:7; 37:3; 48:21, 23; 53:21; 54:1; 58:24; 59:4; 60:18; 73:2, 15; 74:22; 89:5
**stated** 8:16; 11:22; 16:20; 54:14; 60:17; 72:8; 90:2; 91:14
**statement** 8:14; 23:24; 24:20; 33:2; 36:24; 38:16; 39:15; 45:20; 50:16; 51:8; 54:8; 57:20; 58:17; 64:10; 66:14; 74:2; 85:12; 89:21
**statements** 31:15; 32:25; 54:3; 57:2; 58:18; 59:12; 66:7
**States** 67:18
**stay** 25:12; 40:16
**Stephen** 20:10
**stick** 46:24; 88:5
**still** 5:25; 26:14; 28:12, 23; 30:25; 31:7, 19; 43:3, 10, 12; 75:17, 24; 90:24; 91:16
**stipulated** 3:2
**STIPULATION** 3:1
**stood** 23:12
**stopped** 82:20, 23; 83:21
**story** 41:18; 42:2
**straightforward** 39:8
**strikes** 86:15
**strong** 24:7
**strongly** 45:20
**student** 63:17
**student's** 63:18; 64:17
**students** 50:4; 74:9; 88:9
**studied** 68:4, 4
**Studies** 7:8
**study** 67:15, 16
**style** 82:7
**styles** 82:9, 10
**subject** 15:16; 24:8; 25:21; 26:13; 30:9; 35:6; 36:7, 16, 25; 37:1; 38:11; 39:14, 17; 53:17; 67:24; 69:3; 81:19; 88:22
**submitted** 92:3
**subpoena** 3:18
**subpoenas** 75:9
**substance** 37:21; 45:5, 18, 25; 57:6; 87:3
**suggestion** 12:22
**suit** 79:7, 14

ummer 28:7, 20; 32:1
uperintendent 6:6;
:18; 24:2; 25:9, 10; 36:9;
8:18; 39:18; 76:19; 82:11
uperintendents 83:25
uperiors 77:17
upplied 46:19
uppose 36:21
upposedly 53:25
Supreme 11:19; 48:2;
3:8
ure 11:9; 17:9; 19:10;
9:11, 21; 35:23; 53:18;
1:23; 71:5; 73:10; 75:1;
5:18
urfaced 28:8
urvival 15:25
susquehanna 46:16
wing 43:10
word 81:13
worn 3:8
ynonymous 13:17
ystems 83:24

## T

able 85:2, 3, 5; 92:18
alk 15:23; 30:17; 32:9;
4:7
alked 25:20; 30:12, 13;
2:19, 19; 53:8; 59:10;
2:22
alking 26:1; 35:3; 41:22;
0:24; 57:24; 60:11, 12;
1:24
ank 11:10; 60:25; 62:13
ape 11:15
aught 6:23; 10:20;
1:20; 15:15; 16:8; 18:18;
0:6; 31:4; 33:7, 14; 34:3;
7:15, 25; 58:10, 11, 19;
4:23, 24; 65:10; 66:11,
5, 17; 71:19, 19; 72:15;
6:9; 89:22
each 6:22; 15:14; 24:23;
8:22, 25; 40:2; 43:25;
8:24; 49:5, 9; 58:6, 14;
9:4; 69:25; 70:17, 17,
4:21; 84:15
eacher 6:24; 21:5; 74:2;
6:9; 77:9; 78:21
eacher's 63:20
eachers 9:23; 15:2, 13;
6:7, 21; 26:23; 27:3; 28:6,
6; 29:2, 6, 7; 30:4, 18, 21;
1:5, 12, 20; 32:6; 35:23,
4; 41:12; 43:14, 19;
4:13, 18; 46:11, 25; 47:1,
, 11; 52:11; 61:5, 13;
2:9, 14; 65:8; 69:25; 70:4,
7; 72:7, 18, 18; 84:6, 16, 16,
6; 85:10, 15; 89:22, 23
eaching 8:18; 9:12;
4:1, 3; 15:13; 16:12; 20:3;

