# APPENDIX I

# TAB R

# In The Matter Of:

*Tammy Kitzmiller, et al.   v.*
*Dover Area School District, et al.*

---

*Bertha E. Spahr*
*May 19, 2005*

---

*Filius & McLucas Reporting Service, Inc.*
*1427 East Market Street, York, PA*
*4309 Linglestown Road, Harrisburg, PA*

*(717) 845-6418   or   (717) 236-0623*

*Original File BS051905.TXT, 201 Pages*
*Min-U-Script® File ID: 0941183289*

# Word Index included with this Min-U-Script®

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Bertha E. Spahr
May 19, 2005

[1]
1         IN THE UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
[2]
[3]  TAMMY KITZMILLER, et al., . Civil Action No.
          Plaintiffs .  04-CV-2688
[4]
          vs.        . (JUDGE JONES)
[5]
     DOVER AREA SCHOOL DISTRICT, .
[6]  et al.,          .
          Defendants .
[7]
[8]
[9]     Deposition of: BERTHA E. SPAHR
[10]    Taken by              : Defendants
[11]    Date                  : May 19, 2005, 10:11 a.m.
[12]    Place                 : Two School Lane
             Dover, Pennsylvania
[13]
     Before                : Bethann M. Muley, Notary Public
[14]         Registered Professional Reporter
[15]
[16]    APPEARANCES:
[17]  AMERICAN CIVIL LIBERTIES UNION OF PENNSYLVANIA
          By: PAULA KNUDSEN, ESQ.
[18]
[19]         For - Plaintiffs

        THOMAS MORE LAW CENTER
[20]       By: PATRICK T. GILLEN, ESQ.
[21]         For - Defendants
[22]    KILLIAN & GEPHART, LLP
          By: JANE GOWEN PENNY, ESQ.
[23]
[24]         For - Bertha E. Spahr

     ALSO PRESENT: Michael Baksa
[25]         Rena Staub

---

[1]              INDEX
                 WITNESS
[2]
[3]                          Examination
[3]
     BERTHA E. SPAHR
[4]
       By Mr. Gillen              3
[5]
[6]
                 EXHIBITS
[7]
       B. Spahr Deposition            Page
[8]  Exhibit Numbers            Marked
[9]  1. Documents Labeled Research        121
[10] 2. Handwritten Notes        159
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

---

[1]        STIPULATION
[2]  It is hereby stipulated by and between
[3]  counsel for the respective parties that
[4]  sealing, certification and filing are hereby
[5]  waived; and all objections except as to the
[6]  form of the question are reserved to the time
[7]  of trial.
[8]
[9]     BERTHA E. SPAHR, called as a witness,
[10] having been duly sworn, testified as follows:
[11]              BY MR. GILLEN:
[12]    Q: Good morning, Mrs. Spahr. I've introduced
[13] myself to you off the record. I'll do it again
[14] for the purpose of the record. My name is
[15] Patrick Gillen, and I'm an attorney for the
[16] defendants in this case. And as you know, this
[17] is the time and place set for your deposition
[18] which is my opportunity to ask you questions
[19] under oath, get your answers, and as I see it
[20] basically to get your side of the story.
[21]    Plainly we have a dispute here. People
[22] have different viewpoints as to what happened
[23] and so on. This is my chance to find out what
[24] you know about the dispute.
[25]    There are a few facets of this process that

Bertha E. Spahr
May 19, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 4

[1] are sort of unique. The first is that Beth
[2] transcribes our exchange which places a premium
[3] on verbal answers to questions. And it's
[4] surprising how often we don't respond verbally.
[5] So throughout the process, please try and
[6] respond to my questions with yes or no or an
[7] explanation but not some of the things that we
[8] generally do like head nods or uh-huh or
[9] gestures that are difficult for Beth to record.
[10]      Relatedly, the exchange and the desire to
[11] record places a premium on complete sentences.
[12] If you would allow me to finish my questions
[13] before you begin to answer, you may well know
[14] what I'm getting at and begin to answer, but it
[15] makes the transcript a little difficult to
[16] follow, so please allow me to finish. I frankly
[17] confess that's a little difficult for me because
[18] sometimes I pause when I'm asking a question,
[19] but do your best.
[20]      The process also tends to lay bare the
[21] imprecision of human communication. You may
[22] find some of my questions unclear and not know
[23] what I'm trying to ask. If that's the case, let
[24] me know, and I'll do my best to clarify my
[25] question and make it more precise.

Page 5

[1]      By the same token, sometimes it's difficult
[2] for me to understand your answer. If I'm asking
[3] you questions to follow up, it's not for the
[4] purpose of harassing you. I just want to make
[5] sure where you're coming from and what you're
[6] getting at.
[7]      The deposition process is not an endurance
[8] contest. If at any time you would like to take
[9] a break, please let me know, and we'll do that.
[10] Likewise, my purpose today is not to harass you
[11] or make you feel uncomfortable. If I'm asking
[12] you a question that makes you feel
[13] uncomfortable, please let me know, and I'll do
[14] my best to respect your sensitivity consistent
[15] with my duty. I think that covers sort of the
[16] preliminary matters.
[17]      Have you ever been deposed before?
[18]      A: No.
[19]      Q: As we sit here today, Mrs. Spahr, are you on any
[20] medication that might impair your ability to
[21] perceive and respond to my questions?
[22]      A: None.
[23]      Q: If we look at the period from say January 2004,
[24] has there been any time during that period where
[25] you've been on medication that might impair your

Page 6

[1] ability to perceive?
[2]      A: I have never been on medication.
[3]      Q: Excellent. Do you have any handicaps that make
[4] it difficult for you to perceive, recollect,
[5] respond?
[6]      A: No, I do not.
[7]      Q: That's good. A few preliminary questions about
[8] anyone— Well, first, would you state your full
[9] name for the record.
[10]      A: My name is Bertha E. Spahr.
[11]      Q: And your current address?
[12]      A: 1385 Grandview Road in Spring Grove,
[13] Pennsylvania.
[14]      Q: How would you prefer that I address you for
[15] purposes of this deposition?
[16]      A: You may address me as Bert which is my nickname
[17] and appears on several— But my— Most people
[18] in my department call me Bert. My first name is
[19] Bertha. That's fine.
[20]      Q: I appreciate that. You've come up frequently as
[21] Bert, so it will be easier for me to do that if
[22] you don't mind. And for my part, call me Pat if
[23] you have a question that you want to direct to
[24] me, although I ask the questions, but if we need
[25] to talk, please use my first name.

Page 7

[1]      Let me ask you, did you speak with anyone—
[2] Well, I see that you've retained counsel today,
[3] correct?
[4]      A: That's correct.
[5]      Q: Other than your counsel, have you spoken with
[6] anyone in preparation for this deposition?
[7]      A: Certain members of my department. We happen to
[8] eat lunch together.
[9]      Q: When was that?
[10]      A: Well, most of this week, most of last week. I
[11] mean, we did not specifically sit down to
[12] discuss anything there, but members of my
[13] department would say to me, well, when exactly
[14] is it that the department is to be deposed, and
[15] we would say Wednesday, Thursday, and Friday of
[16] this week. Did we discuss issues, the answer is
[17] no.
[18]      Q: That's what I was going to ask you, did you put
[19] your heads together to try to recollect events?
[20]      A: No.
[21]      Q: How about apart from your colleagues in the
[22] science department, did you speak with anyone
[23] else in preparation for the deposition?
[24]      A: No. I had several members of the staff ask us
[25] when the depositions were to occur, but that was

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Bertha E. Spahr
May 19, 2005

[1] the extent of the discussion.

[2]    Q: How about reviewing documents in preparation for
[3] the deposition, did you review documents?

[4]    A: I looked over my time line which I have in front
[5] of me. I looked over the statement that I read
[6] to the board in October. I looked over the
[7] history of the ordering of the textbooks. And I
[8] also looked over the curriculum in relationship
[9] to the Pennsylvania state standards.

[10]    Q: I take it that you've provided all those
[11] documents in response to the subpoena?

[12]    A: Yes, we did.

[13]    Q: Thank you very much. Just with respect to that
[14] subpoena, Bert, it seems to me that my
[15] understanding is that science department
[16] teachers as a whole collected information as a
[17] group which they provided in one set.

[18]    A: That is correct.

[19]    Q: For the most part.

[20]    A: That is correct.

[21]    Q: And then today you have kindly provided me with
[22] some additional materials, a small clip of
[23] documents, which reflect communications with
[24] news media personnel?

[25]    A: That is correct.

[1]    Q: And some other materials in a box there which I
[2] understand to be e-mails that came to Dover
[3] schools relating to this dispute which you got
[4] off the computer system?

[5]    A: I was given them, hard copies from the website.
[6] Some of them came to me personally at my
[7] address, but they are all of the e-mails that I
[8] received concerning this issue.

[9]    Q: Just to be sure on that score, have you checked
[10] your home computer for any documents that might
[11] relate to the—

[12]    A: I do not use my home computer for anything
[13] related to school.

[14]    Q: Good. So you're pretty sure that this is a
[15] complete collection of documents?

[16]    A: To the best of my knowledge.

[17]    Q: Again, just to be sure, did you talk with any of
[18] the plaintiffs in this case in preparation for
[19] your deposition?

[20]    A: Not in preparation for the deposition. I have
[21] spoken to Mr. Bryan Rehm on occasion. He was a
[22] former physics teacher here. And we were
[23] looking for pieces of equipment that were in his
[24] room when he left. I could not find them. So I
[25] spoke to him to ask in which closet they may be

[1] found. But it did not involve anything related
[2] to this.

[3]    Q: To make sure I understand, Mr. Rehm left the
[4] school district?

[5]    A: At the end of last year.

[6]    Q: Have you spoken with him since that time about
[7] the subject matter of this litigation by which I
[8] mean the purchase of the biology text, the text
[9] Of Pandas, the changes to the biology
[10] curriculum?

[11]    A: The only thing I have spoken to him on, and it
[12] was a call from him to me, it had to do with his
[13] running for the school board election, and that
[14] was the issue that was discussed at the time,
[15] would my son who lives in the district put a
[16] sign in his yard.

[17]    Q: Apart from that exchange, anything else?

[18]    A: No.

[19]    Q: Now, I understand from Jen Miller that you have
[20] spoken with plaintiffs' counsel in this case.
[21] Is that correct?

[22]    A: That is correct.

[23]    Q: Tell me when you spoke with them.

[24]    A: Well, spoke or you mean via e-mail?

[25]    Q: Well, very good. Let me make my question more

[1] precise, communicated with plaintiffs' counsel.

[2]    A: The earliest time that I communicated with Eric
[3] Rothschild involved November. He had contacted
[4] me and indicated that there were some parents
[5] who were concerned in the district, would I
[6] supply him with some information that I had
[7] obviously through my department gathered, and he
[8] requested that I send that information to him,
[9] which I did so.

[10]    Q: What did you send him at that time?

[11]    A: There is a communication that you have in your
[12] documents that lists it all. I have it here in
[13] my own binder. If you would like me to, I will
[14] get it out and read it to you.

[15]    Q: Well, if you have something that would refresh
[16] your recollection, please do.

[17]    A: It is dated 11/8/04. It says, I sent the
[18] Pennsylvania state standards for teaching
[19] evolution, my filed materials regarding the
[20] whole curriculum development leading to the ID
[21] resolution, the draft of the guidelines for
[22] teaching ID given to teachers by Mr. Baksa, the
[23] textbook analysis of the Panda book, and the
[24] statement that I made at the October 18th
[25] meeting of the school board and the revised

ertha E. Spahr
May 19, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

**Page 12**

[1] board policy on curriculum development.

[2]   Q: Bert, it appears you've produced all those

[3] documents to me, correct?

[4]   A: That's correct.

[5]   Q: Did you have any conversations with

[6] Mr. Rothschild about those materials?

[7]   A: He did ask me on several occasions to clarify

[8] what was written because we sometimes write

[9] notes on the side, and, you know, two to three

[10] years down the road trying to explain some of

[11] those notes to someone else. He did ask me

[12] about the clarification of what we perceive to

[13] be the change in the policy where before there

[14] was input from five different groups when the

[15] curriculum was changed. And in October the

[16] curriculum was changed virtually by the board

[17] and was basically given to us. He did ask about

[18] the past practice.

[19]   Q: It seems your focus — or he was focused on the

[20] policy-making process?

[21]   A: Yes.

[22]   Q: Apart from that, Bert, have you spoken with

[23] Mr. Rothschild about the subject matter of this

[24] litigation?

[25]   A: Yes.

**Page 13**

[1]   Q: Tell me, what else have you spoken to him about?

[2]   A: Most recently he called me and asked me to

[3] respond to the accuracy to a memo that came from

[4] Dr. Peterman, were the contents of that memo

[5] accurate, and I responded to him to the best of

[6] my knowledge, yes, they were.

[7]   Q: Anything else?

[8]   A: That was the most recent one. One time he did

[9] call us, the members of the science department,

[10] he had basically stopped to see us again about

[11] something. And they went to a board meeting,

[12] and we all sat together to basically determine

[13] the nature of the community and the nature of

[14] the board at a board meeting.

[15]   Q: Do you think that was in December 2004?

[16]   A: It was at the end of the year. I don't know if

[17] it was in November or December specifically.

[18]   Q: Anything else?

[19]   A: Not that I can think of.

[20]   Q: How about any other plaintiffs' counsel?

[21]   A: We met with Paula. As a matter of fact, two

[22] different contingents of the science department

[23] met with Paula concerning some clarification of

[24] issues, and that was not too long ago. I have

[25] to hunt my paper here.

**Page 14**

[1]   Q: Consulting your time line?

[2]   A: Yes. That was on the 22nd of April, Rob, Jen,

[3] and I met with Paula for background

[4] clarification. And then on the 28th Bob Linker,

[5] Leslie Prall met with Paula for the same reason.

[6]   Q: On the 22nd meeting what did you discuss with

[7] Paula?

[8]   A: Certain— She had some questions concerning

[9] background of the documents that she had

[10] received. I'm not specifically sure what issues

[11] there were but asked for our clarification or

[12] our understanding of whatever was there.

[13]   Q: When you referenced documents she received, are

[14] those documents you produced in response to a

[15] subpoena served on you by the plaintiffs? I see

[16] you're looking at Paula.

[17]   A: They are the same documents that we gave to the

[18] Thomas More Law Firm that then went to Tom

[19] Scott, and I am assuming they then went to them.

[20]   Q: That's the thrust of my question.

[21]   A: I did not give it to them.

[22]   Q: Good enough. There's no secret. I just wanted

[23] to make sure it's the same set of documents

[24] we're all looking at.

[25]   A: I think so.

**Page 15**

[1]   Q: Well, let me ask you, who collected the

[2] documents to hand over to Paula?

[3]   A: Jen Miller, Rob Eshbach, and I were given a day

[4] off from school to basically compile what is

[5] basically this together, and we basically worked

[6] roughly 24 hours to get it together so that it

[7] was basically given to the administration, and

[8] they disseminated the information.

[9]   Q: Do you remember any particulars of your exchange

[10] with Paula relating to the documents?

[11]   A: Not specifically. I do not.

[12]   Q: Did you speak with Paula, and we're referencing

[13] Paula Knudsen, plaintiffs' counsel, did you

[14] speak with her on more than one occasion?

[15]   A: I believe she was in attendance when we went to

[16] the board meeting, now when that was in November

[17] or December, and then again on the 22nd is the

[18] only time I remember speaking to her.

[19]   Q: How about any other plaintiffs' counsel that

[20] you've spoken with?

[21]   A: No.

[22]   Q: How about any communications with the NCSE, have

[23] you been in contact with the National Center for

[24] Science Education?

[25]   A: Is that the one that's out of California?

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Bertha E. Spahr
May 19, 2005

Page 16

[1]  Q: I believe it is.
[2]  A: And Nick whatever the name is with an M?
[3]  Q: Matske.
[4]  A: Yes. Have I been in communication with him, I
[5]  have received e-mails from him, and they are in
[6]  the packet of e-mails which are in the box.
[7]  Have I been in any personal communication, the
[8]  answer is no.
[9]  Q: Thank you. How about an organization NSTA?
[10]  A: National Science Teachers Association, I am a
[11]  member of the National Science Teachers
[12]  Association. I also received an e-mail at
[13]  school from that organization. I have not yet
[14]  been personally in contact with them.
[15]  Q: I'm going to ask you a few questions about—
[16]  Well, let me ask you, have you contacted or
[17]  communicated with any former board members in
[18]  preparation for the deposition?
[19]  A: Not in preparation for the deposition, but I
[20]  have spoken to former board members.
[21]  Q: We'll get to that I guess as we go. Well, let
[22]  me ask you, have you spoken with former board
[23]  members since the lawsuit was filed?
[24]  A: Yes.
[25]  Q: Who have you spoken with?

Page 17

[1]  A: Barrie Callahan. She had called me to ask if
[2]  any member of the science department had
[3]  videotaped the presentation that Dr. Behe did in
[4]  the school district from, I don't know, 11 to 12
[5]  on whatever that open house day was.
[6]  And I had indicated to her that none of the
[7]  members of the department had. I believed that
[8]  the school district had done so and she would
[9]  have to inquire as to what procedure would be to
[10]  get that. But that was the contact that I had
[11]  with Mrs. Callahan.
[12]  Q: Apart from that contact with Ms. Callahan, have
[13]  you had any other communications with her since
[14]  the lawsuit was filed?
[15]  A: Not since the lawsuit was filed. I remember she
[16]  had sent me some information, background
[17]  information or research, having to do with
[18]  creationism and evolution and whatever, but that
[19]  was early in fall. That was prior to the
[20]  December 15 filing of the lawsuit.
[21]  Q: Early in the fall of 2004?
[22]  A: Yes.
[23]  Q: Were they printed materials?
[24]  A: Yes, they were printed materials. I believe
[25]  they are in the packet that you have that is

Page 18

[1]  labeled research.
[2]  Q: How about prior to that communication— We'll
[3]  set that aside for now. Any other
[4]  communications with former board members?
[5]  A: I have spoken to Casey Brown. She had called to
[6]  inquire of me, and this had nothing to do with
[7]  the lawsuit, but it had to do with the biology
[8]  book. When we were basically preparing to
[9]  select a biology book, she had some questions
[10]  regarding both the new biology text that we were
[11]  proposing and the new chemistry text. And I
[12]  answered those questions because at that point
[13]  she was on the curriculum committee.
[14]  Q: What were the questions that Casey Brown had
[15]  about the biology text?
[16]  A: Basically what differences appeared between the
[17]  1998 edition and the 2002 edition. Most often
[18]  she would ask of me the difference in the
[19]  chemistry text because obviously biology is not
[20]  my field of expertise.
[21]  And it had to do with her commenting on the
[22]  fact that the problem presentation in the new
[23]  version that we wanted to get was easy enough
[24]  that she could understand it. And she thought
[25]  that this would probably be very good for

Page 19

[1]  students, and she was very supportive of the
[2]  selection of the chemistry text that we had.
[3]  Chemistry is not usually very
[4]  controversial. I mean, it's pretty cut and dry
[5]  with the math. But she had, you know, asked
[6]  some things as to where they differ, why we
[7]  changed book publishers, why we changed book
[8]  authors. And we — I was happy to point that
[9]  out to her for clarification.
[10]  Q: How about any conversations with Angie Yingling?
[11]  A: I have never had a conversation with Angie
[12]  Yingling.
[13]  Q: Jane Cleaver?
[14]  A: No.
[15]  Q: Noel Wenrich, have you spoken with him about the
[16]  subject matter of this dispute?
[17]  A: I have spoken to Noel after a board meeting.
[18]  Actually it was after the board meeting where I
[19]  read my statement. He came up to me afterwards
[20]  and gave me a hug and said, I'm sorry things
[21]  went the way they went. That was the extent of
[22]  the conversation.
[23]  I have worked with Mr. Wenrich when he was
[24]  on the board having to do with the design of the
[25]  new science labs. We had discussions on where

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

Page 20

[1] things should go, what should be the design of
[2] the tables. But that basically had to do with
[3] the new building project, nothing to do with
[4] this.
[5]    Q: So it seems you've never discussed the biology
[6] text, biology curriculum issue with—
[7]    A: No.
[8]    Q: How about any of the current board members, have
[9] you spoken with them personally about the
[10] subject matter of this dispute, the selection of
[11] the biology text, the Of Pandas text, the change
[12] to the curriculum?
[13]    A: We were called into meetings with the curriculum
[14] committee. The curriculum committee at that
[15] time was Mrs. Harkins, Mr. Buckingham, and Casey
[16] Brown. So in those meetings we certainly held
[17] discussions but certainly not outside the forum
[18] of— No.
[19]    Q: Very good. I mean, we'll get to those, as you
[20] know.
[21]    A: Right.
[22]    Q: Likewise, communications with Mr. Bonsell
[23] limited to communications in connection with
[24] meetings of the board curriculum committee?
[25]    A: That's correct, yes, involving the board

---

Page 21

[1] curriculum committee. He sat in on some of the
[2] curriculum committee meetings as president of
[3] the school board. He was not actually a member
[4] of the committee. I believe he presently now is
[5] the chair of that committee.
[6]    Q: I'm going to ask you a few questions just to
[7] explore any connections you might have with some
[8] of the persons involved in this dispute. Do you
[9] have any relations by blood or marriage to
[10] anyone who's been on the Dover Area School
[11] District School Board since December 2002?
[12]    A: No.
[13]    Q: How about anyone that's served in the
[14] administration for the school district?
[15]    A: No.
[16]    Q: How about any other employees of the school
[17] district?
[18]    A: There are other employees of the school district
[19] whose last name are Spahr. I do not know if
[20] there is a distant relationship but not as far
[21] as I know.
[22]    Q: Good enough. How about any business dealings,
[23] did you have any business dealings apart from
[24] your employment with the school district with
[25] anyone?

---

Page 22

[1]    A: No, I did not.
[2]    Q: Anyone in the administration?
[3]    A: No.
[4]    Q: Any shared memberships in fraternal or community
[5] organizations with anyone that's been on the
[6] Dover Area School District School Board since
[7] January 2000?
[8]    A: Would you clarify that. Are you talking about
[9] Lions Club?
[10]    Q: Yes, things like that.
[11]    A: No, I am not, no.
[12]    Q: How about same thing for the administration,
[13] same question.
[14]    A: There are some professional organizations that I
[15] belong to that I have no knowledge whether they
[16] belong to as well.
[17]    Q: Good enough. How about do you have any
[18] relationship outside your relationship as a
[19] teacher and member of a union with Sandy Bowser?
[20]    A: Sandy Bowser is one of the older members of our
[21] staff, and my primary connection to her is I am
[22] chair of the meet and discuss committee for the
[23] association, and so we have regular meetings in
[24] which she is in attendance. I do not have a
[25] social relationship with her outside the school

---

Page 23

[1] district.
[2]    Q: Bill Miller, same question.
[3]    A: No.
[4]    Q: Brad Neal?
[5]    A: No.
[6]    Q: Now, we know, Bert, both you and I, what brings
[7] you here today, and so I want to try and just,
[8] as I say, watch that story unfold from your
[9] perspective.
[10]    We have here a set of documents which is
[11] part of the teachers' production which we used
[12] yesterday when we were working with Jen Miller.
[13] And what I want to do is just let you take a
[14] look at those. It might be easier if we laid
[15] them out.
[16]    The first thing I'd like you to do is to
[17] focus on the period before January 2002, and I
[18] know that seems a long way off. And I just want
[19] to ask, prior to that time, prior to
[20] January 2002, was the biology text or the
[21] biology curriculum an issue in your — let me
[22] ask you, in your experience as a teacher at
[23] Dover Area School District?
[24]    A: Are you asking me when we previously ordered a
[25] biology textbook did this controversy ever come

---

**Min-U-Script®**      **Filius  &  McLucas Reporting Service, Inc.**

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Bertha E. Spahr
May 19, 2005

**Page 24**

[1] up to light?
[2]    Q: Well, yes. Let me ask you this by way of
[3] background, when did you start work at Dover
[4] Area School District, Bert?
[5]    A: 1965 to '66. I have been here for 40 years.
[6]    Q: I will say that every witness has demonstrated
[7] considerable respect for you, Bert. That's a
[8] long time.
[9]    A: Yes, it is.
[10]    Q: Were you hired on as a biology teacher?
[11]    A: I am not a biology teacher.
[12]    Q: Oh, chemistry.
[13]    A: My only certification is chemistry.
[14]    Q: Chemistry.
[15]    A: Yes. My first year is the only year I taught
[16] physics, Chem I, and Chem II.
[17]    Q: Now, when did you become head of the science
[18] department?
[19]    A: About ten years ago after the retirement of
[20] Mr. Glass.
[21]    Q: Mr. Glass?
[22]    A: Yes, Mr. Larry Glass.
[23]    Q: Ten years ago, so what's that, '95?
[24]    A: It might be 10, 11, but it's certainly around 10
[25] years ago.

**Page 25**

[1]    Q: Now, prior to your becoming chair of the
[2] department, would you be involved in the process
[3] of selecting the biology text?
[4]    A: No.
[5]    Q: Biology curriculum?
[6]    A: No.
[7]    Q: So let's look at the period from your tenure as
[8] head of the department up through 2002. You get
[9] the gist of my question. During that period
[10] when biology texts came up for selection where
[11] the biology curriculum was worked on or
[12] discussed, were the issues that are the subject
[13] matter of this litigation, the presentation of
[14] evolutionary theory, a possible purchase of
[15] other texts or presentation of other theories or
[16] subject matter, did they ever come up in that
[17] period of time?
[18]    A: Not to my knowledge.
[19]    Q: There's a few e-mails I just want to ask you
[20] about. If you would, Bert, please direct your
[21] attention to the exhibit marked Miller 5. And
[22] back towards I'd say two-thirds of the way
[23] through that packet of document there's an
[24] e-mail from Robert Hamilton to you dated
[25] December 15th, 2004, and the subject is,
[26]

**Page 26**

[1]    Various.
[2]    A: Got it.
[3]    Q: And then to save us time, I'll ask you to look
[4] at Miller 6, and a third of the way through the
[5] pack you'll see another e-mail from
[6] Mr. Hamilton. It's dated March 28th, 2005 with
[7] the subject, I have not forgotten.
[8]    MS. PENNY: We have the two e-mails in
[9] front of us.
[10]           BY MR. GILLEN:
[11]    Q: Now, I wanted to ask you a few questions about
[12] Mr. Hamilton. I don't know, he's a fairly new
[13] character. Who is he?
[14]    A: Mr. Hamilton was a former member of the biology
[15] department, and his role was to teach
[16] technoscience which is now our present
[17] environmental course, and he taught honors
[18] biology.
[19]    He then went from the science department
[20] into the administration and became our principal
[21] of the high school. I had the pleasure of
[22] teaching a course on the ecology of Bermuda with
[23] Mr. Hamilton in the summer with 20 of our
[24] students, great honors bio man.
[25]    Q: Really?

**Page 27**

[1]    A: Yes, very much so.
[2]    Q: Was that course in Bermuda?
[3]    A: Yes, nine days. We stayed at the Bermuda
[4] Biological Station for Research.
[5]    Q: What I'm interested in is did Mr. Hamilton ever
[6] discuss with you incidents that he thought were
[7] related to this dispute?
[8]    A: Not until after the fact and basically this memo
[9] that— And I'm not sure discuss was the word.
[10] I received the memo, okay, and in the memo, as
[11] you see highlighted in the second paragraph, he
[12] indicates, which we had gotten some rumblings
[13] of, that there was some concern among board
[14] members concerning this evolution presentation
[15] in the biology curriculum. It was as far as we
[16] knew at that point in time with his tenure
[17] handled in his administrative office. We did
[18] not have meetings with him with board members
[19] present on this issue.
[20]    Q: Did he give you any other details about—
[21]    A: No, he did not other than what's written right
[22] here.
[23]    Q: It seems, Bert, from your answer that you didn't
[24] discuss it in further detail with him?
[25]    A: No, I did not.

Bertha E. Spahr
May 19, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 28

[1] Q: Do you know if any member of the science
[2] department did?
[3] A: No, I do not.
[4] Q: It seems from what you've said that whatever
[5] Mr. Hamilton is referencing in this e-mail—
[6] And for the record, I'll say you're referencing
[7] the e-mail dated 12/15/2004. Is that correct?
[8] A: That's correct.
[9] Q: —was news to you at that time?
[10] A: Certainly as it is presented here it was news
[11] that, you know, there have been some board
[12] concerns which because he was a biology teacher
[13] I'm sure he felt quite capable of answering and
[14] handling himself. And, therefore, it certainly
[15] did not come to me because I'm chemistry. Now,
[16] whether it went to other members of the biology
[17] department that are no longer with us I cannot
[18] answer.
[19] Q: It indicates or makes reference to his
[20] principalship. When did he become principal, do
[21] you know?
[22] A: That I can't answer.
[23] Q: That's fine. When did he leave again?
[24] A: Well, Mr. Riedel is there this year.
[25] Dr. Peterman was there for two years, so it

Page 29

[1] would have been four years ago. I'm not sure of
[2] the exact dates, but it was four years ago.
[3] Q: That's quite all right. Don't worry about it.
[4] If we look at Miller 6, again, there's another
[5] e-mail from Mr. Hamilton in which he is seeking
[6] your peanut brittle recipe among other things.
[7] Did you ever have a discussion with Mr. Hamilton
[8] in connection with this e-mail?
[9] A: He came to my home to pick up the peanut brittle
[10] recipe. He did indicate that he certainly will
[11] think about us over this issue because he is at
[12] heart a biology teacher. Did we discuss any
[13] particulars of the situation, not really other
[14] than he was certainly supportive and he will
[15] always keep us in his thoughts.
[16] Q: In your capacity as head of the science
[17] department, did you ever have occasion to
[18] discuss with Mr. Hamilton the manner in which he
[19] presented evolutionary theory?
[20] A: No, I did not.
[21] Q: We're up through 2002, and it seems like at
[22] least so far as you were concerned based on your
[23] personal knowledge, things you heard or saw and
[24] so on, the biology curriculum wasn't an issue of
[25] controversy up to that period?

Page 30

[1] A: I mean, you always— We always had people in
[2] the community, because it's a very conservative,
[3] religious community, that when, you know,
[4] evolution was brought up would always ask
[5] questions or whatever. But we always tried to
[6] take a middle of the ground road that we did not
[7] offend many people.
[8] Q: Well, let's talk about that, Bert, just look at
[9] it in the period— Well, let's look at
[10] community concerns generally prior to 2003.
[11] A: Okay.
[12] Q: Tell me how those concerns came to your
[13] attention.
[14] A: They were never called to me in terms of my
[15] attention. We were always very aware, though,
[16] of the varying groups within the community and
[17] simply took a very cautious presentation. Now,
[18] I do not teach biology, so if you are asking me
[19] exactly how it was taught, I can't respond to
[20] that.
[21] Q: And I'm not. I think I'm understanding better
[22] now. Do I understand you correctly that you're
[23] saying teachers in the science department knew
[24] that they were teaching in this particular area
[25] had a sense for the cultural environment?

Page 31

[1] A: That's correct.
[2] Q: And then also an appreciation for the cultural
[3] dimensions of this theory. Is that right?
[4] A: That's correct.
[5] Q: And they endeavor to be sensitive to those
[6] considerations?
[7] A: That's correct.
[8] Q: If we look at the period prior to 2002, do you
[9] recall any discussions with your teachers, your
[10] science teachers, that were focused on the ways
[11] in which they demonstrated that sensitivity to
[12] the cultural context in which evolutionary
[13] theory was presented?
[14] A: No.
[15] Q: So now we're in January 2003. Tell me, Bert,
[16] did the subject matter of this litigation,
[17] selection of the biology text, some controversy
[18] surrounding that, or some concern expressed
[19] relating to the presentation of evolutionary
[20] theory, did they come to your attention during
[21] 2003?
[22] A: 2003 was our year to order the new biology
[23] textbook. We traditionally send our budget to
[24] the administration and the board in January for
[25] the following year. Since it was our cycle to

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Bertha E. Spahr
May 19, 2005

**Page 32**

[1] order books, the proposed new biology book where
[2] the biology teachers individually and together
[3] reviewed various textbooks and their
[4] recommendation was this at that point 2002
[5] Miller and Levine biology book. That was sent
[6] basically to the administration. We were told
[7] it was going to be delayed a year because the
[8] books that we had were still in relatively good,
[9] usable condition.
[10]     We at that point took them at word that
[11] that really was the reason that it was being
[12] held up. In looking back now, we do question
[13] whether there were other things behind it.
[14]     There was apparently some board interest,
[15] okay, later on in the spring of 2003 which did
[16] not get to the department, okay, where some
[17] people either in the community or on the board
[18] raised questions beginning with this evolution
[19] issue.
[20]     Q: Let's get to that. You say there was apparently
[21] some board interest?
[22]     A: I cannot be specific because it did not come to
[23] the attention of the department until we got to
[24] the fall of 2003. So it apparently had calmed
[25] down somewhat. But then it was revisited in the

**Page 33**

[1] fall, and then we as a department addressed the
[2] questions and the concerns.
[3]     Q: Now, if I understand you correctly, Bert, you're
[4] kind of inferring from the fall 2003 events that
[5] the problem didn't just pop up in the fall of
[6] 2003?
[7]     A: No, it did not.
[8]     Q: Why do you say that, Bert?
[9]     A: And I'm not exactly sure to whom the gentleman
[10] spoke that had the concerns, but in the spring I
[11] think there were some questions either regarding
[12] the selection of the book that we had done or
[13] how evolution is taught in the classroom, how it
[14] is presented. But then in the fall, and it was
[15] early in the fall, we sat down. There is a lot
[16] of confusion between origin of life and origin
[17] of species.
[18]     Q: Are you referencing to the fall meeting, Bert?
[19]     A: Well, but this is— When people see evolution,
[20] they don't always see evolution the way it is
[21] taught in the biology curriculum here. They
[22] have their own concept of what they think it is.
[23] And, you know, you have parents who will, you
[24] know, raise— And they every right to do
[25] so.

**Page 34**

[1]     And when asked, the science department will
[2] sit down and attempt to clarify those issues
[3] since that is their training. So we think this
[4] started in the spring. We went home for the
[5] summer. We weren't getting the new book. So it
[6] pretty much went to rest until we got to the
[7] fall.
[8]     Q: And all I'm trying to get at, Bert, is you have
[9] this sense, as you say, we think it started in
[10] the spring. And we're going to talk about the
[11] memo from Peterman. Is that what you're relying
[12] on to give you the sense that something was
[13] going on in the spring?
[14]     A: Well, that was certainly part of it. But that—
[15] If you look at that memo, that was in 2003.
[16] That was in March and April. Yes, that's where
[17] we got the idea, yes, yes.
[18]     Q: Why don't we—
[19]     A: But we didn't have a meeting— If you're asking
[20] me did we have a meeting over it, the answer
[21] was, no. The meeting occurred in the fall.
[22]     Q: Let's look at that memo which is what, Miller 1.
[23] Take a minute to look that over, Bert, although
[24] I have reason to believe you're fairly familiar
[25] with it.

**Page 35**

[1]     A: I am.
[2]     Q: Did you receive a copy of this memo from
[3] Dr. Peterman?
[4]     A: Not to my knowledge.
[5]     Q: Did you ever speak with Dr. Peterman about not
[6] having received a copy of the memo?
[7]     A: No, I did not.
[8]     Q: Let me ask you, were there any other occasions
[9] in which Dr. Peterman created memos, copied you,
[10] but didn't send you the copy?
[11]     A: I can't answer that. I have an entire file of
[12] Dr. Peterman memos that are numbered from one up
[13] to whatever from the tenure when she was here.
[14] I actually looked in that folder thinking it may
[15] have been there, but I usually filed everything
[16] on this issue in a file that was labeled as
[17] such. I did not have that in my file.
[18]     Q: No other occasions have come to light such as
[19] this where a memo that's directed to you has
[20] later come to light and you've looked in your
[21] file and found, gees, I didn't get that?
[22]     A: Not often. This memo was seen, though, by
[23] another member of my department. The evening, I
[24] don't know, that she may have written it, she
[25] had come to my room. I had left for some reason

**Page 36**

[1] early, and another young staff person who was

[2] working there in the evening remembers seeing

[3] this memo.

[4]   Q: That staff member's name?

[5]   A: Rob Eshbach.

[6]   Q: I take it he's told you he specifically recalls

[7] seeing this document?

[8]   A: Yes. Yes, he has.

[9]   Q: Did he tell you any particular reason why he

[10] recalls seeing it?

[11]   A: Yes. He remembered the enumerations one, two,

[12] three, four, and five which is strange, but

[13] that's what he remembered, looking down and

[14] seeing that.

[15]   Q: Did he have the memo, do you know? Did he have

[16] a copy of the memo?

[17]   A: I don't know that.

[18]   Q: If you look at it, Bert, as you know, it

[19] recounts a conversation — or it's Dr. Peterman

[20] giving her account of a discussion she had with

[21] you concerning the discussion — or concerning

[22] evolutionary theory. And in it, it says that

[23] Mr. Baksa mentioned that a board member wanted

[24] creationism taught. Do you recall that, Bert?

[25]   A: Yes.

**Page 37**

[1]   Q: Do you recall Mr. Baksa using the term

[2] creationism?

[3]   A: I remember the word creationism being used, yes.

[4]   Q: And I could see that. What I'm asking you, do

[5] you recall Mr. Baksa saying that a board member

[6] wanted creationism taught as opposed to, you

[7] know, it coming up in the conversation?

[8]   A: I remember Mr. Baksa saying that a board member

[9] wanted creationism taught. Now, I'm not sure

[10] 50 percent was there. I think it was of equal

[11] time when the evolutionary issue was presented

[12] in biology classes.

[13]   Q: Do you recall Mr. Baksa mentioning a board

[14] member wanting other theories taught?

[15]   A: Not to my knowledge.

[16]   Q: Do you recall anything else of your— Apart

[17] from this memo, do you have a recollection of

[18] your discussion with Mr. Baksa?

[19]   A: Yes.

[20]   Q: Do you recall anything else other than the

[21] statement we've just discussed?

[22]   A: I remember asking Mr. Baksa, may I ask you which

[23] board member has indicated this to know where

[24] the red flag was coming from and are we going to

[25] be prepared, and he responded to me it was

**Page 38**

[1] Alan Bonsell.

[2]   Q: Apart from these features of this conversation,

[3] do you remember anything else?

[4]   A: No. But I think Mr. Baksa had indicated to me

[5] and my science department that this was

[6] obviously going to be a concern that we are

[7] going to have to address sometime soon.

[8]   Q: Now, if you continue down that first paragraph

[9] there, about halfway through there's a sentence

[10] that begins, she, referencing you, explained to

[11] Mr. Baksa that all biology teachers state that

[12] another theory of evolution is creationism, but

[13] creationism per se is not taught since it is not

[14] addressed in the standards. Now, how about

[15] that, Bert, do you recall telling Dr. Peterman

[16] that?

[17]   A: Yes, I do.

[18]   Q: Now, it looks like in order to get that

[19] information you had some discussions with your

[20] science faculty about the issue. Tell me, what

[21] was the basis for that statement or account in

[22] this memo?

[23]   A: Since we are a standards-driven institution and

[24] there was always the controversy even in terms

[25] of getting the state standards over this

**Page 39**

[1] evolutionary issue, we followed the standard

[2] which I believe is listed under biology letter D

[3] that said that the theories of evolution need to

[4] be taught because in the year 2006 or 7 there's

[5] going to be the PSSA test which is going to

[6] address these issues.

[7]   But to present a fair evaluation, they also

[8] said that there are other theories out there;

[9] namely, creationism. And they all mentioned it

[10] and said we encourage you to go to your pastor

[11] of your church or your family if you want a

[12] discussion of that. And that was as much that

[13] was ever done.

[14]   Q: When you say they, are you referencing your

[15] biology teachers?

[16]   A: I am referencing the biology teachers. There

[17] would be no other subject that would—

[18]   Q: Implicate this concern?

[19]   A: That's correct.

[20]   Q: Now, who had you spoken with in order to get

[21] that information, Bert, about the way in which

[22] creationism was presented in the classroom in

[23] connection with the presentation of evolutionary

[24] theory?

[25]   A: When we had various department meetings and

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Bertha E. Spahr
May 19, 2005

Page 40

[1] in-service days and we had all of the waiting
[2] for these state standards and we were in the
[3] process of rewriting our curriculum to match the
[4] state standards, the subject came up. And the
[5] group; namely, Jen Miller who was obviously her
[6] veteran biology teacher, agreed that this is the
[7] way we would all do it so that there would be
[8] consistency in basically how it was presented.
[9]     Q: What did Jen say on that point?
[10]     A: That we would simply mention that creationism
[11] was an alternate theory to Darwin's theory of
[12] evolution and that we request that the churches
[13] or if the families be able to present their own.
[14]     Back then students could literally ask
[15] questions, and at that point the biology
[16] teachers were comfortable in addressing these
[17] issues. And, you know, the major reference was
[18] please contact your own family, your pastor, you
[19] know, or there are other reference books
[20] available if you have those concerns. And it
[21] was a very non-threatening situation at that
[22] point.
[23]     Q: Sure. And it seems that you're saying that the
[24] teachers are trying to just address any
[25] questions or curiosities the student might have?

Page 41

[1]     A: Back then, yes.
[2]     Q: You say back then. You say things are different
[3] now?
[4]     A: Yes, because now the issue obviously is not even
[5] addressed. You know, we teach what is necessary
[6] for the state standards, and then they go on.
[7]     Q: When you say the issue is not addressed, Bert,
[8] what are you getting at?
[9]     A: We don't talk about creationism. I'm not even
[10] sure creationism is ever mentioned in the
[11] classroom anymore, although I am not in a
[12] biology classroom. You would have to ask a
[13] biology teacher that question.
[14]     Q: Now, if you continue to the next paragraph,
[15] Bert, there's a couple sentences there. I know
[16] you can read them, but I'll read them for the
[17] record. It continues, in asking for direction
[18] in this matter, I have advised all Biology I
[19] teachers to teach the approved school board
[20] curriculum for Biology I. I advised them to
[21] continue to mention that creationism is another
[22] alternate theory of evolution. And then she
[23] says, however, as principal, I am uncomfortable
[24] with this topic and so on. Do you recall
[25] Dr. Peterman so advising you?

Page 42

[1]     A: Yes.
[2]     Q: What did Dr. Peterman say?
[3]     A: She basically directed me to direct the biology
[4] teachers to continue with what had been past
[5] practice, that you would teach evolution, you
[6] would mention that creationism was an
[7] alternative theory, and then request that the
[8] families or the churches handle any explanations
[9] that they would have since there are so many
[10] different religious backgrounds in this
[11] community.
[12]     Q: Do you recall anything else that Dr. Peterman
[13] said to you relating to this issue?
[14]     A: I remember we had some discussions as to what
[15] her concerns were if we decide that we are going
[16] to teach creationism or it's going to be
[17] something that's going to have to have equal
[18] time with the evolution.
[19]     Number one, there was a time constraint.
[20] That was another issue because it basically
[21] comes at the very end of the semester. If
[22] you've had snow days, you may not even get to
[23] the issue. And now where are we going to find
[24] the time to put in these additional things.
[25]     And the science teachers felt somewhat

Page 43

[1] uncomfortable because they are not trained in
[2] religious education. They are trained as
[3] biologists but felt that they would not
[4] necessarily have the background to do what would
[5] be an appropriate job.
[6]     And as she pointed out, and she actually
[7] said to me, which theory of creationism are you
[8] going to teach and not offend somebody who is
[9] sitting in the room. So that discussion did
[10] come up.
[11]     Q: Apart from what you've told me that you remember
[12] today, anything else come up with Dr. Peterman
[13] that touched on this issue during her tenure as
[14] principal?
[15]     A: Oh, I'm sure it did because when there was an
[16] issue, whether it be are we going to get our
[17] textbooks, when are we going to get our
[18] textbooks, I always followed chain of command,
[19] and I went from department chair to Dr. Peterman
[20] who would then in turn sometimes go to Mr. Baksa
[21] who was head of curriculum.
[22]     But, yes, we discussed issues. I'm certain
[23] I said to her what is the holdup with this
[24] biology book since this had never been a problem
[25] before.

rtha E. Spahr
ay 19, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

**Page 44**

And the interesting thing about it was it
was simply a new edition of the book that we had
already had, and it was approved. We had the
Miller and Levine book, but it was a 1998
edition. And so we were simply asking for a
newer, more modern copy of it. So we didn't
realize that there was going to be any
controversy.

Q: Now, I just want to make sure, Bert, it seems
like— Well, Peterman left when? Did she leave
in 2003, can you recall?

[2] A: It was the end of the last school year.

[3] Q: So that's 2004?

[4] A: She was there 2003-2004. Mr. Riedel came at the
[5] beginning of this year, although you might want
[6] to—

[7] Q: To check, that's fine.

[8] A: I think it was the end of last year.

[9] Q: I'm not going to hold you to the dates. I'm
[20] just trying to get a sense because it seems to
[21] me—

[22] A: She was there two years.

[23] Q: It seems to me from what you're saying that the
[24] holdup of the books, that's the holdup that
[25] occurred in 2003, correct?

**Page 45**

[1] A: The books were just ordered at the last minute
[2] in August of 2004, right. We got them for the
[3] school year.

[4] Q: You'll see in this Exhibit Miller 1 there's a
[5] number of enumerated points. Would you take a
[6] quick look at those for me, Bert. You've
[7] referenced that Dr. Peterman had some concerns.
[8] Looking through those numbered items, one
[9] through five, do you think that fairly
[10] summarizes the concerns that Dr. Peterman
[11] expressed to you?

[12] A: Yes, I do.

[13] Q: If you look beneath that enumeration, there's a
[14] new paragraph which begins, in the public school
[15] arena creationism— Forgive me, it doesn't
[16] begin this way. The second sentence says, in
[17] the public school arena creationism must always
[18] be mentioned as an alternate theory, but public
[19] school students are teachers of their content
[20] area and are not to be perceived as teachers of
[21] religious instruction. Do you recall
[22] Dr. Peterman making statements to you to that
[23] effect during the conversations you had with
[24] her?

[25] A: I remember on one occasion she certainly brought

**Page 46**

[1] that up. I don't know whether it was on this
[2] particular one. But she did show concern that
[3] we are teachers of biology and certainly not
[4] teachers of religion and this could be a
[5] problem. Yes, she did bring that up.

[6] Q: Have you had any discussions with your biology
[7] teachers about whether they reference
[8] creationism currently?

[9] A: No, I have not. It is my understanding that
[10] since the statement was read I'm not even sure
[11] the reference is made anymore, but you would
[12] have to ask the biology teachers that.

[13] MR. GILLEN: Let's take a brief break.

[14] (Recess taken)

[15] BY MR. GILLEN:

[16] Q: Bert, as we broke off, you were making some
[17] observations about the text purchase process and
[18] holding up the text in 2003. And with that in
[19] mind, I'd like you to look through the packet of
[20] documents that's been marked Miller 5.

[21] Flip back to some notes, handwritten notes,
[22] that at the top of the first page have notes
[23] from Bert Spahr. I ask you, Bert, to just look
[24] at the first two pages of those notes I've just
[25] referenced which relate to a meeting and which

**Page 47**

[1] are dated 1/21/05 in the upper left hand corner
[2] across from the first entry.

[3] A: 1/21/05.

[4] Q: You got it, Bert?

[5] A: Yes.

[6] Q: Having looked those over, Bert, do you have any
[7] recollection of a discussion relating to text
[8] usage?

[9] A: Yes, I do.

[10] Q: Tell me what you recall — let me be more
[11] specific — in the 2003 period.

[12] A: Mr. Baksa had asked us about a question that I
[13] believe came from a board member indicating that
[14] we had not used the textbooks, and he was asking
[15] us why the textbooks were not used. And they
[16] were referring to the 1998 edition of the Miller
[17] and Levine biology book.

[18] And we attempted to explain that in the one
[19] year when we switched what was going to be
[20] taught in the science curriculum we had all
[21] ninth grade and all tenth grade students taking
[22] biology at the same time. Now, this was only
[23] going to occur for one year. We did not have
[24] enough textbooks to give each student a copy.
[25] We would not have presumed to ask the board to

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Bertha E. Spahr
May 19, 2005

**Page 48**

[1] buy additional textbooks to be used for one
[2] year. And so consequently textbooks were not
[3] assigned to each student.
[4]     It was also after that that we instituted
[5] the environment and the ecology curriculum as
[6] the new required course for tenth grade. So we
[7] had the one-year time frame in which roughly
[8] probably 400 students were taking biology. We
[9] did not have enough textbooks to pass out.
[10]     Therefore, most of the biology teachers
[11] with the exception of Mr. Eshbach had class sets
[12] of biology texts in the room for use by
[13] students. Mr. Eshbach did not have a full
[14] biology load. He was teaching another course.
[15] Therefore, he had enough to assign each student
[16] a text.
[17]     And that was why it was being questioned
[18] why did we not use the books that we had
[19] available. Number one, they would not have gone
[20] far enough. Secondly, when the curriculum was
[21] changed, we moved certain topics such as
[22] classification to the eighth — or the seventh
[23] grade level at a different building. And,
[24] therefore, this book dealt a great deal with
[25] classification. And there were some other areas

**Page 49**

[1] that did not address what we had now rewritten
[2] the curriculum to match the state standards
[3] with.
[4]     Q: So I just want to make sure I understand you,
[5] Bert. Your first point, does that relate to a
[6] year in which the state standards changed the
[7] year in which biology would be presented and
[8] Dover as a result compressed two years into —
[9] two class years for the purpose of presenting
[10] biology to try and bring themselves into
[11] compliance with state law?
[12]     A: I do not know in which year exactly the state
[13] standards were approved. There was— And
[14] that's in the one packet. There was about a
[15] two-year time frame where we wrote it, and then
[16] we rewrote it, and then they had the discussion.
[17] And then finally it was approved.
[18]     During that time, we were in the process of
[19] realigning our curriculum within the two
[20] required course departments to match those state
[21] standards realizing that eventually we thought
[22] they would probably be passed. And it was in
[23] this from the roughly 2000 to 2005 — actually
[24] 2001 that we were actually trying to realign the
[25] classes. Prior to that time, earth science was

**Page 50**

[1] taught as a required course.
[2]     Q: Does that touch on your second concern you've
[3] referenced which was the way in which the text
[4] jibed with the actual presentation of material
[5] in various classes?
[6]     A: That's correct.
[7]     Q: And there was sort of a disjunction between the
[8] text the department had at that time and the way
[9] in which the teachers were presenting specific
[10] subject matters?
[11]     A: That's correct.
[12]     Q: And really sort of the net result of that is
[13] various subject matters were being presented in
[14] a variety of classes instead of just biology?
[15]     A: That's true.
[16]     Q: Do you recall Barrie Callahan speaking at school
[17] board meetings about the biology text?
[18]     A: Yes, I do.
[19]     Q: Do you recall Barrie Callahan saying the kids
[20] don't have books?
[21]     A: Yes, I do.
[22]     Q: If I look at your— Well, let me ask you, Bert,
[23] Miller 4 is a small set of documents, the second
[24] page of which has the number one circled in the
[25] upper right hand corner. And that is an

**Page 51**

[1] approximate time line. Am I correct?
[2]     A: That's correct.
[3]     Q: Did you jot this down, Bert?
[4]     A: That is my handwriting, yes.
[5]     Q: And in compiling this document, did you consult
[6] with your colleagues in the science department,
[7] or was this your recollection? Was it kind of a
[8] collective work?
[9]     A: It was a collective time line.
[10]     Q: Well, I see next beneath the entry for
[11] January 2003 the next entry is fall 2003, and
[12] there's a reference to a meeting with
[13] Mr. Bonsell. What I want to ask you is, we've
[14] got a conversation with Dr. Peterman that's
[15] reflected in the memo dated April 1st, 2003, and
[16] we've got a fall meeting coming up here that
[17] we're going to talk about. In between April and
[18] this fall meeting, was there any discussion that
[19] you were privy to relating to the purchase of
[20] the biology text or the biology curriculum?
[21]     A: Other than the discussion I had with
[22] Dr. Peterman after the discussion I had with
[23] Mr. Baksa.
[24]     Q: Have you told me what you can recall about the
[25] discussion you had with Dr. Peterman?

Bertha E. Spahr
May 19, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

**Page 52**

[1] A: I have.

[2] Q: Good enough. Other than that then, there was

[3] really nothing until this fall meeting?

[4] A: There may have been some passing of bodies in

[5] the hall where we may have said, have you heard

[6] anything on our textbooks. But it's not a case

[7] where we had large meetings involving the

[8] department over this issue.

[9] Q: So we have a fall meeting with Mr. Bonsell.

[10] Tell me how that meeting came to your attention.

[11] A: I believe that meeting was at our suggestion.

[12] There was I believe for him some confusion over

[13] the issue of origin of species and origin of

[14] life. I believe—

[15] Q: I'm sorry, Bert, let me stop you there because

[16] that's interesting to me. You say the meeting

[17] was called at your suggestion and you believe

[18] you had some confusion. That seems to point to

[19] some discussion with Mr. Bonsell or some sense

[20] for Mr. Bonsell's position.

[21] A: I believe the discussion was between Mr. Bonsell

[22] and Mr. Baksa. And then Mr. Baksa came to me or

[23] to us — I'm not exactly sure which one — and

[24] we suggested to him maybe we could clarify the

[25] situation if the department and the biology

---

**Page 53**

[1] teachers met with Mr. Bonsell and answered his

[2] questions and basically his concerns.

[3] They're the experts in the field. I am

[4] not. I don't think Mr. Baksa's background is in

[5] biology either. And we felt that this would be

[6] a willing compromise to sit down with him and

[7] basically answer his questions and concerns.

[8] Q: Let me understand you. Is the conversation

[9] you're referencing now the conversation we've

[10] discussed where you and Mr. Baksa talked?

[11] A: Well, and it may have been one that came

[12] subsequent to that. I am not aware of that, but

[13] I think there was this ongoing question and

[14] concern that we felt we could resolve in the

[15] fall meeting. It was fairly early in the fall.

[16] Q: I just want to make sure I understand how the

[17] story unfolds from your perspective. You know

[18] you had a conversation with Mike, and this memo

[19] seems related to that. As you sit here today,

[20] can you remember any other discussions with

[21] Mr. Baksa between April and the fall meeting?

[22] And I guess what I'm trying to get at is,

[23] plainly the discussion that's reflected in some

[24] measure in this memo dated April 1, 2003 alerted

[25] you to a possible problem, as you say, red flag.

---

**Page 54**

[1] Now, what I'm trying to get at is, I could

[2] see you having that in the back of your mind and

[3] carrying it with you through the summer and

[4] saying let's nip this in the bud or let's

[5] address it. Or another way of looking at things

[6] is Mike could have come to you periodically

[7] throughout and said, you know, have you thought

[8] of anything. Do you have any recollection of

[9] what happened in this period?

[10] A: It was not uncommon for Mr. Baksa when he was in

[11] the building to come by the door and say, you

[12] know, I would like to run this past you, you

[13] know, I would like to give you a heads up. Can

[14] I specifically recollect any other discussions,

[15] I cannot.

[16] Q: And that's why the next question for me is, all

[17] right, you've got a concern because you're

[18] suggesting, hey, maybe we can address this if we

[19] have a meeting with Mr. Bonsell. Do you

[20] recall— And you think it was at your

[21] suggestion. Is that—

[22] A: I think it was at either my suggestion or the

[23] suggestion of the department where they felt

[24] that they would be more expertly able to answer

[25] his questions and concerns.

---

**Page 55**

[1] Q: In this intervening period between April and the

[2] fall, had you had any discussions with

[3] Mr. Bonsell personally?

[4] A: No, I did not.

[5] Q: So essentially any sense you have from

[6] Mr. Bonsell's concerns would be derived from

[7] conversations with Mr. Baksa?

[8] A: That's correct.

[9] Q: You've indicated that you think that the fall

[10] meeting with Mr. Bonsell occurred at your

[11] suggestion. What else can you recall about the

[12] meeting, Bert?

[13] A: Well, most of his questions were directed to the

[14] biology teachers. Jen Miller being the veteran

[15] teacher was the one who certainly had the most

[16] responses. I did not chime in that much because

[17] that's not my field. There were other biology

[18] teachers present who also contributed. And I

[19] think the reason for this was that his son was

[20] going to enter a biology classroom that

[21] particular year in the spring, spring semester.

[22] Q: Let's look at that. Who was at the meeting,

[23] Bert? There's Mr. Bonsell, there's you, there's

[24] Jen Miller. Mike Baksa?

[25] A: I believe Mr. Baksa was present.

---

Min-U-Script®   Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Bertha E. Spahr
May 19, 2005

**Page 56**

[1]  Q: How about any other science faculty?
[2]  A: I think Bob Linker was there. Leslie Prall was
[3]  there. And I believe then Bryan Rehm may even
[4]  have been there. He at that point was the
[5]  physics teacher. Do I remember any others, no,
[6]  I do not.
[7]  Q: How about Rob Eshbach?
[8]  A: Yes, he was there.
[9]  Q: Looking at Bryan Rehm, he's the physics teacher,
[10]  is there any particular reason he would be
[11]  there?
[12]  A: Simply as a member of the science department. I
[13]  am not certain that he was present.
[14]  Q: How did it start? To the best of your
[15]  recollection, I just want to get a sense for how
[16]  the meeting unfolded. You're meeting as a
[17]  science department with Mr. Bonsell. Did he
[18]  present his concerns up front at the beginning?
[19]  A: I believe Mr. Baksa basically, you know, might
[20]  have indicated that we are all gathered together
[21]  to basically answer the questions and concerns
[22]  he had. I do not specifically remember the
[23]  mechanics of that meeting, and I do not.
[24]  Q: Do you recall any specific statements that
[25]  Mr. Bonsell made?

**Page 57**

[1]  A: No, I do not or even questions.
[2]  Q: How about any responses from Jen Miller, can you
[3]  recall the— Well, I'll tell you what, can you
[4]  give me a sense for any of the concerns
[5]  Mr. Bonsell expressed during the meeting?
[6]  A: No, I cannot.
[7]  Q: How about Jen, Jen Miller that is, can you tell
[8]  me anything about the issues she was addressing?
[9]  A: I don't know the specific questions. I know
[10]  that she was very well prepared and she answered
[11]  the questions adequately. And as we departed
[12]  from the meeting, we all seemed to feel that he
[13]  was satisfied with the presentation that we had
[14]  given to him. That was our sense as we left.
[15]  Q: If you had to characterize the tone of the
[16]  meeting, was it collegial, cordial, civil?
[17]  A: Yes, indeed, yes.
[18]  Q: You said you departed thinking—
[19]  A: We addressed his concerns and questions and—
[20]  Q: Do you recall any specific scientific subject
[21]  matter coming up like carbon dating, fossil
[22]  record, stuff like that?
[23]  A: No, I don't.
[24]  Q: Any of the other science faculty speak?
[25]  A: I think there were some others who answered that

**Page 58**

[1]  were biology teachers. I cannot tell you
[2]  specifically which one.
[3]  Q: How about the general thrust of Jen's comments,
[4]  get any sense for that in your memory as you sit
[5]  here today sort of what she made clear to him?
[6]  A: Yes, specifically the differentiation between
[7]  origin of species and origin of life and the
[8]  emphasis being made that the biology teachers
[9]  emphasize origin of species and change over
[10]  time. That was the big thing.
[11]  Q: This distinction you've just referenced, this
[12]  has come up a couple times. As you sit here,
[13]  Bert, I know you're not a biology teacher, nor
[14]  am I. I discussed this in some measure
[15]  yesterday with Jen, but can you recall what sort
[16]  of distinction Jen Miller conveyed to
[17]  Mr. Bonsell during this fall 2003 meeting?
[18]  A: I think it had something to do with a bird,
[19]  there was a bird in the tree, and how did the
[20]  bird adapt himself to survive in the
[21]  environment, did the beak get longer, did the
[22]  claws get longer. No one cared where the bird
[23]  came from. The bird was in the tree and changed
[24]  over time. That was the point of the emphasis.
[25]  Q: So change within species as opposed to change

**Page 59**

[1]  across species?
[2]  A: There certainly was main emphasis on change
[3]  within the species. I do not know whether
[4]  change between species was brought up.
[5]  Q: Anything else you recall about that meeting?
[6]  A: No.
[7]  Q: Do you recall anything Mike Baksa said?
[8]  A: No.
[9]  Q: Was Dr. Nilsen present?
[10]  A: I can't answer that.
[11]  Q: Do you think Trudy Peterman was present?
[12]  A: I can't answer that either.
[13]  Q: That's fine. This is a meeting in the fall of
[14]  2003. About around what time, Bert? You said
[15]  you thought it was early?
[16]  A: It was early September or October, I would
[17]  assume.
[18]  Q: Between the meeting and the close of 2003, did
[19]  anything happen that you saw as tied to that
[20]  meeting or relating to the same subject matter,
[21]  evolutionary theory, the curriculum, the biology
[22]  text?
[23]  A: Well, we still had not gotten assurance that the
[24]  biology book that they had hoped to get was
[25]  going to be ordered. Again, in December or

ertha E. Spahr
May 19, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 60

[1] January of what would have been 2004 we
[2] submitted or resubmitted our order for those
[3] books, and we had not been guaranteed that we
[4] would— Now, orders are not usually sent out
[5] before July 1 anyway. But we were trying to get
[6] some sense of are the teachers going to go home
[7] for the summer working on this new book to
[8] present their lessons and their activities and
[9] whatever or are we again not going to have that
[10] particular edition to deal with in the following
[11] year.
[12]   Q: That would be the summer of 2004?
[13]   A: That's correct.
[14]   Q: I'm trying to get a sense, was your concern,
[15] Bert, that if you didn't get them in 2003 you
[16] might lose your turn—
[17]   A: Yes.
[18]   Q: —altogether?
[19]   A: That was a concern because we are on — or were
[20] on a seven-year cycle. And then not only was
[21] that a concern, then that throws the next
[22] subject back a year behind in terms of not
[23] getting their books.
[24]   Q: And that would be subject matter in the science
[25] department?

Page 61

[1]   A: No. That was subject matter I believe it may
[2] have been language arts. So it's an entirely
[3] different department. Everyone is on a
[4] seven-year cycle. So when ours were not
[5] ordered, then the next year somebody else's was
[6] delayed—
[7]   Q: Oh, I see, yes.
[8]   A: —a year because of the budget concerns.
[9]   Q: But apart from that — I mean, I see you have
[10] that concern — was there any further
[11] discussions with Mr. Baksa or anyone in the
[12] administration for that matter relating to the
[13] meeting, the issues that were addressed in that
[14] meeting as we reached the wrapping up of 2003,
[15] between this meeting in the fall and
[16] December 2003?
[17]   A: I'm sure we spoke on this issue, whether it be
[18] an in-service day or some other time, but I
[19] can't recall specific dates.
[20]   Q: At any time in 2003 did you have any discussions
[21] with any member of the board curriculum
[22] committee apart from the discussion that you've
[23] just described?
[24]   A: Not to my knowledge.
[25]   Q: At any time in that 2003 year did anyone from

Page 62

[1] the administration ever get back to you with any
[2] directions to change the biology curriculum or
[3] presentation of subject matter in biology?
[4]   A: On certain in-service days we were directed to
[5] basically revise curriculum as it needed to be
[6] revised based on the new state standards. Were
[7] we directed to change the curriculum as far as
[8] evolution was concerned, not to my knowledge.
[9]   Q: Am I right, Bert, that the revision of
[10] curriculum you've just referenced is an effort
[11] to bring Dover's curriculum into, what shall I
[12] say, to dovetail it with the state standards
[13] we've been talking about?
[14]   A: That's correct.
[15]   Q: Well, that brings us to 2004 which by all
[16] accounts was an eventful year. Let's look at
[17] the period between January and March of 2004.
[18] It's just the beginning of the school year.
[19] We're going to focus on the biology text and the
[20] curriculum issue. In that three-month period,
[21] Bert, were there developments that touched on
[22] those issues?
[23]   A: We did resubmit the budget with the Miller and
[24] Levine book as indicated that that was our
[25] choice for our biology text. Now, that is done

Page 63

[1] by the biology teachers together. They review
[2] various books, and there were many different
[3] books that they looked at. And this was their
[4] selection. And so we resubmitted it again so
[5] that we would have it for basically the
[6] 2004-2005 school year.
[7]   Q: Did you participate in the text review in
[8] biology—
[9]   A: No, I did not.
[10]   Q: —or do you defer to your professionals?
[11]   A: I—
[12]   Q: Looking at that period, as you say, in the
[13] ordinary course the text request would go in.
[14] Any communications with the administration
[15] relating to the department selection of a text?
[16]   A: They usually relied on our professional
[17] judgment. And if we felt that this was an
[18] acceptable biology book, it usually has never
[19] been questioned.
[20]   Q: Looking at the period January through March
[21] 2004, was there any conversations with any
[22] members of the board curriculum committee during
[23] that period relating to the biology text?
[24]   A: We had several meetings with the curriculum
[25] committee of the board. The one that I remember

Min-U-Script®   Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Bertha E. Spahr
May 19, 2005

Page 64

[1] was in June, though, of 2004. But there was one
[2] that preceded that in this room — I cannot tell
[3] you the exact date of that — where we were
[4] present, and it had to do with the accepting of
[5] books for the family and consumer science
[6] department. It was that. But I cannot tell you
[7] exactly when that meeting was. It was in this
[8] room, and it was prior to this June meeting.
[9]     Q: Just tell me generally, there was discussion
[10] about that family and consumer sciences text
[11] here?
[12]     A: Oh, my, yes. Oh, my, yes, that poor woman who
[13] is a very gentle sole and certainly was not
[14] prepared for what was coming. It was pretty
[15] upsetting, where the comparison was made between
[16] the edition that she had and the new edition
[17] that they had recommended. And it was pointed
[18] out to her that there were only five words'
[19] difference in the entire text. I do remember
[20] that quite well.
[21]     Q: Who pointed that out to her?
[22]     A: Well, members of the curriculum committee were
[23] Mrs. Harkins, Mr. Buckingham, and Miss Casey
[24] Brown. One of the meetings Casey Brown did not
[25] attend. It was actually Mrs. Harkins who

Page 65

[1] pointed that out. And we had also brought the
[2] other textbooks, those of the chemistry and
[3] those of the biology, at the same time. But
[4] that was the time, the only time, when the other
[5] department was present as well at that
[6] curriculum meeting.
[7]     Q: Did you leave this meeting you've just
[8] referenced prior to June 2004 with the sense for
[9] whether the family and consumer sciences text
[10] would be purchased?
[11]     A: We had doubt. We did not know.
[12]     Q: You've referenced a meeting in June. Can you—
[13] Towards the end of the month or the beginning,
[14] do you know when it occurred? I see your time
[15] line gives the month.
[16]     A: It had to be before we left school, and the
[17] reason that I know that is I specifically asked
[18] Mr. Buckingham if he would assure us that my
[19] biology teachers would have this new text to
[20] start the beginning of the school year because
[21] they had planned to do work using the new
[22] textbook obviously during the summer months.
[23] And it certainly would be a tremendous waste of
[24] time if, in fact, they knew full well that the
[25] textbook was not going to be chosen.

Page 66

[1]     Q: Am I right, Bert, at this time they're looking
[2] at the 2002 edition?
[3]     A: That's correct.
[4]     Q: So the meeting was had before the close of the
[5] school year?
[6]     A: That's correct.
[7]     Q: Is the school year's close before or after
[8] June 7, 2004, do you recall?
[9]     A: No, I don't. I know we had snow days then, so
[10] my guess is it would be after June 7th would be my
[11] guess, though I don't have a calendar.
[12]     Q: Well, with that in mind, Bert, if you would,
[13] please look at Miller Number 3. And you will
[14] see there a packet of board minutes, board
[15] meeting minutes and agendas, the first one of
[16] which is for Monday, June 7, 2004. There's some
[17] handwriting on that, Bert. Is that your
[18] handwriting?
[19]     A: No, it is not.
[20]     Q: There's a notation SB in the upper right hand
[21] corner. Do you have an idea who that might
[22] refer to?
[23]     A: Yes, probably Sandy Bowser.
[24]     Q: Did Sandy Bowser provide copies of board agendas
[25] and minutes to the teachers when you were

Page 67

[1] compiling materials?
[2]     A: Some board meetings that you attended there were
[3] not sufficient numbers of agendas; and,
[4] therefore, we sometimes asked the president of
[5] the association who was always in attendance if
[6] we could have a copy of hers. And that's where
[7] they came from.
[8]     Q: If you'll page through the ones relating to the
[9] June 7th meeting, Bert, and just let me know if
[10] you have any— Oh, there's only one set, and
[11] that's SB. Do you have any notes that relate to
[12] the June 7th board meeting?
[13]     A: Not to my knowledge. If there were notes, they
[14] would be attached to this.
[15]     Q: Because of the way you guys put the materials
[16] together?
[17]     A: Yes, and because I can recognize the
[18] handwriting.
[19]     Q: Thanks.
[20]     A: Like this is Rob Eshbach's I mean.
[21]     Q: There's a notation on the first page of this
[22] June 7th agenda here that says, Bert, so—
[23]     A: That's me.
[24]     Q: That's you. I thought. Did you attend the
[25] June 7th, 2004 meeting?

ertha E. Spahr
lay 19, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 68

[1]   **A:** I can't remember that. I know I was at the
[2] June 14th meeting.
[3]   **Q:** Well, look at that notation, and that's what I
[4] wanted to ask you about. Do you think that
[5] Sandy Bowser might have scribbled that notation
[6] on the front page as a note to you to let you
[7] know what she heard at the June 7th—
[8]   **A:** That's a possibility. I don't know where this
[9] may have come up that it's on this front page,
[10] but Sheila obviously is referring to Sheila
[11] Harkins says they were never used and they're
[12] six years old. And the comment was bio never
[13] used the books.
[14]     Well, this had to be in relationship, okay,
[15] to this one year where not— It's not that the
[16] students didn't use the books. It was the
[17] students didn't get a book to carry home with
[18] them. They were used within the classroom. And
[19] I do believe that it was probably taken out of
[20] context. And I think this was to basically
[21] alert me that this may be one of the reasons why
[22] you're not getting new ones, you didn't use the
[23] old ones anyway.
[24]   **Q:** That's what I was going to ask you about, Bert.
[25] When you look back at it, it seems like Barrie

Page 69

[1] Callahan, maybe Sheila Harkins, and others had
[2] what was a mis-perception about use of that
[3] text. Is that accurate?
[4]   **A:** I think so. There were some other issues with
[5] the text. The text was not certainly as usable
[6] when we changed the curriculum because the
[7] emphasis of that book was in the area of
[8] classification, and we no longer did that. So
[9] it certainly was not as useful as some of the
[10] other reference books that we had available for
[11] student use.
[12]   **Q:** I think I know the answer, but let me just ask
[13] you, do you have any recollection of attending
[14] the June 7th meeting?
[15]   **A:** No, I do not.
[16]   **Q:** Let's look at the next set of minutes. I'm
[17] calling them minutes. Actually it's the agenda
[18] for the June 14th, 2004 meeting. You said you
[19] attended that, Bert?
[20]   **A:** Yes, I did.
[21]   **Q:** Was there a specific reason?
[22]   **A:** Well, if you go under to curriculum, we thought
[23] the books for the science department, okay, were
[24] going to be approved. And, therefore, I was in
[25] attendance for that reason to know whether they

Page 70

[1] had been approved or whether they had not before
[2] we all left for the summer. But I was in
[3] attendance at that meeting.
[4]   **Q:** If you look at the first page here, you'll see a
[5] note, Bonsell intelligent design, C. Brown which
[6] I think is Casey Brown, uphold the law. Do you
[7] have a recollection of an exchange relating to
[8] the biology textbook at this June 14th meeting?
[9]   **A:** I know there was an exchange. I do not remember
[10] specifics of that.
[11]   **Q:** How about specific comments, does anything stick
[12] out in your memory as you sit here today from
[13] this June 14th meeting?
[14]   **A:** No.
[15]   **Q:** Do you recall any of the board members
[16] addressing the text?
[17]   **A:** Well, I know that the chemistry books and the
[18] family and consumer science books were approved.
[19]   **Q:** Did you stay for the whole meeting?
[20]   **A:** Yes.
[21]   **Q:** Well, I mean, this is one of the meetings where,
[22] you know, you can see there's some exchanges
[23] here relating to the books. Can you recall any
[24] specifics as you sit here today?
[25]   **A:** Not specifics. I do remember that that was a

Page 71

[1] rather contentious meeting. I mean, there were
[2] some exchanges that actually occurred between
[3] board members that— Now, specifics of that—
[4]   **Q:** Well, let's just run through the board members.
[5] Well, let me ask you this, let's start with
[6] people in the public, do you remember any public
[7] comment by Barrie Callahan?
[8]   **A:** I don't know whether it was that specific
[9] meeting, but Barrie Callahan often spoke at
[10] board meetings. And she always addressed her
[11] concern that students get the newest science
[12] books so that they be most updated. And she
[13] always wanted to know why the books had not been
[14] ordered and why they had been delayed.
[15]   **Q:** Do you recall her making statements to that
[16] effect at this meeting or can you—
[17]   **A:** Well, somewhere in those meetings she always
[18] questioned why the board had not approved the
[19] new books when the money for it had been in the
[20] budget.
[21]   **Q:** Was she referring— She's referring to what
[22] we've already talked about?
[23]   **A:** All the science— See, the whole science
[24] department ordered new books. Now, some were
[25] automatically ordered without question, the

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Bertha E. Spahr
May 19, 2005

[1] physics, the physical science, I think even the
[2] anatomy and physiology, although they may have
[3] been on that second one. And the chem of course
[4] then went. They approved those. But there
[5] were— The entire science department is on that
[6] seven-year cycle, and every seven years we get
[7] the opportunity to order new texts.
[8]    Q: You've mentioned some that were automatically
[9] purchased. Were they of the same age as the
[10] other books in chemistry and biology?
[11]    A: Yes. And one set of books for the — well, it
[12] was called STS at that time which is science,
[13] technology, and society. Today it's really
[14] environment and ecology. When we implemented
[15] that new course after that one year where all
[16] ninth and tenth graders took the biology course,
[17] those books were ordered out of our cycle and
[18] sequence because we had adopted the new course
[19] and we needed them for the following year, and
[20] without discussion, that was—
[21]    Q: So did your department put in the request for
[22] new books in that subject area?
[23]    A: Actually the year before we were to be cycled,
[24] yes. And that—
[25]    Q: And, therefore, you didn't request them again?

[1]    A: That's correct.
[2]    Q: Do you recall any exchanges between
[3] Mrs. Callahan and Mr. Buckingham at this
[4] June 14th meeting?
[5]    A: There were some words exchanged. Lonny Langione
[6] also spoke, and there were some exchanges.
[7] Larry Snook - now, these are all former school
[8] members — basically spoke under public comment,
[9] and it got somewhat heated.
[10]    Q: Were the heated exchanges both between board
[11] members and the public?
[12]    A: Both.
[13]    Q: And between board members and board members?
[14]    A: That's correct.
[15]    Q: Let's look at the exchanges between board
[16] members and the public. Do you remember any
[17] specific statements that Mr. Buckingham made in
[18] response to public comment?
[19]    A: I believe this was the board meeting in which
[20] the statement by him was someone died on the
[21] cross so many thousand years ago.
[22]    Q: Do you recall how he came to make that
[23] statement?
[24]    A: Not exactly.
[25]    Q: Do you recall him saying anything else about the

[1] biology text?
[2]    A: Not at that point. I know there was also some
[3] public comment in which a woman stood up and
[4] read at length many verses from Genesis. I
[5] think this was the same board meeting. And that
[6] again I believe was under public comment.
[7]    Q: Anything else memorable from Bill Buckingham's
[8] statements?
[9]    A: No.
[10]    Q: How about Alan Bonsell, do you recall him
[11] responding to public comment?
[12]    A: Not specifically.
[13]    Q: How about Heather Geesey, do you recall anything
[14] she said at the meeting?
[15]    A: I do not know whether it was this meeting— We
[16] ended up attending a lot of board meetings. I
[17] do not know whether it was this one. There was
[18] a statement made by Mrs. Geesey, and I'm not
[19] exactly sure in reference to what. And Rob,
[20] Jen, and I stood up simultaneously and went to
[21] the podium. And it had to do with something
[22] about attorneys and the teachers.
[23]    Q: We'll get to that in due time.
[24]    A: I'm not sure what board meeting that was, but it
[25] was a board meeting.

[1]    Q: Apart from that statement by Heather Geesey, do
[2] you recall anything she said relating to the
[3] biology text?
[4]    A: No.
[5]    Q: How about Jane Cleaver?
[6]    A: No.
[7]    Q: How about Angie Yingling?
[8]    A: No.
[9]    Q: How about Sheila Harkins?
[10]    A: Not specifically.
[11]    Q: You said not specifically. In general do you—
[12]    A: She was not president of the board then, so I
[13] don't specifically remember her being singled
[14] out.
[15]    Q: I understand. If you look at the agenda here
[16] we're talking about, there's a statement there
[17] that says, Bonsell intelligent design. Does
[18] that trigger any—
[19]    A: No, it does not.
[20]    Q: Bert, if you would, I'd ask you to look through
[21] Miller 2. If you look about halfway through
[22] that pack of documents, there's a document there
[23] that's headed at the top — it's directed to
[24] Mr. Baksa — and it begins, the new biology text
[25] we would like to order is Prentice Hall Biology

ertha E. Spahr
lay 19, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 76

[1] by Miller and Levine copyright 2002. It
[2] concludes with, thank you, biology department.
[3] Does that look familiar to you, Bert?
[4]    A: Yes, it does.
[5]    Q: Did you produce that document?
[6]    A: I did not.
[7]    Q: Who did?
[8]    A: Members of the biology department.
[9]    Q: And that's the process we've described?
[10]    A: That's correct. I believe Jen Miller was the
[11] lead person in writing it.
[12]    Q: If you flip two pages, you'll see a document
[13] headed Dover Area School District and beneath
[14] that, Survey of Biology Books Used in Area
[15] Schools. If you flip to the next page, Bert,
[16] you'll see product profile for a book that says
[17] — it's a book by Bob Jones University Press.
[18] And then if you flip further, you'll see
[19] handwritten notes headed at the top, Curriculum
[20] Committee and dated June 4, 2004. Do you
[21] recognize those, Bert?
[22]    A: I recognize the top two documents. I do not
[23] recognize this, and I do not know whose
[24] handwriting it is.
[25]    Q: So let's look at the top two then. Tell me, if

Page 77

[1] you would, when did you first see those
[2] documents?
[3]    A: We were in a curriculum meeting with the
[4] curriculum committee, and these two documents
[5] were handed to us while we were in attendance in
[6] the meeting. Somebody had contacted Christian
[7] School of York, Delone Catholic, and York
[8] Catholic to inquire what textbook they use. The
[9] other book was a suggestion that was given to us
[10] to look at in lieu of the biology book that we
[11] were suggesting.
[12]    Q: Let's take a look at that now. You indicated
[13] there was a meeting of the board curriculum
[14] committee?
[15]    A: I believe in this room.
[16]    Q: Can you date it?
[17]    A: If you look at the bottom of the e-mail or the
[18] book having to do with Bob Jones University, it
[19] says 6/8/2004. I'm assuming that's the date I
[20] received it. So I would think it would be
[21] sometime early in June. And the notes, if you
[22] also look, are dated that same day, 6/4, of the
[23] curriculum committee.
[24]    Q: But you don't recall seeing the notes?
[25]    A: I do not know whose notes they are, no, I do

Page 78

[1] not.
[2]    Q: At this board curriculum committee you're
[3] recalling now, who was present?
[4]    A: Mr. Buckingham, Mrs. Harkins, Mr. Baksa, Jen
[5] Miller, I believe Rob Eshbach, and myself. I do
[6] not know if Bob Linker was in attendance. He's
[7] a coach, and sometimes if you have meetings
[8] after school, he has duties that are elsewhere,
[9] so.
[10]    Q: How about Casey Brown?
[11]    A: One of the meetings with the curriculum
[12] committee Casey Brown was not in attendance, and
[13] I'm not sure for what reason. But one she was
[14] not here.
[15]    Q: How about Alan Bonsell, do you recall him being
[16] there?
[17]    A: I do not recall whether he was present.
[18]    Q: How about Richard Nilsen, Dr. Nilsen?
[19]    A: I don't remember that either, and I'm not sure
[20] if Dr. Peterman was there.
[21]    Q: What was the subject of the meeting?
[22]    A: We were again since this obviously is the
[23] beginning of June of 2004 still trying to
[24] resolve are we going to get the Miller and
[25] Levine biology text before we left to go home

Page 79

[1] from school because the purchase order would
[2] have gone out the 30th of June in preparation
[3] for the July 1 change. And so we were still
[4] discussing the book.
[5]    Q: Do you recall anything more specific about the
[6] discussion? Discussing the book in what way?
[7] Well, do you recall anything Mr. Buckingham
[8] said? Was he complaining about the book?
[9]    A: Well, he still had questions about the book. I
[10] don't know whether complaining about it, but he
[11] certainly still had questions. This was the
[12] reason that he had directed I believe Mr. Baksa
[13] to contact these other — and obviously these
[14] are religious schools here — only to find out
[15] Delone Catholic had the same book that we did
[16] which was the Miller and Levine book.
[17]    The suggestion was also would we — because
[18] we had reviewed many different texts, not just
[19] the Miller and Levine book, Lenko, Prentice
[20] Hall, Holt, Rinehart and Winston. We had
[21] reviewed some and of course were handed this as
[22] a possible suggestion for review.
[23]    Q: Who handed it to you?
[24]    A: I believe this was given to us by Mr. Baksa at
[25] that meeting.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Bertha E. Spahr
May 19, 2005

---

Page 80

[1] Q: Did Mr. Baksa ever tell you to review any of
[2] those books?

[3] A: No. He just handed it to us, and the book was
[4] not present.

[5] Q: And the same thing with the book that's from Bob
[6] Jones University Press, did he—

[7] A: That's the one I'm referring to, that one. We
[8] got both of these from him at that meeting,
[9] these documents.

[10] Q: But he didn't tell you to review any of these it
[11] sounds like.

[12] A: No.

[13] Q: Is that right?

[14] A: Not specifically, no.

[15] Q: How about in terms of recalling the discussion
[16] had at the meeting, do you recall any specifics?

[17] A: I think that may have been the meeting— It
[18] certainly was one of those curriculum meetings
[19] in June where I believe I looked at
[20] Mr. Buckingham, and I said to him, if I hear you
[21] say man and monkey in the same sentence one more
[22] time, I am going to scream. That may have been
[23] the meeting.

[24] Q: Tell me about that. Was Mr. Buckingham saying
[25] man and monkey during this meeting to the extent

Page 81

[1] you can recall?

[2] A: Yes.

[3] Q: Well, tell me what he said in connection with
[4] that—

[5] A: Well, man and monkey in the same sentence
[6] sometimes has to do with certain people's
[7] perception of evolution. We have to my
[8] knowledge never taught that man came from a
[9] monkey. But much of this man and monkey
[10] conversation had to do with a mural that was in
[11] the school district that was given to the, if
[12] you will, I guess science department by a
[13] student. It was his senior focal project in the
[14] late 1990 something, '98 I believe maybe, where
[15] he painted a very large mural, 16 feet by
[16] 4 feet, of the traditional evolutionary assent
[17] of man that you often see where on the one end
[18] you had the four, you know, whatever and the
[19] other end the upright man.

[20] That mural sat in one of the science rooms,
[21] now, not the present ones because the whole
[22] building has been redesigned. And I think there
[23] were certain members of the board and certain
[24] community members that were offended by the fact
[25] that that was in the school system.

Page 82

[1] Q: Let's stop right there. You say I think certain
[2] members of the board were offended. Do you have
[3] any specific members in mind?

[4] A: Yes, Mr. Buckingham. And there were also other
[5] employees in the school district that found that
[6] mural to be offensive because of their religious
[7] convictions.

[8] Q: I think I know the answer to this, but how do
[9] you know that, Bert?

[10] A: Because over one weekend the mural was taken out
[11] of the biology room and burned is how I have
[12] that feeling.

[13] Q: I thought I might have that sense, too. Bert,
[14] if you would, would you look at Miller 4, top
[15] page. Let me refresh your recollection for the
[16] purposes of this little section of the
[17] deposition here. That looks like— That first
[18] page of Miller 4 is titled, history - mural
[19] evolution of man. Is that a document that you
[20] created?

[21] A: Yes.

[22] Q: Where did you get the information for that
[23] document, Bert?

[24] A: I lived it.

[25] Q: You did?

Page 83

[1] A: Yes. I was next door to the room in which the
[2] mural was.

[3] Q: So this document you've just referred to relates
[4] to the mural that you're discussing. Is that
[5] right?

[6] A: That is correct.

[7] Q: So tell me about the discussion— Well, we're
[8] talking about this meeting in June, and you
[9] indicated that Mr. Buckingham is using the
[10] phrase monkey and a man, and you are obviously
[11] linking that usage to this mural. Tell me more.

[12] A: I actually questioned him as to where this man
[13] and monkey idea came from, and I may even have
[14] asked him does this go back to the mural which
[15] basically sat in what then was Room 217. And
[16] the reason that I say that, okay, at a board
[17] meeting in the spring of the year 2004 — now, I
[18] cannot tell you what meeting, okay — a picture
[19] of that mural apparently was shown to board
[20] members by Mr. Buckingham. I knew about that.
[21] And it may have been in this June curriculum
[22] meeting I asked him point-blank where he had
[23] gotten the picture of that mural. He would not
[24] answer me.

[25] Q: A couple things, let me ask you, how did you

---

rtha E. Spahr
...y 19, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 84

know about the picture? How did you come to
know about the picture of the mural?

A: Somebody who was in attendance, and I cannot
tell you specifically who, at the board
meeting — it could have been an association
person — was sitting in the audience when the
picture was being passed around. I did not see
it. I was not present at the time.

Q: But you have this discussion with
Mr. Buckingham, and how did he respond to your
inquiry?

A: He did not respond when I asked him questions as
to how he came by that picture. He just didn't
answer me.

Q: How about your statement, you know, if I hear
man and monkey again I'm going to scream, did he
respond to that?

A: Not really. But he didn't say man and monkey in
a sentence again, so. I mean, it was the end of
that discussion at that point.

Q: Well, Bert, tell me you seem to be remembering a
meeting that has some details sticking out.
What I want to get is what do you remember about
this exchange? What are the concerns that are
being expressed by Mr. Buckingham and the way in

Page 85

[1] which you as the science faculty are responding
[2] to them?

[3]    A: Other than that brief exchange, it's always been
[4] a relatively civilized meeting. That probably I
[5] pushed it on that one, but finally I had had it.
[6] His concern was he felt, did not know, but felt
[7] that we were teaching that man comes from a
[8] monkey.

[9]    Q: Now, did he say that?

[10]    A: Yes, in some discussions he actually said that.
[11] And I said to him, and the biology teachers
[12] obviously said it more emphatically than I did,
[13] that was not my perception. To my knowledge—
[14] Now, I have to say to my knowledge because I am
[15] as department chair a facilitator of doing
[16] things. I am not a first line supervisor. I do
[17] not have the opportunity to go into biology
[18] classrooms and see and hear what they are
[19] teaching. That's not part of my job
[20] description.

[21]    So I'm saying, okay, his perception was we
[22] teach man comes from a monkey. And I felt that
[23] that came about because of the relationship to
[24] this mural, if the mural is sitting in a
[25] classroom. And it was because the building and

Page 86

[1] grounds people refused to hang it on the wall so
[2] it had a permanent hanging. So this is where I
[3] got some of the clue that something was amiss
[4] here.

[5]    The science department had requested that
[6] like all the other murals in the school it be
[7] permanently affixed to the wall so it was
[8] stationary. And for whatever reason, the
[9] building and grounds people would not do that.
[10] And so it was sitting on the chalkboard in the
[11] back of the room in the tray.

[12]    Q: Let me ask you, Bert, the document you created
[13] which is the first document in the packet marked
[14] Miller 4 halfway down has a reference to a
[15] Mr. Reeser?

[16]    A: That's correct.

[17]    Q: Was Mr. Reeser building and grounds?

[18]    A: He was the head of building and grounds for the
[19] district, not just the high school, for the
[20] district, yes.

[21]    Q: Would Mr. Reeser be the person who would be
[22] charged with seeing to it that the mural was
[23] affixed as the department desired?

[24]    A: We originally asked the janitorial staff that
[25] services our building which would have been the

Page 87

[1] high school, and they in turn apparently before
[2] they could hang it up had to get permission from
[3] Mr. Reeser, and that permission was not granted.

[4]    Q: Continue, Bert, with your story. You've got
[5] this sense that the mural is underlying
[6] Mr. Buckingham's concerns, and you bring that to
[7] his attention. What happens next? What's the
[8] nature of the exchange?

[9]    A: I specifically asked him, does this go back to
[10] the time of the mural because man and monkey
[11] would certainly evolve from this picture. And
[12] he questioned as to whether that was what our
[13] biology department was teaching in these biology
[14] classes.

[15]    And it was at that point that Jen Miller
[16] and the biology people responded to that because
[17] I could not answer that. I did not know that.
[18] That pretty much, you know, once we had gotten
[19] over that, that ended it, and we went on to
[20] something else.

[21]    Q: Do you recall what Jen said?

[22]    A: Not specifically. But to my knowledge, she
[23] indicated that none of the present biology
[24] teachers ever teach that man comes from a
[25] monkey.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Bertha E. Spahr
May 19, 2005

---

Page 88

[1]    Q: You say to your knowledge, Bert. Are you saying
[2] based on what Jen had told you earlier about the
[3] way in which she presented evolutionary theory?
[4]    A: Yes. I do not have that firsthand.
[5]    Q: We've got some statements by Mr. Buckingham at
[6] this meeting. How about you say Sheila was
[7] there. Did Sheila Harkins say anything?
[8]    A: Not that sticks out in my mind.
[9]    Q: Did she react or how did she react to
[10] Mr. Buckingham's comments?
[11]    A: I think she raised her eyes when I spoke to him,
[12] as I recall. But she did not make a comment,
[13] you know, in regard to what he had said to me.
[14]    Q: You say you let Mr. Buckingham have it that
[15] time?
[16]    A: I don't know whether I'd say have it. I just
[17] simply said to him, if I hear man and monkey in
[18] the same sentence one more time, I am going to
[19] scream indicating that I had heard enough of it.
[20] But, I mean, that was the only exchange. I may
[21] have raised my voice, but, I mean, I didn't—
[22]    Q: How about any of the other biology teachers, do
[23] you recall them saying anything at this meeting?
[24]    A: I'm sure they had input. I'm not sure
[25] specifically what. Our major concern at the

Page 89

[1] June meeting, wherever this was, okay, was are
[2] we going to have this biology book for the start
[3] of school. It was the last day of school. We
[4] wanted to go home. And so we didn't want to
[5] delay this any longer than we needed to. Our
[6] purpose was to find out will we have a biology
[7] book. And that's primarily. And then the next
[8] monkey wrench.
[9]    Q: Miller 4 references the destruction of the
[10] mural. Do you recall any discussion with
[11] Mr. Buckingham relating to the destruction of
[12] the mural?
[13]    A: Not with Mr. Buckingham. I don't think
[14] Mr. Buckingham was in the school district at
[15] that time. So— Now, he certainly— I think
[16] somewhere in all of our meetings the destruction
[17] of the mural came up because a board policy was
[18] created on accepting contributions from students
[19] and outside sources as a result of that where
[20] the board I guess had not been asked for
[21] approving the fact that the student gave this
[22] mural to the school.
[23]    I'm not exactly sure what the mechanics
[24] were whereby the student gave it to the school
[25] because it was in a classroom of a teacher who

Page 90

[1] is no longer here. But I know a board policy
[2] evolved, okay, where the board felt they had the
[3] right to either accept or reject a gift from
[4] outside.
[5]    Q: Well, let me ask you about that. Do you have
[6] any recollection of discussions concerning
[7] policy relating to donations to the district?
[8]    A: At one meeting it certainly did come up where
[9] they now— And I remember we said it probably
[10] would not be a bad idea for a policy to be used
[11] that this would not happen again that, you know,
[12] a gift would be blatantly destroyed and the
[13] person that gave it not given the opportunity to
[14] take it back.
[15]    Q: Do you recall in that discussion who suggested
[16] the idea of the donations policy?
[17]    A: No, I do not. I know at the curriculum
[18] committee meeting, that may have been the one
[19] that Casey Brown was there, Sheila Harkins, and
[20] Mr. Buckingham, and I think it was simply an
[21] open discussion where we as a department agreed
[22] that maybe it would not be a bad idea so that,
[23] you know, this does not happen and we go through
[24] this one more time.
[25]    MR. GILLEN: Let's take a brief break.

Page 91

[1]    (Recess taken)
[2]                    BY MR. GILLEN:
[3]    Q: Bert, we were speaking about a meeting with the
[4] board curriculum committee which you believe I
[5] think was sometime in June?
[6]    A: That's correct.
[7]    Q: We had some discussion about the exchanges that
[8] occurred in that meeting. I want to ask you, do
[9] you remember the book Of Pandas coming up at
[10] that time?
[11]    A: It did not come up at that meeting.
[12]    Q: You have a definite recollection that it did
[13] not?
[14]    A: I do.
[15]    Q: How about specific complaints that
[16] Mr. Buckingham had with the text?
[17]    A: One of Mr. Buckingham's complaints was that it
[18] was laced with Darwinism.
[19]    Q: Do you remember him saying that?
[20]    A: Yes.
[21]    Q: Do you remember—
[22]    A: I do not know if it was at that specific
[23] meeting, but that was one of his complaints
[24] about the textbook that we had selected.
[25]    Q: Did he tell you what he meant by that? Did he

---

ertha E. Spahr
lay 19, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

Page 92

[1] elaborate?

[2]   A: He indicated that references to Darwin's theory
[3] of evolution was in more than one place in the
[4] chapter in the biology text on evolution.

[5]   Q: Do you remember him going through the text in
[6] any way with page numbers or anything?

[7]   A: Yes. And that is on a document which I believe
[8] you have in your possession.

[9]   Q: Are you referencing to these handwritten notes?

[10]   A: No. It is a typed document.

[11]   Q: Why don't you take a look at Miller 2. Does
[12] that document look familiar to you?

[13]   A: Yes, it does.

[14]   Q: Do you think that you saw this document we're
[15] looking at now which is one of the documents in
[16] Miller 2 headed, Teachers Edition Prentice Hall
[17] Biology Miller/Levine with a handwritten
[18] notation, given to Jen Miller in the upper right
[19] hand corner, do you think you've seen that
[20] before?

[21]   A: Yes, I have.

[22]   Q: Do you think you saw it in connection with the
[23] meeting we're talking about now in June of 2004?

[24]   A: I do not know if we received it at that specific
[25] meeting, but we received a copy of this after

---

Page 93

[1] Mr. Buckingham had reviewed what was the teacher
[2] edition of the 2002 Miller and Levine book. And
[3] that was the only one that we had for him to
[4] review. It was sent to us by the Prentice Hall
[5] rep.

[6]   And some of the objections that he cited
[7] here had to do with references that appeared in
[8] the teacher's edition that would never have been
[9] seen by a student.

[10]   Q: Do you recall any discussion at the meeting
[11] along the lines you just suggested?

[12]   A: I remember Jen Miller pointing out to him that
[13] this was not a student edition of the book but
[14] it was the only one that we had available for
[15] him to take with him to review.

[16]   Q: If I understand you correctly, Bert, you're
[17] saying Jen was pointing out to him that some of
[18] his marked pages were pages that students would
[19] never see?

[20]   A: That's correct, where they had suggested
[21] discussion questions. They had suggested
[22] activities to be used by the teacher, whether a
[23] teacher chose to do so. The student certainly,
[24] though, would never have seen those suggestions.

[25]   Q: Apart from that exchange between Mr. Buckingham

---

Page 94

[1] and Miss Miller and what we've already talked
[2] about, do you recall anything else being said at
[3] the meeting by Mr. Buckingham about the text or
[4] his reservations with the—

[5]   A: Not at that particular meeting, no.

[6]   Q: You say not at that particular meeting. Did you
[7] have discussions with him later?

[8]   A: I did not have discussions with him later.

[9] Subsequently to this June meeting, right before
[10] we left to come home from school, this book rep
[11] sent us and Rob received the book the 2004
[12] edition of Miller and Levine.

[13]   I immediately because I am an honest person
[14] called Mr. Baksa and I said, you need to be
[15] prepared that there is now a 2004 edition of
[16] this textbook out there before the vote which we
[17] thought was going to occur in July goes down to
[18] purchase the 2002 edition.

[19]   Q: Stop right there. I see where you're going.
[20] Let me ask you, about when did you get the 2004
[21] edition?

[22]   A: It was sometime between this meeting and when we
[23] left to go home for the summer.

[24]   Q: Now, if you turn the page on Miller 2, there's
[25] an e-mail I don't want you to look at. Turn the

---

Page 95

[1] page again if you would, Bert. We're looking at
[2] a page that has at its top the heading, Beyond
[3] the Evolution versus Creation Debate. It has a
[4] handwritten notation, given to me by Baksa
[5] spring 2004. Do you recall seeing this
[6] document?

[7]   A: I recall seeing it. I have a copy in my file.

[8]   Q: When did you see this Bert?

[9]   A: I cannot tell you what meeting this was given to
[10] us by Mr. Baksa, but it was sometime in the
[11] spring of 2004. It was before that summer
[12] curriculum meeting.

[13]   Q: Before the June meeting we've been discussing?

[14]   A: I believe.

[15]   Q: Do you recall a discussion of this chart?

[16]   A: No, I do not.

[17]   Q: If you flip the page again, Bert, to a document
[18] that is headed Dover Area School District
[19] Changes in the 2002 and 2004 Copyright Biology
[20] Books from Prentice Hall, do you recognize that
[21] document?

[22]   A: Yes, I do.

[23]   Q: Does that document relate to the process you've
[24] just described of receiving an updated edition
[25] before the close of the school year in the

---

Min-U-Script®   Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Bertha E. Spahr
May 19, 2005

---

**Page 96**

[1] spring of 2004?

[2]     A: The book that we received was very close to when

[3] we left at the end of school which would have

[4] been in June. That was when we got the 2004

[5] edition. But, yes, I recognize this document.

[6]     Q: Now, if I look at Miller 4, I see an entry for

[7] July 2004, and it references that J. Miller,

[8] Spahr, Baksa, Nilsen reviewed the chapter on

[9] evolution. Now, let me ask you, did that review

[10] take place at the beginning, the middle, or in

[11] the end of July?

[12]     A: I have no idea. I know we were all home for the

[13] summer vacation, and all of us came to

[14] Dr. Nilsen's office to review the two editions

[15] of the book side by side.

[16]     Q: Do you know if the meeting you've just

[17] referenced occurred before or after whatever

[18] board meetings were had by the school board in

[19] July of 2004?

[20]     A: My recollection is that it was probably before

[21] because the ordering of the book was tabled

[22] until the August meeting in terms of having

[23] people review the comparison.

[24]     Q: So you think the review took place prior to the

[25] July board meeting?

---

**Page 97**

[1]     A: I believe so.

[2]     Q: Then let's look at that document headed Changes

[3] in the 2002-2004 Copyright Biology Books. Tell

[4] me what sort of reviews you conducted.

[5]     A: We opened both books to the chapter on evolution

[6] because the other chapters were not in question,

[7] and we read paragraph by paragraph, picture,

[8] diagram by diagram to see where the changes were

[9] between the two editions.

[10]     Our conclusion when we got to the end was

[11] that we felt that the 2004 edition would

[12] probably be less offensive to most people than

[13] the 2002 edition. And, therefore, our

[14] recommendation was that we actually purchase one

[15] that was not already two, three years old but

[16] the 2004 edition.

[17]     Q: Did you look through the book yourself, Bert?

[18]     A: I was, yes, sitting at the table.

[19]     Q: As you went through it, did you compare the

[20] presentation of evolutionary theory in the 2002

[21] edition and in the 2004?

[22]     A: Yes.

[23]     Q: Did you have an impression as to the thrust of

[24] the changes made in the presentation of the 2004

[25] text?

---

**Page 98**

[1]     A: The verbiage in the 2004 edition removed words

[2] like primate from the discussion. In Number 1

[3] you will see deleted the word primates from

[4] ancestors shared with felines. Some of the

[5] diagrams and pictures removed again things that

[6] were certainly considered controversial so that

[7] we felt that the presentation of 2004 would be

[8] more acceptable we even thought to the board.

[9]     Q: Did you when you conducted your review look at

[10] the changes from the standpoint of assertions

[11] made on behalf of evolutionary theory, to be

[12] more specific, you know, claims made for what

[13] evolutionary theory could demonstrate?

[14]     A: That was not our intent. Our intent was to see

[15] how the two editions differed on this subject in

[16] that chapter.

[17]     Q: That's what I'm getting at, Bert. When you

[18] looked at it, how they differed, were you

[19] looking at how they differed from the standpoint

[20] of assertions that were made in the 2002 text

[21] with respect to what evolutionary theory showed

[22] or could show and then looking at the 2004

[23] edition with respect to the same concern what

[24] claims could be made for evolutionary theory?

[25]     A: I can't answer that. I am not the authority on

---

**Page 99**

[1] what had previously been done in the textbooks

[2] in evolution. I think I was the one that

[3] basically wrote down words. I believe Jen had

[4] one book. I believe Mr. Baksa had the other

[5] book. And Dr. Nilsen would be floating in and

[6] out. So it was kind of a collaborative effort

[7] where we were literally comparing one chapter to

[8] the other.

[9]     Q: I don't want to belabor it. I just want to get

[10] a sense for the nature of that review. I know

[11] biology isn't your field. So when you're

[12] reviewing the text, I know you're comparing the

[13] presentation of evolutionary theory in the two

[14] versions, correct?

[15]     A: That's correct.

[16]     Q: What are you reviewing them in light of? I

[17] mean, what are you looking for?

[18]     A: Well, we certainly were looking to see if, in

[19] fact — because certain chapters are never

[20] changed from one edition to another. We were

[21] looking to see whether the new chapter in the

[22] 2004 book reflected any changes in light of the

[23] controversy that had been seen in print in the

[24] last several years because certainly this issue

[25] has been in print, e-mail, in documents,

---

ertha E. Spahr
lay 19, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

**Page 100**

[1] discussed all kinds of places. And we were
[2] there to see whether they had made changes that
[3] would make the book less controversial to
[4] people.
[5]   Q: You say seen in print. Are you referring to
[6] just media generally apart from Dover Area—
[7]   A: Yes, yes.
[8]   Q: When you are referencing that sort of
[9] controversy, Bert, what are you getting at
[10] exactly?
[11]   A: Well, there were court cases that were taking
[12] place in Georgia, there were some in Kansas,
[13] there were some in Michigan which involved this
[14] evolution and creationism discussion, and
[15] certain books certainly came up.
[16]    In Texas the discussion came up. And one
[17] of the big things is Texas purchases one book
[18] for the entire state. And, therefore, if you
[19] are going to have this purchased, then you
[20] certainly want to make the chapter that deals
[21] with evolution the least offensive to attract
[22] the greatest audience. And we felt it literally
[23] had been softened.
[24]   Q: You reference the evolution versus creationism
[25] debate, and we're talking about the period of

**Page 101**

[1] July 2004. By that time, Bert, did you have an
[2] opinion concerning whether intelligent design
[3] was equivalent to creationism?
[4]   A: I never heard the word intelligent design up
[5] until that time.
[6]   Q: Up until what time?
[7]   A: Actually August of 2004.
[8]   Q: So are you just— Well, let me ask you, you're
[9] saying in the June board meetings you didn't
[10] hear the term intelligent design?
[11]   A: I did not because I— I don't remember it,
[12] okay. I do not remember it. It certainly was
[13] not a discussion among the members of my
[14] department. Intelligent design never came to us
[15] until the book Of Pandas and People came to our
[16] attention.
[17]   Q: So when you're reviewing the text here in
[18] July 2004, you're reviewing the text to see if
[19] it's less controversial from the standpoint of
[20] creationism?
[21]   A: Well, certainly less controversial with the
[22] introduction of the words primates meaning
[23] monkeys or common descent. That was a big bone
[24] of contention, the stress being change over
[25] time. And those were the kind of things that we

**Page 102**

[1] were basically looking at, at that particular
[2] point in time.
[3]   Q: Let me see if I can go at this a different way
[4] here. When you came away from your review of
[5] the text, you say that you thought it would be
[6] more acceptable?
[7]   A: We felt that.
[8]   Q: Tell me why.
[9]   A: Because some of the words that had been used,
[10] some of the diagrams and some of the pictures
[11] were removed from the 2004 edition. This whole
[12] idea of common descent was a big controversial
[13] issue, anything obviously having to do with
[14] primates.
[15]    But when we reviewed it, and we basically
[16] did it from the beginning to the end of the
[17] chapter, and felt that Miller and Levine had
[18] done their best in doing the new edition to
[19] soften it and make it more appealing to a larger
[20] audience.
[21]   Q: When you looked at those changes, did you have
[22] any sense for what was driving them? I mean—
[23]   A: No.
[24]   Q: No?
[25]   A: I did not.

**Page 103**

[1]   Q: Well, did you see them as addressing specific
[2] claims advanced on behalf of evolutionary
[3] theory?
[4]   A: I was not aware of that, no. That was not what
[5] I was looking for. I was reading sentence by
[6] sentence and not necessarily comprehending
[7] anything that was being presented. We were just
[8] hunting differences to point out.
[9]   Q: And it seems like when you were hunting
[10] differences you were doing it in large in this
[11] sort of cultural controversy you've referenced.
[12] Is that right?
[13]   A: That's correct.
[14]   Q: You've referenced common descent several times.
[15] Numbered Item 11 on the page we're looking at
[16] now says, in same paragraph deletes common
[17] descent. Do you recall any discussion among the
[18] science faculty or the science faculty and the
[19] administration relating to that deletion, what
[20] significance it might have?
[21]   A: I don't recall any, no. That's not to say some
[22] discussion did not occur.
[23]   Q: Understood. You indicated that you— Who was
[24] it, Jen Miller?
[25]   A: I think Jen Miller had the one book, and

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Bertha E. Spahr
May 19, 2005

**Page 104**

[1] Mr. Baksa had the second book, and I was kind of
[2] there writing. We both kind of, you know— We
[3] commonly, you know, shared because of course we
[4] knew that the board meeting was imminent and now
[5] here we were with a new edition, and we knew it
[6] was going to present a new problem.
[7]   Q: A new problem or a solution?
[8]   A: No, a new problem in that we had been assured in
[9] June that the 2002 edition of the Miller and
[10] Levine book was going to be approved by the
[11] board.
[12]   Q: Let's go back to that. Thanks, Bert. So when
[13] you came away from the June 2004 meeting with
[14] the board curriculum committee, it was your
[15] understanding that Miller and Levine 2002 would
[16] be approved by—
[17]   A: We were assured by that curriculum committee
[18] that the 2002 book would be ordered.
[19]   Q: Then the new book comes, and you see it's up in
[20] the air again. Is that correct?
[21]   A: We felt it probably would be because now there's
[22] a new edition. And they always pointed out, you
[23] know, why would you waste money buying a 2002
[24] edition when, in fact, it's always three years
[25] old even though the date says 2002 when now

**Page 105**

[1] there is a new one which is now on the market.
[2]   And that was the reason I called Mr. Baksa
[3] and said, you know, I hate to tell you this but
[4] the new one has now been received by us, what do
[5] we need to do. And that's when we sat down and
[6] we attempted to go through and see where they
[7] differed.
[8]   Q: It seems you anticipated an objection to the
[9] 2002 text based on it being old already?
[10]   A: Yes.
[11]   Q: Now, did you generate this document we're
[12] looking at, Bert, that's got the heading,
[13] Changes in the 2002 and 2004 Copyright Biology
[14] Books?
[15]   A: I believe we had written it in pencil, and I
[16] think it was my understanding that Mr. Baksa's
[17] secretary actually typed the document as you see
[18] it here.
[19]   Q: Did you have a meeting with the board curriculum
[20] committee as a result of the work that we need
[21] to preparing that document?
[22]   A: Not to my knowledge. It was summer, and it
[23] would be hard to find with everybody's
[24] vacations, you know.
[25]   Q: So you don't think there was any other meetings?

**Page 106**

[1]   A: I do not believe we ever had any meeting with
[2] the board subsequent to this.
[3]   Q: The board curriculum committee?
[4]   A: With the board curriculum committee, that's
[5] correct.
[6]   Q: If you would, Bert, please look at Miller 3, the
[7] agenda for the July 2nd, 2004 board meeting.
[8]   A: July 12th?
[9]   Q: Yes. If you go to Item XIII curriculum, you'll
[10] see a notation on the right hand side, table to
[11] next meeting going into new edition at no
[12] additional cost. Does that reflect what we just
[13] talked about?
[14]   A: Yes.
[15]   Q: So it was tabled at the July 12th meeting. From
[16] your standpoint, Bert, you've got this meeting
[17] where you've reviewed the differences in the
[18] text, and was there anything, any communications
[19] that you had with either the administration,
[20] members of the school board, or your science
[21] faculty relating to the science biology textbook
[22] between that meeting you just discussed in July
[23] and the board meeting that was held on
[24] August 2nd, 2004?
[25]   A: Not to my knowledge.

**Page 107**

[1]   Q: Did you attend the August 2nd board meeting?
[2]   A: I don't think so because I think I was on
[3] vacation. I was not in attendance at the August
[4] board meeting.
[5]   Q: But at some point in August it seems to me based
[6] on what you've said that the book Of Pandas came
[7] to your attention?
[8]   A: My recollection is when we met in Mr. — with
[9] Mr. Baksa in July in Dr. Nilsen's office I
[10] believe a copy of Of Pandas and People was given
[11] to Jen to look at. Nothing was said about it
[12] other than this is a book, would she please, you
[13] know, look at it or, you know, read through it.
[14] I did not have one. It was just given to her at
[15] that time.
[16]   Q: Now, I just remembered something I wanted to ask
[17] you about. Going back to that June 2004
[18] meeting, do you recall there being any
[19] videotapes or DVDs given to the science faculty
[20] for review in that June meeting?
[21]   A: I don't know when it was, the department was
[22] given a video which I believe was a set of
[23] three, or certainly there were three videos
[24] involved. And on the last in-service day the
[25] biology department viewed that video. And it

ertha E. Spahr
lay 19, 2005

**Tammy Kitzmiller, et al.   v.**
**Dover Area School District, et al.**

---

Page 108

[1] had to do with discrepancies in the Darwin
[2] theory.
[3]     And while we were viewing the video,
[4] Mr. Baksa came into the building, and I jokingly
[5] said, see, we're doing what you asked us to do,
[6] we're watching this video. And he asked us, you
[7] know, how we felt about it. And we said, there
[8] is some validity to it. Now, are we going to
[9] use it in our classroom, but, you know, we were
[10] willing to say, yes, there certainly is some
[11] validity to what we're looking at.
[12]     And interestingly enough, one of the people
[13] on the video was one of the two authors of the
[14] bio book. But, yes, we did view one video, and
[15] it was basically on the last day of the school
[16] year as I recall.
[17]     Q: And in that meeting in June do you recall there
[18] being some discussion of gaps in evolutionary
[19] theory and Jen Miller saying something like, you
[20] know, we can present the information on gaps?
[21]     A: As a compromise to this curriculum committee,
[22] we — when I say we, certainly the biology
[23] teachers because I don't teach it — would be
[24] willing to point out that there are some gaps in
[25] this theory. And we were willing to do that

Page 109

[1] thinking that we could maybe get this settled if
[2] this was going to be what would make him happy.
[3]     Q: Do you recall Jen saying something to the effect
[4] of I show the gaps to my students anyway?
[5]     A: Many of the biology teachers have already done
[6] that as past practice. But now what we would
[7] have been directed to do at that point is to see
[8] to it that every biology teacher would basically
[9] be teaching this as a consistency.
[10]     Q: Okay, I see. Back now to July and Of Pandas,
[11] you think it was then that Jen got a copy to
[12] review?
[13]     A: Yes.
[14]     Q: How about yourself, did you ever— I know it's
[15] not your subject matter, but did you ever review
[16] the text?
[17]     A: Yes, I did. I read only the beginning which was
[18] the overview. There's a beginning which is the
[19] overview which covers all of the chapters, and
[20] then there's obviously what follows it which
[21] goes into greater depth. I read the overview.
[22]     Q: What was your take on it, Bert, after you
[23] reviewed the text?
[24]     A: I felt that the reading level of the text
[25] material would never have been suitable to a

---

Page 110

[1] ninth grader. I have a master's degree, and I
[2] could barely get through it. Now, granted it is
[3] not my area of expertise, but it was very, very
[4] difficult to read. I felt that it was not good
[5] science, and I felt that there were some
[6] statements in there actually concerning
[7] chemicals that were not accurate.
[8]     I further went to the front of it. I
[9] looked who published it, tried to look up some
[10] information on the publisher. To my knowledge,
[11] this company that's out of Texas prior to the
[12] publishing of this book has only ever published
[13] labels in farming and manuals.
[14]     I furthermore then tried to research the
[15] authors to see what their background was. I
[16] looked at who had reviewed the book and found
[17] there was one high school teacher and everybody
[18] else was college professors. So I felt that the
[19] book was more suitable to freshmen or sophomore
[20] college students than it ever would have been to
[21] a ninth grade student body.
[22]     Q: You said you felt there was not good science.
[23] What did you mean by that, Bert?
[24]     A: Well, that it had some statements in it — one
[25] had to do with the oxidation of carbon

Page 111

[1] compounds — which when you read it just was not
[2] accurate. It had things in it which were not
[3] going to be able to be proven, okay? In other
[4] words, if you— I mean, I felt that what they
[5] were putting forth was a belief and not a
[6] theory.
[7]     Q: You've referenced some things that you think
[8] couldn't be proven and so on. I just want to
[9] make sure I understand what you're getting at
[10] there. Tell me more about that, Bert, when you
[11] say things that couldn't be proven.
[12]     A: Well, a belief is difficult to prove in a lab
[13] situation which is everything in science is
[14] pretty much lab based. For instance, I cannot
[15] prove what God is or is not. It is a belief.
[16] Where a theory has been time-tested explanations
[17] which basically cover observations and is our
[18] foundation in science. It is different from a
[19] law, and it is different from a hypothesis.
[20]     Q: I take it you understood the text to be
[21] advancing claims that were not — did not
[22] satisfy your conception of what a theory was.
[23] Is that correct?
[24]     A: That's correct.
[25]     Q: And it seems, Bert, from what you've said that

---

**Min-U-Script®**    **Filius  &  McLucas Reporting Service, Inc.**

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Bertha E. Spahr
May 19, 2005

---

Page 112

[1] your overall criteria seems to be testable in a
[2] lab situation?
[3]   A: Yes.
[4]   Q: Apart from these reservations you've referenced,
[5] anything else? You said earlier that it was
[6] during this period of time that you first heard
[7] the term intelligent design. Did you first hear
[8] it through your review of this book—
[9]   A: Yes.
[10]   Q: —learned of the term intelligent design? How
[11] about did you ever speak with Jen Miller about
[12] the text Of Pandas?
[13]   A: Not until we returned to school that fall which
[14] was 2004.
[15]   Q: Just when does school start, September?
[16]   A: No. Usually it's the last week of August. I
[17] think because of the building project one year
[18] we went after Labor Day which I can't remember
[19] which year that is. But that was due to the
[20] building project. But normally we begin school
[21] the last week of August.
[22]   Q: Tell me what you recall about your discussions
[23] with Jen about the book.
[24]   A: We talked about the readability of the book —
[25] and everybody who looked at it maintained that

---

Page 113

[1] the readability was too far above the level of
[2] the students it was supposed to serve — some of
[3] the theories which were presented in the book.
[4]   And I think I have some notes somewhere
[5] having to do with notes that I had taken when we
[6] read the book because I remember asking I don't
[7] know whether it was Mr. Buckingham, but it was
[8] somebody on the curriculum committee, to explain
[9] what this meant that I read in the book because
[10] I as a scientist could not figure out what they
[11] were basically trying to say and did not get a
[12] response to that.
[13]   It was a pretty sophisticated vocabulary,
[14] and their explanations were well beyond the
[15] comprehension of ninth graders even if they were
[16] honor students. We did discuss that, though.
[17]   Q: You discussed that with Mr. Buckingham?
[18]   A: No, with Jen.
[19]   Q: Oh, with Jen?
[20]   A: And the department.
[21]   Q: Let's ask about that, how about Rob Eshbach, do
[22] you recall any discussions with him?
[23]   A: I do not know whether he had a copy of the book,
[24] but he certainly read excerpts from the book.
[25]   Q: You said you did some research on the book. Did

---

Page 114

[1] you find criticisms of it online?
[2]   A: Yes.
[3]   Q: Did you collect those?
[4]   A: Yes.
[5]   Q: I know that you provided me with some documents.
[6]   A: Yes. And those are the ones that I had in my
[7] possession.
[8]   Q: Do you recall discussing the book with Bryan
[9] Rehm? Was he still at the district at that
[10] time?
[11]   A: No, he was not.
[12]   Q: Discussions with members of the board curriculum
[13] committee about the book?
[14]   A: I don't remember discussing Of Pandas and
[15] People. I never heard of the book other than
[16] when it was given by Mr. Baksa to Jen at that
[17] July meeting. I was not at the August board
[18] meeting when the vote to purchase the 2004
[19] point 2004 edition of Miller and Levine came up
[20] for the vote. It went to a four/four tie. Then
[21] Mrs. Yingling switched to a five/three.
[22]   And of course I was away but was appalled
[23] when I got back because I had been assured by
[24] the curriculum committee that this book was
[25] going to go through and then come to find out

---

Page 115

[1] that Mr. Buckingham had voted no on the book
[2] unless Of Pandas and People would serve as a
[3] companion book and be given to each student.
[4] Now, that was the first time I had ever heard
[5] anything about this book becoming a student
[6] text, so.
[7]   Q: When you returned, obviously somebody informed
[8] you as to what had transpired at the August 2nd
[9] board meeting. Who was that?
[10]   A: Well, I can't tell you exactly. I do know that
[11] before I left we had prepared all of the
[12] purchase orders so that if this were approved we
[13] had called the book companies, and the book
[14] companies had assured us that within receipt of
[15] the fax on the day after the board had approved
[16] it they would have those textbooks in our
[17] possession within two weeks. So we assumed that
[18] this was going to go ahead.
[19]   Now, the purchase orders were in the hands
[20] of Dawn Spahr, not a relative of mine who was
[21] the secretary to our principal, and they were
[22] automatically when the vote went down faxed to
[23] them.
[24]   Q: So the book was approved and purchased?
[25]   A: That's correct.

---

Filius  &  McLucas Reporting Service, Inc.      Min-U-Script®

(31) Page 112 - Page 11

Bertha E. Spahr
May 19, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

**Page 116**

[1] Q: Now, if we look at your time line, Bert, there
[2] on the page which has the number two circled in
[3] the upper right hand corner there is a reference
[4] to a August 22nd, 2004 curriculum meeting. Did
[5] you attend that, do you know?
[6] A: I don't know that. I would assume that I did.
[7] I can't imagine why I would not have. That was
[8] an in-service day.
[9] Q: You have some recollection—
[10] A: Yes.
[11] Q: —of hearing that Of Pandas would be a
[12] supplementary text?
[13] A: Well, that came out of the board meeting, not
[14] the curriculum meeting. That was the board
[15] meeting in August. I was not in attendance at
[16] that meeting, but it is my recollection that
[17] Casey Brown who then still served on the board
[18] asked Mr. Eshbach who was sitting in that board
[19] meeting whether he had any knowledge of Of
[20] Pandas and People, and he said he did not.
[21] So that was our first inkling that Of
[22] Pandas and People was going to have any
[23] connection to our biology text that we thought
[24] we were going to get.
[25] Q: Just to let me make sure I understand you, Bert,

**Page 117**

[1] do you seem to recall that Casey Brown had not
[2] reviewed the Of Pandas text?
[3] A: I have no knowledge of that. I don't know.
[4] Q: I'm sorry, then I mistook what you just said.
[5] A: I think she was asking of Mr. Eshbach who
[6] represented the science department if we had any
[7] knowledge of the Of Pandas and People book, and
[8] he said he did not because he was not at either
[9] of these other two.
[10] Q: So, in other words, if Jen Miller had been there
[11] or you had been there, you would have known, but
[12] Rob Eshbach had not been at those meetings?
[13] A: That's correct.
[14] Q: Do you recall a meeting in August where this —
[15] the use of Of Pandas was discussed with the
[16] board curriculum committee?
[17] A: Yes.
[18] Q: Tell me what you recall about that meeting.
[19] A: What I recall about the meeting is that, number
[20] one, the science department was certainly based
[21] on the fact of its readability or lack thereof
[22] happy to spend the kind of money that would be
[23] necessary to purchase those companion books for
[24] each student because we ordered 250 books, so
[25] that would mean 250 additional of these books.

**Page 118**

[1] And budget constraints were pretty narrow.
[2] And of course one of our questions was
[3] where are the extra moneys for these books going
[4] to come from. Plus we thought they would not
[5] serve the students well because of their
[6] difficulty in vocabulary and readability.
[7] So then it was suggested, and I cannot
[8] remember by whom, that the Panda book only be
[9] used as a reference text, that they be placed in
[10] the science classroom for use for students who
[11] chose to read them or whatever. And we're told
[12] that the goal of the administration was to place
[13] the books in the classrooms as reference as
[14] opposed to having each student have his own.
[15] Q: Do you recall who specifically made that
[16] suggestion?
[17] A: No. I believe Mr. Baksa and Dr. Nilsen were
[18] trying to appease both sides that, okay, if they
[19] say we must have Of Pandas and People and we say
[20] we do not want the students to carry two books,
[21] we have enough trouble truly trying to get them
[22] to carry one, that again we tried to compromise.
[23] You know, we thought that this would be an
[24] acceptable possible solution.
[25] Q: You say you tried to compromise. Did the

**Page 119**

[1] faculty indicate an openness to that use of Of
[2] Pandas?
[3] A: You mean the science faculty?
[4] Q: Yes.
[5] A: Biology teachers?
[6] Q: Yes.
[7] A: They agreed.
[8] Q: Let me ask you, we referenced that fall meeting
[9] in 2003 with Alan Bonsell. Had you done
[10] research on the legality of presenting
[11] creationism or intelligent design?
[12] A: I did not do the research. Somebody who was a
[13] member of the association, and it was actually
[14] the legislative committee, when this came to be
[15] actually did the research and handed me the
[16] packet of papers.
[17] Q: When this came to be, meaning this dispute or
[18] issue came up?
[19] A: The controversy.
[20] Q: Was that in 2003 that it first came up and you
[21] mentioned the issue to your association?
[22] A: Well, it was wherever that meeting was with
[23] Mr. Bonsell.
[24] Q: That was my question, Bert. So you had the
[25] materials we're talking about now prior to the

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Bertha E. Spahr
May 19, 2005

Page 120

[1] meeting with Mr. Bonsell in the fall of 2003?
[2]   A: Yes.
[3]   Q: Do you recall giving those materials to
[4] Mr. Bonsell?
[5]   A: I remember having those materials. I remember
[6] when the discussion arose I actually had read
[7] from those materials some things that were
[8] highlighted. I believe one member of the board
[9] asked if they could have copies of those things
[10] and was given to one of the secretaries to make
[11] copies of. I cannot tell you for certain
[12] whether it was Mr. Bonsell or whether it was
[13] Casey Brown, but it was somebody. Somebody did
[14] take those materials, copies of them.
[15]   Q: So they got a copy of your materials?
[16]   A: That's correct.
[17]   Q: Bert, if you had to sum up what those
[18] materials— Did you provide me those materials?
[19]   A: I think so.
[20]   MS. PENNY: Why don't we go off the record
[21] a moment and make sure.
[22]   (Discussion held off the record)
[23]   MR. GILLEN: We are back on the record and
[24] have confirmed that Bert in response to my
[25] subpoena provided me with a set of documents

Page 121

[1] labeled research which I am going to mark as—
[2] I'm going to mark the whole packet as
[3] B. Spahr 1.
[4]   (B. Spahr Deposition Exhibit #1 marked for
[5] identification)
[6]   BY MR. GILLEN:
[7]   Q: What we've marked now is B. Spahr 1, and, Bert,
[8] I'm going to ask you a few things. If we flip
[9] through this collection of documents, we come to
[10] a set that has a handwritten mark in the
[11] upper right hand corner, and about a third of
[12] the way down the document a bold heading that
[13] says, what does the Constitution say about
[14] teaching the religious theories of creation.
[15] And then beneath that there's another heading,
[16] what is creationism? What is creation science?
[17] What is intelligent design theory? And then
[18] there's some highlighting on that page. I'm
[19] going to ask you, Bert, do you believe that
[20] these are documents you brought to the meeting
[21] with Alan Bonsell in the fall of 2003?
[22]   A: I believe I brought them to some meeting. I
[23] cannot specifically say if it was that
[24] particular one.
[25]   Q: Do you recall a board member asking you for

Page 122

[1] copies of these documents?
[2]   A: Yes, I do.
[3]   Q: Do you recall which one?
[4]   A: Not specifically.
[5]   Q: Do you have a sense for who — which board
[6] members it might have been who asked for copies?
[7]   A: I believe it may have been Mr. Bonsell. It
[8] might also have been Casey Brown.
[9]   Q: In the meeting we're referencing, did you have
[10] discussion with the members of the board
[11] curriculum committee concerning the legality of
[12] presenting creationism in the classroom?
[13]   A: Yes. And we actually read from some of these
[14] documents.
[15]   Q: The document we've just discussed, is that the
[16] only document that you brought to the meeting
[17] you're recalling?
[18]   A: I cannot say that for sure. I don't know how
[19] many of these documents I would have had in my
[20] possession at that time.
[21]   Q: But the document we're talking about now is
[22] highlighted, and if I understand you correctly,
[23] it's that highlighting that makes you confident
[24] you brought it to the meeting?
[25]   A: I brought it to some meeting, yes, yes.

Page 123

[1]   Q: Do you recall discussing the legality of
[2] teaching creationism with Mr. Bonsell in the
[3] fall of 2003?
[4]   A: I know we brought up in someone's presence this
[5] idea because we actually read may a teacher of
[6] science who teaches evolution also teach
[7] religious theories of creation and then said,
[8] you know, these are the responses which we have
[9] found and our concern is that we will go into
[10] the classroom and be asked to commit an illegal
[11] act.
[12]   Q: Do you recall Mr. Bonsell responding to that—
[13]   A: No, I do not.
[14]   Q: —concern at that time?
[15]   A: He was listening and was very open to what we
[16] had to say. I do not remember him giving us an
[17] answer.
[18]   Q: How did you come by the documents that you
[19] brought to this meeting which we're discussing?
[20]   A: A member of our professional organization who I
[21] believe is on the legislative committee when
[22] this topic came up researched religion in the
[23] science class, printed it off the Internet,
[24] and presented it to me as department head.
[25]   Q: Bert, if you would just page through the

ertha E. Spahr
lay 19, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 124

[1] documents which follow the document that we've
[2] looked at, and you'll see one, Creationist
[3] Geologic Time Scale at the top it's headed that
[4] way.
[5]   A: Yes.
[6]   Q: As you look at that document, do you remember
[7] bringing that to the meeting we're discussing?
[8]   A: No, I do not.
[9]   Q: If you continue to the next stapled group of
[10] documents in this pack, you'll see it looks like
[11] some handwritten notes?
[12]   A: Yes.
[13]   Q: It says, a note from Priscilla J. Lauer?
[14]   A: Lauer.
[15]   Q: Who is that?
[16]   A: Priscilla J. Lauer is one of the substitutes
[17] that substitutes in our district in the field of
[18] science.
[19]   Q: If you flip the page over, you'll see a
[20] handwritten notation on the bottom of that page
[21] says, skeptical inquirer October 27th, 2003?
[22]   A: That's correct.
[23]   Q: Did you make that note?
[24]   A: I wrote it down, and the reason I did is because
[25] Mrs. Lauer said that this was a scientific

Page 125

[1] journal that contained articles having to do
[2] with intelligent design and creationism and
[3] evolution and then tried to find that magazine
[4] or that journal. We did not have it available
[5] in our high school.
[6]   Q: Do you know when you made that note, Bert?
[7]   A: No, I do not.
[8]   Q: Is the handwriting above the reference to
[9] skeptical inquirer Volume 27, is that your
[10] handwriting?
[11]   A: No. That is the handwriting of Priscilla Lauer
[12] who also gave us some reference material on this
[13] issue. She has written some letters to the
[14] editor. She is a biology teacher and was very
[15] concerned over this issue and, therefore, did
[16] some research on her own and presented us with
[17] this material.
[18]   Q: Is this material that you also brought to the
[19] meeting with Mr. Bonsell?
[20]   A: I do not know that. I did not carry all of the
[21] reference materials with me to that meeting. I
[22] believe that I carried only the ones that had to
[23] do with religion in the public school systems
[24] and some of the court cases.
[25]   Q: Bert, were you more focused on the legality as

Page 126

[1] you saw it at that time?
[2]   A: Yes.
[3]   Q: Do you think you had looked at this material
[4] prior to the fall — prior to the meeting we're
[5] discussing?
[6]   A: I don't think so.
[7]   Q: You don't?
[8]   A: No.
[9]   Q: Why is that?
[10]   A: I just didn't have time since my primary
[11] obligation is to teach students and I had labs
[12] to set up and tests to grade. So I did not read
[13] through all of these articles which are here in
[14] the research packet certainly prior to that
[15] meeting.
[16]   Q: Sure. How about do you think that you had
[17] received these documents from Ms. Lauer prior to
[18] the meeting we're discussing?
[19]   A: I can't answer that. My guess would be that
[20] that could not be possible because the reference
[21] to the skeptical inquirer is from a
[22] September/November 2003 journal. And I now
[23] have, and I think you do as well, that reprint
[24] of that article. We actually didn't have the
[25] magazine, but we basically, I believe, were able

Page 127

[1] to acquire a reprint of it where it talks about
[2] science and religion.
[3]   Q: As we sit here today, is there any way for you
[4] to tell me any other documents that you may have
[5] brought to this meeting we're discussing?
[6]   A: Not to my knowledge.
[7]   Q: It's just the highlighting really that allowed
[8] you to distinguish these?
[9]   A: That's correct.
[10]   Q: Bert, we've been discussing a couple meetings of
[11] the board curriculum committee from the spring
[12] through August 30th, 2004. Do you recall
[13] discussing these issues of legality with the
[14] board curriculum committee at these board
[15] curriculum committee meetings we discussed?
[16]   A: No, I do not.
[17]   Q: Do you recall anything else about this
[18] August 30th meeting in which there was
[19] discussion of using Of Pandas as a reference
[20] text?
[21]   A: Nothing more than we felt that a compromise
[22] might possibly be reached in not having each
[23] student have Of Pandas and People but simply
[24] have available. And I think the suggestion was
[25] made that there were to be 20 copies of the book

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Bertha E. Spahr
May 19, 2005

---

**Page 128**

[1] placed in each of the three biology classrooms.

[2]     Q: How about any curriculum change, did that come
[3] up during this August 30th meeting or around
[4] this time?

[5]     A: Not to my knowledge.

[6]     Q: In the meetings that we've discussed here from
[7] the spring through August 30, 2004, do you
[8] recall any discussion relating to curriculum
[9] change at that time?

[10]     A: No.

[11]     Q: So what happened next, Bert, from your
[12] perspective? I mean, there's this August 30th
[13] meeting with discussion of putting the Of Pandas
[14] in the classroom as a reference text. What's
[15] the next step in the story as you see it?

[16]     A: Well, the Miller and Levine book, the biology
[17] book, arrived prior to the beginning of school.
[18] They were appropriately stamped and numbered and
[19] distributed among the biology teachers that they
[20] would basically distribute them on the first day
[21] of school. Nothing else occurred until we got
[22] to the beginning of October.

[23]     Q: And that's what I wanted to ask you. In the
[24] period between August 30th and October 1, were
[25] you part of any discussions relating to the

**Page 129**

[1] contemplated curriculum changes?

[2]     A: Not to my knowledge. I'm sure at that point
[3] they would have been cited on this time line.
[4] The first few weeks at the beginning of school
[5] are rather hectic to say the least, and I think
[6] we were all basically— Now, remember, we were
[7] in new rooms having to move all of our supplies,
[8] and so we were pretty busy trying to get the
[9] start of school.

[10]     Q: How about do you know whether any of your
[11] science faculty, in particular your biology
[12] teachers, were having discussions with the
[13] administration with respect to potential
[14] curriculum change during this period from
[15] August 30th through October 1st?

[16]     A: Not to my knowledge, because usually if they
[17] would have been there, I would have been with
[18] them.

[19]     Q: And is that because in your capacity as science
[20] department head chair?

[21]     A: I'm the facilitator. If the administration
[22] would direct me to see to it that my biology
[23] teachers basically work on curriculum or work on
[24] assessments or standards, I need to know what
[25] the direction is so I can see to it that they

**Page 130**

[1] would, in fact, get their job done, so.

[2]     Q: That brings us to October, and if you'd look at
[3] Miller 3, we'll flip to the board agenda for a
[4] board meeting that was held on October 4th,
[5] 2004. If you look at the top right hand corner
[6] of the cover page, the first page of the agenda,
[7] there's the initials BS. Do you think that's—

[8]     A: Those are mine, and this is my handwriting.

[9]     Q: Did you attend that meeting?

[10]     A: If my notes are on here, I must have. I know
[11] for certain I was at the October 18th one, but
[12] obviously I was at this one as well.

[13]     Q: If you flip back to XIII, there's a notation
[14] there. And opposite the heading curriculum, can
[15] you tell me what that points to, Bert?

[16]     A: Yes. Under curriculum, the superintendent
[17] approved the donation of two classroom sets of
[18] 25 each of the books Of Pandas and People. The
[19] classroom sets will be used as references and
[20] will be made available to all students.

[21]     Casey Brown who was at that point still a
[22] member of the board asked at that point whether
[23] the district would be accepting other books on
[24] the subject of basically evolution/creationism.

[25]     Q: Did she receive a response from the board at

**Page 131**

[1] that time or any members of the board?

[2]     A: I believe the response was they would consider
[3] each gift or presentation individually.

[4]     Q: Okay. And at the bottom of that Page 6 of the
[5] agenda for the October 4th meeting there's a
[6] circled heading, Policy?

[7]     A: I see that.

[8]     Q: Does that trigger any recollection on your part?

[9]     A: None whatsoever.

[10]     Q: Then if we look at Miller 4, your time line, the
[11] page with the Number 2 circled in the upper
[12] right hand corner, we see an entry for
[13] October 8th, 2004. Take a look at that, Bert.
[14] Have you?

[15]     A: Um-hum.

[16]     Q: Tell me, does this reference a meeting you had
[17] with Mr. Baksa?

[18]     A: I don't know whether I would say meeting. It
[19] was not uncommon for Mr. Baksa if he was in the
[20] building to stop in to one of our rooms. I
[21] don't know whether it would be called a formal
[22] meeting, but certainly he came and presented us
[23] — now, when it says us, I am not exactly sure
[24] what that means — but the change in curriculum
[25] including the mention of intelligent design.

---

ertha E. Spahr
ay 19, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

**Page 132**

[1] Now, this was given to us in written form
[2] without any input from us. And the Panda book
[3] was listed as a reference. That was the first
[4] time we had seen this. We were not involved in
[5] the curriculum meeting where this was done.
[6] Q: Bert, do you recall being presented with a
[7] document—
[8] A: Yes, I do.
[9] Q: —at this sort of drop-by meeting?
[10] A: Yes, which is Miller 3.
[11] Q: Does that look like it?
[12] A: There were three different documents. I would
[13] have to—
[14] Q: I know what you're getting at, but—
[15] A: I mean, I would have to see it somewhat closer
[16] to know which one was first.
[17] Q: Well, this one's marked draft.
[18] A: Yes, this is the document.
[19] Q: For the record, I'm showing you a page from the
[20] exhibit that's been marked Miller 3. It is a
[21] document that has draft stamped across the
[22] middle of it and spray adhesive in the upper
[23] right hand corner. It's a planned
[24] instruction/curriculum guide that apparently has
[25] been changed and is in draft form. Is that the

**Page 133**

[1] document you believe that you saw on
[2] October 8th?
[3] A: That is correct.
[4] Q: Tell me, Bert, I know a little about your
[5] reaction to that document. Explain in detail,
[6] if you would, what you saw that was significant
[7] and what thoughts.
[8] A: What was different is the end of the last— In
[9] the second column the part that begins students
[10] will be made aware of the gaps and problems in
[11] Darwin's theory and of other theories of
[12] evolution including, but not limited to,
[13] intelligent design, we weren't agreed or were
[14] asked, I might add, to have that intelligent
[15] design placed there or the reference over in
[16] materials and resources which refer to Of Pandas
[17] and People placed there.
[18] Q: Now, let me ask you a little about that. I
[19] mean, there had been some discussion of putting
[20] Of Pandas as a reference text in the classroom,
[21] right?
[22] A: In the classroom.
[23] Q: But you apparently were not thinking of putting
[24] it in the curriculum. Is that correct, Bert?
[25] A: We were not— We do not cite other reference

**Page 134**

[1] books that are used in other classes. And,
[2] therefore, when we saw this, we were really
[3] quite surprised that that particular reference
[4] book was there.
[5] Q: Surprised because other reference books are not
[6] listed?
[7] A: Yes.
[8] Q: Then there's some language which you've referred
[9] to under the — at the foot of the column that's
[10] headed Unit Content/Concepts/Process. Now, it
[11] starts out, students will be made aware of the
[12] gaps/problems in Darwin's theory and other
[13] theories of evolution. Was that consistent with
[14] matters you had discussed up until this point?
[15] A: Yes, it was.
[16] Q: So it was the addition of including, but not
[17] limited to, intelligent design that was what
[18] attracted your attention?
[19] A: That was what the department, biology
[20] department, specifically objected to.
[21] Q: Do you recall discussions between yourself and
[22] Mr. Baksa relating to that change?
[23] A: I think we exchanged words on the idea.
[24] Q: Exchanged words has a certain connotation.
[25] A: No, I didn't mean it that way. I mean, but was

**Page 135**

[1] it a formal meeting, I don't think so. I know
[2] that members of the department looked at this
[3] when we were handed the draft. And I'm sure we
[4] shared those concerns when we also sent an
[5] amended curriculum how the science department
[6] wanted this to appear.
[7] Q: Yes. We definitely will get to that. Let's
[8] see, who was present when Mr. Baksa stopped by
[9] with this draft document?
[10] A: I have no idea.
[11] Q: Do you have a sense that your biology—
[12] A: The biology department does not meet where the
[13] chemistry room is, so they're in the other end
[14] of the building. So, you know, if he came some
[15] evening after school— Now, Rob Eshbach is
[16] right across the hall. He may have been in the
[17] room. But I have no idea or recollection who
[18] might have been in the room at the time.
[19] Q: And that's all I'm trying to get at. It sounds
[20] like it wasn't a meeting called for the
[21] purpose—
[22] A: It was not a formal meeting, no, it was not.
[23] Q: You were getting this as head of the science
[24] department?
[25] A: That's correct.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Bertha E. Spahr
May 19, 2005

---

Page 136

[1]    Q: Did you take it back to your biology teachers?
[2]    A: Yes.
[3]    Q: Did they express any thoughts in addition to
[4] those you've already told me about?
[5]    A: Yes. They or we, meaning the biology
[6] department, sent an amended curriculum to this
[7] draft in which the reference to Of Pandas and
[8] People was removed, and the last part that had
[9] to do with including, but not limited to,
[10] intelligent design was removed. And I believe
[11] there was a period at the end of, of other
[12] theories of evolution, although I do not have
[13] that.
[14]    Q: Bert, if you would, look at Miller 7.
[15]    A: That's our amended version of the draft that the
[16] science department agreed to be presented.
[17]    Q: Bert, we're looking at Miller 7. As you've
[18] said, there's three memos here which in turn
[19] reference three enclosures titled XI-A, XI-B,
[20] and XI-C. I would ask you to direct your
[21] attention to the curriculum chart following the
[22] cover memo which references enclosed in XI-B.
[23]    MS. PENNY: That's Bates Number 20.
[24]    MR. GILLEN: Right, with Bates Number 20 in
[25] the lower left hand corner.

---

Page 137

[1]    BY MR. GILLEN:
[2]    Q: Is that what you're referring to as the
[3] teachers' amended version?
[4]    A: Yes, it is.
[5]    Q: Comparing that document, Bert, with the draft
[6] that you received on October 8th, what did you
[7] see as the significant changes from the
[8] standpoint of the science faculty?
[9]    A: The reference to the reference material of Of
[10] Pandas and People was removed from the last
[11] column. And under the unit concept and content,
[12] the sentence ended with a period following and
[13] of other theories of evolution.
[14]    Q: Do you recall when you provided this to the
[15] administration, Bert? This plainly was prior to
[16] the October 18th board meeting.
[17]    A: Oh, my, yes. I would imagine that it was—
[18] Well, it was before October the 12th and the
[19] 15th where Mr. Bonsell then amended it and added
[20] another thing which then became the third
[21] version. So I would say somewhere, I don't
[22] know, 10th, 11th because we had to meet
[23] together, and then we decided this would be our
[24] suggestion. And then it was presented back to
[25] Mr. Baksa.

---

Page 138

[1]    Q: Now, you've referenced some changes made between
[2] the 12th and the 15th. Were you a participant
[3] in any discussions which led to those changes,
[4] Bert?
[5]    A: No.
[6]    Q: What do you recall about those changes?
[7]    A: Somewhere between the 12th to the 15th
[8] Mr. Bonsell added a note to the bottom of the
[9] curriculum— Let me go back a minute. The
[10] recommendation of the science department was
[11] rejected by the committee.
[12]    Q: And just for the record, Bert, that's the
[13] recommendation XI-B with the Bates stamp
[14] Number 20 at the bottom?
[15]    A: Yes. Yes, it is. And then after that,
[16] somewhere between the 12th and the 15th, we were
[17] told that Mr. Bonsell was going to add a note at
[18] the bottom of this section of the curriculum
[19] dealing with evolution that was going to read
[20] origins of life will not be taught.
[21]    Q: And you say, we were told. Who's the we?
[22]    A: Well, my guess would be Mr. Baksa. Since he was
[23] the head of curriculum and curriculum
[24] development, he was the one who usually carried
[25] the information between the science department

---

Page 139

[1] and the curriculum committee.
[2]    Q: Well, you anticipated my question. Mike Baksa
[3] told you, but who's the we he told? Was it you
[4] and Jen Miller?
[5]    A: Well, it was probably biology teachers, but
[6] again I am not certain that was a formal
[7] meeting. We were all obviously getting prepared
[8] for the October 18th meeting which was the big
[9] board meeting. So who the we was I'm really not
[10] certain.
[11]    Q: In terms of getting prepared for that board
[12] meeting, Bert, did you have discussions with
[13] your science faculty?
[14]    A: We had some discussion in who would attend, you
[15] know, what was going to happen. I will say that
[16] my science staff was somewhat upset because the
[17] perception in the community and the perception
[18] in some of the newspapers was that the science
[19] department contributed to and were behind the
[20] change in this curriculum. And it was at that
[21] point that I decided that I was going to make a
[22] public statement the night of that board meeting
[23] prior to the vote under public comment.
[24]    Q: Before we go there, I apologize, I didn't ask
[25] you, did you go to board meetings in September

---

**Page 140**

[1] of 2004?

[2]    A: I can't answer that. If we have the board

[3] minutes and I could look and my handwriting is

[4] there, my guess will be that I may have. But I

[5] don't specifically remember attending in

[6] September. August I did and October I did.

[7]    Q: I just want to be sure. I don't think there are

[8] any minutes. There are no agendas or minutes

[9] from September. It seems you don't have any

[10] independent recollection of attending.

[11]    A: No, I do not.

[12]    Q: Good enough. Well, I understand why you decided

[13] you were going to make a statement. Any other

[14] discussions with your science faculty about the

[15] competing versions of proposed curriculum

[16] changes between the period October 8th and

[17] October 18th?

[18]    A: Well, after we were told that our proposal was

[19] rejected, the biology department didn't feel

[20] real comfortable about what was going to happen.

[21] They had a pretty good inclination or at least

[22] thought so that the proposal by the curriculum

[23] committee without our input was probably going

[24] to pass.

[25]    Q: Did you have any discussions with either

**Page 141**

[1] Dr. Nilsen or Mike Baksa about trying to find

[2] some sort of middle way here?

[3]    A: I don't recall that.

[4]    Q: How about you've referenced a note. Do you

[5] recall having any discussions with your science

[6] faculty relating to the purpose of the note

[7] which was added to XI-C document from Miller 7

[8] with Bates stamp Number 22 which says the

[9] origins of life is not taught? Do you recall

[10] discussions touching on that?

[11]    A: Yes, I do.

[12]    Q: Tell me what you remember.

[13]    A: If the note reads the origins of life will not

[14] be taught, then our question is why would the

[15] reference book Of Pandas and People be placed

[16] anywhere because if you look at the title of the

[17] textbook, it says the origins of life right

[18] under the thing Of Pandas and People. And there

[19] was obviously some question if, in fact, you

[20] know, the statement now reads the origins of

[21] life are not going to be taught, then why are we

[22] dealing with the intelligent design issue or of

[23] the book Of Pandas and People.

[24]    Q: Did you ask that question, Bert? Did you direct

[25] that question to any of the administration?

**Page 142**

[1]    A: In this interim there were so many meetings and

[2] so many people, I can't answer that. I don't

[3] know that. I'm certain it came up somewhere

[4] because, I mean, by that time, you know, we had

[5] all seen, many of us, copies of Of Pandas and

[6] People, and there in the title were these words.

[7]    And if, in fact, we are not going to teach

[8] this, then the question would arise as to what

[9] would then be the purpose of that reference

[10] book. But, you know, in terms of having a

[11] formal, you know, meeting in which just that

[12] topic was discussed, the answer is no.

[13]    Q: How about at any time during this period did you

[14] have any conversations with members of the board

[15] curriculum committee about the note?

[16]    A: Not to my knowledge.

[17]    Q: How about with members of the school board

[18] generally, any discussion?

[19]    A: Not that I remember.

[20]    Q: Well, you go into the October 18th board

[21] meeting, Bert, and just tell me what you can

[22] recall. Well, let me ask you this, did you have

[23] any discussions with any board members leading

[24] up to the October 18th board meeting at all?

[25]    A: Could you repeat that, please.

**Page 143**

[1]    Q: From October 8th through October 18th, we have

[2] what we see as the curriculum change is sort of

[3] in process. And I just want to get a sense,

[4] before you go to the public meeting on

[5] October 18th, did you speak to any of the board

[6] members yourself?

[7]    A: About the change in the curriculum and the fact

[8] that the science department had no input into

[9] it?

[10]    Q: Yes.

[11]    A: Not to my knowledge. I believe Casey Brown as I

[12] was either coming into this meeting said

[13] something to me, but it certainly was not a

[14] discussion, how does the science department

[15] feel, but it was not a discussion.

[16]    Q: Going into that meeting, did you have any

[17] discussions with the administration?

[18]    A: Actually prior to the start of the board

[19] meeting, the science department, Jen, Rob, and I

[20] were sitting at a round table, and Mr. Baksa

[21] handed us the document. And it's very confusing

[22] because you have A, you have B, you have C. And

[23] even when the vote came down, even the people

[24] who were voting did not know what we were

[25] looking at, whether it was A, B, or C.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Bertha E. Spahr
May 19, 2005

Page 144

[1] And that was the final— That was the
[2] first time we had seen what became I guess the
[3] final document that was approved. But that's as
[4] much as I remember. He walked over to the
[5] table. He handed us the piece of paper, and I
[6] can't tell you which it is. It's the one that
[7] was finally approved. I can't remember how it
[8] was labeled.
[9]   Q: Don't worry. Don't worry, Bert. Just let me
[10] look at it here. Look at this one with the
[11] blacked out. Take a look at that.
[12]   A: Well, I don't think it's this one because in the
[13] one that was approved, it had intelligent design
[14] at the bottom in addition to this note and this
[15] reference to Of Pandas and People. Now, where
[16] exactly that is, but that was the one.
[17]   Q: Let me ask you this, we're going into the
[18] October 18th board meeting, and you've
[19] referenced a document that Mr. Baksa gave you is
[20] Miller 7, this collection of pages. Is this the
[21] document you received from him?
[22]   A: No. We only got one page from him that one
[23] night at the board meeting. We had had others.
[24] I'm not certain—
[25]   Q: That's okay.

Page 145

[1]   A: Because the one that was finally approved has
[2] this on the bottom. It has this on the side,
[3] but it does not stop after evolution. I believe
[4] it has the original verbiage which is including,
[5] but not limited to, intelligent design on it
[6] under column two.
[7]   Q: Do I understand you correctly that the final
[8] version is a combination of the text from XI-A
[9] along with the addition of the note taken from
[10] XI-C?
[11]   A: That is my understanding.
[12]   Q: All I'm trying to do, Bert, is understand what
[13] you had going into the meeting and how you
[14] viewed that. If I'm correct, you're telling me
[15] that you had already seen the board curriculum
[16] committee's version which is XI-A?
[17]   A: That's correct.
[18]   Q: You had already given to the administration the
[19] teacher's version which is XI-B?
[20]   A: That's correct.
[21]   Q: And Mr. Baksa had just handed you for what you
[22] believe is the first time the page that is
[23] XI-C?
[24]   A: Now, it had been mentioned to us that
[25] Mr. Bonsell was going to add this last

Page 146

[1] statement. I did not have it in print in my
[2] hand. That's what I got prior to the board
[3] meeting.
[4]   Q: Well, let me ask you about that, Bert. As
[5] you've already noted, XI-C does have the note
[6] which you say you were aware of and attributed
[7] to Alan Bonsell. But XI-C also admits the
[8] reference to intelligent design.
[9]   A: That one does appear to do so, yes.
[10]   Q: If you look at the cover memo for XI-C, you'll
[11] see that it states attached is a second draft of
[12] the recommended changes to the biology
[13] curriculum from the administration and staff.
[14] Now, what I want to get your sense for is
[15] this, based on your discussion today, the note
[16] origins of life is not taught reflects the
[17] practice of the teachers which you've described
[18] already, is that correct, that they didn't teach
[19] origins of life?
[20]   A: The present teachers do not teach origins of
[21] life. That's not to say that there were not
[22] biology teachers before this who are no longer
[23] here.
[24]   Q: Oh, yeah, understood.
[25]   A: Yes, that is my understanding.

Page 147

[1]   Q: Okay, good enough. Then as you've noted,
[2] another difference from the version that the
[3] teachers have proposed was the reference to the
[4] book Of Pandas which is contained in the column
[5] headed materials and resources. Is that right?
[6]   A: That's correct.
[7]   Q: Do you recall having any discussions with
[8] Mr. Bonsell about the note? I think I asked you
[9] this but—
[10]   A: No, I did not.
[11]   Q: Do you recall having any discussions with your
[12] science faculty about the note, either Jen
[13] Miller or Rob Eshbach or one of the people
[14] teaching biology?
[15]   A: I remember somewhere like over lunch or whatever
[16] the statement came up if we are not teaching
[17] origins of life, then what, in fact, is the
[18] purpose of having intelligent design listed as
[19] part of the curriculum or the book Of Pandas and
[20] People there because that seems to be what it is
[21] addressing.
[22]   Q: You've referenced this situation where the board
[23] meeting is about to start and Mr. Baksa has
[24] provided you with XI-C. Did you have any
[25] discussion with him about XI-C?

Bertha E. Spahr
May 19, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 148

[1] A: No. The board meeting was about to begin.

[2] Q: Did you have any discussions with Mr. Baksa

[3] about the desire of the biology — or the

[4] science department and biology teachers for the

[5] administration to take a certain position?

[6] A: I don't know when that came to be. But, yes, I

[7] can say that the biology teachers and the

[8] science department were somewhat disappointed

[9] that it did not appear that we were going to

[10] have the support of the administrators on this

[11] issue, that the board was now going to literally

[12] be coming in and without our input since we

[13] happened to be the experts in science altering

[14] the curriculum and then we were going to be held

[15] accountable to teach what is written on the

[16] curriculum.

[17] And that's not standards driven.

[18] Intelligent design or whatever we wish to call

[19] it, creationism, is not part of the mandated

[20] state standards.

[21] Q: That's understood. I'm trying to get at your —

[22] just the exchanges with the administration and

[23] the science faculty about the upcoming meeting,

[24] the October 18th meeting and what you as the

[25] science faculty might have communicated to the

Page 149

[1] administration about the upcoming deliberations

[2] on the competing versions of the curriculum.

[3] A: We had no communication with the administration.

[4] The administration did not know that I was going

[5] to make a statement. I did not inform them I

[6] was going to do so. I am a property owner in

[7] the Dover Area School District, and I felt as a

[8] taxpayer as well as the department chair I had

[9] the right to make a statement.

[10] Q: Certainly.

[11] A: But we did not communicate with the

[12] administration who would attend, what we would

[13] say or do. It just was not something we did.

[14] Q: So it seems like there wasn't a lot of

[15] discussion leading up to the meeting about these

[16] rival versions. Did you feel like everyone knew

[17] everyone had a different choice?

[18] A: Yes. And we did have the feeling going into the

[19] meeting that the administration thought that a

[20] different document was going to be approved. I

[21] don't know why I feel that way. I can remember

[22] Dr. Nilsen walking over toward our table and

[23] saying when you hear, I don't know, the

[24] decision, don't clap. And to this day, we have

[25] no idea what that meant. So we don't know

Page 150

[1] whether they thought something was going to

[2] occur that did not occur. We have no idea.

[3] Q: Well, let me ask you about that, Bert, because

[4] if you look at both XI-B, the cover memo for

[5] that, and the cover memo for XI-C, if you look

[6] at that, read that if you would, Bert, read the

[7] description on that page. That's XI-B, right?

[8] A: Yes.

[9] Q: Now flip to XI-C, Bert.

[10] A: Which is this one?

[11] Q: Yes. You see that cover memo. Read that.

[12] You'll see both are recommended changes to the

[13] biology curriculum from the administration and

[14] staff. They're described as such. Do you

[15] recall, and again looking at XI-C at the note,

[16] the note origins of life is not taught that is a

[17] — that reflects existing practice of the

[18] biology teachers as of the time that this is

[19] submitted to the board. Is that correct?

[20] A: That is my understanding, yes.

[21] Q: On the other hand, we understand that this

[22] reference Of Pandas and People in this column

[23] here, materials and resources, is something that

[24] the science teachers saw as unusual and not in

[25] keeping with the ordinary practice?

Page 151

[1] A: Yes.

[2] Q: So as you approached the board meeting, was

[3] there some exchange between either Dr. Nilsen or

[4] Mr. Baksa and the science faculty about the

[5] administration version being selected?

[6] A: I can't answer that.

[7] Q: Let me look at it this way, when Dr. Nilsen said

[8] when the curriculum is approved—

[9] A: We have no idea whatever that comment meant.

[10] And to this day, we still don't know because we

[11] had the feeling that something was going to

[12] occur that we all would be happy or satisfied

[13] with. Well, it most definitely did not. But

[14] that was kind of our sense that even he may have

[15] thought that something different was going to go

[16] down, that there was going to be a compromise.

[17] And I am now looking at these three

[18] documents, and I can honestly say to you I do

[19] not know which, if any, of the three of these is

[20] the final document.

[21] Q: Well, I agree with you, Bert, because the final

[22] document as reflected in the board minutes is a

[23] combination of these. So you would not have

[24] been able to see the final document prior to the

[25] meeting?

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Bertha E. Spahr
May 19, 2005

---

**Page 152**

[1]   A: Because I'm looking at this, and I am thinking
[2] this is not the document we think that was
[3] passed.
[4]   Q: No, you couldn't have seen it because these are
[5] documents generated coming up to the meeting.
[6] I'm sorry if I was unclear about this.
[7]   A: Because the final one that was passed is
[8] actually with this, with this, and then with the
[9] last part of that sentence. I'm beginning to
[10] think even I don't remember what it looked like,
[11] but, yes. Thank you.
[12]   Q: Now do you see?
[13]   A: Thank you for clarification, yeah.
[14]   Q: And that's why I asked you again, as you were
[15] going into the meeting and you say you had the
[16] sense that the administration thought something
[17] was going to happen that you as teachers were
[18] going to be comfortable with, looking at these
[19] three versions seeing that two of them are
[20] billed as administration and staff, does that
[21] trigger any recollection on your part as to what
[22] the administration went into the board meeting
[23] looking for?
[24]   A: Well, certainly B does because that was the one
[25] where the science — or the biology department

---

**Page 153**

[1] certainly amended it. We had given it to
[2] Mr. Baksa, and he certainly accepted our
[3] discussion. Then this one as it was written—
[4]   MS. PENNY: Say which one for the record.
[5]   A: Enclosure C.
[6]            BY MR. GILLEN:
[7]   Q: XI-C?
[8]   A: XI-C. — would have been acceptable. The
[9] science department could have lived with this.
[10] Now, we weren't happy with Pandas and People
[11] over there. But the fact that the ID issue was
[12] removed from that section of the curriculum we
[13] would have been able to live with.
[14]   Q: And the fact also was that there had been
[15] discussion of putting Of Pandas in the classroom
[16] as a reference text?
[17]   A: That's correct.
[18]   Q: And the teachers had said fine?
[19]   A: Yes.
[20]   Q: So you go into the meeting, and you've prepared
[21] a statement. Let me just, if you would, see the
[22] meeting through your eyes. Did it start with
[23] public comment?
[24]   A: No. It started out with the traditional roll
[25] call, the pledge to the flag. There were a few

---

**Page 154**

[1] other items that were done prior to the public
[2] comment.
[3]   Q: Now, at this time was public comment allowed
[4] before each agenda item?
[5]   A: Yes, it was. Well—
[6]   Q: Or in connection with specific agenda items? In
[7] other words, we're rolling through the agenda
[8] here, and we know that we're coming up on—
[9]   A: I believe at that point public comment was
[10] allowed simply as public comment. I do not
[11] think that policy changed because I know there
[12] were two— Later the change occurred that there
[13] were two public comments, one at the beginning
[14] that had to do with I believe agenda items and
[15] then one at the end which could be of anything
[16] else.
[17]   And usually— Yes, there was a public
[18] comment listed here as 14 on that same day. But
[19] I believe the public comment at the beginning
[20] had to do with items referring to the agenda.
[21] And since the vote on the acceptance of the
[22] curriculum, I spoke at the earlier one.
[23]   Q: You know what, Bert, in looking now at Miller 3,
[24] I note that there are apparently no minutes —
[25] or no agenda for the October 18th board meeting.

---

**Page 155**

[1] Would you look through your stack?
[2]   A: Here it is. It's right here under Exhibit 3.
[3] It's right here with my initials at the top.
[4] It's following the October 4th one that have my
[5] initials at the top.
[6]   MR. GILLEN: Can we go off the record.
[7]   (Discussion held off the record)
[8]            BY MR. GILLEN:
[9]   Q: I'd ask you to look at Miller 3, the agenda
[10] relating to the October 18th, 2004 meeting, and
[11] there are some handwritten notes after that. If
[12] you would look at those, Bert, and tell me—
[13] The agenda has BS in the upper right hand corner
[14] on the first page. Is that Bert Spahr?
[15]   A: Yes, it is.
[16]   Q: And then if we looked at the pages between the
[17] first page of the agenda for October 18th and
[18] the first page of the agenda for November 1st,
[19] 2004, we'll see a couple of things here,
[20] handwritten notes. Are they your notes, Bert?
[21]   A: They are.
[22]   Q: And then behind the handwritten notes there's an
[23] Enclosure XI-C, right?
[24]   A: Yes.
[25]   Q: Now, let me ask you, Bert, it seems to me that

---

ertha E. Spahr
May 19, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

**Page 156**

[1] the fact that these documents are grouped in
[2] this way reflects particularly that XI-C appears
[3] here to reflect what you've already told me
[4] which is that you received this document so far
[5] as you can make it out around the time you had
[6] the agenda. Is that correct?
[7]    A: That's correct. Now, I'm not exactly sure why
[8] there is the blacking out of what would have
[9] been that note down here.
[10]    Q: Would you take a minute to just look through
[11] those notes?
[12]    A: Through the minutes of the board meeting?
[13]    Q: No, your notes.
[14]    A: My notes.
[15]    Q: Yes.
[16]    A: I must say they're not the most legible I've
[17] ever done. Usually I carried with me a tablet
[18] that had lined paper and wrote rather than on
[19] the agenda which we often shared on there. I'll
[20] look at these notes.
[21]    Q: Let me ask you, had you spoken with your science
[22] faculty prior to the October 18th meeting for
[23] the purpose of generating attendance at the
[24] October 18th meeting?
[25]    A: We met over lunch and asked who would be

**Page 157**

[1] attending that meeting. We felt that since the
[2] curriculum was going to be approved at that time
[3] it was important for the science as many of us
[4] to be present as possible.
[5]    Q: Apart from discussions with your science
[6] faculty, did you speak with anyone else?
[7]    A: There were other members of the faculty who also
[8] came in support of the science department to
[9] that meeting. So the English department, the
[10] math department, yes. At length did we discuss
[11] it, no. They simply indicated that in support
[12] of us they were going to attend.
[13]    Q: I mean, did you as a faculty with an issue in
[14] front of the board encourage people — make them
[15] aware of the impending vote and encourage them
[16] to attend for the purpose of showing support?
[17]    A: I don't know how it was done exactly, whether it
[18] was at a faculty meeting, whether it was simply
[19] in the lunchroom, but there were people — an
[20] association of people that said, you know, it
[21] would be a nice idea if you would show the
[22] support to the science staff because this is a
[23] very important issue for them. But it was not a
[24] formal—
[25]    Q: That's fine. And association people are the

**Page 158**

[1] union reps?
[2]    A: That's correct.
[3]    Q: So the meeting begins, and you get to the
[4] curriculum item. As the meeting began, was
[5] there public comment?
[6]    A: Yes. That's when I stood up and made my
[7] statement.
[8]    Q: Do you have your statement here, Bert? Did you
[9] give that to me?
[10]    A: Yes, I have it, and I'm sure you do as well.
[11] You have it. I'm not sure under what. But I
[12] have it here. Again, it's handwritten.
[13]    Q: Let me ask you this, do you recall public
[14] comment at the meeting other than your own?
[15]    A: Oh, yes. I probably was one of the first.
[16]    Q: Tell me what you remember about the meeting as
[17] it opened in terms of public comment other than
[18] your own. Was Barrie Callahan there?
[19]    A: I don't know that exactly. I know Lonny
[20] Langione was there.
[21]    Q: Do you recall anything he said?
[22]    A: Yes. But that was in response to what occurred
[23] after I made my presentation.
[24]    Q: Did you start off, Bert?
[25]    A: Pretty much, yes.

**Page 159**

[1]    Q: You've shown me a document that's headed,
[2] Statement Board Meeting 10/18/04. Is that a
[3] copy of your notes in preparation for that
[4] presentation?
[5]    A: Yes, it is.
[6]    MR. GILLEN: Let's mark that as 2.
[7]    (B. Spahr Deposition #2 marked for
[8] identification)
[9]                BY MR. GILLEN:
[10]    Q: Bert, take a look over that if you need to and
[11] just— I guess what I'm trying to do is get at
[12] the thrust of your objections as they were
[13] expressed. Does this document we've marked as
[14] Spahr 2, does that fairly summarize what your
[15] sentiments were?
[16]    A: Yes. And the purpose of the statement that I
[17] made publicly which was the first statement I
[18] have ever made on this issue before the board
[19] had to do with the fact that the perception in
[20] the community had been that the science
[21] department and specifically the biology
[22] department was in support of what is being done.
[23] And I did this to clarify.
[24]    And then I pointed out to them what the
[25] science department had done to make every effort

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Bertha E. Spahr
May 19, 2005

Page 160

[1] to reach a compromise with this curriculum
[2] committee. And there were obviously four
[3] points. The curriculum change I pointed out to
[4] them which is to be voted on this evening many
[5] feel would be railroaded through and has not
[6] followed past practice, and it had not. Past
[7] practice had been there would be input.
[8]     Mrs. Callahan must have been there because
[9] she had been on the community curriculum
[10] committee, and she had said that that had been
[11] past practice, and she would have known because
[12] she was a member. And the board curriculum
[13] committee usually had had input from the
[14] professional staff, the district curriculum
[15] committee, the community members, and
[16] administrators.
[17]     I also at that point said, you know, it had
[18] been deemed unlawful, illegal, and
[19] unconstitutional to teach intelligent design
[20] which is a synonym for creationism or creation
[21] science along with evolution. I cited the court
[22] case, okay, and, you know, went through the fact
[23] that it was putting my teachers who were fairly
[24] young, two of which were untenured at the time,
[25] into what I felt was a no-win situation in that

Page 161

[1] they either had to defy a ruling of the school
[2] board or they had to walk into a classroom and
[3] possibly commit an illegal act.
[4]     And it was at the end of that— I did ask
[5] Mr. Buckingham directly, though, as part of this
[6] statement if he was going to direct, are you,
[7] meaning the board going to direct my teachers to
[8] teach intelligent design if it appears on the
[9] written curriculum. He did not respond to that
[10] question.
[11]     I then gave them a challenge and said,
[12] please delay the vote of this issue so that we
[13] can again sit down and attempt to resolve this
[14] with a compromise which is beneficial to all
[15] concerned.
[16]     At the conclusion of the statement which
[17] was relatively brief, you know, not
[18] antagonistic — it was I thought very factual
[19] and very professional — Mr. Buckingham looked
[20] at me and asked me where I thought I got my law
[21] degree. When that question was asked, the
[22] entire audience went ha because they knew my
[23] integrity in this district for 40 years has
[24] never been challenged, okay.
[25]     A hundred and twenty-five percent of my

Page 162

[1] life has been devoted to teaching in this
[2] district, and they could not imagine that any
[3] member of a school board would treat me with
[4] such disrespect. I looked at him. I said
[5] nothing. And I sat down. I wasn't even going
[6] to dignify what he had said with a response.
[7]     Now, in addition to that, neither Alan
[8] Bonsell who was president of the board or
[9] Dr. Nilsen who was sitting there ever made any
[10] comment to him about how he had publicly treated
[11] a staff member.
[12]     Q: Did you look up at the board when Mr. Buckingham
[13] made that comment?
[14]     A: Oh, yes.
[15]     Q: I mean, what was their demeanor? I mean, were
[16] they as equally surprised, or could you tell?
[17]     A: Oh, I couldn't tell with that board and I
[18] couldn't. I mean, I certainly know there were
[19] some that were. I do know right subsequent to
[20] that Mr. Langione who was a former board member
[21] got out of his seat and literally attacked the
[22] board for the treatment in which I received. So
[23] it was a little on the heated side right after
[24] that.
[25]     But I felt the statement was not

Page 163

[1] antagonistic. I felt that it was professional.
[2] And I felt that it was very factual. And I did
[3] it at the direction of the department because
[4] they wanted it known in the public that we did
[5] not agree with everything that was being done.
[6] And yet that was the way it basically had been
[7] displayed in some of the news articles.
[8]     Q: It seems to me, Bert, from what you're saying
[9] that Mr. Langione took exception to the way
[10] Mr. Buckingham had addressed you?
[11]     A: Yes, he did. There were others who did as well.
[12]     Q: Other people spoke during public comment in that
[13] way?
[14]     A: But Mr. Langione is the one that stands out.
[15] He's pretty verbal. He's also an Italian.
[16]     Q: Apart from those comments, Bert, do you remember
[17] anything else in terms of public comment
[18] directed at the proposed curriculum change? I
[19] mean, let me put it this way, how many people
[20] were there at that meeting?
[21]     A: Oh, I have no knowledge of that.
[22]     Q: Can you estimate?
[23]     A: No. I was sitting at a table which was
[24] relatively in the front, and that was so I could
[25] get to the podium without, you know, falling

**Page 164**

1) over chairs. So I did not look— It was pretty
2) crowded. But I can't estimate the number of
3) people who were in attendance. There were
4) others who did speak under public comment, you
5) know, having to do with the curriculum issue.
6) But I cannot tell you specifically other than
7) Mr. Langione, and that's primarily because
8) obviously it affected me.
9)    Q: Sure. Well, if you look at your notes, Bert,
10) there's a reference to Lonny Langione, and it
11) says, what does it mean in a classroom?
12)    A: Yes. Mr. Langione did pose the question if this
13) is basically passed as part of the curriculum,
14) what is this going to mean in the classroom
15) where the students obviously are going to be in
16) attendance.
17)    Q: And then there are some notations beneath that,
18) Bert. Would you look at those?
19)    A: May I ask what page you're on.
20)    Q: On I'm on that page, the first page.
21)    A: It's tough to read that I must admit. This is
22) after this thing occurred. I was a little
23) rattled. Oh, this was where Mr. Langione said
24) what does this mean in the classroom. And then
25) what the little note here is, well, read a draft

**Page 165**

1) to the class. I don't know what paragraph three
2) means. I really do not know what that means.
3) If Jen was there, her notes on this may be
4) somewhat clearer.
5)    Q: There's a thing that says purpose, protect us
6) and Dr. Nilsen.
7)    A: I don't even know what that is referring to. I
8) think it had to do with the variations of the
9) drafts. And remember there were three different
10) drafts, the A, B, and the C. But it was very
11) confusing. And it was even very confusing when
12) the vote took place because the people who were
13) voting on the different forms of the change in
14) the curriculum didn't even understand what was
15) going on.
16)    Q: Well, and how— Why do you say that, Bert, I
17) mean that they didn't understand? Did someone—
18)    A: Because many questions came up before the vote
19) was taken in the discussion section that people,
20) you know, wanted clarification, now is it going
21) to be this one, this one, or this one. And
22) there were people sitting in the audience who
23) did not have access to all three of these
24) documents. And it made it very confusing.
25)    Q: Let me make sure I understand you. There was a

**Page 166**

1) whole bunch of different parliamentary maneuvers
2) that took place that night. Are you referencing
3) questions among board members as to exactly what
4) the question was at the time a given vote was
5) being called?
6)    A: There were questions among board members as well
7) as questions of members in the audience because
8) there was also some confusion among them.
9)    Q: Sure. For the reasons you've stated, they
10) didn't have the documents.
11)    A: I think the board members all had the documents.
12) I think the people sitting in the audience did
13) not understand if they were throwing out B or
14) voting on C. And it was a little on the chaotic
15) side to say nothing as well as heated, because
16) there were some people who were very verbal
17) either in support of or against.
18)    Q: Tell me what you recall about those people and
19) their comments. Can you recall any specifics as
20) we sit here?
21)    A: Well, not other than the questions that
22) Mr. Langione posed. I think there were others
23) who spoke. Mr. Snook often spoke. Barrie
24) Callahan would often speak. I do not know if
25) she spoke that evening, though. I mean, after

**Page 167**

1) what had happened, I was so upset that I really
2) didn't clearly see what was going on. It just
3) clouded what I perceived at that point because,
4) I mean, I even had other board members or in
5) some of the — well, Dick Brown, if you will,
6) and even Noel who came up to me after that
7) meeting and attempted to apologize on behalf of
8) what had occurred. At that point I just wanted
9) to get out of there, and I did, but.
10)    Q: Am I right, Bert, you felt that Mr. Buckingham
11) had insulted you?
12)    A: Yes, I did.
13)    Q: Look at the board now. There's some public
14) comment, and I understand why you're saying you
15) don't remember the specifics. Do you recall any
16) of the board members speaking to the substance
17) of the issue that was in front of them, the
18) curriculum change and these issues? Do you
19) recall—
20)    A: In terms of the comments of what the different
21) documents were as to what the difference was
22) between A, B, and C?
23)    Q: Yes.
24)    A: I'm not— No, I do not remember that.
25)    Q: When you made this statement to the board, you

Min-U-Script®

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

[1] know, you've referenced certain legal
[2] information and that, were you relying on the
[3] materials that you've provided to me earlier
[4] that addressed the legality of teaching?
[5]     A: That's correct.
[6]     Q: If you look at your handwritten notes, there's a
[7] series of comments there. There's that purpose,
[8] protect us and Dr. Nilsen.
[9]     A: I don't know what that means.
[10]    Q: Beneath that, why it wasn't negative, does that
[11] trigger any recollection on your part?
[12]    A: Simply the fact that the science department did
[13] everything that was humanly possible to
[14] cooperate with this curriculum committee and
[15] showed a willingness to do short of, you know,
[16] getting the word intelligent design or
[17] creationism into the biology classrooms
[18] everything that we thought might possibly
[19] appease them.
[20]    They did agree to point out gaps in
[21] Darwin's theory. Obviously at that point in
[22] time the mural was gone, so we didn't have that,
[23] you know, contentious thing to deal with. And
[24] we felt that, you know, we worked as positively
[25] and professionally as any department was able to

[1] do. And, therefore, we were tired of being
[2] perceived by the community as being anti-God,
[3] anti-whatever.
[4]     And unfortunately that is how we were
[5] perceived because we were so much against this
[6] intelligent design I think it was perceived in
[7] the wrong way. You know, intelligent design has
[8] a place, you know, philosophy, comparative
[9] religions. It just isn't in the science
[10] classroom in our opinion.
[11]    Q: Certainly. And tell me about that sense you had
[12] of the perception of the community. Was there—
[13] Did you have conversations yourself, or what are
[14] you deriving that from, Bert?
[15]    A: Well, I got to a point that I avoided going
[16] places in this community, whether it be the food
[17] store, you know, whether to the sandwich shop or
[18] whatever because you could literally during all
[19] of this commotion being in the newspaper not go
[20] anywhere and have somebody in the community
[21] knowing that I've been here for 40 years ask me
[22] questions on this issue. And I was not going to
[23] get into a public debate, you know, over ID,
[24] creationism, evolution, in any type of a
[25] nonprofessional setting.

[1]     So there were some churches that were very
[2] vocal in their perception of our department
[3] because we were opposed to this intelligent
[4] design. So it became a very uncomfortable
[5] situation.
[6]     Q: Well, and I just want to get a sense for that.
[7] I don't want to burden you. But there's sort of
[8] two— I think I'm getting two themes out of
[9] what you're saying. One is it became a nuisance
[10] in that it was such a public controversy people
[11] would ask you—
[12]    A: You could not open a newspaper probably anytime
[13] in the last year and a half and not see the book
[14] Of Pandas and People on the page. And of course
[15] that just kept fueling the fire. And so it
[16] became— You know, it's a very small community.
[17] It's a very religious community. It was
[18] basically spoken about in Sunday school, you
[19] know, in terms of, you know, we need to get out
[20] and get the people of the church in support of,
[21] you know, whatever. And it just became, I don't
[22] know whether nuisance is the word, but it became
[23] very uncomfortable because you couldn't do your
[24] job.
[25]    Q: That's what I want to get at. There's plainly

[1] two elements to this, and I want to get at your
[2] basis for each of them. The first is the notion
[3] that you couldn't get out without being asked
[4] questions. That's one thing. Now, you've also
[5] told me about some churches and statements made
[6] at churches and so on. Were they made at your
[7] church?
[8]     A: No. I do not live in this area, and I also do
[9] not attend church in this area. And that is
[10] hearsay from me. I do not have firsthand
[11] knowledge of that. I believe you will get a
[12] better answer to that question from Rob Eshbach
[13] whose father is a minister in this community.
[14]    Q: Was it Rob Eshbach who communicated to you this
[15] phenomena you described of discussions of the
[16] issue in church?
[17]    A: No, it was not.
[18]    Q: Who else?
[19]    A: I can't tell you specifically who it was. It
[20] was members of the community who attend some of
[21] the more fundamental churches in this area that
[22] were in attendance. Obviously the one gentleman
[23] on the school board who was appointed is also a
[24] pastor in a relatively fundamentalist church.
[25]    Q: Who is that?

---

Page 172

[1]   A: Reverend Rowand, R-o-w-a-n-d, I believe. He was
[2] one of the more recently appointed members after
[3] the others had resigned.
[4]   Q: But it's essentially individuals coming up to
[5] you and reporting what—
[6]   A: Yes.
[7]   Q: In the portion of the notes we're looking at,
[8] Bert, there's this notion about why it wasn't
[9] negative. Is that a series of thoughts about
[10] why your statement was not negative?
[11]   A: Yes. It's referring to the preceding statement
[12] that was read. It was not intended to be
[13] negative. It basically was to point out the
[14] cooperation the department had with both the
[15] curriculum committee and the administrators.
[16]   Q: That's sort of what I surmised. I want to ask
[17] you then, you said you jotted down these notes
[18] at the meeting, was there a statement to the
[19] effect that what you had said was negative? The
[20] notes appear as though you were rebutting an
[21] assertion.
[22]   A: No, that was not the case. No, that was not the
[23] case.
[24]   Q: Beneath the portion of the notes we're referring
[25] to now there's a hash mark that sort of brackets

Page 173

[1] off the material on the top of the page from
[2] what comes below. Would you look at what is
[3] below that hash mark?
[4]   A: I'm looking there. Thank you.
[5]   Q: Onto the next page and then on that next page
[6] there's another section marked off by hash
[7] marks, for lack of a better word, under the
[8] heading, Summary. Looking at those, Bert, do
[9] they refresh your recollection as to any
[10] conversations that were had in connection with
[11] the board meeting that was held on October 18,
[12] 2004?
[13]   A: I'm not sure they were conversations. There had
[14] been some discussion as to whether we as members
[15] of the science department were going to be able
[16] to speak to media. And we were told we may talk
[17] to whomever but it makes obviously much more
[18] sense not to talk. But there obviously was no
[19] given gag order. We were not told we could not
[20] communicate with media.
[21]   Now, oftentimes at the board meetings there
[22] were cameras there from ABC. I mean, there
[23] were, you know, people everywhere. And the
[24] court reporters — or court reporters, I'm
[25] sorry, the board reporters, Joe Maldonado was

Page 174

[1] there, Heidi I think Bubb was there, and it was
[2] not uncommon for them— They actually came up
[3] to me after my statement and wanted to have the
[4] statement, and I did not give it to them.
[5]   Q: Why is that, Bert?
[6]   A: Well, I just— You know, I didn't need to see
[7] it in print. I had seen enough in print. But I
[8] mean, you know, they would always come, and we
[9] were actually given the opportunity to speak to
[10] whomever but were told, you know, temper what
[11] you say because you could, in fact, be held
[12] accountable for it.
[13]   And, you know, Sandy, the Sandy that's
[14] being referred to here was at that point
[15] president of the association. And she would
[16] basically be involved in covering statements.
[17] And then she would work oftentimes between the
[18] association and to Dr. Nilsen.
[19]   Q: Looking at that, Bert, do you recall
[20] conversations with Dr. Nilsen or Mike Baksa
[21] after the vote was had and the meeting adjourned
[22] on the evening of October 18th?
[23]   A: No. I can honestly tell you when that meeting
[24] was adjourned I got out of there.
[25]   Q: So these notes then, are they from the days

Page 175

[1] following the October 18th meeting?
[2]   A: Well, the Gary Sutton note has to do— He's a
[3] radio announcer that was basically doing a, I
[4] don't know, a show on the radio on Tuesday
[5] morning, and this was Monday night, having to do
[6] with this issue of evolution and intelligent
[7] design.
[8]   I think these were simply notes that came
[9] out at a later time. I'm not positive that they
[10] came from that board meeting because the one
[11] down here where it says, number four, Brian in
[12] earth science, how do we deal with the fossil
[13] record, that would never have come up at that
[14] board meeting. So I believe this is basically
[15] notes that came from something else, okay,
[16] subsequent to that board meeting.
[17]   Q: That's what I was asking. The note you just
[18] referenced, Brian in earth science, what is
[19] that?
[20]   A: Brian Baun is a first year teacher. He teaches
[21] earth science. And within the earth science
[22] curriculum, there was this time line which had
[23] to do with fossil records. And it had to do
[24] with how are we now to deal with that and is he
[25] going to be impacted with this creationism, ID,

---

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Bertha E. Spahr
May 19, 2005

---

**Page 176**

[1] or evolution. And basically because he is a
[2] first-year teacher should he simply remove that
[3] section from his curriculum or, you know, is he
[4] going to be held accountable for it.
[5]     Q: Let me see, Bert, I know I spoke with Jen Miller
[6] yesterday, and she said after the curriculum
[7] vote she had issues about what does this mean
[8] for my classroom instruction. Is Brian's
[9] concerns of the same nature?
[10]     A: Yes, would he then be able to deal with fossil
[11] records — you know, obviously there are
[12] processes with fossil records that, you know,
[13] evolve that you see in Darwin's theory — or is
[14] he now going to be expected to avoid this to
[15] avoid controversy. But the same thing, how
[16] would this impact on how he is going to present
[17] material in his classroom.
[18]     See, most people it only affected the
[19] biology classroom. But because he taught earth
[20] science and fossil records, he was concerned as
[21] a first-year teacher whether it would also
[22] impact on him.
[23]     Q: Between October 18th and November 1, 2004—
[24] Well, let me ask this before we leave that, do
[25] you recall any comments by the board members on

**Page 177**

[1] October 18th, 2004 on the evening other than
[2] Mr. Buckingham's statement?
[3]     A: Not specifically. I know there were
[4] interchanges with board members. They could
[5] often be very curt with each other in addition
[6] to being curt with some people in the audience.
[7] Specifically I do not remember what the
[8] discussion was among them.
[9]     Q: So when you left this meeting, Bert, you say you
[10] got out of there, did you talk with your science
[11] faculty that evening before you left?
[12]     A: No, because I think I got out of there, and some
[13] of the others remained behind. They were
[14] speaking to— Reporters were there. Some of
[15] the other board members came over. I think the
[16] Browns came over. I think as you see later when
[17] the Browns resigned, you know, over this issue
[18] that we always felt that they were on our side,
[19] whatever that means. She certainly would
[20] listen, you know, to what we had to say, and she
[21] had done some research on her own on this issue.
[22] And she oftentimes would walk over and speak to
[23] us, but those two. Noel Wenrich also I believe
[24] may have come over and exchanged a few words.
[25]     Q: But other than that, nothing?

**Page 178**

[1]     A: Not that I can recall.
[2]     Q: How about in the period between the October 18th
[3] meeting and say the beginning of November, do
[4] you recall any discussions with the
[5] administration about the curriculum change and
[6] its—
[7]     A: October the 28th we were presented the draft
[8] which was to be read to the biology classes
[9] which was written by Mr. Baksa.
[10]     Q: Were you part of that process, Bert?
[11]     A: Writing the draft?
[12]     Q: No. I mean, I understand that the first draft
[13] came from Mr. Baksa. Is that correct?
[14]     A: Correct.
[15]     Q: And then some changes were made to it by Jen
[16] Miller?
[17]     A: That's correct.
[18]     Q: Were you part of the process of making changes
[19] coming from the science faculty?
[20]     A: Jen pretty much made most of the changes on that
[21] because obviously it had to do with biology. It
[22] had to do with the definition of a theory. But
[23] she was the one who primarily was the one who
[24] was in charge of directing the correction of
[25] anything that was scientifically inaccurate

**Page 179**

[1] because Mr. Baksa is not a science person. And
[2] we were directed actually by Tom Scott and I
[3] think Clayton Gibbs was there at the same time
[4] after a meeting at the Shiloh UCC Church, so it
[5] was an association meeting, and they were both
[6] in attendance. And we obviously had a copy of
[7] the document with us and said, okay, now what do
[8] we do with this. And they said, if it's
[9] scientifically inaccurate, we have the
[10] responsibility to correct the document, and that
[11] is exactly what we did. I don't know how many
[12] major changes were there. But there were a few.
[13]     Q: Mr. Scott is an attorney who represented you
[14] through the PSEA?
[15]     A: Yes.
[16]     Q: How about did you participate, Bert, in the
[17] reworking of the statement in any way?
[18]     A: No, I did not.
[19]     Q: You've indicated that your meeting with
[20] Mr. Scott took place on November 1st. If you'd
[21] look at Miller 3 at the agenda for the
[22] November 1st meeting, did you go to that
[23] meeting?
[24]     A: I went to whatever meeting they interviewed all
[25] of the candidates. I do not know exactly what

---

ertha E. Spahr
ay 19, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 180

[1] date that is. Obviously I went to one that was

[2] on— Oh, no, I'm sorry, that was the

[3] November 18th meeting where I went and all the

[4] candidates were being interviewed. To my

[5] knowledge, I did not go to the November 1st

[6] meeting. There are no notes here. These are

[7] all notes that are in Jen Miller's handwriting.

[8]     Q: You went to the November 18th meeting, Bert?

[9]     A: Yes. That was where they interviewed the

[10] candidates to fill the vacancies.

[11]    Q: Was there any discussion had at that meeting

[12] relating to the change to the biology

[13] curriculum?

[14]    A: Some of the questions that were asked of the

[15] candidates involved the ID issue. You will see

[16] that following that those are my handwritten

[17] notes concerning each of the candidates.

[18]    Q: Are they the notes that begin with Nightline

[19] from ABC News filmed the entire meeting on top?

[20]    A: Yes. I will say in many of those interviews

[21] they tried or attempted to avoid that

[22] contentious topic. They kind of scoped it in

[23] the — and they formed the question, do you

[24] believe strongly about a topic and would you try

[25] to persuade others to follow.

Page 181

[1]    On a few occasions they did specifically

[2] come out and ask candidates how they felt about

[3] the change in the curriculum. They certainly

[4] prepared and did their homework some questions

[5] that would put certain of the candidates in some

[6] rather dubious positions.

[7]    Q: Well, tell me about that, Bert. Why do you say

[8] that?

[9]    A: Well, I speak specifically to Mr. Rehm.

[10] Mr. Rehm was obviously my former physics teacher

[11] who left the district, still has children in the

[12] district, is very concerned about education.

[13] And if you go to Bryan, they ask him the

[14] question in essence— Let me find it because I

[15] was appalled. Yes, Mr. Buckingham asked him

[16] have you ever been accused of abusing a child,

[17] and there was dead silence in the room at that

[18] point.

[19]    Now, if Mr. Buckingham had known anything,

[20] if he was now a new teacher in a new district,

[21] he would have had to have all of his security

[22] clearances in order to get there. But this is

[23] what I meant about it would shed — did

[24] Mr. Buckingham know something about this

[25] gentleman that no one else seemed to know. But

Page 182

[1] it cast this.

[2]    Another one was Monica Marlowe. Monica

[3] Marlowe was the mother of one of the biology

[4] teachers in the district, and they specifically

[5] asked her if she owns property in the Dover

[6] district. She does not. She rents. And it was

[7] just things like this that, you know, we just

[8] felt gave certain candidates more credibility

[9] than others.

[10]    You will notice that several of the

[11] candidates who applied for the replacement

[12] positions are candidates who now ran and

[13] successfully won the Democratic ticket for the

[14] recent primary elections.

[15]    But it was interesting as we sat there, we

[16] all knew — when I say we meaning the members of

[17] the science department that were in

[18] attendance — knew who was going to be selected

[19] before anybody was ever interviewed. And we

[20] were right on all of them but one.

[21]    Q: Why is that?

[22]    A: Well, because we knew what the backgrounds were

[23] and which members were in agreement with some of

[24] the other board members. And we felt that this

[25] was going to be a sure thing. And for all

Page 183

[1] practical purposes, we— The only one we

[2] weren't right on was the last woman that was

[3] elected.

[4]    Q: Who was that?

[5]    A: What was her name. It might have been Sherrie

[6] Leber because you'll notice they took how many

[7] different votes and they couldn't get the last

[8] one. Then Leber finally came in on the fifth

[9] ballot when you get to the end of the Page 6, if

[10] you will. Now I just was keeping—

[11]    Q: Score.

[12]    A: —a running total, yes. So that was certainly

[13] an interesting evening.

[14]    Q: Now, this vote is a vote that's made by the

[15] board?

[16]    A: Oh, yes. No one else had any input into this.

[17]    Q: And you say that you had the sense for which

[18] candidates would be, what should I say, the most

[19] attractive to the board?

[20]    A: That's correct, because they philosophically

[21] agreed with the present board members who were

[22] there. We felt very strongly that the

[23] pastor was going to be selected and was. There

[24] were some others. I'm trying to think if he was

[25] on this list. We were pretty much assured that

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Bertha E. Spahr
May 19, 2005

---

Page 184

[1] Bryan Rehm wasn't going to get there.
[2] Q: Why?
[3] A: Well, first of all, being a former teacher, he
[4] was in the science department. He certainly was
[5] opposed to intelligent design and, you know, is
[6] relatively articulate so that, you know— But
[7] that was the evening in which they interviewed
[8] the candidates.
[9] Q: Apart from the interview process, any comments
[10] directed to the curriculum that you can recall?
[11] A: I do believe that some of the candidates were
[12] asked how they felt about intelligent design.
[13] Or, you know, I think they disguised it in if it
[14] were a strong issue and you had a feeling, would
[15] you basically try to convince others to do so.
[16] Bryan Rehm specifically said I am against
[17] intelligent design. If you see the margin in my
[18] notes, this is a death sentence. We didn't
[19] now, remember these are my notes. I didn't
[20] realize they were going to have to be shared
[21] with half the world. And, I mean, we wrote
[22] down— You know, we knew as we were going
[23] along. Over here is a death sentence. Cynthia
[24] Corbett, okay, doesn't agree with the policy on
[25] creationism. Well, we knew that was done. So,

Page 185

[1] you know, as we sat there, we had our own
[2] perceptions of the way things were going to go.
[3] Q: How about let's look at board meetings for the
[4] remainder of the 2004 period, and just did you
[5] attend those board meetings?
[6] A: Unless there was a reason for me to be there,
[7] once this issue basically had been resolved with
[8] the curriculum, I didn't attend as many as some
[9] of the others did.
[10] Q: So do you think you attended them from this
[11] board meeting we just got done discussing?
[12] A: I was present when they interviewed the
[13] candidates. I do not remember attending board
[14] meetings in December. And these notes that are
[15] here are not mine.
[16] Q: How about were you there when Angie Yingling
[17] resigned?
[18] A: No. Well, I don't remember that. I was there
[19] when the Browns resigned.
[20] Q: That's what I was going to ask you next.
[21] A: I can't tell you when that was, but I remember
[22] Casey reading—
[23] Q: Her statement?
[24] A: Right.
[25] Q: Did you speak with Casey Brown after she read

Page 186

[1] her statement?
[2] A: Speak with her, I went up, and other members of
[3] the department thanked her for her efforts on
[4] our behalf, you know, told her we appreciated
[5] the efforts that she had made to try to resolve
[6] the issue between the books and the curriculum.
[7] Yes, that is what I said to her.
[8] Q: How about Noel Wenrich, were you there when he
[9] resigned?
[10] A: Yes. And I knew what date— In fact, one of
[11] the board agendas has that on as to when they
[12] would be leaving. I did speak to him very
[13] briefly, but I did not to the other lady who was
[14] moving to Florida. I did not know her.
[15] Q: Jane Cleaver?
[16] A: Yes, and did not have any reason to work with
[17] her. Noel oftentimes came in because he was
[18] involved with the building project, and there
[19] were eight science rooms that had to be redone.
[20] So there were some issues involving the building
[21] project.
[22] Q: And you had come to know Noel?
[23] A: He was a student while I was a teacher here.
[24] Q: And you developed— I guess what I hear you
[25] saying you talked to Noel more than Jane because

Page 187

[1] you had a relationship with Noel?
[2] A: No, I wouldn't say that. I did speak to Noel,
[3] but it was on very rare occasions. Jane I
[4] didn't have any connection to at all. I just
[5] had no reason to have dealings with her.
[6] Q: Let's look at the period from October 18th
[7] forward. Have you spoken with any of the
[8] persons who were on the board as of October 18th
[9] about the curriculum change from October 18th,
[10] 2004 to the present?
[11] A: Have I spoken to any members of the board after
[12] the curriculum change was voted in?
[13] Q: Right, to the present period about the
[14] curriculum change.
[15] A: Not to my knowledge. Once it had been put in,
[16] we felt we were going to have to deal with it.
[17] Talking was going to get us nowhere. It hadn't
[18] in the future — or hadn't in the past, I mean.
[19] Q: How about I know that some communications were
[20] had between the administration and the science
[21] department, the science faculty relating to the
[22] formulation of the statement.
[23] A: That's correct.
[24] Q: I know you said you didn't personally play a
[25] role in the input from the science faculty into

---

rtha E. Spahr
ay 19, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

**Page 188**

[1] the statement, but did you have discussions with
[2] the administration about the statement after
[3] October 18, 2004?
[4]    A: There were discussions among the staff as to
[5] what input the department should have as Jen
[6] actually wrote it up, you know, what did we
[7] think might be changed. But Jen after she heard
[8] our suggestions is the one who was in charge of
[9] writing that.
[10]    Q: So she was like the point person on the—
[11]    A: Yes, because it dealt with biology. And as I
[12] said, she was the lead teacher and certainly the
[13] most senior teacher in biology.
[14]    Q: Who else participated in that sort of give and
[15] take surrounding the statement?
[16]    A: I can't answer that. My— And I'm guessing
[17] would have been Bob Linker and Leslie Prall who
[18] are the other two biology teachers.
[19]    Q: So essentially they'd be relating to Jen?
[20]    A: Yes, not to me.
[21]    Q: I know there came a time when the department
[22] went on record as not wanting to read the
[23] statement. Bert, just give me your reasons for
[24] that as you see them.
[25]    A: We felt that if the science teachers in the

**Page 189**

[1] department read the statement that they were
[2] going to give credibility to this intelligent
[3] design, and we felt it was not science. And,
[4] therefore, we did not want to become part of
[5] that.
[6]    Q: Bert, when you say you feel intelligent design
[7] theory is not science, give me just a sense for
[8] the basis for your opinion on that issue.
[9]    A: Intelligent design we believe is a belief.
[10] Beliefs cannot be proven scientifically in a
[11] laboratory; and, therefore, we feel intelligent
[12] design does not belong in a science class.
[13]    Now, we were never opposed to teaching
[14] intelligent design. We said it belongs — could
[15] belong in a philosophy class, it could belong in
[16] comparative religions, you know, in some
[17] elective. But we just felt that it had no merit
[18] in the science classroom.
[19]    Q: Do I understand you correctly, Bert, that your
[20] opinion in that regard is based on this notion
[21] that scientific assertions are provable through
[22] lab science?
[23]    A: Testable and repeatedly you get the same
[24] response. A belief cannot be tested; and,
[25] therefore, as far as we're concerned, a belief

**Page 190**

[1] is not science.
[2]    MR. GILLEN: Let me just take a brief
[3] break.
[4]    (Recess taken)
[5]                              BY MR. GILLEN:
[6]    Q: Bert, towards the end there you mentioned that
[7] one of the reporters asked you for your
[8] statement, a copy of your statement, and you
[9] declined to give it to him, you didn't want to
[10] see it in print. Have you had exchanges with
[11] the various reporters that cover the school
[12] district in connection with this dispute?
[13]    A: I have had one or two. Because they were
[14] primarily interested in questions being answered
[15] in biology, they usually spoke to either Jen
[16] Miller or Rob Eshbach instead of me. On a few
[17] occasions I have been interviewed. I have been
[18] contacted by people in the media. Oftentimes I
[19] refer them to Jen Miller. But Joe Maldonado
[20] which is a writer for the local newspapers came
[21] to the school and interviewed the three of us on
[22] this issue.
[23]    Q: Let me ask you about them. Have you had
[24] interviews with Joe Maldonado yourself?
[25]    A: Not alone, no.

**Page 191**

[1]    Q: How about in a group?
[2]    A: Yes. It was Jen Miller, Rob Eshbach, and
[3] myself.
[4]    Q: Have you had a chance to review his reportage of
[5] those interviews and more specifically
[6] statements that he may have attributed to you?
[7]    A: Yes. And they are in the file of newspaper
[8] articles.
[9]    Q: Did you find his reportage accurate—
[10]    A: Yes, I did.
[11]    Q: —inaccurate? How about the same question for
[12] Heidi Bernard Bubb, did she attribute quotes
[13] to—
[14]    A: I never interviewed or answered questions to her
[15] specifically. If she attributed quotations to
[16] me, it was because of being present in a meeting
[17] where I read the statement. I'm not sure she
[18] was there. But I did not ever speak to her
[19] specifically.
[20]    Q: Lori Lebo, did you have—
[21]    A: I've never spoken to her specifically either.
[22] There was a— When the ABC News press was here
[23] and videotaped that one entire meeting, I did
[24] speak briefly to the person from that
[25] organization. The one that I specifically

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Bertha E. Spahr
May 19, 2005

Page 192

[1] remember, and Jen and Rob and I were all three
[2] there, was the gentleman from the very
[3] well-known science journal called Science where
[4] he came to interview us. And I believe that may
[5] have been in December, I don't remember
[6] specifically. And his article which was printed
[7] in the Science magazine was very accurate.
[8]     Q: When we began this deposition, Bert, you
[9] referenced some discussions you had had with
[10] plaintiffs' counsel from the fall of 2004
[11] through I think it was April or May of this
[12] year. As you sit here today, do you recall any
[13] subject matter that you discussed with them that
[14] I haven't asked you questions about today?
[15]     A: When I spoke to Eric most recently, he had
[16] called to ask me the accuracy of the
[17] Dr. Peterman memo, and that was the most recent
[18] contact and probably in the last few months the
[19] only contact I have had with him.
[20]     Now, we exchanged back and forth phone
[21] messages on the answering machine probably three
[22] days in a row. He'd call, I'd call, and he'd
[23] call back. But it basically was to ask me about
[24] the Trudy Peterman memo because that document
[25] was not present in any of the material that I

Page 193

[1] sent to anybody because I did not have it in my
[2] possession, or at least if I do, it was not with
[3] everything else. Do I remember that
[4] conversation and was — what was written in the
[5] memo as accurate as I could remember it, and I
[6] responded to him that it was.
[7]     Q: Anything else, Bert?
[8]     A: Yes. And something that I think has been behind
[9] a lot of this, the science department, at least
[10] the present members who are still here, have
[11] always felt that this entire issue revolved
[12] around that mural that was in that room several
[13] years ago where obviously it was the picture on
[14] that one document where you had what appeared to
[15] be a monkey, okay, evolving into a man. And
[16] that was why when it was first found missing—
[17] And I found it on the exact weekend that it was
[18] moved because I know where things are. And when
[19] something 16 feet by 4 feet disappears, it's not
[20] difficult to find.
[21]     And of course I questioned the janitorial
[22] staff as to who did anything with it, you know,
[23] who directed you to move this, and they knew of
[24] nothing and then of course contacted the
[25] assistant principal at that point was Mr. Larry

Page 194

[1] Redding and asked him to find out what he could
[2] about whatever happened to that because, as I
[3] said, it was a gift. It was a student project
[4] and whatever and then came to find out that
[5] Mr. Reeser who was the head of building and
[6] grounds had come in during the weekend and had
[7] removed it from the room and destroyed it. I
[8] was told that it was burned so that it would
[9] never again appear in the classroom.
[10]     Well, obviously when I found that out as
[11] department chair because it was a gift to the
[12] science department came to Dr. Nilsen, and I
[13] asked Dr. Nilsen what is going to happen to a
[14] district employee who basically steals material
[15] out of a room and destroys it. And Dr. Nilsen
[16] told me at that point in time that it was none
[17] of my concern, that it was a personnel issue,
[18] and that he would take care of it.
[19]     And it was at that point that we kind of
[20] got a hint that, you know, this issue is still
[21] out there in the community. You know, it's a
[22] very strong religious community. And there were
[23] people and openly said so were offended by the
[24] fact that that mural or picture, whatever you
[25] wanted to call it, sat on the chalkboard in the

Page 195

[1] back of the room.
[2]     And as Mr. Reeser's granddaughter was in
[3] the school at that time, she was coming through
[4] the science curriculum, and I don't know whether
[5] there was an open house, but there was
[6] something, and the family saw it, you know,
[7] sitting in the rear of the room. And, you know,
[8] he certainly voiced his displeasure.
[9]     But we always felt— And that's why when
[10] Mr. Buckingham at a subsequent — and that was
[11] years later — meeting, you know, made the
[12] statement about monkeys and man together, that
[13] was it for me because that's where I truly felt
[14] this whole thing stemmed from, that he, you
[15] know, truly believed, and I'm not sure why, that
[16] we taught man evolved from a monkey. So, I
[17] mean, that I think has been at the center of
[18] this controversy.
[19]     Now, had the mural never been in our school
[20] building, would this have occurred, I can't
[21] answer that. But I do know that that was the
[22] inflammatory item that, you know, certainly
[23] caused discussion.
[24]     Q: Well, I mean, and that's important to you. So
[25] let me ask you a few more questions. I'm

rtha E. Spahr
ay 19, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

---

**Page 196**

looking at Miller 4 which has that history -
mural at the beginning of it, and I see that the
mural disappeared according to this document
August 2002. Is that right?

A: It was over a weekend. And we had come in for
in-service day. I don't know, at that point it
might have been a Thursday, Friday, Monday, and
Tuesday. And between Friday and Monday the
mural disappeared.

So when I went back into the room Monday
morning to check on books, if they had their
books that they needed to begin the new year,
where is it. I mean, you know 16 feet by 4 feet
is big, and, you know, it wasn't there. And
that was when we went on a hunting expedition to
find out what had happened to it.

Q: Then you said that you obviously learned some
details about how the mural came to the
attention of was it Mr. Reeser?

A: I don't know whether it came to the attention,
but he was the one who literally removed it from
the school and burned it. That's what I was
told.

Q: Who told you that?

A: I believe Mr. Redding who was then the assistant

---

**Page 197**

principal of the high school at the time.

Q: Was Mr. Redding as assistant principal the
person who investigated the—

A: I believe he was.

Q: You've referenced a PTA or parent/teacher —
some sort of what did you call it, open house?

A: Yes. We have since we're on block schedule an
open house for parents to come and follow their
student's schedule twice a year. And I believe
that — now, obviously the previous year,
because it is now gone. The mural stood in that
room two or three years. The young man who
presented it I believe graduated in 1998. So
this probably had been standing for a good two,
three years. And he gave it at the end of the
year.

So it was there that if you came into the
room it obviously was visible. And sometime in
that interim community members had come in.
They saw it sitting back there. Now, I'm not
sure if the open house they would ask about it,
but it was visible. And most people's
perception when you see that particular picture
is that somebody believes that man came from a
monkey. Now, to my knowledge, that was never

---

**Page 198**

taught. And that was the young man's perception
as his art project of what he saw.

Q: What I'm trying to get at, Bert, is I know that
we've got some specific information that's tied
to Mr. Reeser. And then on the other hand you
have this sort of sense of the community. And
what I'm trying to do is get at what you're
relying on there. I mean, plainly Mr. Reeser
was offended and acted on it.

A: Do I know whether he was ever directed by
someone to do that, the answer to that question
is no. I never spoke to Mr. Reeser on the
issue, no.

Q: Did any members of the community come to you
personally and express objections to that mural?

A: Not to me personally they did not.

Q: Were you aware of members of the community
coming to your science faculty and expressing
objections to the mural?

A: I know that the school district would not
permanently hang the mural in that particular
room, so it was not, you know. Now, I again do
not know again who directed the janitorial staff
to refuse to do that. But they would not
permanently adhere it to the wall.

---

**Page 199**

Q: Again, I think earlier you said Mr. Reeser was
the head of the buildings and grounds?

A: Yes, he was. But there were— I don't know
whether it would have been the responsibility of
the janitors at the high school to do it.

Now, yesterday they were hanging all the
other murals now that all the walls and the
construction has been done. So, I mean, they
were not our janitorial staff but are members of
the district staff that were hanging those huge
murals all over the hall.

But we knew that when they refused — well,
not they, were directed not to adhere it
permanently to a wall that there obviously was
some controversy and of course was the reason
why it was sitting on the chalkboard tray.

Q: I just want to make sure I understand you. Did
you say yesterday it was district staff hanging
the murals in the building now that the building
project has been completed?

A: Yes. And I don't even know who those gentlemen
were, but I know they are not janitors who are
normally in our building.

MR. GILLEN: Bert, I have no further
questions. I thank you for coming.

---

Min-U-Script®   Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Page 200

[1]   (The deposition concluded at 4:39 p.m.)
[2]
[3]
[4]
[5]
[6]
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

Page 201

[1]   COMMONWEALTH OF PENNSYLVANIA :

[2]   COUNTY OF YORK                        :

[3]   I, Bethann M. Mulay, Reporter and Notary
      Public in and for the Commonwealth of

[4]   Pennsylvania and County of York, do hereby
      certify that the foregoing deposition was taken

[5]   before me at the time and place hereinbefore set
      forth, and that it is the testimony of:

[6]

          BERTHA E. SPAHR

[7]

          I further certify that said witness was by

[8]   me duly sworn to testify the whole and complete
      truth in said cause; that the testimony then

[9]   given was reported by me stenographically, and
      subsequently transcribed under my direction and

[10]  supervision; and that the foregoing is a full,
      true and correct transcript of my original

[11]  shorthand notes.

[12]

          I further certify that I am not counsel for

[13]  or related to any of the parties to the
      foregoing cause, or employed by them or their

[14]  attorneys, and am not interested in the subject
      matter or outcome thereof.

[15]

[16]  Dated at York, Pennsylvania this 25th day
      of May, 2005.

[17]

[18]

[19]

[20]          Bethann M. Mulay
              Registered Professional Reporter

[21]          Notary Public

[22]

          The foregoing certification of this

[23]  transcript does not apply to any reproduction of
      the same by any means unless under the direct

[24]  control and/or supervision of the certifying
      reporter.

[25]

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Bertha E. Spahr
May 19, 2005

**#**

#1 121:4
#2 159:7

**1**

1 34:22; 45:4; 53:24; 60:5;
79:3; 98:2; 121:3, 7;
128:24; 176:23
1/21/05 47:1, 3
10 24:24, 24
10/18/04 159:2
10th 137:22
11 17:4; 24:24; 103:15
11/8/04 11:17
11th 137:22
12 17:4
12/15/2004 28:7
12th 106:8, 15; 137:18;
138:2, 7, 16
1385 6:12
14 154:18
14th 68:2; 69:18; 70:8, 13;
73:4
15 17:20
15th 137:19; 138:2, 7, 16
16 81:15; 193:19; 196:13
18 173:11; 188:3
18th 11:24; 130:11;
137:16; 139:8; 140:17;
142:20, 24; 143:1, 5;
144:18; 148:24; 154:25;
155:10, 17; 156:22, 24;
174:22; 175:1; 176:23;
177:1; 178:2; 180:3, 8;
187:6, 8, 9
1965 24:5
1990 81:14
1998 18:17; 44:4; 47:16;
197:13
1st 51:15; 129:15;
155:18; 179:20, 22; 180:5

**2**

2 75:21; 92:11, 16; 94:24;
131:11; 159:6, 14
20 25:23; 127:25; 136:23,
24; 138:14
2000 22:7; 49:23
2001 49:24
2002 18:17; 21:11; 23:17,
20; 29:21; 31:8; 32:4; 66:2;
76:1; 93:2; 94:18; 95:19;
97:13, 20; 98:20; 104:9,
15, 18, 23, 25; 105:9, 13;
196:4
2002-2004 97:3
2003 30:10; 31:15, 21, 22;
32:15, 24; 33:4, 6; 34:15;
44:11, 25; 46:18; 47:11;

51:11, 11, 15; 53:24;
58:17; 59:14, 18; 60:15;
61:14, 16, 20, 25; 119:9,
20; 120:1; 121:21; 123:3;
124:21; 126:22
2003-2004 44:14
2004 5:23; 13:15; 17:21;
44:13; 45:2; 60:1, 12;
62:15, 17; 63:21; 64:1;
65:8; 66:8, 16; 67:25;
69:18; 76:20; 78:23;
83:17; 92:23; 94:11, 15,
20; 95:5, 11, 19; 96:1, 4, 7,
19; 97:11, 16, 21, 24; 98:1,
7, 22; 99:22; 101:1, 7, 18;
102:11; 104:13; 105:13;
106:7, 24; 107:17; 112:14;
114:19; 116:4; 127:12;
128:7; 130:5; 131:13;
140:1; 155:10, 19; 173:12;
176:23; 177:1; 185:4;
187:10; 188:3; 192:10
2004-2005 63:6
2005 25:6; 49:23
2006 39:4
217 83:15
22 141:8
22nd 14:2, 6; 15:17;
116:4
24 15:6
25 130:18
250 117:24, 25
27 125:9
27th 124:21
28th 14:4; 25:6; 178:7
2nd 106:7, 24; 107:1;
115:8

**3**

3 66:13; 106:6; 130:3;
132:10, 20; 154:23; 155:2,
9; 179:21
30 128:7
30th 79:2; 127:12, 18;
128:3, 12, 24; 129:15

**4**

4 50:23; 76:20; 81:16;
82:14, 18; 86:14; 89:9;
96:6; 131:10; 193:19;
196:1, 13
40 24:5; 161:23; 169:21
400 48:8
4:39 200:1
4th 130:4; 131:5; 155:4

**5**

5 46:20
50 37:10

**6**

6 25:4; 29:4; 131:4; 183:9
6/4 77:22
6/8/2004 77:19
66 24:5

**7**

7 39:4; 66:8, 16; 136:14,
17; 141:7; 144:20
7th 66:10; 67:9, 12, 22,
25; 68:7; 69:14

**8**

8th 131:13; 133:2; 137:6;
140:16; 143:1

**9**

95 24:23
98 81:14

**A**

ABC 173:22; 180:19;
191:22
ability 5:20; 6:1
able 40:13; 54:24; 111:3;
126:25; 151:24; 153:13;
168:25; 173:15; 176:10
above 113:1; 125:8
abusing 181:16
accept 90:3
acceptable 63:18; 98:8;
102:6; 118:24; 153:8
acceptance 154:21
accepted 153:2
accepting 64:4; 89:18;
130:23
access 165:23
according 196:3
account 36:20; 38:21
accountable 148:15;
174:12; 176:4
accounts 62:16
accuracy 13:3; 192:16
accurate 13:5; 69:3;
110:7; 111:2; 191:9;
192:7; 193:5
accused 181:16
acquire 127:1
across 47:2; 59:1;
132:21; 135:16
act 123:11; 161:3
acted 198:9
activities 60:8; 93:22
actual 50:4
Actually 19:18; 21:3;

35:14; 43:6; 49:23, 24;
64:25; 69:17; 71:2; 72:23;
83:12; 85:10; 97:14;
101:7; 105:17; 110:6;
119:13, 15; 120:6; 122:13;
123:5; 126:24; 143:18;
152:8; 174:2, 9; 179:2;
188:6
adapt 58:20
add 133:14; 138:17;
145:25
added 137:19; 138:8;
141:7
addition 134:16; 136:3;
144:14; 145:9; 162:7;
177:5
additional 8:22; 42:24;
48:1; 106:12; 117:25
address 6:11, 14, 16; 9:7;
38:7; 39:6; 40:24; 49:1;
54:5, 18
addressed 33:1; 38:14;
41:5, 7; 57:19; 61:13;
71:10; 163:10; 168:4
addressing 40:16; 57:8;
70:16; 103:1; 147:21
adequately 57:11
adhere 198:25; 199:13
adhesive 132:22
adjourned 174:21, 24
administration 15:7;
21:14; 22:2, 12; 25:20;
31:24; 32:6; 61:12; 62:1;
63:14; 103:19; 106:19;
118:12; 129:13, 21;
137:15; 141:25; 143:17;
145:18; 146:13; 148:5, 22;
149:1, 3, 4, 12, 19; 150:13;
151:5; 152:16, 20, 22;
178:5; 187:20; 188:2
administrative 27:17
administrators 148:10;
160:16; 172:15
admit 164:21
admits 146:7
adopted 72:18
advanced 103:2
advancing 111:21
advised 41:18, 20
advising 41:25
affected 164:8; 176:18
affixed 86:7, 23
afterwards 19:19
again 139:19
Again 9:17; 13:10; 15:17;
28:23; 29:4; 59:25; 60:9;
63:4; 72:25; 74:6; 78:22;
84:16, 19; 90:11; 95:1, 17;
98:5; 104:20; 118:22;
139:6; 150:15; 152:14;
158:12; 161:13; 194:9;
198:22, 23; 199:1
against 166:17; 169:5;
184:16
age 72:9
agenda 67:22; 69:17;

75:15; 106:7; 130:3, 6;
131:5; 154:4, 6, 7, 14, 20,
25; 155:9, 13, 17, 18;
156:6, 19; 179:21
agendas 66:15, 24; 67:3;
140:8; 186:11
ago 13:24; 24:19, 23, 25;
29:1, 2; 73:21; 193:13
agree 151:21; 163:5;
168:20; 184:24
agreed 40:6; 90:21;
119:7; 133:13; 136:16;
183:21
agreement 182:23
ahead 115:18
air 104:20
Alan 38:1; 74:10; 78:15;
119:9; 121:21; 146:7;
162:7
alert 68:21
alerted 53:24
allow 4:12, 16
allowed 127:7; 154:3, 10
alone 190:25
along 93:11; 145:9;
160:21; 184:23
altering 148:13
alternate 40:11; 41:22;
45:18
alternative 42:7
although 6:24; 34:23;
41:11; 44:15; 72:2; 136:12
altogether 60:18
always 29:15; 30:1, 1, 4,
5, 15; 33:20; 38:24; 43:18;
45:17; 67:5; 71:10, 13, 17;
85:3; 104:22, 24; 174:8;
177:18; 193:11; 195:9
amended 135:5; 136:6,
15; 137:3, 19; 153:1
amiss 86:3
among 27:13; 29:6;
101:13; 103:17; 128:19;
166:3, 6, 8; 177:8; 188:4
analysis 11:23
anatomy 72:2
ancestors 98:4
Angie 19:10, 11; 75:7;
185:16
announcer 175:3
answered 18:12; 53:1;
57:10, 25; 190:4; 191:14
antagonistic 161:18;
163:1
anti-God 169:2
anti-whatever 169:3
anticipated 105:8; 139:2
anymore 41:11; 46:11
apart 7:21; 10:17; 12:22;
17:12; 21:23; 37:16; 38:2;
43:11; 61:9, 22; 75:1;
93:25; 100:6; 112:4;
157:5; 163:16; 184:9
apologize 139:24; 167:7
appalled 114:2; 181:15

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

apparently 32:14, 20, 24;
3:19; 87:1; 132:24;
33:23; 154:24
appealing 102:19
appear 135:6; 146:9;
48:9; 172:20; 194:9
appeared 18:16; 93:7;
93:14
appears 6:17; 12:2;
.56:2; 161:8
appease 118:18; 168:19
applied 182:11
appointed 171:23; 172:2
appreciate 6:20
appreciated 186:4
appreciation 31:2
approached 151:2
appropriate 43:5
appropriately 128:18
approved 41:19; 44:3;
49:13, 17; 69:24; 70:1, 18;
71:18; 72:4; 104:10, 16;
115:12, 15, 24; 130:17;
144:3, 7, 13; 145:1;
149:20; 151:8; 157:2
approving 89:21
approximate 51:1
April 14:2; 34:16; 51:15,
17; 53:21, 24; 55:1; 192:11
Area 21:10; 22:6; 23:23;
24:4; 30:24; 45:20; 69:7;
72:22; 76:13, 14; 95:18;
100:6; 110:5; 149:7;
171:8, 9, 21
areas 48:25
arena 45:15, 17
arise 142:8
arose 120:6
around 24:24; 59:14;
84:7; 128:3; 156:5; 193:12
arrived 128:17
art 198:2
article 126:24; 192:6
articles 125:1; 126:13;
163:7; 191:8
articulate 184:6
arts 61:2
aside 18:3
assent 81:16
assertion 172:21
assertions 98:10, 20;
189:21
assessments 129:24
assign 48:15
assigned 48:3
assistant 193:25;
196:25; 197:2
Association 16:10, 12;
22:23; 67:5; 84:5; 119:13,
21; 157:20, 25; 174:15, 18;
179:5
assume 59:17; 116:6
assumed 115:17
assuming 14:19; 77:19

assurance 59:23
assure 65:18
assured 104:8, 17;
114:23; 115:14; 183:25
attached 67:14; 146:11
attacked 162:21
attempt 34:2; 161:13
attempted 47:18; 105:6;
167:7; 180:21
attend 64:25; 67:24;
107:1; 116:5; 130:9;
139:14; 149:12; 157:12,
16; 171:9, 20; 185:5, 8
attendance 15:15; 22:24;
67:5; 69:25; 70:3; 77:5;
78:6, 12; 84:3; 107:3;
116:15; 156:23; 164:3, 16;
171:22; 179:6; 182:18
attended 67:2; 69:19;
185:10
attending 69:13; 74:16;
140:5, 10; 157:15; 185:13
attention 30:13, 15;
31:20; 32:23; 52:10; 87:7;
101:16; 107:7; 134:18;
136:21; 196:19, 20
attorney 1520
attorney 179:13
attorneys 74:22
attract 100:21
attracted 134:18
attractive 183:19
attribute 183:19
attributed 146:6; 191:6,
15
audience 84:6; 100:22;
102:20; 161:22; 165:22;
166:7, 12; 177:6
August 45:2; 96:22;
101:7; 106:24; 107:1, 3, 5;
112:16, 21; 114:17; 115:8;
116:4, 15; 117:14; 127:12,
18; 128:3, 7, 12, 24;
129:15; 140:6; 196:4
authority 98:25
authors 19:8; 108:13;
110:15
automatically 71:25;
72:8; 115:22
available 40:20; 48:19;
69:10; 93:14; 125:4;
127:24; 130:20
avoid 176:14, 15; 180:21
avoided 169:15
aware 30:15; 53:12;
103:4; 133:10; 134:11;
146:6; 157:15; 198:17
away 102:4; 104:13;
114:22

## B

B 121:3, 4, 7; 143:22, 25;
152:24; 159:7; 165:10;
166:13; 167:22

back 32:12; 40:14; 41:1,
2; 46:21; 54:2; 60:22; 62:1;
68:25; 83:14; 86:11; 87:9;
90:14; 104:12; 107:17;
109:10; 114:23; 120:23;
130:13; 136:1; 137:24;
138:9; 192:20, 23; 195:1;
196:10; 197:20
background 14:3, 9;
17:16; 24:3; 43:4; 53:4;
110:15
backgrounds 42:10;
182:22
bad 90:10, 22
Baksa 11:22; 36:23; 37:1,
5, 8, 13, 18, 22; 38:4, 11;
43:20; 47:12; 51:23;
52:22, 22; 53:10, 21;
54:10; 55:7, 24, 25; 56:19;
59:7; 61:11; 75:24; 78:4;
79:12, 24; 80:1; 94:14;
95:4, 10; 96:8; 99:4; 104:1;
105:2; 107:9; 108:4;
114:16; 118:17; 131:17,
19; 134:22; 135:8; 137:25;
138:22; 139:2; 141:1;
143:20; 144:19; 145:21;
147:23; 148:2; 151:4;
153:2; 174:20; 178:9, 13;
179:1
Baksa's 53:4; 105:16
ballot 183:9
bare 4:20
barely 110:2
Barrie 17:1; 50:16, 19;
68:25; 71:7, 9; 158:18;
166:23
based 29:22; 62:6; 88:2;
105:9; 107:5; 111:14;
117:20; 146:15; 189:20
basically 20189:20
basically 12:17; 13:10,
12; 15:4, 5, 5, 7; 18:8, 16;
20:2; 27:8; 32:6; 40:8;
42:3, 20; 53:2, 7; 56:19,
21; 62:5; 63:5; 68:20; 73:8;
83:15; 99:3; 102:1, 15;
108:15; 109:8; 111:17;
113:11; 126:25; 128:20;
129:6, 23; 130:24; 163:6;
164:13; 170:18; 172:13;
174:16; 175:3, 14; 176:1;
184:15; 185:7; 192:23;
194:14
basis 38:21; 171:2; 189:8
Bates 136:23, 24; 138:13;
141:8
Baun 175:20
beak 58:21
became 25:20; 137:20;
144:2; 170:4, 9, 16, 21, 22
become 24:17; 28:20;
189:4
becoming 115:5
began 158:4; 192:8
begin 4:13, 14; 45:16;
112:20; 148:1; 180:18;

196:12
beginning 32:18; 44:15;
56:18; 62:18; 65:13, 20;
78:23; 96:10; 102:16;
109:17, 18; 128:17, 22;
129:4; 152:9; 154:13, 19;
178:3; 196:2
begins 38:10; 45:14;
75:24; 133:9; 158:3
behalf 98:11; 103:2;
167:7; 186:4
Behe 17:3
behind 32:13; 60:22;
139:19; 155:22; 177:13;
193:8
belabor 99:9
belief 11:15, 12, 15;
189:9, 24, 25
Beliefs 189:10
believes 197:24
belong 22:15, 16; 189:12,
15, 15
belongs 189:14
below 173:2, 3
beneath 45:13; 51:10;
76:13; 121:15; 164:17;
168:10; 172:24
beneficial 161:14
Bermuda 25:22; 27:2, 3
Bernard 191:12
Bert 6:16, 18, 21; 8:14;
12:2, 22; 23:6; 24:4, 7;
27:23; 30:8; 31:15; 33:3, 8,
18; 34:8, 23; 36:18, 24;
38:15; 39:21; 41:7, 15;
44:9; 45:6; 46:16, 23, 23;
47:4, 6; 49:5; 50:22; 51:3;
52:15; 55:12, 23; 58:13;
59:14; 60:15; 62:9, 21;
66:1, 12, 17; 67:9, 22;
68:24; 69:19; 75:20; 76:3,
15, 21; 82:9, 13, 23; 84:21;
86:12; 87:4; 88:1; 91:3;
93:16; 95:1, 8, 17; 97:17;
98:17; 100:9; 101:1;
104:12; 105:12; 106:6, 16;
109:22; 110:23; 111:10,
25; 116:1, 25; 119:24;
120:17, 24; 121:7, 19;
123:25; 125:6, 25; 127:10;
128:11; 130:15; 131:13;
132:6; 133:4, 24; 136:14,
17; 137:5, 15; 138:4, 12;
139:12; 141:24; 142:21;
144:9; 145:12; 146:4;
150:3, 6, 9; 151:22;
159:21; 168:17; 176:19;
178:8, 21; 180:12; 182:3;
188:11, 13, 18; 190:15
bird 58:18, 19, 20, 22, 23
blacked 144:11
blacking 156:8
blatantly 90:12
block 197:7
blood 21:9
board 8:6; 10:13; 11:25;
12:1, 16; 13:11, 14, 14;
15:16; 16:17, 20, 22; 18:4;
19:17, 18, 24; 20:8, 24, 25;
21:3, 11; 22:6; 27:13, 18;
28:11; 31:24; 32:14, 17,
21; 36:23; 37:5, 8, 13, 23;
41:19; 47:13, 25; 50:17;
61:21; 63:22, 25; 66:14,
14, 24; 67:2, 12; 70:15;
71:3, 4, 10, 18; 73:7, 10,
13, 13, 15, 19; 74:5, 16,
24, 25; 75:12; 77:13; 78:2;
81:23; 82:2; 83:16, 19;
84:4; 89:17, 20; 90:1, 2;
91:4; 96:18, 18, 25; 98:8;

196:25; 172:18

13:5; 56:14; 102:18
Beth 4:1, 9
better 30:21; 171:12;
173:7
Beyond 95:2; 113:14
big 58:10; 100:17;
101:23; 102:12; 139:8;
196:14
Bill 23:2; 74:7
billed 152:20
binder 11:13
bio 25:24; 68:12; 108:14
Biological 27:4
biologists 43:3
biology 10:8, 9; 18:7, 9,
10, 15, 19; 20:5, 6, 11;
23:20, 21, 25; 24:10, 11;
25:14, 18; 27:15; 28:12,
16; 29:12, 24; 30:18;
31:17, 22; 32:1, 2, 5;
33:21; 37:12; 38:11; 39:2,
15, 16; 40:6, 15; 41:12, 13,
18, 20; 42:5; 43:24; 46:3,
6, 12; 47:17, 22; 48:8, 10,
12, 14; 49:7, 10; 50:14, 17;
51:20, 20; 52:25; 53:5;
55:14, 17, 20; 58:1, 8, 13;
59:21, 24; 62:2, 3, 19, 25;
63:1, 8, 18, 23; 65:3, 19;
70:8; 72:10, 16; 74:1; 75:3,
24, 25; 76:2, 8, 14; 77:10;
78:25; 82:11; 85:11, 17;
87:13, 13, 16, 23; 88:22;
89:2, 6; 92:4, 17; 95:19;
97:3; 99:11; 105:13;
106:21; 107:25; 108:22;
109:5, 8; 116:23; 119:5;
125:14; 128:1, 16, 19;
129:11, 22; 134:19;
135:11, 12; 136:1, 5;
139:5; 140:19; 146:12, 22;
147:14; 148:3, 4, 7;
150:13, 18; 152:25;
159:21; 168:17; 176:19;
178:8, 21; 180:12; 182:3;
188:11, 13, 18; 190:15
bird 58:18, 19, 20, 22, 23
blacked 144:11
blacking 156:8
blatantly 90:12
block 197:7
blood 21:9

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Bertha E. Spahr
May 19, 2005

101:9; 104:4, 11, 14;
105:19; 106:2, 3, 4, 7, 20,
23; 107:1, 4; 114:12, 17;
115:9, 15; 116:13, 14, 17,
18; 117:16; 120:8; 121:25;
122:5, 10; 127:11, 14, 14;
130:3, 4, 22, 25; 131:1;
137:16; 139:9, 11, 22, 25;
140:2; 142:14, 17, 20, 23,
24; 143:5, 18; 144:18, 23;
145:15; 146:2; 147:22;
148:1, 11; 150:19; 151:2,
22; 152:22; 154:25;
156:12; 157:14; 159:2, 18;
160:12; 161:2, 7; 162:3, 8,
12, 17, 20, 22; 166:3, 6,
11; 167:4, 13, 16, 25;
171:23; 173:11, 21, 25;
175:10, 14, 16; 176:25;
177:4, 15; 182:24; 183:15,
19, 21; 185:3, 5, 11, 13;
186:11; 187:8, 11
Bob 14:4; 56:2; 76:17;
77:18; 78:6; 80:5; 188:17
bodies 52:4
body 101:23
bold 121:12
bone 101:23
Bonsell 20:22; 38:1;
51:13; 52:9, 19, 21; 53:1;
54:19; 55:3, 10, 23; 56:17,
25; 57:5; 58:17; 70:5;
74:10; 75:17; 78:15;
115:9, 23; 120:1, 4, 12;
121:21; 122:7; 123:2, 12;
125:19; 137:19; 138:8, 17;
145:25; 146:7; 147:8;
162:8
Bonsell's 52:20; 55:6
book 11:23; 18:8, 9; 19:7,
7; 32:1, 5; 33:12; 34:5;
43:24; 44:2, 4; 47:17;
48:24; 59:24; 60:7; 62:24;
63:18; 68:17; 69:7; 76:16,
17; 77:9, 10, 18; 79:4, 6, 8,
9, 15, 16, 19; 80:3, 5; 89:2,
7; 91:9; 93:2, 13; 94:10,
11; 96:2, 15, 21; 97:17;
99:4, 5, 22; 100:5, 17;
101:15; 103:25; 104:1, 10,
18, 19; 107:6, 12; 108:14;
110:12, 16, 19; 112:8, 23,
24; 113:3, 6, 9, 23, 24, 25;
114:8, 13, 15, 24; 115:1, 3,
5, 13, 13, 24; 117:7; 118:8;
127:25; 128:16, 17; 132:2;
134:4; 141:15, 23; 142:10;
147:4, 19; 170:13
books 32:1, 8; 40:19;
44:24; 45:1; 48:18; 50:20;
60:3, 23; 63:2, 3; 64:5;
68:13, 16; 69:10, 23;
70:17, 18, 23; 71:12, 13,
19, 24; 72:10, 11, 17, 22;
76:14; 80:2; 95:20; 97:3, 5;
100:15; 105:14; 117:23,
24, 25; 118:3, 13, 20;
130:18, 23; 134:1, 5;
186:6; 196:11, 12

both 18:10; 23:6; 73:10,
12; 80:8; 97:5; 104:2;
118:18; 150:4, 12; 172:14;
179:5
bottom 77:17; 124:20;
131:4; 138:8, 14, 18;
144:14; 145:2
Bowser 22:19, 20; 66:23,
24; 68:5
box 9:1; 16:6
brackets 172:25
Brad 23:4
break 5:9; 46:13; 90:25;
190:3
Brian 175:11, 18, 20
Brian's 176:8
brief 46:13; 85:3; 90:25;
161:17; 190:2
briefly 186:13; 191:24
bring 46:5; 49:10; 62:11;
87:6
bringing 124:7
brings 23:6; 62:15; 130:2
brittle 29:6, 9
broke 46:16
brought 30:4; 45:25;
59:4; 65:1; 121:20, 22;
122:16, 24, 25; 123:4, 19;
125:18; 127:5
Brown 18:5, 14; 20:16;
64:24, 24; 70:5, 6; 78:10,
12; 90:19; 116:17; 117:1;
120:13; 122:8; 130:21;
143:11; 167:5; 185:25
Browns 177:16, 17;
185:19
Bryan 9:21; 56:3, 9;
114:8; 181:13; 184:1, 16
BS 130:7; 155:13
Bubb 174:1; 191:12
Buckingham 20:15;
64:23; 65:18; 73:3, 17;
78:4; 79:7; 80:20, 24; 82:4;
83:9, 20; 84:10, 25; 88:5,
14; 89:11, 13, 14; 90:20;
91:16; 93:1, 25; 94:3;
113:7, 17; 115:1; 161:5,
19; 162:12; 163:10;
167:10; 181:15, 19, 24;
195:10
Buckingham's 74:7;
87:6; 88:10; 91:17; 177:2
bud 54:4
budget 31:23; 61:8;
62:23; 71:20; 118:1
building 20:3; 48:23;
54:11; 81:22; 85:25; 86:9,
17, 18, 25; 108:4; 112:17,
20; 131:20; 135:14;
186:18, 20; 194:5; 195:20;
199:19, 19, 23
buildings 199:2
bunch 166:1
burden 170:7
burned 82:11; 194:8;
196:22

business 21:22, 23
busy 129:8
buy 48:1
buying 104:23

# C

C 70:5; 143:22, 25; 153:5;
165:10; 166:14; 167:22
calendar 66:11
California 15:25
call 6:18, 22; 10:12; 13:9;
148:18; 153:25; 192:22,
22, 23; 194:25; 197:6
Callahan 17:1, 11, 12;
50:16, 19; 69:1; 71:7, 9;
73:3; 158:18; 160:8;
166:24
called 9:166:24
called 13:2; 17:1; 18:5;
20:13; 30:14; 52:17;
72:12; 94:14; 105:2;
115:13; 131:21; 135:20;
166:5; 192:3, 16
calling 69:17
calmed 32:24
came 9:2, 6; 13:3; 19:19;
29:9; 30:12; 40:4; 44:14;
47:13; 52:10, 22; 53:11;
58:23; 67:7; 73:22; 81:8;
83:13; 84:13; 85:23;
89:17; 96:13; 100:15, 16;
101:14, 15; 102:4; 104:13;
107:6; 108:4; 114:19;
116:13; 119:14, 17, 18, 20;
123:22; 131:22; 135:14;
142:3; 143:23; 147:16;
148:6; 157:8; 165:18;
167:6; 174:2; 175:8, 10,
15; 177:15, 16; 178:13;
183:8; 186:17; 188:21;
190:20; 192:4; 194:4, 12;
196:18, 20; 197:17, 24
cameras 173:22
can 13:19; 41:16; 44:11;
51:24; 53:20; 54:13, 18;
55:11; 57:2, 3, 7; 58:15;
65:12; 67:17; 70:22, 23;
71:16; 77:16; 81:1; 102:3;
108:20; 129:25; 130:14;
142:21; 148:7; 149:21;
151:18; 155:6; 156:5;
161:13; 163:22; 166:19;
174:23; 178:1; 184:10
candidates 179:25;
180:4, 10, 15, 17; 181:2, 5;
182:8, 11, 12; 183:18;
184:8, 11; 185:13
capable 28:13
capacity 29:16; 129:19
carbon 27:21; 110:25
care 194:18
cared 58:22
carried 125:22; 138:24;
156:17
carry 68:17; 118:20, 22;

125:20
carrying 54:3
case 164:3
case 4:23; 9:18; 10:20;
52:6; 160:22; 172:22, 23
cases 100:11; 125:24
Casey 18:5, 14; 20:15;
64:23, 24; 70:6; 78:10, 12;
90:19; 116:17; 117:1;
120:13; 122:8; 130:21;
143:11; 185:22, 25
cast 182:1
Catholic 77:7, 8; 79:15
caused 195:23
cautious 30:17
Center 15:23; 195:17
Certain 7:7; 14:8; 43:22;
48:21; 56:13; 62:4; 81:6,
23, 23; 82:1; 99:19;
100:15; 120:11; 130:11;
134:24; 139:6, 10; 142:3;
144:24; 148:5; 168:1;
181:5; 182:8
certainly 20:16, 17;
24:24; 28:10, 14; 29:10,
14; 34:14; 45:25; 46:3;
55:15; 59:2; 64:13; 65:23;
69:5, 9; 79:11; 80:18;
87:11; 89:15; 90:8; 93:23;
98:6; 99:18, 24; 100:15,
20; 101:12, 21; 107:23;
108:10, 22; 113:24;
117:20; 126:14; 131:22;
143:13; 149:10; 152:24;
153:1, 2; 162:18; 169:11;
177:19; 181:3; 183:12;
184:4; 188:12; 195:8, 22
certification 422
certification 24:13
chain 43:18
chair 21:5; 22:22; 43:19;
85:15; 129:20; 149:8;
194:11
chairs 164:1
chalkboard 86:10;
194:25; 199:16
challenge 161:11
challenged 161:24
chance 2361:24
chance 191:4
change 12:13; 20:11;
58:9, 25, 25; 59:2, 4; 62:2,
7; 79:3; 101:24; 128:2, 9;
129:14; 131:24; 134:22;
139:20; 143:2, 7; 154:12;
160:3; 163:18; 165:13;
167:18; 178:5; 180:12;
181:3; 187:9, 12, 14
changed 12:15, 16; 19:7,
7; 48:21; 49:6; 58:23; 69:6;
99:20; 132:25; 154:11;
188:7
changes 10:9; 95:19;
97:2, 8, 24; 98:10; 99:22;
100:2; 102:21; 105:13;
129:1; 137:7; 138:1, 3, 6;
140:16; 146:12; 150:12;

178:15, 18, 20; 179:12
chaotic 166:14
chapter 92:4; 96:8; 97:5;
98:16; 99:7, 21; 100:20;
102:17
chapters 97:6; 99:19;
109:19
character 25:13
characterize 57:15
charge 178:24; 188:8
charged 86:22
chart 95:15; 136:21
check 44:17; 196:11
checked 9:9
Chem 24:16, 16; 72:3
chemicals 110:7
chemistry 18:11, 19;
19:2, 3; 24:12, 13, 14;
28:15; 65:2; 70:17; 72:10;
135:13
child 181:16
children 181:11
chime 55:16
choice 62:25; 149:17
chose 93:23; 118:11
chosen 65:25
Christian 77:6
church 39:11; 170:20;
171:7, 9, 16, 24; 179:4
churches 40:12; 42:8;
170:1; 171:5, 6, 21
circled 50:24; 116:2;
131:6, 11
cite 133:25
cited 93:6; 129:3; 160:21
civil 57:16
civilized 85:4
claims 98:12, 24; 103:2;
111:21
clap 149:24
clarification 12:12;
13:23; 14:4, 11; 19:9;
152:13; 165:20
clarify 4:24; 12:7; 22:8;
34:2; 52:24; 159:23
class 48:11; 49:9;
123:23; 165:1; 189:12, 15
classes 37:12; 49:25;
50:5, 14; 87:14; 134:1;
178:8
classification 48:22, 25;
69:8
classroom 33:13; 39:22;
41:11, 12; 55:20; 68:18;
85:25; 89:25; 108:9;
118:10; 122:12; 123:10;
128:14; 130:17, 19;
133:20, 22; 153:15; 161:2;
164:11, 14, 24; 169:10;
176:8, 17, 19; 189:18;
194:9
classrooms 85:18;
118:13; 128:1; 168:17
claws 58:22

layton 179:3

ear 58:5

learances 181:22

learer 165:4

learly 167:2

leaver 19:13; 75:5; 86:15

lip 8:22

lose 59:18; 66:4, 7; 95:25; 96:2

loser 132:15

loset 9:25

louded 167:3

Club 20:9

lue 86:3

coach 78:7

collaborative 99:6

colleagues 7:21; 51:6

collect 114:3

collected 8:16; 15:1

collection 9:15; 121:9; 144:20

collective 51:8, 9

college 110:18, 20

collegial 57:16

column 133:9; 134:9; 137:11; 145:6; 147:4; 150:22

combination 145:8; 151:23

comfortable 40:16; 140:20; 152:18

coming 5:5; 37:7, 24; 51:16; 57:21; 64:14; 91:9; 143:12; 148:12; 152:5; 154:8; 172:4; 178:19; 195:3; 198:18; 199:25

command 43:18

comment 68:12; 71:7; 73:8, 18; 74:3, 6, 11; 88:12; 139:23; 151:9; 153:23; 154:2, 3, 9, 10, 18, 19; 158:5, 14, 17; 162:10, 13; 163:12, 17; 164:4; 167:14

commenting 18:21

comments 58:3; 70:11; 88:10; 154:13; 163:16; 166:19; 167:20; 168:7; 176:25; 184:9

commit 123:10; 161:3

committee 18:13; 20:14, 14, 24; 21:1, 2, 4, 5; 22:22; 61:22; 63:22, 25; 64:22; 76:20; 77:4, 14, 23; 78:2, 12; 90:18; 91:4; 104:14, 17; 105:20; 106:3, 4; 108:21; 113:8; 114:13, 24; 117:16; 119:14; 122:11; 123:21; 127:11, 14, 15; 138:11; 139:1; 140:23; 142:15; 160:2, 10, 13, 15; 168:14; 172:15

committee's 145:16

common 101:23; 102:12;

103:14, 16

commonly 104:3

commotion 169:19

communicate 149:11; 173:20

communicated 11:1, 2; 16:17; 148:25; 171:14

communication 4:21; 11:11; 16:4, 7; 18:2; 149:3

communications 8:23; 15:22; 17:13; 18:4; 20:22, 23; 63:14; 106:18; 187:19

community 13:13; 22:4; 30:2, 3, 10, 16; 32:17; 42:11; 81:24; 139:17; 159:20; 160:9, 15; 169:2, 12, 16, 20; 170:16, 17; 171:13, 20; 194:21, 22; 197:19; 198:6, 14, 17

companies 115:13, 14

companion 115:3; 117:23

company 110:11

comparative 169:8; 189:16

compare 97:19

comparing 99:7, 12; 137:5

comparison 64:15; 96:23

competing 140:15; 149:2

compile 15:4

compiling 51:5; 67:1

complaining 79:8, 10

complaints 91:15, 17, 23

complete 4:11; 9:15

completed 199:20

compliance 49:11

compounds 111:1

comprehending 103:6

comprehension 113:15

compressed 49:8

compromise 53:6; 108:21; 118:22, 25; 127:21; 151:16; 160:1; 161:14

computer 9:4, 10, 12

concept 33:22; 137:11

conception 111:22

concern 27:13; 31:18; 38:6; 39:18; 46:2; 50:2; 53:14; 54:17; 60:14, 19, 21; 61:10; 71:11; 85:6; 88:25; 98:23; 123:9, 14; 194:17

concerned 11:5; 29:22; 62:8; 125:15; 161:15; 176:20; 181:12; 189:25

concerning 9:8; 13:23; 14:8; 27:14; 36:21, 21; 90:6; 101:2; 110:6; 122:11; 180:17

concerns 28:12; 30:10, 12; 33:2, 10; 40:20; 42:15; 45:7, 10; 53:2, 7; 54:25;

55:6; 56:18, 21; 57:4, 19; 61:8; 84:24; 87:6; 135:4; 176:9

concluded 200:1

concludes 76:2

conclusion 97:10; 161:16

condition 32:9

conducted 97:4; 98:9

confess 4:17

confident 122:23

confirmed 120:24

confusing 143:21; 165:11, 11, 24

confusion 33:16; 52:12, 18; 166:8

connection 20:23; 22:21; 29:8; 39:23; 81:3; 92:22; 116:23; 154:6; 173:10; 187:4; 190:12

connections 21:7

connotation 134:24

consequently 48:2

conservative 30:2

consider 131:2

considerable 24:7

considerations 31:6

considered 98:6

consistency 40:8; 109:9

consistent 5:14; 134:13

Constitution 121:13

constraint 42:19

constraints 118:1

construction 199:8

consult 51:5

Consulting 14:1

consumer 64:5, 10; 65:9; 70:18

contact 15:23; 16:14; 17:10, 12; 40:18; 79:13; 192:18, 19

contacted 11:3; 16:16; 77:6; 190:18; 193:24

contained 125:1; 147:4

contemplated 129:1

content 45:19; 137:11

Content/Concepts/Process 134:10

contention 101:24

contentious 71:1; 168:23; 180:22

contents 13:4

contest 5:8

context 31:12; 68:20

contingents 13:22

continue 38:8; 41:14, 21; 42:4; 87:4; 124:9

continues 41:17

contributed 55:18; 139:19

contributions 89:18

controversial 19:4; 98:6; 100:3; 101:19, 21; 102:12

controversy 23:25; 29:25; 31:17; 38:24; 44:8; 99:23; 100:9; 103:11; 119:19; 170:10; 176:15; 195:18; 199:15

conversation 19:11, 22; 36:19; 37:7; 38:2; 51:14; 53:8, 9, 18; 81:10; 193:4

conversations 12:5; 19:10; 45:23; 55:7; 63:21; 142:14; 169:13; 173:10, 13; 174:20

conveyed 58:16

convictions 82:7

convince 184:15

cooperate 168:14

cooperation 172:14

copied 35:9

copies 9:5; 66:24; 120:9, 11, 14; 122:1, 6; 127:25; 142:5

copy 35:2, 6, 10; 36:16; 44:6; 47:24; 67:6; 92:25; 95:7; 107:10; 109:11; 113:23; 120:15; 159:3; 179:6; 190:8

copyright 76:1; 95:19; 97:3; 105:13

Corbett 184:24

cordial 57:16

corner 47:1; 50:25; 66:21; 92:19; 116:3; 121:11; 130:5; 131:12; 132:23; 136:25; 155:13

correction 178:24

correctly 30:22; 33:3; 93:16; 122:22; 145:7; 189:19

cost 106:12

counsel 306:12

counsel 72:5, 5; 10:20; 11:1; 13:20; 15:13, 19; 192:10

couple 41:15; 58:12; 83:25; 127:10; 155:19

course 25:17, 22; 27:2; 48:6, 14; 49:20; 50:1; 63:13; 72:3, 15, 16, 18; 79:21; 104:3; 114:22; 118:2; 170:14; 193:21, 24; 199:15

court 100:11; 125:24; 160:21; 173:24, 24

cover 111:17; 130:6; 136:22; 146:10; 150:4, 5, 11; 190:11

covering 174:16

covers 5:15; 109:19

created 35:9; 82:20; 86:12; 89:18

Creation 95:3; 121:14, 16; 123:7; 160:20

creationism 17:18; 36:24; 37:2, 3, 6, 9; 38:12, 13; 39:9, 22; 40:10; 41:9, 10, 21; 42:6, 16; 43:7;

45:15, 17; 46:8; 100:14, 24; 101:3, 20; 119:11; 121:16; 122:12; 123:2; 125:2; 148:19; 160:20; 168:17; 169:24; 175:25; 184:25

Creationist 124:2

credibility 182:8; 189:2

criteria 112:1

criticisms 114:1

cross 73:21

crowded 164:2

cultural 30:25; 31:2, 12; 103:11

curiosities 40:25

current 6:11; 20:8

currently 46:8

curriculum 8:8; 10:10; 11:20; 12:1, 15, 16; 18:13; 20:6, 12, 13, 14, 24; 21:1, 2; 23:21; 27:15; 29:24; 33:21; 40:3; 41:20; 43:21; 47:20; 48:5, 20; 49:2, 19; 51:20; 59:21; 61:21; 62:2, 5, 7, 10, 11, 20; 63:22, 24; 64:22; 65:6; 69:6, 22; 76:19; 77:3, 4, 13, 23; 78:2, 11; 80:18; 83:21; 90:17; 91:4; 95:12; 104:14, 17; 105:19; 106:3, 4, 9; 108:21; 113:8; 114:12, 24; 116:14; 117:16; 122:11; 127:11, 14, 15; 128:2, 8; 129:1, 14, 23; 130:14, 16; 131:24; 132:5; 133:24; 135:5; 136:6, 21; 138:9, 18, 23, 23; 139:1, 20; 140:15, 22; 142:15; 143:2, 7; 145:15; 146:13; 147:19; 148:14, 16; 149:2; 150:13; 151:8; 153:12; 154:22; 157:2; 158:4; 160:1, 3, 9, 12, 14; 161:9; 163:18; 164:5, 13; 165:14; 167:18; 168:14; 172:15; 175:22; 176:3, 6; 178:5; 180:13; 181:3; 184:10; 185:8; 186:6; 187:9, 12, 14; 195:4

curt 177:5, 6

cut 19:4

cycle 31:25; 60:20; 61:4; 72:6, 17

cycled 72:23

Cynthia 184:23

## D

D 39:2

Darwin 108:1

Darwin's 40:11; 92:2; 133:11; 134:12; 168:21; 176:13

Darwinism 91:18

date 64:3; 77:16, 19; 104:25; 180:1; 186:10

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Bertha E. Spahr
May 19, 2005

dated 11:17; 25:6; 28:7; 47:1; 51:15; 53:24; 76:20; 77:22
dates 29:2; 44:19; 61:19
dating 57:21
Dawn 115:20
day 15:3; 17:5; 61:18; 77:22; 89:3; 107:24; 108:15; 112:18; 115:15; 116:8; 128:20; 149:24; 151:10; 154:18; 196:6
days 27:3; 40:1; 42:22; 62:4; 66:9; 174:25; 192:22
dead 181:17
deal 48:24; 60:10; 168:23; 175:12, 24; 176:10; 187:16
dealing 138:19; 141:22
dealings 21:22, 23; 187:5
deals 100:20
dealt 48:24; 188:11
death 184:18, 23
Debate 95:3; 100:25; 169:23
December 13:15, 17; 15:17; 17:20; 21:11; 59:25; 61:16; 185:14; 192:5
decide 42:15
decided 137:23; 139:21; 140:12
decision 149:24
declined 190:9
deemed 160:18
defendants 1660:18
defer 63:10
definite 91:12
definitely 135:7; 151:13
definition 178:22
defy 161:1
degree 110:1; 161:21
delay 89:5; 161:12
delayed 32:7; 61:6; 71:14
deleted 98:3
deletes 103:16
deletion 103:19
deliberations 149:1
Delone 77:7; 79:15
demeanor 162:15
Democratic 182:13
demonstrate 98:13
demonstrated 24:6; 31:11
departed 57:11, 18
department 6:18; 7:7, 13, 14, 22; 8:15; 11:7; 13:9, 22; 17:2, 7; 24:18; 25:15, 19; 28:2, 17; 29:17; 30:23; 32:16, 23; 33:1; 34:1; 35:23; 38:5; 39:25; 43:19; 50:8; 51:6; 52:8, 25; 54:23; 56:12, 17; 60:25; 61:3; 63:15; 64:6; 65:5; 69:23; 71:24; 72:5, 21;

76:2, 8; 81:12; 85:15; 86:5, 23; 87:13; 90:21; 101:14; 107:21, 25; 113:20; 117:6, 20; 123:24; 129:20; 134:19, 20; 135:2, 5, 12, 24; 136:6, 16; 138:10, 25; 139:19; 140:19; 143:8, 14, 19; 148:4, 8; 149:8; 152:25; 153:9; 157:8, 9, 10; 159:21, 22, 25; 163:3; 168:12, 25; 170:2; 172:14; 173:15; 182:17; 184:4; 186:3; 187:21; 188:5, 21; 189:1; 193:9; 194:11, 12
departments 49:20
deposed 5:17; 7:14
deposition 177:14
deposition 5:7; 6:15; 7:6, 23; 8:3; 9:19, 20; 16:18, 19; 82:17; 121:4; 159:7; 192:8; 200:1
depositions 7:25
depth 109:21
derived 55:6
deriving 169:14
descent 101:23; 102:12; 103:14, 17
described 61:23; 76:9; 95:24; 146:17; 150:14; 171:15
description 85:20; 150:7
design 19:24; 20:1; 70:5; 75:17; 101:2, 4, 10, 14; 112:7, 10; 119:11; 121:17; 125:2; 131:25; 133:13, 15; 134:17; 136:10; 141:22; 144:13; 145:5; 146:8; 147:18; 148:18; 160:19; 161:8; 168:16; 169:6, 7; 170:4; 175:7; 184:5, 12, 17; 189:3, 6, 9, 12, 14
desire 14:10; 148:3
desired 86:23
destroyed 90:12; 194:7
destroys 194:15
destruction 89:9, 11, 16
detail 27:24; 133:5
details 27:20; 84:22; 196:18
determine 13:12
developed 186:24
development 11:20; 12:1; 138:24
developments 62:21
devoted 162:1
diagram 97:8, 8
diagrams 98:5; 102:10
Dick 167:5
died 73:20
differ 19:6
differed 98:15, 18, 19; 105:7
difference 18:18; 64:19; 147:2; 167:21
differences 18:16;

103:8, 10; 106:17
different 22106:17
different 12:14; 13:22; 41:2; 42:10; 48:23; 61:3; 63:2; 79:18; 102:3; 111:18, 19; 132:12; 133:8; 149:17, 20; 151:15; 165:9, 13; 166:1; 167:20; 183:7
differentiation 58:6
difficult 4:9, 15, 17; 5:1; 6:4; 110:4; 111:12; 193:20
difficulty 118:6
dignify 162:6
dimensions 31:3
direct 6:23; 42:3; 129:22; 136:20; 141:24; 161:6, 7
directed 35:19; 42:3; 55:13; 62:4, 7; 75:23; 79:12; 109:7; 163:18; 179:2; 184:10; 193:23; 198:10, 23; 199:13
directing 178:24
direction 41:17; 129:25; 163:3
directions 62:2
directly 161:5
disappeared 196:3, 9
disappears 193:19
disappointed 148:8
discrepancies 108:1
discuss 7:12, 16; 14:6; 22:22; 27:6, 9, 24; 29:12, 18; 113:16; 157:10
discussed 10:14; 20:5; 37:21; 43:22; 53:10; 58:14; 100:1; 106:22; 113:17; 117:15; 122:15; 127:15; 128:6; 134:14; 142:12; 192:13
discussing 79:4, 6; 83:4; 95:13; 114:8, 14; 123:1, 19; 124:7; 126:5, 18; 127:5, 10, 13; 185:11
discussion 8:1; 29:7; 36:20, 21; 37:18; 39:12; 43:9; 47:7; 49:16; 51:18, 21, 22, 25; 52:19, 21; 53:23; 61:22; 64:9; 72:20; 79:6; 80:15; 83:7; 84:9, 20; 89:10; 90:15, 21; 91:7; 93:10, 21; 95:15; 98:2; 100:14, 16; 101:13; 103:17, 22; 108:18; 120:6, 22; 122:10; 127:19; 128:8, 13; 133:19; 139:14; 142:18; 143:14, 15; 146:15; 147:25; 149:15; 153:3, 15; 155:7; 165:19; 173:14; 177:8; 180:11; 195:23
discussions 19:25; 20:17; 31:9; 38:19; 42:14; 46:6; 53:20; 54:14; 55:2; 61:11, 20; 85:10; 90:6; 94:7, 8; 112:22; 113:22; 114:12; 128:25; 129:12; 134:21; 138:3; 139:12;

140:14, 25; 141:5, 10; 142:23; 143:17; 147:7, 11; 148:2; 157:5; 171:15; 178:4; 188:1, 4; 192:9
disguised 184:13
disjunction 50:7
displayed 163:7
displeasure 195:8
dispute 2195:8
dispute 245:8
dispute 9:3; 19:16; 20:10; 21:8; 27:7; 119:17; 190:12
disrespect 162:4
disseminated 15:8
distant 21:20
distinction 58:11, 16
distinguish 127:8
distribute 128:20
distributed 128:19
district 10:4, 15; 11:5; 17:4, 8; 21:11, 14, 17, 18, 24; 22:6; 23:1, 23; 24:4; 76:13; 81:11; 82:5; 86:19, 20; 89:14; 90:7; 95:18; 114:9; 124:17; 130:23; 149:7; 160:14; 161:23; 162:2; 181:11, 12, 20; 182:4, 6; 190:12; 194:14; 198:20; 199:10, 18
document 36:7; 51:5; 75:22; 76:5, 12; 82:19, 23; 83:3; 86:12, 13; 92:7, 10, 12, 14; 95:6, 17, 21, 23; 96:5; 97:2; 105:11, 17, 21; 121:12; 122:15, 16, 21; 124:1, 6; 132:7, 18, 21; 133:1, 5; 135:9; 137:5; 141:7; 143:21; 144:3, 19, 21; 149:20; 151:20, 22, 24; 152:2; 156:4; 159:1, 13; 179:7, 10; 192:24; 193:14; 196:3
documents 8:2, 3, 11, 23; 9:10, 15; 11:12; 12:3; 14:9, 13, 14, 17, 23; 15:2, 10; 23:10; 46:20; 50:23; 75:22; 76:22; 77:2, 4; 80:9; 92:15; 99:25; 114:5; 120:25; 121:9, 20; 122:1, 14, 19; 123:18; 124:1, 10; 126:17; 127:4; 132:12; 151:18; 152:5; 156:1; 165:24; 166:10, 11; 167:21
donation 130:17
donations 90:7, 16
done 17:8; 33:12; 39:13; 62:25; 99:11; 102:18; 109:5; 119:9; 130:1; 132:5; 154:1; 156:17; 157:17; 159:22, 25; 163:5; 177:21; 184:25; 185:11; 199:8
door 54:11; 83:1
doubt 65:11
Dover 9:2; 21:10; 22:6; 23:23; 24:3; 49:8; 76:13;

95:18; 100:6; 149:7; 182:5
Dover's 62:11
dovetail 62:12
down 7:11; 12:10; 32:25; 33:15; 34:2; 36:13; 38:8; 51:3; 53:6; 86:14; 94:17; 99:3; 105:5; 115:22; 121:12; 124:24; 143:23; 151:16; 156:9; 161:13; 162:5; 172:17; 175:11; 184:22
Dr 13:4; 17:3; 28:25; 35:3, 5, 9, 12; 36:19; 38:15; 41:25; 42:2, 12; 43:12, 19; 45:7, 10, 22; 51:14, 22, 25; 59:9; 78:18, 20; 96:14; 99:5; 107:9; 118:17; 141:1; 149:22; 151:3, 7; 162:9; 165:6; 168:8; 174:18, 20; 192:17; 194:12, 13, 15
draft 11:21; 132:17, 21, 25; 135:3, 9; 136:7, 15; 137:5; 146:11; 164:25; 178:7, 11, 12
drafts 165:9, 10
driven 184:17
driving 102:22
drop-by 132:9
dry 19:4
dubious 181:6
due 74:23; 112:19
duly 10112:19
during 5:24; 31:20; 43:13; 45:23; 49:18; 57:5; 58:17; 63:22; 65:22; 80:25; 112:6; 128:3; 129:14; 142:13; 163:12; 169:18; 194:6
duties 78:8
duty 5:15
DVDs 107:19

## E

E 907:19
E 6:10
e-mail 10:24; 16:12; 25:5; 28:5, 7; 29:5, 8; 77:17; 94:25; 99:25
e-mails 9:2, 7; 16:5, 6; 25:8
earlier 88:2; 112:5; 154:22; 168:3; 199:1
earliest 11:2
early 17:19, 21; 33:15; 36:1; 53:15; 59:15, 16; 77:21
earth 49:25; 175:12, 18, 21, 21; 176:19
easier 6:21; 23:14
easy 18:23
eat 7:8
ecology 25:22; 48:5; 72:14

(5)  dated - ecolog

ertha E. Spahr
lay 19, 2005

dition 18:17, 17; 44:2, 5; 7:16; 60:10; 64:16, 16; 6:2; 92:16; 93:2, 8, 13; 4:12, 15, 18, 21; 95:24; 6:5; 97:11, 13, 16, 21; 8:1, 23; 99:20; 102:11, 8; 104:5, 9, 22, 24; 06:11; 111:19
ditions 96:14; 97:9; 8:15
ditor 125:14
Education 15:24; 43:2; 181:12
effect 45:23; 71:16; 109:3; 172:19
effort 62:10; 99:6; 159:25
efforts 186:3, 5
eight 186:19
eighth 48:22
either 32:17; 33:11; 53:5; 54:22; 59:12; 78:19; 90:3; 106:19; 117:8; 140:25; 143:12; 147:12; 151:3; 161:1; 166:17; 190:15; 191:21
elaborate 92:1
elected 183:3
election 10:13
elections 182:14
elective 189:17
elements 171:1
else 7:23; 10:17; 12:11; 13:1, 7, 18; 37:16, 20; 38:3; 42:12; 43:12; 55:11; 59:5; 73:25; 74:7; 87:20; 94:2; 110:18; 112:5; 127:17; 128:21; 154:16; 157:6; 163:17; 171:18; 175:15; 181:25; 183:16; 188:14; 193:3, 7
else's 61:5
elsewhere 87:8
emphasis 58:8, 24; 59:2; 69:7
emphasize 58:9
emphatically 85:12
employee 194:14
employees 21:16, 18; 82:5
employment 21:24
enclosed 136:22
Enclosure 153:5; 155:23
enclosures 136:19
encourage 39:10; 157:14, 15
end 10:5; 13:16; 42:21; 44:12, 18; 65:13; 81:17, 19; 84:19; 96:3, 11; 97:10; 102:16; 133:8; 135:13; 136:11; 154:15; 161:4; 183:9; 190:6; 197:15
endeavor 31:5
ended 74:16; 87:19; 137:12
endurance 5:7

English 157:9
enough 14:22; 18:23; 21:22; 22:17; 47:24; 48:9, 15, 20; 52:2; 88:19; 108:12; 118:21; 140:12; 147:1; 174:7
enter 55:20
entire 35:11; 64:19; 72:5; 100:18; 161:22; 180:19; 191:23; 193:11
entirely 61:2
entry 47:2; 51:10, 11; 96:6; 131:12
enumerated 45:5
enumeration 45:13
enumerations 36:11
environment 30:25; 48:5; 58:21; 72:14
environmental 25:17
equal 37:10; 42:17
equally 162:16
equipment 9:23
equivalent 101:3
Eric 11:2; 192:15
Eshbach 15:3; 36:5; 48:11, 13; 56:7; 78:5; 113:21; 116:18; 117:5, 12; 135:15; 147:13; 171:12, 14; 190:16; 191:2
Eshbach's 67:20
essence 181:14
essentially 55:5; 172:4; 188:19
estimate 163:22; 164:2
evaluation 39:7
even 38:24; 41:4, 9; 42:22; 46:10; 56:3; 57:1; 72:1; 83:13; 98:8; 104:25; 113:15; 143:23, 23; 151:14; 152:10; 162:5; 165:7, 11, 14; 167:4, 6; 199:21
evening 35:23; 36:2; 135:15; 160:4; 166:25; 174:22; 177:1, 11; 183:13; 184:7
eventful 62:16
events 7:19; 33:4
eventually 49:21
everybody 110:17; 112:25
everybody's 105:23
Everyone 61:3; 149:16, 17
everywhere 173:23
evolution 11:19; 17:18; 27:14; 30:4; 32:18; 33:13, 19, 20; 38:12; 39:3; 40:12; 41:22; 42:5, 18; 62:8; 81:7; 82:19; 92:3, 4; 95:3; 96:9; 97:5; 99:2; 100:14, 21, 24; 123:6; 125:3; 133:12; 134:13; 136:12; 137:13; 138:19; 145:3; 160:21; 169:24; 175:6; 176:1

evolution/creationism 130:24
evolutionary 29:19; 31:12, 19; 36:22; 37:11; 39:1, 23; 59:21; 81:16; 88:3; 97:20; 98:11, 13, 21, 24; 99:13; 103:2; 108:18
evolve 87:11; 176:13
evolved 90:2; 195:16
evolving 193:15
exact 29:2; 64:3; 193:17
exactly 7:13; 30:19; 33:9; 49:12; 52:23; 64:7; 73:24; 74:19; 89:23; 100:10; 115:10; 131:23; 144:16; 156:7; 157:17; 158:19; 166:3; 179:11, 25
Excellent 6:3
except 5:3
exception 48:11; 163:9
excerpts 113:24
exchange 4:2, 10; 10:17; 15:9; 70:7, 9; 84:24; 85:3; 87:8; 88:20; 93:25; 151:3
exchanged 73:5; 134:23, 24; 177:24; 192:20
exchanges 70:22; 71:2; 73:2, 6, 10, 15; 91:7; 148:22; 190:10
Exhibit 45:4; 121:4; 132:20; 155:2
existing 150:17
expected 176:14
expedition 196:15
experience 23:22
expertise 18:20; 110:3
expertly 54:24
experts 53:3; 148:13
explain 12:10; 47:18; 113:8; 133:5
explained 38:10
explanation 4:7
explanations 42:8; 111:16; 113:14
explore 21:7
express 136:3; 198:15
expressed 31:18; 45:11; 57:5; 84:25; 159:13
expressing 198:18
extent 8:1; 19:21; 80:25
extra 118:3
eyes 88:11; 153:22

# F

facets 25153:22
facilitator 85:15; 129:21
fact 13:21; 18:22; 27:8; 65:24; 81:24; 89:21; 99:19; 104:24; 117:21; 130:1; 141:19; 142:7; 143:7; 147:17; 153:11, 14; 156:1; 159:19; 160:22; 168:12; 174:11; 186:10;

194:24
factual 161:18; 163:2
faculty 38:20; 56:1; 57:24; 85:1; 103:18, 18; 106:21; 107:19; 119:1, 3; 129:11; 137:8; 139:13; 140:14; 141:6; 147:12; 148:23, 25; 151:4; 156:22; 157:6, 7, 13, 18; 177:11; 178:19; 187:21, 25; 198:18
fair 39:7
fairly 25:12; 34:24; 45:9; 53:15; 159:14; 160:23
fall 17:19, 21; 32:24; 33:1, 4, 5, 14, 15, 18; 34:7, 21; 51:11, 16, 18; 52:3, 9; 53:15, 15, 21; 55:2, 9; 58:17; 59:13; 61:15; 112:13; 119:8; 120:1; 121:21; 123:3; 126:4; 192:10
falling 163:25
familiar 34:24; 76:3; 92:12
families 40:13; 42:8
family 39:11; 40:18; 64:5, 10; 65:9; 70:18; 195:6
far 21:20; 27:15; 29:22; 48:20; 62:7; 113:1; 156:4; 189:25
farming 110:13
father 171:13
fax 115:15
faxed 115:22
features 38:2
feel 5:11, 12; 57:12; 140:19; 143:15; 149:16, 21; 160:5; 189:6, 11
feeling 82:12; 149:18; 151:11; 184:14
feet 81:15, 16; 193:19, 19; 196:13, 13
felines 98:4
felt 28:13; 42:25; 43:3; 53:5, 14; 54:23; 63:17; 85:6, 6, 22; 90:2; 97:11; 98:7; 100:22; 102:7, 17; 104:21; 108:7; 109:24; 110:4, 5, 18, 22; 111:4; 127:21; 149:7; 157:1; 160:25; 162:25; 163:1, 2; 167:10; 168:24; 177:18; 181:2; 182:8, 24; 183:22; 184:12; 187:16; 188:25; 189:3, 17; 193:11; 195:9, 13
few 2513
few 6:7; 16:15; 21:6; 25:11; 121:8; 129:4; 153:25; 177:24; 179:12; 181:1; 190:16; 192:18; 195:25
field 18:20; 53:3; 55:17; 99:11; 124:17
fifth 183:8
figure 113:10

file 35:11, 16, 17, 21; 95:7; 191:7
filed 11:19; 16:23; 17:14, 15; 35:15
filing 435:15
filing 17:20
fill 180:10
filmed 180:19
final 144:1, 3; 145:7; 151:20, 21, 24; 152:7
finally 49:17; 85:5; 144:7; 145:1; 183:8
find 23183:8
find 4:22; 9:24; 42:23; 79:14; 89:6; 105:23; 114:1, 25; 125:3; 141:1; 181:14; 191:9; 193:20; 194:1, 4; 196:16
fine 6:19; 28:23; 44:17; 59:13; 153:18; 157:25
finish 4:12, 16
fire 170:15
Firm 14:18
first 4:1; 6:8, 18, 25; 23:16; 24:15; 38:8; 46:22, 24; 47:2, 4; 49:5; 66:15; 67:21; 70:4; 77:1; 82:17; 85:16; 86:13; 112:6, 7; 115:4; 116:21; 119:20; 128:20; 129:4; 130:6; 132:3, 16; 144:2; 145:22; 155:14, 17, 18; 158:15; 159:17; 164:20; 171:2; 175:20; 178:12; 184:3; 193:16
first-year 176:2, 21
firsthand 88:4; 171:10
five 12:14; 36:12; 45:9; 64:18
five/three 114:21
flag 37:24; 53:25; 153:25
Flip 46:21; 76:12, 15, 18; 95:17; 121:8; 124:19; 130:3, 13; 150:9
floating 99:5
Florida 186:14
focal 81:13
focus 12:19; 23:17; 62:19
focused 12:19; 31:10; 125:25
folder 35:14
follow 4:16; 5:3; 124:1; 180:25; 197:8
followed 39:1; 43:18; 160:6
following 31:25; 60:10; 72:19; 136:21; 137:12; 155:4; 175:1; 180:16
follows 10180:15
follows 109:20
food 169:16
foot 134:9
Forgive 45:15
forgotten 25:7
form 65:7

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

form 132:1, 25
formal 131:21; 135:1, 22; 139:6; 142:11; 157:24
formed 180:23
former 9:22; 16:17, 20, 22; 18:4; 25:14; 73:7; 162:20; 181:10; 184:3
forms 165:13
formulation 187:22
forth 111:5; 192:20
forum 20:17
forward 187:7
fossil 57:21; 175:12, 23; 176:10, 12, 20
found 10:1; 35:21; 82:5; 110:16; 123:9; 193:16, 17; 194:10
foundation 111:18
four 29:1, 2; 36:12; 81:18; 160:2; 175:11
four/four 114:20
frame 48:7; 49:15
frankly 4:16
fraternal 22:4
frequently 6:20
freshmen 110:19
Friday 7:15; 196:7, 8
front 8:4; 25:9; 56:18; 68:6, 9; 110:8; 157:14; 163:24; 167:17
fueling 170:15
full 6:8; 48:13; 65:24
fundamental 171:21
fundamentalist 171:24
further 27:24; 61:10; 76:18; 110:8; 199:24
furthermore 110:14
future 187:18

### G

gag 173:19
gaps 10:18, 20, 24; 109:4; 133:10; 168:20
gaps/problems 134:12
Gary 175:2
gathered 11:7; 56:20
gave 14:17; 19:20; 89:21, 24; 90:13; 125:12; 144:19; 161:11; 182:8; 197:15
gees 35:21
Geesey 74:13, 18; 75:1
general 58:3; 75:11
generally 4:8; 30:10; 64:9; 100:6; 142:18
generate 105:11
generated 152:5
generating 156:23
Genesis 74:4
gentle 64:13
gentleman 33:9; 171:22; 181:25; 192:2

gentlemen 199:21
Geologic 124:3
Georgia 100:12
gestures 4:9
Gibbs 179:3
gift 90:3, 12; 131:3; 194:3, 11
GILLEN 111]
Gillen 151
GILLEN 25:10; 46:13, 15; 90:25; 91:2; 120:23; 121:6; 136:24; 137:1; 153:6; 155:6, 8; 159:6, 9; 190:2, 5; 199:24
given 9:5; 11:22; 12:17; 15:3, 7; 57:14; 77:9; 79:24; 81:11; 90:13; 92:18; 95:4, 9; 107:10, 14, 19, 22; 114:16; 115:3; 120:10; 132:1; 145:18; 153:1; 166:4; 173:19; 174:9
gives 65:15
giving 36:20; 120:3; 123:16
Glass 24:20, 21, 22
goal 118:12
God 111:15
goes 94:17; 109:21
Good 12109:21
good 6:7; 9:14; 10:25; 14:22; 18:25; 20:19; 21:22; 22:17; 32:8; 52:2; 110:4, 22; 140:12, 21; 147:1; 197:14
grade 47:21, 21; 48:6, 23; 110:21; 126:12
grader 110:1
graders 72:16; 113:15
graduated 197:13
granddaughter 195:2
Grandview 6:12
granted 87:3; 110:2
great 25:24; 48:24
greater 109:21
greatest 100:22
ground 30:6
grounds 86:1, 9, 17, 18; 194:6; 199:2
group 8:17; 40:5; 124:9; 191:1
grouped 156:1
groups 12:14; 30:16
Grove 6:12
guaranteed 60:3
guess 16:21; 53:22; 66:10, 11; 81:12; 89:20; 126:19; 138:22; 140:4; 144:2; 159:11; 186:24
guessing 188:16
guide 132:24
guidelines 11:21
guys 67:15

### H

ha 161:22
half 170:13; 184:21
halfway 38:9; 75:21; 86:14
hall 52:5; 75:25; 79:20; 92:16; 93:4; 95:20; 135:16; 199:11
Hamilton 25:6, 12, 14, 23; 27:5; 28:5; 29:5, 7, 18
hand 15:2; 47:1; 50:25; 66:20; 92:19; 106:10; 116:3; 121:11; 130:5; 131:12; 132:23; 136:25; 146:2; 150:21; 155:13; 198:5
handed 77:5; 79:21, 23; 80:3; 119:15; 135:3; 143:21; 144:5; 145:21
handicaps 6:3
handle 42:8
handled 27:17
handling 28:14
hands 115:19
handwriting 51:4; 66:17, 18; 67:18; 76:24; 125:8, 10, 11; 130:8; 140:3; 180:7
handwritten 46:21; 76:19; 92:9, 17; 95:4; 121:10; 124:11, 20; 155:11, 20, 22; 158:12; 168:6; 180:16
hang 86:1; 87:2; 198:21
hanging 86:2; 199:6, 10, 18
happen 7:7; 59:19; 90:11, 23; 139:15; 140:20; 152:17; 194:13
happened 22194:13
happened 54:9; 128:11; 148:13; 167:1; 194:2; 196:16
happens 87:7
happy 19:8; 109:2; 117:22; 151:12; 153:10
harass 5:10
harassing 5:4
hard 9:5; 105:23
Harkins 20:15; 64:23, 25; 68:11; 69:1; 75:9; 78:4; 88:7; 90:19
hash 121:10; 172:25; 173:3, 6
hate 105:3
head 4:8; 24:17; 29:16; 43:21; 86:18; 123:24; 129:20; 135:23; 138:23; 194:5; 199:2
headed 75:23; 76:13, 19; 92:16; 95:18; 97:2; 124:3; 134:10; 147:5; 159:1
heading 95:2; 105:12; 121:12, 15; 130:14; 131:6; 173:8

heads 7:19; 54:13
hear 80:20; 84:15; 85:18; 88:17; 101:10; 112:7; 149:23; 186:24
heard 29:23; 52:5; 68:7; 88:19; 101:4; 112:6; 114:15; 115:4; 188:7
hearing 116:11
hearsay 171:10
heart 29:12
heated 73:9, 10; 162:23; 166:15
Heather 74:13; 75:1
hectic 129:5
Heidi 174:1; 191:12
held 20:16; 32:12; 106:23; 120:22; 130:4; 148:14; 155:7; 173:11; 174:11; 176:4
hereby 2176:4
hereby 476:4
hey 54:18
high 25:21; 86:19; 87:1; 110:17; 125:5; 197:1; 199:5
highlighted 27:11; 120:8; 122:22
highlighting 121:18; 122:23; 127:7
himself 28:14; 58:20
hint 194:20
hired 24:10
history 8:7; 82:18; 196:1
hold 44:19
holding 46:18
holdup 43:23; 44:24, 24
Holt 79:20
home 9:10, 12; 29:9; 34:4; 60:6; 68:17; 78:25; 89:4; 94:10, 23; 96:12
homework 181:4
honest 94:13
honestly 151:18; 174:23
honor 113:16
honors 25:17, 24
hoped 59:24
hours 15:6
house 17:5; 195:5; 197:6, 8, 21
hug 19:20
huge 199:10
human 4:21
humanly 168:13
hundred 161:25
hunt 13:25
hunting 103:8, 9; 196:15
hypothesis 111:19

### I

ID 11:20, 22; 153:11; 169:23; 175:25; 180:15
idea 34:17; 66:21; 83:13;

90:10, 16, 22; 96:12; 102:12; 123:5; 134:23; 135:10, 17; 149:25; 150:2; 151:9; 157:21
identification 121:5; 159:8
II 24:16
illegal 123:10; 160:18; 161:3
imagine 116:7; 137:17; 162:2
immediately 94:13
imminent 104:4
impact 176:16, 22
impacted 175:25
impair 5:20, 25
impending 157:15
implemented 72:14
Implicate 39:18
important 157:3, 23; 195:24
imprecision 4:21
impression 97:23
in-service 40:1; 61:18; 62:4; 107:24; 116:8; 196:6
inaccurate 178:25; 179:9; 191:11
incidents 27:6
inclination 140:21
including 131:25; 133:12; 134:16; 136:9; 145:4
indeed 57:17
independent 140:10
indicate 29:10; 119:1
indicated 11:4; 17:6; 37:23; 38:4; 55:9; 56:20; 62:24; 77:12; 83:9; 87:23; 92:2; 103:23; 157:11; 179:19
indicates 27:12; 28:19
indicating 47:13; 88:19
individually 32:2; 131:3
individuals 172:4
inferring 33:4
inflammatory 195:22
inform 149:5
information 8:16; 11:6, 8; 15:8; 17:16, 17; 38:19; 39:21; 82:22; 108:20; 110:10; 138:25; 168:2; 198:4
informed 115:7
initials 130:7; 155:3, 5
inkling 116:21
input 12:14; 88:24; 132:2; 140:23; 143:8; 148:12; 160:7, 13; 183:16; 187:25; 188:5
inquire 17:9; 18:6; 77:8
inquirer 124:21; 125:9; 126:21
inquiry 84:11
instance 111:14

Bertha E. Spahr
May 19, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

instead 50:14; 190:16
instituted 48:4
institution 38:23
instruction 45:21; 176:8
instruction/curriculum
132:24
insulted 167:11
integrity 161:23
intelligent 70:5; 75:17;
101:2, 4, 10, 14; 112:7, 10;
119:11; 121:17; 125:2;
131:25; 133:13, 14;
134:17; 136:10; 141:22;
144:13; 145:5; 146:8;
147:18; 148:18; 160:19;
161:8; 168:16; 169:6, 7;
170:3; 175:6; 184:5, 12,
17; 189:2, 6, 9, 11, 14
intended 172:12
intent 98:14, 14
interchanges 177:4
interest 32:14, 21
interested 27:5; 190:14
interesting 44:1; 52:16;
182:15; 183:13
interestingly 108:12
interim 142:1; 197:19
Internet 123:23
intervening 55:1
interview 184:9; 192:4
interviewed 179:24;
180:4, 9; 182:19; 184:7;
185:12; 190:17, 21;
191:14
interviews 180:20;
190:24; 191:5
into 20:13; 25:20; 49:8,
10; 62:11; 85:17; 106:11;
108:4; 109:21; 123:9;
142:20; 143:8, 12, 16;
144:17; 145:13; 149:18;
152:15, 22; 153:20;
160:25; 161:2; 168:17;
169:23; 183:16; 187:25;
193:15; 196:10; 197:17
introduced 12197:17
introduction 112:24
investigated 197:3
involve 10:1
involved 11:3; 21:8;
100:13; 107:24; 132:4;
174:16; 180:15; 186:18
involving 20:25; 52:7;
186:20
issue 9:8; 10:14; 20:6;
23:21; 27:19; 29:11, 24;
32:19; 35:16; 37:11;
38:20; 39:1; 41:4, 7; 42:13,
20, 23; 43:13, 16; 52:8, 13;
61:17; 62:20; 99:24;
102:13; 119:18, 21;
125:13, 15; 141:22;
148:11; 153:11; 157:13,
23; 159:18; 161:12; 164:5;
167:17; 169:22; 171:16;
175:6; 177:17, 21; 180:15;

184:14; 185:7; 186:6;
189:8; 190:22; 193:11;
194:17, 20; 198:13
issues 7:16; 13:24;
14:10; 34:2; 39:6; 40:17;
43:22; 57:8; 61:13; 62:22;
69:4; 127:13; 167:18;
176:7; 186:20
Italian 163:15
Item 103:15; 106:9;
154:4; 158:4; 195:22
items 45:8; 154:1, 6, 14,
20

**J**

J 96:7; 124:13, 16
Jane 19:13; 75:5; 186:15,
25; 187:3
janitorial 86:24; 193:21;
198:23; 199:9
janitors 199:5, 22
January 5:23; 22:7;
23:17, 20; 31:15, 24;
51:11; 60:1; 62:17; 63:20
Jen 10:19; 14:2; 15:3;
23:12; 40:5, 9; 55:14, 24;
57:2, 7, 7; 58:15, 16;
74:20; 76:10; 78:4; 87:15,
21; 88:2; 92:18; 93:12, 17;
99:3; 103:24, 25; 107:11;
108:19; 109:3, 11; 112:11,
23; 113:18, 19; 114:16;
117:10; 139:4; 143:19;
147:12; 165:3; 176:5;
178:15, 20; 180:7; 188:5,
7, 19; 190:15, 19; 191:2;
192:1
Jen's 58:3
jibed 50:4
job 43:5; 85:19; 130:1;
170:24
Joe 173:25; 190:19, 24
jokingly 108:4
Jones 76:17; 77:18; 80:6
jot 51:3
jotted 172:17
journal 125:1, 4; 126:22;
192:3
judgment 63:17
July 60:5; 79:3; 94:17;
96:7, 11, 19, 25; 101:1, 18;
106:7, 8, 15, 22; 107:9;
109:10; 114:17
June 64:1, 8; 65:8, 12;
66:8, 10, 16; 67:9, 12, 22,
25; 68:2, 7; 69:14, 18;
70:8, 13; 73:4; 76:20;
77:21; 78:23; 79:2; 80:19;
83:8, 21; 89:1; 91:5; 92:23;
94:9; 95:13; 96:4; 101:9;
104:9, 13; 107:17, 20;
108:17

**K**

Kansas 100:12
keep 29:15
keeping 150:25; 183:10
kept 170:15
kids 50:19
kind 33:4; 51:7; 99:6;
101:25; 104:1, 2; 117:22;
151:14; 180:22; 194:19
kindly 8:21
kinds 100:1
knew 27:16; 30:23;
65:24; 83:20; 104:4, 5;
149:16; 161:22; 182:16,
18, 22; 184:22, 25; 186:10;
193:23; 199:12
knowing 169:21
knowledge 9:16; 13:6;
12:15; 29:23; 35:4; 37:15;
61:24; 62:8; 67:13; 81:8;
85:13, 14; 87:22; 88:1;
105:22; 106:25; 110:10;
116:19; 117:3, 7; 127:6;
128:5; 129:2, 16; 142:16;
143:11; 163:21; 171:11;
180:5; 187:15; 197:25
known 117:11; 160:11;
163:4; 181:19
Knudsen 15:13

**L**

lab 111:12, 14; 112:2;
189:22
labeled 18:1; 35:16;
121:1; 144:8
labels 110:13
Labor 112:18
laboratory 189:11
labs 19:25; 126:11
laced 91:18
lack 117:21; 173:7
lady 186:13
laid 23:14
Langione 73:5; 158:20;
162:20; 163:9, 14; 164:7,
10, 12, 23; 166:22
language 61:2; 134:8
large 52:7; 81:15; 103:10
larger 102:19
Larry 24:22; 73:7; 193:25
last 7:10; 10:5; 21:19;
44:12, 18; 45:1; 89:3;
99:24; 107:24; 108:15;
112:16, 21; 133:8; 136:8;
137:10; 145:25; 152:9;
170:13; 183:2, 7; 192:18
late 81:14
later 32:15; 35:20; 94:7,
8; 154:12; 175:9; 177:16;
195:11
Lauer 124:13, 14, 16, 25;

125:11; 126:17
Law 14:18; 49:11; 70:6;
111:19; 161:20
lawsuit 16:23; 17:14, 15,
20; 18:7
lay 4:20
lead 76:11; 188:12
leading 11:20; 142:23;
149:15
learned 112:10; 196:17
least 29:22; 100:21;
129:5; 140:21; 193:2, 9
leave 28:23; 44:10; 65:7;
176:24
leaving 186:12
Leber 163:6, 8
Lebo 191:20
led 138:3
left 9:24; 10:3; 35:25;
44:10; 47:1; 57:14; 65:16;
70:2; 78:25; 94:10, 23;
96:3; 115:11; 136:25;
177:9, 11; 181:11
legal 168:1
legality 119:10; 122:11;
123:1; 125:25; 127:13;
168:4
legible 156:16
legislative 119:14;
123:21
length 74:4; 157:10
Lenko 79:19
Leslie 14:5; 56:2; 188:17
less 97:12; 100:3; 101:19,
21
lessons 60:8
letter 39:2
letters 125:13
level 48:23; 109:24; 113:1
62:24; 76:1; 78:25; 79:16,
19; 93:2; 94:12; 102:17;
104:10, 15; 114:19;
128:16
Levine 32:5; 44:4; 47:17;
line 8:4; 14:1; 51:1, 9;
65:15; 85:16; 116:1;
129:3; 131:10; 175:22
lined 156:18
lines 93:11
Linker 14:4; 56:2; 78:6;
188:17
linking 83:11
Lions 22:9
list 183:25

listed 39:2; 132:3; 134:6;
147:18; 154:18
listen 177:20
listening 123:15
lists 11:12
literally 40:14; 99:7;
100:22; 148:11; 162:21;
169:18; 196:21
litigation 10:7; 12:24;
31:16
little 4:15, 17; 82:16;
133:4, 18; 162:23; 164:22,
25; 166:14
live 153:13; 171:8
lived 82:24; 153:9
lives 10:15
load 48:14
local 190:20
long 13:24; 23:18; 24:8
longer 28:17; 58:21, 22;
69:8; 89:5; 90:1; 146:22
Lonny 73:5; 158:19;
164:10
look 5:23; 23:14; 25:3;
29:4; 30:8, 9; 31:8; 34:15,
22, 23; 36:18; 45:6, 13;
46:19, 23; 50:22; 55:22;
62:16; 66:13; 68:3, 25;
69:16; 70:4; 73:15; 75:15,
20, 21; 76:3, 25; 77:10, 12,
17, 22; 82:14; 92:11, 12;
94:25; 96:6; 97:2, 17; 98:9;
106:6; 107:11, 13; 110:9;
116:1; 124:6; 130:2, 5;
131:10, 13; 132:11;
136:14; 140:3; 141:16;
144:10, 10, 11; 146:10;
150:4, 5; 151:7; 155:1, 9,
12; 156:10, 20; 159:10;
162:12; 164:1, 9, 18;
167:13; 168:6; 173:2;
179:21; 185:3; 187:6
looked 8:4, 5, 6, 8; 35:14,
20; 47:6; 63:3; 80:19;
98:18; 102:21; 110:9, 16;
112:25; 124:2; 126:3;
135:2; 152:10; 155:16;
161:19; 162:4
looking 9:23; 14:16, 24;
32:12; 36:13; 45:8; 54:5;
56:9; 63:12, 20; 66:1;
92:15; 95:1; 98:19, 22;
99:17, 18, 21; 102:1;
103:5, 15; 105:12; 108:11;
136:17; 143:25; 150:15;
151:17; 152:1, 18, 23;
154:23; 172:7; 173:4, 8;
174:19; 196:1
looks 38:18; 82:17;
124:10
Lori 191:20
lose 60:16
lot 33:15; 74:16; 149:14;
193:9
lower 136:25
lunch 7:8; 147:15; 156:25
lunchroom 157:19

Min-U-Script®   Filius & McLucas Reporting Service, Inc.

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

# M

M 16:2
machine 192:21
magazine 125:3; 126:25;
192:7
main 59:2
maintained 112:25
major 40:17; 88:25;
179:12
makes 4:15; 5:12; 28:19;
122:23; 173:17
making 45:22; 46:16;
71:15; 178:18
Maldonado 173:25;
190:19, 24
man 25:24; 80:21, 25;
81:5, 8, 9, 17, 19; 82:19;
83:10, 12; 84:16, 18; 85:7,
22; 87:10, 24; 88:17;
193:15; 195:12, 16;
197:12, 24
man's 198:1
mandated 148:19
maneuvers 166:1
manner 29:18
manuals 110:13
many 30:7; 42:9; 63:2;
73:21; 74:4; 79:18; 109:5;
122:19; 142:1, 2, 5; 157:3;
160:4; 163:19; 165:18;
179:11; 180:20; 183:6;
185:8
March 25:6; 34:16; 62:17;
63:20
margin 184:17
mark 121:1, 2, 10; 159:6;
172:25; 173:3
marked 46:20; 86:13;
93:18; 121:4, 7; 132:17,
20; 159:7, 13; 173:6
market 105:1
marks 173:7
Marlowe 182:2, 3
marriage 21:9
master's 110:1
match 40:3; 49:2, 20
material 50:4; 109:25;
125:12, 17, 18; 126:3;
137:9; 173:1; 176:17;
192:25; 194:14
materials 8:22; 9:1;
11:19; 12:6; 17:23, 24;
67:1, 15; 119:25; 120:3, 5,
7, 14, 15, 18, 18; 125:21;
133:16; 147:5; 150:23;
168:3
math 19:5; 157:10
Matske 16:3
matter 10:7; 12:23;
13:21; 19:16; 20:10;
31:16; 41:18; 57:21;
59:20; 60:24; 61:1, 12;
62:3; 109:15; 192:13

matters 5:16; 50:10, 13;
134:14
may 4:13, 21; 6:16; 9:25;
35:14, 24; 37:22; 42:22;
52:4, 5; 53:11; 56:3; 61:1;
68:9, 21; 72:2; 80:17, 22;
83:13, 21; 88:20; 90:18;
122:7; 123:5; 127:4;
135:16; 140:4; 151:14;
164:19; 165:3; 173:16;
177:24; 191:6; 192:4, 11
maybe 52:24; 54:18;
69:1; 81:14; 90:22; 109:1
mean 7:11; 10:8, 24;
19:4; 20:19; 30:1; 61:9;
67:20; 70:21; 71:1; 84:19;
88:20, 21; 99:17; 102:22;
110:23; 111:4; 117:25;
119:3; 128:12; 132:15;
133:19; 134:25, 25; 142:4;
157:13; 162:15, 15, 18;
163:19; 164:11, 14, 24;
165:17; 166:25; 167:4;
173:22; 174:8; 176:7;
178:12; 184:18, 21;
187:18; 195:17, 24;
196:13; 198:8; 199:8
meaning 101:22; 119:17;
136:5; 161:7; 182:16
means 131:24; 165:2, 2;
168:9; 177:19
meant 91:25; 113:9;
149:25; 151:9; 181:23
measure 53:24; 58:14
mechanics 56:23; 89:23
media 8:24; 100:6;
173:16, 20; 190:18
medication 5:20, 25; 6:2
meet 22:22; 135:12;
137:22
meeting 11:25; 13:11, 14;
14:6; 15:16; 19:17, 18;
33:18; 34:19, 20, 21;
46:25; 51:12, 16, 18; 52:3,
9, 10, 11, 16; 53:15, 21;
54:19; 55:10, 12, 22;
56:16, 16, 23; 57:5, 12, 16;
58:17; 59:5, 13, 18, 20;
61:13, 14, 15; 64:7, 8;
65:6, 7, 12; 66:4, 15; 67:9,
12, 25; 68:2; 69:14, 18;
70:3, 8, 13, 19; 71:1, 9, 16;
73:4, 19; 74:5, 14, 15, 24,
25; 77:3, 6, 13; 78:21;
79:25; 80:8, 16, 17, 23, 25;
83:8, 17, 18, 22; 84:5, 22;
85:4; 88:6, 23; 89:1; 90:8,
18; 91:3, 8, 11, 23; 92:23,
25; 93:10; 94:3, 5, 6, 9, 22;
95:9, 12, 13; 96:16, 22, 25;
104:4, 13; 105:19; 106:1,
7, 11, 15, 16, 22, 23;
107:1, 4, 18, 20; 108:17;
114:17, 18; 115:9; 116:4,
13, 14, 15, 16, 19; 117:14,
18, 19; 119:8, 22; 120:1;
121:20, 22; 122:9, 16, 24,
25; 123:19; 124:7; 125:19,
21; 126:4, 15, 18; 127:5,

18; 128:3, 13; 130:4, 9;
131:5, 16, 18, 22; 132:5, 9;
135:1, 20, 22; 137:16;
139:7, 8, 9, 12, 22; 142:11,
21, 24; 143:4, 12, 16, 19;
144:18, 23; 145:13; 146:3;
147:23; 148:1, 23, 24;
149:15, 19; 151:2, 25;
152:5, 15, 22; 153:20, 22;
154:25; 155:10; 156:12,
22, 24; 157:1, 9, 18; 158:3,
4, 14, 16; 159:2; 163:20;
177:7; 172:18; 173:11;
174:21, 23; 175:1, 10, 14,
16; 177:9; 178:3; 179:4, 5,
19, 22, 23, 24; 180:3, 6, 8,
11, 19; 185:11; 191:16, 23;
195:11
meetings 20:13, 16, 24;
21:2; 22:23; 27:18; 39:25;
50:17; 52:7; 63:24; 64:24;
67:2; 70:21; 71:10, 17;
74:16; 78:7, 11; 80:18;
89:16; 96:18; 101:9;
105:25; 117:12; 127:10,
15; 128:6; 139:25; 142:1;
173:21; 185:3, 5, 14
member 16:11; 17:2;
21:3; 22:19; 25:14; 28:1;
35:23; 36:23; 37:5, 8, 14,
23; 47:13; 56:12; 61:21;
119:13; 120:8; 121:25;
123:20; 130:22; 160:12;
162:3, 11, 20
member's 36:4
members 7:7, 12, 24;
13:9; 16:17, 20, 23; 17:7;
18:4; 20:8; 22:20; 27:14,
18; 28:16; 63:22; 64:22;
70:15; 71:3, 4; 73:8, 11,
13, 13, 16; 76:8; 81:23, 24;
82:2, 3; 83:20; 101:13;
106:20; 114:12; 122:6, 10;
131:1; 135:2; 142:14, 17,
23; 143:6; 157:7; 160:15;
166:3, 6, 7, 11; 167:4, 16;
171:20; 172:2; 173:14;
176:25; 177:4, 15; 182:16,
23, 24; 183:21; 186:2;
187:11; 193:10; 197:19;
198:14, 17; 199:9
memberships 22:4
memo 13:3, 4; 27:8, 10,
10; 34:11, 15, 22; 35:2, 6,
19, 22; 36:3, 15, 16; 37:17;
38:22; 51:15; 53:18, 24;
136:22; 146:10; 150:4, 5,
11; 192:17, 24; 193:5
memorable 74:7
memory 54:7; 70:12
memos 35:9, 12; 136:18
mention 40:10; 41:21;
42:6; 131:25
mentioned 36:23; 39:9;
41:10; 45:18; 72:8;
119:21; 145:24; 190:6
mentioning 37:13
merit 189:17
messages 192:21

met 13:21, 23; 14:3, 5;
53:1; 107:8; 156:25
Michigan 100:13
middle 30:6; 96:10;
132:22; 141:2
might 5:20, 25; 9:10;
21:7; 23:14; 24:24; 40:25;
44:15; 56:19; 60:16;
66:21; 68:5; 82:13;
103:20; 122:6, 8; 127:22;
133:14; 135:18; 148:25;
168:18; 183:5; 188:7;
196:7
Mike 53:18; 54:6; 55:24;
59:7; 139:2; 141:1; 174:20
Miller 10:19; 15:3; 23:2,
12; 25:4; 29:4; 32:5; 34:22;
40:5; 44:4; 45:4; 46:20;
47:16; 50:23; 55:14, 24;
57:2, 7; 58:16; 62:23;
66:13; 75:21; 76:1, 10;
78:5, 24; 79:16, 19; 82:14,
18; 86:14; 87:15; 89:9;
92:11, 16, 18; 93:2, 12;
94:1, 12, 24; 96:6, 7;
102:17; 103:24, 25; 104:9,
15; 106:6; 108:19; 112:11;
114:19; 117:10; 128:16;
130:3; 131:10; 132:10, 20;
136:14, 17; 139:4; 141:7;
144:20; 147:13; 154:23;
155:9; 176:5; 178:16;
179:21; 190:16, 19; 191:2;
196:1
Miller's 180:7
Miller/Levine 92:17
mind 6:22; 46:19; 54:2;
66:12; 82:3; 88:8
mine 115:20; 130:8;
185:15
minister 171:13
minute 34:23; 45:1;
138:9; 156:10
minutes 66:14, 15, 25;
69:16, 17; 140:3, 8, 8;
151:22; 154:24; 156:12
mis-perception 69:2
Miss 64:23; 94:1
missing 193:16
mistook 117:4
modern 44:6
moment 120:21
Monday 66:16; 175:5;
196:7, 8, 10
money 71:19; 104:23;
117:22
moneys 118:3
Monica 182:2, 2
monkey 80:21, 25; 81:5,
9, 9; 83:10, 13; 84:16, 18;
85:8, 22; 87:10, 25; 88:17;
89:8; 193:15; 195:16;
197:25
monkeys 101:23; 195:12
month 65:13, 15
months 65:22; 192:18

more 4:25; 10:25; 14:18;
15:14; 44:6; 47:10; 54:24;
79:5; 80:21; 83:11; 85:12;
88:18; 90:24; 92:3; 98:8,
12; 102:6, 19; 110:19;
111:10; 125:25; 127:21;
171:21; 172:2; 173:17;
162:8; 186:25; 191:5;
195:25
morning 12195:25
morning 175:5; 196:11
Most 6:17; 7:10, 10; 8:19;
13:2, 8; 18:17; 48:10;
55:13, 15; 71:12; 97:12;
151:13; 156:16; 176:18;
178:20; 183:18; 188:13;
192:15, 17; 197:22
mother 182:3
move 129:7; 193:23
moved 48:21; 193:18
moving 186:14
Mrs 1286:14
Mrs 5:19; 17:11; 20:15;
64:23, 25; 73:3; 74:18;
78:4; 114:21; 124:25;
160:8
much 8:13; 27:1; 34:6;
39:12; 55:16; 81:9; 87:18;
111:14; 144:4; 158:25;
169:5; 173:17; 178:20;
183:25
mural 81:10, 15, 20; 82:6,
10, 18; 83:2, 4, 11, 14, 19,
23; 84:2; 85:24, 24; 86:22;
87:5, 10; 89:10, 12, 17, 22;
168:22; 193:12; 194:24;
195:19; 196:2, 3, 9, 18;
197:11; 198:15, 19, 21
murals 86:6; 199:7, 11,
19
must 45:17; 118:19;
130:10; 156:16; 160:8;
164:21
myself 13164:21
myself 78:5; 191:3

# N

name 14191:3
name 6:9, 10, 18, 25;
16:2; 21:19; 36:4; 183:5
namely 39:9; 40:5
narrow 118:1
National 15:23; 16:10, 11
nature 13:13, 13; 87:8;
99:10; 176:9
NCSE 15:22
Neal 23:4
necessarily 43:4; 103:6
necessary 41:5; 117:23
need 6:24; 39:3; 94:14;
105:5, 20; 129:24; 159:10;
170:19; 174:6
needed 62:5; 72:19; 89:5
196:12

Bertha E. Spahr
May 19, 2005

Tammy Kitzmiller, et al. v.
Dover Area School District, et al.

negative 168:10; 172:9, 10, 13, 19
neither 162:7
net 50:12
new 18:10, 11, 22; 19:25; 20:3; 25:12; 31:22; 32:1; 34:5; 44:2; 45:14; 48:6; 60:7; 62:6; 64:16; 65:19, 21; 68:22; 71:19, 24; 72:7, 15, 18, 22; 75:24; 99:21; 102:18; 104:5, 6, 7, 8, 19, 22; 105:1, 4; 106:11; 129:7; 181:20, 20; 196:12
newer 44:6
newest 71:11
news 8:24; 28:9, 10; 163:7; 180:19; 191:22
newspaper 169:19; 170:12; 191:7
newspapers 139:18; 190:20
next 41:14; 51:10, 11; 54:16; 60:21; 61:5; 69:16; 76:15; 83:1; 87:7; 89:7; 106:11; 124:9; 128:11, 15; 173:5, 5; 185:20
nice 157:21
Nick 16:2
nickname 6:16
night 139:22; 144:23; 166:2; 175:5
Nightline 180:18
Nilsen 59:9; 78:18, 18; 96:8; 99:5; 118:17; 141:1; 149:22; 151:3, 7; 162:9; 165:6; 168:8; 174:18, 20; 194:12, 13, 15
Nilsen's 96:14; 107:9
nine 27:3
ninth 47:21; 72:16; 110:1, 21; 113:15
nip 54:4
no-win 160:25
nods 4:8
Noel 19:15, 17; 167:6; 177:23; 186:8, 17, 22, 25; 187:1, 2
non-threatening 40:21
None 5:22; 17:6; 87:23; 131:9; 194:16
nonprofessional 169:25
nor 58:13
normally 112:20; 199:23
notation 66:20; 67:21; 68:3, 5; 92:18; 95:4; 106:10; 124:20; 130:13
notations 164:17
note 68:6; 70:5; 124:13, 23; 125:6; 138:8, 17; 141:4, 6, 13; 142:15; 144:14; 145:9; 146:5, 15; 147:8, 12; 150:15, 16; 154:24; 156:9; 164:25; 175:2, 17
noted 146:5; 147:1

notes 12:9, 11; 46:21, 21, 22, 24; 67:11, 13; 76:19; 77:21, 24, 25; 92:9; 113:4, 5; 124:11; 130:10; 155:11, 20, 20, 22; 156:11, 13, 14, 20; 159:3; 164:9; 165:3; 166:6; 172:7, 17, 20, 24; 174:25; 175:8, 15; 180:6, 7, 17, 18; 184:18, 19; 185:14
notice 182:10; 183:6
notion 171:2; 172:8; 189:20
November 11:3; 13:17; 15:16; 155:18; 176:23; 178:3; 179:20, 22; 180:3, 5, 8
nowhere 187:17
NSTA 16:9
nuisance 170:9, 22
Number 42:19; 45:5; 48:19; 50:24; 66:13; 98:2; 116:2; 117:19; 131:11; 136:23, 24; 138:14; 141:8; 164:2; 175:11
numbered 35:12; 45:8; 103:15; 128:18
numbers 67:3; 92:6

## O

oath 199:6
objected 134:20
objection 105:8
objections 505:8
objections 93:6; 159:12; 198:15, 19
obligation 126:11
observations 46:17; 111:17
obviously 11:7; 18:19; 38:6; 40:5; 41:4; 65:22; 68:10; 78:22; 79:13; 83:10; 85:12; 102:13; 109:20; 115:7; 130:12; 139:7; 141:19; 160:2; 164:8, 15; 168:21; 171:22; 173:17, 18; 176:11; 178:21; 179:6; 180:1; 181:10; 183:22; 193:13; 194:10; 196:17; 197:10, 18; 199:14
occasion 9:21; 15:14; 29:17; 45:25
occasions 12:7; 35:8, 18; 181:1; 187:3; 190:17
occur 7:25; 47:23; 94:17; 103:22; 150:2, 2; 151:12
occurred 34:21; 44:25; 55:10; 65:14; 71:2; 91:8; 96:17; 128:21; 154:12; 158:22; 164:22; 167:8; 195:20
October 8:6; 11:24; 12:15; 59:16; 124:21; 128:22, 24; 129:15; 130:2,

4, 11; 131:5, 13; 133:2; 137:6, 16, 18; 139:8; 140:6, 16, 17; 142:20, 24; 143:1, 1, 5; 144:18; 148:24; 154:25; 155:4, 10, 17; 156:22, 24; 173:11; 174:22; 175:1; 176:23; 177:1; 178:2, 7; 187:6, 8, 9; 188:3
off 13188:3
off 9:4; 15:4; 23:18; 46:16; 120:20, 22; 123:23; 155:6, 7; 158:24; 173:1, 6
offend 30:7; 43:8
offended 81:24; 82:2; 194:23; 198:9
offensive 82:6; 97:12; 100:21
office 27:17; 96:14; 107:9
often 4:4; 18:17; 35:22; 71:9; 81:17; 156:19; 166:23, 24; 177:5
oftentimes 173:21; 174:17; 177:22; 186:17; 190:18
old 68:12, 23; 97:15; 104:25; 105:9
older 22:20
once 87:18; 185:7; 187:15
one 8:17; 13:8, 8; 15:14, 25; 22:20; 35:12; 36:11; 42:19; 45:8, 25; 46:2; 47:18, 23; 48:1, 19; 49:14; 50:24; 52:23; 53:11; 55:15; 58:2, 22; 63:25; 64:1, 24; 66:15; 67:10; 68:15, 21; 70:21; 72:3, 11, 15; 74:17; 78:11, 13; 80:7, 7, 18, 21; 81:17, 20; 82:10; 85:5; 88:18; 90:8, 18, 24; 91:17, 23; 92:3, 15; 93:3, 14; 97:14; 99:2, 4, 7, 20; 100:16, 17; 103:25; 105:1, 4; 107:14; 108:12, 13, 14; 110:17, 24; 112:17; 117:20; 118:2, 22; 120:8, 10; 121:24; 122:3; 124:2, 16; 130:11, 12; 131:20; 132:16; 138:24; 144:6, 10, 12, 13, 16, 22, 22; 145:1; 146:9; 147:13; 150:10; 152:7, 24; 153:3, 4; 154:13, 15, 22; 155:4; 158:15; 163:14; 165:21, 21, 21; 170:9; 171:4, 22; 172:2; 175:10; 178:23, 23; 180:1; 181:25; 182:2, 3, 20; 183:1, 8, 16; 186:10; 188:8; 190:7, 13; 191:23, 25; 193:14; 194:21
one's 132:17
one-year 48:7
ones 67:8; 68:22, 23; 81:21; 114:6; 125:22
ongoing 53:13
online 114:1
only 10:11; 15:18; 24:13,

15; 47:22; 60:20; 64:18; 65:4; 67:10; 79:14; 88:20; 93:3, 14; 109:17; 110:12; 118:8; 122:16; 125:22; 144:22; 176:18; 183:1; 192:19
Onto 173:5
open 17:5; 90:21; 123:15; 170:12; 195:5; 197:6, 8, 21
opened 97:5; 158:17
openly 194:23
openness 119:1
opinion 101:2; 169:10; 189:8, 20
opportunity 72:7; 85:17; 90:13; 174:9
opposed 37:6; 58:25; 118:14; 170:3; 184:5; 189:13
opposite 130:14
order 31:22; 32:1; 38:18; 39:20; 60:2; 72:7; 75:25; 79:1; 173:19; 181:22
ordered 23:24; 45:1; 59:25; 61:5; 71:14, 24, 25; 72:17; 104:18; 117:24
ordering 8:7; 96:21
orders 60:4; 115:12, 19
ordinary 63:13; 150:25
organization 16:9, 13; 123:20; 191:25
organizations 22:5, 14
origin 33:16, 16; 52:13, 13; 58:7, 7, 9
original 145:4
originally 86:24
origins 138:20; 141:9, 13, 17, 20; 146:16, 19, 20; 147:17; 150:16
others 56:5; 57:25; 69:1; 144:23; 163:11; 164:4; 166:22; 172:3; 177:13; 180:25; 182:9; 183:24; 184:15; 185:9
ours 61:4
out 231:4
out 11:14; 15:25; 19:9; 23:15; 39:8; 43:6; 48:9; 60:4; 64:18, 21; 65:1; 68:19; 70:12; 72:17; 75:14; 79:2, 14; 82:10; 84:22; 88:8; 89:6; 93:12, 17; 94:16; 99:6; 103:8; 104:22; 108:24; 110:11; 113:10; 114:25; 116:13; 134:11; 141:11; 153:24; 156:5, 8; 159:24; 160:3; 162:21; 163:14; 166:13; 167:9; 168:20; 170:8, 19; 171:3; 172:13; 174:24; 175:9; 177:10, 12; 181:2; 194:1, 4, 10, 15, 21; 196:16
outside 20:17; 22:18, 25; 89:19; 90:4

over 8:4, 5, 6, 8; 15:2; 29:11; 34:20, 23; 38:25; 47:6; 52:8, 12; 58:9, 24; 82:10; 87:19; 101:24; 124:19; 125:15; 133:15; 144:4; 147:15; 149:22; 153:11; 156:25; 159:10; 164:1; 169:23; 177:15, 16, 17, 22, 24; 184:23; 196:5; 199:11
overall 112:1
overview 109:18, 19, 21
own 11:13; 33:22; 40:13, 18; 118:14; 125:16; 158:14, 18; 177:21; 185:1
owner 149:6
owns 182:5
oxidation 110:25

## P

p.m 200:1
pack 25:5; 75:22; 124:10
packet 16:6; 17:25; 46:19; 49:14; 66:14; 86:13; 119:16; 121:2; 126:14
page 46:22; 50:24; 67:8, 21; 68:6, 9; 70:4; 76:15; 82:15, 18; 92:6; 94:24; 95:1, 2, 17; 103:15; 116:2; 121:18; 123:25; 124:19, 20; 130:6, 6; 131:4, 11; 132:19; 144:22; 145:22; 150:7; 155:14, 17, 18; 164:19, 20, 20; 170:14; 173:1, 5, 5; 183:9
pages 46:24; 76:12; 93:18, 18; 144:20; 155:16
painted 81:15
Panda 11:23; 118:8; 132:2
Pandas 10:9; 20:11; 91:9; 101:15; 107:6, 10; 109:10; 112:12; 114:14; 115:2; 116:11, 20, 22; 117:2, 7, 15; 118:19; 119:2; 127:19, 23; 128:13; 130:18; 133:16, 20; 136:7; 137:10; 141:15, 18, 23; 142:5; 144:15; 147:4, 19; 150:22; 153:10, 15; 170:14
paper 13:25; 144:5; 156:18
papers 119:16
paragraph 27:11; 38:8; 41:14; 45:14; 97:7, 7; 103:16; 165:1
parent/teacher 197:5
parents 11:4; 33:23; 197:8
parliamentary 166:1
part 6:22; 8:19; 23:11; 34:14; 85:19; 128:25; 131:8; 133:9; 136:8; 147:19; 148:19; 152:9, 21;

Case 4:04-cv-02688-JEJ   Document 216-9   Filed 09/28/05   Page 64 of 69

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Bertha E. Spahr
May 19, 2005

161:5; 164:13; 168:11;
178:10, 18; 189:4
**participant** 138:2
**participate** 63:7; 179:16
**participated** 188:14
**particular** 30:24; 36:9;
46:2; 55:21; 56:10; 60:10;
94:5, 6; 102:1; 121:24;
129:11; 134:3; 197:23;
198:21
**particularly** 156:2
**particulars** 15:9; 29:13
**parties** 329:13
**pass** 48:9; 140:24
**passed** 49:22; 84:7;
152:3, 7; 164:13
**passing** 52:4
**past** 12:18; 42:4; 54:12;
109:6; 160:6, 6, 11; 187:18
**pastor** 39:10; 40:18;
171:24; 183:23
**Pat** 6:22
**Patrick** 15:22
**Paula** 13:21, 23; 14:3, 5,
7, 16; 15:2, 10, 12, 13
**pause** 4:18
**peanut** 29:6, 9
**pencil** 105:15
**Pennsylvania** 6:13; 8:9;
11:18
**PENNY** 25:8; 120:20;
136:23; 153:4
**People** 21153:4
**people** 6:17; 30:1, 7;
32:17; 33:19; 71:6; 86:1, 9;
87:16; 96:23; 97:12;
100:4; 101:15; 107:10;
108:12; 114:15; 115:2;
116:20, 22; 117:7; 118:19;
127:23; 130:18; 133:17;
136:8; 137:10; 141:15, 18,
23; 142:2, 6; 143:23;
144:15; 147:13, 20;
150:22; 153:10; 157:14,
19, 20, 25; 163:12, 19;
164:3; 165:12, 19, 22;
166:12, 16, 18; 170:10, 14,
20; 173:23; 176:18; 177:6;
190:18; 194:23
**people's** 81:6; 197:22
**per** 38:13
**perceive** 5:21; 6:1, 4;
12:12
**perceived** 45:20; 167:3;
169:2, 5, 6
**percent** 37:10; 161:25
**perception** 81:7; 85:13,
21; 139:17, 17; 159:19;
169:12; 170:2; 197:23;
198:1
**perceptions** 185:2
**period** 5:23, 24; 23:17;
29:25; 30:9; 31:8; 47:11;
54:9; 55:1; 62:17, 20;
63:12, 20, 23; 100:25;
112:6; 128:24; 129:14;

136:11; 137:12; 140:16;
142:13; 178:2; 185:4;
187:6, 13
**periodically** 54:6
**permanent** 86:2
**permanently** 86:7;
198:21, 25; 199:14
**permission** 87:2, 3
**person** 36:1; 76:11; 84:6;
86:21; 90:13; 94:13;
179:1; 188:10; 191:24;
197:3
**personal** 16:7; 29:23
**personally** 9:6; 16:14;
20:9; 55:3; 187:24;
198:15, 16
**personnel** 8:24; 194:17
**persons** 21:8; 187:8
**perspective** 23:9; 53:17;
128:12
**persuade** 180:25
**Peterman** 13:4; 28:25;
34:11; 35:3, 5, 9, 12;
36:19; 38:15; 41:25; 42:2,
12; 43:12, 19; 44:10; 45:7,
10, 22; 51:14, 22, 25;
59:11; 78:20; 192:17, 24
**phenomena** 171:15
**philosophically** 183:20
**philosophy** 169:8;
189:15
**phone** 192:20
**phrase** 83:10
**physical** 72:1
**physics** 9:22; 24:16;
56:5, 9; 72:1; 181:10
**physiology** 72:2
**pick** 29:9
**picture** 83:18, 23; 84:1, 2,
7, 13; 87:11; 97:7; 193:13;
194:24; 197:23
**pictures** 98:5; 102:10
**piece** 144:5
**pieces** 9:23
**place** 17:23
**place** 92:3; 96:10, 24;
100:12; 118:12; 165:12;
166:2; 169:8; 179:20
**placed** 118:9; 128:1;
133:15, 17; 141:15
**places** 4:2, 11; 100:1;
169:16
**Plainly** 21169:16
**plainly** 53:23; 137:15;
170:25; 198:8
**plaintiffs** 9:18; 10:20;
11:1; 13:20; 14:15; 15:13,
19; 192:10
**planned** 65:21; 132:23
**play** 187:24
**please** 4:5, 16; 5:9, 13;
6:25; 11:16; 40:18; 66:13;
106:6; 107:12; 142:25;
161:12
**pleasure** 25:21

**pledge** 153:25
**Plus** 118:4
**podium** 74:21; 163:25
**point** 18:12; 19:8; 27:16;
32:4, 10; 40:9, 15, 22;
49:5; 52:18; 56:4; 58:24;
74:2; 84:20; 87:15; 102:2;
103:8; 107:5; 108:24;
109:7; 114:19; 129:2;
130:21, 22; 134:14;
139:21; 154:9; 160:17;
167:3, 8; 168:20, 21;
169:15; 172:13; 174:14;
181:18; 188:10; 193:25;
194:16, 19; 196:6
**point-blank** 83:22
**pointed** 43:6; 64:17, 21;
65:1; 104:22; 159:24;
160:3
**pointing** 93:12, 17
**points** 45:5; 130:15;
160:3
**policy** 12:1, 13; 89:17;
90:1, 7, 10, 16; 131:6;
141:1; 184:24
**policy-making** 12:20
**poor** 64:12
**pop** 33:5
**portion** 172:7, 24
**pose** 164:12
**posed** 166:22
**position** 52:20; 148:5
**positions** 181:6; 182:12
**positive** 175:9
**positively** 168:24
**possession** 92:8; 114:7;
115:17; 122:20; 193:2
**possibility** 68:8
**possible** 53:25; 79:22;
118:24; 126:20; 157:4;
168:13
**possibly** 127:22; 161:3;
168:18
**potential** 129:13
**practical** 183:1
**practice** 12:18; 42:5;
109:6; 146:17; 150:17, 25;
160:6, 7, 11
**Prall** 14:5; 56:2; 188:17
**preceded** 64:2
**preceding** 172:11
**precise** 4:25; 11:1
**prefer** 6:14
**preliminary** 5:16; 6:7
**premium** 4:2, 11
**Prentice** 75:25; 79:19;
92:16; 93:4; 95:20
**preparation** 7:6, 23; 8:2;
9:18, 20; 16:18, 19; 79:2;
159:3
**prepared** 37:25; 57:10;
64:14; 94:15; 115:11;
139:7, 11; 153:20; 181:4
**preparing** 18:8; 105:21
**presence** 123:4

**present** 25:16; 27:19;
39:7; 40:13; 55:18, 25;
56:13, 18; 59:9, 11; 60:8;
64:4; 65:5; 78:3, 17; 80:4;
81:21; 84:8; 87:23; 104:6;
108:20; 135:8; 146:20;
157:4; 176:16; 183:21;
185:12; 187:10, 13;
191:16; 192:25; 193:10
**presentation** 17:3;
18:22; 27:14; 30:17;
31:19; 39:23; 50:4; 57:13;
62:3; 97:20, 24; 98:7;
99:13; 131:3; 158:23;
159:4
**presented** 28:10; 29:19;
31:13; 33:14; 37:11;
39:22; 40:8; 49:7; 50:13;
88:3; 103:7; 113:3;
123:24; 125:16; 131:22;
132:6; 136:16; 137:24;
178:7; 197:13
**presenting** 49:9; 50:9;
119:10; 122:12
**presently** 21:4
**president** 21:2; 67:4;
75:12; 162:8; 174:15
**Press** 76:17; 80:6; 191:22
**presumed** 47:25
**pretty** 9:14; 19:4; 34:6;
64:14; 87:18; 111:14;
113:13; 118:1; 129:8;
140:21; 158:25; 163:15;
164:1; 178:20; 183:25
**previous** 197:10
**previously** 23:24; 99:1
**primarily** 89:7; 164:7;
178:23; 190:14
**primary** 22:21; 126:10;
182:14
**primate** 98:2
**primates** 98:3; 101:22;
102:14
**principal** 25:20; 28:20;
41:23; 43:14; 115:21;
193:25; 197:1, 2
**principalship** 28:20
**print** 99:23, 25; 100:5;
146:1; 174:7, 7; 190:10
**printed** 17:23, 24;
123:23; 192:6
**prior** 17:19; 18:2; 23:19,
19; 30:10; 31:8; 49:25;
64:8; 65:8; 96:24; 110:11;
119:25; 126:4, 4, 14, 17;
128:17; 137:15; 139:23;
143:18; 146:2; 151:24;
154:1; 156:22
**Priscilla** 124:13, 16;
125:11
**privy** 51:19
**probably** 18:25; 48:8;
49:22; 66:23; 68:19; 85:4;
90:9; 96:20; 97:12;
104:21; 139:5; 140:23;
158:15; 170:12; 192:18,
21; 197:14

**problem** 18:22; 33:5;
43:24; 46:5; 53:25; 104:6,
7, 8
**problems** 133:10
**procedure** 17:9
**process** 257:9
**process** 4:5, 20; 5:7;
12:20; 40:3; 46:17; 49:18;
76:9; 95:23; 143:3;
178:10, 18; 184:9
**processes** 176:12
**produce** 76:5
**produced** 12:2; 14:14
**product** 76:16
**production** 23:11
**professional** 22:14;
63:16; 123:20; 160:14;
161:19; 163:1
**professionally** 168:25
**professionals** 63:10
**professors** 110:18
**profile** 76:16
**project** 20:3; 81:13;
112:17, 20; 186:18, 21;
194:3; 198:2; 199:20
**property** 149:6; 182:5
**proposal** 140:18, 22
**proposed** 32:1; 140:15;
147:3; 163:18
**proposing** 18:11
**protect** 165:5; 168:8
**provable** 189:21
**prove** 111:12, 15
**proven** 111:3, 8, 11;
189:10
**provide** 66:24; 120:18
**provided** 8:10, 17, 21;
114:5; 120:25; 137:14;
147:24; 168:3
**PSEA** 179:14
**PSSA** 39:5
**PTA** 197:5
**public** 45:14, 17, 18;
71:6, 6; 73:8, 11, 16, 18;
74:3, 6, 11; 125:23;
139:22, 23; 143:4; 153:23;
154:1, 3, 9, 10, 13, 17, 19;
158:5, 13, 17; 163:4, 12,
17; 164:4; 167:13; 169:23;
170:10
**publicly** 159:17; 162:10
**published** 110:9, 12
**publisher** 110:10
**publishers** 19:7
**publishing** 110:12
**purchase** 10:8; 46:17;
51:19; 79:1; 94:18; 97:14;
114:18; 115:12, 19;
117:23
**purchased** 65:10; 72:9;
100:19; 115:24
**purchases** 100:17
**purpose** 1400:17
**purpose** 5:4, 10; 49:9;

Bertha E. Spahr
May 19, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

39:6; 135:21; 141:6;
142:9; 147:18; 156:23;
157:16; 159:16; 165:5;
168:7
**purposes** 6:15; 82:16;
183:1
**pushed** 85:5
**put** 7:18; 10:15; 42:24;
67:15; 72:21; 163:19;
181:5; 187:15
**putting** 111:5; 128:13;
133:19, 23; 153:15;
160:23

## Q

**quick** 45:6
**quite** 28:13; 29:3; 64:20;
134:3
**quotations** 191:15
**quotes** 191:12

## R

R-o-w-a-n-d 172:1
**radio** 175:3, 4
**railroaded** 160:5
**raise** 33:24
**raised** 32:18; 88:11, 21
**ran** 182:12
**rare** 187:3
**rather** 71:1; 129:5;
156:18; 181:6
**rattled** 164:23
**reach** 160:1
**reached** 61:14; 127:22
**react** 88:9, 9
**reaction** 133:5
**read** 8:5; 11:14; 19:19;
41:16, 16; 46:10; 74:4;
97:7; 107:13; 109:17, 21;
110:4; 111:1; 113:6, 9, 24;
118:11; 120:6; 122:13;
125:5; 126:12; 138:19;
150:6, 6, 11; 164:21, 25;
172:12; 178:8; 185:25;
188:22; 189:1; 191:17
**readability** 112:24;
113:1; 117:21; 118:6
**reading** 103:5; 109:24;
185:22
**reads** 141:13, 20
**real** 140:20
**realign** 49:24
**realigning** 49:19
**realize** 44:7; 184:20
**realizing** 49:21
**Really** 25:25; 29:13;
32:11; 50:12; 52:3; 72:13;
84:18; 127:7; 134:2;
139:9; 165:2; 167:1
**rear** 195:7
**reason** 14:5; 32:11;

34:24; 35:25; 36:9; 55:19;
56:10; 65:17; 69:21, 25;
78:13; 79:12; 83:16; 86:8;
105:2; 124:24; 185:6;
186:16; 187:5; 199:15
**reasons** 68:21; 166:9;
188:23
**rebutting** 172:20
**recall** 31:9; 36:24; 37:1,
5, 13, 16, 20; 38:15; 41:24;
42:12; 44:11; 45:21;
47:10; 50:16, 19; 51:24;
54:20; 55:11; 56:24; 57:3,
20; 58:15; 59:5, 7; 61:19;
66:8; 70:15, 23; 71:15;
73:2, 22, 25; 74:10, 13;
75:2; 77:24; 78:15, 17;
79:5, 7; 80:16; 81:1; 87:21;
88:12, 23; 89:10; 90:15;
93:10; 94:2; 95:5, 7, 15;
103:17, 21; 107:18;
108:16, 17; 109:3; 112:22;
113:22; 114:8; 117:1, 14,
18, 19; 118:15; 120:3;
121:25; 122:5; 123:1, 12;
127:12, 17; 128:8; 132:6;
134:21; 137:14; 138:6;
141:3, 5, 9; 142:22; 147:7,
11; 150:15; 158:13, 21;
166:18, 19; 167:15, 19;
174:19; 176:25; 178:1, 4;
184:10; 192:12
**recalling** 78:3; 80:15;
122:17
**recalls** 36:6, 10
**receipt** 115:14
**receive** 35:2; 130:25
**received** 9:8; 14:10, 13;
16:5, 12; 27:10; 35:6;
77:20; 92:24, 25; 94:11;
96:2; 105:4; 126:17;
137:6; 144:21; 156:4;
162:22
**receiving** 95:24
**recent** 13:8; 182:14;
192:17
**recently** 13:2; 172:2;
192:15
**Recess** 46:14; 91:1;
190:4
**recipe** 29:6, 10
**recognize** 67:17; 76:21,
22, 23; 95:20; 96:5
**recollect** 6:4; 7:19; 54:14
**recollection** 11:16;
37:17; 47:7; 51:7; 54:8;
56:15; 69:13; 70:7; 82:15;
90:6; 91:12; 96:20; 107:8;
116:9, 16; 131:8; 135:17;
140:10; 152:21; 168:11;
173:9
**recommendation** 32:4;
97:14; 138:10, 13
**recommended** 64:17;
146:12; 150:12
**record** 13 150:12
**record** 14 50:12

**record** 4:9, 11; 6:9; 28:6;
41:17; 57:22; 120:20, 22,
23; 132:19; 138:12; 153:4;
155:6, 7; 175:13; 188:22
**records** 175:23; 176:11,
12, 20
**recounts** 36:19
**red** 37:24; 53:25
**Redding** 194:1; 196:25;
197:2
**redesigned** 81:22
**redone** 186:19
**Reeser** 86:15, 17, 21;
87:3; 194:5; 196:19;
198:5, 8, 12; 199:1
**Reeser's** 195:2
**refer** 66:22; 133:16;
190:19
**reference** 28:19; 40:17,
19; 46:7, 11; 51:12; 69:10;
74:19; 86:14; 100:24;
116:3; 118:9, 13; 125:8,
12, 21; 126:20; 127:19;
128:14; 131:16; 132:3;
133:15, 20, 25; 134:3, 5;
136:7, 19; 137:9, 9;
141:15; 142:9; 144:15;
146:8; 147:3; 150:22;
153:16; 164:10
**referenced** 14:13; 45:7;
46:25; 50:3; 58:11; 62:10;
65:8, 12; 96:17; 103:11,
14; 111:7; 112:4; 119:8;
138:1; 141:4; 144:19;
147:22; 168:1; 175:18;
192:9; 197:5
**references** 89:9; 92:2;
93:7; 96:7; 130:19; 136:22
**referencing** 15:12; 28:5,
6; 33:18; 38:10; 39:14, 16;
53:9; 92:9; 100:8; 122:9;
166:2
**referred** 83:3; 134:8;
174:14
**referring** 47:16; 68:10;
71:21, 21; 80:7; 100:5;
137:2; 154:20; 165:7;
172:11, 24
**reflect** 8:23; 106:12;
156:3
**reflected** 51:15; 53:23;
99:22; 151:22
**reflects** 146:16; 150:17;
156:2
**refresh** 11:15; 82:15;
173:9
**refuse** 198:24
**refused** 86:1; 199:12
**regard** 88:13; 189:20
**regarding** 11:19; 18:10;
33:11
**regular** 22:23
**Rehm** 9:21; 10:3; 56:3, 9;
114:9; 181:9, 10; 184:1, 16
**reject** 90:3
**rejected** 138:11; 140:19

**relate** 9:11; 46:25; 49:5;
67:11; 95:23
**related** 9:13; 10:1; 27:7;
53:19
**Relatedly** 4:10
**relates** 83:3
**relating** 9:3; 15:10;
31:19; 42:13; 47:7; 51:19;
59:20; 61:12; 63:15, 23;
67:8; 70:7, 23; 75:2; 89:11;
90:7; 103:19; 106:21;
128:8, 25; 134:22; 141:6;
155:10; 180:12; 187:21;
188:19
**relations** 21:9
**relationship** 8:8; 21:20;
22:18, 18, 25; 68:14;
85:23; 187:1
**relative** 115:20
**relatively** 32:8; 85:4;
161:17; 163:24; 171:24;
184:6
**relied** 63:16
**religion** 46:4; 123:22;
125:23; 127:2
**religions** 169:9; 189:16
**religious** 30:3; 42:10;
43:2; 45:21; 79:14; 82:6;
121:14; 123:7; 170:17;
194:22
**relying** 34:11; 168:2;
198:8
**remainder** 185:4
**remained** 177:13
**remember** 15:9, 18;
17:15; 37:3, 8, 22; 38:3;
42:14; 43:11; 45:25;
53:20; 56:5, 22; 63:25;
64:19; 68:1; 70:9, 25; 71:6;
73:16; 75:13; 78:19;
84:23; 90:9; 91:9, 19, 21;
92:5; 93:12; 101:11, 12;
112:18; 113:6; 114:14;
118:8; 120:5, 5; 123:16;
124:6; 129:6; 140:5;
141:12; 142:19; 144:4, 7;
147:15; 149:21; 152:10;
158:16; 163:16; 165:9;
167:15, 24; 177:7; 184:19;
185:13, 18, 21; 192:1, 5;
193:3, 5
**remembered** 36:11, 13;
107:16
**remembering** 84:21
**remembers** 36:2
**remove** 176:2
**removed** 98:1, 5; 102:11;
136:8, 10; 137:10; 153:12;
194:7; 196:21
**rents** 182:6
**rep** 93:5; 94:10
**repeat** 142:25
**repeatedly** 189:23
**replacement** 182:11
**reportage** 174:1, 4, 9
**reporters** 173:24, 24, 25;

177:14; 190:7, 11
**reporting** 172:5
**represented** 117:6;
179:13
**reprint** 126:23; 127:1
**reps** 158:1
**request** 40:12; 42:7;
63:13; 72:21, 25
**requested** 11:8; 86:5
**required** 48:6; 49:20;
50:1
**research** 17:17; 18:1;
27:4; 110:14; 113:25;
119:10, 12, 15; 121:1;
125:16; 126:14; 177:21
**researched** 123:22
**reservations** 94:4; 112:4
**reserved** 6 112:4
**resigned** 172:3; 177:17;
185:17, 19; 186:9
**resolution** 11:21
**resolve** 53:14; 78:24;
161:13; 186:5
**resolved** 185:7
**resources** 133:16;
147:5; 150:23
**respect** 5:14; 8:13; 24:7;
98:21, 23; 129:13
**respective** 3 129:13
**respond** 4:4, 6; 5:21; 6:5;
13:5; 30:19; 84:10, 12, 17;
161:9
**responded** 13:5; 37:25;
87:16; 193:6
**responding** 74:11; 85:1;
123:12
**response** 8:11; 14:14;
73:18; 113:12; 120:24;
130:25; 131:2; 158:22;
162:6; 189:24
**responses** 55:16; 57:2;
123:8
**responsibility** 179:10;
199:4
**rest** 34:6
**resubmit** 62:23
**resubmitted** 60:2; 63:4
**result** 49:8; 50:12; 89:19;
105:20
**retained** 7:2
**retirement** 24:19
**returned** 112:13; 115:7
**Reverend** 172:1
**review** 8:3; 63:1, 7; 79:22;
80:1, 10; 93:4, 15; 96:9,
14, 23, 24; 98:9; 99:10;
102:4; 107:20; 109:12, 15;
112:8; 191:4
**reviewed** 32:3; 79:18, 21;
93:1; 96:8; 102:15;
106:17; 109:23; 110:16;
117:2
**reviewing** 8:2; 99:12, 16;
101:17, 18
**reviews** 97:4

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Bertha E. Spahr
May 19, 2005

revise 62:5
revised 11:25; 62:6
revision 62:9
revisited 32:25
revolved 193:11
reworking 179:17
rewriting 40:3
rewritten 49:1
rewrote 49:16
Richard 78:18
Riedel 28:24; 44:14
Right 20:21; 27:21; 29:3; 31:3; 33:24; 45:2; 50:25; 54:17; 62:9; 66:1, 20; 80:13; 82:1; 83:5; 90:3; 92:18; 94:9, 19; 103:12; 106:10; 116:3; 121:11; 130:5; 131:12; 132:23; 133:21; 135:16; 136:24; 141:17; 147:5; 149:9; 150:7; 155:2, 3, 13, 23; 162:19, 23; 167:10; 182:20; 183:2; 185:24; 187:13; 196:4
Rinehart 79:20
rival 149:16
Road 6:12; 12:10; 30:6
Rob 14:2; 15:3; 36:5; 56:7; 67:20; 74:19; 78:5; 94:11; 113:21; 117:12; 135:15; 143:19; 147:13; 171:12, 14; 190:16; 191:2; 192:1
role 25:15; 187:25
roll 153:24
rolling 154:7
room 9:24; 35:25; 43:9; 48:12; 64:2, 8; 77:15; 82:11; 83:1, 15; 86:11; 135:13, 17, 18; 181:17; 193:12; 194:7, 15; 195:1, 7; 196:10; 197:12, 18; 198:22
rooms 81:20; 129:7; 131:20; 186:19
Rothschild 11:3; 12:6, 23
roughly 15:6; 48:7; 49:23
round 143:20
row 192:22
Rowand 172:1
ruling 161:1
rumblings 27:12
run 54:12; 71:4
running 10:13; 183:12

## S

same 5:1; 14:5, 17, 23; 22:12, 13; 23:2; 47:22; 59:20; 65:3; 72:9; 74:5; 77:22; 79:15; 80:5, 21; 81:5; 88:18; 98:23; 103:16; 154:18; 176:9, 15; 179:3; 189:23; 191:11
sandwich 169:17
Sandy 22:19, 20; 66:23, 24; 68:5; 174:13, 13
sat 13:12; 21:1; 33:15; 81:20; 83:15; 105:5; 162:5; 182:15; 185:1; 194:25
satisfied 57:13; 151:12
satisfy 111:22
save 25:3
saw 29:23; 59:19; 92:14, 22; 126:1; 133:1, 6; 134:2; 150:24; 195:6; 197:20; 198:2
saying 30:23; 37:5, 8; 40:23; 44:23; 50:19; 54:4; 73:25; 80:24; 85:21; 88:1, 23; 91:19; 93:17; 101:9; 108:19; 109:3; 149:23; 163:8; 167:14; 170:9; 186:25
SB 66:20; 67:11
Scale 124:3
schedule 197:7, 9
school 9:13; 10:4, 13; 11:25; 15:4; 16:13; 17:4, 8; 21:3, 10, 11, 14, 16, 18, 24; 22:6, 6, 25; 23:23; 24:4; 25:21; 41:19; 44:12; 45:3, 14, 17, 19; 50:16; 62:18; 63:6; 65:16, 20; 66:5, 7; 76:13; 77:7; 78:8; 79:1; 81:11, 25; 82:5; 86:6, 19; 87:1; 89:3, 3, 14, 22, 24; 94:10; 95:18, 25; 96:3, 18; 106:20; 108:15; 110:17; 112:13, 15, 20; 125:5, 23; 128:17, 21; 129:4, 9; 135:15; 142:17; 149:7; 161:1; 162:3; 170:18; 171:23; 190:11, 21; 195:3, 19; 196:22; 197:1; 198:20; 199:5
schools 9:3; 76:15; 79:14
science 7:22; 8:15; 13:9, 22; 15:24; 16:10, 11; 17:2; 19:25; 24:17; 25:19; 28:1; 29:16; 30:23; 31:10; 34:1; 38:5, 20; 42:25; 47:20; 49:25; 51:6; 56:1, 12, 17; 57:24; 60:24; 64:5; 69:23; 70:18; 71:11, 23, 23; 72:1, 5, 12; 81:12, 20; 85:1; 86:5; 103:18, 18; 106:20, 21; 107:19; 110:5, 22; 111:13, 18; 117:6, 20; 118:10; 119:3; 121:16; 123:6, 23; 124:18; 127:2; 129:11, 19; 135:5, 23; 136:16; 137:8; 138:10, 25; 139:13, 16, 18; 140:14; 141:5; 143:8, 14, 19; 147:12; 148:4, 8, 13, 23, 25; 150:24; 151:4; 152:25; 153:9; 156:21; 157:3, 5, 8, 22; 159:20, 25; 160:21; 168:12; 169:9; 173:15; 175:12, 18, 21, 21; 176:20; 177:10; 178:19; 179:1; 182:17; 184:4; 186:19;
sciences 64:10; 65:9
scientific 57:20; 124:25; 189:21
scientifically 178:25; 179:9; 189:10
scientist 113:10
scoped 180:22
score 9:9; 183:11
Scott 14:19; 179:2, 13, 20
scream 80:22; 84:16; 88:19
scribbled 68:5
se 38:13
sealing 48:13
seat 162:21
second 27:11; 45:16; 50:2, 23; 72:3; 104:1; 133:9; 146:11
Secondly 48:20
secret 14:22
secretaries 120:10
secretary 105:17; 115:21
section 82:16; 138:18; 153:12; 165:19; 173:6; 176:3
security 181:21
seeing 36:2, 7, 10, 14; 77:24; 86:22; 95:5, 7; 152:19
seeking 29:5
seem 84:21; 117:1
seemed 57:12; 181:25
seems 8:14; 12:19; 20:5; 23:18; 27:23; 28:4; 29:21; 40:23; 44:9, 20, 23; 52:18; 53:19; 68:25; 103:9; 105:8; 107:5; 111:25; 112:1; 140:9; 147:20; 149:14; 155:25; 163:8
select 18:9
selected 91:24; 151:5; 182:18; 183:23
selection 19:2; 20:10; 31:17; 33:12; 63:4, 15
semester 42:21; 55:21
send 11:8, 10; 31:23; 35:10
senior 81:13; 188:13
sense 30:25; 34:9, 12; 44:20; 52:19; 55:5; 56:15; 57:4, 14; 58:4; 60:6, 14; 65:8; 82:13; 87:5; 99:10; 102:22; 122:5; 135:11; 143:3; 146:14; 151:14; 152:16; 169:11; 170:6; 173:18; 183:17; 189:7; 198:6
sensitive 31:5
sensitivity 5:14; 31:11
sent 11:17; 17:16; 32:5; 60:4; 93:4; 94:11; 135:4;
136:6; 193:1
sentence 38:9; 45:16; 80:21; 81:5; 84:19; 88:18; 103:5, 6; 137:12; 152:9; 184:18, 23
sentences 4:11; 41:15
sentiments 159:15
September 59:16; 112:15; 139:25; 140:6, 9
September/November 126:22
sequence 72:18
series 168:7; 172:9
serve 113:2; 115:2; 118:5
served 14:15; 21:13; 116:17
services 86:25
set 176:25
set 8:17; 14:23; 18:3; 23:10; 50:23; 67:10; 69:16; 72:11; 107:22; 120:25; 121:10; 126:12
sets 48:11; 130:17, 19
setting 169:25
settled 181:23
seven 72:6
seven-year 60:20; 61:4; 72:6
seventh 48:22
several 6:17; 7:24; 12:7; 63:24; 99:24; 103:14; 182:10; 193:12
shall 62:11
shared 22:4; 98:4; 104:3; 135:4; 156:19; 184:20
shed 181:23
Sheila 68:10, 10; 69:1; 75:9; 88:6, 7; 90:19
Sherrie 183:5
Shiloh 179:4
shop 169:17
short 168:15
show 46:2; 98:22; 109:4; 157:21; 175:4
showed 98:21; 168:15
showing 132:19; 157:16
shown 83:19; 159:1
side 20159:1
side 12:9; 96:15, 15; 106:10; 145:2; 162:23; 166:15; 177:18
sides 118:18
sign 10:16
significance 103:20
significant 133:6; 137:7
silence 181:17
simply 30:17; 40:10; 44:2, 5; 56:12; 88:17; 90:20; 127:23; 154:10; 157:11, 18; 168:12; 175:8; 176:2
simultaneously 74:20
singled 75:13
sit 5:19; 7:11; 34:2; 53:6,
19; 58:4, 12; 70:12, 24; 127:3; 161:13; 166:20; 192:12
sitting 43:9; 84:6; 85:24; 86:10; 97:18; 116:18; 143:20; 162:9; 163:23; 165:22; 166:12; 195:7; 197:20; 199:16
situation 29:13; 40:21; 52:25; 111:13; 112:2; 147:22; 160:25; 170:5
six 68:12
skeptical 124:21; 125:9; 126:21
small 8:22; 50:23; 170:16
Snook 73:7; 166:23
snow 42:22; 66:9
social 22:25
society 72:13
soften 102:19
softened 100:23
sole 64:13
solution 104:7; 118:24
somebody 43:8; 61:5; 77:6; 84:3; 113:8; 115:7; 119:12; 120:13, 13; 169:20; 197:24
someone 12:11; 73:20; 165:17; 198:11
someone's 123:4
sometime 38:7; 77:21; 91:5; 94:22; 95:10; 197:18
sometimes 4:18; 5:1; 12:8; 43:20; 67:4; 78:7; 81:6
somewhat 32:25; 42:25; 73:9; 132:15; 139:16; 148:8; 165:4
somewhere 71:17; 89:16; 113:4; 137:21; 138:7, 16; 142:3; 147:15
son 10:15; 55:19
soon 38:7
sophisticated 113:13
sophomore 110:19
sorry 19:20; 52:15; 117:4; 152:6; 173:25; 180:2
sort 4:1, 5; 15; 50:7, 12; 58:5, 15; 97:4; 100:8; 103:11; 132:9; 141:2; 143:2; 170:7; 172:16, 25; 188:14; 197:6; 198:6
sounds 80:11; 135:19
sources 89:19
SPAHR 99:19
Spahr 12:19
Spahr 5:19; 6:10; 21:19; 46:23; 96:8; 115:20; 121:3, 4, 7; 155:14; 159:7, 14
speak 7:21, 22; 15:12, 14; 35:5; 57:24; 112:11; 143:5; 157:6; 164:4; 166:24; 173:16; 174:9;

Case 4:04-cv-02688-JEJ   Document 216-9   Filed 09/28/05   Page 67 of 69

ertha E. Spahr
lay 19, 2005

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

77:22; 181:9; 185:25;
36:2, 12; 187:2; 191:18,
4

peaking 15:18; 50:16;
1:3; 167:16; 177:14

pecies 33:17; 52:13;
8:7, 9, 25; 59:1, 3, 4

pecific 32:22; 47:11;
0:9; 56:24; 57:9, 20;
1:19; 69:21; 70:11; 71:8;
3:17; 79:5; 82:3; 91:15,
2; 92:24; 98:12; 103:1;
54:6; 198:4

specifically 7:11; 13:17;
4:10; 15:11; 36:6; 54:14;
56:22; 58:2, 6; 65:17;
74:12; 75:10, 11, 13;
80:14; 84:4; 87:9, 22;
88:25; 118:15; 121:23;
122:4; 134:20; 140:5;
159:21; 164:6; 171:19;
177:3, 7; 181:1, 9; 182:4;
184:16; 191:5, 15, 19, 21,
25; 192:6

specifics 70:10, 24, 25;
71:3; 80:16; 166:19;
167:15

spend 117:22

spoke 9:25; 10:23, 24;
33:10; 61:17; 71:9; 73:6, 8;
88:11; 154:22; 163:12;
166:23, 23, 25; 176:5;
190:15; 192:15; 198:12

spoken 7:5; 9:21; 10:6,
11, 20; 12:22; 13:1; 15:20;
16:20, 22, 25; 18:5; 19:15,
17; 20:9; 39:20; 156:21;
170:18; 187:7, 11; 191:21

spray 132:22

Spring 6:12; 32:15;
33:10; 34:4, 10, 13; 55:21,
21; 83:17; 95:5, 11; 96:1;
127:11; 128:7

stack 155:1

staff 7:24; 22:21; 36:1, 4;
86:24; 139:16; 146:13;
150:14; 152:20; 157:22;
160:14; 162:11; 188:4;
193:22; 198:23; 199:9, 10,
18

stamp 138:13; 141:8

stamped 128:18; 132:21

standard 39:1

standards 8:9; 11:18;
38:14, 25; 40:2, 4; 41:6;
49:2, 6, 13, 21; 62:6, 12;
129:24; 148:17, 20

standards-driven 38:23

standing 197:14

standpoint 98:10, 19;
101:19; 106:16; 137:8

stands 163:14

stapled 124:9

start 24:3; 56:14; 65:20;
71:5; 89:2; 112:15; 129:9;
143:18; 147:23; 153:22;
158:24

started 34:4, 9; 153:24

starts 134:11

state 6:8; 8:9; 11:18;
38:11, 25; 40:2, 4; 41:6;
49:2, 6, 11, 12, 20; 62:6,
12; 100:18; 148:20

stated 166:9

statement 8:5; 11:24;
19:19; 37:21; 38:21;
46:10; 73:20, 23; 74:18;
75:1, 16; 84:15; 139:22;
140:13; 141:20; 146:1;
147:16; 149:5, 9; 153:21;
158:7, 8; 159:2, 16, 17;
161:6, 16; 162:25; 167:25;
172:10, 11, 18; 174:3, 4;
177:2; 179:17; 185:23;
186:1; 187:22; 188:1, 2,
15, 23; 189:1; 190:8, 8;
191:17; 195:12

statements 45:22; 56:24;
71:15; 73:17; 74:8; 88:5;
110:6, 24; 171:5; 174:16;
191:6

states 146:11

Station 27:4

stationary 86:8

stay 70:19

stayed 27:3

steals 194:14

stemmed 195:14

step 128:15

stick 70:11

sticking 84:22

sticks 88:8

still 32:8; 59:23; 78:23;
79:3, 9, 11; 114:9; 116:17;
130:21; 151:10; 181:11;
193:10; 194:20

stipulated 2194:20

STIPULATION 194:20

stood 74:3, 20; 158:6;
197:11

stop 52:15; 82:1; 94:19;
131:20; 145:3

stopped 13:10; 135:8

store 169:17

story 2069:17

story 23:8; 53:17; 87:4;
128:15

strange 36:12

stress 101:24

strong 184:14; 194:22

strongly 180:24; 183:22

STS 72:12

student 40:25; 47:24;
48:3, 15; 69:11; 81:13;
89:21, 24; 93:9, 13, 23;
110:21; 115:3, 5; 117:24;
118:14; 127:23; 186:23;
194:3

student's 197:9

students 19:1; 25:24;
40:14; 47:21; 48:8, 13;
68:16, 17; 71:11; 89:18;

93:18; 109:4; 110:20;
113:2, 16; 118:5, 10, 20;
126:11; 130:20; 133:9;
134:11; 164:15

stuff 57:22

subject 10:7; 12:23;
19:16; 20:10; 25:7; 31:16;
39:17; 40:4; 50:10, 13;
57:20; 59:20; 60:22, 24;
61:1; 62:3; 72:22; 78:21;
98:15; 109:15; 130:24;
192:13

submitted 60:2; 150:19

subpoena 8:11, 14;
14:15; 120:25

subsequent 53:12;
106:2; 162:19; 175:16;
195:10

Subsequently 94:9

substance 167:16

substitutes 124:16, 17

successfully 182:13

sufficient 67:3

suggested 52:24; 90:15;
93:11, 20, 21; 118:7

suggesting 54:18; 77:11

suggestion 52:11, 17;
54:21, 22, 23; 55:11; 77:9;
79:17, 22; 118:16; 127:24;
137:24

suggestions 93:24;
188:8

suitable 109:25; 110:19

sum 120:17

summarize 159:14

summarizes 45:10

Summary 173:8

summer 25:23; 34:5;
54:3; 60:7, 12; 65:22; 70:2;
94:23; 95:11; 96:13;
105:22

Sunday 170:18

superintendent 130:16

supervisor 85:16

supplementary 116:12

supplies 129:7

supply 11:6

support 148:10; 157:8,
11, 16, 22; 159:22; 166:17;
170:20

supportive 19:1; 29:14

supposed 113:2

sure 5:5; 9:9, 14, 17; 10:3;
14:10, 23; 27:9; 28:13;
29:1; 33:9; 37:9; 40:23;
41:10; 43:15; 44:9; 46:10;
49:4; 52:23; 53:16; 61:17;
74:19, 24; 78:13, 19;
88:24, 24; 89:23; 111:9;
116:25; 120:21; 122:18;
126:16; 129:2; 131:23;
135:3; 140:7; 156:7;
158:10, 11; 164:9; 165:25;
166:9; 173:13; 182:25;
191:17; 195:15; 197:21;
199:17

surmised 172:16

surprised 134:3, 5;
162:16

surprising 4:4

surrounding 31:18;
188:15

Survey 76:14

survive 58:20

Sutton 175:2

switched 47:19; 114:21

sworn 10114:21

synonym 160:20

system 9:4; 81:25

systems 125:23


# T

table 97:18; 106:10;
143:20; 144:5; 149:22;
163:23

tabled 96:21; 106:15

tables 20:2

tablet 156:17

talk 6:25; 9:17; 30:8;
34:10; 41:9; 51:17;
173:16, 18; 177:10

talked 53:10; 71:22; 94:1;
106:13; 112:24; 186:25

talking 22:8; 62:13;
75:16; 83:8; 92:23;
100:25; 119:25; 122:21;
187:17

talks 127:1

taught 24:15; 25:17;
30:19; 33:13, 21; 36:24;
37:6, 9, 14; 38:13; 39:4;
47:20; 50:1; 81:8; 138:20;
141:9, 14, 21; 146:16;
150:16; 176:19; 195:16;
198:1

taxpayer 149:8

teach 25:15; 30:18; 41:5,
19; 42:5, 16; 43:8; 85:22;
87:24; 108:23; 123:6;
126:11; 142:7; 146:18, 20;
148:15; 160:19; 161:8

teacher 9:22; 22:19;
23:22; 24:10, 11; 28:12;
29:12; 40:6; 41:13; 55:15;
56:5, 9; 58:13; 89:25; 93:1,
22, 23; 109:8; 110:17;
123:5; 125:14; 175:20;
176:2, 21; 181:10, 20;
184:3; 186:23; 188:12, 13

teacher's 93:8; 145:19

teachers 8:16; 11:22;
16:10, 11; 23:13; 24:23;
31:9, 10; 32:2; 38:11;
39:15, 16; 40:16, 24;
41:19; 42:4, 25; 45:19, 19,
20; 46:3, 4, 7, 12; 48:10;
50:9; 53:1; 55:14, 18; 58:1,
8; 60:6; 63:1; 65:19; 66:25;
74:22; 85:11; 87:24;
88:22; 92:16; 108:23;
109:5; 119:5; 128:19;

129:12, 23; 136:1; 137:3;
139:5; 146:17, 20, 22;
147:3; 148:4, 7; 150:18,
24; 152:17; 153:18;
160:23; 161:7; 182:4;
188:18, 25

teaches 123:6; 175:20

teaching 11:18, 22;
25:22; 30:24; 48:14; 85:7,
19; 87:13; 109:9; 121:14;
123:2; 147:14, 16; 162:1;
168:4; 189:13

technology 72:13

technoscience 25:16

telling 38:15; 145:14

temper 174:10

ten 24:19, 23

tends 4:20

tenth 47:21; 48:6; 72:16

tenure 27:16; 35:13;
43:13

term 37:1; 101:10; 112:7,
10

terms 30:14; 38:24;
60:22; 80:15; 96:22;
139:11; 142:10; 158:17;
163:17; 167:20; 170:19

test 39:5

testable 112:1; 189:23

tested 189:24

testified 1089:24

tests 126:12

Texas 100:16, 17; 110:11

textbook 11:23; 23:25;
31:23; 65:22, 25; 70:8;
77:8; 91:24; 94:16;
106:21; 141:17

textbooks 8:7; 32:3;
43:17, 18; 47:14, 15, 24;
48:1, 2, 9; 52:6; 65:2; 99:1;
115:16

texts 48:12; 72:7; 79:18

thanked 186:3

Thanks 67:19; 104:12

themes 170:8

theories 37:14; 39:3, 8;
113:3; 121:14; 123:7;
133:11; 134:13; 136:12;
137:13

theory 29:19; 31:3, 13,
20; 36:22; 38:12; 39:24;
40:11, 11; 41:22; 42:7;
43:7; 45:18; 59:21; 88:3;
92:2; 97:20; 98:11, 13, 21,
24; 99:13; 103:3; 108:2,
19, 25; 111:6, 16, 22;
121:17; 133:11; 134:12;
168:21; 176:13; 178:22;
189:7

therefore 28:14; 48:10,
15, 24; 67:4; 69:24; 72:25;
97:13; 100:18; 125:15;
134:2; 169:1; 189:4, 11, 25

thereof 117:21

thinking 35:14; 57:18;
109:1; 133:23; 152:1

Tammy Kitzmiller, et al.   v.
Dover Area School District, et al.

Bertha E. Spahr
May 19, 2005

third 25:4; 121:11; 137:20
Thomas 14:18
though 30:15; 35:22;
64:1; 66:11; 93:24;
104:25; 113:16; 161:5;
166:25; 172:20
thought 18:24; 27:6;
49:21; 54:7; 59:15; 67:24;
69:22; 82:13; 94:17; 98:8;
102:5; 116:23; 118:4, 23;
140:22; 149:19; 150:1;
151:15; 152:16; 161:18,
20; 168:18
thoughts 29:15; 133:7;
136:3; 172:9
thousand 73:21
three 12:9; 36:12; 97:15;
104:24; 107:23, 23; 128:1;
132:12; 136:18, 19;
151:17, 19; 152:19; 165:1,
9, 23; 190:21; 192:1, 21;
197:12, 15
three-month 62:20
throughout 4:5; 54:7
throwing 166:13
throws 60:21
thrust 14:20; 58:3; 97:23;
159:12
Thursday 7:15; 196:7
ticket 182:13
tie 114:20
tied 59:19; 198:4
time-tested 111:16
times 58:12; 103:14
tired 169:1
title 141:16; 142:6
titled 82:18; 136:19
today 5:10, 19; 7:2; 8:21;
23:7; 43:12; 53:19; 58:5;
70:12, 24; 72:13; 127:3;
146:15; 192:12, 14
together 7:8, 19; 13:12;
15:5, 6; 32:2; 56:20; 63:1;
67:16; 137:23; 195:12
token 5:1
told 32:6; 36:6; 43:11;
51:24; 88:2; 118:11;
136:4; 138:17, 21; 139:3,
3; 140:18; 156:3; 171:5;
173:16, 19; 174:10; 186:4;
194:8, 16; 196:23, 24
Tom 14:18; 179:2
tone 57:15
took 30:17; 32:10; 72:16;
96:24; 163:9; 165:12;
166:2; 179:20; 183:6
top 46:22; 75:23; 76:19,
22, 25; 82:14; 95:2; 124:3;
130:5; 155:3, 5; 173:1;
180:19
topic 41:24; 123:22;
142:12; 180:22, 24
topics 48:21
total 183:12
touch 50:2

touched 43:13; 62:21
touching 141:10
tough 164:21
toward 149:22
Towards 16:13; 190:6
traditional 81:16; 153:24
traditionally 31:23
trained 43:1, 2
training 34:3
transcribes 4:12
transcript 4:15
transpired 115:8
tray 86:11; 199:16
treat 162:3
treated 162:10
treatment 162:22
tree 58:19, 23
tremendous 65:23
trial 75:23
tried 30:5; 110:9, 14;
118:22, 25; 125:3; 180:21
trigger 75:18; 131:8;
152:21; 168:11
trouble 118:21
Trudy 59:11; 192:24
true 50:15
truly 118:21; 195:13, 15
try 4:5; 7:19; 23:7; 49:10;
180:24; 184:15; 186:5
trying 4:23; 12:10; 34:8;
40:24; 44:20; 49:24;
53:22; 54:1; 60:5, 14;
78:23; 113:11; 118:18, 21;
129:8; 135:19; 141:1;
145:12; 148:21; 159:11;
183:24; 198:3, 7
Tuesday 175:4; 196:8
turn 43:20; 60:16; 87:1;
94:24, 25; 136:18
twenty-five 161:25
twice 197:9
two 12:9; 13:21; 25:8;
28:25; 36:11; 44:22;
46:24; 49:8, 9, 19; 76:12,
22, 25; 77:4; 96:14; 97:9,
15; 98:15; 99:13; 108:13;
115:17; 116:2; 117:9;
118:20; 130:17; 145:6;
152:19; 154:12, 13;
160:24; 170:8, 8; 171:1;
177:23; 188:18; 190:13;
197:12, 14
two-year 49:15
type 169:24
typed 92:10; 105:17

U

UCC 179:4
Um-hum 131:15
unclear 4:22; 152:6
uncomfortable 5:11, 13;
41:23; 43:1; 170:4, 23

uncommon 54:10;
131:19; 174:2
unconstitutional 160:19
under 1960:19
under 39:2; 69:22; 73:8;
74:6; 130:16; 134:9;
137:11; 139:23; 141:18;
145:6; 155:2; 158:11;
164:4; 173:7
underlying 87:5
Understood 103:23;
111:20; 146:24; 148:21
unfold 23:8
unfolded 56:16
unfolds 53:17
unfortunately 169:4
union 22:19; 158:1
unique 4:1
Unit 134:10; 137:11
University 76:17; 77:18;
80:6
unlawful 160:18
unless 115:2; 185:6
untenured 160:24
unusual 150:24
up 5:3; 6:20; 19:19; 24:1;
29:9, 21, 25; 30:4; 32:12;
33:5; 35:12; 37:7; 40:4;
43:10, 12; 46:1, 5, 18;
51:16; 54:13; 56:18;
57:21; 58:12; 59:4; 61:14;
68:9; 74:3, 16, 20; 87:2;
89:17; 90:8; 91:9, 11;
100:15, 16; 101:4, 6;
104:19; 110:9; 114:19;
119:18, 20; 120:17; 123:4,
22; 126:12; 128:3; 134:14;
142:3, 24; 147:16; 149:15;
152:5; 154:8; 158:6;
162:12; 165:18; 167:6;
172:4; 174:2; 175:13;
186:2; 188:6
upcoming 148:23; 149:1
updated 71:12; 95:24
uphold 70:6
upper 47:1; 50:25; 66:20;
92:18; 116:3; 121:11;
131:11; 132:22; 155:13
upright 81:19
upset 139:16; 167:1
upsetting 64:15
usable 32:9; 69:5
usage 47:8; 83:11
use 6:25; 9:12; 48:12, 18;
68:16, 22; 69:2, 11; 77:8;
108:9; 117:15; 118:10;
119:1
used 23:11; 37:3; 47:14,
15; 48:1; 68:11, 13, 18;
76:14; 90:10; 93:22;
102:9; 118:9; 130:19;
134:1
useful 69:9
using 37:1; 65:21; 83:9;
127:19

usually 19:3; 35:15; 60:4;
63:16, 18; 112:16; 129:16;
138:24; 154:17; 156:17;
160:13; 190:15

V

vacancies 180:10
vacation 96:13; 107:3
vacations 105:24
validity 108:8, 11
variations 165:8
variety 50:14
Various 25:1; 32:3;
39:25; 50:5, 13; 63:2;
190:11
varying 30:16
verbal 4:3; 163:15;
166:16
verbally 4:4
verbiage 98:1; 145:4
verses 74:4
version 18:23; 136:15;
137:5, 21; 145:8, 16, 19;
147:2; 151:5
versions 99:14; 140:15;
149:2, 16; 152:19
versus 95:3; 100:24
veteran 40:6; 55:14
via 10:24
video 107:22, 25; 108:3,
6, 13, 14
videos 107:23
videotaped 17:3; 191:23
videotapes 107:19
view 108:14
viewed 107:25; 145:14
viewing 108:3
viewpoints 2208:3
virtually 12:16
visible 197:18, 22
vocabulary 113:13;
118:6
vocal 170:2
voice 88:21
voiced 195:8
Volume 125:9
vote 94:16; 114:18, 20;
115:22; 139:23; 143:23;
154:21; 157:15; 161:12;
165:12, 18; 164:4; 174:21;
176:7; 183:14, 14
voted 115:1; 160:4;
187:12
votes 183:7
voting 143:24; 165:13;
166:14

W

waiting 40:1
waived 50:1

walk 161:2; 177:22
walked 144:4
walking 149:22
wall 86:1, 7; 198:25;
199:14
walls 199:7
waste 65:23; 104:23
watch 23:8
watching 108:6
way 19:21; 23:18; 24:2;
25:4; 33:20; 39:21; 40:7;
45:16; 50:3, 8; 54:5; 67:15;
79:6; 84:25; 88:3; 92:6;
102:3; 121:12; 124:4;
127:3; 134:25; 141:2;
149:21; 151:7; 156:2;
163:6, 9, 13, 19; 169:7;
179:17; 185:2
ways 31:10
website 9:5
Wednesday 7:15
week 7:10, 10, 16;
112:16, 21
weekend 82:10; 193:17;
194:6; 196:5
weeks 115:17; 129:4
well-known 192:3
Wenrich 19:15, 23;
177:23; 186:8
weren't 34:5; 153:10;
183:2
what's 24:23; 27:21;
87:7; 128:14
whatsoever 131:9
whereby 89:24
wherever 89:1; 119:22
who's 21:10; 138:21;
139:3
whole 8:16; 11:20; 70:19;
71:23; 81:21; 102:11;
121:2; 166:1; 195:14
whomever 173:17;
174:10
whose 21:19; 76:23;
77:25; 171:13
willing 53:6; 108:10, 24,
25
willingness 118:15
Winston 79:20
wish 148:18
within 30:16; 49:19;
58:25; 59:3; 68:18;
115:14, 17; 175:21
without 71:25; 72:20;
132:2; 140:23; 148:12;
163:25; 171:3
witness 9171:3
witness 24:6
woman 64:12; 74:3;
183:2
won 182:13
word 27:9; 32:10; 37:3;
98:3; 101:4; 168:16;
170:22; 173:7
words 64:18; 73:5; 98:1,

9:3; 101:22; 102:9;
11:4; 117:10; 134:23, 24;
142:6; 154:7; 177:24

work 24:3; 51:8; 65:21;
105:20; 129:23, 23;
174:17; 186:16

worked 15:5; 19:23;
168:24

working 23:12; 36:2;
60:7

world 184:21

worry 29:3; 144:9, 9

wrapping 61:14

wrench 89:8

write 12:8

writer 190:20

writing 76:11; 104:2;
178:11; 188:9

written 12:8; 27:21;
35:24; 105:15; 125:13;
132:1; 148:15; 153:3;
161:9; 178:9; 193:4

wrong 169:7

wrote 49:15; 99:3;
124:24; 156:18; 184:21;
188:6

## X

XI-A 136:19; 145:8, 16

XI-B 136:19, 22; 138:13;
145:19; 150:4, 7

XI-C 136:20; 141:7;
145:10, 23; 146:5, 7, 10;
147:24, 25; 150:5, 9, 15;
153:7, 8; 155:23; 156:2

XIII 106:9; 130:13

## Y

yard 10:16

year 10:5; 13:16; 24:15,
15; 28:24; 31:22, 25; 32:7;
39:4; 44:12, 15, 18; 45:3;
47:19, 23; 48:2; 49:6, 7,
12; 55:21; 60:11, 22; 61:5,
8, 25; 62:16, 18; 63:6;
65:20; 66:5; 68:15; 72:15,
19, 23; 83:17; 95:25;
108:16; 112:17, 19;
170:13; 175:20; 192:12;
196:12; 197:9, 10, 16

year's 66:7

years 12:10; 24:5, 19, 23,
25; 28:25; 29:1, 2; 44:22;
49:8, 9; 68:12; 72:6; 73:21;
97:15; 99:24; 104:24;
161:23; 169:21; 193:13;
195:11; 197:12, 15

yesterday 23:12; 58:15;
176:6; 199:6, 18

Yingling 19:10, 12; 75:7;
114:21; 185:16

York 77:7, 7

young 36:1; 160:24;

197:12; 198:1