# APPENDIX III

# TAB D

1

```
 1        UNITED STATES DISTRICT COURT
 2     FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 3
 4        CIVIL ACTION NO.   4:04-CV-2688
 5
 6     TAMMY J. KITZMILLER, BRYAN REHM
       CHRISTY REHM, DEBORAH FENIMORE,
 7   JOEL A. LIEB, STEVEN STOUGH, BETH A. EVELAND,
       CYNTHIA SNEATH, JULIE SMITH,
 8      ARALENE D. CALLAHAN ("BARRIE"),
            FREDERICK B. CALLAHAN
 9
              VERSUS
10
       DOVER AREA SCHOOL DISTRICT; DOVER AREA
11       SCHOOL DISTRICT BOARD OF DIRECTORS
12
13
14
15
16     Deposition of PROFESSOR BARBARA
17   FORREST, taken in the above-entitled cause,
18   pursuant to the following stipulation, before
19   Lisa A. Lanata, Certified Court Reporter,
20   taken at the offices of Milling, Benson, 909
21   Poydras Street, Suite 2300, New Orleans,
22   Louisiana, on the 7th day of June, 2005.
23
24
25
```

2

```
 1   APPEARANCES:
 2
 3
 4     RICHARD THOMPSON, ESQ.
       THOMAS MORE LAW CENTER
 5     24 Frank Lloyd Wright Drive
       P. O. Box 393
 6     Ann Arbor, MI  48106
            For the Defendants
 7
 8
 9
10     ERIC ROTHSCHILD, ESQ.
       PEPPER HAMILTON, LLP
11     3000 Two Logan Square
       18th & Arch Streets
12     Philadelphia, PA  19103
            For the Plaintiffs
13
14
15   ALSO PRESENT:
16     WILLIAM DEMBSKI
17
18
19   REPORTED BY:
20     LISA A. LANATA
       CERTIFIED COURT REPORTER
21     REGISTERED PROFESSIONAL REPORTER
22
23
24
25
```

3

```
 1                 INDEX
 2
 3                          PAGE
 4   CAPTION                   1
 5   APPEARANCES               2
 6
 7   STIPULATION               4
 8
 9   EXAMINATION BY:
10     MR. THOMPSON,................   5
11
12   EXHIBITS:
13   #1 - Expert Witness Report        29
14   #2 - Biology Curriculum Press Release   166
15   #3 - New Orleans Secular Humanist
           Association                204
16
17   #4 - Council for Secular Humanism -
           Mission Statement          212
18
19   #5 - Council for Secular Humanism -
           What is Secular Humanism   223
20
21   REPORTER'S CERTIFICATE           296
22
23
24
25
```

4

```
 1              S T I P U L A T I O N
 2
 3       It is stipulated and agreed by and
 4   between all parties that the deposition of
 5   PROFESSOR BARBARA FORREST is hereby being
 6   taken pursuant to the Federal Rules of Civil
 7   Procedure.
 8       All formalities with the exception of
 9   the reading and signing of the deposition by
10   the witness are waived.
11       All objections except those as to the
12   form of the question and the responsiveness
13   of the answer are reserved until the
14   deposition is used or sought to be used in
15   evidence.
16
17          *    *    *    *    *
18
19
20       Lisa A. Lanata, Certified Court
21   Reporter in and for the State of Louisiana,
22   officiated in administering the oath to the
23   herein witness:
24
25
```

COPY

## Deposition of Professor Barbara Forrest - 6/7/05

**5**

1    PROCEEDINGS
2    BARBARA FORREST,
3 30147 Forrest Lane, Holden, Louisiana 70744,
4 after having been first duly sworn, was
5 examined and testified as follows:
6   MR. ROTHSCHILD:
7    All objections except as to form are
8 reserved until trial and the witness has
9 asked to read and sign.
10   MR. THOMPSON:
11    Fine.
12    EXAMINATION
13 BY MR. THOMPSON:
14   Q. Professor Forrest, you have been
15 sworn in as a witness in this deposition.
16 Have you ever been in a deposition before?
17   A. No.
18   Q. Well, I am going to be asking you
19 some questions. I represent the defendants
20 in the Dover School Area and the board
21 regarding the case that was started against
22 the board by several parents from the school
23 district.
24    In the deposition, questions and
25 answers are going to be transcribed by the

**6**

1 court reporter, so it is important that all
2 of your answers be verbal so the court
3 reporter can take down the answers rather
4 than a nod of the head or a shrug of the
5 shoulder. You understand that?
6   A. Oh, sure.
7   Q. Also, if you don't understand a
8 question or did not hear it, don't try to
9 answer it. Understand that?
10   A. Uh-huh.
11   Q. Ask me to rephrase it or repeat it
12 and I will try to do that so that you can
13 answer the question that I am propounding.
14 Do you understand that?
15   A. Sure.
16   Q. So that if I give you a question and
17 you answer it, I am going to assume that you
18 heard the question, understood it, and are
19 giving a response to a question I asked. You
20 understand that?
21   A. Yes. And maybe if I am not sure what
22 you are asking, I can try to rephrase the
23 question and see if I have it right. Is that
24 okay?
25   Q. Correct. And it is important that

**7**

1 you answer the questions to the best of your
2 ability because at some point, your question,
3 your answers, my questions and your answers
4 may be repeated in a courtroom and the judge
5 will take that testimony if it is
6 contradictory to any testimony you are giving
7 in the courtroom and weigh it as to your
8 credibility. Do you understand that?
9   A. Sure, yes.
10   Q. Are you taking any medication or
11 drugs that would affect your ability to
12 remember or respond clearly to the questions
13 I give?
14   A. No.
15   Q. Is there any reason that you can
16 think of that you would not be able to fully
17 answer my questions?
18   A. No.
19   Q. You have been sworn in as Barbara
20 Forrest; is that correct?
21   A. That's correct.
22   Q. Have you ever been known by any other
23 name?
24   A. Just my maiden name.
25   Q. And that is?

**8**

1   A. Carroll, before I was married.
2   Q. How do you spell that?
3   A. C-A-R-R-O-L-L.
4   Q. And how long ago were you married?
5   A. Oh, almost 35 years.
6   Q. Great. And your husband's name?
7   A. My husband's name is Edwin Clark
8 Forrest, Junior.
9   Q. And what does he do for a living?
10   A. He is an economic development
11 specialist for the State of Louisiana.
12   Q. Do you have any children as a result
13 of that marriage?
14   MR. ROTHSCHILD:
15    Objection. What's the relevance of
16 her children?
17   MR. THOMPSON:
18    The social antecedents.
19   MR. ROTHSCHILD:
20    Excuse me?
21   MR. THOMPSON:
22    The social antecedents.
23   MR. ROTHSCHILD:
24    I will allow her to answer whether
25 she has children and she does not need to

13
1 biologist and is now retired.
2   Q. And how did you collaborate?
3   A. He contributed a great deal of the
4 scientific analysis, the part of the book
5 that covers that, he went through the entire
6 manuscript and we worked together on wording.
7 He rewrote some sections that I had done. I
8 rewrote some sections that he had done.
9   Q. Prior to the, that phone call by
10 Mr. Rothschild you said in December of 2004?
11   A. Uh-huh.
12   Q. Had you had any other conversations
13 with Mr. Rothschild?
14   A. With Mr. Rothschild, I don't believe,
15 not by phone, no. I could have probably
16 E-mail, but I don't remember.
17   Q. Do you have copies of any of those
18 E-mails?
19   A. I would probably in my E-mail at
20 school, yes.
21   Q. I would like copies of those E-mails.
22   MR. ROTHSCHILD:
23     The parties have already agreed that
24 communications with counsel are not going to
25 be produced. I am not going to revisit that.

14
1 BY MR. THOMPSON:
2   Q. Prior to the time that there were
3 communications regarding expert witness,
4 retention?
5   MR. ROTHSCHILD:
6     All my communications with
7 Mrs. Forrest, Dr. Forrest were related to
8 this case and the prospect of her being
9 retained as an expert witness. I had no
10 relationship with her before then.
11 BY MR. THOMPSON:
12   Q. Did you talk to anyone from the ACLU
13 before you talked to Mr. Rothschild?
14   A. Yes, I did.
15   Q. About this case?
16   A. I e-mailed, uh-huh, (in the
17 affirmative).
18   Q. And do you remember who from the ACLU
19 that you talked to?
20   A. Mr. Waljack, I believe.
21   Q. And you still have copies of those
22 e-mails?
23   A. I think so, yes.
24   MR. THOMPSON:
25     I would like copies of e-mail that

15
1 she exchanged with Mr. Waljack from ACLU.
2   MR. ROTHSCHILD:
3     It is still against our agreement and
4 if we're going to go down that road, there is
5 going to be parallel production from -- it is
6 going to be requiring a lot of production
7 from your side, so you really want to go down this road.
8 you really want to go down this road.
9   MR. THOMPSON:
10     Well, again, I wasn't privy to the
11 agreement that you had with Mr. Gillon, but
12 as I understand, it was the agreement was not
13 to exchange communication between attorneys
14 who retained the expert witnesses, not by
15 some outside attorney from the ACLU.
16   MR. ROTHSCHILD:
17     I am not sure I see the distinction.
18 Why don't you give me a request in writing
19 and then we will have to have a discussion
20 about whether both parties are going to
21 exchange pre-engagement, pre meaning
22 pre-engagment of the experts, communications
23 with lawyers.
24   MR. THOMPSON:
25     Fine, we can discuss that later.

16
1 BY MR. THOMPSON:
2   Q. Now, you have had some relationship
3 with the ACLU prior to the Dover case, have
4 you not?
5   A. Oh, yes.
6   Q. And would you describe your
7 relationship with the ACLU prior to the Dover
8 case?
9   A. I have been a member since about
10 1979, and I served on their board from, a
11 Louisiana affiliate from about 1995 to 1997,
12 I believe.
13   Q. And what did you do on the board, the
14 ACLU?
15   A. I, in tandem with the other members
16 of the board, looked over cases that came
17 through that office deciding, you know, which
18 ones they would take and how they would, you
19 know -- I wasn't, had nothing to do with how
20 -- the legal considerations just which cases
21 did the affiliate want to handle. They
22 always run that through their board members.
23 We look at whatever comes in that the, you
24 know, the complaints that they are thinking
25 of acting on.

## Deposition of Professor Barbara Forrest - 6/7/05

17

1   Q. And is there some criteria that you
2   use?

3   A. If I remember correctly, the cases
4   that the Louisiana affiliate takes up are
5   cases that they think have important national
6   constitutional implications rather than
7   merely, you know, just local ones, that's one
8   criterion. Of course, it would involve, you
9   know, constitutional questions.

10  Q. And during this period of time, did
11  you ever consider cases dealing with the
12  teaching of evolution?

13  A. No, not while I was on the board.

14  Q. What about the cases dealing with the
15  teaching of the theory of intelligent design?

16  A. No.

17  Q. Did you ever deal with cases dealing
18  with issues relating to public school
19  curriculum?

20  A. I don't recall any when I was on the
21  board. That's been 10 years ago but I don't
22  remember anything coming up about public
23  school curricula, no. There are lots of free
24  speech stuff and good many of the cases that
25  the Louisiana affilliate handles had to do

18

1   with prisons, so we did quite a few of those
2   but that's been a long time, so I don't
3   recall the specifics.

4   Q. What prompted you to become a member
5   of the ACLU board?

6   A. Because I liked the work that they do
7   as regards defending the country, especially
8   the first amendment of the constitution and I
9   think they do important work and I thought it
10  would be important enough to support them
11  with my membership.

12  Q. Did you ever not only when you were
13  on the board of the ACLU but afterwards or
14  before then, ever discuss with ACLU members
15  the so-called Wedge Report?

16  A. No.

17  MR. ROTHSCHILD:

18      Can you be clear what you mean by the
19  Wedge Report? Are you talking about the
20  specific Wedge document?

21  BY MR. THOMPSON:

22  Q. Wedge document, yes.

23  A. No.

24  Q. When is the first time you ever
25  became aware of the Wedge document that you

19

1   write about in your book?

2   A. Shortly after it appeared on the
3   Internet.

4   Q. And that would have been? Can you
5   give me a date?

6   A. I believe it appeared on the internet
7   in about February, '99, early 1999 and people
8   started noticing it several months after
9   that.

10  Q. Have you ever been a party to a
11  lawsuit?

12  A. No.

13  Q. Have -- I asked you about the being
14  part of a deposition. Have you ever
15  testified at trial before?

16  A. No.

17  Q. Have you ever testified before any
18  school board?

19  A. Yes, at my own school board at home.

20  Q. Which one was that?

21  A. It wasn't, you know, really formal
22  testimony. The Livingston Parish School
23  Board, that's where I live, uh-huh, (in the
24  affirmative).

25  Q. And when was that?

20

1   A. That has been about 10 years ago, I
2   believe, 1994, thereabouts. I was speaking
3   as a parent.

4   Q. Do you recall the issue?

5   A. And I had actually I had done it
6   before, too. Yes. The issue was that an
7   organization called the Origins Resources,
8   Origin Resources Association, I believe, was
9   requesting that the school board add a
10  creationist curriculum model or supplement of
11  some kind to the science curriculum.

12  Q. And how did you find out about that?

13  A. I believe I found out through the
14  newspaper or local paper.

15  Q. And what prompted your interest in
16  that particular topic that you would address
17  the school board?

18  A. Because I had children in the school . . . . .
19  at that time and so I was speaking as a
20  parent.

21  Q. What was the concern about the
22  policy?

23  A. The policy was the introduction of a
24  religious belief into the science classroom
25  and I thought that was improper.

## Deposition of Professor Barbara Forrest - 6/7/05

21

1  Q. And did you --
2  A. Actually there was no policy, you
3  know, it was just a curriculum supplement I
4  guess you would call it that these gentlemen
5  produced to the school board, and so I was
6  responding to that.
7  Q. Had you heard about the creationism
8  before?
9  A. Creationism, sure.
10  Q. And was this, did you say this policy
11  was a part of that theory of creationism?
12  A. It wasn't really a policy. It was
13  the consideration of a supplement that the
14  school board was being asked to adopt.
15  Q. That would have been the policy?
16  A. If they had adopted it, the policy,
17  of course it would have been a policy to
18  allow it to be taught in the classroom.
19  Q. What, if anything, did you do in that
20  matter aside from addressing the school
21  board?
22  A. Working with the scientists from my
23  university, we analyzed and evaluated the
24  curriculum supplement and presented that to
25  the science curriculum committee which

22

1  consisted of I believe it was 23 teachers and
2  I presented it to them, all of the relevant
3  people. I spoke with members of the board
4  administration.
5  Q. Do you recall the details of the
6  particular curriculum supplement that they,
7  this group proposed to introduce?
8  A. It consisted of I believe some lesson
9  plans. It has been 10 years since we did
10  that, but I believe it consisted of some
11  lesson plans that they were suggesting,
12  things like that.
13  Q. Can you be a little more specific
14  about the lesson plan?
15  A. They were -- no, I am sorry, it has
16  been too long.
17  Q. Was this, do you recall if the lesson
18  plans were in opposition to Darwin's Theory
19  of Evolution?
20  A. Yes, they were certainly calling it
21  into question, offering the creationist
22  model. It was a series of lesson plans
23  dealing with various subjects. They were not
24  written by scientists. Actually, it was -- I
25  remember one lady that they particularly

23

1  credited with helping them write this was a
2  special education teacher, I do remember
3  that.
4     There was one, there was one
5  gentleman I can tell you probably who did
6  most of the writing was Dr. Charles Voss and
7  he was an electrical and computer engineering
8  professor. He was largely, I think,
9  responsible for getting this put together if
10  I remember correct.
11  Q. You say put together, you mean the
12  curriculum supplement put together?
13  A. Yes. He was the person who did most
14  of the speaking to the school board actually.
15  Q. Were there any written documents that
16  supported the curriculum supplement?
17  A. I can't recall that they produced any
18  supporting documents. I am sure they listed
19  some sources but I can't remember. I am
20  sorry, it has been too many years since I
21  have looked at that. It is a long time, I
22  filed it away a while back.
23  Q. Aside from addressing the school
24  board and then meeting with the science
25  experts, what else did you do in this

24

1  particular case?
2  A. I spoke with one of the gentlemen who
3  I believe was the director of curriculum or
4  something at that time, Mr. Rayford Leeger, I
5  spoke with him. I spoke with the people, you
6  know, the relevant people who were
7  administrators on the board, you know. And I
8  also, you know, received help from some
9  scientists at Louisiana State University,
10  they were very helpful.
11  Q. Did you ask for that help?
12  A. I believe that they found out about
13  it through a, probably through a network or
14  something of some kind. I put out a request
15  for help, and they must have heard about it
16  but I was contacted by a young lady there who
17  is a graduate student who wished to help.
18  Q. You put this out on a network of some
19  kind?
20  A. I believe I was -- I can't remember
21  specifically. It went out over E-mail and I
22  think some scientists posted it to a list
23  server something for the paleontological
24  society or something like that if I recall
25  correctly. I started receiving offers of

**Deposition of Professor Barbara Forrest - 6/7/05**

25

1 help from people.
2    Q. To get this correctly in my mind, did
3 you use a list serve?
4    A. No, I don't think I was on any list
5 serves at the time. I can't recall the
6 specifics of it. I just remember a gentleman
7 who was responsible for a list serve with the
8 paleontological society and offerred to post
9 it with him. It was through E-mails of some
10 kind.
11    Q. Did you consider this curriculum now
12 as you look back, would you consider this
13 curriculum advocating the theory of
14 intelligent design?
15    A. I think I recall their using that
16 term. At that particular time, in the mid
17 '90s, it was not a term that we had heard a
18 great deal about but I believe that that was
19 the first time I encountered it. Again, I
20 would have to go back and look at the
21 documents.
22    Q. Did you do any further studying at
23 that time about theory of intelligent design?
24    A. No, not specifically about the wedge
25 strategy because I have not -- or intelligent

26

1 design as Dr. Dembski represents it because
2 at that time, these people were pretty much
3 citing the other creationist sources. I
4 don't recall that they, you know -- I believe
5 they mentioned the concept, you know.
6    Q. Would there be any documents that you
7 would have in your possession that would help
8 you recall that?
9    A. Sure. I think I still have a copy of
10 the curriculum.
11    MR. THOMPSON:
12        We would like a copy of the
13 curriculum.
14    MR. ROTHSCHILD:
15        Fair enough.
16 BY MR. THOMPSON:
17    Q. What happened as a result of your
18 involvement and the involvement of other
19 people in this issue of the curriculum
20 supplement?
21    A. This was put -- kind of the pivotal
22 point was the consideration by the teachers
23 on the science curriculum committee, it was
24 about 23 teachers, and they considered the
25 curriculum supplement, they voted against it

27

1 by quite a large majority. And the school
2 board did not at their subsequent meeting,
3 did not really take up the teachers'
4 decision.
5        They adopted a policy which kind of
6 ignored the teachers' decision, and as a
7 result, the school board superintendent had
8 to clarify. I can't remember exactly the
9 step that the school board actually took. I
10 know that they kind of side-stepped the
11 teachers' decision on the curriculum
12 committee, and as a result, the school board
13 superintendent issued a clarification of the
14 board's, of school board policy regarding
15 teaching of evolution and he said their
16 policy was to teach evolution and pretty much
17 only that.
18        So it was not, it was not adopted.
19 The curriculum model was not adopted.
20    Q. Do you remember at that time your
21 contacting the ACLU?
22    A. I did. Yes, I did.
23    Q. What was the purpose of that?
24    A. To let them know what was happening
25 in my parish and to see if I could get help

28

1 if it was needed.
2    Q. And do you recall if they sent a
3 letter to the parish?
4    A. I believe they probably did, yes.
5    Q. Were they representing you when they
6 sent a letter?
7    A. Not formally. They -- the standard
8 procedure is that when they get any kind of
9 contact like that, they will -- excuse me.
10 There was, I don't believe there was any
11 formal representation. They were just
12 alerting the board to the possibility that
13 they might be entering, you know, territory
14 that could result in legal action.
15    Q. Do you have copy of that letter?
16    A. I am sorry, I don't remember if I
17 have a copy of it or not.
18    Q. Do you remember during this, for this
19 curriculum supplement, were these supplements
20 arguing for the young Earth theory?
21    A. I am sorry, I don't remember the
22 specifics of that.
23    Q. Well, you indicated that you think
24 that they talked about intelligent design?
25    A. My memory could be faulty, but that

## Deposition of Professor Barbara Forrest - 6/7/05

29

1 may be where I first saw the term. Again, I
2 could be mistaken about that. I would have
3 to look. It has been 10 years.
4   Q. Let me see if I can help you. Let me
5 come back to that, I don't want to take up
6 your time at this point.
7   A. Is there a particular document you
8 were looking for?
9   Q. Yes. I will try to find it later.
10 At this point, let me introduce Defendant's
11 Deposition Exhibit Number 1, please.
12   MR. ROTHSCHILD:
13     Just before you mark it, you want to
14 do it Forrest 1, I think that's what we --
15   MR. THOMPSON:
16     That's fine.
17 BY MR. THOMPSON:
18   Q. Professor Forrest, I want you to look
19 at this exhibit deposition, Forrest
20 Deposition Exhibit 1 and ask if you can
21 identify it?
22   A. Yes, this is my expert witness
23 report.
24   Q. Why don't you go through it and make
25 sure it is, it is complete, just look through

30

1 the pages.
2   A. Check the pages? Sure, certainly.
3 All the pages are here.
4   Q. I note in the report, it was dated
5 April 1, 2005. Now, keeping that in mind --
6   A. That was the deadline.
7   Q. There was nothing more significant
8 than April 1, was there?
9   A. No. That hadn't even occurred to me
10 till you just mentioned it.
11   Q. Does the report contain all of the
12 expert opinions that you intend to give at
13 the trial of this case?
14   A. I would say it is a fair
15 representation of them. I had a limited
16 amount of space and I still went over my
17 allotment, but, yes, I would say it is a fair
18 representation.
19   Q. Are there any other topics that at
20 this point you intend to talk about in your
21 testimony before the trial?
22   A. I am not sure I could say. It
23 depends I guess on what I am asked.
24   Q. As of this moment, though, this is
25 the totality of the opinion, the expert

31

1 opinion you intend to give at trial?
2   A. It is a representation of the work
3 that I have done that I know about, yes.
4   Q. Are there any other areas that you
5 would want to cover in your expert opinion
6 that you haven't put in your report?
7   A. I can't think of any at the moment.
8 Again, I guess it depends on what comes up at
9 the trial, but I think that this is a fair
10 representation of what I will be asked to
11 talk about.
12   Q. How many hours did you spend in
13 preparing this report?
14   A. I spent hour wise, I can't say
15 because I spent about two and a half months,
16 about half of January, February, and March.
17   Q. I assume you had other
18 responsibilities during that time or was this
19 your focus?
20   A. Yes, I am a professor, I have a day
21 job. Other than teaching classes, though,
22 this was all I did.
23   Q. Other than teaching classes, this is
24 all you did?
25   A. Yes, worked on this.

32

1   Q. Did you get paid for this report?
2   A. No.
3   Q. Why didn't you ask for any
4 compensation?
5   A. I agreed to do this pro bono.
6   Q. Why?
7   A. Because I think it is an important
8 issue. I was asked to make a contribution.
9   Q. With regard to the preparation of the
10 expert opinion, the report, what materials
11 did you review?
12   A. The materials in the sources that I
13 cited.
14   Q. Did you have any -- were you supplied
15 any materials that related specifically to
16 the case that we're talking about?
17   A. Materials that specifically relate to
18 what the work that I did in the report, I was
19 provided some materials for that.
20   Q. Do you remember what those materials
21 were?
22   A. Yes, some of the sources, for example
23 -- let's see. To give you an example as soon
24 as I find it most of the stuff I had access
25 to already, but there are a few things that,

**Deposition of Professor Barbara Forrest - 6/7/05**

33
1 let's see, the Kenyon Affidavit, of course,
2 which I got from Mr. Rothschild.
3 Q. What was that?
4 A. The Kenyon Affidavit was provided
5 with that. And let's see. Materials from
6 the National Science Center for education
7 that, those are the ones I was looking for.
8 This is an example of that, in '96.
9 Q. Had you ever seen the Kenyon
10 affidavit before?
11 A. No. No.
12 Q. Did you, were you supplied a copy of
13 the complaint that was filed in the Dover
14 case?
15 A. Yes.
16 Q. And you read that before you prepared
17 your report?
18 A. Yes.
19 Q. Were you supplied with any other
20 documents from the case itself?
21 A. The Kenyon affidavit, the Kitzmiller
22 complaint, let's see, those are the two I
23 recall.
24 Q. Were you ever given a copy of the
25 actual board policy?

34
1 A. Oh, I had seen that already. The
2 statement you mean?
3 Q. Yes.
4 A. Yes, I was given that and I had
5 already seen it. Yes, I was given a copy.
6 Q. Where had you seen it?
7 A. On the Internet, new accounts, things
8 like that I believe, but yes, I was given a
9 copy of that along with the Kitzmiller
10 complaint, yes.
11 Q. Any other documentation from the
12 case itself?
13 A. I would have to look back and see
14 exactly what I was provided. I was given a
15 copy of the complaint, a copy of the policy,
16 and I am sorry, I would have to look back and
17 see exactly what I got.
18 Q. Did you talk to any school board
19 members?
20 A. No.
21 Q. I am talking about now the
22 preparation of the report?
23 A. Oh, no, sir.
24 Q. Did you talk to any of the parents
25 that are plaintiffs in the case?

35
1 A. No.
2 Q. Did you talk to any of the teachers?
3 A. No.
4 Q. Did you talk to any of the students
5 in the 9th grade or any classes in the Dover
6 School Area District?
7 A. Oh, no, sir.
8 Q. Have you read the book of *Pandas And
9 People*?
10 A. Yes, I have read through it.
11 Q. You have read through it. Have you
12 read it page by page?
13 A. No, not page by page, no.
14 Q. How long ago?
15 A. Just recently, in doing the report, I
16 went through it, you know, looking for useful
17 material for my report. And actually, that
18 book, I had a copy of that book quite a while
19 back as a reference, and I think it may have
20 come up -- I could be mistaken about this but
21 I had a copy quite a while back and it may
22 have come up during the time I was working on
23 the, my interaction with the school board at
24 home because I do, I had a copy for quite a
25 while.

36
1 Q. Did you --
2 A. It may have been in connection with
3 that.
4 Q. Did you read any portions of the
5 actual 9th grade biology textbook by Ken
6 Miller?
7 A. No, not for this report, no, sir.
8 Q. Have you ever read it?
9 A. I have only seen sections of it on
10 the Internet.
11 Q. Did anyone assist you, any person
12 from outside assist you in writing the
13 report?
14 A. No, not in writing the report.
15 Q. Did you, prior, you know, keeping the
16 April 1st date in mind, prior to submitting
17 that report, did you see any other expert
18 opinions in this case?
19 A. No, not -- no.
20 Q. Did you see any expert opinions of
21 experts retained by your side?
22 A. No.
23 Q. Or draft reports?
24 A. No.
25 Q. Did you see any expert opinions or

## Deposition of Professor Barbara Forrest - 6/7/05

37

1 drafts of the experts retained by the
2 defendants here, the Dover School District?
3   A. No.
4   MR. ROTHSCHILD:
5     Before April 1st?
6 BY MR. THOMPSON:
7   Q. Yes, focused on April.
8   A. No.  I was like a rat in a hole.  I
9 was just working on mine.
10   Q. I notice that there are a lot of
11 similarities in your report and the book that
12 you co-authored with Paul Gross,
13 *Creationism's Trojan Horse*.  Did you take
14 things out of this book to put in your
15 report?
16   A. No.  Just a lot of the information
17 would be similar, of course, because this is
18 the work that I did, there would be, I
19 imagine, quite a bit of overlap, you know.
20   Q. But you didn't go into this book
21 *Creationism's Trojan Horse* and pick things
22 out of it to put in your report?
23   A. Oh, there is information that's in
24 the book that are certainly in the report.
25 In fact, if you look, I referred to my book,

38

1 you know, in the report, chapter 2, for
2 example, on the very first page.  That would
3 be normal that I would refer to the work that
4 I have done.
5   Q. Sure.  Of the book that you, of
6 *Pandas and People* that you said you may have
7 seen during the time that you had the issue
8 with the school board in your parish, do you
9 remember what edition of the book it would
10 have been?
11   A. It would have been the '93, I am
12 pretty sure.  It is the one I still have
13 which I have had for quite a while.
14   Q. Since your submission of this report,
15 since April the 1st, 2005, have you now read
16 any of the other expert opinions?
17   A. Yes, sir.
18   Q. Which ones have you read?
19   A. I have read Dr. Dembski's -- you mean
20 on both sides?
21   Q. Both sides, yes.
22   A. I have read Dr. Dembski, I believe
23 Mr. Carpenter, I have looked through
24 Dr. Behe, I have looked through
25 Dr. Campbell's, I have read Dr. Pennock's and

39

1 I have looked through, let's see,
2 Dr. Miller's -- I have looked through all of
3 the ones on our side and most of the ones, I
4 believe, on the other side.
5   Q. Referring to the expert opinions on
6 your side, are there any opinions that you
7 disagree with?
8   A. I can't think of any.  On our side?
9   Q. Yes.
10   A. No, sir, I can't think of anything I
11 saw that I disagreed with on the reports from
12 our side.
13   Q. Have you read Dr. John Haught,
14 Professor John Haught's report?
15   A. Yes, I did, I read his.  He visited
16 our university and it happened that he had
17 been scheduled to speak there, so I
18 particularly wanted to read his before he
19 spoke, so I did.
20   Q. Do you remember the circumstances of,
21 in which he came to your university?
22   A. There is -- yes.  We have a lecture
23 series that we have been doing for some years
24 now.  It is called the Matheni lecture series
25 on science and religion and that is, that

40

1 lecture series, the speakers are contacted by
2 a Professor Rasono who runs that lecture
3 series and he had invited Professor Haught
4 and I really didn't even know until after it
5 was already scheduled.  So it was a pleasure
6 to meet him.
7   Q. Do you remember what his lecture was
8 about?
9   A. His lecture was about evolution and
10 how to -- presenting a way that that can be
11 reconciled with Christian faith, it was
12 presenting the possibilities for doing that
13 to the audience.
14   Q. Would you consider Professor Haught
15 to be, I hope I get this right, an
16 evolutionary theist?
17   A. A theistic evolutionist?
18   Q. Yes.
19   A. From everything I can gather, yes,
20 that's -- I would say that that's what you
21 could call him.
22   Q. Have you ever read his book *Deeper*
23 *Than Darwin*?
24   A. No, I have not.
25   Q. Professor Haught claims that the

## Deposition of Professor Barbara Forrest - 6/7/05

41

1 theory of intelligent design and creationism
2 are not the same. Do you agree with that?
3 MR. ROTHSCHILD:
4    Objection. What's the foundation for
5 that?
6 MR. THOMPSON:
7    In his book and in his deposition.
8 MR. ROTHSCHILD:
9    Can you show the witness what you are
10 referring to?
11 THE WITNESS:
12    I am sorry, I would like to, you
13 know, I would have to see the context of that
14 because I am not familiar with the specifics
15 of his discussion on it.
16 BY MR. THOMPSON:
17    Q. Did you -- and I will find it, did
18 you have any discussions with Professor
19 Haught about the Dover case when he was here?
20    A. No, other than that fact that we're
21 both expert witnesses, we talked about the
22 scheduling, about the dates, you know, that
23 was it.
24    Q. Now, in your expert witness report,
25 you start off the first sentence by saying:

42

1 "my area of expertise is the nature and
2 strategy of the intelligent design (ID)
3 creationist movement." That's the first
4 sentence. When did you ever hear or first
5 hear about the phrase intelligent design
6 creationist that phrase, movement?
7    A. When did I first hear of it?
8    Q. Yes.
9    A. I couldn't pinpoint the time that I
10 first heard the phrase. It is a phrase that
11 I had used.
12    Q. Do you know of anyone else who has
13 used that phrase?
14    A. Yes, Robert Pennock.
15    Q. And is that phrase descriptive of the
16 theory of intelligent design propounded by
17 people like Professor William Dembski?
18    A. I would say that it is, yes, sir.
19    Q. Have you ever used, have you ever
20 heard or read of any of the intelligent
21 design theorists use the phrase intelligent
22 design creationist movement?
23    A. They themselves don't typically use
24 it, no.
25    Q. So this is a phrase that's been used

43

1 by people who are critical of the theory of
2 intelligent design?
3    A. Yes, I think you could say that.
4 There are other people who have referred to
5 intelligent design as creationism, people for
6 example who support them, you know.
7    Q. For instance, who?
8    A. There is a gentleman by the name of
9 Osterander, I believe, who in an SBC LIFE
10 article referred to the gentleman at the
11 Discovery Institute as creationist, in an SBC
12 LIFE article, I believe. I can't give you
13 the date on that, I am sorry, but he referred
14 to them as creationists one in all.
15    Q. And when you use the phrase
16 intelligent design creationist movement, what
17 are you attempting to communicate by that
18 phrase?
19    A. That intelligent design is a form of
20 creationism.
21    Q. Is it the same thing?
22    A. It is creationism.
23    Q. Would you give me your definition of
24 creationism?
25    A. Well, there are various aspects of

44

1 creationism that you can detect as it has
2 occurred, you know, over the last number of
3 decades, a belief that the earth and the life
4 on earth was created by a supernatural diety
5 and a preference for that view rather than
6 the evolutionary view. So those are the, you
7 know, I would say that's basic to it.
8    Q. And that is the primary commonality
9 between intelligent design theory and
10 creationism?
11    A. I would say so, a rejection of the
12 theory of evolution in favor of the idea that
13 a diety created the earth and life on earth
14 and guides it in a purposeful fashion, that
15 seems to be one of the basic commonalities
16 and some others.
17    Q. I would like to know all of the
18 commonalities that you believe exist?
19    A. That's the basic one. Others are the
20 use of politics to advance, you know, the
21 program of school boards, for example, the
22 rejection of the accepted scientific
23 methodology and the, you know, without really
24 having an alternative scientific methodology
25 to produce, that's another one.

45

1  Q. Now, your statement that describes
2  the commonality between creationism and
3  intelligent design theory implies that
4  evolution does not hold that life was created
5  by a diety?
6  A. That's scientific theory, it would
7  not speak to that question. That would be a
8  question to be answered outside of science.
9  Evolution would not attempt to answer that
10  particular question.
11  Q. So is it your position that anything
12  that is outside of science cannot be
13  discussed regarding the creation of life or
14  the existence of life?
15  A. I am sorry?
16  MR. ROTHSCHILD:
17    Objection. Discussed where?
18  THE WITNESS:
19    Yes.
20 BY MR. THOMPSON:
21  Q. Public schools.
22  A. I would need a clarification of
23 anything, you know, exactly.
24  MR. ROTHSCHILD:
25    Objection.

46

1 BY MR. THOMPSON:
2  Q. Let me back up, that might be a
3 little confusing.
4  A. Yes.
5  Q. Is it true that evolution implies
6 life is not created by a diety?
7  A. No, sir, I don't think it implies
8 that. It just doesn't address the question.
9  Q. Well, many of the major evolutionists
10 do say that, do they not?
11  A. Some do.
12  Q. Well, give me some of the names.
13  A. One would be Richard Dawkins, I am
14 sure that Dr. Dembski is familiar with him.
15 He is one of the most prominent but they
16 certainly all don't say that the, evolution
17 in itself, you know, does not address the
18 question of a diety. It is a scientific
19 theory and the question of a diety lies
20 beyond the reach of scientific methodology
21 and it is a matter for personal faith
22 commitments or philosophical argument, not
23 scientific methodology.
24  Q. There are many more than Richard
25 Dawkins who believe that you cannot separate

47

1 the concept from evolution.
2  A. There are some. I am not sure.
3  MR. ROTHSCHILD:
4    Objection. Is there a question?
5 BY MR. THOMPSON:
6  Q. Yes. Well, I was going to finish and
7 ask isn't that true?
8  A. There are some, yes.
9  Q. Well, besides Mr. Richard Dawkins?
10  A. There are quite a few who actually
11 see evolutionary theories compatible with
12 religion as well. I think you would
13 certainly want to take note of that.
14  Q. I have, but I am asking you the
15 question, give me some more names of major
16 evolutionary theorists who say you cannot
17 separate evolution from the concept that life
18 was not created by --
19  MR. ROTHSCHILD:
20    Objection.
21  THE WITNESS:
22    I am sorry, I don't think I could do
23 that.
24  MR. ROTHSCHILD:
25    I object to the relevance of it, lack

48

1 of foundation. It is not the subject of her
2 expert report or her work. It is something
3 you want to talk about. I mean if you have
4 names, if you have something to show to her,
5 let's do that, but this isn't her --
6 BY MR. THOMPSON:
7  Q. Well, that's an important thing.
8 You're acting as an expert purely on your
9 study of the nature and strategy of
10 intelligent design; is that correct?
11  A. Of the wedge strategy, execution of
12 the wedge strategy and the intelligent design
13 movement, yes.
14  Q. And you are not --
15  A. That was research that I did.
16  Q. And so to be clear about it, you are
17 not testifying as a philosopher of education?
18  A. Oh, no. I am not a philosopher of
19 education.
20  Q. You are not testifying as a
21 philosopher of science?
22  A. I am not a philosopher of science. I
23 am a philosopher.
24  Q. But you don't consider yourself an
25 expert in the philosophy of science, do you?

## Deposition of Professor Barbara Forrest - 6/7/05

49

1  A. You know, I am familiar with
2 scientific reasoning.  You have to know
3 something about that to speak to this issue.
4 It is not the area of my formal philosophical
5 training but it is an area in which I
6 certainly have had to become familiar with
7 scientific reasoning and the nature of
8 science in order to discuss the things that I
9 have discussed, in order to understand the
10 issues that are involved but I would not, you
11 know, I don't call myself a philosopher of
12 science.
13  Q. Do you consider yourself an expert in
14 the philosophy of science?
15  A. No, sir, I am not an expert in the
16 philosophy of science.
17  Q. You are also you do not consider
18 yourself an expert in biology, do you?
19  A. No, I am not biologist.  I am a
20 philosopher.
21  Q. You don't consider yourself an expert
22 in microbiology, do you?
23  A. No, sir.
24  Q. You do not consider yourself and
25 expert in chemistry?

50

1  A. No, sir.
2  Q. You do not consider yourself an
3 expert in paleontology?
4  A. No.
5  Q. You don't consider yourself an expert
6 in physics?
7  A. No.
8  Q. You don't consider yourself an expert
9 in astrophysics?
10  A. No.
11  Q. You don't consider yourself an expert
12 in mathematics?
13  A. No.
14  Q. Do you consider yourself an expert in
15 the theory of probabilities?
16  A. No.  But those aren't the areas that
17 I address.  I mean don't speak to the content
18 of those disciplines.
19  Q. Well, you don't consider yourself a
20 scientist, do you?
21  A. Oh, no.  If I wanted to be a
22 scientist, I would have, you know, done
23 something different.
24  Q. So you are not giving your opinion in
25 this expert report as a scientist but as a

51

1 person who has studied the nature and
2 strategy of the intelligent design
3 creationist movement?
4  A. Yes, that's specifically what I am
5 doing, and you learn a good deal about the
6 movement, you know, in the course of looking
7 at how it is operated and what it favors and,
8 you know, the program that it is pursuing.
9 So all of these, you know, things -- of
10 course you encounter things about
11 paleontology, you encounter things about the
12 various sciences that don't mean that you are
13 an expert on that stuff.
14  Q. Just as the lawyers here have now
15 become so-called experts in all these various
16 areas.
17  A. That's right.  If you wanted to be a
18 biologist, you would have gone to school in
19 biology; right?
20  Q. Much of your report deals with the
21 so-called Wedge strategy; is that correct?
22  A. Yes, sir.
23  Q. And would you describe for us what
24 you, what is the Wedge strategy?
25  A. The Wedge strategy is a plan, as I

52

1 understand it, that was developed by the
2 gentleman, the gentleman at the Center for
3 the Renewal of Science and Culture for as
4 they say overturning materialism and
5 refashioning American culture, renewing
6 American culture in a way that is consistent
7 with their Christian and theistic
8 convictions.
9  Q. Is there anything unconstitutional
10 about the Wedge strategy?
11  A. I would say that there is, yes,
12 insofar as it applies to public schools.
13  Q. Could you be a little more specific
14 than that?
15  A. Well, in the sense that it would
16 promote a religious idea in a science class,
17 that would be the parts that I would consider
18 unconstitutional.
19  Q. What is your definition of a
20 religion?
21  A. Well, certainly there are things that
22 obviously qualify and that's the belief in a
23 supernatural diety, that's certainly an
24 important part of the definition of religion.
25 Of course, it is a little bit slippery to

# Deposition of Professor Barbara Forrest - 6/7/05

53

1 classify in its totality, but you definitely
2 know ideas that qualify as religion and the
3 belief in the supernatural creator is one of
4 those ideas.
5   Q. If I were to discuss what someone
6 might call a religious topic, does that mean
7 that I have to believe in a supernatural
8 diety for it to be religious?
9   A. If you --
10 MR. ROTHSCHILD:
11   Objection, vague.
12 THE WITNESS:
13   I can answer?
14 MR. ROTHSCHILD:
15   Yes.
16 THE WITNESS:
17   I would have to ask you to clarify
18 the question. You mean just in order to
19 discuss it, would it nec -- for a person to
20 discuss a religious topic, would that person
21 have to be religious?
22 BY MR. THOMPSON:
23   Q. No. I am trying to figure out what
24 you mean by religion means a belief in a
25 supernatural diety?

54

1   A. I would say that I am not trying to
2 define religion in its totality. I am
3 pointing out that that, that idea, the belief
4 in the supernatural creator, a supernatural
5 diety certainly would qualify as a religious
6 belief.
7   Q. I would ask you to define a religion
8 in its totality then.
9 MR. ROTHSCHILD:
10   Objection.
11 THE WITNESS:
12   I am sorry, there are -- should I
13 answer?
14 MR. ROTHSCHILD:
15   I mean if you can.
16 THE WITNESS:
17   That's something that I would not
18 presume to do. Religion is fairly broad. It
19 encompasses quite a bit but there are
20 certainly ideas that you know qualify as
21 religious and that's the one I just expressed
22 to you is one of those.
23 BY MR. THOMPSON:
24   Q. In other words, it is like
25 pornography, you can tell it when you see?

55

1   A. You know it when you see it.
2 MR. ROTHSCHILD:
3   Objection.
4 BY MR. THOMPSON:
5   Q. Well, to understand what your
6 concerns are, it is important for us to
7 understand your definition of religion and
8 that's why I am pursuing this.
9   A. What I am saying is that the belief
10 in the supernatural creator is definitely
11 qualifies it would fall under the definition
12 of religion. Whatever else religion is, that
13 would certainly be a part of it, it would
14 qualify it as a religious belief.
15   Q. Can a particular doctrine be
16 religious that does not hold a supernatural
17 creator?
18   A. Could you give me an example, please?
19   Q. Hinduism. I am not a religious
20 expert. Hinduism?
21   A. Hinduism is a very well recognized
22 religion.
23   Q. But do they believe in a supernatural
24 creator?
25   A. I am not -- I am not familiar enough

56

1 with Hinduism to say, you know, to say there
2 are, as I understand it, it is -- while I do
3 have a Hindu friend who recently said to me
4 that, you know, Hindus don't really have a
5 lot of doctrine but there is -- it is well
6 recognized as one of the world's major
7 religions. I am not a specialist in
8 Hinduism.
9   Q. Are you a specialist in religions?
10   A. I would not say that. It is not, you
11 know, it is not my work.
12   Q. You indicated you read Professor John
13 Haught's expert opinion, did you not?
14   A. Yes.
15   Q. Do you recall his definition of
16 religion has being as follows.--
17   A. I am sorry, I can't. I don't recall
18 his definition of religion from that.
19   Q. That's why I am going to read it for
20 you. In a very general sense, religion may
21 be defined as one, the surrender of one's
22 mind and heart to whatever is considered to
23 be ultimate in importance and explanatory
24 power, that's one definition; he gave three
25 definitions.

# Deposition of Professor Barbara Forrest - 6/7/05

9
1 give their names and I am not going to let
2 this to go any further. This is ridiculous.
3    MR. THOMPSON:
4       Well, you can direct her not to
5 answer, that's one thing but I have the right
6 to know her background so that we can judge
7 her credibility and I will tie it in if the
8 answers are what I suspect.
9    MR. ROTHSCHILD:
10      Her family life is -- her private
11 family life is irrelevant to this lawsuit and
12 she can answer whether she has children and
13 how many children she has and then let's go
14 forward and actually ask about her expert
15 testimony.
16   MR. THOMPSON:
17      Let me conduct the investigation.
18 Okay?
19   MR. ROTHSCHILD:
20      Into the matters that are at issue in
21 this litigation, not her private life.
22   MR. THOMPSON:
23      And all relevant matters and matters
24 that could lead to other depositions and
25 discovery.

10
1    MR. ROTHSCHILD:
2       What of her children?
3    MR. THOMPSON:
4       Let me ask the question and see.
5    MR. ROTHSCHILD:
6       She can answer the question does she
7 have children.
8 BY MR. THOMPSON:
9    Q. Do you have any children?
10   A. Yes.
11   Q. what are their ages
12   A. Twenty-five and nineteen.
13   Q. Do they attend public schools?
14   A. Yes, they did.
15   Q. And what public school?
16   A. They attended public schools in the
17 State of Louisiana and Tangipahoa Parish and
18 Livingston Parish.
19   Q. And did they take up biology in those
20 publics schools?
21   A. Yes, they did.
22   Q. Do you recall the textbook --
23   A. No, I am sorry.
24   Q. -- that was used?
25   A. No.

11
1    Q. Now, you are here as an expert
2 witness; is that correct?
3    A. Correct.
4    Q. And who asked you to be an expert
5 witness in this case?
6    A. Mr. Rothschild.
7    Q. And do you know him from a previous
8 experience?
9    A. No.
10   Q. And how did that communication take
11 place? Did he call you on the phone? Did he
12 write you?
13   A. Oh, I am not sure I remember. It was
14 either a phone or E-mail. I am sorry, I
15 don't remember.
16   Q. And do you know when that occurred?
17   A. Late in the year, maybe. Maybe
18 December, early January.
19   Q. Do you remember what he asked you to
20 do?
21   A. He asked --
22   MR. ROTHSCHILD:
23      You mean in that phone call?
24 BY MR. THOMPSON:
25   Q. In the phone call.

12
1    A. He asked if I would willing to serve
2 as an expert witness. In fact, I believe it
3 was a phone call. I believe we did chat by
4 phone.
5    Q. And did he tell you what he wanted
6 you to be an expert witness on, what subject
7 matter?
8    A. Well, he already knew the work that I
9 had done on the book, and so it was as a
10 witness on The Wedge Strategy and the
11 background of that, stuff that I have written
12 about in the book.
13   Q. And the book we have been referring
14 to is what?
15   A. *Creationism's Trojan Horse.*
16   Q. When was that written?
17   A. That was written over a period of
18 years from about 2000 to late -- oh, late
19 2003, published early 2004.
20   Q. And you collaborated on that book
21 with whom?
22   A. I have a co-author, Paul R. Gross.
23   Q. And could you give me his background,
24 please?
25   A. He is a scientist. He was a marine

## Deposition of Professor Barbara Forrest - 6/7/05

57

1   The second one is religion is also
2 sometimes understood as a special sensitivity
3 to mystery where mystery means an
4 inexhaustible and incomprehensible presence
5 that enfolds the ordinary world and is not
6 fully accessible to ordinary or scientific
7 experience, that's second. And the third one
8 is finally, in western culture, religion has
9 usually taken the form of theism, a belief in
10 an ultimate mystery known as God.
11      First of all, I think your definition
12 of religion probably followed the third
13 definition; is that correct?
14   A. Right, and I didn't give a definition
15 of religion. I said --
16   Q. No. I am talking about our
17 definition as we discussed it here today.
18   A. Yes. The understanding of religion
19 as I understand it would certainly include a
20 belief in a supernatural diety, yes.
21   Q. Would you --
22   A. That's a part of religion.
23   Q. Would you agree with Professor Haught
24 that it also means the surrender of one's
25 mind and heart to whatever is considered to

58

1 be ultimate in importance and explanatory
2 power?
3   A. For some people, it means that. I am
4 not sure that everybody would say that.
5   Q. Would you agree with it or disagree
6 with that definition?
7   A. I am sorry, with what definition?
8   Q. The one I just gave you?
9   A. There are three parts to his
10 definition. Are you asking if I agree --
11   Q. There are three definitions of
12 religion that he uses, and basically he says
13 religion could mean any one of the three.
14   MR. ROTHSCHILD:
15      Can I just see the report?
16   MR. THOMPSON:
17      Sure. My handwriting is on it.
18   MR. ROTHSCHILD:
19      I tried to not look at your notes.
20   MR. THOMPSON:
21      I got a clean copy.
22   MR. ROTHSCHILD:
23      It is here.
24 BY MR. THOMPSON:
25   Q. It is down here, I think, in a very

59

1 general sense?
2   A. Yes.
3   MR. ROTHSCHILD:
4      So the question is whether she
5 disagrees or agrees with any of these?
6 BY MR. THOMPSON:
7   Q. Disagrees or agrees with it?
8   A. Let me take a look, too. What
9 Professor Haught is doing here is giving the
10 various ways in which religion has been
11 understood, right, the various things that
12 has been conceived to be and he gives three
13 of them.
14   Q. Yes.
15   Q. And do you agree with those?
16   A. From the -- I had a course in
17 philosophy of religion when I was a graduate
18 student, and all of these things would fall
19 under, you know, what we studied certainly in
20 that class.
21   Q. And would you personally agree with
22 it today?
23   A. I would agree that people have
24 embraced, you know, those aspects of
25 religion. Different people embrace different

60

1 aspects of them, certainly reflects I think
2 how religious people have understood what
3 they are doing or what they believe.
4   MR. ROTHSCHILD:
5      Is it a good time to take a break?
6   MR. THOMPSON:
7      Sure.
8      (A short break was taken).
9 BY MR. THOMPSON.
10   Q. Professor Forrest, I found the
11 document that I was looking for that may
12 assist you in refreshing your recollection
13 about the issue you had with the Livingston
14 Parish. Would you take a look at that?
15   A. Oh, yes.
16   MR. ROTHSCHILD:
17      Is this something you want to mark?
18 BY MR. THOMPSON:
19   Q. No. I just wanted to refresh your
20 recollection.
21   A. Yes.
22   MR. ROTHSCHILD:
23      Is there a particular question?
24 BY MR. THOMPSON:
25   Q. Yeah. I wanted to see if you can

## Deposition of Professor Barbara Forrest - 6/7/05

61

1 give us a little more specifics as to what
2 the curriculum policy you were objecting to
3 stated?
4   A. There was no formal policy, okay.  A
5 policy was never adopted in this case.  I was
6 objecting to the curriculum, the set of
7 lesson plans or whatever it was.  I was
8 objecting to the proposal that that be
9 adopted in our science classes.
10   Q. That particular lesson plan, does
11 that refresh your recollection as to what it
12 really held?
13   A. Yeah.
14   Q. And what was the lesson plan
15 specifically stating as it relates to, you
16 know, creationism?
17   A. It was quite long, actually, but here
18 I quoted that -- well, there was a gentleman
19 John Gawmond, I remember him, who had, I had
20 forgotten about the petition actually to put
21 intelligent design in the science classes.
22 Yes, they are the objectives.
23   Q. Let me ask you a specific question,
24 maybe you can answer it.  Does what the
25 school board attempted to do in Livingston

62

1 Parish relate to the intelligent design
2 theory?
3   A. I would say yes, it does.  Looking
4 back at, you know, use of the term
5 intelligent design.
6   Q. And how did it do that?
7   A. How specifically, sir?
8   Q. Yes.
9   A. I would want to give the specifics of
10 it, I would need to go back and look through
11 the document itself, the curriculum guide to
12 give you the specifics.  I would want to be
13 able to do that and I don't have it with me.
14   Q. Do you remember, just looking at that
15 document to refresh your recollection,
16 whether the lesson plan called for a theory
17 of young earth creationism?
18   A. I know that these were here, I have
19 got a statement here, I know that the
20 gentlemen who drew this up are young earth
21 creationists, I do recall -- I do know that.
22 And as I remember one specifically, I
23 remember one of those gentlemen, he is
24 well-known down here.
25   Q. Do all intelligent design theorists

63

1 believe in young earth creationism?
2   A. All of them?
3   Q. Yes.
4   A. No.
5   Q. Do most of them?
6   A. Some do.
7   Q. Just some?
8   A. I would say most do not, but some do.
9 There are young earth creationists in their
10 movement.
11   Q. How would you define Darwin's theory
12 of evolution?
13   MR. ROTHSCHILD:
14     Objection, vague, overbroad.
15   THE WITNESS:
16     Which means?  I am sorry.
17   MR. ROTHSCHILD:
18     You may answer unless I instruct you
19 not to answer.
20   THE WITNESS:
21     I mean I am certainly not a
22 scientist, okay.  Darwin's theory, the crux
23 of Darwin's theory lies in the mechanism of
24 natural selection.
25 BY MR. THOMPSON:

64

1   Q. Are there any other claims in
2 Darwin's theory of evolution that you are
3 aware of?
4   MR. ROTHSCHILD:
5     Objection.
6   THE WITNESS:
7     I am sorry, that's a bit broad.
8 BY MR. THOMPSON:
9   Q. Does Darwin's theory of evolution
10 discuss gradualism?
11   A. Darwin certainly did believe that
12 this takes place gradually, yes.
13   Q. Did Darwin's theory of evolution
14 discuss common descent?
15   A. Yes.
16   Q. That's all a part of Darwin's theory
17 of evolution?
18   A. Sure.
19   MR. ROTHSCHILD:
20     Just so we can be clear, when we're
21 talking about Darwin's theory, we're just
22 talking about Darwin right now as opposed to
23 the theory of evolution as it --
24 BY MR. THOMPSON:
25   Q. Yes.

**Deposition of Professor Barbara Forrest - 6/7/05**

65

1   A. As you are asking me the question, I
2 am thinking of Darwin as he wrote it in the
3 *Origin of Species*, okay, so you know, I want
4 to make it clear that my questions are with
5 what Darwin himself said in mine knowing that
6 evolution has, you know, come a long way
7 since then, too. So I am addressing Darwin's
8 thinking as I am familiar with it.
9   Q. Yes. And that's what I asked,
10 Darwin's theory of evolution and not the
11 theory of evolution.
12   A. Sometimes people refer, you know,
13 they call it all Darwinism. It is not
14 exactly accurate.
15   Q. Did you read Darwin's *Origin of*
16 *Species*?
17   A. Yes, I read a good part of it. I
18 have my students read it.
19   Q. So you have read it several times?
20   A. I teach it. Yes, I teach excerpts of
21 it.
22   Q. In what class?
23   A. My graduate seminar in the history of
24 western thought, and a little bit of it in my
25 undergraduate history of ideas class.

66

1   Q. Now, you identify yourself as a
2 philosophy instructor?
3   A. Philosophy professor.
4   Q. Philosophy professor?
5   A. Thank goodness I am not an attorney.
6   Q. Are you a part of the philosophy
7 department at your university?
8   A. No. I am actually I am housed in the
9 department of history and political science.
10   Q. Is there a philosophy department --
11 what's the name of your university?
12   A. Southeastern Louisiana University.
13   Q. Is there an philosophy department in
14 Southeastern Louisiana University?
15   A. No, don't -- we're an
16 interdisciplinary development. Philosophy is
17 taught in the history and political science
18 department.
19   Q. What about biology, where is that
20 taught?
21   A. It is taught in the department of
22 biological sciences.
23   Q. So your university brings in several
24 disciplines in to one department?
25   A. My department comprises of three

67

1 disciplines.
2   Q. And what disciplines are those?
3   A. History, political science.
4 philosophy.
5   Q. And are you currently teaching any
6 courses there?
7   A. Yes, sir. Well I will be, starting
8 Wednesday.
9   Q. And what courses are you teaching?
10   A. I will be teaching an intro,
11 introductory philosophy and then later, the
12 second term I will be teaching history of
13 western civilization.
14   Q. Are any of the courses that you teach
15 dealing with science and religion?
16   A. No, we don't have a specific course
17 in science and religion, no. And in
18 philosophy, you touch on those subjects, you
19 talk a little bit about just about
20 everything, you know, periodically because we
21 don't have a specific course in science and
22 religion.
23   Q. Do you have a specific course in your
24 philosophy department?
25   A. We don't have a philosophy

68

1 department?
2   Q. History and political science?
3   A. Yes.
4   Q. Department, in your department do you
5 have a specific course on the theory of
6 evolution?
7   A. No, not in the history and political
8 science department, no.
9   Q. Do you have a specific course on the
10 theory of intelligent design?
11   A. No.
12   Q. What specific courses have you taught
13 in the last 10 years?
14   A. You mean all of them?
15   Q. Yes. What kind of course?
16   A. What are you asking me? What
17 specific courses I have taught?
18   Q. Yes.
19   A. I have taught philosophy 301 which is
20 an introductory course, philosophy 302 which
21 is an introductory class.
22   Q. It is an introductory class?
23   A. Those are both introductory classes.
24 They are just organized a bit differently.
25 Philosophy 310 which is critical thinking;

## Deposition of Professor Barbara Forrest - 6/7/05

69

1 philosophy 315 which is philosophy of
2 history, philosophy 417 which is the history
3 of ideas.
4   MR. ROTHSCHILD:
5     Slow down for the court reporter.
6   THE WITNESS:
7     Oh, I am sorry.  My students make me
8 slow down, too.  I tend to talk a bit fast.
9 I teach history 630 which is a graduate level
10 seminar in the history of western thought.
11 BY MR. THOMPSON:
12   Q.  In the course on critical thinking,
13 what kind of subjects do you take up?
14   A.  It is a very, you know, it is typical
15 introductory for students that have not had,
16 you know, any philosophy.  They learn what
17 arguments are, they learn what fallacies are,
18 they learn how to tell an inductive argument
19 from a deductive argument, the standard stuff
20 pretty much.
21   Q.  What is the difference between an
22 inductive and deductive argument?
23   A.  An inductive argument in one in which
24 the conclusion is derived at with
25 probabilities.  It is not logically

70

1 necessary.  Deductive argument is one in
2 which the premises are true, they guarantee
3 the truth of the conclusion.
4   Q.  In the discussion of fallacies, have
5 you ever heard of a genetic fallacy?
6   A.  Sure.
7   Q.  What is that?
8   A.  A fallacy in which you dismiss a
9 person's argument because of where it comes
10 from or dismiss an idea because of its
11 origin, yeah.
12   Q.  What about the fallacy ad Hominem?
13   A.  That's the fallacy of personal attack
14 where you address your comments to a person's
15 character rather than his arguments
16   Q.  We were discussing Darwin's theory of
17 evolution.
18   A.  As Darwin understood it; right.
19   Q.  As Darwin understood it.  And we were
20 -- are there any other specific claims that
21 Darwin made that you can remember?
22   MR. ROTHSCHILD:
23     Objection, overbroad.
24   THE WITNESS:
25     That's very broad.  It is a very

71

1 long, complicated book.
2 BY MR. THOMPSON:
3   Q.  Well, let me be more specific then.
4 We discussed gradualism, did we not, things
5 that occur gradual overtime?  Did we discuss
6 that?
7   A.  Yes, you asked me -- I think you
8 asked me if Darwin talks about that and he
9 does.
10   Q.  And do you recall what his theory is
11 on gradualism?
12   A.  That evolution occurs by, you know,
13 an accumulation of changes, you know, in
14 organisms over time.  It is a very general
15 statement.
16   Q.  But over a long period of time?
17   A.  Yes.  I don't think he disallows it.
18 It can happen a little bit more rapidly at
19 times, it seems to me that he does, but on
20 the whole, he regards it as something that
21 happens pretty gradually.
22   Q.  You also mentioned I think that there
23 was, I think the first thing you mentioned
24 was the mechanism of natural selection?
25   A.  Yes, that was Darwin's contribution.

72

1   Q.  And what does that mean?
2   A.  Natural selection means that traits
3 that organisms have that prove to be
4 advantageous, and especially in reproduction
5 tend to be preserved in a particular
6 environment and then spreads throughout the
7 population.
8   Q.  The theory of intelligent design, as
9 you understand it, does it confront all of
10 the various claims that we have made that we
11 just discussed in Darwin's theory of
12 evolution?
13   MR. ROTHSCHILD:
14     Let me make sure that we agree on
15 what the list is.
16   THE WITNESS:
17     Yes, Darwin makes many claims.
18 BY MR. THOMPSON:
19   Q.  Let's make sure we know what the list
20 is.  Common descent; right?
21   A.  Sure.
22   Q.  Gradualism?
23   A.  Yes.
24   Q.  Natural selection?
25   A.  Sure.

## Deposition of Professor Barbara Forrest - 6/7/05

73

1  Q. My question is does the theory of
2  intelligent design confront every one of
3  those claims that Darwin made?
4    A. It certainly addresses common
5  descent.
6    Q. In what way?
7    A. It depends on who you are looking at.
8  Professor Law, for example, rejects common
9  descent.
10   Q. Do all intelligent design theorists
11 object to common descent?
12   A. I think Professor Behe probably
13 accepts it more than some others do according
14 to what he has stated.
15   Q. When you say accepts more than some
16 others do, does he not accept it period?
17   A. That's a fairly absolute statement.
18 I wouldn't want to say that he issues no
19 qualifications because I really, you know, I
20 am not familiar with any qualifications
21 specifically that he might have issued.
22      I believe he finds the idea to be
23 much more amenable to his understanding of
24 science than some of the other gentlemen do.
25   Q. Isn't it true that many intelligent

74

1  design theorists hold that the earth can well
2  be four million years old?
3    A. Yes, some of them do, yes.
4    Q. Most of them do?
5    A. Yes.
6    Q. Is that true?
7    A. Yes, I would say that characterizes
8  most of them, yes, from what I know.
9    Q. Now, regarding natural selection,
10 what do, in your opinion, what do intelligent
11 design theorists say about that?
12   A. They find it objectionable.
13   Q. And do you know what the reason is?
14   A. They don't believe that it is capable
15 of producing the degrees of complexity that
16 we find in organisms, biological organisms.
17   Q. Have you ever read *Darwin's Black Box*
18 by Professor Behe?
19   A. I have read sections of it.
20   Q. Do you remember what sections?
21   A. No. The sections I needed to consult
22 at various times when I was, you know,
23 looking up questions.
24   Q. Have you ever heard of the or read
25 the phrase irreducible complexity?

75

1    A. Yes.
2    Q. What does that mean to you?
3    A. I am sorry, you are asking me to
4  personalize a definition. I would not want
5  to do that.
6    Q. What does he mean by irreducible
7  complexity?
8    MR. ROTHSCHILD:
9      Object to the from. She's doesn't
10 know what --
11 BY MR. THOMPSON:
12   Q. You have read Darwin's theory -- you
13 have read Michael Behe's *Darwin's Black Box*
14 have you not?
15   A. I have read sections of it.
16   Q. Did you read the section that dealt
17 with irreducible complexity?
18   A. As I understand it, irreducible
19 comple --
20   Q. You can answer if you read it or not?
21   A. I have read his comments on
22 irreducible complexity; for example, his
23 definition of it.
24   Q. In *Darwin's Black Box*?
25   A. Yes, to see what his definition was.

76

1  yes.
2    Q. And want is his definition?
3    A. I can't give it to you verbatim. I
4  can just generally explain, as I understand
5  it, that all of the parts in an organism or a
6  structure had to have been placed,
7  constructed all in one fell swoop, right, the
8  parts all have to be there in order for the
9  structure to function. If any one part is
10 removed, then the structure ceases to
11 function. It is irreducibly complex in the
12 sense that it doesn't function without a
13 piece.
14   Q. And is it fair to say that that
15 particular theory that Michael Behe holds
16 directly conflicts with Darwin's theory of
17 natural selection?
18   MR. ROTHSCHILD:
19      Objection, lacks foundation, outside
20 her area of expertise. You can answer.
21   THE WITNESS:
22      Yes, I am not a scientist. You are
23 asking me to go into an area that I don't
24 specialize in.
25 BY MR. THOMPSON:

## Deposition of Professor Barbara Forrest - 6/7/05

77

1 Q. So you can't then give an opinion as
2 to whether Michael Behe's theory of
3 irreducible complexity is either valid or
4 invalid; is that true?
5 A. I can tell you what I have read about
6 it as it has been analyzed. For example,
7 Professor Pennock considers it to be a flawed
8 definition, Professor Behe apparently agreed
9 with that assessment.
10 Q. Is Professor Pennock a biologist?
11 A. He is a philosopher of science and he
12 has a biology degree, uh-huh.
13 Q. And do you remember what he
14 criticized about the --
15 A. That the definition of irreducible
16 complexity cannot make stipulations as to
17 what we find in fact, generally, and what we
18 find in fact is that things do function
19 without missing pieces, you know. It is not
20 correct to say that you can take out a piece
21 and they cease to function. Professor
22 Pennock would be the best person to ask about
23 his criticism of the definition.
24 Q. So basically, you're merely repeating
25 what Professor Pennock said?

78

1 A. Who is the expert on that aspect of
2 the issue, yes.
3 Q. Well then, is it fair to say that the
4 experts in biology are disagreeing over the
5 issue of irreducible complexity?
6 MR. ROTHSCHILD:
7 Objection.
8 THE WITNESS:
9 It depends on who you mean by experts
10 in biology.
11 BY MR. THOMPSON:
12 Q. Well, do you usual consider Michael
13 Behe and expert in biology?
14 A. He is a biochemist. He is not an
15 evolutionary biologist.
16 Q. Do you consider him an expert?
17 A. I am sorry, I wouldn't be in a
18 position to know if he is considered an
19 expert. I know that's what he does for a
20 living.
21 Q. A professor?
22 A. A professor.
23 Q. At Lehigh University?
24 A. Yes, he is a professor, right.
25 Q. Did you get any, by reading his book,

79

1 did you form an opinion as to whether he was
2 a qualified instructor?
3 MR. ROTHSCHILD:
4 Objection.
5 THE WITNESS:
6 I don't think I can answer that by
7 whether he was a qualified instructor by
8 reading that particular book.
9 BY MR. THOMPSON:
10 Q. Turning to your book, *Creationism's*
11 *Trojan Horse*, I would like to direct your
12 attention to page 11, down towards the middle,
13 two-thirds of the page down, quote, "we
14 believe, speaking about what is going --.
15 A. I am sorry, I have to find where we
16 are. On page 11, are you in the large
17 paragraph in the middle?
18 Q. Large paragraph in the middle down
19 towards the bottom of that large paragraph.
20 A. Which part?
21 Q. Let me point it out to you. Right
22 there (indicating), we also believe.
23 A. Okay. All right.
24 Q. Referring to Wedge's goal, you state
25 and I quote, we also believe that its

80

1 ultimate goal is to create a theocratic
2 state. What do you mean by that?
3 A. Well, there are different ways of
4 think of a theocracy. And in this particular
5 meaning that I intend is what is known as a
6 general theocracy in which people in
7 positions of public authority do have a,
8 those who influence public policy are people
9 who are fashioned in public policy according
10 to their own religious preferences.
11 Q. Is that a definition that you would
12 find in the political science department?
13 A. It is a definition that you would
14 find in the encyclopedia of religion that I
15 have used. There are different types of
16 theocracies, one would be government run by
17 the priests which I believe is called a
18 hierarchy and one is a general theocracy in
19 which people in positions of policy making
20 authority fashion policies to suit their
21 personal religious preferences, that's also
22 known as a general theocracy.
23 Q. When you speak about people in
24 positions of power, are you talking about the
25 different branches of government?

## Deposition of Professor Barbara Forrest - 6/7/05

81

1  A. Yes, it could be anyone in a
2 policy-making position in government.
3  Q. And which religion did they, would
4 they be probably in?
5  A. I am sorry, that's -- they could be
6 promoting any religion. I am not, you
7 know --
8  Q. I am talking about specifically with
9 reference to your statement there?
10  A. It depends on the, if you are asking
11 just in general theoretically?
12  Q. No, I am asking in the context of
13 your book?
14  A. In the context of my book.
15  Q. The Wedge document you say is aimed
16 at creating theocracy. What did you mean by
17 that?
18  A. That to embody the Christian beliefs,
19 particular Christian belief of the people who
20 are backing this program. So if your
21 question is am I talking about Christianity
22 or some other religion? I am talking about
23 Christianity. Does that help clarify what
24 you are asking me?
25  Q. Well, that's a part of it. I am

82

1 asking you what branches of government are
2 they going to take over?
3  A. I am sorry, I can't make any
4 predictions about that. I am thinking of, I
5 was speaking in general with reference to any
6 position in which policy might be made,
7 especially as it concerns education. I am
8 particularly concerned with education. It
9 could even be a school board, for example,
10 you know.
11  Q. When you say a theocratic state, you
12 are not talking about a particular board, you
13 are talking about the central government, are
14 you not?
15  A. Yes, I am talking about the
16 government of the United States.
17  Q. The government of the United States
18 consists of three branches?
19  A. Right.
20  Q. In other words, the Wedge document is
21 to take over all three branches of
22 government?
23  A. I think the Wedge document is a
24 document which in its stated goals aims to
25 refashion American culture, and one way to do

83

1 that, of course, is to have people in
2 positions of policy-making authority make
3 decisions that reflect the preferences of the
4 people who are promoting the Wedge strategy.
5  Q. So is it, if I understand what you
6 are saying, that you believe that the goal of
7 the Wedge strategy is to take over the
8 executive, judicial, and legislative branches
9 of government?
10  A. I think the goal of the Wedge
11 strategy is to have people in positions of
12 policy-making authority in government promote
13 their particular program to fashion policy
14 that is reflective of their desires.
15  Q. And in a country such as ours, to
16 change the policy, you need a majority vote
17 of the legislative branch of government, do
18 you not?
19  A. Yes, you would need people who have
20 such authority to enact policy.
21  Q. Well, the legislative branch of
22 government means that you --
23  A. That's one.
24  Q. Okay. And then you need the
25 president to sign it?

84

1  A. If you are talking about a bill being
2 passed, you would need the president's
3 signatures.
4  Q. I am talking about what you are
5 saying here, to have a theocratic state, you
6 would need the president to sign any bill
7 that would promote the particular religion,
8 in this case, Christianity, correct?
9  A. Theoretically, that's what you would
10 need.
11  Q. We're not talking about
12 theoretically, but we're talking about your
13 specific statement here. And thirdly, you
14 would need a court, a Supreme Court that
15 would uphold the constitutionality of that;
16 correct?
17  A. You would need a Supreme Court that
18 would uphold a particular piece of
19 legislation.
20  Q. Well, a theocratic state, you are not
21 just talking about a particular piece of
22 legislation. You are talking about a form of
23 government; are you not?
24  A. I am talking about a form of
25 government that -- actually may conceivably

## UNITED COURT REPORTERS, INC.
## 1-800-US-DEPOS

**Deposition of Professor Barbara Forrest - 6/7/05**

85

1 you could use a democratic system to enact
2 policies that are theocratically in their --
3 theocratic in their intent.  Democracies can
4 do lots of things.
5   Q. Do you think that a theocratic state
6 is compatible with democracy?
7   A. No, sir, I don't.
8   Q. Right.  So democracy could not in
9 itself promulgate a theocratic state?
10   A. People in a democracy could decide --
11 to theoretically vote to turn themselves into
12 just about anything they want.  That's one of
13 the -- it is one of the things about
14 democracies that people have noticed in
15 looking at it over the years.  People in
16 democracy could, you know, theoretically
17 decide to turn themselves into a dictatorship
18 if they wanted to, that's they have the
19 freedom to decide the system under which they
20 will live.
21   Q. To do that, they would have to amend
22 the constitution, would they not?
23   A. Either amend it or ignore it.
24   Q. And in your, when you were writing
25 that statement, how did you think that they

86

1 were going to do it?
2   A. I would think that one of the ways
3 they would do that would be to -- well, I can
4 give you an example of what I regard as a
5 small step in that direction.
6   Q. Sure.
7   A. People like Senator Santorum
8 supporting the promotion of intelligent
9 design, that's one example of what I am
10 talking about.
11   Q. Do you think that, and I think you
12 are referring to a Santorum amendment in the
13 2001 No Child Left Behind Act?
14   A. Yes.
15   Q. Do you believe that the goal of that
16 particular legislation was to begin the first
17 steps of a theocratic state?
18   A. I think it points in that direction.
19   Q. And what part of the amendment did
20 that?
21   A. I think the part that holds evolution
22 out for special consideration as
23 controversial since it reflects the idea that
24 the Discovery Institute is promoting.
25   Q. Didn't the amendment also say that

87

1 religion would not be taught?
2   A. I think that it makes some ambiguous
3 statements, and I think that the Santorum
4 amendment makes statement that if you know
5 the project of the Discovery Institute can be
6 certainly understood to be in compliance with
7 their views.  The statement itself is, can be
8 interpreted more than one way.
9   Q. Do you think that asking or intending
10 that a, when speaking about the theory of
11 biological evolution, that students should be
12 made of the controversy, made aware of the
13 controversy, do you think that's leading to a
14 theocratic state?
15   A. It depends on what you mean by
16 controversy.  Could you tell me what you mean
17 by it?
18   Q. The dispute over the theory of
19 evolution and many of the claims that are
20 made under it?
21   A. The controversy as it is being
22 promoted by the Discovery Institute I do not
23 regard as a genuine controversy.
24   Q. And why is that?
25   A. Because the controversy over

88

1 evolution as they portray it simply is not a
2 controversy within science itself.
3   Q. How do you define science?
4   A. I am sorry, that's a very broad
5 question.  I can tell you how I understand
6 science, I can give you my understanding of
7 it.  It is a systematic way of studying the
8 natural world in order to explain it and it
9 certainly involves the search for natural
10 explanations for the phenomena that
11 scientists observe.
12   Q. And where did you come up with that
13 definition?
14   A. That's, I don't call that definition.
15 That's my understanding of science.  That's
16 the understanding of science that I grew up
17 with as I was taught it.  It is the way that
18 scientific method operates as I was always
19 taught that in school.
20   Q. Well, would you agree that that
21 definition is a man-made definition?
22   A. Certainly.  Science is a man-made
23 discipline.  It is people who do it.
24   Q. And so they can change it if they
25 wanted to; is that correct?

**UNITED COURT REPORTERS, INC.**
**1-800-US-DEPOS**

**Deposition of Professor Barbara Forrest - 6/7/05**

89

1   A. They don't, not just on a whim, no.
2 I mean they would have to --
3   Q. I didn't say on a whim, I said but
4 they can change it if they want to, isn't
5 that correct?
6   A. People can always change definitions,
7 yes, sir.
8   Q. And then whatever the new definition
9 is, then the rest of the scientific community
10 would then follow that definition?
11   A. I don't know that you would have a
12 committee that would sit down and write a new
13 definition of science.  The definition of
14 science, the understanding of science as the
15 search for natural explanations for natural
16 phenomena reflects the way that science has
17 been very successfully done now for quite a
18 long time.
19   Q. Isn't it true that that's one of the
20 points of controversy right now. what is
21 science?
22   A. It is a point of controversy with
23 Discovery Institute. It is not a point of
24 controversy within the scientific community
25 as I understand it.

90

1   Q. Well, have you ever heard of Larry
2 Laudin?
3   A. Yes.
4   Q. Have you heard of Carl Popper?
5   A. Yes.
6   Q. Do they agree with your definition?
7   A. I couldn't say.
8   MR. ROTHSCHILD:
9     Objection, that is at least one of
10 them dead?
11 BY MR. THOMPSON:
12   Q. Did they agree with your definition?
13   A. My definition is based on what I
14 understand scientists to be doing.  Those
15 gentlemen, Carl Popper wasn't a scientist,
16 Mr. Laudin isn't a scientist.
17   Q. Well, fine.  Do you recall the
18 dispute that Mr. Laudin got involved with
19 after the Judge Overton gave his definition
20 of science?
21   A. Oh, something about the demarcation
22 dispute, yes.
23   Q. Yes.
24   A. Yes.
25   Q. Do you remember that?

91

1   A. I remember that there was some
2 discussion of that, yes.
3   Q. Are you very familiar with that
4 dispute?
5   A. I am not very familiar with
6 Mr. Laudin's specific treatment of it, no.
7   Q. Well, being a philosophy professor,
8 are you familiar with Aristotle's view of
9 science?
10   A. That was in -- Aristotle certainly
11 was fascinated with the natural world and I
12 was, so, yes, I am familiar with Aristotle.
13   Q. Do you remember how he defined
14 science?
15   A. I think one of the things you have to
16 understand is that science in that day was
17 not quite the same thing as it is today, so
18 Aristotle, even though Aristotle was
19 fascinated with the natural world, the modern
20 concept of science took a while to develop.
21 So again, I wouldn't want to say that
22 Aristotle thought of science in exactly the
23 same way as modern scientists do.
24     Science for Aristotle is a particular
25 type of knowledge.  Science in the ancient

92

1 sense meant knowledge, it meant to know.
2 Science for quite a long time was called
3 natural philosophy, so it depends on, you
4 know.
5   Q. But in Aristotle's day, was he not
6 trying to define science from non-science,
7 was he not?
8   A. If you are talking about science and
9 the modern understanding of the word as
10 purely the study of the natural world,
11 Aristotle didn't use the word science in that
12 way.  Aristotle wrote about the natural
13 world, he wrote about metaphysics, he wrote
14 about many things.  I wouldn't say that --
15 you can't look at Aristotle and try to find,
16 you know, what you consider a modern
17 definition of science in Aristotle.
18   Q. Have you ever read *Posterior*
19 *Analytics* by Aristotle?
20   A. No.
21   Q. That's what I was referring to when
22 I --
23   A. I am sorry, that's -- that was not
24 something in the course of my graduate
25 studies or in my teaching, I have dealt with

**Deposition of Professor Barbara Forrest - 6/7/05**

93

1 that particular book.
2   Q. Would it be fair to say that up
3 through the 18th century, that science was
4 defined in a different way than what is
5 being, what it is being defined as now?
6   A. I can't give you a formal definition
7 of science that held up through the 18th
8 century. The conception of science was in
9 some ways somewhat different, yes, and it
10 depends on which side you are looking at. I
11 mean I think Galileo and the physical
12 sciences were not exactly in the, you know,
13 in the same position as the biological
14 sciences. So it depends on what area of
15 science you are looking at, I think.
16   Q. There was, I guess without trying to
17 pin you down on specifics, there were
18 throughout history different definitions of
19 science that not only philosophers used but
20 also the scientists themselves; is that
21 correct?
22   A. I would not want to be so specific as
23 to says definitions. There were different
24 ways of understanding how one -- different
25 ways of trying to understand the world.

94

1 Different understandings, different ways of
2 trying to learn about the natural world, and
3 I can't speak to formal definitions.
4   Q. And as a part of that process in
5 history was that people, scientists were
6 looking for first causes; is that true?
7   A. Some of them were. Certainly
8 Aristotle was looking for first causes but
9 that's part of Aristotle's metaphysics.
10   Q. And even some of the scientists
11 themselves that we uphold in the history of
12 science thought that that's what they were
13 doing as well?
14   A. In the historical development of
15 science, you see a movement away from looking
16 for first cause. If you are talking about
17 first causes in the sense of God or
18 Aristotle's unmoved movement, that is not a
19 part of standard scientific practice anymore.
20 For a while, I am sure that, you know, some
21 scientists considered themselves doing that
22 but it has come to -- it is no longer part of
23 what scientists do.
24   Q. Isn't it true --
25   A. Because it takes you outside the

95

1 realm of scientific methodology as it is
2 currently understood.
3   Q. And are you familiar with the
4 scientific methodology as it is currently
5 understood?
6   A. Yes, pretty much, it is a way of --
7 it is not one particular method or procedure.
8 It is more a way of approaching, you know,
9 the study of the natural world, and it is a
10 methodology that limits itself to the search
11 for natural explanations because it is a
12 science of an empirical discipline.
13   Q. You have used natural world and
14 natural -- what was the other phrase, natural
15 world and natural what? Implications?
16   A. I don't know.
17   Q. What is your definition of nature?
18   MR. ROTHSCHILD:
19     Objection.
20   THE WITNESS:
21     That's pretty broad, sir.
22 BY MR. THOMPSON:
23   Q. Well, I am trying to understand you
24 know what you mean by science is dealing with
25 the natural world. You must have a

96

1 definition of that?
2   A. Certainly it includes what is
3 accessible to our observationable faculties,
4 the faculties that we use, for example, to
5 observe what lies within reach of, you know,
6 the faculties that humans have.
7   Q. But would you agree that we are not
8 totally aware of what nature is?
9   MR. ROTHSCHILD:
10     Objection.
11   THE WITNESS:
12     We are aware of what lies within our,
13 the reach of the faculties that we have. We
14 have five senses, we have the ability to
15 reflect rationally on what the five senses
16 tell us. We have cognitive faculties that
17 are able to know a great deal about what lies
18 within the reach of the capabilities humans
19 have.
20 BY MR. THOMPSON:
21   Q. But would you agree that our
22 knowledge is ever increasing?
23   A. Within the area that lies within
24 reach of the faculties that we have, yes, I
25 would say knowledge is always increasing.

97

1  Q. That we really don't know the full
2 parameters of nature, do we?
3   MR. ROTHSCHILD:
4     Objection.
5   THE WITNESS:
6     I would have to get you to be more
7 specific on that, what you mean by the full
8 parameters of nature.
9 BY MR. THOMPSON:
10  Q. You are confining science to nature,
11 isn't that true?
12  A. Yes, science is the study of the
13 natural world.
14  Q. And I am saying we don't really know
15 what those confines are, do we?
16  A. I can tell you --
17   MR. ROTHSCHILD:
18     Objection.
19   THE WITNESS:
20     Shall I answer?
21   MR. ROTHSCHILD:
22     Sure.  I am not sure the question
23 makes sense.
24   THE WITNESS:
25     I can tell you that scientists seek

98

1 to understand what lies within their
2 empirical reach and what they can determine
3 based on the empirical data they have.
4 BY MR. THOMPSON:
5  Q. And so is it true then that
6 scientists might be looking at the same
7 empirical data but coming out with different
8 conclusions?
9  A. The conclusions would have to be
10 confined to those that are within the realm
11 of the reach of their cognitive faculties
12 that the scientist have.  If they draw
13 conclusions about the supernatural, then they
14 would be going beyond their proper reach.
15  Q. And when you say proper, that's
16 because your definition makes it improper; is
17 that correct?
18  A. No, sir, it is not my definition.  It
19 is standard scientific procedure that's been
20 established very successfully over quite a
21 long period of time.
22  Q. And you also agree that that could be
23 changed at any time by the scientific
24 community?
25  A. If someone comes up with something

99

1 that works better in its place, it is
2 conceivable.  So far, no one has.
3  Q. Well, when someone starts out with a
4 minority view, that minority view is also
5 going to be under criticism from the
6 consensus of the community; is that true?
7   MR. ROTHSCHILD:
8     Objection, it is just impossibly
9 vague.
10   THE WITNESS:
11     Yes, that is very vague.  You would
12 have to specific what type of minority view
13 you are talking about.
14 BY MR. THOMPSON:
15  Q. Well, let's talk about the big bang
16 theory.  You heard of the big bang theory?
17  A. Sure.
18  Q. At one point is it true that most
19 scientists believed that the universe was
20 constant unchanging?
21  A. Certainly there was a point at which
22 that was a very new theory, big bang was a
23 very new idea and it would have taken, you
24 know, a while for it to be tested, certainly.
25  Q. Well, and are they still testing it?

100

1  A. Yes, they are still carrying it out.
2  Q. Do you recall that when the big bang
3 theory was first introduced, that Einstein
4 himself called the person introducing it a
5 buffoon; do you recall that?
6   MR. ROTHSCHILD:
7     Well, I am not sure she was around.
8 BY MR. THOMPSON:
9  Q. Did you read about that?
10  A. Yes, that's, you know, that was a, I
11 guess a pretty novel idea at one point.
12  Q. And so by being a novel idea, it was
13 criticized by main stream science, was it
14 not?
15  A. Because it was an idea certainly that
16 was one that was test, you know, expected to
17 be testable within the methodology that
18 science works with.  It was, you know, I
19 don't think it was proposed as anything
20 supernatural or outside the boundaries of
21 science.
22  Q. Well, are you saying that there are
23 no supernatural implications of the big bang
24 theory?
25   MR. ROTHSCHILD:

## Deposition of Professor Barbara Forrest - 6/7/05

101

1    Objection.
2    THE WITNESS:
3        That's not a scientific question.
4 BY MR. THOMPSON:
5    Q. I am just asking the question.
6 Whether it is scientific or not --
7    A. I guess a person thinking --
8    MR. ROTHSCHILD:
9        Objection to the word implications.
10 It is --
11    THE WITNESS:
12        Yes.  It would depend on what you
13 mean about what the specific, you know, what
14 are the specific implications that you are
15 asking me about.
16 BY MR. THOMPSON:
17    Q. The implications of there being a
18 start to the universe?
19    A. A supernatural start you mean?
20    Q. Yes.
21    A. That might be a conclusion that a
22 person operating outside science might draw.
23    Q. Well, isn't that the reason why many
24 scientists objected to it at first?
25    MR. ROTHSCHILD:

102

1    Objection.
2    THE WITNESS:
3        I am not sure.
4 BY MR. THOMPSON:
5    Q. From your knowledge, is research
6 still being done to confirm the big bang
7 theory?
8    MR. ROTHSCHILD:
9        Objection to the word confirm.
10    THE WITNESS:
11        I think as far as I understand it,
12 there is certainly a scientific research
13 going on that's relevant to the big bang
14 theory.  It seems to me that from speaking
15 from a layman's standpoint, that scientists
16 have not come up with any evidence that would
17 at that point lead them to change their ideas
18 about it.  I think it is pretty much
19 considered right now the prevailing view
20 about the origin of the certainly the
21 universe that, the physical universe that we
22 live in.
23 BY MR. THOMPSON:
24    Q. Now, you indicated as one of the
25 criterias for science is that we have to be

103

1 able to see with our faculties, observe it?
2    A. That's -- no, sir.  That's a -- it
3 has to be accessible to the faculties that we
4 have, the sensory faculties, the cognitive
5 faculties, and we certainly can use that
6 information to draw conclusions.  We are
7 capable of engaging in rational reflection
8 about the data that are accessible to the
9 faculties that we have.
10    Q. And so when Michael Behe looks at the
11 irreducible complexity of the bacteria
12 Flagella which is in his book *Darwin's Black
13 Box*, and comes up with the conclusions,
14 theory that there has to be intelligent
15 design, is that a rational conclusion based
16 upon the empirical data that he has observed?
17    A. I think that's a conclusion which
18 Professor Behe is going beyond the data that
19 he has.
20    Q. And why do you say that?
21    A. Because intelligent design, as I
22 understand it, is the idea that a
23 supernatural creator is responsible for these
24 things.
25    Q. Have you heard or read where he used

104

1 the term a supernatural creator is
2 responsible for it?
3    A. Dr. Behe in his book states that the
4 exclusion of supernatural explanations from
5 sciences and he believes it is an artificial
6 constraint on science which indicates to me
7 that he believes that supernatural
8 explanations should be permitted within
9 science.
10    Q. Well, you know, some people have
11 postulated that it doesn't have to be a
12 supernatural being at all, but that aliens
13 have planted it.  Have you heard that?
14    A. Yes.  I have heard that.
15    Q. Now, would that make it a scientific
16 theory then because we haven't gone to
17 supernatural?
18    A. If you are talking about you know,
19 aliens in the sense of natural entities
20 maybe, you know, from another galaxy, you are
21 certainly talking about if it is anything to
22 which, you know, beings to which we have
23 access with the faculties that we have, they
24 would be natural beings.
25    Q. Well, isn't it we make those kind of

**Deposition of Professor Barbara Forrest - 6/7/05**

109

1 Objection to the question for so many
2 reasons I probably couldn't even list them.
3 BY MR. THOMPSON:
4 Q. Is there any rationality in coming to
5 that conclusion?
6 A. I don't regard -- I don't think you
7 are really talking about agency in the same
8 sense, sir. In one sense, we have seen
9 people creating artifacts. Right? I think
10 if you are trying to draw the conclusion that
11 an intelligent designer, a supernatural
12 designer came up with a bacterial flagellum,
13 that lies beyond the reach of human
14 experience, and I don't think we can consider
15 them in the same category, no, I don't.
16 Q. Well, at this moment, it may arise
17 beyond the reach of human experience, but is
18 it a logical determination to make?
19 MR. ROTHSCHILD:
20 Objection.
21 THE WITNESS:
22 I don't think I can answer that in
23 the way that you are phrasing it, a logical
24 determination to make. It is not a
25 conclusion that lies within the boundaries of

110

1 the reach of our empirical faculties if
2 that's what you are asking me.
3 BY MR. THOMPSON:
4 Q. Well, I mean there are a lot of
5 things that we discuss in science that's
6 beyond our, the reach of our observable
7 empirical faculties, is there not?
8 A. Well, may I just say that in one of
9 the things that Professor Dembski wrote, he
10 specified that he was talking about a
11 supernatural intelligence where he writes
12 about the possibility of aliens and he
13 writes, he is talking about a supernatural
14 transcendent intelligence. And in that
15 sense, I just think that you are asking the
16 question or drawing a conclusion about
17 something like the bacterial flagellum, it is
18 not comparable to what we do when we draw
19 conclusions about things that we have
20 experience of having been designed like
21 writing messages, building cars, things like
22 that. I think you are talking about two
23 different things.
24 Q. But you don't see the same kind of
25 logic being used?

111

1 A. I don't see the same type of a
2 histological foundation so I don't think you
3 can draw a comparable conclusion.
4 Q. Have neutrons, the theory of
5 neutrons, has that been accessible to our
6 observational faculties?
7 MR. ROTHSCHILD:
8 Objection.
9 THE WITNESS:
10 Are you asking me if I have ever seen
11 a neutron?
12 BY MR. THOMPSON:
13 Q. Well, empirically, yes, empirically
14 whether or not you have seen it, whether
15 scientist have seen it?
16 A. At some point, anything that the
17 scientists postulate has to be empirically
18 confirmable. The conclusions that they draw
19 may go beyond the reach of their immediate
20 experience but it cannot go beyond the reach
21 of the faculties that they are using to
22 gather the data.
23 Q. What about electrons, same answer?
24 A. Same thing.
25 Q. What about quarks?

112

1 A. I would say the same thing, it is all
2 part of physics, is part of physics and a
3 scientist cannot draw conclusions that lie
4 beyond the reach of the faculties that the
5 scientists have to work with.
6 Q. But no one sees that, there is no
7 empirical data that they can look at and say
8 uh-huh --
9 A. May I say that you are approaching
10 this in a much too simplistic a fashion. It
11 is not just a matter of seeing, of talking
12 about what's immediately before your eyes. I
13 think that's a, maybe a naive way to look at
14 science. Scientists certainly don't draw
15 conclusions about what lies beyond the reach
16 of their empirical faculties and their
17 ability to draw conclusions about the data
18 that are accessible to those faculties.
19 Q. Do you think there is any, any
20 validity to what Professor Behe holds based
21 upon his examination of the bacterial
22 flagellum?
23 A. What kind --
24 MR. ROTHSCHILD:
25 Objection.

Deposition of Professor Barbara Forrest - 6/7/05

113

1 THE WITNESS:
2    What kind of validity?
3 BY MR. THOMPSON:
4    Q. Philosophical validity.
5    MR. ROTHSCHILD:
6       Objection.
7    THE WITNESS:
8       I think the question, the relevant
9 question is a scientific validity.
10 BY MR. THOMPSON:
11    Q. Okay.  I was going to ask that next,
12 but since you were a philosopher, I want to
13 ask about philosophy.  Did you think there is
14 any philosophical validity to anything that
15 Professor Behe has done with reference to --
16    A. As long as you are specifying that
17 you are talking about a philosophical
18 conclusion that goes beyond the boundary of
19 strictly what you can consider scientific.
20 You see, people can draw lots of
21 philosophical conclusions.
22    Q. They can draw conclusions that are
23 based on logic?
24    A. Which kind of logic?  There are two
25 kinds, inductive and deductive.

114

1    Q. Either one.
2    MR. ROTHSCHILD:
3       Can people generally draw conclusions
4 based on inductive or deductive reasoning?
5 BY MR. THOMPSON:
6    Q. No, talking about Michael Behe's
7 research on the bacteria flagellum.
8    MR. ROTHSCHILD:
9       What's the question?
10    THE WITNESS:
11       I am sorry, repeat that.
12 BY MR. THOMPSON:
13    Q. Is there any validity logically to
14 what Professor Behe has concluded from his
15 observations of the bacterial flagellum?
16    MR. ROTHSCHILD:
17       I just wanted -- are you asking is it
18 okay that he engages in a form of logic or
19 are you asking her whether --
20    MR. THOMPSON:
21       The validity.
22    MR. ROTHSCHILD:
23       The conclusions he drew from his --
24 BY MR. THOMPSON:
25    Q. Are there any, is there any validity?

115

1    A. Of any kind?
2    Q. Speaking about the bacterial
3 flagellum?
4    MR. ROTHSCHILD:
5       Objection.
6    THE WITNESS:
7       There are different types of
8 validity, sir.  Logical validity is a very
9 specific thing.
10 BY MR. THOMPSON:
11    Q. Yes.
12    A. And if you are asking me to draw, to
13 talk about deductive logic in which validity,
14 logical validity is a concept that makes
15 sense, then I am not sure what you are asking
16 me to saying that Professor Behe is doing.
17    Q. Does it make sense, does any of his
18 conclusion make sense?
19    A. Within what context?
20    Q. Within the context of his study of
21 the bacterial flagellum?
22    A. Within the context of science?
23    Q. Yes.  Go ahead.
24    A. As I understand his understanding of
25 irreducible complexity, something that was

116

1 designed by an intelligent agent, okay, an
2 intelligent designer which he believes to be
3 God, no, sir, I don't think that has validity
4 within science.
5    Q. Is there any -- if he stopped before
6 he got to the intelligent, characteristics of
7 the intelligent being, would you say that
8 that's okay?
9    MR. ROTHSCHILD:
10       Objection.  Again, this is outside
11 her area of, particular area of expertise.  I
12 mean are you asking whether he is right about
13 his analysis of these molecular systems?
14 BY MR. THOMPSON:
15    Q. Or there is some validity to it, yes?
16    A. This just lies beyond the area that I
17 was called upon to testify about.
18    MR. ROTHSCHILD:
19       Objection.
20 BY MR. THOMPSON:
21    Q. You are not qualified -- you don't
22 feel you are qualified to testify about that?
23    A. There are lots of people that you can
24 ask besides me that, lots of scientists that
25 you can ask besides me.

## Deposition of Professor Barbara Forrest - 6/7/05

117

1   Q. You mentioned Professor William
2 Dembski in your book, Darwin's --
3 *Creationism's Trojan Horse* many times.
4   A. Yes.
5   Q. What is the reason for that?
6   A. Because he is one of the pivotal
7 figures in the intelligent design movement,
8 in the execution of the wedge strategy, very
9 important person.
10   Q. And do you believe that that has any
11 relevance at all to the theory of intelligent
12 design?
13   MR. ROTHSCHILD:
14      Objection.
15   THE WITNESS:
16      You used a pronoun.  Do I believe
17 that what has any relevance to the theory of
18 intelligent design?
19 BY MR. THOMPSON:
20   Q. The discussion of William Dembski in
21 your book?
22   A. Dr. Dembski is one of the primary
23 promoters of the intelligent design.  Stands
24 to reason that he would receive a lot of
25 attention in our book.

118

1   Q. But looking at his background --
2 first of all, do we agree that you do go into
3 in depth into his background; correct?
4   A. Depends on what you mean by
5 background.  Insofar, into the activities in
6 which he has engaged in promoting intelligent
7 design, that's what I have looked at.
8   Q. Well, you have also looked at his
9 religious affiliations, have you not?
10   A. Yes, that's part of his promotion of
11 intelligent design.
12   Q. You have looked at how he got
13 involved in the intelligent design movement?
14   A. And how he became affiliated with the
15 group?
16   Q. Yes.
17   A. He was one of the initial people in
18 the establishment of the center for the
19 renewal of science and culture.  We looked at
20 that.
21   Q. And you looked into his motivations
22 for promoting the theory of intelligent
23 design; is that correct?
24   A. He has stated his motivations in
25 promoting this and certainly that was part of

119

1 what we came across in our research.
2   Q. And you wrote in-depth about that;
3 isn't that true?
4   A. We wrote in-depth about a lot of the
5 things that Professor Dembski has done.
6   Q. And mentioned him by name?
7   A. Yes.
8   Q. What is the relevance of either his
9 religion or his motivation when you are
10 trying to determine the validity of the
11 theory of intelligent design?
12   MR. ROTHSCHILD:
13      Objection.
14   THE WITNESS:
15      I haven't spoken with respect to his
16 specific personal religion.  I have spoken, I
17 have recounted statements that he has made
18 about his religious reasons for promoting
19 intelligent design.
20 BY MR. THOMPSON:
21   Q. And accepting that, what is the
22 relevancy of that to the validity of the
23 theory of intelligent design?
24   MR. ROTHSCHILD:
25      Objection.

120

1   THE WITNESS:
2      The relevance is to his promotion of
3 the theory of intelligent design.  It
4 explains why he is promoting, it explains why
5 he is interested in this effort.  That is
6 what we looked at.
7 BY MR. THOMPSON:
8   Q. And would you then agree that it
9 really is irrelevant, his motivations or his
10 religious faith to the validity of the theory
11 of intelligent design?
12   A. I think they are certainly related in
13 an important way.  Insofar as intelligent
14 design is a religious idea, a religious
15 belief, I don't think you can divorce that
16 completely from Professor Dembski's stated
17 religious motives for promoting it.
18   Q. So that it is appropriate when ............
19 discussing the validity of any theory for the
20 opposition to go into the religious
21 motivations or the religion of the person
22 propounding that theory?
23   MR. ROTHSCHILD:
24      Objection, misstates her prior
25 testimony.  She has not said his religion was

## UNITED COURT REPORTERS, INC.
## 1-800-US-DEPOS

## Deposition of Professor Barbara Forrest - 6/7/05

121
1 relevant.
2   THE WITNESS:
3     His personal religion is something I
4 haven't discussed.  I have discussed only his
5 statements that he has made in explaining why
6 he has taken up this work.
7 BY MR. THOMPSON:
8   Q. But there is some reason why you
9 discuss those statements, is there not?
10  A. Yes, because they are relevant to the
11 fact that he is promoting a religious belief,
12 a religious idea.
13  Q. That you oppose; is that correct?
14  A. I don't oppose the idea per se.  I
15 oppose its being taught as science to
16 children in public school science class.
17  Q. So you do not oppose the theory of
18 intelligent design?
19  A. I don't oppose anybody's holding a
20 particular belief.  What I object to is
21 having that religious belief placed into the
22 service of a particular organization's
23 program and taught to children as science in
24 a public school science class.  I have never
25 opposed anybody holding that belief.  What I

122
1 have opposed is having it presented as
2 science to children.
3   Q. Well, you spend the whole book on
4 discussing the religious motivations of the
5 promoters of the theory of intelligent
6 design; correct?
7   MR. ROTHSCHILD:
8     Objection, mischaracterizes the
9 evidence.
10  THE WITNESS:
11    The entire book is not just about the
12 motives.  That's one aspect of what we did.
13 BY MR. THOMPSON:
14  Q. It is a great aspect of it: isn't it?
15  A. It is an important aspect of what we
16 did.  It is not -- does not define
17 everything, doesn't cover everything.
18  Q. Well, you also discuss the so-called
19 Wedge document; is that correct?
20  A. Yes, sir.
21  Q. And that also was used to focus
22 people's attention on the religious
23 motivations of these individuals who are
24 promoting the theory of intelligent design;
25 isn't that correct?

123
1   A. The wedge document itself focuses
2 people's attention on the religious
3 motivations insofar as we report what the
4 wedge document says, then we are reporting
5 it, so I am casting attention on the
6 religious motivations of the people that drew
7 up the document.
8   Q. Yes.  But there is a reason why you
9 pick the Wedge document and there is a -- and
10 you know, the religion of various proponents
11 of the so-called intelligent design theory;
12 is there not?
13  MR. ROTHSCHILD:
14    Objection.  You are mischaracterizing
15 her testimony and the evidence.
16  THE WITNESS:
17    Could you repeat the question,
18 please?
19  MR. THOMPSON:
20    Read that back.
21 THE COURT REPORTER:
22    But there is a reason why you pick
23 the Wedge document and there is a -- and
24 you know, the religion of various
25 proponents of the so-called intelligent

124
1 design theory; is there not?
2   THE WITNESS:
3     I don't need to know the personal
4 religion of the various proponents to
5 understand that that wedge document itself
6 has very specific religious aims.  The Wedge
7 document was -- we looked at the wedge
8 document because it is a very clear statement
9 of how the Discovery Institute views its, the
10 particular project in which they are engaged.
11 BY MR. THOMPSON:
12  Q. But the whole purpose of your book is
13 to attack the theory of intelligent design;
14 is it not?
15  MR. ROTHSCHILD:
16    Objection.
17 THE WITNESS:
18    Excuse me, I wouldn't characterize it
19 that way.  The purpose of the book is to
20 explain the nature and the strategy of the
21 Wedge's agenda, the Discovery Institute as
22 formalized in the Wedge document.
23 BY MR. THOMPSON:
24  Q. And what was your purpose in doing
25 that?

**Deposition of Professor Barbara Forrest - 6/7/05**

129

1 having seen a version of that paper earlier.
2   Q.  I want to make sure that I
3 understand.  Did you read Steve Meyers' paper
4 word for word?
5   A.  Did I sit down and read it to analyze
6 the paper itself?  I read through the paper
7 in a general sort of way to know what he was
8 talking about, enough to recognize that I had
9 seen portions of it before.
10   Q.  So I assume your answer to my
11 question is no, you didn't read it word for
12 word?
13   A.  I didn't read it in order to analyze
14 it scientifically.  I read it to get a
15 general familiarity with what it was about
16 and I recognized certain that he was very
17 similar to a paper that appeared on the
18 Internet in 2001.
19   Q.  How does that make it a bad paper?
20   A.  That in itself does not make it a bad
21 paper, but it appeared in 2001, the first
22 variant of that paper that I recall seeing
23 was on the website of a student group, an
24 intelligent design undergraduate research
25 center which is a student group.  And the

130

1 paper I think evolved into, you know, other
2 versions, and I think Professor Meyer used a
3 substantial portion of that earlier work in
4 his paper for the journal.
5   Q.  But that's a criticism of the paper,
6 is it?
7   A.  I think you might construe it as a
8 criticism in the sense that the first time I
9 saw a version of that paper, it didn't
10 purport to be anything like a paper that had
11 been subjected to peer review.  It showed up
12 on the website of a student group.
13   Q.  The reason I ask that question is
14 because earlier you admitted that portions of
15 your expert report dealt with things that you
16 talked about in your book?
17   A.  Yes.  That paper came out, I mean the
18 review essay he published certainly came out
19 after the book, after my book.
20   Q.  What I am saying is there is nothing
21 wrong with taking things that you have
22 written before and using that in a new
23 version; isn't it?
24   A.  Well, I would like to point out a few
25 things.  The co-authors on these earlier

131

1 versions of paper, one was Dr. Paul Chien who
2 has no credentials in paleontology.  Dr.
3 Meyer is not a paleontologist.  Paul Nelson
4 is a young earth creationist who his name
5 appears on the paper that, you know, takes
6 the earth to be, you know, quite old, and he
7 is listed as a co-author on one variant of
8 the paper.
9     Marcus Ross is listed as a co-author
10 on another variation of the paper.  Marcus
11 Ross is a student who studied paleontology
12 but he is not a paleontologist yet, I don't
13 think, unless he has graduated.  So I think
14 the paper was done, you know, by people who
15 don't really have the credentials that one
16 would expect for a paper about that subject.
17   Q.  And I assume that's that a criticism
18 of the paper
19   A.  Yes, you can construe that as a
20 criticism of the paper, yes, sir.
21   Q.  One of the things that you criticized
22 the paper for was also the fact that it
23 added, it did not add any new data or
24 experiments?
25   A.  I think if you are proposing to

132

1 revolutionize science, you would certainly
2 want to offer some new data in support of
3 what, you know, your contention is.
4   Q.  Well, not being a scientist or a
5 philosopher of science, why do you come to
6 that conclusion?
7   A.  Science operates on the basis of
8 data, right?  I can tell you how Darwin
9 operated.  Darwin came up with an idea and he
10 spent about 20 years gathering data to try to
11 strengthen the idea.  So if you are doing
12 what you call a full-scale scientific
13 revolution, if you are going to change the
14 boundaries and the scientific paradigm
15 completely that intelligent design proponents
16 say they are doing, certainly you would want
17 to have something in the way of data.
18   Q.  Speaking about Darwin, you know,
19 isn't it true that when he came out with his
20 theory *Origin of Species*, that it was
21 criticized by his contemporaries as not being
22 science, do you remember that?
23   A.  I don't know that it was criticized
24 as not being science.  Science as some of the
25 people understood it.  In those days, it was

**Deposition of Professor Barbara Forrest - 6/7/05**

133

1 still -- the final break in biology had yet
2 to be made between science and religion.
3 Many people were upset that Darwin had not
4 provided an explanation which incorporated,
5 you know, the scriptural understandings of
6 the time and I think when Darwin did his
7 work, they were still working out the logic
8 of empirical science.
9     I mean the nature of scientific
10 reasoning was something they were still
11 working out. Darwin was rigorously empirical
12 and he insisted that that, that it must be
13 done that way. That's the way Darwin
14 operated as a scientist and there were people
15 I suppose who objected to that, but I think
16 Darwin set a new standard for the gathering
17 of empirical data in the biological sciences.
18   Q. And the point I am trying to make,
19 Professor, is the fact that when Darwin came
20 up with his conclusion in *Origin of Species*,
21 the scientific community was opposed to it?
22   A. He had to overcome quite a bit of
23 opposition, yet he lived long enough to see
24 his ideas accepted by the majority of
25 scientists.

134

1   Q. And isn't it true that in the *Origin*
2 *of Species*, he continually compares his
3 finding and conclusions with the theory of
4 intelligent design?
5   A. He talks about special creation a
6 lot, uh-huh, (in the affirmative). What he
7 is doing in the *Origin of Species* is showing
8 simply how he can explain things that the
9 concept of special creation cannot, you see,
10 and that was one of the prevailing views,
11 that people were trying to find ways of
12 explaining data that were consistent with
13 their scriptural understandings. And those
14 understandings were simply not sufficient to
15 explain the data and Darwin was pointing out
16 look, if you are going to compare, mine works
17 much better. This, you know, it explains
18 things that the idea of special creation
19 simply can't explain.
20   Q. Well, and isn't it true that that's
21 what Michael Behe is doing when he talks
22 about *Darwin's Black Box* and what his
23 findings are with the bacterial flagellum?
24   A. Michael Behe is doing something
25 Darwin did not do. He is invoking the

135

1 concept of a designer and that's quite
2 different from what Darwin did.
3   Q. Didn't Darwin in his last paragraph
4 invoke the concept of a designer?
5   A. He made reference to a creator and I
6 think that was --
7   Q. The breath of a creator?
8   A. That was a concession to the
9 religious sensibilities of his readers, I
10 would say. He certainly himself never
11 claimed to be addressing the origin of life
12 or the possibility that it was supernatural.
13 Darwin I think considered that a question
14 that was beyond his reach.
15   Q. That he hadn't -- well, not -- what
16 do you mean by beyond his reach?
17   A. He wasn't addressing the idea of the
18 origin of life. He was simply showing how
19 one species -- how a species can
20 differentiate into other species the origin,
21 that's why the book is entitled the *Origin of*
22 *Species*. So Darwin, what Darwin was
23 attempting to explain is a bit more limited,
24 you know, in its scope. He is not talking
25 about the origin of life. He considered that

136

1 a very difficult question, that he was not
2 attempting to answer that.
3   Q. He assumed for the purposes of the
4 book that there was already something alive?
5   A. He was talking about something
6 already there for natural selection to act
7 upon, that was his particular contribution.
8   Q. Going back to the report, Steve
9 Meyer's report.
10   A. His report or his paper?
11   Q. His paper, excuse me, we're talking
12 about whether it is necessary for good
13 science papers to advance new data or
14 experiments and you said that it is; is that
15 correct?
16   A. At some point, it becomes -- yes, I
17 mean think about how easy science would be if
18 you never had to produce data, think about
19 how easy it would be to, you know, if we
20 could just declare a scientific revolution
21 and not have any new data to support it.
22   Q. Well, can a paper take already
23 existing data and come up with a new theory
24 to explain the data?
25   A. It is possible.

**UNITED COURT REPORTERS, INC.**
**1-800-US-DEPOS**

**Deposition of Professor Barbara Forrest - 6/7/05**

137

1  Q. And so that it is not necessary for
2  Steve Meyer's paper to actually develop new
3  data or experiments but merely to explain
4  data; is that possible?
5      A. It depends on what the new theory
6  that you are using.  If you are using a
7  scientific theory, right, then certainly,
8  that is, it is possible to use data that you
9  have and try to think of a new scientific way
10  to explain it.  That isn't what Professor
11  Meyer is doing.  Professor Meyer is invoking
12  a religious idea to explain data that other
13  people collected.
14      Q. Let's get back to what you said about
15  his paper, though.  You said it was, it was
16  bad because it added new data; it did not add
17  new data.
18      A. No, I didn't say it was bad because
19  it added no new data.  I pointed out that it
20  falls short of doing what intelligent design
21  proponents feel that it does because it
22  doesn't add new data.  It is a way of
23  characterizing the essay.  It is a review
24  essay that adds no new data.
25      Q. Would you agree that --

138

1      A. And Professor Meyer, by the way, is
2  not a scientist.  He is a historian and
3  philosopher of science.
4      Q. Is there anything wrong with that?
5      A. No.  No, it is nothing wrong with
6  being a historian and philosopher of science,
7  but if you are going to revolutionize the
8  scientific world, it would be better to come
9  from a scientist.
10      Q. Well, did you consider Albert
11  Einstein to be a scientist?
12      A. Oh, sure.  I am sorry.
13      (A short break was taken).
14  BY MR. THOMPSON:
15      Q. Just a few more questions on Steve
16  Meyer's paper.  I think we ended the question
17  I asked you whether Albert Einstein was a
18  scientist and you said yes.
19      A. Whether or not Einstein was what?
20      Q. A scientist?
21      A. Yes.
22      Q. And you said yes?
23      A. Uh-huh, (in the affirmative).
24      Q. Do you remember whether his first
25  celebrity status as a scientist was based

139

1  upon any original data that he had discovered
2  through experimentation?
3      A. I think you are drawing me beyond the
4  area that I was called upon to testify about,
5  but --
6      Q. You can say I don't know.
7      A. I can't speak to specific data that
8  he had.
9      Q. In your book *Creationism's Trojan
10  Horse* on page 260, the first line of the
11  first full paragraph, on that page, and I
12  quote, religious motivation drives all the
13  CRC leadership.
14      A. Wait, the first full paragraph?  On
15  260, I am sorry.  Here we go.  I see it.
16      Q. And in the first sentence, religious
17  motivation drives all the CRC leadership,
18  indeed Steven C. Lair, the director of the
19  CRC professed his attraction to the origins
20  debate precisely because it is theistic.
21      What relevance does it have to the
22  actual validity of the theory of intelligent
23  design that people who support it have a
24  religious motivation?
25      A. You are asking me what the relevance

140

1  is to the intelligent design itself?
2      Q. The theory of intelligent design.
3      A. The motivations?
4      Q. Yes.
5      A. I wasn't looking purely in the work I
6  have done, I wasn't looking purely at the
7  theory of intelligent design.  I was looking
8  at a very big picture and how -- what they
9  are promoting is what they call the theory of
10  intelligent design fits into their strategy,
11  and I think that it is Professor Meyer's
12  motivation relevant to the promotion of that
13  strategy.  I don't think they have a
14  scientific theory to present.  I think that
15  what they are presenting is a religious
16  program, and to the extent that that is the
17  conclusion I have drawn, I think his motive
18  is quite relevant, and to point out that he
19  is professing to be endorsing a scientific
20  theory to which he was attracted because of
21  its theistic, this conference dealing with --
22  the subject matter of the conference dealing
23  with it from a theistic standpoint, I think
24  that's quite relevant to the claim that they
25  are promoting a scientific theory.

## Deposition of Professor Barbara Forrest - 6/7/05

141

1   Scientists are not usually attracted
2 to scientific theories because of their
3 theistic content.
4   Q. So are you saying that this book is
5 not about the theory of intelligent design?
6   A. This book is about the movement, the
7 strategy. There are other books that deal
8 with the content of what the Discovery
9 Institute is promoting as the intelligent
10 design theory. This book is about the
11 strategy, the nature of the movement, what
12 they are doing to execute the various goals
13 of the Wedge strategy. That's primarily what
14 it is about.
15   Q. Then what, what relevance do you
16 believe the book has, if any, in the
17 controversy surrounding the theory of
18 intelligent design versus evolution?
19   A. Are you talking about that
20 controversy as a political controversy, as an
21 educational controversy? Could I get you to
22 clarify that for me?
23   Q. Both, really. You do agree there is
24 a controversy out there, do you not?
25   A. I don't agree that there is a

142

1 controversy in the same sense that the
2 Discovery Institute intelligent design
3 proponents are promoting the idea of a
4 controversy, no, I don't agree that there is
5 a genuine controversy between intelligent
6 design and evolution. There is a controversy
7 that creationists have fomented because they
8 cannot accept evolutionary theory as the
9 prevailing scientific view and my book speaks
10 to the controversy that creationists
11 themselves have stirred up.
12   Q. Well, normally if there is a
13 controversy, some side or some conflict
14 normal stirs it up, isn't that true?
15   A. In this case it is conflict promoted
16 by the Discovery Institute. It is not coming
17 from the scientific community.
18   Q. You mean Michael Behe is not a
19 scientist?
20   A. He is a scientist but he does not
21 incorporate the idea of intelligent design in
22 his own professional work as a scientist. He
23 does it when, you know, he is a scientist but
24 he is also a proponent of intelligent design.
25   Q. So you don't think *Darwin's Black Box*

143

1 deals with science?
2   A. I don't think that that book is part
3 of what he does for a living at Lehigh
4 University as a biochemist. I think that is
5 what he does as an intelligent design
6 proponent.
7   Q. And so his analysis of the bacterial
8 flagellum is not a part of his scientific
9 work?
10   A. He certainly brings what he knows
11 about science to bear on it, but to the
12 extent that he goes beyond the science and
13 talks about an intelligent designer, then he
14 is no longer acting as a professional
15 biochemist. He is acting in his capacity as
16 a proponent of intelligent design
17 creationism.
18   Q. The controversy that you say the
19 Discovery Institute has fomented, are you
20 saying it because -- are you saying they
21 fomented because of their religious beliefs?
22   A. I think so, yes, I think that's why
23 all this has come up.
24   Q. And you believe that more
25 specifically it is because they are

144

1 Christians and believe in the biblical
2 version of creation?
3   MR. ROTHSCHILD:
4   Objection, compound question.
5   THE WITNESS:
6   Yes. You are asking me two things
7 there. Okay. I think there has always been
8 a segment of the Christian community, it does
9 not represent the entire -- Christianity has
10 been a variety of things to a variety of
11 people even at the same time. There has
12 always been a segment of Christians who have
13 not been able to accommodate the findings of
14 modern science, and it is because they cannot
15 find a workable reconciliation between their
16 religious views and the science, that they
17 have not been able to do this. And this
18 comes pretty much from objections by
19 Christians, the United States, a country in
20 which Christians are the majority. They
21 don't represent all Christians in any sense.
22   Q. There are some Darwinists such as
23 Richard Dawkins that believes you can't have
24 both evolution and God. Have you heard, read
25 any of his statements like that?

## Deposition of Professor Barbara Forrest - 6/7/05

145

1  A. He is very out spoken, I think
2 everyone knows, yeah.
3  Q. Do you agree with that statement?
4  A. No, I don't. Within science, within
5 science, it is improper to invoke religious
6 explanations for natural phenomenon, but from
7 a personal standpoint, people are free to
8 make a reconciliation or not make it. It is
9 a personal choice for them and they are free
10 to make the rec -- if they do decide to make
11 a reconciliation between their personal
12 religious beliefs and science, they are free
13 to do that in any way they choose, that's a
14 personal decision.
15  Q. Well, in following that line, if a
16 religious person, let's say a Christian
17 chooses to reconcile his faith with the
18 theory of evolution, does he have to change
19 the theory of evolution or does he change the
20 theory of his faith or his faith, I should
21 say?
22 MR. ROTHSCHILD:
23    Objection, vague.
24 THE WITNESS:
25    It depends on the person. Certainly,

146

1 you cannot, you know, you cannot just shake
2 the science to bend it to your own personal
3 will. That, science is arrived at by a
4 consensus, the prevailing scientific view
5 based on what the consensus of its
6 practitioners are. And that is not going --
7 and they don't do that based on -- they don't
8 come to that consensus based on how people
9 feel religiously about their work.
10    The task for people who have to make
11 the reconciliation between their personal
12 religious views and the science is to find
13 some way to accept what the scientific
14 community tells us what is their best
15 knowledge, their consensus at a given time,
16 and find a way to work out some
17 reconciliation with their personal religious
18 views.
19    Now, personal religious views show
20 quite a bit of variety, and if you look at
21 the history of religion, you will see that it
22 has changed over time just like species have,
23 religion evolves, and in order to remain the
24 viable human institution that it presently
25 is, it is a historical fact that people have

147

1 changed their religious views throughout
2 history. That's an uncontroversial fact of
3 religious history.
4  Q. And it is also an uncontroversial
5 fact in scientific history that scientists
6 have changed their views; is that correct?
7  A. Sure. It is how science works.
8  Q. Exactly. One of the tenants is that
9 it is always tentative, correct?
10  A. Some things are considered pretty
11 much settled. I mean we know that germs make
12 people sick, you know. There is a lot we can
13 say we know that is not likely to be subject
14 to revision, but science is an open-ended
15 enterprise. When a scientific idea doesn't
16 pan out, it is either discarded, it is
17 amended, it is adjusted, but in doing that,
18 scientist are operating within the
19 methodology that is proven successful for
20 science. They are not changing the science
21 because of religious objections to it. They
22 are doing it because the scientific
23 hypotheses don't prove fruitful or other
24 reasons relevant to science.
25  Q. Well, isn't it a factor of science

148

1 that it is always subject to revision?
2  A. That's part of the nature of science.
3  Q. Yes.
4  A. But because of scientific, relevant
5 scientific discoveries not because of the
6 religious objection of people who cannot
7 accept the science.
8  Q. And you feel that that's the only,
9 not the only but you feel that that's the
10 motivation behind the intelligent design
11 theorists?
12  A. I do.
13  Q. And you discuss that motivation in
14 your, not only in your expert report, but
15 also in your book *Creationism's Trojan Horse;*
16 is that correct?
17  A. Yes, sir. We discuss more than
18 motives. I mean you're placing a great deal
19 of emphasis on the motive. We look at the
20 goals that they have as well and the
21 activities in which they are engaged.
22  Q. Right. But even those goals you
23 frame it in the context of religious goals,
24 isn't that correct?
25  A. That is the way that the Discovery

## Deposition of Professor Barbara Forrest - 6/7/05

149

1 Institute portrays them in the wedge
2 document, makes them very clear images.
3   Q. And that's the way you portray it in
4 your book?
5   A. I report them the way the Discovery
6 Institute portrays them.
7   Q. So your book is basically a book that
8 a reporter could write?
9   A. Not any reporter now, but someone
10 familiar with the issue. I have brought
11 together a great deal of information and
12 concentrated it between the covers of one
13 book. The information is presented within
14 the context of our knowledge of this issue.
15 We offer some analysis of it. It is-- there
16 is a great deal of information in the book as
17 you can see by the number of footnotes we had
18 to include.
19   Q. Yes, but in your book, you focus on
20 the religious motivation?
21   A. Sure.
22   Q. The religion of the people proposing
23 intelligent design?
24   MR. ROTHSCHILD:
25     Objection.

150

1 THE WITNESS:
2     Not the personal religious views, no,
3 sir. We don't object to their having
4 personal religious views.
5 BY MR. THOMPSON:
6   Q. I didn't say you objected, but I am
7 saying you are basing your book on them?
8   MR. ROTHSCHILD:
9     Objection, mischaracterizes the
10 evidence.
11 THE WITNESS:
12     Yes. I don't -- I am simply
13 explaining to the public what the Discovery
14 Institute proponents of intelligent design
15 themselves have said. Everything I write is
16 based on what they themselves have provided
17 in the way of their own statements
18 characterizing what they are doing.
19 BY MR. THOMPSON:
20   Q. But you're picking those statements
21 to show the religious motivation; isn't that
22 correct?
23   A. They provided me with those
24 statements which enable me to show the
25 religious motivation.

151

1   Q. But you have picked those statements
2 to put in your book, isn't that correct?
3   A. You select the statements that you
4 believe are their most effective statements
5 of what they are doing. There are a lot of
6 things that they say that you can't put them
7 all in the book. The book would be extremely
8 long, but they provided me with a great deal
9 of material but I picked what I believe are
10 the most, their most effective statements,
11 their most pointed statements about what they
12 are doing.
13   Q. Effective in what way?
14   A. In conveying the real intention, the
15 real nature of the people behind the wedge
16 strategy.
17   Q. You also in the book, in your book go
18 into the source of funding?
19   A. Yes.
20   Q. What is the relevancy of that to the
21 intelligent design movement?
22   A. All of their sources of funding are
23 religious or their major funding of sources
24 are religious and I think that it is
25 significant in the sense that if they are

152

1 doing science, their funding sources are not
2 scientific. Their funding sources are people
3 who clearly are supporting them because their
4 religious goals are compatible. The
5 MacClellan Foundation, the Stewardship
6 Foundation, those are organizations that fund
7 evangelical work that promotes a particular
8 religious mission.
9   Q. You also mention in your report I
10 believe the expert report the connections
11 with Jim Dobson?
12   A. James Dobson, Dr. Dobson, certainly.
13   Q. And why do you do that?
14   A. He is one of their very significant
15 sources of support, the Focus On The Family
16 co-published the videotape Unlocking the
17 Mystery of Life, he had Dr. Dembski on his
18 show a number of times. He is a very vocal
19 supporter of the intelligent design movement
20 and also I think shares the religious goals
21 that I believe that the intelligent design
22 movement has.
23   Q. You also mentioned Dr. D. James
24 Kennedy.
25   A. Yes.

**Deposition of Professor Barbara Forrest - 6/7/05**

153

1  Q. Why do you do that?
2  A. For the same reason.  He is a
3  supporter of intelligent design and also, the
4  thing that these organizations like Focus on
5  the Family and Carl Rich Ministries have in
6  common is that they do no accept the
7  separation of church and state, and I think
8  that's a very significant fact.
9  Q. And what troubles you about that?
10  A. That's unconstitutional.  Separation
11  of church and state is a very important
12  foundation of American government and I think
13  it would be very unwise for that to be
14  eroded.
15  Q. Do you consider yourself to be a
16  constitutional scholar?
17  A. No.
18  Q. Is that phrase ever found in the
19  constitution?
20  A. What, the separation of church and
21  state?
22  Q. Yes.
23  A. The concept is there.
24  Q. Under what part of the concept?
25  A. In the first amendment.

154

1  Q. What part of the first amendment?
2  A. The establishment clause.
3  Q. What does the establishment clause
4  say?
5  A. That the government, congress shall
6  make no law affecting the establishment of
7  religion.
8  Q. Congress; right?
9  A. Right.
10  Q. Does congress mean a specific body?
11  A. It means congress, it means --
12  MR. ROTHSCHILD:
13     David --
14  BY MR. THOMPSON:
15  Q. I know.  I will.
16  A. High school civics, government 1301.
17  Q. You don't consider yourself a legal
18  expert? You know, I went off, I apologize.
19  MR. ROTHSCHILD:
20     I thought you did pretty well,
21  though.
22  THE WITNESS:
23     I passed my civics class.
24  BY MR. THOMPSON:
25  Q. In your report, page 32, you are

155

1  discussing William Dembski, wedge leader.
2  You state, "William Dembski traces his
3  involvement in the ID issue to a college
4  experience in which he shared his christian
5  witness with two seminary students whose
6  faith, according to Dembski, had been shaken
7  by their seminary's instructing them that
8  modern science had undermined the Bible's
9  veracity."  What's the relevance of that
10  statement to the issue at stake here?
11  A. Dr. Dembski pointed out the relevance
12  of it himself.  He made that statement at an
13  intelligent design event or conference he
14  attended in Texas where he shared a platform
15  with the creationist Carl Baun, and in that
16  meeting, he says that this experience pretty
17  much explains what he has been doing for
18  about the last 20 years in the intelligent
19  design movement.
20  Q. And you on the next page, page 33,
21  the first -- the second paragraph, "Like
22  Johnson, Dembski sees evolution as a threat
23  to religious and specifically Christian
24  faith."
25  A. I am sorry, I need to find the line.

156

1  Q. It is right there.
2  A. Yes, at the top.  Okay.  "He believes
3  defending Christianity against Darwinism to
4  be his task as a Christian apologist, as he
5  stated in 2002," then you give the quote.
6  Why did you put that statement in this
7  report?
8  A. I think it is a very significant
9  statement, the fact that he sees the
10  Darwinian, as he calls it, the Darwinian
11  naturalistic view as an obstacle to people
12  accepting Jesus Christ.  He tells a lot about
13  what he considers himself to be doing.
14  People promoting scientific theories don't
15  usually speak this way.
16  Q. Could scientists be speaking as
17  scientists at one point and also as believers
18  at another point?
19  A. They would be speaking in different
20  capacities.  Dr. Dembski is not a scientist,
21  he does a great deal of work that could be
22  classified as christian apologist, and I
23  think that since there is really no
24  scientific theory of intelligent design to
25  present, I think that in the absence of that,

**Deposition of Professor Barbara Forrest - 6/7/05**

157

1 about all we're left to consider are the
2 religious motivations and the religious
3 content of intelligent design.
4  Q. We keep on going back to no
5 scientific theory.  You are basing that on
6 your concept of what science is; is that
7 correct?
8  A. I am basing that on the evaluation of
9 what has been offered, evaluation by
10 scientists in the scientific community of
11 what has been offered as a scientific theory;
12 right, and in addition to that, the fact that
13 there is a clear appeal to the supernatural
14 in the intelligent design thesis, that does
15 not qualify as science.
16  Q. Does the intelligent design ever
17 describe the characteristics of the so-called
18 supernatural?
19  A. Dr. Dembski has on several occasions
20 specified that this is God.
21  Q. And is that a part of the official
22 intelligent design theory?
23  A. I would say that it is.
24  Q. Don't you agree that the intelligent
25 design theory has a big tent where there are

158

1 a lot of different variations of it?
2  A. A big tent, a big tent with people in
3 it or a big tent --
4  Q. Yes, different people having
5 different, you know, focus on the intelligent
6 design theory?
7  A. It is a big tent dominated by
8 evangelical Christians, largely what this
9 movement is about.
10  Q. Michael Behe is one of the leaders in
11 the intelligent design movement, is he not?
12  A. Right.
13  Q. He is not an evangelical?
14  A. He is a Christian.
15  Q. He is Roman Catholic, is he not?
16  A. Except that it is a fact of the
17 present scene in American, in the United
18 States, is that there is a contention of
19 Catholics who have allied themselves with
20 evangelical Protestants because they share
21 the same, many of the same concerns, many of
22 the same political goals, for example, and
23 that's pretty much recognized by people who
24 follow this issue.
25  Q. Do you believe that was part of the

159

1 so-called cultural war?
2  MR. ROTHSCHILD:
3    Objection.
4  THE WITNESS:
5    That's not my term.  That is the term
6 of the people who consider themselves to be
7 involved in such a phenomenon.
8 BY MR. THOMPSON:
9  Q. The reason I ask that is a response
10 to your last question where you said there is
11 this coalition between Catholics and
12 evangelicals?
13  A. Right.
14  Q. Do you recall this is in part of
15 that, I use the term short term, shorthand
16 term culture war?
17  A. Do I believe what is part of the
18 culture war? --
19  Q. This whole issue?
20  A. The issue of intelligent design?
21  Q. Yes.
22  A. Well, certainly at times the
23 intelligent design proponents have spoken of
24 themselves as being involved in a culture
25 war, and I think that that's the way they see

160

1 it.
2  Q. And isn't it true that you oppose it
3 for that reason?
4  MR. ROTHSCHILD:
5    Objection.
6  THE WITNESS:
7    For what reason?
8 BY MR. THOMPSON:
9  Q. Because you are also engaged in the
10 culture war?
11  A. I don't view myself as having
12 initiated anything called a culture war.  I
13 view myself as responding to the efforts of
14 people who believe that they are involved in
15 a culture war, and who would like to do
16 things that I think are unconstitutionally
17 shouldn't be done.
18  Q. And is that what, one of the reasons
19 why you wrote this book?
20  A. Yes, it is.
21  Q. You are trying to stop the
22 intelligent design movement?
23  A. I am trying to stop intelligent
24 design from being presented in a science
25 class to children as science.  I really have

**UNITED COURT REPORTERS, INC.**
**1-800-US-DEPOS**

**Deposition of Professor Barbara Forrest - 6/7/05**

161

1 no concern with their taking up any
2 particular cause as a professedly religious
3 cause.  I have no particular concern with
4 people's personal religious views, I have no
5 particular concern with their espousing any
6 particular religious movement, but as a
7 citizen of the United States, I have a
8 special concern with activity that would
9 erode the separation of church and state
10 which I believe their efforts will do.
11    Q.  So would you have any problem with
12 this intelligent design theory if it is
13 discussed in a class on comparative religion
14 in public schools?
15    A.  That is the only place in the public
16 school where it would be appropriate.
17    Q.  So it is okay to speak about
18 religious --
19    A.  I think comparative religion is a
20 fine idea, but that's not where they have
21 asked for it to be taught.
22    Q.  Well, have they actually taught it or
23 are they asking to have it taught?
24    A.  Not --
25    MR. ROTHSCHILD:

162

1    They who?
2 BY MR. THOMPSON:
3    Q.  I was responding to her last
4 statement.  They, you are referring to the
5 Dover --
6    A.  Yes, the intelligent design
7 proponents want it to be taught in a science
8 class as science.
9    Q.  And in the Dover case itself, they
10 are not teaching intelligent design, are
11 they?
12    A.  They are in the sense that they are
13 reading a statement to children offering,
14 mentioning it as an alternative to evolution.
15 Any time you walk in a position of official
16 authority and stand up and read something to
17 children, I consider that teaching.
18    Q.  In other words, any time I mention a
19 phrase, that I am teaching something?
20    A.  When you -- when a person in an
21 official capacity tells children that there
22 is an alternative, right, and that they can
23 explore this alternative in the book, that is
24 in a sense teaching, yes.
25    Q.  If I say go to the blackboard.  Is

163

1 that teaching?
2    A.  That's an instruction.  There is no
3 content there.
4    Q.  Well, what is the content of the
5 intelligent design in that policy?
6    MR. ROTHSCHILD:
7    Do you mind showing her the policy?
8 BY MR. THOMPSON:
9    Q.  Okay.  Let's mark it, it starts at
10 the bottom.
11    MR. ROTHSCHILD:
12    The statement?
13 BY MR. THOMPSON:
14    Q.  Yes, the four paragraph statement.
15    A.  Is this the beginning of where the
16 school officials read the Pennsylvania?
17    Q.  Right.
18    A.  Okay.                  . . . ........ ...... ......
19    Q.  By the way, in any of your classes
20 that you have taught at is it Southwestern?
21       Southeastern.  Oh, don't call it
22 Southwestern.
23    Q.  Southeastern, have you ever mentioned
24 intelligent design theory?
25    A.  Yes.

164

1    Q.  In what context?
2    A.  When my graduate students read the,
3 in my history of western thought seminar, we
4 read a book, it is on Darwin.  It is a Norton
5 critical reader on Darwin.  There are
6 excerpts from *Origin of Species* and textbooks
7 from the Descent of Man, relevant critical I
8 think in the back, there is actually material
9 that was written by some of the intelligent
10 design proponents included in that compendium
11 of critical essays and my graduate students
12 read some of those.
13    Q.  And do you recall any of the
14 proponents?
15    A.  Johnson, Professor Philip Johnson in
16 Arizona, I believe an excerpt from *Darwin's*
17 *Black Box* by Professor Behe back there.
18    Q.  And do you test the students on that?
19    A.  No, I don't test them on it.  I test
20 them on Darwin's *Origin of Species*.  I don't
21 test them on intelligent design, no.
22    Q.  You mention any other alternatives to
23 Darwin's theory of evolution?
24    A.  I don't present intelligent design as
25 an alternative to Darwin's theory of

**Deposition of Professor Barbara Forrest - 6/7/05**

165

1 evolution.
2   Q. Why do you insert it in the
3 curriculum?
4   A. Because it is relevant to -- in the
5 back of the Appleman reader, he deals -- he
6 presents thematically arranged essays showing
7 some of the reactions to Darwin's theory, you
8 know, that have taken place, ways of
9 responding to it and he has that in the back,
10 and that's part of what they read and, of
11 course, that's, you know.
12   Q. What is the entitlement of that book.
13   A. It is the Norton Critical Edition,
14 Darwin, the Norton Critical Edition, edited
15 by Philip Appleman.
16   Q. And that's the book that you use in
17 this class?
18   A. Yes. That's the -- Norton publishes
19 a great many very, you know, good textbook
20 type critical editions, you know, Norton
21 Critical Edition. There is one for a variety
22 of thinkers, just about anybody you could
23 want, they are very good.
24   Q. I would like to go down this
25 statement, your four-page statement that is

166

1 supposed to be read to the students, mark it
2 Exhibit 2, Forrest Exhibit 2. The first
3 sentence states: "The Pennsylvania Academic
4 standards require students to learn about
5 Darwin's theory of evolution and eventually
6 to take a standardized test of which
7 evolution is a part. Do you have any problem
8 with that statement?
9   A. No.
10   Q. By the way, did you ever look at the
11 Pennsylvania academic standards in preparing
12 your report?
13   A. Oh, not in preparing the report, no.
14   Q. Did you ever look at it for any
15 reason?
16   A. I may have looked at sections of it a
17 few years ago when this controversy came up.
18 It was just for a year, maybe 2001, something
19 like that, this came up and the standards
20 were being looked at, maybe being revised and
21 looked at then.
22   Q. The next paragraph starts with:
23 "Because Darwin's theory is a theory, it
24 continues to be tested as new evidence is
25 discovered." Do you have any problems with

167

1 that statement?
2   A. Not per se if it is understood in the
3 right way. I have a problem with it as it is
4 followed by the next statement.
5   Q. And I am going to read the next
6 statement.
7   A. Yeah.
8   Q. I want to take it sentence by
9 sentence here. Do you have any problems with
10 that first sentence?
11   MR. ROTHSCHILD:
12     Objection. She stated what her
13 problem was.
14   THE WITNESS:
15     Not if it is properly interpreted, I
16 don't.
17 BY MR. THOMPSON:
18   Q. The next sentence is, "The theory is
19 not a fact." Do you have any problems with
20 that?
21   A. Yes.
22   Q. What is the problem with that?
23   A. I believe it is an extension of the
24 creationist technique of calling the
25 facticity of evolution itself into question.

168

1 There is a long tradition of, and you find
2 this among intelligent design proponents as
3 well, objecting to evolution as being
4 presented as fact, and I believe this is a
5 continuation of that.
6   Q. You will agree that the theory in and
7 of itself is not considered a fact?
8   A. No, theory is an explanation.
9   Q. Right, and we will go into that. So
10 what you are -- if I am not mistaken, what
11 you are reading into that is that sentence is
12 some motivation by the intelligent design
13 proponents?
14   A. I think when you take those two
15 sentences together, that two that we just
16 looked at, I think that is tantamount to
17 putting into the minds of school children the
18 idea that evolution didn't happen, you know,
19 that Darwin's theory simply is not -- that
20 evolution is not -- the fact of evolution is
21 being misrepresented, I think that's a way of
22 putting, of putting doubts into the minds of
23 school children and it is a well-documented
24 technique, it is not new.
25   Q. Well, do you think evolution is a

**UNITED COURT REPORTERS, INC.**
**1-800-US-DEPOS**

**Deposition of Professor Barbara Forrest - 6/7/05**

169

1 fact?
2  A.  I think it is a fact that it
3 happened, yes, sir.
4  Q.  Which part of evolution?
5  A.  Natural selection is fact.  That
6 happened, it is well documented but you are
7 again, you are asking --
8  Q.  When you say it is well documented,
9 show me -- just give me an example where it
10 is well documented?
11  A.  It is a scientifically very well
12 documented natural phenomenon.  What you are
13 asking me to do is to bring well over a
14 hundred years of evidence to bear, you know,
15 in a single sitting.  I mean that's, that
16 would be impossible for me to do and it is,
17 you know, you are asking me to speak as a
18 scientist.
19  Q.  Well, if I told you that there is
20 dispute whether Darwin's theory of evolution
21 as it relates to natural selection is a fact,
22 you would disagree with that?
23  A.  Yes, I would disagree.  In the
24 scientific community, there is no big
25 controversy over this.  Scientists, you know,

170

1 argue about well, the relative importance of
2 the various mechanisms by which evolution
3 takes place.  They don't dispute whether or
4 not natural selection actually occurs.
5 Creationists dispute it, but by and large
6 scientists regards this as very well
7 established.
8  Q.  That's what surprises me.  Is it a
9 fact that natural selection is the principal
10 mechanism of evolution?
11  A.  I will not tell you that it is, if
12 you say the principal, if by that you mean
13 the most important, is that what you mean?
14  Q.  Yes.
15  A.  I am not in a capacity to say which
16 of the various mechanisms by which evolution
17 takes place would be the most important.
18 That's one of the areas in which there is
19 still some scientific debate.  I will say
20 that from everything I understand, from the
21 knowledge of science that I have as a
22 non-scientist, natural selection, whether it
23 has occurred or not is not a question in
24 dispute.
25  Q.  Could you indicate to me where there

171

1 has been a lab experiment that proves the
2 mechanism of natural selection in Darwin's
3 theory?
4  A.  I think a great deal of work has been
5 done with the fruit fly but you would be
6 better advised to ask a scientist to explain
7 that to you.  Again, you are taking me
8 outside the area in which I was called to
9 testify.  There are many people you can ask
10 that can give you the details on that.  You
11 can ask Professor Miller, for example, would
12 be an excellent source for that.
13  Q.  We have already asked him.
14  A.  And I am sure he tried to explain it
15 to your satisfaction.
16  Q.  I am sure he tried.
17  A.  He does a good job of trying, doesn't
18 he?
19  MR. ROTHSCHILD:
20    I am not sure who would be
21 criticizing that.
22 BY MR. THOMPSON:
23  Q.  So your objection with the statement
24 the theory is not a fact is because you think
25 the mechanism of natural selection in

172

1 Darwin's theory of evolution is a fact?
2  MR. ROTHSCHILD:
3    Objection, mischaracterizes her
4 testimony.
5  THE WITNESS:
6    No.  I am objecting to the statement
7 that theory is not a fact because I think it
8 is an attempt to question the entire edifice
9 of evolution theory in the minds of school
10 children.
11 BY MR. THOMPSON:
12  Q.  Well, right now we're just looking at
13 the actual policy that is read?
14  A.  And that's what I am responding to.
15 I think that is what is motivating the policy
16 and I think that it is a very well documented
17 creationist technique.
18  Q.  Do you believe that the people who
19 prepared this policy were acting under the
20 guidance of the intelligent design movement?
21  A.  I have no way to know.
22  Q.  So you are --
23  A.  When they sent out --
24  Q.  So you are speculating on the
25 motivation for putting that in there?

## Deposition of Professor Barbara Forrest - 6/7/05

173
1 A. The motivations are clearly
2 creationists. Whether they initiated this
3 policy with the help of the Discovery
4 Institute, sir, I cannot tell you if that's
5 what you are asking me.
6 Q. If I say because Darwin's theory is a
7 theory, it continues to be tested as new
8 evidence is discovered, the theory is not a
9 fact, right away, I am characterized as
10 motivated by a creationist motivation?
11 A. Given the history of the use of this
12 technique, I would say that that's the first
13 conclusion one would reasonably draw.
14 Q. Would it be an accurate conclusion?
15 A. I think in this case, it is, yes,
16 sir.
17 Q. The next sentence gaps in the theory
18 exist for which there is no evidence. Do you
19 agree or disagree with that statement?
20 A. I think it is a poor statement.
21 Q. It may be a poor statement, but do
22 you agree or disagree with it?
23 A. I would really not want to say in
24 such, answer in such an absolute fashion with
25 a statement that's so poorly worded. It

174
1 would take considerable parsing for me to
2 answer that question.
3 Q. Well pars, pars away.
4 A. Well, I think this particular
5 statement is again the employment of another
6 well-documented creationist technique of
7 pulling to gaps, for example in the fossil
8 record of gaps in the explanations that
9 evolutionary theory offers. It is a
10 well-documented technique for calling the
11 evolutionary theory into question.
12 Q. Well, would you agree that even
13 evolutionists call the theory into question?
14 A. No.
15 MR. ROTHSCHILD:
16 Objection.
17 BY MR. THOMPSON:
18 Q. Excuse me, gaps.
19 A. I am sorry. Would you rephrase your
20 question, please?
21 Q. Yes. Would you agree that even
22 evolutionists mention gaps in the theory?
23 A. All scientists recognize areas where,
24 that they still don't have sufficient data to
25 explain, that's the nature of science.

175
1 Q. So your answer to my question would
2 be yes?
3 A. Surely. I don't think they would
4 have any problem acknowledging that there are
5 parts of evolutionary theory that they are
6 still learning about, sure.
7 Q. A theory is defined in the next
8 sentence as, the theory is defined as a
9 well-tested explanation that unifies a broad
10 range of observations. Do you agree or
11 disagree with that statement?
12 A. I think that statement is pretty
13 good. I wish the rest of the policy were
14 that good.
15 Q. Going to the next paragraph,
16 intelligent design is an explanation of the
17 origin of life that differs from Darwin's
18 view, period. Do you agree or disagree with
19 that?
20 A. I think there are problems with that.
21 I don't like to say up or down agree or
22 disagree. I am philosopher, we pick knit.
23 Q. And that's why we're taking your
24 deposition. Tell me do you agree or disagree
25 with it?

176
1 A. I think that again, that is a very
2 misleading statement. First of all, it is
3 presenting intelligent design within the
4 context of a policy that purports to be about
5 science. Intelligent design is not a
6 bonafide scientific theory. It implies that
7 it is being juxtaposed to Darwin's view of
8 the origin of life. Darwin did not give a
9 view of the origin of life. That is not what
10 the *Origin of Species* or the rest of Darwin's
11 work was about.
12 Q. Any other objections?
13 A. That pretty much sums up why I think
14 it is such a misguided statement to make in a
15 science class.
16 Q. Darwin's theory, though, does discuss
17 changes in the species; right?
18 A. That's what it is about, yes, that is
19 properly what it is about.
20 Q. The next sentence, the reference book
21 *Of Pandas and People* is available for
22 students who might be interested in gaining
23 an understanding of what intelligent design
24 actually involves. Do you have any problems
25 with that particular sentence?

## Deposition of Professor Barbara Forrest - 6/7/05

177

1  A. I do.
2  Q. And that is that?
3  A. I object to offering this particular
4  book as a reference book in a science class
5  because I don't think that's what it is.
6  And suggesting that they should pursue or
7  follow up on intelligence design as what is
8  being presented in the context of a science
9  class, I think it is very misleading. I
10  think it misguides children.
11  Q. Do you think this particular sentence
12  in any way encourages them to look, go to the
13  library and pick up the book?
14  A. I think it does. I think it is
15  offering it to them as an educational
16  resource and to the extent that that
17  constitutes encouragement, yes; otherwise,
18  why would you bring it and make a special
19  mention of it in a policy. There is no
20  reason to do that if you are not suggesting
21  that the children should do it.
22  Q. It only suggests for those students
23  who might be interested in it; is that
24  correct?
25  A. Again, it doesn't matter who they are

178

1  suggesting it for, even if it is one student
2  in a class. It is a very misleading
3  statement which misrepresents what is
4  legitimate science.
5  Q. According to your definition of
6  legitimate science?
7  A. According to the understanding of
8  what constitutes proper science education and
9  my understanding of what constitutes science,
10  yes, sir.
11  Q. You are not a philosopher of science
12  nor are you a philosopher of education?
13  A. Have never claimed to be.
14  Q. Why are you so quick to offer an
15  opinion on that when you refuse to offer an
16  opinion on a lot of other issues dealing with
17  science?
18  MR. ROTHSCHILD:
19  Objection. You are asking her about
20  her opinion about this.
21  MR. THOMPSON:
22  But she refuses to answer a lot of
23  those questions but on these questions, she
24  is immediately ready to answer when she
25  disclaims any expertise in those areas.

179

1  THE WITNESS:
2  Sir, are you asking me about my view
3  on the policy?
4  BY MR. THOMPSON:
5  Q. I was asking you on your view about
6  the science of the policy because you gave an
7  answer?
8  A. Of course I have views on the
9  science. Any well-informed person should
10  have some understanding of science and how it
11  operates and how it should be taught. I am,
12  you know, I am not just a philosopher, I am
13  also a citizen of the United States. I am
14  interested in questions I think that have a
15  constitutional significance. I am a parent,
16  I have a child with a biology degree. So I
17  am looking at it from that standpoint. I am
18  a teacher, I am -- may I finish?
19  Q. Sure. Go ahead.
20  A. I am a teacher, I am concerned with
21  how young people are educated and I am a
22  philosopher, I am concerned with the truth,
23  and I don't believe that this represents the
24  true state of science.
25  Q. So you are, one of your children has

180

1  a biology degree?
2  A. He does.
3  Q. What does he do?
4  A. He is in medical school, studying for
5  his board exams as we speak.
6  Q. Doesn't almost every biology textbook
7  discuss the origin of life?
8  A. I can't say what every biology
9  textbook does. The origin of life is
10  certainly a question that is of scientific
11  interest and I dare say that there is
12  something about it in most but I have not
13  examined all of them.
14  Q. Well, do you know if Ken Miller's
15  book deals with the origin of life?
16  A. I can't tell you that, sir, I am
17  sorry.
18  Q. Going on, with respect to the next
19  paragraph, with respect to any theories,
20  students are encouraged to keep an open mind.
21  Do you have any problems with that sentence?
22  A. In itself, not particularly.
23  Q. The school leaves the discussion of
24  the origins of life to individual students
25  and their families, period. Do you have any

## UNITED COURT REPORTERS, INC.
## 1-800-US-DEPOS

## Deposition of Professor Barbara Forrest - 6/7/05

125

1  A. To inform the public about it.
2  Q. And what was your purpose in doing
3  that?
4  A. Because I believe that what they are
5  trying to do is unconstitutional.
6  Q. Don't you think it is also -- didn't
7  you characterize it as dangerous?
8  A. To the constitution, yes, and to the
9  education of children.
10  MR. ROTHSCHILD:
11     It's time to break.
12  MR. THOMPSON:
13     Sure.
14     (A short break was taken).
15 BY MR. THOMPSON:
16  Q. In your expert witness report, you
17 make mention of the fact that Steve Meyers'
18 piece *Proceedings of the Biological Society*
19 in Washington is a review paper and does not
20 describe new data or experiments. Do you
21 recall that?
22  A. Yes.
23  Q. Does that in and of itself make
24 Professor Meyers' paper a bad scientific
25 paper?

126

1  A. I don't regard the paper as a
2 scientific paper at all. It introduces ideas
3 which go beyond the boundaries of science.
4  Q. You agree that it was accepted by a
5 scientific body, do you not?
6  A. It is a fact that it was published in
7 the Journal of the Biological Societies,
8 that's a fact.
9  Q. Yes. And that is a peer review
10 paper, is it not?
11  A. They have a peer review procedure.
12  Q. And it went through that peer review
13 procedure, did it not?
14  A. According to the accounts I have
15 read, it was not done according to the proper
16 review procedures.
17  Q. You recall that there was a great
18 controversy over that?
19  A. Oh, yes.
20  Q. And in fact, he lost some of -- the
21 person that was responsible for allowing that
22 paper to be peer-reviewed lost many of his
23 privileges at the Smithsonian Institute; do
24 you recall that?
25  A. I can't say that I, you know, whether

127

1 he lost any privileges or not. I know that
2 there were accounts that didn't seem to be
3 consistent. I read, you know, his own
4 account that he did and I read, I seem to
5 recall accounts from officials at the
6 Smithsonian that he was really not, that they
7 didn't quite agree on his treatment. I don't
8 recall the specifics.
9  Q. Do you remember the person's name?
10  A. Certainly. His name is Richard
11 Sternberg.
12  Q. Do you recall reading about an
13 investigation that was conducted upon
14 Mr. Sternberg?
15  A. I don't recall an investigation, no,
16 sir. At the Smithsonian?
17  Q. Yes.
18  A. I know that there was some
19 controversy. He apparently feels that he was
20 wrongly treated. I don't speak to specific
21 details of that.
22  Q. Going to your criticism of the paper
23 that Steve Meyers wrote, you said it is a
24 review paper and does not describe new data
25 or experiments. That was the criticism that

128

1 you used.
2  A. It was characterized as a review
3 essay elsewhere, that's the way it was
4 represented to me. I didn't coin that
5 phrase.
6  Q. But you used that phrase, did you
7 not?
8  A. I did, yes.
9  Q. And does that in and of itself make
10 it a bad scientific paper?
11  A. The fact that something is a review
12 essay does not necessarily make it
13 unscientific. It is the content that the
14 paper deals with and insofar as Professor
15 Meyer injects into that paper the possibility
16 that an intelligent designer is at work, that
17 in itself is what makes the paper outside the
18 boundaries of science.
19  Q. Did you read it?
20  A. That is a -- yes, I have looked at
21 that paper and I have also read earlier
22 versions of it. That is a version of a paper
23 that first appeared on the internet in 2001,
24 so I recognized it, as the paper was
25 published in the journal I recognized as

## Deposition of Professor Barbara Forrest - 6/7/05

181

1 problems with that sentence?
2  A. Yes, sir.  I have two problems with
3 it?
4  A. It indicates to them that the study
5 of evolution has something to do per se with
6 the study of origin of life.  It doesn't
7 necessarily.  Okay.  The other thing is I
8 think it is kind of unfair to these kids to
9 bring this up, right, at the initiation of
10 school administration and then drop it in
11 their laps this way.  If this is a scientific
12 theory, right, if it is, then the school
13 should just simply teach it.  If it is not,
14 then don't mention it.  Don't create this
15 opportunity to raise questions in children's
16 minds about the state of the science.
17  Q. Well, isn't that good science
18 education, to raise those kinds of questions
19 in children's minds?
20  A. No, not these kind of questions, no,
21 sir.  I don't think that's good science
22 education.
23  Q. So basically, you think that in
24 biology, the way it should be taught is
25 dogmatic view that Darwin's theory of

182

1 evolution is the only theory that is
2 acceptable?
3  MR. ROTHSCHILD:
4      Objection.
5  THE WITNESS:
6      I think that you're characterizing it
7 in that way.  That's not the way I am
8 characterizing it, sir.
9 BY MR. THOMPSON:
10  Q. I am just responding to your
11 statement that you said there should be,
12 these questions should not be left open for
13 the students to discern.
14  MR. ROTHSCHILD:
15      Objection, mischaracterization of
16 testimony.
17  THE WITNESS:
18      That's not exactly what we're talking
19 about here.  We're talking about presenting
20 an idea, intelligent design as a scientific
21 option to students.  I don't think that
22 should be done.
23  Q. But you also stated that if it were a
24 scientific option, that they should teach it?
25  A. If it were, yes.  It is not.

183

1  Q. Again, your conclusion; correct?
2  MR. ROTHSCHILD:
3      Objection.
4 BY MR. THOMPSON:
5  Q. As a standards driven district, class
6 instruction focuses upon preparing students
7 to achieve proficiency on standards based
8 assessment.  Do you have any problems with
9 that sentence?
10  A. No.  In itself, no.
11  Q. And then just this is a statement
12 that is read, but a part of the policy which
13 is at issue in the lawsuit continues on.  The
14 superintendent Dr. Richard Nelson has
15 directed that no teacher will teach
16 intelligent design, creationism, or present
17 his or her or the board's religious beliefs.
18 Do you have any problems with that policy?
19  A. May I offer my own judgment on this?
20  Q. That's what I am here for.
21  A. I think it is a disingenuous
22 statement.
23  Q. And so if either the board or the
24 superintendent who prepared this, you are
25 accusing of being disingenuous?

184

1  A. I am accusing them of offering a
2 statement which is disingenuous.  I don't
3 think it is a way of dealing honestly with
4 these children.
5  Q. And the reason for that is --
6  A. They are presented to them as a
7 scientific option and idea which is not
8 science.
9  Q. Again, that's very important.  In
10 other words, if it is found that intelligent
11 design is science, all your objections would
12 disappear, would it not?
13  MR. ROTHSCHILD:
14      Objection, found by who?
15  THE WITNESS:
16      Found by who and --
17 BY MR. THOMPSON:
18  Q. Okay, either found by -- let's start
19 over.  We will see.  Found by who?  The
20 scientific community?
21  A. Intelligent design insofar as it
22 represents the injunction of the idea of a
23 supernatural designer which it does, that
24 cannot be presented as science.
25  Q. Even though the scientific community

**Deposition of Professor Barbara Forrest ~ 6/7/05**

185

1 says it is okay?
2    A. The scientific community hasn't said
3 it is okay.
4    Q. I am giving you the hypothetical
5 now.
6    A. If the people who are proposing this
7 idea could find a scientific test for the
8 supernatural, they would have revolutionized
9 science but they haven't done that.
10    Q. You are not answering my question.
11    A. I think I am answering it.
12    Q. You are not answering the question.
13 My question is if the scientific community
14 found that intelligent design theory is
15 science, okay, that would remove all your
16 objections to this theory of intelligent
17 design and to this policy; is that true?
18    MR. ROTHSCHILD:
19       Improper hypothetical.
20    THE WITNESS:
21       Does that mean I should not answer?
22    MR. ROTHSCHILD:
23       No, you can answer.
24    THE WITNESS:
25       If intelligent design had nothing to

186

1 do with the supernatural, if you are dealing
2 with the idea of intelligent design as being
3 familiar with it within the context of our
4 experience, intelligent people like human
5 beings doing work, designing things, that's
6 not a problem.
7       Intelligent design is involving and
8 invoking a supernatural designer as the
9 problem and I can't foresee that the
10 scientific community would step beyond its
11 proper boundaries and admit that idea as a
12 scientific one unless someone could come up
13 with a methodology and subjecting it to a
14 scientific test.
15       I can't conceive that that could be
16 done, not in the way that science has been
17 successfully practiced.
18 BY MR. THOMPSON:
19    Q. Well, you agreed early on that what
20 is science is determined by the scientific
21 community, did you not?
22    A. But that doesn't mean that what is
23 science is determined by the scientific
24 community is arbitrary.
25    Q. Well, I think you did because you

187

1 said it was man-made?
2    A. No. That doesn't mean it is
3 arbitrary, it is not the same thing.
4    Q. Well, what do you depend then, what
5 do you have to determine whether something is
6 scientific or not?
7    A. The scientific test that enables
8 scientists to verify their proposals. And
9 those are not purely arbitrary. Scientific
10 methodology has not been adopted simply
11 arbitrarily. It is used because it works.
12 It has been very successful, it has enabled
13 scientists to advance in our understanding of
14 the natural world. They do simply what
15 works.
16    Q. When and if they find out that it
17 doesn't work, that it no longer can provide
18 the explanations for the issues that are
19 raised, then you believe that it can change
20 its methodology?
21    A. You mean scientific methodology?
22    Q. Yes. If what they are doing now
23 should stop working, which it hasn't, if they
24 were to find some methodology that works
25 better for pragmatic reasons, you know, of

188

1 course they would adopt it, but that doesn't
2 mean that intelligent design is properly
3 science. It doesn't mean that even if what
4 they are doing now stopped being successful,
5 it wouldn't make intelligent design an
6 acceptable substitute or an acceptable
7 replacement. It is not the same thing.
8    Q. I think you are still not answering
9 my hypothetical.
10    A. Okay. Well, maybe you can help me
11 understand it.
12    Q. Well, maybe we just are at a
13 loggerheads here. What I am saying is that if
14 the scientific community decided that the
15 theory of intelligent design is science,
16 would that eliminate all of your objections
17 to this theory of intelligent design?
18    A. It would depend upon what the
19 intelligent design, what the theory of
20 intelligent design consists of. If you are
21 asking me if they were to consider a
22 supernatural inherently religious idea to be
23 science, I don't think that that's a question
24 that makes any sense within the context of
25 the way science is done. I don't think that

## Deposition of Professor Barbara Forrest — 6/7/05

189

1 that is a realistic possibility.
2    Q. Would you agree that all science has
3 to do is say henceforth, we will look at
4 supernatural causes?
5    A. No.
6    MR. ROTHSCHILD:
7       Objection.
8    THE WITNESS:
9       Certainly no.
10 BY MR. THOMPSON:
11    Q. Do you think that there is any
12 scientific experimentation going on in
13 supernatural causes?
14    A. Not within the boundaries of what is
15 properly considered science.
16    Q. Can you conceive of any circumstance
17 where you would change your view on
18 intelligent design?
19    MR. ROTHSCHILD:
20       Objection? Which view?
21 BY MR. THOMPSON:
22    Q. The validity of intelligent design?
23    MR. ROTHSCHILD:
24       Objection.
25    THE WITNESS:

190

1    May I offer a clarification to see if
2 I am understanding you correctly?
3 BY MR. THOMPSON:
4    Q. Yes.
5    A. Are you asking if I can conceive of
6 any circumstance in which a supernatural
7 religious belief could be considered a
8 scientific idea?
9    Q. Well, you have put those words
10 together but I am saying can you -- I am not
11 trying to limit you in any way. Can you
12 conceive of any circumstance in which
13 intelligent design could be considered a
14 valid scientific theory?
15    A. If one defines intelligent design
16 such that it is confined to the boundaries of
17 what is accessible to scientific methodology,
18 right, and if you do a, you know, if you are
19 looking for -- the only time I have ever seen
20 intelligent design yield any, you know, when
21 I was doing searches, for example, I would
22 find articles about computer science, you
23 know, and so within the boundaries of the
24 methodology of science as it is practiced,
25 you might conceivably find some what,

191

1 operative use for it, but as the
2 supernatural, I can't conceive of ever
3 considering that science. That is religion.
4    Q. Going back to the policy itself, does
5 mentioning the intelligent design, that
6 phrase, in your opinion, consider teaching
7 intelligent design?
8    A. Not the content of what is being
9 proposed, but you're someone who reads a
10 policy or a statement like this to children
11 is teaching them that intelligent design is
12 an alternative to evolutionary theory. It is
13 teaching in that sense, yes, sir, I think it
14 is.
15    Q. And I have to ask you, what is your
16 definition of teaching?
17    A. Being in a position of authority
18 imparting information to students, reading
19 students things that children will inevitably
20 see as coming from an authoritative source,
21 that you are conveying some -- the people who
22 are reading the policy are conveying some
23 information to children or what they purport
24 to be information to children and that is an
25 intelligent design part of science, that is

192

1 how these children are going to understand
2 it.
3    They are conveying to them the
4 information that there is a book in the
5 library that they are presenting as a
6 scientific reference book, that is teaching.
7 When a person in a position of educational
8 authority as school administrators are, and
9 this actually was designed to be read by the
10 teachers, not the administrators, the
11 teachers refuse to read it, they objected to
12 it.
13    When a person in a position of
14 authority stands in front of a classroom and
15 tells children that there is a book that they
16 are presenting as a science book that they
17 can go and follow up on an idea that's being
18 presented within the context of a science
19 class, that's teaching.
20    Q. And you think that that is --
21    A. They were acting in the role of
22 teacher then.
23    Q. And you think that that is harmful to
24 the students, that one statement?
25    A. I think it is, I think it is very

## UNITED COURT REPORTERS, INC.
## 1-800-US-DEPOS

**Deposition of Professor Barbara Forrest - 6/7/05**

193

1  misleading, yes, sir, I do.
2     Q. And even though the students are not
3  tested on intelligent design?
4     A. It doesn't matter.
5     Q. Even though the students then take up
6  several days on evolution?
7     A. Still introduced the idea and you
8  have still presented it to children within
9  the context of a science class where I don't
10 think it is properly designed.
11    Q. In that one statement read once taken
12 about a minute and a half, is going to
13 destroy everything that they learn for the
14 next several days in evolution?
15 MR. ROTHSCHILD:
16      Objection, mischaracterizes.
17 THE WITNESS:
18      You are not -- that is not a
19 representation of what I just said.
20 BY MR. THOMPSON:
21    Q. I am asking you the question.
22    A. The question as phrased is not a
23 question that represents my view.  My view is
24 that it misleads children about what science
25 is and it injects a religious idea into a

194

1  science class.  At the very least, it could
2  create some confusion in children's minds
3  about what science involves, what is part of
4  science.
5     Q. I guess there is an empirical way to
6  find out, right, about whether or not it will
7  cause all this confusion; is that correct?
8     A. There is some other elements here.
9  There is also, even if it caused no confusion
10 at all, I think it is an unconstitutional
11 intervention into a public school setting
12 that is improper.  When you introduce a
13 religious idea for consideration to students
14 as science, I think you are crossing a
15 constitutional boundary; right?  And even if
16 all the children were on to what's going on,
17 even if they were all smart enough to figure
18 out what's going on, I think that there is
19 still the constitutional problem in addition
20 to the pedagogical problem.
21    Q. You think it is unconstitutional to
22 teach bad science?
23    A. Not to teach bad science.  That's
24 done all the time, sir.  I wish science
25 education were a lot better than it is.

195

1     Q. That's because they are spending too
2  much time on this theory of evolution, do you
3  agree?
4     A. You might.
5  MR. ROTHSCHILD:
6      I am going to take a break.
7      (A short break was taken).
8  BY MR. THOMPSON:
9     Q. You are also on the board of
10 directors of the Americans United Separation
11 of Church and State?
12    A. Not on the board of directors, that's
13 a different body.  I am on the national
14 advisory council.
15    Q. And what are your responsibilities?
16    A. To tell you the truth, I have never
17 been asked to do anything.  That the national
18 advisory council is consists of a large group
19 of people that they can conceivably call upon
20 for some function but I don't think we have a
21 specific function.
22    Q. And do you know why they selected you
23 to be on their national advisory board?
24    A. I was nominated.  I think I was
25 nominated by my friend Molly Matsmora

196

1  (spelled phonetically) who has been very
2  active with the Americans United.  They like
3  to have people who are, you know, people that
4  are particularly concerned with that issue
5  that they might be able to call upon if they
6  need to.  And so I think I believe it was my
7  friend Molly Matsmora that nominated me for
8  that.
9     Q. And you accepted?
10    A. Yes.
11    Q. And why did you accept?
12    A. Because I was -- I am a supporter of
13 that organization.  I think they do very
14 important work.  I think it is a very
15 important issue.
16    Q. Do you contribute to that
17 organization?
18    A. My membership dues, yes.  A couple of
19 times they have written letters to, for
20 example, the governor of Louisiana on various
21 issues of, you know, that they are concerned
22 about, pending legislation, things like that.
23 And they have written letters over, you know,
24 with me as co-signer, things like that.
25    Q. Do you subscribe to the principles of

**Deposition of Professor Barbara Forrest - 6/7/05**

197

1 that organization?
2 A. Yes, I do.
3 Q. What are the principles?
4 A. I can't give you a formal statement
5 of the principles of the organization, but
6 the organization is for the purpose of trying
7 to preserve the integrity of the
8 constitutional separation of church and state
9 and I simply subscribe to that.
10 Q. You're also a member of the New
11 Orleans Secular Humanist Society?
12 A. Yes, New Orleans Secular Humanist
13 Association, NOSHA, they call it NOSHA.
14 Q. And how long have you been a member?
15 A. Oh, a few years. In fact, I didn't
16 actually become a member until I was invited
17 to serve on their board. So you pay your
18 membership dues, you know. Serving on the
19 board means that I should at least pay the
20 dues, you know. I would say I was trying to
21 remember the other day when the first year, I
22 guess it has been three or four years maybe.
23 Q. And all those years have been on the
24 board of directors?
25 A. Uh-huh, (in the affirmative). Yes.

198

1 Q. And what do you do as a member of the
2 board of directors?
3 A. Oh, they like for you to attend the
4 meetings which I don't get to go to many of,
5 they are here in New Orleans and I live some
6 distance away, but various things that,
7 projects they take up, various decisions to
8 be made, they consult with their board, and
9 ask you what do you think and things like
10 that. It is a really -- I have contributed,
11 really I am not the person who does most of
12 the work for that organization since I don't
13 really have the time, but as a board member,
14 I do get consulted on occasions when the
15 president or the director, you know, feels he
16 needs some advice, he consults all of us.
17 Q. How many members are there?
18 A. Members on the board?
19 Q. Yes.
20 A. On the board, maybe eight, something
21 like that. It is not a large number of
22 people. It is a very small organization.
23 Q. And who invited you to join it?
24 A. Harry Greenburger, the person who
25 started the group.

199

1 Q. And why did you join?
2 A. Because they are a very nice group of
3 people, they endorse principles that I agree
4 with and I thought it was, when I was invited
5 to serve on their board of directors, I was
6 happy to help them out.
7 Q. What are these principles that you
8 agreed with?
9 A. I can't give you a whole list but
10 basically there is a statement of humanist
11 principles, you know, that they certainly
12 subscribe to and that's you can find that on
13 the web, but basically, it is an organization
14 that endorses the reliance upon reason and
15 science, not an appeal to the supernatural in
16 an attempt, you know, in your effort to
17 understand the world and they endorse
18 principles of, you know, basic moral decency,
19 things like that. It is nothing --
20 Q. Do they believe in a supernatural
21 diety?
22 A. Most humanists do not. That's not to
23 says there aren't some. Humanism is very
24 broad and fluid, but no, this is an
25 organization for people mostly consider

200

1 themselves outside the religious community,
2 that's atheist, agnostics. That's not to say
3 that some of them don't have some kind of,
4 you know, like or are interested in spiritual
5 questions or spirituality but no, it is
6 mostly for people who are not affiliated with
7 any particular religious group.
8 Harry's Jewish, but he is, you know,
9 he considers himself, you know, not to be a
10 religious person, although Harry would be a I
11 think pretty representative of the group.
12 Q. Does he practice his faith of
13 Judaism?
14 A. No.
15 Q. Wouldn't you say that the New Orleans
16 Secular Humanism Association is basically
17 made up of atheists and agnostics?
18 A. That's probably accurate. I haven't
19 done a specific count to see how many of
20 each, but that's a fair statement, yes.
21 Q. And as an atheist or agnostic, one
22 would not believe in God or have questions
23 about whether God exists?
24 A. Well, an atheist and an agnostic are
25 not the same thing. An atheist is a person

**Deposition of Professor Barbara Forrest - 6/7/05**

201

1 who has decided for whatever reason that
2 there is no supernatural, so which means
3 there would be no supernatural deity.  An
4 agnostic is a person who just simply doesn't
5 feel in a position to make that determination
6 one way or the other.
7    Q.  Now which are you?
8    A.  I am agnostic.
9    Q.  You are also as a part of New Orleans
10 Secular Humanist Association are affiliated
11 with the Council of Secular Humanists; is
12 that correct?
13    A.  Yes, there is some.  I am not -- I
14 can't tell you exactly what the technical
15 connection is, yes, but there is -- yes,
16 that's one of the early larger national
17 groups with which Harry made contact in
18 setting up his group.  I think one of the
19 things they do is sort of give advice to
20 humanist groups around the country that want
21 to establish a chapter, I think Harry got
22 some help with them.
23    Q.  They also have a set, I am referring
24 to the Council for Secular Humanism, they
25 also have a set of principles that they go

202

1 by?
2    A.  Those are the ones I was referring
3 to.  I think they are pretty -- I don't know
4 if they are exactly the same but I think they
5 are pretty much a statement of what, you
6 know, NOSHA endorses, yes.  It has been
7 around for a long time.
8    Q.  You know, you said you are an
9 agnostic and I guess the question I had is do
10 you believe that there is no way that one can
11 determine whether there is a God or not?
12    A.  There is no way that I can determine.
13 I think for questions like that, that that is
14 what makes a faith commitment meaningful.  I
15 think that that requires a degree of personal
16 commitment and personal effort to commit
17 oneself to something despite that fact that
18 you may not have sufficient evidence for it.
19 I think that is what makes a faith commitment
20 in the life of a religious person meaningful,
21 and I haven't found a way to definitively
22 answer the question.  It would really be nice
23 for a lot of people if we could do that, but
24 we haven't found a way.
25    Q.  You can't think of a scientific

203

1 method to do that?
2    A.  No, sir, not yet.  I have, you know,
3 I have acquaintances, in fact, the one I have
4 in mind is a scientist who, you know, for
5 whom science is something that is richly
6 suggestive of the existence of God but that's
7 a personal commitment that he has made on his
8 part.
9    Q.  I have in my hands a document that we
10 got from the internet on the New Orleans
11 Secular Humanist Association.  I just want
12 you to take a look at it and see if that
13 accurately depicts what your association
14 stands for?
15    A.  This part right here (indicating)?
16    Q.  All of it.  Just read it.
17    A.  About us.  Okay.
18 MR. ROTHSCHILD:
19    Is this something you want to mark
20 this or at least indicate --
21 BY MR. THOMPSON:
22    Q.  If I mark it, can we have copies made
23 before I leave if you can mark it now.  I
24 have got a couple of others that I am going
25 to look at.

204

1    MR. ROTHSCHILD:
2       Why don't we go ahead and mark this
3 as Exhibit 3.
4 BY MR. THOMPSON:
5    Q.  Does that accurately describe your
6 organization?
7    A.  This is -- yes, this is an accurate
8 description of what NOSHA is about.  Yes,
9 this was drawn up by the people at NOSHA,
10 probably Harry.
11    Q.  And you subscribe to that?
12    A.  Let's see.  You want to go line by
13 line?
14    Q.  Well, you can just read it maybe fast
15 and if there is some objection you have, you
16 know, just maybe mention the objection.
17    A.  Well, this one is just telling who
18 they are, you know, they are just a regional
19 local --
20    Q.  The first section?
21    A.  Yeah, that's just telling who they
22 are, that's all it is, and who they are
23 affiliated with.  We reject efforts to
24 denigrate human intelligence, to seek to
25 explain the world in supernatural terms and

205

1 to look outside nature for salvation.
2     Yes, I would say I agree with that
3 from a personal standpoint. We believe in
4 enjoying life here and in developing our
5 creative talents to their fullest.
6 Certainly. I think a lot of religious people
7 could subscribe to that one.
8     We believe in the common moral
9 decencies: Altruism, integrity, honesty,
10 truthfulness, responsibility. Certainly.
11     Humanist ethics are amenable to
12 critical, rational guidance. I don't see a
13 problem there.
14     Normative standards exist that we
15 discover together. Okay. Moral principles
16 are tested by their consequences. I would
17 agree with that. I would qualify that I
18 would add a little bit more to it. This is
19 very short and concise.
20     Q. What would you qualify it?
21     A. I would say more principles are
22 tested by how they affect human beings, what
23 they are affected, whether they are humane.
24 We affirm humanism as a realistic alternative
25 to theologies of despair and ideologies of

206

1 violence. I agree with that.
2     Q. Is that, I don't know if you know or
3 not, were they -- what were they referring to
4 when they were talking about that?
5     A. I am not sure. I think -- I am not
6 sure. And as a source of rich personal
7 significance and genuine satisfaction in the
8 service to others. That's fine.
9     We believe in the fullest realization
10 of the best and noblest that we are capable
11 of as human beings. That's fine. And that's
12 it. I mean you have got a second page here,
13 but it is just, you know, how to get in --
14 contact them and stuff like that.
15     Q. I want to go back here. As a part of
16 the operating principles of the first, under
17 the section statement of principles, the
18 following sentence is made: We reject
19 efforts to denigrate human intelligence, to
20 seek to explain the world in supernatural
21 terms and to look outside nature for
22 salvation.
23     Now, that's one of the operating
24 principles you believe in; is that correct?
25     A. Sure.

207

1     Q. And it is because of that principle
2 that you object to the theory of intelligent
3 design?
4     A. It is not because of that principle.
5 I object to the theory of intelligent design
6 because I think it is being misrepresented
7 and I think it is unconstitutional to teach
8 in a science class in a public school.
9     Q. If it were even constitutional and
10 even if it were science, you still would
11 object to the theory because it seeks to
12 explain the world in supernatural terms,
13 would you not?
14 MR. ROTHSCHILD:
15     Objection, hypothetical.
16 THE WITNESS:
17     I don't think I can answer that
18 question and agree to that question as you
19 have phrased it.
20 BY MR. THOMPSON:
21     Q. Well, would you ever believe as a
22 member of the Secular Humanist Association
23 that you can explain the world in
24 supernatural terms?
25     A. Not presently. I mean, you know, you

208

1 can explain the world any way you want, but I
2 think if you are trying to give an
3 explanation that is scientific and that is
4 something that we can verify together, then
5 you have to just simply not make the
6 supernatural a part of that.
7     Q. I guess again the question is you
8 believe in this first statement, though?
9     A. As something I personally subscribe
10 to?
11     Q. Yes.
12     A. Yes, I would say yes.
13     Q. And does that form your attitude
14 towards the issues relating to the
15 intelligent design theory?
16     A. No. My attitude toward the issue is
17 mostly based on the constitutional
18 consideration and the considerations that are
19 involved in presenting something honest to
20 school children.
21     Q. Did that belief -
22     A. I certainly didn't have NOSHA in my
23 -- NOSHA didn't even exist when I got
24 involved in all of this. NOSHA is a fairly
25 young organization.

## Deposition of Professor Barbara Forrest - 6/7/05

209

1  Q. Right, but you already had, whether
2  it belonged to NOSHA in a formal way, you
3  already prescribed to these principles?
4  A. It is a statement of my own personal
5  viewpoints, yes, it is. Yes.
6  Q. I mean this would be your viewpoint
7  even if the New Orleans Secular Humanist
8  Association didn't exist; is that correct?
9  A. Sure. Sure. Yes
10  Q. Did this principle in any way form
11  the reason why you wrote the book
12  *Creationism's Trojan Horse?*
13  A. No. Only in a very sort of
14  background way. There was no conscious
15  invocation on my part of that particular
16  principle. The reason I wrote the book is
17  mainly in consideration of the important
18  constitutional and pedagogical questions
19  involved.
20  Q. The reason I ask that question is
21  because you spend a lot of time on the
22  religion and the religious motivation of the
23  intelligent design movement; isn't that true?
24  MR. ROTHSCHILD:
25      Objection, mischaracterizes the

210

1  testimony.
2  THE WITNESS:
3      I am sorry?
4  MR. ROTHSCHILD:
5      Objection, mischaracterizes the
6  testimony.
7  BY MR. THOMPSON:
8  Q. The book will speak for itself
9  obviously.
10  A. Well, the book, the reason religion
11  plays such a great role in the book is
12  because it plays -- it forms such an integral
13  part of what the intelligent design
14  proponents are doing. They are the ones who
15  have injected considerations of religion
16  constantly and pervasively in what they do
17  and I am just simply reflecting that.
18  Q. And one of the reasons why you are
19  reflecting it and chose to write the book is
20  because it is contrary to your, one of your
21  primary beliefs, is it not?
22  A. No. No.
23  MR. ROTHSCHILD:
24      Objection.
25  THE WITNESS:

211

1      Not because it is contrary to my
2  personal belief but because I think it is
3  something that is contrary to the
4  constitution which affects all of us and to
5  the education of children which affects all
6  of us in the long run.
7  BY MR. THOMPSON:
8  Q. The Council for Secular Humanism is
9  the national organization which the New
10  Orleans Secular Humanist Association belongs
11  to; is that correct?
12  A. Not belongs to. They have some kind
13  of affiliation or connection, I am not
14  exactly sure of the technical nature of it.
15  They don't control NOSHA or anything like
16  that. There is an alliance or a maybe some
17  type of partnership, I am not sure that it is
18  formalized in any way. Harry is the one that
19  takes care of all that.
20  Q. I am just reading the statement here
21  about us that says we are an affiliate of the
22  Council of Secular Humanism?
23  A. Right. Affiliate, I guess that's the
24  word, yeah.
25  Q. I want to now have you looked at a

217

1  document that was found on the web page of
2  the Council for Secular Humanism? We can
3  mark this as well, Number 4.
4  A. You want me to read this?
5  Q. Yes, take a look at it.
6  A. Okay. All right.
7  Q. You have looked at the mission
8  statement of the Council for Secular Humanism
9  that is marked Forrest Exhibit Number 4, have
10  you not?
11  A. This being the mission statement
12  here?
13  Q. Yes.
14  A. Yes.
15  Q. Do you agree with that mission
16  statement?
17  A. In general, yes.
18  Q. The mission statement contains the
19  following, after the first paragraph:  The
20  council's specific objectives are:  To
21  promote secular humanist principles to the
22  public, media, and policy-makers.  Do yo
23  agree with that?
24  A. In the sense of making them aware of
25  it, yes.  There are some people who like to

## UNITED COURT REPORTERS, INC.
### 1-800-US-DEPOS

213

1 advocate for secular humanism.  I don't do
2 it.  I don't go out and try to sell it or try
3 to convince people or anything.  I think one
4 of the things that they do is the same thing
5 that other groups, they try to make
6 themselves known to people that they would
7 like to be aware of the organization.
8   Q.  What's your definition or the
9 difference between making them aware and
10 advocating?
11   A.  I mean advocating is probably
12 recommending it as a worthy alternative.
13 That's why these groups exist.  I mean just
14 like you have, you know, people who like to
15 be, to be part, part of a group of
16 like-minded people, that's what this
17 organization exists for.
18   Q.  A second objective is to provide
19 secular humanist activities and communities
20 to serve the needs of non-religious people
21 and foster human enrichment.  Do you support
22 that objective?
23   A.  Sure.  That's the basic reason that
24 the, for example, NOSHA was founded, it was
25 to give people who would like to know other

214

1 people who have similar interests and who are
2 like-minded, give them a chance to interact,
3 give them a chance to do things together,
4 give them a chance to, you know, know each
5 other and to pursue their interests together.
6   Q.  Would you consider yourself a
7 non-religious person?
8   A.  I would, uh-huh, (in the
9 affirmative).
10   Q.  The next objective, to demonstrate
11 the viability of the secular humanist -- I
12 don't know what that word is.
13   A.  Oh, you are looking at the word
14 eupraxophy.  That's kind of a goofy word.
15   Q.  As an alternative naturalistic
16 life-stance.
17   A.  And I could not -- I couldn't even
18 tell you properly what that means.  I am
19 trying to think of who came up with that.  I
20 guess that was Paul Kurtz, and I don't think
21 it ever caught on to tell you the truth.  It
22 is a, the eupraxophy part comes from the
23 Greek work praxus which means, you know, we
24 have get our word practice, you know, the
25 things that people do, but to give you a

215

1 proper definition, I don't even remember what
2 it is to tell you the truth.
3   MR. ROTHSCHILD:
4       That would stop me from joining that
5 organization.  Would you like the document so
6 you can get a spelling?
7   THE WITNESS:
8       You know, I think they were trying to
9 make that a word that would sort of catch on
10 with the people and I don't think it ever
11 did.  You know, I really can't even tell you
12 what it properly means.
13 BY MR. THOMPSON:
14   Q.  But putting it in context maybe, it
15 says to demonstrate the viability of the
16 secular humanist eupraxophy as an alternative
17 naturalistic life-stance.  Alternative to
18 what?
19   A.  Alternative to the religious points
20 of view that these people don't share, yeah.
21   Q.  The next objective:  To engage in
22 research relating to the critical examination
23 of religious and supernatural claims and the
24 humanist outlook.
25   A.  Yes, that's what some of the people,

216

1 for example, affiliated with Free Inquiry
2 Magazine do.  It doesn't apply to all members
3 of the organization, it just covers the
4 activities of what various people associated
5 with the Council for Secular Humanism do.
6   Q.  Well, weren't you fulfilling that
7 objective when you wrote the book,
8 *Creationism's Trojan Horse?*
9   A.  I didn't see myself in fulfilling
10 that particular objective, no.  I wasn't even
11 thinking about that.
12   Q.  Now, looking back, is it fulfilling
13 that objective?
14   A.  I don't see any particular -- would
15 you read it to me again, please
16   Q.  To engage in research relating to the
17 critical examination of religious and
18 supernatural claims and the humanist outlook.
19   A.  No, I don't think so.  That's exactly
20 what I was doing.  I was trying to explain to
21 the public what I think the intelligent
22 design movement is all about in their pursuit
23 of the Wedge strategy.  I certainly didn't
24 have anything like that in mind.  I wasn't
25 doing any kind of like religiously related

## Deposition of Professor Barbara Forrest - 6/7/05

217

1 research or whatever it says. I wasn't even
2 thinking about that.
3  Q. The next objective, to conduct
4 educational programs for all age levels.
5  A. No. It is no connection there. I
6 think what that --
7  Q. But what I am saying is do you agree
8 with that objective?
9  A. Oh, do I agree with that?
10  Q. Yes.
11  A. In the sense that yes, people who,
12 for example, join an organization like NOSHA
13 tend to be like everybody else, they are
14 people with children, they have families and
15 what organizations like, and I know this
16 particular organization, they have things
17 that they write that are particularly geared
18 towards the little people, you know, the
19 younger members of the families and that's
20 all that refers to.
21  Q. Well, it is an educational program.
22 What do you mean by educational program?
23  A. It is just like they have a little
24 newsletter that they put out. I don't get it
25 anymore. It used to come you know, with

218

1 your -- just suggesting activities for
2 children, things that, ways of explaining
3 things, you know, to give parents advice on
4 how to explain various things to children,
5 just, you know, like you would have in lots
6 of other organizations.
7  Q. Is this what you would call a
8 proselytizing effort?
9  A. No. It is just a way of -- for
10 example, this is -- when people join a church
11 for example, you know, they are looking for
12 fellowship with like-minded people and there
13 are ways that they have within the confines
14 of a particular church, for example, of
15 explaining things to their children like what
16 happens when grandmothers die, things like
17 that.
18     And since non-religious people by
19 definition do not avail themselves of those
20 types of explanations, for example, like
21 saying grandmother is in heaven, well how
22 would you explain death to a child? And so
23 the Council for Secular Humanism has, they
24 suggest ways of handling questions like that,
25 and I mean this is all it refers to.

219

1  Q. You mentioned church. Did you go to
2 church at one time?
3  A. Yes.
4  Q. What faith?
5  A. I was raised a Methodist.
6  Q. Was there any particular event in
7 your life that removed you from that church
8 and --
9  A. No particular -- not a particular
10 event. It was kind of a gradual shift or a
11 gradual change. In other words, there wasn't
12 a crisis or anything like that, no one event.
13  Q. Do these programs that you talk
14 about, that not you talk about, the
15 objectives, are they ever introduced in the
16 public school system?
17  A. No, those programs are not, not that
18 I am aware of.
19  Q. Are there any documents or material
20 that had have been prepared for children?
21  A. For children to be used in public
22 schools?
23  Q. No. For children by the Council for
24 Secular Humanism for education programs?
25  A. The only thing I have ever seen are

220

1 little like how to make cookies and stuff
2 like that or how to, you know, that's about
3 the only thing I have ever seen, to tell you
4 the truth or how to, you know, how to
5 suggestions for, oh, little games and things.
6 Really nothing much more than that.
7  Q. Do you know if they talk to children
8 about God, a creator God?
9  A. If the parents talk to their
10 children?
11  Q. No, this program.
12  A. Not that I am aware of. I have never
13 seen any type of -- I have never been in any
14 type of gathering where children were
15 present. I have never -- and I have never
16 really seen any particular, you know, special
17 event, you know, that I was -- that I was
18 ever present at where children were being
19 talked to.
20     You know, pretty much, you know,
21 people that are non-religious tend to, you
22 know, most of them exist outside any
23 particular formal framework unless they join
24 an organization like this, but it is very
25 common, as it is in even in religious

## Deposition of Professor Barbara Forrest - 6/7/05

221

1 families for a thoughtful people to discuss
2 things like that, and I am sure that
3 humanists have conversations with their
4 children just as anybody else would.
5    Q. You indicated that you're an agnostic
6 rather than an atheist; correct?
7    A. Yes; right.
8    Q. Does an agnostic believe in the
9 immortality of the soul?
10    A. No, I wouldn't think so.
11    Q. I mean --
12    A. You know, I am not saying that it is
13 impossible. It is just that people that --
14 an agnostic, for example, the reason
15 agnostics are agnostics is because they place
16 a high premium on evidence, right; you know,
17 what evidence would convince me of X or Y
18 and, you know, I think fully the immortality
19 of the soul again, it is one of those things
20 that requires a faith commitment. Some
21 people can make it, some people don't.
22    Q. As an agnostic, do you believe the
23 inerrancy of the bible?
24    A. As an agnostic?
25    Q. Yes.

222

1    A. No, I certainly don't. There are a
2 lot of Christians who don't believe in the
3 inerrancy of the bible. You know, you don't
4 want to single me out on that. I mean the
5 bible is a beautiful book. I have read it.
6 I appreciate it. It is a lovely, beautiful
7 thing. And it is -- but it is not, you know,
8 it doesn't represent for me what it
9 represents to some other people.
10         I think if you ask a variety, even a
11 variety of religious people, they will give
12 you various answers as to how they understand
13 it and the reason there are so many different
14 religions is because people see it in so many
15 different ways.
16    Q. And so I take it you don't believe in
17 miracles that have been described in the
18 bible?
19    A. In miracles described in what, I am
20 sorry?
21    Q. In the bible.
22    A. No, I don't think there is any reason
23 to believe that those literally happened, no.
24 But that's not an uncommon view. I mean
25 there have been people, you know, lots of

223

1 people, you know, throughout history who have
2 taken that view.
3    Q. Well, do you believe that the bible
4 does have some historical descriptions?
5    A. Oh, sure, yeah, there are.
6    MR. ROTHSCHILD:
7       Okay. I have let you go for a while,
8 but this is very far afield from her expert
9 report or any issues in this case.
10    MR. THOMPSON:
11       Well, I think these are very
12 important issues and since she brought up
13 religion on the other sides.
14    THE WITNESS:
15       But I am the one, I am not the one --
16    MR. ROTHSCHILD:
17       You don't have to argue that.
18 BY MR. THOMPSON:
19    Q. Okay. I would like another
20 deposition exhibit marked, please. Professor
21 Forrest, I am going to show you Forrest
22 Exhibit Number 5 which is taken from the
23 website of Council for Secular Humanism. The
24 first page says what is secular humanism and
25 it is five pages long and take a look at

224

1 that, please.
2    A. Sure. You want the whole thing or
3 just these first bulleted items?
4    Q. The whole thing.
5    A. Okay.
6       (A short break was taken
7 BY MR. THOMPSON:
8    Q. I would like you to focus your
9 attention to Exhibit Forrest Number 5, and it
10 is a web page taken out of the Council for
11 Secular Humanism website. What is secular
12 humanism. You have had an opportunity to
13 review this before?
14    A. Yes, we went through this.
15    Q. Starting with the first paragraph,
16 secular humanism is a term which has come
17 into use in the last 30 years to describe a
18 world view with the following elements and
19 principles and it goes down the elements. Do
20 you describe secular humanism as a world
21 view?
22    A. Oh, gosh, I guess. It is a -- if you
23 mean by world view, kind of a comprehensive
24 way of looking at things, yes, I guess you
25 could call it that.

## Deposition of Professor Barbara Forrest - 6/7/05

225

1   Q. Under the first bullet point, you
2 indicate or I say you, the Secular Humanism
3 Council indicates a conviction that dogmas,
4 ideologies, and traditions, whether
5 religious, political, or social must be
6 weighed and tested by each individual and not
7 simply accepted on faith. Do you accept
8 that?
9   A. Pretty much, since that, you know --
10 humanism is a way of looking at things which
11 is -- it emphasizes evidence very strongly
12 and drawing conclusions about how to
13 understand things based on evidence and so to
14 the extent that that's what this represents,
15 yes, I think that's very important.
16   Q. Do you believe in faith having any
17 part to play in someone's religious point of
18 view?
19   A. I think for religious people in the
20 sense in which we generally understand it in
21 this part of the world, yes, faith is very
22 important for them.
23   Q. I am talking about you personally?
24   A. Oh, I am sorry, ask me again.  I
25 was --

226

1   Q. Do you believe that faith plays any
2 part at all in regarding a person's religious
3 beliefs?
4   A. If the religious beliefs involve the
5 supernatural, yes, I think so.  From
6 everything I know, yes, from the familiarity
7 I have.
8   Q. But do you not accept faith as a
9 basis to accept anything?
10   A. I don't make any commitments to the
11 supernatural based on faith, that's not part
12 of the way I understand things.
13   Q. The next bullet point says commitment
14 to the use of critical reason, factual
15 evidence, and scientific methods of inquiry
16 rather than faith and mysticism.  Do you
17 believe in that point?
18   A. Yes, that's pretty representative of
19 what I believe, yes, the way I think about
20 things, uh-huh, (in the affirmative).
21   Q. And again, you exclude faith as a
22 basis for believing in anything?
23   A. Yes, depending on what you mean by
24 faith.  If you mean faith as a commitment to
25 the reality of the supernatural, yes, that's

227

1 not part of the way I understand things.
2   Q. And the theory of evolution would be
3 consistent with that particular commitment?
4   MR. ROTHSCHILD:
5     Objection.
6   THE WITNESS:
7     I am sorry, that question would have
8 to be clarified.
9 BY MR. THOMPSON:
10   Q. The theory of evolution would be
11 consistent with that particular bullet point
12 which says commitment to the use of critical
13 reason, factual evidence, and scientific
14 methods of inquiry rather than faith and
15 mysticism.
16   A. Evolutionary theory is based on
17 evidence.  So yes, to that extent, it is
18 consistent, yes.
19   Q. Then the next bullet point states:  A
20 constant search for objective truth with the
21 understanding that new knowledge and
22 experience constantly alter our imperfect
23 perception of it.  Do you believe in that
24 particular bullet point?
25   A. You have got, I notice you have got

228

1 scare quotes around objective truth.  Is
2 there --
3   Q. I am going to ask you about it.
4   MR. ROTHSCHILD:
5     But the scare quotes are yours and
6 not the document's?  And actually just to be
7 seriously, I do want to note that the
8 documents 3, 4, and 5 have handwritten
9 markings, I have no objection to that.  I
10 understand those are Mr. Thompson's, he is
11 not trying to imply anything about the
12 documents or that those are Dr. Forrest's,
13 but just for the record, I want to make sure
14 that is clear.
15 BY MR. THOMPSON:
16   Q. Yes, and those were my particular
17 underlinings and quotes as I viewed that
18 document.
19   A. So your question is do I --
20   Q. Believe that bullet point.
21   A. Agree with, subscribe to the idea
22 that we should engage in a constant search
23 for objective truth with the understanding
24 that new knowledge and experience constantly
25 alter our imperfect perception of it.  You

## Deposition of Professor Barbara Forrest - 6/7/05

229

1 know, I would want to maybe clarify in what
2 sense I understand objective before I
3 indicate agreement with this, you know.
4    Q. Well, go ahead and clarify that
5 because I was going to ask you that question.
6    A. I mean that's a question that would
7 naturally come up; right? Objective truth as
8 I understand it, given my background in
9 philosophy, is truth which doesn't depend on
10 my particular preference, a truth which can
11 be verified independently of whether I would
12 wish it to be true or not for which there is
13 some evidence, so that there could be some
14 kind of intersubjective agreement on whether
15 X is true or X is false.  Did that make
16 sense?
17    Q. I understand that, but would it have
18 to be scientific evidence or to prove
19 something as objective truth?
20    A. If you are talking about a scientific
21 question, sure.  We usually consider
22 scientific knowledge to be as objective as we
23 can possibly make it and, you know, objective
24 as you always have to, you know, understand
25 that sometimes there are always things that

230

1 impede full objectivity.  We sometimes don't
2 have all the information or you know.  So
3 objective is an ideal that we try very hard
4 to adhere to.
5    Q. So when it refers to objective truth,
6 it is something that has to have evidence
7 supporting it?
8    A. I would say so, so that if there were
9 a question about it, there would be some
10 criteria to which to appeal criteria which is
11 acceptable to more than just the person who
12 is proposing this, you see.
13    Q. Going now to page two, on the top,
14 that bullet point which states a conviction
15 that with reason, an open marketplace of
16 ideas, good will, and tolerance, progress can
17 be made in building a better world for
18 ourselves and our children.  Do you believe
19 in that particular objective?
20    A. Sure.
21    Q. Would the issue of intelligent design
22 be one of those ideas that should be open in
23 the marketplace of ideas?
24    A. If you are talking about outside the
25 setting of presenting it to children in a

231

1 public science school class, sure, there is
2 no reason why people shouldn't talk about it.
3    Q. And I think you explained earlier
4 that you didn't have any problems in having
5 intelligent design taught in some religious
6 class or comparative religion?
7    A. I said that's the only place that I
8 would find it appropriate to do that, in a
9 class involving religion.  Like you mentioned
10 comparative religion, and I said that would
11 be the only context in which I could see that
12 it would be appropriate.
13    Q. Do you have any objection to it in a
14 comparative religion class?
15    A. Not particularly as long as the
16 scholarship is honest, I think whatever you
17 present to children in any, any class
18 whatsoever, should be the best scholarship
19 available on any question.
20    Q. Given our public school system, don't
21 you think that's almost an unreachable goal?
22    A. Not the honest part, you know.  I
23 have a lot of problems with the competence
24 part a lot of times to tell you the truth.
25    Q. The next section says how do secular

232

1 humanists view religious and supernatural
2 claims.  It says:  secular humanists accept a
3 world view or philosophy called naturalism.
4    A. Sure.
5    Q. In which by the, in which the
6 physical laws of the universe are not
7 superceded by non-material or supernatural
8 entities such as demons, gods, or other
9 spiritual beings outside the realm of natural
10 universe.  Do you subscribe to that
11 statement?
12    A. Yes.
13    Q. That statement would in and of itself
14 would eliminate Christianity from acceptance
15 by secular humanists; is that correct?
16    A. It would eliminate the supernatural
17 part.  You know, I have friends, for example,
18 who consider themselves Christians because
19 they fully endorse the what, the ethical
20 teachings of Christianity.  They don't
21 understand, for example, the resurrection to
22 be a literal event but they consider
23 themselves to be Christians because the
24 resurrection has great symbolic meaning for
25 them.  So it doesn't necessarily exclude, you

**Deposition of Professor Barbara Forrest - 6/7/05**

233

1 know -- Christianity is not the same thing to
2 everyone who practices.  So I can conceive of
3 people who, you know --
4    Q.  Well, don't you agree that
5 Christianity at the very least involves a
6 belief in a creator God?
7    A.  Yes, certainly it does in the
8 traditional sense, yes, it does.
9    Q.  And that particular world view of
10 secular humanists would be contrary to the
11 belief of a creator God?
12    A.  To believe in the supernatural God,
13 yes, it would be.
14    Q.  And it would also be contrary to the
15 belief that Christians have that Christ is
16 the son of God?
17    A.  You know, it depends on what you
18 mean.  Again, if you are talking about the
19 supernatural, yes, it would be but I have,
20 you know, heard Christians say that they are
21 all children of God, you know, so.
22    Q.  I am speaking of it in terms of the
23 God incarnate?
24    A.  Yes, right.  The secular humanist
25 view would not endorse that; correct.  Right.

234

1 it doesn't mean that they don't value the
2 teachings of Jesus, I mean the ethical
3 teachings of Jesus.  It doesn't mean that
4 they don't value that.  It is just they don't
5 see him as the devine being in the
6 supernatural sense.
7    Q.  And also, I'm going on in that
8 paragraph, supernatural event such as
9 miracles (in which physical laws are defied)
10 and psi phenomena such as ESP, telekinesis,
11 et cetera are not dismissed out of hand but
12 are viewed with a high degree of skepticism.
13    A.  Yes, I think that's accurate.  You
14 see, what I think a naturalist, okay, will
15 say is that if a person tells me that he had
16 an encounter with a devine being, I am in no
17 position to say that he is not telling me the
18 truth.  I am just not in a position to say.
19 But if he wants, if he wants others to
20 believe it, then he has to have some very
21 convincing evidence or else it remains a
22 faith commitment, so that's all.  You know,
23 secular humanism is, you know, always open to
24 the possibility that they could be convinced.
25 So far they have not been.

235

1    Q.  And as I recall, you indicated you
2 did not believe in miracles?
3    A.  No, I don't, not in the literal
4 sense, you know, of supernatural
5 interventions, and I would, you know,
6 somebody would tell me I had a long lost
7 uncle who died and left me a lot of money,
8 that would be a miraculous event for me but
9 not in the supernatural sense, no.
10    Q.  Go to the next page, top of the page
11 three, the sentence, the first sentence,
12 complete sentence:  Secular humanists look to
13 the methodology of science as the most
14 reliable source of information about what is
15 factual or true about the universe we all
16 share and goes on.  Do you agree with that?
17    A.  Sure.  You know, that's not, that's
18 something that is not intrinsic to secular
19 humanism.  I think that that's secular and
20 religious people share that idea.
21    Q.  Well, and the question I want to ask
22 you regarding relating to that is secular
23 humanists look to the methodology of science.
24 Do they ever define what the methodology of
25 science is?

236

1    A.  I don't know if secular, if any
2 particular secular humanists has ever offered
3 a, you know, a written definition or
4 anything.  They regard it in the way that I
5 have been discussing today, the methodology
6 of science, the accepted one as it is done in
7 the scientific community of seeking natural
8 explanations for natural phenomenon.  As far
9 as I know, that's the way secular humanists
10 other than, you know, the ones I know would
11 view it.  It is not a controversial idea, it
12 is not unique to secular humanism.  It is
13 also the way Professor Ken Miller looks at
14 it.
15    Q.  Going to the next page, page four, in
16 the first full paragraph, the second
17 sentence:  These early organizers classified
18 humanism as non-theistic religion which would
19 fulfill the human need for an ordered
20 ethical/philosophical system to guides one's
21 life, a spiritualty without the supernatural.
22 Do you believe in that particular statement?
23    A.  No.  No, I do not.  That's a
24 historical statement, just pointing out the
25 historical development of humanism.  I don't

## Deposition of Professor Barbara Forrest ~ 6/7/05

237

1 see it as a religious point of view at all.
2 That's the whole point.
3    Q.  Well, doesn't that particular or
4 doesn't secular humanism fall within the
5 first definition of religion as expounded by
6 Professor Haught?
7    A.  And that definition was?  Remind me
8 again, please.  I remember he had three;
9 right?
10    Q.  Right.  He defined religion as the
11 surrender of one's mind and heart to whatever
12 is considered to be ultimate in importance
13 and explanatory power.
14    A.  I don't see the surrender of one's
15 mind and heart.  Humanists don't do that.  We
16 don't -- that's one of the marks of humanism
17 is we don't surrender our minds.  Our minds
18 are our own.  We give our heart but not our
19 minds.  Can I ask Eric something real quick
20 off the record?
21    MR. THOMPSON:
22       Sure.
23       (A short break was taken).
24 BY MR. THOMPSON:
25    Q.  Going on, that page, page four, down

238

1 a little bit, the sentence:  Secular
2 humanists contend that issues concerning
3 ethics, appropriate social and legal conduct
4 and the methodologies of science are
5 philosophical and are not part of the domain
6 of religion which deals with the
7 supernatural, mystical, and transcendent.  Do
8 you believe that statement?
9    A.  Let me reread it because it took me
10 a while to find it while you were reading it.
11 Yes, I would agree with that.
12    Q.  Do you believe that the methodologies
13 of science are philosophical?
14    A.  In the sense that they, you can say,
15 for example, yes, that's why we have a
16 philosophy of science, those are -- the
17 issues of philosophical.  It is that the
18 issues concern, not the methodology, it is
19 the issues concerning it, if you read it
20 precisely, secular humanists contend that
21 issues concerning ethics, appropriate social
22 and legal conduct and the methodologies of
23 science are philosophical.  Not that the
24 methodologies of science are philosophical
25 but that the issues concerning them, and

239

1 that's why you have philosophers who concern
2 themselves with science, for example.
3    Q.  And basically then, the philosophy of
4 science is the discipline that would deal
5 with the methodology of science?
6    A.  Deal with scientific reasoning,
7 actually, and it is not divorced from the
8 questions of methodology.  I think scientists
9 themselves are the best people to ask about
10 scientific methodology but the reason
11 philosophers are interested in that is
12 because it is connected to questions of
13 scientific reasoning and how you come to
14 learn things and so, yes, they would be
15 interested and concerned with questions of
16 methodology, but they are not the ones who
17 determine what is proper scientific
18 methodology.  It is the scientists who do
19 that.
20    Q.  And then going down further:  Secular
21 humanism, then, is a philosophy and world
22 view which centers upon human concerns and
23 employs rational and scientific methods to
24 address the wide range of issues important to
25 us all.

240

1    A.  Sure.
2    Q.  Do you believe that?
3    A.  I don't find any problem with that.
4    Q.  And the next sentence:  While secular
5 humanism is at odds with faith-based
6 religious systems on many issues, it is
7 dedicated to the fulfillment of the
8 individual and humankind in general.  Do you
9 believe in that statement?
10    A.  I would, you know, I would want a
11 clarification about what it means to say
12 secular humanism is at odds with.  I mean
13 certainly they take a very different position
14 and so it is, you know, it is philosophically
15 different and if that is what at odds means,
16 then I don't see any problem with it.  If you
17 interpret at odds to mean something
18 combative, no, I don't agree with that.
19    Q.  Would it be a fair statement to say
20 that your views on evolution are consistent
21 with your secular humanism?
22    A.  My views on evolution are consistent
23 with the emphasis on the need for evidence to
24 decide those types of questions which are,
25 and that, that is important not only, that is

## Deposition of Professor Barbara Forrest - 6/7/05

241

1 something that secular humanists endorse, but
2 it is not intrinsic to it or unique to it.
3 You know, I would agree with that whether it
4 is part of secular humanism or not, you know.
5   Q. Did your belief, the principles of
6 secular humanism have any kind of influence
7 on the way you wrote your expert report for
8 this case?
9   A. No, sir. This is a way of looking at
10 things that I reached long before I ever
11 wrote this report, long before I even really
12 knew what secular humanism was. It was just
13 there was no conscious link at all between,
14 you know -- I never even think of myself in
15 terms of a secular humanist. I just sort of
16 don't label myself. I am a philosopher and a
17 person who tries to understand things as best
18 I can and I never connect that label to
19 anything that I am doing.
20   Q. Would the reason that you focus so
21 much on the religious beliefs and the
22 motivations of the proponents of intelligent
23 design theory have been because of your
24 secular humanist beliefs regarding the
25 supernatural?

242

1   A. No, sir, that had nothing to do with
2 it. The reason for focusing on the religious
3 motivations of the intelligent design theory
4 is because they have made such an issue of it
5 and it is just an integral part of what they
6 are doing, and I see undesirable implications
7 of what they are doing for both education and
8 the constitutional separation of church and
9 state.
10   Q. Do you see undesirable implications
11 for the mission of secular humanism?
12   A. Not in particular, no. Secular
13 humanism is simply a way of looking at the
14 world which a number of people happen to
15 share and they are not, you know, it is just
16 it is not even a particularly tight-knit
17 group of people to tell you the truth.
18   Q. Right, but we did go through their
19 objectives, did we not?
20   A. They have a -- yeah, they have a
21 formal statement, you know. If you are going
22 to have an organization, it is helpful to
23 have a formal statement of what their
24 organization is about, but those are things
25 that lots of people outside that affiliation

243

1 happen to endorse. It is not, you know --
2   Q. Well, the objectives of the
3 organization are antagonistic towards the
4 intelligent design creation, the intelligent
5 design theorist; is it?
6   A. I am sorry, I wouldn't call it that,
7 I wouldn't say antagonistic towards.
8   MR. ROTHSCHILD:
9     Objection.
10   THE WITNESS:
11     The objectives of secular humanists
12 are certainly such that they do not agree
13 with the way intelligent design theorists are
14 presenting their ideas, they don't agree with
15 those trying to explain of something,
16 presenting something as science which is a
17 religious belief, they certainly don't agree
18 with that, but that is not unique to secular
19 humanism. I know devoutly religious people
20 who don't agree with what the intelligent
21 design theorists are doing. So there is
22 nothing intrinsic to secular humanism that
23 puts it at odds with the intelligent design
24 movement.
25     It is the disagreement shared by a

244

1 number of people, religious and non-religious
2 alike, with the idea of teaching children
3 something about science that isn't really
4 scientific.
5 BY MR. THOMPSON:
6   Q. But my reading the objectives and the
7 principles of the secular humanists, it does
8 not believe in a supernatural; isn't that
9 correct?
10   A. That's correct.
11   Q. And the intelligent design theorists,
12 according to you, point to the supernatural
13 as the designer; is that correct?
14   A. Yes, sir.
15   Q. So you are at odds with one other,
16 are you not?
17   MR. ROTHSCHILD:
18     Objection.
19   THE WITNESS:
20     Those are different positions,
21 different positions. I think just at odds is
22 a problematic phrase which I would not want
23 to use. They are different positions.
24 BY MR. THOMPSON:
25   Q. And they conflict with one another,

245

1 isn't that true?
2 A. They don't agree.
3 Q. Why did you spend so much time in
4 your book and in your report on the Wedge
5 document?
6 A. That's only one chapter and it is one
7 of the smallest chapters of the book, but it
8 is, it is the one document that we have which
9 is a foiled statement by the Discovery
10 Institute of how they regard their program,
11 it gives a way to measure how much of it they
12 are carrying it out, it shows how they view
13 what they are doing, and it indicates the
14 intrinsically religious nature of what they
15 are doing and it shows that that's how they
16 view it, it shows that they do have a
17 strategy which they formalized, and it gives
18 observers a way to measure how much of it
19 they have carried out.  So it is significant
20 only in that sense.
21 Q. But you talk about it in your book
22 for one chapter but you also mention it in
23 great detail in your expert report?
24 A. You kind of have to because that's
25 the, the earliest formal statement and as far

246

1 as I know, it is the only thing that
2 constitutes a tactical document.  It shows
3 how they view -- it is the best concise
4 statement of what they are doing that I know
5 of.  So if I was going to use it, I wanted to
6 make sure that I show people how I know that
7 it is an authentic document.
8 Q. The Wedge document does not reveal
9 anything that had not been made public in
10 years prior to that document being put on the
11 Internet; is that true?
12 MR. ROTHSCHILD:
13 Objection.
14 THE WITNESS:
15 Excuse me.  There were sections of it
16 which were on other web pages at the
17 Discovery Institute, but I am not exactly
18 sure what you mean by doesn't reveal anything
19 that had not been made earlier.
20 BY MR. THOMPSON:
21 Q. Well, I mean the idea of the Wedge
22 had been discussed by Philip Johnson before
23 then?
24 A. Oh, sure.  Yes, I guess he had
25 discussed it before then, yes.  Certainly

247

1 discussed it after that.
2 Q. It is in one of his books?
3 A. Yes, it is.
4 Q. So it wasn't like a revelation that
5 for the first time people could see this
6 concept of the Wedge; is that true?
7 A. No, and I never said that.  What this
8 document does is to give us a view of how
9 they understood their strategy and it, you
10 know, in a formal sense since they took the
11 trouble to outline it formally.
12 Q. Have you, in your investigation,
13 found out how that document was put
14 together?
15 A. How it was put together?
16 Q. Yes.  By the Discovery Institute?
17 A. Exactly who did it?  No.
18 Q. Who did it or how they --
19 A. Somebody with the, presumably with
20 the Center for Renewal of Science and Culture
21 drew it up.  As far as specific whom, I am
22 not sure.  I can't trust my memory on this, I
23 seem to recall reading somewhere that
24 Professor Meyer may have had a hand in
25 drawing it up.  Maybe Professor Pennock was

248

1 maybe trying to ascertain that, I am not
2 sure.  But the wording is, you know,
3 certainly sections of it are exactly the same
4 as are on other parts of the Center for the
5 Renewal of Science and Culture's early web
6 pages and elsewhere.  I mean, you know.
7 Q. Did you ever hear that this was a
8 document for a fundraising effort?
9 A. I believe that they characterized it
10 as such at one point.
11 Q. And do you have any reason to doubt
12 that characterization?
13 A. No.  In fact, that was my first, when
14 I first encountered the document, I figured
15 that it must have been drawn up probably for
16 funds raising purposes but before I had any
17 confirmation of that, I figured it had to
18 have had something to do with that.
19 Q. Now, do you find anything, looking at
20 the document itself, do you find anything
21 illegal about the document?
22 A. In so far -- illegal about the
23 document itself?
24 Q. Yes.  Right.
25 A. No.  I find some problems of legality

## Deposition of Professor Barbara Forrest - 6/7/05

249

1 in what they are proposing which I have
2 already explained that.
3   Q. That's why I said looking at the
4 document, do you see anything about the
5 document --
6   A. There is nothing illegal about the
7 document.
8   Q. Unconstitutional about the document?
9   A. I think some of the ideas that it
10 talks about are unconstitutional.
11   Q. And you know, that's for a court to
12 determine.
13   A. Yes, but the document itself mentions
14 that they have, that they are planning a
15 program of legal assistance in the event of,
16 you know, intelligent design being contested
17 in the public schools, something to that
18 effect.
19   Q. Is there something wrong with that,
20 to contest it with lawyers, an issue?
21   A. It indicates that they themselves
22 acknowledge that they were, you know,
23 foreseeing constitutional problems with their
24 proposal is what it indicates to me. You
25 know why would you propose --

250

1   Q. Or challenges?
2   A. Yes, they were anticipating that.
3   Q. Is there anything wrong in
4 anticipating that?
5   A. I think the wrong part is in making
6 the proposal at all to teach intelligent
7 design in public schools in science classes.
8 I think it indicates the fact that they were
9 anticipating the need for legal assistance
10 indicating that they knew people would find
11 that troublesome and problematic.
12   Q. And obviously, it goes without
13 saying, there are organizations like the ACLU
14 and Americans United For Separation of Church
15 and State that are, you know, looking out for
16 issues like that; isn't it true?
17   A. Yes, sure.
18   Q. And that they, as they did in Dover,
19 filed a lawsuit?
20   A. Sure.
21   Q. That is not, it is not rocket science
22 that these kinds of issues would come
23 forward, is it?
24   A. Right.
25   Q. And as I am sure you are aware, that

251

1 there have been court cases on the teaching
2 of creationism versus or the balance
3 treatment between creationism and the
4 evolution, the last case being the Aguillard
5 case of 1987?
6   A. That was originated right here in
7 Louisiana.
8   Q. So it is not unusual for an
9 organization that is going to be promoting a
10 challenge to evolution to consider the
11 potentiality of a lawsuit?
12   A. No, I would think it was, would not
13 be unusual. It is probably the first thing
14 that they would consider.
15   Q. Now, do you have any evidence at all
16 that the members of the Dover Area School
17 Board had any knowledge of the so-called
18 Wedge document?
19   A. I don't know.
20   Q. Do you have any evidence?
21   A. I can't speak to that at all. I have
22 no way to know.
23   Q. You don't have any evidence?
24   A. No.
25   Q. Do you have any evidence that the

252

1 members of the Dover Area School Board shared
2 in the motivations of the Discovery Institute
3 goals and personnel?
4   A. Shared in the --
5   Q. The motivation?
6   A. The motivations of the Discovery? It
7 sure looks to me like they shared the same
8 motivations, yes.
9   Q. What do you base that on?
10   A. Well, there was, you know, what is
11 typically the case when someone proposes
12 teaching creationism in a public school and
13 if you want to call it intelligent design,
14 you can call it that, there is virtually
15 always religious motivation, and I remember
16 reading comments in the newspaper once of
17 school board members, I can't remember his
18 name, that were clearly religious in their
19 contents.
20   Q. Would you agree that the comments of
21 one school board member, though, doesn't
22 necessarily reflect the beliefs of all the
23 other school board members?
24   MR. ROTHSCHILD:
25     Objection, calls for a legal

## Deposition of Professor Barbara Forrest - 6/7/05

253

1 conclusion.  It is outside of her area of
2 knowledge or expertise.
3    THE WITNESS:
4       Yes, I would have no way to know.  I
5 know what --
6 BY MR. THOMPSON:
7    Q. This is a very common sensical
8 question.
9    MR. ROTHSCHILD:
10      You are giving us your own answer.
11   THE WITNESS:
12      No, I know based on those comments
13 what that gentleman thought, you know.
14 BY MR. THOMPSON:
15   Q. Right.  In fact, there were members
16 of the school board that voted against the
17 policy; isn't that true?
18   A. Apparently so.  I don't remember the
19 breakdown of the votes.
20   Q. Right.  And having viewed apparently
21 some of the cases, you would agree that just
22 because a particular policy happens to be
23 harmonious with a religious view does not in
24 and of itself make it unconstitutional, would
25 you agree with that?

254

1    MR. ROTHSCHILD:
2       Objection, calls for a legal counsel,
3 it is outside of her area of expertise.
4 BY MR. THOMPSON:
5    Q. Well, she has been opining on the
6 constitutionality of separation of church and
7 state so I am just asking her to follow up.
8    A. Well, you know, a judge would have to
9 make that determination.
10   Q. And so you would also say a judge
11 would have to make the determination of
12 whether any of this is a violation of the
13 so-called separation of church and state?
14   A. A judge will give the definitive
15 decision regarding that.  I mean I have my
16 own opinions but the judge is the legal
17 expert here.
18   Q. Well then I asked you for your
19 opinion, your own opinion about whether a
20 policy nearly being harmonious with a
21 religious belief makes it unconstitutional?
22   MR. ROTHSCHILD:
23      Objection.
24   THE WITNESS:
25      Again, you know, policy being

255

1 harmonious with, what exactly do you mean by
2 that?
3 BY MR. THOMPSON:
4    Q. Well, a policy that, let's say,
5 incidentally promotes some religious belief?
6    A. I don't think --
7    MR. ROTHSCHILD:
8       Objection.  I mean the question is a
9 vague and incomplete hypothetical.
10 BY MR. THOMPSON:
11   Q. Let me ask you, let's say do you
12 think that a school system that has Christmas
13 Holidays off, is that unconstitutional?
14   MR. ROTHSCHILD:
15      Objection.  That is so far afield of
16 the issues, you know.
17   MR. THOMPSON:
18      well, you know, when she wants to
19 answer the constitutional issues, you never
20 object to it when it is in your favor.  Now,
21 I am -- she brought it up and I am going to
22 ask her how far her constitutional expertise
23 goes.  That's all.
24   MR. ROTHSCHILD:
25      I mean I don't see to what end.  I

256

1 mean she has expressed that she believes that
2 this teaching of intelligent design would
3 violate separation of church and state.  She
4 is not suggesting that she is going to be the
5 arbiter of that and nor is she going to be
6 the legal expert on the issue.
7       She is giving you an opinion about
8 the religious content of intelligent design
9 and the roots and the way that policies come
10 into play.  It doesn't make her the expert on
11 whether legally this will be determined to be
12 a separation of church and state.  That's
13 what the litigant came for, using her
14 testimony as evidence.  And now, we're going
15 even further afield and we're not talking
16 about curriculum, we're not talking ---
17   MR. THOMPSON:
18      She --
19   MR. ROTHSCHILD:
20      Let me finish.  We're not even
21 talking about curriculum anymore, we're
22 talking about, you know, Christmas holidays.
23 Next we will be on --
24   MR. THOMPSON:
25      Well, I mentioned Christmas holidays

257

1 because she asked me give me an example.
2    MR. ROTHSCHILD:
3    But it is so -- I mean we will be on
4 the In God We Trust on the coins, I mean, you
5 know --
6    MR. THOMPSON:
7    Or the Pledge of Allegiance might be
8 next.
9    MR. ROTHSCHILD:
10    I mean I am not instructing her not
11 to answer but --
12    MR. THOMPSON:
13    I mean she volunteers all this
14 information about what she thinks are
15 violations of constitution.  When I ask her a
16 specific question which may cause her a
17 problem, you know --
18    THE WITNESS:
19    When your questions are related to
20 the issue of intelligent design, I have told
21 you what I thought.  You are asking me about
22 something, Christmas Holidays which are not
23 related to that issue.
24 BY MR. THOMPSON:
25    Q.  I was trying to give you some

258

1 assistance in understanding the question that
2 I was propounding.
3    A.  Right, and I expected some examples
4 that were within the context of intelligent
5 design and with what the school board is
6 doing.
7    Q.  Well, if the school board teaches the
8 big bang theory, do you think that that
9 violates the constitution?
10    A.  No, scientific theory.
11    Q.  Well, some people interpret that as
12 evidence of a God or supernatural, does that
13 still make it a constitutional issue?
14    MR. ROTHSCHILD:
15    Objection.
16    THE WITNESS:
17    There are people who are free to
18 interpret it any way they please.  It depends
19 on how it is taught.  You don't teach it, you
20 know, as a religion.  You teach it as
21 scientific and that's the way it is properly
22 taught.
23 BY MR. THOMPSON:
24    Q.  And it may have some religious
25 implications, may it not?

259

1    A.  If people want to draw those on their
2 own, I guess they are free to do that.  It is
3 not proper for a teacher to do that.  That
4 lies outside the scope of science.
5    Q.  And if the person or student draws it
6 up on their own, come to the conclusion that
7 this must be evidence of a supernatural
8 being, that doesn't make it unconstitutional;
9 is that correct?
10    MR. ROTHSCHILD:
11    Can you repeat the question?
12    THE WITNESS:
13    Yes, please do.
14    THE COURT REPORTER:
15    And if the person or student draws it
16 up on their own, come to the conclusion
17 that this must be evidence of a
18 supernatural being, that doesn't make it
19 unconstitutional; is that correct?
20    THE WITNESS:
21    It is not unconstitutional for a
22 student to draw a conclusion.  It would be
23 unconstitutional to teach the big bang theory
24 in a way that connects it with a religious
25 point of view.

260

1 BY MR. THOMPSON:
2    Q.  If they don't connect it to a
3 religious point of view but just say there
4 was a big bang and this is how the universe
5 started, okay, would you have any
6 constitutional problem with that?
7    A.  No, because that would be within the
8 context of science to present it that way.
9    Q.  Aside from the fact that this wedge
10 documents describes in one place the goals of
11 the Discovery Institute, are there any other
12 issues you see with the wedge document?
13    A.  Issues of what particular kind?
14    Q.  That may lead you to believe that
15 they were engaged in unconstitutional goals?
16    A.  No, I am taking my cues purely from
17 the content of the document which indicates
18 clearly that they see what they are doing as
19 a religious -- they are doing it for
20 religious reasons and that they have
21 religious goals.  It is a statement of their
22 motives and their goals.  It is pretty clear.
23    MR. ROTHSCHILD:
24    Let's take a quick break.
25    (A short break was taken).

## Deposition of Professor Barbara Forrest - 6/7/05

261

1 BY MR. THOMPSON:
2    Q. On page 11, paragraph one of your
3 report, expert report, you make a statement
4 there since no one in the ID group has
5 produced original scientific research in its
6 support, and then go on, Wedge leaders'
7 public statements and publications constitute
8 the substance of ID. Are you aware of any
9 original scientific research by members of
10 the Discovery Institute or people associated
11 with it?
12   A. I am not aware of any.
13   Q. Are you aware of an individual by the
14 name of Chien who has done some research?
15   A. Paul Chien?
16   Q. Yes.
17   A. I don't know of any research
18 Dr. Chien has done.
19   Q. What about by the name of Ax?
20   A. I am familiar with Dr. Ax.
21   Q. Do you remember, are you familiar
22 with any of his research?
23   A. Yes, I know about his research, he is
24 a molecular biologist.
25   Q. So hasn't he done some research in

262

1 this area?
2    A. No. He has done research, he has
3 done scientific research on molecular
4 biology. That's not to say he has done
5 scientific research on intelligent design.
6    Q. And so you don't know of any research
7 he has done on intelligent design?
8    A. No.
9    Q. Or related to intelligent design?
10   A. Dr. Dembski relates it. Dr. Ax does
11 not. He has told me in correspondence that
12 he has never said in any publication and he
13 has ever drawn any implications for his work
14 on intelligent design. Dr. Dembski has done
15 that.
16   Q. Do you have his correspondence?
17   A. Yes.
18   Q. We would like a copy of that at some
19 point.
20   A. It is referred to in the book. It is
21 in the book. The e-mail that he gave me
22 permission to use is in the book. Sure.
23   Q. And then are you aware of any
24 research by Dr. Dembski relating to
25 intelligent design?

263

1    A. Dr. Dembski is not a scientist.
2    Q. But are you aware of any, whether you
3 call him a scientist or not, are you familiar
4 with any original research, scientific
5 research --
6    A. I wouldn't call it scientific.
7    Q. To support?
8    A. No, I wouldn't call it scientific.
9 Dr. Dembski is a philosopher.
10   Q. Well, he is also a --
11   A. He is a mathematician, right.
12   Q. Are you familiar with his *Inference*
13 *Of Design* book?
14   A. The *Design Inference.*
15   Q. Yes.
16   A. That was I believe the first
17 monograph that he published.
18   Q. Yes, by Cambridge University?...........
19   A. Yes.
20   Q. Are you familiar with that?
21   A. I haven't read it because it is
22 beyond my area of expertise. I have read a
23 deal about it.
24   Q. Would you consider that original
25 research?

264

1    A. No. Apparently Dr. Dembski didn't
2 either. He said in July, 2003, that that
3 book did not draw any implications of a
4 design inference for biology, so apparently
5 it is not considered that way.
6    Q. And that's your basis for excluding
7 him, his research?
8    A. Excluding him as what?
9    Q. As an original research.
10   A. Original research I would take it to
11 be research done by a person with scientific
12 credentials operating within the area of
13 science. Dr. Dembski does not do that. He
14 is a philosopher and mathematician and a
15 Christian apologist. He is not a scientist.
16   Q. Do you think probabilities, the
17 theory of probabilities might have some
18 relationship to molecular machines being
19 developed by artificial, what's the word I
20 want, natural selections, excuse me, natural
21 selections?
22   A. I can't say, sir. You are asking me
23 to go beyond my area of expertise.
24   Q. Throughout your report, you talk
25 about the religious and moral implications

## Deposition of Professor Barbara Forrest - 6/7/05

265

1 drawn from intelligent design.
2    MR. ROTHSCHILD:
3       Objection.
4    THE WITNESS:
5       That's Dr. Dembski's phrase and I
6 don't know what he means by that.  He used
7 that phrase.
8 BY MR. THOMPSON:
9    Q. You do not accept that criticism?
10    A. I don't accept -- I don't want to
11 respond to that phrase until I know
12 specifically what he means by it and for him
13 to show me a specific implication that he is
14 talking about.
15    Q. What about the quotes that you
16 utilize on page 20, paragraph two and
17 paragraph three?
18    A. Of my report?
19    Q. Of your report, yes.
20    A. Yes.
21    Q. Some of those references are almost a
22 decade old. For instance, the Institute For
23 Creation Research, you are taking a 1980
24 quote and putting it in your report?
25    A. Yes.

266

1    Q. A Kenyon Affidavit of 1986?
2    A. Yes.
3    Q. Report, a quote from *Of Pandas of*
4 *People*, 1993?
5    A. Yes.
6    Q. Of course, you go way beyond that, in
7 1974 quotes. Is it possible that some of the
8 quotes that you are now, that you put in your
9 report may not be the same theories or stands
10 that those particular individuals or entities
11 would take today?
12    A. No, I wasn't -- what I was using
13 these quotes to do, let's speak to the ones
14 specifically in the section one, those are
15 quotes to show that there are tactical
16 similarities in the way the intelligent
17 design creationists are operating and the way
18 the earlier creationists were operating to
19 show that it really hasn't changed in some
20 ways and these are using some of the same
21 rhetorical tactics.
22    Q. So those were the rhetorical tactics
23 and not necessary for the substance of it?
24    A. Well, in those particular ones, all
25 of these quotes are to show the continuity

267

1 between earlier forms of creationism and
2 intelligent design and to show that in some
3 respects, we're not looking at anything
4 different at all, that's how I am using them.
5    Q. And would you agree that in some
6 respects, they are different?
7    A. Oh, in some respects, for example,
8    Q. Page 26, paragraph two, you quote
9 Dembski down in the middle of the paragraph
10 there, William Dembski has admitted that the
11 ID movement has produced no science of its
12 own, and the quote, because of ID's success
13 at gaining a cultural hearing, the scientific
14 research part of ID is now lagging behind.
15       Is that an accurate, is that an
16 accurate conclusion that you draw from that
17 quote?
18    A. I would say it is accurate, yes, I am
19 not drawing it purely from that quote but the
20 whole point of his key note address was to
21 address the problem that intelligent design
22 was having, it was to take he called it a
23 reality check.
24    Q. Well, isn't it a more reasonable
25 interpretation of that that what Dembski was

268

1 saying was that the ID movement, intelligent
2 design movement was progressing faster on the
3 cultural side than on the scientific front,
4 he was making a comparison?
5    A. That's the way he puts it, yes.
6    Q. Going to page 29, you discuss some of
7 the financial support that the Discovery
8 Institute has received as a criticism of the
9 Discovery Institute.  Is that why you are
10 putting that in there?
11    A. I think you could fairly say it is a
12 criticism, yes.
13    Q. Now, isn't that the fallacious
14 argument of condemning the source or the
15 genesis of a particular idea?
16    A. No.  I am not condemning the source
17 per say.  What I am doing is showing that
18 there are ideas that Howard Ahmanson had that
19 I believe are unconstitutional.  There are
20 ideas that Discovery Institute is promoting
21 that I believe are unconstitutional.
22       I think there was a statement that
23 Mr. Chatman made that the, the Center For the
24 Renewal of Science and Culture was going to
25 change the intellectual and in time the

## UNITED COURT REPORTERS, INC.
### 1-800-US-DEPOS

269

1 political world, and I think to the extent
2 that their religious motives are, that they
3 are planning to have those -- they are
4 seeking political consequences, I think that
5 makes these, these ideas -- Howard Ahmanson's
6 religious motivations and his religious like
7 preferences problematic to the extent that
8 they stand to have a political affect which
9 would affect everyone in the country.
10    Q.  What are Ahmanson's religious
11 motivations as you find them so concerting?
12    A.  He has expresses at one point that he
13 wanted to place -- I can't give it to you
14 verbatim, but he wanted to see biblical law
15 enacted into, you know, all areas of life, he
16 wanted to see things put back under biblical
17 law and I think that's something that I find
18 objectionable and I am not alone in that.
19    Q.  Well, did you also find out that he
20 disavowed that particular --
21    A.  The only thing I know is that he no
22 longer serves on the board of the Chalcedon
23 Foundation.  I don't know that he has
24 disavowed those particular sentiments.
25    Q.  If we showed you a statement that he

270

1 had disavowed them, would you then remove him
2 as a particular negative factor?
3    MR. ROTHSCHILD:
4      Just disavowed what?
5 BY MR. THOMPSON:
6    Q.  His trying to form a biblical state,
7 I guess?
8    A.  Not necessarily because there are
9 some things that would be unconstitutional
10 that might not necessarily go so far as to,
11 you know, found in a biblical oriented state,
12 it would not necessarily make his ideas
13 constitutional.  They might still be
14 objectionable.
15    Q.  I wanted to go back to this concept
16 that mentioning intelligent design is in the
17 four paragraph statement, I think it is
18 mentioned twice, is really teaching, I want
19 to go back to that.  If I were teaching a
20 course on democracy and said another form of
21 government in opposition to democracy is
22 monarchy, now, would you consider me having
23 taught monarchy?
24    A.  In the sense that you are telling the
25 children something about it, yes, you have

271

1 taught them that it is an alternative system
2 to democracy.  It may be in a minimal sense
3 but yes.
4    Q.  So if I -- and so would you then tell
5 the parents of your students that I have
6 taught your students about monarchy, would
7 you say that to your parents of your
8 students?
9    A.  I would say that I made students
10 aware of monarchy as an alternative political
11 system.
12    Q.  Then you would make a distinction
13 between making aware and teaching; right?
14    A.  No.  Part of what teachers do as
15 teachers is to make students aware of lots of
16 things to bring them to their, you know, to
17 bring them to their attention.
18    Q.  Right, but --
19    A.  Teaching encompasses quite a bit.
20    Q.  Yes, but teaching -- doesn't teaching
21 have a little more of focus to it than just
22 making a statement?
23    MR. ROTHSCHILD:
24      Objection.
25    THE WITNESS:

272

1      Everything a teacher does in
2 communicating to students with the exception
3 of giving instructions, when a teacher
4 communicates contents which I take as policy
5 to do, there is some content to that policy,
6 and I would call that pedagogical content,
7 the statement tells students something.  It
8 doesn't, you know, it doesn't go into great
9 detail but it does communicate to them.  It
10 communicates something substantive to them,
11 and that was something that was intended for
12 to be read by the teachers which puts places
13 that, within that pedagogical role.
14 BY MR. THOMPSON:
15    Q.  But would you agree that during the
16 day, teachers are saying all kinds of things
17 to students, not necessarily connected with
18 any subject matter that they are supposed to
19 teach, and you would not consider that
20 teaching?
21    A.  It depends on what it is.  If a
22 teacher says Johnny, walk up to the black
23 board, you know, that's an instruction,
24 that's not content.  A teacher says lots of
25 things which might not necessarily be the

273

1 conveyance of substantive content about a
2 particular subject.
3    Q.  What is the total substantive
4 contents that you -- that a ninth grader
5 would draw from the mention of the phrase
6 intelligent design in that four sentence
7 paragraph?
8    A.  The two things that come to mind
9 first is that there is some doubt about, you
10 know, in the scientific community about
11 evolution, that it is, you know, that it
12 communicates the intent to students for them
13 to believe that there is some reason not to
14 accept it, and it communicates to them that
15 there is an alternative for them to consider,
16 namely intelligent design, that's content.
17    Q.  And that's about it; correct?
18    A.  That's about it.  It also
19 communicates to them that there is a
20 reference book that they can go and, you
21 know, to find out more about it, you know,
22    Q.  Is that more like a go to the
23 blackboard kind of instruction?
24    A.  No.  It is, you know, it is saying
25 that there is, you know, that there is a

274

1 textbook which contains this information
2 indicating to the student that that's a
3 science textbook.  I think that would be a
4 reference that the students could be expected
5 to draw.
6    Q.  It is not an order to go and look at
7 the textbook?
8    A.  No, it is not an order, it doesn't
9 say go and look at this book, but it makes
10 them, it tells them that the book is
11 available.
12    Q.  And knowing 9th grade students, do
13 you think that in and of itself will get them
14 to go to get the book?
15    A.  I think it would be enough to
16 motivate some of them, yes, but not for
17 pedagogical reasons, not on the part of the
18 kids.
19    Q.  I guess we could find out, could we
20 not?
21    A.  Sure.
22    Q.  By doing some research on that?
23    A.  I guess you would have to do some
24 research but again, I pointed out earlier
25 that even if no child went and looked at the

275

1 book, even if every child in the room caught
2 on to what's going on here, it would not make
3 that statement, that policy statement either
4 pedagogically or constitutionally acceptable
5 in my view.  I just don't think it would do
6 that, regardless of what the students do or
7 don't do.
8    Q.  Pedagogically, let's just talk about
9 that, put the constitutional issues aside for
10 a moment.  Pedagogically, wouldn't it have
11 something to do with critical thinking?
12    A.  No.  Critical thinking is an honest
13 presentation of the state of -- critical
14 thinking starts, would have to start with an
15 honest presentation.  For example, if you are
16 talking about science, it would have to start
17 from an honest, accurate presentation of the
18 state of the science.  I don't recall that
19 policy as doing that.
20    Q.  Well, we discussed earlier where
21 Darwin talks about intelligent design?
22    A.  He talks about special creation.
23    Q.  But for the purpose of opposing that
24 particular concept; correct?
25    A.  Darwin -- no, he didn't write that to

276

1 oppose the special creation.  Darwin is
2 speaking as a scientist showing how the
3 previous way of trying to construe the data
4 simply did not work, and he is trying to show
5 that this is -- I offer an explanation which
6 is a much better explanation, it is a
7 scientific one, right, and it simply explains
8 a lot of things that the idea of special
9 creation cannot explain.  That's how Darwin
10 presents it.
11    Q.  So he was balancing the two concepts,
12 comparing the two concepts?
13    A.  He was arguing for his, his idea of
14 natural selection, evolution by natural
15 selection and, you know, in the course of
16 doing that -- since the idea of special
17 creation was the prevailing view, it makes
18 sense that Darwin would point to it and say
19 look, this did not work, I am offering a way
20 that works much better, I can explain the
21 data much better, I am offering it, you know,
22 for consideration, I think it works.
23    Q.  Well, can't we say the same thing
24 about the intelligent design theory then?
25    A.  No, because what Darwin was doing was

## Deposition of Professor Barbara Forrest - 6/7/05

277

1 offering a genuinely scientific explanation.
2 Intelligent design does not.
3    Q. You know, you keep on saying that but
4 I have to keep on coming back to your
5 definition of science as being something that
6 the scientific community today accepts;
7 right?
8    A. Well, I would like to point to
9 intelligent design as the intelligent design
10 theorists themselves have defined that which
11 is the reason I keep saying it is not final.
12 Philip Johnson has defined it as theistic
13 realism. Dr. Dembski has defined it as the
14 logos of John's Gospel restated in the idiom
15 of information theory. That right there
16 indicates that they view it as a religious
17 idea.
18    Q. Are you aware that Barry Lynn refers
19 to John's gospel as well?
20    A. Not as science.
21    Q. Oh, yes, he does.
22    A. I have seen that comment. I have
23 seen how Dr. Dembski represented it. I think
24 that that's not an attempt by Barry Lynn to
25 use John's gospel to argue for evolution. I

278

1 think he was really making a jovial point
2 there during the course of the firing line
3 debate.
4    Q. Well, he did make a point, though,
5 did he not?
6    A. Not in a serious sense offering it as
7 support for evolution. Barry Lynn, I know
8 Barry Lynn. Barry Lynn is fully aware that
9 evolution is supported by the sciences and he
10 would not use the new testament to support
11 the theory of evolution.
12    Q. You mean God could not have said
13 evolve?
14    A. No, I am not saying that Barry would
15 say that God could not have done this, but
16 Barry appreciates the difference between
17 science, what is properly science and what is
18 properly religion. He would not merge the
19 two.
20    Q. Well, does Haught, doesn't Professor
21 Haught basically accept in some way Barry
22 Lynn's concept in that jovial comment,
23 though, that evolution is God's way of --
24    A. That's Professor Haught's view as a
25 religious gentleman, as a theologian. It is

279

1 not a scientific view and he would be very
2 quickly, I think, to tell you that that's not
3 it.
4    Q. He will also be quick to say that his
5 view is a step closer to reality than the
6 theory of evolution?
7 MR. ROTHSCHILD:
8      Objection.
9 THE WITNESS:
10     I am sorry, I don't know what you
11 mean by that.
12 BY MR. THOMPSON:
13    Q. He is reading the signs that, the
14 same signs that Darwin read and scientists
15 today but going even deeper than that?
16 MR. ROTHSCHILD:
17     Objection. It lacks all foundation.
18 If you have some statement by Professor
19 Haught to show the witness, please do that.
20 BY MR. THOMPSON:
21    Q. Well, it is in this book and I don't
22 want to go through the book.
23    A. I have read his report, I have
24 listened to the presentation that he made at
25 my school and what I say is based on what I

280

1 know from that as he explained his position.
2    Q. There is no scientific way, is there,
3 to test the validity of the scientific method
4 that you support?
5    A. I am sorry, let me repeat that.
6 There is no scientific way to test the
7 validity of the scientific method, is that
8 what you just said?
9    Q. That you support, correct.
10    A. Scientific method is tested by its
11 success, whether it works in providing
12 explanations for the data that scientists
13 have, that's the way it is tested.
14    Q. But it is always considered a
15 hypothesis, is it not?
16    A. No, sir.
17 MR. ROTHSCHILD:
18     objection.
19 THE WITNESS:
20     A hypothesis is a proposition with
21 propositional content that you can determine
22 to be true or false. Scientific method is a
23 method, it is a way of approaching, a way of
24 doing things. You don't test it the same
25 way.

**Deposition of Professor Barbara Forrest - 6/7/05**

281

1 BY MR. THOMPSON:
2   Q. Are we talking about the same thing.
3 Are we talking about methodological
4 naturalism?
5   A. Methodological naturalism is just
6 simply a fancy name for science, what you and
7 I learned in school as scientific method,
8 that's all it is.
9   Q. Right. And so I just wanted to make
10 sure we were talking about the same thing.
11 And so you are saying that there has been a
12 scientific method to test the validity of the
13 scientific method?
14   A. No.
15 MR. ROTHSCHILD:
16     She did not say that.
17 THE WITNESS:
18     No, I did not say that. You are
19 asking the question that way, but that's not
20 what I am saying.
21 BY MR. THOMPSON:
22   Q. But you agree, what you said, you
23 said there is?
24 MR. ROTHSCHILD:
25     Objection.

282

1 BY MR. THOMPSON:
2   Q. It is tested by its results?
3   A. The workability of a method is
4 tested. The only test you can have for a
5 methodology, a way of doing something is if
6 it enables you to do what you need to do, It
7 is the same way with anything. You know, it
8 is a methodology. It is not -- a methodology
9 is not, it has -- it has no -- I am speaking
10 as a philosopher here, so tell me if anything
11 I say is not clear to you, but a methodology
12 is a way of doing something.
13     You test -- it is not propositional
14 content. It is not -- you don't say of a
15 method, of methodology, for example, that it
16 is either true or it is false, it doesn't
17 make any sense; right? A methodology either
18 works or it doesn't work, right? Then you
19 can have prop -- a methodology enables you to
20 gather data about what you can enunciate, you
21 know, there is some propositional content
22 there, X, X is such and
23 such. Right? That's a proposition that you
24 can evaluate as to its truth or falsity. You
25 don't use a methodology the same way, you

283

1 don't test it the same way.
2   Q. I guess I am getting at that your
3 scientific method stops when you get to the
4 door of supernatural explanations; is that
5 correct?
6   A. When you say mine scientific method.
7   Q. The scientific method that you are
8 talking about.
9   A. Scientific methodology as it is
10 currently practiced stops short of the
11 supernatural, it simply can't address those
12 questions, doesn't have the ability.
13   Q. Well, because thus far, the
14 scientists have said we don't want to go that
15 far?
16   A. No, it is not because the scientist
17 have said that. It is because it simply
18 doesn't work for that. It can't be used, it
19 just doesn't work. Scientific method is the
20 use of our sensory faculties to gather data,
21 of our rational faculties to draw conclusions
22 about that data, and that's the only reason
23 scientist can't go any farther with respect
24 to the supernatural, it is not something they
25 declare by fiat, it is not arbitrary.

284

1   Q. Well, will you agree that some
2 biological systems look designed?
3 MR. ROTHSCHILD:
4     Objection, that is outside her area
5 of expertise.
6 BY MR. THOMPSON:
7   Q. Well, you read the flagellum, about
8 the flagellum, bacterial flagellum?
9   A. Yes.
10   Q. And Professor Behe says it is
11 designed, correct?
12   A. Well, Mr. Dawson, Richard Dawson even
13 talks about things that have the appearance
14 of design but that is not the same thing.
15 That is not the same thing as to say that
16 they were designed by a supernatural being.
17   Q. And I am glad you mentioned Mr.
18 Dawson because he keeps on saying that as
19 biologists, we have to keep on reminding
20 ourselves as we look at the design that this
21 is merely an illusory, it is not really
22 designed; have you heard that?
23   A. Yes.
24   Q. Comments from him?
25   A. Yes. I have heard Richard Dawson say

## Deposition of Professor Barbara Forrest - 6/7/05

285

1 that.
2    Q.    And so you have some scientists, all
3 scien -- a lot of scientists will say this
4 looks designed.  The evolutionists will say
5 that it is not designed, it merely gives the
6 appearance of design, and intelligent design
7 advocates theorists will say it looks
8 designed because it is designed?
9    A.  Yes, that's what that says.
10    Q.  And so what you have are scientists
11 looking at the same data, both look designed,
12 one says it isn't, it is just a result of
13 natural selection, and the other says, the
14 intelligent design theorists say no, it is as
15 a result of an intelligent cause.  Is that
16 framing the issues that we are confronting
17 today?
18    A.  That is what the intelligent design
19 theorists say, that's correct, yes.
20    Q.  And if tomorrow we -- I should say
21 we, if tomorrow the scientists come to a
22 consensus that they can go beyond just saying
23 it looks designed to looking at whether it
24 was designed by an intelligent agent, would
25 you then accept it?

286

1    MR. ROTHSCHILD:
2        Objection, lack of foundation.  I
3 mean it is chronological, science says we
4 will accept the post-design, we accept the
5 component design, I mean I don't know what
6 you want from this witness.
7 BY MR. THOMPSON:
8    Q.  Because I am trying to understand how
9 far she will go -- I am trying to understand
10 how far you will go in supporting the
11 scientific methodology when let's say
12 scientists change it?
13    A.  I don't think that you're coming at
14 this in the proper way, if I may say so.
15    Q.  Sure.
16    A.  If intelligent design theorists want
17 to say that things look designed because they
18 are designed, then the task is there, it is
19 there, the burden of proof is there.
20 Scientists don't have to do anything.  All
21 scientist have to do is what they have been
22 doing which has been so successful for such a
23 long time.  It is not the scientists, right,
24 that are practicing science in the standard
25 way who have to do anything here.

287

1        Intelligent design theorists, they
2 cannot shift the burden onto the backs of the
3 scientists who have used scientific methods
4 so successfully.  The task belongs to people
5 like Dr. Behe, they should assume it.
6    Q.  They are assuming it, but let me ask
7 you, is there any, because scientific
8 methodology is something that has been
9 arbitrary --
10    A.  It is not arbitrary.
11    Q.  By scientists.
12    A.  It is not arbitrary.
13    Q.  I mean scientists decided it,
14    A.  They didn't sit down and have a
15 meeting and say we're going to do it this
16 way.  The methodology of science is something
17 that was worked out over centuries by trial
18 and error, what works and what doesn't work.
19 It is not arbitrary.
20    Q.  I think we all agree that tomorrow,
21 if they wanted to change it --
22    A.  No.
23    Q.  -- because -- wait, because it is not
24 giving them the information they need, they
25 can change it; right?

288

1    A.  They wouldn't change it just
2 overnight just because they want to.  If
3 there is something that they need to do, they
4 will try to find something that they need to
5 explain, some data they need to obtain, they
6 will have to find a way to do it.  That is
7 not the same thing as changing the definition
8 of science.  It is not the same thing as just
9 arbitrarily adopting a methodology.  That
10 isn't how science works.
11    Q.  Well, if they find that their current
12 methodology cannot adequately explain some
13 empirical data that they are observing, is it
14 conceivable that these scientists then change
15 their methodology to try to explain the
16 empirical data that they are observing?
17    A.  They will do whatever works, you
18 know.  They will adopt a methodology that is
19 successful in coming up with an explanation
20 but they will not, scientists will not go
21 beyond where their faculties will take them.
22 They are very careful.  They are -- it is a
23 very responsible position for them to take.
24 It is not to try to make claims which go
25 beyond their data and the conclusions that

## UNITED COURT REPORTERS, INC.
## 1-800-US-DEPOS

**Deposition of Professor Barbara Forrest - 6/7/05**

289

1 they can reasonably draw from the data.
2 Q. Right, and the conclusions they can
3 draw?
4 A. And science has to be
5 intersubjective, you know. They are not
6 going to go into an area like a supernatural
7 where one scientist might say because a
8 supernatural understanding of something but
9 the other scientists can't share it, there is
10 an epistemological problem here which is very
11 serious and so far has not been overcome.
12 Q. And if they overcome it, you will
13 accept it?
14 A. Somebody invents a human with
15 faculties for the supernatural, then we will
16 all be very amazed
17 Q. Well, if you are a believer in
18 evolution, you also believe that the mind
19 evolves; is that true?
20 A. I think the mind evolves, yes.
21 Q. And is evolving or have we stopped
22 evolution?
23 A. well, evolution is an ongoing process
24 and it is not, you know, it is not a
25 subversive or really a controversial position

290

1 to take to say that our higher rational
2 faculties are a product of the fact that we
3 have a very highly evolved nervous system.
4 That's not -- that's a scientific viewpoint.
5 It is not anything subversive or anything
6 like that.
7 Q. I haven't said it was but I am saying
8 that it is continually evolving according to
9 you, is that true?
10 A. Evolution is a continuous process.
11 Q. I don't think that most people
12 disagree with that evolution means change
13 over time?
14 A. No.
15 Q. And so would you also agree that
16 human minds are evolving?
17 A. I agree that the human physiological
18 organism is evolving. To the extent that
19 that affects our mental functioning, then
20 that would follow as a conclusion.
21 Q. And if our mental functioning somehow
22 develops the ability to perceive the
23 supernatural in a scientific way, then would
24 you accept it?
25 A. It would depend. So far we have

291

1 faculties that are completely natural, we
2 have senses that enable us to detect
3 information about the world around us. I
4 really can't tell you, I can't envision what
5 kind of faculty there would be that would
6 enable us to detect something that is beyond
7 nature itself. I don't know what it would
8 be.
9 Q. But we haven't been able --
10 A. If we detected something, we would
11 have to consider it a natural entity because
12 it is acceptable to the faculties that we
13 have.
14 Q. But we have never defined nature,
15 have we?
16 A. No, we don't, we have not defined it
17 in this discussion.
18 Q. Well, and nature is what nature is;
19 correct?
20 A. I mean that's a very vague statement.
21 I am not going to --
22 Q. I know but I am saying but we don't
23 know what nature is, we don't know the
24 parameters of nature?
25 A. I think we can speak with some

292

1 confidence about the natural world and
2 understand what we mean.
3 MR. ROTHSCHILD:
4 I mean I think we're really getting
5 into a little argument here, and --
6 BY MR. THOMPSON:
7 Q. I don't want to argue. I am trying
8 to understand. I don't think that it is an
9 argument, but --
10 A. I think that you and I could walk
11 around outside and agree what the natural
12 world is.
13 Q. Well, we have theories about multiple
14 universes; correct?
15 A. Oh, yes, that's all highly
16 speculative.
17 Q. But scientists are looking at that;
18 is that correct?
19 A. They are not positing those theories
20 as supernatural.
21 Q. Well, I know, but there are things
22 that are beyond our, that are beyond what we
23 would have expected some 20 years ago?
24 A. They are beyond our immediate sensory
25 reach.

# Deposition of Professor Barbara Forrest - 6/7/05

293

1 Q. And that I guess is the basis of what
2 I said, we really don't know what nature, we
3 don't know the parameters of nature?
4 A. Let's say that we don't know a lot
5 about the natural system that is very distant
6 from us. All right. There is a lot about,
7 for example, what lies beyond, you know, the
8 galaxy that we're in that we still don't
9 know, we can say that.
10 Q. I know we have covered a lot of
11 ground and hours here. I just want to give
12 you an opportunity, is there something that
13 you recall you said or an answer that you
14 gave that you would want to change right now?
15 A. I can't recall anything in
16 particular, no, sir.
17 MR. THOMPSON:
18    I think that concludes it. Thank
19 you.
20 MR. ROTHSCHILD:
21    Thank you.
22             * * * * * * * *
23
24
25

294

1         REPORTER'S PAGE
2
3    I, LISA LANATA, Certified Shorthand
4 Reporter, in and for the State of Louisiana,
5 the officer before whom this sworn testimony
6 was taken, do hereby state:
7    That due to the spontaneous discourse
8 of this proceeding, where necessary, dashes
9 (--) have been used to indicate pauses,
10 changes in thought, and/or talkovers; that
11 same is the proper method for a Court
12 Reporter's transcription of a proceeding, and
13 that dashes (--) do not indicate that words
14 or phrases have been left out of this
15 transcript;
16    That any words and/or names which
17 could not be verified through reference
18 material have been denoted with the phrase
19 "(spelled phonetically)."
20
21
22
23    _____
     LISA LANATA
     Certified Court Reporter #85124
24   Registered Professional Reporter
25

295

1 WITNESS CERTIFICATION
2    I, the undersigned, PROFESSOR BARBARA
3 FORREST, do hereby certify that I have read
  the foregoing deposition and that, to the
4 best of my knowledge, said deposition is true
  and accurate (with the exception of the
  following corrections listed below):
5
6 PAGE  LINE   CORRECTION    REASON FOR CHANGE
7 ___  ____  _____  _____
8 ___  ____  _____  _____
9 ___  ____  _____  _____
10 ___  ____  _____  _____
11 ___  ____  _____  _____
12 ___  ____  _____  _____
13 ___  ____  _____  _____
14 ___  ____  _____  _____
15 ___  ____  _____  _____
16 ___  ____  _____  _____
17 ___  ____  _____  _____
18 ___  ____  _____  _____
19 ___  ____  _____  _____
20 ___  ____  _____  _____
21 ___  ____  _____  _____
22 ___  ____  _____  _____
23 ___  ____  _____  _____
24 DATE      SIGNATURE
25

296

1        CERTIFICATION OF TRANSCRIPT
2    This certification is valid only for a
3 transcript accompanied by my original
  signature and original stamped seal on this
  page.
4
5    I, LISA LANATA, Certified Court Reporter
6 in and for the State of Louisiana, as officer
7 before whom this testimony was taken, do
8 hereby certify that PROFESSOR BARBARA
9 FORREST, after having been duly sworn by me
10 upon authority of R.S. 37:2554, did testify
11 as hereinabove set forth in the foregoing 295
12 pages; that this testimony was reported by me
13 in the machine shorthand reporting method,
14 was prepared and transcribed by me or under
15 my personal direction and supervision, and is
16 a true and correct transcript to the best of
17 my ability and understanding;
18    That I am not related to counsel or to the
19 parties herein, nor am I otherwise interested
20 in the outcome of this matter.
21
22
23    _____
     LISA LANATA
     Certified Court Reporter #85124
24   Registered Professional Reporter
25

# UNITED COURT REPORTERS, INC.

**- ' -**

'90s [1] 25:17
'93 [1] 38:11
'96 [1] 33:8
'99 [1] 19:7

**- 0 -**

04-cv-2688 [1]
1:4

**- 1 -**

1 [7]   3:4, 12;
29:11, 14, 20;
30:5, 8
10 [5]   17:21;
20:1; 22:9; 29:3;
68:13
11 [3] 79:12, 16;
261:2
1301 [1] 154:16
166 [1] 3:14
18th [3]   2:11;
93:3, 7
19103 [1] 2:12
1974 [1] 266:7
1979 [1] 16:10
1980 [1] 265:23
1986 [1] 266:1
1987 [1] 251:5
1993 [1] 266:4
1994 [1] 20:2
1995 [1] 16:11
1997 [1] 16:11
1999 [1] 19:7
1st [3]   36:16;
37:5; 38:15

**- 2 -**

2 [5]   3:5, 14;
38:1; 168:2
20 [4]   132:10;
155:18; 265:16;
292:23
2000 [1] 12:18
2001 [5]   86:13;
128:23;   129:18,
21; 166:18
2002 [1] 156:5
2003 [2]   12:19;
264:2
2004 [2]   12:19;
13:10
2005 [3]   1:22;
30:5; 38:15

**204** [1] 3:15
**212** [1] 3:17
**223** [1] 3:19
**23** [2]   22:1;
26:24
**2300** [1] 1:21
**24** [1] 2:5
**2554** [1] 296:10
**26** [1] 267:8
**260** [2]   139:10,
15
**29** [2]   3:12;
268:6
**295** [1] 296:11
**296** [1] 3:21

**- 3 -**

3 [3]   3:15;
204:3; 228:8
30 [1] 224:17
3000 [1] 2:11
301 [1] 68:19
30147 [1] 5:3
302 [1] 68:20
310 [1] 68:25
315 [1] 69:1
32 [1] 154:25
33 [1] 155:20
35 [1] 8:5
37 [1] 296:10
393 [1] 2:5

**- 4 -**

4 [6]   1:4;   3:7,
17;   212:3,  9;
228:8
417 [1] 69:2
48106 [1] 2:6

**- 5 -**

5 [5]   3:10, 19;
223:22;   224:9;
228:8

**- 6 -**

630 [1] 69:9

**- 7 -**

70744 [1] 5:3
7th [1] 1:22

**- 8 -**

85124   [2]
294:23; 296:24

**- 9 -**

909 [1] 1:20
91h [3]   35:5;
36:5; 274:12

**- A -**

ability [7]   7:2,
11;   96:14;
112:17;   283:12;
290:22; 296:17
able [8]   7:16;
62:13;   96:17;
103:1;   144:13,
17; 196:5; 291:9
about [261]  9:14;
12:12, 18;  14:15;
15:7, 20;   16:9,
11;   17:14, 22;
18:19;   19:1,  7,
13;  20:1, 12, 21;
21:7;   22:14;
24:12, 15;  25:18,
23, 24;   26:24;
28:24;   29:2;
30:20;  31:3, 11,
15, 16;   32:16;
34:21;   35:20;
40:8, 9;   41:19,
21, 22;   42:5;
48:3, 16;   49:3;
51:5,  10,  11;
52:10;   57:16;
60:13;   61:20;
64:21, 22;  66:19;
67:19;   70:12;
71:8;   74:11;
77:5,  14,  22;
79:14; 80:23, 24;
81:8,  21,  22;
82:4, 12, 13, 15;
84:1, 4, 11, 12,
21,  22,   24;
85:12, 13; 86:10;
87:10;   90:21;
92:8, 12, 13, 14;
94:2, 16;  96:17;
98:13; 99:13, 15;
100:9;   101:13,
15;  102:18, 20;
103:8;   104:18,
21;   105:6,  18,
22;   106:1;

107:14;  108:18;
109:7;   110:10,
12, 13, 16, 19,
22;  111:23, 25;
112:12, 15, 17;
113:13,   17;
114:6; 115:2, 13;
116:12, 17, 22;
119:2,  4,  18;
122:11;   125:1;
127:12;
129:8,   15;
130:16; 131:16;
132:10,   18;
134:5,   22;
135:25;   136:5,
12, 17, 18;
137:14;  139:4;
141:5, 6, 10, 14,
19;  143:11, 13;
146:9;   151:11;
153:9;  155:18;
156:12;   157:1;
158:9;  161:17;
165:22;  166:4;
170:1;   175:6;
176:4, 11, 18, 19;
178:19,   20;
179:2, 5;  180:12;
181:16;  182:19;
190:22;  193:12,
24;   194:3,  6;
196:22;  200:23;
203:17;   204:8;
206:4;   211:21;
216:11,   22;
217:2;   219:14;
220:2, 8; 225:12,
23;   226:19;
228:3,   11;
229:20;   230:9,
24;   231:2;
233:18;  235:14,
15;   239:9;
240:11;  242:24;
244:3;  245:21;
248:21,   22;
249:4, 6, 8, 10;
254:19;   256:7,
16,  21,  22;
257:14,   21;
261:19,   23;
263:23;  264:25;
265:14,   15;
270:25;  271:6;
273:1, 9, 10, 17,
18, 21;   275:8,
16,  21,  22;
276:24;  281:2, 3,
10;  282:20, 22;
283:8, 22; 284:7,
13;   291:3;

292:1, 13; 293:5, 6
**above-entitled** [1] 1:17
**absence** [1] 156:25
**absolute** [2] 73:17; 173:24
**academic** [2] 166:3, 11
**accept** [19] 73:16;   142:8; 146:13;   148:7; 153:6;   196:11; 225:7;   226:8, 9; 232:2; 265:9, 10; 273:14;   278:21; 285:25;   286:4; 289:13; 290:24
**acceptable** [6] 182:2;   188:6; 230:11;   275:4; 291:12
**acceptance** [1] 232:14
**accepted** [6] 44:22;   126:4; 133:24;   196:9; 225:7; 236:6
**accepting** [2] 119:21; 156:12
**accepts** [3] 73:13, 15; 277:6
**access** [2] 32:24; 104:23
**accessible** [7] 57:6;   98:3; 103:3, 8;   111:5; 112:18; 190:17
**accident** [3] 105:3, 13; 108:7
**accidents** [2] 106:3
**accommodate** [1] 144:13
**accompanied** [1] 296:2
**according** [9] 73:13;   80:9; 126:14,   15; 155:6;   178:5, 7; 244:12; 290:8
**account** [1] 127:4
**accounts** [4] 34:7;   126:14; 127:2, 5
**accumulation** [1] 71:13
**accurate** [10] 65:14;   173:14; 200:18;   204:7;

234:13;   267:15, 16, 18;   275:17; 295:4
**accurately** [2] 203:13; 204:5
**accusing** [2] 183:25; 184:1
**achieve** [1] 183:7
**acknowledge** [1] 249:22
**acknowledging** [1] 175:4
**aclu** [12] 14:12, 18;   15:1, 15; 16:3, 7, 14;   18:5, 13, 14;   27:21; 250:13
**acquaintances** [1] 203:3
**across** [1] 119:1
**act** [2] 86:13; 136:6
**acting** [6] 16:25; 48:8; 143:14, 15; 172:19; 192:21
**action** [2] 1:4; 28:14
**active** [1] 196:2
**activities** [5] 118:5;   148:21; 213:19;   216:4; 218:1
**activity** [2] 106:4; 161:8
**actual** [4] 33:25; 36:5;   139:22; 172:13
**actually** [21] 9:14; 20:5; 21:2; 22:24;   23:14; 27:9;   35:17; 47:10; 61:17, 20; 66:8;   84:25; 137:2;   161:22; 164:8;   170:4; 176:24;   192:9; 197:16;   228:6; 239:7
**ad** [1] 70:12
**add** [5]   20:9; 131:23;   137:16, 22; 205:18
**added** [3] 131:23;   137:16, 19
**addition** [2] 157:12; 194:19
**address** [9] 20:16;   46:8, 17; 50:17;   70:14; 239:24;   267:20,

21; 283:11
**addresses** [1] 73:4
**addressing** [5] 21:20;   23:23; 65:7; 135:11, 17
**adds** [1] 137:24
**adequately** [1] 288:12
**adhere** [1] 230:4
**adjusted** [1] 147:17
**administering** [1] 4:22
**administration** [2] 22:4; 181:10
**administrators** [3] 24:7; 192:8, 10
**admit** [1] 166:11
**admitted** [2] 130:14; 267:10
**adopt** [3] 21:14; 188:1; 288:18
**adopted** [7] 21:16;   27:5, 18, 19;   81:5, 9; 187:10
**adopting** [1] 288:9
**advance** [3] 44:20;   136:13; 187:13
**advantageous** [1] 72:4
**advice** [3] 198:16;   201:19; 218:3
**advised** [1] 171:6
**advisory** [3] 195:14, 18, 23
**advocate** [1] 213:1
**advocates** [1] 285:7
**advocating** [3] 25:13;   213:10, 11
**affect** [4] 7:11;   205:22; 269:8, 9
**affected** [1] 205:23
**affecting** [1] 154:6
**affects** [3] 211:4, 5; 290:19
**affidavit** [5] 33:1, 4, 10, 21; 266:1
**affiliate** [4] 16:21;   17:4;

211:21, 23
**affiliated** [5] 118:14;   200:6; 201:10;   204:23; 216:1
**affiliation** [2] 211:13; 242:25
**affiliations** [1] 118:9
**affilliate** [2] 16:11; 17:25
**affirm** [1] 205:24
**affirmative** [7] 14:17;   19:24; 134:6;   138:23; 197:25;   214:9; 226:20
**afield** [3] 223:8;   255:15; 256:15
**after** [10]   5:4; 19:2, 8;   40:4; 90:19;   130:19; 212:19;   247:1; 296:9
**afterwards** [1] 18:13
**again** [22] 15:10;   25:19; 29:1; 31:8;   91:21; 116:10;   169:7; 171:7;   174:5; 176:1;   177:25; 183:1;   184:9; 208:7;   216:15; 221:19;   225:24; 226:21;   233:18; 237:8;   254:25; 274:24
**against** [5] 5:21;   15:3;   26:25; 156:3; 253:16
**age** [1] 217:4
**agency** [3] 108:8, 24; 109:7
**agenda** [1] 124:21
**agent** [2] 116:1; 285:24
**ages** [1] 10:11
**agnostic** [10] 200:21,   24; 201:4, 8;   202:9; 221:5, 8, 14, 22, 24
**agnostics** [4] 200:2,   17; 221:15
**ago** [6]   8:4; 17:21;   20:1; 35:14;   166:17; 292:23
**agree** [66] 41:2;

57:23;  58:5, 10;
59:15,  21,  23;
72:14;    88:20;
90:6,  12;  96:7,
21;      98:22;
118:2;   120:8;
126:4;    127:7;
137:25;  141:23,
25;    142:4;
145:3;   157:24;
168:6;    173:19,
22;  174:12, 21;
175:10,  18,  21,
24;      189:2;
195:3;   199:3;
205:2, 17;  206:1;
207:18;   212:15,
23;   217:7,  9;
228:21;   233:4;
235:18;  238:11;
240:18;   241:3;
243:12,  14,  17,
20;    245:2;
252:20;   253:21,
25;    267:5;
272:15;  261:22;
284:1;   287:20;
290:15,   17;
292:11
**agreed** [6]   4:3;
13:23;    32:5;
77:8;   186:19;
199:8
**agreement** [5]
15:3,  11,  12;
229:3, 14
**agrees** [2]  59:5,
7
**aguilliard** [1]
251:4
**ahead**    [4]
115:23;  179:19;
204:2; 229:4
**ahmanson**  [1]
268:18
**ahmanson's** [2]
269:5, 10
**aimed** [1] 81:15
**aims** [2]  82:24;
124:6. ........ .....
**albert**    [2]
138:10, 17
**alerting**   [1]
28:12
**aliens**    [3]
104:12,   19;
110:12
**alike** [1] 244:2
**alive** [1] 136:4
**all** [96]   4:4, 8,
11;   5:7;   6:1;
9:23; 14:6; 22:2;

30:3, 11;  31:22,
24;  39:2;  43:14;
44:17;   46:16;
51:9, 15;  57:11;
59:18;    62:25;
63:2;    64:16;
65:13;    68:14;
72:9;    73:10;
76:5, 7, 8; 79:23;
82:21;   104:12;
112:1;   117:11;
118:2;   126:2;
139:12,   17;
143:23;  144:21;
151:7, 22;  157:1;
174:23;   .176:2;
180:13;   184:11;
185:15;  188:16;
189:2;  194:7, 10,
16,   17,   24;
197:23;  198:16;
203:16;  204:22;
208:24;  211:4, 5,
19;     212:6;
216:2, 22;  217:4,
20;      218:25;
226:2;   230:2;
233:21;  234:22;
235:15;   237:1;
239:25;  241:13;
250:6;   251:15,
21;    252:22;
255:23;  257:13;
266:24;   267:4;
269:15;  272:16;
279:17;   281:8;
285:2;   286:20;
287:20;  289:16;
292:15; 293:6
**allegiance**  [1]
257:7
**alliance**   [1]
211:16
**allied** [1] 158:19
**allotment**   [1]
30:17
**allow** [2]   8:24;
21:18
**allowing**   [1]
126:21
**almost** [4]   8:5;
180:6;   231:21;
265:21
**alone** [1] 269:18
**along** [2]  34:9;
106:20
**already**   [13]
12:8;     13:23;
32:25;  34:1, 5;
40:5;   136:4, 6,
22;     171:13;
209:1, 3; 249:2

**also** [49]   2:15;
6:7; 24:8; 49:17;
57:1, 24;  71:22;
79:22, 25;  80:21;
88:25;    93:20;
98:22;    99:4;
118:8;    122:18,
21;    125:6;
128:21;  131:22;
142:24;   147:4;
148:15;  151:17;
152:9,  20,  23;
153:3;   156:17;
160:9;   179:13;
182:23;   194:9;
195:9;   197:10;
201:9,  23,  25;
233:14;   234:7;
236:13;  245:22;
254:10;  263:10;
269:19;  273:18;
279:4;   289:18;
290:15
**alter** [2] 227:22;
228:25
**alternative**  [15]
44:24;   162:14,
22,  23;  164:25;
191:12;  205:24;
213:12;  214:15;
215:16,  17,  19;
271:1.     10;
273:15
**alternatives** [1]
164:22
**although**   [1]
200:10
**altruism**   [1]
205:9
**always**    [13]
16:22;    88:18;
89:6;    96:25;
144:7, 12;  147:9;
148:1;    229:24,
25;    234:23;
252:15;  280:14
**am** [210]   5:18;
6:13, 17, 21;  9:1;
10:23;  11:13, 14;
13:25;    15:17;
22:15;  23:18, 19;
26:16, 21;  30:22,
23;    31:20;
34:16, 21;  38:11;
41:12, 14;  43:13;
45:15;    46:13;
47:2,   14,   22;
48:18,  22,  23;
49:1,   15,   19;
51:4;    53:23;
54:1, 2, 12;  55:8,
9, 19, 25;  56:7,

17,  19;    57:16;
58:3;  63:16, 21;
64:7;  65:2, 7, 8;
66:5,   8;   69:7;
73:20;    75:3;
76:22;    78:17;
79:15;  81:5, 6, 8,
12,  21,  22,  25;
82:3, 7, 15;  84:4,
24;  86:9;  88:4;
91:5,  12;  92:23;
94:20;    95:23;
97:14, 22;  100:7;
101:5;    102:3;
106:20;   114:11;
115:15;   123:5;
130:20;   133:18;
138:12,   139:15;
150:6,     12;
155:25;   157:8;
160:23;   162:19;
167:5;    168:10;
170:15;   171:14,
16,  20;   172:6,
14;     173:9;
174:19;   175:22;
179:11,  12,  13,
15,  17,  18,  20,
21, 22;   180:16;
182:7,     10;
183:20;   184:1;
185:4, 11;
188:13;   190:2,
10;    193:21;
195:6,     13;
196:12;  198:11;
201:8,  13,  23;
203:24;   206:5;
210:3,     17;
211:13,  17,  20;
214:18;   217:7;
219:18;  220:12;
221:2,     12;
222:19;   223:15,
21;  225:23, 24;
227:7;    228:3;
233:22;   234:16,
18;  241:16, 19;
243:6;   246:17;
247:21;   248:1;
250:25;   254:7;
255:21;  257:10;
260:16;  261:12,
20;   287:4, 18:
268:16,    17;
269:18;   276:19,
21;    278:14;
279:10;   280:5;
281:20;   282:9;
283:2;    284:17;
286:8, 9;   290:7;
291:21,    22;

292:7;     296:18,
19
**amazed**     [1]
289:16
**ambiguous**     [1]
87:2
**amenable**     [2]
73:23; 205:11
**amend** [2]  85:21,
23
**amended**     [1]
147:17
**amendment** [7]
18:8;  86:12, 19,
25;        87:4;
153:25; 154:1
**american**     [5]
52:5, 6;   82:25;
153:12; 158:17
**americans**     [3]
195:10;   196:2;
250:14
**among** [1] 168:2
**amount** [1] 30:16
**analysis**     [4]
13:4;     116:13;
143:7; 149:15
**analytics**     [1]
92:19
**analyze**     [2]
129:5, 13
**analyzed**     [2]
21:23; 77:6
**ancient** [1] 91:25
**ann** [1] 2:6
**another**     [8]
44:25;    104:20;
131:10;   156:18;
174:5;    223:19;
244:25; 270:20
**answer**     [39]
4:13;  8:9, 13, 17;
7:1,  17;    8:24;
9:5,  12;    10:6;
45:9;       53:13;
54:13;      61:24;
63:18, 19;  75:20;
76:20;      79:6;
97:20;      107:5;
109:22;  111:23;
129:10;    136:22;
173:24;    174:2;
175:1;    178:22,
24;        179:7;
185:21,    23;
202:22;   207:17;
253:10;   255:19;
257:11; 293:13
**answered**     [1]
45:8
**answering**     [4]
185:10,  11,  12;

188:8
**answers**     [7]
5:25;   6:2,  3;
7:3; 9:6; 222:12
**antagonistic**  [2]
243:3, 7
**antecedents**  [2]
8:18, 22
**anticipating**  [3]
250:2, 4, 9
**anybody**     [3]
121:25;   165:22;
221:4
**anybody's**     [1]
121:19
**anymore**     [3]
94:19;   217:25;
256:21
**anyone**     [4]
14:12;    36:11;
42:12; 81:1
**anything**     [39]
17:22;     21:19;
39:10;  45:11, 23;
52:9;       85:12;
100:19;   104:21;
107:20;   111:16;
113:14;   130:10;
138:4;    160:12;
195:17;   211:15;
213:3;    216:24;
219:12;   226:9,
22;        228:11;
236:4;    241:19;
246:9,      18;
248:19,     20;
249:4;     250:3;
267:3; 282:7, 10;
286:20,     25;
290:5; 293:15
**apologist**     [3]
156:4,     22;
264:15
**apologize**     [1]
154:18
**apparently**     [6]
77:8;    127:19;
253:18,     20;
264:1, 4
**appeal**     [3]
157:13;   199:15;
230:10
**appearance** [2]
284:13; 285:6
**appearances** [2]
2:1; 3:5
**appeared**     [5]
19:2, 6;  128:23;
129:17, 21
**appears**     [1]
131:5
**appleman**     [2]

165:5, 15
**applies** [1] 52:12
**apply** [1] 216:2
**appreciate**     [1]
222:6
**appreciates**  [1]
278:16
**approaching**  [3]
95:8;     112:9;
280:23
**appropriate**  [6]
120:18;   161:16;
231:8, 12;  238:3,
21
**april** [6]   30:5;
36:16;   37:5, 7;
38:15
**aralene** [1] 1:8
**arbiter** [1] 256:5
**arbitrarily**     [2]
187:11; 288:9
**arbitrary**     [8]
186:24;  187:3, 9;
283:25;     287:9,
10, 12, 19
**arbor** [1] 2:6
**arch** [1] 2:11
**are** (464)   4:10,
13;     5:7,  25;
6:18, 22;    7:6;
9:8, 20;   10:11;
11:1;      13:24;
15:20;     16:24;
17:4, 23;  18:19;
30:3, 19;   31:4;
32:25;  33:7, 22;
34:25; 37:10, 24;
39:6; 40:1; 41:2,
9;   43:1, 4, 17,
25;   44:6,  19;
46:24;   47:2, 8,
10;    48:14, 18,
20;   49:10, 17;
50:24;     51:12;
52:21; 54:12, 19,
55:6;    56:2, 9;
58:9,   10,   11;
60:3;      61:22;
62:20;      63:9;
64:1, 2;  65:1, 4;
66:6; 67:2, 5, 9,
14;   68:16, 23,
24;  69:17; 70:2,
20;  73:7;  76:3;
76:22;      78:4;
79:16; 80:3, 8, 9,
15,  24;   81:10,
20, 24; 82:1, 12,
13;    83:4,  6;
84:1, 4, 20, 22,
23;  85:2; 86:12;
87:19;   91:3,  8;

92:8;  93:10, 15;
94:16;      95:3;
96:7,  12,   17;
97:10, 15;  98:10;
99:13, 25;  100:1,
22;        101:14;
103:6, 8;  104:18,
20;    105:5, 17,
23;      106:12;
107:9,     11;
108:14, 15, 17;
109:7,  10,  23;
110:2,
4,    15,    22;
111:10,     21;
112:9,      18;
113:16, 17,  22,
24;   114:17, 19,
25;    115:7, 12,
15;   116:12, 21,
22, 23;   119:9;
120:12;   121:10;
122:23;    123:4,
14;      124:10;
125:4;    131:25;
132:11, 13,  16;
134:16,     23;
137:6;    138:7;
139:3, 25;  140:9,
15, 25;  141:1, 4,
7, 12, 19;  142:3;
143:19, 20,  25;
144:6,  20,  22;
145:7,   9,   12;
146:6;    147:10,
18,  20,    22;
148:21;    150:7,
18;   151:4, 5, 9,
12, 22, 24, 25;
152:1, 3, 4, 6;
154:25; 157:1, 5,
25;    160:9,  14,
16, 21;   161:23;
162:4,  10,  12;
164:5;    165:23;
168:10,     11;
169:6, 7, 12, 17;
171:7, 9;  172:22,
24;    173:1,  5;
175:4,   5,   20;
177:20,     25;
178:11,  12,  14,
19;    179:2, 21,
25;      180:20;
183:24;    184:6;
185:6,  10,  12;
186:1;  187:9, 18,
22;  188:4, 8, 12,
20;    190:5,  18;
191:21,     22;
192:1, 3, 5, 8, 16;
193:2,      18;

194:14;  195:1, 9,
15;  196:3,
4,  21;    197:3;
198:5, 17;  199:2,
7;  200:4, 6, 24;
201:7,  9,  10;
202:2, 3, 4, 5, 8;
204:18,   22;
205:11,  16,  21,
23;    206:10;
208:2,     18;
210:14,    18;
211:21;   212:20,
25;   214:1, 13;
217:13,    17;
218:11,    13;
219:15,  17,  19,
25;     220:21;
221:15;    222:1,
13;  223:5,  11;
228:5,  10,  12;
229:20,     25;
230:24;   232:6;
233:18,    20;
234:9,  11,  12;
237:18;  238:4, 5,
13,  16,  23,  24;
239:9,  11,  16;
240:20,  22,  24;
242:6, 7, 15, 21,
24;    243:3,  12,
13,  21;   244:15,
16,   20,   23;
245:12,  13,  15;
246:4;  248:3, 4;
249:1,  10,  14;
250:13,  15,  25;
253:10;   257:14,
19,   21,   22;
258:17;   259:2;
260:11,  18,  19;
261:8,  13,  21;
262:23;  263:2, 3,
12,  20;   264:22;
265:21,    23;
266:8, 14, 15, 17,
20,  25;   267:6;
268:9, 18, 19, 21;
269:2,   3,   10;
270:8,    24:.................
272:16,    18;
275:15;   277:18;
281:2, 3, 11, 18;
282:22;
283:7;    285:10,
16;  286:18, 24;
287:6;    288:13,
16,  22;   289:5,
17;  290:2,  16;
291:1;   292:17,
19, 21, 22, 24
**area** [28]   1:10;

5:20;  35:6;  42:1;
49:4,  5,   76:20,
23;    93:14;
96:23;    107:10,
22;  116:11,  16;
139:4;    171:8;
251:18;   252:1;
253:1;    254:3;
262:1;    263:22;
264:12,    23;
284:4;  289:6
**areas** [7]   31:4;
50:16;    51:16;
170:18;   174:23;
178:25;  269:15
**aren't** [2]  50:16;
199:23
**argue** [4]   170:1;
223:17;   277:25;
292:7
**arguing**     [2]
28:20;  276:13
**argument**   [10]
46:22;  69:18, 19,
22,  23;  70:1,  9;
268:14;  292:5, 9
**arguments**   [2]
69:17;  70:15
**arise** [1]  109:16
**aristotle**   [12]
91:10, 12, 18, 22,
24;    92:11,  12,
15, 17, 19;  94:8
**aristotle's**   [4]
91:8; 92:5;  94:9,
18
**arizona**     [1]
164:16
**around**     [6]
100:7;   201:20;
202:7;    228:1;
291:3;  292:11
**arranged**    [1]
165:6
**arrived** [1]  146:3
**article** [2]  43:10,
12
**articles**    [1]
190:22
**artifacts**   [2]
107:19; 109:9
**artificial**   [2]
104:5;  264:19
**ascertain**   [1]
248:1
**aside** [4]   21:20;
23:23;    260:9;
275:9
**ask** [34]    6:11;
9:14;     10:4;
24:11;    29:20;
32:3;     47:7;

53:17;     54:7;
61:23;    77:22;
113:11,    13;
116:24,    25;
130:13;   159:9;
171:6,  9,  11;
191:15;   198:9;
209:20;  222:10;
225:24;    228:3;
229:5;   235:21;
237:19;   239:9;
255:11,    22;
257:15;  287:6
**asked** [20]    5:9;
6:19;   11:4,  19,
21;  12:1;  19:13;
21:14;    30:23;
31:10;    32:8;
65:9;   71:7,  8;
138:17;   161:21;
171:13;   195:17;
254:18;  257:1
**asking** [42]  5:18;
6:22;     47:14;
58:10;    65:1;
68:16;    75:3;
76:23;  81:10, 12,
24;  82:1;  87:9;
101:5,   15;
106:12;   108:14;
110:2,    15;
111:10;   114:17,
19;  115:12,  15;
116:12;  139:25;
144:6;    161:23;
169:7,  13,  17;
173:5;   178:19;
179:2, 5;  188:21;
190:5;   193:21;
254:7;   257:21;
264:22;  281:19
**aspect** [4]  78:1;
122:12, 14, 15
**aspects**     [3]
43:25;   59:24;
60:1
**assessment**  [2]
77:9;  183:8
**assist** [3]  36:11,
12;  60:12
**assistance**  [3]
249:15;   250:9;
258:1
**associated**  [2]
216:4;  261:10
**association** [10]
3:15;    20:8;
197:13;  200:16;
201:10;  203:11,
13;     207:22;
209:8;  211:10
**assume** [5]  6:17;

31:17;   129:10;
131:17;  287:5
**assumed**    [1]
136:3
**assuming**   [1]
287:6
**astrophysics** [1]
50:9
**atheist**     [5]
200:2, 21, 24, 25;
221:6
**atheists**    [1]
200:17
**attack** [2]  70:13;
124:13
**attempt** [4]  45:9;
172:8;   199:16;
277:24
**attempted**   [1]
61:25
**attempting**   [3]
43:17;   135:23;
136:2
**attend** [2]  10:13;
198:3
**attended**    [2]
10:16;  155:14
**attention**    [7]
79:12;   117:25;
122:22;  123:2, 5;
224:9;  271:17
**attitude**     [2]
208:13, 16
**attorney**    [2]
15:15;  66:5
**attorneys**   [1]
15:13
**attracted**    [2]
140:20;  141:1
**attraction**   [1]
139:19
**audience**    [1]
40:13
**authentic**    [1]
246:7
**authoritative** [1]
191:20
**authority**   [10]
80:7,  20;   83:2,
12,  20;   162:16;
191:17;   192:8,
14;  296:10
**avail** [1]  218:19
**available**    [3]
176:21;  231:19;
274:11
**aware**     [21]
18:25;    64:3;
87:12;  96:8,  12;
212:24;  213:7, 9;
219:18;  220:12;
250:25;    261:8,

12, 13; 262:23;
263:2; 271:10,
13, 15; 277:18;
278:8
**away** [5] 23:22;
94:15; 173:9;
174:3; 198:6
**ax** [3] 261:19,
20; 262:10

- B -

**b** [1] 1:8
**back** [26] 23:22;
25:12, 20; 29:5;
34:13, 18; 35:19,
21; 46:2; 62:4,
10; 123:20;
136:8; 137:14;
157:4; 164:8, 17;
165:5, 9; 191:4;
208:15; 216:12;
269:16; 270:15,
19; 277:4
**background** [8]
9:6; 12:11, 23;
118:1, 3, 5;
209:14; 229:8
**backing** [1]
81:20
**backs** [1] 287:2
**bacteria** [3]
103:11; 105:22;
114:7
**bacterial** [12]
105:14, 18;
106:13; 109:12;
110:17; 112:21;
114:15; 115:2,
21; 134:23;
143:7; 284:8
**bad** [8] 125:24;
128:10; 129:19,
20; 137:16, 18;
194:22, 23
**balance** [1]
251:2
**balancing** [1]
276:11
**bang** [10] 99:15,
16, 22; 100:2,
23; 102:6, 13;
258:8; 259:23;
260:4
**barbara** [6] 1:16;
4:5; 5:2; 7:19;
295:2; 296:8
**barrie** [1] 1:8
**barry** [8] 277:18,
24; 278:7, 8, 14,
16, 21

**base** [1] 252:9
**based** [18]
90:13; 98:3;
103:15; 112:20;
113:23; 114:4;
138:25; 146:5, 7,
8; 150:16;
183:7; 208:17;
225:13; 226:11;
227:16; 253:12;
279:25
**basic** [5] 44:7,
15, 19; 199:18;
213:23
**basically** [8]
58:12; 77:24;
149:7; 181:23;
199:10, 13;
200:16; 239:3;
278:21
**basing** [3] 150:7;
157:5, 8
**basis** [5] 132:7;
226:9, 22; 264:6;
293:1
**baun** [1] 155:15
**be** [224] 4:14;
5:18, 25; 6:2;
7:4, 16; 11:4;
12:6; 13:25;
15:5, 6; 18:10,
18; 21:18;
22:13; 26:6;
28:13, 25; 29:1;
31:10; 35:20;
37:17, 18; 38:3;
40:10, 15; 44:15;
45:7, 8, 12; 46:2,
13; 48:18;
50:21; 51:17;
52:13, 17; 53:8,
21; 55:13, 15;
56:21, 23; 58:1;
59:12; 61:8;
62:12; 64:20;
67:7, 10, 12;
71:3; 72:3, 5;
73:22; 74:2;
76:8; 77:7, 22;
78:17; 80:16;
81:1, 4, 5; 82:6,
9; 86:3; 87:1, 5,
6, 7, 11; 90:14;
93:2, 22; 97:6;
98:6, 9, 14, 22;
99:5, 24; 100:17;
101:21; 102:25;
103:3, 14; 104:8,
11, 24; 105:23;
108:16, 24;
111:17; 116:2;
126:22; 127:2;

130:10; 131:6;
133:2, 12;
135:11; 136:17,
19; 138:8, 11;
140:19; 147:13;
151:7; 153:13,
15; 156:4, 13,
16, 19, 21;
159:6; 160:17;
161:16, 21;
162:7; 166:1, 24;
169:16; 170:17;
171:5,
12, 20; 173:7,
14, 21; 175:2;
176:4, 22;
177:23; 178:13;
179:11; 181:24;
182:11, 12, 22;
184:24; 186:15;
188:22; 190:7,
13; 191:24;
192:9; 195:23;
196:5; 198:8;
200:9, 10; 201:3;
202:22; 209:6;
213:7, 15;
217:13; 219:21;
225:5; 227:2, 8,
10; 228:6;
229:11, 12, 13,
18, 22; 230:9,
17, 22; 231:11,
12, 18; 232:22,
23; 233:10, 13,
14, 19; 234:24;
235:8; 237:12;
239:14; 240:19;
251:9, 13;
253:22; 256:4, 5,
11, 23; 257:3, 7;
259:7, 17, 22;
260:7; 264:11;
266:9; 270:9, 13;
271:2; 272:12,
25; 274:3, 4, 15;
279:1, 4; 280:22;
283:18; 289:4,
16; 291:5, 8;
294:17
**bear** [2] 143:11;
169:14
**beautiful** [2]
222:5, 6
**became** [2]
18:25; 118:14
**because** [97]
7:2; 18:6; 20:18;
25:25; 26:1;
31:15; 32:7;
35:24; 37:17;
41:14; 67:20;

70:9, 10; 73:19;
87:25; 94:25;
95:11; 98:16;
100:15; 103:21;
104:16; 107:16,
18; 117:6;
121:10; 124:8;
125:4; 130:14;
137:16, 18, 21;
139:20; 140:20;
141:2; 142:7;
143:20, 21, 25;
144:14; 147:21,
22; 148:4, 5;
152:3; 158:20;
160:9; 165:4;
166:23; 171:24;
172:7; 173:6;
177:5; 179:6;
186:25; 187:11;
195:1; 196:12;
198:2; 207:1, 4,
6, 11; 209:21;
210:12, 20;
211:1, 2; 221:15;
222:14; 229:5;
232:18, 23;
238:9; 239:12;
241:23; 242:4;
245:24; 253:22;
257:1; 260:7;
263:21; 267:12;
270:8; 276:25;
283:13, 16, 17;
284:18; 285:8;
286:8, 17; 287:7,
23; 288:2;
289:7; 291:11
**become** [4] 18:4;
49:6; 51:15;
197:16
**becomes** [1]
136:16
**been** [76] 5:4,
14, 16; 7:19, 22;
12:13; 16:9;
17:21; 18:2;
19:4, 10; 20:1;
21:15, 17; 22:9,
16; 23:20; 29:3;
36:2; 38:10, 11;
39:17, 23; 42:25;
59:10, 12; 76:6;
77:6; 89:17;
98:19; 110:20;
111:5; 130:11;
144:7, 10, 12, 13,
17; 155:6, 17;
157:9, 11; 171:1,
4; 186:16;
187:10, 12;
195:17; 196:1;

197:14, 22, 23;
202:6; 219:20;
220:13; 222:17,
25; 234:25;
236:5; 241:23;
246:9, 19, 22;
248:15; 251:1;
254:5; 281:11;
286:21, 22;
287:8; 289:11;
291:9; 294:9, 14,
18; 296:9
**before** [30] 1:18;
5:16; 8:1; 14:10,
13; 18:14;
19:15, 17; 20:6;
21:8; 29:13;
30:21; 33:10, 16;
37:5; 39:18;
112:12; 116:5;
129:9; 130:22;
203:23; 224:13;
229:2; 241:10,
11; 246:22, 25;
248:16; 294:5;
296:7
**begin** [1] 86:16
**beginning** [1]
163:15
**behe** [20] 38:24;
73:12; 74:18;
76:15; 77:8;
78:13; 103:10,
18; 104:3;
112:20; 113:15;
114:14; 115:16;
134:21, 24;
142:18; 158:10;
164:17; 284:10;
287:5
**behe's** [3] 75:13;
77:2; 114:6
**behind** [4] 86:13;
148:10; 151:15;
267:14
**being** [51] 4:5;
14:8; 19:13;
21:14; 56:16;
84:1; 87:21;
91:7; 93:5;
100:12; 101:17;
102:6; 104:12;
108:22; 110:25;
116:7; 121:15;
132:4, 21, 24;
138:6; 159:24;
160:24; 166:20;
168:3, 21; 176:7;
177:8; 183:25;
186:2; 188:4;
191:8, 17;
192:17; 207:6;

212:11; 220:18;
234:5, 16;
248:10; 249:16;
251:4; 254:20,
25; 259:8, 18;
264:18; 277:5;
284:16
**beings** [6]
104:22, 24;
186:5; 205:22;
206:11; 232:9
**belief** [27]
20:24; 44:3;
52:22; 53:3, 24;
54:3, 6; 55:9, 14;
57:9, 20; 81:19;
120:15; 121:11,
20, 21, 25;
190:7; 208:21;
211:2; 233:6, 11,
15; 241:5;
243:17; 254:21;
255:5
**beliefs** [10]
81:18; 143:21;
145:12; 183:17;
210:21; 226:3, 4;
241:21, 24;
252:22
**believe** [98]
12:2, 3; 13:14;
14:20; 16:12;
19:6; 20:2, 8, 13;
22:1, 8, 10; 24:3,
12, 20; 25:18;
26:4; 28:4, 10;
34:8; 38:22;
39:4; 43:9, 12;
44:18; 46:25;
53:7; 55:23;
60:3; 63:1;
64:11; 73:22;
74:14; 79:14, 22,
25; 80:17; 83:6;
86:15; 117:10,
16; 125:4;
141:16; 143:24;
144:1; 151:4, 9;
152:10, 21;
158:25; 159:17;...
160:14; 161:10;
164:16; 167:23;
168:4; 172:18;
179:23; 187:19;
196:6; 199:20;
200:22; 202:10;
205:3, 8; 206:9,
24; 207:21;
208:8; 221:8, 22;
222:2, 16, 23;
223:3; 225:16;
226:1, 17, 19;

227:23; 228:20;
230:18; 233:12;
234:20; 235:2;
236:22; 238:8,
12; 240:2, 9;
244:8; 248:9;
260:14; 263:16;
268:19, 21;
273:13; 289:18
**believed** [1]
99:19
**believer** [1]
289:17
**believers** [1]
156:17
**believes** [6]
104:5, 7; 116:2;
144:23; 156:2;
256:1
**believing** [1]
226:22
**belonged** [1]
209:2
**belongs** [3]
211:10, 12;
287:4
**below** [1] 295:4
**bend** [1] 146:2
**benson** [1] 1:20
**besides** [3] 47:9;
116:24, 25
**best** [10] 7:1;
77:22; 146:14;
206:10; 231:18;
239:9; 241:17;
246:3; 295:3;
296:16
**beth** [1] 1:7
**better** [10] 99:1;
134:17; 136:8;
171:6; 187:25;
194:25; 230:17;
278:6, 20, 21
**between** [19]
4:4; 15:13; 44:9;
45:2; 69:21;
106:3; 133:2;
142:5; 144:15;
145:11; 146:11;
149:12; 159:11;
213:9; 241:13;
251:3; 267:1;
271:13; 278:16
**beyond** [29]
46:20; 98:14;
103:18; 109:13,
17; 110:6;
111:19, 20;
112:4, 15;
113:18; 116:16;
126:3; 135:14,
16; 139:3;

143:12; 186:10;
263:22; 264:23;
266:6; 285:22;
288:21, 25;
291:6; 292:22,
24; 293:7
**bible** [6] 221:23;
222:3, 5, 18, 21;
223:3
**bible's** [1] 155:8
**biblical** [5]
144:1; 269:14,
16; 270:6, 11
**big** [17] 99:15,
16, 22; 100:2,
23; 102:8, 13;
140:8; 157:25;
158:2, 3, 7;
169:24; 258:8;
259:23; 260:4
**bill** [2] 84:1, 6
**biochemist** [3]
78:14; 143:4, 15
**biological** [9]
66:22; 74:16;
87:11; 93:13;
105:14; 125:18;
126:7; 133:17;
284:2
**biologist** [6]
13:1; 49:19;
51:18; 77:10;
78:15; 261:24
**biologists** [1]
284:19
**biology** [18]
3:14; 10:19;
36:5; 49:18;
51:19; 66:19;
77:12; 78:4, 10,
13; 133:1;
179:16; 180:1, 6,
8; 181:24;
262:4; 264:4
**bit** [15] 37:19;
52:25; 54:19;
64:7; 65:24;
67:19; 68:24;
69:8; 71:18;
133:22; 135:23;
146:20; 205:18;
238:1; 271:19
**black** [8] 74:17;
75:13, 24;
103:12; 134:22;
142:25; 164:17;
272:22
**blackboard** [2]
162:25; 273:23
**board** [60] 1:11;
5:20, 22; 16:10,
13, 16, 22;

17:13, 21;   18:5,
13;    19:18, 19,
23;    20:9,  17;
21:5,   14,   21;
22:3;  23:14, 24;
24:7;  27:2, 7, 9,
12,  14;   28:12;
33:25;    34:18;
35:23;    38:8;
61:25;  82:9. 12;
180:5;   183:23;
195:9,  12,  23;
197:17, 19, 24;
198:2, 8, 13, 18,
20;    199:5;
251:17;    252:1,
17,   21,   23;
253:16; 258:5, 7;
269:22; 272:23
**board's**    [2]
27:14;  183:17
**boards** [1] 44:21
**body** [3]   126:5;
154:10; 195:13
**bonafide**   [1]
176:6
**bono** [1] 32:5
**book** [96]   12:9,
12, 13, 20;  13:4;
19:1;   35:8, 18;
37:11, 14, 20, 24,
25;    38:5,   9;
40:22;    41:7;
71:1;   78:25;
79:8, 10;  81:13,
14;    93:1;
103:12;   104:3;
117:2,  21,  25;
122:3,    11;
124:12,    19;
130:16,    19;
135:21;   136:4;
139:9;  141:4, 6,
10, 16;   142:9;
143:2;   148:15;
149:4, 7, 13, 16,
19;    150:7;
151:2,  7,  17;
160:19;  162:23;
164:4;    165:12,
16;    176:20;
177:4,    13;
180:15; 192:4, 6,
15, 16;  209:11,
16;    210:8, 10,
11, 19;   216:7;
222:5;  245:4, 7,
21;   262:20, 21,
22;    263:13;
264:3;   273:20;
274:9, 10,  14;
275:1;    279:21,

22
**books** [2]  141:7;
247:2
**both** [9]   15:20;
38:20, 21;  41:21;
68:23;    141:23;
144:24;    242:7;
285:11
**bottom**     [2]
79:19; 163:10
**boundaries**   [9]
100:20;  109:25;
126:3;    128:18;
132:14;   186:11;
189:14;    190:16,
23
**boundary**    [2]
113:18; 194:15
**box**  [8]    2:5;
74:17;  75:13, 24;
103:13;   134:22;
142:25; 164:17
**branch**     [2]
83:17, 21
**branches**   [5]
80:25;  82:1, 18,
21;  83:8
**break** [12]  60:5,
8;   125:11, 14;
133:1;   138:13;
195:6, 7;  224:6;
237:23;   260:24,
25
**breakdown**   [1]
253:19
**breath** [1] 135:7
**bring** [5] 169:13;
177:18;   181:9;
271:16, 17
**brings** [2] 66:23;
143:10
**broad** [7]  54:18;
64:7;    70:25;
88:4;    95:21;
175:9; 199:24
**broadly**    [1]
108:15
**brought**    [3]
149:10;  223:12;
255:21
**bryan** [1] 1:6
**buffoon**    [1]
100:5
**building**    [2]
110:21; 230:17
**bullet** [7] 225:1;
226:13;   227:11,
19, 24;  228:20;
230:14
**bulleted**    [1]
224:3
**burden**     [2]

286:19; 287:2
**by** [269]   2:19;
3:9;   4:3,  9;
5:13,  22,  25;
7:22;    10:8;
11:24;    12:3;
13:9, 15;   14:1,
11;  15:14;  16:1;
18:18, 21;  22:24;
24:16;  26:16, 22;
27:1;    29:17;
35:12, 13;  36:5,
21;    37:1,  6;
40:1;  41:16, 25;
42:16;   43:1, 8,
17;   44:4;  45:5,
20;   46:1,  6;
47:5, 18;   48:6;
52:1;  53:22, 24;
54:23;    55:4;
58:24;    59:6;
60:9,  18,  24;
63:25;  64:8, 24;
69:11;  71:2, 12;
72:18;    74:18;
75:6, 11;  76:25;
78:9,  11,  25;
79:6, 7, 9;  80:2,
16;    81:16;
87:15,  17,  22;
90:11;   92:19;
95:22, 24;  96:20;
97:7, 9;  98:4, 23;
99:14;  100:8, 12,
13;   101:4, 16;
102:4,    23;
105:11,    20;
106:2, 9; 107:15;
108:2, 7, 11, 19;
109:3;    110:3;
111:12;   113:3,
10;   114:5, 12,
24;    115:10;
116:1, 14,  20;
117:19;   118:4;
119:6, 20;  120:7;
121:7;    122:13;
124:11,    23;
125:15;   126:4;
131:14;
132:21;   133:24;
135:16;    138:1,
14;    142:16;
144:18;   146:3;
149:17;   150:5,
19;   154:14, 24;
155:7;    157:9;
158:7, 23;  159:8;
160:8;   162:2;
163:8,  13,  19;
164:9,    17;
165:15;   166:10;

167:4,   8,  17;
168:12;  170:2, 5,
12,  16;   171:22;
172:11;   173:10;
174:17;    179:4;
182:9;   183:4;
184:14,  16,  17,
18,  19;   186:18,
20,  23;   189:10,
21;    190:3;
192:9;   193:20;
195:8, 25;  202:1;
203:21;  204:4, 9,
12;   205:16, 22;
207:20;   210:7;
211:7;   215:13;
217:22;   218:18;
219:23;   223:18;
224:7, 23;  225:6;
226:23;   227:9;
228:15;  232:5, 7,
15;    237:5, 24;
243:25;    244:5,
24;    245:9;
246:18, 20,  22;
247:16;    253:6,
14;    254:4;
255:1,   3,   10;
257:24;  258:23;
260:1;   261:1. 9,
13, 19;   262:24;
263:18;    264:11,
19;  265:6, 8, 12;
270:5;    272:12,
14;    274:22;
276:14;   277:24;
278:9;    279:11,
12,
18,  20;   280:10;
281:1, 21;  282:1,
2;    283:25;
284:6,    16;
285:24;   286:7;
287:11,    17;
292:6;   296:2, 9,
12, 14

---

- C -

c [1] 139:18
c-a-r-r-o-l-l  [1]
8:3
**call** [27]   11:11,
23,  25;   12:3;
13:9;    21:4;
40:21;   49:11;
53:6;    65:13;
88:14;   132:12;
140:9;   163:21;
174:13;  195:19;
196:5;   197:13;

218:7;   224:25;
243:6;    252:13,
14;  263:3, 6, 8;
272:6
**callahan** [2]  1:8
**called** [12]  20:7;
39:24;      62:16;
80:17;       92:2;
100:4;   116:17;
139:4;   160:12;
171:8;    232:3;
267:22
**calling**      [3]
22:20;   167:24;
174:10
**calls** [3]  156:10;
252:25; 254:2
**cambridge**   [1]
263:18
**came** [13]  18:16;
39:21;   109:12;
119:1;    130:17,
18;   132:9,  19;
133:19;   186:17,
19;     214:19;
256:13
**campbell's**   [1]
38:25
**can**  [121]   6:3,
12, 22;     7:15;
9:4, 6, 12;  10:6;
15:25;     18:18;
19:4;     22:13;
23:5;   29:4, 20;
40:10, 19;  41:9;
44:11;     53:13;
54:15, 25;  55:15;
58:15;     60:25;
61:24;     64:20;
70:21;     71:18;
74:1;      75:20;
76:4, 20;    77:5,
20;  79:8;  85:3;
86:3;    87:5,  7;
88:5, 6, 24;  89:4,
6;    97:16,   25;
98:2;     103:5;
106:24;  107:13;
108:12,     15;
109:14,     22;
111:3;    112:7;
113:19, 20, 22;
114:3;    116:23,
25;     120:15;
131:19;  132:8;
134:8;   135:19;
136:22;   139:6;
147:12;  149:17;
162:22;   171:9,
10, 11;  185:23;
187:17,     19;
188:10;   189:16;

190:5,  10,  11;
192:17;  195:19;
199:12;  202:10,
12;  203:22, 23;
204:14;   207:17,
23;    208:1,  4;
212:2;    215:6;
221:21;  229:10,
23;      230:16;
233:2;   237:19;
238:14;  241:18;
252:14;  259:11;
273:20;  278:20;
280:21;   282:4,
19,  20,   24;
285:22; 287:25;
289:1, 2; 291:25;
293:9
**can't** [45]  23:17,
19;  24:20;  25:5;
27:8;   31:7,  14;
39:8, 10;  43:12;
56:17;    76:3;
77:1;     82:3;
92:15;    93:6;
94:3;   126:25;
134:19;   139:7;
144:23;   151:6;
180:8, 16;  186:9,
15;    191:2;
197:4;    199:9;
201:14;  202:25;
215:11;  247:22;
251:21;  252:17;
264:22;  269:13;
278:23;  283:11,
18,  23;   289:9;
291:4; 293:15
**cannot**     [17]
45:12;    46:25;
47:16;    77:16;
111:20;   112:3;
134:9;    142:8;
144:14;   146:1;
148:6;    173:4;
184:24;   276:9;
287:2; 288:12
**capabilities**  [1]
96:18
**capable**     [3]
74:14;    103:7;
206:10
**capacities**   [1]
156:20
**capacity**     [3]
143:15;  162:21;
170:15
**caption** [1]  3:4
**care** [1]  211:19
**careful**      [1]
288:22
**carl** [4]  90:4, 15;

153:5;  155:15
**carpenter**   [1]
38:23
**carried**     [1]
245:19
**carroll** [1]  8:1
**carrying**     [2]
100:1; 245:12
**cars** [1]  110:21
**case**  [25]   5:21;
11:5;  14:8;  16:3,
8;  24:1;  30:13;
32:16;  33:14, 20;
34:12, 25;  36:18;
41:19;     61:5;
84:8;    142:15;
162:9;   173:15;
223:9;    241:8;
251:4, 5;  252:11
**cases**     [10]
16:16, 20;   17:3,
5, 11, 14, 17, 24;
251:1; 253:21
**casting** [1] 123:5
**catch** [1]  215:9
**category**     [1]
109:15
**catholic**     [1]
158:15
**catholics**    [2]
158:19;  159:11
**caught**      [2]
214:21;  275:1
**cause** [7]  1:17;
94:16;   161:2, 3;
194:7;   257:16;
285:15
**caused** [1] 194:9
**causes** [5]  94:6,
8, 17; 189:4, 13
**cease** [1] 77:21
**ceases** [1] 76:10
**celebrity**     [1]
138:25
**center**  [8]   2:4;
33:6;       52:2;
118:18;  129:25;
247:20;   248:4;
268:23
**centers**     [1]
239:22
**central** [1] 82:13
**centuries**    [1]
287:17
**century** [2] 93:3,
8
**certain**     [1]
129:16
**certainly**   [57]
22:20;    30:2;
37:24;   46:16;
47:13;    49:6;

52:21, 23;   54:5,
20;       55:13;
57:19;    59:19;
60:1;     63:21;
64:11;     73:4;
87:6;   88:9, 22;
91:10;     94:7;
96:2;  99:21, 24;
100:15;   102:12,
20;       103:5:
104:21;   112:14;
118:25;  120:12;
127:10;  130:18;
132:1,      16;
135:10;   137:7;
143:10;  145:25;
152:12;  159:22;
180:10;   189:9;
199:11;    205:6,
10;     208:22;
216:23;   222:1;
233:7;   240:13;
243:12,     17;
246:25; 248:3
**certificate**   [1]
3:21
**certification**  [3]
295:1;  296:1, 2
**certified**     [7]
1:19;  2:20;  4:20;
294:3, 23;  296:5,
24
**certify** [2] 295:2;
296:8
**cetera** [1] 234:11
**chalcedon**   [1]
269:22
**challenge**    [1]
251:10
**challenges**   [1]
250:1
**chance**     [3]
214:2, 3, 4
**change**    [20]
83:16;    88:24;
89:4, 6;  102:17;
132:13;   145:18,
19;     187:19;
189:17;  219:11;
268:25;  286:12;
287:21,     25;
288:1,      14;
290:12;  293:14;
295:5
**changed**    [5]
98:23;   146:22;
147:1, 6; 266:19
**changes**    [3]
71:13;   176:17;
294:10
**changing**    [2]
147:20; 288:7

chapter [4] 38:1; 201:21; 245:6, 22
chapters [1] 245:7
character [1] 70:15
characteristics [2] 116:6; 157:17
characterization [1] 248:12
characterize [2] 124:18; 125:7
characterized [3] 128:2; 173:9; 248:9
characterizes [1] 74:7
characterizing [4] 137:23; 150:18; 182:6, 8
charles [1] 23:6
chat [1] 12:3
chatman [1] 268:23
check [2] 30:2; 267:23
chemistry [1] 49:25
chien [4] 131:1; 261:14, 15, 18
child [5] 86:13; 179:16; 218:22; 274:25; 275:1
children [53] 8:12, 16, 25; 9:12, 13; 10:2, 7, 9; 20:18; 121:16, 23; 122:2; 125:9; 160:25; 162:13, 17, 21; 168:17, 23; 172:10; 177:10, 21; 179:25; 184:4; 191:10, 19, 23, 24; 192:1, 15; 193:8, 24; 194:16; 208:20; 211:5; 217:14; 218:2, 4, 15; 219:20, 21, 23; 220:7, 10, 14, 18; 221:4; 230:18, 25; 231:17; 233:21; 244:2; 270:25
children's [3] 181:15, 19; 194:2
choice [1] 145:9

choose [1] 145:13
chooses [1] 145:17
chose [1] 210:19
christ [2] 156:12; 233:15
christian [12] 40:11; 52:7; 81:18, 19; 144:8; 145:16; 155:4, 23; 156:4, 22; 158:14; 264:15
christianity [9] 81:21, 23; 84:8; 144:9; 156:3; 232:14, 20; 233:1, 5
christians [11] 144:1, 12, 19, 20, 21; 158:8; 222:2; 232:18, 23; 233:15, 20
christmas [4] 255:12; 256:22, 25; 257:22
christy [1] 1:6
chronological [1] 288:3
church [17] 153:7, 11, 20; 161:9; 195:11; 197:8; 218:10, 14; 219:1, 2, 7; 242:8; 250:14; 254:6, 13; 256:3, 12
circumstance [3] 189:16; 190:6, 12
circumstances [1] 39:20
cited [1] 32:13
citing [1] 26:3
citizen [2] 161:7; 179:13
civics [2] 154:16, 23
civil [2] 1:4; 4:6
civilization [1] 67:13
claim [1] 140:24
claimed [2] 135:11; 178:13
claims [11] 40:25; 64:1; 70:20; 72:10, 17; 73:3; 87:19; 215:23; 216:18; 232:2; 288:24
clarification [4] 27:13; 45:22;

190:1; 240:11
clarified [1] 227:8
clarify [6] 27:8; 53:17; 81:23; 141:22; 229:1, 4
clark [1] 8:7
class [27] 52:16; 59:20; 65:22, 25; 68:21, 22; 121:16, 24; 154:23; 160:25; 161:13; 162:8; 165:17; 176:15; 177:4, 9; 178:2; 183:5; 192:19; 193:9; 194:1; 207:8; 231:1, 6, 9, 14, 17
classes [8] 31:21, 23; 35:5; 61:9, 21; 68:23; 163:19; 250:7
classified [2] 156:22; 236:17
classify [1] 53:1
classroom [3] 20:24; 21:18; 192:14
clause [2] 154:2, 3
clean [1] 58:21
clear [10] 18:18; 48:16; 64:20; 65:4; 124:8; 149:2; 157:13; 226:14; 260:22; 282:11
clearly [5] 7:12; 152:3; 173:1; 252:18; 260:18
closer [1] 279:5
co-author [3] 12:22; 131:7, 9
co-authored [1] 37:12
co-authors [1] 130:25
co-published [1] 152:16
co-signer [1] 196:24
coalition [1] 159:11
cognitive [3] 96:16; 98:11; 103:4
coin [1] 128:4
coins [1] 257:4
collaborate [1] 13:2
collaborated [1]

12:20
collected [1] 137:13
college [1] 155:3
combative [1] 240:18
come [25] 29:5; 35:20, 22; 65:6; 88:12; 94:22; 102:16; 106:24; 108:21; 132:5; 136:23; 138:8; 143:23; 146:8; 186:12; 217:25; 224:16; 229:7; 239:13; 250:22; 256:9; 259:6, 16; 273:8; 285:21
comes [7] 16:23; 31:8; 70:9; 98:25; 103:13; 144:18; 214:22
coming [9] 17:22; 98:7; 108:23; 109:4; 142:16; 191:20; 277:4; 286:13; 288:19
comment [2] 277:22; 278:22
comments [6] 70:14; 75:21; 252:16, 20; 253:12; 284:24
commit [1] 202:16
commitment [10] 202:14, 16, 19; 203:7; 221:20; 226:13, 24; 227:3, 12; 234:22
commitments [2] 46:22; 226:10
committee [4] 21:25; 26:23; 27:12; 89:12
common [9] 64:14; 72:20; 73:4, 6, 11; 153:6; 205:8; 220:25; 253:7
commonalities [2] 44:15, 18
commonality [2] 44:8; 45:2
communicate [2] 43:17; 272:9
communicates [5] 272:4, 10; 273:12, 14, 19
communicating

[1] 272:2
**communication**
[2] 11:10; 15:13
**communications**
[4] 13:24; 14:3,
6; 15:22
**communities** [1]
213:19
**community** [22]
89:9, 24; 98:24;
99:6; 133:21;
142:17; 144:8;
146:14; 157:10;
169:24; 184:20,
25; 185:2, 13;
186:10, 21, 24;
188:14; 200:1;
236:7; 273:10;
277:6
**comparable** [2]
110:18; 111:3
**comparative** [5]
161:13, 19;
231:6, 10, 14
**compare** [1]
134:16
**compares** [1]
134:2
**comparing** [1]
276:12
**comparison** [1]
268:4
**compatible** [3]
47:11; 85:6;
152:4
**compendium** [1]
164:10
**compensation** [1]
32:4
**competence** [1]
231:23
**complaint** [4]
33:13, 22; 34:10,
15
**complaints** [1]
16:24
**comple** [1] 75:19
**complete** [2]
29:25; 235:12
**completely** [4]
106:8; 120:16;
132:15; 291:1
**complex** [3]
76:11; 108:6, 23
**complexity** [11]
74:15, 25; 75:7,
17, 22; 77:3, 16;
78:5; 103:11;
105:15; 115:25
**compliance** [1]
87:6
**complicated** [1]

71:1
**component** [1]
286:5
**compound** [1]
144:4
**comprehensive**
[1] 224:23
**comprises** [1]
66:25
**computer** [2]
23:7; 190:22
**conceivable** [2]
99:2; 288:14
**conceivably** [3]
84:25; 190:25;
195:19
**conceive** [6]
186:15; 189:16;
190:5, 12; 191:2;
233:2
**conceived** [1]
59:12
**concentrated** [1]
149:12
**concept** [15]
26:5; 47:1, 17;
91:20; 115:14;
134:9; 135:1, 4;
153:23, 24;
157:6; 247:6;
270:15; 275:24;
278:22
**conception** [1]
93:8
**concepts** [2]
276:11, 12
**concern** [7]
20:21; 161:1, 3,
5, 8; 238:18;
239:1
**concerned** [6]
82:8; 179:20, 22;
196:4, 21;
239:15
**concerning** [4]
238:2, 19, 21, 25
**concerns** [2]
55:6; 82:7;
158:21; 239:22
**concerting** [1]
269:11
**concession** [1]
135:8
**concise** [2]
205:19; 246:3
**concluded** [1]
114:14
**concludes** [1]
293:18
**conclusion** [30]
69:24; 70:3;
101:21; 103:15,

17; 105:23;
106:12, 15, 25;
107:14; 108:23;
109:5, 10, 25;
110:16; 111:3;
113:18; 115:18;
132:6; 133:20;
140:17; 173:13,
14; 183:1;
253:1; 259:6, 16,
22; 267:16;
290:20
**conclusions** [23]
98:8, 9, 13;
103:8, 13;
105:18, 21;
107:23; 108:3;
110:19; 111:18;
112:3, 15, 17;
113:21, 22;
114:3, 23; 134:3;
225:12; 283:21;
288:25; 289:2
**condemning** [2]
268:14, 16
**conduct** [4]
9:17; 217:3;
238:3, 22
**conducted** [1]
127:13
**conference** [3]
140:21, 22;
155:13
**confidence** [1]
292:1
**confined** [2]
98:10; 190:16
**confines** [2]
97:15; 218:13
**confining** [1]
97:10
**confirm** [2]
102:6, 9
**confirmable** [1]
111:18
**confirmation** [1]
248:17
**conflict** [3]
142:13, 15;
244:25
**conflicts** [1]
76:16
**confront** [2]
72:9; 73:2
**confronting** [1]
285:16
**confusing** [1]
46:3
**confusion** [3]
194:2, 7, 9
**congress** [4]
154:5, 8, 10, 11

**connect** [2]
241:18; 260:2
**connected** [2]
239:12; 272:17
**connection** [4]
36:2; 201:15;
211:13; 217:5
**connections** [1]
152:10
**connects** [1]
259:24
**conscious** [2]
209:14; 241:13
**consensus** [6]
99:6; 146:4, 5, 8,
15; 285:22
**consequences** [2]
205:16; 269:4
**consider** [41]
17:11; 25:11, 12;
40:14; 48:24;
49:13, 17, 21, 24;
50:2, 5, 8, 11, 14,
19; 52:17;
78:12, 16; 92:16;
109:14; 113:19;
138:10; 153:15;
154:17; 157:1;
159:6; 162:17;
188:21; 191:6;
199:25; 214:6;
229:21; 232:18,
22; 251:10, 14;
263:24; 270:22;
272:19; 273:15;
291:11
**considerable** [1]
174:1
**consideration** [7]
21:13; 26:22;
86:22; 194:13;
208:18; 209:17;
276:22
**considerations**
[3] 16:20;
208:18; 210:15
**considered** [16]
26:24; 56:22;
57:25; 78:18;
94:21; 102:19;
135:13, 25;
147:10; 168:7;
189:15; 190:7,
13; 237:12;
264:5; 280:14
**considering** [1]
191:3
**considers** [3]
77:7; 156:13;
200:9
**consisted** [3]
22:1, 8, 10

consistent [8]
52:6; 127:3;
134:12; 227:3,
11, 18; 240:20,
22
consists [3]
82:18; 188:20;
195:18
constant [3]
99:20; 227:20;
228:22
constantly [3]
210:16; 227:22;
228:24
constitute [1]
261:7
constitutes [4]
177:17; 178:8, 9;
246:2
constitution [7]
18:8; 85:22;
125:8; 153:19;
211:4; 257:15;
258:9
constitutional
[18] 17:6, 9;
153:18; 179:15;
194:15, 19;
197:8; 207:9;
208:17; 209:18;
242:8; 249:23;
255:19, 22;
258:13; 260:6;
270:13; 275:9
constitutionality
[2] 84:15; 254:6
constitutionally
[1] 275:4
constraint [1]
104:6
constructed [1]
78:7
construe [3]
130:7; 131:19;
276:3
consult [2]
74:21; 198:8
consulted [1]
198:14
consults [1]
198:16
contact [3] 28:9;
201:17; 206:14
contacted [2]
24:16; 40:1
contacting [1]
27:21
contain [1] 30:11
contains [2]
212:18; 274:1
contemporaries
[1] 132:21

contend [2]
238:2, 20
content [18]
50:17; 128:13;
141:3, 8; 157:3;
163:3, 4; 191:8;
256:8; 260:17;
272:5, 6, 24;
273:1, 16;
280:21; 282:14,
21
contention [2]
132:3; 158:18
contents [3]
252:19; 272:4;
273:4
contest [1]
249:20
contested [1]
249:16
context [19]
41:13; 81:12, 14;
115:19, 20, 22;
148:23; 149:14;
164:1; 176:4;
177:8; 186:3;
188:24; 192:18;
193:9; 215:14;
231:11; 258:4;
260:8
continually [2]
134:2; 290:8
continuation [1]
168:5
continues [3]
166:24; 173:7;
183:13
continuity [1]
266:25
continuous [1]
290:10
contradictory [1]
7:6
contrary [5]
210:20; 211:1, 3;
233:10, 14
contribute [1]
196:16
contributed [2]
13:3; 198:10
contribution [3]
32:8; 71:25;
136:7
control [1]
211:15
controversial [3]
86:23; 236:11;
269:25
controversy [26]
87:12, 13, 16, 21,
23, 25; 88:2;
89:20, 22, 24;

126:18; 127:19;
141:17, 20, 21,
24; 142:1, 4, 5,
6, 10, 13;
143:18; 166:17;
169:25
conversations [2]
13:12; 221:3
conveyance [1]
273:1
conveying [4]
151:14; 191:21,
22; 192:3
conviction [2]
225:3; 230:14
convictions [1]
52:8
convince [2]
213:3; 221:11
convinced [1]
234:24
convincing [1]
234:21
cookies [1]
220:1
copies [4] 13:21;
14:21, 25;
203:22
copoies [1]
13:17
copy [15] 26:9,
12; 28:15, 17;
33:12, 24; 34:5,
9, 15; 35:18, 21,
24; 58:21;
262:18
correct [55]
6:25; 7:20, 21;
11:2; 23:10;
48:10; 51:21;
57:13; 77:20;
84:8, 16; 88:25;
89:5; 93:21;
98:17; 118:3, 23;
121:13; 122:6,
19, 25; 136:15,
147:6, 9; 148:16,
24; 150:22;
151:2; 157:7;
177:24; 183:1;
194:7; 201:12;
206:24; 209:8;
211:11; 221:6;
232:15; 233:25;
244:9, 10, 13;
259:9, 19;
273:17; 275:24;
280:9; 283:5;
284:11; 285:19;
291:19; 292:14,
18; 296:16
correction [1]

295:5
corrections [1]
295:4
correctly [4]
17:3; 24:25;
25:2; 190:2
correspondence
[2] 262:11, 16
could [56] 9:24;
12:23; 13:15;
27:25; 28:14, 25;
29:2; 30:22;
35:20; 40:21;
43:3; 47:22;
52:13; 55:18;
58:13; 81:1, 5;
82:9; 85:1, 8, 10,
16; 87:16;
98:22; 106:18;
108:6; 123:17;
136:20; 141:21;
149:8; 156:16,
21; 165:22;
170:25; 185:7;
186:12, 15;
190:7, 13; 194:1;
202:23; 205:7;
214:17; 224:25;
229:13; 231:11;
234:24; 247:5;
268:11; 274:4,
19; 278:12, 15;
292:10; 294:17
couldn't [4]
42:9; 90:7;
109:2; 214:17
council [16]
3:17, 19; 195:14,
18; 201:11, 24;
211:8, 22; 212:2,
8; 216:5;
218:23; 219:23;
223:23; 224:10;
225:3
council's [1]
212:20
counsel [3]
13:24; 254:2;
296:18
count [1] 200:19
country [5] 18:7;
83:15; 144:19;
201:20; 269:9
couple [2]
196:18; 203:24
course [25] 17:8;
21:17; 33:1;
37:17; 51:6, 10;
52:25; 59:16;
67:16, 21, 23;
68:5, 9, 15, 20;
69:12; 83:1;

92:24;    165:11;
179:8;    188:1;
266:6;    270:20;
276:15; 278:2
**courses** [5] 67:6,
9, 14; 68:12, 17
**court** [18]    1:1,
19;  2:20;  4:20;
6:1,  2;    69:5;
84:14,    17;
123:21; 249:11;
251:1;  259:14;
294:11,    23;
296:5, 24
**courtroom**    [2]
7:4, 7
**cover** [2]   31:5;
122:17
**covered**    [1]
293:10
**covers** [3]  13:5;
149:12; 216:3
**crc** [3]   139:13,
17, 19
**create** [3]  80:1;
181:14; 194:2
**created** [5]  44:4,
13;  45:4;  46:6;
47:18
**creating**    [3]
81:16;   107:18;
109:9
**creation**    [11]
45:13;  134:5, 9,
18;    144:2;
243:4;   265:23;
275:22;    276:1,
17
**creationism** [20]
21:7, 9, 11;  41:1;
43:5, 20, 22, 24;
44:1, 10;   45:2;
61:16;    62:17;
63:1;    143:17;
183:16; 251:2, 3;
252:12; 267:1
**creationism's** [9]
12:15;  37:13, 21;
79:10;    117:3;
139:9;   148:15;
209:12; 216:8
**creationist** [15]
20:10;    22:21;
26:3;  42:3, 6, 22;
43:11, 16;  51:3;
131:4;   155:15;
167:24;  172:17;
173:10; 174:6
**creationists** [9]
43:14;    62:21;
63:9;  142:7, 10;
170:5;    173:2;

266:17, 18
**creative**    [1]
205:5
**creator**    [12]
53:3;    54:4;
55:10,  17,  24;
103:23;    104:1;
135:5, 7;  220:8;
233:6, 11
**credentials**  [3]
131:2,    15;
264:12
**credibility**  [2]
7:8; 9:7
**credited** [1] 23:1
**crisis** [1] 219:12
**criteria** [3] 17:1;
230:10
**criterias**   [1]
102:25
**criterion**   [1]
17:8
**critical**    [18]
43:1;    68:25;
69:12;  164:5, 7,
11;   165:13, 14,
20, 21;   205:12;
215:22;    216:17;
226:14;    227:12;
275:11, 12, 13
**criticism**   [11]
77:23;    99:5;
127:22,    25;
130:5, 8;  131:17,
20;    265:9;
268:8, 12
**criticized**   [5]
77:14;   100:13;
131:21;    132:21,
23
**criticizing**  [1]
171:21
**crossing**    [1]
194:14
**crux** [1] 63:22
**cues** [1] 260:16
**cultural**    [3]
159:1;    267:13;
268:3
**culture**    [14]
52:3, 5, 6;  57:8;
82:25;   118:19;
159:16,  18,  24;
160:10,  12,  15;
247:20; 268:24
**culture's**   [1]
248:5
**current**    [1]
288:11
**currently**   [4]
67:5;   95:2, 4;
283:10

**curricula**   [1]
17:23
**curriculum**  [27]
3:14;    17:19;
20:10,  11;   21:3,
24,  25;    22:6;
23:12,  16;   24:3;
25:11, 13;  26:10,
13,  19,  23,  25;
27:11, 19;  28:19;
61:2, 6;   62:11;
165:3;    256:16,
21
**cynthia** [1] 1:7

──────── - D - ────────

**d** [2] 1:8; 152:23
**dangerous**   [1]
125:7
**dare** [1] 180:11
**darwin**    [38]
40:23;  64:11, 22;
65:2,  5;    70:18,
19,  21;    71:8;
72:17;    73:3;
132:8,  9,  18;
133:3, 6, 11, 13,
16,  19;   134:15,
25;   135:2, 3, 13,
22;   164:4,  5;
165:14;    176:8;
275:21,    25;
276:1, 9, 18, 25;
279:14
**darwin's**    [41]
22:18;  63:11, 22,
23;   64:2, 9, 13,
16, 21;  65:7, 10,
15;    70:16;
71:25;    72:11;
74:17;  75:12, 13,
24;    76:16;
103:12;   117:2;
134:24;  142:25;
164:16,  20,  23,
25;    165:7;
166:5,    23;
168:19; 169:20;
171:2;   172:1;
173:6;   175:17;
176:7,  10,  16;
181:25
**darwinian**   [2]
156:10
**darwinism**   [2]
65:13; 156:3
**darwinists**   [1]
144:22
**dashes**    [2]
294:8, 13

**data** [47]   98:3,
7;  103:8, 16, 18;
111:22;    112:7,
17;    125:20;
127:24;  131:23;
132:2, 8, 10, 17;
133:17;    134:12,
15;   136:13, 18,
21,   23,    24;
137:3, 4, 8, 12,
16,  17, 19, 22,
24;   139:1,  7;
174:24;    276:3,
21;    280:12;
282:20;    283:20,
22;    285:11;
288:5, 13, 16, 25;
289:1
**date** [4]   19:5;
36:16;    43:13;
295:24
**dated** [1] 30:4
**dates** [1] 41:22
**david** [1] 154:13
**dawkins**    [4]
46:13, 25;   47:9;
144:23
**dawson**    [4]
284:12, 18, 25
**day** [8]    1:22;
31:20;    91:16;
92:5;    105:24;
106:17;  197:21;
272:16
**days** [3]  132:25;
193:6, 14
**dead** [1] 90:10
**deadline** [1] 30:6
**deal** [15]    13:3;
17:17;    25:18;
51:5;    96:17;
141:7;    148:18;
149:11,    16;
151:8;   156:21;
171:4;  239:4, 6;
263:23
**dealing**    [11]
17:11,  14,  17;
22:23;    67:15;
95:24;   140:21,
22;    178:16;
184:3; 186:1
**deals** [6]  51:20;
128:14;   143:1;
165:5;   180:15;
238:6
**dealt** [3]  75:16;
92:25; 130:15
**death** [1] 218:22
**debate**    [3]
139:20;   170:19;
278:3

**deborah** [1] 1:6
**decade** [1] 265:22
**decades** [1] 44:3
**december** [2] 11:18; 13:10
**decencies** [1] 205:9
**decency** [1] 199:18
**decide** [6] 85:10, 17, 19; 108:17; 145:10; 240:24
**decided** [3] 188:14; 201:1; 287:13
**deciding** [1] 16:17
**decision** [5] 27:4, 6, 11; 145:14; 254:15
**decisions** [2] 83:3; 198:7
**declare** [2] 136:20; 283:25
**dedicated** [1] 240:7
**deductive** [6] 69:19, 22; 70:1; 113:25; 114:4; 115:13
**deeper** [2] 40:22; 279:15
**defendant's** [1] 29:10
**defendants** [2] 2:6; 5:19; 37:2
**defending** [2] 16:7; 156:3
**defied** [1] 234:9
**define** [7] 54:2, 7; 63:11; 88:3; 92:6; 122:16; 235:24
**defined** [12] 56:21; 91:13; 93:4, 5; 175:7, 8; 237:10; 277:10, 12, 13; 291:14, 16
**defines** [1] 190:15
**definitely** [2] 53:1; 55:10
**definition** [52] 43:23; 52:19, 24; 55:7, 11; 56:15, 18, 24; 57:11, 13, 14, 17; 58:6, 7, 10; 75:4, 23, 25; 76:2; 77:8, 15, 23; 80:11,

13; 88:13, 14, 21; 89:8, 10, 13; 90:6, 12, 13, 19; 92:17; 93:6; 95:17; 96:1; 98:16, 18; 178:5; 191:16; 213:8; 215:1; 218:19; 236:3; 237:5, 7; 277:5; 288:7
**definitions** [6] 56:25; 58:11; 89:6; 93:18, 23; 94:3
**definitive** [1] 254:14
**definitively** [1] 202:21
**degree** [5] 77:12; 179:16; 180:1; 202:15; 234:12
**degrees** [1] 74:15
**deity** [1] 201:3
**demarcation** [1] 90:21
**dembski** [30] 2:16; 26:1; 38:22; 42:17; 46:14; 110:9; 117:2, 20, 22; 119:5; 152:17; 155:1, 2, 6, 11, 22; 156:20; 157:19; 262:10, 14, 24; 263:1, 9; 264:1, 13; 267:9, 10, 25; 277:13, 23
**dembski's** [3] 38:19; 120:16; 265:5
**democracies** [2] 85:3, 14
**democracy** [7] 85:6, 8, 10, 16; 270:20, 21; 271:2
**democratic** [1] 85:1
**demons** [1] 232:8
**demonstrate** [2] 214:10; 215:15
**denigrate** [2] 204:24; 206:19
**denoted** [1] 294:18
**department** [14] 66:7, 9, 10, 13, 18, 21, 24, 25; 67:24; 68:1, 4, 8;

80:12
**depend** [5] 101:12; 187:4; 188:18; 229:9; 290:25
**depending** [1] 226:23
**depends** [17] 30:23; 31:8; 73:7; 78:9; 81:10; 87:15; 92:3; 93:10, 14; 105:7; 108:2; 118:4; 137:5; 145:25; 233:17; 258:18; 272:21
**depicts** [1] 203:13
**deposition** [16] 1:16; 4:4, 9, 14; 5:15, 16, 24; 19:14; 29:11, 19, 20; 41:7; 175:24; 223:20; 295:3
**depositions** [1] 9:24
**depth** [1] 118:3
**derived** [1] 69:24
**descent** [5] 64:14; 72:20; 73:5, 9, 11; 164:7
**describe** [8] 16:6; 51:23; 125:20; 127:24; 157:17; 204:5; 224:17, 20
**described** [2] 222:17, 19
**describes** [2] 45:1; 260:10
**description** [1] 204:8
**descriptions** [1] 223:4
**descriptive** [1] 42:15
**design** [189] 17:15; 25:14, 23; 26:1; 28:24; 41:1; 42:2, 5, 16, 21, 22; 43:2, 5, 16, 19; 44:9; 45:3; 48:10, 12; 51:2; 61:21; 62:1, 5, 25; 68:10; 72:8; 73:2, 10; 74:1, 11; 86:9; 103:15, 21; 105:13; 108:5,

17; 117:7, 12, 18, 23; 118:7, 11, 13, 23; 119:11, 19, 23; 120:3, 11, 14; 121:18; 122:6, 24; 123:11; 124:1, 13; 129:24; 132:15; 134:4; 137:20; 139:23; 140:1, 2, 7, 10; 141:5, 10, 18; 142:2, 6, 21, 24; 143:5, 16; 148:10; 149:23; 150:14; 151:21; 152:19, 21; 153:3; 155:13, 19; 156:24; 157:3, 14, 16, 22, 25; 158:6, 11; 159:20, 23; 160:22, 24; 161:12; 162:6, 10; 163:5, 24; 164:10, 21, 24; 168:2, 12; 172:20; 175:16; 176:3, 5, 23; 177:7; 182:20; 183:16; 184:11, 21; 185:14, 17, 25; 186:2, 7; 188:2, 5, 15, 17, 19, 20; 189:18, 22; 190:13, 15, 20; 191:5, 7, 11, 25; 193:3; 207:3, 5; 208:15; 209:23; 210:13; 216:22; 230:21; 231:5; 241:23; 242:3; 243:4, 5, 13, 21, 23; 244:11; 249:16; 250:7; 252:13; 258:2, 8; 257:20; 258:5; 262:5, 7, 9, 14, 25; 263:13, 14; 264:4; 265:1; 268:17; 287:2, 21; 268:2; 270:16; 273:6, 18; 275:21; 276:24; 277:2, 9; 284:14, 20; 285:6, 14, 18; 286:5, 16; 287:1
**designed** [21] 105:3, 23; 106:14, 15;

110:20;     116:1;
192:9;     193:10;
284:2, 11, 16, 22;
285:4,  5,  8,  11,
23,  24;   286:17,
18
**designer**    [10]
109:11,      12;
116:2;    128:16;
135:1, 4;  143:13;
184:23;    186:8;
244:13
**designing**    [1]
186:5
**desires** [1] 83:14
**despair**      [1]
205:25
**despite**      [1]
202:17
**destroy**      [1]
193:13
**detail**      [2]
245:23; 272:9
**details** [3]  22:5;
127:21; 171:10
**detect** [3]   44:1;
291:2, 6
**detected**     [1]
291:10
**determination** [7]
105:7;    108:21;
109:18,      24;
201:5; 254:9, 11
**determinations**
[1] 105:1
**determine**    [8]
98:2;     119:10;
187:5;    202:11,
12;      239:17;
249:12; 280:21
**determined**   [3]
188:20,     23;
256:11
**develop**      [2]
91:20; 137:2
**developed**    [2]
52:1; 264:19
**developing**   [1]
205:4
**development** [4]
8:10;     86:16;
94:14; 236:25
**develops**     [1]
290:22
**devine** [2] 234:5,
16
**devoutly**     [1]
243:19
**diagram**      [1]
107:1
**dictatorship** [1]
85:17

**didn't** [28]  32:3;
37:20;      40:4;
57:14;    86:25;
89:3;     92:11;
125:6;  127:2, 7;
128:4;   129:11,
13;      130:9;
135:3;   137:18;
150:6;   168:18;
197:15;   208:22,
23;      209:8;
216:9, 23; 231:4;
264:1;   275:25;
287:14
**die** [1] 218:16
**died** [1] 235:7
**diety** [12]   44:4,
13;   45:5;  46:6,
18,  19;   52:23;
53:8, 25;   54:5;
57:20; 199:21
**difference**   [3]
69:21;    213:9;
278:16
**different**    [31]
50:23;    59:25;
80:3,  15,   25;
93:4, 9, 18, 23,
24;   94:1;  98:7;
110:23;    115:7;
135:2;    156:19;
158:1,  4,   5;
195:13;   222:13,
15;   240:13, 15;
244:20, 21, 23;
267:4, 6
**differentiate** [1]
135:20
**differently**   [1]
68:24
**differs**      [1]
175:17
**difficult**    [1]
136:1
**direct** [2]    9:4;
79:11
**directed**     [1]
183:15
**direction**    [3]
86:5, 18;  296:15
**directly**     [1]
76:16
**director**     [3]
24:3;     139:18;
198:15
**directors**    [6]
1:11;  195:10, 12;
197:24;    198:2;
199:5
**disagree**    [11]
39:7;     58:5;
169:22,     23;

173:19,     22;
175:11,  18,  22,
24; 290:12
**disagreed**   [1]
39:11
**disagreeing**  [1]
78:4
**disagreement** [1]
243:25
**disagrees**    [2]
59:5, 7
**disallows**    [1]
71:17
**disappear**    [1]
184:12
**disavowed**    [4]
269:20,     24;
270:1, 4
**discarded**    [1]
147:16
**discern**      [1]
182:13
**discipline**   [3]
88:23;    95:12;
239:4
**disciplines**  [4]
50:18;    66:24;
67:1, 2
**disclaims**    [1]
178:25
**discourse**    [1]
294:7
**discover**     [1]
205:15
**discovered**   [3]
139:1;   166:25;
173:8
**discoveries**  [1]
148:5
**discovery**   [26]
9:25;     43:11;
86:24;   87:5, 22;
89:23;  124:9, 21;
141:8;   142:2, 18;
143:19;   148:25;
149:5;    150:13;
173:3;    245:9;
246:17;   247:16;
252:2, 6;  280:11;
261:10;  268:7, 9,
20
**discuss**     [18]
15:25;     18:14;
49:8;    53:5,  19,
20;   64:10,  14;
71:5;    110:5;
121:9;   122:18;
148:13,     17;
176:16;   180:7;
221:1; 268:6
**discussed**   [13]
45:13, 17;   49:9;

57:17;      71:4;
72:11;    121:4;
161:13;   246:22,
25;      247:1;
275:20
**discussing**   [5]
70:16;   120:19;
122:4;    155:1;
236:5
**discussion**   [7]
15:19;    41:15;
70:4;      91:2;
117:20;   180:23;
291:17
**discussions**  [1]
41:18
**disingenuous** [3]
183:21,     25;
184:2
**dismiss** [2] 70:8,
10
**dismissed**    [1]
234:11
**dispute**      [8]
87:18;  90:18, 22;
91:4;     169:20;
170:3, 5, 24
**distance**     [1]
198:6
**distant** [1] 293:5
**distinction**   [2]
15:17; 271:12
**district** [8]   1:1,
2,  10,  11;  5:23;
35:6;      37:2;
183:5
**divorce**      [1]
120:15
**divorced**     [1]
239:7
**dobson**       [3]
152:11, 12
**doctrine**     [2]
55:15;   56:5
**document**    [47]
18:20,  22,   25;
29:7;      60:11;
62:11, 15;  81:15;
82:20,   23,   24;
122:19;  123:1,  4,
7,  9,  23;  124:5,
7,  8,  22;  149:2;
203:9;    212:1;
215:5;    228:18;
245:5, 8;   246:2,
7,  8,  10;  247:8,
13;    248:8,  14,
20,   21,    23;
249:4, 5, 7, 8, 13;
251:18;   260:12,
17
**document's** [1]

228:6
**documentation**
**[1]** 34:11
**documented [5]**
169:6, 8, 10, 12;
172:16
**documents [9]**
23:15, 18;  25:21;
28:6;        33:20;
219:19;      228:8,
12; 260:10
**does [76]** 8:9,
25;  10:6;  30:11;
45:4;       46:17;
53:6;       55:16;
61:10, 24;  62:3;
64:9;   71:9, 19;
72:1, 9; 73:1, 16;
75:2, 6;    78:19;
81:23;     115:17;
122:16;    125:19,
23;       127:24;
128:9,         12;
129:19,        20;
137:21;    139:21;
142:20,        23;
143:3, 5;  144:8;
145:18,        19;
154:3,         10;
156:21;    157:14,
16;        171:17;
176:16;    177:14;
180:2,    3,    9;
184:23;    185:21;
191:4;     198:11;
200:12;     204:5;
208:13;    221:8;
223:4;   233:7, 8;
244:7;      246:8;
247:8;     253:23;
258:12;    262:10;
264:13;  272:1, 9;
277:2,         21;
278:20
**doesn't      [42]**
46:8;       75:9;
76:12;     104:11;
122:17;    137:22;
147:15;    171:17;
177:25;    180:6;
181:6;     186:22;
187:2, 17;  188:1,
3;  193:4; 201:4;
216:2;     222:8;
229:9;     232:25;
234:1, 3;  237:3,
4;      246:18;
252:21;    256:10;
259:8,         18;
271:20;    272:8;
274:8;     278:20;
282:16,        18;

283:12,  18,  19;
287:18
**dogmas      [1]**
225:3
**dogmatic     [1]**
181:25
**doing [54]** 35:15;
39:23;      40:12;
51:5;  59:9;  60:3;
90:14;  94:13, 21;
115:16;    124:24;
125:2;      132:11,
16;       134:7, 21,
24;    137:11, 20;
141:12;    147:17,
22;        150:18;
151:5, 12;  152:1;
155:17;    156:13;
186:5;     187:22;
188:4;     190:21;
210:14;    216:20,
25;        241:19;
242:6, 7;  243:21;
245:13,        15;
246:4;      258:6;
260:18,        19;
268:17;    274:22;
275:19;    276:16,
25;        280:24;
282:5,         12;
286:22
**domain [1]** 238:5
**dominated      [1]**
158:7
**done [34]**  12:9;
13:7,  8;   20:5;
31:3;        38:4;
50:22;      69:17;
102:6;     113:15;
119:5;     126:15;
131:14;    133:13;
140:6;     160:17;
171:5;     182:22;
185:9;     186:16;
188:25;    194:24;
200:19;    236:6;
261:14,  18,  25;
262:2, 3, 4, 7, 14;
264:11;   278:15
**door [1]** 283:4
**doubt        [2]**
248:11;  273:9
**doubts        [1]**
168:22
**dover [14]**  1:10;
5:20;   16:3,  7;
33:13;      35:5;
37:2;       41:19;
162:5, 9;  250:18;
251:16;   252:1
**down [20]**   6:3;
15:4,  8;   58:25;

62:24;    69:5,  8;
79:12,  13,  18;
89:12;     93:17;
129:5;     165:24;
175:21;    224:19;
237:25;    239:20;
267:9;  287:14
**dr [37]**      14:7;
23:6;        26:1;
38:19, 22, 24, 25;
39:2, 13;   46:14;
104:3;     117:22;
131:1, 2;  152:12,
17, 23;    155:11;
156:20;    157:19;
183:14;    228:12;
261:18,        20;
262:10, 14, 24;
263:1, 9;  264:1.
13;        265:5;
277:13,        23;
287:5
**draft [1]** 36:23
**drafts [1]** 37:1
**draw [27]** 98:12;
101:22;    103:6;
106:16;    107:12,
14;     109:10;
110:18;     111:3,
18;    112:3, 14,
17;    113:20, 22;
114:3;      115:12;
173:13;    259:1,
22;        264:3;
267:16;    273:5;
274:5;     283:21;
289:1, 3
**drawing       [5]**
110:18;    139:3;
225:12;    247:25;
267:19
**drawn        [5]**
140:17;    204:9;
248:15;    262:13;
265:1
**draws [2]** 259:5,
15
**drew [5]**  62:20;
107:1;    114:23;
123:6;   247:21
**drive [1]**  2:5
**driven [1]** 183:5
**drives        [2]**
139:12, 17
**drop [1]** 181:10
**drugs [1]** 7:11
**due [1]** 294:7
**dues [3]** 196:18;
197:18, 20
**duly    [2]**  5:4;
296:9
**during [7]** 17:10;

28:18;      31:18;
35:22;       38:7;
272:15;  278:2

---

**- E -**

---

**e-mail [6]** 11:14;
13:16, 19;  14:25;
24:21; 262:21
**e-mailed      [1]**
14:16
**e-mails        [4]**
13:18, 21;  14:22;
25:9
**each [3]** 200:20;
214:4; 225:6
**earlier      [11]**
128:21;    129:1;
130:3,  14,  25;
231:3;     246:19;
266:18;    267:1;
274:24; 275:20
**earliest       [1]**
245:25
**early [7]** 11:18;
12:19;      19:7,
186:19;    201:16;
236:17; 248:5
**earth [12]** 28:20;
44:3,   4,    13;
62:17,  20;   63:1,
9; 74:1; 131:4, 6
**easily [1]** 107:14
**easy [2]** 136:17,
19
**economic      [1]**
8:10
**edifice [1]** 172:8
**edited [1]** 165:14
**edition [4]** 38:9;
165:13, 14, 21
**editions       [1]**
165:20
**educated       [1]**
179:21
**education [15]**
23:2;        33:6;
48:17, 19;  82:7,
8;  125:9;  178:8,
12;    181:18, 22;
194:25;    211:5;
219:24; 242:7
**educational   [6]**
141:21;    177:15;
192:7; 217:4, 21,
22
**edwin [1]** 8:7
**effect [1]** 249:18
**effective      [3]**
151:4, 10, 13
**effort [5]** 120:5;

199:16;   202:16;
218:8; 248:8
**efforts**      [4]
160:13;   161:10;
204:23; 206:19
**eight** [1] 198:20
**einstein**      [4]
100:3;      138:11,
17, 19
**either**      [12]
11:14;      77:3;
85:23;      114:1;
119:8;   147:16;
183:23;   184:18;
264:2;   275:3;
282:16, 17
**electrical**      [1]
23:7
**electrons**      [1]
111:23
**elements**      [3]
194:8;   224:18,
19
**eliminate**      [3]
188:16; 232:14,
16
**else** [7]   23:25;
42:12;   55:12;
108:22; 217:13;
221:4; 234:21
**elsewhere**    [2]
128:3; 248:6
**embody**      [1]
81:18
**embrace**      [1]
59:25
**embraced**      [1]
59:24
**emphasis**      [2]
148:19; 240:23
**emphasizes**    [1]
225:11
**empirical**      [15]
95:12;  98:2, 3, 7;
103:16;  110:1, 7;
112:7, 16;  133:8,
11,   17;   194:5;
288:13, 16
**empirically**    [3]
111:13, 17
**employment**    [1]
174:5
**employs**      [1]
239:23
**enable**      [3]
150:24; 291:2, 6
**enabled**      [1]
187:12
**enables**      [3]
187:7; 282:6, 19
**enact** [2]   83:20;
85:1

**enacted**      [1]
269:15
**encompasses** [2]
54:19; 271:19
**encounter**      [3]
51:10,      11;
234:16
**encountered** [2]
25:19; 248:14
**encouraged** [1]
180:20
**encouragement**
[1] 177:17
**encourages**    [1]
177:12
**encyclopedia** [1]
80:14
**end** [1] 255:25
**ended** [1] 138:16
**endorse**      [6]
199:3,      17;
232:19;   233:25;
241:1; 243:1
**endorses**    [2]
199:14; 202:6
**endorsing**    [1]
140:19
**enfolds** [1] 57:5
**engage**      [3]
215:21;  216:16;
228:22
**engaged**      [5]
118:6;   124:10;
148:21;   160:9;
260:15
**engages**      [1]
114:18
**engaging**    [1]
103:7
**engineering**    [1]
23:7
**enjoying**      [1]
205:4
**enough**      [7]
18:10;   26:15;
55:25;   129:8;
133:23;   194:17;
274:15
**enrichment**    [1]
213:21
**entering**      [1]
28:13
**enterprise**    [1]
147:15
**entire** [4]   13:5;
122:11;   144:9;
172:8
**entities**      [3]
104:19;   232:8;
266:10
**entitled**      [1]
135:21

**entitlement**    [1]
165:12
**entity** [1] 291:11
**enunciate**    [1]
282:20
**environment**    [1]
72:6
**envision**      [1]
291:4
**epistemological**
[1] 289:10
**eric** [2]    2:10;
237:19
**erode** [1] 161:9
**eroded**      [1]
153:14
**error** [1] 287:18
**esp** [1] 234:10
**especially**    [3]
18:7; 72:4; 82:7
**espousing**    [1]
161:5
**esq** [2] 2:4, 10
**essay** [5]   128:3,
12;      130:18;
137:23, 24
**essays**      [2]
164:11; 165:6
**establish**    [1]
201:21
**established** [2]
98:20; 170:7
**establishment** [4]
118:18;   154:2, 3,
6
**et** [1] 234:11
**ethical**      [3]
232:19;   234:2;
236:20
**ethics**      [3]
205:11,    238:3,
21
**eupraxophy** [3]
214:14,      22;
215:16
**evaluate**    [1]
282:24
**evaluated**    [1]
21:23
**evaluation**    [2]
157:8, 9
**evangelical**    [4]
152:7;  158:8, 13,
20
**evangelicals** [1]
159:12
**eveland** [1] 1:7
**even** [38]   30:9;
40:4;      82:9;
91:18;   94:10;
109:2;   144:11;
148:22;   174:12,

21;      178:1;
184:25;   188:3;
193:2, 5;   194:9,
15,   17;   207:9,
10;      208:23;
209:7;   214:17;
215:1,      11;
216:10;   217:1;
220:25;   222:10;
241:11,      14;
242:16;   256:15,
20;      274:25;
275:1;   279:15;
284:12
**event** [9]   155:13;
219:6,   10,   12;
220:17;   232:22;
234:8;      235:8;
249:15
**eventually**    [1]
166:5
**ever** [43]    5:16;
7:22;   17:11, 17;
18:12,   14,   24;
19:10,   14,   17;
33:9,   24;   36:8;
40:22;   42:4, 19;
70:5;   74:17, 24;
90:1;      92:18;
96:22;   111:10;
153:18;   157:16;
163:23;   166:10,
14;      190:19;
191:2;   207:21;
214:21;   215:10;
219:15,      25;
220:3,      18;
235:24,      236:2;
241:10;   248:7;
262:13
**every** [6]    73:2;
105:24;   106:17;
180:6, 8; 275:1
**everybody**    [2]
58:4; 217:13
**everyone**    [3]
145:2;  . .. 233:2;
269:9
**everything**    [9]
40:19;      67:20;
122:17;   150:15;
170:20;   193:13;
226:6; 272:1
**evidence**    [30]
4:15;   102:16;
122:9;   123:15;
150:10;   166:24;
169:14;      173:8,
18;   202:18;
221:16,      17;
225:11,      13;
226:15;   227:13,

17;   229:13, 18;
230:6;   234:21;
240:23;   251:15,
20,   23,   25;
256:14;   258:12;
259:7, 17
**evolution**   [77]
17:12;   22:19;
27:15, 16;   40:9;
44:12;   45:4, 9;
46:5, 16;   47:1,
17;   63:12;   64:2,
9,   13,   17,   23;
65:6,   10,   11;
68:6;   70:17;
71:12;   72:12;
86:21;   87:11, 19;
88:1;   141:18;
142:6;   144:24;
145:18,   19;
155:22;   162:14;
164:23;   165:1;
166:5, 7;   167:25;
168:3, 18, 20, 25;
169:4, 20;   170:2,
10, 16;   172:1, 9;
181:5;   182:1;
193:6, 14;   195:2;
227:2,   10;
240:20,   22;
251:4,   10;
273:11;   276:14;
277:25; 278:7, 9,
11,   23;   279:6;
289:18, 22, 23;
290:10, 12
**evolutionary** [11]
40:16;   44:6;
47:11, 16;   78:15;
142:8; 174:9, 11;
175:5;   191:12;
227:16
**evolutionist** [1]
40:17
**evolutionists** [4]
46:9; 174:13, 22;
285:4
**evolve**   [1]
278:13
**evolved**   [2]
130:1; 290:3
**evolves**   [3]
146:23;   289:19,
20
**evolving**   [4]
289:21;   290:8,
16, 18
**exactly**   [17]
27:8;   34:14, 17;
45:23;   65:14;
91:22;   93:12;
147:8;   182:18;

201:14;   202:4;
211:14;   216:19;
246:17;   247:17;
248:3; 255:1
**examination**   [5]
3:9;   5:12;
112:21;   215:22;
216:17
**examined**   [2]
5:5; 180:13
**example**   [39]
32:22, 23;   33:8;
38:2;   43:6;
44:21;   55:18;
73:8;   75:22;
77:6; 82:9; 86:4,
9;  96:4;  106:18,
23;   158:22;
169:9;   171:11;
174:7;   190:21;
196:20;   213:24;
216:1;   217:12;
218:10,  11,  14,
20;   221:14;
232:17,   21;
238:15;   239:2;
257:1;   267:7;
275:15;   282:15;
293:7
**examples**   [1]
258:3
**exams** [1] 180:5
**excellent**   [1]
171:12
**except** [3]  4:11;
5:7; 158:16
**exception**   [3]
4:8;   272:2;
295:4
**excerpt**   [1]
164:16
**excerpts**   [2]
65:20; 164:6
**exchange**   [2]
15:13, 21
**exchanged**   [1]
15:1
**exclude**   [2]
226:21; 232:25
**excluding**   [2]
264:6, 8
**exclusion**   [1]
104:4
**excuse** [7]  8:20;
28:9;   124:18;
136:11;   174:18;
246:15;   264:20
**execute**   [1]
141:12
**execution**   [2]
48:11; 117:8
**executive**   [1]

83:8
**exhibit**   [10]
29:11,  **19,   20;**
186:2;   204:3;
212:9;   223:20,
22; 224:9
**exhibits** [1] 3:11
**exist** [7]  44:18;
173:18;   205:14;
208:23;   209:8;
213:13; 220:22
**existence**   [2]
45:14; 203:6
**existing**   [1]
136:23
**exists**   [2]
200:23; 213:17
**expect**   [1]
131:16
**expected**   [4]
100:16;   258:3;
274:4; 292:23
**experience**  [14]
11:8;   57:7;
107:10,   21;
108:15;   109:14,
17;   110:20;
111:20;   155:4,
16;   186:4;
227:22; 228:24
**experiment**   [1]
171:1
**experimentation**
[2]   139:2;
169:12
**experiments**  [5]
125:20;   127:25;
131:24;   136:14;
137:3
**expert** [54] 3:12;
9:14;   11:1,  4;
12:2;   14:3,  9;
15:14;   29:22;
30:12, 25;   31:5;
32:10;  36:17, 20,
25;  38:16;  39:5;
41:21, 24;  48:2,
8, 25;  49:13, 15,
18, 21, 25;  50:3,
5,  8,  11,  14,  25;
51:13;   55:20;
56:13;   78:1,  13,
16,  19;   125:16;
130:15;   148:14;
152:10;   154:18;
223:8;   241:7;
245:23;   254:17;
256:6, 10;  261:3
**expertise**   [10]
42:1;   76:20;
116:11;   178:25;
253:2;   254:3;

255:22;   263:22;
264:23; 284:5
**experts**   [7]
15:22;   23:25;
36:21;   37:1;
51:15; 78:4, 9
**explain**   [28]
76:4;   88:8;
124:20;   134:8,
15, 19;   135:23;
136:24;   137:3,
10,  12;   171:6,
14;   174:25;
204:25;   206:20;
207:12,   23;
208:1;   216:20;
218:4,   22;
243:15;   276:9,
20; 288:5, 12, 15
**explained**   [3]
231:3;   249:2;
280:1
**explaining**   [5]
121:5;   134:12;
150:13;   218:2,
15
**explains**   [5]
120:4;   134:17;
155:17; 276:7
**explanation**   [9]
133:4;   168:8;
175:9, 16;  208:3;
276:5, 6;   277:1;
288:19
**explanations** [12]
88:10;   89:15;
95:11;   104:4;
145:6;   174:8;
187:18;   218:20;
236:8;   280:12;
263:4
**explanatory**   [3]
56:23;   58:1;
237:13
**explore**   [1]
182:23
**expounded**   [1]
237:5
**expressed**   [2]
54:21; 256:1
**expresses**   [1]
269:12
**extension**   [1]
167:23
**extent**   [6]
140:16;   143:12;
177:16;   225:14;
227:17; 269:1, 7;
290:18
**extremely**   [1]
151:7
**eyes** [1] 112:12

**- F -**

f [1] 1:6
facets [1] 105:1
fact [41]   12:2;
37:25;    41:20;
77:17,    18;
121:11;   125:17;
126:6,  8,  20;
128:11;  131:22;
133:19;  146:25;
147:2, 5;  153:8;
156:9;    157:12;
158:16;  167:19;
168:4, 20;  169:1,
2, 5, 21;  170:9;
171:24;  172:1, 7;
173:9;    197:15;
202:17;    203:3;
248:13;   250:8;
253:15;   260:9;
290:2
facticity    [1]
167:25
factor    [2]
147:25; 270:2
factual    [3]
226:14;   227:13;
235:15
faculties    [27]
96:3,  8,  13,  16,
24;      98:11;
103:1, 3, 4, 5, 9;
104:23;  110:1, 7;
111:6, 21;  112:4,
16,  18;  283:20,
21;      288:21;
289:15;   290:2;
291:1, 12
faculty [1] 291:5
fair [9]   26:15;
30:14, 17;  31:9;
76:14;     78:3;
93:2;  200:20;
240:19
fairly [4]  54:18;
73:17;  208:24;
268:11
faith [25]  40:11;
46:21;   120:10;
145:17,    20;
155:6,    24;
200:12;  202:14,
19;      219:4;
221:20;   225:7,
16, 21;  226:1, 8,
11, 16, 21, 24;
227:14; 234:22
faith-based  [1]
240:5

fall [3]   55:11;
59:18; 237:4
fallacies    [2]
69:17; 70:4
fallacious   [1]
268:13
fallacy [4]  70:5,
8, 12, 13
falls [1] 137:20
false [3]  229:15;
280:22; 282:16
falsity [1] 282:24
familiar    [20]
41:14;   46:14;
49:1, 6;   55:25;
65:8;    73:20;
91:3,  5,  8,  12;
95:3;    107:11;
149:10;   186:3;
261:20,    21;
263:3, 12, 20
familiarity   [2]
129:15; 226:6
families    [4]
180:25;  217:14,
19; 221:1
family [4]  9:10,
11;    152:15;
153:5
fancy [1] 281:6
far [17]   99:2;
102:11;  223:8;
234:25;   236:8;
245:25;  247:21;
248:22;  255:15,
22;    270:10;
283:13,    15;
286:9,    10;
289:11; 290:25
farther    [1]
283:23
fascinated   [2]
91:11, 19
fashion    [5]
44:14;   80:20;
83:13;  112:10;
173:24
fashioned   [1]
80:9
fast [2]   69:8;
204:14
faster [1] 268:2
faulty [1] 28:25
favor [2]  44:12;
255:20
favors [1] 51:7
february    [2]
19:7; 31:16
federal [1] 4:6
feel [6]  116:22;
137:21;   146:9;
148:8, 9; 201:5

feels [2]  127:19;
198:15
fell [1] 76:7
fellowship   [1]
218:12
fenimore [1] 1:6
few [7]    18:1;
32:25;    47:10;
130:24;  138:15;
166:17; 197:15
flat [1] 283:25
figure [2] 53:23;
194:17
figured    [2]
248:14, 17
figures [1] 117:7
filed [3]  23:22:
33:13; 250:19
final [2]  133:1;
277:11
finally [1] 57:8
financial    [1]
268:7
find [40]  20:12;
29:9;    32:24;
41:17;  74:12, 16;
77:17, 18;  79:15;
80:12, 14; 92:15;
134:11;   144:15;
146:12,    16;
155:25;   168:1;
185:7;   187:16,
24;  190:22, 25;
194:6;   199:12;
231:8;   238:10;
240:3;   248:19,
20, 25;  250:10;
269:11, 17, 19;
273:21;  274:19;
288:4, 6, 11
finding [1] 134:3
findings    [2]
134:23; 144:13
finds [1] 73:22
fine [7]   5:11;
15:25;    29:16;
90:17;   161:20;
206:8, 11
finish [3]  47:6;
179:18; 256:20
firing [1] 278:2
first [54]   5:4;
18:8, 24;  25:19;
29:1;     38:2;
41:25;  42:3, 4, 7,
10;     57:11;
71:23;    86:16;
94:6,  8,  16,  17;
100:3;   101:24;
118:2;   128:23;
129:21;   130:8;
138:24;   139:10,

11,   14,   16;
153:25;   154:1;
155:21;   166:2;
167:10;  173:12;
176:2;   197:21;
204:20;  206:16;
208:8;   212:19;
223:24;   224:3,
15;      225:1;
235:11;  236:16;
237:5;    247:5;
248:13,    14;
251:13;  263:16;
273:9
fits [1] 140:10
five [3]   96:14,
15; 223:25
flagella    [2]
103:12; 108:22
flagellum   [16]
105:14,  19,  22;
106:13;  109:12;
110:17;  112:22;
114:7, 15;  115:3,
21;     134:23;
143:8; 284:7, 8
flagellum's  [1]
108:17
flawed [1] 77:7
fluid [1] 199:24
fly [1] 171:5
focus [9]  31:19;
122:21;  149:19;
152:15;   153:4;
158:5;    224:8;
241:20; 271:21
focused [1] 37:7
focuses    [2]
123:1; 183:6
focusing    [1]
242:2
foiled [1] 245:9
follow [6]  89:10;
158:24;   177:7;
192:17;   254:7;
290:20
followed    [2]
57:12; 167:4
following    [6]
1:18;    145:15;
206:18;  212:19;
224:18; 295:4
follows [2]  5:5;
56:16
fomented    [3]
142:7;   143:19,
21
footnotes    [1]
149:17
foregoing    [2]
295:3; 296:11
foresee [1] 186:9

**foreseeing** [1] 249:23
**forgotten** [1] 61:20
**form** [12] 4:12; 5:7; 43:19; 57:9; 79:1; 84:22, 24; 114:18; 208:13; 209:10; 270:6, 20
**formal** [13] 19:21; 28:11; 49:4; 61:4; 93:6; 94:3; 197:4; 209:2; 220:23; 242:21, 23; 245:25; 247:10
**formalities** [1] 4:8
**formalized** [3] 124:22; 211:18; 245:17
**formally** [2] 28:7; 247:11
**forms** [2] 210:12; 267:1
**forrest** [20] 1:17; 4:5; 5:2, 3, 14; 7:20; 8:8; 14:7; 29:14, 18, 19; 60:10; 168:2; 212:9; 223:21; 224:9; 295:2; 296:9
**forrest's** [1] 228:12
**forth** [1] 296:11
**forward** [2] 9:14; 250:23
**fossil** [1] 174:7
**foster** [1] 213:21
**found** [15] 20:13; 24:12; 60:10; 153:18; 184:10, 14, 16, 18, 19; 185:14; 202:21, 24; 212:1; 247:13; 270:11
**foundation** [10] 41:4; 48:1; 76:19; 111:2; 152:5, 6; 153:12; 269:23; 279:17; 286:2
**founded** [1] 213:24
**four** [7] 74:2; 163:14; 197:22; 236:15; 237:25; 270:17; 273:6
**four-page** [1]

165:25
**frame** [1] 148:23
**framework** [1] 220:23
**framing** [1] 285:16
**frank** [1] 2:5
**frederick** [1] 1:8
**free** [7] 17:23; 145:7, 9, 12; 216:1; 258:17; 259:2
**freedom** [1] 85:19
**friend** [3] 56:3; 195:25; 196:7
**friends** [1] 232:17
**from** [84] 5:22; 11:7; 12:18; 14:12, 18; 15:1, 5, 7, 15; 16:10, 11; 21:20, 22; 23:23; 24:8; 25:1; 33:2, 5, 20; 34:11; 36:12; 39:11; 40:19; 47:1, 17; 56:18; 59:16; 69:19; 70:10; 74:8; 75:9; 92:6; 94:15; 99:5; 102:5, 14, 15; 104:4, 20; 106:23; 107:20; 114:14, 23; 120:16; 127:5; 135:2; 138:9; 140:23; 142:17; 144:18; 145:6; 160:24; 164:6, 7, 16; 170:20; 175:17; 179:17; 191:20; 203:10; 205:3; 214:22; 215:4; 219:7; 223:8, 22; 226:5, 6; 232:14; 239:7; 260:9, 16; 265:1; 266:3; 267:16, 19; 273:5; 275:17; 280:1; 284:24; 286:8; 289:1; 293:6
**front** [2] 192:14; 268:3
**fruit** [1] 171:5
**fruitful** [1] 147:23
**fulfill** [1] 236:19
**fulfilling** [3]

216:6, 9, 12
**fulfillment** [1] 240:7
**full** [6] 97:1, 7; 139:11, 14; 230:1; 236:16
**full-scale** [1] 132:12
**fullest** [2] 205:5; 206:9
**fully** [5] 7:16; 57:6; 221:18; 232:19; 278:8
**function** [7] 76:9, 11, 12; 77:18, 21; 195:20, 21
**functioning** [2] 290:19, 21
**fund** [1] 152:6
**funding** [5] 151:18, 22, 23; 152:1, 2
**fundraising** [1] 248:8
**funds** [1] 248:16
**further** [4] 9:2; 25:22; 239:20; 256:15

---

- G -

**gaining** [2] 176:22; 267:13
**galaxy** [2] 104:20; 293:8
**galileo** [1] 93:11
**games** [1] 220:5
**gaps** [5] 173:17; 174:7, 8, 18, 22
**gather** [4] 40:19; 111:22; 282:20; 283:20
**gathering** [3] 132:10; 133:16; 220:14
**gave** [6] 56:24; 58:8; 90:19; 179:6; 262:21; 293:14
**gawmond** [1] 61:19
**geared** [1] 217:17
**general** [12] 56:20; 59:1; 71:14; 80:6, 18, 22; 81:11; 82:5; 129:7, 15; 212:17; 240:8
**generally** [6]

76:4; 77:17; 108:18, 20; 114:3; 225:20
**genesis** [1] 268:15
**genetic** [1] 70:5
**gentleman** [10] 23:5; 25:6; 43:8, 10; 52:2; 61:18; 62:23; 253:13; 278:25
**gentlemen** [5] 21:4; 24:2; 62:20; 73:24; 90:15
**genuine** [3] 87:23; 142:5; 206:7
**genuinely** [1] 277:1
**germs** [1] 147:11
**get** [19] 25:2; 27:25; 28:8; 32:1; 40:15; 78:25; 97:6; 129:14; 137:14; 141:21; 198:4, 14; 206:13; 214:24; 215:6; 217:24; 274:13, 14; 283:3
**getting** [3] 23:9; 283:2; 292:4
**gillon** [1] 15:11
**give** [46] 6:16; 7:13; 9:1; 12:23; 15:18; 19:5; 30:12; 31:1; 32:23; 43:12, 23; 46:12; 47:15; 55:18; 57:14; 61:1; 62:9, 12; 76:3; 77:1; 86:4; 88:6; 93:6; 106:18; 156:5; 169:9; 171:10; 176:8; 197:4; 199:9; 201:19; 208:2; 213:25; 214:2, 3, 4, 25; 218:3; 222:11; 237:18; 247:8; 254:14; 267:1, 25; 289:13; 293:11
**given** [9] 33:24; 34:4, 5, 8, 14; 146:15; 173:11; 229:8; 231:20
**gives** [4] 59:12; 245:11, 17; 285:5

giving [9]   6:19;
7:6;  50:24;  59:9;
185:4;   253:10;
256:7;   272:3;
287:24
glad [1] 284:17
go [55]  9:2, 13;
15:4, 8;   25:20;
29:24;    37:20;
62:10;   76:23;
111:19,     20;
115:23;   118:2;
120:20;   126:3;
139:15;  151:17;
162:25;  165:24;
168:9;  177:12;
179:19;  192:17;
198:4;  201:25;
204:2,     12;
206:15;  213:2;
219:1;   223:7;
229:4;  235:10;
242:18;  261:6;
264:23;  266:6;
270:10, 15, 19;
272:8;   273:20,
22;  274:6, 9, 14;
279:22;  283:14,
23;   285:22;
286:9,      10;
288:20,     24;
289:6
goal [6]  79:24;
80:1;  83:6, 10;
86:15; 231:21
goals [13] 82:24;
141:12;  148:20,
22, 23;  152:4,
20;   158:22;
252:3;  260:10,
15, 21, 22
god [21]  57:10;
94:17;   116:3;
144:24;  157:20;
200:22,    23;
202:11;   203:6;
220:8; 233:6, 11,
12, 16, 21, 23;
257:4;  258:12;
278:12, 15
god's [1] 278:23
gods [1] 232:8
goes [6] 113:18;
143:12;  224:19;
235:16;  250:12;
255:23
going [60]  5:18,
25;   6:17;   9:1;
13:24, 25;   15:4,
5, 6, 20;   47:6;
56:19;   79:14;
82:2;       86:1;

98:14;       99:5;
102:13;  103:18;
113:11;  127:22;
132:13;  134:16;
136:8;    138:7;
146:6;   157:4;
167:5;  175:15;
180:18;  189:12;
191:4;   192:1;
193:12;  194:16,
18;      195:6;
203:24;  223:21;
228:3;    229:5;
230:13;   234:7;
236:15;  237:25;
239:20;  242:21;
246:5;   251:9;
255:21;  256:4, 5,
14;   268:6, 24;
275:2;  279:15;
287:15;   289:6;
291:21
gone [2]  51:18;
104:16
good [13]  17:24;
51:5;    60:5;
65:17;  136:12;
185:19,     23;
171:17;  175:13,
14;  181:17, 21;
230:16
goodness      [1]
66:5
goofy [1] 214:14
gosh [1] 224:22
gospel       [3]
277:14, 19, 25
got [14]   33:2;
34:17;   58:21;
62:19;   90:18;
116:6;   118:12;
201:21;  203:10,
24;    208:12;
208:23; 227:25
government [18]
80:16, 25;   81:2;
82:1, 13, 16, 17,
22;  83:9, 12, 17,
22;   84:23, 25;
153:12;   154:5,
16;  270:21
governor       [1]
196:20
grade [3]   35:5;
36:5; 274:12
grader [1] 273:4
gradual [3] 71:5;
219:10, 11
gradualism    [4]
64:10;  71:4, 11;
72:22
gradually     [2]

64:12;  71:21
graduate      [7]
24:17;     59:17;
65:23;     69:9;
92:24; 164:2, 11
graduated     [1]
131:13
grandmother [1]
218:21
grandmothers [1]
218:16
great [17]  8:6;
13:3;     25:18;
96:17;   122:14;
126:17;  148:18;
149:11,      16;
151:8;   156:21;
165:19;   171:4;
210:11; 232:24;
245:23; 272:8
greek [1] 214:23
greenburger [1].
198:24
grew [1] 88:16
gross [2]  12:22;
37:12
ground         [1]
293:11
group [14]  22:7;
118:15;  129:23,
25;    130:12;
195:18;  198:25;
199:2; 200:7, 11;
201:18;  213:15;
242:17; 261:4
groups         [4]
201:17,     20;
213:5, 13
guarantee      [1]
70:2
guess [21]  21:4;
30:23;    31:8;
93:16;  100:11;
101:7;   194:5;
197:22;  202:9;
208:7;   211:23;
214:20;  224:22,
24;    246:24;
259:2;   270:7;
274:19,     23;
283:2; 293:1
guidance       [2]
172:20; 205:12
guide [1] 62:11
guides [2] 44:14;
236:20


- H -


had [72]   12:9;
13:7, 8, 12;  14:9;

15:11;   16:2, 19;
17:25;   20:5, 18;
21:7, 16;   25:17;
27:7;      30:15;
31:17;     32:24;
33:9;  34:1, 4, 6;
35:18, 21,    24;
38:7, 13;   39:16;
40:3;      42:11;
49:6;     59:16;
60:13;     61:19;
69:15;     76:6;
108:24;   129:8;
130:10; 133:1, 3,
22;     136:18;
139:1, 8; 149:17;
152:17; 155:6, 8;
185:25;   202:9;
209:1;   219:20;
224:12;  234:15;
235:6;    237:8;
242:1;  246:9, 19,
22, 24;   247:24;
248:16,  17,  18;
251:17;  268:18;
270:1
hadn't [2]  30:9;
135:15
half [3]   31:15,
16; 193:12
hamilton    [1]
2:10
hand [2]  234:11;
247:24
handle [1] 16:21
handies        [1]
17:25
handling       [1]
218:24
hands [1] 203:9
handwriting  [1]
58:17
handwritten  [1]
228:8
happen        [4]
71:18;  168:18;
242:14; 243:1
happened     [6]
26:17;   39:16;
108:7;  169:3, 6;
222:23
happening    [1]
27:24
happens       [3]
71:21;   218:16;
253:22
happy [1] 199:6
hard [1] 230:3
harmful        [1]
192:23
harmonious  [3]
253:23;   254:20;

255:1
**harry** [6]  198:24;
200:10;    201:17,
21;     204:10;
211:18
**harry's** [1]  200:8
**hasn't** [4]  185:2;
187:23;   281:25;
286:19
**haught**    [11]
39:13;   40:3, 14,
25;      41:19;
57:23;     59:9;
237:6;    278:20,
21; 279:19
**haught's**   [3]
39:14;    56:13;
278:24
**haven't**    [11]
31:6;    104:16;
119:15;   121:4;
185:9;   200:18;
202:21,      24;
263:21;   290:7;
291:9
**having** [15]  5:4;
44:24;    110:20;
121:21;    122:1;
129:1;    150:3;
158:4;    160:11;
225:16;   231:4;
253:20;   267:22;
270:22; 296:9
**he** [236]  8:9, 10;
11:11,  19,  21;
12:1, 5, 8, 25;
13:3,  5,  7,  8;
23:7,   8,    13;
27:15;  39:15, 16,
18,  21;   40:3;
41:19;    43:13;
46:15;    56:24;
58:12;    59:12;
62:23;    65:2;
71:8, 17, 19, 20;
73:14, 16, 18, 21,
22;  75:6;  77:11,
13;     78:14,  18,
19, 24;  79:1, 7;
91:13;   92:5,  7,
13;  103:16,  19,
25;    104:5,  7;
110:9, 10, 11, 12,
13;   114:18, 23;
116:2, 5, 6, 12;
117:6, 24;  118:6,
12, 14, 17, 24;
119:17;  120:4, 5;
121:5,   6,   11;
126:20;  127:1, 4,
6, 19;  129:7, 16;
130:18;    131:6,

12,  13;    132:9,
19;   133:12, 22,
23;   134:2, 5, 6,
8, 21, 25;  135:5,
10,  15, 17,  18,
24, 25;  136:1, 3,
5;  138:2;  139:1,
8;   140:18,  20;
142:20,  22,  23,
24;  143:3, 5, 10,
12,   13,   15;
145:1,  18,   19;
152:14,  17,  18;
153:2;  155:4, 12,
13, 14, 16,  17;
156:2, 4, 9,  10,
12,   13,   21;
158:11,  13,  14,
15;  165:5,
9;   171:14,  16,
17, 18;  180:2, 3,
4;   198:15,  16;
200:8,  9,   12;
203:7;   228:10;
234:15,  17,  19,
20;   237:8, 10;
246:24;   261:23,
25;   262:2, 4, 7,
11,   12,   21;
263:10,  11,  17;
264:2,  13,  15;
265:6,  12,  13;
267:22; 268:4, 5;
269:12,  14,  15,
19, 21, 23, 25;
275:22,      25;
276:4,  11,  13;
277:21; 278:1, 4,
5, 9, 18;  279:1,
4, 13, 24;  280:1;
284:18
**head** [1]  6:4
**hear**  [5]    6:8;
42:4, 5, 7;  248:7
**heard** [18]  6:18;
21:7;     24:15;
25:17; 42:10, 20;
70:5;     74:24;
90:1, 4;   99:18;
103:25;   104:13,
14;     144:24;
233:20;   284:22,
25
**hearing**    [1]
267:13
**heart** [6]  56:22;
57:25;   106:21;
237:11, 15, 18
**hearts** [1] 107:12
**heaven**     [1]
218:21
**held** [2]   61:12;

93:7
**help** [13]   24:8,
11, 15, 17;  25:1;
26:7;     27:25;
29:4;     81:23;
173:3;   188:10;
199:6; 201:22
**helpful**    [2]
24:10; 242:22
**helping** [1] 23:1
**henceforth**   [1]
189:3
**her** [40]   8:16,
24;  9:4, 6, 7, 10,
14,  21;    10:2;
14:8, 10;  48:1, 2,
4,  5;   76:20;
114:19;   116:11;
120:24;  123:15;
162:3;    163:7;
167:12;   172:3;
178:19,      20;
183:17;   223:8;
253:1;    254:3;
255:22;   256:10,
13;   257:10, 15,
16;   284:4
**here** [38]   11:1;
30:3;     37:2;
41:19;    51:14;
57:17;  58:23, 25;
59:9;     61:17;
62:18,  19,   24;
84:5, 13;  108:5;
139:15;   155:10;
167:9;   182:19;
183:20;   188:13;
194:8;    198:5;
203:15;   205:4;
206:12,      15;
211:20;   212:12;
251:6;    254:17;
275:2;    282:10;
286:25;   289:10;
292:5; 293:11
**hereby** [4]   4:5;
294:6;    295:2;
296:8
**herein** [2]  4:23;
296:19
**hereinabove**  [1]
296:11
**hierarchy**   [1]
80:18
**high** [3]  154:16;
221:16; 234:12
**higher** [1] 290:1
**highly** [2]  290:3;
292:15
**him** [17]   11:7;
24:5; 25:9;  40:6,
21;     46:14;

61:19;    78:16;
119:6;    171:13;
234:5;    263:3;
264:7, 8;  265:12;
270:1; 284:24
**himself** [6]  65:5;
100:4;    135:10;
155:12;   156:13;
200:9
**hindu** [1]  56:3
**hinduism**    [5]
55:19,  20,  21;
56:1, 8
**hindus** [1]  56:4
**his** [106]  12:23;
39:15, 18;   40:7,
9, 22;  41:7, 15;
56:15, 18;   58:9;
70:15;    71:10;
73:23;  75:21, 22,
25;  76:2;  77:23;
78:25;    90:19;
103:12;   104:3;
112:21;   114:14,
23;   115:17, 20,
24;     116:13;
118:1, 3,  8, 10,
21, 24;  119:8, 9,
15, 18;  120:2, 9,
25;   121:3, 4;
126:22;  127:3, 7,
10;      130:4;
131:4;    132:19,
21;   133:6, 20,
24;   134:2, 22;
135:3, 9, 14, 16;
136:7,  10,  11;
137:15;   138:24;
139:19;   140:17;
142:22;  143:7, 8,
15;     144:25;
145:17,      20;
152:17;  155:2, 4;
156:4;    180:5;
183:17;   200:12;
201:18;   203:7;
247:2;    252:17;
261:22,      23;
262:13,      16;
263:12;   264:7;
267:20;   269:6;
270:6,      12;
276:13;    279:4,
23; 280:1
**histological**  [1]
111:2
**historian**    [2]
138:2, 6
**historical**   [5]
94:14;    146:25;
223:4;    236:24,
25

**history** [22]
65:23, 25; 66:9,
17; 67:3, 12;
68:2, 7; 69:2, 9,
10; 93:18; 94:5,
11; 146:21;
147:2, 3, 5;
164:3; 173:11;
223:1
**hold** [3] 45:4;
55:16; 74:1
**holden** [1] 5:3
**holding** [2]
121:19, 25
**holds** [3] 76:15;
86:21; 112:20
**hole** [1] 37:8
**holidays** [4]
255:13; 256:22,
25; 257:22
**home** [2] 19:19;
35:24
**hominem** [1]
70:12
**honest** [6]
208:19; 231:16,
22; 275:12, 15,
17
**honestly** [1]
184:3
**honesty** [1]
205:9
**hope** [1] 40:15
**horse** [9] 12:15;
37:13, 21; 79:11;
117:3; 139:10;
148:15; 209:12;
216:8
**hour** [1] 31:14
**hours** [2] 31:12;
293:11
**housed** [1] 86:8
**how** [75] 8:2, 4;
9:13; 11:10;
13:2; 16:18, 19;
20:12; 31:12;
35:14; 40:10;
51:7; 60:2; 62:6,
7; 63:11; 69:18;
85:25; 88:3, 5;
91:13; 93:24;
118:12, 14;
124:9; 129:19;
132:8; 134:8;
135:18, 19;
136:17, 19;
140:8; 146:8;
147:7; 179:10,
11, 21; 192:1;
197:14; 198:17;
200:19; 205:22;
206:13; 218:4,

21; 220:1, 2, 4;
222:12; 225:12;
231:25; 239:13;
245:10, 11, 12,
15, 18; 246:3, 6;
247:8, 13, 15, 18;
255:22; 258:19;
260:4; 267:4;
276:2, 9; 277:23;
286:8, 10;
288:10
**howard** [2]
268:18; 269:5
**human** [16]
107:10, 21;
109:13, 17;
146:24; 186:4;
204:24; 205:22;
206:11, 19;
213:21; 236:19;
239:22; 289:14;
290:16, 17
**humane** [1]
205:23
**humanism** [41]
3:17, 19; 199:23;
200:18; 201:24;
205:24; 211:8,
22; 212:2, 8;
213:1; 216:5;
218:23; 219:24;
223:23, 24;
224:11, 12, 16,
20; 225:2, 10;
234:23; 235:19;
236:12, 18, 25;
237:4, 16;
239:21; 240:5,
12, 21; 241:4, 6,
12; 242:11, 13;
243:19, 22
**humanist** [20]
3:15; 197:11, 12;
199:10; 201:10,
20; 203:11;
205:11; 207:22;
209:7; 211:10;
212:21; 213:19;
214:11; 215:16,
24; 216:18;
233:24; 241:15,
24
**humanists** [17]
199:22; 201:11;
221:3; 232:1, 2,
15; 233:10;
235:12, 23;
236:2, 9; 237:15;
238:2, 20; 241:1;
243:11; 244:7
**humankind** [1]
240:8

**humans** [2] 96:6,
18
**hundred** [1]
169:14
**husband's** [2]
8:6, 7
**hypotheses** [1]
147:23
**hypothesis** [2]
280:15, 20
**hypothetical** [5]
185:4, 19; 188:9;
207:15; 255:9

― I ―

**i'm** [1] 234:7
**id** [7] 42:2;
155:3; 261:4, 8;
267:11, 14;
268:1
**id's** [1] 267:12
**idea** [47] 44:12;
52:16; 54:3;
70:10; 73:22;
86:23; 99:23;
100:11, 12, 15;
103:22; 105:12;
120:14; 121:12,
14; 132:9, 11;
134:18; 135:17;
137:12; 142:3,
21; 147:15;
161:20; 168:18;
182:20; 184:7,
22; 185:7;
186:2, 11;
188:22; 190:8;
192:17; 193:7,
25; 194:13;
228:21; 235:20;
236:11; 244:2;
246:21; 268:15;
276:8, 13, 16;
277:17
**ideal** [1] 230:3
**ideas** [17] 53:2,
4; 54:20; 65:25;
69:3; 102:17;
126:2; 133:24;
230:16, 22, 23;
243:14; 249:9;
268:18, 20;
269:5; 270:12
**identify** [2]
29:21; 66:1
**ideologies** [2]
205:25; 225:4
**idiom** [1] 277:14
**ignore** [1] 85:23
**ignored** [1] 27:6

**illegal** [3]
249:21, 22;
249:6
**illusory** [1]
284:21
**images** [1] 149:2
**imagine** [1]
37:19
**immediate** [2]
111:19; 292:24
**immediately** [2]
112:12; 178:24
**immortality** [2]
221:9, 18
**imparting** [1]
191:18
**impede** [1] 230:1
**imperfect** [2]
227:22; 228:25
**implication** [1]
265:13
**implications** [12]
17:6; 95:15;
100:23; 101:9,
14, 17; 242:6,
10; 258:25;
262:13; 264:3,
25
**implies** [4] 45:3;
46:5, 7; 176:6
**imply** [1] 228:11
**importance** [4]
56:23; 58:1;
170:1; 237:12
**important** [24]
6:1, 25; 17:5;
18:9, 10; 32:7;
48:7; 52:24;
55:6; 117:9;
120:13; 122:15;
153:11; 170:13,
17; 184:9;
196:14, 15;
209:17; 223:12;
225:15, 22;
239:24; 240:25
**impossible** [2]
169:16; 221:13
**impossibly** [1]
99:8
**improper** [5]
20:25; 98:16;
145:5; 185:19;
194:12
**in-depth** [2]
119:2, 4
**incarnate** [1]
233:23
**incidentally** [1]
255:5
**include** [2]
57:19; 149:18

included [1]
164:10
includes [1] 96:2
incomplete [1]
255:9
incomprehensibl
e [1] 57:4
incorporate [1]
142:21
incorporated [1]
133:4
increasing [2]
96:22, 25
indeed [1]
139:18
independently [1]
229:11
index [1] 3:1
indicate [6]
170:25; 203:20;
225:2; 229:3;
294:9, 13
indicated [5]
28:23; 56:12;
102:24; 221:5;
235:1
indicates [9]
104:6; 181:4;
225:3; 245:13;
249:21, 24;
250:8; 260:17;
277:16
indicating [4]
79:22; 203:15;
250:10; 274:2
individual [4]
180:24; 225:8;
240:8; 261:13
individuals [2]
122:23; 266:10
inductive [5]
69:18, 22, 23;
113:25; 114:4
inerrancy [2]
221:23; 222:3
inevitably [1]
191:19
inexhaustible [1]
57:4
inference [3]
263:12, 14;
264:4
influence [2]
80:8; 241:6
inform [1] 125:1
information [17]
37:16, 23; 103:6;
149:11, 13, 16;
191:18, 23, 24;
192:4; 230:2;
235:14; 257:14;
274:1; 277:15;

287:24; 291:3
inherently [1]
188:22
initial [1] 118:17
initiated [2]
160:12; 173:2
initiation [1]
181:9
injected [1]
210:15
injects [2]
128:15; 193:25
injunction [1]
184:22
inquiry [3]
216:1; 226:15;
227:14
insert [1] 165:2
insisted [1]
133:12
insofar [6]
52:12; 118:5;
120:13; 123:3;
128:14; 184:21
instance [2]
43:7; 265:22
institute [26]
43:11; 86:24;
87:5, 22; 89:23;
124:9, 21;
126:23; 141:9;
142:2, 16;
143:19; 149:1, 6;
150:14; 173:4;
245:10; 246:17;
247:16; 252:2;
260:11; 261:10;
265:22; 268:8, 9,
20
institution [1]
146:24
instruct [1]
63:18
instructing [2]
155:7; 257:10
instruction [4]
163:2; 183:6;
272:23; 273:23
instructions [1]
272:3
instructor [3]
66:2; 79:2, 7
integral [1]
210:12; 242:5
integrity [2]
197:7; 205:9
intellectual [1]
268:25
intelligence [5]
110:11, 14;
177:7; 204:24;
206:19

intelligent [194]
17:15; 25:14, 23,
25; 28:24; 41:1;
42:2, 5, 16, 20,
21; 43:2, 5, 16,
19; 44:9; 45:3;
48:10, 12; 51:2;
61:21; 62:1, 5,
25; 68:10; 72:8;
73:2, 10, 25;
74:10; 86:8;
103:14, 21;
105:12; 106:4,
14; 107:1;
108:8, 24;
109:11; 116:1, 2,
6, 7; 117:7, 11,
18, 23; 118:6,
11, 13, 22;
119:11, 19, 23;
120:3, 11, 13;
121:18; 122:5,
24; 123:11, 25;
124:13; 128:16;
129:24; 132:15;
134:4; 137:20;
139:22; 140:1, 2,
7, 10; 141:5, 9,
18; 142:2, 5, 21,
24; 143:5, 13,
16; 148:10;
149:23; 150:14;
151:21; 152:19,
21; 153:3;
155:13, 18;
156:24; 157:3,
14, 16, 22, 24;
158:5, 11;
159:20, 23;
160:22, 23;
161:12; 162:6,
10; 163:5, 24;
164:9, 21, 24;
168:2, 12;
172:20; 175:16;
176:3, 5, 23;
182:20; 183:16;
184:10, 21;
185:14, 16, 25;
186:2, 4, 7;
188:2, 15,
17, 19, 20;
189:18, 22;
190:13, 15, 20;
191:5, 7, 11, 25;
193:3; 207:2, 5;
208:15; 209:23;
210:13; 216:21;
230:21; 231:5;
241:22; 242:3;
243:4, 13, 20, 23;
244:11; 249:16;

250:6; 252:13;
256:2, 8; 257:20;
258:4; 262:5, 7,
9, 14, 25; 265:1;
266:16; 267:2,
21; 268:1;
270:16; 273:6,
16; 275:21;
276:24; 277:2, 9;
285:6, 14, 15, 18,
24; 286:16;
287:1
intelligently [1]
106:14
intend [4] 30:12,
20; 31:1; 80:5
intended [1]
272:11
intending [1]
87:9
intent [2] 65:3;
273:12
intention [1]
151:14
interact [1]
214:2
interaction [1]
35:23
interdisciplinary
[1] 66:16
interest [2]
20:15; 180:11
interested [6]
120:5; 176:22;
177:23; 179:14;
200:4; 239:11,
15; 296:19
interests [2]
214:1, 5
internet [8] 19:3,
6; 34:7; 36:10;
128:23; 129:18;
203:10; 246:11
interpret [3]
240:17; 258:11,
18
interpretation [1]
267:25
interpreted [2]
87:8; 167:15
intersubjective
[2] 229:14;
269:5
intervention [1]
194:11
interventions [1]
235:5
into [33] 9:20;
20:24; 22:21;
37:20; 76:23;
85:11, 17; 118:2,
3, 5, 21; 120:20;

121:21; 128:15;
130:1; 135:20;
140:10; 151:18;
167:25; 168:9,
11, 17, 22;
174:11, 13;
193:25; 194:11;
224:17; 256:10;
269:15; 272:8;
289:6; 292:5
**intrinsic** [3]
235:16; 241:2;
243:22
**intrinsically** [1]
245:14
**intro** [1] 57:10
**introduce** [3]
22:7; 29:10;
194:12
**introduced** [3]
100:3; 193:7;
219:15
**introduces** [1]
126:2
**introducing** [1]
100:4
**introduction** [1]
20:23
**introductory** [6]
67:11; 68:20, 21,
22, 23; 69:15
**invalid** [1] 77:4
**invents** [1]
289:14
**investigation** [4]
9:17; 127:13, 15;
247:12
**invited** [4] 40:3;
197:16; 198:23;
199:4
**invocation** [1]
209:15
**invoke** [2] 135:4;
145:5
**invoking** [3]
134:25; 137:11;
186:8
**involve** [2] 17:8;
226:4
**involved** [11]
49:10; 90:18;
108:8, 24;
118:13; 159:7,
24; 160:14;
208:19, 24;
209:19
**involvement** [3]
26:18; 155:3
**involves** [4]
88:9; 176:24;
194:3; 233:5
**involving** [2]

186:7; 231:9
**irreducible** [11]
74:25; 75:6, 17,
18, 22; 77:3, 15;
78:5; 103:11;
105:15; 115:25
**irreducibly** [3]
76:11; 108:6, 22
**irrelevant** [2]
9:11; 120:9
**isn't** [35] 47:7;
48:5; 73:25;
89:4, 19; 90:16;
94:24; 97:11;
101:23; 104:25;
119:3; 122:14,
25; 130:23;
132:19; 134:1,
20; 137:10;
142:14; 147:25;
148:24; 150:21;
151:2; 160:2;
181:17; 209:23;
244:3, 8; 245:1;
250:16; 253:17;
267:24; 268:13;
285:12; 288:10
**issue** [28] 9:20;
20:4, 6; 28:19;
32:8; 38:7; 49:3;
60:13; 78:2, 5;
149:10, 14;
155:3, 10;
158:24; 155:11
20; 183:13;
196:4, 15;
208:16; 230:21;
242:4; 249:20;
256:6; 257:20,
23; 258:13
**issued** [2] 27:13;
73:21
**issues** [25]
17:18; 49:10;
73:18; 178:16;
187:18; 196:21;
208:14; 223:9,
12; 238:2, 17,
18, 19, 21, 25;
239:24; 240:6;
250:16, 22;
255:16, 19;
260:12, 13;
275:9; 285:16
**it's** [1] 125:11
**items** [1] 224:3
**its** [19] 53:1;
54:2, 8; 70:10;
79:25; 82:24;
99:1; 121:15;
124:9; 135:24;
140:21; 146:5;

186:10; 187:20;
261:5; 267:11;
280:10; 282:2,
24
**itself** [30] 33:20;
34:12; 46:17;
82:11; 85:9;
87:7; 88:2;
95:10; 123:1;
124:5; 125:23;
128:9, 17; 129:6;
140:1; 162:9;
187:25; 168:7;
180:22; 183:10;
191:4; 210:8;
232:13; 248:20,
23; 249:13;
253:24; 274:13;
291:7

- J -

**j** [1] 1:6
**james** [2]
152:12, 23
**january** [2]
11:18; 31:16
**jesus** [3] 156:12;
234:2, 3
**jewish** [1] 200:8
**jim** [1] 152:11
**job** [2] 31:21;
171:17
**joel** [1] 1:7
**john** [7] 39:13,
14; 56:12;
61:19; 106:22;
107:9, 13
**john's** [3]
277:14, 19, 25
**johnny** [1]
272:22
**johnson** [5]
155:22; 164:15;
246:22; 277:12
**join** [5] 198:23;
199:1; 217:12;
218:10; 220:23
**joining** [1] 215:4
**journal** [3]
126:7; 128:25;
130:4
**jovial** [2] 278:1,
22
**judaism** [1]
200:13
**judge** [7] 7:4;
9:6; 90:19;
254:8, 10, 14, 16
**judgment** [1]
183:19

**judicial** [1] 83:8
**julie** [1] 1:7
**july** [1] 264:2
**june** [1] 1:22
**junior** [1] 8:8
**juxtaposed** [1]
176:7

- K -

**keep** [6] 157:4;
180:20; 277:3, 4,
11; 284:19
**keeping** [2] 30:5;
36:15
**keeps** [1] 284:18
**ken** [3] 36:5;
180:14; 236:13
**kennedy** [1]
152:24
**kenyon** [5] 33:1,
9, 21; 266:1
**key** [1] 267:20
**kids** [2] 181:8;
274:18
**kind** [30] 20:11;
24:14, 19; 25:10;
26:21; 27:5, 10;
28:8; 68:15;
69:13; 104:25;
110:24; 112:23;
113:2, 24; 115:1;
181:8, 20; 200:3;
211:12; 214:14;
216:25; 219:10;
224:23; 229:14;
241:6; 245:24;
260:13; 273:23;
291:5
**kinds** [7] 105:21,
23; 106:19;
113:25; 181:18;
250:22; 272:16
**kitzmiller** [3]
1:6; 33:21; 34:9
**knew** [3] 12:8;
241:12; 250:10
**knit** [1] 175:22
**know** [295] 9:6;
11:7, 16; 16:17,
19, 24; 17:7, 9;
19:21; 21:3;
24:6, 7, 8; 26:4,
5; 27:10, 24;
28:13; 31:3;
35:16; 36:15;
37:19; 38:1;
40:4; 41:13, 22;
42:12; 43:6;
44:2, 7, 17, 20,
23; 45:23;

46:17;   49:1, 2,
11;  50:22;  51:6,
8,   9;     53:2;
54:20;     55:1;
56:1,   4,   11;
59:19, 24;  61:16;
62:4, 18, 19, 21;
65:3,   6,   12;
67:20;  69:14, 16;
71:12, 13;  72:19;
73:19;   74:8, 13,
22;      75:10;
77:19;  78:18, 19;
81:7;      82:10;
85:16;     87:4;
89:11;   92:1,  4,
16;      93:12;
94:20;  95:8, 16,
24;    96:5,  17;
97:1, 14;  99:24;
100:10, 16, 18;
101:13;  104:10,
18,   20,   22;
123:10,    24;
124:3;  126:25;
127:1,   3,   18;
129:7;    130:1;
131:5,   6,   14;
132:3,  18,  23;
133:5;   134:17;
135:24;  136:19;
139:6;   142:23;
146:1;    147:11,
12,  13;  154:15,
18;       158:5;
165:8, 11, 19, 20;
168:18;
169:14,  17,  25;
172:21;   179:12;
180:14;  187:25;
190:18, 20, 23;
195:22;    196:3,
21, 23;  197:18,
20;      198:15;
199:11,  16,  18;
200:4,   8,   9;
202:3,   6,   8;
203:2, 4;  204:16,
18;  206:2, 13;
207:25;   213:14,
25;   214:4, 12,
23,  24;   215:8,
11;  217:15, 18,
25; 218:3, 5, 11;
220:2,  4,  7, 16,
17,   20,   22;
221:12, 16, 18;
222:3,  7,  25;
223:1;   225:9;
226:6;  229:1, 3,
23, 24;   230:2;
231:22;  232:17;

233:1, 3, 17, 20,
21;  234:22, 23;
235:4,  5,   17;
236:1, 3, 9, 10;
240:10,    14;
241:3,   4,  14;
242:15,   21;
243:1, 19; 246:1,
4,  6;   247:10;
248:2, 6; 249:11,
16,  22,   25;
250:15;  251:19,
22;     252:10;
253:4, 5, 12, 13;
254:8;    255:16,
18;   256:22;
257:5,   17;
258:20;  261:17,
23;    262:6;
265:6,   11;
269:15, 21, 23;
270:11;  271:16;
272:8,   23;
273:10,  11,  21,
24, 25;  276:15,
21;    277:3;
278:7;
279:10;   280:1;
282:7, 21; 286:5;
288:18;   289:5,
24;   291:7, 22,
23;     292:21;
293:2, 3, 4, 7, 9,
10
**knowing**    [2]
65:5; 274:12
**knowledge** [14]
91:25;   92:1;
96:22, 25; 102:5;
146:15;  149:14;
170:21;  227:21;
228:24;  229:22;
251:17;   253:2;
295:3
**known** [5]  7:22;
57:10;  80:5, 22;
213:6
**knows**    [2]
143:10; 145:2
**kurtz** [1] 214:20

_____
· L ·
_____

**l** [1]  4:1
**lab** [1] 171:1
**label** [2]  241:16,
18
**lack** [2]   47:25;
286:2
**lacks** [2]  76:19;
279:17

**lady** [2]   22:25;
24:16
**lagging**    [1]
267:14
**lair** [1] 139:18
**lane** [1]  5:3
**laps** [1] 181:11
**large** [7]   27:1;
79:16, 18, 19;
170:5;   195:18;
198:21
**largely** [2]  23:8;
158:8
**larger** [1] 201:16
**larry** [1]  90:1
**last**  [8]   44:2;
68:13;   135:3;
155:18;  159:10;
162:3;   224:17;
251:4
**late** [3]   11:17;
12:18
**later** [3]   15:25;
29:9;  67:11
**laudin** [3]  90:2,
16, 18
**laudin's** [1[ 91:6
**law**  [5]   2:4;
73:8;    154:6;
269:14, 17
**laws** [2]  232:6;
234:9
**lawsuit** [5]  9:11;
19:11;  183:13;
250:19; 251:11
**lawyers**    [2]
15:23;    51:14;
249:20
**layman's**    [1]
102:15
**lead** [3]   9:24;
102:17; 260:14
**leader** [1] 155:1
**leaders**    [2]
158:10; 261:6
**leadership**   [2]
139:13, 17
**leading** [1] 87:13
**learn**  [8]   51:5;
69:16,  17,  18;
94:2;    166:4;
193:13; 239:14
**learned** [1] 281:7
**learning**    [1]
175:6
**least** [5]   90:9;
194:1;   197:19;
203:20; 233:5
**leave** [1] 203:23
**leaves**    [1]
180:23
**lecture**    [6]

39:22, 24;  40:1,
2, 7, 9
**leeger** [1] 24:4
**left** [5]   88:13;
157:1;    182:12;
235:7; 294:14
**legal** [11]  16:20;
28:14;   154:17;
238:3.     22;
249:15;   250:9;
252:25;    254:2,
16; 256:6
**legality**     [1]
248:25
**legally**     [1]
256:11
**legislation** [4]
84:19, 22;  86:16;
196:22
**legislative**   [3]
83:8, 17, 21
**legitimate**   [2]
178:4, 6
**lehigh** [2]  78:23;
143:3
**lesson** [9]   22:8,
11,  14,  17,  22;
61:7,   10,   14;
62:16
**let** [19]   9:1, 17;
10:4;    27:24;
29:4, 10;   46:2;
59:8;    61:23;
71:3;    72:14;
79:21;    223:7;
238:9;    255:11;
256:20;   280:5;
287:6
**let's** [21]   9:13;
32:23;  33:1,  5,
22;  39:1;  48:5;
72:19;   99:15;
137:14;  145:16;
163:9;    184:18;
204:12;   255:4,
11;    260:24;
266:13;   275:8;
286:11;  293:4
**letter** [3]   28:3,
5, 15
**letters**    [2]
196:19, 23
**level** [1] 69:9
**levels** [1] 217:4
**library**     [2]
177:13; 192:5
**lie** [1] 112:3
**lieb** [1]  1:7
**lies** [14]   46:19;
63:23;  96:5, 12,
17,  23;   98:1;
107:10;  109:13,