# APPENDIX III

# TAB O

# CONDENSED TRANSCRIPT

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

TAMMY KITZMILLER,
et al.,

Plaintiffs

v                        CASE NO. 04-CV-2688

DOVER AREA SCHOOL
DISTRICT and DOVER
AREA SCHOOL DISTRICT
BOARD OF DIRECTORS,

Defendants.


        Oral deposition of JEFFREY
O. SHALLIT, Ph.D., taken at the law
offices of PEPPER HAMILTON LLP, 3000
Two Logan Square, 18th and Arch
Streets, Philadelphia, Pennsylvania,
on Tuesday, June 28, 2005, commencing
at 11:20 a.m., before Dianna R.
Pugliese, Registered Merit Reporter,
Certified Realtime Reporter,
Certified Shorthand Reporter (NJ),
and Notary Public, pursuant to
notice.

**James DeCrescenzo Reporting, LLC**
INNOVATING LITIGATION
1880 JFK Blvd., 6th Floor • Philadelphia, PA 19103
www.jdreporting.com

215.564.3905
PHONE

215.751.0581
FAX

ORAL DEPOSITION OF JEFFREY O. SHALLIT - 06-28-05

**Page 2**

```
 1  APPEARANCES:
 2  PEPPER HAMILTON LLP
       STEPHEN G. HARVEY, ESQUIRE
 3     harvey@pepperlaw.com
       ERIC J. ROTHSCHILD, ESQUIRE*
 4     3000 Two Logan Square
       18th & Arch Streets
 5     Philadelphia, Pennsylvania
       19103-2799
 6     215-981-4008
       Counsel for Plaintiffs
 7
 8  THOMAS MORE LAW CENTER
       RICHARD THOMPSON, ESQUIRE
 9     www.thomasmore.org
       24 Frank Lloyd Wright Drive
10     PO Box 393
       Ann Arbor, Michigan 48106
11     734-827-2001
       Counsel for Defendants
12
13  ALSO PRESENT:
14  Emily Petkun
       Summer Assistant, Pepper Hamilton LLP
15
       (*Present from 1:46 to 2:24 p.m.)
16
17
18
19
20
21
22
23
24
```

**Page 3**

```
 1            EXHIBIT INDEX
 2                              MAR
    Shallit
 3   1  Expert Report under        22
        Federal Rule of Civil
 4      Procedure 26, Jeffrey
        Shallit, Ph.D., May 16
 5      2005
 6   2  Federal Rule of Civil      36
        Procedure 26 Disclosure
 7      of Expert Testimony of
        William A. Dembski
 8      Ph.D., with handwritten
        annotations
 9
10   3  Federal Rule of Civil      73
        Procedure 26 Disclosure
11      of Expert Testimony of
        William A. Dembski, Ph.D.
12   4  Document entitled         113
        Pseudoscience for
13      Amateurs or Ten Ways to
        Tell the Real Scientists
14      from the Fake Ones by
        Jeffrey Shallit
15
          EXAMINATION INDEX
16
17  JEFFREY O. SHALLIT
        BY MR. THOMPSON . . . 4
18
19
20
21
22
23
24
```

**Page 4**

```
 1            COURT REPORTER:  Any
 2  stipulations?
 3            MR. HOWARD:  All objections
 4  are preserved, except as to the form
 5  of the question, and there are no
 6  stipulations that I'm aware of.
 7            MR. THOMPSON:  Agreed.
 8            JEFFREY OUTLAW SHALLIT,
 9  Ph.D., having duly affirmed, was
10  examined and testified as follows:
11            EXAMINATION
12  BY MR. THOMPSON:
13       Q.  Professor Shallit, my name
14  is Richard Thompson.  I'm one of the
15  attorneys representing the Dover Area
16  School District and the Dover Area
17  School District Board of Directors in
18  this lawsuit that has been filed in
19  the Federal Court in Harrisburg.  The
20  lawsuit has been filed by several
21  parents who attend the Dover Area
22  School District.
23       I will just ask you, first
24  of all, are you familiar with any of
```

**Page 5**

```
 1  the plaintiffs, the parties that have
 2  brought the lawsuit against the Dover
 3  Area School District?
 4            MR. HARVEY:  Before he
 5  answers that question, I'll just note
 6  you misspoke, Dick.  It's not the
 7  parents who attend the School
 8  District, you meant the children of
 9  the parents.
10            MR. THOMPSON:  The children
11  of the parents, correct.
12            MR. HARVEY:  It's a minor
13  clarification, but, please.
14            THE WITNESS:  Could you
15  clarify, do you mean do I know them
16  personally, on a personal basis —
17  BY MR. THOMPSON:
18       Q.  Yes.
19       A.  — or have I seen their
20  names in print or —
21       Q.  Do you know them on a
22  personal basis?
23       A.  No, I do not.
24       Q.  Do you know any of the
```

**JDR**

**James DeCrescenzo Reporting, LLC**

215.564.3905

Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

FAX  215.751.0581

3 (Pages 6 to 9)

ORAL DEPOSITION OF JEFFREY O. SHALLIT - 06-28-05

**6**

1  attorneys representing the
2  plaintiffs, the parties who have
3  brought the lawsuit?
4      A.  Again, you're asking do I
5  have personal knowledge of them?
6  Have I met them in person?
7      Q.  Yes.
8      A.  Steve Harvey I've met in
9  person.
10     Q.  Okay.
11     A.  Your colleague -- remind me
12 his name.
13         MR. HARVEY:  Eric
14 Rothschild.
15         THE WITNESS:  Eric
16 Rothschild I've met in person.  I
17 would -- I don't know that I know any
18 of the others.  I would have to
19 refresh my memory by looking at the
20 Complaint with the list of lawyers
21 just to be absolutely sure.
22 BY MR. THOMPSON:
23     Q.  Did you know these lawyers
24 prior to the lawsuit being filed?

**8**

1      A.  No.
2      Q.  Do you know Witold Walczak?
3      A.  No.
4          MR. HARVEY:  Also goes by
5  Vic.
6  BY MR. THOMPSON:
7      Q.  Vic Walczak?
8      A.  No.
9      Q.  Okay.  Do you know a Paula
10 Knudsen?
11     A.  No.
12     Q.  Do you know a Richard B.
13 Katskee?
14     A.  No.
15     Q.  Alex J. Luchenitser?  I'll
16 spell that, L-u-c-h-e-n-i-t-s-e-r.
17     A.  No.
18         MR. HARVEY:  Pronounced
19 Luchenitser.
20 BY MR. THOMPSON:
21     Q.  Luchenitser.  Okay.  And
22 there are several other attorneys
23 involved in this lawsuit, and I don't
24 have their names readily available.

**7**

1      A.  Steve Harvey and Eric
2  Rothschild?
3      Q.  Right.
4      A.  No, I did not.
5      Q.  Okay.  Do you know any of
6  the lawyers that are involved in this
7  lawsuit, to the best of your
8  knowledge?
9      A.  Could I look at the list?
10     Q.  It's a long list.  I don't
11 have a list of everyone.
12     A.  Well, I can't answer --
13     Q.  Okay.
14     A.  -- affirmatively or
15 negatively without seeing the list.
16     Q.  Do you know -- you already
17 mentioned Eric Rothschild, and you
18 also mentioned Mr. Harvey.  Do you
19 know a Joseph Farber?
20     A.  No, I do not.
21     Q.  A Benjamin Mather?
22     A.  No.
23     Q.  Okay.  Do you know a Thomas
24 Schmidt?

**9**

1          Have you ever participated
2  in a deposition before?
3      A.  No, I have not participated
4  in a deposition before.
5      Q.  Okay.  Have you ever been
6  deposed in any kind of proceedings?
7      A.  I have served as a witness
8  in a quasi-judicial hearing
9  regarding -- at the University of
10 Waterloo.
11     Q.  And could you describe that
12 hearing?
13     A.  It was a hearing to
14 determine whether another professor
15 should be fired.
16     Q.  And you were a witness in
17 that case?
18     A.  I was serving as the
19 professor's faculty colleague, and I
20 also served as a witness in that
21 case.
22     Q.  How long ago was that?
23     A.  Approximately three years
24 ago, but I would have to check to be

**James DeCrescenzo Reporting, LLC**

215.564.3905

Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

FAX  215.751.0581

ORAL DEPOSITION OF JEFFREY O. SHALLIT - 06-28-05

10

1  sure.
2      Q.  Do you recall the
3  allegations that were at issue?
4      A.  They were allegations of
5  sexual misconduct.
6      Q.  That case was handled at
7  the university level, it didn't go
8  into the criminal justice system?
9      A.  That's correct.  It was an
10 arbitration.
11     Q.  Okay.  Professor Shallit,
12 I'm going to ask you a series of
13 questions dealing with your testimony
14 as an expert witness, and also as a
15 witness in the case.
16         If at any time you don't
17 understand the question or don't hear
18 the question, please let me know and
19 I will repeat it.  And I want you to
20 understand the question before you
21 attempt to answer it.  Do you
22 understand that?
23     A.  I do.
24     Q.  Okay.  If you respond to a

11

1  question, it's important that your
2  response be verbal, not merely a
3  shrug of the shoulders, because the
4  reporter has to take down verbal
5  responses.  Do you understand that?
6      A.  I do.
7      Q.  Okay.  And if you don't
8  know the answer to a question, simply
9  state you don't know the answer
10 rather than attempt to guess or
11 speculate as to the answer.  Do you
12 understand that?
13     A.  I do.
14     Q.  If at any time you need to
15 take a break, please let us know and
16 we'll try to arrange for a break at a
17 mutually convenient time, but
18 hopefully not in the middle of a
19 question.  Do you understand that?
20     A.  Yes.  Thank you.
21     Q.  Okay.  So that you
22 understand, all of the questions that
23 I ask and all of the answers that you
24 give are being transcribed by the

12

1  reporter who is in the room with us.
2  Do you understand that?
3      A.  Yes.
4      Q.  Okay.  And you've already
5  taken an affirmation that you will
6  tell the truth, the whole truth, and
7  nothing but the truth.  You
8  understand that?
9      A.  Absolutely, yes.
10     Q.  And you understand that at
11 some point in this case, your
12 testimony here may be introduced at
13 trial?  Do you understand that?
14     A.  Yes.
15     Q.  And you understand that
16 it's important that you do the best
17 you can to tell the whole truth and
18 nothing but the truth?  Do you
19 understand that?
20     A.  Yes.
21     Q.  And that if at some point
22 your testimony at trial is different
23 than your testimony here today in
24 this deposition, the deposition may

13

1  be used at the trial.  Do you
2  understand that?
3      A.  Yes.
4      Q.  Okay.  So that you
5  understand that if you respond to a
6  question that I ask that I will
7  assume that you heard the question,
8  understood the question, and are
9  responding to the question.  Do you
10 understand that?
11     A.  Yes.
12     Q.  Do you know anyone in the
13 Dover School District?
14     A.  To the best of my
15 knowledge, no.
16     Q.  Okay.  Have you discussed
17 this case with any of the current
18 school board members?
19     A.  No.
20     Q.  Have you discussed this
21 case with any of the parents who have
22 sued the Dover School District?
23     A.  No.
24     Q.  Have you discussed this

James DeCrescenzo Reporting, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                              FAX  215.751.0581

ORAL DEPOSITION OF JEFFREY O. SHALLIT - 06-28-05

14

1   case with any of the individuals who
2   are currently running for the school
3   district board?
4       MR. HARVEY: Objection. No
5   foundation that he knows of any such
6   election.
7   BY MR. THOMPSON:
8       Q. If you know.
9       A. I don't know who is
10  currently running.
11      Q. Okay. Now, would you give
12  me your full name for the record?
13      A. Jeffrey Outlaw Shallit.
14      Q. Okay. How do you spell
15  Outlaw?
16      A. It's spelled exactly the
17  same as the English word outlaw.
18      Q. And your date of birth?
19      A. October 17th, 1957.
20      Q. And where were you born?
21      A. Here in Philadelphia.
22      Q. Have you ever been
23  convicted or arrested for a felony?
24      A. No.

15

1       Q. Are there any physical
2   problems that you have today that
3   would prevent you from understanding
4   and recalling your expert report, or
5   recalling the facts surrounding how
6   that expert report was developed?
7       A. No.
8       Q. Are you married?
9       A. Yes.
10      Q. And what is your wife's
11  name?
12      A. My wife's name is Anna
13  Lubiw — L-u-b-i-w.
14      Q. And how long have you been
15  married?
16      A. We've been married since
17  1989.
18      Q. Do you have any children as
19  a result of that marriage?
20      A. I do.
21      Q. And are they going to
22  school?
23      A. They are.
24      Q. Okay. What grades are they

16

1   in?
2       A. They are — they have just
3   finished fifth and third grade.
4       Q. Okay. I noted on your
5   report that you indicated you are a
6   United States citizen, but a
7   permanent resident of Canada?
8       A. That is correct.
9       Q. Could you define what that
10  being a permanent resident means?
11      MR. HARVEY: To the best of
12  his understanding?
13      MR. THOMPSON: Yes.
14      MR. HARVEY: As opposed to
15  the legal definition of permanent
16  resident?
17  BY MR. THOMPSON:
18      Q. Yes.
19      A. Yes, I want to emphasize
20  that I have no qualifications in
21  Canadian law and cannot describe
22  anything other than my personal
23  understanding.
24      Q. Okay.

17

1       A. To the best of my
2   knowledge, a permanent resident of
3   Canada means someone who has passed
4   certain tests dealing with becoming
5   an immigrant in which their
6   background has been checked, and that
7   they have many of the rights, but not
8   all, of Canadian citizens.
9       Q. Is it your intent at some
10  point to become a Canadian citizen,
11  as we sit here today?
12      A. That's a question which
13  does not have a yes or no answer, I'm
14  afraid. I would happily become a
15  Canadian citizen if I could retain my
16  U.S. citizenship, and if it did not
17  require swearing allegiance to the
18  Queen, her heirs and successors.
19      MR. HARVEY: Off the
20  record.
21      (Discussion off the
22  record.)
23  BY MR. THOMPSON:
24      Q. Could you describe your

ORAL DEPOSITION OF JEFFREY O. SHALLIT - 06-28-05

**18**

1 present employment for us, please?
2     A. University of Waterloo, the
3 School of Computer Science.
4     Q. And what is your job there?
5     A. I'm a professor.
6     Q. And how long have you held
7 that title at the University of
8 Waterloo?
9     A. Well, I was hired as an
10 associate professor in 1990, and I
11 was promoted to professor, I will
12 have to look at my vitae to know if
13 hopefully it says. In July 2000 I
14 was promoted to full professor.
15     Q. What's the difference
16 between the title associate professor
17 and full professor?
18     A. Well, there – in North
19 America typically there are three
20 ranks of professors: assistant,
21 associate, and full. A professor is
22 hired as an assistant professor,
23 newly starting out, typically.
24     After a period of typically

**19**

1 six to seven years they can be
2 promoted to associate and, again,
3 typically with tenure.
4     And then after another
5 period of time in which they have
6 passed certain qualifications such as
7 having graduate students, producing a
8 lot of research that is well thought
9 of, then they can be promoted to full
10 professor. Not everyone is promoted
11 to full professor.
12     Q. And you indicate you are a
13 full professor in the School of
14 Computer Science. What kind of
15 courses do you teach?
16     A. I've taught a wide variety
17 of courses starting with the basic
18 courses such as courses in
19 programming, and then proceeding to
20 second-year courses such as data
21 structures.
22     I've taught third-year
23 courses such as theory of
24 computation, and fourth-year courses

**20**

1 such as formal languages, algorithms,
2 complexity-related courses. I've
3 taught graduate courses. So these
4 would be for master's and doctoral
5 students. So I've taught at all
6 levels.
7     MR. THOMPSON: I'm going to
8 introduce a copy of your expert
9 report that you've prepared under
10 Federal Rule of Civil Procedure 26.
11     I might ask, Steve, do you
12 have a clean copy with you? I've got
13 one that has just a few marks on it,
14 but –
15     MR. HARVEY: I could get a
16 clean copy.
17     MR. THOMPSON: Could you do
18 that, please?
19     MR. HARVEY: Sure. Off the
20 record.
21     (Discussion off the
22 record.)
23     MR. HARVEY: Dick, I don't
24 have a problem with you using this.

**21**

1 Let me just note the marks.
2     MR. THOMPSON: The marks
3 can be considered redacted as far as
4 the introduction of the evidence,
5 introduction at time of trial.
6     MR. HARVEY: There's some
7 highlighting on page one, the word
8 "mathematical." On page 13, the
9 items noted 20, 21 and 22 and 23 have
10 highlighting on them.
11     On page 20, under Articles
12 Submitted, item number 1 is
13 highlighted and the words "submitted
14 where?" are written.
15     On page 23, item number 10
16 is highlighted. On page 25, under
17 Book Reviews, item number one, the
18 words "Paul Gross" is highlighted,
19 and number five is highlighted
20 completely.
21     Other than that, there are
22 no marks on it, and I have no
23 objection to using this copy.
24     MR. THOMPSON: Please mark

**James DeCrescenzo Reporting, LLC**
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905      FAX 215.751.0581

7 (Pages 22 to 25)

ORAL DEPOSITION OF JEFFREY O. SHALLIT - 06-28-05

22

1 it Shallit Exhibit 1.
2        (Exhibit Shallit-1 was
3 marked for identification.)
4 BY MR. THOMPSON:
5    Q.  Professor Shallit --
6    A.  Yes.
7    Q.  -- I've had Shallit Exhibit
8 1 marked, which purports to be the
9 expert report that you provided in
10 this case. Would you please take a
11 look at it and see if that is
12 accurate?
13        MR. HARVEY:  Accurate with
14 the exceptions that I noted.
15        THE WITNESS:  (Witness
16 reviews document.) Yes, it is
17 accurate.
18 BY MR. THOMPSON:
19    Q.  Thank you. When were you
20 first contacted regarding the
21 potential of being an expert witness
22 in this case?
23    A.  I don't recall the exact
24 date. I believe it was within the

24

1    A.  In the areas of my
2 competence.
3    Q.  And what is that?
4    A.  Mathematics, generally.
5 More precisely, complexity theory,
6 Kolmogorov complexity, the work of
7 Dembski, since I've written papers on
8 that work, and pseudoscience and
9 pseudomathematics.
10        MR. HARVEY:  Mr. Shallit,
11 for the benefit of the court
12 reporter, perhaps you could spell
13 Kolmogorov.
14        THE WITNESS:  Yes,
15 Kolmogorov -- K-o-l-m-o-g-o-r-o-v.
16 BY MR. THOMPSON:
17    Q.  When you were contacted by
18 e-mail, how long did it take you to
19 respond in an affirmative way?
20    A.  I responded very quickly.
21    Q.  Did you at that time
22 discuss the remuneration as being an
23 expert?
24    A.  I don't recall that we

23

1 last two or three months.
2    Q.  The report that you filed,
3 I believe it was dated in May, May
4 16, 2005. Do you know if that helps
5 you try to pinpoint the date?
6    A.  I don't remember the exact
7 date. It was a contact by e-mail, I
8 believe, and I don't have that in
9 front of me, so -- but it was -- to a
10 first approximation, within the past
11 two or three months.
12    Q.  Okay. Do you know who
13 contacted you?
14    A.  I believe it was Steve
15 Harvey.
16    Q.  And do you recall what the
17 conversation was?
18    A.  He asked if I would be
19 willing to serve as an expert witness
20 in this case.
21    Q.  And did he indicate into
22 what areas?
23    A.  The areas of my competence.
24    Q.  Pardon me?

