# APPENDIX IV

# TAB F

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

Tammy J. Kitzmiller, et al.      :
                                 :
    vs                           :   04 CV 02688
                                 :
Dover Area School                :
District, et al.                 :

JUDGE:          Honorable John E. Jones III

PLACE:          Williamsport, Pennsylvania

PROCEEDINGS:    Oral Argument

DATE:           Thursday, July 14, 2005

APPEARANCES:

For the Plaintiffs:   Eric J. Rothschild, Esquire
                      Pepper Hamilton, LLP
                      3000 Two Logan Square
                      18th & Arch Streets
                      Philadelphia, PA  19103-2799

                      Thomas B. Schmidt, III, Esquire
                      Pepper Hamilton, LLP
                      200 One Keystone Plaza
                      P. O. Box 1181
                      Harrisburg, PA  17108-1181

                      Witold J. Walczak, Esquire
                      American Civil Liberties
                      Union of PA
                      313 Atwood Street
                      Pittsburgh, PA  15213

OFFICIAL COURT REPORTER

---

APPEARANCES, Cont'd.

For the Defendants:   Patrick T. Gillen, Esquire
                      Thomas More Law Center
                      24 Frank Lloyd Wright Drive
                      P. O. Box 393
                      Ann Arbor, MI  48106

For the York Daily   Niles S. Benn, Esquire
Record, York         Terence J. Barna, Esquire
Dispatch:            161-163 East Market Street
Joseph Maldonado and P. O. Box 5185
Heidi Bernhard-Bubb  York, PA  17405-5185

For the Foundation for  Dennis S. Boyle, Esquire
Thought and Ethics:     1123 Cedar Cliff Drive
                        Camp Hill, PA  17011

                        Leonard G. Brown, III, Esquire
                        Clymer & Musser, PC
                        23 North Lime Street
                        Lancaster, PA  17602

OFFICIAL COURT REPORTER

---

INDEX TO WITNESSES

| MOVANT: | DIRECT | CROSS | REDIRECT | RECROSS | COURT |
|---------|--------|-------|----------|---------|-------|
| John A. Buell | 61 | 71 | | | 103 |

OFFICIAL COURT REPORTER

---

INDEX TO EXHIBITS

| PLAINTIFF: | IDENTIFIED | ADMITTED |
|-----------|-----------|----------|
| Exhibit No. 1 | 82 | 103 |
| Exhibit No. 2 | 82 | 103 |
| Exhibit No. 3 | 83 | 103 |
| Exhibit No. 4 | 84 | 103 |
| Exhibit No. 5 | 91 | 103 |
| Exhibit No. 6 | 96 | 103 |
| Exhibit No. 7 | 97 | 103 |

OFFICIAL COURT REPORTER

5

```
1          (1:30 p.m. convened.)
2          THE COURT:  We have several matters before the
3   court this afternoon, the first of which I believe by
4   agreement is the application to intervene by the Foundation
5   for Thought and Ethics, followed by a motion to quash, which
6   we'll take second.
7          Is that everybody's agreement?  Is that acceptable
8   to everybody or are we lined up differently?
9          MR. BERN:  I think that was the initial intent,
10  Your Honor.  Somewhere down the pike we were advised that
11  the newspaper would be going first and the interveners
12  again be going second.  It doesn't matter to me.
13         THE COURT:  It doesn't matter to me.  Are we lined
14  up to go with the newspapers first?  All right, that's
15  perfectly fine with me.
16         MR. BERN:  I think it will be a briefer argument.
17         THE COURT:  All right, we can certainly do that.
18         Why don't we have counsel enter your appearances,
19  please, Clerk, in the matter of the newspaper reporters.
20         MR. BERN:  My name is Niles Bern, attorney in York,
21  Pennsylvania.  I'm here with my co-counsel, Terry Barna.  We
22  represent the York Daily Record as well as the York
23  Dispatch.  We also represent the reporters in issue, Joseph
24  Maldonado and Heidi Bernard-Bubb.
25         MR. GILLEN:  Patrick Gillen for the defendant, Your
```

OFFICIAL COURT REPORTER

---

6

```
1   Honor.
2          THE COURT:  All right.
3          MR. ROTHSCHILD:  Good afternoon, Eric Rothschild
4   for the plaintiffs with my co-counsel Witold Walczak with
5   the ACLU, and Tom Schmidt from Pepper Hamilton.
6          THE COURT:  Nice to see some of you again, some of
7   you I haven't seen previously in this litigation.
8          All right.  We have two, as I noted, two motions to
9   quash filed on behalf of Mr. Maldonado and Ms. Bernard-Bubb.
10  And in reviewing the submissions by the parties, it's -- I
11  believe that I will understand how the issues frame out, and
12  I also understood, I think, pretty comprehensively what your
13  arguments are, but let me first then turn to counsel for
14  the movants, and if you want to make an additional
15  presentation I'll certainly give you the opportunity to do
16  that.
17         MR. BERN:  Thank you.  Would you like me to be
18  here?
19         THE COURT:  Wherever you're comfortable.
20         MR. BERN:  Your Honor, I would like to say
21  something for the record initially to clarify I think some
22  confusion with regard to something that we had done
23  on behalf of both the newspapers as well as the reporter
24  clients.
25         When we were first served with a subpoena relative
```

OFFICIAL COURT REPORTER

---

7

```
1   to a deposition that Pepper Hamilton had served upon us, we
2   had taken the position that it was far better to try to
3   amicably resolve the matter and not have the Court's
4   intervention with respect to the issue that is before the
5   Court today.  So what we arranged to do was to provide
6   affidavits wherein the reporters would otherwise indicate
7   that if they were called to testify the nature of their
8   testimony would be to verify the statements set forth in
9   their articles and the veracity of the articles, meaning if
10  they were quoted, that is what the quotes were that they
11  took from somebody else, if they there were not quotes, then
12  that was the general information that they received when
13  they were attending the school district meetings.
14         Likewise there was an issue in terms as to whether
15  there was any request of retractions or corrections.  So
16  both reporters indicated in their affidavits that they had
17  never been served with a request for retraction or
18  corrections.  And the newspaper editors likewise indicated
19  the same.  I think with one exception that being the -- I think
20  we made reference to intelligent design in a manner in which
21  it shouldn't have been made, and corrected it in a
22  subsequent newspaper article.  But it wasn't as a result of
23  trying to avoid being cross examined.  And I think that has
24  been an allegation that's been made by the defendants in
25  this case that the purpose under which we submitted the
```

OFFICIAL COURT REPORTER

---

8

```
1   affidavits was to circumvent the issue of cross examination.
2          THE COURT:  Well, if I understand your submission,
3   and maybe I don't, what apparently you're seeking is to have
4   the -- at least for the purpose of discovery, you want to
5   have the affidavits supplant, for example, a discovery
6   deposition or your client, is that correct?
7          MR. BERN:  We take the position that if the
8   affidavits were accepted by both sides, that that would
9   preclude the need to depose them.  If the affidavits were
10  not accepted by both sides -- and we wrote this in
11  correspondence -- then we recognize that we would have to
12  proceed with a return to quash because it was our position
13  that the reporters were otherwise protected by a reporter's
14  privilege and not be compelled to testify.
15         THE COURT:  Well, the privilege is a concept that
16  at times is difficult to get -- for lawyers and judges to
17  get our arms around.  But having read the cases and
18  certainly your good submissions, we have a situation where
19  it's a sound bay in terms of what the requests hit.
20         It appears to me that one of the things we have is
21  a request that your clients testify summarizing what they saw
22  and heard, particularly what they heard, during public
23  meetings.
24         MR. BERN:  That's correct.
25         THE COURT:  Now, if I understand your position, it
```

OFFICIAL COURT REPORTER

5

isn't necessarily that that in and of itself is protected by
privilege, although it may be. I don't want to
overcharacterize your argument; you seem to say that there
would be some privilege there, I guess. But also that, for
example, the seeing is not not in that this information that
in sought, could be obtained from others, and there's been no
showing that it hasn't been obtained from others. Is that a
fair statement?

MR. BENN: That's a fair statement, yes.

THE COURT: Are you taking a position that to the
extent the deposition would be a ... a deposition or
depositions of your clients would be limited to what they
saw and heard at a public meeting

MR. BENN: We're saying

THE COURT: ... and to the extent ... just to
finish ... and to the extent that I doesn't involve
confidential sources, that that's not something that your
clients are amenable to?

MR. BENN: We've taken the position that what it is
that we wrote is protected in the sense that the defendants
or whoever is deposing us or calling us as a witness at the
trial has to establish the fact that our testimony is
relevant and crucial, and that for the most part we are the
only parties that can otherwise testify to what it is that
was printed.

OFFICIAL COURT REPORTER

10

And in this particular instance, that's far from
relevant. Then

THE COURT: You so we know it's not relevant?

MR. BENN: It may be relevant. But the issue is
are there other sources where this information can be
obtained.

THE COURT: I'm sorry; clearly there are ...

MR. BENN: That's right.

THE COURT: Clearly there were other attendees at
the meeting. I don't think anybody would controvert that;
however, it's different for me to see how we, for example,
until a rive gathering or cause difficulty it is that ... and
I understand that you can make the argument that the
information can be obtained from others, but the parties can
take the position they want to depose everyone who is in
the room. I suppose, and then we get into, well, they can
depose others first, and get to you later on. But it's
difficult for me to see how we implicate the privilege at we
chill the same gathering it they've questioned about what
they saw and heard exclusive of confidential sources, which
seems to me is the parties are saying they don't want to get
into, at least, in terms of the deposition.

And I think the materials that are sought are a
different area, and I want to get to that. But you're
saying, finally, you don't want that, you don't want to

OFFICIAL COURT REPORTER

11

subject that to depositions about what they saw and heard.

MR. BENN: No, what I'm saying, Your Honor, is if
the Court determines that what you just said is how you
feel, then in the alternative I would ask for a protective
order such that if there were depositions they would be
limited ...

THE COURT: I see.

MR. BENN: ... to what you just said, and not be
assumed to a myriad of questions that I don't think would
be ...

THE COURT: I understand. All right. But you
particularly expect to ... again, I don't want to
mischaracterize your argument ... but you particularly object
to that ... those inquiries, tromping into confidential
sources and other areas that would clearly come under the
protection of the reporter's privilege.

MR. BENN: Well, and let me just respond to the
confidential source issue, because I can put that to bed. I
don't believe that there are confidential sources in this
case, and I'm not alleging that in my pleadings in terms of
the shield law.

THE COURT: Well, tell me ... tell me if in fact the
Court framed an order that would allow the reporters to be
questioned as to, as we just discussed, what they saw and
heard, where do you want the line drawn?

OFFICIAL COURT REPORTER

12

MR. BENN: That is where I would want the line
drawn, not beyond that testimony.

THE COURT: All right.

MR. BENN: What is they saw and what it is that
they heard, and that the quotes that they made are the
quotes that they heard.

THE COURT: All right.

Now, let's that segue for a moment into the
materials sought. Continue.

MR. BENN: With all due respect, I'm not exceeding
that.

THE COURT: I understand.

MR. BENN: In terms of what I just said, I'm not
exceeding.

THE COURT: I understand you're not conceding the
point. This is for the sake of argument. And I respect
what your position is, and I appreciate your candor in that
request. And I know you don't concede the essential point,
and I want to make everybody on this, but with respect to
the materials that are sought, what I need to know is to be
particularly problematic from your standpoint are the notes,
reporters' notes, drafts, et cetera. Is that a fair
statement?

MR. BENN: That is correct. And, again, I would
like to tell the Court what it is they have do that we

OFFICIAL COURT REPORTER

understand what's in issue here.

With respect to Mr. Kaldonski, I believe I have
run a mark. That's all I have that occurred I believe in
March of 2001, so almost a year subsequent to when the
articles in issue were printed. He has no notes. It's his
policy to destroy notes within 30 days of the printing of
the articles, so there are no notes.

With respect to Mr. Bernard Dumm, I do have drafts
of the articles that were written. I have the notes that
were taken at the school board meetings, in other words the
retained that information, and I have that if that my
position.

It's my position however, that if hypothetically
she were called to testify under the guise of what you just
enunciated, namely that husband relevant because she's
testifying as what is is she heard, and what notes she took
and what drafts of the articles she prepared have nothing to
do with the final article so touch to what she's testifying.

THE COURT: So you would seek to protect the
e-mails and the notes and drafts.

MR. DERM: That is correct. And if the Court took
the position that they may be relevant predicated upon what
my opposing counsel argues, then I would ask for an in
camera review prior to turning over to school. And I
believe the defendants in their brief have likewise
requested that that may be appropriate.

OFFICIAL COURT REPORTER

---

They have also raised the issue that when we had
initiated our resumption, our written letter to them
requesting or there in that which they were
requesting by there of the motion to produce, we failed to
object to several items set forth if that motion to produce
or the subpoena to produce, and that is correct. We didn't
respond to it because we don't have it, but —

THE COURT: What would go to the, for example, the
disciplinary areas, the

MR. DERM: Personnel files.

THE COURT: — personnel files. When you say, you
don't have it, what do you mean?

MR. DERM: There are no personnel files. The two
reporters are independent contractors. They are not
employed by our paper on a per diem basis. They're not
employed by our paper on a weekly basis. They're employed
on a per article basis.

THE COURT: Given how comprehensive your submission
was, my assumption, which now you're telling me is correct,
is that you didn't respond because you didn't have those
things.

MR. DERM: That's exactly right, they don't exist.

THE COURT: All right. All right. So heard.

MR. DERM: Getting back to my argument, and I
believe the Court is now well aware in terms as to state as

OFFICIAL COURT REPORTER

---

are, and obviously, you are very much familiar with the case
law. We believe that there are two cites in Pennsylvania
or excuse me, in the Third Circuit, one in Pennsylvania in
the Commonwealth Court, and one in the Third Circuit in
Delaware, that really go to the very teeth at hand.

The Barnes case, which we cited in our reply
brief, was a case wherein there were four individuals
speaking, and a reporter who heard what it is that they were
discussing. And one individual correction officer, who
interview was denoted in vast and suspended for some period
of time thereof was, had filed a complaint requesting that
he be reinstituted at his higher rank and receive his
backpay. And he subpoenaed the reporter to testify because
he thought she misconstrued some of that, which she had heard
and portrayed it wrong in a false light that otherwise
adversely affected the disciplinary section. The Court
concluded that he had to first go to the other three people
that were present before he went to the reporter and
therefore they sustained the action to quash.

The same kind of thing happened in the state court
case. There was a trial court decision where a motion to
quash was sustained. It went to the Commonwealth Court, and
in McMenamin the Commonwealth Court case that wherein there
are other persons present at the press conference, before
they can go to the reporters, they had to first go to the

OFFICIAL COURT REPORTER

---

other parties.

In this particular instance we have said in our
pleadings and you have already indicated there were public
meetings. There were approximately 100 persons present from
the public, in addition to all the school board members,
both current as well as past, and there haven't even
attempted to depose the other persons from the public. They
deposed some of the school board members, and then they
deposed or they requested to depose by reporter.

The extent that I have there, Your Honor, is that
I find it somewhat incongruous when in fact this particular
district decides to tape record this meetings, and
therefore has in effect its own record with regard to what
was stated, and then chooses to overcome those meetings
which the minutes are prepared, and the minutes clearly
don't enliven the dialogue that has occurred. Don't enliven
an issue with regard to circumstances after the article are
printed. Don't raise an issue with regard to circumstances
after the articles are printed, and the only time the issue
comes into play is after they're sued and after someone gets
involved, and then all of a sudden everybody conveniently
forgets what it is that they may have said, and now they
come to the press and say what did we say or how did we say
it.

And I guess my concern is, why not go to the other

OFFICIAL COURT REPORTER

**Page 17 (left column)**

1   markets of the public, why not go to a list the numbers of
2   the names board, past and present, before you come to me,
3   because I think that's what these two cases are saying.
4       The experts' privilege is such that, A, the
5   testimony that we're going to offer it is just we have to
6   offer it has to be proved, it has got to be material, it's
7   got to be relevant, and we have to be the court of last
8   resort, so to speak; and we're not.
9       And to the extent that we've basically being asked
10  to do the job that they would do for themselves by
11  interviewing other parties, I think that that's wrong, and I
12  think that that's violative of what my privilege is. I
13  think the law goes with respect to the notes. I think the
14  notes are likewise privileged, unless they can prove the
15  materiality of it, the relevancy of it, et cetera. And
16  nowhere in the pleadings have they done that.
17      I find it further interesting that they now raise
18  the issue in terms of how material this testimony is when in
19  fact I believe the latest day to depose parties or conclude
20  discovery was July the 15th, and that's the date of my
21  deposition. And having said that -- of course me, I guess
22  it was earlier this month, but having told that -- the
23  deposition of the various school board members who are
24  alleging that they don't remember saying whatever,
25  particularly Mr. Buckingham, occurred many months before.

