# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TAMMY J. KITZMILLER, *et al.*<br><br>　　Plaintiffs,<br><br>　　　　v.<br><br>DOVER AREA SCHOOL,<br>DISTRICT and DOVER AREA<br>SCHOOL DISTRICT BOARD OF<br>DIRECTORS,<br><br>　　Defendants, | ) ) ) ) ) ) ) ) ) ) ) ) ) )<br><br>Civil Action No. 4:04-CV-2688<br><br>Hon. John E. Jones, III |

---

## BRIEF OF AMICI CURIAE BIOLOGISTS AND OTHER SCIENTISTS IN SUPPORT OF DEFENDANTS

---

DAVID K. DEWOLF*
L. THEODORE HOPPE, JR.
C. SCOTT SHIELDS

*Counsel of Record

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES**      iii

**INTRODUCTION**      1

**INTEREST OF AMICUS CURIAE**      1

**SELECTED LIST OF AMICI CURIAE**      2

**SUMMARY OF ARGUMENT**      5

**ARGUMENT AND CITATIONS OF AUTHORITY**      6

I.    THE NATURE OF SCIENCE IS NOT A QUESTION TO BE DECIDED BY THE COURTS.      6

II.    SCIENTIFIC PROGRESS DEPENDS ON AN UNINHIBITED SEARCH FOR THE TRUTH      7

     a.   Dissent within Science is Healthy.      7
     b.   Existing Scientific Establishments Are Sometimes Unable to Admit Possibility of Error.      8
     c.   Even Theories that are Eventually Proven Erroneous may Benefit Science by Requiring Reexamination of Long-Held Assumptions.      10

III.   AD HOMINEM ATTACKS ON SCIENTISTS SHOULD NOT BE THE BASIS FOR EXCLUDING THEIR SCIENTIFIC CONTRIBUTIONS      12

     a.   Religious Motivations are Irrelevant to the Scientific Merits of a  Hypothesis.      13
     b.   Scientists and Advocates on All Sides of this Issue have Religious (or Anti-Religious) Motivations.      15

IV.   EFFORTS TO SUPPRESS INTELLIGENT DESIGN
      THEORY HAVE ALREADY BEGUN.                          18

**CONCLUSION**                                            24

CERTIFICATE OF COMPLIANCE                                 25

APPENDIX A

      COMPLETE LIST OF AMICI CURIAE                       26

ii

**TABLE OF AUTHORITIES**

**Scientific Authorities**

Bruce Alberts, "The Cell as a Collection of Protein Machines:
Preparing the Next Generation of Molecular Biologists,"
Cell 92:291 (February 8, 1998).                                                          11

Francis H. C. Crick., *What Mad Pursuit* (Basic Books, 1990).              10

Richard Dawkins, *The Blind Watchmaker* (New York: W.W.
Norton & Company, 1986).                                                                  12

William A. Dembski, *The Design Inference* (Cambridge University
Press, 1998).                                                                                      2

William A. Dembski, *Intelligent Design: The Bridge Between
Science and Theology* (InterVarsity Press, 1999).                              14

William A. Dembski and Michael Ruse, ed. *Debating Design*,
(Cambridge University Press, 2004).                                              6,9

Barbara Forrest and Paul Gross, *Creationism's Trojan Horse*
(Oxford University, Press, 2004).                                                 12,23

Guillermo Gonzalez, Donald Brownlee, Peter D. Ward, "Refuges
for Life in a Hostile Universe," *Scientific American*, October (2001).   20

Guillermo Gonzalez and Jay W. Richards, *The Privileged Planet:
How Our Place in the Cosmos is Designed for Discovery* (Regnery
Publishing, 2004).                                                                            20

Thomas Kuhn, *The Structure of Scientific Revolutions*
(2nd Ed, 1970, University of Chicago Press).                                       7

Edward J. Larson and Larry Witham, "Scientists and Religion in
America," *Scientific American*, 281:88-93, September, 1999).             17

Ernst Mayr, *Foreword*, Michael Ruse, *Darwinism Defended* (1982).   11

Stephen Meyer, "The Origin of Biological Information and the
Higher Taxonomic Categories" *Proceedings of the Biological
Society of Washington* 117:213-239, 2004.                                        19

Gordon Moran, *Silencing Scientists and Scholars in Other Fields:
Power, Paradigm Controls, Peer Review, and Scholarly
Communication* (Greenwich, Connecticut: Ablex Publishing
Corporation, 1998).                                                              18

National Academy of Sciences, *Teaching about Evolution and the
Nature of Science: A view from the National Academy of Sciences*
(National Academy Press 1998).                                                   17

National Academy of Sciences, *Science and Creationism: A View
from the National Academy of Sciences* (2nd edit. National Academy
Press, 1999).                                                                    17

## INTRODUCTION

Amici curiae are scientists who oppose any attempt to define the nature of science in a way that would limit their ability to follow the evidence wherever it may lead. Since the identification of intelligent causes is a well established scientific practice in fields such as forensic science, archaeology, and exobiology,[1] Amici urge this Court to reject plaintiffs' claim that the application of intelligent design to biology is unscientific. Any ruling that depends upon an outdated or inaccurate definition of science, or which attempts to define the boundaries of science, could hinder scientific progress.

## INTEREST OF AMICI CURIAE

Amici are professional scientists who support academic freedom for scientific research into the scientific theory of intelligent design. Some Amici are scientists whose research directly addresses design in biology, physics, or astronomy. Other Amici are scientists whose research does not bear directly upon the intelligent design hypothesis, but feel it is a viable conclusion from the empirical data. Finally, some Amici are skeptics of intelligent design who believe that protecting the freedom to pursue scientific evidence for intelligent design stimulates the advance of scientific knowledge. All Amici agree that courts should decline to rule on the scientific validity of theories which are the subject of

1

vigorous scientific debate.

