# EXHIBIT 7

| Deposition | Plaintiffs' Designation | Defendants' Corresponding Counter Designation | Reason that Defendants' Counter Designation Must be Considered According to Fed.R.Civ.P 32(a)(4) |
|---|---|---|---|
| Sheila Harkins, April 12, 2005 | 28:23-29:4, 30:4-25 | 37:11-38:9 | Defendants' designation treats the topic of Harkins' understanding of intelligent design, and is responsive to Plaintiffs' designations regarding whether Harkins discussed her understanding with other board members and whether she or the board received materials on intelligent design from the administration |
| | 28:23-29:4, 30:4-25 | 39:7-24 | Defendants' designation addresses the board's discussion and acceptance of the *Pandas* donation and Harkins' review of the book, and is responsive to Plaintiffs' designations regarding whether Harkins discussed her understanding with other board members and whether she or the board received materials on intelligent design from the administration |
| | 53:21-54:5 | 55:9-18 | Defendants' designation is part of the same line of questioning as Plaintiffs' regarding student questions about intelligent design in the classroom |

# In The Matter Of:

## *Tammy Kitzmiller, et al.   v.*
## *Dover Area School District, et al.*

### Sheila Harkins
### April 12, 2005

*Filius & McLucas Reporting Service, Inc.*
1427 East Market Street, York, PA
4309 Linglestown Road, Harrisburg, PA

(717) 845-6418   or   (717) 236-0623

Original File SH041205.TXT, 61 Pages
Min-U-Script® File ID: 2756733703

**Word Index included with this Min-U-Script®**

Tammy Kitzmiller, et al. v.
Dover Area School District, et al.

Case 4:04-cv-02688-JEJ   Document 253-9   Filed 10/11/05   Page 4 of 7

Sheila Harkins
April 12, 2005

Page 25

[1] too far.
[2]  A: Pat didn't kick me yet.
[3]  MR. GILLEN: That would be improper, and therefore
[4] I will not be kicking you.
[5]            BY MR. LOWE:
[6]  Q: Did you at any time discuss with either the
[7] administrators or other members of the Board the
[8] concerns that Ms. Spahr had shared with you in the
[9] second meeting?
[10]  A: Excuse me?
[11]  Q: Did you at any time either prior to or after the June
[12] Board meeting discuss with any of the members of the
[13] School Board or with any members of the administration
[14] the concerns that Ms. Spahr had shared with you during
[15] the meetings you had with the staff?
[16]  A: No. I believe at the June meeting is when Bert Spahr
[17] herself made the statement that she did not support the
[18] Intelligent Design phrase. That was the first time I
[19] became aware that she was opposed to the Intelligent
[20] Design statement in the resolution. Is that clear?
[21]  Q: I believe so. It is a little bit inconsistent. Earlier
[22] you had said that she had stated some concerns with it?
[23]  A: Right.
[24]  Q: Is the difference at this meeting that she made her
[25] concerns much stronger; you understood at this point

Page 26

[1] that they were strong concerns and not just mild
[2] questions, moderate questions?
[3]  A: Yes, that's correct.
[4]  Q: Did you investigate her concerns after the June meeting?
[5]  A: No. I can't say I did.
[6]  Q: Are you aware of whether other members of the School
[7] Board took the time to investigate Ms. Spahr's concerns
[8] with respect to including Intelligent Design?
[9]  A: No, I'm not.
[10]  Q: Did you as a Board discuss Ms. Spahr's concerns with
[11] respect to Intelligent Design?
[12]  A: No, we didn't.
[13]  Q: Are you aware of whether any of the Board members
[14] discussed either with each other or with the
[15] administration Mrs. Spahr's concerns?
[16]  A: No, I'm not.
[17]  Q: Are you aware of whether or not any of the School Board
[18] members further investigated Ms. Spahr's concerns?
[19]  A: I don't know, no.
[20]  Q: Did you personally discuss Ms. Spahr's concerns after
[21] this June meeting with anyone?
[22]  A: I believe I discussed it with our school counsel.
[23]  Q: So that you understand when I am asking you questions
[24] about discussions that you have had about anything
[25] today, I am not referring to discussions that you had

