EXHIBIT 10

| Deposition | Plaintiffs' Designation | Defendants' Corresponding Counter Designation | Reason that Defendants' Counter Designation Must be Considered According to Fed.R.Civ.P 32(a)(4) |
|---|---|---|---|
| Richard Nilsen, April 14, 2005 | 8:10-18 | 12:6-13:8 | Defendants' designation follows Plaintiffs and is part of the same line of questioning about textbook selection and research into parochial school biology textbooks |
| | 8:10-18 | 13:15-24 | Defendants' designation follows Plaintiffs in the same line of questioning and is about the exact same topic of research into parochial school biology textbooks |
| | 8:10-18 | 15:10-19:2 | Defendants' designation is part of the same line of questioning about textbook selection that Plaintiffs partially designated |
| | 49:6-17, 53:16-54:4 | 50:15-53:15 | Defendants' designation is in between designations made by Plaintiffs and addresses the same issues, including the biology curriculum and how much time is devoted to teaching evolution, and debate about the origins of life |
| | 58:24-59:6 | 63:2-64:3 | Defendants' designation follows Plaintiffs' and is part of the same discussion the same document, a memo from Dr. Peterman |
| | 58:24-59:6 | 95:3-96:15 | Defendants' designation is separated in space from Plaintiffs' due to the fact that counsel for Defendants' had to wait to ask his questions about the topic until Plaintiffs' counsel was finished—the subject matter is the same (Dr. Peterman's memo) |

# In The Matter Of:

*Tammy Kitzmiller, et al.   v.*
*Dover Area School District, et al.*

---

*Richard Nilsen*
*April 14, 2005*

---

*Filius & McLucas Reporting Service, Inc.*
*1427 East Market Street, York, PA*
*4309 Linglestown Road, Harrisburg, PA*

*(717) 845-6418   or   (717) 236-0623*

*Original File RN041405.TXT, 98 Pages*
*Min-U-Script® File ID: 0878714387*

**Word Index included with this Min-U-Script®**

Tammy Kitzmiller, et al. v.
Dover Area School District, et al.
Case 4:04-cv-02688-JEJ   Document 253-12   Filed 10/11/05   Page 4 of 13
April 14, 2005

Page 7

[1] in the dealings between defendants and their attorneys?
[2]  A: I am not sure what your definition of principal is.
[3]  Q: Okay. Are you authorized to speak for the defendants
[4] when you speak with Mr. Gillen and the attorneys that he
[5] works with in matters involving how the litigation is
[6] being conducted?
[7]  MR. GILLEN: Object to form.
[8]  A: Only in the capacity of being specifically directed by
[9] the majority of the Board.
[10]      BY MR. SCHMIDT:
[11]  Q: I was asking the question awkwardly. I apologize. It
[12] wasn't meant to be a trick question.
[13]    You are the Superintendent of the Dover Area
[14] School District?
[15]  A: That is correct.
[16]  Q: You are its chief executive?
[17]  A: That's correct.
[18]  Q: You report directly to the Board?
[19]  A: That is correct.
[20]  Q: Your powers and responsibilities are dictated in part by
[21] state statute; is that right?
[22]  A: That is correct.
[23]  Q: And some regulations I suspect?
[24]  A: Yes.
[25]  Q: And you also have an employment contract with the Board;

Page 8

[1] is that correct?
[2]  A: That is correct.
[3]  Q: In Mr. Baksa's deposition, which you have reviewed,
[4] there was some testimony about his work with one or both
[5] curriculum committees in 2004, work involving the
[6] selection of a new biology textbook for the ninth grade
[7] at the Dover Area High School.
[8]    Do you recall his testimony on that subject?
[9]  A: I recall parts of the testimony.
[10]  Q: Mr. Baksa testified that at some time after June, 2004,
[11] he made some inquiries about what biology textbooks were
[12] being used by parochial schools that operate near Dover;
[13] do you recall that testimony?
[14]  A: Yes.
[15]  Q: Do you recall telling Mr. Baksa that he should make
[16] those inquiries about what biology textbooks were being
[17] used by those parochial schools?
[18]  A: I do not recall that, no.
[19]  Q: Do you know anything about Mr. Baksa's making such an
[20] inquiry?
[21]  A: Yes.
[22]  Q: What do you know about it?
[23]  A: I know that he did make the inquiry based on the fact
[24] that he developed a memo that I believe is part of the
[25] submitted documents in reviewing, if recollection is

Page 9

[1] correct, three of the districts — or I am sorry —
[2] three of the schools and which biology books they were
[3] using.
[4]  Q: What was your role in 2004 in the work of the curriculum
[5] committee's to select or recommend, rather, new
[6] textbooks in the School District?
[7]  A: My role as Superintendent were to place the book that
[8] Mr. Baksa as Director of Curriculum Instruction — to
[9] place his recommendation on the Board agenda.
[10]  Q: It sounds like your role is passive. You simply take
[11] whatever Baksa gives you and put it on the agenda
[12] without making any judgments about whether it is an
[13] appropriate recommendation; am I right about that?
[14]  A: Passive to the extent of where Mr. Baksa in his capacity
[15] makes the recommendation. In this case and in most
[16] cases, his recommendation has been put on where I have
[17] not questioned his recommendation beyond the fact that
[18] did he follow procedure. And when he communicated to me
[19] he did, it was placed on the agenda.
[20]  Q: Mr. Baksa described some of the work that he did with
[21] the curriculum committees in the summer of 2004. I
[22] believe from his testimony that this inquiry to the
[23] parochial schools followed a June meeting of the School
[24] District Board when the biology textbook issue was
[25] discussed.

