IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

———————————————————— :
                                               :
TAMMY KITZMILLER; BRYAN and   :
CHRISTY REHM; DEBORAH           :
FENIMORE and JOEL LIEB; STEVEN  :
STOUGH; BETH EVELAND; CYNTHIA   :
SNEATH; JULIE SMITH; and ARALENE :
("BARRIE") D. and FREDERICK B.   :
CALLAHAN,                        :
                                               :   CIVIL ACTION
                Plaintiffs,      :
                                               :   No. 4:04-cv-2688
        v.                       :
                                               :   (JUDGE JONES)
DOVER AREA SCHOOL DISTRICT and  :
DOVER AREA SCHOOL DISTRICT       :   (Filed Electronically)
BOARD OF DIRECTORS,              :
                                               :
                Defendants.      :
———————————————————— :

BRIEF IN SUPPORT OF PLAINTIFFS' PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW
————————————————————————————————

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.     DEFENDANTS' POLICY AND CURRICULUM CHANGE IMPROPERLY ENDORSE A PARTICULAR RELIGIOUS VIEW . . . . . 4

     A.     The Endorsement Test Applies To Defendants' Actions Here No Less Than To Any Other Governmental Conduct Favoring Religion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

          1.     The endorsement test applies in all Establishment Clause cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

          2.     In this circuit, the endorsement test should be applied separate from, and prior to, the *Lemon* test . . . . . . . . . . . . . . 9

     B.     Nature Of The Endorsement Test . . . . . . . . . . . . . . . . . . . . . . . . . . 12

     C.     Defendants' Conduct Should Be Judged Both From The Standpoint Of An Objective Student And From The Standpoint Of An Objective Adult . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

     D.     An Objective Student Would View The Disclaimer As A Strong Official Endorsement Of Religion . . . . . . . . . . . . . . . . . . . . . . . . . 19

     E.     An Informed, Objective Dover Citizen Would Perceive Defendants' Conduct To Be A Strong Endorsement Of A Religious View . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

# TABLE OF CONTENTS

**Page**

1.    An objective observer would know that intelligent design and teaching about supposed gaps and problems in evolutionary theory are creationist religious strategies that evolved from earlier forms of creationism . . . . . . . . . . . . . . . 43

2.    Considered in light of this history, the challenged policy constitutes an endorsement of a religious view . . . . . . . . . . 57

F.    The Civil Divisiveness Resulting From The Challenged Policy Constitutes Strong Evidence That The Community Perceives Defendants To Have Taken Sides In A Religious Dispute . . . . . . . . 60

    1.    The Board's conduct has engendered religiously based divisions in the community . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

    2.    The letters to the editor and editorials are admissible and highly probative of that divisiveness . . . . . . . . . . . . . . . . . . . 67

II.    DEFENDANTS' PRIMARY PURPOSE WAS TO ADVANCE RELIGION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

    A.    The Purpose Inquiry Requires Consideration Of The Legislative History And Historical Context For The Board's Actions . . . . . . . . 74

    B.    The Challenged Policy, Its Legislative History, and Its Historical Context All Conclusively Show That The District's Purpose Was Religious . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

        1.    The disclaimer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

        2.    The legislative history . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

    C.    To The Extent That Defendants Advance A Secular Purpose, It Is A Sham . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

ii

# TABLE OF CONTENTS

**Page**

D.   Defendants Cannot Distance Themselves From Their Own Actions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

    1.   The Board members' untruthful testimony constitutes strong evidence of improper purpose . . . . . . . . . . . . . . . . . . 101

    2.   Both settled Supreme Court authority and common sense dictate that this Court should refuse to credit defendants' claim to have put aside their creationist agenda . . . . . . . . . . 105

III.   THE CHALLENGED POLICY'S PRIMARY EFFECT IS TO ADVANCE RELIGION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*ACLU v. Black Horse Pike Reg'l Bd. of Educ.*,
   84 F.3d 1471 (3d Cir. 1996) ................................. *passim*

*Agostini v. Felton*, 521 U.S. 203 (1997) .............................. 6, 20

*Bennun v. Rutgers State Univ.*, 941 F.2d 154 (3d Cir. 1991) ............... 103

*Bd. of Educ. v. Grumet*, 512 U.S. 687 (1994) ............................. 3

*Bd. of Educ. v. Mergens*, 496 U.S. 226 (1990) ....................... *passim*

*Books v. Elkhart County, Ind.*, 401 F.3d 857
   (7th Cir. 2005) ................................................. 67

*Bowen v. Kendrick*, 487 U.S. 589 (1988) ................................ 3

*Bown v. Gwinnett County School District*, 112 F.3d 1464
   (11th Cir. 1990) ............................................... 79

*Capital Square Review & Advisory Bd. v. Pinette*,
   515 U.S. 753 (1995) ........................................ *passim*

*Child Evangelism Fellowship v. Stafford Twp. Sch. Dist.*,
   386 F.3d 514 (3d Cir. 2004) ................................. *passim*

*Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*,
   447 U.S. 102 (1980) ............................................ 79

*County of Allegheny v. ACLU*, 492 U.S. 573 (1989) ................... *passim*

*Daniel v. Waters*, 515 F.2d 485 (6th Cir. 1975) ...................... 45, 46

# TABLE OF AUTHORITIES

**Page(s)**

*Daubert v. Merrell Dow Pharm., Inc.*,
    509 U.S. 579 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96, 97, 98, 100

*DeStefano v. Emergency Hous. Group, Inc.*, 247 F.3d 397
    (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Doe v. Harlan County Sch. Dist.*, 96 F. Supp. 2d 667 (E.D. Ky. 2000), *aff'd,*
    *ACLU v. McCreary County, Ky.*, 354 F.3d 438 (6th Cir. 2003),
    *cert. denied sub nom. Harlan County, Ky. v. ACLU*,
    125 S. Ct. 2988 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 40

*Doe v. Porter*, 370 F.3d 558 (6th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . 24

*Edwards v. Aguillard*, 482 U.S. 578 (1987) . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Epperson v. Arkansas*, 393 U.S. 97 (1968) . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Freethought Soc'y v. Chester County*, 334 F.3d 247 (3d Cir. 2003) . . . . . . *passim*

*Freiler v. Tangipahoa Parish Bd. of Educ.*,
    185 F.3d 337 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Freiler v. Tangipahoa Parish Bd. of Educ.*, 975 F. Supp. 819
    (E.D. La. 1997), *aff'd*, 185 F.3d 337 (5th Cir. 1999) . . . . . . . . . . . . . . . . 58

*Good News Club v. Milford Cent. Sch.*, 533 U.S. 98 (2001) . . . . . . . 5, 6, 21, 22, 42

*Gov't of Virgin Islands v. Lovell*, 378 F.2d 799 (3d Cir. 1967) . . . . . . . . 103, 104

*Joki v. Bd. of Educ.*, 745 F. Supp. 823 (N.D.N.Y. 1990) . . . . . . . . . . . . . . . . 24

*Kanawha & Mich. Ry. v. Kerse*, 239 U.S. 576 (1916) . . . . . . . . . . . . . . . . . . 103

# TABLE OF AUTHORITIES

**Page(s)**

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*,
 508 U.S. 384 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Larson v. Valente*, 456 U.S. 228 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Lee v. Weisman*, 505 U.S. 577 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . 19, 109, 110

*Lemon v. Kurtzman*, 403 U.S. 602 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Lynch v. Donnelly*, 465 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Malnak v. Yogi*, 440 F. Supp. 1284 (D.N.J. 1977),
 *aff'd*, 592 F.2d 197 (3d Cir. 1979) (per curiam) . . . . . . . . . . . . . . . . . . . 31, 56

*Marks v. United States*, 430 U.S. 188 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

*McCollum v. Bd. of Educ.*, 333 U.S. 203 (1948) . . . . . . . . . . . . . . . . . . . . . . . . 109

*McCreary County, Ky. v. ACLU*, 125 S. Ct. 2722 (2005) . . . . . . . . . . . . . . . *passim*

*McLean v. Ark. Bd. of Educ.*,
 529 F. Supp. 1255 (E.D. Ark. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*McQueeney v. Wilimington Trust Co.*, 779 F.2d 916 (3d Cir. 1985) . . . . . . . . . 102

*Mitchell v. Helms*, 530 U.S. 793 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Modrovich v. Allegheny County*, 385 F.3d 397 (3d Cir. 2004) . . . . . . . . . . . *passim*

*Mozert v. Hawkins County Bd. of Educ.*,
 827 F.2d 1058 (6th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Peloza v. Capistrano Unified Sch. Dist.*, 37 F.3d 517 (9th Cir. 1994) . . . . . . . . . 58

vi

# TABLE OF AUTHORITIES

**Page(s)**

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000) . . . . . . . . . . . 103

*Romano v. Oklahoma*, 512 U.S. 1(1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
515 U.S. 819 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 12

*Rusk v. Crestview Local Sch. Dist.*, 379 F.3d 418
(6th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290 (2000) . . . . . . . . . . . . . . . *passim*

*Sch. Dist. v. Ball*, 473 U.S. 373 (1985), *overruled in part on*
*other grounds*, *Agostini v. Felton*, 521 U.S. 203 (1997) . . . . . . . . . 19, 20, 39

*Sch. Dist. v. Schempp*, 374 U.S. 203 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Scopes v. Tennessee*, 289 S.W. 363 (1927) . . . . . . . . . . . . . . . . . . . . 44, 45, 47, 50

*Selman v. Cobb County Sch. Dist.*,
390 F. Supp. 2d 1286 (N.D. Ga. 2005) . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Sheridan v. E.I. DuPont de Nemours & Co.*,
100 F.3d 1061 (3d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

*Tenafly Eruv Ass'n v. Borough of Tenafly*,
309 F.3d 144 (3d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 12, 39, 67

*Texas Monthly, Inc. v. Bullock*, 489 U.S. 1 (1989) . . . . . . . . . . . . . . . . . 13, 14, 108

*Van Orden v. Perry*, 125 S. Ct. 2854 (2005) . . . . . . . . . . . . . . . . . . . . . . 61, 65, 67

*Verbena United Methodist Church v. Chilton County Bd. of Educ.*,
765 F. Supp. 704 (M.D. Ala. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

vii

# TABLE OF AUTHORITIES

**Page(s)**

*Wallace v. Jaffree*, 472 U.S. 38 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Washegesic v. Bloomingdale Pub. Sch.*, 813 F. Supp. 559
    (W.D. Mich. 1993), *aff'd*, 33 F.3d 679 (6th Cir. 1994) . . . . . . . . . . . . 23, 40

*Zelman v. Simmons-Harris*, 536 U.S. 639 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Zorach v. Clauson*, 343 U.S. 306 (1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

## CONSTITUTION

U.S. CONST. amend. I, cl. 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

## MISCELLANEOUS

Brief of United States as *Amicus Curiae*, *McCreary County, Ky. v.
    ACLU*, 125 S. Ct. 2722 (2005) (No. 03-1693) . . . . . . . . . . . . . . . . . . . . . . 77

PERCIVAL DAVIS & DEAN H. KENYON, OF PANDAS AND PEOPLE: THE
    CENTRAL QUESTION OF BIOLOGICAL ORIGINS (2d ed. 1993) . . . . . . . *passim*

3 FED. JURY PRAC. & INSTR. § 105.04 (5th ed. 2005) . . . . . . . . . . . . . . . . . . . . . 103

2 JOHN H. WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW
    § 278(2) (Chadbourn rev. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

George Will, Editorial, *What next for conservatives*, TOWNHALL.COM,
    Nov. 17, 2005, http://www.townhall.com/opinion/columns/
    georgewill/2005/11/17/175897 .html . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

W. PAGE KEETON ET AL., PROSSER AND KEETON ON TORTS (5th ed. 1984) . . . . . 69

# TABLE OF AUTHORITIES

**Page(s)**

Charles Krauthammer, Op-Ed, *Phony Theory, False Conflict:*
  *'Intelligent Design' Foolishly Pits Evolution Against Faith*,
  WASH. POST, Nov. 18, 2005  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65


CHARLES MCCORMICK, HANDBOOK OF THE LAW OF EVIDENCE
  § 273 (2d ed. 1972)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102, 103

*The 700 Club* (CBN television broadcast Nov. 10, 2005),
  *available at* http://www.cbn.com/700club/Guests/Bios/
  Kyle_Maynard111005.asp  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1986) . . . . . . . . . . . . . . 34

## INTRODUCTION

After six weeks in the courtroom, nine expert witnesses, twenty-three fact witnesses, hundreds of exhibits, and more hours discussing bacterial flagella than any judge should ever have to endure, at least three things are entirely clear:  First, intelligent design is nothing more than warmed-over creationism, invoking God not by name but tacitly, with a wink and a nod.  Second, the Dover Area School Board set out to inject that brand of creationism into its ninth-grade-biology curriculum; and with the help of the Thomas More Law Center and the Discovery Institute, it did just that.  And third, the Board's actions have, unfortunately but also unsurprisingly, generated religiously based civil discord.

The Establishment Clause of the First Amendment to the U.S. Constitution was designed, intelligently, to prevent just such strife by prohibiting public officials from furthering their personal religious agendas using the machinery of the state.  To that end, the Clause reserves to parents the right to decide what religious education their children will receive.  Here, however, the Dover Area School Board arrogated to itself that intensely important, intensely personal decision, sacrificing Dover students' science education in order to impose the Board's own particular brand of religion — without regard for the students' own beliefs or the faiths of their families.  And the intelligent-design movement self-consciously provided the District with the tools to accomplish that aim.

Plaintiffs seek to vindicate the fundamental principles of the Establishment Clause for themselves as parents, deprived of the right to determine what religious education their children will receive; for their children as students, whose science education the District sacrificed to further a religious objective; for the Dover community, which defendants plunged into religious and political turmoil; and for parents across the country, who now wait to see whether their local school boards will be given license to press intelligent-design creationism on the students in their charge, immersing their communities in conflict over the intelligent-design movement's religious agenda.  Plaintiffs have incurred substantial expense presenting their case; and their experts have donated countless hours bringing their expertise to bear on the factual and legal issues that this case raises.  On the other side of the equation, defendants have undoubtedly incurred substantial expense tendering their defense and offering their own expert witnesses.  And this Court has committed substantial judicial resources giving the parties a full and fair hearing.  The parties, the Dover community, and communities across the country, now look to this Court to give guidance as to whether intelligent-design creationism and so-called evidence against evolution can be incorporated into public-school science classes.  The answer to that question is straightforward:  They cannot.

# ARGUMENT[1]

"There is and can be no doubt that the First Amendment does not permit the State to require that teaching and learning must be tailored to the principles or prohibitions of any religious sect or dogma."[2]  The Establishment Clause mandates that, "[i]n the relationship between man and religion, the State [must be] firmly committed to a position of neutrality."[3]  And that principle applies with particular force to public schools and their policymakers:  "[O]ne of the few absolutes in Establishment Clause jurisprudence is the 'prohibit[ion against] government-financed or government-sponsored indoctrination into the beliefs of a particular religious faith.'"[4]  Simply stated, "Government may not * * * undertake religious instruction."[5]

---

[1]     For simplicity's sake, plaintiffs will cite to the record using the format X:Y to denote volume (X) and page number (Y) of the transcript.  We will cite to paragraphs in the proposed findings of fact using the format FF__, and to plaintiffs' trial exhibits using the format P__.

[2]     *Epperson v. Arkansas*, 393 U.S. 97, 106 (1968).

[3]     *Sch. Dist. v. Schempp*, 374 U.S. 203, 226 (1963); *accord, e.g.*, *Bd. of Educ. v. Grumet*, 512 U.S. 687, 703 (1994) ("a principle at the heart of the Establishment Clause [is] that government should not prefer one religion to another, or religion to irreligion"); *Larson v. Valente*, 456 U.S. 228, 244 (1982) ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another.").

[4]     *DeStefano v. Emergency Hous. Group, Inc.*, 247 F.3d 397, 416 (2d Cir. 2001) (quoting *Bowen v. Kendrick*, 487 U.S. 589, 611 (1988)) (alteration in original).

[5]     *Zorach v. Clauson*, 343 U.S. 306, 314 (1952).

3

The Dover Area School District and its Board of Directors have violated that clear constitutional prohibition.

## I.   DEFENDANTS' POLICY AND CURRICULUM CHANGE IMPROPERLY ENDORSE A PARTICULAR RELIGIOUS VIEW.

Although the parties agree that the *Lemon* test applies to this case, defendants object to using the endorsement test, arguing that it applies only to religious-display cases.  Defendants are wrong as a matter of law:  In this Circuit, ***both*** the endorsement test ***and*** the *Lemon* test apply.  And both point to the same conclusion:  Defendants violated the Establishment Clause.

### A.   The Endorsement Test Applies To Defendants' Actions Here No Less Than To Any Other Governmental Conduct Favoring Religion.

Notwithstanding defendants' contention that the endorsement test is (or should be) limited to the religious-display context,[6] both the Supreme Court and the Third Circuit routinely apply that test to all classes of Establishment Clause cases — including cases like this one that challenge incorporation of religion into the public schools.  The Third Circuit, moreover, treats the endorsement test as separate from the *Lemon* test, applying the endorsement test first and then conducting a separate *Lemon* inquiry.  Best practice in this circuit, therefore, would be for this Court to do the same here.

---

[6]      *See, e.g.*, Defs.' Reply Supp. Mot. Summ. J. at 52.

4

1.     **The endorsement test applies in all Establishment Clause cases.**

Despite defendants' claim that 'endorsement' is a concept suited only to public displays of religious objects, neither the Supreme Court nor the Third Circuit views it that way.  On the contrary, since a majority of the Supreme Court first implemented the endorsement test in *County of Allegheny v. ACLU*,[7] the Court has consistently applied the test to all types of Establishment Clause cases — including, notably, ones involving religion in public-school settings.  And the same is true for the Third Circuit.

In case after case since *Allegheny*, the Supreme Court has applied the endorsement test whenever Establishment Clause concerns have been implicated — irrespective of whether the cases involved religious displays.  In *Santa Fe Independent School District v. Doe*, for example, the Court applied the endorsement test to school-sponsored prayer at high-school football games.[8]  In *Zelman v. Simmons-Harris*, the Court applied the test to a school-voucher program.[9]  In *Good News Club v. Milford Central School*, the Court applied the test to a school district's policy regarding a

_____

[7]     492 U.S. 573 (1989).

[8]     530 U.S. 290, 307-10 (2000).

[9]     536 U.S. 639, 652-53 (2002).

student religious-club meeting on school property.[10]  In *Mitchell v. Helms*[11] and *Agostini v. Felton*,[12] the Court applied the test to programs providing governmental aid to parochial schools.[13]  In *Rosenberger v. Rector & Visitors of the University of Virginia*, the Court applied the test to a public university's policy regarding funding of a student religious newspaper.[14]  And in *Lamb's Chapel v. Center Moriches Union Free School District*, the Court applied the test to a school district's policy regarding a church's use of school facilities after hours.[15]  None of those cases involved a challenge to a religious display; yet in each, the Supreme Court reviewed the challenged governmental conduct to see whether it constituted religious endorsement.[16]

---

[10]    533 U.S. 98, 118-19 (2001).

[11]    530 U.S. 793 (2000).

[12]    521 U.S. 203 (1997).

[13]    *Mitchell*, 530 U.S. at 835 (plurality op.); *id.* at 842 (O'Connor, J., concurring in judgment) (controlling concurring opinion); *Agostini*, 521 U.S. at 234-35.

