# THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

TAMMY KITZMILLER, et al.,    )

    )

    Plaintiffs,    )    Case No. 04-CV-2688

    )    (Hon. Judge Jones)

    v.    )

    )

DOVER AREA SCHOOL DISTRICT and    )    **DEFENDANTS PROPOSED**

DOVER AREA SCHOOL DISTRICT    )    **FINDINGS OF FACT**

BOARD OF DIRECTORS,    )    **AND CONCLUSIONS OF**

    )    **LAW**

    Defendants.    )

_____)

# PART ONE

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| TAMMY KITZMILLER; et al. | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No.  04-CV-2688 |
| | ) | (M.D. Pa.) |
| | ) | |
| v. | ) | Hon. John E. Jones III |
| | ) | |
| | ) | |
| DOVER AREA SCHOOL | ) | **Defendants' Proposed** |
| DISTRICT; et al., | ) | **Findings Of Fact And** |
| | ) | **Conclusions Of Law.** |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

## DEFENDANTS PROPOSED
## FINDINGS OF FACT
## AND
## CONCLUSIONS OF LAW

### FINDINGS OF FACT

**Board Members Coming to the Board.**

1.  Alan Bonsell became a member of the DASD school board in December of
    2001; he was elected after running in the primaries in May of 2001 and the
    general election of November, 2001.  v. 32 (Bonsell); p. 53:17–p. 54:2.

2.  Bonsell ran for office to promote fiscal responsibility with respect to the
    building projects under consideration by the district and to try to make
    Dover schools the best in the county.  v. 32 (Bonsell); p. 54:3–55:5.

3.  There was no religious dimension to Bonsell's platform for office.  v. 32
    (Bonsell); p. 55:6–20.

4.  Bonsell ran for the board along with Sheila Harkins, Angie Yingling, and
    Carol (known as Casey) Brown; they shared a common interest in fiscal
    responsibility and had no religious agenda. v. 32 (Bonsell); p. 55:21–p.
    57:16.

5.    Harkins has served eight years on the DASD board.  v. 34 (Harkins); p.

      25:10–p. 26:13.  Her first run for office she did not run with anyone.  v. 34

      (Harkins); p. 26:22–24.

6.    She ran for the board because she had an interest in education; there was no

      religious dimension to her platform.  v. 34 (Harkins); p. 25:20–25; p.

      26:1–3.

7.    Harkins second run for office she ran with Casey Brown, Alan Bonsell, and

      Angie Yingling.  v. 34 (Harkins); p. 26:25–p. 27:3.  Harkins ran a second

      time because she found herself at odds with board members over issues of

      fiscal responsibility.  v. 34 (Harkins); p. 26:12–21.

8.    When Harkins came to the board she found herself in agreement with Casey

      Brown and at odds with other board members, including Larry Snook,

      Lonny Langione, and Barry Callaghan, in terms of issues and views relating

      to fiscal responsibility.  v. 34 (Harkins); p. 26:12–21; p. 29:4–25.  The

      building project was the big issue of her second race.  v. 34 (Harkins); p.

      30:1–8.

9.    Harkins ran with Bonsell because he was fiscally conservative; she had no

      discussion of religion with Bonsell before she decided to run with him; and

3

she did not know Bonsell before this decision. v. 34 (Harkins); p. 30:19–p.

31:5.

10. Harkins decided to run with Yingling because she opposed the building

project; and there was no discussion of religion before the decision. v. 34

(Harkins); p. 31:6–12.

11. Harkins ran with Casey Brown because they were both minority members

with shared views on fiscal responsibility; there was no discussion of

religion prior to the decision to run with Casey Brown. v. 34 (Harkins); p.

31.

12. Casey Brown ran with Alan Bonsell, Sheila Harkins, Angie

Zeigler–Yingling, and there was no religious dimension to their platform, it

was based on fiscal responsibility. v. 8 (Casey Brown); p. 10:4–p. 11:9.

13. Heather Geesey was elected to the DASD school board in 2003 and started

in the position in December 2003; her platform was that she an elementary

mom by which she meant that she could represent concerns of parents with

children in elementary school. v. 31 (Geesey); p. 146:7–20.

