## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

TAMMY KITZMILLER, et al., )
)
Plaintiffs, )            Case No. 04-CV-2688
)            (Hon. Judge Jones)
v. )
)
DOVER AREA SCHOOL DISTRICT and )   **DEFENDANTS PROPOSED**
DOVER AREA SCHOOL DISTRICT )       **FINDINGS OF FACT**
BOARD OF DIRECTORS, )              **AND CONCLUSIONS OF**
)                                  **LAW**
Defendants. )
_____)

# PART TWO

123. Before speaking with Peterman, Spahr had spoken with the science faculty and based upon what she learned from the teachers, Spahr told Peterman that teachers mentioned Creationism but they did not teach it. v. 14 (Spahr); p. 6:13–7:1.

124. Jen Miller, the veteran biology teacher, told Spahr that teacher would mention Creationism as an alternate to Darwin's theory. v. 14 (Spahr); p. 7:2–8.

125. Jen Miller also told Spahr that if students wanted to talk about Creationism they should talk to their families and pastors, an approach that teachers took because they knew the subject was controversial and they wanted to treat it properly. v. 14 (Spahr); p. 7:9–16.

126. Spahr also learned that teachers would sometimes point students to the reference section of the library if they had additional questions about Creationism. v. 14 (Spahr); p. 7:5–21.

127. Plaintiff Bryan Rhem used a videotape discussing Creationism when he taught classes dealing with evolution. v. 4 (Rehm); p. 117:3–6.

128. Jen Miller maintains that Creationism was not taught. v. 13 (Miller); p. 15:7–19.

129.   The Pennsylvania State Academic Standards speak to teaching as that term is used in the educational profession, teachers for DASD teach evolution as required by state standards they do not teach intelligent design.  v. 31 (Baksa); p. 227:9–p. 228:23; p. 230:1; D 54.

**Baksa' Draft Curriculum Change August/September 2003.**

130.   Sometime in the summer of 2003 Baksa did draft a change to the biology curriculum for DASD including as a goal that students would be able to demonstrate awareness of other theories of evolution, including Creationism; he believes he generated this draft based upon information in the Peterman Memo, which indicated that teachers were mentioning Creationism, Bonsell's concern that other theories of origins of life were mentioned alongside evolution to create a more balanced presentation, that it would and the information he received at the seminar sponsored by Messiah College to the effect that adding a discussion of Creationism to the biology curriculum might enrich the discussion of evolutionary theory.  v. 26 (Baksa); p. 83:14–p. 85:7; p. 86:6–p. 87:5.   D 286.

131.   Baksa thought this curriculum change might address Bonsell's concerns about making students aware of other theories of origins of life.  v. 26 (Baksa); p. 86:6–p. 87:5; D 286.

132. Bonsell had never mentioned teaching Creationism to Baksa at the time this draft curriculum was created.  v. 26 (Baksa); p. 85:8–10.

133. Bonsell did not tell Baksa he wanted Creationism taught 50/50 and his criticisms of the biology text were scientific, not religious.  It appears that certain persons assumed that Bonsell was talking about teaching Creationism because he mentioned it but the weight of the evidence shows that Bonsell's comments about teaching other theories were made with reference to ID, not Creationism.

**Meeting of Bonsell and Science Faculty In The Fall of 2003.**

134. Baksa never passed out this draft curriculum document because he had a conversation with Bert Spahr which made him believe that teachers did not teach origins of life, but only change over time within species, and this made Baksa think that Bonsell's concern for balance in presentation of theories about origins of life was moot if teachers were not presenting any theory of origins of life.  v. 26 (Baksa); p. 85:11–18; p. 87:6–19; D. 286.

135. Baksa set up a meeting with the science teachers in September of 2003 to learn if the information provided by Spahr was accurate and he took notes during that meeting.  v. 26 (Baksa); p. 87:20–p. 88:8; D 287.

