## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TAMMY KITZMILLER, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 04-CV-2688 |
| | ) | (Hon. Judge Jones) |
| v. | ) | |
| | ) | |
| DOVER AREA SCHOOL DISTRICT and | ) | **DEFENDANTS PROPOSED** |
| DOVER AREA SCHOOL DISTRICT | ) | **FINDINGS OF FACT** |
| BOARD OF DIRECTORS, | ) | **AND CONCLUSIONS OF** |
| | ) | **LAW** |
| Defendants. | ) | |
| _____ | ) | |

# PART THREE

243.   There was a confusion in use of terms at various times by members of the public and Buckingham during the June 2004 period.  Some deliberately equated ID with Creationism; others appeared to have done so inadvertently. The weight of the evidence shows that the mere fact that the term Creationism was raised and discussed at public meeting fails to show that board members actually considered a curriculum change involving the presentation of Creationism during this period.  The weight of the evidence shows that board members were considering a curriculum change relating to ID, not Creationism.

244.   Buckingham's use of the term Creationism fails to prove that he actually sought to secure the teaching of Creationism in the classroom.  All of the information he provided to the Administration related to scientific critiques of Evolutionary Theory ("ET") and scientific critiques of the Miller & Levine text, Biology, recommended for purchase by the science faculty.

**Issues with Reporting on the June 2004 Board  Meetings.**

245.   Bonsell believed reporting of the June board meetings was inaccurate, and that this inaccuracy was part of a larger problem with inaccurate newspaper coverage; problems with accuracy in reporting continued despite Bonsell's request for accuracy/corrections.  v. 32 (Bonsell); p. 93:21–p. 99:19; v. 34 (Harkins); p. 74:15–76:19.

246.   Harkins had spoken with reporters about inaccuracies.  v. 34 (Harkins); p. 76:21–p. 77:16.

247.   Cleaver did not get or read the local papers because the reporting was so biased and inaccurate.  v. 32 (Cleaver); p. 17:14–p. 19:6.

248.   One of the inaccuracies in the press reporting on board meetings was that the reporters were referring to ID as Creationism.  v. 32 (Bonsell); p. 95:14–21.

249.   Miller remembers Bonsell saying that papers should stick to reporting facts. v. 13 (Miller);  p. 28:6–12.

250.   During this period board members did complain about inaccurate press coverage–as it relates to this dispute their complaints related to the assertion that the board was discussing a curriculum change that would require the teaching of Creationism.

**BCC Meeting June 24, 2004.**

251. Baksa, after meeting with Buckingham, set up a meeting with the BCC and science faculty to address Buckingham's concerns, the meeting was held on June 24, 2004, and Baksa took notes. v. 26 (Baksa); p. 115:17–118:8; D 19 & 20.

252. Meeting was attended by Harkins, Casey Brown, Buckingham, Baksa, Spahr, and Miller. Bonsell did not attend BCC meetings in June 2004. v. 32 (Bonsell); p. 108:5–11.

253. Prior to this BCC meeting, Baksa had collected information about text used by parochial schools and homeschoolers; he did so because he realized that science teachers at Dover would already have reviewed the text commonly provided to public schools.. v. 26 (Baksa); p. 117:1–p. 119:1. D 19 & D 5.

254. Baksa looked at texts for parochial and homeschools because he realized that science teachers at Dover would already have reviewed the text commonly provided to public schools and he as looking for other texts. v. 26 (Baksa); p. 125:24–126:7. Science teachers had reviewed a number of texts prior to this meeting. v. 13 (Miller); p. 28:4–p. 29:6.

255. The text used by homeschoolers was put out by Bob Jones University text and was not discussed at the 6/24/04 BCC meeting because its religious

content made it unsuitable for use in a public school.  v. 26:124:25–p. 125:10.  Miller remembers Baksa saying that this text was obviously inappropriate.  v. 13 (Miller);  p. 27:8–19.

256.  At this June meeting of the BCC, teachers stated that they did not teach origins of life; and teachers indicated that if the issue was raised by a student, then they told students to talk to their parents, family, pastors.  v. 13. p. 26:21–. p. 27:7; v. 8 (Casey Brown); p. 18:13–p. 19:20.

