## THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

TAMMY KITZMILLER, et al.,      )
                            )
      Plaintiffs,        )      Case No. 04-CV-2688
                            )      (Hon. Judge Jones)
      v.                  )
                            )
DOVER AREA SCHOOL DISTRICT and  )      **DEFENDANTS PROPOSED**
DOVER AREA SCHOOL DISTRICT    )      **FINDINGS OF FACT**
BOARD OF DIRECTORS,        )      **AND CONCLUSIONS OF**
                            )      **LAW**
      Defendants.      )
_____)

# PART FOUR

352.   Bonsell does not believe that Buckingham contributed any money to the books either but did get a check from Buckingham to pass on to Bonsell's father.  v. 32 (Bonsell); p. 126:7–127.

353.   Bonsell did not ask who gave Buckingham the money Buckingham passed on to Bonsell to pass on to Bonsell's father because he saw no particular reason to do so.  v. 32 (Bonsell); p. 126:21–p. 127:3.  Bonsell did not know how Buckingham had collected the funds or where the money came from. v. 34 (Bonsell); p. 11:3–12.

354.   The funds donated by Buckingham did not cover the full cost of the books. v. 34 (Bonsell); p. 11:13–p. 12:12; D 26 (books at $24.95 apiece); D 35 (same).

**Nilsen's Acceptance of the Donation of the Text Of Pandas.**

355.   When the donation of Of Pandas was made to the district, Nilsen accepted for the district and informed the board  by placing an informational item on the agenda for the October 4, 2004 board  meeting.  He described the donation as one of "classroom sets" and the text as "reference" based on his understanding of the agreement on this point expressed by teachers during the August 27, 2004 meeting of the BCC.  D 48 at 135; v. 24 (Nilsen); p. 76:11–p. 77:12.  Bonsell also understood that Of Pandas would be used as a

reference text such that classroom sets would suffice for their contemplated use. v. 32 (Bonsell); p. 123:7–23.

356. At the time Nilsen approved the donation of Of Pandas he understood that it would be reflected in a curriculum change–that Of Pandas would be a reference text that teachers would make mention of in class. v. 24 (Nilsen); p. 78:6–12.

**October 7, 2004 BCC Meeting.**

357. After soliciting input from the science faculty, Baksa set a meeting of the BCC so they could try to reach a consensus on the board's goals. v. 31 (Baksa); p. 239:19– p. 240:10; D 46.

358. Baksa prepared a memo for the meeting that reflected the issues to be addressed and various versions of language relating to the curriculum change contemplated by the BCC. v. 31 (Baksa); p. 240:14–p. 241:9. D 50 at 35.

359. Harkins had no position attributed to her because she was interested in hearing the various positions advocated by the persons participating in this process. v. 34 (Harkins); p. 61:14–p. 62:19. Harkins had the sense that the board, administration, and faculty were moving towards a consensus. v. 34 (Harkins); p. 62:20–p. 63:4.

360. The meeting was attended by Baksa, Bonsell, Harkins, and Buckingham. v. 32 (Bonsell); p. 127:4–p. 128:2.  Bonsell attended because he was trying to build consensus.  v. 32 (Bonsell); p. 128:13–22; v. 34 (Harkins); p. 61:14–p. 62:2; D 46 & 50.

361. Casey Brown did not attend but had indicated she could abide by BCC's results.  v. 32 (Bonsell); p. 128:4–12.

362. Bonsell understood the various positions under consideration by the BCC as follows:

363. Under D 50 A 1.  Bonsell understood this to be the draft curriculum that Baksa had provided after review and input by the teachers.  v. 32 (Bonsell); p. 128:23–p. 129:9; v. 31 (Baksa); p. 232:23–237:14; D 43 & 44; v. 32 (Bonsell); p. 118:23–p. 121:15.

364. Intelligent Design was <u>not</u> mentioned under Bonsell's name because he did not have any problem with the teacher's proposed language because it mentioned other theories of evolution and ID is another theory.  v. 32 (Bonsell); p. 129:12–23.  D. 50 at 35 [at A-2].

365. Bonsell's suggested language for the curriculum change added the word "problems" so the teachers' proposed version read "students will be made aware of gaps/problems...." because Bonsell sees gaps and problems as two

different things, the former dealing with evidence directly supporting the theory, the later dealing with such matters as the statistical improbability of certain claims; and he believed that adding the term problems would make the statement more accurate.  v. 32: p. 129:24–p. 130:17.

