## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

TAMMY KITZMILLER, et al.,       )

                                  )

       Plaintiffs,          )       Case No. 04-CV-2688

                                  )       (Hon. Judge Jones)

       v.                 )

                                  )

DOVER AREA SCHOOL DISTRICT and  )      **DEFENDANTS PROPOSED**

DOVER AREA SCHOOL DISTRICT     )      **FINDINGS OF FACT**

BOARD OF DIRECTORS,          )      **AND CONCLUSIONS OF**

                                  )      **LAW**

       Defendants.        )

_____)

# PART FIVE

463.   The tape of the October 18, 2004 board meeting was incomplete because of an error made by a fill-in secretary.  v. 24 (Nilsen); p. 115:5–p. 116:3; D. 231.

464.   Nilsen had a partial transcript made of that portion of the board discussion about the curriculum item on the agenda to the extent the discussion had been taped; but the transcript is not of the whole tape (omitting portions prior to the discussion of the curriculum item); and does not include the actual voting (with the transcript referring instead to the minutes for the motions and voting).  D 153; v. 24 (Nilsen); p. 116:6–p. 120:3; v. 25 (Nilsen); p. 14:2–13.

**Development of a Statement to Implement the Curriculum Policy.**

465.   The administration's original plan for implementation of the curriculum change called for teachers to communicate information concerning ID to the students and then teach evolution as required by state standards.  v. 25 (Nilsen); p. 57:3–p. 58:23; D 142 (statement read January, 2005); v. 13 (Miller);  p. 55:25–p. 56:2.

466.   Nilsen believed that as a result of the curriculum change adopted by the board  on October 18, 2004, teachers would simply mention ID the way they had mentioned Creationism as an alternative theory of evolution, reference

the book in the library [Of Pandas and People], and move on.  v. 25 (Nilsen); p. 58:8–p. 59:8; v. 26 (Nilsen); p. 41:12–15.

467.  It was never the board or the administration's intent to develop a statement or for the administration to read it; but, in order to address concerns expressed by teachers, the administration worked out the informational statement and later read that statement.  v. 25 (Nilsen); p. 57:3–p. 60:1; D 142 (statement read January, 2005); v. 35 (Baksa); p. 33:11–23; p. 38:10–18; v. 34 (Harkins); p. 74:5–14.

468.  Immediately after the October 18, 2004 board meeting Nilsen had sent a memo to science faculty members in order to discuss the implementation of the curriculum policy adopted on October 18, 2004. D 172 at 341; v. 24 (Nilsen); p. 38:5–p. 40:15.

469.  After the board meeting Miller told Baksa she wanted specific direction if ID was mentioned, what teachers were to say, what, exactly word–for–word the teachers were to say.  v. 13 (Miller);  p. 49:16–21; v. 36 (Linker); p. 74:2–6.

470.  There was no way for the administration to know what questions students might ask in the classroom.  v. 13 (Miller);  p. 63:23–p. 64:5.

471.  After the meeting Nilsen directed Baksa to work with the science faculty to develop a statement that would address faculty concerns about implementation of the curriculum in a manner that implemented the curriculum change but protected teachers.  v. 25 (Nilsen); p. 16:2–15; v. 35 (Baksa); p. 25:9–22; D 86–100.

472.  Baksa began drafting a statement designed to implement the board's curriculum change while providing teachers with the guidance they wanted concerning what to say about intelligent design.  D 65; v. 24 (Nilsen); p. 16:8–p. 17:4.

473.  Baksa included language indicating that ID was a theory and he did not believe it was a religious theory based upon his review of the text Of Pandas, which he did not see as making a religious argument.  D 65; v. 35 (Baksa); p. 19:22–p. 20:6.

474.  Baksa also included language that origins is not taught and that the discussion of this topic was left to students and families based on his understanding that this is what teachers had done in the past.  D 65; v. 35 (Baksa); p. 20:7–17.  Baksa also understood this language to mean that teachers would not be teaching ID.  v. 35 (Baksa); p. 20:18–20.

