# THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

TAMMY KITZMILLER, et al.,       )
                                )
       Plaintiffs,          )     Case No. 04-CV-2688
                                )     (Hon. Judge Jones)
       v.                   )
                                )
DOVER AREA SCHOOL DISTRICT and  )     **DEFENDANTS PROPOSED**
DOVER AREA SCHOOL DISTRICT    )     **FINDINGS OF FACT**
BOARD OF DIRECTORS,         )     **AND CONCLUSIONS OF**
                                )     **LAW**
       Defendants.        )
_____)

# PART SIX

(Cleaver); p. 16:19–p. 17:3; Geesey ignored Mrs. Buckingham when she spoke about Creationism in the June 2004 board meetings because Geesey did not see the point of Buckingham's comments since the board was not discussing Creationism.  v. 31 (Geesey); p. 152:17–p. 154:6.

559.   For his part, Nilsen never believed that the board ever contemplated an illegal course of action.  v. 24 (Nilsen); p. 103:16–p. 104:12. Based upon his graduate education, Nilsen also believed that the curriculum change was constitutional because it neither advanced nor inhibited religion.  v. 25 (Nilsen); p. 34:20–p. 35:16; D 103 at 50.

560.   Nilsen believed that the course of action contemplated by the board was legal based upon information provided by the solicitor.  v. 24 (Nilsen); p. 106:6–11.

561.   Plaintiff Bryan Rehm remembers Bonsell saying that the solicitor had indicated that the curriculum was not illegal.  v. 4 (Rehm); p. 110:23–p. 111:20.  Buckingham remembers learning about ID when he was appointed to the BCC in January of 2004.  v. 30 (Buckingham); p. 57:22–17.

562.   Plaintiff Bryan Rhem remembers Angie Yingling saying that she did not understand why people were so upset and, ultimately, she voted for the curriculum change.  v. 4 (Rehm); p. 111:13–p. 114:14.

126

563. At every point in this process Baksa believed that the board was acting in what it saw as the best interest of the children and given the board's legal responsibility to make the final decision when board and faculty differ concerning what is best for students. v. 36 (Baksa); p. 48:25–p. 49:16.

564. The text used by homeschoolers was put out by Bob Jones University text and was not discussed at the 6/24/04 BCC meeting because its religious content made it unsuitable for use in a public school. v. 26:124:25–p. 125:10. Miller remembers Baksa saying that this text was obviously inappropriate. v. 13 (Miller); p. 27:8–19.

565. Jeff Brown did bring up ID and at that time believed he was on safe legal ground. v. 8 (Jeff Brown); p. 86:12–17. One of Jeff Brown's objections to the curriculum change was that it would complicate contract negotiations with the teachers. v. 8 (Jeff Brown); p. 97:3–8.

566. Jeff Brown's opinion is that Bonsell might have some interest in Creationism but he would not violate the law. v. 8 (Jeff Brown); p. 89:20–90:1.

567. To Bonsell, Creationism means a literal interpretation of the Bible, which is a matter of religious faith for Bonsell. v. 32 (Bonsell); p. 70:24–p. 71:9. To Bonsell ID is not Creationism. v. 32 (Bonsell); p. 71:10–22.

127

568.   During discussions with faculty at the August meeting of the BCC it was evident to Miller that Bonsell viewed ID and Creationism as two different things. v. 13 (Miller); p. 33:12–14. Jen Miller remembers receiving Of Pandas around this time and, in August, a meeting of the BCC focused on Of Pandas at which she brought some reservations about the readability and science to attention of board members. v. 13 (Miller); p. 30:2–p. 32:17.

569.   Plaintiff Bryan Rehm recognized that Bonsell thought that teaching intelligent design is not teaching Creationism. v. 4 (Rehm); p. 103:14–17.

570.   Throughout the process that culminated in the curriculum change adopted by the board on October 18, 2004, Bonsell was trying to serve the families of the district by improving DASD schools and the education those schools provide. v. 33 (Bonsell); p. 25:3–p. 26:3. Bonsell supported the curriculum change even though he does not believe that ID is necessarily consistent with his religious faith because he believed the change promoted good education. v. 34 (Bonsell); p. 8:25–p. 9:16.

