## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

TAMMY KITZMILLER, et al.,    )

                         )

       Plaintiffs,       )    Case No. 04-CV-2688

                         )    (Hon. Judge Jones)

       v.               )

                         )

DOVER AREA SCHOOL DISTRICT and  )    **DEFENDANTS PROPOSED**

DOVER AREA SCHOOL DISTRICT     )    **FINDINGS OF FACT**

BOARD OF DIRECTORS,        )    **AND CONCLUSIONS OF**

                         )    **LAW**

       Defendants.     )

_____)

# PART EIGHT

799.  The common understanding of Darwin's theory of evolution is that it refers to the mechanism of evolution proposed by Darwin, which is natural selection.  v. 19 (Behe); 27:19-24.

800.  Darwin's theory of evolution is not a fact.  v. 2 (Miller); 94:19-24; v. 19 (Behe); 28:12-14; v. 37 (Minnich); 46:13-17.

801.  Darwin's theory of evolution is not an absolute truth.  v. 2 (Miller); 94:25-95:1-4.

802.  Darwin's theory of evolution continues to change as new data are gathered and new ways of thinking arise.  v. 2 (Miller):95:16-22; v. 17 (Padian); 101:6-9.

803.  Darwin's theory of evolution continues to be tested as new evidence is discovered.  v. 2 (Miller); 97:20-25-98:1-4.

804.  A stew of organic molecules is a long way from a living cell and the leap from non-life to life is the greatest gap in scientific hypotheses of earth's early history.  D 214 at 425.

805.  It is entirely appropriate to refer to missing evidence as a gap.  v. 2 (Miller); 100: 14-15.

806.  Darwin's theory of evolution should be regarded as tentative.  v. 2 (Miller); 101:24-25-102:1-3.

807. Darwin's theory of evolution is incomplete.  v. 2 (Miller); 102:4-14; v. 15 (Alters); 28:9-13.

808. Our understanding of the data is incomplete with regard to the details of human evolution and with regard to virtually everything in evolution.  v. 17 (Padian); 102:10-25-103:1-3.

809. Scientists do not know enough about the structures in the cell to describe how they all work or to describe how evolution could have produced them by a step-by-step Darwinian process.  v. 2 (Miller); 102:15-25-103:1-12.

810. The origin of life is an unsolved scientific problem.  v. 2 (Miller); 105:21-24; v. 17 (Padian); 100:25-101:1-2.

811. The origin of life is an area of scientific inquiry in which there is little direct fossil evidence.  v. 17 (Padian); 101:3-5.

812. The origin of DNA and RNA in the evolution of cells is an unanswered scientific question.  v. 2 (Miller); 107: 4-8.

813. Scientists are still debating questions such as how new species arise.  v. 17 (Padian); 100:18-21.

814. Scientists still debate the question why species become extinct.  v. 17 (Padian); 100:22-24.

815. Many scientists think that Darwin's original formulation of the mechanism of evolution was either incorrect or incomplete on the basis of much better current information on how genetics, molecular biology, and adaptation actually work. v. 2 (Miller); 108:3-10.

816. Horizontal gene transfer makes it difficult to trace the pathway of common decent through microorganisms. v. 2 (Miller); 111:13-25.

817. Scientists disagree about the relative importance of natural selection, sexual selection, chance, species hybridization and other factors which all influence evolution. v. 2 (Miller); 112:2-7.

818. Gaps and problem exist in Darwin's theory of evolution. v. 19 (Behe);28:15-17; v. 37 (Minnich); 46:18-23.

819. The theory of evolution, in particular, natural selection, cannot explain much of the structure and development of life, including the very foundation of life, the cell. v. 19 (Behe); 28:18-25-33:1-7; v. 37 (Minnich); 98:12-22.

820. The inability of natural selection to account for this causes scientists, such as intelligent design proponents, to question whether a Darwinian framework is the proper approach to solving such questions. v. 19 (Behe); 32:20-25-33:1-7; v. 37 (Minnich); 98:12-22.

821. There are presently no detailed Darwinian accounts of the evolution of any biochemical system, only a variety of wishful speculations.  v. 19 (Behe); 28:18-25-30:1-6.

