## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

TAMMY KITZMILLER, et al.,    )
                                      )

       Plaintiffs,          )    Case No. 04-CV-2688
                                      )    (Hon. Judge Jones)

       v.                   )
                                      )

DOVER AREA SCHOOL DISTRICT and    )    **DEFENDANTS PROPOSED**
DOVER AREA SCHOOL DISTRICT      )    **FINDINGS OF FACT**
BOARD OF DIRECTORS,          )    **AND CONCLUSIONS OF**
                                      )    **LAW**

       Defendants.         )
_____)

# PART NINE

aware of other scientific theories (including but not limited to IDT). FF 339.

    c.    She did not believe IDT should be taught because the teachers objected. FF 426.

    d.    She believes that Creationism should never be taught. FF 576–578.

911.  Heather Geesey cannot be said to have acted for religious reasons.

    a.    She did not come to the board with a religious agenda. FF 13-14, 558.

    b.    She went to Christian schools as a child and was taught Creationism but she knew IDT was not Creationism, which is based on the Bible, and thought it was good education to make students aware other scientific theories including, but not limited to, IDT. FF 220–223, 428, 558, 579–83.

    c.    And the whole purpose of her letter to the editor was to make it clear that DASD cooperated with families in the district by leaving religious or philosophical issues to the family. FF 224-25.

    d.    She voted to delay the text purchase because she thought the Board could reach consensus on the text issue. FF 301.

e.      But she took it for granted, quite rightly, that DASD would purchase the basal biology text recommended by the science faculty seeing the vote in August was to link <u>approval</u> of that basal text (*Biology* by Miller & Levine), with <u>approval</u> of a supplemental text (*Of Pandas*); it was <u>not</u> a vote to approve *Of Pandas* as the basal text (this was never an issue).  FF 301, 308, 584.

f.      She voted for the curriculum change because she thought it had a valid educational goal but she did not want to force the teachers to teach ID.  FF 424, 422, 445, 459-61, 585.

g.      She sends her children to DASD schools precisely because she wants her children to receive a broader education, including exposure to ET. FF 586.

912.    The weight of the evidence does not support the claim that Alan Bonsell, a board member since December of 2001, sought to effect a religious purpose.

a.      He came to the board without a religious agenda.  FF 1-4, 9, 12, 17, 25, 33.

b.      He believes he may have asked whether Creationism was addressed in biology classes upon coming to the board, and he did meet with the science faculty in the fall of 2003 to learn how they approached ET.

At that meeting he learned that faculty taught ET and mentioned Creationism; he also learned that faculty did not teach Creationism because they believed it would be illegal; for his part, Bonsell was happy that teachers did not teach that Creationism was wrong and did not teach Creationism, which he believes is a matter for the family. FF 43–47, 50, 74–81, 87-89.

c.   Bonsell's criticism of ET was scientific not religious in nature and he never asked for any change to the curriculum or text related to Creationism.  FF 51–55, 87–89.

d.   Bonsell's interest in various subjects cannot become a surrogate for unlawful action.  Bonsell has expressed interest in a number of things but has never initiated a move to require a change in the curriculum or text, including the biology text or curriculum.  FF 82-83, 86, 134–38, 149.

e.   Moreover, Bonsell's interest cannot be discounted out of hand as unlawful.  The notion that the very mention of Creationism was not forbidden by law was reinforced by the information that Baksa received at the seminar of Creationism and the Law sponsored by the

Pennsylvania School Board Association and given by a presenter with a law degree from Harvard.  FF 56–66.

f.   And teachers mentioned Creationism in their classes even though Bonsell never made any move to require this. FF 598–609.

g.   More importantly, Bonsell plainly discussed ID when discussing the curriculum change contemplated–and ultimately enacted–by the board.  FF, 208, 214, 230-31, 236, 320, 427.

h.   Just like Bonsell's inaction, his actions plainly undermine any claim of unlawful purpose.  When Bill Buckingham tried to hold up the purchase of the biology text recommended by the science teachers in August, 2004, Bonsell voted <u>against</u> Buckingham's motion because he believed students should have the text recommended by the science faculty regardless of whether *Of Pandas* was approved.  FF 297, 299, 303-05.

i.   Bonsell's actions reveal that he sought to promote what he believed was a legitimate educational goal in a way that also took into account the views of the faculty and administration.  FF 360-67, 395–97, 403–415, 426-27.

