as any realistic sign of a religious agenda.  v. 36; p. 57:18–p. 60:11.

l.  This view of the matter also jibes the facts surrounding the meeting of Baksa, Bonsell, and the science faculty in the Fall of 2003. D FF 134–148.

    i.  Baksa testified that Bonsell's expressed concerns were based upon science, not religion, and focused on the origins of life.

    ii.  Teachers told Bonsell that they did not teach the portion of ET that he saw most problematic given his personal reading in science.

    iii.  When Bonsell met with teachers in the Fall of 2003 he learned that they too saw some relationship between ET and Creationism.  More specifically, teachers told him that they mentioned Creationism to students but did not teach it; and they told students with questions about origins of life to speak with their family about the issue.

    iv.  The only thing Bonsell remembers from this meeting is that he came away from the meeting glad that teachers mentioned Creationism but did not teach it; and he was also pleased that

35

teachers did not tell students Creationism was wrong, which Plaintiffs expert Brian Alters indicates would be improper. v. 14 (Alters); p. 86:14–p. 90:8. See D–FF 148.[5]

    v.    Bonsell's honest recollection is in keeping with a legitimate interest he might have concerning whether and how Creationism was addressed.

    vi.    Further, teachers believed Bonsell's concerns had been addressed.

    vii.    Bonsell's actions speak volumes here for his conduct shows that whatever interest he did have was satisfied by this meeting because he never asked for any change to the biology text or curriculum.

m.    Based upon this recognition of a natural relationship and legitimate interest recognized by the faculty, administration, the Pennsylvania School Board, Plaintiffs experts, and others, and the result of the meeting, (i.e., Bonsell offered no criticism fo the teachers and never called for any change to the biology text or curriculum), it appears to

---

[5]The Court also notes that it is obviously this wholly proper interest–the only thing in evidence which Bonsell can remember about the issue–that provides the basis for counsel's recognition that Bonsell had some interest in Creationism and whether and how it was mentioned.

this Court–and the Court finds–that various witnesses were <u>assuming</u> that Bonsell was talking about <u>teaching</u> Creationism when he mentioned teaching other theories.

i.     As Baksa testified, Spahr appeared to assume that Bonsell's reference to teaching "other theories" was a reference to teaching Creationism based upon information that she received from Baksa.  v. 35; p. 58:1–24.

ii.    It also appears that Barrie Callahan made a similar assumption in her notes.  Again, she did not remember Bonsell mentioning Creationism until she found notes said to be made at the time of the March 2003 Board/Administration Retreat) to assume that Bonsell was referring to teaching Creationism when he referenced teaching other theories 50/50.

iii.   In contrast, Baksa remembers Bonsell raising the possibility of teaching "other theories" but never raising the teaching of Creationism.

iv.   It also appears that the science faculty jumped to the conclusion that Bonsell was interested in teaching Creationism based upon the information that Baksa provided to them about Bonsell's

views–consistent with the assumption Spahr had made earlier in the year.

v.      Significantly, although teachers came prepared to meet a demand that they teach Creationism, not one teacher has testified that Bonsell made that demand–or even raised the issue of teaching Creationism–during in the Fall 2003 meeting. In contrast, both Bonsell and Baksa have testified that they were surprised when the teachers devoted so much attention to the issue precisely because neither Bonsell or Baksa came to the meeting with the goal of teaching Creationism.

vi.     Moreover, although Plaintiffs seek to characterize this meeting as a "confrontation" the evidence shows that all the individuals involved did not see it as a confrontation.

n.   Confirming this view of the matter is the simple fact that Baksa worked dealt with Bonsell from 2002 onward and testifies that there was never any direction to teach Creationism but there was discussion of teaching other theories.  D FF 149.

o.   In contrast, the weight of the evidence shows that any reference

Bonsell made to <u>teaching</u> other  theories must be seen as a reference

to ID, a theory which he understood to be scientific (not religious).

