27.  Contrary to P FF–253–255, the Court finds that Dover's Newsletter was nothing more than an effort of the Defendants to address what they perceived to be inaccurate information concerning the actual curriculum policy and its actual effect on classroom instruction as well as mistaken claims that were being made on issues relating to the curriculum change.  D FF 484–92; 534–536.

    a.  For the same reason, the presentation made by Dr. Behe, who takes the position that ID is <u>not</u> religion, provides no basis for a claim that the Defendants are trying to advance religion.

28.  Contrary to P–FF 256–262, the Court finds that the Defendants are not responsible for the effects complained of by the Plaintiffs because these are not the primary effects of the Board's curriculum policy.

    a.  The Defendants are not responsible for the Plaintiffs' belief that the source of intelligent design is God–that conclusion is one drawn by the Plaintiffs and not offered by the Defendants.  The Plaintiffs point to no evidence that the statement informs student that they source of intelligent design is God, and the evidence shows that ID does not require any supernatural agency or teach the source of design is God.

The Plaintiffs are entitled to their beliefs, but the Defendants are not responsible for them.  Cf. P–FF 256-57.

b.    The Defendants' policy does not interfere with the Plaintiffs' right to teach their children religion is unsupported by the evidence.  The parents can opt-out of the statement if they believe that it interferes with their right to teach their children about religion. Cf. P–FF 256-57, 259.  In any event, this is a Free Exercise claim which is neither advanced in this case nor tenable under the law.

c.    The Defendants are not liable for comments made by students.  Cf P–FF 258–59.

d.    The Defendants are not liable for comments or conduct of members of the community.  Cf P–FF 258–260, 262.

e.    Finally, with respect to P-FF 262, the Court finds statements advanced here provide no basis for liability.

   i.    The Plaintiffs assertion that Yingling was coerced to vote for the curriculum change is a mischaracterization of Sneath's testimony; as Sneath admitted, she cannot make any connection between any comment made about her religion and Yingling's vote on the curriculum policy.  v. 15; p.106:9–19.  There is no

evidence that Yingling was coerced to vote for the curriculum change.

ii.   Spahr has no personal experience with the hearsay she recounts.  v. 14; p. 35:3–5.  In any event, the Defendants are not liable for comments made by community members.

iii.  Further, the Court does not believe the statements that Brown attributes to Bonsell and Buckingham.

(1)   Bonsell has denied telling Brown she would go to hell and he does not strike the Court as the kind of man who would make such a statement.  In contrast, Brown's testimony regarding questions about religion shows a penchant for tendentious manipulation of the facts. Likewise, Brown did not testify that Buckingham called her an atheist but did so testify at trial–it seems highly improbable that Brown would not remember such a comment during her deposition but would at trial and no explanation is offered for this recovery.

(2)   In any event, the Defendants in this action, i.e. the Board and the District, would not be liable for random and

unauthorized statements of Board members which are plainly not a primary effect of Dover's curriculum change, but (if they had been said) offensive comments made by individuals elected to public office–not an Establishment Clause violation.

29. Contrary to P–FF 263–70, the Court finds that newspaper articles, editorials, and letters to the editor, provide no basis for finding that the Defendants' policy has an unlawful purpose of effect.

   a.   The newspaper materials were not admitted into evidence and will not be.

   b.   The Defendants are not liable for statements made by third parties about the Board's policy.

30. Contrary to P-FF 271–286, the Court refuses to discredit the testimony of all the board members based on the discrepancies asserted.

   a.   As noted above, the admitted discrepancies in Bonsell's testimony relating to the donation of the Pandas text do not warrant disregarding the whole of his testimony, which is corroborated by his actions and the testimony of others.

68

i.  Upon close questioning he admitted he mispoke, but the testimony highlighted by the Plaintiffs show that he was "trying to think about exactly how it was done," see P–FF 271(a), and on redirect he admitted that he was nervous and under pressure at the deposition.  v. 34; p. 12:8–24.

ii.  It is unremarkable that Bonsell should be able to remember more about Charlotte Buckingham's statement to the Board after sitting through trial testimony recounting the statement than he did at his deposition.

iii.  Bonsell's testimony regarding his interest in Creationism is the best he could do under the circumstances.  Neither Callahan or others remembered what he said either.

iv.  Geesey's testimony cannot be disregarded because in preparation for trial the scrutiny of her letter to the editor helped her realize that if she was taking issue with Eveland's charge that the Board was considering teaching Creationism, she must have heard of ID as of that date.  v. 31; p. 196:18–p. 197:5.  She also testified in her deposition that Pandas was brought up in June or July.  v. 31; p. 200:9–15.

