IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TAMMY KITZMILLER; BRYAN AND CHRISTY REHM; DEBORAH FENIMORE AND JOEL LIEB; STEVEN STOUGH; BETH EVELAND; CYNTHIA SNEATH; JULIE SMITH; AND ARALENE ("BARRIE") D. AND FREDERICK B. CALLAHAN, | : : : : : : : : : | |
| Plaintiffs, | : : | CIVIL ACTION |
| vs. | : : | No. 4:04-cv-2688 |
| DOVER AREA SCHOOL DISTRICT; DOVER AREA SCHOOL DISTRICT BOARD OF DIRECTORS, | : : : : | (JUDGE JONES) |
| Defendants. | : : | (Filed Electronically) |

**PLAINTIFFS' RESPONSE TO AMICUS BRIEFS**

Plaintiffs submit this brief in response to the *amicus curiae* briefs of the Foundation for Thought and Ethics (the "FTE"), the Discovery Institute, and a collection of scientists, all of which are designed to persuade the Court that it should issue a ruling that does not take any position about whether intelligent design is religious or scientific.

Consistent with the incestuous relationships among the *amicis*, the briefs of the FTE and the Discovery Institute, arguing that intelligent design has nothing to do with religion, are written by the same attorney, Randy Wenger of the Alliance Defense Fund ("ADF"), a legal organization dedicated to advocating the rights of Christians.[1]  Mr. Wenger's co-author on the Discovery Institute brief, David K. DeWolf, also wrote the brief for *Amici Curiae* Biologists and Other Scientists, a number of whom are Discovery Institute fellows.  As a fellow of the Discovery Institute himself, Mr. DeWolf has advocated the incorporation of intelligent design into public school curriculums,[2] but, now that the Dover board has followed that suggestion, the Discovery Institute has abandoned that position (indeed, neither it nor the FTE styles its brief as being "in support of defendants"),

---

[1] According to its website, "ADF is Christ-Centered. ... We rely solely upon God's redemptive grace for our existence, our vision, and our sustenance, trusting in His sovereignty as we seek to convey hope to all we serve." http://www.alliancedefensefund.org/about/Purpose/principles.aspx (downloaded December 7, 2005).  Under "What we believe," the site reads:  "The Alliance Defense Fund is a servant organization that provides the resources that will keep the door open for the spread of the Gospel through the legal defense and advocacy of religious freedom, the sanctity of human life, and traditional family values." http://www.alliancedefensefund.org/about/Purpose/whatwebelieve.aspx (downloaded December 7, 2005).

[2] David DeWolf, Stephen C. Meyer, and Mark E. DeForrest, *Teaching the Controversy:  Is it Science , Religion, or Speech, in* DARWINISM, DESIGN AND PUBLIC EDUCATION, 59, 100-03.  (John Angus Campbell and Stephen C. Meyer eds., 2003).  (Attached to this brief as Exh. A).

PHLEGAL: #1830795 v10 (138nf10!.DOC)

focusing solely on its own interest in protecting the public image of intelligent design.

The *amici* claim to be bringing material to the Court's attention that has not already been put forth by the parties. *See* Discovery Institute's Motion Seeking Leave to File *Amicus* Brief at 3-5. But the same arguments that the *amici* make for intelligent design as a scientific proposition have been made by defendants, including by their expert witnesses Michael Behe and Scott Minnich, who are, of course, both fellows of the Discovery Institute. The *amici* make the same tired invocations of the Big Bang as Professor Behe, all from the same vantage point of non-physicists with no expertise in the Big Bang.[3] *Amici* also makes the same logically inconsistent assertions that, on one hand, science must discard the longstanding and successful ground rule of methodological naturalism, *see* Discovery Institute Brief at 22 ("*methodological naturalism is itself a large part of what the controversy is about*") (emphasis in original), yet, on the other hand, intelligent design does not involve supernatural causation, *id.* at 23,[4] – which

---

[3] Unlike the scientists who developed the Big Bang theory, the intelligent-design movement exhibits no patience for the hard slog of hypothesis testing and publication that characterized the development and acceptance of the Big Bang theory. Instead, the intelligent-design movement, with no scientific production to its name, argues for "affirmative action" for its ideas. 27:134 (Fuller).

[4] The FTE makes the specious argument that when *Pandas* offers two distinct categories of scientific explanation, natural and intelligent, it does not

(continued...)

is the only reason methodological naturalism matters to the controversy.  Plaintiffs

have already debunked this argument.

In short, the *amicus* briefs add nothing new to the argument for

intelligent design as science.  What *could have been* helpful to the Court, and was

uniquely in control of the *amicus* organizations, is some explanation why the

Discovery Institute's and FTE's own descriptions of their mission and activities as

Christian apologetics are not dispositive of the religious nature of intelligent

design.[5]

As one obvious example, the Discovery Institute does not explain –

literally does not say a word about – the organization's Wedge Document (P140),

which sets forth the goals and objectives of the intelligent-design movement.  The

Governing Goals of the Discovery Institute are "[t]o defeat scientific materialism

---

(continued...)

mean that the "intelligent" explanations that it distinguishes from "natural"
explanations are supernatural.  This is pure sophistry.  Science, operating under the
constraints of methodological naturalism, already studies known, natural,
intelligent activity, including all the human activities listed on page 8 of the FTE's
brief.  It is *only* supernatural "intelligent causes" that are excluded by
methodological naturalism.