24:21; 32:17; 45:21; 71:24
Technology 78:2
telephone 45:25
telephoned 75:4
telling 64:4
temper 92:19
tenure 12:24; 14:20;
15:14; 19:4; 31:11; 46:13,
14; 47:18, 22; 63:7, 16;
72:12; 74:21
term 11:16; 12:17, 25;
15:17; 54:24; 61:11, 14,
16, 21; 62:1, 4, 5; 71:11,
13
termed 13:14
terminologies 48:5
terminology 11:24; 48:7
terms 20:20; 22:25, 25;
47:8; 49:10; 67:24; 69:10
testified 3:8
testify 3:18
testimony 19:15
Testing 68:14
testy 80:19
textbook 11:13; 12:10;
13:15, 18; 14:11, 13, 19;
22:10; 23:13; 44:22;
51:16; 52:20; 53:16, 22,
24; 60:16; 73:4; 74:5
textbooks 11:6; 12:9;
13:13; 22:21, 22; 23:4, 23;
24:18; 25:22; 26:24;
28:10, 12, 24; 30:23;
35:23; 37:2; 38:11; 39:14;
40:8; 43:11, 11, 12, 13;
47:15; 51:19; 52:5, 10;
53:9, 10, 13, 19, 22; 56:19;
57:18; 60:1
texts 55:19, 24; 56:1, 2, 5,
5, 8
Th 88:19
thanked 46:21
theologian 69:8
theories 57:19; 73:16;
74:3, 7, 9; 89:23
Theory 13:4, 17; 16:23;
48:4, 6; 49:12; 55:2; 62:18;
67:25, 25; 68:3; 69:5, 7, 7,
13, 15, 15, 19; 70:16; 72:3,
10, 17; 73:3, 5; 74:10;
84:15; 90:1, 3
thinking 20:19; 37:20
third 30:25
thirty 5:10
thoroughly 47:8
though 31:8; 58:2
thought 16:12; 33:4;
38:6; 49:15; 56:14; 64:22;
66:10; 72:25; 85:8
threatened 80:14, 22
three 15:2, 25; 16:5; 31:6;
36:1; 43:13; 65:7; 76:17,
23; 77:23; 78:13
throughout 40:22
thrust 24:13

times 11:17; 16:20; 20:2,
11, 25; 36:8; 43:14; 50:23;
80:18, 21, 23; 81:5; 85:6;
88:6
tired 21:25; 47:14
title 13:2
today 4:16, 21; 40:24;
51:16; 74:11; 75:3; 86:5,
15
together 55:12; 82:13
told 8:11, 20; 9:8; 22:17;
25:16; 32:12, 13, 22; 39:1;
47:16; 62:25; 71:6; 72:11;
73:6, 8; 81:12; 85:7; 86:3,
3, 7, 13, 14; 93:11
tone 39:21; 85:6, 8, 9
took 5:23; 21:8; 50:25;
58:25; 59:1, 1; 67:10, 10,
11; 82:22; 89:3
topic 8:17; 9:11; 39:20;
52:20; 71:20
topics 93:12
tops 78:22, 24
touches 63:8
touted 48:17
toward 30:15
transcribed 4:20
transcript 5:7, 8, 10, 12
transpired 21:10; 34:18
treated 16:4; 19:16
tremendously 65:9
trial 3:5
tried 25:23; 66:16
TRUDY 3:7
truly 86:23
try 27:18; 28:15; 30:20;
51:15; 67:23; 69:10
trying 5:23; 12:23; 23:8;
25:13; 26:3, 10, 19; 27:22;
30:11; 31:15, 21; 34:2;
35:15; 36:12; 37:8, 11, 13,
19; 38:4; 39:9; 41:17, 20,
23; 42:1, 9, 13; 51:4;
56:21, 25; 57:6; 77:14;
81:24; 83:3; 86:6, 8, 17,
19; 89:4
twelve 6:23
twisted 64:20
two 9:23; 11:1; 12:25;
26:7; 30:18; 40:23; 75:9;
78:9; 88:12; 90:21

## U

uncomfortable 6:9; 89:7
under 23:4; 31:10
understood 32:16; 59:8;
73:11
unfolded 26:4; 41:18, 24
unfolding 42:3
unfolds 44:25
unfortunately 88:16
unique 36:10, 15, 25;
38:17; 39:16