25

1 discussed it at that time.
2    Q.  Okay. Did you ever make a
3 decision that you were not going to
4 be paid to be an expert?
5    A.  Yes.
6    Q.  And what was the reason for
7 not asking for expert witness fees?
8    A.  I believe --
9        MR. HARVEY:  I'm going to
10 object to the form of the question.
11 You can answer. Go ahead.
12        THE WITNESS:  I believe the
13 case is an important one, and that I
14 have something to offer.
15 BY MR. THOMPSON:
16    Q.  And how much of your time
17 did it take to prepare the expert
18 witness report, which is Exhibit 1?
19    A.  Probably about 30 hours, I
20 would say.
21    Q.  Now, when you agreed to
22 become an expert did you ask for
23 information regarding the lawsuit?
24    A.  Could you -- could you

**James DeCrescenzo Reporting**, LLC

215.564.3905

Innovating Litigation
1880 JFK Blvd., 5ᵗʰ Floor, Philadelphia, PA 19103
www.JDReporting.com

FAX  215.751.0681

ORAL DEPOSITION OF JEFFREY O. SHALLIT - 06-28-05

**26**

1 maybe rephrase it to make it more
2 precise?
3    Q.  I'll try.  At the time the
4 discussion of whether you were going
5 to be an expert or not occurred, and
6 then you agreed that you were going
7 to be an expert, did you ask for
8 information regarding the lawsuit
9 that was at issue here?
10    A.  I asked for perhaps general
11 information, what I would be expected
12 to do, who would be testifying.
13    Q.  Were you aware that
14 Professor William Dembski would
15 become an expert in this case —
16    A.  Yes.
17    Q.  — at that time?
18    A.  Yes.
19    Q.  Was that one of the reasons
20 why you wanted to testify as an
21 expert?
22    A.  I — I do — I have
23 spent — yes.
24    Q.  What documents did you ask

**27**

1 for or receive prior to preparing
2 your expert report?
3    A.  I received — let me
4 think.  I have to think about exactly
5 what I received.  I believe I
6 received this document, which is
7 Disclosure of Expert Testimony by
8 William Dembski.
9    Q.  Okay.
10    A.  Then as the testimony — as
11 I prepared my testimony, other
12 documents were sent to me, including
13 this document, Rebuttal to Reports By
14 Opposing Expert Witnesses.
15    Q.  By Professor Dembski?
16    A.  By Professor Dembski,
17 correct.
18    Q.  Okay.
19    A.  And after I completed my
20 report —
21    Q.  Well, right now I'm just
22 interested in —
23    A.  Okay.
24    Q.  — your report, what you

**28**

1 had when you prepared your report.
2    A.  Sorry.  Okay.
3    Q.  Anything else?
4    A.  I believe that's all.
5    Q.  Did you have a copy of the
6 Complaint that was filed in the
7 lawsuit?
8    A.  No, I did not.
9    Q.  Okay.  Did you have a copy
10 of the policy of the School Board
11 that was at issue in the lawsuit?
12    A.  I believe I had read about
13 it in news reports.
14    Q.  What you had read about in
15 the news reports was all that you
16 knew about the policy of the School
17 Board at the time you prepared your
18 expert report?
19    A.  That's correct.
20    Q.  Were there any other
21 documents that you had at the time
22 you prepared your expert report?
23    A.  Could you be more precise?
24 Any documents —

**29**

1    Q.  Any documents at all?
2 Anything in writing?
3    A.  I have a house filled with
4 thousands of books, so could you be a
5 little more precise about what you
6 want?
7    Q.  Any documents that related
8 particularly to the lawsuit at issue
9 here.
10       MR. HARVEY:  I'm going to
11 object myself.  You want to know,
12 Dick, just to be clear, you want to
13 know documents that were provided to
14 him, or documents that he already had
15 in his possession?
16       And when you say in the
17 lawsuit, related to the lawsuit, do
18 you mean related to intelligent
19 design, or related specifically to
20 the lawsuit such as a pleading or
21 something or a deposition?
22 BY MR. THOMPSON:
23    Q.  Any document, anything in
24 writing that dealt with —

**James DeCrescenzo Reporting**, LLC

215.564.3905

Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

FAX  215.751.0581

9 (Pages 30 to 33)

ORAL DEPOSITION OF JEFFREY O. SHALLIT - 06-28-05

30

1  particularly dealt with the lawsuit.
2     A.  No.
3     Q.  Okay.  Did you receive any
4  information from attorneys regarding
5  the factual basis of the lawsuit?
6        MR. HARVEY:  Objection.
7  You mean in conversation or in
8  writing?
9  BY MR. THOMPSON:
10    Q.  Either way.
11    A.  We had a meeting here where
12  we discussed aspects of Dembski's
13  claims.
14    Q.  Okay.  Who was at the
15  meeting?
16    A.  Myself, Steve Harvey,
17  Wesley Elsberry, Eric Rothschild from
18  time to time.
19    Q.  Who's Wesley Elsberry?
20    A.  He is my coauthor on a
21  paper, two papers that I've written
22  about Dembski's work, one entitled
23  Information Theory, Evolutionary
24  Computation, and Dembski's Complex

32

1  or did you break for lunch?
2     A.  We broke for lunch.
3     Q.  How long did you take for
4  lunch?
5     A.  Approximately half an hour
6  to 45 minutes.
7        MR. HARVEY:  For the
8  record, if it involves me, we always
9  break for lunch.
10  BY MR. THOMPSON:
11    Q.  I would like you to be as
12  detailed as possible as to the
13  conversation that took place during
14  that meeting.
15    A.  Could you tell me what you
16  would like me to be clear --
17    Q.  I'd like what were the
18  specific topics addressed, what were
19  the --
20    A.  I believe I already said
21  that.  We discussed Dembski's
22  testimony, we discussed --
23    Q.  Okay.  Well, stop right
24  there.  What part of Dembski's

31

1  Specified Information.  And the
2  other, a chapter in this book, Why
3  Intelligent Design Fails.
4     Q.  Now, who had invited
5  Mr. Elsberry to the meeting?
6     A.  I have no personal
7  knowledge who invited him.  I could
8  speculate.
9     Q.  So what was discussed at
10  the meeting?
11        MR. HARVEY:  You can answer
12  the question.
13        THE WITNESS:  We discussed
14  Dembski's report.  We discussed what
15  should go in an expert report, since
16  I'd never written one before.
17  BY MR. THOMPSON:
18    Q.  How long did the meeting
19  last?
20    A.  It started at 10:00 a.m., I
21  can tell you that with certainty, and
22  it ended probably approximately
23  4:00 p.m.
24    Q.  Did it go straight through

33

1  testimony?
2     A.  His Federal Rule of Civil
3  Procedure Disclosure of Expert
4  Testimony document.
5     Q.  Okay.  Did you go through
6  the document page by page?
7     A.  Yes, we did.
8     Q.  Okay.  And was your
9  coauthor -- what was his name again?
10    A.  Wesley Elsberry.
11    Q.  Was he involved in that
12  discussion as well?
13    A.  Yes, he was.
14    Q.  What did he add to the
15  discussion?
16    A.  He's a biologist and I'm
17  not.
18        MR. HARVEY:  I'm going to
19  object to the form of the question.
20  BY MR. THOMPSON:
21    Q.  What did he say about
22  Dembski's report?
23    A.  He took issue with various
24  aspects of the report.

James DeCrescenzo Reporting, LLC

215.564.3905

Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

FAX  215.751.0581

10 (Pages 34 to 37)

ORAL DEPOSITION OF JEFFREY O. SHALLIT - 06-28-05

34

1    Q. What aspects?
2    A. I will have to look at the
3  report to tell you.
4    Q. Be my guest.
5      MR. HARVEY: Just to be
6  clear, you're asking him to tell to
7  you everything that he can recall
8  that Wesley Elsberry said at that
9  meeting about Mr. Dembski's reports?
10 BY MR. THOMPSON:
11   Q. With regard to the reports.
12   A. We're going to be here a
13 long time then, I guess.
14   Q. Well, you start and I will
15 try to maybe make it more concise.
16     MR. HARVEY: I'm going to
17 have to instruct you, Mr. Shallit,
18 because you've been asked to --
19 obviously you can answer this
20 question and you need to provide
21 truthful testimony, take the time you
22 need to read the report and provide
23 this testimony, and to go through it
24 carefully.

35

1      THE WITNESS: I will have
2  to think about it. It was -- the
3  meeting was a while ago, and it was a
4  six-hour meeting, so --
5  BY MR. THOMPSON:
6    Q. Did you make any notes?
7    A. I did make some notes.
8    Q. Do you have those notes?
9    A. The notes are just
10 annotations to this document.
11   Q. Do you have those notes?
12   A. Yes, they are right here.
13 They're not very informative.
14   Q. Can I see them?
15   A. (Document provided.)
16   Q. Were these notes made in
17 your handwriting?
18   A. Yes.
19   Q. And these notes were made
20 during the meeting that we've been
21 discussing?
22   A. No, some of them were made
23 prior to the meeting, and some of
24 them were made after the meeting.

36

1      MR. THOMPSON: I'd like
2  this marked.
3      MR. HARVEY: I'm going to
4  have to get you a copy of that.
5  That's his copy of that, and I'd be
6  happy to get you a copy of that.
7      MR. THOMPSON: Sure. Let's
8  mark it right now as an exhibit, and
9  then we can switch.
10     MR. HARVEY: Sure, unless
11 you have any particular allegiance to
12 that copy.
13     THE WITNESS: I don't.
14     MR. HARVEY: Okay.
15     (Exhibit Shallit-2 was
16 marked for identification.)
17 BY MR. THOMPSON:
18   Q. Aside from your writings on
19 Shallit Exhibit 2, did you make any
20 other notes of that meeting?
21   A. I don't believe so.
22   Q. Did Mr. Elsberry make any
23 notes, that you're aware of, in that
24 meeting?

37

1    A. I don't know.
2    Q. Do you know if Mr. Elsberry
3  was intending to be a witness in this
4  case at the time of the meeting?
5    A. I can't speak about his
6  intent. I'm sorry.
7    Q. Did you discuss the
8  preparation of your report, your
9  expert report, with Mr. Elsberry?
10   A. We discussed aspects of
11 Dembski's testimony that would go in
12 my report, yes.
13   Q. What aspects were they?
14   A. Well, again, I'll have to
15 look at it.
16   Q. Okay. Go ahead.
17   A. I remember one thing that
18 we talked about, which was on page
19 three, "Design theorists take these
20 methods and apply them to naturally
21 occurring systems. When they do,"
22 ellipses, this means that -- I'm
23 inserting now -- this means that,
24 "they are the result of intelligence

**JDR**
**James DeCrescenzo Reporting**, LLC
215.564.3905
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com
FAX  215.751.0581

ORAL DEPOSITION OF JEFFREY O. SHALLIT - 06-28-05

**38**

1 and highly unlikely to have come
2 about by purely material forces."
3       And Wesley Elsberry pointed
4 out that Del Ratzsch said that as
5 opposed to intelligence, God must
6 have had a hand -- must have had to
7 do it.
8       I remember -- again, I'm
9 supposed to be talking about
10 everything we discussed during that
11 meeting?
12      Q.  Well, I asked you a more
13 specific question --
14      A.  Okay.
15      Q.  -- to try to focus your
16 attention on it.
17      A.  Okay.  Do you want me to
18 continue to try to --
19      Q.  Yes.
20      MR. HARVEY:  And the
21 question is what do you remember
22 Mr. Elsberry saying at that meeting.
23 Is that -- do I understand?
24      MR. THOMPSON:  Right.  But

**39**

1 right now I've focused in on the
2 notations.
3       THE WITNESS:  We
4 discussed --
5       MR. HARVEY:  I'm very
6 unclear as to what the question is
7 here.
8       MR. THOMPSON:  Why don't
9 you go back and please read the
10 question that started this.
11      (The court reporter read
12 back the following:
13      "Q.  Did you discuss the
14 preparation of your report, your
15 expert report, with Mr. Elsberry?"
16      "A.  We discussed aspects
17 of Dembski's testimony that would go
18 in my report, yes."
19      "Q.  What aspects were
20 they?")
21      MR. THOMPSON:  So we're
22 talking about now the aspects that
23 would go in your report.
24      MR. HARVEY:  The aspects

**40**

1 that would be addressed, you mean, in
2 his report?
3       BY MR. THOMPSON:
4       Q.  Right, that he discussed
5 with Elsberry.
6       A.  I think it would be more
7 accurate to say potentially go in the
8 report, sir.
9       Q.  Okay.
10      A.  We discussed various papers
11 in Dembski's vitae that we did not
12 have copies of, and that we would get
13 copies of.  We discussed Dembski's
14 winning the Trotter Prize.
15      Q.  Let me stop you right there
16 for a moment.  What kind of
17 discussion did you have about Dembski
18 winning the Trotter Prize?
19      A.  We were curious about how
20 it happened, and who was on the
21 committee.
22      Q.  This was a surprise to you,
23 was it not?
24      MR. HARVEY:  Objection.

**41**

1 What was a surprise to him?
2 BY MR. THOMPSON:
3       Q.  That he had won the Trotter
4 Prize?
5       A.  Yes.
6       Q.  Because that is a prize
7 that's given to renowned scientists,
8 is it not?
9       A.  I don't have a detailed
10 history of who the Trotter Prize has
11 been given to in front of me.  I
12 couldn't tell you.
13      Q.  Do you know some of the
14 people who have received the Trotter
15 Prize?
16      A.  I can't -- I could not reel
17 them off now, no.
18      Q.  But that became something
19 that you discussed?
20      A.  Uh-huh, yes.
21      Q.  And what did Mr. Elsberry
22 say about that?
23      A.  We were curious as to the
24 makeup of the committee who had

42

1  decided it.
2      Q.  Why would you be curious
3  about the committee?
4      A.  We -- whenever a prize is
5  awarded, you're interested in who
6  makes the decision of the prize.  And
7  this wasn't information that was
8  available to us.
9      Q.  Were you of the opinion
10  that he didn't deserve the prize?
11      A.  I am of that opinion.
12      Q.  Did Mr. Elsberry express
13  that opinion as well?
14      A.  I believe he did.
15      Q.  Did you express that
16  opinion to anyone else?
17      A.  Yes.
18      Q.  Who?
19      A.  I sent e-mail to people at
20  the university where the Trotter
21  Prize was awarded, and asked them if
22  they knew that this prize had been
23  awarded to Dembski.
24      Q.  Did you get a response

43

1  back?
2      A.  I did from some people,
3  yes.
4      Q.  What did they say?
5      A.  Some were embarrassed by
6  it.
7      Q.  Who?
8      A.  I can't -- I can't produce
9  names from my head right now.
10      Q.  Okay.  Do you recall how
11  many people expressed embarrassment?
12      A.  About three to four people
13  replied to me.
14      Q.  And how many e-mails did
15  you send out?
16      A.  I sent e-mail to -- I'm
17  trying to think exactly who I sent it
18  to.  I think to everyone in the
19  Computer Science Department.
20      Q.  How many people would that
21  have been?
22      A.  I'm not sure.  Probably
23  about 20.
24      Q.  So out of the 20 e-mails

44

1  you sent, you had three or four
2  people respond to you; is that right?
3      A.  That's correct.
4      Q.  Have you ever done that
5  before?
6      A.  Done what?
7      Q.  Regarding a prize, that you
8  sent, you know, e-mails out
9  questioning why an individual
10  received a prize?
11      A.  I didn't question why he
12  had received the prize.  I didn't say
13  that I had.  I said I sent e-mail
14  asking them if they knew that Dembski
15  had won the prize.
16      Q.  What was the purpose of
17  that?
18          MR. HARVEY:  Object to the
19  form of the question.  Relevance.
20  What does this have to do with his
21  expert testimony?
22          MR. THOMPSON:  We'll tie it
23  all up.
24  BY MR. THOMPSON:

45

1      Q.  What was the purpose of
2  that?
3          MR. HARVEY:  Perhaps you
4  could help me by articulating the
5  theory of relevance for this line of
6  inquiry?
7          MR. THOMPSON:  Not right
8  now.
9          MR. HARVEY:  It's not
10  addressed in his expert report.
11          MR. THOMPSON:  It's all
12  over his expert report.
13          MR. HARVEY:  There's
14  nothing, I don't believe, that says a
15  word in there about the Trotter
16  Prize.  Counsel, I mean --
17  BY MR. THOMPSON:
18      Q.  Answer the question.
19          MR. HARVEY:  -- seriously,
20  there has to be some line of some
21  relevance to this line of inquiry.
22          MR. THOMPSON:  We'll tie it
23  up later.
24  BY MR. THOMPSON:

James DeCrescenzo Reporting, LLC
215.564.3905
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com
FAX  215.751.0581

ORAL DEPOSITION OF JEFFREY O. SHALLIT - 06-28-05

46

1  Q. Please answer the question.
2  A. Could you remind me what it
3  is?
4        MR. HARVEY: Mr. Shallit,
5  you don't need to answer that.
6  Counsel, seriously, I don't -- you
7  know, broad-ranging inquiries into
8  Mr. Shallit's activities outside of
9  this lawsuit and his expert report
10  have no relevance here, and I don't
11  know of any relevance.
12        And I'm going to
13  reluctantly instruct the witness not
14  to answer the question unless you can
15  articulate some relevance to this
16  line -- this inquiry.
17        MR. THOMPSON: The whole
18  report is an attack on Bill Dembski.
19  His whole report is an attack on Bill
20  Dembski. That's his whole rebuttal.
21  And that's the relevance.
22        MR. HARVEY: I'm sorry, I
23  don't understand that. I mean, he's
24  submitted an expert report in this

47

1  case that at least initially was to
2  rebut Mr. Dembski's work.
3        He's here to answer
4  questions about that in any respect.
5  And communications that he may have
6  had with people on the subject of
7  this Trotter Prize, I don't believe
8  the Trotter Prize is addressed
9  anywhere in his report. And what he
10  may have done on that at some
11  undetermined time, I just don't see
12  of any relevance here.
13        I'll tell you what, I'll
14  permit you a little latitude here to
15  go forward with this line of inquiry,
16  but I'm not going to let it go very
17  long at all because I don't see the
18  relevance. Please continue.
19        MR. THOMPSON: Would you
20  read the question back.
21        (The court reporter read
22  back the following:
23        "A. I didn't question
24  why he had received the prize. I

48

1  didn't say that I had. I said I sent
2  e-mail asking them if they knew that
3  Dembski had won the prize."
4        "Q. What was the purpose
5  of that?")
6        THE WITNESS: And I'd like
7  to add something to that. Now that I
8  think about it, I also remember that
9  I asked them did they know that
10  Dembski was giving a talk in their
11  department with a particular title.
12  BY MR. THOMPSON:
13  Q. Okay. Then what was the
14  purpose of sending that e-mail with
15  that message?
16  A. I wanted to make sure that
17  people knew at this university what
18  was going on. It was -- it -- the
19  announcement implied that the Trotter
20  Prize was being co-sponsored by their
21  department, and I wasn't sure that
22  everyone in the department knew about
23  it, and I wanted to inform them. I
24  did not, in my message, attack

49

1  Mr. Dembski in any way.
2  Q. And then is this something
3  that you've done in other instances?
4        MR. HARVEY: I'm going to
5  object to the form of the question
6  and instruct the witness not to
7  answer. That has no relation
8  whatsoever to this, to these
9  proceedings, and I'm going to
10  instruct him not to answer that,
11  unless you can articulate some ground
12  of relevance here.
13        MR. THOMPSON: I think it's
14  the other way around. If you're
15  going to instruct him not to answer
16  the question, you have to establish a
17  principle of privilege here.
18        MR. HARVEY: I disagree, I
19  disagree. There's no relevance
20  whatsoever to just general inquiries
21  about Mr. Shallit's activities as
22  they may relate to Mr. Dembski.
23  You're certainly entitled to ask him
24  any questions about his report or his

**James DeCrescenzo Reporting**, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX 215.751.0681

14 (Pages 50 to 53)

ORAL DEPOSITION OF JEFFREY O. SHALLIT - 06-28-05

50

1 testimony in this matter.
2 BY MR. THOMPSON:
3     Q.  Were there any other, going
4 on with the questions, were there any
5 other aspects that you and Elsberry
6 discussed?
7     A.  We discussed the phrasing
8 of the press release which said Two
9 of the nation's top scientists will
10 visit the Texas A & M University
11 campus.  And we disputed the
12 characterization of Dembski as a top
13 scientist.
14     Q.  You're aware that Professor
15 Dembski didn't — that press release
16 did not come from Professor Dembski?
17 You're aware of that, are you not?
18     A.  I am.
19     Q.  What else did you discuss
20 in that report on the aspects?
21     A.  I'm continuing to page
22 through it and look.
23     Q.  Okay.
24     A.  We discussed whether or not

51

1 the characterization by Professor
2 Dembski that his book The Design
3 Inference was peer reviewed was
4 accurate.
5     Q.  And what was your position
6 on that?
7     A.  It's a complex position.
8 It's that peer review is not a
9 yes-or-no thing, it's a continuum.
10 And that papers typically receive the
11 highest level of peer review;
12 whereas, books often do not receive
13 the same scrutiny.  And so my view is
14 that claiming that the book is peer
15 reviewed in the same sense that a
16 paper is is not correct.
17     Q.  But you would agree that it
18 is peer reviewed?
19     A.  I have no personal
20 knowledge that Dembski's book was
21 peer reviewed by anyone.  I only can
22 speak about my own book.
23     Q.  Which book are you
24 referring to?