OFFICIAL COURT REPORTER

**Page 18 (right column)**

1   And in fact our testimony was so directly crucial, any
2   weren't we deposed very months before? Why wasn't that
3   request made of us previously? The defendants in this case
4   are piggybacking on what the plaintiffs attempted to do.
5   And when the plaintiffs asked for a deposition, and we
6   communicated with them by means of providing that affidavit,
7   and they were willing to accept that affidavit.
8       THE COURT: Let me ask this, if -- if your clients
9   are not deposed, because I don't let them be deposed, and in
10  that hypothetical situation, what would happens if
11  they're called as witnesses in the case in chief?
12      MR. TANK: I will file my same objection.
13      THE COURT: Same basis?
14      MR. BAKK: You got it.
15      THE COURT: All right.
16      MR. BENN: So my position today is that after -- after
17  the plaintiffs had indicated that they were willing not to
18  pursue the subpoena and address the issue at trial, that's
19  when defense said, you know, they want the right to
20  cross-examine as they would learn hereinbefore in terms of
21  what it is that we might otherwise testify to. But the
22  reality of this is, maybe it's going to an examination by the
23  plaintiffs that they're not even going to call us at trial,
24  so why do we need to do the deposition now?
25      THE COURT: All right.

OFFICIAL COURT REPORTER

**Page 19 (bottom left column)**

1       MR. SENK: Thank you.
2       THE COURT: Thank you for your argument. I
3   appreciate it. We've hear from defendant's counsel.
4       MR. GILLEN: Thank you, Your Honor. Pat Gillen for
5   the defendants.
6       A couple of preliminary matters first. I think
7   you've properly indicated that the role of the privilege is
8   confidential sources. And we have judgement that we have no
9   interest in getting at any, so it appears that is not an
10  issue. Likewise
11      THE COURT: Well, but is it? You know, it may be
12  the core issue of what the privilege is, not certainly the
13  stripe that cuts through the same law. As indicated by the
14  movant's counsel, as that there may be some obligation to
15  depose others before you get to the reporters. What do you
16  say about that?
17      MR. GILLEN: Yeah I say about that, Your Honor, is
18  we did not drag them into this. We had -- we understood
19  that these were witnesses. We knew there are other
20  witnesses, and we've deposed some of them.
21      When they weren't witnesses, when they were on the
22  sidelines, we were content with that. As you know, also by
23  way of the answer for our this subpoena, in May a subpoena
24  was served on them to get testimony by the plaintiffs on
25  claim 1-9. Naturally we expected that. We subpoenaed

OFFICIAL COURT REPORTER

**Page 20 (bottom right column)**

1   documents that would allow us to conduct a meaningful cross
2   examination of the reporters when they offered their
3   testimony. So we didn't bring them into this.
4       Our position, the purpose of our subpoena and our
5   return to annual is very simple. This really is bottom due
6   process, fundamental fairness. If they are going to come
7   forward, if they are going to testify against our clients,
8   then all we want is a fair ability to conduct a meaningful
9   examination into their bias, their motive, et cetera.
10      THE COURT: What about the notes?
11      MR. GILLEN: The notes I think go to all of that.
12  I hear from the standpoint of our clients' interests, giving
13  their deposition testimony, these experts were continually
14  taking and placing things in false light. The notes are very
15  material to that.
16      THE COURT: Well, what about the privilege?
17      MR. GILLEN: The privilege -- I believe that the
18  privilege, at least as far as it is, you know, secure, it's
19  clear, doesn't extend to that material.
20      THE COURT: Because?
21      MR. GILLEN: The only holding in the Third Circuit
22  that relates to that sort of secondary reversal is
23  confidential, and is concerned whatsoever. It recognized, as
24  I believe to be what is true, and is from in that cases, that
25  those kind of notes of statements made, reporting by a

OFFICIAL COURT REPORTER

21

1  reporters, are unique in and of themselves.  (That's what the
2  Third Circuit said, that that's right.
3       Now, I think that Cuthbertson wrongly extended the
4  privilege beyond that.  And I think Judge Barbo's
5  concurrence in the subsequent case, Criden, is right.  And I
6  think that at a very interesting that Cuthbertson did not
7  mention Zurcher v. Lango decided by the Supreme Court
8  shortly before Cuthbertson was decided and holding that
9  there is no editorial process privilege.
10      So my position is if they're going to be allowed to
11  testify, then that's the purpose of the subpoenas, that's
12  the purpose of our examination.
13      THE COURT:  Where does it -- does the privilege
14  affect this case at all on these facts?
15      MR. GILLEN:  But based on the representation that
16  there were no confidential sources involved.
17      THE COURT:  So you say the privilege, really, at
18  its essence, applies only to confidential sources?
19      MR. GILLEN:  Yes.  I say that that's the holding,
20  that narrow view is what is most secure.  Beyond that, the
21  cases from the Supreme Court and the Third Circuit indicate
22  it's just non-editorial sources, perhaps information that
23  would lead to the discovery of the identity of confidential
24  sources.  Beyond that --
25      THE COURT:  But we don't have -- Well, of course

OFFICIAL COURT REPORTER

22

1  counsel says there are no confidential sources, but I think
2  you read the privilege too narrowly.  We may disagree on
3  that, and I think, again, another script that runs through
4  the cases, or at least a there is that we run the risk of
5  shilling the ability of reporters to do their work,
6  particularly if we examine their notes.
7       MR. GILLEN:  The only thing I can say to that,
8  Judge, is the U.S. Supreme Court considered all of those
9  objections in Herbert v. Lando.  In Herbert.  If those
10 reporters were defendants in a defamation action brought by
11 my clients, they would have to turn that stuff over.
12      THE COURT:  Well they might, but they're not.
13      MR. GILLEN:  Well, I mean that's the question for
14 you to decide.  But my point is, these notes are not
15 protected.  I firmly believe that under the Bartermen
16 [Bartnicki?] notes and in light of their holdings.
17      THE COURT:  All right.  Thank you.
18      MR. GILLEN:  You're welcome.
19      THE COURT:  Is the plaintiffs.
20      MR. KALCZNK:  Your Honor, Witold Walczak, ACLU of
21 Pennsylvania for the plaintiffs.
22      The plaintiffs' position, as I think the Court has
23 correctly identified them, are fairly narrow.  But before I
24 get to those, it might -- I mean I would like to focus on
25 this privilege issue because I'd like to reconceptualize it

OFFICIAL COURT REPORTER

23

1  a little bit differently.
2       THE COURT:  Well, you say they've waived it.
3       MR. WALCZAK:  Well, it is an argument in there, and
4  how this works out in practice if we don't get the
5  affidavits in, and whether the reporters get nailed at
6  trial.
7       THE COURT:  I'm not sure the reports feel were used
8  about your argument that they've waived it, but you've made
9  that argument nonetheless.  Is that right?
10      MR. WALCZAK:  We have, Your Honor.  We also argue,
11 so I will in just a second, that the information we're
12 seeking stops at the line of privilege.
13      Just from the contacts I've seen, it seems to me
14 that it is appropriate and makes sense under the law to look
15 at it as two separate privileges related to news reporters.
16 One is the confidential source privilege, which is quite
17 clear, everybody understands.  The other is a news gatherers
18 privilege.  And, again, Cuthbertson is really the leading
19 case on this.  And on page 147 the Court writes, We hold the
20 privilege extends to unpublished material in the possession
21 of CBS.
22      So that there's the confidential source privilege,
23 and there's the news gathering privilege, which gives the
24 media that sort of -- that breathing space, and it could be
25 analogous to an attorney work product privilege.

OFFICIAL COURT REPORTER

24

1       THE COURT:  And part of the rationale, obviously,
2  as I said stated to Mr. Gillen, I think the rationale has
3  the tendency to chill efforts by the media to do their work.
4  Is that not correct?
5       MR. WALCZAK:  That's absolutely correct, and
6  that -- and that is the justification.  And with all due
7  respect to Mr. Gillen, who we've gotten to know quite well,
8  I don't think that his assertion that Cuthbertson is kind of
9  way out there on the fringe is correct.  In fact --
10      THE COURT:  What is it that you want?  Let's try to
11 line up first of all --
12      MR. WALCZAK:  Very happily, Your Honor, in our
13 complaint filed on December the 14th, as alleged on there
14 that the defendants made numerous statements at public
15 meetings, as agents of the defendants.  Mr. Buckingham
16 privately, head of the curriculum committee.
17      THE COURT:  I understand.
18      MR. WALCZAK:  For instance that, "We need to
19 balance the teaching of evolution with creationism.  This
20 country vasn't founded on Muslim tenets or evolution.  This
21 country was founded on Christianity.  And has students should
22 be taught as such."  That's at paragraph 29.
23      Paragraph 30:  "2000 years ago someone died on a
24 cross.  Can I someone take a stand for him."
25      And those comments are important under the Lemon

OFFICIAL COURT REPORTER

24

test. And I remember back in February or March Your Honor
had some question about whether Lemon is the applicable
test. So asked in a quick reading of the summary judgment
brief defendants filed last night, they are now conceding
that Lemon is the applicable test. And a child under
Allegheny County versus ACLU that's probably right. We don't
need to decide that today.

THE COURT: So, we don't. We'll have a lot to say
about that.

MR. WALCZAK: And I want to just take this
opportunity to apologize because it's now as it is we don't
have enough interesting constitutional issues in this case,
and now we have additional ones that are coming to light
today, and we kind of got us into this. For the reason this
has become so important was this has become an issue is that
these journals are important to the plaintiff's case, they
go both to the purpose/effect prong, and the effects prong.

THE COURT: Well, I understand that, but let me try
to make sure that I understand, and I recognize what it is
that you're saying and why you need to say it. But my
question is fairly basic. If I understand Mr. Gillen, the
defendants seek pretty much unfettered ability to not only
conduct an examination of the reports, but also to get into
the notes, and, I assume, Mr. Gillen, the e-mails as well,
to the extent that they're relevant to the proceedings.

OFFICIAL COURT REPORTER

25

Now, do I understand that you stop short of the
notes and the e-mails. I want to just make note I
understand everybody's position — and you have the ability
to explain, or you do or, you should be what I'm trying to —

MR. WALCZAK: Well, it depends on how all this
plays out, let just — let me just explain historically. On
June — on January 7th we began taking depositions of the
defendants. And somewhat to our surprise, one by one they
uniformly denied the quotes attributed to them in the two
different newspapers. And, you know, and it wasn't the
reading is story, we never used the word creationism at any
public meeting. So there really is a factual dispute there.

Under Rule 902(6), I believe it is, these newspaper
articles are self authenticating so that's not a problem.
But we still need to lay a foundation. And the only thing
we need from the newspapers is the only way to lay a proper
foundation to that we can get those newspaper articles into
evidence. The affidavits that the reporters and that the
editors have given to us, and the stipulation that in fact
was signed and submitted in court covers everything we're
looking for.

THE COURT: So do I understand then that to try to
answer the question that I asked you, and Mr. Gillen
obviously want to depose those two reporters. You're
content to stand on what you have, but it there is a

OFFICIAL COURT REPORTER

26

deposition you're going to win in?

MR. WALCZAK: Your Honor, that is correct. We are
content with what we have now. If we don't get the
stipulation entered or get some type of affidavits in, which
I don't believe we can get in without defendant's consent,
then we would want without to participate in the deposition
to ask the foundational questions, and I can — I can give
assurance to the Court that's the only thing we would ask
unless there's some reason to rehabilitate or something
comes to in the cross. So, again, I can't promise
that we would drop at that point.

THE COURT: All right. I understand. All right.

MR. GILLEN: Your Honor, may I respond briefly?

Two things, the newspaper articles are hearsay. I
mean these are Ms. Maldonado —

THE COURT: We're not going to argue evidence.

MR. GILLEN: Okay, I understand.

THE COURT: the admissibility and the self
authentication, I'm not —

MR. GILLEN: Very well.

THE COURT: We don't need to discourse about that
today.

MR. GILLEN: That's fine, and I accept that, Your
Honor.

Then said, the next thing is, you know, it's no

OFFICIAL COURT REPORTER

27

comfort to my clients that the reporters can come forward
and selectively testify and not be exposed to meaningful
examination.

As you know, opposing counsel knows, many
statements have been attributed to my clients which they
flat out deny. They believe statements were taken wholly
out of context, words were put in their mouth. That is
their testimony, and they show you that. And what's more,
the reporters say no one ever talked to us about it. That
is not the testimony is from as you from the depositions.
They say we went to them, we tried to get a fair hearing and
we couldn't.

So from these standpoint, the motion that the
reporters have a limited right to come forward, you know,
say what they like and shield that, that the process and
their notes have any meaningful scrutiny, that is no
comfort. That would deprive them of due process. They need
a chance to really examine them. What do those notes say?
What words were used? What statements were omitted from
the articles? I mean that's part of the concern of my clients.

Creationism was a word that was largely put into
their mouth by those reporters. There were times when they
said under the reason argument, maybe they misspoke because
people were shouting them with that. That's not the point.
These statements they may flat out. We want an opportunity

OFFICIAL COURT REPORTER

19

20

31

32

33

1  reporters have been placed in terms of the reporting.  I
2  need the Court to be cognizant of the fact that both the two
3  newspapers, the York Daily Record, which is owned by Media
4  News Group, are the York Dispatch, which is run by Buckner
5  News Associates.  They are two separate distinct newspapers,
6  two separate editorial staffs.  They have nothing to do with
7  the other.  And it doesn't tie them up in allowing some
8  element of complicity here as it relates to the two
9  reporters because the reporters wrote two separate articles
10 for news meeting they attended.  And ironically they all
11 heard the same thing.

12              THE COURT:  I understand.

13              MR. WERK:  That's number one.

14              Number two, I believe that counsel has indicated
15 that we've used the sole eyewitness and that they never
16 came out of the instant mouse member's mouth and that that's
17 part of what this problem is in terms as to the language we
18 used in our article.  Not an amount that you need to go
19 another media in this case, but there is a Fox 43 expose on
20 the internet where Mr. Buckingham is interviewed and
21 specifically used the word creationism.

22              Thank you.

23              THE COURT:  How does that help us today?

24              MR. WERK:  Well, I think it disqualifies somebody's
25 argument.

OFFICIAL COURT REPORTER

34

1              THE COURT:  And I -- and I take these somewhat
2  ancillary points as arguments, and I'm not sure that they
3  are helpful to me today.  Everybody has got a position.  The
4  position obviously the defendant have is that certain
5  things aren't said, and they want to have the ability to
6  examine the reporters on those points, I recognize that.

7              MR. WERK:  But again, and this will be my final
8  statement, I promise you, although there's really during what
9  it jones out or a lawyer's mouth, if the argument is that my
10 clients wrote whatever, and it was contradictory or not in
11 conference with or not exactly what was said by the board
12 members, again to position it, very clearly, but there were
13 other independent persons not associated with the newspaper,
14 not associated with the school board, for certain members of
15 the general public, parents of students that attended those
16 school board meetings, they are the sole possessors of the
17 names of those individuals because they maintain the ability
18 that, and those parties I would presume would likewise be
19 able to evidentiary state what it is that they heard, saw
20 and observed.

21              THE COURT:  I understand.

22              MR. WALCZAK:  I'm sorry, Your Honor.

23              THE COURT:  We'll have to end this sometime, but
24 give you a couple more comments.

25              MR. WALCZAK:  He started down the road of, is this

OFFICIAL COURT REPORTER

35

1  information really necessary, and I think Mr. Werk is
2  correct, that in order for plaintiffs or either of the
3  parties to overcome that privilege, we have to show that
4  it's really necessary, that it can't be gotten from other
5  sources.

6              Just in case this Court is thinking that maybe none
7  of this should be admissible, the plaintiffs would focus on
8  a statement in Cumberman that they said referring to TV
9  tape, these are unique bits of evidence that are frozen at a
10 particular place and time.

11             And yes, it's true we have several other witnesses
12 including plaintiffs who will jone in and say we were at
13 these meetings and, yes, we recall statements about
14 creationism, we recall statements about Muslim beliefs, we
15 recall statements about Darwinism, but that is all based or
16 recollection.  What we have here is contemporaneously
17 recorded statements; and that is unique.  No other
18 individuals can testify to that.

19             Also, and I don't know if Your Honor has had a
20 chance to read McCreary County versus ACLU yet, but the
21 Court goes to great lengths to talk about out of the
22 gestalt of the situation, what is the environment; and when
23 the reasonable observer looks at a situation, do they
24 perceive an endorsement of religion.  So you have to really
25 look at the historical record.  These news reports in

OFFICIAL COURT REPORTER

36

1  totality are part of the historical records.  So this is --
2  this is unique evidence that's really important to our case.