## SELECTED LIST OF AMICI CURIAE

NOTE: Scientists are listed by academic affiliation or doctoral degree. A complete list of all 85 Amici Curiae is attached as Appendix A.

Philip Skell
Member, National Academy of Sciences
Emeritus, Evan Pugh Professor of Chemistry
Pennsylvania State University

Lyle H. Jensen
Fellow, American Association for the Advancement of Science
Professor (Emeritus), Department of Biological Structures and Department of
Biochemistry, University of Washington

Russell W. Carlson
Professor of Biochemistry and Molecular Biology
Executive Technical Director, Plant and Microbial Carbohydrates
Complex Carbohydrate Research Center
University of Georgia

Dean H. Kenyon
Emeritus Professor of Biology
San Francisco State University

Ralph W. Seelke
Professor of Molecular & Cell Biology
University of Wisconsin-Superior

Gary Maki
Director, Center for Advanced Microelectronics and Biomolecular Research
University of Idaho.

---

[1] *See* William A. Dembski, *The Design Inference* (Cambridge University Press, 1998).

Ronald Larson
George Granger Brown Professor of Chemical Engineering
Chair, Department of Chemical Engineering
University of Michigan

Gregory J. Brewer
Professor of Neurology, Medical Microbiology, Immunology and Cell Biology
Southern Illinois University School of Medicine

Frederick N. Skiff
Professor, Department of Physics and Astronomy
University of Iowa

Wesley L. Nyborg
Professor of Physics (emeritus)
University of Vermont

Michael R. Egnor
Professor and Vice-Chairman
Department of Neurological Surgery
State University of New York at Stony Brook

M. Harold Laughlin
Professor & Chair, Department of Biomedical Sciences
University of Missouri

Bruce D. Evans
Chair, Department of Biology
Huntington University

Wusi Maki
Research Assistant Professor
Department of Microbiology, Molecular Biology, and Biochemistry University of
Idaho

Granville Sewell
Professor of Mathematics
University of Texas, El Paso

Christian M. Loch
Ph.D. Biochemistry & Molecular Genetics
University of Virginia

I. Caroline Crocker
Ph.D. Immunopharmacology
University of Southampton

Lisanne D'Andrea-Winslow
Associate Professor of Biology
Northwestern College

Mark E. Fuller
Ph.D. Microbiology
University of California, Davis

Christopher P. Williams
Ph.D. Biochemistry
The Ohio State University

Scott H. Northrup
Professor of Chemistry
Tennessee Tech University

Richard M Anderson
Assistant Professor of Environmental Science and Policy
Duke University

Stephen Meyer
Ph.D. Philosophy of Science
Cambridge University

Jonathan Wells
Ph.D. Molecular & Cell Biology
University of California (Berkeley)

## SUMMARY OF ARGUMENT

Courts are ill-suited to resolve debates over the validity of controversial scientific theories. In particular, the scientific theory of intelligent design should not be stigmatized by the courts as less scientific than competing theories. The advance of scientific knowledge depends on uninhibited, robust investigation seeking the best explanation. Over time, new evidence and new perspectives on existing evidence may require the modification of existing theories or even the abandonment of previously accepted theories that have lost their explanatory power.

The method of identifying intelligent causes is well established in many scientific fields.[2] As a result, Amici assert that the hypothesis of intelligent design can be an appropriate topic for discussion in a curriculum that addresses biological origins as well as for investigation in the laboratory. Efforts to ban the scientific theory of intelligent design from the classroom, whether by a narrow definition of science or by a discriminatory attack on the personal motives of the scientists conducting scientific research into intelligent design, should be rejected by the Court.

---

[2] *Id.* These areas include archaeology, and the Search for Extra-Terrestrial Intelligence (SETI) Project, which seeks to detect intelligently designed radio signals coming from space.

5

Finally, litigation should not usurp the laboratory or scientific journals as the

venue where scientific disputes are resolved.  Doubts as to whether a theory

adequately explains the evidence should be resolved by scientific debate, not by

court rulings.  Amici urge the Court to avoid a ruling limiting the nature of science,

as it would have far-reaching detrimental effects beyond the schoolhouse doors and

into the laboratories and careers of many legitimate scientists

## ARGUMENT AND CITATIONS OF AUTHORITY

### I.    THE NATURE OF SCIENCE IS NOT A QUESTION TO BE DECIDED BY THE COURTS.

Intelligent design, while admittedly a minority view, is currently being

vigorously debated by scientists.  For example, Cambridge University Press

recently published a volume entitled "Debating Design," in which scientists on

both sides of the issue stated their respective cases.[3] Whether or not intelligent

design is ultimately widely accepted as the most persuasive explanation for

particular scientific phenomena, design theorists have formulated their theory

based upon a scientific evaluation of the empirical evidence.  The current

formulation of intelligent design theory by its proponents, and its application to

recent scientific discoveries, is still in its youth compared to many other scientific

theories.  For that very reason it is premature to conclude that one side has

---

[3] Michael Ruse and William Dembski, eds., *Debating Design* (Cambridge University Press, 2004).

triumphed and the other has lost.  Simply because one group of scientists favors

one interpretation, we must not relegate the other side to a category of "non-

scientists" who are ineligible to state their case.  Amici strenuously object to

appeals to the judiciary to rule on the validity of a scientific theory or to rule on the

scope of science in a manner that might exclude certain scientific theories from

science. These questions should be decided by scientists, not lawyers.

## II.   SCIENTIFIC PROGRESS DEPENDS ON AN UNINHIBITED SEARCH FOR TRUTH.

### a. Dissent within Science is Healthy.

The scientific enterprise advances when scientists make new discoveries

correcting or overturning previously held theories.  Scientists in many fields

operate under a "paradigm," an overarching theory that provides a framework for

interpreting data, performing experiments, and doing further research.[4] Paradigms

are typically unquestioned by most scientists and reign over thinking in scientific

fields much like established law reigns over a society.