Page 27

[1] with attorneys that represent you in any way. That
[2] would be privileged. If I start to go down that road, I
[3] can promise you Pat will be very quick to let me know
[4] and to let you know. Those are off the record. I don't
[5] have a right to those conversations.
[6]  A: Okay.
[7]  Q: You can, of course, tell me if you want, but that is not
[8] why I am here. And I am not curious about those.
[9]     Other than I may ask questions about who was in
[10] attendance, but I don't want information about either
[11] conversations you had with your attorneys or
[12] conversations you had with other defendants in this case
[13] about what your attorneys said to you or what they
[14] discussed with you. Okay?
[15]  A: Okay. Yes.
[16]  Q: At this point, you have expressed that you did some
[17] Internet research, that you don't recall specifically
[18] what it was you looked at. Other than that, at any time
[19] did you conduct any more research with respect to
[20] Intelligent Design?
[21]  A: Not that I recall.
[22]  Q: At any time, did any member of the School Board or the
[23] administration or of the general public come to educate
[24] you as to Intelligent Design?
[25]  A: I believe there were several people who talked at the

Page 28

[1] School Board meetings.
[2]  Q: Aside from people that perhaps got up during public
[3] discussion at the School Board meetings, did the Board
[4] ever bring anyone in to discuss with you guys what
[5] Intelligent Design was, or did the School Board itself
[6] as a group ever get together to discuss Intelligent
[7] Design?
[8]  A: No, not that I recall.
[9]  Q: Is it your understanding that the research that was done
[10] by the School Board members with respect to Intelligent
[11] Design was done on an independent nature?
[12]  A: Yes, that is correct.
[13]  Q: Is it also your understanding — and, again, I am just
[14] asking for your understanding — that what the
[15] administration then did as well with respect to
[16] Intelligent Design was done on their own independently?
[17]  A: That's my understanding. Pat is writing an awful lot of
[18] notes.
[19]  MR. GILLEN: It's a habit.
[20]  MR. LOWE: And he is going to get everything in
[21] print at the end of this.
[22]            BY MR. LOWE:
[23]  Q: At any time, were you presented with materials with
[24] respect to Intelligent Design by members of the Board?
[25]  A: Not that I recall.

Sheila Harkins
April 12, 2005

Tammy Kitzmiller, et al.
Dover Area School District, et al.

Case 4:04-cv-02688-JEJ   Document 253-9   Filed 10/11/05   Page 5 of 7

Page 29

[1] **Q:** Were you presented with any materials from members of
[2] the administration?
[3] **A:** I may have been, but I don't recall any. And if I would
[4] have been, they would have given it to you.
[5] **Q:** Sure.
[6] **A:** I think they gave you copies of what was included in our
[7] Board packets, but I don't keep this stuff so I don't
[8] know that.
[9] **Q:** I understand that. One reason we go down this avenue of
[10] questions is because we realize that both with the
[11] defendants, as well as with the plaintiffs, sometimes
[12] these questions can just spark memories the way we ask
[13] or, just something that has occurred can help you recall
[14] something that you didn't remember before. That is why
[15] I am going through this.
[16]    I am confident we have received everything you
[17] guys have turned over. I am also confident at the time
[18] you turned it over, you turned over everything you
[19] remembered that was relevant to this case. I just might
[20] be exploring a few avenues just to make sure that since
[21] that time, you don't recall anything.
[22] **A:** Okay.
[23] **MR. LOWE:** Pat, we don't have that much more.
[24] **MR. GILLEN:** That's fine. Off the record.
[25] (An off-the-record discussion was had.)

Page 30

[1] (A recess was taken.)
[2]                     **AFTER RECESS**
[3]                     **BY MR. LOWE:**
[4] **Q:** Did you ever participate in discussions with members of
[5] the School Board in which you described your
[6] understanding of Intelligent Design?
[7] **A:** No.
[8] **Q:** And did you ever participate in discussions with members
[9] of the School Board in which they shared with you their
[10] understanding of Intelligent Design?
[11] **A:** No.
[12] **Q:** To your knowledge, did any of the members of the Board,
[13] yourself included, make any phone calls to any
[14] scientific organizations with respect to Intelligent
[15] Design?
[16] **A:** Could you read the question again?
[17] **Q:** Sure. Maybe I will be more specific. To the best of
[18] your knowledge, did either you or any of the members of
[19] the School Board make any phone calls or discuss
[20] Intelligent Design with any scientific organizations?
[21]    And I will give you a couple of different
[22] scientific organizations such as the American
[23] Association for the Advancement of Science or the
[24] American Federation of Biology Teachers.
[25] **A:** Not that I'm aware of.