Page 10

[1]    Were you at that School Board meeting?
[2]  A: Yes.
[3]  Q: Do you recall the discussion about biology textbooks in
[4] the high school?
[5]  A: I remember the discussion, the specifics. I am not sure
[6] I remember all of them.
[7]  Q: What do you remember of the discussion?
[8]  A: I remember that Mr. Buckingham had some concerns about
[9] the textbook and was interested in looking at other
[10] options.
[11]  Q: What do you recall he said about his concerns about the
[12] textbook?
[13]  A: I believe he communicated his dissatisfaction with how
[14] the Darwinian Theory of Evolution was presented in the
[15] book.
[16]  Q: Was his dissatisfaction with how the Darwinian Theory
[17] was presented, or was his dissatisfaction with the
[18] absence of any other theory being presented?
[19]  A: My only recollection is how the Darwinian Theory was
[20] presented.
[21]  Q: What did he say about his dissatisfaction?
[22]  A: He documented — and again the documentation I believe
[23] you have — of areas of concern about how evolution was
[24] being presented in the book. Beyond that, I don't
[25] recollect what was specifically stated and/or written.

Richard Nilsen
April 14, 2005

Tammy Kitzmiller, et al. v.
Dover Area School District, et al.

Case 4:04-cv-02688-JEJ   Document 253-12   Filed 10/11/05   Page 5 of 13

Page 11

[1] Q: Did you make any notes yourself of the discussion of the
[2] biology textbook at that June Board meeting?
[3] A: No.
[4] Q: Do you have a practice of making notes during Board
[5] meetings?
[6] A: Yes.
[7] Q: What do you do with those notes?
[8] A: All the notes I take are actions the Board has requested
[9] me to do and/or any changes in future agenda items.
[10] Once those items have been completed, those notes are
[11] thrown out.
[12] Q: Did you make notes of the discussion of the biology
[13] textbook at the June meeting?
[14] A: No.
[15] Q: Did you have any conversation with Mr. Baksa after that
[16] meeting about the actions that should follow in
[17] connection with Mr. Buckingham's concerns or any other
[18] discussion that happened at that June meeting?
[19] A: Yes.
[20] Q: What was that discussion with Baksa?
[21] A: My discussion with Mr. Baksa was he had to decide what
[22] direction he was going to go with as it related to the
[23] textbook and when the textbook decision was to be made.
[24] Q: At that time, I mean at the time of your discussion with
[25] Mr. Baksa, what did you think the directions were that

Page 12

[1] he needed to consider?
[2] A: I think he needed to consider answering whatever
[3] concerns Mr. Buckingham and/or any other Board member
[4] had with the present recommended book Miller and Levin
[5] Biology.
[6] Q: I understand that. But what did you think his options
[7] were? You referred — and I am using the word options.
[8] You referred to he needed to decide what direction he
[9] was going to go in. That suggests to me that there
[10] were — there was more than one direction available to
[11] Baksa.
[12] What did you have in mind when you had that
[13] conversation with him?
[14] A: I don't recommend — my apologies. I don't recollect
[15] the full conversation, but obviously, there would be
[16] two. One would be to continue the conversation on the
[17] current book. Or two, look for other options that
[18] possibly anybody and everybody would be satisfied with.
[19] Q: Did you give him any suggestions for how to find out
[20] more about other options than simply persisting with the
[21] Miller and Levin book?
[22] A: Again, I don't remember any specific. It would not be
[23] out of character for me to tell him to call and make
[24] sure he has contacted every other district and everyone
[25] he knows of to see if there would have been another

Page 13

[1] textbook.
[2] Now do I remember that specific conversation? No.
[3] Would it be out of my character? Again, no.
[4] Q: Is it possible that in that conversation you suggested
[5] that he not only contact other public school districts
[6] but that he contact parochial schools in the area?
[7] A: It is possible I told him to contact everybody and
[8] anybody that he hadn't contacted before.
[9] Q: When you first saw the memorandum reporting on his
[10] contacts with parochial schools, what did you do with
[11] that information?
[12] A: Read it.
[13] Q: Did you talk to him about it?
[14] A: Yes, but I don't remember the conversation.
[15] Q: Were you surprised when you got the memorandum to see
[16] that it only reported on contacts with parochial schools
[17] and didn't provide any information about contacts with
[18] other area schools?
[19] A: No.
[20] Q: I ask why not?
[21] A: Because I would have assumed he would have contacted the
[22] other parochial schools beforehand.
[23] Q: Did you mean most of the other public schools?
[24] A: Yes, my apologies.
[25] Q: Did you know that he actually did make those contacts?

Page 14

[1] A: No, I don't know that as a fact.
[2] Q: Did you suggest at any time to Mr. Baksa that he speak
[3] with any of the families that are providing home
[4] schooling in your district —
[5] A: No.
[6] Q: — to see what textbooks they used?
[7] A: No.
[8] Q: Did you make any inquiries on your own about alternative
[9] biology textbooks? That is alternatives to Miller and
[10] Levin.
[11] A: No.
[12] Q: What was done, if you know, with the information that
[13] Mr. Baksa collected about the books being used in
[14] parochial schools?
[15] A: I do not know.
[16] Q: Did you share the memorandum or that information with
[17] any Board member?
[18] A: I have no recollection of that.
[19] Q: Did you ask Mr. Baksa to share that information with any
[20] Board member?
[21] A: I have no recollection of that either.
[22] Q: I am trying to understand what happened when he
[23] developed the information. You received the
[24] information, and the sense I have is that it landed on a
[25] piece of paper, and the piece of paper landed in a

Tammy Kitzmiller, et al. v.
Dover Area School District, et al.
Case 4:04-cv-02688-JEJ  Document 253-12  Filed 10/11/05  Page 6 of 13
Richard Nilsen
April 14, 2005

Page 15

[1] drawer or in a file, and that no use was made of it.
[2] A: Well —
[3] Q: I'm trying to figure out what use was made of that
[4] information since somebody went to the trouble to
[5] collect it.
[6] A: Well, I think that is a question that needs to be
[7] directed to Mr. Baksa being he generated information and
[8] it was his responsibility to research and make the
[9] recommendation on the textbook.
[10] Q: Did you see at this time, which is after the June Board
[11] meeting, that the selection of a biology textbook was
[12] not just the selection of another textbook but had
[13] become a matter of primary interest to the Board, at
[14] least in terms of its curriculum responsibilities?
[15] A: I am sorry. I don't understand the question.
[16] Q: It was a cumbersome question. Can you remember any
[17] other debate and discussion involving the teachers, the
[18] administration and the Board on a textbook selection
[19] that has the same characteristics as what you and the
[20] District have been through since last June on the
[21] selection of a biology textbook?
[22] A: Yes.
[23] Q: Which textbook was that?
[24] A: The chemistry book the prior year and the family
[25] consumer science books the prior year.