[14]    515 U.S. 819, 841-42 (1995); *id.* at 846 (O'Connor, J., concurring).

[15]    508 U.S. 384, 395 (1993).

[16]    Despite the Supreme Court's reliance on the endorsement test in all manner of Establishment Clause cases, defendants argued in their summary-judgment Reply that this Court should not apply the endorsement test to the challenged policy here because the Supreme Court did not apply that test to the creationism statutes at issue in *Epperson*, *supra*, and *Edwards v. Aguillard*, 482 U.S. 578 (1987).  *See* Defs.'

The cases have something else in common too:  In each, the Supreme Court reviewed a public school district's (or, in *Rosenberger*, a public university's) policy touching on religion.  Accordingly, it is beyond peradventure that the endorsement test applies to the policies of a public school district and the actions of its decisionmakers.

Indeed, the Supreme Court could not have been more clear on that score than it was in *Santa Fe*:  The Court in that case first defined the endorsement test, noting, "[i]n cases involving state participation in a religious activity, one of the relevant questions is 'whether an objective observer, acquainted with the text, legislative history, and implementation of the statute, would perceive it as a state endorsement of prayer in public schools.'"[17]  The Court then went on to  describe more concretely how the test functions in the public-school context, explaining:

_____

Reply Supp. Mot. Summ. J. at 52.  But *Epperson* was decided in 1968 — five years before *Lemon*, and hence nearly **two decades** before Justice O'Connor first began to articulate the endorsement test as a way to conceptualize *Lemon*.  And not only did *Edwards* similarly pre-date the test's adoption in *Allegheny*, but the Supreme Court in that case **did** invoke the endorsement concept.  *See Edwards*, 482 U.S. at 585 ("If the law was enacted for the purpose of endorsing religion, 'no consideration of the second or third criteria [of *Lemon*] is necessary.'" (quoting *Wallace v. Jaffree*, 472 U.S. 38, 56 (1985) (alteration in original)).   And in all events, *Edwards* was a 'purpose' case, so there would have been no need for the Court to go into a full-scale endorsement analysis even if the test had existed at the time, as the test itself is most closely associated with *Lemon*'s 'effect' prong rather than its 'purpose' prong.  *See infra* Sections I.A.2, I.B.

[17]    530 U.S. at 308 (quoting *Wallace*, 472 U.S. at 73, 76).

> School sponsorship of a religious message is impermissible
> because it sends the ancillary message to members of the audience who
> are nonadherents "that they are outsiders, not full members of the
> political community, and an accompanying message to adherents that
> they are insiders, favored members of the political community."[18]

Whatever reason defendants here may have to fear this Court's application of the endorsement test, their claim that it does not apply to cases like this one cannot be squared with *Santa Fe* or the Supreme Court's post-*Allegheny* Establishment Clause jurisprudence generally.

Nor does the law of this Circuit provide any more support for defendants' position. On the contrary, the Third Circuit has not hesitated to apply the endorsement test to cases involving public-school policies; indeed, in its recent cases the court of appeals has gone a step further, treating the endorsement test as the primary Establishment Clause inquiry. In *Child Evangelism Fellowship v. Stafford Township School District*,[19] for example, the court of appeals (per Judge Alito) applied the endorsement test in considering whether a public school district would violate the Establishment Clause if it allowed religious groups to access students through a take-home-flyer system or a back-to-school-night event.[20] And in *ACLU v. Black Horse*

---

[18]     *Santa Fe*, 530 U.S. at 309-10 (quoting *Lynch v. Donnelly*, 465 U.S. 668, 688 (1984) (O'Connor, J., concurring)).

[19]     386 F.3d 514 (3d Cir. 2004).

[20]     *Id.* at 530.

*Pike Regional Board of Education*,[21] the court of appeals applied the endorsement test in considering a challenge to a school-board policy with respect to whether prayer would be included in high-school-graduation ceremonies. The court in *Black Horse Pike* explained straightforwardly that its duty was to "determine whether, under the totality of the circumstances, the challenged practice conveys a message favoring or disfavoring religion."[22]

If defendants wish to advocate that the endorsement test should be abandoned or that it should be held inapplicable in cases challenging public-school policies, they must take up that issue in the Supreme Court. But unless or until the Supreme Court directs a watershed change in its settled Establishment Clause jurisprudence, this Court remains bound by the Supreme Court's and the Third Circuit's consistent rulings: The endorsement test applies here just as much as in any other Establishment Clause challenge.

> **2.    In this circuit, the endorsement test should be applied separate from, and prior to, the *Lemon* test.**

As for how the endorsement test relates to *Lemon*, the Third Circuit treats the endorsement inquiry as a distinct test to be applied separately from, and prior to, the

---

[21]    84 F.3d 1471 (3d Cir. 1996).

[22]    *Id.* at 1486.

9

*Lemon* test. Thus, although this Court need not blind itself to the fact that there is substantial overlap between the endorsement inquiry and *Lemon*'s effect prong, the best practice will be for the Court to evaluate defendants' conduct under the endorsement test first, and then to subject it to traditional *Lemon* analysis.

In a number of opinions, the Third Circuit wrestled with how to view the endorsement test. In *Black Horse Pike*, the court initially took the view that it made no difference whether the endorsement test was regarded as "a separate inquiry" or merely "part of the inquiry under *Lemon*" because, as the court saw it, "the import of the test is the same."[23] Later, in *Tenafly Eruv Ass'n v. Borough of Tenafly*, the court took a different tack, treating the endorsement test as having superceded *Lemon*.[24] But in its most recent spate of Establishment Clause opinions, the court has settled on a belt-and-suspenders approach:[25]   In *Freethought Society v. Chester County*,[26]

---

[23]   84 F.3d at 1486.

[24]   309 F.3d 144, 175-77 (3d Cir. 2002).

[25]   *See, e.g.*, *Modrovich v. Allegheny County*, 385 F.3d 397, 406 (3d Cir. 2004) ("[A]lthough we find the endorsement test to be the appropriate standard by which to scrutinize the Plaque, we will apply both the endorsement test and the *Lemon* test, in case a higher court prefers to apply the traditional *Lemon* test.").

[26]   334 F.3d 247, 261 (3d. Cir. 2003).

*Modrovich v. Allegheny County*,[27] and *Child Evangelism*,[28] the court adopted the practice of applying **both** tests, conducting the endorsement inquiry first and then, separately, measuring the challenged conduct against *Lemon*'s traditional purpose and effect standards.

But while the Third Circuit now formally treats the endorsement test and the *Lemon* test as distinct inquiries to be performed *seriatim*, it has continued to recognize the relationship between the two. In *Freethought*, for example, the court noted that "effect under the *Lemon* test is cognate to endorsement,"[29] and hence the court did not hesitate simply to "incorporate [its] discussion of endorsement" into the effect analysis.[30] By contrast, the court in *Child Evangelism* treated the two inquiries as implicating slightly different — albeit related — considerations: In its endorsement inquiry the court focused on whether granting a religious group equal access to a public school's facilities would communicate a message that government was sponsoring the group or its religious beliefs; and in its effect inquiry the court focused

---

[27]    385 F.3d at 401-04, 406-13.

[28]    386 F.3d at 530-35.

[29]    334 F.3d at 269. That conclusion follows logically from Justice O'Connor's explanation that "[t]he effect prong asks whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval." *Lynch*, 465 U.S. at 690 (O'Connor, J., concurring).

[30]    *Id.*

on whether allowing the group to use school facilities would improperly advance the group's religious mission.[31]   Yet *Child Evangelism*'s 'effect' analysis was abbreviated — presumably because the court had already scrutinized the facts under the endorsement test, and all that remained under the purpose prong was to apply *Lemon*'s different conceptual framework to those facts.[32]

The upshot is that, while Third Circuit precedent requires this Court to apply the endorsement test and strongly encourages this Court then to apply traditional *Lemon* analysis as a formally separate inquiry, this Court need not plow the same ground twice.  It may instead incorporate by reference the factual findings and legal conclusions from the endorsement analysis insofar as they also relate to *Lemon*'s effect prong.  With those procedures in mind, and in order to alleviate some of the burden on the Court, we turn to a more thorough and systematic explication of the endorsement test.

**B.    Nature Of The Endorsement Test.**

"[T]here is a vital difference between purely private religiously motivated conduct and conduct initiated or sponsored by government."[33]  The endorsement test

---

[31]    386 F.3d at 531, 534.

[32]    *Id.* at 534.

[33]    *Tenafly*, 309 F.3d at 177 (citing *Rosenberger*, 515 U.S. at 841).

12

takes this distinction seriously, recognizing that when government transgresses the

limits of neutrality and acts in ways that show religious favoritism or sponsorship, it

violates the Establishment Clause.

> 1.      As Justice O'Connor first elaborated it, the endorsement test was a gloss

on *Lemon* that encompassed both the purpose and the effect prongs:

> The central issue * * * is whether [the government] has endorsed
> [religion] by its [actions].  To answer that question, we must examine
> both what [the government] intended to communicate * * * and what
> message [its conduct] actually conveyed.  The purpose and effect prongs
> of the *Lemon* test represent these two aspects of the meaning of the
> [government's] action."[34]

But as it developed through application, the test has come to be primarily a lens

through which to view 'effect,' with purpose evidence being relevant to the inquiry

derivatively — just as it always was to *Lemon*'s effect analysis — both because what

---

[34]      *Lynch*, 465 U.S. at 690 (O'Connor, J., concurring).  As the plurality
explained in *Texas Monthly, Inc. v. Bullock*:

> In proscribing all laws "respecting an establishment of religion," the
> Constitution prohibits, at the very least, legislation that constitutes an
> endorsement of one or another set of religious beliefs or of religion
> generally. It is part of our settled jurisprudence that "the Establishment
> Clause prohibits government from abandoning secular purposes in order
> to put an imprimatur on one religion, or on religion as such, or to favor
> the adherents of any sect or religious organization."

489 U.S. 1, 8-9 (1989) (plurality op.) (citations omitted); *see also Freiler v.
Tangipahoa Parish Bd. of Educ.*, 185 F.3d 337, 346 (5th Cir. 1999); *Selman v. Cobb
County Sch. Dist.*, 390 F. Supp. 2d 1286, 1305-06 (N.D. Ga. 2005).

policymakers set out to accomplish is typically strong evidence of what they actually do accomplish, and because members of the community take that fact into account when considering what a particular enactment means.[35]   The test starts from the principle that government may not "adopt a 'preference for the dissemination of religious ideas,'"[36] recognizing that official action violates that proscription if it "'convey[s] * * * a message that religion or a particular religious belief is *favored* or *preferred*.'"[37]  Ultimately, the test seeks to ascertain whether some action "place[s the government's] prestige, coercive authority, or resources behind a single religious faith or behind religious belief in general,"[38] on the ground that "[t]he Establishment Clause, at the very least, prohibits government from appearing to take a position on

---

[35]    *See, e.g.*, *McCreary County, Ky. v. ACLU*, 125 S. Ct. 2722, 2747 (2005) (O'Connor, J., concurring) ("The purpose behind the counties' display is relevant because it conveys an unmistakable message of endorsement to the reasonable observer."); *Lynch*, 465 U.S. at 690 (O'Connor, J., concurring) ("The meaning of a statement to its audience depends both on the intention of the speaker and on the 'objective' meaning of the statement in the community.").

[36]    *Allegheny*, 492 U.S. at 593 (citing *Texas Monthly*, 489 U.S. at 28 (Blackman, J., concurring)).

[37]    *Id.* (quoting *Wallace*, 472 U.S. at 70 (O'Connor, J., concurring in judgment)) (emphasis in original).

[38]    *Texas Monthly*, 489 U.S. at 9 (plurality op.).

14

questions of religious belief or from 'making adherence to a religion relevant in any way to a person's standing in the political community.'"[39]

The test consists of the reviewing court determining what message a challenged governmental policy or enactment conveys to a reasonable, objective observer who knows the policy's language, origins, and legislative history, as well as the history of the community and the broader social and historical context in which the policy arose.[40]  "[T]he reasonable observer is an informed citizen who is more knowledgeable than the average passerby":[41]  In addition to knowing the challenged conduct's history, the observer is deemed able to "glean other relevant facts" from the face of the policy in light of its context.[42]  And knowing the challenged policy's legislative history, the community's history, and the broader social and historical

---

[39]    *Allegheny*, 492 U.S. at 594 (quoting *Lynch*, 465 U.S. at 687 (O'Connor, J., concurring)).

[40]    *McCreary*, 125 S. Ct. at 2736-37 (objective observer "presumed to be familiar with the history of the government's actions and competent to learn what history has to show"); *Santa Fe*, 530 U.S. at 308 (objective observer familiar with "'implementation of'" governmental action (citation omitted)); *Selman*, 390 F. Supp. 2d at 1306 (objective observer "familiar with the origins and context of the government-sponsored message at issue and the history of the community where the message is displayed").

[41]    *Modrovich*, 385 F.3d at 407; *accord Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 779 (1995) (O'Connor, J., concurring).

[42]    *Modrovich*, 385 F.3d at 407; *see also Freethought*, 334 F.3d at 258-60.

15

context in which the policy arose, the objective observer thus considers the publicly available evidence relevant to the purpose inquiry,[43] albeit not to ascertain, strictly speaking, what the governmental purpose actually was.  Instead, the observer looks to that evidence to ascertain whether the policy "in fact conveys a message of endorsement or disapproval" of religion, irrespective of what the government might have intended by it.[44]  Put differently, whereas the purpose inquiry looks at the "intention of the speaker" *simpliciter*, the effect inquiry focuses on "the 'objective' meaning of the statement [*i.e.*, the challenged governmental conduct] in the community" — an analysis that is informed by purpose evidence just to the extent that an objective observer would look to that evidence to ascertain the conduct's actual meaning in and for the community.[45]

    2.    With apologies for belaboring the point, the Third Circuit recently summarized the endorsement test this way:

---

[43]    *See, e.g.*, *Selman*, 390 F. Supp. 2d at 1306-07.

[44]    *Lynch*, 465 U.S. at 690 (O'Connor, J., concurring) ("The central issue in this case is whether [government] has endorsed Christianity by its [actions]. To answer that question, we must examine both what [the government] intended to communicate * * * and what message [its conduct] actually conveyed.  The purpose and effect prongs of the *Lemon* test represent these two aspects of the meaning of the [government's] action."); *Freiler*, 185 F.3d at 346; *Selman*, 390 F. Supp. 2d at 1305-06.

[45]    *Lynch*, 465 U.S. at 690 (O'Connor, J., concurring).

16

An unconstitutional endorsement of religion is said to occur when government makes adherence to a religion relevant in any way to a person's standing in the political community.  Endorsement sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community. * * *

In order to determine whether a challenged practice constitutes an endorsement or disapproval of religion, the practice must be judged in its unique circumstances.  In addition, the challenged practice must be considered from the perspective of a hypothetical reasonable observer who is aware of the history and context of the community and forum.[46]

The endorsement test's central question remains, however, whether governmental conduct in fact conveys a message of official endorsement or disapproval of religion, with the reasonable, objective observer being the hypothetical construct for considering that question.

### C.    Defendants' Conduct Should Be Judged Both From The Standpoint Of An Objective Student And From The Standpoint Of An Objective Adult.

The challenged conduct here falls into two basic categories:  That which the District directed to students in the classroom, and that which the District directed to parents and the Dover community as a whole.  Because the endorsement test is designed to suss out "the 'objective' meaning of the statement [that the District's

---

[46]    *Child Evangelism*, 386 F.3d at 530-31 (quotation marks and emphasis omitted) (quoting *Pinette*, 515 U.S. at 780 (O'Connor, J., concurring); *Allegheny*, 492 U.S. at 624-25).

conduct communicated] in the community"[47] by focusing on how "the members of the listening audience" perceive the conduct,[48] those two categories of conduct must be viewed from different perspectives.  For the disclaimer that the District ordered the science teachers (and, when they refused, the District's administrators) to read in the biology classrooms, the students are the primary listening audience.  So at minimum, "the operative inquiry is whether an 'objective observer' in the position of a student of the relevant age would 'perceive official school support' for the religious activity in question."[49]  In other words, this Court should in the first instance consider "the message conveyed by the disclaimer to the students who are its intended audience,"[50] from the perspective of "an objective [Dover Area] High School student."[51]  But as for the conduct directed at the Dover community as a whole — most obviously the newsletter advocating intelligent-design creationism that the Board voted to send to every household in the district, as well as the Board members' explication and defense

---

[47]     *Lynch*, 465 U.S. at 690 (O'Connor, J., concurring).

[48]     *Santa Fe*, 530 U.S. at 308.

[49]     *Verbena United Methodist Church v. Chilton County Bd. of Educ.*, 765 F. Supp. 704, 711 (M.D. Ala. 1991) (quoting *Bd. of Educ. v. Mergens*, 496 U.S. 226, 249 (1990)).

[50]     *Freiler*, 185 F.3d at 346 (citing *Allegheny*, 492 U.S. at 620).

[51]     *Santa Fe*, 530 U.S. at 308.

of the curriculum change in Board meetings and in the media — the listening audience was and is much broader.  So this Court must take that fact into account, evaluating the conduct from the standpoint of a reasonable, objective, adult observer in the Dover community.

In both cases, defendants have communicated a clear and unequivocal message that the Dover schools are endeavoring to "protect and maintain a particular religious viewpoint,"[52] both by disparaging the scientific theory historically thought to rival that viewpoint, and by encouraging students to study and reflect on inherently religious beliefs.  Accordingly, both the statement read to students and the broader policy of which it is a part are unconstitutional endorsements of religion that this Court should strike down.

### D.    An Objective Student Would View The Disclaimer As A Strong Official Endorsement Of Religion.

Because students in public schools "are impressionable and their attendance is involuntary,"[53] cases like this one require "particular[] vigilan[ce] in monitoring compliance with the Establishment Clause."[54]  Defendants insist that Dover ninth-

---

[52]    *Freiler*, 185 F.3d at 346.

[53]    *Edwards*, 482 U.S. at 584.

[54]    *Id.* at 583; *see also Lee v. Weisman*, 505 U.S. 577, 592-93 (1992) (students are impressionable and must be protected from government's coercive power); *Sch. Dist. v. Ball*, 473 U.S. 373, 390 (1985) ("The inquiry into this kind of

19

graders are the disclaimer's only relevant audience;[55] so while that is wrong for the reasons just stated, there is no question that the Court should, at minimum, evaluate the disclaimer from a reasonable student observer's standpoint.[56] As explained below, when the evidence is viewed from that perspective there can be only one conclusion: The District has impermissibly sponsored a religious message in its public-school biology classes.[57]

1.    But first, plaintiffs must dispense with defendants' suggestion that this Court must ignore all the evidence apart from the bare text of the administrators'

---

effect must be conducted with particular care when many of the citizens perceiving the governmental message are children in their formative years."), *overruled in part on other grounds*, *Agostini v. Felton*, 521 U.S. 203 (1997); *Selman*, 390 F. Supp. 2d at 1306.

[55]    *See* Defs.' Reply Supp. Mot. Summ. J. at 54.

[56]    *Santa Fe*, 530 U.S. at 307-08.  Defendants contend, however, that the endorsement test makes no sense here because (a) unlike in religious-display cases, "[t]here is no 'physical setting' for th[e] observer to consider," and (b) there is no way to discern "how much or little knowledge" should be attributed to a ninth-grade student. Defs.' Reply Supp. Mot. Summ. J. at 53-54.  Yet the Supreme Court applied the endorsement test in *Santa Fe* — where the listening audience consisted primarily of high-school students; the challenged conduct was school-sponsored prayer; and the setting was a high-school football game.  *See Santa Fe*, 530 U.S. at 307-08.  The Supreme Court was not stymied in applying the endorsement test by the fact that the challenge was to a spoken prayer rather than a tangible physical object, nor did it hesitate to ascribe to the objective student the knowledge of the challenged policy's history that the endorsement test presupposes.  *Id.* at 308.