14. Geesey was endorsed by Jeff Brown. v. 31 (Geesey); p. 146:21–25.

15. Casey Brown was her mentor for purpose of bringing Geesey up to speed

regarding board procedures etc. but the relationship was strained because

Casey Brown did not approve of those who disagreed with her and when Geesey differed with Brown, Brown refused to return calls or give advice. v. 31 (Geesey); p. 147:12–p. 148:17.

16.   Barrie Callaghan improperly accused Geesey of dishonesty because Geesey ran alone but was endorsed by Jeff Brown who did not want Barrie Callaghan on the board; and Callaghan's rude and inappropriate comments made Geesey regard Callaghan as a troublemaker when Callaghan spoke at board meetings. v. 31 (Geesey); p. 148:25–p. p. 150:3.

**Political Divisions Created by Building Project.**

17.   Bonsell campaign in 2002 was focused on the building project. v. 24 (Nilsen); p. 16:9--23;

18.   Divisions over building project led two board remembers, vehement critics of board in this dispute, to resign. v. 24 (Nilsen); p. 25:14--p. 26:5; v. 32 (Bonsell); p. 60:11–p. 62:5; v. 34 (Harkins); p. 33:1–p. 11.

19.   Barrie Callaghan shared view of Langione and Snook regarding building project. v. 24 (Nilsen); p. 26:3--8; v. 34 (Harkins); p. 32:9–19.

20.   Barrie Callaghan, Lonnie Langione, and Snook, became critics of the board, Casey Brown believed they were politically motivated and shut her ears when they addressed the board. v. 8 (Casey Brown); p. 13:23–p. 14:6.

21.   Jeff Brown regarded Barrie Callaghan as irritating and believed that at time her appearance before the school board appeared politically motivated.  v. 8 (Jeff  Brown); p. 85:5–12.

22.   Eventually Plaintiff Barrie Callaghan lost her seat on the board.  v. 32 (Bonsell); p. 62:6–11.

23.   The building project divided the community v. 32 (Bonsell); p. 57:23–p. 60:10.  It also created tension between the school board and the faculty.  v. 32 (Bonsell); p. 65:3–p. 66:13.  The division created by the building project and other issues far exceeded that created by the dispute over the biology curriculum.  v. 32 (Bonsell); p. 104:2–p. 108:4.

24.   The building project was extremely divisive in the community and produced a reversal of board membership from 6-3 for the project as contemplated to 6-3 against the project as contemplated.  v. 34 (Harkins); p. 31:20–p. p. 32:21.

**Appointment of Bill Buckingham and Jane Cleaver.**

25.   With the resignation of Snook and Langione, Bill Buckingham and Jane Cleaver were selected to fill their slots; Bonsell did not have a personal friendship with either Buckingham or Cleaver; both Buckingham and Cleaver were chosen because of fiscal responsibility; and they did not

discuss religion or a religious agenda with Bonsell before Buckingham or Cleaver came to the board.  v. 32 (Bonsell); p. 62:12–p. 65:2.

26.   Harkins voted for Buckingham because she knew him from a taxpayers groups started by Jeff Brown and knew Buckingham was a fiscal conservative; Harkins had no discussion with Buckingham about religion when she voted for Buckingham; v. 34 (Harkins); p. 33:12–34:25.

27.   Harkins voted for Cleaver because Cleaver knew the majority of the community and Harkins thought Cleaver would be a good fit for the board. v. 34 (Harkins); p. 35:12-17.

28.   Cleaver applied for the position vacated by Snook or Langione based on her attendance at board meetings and the responsible handling of the building project; she believed that they did not use good judgment.  v. 32 (Cleaver); p. 7:10–p. 9:21.  Barrie Callaghan voted against Cleaver, and Callaghan took the same approach to the building project as Snook and Langione.  v. 32 (Cleaver); p. 9:22–p. 10:21.

29.   Upon coming to the board Cleaver was appointed to the policy committee but she did little work on that project because Casey Brown was the head of that committee and Brown did what she wanted and had no consideration for what others thought. v. 32 (Cleaver); p. 12:9-23.

30.    There is no evidence of any religious agenda shared by the various board members who voted for the curriculum change during this period.

31.    The board members were drawn together by an interest in fiscal responsibility that was brought into sharp focus by the building project.