136. During the September 2003 meeting Baksa learned that teachers did not teach origins of life but focused on change within species, and Jen Miller gave the example of a finch becoming the basis for several species of finches.  v. 26 (Baksa); p. 88:9–25; v. 36 (Linker); p. 71:3–9.

137. During this meeting with Baksa, Linker explained that when he began his presentation on evolutionary theory, he drew a line down the middle of the chalkboard; on one side of the board he wrote evolution, on the other side of the board he wrote Creationism; and he told students that he would not be discussing Creationism, which was based on religion and writings in the Bible because he was not an expert in that; but that he would be teaching them about evolution, which was based on science, the fossil record, DNA and the like.  v. 36 (Linker); p. 67:5–16; p. 70:1–p. 71:5.

138. Upon speaking with Baksa the science department suggested a meeting with Bonsell in order to address any questions he might have.  v. 14 (Spahr); p. 10:15–p. 11:5.

139. Baksa and the teachers believed it was a good idea to set up a meeting with Bonsell and the science faculty so the faculty could explain how they addressed the subject.  v. 26 (Baksa); p. 89:18–p. 90:8;

29

140. During the meeting with Bonsell and the science faculty, the teachers explained what they taught and what they did not.  The meeting was short and Bonsell was satisfied with the information provided by the teachers.  v. 26 (Baksa); p. 90:7–20; v. 26 (Baksa); p. 94:24–p. 95:6; v. 32: p. 80:6–p. 81:12.

141. During the meeting Jen Miller told Bonsell that she did not address origins of life and the other teachers agreed.  v. 13 (Miller);  p. 15:20–p. 17:22; v. 14 (Spahr); p. 11:6–p. 12:9; v. 36 (Linker); p. 66:9–p.67:4.

142. As a result of this meeting Bonsell believed that teachers did not present origins of life.  v. 32 (Bonsell); p. 81:13–18.

143. During the meeting Bob Linker described how he presented evolutionary theory in his classes, and as a result of this information, Baksa understood that teachers mentioned Creationism in connection with their presentation of evolutionary theory, as indicated by the Peterman memo.  v. 26 (Baksa); p. 90:21–25; p. 94:14–18; D 1.  Miller agrees that Creationism is not taught. v. 13 (Miller);  p. 15:7–15.

144. Jen Miller does not even remember Creationism coming up during this meeting with Bonsell in 2003.  v. 13 (Miller);  p. 18:17:12–p. 18:5.

145. Plaintiff Rehm believes that Creationism and intelligent design came up at, or prior to, the meeting between science faculty and Bonsell in 2003; he remembers Bonsell talking about holes in the geologic record; and Spahr gave an explanation for the way in which theory is used in science.  v. 4 (B. Rehm); p. 97:4–p. 100:15.

146. Spahr gave Bonsell materials indicating it would be illegal to teach Creationism and Bonsell was a little taken aback because he was not talking about having the faculty teach Creationism.  v. 32 (Bonsell); p. 83:2–15; v. 36 (Linker); p. 71:9–19.

147. The tone of the meeting was civil, Bonsell did not criticize the teachers' teaching method, Bonsell and the science faculty parted on good terms, and teachers felt no more would come of the meeting.  v. 13 (Miller);  p. 17:12–p. p. 18:2; v. 26 (Baksa); p. 94:19–23; v. 32 (Bonsell); p. 83:16–p. 84:4; v. 14 (Spahr); p. 12:10–16; v. 36 (Linker); p. 71:20–p. 72:2.

148. As a result of this meeting Bonsell believed that teachers mentioned Creationism in their biology class; Bonsell was happy because teachers did not teach that Creationism was wrong and did not teach Creationism, which is up to the family.  v. 32 (Bonsell); p. 81:19–p. 83:1.

**No Change To Biology Curriculum in 2003.**

149.    There was no demand from any board member, including Bonsell, to change

the biology curriculum in 2003.  v. 24 (Nilsen); p.  32:2–6; v. 26 (Baksa); p.