257.  When teachers said that they did not teach origins of life, Buckingham expressed his belief that teachers were addressing origins of life.  v. 26 (Baksa); p. 121:6–18.  He based this belief in part on a classroom mural depicting the ascent of man.  v. 13 (Miller);  p. 20:22–7; v. 26 (Baksa); p. 118:3–p. 119:17; v. 30 (Buckingham); p. 60:7–p. 62:5.

258.  In response to Buckingham's reference to the mural, Miller explained again that teachers did not teach origins of life. v. 14 (Spahr); p. 16:3–7.

259.  At this meeting teachers agreed to point out the Darwin's theory is not a fact and that some parts of Darwin's theory do not have as much evidence as others.  v. 13 (Miller);  p. 21:24–p. 22:11.

260.  At the 6/24/04 meeting teachers agreed to review the Icons of Evolution video provided by Buckingham again, and consider using the material if it

lined up with content they taught.  v. 26 (Baksa); p. 121:22–p. 122:5; v. 14 (Spahr); p. 16:8–20.

261.   Teachers agreed to make students aware of gaps and problems in Darwin's theory, something that they had always done, and which would be put in the curriculum language.  v. 13 (Miller);  p. 22:9–21; v. 14 (Spahr); p. 16:8–p. 17:11.

262.   Baksa believed that the teachers also agreed that they would make students aware of Intelligent Design in response to his suggestion that they mention ID instead of Creationism.  v. 26 (Baksa); p. 122:10–15; p. 123:7–p. 124:11; D 19 & 20.  When Baksa made this suggestion he believed it would have no impact on what teachers taught and assessed in the classroom.  v. 36 (Baksa); p. 39:24–p. 41:4.

263.   At the end of this meeting Buckingham agreed to support approval of the Miller & Levine text, and the Miller & Levine text was placed on the agenda for the board meeting to be held in July, 2004.  v. 26 (Baksa); p. 124:2–24; D 21.

264.   The June meeting of BCC and teachers ended on good terms.  v. 13 (Miller);  p. 21:8–17.

**July, 2004, Board  Meeting.**

265.    Up through July 12, 2004 Buckingham had never used the term Creationism

in his discussions with Baksa.  v. 31 (Baksa); p. 208:1–5.

266.    Up through July 12, 2004, no other board member had discussed the

teaching of Creationism with Baksa in classes at Dover.  v. 31 (Baksa); p.

208:6–9.

267.    At some point prior to July 12, 2004 Buckingham had used the term

Creationism at a board meeting and Baksa was surprised because he had not

heard Buckingham use this term before  v. 31 (Baksa); p. 208:10–p. 209:14.

268.    During this period Plaintiff Barrie Callaghan called Baksa asking him about

a text which addressed Creationism.  v. 31 (Baksa); p. 208:10–p. 209:14.

269.    Later Plaintiff Barrie Callaghan called Baksa about a text addressing

Creationism and Baksa told her that he was not going to find a text that has

Creationism for teaching in the public schools–and Baksa was not looking

for a text that included Creationism.  v. 31 (Baksa); p. 208:15–209:5.

270.    The approval of Miller & Levine text, 2002 was placed on board  Agenda

for the July 2004 meeting.  D. 22; v. 24 (Nilsen); p. 53:18--p. 54:4; v. 26

(Baksa); p. 126:13–127:13.

271.   Approval of the text requested by faculty was placed on agenda because Baksa understood that Buckingham's concerns had been addressed.  v. 24 (Nilsen); p.  54:5--12.

272.   The Purchase of the 2002 edition of Miller and Levine was not approved because the faculty learned that there was a more recent edition of Biology by Miller & Levine, a 2004 edition, and the faculty requested delay while the new edition was considered.  D. 23; v. 24 (Nilsen); p. 53:13--p. 55:2; v. 26 (Baksa); p. 127:14–p. 128:9; v. 32 (Bonsell); p. 198:12–p. 109:18; v. 34 (Harkins); p. 50:7–15; v. 14 (Spahr); p. 20:23–p. 22:2.

273.   Bonsell did not attend any meetings of the BCC in July.  v. 32 (Bonsell); p. 109:19–p. 110:9.

**July 2004 Meeting of Administration and Science Faculty to Review 2004 Edition of Biology, by Miller & Levine, 2004 Ed., in Light of Complaints by Buckingham.**

274.   Baksa, biology teacher Jen Miller, and Bert Spahr, the Science Department Chair, examined the new (2004 edition) of the biology text recommended by the faculty in light of Buckingham' complaints about the 2002 edition.  v. 24 (Nilsen); p.  55:19--56:2.