366. Bonsell really did not see any big difference in the language suggested by Casey Brown; it just seemed wordier to him.  v. 32 (Bonsell); p. 130:18–p. 131:3.

367. Bonsell thought the only difference between Buckingham's version was that it mentioned two words "intelligent design."  v. 32 (Bonsell); p. 131:5–10.

368. Harkins saw the differences between the versions as follows: (1) she thought Buckingham's was the only version that mentioned ID; (2) Alan Bonsell's was very similar to the administration/staff version.  v. 34 (Harkins); p. 63:5–16; D 50 at 35.

369. During the meeting, the members of the BCC agreed to language which added the term "intelligent design" to the phrase, common to all versions, about "students will be made aware of" "other theories of evolution," so that it read "students will be made aware of other theories of evolution including but not limited to intelligent design."  v. 31 (Baksa); p. 241:10–p. 242:7.  D 50 at 36.

370. Bonsell agreed to this change after discussion because he thought that adding the term "intelligent design" to his language, which included reference to gaps/problems, left the language saying basically the same thing but made it a little more specific. v. 32 (Bonsell); p. 131:11–p. 132:1.

371. Bonsell understood the "made aware of" language appearing in the various drafts of the curriculum change to indicate that teachers would be mentioning ID but not teaching it. v. 32 (Bonsell); p. 132:2–p. 134:20. And all of the members of the BCC had an opportunity to review the language worked out by those members present at the October 7, 2004 meeting of the BCC. v. 32 (Bonsell); p. 134:21–p. 135:2; D 50 at 36.

372. Harkins decided to go with the language including a specific reference to intelligent design because she thought if students were going to be made aware of other theories you ought to have an example of those other theories of evolution and Bonsell went along with that result. v. 34 (Harkins); p. 63:23–p. 64:11; D 50 at 36; v. 8 (Jeff Brown); p. 90:5–p. 92:11 (Harkins believed ID was another theory of evolution).

373. In addition, the text Of Pandas was listed as a reference material in the curriculum so that teachers would be protected from any liability if someone

objected to the use of the text. v. 31 (Baksa); p. 243:22–p. 244:6. D 50 at 35.

**Curriculum Developments Between the October 7, 2004 Meeting of Bcc and the Meeting of the DASD School Board on October 18, 2004.**

374. On or about October 8, 2004, Baksa presented teachers with a proposed curriculum change from the BCC providing that students would be made aware of gaps and problems in Darwin's theory–and teachers were okay with this language because this is what had been discussed. v. 13 (Miller); p. 37:14–p. 38:3. This draft also provided that students would be made aware of other theories of evolution and teachers were okay with that. v. 13 (Miller); p. 38:4–14.; v. 14 (Spahr); p. 25:16–p. 26:16.

375. Teachers were concerned that including ID in the curriculum might lead to the requirement that they teach ID. v. 13 (Miller); p. 39:16–20.

376. Teachers told Baksa that they were opposed to the inclusion of ID and the listing of Of Pandas as a reference. v. 13 (Miller); p. 39:21–40:9; v. 14 (Spahr); p. 25:16–p. 27:15.

377. Later Nilsen learned from Baksa that Buckingham wanted to place the BCC's version of the proposed curriculum change on the agenda for the October 18, 2004 board meeting. v. 24 (Nilsen); p. 78:13–79:3.

378.  Nilsen then contacted Buckingham because he did not believe the BCC version had support of full board or the science faculty—and he saw the goal here as creating consensus.  v. 24 (Nilsen); p. 78:23–p. 79:12.

379.  At this time Nilsen knew that the science faculty had proposed a different version of a curriculum change.  v. 24 (Nilsen); p. 79:13–18.

380.  Nilsen told Buckingham that the proposed curriculum change should be sent to CAC for review and input, even though policy did not require review by the CAC.  v. 24 (Nilsen); p. 79:19–p. 80:7; id at p. 81:17–22.

381.  Nilsen also told Buckingham that an action item should first be placed on a planning meeting agenda before going to a vote at a subsequent meeting.  v. 24 (Nilsen); p. 79:19–p. 80:7.