475.   The statement made clear that teachers did not address origins of life issues
because teachers has never addressed the origins of life, the curriculum
change included a note to make it clear that teachers did not do so and
would not be required to teach ID, which was understood to deal with
origins of life.  D 65 at 15; v. 25 (Nilsen); p. 17:5–p. 18:5; v. 8 (Casey
Brown); p. 18:13–p. 19:20.

476.   The draft statement also contained language providing "As a standards
driven district, class instruction focuses on the standards and preparing
students to be successful on standards-based assessments." to reinforce that
teachers were focusing on standards and doing what they had done before
the curriculum change, teaching evolution.  D. 65 at 15; v. 25 (Nilsen); p.
18:6–23.

477.   A definition of theory was included by Baksa at the request of the Jen
Miller, the senior biology teacher. v. 35 (Baksa); p. 25:23–p. 26:24.  Miller
also changed the description of ID from a "theory" (the term Baksa had
used) to an "explanation."  v. 35 (Baksa); p. 26:25–p. 27:22; D 65 & 103; v.
35 (Baksa); p. 19:22–p. 20:6; v. 14 (Spahr); p. 40:4–p. 41:2.

**Faculty Obstruction Regarding Implementation of Curriculum Policy.**

478. Once the curriculum change was approved by the board, the teachers requested that their names be removed from the curriculum based on concerns that the change might result in litigation.  v. 25 (Nilsen); p. 18:24–p.20:19; D. 81; v. 35 (Baksa); p. 20:21–p. 21:23.

479. Nilsen was confused with the science faculty's request to be removed from the curriculum because teachers had been involved in ninety-nine percent of the document.  v. 25 (Nilsen); p. 20:20–p.21:1.

480. Nilsen regarded the faculty's concern for litigation as mistaken because he believed that faculty would not be liable for actions required by the board, but he supported Baksa's decision to remove the name of the teachers from the curriculum as they had requested.  v. 25 (Nilsen); p. 21:2–p. 22:5.

**Board Concern Regarding Reporting of Actual Nature of the Curriculum Change Approved on October 18, 2004 and November 19, 2004 Press Release.**

481. In the post October 18, 2004 period, board members expressed concerns to Nilsen about inaccuracy in press reporting of the actual nature and consequences of the curriculum change approved by the board, including concerns that there were reports that the curriculum change required: (1) teachers to teach Creationism: (2) teachers to teach ID; and (3) required use of the text Of Pandas as a required textbook.  v. 25 (Nilsen); p. 22:5–p. 23:11.

482. For his part, Nilsen did not take steps to address the misreporting because his duties prevented him from engaging in an effort he saw as fruitless.  v. 25 (Nilsen); p. 23:12–p. 24:1.

483. Baksa was privy to specific instances where reporters continued to report that teachers were teaching intelligent design although Baksa had told them that teachers would only be mentioning ID before teaching evolution.  v. 35 (Baksa); p. 21:24–p. 24:25.

**November 19, 2004, Press Release.**

484.   When the curriculum change was adopted there was no discussion of issuing a press release and Bonsell had no intention of issuing a press release; he called for the press release because of inaccurate reports about the nature and effect of the curriculum change.  v. 33 (Bonsell); p. 16:5–16.

485.   In the period after the October 18, 2004 board meeting Bonsell became aware of inaccuracies in the reporting, including the claims that ID was Creationism and that teachers were teaching Creationism.  v. 33 (Bonsell); p. 10:21–p. 12:21.  Bonsell complained to numerous editors and reporters about this problem.  v. 33 (Bonsell); p. 15:7–12.  He called for the press release in because of inaccurate reports about the nature and effect of the curriculum change.  v. 33 (Bonsell); p. 16:5–16.

486.   Bonsell asked Nilsen to prepare a press release in order to address misinformation in the community concerning the actual nature of the curriculum change and its actual consequences for the instruction and provided Nilsen with a rough draft.   v. 25 (Nilsen); p. 24:2–p. 25:6; D 83; v. 33 (Bonsell); p. 15:13–p. 16:4.

487.   Nilsen requested information from Baksa regarding the statement Baksa was working on in order to draft the press release.  v. 25 (Nilsen); p. 24:22–p. 25:21; v. 35 (Baksa); p. 24:5–p. 25:8; D 83 & 85.