571.   Bonsell has never taken any step that would lead to the teaching of Creationism in the high school of DASD; he has never taken any step to prevent the teaching of evolutionary theory; he never tried to obstruct

purchase of the biology text recommended by the faculty.  v. 33 (Bonsell); p. 26:24–p. 27:11.

572.  Bonsell does not believe that ID is necessarily religious.  v. 34 (Bonsell); p. 6:5–9. He does not believe that ID is necessarily consistent with his religious faith.  v. 34 (Bonsell); p. 8:25–p. 9:12.  He does not believe evolutionary theory is necessarily religious or atheistic.  v. 34 (Bonsell); p. 6:10–21.  He realizes people can bring religious views to any scientific theory but this does not make a scientific theories either religious or non-scientific.  v. 34 (Bonsell); p. 6:4–p. 8:17; P 127.

573.  Bonsell's daughter is in biology class, she will be taught the theory of evolution, and he has no intention of removing her from the class.  v. 33 (Bonsell); p. 27:12–p. 28:4.

574.  Plaintiff Barrie Callaghan distributed materials to the board relating to the definition of theory and the origins of life.  v. 4 (Barrie Callaghan); p. 24:10–p. 25:3.

575.  Harkins had no problem with the presentation of evolutionary theory in the biology text and, in fact, evolutionary theory is not inconsistent with her religious convictions.  v. 34 (Harkins); p. 41:13–20.  Harkins did not vote for the curriculum change for a religious reason.  v. 34 (Harkins); p.

129

73:15–17.  She voted for the curriculum change because she thought it was a good idea to add additional information; because when kids walk across the stage [at graduation] you want them to know how to think, not just what to think.  v. 34 (Harkins); p. 84:10–20.

576.   Cleaver did not want religion taught in the public schools.  v. 32 (Cleaver); p. 15:17–p. 16:2.  Cleaver did not want Creationism taught in the public schools because she thinks Creationism should be taught in the home and in the churches but not the schools.  v. 32 (Cleaver); p. 16:11–18.

577.   Cleaver did not believe that ID was Creationism because the discussions she heard about ID included no mention of Creationism. v. 32 (Cleaver); p. 17:4:–13. Cleaver also believed ID was science based upon her review of the text Of Pandas.  v. 32 (Cleaver); p. 21:3–p. 22:20.  Cleaver did not believe ID was religious.  v. 32 (Cleaver); p. 26:14–16.

578.   Cleaver voted for the curriculum policy simply because she thought that students would benefit from being made aware of other scientific theories and that it would make for a better education.  v. 32 (Cleaver); p. 24:24–27:7.

579.   Geesey understands Creationism to be based on Genesis I and at no time during her tenure as school board member did she understand the purpose of

130

the board to provide for the teaching of Creationism.  v. 31 (Geesey); p. 154:7–13.

580.   Geesey did not believe ID was Creationism because ID does not reference the Bible.  v. 31 (Geesey); p. 154:14–20.

581.   Geesey did not believe that ID was religion.  v. 31 (Geesey); p. 163:3–9.

582.   Geesey also did not believe that ID was Creationism because Bill [Buckingham] and Alan [Bonsell] said it was a scientific theory and that other scientists believed it.  v. 31 (Geesey); p. 154:21–p. 155:5.

583.   Geesey believed ID was a scientific theory; and her letter to the editor was designed to make clear what the board was actually considering during this period: choosing a biology book that taught the most prevalent theories.  v. 31 (Geesey); p. 161:19–p. 162:2; p. 163:7–17; P 56 (6/20/2004) & 60 (6/27/04).

584.   Geesey voted against approval of the text recommended by the science faculty because she thought there were issues that needed to be worked out: her intent was not to deny approval of the text recommended by the faculty at any time but simply to hold off on approval of that text to see if things could be worked out.  v. 31 (Geesey); p. 165:10–p. 166:3.

585.  Geesey voted for the curriculum change because she believed it was
      consistent with the [DASD] mission statement by making students aware of
      another theory; she did not believe that the proposed curriculum change
      would result in teaching religion.  v. 31 (Geesey); p. 170:5–15.

586.  Geesey sends her children to DASD schools precisely because she wants
      them to be exposed to ideas other than those that Geesey was exposed to in
      Christian schools–including evolutionary theory.  v. 31 (Geesey); p.
      173:20–p. 174:4.