822. Darwin's theory cannot account for sexual reproduction; it actually erroneously predicts that most organisms should reproduce asexually.  v. 19 (Behe); 38:15-25-44:1-14.

823. Darwin's theory cannot account for the origin of life, which poses a large problem for the theory.  v. 19 (Behe); 44: 14-25-45:1-15.

824. Charles Darwin lived, worked, and wrote during a time when scientists were unaware of the existence of genes, of macromolecules, DNA, and other complexities at the macromolecular level.  v. 1 (Miller); 73:15-18;

825. There is enormous controversy within evolutionary theory on the relative values and weights to give to forces such as natural selection, sexual selection, genetic recombination, horizontal gene transfer, and so forth.  v. 1 (Miller); 99: 18-22.

826. It is absolutely true that there are many structures in the living cell, many biochemical pathways for which we do not have a detailed, evolutionary explanation, which is a point that all scientists will concede.  v. 2 (Miller); 8:12-17.

179

827.    A useful theory may become the dominant view among the majority of

scientists, but no theory is considered absolute truth.  Scientists analyze,

review, and critique the strengths and weaknesses of theories.  As new

evidence is uncovered a theory may be revised or replaced by a more useful

explanation.  Sometimes scientists resist a new way of looking at nature, but

over time new evidence determines which ideas survive and which are

replaced.  Thus science is characterized by continuity and change.  This

includes Darwin's theory of evolution.  v. 3 (Miller); 82:20-25-83:1-20; D

214 at 15.

828.    The fossil record is incomplete, and there are increasingly more gaps in the

fossil record the further back we go in time.  v. 17 (Padian); 76:16-25-77:1-

6; 101:10-12.

829.    If you are looking for direct ancestors in the fossil record and you insist on

an unbroken stream of intermediate fossils to document a case that is going

to be difficult under any circumstance.  v. 16 (Padian); 116: 18-21.

**DASD's Policy Promotes Good Science Education.**

830.    DASD's policy as issue promotes good science education.  v. 18 (Behe);

88:1-25; v. 21 (Behe); 22:2-4; v. 37 (Minnich); 145:7-10.

831. The purpose of a high school biology class is not to train scientists but to contribute to the liberal education of students. v. 3 (Miller); 48:15-21; v. 15 (Alters); 20:19-22.

832. Critical thinking is a legitimate pedagogical goal for a high school science class and an important component of teaching science. v. 3 (Miller); 48:7-14; v. 15 (Alters); 18:11-19.

833. Critical thinking involves taking a scientific proposition, concept, or idea and being able to look at it from different scientific points of view. v. 15 (Alters); 19:3-8.

834. Critical thinking involves questioning fundamental theories in science, including the theory of evolution. v. 15 (Alters); 19:16-25-20:1-8.

835. Critical thinking involves comparing equivalent scientific ideas and comparing them with the evidence and comparing sometimes misconceptions with the evidence. v. 15 (Alters); 20:9-14.

836. All things in science should be looked at critically. v. 15 (Alters); 20:15-18.

837. Students come to a science class with misconceptions about Darwin's theory of evolution. v. 20 (Behe); 84:9-21, 25-87:1-10.

838. Some common student misconceptions about Darwin's theory of evolution include: (1) that the theory is completely true, that is, students typically do

not make distinctions between fact and theory, they do not think the theory will be falsified, or they do not think there is a possibility of it being falsified; (2) students often confuse various components of the theory, typically confusing change over time with the mechanism of natural selection and confusing the evidence for each; and (3) students often think that utterly unsolved scientific problems, such as the origin of life, have in fact been solved. v. 20 (Behe); 84:25-86: 1-6.

839.   Intelligent design seeks to address some of these misconceptions by demonstrating the distinction between data and theory and to provide an additional framework with which to treat the data. v. 20 (Behe); 86:11-23.

840.   Students will be better prepared and educated if they learn that Darwin's theory of evolution is not a fact and that there are gaps and problems within the theory. v. 20 (Behe); 86:24-25-87:1-10; v. 37 (Minnich); 46:24-25-47:1-11.

841.   Good science pedagogy involves helping students overcome misconceptions. v. 14 (Alters); 71:2-15.

842.   It is most definitely a misconception for a student to believe that Darwin's theory of evolution is a fact. v. 3 (Miller); 48:22-25-49:1-13.