204

j.      On the night the Board approved the curriculum change at issue here, Bonsell moved to add the "note" which ensured that IDT was <u>not</u> taught in biology classes at DASD in an effort to address concerns expressed by teachers.  <u>Bonsell's</u> <u>motion</u> was seconded by Jeff Brown, who opposed the curriculum change and also did not want IDT taught in the classroom; and it was <u>approved</u> <u>unanimously</u> by the Board, including those members opposed to the curriculum change, because it was understood to have that effect.  FF 444-52.

k.      Bonsell did not believe that ID was Creationism or religion, and he believed the curriculum change was lawful.  FF 561, 567-72.

l.      Bonsell's daughter will receive instruction in ET at Dover Schools. FF 573.

913.  The evidence is also insufficient to find even that Bill Buckingham acted to effect a religious purpose.

a.      He was appointed to the board by reason of his stated interest in fiscal responsibility not any religious agenda.  FF 25-29.

b.      Based upon his personal reading, he believed the biology text made claims for ET far in advance of what had been demonstrated by science and that the biology text recommended by the faculty was poor in this regard.  FF 184–97, 239–40.

205

c.      He wanted students to be aware of IDT, a scientific theory he believed to be supported by numerous scientists.  239-40.

d.      Indeed changes to the Miller and Levine text seemed to validate his complaints.  FF 274–76.

e.      And he wanted approval of the <u>basal</u> text recommended by teachers (*Biology*) to be linked to approval of the <u>supplemental</u> text (*Of Pandas*) but he never intended to permanently delay purchase of the texts recommended by the faculty; and he never intended to prevent the teaching of ET.  FF 309, 595.

f.      And Buckingham wanted the supplemental text used in the classroom, and he wanted the two theories taught side-by-side, to spur debate and critical thinking.  FF 281–83, 292,

g.      But he relinquished those goals in light of teacher objections, settling for the goal that the Board reached by consensus voting for the final policy which is so far removed from his goals.  FF 421.

h.      He voted for the curriculum change because he believed making students aware of ID was a legitimate educational goal, and he never believed that ID was Creationism or religion.  FF 234, 587–94, 596.

914.   Finally, the whole notion that the text selection process or curriculum change were rigged to secure a religious goal is wholly undermined by the role of Angie Yingling, a former board member.

   a.   In August, 2004, Yingling agreed to support Buckingham's effort to link approval of the basal text recommended by the science faculty (*Biology*) with approval of the supplemental text (*Of Pandas*) but later reversed her vote a few minutes later, voting (with Bonsell) to approve purchase of the basal text and defer consideration of the supplemental text, because of the reaction from the gallery and a heated exchange by board members.  FF 310–313.

   b.   Nevertheless, she voted for the curriculum change approved by the Board on October 18, 2004, not because she wanted a religious theory taught in biology class, but because she felt she should support Buckingham given her reversal in August.   FF 562; Joint Stipulation 4.

   c.   There is no evidence that Yingling had any religious purpose at any stage in these proceedings.

207

915. In addition, both Nilsen and Baksa believed that the board had a legitimate educational goal, not a religious purpose, when the board approved the curriculum change.

   a.   At each step in the process Nilsen believed that the board had a lawful goal and he took no steps to further an unlawful goal.  FF 57-58, 114, 117, 120, 149, 171–72, 228, 293, 320, 324–25, 429, 432-34, 452, 555–58, 560, 602, 610, 621, 624–28.

   b.   At each step in the process Baksa believed that the board had a lawful goal and he took no steps to further an unlawful goal.  FF 87–92, 119–20, 130–32, 199, 253–55, 262, 267, 394, 432, 472–75, 550, 552, 563–64, 600, 602, 610–11.

916. Finally, teachers contributed to the board's belief that the board contemplated a legitimate educational goal by agreeing to a number of the steps board members saw as desirable educational goals.  FF 259-61, 321–24, 403–08.

917. The teachers did differ with the board concerning whether ID was Creationism and therefore whether ID could be taught consistent with the law, and, in this regard, teachers expressed concerns with potential liability. FF 320, 325.