    i.   Bonsell has made it clear that he did not want Creationism

taught but he did believe ID was a scientific theory which

could be taught.

    ii.   Others have acknowledged that Bonsell discussed ID and

Creationism as two different things.

    iii.   Baksa and Bonsell were surprised when the faculty discussed

the illegality of <u>teaching</u> Creationism during the Fall 2003

meeting because no one was talking about teaching

Creationism.

    iv.   Rehm has acknowledged that ID may have come up at the Fall

2003 meeting.

    v.   Buckingham has testified that he learned about ID from

Bonsell around the time that he was appointed chair of the

BCC.

p.   Moreover, the action of Bonsell and the Board demonstrates that they

were determined not to violate the law.

39

i.   Court notes that, as Baksa has testified he would have seen any call for the teaching of Creationism as a non-starter since this is illegal.  v. 35; p. 61:4–16.

ii.   For his part, Jeff Brown, a witness favorable to the <u>Plaintiffs,</u> testified that Bonsell had an interest in Creationism but would not do anything illegal.

iii.   BCC members directed Baksa to determine if Pandas was being used in public schools or had produced litigation.

iv.   Members of the Board sought advice of counsel, which they shared with teachers to show that the course contemplated by the Board was not illegal.

v.   Even Buckingham's statement to Spahr at the October 18, 2004 shows a disregard for Spahr's <u>legal</u> opinion which, while discourteous, was understandable.

vi.   If the Board were determined to pursue a course of action without regard for the consequences, then there was no need to ask anyone for their opinion or do any due diligence.  But the Board did both, which leads this Court to conclude that they were proceeding in good faith in an area of the law that is

unclear to say the least and with reference to a theory which appears on its face to be scientific in nature.

vii.   Finally, Bonsell's interest in Creationism has no meaningful relationship with the Board's current policy which prohibits the <u>teaching</u> of Creationism.

q.   For all these reasons, it appears from the weight of the evidence that Bonsell's interest in Creationism was <u>not</u> an interest in having it taught.  It further appears that Bonsell's interest in Creationism related to the wholly legitimate concern that teachers might be mentioning Creationism and telling students it was wrong.  This wholly legitimate concern (recognized by many as noted above), when taken with Bonsell's stated concern that teachers might be teaching a scientific theory as fact, which Baksa remembers (and which could also create a needless conflict between science and religion), provide a readily understandable basis for the comment, remembered by Jen Miller, that depending on how the science faculty approached the matter, students might have the impression that somebody is lying.  See P–FF 155.  This makes sense to in light of the

41

fact that Bonsell's concerns were addressed by the Fall 2003 meeting and he did not call for any change to the biology curriculum.

r.    For these same reasons the Court finds that Bonsell's interest in any _teaching_ of other theories was an interest in ID, a theory he mentioned to Buckingham when Buckingham became head of the BCC in 2004 for the reasons stated above.

12.   Contrary to P–FF 160 & 161, the Court finds that the Plaintiffs have not proven that the curriculum policy has actually caused any limitation on classroom instruction except that barring discussion of ID, Creationism, and religion, as part of the Board's effort to address faculty concerns and objections. D FF 610–629.

a.    The board did not direct any changes which teachers made to classroom instruction in the exercise of their discretion.  Baksa understands that teachers were left with discretion concerning whether their teaching practice was consistent with the curriculum policy. v. 36; 5:3–p. 6:24.  Baksa also understands that the curriculum language did not impose any actual limitation on instruction.  v. 36; p. 9:23–p. 10:5.  This shows that there was no board purging of offensive material from the classroom.  Quite the contrary, here the

42

board trusted the teachers to act responsibly–and add mention of ID as required by the policy.

b.     At the end of the day Board members made numerous concessions to address the teachers concerns and the instruction in the classroom was understood to be the same but for the statement.  v. 36; p. 51:16–p. 52:9.

c.     In this regard, the whole notion that the Defendants' goal was to hold ID (which the Plaintiffs believe the board members understood to be a religious doctrine) out as science is undercut by the statements use of the terms "theory" to describe ET and the description of ID as an "explanation" *at the suggestion of Jen Miller*.  D FF 477.  If the board members were bent on false–billing they would have objected to such a distinction.