69

v.  As Defendants note, other evidence corroborates her recollection that ID was discussed as of this time.  D FF 134–244.

vi.  Geesey believes she was questioned about the letters after she was asked for her recollection of when ID first came up at board meetings; and she believes it was after so the letters would not have refreshed her recollection prior to this line of questioning in her deposition.  v. 31; p. 205:5–8.  Plaintiffs have made no showing that in her deposition Geesey was questioned about this correspondence before she was questioned about her recollection of when ID was discussed at board meetings.  Under these circumstances, there is no basis to discount Geesey's very understandable observation that in preparing to testify she realized she must have been aware of ID and believed it was a scientific theory as of the date she wrote the letter taking issue with Eveland's charge–indeed if she did not have that belief it is difficult to see why she would bother writing.  As for the notion that she was advocating teaching Creationism, the Plaintiffs' reading of the letter

70

neglects the relationship it has to Eveland's assertions, explained by Geesey at trial, as well as Geesey's observation that if Eveland wanted to teach Creationism she was free to do so pursuant to her own ideology.  Finally, Plaintiffs go to far when they would make too much of Geesey's observation that Christianity played an important part in the migration to, and history of, this nation, something that has been acknowledged in opinions of the United States Supreme Court.  This historical observation is no reason to believe that Geesey was acting for a religious purpose.

vii.   The Plaintiffs also attempt to make to much of the Defendants' failure to request a written retraction of inaccurate reports. There is no duty to do so, The same goes for newspaper articles etc.  The Plaintiffs cannot prove their claim by proving the Defendants read the paper or did not.

viii.   As for discrepancies in memory and the crediting of newspaper reports, these are common place.  The Plaintiffs, science teachers who are opposed to the Board's policy, and reporters (who wrote the quotes and are plainly committed to their

71

veracity by reason of professional reputation if nothing else) are just as easily susceptible to the charge that they are vouching for statements because of their own interests or agendas.

ix.   As for recollections by various Defendants concerning whatever statements Buckingham made and when, this Court will not make too much of that.  The record reflects that Buckingham was wrestling with Oxycontin during his service on the board and by all accounts made several unusual and provocative statements during his tenure on the board.  Given his record, it is not all that surprising that those who worked with him might regard this as "spouting off" and discount it precisely because it Buckingham did not speak for them or control the board.  As Defendants have noted, members of the board disregarded Buckingham's wishes–and took the position that he did not speak for the Board–in numerous instances. Under these circumstances, their failure to attach importance, and therefore remember, statements by Buckingham is hardly a basis to discount their testimony.  The same is true with respect

to Buckingham himself.  He frankly stated that he had a problem with Oxycontin abuse that makes it difficult for him to remember and date events.  v. 30; p. 6:18–p. 8:6.  There is no reason to disbelieve that Buckingham had this drug problem which was a matter of public record, see P–FF 273(d), and no reason (or evidence) to doubt his claim that it impaired his faculties both at the time and afterwards.

b.   As for the reporters, there is reason to believe that not only did their instinct to preserve their professional reputation influence their testimony but also that they were not entirely accurate.

    i.   According to Bernhard-Bubb, one of the main subjects discussed at the June 7, 2004, school board meeting was creationism.  But, she only attributes the word creationism to school board members in her summaries and not in any direct quotes of statements made by school board members.  v.31 (Bernhard-Bubb); p. 26:14-p. 27:9; Exhibit 804.

    ii.   Bernhard-Bubb did not verify the accuracy of quotes with the persons she quoted in her articles; she did not verify the accuracy of her summaries of statements attributed to school

board members in her articles; and she did not verify with school board members the context of any of the statements she attributed to them in her articles.  v.31 (Bernhard-Bubb); p.27:10-p. 28:8; e.g. Exhibit 804.

iii.   According to Bernhard-Bubb, the focus of her article and the June 7, 2004, school board meeting was the subject of creationism in textbooks, but she never directly quotes a school board member or school official as using the term creationism. The term only appears in her summaries of statements and she did not check the accuracy of the summaries or the context of the statements with those to whom she attributed the summaries or statements.  v.31 (Bernhard-Bubb); p.32:3-19; Exhibit 805.

iv.   According to Bernhard-Bubb, the focus of the June 14, 2004, school board meeting was on creationism and the textbook, and the debate lasted 1-1/2 hours.  Yet, she offered no direct quotes from a board member or school official containing the word creationism.  The term creationism appears only in Bernhard-Bubb's summaries.  v.31 (Bernhard-Bubb); p.33:14-25; p. 34:5-23.  Also, she never verified the statements or context of