[5] It is the intelligent-design movement's leaders' descriptions of intelligent
design as supernatural, creationist, religious, and Biblical that are the subject of
Barbara Forrest's book *Creationism's Trojan Horse* and her trial testimony, not, as
*Amici* Biologists and Other Scientists argue, their religious affiliations and beliefs.
(Biologists' Brief at 12-14).

and its destructive moral, cultural and political legacies" and "[t]o replace

materialistic explanations with the theistic understanding that nature and human

beings are created by God." P140.  The Wedge Document is no anomaly, but

rather reflective of the positions of the Discovery Institute and the intelligent-

design movement's leaders, such as Phillip Johnson (originator of the "Wedge"

strategy described in the Wedge Document), 10:16-17 (Forrest), William Dembski

(avowed Christian apologist who advocates intelligent design as the theology of

John the Apostle translated into the technical language of information theory),

P357; 11:18, 48-50, 55 (Forrest), and Stephen Meyer (director of the Discovery

Institute, and advocate of intelligent design as "the God hypothesis.").[6]  P332; 5:52

(Pennock); 11:31 (Forrest)

---

[6] Meyer, as Director of the Discovery Institute both now and when the
Wedge Document was created (according to the document itself), is uniquely
situated to shed light on the authorship, use of, and purpose of the Wedge
Document.  But, as with Meyer's expert report in the case, and the deposition that
he declined to sit for, the Discovery Institute avoids these uncomfortable questions
in its *amicus* submission.

Rather than explain Meyer's involvement with the Wedge Document, or
what he meant by describing intelligent design as "the God hypothesis," the
Discovery Institute's *amicus* brief misrepresents Meyer to the Court as a "scientist"
offering scientific research on the digital information encoded in DNA, and on the
fossil record of the "Cambrian Explosion," in support of intelligent design.
Discovery Institute Brief at 16.  Meyer is not in fact a practicing scientist, but a
philosophy professor at a small Christian college. 11:30, 33-34 (Forrest).  His
previous career is as an engineer for private industry, which did not entail any
research or expertise in the genetic information in DNA or paleontology. *Amici's*

(continued...)

Similarly, the FTE declines to address facts that it is best situated to explain.  Numerous documents in evidence reveal FTE to be a religious organization with religious objectives, not a scientific one pursuing scientific aims. P12; P28; P168A; P566; P633; 10:90-92, 96-101 (Forrest).  The FTE ignores all this evidence in its *amicus* brief.

In a pre-trial hearing in this case, FTE president Jon Buell attributed religious descriptions of his organization, in legally required public filings he had signed, to mistakes by lawyers and accountants.  The Court can decide whether Mr. Buell and the FTE were filing false documents with the federal government and the State of Texas, or whether they were instead misrepresenting themselves to this Court, by disowning the religious agenda stated in those documents.  The overwhelming evidence from Mr. Buell's own writings regarding his and FTE's Christian, creationist objectives gives the Court ample basis to make that judgment. P12; P28; P168A; P566; P633; 10:90-92, 96-101 (Forrest).  Either way, the FTE's submission is entitled to no credence or respect from this Court.

--------------------------------

(continued...)

trumpeting of a non-scientist's views on areas of scientific inquiry in which he has no expertise as evidence of the scientific merits of intelligent design reveals that intelligent design has not advanced beyond the religious, cultural movement that law professor Phillip Johnson invented to bolster Christianity's competitive case against the theory of evolution, a staple of modern science.

-6-

This is particularly true of the FTE's rationalization for the substitution of the phrase "intelligent design" for "creation" in versions of *Pandas* prepared after *Edwards*. FTE makes the impossibly silly argument that by discarding the words "creation" and "creationism" found in early drafts, the FTE expressly rejected creationism. FTE Brief at 17. The only way the drafting history of *Pandas* could be interpreted as rejecting creationism is if the authors had discarded not just the *word*, but the explanation of what the word means – "various forms of life began abruptly through an intelligent agency with their distinctive features already intact – fish with fins and scales, birds with feathers, beaks, and wings, etc." The retention of the central creationist concepts using a different term, "intelligent design," dictates only one inference:  intelligent design equals creationism.

If this were not true, surely the FTE would have provided an explanation in its brief for why *Pandas* was written by two admittedly creationist authors, one of whom was an advocate for creation science in the federal courts, and for why Buell thought that the *Edwards* ruling on creation science would matter so much to the financial success of *Pandas*.  P350; 10:102-104, 126-128 (Forrest).  But there is no discussion of these facts.

PHLEGAL: #1830795 v10 (138nf10!.DOC)

In summary, the *amicus* originations have a lot of explaining to do. But they studiously avoid their own words and history, which reveal the religious content of intelligent design.

What all three *amici* are clearly devoted to is getting the Court to blame any Establishment Clause violation on the defendant board members – without addressing the facts that show *that the Board was right* in understanding intelligent design to be a religious, God-friendly alternative to the theory of evolution.  FTE has stated in a fundraising letter that if the Court "rule[s] narrowly, focusing only on the school board's action and not ruling on the status of *Pandas* ... that would be great news."[7]  (emphasis in original).  The Discovery Institute and the FTE, having provided the Dover Board with the idea and the materials to advance its religious agenda, are content to throw the Board under the legal bus, so long as it does not involve the exposure of intelligent design as an inherently religious proposition.

The reason for this approach is obvious:  it allows the FTE and Discovery Institute to fight on in the culture wars – perhaps in school boards in Kansas or Ohio – where they may be able to exert greater control over the message broadcast by government officials, avoid the type of rigorous cross-examination

---

[7] Exh. B.

applied in this case to expose intelligent design's alleged scientific underpinning to be an empty vessel, and suppress the kind of revealing acknowledgments of the religious reasons for promoting intelligent design made by Dover school board members.[8] As FTE and Discovery Institute attorney Wenger recently explained to a church audience, the Dover Board could have improved its case for intelligent design by being "clever as serpents."[9]

Plaintiffs argued at the close of trial that the challenged policy at issue in this case would not have been any more constitutional if the Dover Board had been more circumspect about its objectives, or better at covering its tracks, because intelligent design is an inherently religious proposition, and a modern form of creationism. By availing themselves of the opportunity to submit *amicus* briefs, but not contesting the evidence of their religious and creationist words and actions, the FTE, Discovery Institute, and their affiliated scientists have effectively admitted the validity of that evidence.