United 67:18
University 7:2, 4, 6, 8;
46:16
unless 45:3
unsatisfactory 56:14
unusual 86:16, 18
unwarranted 39:23
up 11:18; 12:3; 13:16;
19:17; 23:22; 24:19;
25:10, 22; 26:10, 13, 23;
27:13; 28:22; 30:10; 31:1;
33:20; 40:25; 42:6; 43:4;
44:14; 48:1, 14; 50:4;
51:11; 52:8, 15; 53:5;
54:24; 56:23; 57:9, 23;
58:9, 9; 59:11; 60:23;
64:20; 68:6, 7; 70:20, 25;
75:10; 81:21; 82:1; 83:5;
90:18; 92:20
upset 83:12; 90:14
urge 14:18
use 12:13; 15:4, 17;
20:15; 60:7; 71:11; 79:23
used 11:16; 12:14, 17,
19; 14:22; 16:2; 20:14;
49:10; 53:25; 61:11, 12,
14, 19; 62:2, 4; 71:13
using 53:14; 61:16
usually 29:18

## V

variety 76:15
vehemently 45:17
verbal 5:2
verbally 10:1, 5
verses 12:6
versus 3:14; 32:17; 59:4
Vice-President 90:22;
91:18
video 16:20, 22; 44:19;
60:22, 24; 62:14, 15, 17
videotape 11:8, 11, 12
view 11:8, 11; 16:6; 37:3;
62:14; 66:18
viewed 50:22
views 24:8; 35:11; 36:10,
15, 18, 21, 23, 25; 37:6;
38:13, 17; 39:16; 45:24;
46:3; 50:21; 51:2; 57:24;
64:8; 86:21, 22
violate 91:6
violation 73:7
violations 88:23
Virginia 4:3; 78:5, 7, 8
visible 82:12
vitae 76:23
vo-tech 76:17
voice 80:24; 85:7, 8, 9
voted 21:13
vs 11:19

## W

waived 3:4
wants 38:22
Warrington 78:7
Washington 11:10
waste 76:13
watch 16:16; 60:22
way 10:3, 10, 16; 12:22;
34:3; 42:2; 44:2; 49:23;
66:10; 74:6
ways 42:7
wear 78:24
wearing 78:21
week 44:8; 45:2; 63:14
week's 18:4
Wenrich 91:13
weren't 29:22; 30:4; 32:9;
51:1; 80:5; 82:17, 18
whole 16:22; 21:10; 52:4;
64:20
whose 64:1
wife 12:3; 18:15
wild 67:20
Wildlife 67:19
William 10:23; 18:2; 69:9;
81:1
win 20:6
wish 31:13; 91:10
withdrawn 79:20
withdrew 80:10
witness 3:7; 39:22
wolf 67:14, 17
wolves 67:19, 20
woman 19:22; 85:25
won 20:5
word 12:13, 14, 19; 15:4
words 5:1; 18:12; 31:24;
34:1; 39:11; 86:13
work 67:7, 9; 82:13
working 68:21
works 32:2
writing 10:2, 6; 75:6;
90:9; 91:20, 25; 92:25;
93:1, 9
written 4:20; 5:3; 7:25;
23:16, 18; 43:21, 23;
46:20; 56:17; 91:4, 14
wrong 82:8; 83:21
wrote 64:3; 81:9

## X

xerox 14:5

## Y

year 23:11; 26:1, 4, 17,
17, 21; 28:4, 5, 11; 29:14,
18; 30:7, 15; 32:2; 43:9,
10; 47:14, 14; 78:6; 79:4;

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Trudy Peterman
April 7, 2005

89:5
**years** 7:12; 11:25; 12:16,
5; 18:7; 20:4; 29:16, 17;
40:23; 41:7; 67:21; 69:17;
75:24, 25; 76:10, 14, 20,
25; 77:14, 17, 23; 78:1, 9,
13, 25
**Yellowstone** 67:16
**Yingling** 19:24; 87:19
**York** 60:7
**young** 75:24
**younger** 30:20