52

1         MR. HARVEY:  Which book of
2 Dembski's or his?
3 BY MR. THOMPSON:
4     Q.  Of Dembski's.
5     A.  Dembski's book, The Design
6 Inference.
7     Q.  Who published that?
8     A.  Cambridge University Press.
9     Q.  Would you say Cambridge
10 University Press is a prestigious
11 publishing house?
12     A.  I would.
13     Q.  Okay.  And you don't know
14 whether they had anyone peer review
15 that?
16     A.  I can't speak to personal
17 knowledge of their internal review
18 process with regard to anything
19 except my own book.
20     Q.  Is there any reason for you
21 to doubt that it was peer reviewed in
22 some sense?
23     A.  I have no personal
24 knowledge of the Cambridge University

53

1 Press's guidelines for reviewing
2 books other than in my own book.
3     Q.  Aside from the two reports
4 that you indicated you looked at in
5 preparing your report, and that was
6 of the Dembski report, the Dembski
7 report and the Dembski rebuttal
8 report, did you look at the reports
9 of any other experts?  This is —
10     A.  In preparing my report?
11     Q.  In preparing, yes.
12     A.  I don't know the
13 chronology.  I will tell you that I
14 was sent the other reports at some
15 time.
16     Q.  You did what?
17     A.  I was sent the other
18 reports.
19     Q.  You don't know when?
20     A.  I don't remember the
21 chronology of whether it was before I
22 prepared my report, during, or after.
23     Q.  And who sent you those
24 other reports?

15 (Pages 54 to 57)

ORAL DEPOSITION OF JEFFREY O. SHALLIT - 06-28-05

54

1    A.  It was Mr. Harvey.
2    Q.  And which reports did you
3  receive?
4    A.  Do I have them with me?
5  No, I don't have them with me.  I
6  received the report of Kevin Padian,
7  I remember that.  I received the
8  report of Barbara Forrest.  I
9  received the report of Michael Behe.
10  That's all I can remember currently,
11  but I did receive others.
12    Q.  Okay.  But you don't know
13  whether it was before or after you
14  had prepared the report?
15    A.  I can't remember.  I could
16  probably deduce it by looking at
17  notes.
18    Q.  Do you have your notes
19  here?
20    A.  I have no notes here.
21    Q.  By the way, did you look at
22  any notes before you came for this
23  deposition?
24    A.  Notes that I took myself,

55

1  personally?
2    Q.  Yes.
3    A.  Yes.
4    Q.  Where are they?
5    A.  I don't have them here.
6    Q.  Where did you put them, or
7  where do you have them, I should say?
8    A.  Well, there's a variety of
9  different notes.  Some are on a
10  computer, some are handwritten notes
11  in my hotel room.
12    Q.  And what do those notes
13  relate to?
14    A.  What I should be -- what I
15  should have knowledge of for the
16  deposition, or what I thought,
17  questions you might ask.
18    Q.  Okay.  Were these notes
19  prepared by you or --
20    A.  By me.
21    Q.  Okay.  In conversation --
22    A.  No.
23    Q.  -- as a result of a
24  conversation you had with someone?

56

1    A.  No.
2    Q.  Why don't we continue on
3  with the other aspects you discussed
4  with Elsberry.
5    A.  We discussed the ten peer-
6  reviewed ID articles on page 28.  And
7  we discussed the paper of Axe.  And I
8  remember Wes Elsberry, by seeing my
9  note here, mentioned that Ian
10  Musgrave had something to say about
11  "The probabilities implicit in such
12  extreme functional sensitivity
13  analyses are precisely those needed
14  for a design inference."
15    Q.  What's the significance of
16  that?
17    A.  I believe Mr. Elsberry was
18  skeptical of the claim that the
19  probabilities were precisely those
20  needed for a design inference.
21    Q.  Okay.  And what else?
22    A.  We discussed the paper of
23  Chiu and Lui, Integrated Use of
24  Multiple Independent Patterns for

57

1  Biomolecular Sequence Analysis.  I
2  brought -- I just wanted to clarify
3  that I'm expected to tell everything
4  I remember about that meeting to you?
5    Q.  Well, right now you're
6  answering specific questions.
7    A.  Okay.
8    Q.  This is the aspects that
9  you discussed with Elsberry.
10    A.  With Elsberry.
11    MR. HARVEY:  For purposes
12  right now, that question about
13  answering everything you remember has
14  been withdrawn, or is not on the
15  table.
16    THE WITNESS:  Okay.  I'm
17  just --
18    MR. HARVEY:  He may ask you
19  about it later.  Just your
20  conversations with Elsberry.
21  BY MR. THOMPSON:
22    Q.  Yes.
23    A.  So we discussed that paper
24  and aspects of that paper, and the

James DeCrescenzo Reporting, LLC
215.564.3905
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com
FAX  215.751.6681

16 (Pages 58 to 61)

ORAL DEPOSITION OF JEFFREY O. SHALLIT - 06-28-05

58

1    claim that Dembski -- that Dembski
2    said this was using his work.
3         Q.   Okay.  And what other
4    aspects of that paper did you
5    discuss?
6         A.   With Elsberry?
7         Q.   Yes.
8         A.   We discussed whether, in
9    fact, it was accurate that Mr. --
10   Professor Chiu used Dembski's
11   methodology.
12        Q.   Okay.  Continue on.  Any
13   other aspects of the report that you
14   discussed with Mr. Elsberry?
15        A.   I'm sure we discussed much
16   more, but it was -- it was a long
17   meeting and it was a while ago.  I'm
18   doing my best to remember exactly
19   what we discussed.
20        Oh, yeah, we discussed his
21   intelligent design research themes,
22   and we discussed in particular points
23   one, two and four.
24        Q.   And why did you discuss

59

1    those points in particular?
2         A.   Well, point one is Methods
3    of Design Detection, which is an
4    aspect of his -- Professor Dembski's
5    work that I've criticized.
6         We discussed Biological
7    Information, which is close to my
8    areas of interest.  And we discussed
9    Evolutionary Computation, which is
10   something that I'm familiar with.
11   Other aspects I am -- you know,
12   Psychology of Design Detection,
13   that's not my field.
14        Q.   Okay.  These were research
15   projects that he mentioned that
16   intelligent design was involved with?
17        A.   I wouldn't characterize
18   them as research projects.  They're
19   intelligent design research themes.
20   I don't believe that there has been
21   any progress on these that would
22   merit the word project.
23        Q.   What's the difference
24   between a theme and a project?

60

1         MR. HARVEY:  Just note for
2    the record he was reading off of
3    Appendix 4 on page 31 of Dembski's
4    report.
5         THE WITNESS:  I think
6    you'll have to ask Professor Dembski
7    what he meant by a theme.
8    BY MR. THOMPSON:
9         Q.   I think you used the word
10   theme, did you not?
11        A.   No, it's -- I'm reading
12   from page 31.
13        Q.   Okay.  Any other aspects
14   that you discussed with Mr. Elsberry?
15        A.   Yes.  We discussed item
16   number 11 on page 34, Steganographic
17   Layering of Biological Information,
18   and we wondered what results there
19   were in steganography that Professor
20   Dembski had achieved.
21        We discussed the claim on
22   item 13 on page 34, "The intelligent
23   design community is at the forefront
24   in raising and answering such

61

1    questions," and "such questions"
2    referred to astrobiology, and we
3    disputed that this was correct.
4         We discussed Dembski's
5    testimony on page 36 where he
6    discusses a paper of Murray Eden that
7    appeared in the Wistar Symposium.
8    And both Wesley and I provided the
9    context of that symposium for
10   Mr. Harvey, explained when it was,
11   and what it was about.
12        Again, on page 41, we
13   discussed the paper of Chiu.  I think
14   we may -- since we went through it
15   page by page, we probably briefly
16   touched on it again.
17        We discussed the claim at
18   the top of page 42 with reference to
19   the article of Chiu.  "Not only does
20   this article cite my work favorably,
21   but it makes my work in The Design
22   Inference the basis for the entire
23   article."  We disputed that
24   characterization.

17 (Pages 62 to 65)

ORAL DEPOSITION OF JEFFREY O. SHALLIT - 06-28-05

62

1    We discussed the peer
2  review in the second paragraph on
3  page 42. It did not undergo peer
4  review in the sense, research,
5  scientific research articles are peer
6  reviewed. And both Professor -- both
7  Dr. Elsberry and I clarified for
8  Mr. Harvey what the difference was
9  between a review of a book and an
10  article.
11    I'm now trying to remember
12  what other things we may have
13  discussed that are not in these
14  notes. We discussed -- I had
15  prepared, when I came to the meeting,
16  I had prepared a draft of this
17  report.
18    We discussed my draft, and
19  there were some changes, I would
20  say -- I would characterize them as
21  mostly editorial and minor changes to
22  wording, spelling, punctuation.
23    We discussed, since it was
24  a draft, I had not written section

63

1  six or seven at that time, and we
2  discussed the fact that I was going
3  to add sections six and seven.
4    And that's all I can
5  currently remember.
6    Q.  Did Mr. Elsberry assist you
7  in writing your report?
8    A.  No.
9    Q.  Did he provide you any of
10  the wording for your report?
11    A.  No.
12    Q.  Did you get any assistance
13  from anyone in preparing your report?
14    A.  As I said, Steve Harvey
15  gave me --
16    Q.  Other than that?  Other
17  than that?
18    A.  -- minor editorial
19  assistance. No.
20    Q.  Someone outside of your
21  lawyers, some other individual?
22    A.  No.
23    Q.  I want to address your
24  curriculum vitae right now.

64

1    A.  Okay.
2    Q.  And that is included in
3  your Expert Report, I believe on page
4  14.
5    A.  That's right, it begins on
6  page 14.
7    Q.  Okay. Would you please
8  take a look at that. Is that an
9  accurate depiction of your curriculum
10  vitae?
11    A.  It is.
12    Q.  Okay. Is it current?
13    A.  Some papers have -- I
14  attempted to list all my scientific
15  research papers, and some papers, for
16  example, Articles Submitted,
17  Enumeration of context-free languages
18  on page 20, that's now been accepted.
19    Q.  Okay.
20    A.  So it's not entirely
21  current, but I would say it's fairly
22  accurate.
23    Q.  Okay. Would you update it,
24  then, right now? Can you update your

65

1  curriculum vitae right now?
2    A.  You mean orally?
3    Q.  Yes.
4    A.  Well, I mentioned one
5  thing.
6    Q.  Right.
7    A.  I've also, becoming an
8  invited speaker at the Words
9  Conference in Montreal in September
10  of 2005.
11    Q.  And what is the topic
12  there?
13    A.  Words. By this I mean
14  combinatorial arrangements of
15  letters.
16    Q.  Okay. Is that a
17  mathematical theory?
18    A.  It is.
19    Q.  Okay.
20    A.  Yes. I would also, had I
21  been writing it now, I would have
22  also included the fact that I
23  organized a special session of the
24  Canadian Mathematical Society

James DeCrescenzo Reporting, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                          FAX  215.751.0581

18 (Pages 66 to 69)

ORAL DEPOSITION OF JEFFREY O. SHALLIT - 06-28-05

66

1    entitled Automatic Sequences and
2    Related Topics. And that was held at
3    the University of Waterloo at the
4    beginning of June.
5        Q. And that's mathematical as
6    well?
7        A. Mathematical and computer
8    science.
9        Q. Okay. Any other updates?
10       A. I'm trying to think.
11   That's all I can think of right now.
12       Q. Okay. Are you currently
13   engaged in writing any books?
14       A. I've just finished a first
15   draft of a manuscript which has been
16   accepted for publication by Cambridge
17   University Press.
18       Q. And what is the name of
19   that?
20       A. The name of it is Advanced
21   Topics in Formal Languages, an
22   Automata Theory.
23       Q. And again, that's in the
24   mathematics area or computer science?

67

1        A. It's between mathematics
2    and computer science, it combines
3    both aspects. And that, it will be
4    revised. They've asked me to add
5    some topics to it. I will be working
6    on that.
7        Q. And that is in manuscript
8    form right now?
9        A. It's in manuscript form,
10   that's right.
11       Q. Is there a peer review
12   going on?
13       A. There was a review of the
14   original text by two authors, two
15   referees.
16       Q. Okay.
17       A. Possibly three... I can't
18   remember.
19       Q. Is that considered peer
20   review?
21       A. It is considered peer
22   review, but not to the extent that an
23   article would be.
24       Q. I'm interested, when did

68

1    this whole concept of peer review
2    take hold of American science? Do
3    you have any idea?
4        MR. HARVEY: I'm going to
5    object to the form of the question.
6    What do you mean when you say "take
7    hold"?
8    BY MR. THOMPSON:
9        Q. When people started to talk
10   about peer review as a part of the
11   scientific community.
12       A. Although I have an interest
13   in history of mathematics and history
14   of science, I can't say that I've
15   ever investigated that question.
16       Q. Now, you've listed your
17   education and your awards in your
18   curriculum vitae?
19       A. I have.
20       Q. And you received, as I
21   understand it, your Ph.D. in
22   mathematics from the University of
23   California —
24       A. I did.

69

1        Q. — Berkeley, 1983?
2        A. I did.
3        Q. And your dissertation was
4    on Metric Theory of Pierce
5    Expansions. Could you give me a very
6    layman's explanation of what that is?
7        A. Sure. A real number, which
8    means a number like pi or the square
9    root of two, can be expanded as a sum
10   of terms.
11       So probably the most famous
12   example of this is pi over four is
13   one minus a third plus a fifth minus
14   the seventh, and so forth. It's an
15   infinite series.
16       And the particular
17   expansions I was looking at were
18   developed by Pierce in the beginning
19   of the 20th Century.
20       And the metric theory of
21   these treats — normally when you
22   discuss an algorithm, or often when
23   you discuss an algorithm you're
24   dealing with a finite object.

**James DeCrescenzo Reporting,** LLC

215.564.3905

Innovating Litigation
1880 JFK Blvd., 6ᵗʰ Floor, Philadelphia, PA 19103
www.JDReporting.com

FAX - 215.761.0581

19 (Pages 70 to 73)

ORAL DEPOSITION OF JEFFREY O. SHALLIT - 06-28-05

70

1    Pierce expansion is an
2    infinite object, and the space of
3    inputs is the set of all real numbers
4    which, again, is an infinite object.
5    Which means you can put a measure on
6    that, and then you can talk about how
7    the expansions can be characterized
8    in terms of this measure. And that's
9    what I did.
10    Q.   You got your mathematics
11    degree from Princeton University in
12    June of 1979; is that correct?
13    A.   That's correct.
14    Q.   Okay. Have you received
15    any other degrees that you have not
16    mentioned in your curriculum vitae?
17    A.   No.
18    Q.   Do you have any other
19    credentials which would qualify you
20    to render an opinion in this case
21    which is not reflected in your
22    curriculum vitae?
23    A.   No.
24    Q.   Have you ever taught, in

71

1    your career as an educator, have you
2    ever taught any classes in biology?
3    A.   No.
4    Q.   Genetics?
5    A.   No.
6    Q.   Have you ever taught any
7    classes on evolution?
8    A.   No.
9    Q.   Have you ever taught any
10    classes on the philosophy of
11    education?
12    A.   No.
13    Q.   Have you taught any classes
14    on philosophy?
15    A.   No.
16    Q.   Have you taught any classes
17    on constitutional law?
18    A.   No.
19    Q.   Okay. It would be
20    accurate, then, to indicate that you
21    are not holding yourself out as an
22    expert in the philosophy of science?
23    A.   That's correct.
24    Q.   You're not holding yourself

72

1    out as an expert in the philosophy of
2    education?
3    A.   That's correct.
4    Q.   You're not holding yourself
5    out as an expert in biology?
6    A.   That's correct.
7    Q.   You're not holding yourself
8    out as an expert in microbiology?
9    A.   That's correct.
10    Q.   You're not holding yourself
11    out as an expert in biochemistry?
12    A.   That's correct.
13    Q.   You're not holding yourself
14    out as an expert in paleontology?
15    A.   That's correct.
16    Q.   You're not holding yourself
17    out as an expert in theology?
18    A.   That's correct.
19    Q.   You're not holding yourself
20    out as an expert in evolutionary
21    theory?
22    A.   That's correct.
23    Q.   And you're not holding
24    yourself out as an expert in American

73

1    Constitutional law?
2    A.   That's correct.
3    Q.   Keeping in mind the
4    credentials that you have, how do you
5    believe those credentials would give
6    you the expertise to rebut Dembski's
7    report, the two reports that you
8    mentioned, his expert report and his
9    rebuttal report?
10    A.   I only addressed aspects of
11    the report that were in my
12    professional competence.
13        MR. THOMPSON:  Okay. Let's
14    go to Dembski's initial report, and
15    I'll mark this as an exhibit.
16        MR. HARVEY:  Do you have an
17    extra copy, Counsel?
18        MR. THOMPSON:  Yes.
19        (Exhibit Shallit-3 was
20    marked for identification.)
21        MR. HARVEY:  I can look on
22    with the witness. I'm familiar,
23    generally.
24    BY MR. THOMPSON:

**James DeCrescenzo Reporting**, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905          FAX  215.751.0581

ORAL DEPOSITION OF JEFFREY O. SHALLIT - 06-28-05

78

1 that the delicate balance of
2 cosmological constants (known as
3 cosmological fine-tuning) and the
4 machine-like qualities of certain
5 tightly integrated biochemical
6 systems (known as irreducibly complex
7 molecular machines) are the result of
8 intelligence and highly unlikely to
9 have come about by purely material
10 forces."
11       So I won't say that my
12 competence addresses every single
13 word in every single sentence, but
14 certainly the claims, the implied
15 mathematical claims about specified
16 complexity and the fact that it was
17 formulated exactly, that it can be
18 studied rigorously and
19 scientifically, that the sequence of
20 prime numbers is complex, these are
21 all aspects that are within my
22 competence.
23       Q.  Are these mathematical
24 formulations that he is making right

79

1 here?
2       A.  Specified complexity is a
3 mathematical formulation.
4       Q.  Okay.  Excuse me.  Go
5 ahead.  I'm sorry.
6       A.  Prime numbers are a
7 mathematical formulation.
8 Cryptography is an area that I am
9 familiar with.  Random number
10 generation is an area that I'm
11 familiar with.
12       Q.  Now, going to specified
13 complexity, is that something that
14 you've studied?
15       A.  I have studied the concept
16 as described in his work, yes.
17       Q.  Okay.  Now, based upon your
18 credentials, do you feel you are
19 qualified to act as an expert in
20 discussing specified complexity?
21       A.  I do.
22       Q.  Okay.  What is your
23 understanding of what Professor
24 Dembski means by specified

80

1 complexity?
2       A.  Well, the concept is
3 incoherent, so I'll do my best.  But
4 Professor Dembski says that an event
5 possesses specified complexity if it
6 is improbable, which he calls
7 complex, and specified, by which it
8 means -- he means it matches an
9 independently given pattern.
10 However, both these concepts are
11 problematic as he has formulated
12 them.
13       Q.  And what do you think is
14 wrong with that?
15       A.  I've said exactly in my
16 Expert Report, I believe.
17       Q.  I want to hear it on the
18 record.
19       A.  We're going to be here a
20 long time.  So the first problem is
21 complexity.  Dembski misuses the term
22 complexity.
23       When a mathematician or
24 computer scientist talks about

81

1 complexity, they're typically talking
2 about computational complexity, which
3 is the study of how complicated a
4 problem is in terms of the available
5 resources to solve it.
6       Or descriptional
7 complexity, and a particular example
8 of descriptional complexity is
9 Kolmogorov complexity.
10       That measures the
11 complexity of the finite
12 combinatorial object in terms of its
13 description size.
14       So to use the term
15 complexity as Dembski has done is
16 misleading and contrary to scientific
17 practice.  So that's number one.
18       Number two is that he
19 evaluates the complexity, in quotes,
20 of an event based on a probability
21 distribution, but he gives no
22 coherent method for determining what
23 the correct probability distribution
24 is.