3              THE COURT:  If you won't let me use the word
4  coincidence, I won't let you use the word gestalt.

5              MR. WALCZAK:  Thank you.

6              THE COURT:  Last word.

7              MR. GILLEN:  Thank you, Your Honor.  Two things.
8  With respect to the sign-in sheets, they do exist.  Plainly
9  they're unreliable in this voice, there's a handful of
10 signatures on each one.  They've been produced.  These are
11 meetings at which I know many people say 50 or 100 were
12 present.

13             THE COURT:  I understand.

14             MR. GILLEN:  Second, is the sign in sheets are to
15 be created by counsel for the reporters, I mean, it's not
16 at all clear that reporters were present at all of the
17 meetings, and it's -- it wouldn't be the first time that
18 reporters testified quotes from one another.

19             I mean, I don't want to say that somehow we
20 wholly disproved, but I cannot foreclose that there was some
21 cooperation because

22             THE COURT:  I understand your position, Mr. Gillen.
23 I entered the issues you argue it.  The more you're going to
24 beg wisdom comfort from Mr. Werk, and this will become
25 endless.

OFFICIAL COURT REPORTER

25

```
 1        MR. SENK:  I have answers for that one.

 2        THE COURT:  I bet you do.

 3        I would like to examine the -- and I think it's

 4  incumbent upon me in examining the e-mails and the notes and

 5  drafts, and I would do so in two ways, Mr. Senk.  We can

 6  either have you file them under seal or we can have you

 7  simply provide them for an in camera inspection.  I would

 8  prefer the latter, I think.

 9        MR. SENK:  That's what we'll do.

10        THE COURT:  Why don't you provide those to me, in

11  my chambers.  I would say -- well, how long is it going to

12  take you?

13        MR. SENK:  Can I give them to you next Tuesday?

14        THE COURT:  Let's say by the close of business

15  Tuesday, that will be fine.  And I will conduct an

16  examination in camera and rule then pursuant to arguments

17  heard today and the submissions of the parties and my

18  examination of the materials.

19        Now, let me -- before we close this portion of

20  today's proceedings, Mr. Gillen, do you accept -- do we have

21  any issue with respect to Mr. Senk's assertion that, to the

22  extent you don't get anything else, it doesn't exist?

23        MR. GILLEN:  Certainly.  I'm not going to impugn

24  his integrity.  If he says there are no comments that

25  exist, Your Honor, I have to be content with that.
```

OFFICIAL COURT REPORTER

26

```
 1        THE COURT:  I simply don't want to have another

 2  proceeding on a motion to compel or some other vehicle

 3  because you say that you're entitled to something that you

 4  don't get.  It seems to me that the only materials

 5  requested as a portion of your subpoena at the individual

 6  reporters that exist according to Mr. Senk are the e-mails

 7  and the notes and drafts.  All other matters, including the

 8  employment records, to the extent that those are independent

 9  contractors, simply don't exist.  So speak now or --

10        MR. MILLER:  Well, I would say

11        THE COURT:  -- hold your peace.

12        MR. GILLEN:  Judge, and I thank you for the

13  opportunity.  I think that everything we've asked for is

14  proper, to the extent it doesn't exist.  I have noted that,

15  and that's represented to me by counsel for the reporters.

16        THE COURT:  Have you represented that formally

17  other than perhaps on the record today?

18        MR. SENK:  The first time that I represented those

19  items don't exist is in today's argument.  I can do it in a

20  letter.

21        THE COURT:  I think you should do that so we're all

22  clear.  And I think Mr. Gillen certainly respects your

23  integrity, it's clear, but I think you ought to spell it out

24  and -- so that everybody understands.  So then I'm in camera

25  inspection of these matters that we just spoke about would
```

OFFICIAL COURT REPORTER

34

```
 1  notices for the materials sought via the subpoenas.  So we

 2  have that, and we have the actual issue of the testimony of

 3  the reporters and, if so, what the boundaries are.

 4        MR. SENK:  There's one other thing that I have in

 5  my file, that I didn't mention once because it's a letter

 6  from Mr. Bonsell, who I believe was the school board

 7  president.  He wrote a letter to the editor that he asked to

 8  be published.  So I have that letter together with the

 9  letter that he wrote that he wanted published together with

10  the editorial that was published.

11        THE COURT:  Are you going to turn that over?

12  You're going to submit that to me?

13        MR. SENK:  That's all I have, and I'll give you what

14  I have.

15        THE COURT:  What is the problem with turning that

16  over?

17        MR. SENK:  I don't have a problem with it.

18        THE COURT:  Why don't you just turn it over.  I

19  don't think it's helpful to have me review everything that

20  is, under the circumstances, would appear to be innocuous

21  and in their possession anyway likely, so I would -- perhaps

22  when you send your missive to Mr. Gillen that indicates what

23  you have and what you don't have, you ought to just send

24  it --

25        MR. SENK:  I'll send it to both counsel
```

OFFICIAL COURT REPORTER

40

```
 1        THE COURT:  -- so both counsel, to all counsel, to

 2  the many counsel we have in this case, copies to everyone.

 3        MR. SENK:  You're dealing with sole counsel that I

 4  am.

 5        THE COURT:  So I am.

 6        Anything else before we close the record in this

 7  portion of the proceedings?  All right.

 8        Then we'll excuse you.  That concludes --

 9        MR. SENK:  Thank you.

10        THE COURT:  Thank you, Mr. Senk.  Let's have

11  counsel I guess for the Foundation for Thought and Ethics

12  will take their seats.

13        While you're setting up we'll take five minutes and

14  I'll be right back.

15        THE DEPUTY CLERK:  All rise.

16        (Whereupon, a recess was taken from 12:12

17  p.m. to 12:21 p.m.)

18        THE COURT:  Part two of today's proceeding is the

19  application for intervention filed by the Foundation for

20  Thought and Ethics for the plaintiffs, and the defendant

21  obviously we have the same counsel.

22        Counsel, would you enter your appearances for --

23  on behalf of the applicant.

24        MR. BOYLE:  Yes, Your Honor, Dennis Boyle on behalf

25  of Foundation for Thought & Ethics.
```

OFFICIAL COURT REPORTER

41

```
 1          MR. ESKRA:  Leonard Brown.  Good afternoon, nice to
 2   see you.
 3          THE COURT:  All right, nice to see you.
 4          All right.  You filed the application.  It's my
 5   understanding that you may have some testimony that you want
 6   to present.
 7          MR. BOYLE:  That's correct, Your Honor.
 8          THE COURT:  You may proceed.
 9          MR. BOYLE:  At this time, Your Honor, I would call
10   Jon Buell, the president of the Foundation for Thought and
11   Ethics.
12                    JON A. BUELL,
13   called as a witness on behalf of the defendants, having been
14   duly sworn or affirmed according to law, testified as
15   follows:
16          THE DEPUTY CLERK:  State your name and spell your
17   last name please for the record.
18          THE WITNESS:  My name is Jon Buell.  Jon A. Buell.
19   J-O-N  A.  B-U-E-L-L.
20          THE COURT:  All right, you may proceed.
21                 DIRECT EXAMINATION
22   BY MR. BOYLE:
23      Q   Mr. Buell, what is your current address?
24      A   6801 Regera Road, R-E-G-E-R-A Road, Dallas, Texas,
25   75248.
```

OFFICIAL COURT REPORTER

42

```
 1      Q   And by whom are you currently employed?
 2      A   I am employed by the Foundation for Thought and
 3   Ethics.
 4      Q   And what is your position there?
 5      A   My position is as president.
 6      Q   And prior to working there where did you work?
 7      A   I worked at Probe Ministries prior to the
 8   Foundation.
 9      Q   And was Probe Ministries a publication type
10   ministry?
11      A   Lectures in classrooms but publications as well,
12   and I was the editor of the publications.
13      Q   Okay.  What is the Foundation for Thought and
14   Ethics?
15      A   The Foundation for Thought and Ethics is organized
16   to promote freedom of choice for young people in the
17   classroom, especially as it pertains to matters of moral
18   view and philosophy and character and the like.
19      Q   How about with respect to science?
20      A   And with respect to science, we've had a burden
21   that -- that natural -- that -- I'm sorry, that intelligent
22   design, which is to do here in various branches of science,
23   right also extends to biology.
24      Q   And how does the Foundation for Thought and Ethics
25   fulfill this job, this mission?
```

OFFICIAL COURT REPORTER

43

```
 1      A   Well, we've organized some scientific symposia and
 2   we do some teacher training, but primarily through
 3   publication of supplemental textbooks for the public school
 4   classroom.
 5      Q   And where does the Foundation for Thought receive
 6   its support from?
 7      A   Well, we sell our books, market our books to the
 8   schools.
 9      Q   What percentage of your income comes from marketing
10   books?
11      A   Well, at this point it's probably about 40 percent.
12      Q   Is that a growing percentage every year?
13      A   Yes, it is.
14      Q   And why is that?
15      A   Well, because an order to really make independent
16   ones who are out there making contacts with teachers prospective,
17   you have to have a pipeline of product.  And as we -- at
18   this point we don't have as much product as the average
19   publisher does, so we have to produce more product which
20   would be text -- supplemental textbooks and teacher's guides
21   are peripheral that make them attractive and easy to use
22   for the teachers.  And as we do that, as we accomplish that,
23   then we'll have more keep and be able to contact more
24   schools.
25      Q   Okay.  Is the Foundation for Thought and Ethics a
```

OFFICIAL COURT REPORTER

44

```
 1   religious organization?
 2      A   No, it's not.
 3      Q   What kind of organization is it?
 4      A   Well, it's an educational organization.
 5      Q   And does it seek to provide any -- promote any
 6   Christian message in that education?
 7      A   No, it does not.
 8      Q   Any religious message at all?
 9      A   No, none at all.
10      Q   Your nonprofit charter section: a Christian
11   purpose, does it not?
12      A   The articles of incorporation
13      Q   Okay.  And when were they founded, when --
14      A   They were -- they're -- I think it was 1980.
15      Q   And since 1980 have you operated as a Christian
16   organization at all?
17      A   Not at all.  We have, you know, a 25 year plus
18   track record of what we've done, which does -- you know,
19   which you can easily compare or look for Christian
20   activities, it's not there.
21      Q   Do you seek to promote any sort of evangelical
22   heritage in any way?
23      A   No, we don't.
24      Q   Do you publish -- are you familiar with the book
25   Pandas and People?
```

OFFICIAL COURT REPORTER

BUELL - DIRECT                                                    45

1   A   Yes.

2   Q   What is your relationship to the book Pandas and
3   People?

4   A   Well, we are the publisher of Pandas and People.

5   Q   And what is Pandas and People?

6   A   It's a book designed to supplement basal biology
7   textbooks in public school classrooms and present the
8   scientific rationale for intelligent design.

9   Q   I guess we ought to be clear on what a basal textbook
10  is.

11  A   A basal textbook is a textbook that's designed to
12  cover all the material in a course.  Each state has its
13  required benchmarks, if you will, of what has to be covered
14  in American history, what has to be covered in biology,
15  et cetera, and so a basal textbook is going to fare on the
16  material in that state according to how much -- if it has a
17  large percentage of all of those benchmarks so that the
18  teacher can use that basal textbook and be fulfilling his
19  responsibility.

20  Q   And how would a supplemental textbook like Pandas
21  and People be used in that curriculum?

22  A   Well, the layout of Pandas and People as -- follows
23  the -- typically follows the basal textbook.  So we would
24  like for our book to be used during the entire course, but
25  practically speaking many people, many teachers will team it

OFFICIAL COURT REPORTER

---

BUELL - DIRECT                                                    46

1   and use it try try a few news periods.  So it's flexible.

2   Q   And what is the rationale for Pandas and People;
3   what is the -- why is it different?

4   A   Well, it's different because it presents the view
5   of intelligent design.  And the view of intelligent design
6   is that -- it's the view that intelligent cause, which we see
7   at home in various branches of science, examples would be
8   the search for extraterrestrial intelligence, forensic
9   science, archeology, in all of these branches of science
10  we're very much at home in searching for, recognizing and
11  having confidence that we can identify the presence of
12  intelligence.

13      Now, it's saying that same -- that same kind of
14  confidence and that same purpose are looking, for example,
15  in biology.  When we look at biological organisms and
16  especially their genomes, we recognize the same intelligent
17  cause.  And because we extend a uniform application of the
18  principles of science, there's good warrant to say that this
19  intelligent -- this designed activity is the product of
20  intelligence.  So it's a plausible warrant and hypothesis when
21  we look at the information that we too.

22  Q   Now, prior to deciding to engage in the product
23  that resulted in Pandas and People, did you do any marketing
24  studies or any studies for necessary trends?

25  A   Yes, in fact, while we were doing our first book

OFFICIAL COURT REPORTER

---

BUELL - DIRECT                                                    47

1   prior to Pandas, we engaged a professor actually who was a
2   former professor of anthropology on a tenured level at SMU,
3   Southern Methodist University, who had a polling business.
4   And we engaged him, he was a Darwinist, he sat with our and
5   diagramed questions and let him take our questions and
6   re-express them and then conducted a poll.  And the results
7   were all turned over to him and he gave him computer center
8   at SMU to draw a large number of distributions.  And it
9   showed a very strong, a very high percentage of interest
10  among biology teachers -- this was all biology teachers
11  in having teamwork or curricular help and assistance in
12  teaching a hypothesis that was an alternative to Darwin's.

13      And it also asked the question, if there is a
14  dominant hypothesis and a secondary hypothesis, which should
15  you teach.  And the options, given to the teachers were, just
16  teach your personal viewpoint, teach the dominant hypothesis
17  and the secondary hypothesis, or teach the secondary
18  hypothesis, teach the dominant hypothesis.  The overwhelming
19  majority said teach both, 70 some percent.

20  Q   The individual who conducted this study for you,
21  was he a Darwinist?

22  A   No, he wasn't.

23  Q   And you referred to him as a Darwinist?

24  A   He was a Darwinist.

25  Q   Perhaps we should define that term for the Court.

OFFICIAL COURT REPORTER

---

BUELL - DIRECT                                                    48

1   A   The term Darwinist?

2   Q   Yes.

3   A   Well, a Darwinist is one who adheres to Darwinian
4   or neo-Darwinian evolution.

5   Q   So who then was commissioned to write the book
6   Pandas and People?

7   A   So the authors of the book were P. William Dembski
8   who had authored -- previously co-authored books -- major
9   books in biology with McGraw-Hill and K. P. Saunders in his
10  book with Claude Villee, co-authored by P. D. Saunders is the
11  best selling, most widely used college level biology majors'
12  major textbook in the world.

13      And then Jean Kenyon was the other co-author.  And
14  Dr. Kenyon was the co-author of the best selling book of the
15  origin of life prior to the Cell, previous, the book before
16  Pandas.  And it also was a McGraw Hill title, and it was
17  called Biochemical Predestination.  And Dr. Kenyon was
18  recognized as one of the top, you know, five or ten origin
19  of life researchers in the world.

20  Q   So this book was written by individuals who were
21  biologists by profession?

22  A   Biologists and origin of life researchers.

23  Q   Okay.  After the book was prepared was it submitted
24  for peer review?

25  A   Yes, it was extensively.

OFFICIAL COURT REPORTER

BUELL - DIRECT

1 Q. Would you submit it just to Christian scientists
2 or --
3 A. Oh no. No, we sent it to -- we sent it to people
4 who we had reason to believe might be receptive or it
5 agreement. We sent it to people who we knew were not
6 would not be receptive to it. We sent it to people because
7 of their academic credentials in a variety of sciences. It
8 was an extensive project, certainly lasted over a year,
9 meaning -- just working in terms of the input of the peer
10 review.
11 Q. And what did you do then when you got the results
12 of the peer review?
13 A. We would take -- the peer review informed take the
14 final edit of the book in a very serious -- to a very
15 serious degree.
16 Q. When was Pandas and People first published?
17 A. It was first published in 1989.
18 Q. And how many books have been sold since that time?
19 A. Somewhere between thirty-five and 38,000.
20 Q. And what has the average selling price been?
21 A. Well, the average price over that lifetime has
22 been -- the average discounted selling price, not run
23 retail, has been between 12 and $13. But presently the
24 current print run is -- the price was adjusted. The retail
25 is $24.95. So the average selling price in this case is

OFFICIAL COURT REPORTER

---

BUELL - DIRECT

1 $6.22.
2 Q. And how many books do you have remaining to be
3 sold?
4 A. The sixty?
5 Q. How many books do you have in inventory to be sold?
6 A. Oh, about 1300 copies.
7 Q. And is there another edition of the Pandas and
8 People in the works at this time?
9 A. There is, yes.
10 Q. And what is that, the title of that book?
11 A. The title of that book will be The Design of Life.
12 Q. And how does that differ from Pandas and People?
13 A. Well, since the second edition of Pandas, you know,
14 we're about 15 years down the road, and of course the
15 debate has remained a great deal. A lot of revision has been
16 done, and so it's been necessary to update quite a bit of
17 material. A lot of the original Pandas will be retained,
18 but a lot will be rejusted, and we've added three authors.
19 They're currently among the top intelligent design
20 scientists in the world.
21 Q. When do you anticipate this book being released?
22 A. Next year, in '06.
23 Q. And how many -- how many books will you produce in
24 your first printing?
25 A. We'll print 10,000.