The history of science is replete with examples of novel ideas which were

given birth when scientists realized that the empirical data conflicted with reigning

---

[4] Thomas Kuhn, *The Structure of Scientific Revolutions* (2nd edit., 1970, University of Chicago Press).

paradigms.[5] Scientists who observe data that conflicts with popular scientific paradigms form innovative theories to explain the new data. Scientists propounding these new theories often experience sharp opposition from their peers. It is crucial that advocates of the new scientific theories be granted freedom of inquiry to question reigning scientific ideas if scientific progress is to be possible.

### b. Existing Scientific Establishments Are Sometimes Unable to Admit Possibility of Error.

The history of science also reveals that novel scientific theories, even those that prove successful, are often resisted by an "old guard" that defends the long-standing paradigms. Philosophers of science teach that scientists committed to the reigning paradigm engage in "normal science" where scientific dogmas are not questioned.[6] Those practicing "normal science" typically close their ears to dissent:

> No part of the aim of normal science is to call forth new sorts of phenomena; indeed those that will not fit the box are often not seen at all. Nor do scientists normally aim to invent new theories, and they are often intolerant of those invented by others.[7]

---

[5] *Id.* For example, Einstein's theories of relativity helped explain why Newton's classical laws of motion made inaccurate predictions when dealing with objects moving at very high speeds.

[6] *Id.*

[7] *Id.* at 24.

Intelligent design fits this historical pattern. It is a relatively young scientific theory, based upon relatively new scientific data, which is currently opposed by many "normal scientists" committed to the Neo-Darwinian paradigm.[8]

This opposition to intelligent design within the scientific establishment is more often based on pride and prejudice than an impartial evaluation of the evidence. A case in point is the resolution opposing intelligent design issued by the board of the American Association for the Advancement of Science (AAAS) in 2002.[9] The AAAS declaration reads like an imperial edict, asserting without any discussion of the evidence that "the ID movement has failed to offer credible scientific evidence to support their claim that ID undermines the current scientifically accepted theory of evolution." Notably, several AAAS board members who voted for the resolution were later unable to cite even one article they had read by an intelligent design proponent.[10] In other words, they had voted to condemn intelligent design as unscientific without bothering to investigate it for themselves. The AAAS resolution is little more than a political document that seeks to substitute political consensus for scientific demonstration. When the votes

---

[8] *See* Michael Ruse and William Dembski, *Debating Design* 3-4 (Cambridge University Press, 2004).

[9] AAAS News Archives, "AAAS Board Resolution on Intelligent Design Theory," aaas.org/news/releases/2002/1106id2.shtml (last visited September 23, 2004).

[10] John West, "Intelligent design could offer fresh ideas on evolution," *Seattle Post Intelligence*, December 6, 2002,

9

of scientific organizations, acting in a political capacity, are substituted for the give-and-take of public argument and refutation, science loses. To convert such votes into a coercive rule of law would only compound the error. Amici ask the Court not to erode the right of all scientists to pursue scientific inquiry regardless of the views of the current scientific majority.

### c. Even Theories that are Eventually Proven Erroneous may Benefit Science by Requiring Reexamination of Long-Held Assumptions.

Whether or not intelligent design is adopted as an explanation for biological origins, science benefits from the competition of alternate hypotheses. Amici see great value to design theory simply because it forces scientists to confront evidence which conflicts with the Neo-Darwinian paradigm, and to finally provide better answers for the origin of highly complex and machine-like biological features.

Even eminent critics of design concede that the possible conclusion of design influences their thinking. The co-discoverer of the structure of DNA, Francis Crick, contended that "[b]iologists must constantly keep in mind that what they see was not designed, but rather evolved."[11] Though himself critical of design, the President of the National Academy of Sciences, Bruce Alberts, has acknowledged that cells resemble human-designed machines:

---

seattlepi.nwsource.com/opinion/98810_idrebut06.shtml (last visited September 13, 2005).
[11] Francis H. C. Crick, *What Mad Pursuit* 138 (Basic Books, 1990).

> The entire cell can be viewed as a factory that contains an elaborate
> network of interlocking assembly lines, each of which is composed of
> a set of large protein machines. . . .  Why do we call the large protein
> assemblies that underlie cell function protein *machines*?  Precisely
> because, like machines invented by humans to deal efficiently with
> the macroscopic world, these protein assemblies contain highly
> coordinated moving parts.[12]

Evolutionary biologist Ernst Mayr explained that the "core of Darwinism ... is the

theory of natural selection. This theory is so important for the Darwinian because it

permits the explanation of adaptation, the `design' of the natural theologian, by

natural means ..."[13] Finally, prominent evolutionary biologist and intelligent

design critic Richard Dawkins writes that "[b]iology is the study of complicated

things that give the appearance of having been designed for a purpose."[14]  Thus

evolutionary biologists are sensitive to arguments to design and in fact realize that

arguments for design pose challenges to their theories.

     Amici reiterate that even incorrect scientific theories advance scientific

progress by challenging the scientific community to better explain the natural

world. Moreover, dissenting scientific viewpoints should not be suppressed.  The

freedom of scientists to pursue the scientific evidence to its logical conclusion

must be protected so that a better explanation, when it emerges, can be accepted.

---

[12] Bruce Alberts, "The Cell as a Collection of Protein Machines: Preparing the
Next Generation of Molecular Biologists," *Cell*, 92: 291, February 6, 1998
(emphasis in original).
[13] Ernst Mayr, *Foreword*, Michael Ruse, *Darwinism Defended* xi-xii (1982).

The Court should oppose any requests to define intelligent design as unscientific or to place it outside of the scope of science.