Page 31

[1] **Q:** Are you aware of any member of the administration
[2] reaching out to any of these scientific organizations
[3] for information on Intelligent Design?
[4] **A:** Not that I'm aware of.
[5] **Q:** Is it your understanding that Intelligent Design is in
[6] fact sound science or good science?
[7] **A:** Yes.
[8] **Q:** Is it your understanding that Intelligent Design is a
[9] scientific theory?
[10] **A:** Yes.
[11] **Q:** How did you come to this understanding that Intelligent
[12] Design was sound science?
[13] **A:** I read different things, saw different things, and it
[14] sounded like sound science to me.
[15] **Q:** When you are referring to things that you read and saw,
[16] you are referring specifically to what you had seen on
[17] websites?
[18] **A:** Yes.
[19] **Q:** At this time, do you recall anything else?
[20] **A:** No, they were written by — some of them by credible
[21] biologists, people that sounded like they were credible
[22] biologists.
[23] **Q:** You have touched on my next question. How is it that
[24] you determined that these people were, first of all,
[25] biologists?

Page 32

[1] **A:** Because the website said they were biologists. Whether
[2] they were or not, I don't know that. It is just what
[3] they claimed to be, and they had background information
[4] on themselves.
[5] **Q:** Did you go beyond the website to research whether any of
[6] these individuals were biologists?
[7] **A:** Ie?
[8] **Q:** You are on a website put together by Mr. Gillen, and he
[9] explains his background. Did you go beyond that website
[10] to see whether or not what he said about himself was in
[11] fact accurate or true?
[12] **A:** I had on — I don't remember the names, but one or two I
[13] just put in their names.
[14] **Q:** When you say put in their names, you mean —
[15] **A:** Google.
[16] **Q:** Do you recall what you got back when you Googled their
[17] names?
[18] **A:** No, I don't exactly. No.
[19] **Q:** Google is wonderful; isn't it? Did you go further than
[20] just Googling their names?
[21] **A:** I might have hit one or two of them. In Google, you
[22] read what it says, and I may have hit one or two.
[23] **Q:** Do you recall any of these names?
[24] **A:** I'm sorry.
[25] **Q:** That's okay. Do you recall what any of these second

Sheila Harkins
April 12, 2005

Tammy Kitzmiller, et al. v.
Dover Area School District, et al.

Case 4:04-cv-02688-JEJ   Document 253-9   Filed 10/11/05   Page 6 of 7

Page 37

[1] believe that something outside of what we can perceive
[2] needs to take an action according to Intelligent Design?
[3]   A: Something?
[4]   Q: Something, someone.
[5]   A: Excuse me?
[6]   MR. GILLEN: Objection to the form. Can we go off
[7] the record?
[8]   MR. LOWE: Sure.
[9]   (An off-the-record discussion was had.)
[10]              BY MR. LOWE:
[11]   Q: Is it your understanding that Intelligent Design
[12] requires an acceptance of the fact that there is some
[13] intelligent designer?
[14]   A: I would say an acceptance that there is — that it is
[15] designed by intelligence.
[16]   Q: Do you have any understanding of what this intelligence
[17] is?
[18]   A: No, I don't.
[19]   Q: Do you think one needs an understanding of what this
[20] intelligence is in your opinion?
[21]   A: Does one need? It is up to whether one does need.
[22]   Q: To understand Intelligent Design, would one need an
[23] understanding of what this designer is?
[24]   A: Only if one desired to know.
[25]   Q: Would it be okay in your opinion for what the