Page 16

[1] Q: What was the controversy involving the chemistry book?
[2] A: The financial issue, as well as the issue of whether the
[3] teachers needed the book or not.
[4] Q: By financial, you mean the cost of the book?
[5] A: The ability for the District to pay for a new book.
[6] Q: I assume whether the teachers needed it or not was an
[7] aspect of that financial decision?
[8] A: Yes.
[9] Q: And the other book was family consumer science?
[10] A: That is correct.
[11] Q: What was the controversy surrounding that?
[12] A: The controversy surrounded whether it was an identical
[13] replacement of the book that the faculty already had,
[14] and the issue of whether the Board could once again
[15] finance a textbook that the teachers already had in
[16] their possession.
[17] Q: It strikes me that both of those controversies — and I
[18] will use that word in quotes — involved basically
[19] financial considerations, cost considerations. It
[20] appears to me that the discussions about the biology
[21] book involve its contents.
[22] Can you think of any other situation when a book
[23] is being considered by the Board for inclusion in the
[24] curriculum when there has been this kind of attention
[25] and controversy devoted to that subject?

Page 17

[1] A: I will clarify your question. The family consumer
[2] science book was content issue based on the fact that
[3] they thought the content was already in our curriculum
[4] and didn't see the reason to purchase another book that
[5] had the same content.
[6] Q: Okay.
[7] A: Not specifically along the same lines, but along the
[8] same general conversation. The District gets a donation
[9] from the county on a book pamphlet that we give to our
[10] students that has a number of agencies listed in it, and
[11] a Board member and a parent had a considerable concern
[12] on the information that was in the book, specifically
[13] dealing with comments dealing with sexual education and
[14] issues concerning specific agencies that was in there.
[15] To the point of where we ended up sending home
[16] information prior to the students receiving the books,
[17] as well as a discussion of whether to even continue
[18] handing out the individual books.
[19] And through my experience, not only in this
[20] district, but other districts, any time we have adopted
[21] a health curriculum, there has always been conversations
[22] zeroing in on what is and what is not taught as it
[23] relates to the curriculum.
[24] Mr. Bonsell and I had conversations and I believe
[25] a third party, but nonetheless I believe Mr. Bonsell has

Page 18

[1] also talked to Mr. Baksa about the health curriculum in
[2] our education dealing with abstinence.
[3] I know Mr. Baksa is meeting next week, if not the
[4] following week, with another Board member dealing with
[5] our drug and alcohol curriculum, specifically where
[6] inhalants are being taught.
[7] If your question is does the Board hold
[8] discussions on multiple issues with content beyond this
[9] individual issue, my experience is yes.
[10] Q: On those issues where the Board has either demonstrated
[11] or expressed a keen interest in a decision like the
[12] distribution of a pamphlet, or the selection of a
[13] textbook, is it your practice as Mr. Baksa's supervisor
[14] and as the Superintendent of Schools to basically say we
[15] have got to pay attention to this, get it right, be sure
[16] that we do what we need to do to be giving all the
[17] information to the Board and do the best job we can?
[18] You don't treat it as a routine matter; do you?
[19] MR. GILLEN: I object to the form.
[20] A: I think it is a routine matter. I think the routine
[21] matter of the Board's reviewing curriculum and making
[22] comments about curriculum is routine. Board members
[23] historically have had conversations about what is in the
[24] curriculum, and their recommendations on what should be
[25] in the curriculum, and what type of curriculum should be

Page 19

[1] placed in our planned courses. That is a routine
[2] matter.
**BY MR. SCHMIDT:**
[4] Q: At the time of the June meeting in 2004, had you ever
[5] heard of the notion of Intelligent Design?
[6] A: Not that I can remember, no.
[7] Q: Do you remember your first contact with the Discovery
[8] Institute? And by you in this case, I am referring to
[9] you personally.
[10] A: Me personally, yes.
[11] Q: When did that contact take place?
[12] A: The fall of 2004.
[13] Q: Where did the contact take place?
[14] A: Over the phone.
[15] Q: Who else was involved in the telephone contact?
[16] A: No one else.
[17] Q: That wasn't meant to be a trick question. You were on
[18] the phone. Who else was on the phone; somebody from the
[19] Discovery Institute?
[20] A: Yes.
[21] Q: Do you remember who it was?
[22] A: No, I don't.
[23] Q: Do you know someone named Seth Cooper?
[24] A: Yes.
[25] Q: There is a deposition exhibit that has previously been

Page 20

[1] marked as Plaintiff 38 which I would ask you to take a
[2] look at?
[3] A: (Witness complies.)
[4] MR. GILLEN: Tom, I mentioned to Eric yesterday
[5] that 40, I have a problem with in that I am not sure if
[6] it wasn't inadvertently provided. I need to go back to
[7] the office and check on that.
[8] MR. SCHMIDT: Okay.
[9] MR. GILLEN: Thank you.
**BY MR. SCHMIDT:**
[11] Q: Dr. Nilsen, have you seen this document before today?
[12] A: I have reviewed over 2,000 documents. Does this jump
[13] out at me? No. Would I have reviewed it before? I
[14] believe so.
[15] Q: Do you recall seeing this e-mail at about the time it
[16] was sent in June of 2004?
[17] A: Not to my recollection, no.
[18] Q: Were you aware in June of 2004 that Seth Cooper or
[19] anyone from the Discovery Institute was reaching out and
[20] trying to contact Mr. Bonsell?
[21] A: Not to my recollection, no.
[22] Q: If you would, look at the e-mail address at the top of
[23] Plaintiffs 38. Is the e-mail address for Mr. Bonsell
[24] one that is provided by the School District?
[25] A: Yes.