[57]    *See id.* at 309-10.

statement.  While defendants apparently wish to treat Dover biology students as either stupid or tragically uninformed about the controversy swirling around them — a position that itself reflects poorly on the Board and the school administrators charged with educating them — the Supreme Court in *Santa Fe* took a much more expansive view of the reasonable, objective student's knowledge, positing that an "objective Santa Fe High School student" would know "the text and history" of the policy permitting student-led prayer at school football games, and holding that such background knowledge would "reinforce our objective student's perception that the prayer is, in actuality, encouraged by the school."[58]  Similarly, in evaluating a school district's policy regarding inclusion of religious groups' flyers in the take-home folders that the district provided to elementary-school students, the Third Circuit held in *Child Evangelism* that "a reasonable observer, 'aware of the history and context of the community and forum,' would know that [the school district] has a policy of assisting a broad range of community groups, that [the district] plays no role in composing the flyers that are sent home and does not pay for them, and that [the district's] teachers do not discuss the flyers in class."[59]  Citing the Supreme Court's

---

[58]    *Id.* at 308; *cf. Mergens*, 496 U.S. at 250 ("secondary school students are mature enough and are likely to understand that a school does not endorse or support student speech that it merely permits on a nondiscriminatory basis").

[59]    *Child Evangelism*, 386 F.3d at 531.

admonition in *Good News* not to proscribe religious activity "on the basis of what the youngest members of the audience might misperceive,"[60] the court of appeals thus imputed to ***elementary-school students*** a detailed, sophisticated knowledge about the flyer-distribution system, school-board policies, and the nature of the surrounding community — despite the defendant school district's insistence that the students were incapable of understanding the distinction between school-sponsored extracurricular activities, on the one hand, and privately run activities that the school assisted in publicizing, on the other.[61]  The point, of course, is that a reasonable, objective student is not any actual student (or even an amalgam of actual students), but instead is a hypothetical student — one to whom the reviewing court imputes detailed historical and background knowledge, but also one who interprets the challenged conduct, in the light of that knowledge, with the level of intellectual sophistication that a child of the relevant age would bring to bear.

Indeed, reviewing courts often make no distinction at all between an adult observer and a student observer when deciding whether a public school's conduct

---

[60]     533 U.S. at 119.

[61]     *Child Evangelism*, 386 F.3d at 532 (quoting *Good News*, 533 U.S. at 118-119).

conveys an unconstitutional message of religious endorsement,[62] an approach that makes good sense because the imputed knowledge is the same in either case. But even in those cases where courts do draw that distinction, they do not treat the objective-student-observer standard as a ground for excluding contextual evidence so as to insulate governmental conduct from scrutiny. On the contrary, where reviewing courts have looked at a practice through students' eyes, they have recognized that because students are more impressionable than adults, they may be systematically less effective than adults at recognizing when religious conduct is unofficial and therefore permissible.[63]    In other words, the objective-student standard is ***not*** a tool for

---

[62]      *See, e.g.*, *Wallace*,  472 U.S. at 76 (O'Connor, J., concurring) ("The relevant issue is whether an objective observer, acquainted with the text, legislative history, and implementation of the statute [requiring public schools to observe moment of silence], would perceive it as a state endorsement of prayer in public schools."); *Black Horse Pike*, 84 F.3d at 1487 ("the reasonable observer here could not help but conclude that the Board favors the inclusion of prayer" in public-high-school graduation ceremony); *Doe v. Harlan County Sch. Dist.*, 96 F. Supp. 2d 667, 675 (E.D. Ky. 2000) (to determine whether Ten Commandments display in public high school conveys message of religious endorsement, "the court must ask whether an objective observer acquainted with the displays would perceive them as a governmental endorsement of religion"), *aff'd*, *ACLU v. McCreary County, Ky.*, 354 F.3d 438 (6th Cir. 2003), *cert. denied sub nom. Harlan County, Ky. v. ACLU*, 125 S. Ct. 2988 (2005); *Washegesic v. Bloomingdale Pub. Sch.*, 813 F. Supp. 559, 565 (W.D. Mich. 1993) ("The Court finds that any reasonable observer would find that the picture of Jesus [displayed in public high school] transmits a religious message."), *aff'd*, 33 F.3d 679 (6th Cir. 1994).

[63]      *See, e.g.*, *Selman*, 390 F. Supp. 2d at 1311 (textbook sticker stating that evolution was theory was particularly likely to convey message of endorsement "given

excluding or ignoring material evidence; it is instead a means to ensure that courts exercise the particular vigilance — the extra modicum of care — that the Supreme Court has mandated for protecting impressionable children from religious messages that appear to carry official imprimatur.[64]

2.    As for how the disclaimer in this case bears up under endorsement-test analysis, application of the objective-student standard is straightforward:    An objective Dover ninth-grader will "unquestionably perceive" the text of the disclaimer, "enlightened by its context and contemporary legislative history,"[65] as conferring on a religious concept "her school's seal of approval."[66]

---

the Sticker's intended audience, impressionable school students"); *Joki v. Bd. of Educ.*, 745 F. Supp. 823, 831 (N.D.N.Y. 1990) ("To an impressionable student, even the mere appearance of secular involvement in religious activities might indicate that the state has placed its imprimatur on a particular religious creed."); *see also Doe v. Porter*, 370 F.3d 558, 563 (6th Cir. 2004) ("Because [Bible course] is conducted in public school classrooms, during school hours, and for children who are as young as kindergarten age, we must treat the objective observers as students in these classes.").

[64]    *See generally Edwards*, 482 U.S. at 584.

[65]    *Selman*, 390 F. Supp. 2d at 1300; *see Edwards*, 482 U.S. at 594 (in addition to "[t]he plain meaning of the [enactment's] words, enlightened by their context and the contemporaneous legislative history," Supreme Court also looks for legislative purpose in "the historical context of the [enactment], and the specific sequence of events leading to [its] passage").

[66]    *Santa Fe*, 530 U.S. at 308.

The disclaimer here singles out evolutionary theory for special treatment; misrepresents its status in the scientific community; causes students to doubt its validity without scientific justification; presents students with a religious alternative masquerading as a scientific theory; directs them to consult a creationist text as though it were a science resource; and cordons off from the science curriculum a topic with religious implications, instructing students to forego scientific inquiry at school and instead to seek out religious instruction elsewhere.  And as Drs. Alters and Miller testified, introducing intelligent design necessarily invites religion into science class: It sets up what will be perceived by students as a "God-friendly" science (the one that mentions an intelligent designer) and that 'other science' (evolution) that takes no position on religion.[67]  Or, in Dr. Miller's words, it produces a false duality:  It "tells students * * * quite explicitly, choose God on the side of intelligent design or choose atheism on the side of science."[68]  Introducing such a religious conflict into the classroom is "very dangerous" because it forces students to "choose between God and science" — not a choice that schools should be foisting on them.[69]

---

[67]     14:144-45 (Alters).

[68]     2:54-55 (Miller).

[69]     2:55 (Miller).

25

In each respect, the disclaimer communicates the strong, unequivocal message that the Dover Area School District, its Board of Directors, and its administrators are promoting a particular religious view.

3.    Taking the disclaimer paragraph by paragraph:

In the disclaimer's first paragraph, defendants tell students that the "Pennsylvania Academic Standards require [them] to learn about Darwin's Theory of Evolution and eventually to take a standardized test of which evolution is a part."[70] Defendants do not mandate a similar pronouncement about any other aspect of the biology curriculum or the curriculum for any other course — even though the state standards speak directly to numerous other topics covered in the biology curriculum and the students' other classes, and even though standardized tests cover those other topics as well.  As the unrefuted testimony of science-education-expert Dr. Alters explains, and the testimony of Drs. Miller and Padian confirms, the message that this paragraph communicates to students is that:

> [W]e have to teach this stuff[.]  The other stuff we're just going to teach you, but now this one we have to say the Pennsylvania academic standards require[] students to * * * eventually take a test.  We'd rather not do it, but Pennsylvania academic standards * * * require students to do this.[71]

---

[70]    P124.

[71]    14:110-11 (Alters).

In other words, the paragraph disavows evolutionary theory, telling students that they will have to hear the upcoming lesson on evolution because the state says so, even though the Board and school administrators 'know' that evolutionary theory is flimsy or false.

In the second paragraph, defendants tell students that "Darwin's Theory is a theory," that "it continues to be tested as new evidence is discovered," that "it is not a fact," and that it has "[g]aps * * * for which there is no evidence."[72] The paragraph thus goes even further in singling out evolution from the rest of the science curriculum: The paragraph suggests to students that evolution, unlike everything else they are learning, is 'just a theory,' thereby playing on the "colloquial or popular understanding of the term ['theory'] and suggest[ing] to the informed, resonable observer that evolution is only a highly questionable 'opinion' or 'hunch.'"[73] And it tells students that evolutionary theory has "gaps" — a bizarre, indeed incoherent, way to speak of a scientific theory — without suggesting even the possibility that other scientific theories might suffer the same supposed weakness.  As Dr. Alters — the only science-education expert in the case — explained, the paragraph is thus

---

[72]     P124.

[73]     *Selman*, 390 F. Supp. 2d at 1310; *see* 14:110-12 (Alters); 1:92 (Miller).

misleading and creates misconceptions in students about evolutionary theory:[74]  It misrepresents the scientific status of evolution, telling students that they should regard it as singularly unreliable or on shaky ground.  Dr. Miller, speaking from the standpoint of a working biologist and author of the high-school-biology textbook, agreed, and went on to conclude that there is no scientific basis for introducing students to intelligent design.[75]  But perhaps most tellingly, even plaintiffs' expert Professor Fuller agreed as well, stating as his own expert opinion that the disclaimer is misleading.[76]  And Dr. Padian put the point most bluntly, stating that in confusing students about science generally and evolution in particular, the disclaimer makes students "stupid."[77]  In short, the disclaimer's second paragraph undermines the students' education in evolutionary theory, setting the groundwork for presenting students with the District's favored religious alternative.

And presenting that alternative is, of course, just what the third paragraph does: Defendants serve up intelligent design as an alternative "explanation of the origin of life that differs from Darwin's view," and they direct students to consult *Of Pandas*

---

[74]    14:117.

[75]    2:47-55.

[76]    Fuller Dep. 111.

[77]    17:48-52.

*and People* as though it were a scientific text that provided a scientific account of, and empirical scientific evidence for, intelligent design. The disclaimer thus contrasts the theory (or "view")  that biological organisms evolve — a theory that the District has now discredited in the students' eyes — with an alternative "explanation" that can be offered without qualification or cautionary note. In other words, the disclaimer relies on the very same "contrived dualism" that the court in *McLean v. Arkansas Board of Education* recognized to be a creationist tactic that has "no scientific factual basis or legitimate educational purpose."[78] And the overwhelming evidence at trial establishes

---

[78]    529 F. Supp. 1255, 1266 (E.D. Ark. 1982).  As the *McLean* court explained:

> The approach to teaching "creation science" and "evolution science" * * * is identical to the two-model approach espoused by the Institute for Creation Research and is taken almost verbatim from ICR writings.  It is an extension of Fundamentalists' view that one must either accept the literal interpretation of Genesis or else believe in the godless system of evolution.

> The two model approach of the creationists is simply a contrived dualism which has no scientific factual basis or legitimate educational purpose. It assumes only two explanations for the origins of life and existence of man, plants and animals:  It was either the work of a creator or it was not.  Application of these two models, according to creationists, and the defendants, dictates that all scientific evidence which fails to support the theory of evolution is necessarily scientific evidence in support of creationism and is, therefore, creation science "evidence" * * *.

*Id.* (footnote omitted).

that intelligent design is a religious view — the progeny of creation science — and not a scientific theory.[79]  As the Fifth Circuit held in *Freiler*, an educator's "reading of a disclaimer that not only disavows endorsement of educational materials but also juxtaposes that disavowal with an urging to contemplate alternative religious concepts implies School Board approval of religious principles."[80]

In the fourth paragraph, defendants encourage students to "keep an open mind," while "leav[ing] the discussion of the Origins of Life to individual students and their families."  The disclaimer thus mimics the one that the Fifth Circuit struck down in *Freiler* in two other key respects as well:  First, while encouraging students to keep an open mind and explore alternatives to evolution, it offers no scientific alternative; instead, the only alternative that it offers is an inherently religious one — namely, intelligent-design creationism.[81]  But even an unsophisticated ninth-grader — not to mention a reasonable, objective, fully informed one — will figure out that the phrase 'intelligent design' necessarily contemplates an 'intelligent designer,' *i.e.*, a

---

[79]    FF17-29.

[80]    185 F.3d at 348.

[81]    *Cf. Freiler*, 185 F.3d at 344-46 (disclaimer urging students to "exercise critical thinking and gather all information possible and closely examine each alternative toward forming an opinion" referenced "'Biblical version of Creation' as the only alternative theory," thus "encourag[ing] students to read and meditate upon religion in general and the 'Biblical version of Creation' in particular").

30

supernatural creator, which the Supreme Court has identified as an inherently religious concept.[82]  In other words, whether a student accepts the Board's invitation to explore *Pandas* (and hence reads and possibly takes to heart that creationist text) or instead follows the Board's other suggestion and discusses 'Origins of Life' with family members, it requires no great leap for the student to infer that the ***District's*** favored view is a religious one — and therefore that the District is sponsoring religion. Second, in directing students to their families to learn about the "Origins of Life," the paragraph performs exactly the same function as the *Freiler* disclaimer: It "remind[s] that students have the right to maintain beliefs taught by their parents regarding the

---

[82]    *Edwards*, 482 U.S. at 591 ("The preeminent purpose of the Louisiana Legislature was clearly to advance the religious viewpoint that a supernatural being created humankind."); *id.* at 599 (Powell, J., concurring) ("[T]he Balanced Treatment Act mandates that public schools present the scientific evidence to support a theory of divine creation whenever they present the scientific evidence to support the theory of evolution. '[C]oncepts concerning God or a supreme being of some sort are manifestly religious . . . . These concepts do not shed that religiosity merely because they are presented as a philosophy or as a science.'" (quoting *Malnak v. Yogi*, 440 F. Supp. 1284, 1322 (D.N.J. 1977), *aff'd*, 592 F.2d 197 (3d Cir. 1979) (per curiam)); *accord McLean*, 529 F. Supp. at 1265 ("The argument that creation from nothing * * * does not involve a supernatural deity has no evidentiary or rational support.  To the contrary, 'creation out of nothing' is a concept unique to Western religions.  In traditional Western religious thought, the conception of a creator of the world is a conception of God.  Indeed, creation of the world 'out of nothing' is the ultimate religious statement because God is the only actor. * * * The only 'one' who has this power is God.").

origin of life,"[83] thereby stifling the critical thinking that the class's study of evolutionary theory might otherwise prompt, in order to protect a religious view from what the Board considers a threat to that view.[84]  But the Supreme Court has long recognized that "there can be no legitimate state interest in protecting particular religions from scientific views 'distasteful to them.'"[85]

4.    The classroom presentation of the disclaimer conveys a strong  message of religious endorsement in at least three other respects as well.

First, school administrators make a special appearance in the science classrooms to deliver the disclaimer, displacing the regular classroom teachers.  There is no evidence that the students hear a disclaimer on any other topic in the curriculum.  An objective student observer thus would not be blind to the fact that *this* message is special, and therefore carries special weight.  What is more, the objective student would be familiar with the fact that the administrators are reading the statement because the teachers refused to do so, on the ground that they are legally and ethically

---

[83]    185 F.3d at 346.

[84]    *Id.* at 344-45 (because disclaimer effectively told students "that evolution as taught in the classroom need not affect what they already know," it sent message that was "contrary to an intent to encourage critical thinking, which requires that students approach new concepts with an open mind and a willingness to alter and shift existing viewpoints").

[85]    *Edwards*, 482 U.S. at 590-91 (quoting *Epperson*, 393 U.S. at 107).

barred from misrepresenting a religious belief as science.[86]  Thus, the students would

have yet more reason to conclude that the District was advocating a non-scientific,

religious view in biology class.[87]  And indeed, Dr. Alters testified that the teacher 'opt

out' adds "novelty," thereby enhancing the importance of the disclaimer in students'

eyes.[88]

Second, the administrators inform the students that "there will be no other

discussion of the issue and your teachers will not answer questions on the issue."[89]

Unlike everything else in the curriculum, in other words, the topic introduced in the

disclaimer — intelligent design — is so sensitive that the students and their teachers

---

[86]    25:56-57 (Nilsen); 35:38 (Baksa).

[87]    And even if, as defendants presumably would contend, the students lack
such knowledge of the teachers' actions and so that information would not inform the
Court's inquiry into how they perceive the policy, the students' unawareness of the
teachers' position would only compound the problem.  For if a student does not know
that the administrators are presenting the disclaimer because the science teachers
refused, the theater of having the superintendent enter the classroom to make an
official pronouncement would give the disclaimer an "overwhelming presence" in the
students' eyes — no matter how short the disclaimer itself might be — thereby
stamping the Board's religious message even more clearly with the District's seal of
approval.  *Selman*, 390 F. Supp. 2d at 1311; *see also Santa Fe*, 530 U.S. at 307-08
(because school allows broadcasting of invocation over public-address system as part
of school's pre-football-game ceremony, "an objective Santa Fe High School student
will unquestionably perceive the inevitable pregame prayer as stamped with her
school's seal of approval").

[88]    14:123-25.

[89]    P124.

are barred from asking questions or talking about it.[90] Thus, as Dr. Alters explained,

the reasonable student observer would conclude that intelligent design is some kind

of "secret science that students apparently can't discuss with their science teacher."[91]

And that, Dr. Alters explains, is pedagogically "about as bad as I could possibly think

of."[92]

---

[90]    Defendants' attempt to excuse the disclaimer by saying that the superintendent is not 'teaching' intelligent design but instead is merely 'making students aware of it' is nonsense both as a pedagogical matter and as a linguistic one. As Dr. Alters, the District's own science teachers, and plaintiffs Christy Rehm and Steven Stough — who are themselves teachers — all testified, an educator who reads the disclaimer is indeed engaged in 'teaching,' even if it is colossally bad teaching. *See, e.g.*, 6:77 (C. Rehm); 15:139-40 (Stough). The disclaimer is, after all, a "mini-lecture" that, as Dr. Alters explains, "facilitates learning" about the topics included therein — namely, evolutionary theory and intelligent design. 14:120-23. *See generally* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2346 (1986) (defining 'teach' to include "present[ing] in a classroom lecture or discussion"). And superintendent Nilsen agrees that students "learn" from the statement, irrespective of whether it gets labeled as 'teaching.' 26:39. But even if defendants were correct as a descriptive matter that the disclaimer does not 'teach,' defendants' argument would still be a red herring: The Establishment Clause forbids not just 'teaching' religion, but ***any*** governmental action that endorses or has the primary purpose or effect of advancing religion. Thus, for example, the constitutional violation in *Epperson* consisted not of teaching a religious concept but of ***forbidding*** the teaching of a secular one — evolution — for religious reasons. 393 U.S. at 103 The violation in *Santa Fe* was school sponsorship of prayer at an extracurricular activity. 530 U.S. at 307-09. And the violation in *Selman* was embellishing students' biology textbooks with a warning sticker disclaiming evolution. 390 F. Supp. 2d at 1312.