32.    The building project produced bitter political and in some cases personal animosity that influenced the way board members viewed complaints or concerns voiced by certain community members, including former board members Callaghan, Snook, and Langione, as well as teachers, leading the board that came to power during this period to discount such criticism believing it was largely politically motivated and, in some cases, not accurate.

**DASD board /Administration Retreat, January 9, 2002.**

33.    Bonsell's first school board meeting was December of 2001. v. 32 (Bonsell); p. 66:14-20.  Casey Brown put him on the board  Curriculum Committee ("BCC").  v. 32 (Bonsell); p. 66:21–25.

34.    Rich Nilsen, the Superintendent for DASD during this period, was in his first week in that position in January of 2002.  v. 24 (Nilsen); p.  7:23--p. 8:3.

35.   Mike Baksa is the Assistant Superintendent for DASD since the 2002-03 school year; v. 26 (Baksa); p. 59:16–18; p. 60:21–24.

36.   An administrative retreat of the board  was held on January 9, 2002; it was a meeting intended to allow board  and Administration to meet socially, team--build, give the Administration an opportunity to present achievements, allow a look of future tasks.  v. 24 (Nilsen); p. 7:24--p. 9:1; v. 32 (Bonsell); p. 67:12–p. 68:22.  These retreats were not for the purpose of deliberating on district policy.  v. 4 (Barrie Callaghan); p. 16:2–25.

37.   Baksa was not present for this 2002 retreat as he had not been hired yet. v. 26 (Baksa); p. 59:16–18; p. 60:21–24; p. 61:13–16.

38.   The meeting on January 9, 2002, lasted about three and a half hours.  v. 24 (Nilsen); p.  9:4--6; v. 32 (Bonsell); p. 68:22–p. 69:2.

39.   Toward the end of that meeting there was a brief period, dealing with "Board Feedback and Items of Interest" during which Nilsen solicited input from board members.  v. 24 (Nilsen); p. 8:8--10; v. 24 (Nilsen); p. 10:22--p. 11:5.

40.   This portion of meeting allotted about minute or two to each minute. v. 24 (Nilsen); p. 9:6--16; v. 32 (Bonsell); p. 69:12–20.

41.   During this portion of the meeting each member had an opportunity to mention comments or issues; v. 24 (Nilsen); p. 9:13--19; v. 32 (Bonsell); p. 69:3–20.

42.   Nilsen noted input received from this portion of the meeting and late generated a document for reference.  v. 24 (Nilsen); p. 6: 12--17; id at p. 9:17--21; D.  288 at 3968.

43.   During the meeting Bonsell mentioned Creationism and prayer.  D 288 at 3968 [at C--1].

44.   Prior to finding this memo Nilsen had no recollection that Bonsell mentioned Creationism or prayer.  v. 24 (Nilsen); p. 7:1–13; id at 15:13--p. 17--9.  Bonsell does not remember using the term or what he said but believes he must have mentioned Creationism because Nilsen noted the term.  v. 32 (Bonsell); p. 69:21–p. 70:23.   Harkins does not remember Bonsell mentioning Creationism or prayer.  v. 34 (Harkins); p. 36:8–15.  Plaintiff Callaghan does not remember anything about this retreat.  v. 4 (Barrie Callaghan); p. 16:2–10.

45.   To Bonsell, Creationism means a literal interpretation of the Bible, which is a matter of religious faith for Bonsell.  v. 32 (Bonsell); p. 70:24–p. 71:9

46.   To Bonsell ID is not Creationism.  v. 32 (Bonsell); p. 71:10–22.

47.   Bonsell does not recall anything he said about prayer at the 2002 board

retreat and believes he might have had questions about what sort of student

prayer was permitted, but he has never taken any step to require prayer in

schools.  v. 32 (Bonsell); p. 71:23–72:23; v. 33 (Bonsell); p. 4:3–13.

48.   Buckingham never contemplated mandatory prayer for students while on the

board or discussed it with anyone on the board.  v. 30 (Buckingham); p.

56:13–24.

49.   In contrast, some "items of interest" mentioned by board  members did

generate action over the following year.  v. 24 (Nilsen); 11:6--15; id at p.