95:7–9;. p. 84:5–8; v. 13 (Miller);  p. 18:6–9; v. 36 (Linker); p. 72:4–8; v. 4

(Barrie Callaghan); p. 17:21–p. 18:16;

**Factors Consistently Applied To Text Requests.**

150.    Purchase of texts, including family and consumer science, chemistry, and

biology, was held up. for 2003 due to budgetary considerations that had

nothing to do with the presentation of evolutionary theory.  v. 24 (Nilsen);

p.  32:32; v. 26 (Baksa); p. 95:10–p. 96:2; v. 34 (Harkins); p. 38:20–p.

39:16; v. 8 (Casey Brown); p. 12:22–p. 13:1.

151.    Nilsen was aware of concerns expressed by Plaintiff Barrie Callaghan and

others that students did not have a biology text in 2003 but knew those

concerns were misplaced.  v. 24 (Nilsen); p.  32:16–p. 33:15.

152.    Baksa was aware of concerns by Plaintiff Barrie Callaghan that students did

not have biology texts but Baksa learned these concerns were misplaced.  v.

26 (Baksa); p. 97:4–p. 98:9.

153.    Spahr knew that Callaghan's concern about students not having a biology

text was mistaken.  v. 14 (Spahr); p. 8:15–p. 10:14.

154. Harkins was aware of Barrie Callaghan's notion that students did not have biology texts but Harkins believed the students did in fact have texts based on a discussion with Spahr.  v. 34 (Harkins); p. 37:21–p. 38:19.

155. Nilsen also became aware that some believed that teachers were not using the biology text purchased by the district in connection with their instruction.  v. 24 (Nilsen); p.  33:16--p. 34:3; v. 8 (Casey Brown); p. 13:2-12.

156. Harkins thought there was no great need to purchase a new biology text if teachers did not using the one that had been purchased. v. 24 (Nilsen); p. 16--p. 34:3; v. 26 (Baksa); p. 96:22–p. 97:3.

157. During this period board members repeatedly considered a number of factors when looking at request for text purchases, including the science textbooks, in keeping with a goal of fiscal responsibility, including condition of books, age (via copyright), relationship of content to standards. v. 24 (Nilsen); p. 40--p. 41:12.  The biology books were subject to this standard inquiry.  D. 14&16; v. 24 (Nilsen); p.  43:8--p. 44:8.  Cost analysis were prepared in ordinary course.  D. 8; v. 24 (Nilsen); p.  52:12--p.  53:8. The board typically looked at a number of factors in connection with any text purchase, including the condition of the text, its copyright, how long it

33

had been used, and whether differences in content justified the purchase. v. 26 (Baksa); p. 96:3–20.

158.  The board evaluated the biology text in light of the same uniform criteria consistently applied to request for texts by any department.  The board did not hold up the biology text based upon any unlawful consideration during this period.

159.  The concerns Bonsell had expressed about the text were legitimate educational concerns based on non-religious criteria.

**Developments Bearing on Biology Text/Curriculum in Early 2004.**

160.  In 2004 Bonsell was elected to chairman of the DASD board. v. 32 (Bonsell); p. 86:18.

161.  He appointed Buckingham to chair the BCC but the committee chair has no more authority than anyone else. v. 32 (Bonsell); p. 86:22–p. 87:19.

162.  Buckingham remembers learning about ID when he was appointed to the BCC in January of 2004. v. 30 (Buckingham); p. 57:4–17.

163.  Bonsell did not tell Buckingham that he wanted ID worked into the biology curriculum when he appointed Buckingham. v. 32 (Bonsell); p. 87:20–p. 88:4.

164. Bonsell put Harkins on the BCC in 2004; there was no discussion of working Creationism or intelligent design into the curriculum with either Bonsell or Buckingham.  v. 34 (Harkins); p. 39:17–p. 40:7.