275.   Although Nilsen was not apprised of the specific nature of Buckingham's concerns, he recalls Baksa, Miller and Spahr thinking that the 2004 edition

of the text would be acceptable to Buckingham precisely because it seemed to acknowledge–and address–so many of his concerns by revised language. v. 24 (Nilsen); p. 56:3--57:8.

276. As a result of the review and comparison of the 2002 and 2004 editions of Biology by Miller & Levine, Baksa believed that the 2004 edition had addressed many of Buckingham's concerns including: (1) a softening of language concerning evidence for a species to species change; (2) language that talked about gaps and a new section dealing with strengths and weaknesses of evolution.  v. 31 (Baksa); p. 210:2–p. 211:24; D 24;  v. 36 (Baksa); p. 42:20–p. 43:8; v. 13 (Miller);  p. 30:10–p. 31:3.

277. Baksa did not meet with the BCC as a whole to discuss the 2004 edition but he did meet with Buckingham to bring the information gathered by the science teachers to Buckingham's attention, Buckingham took the information and the new edition of Miller & Levine for review.  v. 31 (Baksa); p. 211:16–212:18.

278. Later Buckingham called and indicated he still could not approve the book. v. 31 (Baksa); p. 212:14–24.

279. The Miller & Levine text was placed on the board agenda for the August 2004 board meeting despite the objections of Buckingham.  v. 31 (Baksa); p. 212:21–p. 213:21.  D 25.

280. The 2004 edition of Biology by Miller & Levine, was placed on the agenda for the August 2004 board  meeting–for approval of the text–with the understanding the text would be purchased.  D. 28; Nilsen p.  57:3--p.  58:7.

**Buckingham's Request for Approval of the of Pandas and People Text.**

281. Buckingham mentioned the text Of Pandas to the administration in the June/July 2004 period.  v. 24 (Nilsen); p.  53:9--17.

282. Buckingham brought the text to the attention of the Administration via a memo indicating he wanted Of Pandas approved as a text before approval of the 2004 edition of Biology, by Miller & Levine.  v. 24 (Nilsen); p.  58:13--p. 59:5; v. 31 (Baksa); p. 213:22–p. p. 214:8; D 26.

283. Harkins remembers Buckingham bringing the text up in connection with the board  meeting held in July 2004; Buckingham brought a text but did not have copies to pass out for review.  v. 34 (Harkins); p. 50:16–p. 51:7.  Prior to this mention of the book Harkins had never heard of it–she had never discussed it with Buckingham or Bonsell.  v. 34 (Harkins); p. 53:11–p. 54:4.

284.   Spahr first saw Of Pandas at the meeting in July 2004 where the 2002 & 2004 editions of Biology by Miller and Levine were compared, when Of Pandas was given to Jen Miller to review.  v. 14 (Spahr); p. 22:14–p. 23:2.

285.   Later Spahr reviewed the text, she learned that college professors were using it; she did not think it was appropriate for use in 9th grade given vocabulary and complexity of material presented.  v. 14 (Spahr); p. 22:17–p. 23:20.

286.   Harkins remembers getting a copy from Baksa, reviewing it quickly because Jeff Brown wanted a copy for review, and then passing her copy on to Jeff Brown for review.  v. 34 (Harkins); p. 51:8–21.  Harkins reviewed Of Pandas for about 1 ½ or 2 hours.  She reviewed the Miller & Levine text for about six hours.  v. 34 (Harkins); p. 54:25–p. 54:16.

287.   Later Harkins came to know that Jeff Brown viewed Of Pandas as offensive to his religious convictions.  v. 34 (Harkins); p. 52:6–17.  Harkins did not agree with Brown because she did not see religion in the book it looked like science to her; and Harkins did not believe that the text addressed Creationism or was religious. v. 34 (Harkins); p. 52:6–p. 53:2.

288.   When Jeff Brown expressed reservations about any use of Of Pandas because Buckingham had poisoned the well, Harkins told Brown that

Buckingham was not the board, echoing the point Brown had made to Max

Pell when the biology text was discussed at board meetings in 2004.  v. 8

(Jeff Brown); p. 91:10–p. 92:22.