382.  Buckingham responded to Nilsen's concerns by expressing his view that there had been about six months of input from faculty etc. which was enough information gathering.  Buckingham also said that he wanted to get a decision on the curriculum change before board members Cleaver and Wenrich left the board—creating vacancies that would further delay final resolution of this issue.  v. 23; p. 80:14–p. 81:16.

383. Buckingham was aware of other instances in which an item had been placed on an agenda for action without having been placed on a planning meeting agenda. v. 30 (Buckingham); p. 62:6–15.

384. Nilsen told Baksa to send the curriculum change that Buckingham wanted placed upon agenda for October 18, 2004 board meeting to the CAC over Buckingham's objection that this was not necessary–because he recognized that Buckingham was not the board and that the board as a whole would be interested in receiving input from the CAC. v. 24 (Nilsen); p. 81:23–p. 82:19.

385. Baksa sent the BCC version to the CAC and he received feedback from Barrie Callaghan and a teacher. D 51 & 67; v. 24 (Nilsen); p. 83:11–p. 84:1; v. 35 (Baksa); p. 7:9–p. 8:22.

386. The CAC does not have to consulted prior to curriculum changes or text purchases pursuant to DASD policy. v. 24 (Nilsen); p. 39:3--10.

387. Nonetheless, Nilsen consulted the CAC prior to the curriculum change at issue in this case. v. 24 (Nilsen); p. 39:11--14.

388. On item of input from the CAC indicated that DASD policy required review by the CAC before vote by the board; but the administration found that this

was not required by the policy in effect during this period. D 67 &71; v. 24 (Nilsen); p. 84:2–p. 85:17; v. 35 (Baksa); p. 7:18–23.

389.   Nilsen put the BCC version on the agenda for the October 18, 2004 board meeting.  v. 24 (Nilsen); p. 82:20–25.  Nilsen also put the version of the curriculum change supported by the administration and the staff on the agenda for this meeting because he knew Buckingham is not the board and that the board would want this information–and the ability to consider this version–as well.  v. 24 (Nilsen); p. 82:23–p. 83:10.

390.   By memo dated October 13, 2004, Baksa circulated the BCC's proposed curriculum change to the whole board, the version of the proposed curriculum change labeled enclosure "XI-A."  D 60; v. 24 (Nilsen); p. 86:2–p. 87:4; v. 32 (Bonsell); p. 135:3–p. 136:24.

391.   By memo dated October 13, 2004, Baksa circulated the version of the proposed curriculum change suggested by the staff (science faculty) and Administration, the version of the proposed curriculum change labeled enclosure "XI-B."  D 61; v. 24 (Nilsen); p. 87:5–24; v. 14: p. 29:7–18.

392.   Nilsen's view of the differences between XI-A and XI-B boiled down to the fact that the BCC version listed Of Pandas as a reference text; whereas the staff/administration version did not do so.  In addition, the BCC version

84

included language making students aware of Intelligent Design, whereas the staff/administration, while including language regarding "making students aware of other theories of evolution," did not include a reference to Intelligent Design. D 60; cf. D 61; v. 24 (Nilsen); p. 87:25–p. 89:3.

393. Baksa saw the BCC's version (XI-A) as addressing the board's concerns, more specifically: (1) making sure students were aware of gaps/problems in Darwin's theory; (2) making students aware of other theories including, but not limited to intelligent design; and (3) ensuring a use of Of Pandas. D. 60 at 18; v. 35 (Baksa); p. 8:23–p. 10:3. In contrast, Baksa saw the draft proposed by the administration and faculty as making students aware of other theories of evolution (with no mention of ID) and omitting reference to Of Pandas. v. 35 (Baksa); p. 10:4–p. 11:5.

394. Baksa understood that Nilsen wanted Of Pandas listed in the curriculum so that teachers would have no liability for having that book in the classroom. v. 35 (Baksa); p. 11:6–14.

395. Bonsell saw the differences between the BCC versions (XI-A) and the first draft from the administration and faculty (XI-B) as the following: (1) version XI-A had the "gaps/problems" language whereas version XI-B referred only to "gaps"; (2) versions XI-A referenced Of Pandas as a

resource whereas versions XI-B did not do so; and (3) version XI-A included a specific reference to intelligent design whereas version XI-B did not. v. 32 (Bonsell); p. 136:25–p. 138:20.