488.   In addition, during this period, Plaintiff Kitzmiller requested information concerning the actual impact of the curriculum change on classroom instruction, including the perception that ID would be taught, and whether students could opt-out of the discussion of ID.  D 70; v. 25 (Nilsen); p. 25:14–p. 28:6

489.   Nilsen drafted a Press Release, and a final version was ultimately placed on DASD's website.  v. 25 (Nilsen); p. 28:7–p. 29:1; v. 33 (Bonsell); p. 16:5–p. 17:8; D 101 & 103.

490.   The Press release posted included the text of the statement that was to be read to students as a result of the curriculum change in January of 2005.  D 103; v. 25 (Nilsen); p. 30:1–6.

491.   Baksa worked out the statment to be read to students in January of 2005 with the science faculty and the board.  v. 25 (Nilsen); p. 30:4–15.

492.   The Press Release was specifically designed to address misperceptions concerning the effect of the curriculum change, including the notion that the curriculum change called for the teaching of ID, Creationism, or religion by

making it clear that teachers would not teach ID, Creationism or Religion as directed by Nilsen.  v. 25 (Nilsen); p. 30:16–p. 33:8; D 103.

**Faculty Objections to November 19, 2004 Press Release.**

493.  The Press Release included language referencing coordination by board, Administration, faculty, and the solicitor in order to reflect the various roles that each had played in developing the curriculum policy.  v. 25 (Nilsen); p. 36:1–16.

494.  The science faculty objected to the language in the press release referencing "coordination" with science faculty.  v. 25 (Nilsen); p. 36:17–p. 37:20; D 106; v. 13 (Miller);  p. 51:16–p. 52:4.

495.  Nilsen did not understand the objection of the faculty to the "in coordination with" language of the press release but he asked Baksa to schedule a meeting with the faculty to discuss their concerns.  v. 25 (Nilsen): p. 37:4–p. 38:4; v. 35 (Baksa); p. 29:5–17.

496.  Nilsen explained that the Press Release was designed to protect teachers.  v. 13 (Miller);  p. 54:13–16.  The release indicates Nilsen's directions that Creationism is not to be taught, ID is not taught, the religious beliefs of teachers or board members are not to be taught.  v. 13 (Miller);  p. 56:6–24.

497. Baksa thought the press release accurately reflected the participation of the faculty.  v. 35 (Baksa); p. 28:4–p. 29:4; D 106.

498. Bonsell requested information and documentation detailing faculty involvement in the curriculum drafting and implementation process, and he later made notes on documentation to reflect the faculty's continued participation.  D 184; v. 33 (Bonsell); p. 17:6–p. 19:17.

**November 24, 2004 Meeting Between Administration and Science Faculty, Local Union Representatives.**

499. A meeting was held between administration and the science fculty and union representatives on or about November 24, 2004.  v. 25 (Nilsen); p. 40:13–p. 41:16.  Present at the meeting were Nilsen, Baksa, the science teachers, and union officials Sandy Bowser, Brad Neal, and Bill Miller.  v. 35 (Baksa); p. 29:5–17.  The tone of the meeting was strained.  v. 25 (Nilsen); p. 46:1–3.

500. At the meeting on 11/24/04 teachers expressed reservations about the "in coordination with" language from the 11/19/04 DASD press release (D 103) and v. 25 (Nilsen); p. 41:18–43:9.  Teachers took the position that they had only reviewed the statement for scientific accuracy.  v. 35 (Baksa); p. 29:18–p. 30:13.

501. Nilsen agreed to make a comment indicating that teachers had been cooperative, teachers provided him with a statement to help him make that clear, and he did appear on a local radio station for the purpose of making it clear that the teachers had cooperated, and Nilsen did participate in a local radio show to do just that.  D 172 at 359-60; v. 25 (Nilsen); p. 42:11–p. 44:10.

502. At the November 24, 2004 meeting teachers again expressed concerns about potential liability arising from implementation of the curriculum change and Nilsen assured them he would give them guidance in response to any specific concerns to provide them with protection.  v. 25 (Nilsen); p. 44:11–46:19.