587.  Buckingham remembers learning about ID when he was appointed to the
      BCC in January of 2004.  v. 30 (Buckingham); p. 57:4–17.  Buckingham did
      research on ID and learned that it was a scientific theory that was supported
      by 300 scientists.  v. 30 (Buckingham); p. 57:4–21.  In Spring of 2004
      Buckingham delivered materials relating to biology text and curriculum to
      the administration, more specifically, two CDs and a book.  v. 24 (Nilsen);
      p. 41:13--22.  The two CDs were entitled, Icons of Evolution and
      Unlocking the Mysteries of Life.  v. 24 (Nilsen); p. 42:3–11; D 227, 228 &
      229.

588.  In response to claim that a board decision to require teaching of Creationism
      would violate the separation of church and state Buckingham observed that

132

separation of church and state was a myth, meaning it is not in the Constitution; but he was not saying that it was permissible to teach Creationism because the separation of church and state was a myth; he simply believed that ID was not Creationism.  v. 30 (Buckingham); p. 58:23–p. 60:6.

589.   Buckingham never intended to permanently prevent the purchase of the biology text recommended by the science faculty.  v. 30 (Buckingham); p. 63:15–19.

590.   Buckingham did not believe ID was a religious theory.  v. 30 (Buckingham); p. 57:22–p. 58:1.

591.   Buckingham believed that Creationism was a biblical theory whereas ID was a scientific theory.

592.   Buckingham did not believe ID was Creationism at any time during the process that led up to the curriculum policy.  v. 30 (Buckingham); p. 58:2–4.

593.   Buckingham did not believe that ID was Creationism when he voted for the curriculum change on October 18, 2004.  v. 30 (Buckingham); p. 62:16–19.

594. When Buckingham voted for the curriculum change he did not believe that the board was enacting an illegal curriculum policy. v. 30 (Buckingham); p. 63:11–14.

595. Buckingham never had as his purpose to prevent the teaching of evolutionary theory. v. 30 (Buckingham); p. 64:22–25.

596. Buckingham supported the curriculum change on October 18, 2004 to give students an alternate scientific theory to go along with their biology class. v. 30 (Buckingham); p. 65:1–6.

597. The Plaintiffs have failed to prove that the Defendants had a religious purpose based on statements said to demonstrate an illicit motive or goal on the part of these third parties who were strangers to board members. Although the Plaintiffs focus a great deal of attention on Discovery Institute's "Wedge Strategy," there is no evidence that the Defendants have never seen the so-called "Wedge Document" or discussed the "Wedge Strategy" with anyone at any time. Although the Plaintiffs focus on statements of Phillip Johnson, there is no evidence that the Defendants do not know the man. Although the Plaintiffs focus on the Foundation for Thought and Ethics ("FTE") and statements made by Jon Buell, there is no evidence that the Defendants ever spoke with Buell or knew nothing about

134

the origins, purpose, or mission of FTE. Although the Plaintiffs are focused on prior drafts of the text *Of Pandas*, and the motives or statements of its authors or editors, there is no evidence that the Defendants had any knowledge of, or interest in, these statements, or for that matter the motives, purpose, or metaphysical commitments of these strangers.

**Making Students Aware of Something by Mentioning it Is Not Teaching as That Term Is Used in the Educational Profession.**

598.  Nilsen was not concerned with teachers mentioning Creationism because he believed that the conduct described–and advised–by Peterman violated the law on the theory that mentioning Creationism amounted to a teaching of Creationism in violation of the law. v. 24 (Nilsen); p. 29:17--p. 30:20.

599.  Teaching is a term of art in the educational profession that has a techinical meaning which includes specific objectives in curriculum, identified steps for implementation, dedicated materials, and assessment. v. 24 (Nilsen); p. 31:12--p. 32:1.

600.  Baksa was not concerned that teaches were engaged in unlawful activity when he learned via the Peterman memo that teachers were mentioning Creationism because merely mentioning something is not teaching it as that term is used in the educational profession, which involves specific

135

instrucitonal objectives, instructional goals, dedicated materials, assessment of student learning, and feedback from teachers to students.  v. 26 (Baksa); 82:9–83:4.