843. It would be a terrible misconception for a student to believe that science has answered all questions regarding evolution.  v. 3 (Miller); 49:11-14; v. 15 (Alters); 25:18-21.

844. It would be a misconception for a student to believe that science has solved the origin of life question.  v. 15 (Alters); 25:22-25.

845. It would be a misconception for a student to believe that Darwin's theory of evolution was <u>not</u> tentative.  v. 15 (Alters); 26:14-17.

846. To say that a theory is tentative means that as new information comes in, scientists should accept that new information and, if necessary, modify existing theories.  v. 15 (Alters); 26:6-10.

847. It would be a misconception about the nature of science for a student to believe that science has disproven the existence of God.  v. 15 (Alters); 43:15-19.

848. It would be a misconception for a scientist to believe that science has disproven the existence of God.  v. 15 (Alters); 43:15-23.

849. Students should be able to evaluate the nature of scientific and technical knowledge.  v. 2 (Miller); 62:6-12.

850. It is good educational policy to critical evaluate the status of existing theories, including the theory of evolution.  v. 2 (Miller) 63:5-18.

851.  Making students aware of the scientific theory of intelligent design in a
      ninth-grade biology class during instruction on Darwin's theory of
      evolution is good for science education.  v. 18 (Behe); 13-18; v. 20 (Behe);
      86:11-23; v. 21 (Behe); 20:16-25-22:1; v. 37 (Minnich); 47:12-17; v. 37
      (Minnich); 144:12-23.

852.  Making students aware of intelligent design as a scientific theory during
      class instruction of Darwin's theory of evolution promotes science
      education because in order for a student to properly appreciate the
      difference between fact and theory, the student needs at least a couple of
      different theoretical perspectives to view facts from.  If a student is given
      one theoretical framework in which to view a theory, then the danger is that
      the theory will blend into the facts and students will not be able to
      distinguish between the two.  Additionally, the ability to view a set of facts
      from a different framework allows a student to judge whether some
      difficulties for one theory are either greater or lesser.  Somebody who is
      convinced that a theory is correct will oftentimes view difficulties as minor
      annoyances, or maybe ignore them altogether.  But somebody who is not
      convinced of that theoretical framework might see those difficulties as much
      more telling and weighty than the first person.  Finally, the strength of

evidence supporting a theory, or even whether facts brought to bear have anything to do with a theory, oftentimes depends on a person's theoretical perspective.  Sometimes a person who has one theoretical perspective will view data that is newly obtained as support for the theory, whereas somebody outside of that will think of it as either irrelevant or not supporting the theory as strongly as the first person.  It is useful for students to view data from different perspectives.  v. 21 (Behe); 20:16-25-22:1.

853.   Making students aware of intelligent design as a scientific theory as Dover has done through their statement promotes critical thinking, it indicates to students that there are important problems that are being discussed in this important area of biology and it will serve their education well.  v. 37 (Minnich); 144:12-23.

854.   Makings *Pandas* available for students to review is good for science education.  v. 18 (Behe); 54:18-25-55:1-8; 56:5-16; 88:19-25; v. 21 (Behe); 10:7-25-11:1-3; v. 37 (Minnich); 35:23-25-36:1-12; 47:18-24; v. 37 (Minnich); 144:24-25-145:1-6.

855.   Dr. Miller teaches an introductory biology course at Brown University in which one of his educational goals is to establish links between biology and

other disciplines and to briefly explore some of the ways in which science is related to popular culture.  v. 3 (Miller); 49:19-21; 50:18-25-51:1.

856.   Dr. Miller provides the students of his introductory biology course access to supplemental materials on evolution, including access to articles he wrote regarding intelligent design and a PBS film called, "Why is Evolution Controversial."  v. 3 (Miller); 51:2-25-52:1-4.

857.   Dr. Miller provides access to these supplemental materials because they allow students to explore supplemental information related to the lecture topic of evolution.  v. 3 (Miller); 52:5-15.

858.   Dr. Miller provides students access to supplemental materials on evolution, including access to articles critical of intelligent design, because he believes that these materials promote the goal of giving students an opportunity to explore implications of the material he covers in his lectures, and furthers the educational goal of not necessarily defining a set of material to be mastered, but to open the door for the students and say if you want to walk through that door, take a look, there it is.  v. 3 (Miller); 52:16-25-54:1-13.