918.   But the board differed with them on the legality of their course of action and took measures designed to protect the teachers from any threat of liability. FF 373, 471, 496, 502, 527.

919.   The board continued to act in good faith even when teachers obstructed implementation of the board's policy out of recognition for the good faith basis for the faculty's expressed concerns.  FF 479-80, 522–38.

920.   The actual deliberative process employed by the Defendants belies the Plaintiffs' claim that a religiously motivated cabal ram-rodded the curriculum change heedless of the science faculty or community.

   a.   While the Plaintiffs have alleged that neither the science faculty nor Community Advisory Committee were consulted with respect to the curriculum change, the evidence shows that this allegation is simply untrue.  FF 171, 385–87.

   b.   Moreover, the evidence shows that any disregard for the objections of individual members of the public was driven by personal and political animosity or the notion that individuals or entities (e.g. Discovery Institute) were proceeding on the basis of in accurate information.  FF 1-32, 151–55, 169, 218, 245–50, 481–92, 509, 534–536.

921.  Indeed the science faculty exerted a much more determinative impact on the curriculum policy than any board member.

  a.    Teachers were consulted with respect to Buckingham's effort to secure the teaching of IDT.  Members of DASD's Board Curriculum Committee and the science faculty met throughout the Summer of 2004; science teachers reviewed materials regarding IDT provided by Discovery Institute and agreed that ET, like any theory, had gaps and problems.  Teachers agreed to make students aware of gaps and problems (the basal text mentions some gaps and problems precisely because this is good science education), and that consensus became part of the curriculum changes.  FF 251–64, 281–99.

  b.    Ultimately the text requested by the teachers was approved and purchased.  FF 562; Joint Stipulation 15.

  c.    Buckingham's also failed in his effort to ensure that the supplemental text *Of Pandas* was given to students in the classroom and that ET and IDT were taught side–by–side.  The teachers opposed these goals, and he lost on these issues.  FF 314–30, 374–408.

  d.    The final result is that board deferred to the teachers and settled for the more modest goal of making students aware of IDT and informing

them that *Of Pandas* was in the library for their reference (if interested). FF 510–16.

e. The statement was drafted to address faculty concerns about implementation and the faculty was consulted in connection with this process. FF 465–477.

f. In sum, teachers were also consulted extensively in connection with the curriculum changes and the final result reflects, in large measure, their input. These efforts to consult and reach a consensus belie any claim that a faction of the board was bent on achieving a religious end heedless of the concerns expressed by others.

922. It is true that the Board did not agree with all the assertions and recommendations of the science faculty–or the administration for that matter. Of course, it is the Board's right and duty to exercise its judgment when adopting measures designed to serve the citizens of DASD. After all, consultation designed to help Board members exercise their authority does not require capitulation to science faculty at the High School or members of the Curriculum Advisory Committee (which was also consulted with respect to the curriculum change). Quite the contrary, the Board's decision is entitled to the great deference precisely because the Board is elected by

211

citizens who entrust board members to serve the community to the best of their ability.

923.   Finally, the Court concludes that the curriculum change adopted by the board on October 18, 2004, demonstrates that the board had a legitimate, secular, educational, purpose.  The curriculum change, now implemented, has resulted in a four paragraph statement drafted prior to this litigation, which references IDT twice, informs students that IDT is an explanation for the origins of life that differs from ET, makes students aware of a supplemental text, *Of Pandas*, and the existence of other texts addressing ET and IDT, and prohibits the teaching of IDT, Creationism, or religion. These results do not reflect a religious purpose; they do demonstrate that the board had a legitimate secular educational purpose–to advance science education.  FF 610–629.

924.   The Court also finds that the Defendants believed that IDT was a scientific theory, not Creationism, when they enacted a curriculum change designed to enhance science education based upon the knowledge board members acquired through their personal efforts or board deliberations.  FF 555–97.

925.   The Court also believes that a review of the text shows the *bona fide* basis for the judgment that IDT was a scientific theory, and DASD expressly

212

prohibited the teaching of Creationism or religion in order to ensure absolute compliance with the law.   FF 883–98.