13.   Contrary to P–FF 162–166, the Court finds that Buckingham's discussions with Discovery and the information that he received confirmed Buckingham's basis for believing that the Miller & Levine text was flawed and that making students aware of ID was a legitimate educational goal.  D FF 587–595.

14.    Contrary to P–FF 166–169, the Court finds that the purchase of a new biology text was treated just like every other text purchase.  D FF 150–157; 177–183;

    a.    The purchase of a number of science texts, not just biology, were put off in 2003 for fiscal reasons.

    b.    Barrie Callahan's complaints were discounted because they were believed to be unfounded and, in addition, she was deemed politically motivated.  D FF 16-21; 151–154.

    c.    The purchase of the biology text was delayed in June 2004 while the BCC, administration and teachers, discussed Buckingham's concerns.

    d.    Significantly, the comparison of the 2002 and 2004 editions of Miller & Levine, led Baksa and the teachers to note changes that addressed in some measure the issues raised by Buckingham accrediting his complaints.  D FF 274–276.

    e.    Finally, the Court finds any inference that the board held up the texts due to objections to ET is untenable.  If the Board had really wanted to put off the purchase science texts it could have done so quite easily by making the Science Department wait for a whole rotation of the

curriculum cycle.  It never made any move in that direction.  D FF 165–167.

15.  Contrary to P–FF 170–177, the Court finds that the Plaintiffs have failed to prove that <u>board</u> members discussed a text presenting Creationism at Board meetings as an objective of the Board in connection with the approval of the biology text. The weight of the testimony points to a series of heated discussions in which persons made statements–or leveled accusations–based on conclusions they reached on the issue of the board's motives and purpose as well as the nature of ID as religious or scientific–and then used language that reflected their own judgments and agendas (frequently political agendas).  This trial has provided another example of that: experts and lay witnesses have labeled ID as Creationism or science based on their judgment and have used terms in keeping with that judgment in their testimony.  D FF 184–244.

a.  Board members have testified that they were discussing ID and taking issue with those who were mischaracterizing the Board's discussion as one concerning the teaching of Creationism.

b.  Buckingham admits that he used the term Creationism on at least one occasion but he testifies that he did so in circumstances where he was flustered.

c.  Nilsen and Baksa have testified that there was no mention of a text presenting Creationism or teaching Creationism.

d.  Indeed Baksa was surprised when Buckingham mentioned Creationism because he had not heard this term before.

e.  The reporters' testimony cannot be credited on these points.

    i.  At the very least, the news reporters covering these meetings made a judgment that ID was Creationism and continued to describe ID as Creationism no matter what the board said throughout this period.

    ii.  Further, the reporters perfect recall of these statements strains credulity.

f.  As for the Plaintiffs it is evident that they have motive and bias needed to adopt wholesale the mischaracterizations in the press clippings.

    i.  Barrie Callahan was a partisan critic of the board (as testified to by Jeff and Casey Brown) and Fred Callahan is her husband.

46

ii.    Jeff and Casey Brown are disgruntled board members who made the same sort of accusations that the reporters did. D FF 15, 29.

    (1)    In this regard, Casey Brown's effort to portray private conversations with board members as indicating that they were using religion as an acid-test of public service is unworthy of credence and indicates that she has a personal animosity towards members of the board. v. 8; p. 3:10–p. 9:6

    (2)    The Court also disregards as incredible her claim that board members told her she was going to hell or the claim, offered for the first time at trial, that Buckingham accused her of being an atheist. v. 8; p. 32:8–p. 34:18.

iii.    Bryan Rehm and his wife are plaintiffs in this action who has an interest in prevailing–just like all the other Plaintiffs.

g.    In sum, the Court concludes that the notion that board members actually considering teaching Creationism just does not have enough factual support to justify a finding that the board was bent on a goal that was plainly illegal.