74

statements with person to whom she attributed the statements. v.31 (Bernhard-Bubb); p.36:16-22; Exhibit 806.

v.    According to Bernhard-Bubb, the August 2, 2004, school board meeting dealt with the *Biology* textbook and the companion book, *Of Pandas and People,* that teaches Intelligent Design. v.31 (Bernhard-Bubb); p.38:18-20, p. 40:7-11; Exhibit 807.  At the meeting, Buckingham referred to *Of Pandas and People* as only teaching Intelligent Design.  Buckingham did not say that *Of Pandas* teaches creationism.  v.31 (Bernhard-Bubb); p.39:13-23; Exhibit 807.   Yet, in the introductory paragraph of her article, Bernhard-Bubb states that "the debate over teaching creationism alongside evolution in the district is far from over."

vi.    Title of article of Exhibit 808 is "Michigan law center offers a defense of creationism.," Exhibit 808.  Title written by editor and not Bernhard-Bubb.  v.31 (Bernhard-Bubb); p.40:19-25; Exhibit 808.  Bernhard-Bubb from a Thomas More Law Center letter to Buckingham and quoted the most relevant part of letter.  The quote does not refer to creationism and discusses a textbook that presents an alternative theory to evolution.

75

Bernhard-Bubb states in article that Buckingham said that Thomas More Law Center recommended *Of Pandas and People* and she testified that Buckingham referred to *Of Pandas* as teaching only Intelligent Design and not creationism. v.31 (Bernhard-Bubb); p.42:7-p.43:9.

vii.   In Exhibit 809, which dealt with the September 6, 2004, meeting, the title of the article mentions creationism. The editor writes the title, not Bernhard-Bubb. The titles are intended to catch the attention of the reader. v.31 (Bernhard-Bubb); p. 43:14-22.

viii.   In first paragraph of Exhibit 809,, Bernhard-Bubb writes that the school board is still "considering purchase of a companion textbook to teach creationism as part of the district's high school biology curriculum." Exhibit 809. The companion textbook she is referring to is *Of Pandas*. *Of Pandas* had only been referred to at school board meetings as teaching Intelligent Design. From Bernhard-Bubb's research concerning *Of Pandas* and from what was mentioned about *Of Pandas* at the school board meetings, there is nothing to

76

indicate that *Of Pandas* is a creationism book.  v.31 (Bernhard-Bubb); p.43:23-p.44:21; see also v.31 (Bernhard-Bubb); p. 39:24-P.40:6.

ix.   Bernhard-Bubb testified that in November 2004 that school board members complained about inaccuracies in the reporting. V.31 (Bernhard-Bubb); p. 49-11-14.

x.    Joseph Maldonado does not have the person he quotes verify the accuracy of the quote.  v.31 (Maldonado); p. 95:7-23. Maldondo does not have the person he paraphrases verify the accuracy of the paraphrase.  v.31 (Maldonado); p. 95:10-23. Maldonado does not have the person he quotes or paraphrases verify the accuracy of the context in which the quote or paraphrase is used.  v.31 (Maldonado); p.95:21-p.96:6.  The titles of his articles are written by editors and are designed to get the attention of the reader.  v.31 (Maldonado); p. 55:4-13; p.113:14-24.

xi.   Maldonado never directly quoted any school board member using the word creationism, even though, according to Maldonado, the June 7, 2004, meeting dealt with creationism as

77

it relates to the selection of a textbook. v.31 (Maldonado); p. 106:2-25; Exhibit 790. The word creationism only appears when Maldonado is paraphrasing. v.31 (Maldonado); p. 107:1-4; v.31 (Maldonado); p. 109:6-25; p.112:10-21; Exhibits 791, 792. The same applies to Maldonado's reporting of the June 14, 2004, school board meeting. v.31 (Maldonado); p.116:1-p.118:19; Exhibit 793.

xii.   According to Maldonado, intelligent design was mentioned at the July 12, 2004, school board meeting. v.31 (Maldonado); p. 119:4-20; Exhibit 794. And, as with other meetings, Maldonado has no direct quotes from board members or school officials that includes the use of the word creationism. v.31 (Maldonado); p.119:21-25.

xiii.   According to Maldonado, *Of Pandas and People* and intelligent design were discussed at the August 2, 2004, school board meeting, and Bill Buckingham referred to *Of Pandas* as an intelligent design book. Buckingham did not refer to the book as a creationism book. v.31 (Maldonado); p.120:1-19; Exhibit 795.

78

xiv.   According to Maldonado, creationism was not mentioned during the October 18, 2004, school board meeting.  The topic of discussion was the inclusion of intelligent design in the biology curriculum.  v.31 (Maldonado); p.121:16-22; Exhibit 797.

xv.   Maldonado recalls school board meetings when the school board members generally complained about the accuracy of news reporting.  v.31 (Maldonado); p.122:18-p. 123:12.