---

[8] *See, e.g.,* Linda Shaw, *Does Seattle group "teach controversy" or contribute to it?*, SEATTLE TIMES, March 31, 2005 (Exh. C).

[9] Daniel Burke, *Bring us your legal issues*, LANCASTER NEW ERA, October 20, 2005  (Exh. D).

Respectfully submitted,

/s/ Eric Rothschild

Eric Rothschild (PA 71746)
Stephen G. Harvey (PA 58233)
Alfred H. Wilcox (PA 12661)
Christopher J. Lowe (PA 90190)
Stacey I. Gregory (PA 90290)
Pepper Hamilton LLP
3000 Two Logan Square
18th & Arch Streets
Philadelphia, PA 19103
(215) 981-4000
*rothschilde@pepperlaw.com*
*harveys@pepperlaw.com*
*wilcoxa@pepperlaw.com*
*lowec@pepperlaw.com*
*gregorys@pepperlaw.com*

Thomas B. Schmidt, III (PA 19196)
Pepper Hamilton LLP
200 One Keystone Plaza
North Front and Market Streets
P.O. Box 1181
Harrisburg, PA 17108
(717) 255-1155
*schmidtt@pepperlaw.com*

Witold J. Walczak (PA 62976)
ACLU of Pennsylvania
313 Atwood Street
Pittsburgh, PA 15213
412-681-7864
*vwalczak@aclupgh.org*

Paula K. Knudsen (PA 87607)
ACLU of Pennsylvania
105 N. Front St., Suite 225
Harrisburg, PA 17101
(717) 236-6827
*pknudsen@aclupa.org*

Ayesha Khan (adm. *phv*)
Richard B. Katskee (adm. *phv*)
Alex J. Luchenitser (adm. *phv*)
Americans United for Separation of
Church and State
518 C St., NE
Washington, DC 20002
(202) 466-3234
*akhan@au.org*
*katskee@au.org*
*luchenitser@au.org*

Attorneys for plaintiffs:
TAMMY KITZMILLER; BRYAN AND
CHRISTY REHM; DEBORAH
FENIMORE AND JOEL LIEB; STEVEN
STOUGH; BETH EVELAND; CYNTHIA
SNEATH; JULIE SMITH, AND
ARALENE ("BARRIE") D. AND
FREDERICK B. CALLAHAN

Dated:  December 7, 2005

PHLEGAL: #1830795 v10 (138nf10!.DOC)

## CERTIFICATE OF SERVICE

I, Eric Rothschild, hereby certify that on December 7, 2005, a copy of the foregoing *Plaintiffs' Response to Amicus Briefs* was served on the following counsel through the electronic case filing system and electronic mail:

Richard Thompson
Patrick T. Gillen
Robert J. Muise
THOMAS MORE LAW CENTER
24 Frank Lloyd Wright Drive, P.O. Box 393
Ann Arbor, Michigan  48106

and through the electronic case filing system:

Thomas B. Schmidt, III
Pepper Hamilton LLP
200 One Keystone Plaza
North Front and Market Streets, P.O. Box 1181
Harrisburg, PA  17108

Witold J. Walczak
ACLU of Pennsylvania
313 Atwood Street
Pittsburgh, PA 15213

Paula K. Knudsen
ACLU of Pennsylvania
105 N. Front St., Suite 225
Harrisburg, PA  17101

Mary Catherine Roper
ACLU of Pennsylvania
P. O. Box 1161
Philadelphia, PA 19105

PHLEGAL: #1830795 v10 (138nf10!.DOC)

Richard B. Katskee
Ayesha Khan
Alex J. Luchenitser
Americans United for Separation of Church and
State
518 C St., NE
Washington, DC 20002

Ron Turo
Turo Law Offices
29 South Pitt Street
Carlisle, PA  177013

Randall L. Wenger
Leonard G. Brown
CLYMER & MUSSER, P.C.
23 North Lime Street
Lancaster, PA 17602

David K. DeWolf
Gonzaga University School of Law
721 Cincinnati Street
Spokane, WA 99220

Michael Crocenzi
Goldberg, Katzman
P. O. Box 1268
Harrisburg, PA 17018-1268

L. Theodore Hoppe, Jr.
C. Scott Shields
223 N. Monroe Street
Media, PA 19063

Jeffrey C. Mateer
MATEER & SHAFFER, L.L.P.
1300 Republic Center
325 N. St. Paul Street
Dallas, TX 75201




*/s/ Eric Rothschild*
Eric Rothschild

PHLEGAL: #1830795 v10 (138nf10!.DOC)

# EXHIBIT

# A



# DARWINISM, DESIGN,

# AND PUBLIC EDUCATION

58   Warren A. Nord

Rethinking a National Dilemma (Chapel Hill: University of North Carolina Press, 1995); Warren A. Nord and Charles C. Haynes, Taking Religion Seriously across the Curriculum (Alexandria, Va.: ASCD Press, 1998).

2. See Nord, Religion and American Education, chap. 4; Nord and Haynes, Taking Religion Seriously.

3. See Gerald Graff, Beyond the Culture Wars (New York: Norton, 1992).

4. Everson v. Board of Education, 330 U.S. 1, 16 (1947).

5. Abington Township v. Schempp, 374 U.S. 203, 225, 306 (1963).

6. The important point here is that the curriculum should be driven by what is important in the larger culture rather than what is important in the disciplines only.