JDR

James DeCrescenzo Reporting, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                           FAX  215.751.0681

ORAL DEPOSITION OF JEFFREY O. SHALLIT - 06-28-05

82

1    In particular, for the very
2    same event such as in his book No
3    Free Lunch, he analyzes Dawkins'
4    weasel program, he gives two
5    different probability distributions
6    in order to analyze and never says
7    which one is the correct one to use.
8        So because he chooses his
9    probability distributions at whim, in
10   some sense, he is able to say this is
11   complex and this isn't, without any
12   rational basis.
13   Q.  And you've taken him to
14   task for that, have you not?
15   A.  I have.
16   Q.  Not only in your expert
17   report, but you've taken him to task
18   in other publications that you've
19   done?
20   A.  That's correct.
21   Q.  Okay.  Continue on with his
22   report.
23   A.  Okay.  And in terms of --
24       MR. HARVEY:  Just to be

84

1    the term exactly the opposite of what
2    standard scientific practice would
3    say.
4    Q.  Well, can he define
5    complexity the way he wants to?
6    A.  He certainly can.
7    Q.  And has he done that?
8    A.  No, he hasn't done it in a
9    coherent way.
10   Q.  Has he attempted to?
11       MR. HARVEY:  Object to the
12   form of the question.  Calls for
13   speculation.
14   BY MR. THOMPSON:
15   Q.  In his writings has he
16   attempted to?
17   A.  He has made an attempt
18   which I don't consider to be very
19   good.
20   Q.  You still dispute his
21   theory on that complexity?
22   A.  I wouldn't -- I wouldn't
23   dignify it with the term theory.  It
24   offers no predictions.  It makes --

83

1    clear, the question is what does he
2    see wrong with the concepts of
3    complexity and specification?
4    BY MR. THOMPSON:
5    Q.  Right.  If you -- I thought
6    you answered that.
7    A.  Well, I'm not done yet,
8    no.  Sorry.
9    Q.  Okay.
10   A.  So that's a brief summary
11   of what's wrong with his claims about
12   complexity.  I would also point out
13   that when Dembski says a sequence of
14   prime numbers is complex, this is
15   completely contrary to what a
16   mathematician or a computer scientist
17   would understand as complex; namely,
18   that it -- it would be very difficult
19   to generate prime numbers.
20       On the contrary, a very
21   short program will generate as many
22   prime numbers as you like.  So in
23   terms of Kolmogorov complexity,
24   they're not complex.  So he is using

85

1    it makes -- it is not applicable
2    empirically, and it doesn't have any
3    data in support of it.  I would call
4    it not even really a hypothesis at
5    this point.
6    Q.  Continue on with your --
7    A.  Yes, I'm not done yet.
8    Q.  Yes.
9    A.  So that, now I addressed
10   the concept of complexity.  Now, the
11   second -- the second part of his idea
12   is specification.  So specification
13   is again very vaguely defined.
14       He says that it matches an
15   independently given pattern, but he
16   doesn't say specifically where the
17   class of patterns is supposed to be
18   drawn from, and he also does not
19   offer any coherent way of separating
20   what -- the valid patterns from the
21   invalid patterns, which he calls
22   fabrications.
23       Now, Kolmogorov himself was
24   one of the first people to give a

James DeCrescenzo Reporting, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX  215.751.0581

ORAL DEPOSITION OF JEFFREY O. SHALLIT - 06-28-05

86

1  rigorous definition of pattern. And
2  for Kolmogorov, a pattern was
3  something that is specifiable by a
4  computer program.
5      So a string, X, has a
6  description in Kolmogorov's sense if
7  there exists a computer program, P,
8  and an input, Y, such that when you
9  run P on Y, you get X.
10     So the advantage to this
11 definition is there's absolutely no
12 way to contest when you have a
13 description of the string X, anyone
14 can run the computer program and see
15 that X is produced.
16     Whereas, Dembski allows
17 natural language specifications. His
18 notion of specification is tied to
19 the background knowledge of an
20 intelligent agent, which means it can
21 be different from person to person.
22 So a specification for you might be
23 different from a specification for
24 me.

87

1      He says that specifications
2  are holistic in the sense that they
3  only apply to the string as a whole,
4  and that you can't take a
5  specification for one thing and hook
6  it on next to a specification of
7  another thing.
8      And yet in one of his
9  examples, he takes a list of prime
10 numbers encoded, and that is a
11 concatenation of different
12 specifications, one for each prime
13 number.
14     He -- the real breakthrough
15 of Kolmogorov, which Dembski just
16 discards, is that these specification
17 or these -- Kolmogorov wouldn't call
18 them specifications, but these
19 descriptions are measured in terms of
20 the length of the description. That
21 was his big breakthrough. And
22 Dembski just throws that away.
23     A specification can be as
24 long as you like. It can be even

88

1  longer than the string itself. And
2  that creates problems. Because he
3  allows natural language
4  specifications, he runs into a
5  paradox called the Berry paradox,
6  which is a paradox in logic which
7  would create self-contradicting
8  specifications. He has no way of
9  removing those.
10     So there are a lot of
11 problems. That's a brief summary of
12 the problems.
13     Q. And as I indicated, you
14 have discussed those problems in
15 writing --
16     A. I have.
17     Q. -- correct? Now, have you
18 read his -- one of his most recent
19 papers entitled Specification, The
20 Pattern That Signifies Intelligence?
21     A. It -- it only came out, I
22 think -- what's today, Tuesday? I
23 believe it came out either Sunday or
24 Monday night. I've had a chance to

89

1  skim it, but I haven't read it in
2  great detail.
3      Q. On his web site he claims
4  that he answers a lot of your
5  criticisms. Skimming it, have you
6  seen any attempt to respond to your
7  criticisms?
8      A. No. No, he doesn't refer
9  to me, to the best of my knowledge.
10     Q. Well, whether he refers to
11 you by name, has he responded to the
12 issues that you've raised with his
13 specified complexity?
14     A. Typical scientific practice
15 when one is addressing a criticism is
16 to refer to the person by name. So I
17 would expect that if he addressed it,
18 he would have mentioned me.
19     To the best of my
20 knowledge, he doesn't adequately
21 address those. But I would say that
22 that -- that that is only based on a
23 very, very cursory reading.
24     Q. You used the word

JDR
James DeCrescenzo Reporting, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com
215.564.3905                                          FAX  215.751.0581

ORAL DEPOSITION OF JEFFREY O. SHALLIT - 06-28-05

90

1  "adequately," but does -- on your
2  cursory review of it, do you get a
3  feeling that there is an attempt to
4  respond to the criticisms that you
5  raised?
6      A. I would -- I would say that
7  it appears that he's abandoned his
8  previous description of
9  specification.
10     Q. Okay.
11     A. So if abandoning the
12  previous one is a response to my
13  criticism, I suppose you could
14  characterize it that way.
15     Q. When you say you gave it a
16  cursory look, did you read the whole
17  thing over?
18     A. I didn't read every word,
19  no.
20     Q. Okay. Have you studied it
21  in any way?
22     A. As I say, it was only
23  released on the Internet two nights
24  ago. I need more -- to give it a

92

1      Q. Okay. Got it.
2      A. "It" -- meaning intelligent
3  design -- "simply argues that certain
4  finite material objects exhibit
5  patterns that convincingly point to
6  an intelligent cause."
7      Q. How do your credentials as
8  an expert give you the expertise to
9  respond to that statement?
10     A. Because the convincingly
11  point is supported through
12  mathematical argument, which I
13  dispute.
14     Q. Is that the only kind of
15  argument that can be used to come to
16  the conclusion convincingly point?
17     A. I'm sorry, could you
18  restate?
19     Q. Is mathematics the only
20  basis upon which you can come to the
21  conclusion that it convincingly
22  points?
23     A. Well, I would say
24  mathematics and aspects of computer

91

1  careful reading, I would need to
2  spend more time than that.
3      Q. Okay. Continue on going
4  through your review of Professor
5  Dembski's book -- excuse me, report.
6      MR. HARVEY: You say
7  going -- oh, the question now is back
8  to the question, to identify those
9  aspects of the report which he feels
10  qualified to respond to?
11     MR. THOMPSON: Correct.
12     MR. HARVEY: Go back.
13     THE WITNESS: Page four,
14  "It" -- referring to intelligent
15  design -- "simply argues that certain
16  finite material objects exhibit
17  patterns" --
18  BY MR. THOMPSON:
19     Q. Could you -- excuse me,
20  where are you on that page?
21     A. The first complete
22  paragraph on page four.
23     Q. Okay.
24     A. The second sentence.

93

1  science, which include complexity
2  theory, for example. And that --
3  there may be other aspects, but I
4  don't --
5      Q. What about biology?
6      A. I don't -- I'm not an
7  expert in biology. I don't -- I
8  don't offer expert testimony in that
9  area.
10     Q. Okay. And what in computer
11  science would relate to that comment?
12     A. The claim that patterns
13  that convincingly point to
14  intelligent cause has been convincing
15  through Dembski's mathematical
16  arguments.
17     Q. And that's a matter of
18  opinion, then; correct? He
19  believes -- in other words, he
20  believes it's convincing and you do
21  not?
22     A. I would say that if his
23  mathematical arguments are intended
24  to be the evidence that it is

JDR

James DeCrescenzo Reporting, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                        FAX  215.751.0581

94

1 convincing, then he has failed on
2 that -- the mathematical aspects of
3 it.
4    Q.  In accordance with your
5 opinion?
6    A.  Yes.
7    Q.  Continue.  What page are
8 you on right now, Professor Shallit?
9    A.  I'm currently on page
10 seven.  I would say "One indicator is
11 that design theorists are
12 increasingly publishing research
13 supporting intelligent design in the
14 peer-reviewed mainstream scientific
15 literature, especially in the
16 biological literature."
17    Q.  And where is that on that
18 page?
19    A.  Sorry, it's the second
20 paragraph of section five.  "A
21 related indicator is that their work
22 is increasingly being subjected to
23 criticism within mainstream
24 scientific literature."

96

1 Harvey.  So --
2    Q.  Have you read that?
3    A.  I have read it, yes.
4    Q.  Okay.
5    A.  And there are -- there are
6 some aspects of the book which touch
7 on specified complexity, mathematics,
8 probability, and I can serve as an
9 expert in those areas.
10    Q.  Okay.  Continue.
11    A.  I can address the claim
12 that "This is because both the" --
13 sorry, page ten, third paragraph,
14 second sentence.  "This is because
15 both the criticisms it offers against
16 neo-Darwinian theory and the
17 evidences it provides in favor of
18 intelligent design continue to
19 stand -- the book is accurate."  So I
20 dispute the claims of accuracy with
21 respect to the mathematical content
22 of the book.
23    Q.  Okay.  You dispute all of
24 it, or parts of the mathematical

95

1    So to the extent that this
2 refers to Dembski's mathematical
3 publications, and the ability that I
4 have to search databases for such
5 publications, I can address those.
6    Q.  Okay.
7    A.  I can address some aspects
8 of the supplemental biology textbook.
9    Q.  Excuse me, what page are
10 you on?
11    A.  I'm sorry.  I apologize.
12 Page ten --
13    Q.  Okay.
14    A.  -- section seven, first
15 paragraph.  I can address some
16 aspects of the book The Design Of
17 Life:  Discovering Signs of
18 Intelligence in Biological Systems.
19 I was sent a copy of this, and have
20 signed an agreement to maintain its
21 confidentiality.
22    Q.  Who sent you a copy of
23 this?
24    A.  I think it was Steve

97

1 content?
2    A.  I dispute parts of the
3 mathematical content.
4    Q.  Other parts you agree with?
5    A.  I wouldn't say that, no.
6    Q.  How would you --
7    A.  I may -- I may hold no
8 opinion on some aspects of it.
9    Q.  Oh, I see.  Do you recall
10 what parts you hold no opinion on?
11    A.  It's a 200 -- a 300-page
12 book.  We can go through it if you
13 wish.
14    Q.  Where is the book?
15    A.  Right here.
16    Q.  May I see it?
17    MR. HARVEY:  Dick, I assume
18 you've signed a confidentiality
19 order?
20    MR. THOMPSON:  No.
21    MR. HARVEY:  Well, then, I
22 must ask that you give that back.
23    MR. THOMPSON:  Okay.
24    MR. HARVEY:  Because I

JDR

James DeCrescenzo Reporting, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.664.3905                                              FAX  215.751.0581

ORAL DEPOSITION OF JEFFREY O. SHALLIT - 06-28-05

98

1  think there's a strict
2  Confidentiality Order from the Court
3  on that.
4       MR. THOMPSON: Oh, is that
5  right?
6       THE WITNESS: Yes.
7       MR. HARVEY: Yes. I don't
8  have it in front of me. I would
9  assume it might cover counsel in this
10 case.
11      MR. THOMPSON: Okay.
12 That's fine.
13      MR. HARVEY: But we need to
14 be careful of that. Mr. Shallit,
15 that's --
16      THE WITNESS: I apologize.
17 BY MR. THOMPSON:
18      Q. Okay. Let's forget about
19 that book. Continue on.
20      A. On page 11, the second full
21 paragraph, "Moreover, it" --
22 referring to intelligent design --
23 "provides a scientific explanation
24 for the origin and diversification of

99

1  life."
2       So to the extent that his
3  explanation is based in mathematics,
4  I can dispute the accuracy of the
5  claim that -- and if the claim is
6  inaccurate, then it can't be
7  scientific.
8       Q. What part of that statement
9  do you believe is mathematical?
10      A. "It," referring to the
11 theory of intelligent design.
12      Q. Okay. And so if I
13 understand you correctly, it,
14 referring to the theory of
15 intelligent design, you are saying
16 that any aspect of the theory of
17 intelligent design which touches on
18 mathematics you are qualified to
19 speak?
20      A. I wouldn't say any aspect.
21 I would say the aspects that are
22 addressed in my Expert Report.
23      Q. Okay. Fine. Continue on.
24      A. So in Professor Dembski's

100

1  vitae, I am -- I do have some
2  expertise in the journals in which he
3  has published; for example, the
4  quality of the journals, the impact
5  of the journals as measured by
6  databases.
7       And so I can speak with
8  respect to some papers of the value
9  in the mathematical and scientific
10 community of those papers. Would you
11 like me to list all of them or --
12      Q. No, not --
13      A. Okay.
14      Q. The report ends on page 12,
15 and then he has these appendix --
16      A. Yes.
17      Q. -- starting from 13 all the
18 way through 50, I guess.
19      A. Right. I'm happy to go
20 through those, too, if you like.
21      Q. I don't need to do that
22 right now. But I do have a question
23 for you. Did you ever read the book
24 Of Pandas and People?

101

1       A. No, I did not. I've only
2  read the follow-up version.
3       Q. Okay. Going back to your
4  report now, on page two of your
5  report, headline one, you say
6  "Dembski is not a scientist."
7       A. That's correct.
8       Q. On the other hand, you
9  consider yourself a computer
10 scientist?
11      A. I am both a mathematician
12 and a computer scientist.
13      Q. What is the distinction
14 between being a mathematician, in
15 which you say it is not science,
16 versus computer science?
17      A. I would say that the
18 distinction is that computer
19 scientists deal with computers;
20 whereas, mathematicians often do not
21 deal with -- a pure mathematician,
22 for example, does not deal with
23 actual objects in the physical world,
24 but with concepts.

James DeCrescenzo Reporting, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX 215.751.0581

102

1    Computer scientists,
2    typically their work is related,
3    however tangentially, to a physical
4    computer.
5        Q. Could you clarify that by
6    just giving us a definition of what
7    science is, then?
8        A. I'm not a philosopher of
9    science, although I do have interest
10   in pseudoscience and
11   pseudomathematics, and I have
12   commented on them. So I'm not sure
13   that my definition of science would
14   be useful.
15       I can say that there are
16   certain characteristics of
17   scientists, certain characteristics
18   that scientists have, in my
19   understanding, that Dembski doesn't
20   have. Is that what you're driving
21   at?
22       Q. Well, you were the one that
23   said in your report "Dembski is not a
24   scientist."

103

1        A. Yes. And by --
2        Q. And then down below in your
3    footnote you say "I do not consider
4    mathematics to be" --
5        A. That's right.
6        Q. -- "a science." I'm trying
7    to understand that.
8        A. All right. So to the best
9    of my understanding, science deals
10   with aspects of the natural world.
11   And mathematics can be -- is a
12   language, it's usually referred to as
13   the language of science, for
14   example. And science is a process,
15   also. It's a way that claims are
16   investigated.
17       Q. Isn't it true, though, that
18   computer science was developed by
19   mathematicians like Kurt Godel, Alan
20   Turing?
21       A. To answer that, I mean,
22   it -- if a field doesn't exist, then
23   the fact that it is initiated by
24   people who were originally from

104

1    another field doesn't seem like a
2    reasonable criticism to me. I mean,
3    when a field branches off, by
4    definition there were no
5    practitioners of that field before.
6        Q. Well, when you were
7    studying mathematics, what department
8    in the university was that in?
9        A. At Princeton University, it
10   was in the Department of Mathematics.
11       Q. Okay. And it was not in
12   the Science Department?
13       A. No, it wasn't, it was in
14   the Faculty of Arts, actually.
15       Q. Okay. What about
16   University of Waterloo?
17       A. The Faculty of Mathematics
18   is its own faculty, separate from the
19   faculties of Science and Arts.
20       Q. Okay. Does computer
21   science fall under the branch of
22   mathematical logic, a branch of
23   mathematical logic called recursion
24   theory?