OFFICIAL COURT REPORTER

---

BUELL - DIRECT

1 Q. Do you anticipate any printings of that book after
2 that?
3 A. We certainly hope so. No guarantees, you know.
4 Anticipate or wants to wrap up, you know, the first print
5 run, especially, if it's a spell one like that. So of course
6 we hope that there will be more print like the Pandas
7 before it, and anticipate that, but, you know, in terms of
8 our fiscal responsibility, we have to be conservative and do
9 a small print run.
10 Q. Are Pandas and People and The Design of Life both
11 based upon the rationale of intelligent design?
12 A. Yes, they are.
13 Q. Would a special determination equating
14 intelligent design to religion affect the sale of Pandas and
15 People and The Design of Life?
16 A. Oh, it would be -- it would be catastrophic for the
17 sales. It would be -- would make that book problematic.
18 The teacher would not buy it. It would not be used in the
19 classroom. The market for which the book is being prepared
20 would just effectively evaporate.
21 Q. And the market for who the book is prepared, where
22 is that, what is that market?
23 A. That market is in high school biology classes, AP
24 biology classes, and in some introductory level biology in
25 college.

OFFICIAL COURT REPORTER

---

BUELL - DIRECT

1 Q. That would a decision affecting the sale of that
2 most affect FTE -- or those books affect FTE?
3 A. Well, we're several years into the process of
4 preparing this book. It would as a dramatic blow to FTE and
5 could go to our viability -- probably would, because we've
6 been working since 1998 to develop this book. We've
7 involved a lot of, a lot of scientists. And in addition to
8 the economic hit that it would provide for us, it would be a
9 very scary experience for these authors that we might
10 approach in the future to ask them to write for us, to see
11 what's happened to this book.
12 Q. And what would the total figures that you've
13 calculated for loss be, just from -- through the first
14 printing of Design of Life?
15 A. The revenues for the first printing of the Design
16 of Life would be $10,000 plus more.
17 Q. And when you add that to the other costs that you
18 have, or expenses you have, what would the total loss be?
19 A. Well, we have, as I say, 1500 -- roughly 1500
20 copies of Pandas presently which are as long as it's left
21 was, 19.16, average re. And from that next print run of
22 Pandas will sell at a little bit more. So the combined
23 present remainder of the present print run and the next
24 print run together would total $233,000 in revenues,
25 projected revenues. And then when you add that to the 10,

OFFICIAL COURT REPORTER

BUELL - DIRECT

1  five thousand dollars, $215,000 for "The Design of Life,"
2  we're talking now 224,000.
3     Q   Mr. Buell, what is intelligent design?
4     A   Intelligent design is the view that, just as
5  intelligent causes lie well accepted in branches of science,
6  and I mentioned this a while ago, that forensic science and
7  the search for extraterrestrial intelligence or SETI, and
8  you might picture the Arecibo Observatory in the movie
9  Contact that was about Carl Sagan's work and so forth, those
10 were the implicants, the tools at SETI, as well as in
11 archeology.
12        These branches of science are very comfortable
13 and comfortable with the mechanism to identify the product
14 of intelligent design.  And so if we draw that same
15 rationale and we start with the assumption that in
16 biological organisms, in the nature, there is enormously
17 highly organized, mathematically highly improbable
18 organization along the genome at the DNA molecule, so that
19 the genome as a whole is something that unites, that couples
20 our mind.  So this would be I think a good starting place
21 for the definition of intelligent design.
22     Q   Would you say that the finding of things is evidence
23 of intelligence?
24     A   Yes, I would.  I would -- I'm not aware of this is
25 admissible or not, but recently in the press it was widely

OFFICIAL COURT REPORTER

---

BUELL - DIRECT

1  reported that the famous British atheist Anthony Flew,
2  incidentally a lifetime of advocating atheism, he had been to
3  a symposium in Dallas in 1985.  He had been in touch with
4  intelligent design scientists, read several of this, and he
5  had -- he came out in the press, I think it was in December,
6  and he said this.  He said a lot of my friends are going to
7  be very angry with me that I'm doing this, but he said, I've
8  always said that you follow the evidence wherever it leads,
9  and that's what I'm doing.  And he put his finger on the
10 several argument at intelligent design, that DNA molecule,
11 and the highly unexpected improbable arrangement of the
12 coding of raw codes on the DNA spine.  And he said that
13 is -- that persuades me.  He won't say that the agent, the
14 intelligent agent is even personal, and he doesn't accept
15 the God of the Bible, he doesn't accept the God of the
16 Koran, but he says, it is unacceptable to me.  And so he's
17 emerged, at an 81-year-old man, he's coming out his atheism.
18     Q   Now, you say that the theory originates, or the
19 basis originates with scientific observation.
20     A   Yes, it does, it originates with that conversation
21 that is solely made in science.
22     Q   And that inducible is simply a conclusion from that
23 observation?
24     A   Yes, it is.  It's a conclusion, once you realize
25 that we have artificially removed intelligent causes from the

OFFICIAL COURT REPORTER

---

BUELL - DIRECT

1  branch of science, it's welcome in several others, if it
2  were necessary in my own evidence of intelligence in another
3  branch of science, it would be welcomed overnight, but it an
4  artificially removed from biology.
5     Q   What does intelligent design tell us about who the
6  creator or designer might be?
7     A   Well, first of all, intelligent design can't tell
8  us anything beyond intelligence.  If you accept the well
9  accepted principles of analogical reasoning without which
10 science could not be done, the principles that were given to
11 us by David Hume, philosopher David Hume, then you realize
12 that science cannot go from the material realm, from
13 observations of the materials, to the supernatural.  And this
14 is -- this is an natural part of the teachings of David
15 Hume that have been -- that were accepted into science at
16 that time, the stage that it was, and have been a part of it
17 ever since.
18     Q   Can you tell us at this, that intelligence is a
19 natural or supernatural event?
20     A   No, intelligent design cannot tell us whether it's
21 natural or supernatural?
22     Q   Or even personal in nature?
23     A   And it can't tell us if it's personal.
24     Q   Or even if it still exists?
25     A   That would be right, yes.

OFFICIAL COURT REPORTER

---

BUELL - DIRECT

1     Q   Are you familiar with creation science?
2     A   Yes, I am.
3     Q   What is creation science?
4     A   Creation science was defined in the mid '80s by the
5  National Academy of Sciences in their special, Science and
6  Creationism, a view from the National Academy, as entailing
7  three teachings.  Number one, that creation occurred
8  sometime between six and ten thousand years ago; number two,
9  that it was a supernatural creation, simultaneously creating
10 all of the life forms independently of each other, including
11 very nearby those, invoking flood geology as
12 a catastrophism, to explain the order of the fossils in the
13 fossil record.
14     Q   Now, does creation science begin, as it promised
15 upon scientific observation or upon something else?
16     A   To begin with the observation of the complexity of
17 the information in the genome.
18     Q   Creation science.
19     A   Oh, I'm sorry, I'm sorry.  I was thinking
20 intelligent design.
21        Would you rephrase the question?
22     Q   Does creation science begin with scientific
23 observation of the natural world --
24     A   No, creation science --
25     Q   As it

OFFICIAL COURT REPORTER

SUELL - DIRECT

57

MR. ROTHSCHILD:  Your Honor, defendant's counsel is
leading the witness continuously.

THE COURT:  Well, I'm going to allow some leading
in the interest of time.  But I want to say that -- am I'm
overrule the objection.  But I will say I'm not sure,
counsel, with all respect and due respect to your
efforts to be as comprehensive as possible, under Rule 24,
I'm not sure how this line of questioning helps me.
Enlighten me.

MR. MUYER:  Your Honor, we have to show -- as the
Court is aware, there are several things we have to show,
one of which is the interest to the litigation that is not
being permitted.

THE COURT:  Well, you have to show timeliness, you
have to show the significant legal interest.

MR. MUYER:  That's correct.

THE COURT:  You have to show the impairment of that
interest, and you have to show the lack of adequate
representation by existing parties, at least as      in terms
as of right, which is unposed that we are at least by this
line of questioning.

So I'd ask you to move through this and try to get
to the other parts.  I am particularly interested in
timeliness.  I'm interested in the area of lack of adequate
representation by the existing parties as well.

OFFICIAL COURT REPORTER

---

SUELL - DIRECT

58

So    am I don't -- I don't want to drastically
limit your case.  I've free to do that you have to do.  I
recognize, but you should move through this.

MR. MUYER:  I understand, Your Honor.  I think that
does go to the adequacy of representation and the different
interests between the school board.

THE COURT:  All right.

MR. BOYLE:  In essence we've heard that the
plaintiffs are alleging that the school board had a creation
science policy.  Apparently there are pieces experts where
the teva creationism and policies were used to justify the
policy.  And that, we will assert, is the interest that the
defendant have to extend in this particular case.  Our
interest is more academic and more a financial interest
concerning intelligent design.

THE COURT:  And I won't think that -- is great deal
at that does not seem to be controverted.  And I'm not sure
that there is a strenuous contention that some edits of a
test could be left.

Now, there is an issue as to the Kaitzes, and I
recognize we're going to hear cross examination, and there
line of questioning that goes into the broader principles of
intelligent design and the subject of the Pandas and People,
I think the Court is pretty familiar with a lot of those

OFFICIAL COURT REPORTER

---

BOYLE - DIRECT

59

areas.  And I'm just saying, I think you can move through
and build the record you think you need to, but I'm  -

MR. BOYLE:  I'll move through.

THE COURT:  -- I'm not sure that you need to stay
in this area that long.

BY MR. BOYLE:

Q     What are the differences between creation science
and intelligent design?

A     Well, creation science, the driving impetus is to
affirm the genesis narrative in the Bible.  And the driving
impetus in intelligent design begins with observation,
observation of the genome, and the obvious product of
intelligence that we see in living systems.  So . . . .

Q     Are there prominent scientists who agree with the
theory of intelligent design?

A     Oh yes.

Q     Could you give us an example?

A     Well  -

Q     Prominent scientists who are not Christians, at
didn't, make that clear.

A     Dr. Fred Hoyle and Chandra Wickramasinghe published
together an article in the journal, a technical journal
called Icarus.  The title of the article was titled
Panspermia.  And they believe that the evidence for
panspermia, for intelligent origin of life is so great

OFFICIAL COURT REPORTER

---

BOYLE - DIRECT

60

that they meant a somewls where some intelligent
civilization in deep space sent moisten mated activity to
the earth located with life spores, seeded the earth, and was
then searching like a laboratory experiment.

It -- and then Dr. Hoyle, who is one of the
an authors of one of the three major theories of the origin
of the universe in the last century.  It's since both
eliminated from the running.  But he -- and he is a Nobel
prize winner, wrote a book exciting the intelligent
Universe.  And it does say that we -- what it sounds like,
he is showing that we cannot explain the genome apart from
intelligence.

Q     So when is -- in fact, is I could have just the
second?

Are you aware of the Dover School Board policy in
this particular case?

A     I saw it quoted in the complaint.  I believe it was
the complaint, or the issue document.

Q     Do you support using the book of Pandas and People
to advance a religious agenda?

A     Oh no.  We've opposed that throughout the sale of
throughout the  - both editions of Pandas.

Q     Were you ever contacted by anybody from the Dover
School Board before the institution of the policy?

A     No, we were not.

OFFICIAL COURT REPORTER

61

BUELL - DIRECT

1  Q   Were you ever contacted by anybody from the Dover
2  School Board after the policy was instituted?
3  A   No.
4  Q   Do you know how they got ahold of your book Pandas
5  and People?
6  A   No, we have no idea how they got ahold of the
7  book.
8  Q   Did Thomas More Law Center ever contact you about
9  the policy before it was implemented?
10  A   No, they didn't.
11  Q   Did they ever contact you about the policy after it
12  was implemented?
13  A   No.
14  Q   Did you ever call the Thomas More Law Center?
15  A   Yes, I did.  I called Mr. Thompson, Richard
16  Thompson, on April 1st.  I was concerned that we had a few
17  things that he may not have, that are our widely circulated
18  survey intelligent design essentials and educators, and I
19  wanted to offer them to him if he thought they would be
20  useful.
21  Q   Now, when you called on April 13th, was that
22  because of some recent knowledge you gained of what was
23  going on?
24  A   It was because my own audience editor,
25  Dr. William Dembski, told me that he had been in touch with

OFFICIAL COURT REPORTER

62

BUELL - DIRECT

1  Mr. Thompson.  And we felt that it was strange and, frankly,
2  very uncomfortable that we had not had contact with the
3  Dover School Board, we had not had contact with the Thomas
4  More Law Center.  And yet we were the publishers of the book,
5  the producers of the book, we knew more about the book than
6  anybody.  And so, you know, I did -- I did ask Dr. Dembski
7  for the phone number, and he gave me Mr. Thompson and
8  introduced me, and then I called them.
9  Q   After that, were you ever able to talk to the
10  Thomas More Law Center or anybody there about the theory of
11  intelligent design?
12  A   No, we never did discuss it.
13  Q   Did you ever discuss what your interest in this
14  suit might be?
15  A   No, we did not.
16  Q   Did you ever discuss your standing concerning
17  school board policies with respect to the use of your book?
18  A   No.
19  Q   With respect to school board policies and the use
20  of your book, who do you market your book to?
21  A   Well, we have from the beginning marketed our book
22  to teachers.  That's the one thing that unifies a lot of
23  different marketing methodologies.  For example, we exhibit
24  the book at science and education conventions.  We place
25  space ads in education journals.

OFFICIAL COURT REPORTER

63

BUELL - DIRECT

1  Now, we're not doing all of these things
2  simultaneously, but over the years we've done that.  We've
3  done direct mail to biology teachers.  We have been building
4  a network of independent reps who go and they contact
5  directly with individual science teachers.
6  Q   Why do you market it to science teachers instead of
7  school boards?
8  A   Well, we market to science teachers because they're
9  the people that have the expert -- the training and
10  acquaintance to evaluate the book.  And we don't believe that
11  if the book is handed down from above, from an authority
12  structure like a school board, that that's going to be a
13  positive educational experience, especially if the school
14  board requires that the teacher or teachers use the book.
15  And so we've always counseled -- when we get a
16  call from a school board member, we're always counsel them to
17  turn the book over to the teacher, just hand it carefully,
18  don't say, you know, I really think this is a great book or
19  whatever, just give it to the teacher, the science teacher,
20  and just say, you know, I would like to know what you think
21  of it, and with your background and expertise, I would like,
22  you know, I would like to hear about that.
23  Q   When -- has there ever been a time when you have
24  refused to send a book to a school district because of a
25  school board policy?

OFFICIAL COURT REPORTER

64

BUELL - DIRECT

1  A   Yes, there have been two notable instances where
2  the school board was ready, was poised to pass a resolution
3  requiring the use of Pandas and People, one in Louisville,
4  Ohio, and one right up the road from us in Plano, Texas.
5  And because in Louisville there was a connection between
6  creation science and intelligent design, and they wanted to
7  get the school board to pass a policy that it would be used,
8  we wrote them a letter and said we will not sell you copies
9  of Pandas and People.  We did the same thing in the case of
10  a Plano school district.
11  Q   Getting back to your conversations and your contact
12  with Thomas More, after that conversation with Richard
13  Thompson in April of this year.
14  A   Yes.
15  Q   Did Thomas More ever contact you concerning the
16  documents you had sent them?
17  A   I'm sorry, concerning the --
18  Q   The documents that you had sent them.
19  A   No.
20  Q   Did they ever contact you to find out what your
21  position was on the policy?
22  A   No, I was never asked about my -- our position or
23  the policy.
24  Q   Were you ever asked about your legal interest?
25  A   No.