## III.  AD HOMINEM ATTACKS ON SCIENTISTS SHOULD NOT BE THE BASIS FOR EXCLUDING THEIR SCIENTIFIC CLAIMS.

As this litigation demonstrates, opponents of intelligent design frequently resort to ad hominem attacks, asserting that because some scientists hold religious views, their scientific work should be dismissed as merely "religious."[15] *Creationism's Trojan Horse*, co-authored by Dr. Barbara Forrest (one of plaintiffs' experts), epitomizes the argument that because many intelligent design theorists are devoutly religious, therefore intelligent design proponents intend to pass off religion as science and are not offering design as a scientific theory.[16]

Forrest's book devotes little space to evaluating the science of intelligent design, but is full of documentation of irrelevant connections (sometimes concrete and sometimes highly tenuous) between intelligent design proponents and religious organizations. Such harping upon the religious affiliations of design proponents and their allegedly deceitful scholarship is bigoted as well as beside the point.

---

[14] Richard Dawkins, *The Blind Watchmaker* 1 (New York: W.W. Norton & Company, 1986).

[15] *See* Barbara Forrest and Paul Gross, *Creationism's Trojan Horse* (Oxford University Press, 2004).

[16] "A movement based on religion does not need the credibility afforded by scientific evidence." *Id.* at 314.

This *"Trojan Horse"* method of critique encourages discrimination against intelligent design proponents by fostering a stereotype among academics that supporters of design are incompetent scientists who use deceitful methods to peddle religion as though it were science.[17]  Such a prejudicial tactic would never be permitted if the alleged agenda of the accused group were, say, feminism or gay rights.  Indeed, no other group of academics face attacks on their professional careers based primarily on their alleged personal beliefs.[18]  Arguments employing such *ad hominem* attacks on the supposed religious beliefs of design theorists should be decisively rejected by this Court.

### a. Religious Motivations are Irrelevant to the Scientific Merits of a Hypothesis.

The motivations and religious views of scientists have nothing to do with the scientific validity of their discoveries.  For example, the eminent scientists Isaac Newton and Johannes Kepler were devoutly religious and believed God created a rationally comprehensible universe.  Despite their religious motivations, their scientific investigations led to accurate explanations of motion which became the bedrock of physical mechanics.  Amici thus assert that motivations for conducting scientific investigations have no bearing upon the empirical validity or scientific

---

[17] *See infra* notes 45-51 and accompanying text for documentation of the discrimination leveled at Dr. Guillermo Gonzalez.

[18] *See infra*, notes and 35-56 and accompanying text, for a discussion of the discrimination faced by intelligent design sympathizers.

nature of the conclusions obtained therein.

Additionally, any religious affiliations or beliefs of intelligent design proponents are protected by their First Amendment rights of freedom of religion and association. Regardless of their associations or motivations, intelligent design theorists do not base their arguments on theological premises:

> The design theorists' critique of Darwinism begins with Darwinism's failure as an empirically adequate scientific theory, not with its supposed incompatibility with some system of religious belief. This point is vital to keep in mind in assessing intelligent design's contribution to the creation - evolution controversy. Critiques of Darwinism by creationists have tended to conflate science and theology, making it unclear whether Darwinism fails strictly as a scientific theory or whether it must be rejected because it is theologically unacceptable. Design theorists refuse to make this a Bible-science controversy. Their critique of Darwinism is not based upon any supposed incompatibility between Christian revelation and Darwinism.[19]

Highly probative of this account is the fact that notable sympathizers of intelligent design are not religious. For example, the famous British atheist, Antony Flew, announced in 2004 that he had been persuaded by the empirical data supporting design. Although Flew continued to espouse no religious commitments after his intellectual shift, he stated "[i]t now seems to me that the findings of more than fifty years of DNA research have provided materials for a new and enormously

---

[19] William A. Dembski, *Intelligent Design: The Bridge Between Science and Theology* 112 (InterVarsity Press, 1999).

powerful argument to design."[20]  This Court should rule that the motivations and religious beliefs of design proponents are irrelevant to the empirical validity or epistemological nature of design theory.

### b. Scientists and Advocates on All Sides of this Issue have Religious (or Anti-Religious) Motivations.

Although Amici emphasize that the religious beliefs and motivations of scientists are irrelevant when evaluating the scientific nature of their arguments, Amici feel compelled to point out that leading opponents of intelligent design are not without their own religious (or anti-religious) motivations.

For example, Eugenie Scott, director of a leading activist organization opposing the teaching of design, the National Center for Science Education ("NCSE"), is a "Notable Signer" of the "Humanist Manifesto III."  The Manifesto makes broad theological (or "anti-theological") claims that "[h]umans are ... the result of unguided evolutionary change. Humanists recognize nature as self-existing."[21]

Another public opponent of intelligent design is Nobel Laureate Steven

---

[20] *See* biola.edu/antonyflew/page2.cfm (last visited September 10, 2005).
[21] Humanist Manifesto III Public Signers, americanhumanist.org/3/HMsigners.htm (last visited September 10, 2005); Humanism and its Aspirations, americanhumanist.org/3/HumandItsAspirations.htm (last visited September 10, 2005).

Weinberg.[22] Weinberg explains his scientific career is motivated by a desire to disprove religion:

> I personally feel that the teaching of modern science is corrosive of religious belief, and I'm all for that! One of the things that in fact has driven me in my life, is the feeling that this is one of the great social functions of science—to free people from superstition.[23]

Lest there be any doubt about Weinberg's meaning, he expresses his hope that "this progression of priests and ministers and rabbis and ulamas and imams and bonzes and bodhisattvas will come to an end, that we'll see no more of them. I hope that this is something to which science can contribute and if it is, then I think it may be the most important contribution that we can make."[24]

Plaintiff's expert Barbara Forrest is on the Board of Directors of the New Orleans Secular Humanist Association (NOSHA).[25] NOSHA is also an affiliate of the Council for Secular Humanism which it describes as "North America's leading organization for non-religious people."[26] NOSHA's links page boasts "The Secular Web," whose "mission is to defend and promote metaphysical naturalism,