Page 38

[1] intelligent designer was to be explored in the public
[2] school setting?
[3]   A: Would it be okay?
[4]   Q: Yes, in your opinion.
[5]   A: I never crossed — I never thought of that.
[6]   Q: In your opinion, would it be okay to discuss in the
[7] public school setting what this intelligent designer
[8] was?
[9]   A: That was never considered.
[10]   MR. GILLEN: Object to the form.
[11]   MR. LOWE: Could you explain?
[12]   MR. GILLEN: Sure. I mean you are assuming she
[13] had an opinion.
[14]   A: I don't have an opinion.
[15]              BY MR. LOWE:
[16]   Q: So you have no opinion as to whether or not the teaching
[17] of what an intelligent designer is would be appropriate
[18] in the public schools?
[19]   A: There was never any thought given or consideration.
[20]   Q: That is okay. I am asking if you were to give
[21] consideration to it at this moment. And it is fine to
[22] say what you have already said.
[23]   A: I don't have one.
[24]   Q: I am going to take a couple of minutes, and I am going
[25] to actually step back from that topic this time, and I

Page 39

[1] am going to spend just a couple of seconds to talk about
[2] the donation of books in your School District.
[3]   A: Okay. Do you want me to look at this anymore?
[4]   Q: Not at this time. I doubt we will get back to this.
[5] And by this, she is referring to her own deposition, her
[6] previous deposition testimony.
[7]   Who is it that made the decision to accept the
[8] donation of Pandas and People?
[9]   A: I believe the administration.
[10]   Q: Did the School Board or any committee of the School
[11] Board review the books before they were accepted?
[12]   A: There had been discussion of the book Of Pandas prior.
[13]   Q: Do you recall who was involved with these discussions?
[14]   A: It was at the Board meeting.
[15]   Q: Did you personally review these books before the
[16] donation was accepted?
[17]   A: Yes.
[18]   Q: Do you recall if any other members of the Board reviewed
[19] the books prior them being accepted?
[20]   A: I don't know that.
[21]   Q: Is it my understanding that recently, you accepted the
[22] donations of a number of other textbooks that were
[23] donated by a group called Debunk Creation?
[24]   A: A lot of those weren't textbooks.
[25]   Q: Let me rephrase my question. Are you aware of some

Page 40

[1] books being donated by a group called Debunk Creation?
[2]   A: Yes.
[3]   Q: Was that donation handled in a different manner than the
[4] donation of the book Of Pandas and People?
[5]   A: Oh, yes.
[6]   Q: In what ways was it handled differently?
[7]   A: They just showed up at the door.
[8]   Q: When you say they just showed up at the door, could you
[9] elaborate?
[10]   A: I think Dr. Nilsen got an e-mail from Debunk Creation
[11] saying they had a UPS slip that we got the books, if we
[12] accepted them or something like that. And he didn't
[13] even know where the books were. That is incorrect
[14] English. It hurt my ears when I said it.
[15]   Q: It's okay. Do you know who received those books?
[16]   A: They had a slip saying with some secretary's name. Then
[17] they were hunted down. Is that what you are asking?
[18]   Q: Yes. I just wanted to know if you had personal
[19] knowledge whether they were sent to the School Board. I
[20] am trying to pursue who it was sent to.
[21]   A: I don't know who they were addressed to, but I just know
[22] one of the secretaries in the building signed the UPS
[23] slip.
[24]   Q: That's good enough. Other than the fact that they
[25] showed up unannounced, was there any other way in which

Sheila Harkins
April 12, 2005

Case 4:04-cv-02688-JEJ   Document 253-9   Filed 10/11/05   Page 7 of 7

Tammy Kitzmiller, et al. v.
Dover Area School District, et al.