Page 21

[1] Q: Is an e-mail address provided by the School District for
[2] all of its Board members?
[3] A: Provided, yes. Accessed by all of them, no.
[4] Q: How do you know that?
[5] A: I have had Board members tell me that they don't want
[6] the e-mail address. In fact when we provided it to
[7] them, one Board member in specific — a prior Board
[8] member said she doesn't like the computer and doesn't
[9] want to have access in the computer and has no interest
[10] in the computer.
[11] Other Board members have told me that they don't
[12] have time to access it and would prefer their own
[13] personal e-mail addresses as the contact. Other Board
[14] members have said they don't — even though they use the
[15] computer would prefer not to be contacted.
[16] So we have provided it to all of the Board
[17] members, but then housed within the scope of Board
[18] members, some have chosen not to access it. Some have
[19] chosen not to have it. Some have chosen to have
[20] different e-mails.
[21] Q: What do you know about Mr. Bonsell's use of the District
[22] provided e-mail?
[23] A: Beyond him telling me he has had frustration accessing
[24] his own personal e-mail, nothing.
[25] Q: Can a Board member access e-mail using that address from

Page 22

[1] a location other than the School District's office?
[2] A: Yes.
[3] Q: To turn that question around, so they don't have to go
[4] to the School District to access the e-mail; do they?
[5] A: No, offsite.
[6] Q: Did you — and I am referring again to you — hear
[7] anything from the Discovery Institute in June or July of
[8] 2004 that represented an effort to reach out to you on
[9] the subject matter addressed in Exhibit 38?
[10] A: No.
[11] Q: Did you know of an organization called the Discovery
[12] Institute in the summer of 2004?
[13] A: I heard of the Institute. Whether my knowledge base was
[14] beyond the name, I can't speak to that.
[15] Q: What did you — well, let me ask the question a
[16] different way. Who did you hear about the Discovery
[17] Institute from in the summer of 2004?
[18] A: Mr. Buckingham.
[19] Q: Do you recall anything that he said to you about the
[20] Discovery Institute?
[21] A: No.
[22] Q: I am going to show you what has been marked as Exhibit
[23] 39. Do you recall seeing that e-mail at about the time
[24] it was sent?
[25] A: Do I have specific recollection? No. Once again, as

Tammy Kitzmiller, et al. v.
Dover Area School District, et al.

Case 4:04-cv-02688-JEJ   Document 253-12   Filed 10/11/05   Page 8 of 13

Richard Nilsen
April 14, 2005

Page 47

[1] meeting with the teachers took place before the release
[2] was issued.
[3]    A: No. This press release was issued before I met with the
[4] teachers.
[5]    Q: So when it says in this sentence we are going over that
[6] you have directed, it really means you will direct them
[7] not to teach certain subjects?
[8]    A: Yes.
[9]    Q: Okay. I am with you now.
[10]   MR. GILLEN: Me, too.
[11]           BY MR. SCHMIDT:
[12]   Q: I think my question was whether during the discussion
[13] with the teachers, you came to understand that at least
[14] some of them believed teaching Intelligent Design was
[15] illegal because it had religion as part of its content?
[16]   A: I don't remember if anyone ended up specifically stating
[17] that. I do remember them stating teaching Creationism
[18] was illegal, and I agreed with that.
[19]   Whether they ended up saying at that time period
[20] they believed Intelligent Design was religious and
[21] therefore illegal, I don't remember that at that time
[22] period.
[23]   Q: To put this in context, you predicted what you were
[24] going to tell them about a week before you actually had
[25] your meeting with them.

Page 48

[1]    Why was it before you had your discussion with the
[2] teachers about any of the subjects covered in this
[3] sentence we have been going over that you were directing
[4] them not to teach Intelligent Design?
[5]    A: Because I think the way the Board adopted the
[6] curriculum, they were not to teach Intelligent Design.
[7] Meaning if you interpret the prior paragraph, it doesn't
[8] say to teach Intelligent Design.
[9]    And I'm on record twice at two different Board
[10] meetings when a former Board member asked are teachers
[11] going to teach Intelligent Design, I said no in both
[12] instances.
[13]   It is my interpretation of what the Board did on
[14] October 18th that they are not teaching Intelligent
[15] Design. So it was my interpretation and directive to
[16] them as I saw that piece that that is what my direction
[17] was.
[18]   The Board member — former Board member basically
[19] said that the teachers would not be aware of what to do
[20] with that sentence. And I directed Mr. Baksa to flesh
[21] out the interpretation, and that is the four paragraph
[22] sentence.
[23]   And then in the November 24th, I reiterated once
[24] again that they are not teaching Intelligent Design.
[25]   Q: What was your understanding of the District's position

Page 49

[1] that teachers were not to teach Intelligent Design?
[2]    A: I am sorry. I don't understand that.
[3]    Q: Okay. Why weren't the teachers to teach Intelligent
[4] Design?
[5]    A: Based on the fact that it is not one of the standards.
[6]    Q: My reading of the curriculum documents tells me that the
[7] amount of time devoted to Evolution is 19 days?
[8]    A: No.
[9]    Q: How much time is devoted to Evolution?
[10]   A: One to two days.
[11]   Q: What is the origin of life debate that is referred to in
[12] the next sentence of Exhibit P-3?
[13]   A: The origins of life debate is the origin of the creation
[14] or beginning, the genesis, if you would, not using
[15] Biblical references, but the beginning part of man.
[16]   Q: Of man?
[17]   A: Yes.
[18]   Q: What is Darwin's opinion about the origin of life as you
[19] understand it? I am now looking at the next sentence.
[20]   A: I don't know.
[21]   Q: What did you mean when you put that sentence in the
[22] release?
[23]   A: The Board believes that there are other options and
[24] discussions on Darwin's opinion on the origins of life,
[25] and I have communicated that.