[91]    14:125-27.

[92]    14:127.

Third, students who do not wish to be exposed to the District's advocacy against evolution and in favor of intelligent-design creationism — or students whose parents do not care to have them exposed to that message — must absent themselves from the classroom in order to avoid the unwanted religious message. The stark choice between submitting to state-sponsored religious instruction and getting out of the public-school classroom is, as much as anything plaintiffs can imagine, a clear message to students "who are nonadherents 'that they are outsiders, not full members of the political community.'"[93]

5.      But that is not all. *Santa Fe*, *Freiler*, and the other pertinent authorities all make clear that the objective student observer's judgment about the nature of the Board's message would be informed by the legislative history and historical context in which the disclaimer was adopted.[94]  For as the Third Circuit has recognized, "'the history and ubiquity' of a practice is relevant because it provides part of the context

---

[93]      *Santa Fe*, 530 U.S. at 309-10 (quoting *Lynch*, 465 U.S. at 688 (O'Connor, J., concurring).

[94]      *Santa Fe*, 530 U.S. at 308 ("The text and history of this policy, moreover, reinforce our objective student's perception that the prayer is, in actuality, encouraged by the school."); *Freiler*, 185 F.3d at 346.

in which a reasonable observer evaluates whether a challenged governmental practice conveys a message of endorsement of religion."[95]

Thus the student would know, in the first instance, that the Board advocated for the curriculum change and disclaimer in expressly religious terms, that the proposed curriculum change prompted massive community debate over the Board's attempts to inject religious concepts into the science curriculum, and that the Board adopted the policy in furtherance of an expressly religious agenda.[96]  And the objective student's perception that the disclaimer is a religious message would be informed by the student's knowledge that the Board expressly designed it as one.

---

[95]    *Freethought*, 334 F.3d at 259 (quoting *Pinette*, 515 U.S. at 780 (O'Connor, J., concurring in part and concurring in judgment).

[96]    *See infra* Section II.B.

In *Selman*, for example, the court determined that "the informed, reasonable observer would know that (i) "a significant number of Cobb County citizens had voiced opposition to the teaching of evolution for religious reasons"; (ii) "citizens and parents largely motivated by religion put pressure on the School Board to implement certain measures that would nevertheless dilute the teaching of evolution"; and (iii) "the language of the Sticker essentially mirrors the viewpoint of these religiously motivated citizens."  *Selman*, 390 F. Supp. 2d at 1307.  Thus, the court held that, "[i]n light of the historical opposition to evolution by Christian fundamentalists and creationists in Cobb County and throughout the Nation, the informed, reasonable observer would infer the School Board's problem with evolution to be that evolution does not acknowledge a creator."  *Id.* at 1309.  Although *Selman* appears to have applied an adult-observer standard, the court's conclusions would be equally valid here because precisely the same knowledge would be imputed to the objective student as to the objective adult.

The student would also know something about the history of religious opposition to evolution, and would recognize that the Board's policy was in keeping with that tradition.  In *Santa Fe*, the Supreme Court presumed that "every Santa Fe student understands clearly" that the school district's policy "is about prayer" (and not student free-speech rights, as the school board had alleged);[97] and the Court premised that presumption on the principle that "the history and ubiquity" of the graduation-prayer practice "provides part of the context in which a reasonable observer evaluates whether a challenged governmental practice conveys a message of endorsement of religion."[98]

Here, the historical context that the objective student would know is that, "[o]ut of the many possible science subjects taught in the public schools, the legislature chose to affect the teaching of the one scientific theory that historically has been opposed by certain religious sects" — a factor that weighed heavily in the Supreme Court's decision to strike down the balanced-treatment law in *Edwards*.[99]  And the objective student would know that "encouraging the teaching of evolution as a theory

---

[97]    *Santa Fe*, 530 U.S. at 315.

[98]    *Allegheny*, 492 U.S. at 593; *see also Black Horse Pike*, 84 F.3d at 1486.

[99]    482 U.S. at 593.

37

rather than as a fact is one of the latest strategies to dilute evolution instruction employed by anti-evolutionists with religious motivations."[100]

Indeed, an objective student would know far more than that. But for simplicity's sake, we save the more detailed historical analysis for the next Section (as the objective adult would similarly possess a detailed historical knowledge).

### E.    An Informed, Objective Dover Citizen Would Perceive Defendants' Conduct To Be A Strong Endorsement Of A Religious View.

Quite apart from what an objective student would perceive upon hearing the superintendent deliver the disclaimer, this Court should also consider how a reasonable, objective, informed adult observer in the Dover community would perceive the challenged policy. That is because the unrefuted evidence offered at trial establishes that, although the disclaimer may be read to students in their biology classes, the Board made and defended its decision to implement the curriculum change publicly — thus casting the entire community as the "listening audience" for its religious message.[101]

When a governmental practice bearing on religion occurs within view of the entire community, the reasonable observer is an objective, informed adult within the

---

[100]    *Selman*, 390 F. Supp. 2d at 1308.

[101]    *Santa Fe*, 530 U.S. at 308.

community at large — even if the specific practice is directed at only a subset of that

community.   Indeed, courts routinely look beyond the government's 'intended

audience' to the broader listening audience — *i.e.*, everyone who receives the message

that the governmental conduct is communicating — because, otherwise, government

would be free to sponsor religious messages simply by declaring that those who share

in the beliefs that it is espousing are the message's only intended recipients.[102]   In

other words, the endorsement test recognizes that "our concern is with the political

---

[102]   *See Allegheny*, 492 U.S. at 597 ("when evaluating the effect of government conduct under the Establishment Clause, we must ascertain whether 'the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices'") (quoting *Ball*, 473 U.S. at 390); *see also Black Horse Pike*, 84 F.3d at 1486 ("the viewpoint of the reasonable observer (adherent or nonadherent) helps us to determine if the 'principal or primary effect [is] one that neither advances nor inhibits religion'") (quoting *Lemon v. Kurtzman*, 403 U.S. 602, 612 (1971)).

In *Tenafly*, for example, the Third Circuit applied the endorsement test to the question whether a town would violate the Establishment Clause if it allowed a group of Orthodox Jews to attach markers to utility poles for religious reasons (in order to demarcate a region in which they would be permitted to engage in certain conduct on the Sabbath that they otherwise would have regarded as prohibited). 309 F.3d at 174-78. Although the markers "were attached for the benefit of other Orthodox Jews, not the general public" (*id.* at 161-62), the court nonetheless performed the endorsement inquiry from the standpoint of a reasonable, informed, objective observer in the community at large (*id.* at 176-77). And that only makes sense: Although Orthodox Jews were the markers' "intended audience" in the sense that they were the ones for whose benefit the markers were placed (*id.* at 161-62), the markers nonetheless appeared on utility poles, where anyone in the community might see them and attempt to ascertain their meaning and the government's relationship to them.

community writ large":[103]   When government speaks or acts in ways that favor a particular religious belief, the entire community hears the message and recognizes that the government is playing favorites among faiths.

Thus, as noted above,[104] courts often do not see any need to distinguish between the objective student and the objective adult in determining whether a school policy conveys a message of religious endorsement.[105]   For when the same knowledge is imputed to both hypothetical observers, they generally reach the same conclusion. Thus, for example, the court in *Selman* considered the challenged textbook warning stickers from the perspective of a reasonable observer in the community, even though the intended audience for the stickers was the students on whose biology books they appeared.[106]   And although in *Freiler* the Fifth Circuit considered "the message conveyed by the disclaimer to students who are its intended audience," the court

_____

[103]    *Pinette*, 515 U.S. at 779 (O'Connor, J., concurring).

[104]    *See supra* Section I.C.

[105]    *See, e.g.*, *Wallace*, 472 U.S. at 76-77 (O'Connor, J., concurring) (state statute requiring moment of silence); *Black Horse Pike*, 84 F.3d at 1486 (public-high-school graduation prayer); *Harlan County Sch. Dist.*, 96 F. Supp. 2d at 675 (Ten Commandments display in public high school); *Washegesic*, 813 F. Supp. at 565 (Jesus portrait in public high school).

[106]    *See* 390 F. Supp. 2d at 1312 ("the Sticker conveys an impermissible message of endorsement and tells some citizens that they are political outsiders while telling others that they are political insiders").

nevertheless went on to hold that "there is a * * * danger of students **and parents** perceiving that the School Board endorses religion, specifically those creeds that teach the Biblical version of creation."[107]

But here, the reason that this Court should look to an objective adult observer is even more straightforward:  Not only were parents and other citizens part of the listening audience for the Board's curriculum change, but they were part of its 'intended audience' as well.

First and foremost, the Board invited [or, more accurately, "dragged"] the public into the debate over whether to include intelligent-design creationism in the curriculum.  The Board  proposed, advocated, and ultimately approved its preferred policy in public board meetings — meetings where members of the public not only attended but also had the opportunity to offer public comment on the proposal.  And in those meetings, several Board members pressed the policy in expressly religious terms (with their comments reported extensively in the local newspapers).[108]  At least two Board members, Buckingham and Geesey, also defended the proposed curriculum change in the media, again in expressly religious terms.[109]  And if all that were not

---

[107]      185 F.3d at 346, 348 (emphasis added).

[108]      *See infra* Section II.B.2; FF 170-77.

[109]      P145; P60.

enough, the Board then sent a newsletter to every household in Dover, explaining the religious concept that the District was incorporating into the biology curriculum.[110] So even those who had no children, never attended a board meeting, and never concerned themselves in any other way with informing themselves about school policies, were confronted with and made the listening audience for the District's announcement of its sponsorship of a religious view.

Beyond that, the District has assigned parents a special role with respect to the policy: It sends them a letter when their children are taking biology, "asking if anyone ha[s] a problem with the [disclaimer] statement," and calling on them to decide whether to allow their children to remain in the classroom and hear the religious message or instead to direct their children to leave the room.[111] When parents must give permission for their children to participate in an activity, the Supreme Court has held that the **parents** are the relevant audience for purposes of the endorsement test.[112]

---

[110]    P127.

[111]    P124 (preamble to disclaimer describing to students contents of letter to their parents).

[112]    *See Good News*, 533 U.S. at 115 (parents are relevant audience for determining whether presence of after-school Bible club at public elementary school conveyed message of religious endorsement because the parents had to give children permission to participate in club); *see also Rusk v. Crestview Local Sch. Dist.*, 379 F.3d 418, 421 (6th Cir. 2004) (parents are audience for flyers distributed to elementary-school students because parents must give permission for children to participate in advertised activities).

42

So the converse must also be true:  When parents must decide whether to withhold permission to participate in an activity or course of instruction, they remain the relevant audience for ascertaining whether government is communicating a message favoring religion.

Viewed from the perspective of an objective adult member of the Dover community (or, if the Court prefers, that of a reasonable, objective Dover parent), the evidence is overwhelming that defendants have improperly endorsed religion.

> **1.    An objective observer would know that intelligent design and teaching about supposed gaps and problems in evolutionary theory are creationist religious strategies that evolved from earlier forms of creationism.**

The history of the intelligent-design movement and the development of the strategy to weaken education in evolution by focusing on supposed gaps in the theory are the historical and cultural background against which the Dover Area School Board acted in adopting the challenged policy.  So because a reasonable observer (whether adult or child) would be aware of this social context, and would use it to shed light on the meaning and message of defendants' actions here, we trace the history at some length.

1.    Opposition to teaching evolution grew out of a religious tradition — Christian fundamentalism — that "began in nineteenth century America as part of

43

evangelical Protestantism's response to," among other things, Charles Darwin's exposition of the theory of evolution as a scientific explanation for the diversity of species.[113] Then, in an "upsurge of 'fundamentalist' religious fervor of the twenties," religiously motivated groups pushed state legislatures to adopt laws prohibiting public schools from teaching evolution,[114] leading to the *Scopes* 'monkey trial' of 1925.[115] But the battle against evolution was cultural as much as legal: "Between the 1920's and early 1960's, anti-evolutionary sentiment had a subtle but pervasive influence on the teaching of biology in public schools," with one consequence being that, "[g]enerally, textbooks avoided the topic of evolution."[116] In other words, formal legal sanctions reinforced a religiously based social movement to expel the scientific theory of evolution from the classroom.

The legal landscape changed radically in 1968 when, in *Epperson*,[117] the Supreme Court struck down Arkansas's statutory prohibition against teaching

---

[113]    *McLean*, 529 F. Supp. at 1258; *see also, e.g.*, *Edwards*, 482 U.S. at 590-92; *Epperson*, 393 U.S. 98, 107-08.

[114]    *Epperson*, 393 U.S. at 98; *accord McLean*, 529 F. Supp. at 1259.

[115]    *McLean*, 529 F. Supp. at 1259; *see Scopes v. Tennessee*, 289 S.W. 363 (1927) (criminal prosecution of public-school teacher for teaching about evolution).

[116]    *McLean*, 529 F. Supp. at 1259.

[117]    393 U.S. 97.

evolution.  Although, unlike the *Scopes* law, the Arkansas statute did not include

direct references to the Book of Genesis or the fundamentalist view that religion

should be protected from science, the Supreme Court readily concluded that "the

motivation for the [Arkansas] law was the same: to suppress the teaching of a theory

which, it was thought, 'denied' the divine creation of man."[118]

Following *Epperson*, evolution's religious opponents replaced the outright

prohibitions that the Supreme Court had invalidated with "balanced treatment"

statutes requiring public-school teachers who taught evolution to devote equal time

to teaching the biblical view of creation.  But in *Daniel v. Waters*,[119] the Sixth Circuit

rejected this new ploy as just another attempt to "establish[] the Biblical version of the

creation of man."[120]  The court held that, by assigning a "preferential position for the

Biblical version of creation" over "any account of the development of man based on

scientific research and reasoning," the challenged statute officially promoted religion,

violating the Establishment Clause.[121]

---

[118]    *Edwards*, 482 U.S. at 590 (quoting *Epperson*, 393 U.S. at 109) (alterations in original).

[119]    515 F.2d 485, 487 (6th Cir. 1975).

[120]    *Id.* at 496.

[121]    *Id.* at 489, 491.

Fundamentalist opponents of evolution responded with a new tactic suggested by *Daniel*'s reasoning: They began dressing up their religious beliefs in scientific-sounding language and then mandating that schools teach the resulting 'creation science' (or 'scientific creationism') as an alternative to evolution. "Fundamentalist organizations were formed to promote the idea that the Book of Genesis was supported by scientific data."[122] The creation-science movement then pressed for state and local school boards to impose new balanced-treatment requirements affording equal instruction time to creation science whenever the scientific theory of evolution was taught.[123]

But the courts were not fooled by this new ploy: In 1982, the district court in *McLean*[124] saw creation science for what it was — biblical creationism in a new guise — and struck down one of the new laws. And five years later, in *Edwards*,[125] the Supreme Court drew on *McLean*, striking down a similar law (and making the prohibition against teaching creation science in the public schools a national one).

---

[122]    *McLean*, 529 F. Supp. at 1259.

[123]    *See Edwards*, 482 U.S. at 590-93; *McLean*, 529 F. Supp. at 1256, 1259.

[124]    529 F. Supp. 1255.

[125]    482 U.S. 578.

In reviewing Arkansas' balanced-treatment law, the *McLean* court evaluated creation science in light of *Scopes*, *Epperson*, and the long history of fundamentalism's assault on the scientific theory of evolution.[126]  Reviewing the statute's legislative history and historical context,[127] the court found that creation-science organizations were fundamentalist religious entities that "consider[ed] the introduction of creation science into the public schools part of their ministry."[128]  The court then explained that creation science rested on a "contrived dualism" that (a) recognized two and only two possible explanations for life — the scientific theory of evolution and biblical creationism; (b) treated the two as mutually exclusive such that "one must either accept the literal interpretation of Genesis or else believe in the godless system of evolution"; and accordingly (c) viewed any critiques of evolution — whether in the form of science, pseudo-science, or unadorned religion — as evidence that necessarily supported biblical creationism.[129]  The court explained

---

[126]    *McLean*, 529 F. Supp. at 1258-64.

[127]    *Id.*

[128]    *Id.* at 1260.

[129]    *Id.* at 1266; *see also id.* at 1260 ("Creationists have adopted the view of Fundamentalists generally that there are only two positions with respect to the origins of the earth and life: belief in the inerrancy of the Genesis story of creation and of a worldwide flood as fact, or belief in what they call evolution.").

As the court explained, however, creation science and evolutionary biology do

that, because creation science "depends upon a supernatural intervention," it cannot be explained by natural causes or proven through empirical investigation, and therefore is neither testable nor falsifiable.[130] So it "is simply not science."[131] For that reason, Arkansas' balanced-treatment statute could have no valid secular purpose or effect, and could serve only to advance religion, violating the First Amendment.[132]

Five years later, the Supreme Court in *Edwards* struck down Louisiana's balanced-treatment law for similar reasons. Beginning with *Epperson* and *McLean*'s history of fundamentalist attacks against evolution, the Court painstakingly reviewed legislative history, focusing both on statements by the statute's sponsor and most

─────────────────

not address the same issues:

> The emphasis on origins as an aspect of the theory of evolution is peculiar to creationist literature. Although the subject of origins of life is within the provice of biology, the scientific community does not consider origins of life a part of evolutionary theory. The theory of evolution assumes the existence of life and is directed to an explanation of how life evolved. Evolution does not presuppose the absence of a creator or God * * *.

*Id.* at 1266. Hence, juxtaposing creation science with evolution could not yield "balanced treatment" even if creation science had in fact been a scientific theory rather than a religious view.

[130]    *Id.* at 1267.

[131]    *Id.*

[132]    *Id.* at 1264, 1272.

vocal legislative proponents, and on the character of the organizations advocating for creation science.[133]   In light of those factors, the Court specifically rejected as disingenuous the state's proffered legislative purposes of encouraging academic freedom and making the science curriculum more comprehensive by "teaching all of the evidence" respecting 'origins of life.'[134]   Among other reasons, the Court concluded that the challenged statute did not actually serve the legislature's professed purposes because (a) state law already allowed schools to teach any scientific theory (so academic freedom already received full protection);[135] and (b) if the legislature really had intended to make science education more comprehensive, "it would have encouraged the teaching of all scientific theories about the origins of humankind" rather than permitting schools to forgo teaching evolution but mandating that schools that do teach it must also teach creation science — an inherently religious view.[136] The Court also considered it especially revealing that, "[o]ut of the many possible science subjects taught in the public schools, the legislature chose to affect the

---

[133]    482 U.S. at 586-87, 591-92 & nn. 12-14; *see also id.* at 599-604 (Powell, J., concurring).

[134]    *Id.* at 578.

[135]    *Id.* at 588 (disbelieving professed purpose because state had not "'identified any secular purpose that was not fully served by existing state law'" (alteration and citation omitted)).

[136]    *Id.* at 588-89.

teaching of the one scientific theory that historically has been opposed by certain religious sects."[137]  And although presented with experts affidavits (including *Pandas*-coauthor Dean Kenyon's) declaring that creation science is scientific,[138] the Court gave short shrift to the claim that the state was trying to teach competing scientific theories.  The Court held instead that the state had violated the Establishment Clause by "restructur[ing] the science curriculum to conform with a particular religious viewpoint."[139]

    2.     Intelligent design rose like a phoenix from the ashes of creationism.

To be sure, it is the twenty-first-century version — a bit more high-tech than creation science, a bit more sophisticated in disguising overt Biblical references.  But it is virtually identical in argument form, content, and purpose.  Intelligent design is, in other words, just the next chapter in the anti-evolution movement by religious fundamentalists that began even before *Scopes* and evolved in response to what Professor Behe might call the 'selective pressures' of the *Epperson*, *McLean*, and *Edwards* decisions.