12:9--p. 15:12.

50.   Nilsen's memory reflects the actual operational priorities of school board

members, and Bonsell's interest was building project.  v14; p. 16:417:2.

51.   In the period between Baksa's arrival at DASD and the Board

/Administrative Retreat held on March 26, 2003, Baksa had discussions

with Bonsell regarding curriculum, including discussions relating to the

theory of evolution and the Founding Fathers.  v. 26 (Baksa); p. 62:7–p.

63:6.

52.   Bonsell had reviewed the text and was concerned its presentation of

evolutionary theory, that the theory was presented as fact (not theory), that

evidence for the theory was overstated, that the presentation did not leave open the possibility that their might be other theories to consider.  Baksa also learned that Bonsell had questions concerning the reliability of Carbon 14 dating and, based upon a documentary Bonsell had reviewed, regarded the possibility of species to species change as improbable.  v. 26 (Baksa); p. 63:7– 64:17.

53.  Jeff Brown knew that Bonsell was skeptical of claims made for evolutionary theory and regarded Bonsell's objections as reasonable.  v. 8 (Jeff  Brown); p. 86:18–p. 87:5.

54.  Prior to 2003 the biology text and curriculum were not even on the radar for Miller as a biology teacher in Dover.  v. 13 (Miller);  p. 12:17–p. 13:1.

55.  Any mention of Creationism by Bonsell during this meeting was plainly desultory as no witness has no independent recollection of what Bonsell said.

**Seminar on Creationism and the Law, March 26, 2003.**

56. During the Winter 2002--2003 Nilsen received a mailing concerning a seminar entitled "Creationism and the Law," sponsored by the Pennsylvania School board Association. D. 283. v. 24 (Nilsen); p. 26:9--p. 27:8.

57. Nilsen directed Baksa to attend because he knew that evolution was an area of the curriculum that sometimes generated controversy and he wanted Baksa to get a sense for the issues. v. 24 (Nilsen); p. 27:11–19;

58. Nilsen did not send Baksa to the seminar because he believed Bonsell wanted to teach Creationism. v. 24 (Nilsen); p. 27:20--23.

59. Baksa attended the seminar which was sponsored by the Pa. School board Assoc. and Messiah College. v. 26 (Baksa); p. 64:18–65:13.

60. Baksa took notes relating to the seminar which was given by Dr. Larsen, who had a law degree from Harvard University and was facilitated by Ted Davis, who had a PhD in history of science. D. 184; v. 26 (Baksa); p. 65:12–66:8.

61. The bulk of the presentation consisted in a presentation concerning the historical dimension of the controversy surrounding the teaching of evolutionary theory; it ended with thoughts concerning why public schools

could present alternate theories in contrast to evolution consistent with the law.  v. 26: p. 66:9–p. 67:6.

62.   Baksa came away thinking it would be good for biology teachers to attend the seminar.  v. 26 (Baksa); p. 67:7–68:8.  D 284 at 4013.

63.   Baksa also learned that teaching Creationism was illegal and that information informed his actions at every point in this process.   v. 36 (Baksa); p. 35:1–20.

64.   Nilsen recalls that Baksa, upon returning from the seminar, believed that it was productive.  v. 24 (Nilsen); p.  27;24–p. 28:8.

65.   Science curriculum and text were up. for review in 2003 in the ordinary course of the curriculum and text cycle put in place by Nilsen.  v. 24 (Nilsen); p.  19:14–21; D.  288 at 3969; v. 24 (Nilsen); p.  34:4–35:3.

66.   Nilsen sent Baksa because curriculum was responsibility of the Assistant Superintendent, and Nilsen does not micro--manage.  v. 24 (Nilsen); p. 28:9–20.

**DASD board /Administration Retreat March 26, 2003.**

67.   Another board  Retreat was held on March 26, 2003.  v. 24 (Nilsen); p. 9:23--p. 10:6; v. 32 (Bonsell); p. 72:24–p. 73:8.

68.   The March 2003, meeting followed a similar format to that of the 2002 retreat.  v. 24 (Nilsen); p. 17--p. 18:7.

69.   A comparison of the items of interest mentioned at the 2002 Retreat and the Agenda for the 2003 retreat indicates that some items mentioned in the 2002 retreat had issued in action.  D.  288 at 3968--69; v. 24 (Nilsen); p.  18:8--p. 19:5.