**Science Faculty Concerns That Texts Would Not Be Purchased in 2004.**

165. The science faculty was concerned that the board's decision to forgo purchase of texts in 2003 would mean that the purchase of science texts would be delayed for one whole rotation of the seven year curriculum cycle. v. 24 (Nilsen); p. 37:9–18; v. 14 (Spahr); p. 12:17–p. 13:10; v. 26 (Baksa); p. 98:10–p. 99:25;

166. At an April 2004 meeting of the Curriculum Advisory Council ("CAC"), the council advised that board  Curriculum Committee ("BCC") should address faculty concerns that requests for texts would be delayed for another review of the text/curriculum cycle; Baksa assured them the plan was for these texts to be purchased.  D. 1,2 3; v. 26 (Baksa); p. 98:10–p. 100:8.

167. The board  did not delay the purchase of science and family and consumer science texts for a complete curriculum cycle..  v. 24 (Nilsen); p.  37:19--21.

168. Although the board  had postponed the purchase of certain texts in 2004, it was prepared to purchase those texts in 2004, and Baksa assured them the plan was for these texts to be purchased.  D. 1,2 3; v. 26 (Baksa); p.

35

98:10–p. 100:8; v. 24 (Nilsen); p.  22--p. 37:8; v. 24 (Nilsen); p. 37:22--38:1; v. 32 (Bonsell); p. 90:14–p. 91:3.

169.   The mistaken notion that students did not have biology texts carried over into the 2004 year.  v. 24 (Nilsen); p.  38:2--10; p.  38:11--14. Geesey remembers Callaghan saying that students needed their books at board meetings in June; and Geesey discounted these assertions because she knew students had their books.  v. 31 (Geesey); p. 151:8–p. 152: 6.

**Curriculum Advisory Council ("CAC").**

170.   CAC is a council chaired by Superintendent for curriculum that has as members, faculty, community members, and administrators.  v. 24 (Nilsen); p. 38:23--p. 39:2.

171.   The CAC does <u>not</u> have to consulted prior to curriculum changes or text purchases pursuant to DASD policy.  v. 24 (Nilsen); p.  39:3--10.

172.   Nonetheless, Nilsen consulted the CAC prior to the curriculum change at issue in this case.  v. 24 (Nilsen); p. 39:11--14.

173.   All of DASD policies concerning curriculum development were followed in this case.  v. 24 (Nilsen); p.  39:15--18.

**The Board  Curriculum Committee ("BCC").**

174.  The BCC is a subcommittee of the DASD School board  that has three board members on it and that reviews all curriculum and texts prior to submission to the board for approval.  v. 24 (Nilsen);, p.  39:22--p.  40:4.

175.  Bonsell did not attend meetings of the BCC from January through May of 2004.  v. 32 (Bonsell); p. 91:4–14.

176.  The family and consumer science text was considered in Spring of 2004, and board members had concerns that text recommended for purchase was virtually identical to text in use.  v. 24 (Nilsen); p.  39:19--p.  40:17.

177.  During this period board members repeatedly considered a number of factors when looking at request for text purchases, including the science textbooks, in keeping with a goal of fiscal responsibility, including condition of books, age (via copyright), relationship. of content to standards. v. 24 (Nilsen); p.  40--p. 41:12.  The biology books were subject to this standard inquiry. D.  14&16; v. 24 (Nilsen); p.  43:8--p. 44:8.  Cost analysis were prepared in ordinary course. D. 8; v. 24 (Nilsen); p.  52:12--p. 53:8.  The board typically looked at a number of factors in connection with any text purchase, including the condition of the text, its copyright, how

37

long it had been used, and whether differences in content justified the purchase.  v. 26 (Baksa); p. 96:3–20.

178.   BCC and faculty met in the Spring of 2004 to discuss text requests and explain need for texts in light of the typical factors the board considered during this period.  v. 26 (Baksa); p. 100:9–p. 105:19; D 7, 8, 9,10, & 164.