289.  Jen Miller remembers receiving Of Pandas around this time and, in August,

a meeting of the BCC focused on Of Pandas at which she brought some

reservations about the readability and science to attention of board

members.  v. 13 (Miller);  p. 30:2–p. 32:17.

290.  As a result of Buckingham's request re: Of Pandas, Nilsen set up a meeting

with Nilsen, Baksa, and Buckingham.  v. 24 (Nilsen); p.  59:6–11; v. 31

(Baksa); p. 214:1–p. 215:1.

291.  Nilsen's purpose was to inform Buckingham that Nilsen would not approve

the Of Pandas text.  v. 24 (Nilsen); p.  59; 12--24.

292.  Buckingham wanted Of Pandas approved as a companion text to the basal

text; and he wanted teachers teaching out of both, side-by-side; but Nilsen

refused that request.  v. 24 (Nilsen); p.  60:8--18; v. 31 (Baksa); p.

215:3—15.

293.  Under Pennsylvania law, the Superintendent's decision <u>not</u> to approve the

text meant that Buckingham would need six votes to approve it; and in light

of Nilsen's position, Buckingham agreed to approve the biology text

recommended by the science faculty.  v. 24 (Nilsen); p.  59:21--24;

294.  Nilsen discussed the possibility of using the text as a reference text.  v. 24

(Nilsen); p.  60:19--23; v. 31 (Baksa); p. 215:18–25.

295.  Nilsen refused to delay approval of the basal text pending approval of Of

Pandas.  v. 24 (Nilsen); p.  60:24--p. 61:2.  Instead, Nilsen said that he

would allow the teachers to review Of Pandas to see if it could be used as a

reference.  v. 24 (Nilsen); p.  61:3--13; v. 31 (Baksa); p. 216:1–23.

296.  Buckingham agreed to approve the text recommended by the science

faculty.  v. 24 (Nilsen); p.  61:14--21; v. 31 (Baksa); p. 216:1–10.

297.  Nilsen told Bonsell that Buckingham had agreed to approve the text, and

Bonsell was pleased with this news.  v. 24 (Nilsen); p.  61:22--p. 62:24.

Bonsell wanted the text recommended by the faculty to be purchased.  v. 24

(Nilsen); p. 62:1--p. 63:11.  Bonsell did not want Of Pandas placed on the

agenda for the August 2004 meeting.  v. 24 (Nilsen); p.  64:2--17.  Bonsell

did not support Buckingham's desire to hold to purchase Of Pandas along

with Biology by Miller & Levine.  v. 24 (Nilsen); p.  63:12--15; v. 24

(Nilsen); p. 64:18--p. 65:10.  Bonsell was pleased when he learned that

Buckingham had agreed to approve the text recommended by the science faculty. v. 24 (Nilsen); p. 64:18--p. 65:10.

298.   After the meeting with Buckingham, Nilsen sent a memo setting a meeting of the BCC for August 27, 2004 so that BCC members, faculty and administration could consider Of Pandas and its possible use in connection with the curriculum.  D 30; v. 24 (Nilsen); p. 68:9–p. 69:16; v. 31: p. 216:24–p. 218:6.

299.   The first Bonsell had heard of the text Of Pandas was when Nilsen called him to tell Bonsell about Buckingham's desire to link approval of the basal text recommended by the teachers with Of Pandas; Bonsell called Buckingham to make sure that Buckingham was on board for approval of the Miller & Levine text at the August board meeting.  v. 32 (Bonsell); p. 110:4–p. 111:24.

**August, 2004 Board  Meeting.**

300.   Pursuant to Nilsen's agreement with Buckingham, approval of the biology text recommended by the science faculty was placed on the agenda for the school board meeting held on August 2, 2004–but Of Pandas was not-- because Nilsen refused to approve Of Pandas.  D. 28 at 116; v. 24 (Nilsen); p.  65:11--p. 66:5.

301. Geesey remembers Buckingham being upset that Of Pandas was not on the agenda because he wanted both books together to balance each other out. v. 31 (Geesey); p. 164:16–p. 165:9.

302. When the vote on approval of the Miller & Levine text came up, there was a 4--4 tie on approval of the text. v. 24 (Nilsen); p. 66:6--22;

303. Bonsell understood Buckingham's vote as trying to tie approval of Miller & Levine to approval of Of Pandas; Bonsell did not vote with Buckingham because he wanted the students to have the books recommended by the faculty. v. 32 (Bonsell); p. 112:22–p. 114:11.