396. Upon learning of these differences Nilsen contacted Bonsell, then board president, to let Bonsell know that Baksa had been unable to forge a consensus and Nilsen knew that Bonsell would want a consensus. v. 24 (Nilsen); p. 89:4–p. 90:25.

397. Bonsell spoke with Nilsen in the period between October 13 and October 18, 2004; he suggested to Nilsen that a note might be added to the curriculum in order to address concerns that teachers would be required to teach ID. D 68 at 22 [at "note"]; v. 32 (Bonsell); p. 142:18–p. 143:15; v. 35 (Baksa); p. 11:15–p. 12:7.

**Nilsen's Visit with Miller at Suggestion of Bonsell.**

398. After the discussion with Bonsell, Nilsen met with Jen Miller, the senior biology teacher, at Bonsell's request, to see if Nilsen could create a consensus. v. 24 (Nilsen); p. 91:1–9; v. 13 (Miller); p. 40:2–13.

399. Nilsen told Miller that Bonsell recommended adding a note to the BCC's proposed curriculum change (XI-A) providing that "origins of life will not be taught" in order to address the teachers' concern that mentioning

86

Intelligent Design ("ID") in the curriculum would require teachers to teach Intelligent Design Theory ("IDT"). v. 24 (Nilsen); p. 91:10–p. 93:2; v. 13 (Miller); p. 40:14–24.

400.  Nilsen and Miller understood that the note proposed by Bonsell would have that effect because ID dealt with origins of life. v. 24 (Nilsen); p. 93:3–13; v. 13 (Miller); p. 44:24–p. 45:21.

401.  In addition, Nilsen told Miller that the text Of Pandas should be placed in the classroom and that listing Of Pandas in the curriculum would insulate science faculty from liability for use of the text. v. 24 (Nilsen); p. 93:14–p. 94:25; v. 13 (Miller); p. 40:25–p. 41:4; p. 46:3–11.

402.  Miller told Nilsen that she was concerned about being required to teach ID and personal liability. v. 13 (Miller); p. 41:5–14.

**Development of the Administration and Staff's Second Draft, XI-C.**

403.  As the meeting with Jen Miller was inconclusive, Nilsen asked Baksa to work with the faculty to see if he could be a consensus and the result of this effort was a second draft of recommended changes to the biology curriculum from the administration and staff, labeled enclosure "XI-C." D68; v. 24 (Nilsen); p. 95:1–p. 97:25;

404.  Nilsen understood the compromise reflected in "XI-C" had a number of elements.  The first was the note suggested by Bonsell that origins of life was not taught.  The second was that the document continued to list Of Pandas as a resource.  The third was that the staff/administration second draft did not list Intelligent Design.  v. 24 (Nilsen); p. 98:1–p. 99:9.

405.  Bonsell saw the second draft produced by the administration/faculty as an effort to reach consensus which included Of Pandas as a reference, added the terms "problems" and included the note he had suggested making it clear that origins of life is not taught.  v. 32 (Bonsell); p. 139:21–p. 141:2.

406.  Baksa saw the second draft offered by the administration and staff (XI-C) as including a number of changes designed to foster an agreement: (1) it included a reference to "problems" in v. 35 (Baksa); p. 11:15–13:8.

407.  Spahr indicated that the teachers could live with the curriculum change proposed by XI-C.  D-68; v. 14 (Spahr); p. 29:19–p. 31:21.

408.  On October 18, 2004, Spahr stated that in an effort to compromise the teachers had agreed to: (1) point out problems with Darwin's theory; (2) make students aware of other theories of evolution; (3) have Of Pandas in the classroom as a reference text; (4) assist students if they wanted to seek

other reference material materials; and, in addition, teachers had emphasized that they did not teach origins of life.  v. 14 (Spahr); p. 35:16–p. 36:14.

409.  In the period between October 13, and October 18, 2004 Bonsell called Casey and Jeff Brown; he called Casey because he wanted to be sure she had received everything and confirm his belief that Casey was okay with the BCC version. v. 32 (Bonsell); p. 128:4–12; v. 32 (Bonsell); p. 143:16–p. 144:11.

410.  Bonsell also asked Jeff Brown to give him a call to discuss the situation but Jeff Brown never returned the call.  v. 32 (Bonsell); p. 145:3–8; v. 8 (Jeff Brown); p. 93:8–p. 94:20.