503. Teachers demanded guidance with respect to exactly what they were supposed to say if students asked questions after the statement was read.  v. 25 (Nilsen); p. 45:12–25.

**Application of the Opt-Out Policy.**

504. Later Nilsen decided that DASD's opt out policy would apply if parents
objected to the statement about ID; he did so because Dover has a broad
opt-out policy which applies to any curriculum item, including such things
as recruiters' lists, sex education materials, animal dissection–he did not
make this decision because he regarded ID as religious; and an opt-out form
and letter was prepared.  D 70; v. 25 (Nilsen); p. 50:13–51:9; v. 35 (Baksa);
p. 31:9–p.33:10.

505. He did so in part because during this period, plaintiff Kitzmiller requested
information concerning the actual impact of the curriculum change on
classroom instruction, including the perception that ID would be taught, and
whether students could opt-out of the discussion of ID.  D 70; v. 25
(Nilsen); p. 25:14–p. 28:6.

506. The meeting also dealt with implementation of the curriculum change such
as details relating to the opt-out, in light of parent requests for information
on this, and how students could use the books Of Pandas.  v, 35; p. 30:17–p.
33:10.  D 70, 133, 134, 135.

**Teachers' Press Release in Opposition to November 19, 2004 Release.**

507.  Despite the 11/24/04 meeting. the science faculty and union representatives issued a press release which they said was designed to make it clear that the faculty did not support that portion of th curriculum change which called for students to be made aware of ID. v. 25 (Nilsen); p. 46:25–p. 48:14.

508.  Despite an agreement to communicate with respect to public statements, the teachers and local union officials later issued a press release disputing the notion that the curriculum change had been adopted "in coordination with" the science faculty. v. 25 (Nilsen); p. 46:11–p. 48:14; D 105.

**Discovery Institute's Press Release.**

509.  Discovery Institute issued a press release critical of DASD's curriculum but Bonsell discounted the release because it said that DASD was teaching ID but DASD does not provide for the teaching of ID. D 119; v. 33 (Bonsell); p. 19:18–p. 20:4.  Harkins disagree with Discovery's Press Release because she thought Discovery supported ID. v. 34 (Harkins); p. 78:9–p. 79:9.

**Placement of Pandas in the Dover Highschool Library in December 2004.**

510.   When the donation of Of Pandas was made to the district, Nilsen accepted for the district and informed the board by placing an informational item on the agenda for the October 4, 2004 board meeting. He described the donation as one of "classroom sets" and the text as "reference" based on his understanding of the agreement on this point expressed by teachers during the August 27, 2004 meeting of the BCC. D 48 at 135; v. 24 (Nilsen); p. 76:11–p. 77:12.

511.   Later at the November 24, 2004 meeting with faculty Nilsen spoke with Jen Miller about placement of the books in the classroom. Later Nilsen decided to move the books to the library when he learned, during a holiday meeting in the school library, that the librarian had a section dealing with evolution, Creationism etc. v. 25 (Nilsen); p. 48:15–p. 50:7; D. 127 & 137.

512.   Spahr had recommended placement of Of Pandas in the library at the August 27, 2004 meeting. v. 31 (Baksa); p. 221:6–14; v. 31 (Baksa); p. 226:18–22.

513.   Nilsen was not advised to place Of Pandas in the library by anyone prior to this decision to place the text in the library. v. 25 (Nilsen); p. 50:8–12.

514. Bonsell knows that Nilsen placed Of Pandas in the library and believes this is consistent with the board's intent when it passed the curriculum change on October 18, 2004 because the texts are reference books. v. 33 (Bonsell); p. 20:5–13.

515. Harkins believes that placement of Of Pandas in the library is consistent with the board's intent. v. 34 (Harkins); p. 79:10–21.

516. No member of the DASD board [as of October 31, 2005], had called for removal of the text Of Pandas from the library. v. 33 (Bonsell); p. 20:5–16.