601.  Linker explained to Baksa that when he began his presentation on evolutionary theory, he drew a line down the middle of the chalkboard; on one side of the board he wrote evolution, on the other side of the board he wrote Creationism; and he told students that he would not be discussing Creationism, which was based on religion and writings in the Bible because he was not an expert; at the time Linker mentioned Creationism to his students before teaching evolution, he knew it was illegal to teach Creationism but he did not believe he was doing anything illegal.  v. 36 (Linker) p. 74:7–14; p. 67:5–16; p. 70:1–p. 71:5.

602.  Neither Nilsen or Baksa ever believed that mentioning either Creationism or ID was teaching it.   v. 25 (Nilsen); p. 52:4–p. 53:1; D 138 & 139; v. 35 (Baksa); p. 34:19–p. 35:17; v. 36 (Baksa); p. 41:19–p. 42:19.

603.  Before speaking with Peterman, Spahr had spoken with the science faculty and based upon what the teachers had told her Spahr told Peterman that Creationism per se was not taught because it was not within state standards. v. 14 (Spahr); p. 6:13–19.

136

604.   Before speaking with Peterman, Spahr had spoken with the science faculty and based upon what she learned from the teachers, Spahr told Peterman that teachers mentioned Creationism but they did not teach it.  v. 14 (Spahr); p. 6:13–7:1.

605.   Jen Miller, the veteran biology teacher, told Spahr that teacher would mention Creationism as an alternate to Darwin's theory.  v. 14 (Spahr); p. 7:2–8.

606.   Jen Miller also told Spahr that if students wanted to talk about Creationism they should talk to their families and pastors, an approach that teachers took because they knew the subject was controversial and they wanted to treat it properly.  v. 14 (Spahr); p. 7:9–16.

607.   Spahr also learned that teachers would sometimes point students to the reference section of the library if they had additional questions about Creationism.  v. 14 (Spahr); p. 7:5–21.

608.   Jen Miller maintains that Creationism was not taught.  v. 13 (Miller);  p. 15:7–19.

609.   The Pennsylvania State Academic Standards speak to teaching as that term is used in the educational profession, teachers for DASD teach evolution as

137

required by state standards they do not teach intelligent design.  v. 31

(Baksa); p. 227:9–p. 228:23; p. 230:1D 54.

**The Primary Effect of the Curriculum Change Is the Reading of an Informational Statement, the Placement of Books in the Library, and an Explicit Direction That Neither ID, Creationism, or Religious Beliefs Are Taught.**

610.    Baksa believed that the teachers also agreed that they would make students

aware of Intelligent Design in response to his suggestion that they mention

ID instead of Creationism.  v. 26 (Baksa); p. 122:10–15; p. 123:7–p. 124:11;

D 19 & 20.  When Baksa made this suggestion he believed it would have no

impact on what teachers taught and assessed in the classroom.  v. 36

(Baksa); p. 39:24–p. 41:4.

611.    Teachers did not teach the origins of life before the curriculum change and

they do not do so now.  v. 13 (Miller);  p. 15:20–p. 17:22; v. 36 (Linker); p.

71:6–8; p. 73:8–12; v. 26 (Baksa); p. 88:9–25.

612.    Teachers recognized that the effect of the "note" added at Bonsell's

suggestion would be to ensure that ID was not taught.  D-68; v. 14 (Spahr);

p. 31:10–32:18.

613.    The statement tells students with questions about origins to consult parents,

family, pastors, which parents had done before.  v. 8 (Casey Brown); p.

138

18:13–p. 19:20; D 142 (statement read January, 2005).  Jen Miller also told Spahr that if students wanted to talk about Creationism they should talk to their families and pastors, an approach that teachers took because they knew the subject was controversial and they wanted to treat it properly.  v. 14 (Spahr); p. 7:9–16.

614.   Teachers do not teach ID or take questions, the same approach teachers employed with respect to Creationism prior to the curriculum change.  v. 13 (Miller);  p. 64:16–20.  Prior to the curriculum change teachers had told her Spahr told Peterman that Creationism per se was not taught because it was not within state standards, teachers mentioned Creationism but they did not teach it; v. 14 (Spahr); p. 6:13–7:8; v. 36 (Linker); p. 67:5–16; p. 70:1–p. 71:5.

615.   The statement makes students aware of gaps and problems in evolutionary theory, something teachers had always done.  v. 13 (Miller);  p. 22:9–21; v. 14 (Spahr); p. 16:8–p. 17:11.