859.   Dr. Miller believes that DASD's selection of his 2004 version of *Biology* as the textbook for its ninth-grade biology class was a good choice.  v. 3 (Miller); 55:1-9; 56:7-13.

860.   The 2004 version of *Biology* provides comprehensive coverage of the theory of evolution.  v. 3 (Miller); 56:14-16.

861.   The 2004 version of *Biology* comports with the Pennsylvania state academic standards.  v. 3 (Miller); 56:25-57:1-3.

862.   Dr. Miller believes that his 2004 version of *Biology* comports with good science pedagogy.  v. 3 (Miller); 57:4-7.

863.   Dr. Miller believes that his 2004 version of *Biology* presents science in a way that is proper for a ninth grade biology student.  v. 3 (Miller); 57:8-10.

864.   The 2004 version of *Biology* was the first edition of Dr. Miller's *Biology* text that described the strengths and weaknesses of evolutionary theory under a specific heading so they could not be missed.  v. 3 (Miller); 57:11-14; 58:4-10.

865.   The 2004 version of *Biology* states, under the heading "Strengths and Weaknesses of Evolutionary Theory," the following accurate statement: "Like any scientific theory, evolutionary theory continues to change as new data are gathered and new ways of thinking arise.  As we shall see shortly, researchers still debate such important questions as precisely how new species arise and why species become extinct.  There is also uncertainty about how life began."  v. 3 (Miller) 58:11-25-59:1-6; D 214 at 386.

866. Dr. Miller included the section under the heading "Strengths and Weaknesses of Evolutionary Theory" in the 2004 version of *Biology* because the state requirements for Texas specifically required students to analyze and critique the strengths of scientific theories and hypotheses and the theory of evolution was the only theory that the Texas board of education was interested in seeing strengths and weaknesses for. v. 3 (Miller); 60:24-25-62:1-14.

867. Thus, in Dr. Miller's opinion, the 2004 version of *Biology* comports with good science pedagogy even though it singles out the theory of evolution as having strengths and weaknesses. v. 3 (Miller); 57:8-10; 60:24-25-62:1-14.

868. Students should be able to recognize and differentiate between speculation and actual data that supports a theory, including Darwin's theory of evolution. v. 20 (Behe); 48:9-25-49:1.

**DASD's Statement Promotes Good Science Education.**

869. The Pennsylvania Academic Standards require students to learn about Darwin's Theory of Evolution and eventually to take a standardized test of which evolution is a part.

870. Paragraph 1 tells students that they are going to be tested on evolution, so if they want to do well, they should study hard. v. 21 (Behe); 12:11-18.

871.  Because Darwin's Theory is a theory, it continues to be tested as new evidence is discovered.  The Theory is not a fact.  Gaps in the Theory exist for which there is no evidence.  A theory is defined as a well-tested explanation that unifies a broad range of observations.

872.  Paragraph 2 is accurate and students should understand what is stated in it. v. 21 (Behe); 12:19-25-13:1-2; v. 37 (Minnich); 139:5-20.

873.  No scientific theory is a fact and DASD's statement is very clear because it refers to "Darwin's theory of evolution," which is not a fact.  v. 3 (Miller); 79:1-12; 80:7-25-81:1-12.

874.  DASD's statement provides a good definition of the term "theory," which properly defines the theory of evolution.  v. 3 (Miller); 79:14-25-80:1-6; v. 17 (Padian); 99:22-24-100:1-4.

875.  Students learn through the DASD statement that Darwin's theory is a well-tested explanation that unifies a broad range of observations. v. 15 (Alters): 59:6-10.

876.  Intelligent Design is an explanation of the origin of life that differs from Darwin's view.  The reference book, *Of Pandas and People*, is available in the library along with other resources for students who might be interested in gaining an understanding of what Intelligent Design actually involves.

189

877.  This paragraph of DASD's statement is a fair statement that effectively communicates the reality of the situation to the students, which is we have this book and it is available for you, and it describes intelligent design.  v. 3 (Miller); 81:15-25-82:1-16; v. 21 (Behe); 13:3-9.