926.  Thus, even if the Plaintiffs had proven that IDT was religion (which they have not), this would <u>not</u> support their claim that Defendants' primary purpose was to advance religion because the Board's actual purpose, based upon the actual conclusion it derived from its deliberations, was to enhance science education by making students aware of what they regarded as a scientific theory.

927.  This Court also rejects the Plaintiffs effort to establish that the Defendants' primary purpose was to advance religion based on evidence concerning statements allegedly going to the motives of individual board members. The purpose of actions taken by <u>public</u> <u>bodies</u> must be determined with reference to the collective resolutions and actions of the body, determined first and foremost by the actual language of the legislation or policy at issue—the only true reflection of the actions of a <u>public</u> <u>body</u>. *See Edwards*, 482 U.S. at 594 "The plain meaning of the statute's words, enlightened by their context and the contemporaneous legislative history, can control the determination of legislative purpose."). *Mueller v. Allen*, 463 U.S. 388, 394-95 (1983) (ascribing the Court's disinclination to

invalidate government practices under Lemon's purpose prong to its

"reluctance to attribute unconstitutional motives to the States, particularly

when a plausible secular purpose for the State's program may be discerned

from the face of the statute"); *Board of Education v. Mergens*, 496 U.S. 226,

249 (1990) (upholding statute against Establishment Clause challenge and

stating that "[b]ecause the Act on its face grants equal access to both secular

and religious speech, we think it clear that the Act's purpose was not to

endorse or disapprove of religion") (quotations and citation omitted).  And

this Court's inquiry into the Defendants' purpose should be limited and

deferential. *Edwards*, 482 U.S. at 586.

928.   The purpose of the public body <u>cannot</u> be proven with evidence about the

motives or goals of <u>individuals</u> with no legal authority, as <u>individuals</u>, to

bind or speak for the <u>public body</u>.  *See Board of Education v. Mergens*, 496

U.S. 226, 249 (1990) (upholding the Equal Access Act against an

Establishment Clause challenge and stating that "even if some legislators

were motivated by a conviction that religious speech in particular was

valuable and worthy of protection, that alone would not invalidate the Act,

because what is relevant is the legislative purpose of the statute, not the

possibly religious motives of the legislators who enacted the law"); *see also*

214

*U.S. v. O'Brien*, 391 U.S. 367, 383-84 (1968)(refusing to invalidate

legislation based upon comments of individual legislator); *Modrovich v.*

*Allegheny County, PA*, 385 F.3d 397 (3rd Cir. 2004)(refusing to invalidate

Ten Commandments display on grounds some legislators allegedly had

religious purpose supporting display).[5]

929.   By reason of the findings made above, this Court concludes that the

<u>collective</u> purpose of the board, i.e. the purpose that is legally material, was

the wholly legitimate and secular purpose of enhancing science education.

    a.   Indeed, the Court finds that at critical points in this process, members

       of the board and administration acted in ways which showed that they

       were not governed by Buckingham.  FF 548-54.

    b.   Under these circumstances, there is simply no adequate basis for this

       Court to conclude that utterances by one board member, even if they

       accurately reflect that individual board members purpose, can be used

       to vitiate a policy that–as a matter of factual and legal necessity–had

       to be approved by the board.  It is the collective purpose of the board,

       as reflected in the actual results of their deliberations, which must

---

[5]Defendants maintain that evidence of the religious beliefs, motives or purpose of individual board members is not material or admissible but acknowledge at this stage of the proceedings the Court's ruling on their motion *in limine* to exclude such evidence.

control this inquiry and, as this Court has found, that collective

purpose was a legitimate, secular, educational, purpose.

930.   This also Court rejects the Plaintiffs effort to establish that the Defendants'

primary purpose was to advance religion based on evidence concerning the

motives, words, or deeds of third parties who were strangers to the board.

As a matter of law, the purpose of a public body <u>cannot</u> be proven with

evidence of the motives or purpose of third parties, whether scientists,

academics, editors, authors, or publishers, because–again–the purpose of

<u>public bodies</u> must be determined with reference to the collective purpose of

the <u>public body</u>.  And, of course, Plaintiffs cannot prove that the Defendants

had an improper purpose based on rank speculation by political opponents

of the Board (even if Plaintiffs in this case), newspaper reporters, or other

third parties.