47

16.    Contrary to P–FF 178–188, the Court finds that the June 2004 meeting of
       the BCC does not represent a "morphing" or change in focus by the BCC.
       Information and materials from Discovery Institute were already in the mix.
       D FF 184–244.  These facts show:

    a.    There is no question that Buckingham was focused on flaws in the
              presentation of ET–but the evidence shows that the information he
              provided was a scientific criticism of ET and information about ID
              which he had received from Discovery Institute.

    b.    The materials from Discovery Institute had already been received.

    c.    The Court notes that Plaintiffs proposed findings here appear
              contradictory.  On the one hand, they maintain that teachers had
              already reviewed at least some of the materials that Buckingham
              received from Discovery, see P–FF 186, on the other they seem to
              imply that neither Buckingham nor Baksa were familiar with these
              materials.

    d.    Buckingham did not even know about the existence of the mural until
              June of 2004 and did not know it was destroyed.  v. 30; p. 60:21–p.
              62:5.

e.     When Baksa talked about a text with a presentation of ET that was more acceptable to board members he was focused on the criticisms they had advanced in terms of science. As he made very clear, he was not looking for a text with Creationism. D FF 269.

f.     The Plaintiffs effort to make much of Baksa's print out P-136 is not supported by the evidence. As Baksa and Miller agree, there was no discussion of this text because it was plainly inappropriate for a public school. D FF 255.

g.     The Plaintiffs effort to make much of P-149 is not supported by the evidence. D FF 215.

    i.     The only person who actually remembers discussion of the document is Sheila Harkins, who provided it. The only discussion of the document in evidence is that Harkins showed it to the Browns to note that, according to this chart, both Darwin's theory of evolution and ID seemed to believe in an intelligent designer. This explains why she did not see any big deal in discussing ID and did not see ID as religious. Again, this is the only evidence of any discussion of the document.

49

      ii.    And Harkins' notion that ET and ID were similar is consistent with much of the evidence which tends to show that various people just regarded ID as another theory of evolution.  See D–1; D–60, 61 & 68 (all evidencing the treatment of ID as one among "other theories of evolution.").

h.    Harkins testimony here is also consistent with the recollection of Jeff Brown who recalls Harkins opinion about Pandas was based on the view that Pandas was an eye-opening book concerning problems with ET.  See P–FF 199.  And Harkins made this statement even though ET poses no problem for her based upon her religious convictions.

i.    This goes to show that the Plaintiffs are making an argument that imputes knowledge to the Board based upon a document only one board member voting for the change discussed–for a purpose wholly different from that argued for by the Plaintiffs.

j.    Finally, the effort to make much of Buckingham's desire that teachers review the Icons of Evolution video is wholly misplaced.  If anything this shows that Buckingham was <u>not</u> interested in dictating to the faculty; he was trying to persuade them about the <u>scientific</u> <u>merits</u> of the scientific criticism of ET that he had come across after pursuing

50

Bonsell's mention of ID.  This is hardly evidence of a plan to ram through an unlawful agenda.

17.   Contrary to P–FF 189–190, the Court finds that Geesey's purpose in writing her letter to the editor was to rebut a false charge that the Board was actually teaching Creationism and to make it clear that in her view it was up to Plaintiff Eveland to teach religion as she saw fit (including the Creationism she accused the Board of trying to teach, see P–FF 189; while also trying to make it clear that the Board was staying true of its policy of leaving such issues to the family as indicated by Dover's mission statement. P–FF 190.  It is true that the letter is rather difficult to follow her line of thought but when the two letters are compared, the point of Geesey's response does emerge.  D FF 241.