31.   Contrary to P–FF 287–290, the Court finds that the Plaintiffs have failed to prove that the Board's stated reason for its policy is a pretext.  See D CL 907–931.

a.   Here again the Court notes that the Plaintiffs assertions here are contrary to the weight of the evidence which shows that the board did have a bona fide belief that it was pursuing a legitimate educational goal based upon information board members had in their position concerning gaps and problems in ET as well as information about ID.

b.   The long process of consultation with science teachers and effort to create consensus defies any claim that the board members were bent on an illegal agenda.

79

c.      The consultation with the Solicitor and effort to allay teacher

concerns about possible liability

d.      The Plaintiffs sense that the Defendants should have known better

than to credit this information amounts an indictment of the system

whereby public education is governed; but that system is not on trial

here.

e.      Ultimately the Board reached an impasse with the faculty.

Confronted with this impasse the Board decided to disregard the

objections of for a number of simple and understandable reasons.

First, the Board believed ID was a scientific theory that the teachers

objected to while maintaining that they were not trained in, or

qualified to teach, and as to which the teachers never advanced any

systematic <u>scientific</u> critique.  Second, the faculty continually asserted

that ID was Creationism (with which the Board disagreed in good

faith) such that teaching it would be illegal, claims the Board saw as

outside the expertise of the science faculty and unfounded because

the policy was not understood by the Board to require the faculty to

teach ID in any event.

## CONCLUSIONS OF LAW RELATING TO

## THE PLAINTIFFS' ARGUMENTS

**Conclusions With Respect To Preliminary Matters.**

32.   This Court has admitted a certain limited number of newspaper articles into the record for a specific purpose.  The Court will not admit any other newspaper articles because the articles are hearsay that is not within an exception which are not admissible for any purpose.

a.   The Establishment Clause of the First Amendment is not an exception to the Federal Rules of Evidence.  Likewise, the "endorsement test" glossed on to the Establishment Clause for certain purposes is not an exception to the Federal Rules of Evidence.  Plaintiffs reliance on the "imputed knowledge" of a reasonable observe provides no authority for their argument that the basis for the knowledge imputed to the hypothetical reasonable (and reasonably informed) observer is based on hearsay and Plaintiffs' cite no case law <u>holding</u> on this evidentiary point and it is fundamental that a case is not authority for a proposition not raised and decided.  *See, e.g., Brecht v. Abrahamson*,

81

507 U.S. 619, 630-31 (1993) (decision that does not squarely address issue is not binding under doctrine of stare decisis); *U.S. v. L.A. Tucker Truck Lines, Inc.,* 344 U.S. 33, 38 (1952) (case is not binding precedent on issue not raised in brief or argument or discussed in opinion of court); *Webster v. Fall,* 266 U.S. 507, 511 (1925) ("Questions which merely lurk in the record, neither brought to the attention of the Court nor ruled upon, are not to be considered as having been so decided as to constitute precedents").

b.   Further, the Plaintiffs' effort to admit this hearsay for the purpose of proving the state of mind of the Dover community is flawed because is fundamental that a belief cannot prove the fact believed.  See FRE 803(3) (allowing hearsay to establish a state of mind, but not to prove the fact...believed [with exceptions not relevant here]).  The reason for the limitation is obvious: if a person's mere belief in a fact could be used to proof the fact believed, then any number of unsubstantiated beliefs could give rise to liability–no matter how insupportable.  So the effort to prove that the Board's policy has the effect of advancing religion based on the belief (by some) that the policy advances religion is plainly illicit.

c.  The effort to prove the effect of the Board's policy based on a community's state of mind is just a fancy (and farfetched) effort to prove a fact by supposed proof of a community's belief.   And given that the Plaintiffs' would have this Court make that finding of "community belief" based on hearsay in newspaper accounts, it amounts to an effort to prove a fact (i.e. the Board's curriculum policy has the effect of advancing religion) based on double hearsay, the newspaper and the community's alleged state of mind.  One need only consider recent scandals involving fabricated newspaper stories to see the pernicious results of such an evidentiary ruling, indeed on this theory a man might be convicted on the basis for a wholly false story.

d.  Further, this Court declines the invitation to use newspaper articles and letters to the editor to engage in rank speculation concerning what the community at large thought about the Board's policy as a result of these reports.  There is plainly no reliable basis for an opinion, never mind a finding of fact, as to whether the community read these reports or gave them any credence.  There is no way to

determine whether views expressed in the paper were representative or minority views.

e.   Finally, evidence of a community's state of mind is not material.  As Defendants have already noted, the notion of divisiveness asserted by the Plaintiffs does not support an Establishment Clause violation. *See Lynch v. Donnelly*, 465 U.S. 668, 683-84 (1984)(rejecting claim that political divisiveness provides basis for Establishment Clause violation).

f.   These are just some of the reasons why Courts do not find facts based upon newspaper accounts or letters to the editor but based on evidence admitted pursuant to the Federal Rules of Evidence for purpose that are proper under the governing law.  As noted above, and discussed further below, the these press reports or for that matter the effects of these reports do not provide a basis for liability in this case.