7. See the National Association of Biology Teachers, "Statement on Teaching Evolution," (www.nabt.org/oldsite/evolution.html) (n.d.); the National Academy of Sciences, Teaching about Evolution and the Nature of Science (Washington, D.C.: National Academy Press, 1998), 58.

8. Edwards v. Aguillard, 482 U.S. 578 (1987).

9. The fact that there are many religious ways of conceiving nature is sometimes used to argue that it is impractical, if not impossible, to include them all in the discussion. But there are not so many different kinds of religious alternatives. In any case, it would seem to be educationally and constitutionally important to approximate fairness rather than to disregard it completely.

10. National Research Council, National Science Education Standards (Washington, D.C.: National Academy Press, 1996), 107, 197-98, 199.

11. Ibid., 107, 201, 59.

12. Here I owe a great deal to Phillip Johnson, though my more fundamental debt is to the philosopher E. M. Adams. For Johnson, see "Evolution on Trial: The Establishment of Naturalism," in First Things (Oct. 1990), and Reason in the Balance: The Case Against Naturalism in Science, Law and Education (Downers Grove, Ill.: InterVarsity Press, 1995); For Adams, see Religion and Cultural Freedom (Philadelphia: Temple University Press, 1993).

13. I develop this argument at much greater length in Religion and American Education, 179-87.

# Teaching the Controversy:
## Is It Science, Religion, or Speech?

David DeWolf, Stephen C. Meyer, and Mark E. DeForest

One can hardly imagine a more contentious issue in the American culture wars than the debate over how biological origins should be taught in public schools. On the one hand, the National Academy of Sciences, the National Center for Science Education, and the American Civil Liberties Union have insisted that any departure from a strictly Darwinian approach to the issue constitutes an attack on science and even an unconstitutional intrusion of religion into the public school science curriculum. On the other hand, many parents and religious activists have long rebelled against what they perceive as a dogmatic attack on their religious beliefs. Beginning in the 1970s, such activists sought to promote a Bible-based curriculum—known as scientific creationism—as either a complement or an alternative to the standard Darwinist curriculum advocated by the National Academy of Sciences and others. So the battle lines were drawn.

When confronted with a conflict between establishment science and religious fundamentalism, most lawyers have assumed that the law clearly favors the former. Although the creationists won some battles in state legislatures during the 1980s, they clearly lost the war in the courts. In

the State may impose upon the teachers in its schools any conditions that it chooses, however restrictive they may be of constitutional guarantees."215 The same freedoms that allow teachers to present Darwinian evolutionary theory would seem to allow teachers to teach students about the theory of intelligent design, even if their school boards oppose their pedagogy.

Although public schools are not public forums per se, they are publicly funded places where ideas are exchanged.216 Thus, if public schools or other governmental agencies bar teachers from teaching about design theory but allow teachers to teach neo-Darwinism, they will undermine free speech and foster viewpoint discrimination. At the very least, the government has no affirmative duty to censor teachers who attempt to present alternative viewpoints on scientific issues. Instead, strictly speaking, the Constitution prohibits such censorship or the regulation of speech "in ways that favor some viewpoints or ideas at the expense of others."217

## B. Edwards v. Aguillard Revisited

Some might argue, of course, that court strictures against viewpoint discrimination apply only to "soft" subjects in the humanities such as politics, law, and religion that admit many differing interpretations. Since, they argue, the "hard" sciences do not involve significant subjectivity in interpretation, controversy plays no legitimate role in scientific discourse or education. Thus, teachers have no need to teach both sides of controversial issues in science, and school boards have no reason to respect the right of teachers who do so. Such an objection, however, not only belies a false and antiquated positivistic philosophy of science (certainly the history of science shows many arguments between scientists about the correct interpretation of data), it also contradicts the explicit and specific ruling of the Court concerning the scientific controversy over biological origins.

As noted above, in Edwards v. Aguillard the Court affirmed the academic freedom of teachers in public schools to present a variety of scientific theories about biological origins. Indeed, the Court struck down the Louisiana Balanced Treatment Act in large part based on academic freedom considerations. Recall that the Court found disingenuous the Act's proffered secular purpose of promoting academic freedom and that it expressed concern about several specific provisions of the Act that appeared to limit such freedom. In rejecting the proffered purpose of the Act, the Court carefully reaffirmed the academic freedom of teachers to teach alternative scientific theories of origins. The Court noted that the

Louisiana law did not give teachers any more flexibility in teaching about scientific origins theories than they had before the passage of the law. It noted that Louisiana had no statute that prevented teachers from presenting any scientific theory regarding biological or human origins.218 The Court's language on this point is both instructive and decisive:

We do not imply that a legislature could never require that scientific critiques of prevailing scientific theories be taught. Indeed, the Court acknowledged in Stone that its decision forbidding the posting of the Ten Commandments did not mean that no use could ever be made of the Ten Commandments, or that the Ten Commandments played an exclusively religious role in the history of Western Civilization. In a similar way, teaching a variety of scientific theories about the origins of humankind to schoolchildren might be validly done with the clear secular intent of enhancing the effectiveness of science instruction.219

Far from placing its imprimatur on Darwinism as the only permissible scientific theory of biological origins, Edwards clearly supports the principle of academic freedom in science education.220 Further, the Edwards case, viewed in the context of recent rulings on viewpoint discrimination, suggests that science teachers, as much as teachers of other subjects, have the academic freedom to structure their presentations of controversial issues to avoid discrimination based on the content of the ideas in question—that is, to avoid viewpoint discrimination.