105

1        A. No, I'd say aspects of
2    computer science are related to
3    recursion theory. Computer science
4    is a very broad field.
5        Q. Well, would you call Albert
6    Einstein a scientist?
7        A. I would.
8        Q. Okay. Wasn't he a
9    mathematician as well?
10       A. No, I would call him a
11   mathematical physicist.
12       Q. Okay. You used to be on
13   the faculty of the University of
14   Chicago?
15       A. I did.
16       Q. Okay. And didn't you teach
17   Professor Dembski at one point?
18       A. When I met Professor
19   Dembski at a conference, he informed
20   me that he had been a student in one
21   of my classes. Whether he took the
22   course for credit or not, I actually
23   don't remember. And I have very
24   little memory of him being in my

James DeCrescenzo Reporting, LLC
215.564.3905
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com
FAX 215.751.0581

ORAL DEPOSITION OF JEFFREY O. SHALLIT - 06-28-05

106

1    class.
2         Q.  Okay.
3         A.  He may have simply been
4    sitting in on the class.
5         Q.  Well, then, you wouldn't
6    know whether he was a good student or
7    not; is that correct?
8         A.  No, I don't know anything
9    about his record.
10        MR. HARVEY:  Counsel, it's
11   1:00. I made a statement earlier
12   today about lunch and me, which is
13   that I always take it.  I assume
14   you're flying out tonight so you want
15   to get this concluded today?
16        MR. THOMPSON:  Well, if we
17   can.  If not, I'll stay.  But, yes,
18   I'd like to see if we can conclude it
19   today.
20        MR. HARVEY:  We can go off
21   the record.
22        (A luncheon recess was
23   taken from 1:03 to 1:39 p.m.)
24   BY MR. THOMPSON:

107

1         Q.  Now, your report, expert
2    report, this is the sum total of the
3    opinions that you are giving in the
4    case; is that correct?
5         A.  It's a summary, yes.
6         Q.  Yes.  You are not intending
7    to give opinions on any other aspect
8    of this case?
9         A.  No.
10        Q.  Okay.  You're not intending
11   to write any kind of supplemental
12   reports to your expert opinion
13   report?
14        A.  No.  This is my expert
15   opinion report.
16        Q.  Okay.  Now, I went through
17   with you the Dembski report and asked
18   you to indicate what portions of the
19   report related to the specific
20   credentials that you had.  Do you
21   recall that?
22        A.  Yes.  We only -- we didn't
23   go through the entire document, but
24   just --

108

1         Q.  Right.  We stopped at the
2    appendix.  We did not go through the
3    appendix.
4         A.  Right.
5         Q.  Now, you've given me all of
6    the areas in the report up to the
7    appendix where you feel your
8    credentials allow you to discuss?
9         A.  Yes.
10        Q.  On page two of your report
11   you mention the fact that Dembski has
12   been viewed as the Isaac Newton of
13   information theory by a proponent of
14   intelligent design, Rob Koons.
15        A.  Right.
16        Q.  And you take issue with
17   that; is that correct?
18        A.  I do.
19        Q.  And why?
20        A.  Well, Isaac Newton was
21   probably the greatest physicist or
22   one of the greatest physicists of all
23   time, and -- sorry, mathematicians of
24   all time.

109

1         And he -- to call someone
2    an Isaac Newton of information theory
3    would imply, for example, Isaac
4    Newton was the founder of the
5    calculus independently of LiveNet.
6         So to say someone is the
7    Isaac Newton of information theory,
8    you would think this is someone who
9    founded the field or at least was a
10   huge, towering figure with dozens of
11   published papers or published works,
12   viewed by everyone as either the
13   founder of the field information
14   theory, or certainly a very well
15   recognized expert in the field.  And
16   I take exception to that because I
17   don't see that any of those things
18   are true.
19        Q.  You briefly mentioned the
20   definition of theory, I think, when
21   you were talking about Dembski's
22   referring to something as a theory,
23   you said that's not a theory.  It's
24   not even a hypothesis.  Do you

James DeCrescenzo Reporting, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                          FAX  215.751.0581

110

1  remember that --
2     A.  Right.
3     Q.  -- comment by you?
4     A.  Yes, uh-huh.
5     Q.  What is your definition of
6  a theory?
7     A.  Well, I want to preface my
8  remarks by saying that I'm not a
9  historian or -- I'm sorry, I'm not a
10  philosopher of science. I'll give
11  you my layman's understanding of the
12  word theory. To me, a theory
13  means --
14     MR. HARVEY: I'm going to
15  object to the form of the question.
16  You're referring now to a scientific
17  theory as opposed to the dictionary
18  definition of --
19  BY MR. THOMPSON:
20     Q.  The definition of theory he
21  was using when he was criticizing
22  Dembski's use of the word.
23     A.  Yes. So I would understand
24  a theory to be a description based on

111

1  a large amount of evidence, empirical
2  evidence, experimental evidence to
3  elucidate some aspect of the physical
4  world.
5     Q.  Is there a distinction, in
6  your mind, between fact and theory?
7     A.  Yes. A fact is something
8  that is -- I like to use -- well,
9  again, it's my layman's
10  understanding, that it's Stephen
11  Jay Gould's description of a fact is
12  something that has been confirmed so
13  much that it would be absurd to
14  withhold provisional assent; whereas,
15  a theory, theories are constantly
16  being revised, changed through time.
17     Q.  And when scientists use the
18  word theory, they're using it in a
19  sense that it is revisable over time?
20     A.  I'd say that's typically
21  the case. Scientists aren't
22  philosophers of science, and aren't
23  always completely careful about how
24  they use the term theory.

112

1     Q.  You indicated that you read
2  the expert report by Michael Behe?
3     A.  I did.
4     Q.  Okay. Do you consider
5  Michael Behe a credible scientist?
6     A.  I would say my opinion, it
7  doesn't matter because I'm not a
8  biologist, and I don't offer any
9  opinion on biology through my expert
10  testimony.
11     Q.  In his report, he talks
12  about different definitions of
13  theory. Do you recall --
14     A.  Not well enough to -- to
15  rattle them off, no.
16     Q.  Okay. Also in his report
17  he talks about the various claims
18  that are made under the umbrella of
19  the theory of evolution. Do you
20  recall that?
21     A.  No.
22     MR. THOMPSON: Mark this as
23  Shallit Exhibit 4.
24     (Exhibit Shallit-4 was

113

1  marked for identification.)
2     (Mr. Rothschild entered the
3  deposition room at 1:46 p.m.)
4  BY MR. THOMPSON:
5     Q.  I show you Shallit Exhibit
6  4 entitled Pseudoscience for Amateurs
7  or Ten Ways to Tell Real Scientists
8  from Fake Ones. Do you recognize
9  that document?
10     A.  I do.
11     Q.  Is that a document that you
12  prepared?
13     A.  It is.
14     MR. HARVEY: I'm going to
15  ask the witness to read this
16  document, and I'd like just a second
17  to read it as well.
18     THE WITNESS: All right.
19     MR. HARVEY: It's not long,
20  but --
21     I recognize the title on
22  the first -- you know, and the
23  excellent writing. (Witness reviews
24  document.)

James DeCrescenzo Reporting, LLC

215.564.3905

Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

FAX 215.751.0581

ORAL DEPOSITION OF JEFFREY O. SHALLIT - 06-28-05

114

1       Yes, I recognize that, and
2   I did write it.
3   BY MR. THOMPSON:
4       Q.  Yes.  And do you still
5   stand by the claims you make on the
6   ten ways of telling real scientists
7   from fake ones?
8       A.  Well, let me look
9   carefully.  I'd say I stand by
10   probably most of it, yeah.
11       Q.  Which parts would you not
12   stand by?
13       A.  I think maybe I might be a
14   little more cautious about saying
15   books published by them go through a
16   peer review process that usually
17   weeds out the bad ones.  When I wrote
18   this --
19       Q.  What page are you looking
20   at?
21       A.  Page one, item two, last
22   sentence.  "These presses have a
23   reputation to maintain and books
24   published by them go through a peer

115

1   review process that usually weeds out
2   the bad ones."
3       I think, now having
4   published two books, I would be less
5   sanguine about this ability.  But --
6       Q.  What was your experience
7   that would make you change?
8       A.  Well, my books were
9   reviewed, but not -- not by any means
10   adequate review to the length of the
11   book.  I received private peer review
12   of one of my books that went on for
13   55 pages, and compare that to a
14   two-page peer review from the
15   University Press, it just doesn't
16   compare.
17       Q.  Which University Press was
18   that?
19       A.  Cambridge University Press.
20       Q.  Any others?  Any other
21   changes you would make in that
22   document?
23       A.  I think it's accurate other
24   than that.

116

1       Q.  I'm going to take you back
2   to your days on the faculty of
3   University of Chicago.  You were a
4   teacher there; correct?  You were an
5   instructor there?
6       A.  I was a professor there.
7       Q.  A professor there.
8       A.  I wasn't an instructor.
9       Q.  Okay.  Do you recall that
10   they had the graduate school divided
11   into different divisions?
12       A.  No, I don't actually
13   remember the structure of the
14   graduate school.
15       Q.  Okay.  Let me just attempt
16   to refresh your recollection.  A
17   Division of Biological Sciences, a
18   Division of Physical Sciences, a
19   Division of Humanities, and Division
20   of Social Sciences.  Do you recall
21   that at all?  Does that ring a bell?
22       A.  No, not terribly well.  I
23   remember the Division of Physical
24   Sciences, yes.

117

1       Q.  Okay.  Is it accurate to
2   say that mathematics was under the
3   Division of Physical Sciences?
4       A.  I wouldn't know.  I didn't
5   teach in the Mathematics Department.
6       Q.  What were you teaching
7   there?
8       A.  I taught in the Computer
9   Science Department.
10       Q.  Okay.  We did briefly
11   mention the Trotter Prize awarded by
12   Texas A & M University.  Are you
13   familiar with Francis Krick and
14   Charlie Townes?
15       A.  I'm familiar with Francis
16   Krick, yes.
17       Q.  Okay.
18       A.  And Charlie Townes is -- I
19   know the name.  I don't know as much
20   about him, yes.
21       Q.  Okay.  Were you aware that
22   they had received the Trotter Prize
23   the first year it was given in 2002?
24       A.  Yes.

James DeCrescenzo Reporting, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                           FAX  215.761.0681

ORAL DEPOSITION OF JEFFREY O. SHALLIT - 06-28-05

118

1    Q. Okay. And when the Trotter
2    Prize was awarded to William Dembski,
3    there was a press release that
4    started out with, Two of the nation's
5    top scientists will visit Texas A &
6    M. Do you recall that?
7    A. I do.
8    Q. Okay. And you disagree
9    with that characterization of Bill
10   Dembski?
11   A. I do.
12   Q. Okay. On page four of your
13   expert report, I think you say
14   that -- let me see if I can find it.
15   Okay, bottom of the page, "Dembski
16   argues that his books represent
17   original mathematical research."
18   Okay. Can you provide us with an
19   exact quote where Dembski says that
20   he is conducting mathematical
21   research?
22   A. Yes. On page 14 of his
23   Disclosure of Expert Testimony, he
24   says, about a third of the way down

119

1    the page, under Academic Experience,
2    Postdoctoral Visiting Fellow, MIT,
3    Department of Mathematics, research
4    in probability theory, 1988.
5        Above that, research in
6    chaos and probability, 1989. Above
7    that, research in cryptography and
8    complexity theory, 1990. Above that,
9    Independent Scholar, Pascal Centre,
10   Hamilton, Ontario, research in
11   complexity, information, and design,
12   1993 to 1996.
13       Above that, Fellow,
14   Discovery Institute, Center for the
15   Renewal of Science and Culture,
16   research in complexity, information,
17   and design.
18   Q. You are reading on the
19   Appendix?
20   A. Page 14 of his document.
21   It's Appendix 1, Curriculum Vitae.
22   Q. Okay. You are looking at
23   his Academic Experience?
24   A. Yes, that's correct. You

120

1    asked did I ever --
2    Q. But does he ever call
3    himself a mathematical researcher?
4    A. That was -- that's a
5    different question; right? You
6    realize that?
7    Q. Well --
8    A. The original question was
9    does he ever state that he is doing
10   mathematical research.
11   Q. Let me go back to see what
12   my exact question was here. You
13   said, "Dembski argues that his books
14   represent original mathematical
15   research"; right?
16   A. You read that, but then you
17   asked --
18   Q. No, can you provide an
19   exact quote where Dembski says --
20   A. Where Dembski says he is
21   doing mathematical research?
22       COURT REPORTER: One at a
23   time, please.
24       THE WITNESS: Sorry, I

121

1    apologize.
2    BY MR. THOMPSON:
3    Q. Okay. Go ahead. And
4    that's what you're responding to?
5    A. I'm responding to your
6    question does Dembski ever say he was
7    doing mathematical research, and the
8    answer is yes, according to his
9    vitae.
10   Q. Okay. On different
11   occasions by different people, there
12   has been criticism of Dembski's book
13   No Free Lunch, and specifically
14   chapter four in that book. Do you
15   understand that? Do you --
16   A. I know there's been
17   criticism of many aspects of his
18   book, yes.
19   Q. Right.
20   A. I could look at chapter
21   four.
22   Q. We are specifically looking
23   at chapter four.
24   A. May I look at chapter

ORAL DEPOSITION OF JEFFREY O. SHALLIT - 06-28-05

122

1 four? I don't know his book well
2 enough to know it -- the number of
3 the chapter. Evolutionary
4 Algorithms, yes.
5 Q. And in that book, or in
6 that chapter, referring to that
7 chapter, a person by the name of
8 David Wolpert said it was, I think,
9 written in Jell-O. Okay. Are you
10 aware that Dembski has claimed that a
11 few months back that he has filled in
12 what was considered mathematical gaps
13 in that chapter?
14 A. I'm aware of his claim,
15 yes.
16 Q. Okay. Have you looked at
17 that?
18 A. I have.
19 Q. And that was in the paper
20 entitled Searching Large Spaces?
21 A. I have, yes.
22 Q. Okay. Is that accurate?
23 Is that an accurate claim that he's
24 made?

123

1 A. Not in my opinion, no.
2 Q. Has he attempted to fill in
3 some of the gaps?
4 MR. HARVEY: Object to the
5 form of the question.
6 THE WITNESS: He's filled a
7 lot of pages.
8 BY MR. THOMPSON:
9 Q. Okay. Has he addressed any
10 of the criticisms?
11 A. No, he hasn't addressed,
12 for example, any of my criticisms.
13 Q. Okay. When did you read
14 that paper?
15 A. I think it was posted to
16 the Internet something like two
17 months ago, one to two months ago, if
18 I remember correctly.
19 Q. And you read it at that
20 time?
21 A. I looked at it at that
22 time, and I read it again more
23 carefully in preparing for today's
24 event.

124

1 Q. Okay. Is it accurate to
2 say that at some point that you had
3 an e-mail communication with
4 Professor Dembski indicating that you
5 were not going to waste your time
6 finding more errors in his works?
7 A. Yes. Let me explain the
8 context of the sentence -- of this.
9 He sent me a copy of the paper, I
10 think he sent it to many people, and
11 asked me to give my comments. And my
12 response to him was, I don't intend
13 to waste more time finding more
14 errors in more work of yours.
15 Q. Is there an academic code
16 of conduct in professors dealing with
17 each other?
18 A. I don't think there's a
19 formal code. There -- my University
20 has a code of conduct about how
21 professors should treat each other.
22 I think it varies from university to
23 university, and many universities may
24 have -- may have no such code.

125

1 Q. Okay. Your University has
2 a written code of conduct?
3 A. It does.
4 Q. Okay. And where is that
5 found?
6 A. In documents on the
7 University of Waterloo web site, for
8 example, can be found a code of
9 conduct.
10 Q. So it is your claim that
11 Dembski's paper that I've referred to
12 does not address your criticisms of
13 his --
14 A. It does not.
15 Q. Are you concerned that when
16 you raise a criticism, publicly or
17 privately, that he does not respond
18 to your criticism by name?
19 A. I'm sorry, could you
20 rephrase the question?
21 Q. Sure. When you raise a
22 criticism to his work, privately or
23 publicly, are you concerned that he
24 does not respond to your criticisms

James DeCrescenzo Reporting, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX 215.751.0581

ORAL DEPOSITION OF JEFFREY O. SHALLIT ~ 06-28-05

---

126

1  by name, referring to you and your
2  criticism?
3      A.  I'm sorry, it's the word
4  concerned that I don't know how to
5  deal with.
6      Q.  Okay.
7      A.  Can you use another word?
8      Q.  Upset?
9      A.  No.
10     Q.  Well, why don't you tell me
11  how you feel about that?
12     A.  I think that he has an
13  obligation to address valid
14  criticisms, and I think he hasn't
15  done that.
16     Q.  Okay.  Now, does he have to
17  do that by referring to the person
18  who expressed the criticism?
19     A.  That would be standard
20  scientific or mathematical practice,
21  yes.
22     Q.  Okay.  Would you say that
23  that's a part of the academic code of
24  conduct?

---

128

1      A.  I think he's trying to do
2  that.
3      Q.  So you would give him a
4  good grade for effort?
5          MR. HARVEY: Object to the
6  form of the question.
7  BY MR. THOMPSON:
8      Q.  Go ahead, if you can
9  answer.
10         MR. HARVEY: If you can
11  answer, you can answer, if you
12  understand the question.
13         THE WITNESS:  As a
14  professor, we don't give grades for
15  effort, we give grades for
16  accomplishment.
17  BY MR. THOMPSON:
18     Q.  Okay.  You don't think he's
19  accomplished it?
20     A.  I don't.
21     Q.  Even though he's attempted?
22     A.  I don't.
23     Q.  Okay.  Do you recall in
24  that same phone conversation that you

---

127

1          MR. HARVEY: Object to the
2  form of the question. He hasn't
3  testified that there's any code of
4  conduct that applies to this
5  situation.
6  BY MR. THOMPSON:
7      Q.  Is there a code of conduct
8  that would apply to this situation?
9      A.  Not a formal written one
10  that I can think of.
11     Q.  Do you recall calling
12  Professor Dembski back in 2002 —
13     A.  I do.
14     Q.  — about his book No Free
15  Lunch?
16     A.  I do.
17     Q.  Do you recall encouraging
18  him to write up his results in the
19  book in a mathematically rigorous
20  way?
21     A.  I do.
22     Q.  Okay.  Don't you think he's
23  doing that now with these various
24  papers that he's issued?

---

129

1  told him you were on the phone with
2  Wesley Elsberry several times a week
3  about his book?
4      A.  That's true at that time,
5  yes.
6      Q.  Okay.  How much time do you
7  feel you spent in analyzing his book
8  No Free Lunch?
9      A.  I think by the estimate
10  that I gave in the expert testimony
11  was three months, if I remember
12  correctly.
13     Q.  Is that unusual, for
14  professors to spend their sabbaticals
15  reviewing a book?
16     A.  I didn't review the book,
17  precisely.  I read it and tried to
18  understand its arguments.  Then after
19  doing so, I thought it would be
20  worthwhile to write a review of it.
21     Q.  Isn't it true that during
22  sabbaticals, mathematicians typically
23  devote their time to primary
24  research?