OFFICIAL COURT REPORTER

BUELL - DIRECT                                     65

```
1        THE COURT:  I think he said he had no contact, is
2   that correct?
3        THE WITNESS:  Well, I think -- were you asking
4   about afterwards, later?
5        MR. BOYLE:  I believe there was one contact, Your
6   Honor.
7        THE COURT:  All right.
8   BY MR. BOYLE:
9        Q    Did you at some point in time receive a contact
10  from Mr. Gillen?
11       A    Yes.
12       Q    And when would that have been?
13       A    That was on April 21st, I got three phone calls
14  that day.  One was from Bill Dembski, our academic editor,
15  and he said that you are going to be served a subpoena.  And
16  I got a call from Tapper Mancomber, and Casey said, you know,
17  will your promise a subpoena at that could by mail or do you
18  need to be served.  And my reply was that I'll take it
19  either way, but I'll go to prison before I turn them over
20  over to you -- referring to the emails of Life.  And then
21  the third call was from Thomas More, from Patrick Gillen.
22       Q    And was that just an informational call?
23       A    Yeah, letting me know that we would be subpoenaed.
24       Q    Did he offer to represent your interests at that
25  point in time?
```

OFFICIAL COURT REPORTER

BUELL - DIRECT                                     66

```
1        A    No, I don't believe so.  I don't remember that he
2   did so.
3        Q    Did you have any further conversations with
4   Mr. Gillen after that?
5        A    Yes, there were -- there were very, very brief
6   contacts, but not anything of the nature of defending our
7   interests or what are your concerns, what are your
8   interests, you know, what is your exposure, nothing like
9   that.
10       Q    Okay.  After you heard about the subpoena, when was
11  the subpoena served upon you?
12       A    Well, the subpoena -- I'm still confused about that
13  because I was told that effectively the day the phone call
14  was made that's when the clock started ticking on the
15  subpoena.  But I didn't -- I was actually way out of town
16  within a few days of the 21st, and I was unable to handle
17  my trip.  So I spent the first two or three days of my trip
18  actually trying to locate an attorney.  And then this -- and
19  the subpoena was delivered to our office on the 28th of
20  April, and then I saw it when I returned to town another day
21  or two later.
22       Q    Were you able to locate an attorney?
23       A    Yes, I was.
24       Q    And who was that?
25       A    It was Herb Palmer of Mateer & Shaffer.
```

OFFICIAL COURT REPORTER

BUELL - DIRECT                                     67

```
1        Q    And did Mr. Mateer get a copy of the complaint and
2   the lawsuit for you?
3        A    Yes.
4        Q    And prior to that, that name I guess would have
5   been really Mary, had you even seen the complaint before?
6        A    No, I had not seen anything about the lawsuit other
7   than the subpoena.
8        Q    What actions did you take with respect to the
9   subpoena after that?  What legal actions did you take?
10       A    Well, following Mr. Mateer's advice, we submitted a
11  motion to quash and a motion for a protective order.
12       Q    Where were these motions filed at?
13       A    Well, one was filed in this Court, and one was
14  filed in the Northern Texas district.
15       Q    And a hearing on the motion to quash in this Court
16  was held on May 12th of '05?
17       A    Yes, that's right.
18       Q    And the hearing in the Northern District of Texas
19  was held subsequent to that?
20       A    Yes.
21       Q    Did anybody from Thomas More law center show up
22  for the hearing in Northern Texas?
23       A    No, they didn't, nor any written communication
24  either.  No, there was no presence from Thomas More.
25       Q    And I think we've covered it, but through those
```

OFFICIAL COURT REPORTER

BUELL - DIRECT                                     68

```
1   conversations had Thomas More ever sought your interest?
2        A    No, they had not solicited our interest or our
3   concerns or our exposure.
4        Q    Okay.  And they did not show up to the hearing in
5   Texas?
6        A    That's right.
7        Q    Do you have any confidence in -- that the amount
8   heard is representing your interest at this point in time?
9        A    No, I don't have any confidence in that at all.
10       I think, you know, that we are -- we are certainly
11  the primary stakeholder in this, and we are -- our interests
12  are -- yet know, we are a nonparty to the lawsuit, our interests
13  are highly at risk, at least.  And not the economic part of
14  this, much less the reputation among potential authors in
15  the future, this would cost us a great deal.
16       Q    Do you have any confidence that the Thomas More Law
17  Center is representing your interests in this matter?
18       A    No, no, there's not any evidence that they are.
19       Q    Who is William Dembski?  I believe you mentioned
20  his name earlier.
21       A    Yes, Dr. William Dembski is our academic editor,
22  and he's the editor of our book the design of life, and one
23  of the new -- the third new co-authors.
24       Q    And how would you describe Dr. Dembski's position
25  on the intelligent design movement?
```

OFFICIAL COURT REPORTER

BUELL - DIRECT                                    69

1    A    Well, there are many people that would say that he
2    is the premiere intelligent design scientist at this point.
3    Some would say Michael Behe is, who is another one of our
4    authors.  But Dr. Dembski is possibly, he's produced
5    either edited or authored, roughly ten books about the
6    intelligent design being one underway.  He debated -- he and
7    Niles Eldredge [?] can Darwinists at the American Museum of
8    Natural History.  He published a book with Cambridge
9    University Press.  He travels really around the world
10   speaking and debating.

11   Q    And he holds multiple Ph.D.s, is that correct?
12   A    Yes, he's got a Ph.D. in mathematics from the
13   University of Illinois, and a Ph.D. in philosophy from the
14   University of Chicago or Illinois -- I mean Illinois at
15   Chicago, pardon me.

16   Q    Does he have a relationship -- did he have a
17   relationship with the Thomas More Law Center?
18   A    He did.  He was an expert witness for them at one
19   point.

20   Q    And is he an expert witness at this point in time?
21   A    No, he's not.  He's not an expert witness now.  He
22   was fired.

23   Q    By whom?
24   A    By Mr. Thompson.

25   Q    And how does that, his lack of involvement in this

OFFICIAL COURT REPORTER

---

BUELL - DIRECT                                    70

1    case, affect your interest in it at all?
2    A    Well, he's the leading authority and expert on the
3    book.  And so we would be protototypically important to asking
4    the points, answering the allegations, authoring the
5    book, establishing its scientific status and so forth.

6    Q    Are you familiar with John A. Campbell?
7    A    Yes, I am.
8    Q    Who is Dr. Campbell?
9    A    Mr. Campbell is a professor at Memphis State, I
10   believe, of the -- his area is the science -- I'm sorry, the
11   rhetoric of science.  And he's very very connected with the
12   intelligent design/Darwinist debate.

13   Q    And he have a relationship with the Thomas More Law
14   Center?
15   A    Yes, he did.
16   Q    Do you know if that relationship has continued?
17   A    He was hired as an expert witness, and then he was
18   let go, he was fired.

19   Q    Do you know why when?
20   A    I don't know.
21   Q    By the Thomas More Law Center?
22   A    By the Thomas More Law Center, right.
23   Q    Does his discharge affect FTE's interests in this
24   litigation?
25   A    He's -- he's a leading authority, and so, yes, I

OFFICIAL COURT REPORTER

---

BUELL - DIRECT                                    71

1    mean it puts us in greater jeopardy.  He -- we need the
2    scientists that, you know, are willing to be expert
3    witnesses.
4         You have to understand that there are very
5    scientists who have tremendous credentials who have no
6    stomach for this kind of thing.  And we don't have access to
7    everybody then, you know, that has -- that believes in
8    intelligent design or has done great things in science.
9         So yes, that is an extremely disappointing loss.
10   It's unwelcome to us.

11   Q    Now, the plaintiffs in their lawsuit have alleged
12   that your policy of Pandas had a religious agenda or
13   motive.  Do you have a religious agenda or motive for the
14   book Pandas and People?
15   A    No, I don't.
16   Q    Is your interest solely educational and scientific?
17   A    My interest is scientific and educational, that's
18   correct.
19   Q    How does that differ from Pandas' interest in this
20   case?
21   A    Well, I think that the comments that I heard above,
22   you know, from the Pandas sales report of Pandas indicate
23   religious purposes to me.
24         MR. BOYLE:  If I could have just one second, Your
25   Honor?

OFFICIAL COURT REPORTER

---

BUELL - DIRECT                                    72

1         (Pause.)
2         MR. BOYLE:  Cross exam, sir.
3         THE COURT:  Let's go to plaintiffs.
4              (CROSS EXAMINATION)
5    BY MR. ROTHSCHILD:
6    Q    Good afternoon, Mr. Buell.
7    A    Good afternoon.
8    Q    My name is Eric Rothschild and I represent the
9    plaintiffs.
10        You indicated that you were familiar with
11   Dr. Campbell and Mr. Meyer.
12   A    No, Dr. Campbell and Mr. Dembski.
13   Q    I'm sorry.  And are you familiar with Steven Meyer?
14   A    Yes, I am.
15   Q    Do you understand that he was also an expert in
16   this case?
17   A    Yes, I do.
18   Q    And do you understand that he also is no longer an
19   expert in this case?
20   A    Yes, I do.
21   Q    Now, you said Dr. Dembski is affiliated with the
22   Foundation for Thought and Ethics, right?
23   A    That's right.
24   Q    Dr. Campbell is not, correct?
25   A    That's correct.

OFFICIAL COURT REPORTER

BUELL - CROSS - ROTHSCHILD

```
1    Q    And Dr. Meyer is not, correct?
2    A    That's true.
3    Q    Okay.  The precipitating event for these three
4    experts being removed from the room is that they requested
5    private representation at their depositions by counsel for
6    the Foundation, isn't that right?
7    A    I know that to be true in the case of Bill Dembski,
8    Dr. Berlinski.
9    Q    Is it not true for Dr. Campbell and Dr. Meyer?
10   A    I'm not denying that, I just don't know.
11   Q    Do you understand that in one -- in one of the
12   pleadings that the Foundation submitted in support of its
13   intervention that it represented that certain experts
14   requested private representation by counsel for FTE?
15   A    Yes.
16   Q    And that request -- that request by those experts
17   for representation by counsel for FTE was not accepted by
18   counsel for the defendants, correct?
19   A    I'm sorry, would you restate that?
20   Q    Yes.  The request that these three experts made for
21   representation by counsel for the FTE was not agreed with by
22   counsel for the defendants, correct?
23   A    Are you saying that these three are named in the
24   deposition, you mean?
25   Q    What I'm reading from is the reply brief that the
```

OFFICIAL COURT REPORTER

BUELL - CROSS - ROTHSCHILD

```
1    Foundation submitted in support of intervention.  It says,
2    "When certain experts requested private representation by
3    counsel for FTE, defendants, parent, seemingly filed several
4    experts because they insisted on that representation."
5         Do you understand that to be the case?
6    A    I understand that, yes.
7    Q    And ultimately they were not allowed to have that
8    second representation, correct?
9    A    Right.
10        MR. BOYLE:  I'm going to object to the term "second
11   representation."
12        THE COURT:  What do you want me to do inasmuch as
13   he said it, and even in a bench proceeding?
14        MR. BOYLE:  Well, just to clarify for the record
15   that they requested their own representation.
16        THE COURT:  Well, it's so noted.  You may proceed
17   Mr. Rothschild.
18   Q    Now, you acknowledge that you were not aware of
19   when the Pandas books were purchased for Dover, correct?
20   A    Not at all.
21   Q    Okay.  And, in fact, when school districts or other
22   purchasers purchase Pandas, it's not always directly through
23   the Foundation, correct?
24   A    Truly, I would say it's not always -- I mean we have
25   no way of knowing how such -- you know, we have no way of
```

OFFICIAL COURT REPORTER

BUELL - CROSS - ROTHSCHILD

```
1    inquiring about purchases that aren't directly from us.
2    Q    Some are done through our own vendor.
3    A    There are -- you know, there are distributors.
4    Normally, we would expect them to call us, at least it was
5    requested that the years would call us.
6    Q    In the case of Dover, you weren't aware of how the
7    book was going to be used in that school district or high
8    school, correct?
9    A    We weren't aware that the book was being
10   considered.
11   Q    Okay.  And so therefore you weren't aware of
12   whether it might be, for example, in the curriculum -- in
13   the classroom or in the library?
14   A    We -- because they did this, because the press
15   reports came out reporting what they had done, we were not
16   aware that the book was even being considered in Dover.
17   Q    And so sometimes the case for other school
18   districts, that you're not aware that the book is being
19   purchased?
20   A    It has been the case on some occasions, it
21   certainly is the extraordinary.  But I'm certain that over
22   the years that's happened.
23   Q    And is it generally the case that even when you are
24   aware of who purchased it, you don't know how the book is
25   going to be used in the school district?
```

OFFICIAL COURT REPORTER

BUELL - CROSS - ROTHSCHILD

```
1    A    We try and contact the school district if we know
2    there is an interest or somtime making a purchase or they've
3    made a purchase, to find out, you know, what their
4    intentions are.  We know that having talked to an many
5    teachers and administrators in schools as we have, we might
6    be able to help them.
7    Q    And so I correct that, for example, one of the
8    online vendors that the book is sold through is a home
9    vendor who provides support to people who are home schooling
10   their children?
11   A    Yes.
12   Q    And so that -- and I take it that some of the
13   purchasers of the Pandas books are people who are home
14   schooling their children?
15   A    Yes, that's right.
16   Q    And I take it it's even the case that private
17   schools or secterian schools sometimes purchase the books?
18   A    I'm sure they do.
19   Q    Just to make sure I understand your testimony on
20   direct, your estimate of the loss or profits that could
21   ensue depending on how this Court rules, is based on the
22   amount of inventory that you have of Pandas, the books you
23   have?
24   A    In part.  In fact on the inventory.
25   Q    And one printing of -- one subsequent printing of
```

OFFICIAL COURT REPORTER

BUELL - CROSS - ROTHSCHILD

1  Pandas!
2      Q    One subsequent printing of Pandas and a first
3  printing of The Design of Life.
4      Q    Okay.  You never have been told by anybody at Focus
5  that they're going to ask for their money back if they lose
6  this lawsuit, have you?
7      A    No.
8      Q    You filed your petition to intervene on May 23rd?
9      A    That sounds right.
10     Q    And you're aware that the complaint in this case
11 was filed on December 14th.
12     A    No, I wasn't aware of that.
13     Q    Are you aware of that now?
14     A    Since you just said it, yes.
15     Q    Okay.  Prior to that you were not?
16     A    No.
17     Q    Okay.  You were aware assuming around December of
18 2004 or the beginning of 2005 of the lawsuit, weren't you?
19     A    I was aware early in the year, early in 'OS that
20 there was    issue with some    you know, there was some
21 talk in the media.
22     Q    And the reason you were aware is if you were actually
23 going onto the Internet and looking for articles about this
24 lawsuit, right?
25     A    Generally, no, I wasn't.  You know, I mean I

OFFICIAL COURT REPORTER

---

BUELL - CROSS - ROTHSCHILD

1  certainly had an article or two sent to me.
2      Q    You were not following it on the Internet?
3      A    No.
4      Q    You were also aware that Pandas was part of the
5  controversy?
6      A    I heard that somewhere in the, you know, in the
7  spring.
8      Q    Mr. Buell, you remember having your deposition
9  taken by my colleague, Eric Rothschild, last week?
10     A    Yes, I do.
11     Q    And I'm going to --
12          MR. ROTHSCHILD:  If I may approach the witness,
13 Your Honor?
14          THE COURT:  You may.
15          MR. BUELL:  Your Honor, could I see a copy?
16          MR. ROTHSCHILD:  Certainly.  Your Honor, would you
17 like a copy?
18          THE COURT:  Are you going to take him to a brief
19 passage?
20          MR. ROTHSCHILD:  Yes, I am.
21          THE COURT:  I don't think I need a copy.  I'll see
22 how it if I do.
23          MR. ROTHSCHILD:
24     Q    Do you see on page 98 of the deposition, if you
25 could flip through it.  These versions of the deposition

OFFICIAL COURT REPORTER

---

BUELL - CROSS - ROTHSCHILD

1  have just numbered pages on each single page.
2          Do you see on page 98 my colleague, Mr. Wilcox,
3  asked when you because generally aware of the lawsuit; is it
4  or line 18 at page 98?
5      A    Yes, uh-huh.
6      Q    And you answered that around the turn of the year
7  or my guess was that it was in December, correct?
8      A    I'm sorry?
9      Q    When he asked you when you became generally aware
10 of the lawsuit, you answered, close to the turn of the year,
11 and then you went on to say, my guess is that it was in
12 December.
13     A    Okay, I see that.
14     Q    That was your testimony, correct?
15     A    Right.
16     Q    And then he asked you whether you knew the book
17 involved was Pandas, didn't you -- and this is on page 99,
18 at line 10
19     A    Yes, uh-huh.
20     Q    And you answered yes.  Right on that next
21     A    I think at that point we're talking about line ten,
22 I said, then when I got in press reports I wasn't clear
23 it wasn't clear to me that the school board knew the
24 difference between creating science and intelligent design,
25 but they knew    but you know the book involved was Pandas,

OFFICIAL COURT REPORTER

---

BUELL - CROSS - ROTHSCHILD

1  didn't you.
2      A    So I don't know exactly when I became aware that
3  Pandas was involved.  I also don't know to this minute, I've
4  heard conflicting information as to whether Pandas is -- has
5  been -- the policy selected Pandas for use in the classroom
6  or put copies in the library.
7      Q    But you knew that Pandas was involved?
8      A    At some point I became aware of that.
9      Q    And if you continue over to page 100, you state, I
10 read the articles as they, you know, as we pulled them off
11 the Internet, isn't that right?
12     A    Yes.
13     Q    So you did pull articles off the Internet?
14     A    Yeah, but we were not researching, we were not
15 going to Google and searching on it.  We didn't Google it.
16 Somebody would say, you know, there's an article on such and
17 such and so I would go there.
18     Q    Okay.  And during that time that you were becoming
19 aware of the lawsuit through the articles you didn't try to
20 get a copy of the complaint, correct?
21     A    No, I didn't.
22     Q    By now you have read the complaint?
23     A    Yes, I have.
24     Q    And if I understand the reason you're intervening
25 here is because you think FTE's academic interests are

OFFICIAL COURT REPORTER

BUELL - CROSS - ROTHSCHILD

81

1   threatened by the position that the plaintiffs are urging

2   the court to take, is that right?