---

[22] Dr. Weinberg testified in support of teaching only the evidence for evolution before the Texas State Board of Education. *See* Forrest Wilder, "Academics need to get more involved," Opinion, *The Daily Texan,* October 2, 2003. dailytexanonline.com/media/paper410/news/2003/10/02/Opinion/Academics.Need. To.Get.More.Involved-510574.shtml (last visited September 15, 2005).
[23] "Free People from Superstition," ffrf.org/fttoday/2000/april2000/weinberg.html (last visited September 15, 2005).
[24] *Id.*
[25] NOSHA Who's Who, nosha.secularhumanism.net/whoswho.html (last visited September 10, 2005).

the view that our natural world is all that there is, a closed system in no need of an explanation and sufficient unto itself."[27]  Most notably, NOSHA is an associate member of the American Humanist Association,[28] which publishes the Humanist Manifesto III.[29]  In 1996, this American Humanist Association named Richard Dawkins as its "Humanist of the Year."[30]  To help underscore the anti-religious mindset of these humanist organizations, in his acceptance speech for the award before the American Humanist Association, Dawkins stated that "faith is one of the world's great evils, comparable to the smallpox virus but harder to eradicate."[31]

Even the eminent National Academy of Sciences, which has issued various booklets against teaching intelligent design,[32] has a membership of biologists who (according to surveys) are 95% atheists or agnostics.[33]  Amici detail these affiliations not because religious (or anti-religious) beliefs are relevant to a

---

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] *See* americanhumanist.org/3/HumandItsAspirations.htm (last visited September 10, 2005).

[30] *See* thehumanist.org/humanist/articles/dawkins.html (last accessed Sept 10, 2005).

[31] *Id.*

[32] *See* National Academy of Sciences, *Teaching about Evolution and the Nature of Science* and *Science and Creationism: A view from the National Academy of Sciences* (National Academy Press, 1998); National Academy of Sciences, *Science and Creationism: A View from the National Academy of Sciences* (2nd edit. National Academy Press, 1999).

[33] Edward J. Larson and Larry Witham, "Scientists and Religion in America," *Scientific American* 281:88-93, September, 1999.

scientific argument, but to demonstrate that the legal rule proposed by the plaintiffs would jeopardize the scientific contributions of many critics of intelligent design just as much as the contributions of some intelligent design proponents. It would also inspire a never-ending succession of irrelevant *ad hominem* attacks. Amici urge the Court to reject such a deeply flawed rule that is so inimical to free inquiry.

## IV.   EFFORTS TO DISCRIMINATE AGAINST INTELLIGENT DESIGN PROPONENTS HAVE ALREADY BEGUN.

The concern that acceptance of the plaintiffs' claims could adversely affect the freedom of scientists to pursue the truth is hardly a remote contingency. The Court should be aware that opponents of intelligent design, including some of the witnesses testifying in this case, already have sought to hinder the careers and academic freedom of scientists who are sympathetic towards intelligent design. The following examples demonstrate the potential for the plaintiffs' requested relief to become the basis for further efforts to stifle the intelligent design viewpoint.[34]

Richard Sternberg is a trained evolutionary biologist,[35] and former editor of the peer-reviewed biology journal, *Proceedings of the Biological Society of*

---

[34] For an account of modern-day persecution of scientists, *See* Gordon Moran, *Silencing Scientists and Scholars in Other Fields: Power, Paradigm Controls, Peer Review, and Scholarly Communication* (Greenwich, Connecticut: Ablex Publishing Corporation, 1998).

[35] Dr. Sternberg holds Ph.D.'s in molecular evolution and theoretical biology. *See* rsternberg.net/CV.htm (last visited September 9, 2005).

*Washington* ("PBSW"). As a PBSW editor, in 2004 Dr. Sternberg oversaw the

publication of a peer-reviewed technical article which supported the hypothesis of

intelligent design.[36] Although the article was reviewed and published using normal

procedures,[37] Dr. Sternberg subsequently experienced retaliation by his co-workers

and superiors at the Smithsonian, including transfer to a hostile supervisor,

removal of his name placard from his door, deprivation of workspace, subjection to

work requirements not imposed on others, restriction of specimen access, and loss

of his keys.[38] Smithsonian officials also tried to smear Dr. Sternberg's reputation[39]

and even investigated his religious and political affiliations in violation of his

privacy and First Amendment rights.[40] According to an investigation by the U.S.

Office of Special Counsel (OSC), these efforts were aimed at creating "a hostile

work environment... with the ultimate goal of forcing [Sternberg]... out of the

[Smithsonian]."[41] Furthermore, the OSC found that the pro-evolution NCSE

---

[36] Stephen Meyer, "The Origin of Biological Information and the Higher Taxonomic Categories," *Proceedings of the Biological Society of Washington* 117:213-239, 2004.

[37] *See* rsternberg.net/ (last visited September 9, 2005). *See also* rsternberg.net/OSC_ltr.htm (last visited September 9, 2005).

[38] *Id.*

[39] Michael Powell, "Editor Explains Reasons for 'Intelligent Design' Article," *Washington Post*, August 19, 2005, A19, washingtonpost.com/wp-dyn/content/article/2005/08/18/AR2005081801680_3.html (last visited September 15, 2005).