Page 53

[1] **Q:** So it was more of a grammatical or stylistic change than
[2] it was a substantive change?
[3] **A:** Yes.
[4] **Q:** Do you recall anyone else making changes to the
[5] newsletter prior to its publication?
[6] **A:** I don't know that.
[7] **Q:** Okay. We are on to my last section. It is my
[8] understanding of the Intelligent Design or rather of the
[9] curriculum policy or the curriculum update that when
[10] Intelligent Design is presented in class, students are
[11] not allowed to ask questions about Intelligent Design;
[12] is that correct?
[13] **MR. GILLEN:** Objection to the form.
[14] **MR. LOWE:** Could you explain?
[15] **MR. GILLEN:** Yeah. Did you say students aren't
[16] allowed to ask or teachers aren't allowed to answer?
[17] **MR. LOWE:** I started students aren't allowed to
[18] ask. I am trying to get an understanding.
[19] **A:** That is really not something the Board deals with.
[20] BY MR. LOWE:
[21] **Q:** Is it your understanding that students — let me go to
[22] the teacher's end of it. That might be easier for you.
[23] It is my understanding that teachers aren't
[24] allowed to respond to any questions concerning
[25] Intelligent Design that may be brought up?

Page 54

[1] **A:** That is my understanding.
[2] **Q:** Are you aware of any other subject that is covered in
[3] the Dover area curriculum in which students or rather in
[4] which teachers aren't allowed to answer questions?
[5] **A:** No, I'm not.
[6] **Q:** Can you explain why it is that Intelligent Design is
[7] treated differently than any other subject that is
[8] introduced in school?
[9] **MR. GILLEN:** Objection to the characterization of
[10] the evidence.
[11] **MR. LOWE:** Can you explain?
[12] **MR. GILLEN:** Just she said she doesn't — she is
[13] not aware of anything else. I am not sure there are any
[14] other subject matters that teachers can't address, and
[15] therefore —
[16] **MR. LOWE:** Fair enough.
[17] BY MR. LOWE:
[18] **Q:** Could you explain why it is — according to your
[19] understanding, there's no other subjects in which the
[20] teachers aren't allowed to address questions.
[21] With this in mind, could you explain why
[22] Intelligent Design is treated differently?
[23] **A:** I think it was an administrative decision, possibly
[24] because of the lawsuit. I don't know. I only would be
[25] guessing then.

Page 55

[1] **Q:** I don't want you to guess. Is it your belief, your
[2] opinion that Intelligent Design should be allowed to be
[3] more fully explored in the science classroom?
[4] **MR. GILLEN:** Objection to the form.
[5] **MR. LOWE:** Could you explain?
[6] **MR. GILLEN:** You are assuming she has a belief or
[7] opinion on that issue.
[8] BY MR. LOWE:
[9] **Q:** Do you have an opinion as to whether Intelligent Design
[10] should be allowed to be fully explored in the science
[11] classroom?
[12] **A:** We never got that far because the teachers made us aware
[13] they weren't educated in the area and preferred not to
[14] teach it. So that's where it stopped.
[15] **Q:** Would you personally have a problem if Intelligent
[16] Design were fully explored in the science classroom —
[17] more fully explored?
[18] **A:** I never gave it consideration.
[19] **Q:** If I were to ask you to give it consideration now, would
[20] you have an opinion either way?
[21] **MR. GILLEN:** Objection. Calls for speculation.
[22] BY MR. LOWE:
[23] **Q:** I am asking for your opinion.
[24] **A:** We are a standards driven district. It would have to be
[25] explored more fully how it would relate to the standards

Page 56

[1] before I could form an opinion I think.
[2] **Q:** That's fine. In your opinion, is not allowing questions
[3] with respect to a topic that is brought up or introduced
[4] in schools, is that consistent with your general
[5] understanding of good educational practice?
[6] **MR. GILLEN:** Objection to the form.
[7] **MR. LOWE:** Could you explain?
[8] **MR. GILLEN:** Sure. I think you are assuming she
[9] has got an understanding of good educational practice
[10] and how certain questions and certain subject matters
[11] should be dealt with according to standard educational
[12] practice.
[13] **MR. LOWE:** Fair enough. Are you instructing her
[14] not to answer?
[15] **MR. GILLEN:** No. I am saying — read back the
[16] question, please. May I ask you to read back the
[17] question?
[18] (The question, "In your opinion, is not allowing
[19] questions with respect to a topic that is brought up or
[20] introduced in schools, is that consistent with your
[21] general understanding of good educational practice," was
[22] read by the reporter.)
[23] BY MR. LOWE:
[24] **Q:** Again, I believe I was clear in both instances that's
[25] your opinion in each instance.