Page 50

[1]    Q: The sentence reads the School Board has noted that there
[2] are opinions other than Darwin's on the origin of
[3] life — end of quote.
[4]    Do you know what Darwin's opinions on the origin
[5] of life are?
[6]    A: No.
[7]    Q: Did you make any inquiry about what the Board had in
[8] mind when it said there are other opinions?
[9]    A: No. But my context was some Board members differed with
[10] Darwin's concept of origins of life and communicated
[11] such publicly.
[12]   Q: Why did you capitalize origin of life in these
[13] sentences?
[14]   A: I have no idea.
[15]   Q: Are you aware of any opinions other than Darwin's
[16] opinion on the origin of life, whatever that may be?
[17]   A: Yes.
[18]   Q: What are the other opinions that you are aware of?
[19]   A: There is the opinion — and I have no idea how to spell
[20] it — Plantaria, whatever it is, where there are aliens
[21] that have come in some capacity. The whole conversation
[22] dealing with the pyramids and the structure that the
[23] earth was created by an outside force, whatever that —
[24] either alien as defined as an entity beyond homo sapiens
[25] on earth.

Page 51

[1] There is the Big Bang Theory of where the
[2] beginning of time was created out of an explosion in
[3] some capacity. And there is also the conversation that
[4] there is a Godlike entity that created earth and
[5] everything on it.
[6] **MR. SCHMIDT:** Off the record, please.
[7] (An off-the-record discussion was had.)
[8] (Plaintiffs Exhibit 43 was marked.)
[9]       **BY MR. SCHMIDT:**
[10] Q: Dr. Nilsen, have you had an opportunity to review
[11] Plaintiffs Exhibit 43?
[12] A: Yes, I have.
[13] Q: Identify the document, please.
[14] A: The document is Administrator's Biology Statement in
[15] Biology Class.
[16] Q: Bates numbered 1099 1100. Do you know who prepared this
[17] document?
[18] A: Yes.
[19] Q: Who?
[20] A: I did.
[21] Q: What use was made of the document?
[22] A: The document was read in total by either myself or Mr.
[23] Baksa.
[24] Q: Verbatim?
[25] A: 99.9 percent.

Page 52

[1] Q: Was it the plan to stick —
[2] A: As close as possible.
[3] Q: Paragraph five on page two of the document includes a
[4] statement that there will be no other discussion of the
[5] issue and your teachers will not answer any questions on
[6] this issue.
[7] What is this issue that is referred to in that
[8] paragraph?
[9] A: The issue of Intelligent Design.
[10] Q: When you prepared what has been marked as P-43, what was
[11] your understanding of the difference between the
[12] Intelligent Design explanation of the origin of life and
[13] Darwin's explanation of the origin of life?
[14] A: When I prepared the document?
[15] Q: Right.
[16] A: At that time, I don't think I had an understanding.
[17] Q: Do you recall when you prepared the document?
[18] A: Yes.
[19] Q: When?
[20] A: It would have been in mid January.
[21] Q: Do you have an understanding now?
[22] A: I have somewhat of an understanding. I don't think I
[23] have a total understanding.
[24] Q: I can't ask for perfection, but what is your present
[25] understanding?

Page 53

[1] A: Intelligent Design refers to an order. Darwin refers to
[2] randomness.
[3] Q: And how do those two notions that you have just stated
[4] have to do with the origin of life?
[5] A: As it relates to Darwin, there could be a randomness. I
[6] think his theory is survival of the fittest. And
[7] Intelligent Design has a specific design to it, not a
[8] randomness.
[9] Q: I think I took that from the order versus random. But
[10] what do those two notions have to do with what you have
[11] used the phrase and it is used in this document the
[12] origin of life; do you have any understanding of the
[13] relationship between the two concepts you have referred
[14] to and the origin of life?
[15] A: Not beyond what I have said, no.
[16] Q: You have been an educator for going on 20 years?
[17] A: Twenty-nine.
[18] Q: Twenty-nine years. Can you recall any instance in your
[19] career as an educator when students have been directed
[20] that they are not to discuss topics, and teachers are
[21] not permitted to comment on topics with students?
[22] **MR. GILLEN:** Object to the form.
[23] A: Yes.
[24]       **BY MR. SCHMIDT:**
[25] Q: Can you give me another circumstance besides this one?

Page 54

[1] A: Political affiliation, sexual education, issues within
[2] the community that are highly politically charged.
[3] Q: And religion?
[4] A: And religion.
[5] Q: Did any parents or students ever contact you after the
[6] statement was read?
[7] A: Not that I remember, no.
[8] Q: I am going to show you a document that has been marked
[9] previously as Plaintiffs 9. Have you had an opportunity
[10] to look at Exhibit P-9?
[11] A: Look at it. Read it in total, no.
[12] Q: Let me ask you some questions. If you need to review it
[13] in any detail, just let me know. This is a document
[14] that contains Bates numbered pages 944 through 951. Let
[15] me ask you to turn first to page 946.
[16] A: (Witness complies.)
[17] Q: Do you recognize this document?
[18] A: Yes.
[19] Q: Is this the Biology One Curriculum that was in place
[20] before October 18th, 2004?
[21] A: To the best of my ability, yes.
[22] Q: I need your help to understand it. As I read this
[23] document, it suggested to me that there were 19 days out
[24] of the biology curriculum devoted to natural selection,
[25] the mechanism of Evolution and the origins of bio

Tammy Kitzmiller, et al. v.
Dover Area School District, et al.