---

    [137]    *Id.* at 593.

    [138]    *See id.* at 612 (Scalia, J., dissenting) (citing experts' statements that creation science is collection of scientific data); P418.

    [139]    *Id.* at 593.

Intelligent design's religious nature would be apparent to an objective observer. The Court will recall that defendants criticized Dr. Forrest for gathering data on the intelligent-design movement, branding her a "web-surfing" "cyber-stalker."[140]  But any mildly inquisitive member of the Dover community could run a few Google searches — just as Alan Bonsell, William Buckingham,[141] Sheila Harkins,[142] and Cyndi Sneath[143] did — and turn up much of the same information that Dr. Forrest did. And that information clearly shows intelligent design to be creation science's younger sibling.  Among other things, many of the same people who were active in the 1980s creation-science movement are involved with intelligent design, including, notably, *Pandas'* authors Dean Kenyon and Percival Davis.[144]  And just as Kenyon claimed in an expert affidavit in *Edwards* that "creation science [is the] sole scientific alternative" to evolution,[145] so too do intelligent-design proponents make that same argument about their offering.[146]

---

[140]   *See* Defs.' Br. Supp. Mot. *in Limine* to Exclude Forrest Testimony at 1.

[141]   29:38-39.

[142]   34:48-49.

[143]   15:91-93.

[144]   FF19.

[145]   P418.

[146]   16:79-81.

51

But perhaps the strongest evidence of intelligent design's creationist pedigree is the history of *Pandas*.  The book went through many drafts, some before and others after the Supreme Court's decision in *Edwards*[147] — which was, of course, the case in which the Court held that the Constitution forbids teaching creationism as science. And whereas the pre-*Edwards* drafts advocate 'creationism,' the post-*Edwards* ones substitute the new term 'intelligent design.'   In that regard, the definition of *creationism* in pre-*Edwards* drafts is identical to that of intelligent design in the post-*Edwards* versions:  "Creationism [or intelligent design] means that various forms of life began abruptly through an intelligent agency with their distinctive features already intact — fish with fins and scales, birds with feathers, beaks, and wings, etc."[148]  And where cognates of the word creationism appeared roughly 150 times in pre-*Edwards* drafts, they were systematically replaced with "intelligent design" after the Supreme Court's decision — again without any change in content.[149]   This evidence alone compels a finding of an Establishment Clause violation under *Edwards*.  For while an objective observer might not know the whole drafting history of *Pandas*, at the very least she would readily apprehend that the published version's content is creationist

---

[147]    FF22.

[148]    P11, at 99-100.

[149]    10:119-22.

to the core, as Bonsell, Nilsen, and the science teachers all did.[150]  And the objective

observer would also conclude from the fact that *Pandas* posits a master intellect that

the intelligent designer is God.

Furthermore, the arguments for intelligent design are virtually identical to those

undergirding creation science.  Demonstrative charts introduced through Dr. Forrest

show parallel arguments relating to the rejection of naturalism; evolution's threat to

culture and society; "abrupt appearance" implying divine creation; exploiting the same

alleged gaps in the fossil record; the alleged inability of science to explain complex

biological information like DNA; and the theme that proponents of each version of

creationism merely aim to teach a scientific alternative to evolution, to show its

"strengths and weaknesses," and to alert students to a supposed "controversy" in the

scientific community.[151]

Finally, as with creation science, the intelligent-design movement is supported

by many people who have expressed patently sectarian reasons for promoting 'design'

and at the same time have also attempted to mask their true intentions with a

putatively scientific rationale.  For instance, *Pandas* is published by the FTE, which

has an overtly evangelical-Christian mission and has stated in published newsletters

---

[150]    *See, e.g.*, 01/03/2005 Nilsen Dep. 100-01; 33:54-56 (Bonsell); FF21.

[151]    10:140-48 (Forrest).

and fundraising pieces that the book is designed to negate the "deep hostility to traditional Christian views and values" allegedly found in public-school curricula.[152] And intelligent-design proponents affiliated with the Discovery Institute have also made known their true evangelical-Christian motivations.[153]

Equally dramatic proof of intelligent design's religious nature and aspirations is the Wedge Document, which, like much intelligent-design writing, can be found on the Internet.  The Wedge Document represents, from an institutional standpoint, the intelligent-design movement's goals and objectives, much as writings from the Institute for Creation Research did for the earlier creation-science movement,[154] as discussed in *McLean*.[155]   (Virtually all the leaders of the intelligent-design movement — including defendants' experts Behe and Minnich — are affiliated with the Discovery Institute.[156])  The Wedge Document states in its "Five Year Strategic Plan Summary" that the intelligent-design movement's goal is to replace science as

---

[152]    FF18.

[153]    FF48.

[154]    FF9; 11:24-25, 46 (Forrest).

[155]    *See* 529 F. Supp. at 1255.

[156]    FF9; 11:46-47 (Forrest).

currently practiced with "theistic and Christian science."[157]   The movement's "Governing Goals" as stated in the Wedge Document are to "defeat scientific materialism and its destructive moral, cultural, and political legacies," and "to replace materialistic explanations with the theistic understanding that nature and human beings are created by God."[158]   But those goals are not scientific; they are cultural and religious.   And similar language appears throughout the document.[159]   Like the creation-science movement before it, which attempted in a more open and forthright manner to validate Biblically-based creationism by distorting scientific data and concepts, intelligent design aspires to change the ground rules of science to make room for religion — specifically, beliefs consonant with a particular version of Christianity that even many Christians do not share.[160]

More generally, intelligent design's pseudo-scientific arguments are practically identical to those of the creation-science movement two decades earlier — with the one significant difference that the words God, creationism, and Genesis have been systematically purged, replaced by an unnamed 'designer.'   But intelligent design

---

[157]   FF10; P140, at 6.

[158]   *Id.*

[159]   *See* P140; FF11; 11:26-48 (Forrest).

[160]   5:111-12.

retains the same essential characteristic that convinced the Supreme Court to hold that creation science cannot be considered real science and that it is in fact a religious proposition appealing to a higher, supernatural power.  And under *Edwards*, that one similarity would be enough to mandate holding that intelligent design cannot constitutionally be taught in public-school science classes, even if none of the other parallels to creation science existed.[161]

2.    At the same time that intelligent design was getting its sea legs, religion-based opposition to the scientific theory of evolution also began taking another form: disclaimers casting doubt on evolution's validity so that students would credit religious alternatives.  But the Fifth Circuit rejected this new ploy in *Freiler*, as did the district court in *Selman*.

In *Freiler*, the challenged disclaimer informed students that evolution was "presented to inform students of the scientific concept and not intended to influence or dissuade the Biblical version of Creation or any other concept"; and it urged them to examine alternatives to evolution.[162]  The Fifth Circuit invalidated the policy, concluding that "[a] teacher's reading of a disclaimer that not only disavows

---

[161]    *See Edwards*, 482 U.S. at 591; *id.* at 599 (Powell, J., concurring); *McLean*, 529 F. Supp. at 1265; *Malnak*, 440 F. Supp. at 1322.

[162]    185 F.3d at 341.

endorsement of educational materials but also juxtaposes that disavowal with an urging to contemplate alternative religious concepts implies School Board approval of religious principles."[163]

The challenged disclaimer in *Selman*, meanwhile, took the form of a textbook sticker announcing that evolution is "a theory, not a fact," and directing students to approach the topic with an "open mind" and consider it "critically."[164]  The court there found that "whether evolution is referenced as a theory or a fact is * * * a loaded issue with religious undertones" such that, in choosing to describe evolution as a theory, the school board "appear[ed] to have sided with the proponents of religious theories of origin in violation of the Establishment Clause."[165]

## 2. Considered in light of this history, the challenged policy constitutes an endorsement of a religious view.

A reasonable observer viewing the challenged policy in light of the longstanding tug-of-war between religiously motivated opponents of evolution, on the one hand, and the federal courts, on the other, could not help but conclude that the challenged policy here is all of a piece with earlier creationist efforts.

---

[163]    *Id.* at 348.

[164]    390 F. Supp. 2d at 1292.

[165]    *Id.* at 1307.

First, the Board's disclaimer's declaration that evolution "is a theory * * * not a fact" has the cultural meaning that the *Selman* court explained: "[W]hether evolution is referenced as a theory or a fact is * * * a loaded issue with religious undertones," reflecting "a lengthy debate between advocates of evolution and proponents of religious theories of origin."[166]  It is "one of the latest strategies to dilute evolution instruction employed by anti-evolutionsists with religious motivations."[167]  As the Third Circuit held in *Freethought*, "'the history and ubiquity' of a practice is relevant because it provides part of the context in which a reasonable observer evaluates whether a challenged governmental practice conveys a message of endorsement of

---

[166]    *Selman*, 390 F. Supp. 2d at 1307-08 (citing *Edwards*, 482 U.S. at 624 (Scalia, J., dissenting) (noting that balanced-treatment-act's sponsor opposed evolution being taught as fact because it would communicate to students that "science has proved their religious beliefs false"); *Peloza v. Capistrano Unified Sch. Dist.*, 37 F.3d 517, 520 9th Cir. 1994) (rejecting Christian teacher's claim that "evolutionism" is a religion and that school district therefore violated Establishment Clause by requiring him to teach evolution as fact rather than theory); *Mozert v. Hawkins County Bd. of Educ.*, 827 F.2d 1058, 1062 (6th Cir. 1987) (witness in Free Exercise case brought by born-again Christians complained that teachers presented evolution as fact); *Freiler v. Tangipahoa Parish Bd. of Educ.*, 975 F. Supp. 819, 824 (E.D. La. 1997), *aff'd*, 185 F.3d 337 (5th Cir. 1999) (noting school-board-members' concern with teaching evolution as fact because many students in district believed in biblical view of creation)).

[167]    *Selman*, 390 F. Supp. 2d at 1308 (citing law-review articles explaining that fact).

religion."[168] A reasonable observer would thus know the social meaning of the theory-not-fact circumlocution and would "perceive the School Board to be aligning itself with proponents of religious theories of origin," thus "communicat[ing] to those who endorse evolution that they are political outsiders, while * * * communicat[ing] to the Christian fundamentalists and creationists who pushed for a disclaimer that they are political insiders."[169] But, of course, "'[t]he Establishment Clause, at the very least, prohibits government from appearing to take a position on questions of religious belief,' and this is exactly what the School Board appears to have done."[170]

Second, the Board singles out the scientific theory of evolution, targeting it and nothing else in the curriculum as a "theory" with "[g]aps," "problems," and inadequate empirical support.[171]   In singling out "the one scientific theory that

---

[168]    *Freethought*, 334 F.3d at 259 (quoting *Black Horse Pike*, 84 F.3d at 1486).

[169]    *Selman*, 390 F. Supp. 2d at 1308.  That message would only be bolstered by the reasonable observer's knowledge that Buckingham first used the language when publicly advocating for creationism.  *See supra* pages 18-19.

[170]    *Id.* at 1307 (quoting *Allegheny*, 492 U.S. at 593-94) (alteration in original).

[171]    The district makes the truly bizarre argument that "it is of no constitutional significance that the Darwinian theory of evolution is the only theory of evolution in which 'gaps/problems' will be presented because it is the *only* such theory that will be taught."  Br. at 14.  The point, of course, is that the district singles out ***evolution***, not that it singles out one person's exposition of evolution.

historically has been opposed by certain religious sects,"[172] the Board sent the message that it "believes there is some problem peculiar to evolution";[173] and "[i]n light of the historical opposition to evolution by Christian fundamentalists and creationists[,] * * * the informed, reasonable observer would infer the School Board's problem with evolution to be that evolution does not acknowledge a creator."[174]

Finally, and most straightforwardly, "[s]ince [intelligent design] is not science, the conclusion is inescapable that the only real effect of [the District's policy] is the advancement of religion."[175]

### F.  The Civil Divisiveness Resulting From The Challenged Policy Constitutes Strong Evidence That The Community Perceives Defendants To Have Taken Sides In A Religious Dispute.

There is another key component to the endorsement analysis as well:  This Court should consider the divisive effect of defendants having placed the state's power and prestige behind a particular religious view.

"[O]ne of the major concerns that prompted adoption of the Religion Clauses" was that "[t]he Framers and the citizens of their time intended * * * to guard against

---

[172]    *Edwards*, 482 U.S. at 522 n.7.

[173]    *Selman*, 390 F. Supp. 2d at 1309.

[174]    *Id.*

[175]    *McLean*, 529 F. Supp. at 1272.

the civil divisiveness that follows when the Government weighs in on one side of a religious debate."[176]   Simply stated, the Establishment Clause was designed "to remove debate over this kind of issue from governmental supervision or control" so that it would no longer be a source of political or civil strife.[177]   But the Board's statements and actions here have injected just such religiously based strife into the Dover community.

### 1.   The Board's conduct has engendered religiously based divisions in the community.

There can be no doubt, based on the evidence adduced at trial, that Dover is sharply divided over the Board's religiously motivated decision to disparage evolution and incorporate intelligent-design creationism into the biology curriculum.

First of all, the Board's proposal to implement the curriculum change sparked immediate, heated public debate at the June 2004 board meetings.   Board members and others (including Board member William Buckingham's wife) advocated for the policy in expressly religious terms.[178]   From their position of authority, Board

---

[176]    *McCreary*, 125 S. Ct. at 2742; *see also, e.g.*, *Van Orden v. Perry*, 125 S. Ct. 2854, 2868 (2005) (Breyer, J., concurring in judgment) (controlling concurring opinion explaining that Religion Clauses "seek to avoid that divisiveness based upon religion that promotes social conflict, sapping the strength of government and religion alike").

[177]    *Santa Fe*, 530 U.S. at 310.

[178]    FF170-77.

members attacked citizens who dared to speak out against the policy.[179]  They

disparaged a former-student, Max Pell, declaring that he had been "brainwashed" by

his biology studies into forsaking Christianity (or their brand of it, anyway).[180]  They

drove three of their own number — Casey Brown, Jeff Brown, and Angie Yingling —

to resign their posts, with Ms. Brown explaining in her resignation speech that the

Board majority had marginalized those who didn't share its religious beliefs, with the

result that she could no longer do her job as a duly-elected representative.[181]  The

Board branded the three who left as atheists.[182]  And the Board members, in their

official capacity, cast themselves as standing up for Christ.[183]  In other words, the

Board told nonadherents in the strongest terms possible "'that they are outsiders, not

full members of the political community.'"[184]  And in the end, the Board implemented

the curriculum change despite repeated warnings that the District would face costly

---

[179]    FF243-44.

[180]    3:137-38 (B. Callahan).

[181]    FF243-44.  As Ms. Brown put it, "holding a certain religious belief [was] of paramount importance" to the Board, and hence anyone who did not hold that belief could "no longer effectively function as a member of this board * * * [or] properly represent the members of this community."  7:93.

[182]    FF261; 7:94-95; 15:95-97.

[183]    FF176, 189-90.

[184]    *Santa Fe*, 530 U.S. at 309 (quoting *Lynch*, 465 U.S. at 688).

Establishment Clause litigation if the Board persisted in its effort to enact its creationist agenda.

Outside official board meetings, defendants succeeded in turning neighbor against neighbor: As plaintiff Joel Lieb testified, with an inadvertent homage to the intelligent-design movement's charter document, "Well, it's driven a wedge where there hasn't been a wedge before. People are afraid to talk to people for fear, and that's happened to me. They're afraid to talk to me because I'm on the wrong side of the fence."[185] Similarly, plaintiff Fred Callahan testified that "there have been letters written about the plaintiffs. We've been called atheists, which we're not. * * * We're said to be intolerant of their views."[186] Plaintiff Steven Stough testified that his daughter's opposition to the District's policy would mark her as "no longer part of the accepted school community."[187] Plaintiff Brian Rehm has found that some people in the community disparage him, calling him an atheist and a whole lot more, because he is a plaintiff in this action.[188] Plaintiff Christy Rehm (Brian's wife) believes that the Rehms have been cast as outsiders based on their belief that religion should not

---

[185]    17:146-47.

[186]    8:115-16.

[187]    16:30.

[188]    4:93-94.

be taught in public-school science classes.[189]    And although Casey Brown had previously considered Board-member Alan Bonsell a family friend, Bonsell told her that, because of her political judgment that the Board should not inject religion into the science curriculum, she would be "going to hell."[190]

Indeed, the entire community became embroiled in the controversy.  The 225 letters to the editor and 62 editorials from the *York Daily Record* and *York Dispatch* that plaintiffs offered at trial[191] show that, in an era when political apathy abounds, hundreds of people in this small community were sufficiently worked up over this issue to take the extraordinary step of putting pen to paper and getting their views published for all to see.  And even more significantly, perhaps, the letters demonstrate that the perception of unconstitutional endorsement is not one-sided.  Rather, people on both sides of the issue recognize it for what it is: a pitched battle over whether the Dover public schools should be teaching religion.[192]

And finally, the Board's insistence on advancing a religious view in science class, and its recalcitrance in the face of community opposition and repeated warnings

---

[189]    6:77-78.

[190]    7:95.

[191]    *See* P671-72, 674-75.

[192]    *See infra* Section I.F.2.

about the illegality of that conduct, led eleven courageous citizens to stand up for themselves, their children, and their community by filing this lawsuit, even knowing that some of their neighbors would villify them for doing so.  If there is a surer measure of the community's perception of, and outrage over, a school district's unconstitutional conduct, plaintiffs cannot think of one.[193]

What is more, the divisiveness originating in Dover has spread far and wide, fueling the culture wars.  Plaintiffs need not remind the Court of the attention that the trial has drawn both nationally and internationally.  But we emphasize that the media's interest in this case is not merely a prurient one:  It reflects a deeper awareness of the religiously based political conflict that the Dover Area School Board has engendered.  Without belaboring the point, a few examples just since the trial concluded reflect this sad state of affairs:   Columnist Charles Krauthammer described putting intelligent design into the biology curriculum as "mak[ing] evolution the enemy of God."[194] Columnist George Will warned that, as "zealots try to compel public education to infuse theism into scientific education," the Republican party's governing coalition

---

[193]    *Cf. Van Orden*, 125 S. Ct. at 2870-71 (Breyer, J., concurring) (looking to whether Ten Commandments display drew legal challenges or other citizen complaints as strong indication whether it is perceived as official endorsement of religion).

[194]    Charles Krauthammer, Op-Ed, *Phony Theory, False Conflict: 'Intelligent Design' Foolishly Pits Evolution Against Faith*, WASH. POST, Nov. 18, 2005, at A23.

is in danger of "disintegrat[ing]," leaving the country rudderless.[195]    But most

tellingly, and most disturbingly in a time when the United States confronts terrorist

threats from religious extremists abroad and mass death and destruction from

hurricanes at home, televangelist Pat Robertson thought it entirely appropriate to fan

the flames of religious strife by warning Dover residents that they shouldn't bother

asking for God's help if disaster should strike their community because "you just

voted God out of your city."[196]

In sum, this is not a situation in which milquetoasty official action went

unnoticed, unrecognized as in any sense religious, and therefore unchallenged for

---

[195]    George Will, Editorial, *What next for conservatives*, TOWNHALL.COM, Nov. 17, 2005, http://www.townhall.com/opinion/columns/georgewill/2005/11/17/175897.html.