70.   The building project continued to dominate attention of board and administration in 2003 along with other items such as a tech-Ed program, transitional 1st grade, and the relationship between new state standards for science & technology.  v. 24 (Nilsen); p.  25:8--11; v. 26 (Baksa); p. 68:9–p. 71:16.

71.   Again Nilsen solicited "Board Feedback and Items of Interest" during a one to two minute section of meeting.  v. 24 (Nilsen); p. 10:17--23.  D.  288 at 3969; v. 24 (Nilsen); p.  17:17--p. 18:7; v. 24 (Nilsen); p. 19:22--20:12; v. 26 (Baksa); p. 72:10–73:2; v. 34 (Harkins); p. 37:5–20; v. 4 (Barrie Callaghan); p. 17:5–20.

15

72.   Nilsen remembers a few items that were mentioned by board members where they took on importance over time.  v. 24 (Nilsen); p. 20:13--p.  24--20.  Baksa likewise remembers some items that took on enduring importance from this meeting such as a tech-Ed program, transitional 1st grade, and the relationship between new state standards for science & technology.  v. 24 (Nilsen); p.  25:8--11; v. 26 (Baksa); p. 68:9–p. 71:16; p. 73:3–p. 74:22; v. 26 (Baksa); p. 76:5–25.

73.   It is not unusual for board members to raise and issues and then nothing concrete to result from this at the end of the day.  v. 26 (Baksa); p. 771–4.

74.   Bonsell mentioned Creationism during this Retreat.  D. 288 at 3970; v. 24 (Nilsen); p.  23:21–p. 24:2.

75.   Bonsell does not remember using the term but believes he must have since Nilsen wrote it down.  v. 32 (Bonsell); p. 73:22–p. 75:9.

76.   Nilsen does not remember Bonsell's mention of Creationism because his memory is tied to issues that became important to the district.  v. 24 (Nilsen); p.  23--21--p.  24:20.

77.   Baksa does not remember Bonsell mentioning Creationism.  D 288; v. 26: p. 74:13-14; p. 75:14–19.  But he does remember Bonsell talking about teaching a 50/50 split with evolution.  v. 26: p. 71:23–72:10.

78. Harkins does not remember Bonsell mentioning Creationism or prayer or social studies.  v. 34 (Harkins); p. 36:22–p. 37:4.

79. Plaintiff Barrie Callaghan does not remember any discussion concerning any issues raised by Bonsell, including Creationism, in 2003.  v. 4 (Barrie Callaghan); p. 18:2–16.

80. Jeff Brown had no recollection of Bonsell mentioning Creationism when his deposition was taken on May 17, 2005.  v. 8 (Jeff Brown); p. 88:1–10.

81. Cleaver remembers no mention of the biology text or curriculum until after May of 2004.  v. 32 (Cleaver); p. 13:11–22.

82. Bonsell also mentioned that the Social Studies curriculum, and issues dealing with the Founding Fathers and Constitution, a longstanding area of interest.  v. 24 (Nilsen); p. 22:25--23:20; v. 26 (Baksa); p. 74:15–19.  D 288; v. 32 (Bonsell); p. 75:10–p. 76:7.

83. Sometime in 2002 Bonsell provided Baksa with a book entitled The Myth of Separation but Bonsell has never requested that Baksa make any change to the Social Studies Curriculum or require anyone to read the book.  v. 36 (Baksa); p. 47:16–23; p. 57:18–p. 60:11; v. 32 (Bonsell); p. 76:8–11; v. 33 (Bonsell); p. 4:14–24.

84.  Board members have also looked at other areas of the curriculum, including consumer science, sex education, and language arts.  v. 32 (Bonsell); p. 76:16–25.

85.  Buckingham did not attend the March 2003 Retreat, and it was during this time that the board  and Administration began to learn that Buckingham was having several health issues, including problems with an addictive painkiller, Oxycontin.  v. 24 (Nilsen); p.  24:21--p.  25:7.

86.  Again whatever mention Bonsell made of Creationism made at the board /Administration Retreat was desultory and did not issue in action.  Bonsell has expressed interest in other areas of the curriculum which have not produced any concrete call for action and this is not unusual.