179.   Harkins remembers a meeting in May where the BCC discussed the family consumer science, chemistry, and biology texts were discussed; v. 34 (Harkins); p. 40:20–25.  Harkins questioned the need for a new Family & Consumer Science text based on the apparent lack of any real difference between the old and new editions.  v. 14 (Spahr); p. 13:11–p. 14:15.

180.   Harkins remembers requesting a copy of the old biology text and the new text recommended for purchase in order to compare the two.  v. 34 (Harkins); 41:1–6.

181.   Harkins concluded that the chemistry book needed to be replaced because it was worn; but she thought both the family and consumer science books were in good condition and fairly new.  v. 34 (Harkins); p. 7–12.

182.   Harkins had no problem with the presentation of evolutionary theory in the biology text and, in fact, evolutionary theory is not inconsistent with her religious convictions.  v. 34 (Harkins); p. 41:13–20.

183.   Harkins recalls a meeting in the Spring of 2004 at which Buckingham expressed concerns with the presentation of evolutionary theory at which Buckingham had a list of concerns about the text and a discussion of gaps and problems.  v. 34 (Harkins); p. 42:3–p. 43:13.

**Buckingham's Distribution of Materials from Discovery Institute Relating to Biology Text and Curriculum to Administration.**

184.   Buckingham remembers learning about ID when he was appointed to the BCC in January of 2004.  v. 30 (Buckingham); p. 57:4–17.  Buckingham did research on ID and learned that it was a scientific theory that was supported by 300 scientists.  v. 30 (Buckingham); p. 57:4–21.  Buckingham did not believe ID was a religious theory.  v. 30 (Buckingham); p. 57:22–p. 58:1.  Buckingham did not believe ID was Creationism.  v. 30 (Buckingham); p. 58:2–4.

185.   In Spring of 2004 Buckingham delivered materials relating to biology text and curriculum to the administration, more specifically, two CDs and a book.  v. 24 (Nilsen); p. 41:13--22.  The two CDs were entitled, Icons of Evolution and Unlocking the Mysteries of Life.  v. 24 (Nilsen); p. 42:3--11; D 227, 228 & 229.

186. Buckingham recommended that Nilsen take a look at the materials. v. 24 (Nilsen); p. 42:15--21.

187. Nilsen passed these materials from Discovery Institute on to Baksa, telling him that a board member had dropped the materials off and that Baksa might want to take a look at them. v. 24 (Nilsen); p. 42:220--p. 43:7.

188. Miller remembers viewing a DVD or video entitled Icons of Evolution. v. 13 (Miller); p. 25:14–p. 26:20.

189. Bob Linker wanted to view the video because it dealt with gaps in evolutionary theory; it was the first time he actually saw a lot of gaps, although he had taught there were gaps in class; he thought it was good to get the other side of the story; and he told his colleagues that the video was good. v. 36 (Linker); p. 72:9–p. 73:4.

190. Upon reviewing one of these videos teachers agreed that there was some validity to the information it contained and agreed to make students aware of gaps in evolutionary theory, something they had already done. v. 14 (Spahr); p. 16:8–p. 17:11.

191. At the 6/24/04 meeting teachers agreed to review the Icons of Evolution video provided by Buckingham again, and consider using the material if it lined up with content they taught. v. 26 (Baksa); p. 121:22–p. 122:5.

192.   At some point Bonsell reviewed these materials in keeping with his personal interest.  v. 32 (Bonsell); p. 88:18–p. 90:13.

**Buckingham's Complaints about Biology, by Miller & Levine, 2002 Edition.**

193.   Buckingham also presented a list of complaints re: the Miller & Levine text, 2002 edition in the April/May 2004 period.  D.  15; v. 24 (Nilsen); p. 44:19--p.  45:3; v. 26 (Baksa); p. 105:20–p. 106:9.

194.   Nilsen and Baksa discussed Buckingham's complaints, but Creationism did not come up.   v. 24 (Nilsen); p.  44:22--p.  45:5.