304. At the time of the August 2, 2004 board meeting, Bonsell believed he did not know enough about Of Pandas, which he had just heard of, to make a judgment about the text. v. 32 (Bonsell); p. 114:12–18.

305. Bonsell refused to capitulate to Buckingham's effort to link approval of the text Of Pandas to approval of the Miller & Levine text and any use of taxpayer funds to purchase the book. v. 8 (Jeff Brown); p. 89:6–19.

306. Harkins voted the same way as Buckingham but she had not spoken with Buckingham before the vote. v. 34 (Harkins); p. 54:17–p. 55:6. Harkins had not spoken with Geesey about the way she was going to vote. v. 34

(Harkins); p. 55:24–p. 56:1.  Harkins had not spoken with Angie Yingling prior to the first vote.  v. 34 (Harkins); p. 56:3–5.

307.  Harkins was voting against the biology book simply because she felt that there was not enough money left to purchase the text; she was <u>not</u> voting with Buckingham to link approval of the science text recommended by the faculty with approval of Of Pandas.  v. 34 (Harkins); p. 55:7–23.  Harkins felt that the biology books should have been purchased instead of the family and consumer science books given the amount of money available and that the biology texts were not that old and that the teachers could wait one more year for the books.  v. 34 (Harkins); p. 56:14–p. 57:8.

308.  Geesey voted against approval of the text recommended by the science faculty because she thought there were issues that needed to be worked out; her intent was <u>not</u> to deny approval of the text recommended by the faculty at any time but simply to hold off on approval of that text to see if things could be worked out.  v. 31 (Geesey); p. 165:10–p. 166:3.

309.  Buckingham never intended to permanently prevent the purchase of the biology text recommended by the science faculty.  v. 30 (Buckingham); p. 63:15–19.

310.    There was heated discussion and Jeff Brown, Bonsell and other board members were upset. v. 32 (Bonsell); p. 114:19–p. 115:7; v. 34 (Harkins); p. 56:8–13;

311.    Nilsen then directed comments to board members voting against approval of the text, indicating that the text needed to be approved.  v. 24 (Nilsen); p. 66:22--p. 67:14.

312.    At this point, board member Angie Yingling requested a revote and, ultimately, the text recommended by the science faculty was approved.  v. 24 (Nilsen); p. 67:15--24; v. 32 (Bonsell); p. 114:19–p. 115:10; v. 31 (Geesey); p. 166:4–19.  Joint Stipulations 4 & 15.

313.    At no point in this process of approving the Miller & Levine text was there any discussion of Creationism.  v. 24 (Nilsen); p. 67:20--p. 68:8.

**August 27, 2004 Meeting of BCC Regarding of Pandas.**

314.    As per Nilsen's memo, a meeting of the BCC was held on August 27, 2004 to discuss Of Pandas with the science teachers.  v. 24 (Nilsen); p. 69:17-19.

315.    Bonsell attended this meeting of the BCC, unlike prior meetings for the purpose of building consensus.  v. 32 (Bonsell); p. 115:11–p. 116:18.

316.    The meeting was attended by BCC members Buckingham, Carol ("Casey) Brown, Sheila Harkins, Alan Bonsell; science faculty Jen Miller and Bert

Spahr; and administrators Nilsen and Baksa.  v. 24 (Nilsen); p. 69:20-24; v. 32 (Bonsell); p. 116:19–p. 117:7.

317. Baksa took notes on the meeting.  v. 31 (Baksa); p. 218:1–17; D 31.

318. Buckingham took the position that he wanted Of Pandas to used as a text book in conjunction with the Miller & Levine text.  v. 24 (Nilsen); p. 71:6–13; v. 32 (Bonsell); p. 117:8–12; v. 13 (Miller);  p. 35:3–21; v. 14 (Spahr); p. 24:1-10.

319. Buckingham also indicated that he wanted the text purchased with public funds, some board members seemed open to this, others opposed it, but there was no decision.  v. 24 (Nilsen); p. 71:14–20; v. 24 (Nilsen); p. 71:21–p. 72:2.