411.  These three draft versions of the curriculum change went before the board fro consideration on October 18, 004.  v. 24 (Nilsen); p. 99:10–13.  D 63 (Enclosure XI-A and XI-B were listed on agenda; enclosure XI-C was not because it had been worked out after the agenda was printed.  v. 24 (Nilsen); p. 99:14–p. 100:12); v. 35 (Baksa); p. 9:2–p. 13:16.

412.  Nilsen briefly described the differences between the versions and the proponents of each as the board moved from its executive session to the public portion of the meeting.  v. 24 (Nilsen); p. 110:18–p. 101:6.

413.   Baksa explained that the first recommendation from the teachers would be XI-B and if that did not address the board's concerns, the teachers would be willing to submit XI-C as a compromise.  v. 35 (Baksa); p. 13:17–p. 14:2.

414.   At this period teachers were concerned that a reference to ID in the curriculum would require the faculty to have to teach ID.  v. 35 (Baksa); p. 14:3–17.

415.   Baksa understood that Bonsell was trying to address the teachers concern that a reference to ID in the curriculum would require the faculty to have to teach ID by the note indicating that origins of life is not taught.  v. 35 (Baksa); p. 14:3–22.

**October 18, 2004 Board  Meeting.**

416.   The October 18, 2004 board meeting opened with a portion for public comment and Bert Spahr spoke during this portion of the meeting, expressing the view that ID was Creationism and that teaching Creationism was illegal.  v. 14 (Spahr); 36:15–22; v. 24 (Nilsen); p. 102:10–13; v. 33 (Bonsell); p. 3:12–24; v. 13 (Miller);  p. 41:15–p. 42:16.

417.   Spahr cited several law cases.  v. 34 (Harkins); p. 68:6–14;

418.  Spahr and Miller spoke against BCC version (XI-A) and in support of either version put forward by the administration and staff (XI-A or XI-B).  v. 35 (Baksa); p. 4–10.

419.  Miller said she did not want to be required to teach ID.  v. 33 (Bonsell); p. 4:1–7.

420.  Teachers made clear that they did not teach origins of life and took the view that putting ID in the curriculum would require them to teach origins of life. v. 8 (Jeff Brown); p. 94:20–95:7.

421.  Jeff Brown remembers Buckingham saying that teachers would not be required to teach ID and therefore teach origins of life.  v. 8 (Jeff Brown); p. 94:20–p. p. 95:17.

422.  Jeff Brown remembers Geesey saying more than once that teachers would not be required to teach ID and therefore origins of life.  v. 8 (Jeff Brown); p. 94:20–p. p. 95:17.

423.  Teachers expressed concerns about implementing the language that included ID.  v. 35 (Baksa); p. 16:17–p. 17:7.

424.  Teachers expressed concerns about liability.  v. 31 (Geesey); p. 168:14–18; v. 13 (Miller);  p. 41:20–p. 42:19; v. 14 (Spahr); 37:15–18;

425. During her statement Spahr expressed concerns that the curriculum change might open teachers to a lawsuit and asked the board whether teachers would be required to teach ID.  v. 14 (Spahr); p. 37:10:23.

426. The board responded by assuring teachers that they would not be required to teach ID.  v. 33 (Bonsell); p. 4:5–14; v. 34 (Harkins); p. 15–p. 71:8; v. 32 (Cleaver); p. 23:12–p. 24:5.

427. Bonsell discussing ID at this board meeting.  v. 4 (Rehm); p. 108:10–p. 109:10.

428. Geesey discounted Spahr's remarks because she knew that teachers had been part of the process; she knew ID was not Creationism or religion; and she knew the board was not going to make teachers teach.  v. 31 (Geesey); p. 167:9–p. 168:13.

429. For his part, Nilsen never believed that the board ever contemplated an illegal course of action.  v. 24 (Nilsen); p. 103:16–p. 104:12.

**The Voting on October 18, 2004.**

430.  Once the voting started, Nilsen made sure members knew about the three versions before the board for consideration, who supported each version, and what difference there was between the three versions.  v. 24 (Nilsen); p. 104:18–p. 105:2.