**January 5, 2005 Meeting with Science Faculty Regarding Implementation of the Curriculum Change.**

517. A meeting was held with members of faculty and administration on January 5, 2005, for purpose of discussing curriculum change; the substance of the meeting was memorialized as per faculty's request for written direction concerning implementation of the curriculum change and to foster good communication. v. 25 (Nilsen); p. 51:10–p. 52:3; D 138 & 139.

518. Nilsen took pains to make sure teachers and parents would know that students were not being assessed with respect to ID in keeping with his understanding that students were not being taught ID. v. 25 (Nilsen); p. 52:4–p. 53:1; D 138 & 139; v. 35 (Baksa); p. 34:19–p. 35:17.

115

519. Likewise, he wanted to make it clear that parents would be allowed to exercise an opt-out as per DASD's procedures.  v. 25 (Nilsen); p. 53:2–10.

520. Baksa prepared an opt-out letter and form to apply to v. 25 (Nilsen); p. 50:13–51:9, p. 53:2–p. 54:10; D 133, 134 & 135.

521. Bonsell met with teachers to express his surprise at the objections to the November 19, 2004 Press Release because he thought teachers had cooperated throughout and Miller explained that they had cooperated until the board decided to put ID in the curriculum and at that point compromise stopped.  v. 13 (Miller);  p. 54:5–p. 55:12.

**Teacher Obstruction Regarding Distribution of Opt-out Letter & Form.**

522. The administration's original plan called for teachers to distribute the opt-out letter and form in class but teachers refused to do so.  v. 25 (Nilsen); p. 54:11–56:11; v. 35 (Baksa); p. 35:18–p. 38:14.

523. Nilsen was frustrated by the teachers' refusal to distribute the opt-out form, particularly given that he had allowed their request not to participate in reading of the statement worked out to implement the curriculum change but they now sought to obstruct the administration's effort to give parents/students the same opportunity.  v. 25 (Nilsen); p. 54:11–p. 57:2.

**Teacher Obstruction Regarding Reading of Statement Drafted to Implement the Curriculum Change.**

524.    The administration's original plan for implementation of the curriculum change called for teachers to communicate information concerning ID to the students and then teach evolution as required by state standards.  v. 25 (Nilsen); p. 57:3–p. 58:23; D 142 (statement read January, 2005).

525.    Nilsen believed that as a result of the curriculum change adopted by the board  on October 18, 2004, teachers would simply mention ID the way they had mentioned Creationism as an alternative theory of evolution, reference the book in the library [Of Pandas and People], and move on.  v. 25 (Nilsen); p. 58:8–p. 59:8; v. 26 (Nilsen); p. 41:12–15.

526.    It was never the board or the administration's intent to develop a statement or for the administration to read it; but, in order to address concerns expressed by teachers, the administration worked out the informational statement and later read that statement.  v. 25 (Nilsen); p. 57:3–p. 60:1; D 142 (statement read January, 2005); v. 35 (Baksa); p. 33:11–23; p. 38:10–18; v. 34 (Harkins); p. 74:5–14.

527.    After the October 18, 2004 board meeting approving the curriculum change, Nilsen directed Baksa to work with the science faculty to develop a

statement that would address stated concerns of the faculty about implementation of the curriculum in a manner that implemented the curriculum change but protected teachers.  v. 25 (Nilsen); p. 16:2–15.

528. Baksa began drafting a statement designed to implement the board's curriculum change while providing teachers with the guidance they wanted concerning what to say about intelligent design.  D 65; v. 24 (Nilsen); p. 16:8–p. 17:4.

529. The statement made clear that teachers did not address origins of life issues because teachers has never addressed the origins of life, the curriculum change included a note to make it clear that teachers did not do so and would not be required to teach ID, which was understood to deal with origins of life.  D 65 at 15; v. 25 (Nilsen); p. 17:5–p. 18:5.

530. The draft statement also contained language providing "As a standards driven district, class instruction focuses on the standards and preparing students to be successful on standards-based assessments." to reinforce that teachers were focusing on standards and doing what they had done before the curriculum change, teaching evolution.  D. 65 at 15; v. 25 (Nilsen); p. 18:6–23.

531.   The intent was for teachers to read the statement but they refused to do so. v. 13 (Miller);  p. 55:25–p. 56:5; v. 14 (Spahr); p. 41:3–6.