616.   Nilsen passed these materials from Discovery Institute on to Baksa, telling him that a board member had dropped the materials off and that Baksa might want to take a look at them.  v. 24 (Nilsen); p.  42:220--p. 43:7.

617.   Upon reviewing one of these videos teachers agreed that there was some validity to the information it contained and agreed to make students aware of gaps in evolutionary theory, something they had already done.  v. 14 (Spahr); p. 16:8–p. 17:11.

618.   Linker wanted to view the video because it dealt with gaps in evolutionary theory; it was the first time he actually saw a lot of gaps, although he had taught there were gaps in class; he thought it was good to get the other side of the story; and he told his colleagues that the video was good.  v. 36; p. 72:9–p. 73:4.

619.   At the 6/24/04 meeting teachers agreed to review the Icons of Evolution video provided by Buckingham again, and consider using the material if it lined up with content they taught.  v. 26 (Baksa); p. 121:22–p. 122:5.

620.   On or about October 8, 2004, Baksa presented teachers with a proposed curriculum change from the BCC providing that students would be made aware of gaps and problems in Darwin's theory–and teachers were okay with this language because this is what had been discussed. v. 13 (Miller); p. 37:14–p. 38:3.  This draft also provided that students would be made aware of other theories of evolution and teachers were okay with that.  v. 13 (Miller);  p. 38:4–14.

621.   In connection with the curriculum change, Nilsen has directed that teachers

should teach ET to state standards and that Creationism is not to be taught,

ID is not to be taught, the religious beliefs of teachers or board members are

not to be taught and teachers observe those directions.  v. 13 (Miller);  p.

56:6–24; v. 14 (Spahr); p. 42:18–p. 44:10; v. 25 (Nilsen); p. 30:16–p. 33:8;

D 103.

622.   At the October 18, 2004 board meeting Spahr stated that teachers had

agreed to: (1) point out problems with Darwin's theory; (2) make students

aware of other theories of evolution; (3) have Of Pandas in the classroom as

a reference text; (4) assist students if they wanted to seek other reference

material materials; and, in addition, throughout the process of consultation

and deliberation which culminated in the curriculum change, teachers had

emphasized that they did not teach origins of life.  v. 14 (Spahr); p. 35:16–p.

36:14.

623.   The statement read to students as a result of the curriculum change points

students to resources in the library that deal with ID.  D 142 (statement read

January, 2005); D 193 (revised statement read June, 2005).  Prior to the

curriculum change teachers would sometimes point students to the reference

section of the library if they had additional questions about Creationism. v. 14 (Spahr); p. 7:5–21.

624. Another effect of the curriculum change is the placement of books in the library. Nilsen decided to move the Of Pandas books to the library when he learned, during a holiday meeting in the school library, that the librarian had a section dealing with evolution, Creationism etc. v. 25 (Nilsen); p. 48:15–p. 50:7; D. 127 & 137. Spahr had recommended placement of Of Pandas in the library at the August 27, 2004 meeting. v. 31 (Baksa); p. 221:6–14; v. 31 (Baksa); p. 226:18–22. Nilsen was not advised to place Of Pandas in the library by anyone prior to this decision to place the text in the library. v. 25 (Nilsen); p. 50:8–12. Nilsen did so because he believed that this was consistent with the intent of the board when it adopted the curriculum change on October 18, 2004. v. 25 (Nilsen); p. 64:9–14.

625. Bonsell knows that Nilsen placed Of Pandas in the library and believes this is consistent with the board's intent when it passed the curriculum change on October 18, 2004 because the texts are reference books. v. 33 (Bonsell); p. 20:5–13. No member of the DASD board [as of October 31, 2005], had called for removal of the text Of Pandas from the library. v. 33 (Bonsell); p. 20:5–16.