878.  Intelligent design is an explanation of the origin of life that differs from Darwin's view.  v. 37 (Minnich); 139:21-24.

879.  With respect to any theory, students are encouraged to keep an open mind. The school leaves the discussion of the Origins of Life to individual students and their families.  As a Standards-driven district, class instruction focuses upon preparing students to achieve proficiency on Standards-based assessment.

880.  Paragraph 4 is reasonable and it is good advice to tell students to keep an open mind with respect to any theory.  v. 21 (Behe); 13:10-21.

881.  Religious claims about this statement are utterly unconnected to the text and tell more about the preconceptions and misperceptions of those who are making such claims.  v. 21 (Behe) 13:22-25-15:1-14.

882.  Providing the information contained in DASD's statement to the students promotes good science education.  v. 37 (Minnich); 139:25-140:1-5.

**Of Pandas and People Is a Good Resource for Students.**

883.   Pandas is a book about biology. v. 1 (Miller); 111:25-112:1; D 220.

884.   In the section on the fossil record, *Pandas* quotes one of the most prominent

Darwinian evolutionists, Stephen Jay Gould, as follows: "The extreme rarity

of transitional forms in the fossil record persists as the trade secret of

paleontology.  The evolutionary trees that adorn our textbooks have data

only at the tips and nodes of their branches; the rest is inference, however

reasonable, not the evidence of fossils."  D 220 at 96.

885.   Dr. Behe drafted the section on blood clotting for the 1993 version of

*Panda*s; he did not contribute to any prior draft of *Pandas*.  v. 18 (Behe);

28:14-23; 53:12-17.

886.   The discussion found in the blood clotting section in *Pandas* drafted by Dr.

Behe is similar to his discussion of blood clotting found in *Darwin's Black

Box*, and this section in *Pandas* is still valid based on current scientific

evidence.  v. 18 (Behe); 53:18-25-54:1-14.; D 300-DD, EE.

887.   *Pandas* addresses real live scientific problems with protein sequencing and

the molecular clock hypothesis and a student reading this section would get

a good appreciation for this subject and the issues presented, which are

currently discussed in the science literature.  v. 20 (Behe); 49:15-25-68:1-13; D 220 at 38-39; D 300 VV, WW, XX, YY, ZZ, AAA, BBB.

888.  *Pandas* seeks to describe the fossil data without a theoretical framework.  It does not rule out common descent, it discusses the standard interpretations of the fossil data, and it expressly states, "Scientists should not accept the face value interpretation of the fossil record without also exploring the other possibilities, and even then, only if the evidence continues to support it."  v. 20 (Behe); 81: 12-25-84:1-8; D 220 at 98; D 300-CCC.

889.  *Pandas* teaches the following about intelligent design: "The ordering of independent pieces into a coherent whole to accomplish a purpose which is beyond any single component of the system is characteristic of intelligence."  (D 220 at 144); v. 37 (Minnich); 50:23-25-52:1.

890.  Pandas advances a positive argument for design.  D 220 at 144; v. 21 (Behe); 5:10-25; v. 37 (Minnich); 50:23-25-52:1-10; D 301-A.

891.  *Pandas* advances an example of scientific, inductive reasoning for design.  D 220 at 7; v. 20 (Behe); 68:14-25-72:1-4.

892.  *Pandas* makes clear that intelligent design is not a religious or philosophical belief and that it does not require the action of a supernatural creator acting outside of the laws of nature.  D 220 at 7, 126-27.

893.   Pandas states, "If science is based upon experience, then science tells us the message encoded in DNA must have originated from an intelligent cause. What kind of intelligent agent was it?  On its own, science cannot answer this question; it must leave it to religion and philosophy.  But that should not prevent science from acknowledging evidences for an intelligent cause origin wherever they may exist."  D 220 at 7.

894.   Pandas states, "Today we recognize that appeals to intelligent design may be considered in science, as illustrated by current NASA search for extraterrestrial intelligence (SETI).  Archaeology has pioneered the development of methods for distinguishing the effects of natural and intelligent causes.  We should recognize, however, that if we go further, and conclude that the intelligence responsible for biological origins is outside the universe (supernatural) or within it, we do so without the help of science."  D 220 at 126-27.

895.   *Pandas* makes clear that intelligent design does not refute the proposition that life has changed over time.  D 220 at 154-55.