931.   Moreover, even if such evidence could be used to prove the Defendants'

purpose, the Plaintiffs have failed to prove that the Defendants had a

religious purpose based on statements said to demonstrate an illicit motive

or goal on the part of these third parties who were strangers to board

members.  Although the Plaintiffs focus a great deal of attention on

Discovery Institute's "Wedge Strategy," there is no evidence that the

216

Defendants have never seen the so-called "Wedge Document" or discussed the "Wedge Strategy" with anyone at any time.  Although the Plaintiffs focus on statements of Phillip Johnson, there is no evidence that the Defendants do not know the man.  Although the Plaintiffs focus on the Foundation for Thought and Ethics ("FTE") and statements made by Jon Buell, there is no evidence that the Defendants ever spoke with Buell or knew nothing about the origins, purpose, or mission of FTE. Although the Plaintiffs are focused on prior drafts of the text *Of Pandas*, and the motives or statements of its authors or editors, there is no evidence that the Defendants had any knowledge of, or interest in, these statements, or for that matter the motives, purpose, or metaphysical commitments of these strangers.[6]  FF 597.

### The Plaintiffs Have Failed to Prove That the Primary Effect of DASD's Curriculum Change Is to Advance Religion.

932.   The Court finds that the Plaintiffs have failed to prove that the primary effect of the Defendants' policy is to advance religion.   FF 611–29.

---

[6]Defendants maintain that evidence relating to the motives, statements, and activities of such third-parties has no proper place in these proceedings but acknowledge at this stage this Court's ruling on their motion *in limine* to exclude this evidence.

933.   The notion that a faction of the board was on a religious crusade to alter the biology curriculum is also belied by the actual result of the deliberative process. The primary effect of the curriculum change on science education in the district is an informational statement which reads:

> The Pennsylvania Academic Standards require students to learn about Darwin's Theory of Evolution and eventually take a standardized test of which evolution is a part.
>
> Because Darwin's Theory is a theory, it continues to be tested as new evidence is discovered.  The Theory is not a fact.  Gaps in the Theory exist for which there is no evidence.  A theory is defined as a well-tested explanation that unifies a broad range of observations. Intelligent Design is an explanation of the origin of life that differs from Darwin's view.  The reference book, Of Pandas and People is available in the library along with other resources for students who might be interested in gaining an understanding of what Intelligent Design actually involves.

218

With respect to any theory, students are encouraged to keep an open mind.  The school leaves the discussion of Origins of Life to individual families.  As a Standards-driven district, class instruction focuses upon preparing students to achieve proficiency on Standards-based assessment.  FF 545-47.

934.    The informational statement implementing the curriculum change simply informs students that IDT is an explanation for the origins of life which differs from ET, that *Of Pandas* is a book about IDT available in the library, and that there are other books about ET and IDT in the library.  The statement does not describe the substance of claims advanced by IDT theorists.  Also, DASD prohibits the teaching of IDT, Creationism, or religion.  The Court concludes that these are the primary effects of the curriculum policy adopted by the Board on October 18, 2004, as implemented, and that these primary effects are <u>not</u> religious effects.

935.    The Court finds that the challenged curriculum policy and implementing statement plainly advance legitimate educational goals.  FF 830–882.

936.   In this regard, the Court notes that although the Plaintiffs object to the Defendants' observation that ET has gaps and problems, the evidence shows that ET does have gaps and problems.  FF 784–827.

937.   The Plaintiffs' effort to prove that Defendants advance "religion" by informing students about *Of Pandas* and other texts in the library fails as a matter of law.

a.   For one thing, DASD cannot be charged with individual decisions to examine texts in the library for the same reasons that government cannot be charged with establishing religion because individuals exercising private choices use public vouchers to attend religious schools.  *Cf. Zelman v. Simmons-Harris*, 536 U.S. 639, (2002)(voucher program did not violate Establishment Clause even though majority of students enrolled in religiously affiliated schools where public funds flowed as a result of private choices); *see also Rosenberger v. University of Virginia*, 515 U.S. 819, 842-44 (1995)(government does not advance religion by making facilities or funds available to students which engage in religious activity).