18.   Contrary to P–FF 191–194, the Court finds that no one involved in this process viewed Pandas as a Creationist text.

    a.   In this regard, the Court finds yet again that the Plaintiffs' characterization of the text is based on evidence which has no connection with the Defendants for the simple reason that there is no evidence that any Defendant (or anyone any Defendant communicated with) had any knowledge concerning the origins of the

51

text etc.  Likewise there is no reason to believe that anyone who examined Pandas on its face would see it as a Creationist text. Moreover, as Defendants have demonstrated, the text has manifest educational merit regardless of how controversial some of its claims might be to the mainstream scientific community.  D FF 314–330.

b.  For these reasons, the Court finds that the selection of Pandas as a supplemental text provides no persuasive evidence that board members were pursuing a religious agenda.

19.  Contrary to P–FF 195–196.  The Court finds that the review and comparison of the 2002 and 2004 editions of the Miller and Levine text provides no reason to believe that the BCC or the board as a whole had an improper purpose.  Quite the contrary, the changes to the 2004 edition seemed to accredit Buckingham's complaints to Baksa–who had no axe to grind with ET.  D FF 274–76.

20.  Contrary to P–FF 197–201, the Court finds that the vote to delay approval of text recommended by the science faculty points to no block of board members bent on a religious agenda.

a. For one thing, as Plaintiffs concede, Harkins' interest in Pandas was based on her impression of the argument–and has no root in her religious convictions.  See P–FF 199.

b. For another, Buckingham's purported claim to have the votes necessary to tie up approval of the Miller and Levine text was exposed for the bluff it was within minutes of the making.  D FF 300–315.

c. In fact, the voting defies Plaintiffs' effort to portray board members as united behind a religious agenda because Yingling's vote-switch plainly has nothing to do with the merits of ID or a belief that it was religious not scientific.  As she frankly told Rehm, she did not understand what all the fuss was about and she proceeded to vote for the curriculum change despite Rehm's effort to convince her that ID was religious and she voted for the curriculum change even though she voted to approve purchase of the science text recommended by the faculty without approval of Pandas.  D FF 562.

21. Contrary to P–FF 203–206, the Court finds that the e-mail highlighted by Plaintiffs' counsel does not support the claim that the Defendants' believed that ID was Creationism.

a.     As an initial matter, the Court has already ruled that it does not take the assertion highlighted by the Plaintiffs as a fact.  v. 35; p. 105:23–p. 108:13.

b.     As Plaintiffs' counsel conceded at trial, the e-mail obviously does not amount to an opinion that the use of Pandas contemplated at this time, i.e., use in classroom instruction, was unlawful. v. 35; p. 105:23–25–p. 110:4–11.  The Administration saw the issue the same way.  See e.g., v. 35; p. 110:4–p. 111:24.

c.     Moreover, the e-mail actually points to the very sort of confusion writ large throughout this case.  For it is evident that the Board solicitor, plainly relying on newspaper accounts of board meetings (e.g. "My concern for Dover is that..."), is apparently viewing the proposed use of Pandas as the use of a text involving Creationism (hence the solicitor's observation that "They refer to the creationism issue as Intelligent Design") while at the same time recognizing that Thompson conveyed a distinction between Creationism and Intelligent Design when he spoke with the solicitor.  The solicitor makes this "disconnect" plain when he indicates that Thompson referred to [what the solicitor saw as a creationism issue] as an issue

involving "intelligent design." P–70. Again, this is the very sort of "talking passed each other" that has occurred throughout this case.

    d.    Moreover, the solicitor's concern with newspaper accounts which both the Board and Administration regarded as inaccurate (with rare exceptions that were conceded) demonstrates why the board would feel free to take this concern for what it was worth–not much in their estimation. Defendants can be forgiven if they believed that their decisions would be tried based on the facts of the matter not hearsay in the form of press clippings.

22.    Contrary to P–FF 207–209, the Court does not find that the teachers agreement to use Pandas as a reference text provides evidence that the BCC was bent on a religious agenda.

    a.    The teachers may have agreed to use Pandas as a reference but given their stated fears with being sued for teaching Creationism it is evident that neither the BCC nor Administration would have any reason to believe that teachers would agree to use a Creationist text. D FF 322.