33.   The Court will not consider the additional exhibits included by Plaintiffs in their post-trial submissions.  Post-trial submissions do not authorize adding new evidence or new exhibits to the record, and the record reflects no agreement of the parties on the addition of new exhibits not admitted at

trial.  For this reason, the Court will not consider any new exhibits including, but not limited to, the expert reports of Barbara Forrest (and attachments); exhibits attached to deposition designations; and any additional materials referenced in or attached to post-trial submissions of the parties, including newspaper articles referenced in Plaintiffs Proposed Findings Of Fact and Conclusions of Law or supporting brief.[6]

34.   The Court also notes that the Plaintiffs cannot rest their claim on a supposed interference with their right to direct the religious education of their children.  This assertion amounts to a Free Exercise claims which the Plaintiffs have not advanced in their Complaint or afterwards.  See Plaintiffs' Brief in Opposition To Defendants' Motion To Dismiss at 15. The claim is also factually and legally untenable given the uncontradicted evidence that the Plaintiffs can opt-out of the statement resulting from the policy.  See DFF 504–506; 522–523. To the extent the Plaintiffs argue that DASD's policy amounts to advancing religion in the classroom, that claim is addressed below.

---

[6]Defendants waive no objections to evidence made in pretrial proceedings or at trial.  Defendants do not object to any exhibits admitted on the record but inadvertently omitted from the exhibit lists of the Court or the parties but do object to all additional exhibits submitted by the Plaintiffs in connection with their post-trial submissions.

**The Plaintiffs Have Failed to Prove That the Primary Effect of DASD's Curriculum Change Is to Advance Religion.**[7]

35.    Plaintiffs effort to demonstrate that the Defendants curriculum policy has the primary effect of advancing religion requires recourse to fundamental principles of governmental liability.

a.    With respect to the Establishment Clause it is fundamental that Plaintiffs are required to show that the <u>primary</u> effect of <u>government</u> policy is to advance religion.  *See e.g. Edwards v. Aguillard*, 482 U.S. 578, 582-83 (1987).  This principle has two corollaries typical of Establishment Clause jurisprudence and critical to determining liability.  A violation of the Establishment Clause <u>cannot</u> be based on a showing that the <u>secondary</u> or <u>incidental</u> effects of a government policy can be shown to advance religion.  *See e.g. Hernandez v. IRS*, 490 U.S. 680 (1988)(tax exemption to religious organizations does not violate Establishment Clause because benefit to religion was not primary effect of statute); *Bowen v. Kendrick*, 487 U.S. 589 (1988)(federal law using religious organizations to provide pregnancy counseling did not violate Establishment Clause because any benefit

_____

[7]In lieu of another brief the Defendants have addressed the Plaintiffs' contention that the endorsement test applies in this case in connection with their proposed conclusions of law.

to religion was not primary effect of statute).  Relatedly, no violation
of the Establishment Clause is made out any benefit to religion is not
the result of government action but results instead from the actions of
private individuals.  *Cf. Zelman v. Simmons-Harris*, 536 U.S. 639,
(2002)(voucher program did not violate Establishment Clause even
though majority of students enrolled in religiously affiliated schools
where public funds flowed as a result of private choices); *see also
Zobrest v. Catalina Foothills School District*, 509 U.S. 1, 8 (1993);
*Witters v. Washington Dept. of Services for the Blind*, 474 U.S. 481,
486-89 (1986);  *Rosenberger v. University of Virginia*, 515 U.S. 819,
842-44 (1995)(government does not advance religion by making
facilities or funds available to students which engage in religious
activity).

b.  In bears noting that these principles shaping governmental liability
are not unique to the law governing the Establishment Clause.  Thus,
for example, it is fundamental to the law governing standing that in
order to have a claim against the government, the complained of
wrong must be "fairly traceable" to government action even to state a
claim.  *See e.g. Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992);