Thus, following Edwards, John Spokes certainly has the academic freedom to present the scientific weaknesses of Darwinism to his students without fear of running afoul of the Establishment Clause. As the Court itself stated, it did not want its ruling in Edwards to be construed as a ban on teaching "scientific critiques of prevailing scientific theories." Further, nothing in the Edwards decision justifies excluding consideration of design theory in the biology curriculum, unless it could be established that design theory, like creation science, constitutes a religious belief. Quite the contrary, the Court made clear that "teaching a variety of scientific theories about the origins of humankind to schoolchildren might be validly done with the clear secular intent of enhancing the effectiveness of science instruction."221

Thus, following Edwards and Rosenberger, Spokes's proposed curricular changes do give every indication of being constitutionally protected speech. Provided that his school board has already directed him to teach about the general subject of biological origins, Spokes should have the freedom to define how specifically he will do so in accord with his own

professional judgment about the merits of relevant scientific ideas and in accord with court dictates about the dangers of viewpoint discrimination. Further, *Rosenberger* suggests that a school board would face far more exposure to litigation by preventing Spokes from implementing his changes than by allowing him to do so. Certainly, a school district that forced a teacher to affirm the truth of Darwinism as a condition of employment would enshrine the type of "officially prescribed orthodoxy" condemned by the Court in *West Virginia Board of Education v. Barnette*.[22] A school board that refused to permit criticism of Darwinism would violate the principles expressed in *Tinker* and *Pico*. But a school board that encouraged an open discussion of the issue, consistent with the best scientific evidence, would reduce the likelihood of litigation by any party.

## VII. Conclusion

Until recently, the Darwinian perspective has enjoyed a monopoly over the curriculum in public school biology classes. Nevertheless, various factors have undermined the basis for that monopoly.

First, dissenting scientific opinion about the sufficiency of the neo-Darwinian mechanism as an explanation for the origin of apparent design has broken the Darwinian hegemony in the scientific world.

Second, within the philosophy of science, the failure of demarcation arguments has meant that both Darwinian evolutionary theory and design theory now enjoy equivalent methodological status, thereby denying any legal basis for excluding opposing theories from consideration.

Constitutional precedents have also changed the context of this curriculum debate. In 1986, *Edwards* affirmed the right of teachers to discuss alternative scientific theories of origin in their classrooms. In addition, subsequent cases such as *Rosenberger* have made it more difficult to use the Establishment Clause to limit academic freedom and the rights of free expression.

These changes have begun to affect public perceptions of the curricular debate. For example, recently in Melvindale, Michigan, a Detroit suburb, the school board voted to purchase a number of books (including Michael Behe's *Darwin's Black Box*) that detail specifically scientific challenges to standard materialistic theories of evolution.[23] This seemingly innocuous action provoked the National Center for Science Education (NCSE), a Darwinist lobby in Oakland, California, to issue a creationism "alert" on its website. NCSE director Eugenie Scott has warned that the inclusion of

books such as Behe's would have a chilling effect on science education,[24] Such hysteria not only betrays the fear that always accompanies loss of cultural control but represents a clear attempt to suppress controversy rather than to enlist it in the service of science education—as the law not only allows but would now encourage.

When school boards or biology teachers (like John Spokes) take the initiative to teach rather than suppress the controversy as it exists in the scientific world, school board lawyers should encourage rather than resist this more open dialectical approach.

The time has come for school boards to resist threats of litigation from those who would censor teachers like Spokes and to defend their efforts to expand student access to evidence and information about this timely and compelling controversy.

## Notes

1. *McLean v. Arkansas Board of Education*, 529 F. Supp. 1255 (E.D. Ark. 1982); *Edwards v. Aguillard*, 482 U.S. 578 (1987).
2. John Gibeaut, "Evolution of a Controversy," *Journal of the American Bar Association* (Nov. 1999): 50–55.
3. Throughout this essay, we will refer to this view as "Darwinian" or "Darwinist." Although in this essay we sometimes carefully distinguish between classical Darwinian, contemporary neo-Darwinian, and chemical evolutionary theories, we also use the term "Darwinian" or "Darwinist" to refer to all purely naturalistic theories of evolution—those that deny any role for a designing intelligence in the history of life. As will be discussed in greater detail below, the central feature of a Darwinian theory is that it regards the apparent design of living things as merely apparent. Moreover, the term *creationism* is misleading because it suggests that those who are opposed to Darwinism base their opposition on a literal reading of the book of Genesis. See discussion in part IV.A.
4. Kenneth R. Miller and Joseph Levine, *Biology*, 4th ed. (Upper Saddle River, N.J.: Prentice Hall, 1998), 658; Charles Darwin, *The Origin of Species* (Harmondsworth, England: Penguin Books, 1968), 130–172; Francisco J. Ayala, "Darwin's Revolution," in *Creative Evolution*, ed. John H. Campbell and J. William Schopf (Boston: Jones and Bartlett, 1994), 1, 4–5.

# EXHIBIT

# B

FOUNDATION FOR
THOUGHT AND ETHICS

November 23, 2005

REDACTED

Dear    REDACTED

The courtroom phase of the landmark case, *Kitzmiller, et al. v. Dover Area School District* came to an end on November 4.  You know that we have been in the cross-hairs of the ACLU through this case, and we thank you for your interest, for your prayer involvement, and your support.  Indeed, you have taken a place on our "horizon of warriors," in our fight to survive the ACLU's ambush in Federal District Court.  <u>And by standing with us</u>, you have done much to enable us to make our best effort. Now, you can profoundly affect the outcome of this struggle.