James DeCrescenzo Reporting, LLC

215.564.3995

Innovating Litigation
1880 JFK Blvd., 6ᵗʰ Floor, Philadelphia, PA 19103
www.JDReporting.com

FAX 215.751.0581

ORAL DEPOSITION OF JEFFREY O. SHALLIT - 06-28-05

130

1    A.  Your question doesn't have
2  an easy answer with a yes or a no.
3    Q.  Answer it and explain it.
4    A.  A sabbatical is granted
5  typically every six years, every --
6  the seventh year is the sabbatical
7  year.  And this is a time for
8  professors to pursue many different
9  activities that they normally
10  wouldn't be able to do.
11    During my sabbatical, I
12  finished a book, namely, the book
13  Automatic Sequences that was
14  published by Cambridge University
15  Press.
16    I also wrote many papers.
17  And in addition, something that I
18  would typically not have the ability
19  to do during teaching and other
20  duties, is I spent three months
21  analyzing the arguments in Professor
22  Dembski's book.
23    Q.  Why did you feel it was
24  necessary to take three months out of

131

1  your professional life to analyze
2  that book?
3    A.  I thought that -- I wanted
4  to understand his arguments, and I
5  didn't anticipate it would take as
6  long as it did to read them and
7  consider them carefully.
8    Q.  So it's a fair statement to
9  say you took his book seriously?
10    A.  I did take it seriously, as
11  he -- he challenged people to do.
12    Q.  On page six of your report,
13  you talk about in No Free Lunch,
14  Dembski recorded a number that is 65
15  orders of magnitude off.  Could you
16  explain that for me, please?
17    A.  Yes.  Let's see if I can
18  get the exact page here for you.  On
19  page 297 of No Free Lunch, there's a
20  calculation where he uses something
21  he calls a perturbation probability
22  to approximate a probability, one of
23  several that he uses in computing the
24  probability that the flagellum would

132

1  arise, the bacterial -- he says the
2  bacterial flagellum.
3    That's an error, but let's
4  say a bacterial flagellum.  He does
5  so in terms of a calculation
6  involving binomial coefficients and
7  powers, and he asserts the number
8  corresponds to ten to the minus 288th
9  power, that means .00000 with 287
10  zeroes and then a one.
11    Q.  Okay.  Could you, to a
12  layman, could you explain what that
13  means, what the significance of that
14  is?
15    A.  It's an extremely small
16  probability.
17    Q.  And how would that relate
18  to the theory of intelligent design?
19    A.  You're asking me to make
20  Dembski's argument for him.  Dembski
21  would say such a small probability
22  indicates that the flagellum could
23  not have arisen naturally.
24    Q.  Okay.  Now, with his number

133

1  off by 65 orders of magnitude, what
2  does that mean?
3    A.  That means he's off by a
4  thousand thousand thousand thousand
5  thousand thousand thousand thousand
6  thousand thousand thousand
7  thousand -- I said thousand 22 times
8  there -- a factor that large.
9    Q.  How does that affect the
10  validity of the theory?
11    A.  I'd say that when you have
12  a calculation in a book that's off by
13  65 orders of magnitude, it indicates
14  sloppiness, certainly, and that the
15  figure should be retracted or
16  otherwise publicized as wrong, and
17  the correct figure should be given.
18    Q.  My question was, how does
19  that implicate his theory?
20    A.  It implies that the
21  flagellum is far more improbable than
22  his own calculation actually says.
23    Q.  So it actually helps his
24  theory, does it not?

ORAL DEPOSITION OF JEFFREY O. SHALLIT - 06-28-05

234

1    A. The error helps his theory,
2    that's right. The error makes it
3    look more improbable.
4    Q. Oh, it does?
5    A. Yes.
6    Q. Than had he corrected the
7    65 magnitude?
8    A. Right. So it should be 10
9    to the minus 223 power, so he's made
10   it 10 to the 65 more times improbable
11   than it should be.
12   Q. Okay. In the scheme of
13   things, would it make much
14   difference, I mean, even the number
15   that is accurate, how would you
16   describe that? As highly improbable?
17   A. I would describe that if
18   the calculation were done correctly,
19   it would be improbable.
20   Q. Okay. Virtually
21   improbable?
22   A. I don't know what that
23   means. Sorry.
24   Q. In layman's terms, what

135

1    would be the chances?
2    A. But the entire calculation
3    is based on a nonsensical model, so I
4    think it has no interpretation.
5        My only point in pointing
6    out that this was wrong is that
7    Dembski has made a calculation where
8    he's made 10 to the 65th error, and
9    routine scientific practice would be
10   to issue an erratum to this, and he
11   hasn't.
12   Q. Now, okay, other
13   mathematicians have made errors?
14   A. Yes.
15   Q. And it is not something
16   that is tremendously unusual, is it?
17   A. No, it's not.
18   Q. Okay. And your objection
19   is that when the error was presented
20   to him, he should have issued some
21   kind of correction?
22   A. At the very least, yes.
23   Q. Okay. Would it help to
24   know that he has issued some

136

1    correction, changed the figure?
2    A. I was not aware of it. He
3    certainly didn't inform me.
4    Q. Okay. Do you know an
5    individual by the name of Robert
6    Marks, or know of him, I should say?
7    A. Robert Marks?
8    Q. Uh-huh.
9    A. The name is not familiar,
10   no.
11   Q. Okay. Are you familiar
12   with the expert report of Scott
13   Minick?
14   A. No, I wouldn't say I could
15   say anything about it, really.
16   Q. As I understand the
17   position that you've taken
18   throughout, that, you know, you're
19   limiting your expert opinions to the
20   areas that you have credentials in,
21   and that is, mathematics and computer
22   science; is that correct?
23   A. Mathematics, computer
24   science, and also pseudomathematics

137

1    and pseudoscience to some extent.
2    Q. Okay. Is that a field,
3    pseudomathematics and pseudoscience?
4    A. The study of it is a field,
5    yes.
6    Q. Who studies that?
7    A. There have been many, many
8    books and papers on pseudoscience and
9    pseudomathematics.
10   Q. Is it a department in any
11   university?
12   A. No.
13   Q. Are there any --
14   A. No, it's a -- it would be a
15   sub field.
16   Q. Okay. Are there any
17   professors who claim to be experts in
18   pseudomathematics and pseudoscience?
19   A. Yeah, I think there would
20   be several, yeah.
21   Q. Okay. How would you define
22   a pseudomathematician?
23   A. Well, let me start with
24   pseudoscience as a preliminary.

James DeCrescenzo Reporting, LLC

215.564.3905
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com
FAX  215.751.0581

ORAL DEPOSITION OF JEFFREY O. SHALLIT - 06-28-05

138

1  Q. Okay.
2  A. Pseudoscience is a social
3  activity which has the trappings of
4  science, mimics science in several
5  ways, but is not actual science in
6  many respects.
7      And Martin Gardner, the
8  popular science writer and editor of
9  the mathematical games column of
10  Scientific American wrote a book
11  entitled In the Name of Science where
12  he lists some of the characteristics
13  of pseudoscience.
14     So he says that
15  pseudoscientists make grandiose
16  claims. Pseudoscientists attack the
17  best-known scientists and the best-
18  known theories.
19     Pseudoscientists develop
20  their own jargon, a form of discourse
21  that's unique to them and which is
22  not shared by the larger scientific
23  community.
24     Pseudoscientists believe

139

1  they are – often believe they are
2  unjustly persecuted or prevented from
3  disseminating their results.
4      Pseudoscientists do not
5  respond to critics. So these are
6  some of the things that he laid out
7  as characteristics of pseudoscience.
8      And pseudomathematics is
9  similarly the practice of mathematics
10  where it looks, perhaps to the
11  untrained eye, as if someone is doing
12  mathematics, but the person is not
13  following the generally accepted
14  standards of presenting, for example,
15  theorems together with proofs, of
16  responding to criticism, focusing
17  attacks on, you know, on the very
18  best known mathematical theories that
19  are accepted by everyone.
20      So I would say it's very
21  similar to that, just the focus has
22  shifted from – very similar to
23  pseudoscience, but the focus has
24  shifted from science to mathematics.

140

1  Q. Would you consider or do
2  you consider, excuse me, do you
3  consider William Dembski a
4  pseudoscientist?
5  A. I think pseudo – yes, I
6  think it's a combination of
7  pseudoscience and pseudomathematics.
8  I was restricting myself to the
9  pseudomathematics.
10  Q. Okay. Would you consider
11  Michael Behe a pseudoscientist?
12  A. I – at this point, if I
13  answer, I would say that it's only
14  with a layman's understanding of the
15  biology involved, and not any
16  professional credentials. So with
17  that preface, I would say that, yes,
18  his work does exhibit some of the
19  aspects of pseudoscience.
20  Q. You know he's a professor
21  of microbiology at Lehigh University?
22  A. I do.
23  Q. And that he has published a
24  lot of works in the area of

141

1  microbiology?
2  A. I didn't say all his work.
3  Q. Which work do you think is
4  pseudoscience?
5  A. Darwin's Black Box.
6  Q. What part of that?
7  A. I think, again, I'm only
8  speaking as a layman's understanding,
9  and I don't intend to offer this as
10  expert testimony.
11     I think the fact that he
12  doesn't -- he doesn't change his
13  arguments and respond to good
14  criticisms. So, for example, the
15  mouse trap analogy I think has been
16  decisively refuted, but he continues
17  to give that.
18  Q. Where do you believe it's
19  been decisively refuted? Who's
20  decisively refuted it?
21  A. I think there are a
22  large –
23     MR. HARVEY: I'm going to
24  object to the line of questioning.

ORAL DEPOSITION OF JEFFREY O. SHALLIT - 06-28-05

142

1  It's outside his area of expertise.
2  I don't know why we're pursuing this,
3  what relevance this has to this
4  litigation. He can answer the
5  question, but I'm not going to let
6  this go on for too long.
7      THE WITNESS: I would say,
8  again, prefacing that this is only my
9  layman's understanding, I believe
10  it's been decisively refuted by many
11  people whose critiques I've read,
12  such as Kenneth Miller, for example.
13  BY MR. THOMPSON:
14     Q. What about Professor Scott
15  Minnick, do you think he's a
16  pseudoscientist?
17     A. I don't know enough of his
18  work to be able to give you an
19  answer.
20     Q. Did you read the report of
21  Stephen Meyer?
22     A. I did read it, yes.
23     Q. Do you think he's a
24  pseudoscientist?

143

1     A. Again, prefacing my remarks
2  that it's only a layman's, I
3  wouldn't -- I wouldn't call him a
4  pseudoscientist because I don't think
5  he's even mimicking science, so I
6  don't -- he's a philosopher, as far
7  as I can tell.
8     Q. Isn't it true many times
9  new theories, before they're accepted
10  by the general scientific community,
11  are considered pseudoscience?
12     A. No, I don't think so. I
13  don't think that's true. But -- no,
14  I would say no.
15     Q. What about the Big Bang
16  theory?
17     A. I'm not --
18        MR. HARVEY: I'm going to
19  object to the form of the question.
20  What about it?
21  BY MR. THOMPSON:
22     Q. Wasn't it at one point
23  considered pseudoscience?
24     A. I couldn't offer any expert

144

1  opinion on that.
2     Q. Okay. Can you offer any
3  expert opinion on the policy that was
4  adopted by the Dover Area School
5  Board which is the subject matter of
6  this lawsuit?
7     A. I'm not qualified to
8  discuss science education in the high
9  schools, per se. I don't know the
10  legal issues, and I couldn't offer
11  anything of value about their
12  particular policy.
13     Q. What do you understand as
14  the theory of an intelligent design?
15     A. I think that based on my
16  understanding of Dembski's summary,
17  that it is the belief that certain
18  aspects of nature exhibit a
19  complexity which could not be reduced
20  to chance or necessity and,
21  therefore, according to Dembski, must
22  be assigned to an intelligent
23  designer, a supernatural being.
24     Q. Do you agree that

145

1  scientists like Michael Behe look at
2  a bacterial flagellum and see design?
3        MR. HARVEY: Object to the
4  form of the question.
5        THE WITNESS: You're asking
6  me to talk about Michael Behe's
7  internal state, and I don't --
8  BY MR. THOMPSON:
9     Q. Well, no, his report, his
10  expert opinion.
11     A. I haven't -- I don't feel I
12  have been qualified to answer
13  anything about bacterial flagellum
14  other than the calculation in No Free
15  Lunch by Dembski.
16     Q. Your report focuses on a
17  rebuttal of Dembski; is that correct?
18     A. I think there are several
19  aspects of my report. I address his
20  qualifications, and I address his
21  mathematical claims.
22     Q. A lot of your report,
23  though, really deals with an attack
24  on Dembski, does it not?

James DeCrescenzo Reporting, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                          FAX  215.751.0581

ORAL DEPOSITION OF JEFFREY O. SHALLIT - 06-28-05

146

1    MR. HARVEY: Object to the
2  form of the question. Attacking
3  Dembski personally, or on his work?
4    MR. THOMPSON: An attack on
5  Dembski. If you can answer the
6  question.
7    MR. HARVEY: Object to the
8  form of the question.
9    THE WITNESS: Can you
10  qualify what you mean by the word
11  attack?
12  BY MR. THOMPSON:
13    Q. Well, you make a claim
14  Dembski is not a scientist. Is that
15  an attack on Dembski?
16    A. I think it's --
17    MR. HARVEY: Object to the
18  form of the question.
19    THE WITNESS: I think it's
20  a factual statement, by my
21  understanding of the word science.
22  BY MR. THOMPSON:
23    Q. You say in your report that
24  Dembski is not a renowned

147

1  mathematician. Is that an attack on
2  Dembski?
3    MR. HARVEY: Object to the
4  form of the question.
5    THE WITNESS: I think it's
6  a factual statement.
7  BY MR. THOMPSON:
8    Q. You say Dembski's work is
9  extensively criticized in the
10  literature, but he rarely responds.
11  Is that an attack on Dembski?
12    MR. HARVEY: Object to the
13  form of the question. You may
14  answer.
15    THE WITNESS: I think it's
16  a factual statement.
17  BY MR. THOMPSON:
18    Q. You make a statement,
19  Dembski's method for inferring design
20  is neither accepted by the scientific
21  community at large nor useful to
22  science. Is that an attack on
23  Dembski?
24    MR. HARVEY: Same

148

1  objection.
2    THE WITNESS: I'd say
3  neither is -- not accepted by the
4  scientific community at large is a
5  fact, and not useful to science is my
6  opinion.
7  BY MR. THOMPSON:
8    Q. Now, when you say Dembski
9  is not a scientist, how is that
10  relevant to the question of whether
11  his theory is valid?
12    A. It's a separate issue.
13    Q. Okay. So when you make a
14  statement Dembski is not a scientist,
15  you are not in any way impugning the
16  validity of his theory --
17    MR. HARVEY: Object.
18  BY MR. THOMPSON:
19    Q. -- is that correct?
20    MR. HARVEY: You may
21  answer.
22    THE WITNESS: Yes, that's
23  correct.
24  BY MR. THOMPSON:

149

1    Q. Okay. So when you make a
2  statement that Dembski is not a
3  renowned mathematician, you are not
4  in any way impugning the validity of
5  his theory; is that correct?
6    MR. HARVEY: I'm going to
7  object to the form of the question.
8    THE WITNESS: Yes, that's
9  correct.
10  BY MR. THOMPSON:
11    Q. You make the statement
12  Dembski's work is extensively
13  criticized in the literature, but he
14  rarely responds. That is not in any
15  way impugning the validity of his
16  theory, is it?
17    MR. HARVEY: Same
18  objection.
19    THE WITNESS: I don't think
20  it has a yes or no answer, again.
21  BY MR. THOMPSON:
22    Q. You mean the validity of a
23  theory depends on whether someone
24  responds to criticism?

James DeCrescenzo Reporting, LLC
215.564.3905
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com
FAX 215.751.0581

ORAL DEPOSITION OF JEFFREY O. SHALLIT - 06-28-05

150

1    A.  If the criticism isn't
2 addressed and it's correct, then,
3 yes.
4    Q.  Well, that's -- I didn't
5 ask -- you inserted "and it's
6 correct." I'm just talking about the
7 claim itself.
8    A.  Okay.  Could you rephrase,
9 then?
10    Q.  Okay.  You indicated
11 Dembski's work is extensively
12 criticized in the literature, but he
13 rarely responds.  Does that claim in
14 any way impugn the validity of his
15 theory?
16    A.  In a logical sense, no.
17    Q.  Well, aren't scientists
18 supposed to be logical?
19    A.  Well, in a sociological
20 sense, yes, so I find it hard --
21    Q.  It's a --
22    A.  I'm a mathematician and
23 scientist and I don't fit well into a
24 legal community, and for that, I

151

1 apologize.
2    Q.  Well, no, I'm talking about
3 logic in the sense of is it a
4 fallacious argument to make that just
5 because he does not respond to
6 literature -- excuse me.  Just
7 because he does not respond to
8 criticism in the literature, that
9 that impugns the validity of his
10 theory?
11    A.  That would be fallacious if
12 I had made that argument, yes.
13    Q.  Right.  And would it in any
14 way impugn the validity of his theory
15 by claiming Dembski's method for
16 inferring design is neither accepted
17 by the scientific community at large,
18 nor useful to science?
19    A.  It could be correct even
20 so.
21    Q.  Correct.
22    (Mr. Rothschild exited the
23 deposition room at 2:24 p.m.)
24 BY MR. THOMPSON:

152

1    Q.  So much of the claims that
2 you are making and that I just
3 referred to have no relevancy at all
4 to the validity of whether Dembski's
5 theory of intelligent design is a
6 valid theory; is that correct?
7       MR. HARVEY:  Objection.
8 Mischaracterizes the testimony.
9       THE WITNESS:  Do you want
10 to -- could you rephrase it?
11       MR. THOMPSON:  I'll try to
12 rephrase it.  Would you please repeat
13 what I asked.
14       (The court reporter read
15 back the following:
16       "Q.  So much of the
17 claims that you are making and that I
18 just referred to have no relevancy at
19 all to the validity of whether
20 Dembski's theory of intelligent
21 design is a valid theory; is that
22 correct?")
23 BY MR. THOMPSON:
24    Q.  Do you understand the

153

1 question now?
2    A.  I would say some of what
3 I've said is not directly addressing
4 that question, yes.
5    Q.  Well, the various
6 allegations that I referred to
7 earlier, Dembski is not a scientist,
8 Dembski is not a renowned
9 mathematician, Dembski's work is
10 extensively criticized in the
11 literature but he rarely responds,
12 Dembski's method for inferring design
13 is neither accepted by scientific
14 community at large nor useful to
15 science, none of those allegations
16 really relate to whether Dembski's
17 theory of intelligent design is a
18 valid theory; is that correct?
19    A.  It's just hard because it
20 doesn't have a yes or no answer.
21 It's a -- we use many methods for
22 determining the validity of theories.
23       We use methods where we
24 examine the claims, which I also have

ORAL DEPOSITION OF JEFFREY O. SHALLIT - 06-28-05

154

1  done. But we also evaluate theories
2  every day on the basis of appeal to
3  appropriate authority. So --
4     Q. Well, isn't -- even --
5        MR. HARVEY: I'm going to
6  object. I don't believe, I'm not
7  sure that it's clear that he was
8  finished.
9        MR. THOMPSON: Okay.
10       MR. HARVEY: Were you
11  finished with your answer?
12       THE WITNESS: I think I was
13  finished.
14  BY MR. THOMPSON:
15    Q. Okay. Well, appeal to
16  appropriate authority, that's a
17  fallacious argument in itself, isn't
18  it?
19    A. No, appeal to authority is
20  a fallacious argument.
21    Q. But even appeal to
22  appropriate authority, the authority
23  might be wrong; isn't that true?
24  Isn't that one of the fallacious

155

1  arguments discussed in books in
2  logic, appeal to authority?
3    A. No, I think appeal to
4  authority is a fallacious argument.
5  But appeal to appropriate authority
6  is not always fallacious. It could
7  be fallacious, but it's not
8  necessarily fallacious.
9    Q. When you prove your
10  argument, when you're attempting to
11  prove the validity of your argument,
12  how does the validity of your
13  argument depend upon the authority
14  that you're appealing to?
15    A. You didn't -- you didn't
16  really follow what I said, I think.
17  I said that we -- we, as people, use
18  many different methods for assessing
19  the correctness of claims. And in
20  areas where one is not an expert, the
21  opinions of experts are useful.
22    Q. Okay. Now I'll ask my
23  question again. The fact that
24  Dembski is not a scientist, which

156

1  you've alleged, does not affect the
2  validity of his theory, does it?
3    A. No.
4    Q. Okay. And the fact that
5  Dembski is not a renowned
6  mathematician does not affect the
7  validity of his theory, does it?
8    A. No.
9    Q. Okay. And the fact that
10  Dembski's work is extensively
11  criticized in the literature but he
12  rarely responds does not affect the
13  validity of his theory, does it?
14    A. I think we're back to the
15  same point again.
16    Q. Are we stuck on that one?
17    A. I guess to make it clear,
18  that alone, with nothing else, would
19  not affect the validity.
20    Q. Okay. And then the fact
21  that Dembski's method for inferring
22  design is neither accepted by the
23  scientific community at large, nor
24  useful to science, does that affect

157

1  the validity of his theory?
2    A. That alone, no.
3    Q. Okay. On page ten, you
4  refer to -- and that's paragraph
5  number six, "Dembski's 'Law of
6  Conservation of Information' is not a
7  law." Can you explain what you mean
8  by that?
9    A. Yes. Dembski makes a
10  certain claim that his version of
11  complexity, which he calls specified
12  complexity, has the property that if
13  a function, a deterministic function,
14  is applied to a particular item of
15  information with a particular
16  specified complexity, then the new
17  item of information that you get by
18  applying the function, let's call it
19  F, to the item of information X, new
20  piece of information F of X, has no
21  more information in the Dembski
22  sense, specified complexity, than the
23  original X.
24       And he makes a similar

James DeCrescenzo Reporting, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                    FAX 215.751.0581

ORAL DEPOSITION OF JEFFREY O. SHALLIT - 06-28-05

158

1 claim to F's that are not strictly
2 deterministic but involve a
3 stochastic element. This he calls
4 his Law of Conservation of
5 Information.
6    Q. And you're saying it's not
7 a law?
8    A. It's not a law.
9    Q. Could you define what you
10 mean by law?
11    A. He uses the term law, and
12 when I say it's not a law, I mean
13 it's not correct. The claim, the Law
14 of Conservation of Information, is
15 not correct.
16    Q. Are you aware of the
17 endorsements of Dembski's book No
18 Free Lunch?
19    A. I'm familiar with many of
20 them, yes.
21    Q. Okay. Are you familiar
22 with the endorsement he received by
23 John C. Lennox?
24    A. I am.