3        A    Yes, among other things.  I think what but -- our

4   interest in terms of publishers and being a participant in

5   the process of creation and science are also at risk here.

6        Q    And the reason you think these interests are of

7   issue is because plaintiffs are arguing that intelligent

8   design is a religious concept not a scientific concept?

9        A    Yes, that's right, that is -- so that is a very

10  large concern to us because that would hurt the market for

11  the book to evaporate.

12       Q    And another concern you've expressed that would

13  affect your economic interest and the educational interest

14  is that plaintiffs are objecting to intelligent design be

15  creationism or creation science, is that right?

16       A    Yes, that's right

17       Q    And if I understand your briefs and your testimony

18  today, you weren't aware of that until the Foundation became

19  involved in the litigation through the subpoenas.

20       A    That's really what made it clear to us that we were

21  in the crosshairs.

22       Q    And, you would agree that if you had read the

23  complaints you would have realized there were the plaintiffs'

24  contentions?

25       A    Yes, I would have if I had read the complaint.  I

---

BUELL - CROSS - ROTHSCHILD

82

1   didn't even know that a lawsuit involved a complaint that

2   was public and accessible.

3        Q    But you agree that having now looked through the

4   complaint, these propositions that you're concerned about

5   that intelligent design is a religious concept not a

6   scientific concept, and that intelligent design is akin to

7   creationism, these are apparent in the complaint, correct?

8        A    I believe so.

9        MR. ROTHSCHILD:  Your Honor, I would like to

10  introduce an exhibit.  May I approach the clerk?

11       THE COURT:  Show a copy to opposing counsel.

12       MR. ROTHSCHILD:  Also you like a copy, Your Honor?

13       THE COURT:  Yes, please.

14  BY MR. ROTHSCHILD:

15       Q    Mr. Buell, what I've given you is an archive on the

16  New York Times dated January 16, 2005, of a copy that was

17  printed from the Internet entitled, An Alternative to

18  Evolution Splits a Pennsylvania Town.

19            If you would turn to the second page of the

20  document, and look at the second full paragraph.

21       A    All right.

22       Q    To you see where it says, in mid December a local

23  parents represented by the American Civil Liberties Union

24  and Americans United for Separation of Church and State sued

25  the school board contending that discussing intelligent

---

BUELL - CROSS - ROTHSCHILD

83

1   design in a way to boost religion on their children; do you

2   see that?

3        A    Yes.

4        Q    So that makes clear that the ACLU and the Americans

5   United, they always forget my law firm, was taking the

6   position in the complaint, in the lawsuit that intelligent

7   design is religious?

8        A    Yes.

9        Q    And you recognize this as an article that came out

10  of the foundation's production at documents?

11       A    Yeah, I think I do.

12            By the way, if I might add, we did not read

13  everything that came to us in this regard because over the

14  years we have seen virtually thousands of articles, and they

15  all follow a very similar access, scheme.  So I can tell you

16  that I saw this article.  I can tell you also that I wasn't

17  read it.  I probably scanned down the first, you know,

18  several paragraphs.

19       Q    Now, you testified today that the Foundation does

20  not have a religious agenda or nature, correct?

21       A    That's right.

22       MR. ROTHSCHILD:  Your Honor, I would like to mark

23  another exhibit.

24  BY MR. ROTHSCHILD:

25       Q    Mr. Buell, do you recognize the document I've given

---

BUELL - CROSS - ROTHSCHILD

84

1   you, which is the second exhibit today, a Form 990, Return

2   of Organization Exempt from Income Tax for 2003 to me a

3   document filed by the Foundation?

4        A    Yes, I do.

5        Q    Okay.  And if you would turn to the last page of

6   that exhibit.  Are you on that page?

7        A    I am.

8        Q    And if you go about 35 percent down the page,

9   there's an entry for statement of Organization's Primary

10  Exempt Purpose.

11       A    Uh-huh, unclear.

12       Q    And the explanation that the Foundation provides to

13  the IRS is that its primary exempt purpose is promoting and

14  publishing textbooks promoting a Christian perspective,

15  isn't that right?

16       A    That is what it says.

17       Q    Okay.  And Pandas is one of those publications,

18  isn't it?

19       A    No, Pandas doesn't fit this because this is not an

20  accurate statement.

21       Q    Okay.  This --

22       A    This statement was -- we had a new CPA do our 990

23  and audit as we never used before.  We weren't even from the

24  state of Texas.  He was not familiar with us.  You know, I

25  neither saw that statement, nobody gave him that

BUELL - CROSS - ROTHSCHILD

1   information, and I didn't -- I certainly didn't approve it.
2
3   Q   Okay.  So -- and was this statement that's filed
4   with the IRS so that the Foundation can be exempt from
5   paying income tax on labels is that what you're saying?
6   A   Well, I'm saying that I didn't see that statement.
7   Q   And just if you could turn to the preceding page of
8   the document, those are your initials on the page, aren't
9   they, towards the bottom of the page?
10  A   Yes.
11  Q   Now, your counsel brought up some articles of
12  incorporation and I'd like to show those to you as well.
13      These are the articles of incorporation that the
14  Foundation filed with the state of Texas.
15      THE COURT:  I'm not sure that was recognized as a
16  question.
17      THE WITNESS:  Oh, I'm sorry.  Yes, I'm sorry.
18      THE COURT:  Let's keep this moving.
19      MR. ROTHSCHILD:  Sorry, Your Honor.
20  BY MR. ROTHSCHILD:
21  Q   And on the second page of the document there's a
22  signature space with your signature on it?
23  A   On the second page of the document?  Yes, uh-huh, I
24  see it.
25  Q   If you go to the third page of the document, it
26  identifies the purpose for the -- for which the corporation

OFFICIAL COURT REPORTER

---

BUELL - CROSS - ROTHSCHILD

1   was formed?
2   A   Right.
3   Q   And what it states is that the primary purpose is
4   both religious and educational, and then it talks about
5   making known the Christian gospel and understanding of the
6   Bible?
7   A   Yes.
8   Q   Is it your testimony that that's also an inaccurate
9   submission?
10  A   It was boilerplate that the attorney that was
11  helping us because established used.  I felt that it was
12  inappropriate.  He said we need to be clear in identifying
13  yourself as having a genuine nonprofit purpose, and so the
14  language that originated with me is the phrase, "but is not
15  limited to."
16  Q   And everything else was the attorney's?
17  A   Yes, most of it.  I think nearly all of it, possibly
18  all of it.
19  Q   So the accountant got it wrong and the attorney got
20  it wrong?
21  A   It's true.
22      MR. ROTHSCHILD:  I would like to mark another
23  exhibit, Your Honor.
24  BY MR. ROTHSCHILD:
25  Q   Mr. Buell, this document is something that was

OFFICIAL COURT REPORTER

---

BUELL - CROSS - ROTHSCHILD

1   pulled off the Internet, but you remember it as a purpose
2   statement for the Foundation that was to be distributed?
3   A   Yes, I don't actually -- I don't actually remember
4   this statement, but it's consistent with a FTE statement.
5   Q   And in this statement it says, "The Foundation for
6   Thought and Ethics has been established to introduce
7   biblical perspective into the mainstream of America's
8   scholastic society, confronting the secular thought of
9   modern man with the truth of God's word."
10  A   Yes, that's right.
11  Q   And then it talks about how there would be a
12  public -- a textbook published which will present the
13  scientific evidence for creation side by side with
14  evolution.
15  A   Yes, and note, by the way, was written before -- I
16  can just tell from the language, this was very early, before
17  the National Academy defined the term mainstream science, to
18  the stars of art that are in play today were not an
19  existence at that time.
20  Q   This was just your use of the word creation?
21  A   Yes, right.
22  Q   And into the third paragraph it describes the
23  Foundation as a Christian think tank, correct?
24  A   Yes.  I would say an umbrella to that, there's what
25  we've done for over 25 years, which is not to be a Christian

OFFICIAL COURT REPORTER

---

BUELL - CROSS - ROTHSCHILD

1   think tank, but we actually, engage in primary works of
2   science.
3   Q   And that includes Pandas, correct?
4   A   It includes Pandas, yes.
5       MR. ROTHSCHILD:  New exhibit, Your Honor.
6   BY MR. ROTHSCHILD:
7   Q   You recognize this as a letter that you wrote to
8   raise funds for the Foundation?
9   A   Yes, I do.
10  Q   And this is written in 1995, well into the
11  Foundation's 15 year existence?
12  A   Uh-huh, yes.
13  Q   And just, Mr. Buell, so the record is clear, if you
14  can say yes.
15  A   I'm sorry, yes.
16  Q   Not a problem.
17      And this letter was written after both editions of
18  Pandas had been published, correct?
19  A   That is correct.
20  Q   And in that it mentions Pandas, right, the letter?
21  A   Yes, it does.
22  Q   And at the bottom of the first page, what it says
23  is, "Our concern is to see the monopoly of naturalistic
24  curriculum in the schools broken.  Presently school
25  curriculum reflects a deep hostility to traditional

OFFICIAL COURT REPORTER

BUELL - CROSS - ROTHSCHILD

1 Christian views and values, and indoctrinates students in
2 this mindset through subtle but persuasive arguments."
3 
4 Do you see that?
5 A   I see that.
6 Q   That's what she wrote, correct?
7 A   Yes.
8 Q   And your view one of the areas of curriculum that
9 is a primary offender in terms of showing hostility to
10 Christian views and values is the subject of biology, isn't
11 that right?
12 A   Yes, that's right.   I think that anybody should
13 oppose this from an education -- that'd oppose that stance
14 of the state of education being imparted, just from an
15 educational standpoint.
16 Q   Because the teaching of biology you consider to
17 have a deep hostility to traditional Christian views and
18 values?
19 A   I think that the teaching of biology is done with
20 an artificial removal of biology from the sciences which can
21 legitimately entertain intelligent cause.  I think that is
22 an artificial truncation of science.
23 Q   And then if you go over to the next page, in the
24 first paragraph, you blame -- you blame the current
25 deplorable condition of our schools resulting in large part
    in denying the dignity of man created in God's image,

OFFICIAL COURT REPORTER

---

BUELL - CROSS - ROTHSCHILD

1 correct?
2 A   Yes, correct.
3 Q   And the rest of the paragraph builds on that
4 concept, right?
5 A   That's right.   Many teachers tell me they have
6 difficulty in the classroom with student behavior
7 because there is -- there's no sense of respect or
8 accountability to the teacher, to the school, or to
9 authority.
10 Q   And effectively what you're advocating in this
11 fundraising letter is that the FTE's publications are an
12 antidote or a partial antidote to these practices of
13 hostility to Christian views and the cultural decay in our
14 schools, isn't that right?
15 A   I would say that they're not an antidote to the
16 hostility to Christian views, but that are an antidote to
17 the hostility toward positive character qualities and moral
18 traits and a positive outlook and philosophy.
19 Q   And you think Pandas would contribute to that
20 goal?
21 A   I think Pandas could reestablish a level playing
22 field where if science were true to entertain intelligent
23 causation wherever we find it.
24 Q   And also it would be a remedy or antidote to these
25 issues of character that you're talking about?

OFFICIAL COURT REPORTER

---

BUELL - CROSS - ROTHSCHILD

1 A   You know, that would be up to individual
2 individuals and their own classes.
3 Q   Isn't that what you're advocating here, Mr. Buell?
4 A   What I'm saying here is that I think that many
5 would, once they saw that it's a plausible action for them,
6 but that would be their choice.  That would be how they may
7 respond.
8 Q   Mr. Buell, this is not the first time that you have
9 recognized that a court decision could affect the financial
10 fortunes of your company, isn't that right?
11 A   That is right.
12 MR. ROTHSCHILD:   If you'd just give me one moment,
13 Your Honor.
14 (Pause.)
15 BY MR. ROTHSCHILD:
16 Q   Mr. Buell, do you recognize the document we've just
17 introduced as an exhibit?
18 A   Yes.
19 Q   It's a letter that you wrote to a potential
20 publisher of Pandas?
21 A   Yes.
22 Q   And just to orient ourselves here, if you turn to
23 second page, there's mention of a book called Biology and
24 Origins, is that right?
25 A   Yes.

OFFICIAL COURT REPORTER

---

BUELL - CROSS - ROTHSCHILD

1 Q   And Biology and Origins was the working title for
2 the book that became Pandas, correct?
3 A   Well, it was the field test edition that was used
4 prior to the publication of the book.
5 Q   There aren't two different books.  This is the book
6 that eventually, after field testing, became Pandas,
7 correct?
8 A   Right.
9 Q   And turning to the front page, there is some
10 mention here of polls showing that three quarters of the
11 public want creation taught in schools, and it's about half
12 way down the page, and another poll about biology teachers.
13 Do you see that?
14 A   I see the first -- yes, I see them both.
15 Q   And are these the polls you were talking about in
16 your direct testimony?
17 A   The second one is.
18 Q   Okay.  And the first one?
19 A   No, I wasn't referring to that.
20 Q   Now, this first page talks about a decision out of
21 the United States Fifth Circuit Court of Appeals on the
22 Louisiana Balanced Treatment Act that was on appeal to the
23 United States Supreme Court, correct?
24 A   Correct.
25 Q   And that's a decision known as Edwards versus

OFFICIAL COURT REPORTER

BUELL - CROSS - ROTHSCHILD                93

Aguillard?

A.  Yes, on sir.

Q.  It was eventually decided by the Supreme Court?

A.  Right.

Q.  This letter was written before that decision?

A.  I believe that's right.

Q.  Okay.  And what you said was at issue for the United States Supreme Court was whether there could be state mandated teaching of creation, correct?

A.  I don't know.  Would you point me to that passage?

Q.  Yeah, I'm sorry, it's on -- the paragraph that begins "The U.S. Fifth Circuit."  And if you --

A.  On the -- okay.  All right.

Q.  That's what you wrote the decision was about, right, whether the United States Supreme Court would allow state mandated teaching of creation or not?

A.  I didn't I wrote that that was what it was about?

A.  Yes.

A.  Yes.

Q.  And then if you go down to the bottom of the page, you have some projections of how that book, the one called Biology and Origins.  Would do if the Supreme Court reversed the decision and did not allow state mandered teaching of creation, you said modest expectations, correct?

A.  Yes.

OFFICIAL COURT REPORTER

---

BUELL - CROSS - ROTHSCHILD                94

Q.  Even those modest expectations were not actually realized, correct?

A.  Right.

Q.  And when you say that if they opens it, it does allow state mandered teaching of creation, you would throw out those projections, the publication notice would be optimistic, right?

A.  I said that, but that does not mean that I would favor that.

Q.  Okay.  But what you are saying is, if state mandated teaching of creation is not allowed, we have those modest expectations, and if it is allowed, then the market for this book is explosive, right?

A.  Yeah, I think that was sort, you know, good salesmanship and banner analysis.

Q.  Do you remember the document that I just gave you?

A.  I recognize that it's our document and that it's my handwriting on it.

Q.  And was this -- this document was a part of a drafting of either Biology and Origins or Pandas?

A.  Yes, it played some role in that, that's right.

Q.  And if you could turn to page three, headed Survey Chapter.

A.  Yes.

Q.  If you look in the second paragraph, about half way

OFFICIAL COURT REPORTER

---

BUELL - CROSS - ROTHSCHILD                95

down it says, "Evolution is the theory that natural causes are adequate to account for everything in the natural world, including life itself.  Creation is the theory that certain phenomena must be explained by intelligent causes.  In this book we counterbalance these two theories about life's origins."

A.  Yes.

Q.  Okay?

A.  That's right, that would be -- pardon me.

Q.  This was what was written in this draft of either Biology and Origins or Pandas?

A.  Yes.  At that point the term creationist did not mean what it does now.  It referred to creation in general, not to -- today it is a synonym for creation science.

Q.  Is today creation means creation science and before creation means --

A.  Before the National Academy of Sciences gave it the specific definition, which I quoted earlier, and that definition was affirmed by the U.S. Supreme Court, it did not carry that meaning.

Creation, in general, was a word used in -- even in scientific literature, for instance.  And then when you say a creationist, prior to those terms of art, the origin of those terms of art, you were just talking about somebody who holds to a general view of creation, not -- this is not a reference to creation science or, you know, a specified

OFFICIAL COURT REPORTER

---

BUELL - CROSS - ROTHSCHILD                96

viewpoint.