[40] *Id.*

[41] *See* rsternberg.net/ (last visited September 9, 2005). *See also* rsternberg.net/OSC_ltr.htm (last visited September 9, 2005).

helped devise the strategy to have Dr. Sternberg "investigated and discredited."[42]

NCSE executive director Eugenie Scott later indicated to the *Washington Post* that

Sternberg was lucky he was not fired outright: "If this was a corporation, and an

employee did something that really embarrassed the administration... how long do

you think that person would be employed?"[43]  Dr. Sternberg was singled out

because he permitted an open discussion of a dissenting scientific viewpoint,

despite the fact that he is neither a proponent of intelligent design nor a

creationist.[44]

    Another target of intimidation is Guillermo Gonzalez, an astronomer at Iowa

State University (ISU). In a recent book, Dr. Gonzalez postulated that the laws of

the universe were intelligently designed to permit the existence of advanced forms

of life.[45]  Some of Dr. Gonzalez's astronomical work fundamental to his design

hypotheses appeared on the cover of *Scientific American*.[46]  In retaliation against

---

[42] *Id.*

[43] Michael Powell, "Editor Explains Reasons for 'Intelligent Design' Article," *Washington Post*, August 19, 2005, A19, washingtonpost.com/wp-dyn/content/article/2005/08/18/AR2005081801680_3.html (last visited September 15, 2005).

[44] *See* Michael Powell, "Editor Explains Reasons for 'Intelligent Design' Article," *Washington Post*, August 19, 2005, A19, washingtonpost.com/wp-dyn/content/article/2005/08/18/AR2005081801680.html (last visited September 15, 2005).

[45] Guillermo Gonzalez and Jay W. Richards, *The Privileged Planet: How Our Place in the Cosmos is Designed for Discovery* (Regnery Publishing, 2004).

[46] Guillermo Gonzalez, Donald Brownlee, Peter D. Ward, "Refuges for Life in a Hostile Universe," *Scientific American*, October, 2001.

Dr. Gonzalez's application of design to astronomy, his opponents at ISU circulated a petition signed by over 120 faculty members "denouncing 'intelligent design...'"[47] The leader of the intimidation campaign—also faculty adviser for the ISU Atheist and Agnostic Society[48]—accused Gonzalez of having a hidden religious agenda. Others similarly "charged him with forcing his scientific evidence into a religious prism, fingering him as an academic fraud."[49] Thus the thesis of "religious and cultural agenda"—the *Trojan Horse* stereotype—has spurred efforts to impede scientific research. Like Sternberg, Gonzalez's attempts to focus on science have been futile: "I don't bring God into science. I've looked out at nature and discovered this pattern, based on empirical evidence."[50] After initiating the campaign of harassment, Gonzalez's chief accuser castigated Gonzalez for declining to appear at a "forum" sponsored by critics determined to denounce intelligent design.[51]  Since he is coming up for tenure in the near future,

---

[47] Jamie Schuman, "120 Professors at Iowa State U. Sign Statement Criticizing Intelligent-Design Theory," *Chronicle of Higher Education*, August 26, 2005, chronicle.com/temp/email.php?id=7d6oum55u2gs4xgz0zoqckkx4ulkgoy6 (last visited September 9, 2005).
[48] *Id.*
[49] Reid Forgrave, "Life: A universal debate," *Des Moines Register*, August 31, 2005, dmregister.com/apps/pbcs.dll/article?AID=/20050831/LIFE/%20508310325/1001/LIFE (last visited September 12, 2005).
[50] *Id.*
[51] Lisa Livermore, "'Intelligent design' faces ISU opposition," *Des Moines Register*, August 26, 2005,

Gonzalez is especially vulnerable to this effort to create a hostile work environment.

Other faculty have experienced similar retribution for their pro-design views. Dr. Caroline Crocker was a biology professor at George Mason University until she mentioned intelligent design in a class and was then banned from teaching both intelligent design *and* evolution.[52] Subsequently, her contract was not renewed. Leading design theorist Dr. William Dembski was banned from teaching at Baylor University and forced into a "five-year sabbatical."[53] This followed after Barbara Forrest wrote letters to dissuade scholars from associating with Dembski's Polanyi Center at Baylor because it was "the most recent offspring of the creationist movement."[54] Finally, Dr. Nancy Bryson was removed as head of the Division of Science and Mathematics at Mississippi University for Women, without explanation, the day after she taught an honors forum entitled "Critical Thinking on Evolution."[55] Such incidents have a chilling effect on the freedom of

---

desmoinesregister.com/apps/pbcs.dll/article?AID=/20050826/NEWS02/508260394/1001 (last visited September 9, 2005).
[52] Geoff Brumfiel "Cast out from class," *Nature*, 434:1064, April 28, 2005.
[53] *Id.*
[54] *Barbara Forrest*, Letter to Simon Blackburn, designinference.com/documents/2005.05.ID_at_Baylor.htm (last visited September 9, 2005).
[55] Transcript of Proceedings before Kansas State Board of Education, ksde.org/outcomes/schearing05072005am.pdf (last visited September 15, 2005).

pro-design scientists to voice their scientific views.[56]

By pursuing tactics reminiscent of the McCarthy era, opponents of design have put the integrity of scientific research in jeopardy. These examples illustrate the need for this Court to reject the narrow definition of science proffered by plaintiffs, and to affirm the law's respect for the normal process of scientific debate to generate answers to scientific controversies.

---

[56] *Id.* This effort to deny academic freedom to intelligent design proponents is fostered by rhetoric from the leading critics of intelligent design. In *Creationism's Trojan Horse*, for example, Forrest and Gross express a "final hope [ ] that readers will consider seriously the question of what they ought to be doing about" the supposed threat from intelligent design. Barbara Forrest and Paul Gross, *Creationism's Trojan Horse* 315 (Oxford University Press, 2004).

## CONCLUSION

The plaintiffs have invited this Court to determine the status of intelligent

design as science. Because the definition of science and the boundaries of science

should be left to scientists to debate, this Court should reject the relief requested by

the plaintiffs, and affirm the freedom of scientists to pursue scientific evidence

wherever it may lead.