Case 4:04-cv-02688-JEJ   Document 253-12   Filed 10/11/05   Page 10 of 13

Richard Nilsen
April 14, 2005

Page 55

[1] diversity. Have I read the top line correctly?
[2]     A: That's correct.
[3]     Q: And it appears, for instance, that the references to
[4] Darwin, Darwin's Theory of the origin of species and
[5] issues involving Evolution are spread throughout this 19
[6] day period?
[7]     A: That is what is written here, correct.
[8]     Q: As I understood your testimony a few moments ago, it was
[9] the Theory of Evolution was limited to two days in the
[10] biology curriculum. Did I mishear your testimony?
[11]     A: You did not.
[12]     Q: Can you explain why you say two days and this appears to
[13] say 19?
[14]     A: The ugliness that every Superintendent and Assistant
[15] Superintendent has is the fact that teachers teach not
[16] solely the outline of the planned instruction. This
[17] obviously is the case.
[18]     Because when asking the specific teachers how many
[19] days they spend on the theory, they said two. So I am
[20] following what they have told us is the reality versus
[21] what is in the planned course. Meaning this document is
[22] obviously the instructional guide, but not what is in
[23] practice.
[24]     Q: As Superintendent, are you concerned that the guide's
[25] call for 19 days of instruction and your teachers are

Page 56

[1] telling you they are only devoting two?
[2]     A: I think you noted my introductory comment of the
[3] ugliness of it, and the answer is yes. Whether the
[4] planned course is misdone or the instruction is misdone,
[5] I can't speak to that. But obviously, both should be
[6] similar.
[7]     Q: Back to page 944, have you seen this memorandum before
[8] today, the memorandum from Trudy Peterman to Mr. Baksa,
[9] Mr. Redding and Mrs. Spahr dated April 1, 2003?
[10]     A: Yes.
[11]     Q: I am assuming you saw it in the course of preparing
[12] documents for discovery in this case, but did you see it
[13] about the time it was issued?
[14]     A: I have no recollection of that except to say that it is
[15] carbon copied to me, and I would expect within my
[16] responsibilities that I would have come across it.
[17]     Q: Would you have read it?
[18]     A: Yes.
[19]     Q: Do you recall doing anything in response to or following
[20] receipt of this memorandum?
[21]     A: No.
[22]     Q: You don't recall any discussions with Mr. Baksa or Mrs.
[23] Spahr about it?
[24]     A: No. Let me rephrase that. About this specific memo
[25] with Mr. Baksa?

Page 57

[1]     Q: Yes.
[2]     A: Do I recollect anything? No, I don't.
[3]     Q: Were you concerned?
[4]     A: My apologies. Let me rephrase that. At the time.
[5] Obviously, I have had conversations since then.
[6]     Q: I understand. The first paragraph in the memo indicates
[7] that your science teachers are teaching that Creationism
[8] is an alternative theory of Evolution which I believe
[9] you testified a little while ago would be illegal in
[10] your understanding.
[11]     What did you do when you learned about what your
[12] teachers were doing in Biology I?
[13]     MR. GILLEN: I object to the form.
[14]     A: What did I do?
[15]                 BY MR. SCHMIDT:
[16]     Q: Yes.
[17]     A: Nothing. I didn't think they were doing it.
[18]     Q: You didn't think they were doing it?
[19]     A: No.
[20]     Q: I will ask you to look at a sentence that starts five
[21] lines down in paragraph one on Bates page 944. She — I
[22] think referring to Mrs. Spahr — explained to Mr. Baksa
[23] that all biology teachers state that another theory of
[24] Evolution is Creationism. I know that is not the end of
[25] the sentence, but let me ask a question about that.

Page 58

[1]     If teachers were making that statement in their
[2] biology classes, is it your understanding that that
[3] would be improper?
[4]     MR. GILLEN: Object to the form.
[5]                 BY MR. SCHMIDT:
[6]     Q: I am trying to avoid the word illegal even though that
[7] is a notion you used earlier.
[8]     A: No, I don't because I define teach and present other
[9] theories not teaching.
[10]     Q: So mentioning —
[11]     A: That there are other theories.
[12]     Q: I will say my question again. If I understand the
[13] distinction you are making, that to stand in front of a
[14] classroom sand say there is a theory or a belief in
[15] Creationism in the context of teaching Evolution is
[16] acceptable, but to go beyond that and describe what
[17] Creationism means or do anything more than simply
[18] mentioning it would be improper?
[19]     A: Correct.
[20]     Q: If a student says gee, teach, you just used the word
[21] Creationism, what does that mean, the teacher is
[22] supposed to say I am sorry, I can't tell you?
[23]     A: That's correct.
[24]     Q: Do you know who the Board member is that is referred to
[25] in the last sentence of that first paragraph, the Board

Richard Nilsen
April 14, 2005
Dover Area School District, et al.
Case 4:04-cv-02688-JEJ   Document 253-12   Filed 10/11/05   Page 11 of 13

Page 59

[1] member is supposed to have wanted fifty percent of the
[2] teaching of Evolution to involve Creationism?
[3]    A: Only indirectly.
[4]    Q: Who is it?
[5]    A: In my discussions with Mr. Baksa, he communicated to me
[6] that he believed they are referring to Mr. Bonsell.
[7]    Q: Without going over each of the five questions that are
[8] posed in paragraph two of Trudy Peterman's memorandum,
[9] do you know if those questions were ever answered by Mr.
[10] Baksa or anyone else in the administration of the School
[11] District?
[12]    A: No, I do not know.
[13]    Q: Did you direct anyone to provide those answers?
[14]    A: No.
[15]    Q: Did you believe when you saw this memorandum that it
[16] raised important issues that required some attention by
[17] the administration?
[18]    A: Yes, but not in the direction you are heading.
[19]    Q: What attention did you think it required to.
[20]    A: To make sure that the principal was telling the truth.
[21]    Q: What part of what is in this exhibit did you think was
[22] untruthful?
[23]    A: The third line, the third sentence Mr. Baksa mentioned
[24] that a Board member wanted Creationism taught in Biology
[25] I class.