[196]    *The 700 Club* (CBN television broadcast Nov. 10, 2005), *available at* http://www.cbn.com/700club/Guests/Bios/Kyle_Maynard111005.asp (transcript on file with Americans United for Separation of Church and State).  Robertson's full commentary was:

> I'd like to say to the good citizens of Dover, uh, if there is a disaster in your area, don't turn to God.  You just rejected him from your city.  And don't wonder why he hasn't helped you when the problems begin, if they begin, and I'm not saying they will.  But if they do, you just remember you just voted God out of your city.  And if that's the case, then don't ask for his help because he might not be there.

*Id.*

years.[197]  Nor is it one in which a few hypersensitive individuals got worked up over what their fellow citizens would recognize to be either mere private religious expression[198] or else religiously neutral governmental conduct.[199]  It is one in which the community knew, anyone who endured the six weeks in Harrisburg's courtroom number 2 now knows, and an objective observer cannot help but know, that defendants ran roughshod over the Establishment Clause and the citizens of Dover in order to get their own brand of religion taught in the public schools.

> **2.    The letters to the editor and editorials are admissible and highly probative of that divisiveness.**

Although defendants have strenuously objected to plaintiffs' introduction of the letters to the editor and editorials from the *York Daily Record* and the *York Dispatch* addressing the curriculum controversy, those materials are relevant and highly probative to show that defendants' conduct endorses religion because they reveal that

---

[197]    *Cf. Van Orden*, 125 S. Ct. at 2870-71 (Breyer, J., concurring) (fact that Ten Commandments monument did not draw legal challenge or other complaint in 40 years was evidence that it did not communicate message of official religious endorsement).

[198]    *Tenafly*, 309 F.3d at 177 ("there is a vital difference between purely private religiously motivated conduct and conduct initiated or sponsored by government").

[199]    *Cf. Pinette*, 515 U.S. at 779 (O'Connor, J., concurring); *Books v. Elkhart County, Ind.*, 401 F.3d 857, 867 (7th Cir. 2005) (endorsement inquiry focuses on objective observer, not hypersensitive one).

the entire community has all along understood the controversy to concern whether a religious view should be taught as science in the Dover public schools.

As explained above, the Supreme Court held in *Santa Fe* that a public school district's conduct touching on religion should be evaluated under the endorsement test from the standpoint of how the "listening audience" would view it:  If the members of the listening audience would perceive the district's conduct as endorsing religion or a particular religious view, then the conduct violates the Establishment Clause.[200]

To be sure, "the endorsement inquiry is not about the perceptions of particular individuals"; its "concern is with the political community writ large."[201]  And hence, plaintiffs do not argue that any particular letter or editorial, or the views expressed therein, can or should stand in for this Court's consideration of the curriculum change from the standpoint of a reasonable observer.  But "our Establishment Clause jurisprudence must seek to identify the point at which the government becomes responsible, whether due to favoritism toward or disregard for the evident effect of

---

[200]     530 U.S. at 308 ("In this context the members of the listening audience must perceive the pregame message as a public expression of the views of the majority of the student body delivered with the approval of the school administration. * * * Regardless of the listener's support for, or objection to, the message, an objective Santa Fe High School student will unquestionably perceive the inevitable pregame prayer as stamped with her school's seal of approval."); *see supra* Sections I.A.1, I.B.

[201]     *Pinette*, 515 U.S. at 779 (O'Connor, J., concurring in part and concurring in judgment).

religious speech, for the injection of religion into the political life of the citizenry,"[202] and hence it looks to the hypothetical reasonable observer as a "'personification of a community ideal of reasonable behavior, determined by the collective social judgment.'"[203]

The 225 letters to the editor and 62 editorials that plaintiffs have offered constitute what counsel believes to be the entire set of such materials published in the principal newspapers serving the Dover community during the period from June 1, 2004, though September 1, 2005; in other words, from the first board meetings where the proposal to change the curriculum was announced through the run up to the trial. In letter after letter and editorial after editorial, community members recognize that intelligent design is an inherently religious concept; that the decision whether to incorporate it into the high-school biology curriculum is nothing other than a decision whether to teach that religious concept; and hence that the curriculum change has the effect of placing the government's stamp of approval on the Board's preferred religious view.[204]  They thus are not only relevant to, but highly probative of, the Dover community's collective social judgment about the curriculum change because

---

[202]      *Id.*

[203]      *Id.* at 780 (quoting W. PAGE KEETON ET AL., PROSSER AND KEETON ON TORTS 175 (5th ed. 1984)) (brackets omitted).

[204]      *See* P671-72, 674-75.

they demonstrate that, "[r]egardless of the listener's support for, or objection to," the curriculum change, the community — and hence the objective observer who personifies it — cannot help but see that the policy endorses religion.

That conclusion is also entirely in keeping with the Supreme Court's decision in *Epperson*. In that case, the Supreme Cout pointed to letters to the editor in a local newspaper as support for its conclusion that "fundamentalist sectarian conviction was and is" the reason that Arkansas enacted its statutory prohibition against teaching evolution in public schools.[205] The Court quoted from three letters published in the *Arkansas Gazette* to show that the public "fear[ed] that teaching of evolution would be 'subversive of Christianity,' and that it would cause school children 'to disrespect the Bible.'"[206]

---

[205]    393 U.S. at 108.

[206]    *Id.* at 108 n.16. The Court treated the letters as evidence not only of the community's view that evolutionary theory should be banned because of its perceived religious implications, but also of the public pressures driving the Arkansas legislature to adopt the measure. And hence, the Court viewed them as, among other things, shedding light on the legislative purpose underlying the anti-evolution statute. Although in *Modrovich* (a pre-*McCreary* decision) the Third Circuit departed from *Epperson* by treating as irrelevant to the purpose inquiry some letters from citizens to county officials (on the grounds that (a) the letters were not authored by official decision-makers and so might not reflect their views, and (b) most of the letters were received after the county made its policy decision) (*see* 385 F.3d at 412 & n.4), plaintiffs here do not offer the letters as purpose evidence or ask the Court to find that they prove defendants' religious purpose for changing the curriculum. Instead, plaintiffs offer the evidence under the endorsement test and *Lemon*'s effect prong.

Taken all together, the letters to the editor and editorials in the local York papers consitute substantial additional evidence that the essential religious nature of defendants' conduct was lost on no one:  Despite the Board's sometime protestations that it was acting in a religiously neutral fashion, the community collectively — and correctly — perceives the policy as favoring a particular religious view.   And defendants' advocacy for and adoption and implementation of that policy have produced religiously based divisiveness within the Dover community, expressed, among other places, in the citizens' public reaction in print to the Board's actions.

## II.   DEFENDANTS' PRIMARY PURPOSE WAS TO ADVANCE RELIGION.

Although defendants' conduct here plainly conveys a strong message of endorsement of the Board members' particular religious view (and hence nothing more need be said to strike down defendants' conduct as unconstitutional), the best practice in this Circuit, for the reasons explained above,[207] is for this Court also to evaluate the challenged conduct separately under the *Lemon* test.[208]  And, of course, defendants concede that the *Lemon* test applies.[209]  Accordingly, this Court should

---

[207]     *See supra* I.A.1.

[208]     *See Child Evangelism*, 386 F.3d at 530-35; *Modrovich*, 385 F.3d at 406; *Freethought*, 334 F.3d at 261.

[209]     *See* Defs.' Pre-Trial Mem. at 24.

consider whether (a) the district's primary purpose was to advance religion[210] or (b) the policy has the primary effect of promoting religion.[211]

Following convention, we start with the purpose inquiry, for which the central issue is whether the district has shown favoritism toward religion generally or any set of religious beliefs in particular:

> The touchstone for our analysis is the principle that the "First Amendment mandates governmental neutrality between religion and

---

[210]    Although in their summary-judgment briefs defendants steadfastly maintained that governmental conduct fails the purpose prong only if its **sole** purpose is religious (*see* Defs.' Br. Supp. Mot. Summ. J. at 11; Defs.' Reply Supp. Mot. Summ. J. at 41-44), they have since acknowledged that the operative legal standard is, as the Supreme Court explained in *McCreary*, whether the policy's **primary** purpose is religious or secular (*see* Defs.' Pre-trial Mem. at 24-25).

[211]    *See McCreary*, 125 S. Ct. at 2732-33; *Edwards*, 482 U.S. at 582-83. As previously explained, plaintiffs are not claiming excessive entanglement.

Because the *Lemon* test is disjunctive, the policy must be struck down if it fails **either** the purpose prong or the **effect** prong.  *Edwards*, 482 U.S. at 582-83; *Freiler*, 185 F.3d at 343.  Thus, for example, the Supreme Court struck down the religious display in *McCreary* and the balanced-treatment statute in *Edwards* under the purpose prong without reaching the question whether the challenged conduct also had an unconstitutional effect.  *McCreary*, 125 S. Ct. at 2745; *Edwards*, 482 U.S. at 593-94.  And the courts in *Freiler* and *Selman* struck down the anti-evolution disclaimers at issue in those cases under the effect prong and as governmental endorsement of religion (*see Freiler*, 185 F.3d at 346, 348; *Selman*, 390 F. Supp. 2d at 1305-06) even though, after applying an incorrect interpretation of *Wallace v. Jaffree* (*compare Freiler*, 185 F.3d at 344-45, *and Selman*, 390 F. Supp. 2d at 1300-01, *with McCreary*, 125 S. Ct. at 2735-36), they had erroneously concluded that the disclaimers did not violate the purpose prong (*see Freiler*, 185 F.3d at 344-46; *Selman*, 390 F. Supp. 2d at 1305).

religion, and between religion and nonreligion." When the government acts with the ostensible and predominant purpose of advancing religion, it violates that central Establishment Clause value of official religious neutrality, there being no neutrality when the government's ostensible object is to take sides.[212]

The purpose inquiry involves considering the policy language, "enlightened by its context and contemporaneous legislative history"[213] — including, in this case, the broader context of historical and ongoing, religiously driven attempts to advance creationism and denigrate evolution.[214]

The evidence here is overwhelming that the District's purpose was to advance creationism — an inherently religious view — both by introducing it directly under

---

[212]    *McCreary*, 125 S. Ct. at 2733 (quoting *Epperson*, 393 U.S. at 104).

[213]    *Selman*, 390 F. Supp. 2d at 1300; *see Edwards*, 482 U.S. at 594-95 (in addition to "[t]he plain meaning of the [enactment's] words, enlightened by their context and the contemporaneous legislative history," Supreme Court also looks for legislative purposes in "the historical context of the [enactment], and the specific sequence of events leading to [its] passage").

[214]    *See Edwards*, 482 U.S. at 590-92; *Epperson*, 393 U.S. at 98-101; *McLean*, 529 F. Supp. at 1259-64 (looking to history of Christian Fundamentalism nationally and to Arkansas' "long history of official opposition to evolution which is motivated by adherence to Fundamentalist beliefs," and holding that, "[i]n determining the legislative purpose of a statute, courts may consider evidence of the historical context of the Act, the specific sequence of events leading up to passage of the Act, departures from normal procedural sequences, substantive departures from the normal, and contemporaneous statements of the legislative sponsor." (citations omitted)).

the label 'intelligent design,' and by disparaging the scientific theory of evolution so that creationism would gain credence by default as the only apparent alternative.

### A.   The Purpose Inquiry Requires Consideration Of The Legislative History And Historical Context For The Board's Actions.

During closing arguments, defendants argued that this Court must ignore the Board members' religious statements and plaintiffs' other purpose evidence, and that this Court must instead confine itself to gleaning purpose solely from the text of the statement read to Dover ninth graders. We assume, however, that defendants meant only to advance the same positions they did in their pre-trial filings — namely, that (a) this Court must first look for the Board's purpose in the plain text of the challenged policy and may consider other indicia of purpose only if the policy is ambiguous as to purpose; and (b) individual Board members' statements are irrelevant as a matter of law and cannot be considered as part of the legislative history because they are not statements by the full board in its collective, corporate capacity. Not only do those contentions rest on a fundamental misunderstanding of *Board of Education v. Mergens*[215] — the case on which defendants premise both claims — but they are utterly irreconcilable with subsequent Supreme Court precedent.

---

[215]   496 U.S. 226 (1990).

74

1.      The claim that this Court must blind itself to the clear and unequivocal legislative history here, and may look only at the disclaimer's text unless the disclaimer is ambiguous, reduces the Establishment Clause's purpose inquiry to a run-of-the-mine exercise in statutory interpretation.  That view is not only unsupported by any legal precedent, but also utterly inconsistent with *Lemon* and the principles that it embodies.

At the most superficial level, defendants' 'look at the text alone' approach is on its face inapposite because 'intelligent design' is not defined in the District's policy.  Thus, even if this Court were limited in the first instance to the disclaimer's language (which it is not), statutory-interpretation canons would require looking to the challenged policy's legislative history and historical context in order to ascertain what the term 'intelligent design' actually means.  For ***that*** inquiry would be the prerequisite to determining what the disclaimer as a whole means, and therefore what it is supposed to accomplish.[216]

2.      But there is also a far more important reason why defendants' attempt to curtail this Court's inquiry into legislative history must fail:  Unlike ordinary

---

[216]      *See, e.g.*, *Edwards*, 482 U.S. at 591-92 (ascertaining meaning of statutory term 'creation science' by looking to legislative history showing that "the term 'creation science,' as contemplated by the legislature that adopted this Act, embodies the religious belief that a supernatural creator was responsible for the creation of humankind").

limitations on governmental power, which circumscribe conduct but do not attach any liability based upon the reasons that the government chose to act, the Establishment Clause makes improper purpose an independent constitutional violation.[217]  Because a governmental entity like the Dover Area School District violates the Establishment Clause by adopting a policy with the primary purpose of advancing religion even if it might lawfully have implemented an identically worded policy had it done so for valid secular reasons, legislative history is *always* relevant and appropriate to consider under the purpose prong.[218]  By attempting to limit this Court's purpose analysis to the disclaimer's bare text, defendants strip the purpose prong of all meaning and consequence.

Indeed, in *McCreary* the Supreme Court declined to adopt the approach that defendants here advance, and instead made clear that courts in Establishment Clause cases today should look to legislative history and historical context to determine purpose just as they always have.  In that regard, the United States argued as an *amicus curiae* in *McCreary* that, at least in religious-display cases, the Supreme Court should eliminate the inquiry into decision-makers' actual purpose under *Lemon*:  The

---

[217]    *See, e.g.*, *Edwards*, 482 U.S. at 582-83; *Freiler*, 185 F.3d at 343.

[218]    That is so even though, unlike here, the legislative history in some cases may not be clear and so may not provide genuine insights.  *Cf. Mergens*, 496 U.S. at 238-39 (plurality op.).

United States advocated that the Court should instead limit the purpose inquiry to "the objectively discernible purpose," defined as, "whether the display itself * * * expresses favoritism for or an endorsement of religion," and should not consider the "subjective motivation" of those who erected the display.[219] Thus, the United States, like defendants here, sought to persuade the Court to eviscerate the purpose prong and focus single-mindedly on the final product of the governmental conduct — *i.e.*, its effect.

The Supreme Court refused that invitation. Instead, it reaffirmed that *Lemon*'s purpose inquiry has independent significance and that it "takes account of the traditional external signs that show up in the text, legislative history, and implementation of" an "official act."[220] The Supreme Court's decision leaves no room for doubt that the purpose that is relevant to the Establishment Clause is the *actual purpose* behind official action — the real story of how it came to pass, not some hypothetical explanation for it that a litigant might cook up after the fact. Thus, the Court reaffirmed the approach to uncovering purpose that it took in *Epperson*, for example, where it concluded from the legislative history and social context of the

---

[219]    Brief of United States as *Amicus Curiae* at 6, 26, *McCreary County, Ky. v. ACLU*, 125 S. Ct. 2722 (2005) (No. 03-1693).

[220]    *McCreary*, 125 S. Ct. at 2734 (quoting *Santa Fe*, 530 U.S. at 308) (internal quotation marks omitted).

challenged anti-evolution statute that "fundamentalist sectarian conviction was and is the law's reason for existence"[221] — a conclusion that the Court did not hesitate to reach even though the statute itself did not say a single word about religious fundamentalism.

3.    For essentially the same reasons, defendants also fail in their fallback position of trying to exclude individual Board members' statements from the legislative history on the ground that they are not pronouncements by the full Board. Notwithstanding Justice O'Connor's discussion in *Mergens* of Congress's legislative purpose for passing the Equal Access Act, on the one hand, and the "'possibly religious motives'" of some of the Act's individual supporters, on the other,[222] the Supreme Court has consistently held not only that legislative history can and must be considered in ascertaining legislative purpose under *Lemon*, but also that statements by a measure's sponsors and chief proponents are strong indicia of such purpose.[223]

---

[221]    *Epperson*, 393 U.S. at 108.

[222]    *Mergens*, 496 U.S. at 249 (plurality op.) (emphasis omitted).  Because that portion of Justice O'Connor's opinion in *Mergens* did not garner a majority, it obviously lacks precedential value.  *See, e.g.*, *Romano v. Oklahoma*, 512 U.S. 1, 8-9 (1994); *Marks v. United States*, 430 U.S. 188, 193-94 (1977).

[223]    Indeed, in *McCreary* the Supreme Court explained the essence of the *Mergens* plurality's distinction between individual motives and legislative purpose when it stated that, where "savvy officials ha[ve] disguised their religious intent so cleverly that the objective observer * * * cannot see it, then without something more the government does not make a divisive announcement that in itself amounts to

78

Most recently, for example, the Supreme Court reaffirmed in *McCreary* that the

purpose inquiry looks to "the ''text, legislative history, and implementation of'''" an

"official act."[224]  The Court did ***not*** say that the purpose inquiry looks solely to the

_____

taking religious sides." *McCreary*, 125 S. Ct. at 2735.  But nothing in *Mergens* or any other Supreme Court decision casts the slightest doubt on the longstanding and well-settled rules concerning the Establishment Clause's required purpose inquiry; and nothing lends any credence to the claim that public statements of purpose by a policy's sponsor and other legislative proponents must — or even may — be ignored. *See, e.g.*, *McCreary*, 125 S. Ct. at 2734 (although courts do not engage in "psychoanalysis of a drafter's heart of hearts," they routinely and quite properly look to individual legislators' public statements to determine legislative purpose).

What is more, the other case on which defendants principally relied in their pre-trial submissions — *Bown v. Gwinnett County School District*, 112 F.3d 1464 (11th Cir. 1997) — interprets *Mergens* rather differently than defendants do, explaining that the *Mergens* plurality's attempt to distinguish individual motives from legislative purpose "provides helpful guidance for a case * * * in which the legislative history is ***conflicting***." *Id.* at 1471 (emphasis added).  Here, as we argue below, the legislative history is all of a piece:  Everyone on the Board understood the dispute to be over creationism, whatever label was being used, and Bonsell, Buckingham, and Geesey expressly defended it as such.  Additionally, Harkins had to be aware that intelligent design is a form of creationism based on her review of the chart entitled "Views on the Origin of the Universe and Life."  *See* P149.  But even if that were not the case, defendants would not be entitled to have the Court ignore their statements in board meetings and to the media; conflicts among board members would go to the weight of plaintiffs' purpose evidence and would not be a basis for excluding it altogether. *Cf. Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 118 (1980) (to ascertain legislative intent in ordinary statutory-interpretation context, Supreme Court treated  "isolated remark" by legislator as "not * * * entitled to much weight" in light of countervailing legislative history, but did not suggest that remark could have been excluded or should have been ignored).