**Meeting Between Baksa And Bonsell Regarding Biology Text.**

87.  Around the time of the March 26, 2003 Retreat, Baksa had conversations with Bonsell regarding evolutionary theory, he learned that Bonsell thought the presentation in the text presented evolutionary theory as fact leaving no room for alternative theories; but Bonsell did <u>not</u> use the term Creationism during these discussions.   v, 26; p. 74:23–p. 75:19; v. 32 (Bonsell); p. 77:1–22.

18

88.   Bonsell based his judgment on information he had received in personal reading. v. 32 (Bonsell); p. 77:23–p. 79:17.

89.   Based on information derived from personal reading Bonsell expressed a concern that the theory of evolution as stated in the text left no room for a discussion of other theories and that students might have a conflict with evolution as it might be taught or understood in the home.  v. 26 (Baksa); p. 75:2–13; v. 32 (Bonsell); p. 79:9–p. 80:5.

90.   Baksa did not get a firm sense for what other theory Bonsell or other board members might have in mind.  v. 26: p. 75:20–p. 76:4.

91.   As of April 1, 2003, the date of the Peterman memo no board member had ever discussed teaching Creationism with Baksa.  v. 26 (Baksa); p. 83:5–16; v. 24 (Nilsen); p.  32:2--6.

92.   Bonsell's concerns about the text those were made with reference to scientific claims and criticisms not his religious conviction and not Creationism.

**The Peterman Memo Dated April 1, 2003.**

93.    After the March 26, 2003 board /Administration Retreat, Baksa met with Bert Spahr to give her a heads-up; he did not use the term Creationism but could see how Spahr might assume Bonsell was talking about Creationism based upon the information he communicated, e.g. Bonsell's questioning of carbon 14 dating.  v. 26 (Baksa); p. 77:5– p. 78:5.

94.    Baksa did not go to Peterman because she had a habit of blowing things out of proportion and making it difficult to manage matters.  v. 26 (Baksa); p. 78:19–p. 80:23.

95.    Spahr did discuss her conversation with Baksa with Peterman.  v. 14 (Spahr); p. 5:16–24.

96.    Spahr expressed her concern about a possible change to the biology curriculum that related to Creationism.  v. 14 (Spahr); p. 6:6–12.

97.    Before speaking with Peterman, Spahr had spoken with the science faculty and based upon what the teachers had told her Spahr told Peterman that Creationism per se was not taught because it was not within state standards.  v. 14 (Spahr); p. 6:13–19.

98.    Before speaking with Peterman, Spahr had spoken with the science faculty and based upon what she learned from the teachers, Spahr told Peterman

that teachers mentioned Creationism but they did not teach it.  v. 14 (Spahr); p. 6:13–7:1.

99.   Jen Miller, the veteran biology teacher, told Spahr that teacher would mention Creationism as an alternate to Darwin's theory.  v. 14 (Spahr); p. 7:2–8.

100.   Jen Miller also told Spahr that if students wanted to talk about Creationism they should talk to their families and pastors, an approach that teachers took because they knew the subject was controversial and they wanted to treat it properly.  v. 14 (Spahr); p. 7:9–16.

101.   Spahr also learned that teachers would sometimes point students to the reference section of the library if they had additional questions about Creationism.  v. 14 (Spahr); p. 7:5–21.

102.   Baksa learned that Spahr had spoken with Peterman about the conversation between Baksa and Spahr concerning evolution upon receiving a memo from Peterman relating to the biology curriculum.  v. 26 (Baksa); p. 78:6–11; D 1.

103.   On April 1, 2003, Trudy Peterman, then principal at Dover High School, directed a memo to, among others, Baksa.  D. 1.  (hereinafter "Peterman Memo").

104. The Peterman Memo recounted a conversation with Bert Spahr.  According to Peterman, Spahr had also indicated that Baksa said a board member wanted fifty percent of the topic of evolution to involve the teaching of Creationism. D. 1 at ¶1.

105. According to the Peterman Memo Spahr had explained that "all teachers state that another theory of evolution is Creationism, but Creationism, per se, is not taught since it is not addressed by the [Pennsylvania Academic] standards. D. 1 at ¶1.