195.   Baksa set a meeting with Buckingham to get more detail on the nature of the concerns expressed in D 15.  v. 26 (Baksa); p. 106:2–21.

196.   At the meeting, which occurred on June 4, 2004, Baksa learned that Buckingham objected to the presentation of evolutionary theory because it presented the theory as a fact.  v. 26 (Baksa); p. 106:22–p. 107:9; D 4; v. 26 (Baksa); p. 112:17–p. 114:8.

197.   In addition, Baksa received two DVDs and a book that Buckingham had provided.  v. 26p. 114:9–p. 115:16; D 227 (Icons of Evolution DVD); D 228 (Unlocking The Mysteries Of Life DVD); D 229 (Icons of Evolution book).

**June 2004 Board Meetings.**

198. The biology text or curriculum was not discussed at board meetings from January through May of 2004. v. 32: p. 91:15–24.

199. The biology text came up. for final approval beginning in June, 2004. v. 24 (Nilsen); p. 47:19--p. 48:3; D. 6&14.

200. Harkins had some reservations about the need to purchase new biology text because they were fairly close in time, the old edition was 1998, the new edition was 2002. v. 34 (Harkins); p. 43:20–p. 44:17.

**1st Board Meeting in June, 2004.**

201. During the first board meeting in June of 2004, Plaintiff Barrie Callaghan approached the board to express concerns about status of the biology books and ask why they had not been purchased yet. v. 24 (Nilsen); p. 45:7--20.

202. In response to her inquiry, Buckingham said that he had concerns about text, including his observation that it was "laced with Darwinism." v. 24 (Nilsen); p. 45:21--p. 46.1; v. 32 (Bonsell); p. 92:5–p. 93:1.

203. Barrie Callaghan does not recall any comments by Harkins, Cleaver, or Yingling. v. 4 (Barrie Callaghan); p. 21:24–p. 22:7.

204. Prior to this time Nilsen had never heard Buckingham complain about the Darwinism and Nilsen did not understand what Buckingham was getting at

since all biology books would have Darwin in them.  v. 24 (Nilsen); p. 46:6--17.  Bonsell did not know what to make of Buckingham's "laced with Darwinism" comment. v. 32 (Bonsell); p. 93:2–10.

205.   Up. to this first board  meeting in June 2004, no board member had complained to Nilsen about the biology text or expressed concern that it was laced with Darwinism.  v. 24 (Nilsen); p.  47:3--18.

**2nd Board  Meeting in June, 2004.**

206.   Attendance at the second board meeting in June 2004 was large because the board was contemplating elimination of a highschool English position and Peterman encouraged faculty to attend; by Nilsen's estimate, eighty percent of attendees were faculty. v. 24 (Nilsen); p.  48:8--24.

207.   A young man approached the board to object to bringing Creationism into the schools and board members told the young man that they were not talking about Creationism, they were talking about ID. v. 32 (Bonsell); p. 99:21–p. 100:22.

208.   During this period Bonsell believed that many, including Joe Moldanado, confused ID with Creationism. v. 32 (Bonsell); p. 100:23–p. 101:8.

209.   Harkins does not remember board members discussing Creationism among themselves during these June meetings. v. 34 (Harkins); p. 45:3–5.

210. Harkins does remember people in the audience talking about Creationism during board meetings in June and Jeff Brown talking about intelligent design and Creationism.  v. 34 (Harkins); p. 44:18–p. 45:2.

211. In response to claim that a board decision to require teaching of Creationism would violate the separation of church and state Buckingham observed that separation of church and state was a myth, meaning it is not in the Constitution; but he was not saying that it was permissible to teach Creationism because the separation of church and state was a myth; he simply believed that ID was not Creationism.  v. 30 (Buckingham); p. 58:23–p. 60:6.

212. Harkins believes Jeff Brown was the first board member to bring up ID at board meetings but that Alan [Bonsell], Noel [Wenrich], and Bill [Buckingham], joined the conversation.  v. 34 (Harkins); p. 45:6–14.