320. At this meeting the faculty also expressed concern about liability, including personal liability. v. 24 (Nilsen); p. 70: 13-17; v. 31 (Baksa); p. 220:1–14; v. 13 (Miller);  p. 32:18–p. 34:10;  Bonsell got the impression that teachers believed ID was Creationism and did not want to teach it and did not want to be sued.  v. 32 (Bonsell); p. 117:13–21.

321. At the meeting, the administration sought to find a compromise position between Buckingham's desire that the text be used in instruction and the teachers' desire not to use the book in the classroom–and the administration

67

proposed that Of Pandas be a reference text made available to students in the classroom.  v. 14 (Spahr); p. 24:11–p. 25:5.

322.  The faculty indicated that they would use Of Pandas as a reference text in their classrooms and the teachers, administration, and board received accolades from the press.  v. 24 (Nilsen); p. 6925–p. 70:7; v. 8 (Jeff Brown); p. 92:23–p. 93:7; v. 13 (Miller);  p. 34:16p. 35:2.

323.  The science faculty also indicated they would make students aware of gaps and problems in evolutionary theory.  v. 32 (Bonsell); p. 118:7–15.

324.  Nilsen did not know the contents of Of Pandas but learned that teachers had a concern that science was dated and that the text would be difficult for ninth graders to read.  v. 24 (Nilsen); p. 77:13–78:5; v. 13 (Miller);  p. 30:2–p. 32:17.

325.  In an effort to allay faculty concerns about liability, Nilsen distributed an e-mail containing information from the solicitor.  v. 24 (Nilsen); p. 70:18–24. The board also asked Baksa to check regarding use of the text, Of Pandas, and to see if there had been any litigation involving ID, and Baksa had his staff collected information on the book and did some checking himself, learning that the text had been used in public schools, including an AP

biology class. v. 31 (Baksa); p. 220:8–14; p. 221:23–p. 226:6.  D 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42 & 116; v. 13 (Miller);  p. 33:5–p. 34:10.

326.  Nilsen also handed out a draft curriculum referencing ID which Baksa had developed as a result of the BCC meeting held on 6/24/04, and Spahr reacted angrily stating that they [the teachers] had never been in it.  v. 31 (Baksa); p. 218:23–p. 219:25; After the June 24, 2004 meeting of the BCC, Baksa believed that the teachers also agreed that they would make students aware of Intelligent Design in response to his suggestion that they mention ID instead of Creationism.  v. 26 (Baksa); p. 122:10–15; p. 123:7–p. 124:11; D 20 [at note "mention other theories of evolution including but not limited to intelligent design."] & D 19 [at note "mention Intelligent Design instead of Creationism."].

327.  Buckingham left the BCC meeting early and Bonsell took that opportunity to let the teachers know that Buckingham was only one person on the board and not everybody always agrees with Buckingham.  v. 32 (Bonsell); p. 117:2–p. 118:6.

328.  Another result of meeting was that Baksa was charged to consult with the teachers and BCC to develop a curriculum modification that would reflect

use of Of Pandas.  v. 24 (Nilsen); p. 70:25–p. 71:5; v. 31 (Baksa); p. 218:20–p. 219:25.

329.  After developing curriculum language, Baksa was going to send it to the full board for review.  v. 31 (Baksa); p. 221:15–22.

330.  The tone of this meeting was generally positive.  v. 13 (Miller);  p. 35:22–25.

**Curriculum Developments Between August 27, 2004 BCC Meeting and October 4, 2004 Board  Meeting.**

331.  After the August 27, 2004 board  meeting, Baksa worked with science faculty and BCC members on a contemplated curriculum change that would take into account the use of *Of Pandas* in connection with instruction concerning evolutionary theory.  v. 24 (Nilsen); p. 73:9–17.

332.  Baksa and Nilsen communicated in general about this process.  v. 24 (Nilsen); p. 73:9–17.

333.  Baksa generated a draft curriculum change, that was reviewed by the science faculty, which he forwarded to the BCC and entire board as per the August 27, 2004 meeting of the BCC in an effort to develop a agreement between the board and teachers concerning the curriculum.  v. 31 (Baksa); p. 232:23–237:14; D 43 & 44; v. 32 (Bonsell); p. 118:23–p. 121:15.