431.  Nilsen and Baksa made sure that the board knew that the administration supported the administration/staff versions of the proposed curriculum change on the theory that this version addressed the concerns addressed over the past six months.  v. 24 (Nilsen); p. 105:3–106:8.

432.  The administration supported the versions of the proposed curriculum change recommended by the faculty for the practical reason that faculty support is an essential element of successful policy implementation.   v. 36 (Baksa); p. 46:23–p. 47:15; v. 35 (Baksa); p. 15:11–p. 17:7.

433.  Nilsen believed that the course of action contemplated by the board was legal based upon information provided by the solicitor.  v. 24 (Nilsen); p. 106:6–11.

434.  Nilsen also believed that ID was science based upon information that over 300 scientists supported it.  v. 24 (Nilsen); p. 106:12–24.

93

435. Nilsen thought the compromise version adopted the board's goals which he understood to be ensuring that students were made aware that: (1) there were gaps/problems in Darwin's theory; (2) that there were other theories of evolution (including ID); and (3) that Of Pandas be included as a reference. v. 24 (Nilsen); p. 107:1–13.

436. Nilsen continued to believe that an express reference to Of Pandas in the curriculum should address teacher concerns that use of the book might expose them to liability.  v. 24 (Nilsen); p. 107:12–24; v. 13 (Miller);  p. 40:25–p. 41:4; p. 46:3–11.

437. Nilsen did not believe that the BCC version (XI-A) would be approved by the board on October 18, 2004, he believed that XI-C would pass and he made a comment to teachers based on that belief. v. 26 (Nilsen); p. 46:13–p. 47:6.

438. Based on Nilsen's comment teachers had a sense that Nilsen thought the outcome of the voting would be favorable to the science faculty.  v. 14 (Spahr); p. 32:19–p. 33:14.

439. As voting started, there was discussion among members; a series of motions made by board member Noel Wenrich; and Nilsen perceived that some members sought to delay a final vote on the versions to send the matter back

94

for further study.  v. 24 (Nilsen); p. 107:25–p. 108:21; v. 25 (Nilsen); p.

14:14–p. 16:1; v. 35 (Baksa); p. 17:8–23; D 64 at 158 et seq.

440.   Bonsell thought Wenrich's motions were silly and wanted to discuss the

merits of the three versions that were before the board, which were the

result of much hard work.  v. 33: p. 4:15–p. 6:8.  Cleaver did not think that

Wenrich's motions were proper.  v. 32 (Cleaver); p. 24:6–17.  Geesey was

surprised by Wenrich's motions in order to prevent passage of a curriculum

change and that surprised her because she believed Wenrich supported ID.

v. 31 (Geesey); p. 169:2–14; D 64 at 158 et seq.

441.   Nilsen believed other board members wanted to make the issue go to a vote

v. 24 (Nilsen); p. 108:22–p. 109:1.

442.   Harkins did not see any big difference between the three versions before the

board.  v. 34 (Harkins); p. 64:12–p. 68:5.  Harkins did not see the point to

Wenrich's motions.  v. 34 (Harkins); p. 69:11–p. 70:14.

443.   Harkins voted for the curriculum change although she has not religious

objection to evolution; Wenrich voted against the curriculum change

believes in Creationism.  v. 8 (Casey Brown); p. 28:8–19; v. 13 (Miller);  p.

29:17–21.

**Genesis of the Final Version of Curriculum Change Worked out During the Board Meeting on October 18, 2004.**

444.   The final version of the curriculum change was actually worked out on the

night of the meeting with Bonsell making a motion to add the

"note"providing that "origins of life is not taught" from the second draft

recommended by the staff/administration (D 68 at "XI-C") to the BCC's

proposed curriculum change (D 60 at "XI-A").  v. 24 (Nilsen); p. 109:2–p.

111:10; v. 35 (Baksa); p. 17:8–p. 18:12; D 64 at 158–59;

445.   The purpose of Bonsell's motion to add the note stating that origins of life

was not taught was to make it clear that teachers would <u>not</u> be required to

teach intelligent design.  v. 24 (Nilsen); p. 109:2–p. 111:10; D 64 at 158–59.

Bonsell's purpose in making the motion to move the "note" from the

administration/staff version (D 68 at XI-C) to the BCC version (D 60 at XI-

A) was to address teacher concerns that the curriculum language would

require teachers to teach ID.  D 187; v. 33 (Bonsell); p. 6:9–p. 8:20.