532.   Bonsell regarded the faculty's refusal to read the statement as insubordination but called for no action since this litigation should address the issues that provide the basis for the faculty's objection. v. 33 (Bonsell); p. 20:21–p. 21:6.

533.   There was never any discussion of having the administration read the statement when the curriculum change was voted on by the board and no board member directed the administration to do so; this was a result of the faculty's refusal to do so.  v. 33 (Bonsell); p. 21:7–22; v. 34 (Harkins); p. 79:22–p. 81:16.

**Development of the Newsletter Regarding Curriculum Change.**

534.   There was no discussion of preparing a newsletter when the curriculum change was approved by the board on October 18, 2004 Bonsell called for it later in an effort to communicate accurate information.  v. 33 (Bonsell); p. 22:14–p. 22:24; P 127; v. 25 (Nilsen); p. 60:2–17; v. 34 (Harkins); p. 81:17–p. 82:6.

535. The portion of the newsletter discussing Anthony Flew was intended to convey that you did not have to be Christian or religious to believe in ID. v. 34 (Bonsell); p. 5:12–p. 6:4; P 127.

536. The portion of the newsletter addressing metaphysical extrapolation from scientific theories was designed to show that such metaphysical extrapolation did not make scientific theories non-scientific.  v. 34 (Bonsell); p. 6:4–p. 8:17; P 127.

**Donation of Books by Debunk Creation and Placement of Books in Library.**

537. In 2005 another set of books dealing with evolutionary theory, other theories, the controversy surrounding evolutionary theory were donated to DASD. v. 25 (Nilsen); p. 60:18–p. 61:25.

538. Eventually Nilsen learned that the books had been sent to the library and he directed that they be sent to Baksa. v. 25 (Nilsen); p. 61:13–p. 62:6; v. 35 (Baksa); p. 38:19–p. 39:10.

539. As in the case with the donation of the text Of Pandas, Nilsen did not ask who had donated the books because he was more interested in what was donated than who had donated the books. v. 25 (Nilsen); p. 62:7–16.

540. The books were reviewed for appropriateness and placed in the library; Nilsen did not direct the librarian where to place the books, the books were

120

placed where the librarian believed they should be placed.  v. 25 (Nilsen); p. 62:4–p. 63:1; v. 35 (Baksa); p. 39:9–40:2; v. 34;

541.   When Bonsell and Harkins became aware of the books he did not ask who donated them; he reviewed them for appropriateness given the odd way in which they had been sent to the district. 33; p. 22:25–p. 23:24; v. 34 (Harkins); p. 82:7–p. 83:12.

542.   The board approved the addition of these donated books to the library collection; Bonsell does not know where they are placed in the collection because this is the librarian's job.  v. 33 (Bonsell); p. 23:24–p. 24:5; v. 34 (Harkins); p. 83:13–19.

543.   Among the books now in the library are the following: (1) Intelligent Design Creationism and Its Critics, edited by Robert Pennock; (2) Tower of Babel by Robert T. Pennock, and (3) Finding Darwin's God, by Kenneth Miller.  v. 25 (Nilsen); p. 64:15–65:2; D 221 (Pennock, Intelligent Design Creationism & Its Critics); D 225 (Pennock, Tower of Babel); and D 223 (Miller, Finding Darwin's God).

544.   Nilsen allowed these books to be placed in the library because he believed it was consistent with the board's intent when it adopted the curriculum change on October 18, 2004, and no board member has every asked him to

remove these books from the library.  v. 25 (Nilsen); p. 66:4:–18.  Baksa likewise believes placement of the books from Debunk Creation is consistent with the purpose of the curriculum change adopted by the board on October 18, 2004.  v. 35 (Baksa); p. 40:3–7.

**Revision of Statement Read to Students in June 2005 in Light of Donation from Debunk Creation.**

545.  Nilsen directed Baksa to revise the informational statement read to students in light of the donation of books from Debunk Creation in order to inform students that there were other resources besides Of Pandas in the library which addressed ID.  v. 25 (Nilsen); p. 63:2–p. 64:8.  Baksa revised the statement to include reference to other resources in the library.  v. 35 (Baksa); p. 40:8–20.