626. The books donated by Debunk Creation were reviewed for appropriateness and placed in the library; Nilsen did not direct the librarian where to place the books, the books were placed where the librarian believed they should be placed. v. 25 (Nilsen); p. 62:4–p. 63:1; v. 35 (Baksa); p. 39:9–40:2; v. 34; The board approved the addition of these donated books to the library collection; Bonsell does not know where they are placed in the collection because this is the librarian's job. v. 33 (Bonsell); p. 23:24–p. 24:5; v. 34 (Harkins); p. 83:13–19. Among the books now in the library are the following: (1) Intelligent Design Creationism and Its Critics, edited by Robert Pennock; (2) Tower of Babel by Robert T. Pennock, and (3) Finding Darwin's God, by Kenneth Miller. v. 25 (Nilsen); p. 64:15–65:2; D 221 (Pennock, Intelligent Design Creationism & Its Critics); D 225 (Pennock, Tower of Babel); and D 223 (Miller, Finding Darwin's God). Nilsen allowed these books to be placed in the library because he believed it was consistent with the board's intent when it adopted the curriculum change on October 18, 2004, and no board member has every asked him to remove these books from the library. v. 25 (Nilsen); p. 66:4:–18. Baksa likewise believes placement of the books from Debunk Creation is consistent with the purpose of the curriculum change adopted by the board on October 18,

2004. v. 35 (Baksa); p. 40:3–7.  Nilsen directed Baksa to revise the informational statement read to students in light of the donation of books from Debunk Creation in order to inform students that there were other resources besides Of Pandas in the library which addressed ID.  v. 25 (Nilsen); p. 63:2–p. 64:8.  Baksa revised the statement to include reference to other resources in the library.  v. 35 (Baksa); p. 40:8–20.  Bonsell knows that Nilsen changed the statement read to students to make them aware of additional resources addressing ID and believes this is wholly consistent with the purpose of the board's curriculum change because it points students to more information and books on the subject.  v. 33 (Bonsell); p. 24:6–p. 25:2;  D 193 (Revised Statement read in June, 2005). Harkins thought it was a good idea to revise the statement to make students aware of more information and believes it is wholly consistent with the board's intent. v. 34 (Harkins); p. 83:20–p. 84:9.

627.  If a student goes to the catalogue of the Dover High School library and does a search using the term "intelligent design" the result is one book: Robert Pennock, Intelligent Design Creationism and Its Critics–and Pennock is one of the Plaintiffs' experts.  v. 35 (Baksa); p. 40:22–p. 41:10.

144

628.   The curriculum change adopted by the board on October 18, 2004, as implemented, has resulted in a four paragraph statement drafted prior to this litigation, which references IDT twice, informs students that IDT is an explanation for the origins of life that differs from ET, makes students aware of a supplemental text, *Of Pandas*, and the existence of other texts addressing ET and IDT, and prohibits the teaching of IDT, Creationism, or religion.

629.   The primary effect of the curriculum change is a legitimate, secular, educational, effect: to make students aware of a scientific theory, ID, that is related to the information students are taught about ET in their biology classes.

**ID Is A Science Theory When Seen In Light Of The Philosophy, History, And Sociology Of Science.**

630.   Dr. Steve is a highly credentialed PhD who has expertise in philosophy, history, and sociology of science and numerous publications directly pertinent to the Plaintiffs' claim that ID is an inherently religious assertion. D 243; v. 27 (Fuller); p. 1-33. Based on Fuller's testimony, the Court finds the following:

631.   ID is science. v. 27 (Fuller); p. 34:14–21.

145

632.   ID theorists such as Dembski and Behe are working at recognized scientific problems using deductive and inductive approaches.  v. 27 (Fuller);  p. 36:1–p. 39:16.

633.   ID is as testable as ET and, if fact, higher order theoretical claims of the kind advanced by proponents of both ID and ET are equally testable and testable in the same (often indirect or inferential) ways.  v. 27 (Fuller);  p. 35:15–21; p. 82:18–86:22; p. 99:24–p. 103:8.

634.   ID cannot be disqualified from science on the grounds that it is not testable because it can take several decades for scientists to come to grips with a theory and come up with a serious experiment that can test its merits v. 27 (Fuller);  p. 82:18–86:22; p. 99:24–p. 103:8.

635.   Both Newton's work in optics and Einstein's theory of relativity required considerable study and reflection before they could be tested.  v. 27 (Fuller); p. 84:11–p. 85:12; p. 106:8–p. 107:3.

**ID Is Not Religious, Inherently Religious, Creationism, or Creation Science.**

636.   ID is not religion and it is not inherently religious; it is not Creationism or creation science. v. 27 (Fuller);  p. 34:22–p. 35:10.