896.   *Pandas* makes clear that it is a misrepresentation to claim that it is "anti-evolution."  D 220 at 154-55.

897.  Pandas states, "Yale biologist Keith Stewart Thompson points out that

scientists have used the term [evolution] in at least three different ways.

The first meaning he identifies is 'change over time.'  In this sense, to say

that evolution has taken place is to say that change has occurred and that

things are different now from what they were in the past.  The fossil

evidence, for example, reveals different organisms from one geological

period to the next.  When the word is used in this sense, it is hard to

disagree that 'evolution' is a fact.  The authors of this volume certainly have

no dispute with that notion.  *Pandas* clearly teaches that life has a history

and that the kinds of organisms present on earth have changed over time."

D 220 at 154-55; D 300-N.

898.  *Pandas* is a good resource for students in a ninth-grade biology course

because it brings a different viewpoint, a different perspective to the same

data that is oftentimes viewed through a Darwinian perspective, and it can

show students that viewing data from different directions can affect how we

judge the problems associated with a particular viewpoint.  It allows

students to separate data from theory and to view problems from different

perspectives.  It is good for science education. v. 18 (Behe); 54:18-25-55:1-

194

8; 56:5-16; 88:19-25; v. 21 (Behe); 10:7-25-11:1-3; v. 37 (Minnich);

144:24-25-145:1-6.

## CONCLUSIONS OF LAW

899.   The legal issue in this case is whether the curriculum change adopted by

DASD on October 18, 2004 violates the Establishment Clause of the First

Amendment to the Constitution of the United States.[2]

900.   As applied to cases concerning allegations that a curriculum change violates

the Establishment Clause, the controlling law requires this Court to

determine whether the policy at issue has the <u>primary purpose</u> and <u>primary</u>

<u>effect</u> of advancing religion. *see Edwards v. Aguillard*, 482 U.S. 578, 582-

83 (1987)(applying the *Lemon* test); *see also Agostini v. Felton*, 521 U.S.

203, 237 (1997) ("[I]f a precedent of this Court has direct application in a

case . . . the Court of Appeals should follow the case which directly

controls, leaving to this Court the prerogative of overruling its own

decisions.").[3]

---

[2]The parties are agreed that Plaintiffs advance only a claim under the First Amendment and do not base their claim on an alleged entanglement of church and state.

[3]Defendants acknowledge this Court's ruling in connection with the Defendants' motion for summary judgment that the Lemon test is in the disjunctive and acknowledge the basis for that decision, but phrase the test in the conjunctive here for the purpose of preserving this argument on appeal.

901.   The Plaintiffs argue that DASD's curriculum violates the Establishment

Clause because it has the <u>primary</u> <u>purpose</u> and <u>primary</u> <u>effect</u> of advancing a

religious doctrine, *see Edwards v. Aguillard*, 482 U.S. 578 (1987), not

because it prohibits the teaching of ET. *See Epperson v. Arkansas*, 393 U.S.

97 (1968).

902.   As this Court considers the evidence presented, it must be mindful that "The

First Amendment does not prohibit practices which <u>by any realistic measure</u>

create none of the dangers which it is designed to prevent and which <u>do not</u>

<u>so directly or substantially</u> involve the state in religious exercises or in the

favoring of religion as to have <u>meaningful and practical impact</u>." *School*

*Dist. of Abington Township v. Schempp*, 374 U.S. 203, 308 (1963)

(concurring opinion) (emphasis added).  Put simply, this Court must

"distinguish between real threat and mere shadow." *Id.*

903.   For the reasons stated below, this Court will enter an order dismissing the

Plaintiffs' claim with prejudice.

**Certain Plaintiffs Lack Standing and Therefore Their Claims Will Be Dismissed.**

904.   As an initial matter, the Court finds that certain Plaintiffs lack standing to

advance a claim.  The focus of the Plaintiffs' claim is on the ninth grade

biology curriculum.  Consequently, any student who has already passed

ninth grade, or is too far removed from the ninth grade to suffer immediate

harm, has not suffered an actual injury and as such cannot have standing to

sue. *See Valley Forge Christian College v. Americans United for Separation*

*of Church and State,* 454 U.S. 464, 472 (1982) ("Article III requires that the

party who invokes the courts authority to 'show that he personally has

suffered some actual or threatened injury as a result of the putatively illegal

conduct of the defendant'") (internal citation omitted), and *City of Los*

*Angeles v. Lyons,* 461 U.S. 95, 101 (1983) ("The plaintiff mus show that he

'has sustained or is immediately in danger of sustaining some direct injury'

as the result of the challenged official conduct.'").