b.   Indeed, even if DASD could be charged with individual decisions to conduct free inquiry, it is pure speculation to guess whether the effect

of DASD's reference to books in the library will advance–or

retard–IDT.  DASD points students to *Of Pandas* and other resources

in the library addressing ET and IDT, at least three of which are

authored by Plaintiffs' experts and critical of IDT.  FF 543–47.

c.     This is particularly true because DASD requires use of a basal text

addressing ET and provides classroom instruction in ET, but merely

alerts students to a supplemental text addressing IDT in the library

and allows no teaching of IDT in the classroom as recommended by

the science faculty.  FF 545-47, 621 & Joint Stipulation 15.

d.     The Plaintiffs likewise cannot prove that the primary effect of the

Defendants' policy is to advance religion based upon drafts of the

texts wholly unknown to the Defendants or any student who might

examine the book. Seen in this light the Court finds that Of Pandas is

a science text that does provide educational benefit to students.

938.   Indeed, the curriculum policy as implemented does not really advance ET in

any realistic sense.

a.     The current statement informs students that there are other texts

addressing ET and IDT in the library, including six texts addressing

221

IDT, three of those are authored by Plaintiffs' experts in this case and are <u>critical</u> of the IDT.  FF 543–47.

b.    And if a student goes to the computer terminal of the school library and enters the term "Intelligent Design" that student will be directed to a book by Plaintiffs' expert Robert Pennock entitled *Intelligent Design Creationism And Its Critics*, a book critical of ID.  FF 627.

c.    These facts make clear that DASD's curriculum policy does not advance ID as such–it does advance science education by making students aware of ID and pointing students to resources that are for–<u>but mostly against</u>–ID.

939.    Even if the policy could be said to "advance" IDT in any meaningful sense the evidence shows, and the Court finds, that this does not amount to advancing religion because IDT is–in fact–a scientific theory, not Creationism and the statement provides truthful and accurate information about ET.

a.    Although Plaintiffs allege that IDT is a non-scientific argument that is inherently religious, the evidence shows that IDT is a scientific argument, advanced by scientist relying on evidence and technical

knowledge proper to their specialties.  FF 630–635, 665–744; 771–783.

b.      Although the Plaintiffs claim that IDT is Creationism, the evidence shows that <u>IDT</u> <u>is</u> <u>not</u> <u>Creationism</u>.  FF 636–644; 745–783.

c.      The evidence also shows that IDT's openness to the possibility of causation which some might classify as "supernatural" (at least in light of current knowledge) does not place IDT beyond the bounds of "science." In truth, it is merely a philosophical commitment to so-called methodological naturalism, adopted as a convention by the bulk of the scientific community, which bars reference to the possibility of supernatural causation (at least so far as current knowledge regards phenomena as "super" natural). But the evidence shows that this philosophical (nonscientific) commitment is in no way an essential feature of scientific inquiry.  FF 652–664.

d.      This Court will not attempt to impose–as a matter of federal law–a current convention of the scientific community because the evidence shows that such a Procrustean effort to confine science within bounds set by nothing greater than present-day convention is <u>not</u> <u>science</u>; <u>but</u> it is <u>bad</u> <u>philosophy</u> <u>of</u> <u>science</u>.  FF 645–664.

940. The Plaintiffs' effort to classify IDT as religion rests upon a mischaracterization of the hypotheses actually advanced by IDT, which is not a religious assertion and which, as a matter of science, leaves open various possibilities concerning the source of design thought to be evidenced by nature (which some might classify as natural, others supernatural).

941. From this it follows, and this Court finds, that IDT is not <u>religion</u> as a matter of law. *See Grove v. Mead Sch. Dist.*, 753 F.2d 1528, 1537 (9th Cir. 1985) (noting that while an expansive definition of religion "best serves free exercise values, the same expansiveness in interpreting the establishment clause is simply untenable"); *United States v. Allen*, 760 F.2d 447, 450-51 (2nd Cir. 1985) (recognizing that "all that is 'arguably religious' should be considered religious in a free exercise analysis," while "anything 'arguably non-religious' should not be considered religious in applying the establishment clause") (quoting L. Tribe, *American Constitutional Law* 828 (1978)). Indeed, even if IDT were considered "junk science" (which it is not), such proof would not suffice to show that DASD's curriculum change has the purpose or effect of advancing religion because this would not prove that IDT is religion.