55

b.  Plaintiffs effort to portray Baksa as directing staff to go to a Creationist website, P–FF 209 is a mischaracterization of the evidence.

i.  The cited transcript does not support the Plaintiffs' argument that Baksa testified that "he directed his secretary to go to the webpage from the Institute for Creation Research to get information about Pandas." Baksa actually testified that either his secretary or Marsha Hake did the research to get pricing and publishing information about Pandas and printed this page. See v. 35; p. 113:9–p. 114:6.

ii.  Plaintiffs' counsel then asked Baksa a question concerning whether he was aware of information contained on a specific page of D 35 creating the false impression that Baksa had read the document [D 35] as opposed to being generally aware of information that various secretary's had collected at his direction generally speaking. This false impression that Baksa had actually reviewed D 35 was cleared up on redirect as noted by the Plaintiff. P–FF 209. The net result is to make it clear that Baksa meant that he was aware that his secretaries had

collected information but had not read this specific document, i.e. D 35. v. 36; p. 45:6–14. Any insinuation that counsel solicited false testimony is wholly improper; the purpose of redirect is to clear up testimony that leaves a mistaken impression.

23. Contrary to P–FF 210–218, the Court finds that the donation of Pandas does not prove that the Plaintiffs had an unlawful religious purpose. D FF 340–356.

    a.    Viewed in its entirety the donation was plainly designed to short-circuit criticism of the board that was deemed politically motivated.

    b.    The Defendants did not disclose the identity of the donor but there was no duty to disclose this to Lonny Langione, a politically motivated foe of the board members. D FF 17–24; Cf P–FF 211.

    c.    Defendants did disclose the details surrounding this donation in connection with this litigation as required by law.

    d.    The Court will not make too much of two answers by Bonsell and Buckingham who were haled in for depositions on short notice.

        i.    Bonsell has admitted that he answered one question incorrectly but the Court notes that the highlighted deposition testimony

57

featured a series of questions focused on who donated the books and Bonsell appears to have answered another question concerning who was involved in the donation based upon the line of questioning to that point.

ii.    Likewise, Buckingham's testimony taken as a whole is truthful insofar as his point seemed to be that he did not literally know who among his fellow congregation actually put the money in the box in response to his announcement of the opportunity to donate at his church.  Cf. P–FF 212–213.

iii.    The claim that Alan Bonsell used his father as a conduit to conceal the source of the money does not hold up.  His father volunteered to donate without any understanding that others would pitch in.  Others joined him in this effort but it is likewise clear that those additional funds passed on to Don Bonsell did not cover the whole cost of the book.

iv.    As for Spahr's receipt of a catalogue listing Pandas under "Creation Science," she testified that she did not pass that on to the Administration so the Defendants obviously cannot be

58

charged with knowledge based upon a document they did not

see. v. 14; p. 36:20–p. 37:9.

24.   Contrary to P–FF 219–223, the Court finds that the conduct of board

members at the October 7, 2004 meeting of the BCC does not support a

claim that the Defendants acted with an unlawful purpose.  D FF 331–339;

357–373.

   a.   As Defendants have pointed out, they met in an effort to work out a

        version of the curriculum change.

   b.   The absence of the teachers at this stage is unremarkable.  The

        meeting is, after all, a meeting of the <u>Board</u> curriculum committee;

        teachers had been consulted extensively throughout; and the board

        already had a version of the proposed curriculum change before the

        board.

25.   Contrary to P–FF 224–44, the Court finds that the Board's decision to adopt

the curriculum change does not support the Plaintiffs' claim that the Board

adopted its policy for an unlawful purpose or to promote an unlawful effect.