*Allen v. Wright*, 468 U.S. 737 (1984). For the same reason, government liability does not arise unless the harm is <u>caused</u> by government <u>policy</u>. *See e.g. Monell v. Dept. of Social Services*, 436 U.S. 658, 694 (1978)(governmental liability is only proper when harm is caused by governmental policy). Relatedly, the government is not liable for harm caused by the unauthorized acts of government employees–precisely because those acts are not the primary effects of government policy. *See e.g. Collins v. City of Harker Heights*, 503 U.S. 115, 121, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). And of course there can be no governmental liability for acts of third parties because there is no state action. *See e.g. American Mfrs Mut. Ins. Co. v. Sullivan*, 526 U.S. 40 (1990).

c.  Thus it is clear that Dover's liability must be premised on the primary effects of its policy, <u>not</u> incidental or secondary effects of its policy, <u>not</u> harm caused by third parties, and <u>not</u> effects caused by individual choice. It is also clear that the Defendants are liable for the primary effect of the curriculum change i.e. its impact on classroom instruction. The Defendants are not liable for metaphysical extrapolation by the Plaintiffs or others regarding IDT; the Plaintiffs

are entitled to their opinions concerning the source of intelligent design–but the government is not liable for that opinion.  The Defendants are not liable for the decision of an individual student to go to the library and examine Pandas.  The Defendants are not liable for statements or conduct of students or members of the community occasioned by the curriculum change, even comments that are deplorable and disturbing to the Plaintiffs.  And the Defendants are not liable for the conduct of reporters or the effects of press reports, which are the acts of independent third parties who are not officers or agents of the state.

36.  The Court finds that the Plaintiffs have failed to prove that the primary effect of the Defendants curriculum change is advance religion.  not to change in classroom instruction.  See infra at D FF 12, 26–28; See also D FF 610–629; D CL 932–950;

37.  The Court also finds that the "endorsement test" does not apply in this case. In neither *Edwards v.* Aguillard, 482 U.S. 578 (1987) nor *Epperson v. Arkansas*, 393 U.S. 97 (1968), the only controlling cases to have addressed a similar issue, did the Court apply an endorsement test, and certainly not anything as far reaching as Plaintiffs propose.  The "endorsement" test,

89

properly understood, is a modification of the *Lemon* test that is <u>principally</u> used in cases involving religious displays on government property, for the obvious reasons that will be discussed further below. *See, e.g., Modrovich v. Allegheny County*, 385 F.3d 397, 401 (3ʳᵈ Cir. 2004) ("[T]he 'endorsement' test modifies *Lemon* in cases involving religious displays on government property. The endorsement test dispenses with *Lemon*'s 'entanglement' prong, and, combining an objective version of *Lemon*'s 'purpose' prong with its 'effect' prong, asks whether a reasonable observer familiar with the history and context of the display would perceive the display as a government endorsement of religion."). *Modrovich, supra,* recognizes that the so-called "endorsement test" was announced by Justice O'Connor in her concurring opinion in *Lynch v. Donnelly*, 465 U.S. 668 (1984), a religious display case, and used again in *County of Allegheny v. ACLU*, 492 U.S. 573 (1989) and *Capital Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753 (1995), both religious display cases.

38.   Thus, the endorsement test is applicable in cases involving overtly religious symbols, such as a crèche, the Ten Commandments, and the Latin cross. The endorsement test for these types of cases is an inquiry into the nature of the forum and the physical setting of the display. It seeks to determine

whether a reasonable observer would conclude that the message conveyed by the overtly religious symbol in its present context is a government endorsement of religion. For example, in *Lynch*, the Court held that the crèche was permissible because the physical setting included various secular symbols of the holiday season. *See Lynch*, 465 U.S. at 671. Therefore, a reasonable observer would <u>not</u> conclude that the government was endorsing religion by the display of this overtly religious symbol in its physical context. *Id.* at 692 (O'Connor, J., concurring). In comparison, in *County of Allegheny*, the crèche at issue stood alone on the "Grand Staircase," a prominent location in which others were not permitted to erect similar displays. *See County of Allegheny*, 492 U.S. at 599-600, n.50. Therefore, a reasonable observer would conclude that the government was endorsing religion by the display of this overtly religious symbol in its present context. *Id.* In *Capital Square Review & Advisory Bd.,* the KKK sought to display a Latin cross in the plaza next to the state capitol. Reviewing the history and context of the community and forum in which the cross would be displayed, the Court concluded that an informed reasonable person (not just a stranger who wandered past the display for the first time) would conclude that the government was <u>not</u> endorsing religion because the observer would know

91

that the forum was open for all forms of speech, not just religious expression.