The prospect for defeat is very real.  <u>**But we could also have the greatest victory in our history!**</u>

Although Suzanne Sataline's *Wall Street Journal* article tilted strongly toward the ACLU, she was correct in saying that our textbook, *Of Pandas and People*, was "central to the trial," adding, "The legal battle will ultimately determine whether intelligent design can be taught in public school science classes or whether it is a religious viewpoint akin to creationism, as the plaintiffs contend."  Judge John E. Jones's ruling will probably come sometime between late December and early January.

There were two allegations in the Plaintiffs attack:1) that the intelligent design view of *Pandas* is really Creation Science in disguise, and as such, is religion, and therefore unconstitutional for use in the science classroom; 2) that the Dover Area School Board was religiously motivated in placing copies of *Pandas* into the school library and alerting students to its availability.

Much of the media, of course, spin this story as ignorant fundamentalist Christians pronouncing their explanation of the complexity of living things to be a scientific theory.  Reading press report after press report, one can almost hear intelligent design proponents, staring into a microscope and twanging, "Golleee!  Look how complicated it all is!  This just had t' be designed!"

**What are the Ramifications of this Lawsuit?**

In the *Seattle Times*, Shaunti Feldhahn, a syndicated columnist, called it "a quiet battle with massive ramifications."  What are those ramifications?

According to Eugenie Scott, the Executive Director of the National Center for Science Education (NCSE), this battle is about protecting the teaching of evolution.  In fact, she describes the NCSE's mission as "defending the teaching of evolution in public schools."  But her argument that intelligent design threatens the teaching of evolution is utterly absurd!  Right in the Introduction of *Pandas*, teachers are admonished that it is a supplement to, *not a substitute for*, the main evolutionary textbook. In fact, *Pandas* itself teaches a lot of evolution to let students compare how the two views look at the same facts.  But this is typical spin for the NCSE.

P.O. Box 830721  Richardson, Texas 75083-0721  972.661.1661  Fax 972.661.2989
Email: info@fteonline.com   www.fteonline.com

It's a bit complex, but please follow this carefully: Our adversary in this battle wants to make certain that of the two dominant views on origins that parallel the two long-standing world views of Western Civilization, only one, the one that parallels Philosophical naturalism, (Scientific Materialism, or atheism) is taught in the public schools. The goal of this lawsuit is permanent government censorship, pure and simple.

Perhaps you have read, or read about the new book, *Freethinkers: A History of American Secularism* by Susan Jacoby, a former *Washington Post* journalist. Her purpose, Jacoby declares, is "to restore secularism, and its noble and essential contributions at every stage of the American experiment, to its proper place in our nation's historical memory and vision of the future." Just think of how a state run system of Naturalistic indoctrination can nourish and activate this "vision of America's future"! (Kenneth B. McIntyre offers a worthwhile review of *Freethinkers* in the November, 2005 *Touchstone Magazine*.)

<u>Please don't underestimate the gravity of censorship and the confiscation of intellectual property when done for some glorious vision of the future.</u>

**How Did the Trial Go, Jon?**

In view of these media reports, it was fascinating to listen in as expert witness, Michael Behe, was going through early questioning on direct. Dr. Behe has taught biochemistry at the university level for 23 years. He has 39 articles in peer-reviewed science journals, including two on intelligent design itself. His peer-reviewed book, *Darwin's Black Box*, has sold 200,000 copies, been reviewed in over 200 publications, and translated into 10 languages. The defendant's attorney asked Dr. Behe why he thought that *Pandas* was a good book for students to have access to. He replied, "Because in order to best discern the difference between facts and theories, it is extremely useful to be able to view facts from a couple of different theoretical perspectives. It would help a student separate theory from facts." Typical, ignorant, religious fundamentalist, wouldn't you say? Me neither. Actually, Behe had several other reasons, and his lengthy testimony was most impressive.

**The Judge's Ruling Alternatives**

Earlier this week, our attorney, Jeff Mateer of Mateer & Shaffer, LLP, noted, "It's in the Judge's hands. If he fairly considers the information presented to him concerning the history and the development of Intelligent Design, especially in our brief and the briefs from Discovery Institute, then we should anticipate a decision upholding academic freedom." The Judge could rule in three ways. First, he could rule against the Plaintiffs (ACLU). That, of course, would be great news for academic freedom. Second, he could rule for the Plaintiffs, in accordance with the entirety of the ACLU's charges. Without the prospect of an appeal, this would be very bad news. The adversary could preach from the house tops that *Pandas* has been declared in a Federal Court to be unconstitutional for use in the public school classroom. And finally, the Judge could rule narrowly, focusing only on the school board's action and not ruling on the status of *Pandas*, and that too would be <u>great</u> news. But even if this happens, the adversary will likely hit those house tops to brand the outcome, spinning and mis-representing at the top of their lungs, telling everybody that the book went down with the verdict.

**So, Now it's the Waiting Game, Right Jon?**

Not really.  If the Judge does rule narrowly, we will have an elevated access to the media for only a brief window following the verdict.  If we counter that spin decisively during that brief window, we could ride a tidal wave of publicity.  If not, in just weeks, our chance will be past, and the ACLU and NCSE will never stop their spinning and intimidation, probably thereby ending all hope for a school market.

We must be prepared to launch a marketing and publicity campaign, complete with web sites and email, press releases, broadcast interviews of Bill Dembski and other authors of the book (and possibly other ID scientists), op/ed pieces in newspapers, spot radio announcements, direct mailings, and more. Obviously, once there is a ruling, it will be too late to prepare for a campaign.  Therefore, we must do the hard work of planning and funding this campaign now; if we are to be good stewards, we must raise the funds for this campaign before that occurs.

**We Need Your Help!**

I'm sure you recognize this requires significant expenses.  We must raise $200,000.  If we are successful, this is money that will be replaced (and more) through sales, leveraging the impact of our work on into the future.  Would you ask the Lord what your part should be, what is the most generous check you can write?