159

1    Q. Do you consider John C.
2 Lennox a credible scientist,
3 mathematician?
4    A. He's a mathematician, yes.
5    Q. Credible mathematician?
6    A. Yes.
7    Q. Do you consider him
8 involved in pseudomathematics?
9    A. No.
10    Q. Okay. What about Andrew
11 Ruys, are you aware of his
12 endorsement of --
13    A. I am.
14    Q. And do you consider himself
15 a credible scientist?
16    A. I believe he's an engineer,
17 a materials engineer.
18    Q. How would you define that
19 in the different departments of
20 academia?
21    A. He's an engineer.
22    Q. Engineer. Okay. What is a
23 biochromatic engineer?
24    A. Bioceramics?

160

1    Q. Ceramic, is it? Okay.
2    A. I believe that's what it
3 says. May I consult the book?
4    Q. Sure.
5    A. Bioceramic engineering. I
6 don't purport to be an expert in
7 engineering, but bio means life, and
8 ceramic, I think we know what
9 ceramics are, so I imagine it has to
10 do with the properties of materials
11 that involve organic substances
12 together with ceramics. That would
13 be my guess.
14    Q. Do you recall criticizing
15 Ruys --
16    A. I do.
17    Q. -- for endorsing Dembski's
18 work --
19    A. I do.
20    Q. -- on ethical grounds?
21    A. I criticized him on the
22 basis that giving your opinion where
23 you're not an expert for the
24 endorsement of a book might be

161

1 unethical.
2    Q. And you cited the Code of
3 Canadian Ethics -- excuse me, the
4 Canadian Code of Ethics for
5 Engineers?
6    A. I did.
7    Q. Was there a specific
8 provision in there?
9    A. I cited -- I quoted to him
10 something along those lines. It was
11 three years ago. I don't remember
12 the exact.
13    Q. Well, why did you do that?
14    A. Because he insisted that it
15 was perfectly fine for him to endorse
16 it. And -- but he didn't respond to
17 my question about whether he felt he
18 had the qualifications to understand
19 it.
20    Q. And so your --
21    A. This was private
22 correspondence, I want to emphasize.
23    Q. Okay. So what you were
24 saying is you don't have the

42 (Pages 162 to 165)

ORAL DEPOSITION OF JEFFREY O. SHALLIT – 06-28-05

162

1  qualifications to endorse the book,
2  therefore, you should not have
3  endorsed the book?
4      A.  Yes.
5      Q.  Have you contacted any
6  other scholars who have endorsed --
7      A.  I have.
8      Q.  -- Dembski's book?
9      A.  Uh-huh.
10     Q.  How many?
11     A.  I couldn't say because the
12  book came out in 2002, but I would
13  guess it was between five and ten.
14     Q.  Is this a usual practice of
15  yours?
16     A.  Please rephrase the
17  question.
18     Q.  Is it a usual practice of
19  yours to look at book reviews and
20  criticize individuals who are
21  endorsing a book?
22     A.  I have on occasion, yes.
23     Q.  What other occasions?
24     A.  I have to think. I believe

163

1  I once criticized someone for
2  endorsing a pro-evolution,
3  anticreationist book which was poorly
4  written.
5      Q.  And you criticized it on
6  what grounds?
7      A.  That the endorsement wasn't
8  accurate.
9      Q.  And do you remember what
10  the title of that book was?
11     A.  It was -- it was -- just a
12  second. I can't remember. It was by
13  an Australian anticreationist, and I
14  could come up with the title and give
15  it in a minute, but --
16     Q.  Okay. Is it a fair
17  statement to make that there is
18  animosity between you and Bill
19  Dembski?
20        MR. HARVEY: Object to the
21  form of the question. I believe he
22  can only testify about his end of
23  that.
24        THE WITNESS: I'd say

164

1  there's a small amount of animosity,
2  yes.
3  BY MR. THOMPSON:
4      Q.  Why is that?
5      A.  Well, to take the most
6  recent example, he -- he alleged that
7  I engaged in unethical conduct, and
8  his summary of the events was
9  incorrect, and he did so by posting
10  it on the Internet.
11     Q.  Was that with reference to
12  the book that he was co-editing
13  with --
14     A.  It was.
15     Q.  -- Professor Michael Ruse?
16     A.  It was.
17     Q.  And you, in fact,
18  apologized for what you did; is that
19  true?
20     A.  It is a -- your summary of
21  the events is misleading.
22     Q.  Okay. Why don't you give
23  me the summary of events.
24     A.  The summary of events was

165

1  that Elsberry and I considered the
2  possibility of submitting our paper
3  to a volume edited by Ruse and
4  Dembski.
5      I wrote to Ruse and asked
6  him to keep my concern confidential,
7  that if I sent the paper to Ruse and
8  Dembski, Dembski would find some
9  reason to not include it in the
10  volume. And then he would not only
11  know our arguments, but also have
12  kept our paper out. That was the
13  context.
14     And -- however, Ruse
15  mistakenly forwarded this
16  confidential e-mail, which I asked
17  him to keep confidential, to Dembski
18  by accident, which he was mortified
19  to do, and he apologized -- Ruse
20  apologized to me profusely.
21     And I called up Dembski and
22  I said -- I explained to him, because
23  Dembski thought in his e-mail to me
24  that this meant I was trying to sneak

ORAL DEPOSITION OF JEFFREY O. SHALLIT - 06-28-05

166

1    the paper in behind his back.
2        I wasn't.  I was simply
3    expressing my concern.  We hadn't
4    submitted a paper.  We hadn't asked
5    the paper to be included.  We had
6    never asked it to be included behind
7    his back.
8        I simply asked -- I
9    expressed my concern to Ruse, and
10   Ruse replied.  And that was it.  The
11   paper was never submitted, or Ruse
12   never saw the paper.
13       And I apologized to Dembski
14   because I thought I should not have
15   denigrated him to his coauthor.  That
16   was rude.  And I apologized for my
17   rudeness, and Dembski accepted my
18   apology.
19       Q.  Well, isn't it true the
20   actual e-mail that you sent said the
21   following:  "I am somewhat worried
22   that if you send the MS" -- is that
23   the manuscript --
24       A.  Uh-huh.

167

1        Q.  -- "to him," meaning
2    Dembski, "he will find some reason to
3    put the kibosh on it."  And then
4    you've got in parentheses, "Too
5    technical, too long."  "And then he
6    will win both ways.  It doesn't get
7    published in your anthology, and he
8    already knows the content before it
9    appears."  Isn't that what you wrote
10   in your e-mail?
11       A.  That's what I wrote, and I
12   believe I made an accurate summary of
13   it just now.
14       Q.  Well, you wanted to keep
15   your manuscript away from Dembski;
16   isn't that true?
17       A.  I did -- I expressed my
18   worry that if he saw it, he would
19   unfairly reject it.  That was my
20   worry.
21       Q.  Okay.
22       A.  I never submitted the
23   manuscript to Ruse.  He never saw
24   it.  And it -- well --

168

1        Q.  Continuing on with this, I
2    don't know how to characterize this,
3    but this exchange that you're having
4    with Professor Dembski, you indicated
5    to him just recently, actually in
6    March, that you were not going to
7    waste any more time looking at papers
8    of his; is that correct?
9        A.  No.  I believe what I said
10   was -- well, you can read what I
11   said.  I think you have it in front
12   of you.  I said something to the
13   order of I don't plan to waste any
14   more time finding mistakes in papers
15   of yours.
16       Q.  Right.
17       A.  That's different from
18   reading.  Finding mistakes is a more
19   thorough reading.
20       Q.  I'll quote it so that it's
21   accurate.  "I already told you that
22   since you have never publicly
23   acknowledged even one of the many
24   errors I have pointed out in your

169

1    work, I do not intend to waste my
2    time finding more errors in more work
3    of yours."
4        A.  That's correct.
5        Q.  Then the next paragraph.
6    "I find your failure to acknowledge
7    the errors I have pointed out
8    completely indefensible, both
9    ethically and scientifically."
10       A.  Yes.
11       Q.  Period.  That's what the
12   letter was, or the e-mail you sent.
13       A.  Uh-huh, yes.
14       Q.  In that e-mail you were
15   saying, and correct me if I'm wrong,
16   that you were not going to read any
17   more of his papers?
18       A.  At the time that e-mail was
19   written, I had the intention that I
20   would not search for errors in his
21   papers.
22       Q.  And that was a response,
23   your e-mail that I just read was a
24   response to an e-mail that he had

James DeCrescenzo Reporting, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.584.3905                    FAX  215.751.0581

ORAL DEPOSITION OF JEFFREY O. SHALLIT - 06-28-05

170

1  sent you, among other critics, and
2  that e-mail basically indicated that
3  he was attaching a paper to fill in
4  the details of chapter four of No
5  Free Lunch which, you know, David
6  Wolpert had referred to as, quote,
7  written in Jell-O.
8      A.  That's correct.
9      Q.  Okay.  And he wanted you
10  all to take a look at it; right?
11      A.  Yes.
12      Q.  Okay.  And he welcomed your
13  comments; correct?
14      A.  He said he welcomed my
15  comments.
16      Q.  Right.  And your response
17  was the e-mail that you sent him that
18  we just referred to?
19      A.  That's true.
20      Q.  Well, isn't that an
21  indication that at least he was
22  willing to listen to critics and had
23  already responded to critics?
24      A.  No, it's not such an

171

1  indication.
2      Q.  Now, are you aware that
3  there is a dispute between
4  intelligent design theory and the
5  theory of evolution that has
6  religious implications to it?
7          MR. HARVEY:  Object to the
8  use of the word theory.
9          THE WITNESS:  Could you
10  rephrase?
11  BY MR. THOMPSON:
12      Q.  Are you aware of the
13  religious implications in the battle
14  between the theory of intelligent
15  design and the theory of evolution?
16      A.  I'm aware --
17          MR. HARVEY:  Object to the
18  form of the question.
19  BY MR. THOMPSON:
20      Q.  Okay.  Continue.
21      A.  Sorry.  Could you read back
22  the question?
23          (The court reporter read
24  back the following:

172

1          "Q.  Are you aware of the
2  religious implications in the battle
3  between the theory of intelligent
4  design and the theory of evolution?")
5          THE WITNESS:  I don't know
6  what I'm supposed to do.  If I don't
7  think that intelligent design is a
8  theory, then how should I answer the
9  question?  It seems to be like do you
10  beat your wife?  When did you stop
11  beating your wife?
12  BY MR. THOMPSON:
13      Q.  You don't acknowledge that
14  proponents of intelligent design view
15  it as a theory?
16      A.  Yes, but I don't view it as
17  a theory, and so I can't answer the
18  question without betraying my own
19  understanding of it.
20      Q.  Do you acknowledge reading
21  the book by Barbara Forrest and Paul
22  Gross entitled Creationism's Trojan
23  Horse, I believe?
24      A.  I do.

173

1      Q.  In there they discuss the
2  theory of intelligent design, do they
3  not?
4      A.  I think they discussed
5  intelligent design.  I'm not sure
6  they used the word theory.
7      Q.  Are you having a problem
8  with the word theory that I put in
9  front of intelligent design?
10      A.  That is precisely the
11  problem, yes.
12      Q.  Okay.  If I took the word
13  theory out, would you answer the
14  question?
15      A.  I would.
16      Q.  Okay.  I take the word
17  theory out.  Are you familiar with
18  the religious implications in the
19  conflict between the theory of
20  evolution and intelligent design?
21      A.  I'm aware that some believe
22  there are religious conflicts, yes.
23      Q.  Does that in any way affect
24  your view of intelligent design as

James DeCrescenzo Reporting, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905          FAX  215.751.0581

ORAL DEPOSITION OF JEFFREY O. SHALLIT - 06-28-05

174

1 propounded by William Dembski and
2 Michael Behe?
3    A.  I can only speak about
4 William Dembski.
5    Q.  Okay.
6    A.  That's what I'm offering my
7 expert testimony.  My expert
8 testimony has nothing to do with the
9 religious implications.
10    Q.  Okay.  Have you read the
11 biology textbook that the Dover ninth
12 grade high school students use?
13    A.  I have not.
14    Q.  Have you consulted with Ken
15 Miller at all, who is the author of
16 that book?
17    A.  Could you be more precise?
18 With respect to this issue?
19    Q.  Yes.
20    A.  No.
21    Q.  Have you consulted him with
22 respect to any issue?
23    A.  I've sent him e-mail on
24 occasion.

176

1    Q.  And basically it went
2 through the Wedge document.  Have you
3 ever seen the Wedge document?
4    A.  I have.
5    Q.  Okay.  Have you read it?
6    A.  I have.
7    Q.  And Barbara Forrest
8 discusses that; is that correct?
9    A.  Yes.
10    Q.  And her book also discusses
11 the various strategies and ways in
12 which intelligent design proponents
13 are moving their intelligent design
14 along; is that correct?
15    A.  That's correct.
16    Q.  Okay.  Now, that book was
17 not a science book, was it?
18    A.  I would say it's a more --
19 it had aspects of science in it, but
20 I'd say primarily a political and
21 sociological analysis.
22    Q.  Right.  It didn't discuss
23 mathematics, did it?
24    A.  I think it was briefly

175

1    Q.  Dealing with what?
2    A.  Something he said,
3 something I read of his.
4    Q.  Dealing with the battle
5 between the theory of evolution and
6 intelligent design?
7    A.  Probably, but it's been a
8 while since -- I actually don't
9 remember the precise details of my
10 e-mail message.  I correspond with
11 many people.
12    Q.  Okay.  Now, when you read
13 Barbara Forrest's book, Creationism's
14 Trojan Horse, you gave it a very
15 sterling review, did you not?
16    A.  I did.
17    Q.  And would you describe, if
18 you can, the book.  What was the book
19 about?
20    A.  The book was about the
21 political and sociological aspects,
22 largely about the political and
23 sociological aspects of the -- of the
24 intelligent design movement.

177

1 discussed, yes.
2    Q.  Which part?
3    A.  Without having --
4    Q.  You don't remember, okay.
5    A.  Not having it in front of
6 me, I couldn't say.
7    Q.  It really was a book about
8 the intelligent design movement?
9    A.  Yes, it was.
10    Q.  Okay.  It was not supposed
11 to be a science book?
12    A.  That's correct.
13    Q.  Okay.  Have you taken sides
14 in this battle between the theory of
15 evolution and intelligent design?
16         MR. HARVEY:  Object to the
17 form of the question.
18         THE WITNESS:  Could you
19 rephrase it, make it more precise?
20 BY MR. THOMPSON:
21    Q.  Yes.  Have you decided
22 which is correct, the theory of
23 evolution or intelligent design?
24         MR. HARVEY:  Object to the

James DeCrescenzo Reporting, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3906                                    FAX  215.751.0581

ORAL DEPOSITION OF JEFFREY O. SHALLIT - 06-28-05

178

1  form of the question.
2  BY MR. THOMPSON:
3      Q.  If you understand the
4  question, you may answer.
5      A.  I have a personal belief.
6      Q.  Yes.
7      A.  Which I am not offering as
8  expert testimony --
9      Q.  Correct.
10     A.  -- about this debate.
11     Q.  I understand.  You have
12  limited, quite rightly, your area of
13  expertise in mathematics and computer
14  science, and so I'm asking you some
15  questions that are outside of your
16  expertise.  And if you have an
17  opinion, I'm asking for your personal
18  opinion.
19     A.  It would only be -- I'll
20  answer it with the understanding it's
21  only my personal opinion.  Yes, I --
22  I accept the theory of evolution as a
23  good explanation for biological
24  diversity.

179

1      Q.  Okay.  Do you also accept
2  the fact that the theory of evolution
3  does have gaps in it?
4          MR. HARVEY:  Object to the
5  form of that question.
6          THE WITNESS:  Please define
7  the word gap.
8  BY MR. THOMPSON:
9      Q.  There are things that it
10  can't explain?
11     A.  Yes, it does not explain
12  why objects fall at 32 feet per
13  second per second acceleration, for
14  example.
15     Q.  Well, things that is
16  encompassed in the theory that it
17  doesn't explain?
18     A.  No theory is complete.
19     Q.  Okay.  And you would agree
20  that the theory of evolution
21  continues to change as new data are
22  gathered?
23          MR. HARVEY:  Object.
24  Again, this is outside his area of

180

1  expertise.  You can answer.
2          THE WITNESS:  Yes, it's
3  outside my area of expertise, really.
4  BY MR. THOMPSON:
5      Q.  You don't feel competent to
6  answer that question as a --
7      A.  I could only answer it as a
8  layman --
9      Q.  Okay.
10     A.  -- and I don't think it
11  would be of any value.
12     Q.  Well, I'm interested.
13     A.  I don't think that my
14  answer would be of any value.
15     Q.  Well, I'm interested in
16  your answer.
17     A.  I think like -- I think it
18  has changed, yes.
19     Q.  Okay.  Are you aware that
20  researchers still debate important
21  questions in the theory of evolution,
22  such as how new species arise?
23          MR. HARVEY:  Same
24  objection.

181

1          THE WITNESS:  Now we're
2  really heading out of anything where
3  I have much competence.
4  BY MR. THOMPSON:
5      Q.  Okay.  What about how life
6  began, are you aware that there --
7      A.  Even less competence.
8      Q.  Okay.
9          MR. HARVEY:  Counsel, I'd
10  like to use the men's room, if this
11  is a good time.
12          MR. THOMPSON:  Okay, sure.
13          (A recess was taken from
14  2:50 to 2:56 p.m.)
15  BY MR. THOMPSON:
16     Q.  Do you believe that
17  intelligent design and creationism
18  are the same thing?
19          MR. HARVEY:  Object to the
20  form of the question.  Outside the
21  scope of his expert report.
22          THE WITNESS:  Yeah, I
23  really, I think that's outside the
24  scope of my report.