Q.  So this is the term in operation before the Board defined it and before the NAS defined it?

A.  Yes, it is.

Q.  And at that time -- and just a general usage of the word creation or creationist, right?

A.  I'm sorry, would you ask me again?

Q.  At that time what you meant by creation was just how creation was used in the general public, right?

A.  Yes, it was just a general -- a broad general term, not a reference to creation science.

Q.  Okay.  And specifically, the term creationist was just intended as how it was used generally in the public before it was defined by the NAS and the Supreme Court?

A.  I'm sorry, I thought that's the question we just discussed.

Q.  I used the word creation, and now I'm on creationist.

A.  A creationist in that sense would be like an evolutionist.  I mean an evolutionist is not a synonym for evolution science.  It's one who adheres to creation in that broad -- you know, in a broad sense, not defined as later it was defined by the National Academy.

Q.  So, for example, Harry North is just holding himself out as a creationist, right?

OFFICIAL COURT REPORTER

97

EWELL - CROSS - ROTHSCHILD

```
1    A    I'm sorry?
2    Q    Henry Morris holds himself out as a creationist?
3    A    It would -- it was not -- it was not a represent --
4    it was not a representation to Henry Morris's thought or
5    thought like Henry Morris's.
6    Q    But he described himself as a creationist, right,
7    is that right?
8    A    Yes.  What we're talking about here is a nuance of
9    terms when the vocabulary was not as precise as it is now.
10   And I offer as an example of way you can count on that, is
11   because before we even started this book at all, we
12   published a book that has been acknowledged as one of the
13   top books ever published on the origin of life, published by
14   a secular publisher, outsold the previously best selling
15   book by McGraw Hill.  And, you know, so it would be
16   difficult for us to imagine, having achieve something like
17   that that involves accolades from the highest levels of
18   science, and turn around and talk about creation science,
19   and try and publish a trash of a book of, you know, some
20   kind of a subterfuge promoting creation science.
21   Q    Actually in this version of the book it describes
22   two creationists now, doesn't it, if you look at pages 12
23   and 23 and 24.  It says there's different types of
24   creationist's literature.  There are older creationists,
25   younger creationists, agnostic creationists, right?
```

OFFICIAL COURT REPORTER

98

EWELL - CROSS - ROTHSCHILD

```
1    A    Yes.  We were trying to give some articulation to
2    the breadth of what that term was.
3    Q    And then if you could turn back to page 22, you
4    explain that "Creation is the theory that various forms of
5    like began abruptly, with their distinctive features already
6    intact:  Fish with fins and scales, birds with feathers and
7    wings, mammals with fur and mammary glands."
8         That's how you defined creation, correct?
9    A    Yes.
10   Q    All right.  And I would like to take -- you to take
11   a look at an excerpt from Pandas and People.  Turn to page
12   99 in the excerpt I gave you.
13   A    All right.
14   Q    Says, "Intelligent design means that various forms
15   of life began abruptly through an intelligent agency, with
16   their distinctive features already intact:  fish with fins
17   and scales, birds with feathers, beaks and wings, et
18   cetera."
19        Do you see that?
20   A    I see it.
21   Q    So that's pretty much the exact same sentence
22   substituting creation for intelligent design, isn't that
23   right?
24   A    The reason that you find the similarity in the two
25   passages is because this certainly was at a time when we
```

OFFICIAL COURT REPORTER

99

EWELL - CROSS - ROTHSCHILD

```
1    were developing the manuscript.  We had not chosen the term
2    "intelligent design" at that point.  We were trying to
3    this was just a place holder term until we came to grips
4    with which of the particular two or three terms that are in
5    scientific literature we would settle on.  And that was the
6    last thing we did before the book was review -- I read was
7    sent to the publisher.
8    Q    It was creation, creation, creation until the was
9    and then it was intelligent design.
10   MR. MUSE.  Your Honor, I'm going to object to this
11   line of questioning based upon relevance.
12        As the Court will recall, we attempted to describe
13   the difference between intelligent design and creation
14   science, and the Court indicated that that really wasn't the
15   issue for today's hearing, so at least that was my
16   understanding, and ask that we move along.
17        MS. ROTHSCHILD:  First of all, I'm finishing up.
18   Your Honor, in case you're concerned about that.  But first
19   of all, that was still a substantial subject of the direct
20   testimony.  And on the issue of timeliness and the interest,
21   the foundation has been laid and claiming that they were
22   surprised to find that plaintiffs would characterize
23   intelligent design as being akin to creationism, that they
24   are surprised that we have suggested that it is a religious
25   proposition that being promoted for religious reasons.  And
```

OFFICIAL COURT REPORTER

100

EWELL - CROSS - ROTHSCHILD

```
1    the evidence that has been introduced here, particularly
2    relevant given the "nature of direct, clearly addresses that
3    point.
4         THE COURT:  Well, I'll overrule the objection.  I'm
5    hoping to hear that you're nearing an end.  I think you're
6    made your point.  I'll allow the answer to the question, but
7    I think you're going to run the risk soon or going in this
8    area too long.  And you're also going to run the risk of
9    lapsing over excessively into your case in chief.  And I
10   know you don't want to do that, and I don't want you to do
11   that.  So let's move through this.  And I'll tell you that
12   we can sit today until five o'clock.  I was hoping that we
13   wouldn't have to, but we may have to.
14        Do you have another witness?
15        MR. MUSE:  I don't have another witness, Your
16   Honor, but there are some points I wish like to clarify on
17   redirect.
18        THE COURT:  Well, particularly if and -- and you
19   certainly will have that right, and to the extent that
20   there's a question that hasn't been asked yet, and I can't
21   imagine what that would be, but we're going to give
22   Mr. Dillon an opportunity to ask questions as he needs to
23   have as well, to let's wrap it up.
24        We'll overrule the objection.  And I'm not sure.
25   Do you remember the question, sir?
```

OFFICIAL COURT REPORTER

BUELL - CROSS - ROTHSCHILD                101

1    THE WITNESS:  I would have to hear it again.

2    THE COURT:  I would too.  So why don't we read that

3  back.

1    (Question read.)

2    THE WITNESS:  That misrepresents the actual fact of

3  the matter because creationism did not on a specialized reasoning

4  while the book was being developed.

5    There was a new position that was being determined

6  through some extensive interaction between creationism and

7  philosophy science.  We knew that it was fundamentally

8  different from creation science.  And then when the National

9  Academy came out with their definition, we knew that we had

10  to sketch a term that would distinguish between the two.

11  And as evidence of what I'm saying I offer you this, that

12  is, on our own dime, flew to Little Rock, Arkansas, after

13  McClean went down, and tried to appeal to the Attorney

14  General for to appeal the verdict, because we felt that it

15  was wrong -- wrong finder.  And the same is true before the

16  case with Edwards v. Aguillard, we flew to Atlanta, we met

17  with the attorney, the lead attorney.  We tried to persuade

18  him to drop creation science.  And it is true that among --

19  in the literature, intelligent design was a term that

20  appeared now and then.

21    These terms go back to a previous century.

22  K. J. Ambrose, a British cell biologist and cancer

OFFICIAL COURT REPORTER

---

BUELL - CROSS - ROTHSCHILD                102

1  researcher, have the term creative intelligence.  That was

2  one of the things that we thought about.  We kicked this

3  term.

1    We knew well before we wrote -- I don't know, anyway

2  a year before we were running with the manuscript, editing

3  it, that we would not use the term that had been assigned

4  while we were doing the book with specialized terminology,

5  and now you're moving and and moving that this terminology

6  as it applied today is what we had in mind.  That just is

7  not the fact.

8  BY MR. ROTHSCHILD:

9    Q    Mr. Buell, one of the authors you mentioned for

10  Pandas is Dean Kenyon?

11    A    Yes.

12    Q    And you're aware that Dean Kenyon submitted an

13  affidavit in Edwards?

14    A    Yes, I am.

15    Q    And that affidavit was in support of creation

16  science, wasn't it?

17    A    Yes, it was.

18    Q    And he actually said in that affidavit that there are

19  the only two explanations for origins of life, evolution and

20  creation science.

21    A    Dr. Kenyon changed his view after he interacted

22  with me.  We went to Davis and Kenyon for the text and split

OFFICIAL COURT REPORTER

---

BUELL - CROSS - ROTHSCHILD                103

1  of science in Davis' case of biology, and in Kenyon's case

2  in the origin of life.

3    Dr. Thaxton, Charles Thaxton, who was the academic

4  editor, was the one who had been steeped in the history of

5  science and philosophy of science and was working out the

6  framework that -- through which Charles would be laid out.  So

7  we did not hire Kenyon for his view on creation science.

8    Q    And Percy Pearcey, she also contributed to the

9  drafting of Pandas?

10    A    Yes, under Dr. Thaxton's direction.

11    Q    And you recognize that she holds herself out as the

12  owner of Creation?

13    A    I didn't know that.

14    MR. ROTHSCHILD:  I have no further questions, Your

15  Honor.

16    THE COURT:  Mr. Gillen.

17    MR. GILLEN:  I have no questions, Your Honor.

18    THE COURT:  Redirect.

19    MR. BOYLE:  Perhaps we will finish by four, Your

20  Honor.

21    MR. ROTHSCHILD:  Your Honor, I would like to move

22  the exhibits into evidence.

23    THE COURT:  Any objection?

24    MR. BOYLE:  No objection.

25    THE COURT:  Any objection, Mr. Gillen?

OFFICIAL COURT REPORTER

---

BUELL - CROSS - ROTHSCHILD                104

1    MR. GILLEN:  No objection.

2    THE COURT:  All right, exhibits 1 through 8, is

3  that correct?

4    THE DEPUTY CLERK:  I think it's --

5    THE COURT:  You had one -- have 1s marked 2.

6    MR. ROTHSCHILD:  I gave you a copy of Pandas, that

7  was the last one.

8    THE COURT:  It's 7-8 or more.

9    THE DEPUTY CLERK:  That's okay.

10    THE COURT:  So 1 through 8 are admitted.  P-1

11  through 8 are admitted.  Redirect.

12    REDIRECT EXAMINATION

13  BY MR. BOYLE:

14    Q    Mr. Buell, when was Exhibit 8 produced to the    in

15  response to the subpoena?

16    A    Exhibit 8?

17    Q    Yes, that would be the introduction chapter.  The

18  exhibit before that.

19    A    When was it produced?

20    Q    Yes, when was it produced in this case?

21    THE COURT:  Are you referring to P-7 or P-8?

22    MR. BOYLE:  Sorry, Your Honor.

23    THE COURT:  I can see we have two different tags

24  and that's what's causing us -- my tag for today's hearing,

25  apparently it was a deposition exhibit 8, I think.

OFFICIAL COURT REPORTER

105

BOYLE - REDIRECT

1    MR. ROTHSCHILD:  That's right.

2    MR. BOYLE:  That's correct, Your Honor.

3    THE COURT:  It looks like to me, but for the

4    proofing today you are entering to P 3 for this hearing?

5    MR. BOYLE:  And that's correct, Your Honor, I'm

6    sorry.

7    THE COURT:  All right, go ahead.

8    MR. BOYLE:  I looked at the wrong number.  This

9    document.

10    THE WITNESS:  All right.  I have that -- all right,

11    I have that as 5, but that's, that's fine.

12    THE COURT:  Well, it's P-3 for today.  Just resume

13    that.  We all have the right document.  Go ahead.

14    THE WITNESS:  In May.

15    BY MR. BOYLE:

16    Q    In May of this year?

17    A    Yes.

18    Q    Prior to this had this document been circulated

19    outside of your office, to your knowledge?

20    A    No, it had not.

21    Q    Now, you indicated on your initial examination that

22    there were non Christians that hold to the theory of

23    intelligent design.

24    A    Right.

25    Q    Are there Christians scientists that have up with

OFFICIAL COURT REPORTER

106

BOYLE - REDIRECT

1    modern scientific theories in the modern day Christian

2    scientists et noted.

3    A    Yes.

4    Q    Could you give me some examples?

5    A    You mean theories of origins?

6    Q    Or other scientific theories, outside the theory of

7    origins.

8    A    Sure, oh yeah, okay.

9    Q    Could you give me a couple examples?

10    A    Well, yeah, I think two recent examples that are

11    think outstanding, one is Dr. Thaxton, who is the

12    co-discoverer of the DNA invention, however you want to hold

13    it, of the laser.  He received a Nobel prize for it

14    Dr. Francis Collins, the head of the human genome project is

15    a Christian.  That would be a couple of good examples.

16    Q    And were their views diminished because they were

17    Christian?

18    A    No.  You know, I will say that they probably were

19    reviewed to be good science because they were -- because

20    they were Christians, just like I've heard a Jewish talk

21    show host talk about being motivated by his faith to do well

22    in his field.

23    Q    Now, on exhibit 5, it's going to be on the top

24    exhibit 3 from the deposition, that's in front of you.

25    A    Got it.

OFFICIAL COURT REPORTER

107

BOYLE - REDIRECT

1    Q    Okay.  And the first sentence says, "We are a

2    non-profit organization working in the field of education."

3    A    Yes.

4    Q    Is that true?

5    A    Yes.

6    Q    Was it true at the time this was written?

7    A    Yes, it was.

8    Q    "Our goal is to provide supplemental textbooks to

9    teachers in the public schools, giving them self documents

10    information so they can teach the truth in the classroom."

11    Is that true?

12    A    Yes.

13    Q    Is the truth there synonymous with Christianity?

14    A    It's truly?

15    Q    Is the term "truth" that you use synonymous with

16    Christianity?

17    A    Oh, no.

18    Q    What do you mean by "truth"?

19    A    Well, I meant that we -- I'm going back to the

20    artificial removal of biology among those sciences where we

21    are permitted to consider intelligent causes.

22    Q    Okay.  And did you ever -- was there ever a

23    discussion of producing Pamela and People as a religious

24    book?

25    A    Never was, there never was.

OFFICIAL COURT REPORTER

108

BOYLE - REDIRECT

1    Q    With any religious terms at all?

2    A    No.

3    MR. BOYLE:  I have nothing further, Your Honor.

4    MR. ROTHSCHILD:  Nothing further.  Take a break.

5    MR. GILLEN:  Nothing.

6    THE COURT:  I have some questions.

7    EXAMINATION

8    BY THE COURT:

9    Q    I am a little anxious.  This lawsuit was filed in

10    December, specifically December 14th of 2004.  Tell me

11    when you first became aware of the existence of this

12    lawsuit.

13    A    I know that it was close to the turn of the year.

14    Q    So is it a fair statement to say in January of

15    2005?

16    A    That would be fine, yes.

17    Q    Well, I don't want to put words in your mouth.  I

18    want you to tell me when you found out.

19    A    Well, I don't really remember exactly.  The end of

20    the year is a very very intense time, and there was just a

21    lot crammed into a short period.

22    Q    And how did you find out about the lawsuit?

23    A    First in mass reports, and only then much later in

24    April did I get any more specific information.

25    Q    Did you understand in January of this year what the

OFFICIAL COURT REPORTER

BUELL - THE COURT                                   109

1   main parameter of the lawsuit were?

2       A    If you include within that list they were naming as

3   our interests, no, I did not understand that.

4       Q    Well, that's not my question.  Did you understand

5   that a group of parents had brought suit against a school

6   board in this case alleging that a particular policy by the

7   school board that featured the mention of intelligent

8   design, that that was -- that those parents allege that that

9   was an infringement or an unconstitutional infringement

10  under the First Amendment?

11      A    I don't think that I recognized it as specifically

12  as you express it.  I recognized --

13      Q    What did you know?  What did you know?

14      A    I knew that the books were put in a library and

15  that students were told that they could go about the hand

16  out.

17      Q    Well, that was my next question.  So is it fair

18  that as early as January you knew that Mr Pennock and Pennock

19  somehow figured in this mistake?

20      A    Yes, that's true.

21      Q    All right.  Now, it's your contention, if I

22  understand it correctly, that your company or your

23  non for profits interest are not adequately protected by the

24  defendants in this case, is that correct?

25      A    That's true.  Correct.

OFFICIAL COURT REPORTER

---

BUELL - THE COURT                                   110

1       Q    Tell me why.

2       A    Well, because we found out later in the case that

3   the intention was to take intelligent design back to the

4   Supreme Court and have it declared to be creation science,

5   and therefore included in the -- as a religion in the

6   constitutional prohibition against creation science.  And we

7   didn't know until well on, until April that we were going to

8   be required to turn over a work in progress.

9       Q    Well, you believe that the thrust of the defense in

10  this case is that?  Is that what you're saying?

11      A    I'm sorry?

12      Q    You said that you found out that creation science

13  is going to be part of a defense?  Elaborate on that for me.

14      A    Well, I found out that the intent of the

15  plaintiff --

16      Q    I see, the intent of the plaintiff.

17      A    -- was to take intelligent design back to the

18  Supreme Court and have it included in the creation science.

19      Q    Well, I'm not asking you about what the plaintiff's

20  intent is --

21      A    I'm sorry.

22      Q    -- or their intentions are, I'm asking you about

23  the defendant in this case.