Respectfully submitted,

/s/ David K. DeWolf *
David K. DeWolf, Esquire**
Professor of Law
Gonzaga University School of Law
WA Attorney I.D. No. 10875
721 Cincinnati Street
Spokane, WA  99220
(509) 323-3767
Ddewolf@lawschool.gonzaga.edu
** Counsel of Record

**SHIELDS & HOPPE, LLP**

**By:**

L. Theodore Hoppe, Jr., Esquire
Attorney I.D. No. 62082
C. Scott Shields, Esquire
Attorney I.D. No. 62082
223 N Monroe Street
Media, PA  19063
(610) 892-7777
(610) 892-7525 (fax)
TedH@shieldsandhoppe.com

/s/ Michael Crocenzi

Michael Crocenzi, Esquire
Goldberg, Katzman
Attorney I.D. No. 66255
P.O. Box 1268
Harrisburg, PA 17018-1268
(717)234-4161
(717)234-6808 (fax)
MJC@goldbergkatzman.com

Date:  10/3/05

24

## CERTIFICATE OF COMPLIANCE

Counsel certifies that this brief complies with the type-volume limitation set forth in Local Rule 7.8 (b)(2) of the Local Rules for the United States District Court for the Middle District of Pennsylvania.  According to the word-processing system used to prepare it, this brief contains 4,691 words.

L. Theodore Hoppe, Jr., Esquire

APPENDIX A –    COMPLETE LIST OF AMICI CURAE

Richard M Anderson
Assistant Professor of Environmental Science and Policy
Duke University

Phillip A. Bishop
Professor of Kinesiology
University of Alabama

John A. Bloom
Professor of Physics
Biola University

William H. Bordeaux
Professor of Chemistry
Huntington University

Gregory J. Brewer
Professor of Neurology, Medical Microbiology, Immunology and Cell Biology
Southern Illinois University School of Medicine

Rudolf Brits
Ph.D. Nuclear Chemistry
University of Stellenbosch, South Africa

Mary A. Brown
DVD (Veterinary Medicine)
The Ohio State University

John B. Cannon
Ph.D. Chemistry
Princeton University

Russell W. Carlson
Professor of Biochemistry and Molecular Biology
Executive Technical Director, Plant and Microbial Carbohydrates
Complex Carbohydrate Research Center
University of Georgia

26

Jarrod W. Carter
Ph.D. Bioengineering
University of Washington

Mark A. Chambers
Ph.D. Virology
University of Cambridge

I. Caroline Crocker
Ph.D. Immunopharmacology
University of Southampton

Lisanne D'Andrea-Winslow
Associate Professor of Biology
Northwestern College

Paul S. Darby
M.D., Georgetown University School of Medicine
Ph.D., Organic Chemistry, University of Georgia

Lawrence DeMejo
Ph.D. Polymer Science and Engineering
University of Massachusetts at Amherst

David A. DeWitt
Ph.D. Neuroscience
Case Western University

Michael R. Egnor
Professor and Vice-Chairman
Department of Neurological Surgery
State University of New York at Stony Brook

Bruce D. Evans
Chair, Department of Biology
Huntington University

Kenneth A. Feucht
Ph.D. Anatomy
University of Illinois in Chicago

27

Clarence Fouche
Professor of Biology
Virginia Intermont College

Mark E. Fuller
Ph.D. Microbiology
University of California, Davis

Charles M. Garner
Professor of Chemistry
Baylor University

Theodore W. Geier
Ph.D. Forrest Hydrology
University of Minnesota

Dominic M. Halsmer
Ph.D. Mechanical Engineering
UCLA

Jeffrey H. Harwell
Conoco/DuPont Professor of Chemical Engineering
The University of Oklahoma

Christian Heiss
Post-Doctoral Associate
Complex Carbohydrate Research Center
University of Georgia

Dewey H. Hodges
Professor of Aerospace Engineering
Georgia Institute of Technology

Curtis Hrischuk
Ph.D. Computer and Systems Engineering
Carleton University, Ottawa, Ontario, Canada

Tony Jelsma
Associate Professor of Biology
Dordt College

Lyle H. Jensen
Professor (Emeritus), Department of Biological Structures and Department of
Biochemistry, University of Washington
Fellow, American Association for the Advancement of Science

Jerry D. Johnson
Ph.D. Pharmacology & Toxicology
Purdue University

David H. Jones
Professor of Biochemistry & Chair of Department of Chemistry
Grove City College

Michael J. Kelleher
Ph.D. Biophysical Chemistry
University of Ibadan

Dean H. Kenyon
Emeritus Professor of Biology
San Francisco State University

Carl Koval
Full Professor, Chemistry & Biochemistry
University of Colorado, Boulder

Ronald Larson
George Granger Brown Professor of Chemical Engineering
Chair, Department of Chemical Engineering
University of Michigan

Joseph M. Lary
Epidemiologist and Research Biologist (retired)
Centers for Disease Control and Prevention

M. Harold Laughlin
Professor & Chair, Department of Biomedical Sciences
University of Missouri

Garrick Little
Ph.D. Organic Chemistry
Texas A & M University

Christian M. Loch
Ph.D. Biochemistry & Molecular Genetics
University of Virginia

Gary Maki
Director, Center for Advanced Microelectronics and Biomolecular Research
University of Idaho.

Wusi Maki
Research Assistant Professor
Department of Microbiology, Molecular Biology, and Biochemistry University of
Idaho

Graham Dean Marshall
Ph.D. Analytical Chemistry
University of Pratoria, South Africa

L. Whit Marks
Emeritus Professor of Physics
University of Central Oklahoma

Thomas H. Marshall
Adjunct Professor, Food, Agricultural and Biological Engineering
The Ohio State University

David A. McClellan
Assistant Professor of Family & Community Medicine
Texas A&M University Health Science Center

Charles H. McGowen
Assistant Professor of Medicine
Northeastern Ohio Universities College of Medicine

David B. Medved
Ph.D. in Physics
University of Pennsylvania

Stephen Meyer
Ph.D. Philosophy of Science
Cambridge University

Ruth C. Miles
Dean of the School of Arts and Sciences
Professor of Chemistry
Malone College