Page 60

[1]    Q: What is untruthful about that statement?
[2]    A: I am not aware of that, nor is Mr. Baksa aware of that
[3] conversation. Nor did I ever hear a Board member
[4] mention that in any capacity. Neither did Mr. Baksa.
[5]    Q: When you read that if you thought it was untrue, what
[6] did you do?
[7]    A: The germane area was directed to Mr. Baksa. It is his
[8] responsibility to take care of that additional quote.
[9] It is my responsibility to deal with the Principals, the
[10] behavior.
[11]    Q: What did you do with it?
[12]    A: It reflected in her evaluation.
[13]    Q: In what way?
[14]    A: Her behavior was evaluated. Her conversations were
[15] evaluated negatively.
[16]    Q: When did her evaluation take place?
[17]    A: June of 2003 and June of 2004, at the end of each of her
[18] two years.
[19]    Q: Now as I read this memorandum, the first paragraph, it
[20] appears to me that Trudy Peterman is reporting on a
[21] conversation that she had with Mrs. Spahr in which Mrs.
[22] Spahr recounts a conversation with Mr. Baksa.
[23]    Have you taken any disciplinary action with Mrs.
[24] Spahr for misstating or misrepresenting a conversation
[25] she had with Mr. Baksa?

Page 61

[1]    A: No.
[2]    Q: Why not?
[3]    A: Two reasons. One is the Superintendent doesn't have
[4] direct supervision in the evaluation of teachers. Those
[5] are the individual responsibilities of the building
[6] principal.
[7]    And secondly, this conversational capacity would
[8] end up being between the conversation of Mr. Baksa, Dr.
[9] Peterman and her eventual responsibilities of
[10] evaluation.
[11]    Q: I misunderstood that answer.
[12]    A: Meaning if Mrs. Spahr is misquoting Mr. Baksa, it would
[13] be Mr. Baksa's responsibility to communicate to Dr.
[14] Peterman of the misquotation.
[15]    Q: Do you know whether he did that or not?
[16]    A: No, I do not know that.
[17]    Q: As I understand what happened in response to the two
[18] sentences that appear at the beginning of — I am sorry
[19] — three sentences that appear at the beginning of this
[20] exhibit, Dr. Peterman is disciplined for having made a
[21] statement that she heard from Mrs. Spahr, but Mrs. Spahr
[22] is not disciplined for having made the original
[23] statement which you and Mr. Baksa think is untrue?
[24]    MR. GILLEN: Object to the form.
[25]    A: I can speak to the first which is yes. I can't speak to

Page 62

[1] the other point based on the fact that I have not an
[2] understanding of what Dr. Peterman did and what Mr.
[3] Baksa did with the individual teacher.
[4]    Q: Did you ask Dr. Peterman what she did in her supervision
[5] of Mrs. Spahr about this subject?
[6]    A: No, not this subject, no.
[7]    Q: Is it your position as the Superintendent that when
[8] somebody that you are evaluating repeats the statement
[9] of another person, if that statement turns out to be
[10] untrue, that the person you supervise bears the
[11] responsibility for that untruth?
[12]    Let me withdraw the question. It's too big. I
[13] have already got your answer on it. I understand what
[14] you did.
[15]    MR. GILLEN: Thank you, Tom.
[16]                BY MR. SCHMIDT:
[17]    Q: Did you have any further discussion with Mr. Baksa about
[18] the subject of his reported conversation with Mrs. Spahr
[19] on the topics that are addressed in this memorandum?
[20]    A: Yes.
[21]    Q: When did you have that conversation with him?
[22]    A: Over the past year.
[23]    Q: Did you have a conversation with him around the time
[24] that this memorandum was issued in April of '03?
[25]    A: In a general sense, yes. As it relates to specifics,

Tammy Kitzmiller, et al. v.
Dover Area School District, et al.
Case 4:04-cv-02688-JEJ   Document 253-12   Filed 10/11/05   Page 12 of 13
April 14, 2005

Page 63

[1] no.
[2] Q: How did you reach the determination to give Dr. Peterman
[3] a bad evaluation because of what appears in this first
[4] paragraph without doing an investigation —
[5] MR. GILLEN: Object to the form.
[6] BY MR. SCHMIDT:
[7] Q: — with Mr. Baksa?
[8] MR. GILLEN: I am sorry.
[9] MR. SCHMIDT: That is all right. I paused.
[10] A: The evaluation was not solely based on this individual
[11] action. It was significantly broader obviously than
[12] this. And the behavior reflected not solely the
[13] information, but the process of the information.
[14] BY MR. SCHMIDT:
[15] Q: Did you ever instruct Dr. Peterman about how she was to
[16] behave or interact with the Board at Board meetings?
[17] A: Yes.
[18] Q: What instructions did you give her?
[19] A: The Board directed me to direct to her that when she
[20] came to Board meetings, that she like every other
[21] individual was to be recognized prior to coming to the
[22] podium, was to direct her comments to the Board and not
[23] the constituents.
[24]    She was also not to raise her voice. She was also
[25] not to pound the podium. And she was to be on point,

Page 64

[1] not wander off a point.
[2] Q: Did you give her those directions in writing?
[3] A: Yes.
[4] Q: Is that the current state of her instructions with
[5] respect to Board meetings?
[6] A: She is no longer employed.
[7] Q: Was she fired?
[8] A: No. She has since gone to another district where she is
[9] in litigation with the Superintendent because the
[10] Superintendent put her on leave, as the prior district
[11] also put her on leave. So out of three districts, two
[12] out of the three, she was put on leave for behavior
[13] unbecoming to an administrator.
[14] Q: I would like to show you a document that has previously
[15] been marked as Plaintiffs 28. I just have a quick
[16] question or two about this.
[17]    Dr. Nilsen, at least initially, you can probably
[18] answer my question by looking at the first page. If
[19] someone else has already asked this, I apologize to you.
[20]    But is this your handwriting on this document?
[21] A: No.
[22] Q: Do you know whose it is?
[23] A: Without certainty. But it does look like Mr. Baksa's.
[24] It is neater than mine.
[25] MR. GILLEN: Off the record.