[224]     *McCreary*, 125 S. Ct. at 2734 (quoting *Santa Fe*, 530 U.S. at 308).

79

text, or even that it looks to other factors only if the text is ambiguous. What is more, the Court specifically took guidance from its earlier decision in *Edwards*,[225] in which it had properly "relied on a statute's text ***and the detailed public comments of its sponsors***, when we sought the purpose of a state law requiring creationism to be taught alongside evolution."[226] And in *Wallace*, the Supreme Court likewise treated as both relevant and highly probative to the purpose inquiry the statements made by the challenged moment-of-silence statute's sponsor during legislative debate over the bill as well as during testimony in the district-court proceeding.[227] The Court took seriously the bill's sponsor's testimony that he had been seeking to get prayer into the public schools and "did not have no other purpose in mind" when he proposed the bill;[228] the Court did not brush that testimony aside, as defendants here would have this Court do, just because it came out of the mouth of a single legislator instead of being written into the statute.[229] Indeed, to adopt defendants' position not only would

---

[225]    482 U.S. at 586-88.

[226]    *McCreary*, 125 S. Ct. at 2734 (emphasis added); *see Edwards*, 482 U.S. at 585, 587 (evaluating "governmental intention" by looking at "the purpose of the legislative sponsor").

[227]    472 U.S. at 43, 56-58.

[228]    *Id.* at 57.

[229]    *Id.*

foreclose all judicial inquiry into legislative history (including what the Supreme Court did in *Edwards*, *Wallace*, and countless other cases), but also would write the purpose prong out of the *Lemon* test — a result that the Supreme Court expressly forbade in *McCreary*.[230]

### B. The Challenged Policy, Its Legislative History, and Its Historical Context All Conclusively Show That The District's Purpose Was Religious.

The disclaimer language, the legislative history, and the historical context in which the policy arose, all lead ineluctably to the conclusion that defendants chose to alter Dover's biology curriculum in order to advance religion.

### 1. The disclaimer.

Although plaintiffs have already parsed the disclaimer to determine what message it sends to the students hearing it, and so will focus their purpose arguments in the main on the legislative history and historical context for the curriculum change, at least three central features of the disclaimer deserve mention as being especially pertinent to ascertaining purpose: (1) the singling out of evolution for special treatment from among all the scientific theories in the Dover science curriculum; (2)

---

[230]   *McCreary*, 125 S. Ct. at 2735 ("After declining the invitation to abandon concern with purpose wholesale, we also have to avoid the Counties' alternative tack of trivializing the enquiry into it."); *see also id.* at 2734 ("Examination of purpose is a staple of statutory interpretation that makes up the daily fare of every appellate court in the country.").

the description of evolution as a "theory, * * * not a fact"; and (3) the fact that the Board removed from the disclaimer language that science-teacher Jen Miller and assistant-principal Mike Baksa had drafted that portrayed evolutionary theory favorably.

First, the disclaimer singles out evolution for special treatment — specially disparaging treatment.  As the Supreme Court explained in *Edwards*, "[t]here is a historic and contemporaneous link between the teachings of certain religious denominations and the teaching of evolution."[231]  "Out of many possible science subjects taught in the public schools, the [Board] chose to affect the teaching of the one scientific theory that historically has been opposed by certain religious sects," mimicking the very behavior of the Louisiana legislature that the Supreme Court held to violate *Lemon*'s secular-purpose requirement in *Edwards*.[232]  For as the Court explained, "there can be no legitimate state interest in protecting particular religions from scientific views distasteful to them, and * * * the First Amendment does not permit the State to require that teaching and learning must be tailored to the principles or prohibitions of any religious sect or dogma."[233]

---

[231]     482 U.S. at 590.

[232]     *Id.* at 593.

[233]     *Id.* at 590-91 (quoting *Epperson*, 393 U.S. at 106-07) (internal quotation marks omitted).

Second, the disclaimer makes a point to characterize evolution as a theory, "not a fact."[234]  As the *Selman* court explained, "encouraging the teaching of evolution as a theory rather than as a fact is one of the latest strategies to dilute evolution instruction employed by anti-evolutionists with religious motivations."[235]  Although the *Selman* court considered that historical trend only in the opinion's effect/endorsement discussion and did not mention it in the purpose analysis, the court issued the opinion before the Supreme Court had clarified in *McCreary* that "[t]he eyes that look to purpose belong to an objective observer,"[236] and therefore that "our precedents sensibly forbid an observer 'to turn a blind eye to the context in which the policy arose.'"[237]  The upshot is that the purpose inquiry must take just as much account of the cultural context that produced the theory-not-fact formulation as the effect inquiry does.  And hence, the fact that the Board here chose to embrace a religious strategy for undermining evolutionary theory is probative of the Board's religious purpose.

---

[234]   P124.

[235]   *Selman*, 390 F. Supp. 2d at 1308.

[236]   125 S. Ct. at 2734 (internal quotation marks omitted).

[237]   *Id.* at 2737 (quoting *Santa Fe*, 530 U.S. at 315) (brackets omitted).

83

Third, the Board made sure that the disclaimer denigrated evolutionary theory in students' eyes. Among other things, the Board ordered language removed from drafts of the disclaimer that would have communicated to students the strength of evolutionary theory by informing them, for example, that evolution is the "dominant scientific theory" and that there is a "significant amount of evidence supporting Darwin's theory.[238] What was left was negative language telling students that evolutionary theory has "gaps for which there is no evidence" and that it is a theory and not a fact.[239]

### 2.    The legislative history.

What the disclaimer itself conveys, the legislative history confirms: Plaintiffs adduced overwhelming evidence at trial that defendants openly, affirmatively, consistently, and aggressively sought to implement a religious agenda.

The two Board members most directly responsible for bringing about the change to the biology curriculum — Board president Bonsell and Curriculum Committee-chair Buckingham — both made it entirely clear that they have strong religious convictions in opposition to important aspects of the scientific theory of

---

[238]    FF245-47.

[239]    FF248.

evolution, namely, macroevolution, speciation, and especially common ancestry.[240] Both overtly expressed their desire to teach creationism at Dover High School.[241]  And both then lied about it under oath.[242]

Bonsell raised creationism by name when he ran for the Board in 2001, at the Board retreat in 2002, and again at the Board retreat in 2003.[243]  He claims not to recall raising the subject of creationism or even having an interest in it (although his counsel admitted in opening argument that Bonsell did in fact have such an interest); and he insisted at his deposition that he had never raised the subject of creationism *at any time*.[244]  Documents that were discovered and produced later (though not by Bonsell) proved, however, that he had raised the subject of creationism in 2002 and 2003, and even that he had advocated teaching it on a 50/50 basis with evolution.[245] Plaintiffs also proved that Bonsell advocated the teaching of creationism at the public board meetings in June 2004.[246]

---

[240]    FF133-34.

[241]    FF135-50, 170-77.

[242]    FF271-73, 276-81.

[243]    FF143a-b, 144a.

[244]    FF272b-c.

[245]    FF135-43.

[246]    FF175d, 175g, 176e.

Buckingham also openly expressed a desire to teach creationism.[247] Buckingham, Bonsell, Harkins, and Geesey insisted that none of them had ever discussed creationism at the June 2004 Board meetings.[248] But plaintiffs produced a mountain of evidence that Buckingham and other Board members did in fact advocate teaching creationism at those meetings.[249] Half the mouths in the courtroom dropped open when plaintiffs' counsel showed the videotape of Buckingham outside the school district building in June of 2004 and heard him say "it's okay to teach Darwin, but you have to balance it with something else, such as creationism."[250] Nearly all the remaining mouths dropped open when Buckingham blurted out that he had known about the newspaper reports on the creationism discussions because the Board members had talked about them at that time — this after Buckingham had, just minutes before, denied knowing the substance of those news reports.[251]

The words that Buckingham used on the videotape are almost the exact same ones that the reporters for the *York Daily Record* and the *York Dispatch* reported him

---

[247]    FF175-76.

[248]    FF276.

[249]    FF170-77.

[250]    FF273b.

[251]    FF273e.

saying during the June board meetings.  Buckingham's use of the word "creationism" was confirmed — despite all defendants' denials and all their efforts to malign two honest local newspaper reporters — when assistant-superintendent Baksa, whom defendants called as their witness, set the record straight.[252]

Of course, Buckingham's statements at the June Board meetings went far beyond references to creationism:  They included memorable expressions of religious hostility toward evolution, such as:

- "It is inexcusable to have a book that says man descended from apes with nothing to counterbalance it."[253]

- "This country wasn't founded on Muslim beliefs or evolution.  This country was founded on Christianity and our students should be taught as such."[254]

- "2,000 years ago someone died on a cross.  Can't someone take a stand for him?"[255]

Those statements and many others by Buckingham and other Board members were reported in the two daily York papers in June of 2004, and no one — not any Board member or administrator — denied any of them, even though those individuals

---

[252]    FF174.

[253]    FF175j.

[254]    FF175k.

[255]    FF176k.

obviously knew of the reports, as Buckingham admitted.[256]  If the reports were false, as defendants later claimed, anyone on the Board or in the administration could easily have disproved them simply by having the audiotapes of the June board meetings transcribed.[257]  They chose not to do so, and the tapes were destroyed.

Thus, only one reasonable conclusion can be drawn from the evidence presented at trial — the reports in the newspaper about the events at Board meetings in June 2004 were accurate in all respects.  And the defendants' witnesses lied.

More generally, Bonsell and Buckingham did not keep their religious hostility toward evolution to themselves, but instead manifested it in important ways.  First, they sought to limit the teaching of evolution.  Bonsell met with the science teachers in the fall of 2003 to ensure that they did not teach his daughter (a ninth-grade student taking biology that year) what he referred to as "origins of life," *i.e.*, speciation, macroevolution, and common ancestry.  Buckingham met with the teachers in June of 2004, also to ensure that the teachers did not present any scientific concepts that offended his religious views.[258]  Bonsell and the other board members who voted for the October 18 resolution made sure that the assurances they received were codified

---

[256]    FF175-76.

[257]    FF276c.

[258]    FF154-57.

as school district policy.  By enacting the phrase "origins of life is not taught" into the curriculum guide, the Board ensured that the teachers would not teach students core evolutionary concepts that conflict with the religious beliefs of Bonsell, Buckingham, and other Board members.[259]

Of course, the primary manifestation of Bonsell's and Buckingham's religious hostility toward evolution was the Board mandate that students "be made aware of gaps/problems in Darwin's Theory and of other theories of evolution, including but not limited to Intelligent Design."[260]  Defendants' counsel and a number of defendants' witnesses have claimed that the Board enacted this policy to promote good science education.  If this were true, there should be some evidence in the record that board members discussed such an objective or took some reasonable measure to ensure that their actions would further such a purpose.

In fact there is no such evidence in the record.  None of the board members ever discussed gaps or problems in the theory of evolution, the concept of intelligent design, or how making students aware of either would promote good science education.[261]  At least four of the board members who supported the resolution

---

[259]    FF233.

[260]    FF224.

[261]    FF234.

89

(Buckingham, Harkins, Cleaver, and Geesey) admitted that they did not understand the concept of intelligent design when they voted in favor of the Board's resolution.[262] They did know that the science teachers adamantly opposed it on the grounds that it is creationism and not science, but they disregarded the views of the science teachers, their only resource for information about science education.[263]  The Board consulted no science or education organizations about the curriculum change.[264]

The only outside advice that the Board received was legal advice from the Discovery Institute (an anti-evolution think tank) and the Thomas More Law Center (a faith-based law firm).[265]  The Board's choice of 'science advisers' says everything about the true reason for the October 18 resolution — the Board members who supported the resolution wanted to promote a religious alternative to evolution — without getting caught.

The Board also deviated from established practice in passing the resolution. Standard practice called for (a) the resolution to be discussed at a planning meeting before being considered at an action meeting, (b) the teachers' input, and (c) review

---

[262]   FF235, 240, 289c.

[263]   FF229, 232, 237.

[264]   FF238-39.

[265]   FF238.

90

by the District Curriculum Committee.[266]  The October 18 board resolution was irregular in every way.

The plaintiffs filed this lawsuit in December 2004, based in large measure on the undisputed reports about events and circumstances at board meetings earlier that year.  The next day, plaintiffs' counsel wrote to defendants' counsel, noted the strength of the plaintiffs' case, and offered to withdraw the lawsuit and any claims to attorneys' fees if the Board would rescind the policy.[267]  But the Board refused. Shortly thereafter, the Court permitted plaintiffs to take expedited discovery in order to decide whether to seek a temporary restraining order.  Plaintiffs took four depositions on January 3, 2005 — Bonsell, Buckingham, Harkins, and Nilsen — and, much to plaintiffs' surprise, learned that all four witnesses denied the news reports from the York papers in June 2004.

As it turned out, that was the beginning of a very slippery slope for the defendants' witnesses.  The witnesses at those January 2005 depositions told other lies as well.  Most notably, Bonsell and Buckingham failed to tell the truth about the source of the donation of the creationist textbook *Of Pandas and People*.[268]  Faced

---

[266]    FF226.

[267]    P758.

[268]    FF210-18, 227.

with a conflicting factual record, plaintiffs chose not to seek a temporary restraining order, and the defendants crowed.[269]  And emboldened by their success at fending off a push for immediate injunctive relief, the Board published a newsletter to the entire Dover community that amounted to an aggressive advocacy piece for the Board's religious attack on science.[270]  The newsletter attacked supporters of the scientific theory of evolution and opponents of the Board's policy:  It accused them of spreading "misinformation."[271]  The newsletter made the grandiose claim that intelligent design qualifies as a scientific theory on a par with evolution and other scientific theories.[272]  It denigrated evolution and made claims that have never been advanced, much less proven in the scientific community.[273]  And it strongly suggested that evolution has atheistic implications and that intelligent design is the cure for atheism.[274]  The Board in its October 18 resolution promoted religion directly to students at Dover High

---

[269]    FF281.

[270]    FF253-55.

[271]    FF254c.

[272]    FF254e.

[273]    FF254f.

[274]    FF254g, 254i.

school.  By its February 2005 newsletter, the Board sought to spread its religious, anti-scientific message to a much broader audience.

At bottom, the purpose inquiry turns on a question of credibility:  Should the Court believe the testimony of the Board members who supported the October 18 resolution and the February 2005 newsletter that they had no religious purpose and sought only to advance science education?  Review of all the evidence shows that the Court cannot believe that the defendants acted with no religious purpose.  The record contains far too much evidence that religion motivated Bonsell, Buckingham, and others;[275] that Board members openly expressed a desire to teach creationism and then lied about it;[276] that Board members were willing to sacrifice the best interests of students at Dover High School and deny them a new standard biology textbook in favor of a creationist text not used at any public school in the country;[277] that Board members instructed administration to find a textbook that taught an alternative to evolution;[278] that TMLC recommended just such a book in *Pandas*;[279] that Board

---

[275]     FF135-50.

[276]     FF175-76, 272c, 273-81.

[277]     FF197-202.

[278]     FF182-83.

[279]     FF193.

93

members arranged for a secret donation of the *Pandas* book with funds collected at Buckingham's church and then failed to tell the truth about it to the public or to plaintiffs' counsel;[280] and that the Board took no actions that would suggest that it wanted to promote good science education, but instead did everything that would be expected of a school board that wanted to denigrate evolution and promote a religious alternative.[281]

**C.      To The Extent That Defendants Advance A Secular Purpose, It Is A Sham.**

To the extent that defendants claim to have changed the biology curriculum in order to improve or "balance" science education, their asserted purpose is a sham: Because intelligent design is not science, it can do nothing whatsoever to improve or balance science education.  All it can do is mislead the students and interfere with their science education — just as three of plaintiffs' experts (Drs. Alters, Miller, and Padian) and one of defendants' own experts (Prof. Fuller) testified that it would.  And hence, when weighed against the legion evidence of the Board's actual purpose, the absence of evidence that the Board actually acted with an eye toward furthering any

---

[280]   FF210-18, 271.

[281]   FF287-89.

secular purpose, and the fact that the policy would not serve the asserted secular purposes, the asserted purposes should be rejected as shams.

Having been born out of creation science in the wake of *McLean* and *Edwards*, intelligent design simply does not manage to avoid the defects of its forebear. To take only a couple of key features:  First, intelligent design is premised on the same "contrived dualism" as creation science.  Its proponents assume only two possible alternatives — evolution and their view — and claim anything that purportedly does not support evolutionary theory is affirmative evidence for intelligent design.[282] Second, intelligent design, like creation science, does not partake of the scientific method.  In that regard, the *McLean* court identified the characteristics of science, noting in particular that "it is guided by natural law," "it is explanatory by reference to natural law,"  and it is "testable against the empirical world."[283]  The Court recognized that creation science "is not science because it depends upon a supernatural intervention which is not guided by natural law."[284]  Precisely the same thing is true of intelligent design.[285]

---

[282]   *Compare* FF58 *with McLean*, 529 F. Supp. at 1266.

[283]   *Id.* at 1267.

[284]   *Id.*

[285]   FF4.

Other considerations also strongly support the conclusion that intelligent design is not science.  For example, the federal courts have well-developed criteria for evaluating whether something is science, junk science, or vacuous pseudo-scientific jargon for purposes of determining the admissibility of expert testimony.  Specifically, the Supreme Court identified four factors for determining whether proffered evidence is scientific:[286]

(1)     whether the theory or technique can be ***and has been*** tested;[287]

(2)     whether the theory or technique been subjected to peer review and publication;[288]

(3)     whether there is a known or potential rate of error;[289] and,

(4)     whether the theory or technique is "generally accepted" in the relevant scientific community.[290]

In doing so, the Supreme Court rejected the argument that "a screening role for the judge that allows for the exclusion of 'invalid' evidence will sanction a stifling and

---

[286]     *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

[287]     *Id.* at 593.

[288]     *Id.*

[289]     *Id.* at 594.

[290]     *Id.*

repressive scientific orthodoxy and will be inimical to the search for truth."[291]  Thus, a determination that intelligent design is non-scientific is not only important for deciding this case but also well within the fact-finding function that the federal courts regularly undertake in any case that raises scientific issues.[292]

The evidence demonstrates that intelligent design is not science as the Supreme Court and the *McLean* court (and scientists) define that endeavor.

The evidence submitted by both parties demonstrates that intelligent design's core assertion is that, for intelligent design to be 'science,' the long-standing scientific ground rule of methodological naturalism must be discarded so that "supernatural intervention" can be considered as a scientific cause.[293]  Not only is this radical proposition inconsistent with *McLean* (as well as the definitions of science offered by all the major science organizations), but there was no evidence submitted at trial that any other area of scientific inquiry has ever been opened up to supernatural causes.

---

[291]    *Id.* at 596.  This Court should similarly reject any suggestion by defendants or their *amici* that this Court cannot evaluate whether intelligent design is science in order to determine whether there could be a secular purpose in presenting it to students in a public-school science class.

[292]    And nothing about such a finding would stop the intelligent-design movement from conducting research, publishing results, or gaining acceptance in the scientific community — should it choose to try to do so.

[293]    FF46.