106. Peterman also indicated that she had "advised them [biology teachers] to continue to mention Creationism as another theory of evolution.  D. 1 at ¶2.

107. Peterman told Spahr to tel the teachers to continue what they had done in the past.  v. 14 (Spahr);; p. 7:22–p. 8:1.

108. After the discussion between Peterman and Spahr, Spahr told teachers to continue teaching evolution as they had before.  v. 13 (Miller);  p. 13:3–p. 14:25.

109. Giving teachers direction with respect to curriculum was not within the area of Peterman's authority as the principal.  v. 24 (Nilsen); p.  3521--p. 36:21.

110.   Peterman posed a number of questions relating to academic and legal issues surrounding this possibility she had in mind based upon her conversation with Spahr.  D.1 at ¶2 [at items 1--5].

111.   Nilsen received the Peterman memo.  v. 24 (Nilsen); p. 28:21--p. 29:4.

112.   The memo gave him cause for concern, because Peterman continued to send memos without adequate investigation.  v. 24 (Nilsen); p. 29:5--16; v. 24 (Nilsen); p. 31:2--8.  In addition, Peterman indicated that she had "advised them [biology teachers] to continue to mention Creationism as another theory of evolution.  D. 1 at ¶2.  Giving teachers direction with respect to curriculum was not within the area of Peterman's authority as the principal.  v. 24 (Nilsen); p. 35:21--p. 36:21.

113.   This reflected negatively in Peterman's evaluation, but she was not punished for the content of the memo.  v. 24 (Nilsen); p. 31:6--11.

114.   Nilsen discussed the assertion in the memo that Baksa had told Spahr that a board member wanted Creationism taught fifty percent with evolution; and Baksa had assured Nilsen that Baksa had not said that to Spahr.  v. 24 (Nilsen); p. 30:21--p. 31; 1.

115. For his part, Baksa saw the Peterman memo as another example of her overreacting–taking a two minute discussion with Spahr and blowing it out of proportion. v. 26 (Baksa); p. 78:19–p. 81:10.

116. Baksa also viewed the Peterman memo as improper because she was giving direction regarding curriculum which was the job of the board and administration. v. 26 (Baksa); p. 81:82:8.

117. Nilsen was not concerned with teachers mentioning Creationism because he believed that the conduct described–and advised–by Peterman violated the law on the theory that mentioning Creationism amounted to a teaching of Creationism in violation of the law. v. 24 (Nilsen); p. 29:17--p. 30:20.

118. Teaching is a term of art in the educational profession that has a technical meaning which includes specific objectives in curriculum, identified steps for implementation, dedicated materials, and assessment. v. 24 (Nilsen); p. 31:12--p. 32:1.

119. Baksa was not concerned that teaches were engaged in unlawful activity when he learned via the Peterman memo that teachers were mentioning Creationism because merely mentioning something is not teaching it as that term is used in the educational profession, which involves specific instructional objectives, instructional goals, dedicated materials, assessment

24

of student learning, and feedback from teachers to students.  v. 26 (Baksa); 82:9–83:4.

120.   Neither Nilsen or Baksa ever believed that mentioning either Creationism or ID was teaching it.   v. 25 (Nilsen); p. 52:4–p. 53:1; D 138 & 139; v. 35 (Baksa); p. 34:19–p. 35:17; v. 36 (Baksa); p. 41:19–p. 42:19.

121.   Linker explained to Baksa that when he began his presentation on evolutionary theory, he drew a line down the middle of the chalkboard; on one side of the board he wrote evolution, on the other side of the board he wrote Creationism; and he told students that he would not be discussing Creationism, which was based on religion and writings in the Bible because he was not an expert; at the time Linker mentioned Creationism to his students before teaching evolution, he knew it was illegal to teach Creationism but he did not believe he was doing anything illegal.  v. 36 (Linker); p. 74:7–14; p. 67:5–16; p. 70:1–p. 71:5.

122.   Before speaking with Peterman, Spahr had spoken with the science faculty and based upon what the teachers had told her Spahr told Peterman that Creationism per se was not taught because it was not within state standards. v. 14 (Spahr); p. 6:13–19.