213. Brown did bring up ID at one point and at that time believed he was on safe legal ground.  v. 8 (Jeff  Brown); p. 86:12–17.

214. Casey Brown remembers Bonsell mentioning ID during the board meetings. v. 8 (Casey Brown); p. 17:2–p.18:21.

215. It was sometime during June 2004 that Harkins gave P 149 to Casey Brown; someone gave it to her but her point in passing it on to the Browns was that

44

according to this chart Darwin believed in intelligent design in response to discussions of ID during this period. P 149. v. 34 (Harkins);p. 45:24–p. 48:10. Harkins was not trying to persuade Casey Brown to accept ID for religious reasons. v. 34 (Harkins);p. 48:11–17. She did not draw any conclusion from P 149. v. 34 (Harkins);p. 14–21. Harkins believed that ID was another theory of evolution. v. 8 (Jeff Brown); p. 90:5–p. 92:11.

216.    Harkins did not know much about ID but had conducted an internet search v. 34 (Harkins);p. 48:18–p. 49:13.

217.    Cleaver remembers Intelligent Design being mentioned some time in the June/July 2004 period. v. 32 (Cleaver); p. 13:23–p. 14:12; p. 50:11–51:16.

218.    Geesey remembers Callaghan saying that students needed their books at board meetings in June; and Geesey discounted these assertions because she knew students had their books. v. 31 (Geesey); p. 151:8–p. 152: 6.

219.    At the second board meeting in June, Spahr made a statement to address the concern that books were not being used. v. 14 (Spahr); p. 18:11–23.

220.    Geesey does not recall the term "creationism" being used by board members during the June but she remembers teachers and Mrs. Buckingham bringing this up; Geesey ignored Mrs. Buckingham because she did not see the point

since the board was not discussing Creationism.  v. 31 (Geesey); p.

152:17–p. 154:6.

221.   Geesey understands Creationism to be based on Genesis I and at no time

during her tenure as school board member did she understand the purpose of

the board to provide for the teaching of Creationism.  v. 31 (Geesey); p.

154:7–13.

222.   Geesey did not believe ID was Creationism because ID does not reference

the Bible.  v. 31 (Geesey); p. 154:14–20.  Geesey also did not believe that

ID was Creationism because Bill [Buckingham] and Alan [Bonsell] said it

was a scientific theory and that other scientists believed it.  v. 31 (Geesey);

p. 154:21–p. 155:5.

223.   Geesey did not do independent research regarding ID because she was not

on the curriculum committee and it is the responsibility of each committee

to do work and bring it back to the board for consideration, and she relies

upon other committee members.  v. 31 (Geesey); p. 155:6–17.

224.   Geesey directed a letter to the editor to address false charges leveled against

the board, make it clear that the board was not teaching Creationism or

religion, and make it plain that the board was cooperating with parents by

leaving religious or philosophical issues to the parents and families of the

district. v. 31 (Geesey); p. 155:18–p. 164:4; P 56 (6/20/2004) & 60 (6/27/04).

225. Geesey remembers ID coming up during board meetings in June and she believed it was a scientific theory; and her letter to the editor was designed to make clear what the board was actually considering during this period: choosing a biology book that taught the most prevalent theories. v. 31 (Geesey); p. 161:19–p. 162:2; p. 163:7–17; P 56 (6/20/2004) & 60 (6/27/04).

226. After the exchange between Max Pell and board members regarding the biology text, Jeff Brown emphasized that the whole board, not just Buckingham, would make the decision on the text in order to emphasize that it would be the board that controlled the matter not just Buckingham. v. 8 (Jeff Brown); p. 85:13–p. 86:11.

**C. Buckingham's Statement to board at Second Board Meeting.**

227. At the second board meeting in June 2004, Charlotte Buckingham made a statement that quoted the Bible and rambled on. v. 24 (Nilsen); p. 48:8--p. 49:13.