334. On or about September 22, 2004, BCC member Casey Brown provided a
memo to Baksa offering input on the curriculum change proposed by the
science faculty.  Casey Brown made two suggestions. The first provided that
"Students will be made aware of gaps in Darwin's theory, as well as the fact
that there are other explanations for the origins of life on earth."  In the
alternative, she suggested language "Students will be made aware of gaps in
Darwin's theory, and of the fact that there are other theories concerning the
origins of life."  D 45; v. 8 (Casey Brown); p. 26:25–p. 27:21; v. 24
(Nilsen); p. 73:18–74:6; v. 31 (Baksa); p. 237:15–p. 238:10.

335. Nilsen saw Brown's suggestions as a positive effort to address the BCC's
concerns.  v. 24 (Nilsen); p. 74:7–16.  Nilsen saw Casey Brown's
suggestions as contributing toward the goal of developing a consensus
between BCC members, the science faculty, and administration.  v. 24
(Nilsen); p. 75:4–p. 76:10.

336. Nilsen understood the board's concerns as follows.  A concern that students
be made aware of gaps in Darwin's theory.  A concern that students be made
aware of other explanations for the origins of life on earth.  v. 24 (Nilsen);
p. 74:17–p. 75:3.

337.   Bonsell provided information to Nilsen to the effect that the curriculum
change should call for teachers to make students aware of gaps/problems.  v.
31 (Baksa); p. 239:13–18.

338.   Buckingham also provided Baksa with feedback–Buckingham still wanted
Of Pandas used side-by-side with Miller and Levine; he was okay with
mentioning intelligent design.  v. 31 (Baksa); p. 238:11–p. 239:12; D 31 at
59.

339.   In October Cleaver learned the board was discussing possible Of Pandas as
a supplemental text; she had never heard of the text before; she spoke with
Buckingham about the text and he told her it discussed Intelligent Design
and that he believed students should have the book available to refer to;
Cleaver asked for a copy of the book and reviewed it; she believed ID was
science based upon her review of the text Of Pandas.  v. 32 (Cleaver); p.
20:19–p. 22:20.

**Donation of the text Of Pandas And People.**

340.  Callaghan and Snook objected to any use of public funds to purchase Of
      Pandas.  v. 13 (Miller);  p. 36:1–p. 37:9.

341. Barrie Callaghan, Lonnie Langione, and Snook, became critics of the board, Casey Brown believed they were politically motivated and shut her ears when they addressed the board.  v. 8 (Casey Brown); p. 13:23–p. 14:6.

342. Jeff Brown regarded Barrie Callaghan as irritating and believed that at time her appearance before the school board appeared politically motivated.  v. 8 (Jeff Brown); p. 85:5–12.

343. Later Bonsell told Nilsen that he knew of individuals willing to donate Of Pandas.  v. 24 (Nilsen); p. 72:3–13.

344. Bonsell's father volunteered to donate the Of Pandas books.  v. 34 (Bonsell); p. 9:17–22.

345. The donation was made in response to criticism that Barrie Callaghan leveled at the board based on belief that public money would be spent on the book; and Alan Bonsell's father volunteered to donate the books because he believed Callaghan's criticism was politically motivated. v. 32 (Bonsell); p. 122:9–p. 124:19.

346. Prior to Bonsell's father volunteering, Bonsell had not spoken to Buckingham about arranging a donation of books. v. 34 (Bonsell); p. 9:23–p. 10:1.

347. At the time Bonsell's father made the donation, his father had made other donations (and offers of donations) to DASD. v. 32 (Bonsell); p. 124:19–p. 125:10.

348. At the time Bonsell's father made the donation, Alan Bonsell himself, had donated books to the district. v. 32 (Bonsell); p. 125:17–p. 126:6.

349. Bonsell did not tell Nilsen who was going to donate the books and Nilsen did not ask because he was glad to receive support and save funds. v. 24 (Nilsen); p. 72:3–23. Later when another group donated books to the district relating to the curriculum change, Nilsen likewise did not ask who donated the books or why. v. 24 (Nilsen); p. 72:24–73:8.

350. Bonsell did tell others that his father had offered to donate the books. v. 32 (Bonsell); p. 125:11–13. If others contributed money to the donation that was fine but Bonsell's father was willing to pay even if he received no money from anyone else. v. 33 (Bonsell); p. 130:4–16; v. 33 (Bonsell); p. 131:18–p. 132:8.

351. Bonsell did not contribute any money personally to the books v. 32 (Bonsell); p. 125:14-16.