Harkins and Geesey supported Bonsell's motion for this reason.  v. 34

(Harkins); p. 71:9–p. 72:6; v. 31 (Geesey); p. 169:15–p. 170:7.

446.   Bonsell's motion to amend the BCC version to add the "note" was seconded

by Jeff Brown because Brown understood the "note" would prohibit the

teaching of ID. D 64 at 159 [at ".6." & ".7." ].  v. 8 (Jeff Brown); p.

95:18–p. 96:14; p. 97:14–99:12.

447.  Barrie Callaghan recognized that the effect of the note was to ensure that ID

was not taught.  v. 13 (Miller);  p. 52:5–p. 53:17.

448.  Teachers recognized that the effect of the "note" added at Bonsell's

suggestion would be to ensure that ID was not taught.  D-68; v. 14 (Spahr);

p. 31:10–32:18; v. 36 (Linker); p. 73:8–16.

449.  Teachers did not teach the origins of life before the curriculum change and

they do not do so now.  v. 13 (Miller);  p. 15:20–p. 17:20; p. 44:24–p.

45:21; v. 26 (Baksa); p. 88:9–25;

450.  Bonsell's motion was approved unanimously by the board, including votes

by board members who opposed the proposed curriculum change.  D 64 at

159 [at ".6." & ".7." ]; v. 33 (Bonsell); p. 7:2–p. 8:24.

451.  Bonsell's motion carried by a final vote of 6-3.  D 64 at 159 [at ".8."]; v. 33

(Bonsell); p. 8:25–p. 9:19.  See Joint Stipulations at Ex. 1.

452.  During the discussion of the curriculum change there was no mention of

Creationism on the part of any board member.  v. 24 (Nilsen); p. 111:11–20.

453.  Buckingham did not believe that ID was Creationism when he voted for the

curriculum change on October 18, 2004.  v. 30 (Buckingham); p. 62:16–19.

454. When Buckingham voted for the curriculum change he did not believe that the board was enacting an illegal curriculum policy.  v. 30 (Buckingham); p. 63:11–14.

455. Buckingham never had as his purpose to prevent the teaching of evolutionary theory.  v. 30 (Buckingham); p. 64:22–25.

456. Buckingham supported the curriculum change on October 18, 2004 to give students an alternate scientific theory to go along with their biology class. v. 30 (Buckingham); p. 65:1–6.

**Brown Resignations.**

457. After the vote board members Jeff and Casey Brown resigned, Bonsell thought this was ridiculous and inconsiderate to resign without any notice. v. 33 (Bonsell); p. 9:20–p. 10:3.  Harkins was disappointed at the Brown's resignation and felt hurt at the charges leveled.  v. 34 (Harkins); p. 72:11–p. 73:14.

**Geesey Comment and Transcript Request.**

458.   During the portion of the board meeting devoted to the curriculum item

concerns were expressed about possible liability of teachers and the

possibility that the board 's solicitor had incorrectly indicated that the

contemplated curriculum change was not illegal.  v. 24 (Nilsen); p. 112:6–17.

459.   In response, board member Heather Geesey uttered words to the effect that "if they are wrong, then we'll fire them" and Nilsen understood the "they" in Geesey's statement to refer to the district solicitor. v. 24 (Nilsen); p. 112:18–p. 113:10; v. 31 (Geesey); p. 170:16–p. 171:5.

460.   Later Geesey requested a transcript in order to help her address concerns that she had been mistakenly understood to be calling for the discharge of the science faculty and sent an e-mail to be forwarded to all teachers designed to address this mistaken impression.  v. 24 (Nilsen); p. 113:11–p. 114:3; v. 31 (Geesey); p. 170:22–p. 172:15; v. 13 (Miller);  p. 48:1–20.

461.   Geesey also spoke to Joe Moldanado about the inaccuracy of his reporting of Geesey's comment but she got the sense that he knew it was inaccurate and he did not care.  v. 31 (Geesey); p. 171:10–p. 173:1.

462.   Although DASD policy provided for reuse or discard of tapes of board meetings once the minutes for board meetings were approved, the tape of the October 18, 2004 meeting was preserved upon advice of counsel.  v. 24 (Nilsen); p. 114:4–p. 115:4.