546.  Bonsell knows that Nilsen changed the statement read to students to make them aware of additional resources addressing ID and believes this is wholly consistent with the purpose of the board's curriculum change because it points students to more information and books on the subject.  v. 33 (Bonsell); p. 24:6–p. 25:2;  D 193 (Revised Statement read in June, 2005).

547.    Harkins thought it was a good idea to revise the statement to make students

aware of more information and believes it is wholly consistent with the

board's intent. v. 34 (Harkins); p. 83:20–p. 84:9.

**Members of the Administration and Board in Their Words and Actions Acknowledged That Buckingham's Was Not the Board and Buckingham's Words and Deeds Were Not the Board 's Words and Deeds.**

548.    After the exchange between Max Pell and board members regarding the

biology text during the second board meeting in June, Jeff Brown

emphasized that the whole board, not just Buckingham, would make the

decision on the text in order to emphasize that it would be the board that

controlled the matter not just Buckingham. v. 8 (Jeff Brown); p. 85:13–p.

86:11.

549.    When Jeff Brown expressed reservations about any use of Of Pandas

because Buckingham had poisoned the well, Harkins told Brown that

Buckingham was not the board, echoing the point Brown had made to Max

Pell when the biology text was discussed at board meetings in 2004. v. 8

(Jeff Brown); p. 91:10–p. 92:22.

550.    Baksa placed the Miller & Levine text on the board agenda for the August

2004 board meeting despite the objections of Buckingham because he knew

that Buckingham was not the board and that the board would want to vote on approval of the text given the coming school year. v. 31 (Baksa); p. 212:14–p. 213:21. D 25

551.   Buckingham left the BCC meeting on August 27, 2004 early and Bonsell took that opportunity to let the teachers know that Buckingham was only one person on the board and not everybody always agrees with Buckingham. v. 32 (Bonsell); p. 117:2–p. 118:6; v. 13 (Miller); p. 35:3–21.

552.   Nilsen told Baksa to send the curriculum change that Buckingham wanted placed upon agenda for October 18, 2004 board meeting to the CAC over Buckingham's objection that this was not necessary–because he recognized that Buckingham was not the board and that the board as a whole would be interested in receiving input from the CAC. v. 24 (Nilsen); p. 81:23–p. 82:19.

553.   Baksa sent the BCC version to the CAC and he received feedback. D 51 & 67; v. 24 (Nilsen); p. 83:11–p. 84:1; v. 35 (Baksa); p. 7:9–p. 8:22.

554.   Nilsen put the BCC version on the agenda for the October 18, 2004 board meeting. v. 24 (Nilsen); p. 82:20–25. Nilsen also put the version of the curriculum change supported by the administration and the staff on the

agenda for this meeting because he knew Buckingham is not the board and that the board would want this information—and the ability to consider this version—as well.  v. 24 (Nilsen); p. 82:23–p. 83:10.

**Board Members Did Not Believe ID Was Creationism, They Believed ID Was a Scientific Theory, Not a Religious Teaching, and Therefore Believed the Curriculum Change Was Lawful.**

555.  Nilsen did not see ID as Creationism because he understood that Creationism was based on Genesis—and he did not understand ID to advance a religious claim.  v. 24 (Nilsen); p. 33:16–p. 34:19.  Nilsen understood ID to be science not a religious or philosophical claim.  v. 26 (Nilsen); p. 48:10–19.

556.  Nilsen did not understand ID to be religion in part because the science faculty's acceptance of the use of Of Pandas as a reference.  v. 25 (Nilsen); p. 34:14–19.

557.  The science faculty objected to teaching ID because they were not trained to teach the subject—and the faculty never provided a detailed scientific criticism of ID.   v. 36 (Baksa); p. 41:5–18; v. 36 (Linker); p. 73:17–23.

558.  During the discussion of the curriculum change there was no mention of Creationism on the part of any board member.  v. 24 (Nilsen); p. 111:11–20; v. 32 (Bonsell); p. 103:6–p. 104:1; v. 34 (Bonsell); p. 4:25–p. 5:3; v. 32

125