637. It is not proper to classify an idea as scientific or nonscientific because the idea arose from a "context of discovery" with a religious dimension; indeed, most of Western science arose from a religious "context of discovery." v. 27 (Fuller); p. 75:22–p. 80:23; p. 115:18–p. 166:25. Indeed applying this sort of analysis to disqualify ideas from realm of science would do a great deal of damage to science. v. 27 (Fuller); p. 107:4–p. 109:17.

638. What qualifies an idea as science is not its "context of discovery" the mindset of the individual scientist, but rather, the "context of justification," i.e., whether the idea can be understood and tested by someone who does not share the "context of discovery." v. 27 (Fuller); p. 80:24–p. 82:17

639. ID cannot be disqualified from science on the grounds that it is not testable because it can take several decades for scientists to come to grips with a theory and come up with a serious experiment that can test its merits v. 27 (Fuller); p. 82:18–86:22; p. 99:24–p. 103:8.

640. ID is as testable as ET and, if fact, higher order theoretical claims of the kind advanced by proponents of both ID and ET are equally testable and testable in the same (often indirect) ways. v. 27 (Fuller); p. 82:18–86:22; p. 99:24–p. 103:8.

147

641. ID is not inherently religious and it is not religion.  v. 27 (Fuller);  p. 107:4–p. 109:17; p. 135:22–p. 136:1.

642. The relationship between ID and religion and ET is not religion is not different in principle.  v. 27 (Fuller);  p. 114:4–p. 115:17.

643. ID is not Creationism.  v. 27 (Fuller);  p. 115:18–p. 166:25.

644. It is mistaken to believe that ID is a science stopper simply because it has arisen in a context of discovery characterized by a Western and religiously monotheistic culture, a context of discovery that has actually fostered scientific progress.  v. 27 (Fuller);  p. 177:1–p. 199:11.  In fact, Thomas Huxley, a famous defender of Darwin's theory of evolution, recognized that this Western mindset, which featured a religiously inspired notion of man's centrality to creation, which made scientific progress, including the development of evolutionary theory, possible.  v. 27 (Fuller);  p. 119:12–p. 122:6.  In fact, the very striving for unifying theory characteristic of Western science originated from a religious, in a broad sense creationist, context of discovery.  v. 27 (Fuller);  p. 122:7–p. 125:2.

**ID Is a Scientific Theory under the Proper Conception of Scientific Theory.**

645.   The notion that a scientific theory is only a valid theory if it is well substantiated is mistaken because a new theory could never get off the ground.  v. 27 (Fuller);  p. 104:8–21.

646.   A oversimplified notion of theory which insists upon a claim being well substantiated is at odds with the history of science according to which all new theories, no matter how true, are born refuted (or at least not well substantiated).  v. 27 (Fuller);  p. 82:18–p. 84:10.

647.   ID is not merely a negative argument but overs a reinterpretation of data and reconceptualization of various sciences and offers a different explanation for phenomena.  v. 27 (Fuller);  p. 104:25–p. 106:7.

648.   New scientific theories can involve little new experimentation but consist in a reinterpretation of existing data, such as Lavosier's revolutionary reinterpretation of evidences in chemistry.  v. 27 (Fuller);  p. 41:3–p. 44:22.

649.   There is reason to believe that ID may be involved in the kind of reinterpretation of data characteristic of a scientific revolution.  v. 27 (Fuller);  p. 86:23–p. 87:21.

650.   The current reception of ID by peer reviewed journals is likewise insufficient to disqualify ID from science, since the peer review system is biased in favor of "normal science," and reflects extra-scientific/sociological features that can impede the reception and development of new theories no matter how valid.  v. 27 (Fuller);  p. 125:3–p. 133:13.  DASD's statement actually promotes good science education by making students aware of a theory that shows promise but has not been accepted by the mainstream scientific community.  v. 27 (Fuller); p. 133:20–p. 135:21.

651.   There is good reason to believe that ID presents the prospect of a theory that will foster scientific progress and no question but that ID has proven heuristic.  v. 27 (Fuller);  p. 136:2–p. 137:18.

**ID Cannot Be Disqualified from Science Through Reliance on So-called Methodological Naturalism.**

652.   Methodological naturalism is not an essential element of science.  v. 27 (Fuller);  p. 35:11–14.

653.   Methodological naturalism is a philosophical, not scientific, principle.  v. 27 (Fuller);  p. 89:5–p. 95:6.