905.   Plaintiffs Aralene 'Barrie' Callahan, Frederick Callahan, and Julie Smith, do

not have standing because their children have already passed the ninth

grade, and will, therefore, not suffer any constitutional harm, as they will

never be exposed to the challenged conduct. *See Donovan v. Punxatawney*

197

*Area Sch. Bd.,* 336 F.3d 211, 216 (If circumstances develop in a lawsuit that "eliminate a plaintiff's personal stake in the outcome of a suit or prevent a court from being able to grant the requested relief, the case must be dismissed as moot...When a student challenges the constitutionality of a school policy, graduation typically moots her claim for injunctive or declaratory relief." v.3 (Aralene "Barrie" Callahan); 124: 13-25-125:1; v. 8 (Frederick Callahan); 116: 16-25-117: 1-10; v.6 (Julie Smith): 41:11-25-42:1-17

906.   Plaintiffs Beth Eveland and Cynthia Sneath do not have standing because their claims are not ripe. Their children are currently of pre-school age and in the first grade, and are eight years away from the curriculum presented in ninth-grade biology. Their claims are therefore remote and speculative and not ripe for adjudication. *See Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) ("Allegations of possible future injury do not satisfy the requirements of Art. III. A threatened injury must be 'certainly impending' to constitute injury in fact." (Internal citations omitted), *Texas v. United States*, 523 U.S. 296, 300 (1995) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or

indeed may not occur at all." v. 6 (Beth Eveland): 106:23-25-107:1-5; v. 15

(Cynthia Sneath)107:24-25-108:1-3.

### The Plaintiffs Have Failed to Prove That the <u>Primary</u> <u>Purpose</u> of DASD's Curriculum Change Was to Advance Religion.

907. The Plaintiffs argue that DASD's curriculum violates the Establishment

Clause because it has the <u>primary</u> <u>purpose</u> and <u>primary</u> <u>effect</u> of advancing a

religious doctrine, *see Edwards v. Aguillard*, 482 U.S. 578 (1987), not

because it prohibits the teaching of ET. *See Epperson v. Arkansas*, 393 U.S.

97 (1968). The Court finds that the Plaintiffs have failed to prove that the

<u>primary</u> purpose of the curriculum change adopted by DASD on October 18,

2004, was to advance religion.

908. The actions and votes of the board members responsible for the approval of

biology texts and the curriculum change belie the Plaintiffs' claim.[4]

909. The evidence does not support any claim that Sheila Harkins had a religious

purpose.

    a.    Harkins came the board with no religious agenda. FF 1-12, 27–27,

        164, 215, 283, 287,

---

[4]Defendants maintain that evidence regarding the individual motives or statements of board members have no proper place in these proceedings but acknowledge this Court's ruling on their motion *in limine* to exclude this evidence.

b.     Harkins has no objection to evolutionary theory ("ET") based upon her religious beliefs.  FF 443, 575.

c.     She was <u>for</u> "making students aware" of other theories, including <u>but not limited to</u> Intelligent Design Theory ("IDT"), because she believed this would encourage critical thinking.  FF 359, 368-79, 575.

d.     She was <u>against</u> "teaching" IDT because she deferred to the science teachers, who were against it.  FF 426, 445.

e.     She thought the purchase of the biology text could be put off for another year based upon the copy right and condition of the book, information that teachers were not actually using the text in connection with classroom instruction in ET.  FF 307.

f.     She did not share any purpose with Buckingham when she voted to delay purchase of the text recommended by the faculty.  FF 306, 307.

910.   Jane Cleaver's views are similar and the evidence does not show that she acted with a religious purpose.

a.     She did not come to the board with a religious agenda.  FF 28, 25, 27, 232.

b.     She was <u>for</u> the curriculum change because she believes ET is a scientific theory (not a fact), and it was a good idea to make students

200