D FF 416–456.

a.  As the Defendants have demonstrated, the events on this evening were part of a larger effort to make a policy change that would provide an educational benefit to the students.

b.  Deviations from any normal practice were justified by the fact that two board members were set to resign, which would have made it necessary to revisit the whole issue yet again after a great deal of discussion had been had over the last year and were not unprecedented.  D FF 374–416.

c.  Plaintiffs make too much of the Board's rather limited knowledge of science and its disregard for criticisms.

   i.  It is true that teachers opposed the change but the Board discounted the teachers objections believing them to be unfounded–and based on legal concerns that were not within the science teachers' area of expertise.  As noted, the science teachers told the administration that they were not trained in ID and never advanced any scientific (as opposed to legal) criticism of the theory.  D FF 557.

   ii.  It is true that the Administration opposed the changes, but both Nilsen and Baksa have testified that they did so for the

practical reason that teacher objections would make any change very difficult to implement–an instinct confirmed by the way in which teachers have actually obstructed the curriculum policy–not because they disagreed in principle with the Board's objective or thought the board's objective was unlawful.

d.    The Court cannot accept the Plaintiffs view of the process that led to the curriculum policy is insufficient because this just reduces to a claim that the Defendants were negligent–which is not the issue in this case.

i.    The absence of further consultation with various science organizations does not undermine the evidence that the Board's purpose was to enhance science education.  Reduced to its essence the Plaintiffs' findings ask this Court to conclude that the Board was negligent in relying upon information board members received as a result of their own research and personal reading as well as Discovery Institute.

ii.    Moreover, the Court finds that the amount of information possessed by board members was in keeping with the modest

61

goal they had settled on by the time the policy was actually adopted, i.e. to make students aware of additional information.

iii.   Relatedly, the Court finds that notion that the board members were not scientists and could not actually vet the scientific validity of ID but took it (as well as the text Pandas) at face value proves too much.  This lack of technical expertise is typical and supports the Defendants' contention that they were proceeding in good faith, disregarding criticism from teachers because it seemed to be non-scientific criticism.

iv.   For the same reason, the Court refuses to draw any adverse inference from the fact that certain board members who were not a part of the BCC relied upon statements and information made by other board members.  This is a policy-making body and the evidence shows that various board members did have some basis for their view that ID was science.  This is the way the policy-making process works–certainly there is no evidence to the contrary.

v.   Put simply, the point of this trial is not whether the board could have or should have done more by way of background research

etc., because the system whereby public education is governed is not on trial here.

e.  The evidence does not support the Plaintiffs assertion that there had been no discussion of ID–only discussion of Creationism–at board meetings held prior to October 18, 2004.  D FF 184–330.

f.  The Court rejects the Plaintiffs effort to characterize many months of proceedings by board members as religious based upon Casey Brown's resignation speech.

    i.  The evidence shows that in this speech Brown wholly twisted two private conversations with friends for a plainly political purpose born of personal animosity against board members who disagreed with her on this issue (other witnesses described Ms. Brown as intolerant of disagreement with her). D FF 15 & 29.

    ii.  Brown's stated view that she board members could not discuss religious beliefs is belied by her own actions–Brown had asked Harkins questions about her religious beliefs. v. 34 (Harkins); p. 27:4–p. 29:3.

iii.   Under these circumstances, Brown's invective must be discounted as such.

g.   As for Wenrich's speech, one comment by a board member who is resigning in anger simply cannot undermine all the evidence that various members of the board spent months trying to build a consensus around a proposed curriculum change in the face of a great deal of partisan political conflict.

26.   Contrary to P–FF 245–252, the Court finds that the statement was drafted and read to achieve a legitimate educational purpose. D FF 465–477.

a.   Given that the statement was designed to address concerns that exaggerated claims were being made for ET, a theory with gaps and problems, as Dover's' science teachers and Plaintiffs' experts have admitted, the language changes highlighted by the Plaintiffs are understandable.  In this regard, the whole notion that the Defendants' goal was to hold ID (which they understood to be a scientific theory) out as a religious concept out as science is undercut by the statements use of the terms "theory" and description of ID as an "explanation" at the suggestion of Jen Miller.  D FF 477.

64