39.    Thus, for the obvious reasons set forth in these opinions, the broader history and context of the forum and community in which the religious display appears are relevant to the endorsement inquiry, as is the fact that the reasonable observer is informed of such history.  *See also Freethought Soc'y v. Chester County*, 334 F.3d 247, 257 (3rd Cir. 2003) (holding that a reasonable observer, aware of the history of the 82-year-old plaque bearing the Ten Commandments, would not have viewed the county's refusal to remove the plaque as an endorsement of religion); *Modrovich v. Allegheny County*, 385 F.3d 397 (3rd Cir. 2004) (upholding the public display of a plaque bearing the Ten Commandments and noting that in applying the endorsement test, the court does not examine the government's motivations in displaying the plaque, but considers the plaque's effect on the reasonable observer, determining whether the reasonable observer would perceive it as an endorsement of religion).

40.    The endorsement inquiry that was applied in these religious display cases was also applied, in some respects, in *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819 (1995) (striking down public university's

92

policy of excluding student religious groups from facilities available to other student groups) and *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.,* 508 U.S. 384 (1993) (striking down school district policy that allowed private groups to use school facilities during off-hours for a variety of purposes, excluding, however, religious purposes). *See Capital Square Review & Advisory Bd.,* 515 U.S. 763-66. These cases, including *Capital Square Review & Advisory Bd.,* were ultimately decided under the Free Speech Clause of the First Amendment and not the Establishment Clause. The forum/context aspect of the endorsement inquiry was critical. This forum/context analysis, which is a central feature of the "endorsement test," has also been applied in cases involving equal access of government facilities to overtly religious groups or religious organizations. *See Good News Club v. Milford Ctr. Sch.,* 533 U.S. 98 (2001) (holding that a public school's exclusion of a Christian student club from meeting after hours on school property based on its religious nature was unconstitutional); *Child Evangelism Fellowship v. Stafford Sch. Dist.,* 386 F.3d 514 (3rd Cir. 2004) (granting injunction in favor of religious organization that sought to enjoin a school district from denying it access to certain public elementary schools to promote meetings and activities). Again, these cases were decided under

the Free Speech Clause and not the Establishment Clause.  Thus, in each of these cases the relevant Establishment Clause question was whether a reasonable observer would conclude that the government was endorsing the message of the overtly religious symbol that was displayed on or near government property or whether a reasonable observer would conclude that the government was endorsing the message of the overtly religious group or organization that was using its facilities.

41.   Another line of cases in which an "endorsement" inquiry has been applied involves public funding or providing government resources to overtly religious organizations that are engaging in religious activity.  *See, e.g., Zelman v. Simmons-Harris,* 536 U.S. 639 (2002); *Mitchell v. Helms,* 530 U.S. 793 (2000); *Agostini v. Felton,* 521 U.S. 203 (1997); *see generally Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly,* 309 F.3d 144, 174 (3rd Cir. 2002) (stating, "in cases involving Establishment Clause challenges to private individuals' use of government resources, the Court has applied the endorsement test developed by Justice O'Connor").  The question again involves whether a reasonable observer would conclude that the government was endorsing the message of these religious organization.

94

42.    In a final line of cases in which an "endorsement" inquiry is loosely applied

involves challenges to policies in which the government is participating in

an overtly religious activity, such as school prayer.  For example, Plaintiffs

cite to *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290 (2000), a case

involving prayer in school—a religious activity.  A close reading of this

case, however, reveals that it was decided principally under the "coercion"

test articulated in *Lee v. Weisman*, 505 U.S. 577 (1992).  *See Sante Fe*, 530

U.S. at 301-02 ("Although this case involves student prayer at a different

type of school function, our analysis is properly guided by the principles

that we endorsed in *Lee*.").  Nevertheless, the Court stated, "In cases

involving <u>state participation in a religious activity</u>, one of the relevant

questions is whether an objective observer, acquainted with the text,

legislative history, and implementation of the statute, would perceive it as a

<u>state endorsement of prayer</u> in public schools." *Id.* at 308 (internal

quotation and citation omitted) (emphasis added).  *See also ACLU v. Black

Horse Pike Reg'l Sch. Bd.*, 84 F.3d 1471, 1486-87 (3rd Cir. 1996) (enjoining

school policy that permitted prayer in a public school and stating, under its

endorsement inquiry, that "the viewpoint of the reasonable observer

(adherent or nonadherent) helps us to determine if the 'principle or primary

effect [is] one that neither advances nor inhibits religion'" and concluding "that the Board favors the inclusion of prayer").

43.    Thus, in the school prayer cases, the courts are faced with an overtly religious practice, prayer, and seek to determine whether the government policy at issue endorses or favors this religious practice.  If it does, it violates the Establishment Clause.