**Friends, I believe we are at a tipping point in our culture.  It is hard to imagine another moment of such great potential coming within the next 25 years, if ever.  That is why we are asking all our friends, allies, and supporters to step out and take ownership of this historic moment.**

They say that "timing is everything."  That is certainly true in this case.  It is time for the line of warriors to charge!  Whatever the trial's outcome, we must be ready. The battle will quickly change from the courtroom to the airwaves.  We cannot wait for the end of the year, or for the Court's ruling, to raise the funds.  Whatever gains are made will quickly dissipate if we don't prepare to seize this window of opportunity.

Please pray that everyone receiving this letter will *recognize the magnitude of this moment in time for us to be ahead of the curve*.  If this is the prayer request of a mighty team, we can do it!

**Thank you so much.**  A response card and reply envelope are enclosed for your convenience.  Please feel free to call me if you have any questions.

Sincerely, in Christ,

Jon Buell
President

P.S. Temporary Tax Law Brings New Giving Opportunities.  Effective Aug. 28, 2005, Congress suspended the 50% limit on cash gifts to qualified charities.  This year alone, cash gifts in amounts up to 100% of the donor's AGI are deductible.  We encourage you to refer to your tax advisor.

# EXHIBIT

# C



**The Seattle Times**

seattletimes.com

Thursday, March 31, 2005 - 12:00 AM

*Permission to reprint or copy this article or photo, other than personal use, must be obtained from The Seattle Times. Call 206-464-3113 or e-mail resale@seattletimes.com with your request.*

# Does Seattle group "teach controversy" or contribute to it?

**By Linda Shaw**
*Seattle Times staff reporter*



THOMAS JAMES HURST / THE SEATTLE TIMES

"Why fight when you can have a fun discussion?" asks Stephen Meyer, director of the Discovery Institute's Center for Science and Culture, which endorses "teaching the controversy" over evolution theories.

Three years ago, the Ohio Board of Education invited a small but influential Seattle think tank to debate the way evolution is taught in Ohio schools.

It was an opportunity for the Discovery Institute to promote its notion of intelligent design, the controversial idea that parts of life are so complex, they must have been designed by some intelligent agent.

Instead, leaders of the institute's Center for Science and Culture decided on what they consider a compromise. Forget intelligent design, they argued, with its theological implications. Just require teachers to discuss evidence that refutes Charles Darwin's theory of evolution, as well as what supports it.

They called it "teach the controversy," and that's become the institute's rallying cry as a leader in the latest efforts to raise doubts about Darwin in school. Evolution controversies are brewing in eight school districts, half a dozen state legislatures, and three state boards of education, including the one in Kansas, which wrestled with the issue in 1999 as well.

"Why fight when you can have a fun discussion?" asks Stephen Meyer, the center's director. The teach-the-controversy approach, he says, avoids "unnecessary constitutional fights" over the separation of church and state, yet also avoids teaching Darwin's theories as dogma.

But what the center calls a compromise, most scientists call a creationist agenda that's couched in the language of science.

There is no significant controversy to teach, they say.

"You're lying to students if you tell them that scientists are debating whether evolution took place," said Eugenie Scott, director of the National Center for Science Education, a nonprofit group that defends teaching of evolution in school.

The Discovery Institute, she said, is leading a public-relations campaign, not a scientific endeavor.

The Discovery Institute is one of the leading organizations working nationally to change how evolution is taught. It works as an adviser, resource and sometimes a critic with those who have similar views.

"There are a hundred ways to get this wrong," says Meyer. "And only a few to get them right."

Ohio got it right, he says, when its state Board of Education voted in 2002 to require students to learn that scientists "continue to investigate and critically analyze aspects of evolutionary theory."

Scott says it was a small victory at most for intelligent-design supporters, but Meyer considers it a significant one — a model other states should follow. Minnesota has adopted similar language.

The School Board in Dover, Pa., however, got it wrong, Meyer said, when it required instruction in intelligent design. (The matter is now in court.) Intelligent design isn't established enough yet for that, Meyer says.

He also criticizes the Georgia school board that put stickers on biology textbooks with a surgeon-general-like warning that evolution is "a theory not a fact." The stickers were a "dumb idea," he says bluntly. (A Georgia court ruled they were illegal, and the case is under appeal.)

In Wisconsin, the institute hopes it helped the School Board in the small town of Grantsburg switch to a teach-the-controversy approach.

In each place, the institute says it responds to requests for help, although it's working to become more proactive, too. Some critics suspect the ties are even closer.

**Center's beginnings**

The Center for Science and Culture opened in 1996 as a part of the already-established Discovery Institute, which also studies more earthbound topics such as transportation, economics, technology, bioethics. Founder Bruce Chapman — who has worked as an official in the Reagan administration, head of the U.S. Census Bureau and Washington's secretary of state — became interested in intelligent design after reading a piece Meyer wrote for The Wall Street Journal.

Meyer, then a philosophy professor at Whitworth College in Spokane, was defending a California professor in trouble for talking about intelligent design in biology class. To Chapman, it was an issue of academic freedom. He invited Meyer to come speak at the institute. The more they talked, the more Chapman and others at the institute became interested in offering a home to Meyer and others interested in intelligent design.

Intelligent design appealed to their view that life isn't really as unplanned or unguided as Darwin's theories can make it seem.

"It interested me because it seemed so different than the reductionist science that came out of the 19th century ... that everything could be reduced to chemistry," said John West, a political scientist and center associate director.

The private institute has an annual budget of about $3.2 million, and plans to spend about $1.3 million on the intelligent-design work, Chapman says, mostly to support the work of about three dozen fellows. The Fieldstead Charitable Trust, run by Christian conservative Henry Ahmanson and his wife, is one of the largest donors to that effort. Chapman declines to name more.