James DeCrescenzo Reporting, LLC
Innovating Litigation
1880 JFK Blvd., 6ᵗʰ Floor, Philadelphia, PA 19103
www.JDReporting.com

215.664.3906                                    FAX  215.761.0581

ORAL DEPOSITION OF JEFFREY O. SHALLIT - 06-28-05

182

1  BY MR. THOMPSON:
2     Q.  Okay.  So you would not
3  want to venture an opinion on that
4  question?
5     A.  No.
6     Q.  You indicated that
7  intelligent design posits a
8  supernatural creator or being; is
9  that correct?  Is that what you --
10    A.  You asked for my
11 understanding of what the theory was
12 according to Dembski.  I believe that
13 was the original context.
14    Q.  Would it be more accurate
15 to say an intelligent cause?
16    A.  I think his writings
17 definitely suggest a supernatural
18 being in several places.
19    Q.  Well, I'm aware that some
20 of his writings are religious and
21 some of his writings are scientific.
22 I want you to focus on his scientific
23 writings.  Do you think that in his
24 scientific writings he posits a

183

1  supernatural creator?
2        MR. HARVEY:  Object to the
3  form of the question.  Asks him to
4  assume that his work is scientific.
5  BY MR. THOMPSON:
6     Q.  You can answer it.
7     A.  Which scientific writings?
8  Which writings in particular would
9  you like me to --
10    Q.  Well, you can start with
11 his report, okay, his expert opinion
12 report, or you can look at the book
13 that you have got in front of you,
14 the books that you've got in front of
15 you.
16    A.  I think No Free Lunch does,
17 in fact, have suggestions about
18 supernatural design, and I guess I
19 would -- I would -- I would point to
20 the last chapter as places where
21 supernatural design might be
22 mentioned.
23    Q.  Okay.  Do you have a
24 specific paragraph or sentence there,

184

1  the last chapter?
2     A.  Well, the word God appears
3  many times in chapter six.
4  "Likewise, the design theorist is
5  likely to posit a generic designer or
6  specified complexity or imminent
7  teleology or God as the final resting
8  place of explanation."
9     Q.  Well, that --
10    A.  The design theorists.
11    Q.  Right.  That could be what
12 some theorists may ultimately define
13 God as; correct?  But that does not
14 necessarily mean that that's what
15 intelligent design theory or concept
16 refers to?
17    A.  With respect to the first
18 part of your sentence where you said
19 correct, I don't agree.  So I can't
20 answer the rest.
21    Q.  Well, what characteristics
22 of the intelligent cause does the
23 concept of intelligent design posit?
24        MR. HARVEY:  Object to the

185

1  form of the question.  Intelligent
2  cause is not a defined term.
3        THE WITNESS:  You asked me
4  does Dembski refer to the intelligent
5  design intelligence as God, and I
6  gave you an example in the book where
7  he says --
8  BY MR. THOMPSON:
9     Q.  Some theorists?
10    A.  -- the design theorists.
11 The design theorists.  I understand
12 that to mean the typical design
13 theorist is likely ... to posit God
14 as the final resting place.  So this
15 is a possibility, so I think I
16 answered your question there.
17    Q.  Again, understanding that
18 you're not holding yourself out to be
19 an expert in this area, so are you
20 saying by that answer that the
21 concept of intelligent design posits
22 the intelligence as being God?
23    A.  I understand that claim to
24 be made by people who represent

ORAL DEPOSITION OF JEFFREY O. SHALLIT - 06-28-05

186

1 themselves as proponents of
2 intelligent design.
3     Q. Are there atheists who
4 support the concept of intelligent
5 design?
6     A. I couldn't tell you.
7     Q. Do you know a David
8 Berlinski?
9     A. I know him, yeah.
10    Q. Isn't he an atheist?
11    A. I don't know.
12    Q. What about Anthony Flew?
13    A. He's a famous British
14 philosopher. What about him?
15    Q. He is an atheist, until the
16 concept of intelligent design came
17 along. And are you aware that he is
18 now a supporter of the concept of
19 intelligent design?
20    A. I don't think I can speak
21 intelligently or as an expert on
22 respect to Anthony Flew's beliefs.
23 I'm not a -- I'm not a philosopher of
24 religion or -- yeah.

188

1 part was written by Wesley Elsberry.
2     Q. So you have pulled back
3 from Wesley Elsberry's claims?
4     A. When you write a joint
5 paper, not everyone writes every
6 single -- not -- both of you don't
7 write every single word. There are
8 some parts that are due to his
9 expertise, and some parts that are
10 due to mine.
11    Q. Okay. So you are not
12 taking a position one way or the
13 other on the question of whether
14 intelligent design is an argument
15 from ignorance?
16    A. I have to think about
17 that. I think that the methodology
18 for inferring design that I have
19 critiqued in this long paper with
20 Elsberry does involve deducing design
21 through a negative means rather than
22 a positive assertion of evidence.
23    Q. Okay. So you would not
24 agree with the statement that

187

1     Q. And I wasn't meaning for
2 you to venture a guess on that, but
3 merely to comment on whether to be a
4 proponent of intelligent design you
5 have to believe in God?
6     A. I can't answer the
7 question. Sorry.
8     Q. Have you heard of the
9 attack on intelligent design as being
10 an argument from ignorance?
11    A. Yes, I've heard of that.
12    Q. Okay. Do you agree with
13 that?
14    A. I think in my expert
15 testimony -- maybe -- I'm not sure
16 whether it's in the expert testimony
17 or not. Let's see. Let me -- no,
18 it's not -- I don't think it's
19 mentioned in our expert -- in my
20 expert testimony.
21    But there is some
22 discussion of the argument from
23 ignorance in my longer paper with
24 Elsberry. However, I believe that

189

1 irreducible complexity -- have you
2 heard of that phrase, irreducible
3 complexity?
4     A. I have.
5     Q. That's Michael Behe's
6 phrase?
7     A. Yes.
8     Q. You do not agree with the
9 phrase that irreducible complexity is
10 not evolvable by Darwinian evolution?
11    A. You're asking me to comment
12 on what is and what is not evolvable,
13 and I'm not a biologist, and I have
14 no --
15    Q. Okay.
16    A. -- it's outside my area of
17 expertise.
18    Q. Would you agree that the
19 concept of intelligent design really
20 addresses only one of the claims of
21 the theory of evolution, and that is
22 the complex biological systems could
23 not be established by natural
24 selection?

190

1    A.  Well, I don't agree with
2  the premise of the question, so --
3    Q.  Which premise?
4    A.  You say that complex
5  biological systems could not be
6  formed by natural selection. But
7  evolution is much more than natural
8  selection, as I understand it, in my
9  layman's understanding.
10   Q.  Yes, it is. We can go back
11 and say evolution encompasses several
12 claims. But what I'm asking you is,
13 isn't it true that the concept of
14 intelligent design only addresses one
15 of those claims, and that claim is
16 that complex systems can be created
17 by natural selection?
18   A.  I think you're -- you're
19 still moving a little bit away from
20 my area of expertise. I was really
21 trying to restrict my expert report
22 to Dembski's mathematical background
23 and mathematical claims, and now
24 we're wandering off to --

191

1    Q.  If you can't answer it or
2  it's beyond your expertise --
3    A.  Yeah, yeah.
4    Q.  -- that's a good answer.
5    A.  Okay.
6    Q.  Okay. There was a lot of
7  controversy over a proposed -- I
8  shouldn't say a proposed -- alleged
9  quote by Arthur Schopenhauer, that
10 quote being, "All truth passes
11 through three stages: First, it is
12 ridiculed; second, it is violently
13 opposed; third, it is accepted as
14 being self evident." Now, apparently
15 you took William Dembski to task for
16 using that quote; is that correct?
17   A.  I did.
18   Q.  And you did a lot of
19 research to try to discover the
20 genesis of that quote; is that
21 correct?
22   A.  I did.
23   Q.  And you ultimately
24 uncovered that that quote was not

192

1  attributable to Arthur Schopenhauer,
2  did you not?
3    A.  Can you rephrase the
4  question?
5    Q.  I don't know if I can. The
6  quote that Dembski cited and I just
7  read was not a statement made by the
8  German philosopher Arthur
9  Schopenhauer?
10   A.  I established that to the
11 best ability that I have, yes.
12   Q.  And many, many people were
13 attributing that quote to Arthur
14 Schopenhauer, correct?
15   A.  Some people have, yes.
16   Q.  And that was not just
17 William Dembski?
18   A.  That's true.
19   Q.  And there are many times
20 where somehow quotes get started and
21 are carried from one person to
22 another, one generation to another,
23 and ultimately no one can really
24 authenticate the person who allegedly

193

1  made that statement; is that correct?
2    A.  That's true.
3    Q.  I was searching your web
4  site, and in your web site you talk
5  about -- or you link to some
6  organizations that are of interest.
7  One is the ACLU, and one is Americans
8  United for Separation of Church and
9  State. Is that an accurate
10 statement?
11   A.  I believe so.
12   Q.  Was there any particular
13 reason why you listed those
14 organizations on your web site and
15 not the Thomas More Law Center?
16        MR. HARVEY: If you can
17 answer it. I don't see the relevance
18 of it, but --
19        THE WITNESS: I admire the
20 goals of both organizations.
21 BY MR. THOMPSON:
22   Q.  And you support those
23 goals?
24   A.  I do.

ORAL DEPOSITION OF JEFFREY O. SHALLIT - 06-28-05

194

1   Q.  Okay.  Are you --
2   A.  I would not say all -- all
3   goals of the organization, but in
4   general.
5   Q.  And you support the goals
6   both of the ACLU and Americans United
7   for Separation of Church and State;
8   correct?
9   A.  I do.
10  Q.  And both of those
11  organizations are involved in this
12  lawsuit.  Are you aware of that?
13  A.  I am aware of that.
14  Q.  Okay.  Does that affect
15  your ability to give an objective
16  view of Dembski and intelligent
17  design?
18  A.  I don't believe so.
19  Q.  You also -- I'm trying to
20  find it here.  You also referred to
21  some sites dealing with skepticism?
22  A.  Yes.
23  Q.  And in one of your -- I
24  think a letter to the editor, you

195

1   praised intelligent skepticism.  Do
2   you recall --
3   A.  I don't remember.
4   Q.  -- phrasing that?
5   A.  I don't remember that
6   phrase, no.
7   Q.  But is that something that
8   you do believe in?
9   A.  I think skepticism is a
10  good thing, yes, in general.
11  Q.  And would that also apply
12  to science?
13  A.  Absolutely, yes.
14  Q.  Okay.  Do you find it
15  appropriate to allow students to
16  critically evaluate the theory of
17  evolution?
18      MR. HARVEY:  Object to the
19  form of the question.  Outside the
20  scope.
21      THE WITNESS:  Yeah, it's --
22  it's pretty vague, and I don't even
23  know what curriculum you're referring
24  to, what year student.  You know, I

196

1   don't have any expertise in theory of
2   education, other than being a
3   professor, which may rule it out.
4   BY MR. THOMPSON:
5   Q.  When you talk about
6   skepticism as being a good quality,
7   what are you referring to there?
8   A.  I think that truth is best
9   arrived at by free inquiry.
10  Q.  And would that also apply
11  to science?
12  A.  Yes.
13  Q.  And would you agree that
14  science many times basically deals
15  with argumentation?
16  A.  Yes, I would agree with
17  that.
18  Q.  That scientists look at the
19  same empirical data and come to
20  different conclusions; is that
21  correct?
22  A.  I think that that does
23  happen, yes.
24  Q.  And then as scientists, it

197

1   is argued out in the scientific
2   community --
3   A.  Yes.
4   Q.  -- until some consensus is
5   arrived; is that correct?
6   A.  Yes.
7   Q.  And is it also true that
8   the consensus in one generation might
9   be the theory that's on the junk pile
10  in the next?
11  A.  It does happen, yes.
12  Q.  And so do you think that
13  this dispute between the theory of
14  evolution and the concept of
15  intelligent design serves science in
16  any way?
17      MR. HARVEY:  I'm going to
18  object as outside the scope of his
19  expert testimony.
20      THE WITNESS:  Yeah, I
21  really don't know if I could say with
22  any knowledge what would serve
23  science.  I think that's for maybe a
24  sociologist of science or, you know.

James DeCrescenzo Reporting, LLC
Innovating Litigation
1880 JFK Blvd., 6ᵗʰ Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                                           FAX  215.751.0581

ORAL DEPOSITION OF JEFFREY O. SHALLIT - 06-28-05

198

1  BY MR. THOMPSON:
2      Q.  Would you agree that the
3  science community a lot of times
4  defends the particular consensus that
5  it has against some newly arrived at
6  theory?
7          MR. HARVEY:  Same
8  objection.
9          THE WITNESS:  I'm not sure
10  I have any personal, you know,
11  expertise in this area.
12  BY MR. THOMPSON:
13      Q.  Okay.  And as a person that
14  deals in science, are there disputes
15  that go on in the area that you're
16  involved with, computer science?
17      A.  It's quite rare.
18      Q.  Is that because it deals
19  with mathematics so much?
20      A.  I think it's more -- it's
21  more difficult.  Mathematical claims
22  are more susceptible to absolute
23  proof and, therefore, less
24  disputable.

199

1      Q.  Okay.  I noted from your
2  web site that you've taken Princeton
3  University to task several times for
4  promoting religion over atheism, is
5  that correct?
6      A.  I think, no, that's not
7  correct.  I think it was the -- it
8  was not Princeton University, per se.
9      Q.  The Princeton Alumni
10  Weekly, I guess, more accurately?
11      A.  Princeton Alumni Weekly, I
12  wouldn't say the word promote is
13  precisely correct, no.  I have
14  objected to their coverage of
15  religious students out of proportion
16  to the number of such students at
17  Princeton.
18      Q.  In other words, you claim
19  that the Princeton Alumni Weekly has
20  not seen fit to give nonbelievers
21  equal treatment?
22      A.  Exactly.
23      Q.  Do you believe God is a
24  fiction?

200

1          MR. HARVEY:  Object to the
2  form of the question.  I don't know
3  what this has to do with his expert
4  testimony, but I'll allow him to
5  answer it.
6          THE WITNESS:  You're asking
7  about my personal religious beliefs?
8  BY MR. THOMPSON:
9      Q.  Yes.
10      A.  I have -- I hold no belief
11  in the existence of the Judeo-
12  Christian God, that's correct.
13      Q.  Well, you consider yourself
14  an atheist as well?
15      A.  I would say a provisional
16  atheist, yes.
17      Q.  What is a provisional
18  atheist?
19      A.  Well, I think the term
20  atheism is poorly understood by many
21  people.  Many people believe it's --
22  it needs the assertion that God does
23  not exist.
24          I think in my case, it's

201

1  more that I personally hold no such
2  belief in the existence of God, and
3  that I would be -- and the word
4  provisional means that I would be
5  willing to revise my beliefs in the
6  case that new evidence is provided.
7      Q.  Evidence like intelligent
8  design?
9          MR. HARVEY:  Same
10  objection.
11  BY MR. THOMPSON:
12      Q.  You consider -- if I can
13  find it -- you consider people who
14  believe in God are less intelligent
15  than people who don't?
16          MR. HARVEY:  Object to the
17  form of that question.  I don't know
18  what that has to do with anything.
19          THE WITNESS:  On an
20  individual basis, no.
21  BY MR. THOMPSON:
22      Q.  But haven't you made
23  comments that studies show?
24      A.  There is a study that

James DeCrescenzo Reporting, LLC
Innovating Litigation
1880 JFK Blvd., 6th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3996                    FAX  215.751.0681

ORAL DEPOSITION OF JEFFREY O. SHALLIT - 06-28-05

202

1  suggests that people who believe in
2  God have, I think lower marks or
3  lower grades. I'm not sure I
4  referred to being more stupid.
5  Perhaps. Maybe if you want to read
6  to me the particular quote and
7  refresh my memory.
8      Q.  I'm going to find that
9  quote for you in a minute.
10     A.  Okay.
11     Q.  But I found this other
12  letter that you wrote to the
13  Princeton Alumni Weekly where you
14  say, "Yet instead of covering the
15  comforting fact that two-thirds of
16  students at one of America's best
17  universities have not been swayed by
18  the propaganda of organized religion,
19  you instead choose to focus on the
20  one-third who have."
21          What do you mean by
22  "propaganda of organized religion"?
23     A.  Are you asking me to define
24  the word propaganda?

203

1      Q.  Yes, what you meant by
2  that?
3      A.  I think it's rhetoric with
4  the attempt to persuade someone of a
5  particular position.
6      Q.  Here's where I was
7  referring to. You indicate, "Why is
8  it that studies show that lack of
9  religious belief is correlated with
10  intelligence and education?" That's
11  the quote that I was looking for.
12     A.  I think that's a factual
13  statement based on studies of
14  sociology that I've read.
15     Q.  That say what?
16     A.  That lack of religious
17  belief is correlated with education.
18     Q.  And so if you are more
19  educated, you will have less
20  religious belief?
21     A.  You tend to have, as a
22  probability measure.
23     Q.  Give me a minute. We're
24  almost done.

204

1      You never saw the policy of
2  the Dover Area School District that
3  is the center of the dispute here?
4      A.  I have seen the statement
5  of the School Board.
6      Q.  When did you see that?
7      A.  This morning.
8      Q.  For the first time?
9      A.  For the first time. I may
10  have read popular glosses of it in
11  the newspaper.
12     Q.  That policy is not the
13  concern of your expert opinion,
14  though, is it?
15     A.  No, it's not.
16     Q.  And you do not intend to
17  give an expert opinion in court on
18  that policy?
19     A.  I do not.
20     Q.  I just want you to think
21  back, and this is a general question,
22  I'll give you an opportunity to
23  correct any statements that, on
24  hindsight, you think were inaccurate,

205

1  and if you have any, this is a time
2  that you can correct those
3  statements.
4          MR. HARVEY:  Are you asking
5  him if he has provided any testimony
6  today that, upon reflection, was
7  inaccurate?
8          MR. THOMPSON:  Yes.
9          THE WITNESS:  Maybe I would
10  like to, when you asked me are these
11  the areas that you're competent in
12  and we went through a long list, I
13  would like to say that I believe that
14  I am competent in the areas of
15  pseudoscience and pseudomathematics.
16         I believe I enunciated that
17  elsewhere. But I believe I do have
18  some knowledge of that area.
19  BY MR. THOMPSON:
20     Q.  Yes, I think you said
21  that --
22     A.  Okay.
23     Q.  -- if my recollection is
24  correct, yes.

**JDR**
**James DeCrescenzo Reporting,** LLC
Innovating Litigation
1880 JFK Blvd., 8th Floor, Philadelphia, PA 19103
www.JDReporting.com

215.564.3905                    FAX  215.751.0581

ORAL DEPOSITION OF JEFFREY O. SHALLIT - 06-28-05

206

1  A. Okay.
2  Q. Anything else?
3  A. Nothing that I can think
4  of, no.
5        MR. THOMPSON: Okay. That
6  will do it for me.
7        MR. HARVEY: Thank you very
8  much. This deposition is concluded.
9        THE WITNESS: Thank you.
10        MR. THOMPSON: Thank you.
11        (Witness excused.)
12
13        (The deposition concluded at 3:24 p.m.)
14
15
16
17
18
19
20
21
22
23
24

207

1        WITNESS CERTIFICATION
2
3        I hereby certify that I
4  have read the foregoing transcript of
5  my deposition testimony, and that my
6  answers to the questions propounded,
7  with the attached corrections or
8  changes, if any, are true and
9  correct.
10
11
12  DATE    JEFFREY SHALLIT, Ph.D.
13
14        PRINTED NAME
15
16
17
18
19
20
21
22
23
24