24         You are saying, by your reason, that you don't

25  think that interests are adequately represented.  Now, what

OFFICIAL COURT REPORTER

---

BUELL - THE COURT                                   111

1   makes you think that goal would be the same as the

2   defendant's goal, that is, to have the policy of the Dover

3   School Board remain in place as it's presently cast?

4       A    No, I don't think the Dover School Board policy

5   -- I think that is the very thing that we have opposed on

6   the part of school boards in the past.

7       Q    Oh, right.  But that's what's at issue in this

8   case, is it not?

9       A    Well, my understanding is that we've been led to

10  believe in the documents -- and I'm sorry, Your Honor, I

11  couldn't pinpoint which one, but in the legal documents,

12  that it's the intention of the AFLC to take intelligent

13  design back to the Supreme Court and have them declare it to

14  be religion or creation science or both.

15      Q    So your belief as to what you claim to be an

16  unprotected interest is based largely upon what you -- what

17  you think the thrust of the plaintiff's arguments are?

18      A    Yes, but not exclusively, because $425,000 is more

19  than any of our school budgets have ever been.

20      Q    I understand that.  And I'm not sure that you

21  answered my question.

22      A    I'm sorry.

23      Q    Perhaps it wasn't clear.

24         If the Dover School Board prevails in this

25  litigation, in the sense that the policy remains in place,

OFFICIAL COURT REPORTER

---

BUELL - THE COURT                                   112

1   that gets you where you want to be, doesn't it?

2       A    If -- if it prevails, I can't imagine that the

3   AFLC's other goal would be accomplished, so yes, I mean an

4   appeal it might change, but yes.

5       Q    What do you know of the Thomas More Law Center?

6       A    I don't know a lot.  I know that we removed their

7   holdings for some period of time, and that I generally feel

8   antilegal leanings for them.

9       Q    Do you know how many attorneys have entered their

10  appearance on behalf of the Thomas More Center representing

11  the defendants in this case -- or the defendant in this

12  case?

13      A    I don't know.  The only thing that I know was that

14  I believe at was in this Court there was one, it was

15  Mr. Gillen.

16      Q    Now it surprise you if I told you that there

17  might be four attorneys?

18      A    From Thomas More at this hearing?

19      Q    And local counsel.

20      A    Yes, I didn't know that.

21      Q    I guess then I'm interested in understanding why

22  you don't think your interest can be protected when you're

23  not sure how many counsel are involved, and because you

24  can't tell me anything about counsel who are representing

25  the defendants.

OFFICIAL COURT REPORTER

113

BUELL - THE COURT

OFFICIAL COURT REPORTER

114

BUELL - THE COURT

OFFICIAL COURT REPORTER

115

OFFICIAL COURT REPORTER

116

OFFICIAL COURT REPORTER

113

1   say the motion to intervene.

2   MR. BOYLE:  Well, I think that we have no reason to

3   know if no reason to know why Thomas More dropped

4   Mr. Pepinski as an expert.

5   THE COURT:  Well, we can -- we can correct the

6   dots.  Go ahead.

7   MR. BOYLE:  Perhaps I connect the dots differently,

8   Your Honor.

9   THE COURT:  Well, tell me how you connect the dots.

10  MR. BOYLE:  I think what happened in this case is

11  there was a policy in Pennsylvania, and I think that that

12  policy received a variety of mass coverage that may or may

13  not have been annexed around the country.  I believe that

14  Mr. Pepinski saw some of that news coverage, did not connect

15  the fact that that implanted FTE's interest that much.  And

16  Mr. Spahr testified that the school district policy is not

17  the way they packet the book.  They have to interest in a

18  policy that renders the use of the book.

19  THE COURT:  But that's the very subject of this

20  lawsuit.

21  MR. BOYLE:  Well, that's one of the subjects of the

22  lawsuit.  I think the other subject is whether or not

23  intelligent design is creative science.

24  I think that the position the plaintiffs take in

25  this case is there was a mandatory policy under the Lemon

OFFICIAL COURT REPORTER

114

1   test with a religious purpose.  But I think they also in

2   their remarks clearly equate intelligent design with

3   creation science under Edwards v. Aguillard, and for that

4   reason alone just if it is a separate basis the motion should

5   be unconstitutional.

6   THE COURT:  Defendants say it's not.

7   MR. BOYLE:  Pardon?

8   THE COURT:  The defendants say it's not.

9   MR. BOYLE:  Well, the defendants, though, Your

10  Honor, have to defend the political policy of the Dover

11  school board.  That's where the defendants' case comes in

12  fully.  It is on that political determination by the Dover

13  school board.

14  THE COURT:  Well, you may say it's a political

15  policy.  It's an explicit policy that calls for something

16  to be said.  As the Court understands it, as a statement to

17  the Biology curriculum.  Now, you call it a political

18  policy.  It's a policy.  It's a statement.  It's being

19  vigorously defended by the school district.  My, I might say,

20  experienced and accomplished counsel who have at every turn

21  litigated this case zealously.

22  Now, tell me what you would do, both, before today

23  and hence forth, that they haven't done?

24  MR. BOYLE:  What we would do, Your Honor, is we

25  would retain William Dembski and Mr. Campbell as experts in

OFFICIAL COURT REPORTER

115

1   this case.

2   THE COURT:  Well, and Mr. Dembski would then

3   reappear in the litigation.  And Mr. Thall just said that if

4   Mr. Dembski's manuscript -- it takes manuscript is dragged

5   back into the mix, that he would rather go to jail than

6   reveal that.  So where does that get us if Mr. Dembski comes

7   back in?

8   MR. BOYLE:  Well, in terms of the production of the

9   documents, I don't know that there's been a ruling on that or

10  the relevance of what has been determined.

11  THE COURT:  Well, when you put it to an expert

12  report and you name that as the basis for your expert

13  report, then you have a problem if you don't want to produce

14  it.

15  MR. BOYLE:  Well, it's a handicap, Your Honor, to

16  try to litigate the case, a case of intelligent design

17  without using the foremost experts in the field.

18  THE COURT:  Well, you want to unring a bell, and

19  I'm not sure that that can be done in the case of

20  Mr. Dembski, and I think you get into a, be careful what you

21  wish for, it may come true, if in fact intervention is

22  granted in this case.

23  MR. BOYLE:  If intervention were granted, Your

24  Honor, we would -- we would take a different tact with

25  respect to the policy, the Dover policy.  Our approach is --

OFFICIAL COURT REPORTER

120

1   THE COURT:  What?

2   MR. BOYLE:  To litigate intelligent design.

3   THE COURT:  What would you do?

4   MR. BOYLE:  Pardon?

5   THE COURT:  What would you do?  I still haven't

6   heard it.  You say you would take a different tact.  I don't

7   understand what it is.

8   MR. BOYLE:  Well, we would attempt -- we would

9   establish to separate the difference between intelligent

10  design and creation science.

11  THE COURT:  And you don't think that the defendants

12  are doing that?

13  MR. BOYLE:  I think the defendants are, by the

14  statements made by their clients, are limited to -- I think

15  they have to defend a policy.  I think they have to decide

16  to defend a political --

17  THE COURT:  And that's the very subject of this

18  litigation.  And it seems to be by your comments that you

19  want to make this a broader litigation by the intervention,

20  and I'm not sure --

21  MR. BOYLE:  I think --

22  THE COURT:  -- that that makes sense.

23  MR. BOYLE:  If the case only involved the Dover

24  policy and not the theory of intelligent design, it would be

25  a narrow case, but the plaintiffs have taken the view, as I

OFFICIAL COURT REPORTER

121

1  understand it, that Intelligent Design is creation science,
2  irrespective of the policy.  And that is where our interest
3  is.

4        THE COURT:  And how am I going to rule differently
5  or not if you're in or if you're not in?

6        MR. BOYLE:  Well, exclude our interest as in
7  presenting the scientific evidence and the legal arguments
8  in that case.

9        THE COURT:  And you don't think the defendants are
10 going to do that?

11        MR. BOYLE:  I think the defendants are limited to
12 what.  I think they're limited to the depth of the policy
13 the Board has enacted and what that policy is.  I don't
14 think the Dover policy and Intelligent Design are
15 synonymous.

16        THE COURT:  You talked just told me he didn't know
17 how many attorneys were in this box from the Thomas More Law
18 Center.  He knew very little about the attorneys who were in,
19 quite obviously.  He had a national relationship with
20 Thomas More, but didn't know that much about them.  How can
21 you come before this court and indicate to me that the
22 intimate wasn't adequately protected when you don't even
23 tell me about course.  Not you, but your client?

24        MR. BOYLE:  Well, I think on the flip side of that,
25 Your Honor, the reason why he can't is because he's never

OFFICIAL COURT REPORTER

122

1  had any calls from Thomas More.  Thomas More has never
2  sought out what his interest is.

3        THE COURT:  Well, think about what that argument
4  implies.  That is that there is an obligation on the Thomas
5  More Law Center to, in the event of their representation of
6  the Dover school board, make contact with every
7  potentially -- like a class action suit, every potentially
8  affected entity or person.  They don't have that burden, no
9  they?

10        MR. BOYLE:  I don't think they have that burden to
11 contact everybody in the Universe, but certainly, Fred
12 Bowman, the publisher of the book that's at issue would seem
13 to be a primary person they would contact.

14        THE COURT:  Well, they named Mr. Deubeck as their
15 expert.  And it was only when an objection was raised to the
16 revelation of the transcript, it seems to me, that the chain
17 separated here.

18        MR. BOYLE:  I think that the chain separated when
19 Mr. Buell received the subpoena, when he had no notice or no
20 assistance from Thomas More in how to respond to that
21 subpoena, when he hired separate counsel at that point to
22 step to protect his interests, when motions were filed and
23 when the Thomas More Law Center did not move to an issue to
24 present --

25        THE COURT:  And I might agree that his interests

OFFICIAL COURT REPORTER

123

1  diverge as it relates to the disclosure of the manuscript
2  and the need to keep that confidential; and I completely
3  understand that, and we were very careful about that in the
4  prior proceedings.  And there's no question on that count.  The
5  same.  But I'm not so sure that the interests diverge as it
6  gets to the merits of the lawsuit.  All right.

7        MR. BOYLE:  Thank you.  Thank you, Your Honor.

8        THE COURT:  Any closing comments?

9        MR. ROTHSCHILD:  Yes, and I will be brief, Your
10 Honor.

11        On the issue of timing, even if Mr. Buell and the
12 Foundation had not sat on their rights in this case, which I
13 feel very strongly they did, it's too late in this case to
14 bring them in.  We are at the close of discovery, and now
15 what they are talking about is not simply just participating
16 in trial, but that means, those depositions were scheduled
17 and would be brought into the case.

18        And what is particularly extraordinary about this
19 is that -- and I don't need to vouch for Mr. Cillen or his
20 firm, but they're complaining about adequacy of
21 representation because these experts were removed from the
22 case.  But if you look at their representation an their
23 brief it was because FTE counsel was going to represent
24 them.

25        Mr. Dr. Meyer has no affiliation with FTE.

OFFICIAL COURT REPORTER

124

1  Mr. Dr. Campbell has no affiliation with FTE.  And here
2  is FTE counsel insisting on representing them in this
3  litigation.  They would not be deterred by meddling with
4  defendants case by being a -- need to interweave and then
5  bringing those same experts back in whose depositions would
6  have to be taken and the transaction remade.  That's all I
7  have.

8        THE COURT:  I understand.

9        Mr. Cillen.

10        MR. CILLEN:  Your Honor, if I may, a few comments.
11        I'm arranging with my personal pride because to
12 some extent I feel like the efforts we made on behalf of the
13 defendants have been impugned here.  But I want to --

14        THE COURT:  Well, to the extent that they have, and
15 I didn't necessarily see that, that may be so overly
16 sensitive reaction to it.  But I well understand, and my
17 comments should imply that I understood the zealous
18 representation that you've provided.  And inasmuch as it's
19 the firm's arbiter, at least as this stage, that is well
20 established.  But go ahead.

21        MR. CILLEN:  Thank you, Your Honor.  I appreciate
22 that very much.

23        I want to make the fact and make it clear that I
24 have made it abundantly clear to Mr. Buell that I do not
25 represent FTE.  They are strangers to my defendants.  We are

OFFICIAL COURT REPORTER

1   met contact that when we purchased the core because we
2   believed then and believe now we purchased a private
3   lecture. I see no reason why we would have to contact the
4   and that's why we didn't.
5       It is also true that we did in fact have some
6   feeling of inanimosity when the notion of separate counsel
7   was forthcoming on behalf of some of the experts named or
8   affiliations we did not know about, and we did not want to
9   suffer by reason of those. There was some sense of, we
10  hired experts to serve the interests of our clients.
11      This new notion, interjecting into the litigation,
12  gave us reasonable grounds for inaccuracy concerning the
13  accelerates with which we could expect that misinformation
14  I just want in case it does for the record there's why we
15  needed not to retain those --
16      THE COURT:  Understood.
17      MR. GILLEN:  Finally, as your comments indicate,
18  Judge, it is the position of the Dover Area School District,
19  the defendants in this case, that intelligent design is a
20  scientific theory.  To the extent that that is an issue in
21  this case, we will fully and fairly and vigorously defend
22  that interest.
23      THE COURT:  All right, thank you.
24      All right, that will conclude part two, and the
25  final part of our hearing this afternoon.

OFFICIAL COURT REPORTER

---

1       Now, I understand from Mr. counsel, that you had
2   some concerns about scheduling, and that you might want to
3   address those.
4       I think what we ought to do, as two hour draws
5   somewhat late, and it's a legitimate subject, is probably
6   set up at some appropriate time a scheduling conference
7   call, and then we can all then reach on scheduling.
8       I will tell you that -- well, let me ask you first
9   at all, the nexus of the inquiry, as I understood it, was
10  not that you wanted to delay, it was simply that you wanted
11  to have some idea of where we go after the start date of the
12  trial; and that's certainly fair.
13      It would not be my intention, because I simply
14  can't, given your recent estimate of the duration of the
15  trial, I can't go from start to finish in straight days.
16  That wouldn't work for any of us, I suppose.  Everyone is
17  busy and I have other duties that I have to attend to.  So
18  what we'll look at, when we have a scheduling conference, is
19  to designate certain days.
20      I am going to do my best to be in Harrisburg for as
21  many days as I can.  However, as Lux may have advised you,
22  it appears to me that given the expected duration, we simply
23  are not going to be able to avoid having some trial days in
24  Williamsport.  I'll try to schedule those back to back; and
25  I wouldn't tax you anyone unnecessarily from one place to

OFFICIAL COURT REPORTER

---

1   the other, and nor do I want to do that, but we'll work
2   through that.
3       So I'll, by separate order, schedule a scheduling
4   conference.  And I'll ask you to get your schedules out for
5   that, and let's us try to work through that.
6       I can't promise that it will be in the next week or
7   so, but we'll do it in due time and we'll try to set a
8   schedule so that everyone has a little predictability
9   it's my policy that I -- I think that courtesy dictates to
10  counsel, although this courtesy was not always afforded to
11  me when I was practicing, but courtesy dictates in counsel
12  that we have some sense of where we're going on that,
13  particularly for those who are travelling in, they can use
14  what they need to do.
15      MR. ROTHSCHILD:  Thank you.
16      THE COURT:  Anything else before we close the
17  record?
18      MR. ROTHSCHILD:  No.
19      MR. BOYLE:  No, Your Honor.
20      THE COURT:  We'll close the record.  We will render
21  a decision with respect to the intervention matter promptly.
22  I will render a decision with respect to the motion to quash
23  after I've had an opportunity to review in camera the
24  documents which will be submitted, as I understand it, no
25  later than the close of business next Tuesday.

OFFICIAL COURT REPORTER

---

1       With that, the record is closed and we're
2   adjourned.
3       THE DEPUTY CLERK:  All rise.
4           (4:24 p.m., court adjourned.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

OFFICIAL COURT REPORTER

129

REPORTER'S CERTIFICATE

I, Joan D. Spenaling, Official Court Reporter for
the United States District Court for the Middle District of
Pennsylvania, appearing pursuant to the provisions of Title
28, United States Code, Section 753, do hereby certify that
the foregoing is a true and correct transcript of the
within-mentioned proceedings had in the above-mentioned and
numbered cause on the date or dates hereinbefore set forth;
and I do further certify that the foregoing transcript has
been prepared by me or under my supervision.

Joan D. Spenaling, RMR
Official Court Reporter

REPORTED BY:

    JOAN D. SPENALING, RMR
    Official Court Reporter
    United States District Court
    Middle District of Pennsylvania
    240 Kent Third Street, Suite 4**
    Williamsport, PA 17701-1478
    (570) 323 9501

    (The foregoing certificate of this transcript does
not apply to any reproduction of the same by any means
unless under the direct control and/or supervision of the
certifying reporter.)

OFFICIAL COURT REPORTER