Dr. John Millam.
Ph.D. Theoretical Chemistry
Rice University

Forrest M. Mims
Atmospheric Researcher
Geronimo Creek Observatory

Paul J. Missel
Ph.D. Physics
Massachusetts Institute of Technology

K. David Monson
Ph.D. Analytical Chemistry
Indiana University

Dr. Ed Neeland
Assoc. Prof. of Chemistry
Barber School of Arts and Sciences
University of British Columbia

Benjamin K. Nelson
Research Toxicologist (Retired), National Institute for Occupational Safety and
Health Centers for Disease Control and Prevention

Bijan Nemati
Ph.D. High Energy Physics
University of Washington

Arthur J. Nitz
Ph.D. Anatomy and Neurobiology, University of Kentucky
Full Professor of Physical Therapy
University of Kentucky

Scott H. Northrup
Professor of Chemistry
Tennessee Tech University

Wesley L. Nyborg
Professor of Physics (emeritus)
University of Vermont

Rafe Payne
Professor of Biology
Department of Biological Sciences
Biola University

Todd Peterson
Ph.D. Plant Physiology
University of Rhode Island

Fazale Rana
Ph.D. Chemistry
Ohio University

John Rickert
Ph.D. Mathematics
Vanderbilt University

Mark A. Robinson
Ph.D. Environmental Science
Lacrosse University

Prof. Paul Roschke
A.P. and Florence Wiley I. Professor
Department of Civil Engineering
Texas A&M University

David W. Rusch
Senior Research Scientist
Laboratory for Atmospheric and Space Physics
University of Colorado

Lennart Saari
Adjunct Professor, Wildlife Biology
University of Helsinki

Fernando D. Saravi
M.D., Ph.D. Medical Sciences School, National University of Cuyo
Professor & Director of the Course of Physiology & Biophysics Department of
Morphology & Physiology, Medical Sciences School, National University of
Cuyo, Mendoza, Argentina

Ralph W. Seelke
Professor of Molecular & Cell Biology
University of Wisconsin-Superior

Granville Sewell
Professor of Mathematics
University of Texas, El Paso

Theodore J. Siek
Ph. D. Biochemistry
Oregon State University

Arlen W. Siert
Ph.D. Environmental Health
Colorado State University

Philip Skell
Emeritus, Evan Pugh Professor of Chemistry
Pennsylvania State University
Member, National Academy of Sciences

Frederick N. Skiff
Professor, Department of Physics and Astronomy
University of Iowa

Timothy G. Standish
Ph.D. Environmental Biology
George Mason University

Dr. Joseph A. Strada
PhD, Aeronautic Engineering
Naval Postgraduate School

James G. Tarrant
Ph.D., Organic Chemistry
University of Texas at Austin

Mark Toleman
Ph.D. Molecular Microbiology
Bristol University, UK

Jairam Vanamala
Postdoctoral Research Associate
Department of Nutrition and Food Science
Texas A&M University

W. Todd Watson
Assistant Professor of Urban and Community Forestry
Department of Forest Science
Texas A&M University

Jonathan Wells
Ph.D. Molecular & Cell Biology
University of California (Berkeley)

Christopher P. Williams
Ph.D. Biochemistry
The Ohio State University

John W. Worraker
Ph.D. Applied Mathematics
University of Bristol

Henry Zuill
Emeritus Professor of Biology
Union College

**IN THE UNITED STATES DISTRICT COURT MIDDLE DISTRICT OF PENNSYLVANIA**

---

No. 4:04-CV-2688

---

Tammy J. Kitzmiller *et al.*
Plaintiffs
v.

Dover Area School District and Dover Area School District Board of Directors
Defendants

---

**CERTIFICATE OF SERVICE**

---

I hereby certify that a true and correct copy of the foregoing Brief Of Amici Curiae Biologists And Other Scientists In Support Of Defendants was served upon the following in the manner indicated:

**Notices to be served electronically to the following persons:**

Terence J. Barna
Niles S. Benn
Leonard G. Brown
Christian J. Dabb
John B. Dempsey
Patrick T. Gillen
Stacey I. Gregory
Stephen G. Harvey
Richard B. Katskee
Ayesha Khan
Paula Kay Knudsen
Alex J. Luchenitser
Robert J. Muise
Mary Catherine Roper
Eric J. Rothschild
Thomas B. Schmidt, III

36

Stephen A. Serfass
Gayle C. Sproul
Ronald A. Turo
Witold J. Walczak
Randall L. Wenger

**Served by United States First Class Mail, postage prepaid:**

Benjamin W. Bull
Alliance Defense Fund
15333 N. Pima Road
Suite 165
Scottsdale, AZ 85260

Joseph M. Farber
Pepper Hamilton LLP
3000 Two Logan
18th & Arch Streets
Philadelphia, PA 19103

Lee Levine
1050 17th Street, N.W.
Suite 800
Washington, DC 20036

Christopher J. Lowe
3000 Two Logan Square
18th and Arch Streets
Philadelphia, PA 19103

Benjamin M. Mather
Pepper Hamilton LLP
3000 Two Logan Square
18th & Arch Streets
Philadelphia, PA 19103

Gary S. McCaleb
Alliance Defense Fund
15333 N. Pima Road1
Suite 165

Scottsdale, AZ 85260


Elizabeth A. Murray
Alliance Defense Fund
15333 N. Pima Road
Suite 165
Scottsdale, AZ 85260

Hiram Sasser
903 E. 18th St.
Suite 230
Plano, TX 75074

Kelly Shakelford
903 East 18th St.
Suite 230
Plano, TX 75074

Richard Thompson
24 Frank Lloyd Wright Drive
P.O. Box 393
Ann Arbor, MI 48106

Edward L. White , III
24 Frank Lloyd Wright Drive
PO Box 393
Ann Arbor, MI 48106

L. Theodore Hoppe, Jr., Esquire

Date: 10/3/05

38