Page 65

[1] (An off-the-record discussion was had.)
[2] BY MR. SCHMIDT:
[3] Q: If you look back to Bates page 238, do you recognize
[4] that handwriting?
[5] A: No.
[6] Q: Do you recall Mr. Buckingham making a statement about
[7] someone died on the cross for us two thousand years ago
[8] at the June, 2004 meeting?
[9] A: No.
[10] (Plaintiffs Deposition Exhibit 44 was marked.)
[11] BY MR. SCHMIDT:
[12] Q: Dr. Nilsen, I am showing you a document that has been
[13] marked as Plaintiffs Exhibit 44, Bates pages 1115
[14] through 1117. Please take a look at it.
[15] A: (Witness complies.)
[16] Q: Have you had a chance to look at the document?
[17] A: Yes.
[18] Q: These appear to be excerpts from a document generally
[19] titled Superintendent's Weekly Update. Am I correct
[20] about that?
[21] A: Yes.
[22] Q: What is the Superintendent's Weekly Update?
[23] A: That is sent to all Board members, a weekly report on
[24] events that happen on non Board meeting weeks as well as
[25] during Board meeting weeks.

Page 66

[1] Q: Does anyone else receive a copy of the update?
[2] A: The administrative staff and the Board members.
[3] Q: Is it available to the public?
[4] A: No.
[5] Q: When you said administrative staff?
[6] A: Principals and Department Supervisors.
[7] Q: Who is the Mr. Russell referred to at the top of the
[8] first page of this?
[9] A: He is the District Solicitor.
[10] Q: The document begins with an Update dated November 5,
[11] 2004. Is that the date this is published if you will?
[12] A: Disseminated.
[13] Q: Disseminated on the 5th, okay. This one starts with B,
[14] right under the title. Is that a mistake, or was a
[15] section redacted before the document was copied; do you
[16] know?
[17] A: The directions was to communicate to all of the
[18] documents that I had in possession that dealt with the
[19] case. We ended up for the purpose of efficiency
[20] eliminating all of my Superintendent report's peripheral
[21] information.
[22]    So the only thing that was listed on the sheet
[23] were items. For example if you turn to the next page,
[24] 1116, you will note under the December 3rd, it begins
[25] with a C.

Tammy Kitzmiller, et al. v.
Dover Area School District, et al
Case 4:04-cv-02688-JEJ   Document 253-12   Filed 10/11/05   Page 13 of 13
April 14, 2005

Page 95

[1]  MR. GILLEN: I just have a few questions, Tom.
[2]  BY MR. GILLEN:
[3]  Q: Mr. Schmidt asked you a few questions. One set of them
[4]  related to Plaintiffs Deposition Exhibit 9 which is that
[5]  memo from Dr. Peterman. Tom asked you did you take
[6]  action in light of that, and you said no.
[7]  Just to be clear on this point, at the time that
[8]  you received this memo, did Dr. Peterman have a lot of
[9]  credibility with you?
[10] A: Zero.
[11] Q: Was it in large measure because this memo came from Dr.
[12] Peterman which explained your inaction?
[13] A: Two things. One, first of all, I knew no one was
[14] discussing either from the administrative standpoint, or
[15] the Board standpoint, or Mr. Baksa's standpoint, or my
[16] standpoint any discussion of Creationism. So a memo
[17] that generated and stated that there was a discussion of
[18] Creationism had absolutely a non starter.
[19] Secondly, as it related to Dr. Peterman, I didn't
[20] believe anything she put in writing anyway. In fact,
[21] one of the prior evaluations I had with her was to stop
[22] putting things in writing because she would put things
[23] in writing prior to knowing what actually was the
[24] reality. And I had to spend time with her going back
[25] and correcting what was on the record.

Page 96

[1]  She had a long history of putting things in
[2]  writing that were inaccurate that we had to go back and
[3]  correct.
[4]  She had dictated to the faculty that she no longer
[5]  would talk to any faculty members, and that the only way
[6]  she would communicate with faculty members is through
[7]  Department Chairs. And the only way that Department
[8]  Chairs could talk to her is if they requested a meeting.
[9]  And then in the middle of that year '03-'04, she
[10] communicated the Department Chair, she would no longer
[11] talk to them. So she generated information that was
[12] totally inaccurate in memo format.
[13] So her credibility with me in any written format
[14] was absolutely nonexistent. And eventually, it was
[15] reflected in the end of the year evaluations.
[16] Q: Tom also directed your attention to Plaintiff Exhibit
[17] 48. When I looked at it here today, I noticed that it
[18] said any future communication pertaining to
[19] Creationism/Intelligent Design intended for the Science
[20] Department shall be in written form.
[21] Is it accurate that the teachers when they
[22] discussed Intelligent Design equated it with Creationism
[23] in the way they have here in this memo?
[24] A: Yes. There was never any communication ever on
[25] Creationism. And they had a behavior of equating both,

Page 97

[1]  and therefore the memo would end up being tied to both.
[2]  Q: Tom asked you questions about religion and dogma. Was
[3]  it clear in their communications that they equated
[4]  Creationism with religion?
[5]  A: Yes.
[6]  MR. GILLEN: Those are the only questions I have.
[7]  MR. SCHMIDT: Nothing further.
[8]  (The deposition was concluded at 1:30 p.m.)

Page 98

COMMONWEALTH OF PENNSYLVANIA :
COUNTY OF CUMBERLAND           :

I, Vicki L. Fox, Reporter and Notary Public in and
for the Commonwealth of Pennsylvania and County of
Cumberland, do hereby certify that the foregoing
testimony was taken before me at the time and place
hereinbefore set forth, and that it is the testimony of:
    RICHARD NILSEN
I further certify that said witness was by me duly
sworn to testify the whole and complete truth in said
cause; that the testimony then given was reported by me
stenographically, and subsequently transcribed under my
direction and supervision; and that the foregoing is a
full, true and correct transcript of my original
shorthand notes.
I further certify that I am not counsel for nor
related to any of the parties to the foregoing cause,
nor employed by them or their attorneys, and am not
interested in the subject matter or outcome thereof.
Dated at Camp Hill, Pennsylvania, this 29th day of
April, 2005.
        Vicki L. Fox
        Reporter - Notary Public
(The foregoing certification does not apply to any
reproduction of the same by any means unless under the
direct control and/or supervision of the certifying
reporter.)