That is entirely understandable:  Supernatural causes are not testable, so intelligent design has not been, and cannot be, tested.  But *Daubert*, *McLean*, and the scientific community agree that testability is a core element of the scientific method.[294] Indeed, defendants' expert scientific philosopher Steven Fuller insisted that testability is the hallmark criterion of science; and he conceded that intelligent design has not been tested.[295]

To be sure, defendants' experts Behe and Minnich argued that intelligent design is testable.  But what they really mean by that claim is that 'irreducible complexity' is testable.[296]  But irreducible complexity is a negative argument against evolution and not an affirmative one supporting intelligent design, for the reasons that the *McLean* court's analysis of "contrived dualism" makes clear.  In fact, Behe conceded that

---

[294]   FF38-39.

[295]   27:90; 28:67-68.

[296]   FF22:101 (Behe).  Plaintiffs and their experts presented convincing peer-reviewed scientific evidence that has tested and falsified Behe's claims that the bacterial flagellum, the blood-clotting cascade, and the immune system could not have evolved through natural selection.  FF74-76.  Behe argued that the tests described by plaintiffs' experts were inadequate, and he proposed a competing test — growing a bacterial flagellum in the laboratory.  FF79.  Setting aside the patent frivolousness of that proposal, defendants' experts admitted that no one has ever even attempted to perform such a test — even though the scientific method dictates that those who advance a hypothesis like irreducible complexity should themselves test and attempt to falsify it.  So while irreducible complexity might be testable, it is untested, and hence does not live up to the demands of science.

98

intelligent design can never be ruled out, which just means that it is not testable or falsifiable.

Defendants admit, moreover, there are no articles in peer-reviewed scientific journals arguing for the intelligent design or irreducible complexity of any biological system.[297]  And while defendants asserted that there are a handful of articles in peer-reviewed journals that relate in general terms to the issue of intelligent design,[298] none of those articles even mentions the terms 'intelligent design' or 'irreducible complexity.'  And as for the only one introduced into evidence — Dr. Behe's article with Doug Snoke[299] — inspection of the article and cross examination revealed that the paper does not mount much of an argument against evolution, much less make a positive case for intelligent design.[300]

Minnich and Behe admitted that there has been no attempt to quantify the so-called design inference in a way that would allow for computation of a rate of error.[301]

---

[297]   FF118.

[298]   39:24 (Minnich).

[299]   P721.

[300]   FF118.

[301]   FF91.

99

Finally, intelligent design flatly fails the "general acceptance" test. In *Daubert*, the Supreme Court explained that "'a known technique which has been able to attract only minimal support within the [scientific] community' may properly be viewed with skepticism."[302] Not only has intelligent design failed to garner general acceptance, but it has not even achieved "minimal support": It has been roundly rejected by the entire scientific community.[303] Indeed, defendants' expert Steven Fuller characterized it as "fringe science" requiring "affirmative action."[304]

In the end, the hours and hours of complicated scientific testimony that the Court heard boils down to a simple conclusion: Intelligent design falls too short of the mark even to merit the label "junk science." Whatever its merits or demerits might be as a theological claim, therefore, the claim that it could serve a useful pedagogic purpose as science instruction is indefensible.

## D.   Defendants Cannot Distance Themselves From Their Own Actions.

Confronted with the mountain of purpose evidence presented at trial, defendants attempt to distance themselves from their own words and deeds in two ways. First, the Board members simply deny ever having made religious statements. And second,

---

[302]   509 U.S. at 594.

[303]   FF49-52.

[304]   FF54.

100

where the Board members could not deny their statements in the face of documentary evidence from their own administrators and an independent news crew's video recording, they contended either that they "misspoke" when they made the religious statements or that those statements were completely divorced from their later advocacy in favor of presenting intelligent design and so-called "[g]aps" and "problems" with evolutionary theory.

Both stratagems fail.

### 1.   The Board members' untruthful testimony constitutes strong evidence of improper purpose.

Although Board members testified in their depositions and at trial that they never sought to put creationism into the curriculum, that they never advocated in favor of creationism, that they never made religious statements in favor of the curriculum change, and that they did not know the source for the donated copies of the creationist text *Pandas*, that testimony is not credible.  It is belied by superintendent Nilsen's and assistant-superintendent Baksa's trial testimony.   It is belied by superintendent Nilsen's and plaintiff Barrie Callahan's notes from Board retreats.  It is belied by the Trudy Peterman memorandum.   It is belied by the curriculum charts tracing the policy's development over time.  It is belied by the testimony from Dover science teachers Jen Miller and Bertha Spahr.  It is belied by the testimony from plaintiffs

Christy Rehm, Brian Rehm, Barrie Callahan, and Fred Callahan, all of whom attended board meetings in June 2004.  It is belied by Joseph Maldonado's and Heidi Berhard-Bubb's testimony and newspaper reportage relating to the board meetings and post-meeting press interviews with Board members.  It is belied by the Fox news videotape of William Buckingham on the way out of a Board meeting.  And it is belied by the check that Buckingham, Alan Bonsell, and Donald Bonsell used in their shell game to hide the funds used to purchase *Pandas*.

One of the oldest, clearest, and most important rules in Anglo-American law is that, when parties testify under oath, they are duty-bound to tell the truth; and if they break trust with the court, their dishonesty casts a pall on their entire case:

> It has always been understood * * * that a party's *falsehood* or other *fraud* in the preparation and presentation of his cause * * * is receivable against him as an indication of his consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit.  The inference thus does not necessarily apply to any specific fact in the cause, but operates, indefinitely though strongly, against the whole mass of alleged facts constituting his cause.[305]

---

[305]    2 JOHN H. WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW § 278(2), at 133 (Chadbourn rev. 1979).  *See also McQueeney v. Wilimington Trust Co.*, 779 F.2d 916, 921 (3d Cir. 1985) ("[W]rongdoing by the party in connection with his case . . . is also commonly regarded as an admission by conduct.  By resorting to wrongful devices he is said to give ground for believing that he thinks his case is weak and not to be won by fair means.  Accordingly, a party's false statement[s] about the matter in litigation, whether before suit or on the stand, . . . are instances of this type of admission by conduct.") (quoting CHARLES MCCORMICK, HANDBOOK OF THE LAW OF

The underlying principle is "*falsus in uno, falsus in omnibus*" — "false in one thing, false in everything" — which means that a court may disregard a party's evidence, for a specific issue or even for the entire case, if the party's offer of blatantly deceptive testimony puts the party's credibility in doubt.[306]   And in accordance with that principle, it follows that the factfinder is entitled to infer from a defendant's or its agent's disingenuousness that any proffered innocent explanations for its actions are mere pretext.[307]

_____

EVIDENCE § 273, at 660 (2d ed. 1972)).

   [306]   *See Bennun v. Rutgers State Univ.*, 941 F.2d 154, 179 (3d Cir. 1991) ("The district court * * * finds facts and assesses credibility.  Like any factfinder, it can accept some parts of a party's evidence and reject others.  It may also, like any factfinder, assess credibility in light of the maxim, *falsus in uno, falsus in omnibus.*"); *see also, e.g., Kanawha & Mich. Ry. v. Kerse*, 239 U.S. 576, 581 (1916) (witness' testimony plainly contradicted by other evidence could be "rejected in *toto — falsus in uno, falsus in omnibus*").  Indeed, a standard federal civil jury instruction directs that "[i]f a witness is shown knowingly to have testified falsely about any material matter, you have a right to distrust such witness' other testimony and you may reject all the testimony of that witness or give it such credibility as you may think it deserves."  3 FED. JURY PRAC. & INSTR. § 105.04 (5th ed. 2005).

   [307]   *See, e.g., Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) (in case alleging intentional discrimination, "it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation") (emphasis omitted); *id.* (allowing inference of intent based on false statements "is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt" (internal quotation marks omitted)); *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1071-72 (3d Cir. 1996) (factfinder decides whether to infer discrimination by assessing witnesses' credibility and other evidence that undermines employer's "proffered reasons for its actions"); *Gov't of Virgin Islands*

Inferences of pretext are, moreover, especially appropriate under *Lemon*'s purpose prong.  For the Supreme Court has repeatedly held that, to survive judicial scrutiny, any asserted secular purpose "has to be genuine, not a sham, and not merely secondary to a religious objective."[308]  Defendants' flagrant falsehoods to this Court provide strong reason to deduce that any supposedly secular purposes they may offer are equally insincere.[309]

_____

*v. Lovell*, 378 F.2d 799, 806-07 (3d Cir. 1967) (approving jury instruction that defendant's false exculpatory statements may be used to infer consciousness of guilt).

[308]    *McCreary*, 125 S. Ct. at 2735; *accord, e.g.*, *Santa Fe*, 530 U.S. at 308 ("it is * * * the duty of the courts to 'distinguish a sham secular purpose from a sincere one'" (citation omitted)); *Edwards*, 482 U.S. at 586-87 ("While the Court is normally deferential to a State's articulation of a secular purpose, it is required that the statement of such purpose be sincere and not a sham.").

[309]    What is more, although defendants in their summary-judgment brief offered up an impressive litany of hypothetical excuses for why one might adopt a disclaimer like the one here (*see* Defs.' Br. Supp. Mot. Summ. J. at 18), defendants offered no evidence at trial to show that the Board was in fact motivated by any of those asserted justifications:  Not one of them testified that defendants were genuinely pursuing permissible secular objectives.  (Nor, for that matter, did any expert witness qualified to speak about high-school-science education testify that the policy might actually serve any of those alleged objectives.)  The Board members' silence in this regard speaks volumes, especially when compared with their unhesitating willingness to offer transparently false denials of their words and deeds evidencing the Board's religious purpose.  And as for the unsupported assertions of secular purpose in their briefs, *post hoc* rationalizations developed in the course of litigation are not entitled to any more deference in Establishment Clause cases than they are in any other type of action.  *See, e.g.*, *McCreary*, 125 S. Ct. at 2740; *see also, e.g.*, *Freiler*, 185 F.3d at 342.

### 2.     Both settled Supreme Court authority and common sense dictate that this Court should refuse to credit defendants' claim to have put aside their creationist agenda.

Quite apart from the fact that the Board members lack credibility on any topic, defendants misrepresent controlling law when they argue that this Court should ignore their unconstitutional efforts to put 'creationism' into the curriculum and should look only at what they were doing when they happened to employ the label 'intelligent design.'  For viewed as it must be from the standpoint of the objective observer familiar with the entire history and implementation of the curriculum change,[310] the Board's publicly expressed desire to teach creationism undeniably carries over into its implementation of the curriculum change as finally drafted.

In *McCreary*, the Supreme Court considered and conclusively rejected the judicial blinders that defendants in the instant case seek to press on this Court. *McCreary* was a challenge to displays of the Ten Commandments and other documents posted in two county courthouses.  The defendant counties had originally posted the Ten Commandments alone.  Then, upon being sued, the counties added other religious texts to the displays.  After the district court struck down those enhanced displays, the counties retained more clever lawyers, and proceeded to try to whitewash their earlier efforts by putting up new displays, entitled "The Foundations

---

[310]     *See McCreary*, 125 S. Ct. at 2734.

of American Law and Government Display," that placed the Ten Commandments

alongside secular documents and purported to describe an overarching secular

theme.[311]  Although the counties argued that the clearly unconstitutional purposes for

the earlier displays should not be charged against them with respect to the final

displays because the counties' ultimate aim was, supposedly, to make the displays

comport with Establishment Clause requirements, the Supreme Court took a different

view of things:

> The Counties' * * * proffered limitation [on purpose evidence] can be
> dispatched quickly.  They argue that purpose in a case like this one
> should be inferred, if at all, only from the latest news about the last in a
> series of governmental actions, however close they may all be in time
> and subject.  But the world is not made brand new every morning, and
> the Counties are simply asking us to ignore perfectly probative evidence;
> they want an absentminded observer, not one presumed to be familiar
> with the history of the government's actions and competent to learn what
> history has to show.  The Counties' position just bucks common sense:
> reasonable observers have reasonable memories, and our precedents
> sensibly forbid an observer "to turn a blind eye to the context in which
> [the] policy arose."[312]

Defendants' argument in the instant case is a page out of the counties' playbook

in *McCreary*.  So it deserves just the same judicial response.  As in *McCreary*, where

---

[311]     *See* 125 S. Ct. at 2727-31.

[312]     *Id.* at 2736-37 (quoting *Santa Fe*, 530 U.S. at 315; citing *id.* at 308;
*Wallace*, 472 U.S. at 73; *Pinette*, 515 U.S. at 780 (O'Connor, J., concurring in part
and concurring in judgment); *Edwards*, 482 U.S. at 595)) (second alteration in
original; footnote omitted).

"[n]o reasonable observer could swallow the claim that the Counties had cast off the objective so unmistakable in the earlier displays,"[313] so too here:   No reasonable observer could swallow the claim that the Board, after repeatedly expressing its desire to add creationism to the curriculum, suddenly abandoned that aim entirely, coincidentally decided at that very moment to beef up the District's curriculum on the scientific theory of evolution for secular reasons, and just happened to settle on doing so by incorporating what  unbeknownst to the Board turned out to be an inherently religious view, on the one hand, and a religiously motivated rhetorical strategy to disparage a secular scientific theory, on the other.  Even if the Board members hadn't imprudently (but with accidental honesty) slipped back into calling intelligent design by its proper name 'creationism,'[314] there can be no question, on the wealth of evidence adduced at trial, that defendants' actions were all of a piece:  They were self-consciously aimed at promoting the Board's particular brand of religion.

## III.   THE CHALLENGED POLICY'S PRIMARY EFFECT IS TO ADVANCE RELIGION.

The core notion animating the requirement that  * * * [an official act's] "principal or primary effect . . . be one that neither advances nor inhibits religion," is not only that government may not be overtly hostile

---

[313]     *Id.* at 2740.

[314]     *See, e.g.*, P145 (Fox news video of Buckingham); 8:60-61 (J. Brown); 8:128 (F. Callahan).

to religion but also that it may not place its prestige, coercive authority, or resources behind a single religious faith or behind religious belief in general, compelling nonadherents to support the practices or proselytizing of favored religious organizations and conveying the message that those who do not contribute gladly are less than full members of the community.[315]

Because the effect test thus largely covers the same ground as the endorsement test,[316] plaintiffs will not rehash the endorsement analysis presented above,[317] but instead simply incorporate it by reference here as the Third Circuit does.[318]  What follows is plain:  First, "[s]ince [intelligent design] is not science, the conclusion is inescapable that the only real effect of [defendants' policy] is the advancement of religion."[319] Second, the disclaimer read to students "has the effect of implicitly bolstering alternative religious theories of origin by suggesting that evolution is a problematic theory even in the field of science."[320]  Third, "[an administrator's] reading of a disclaimer that not only disavows endorsement of educational materials but also

---

[315]   *Texas Monthly*, 489 U.S. at 9 (plurality op.).

[316]   *See Lynch*, 465 U.S. at 690 (O'Connor, J., concurring) ("The effect prong asks whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval.").

[317]   *See supra* Sections I.D-F.

[318]   *See, e.g.*, *Modrovich*, 385 F.3d at 412-13; *Freethought*, 334 F.3d at 269.

[319]   *McLean*, 529 F. Supp. at 1272.

[320]   *Selman*, 390 F. Supp. 2d at 1308-09.

juxtaposes that disavowal with an urging to contemplate alternative religious concepts implies School Board approval of religious principles."[321]   And fourth, defendants drew Dover's citizenry into a vicious battle over religion, rending the community's social fabric in a way that the Establishment Clause was designed to prevent.

## CONCLUSION

The Supreme Court has long recognized that the public schools are "[d]esigned to serve as perhaps the most powerful agency for promoting cohesion among a heterogeneous democratic people,"[322] and therefore that courts must be particularly scrupulous in the public-school context to enforce the mandates of the Establishment Clause.[323]  "What to most believers may seem nothing more than a reasonable request that the nonbeliever respect their religious practices, in a school context may appear to the nonbeliever or dissenter to be an attempt to employ the machinery of the State to enforce a religious orthodoxy."[324]   In simplest terms, the "preservation and transmission of religious beliefs and worship is a responsibility and a choice

---

[321]     *Freiler*, 185 F.3d at 348.

[322]     *McCollum v. Bd. of Educ.*, 333 U.S. 203, 216-17 (1948).

[323]     *Lee*, 505 U.S. at 592 ("there are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools").

[324]     *Id.*

committed to the private sphere."[325]   And when government takes sides on a religious

issue — such as whether to teach students that the world is the product of creation by

a supernatural being or to disparage a scientific theory that public officials fear may

conflict with that religious belief — "the debates that presumably must precede" the

official action "impermissibly invade that private sphere."[326]

Defendants here have implemented a policy that was designed to, and does in

fact, endorse and advance a particular religious view.  This Court should strike down

the policy.  In doing so, the Court should directly address the issues that the parties

have placed before it regarding the nature of intelligent design and the teaching of so-

called gaps in evolutionary theory.  For without a strong message to the groups selling

intelligent-design creationism nationwide, and the officials waiting in line to buy it,

other communities will suffer the same fate as Dover.  And other courts will have to

endure a reprise of this litigation to decide questions left unresolved here.  But more

than that, the citizens of Dover need a clear statement about what the Constitution

does and does not allow.  Otherwise, there will remain the substantial danger that

some future Board will pick up where Bonsell, Buckingham, Geesey, and the rest left

off.  And as long as that danger looms large, the Dover community will never be able

---

[325]    *Id.* at 589.

[326]    *Santa Fe*, 530 U.S. at 311.

to put this lawsuit behind it and begin healing the wounds that defendants and their

official religious agenda have caused.


Respectfully submitted,


 /s/ *Richard B. Katskee*
Ayesha N. Khan (adm. *phv*)
Richard B. Katskee (adm. *phv*)
AMERICANS UNITED FOR SEPARATION
    OF CHURCH AND STATE
518 C St., NE
Washington, DC  20812
(202) 466-3234
*akhan@au.org*
*katskee@au.org*

Eric Rothschild (PA 71746)
Stephen G. Harvey (PA 58233)
Alfred H. Wilcox (PA 12661)
Christopher J. Lowe (PA 90190)
PEPPER HAMILTON LLP
3000 Two Logan Square
18th & Arch Streets
Philadelphia, PA  19103
(215) 981-4000
*rothschilde@pepperlaw.com*
*harveys@pepperlaw.com*
*wilcoxa@pepperlaw.com*
*lowec@pepperlaw.com*

Thomas B. Schmidt, III (PA 19196)
PEPPER HAMILTON LLP
200 One Keystone Plaza
North Front and Market Streets
P.O. Box 1181
Harrisburg, PA  17108
(717) 255-1155
*schmidtt@pepperlaw.com*

Witold J. Walczak (PA 62976)
ACLU OF PENNSYLVANIA
313 Atwood St.
Pittsburgh, PA  15213
(412) 681-7864
*vwalczak@aclupgh.org*

Paula K. Knudsen (PA 87607)
ACLU OF PENNSYLVANIA
105 N. Front St., Suite 225
Harrisburg, PA  17101
(717) 236-6827
*pknudsen@aclupa.org*

*Counsel for Plaintiffs*

Date:  November 23, 2005

## CERTIFICATE OF SERVICE

I hereby certify that, on November 23, 2005, I caused the foregoing *Brief in*

*Support of Plaintiffs' Proposed Findings of Fact and Conclusions of Law* to be served

by the Middle District's ECF system on the following counsel:

Richard Thompson                  Ron Turo
Robert J. Muise                   Turo Law Offices
Patrick T. Gillen                 28 South Pitt St.
THOMAS MORE LAW CENTER            Carlisle, PA  17013
24 Frank Lloyd Wright Dr.
P.O. Box 393
Ann Arbor, MI  49106

*Counsel for Defendants*

 /s/ Richard B. Katskee

Richard B. Katskee

113