228. Nilsen could not understand her point. v. 24 (Nilsen); p. 49:22--p. 50:2.

229.   Charlotte's speech was somewhat embarrassing and out–of–place. v. 24 (Nilsen); p. 50:3--4.

230.   Bonsell was likewise embarrassed by the speech but found it difficult to gavel her down because she was a fellow-board members wife; Bonsell had not spoken with Charlotte Buckingham or her husband, board member Bill Buckingham, prior to her statement. v. 32 (Bonsell); p. 101:9–103:5.

231.   Bonsell did not see Charlotte Buckingham's comments as relevant to board business; she mentioned Creationism but there was never any consideration of a policy change to make Creationism part of the school curriculum. v. 32 (Bonsell); p. 103:6–p. 104:1.

232.   Cleaver thought Charlotte Buckingham's comments regarding the Book of Genesis and Creationism were offered at the wrong time and the wrong place. v. 32 (Cleaver); p. 15:12–p. 16:2. At the time Charlotte Buckingham spoke there was no member was considering a policy that would require the teaching of Creationism in Dover schools. v. 32 (Cleaver); p. 16:19:23.

233.   Charlotte Buckingham had not told her husband Bill Buckingham what she intended to say before she addressed the board. v. 30 (Buckingham); p. 58:5–13.

234.   After the meeting Bill Buckingham spoke to his wife Charlotte and told her remarks were biblical and that the board was not talking about Creationism but about Intelligent Design, which was not a biblical theory but a scientific one.  v. 30 (Buckingham); p. 58:14–22.

**Issues Discussed at Board  Meetings in June 2004.**

235.   ID was discussed during these board meetings probably in response to comments by Barrie Callaghan.  v. 32 (Bonsell); p. 93:11–20.

236.   Casey Brown remembers Bonsell mentioning ID during the board meetings. v. 8 (Casey Brown); p. 17:2–p.18:21.

237.   Miller remembers ID coming up during the June 2004 period.  v. 13 (Miller);  p. 27:24–p. 28:5.

238.   Creationism and intelligent design came up at, or prior to, the meeting between science faculty and Bonsell in 2003.  v. 4 (Rehm); p. 97:4–19; p. 103:8–p. 104:6.

239.   During the June 2004 period Buckingham asserted that a think tank had give the Miller & Levine text and "F".  p. v. 4 (Rehm); p. 102:22–p. 103:13.

240.   Buckingham remembers learning about ID when he was appointed to the BCC in January of 2004.  v. 30 (Buckingham); p. 57:4–17. Buckingham did research on ID and learned that it was a scientific theory that was supported

by 300 scientists. v. 30 (Buckingham); p. 57:4–21.  In Spring of 2004

Buckingham delivered materials relating to biology text and curriculum to

the administration, more specifically, two CDs and a book. v. 24 (Nilsen);

p. 41:13--22.  The two CDs were entitled, Icons of Evolution and

Unlocking the Mysteries of Life. v. 24 (Nilsen); p. 42:3--11; D 227, 228 &

229; Buckingham did not believe ID was a religious theory. v. 30

(Buckingham); p. 57:22–p. 58:1.  Buckingham did not believe ID was

Creationism. v. 30 (Buckingham); p. 58:2–4.

241.  Geesey remembers ID coming up during board meetings in June, she

believed it was a scientific theory; and her letter to the editor was designed

to make clear what the board was actually considering during this period:

choosing a biology book that taught the most prevalent theories. v. 31

(Geesey); p. 161:19–p. 162:2; p. 163:7–17; P 56 (6/20/2004) & 60 (6/

27/04).

242.  At this second board meeting in June, members discussed the need for the

biology curriculum to reflect balance, a desire that other theories be

represented along with evolution, and some mention of gaps and problems

in Darwin's theory of evolution. v. 24 (Nilsen); p. 51:18--p. 52:11.