44.    What is evident from a close inspection of these cases is that the endorsement test is only applicable when the policy or practice in question involves a display that is either facially religious, such as a crèche, the Ten Commandments, or a Latin cross, or permits an overtly religious group or organization to use government facilities, or provides for public funding or government resources to overtly religious groups engaged in religious activity, or permits an overtly religious practice, such as prayer.  The present case involves none of these issues.

45.    Moreover, the Court notes that he application of the endorsement test suggested by the Plaintiffs is highly problematic because they seek to use this test to introduce a vast quantity of evidence that has no meaningful relationship to the primary purpose or primary effect of the actual policy at issue. Unlike the cases cited above, there is nothing facially religious

contained in the one-minute statement that is read to the students, and there is no forum inquiry that is applicable.  What is relevant is whether the principal or primary effect of the policy at issue (i.e., the statement that is read to ninth-grade students in which the words "intelligent design" are stated twice and which references *Pandas* and other books in the library that are critical of intelligent design) advances or inhibits religion.  The history of the "intelligent design movement," the so-called "Wedge Document" and "Wedge Strategy," prior drafts of *Pandas*, the public filings of FTE, statements by William Dembski, Phillip Johnston, et al., newspaper articles and editorials, DASD's newsletter, Plaintiffs' experts' dramatic reading and histrionic interpretations of the short statement at issue, and the host of other extraneous matter that Plaintiffs want to incorporate into the modest curriculum change at issue are not proper for this Court to consider.

46.  The difficulty in applying Plaintiffs' version of the endorsement test is readily apparent.  Is this Court really to suppose that a ninth-grade student should be charged with the entire history of religious opposition to the teaching of evolution, or the alleged change in the legal landscape in 1968 when *Epperson* was decided, or the factual backgrounds and holdings of cases such as *McLean* and *Edwards*, or the alleged history of the "intelligent

97

design movement," or the opinions, motives, and statements of people such as Dean Kenyon and Percival Davis, or the history of *Pandas* and its prior drafts, or the newsletters and fundraising pieces of FTE, or the so called "Wedge Document" and "Wedge Strategy," or the motives of various Discovery Institute fellows, or the holdings in *Freiler, Selman,* and a host of other cases cited by Plaintiffs, or such amorphous and esoteric claims as "the social meaning of the theory-not-fact circumlocution"? *See* Pls.' Br. in Supp. of Findings of Fact and Conclusions of Law at 43-60 ("Pls.' Br."). It is highly unlikely. Indeed, Plaintiffs offer no principle to limit the scope of the inquiry they urge.

47.    Moreover, Plaintiffs' argue that the "reasonable observer" is not limited to the ninth-grade students actually taking the class in which the challenged policy will apply, but extends to a "reasonable, objective, informed adult observer in the Dover community would perceive the challenged policy." Pls.' Br. at 38. But why stop there? Plaintiffs argument would seem to suggest that the effects of the policy extend to journalists reporting throughout trial; they heard Defendants' counsel "defend[ing the Board's] decision to implement the curriculum change publicly." *See* Pls.' Br. at 38. Maybe this Court should also consider the message conveyed to the nation

as a whole, since this case has received national press or, given international coverage, perhaps the U.N. should be consulted.

48.   These obvious problems convince the Court that this case comes down to the students: They are the policy's intended audience.  Moreover, the only thing that this Court determine with reasonable certainty is that this hypothetical ninth-grade student will know when he hears the statement which implements the curriculum policy, a statement which mentions the words "intelligent design" twice and references *Pandas* and other books that are in the school's library.  It is the reading of this statemen–in a biology class in which Darwin's theory of evolution will be taught and the student's primary text for this class is *Biology*, written by Plaintiffs' expert Professor Miller, which provides comprehensive coverage of Darwin's theory of evolution and presents this theory in a manner that is consistent with its status in the science community.  Thus, the issue for this Court to decide is whether, from the perspective of a ninth-grade biology student, the primary effect of DASD's policy is to advance religion.  For the same reasons that the Court concludes that the Plaintiffs have failed to prove that the primary effect of the policy is to advance religion, the Court concludes that the answer to this question is also straightforward: <u>it does not</u>.

Respectfully submitted,

30 November 2005

_____

Patrick T. Gillen (P47456)*
Robert J. Muise  (P62849)*
Richard Thompson (P21410)*
THOMAS MORE
LAW CENTER
24 Frank Lloyd Wright Drive
PO Box 393
Ann Arbor, Michigan 48106
(734) 827-2001
*Attorneys for Defendants*
        **admitted pro hac vice*

By:_____

    Ron Turo
    Turo Law Offices
    29 South Pitt Street
    Carlisle, PA 177013