Meyer, the center's director, is a tall, friendly man who has undergraduate degrees in geology and physics and a Ph.D. in the philosophy of science from Cambridge, where he wrote his doctorate on the origins of life.

He says he's no creationist. He doesn't, for example, believe in a literal reading of the Bible, which would mean the Earth is about 6,000 years old.

He doesn't dispute that natural selection played a role in evolution, he just doesn't think it explains everything.

He often points to the Cambrian Period, a time more than 500 million years ago when most of the major groups of animals first appear in the fossil record. Meyer and other Discovery Institute fellows say those groups show up too fast, geologically speaking, to have come about through natural selection. That's one of what they see as controversies they want taught in school.

Scientists, however, say the Cambrian Period may not be completely understood, but that doesn't mean the theory of evolution is in trouble.

"They harp and harp on natural selection, as if natural selection is the only thing that evolutionary biologists deal with," says Scott. "Who knows whether natural selection explains the Cambrian body plans. ... So what?"

Scientists consider Meyer a creationist because he maintains that some unnamed intelligence — and Meyer says he personally thinks it is God — has an active hand in creating some complex parts of life.

"I don't know what else to call it other than creationism," said Michael Zimmerman, a critic and dean at the University of Wisconsin Oshkosh.

Meyer, however, says he's a scientist, who starts with scientific evidence, not the Bible. His goal — a big one — is to change the very definition of science so that it doesn't rule out the possibility that an intelligent designer is actively at work.

"Science should be open to whatever cause ... can best explain the data," Meyer says.

That would be a major change for science, which limits itself to the natural world. Scott says it would be a "science stopper."

"Once you allow yourself to say God did it, you stop looking for naturalistic explanations. If you stop looking, you won't find them," she says.

Scott says science isn't an atheistic world view. In science, she says, "It is equally inappropriate to say God did it, or God had nothing to do with it."

The institute's call to "teach the controversy" meets strong resistance.

"There's no controversy about whether living things have common ancestors," Scott said. "There's no controversy about whether natural selection is very important in creating the variety of organisms we have today."

While the institute touts its list of 370 scientists who've signed a statement saying they have some doubts about Darwin's theory of natural selection, Scott's organization, in a parody of that effort, has a list of 500 names limited to scientists named Steve or Stephanie, in honor of the late Stephen Jay Gould, a well-known biologist who once wrote that evolution is "one of the best documented, most compelling and exciting concepts in all of science."

Public opinion is mixed. Many Christian denominations, including Catholics, see no contradiction between evolution and their faith, but a Gallup Poll last November found that only about a third of the respondents think Darwin's theory of evolution is well supported by scientific evidence.

Meyer hopes the Kansas Board of Education will invite the center to speak at its hearings in May. Speakers will be asked to address the issue the center wants to highlight: whether Kansas' science curriculum helps students understand debate over controversial topics such as evolution.

Kansas Citizens for Science, however, has urged a boycott of the hearings, saying the proposals have been "rejected by the science community at large."

*Linda Shaw: 206-464-2359 or lshaw@seattletimes.com*

Copyright © 2005 The Seattle Times Company

# EXHIBIT

# D

# 'Bring us your legal issues,' clergy told

■ **Conservative Christian attorneys offer free legal advice in church-culture clashes.**

**By DANIEL BURKE**
New Era Staff Writer

With a golden cross gleaming behind him, Lancaster lawyer Randy Wenger called for a new analogy.

Advocates for gay rights have been described as "trailblazing," Wenger said.

"But I don't think that's the right metaphor," he said. "I would say 'quickly going to hell.'"

The remark drew chuckles from the audience of ministers and alumni at Lebanon County's Evangelical School of Theology.

They were assembled in the Myerstown school's Christ Hall for a conference called "When Christians and Cultures Clash."

The Wednesday conference starred representatives of the Pennsylvania Family Institute and lawyers, like Wenger, affiliated with the Alliance Defense Fund, a team of conservative Christian attorneys.

Throughout the daylong event, the roughly 50 ministers and alumni were constantly encouraged to call on the advocates for aid in the "culture wars," presumed to be raging across America.

Taking the group through quick lessons about the First Amendment, religion in public schools, and gay marriage, the day seemed a combination of civics lessons and political rally.

Lancaster attorney Leonard Brown showed a movie about the Alliance Defense Fund, in which the Arizona-based group acclaimed its "army of Christian lawyers."

"There will be no stopping us," said one man in the movie. "In the

Please see **CLERGY** page **B5**

Continued from **B1**

next few years we will turn this country around."

As speaker after speaker rose, it seemed the only obstacle to the ADF's new path is the American Civil Liberties Union.

In recent years, the ACLU and ADF have gone head-to-head in constitutional battles over school prayer, gay marriage and discrimination.

Last month Alan Sears, ADF's president, published a book titled "The ACLU vs. America: Exposing the Agenda to Redefine Moral Values."

Wednesday, the ADF asked ministers and alumni to bring them legal issues to continue that fight. They offered free legal advice and representation to any person or municipality with "a good case."

Pennsylvania Family Institute President Michael Geer said conservative Christian advocates may hear people calling them "opinionated zealots."

But it's up to them, he said "to rescue our society from corruption should the Lord tarry."

But even with God's blessing, it's helpful to consult a lawyer before joining the battle, the speakers said.

For instance, the Dover area school board might have had a better case for the intelligent design disclaimer they inserted into high school biology classes had they not mentioned a religious motivation at their meetings, Wenger said.

"Give us a call before you do something controversial like that," he said.

"I think we need to do a better job at being clever as serpents," Wenger added.